# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; SANDRA DORRELL; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | CIVIL ACTION NO. 3:12-cv-04641-N |
| vs. | §<br>§ | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ, | §<br>§<br>§<br>§ | |
| Defendants. | §<br>§<br>§ | |

---

**PLAINTIFFS RALPH JANVEY AND THE OFFICIAL STANFORD INVESTORS COMMITTEE'S JOINT RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS GREENBERG TRAURIG, LLP, HUNTON & WILLIAMS LLP, AND YOLANDA SUAREZ'S MOTIONS TO DISMISS**

---

Edward C. Snyder
Jesse R. Castillo
**CASTILLO SNYDER, P.C.**
300 Convent Street, Suite 1020
San Antonio, Texas  78205
esnyder@casnlaw.com
(210) 630-4200
(210) 630-4210 (Facsimile)

(Counsel for the Official Stanford Investors Committee)

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................................1

II.     FACTUAL SUMMARY ........................................................................5

III.    ARGUMENT....................................................................................5

    A.     Standard for Dismissal under Rule 12(b)(6) ........................................ 5

    B.     The Receiver States a Valid Claim for Professional
        Negligence/Malpractice ............................................................. 9

        1.      Hunton and Suarez Continuously Represented Multiple Stanford
            Entities ...........................................................................9

        2.      Hunton and Suarez Failed to Protect the Stanford Entities they
            Represented.....................................................................10

        3.      Hunton's Conflicting Representations Also Support the Receiver's
            Professional Negligence Claim...............................................27

    C.     Plaintiffs State a Valid Claim for Breach of Fiduciary Duty................................ 31

        1.      Breach of Fiduciary Duty by the Law Firms ...............................33

        2.      Breach of Fiduciary Duty by Suarez as Officer and Director..................37

    D.     Plaintiffs State Valid Claims for Aiding and Abetting Breach of Fiduciary
        Duty.................................................................................. 41

        1.      Aiding and Abetting Liability is Recognized in Texas............................41

        2.      Plaintiffs State a Valid Claim for Aiding and Abetting Breaches of
            Fiduciary Duty ................................................................42

            a.      *Greenberg* ..............................................................43

            b.      *Hunton and Suarez*.....................................................50

    E.     Plaintiffs Have Adequately Alleged Injury To The Receivership Entities........... 51

    F.     Plaintiffs' Have Properly Pled Proximate Cause ................................... 58

    G.     Plaintiffs Have Stated Valid Fraudulent Transfer and Unjust Enrichment
        Claims .............................................................................. 67

        1.      Defendants May Be Held Liable For Aiding and Abetting
            Fraudulent Transfers .........................................................67

        2.      Plaintiffs Have Sufficiently Plead Their Aiding And Abetting
            Claim............................................................................69

        3.      Plaintiffs Have Stated Claims For Fraudulent Transfers .........................71

        4.      Plaintiffs' Fraudulent Transfer Claims Are Not Time Barred .................73

        5.      Unjust Enrichment/Money Had And Received Claims ............................74

    H.     Plaintiffs have Stated Valid Negligent Retention and Responeat Superior
        Claims .............................................................................. 76

        1.      Negligent Retention .........................................................76

        2.      Respondeat Superior .........................................................78

IV.   MOTION FOR LEAVE TO AMEND COMPLAINT .......................................................80
V.    PRAYER.............................................................................................................................81

# TABLE OF AUTHORITIES

### CASES

12261 *Fondren, LLC v. Riverbank Realty GP, LLC*,
No. H-09-4074, 2010 WL 1741071 (S.D. Tex. Apr. 29, 2010)........................................ 37

*Am. Realty Trust, Inc. v. Travelers Cas. & Surety Co. of Am.*,
362 F. Supp. 2d 744 (N.D. Tex. 2005) ............................................................... 8

*American Cancer Soc. v. Cook*,
675 F.3d 524 (5th 2012).................................................................................. 72

*Antioch Litig. Trust v. McDermott Will & Emery LLP*,
738 F. Supp. 2d 758 (S.D. Ohio 2010) ................................................... 12, 28

*Arbelaez v. Just Brakes Corp.*,
149 S.W.3d 717 (Tex. App. – Austin 2004) ..................................................... 79

*Archer v. Medical Protective Co.*,
197 S.W. 3d 422 (Tex. App. – Amarillo 2006, pet. denied)................................. 32, 33, 34

*Askanase v. Fatjo*,
828 F. Supp. 465 (S.D. Tex. 1993) ................................................................... 64

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (5th Cir. 1988) ........................................................................... 80

*Barton v. Whataburger, Inc.*,
276 S.W.3d 456 (Tex. App.—Houston [1st Dist.] 2008, pet. denied)............................ 36

*Basalto Shipping Co., S.A. v. HTCO-3011*,
129 F.3d 611 (5th Cir. 1997) ........................................................................... 64

*Beck v. Law Offices of Edwin J. Terry*,
284 S.W. 3d 416 (Tex. App. – Austin 2009) ............................................... 31, 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................... passim

*Berly v. D&L Security Services and Investigations Inc.*,
876 S.W. 2d 179 (Tex. App. – Dallas 1994)................................................. 66

*Biaggi v. Patrizio Rest. Inc.*,
149 S.W.3d 300 (Tex.App.—Dallas 2004, pet. denied) ................................. 65

*Biliouris v. Sundance Res., Inc.*,
   559 F. Supp. 2d 733 (N.D. Tex. 2008) ................................................ 68

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
   754 F.2d 57 (2d Cir. 1985) .................................................................. 65

*BMG Direct Mktg., Inc. v. Peake*,
   178 S.W.3d 763 (Tex. 2005) ................................................................ 75

*Brandau v. Howmedica Osteonics Corp.*,
   439 Fed. Appx. 317 (5th Cir. 2011) ................................................... 74

*Brown v. Edwards Transfer Co.*,
   764 S.W.2d 220 (Tex. 1988) ............................................................... 59

*Brown v. Thompson*,
   430 F.2d 1214 (5th Cir. 1970) ........................................................... 81

*Cantu v. Horany*,
   195 S.W.3d 867 (Tex. App.—Dallas 2006) ...................................... 58

*Cede & Co. v. Technicolor, Inc.*,
   634 A.2d 345 (Del. 1993) ................................................................... 37

*Chartwell Healthcare v. People's Home Health*,
   1997 WL 86435 (N.D. Tex. Feb. 19, 1997) ........................................ 7

*Cinema 5, Ltd. v. Cinerama, Inc.*,
   528 F.2d 1384 (2d Cir. 1976) ............................................................ 28

*City of Driscoll, Texas v. Saenz*,
   2007 WL 173232 (S.D. Tex 2007) ....................................................... 6

*Connaway v. Vill. Farms, L.P.*,
   200 S.W.3d 353 (Tex. App. – Dallas 2006) ...................................... 58

*Court-Appointed Receiver for Lancer Mgmt. Group LLC v. 169838 Canada, Inc.*,
   2008 WL 2262063 (S.D. Fla. May 30, 2008) ...................................... 8

*Cox Tex. Newspapers, L.P. v. Wootten*,
   59 S.W.3d 717 (Tex.App.-Austin 2001, pet. denied) ...................... 41

*Crisp v. Southwest Bancshares Leasing Co.*,
   586 S.W. 610 (Tex. App. – Amarillo 1979) ...................................... 63

*D. Houston, Inc. v. Love*,
   92 S.W.3d 450 (Tex. 2002) ................................................................ 58

*Davis v. Dallas County, Texas,*
    541 F. Supp. 2d 844 (N.D. Tex. 2008) .......................................................... 65

*Deutsch v. Hoover, Bax & Slovacek, LLP,*
    97 S.W. 3d 179 (Tex. App. – Hous. [14th Dis.] 2003)(emphasis added) ............. 31, 32, 33

*Dew v. Crown Derrick Erectors, Inc.,*
    208 S.W.3d 448 (Tex. 2006) .......................................................................... 36

*Donaghey v. Ocean Drilling & Exploration Co.,*
    974 F.2d 646 (5th Cir. 1992) ......................................................................... 66

*Donell v. Kowell,*
    533 F.3d 762 (9th Cir. 2008) ......................................................................... 53

*Dorsey v. Portfolio Equities, Inc.,*
    540 F.3d 333 (5th Cir. 2008) ........................................................................... 8

*El Chico Corp. v. Poole,*
    732 S.W.2d 306 (Tex. 1987) ......................................................................... 59

*Essex Crane Rental Corp. v. Carter,*
    371 S.W.3d 366 (Tex. App. – Houston [1st Dist.] 2012) .......................... 68, 69

*Experian Info. Solutions, Inc. v. Lexington Allen L.P.,*
    2010 WL 4026823 (E.D. Tex. Aug. 27, 2010) ................................................ 7

*Exxon Co., U.S.A. v. Sofec, Inc.,*
    517 U.S. 830 (1996) ....................................................................................... 64

*FDIC v. Clark,*
    978 F.2d 1541 (10th Cir. 1992) .................................................................... 12

*FDIC v. Ernst & Young,*
    967 F. 2d 166 (5th Cir. 1992) ....................................................................... 62

*FDIC v. Lott,*
    460 F.2d 82 (5th Cir. 1972) .......................................................................... 62

*FDIC v. Nathan,*
    804 F.Supp. 888 (S.D. Tex. 1992) ........................................................... 63, 64

*FDIC v. O'Melveny & Meyers,*
    969 F.2d 744 (9th Cir. 1992)*; rev'd and remanded on other grounds*, 512 U.S. 79
    (1994), *reaffirmed on remand,* 61 F.3d 17 (9th Cir. 1995) ............................. 11

*FDIC v. Shrader & York*,
    991 F.2d 216 (5th Cir. 1993) ............................................................... 63, 64

*First State Bank, N.A. v. Morse*,
    227 S.W.3d 820 (Tex. App.—Amarillo 2007, no pet.) ................................. 36

*Flock v. Scripto-Tokai Corp.*,
    319 F.3d 231 (5th Cir.2003) ............................................................... 58, 60

*Floyd v. CIBC World Markets, Inc.*,
    426 B.R. 622 (S.D. Tex. 2009) ................................................................ 64

*Floyd v. Hefner*,
    556 F. Supp. 2d 617 (S.D. Tex. 2008) ................................................ passim

*GE Capital Comm., Inc. v. Wright & Wright, Inc.*,
    2009 WL 5173954 (N.D. Tex. Dec. 31, 2009) ........................................ 8, 69

*Great Plains Trust Co., et al v. Morgan Stanley Dean Witter & Co.*,
    313 F.3d 305 (5th Cir. 2002) .................................................................. 80

*Greathouse v. McConnell*,
    982 S.W.2d 165 (Tex. App.—Houston [1st Dist.] 1998) ............................ 58

*Greenstein, Logan & Co. v. Burgess Mktg., Inc.*,
    744 S.W.2d 170 (Tex. App. – Waco 1987, writ denied) ............................ 63

*Griggs v. Hinds Junior College*,
    563 F.2d 179 (5th Cir. 1977) ................................................................ 80

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003) ........................................................... 38, 42

*Havner v. E–Z Mart Stores, Inc.*,
    825 S.W.2d 456 (Tex. 1992) ................................................................. 60

*Herrmann Holdings Ltd. v. Lucent Technologies Inc.*,
    302 F.3d 552 (5th Cir. 2002) ................................................................ 81

*Hill v. Day (In re Today's Destiny, Inc.)*,
    388 B.R. 737 (Bankr. S.D. Tex. 2008) .................................................... 57

*Hitt v. City of Pasadena*,
    561 F.2d 606 (5th Cir. 1977) ................................................................ 81

*Hooper v. Pitney Bowes, Inc.*,
    895 S.W.2d 773 (Tex. App.—Texarkana 1995, writ denied) ...................... 79

*IHS Cedars Treatment Center of DeSoto, Texas, Inc. v. Mason*,
    143 S.W.3d 794 (Tex. 2003).................................................................. 58, 59

*In re Allou Distributors, Inc.*,
    395 B.R. 246 (E.D.N.Y. 2008) ........................................................... 52

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,*
    794 F. Supp. 1424 (D. Ariz. 1992) ......................................................... 13, 27

*In re Brooke Corporation*,
    467 B.R. 513 (D. Kansas 2012) ......................................................... 13

*In re Chavez*,
    140 B.R. 413 (Bankr. W.D. Tex. 1992)................................................ 37, 38, 42

*In re Electronic Data Systems Corp. ERISA Litigation*,
    305 F.Supp.2d 658 (E.D.Tex.2004)................................................ 7

*In re Parmalat Sec. Litig.*,
    501 F. Supp. 2d 560 (S.D.N.Y. 2007)................................................ 52

*Int'l Bankers Life Ins. V. Holloway*,
    368 S.W.2d 567 (Tex. 1963)................................................ 37

*Isilon Systems, Inc., v. Twin City Fire Insurance Company*,
    No. C-10-1392-MJP, 2012 WL 503854 (W.D. Wash. 2012) ......................... 54

*J. Wigglesworth Co. v. Peeples,*
    985 S.W.2d 659 (Tex.App. – Fort Worth 1999, pet. denied) ......................... 60

*Jackson Law Office, P.C. v. Chappell*,
    37 S.W.3d 15 (Tex. App. - Tyler 2000, pet. denied) ..................................... 74

*Janvey v. Adams*,
    588 F.3d 831 (5th Cir. 2009) .................................................................. 1

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) .................................................................. 72

*Janvey v. Alguire*,
    846 F. Supp. 2d 662 (N.D. Tex. 2011) ............................................. 69, 70, 74

*Janvey v. Dem. Sen. Camp. Comm.*,
    793 F. Supp. 2d 825 (N.D. Tex. 2011), *aff'd* 699 F.3d 848 (5th Cir. 2012), *op'n
    withdrawn and substituted* ................................................................. 1

*Janvey v. Dem. Sen. Camp.Comm.*,
    712 F.3d 185 (5th Cir. 2013) ................................................................. passim

*Janvey, et al. v. IMG Worldwide, Inc., et al.*,
    Case No. 3:11-cv-00117-N ..................................................................... 55

*Janvey, et al. v. James R. Alguire, et al.*,
    Case No. 3:09-cv-0724-N ............................................................... 8, 69, 72

*Johnson v. Miller*,
    596 F.Supp. 768 (D. Colo. 1984)............................................................ 66

*Jones v. Wells Fargo Bank*,
    666 F. 3d 955 (5th Cir. 2012) .......................................................... 3, 57, 62

*Kesler v King*,
    29 F. Supp. 2d 356 (S.D. Tex. 1998) ...................................................... 76

*Kinzbach Tool Co. v. Corbett–Wallace Corp.*,
    138 Tex. 565, 160 S.W.2d 509 (1942)..................................................... 41

*Kline v. O'Quinn*,
    874 S.W.2d 776 (Tex.App.-Houston [14th Dist.] 1994, writ denied) ............................. 41

*Knauer v. Jonathan Roberts Financial Group*,
    348 F. 3d 230 (7th Cir. 2003) ............................................................. passim

*Koehler v. Pulvers*,
    614 F.Supp. 829 (S.D. Cal. 1985)............................................................ 11

*Landon v. S & H Marketing*,
    82 S.W.3d 666 (Tex. App. 2002)............................................................. 37

*Mack v. Newton*,
    737 F.2d 1343 (5th Cir. 1984) .............................................................. 68

*Martin K. Eby Constr. Co., v. Dallas Area Rapid Transit*,
    369 F.3d 464 (5th Cir. 2004) ............................................................. 5, 56

*Matter of Educators Group Health Trust (Schertz-Cibolo-Universal City I.S.D. v. Wright)*,
    25 F.3d 1281 (5th Cir. 1994) ............................................................ 68, 69

*McCollum v. Dollar*,
    213 S.W. 259 (Tex.Comm'n. App. 1919)................................................... 38

*McMahan v. Greenwood,*
   108 S.W.3d 467 (Tex. App. —Houston [14th Dist.] 2003).............................. 33

*Meadows v. Hartford Life Ins. Co.,*
   492 F.3d 634 (5th Cir. 2007) ............................................................. 42

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.,*
   854 A.2d 121 (Del. Ch. 2004)........................................................ 38, 42

*Meyers v. Moody,*
   693 F. 2d 1196 (5th Cir. 1982), *cert. denied*, 464 US. 920, 104 S.Ct. 287, 78
   L.Ed.2d 264 (1983) .................................................................. 37, 53

*Milbank v. Holmes (In re TOCFHBI Inc.),*
   413 B.R. 523 (N.D. Tex. 2009)...................................................... 14, 52, 57

*Miller v. McDonald (In re World Health Alternative, Inc.)*
   385 B.R. 576 (Bankr. D. Del. 2008) .................................................... 14

*Missouri Pac. RR. Co. v. American Statesman,*
   552 S.W.2d 99 (Tex. 1977)................................................................ 59

*Moratzka v. Morris (In re Senior Cottages of America, LLC),*
   482 F.3d 997 (8th Cir. 2007) ............................................................. 56

*Murphy v. Gruber,*
   241 S.W. 3d 689 (Tex. App. – Dallas 2007, pet. denied).......................... 10, 32

*Network Staffing Servs., Inc. Liquidating Trust v. Jenkens & Gilchrist (In re Network*
   *Staffing Servs.),*
   2004 WL 3007082 (Bankr. N.D. Tex. Oct. 22, 2004) ...................................... 8

*Nixon v. Mr. Property Management Co.,*
   690 S.W.2d 546 (Tex. 1985)........................................................... 59, 66

*Nunley v. M/V Dauntless Colocotronis,*
   727 F.2d 455 (5th Cir. 1984) ............................................................. 66

*O'Cain v. Harvey Freeman and Sons, Inc.,*
   603 So.2d 824 (Miss. 1991)............................................................... 64

*O'Halloran v. First Nat'l Bank of Fla.,*
   350 F.3d 1197 (11th Cir. 2003) ...................................................... 55, 57

*Obermaier v. Arnett,* No.
   2:02CV111FTM29DNF, 2002 WL 31654535 (M.D. Fla. Nov. 20, 2002) ..................... 55

*Pan E. Exploration Co. v. Hufo Oils*,
    855 F.2d 1106 (5th Cir.1988) ..................................................................... 17

*Pennwalt Corp. v. Plough, Inc.*,
    85 F.R.D. 264 (D. Del. 1980) ..................................................................... 27

*People's Choice Home Loan, Inc. v. Mora*,
    No. 3:06-CV-1709-G, 2007 WL 708872 (N.D. Tex. March 7, 2007)............................ 76

*Perlman v. Wells Fargo Bank*,
    830 F. Supp. 2d 1308 (S.D. Fla. 2011) .......................................................... 57

*Peters v. Metropolitan Life Ins. Co.*,
    164 F.Supp.2d 830 (S.D.Miss.2001)................................................................ 7

*Phan Son Van v. Pena*,
    990 S.W.2d 751 (Tex. 1999).......................................................................... 65

*Picard v. Madoff (In re Bernard L. Madoff Inv. Securities LLC)*,
    458 B.R. 87 (S.D.N.Y. 2011)................................................................... 40, 67

*Priester v. Lowndes County*,
    354 F.3d 414 (5th Cir. 2004) ....................................................................... 6

*Prime Income Asset Mgmt. Co. v. Waters Edge Living*,
    No. 3:07-cv-0102-D, 2007 WL 2229050 (N.D. Tex. Aug. 3, 2007) ............................ 75

*Prudence Co. v. Fidelity & Deposit Co. of Maryland*,
    297 U.S. 198 (1936)................................................................................... 54

*Ramirez v. Rodriguez (In re Ramirez)*,
    413 B.R. 621 (Bankr. S.D. Tex. 2009) ......................................................... 68

*Randolph v. Resolution Trust Corp.*,
    995 F.2d 611 (5th Cir. 1993) ....................................................................... 8

*Reneker v. Offill*,
    2009 WL 3365616 (N.D. Tex. 2009)............................................................... 13

*Reneker v. Offill*,
    2010 WL 1541350 (N.D. Tex. 2010)............................................................... 57

*Reneker v. Offill*,
    2012 WL 2158733 (N.D. Tex. 2012)............................................................... 54

*Riverwalk Cy Hotel Partners Ltd. v. Akin Gump Strauss Hauer & Feld, LLP*,
    2012 Tex. App. LEXIS 9366 (Tex. App. —San Antonio Nov. 14, 2012) ...................... 33

*Rodriguez v. Moerbe*,
    963 S.W.2d 808 (Tex. App.—San Antonio 1998,  pet. denied) ...................................... 65

*Rogers v. McDorman*,
    521 F. 3d 381 (5th Cir. 2008) ...................................................................................... 57

*Roth v. Mims*,
    298 B.R. 272 (Bankr. N.D. Tex. 2003) .......................................................................... 37

*Sandhar v. Grewal*,
    2009 WL 175073 (S.D. Tex. Jan. 23, 2009) .................................................................... 6

*Schakosky v. Client Services, Inc.*,
    634 F. Supp. 2d 732 (E.D. Tex. 2007), ......................................................................... 78

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ................................................................................... passim

*Scholes v. Stone, McGuire & Benjamin*,
    786 F. Supp. 1385 (N.D. Ill. 1992) ............................................................................... 16

*SEC v. Brady*,
    2006 WL 1310320 (N.D. Tex. May 12, 2006) ................................................................ 7

*SEC v. Reynolds*,
    No. 2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) ......................................................... 5

*SEC v. Sharp Capital, Inc.*,
    1999 WL 242691 (N.D. Tex. Apr. 16, 1999) .................................................................. 7

*SEC v. Stanford Int'l Bank, Ltd., et al.*,
    Case No. 3:09-cv-00298-N, [Doc 1858].................................................................. 2, 54

*Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*,
    66 S.W.3d 340 (Tex. App.—Tyler 2001 pet. denied)................................................... 65

*Smith v. Arthur Andersen LLP*,
    421 F.3d 989 (9th Cir. 2005) ...................................................................................... 52

*Smith v. Arthur Anderson*,
    175 F. Supp. 2d 1180 (D. Ariz. 2001) .................................................................... 63, 64

*Smith v. Texas*,
    No. 2012 WL 5868657 (S.D. Tex. Oct. 26, 2012).......................................................... 8

*Spera v. Fleming, Hovenkamp & Grayson, P.C.*,
    25 S.W.3d 863 (Tex. App. —Houston [14th Dist.] 2000).............................................. 33

*SR Int'l Bus. Ins. Co. v. Energy Future Holdings Corp.*,
    539 F. Supp. 2d 871 (N.D. Tex. 2008) ........................................................... 6

*Steiner v. Southmark Corp.*,
    734 F.Supp. 269 (N.D. Tex. 1990). ............................................................... 7

*Stone ex el. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006) .............................................................................. 37

*Stonecipher v. Butts*,
    591 S.W.2d 806 (Tex. 1979) .......................................................................... 68

*Suarez Matos v. Ashford Presbyterian Community Hosp., Inc.*
    4 F.3d 47 (1st Cir. 1993) ............................................................................... 54

*Sullivan v. Bickel & Brewer*,
    943 S.W. 2d. 477 (Tex. App. – Dallas 1995)(writ denied) ............................. 34

*Texas Dep. of Transportation v. Olson*,
    980 S.W.2d 890 (Tex. App.— Fort Worth 1998, no pet.) ......................... 58, 60

*Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*,
    300 S.W.3d 348 (Tex. App. – Dallas 2009, pet. denied) ................................ 74

*Thaubault v. Chait*,
    541 F.3d 512 (3rd Cir. 2008) ......................................................................... 53

*Tigue Investment Co., Ltd. v. Chase Bank of Texas, N.A.*,
    2004 WL 3170789 (N.D. Tex. Nov. 15, 2004) ................................................ 6

*Toles v. Toles*,
    113 S.W.3d 899 (Tex. App.—Dallas 2003, no pet.) ...................................... 41

*Tompkins v. Cyr*,
    202 F.3d 770 (5th Cir. 2000) ......................................................................... 60

*Travis v. City of Mesquite*,
    830 S.W.2d 94 (Tex. 1992) ....................................................................... 59, 66

*Trousdale v. Henry*,
    261 S.W.3d 221 (Tex. App. — Houston [14th Dist.] 2008) ........................... 32

*U.S. Bank. Nat. Ass'n v. Verizon Comm's Inc.*,
    No. 3:10-cv-1842-G, 2012 WL 3100778 (N.D. Tex. Jul. 31, 2012) ......... 69, 70

*Udoewa v. Plus4 Credit Union*,
    2009 WL 1856055 (S.D. Tex. June 29, 2009) ................................................. 8

*Union Pump Co. v. Allbritton*,
    898 S.W.2d 773 (Tex. 1995) (emphasis added)..............................................................59

*Univ. Preparatory School v. Huitt*,
    941 S.W.2d 177 (Tex.App.-Corpus Christi 1996, writ denied).......................................59

*USPPS, Ltd. v. Avery Dennison Corp.*,
    326 Fed. Appx. 842 (5th Cir. 2009)...............................................................................74

*Vaughn v. Vaughn (In re Legal Econometrics)*,
    191 B.R. 331 (Bankr. N.D. Tex. 1995)...........................................................................33

*Wansey v. Hole*,
    379 S.W.3d 246 (Tex. 2012)...........................................................................................77

*Warfield v. Byron*,
    436 F.3d 551 (5th Cir. 2006) ..........................................................................................72

*Welt v. EfloorTrade LLC (In re Phoenix Diversified Inv. Corp.)*,
    439 B.R. 231 (Bankr. S.D. Fla. 2010).............................................................................56

*Wiatt v. Winston & Strawn LLP*,
    838 F. Supp. 2d 296 (D.N.J. 2012) .................................................................................28

*Willard v. Humana Health Plan of Texas, Inc.*,
    336 F.3d 375 (5th Cir. 2003) ..........................................................................................80

*Williams v. Sabin*,
    884 F.Supp. 294 (N.D. Ill. 1995) ...................................................................................54

*Williams v. U.S.*,
    71 F.3d 502 (5th Cir. 1995) ............................................................................................79

*Wilson v. Brister*,
    982 S.W.2d 42 (Tex.App. – Houston [1st Div.]1998, pet. denied) .................................59

*Wing v. Horn*,
    No. 2:09-cv-00342, 2009 WL 2843342 (D. Utah 2009)..................................................69

*Zarzana v. Ashley*,
    218 S.W.3d 152 (Tex. App. – Houston [14th Dist.] 2007)..............................................78

## STATUTES

17 C.F.R. § 205.3(b) .............................................................................................................14

Fed. R.  Civ. P. 15(a) ...........................................................................................................80

FED. R. CIV. P. 12(b)(6) .................................................................................. 5, 6, 80

Fed. R. Civ. P. 8 ............................................................................................. 6, 7, 8

Fed. R. Civ. P. 8(a) ................................................................................................ 6

Fed. R. Civ. P. 8(a)(2) ............................................................................................ 6

Fed. R. Civ. P. 9(b) ......................................................................................... 6, 7, 8

TEX. BUS. & COM. CODE § 24.005(a)(1) ............................................................. 71

**OTHER AUTHORITIES**

ABA Formal Op. 95-390 ....................................................................................... 27

Leo E. Strine, et al., *Loyalty's Core Demand: The Defining Role of Good Faith in
   Corporation Law*,
   98 GEO. L.J. 629 (Mar. 2010) ................................................................. 38, 42

Ohio Rule of Professional Conduct 1.13(b) ........................................................ 12

Sarbanes-Oxley Act of 2002 ................................................................................ 14

The Receiver, Ralph S. Janvey, (the "Receiver") and the Official Stanford Investors Committee (the "Committee," and together with the Receiver, "Plaintiffs") hereby file this Joint Response and Brief in Opposition to the Motions to Dismiss filed by Defendants Greenberg Traurig, LLP [Docs. 27 and 29],[1] Hunton & Williams LLP [Doc. 49], and Yolanda Suarez [Doc. 56], and respectfully show the Court as follows:

## I.   BACKGROUND

*"you are…a major reason why I was able to survive the difficult battles over the years and are in the position I am today"*.

*Allen Stanford December 1, 2004 e-mail to Carlos Loumiet*

*"my loyalty is first and foremost to you, and not anyone else, so I will watch out for your interests, and not those of anyone else in your organization"*.

*Carlos Loumiet December 1, 2004 e-mail to Allen Stanford*

This action arises out of the multi-billion-dollar Ponzi scheme perpetrated by R. Allen Stanford ("Stanford") and other co-conspirators through a network of over 130 entities (the "Stanford Entities") in 14 countries over a period of at least 15 years.  *See Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009); *Janvey v. Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d 825, 856-57 (N.D. Tex. 2011), *aff'd* 699 F.3d 848 (5th Cir. 2012), *op'n withdrawn and substituted* 712 F.3d 185 (5th Cir. 2013) .   As the Court presiding over the Stanford Receivership and all Stanford-related litigation, this Court is aware of the facts and circumstances surrounding Stanford's criminal and fraudulent conduct.

---

[1] Greenberg Traurig filed a "Partial Motion to Dismiss" because Greenberg does not seek dismissal of the Receiver's negligence/malpractice claim against Greenberg.

In a comprehensive, painstakingly detailed, and factually intensive 464-paragraph Complaint [Doc. 1], Plaintiffs allege that attorney Carlos Loumiet ("Loumiet"), a close confidant of Allen Stanford, along with Stanford's General Counsel, Chief of Staff and all around right hand "fixer", Yolanda Suarez ("Suarez"),[2] negligently or intentionally facilitated Stanford's achievement of his ultimate goal:  to operate his illicit offshore bank scheme without any proper regulatory oversight, all while tricking investors into believing that his financial service empire was based in the United States and therefore regulated by and compliant with U.S. laws and regulations.  Loumiet was employed throughout the relevant period first by Defendant Greenberg Traurig, LLP ("Greenberg") and then by Defendant Hunton & Williams, LLP ("Hunton")(together with Greenberg, the "Law Firms").  Plaintiffs allege that Defendants participated in Stanford's regulatory fraud and violations of banking and securities laws (including the Investment Company Act) in the United States and around the world by helping Stanford create, implement and perpetuate his complex "regulatory evasion" structure, thereby exposing the Stanford Entities to criminal and civil liability. [3]

Allen Stanford caused the entities he controlled to repeatedly violate the laws of various countries around the world, but Stanford was the mastermind and principal wrongdoer, not the entities. As the Fifth Circuit has held, the Stanford Entities were merely innocent "robotic tools"

---

[2]  Plaintiffs note that the Receiver and Committee have also sued Suarez in this Court in a separate fraudulent transfer lawsuit based on her receipt of some $5 million in funds from the receivership entities.  *Ralph Janvey et al. v. Yolanda Suarez*, Case No. 3:10-cv-2581-N.  Plaintiffs may later seek leave to consolidate that action with the instant action, if necessary, for trial purposes.

[3]  Of particular relevance, on April 25, 2013, this Court granted summary judgment for the Securities and Exchange Commission ("SEC") against Allen Stanford and several of the Stanford Entities, finding that they, *inter alia*, "committed serious violations of the securities laws, did so recurrently, and did so with a high degree of scienter." *SEC v. Stanford Int'l Bank, Ltd., et al.*, Case No. 3:09-cv-00298-N, [Doc 1858], p. 11.  The Court granted judgment in favor of the SEC and against Stanford and his entities for violations of: (i) §10(b) and 10b-5 of the Exchange Act; (ii) §17(a) of the Securities Act; (iii) §206(1) and (2) of the Investment Advisers Act; and (iv) §7(d) of the Investment Company Act. *Id.*

under the control of Allen Stanford when they committed the illegal and illicit acts that facilitated and culminated in Stanford's massive Ponzi scheme; absent his control they were otherwise innocent of wrongdoing.[4]   Stanford's conduct in causing the Stanford Entities to violate laws around the world constitutes a breach of the fiduciary duties he owed to those Stanford Entities.

Plaintiffs allege that Defendants negligently and/or recklessly guided and aided Stanford as he caused the Stanford Entities to repeatedly violate the law.   Defendants therefore aided Stanford's breaches of fiduciary duty, and were otherwise negligent in not preventing (or even attempting to prevent) Stanford's manipulation of the Stanford Entities into repeatedly violating laws around the world.   Finally, Plaintiffs allege that Defendants engaged in such conduct because they were more beholden to Allen Stanford personally than to the companies they were hired to represent.

The Receiver and Committee have stated claims against Defendants in the Complaint for:

- Professional Negligence/Malpractice (Complaint ¶ 407);
- Aiding, Abetting/Participation in Breaches of Fiduciary Duty (*id.* at ¶¶ 408-410);
- Breaches of Fiduciary Duty (*id.* at ¶¶ 411-413);
- Fraudulent Transfer/Unjust Enrichment (*id.* at ¶¶ 414-425);
- Aiding, Abetting, Participation in Fraudulent Transfers (*id.* at ¶¶ 426-427); and
- Negligent Retention/Negligent Supervision (*id.* at ¶ 428).

Importantly, and contrary to Defendants' repeated assertions, <u>none</u> of Plaintiffs' causes of action require proof that Defendants ***<u>knew</u> that Stanford was operating a Ponzi scheme.***   There

---

[4] *Janvey v. Dem. Sen. Camp.Comm.*, 712 F.3d 185, 190 (5th Cir. 2013) (citing *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995)("The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more [ ] evil zombies…") (citations omitted); *see also Jones v. Wells Fargo Bank*, 666 F. 3d 955, 965- 967 (5th Cir. 2012) (corporation is entity separate from its individual bad actors).

is no cause of action for "*aiding and abetting a Ponzi scheme*" under Texas or federal law, and Plaintiffs have not pled that any of the Defendants **knew** that Stanford was running a Ponzi scheme.   Rather, the heart of Plaintiffs' Complaint alleges that Defendants negligently or intentionally instructed and guided Stanford as he caused his entities to operate wholly outside the law, which naturally set the stage for, and was a substantial factor in enabling, Stanford to perpetuate one of the largest fraud schemes in U.S. history.[5]

Hunton and Suarez seek dismissal of all Receiver/Committee claims against them. Greenberg has filed a Motion for Partial Dismissal [Doc.  27] and supporting Brief [Doc. 29],[6] seeking dismissal of some – not all – of the investor class action claims and the Receiver/Committee claims stated in the Complaint.[7]  In light of the Court's Order staying the investor class claims until the question of SLUSA is decided in the Supreme Court, Plaintiffs here address only Greenberg's arguments as they relate to the Receiver/Committee claims. Plaintiffs will address Greenberg's investor class claim arguments when the Court-ordered stay expires.

Defendants' arguments in favor of dismissal fail.   As demonstrated below, the Receiver/Committee claims are properly pled and well-stated under applicable law.

---

[5]  See e.g., Complaint at ¶37.

[6]  As the Court is aware, the investor class action claims included in the Complaint were stayed by this Court's February 22, 2013 Order "until 30 days after the Supreme Court renders a decision on the merits in the consolidated cases of *Chadbourne & Parke LLP v. Troice*, No. 12-79; *Willis of Colorado, Inc. v. Troice*, No. 12-86; and *Proskauer Rose, LLP v. Troice*, No. 12-88" concerning the scope and applicability of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") to Stanford-related litigation.  [Doc. 34.]

[7]  Greenberg only seeks dismissal of the Receiver and Committee's claims for breach of Greenberg's fiduciary duty to the Stanford entities, aiding and abetting/participation in the breaches of fiduciary duty by Stanford's former directors and officers (including Allen Stanford himself), and aiding and abetting fraudulent transfers.  Greenberg does not seek dismissal of the Receiver/Committee's claims for negligence, fraudulent transfer, unjust enrichment or negligent retention/supervision.

## II.   <u>FACTUAL SUMMARY</u>

The Complaint contains detailed factual allegations supporting causes of action for professional negligence/malpractice, breach of fiduciary duty, fraudulent transfers, and aiding and abetting liability.   As with most cases of this nature, the primary issues the Court must resolve boil down to: (1) what did the Defendants know about Stanford's illegal and illicit activities and (2) what did Defendants do to assist such activities.   Plaintiffs have created a 10 page summary of the relevant facts pled in the Complaint as to each Defendants' knowledge and conduct, with citations to the corresponding paragraphs in the Complaint.   The Summary of Facts is included in the Appendix as Exhibit "1".

Generally, Plaintiffs allege that each of the Defendants (i) knew that Stanford was causing the Stanford Entities to engage in illegal and illicit activities as part of his global conspiracy to sell the unregulated SIBL CDs and (ii) materially assisted Stanford in causing the Stanford Entities to engage in illegal and illicit activities in order to sell the SIBL CDs during a period spanning 20 years.   See Summary of Facts, Exhibit "1".   In doing so, Defendants were, at the very least, negligent, and their conduct exposed the Stanford Entities to both criminal and civil liability.

## III.   <u>ARGUMENT</u>

### A.      <u>Standard for Dismissal under Rule 12(b)(6)</u>

In reviewing a motion to dismiss under FED. R. CIV. P. 12(b)(6), the Court must accept all well-pleaded allegations as true and view them in the light most favorable to the Plaintiffs. *Martin K. Eby Constr. Co., v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *SEC v. Reynolds*, No. 2008 WL 3850550, at *3 (N.D. Tex. Aug. 19, 2008).   Motions to dismiss are viewed with disfavor and should rarely be granted.   *Priester v. Lowndes County*, 354 F.3d 414,

418 (5th Cir. 2004); *SR Int'l Bus. Ins. Co. v. Energy Future Holdings Corp.*, 539 F. Supp. 2d 871, 874-75 (N.D. Tex. 2008). A Rule 12(b)(6) motion should be granted only if the complaint does not include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted).

Plaintiffs allege that the Defendants engaged in conduct that was, negligent and which assisted Stanford to breach fiduciary duties he owed to the Stanford Entities. As such, Rule 8, not Rule 9(b), applies to Plaintiffs' claims for breach of fiduciary duty and aiding and abetting breaches of fiduciary duty. As this Court has held, "[b]y its clear terms, Rule 9(b) applies only to averments of fraud or mistake, not to averments of negligence, breach of fiduciary duty, or non-fraudulent misstatement." *Tigue Investment Co., Ltd. v. Chase Bank of Texas, N.A.*, 2004 WL 3170789, at *2 (N.D. Tex. Nov. 15, 2004)(Godbey, J.)(denying motion to dismiss breach of fiduciary duty claims); see also *Sandhar v. Grewal*, 2009 WL 175073, at *3 (S.D. Tex. Jan. 23, 2009)("With respect to the breach of fiduciary duty claim against Counter–Defendant Gurnam Sandhar, Counter–Plaintiffs have satisfied their pleading burden under Rule 8(a)(2)."); *City of Driscoll, Texas v. Saenz*, 2007 WL 173232, AT *5 (S.D. Tex 2007)("A claim for breach of fiduciary duty is covered by the notice pleading standard in Fed. R. Civ. P. 8(a), not the heightened pleading standard for fraud claims set forth in Fed. R. Civ. P. 9(b).")(citation omitted).

To be sure, "[c]laims of breach of fiduciary duty are subject to Rule 9(b) when the alleged breach consists of fraudulent conduct." *Tigue*, 2004 WL 3170789, at *2. But this does not apply when the claim "consists of nonfraudulent conduct." *Id.* (citing *Peters v. Metropolitan*

6

*Life Ins. Co.*, 164 F.Supp.2d 830, 836 (S.D.Miss.2001); *In re Electronic Data Systems Corp. ERISA Litigation*, 305 F.Supp.2d 658, 672 (E.D.Tex.2004)).   In the present case, and as described in detail below, the negligence and fiduciary duty claims stated in the complaint do not rise and fall on "averments of fraud"; and therefore, the claims should not be held to Rule 9(b) standards.

   If Plaintiffs were required to comply with Rule 9(b)(which they are not), the breach of fiduciary duty allegations in the Complaint are more than sufficient to withstand a motion to dismiss.   Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.   Malice, intent, knowledge, and other condition of mind of a person may be averred generally."   *Bell Atl. Corp. v. Twombly*, 550 U.S. at 545; *see also Experian Info. Solutions, Inc. v. Lexington Allen L.P.*, 2010 WL 4026823, at *3 (E.D. Tex. Aug. 27, 2010)(finding allegations in complaint "provide the slight circumstantial evidence of fraud required to support an inference of fraudulent intent")(citation omitted); *Chartwell Healthcare v. People's Home Health*, 1997 WL 86435, at *2 (N.D. Tex. Feb. 19, 1997)(scienter adequately pled and "minimum allegations required by Rule 9(b) met" in two paragraphs of complaint)(citations omitted).   Rule 9(b) must be "read in conjunction with FED. R. CIV. P. 8, which requires only a short and plain statement of the claim showing that the pleader is entitled to relief."   *Steiner v. Southmark Corp.*, 734 F.Supp. 269, 273 (N.D. Tex. 1990).   Rule 9(b) is <u>not</u> intended "to procure punctilious pleading detail."   *SEC v. Brady*, 2006 WL 1310320, at *3 (N.D. Tex. May 12, 2006) (citing *Steiner*); *see also SEC v. Sharp Capital, Inc.*, 1999 WL 242691, at *2 (N.D. Tex. Apr. 16, 1999) (noting with respect to Rule 9(b) that "courts have never required a plaintiff to plead detailed evidence in its complaint") (citations omitted).

Fed. R. Civ. P. 8 applies to Plaintiffs' claims for legal malpractice and negligent retention/negligent supervision.[8]  *See Smith v. Texas*, No. 2012 WL 5868657 at *12 (S.D. Tex. Oct. 26, 2012)(applying Rule 8 to malpractice claim); *see also Network Staffing Servs., Inc. Liquidating Trust v. Jenkens & Gilchrist (In re Network Staffing Servs.)*, 2004 WL 3007082, at *5 (Bankr. N.D. Tex. Oct. 22, 2004); *Randolph v. Resolution Trust Corp.*, 995 F.2d 611, 616 n.3 (5th Cir. 1993); *Udoewa v. Plus4 Credit Union*, 2009 WL 1856055, at *7 (S.D. Tex. June 29, 2009))(citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008).  Rule 8 also applies to Plaintiffs' fraudulent transfer claims.  *See* Order Denying Motions to Dismiss, *Janvey, et al. v. James R. Alguire, et al.*, Case No. 3:09-cv-0724-N, Docket No. 696 (Sept. 6, 2011) at p. 20; *see also GE Capital Comm., Inc. v. Wright & Wright, Inc.*, 2009 WL 5173954, at *10 (N.D. Tex. Dec. 31, 2009); *Court-Appointed Receiver for Lancer Mgmt. Group LLC v. 169838 Canada, Inc.*, 2008 WL 2262063, at *2-3 (S.D. Fla. May 30, 2008) (fraudulent-transfer claim is not subject to Rule 9(b)).

As demonstrated below, Plaintiffs easily meet and exceed <u>all</u> applicable pleading requirements. Dismissal of Plaintiffs' claims is unwarranted.

---

[8]  To the extent Hunton implies that <u>all</u> of Plaintiffs' claims (including legal malpractice) must be pled under Rule 9(b), this argument, including Hunton's citation to this Court's decision in *Am. Realty Trust, Inc. v. Travelers Cas. & Surety Co. of Am.*, 362 F. Supp. 2d 744, 751 (N.D. Tex. 2005) is incorrect.  *See* Hunton Brief at 10.  In *Am Realty Trust,* this Court simply clarified that to the extent averments of fraud were <u>necessary</u> to a claim of negligent misrepresentation, that claim must be pled under Rule 9(b).  *Id.* at 749.  However, the Court was clear in noting that the "the text of Rule 9(b) precludes any interpretation that would require a plaintiff to plead negligent misrepresentation, per se, in conformity with the heightened requirements."  *Id.*  Moreover, the Court in *Am Realty Trust* did <u>not</u> consider the plaintiff's breach of contract and other claims under Rule 9(b).

**B.     The Receiver States a Valid Claim for Professional Negligence/Malpractice**

The Receiver has sued Defendants for professional negligence/malpractice.[9]  The gist of the Receiver's professional negligence claim is that Defendants owed duties to the Stanford Entities to adequately advise those Entities concerning the legality of their actions, and to take action to prevent the Entities from being manipulated by Allen Stanford into violating laws and otherwise engaging in illegal and illicit conduct that exposed the entities to liability.  In light of the factual allegations made in the Complaint (summarized in the Summary of Facts attached as Appendix Exhibit "1"), that claim easily satisfies the *Twombly* "plausibility" standard.

**1.     Hunton and Suarez Continuously Represented Multiple Stanford Entities**

Only Hunton and Suarez have moved to dismiss the Receiver's professional negligence/malpractice claims.  Hunton and Suarez's first argument is that they cannot determine who their clients allegedly were (and therefore to whom they allegedly owed duties) from the Complaint.  This argument is baseless; Plaintiffs explicitly allege that Defendants represented (and therefore owed a duty to) the Stanford Financial Group *as a whole,* and all its constituent member companies, including, *inter alia*, SIBL, SGC, SFG, STC and SFIS.[10]  This allegation is particularly true as it relates to Suarez, whom Plaintiffs have alleged served as General Counsel for the whole Stanford group from 1992 through 2002.  Complaint at ¶¶80, 259, 411.

The Complaint makes clear that Hunton affirmatively represented to foreign regulators that it served as "principal external counsel" to the "Stanford group of companies", i.e., *all* the

---

[9]  The Receiver has brought the professional negligence/malpractice claim in his own name, and has not assigned that claim to the Committee.  Therefore, there is no reason for this Court to address Hunton's arguments about the assignability of malpractice claims.  See Hunton Brief at 15-16.

[10] These acronyms refer to Stanford International Bank, Ltd. (SIBL), Stanford Group Company (SGC), Stanford Financial Group (SFG), Stanford Trust Company, Inc. (STC) and Stanford Fiduciary Investor Services (SFIS).

Stanford Entities.  *Id.* at ¶309-311.  This is borne out by the specific facts alleged in the Complaint.  For example, the Receiver specifically alleges that Hunton represented Stanford Financial Group Company in making loans to the Antiguan Government. Complaint at ¶¶252-254.  Plaintiffs further allege that Hunton represented the following Stanford Entities in the following matters:

    (a)    SGC and SIBL in DEA money laundering-related and Ponzi scheme-related litigation [*id.* at ¶¶258-263, 327-328];

    (b)    SIBL in the Mexican money laundering criminal proceeding [*id.* at ¶¶319-324];

    (c)    SIBL in evading increased regulatory scrutiny by the ECCB [*id.* at ¶¶329-334];

    (d)    SGC in growing its offices in the U.S. [*id.* at ¶366];

    (e)    STC Louisiana in establishing more trust offices in other states [*id.* at ¶¶367-369];

    (f)    SFIS in the investigation by Florida regulators [*id.* at ¶¶370-386];

    (g)    Stanford's Venture Capital fund [*id.* at ¶¶345-350] and Stanford's Caribbean Investment Fund and other Stanford companies involved in purchasing Caribbean real estate as part of Stanford's plan to develop a mega resort in Antigua for the wealthy [*id.* at ¶¶351-360].

Hunton and Suarez's supposed confusion as to the identity of their alleged clients is farcical, and their arguments are entirely without merit.

    **2.**    **Hunton and Suarez Failed to Protect the Stanford Entities they Represented**

Hunton and Suarez next argue that the Receiver's negligence claim must be dismissed because the Receiver has not alleged that Hunton provided flawed or deficient legal services to the Stanford Entities "or otherwise improperly represent[ed] the client".  Hunton Brief at 10-11 (quoting *Murphy v. Gruber*, 241 S.W. 3d 689, 692-693 (Tex. App. – Dallas 2007, pet. denied).

This is not an ordinary, garden variety malpractice case where a lawyer neglected to file a pleading or missed a deadline.  Federal courts (applying malpractice/negligence legal standards that are virtually identical to Texas standards) have routinely found the type of conduct alleged in the Complaint sufficient to state a negligence claim against a law firm, particularly in bankruptcy and bank and securities-related cases.

For example, the 9th Circuit in *FDIC v. O'Melveny & Meyers,*[11] held that a law firm has a "broad duty" to protect its corporate clients "in every possible way", including to "guide [its client] as to its obligations and to protect it against liability".  *O'Melveny*, 969 F. 2d at 748-749. *O'Melveny* noted that if an attorney "specializes within the profession, he must meet the standards of knowledge and skill of such specialists," and that an important duty of lawyers is to make a "reasonable, independent investigation to detect and correct false or misleading materials" in securities offering documents.  *Id. See also Koehler v. Pulvers*, 614 F.Supp. 829, 845 (S.D. Cal. 1985)(due diligence required lawyer's independent investigation of information supplied by issuer for incorporation into offering materials).  The 9th Circuit further explained that, "[p]art and parcel of effectively protecting a client, and thus discharging the attorney's duty of care, is to protect the client from the liability which may flow from promulgating a false or misleading offering to investors".  *Id.* at 749.  Although attorneys do not have a duty to "ferret out fraud," they do have a duty to make further inquiry when the lawyer encounters suspicious circumstances or "red flags".  *Id.*  The duty of due care owed to the client requires that the lawyer make a "reasonable, independent investigation" of the suspicious circumstances or red

---

[11]  969 F.2d 744, 749 (9th Cir. 1992)*; rev'd and remanded on other grounds*, 512 U.S. 79 (1994), *reaffirmed on remand*, 61 F.3d 17 (9th Cir. 1995).

flags.  *Id.*

Federal courts around the country have consistently recognized that attorneys have a duty, based in part on the rules of professional conduct, to act as "gatekeepers" and to protect their corporate clients from wrongdoing by directors and officers.  In *Antioch Litigation Trust v. McDermott Will & Emery LLP,* the court held (in denying defendant's motion to dismiss) that the defendant law firm owed a duty of care to the corporate entity and that if a transaction chosen by the directors was not legal or could have resulted in severe consequences for the company, the defendant law firm had a duty "to take appropriate action to advise the directors, and to help them avoid wrongdoing that could seriously harm its corporate client".[12]

Similarly, the Tenth Circuit has held that, when presented with allegations of wrongdoing by corporate officers which might expose the corporation to liability, attorneys have a duty to independently investigate those allegations in order to fulfill their duty to adequately represent their corporate clients.  *FDIC v. Clark,* 978 F.2d 1541 (10th Cir. 1992).  In that case, a bank's outside legal counsel failed to investigate allegations made in a civil lawsuit that the bank's president had conspired to defraud the bank through a fraudulent loan scheme.  The lawyers accepted the president's explanation of the loan at face value, failed to make any further inquiry, and failed to inform the board of directors of the allegations.  The Tenth Circuit upheld a jury verdict against the lawyers, stating that "there was ample proof for the jury to find that defendants were negligent in their professional duties to the bank, and that their negligence was a

---

[12] *See Antioch Litig. Trust v. McDermott Will & Emery LLP,* 738 F. Supp. 2d 758, 762 (S.D. Ohio 2010); *see also Id.* at 770 (citing Ohio Rule of Professional Conduct 1.13(b) and holding a corporation, acting through its board of directors, has an obligation to determine that a transaction between the corporation and its directors or officers is fair to the corporation and not prejudicially beneficial to the conflicted directors or officers" and that the defendant law firm "had a duty to its client, the company, to ensure that the Board was not self-dealing").

cause of loss" to the bank.  *Id*. at 1551. [13]

The decision in *Clark* is particularly relevant here given the numerous and repeated reports that the Defendants received over the years concerning allegedly illegal and illicit conduct by Stanford from multiple sources, including various U.S. federal agencies, journalists, and former Stanford employee whistleblowers.  As an Arizona federal court held: "[W]here a law firm believes the management of a corporate client is committing serious regulatory violations, the firm has an obligation to actively discuss the violative conduct, urge cessation of the activity, and withdraw from representation where the firm's legal services may contribute to the continuation of such conduct" and that "[c]lient wrongdoing ... cannot negate an attorney's fiduciary duty."[14]

Decisions in this District are in accord with this body of law.  Judge Fitzwater recently analyzed the duties owed by a law firm under Texas law to entities that were later taken over in an SEC receivership.  Judge Fitzwater concluded that "attorneys unquestionably have a duty to their clients to advise them of the legality of their actions and to assist them in accordance with the degree of care that would be exercised by a reasonably prudent attorney."  *Reneker v. Offill*, 2009 WL 3365616, at *5 (N.D. Tex. 2009).  In another Northern District case, the court held that there was sufficient evidence to support a claim that the defendant law firm had committed malpractice because it "negligently devised and implemented the creation of a new business structure that ultimately facilitated a transfer of assets from the Debtor without adequate

---

[13] See also, *In re Brooke Corporation*, 467 B.R. 513, 520-521 (D. Kansas 2012) (denying dismissal of malpractice claim based in part on allegations that attorney that acted as outside general counsel acquired sufficient knowledge of corporation's accounting practices to make him aware that corporation was insolvent).
[14] *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp., 1424, 1459 (D. Ariz. 1992).

consideration being given and, thus, may have improperly denuded the Debtor of its assets."
*Milbank v. Holmes (In re TOCFHBI Inc.)*, 413 B.R. 523, 531 (N.D. Tex. 2009).

In addition, the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") requires attorneys appearing and practicing before the SEC – like Greenberg and Hunton - to report credible evidence of a material violation of the securities laws, or a breach of fiduciary duty by an issuer or any agent of such issuer, "up the ladder" to the chief legal counselor and the chief executive officer of the company.[15]  If they do not respond appropriately, the attorney is then obligated to report the evidence to the audit committee, another committee of independent directors, or the full board of directors.[16]

A Delaware bankruptcy court relied on Sarbanes-Oxley in denying a motion to dismiss by an attorney who served as in-house counsel to a bankrupt company,[17] holding that *attorneys practicing before the SEC have both "a duty to know" of corporate wrongdoings, including material misrepresentations in their client's SEC filings, and a duty to report such corporate wrongdoings*:

> Since the SEC adopted a final rule pursuant to § 307 of the Sarbanes-Oxley Act, effective August 5, 2003, *a general counsel has an affirmative duty to inspect the truthfulness of the SEC filings.*  Section 307 addresses the professional responsibilities of attorneys.  It directs the SEC to issue rules that "set[] forth minimum standards of professional conduct for attorneys appearing and practicing before the Commission in any way in the representation of issuers."  The standards must contain a rule requiring "an attorney to report evidence of a material violation of securities law or breach of fiduciary duty or

---

[15] *See* 17 C.F.R. § 205.3(b)
[16] *Id.* § 205.3(b)(3).  The rules further provide that "[i]f an attorney reasonably believes that it would be futile to report evidence of material violation to the issuer's chief legal officer and chief executive officer," then "the attorney may report such evidence" to the issuer's audit committee, independent directors, or full board of directors. *Id.* §205.3(b)(4).
[17] *See Miller v. McDonald (In re World Health Alternative, Inc.)* 385 B.R. 576, 591 (Bankr. D. Del. 2008).

similar violation by the issuer up-the-ladder within the company." Therefore, the [plaintiff] appropriately asserts that [the defendant] as the in-house general counsel and the only lawyer in top management of World Health during the relevant period, *had a duty to know or should have known of [the alleged] corporate wrongdoings and reported such breaches of fiduciary duties by the management.*[18]

Hunton admittedly served as the "outside General Counsel" and "principal outside counsel" to the Stanford group of companies. Complaint at ¶290, 309. Suarez served as internal General Counsel to the entire Stanford group. Both represented Stanford before the SEC in connection with various SEC investigations of Stanford, with SGC's Reg D filings, and with the expansion of the SGC's various offices. As such, these Defendants had a duty to understand the Stanford Entities' business practices, to investigate allegations of fraud and illegal conduct, to guide the Stanford Entities with respect to their legal obligations, to ensure that the Stanford Entities complied with the law and to protect the Stanford Entities against liability.

The Receiver has alleged that Suarez violated those duties by, *inter alia*:

(1) overseeing the establishment of SGC, STC and SFIS with full knowledge that the sole purpose of those entities was to sell the unregulated SIBL CDs [Complaint at ¶¶136-140, 165-185, 186-188];

(2) overseeing Stanford's deceptive responses to the SEC's 1998 investigation of SGC (*id*. at ¶¶194-195];

---

[18] *See Id.* (emphasis added) (internal citations omitted); *see also id.* at 598 (holding that the trustee has alleged sufficient facts supporting its cause of action for professional negligence against the in-house counsel).

(3) overseeing the implementation of Stanford's Reg D disclosures for the SIBL CDs with full knowledge that they omitted material facts, including that Stanford was under federal investigation [*id*. at ¶¶208-213];[19]

(4) ignoring advice from Stanford's securities counsel to register SIBL as an investment company [*id*. at ¶¶212-213];

(5) overseeing Stanford's unauthorized and undisclosed investments in Caribbean real estate [*id*. at ¶¶141, 351, 353]; and

(6) being actively involved in Stanford's deceptive marketing campaign to trick investors into believing the SIBL CDs were insured [*id*. at ¶¶197-204].

The Receiver alleges that Suarez engaged in the above activity with full knowledge that, *inter alia*:  (1) SIBL was evading proper regulation in the U.S. and was not properly regulated in Antigua because Stanford controlled the Antiguan government both through his bribery of Antiguan government officials and through undisclosed loans to the Antiguan government using SIBL investor money [Complaint at ¶¶83-84, 90-96, 106-107, 114-116, 118, 158-160, 164-185, 209]; (2) Stanford was misrepresenting to investors that the SIBL CDs were insured [*id*. at ¶¶196-197, 200-204]; (3) Stanford had been accused of violating laws in Mexico and Ecuador for selling SIBL CDs in those countries [*id*. at ¶¶319-326]; and (4) members of the Florida International Bankers Association alleged that Stanford was running a Ponzi scheme [*id*. at ¶293-294].

---

[19] See *Scholes v. Stone, McGuire & Benjamin*, 786 F. Supp. 1385 (N.D. Ill. 1992) (denying law firm's motion to dismiss based in part on allegations that law firm knew that principal wrongdoer was not disclosing his criminal past in offering materials).

The Complaint very clearly and specifically alleges that Suarez failed in her duties to properly guide the Stanford Entities to comply with applicable laws and regulations, and instead helped Allen Stanford evade and otherwise violate laws around the world to keep SIBL unregulated, thereby exposing the Stanford Entities to liability.   The Complaint's professional negligence allegations as to Suarez are more than sufficient to meet *Twombly's* "plausibility" standard.

The Receiver's malpractice claim against Hunton has as its foundation the vast amount of knowledge that Hunton possessed during its representation of the Stanford Entities concerning Stanford's illegal and illicit acts in the United States and elsewhere.   Much of that knowledge came to Hunton through Loumiet, who brought with him to Hunton all the knowledge concerning Stanford's activities he had gained while he was at Greenberg. Contrary to Hunton's argument [Hunton Brief, footnote 7], the knowledge Loumiet acquired while a partner at Greenberg is fully imputable to Hunton under established Fifth Circuit and Texas state law precedent.   See *Pan E. Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1128 (5th Cir.1988) ("Texas now follows the Restatement rule which imputes all knowledge of an agent (except that acquired in confidence) to his current principal"); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 655 (S.D. Tex. 2008).

In summary, Hunton knew that, *inter alia*:

(1) Stanford's principal business strategy and model was to operate an offshore, unlicensed and unregulated investment company from the U.S. while wholly evading U.S. laws [Complaint at ¶¶49, 53, 165-166, 168];

(2) SIBL (and its predecessor GIBL[20]) *was not* a commercial bank, but rather was an investment company [*id.* at ¶50];

(3) Stanford had been accused by the OCC of violating U.S. banking laws by operating unlicensed bank offices from U.S. soil [*id.* at ¶57];

(4) Stanford's former in-house lawyer believed in 1988 that the SIBL/GIBL CDs were securities that likely needed to be registered in the U.S. (yet were never registered) [*id.* at ¶58];

(5) the government of Montserrat revoked GIBL's bank license and alleged that GIBL/SIBL's auditor, Hewlett, *w*as not qualified, that GIBL was operating in a manner detrimental to its depositors, and that Stanford was withholding information from GIBL's audited financial statements [*id.* at ¶¶60-61],

(6) Despite these allegations, Stanford continued to use Hewlett as GIBL/SIBL's **sole** auditor throughout its history [*id.* at footnote 12];

(7) Antigua was infamous as a cesspool of corruption and lax regulation, and had a reputation as a haven for drug running and money laundering [*id.* at ¶¶64, 122];

(8) over the years, several U.S. banks (including Chase) terminated their correspondent banking relationships with SIBL and Stanford's affiliated Bank of Antigua ("BoA")[*id.* at ¶¶72, 84];

(9) SIBL was a façade; its real banking operations were carried out from the U.S. [*id.* at ¶¶83-84, 189-191];

---

[20] GIBL is Guardian International Bank, Ltd., which was established by Allen Stanford in Montserrat.

(10) Stanford was consistently under investigation by various agencies within the U.S. government, including the OCC [*id.* at ¶¶57, 63, 70, 74-75]; FBI [*id.* at ¶¶97, 100, 135]; Customs [*id.* at ¶99]; for, *inter alia*, money laundering [*id.* at ¶¶83, 97, 99-100, 199, 214, 261];

(11) a Texas joint task force investigation of Stanford in 1991 caused Stanford to fire several Stanford employees suspected of leaking information to the authorities [*id.* at ¶99];

(12) Stanford corrupted several members of the Antigua government, including former Antiguan Prime Minister Lester Bird and the Minister of Finance in charge of regulating GIBL/SIBL, through loans, gifts and bribes; Stanford's corruption of Antiguan government officials continued unabated until Stanford was shut down [*id.* at ¶¶104, 112, 114-117, 164, 218, 230];

(13) Stanford exercised inordinate control over the Antiguan Government through, *inter alia*, the tens of millions of dollars in loans his entities extended to Antigua, giving Stanford a lien on the entire country [*id.* at ¶¶66, 106, 254];

(14) various journalists had alleged that Stanford's loans to the Antiguan Government were in reality funded with SIBL CD investor funds in violation of Antiguan law and in contravention of SIBL's disclosures to its investors because BoA[21] did not have sufficient funds to make the loans to the Government of Antigua that it purported to make [*id.* at ¶¶92, 106, 107; 110, 123, 223];

(15) From 1996 forward, Stanford was investing hundreds of millions of dollars in Antiguan real estate projects [*id.* at ¶¶141-142];

---

[21] BOA is Bank of Antigua, an Antiguan domestic bank wholly owned by Allen Stanford.

(16) Stanford took over the Antiguan bank regulatory system, rewrote Antiguan bank regulations applicable to SIBL, and appointed himself and his agents (including Loumiet) to the commission overseeing the regulation of SIBL [*id.* at ¶¶143-153];

(17) one of Stanford's goals in re-writing Antiguan banking laws and regulations was to make it more difficult for U.S. authorities to investigate cases involving fraudulent accounting in Antigua [*id.* at ¶¶147-149];

(18) Stanford did not want U.S. authorities to gain access to SIBL's information through computer linkages with Stanford employees in the U.S. [*id.* at footnote 17];

(19) the U.S. and British governments accused Stanford of manipulating and controlling the regulation of his banks in Antigua and issued warnings about doing business with Antigua [*id.* at ¶¶152, 154-155];

(20) Stanford's "de facto" representative offices for SIBL in the U.S. likely violated U.S. banking laws [*id.* at ¶167];

(21) the real purposes of the SFIS "trust representative" offices Stanford established in Miami, Houston and San Antonio was to market and sell SIBL CDs [*id.* at ¶168];

(22) the SEC was investigating Stanford in 1998 for violations of federal securities laws [*id.* at ¶192];

(23) Stanford marketed SIBL's portfolio as being invested conservatively in safe and liquid instruments, but Stanford did not disclose to investors any investments by SIBL in loans to Stanford or the Antiguan Government, Caribbean real estate or private equity companies [*id.* at ¶¶196-198];

(24) Stanford marketed SIBL CDs as being insured to a greater extent than FDIC insurance and represented that an investment in SIBL was safer than an investment in a U.S. commercial bank because SIBL did not make loans [*id.* at ¶¶197-198];

(25) a former Stanford employee accused Stanford of manipulating SIBL's financial statements and of training the sales force to falsely market the SIBL CDs as being 100% insured [*id.* at ¶¶200-201];

(26) SIBL investors were being duped into believing their CD investments were insured [*id.* at ¶¶203, 236];

(27) SGC's primary purpose and business model was to sell SIBL CDs [*id.* at ¶204];

(28) Stanford's loans to the Antiguan Government violated Antiguan law in part because no other banks participated in the loans [*id.* ¶¶207, 223];

(29) in 1998, Stanford was experiencing severe liquidity problems, and his Antiguan trust company and BoA were in regulatory trouble and financial difficulty [*id.* at ¶¶223-224];

(30) Stanford was accused of violating Ecuadoran law in 2005 through the sale of SIBL CDs in that country [*id.* at ¶235];

(31) the loans to the Antiguan government that Loumiet helped Stanford structure were under investigation by the British Governor General of Antigua, and Stanford's Antiguan lawyer Errol Cort was under investigation for having received $1.2 million in connection with those loans [*id.* at ¶¶247-251];

(32) in 2002, the Wall Street Journal highlighted Stanford's corrupt influence over Antigua and referred to Antigua as Stanford's "personal fief" [*id*. at ¶255];

(33) Stanford's U.S.-based entities controlled SIBL from the U.S. [*id.* at ¶¶258-261];

(34) Stanford was accused by the Antiguan political opposition party of running a "graft pyramid scheme" in Antigua with Prime Minister Lester Bird, engaging in corruption of Antiguan government officials, and of having made $250 million in real estate investment in Antigua [*id.* at ¶¶264-265, 268-270];

(35) Stanford falsely claimed a familial relationship with the founder of Stanford University [*id.* at ¶¶285, 313-315];

(36) the Florida International Bankers Association refused membership to Stanford; many Miami-based international bankers suspected Stanford was a Ponzi scheme [*id.* at ¶¶293-294];

(37) KPMG refused to audit any of Stanford's entities as too risky [*id.* at ¶317];

(38) Stanford's CD sales operations in Mexico violated Mexican law, Stanford was criminally accused of money laundering by the Mexican government, and one of his employees was jailed in Mexico [*id.* at ¶¶319-320];

(39) Mexican counsel recommended that SIBL be registered to operate as a bank in Mexico but Stanford refused to follow that recommendation [*id.* at ¶321];

(40) Stanford was accused of violating Ecuadoran law based on SIBL CD sales in that country, and Stanford's operations in that country were suspended [*id.* at ¶¶325-326];

(41) Stanford wanted to avoid increased regulatory oversight of SIBL and BoA by the Caribbean central bank authority, the Eastern Caribbean Central Bank ("ECCB") [*id.* at ¶¶329-334];

(42) Stanford could and did dictate to SIBL's purported chief regulator, Leroy King, how to respond to the risk of increased regulatory oversight of SIBL by the ECCB [*id.* at ¶¶330-334];

(43) SIBL comprised 90% of the asset value of Stanford's global empire [*id.* at ¶339];

(44) the revenue streams for Stanford's global empire of Entities depended upon SIBL, and SIBL funded all investments by related Stanford affiliated companies, including private equity and venture capital investments [*id.* at ¶¶342-344];

(45) Stanford continued to make massive investments in Antiguan and other Caribbean real estate (including purchasing whole islands) using SIBL's money as part of his master plan to develop a "super resort" for the wealthy [*id.* at ¶¶339, 347, 351-359];

(46) Stanford listed SIBL as the custodian and administrator, and guarantor through a letter of credit, for Stanford's Caribbean real estate fund [*id.* at ¶¶353-354];

(47) Stanford's investments in Caribbean real estate and private equity/venture capital were contrary to what was disclosed to SIBL investors [*id.* at ¶356]; and

(48) Florida regulators accused Stanford's SFIS of being uncooperative with their investigation, of destroying documents related to the SFIS Miami "trust representative office" operations, and of "stonewalling" Florida regulators' investigation of SFIS by relying on Antiguan confidentiality laws to refuse to produce documents related to SIBL. *Id.* at ¶¶371, 373.

The Receiver has alleged that, armed with the above knowledge, Hunton violated its duties owed to the Stanford Entities by, *inter alia*:

(1) representing Stanford in structuring $40 million in loans to the Antiguan government, despite Loumiet's knowledge that BoA didn't have that kind of money, that the money was likely coming from SIBL, and that previous Stanford loans to the Antiguan government were under investigation [Complaint at ¶¶252-254];

(2) helping Stanford perpetuate his corrupt control over Antigua by, *inter alia*, sending undercover agents to infiltrate a meeting of an Antiguan opposition party in order to spy on what

was said about Stanford, and to use that information to prepare a lawsuit designed to quash political speech and protect Stanford's stranglehold over Antigua [*id.* at ¶¶267-275];

(3) sending letters to Panamanian and Venezuelan bank regulators endorsing Stanford and misrepresenting to those regulators that Stanford was compliant with laws and regulations despite knowledge that Stanford was in fact under constant U.S. government investigation [*id.* at ¶¶309-311];

(4) assisting Stanford in evading increased regulatory oversight of SIBL by the Caribbean central bank authority, the ECCB, including communicating with and drafting the legal strategy for SIBL's corrupt Antiguan regulator, Leroy King, to use to counter the ECCB's legal basis for exercising regulatory oversight over SIBL [*id.* at ¶¶329-334];

(5) helping extricate Stanford from criminal proceedings in Mexico that threatened to shutter Stanford's CD sales operation in Mexico [*id.* at ¶¶319-324];

(6) representing Stanford Entities in making private equity and venture capital investments with knowledge that Stanford was likely funding the transactions with SIBL investor funds and failing to disclose those investments to SIBL investors [*id.* at ¶¶345-350, 361];

(7) representing Stanford in Caribbean real estate deals with knowledge that Stanford was likely using SIBL investor money to fund the transactions and failing to disclose those real estate deals to SIBL investors [*Id.*, at ¶¶351-359];

(8) assisting SGC's expansion of its SIBL CD sales operations in the U.S. despite knowing that the primary business purpose of SGC was to sell the unregulated SIBL CDs [*id.* at ¶366];

(9) assisting Stanford's expansion of U.S. sales of the unregulated SIBL CDs through the establishment of new STC trust offices in various states [*id.* at ¶¶367-368];

(10) lying to Florida regulators during their investigation of SFIS, and otherwise seeking to curtail said investigation by, *inter alia*, counseling Stanford to rely on Antiguan confidentiality statutes to avoid turning over SIBL information and having SIBL's corrupt regulator, Leroy King, provide information to the Florida regulators designed to ward them off [*id.*, at ¶¶374-382].

The Receiver's allegations [Complaint, ¶¶ 329-334] concerning Hunton's conduct in advising SIBL's Antiguan regulator, Leroy King, on how to avoid increased oversight of SIBL by the ECCB are particularly noteworthy because that conduct was discussed in detail during Allen Stanford's criminal trial.  IRS agent Kalford Young testified at length about Stanford's corrupt relationship with SIBL's lead regulator, Leroy King, and their joint effort to evade ECCB regulatory supervision over SIBL.  That joint effort included Stanford's having General Counsel Mauricio Alvarado draft King's responses to the ECCB.  Transcript of Proceedings in *U.S. v. Robert Allen Stanford*, Volume 13, at 3918-4038 (attached to Appendix as 0015 to 0136).[22]

Agent Young also testified that Loumiet (and Hunton) provided a legal Memorandum to King for him to use as ammunition in responding to the ECCB, with the clear goal of preventing the ECCB from exercising increased regulatory oversight over SIBL.  *Id.* at 3933-3941.  Agent Young further testified (in cross-examination) that Loumiet clearly had an understanding of "what's going on between Mr. Stanford and Mr. King", and that Stanford and Loumiet's conduct in "helping" SIBL's regulator respond to the ECCB raised red flags.  *Id.* at 4004, 4009-4010 (Appendix at 0102, 0107-0108).

---

[22] Hunton has asked this Court to take judicial notice of the transcript of Allen Stanford's criminal trial.  Hunton Brief, at 7 and fn 8.  The Receiver has included in the Appendix filed herewith pertinent pages of that trial transcript wherein Loumiet and Hunton figure prominently, and similarly ask the Court to take judicial notice of its contents.

Agent Young further testified (on redirect) that Loumiet was no stranger to federal investigations concerning his representation of offshore banks:

BY MR. COSTA:[23]

Q:     Do you remember Mr. Faisel's questions where he said lawyers aren't supposed to do anything dishonest; right?

A:     Yes.

Q:     And lawyers aren't supposed to do anything illegal; right?

A:     Yes.

Q:     Are you aware that Mr. Loumiet, there are public reports that he was under federal investigation for a number of years?

A:     I am aware he was under investigation for some kind of work he did for another – for a bank.

Q:     Another offshore bank?

A.     A bank in Florida.  That's all I saw, that I recall.

Q:     And there's public reports that he was under federal investigation for a number of years for the legal work he did for another bank; is that right?

A:     Yes.

Q:     That's the honest, ethical, typical lawyer Mr. Fazel was referring to?

       [Objection made and overruled]

THE WITNESS:        It was the same Carlos Loumiet.

Q:     That Mr. Stanford's bank had hired --

A:     Yes.

---

[23]  The prosecutor, Hon. Gregg Costa, is now serving as a Judge in the Southern District of Texas, Galveston Division.

*Id.* at 4018-19 (Appendix at 0116 - 0117).

The Complaint very clearly and specifically alleges that Hunton failed in its duties to properly guide the Stanford Entities to comply with applicable laws and regulations, and instead helped Allen Stanford evade and otherwise violate laws around the world in order to keep SIBL unregulated, thereby exposing the Stanford Entities to liability.   The Complaint's professional negligence allegations as to Hunton are more than sufficient to meet *Twombly's* "plausibility" standard.

### 3.   Hunton's Conflicting Representations Also Support the Receiver's Professional Negligence Claim

Hunton's simultaneous and continuous representation of multiple Stanford Entities, as well its as individual representation of Allen Stanford, also raises liability issues based on inherent conflicts of interest.   When an attorney (or law firm) has direct or separate attorney-client relationships with affiliated entities and their principals, "the onus is squarely on the lawyer to anticipate and resolve conflicts of interest involving corporate affiliates."[24]   Courts have recognized that that "an attorney who represents a corporation has a duty to act in the corporation's best interest" and that "[i]t is not a defense that corporate representation often involves the distinct interests or affiliated entities" because "[a]ttorneys are bound to act when those interests conflict".[25]

Courts have held that a lawyer's or law firm's concurrent representation of clients with adverse interests is prohibited.   Under this general rule, "where the relationship is a continuing

---

[24]   *See* ABA Formal Op. 95-390 citing *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 273 (D. Del. 1980).
[25]   *See In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 794 F. Supp. 1424, 1453 (D. Ariz. 1992)* (denying law firm's motion to dismiss).

one, adverse representation is prima facie improper ... and the attorney must be prepared to show, at the least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representations."[26]  See also, *Antioch Litigation Trust v. McDermott Will & Emery LLP* (attorneys have duty to act as "gatekeepers" to protect their corporate clients from wrongdoing by directors and officers and a duty "to take appropriate action to advise the directors, and to help them avoid wrongdoing that could seriously harm its corporate client").[27]

In *Wiatt v. Winson & Strawn LLP,* a New Jersey court recognized that a law firm's conflicts of interest could support a legal malpractice claim.[28]  The court held that "[g]iven the substantial number of red flags ... [known by] Winston & Strawn that one of their clients may have conflicting interests with another of their clients, and their concomitant failure to disclose the conflict or more closely monitor or manage the assets and financial losses of the Wiatts, it is plausible to infer that they did not fulfill the legal duties of attorneys with ordinary and reasonable skill and knowledge commonly possessed by members of the legal profession, and, further, that said failures were a substantial factor in the [the plaintiffs] not being able to recover the financial losses they incurred while they were clients of Winston & Strawn ..." *Id.*

The Receiver alleges that Hunton was engaged in conflicts of interest based, in part, on its dual representation of Allen Stanford and the various Stanford Entities.  It is clear from a full reading of the Complaint that Hunton's principal loyalty was to Allen Stanford, not to the Stanford Entities; indeed, Hunton appears to have considered the Stanford Entities to be mere appendages of Allen Stanford, not clients to which Hunton owed separate obligations.  Hunton's

---

[26] *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir. 1976).
[27] *See Antioch Litig. Trust v. McDermott Will & Emery LLP,* 738 F. Supp. 2d 758, 762 (S.D. Ohio 2010).
[28] *Wiatt v. Winston & Strawn LLP,*  838 F. Supp. 2d 296, 311 (D.N.J. 2012).

conflict is best exemplified by Loumiet's own words.  In November 2004, he told Allen Stanford that one reason Stanford should continue to use Hunton was to "**assure that outside counsel was primarily loyal" to Allen Stanford**. Complaint at ¶290.  Then, in December 2004, Loumiet told Stanford that: "*my loyalty is first and foremost to you, and not anyone else, so I will watch out for your interests, and not those of anyone else in your organization*".  *Id.* at ¶¶ 292, 409.

It is indisputable that Hunton represented Allen Stanford personally, in everything from tax matters to real estate deals to traffic tickets.  *Id.* ¶¶264-276 (Hunton representation of Allen Stanford in political defamation suit linked to SIBL); ¶¶287, 300 (Hunton representation of Allen Stanford in his personal home purchases and even traffic tickets);  ¶¶335-344 (Hunton representation of Allen Stanford in legislative lobbying campaign designed to lower his personal tax exposure by changing his personal residency to the Virgin Islands).  Hunton regularly sent its fee bills for Allen Stanford's personal representation to the Stanford Entities for payment by those Entities.  *Id.* at ¶300.  Furthermore, it is clear that Hunton considered Stanford's Caribbean real estate buying spree, which Hunton helped direct as Stanford's deal counsel, to be Allen Stanford's "pet" project, even though Hunton knew or should have known (and had a duty to investigate) that all of the money Stanford was pouring into Caribbean real estate deals came from the SIBL investors **and** was contrary to SIBL's disclosures about its investment portfolio. *Id*. at ¶¶339, 343-344 (knowledge that Stanford's investment capital came from SIBL), ¶347 (Loumiet attending Board meeting for Stanford's Caribbean investment fund); ¶¶351-359 (Hunton's knowledge of and extensive involvement in Stanford's "Super Club" Caribbean resort scheme); ¶360 (Loumiet informing another Hunton partner that Allen Stanford's most important business priority was **"his"** Caribbean "Super Club" resort).

The Receiver further alleges that Loumiet used his loyalty to, and personal relationship with, Allen Stanford to keep the pipeline of billable fee work from the Stanford Entities flowing to Hunton.  *Id.* at ¶¶263 (Loumiet noting that his "strong" personal ties to Stanford and Suarez helped Hunton get Stanford Financial work), ¶¶284-306 (describing Loumiet's personal relationship with Stanford), ¶336 (Loumiet pushing Suarez to get more of Stanford's Washington lobbying work), ¶¶338, 351 (Suarez telling Alvarado that "RAS wants Hunton to do the work" on Stanford's Caribbean real estate investments), ¶357 (Hunton pushing to get more of Stanford's Caribbean real estate work).  As a result of that loyalty to Stanford, Hunton billed and collected exorbitant fees through its continued representation of the Stanford Entities.  *Id.* at ¶263 (citing $300,000 in litigation billing by Hunton at the preliminary motion to dismiss stage of a federal case); ¶340 (Hunton billing $450,000 to Stanford for Virgin Islands lobbying work). Loumiet also served on Stanford Financial's "advisory board" from 1993 until 2009 [*id.* at ¶¶89, 302-304], and Hunton was paid $100,000 per year by the Stanford Entities (in addition to its regular billings) to serve as counsel to the advisory board, although it is unclear what work (if any) Hunton actually did for that money.  *Id.* at ¶302.

Therefore it is entirely plausible that the Receiver has sufficiently alleged, and can  build and present a case to the jury that Hunton was blind to the obligations it owed to the Stanford Entities by its conflicted loyalty to Allen Stanford personally.  As a result, Hunton breached the duties it owed to those Stanford Entities in order to continue reaping the lucrative legal fees that Allen Stanford was authorizing the Stanford Entities to pay Hunton as long as Hunton continued to do what Allen Stanford wanted – which was to keep his offshore bank business alive and unregulated.

**C.** **Plaintiffs State a Valid Claim for Breach of Fiduciary Duty**

Defendants next assail Plaintiffs' breach of fiduciary duty claim.  Defendants argue that Plaintiffs have improperly "fractured" the Receiver's malpractice claim into several causes of action, including a claim for breach of fiduciary duty.  [GT Brief at p. 6. Hunton Brief at p. 22; Suarez Brief at 13.]

Defendants fail to support this argument with applicable case law and misconstrue Texas law on fracturing legal malpractice claims.  Texas law is clear that "when cases say that clients cannot divide or fracture their negligence claims against their attorneys into other claims, this does _not_ mean that clients can sue their attorneys _only_ for negligence."  *Beck v. Law Offices of Edwin J. Terr*y, 284 S.W. 3d 416, 427 (Tex. App. – Austin 2009)(citing *Deutsch v. Hoover, Bax & Slovacek, LLP*, 97 S.W. 3d 179, 190 (Tex. App. – Hous. [14th Dis.] 2003)(emphasis added)).  Nor does the non-fracturing rule necessarily bar a client from *simultaneously* asserting professional negligence and non-negligence claims against an attorney that are **predicated on some common or overlapping facts**. *Id.*[29]

The Defendants mistakenly argue that Plaintiffs' allegations for breach of fiduciary duty are merely restatements of the Receiver's malpractice claim.  Plaintiffs are entitled to allege and prove the same underlying facts to support both their breach of fiduciary duty and negligence claims; in those circumstances, courts have held that the jury should be charged on both claims:

---

[29]  There is no question that Plaintiffs can sue Defendants for both malpractice _and_ for aiding and abetting breaches of fiduciary duties owed by Stanford's directors and officers to the Stanford Entities, *Floyd v. Hefner*, 556 F. Supp. 2d 617, 659 (S.D. Tex. 2008)(denying summary judgment based on evidence the lawyers' actions in providing legal services with knowledge of the unlawful purpose of the underlying transaction  were sufficient to state a claim for aiding and abetting breach of fiduciary duty).

> Though [plaintiff] alleged the same facts in his petition for both his negligence and breach-of-fiduciary-duty claims, this pleading practice is not determinative. The procedural rules allow a claimant to plead in the alternative. When, as in this case, the evidence raises a genuine issue of material fact regarding alleged wrongful conduct that sounds in negligence as well as alleged wrongful conduct that sounds in breach of fiduciary duty, the trial court should charge the jury on both claims, regardless of any alternative pleading.

*Deutsch*, 97 S.W.3d at 190-191 (internal citations omitted).

In order for a breach of fiduciary duty claim against an attorney to survive as a claim separate and apart from a legal malpractice claim, the plaintiff must plead (and eventually prove) that the attorney's conduct involved *"placing the attorney's personal interest over the client's interest"*. *Beck*, 284 S.W. 3d at 429. *See also*, *Murphy v. Gruber*, 241 S.W. 3d 689, 693 (Tex. App. – Dallas 2007)(attorney conduct indicative of breach of fiduciary duty included the attorney "subordinating his client's interest to his own"); *Archer v. Medical Protective Co*., 197 S.W. 3d 422, 427-28 (Tex. App. – Amarillo 2006, pet. denied)(attorney breach of fiduciary duty claim upheld because it "concerns a matter of divided loyalties, e.g., the pursuit of [the attorney's] own pecuniary interest over the interests of his client").   "[A] separate cause of action for breach of fiduciary duty exists if the allegations in the petition allege self-dealing, deception, or misrepresentations in the attorney's legal representation of the client." *Trousdale v. Henry*, 261 S.W.3d 221, 228 (Tex. App. — Houston [14th Dist.] 2008) (internal citations omitted). "[B]reach of fiduciary duty by an attorney often involves the attorney's *failure to disclose conflicts of interest*, failure to deliver funds belonging to the client, *placing personal interests over the client's interests*, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing, and making misrepresentations." *Id.* at 232 (emphasis added; citations omitted)

Under these standards, there is a wealth of authority holding that a separate claim for breach of fiduciary duty can be maintained against one's lawyer.[30]  For example, in *Archer v. Medical Protective Co.*, 197 S.W.3d 422 (Tex. App. Amarillo 2006), the court concluded that one of the client's allegations could be characterized as a claim for breach of fiduciary duty, as opposed to a claim for professional negligence: failure to "represent [client/insured]'s interests notwithstanding the interests of [insurer] in a situation in which the representation of [client/insured] was ***adversely limited by [the lawyer's] own interest in keeping the business and favor of*** [insurer]." *Id.* at 427-28 (emphasis added).  *Archer* held that the allegation stated an independent claim for breach of fiduciary duty because it "concerns a matter of <u>divided loyalties</u>, e.g., the pursuit of [the attorney's] own pecuniary interests over the interests of his client." *Id.* (emphasis supplied).

### 1.    Breach of Fiduciary Duty by the Law Firms

As described in more detail above (*supra* at pps. 28-30), the Complaint contains numerous allegations of conflicting interests and divided loyalties influenced by the Law Firms' own pecuniary interests.  Like the attorneys at issue in *Archer*, the Law Firms' representation of

---

[30]  *See, e.g.*, *Spera v. Fleming, Hovenkamp & Grayson, P.C.*, 25 S.W.3d 863, 873 (Tex. App. —Houston [14th Dist.] 2000)(remanding claim for breach of fiduciary duty because court concluded fact issue existed concerning whether lawyers had duty to tell clients about potential conflict of interest in time for clients to obtain other counsel prior to hearings); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 662 (S.D. Tex. 2008) (finding that "the 'gist' of the conflict-of-interest allegations was Lawyers obtained an improper benefit from their dual roles, "which speaks to a breach of fiduciary duty claim."); *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 187 & 190 (Tex. App. —Houston [14th Dist.] 2002)(allegations that law firm failed to advise client about conflicts presented when law firm was named as party in related proceeding, failed to withdraw, and failed to recommend separate counsel "are appropriately classified as a breach-of-fiduciary-duty claim, independent of Deutsch's negligence claim."); *Riverwalk Cy Hotel Partners Ltd. v. Akin Gump Strauss Hauer & Feld, LLP*, 2012 Tex. App. LEXIS 9366, 18-19 (Tex. App. —San Antonio Nov. 14, 2012)(holding that the trial court erred in granting summary judgment as to plaintiff's breach of fiduciary duty claim alleging that defendants intentionally withheld tendering the defense of a lawsuit to the insurance company, despite its knowledge of the existence of insurance coverage, in order to collect legal fees); *Vaughn v. Vaughn (In re Legal Econometrics)*, 191 B.R. 331, 348 (Bankr. N.D. Tex. 1995); *McMahan v. Greenwood*, 108 S.W.3d 467, 496 (Tex. App. —Houston [14th Dist.] 2003).

the Stanford Entities was adversely limited by their own interests in keeping the business and favor of Allen Stanford personally,[31] and in leveraging Loumiet's personal relationship with Allen Stanford to keep the pipeline of billable fee work from the Stanford Entities flowing.[32] Complaint at ¶¶ 66, 74, 91, 139, 142, 151, 164, 174-175, 189, 196-198, 209, 232, 236, 243, 288-292, 407, 409, 411-413.[33]

Greenberg in particular ignored egregious conflicts of interest during its representation of the Stanford Entities.  While it continued to represent the Stanford Entities, Greenberg also represented the Antiguan government in an effort to rewrite the laws that regulated SIBL – **all while having its legal fees paid by Stanford Entities**.  *Id.* at ¶¶66, 118 (writing Antigua's trust

---

[31]  Complaint, at ¶81, fn 9, ¶189-191 (Greenberg representation of Allen Stanford in his personal IRS dispute); ¶264-276 (Hunton representation of Allen Stanford in political defamation suit linked to SIBL); ¶¶287, 300 (Hunton representation of Allen Stanford in his personal home purchases and even traffic tickets); ¶¶335-344 (Hunton representation of Allen Stanford in legislative lobbying campaign designed to lower his personal tax exposure through changing personal residency to the Virgin Islands – all Hunton bills paid by Stanford Entities).  Greenberg and Hunton regularly sent their fee bills for Allen Stanford's personal representation to the Stanford Entities for payment by said entities.  *Id.*, at ¶300.

[32]  Complaint at ¶¶263, 284-292; 295-306, 336, 338, 351 (Suarez telling Alvarado that "RAS wants Hunton to do the work" on Stanford's Caribbean real estate investment fund), 357.  Plaintiffs allege that the Law Firms billed and collected exorbitant fees through their continued representation of the Stanford Entities.  *Id.*, at ¶156 (Greenberg expecting Stanford to pay "very significant compensation" in order for Greenberg to sue the U.S. government on behalf of Antigua); ¶134 (Greenberg billing Stanford $300 an hour – in 1996 – to have Pat O'Brien send FOIA request forms to the U.S. Government); ¶151 (Greenberg billing Stanford $2,750 *a day* for O'Brien's service on Antigua's bank regulatory reform task force); ¶244 (Greenberg billed Stanford $162,000 for *one month* of work on a transaction); ¶263 (citing $300,000 in litigation billing by Hunton at the preliminary motion to dismiss stage of a federal case); ¶340 (Hunton billing $450,000 to Stanford for Virgin Islands lobbying work).  Loumiet also served on Stanford Financial's "advisory board" from 1993 until 2009 [*Id.*, at ¶¶89, 302-304], and Hunton was paid $100,000 per year (in addition to its regular billings) to serve as counsel to the advisory board, although it is unclear what Hunton really did for that money.  *Id.*, at ¶302.

[33]  Greenberg argues in a footnote that receipt of legal fees is not the type of benefit contemplated by breach of fiduciary duty.  Greenberg Brief at fn 3.  But Texas courts have held that a law firm's pecuniary interest in legal fees can constitute sufficient grounds to support a breach of fiduciary duty claim.  *See, e.g.*, *Sullivan v. Bickel & Brewer*, 943 S.W. 2d. 477, 482-83 (Tex. App. – Dallas 1995)(writ denied)(Plaintiffs that the plaintiff had properly plead a claim for breach of fiduciary duty and not just malpractice where he alleged that the lawyer defendants had taken "*a posture in their representation which caused the duration and scope of the litigation to be increased drastically and thereby increased the cost of legal fees and expenses*".) (emphasis added); *Archer v. Medical Protective Co.*, 197 S.W.3d 422 (Tex. App. Amarillo 2006).

legislation); ¶151 (Greenberg technically represented Antiguan government in reform of its banking laws spearheaded by Stanford, but all of Greenberg's bills were paid by Stanford Entities).  Greenberg lawyers were so cavalier about these conflicts that Greenberg's O'Brien actually told another Greenberg partner that they might be able to gin up some new business from Stanford "*writing Antiguan laws with [Stanford] paying for it.*"  *Id.* at ¶231.

During the time period that Greenberg represented both Stanford and the Antiguan government, Greenberg also represented certain of the Stanford Entities in making multiple, multi-million dollar loans (at Allen Stanford's instance) to the Antiguan government [Complaint at ¶¶106, 207, 247-248].  Several of those loans resulted in investigations in Antigua during which Stanford and his Antiguan counsel, Errol Cort, were themselves accused of engaging in conflicts of interest. *Id.* at ¶¶247-251.  Despite its knowledge of this investigation, Hunton later assisted Stanford in causing certain of the Stanford Entities to make an additional $40 million in loans to the Antiguan Government.  *Id.* at ¶¶247-254.  As the Court is well aware, none of those loans were ever repaid.  *Id.* at ¶283.

Therefore it is entirely plausible that Plaintiffs have sufficiently alleged, and can build and present a case to the jury that the Law Firms became blinded to the obligations they owed to the Stanford Entities by their conflicted loyalty to Allen Stanford personally.  As a result, the Law Firms breached the fiduciary duties they owed to the Stanford Entities in order to continue reaping the lucrative legal fees that Allen Stanford was authorizing the Stanford Entities to pay the Law Firms as long as the Law Firms continued to do what Allen Stanford wanted.

Greenberg's separate and additional arguments regarding Plaintiffs' breach of fiduciary duty claim are simply red herrings and without merit.  Specifically, Greenberg argues that allegations about ignoring "red flags" and warnings while continuing to provide representation

do not state a claim.   [Greenberg Brief at p. 8.]   Greenberg contends that Texas law does not require it to anticipate that Stanford would commit crimes and that his criminal conduct is a superseding cause of the investors' injuries.   *Id.*   However, Plaintiffs do not allege a breach of fiduciary duty claim for Greenberg's failure to <u>anticipate</u> crimes.   Instead, and as described in detail *infra* at pps. 37-40, Plaintiffs allege that <u>Greenberg had knowledge of and actually participated in the misconduct in "real time"</u>.[34]   Plaintiffs respond to the arguments about superseding cause *infra* at p. 64-67.

Greenberg also argues separately that it did not have a duty to "blow the whistle on its own clients." Greenberg Brief at p. 9.   Plaintiffs do not allege that Greenberg breached its fiduciary duty *solely* by failing to blow the whistle on Stanford and the Stanford Entities.[35] Instead, Plaintiffs clearly allege that Greenberg failed in its fiduciary duty to protect its corporate clients (the Stanford Entities) and steer them away from illegalities because Greenberg (and Loumiet in particular) was too much under the spell of Allen Stanford.   Greenberg breached its fiduciary duties when it lost sight of, and ignored, the obligations it owed separately and directly to the Stanford Entities.

Plaintiffs have properly stated a separate and valid claim for breach of fiduciary duty under Texas law.

------

[34]   Furthermore, <u>all</u> of the cases cited by Greenberg for this argument – *see e.g.*, *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 458 (Tex. 2006); *Barton v. Whataburger, Inc.*, 276 S.W.3d 456, 462 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *First State Bank, N.A. v. Morse*, 227 S.W.3d 820, 825 (Tex. App.—Amarillo 2007, no pet.) – involve wrongful death claims or other negligence cases, and <u>not</u> a breach of fiduciary duty.

[35]   Moreover, *Reneker v. Offill*, 2009 U.S. Dist. LEXIS 97338 (N.D. Tex. Oct. 20, 2009), and the other cases relied on by Greenberg for this argument, are distinguishable in that they focus on whether an attorney has a duty to reveal his client's illegal actions to <u>third parties</u> (i.e. blowing the whistle on his client to the outside world).   These cases do not address an attorney's failure to advise its clients that the conduct they are engaged in is illegal, which is what Plaintiffs allege in the present case.

2.        **Breach of Fiduciary Duty by Suarez as Officer and Director**

There is really no debate that Suarez, who was an officer and director of many of the Stanford Entities [see e.g., Complaint at ¶411], including serving as General Counsel, breached her fiduciary duties owed to the Entities.  Under well-settled Texas law, officers and directors of corporations must exercise due care in the management of corporate affairs.  *See Roth v. Mims*, 298 B.R. 272, 284-85 (Bankr. N.D. Tex. 2003)(citing *Meyers v. Moody*, 693 F. 2d 1196, 1209 (5th Cir. 1982), *cert. denied*, 464 US. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983)).  In relevant part, "[t]he duty of care involves the director's diligence and competence in running the corporation."  *In re Chavez*, 140 B.R. 413, 424 (Bankr. W.D. Tex. 1992).  Importantly, "[b]reaches of [the duty of care and duty of loyalty] may arise where the director engages [in] or promotes activities which are detrimental to the corporation."  *Id.*

A director is "'held to a higher standard of care and fair-dealing than would be for one not in a fiduciary position.'"  *Meyers*, 693 F. 2d at 1211.  "The duty of loyalty requires an extreme measure of candor, unselfishness, and good faith on the part of the officer or director."  *Landon v. S & H Marketing*, 82 S.W.3d 666, 672 (Tex. App. 2002) (citing *Int'l Bankers Life Ins. V. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963)).  The duty of loyalty "demands that the best interests of the corporation and its beneficiaries take precedence over that of the individual director."  *122261 Fondren, LLC v. Riverbank Realty GP, LLC*, No. H-09-4074, 2010 WL 1741071, *3 (S.D. Tex. Apr. 29, 2010) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993)).  "'Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.'"  *Id.* (quoting *Stone ex el. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

Critically, officers and directors breach their duty of loyalty when they allow the corporation to violate the law.  *See In re Chavez,* 140 B.R. 413, 424 (W.D.Tex. 1992).  In *Chavez*, the court found that a director breached his duty of loyalty by permitting the corporation to make illegal loans to other directors and corporations in clear violation of federal regulations. *Id.* ("Breaches of these duties may arise where the director engages in or promotes activities which are detrimental to the corporation.") (citing *McCollum v. Dollar*, 213 S.W. 259 (Tex.Comm'n. App. 1919)); *see also Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 163-64 (Del. Ch. 2004) (directors violated their duties of loyalty when they engaged in unlawful bribery because "a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity"); *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."); Leo E. Strine, et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 GEO. L.J. 629, 652 (Mar. 2010) (noting that directors breach their fiduciary duties when they knowingly cause the corporation to violate the law).

The Complaint alleges in great detail how Suarez breached her duties of care and loyalty by knowingly assisting Stanford to cause the Stanford Entities to violate the law, thus perpetuating a $7 billion dollar fraud.  Suarez served as General Counsel of the Stanford Entities from 1992 until 2002 and then became Stanford's Chief of Staff until November 2008, resigning shortly before the SEC filed its action against Stanford.  Complaint, at ¶¶80, 259, 393.  Suarez also served as a Director on the boards of literally dozens of companies within the Stanford Financial Group.  *Id.*, at ¶411.

Plaintiffs have alleged that Suarez violated her fiduciary duties by, *inter alia*:

(1) overseeing the establishment of SGC, STC, SFIS with full knowledge that the sole purpose of said entities was to sell the unregulated SIBL CDs [Complaint at ¶¶136-140, 165-185, 186-188];

(2) overseeing Stanford's deceptive responses to the SEC's 1998 investigation of SGC [*id*. at ¶¶194-195];

(3) overseeing the implementation of Stanford's Reg D disclosures for the SIBL CDs with full knowledge that they omitted material facts [*id*. at ¶¶208-213];

(4) ignoring advice from Stanford's securities counsel to register SIBL as an investment company [*id*. at ¶¶212-213];

(5) overseeing Stanford's unauthorized and undisclosed investments in Caribbean real estate [*id*. at ¶¶141, 351, 353];

(6) being actively involved in Stanford's deceptive marketing campaign to trick investors into believing the SIBL CDs were insured [*id*. at ¶¶197-204];

(7) being involved in Stanford's Antiguan banking law reform efforts and Stanford's attempts to quell the subsequent U.S. government criticisms and advisories [*id.* at ¶¶158-160];

(8) being involved in Stanford's bribery of Antiguan government officials through loans (that were eventually forgiven) and political donations [*id.* at ¶¶114-116, 164]; and

(9) overseeing Stanford's relentless campaign to silence critics and whistleblowers, including journalists, who threatened Stanford's fraudulent operations with litigation and threats of litigation [*id.* at ¶¶125, 200-206].

A decision in the Madoff case provides a useful reference point for the Court to analyze Suarez's breach of fiduciary duty as an officer and director of the Stanford Entities. *See Picard*

*v. Madoff (In re Bernard L. Madoff Inv. Securities LLC)*, 458 B.R. 87 (S.D.N.Y. 2011).  In that case, the Madoff bankruptcy trustee Irving Picard brought claims against the former directors and officers of the Madoff broker-dealer company (most of whom were members of Madoff's family), including the General Counsel.  In denying motions to dismiss the breach of fiduciary duty claim, the court held that the trustee had plausibly alleged that the Defendants' conduct, whether intentional or negligent, constituted a breach of their fiduciary duty, including the duties "mandated by applicable securities laws and regulations, to properly supervise BLMIS operations", and failing to investigate or detect suspicious transfers of funds to other entities.  *Id.* at 128.  The court went on to hold that *"[i]ndeed, of all the possible parties to uncover or prevent the fraud, the Defendants were those best situated, and in fact obligated, to do so. Yet, on the basis of the facts alleged, the Defendants shirked their compliance and supervisory duties, engaged in improper personal use of BLMIS funds, and consequently impoverished BLMIS while permitting its descent towards its eventual demise. As such, the Trustee has adequately stated claims for breach of fiduciary duty and negligence against the Defendants".  Id.* at 129.

In sum, the Complaint adequately details Suarez's active facilitation of and involvement in Stanford's fraud and regulatory violations as General Counsel of Stanford Financial, and as a Director of numerous other Stanford Entities.  Those acts, and intentional inaction and misconduct, are more than sufficient to support Plaintiffs' claims that Suarez breached her duties of care and loyalty owed to the Stanford Entities, thereby exposing those Stanford Entities to criminal and civil liability.

D.       **Plaintiffs State Valid Claims for Aiding and Abetting Breach of Fiduciary Duty**

      1.       **Aiding and Abetting Liability is Recognized in Texas**

Plaintiffs have also stated valid claims against Defendants for aiding and abetting breaches of fiduciary duty.   The Defendants' threshold argument in favor of dismissing the aiding, abetting, and participation claims is that such causes of action have not been "addressed" by the Texas Supreme Court.   [Greenberg Brief at p. 3; *see also* Hunton Brief at 23-24]. Greenberg even goes so far as to claim that "Texas has never adopted this derivative cause of action, and Texas is not likely to do so." *Id.*  Greenberg is simply wrong.

Texas has long recognized a cause of action for aiding and abetting (or participation in) breach of fiduciary duty. *See, e.g., Floyd v. Hefner*, 556 F. Supp. 2d 617, 654-655 (S.D. Tex. 2008)("Texas recognizes a cause of action for aiding and abetting a breach of fiduciary duty")(citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 514 (1942)(a defendant's knowing participation in a breach of fiduciary duty gives rise to a viable cause of action)); *see also Cox Tex. Newspapers, L.P. v. Wooten,* 59 S.W.3d 717, 721 (Tex.App.-Austin 2001, pet. denied)(quoting *Kinzbach Tool Co.,* 160 S.W.2d at 514)("'It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor with the fiduciary and is liable as such.'"); *Kline v. O'Quinn,* 874 S.W.2d 776, 786 (Tex.App.-Houston [14th Dist.] 1994, writ denied)(same); *Toles v. Toles*, 113 S.W.3d 899, 912 (Tex. App.—Dallas 2003, no pet.)(discussing claim for aiding and abetting breach of fiduciary duty).  Accordingly, this Court should similarly consider Plaintiffs' well-pled aiding and abetting claims.

**2.     Plaintiffs State a Valid Claim for Aiding and Abetting Breaches of Fiduciary Duty**

To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co.,* 492 F.3d 634, 639 (5th Cir. 2007).

Plaintiffs have adequately alleged plausible claims against Defendants for aiding and abetting breaches of fiduciary duties owed by the directors and officers of the various Stanford Entities (including but not limited to Allen Stanford himself).   It is undisputed that Allen Stanford and other directors and officers of the Stanford Entities (including Suarez) owed fiduciary duties to said Entities.[36]  Complaint ¶ 411.  Plaintiffs have pled that the Stanford Entity directors and officers breached the fiduciary duties they owed to SIBL, SGC, SFIS and other Stanford Entities by causing those Entities to engage in significant and wide-ranging illegal activity, thereby setting the stage for and allowing Stanford to misappropriate billions of dollars in assets.[37]

---

[36]  Defendants do not, nor could they, deny the existence of fiduciary duties owed by Allen Stanford and other Stanford officers and directors to the Stanford Entities**.**

[37]  *See Chavez*, 140 B.R. at 424 (director breached his duty of loyalty by permitting the corporation to make illegal loans to other directors and corporations in clear violation of federal regulations)(citing *McCollum v. Dollar*, 213 S.W. 259 (Tex.Comm'n. App. 1919)); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 163-64 (Del. Ch. 2004) (finding that directors had violated their duties of loyalty if they had engaged in unlawful bribery because "a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity"); *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."); Leo E. Strine, et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 GEO. L.J. 629, 652 (Mar. 2010) (noting that directors breach their fiduciary duties when they knowingly cause the corporation to violate the law).

Defendants apparently will contend that they did not know Stanford's directors and officers were breaching the fiduciary duties they owed to the Stanford Entities (when they caused those Entities to engage in illegal and deceptive conduct).[38]   Plaintiffs' Complaint contains extensive and factually specific allegations concerning what Defendants knew about the breaches of fiduciary duty by Allen Stanford and other Stanford officers and directors.

a.    *Greenberg*

Greenberg argues that Plaintiffs allege only that Greenberg knew about Stanford's wrongful conduct *"after the fact"*.  See Greenberg Brief at 5.  That is clearly not the case; Plaintiffs have painstakingly alleged how Loumiet was aware of, and complicit in, Stanford's illegal and deceptive conduct in "real time" since 1988.

Among other things, Plaintiffs allege that Greenberg knew that, *inter alia*:

(1) Stanford's principal business strategy and model was to operate an offshore, unlicensed and unregulated investment company from the U.S. while wholly evading  U.S. laws [Complaint at ¶¶49, 53, 165-166, 168];

(2) SIBL (and its predecessor GIBL) *was not* a commercial bank, but rather was an investment company [*id* at ¶50];

(3) Stanford had been accused by the OCC of violating U.S. banking laws by operating an unlicensed bank from U.S. soil [*id.* at ¶57];

---

[38]  Greenberg also appears to argue that it didn't know about the *existence* of fiduciary duties, although it is unclear which fiduciary duties Greenberg refer to:  those owed by the Stanford directors and officers to the Stanford Entities, or those owed by the Stanford Entities and/or their employees to the investors.  At any rate, Plaintiffs allege that Defendants knew of the existence of the fiduciary duties.   See Complaint at ¶409.

(4) Stanford's former in-house lawyer believed in 1988 that the SIBL/GIBL CDs were securities that likely needed to be registered in the U.S. (yet were never registered) [*id.* at ¶58];

(5) the government of Montserrat revoked GIBL's bank license and alleged that GIBL/SIBL's auditor, Hewlett, *w*as not qualified, that GIBL was operating in a manner detrimental to its depositors, and that Stanford was causing information to be withheld from GIBL's audited financial statements [*id.*, at ¶¶60-61];

(6) Stanford continued to use Hewlett as GIBL/SIBL's **sole** auditor throughout its history [*id.* at footnote 12];

(7) Stanford had an informant within the Montserrat government that relayed information to Stanford about that government's (and the British government's) investigation of Stanford [*id.* at footnote 6];

(8) Antigua was infamous as a cesspool of corruption and lax regulation, and had a reputation as a known haven for drug running and money laundering [*id.* at ¶¶64, 122];

(9) several U.S. banks (including Chase) terminated their correspondent banking relationships with SIBL and Stanford's affiliated Bank of Antigua over the years [*id.* at ¶¶72, 84];

(10) SIBL was just a façade; SIBL's real banking operations were carried out from the U.S. [*id.* at ¶¶83-84, 189-191];

(11) a British journalist accused Stanford of deceiving investors into believing that his banking operations were compliant with U.S. laws [*id.* at ¶77];

(12) Stanford was consistently under investigation by various agencies within the U.S. government, including the OCC [*id.* at ¶¶57, 63, 70, 74-75]; FBI [*id.* at ¶97]; and Customs [*id.* at ¶99]; for, *inter alia*, money laundering [*id.* at ¶¶99-100, 307, 385, 387];

(13) a Texas joint task force investigation of Stanford in 1991 caused Stanford to fire several Stanford employees suspected of leaking information to the authorities [*id.* at ¶99];

(14) Stanford corrupted several members of the Antiguan government, including former Antiguan Prime Minister Lester Bird and the Minister of Finance in charge of regulating GIBL/SIBL, through loans, gifts and bribes; Stanford's corruption of Antiguan government officials continued unabated until the Receiver was appointed [*id.* at ¶¶104, 112, 114-117, 164, 218; 230];

(15) Stanford exercised inordinate control over the Antiguan Government through, *inter alia*, the tens of millions of dollars in loans his Stanford Entities extended to Antigua, giving Stanford a lien on the entire country [*id.* at ¶¶66, 106, 254];

(16) various journalists had alleged that Stanford's loans to the Antiguan Government were funded with SIBL CD investor funds, in violation of Antiguan law and in contravention of SIBL's disclosures to its investors, because BoA did not have sufficient funds to make the loans to the Government of Antigua that it purported to make [*id.* at ¶¶92, 106, 107; 110, 123, 223];

(17) Since 1996, Stanford invested hundreds of millions of dollars (derived from SIBL CD investors) in Antiguan real estate projects [*id*. at ¶¶141-142];

(18) Stanford took over the Antiguan bank regulatory system, rewrote Antiguan bank regulations applicable to SIBL, and appointed himself and his agents (including Loumiet) to the commission overseeing the regulation of SIBL [*id.* at ¶¶143-153];

(19) one of Stanford's goals in re-writing Antiguan banking laws and regulations was to make it more difficult for U.S. authorities to investigate cases involving fraudulent accounting in Antigua [*id.* at ¶¶147-149];

(20) Stanford did not want U.S. authorities to gain access to SIBL's information through computer linkages with Stanford employees in the U.S. [*id.* at footnote 17];

(21) the U.S. and British governments accused Stanford of manipulating and controlling the regulation of his banks in Antigua; as a result, each issued international warnings about doing business with Antigua [*id.* at ¶¶152, 154-155];

(22) Stanford's "de facto" representative offices for SIBL in the U.S. likely violated U.S. banking laws [*id.* at ¶167];

(23) the real purposes of the SFIS "trust representative" offices Stanford established in Miami, Houston and San Antonio was to market and sell SIBL CDs [*id.* at ¶168];

(24) the SEC investigated Stanford in 1998 for violations of federal securities laws [*id.* at ¶192];

(25) Stanford marketed SIBL's portfolio as being invested conservatively in safe and liquid instruments; Stanford never disclosed to investors any investments by SIBL in loans to Stanford or the Antiguan Government, Caribbean real estate or private equity companies [*id.* at ¶¶196-198];

(26) Stanford marketed SIBL CDs as being insured to a greater extent than FDIC insurance, and represented that a CD investment in SIBL was safer than an

investment in a U.S. commercial bank because SIBL did not make loans [*id.* at ¶¶197-198];

(27) a former Stanford employee accused Stanford of manipulating SIBL's financial statements and training the sales force to falsely market the SIBL CDs as being 100% insured [*id.* at ¶¶200-201];

(28) SIBL investors were being duped into believing their CD investments were insured [*id.* at ¶¶203, 236];

(29) SGC's primary purpose and business model was to sell SIBL CDs [*id.* at ¶204];

(30) Stanford's loans to the Antiguan Government violated Antiguan law, in part because no other banks had participated in the loans [*id.* ¶¶207, 223]; and

(31) in 1998, Stanford experienced severe liquidity problems, and Stanford's Antiguan trust company and BoA were in regulatory trouble and financial difficulty [*id.* at ¶¶223-224].

Plaintiffs have also adequately alleged that, given the above knowledge, Greenberg aided, abetted, and participated in breaches of fiduciary duties by Allen Stanford, Suarez and other directors and officers of the Stanford Entities by, *inter alia*:

(1) advising Stanford on how to operate unlicensed bank sales offices in Miami (and later Houston) for GIBL/SIBL to sell the unregulated SIBL CDs [*id.* at ¶55];

(2) assisting Stanford in moving his operations to Antigua after Stanford was effectively run out of Montserrat [*id.* at ¶¶66-68];

(3) lying to Nationsbank about Stanford's historical compliance with U.S. law [*id.* at ¶73];

(4) lying to the U.S. Treasury Department about Stanford's problems with the Montserrat Government [*id.* at ¶¶74-75];

(5) taking measures, through lawsuits and threats of lawsuits, to silence multiple journalists who at various times publicly reported Stanford's illegal or fraudulent activities [*id.* at ¶¶77-80, 124-128];

(6) providing Stanford with legal documentation to assist Stanford's regulatory fraud and banking law violations [*id.* at ¶¶55, 81];

(7) lying to the U.S. Federal Reserve about Stanford's past problems in Montserrat as part of Stanford's attempt to qualify his Bank of Antigua in the U.S. so SIBL could sell more unregulated CDs [*id.* at ¶91];

(8) preparing letters to the Federal Reserve to be signed by Stanford cronies in the Antiguan Government to assist Stanford's goal of selling more unregulated CDs through BoA's proposed U.S. representative office [*id.* at ¶¶93-95];

(9) directing a counter-espionage campaign against the U.S. Government, on Stanford's behalf, using FOIA requests to determine what the U.S. Government knew about Stanford's activities [*id.* at ¶¶98, 134-135];

(10) representing Stanford, and preparing all the legal documentation, for the tens of millions of dollars in loan transactions between Stanford and the Antiguan Government [*id.* at ¶¶106; 207];

(11) using Greenberg's reputation and connections in the U.S. Government to intimidate U.S. government officials who were wary of Allen Stanford [*id.* at ¶¶130-132];

(12) assisting Stanford with the establishment of the U.S. broker-dealer Stanford Group Company ("SGC") in 1996, with full knowledge that SGC's primary purpose was

to sell more unregulated SIBL CDs, and preparing all of the related party transaction documents for CD referral fees between SGC, SIBL and other Stanford Entities [*id.* at ¶138];

(13) drafting the Reg. D disclosures in 1997-1998 for SGC to market and sell SIBL CDs as private placement securities, while omitting to disclose that Stanford (a) was under constant investigation by the U.S. Government, (b) had loaned tens of millions of dollars to SIBL's sole purported regulator, the Antiguan government, and (c) had written Antigua's banking laws [*id.* at ¶¶139; 209];

(14) advising Stanford on securities registration issues in 1996-1998, including advising that SIBL did <u>not</u> need to be registered as an Investment Company under the Investment Company Act [*id.* at ¶¶140, 213];

(15) representing Stanford in various multi-million dollar real estate projects in Antigua [*id.*, at ¶¶141-142, and footnote 16];

(16) serving on Stanford's Antiguan bank regulatory reform commission and representing the Antiguan government in the drafting of banking laws and regulations – all while being paid by Stanford.  Greenberg wrote the laws and regulations that made it more difficult for the U.S. government to investigate Stanford's activities in Antigua [*id.* at ¶¶147-152];

(17) utilizing its political connections in Washington to try and stop the U.S. Government from investigating Stanford and Antigua [*id.* at ¶¶159-160, 162];

(18) advising and directing the creation of the SFIS trust representative offices, which allowed Stanford to sell the unregulated SIBL CDs to Latin Americans from offices in the U.S., in violation of U.S. banking laws [*id.* at ¶¶165-185];

(19) concealing facts from, lying to, and providing fraudulent documents to Florida state banking regulators in order to help Stanford obtain a license to operate offshore trust representative offices for SFIS [*id.* at ¶¶168-176];

(20) exerting political influence on Florida regulators to get Stanford's SFIS office approved [*id.* at ¶¶178, 180-181];

(21) helping Stanford establish IRA trust operations in Louisiana as Stanford Trust Company ("STC") to sell more unregulated SIBL CDs [*id.* at ¶¶186-188];

(22) lying to Louisiana state regulators about Stanford's troubles with the OCC and the Montserrat government in order to help Stanford get STC Louisiana approved [*id.* at ¶188];

(23) helping Stanford respond to the SEC's 1998 investigation by lying about the scope of regulation of SIBL [*id.* at ¶194];

(24) advising Stanford to take the legal position with the SEC, in June 1998, that the SIBL CDs were <u>not</u> securities even though Loumiet knew that they were securities [*id.* at ¶195]; one month later Greenberg advised Stanford that the CDs qualified as securities under state Blue Sky laws [*id.* at¶210];

(25) suing and threatening to sue a former Stanford employee whistleblower who alleged fraudulent conduct by Stanford [*id.* at ¶¶202-206]; and

(26) advising Stanford that he did not need to register SIBL as an investment company because it was a commercial bank, even though Loumiet and Greenberg both knew that SIBL was not a commercial bank, and that SIBL marketed itself as being a safer investment precisely because it was not a commercial bank [*id.* at ¶213].

     b.     *Hunton and Suarez*

Based on the plethora of factual allegations described in detail *supra* at pps. 15-16 (Suarez) and pps. 17-27 (Hunton), Plaintiffs have more than adequately alleged viable claims against Hunton and Suarez for aiding and abetting, and participating in, breaches of fiduciary duty by Stanford and other directors and officers of the Stanford Entities.  See *Floyd v. Hefner*, 556 F. Supp. 2d 617, 659 (S.D. Tex. 2008) ("[w]here supporting evidence exists, Texas law permits a party to bring both a malpractice action based on his lawyer's breach of independent duties and a separate claim for the lawyer's assistance with the breach of another's fiduciary duties").  At a minimum, the Complaint's allegations concerning these claims are more than sufficient to meet *Twombly's* "plausibility" standard.

Plaintiffs have properly pled the elements of aiding, abetting, and participating in breaches of fiduciary duty against all Defendants under Texas law.  Specifically, Plaintiffs have alleged in detail facts concerning Defendants' knowledge of the primary breaches, and their active and knowing participation in those breaches.  Accordingly, Defendants' motions to dismiss these claims must be denied.

### E.    Plaintiffs Have Adequately Alleged Injury To The Receivership Entities

Hunton and Suarez argue that Plaintiffs' claims fail because they fail to plausibly plead damages suffered by the Stanford Entities, as opposed to Stanford investors. Hunton Brief at 17-20; Suarez Brief at 8-9.  But the Complaint clearly states otherwise:

> The Defendants' breach of this duty proximately caused injury to SIBL, SGC, STC and the Stanford.  Financial Group generally, and therefore to the Receiver, ***by enabling Stanford and his co-conspirators to misappropriate billions of dollars in assets from Stanford Financial companies, including at least $1.8 billion in funds that were improperly diverted and subsequently misappropriated from Stanford Financial companies***. As a result of the Defendants' breach, SIBL, SGC, STC, SFIS and Stanford Financial generally, and therefore the Receiver, suffered damages.

Complaint ¶ 407 (emphasis added).

As noted previously, at least one Northern District of Texas court has denied summary judgment in a legal malpractice case based on evidence that a law firm "negligently devised and implemented the creation of a new business structure that *ultimately facilitated a transfer of assets from the Debtor without adequate consideration being given and, thus, may have improperly denuded the Debtor of its assets*."  *Milbank v. Holmes, (In re TOCFHBI Inc*.), 413 B.R. 523, 531 (N.D. Tex. 2009) (emphasis added).  Diversion or "looting" of corporate assets is a routinely recognized theory of damages.  *See e.g., Scholes v. Lehmann*, 56 F. 3d 750, 754 (7th Cir. 1995)("transfers removed assets from the corporations for an unauthorized purpose and … so injured the corporations"); *Knauer v. Jonathan Roberts Financial Group*, 348 F. 3d 230 (7th Cir. 2003)(embezzlement or diversion of corporate assets is a legally cognizable injury);  *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1003 (9th Cir. 2005)(wrongful expenditure of corporate assets qualifies as an injury to the corporation); *In re Parmalat Sec. Litig*., 501 F. Supp. 2d 560, 574-578 (S.D.N.Y. 2007)(damage theory premised on "looted assets"); *In re Allou Distributors, Inc*., 395 B.R. 246 (E.D.N.Y. 2008)(denying dismissal of accountant malpractice case premised on damages to the estate in terms of dissipation, diversion or depletion of corporate assets).

Contrary to Defendants' arguments, Plaintiffs' damages claims here are supported by numerous detailed factual allegations detailing Stanford's denuding of the Stanford Entities of approximately $1.8 billion [Complaint at ¶¶ 11-15, 345-364, 400], as well as his diversion and "wrongful expenditure" of corporate funds through bogus loans to the Antiguan Government [*id*. at ¶¶ 66, 106, 116-118, 207], unauthorized investments in private equity and venture capital projects [*id*. at ¶¶345-350, 361] and investments in his "pet project," the Caribbean Super Club

52

resort, and other Caribbean real estate ventures [*id.* at ¶¶351-359].   Each of these supposed "investments" exposed the Stanford Entities to criminal and civil liability because those "investments" were inconsistent with what was being represented to CD investors.  *Scholes*, 56 F.3d at 754 (transfers removed assets from the corporations for an ***unauthorized purpose*** and…so injured the corporations") (emphasis added).

Furthermore, Plaintiffs have alleged that Defendants' wrongful conduct enabled Stanford to increase the liabilities of the Stanford Entities.  See Complaint ¶400 (detailing increase in CD deposit liability as a result of Defendants assisting Stanford to implement his regulatory evasion structure).  An increase in corporate liabilities is a recognized theory of damages in many federal courts, and has been so recognized in this district.  *See, e,g., Thaubault v. Chait*, 541 F.3d 512, 523 (3rd Cir. 2008); *Meyers v. Moody*, 475 F.Supp. 232, 238-240 (N.D. Tex. 1979)(approving of jury instruction that included increased liabilities as "fair and proper" measure of damages).  As such, Plaintiffs have more than adequately identified the harm inflicted directly on the Stanford Entities as a result of Defendants' wrongful conduct.[39]

Finally, Chief Judge Fitzwater recently considered similar injury issues, *albeit at the summary judgment stage*, and concluded that an SEC Receiver appointed to liquidate entities involved in a securities fraud could proceed to trial against the entities' former law firm on at least one theory of "increased liability" damages:  the costs and expenses, including professional fees, associated with the Receivership proceeding itself.  *Reneker v. Offill*, 2012 WL 2158733, at

---

[39]  To be sure, Plaintiffs hope Stanford CD investors will eventually benefit from recoveries in this and other cases. But, that should not color the harm alleged in the Complaint.  *See Donell v. Kowell*, 533 F.3d 762, 767, 777 (9th Cir. 2008)("although the losing investors will ultimately benefit from the asset recovery, the Receiver is in fact suing to redress injuries that Wallenbrock suffered when its managers caused Wallenbrock to commit waste and fraud.").

*9-10 (N.D. Tex. 2012).  As this Court well knows, the Stanford Receivership process, to date, has cost well in excess of $120 million.[40]  These expenses have all been paid from funds recovered by the Receiver or obtained via liquidation of assets belonging to the Stanford Entities – funds which otherwise would have been available for distribution to the Stanford Entities' creditor victims.  It is fair and appropriate that these Defendants, who flagrantly assisted Stanford's creation and perpetuation of his complex U.S.-Antiguan regulatory evasion structure, be held to account for at least the resulting costs associated with the receivership proceedings. *Reneker*, 2012 WL 2158733 at *9-10.

Plaintiffs acknowledge that they have not *specifically* alleged the cost of the Receivership as a measure of damages under an "increase in liabilities" theory of damages; however, under federal pleading standards a plaintiff does not need to plead such general damages with specificity.  *Prudence Co. v. Fidelity & Deposit Co. of Maryland*, 297 U.S. 198, 207–08 (1936); *Isilon Systems, Inc., v. Twin City Fire Insurance Company*, No. C-10-1392-MJP, 2012 WL 503854 (W.D. Wash. 2012); *Williams v. Sabin*, 884 F.Supp. 294, 297 (N.D. Ill. 1995) ("A detailed calculation of the damages alleged to have been incurred by the plaintiff is not necessary to give the defendant notice."); *Suarez Matos v. Ashford Presbyterian Community Hosp., Inc*. 4 F.3d 47, 52 (1st Cir. 1993) ("We believe the purpose is to give notice; the more natural are the damages, the less pleading is needed."); *see also* 22 Am. Jur. 2d Damages § 627 ("It is an established rule of pleading that general damages, as distinguished from special damages, need

---

[40]  See Civil Action No. 09-CV-0298-N, Doc. No. 1773 (Receiver's 5th Interim Status Report, as of January 31, 2013).  The Receiver's 5th Interim Status Report indicates that Receivership expenses through January 31, 2013, were $119.2 million, consisting of professional fees of approximately $65.8 million payable and other expenses (including taxes, personnel, insurance, telecommunications, occupancy, and claim settlement) of approximately $53.3 million.  Doc. No. 1773 at 5-6.

not be specifically pleaded"). Plaintiffs can and will amend their Complaint to more specifically allege this measure of damages if the Court so requires, and have moved generally for leave to amend at the end of this Response.

Hunton and Suarez also argue – like countless other defendants in Stanford-related litigation – that Plaintiffs lack standing to maintain the tort-based claims in this action because Plaintiffs indirectly seek to recover investor damages. *See* Hunton Brief at 32-33; Suarez Brief at 21. Hunton and Suarez further argue that because the Stanford Entites operated a Ponzi scheme, the Receiver "lacks standing to pursue alleged damages resulting from the scheme." Hunton Br. at 34 (citing *O'Halloran v. First Nat'l Bank of Fla.*, 350 F.3d 1197, 1202-03 (11th Cir. 2003) and *Knauer v. Jonathon Roberts Fin. Grp., Inc.* 348 F.3d 230 (7th Cir 2003)); *see also* Suarez Brief at 22-23. Both of these arguments fail.

As an initial matter, Hunton and Suarez cannot dispute well-settled law that receivers have standing to sue for injuries inflicted on the entities they represent.[41] *See Janvey v. Dem. Sen. Camp. Comm.*, 712 F.3d 185, 190 (5th Cir. 2013) *see also Obermaier v. Arnett*, No. 2:02CV111FTM29DNF, 2002 WL 31654535, at *4 (M.D. Fla. Nov. 20, 2002) ("The Receiver, as an equity receiver, clearly has standing to bring claims if the causes of action attempts to redress injuries to the Receivership Entities."); *Moratzka v. Morris (In re Senior Cottages of*

---

[41] The Committee likewise has standing to pursue the claims it has asserted via assignment from the Receiver. Complaint at ¶2. The Committee, which was formed by order of the Court, is authorized explicitly to represent the interests of Stanford CD investors and sue third-parties. *See* Order, Case No. 3:09-cv-00298-N [Doc. 1149], ¶1 ("the Stanford Investors will hereafter be represented in this case and related matters by an official committee); ¶1(a) (the Committee shall represent "a cross section of Stanford Investors"); ¶¶ 7-11 (describing protocols for bringing claims against third parties). Moreover, the Court has already confirmed the Committee's standing to prosecute litigation claims on behalf of Stanford CD investors and creditors. *See* Order Denying Motion to Dismiss, *Janvey, et al. v. IMG Worldwide, Inc., et al.*, Case No. 3:11-cv-00117-N, [Doc. 33] (Sept. 24, 2012). As such, the Committee's standing to bring claims on behalf of Stanford CD investors is settled.

*America, LLC),* 482 F.3d 997, 1004 (8th Cir. 2007) ("We agree with the First, Third, Fifth, and Eleventh Circuits that the collusion of corporate insiders with third parties to injure the corporation does not deprive the corporation of standing to sue the third parties").

The Complaint here clearly alleges that the Receiver's tort claims are based on harm suffered directly by the <u>Stanford Entities</u>, including Allen Stanford's outright misappropriation of some $1.8 billion from the Stanford Entities, and his wrongful expenditure and diversion of funds belonging to the Stanford Entities through (a) loans and bribes to the Antiguan government and (b) unauthorized investments in venture capital/private equity and Caribbean real estate deals.  Any argument that the Receiver's tort claims are really stealth "investor" claims, or that the Complaint should somehow not be read for what it actually says, is disingenuous.  *See e.g. Welt v. EfloorTrade LLC (In re Phoenix Diversified Inv. Corp.)*, 439 B.R. 231, 239 (Bankr. S.D. Fla. 2010) ("The Moving Defendants argue that … the Complaint is, in effect, seeking to recover on behalf of investors in the Ponzi scheme.  This argument requires the Court to read into the Complaint causes of action and facts not expressly alleged."); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d at 464, 467 (on a motion to dismiss, the Court must accept all well-pleaded allegations as true and view them in the light most favorable to the plaintiff).

Defendants' reliance upon the *O'Halloran* and *Knauer* decisions is misplaced.  The legal conclusions reached in *O'Halloran* and *Knauer* regarding the *in pari delicto* affirmative defense have been explicitly rejected by the Fifth Circuit, which instead has adopted the reasoning of the Seventh Circuit in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) with respect to federal

receivers.[42]  *See e.g., Jones v. Wells Fargo Bank*, 666 F. 3d at 969, n.12 (rejecting *Knauer*); *Janvey v. Democratic Senatorial Campaign Comm.*, 712 F.3d at 190-192 (adopting *Scholes*); *see also Perlman v. Wells Fargo Bank*, 830 F. Supp. 2d 1308 (S.D. Fla. 2011)(describing tension between the *O'Halloran* and *Scholes* decisions, and opting to follow *Scholes*).

In any event, both *O'Halloran* and *Knauer* support Plaintiffs' ability to bring the claims made in the Complaint.  *O'Halloran* specifically found that the trustee ***had standing*** to sue a third-party bank that allowed the Ponzi scheme to loot funds from bank accounts held in the name of corporate entity, although the court went on to hold that it appeared the wrongdoer was fully authorized by the corporate entity to withdraw the money from its bank accounts.  *See O'Halloran*, 350 F.3d at 1203 ("The district court apparently ruled that the trustee had no standing to pursue the embezzlement claim. We disagree.").  Similarly, *Knauer* held that a receiver ***has standing*** to sue third-parties for their misconduct in ***the "embezzlement step" of a Ponzi scheme, defined as the phase in which "the Ponzi entity resources" are <u>"diverted to the entity's principal, the schemer"</u>***, but that the facts there made it clear that the defendants' role in the scheme was "quite minor" and insufficient under Indiana law.  *Knauer*, 348 F.3d at 233-34,

---

[42]  Hunton strains to avoid characterizing its *O'Halloran/Knauer* argument as the affirmative defense of *in pari delicto*, but that is exactly what it is.  *See Knauer* at 238 (affirming dismissal of receiver's action under defense of *in pari delicto*); *O'Halloran* at 1202 (noting that defendant was invoking *in pari delicto* defense).  In the Fifth Circuit, *in pari delicto* is an **affirmative defense** and as such the Court cannot dismiss this action at this preliminary stage of the proceeding unless the defense appears on the face of the Complaint.  *Rogers v. McDorman*, 521 F. 3d 381, 386 (5th Cir. 2008); *Reneker v. Offill*, 2010 WL 1541350, at *7-8 (N.D. Tex. 2010); *Milbank v. Holmes, (In re TOCFHBI Inc.*), 413 B.R. 523, 531 (N.D. Tex. 2009) denying summary judgment because the defense of *in pari delicto* is "intensely factual");  *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737, 746-47 (Bankr. S.D. Tex. 2008) ("In the Fifth Circuit and the majority of circuits, *in pari delicto* operates as an affirmative defense to a claim's merits, but can not [sic] independently preclude a Trustee's standing to bring a claim. The questions of whether a party has standing and whether the party's claims are barred by an equitable defense are separate questions.")(citations and quotations omitted).

237-238 (emphasis added).   Thus Defendants' reliance on these cases is misplaced and their arguments should be rejected.

**F.        Plaintiffs' Have Properly Pled Proximate Cause**

Hunton and Suarez next argue that Plaintiffs fail to adequately allege that Defendants' conduct proximately caused damages to the Stanford Entities.   Hunton Brief at 18-20; Suarez Brief at 9-10.   As an initial matter, these arguments are premature and improperly raised at this stage of the proceedings. Under Texas law the issue of proximate causation is a question of fact for the jury to decide.  *See e.g., Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 237 (5th Cir.2003) ("Under Texas law, causation generally is a question of fact for the jury."); *Texas Dep. of Transportation v. Olson*, 980 S.W.2d 890, 893 (Tex. App.— Fort Worth 1998, no pet.) ("The question of proximate cause is one of fact particularly within the province of a jury, and a jury finding on proximate cause will be set aside only in the most exceptional circumstances.").

Hunton and Suarez cite no federal case law to support their assertion that proximate cause can be summarily decided via a Rule 12(b) motion to dismiss. All of the Texas state court cases Hunton and Suarez rely upon were necessarily ***decided on motions for summary judgment***.  *See e.g., Connaway v. Vill. Farms, L.P.*200 S.W.3d 353 (Tex. App. – Dallas 2006); *see also IHS Cedars Treatment Center of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794 (Tex. 2003)(reversing grant of summary judgment that alleged negligence did not proximately cause injuries); *Greathouse v. McConnell*, 982 S.W.2d 165 (Tex. App.—Houston [1st Dist.] 1998)(affirming summary judgment ruling on proximate causation); *Cantu v. Horany*, 195 S.W.3d 867 (Tex. App.—Dallas 2006) (affirming grant of summary judgment).

In Texas, "[t]he two elements of proximate cause are cause in fact (or substantial factor) and foreseeability."  *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002).  "Cause in fact is

established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Mason*, 143 S.W.3d at 799. "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex. 1995) (emphasis added).

"Foreseeability" means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992) (citing *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 549–50 (Tex. 1985) and *Missouri Pac. RR. Co. v. American Statesman*, 552 S.W.2d 99, 103 (Tex. 1977)). Significantly, "[f]oreseeability does not require that a person anticipate the <u>precise</u> manner in which injury will occur once he has created a dangerous situation through his negligence." *Id.* (citing *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 222 (Tex. 1988); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex. 1987). "All that is required is that the injury be of such a general character as might reasonably have been anticipated, and the injury should be so situated with relation to the wrongful act that the injury to him or to one similarly situated might reasonably have been foreseen." *Univ. Preparatory School v. Huitt,* 941 S.W.2d 177, 180 (Tex.App.-Corpus Christi 1996, writ denied). Importantly**, "[m]ore than one action may be the proximate cause of the same injury." *Wilson v. Brister,* 982 S.W.2d 42, 44 (Tex.App. – Houston [1st Div.]1998, pet. denied). "To proximately cause an injury, *an actor need not be the last***

*cause, or act immediately preceding the injury*." *J. Wigglesworth Co. v. Peeples,* 985 S.W.2d 659, 663 (Tex.App. – Fort Worth 1999, pet. denied).

Under Texas law "causation need not be supported by direct evidence." *Tompkins v. Cyr*, 202 F.3d 770, 782 (5th Cir. 2000). "Circumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation." *Id., citing Texas Dept. of Transportation v. Olson,* 980 S.W.2d 890, 893 (Tex.App.-Fort Worth 1998); *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 459 (Tex. 1992). "Establishing causation requires facts sufficient for a jury to reasonably infer that the defendant[']s acts were a substantial factor in bringing about the injury." *Flock v. Scripto–Tokai Corp.,* 319 F.3d 231, 237 (5th Cir.2003)(citing *Tompkins*).

As described in great detail above, Plaintiffs allege Defendants committed various overt acts that proximately caused damages to the Stanford Entities because they acted jointly with Allen Stanford and his co-conspirators in causing the Stanford Entities to violate and/or evade compliance with laws around the world and otherwise engage in illegal conduct. Those acts led directly to Allen Stanford's ability to misappropriate, divert and otherwise waste billions of dollars in assets from the Stanford Entities, including at least $1.8 billion in SIBL funds that were improperly diverted from the Stanford Entities, tens of millions of dollars that Stanford fraudulently loaned to the Antiguan government and hundreds of millions of dollars that Stanford wrongfully invested in venture capital and his personal "pet" Caribbean real estate projects. *See e.g*., Complaint at ¶¶ 400, 407-08, 410, 413, 427-28 and 460.

Such a theory of causation, supported by the mountain of facts alleged in the Complaint, clearly meets and exceeds the *Twombly* "plausibility" standard. The injury to the Stanford Entities was foreseeable to Defendants because they **knew** that Stanford was vigorously evading regulation of SIBL's business for twenty years, and otherwise causing the Stanford Entities to

violate the laws of virtually every country in which the Entities operated. At a minimum, Defendants knew about and actively assisted Stanford in making the loans to the Antiguan government and in making the massive, unauthorized and undisclosed investments in Caribbean real estate and venture capital. Plaintiffs have plausibly alleged that Defendants' conduct (whether under a negligence or other tort law cause of action) in (1) advising and representing Stanford in structuring the millions of dollars in loans to the Antiguan government and otherwise helping Stanford to perpetuate his corrupt control over Antigua, including controlling its regulatory oversight of SIBL; (2) representing Stanford Entities in making private equity and venture capital investments; (3) representing Stanford in Caribbean real estate deals; and (4) assisting SGC, STC and SFIS to operate as de facto unlicensed sales offices of SIBL in the U.S. thereby expanding SIBL's unregulated CD sales; exposed the entities to liability and proximately caused and resulted in the damages to the Stanford Entities as described above, including the institution of the Receivership proceedings.

The Complaint also alleges that when Loumiet and Greenberg began representing Stanford and the Stanford Entities in 1988, Stanford's offshore bank (at that time called GIBL) held only $17 million in investor CD deposits. Complaint at ¶400. By 1999, the year after Loumiet and Greenberg helped Stanford cement his wildly successful U.S.-Antigua regulatory evasion structure, Stanford's offshore bank SIBL held $676 million in investor CD deposits. *Id.* Thereafter, with the regulatory evasion structure firmly in place, Stanford's Ponzi scheme grew exponentially, such that by 2001 SIBL CD deposits had grown to close to $1.2 billion; by 2004 they had grown to $3 billion; by 2006 they had grown to over $5 billion; and grew an additional billion dollars per year in 2007 and 2008. *Id.* Plaintiffs allege that all of that growth was made possible through Defendants' material assistance. *Id.*

Plaintiffs anticipate that Defendants will point to Judge Fitzwater's October 20, 2009 decision in *Reneker v. Offill* and argue that Defendants' conduct could not have caused harm to the Stanford Entities because nothing the Defendants did or failed to do caused the Stanford Entities to engage in the wrongful conduct alleged because the Entities would have done it anyway. *See* 2009 WL 3365616 at *5-6 (N.D. Tex. Oct. 20, 2009).  That argument is based on a fallacy; it assumes that the Stanford Entities *themselves* - as opposed to the principals of the Stanford Entities - knew about or intended to violate the law and engage in illicit acts.   The Fifth Circuit has recognized that the Entities themselves are innocent of wrongdoing and could not have intended to violate the law or to deceive investors.  *Janvey v. Democratic Sen. Campaign Comm., Inc*., 712 F.3d 185, 190-92 (5th Cir. 2013) (Stanford entities' actions were "coerced" by Allen Stanford who used them like "robotic tools" and "evil zombies"); *Jones v. Wells Fargo Bank*, 666 F. 3d 955, 965- 967 (5th Cir. 2012)(corporation is entity separate from its individual bad actors).

Defendants' argument really is one of imputation; Defendants attempt to impute Allen Stanford's wrongdoing to the otherwise innocent Stanford Entities.  The law is clear that a court may not impute an officer or director's knowledge to a corporation where that officer or director is acting with an interest adverse to the corporation.  *See FDIC v. Ernst & Young*, 967 F. 2d 166, 170 (5th Cir. 1992); *FDIC v. Lott*, 460 F.2d 82, 88 (5th Cir. 1972).  Plaintiffs here allege that Allen Stanford and Suarez acted adversely to the Stanford Entities when they caused those Entities to engage in illegal and illicit conduct.  "[W]here, as here, [Stanford] fraudulently dealt with the bank in his own interest, he is deemed to have an adverse interest and the knowledge possessed by him in the transaction is not imputable to the bank."  *Lott*, 160 F.2d at 88; *see also Wight v. Bank America Corp.*, 219 F 3d 79, 87 (2d Cir. 2000) (debtor's management acted in

their own interest and not in company's interest, barring application of the imputation doctrine); *Smith v. Arthur Anderson*, 175 F. Supp. 2d 1180, 1199 (D. Ariz. 2001)(scheme to continue a company in business past its point of insolvency cannot be said to benefit the company); *FDIC v. Nathan*, 804 F.Supp. 888 (S.D. Tex. 1992) (imputation not applicable where directors milked company and pushed it into insolvency).

In Texas, whether an officer's fraud is attributable to a corporation depends on whether the fraud was on behalf of the corporation or against it:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-a-vis a careless or reckless [law firm] are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud . . . .

*Ernst & Young*, 967 F.2d at 170 (quoting *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 190-91 (Tex. App. – Waco 1987, writ denied)). Plaintiffs here allege that Stanford committed fraud against the Stanford Entities, not on their behalf. Under these circumstances, Stanford's knowledge and criminal conduct is not, and cannot be, imputed to the Stanford Entities. *Id.*

Moreover, the imputation doctrine is designed to benefit and protect <u>innocent third parties;</u> it does not protect those who collude with the agent (here, Allen Stanford) to defraud the principal (here, the Stanford Entities). *FDIC v. Shrader & York*, 991 F.2d 216, 226 (5th Cir. 1993)(citing *Crisp v. Southwest Bancshares Leasing Co.*, 586 S.W. 610, 615 (Tex. App. – Amarillo 1979)); *see also FDIC v. Nathan*, 804 F.Supp. 888, 893 (S.D. Tex. 1992)(the equitable imputed knowledge rule applies only to innocent third parties, not to culpable defendants acting in collusion with the wrongdoer). For example, where a plaintiff alleges that a law firm defendant colluded with the sole shareholder to defraud the bank, the shareholder's knowledge

will not be imputed to the bank.  *Shrader & York*, 991 F.2d at 226.  Here, the Plaintiffs have

explicitly stated a claim against Defendants for participation in Allen Stanford's breaches of the

fiduciary duties he owed to the Stanford Entities.  The Defendants are not the "innocent third

party" the imputation doctrine is designed to protect; therefore, the imputation doctrine cannot be

used as shield to protect Defendants from their own illegal and wrongful acts.[43]

In a similar argument, Hunton criticizes Plaintiffs' pleading of the foreseeability aspect of

proximate cause by arguing that "Mr. Stanford's theft of assets was the superseding cause of any

claimed harm."  Hunton Brief at 21.  This argument is both premature and incorrect. Questions

of superseding causation, like proximate causation, are to be decided by the "fact finder," not on

a motion to dismiss.  *See Basalto Shipping Co., S.A. v. HTCO-3011*, 129 F.3d 611, 612 (5th Cir.

1997);  *see also Floyd v. CIBC World Markets, Inc.,* 426 B.R. 622, 649 (S.D. Tex. 2009)

(typically "[t]he issues of proximate causation and superseding cause involve application of law

to fact, which is left to the fact finder") (citing *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830,

840–41 (1996)); *see also O'Cain v. Harvey Freeman and Sons, Inc.*, 603 So.2d 824, 830 (Miss.

1991)) ("the question of superseding intervening cause is so inextricably tied to causation, it is

difficult to imagine a circumstance where such issue would not be one for the trier of fact.")

Further, Stanford's criminal conduct did not supersede the wrongful conduct of the

Defendants; at best, Defendants' conduct was a "concurrent" cause of the damages claimed in

---

[43] Moreover, questions of imputation and the adverse interest exception generally involve fact issues that cannot be
decided on a motion to dismiss.  *See Shrader & York*, 991 F. 2d at 222-24; *Nathan*, 804 F. Supp. at 893-94  (whether
[the directors] were acting for or against a bank's interests is a factual issue); *Arthur Andersen*, 175 F. Supp. 2d at
1198-1200 (denial of motion to dismiss because allegations of adverse interest exception to imputation doctrine
sufficient to avoid dismissal); *Askanase v. Fatjo*, 828 F. Supp. 465, 471 (S.D. Tex. 1993) (a fact issue existed as to
whether the officers and directors were acting entirely in their own interest and to the detriment of the corporation).

this action, for which the Defendants cannot escape liability as a matter of law. *See Davis v. Dallas County, Texas,* 541 F. Supp. 2d 844, 854-855 (N.D. Tex. 2008)("[a]ll persons who contributed to the injury are liable"); *Biaggi v. Patrizio Rest. Inc.*, 149 S.W.3d 300, 309 (Tex.App.—Dallas 2004, pet. denied)("An intervening cause of plaintiff's injury, even if unforeseeable, may be a concurring cause if the chain of causation flowing from the defendant's original negligence is continuous and unbroken."); *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 350 (Tex. App.—Tyler 2001 pet. denied)("It is no defense that a third person's negligent act intervened to cause the injury to the plaintiff, if the new act cooperates with the still persisting original negligence of the defendant to bring about the injury."); *Rodriguez v. Moerbe*, 963 S.W.2d 808, 819 (Tex. App.—San Antonio 1998,  pet. denied).[44]

This is true even if the intervening act is criminal in nature (such as Stanford's theft of assets).  "Although the criminal conduct of a third party may be an intervening, superseding cause that relieves the negligent actor from liability, the actor's negligence is not superseded and will not be excused when the third party's criminal conduct is a foreseeable result of such negligence."  *Berly v. D&L Security Services and Investigations Inc.*, 876 S.W. 2d 179, 183

---

[44]  Hunton cites *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 59 (2d Cir. 1985) for the proposition that "a law firm cannot be accused of committing fraud by performing "run-of-the-mill services that purportedly helped keep the company to stay afloat."  Hunton Brief at 21.  The Law Firms' legal work for Stanford was hardly "run of the mill."  As alleged in the Complaint, Hunton had knowledge of and/or was on notice of Stanford's illegal and illicit conduct and the legal services it provided actively facilitated and abetted that illegal and illicit conduct.  The case of *Phan Son Van v. Pena*, 990 S.W.2d 751 (Tex. 1999), cited by Hunton, is also easily distinguishable. Hunton Brief at 21.  In *Phan Son Van*, the court found that it was not foreseeable that the sale of alcohol to minors would lead to criminal activity.  However, *Phan Son Van* is part of a line of cases, limited to the facts, holding that shopkeepers cannot be liable for acts committed by patrons following intoxication, given that those acts are "extraordinary in nature."  *Id.* at 757.  Here, it is hardly "extraordinary" to conclude that a law firm providing legal services in direct furtherance of illegal activity would proximately cause damages that flow from such illegal activity.  Moreover, and unlike this case, *Phan Son Van*, was decided on a motion for summary judgment after a factual record in respect of foreseeability could be established.

(Tex. App. – Dallas 1994) (citing *Travis v. City of Mesquite*, 830 S.W. 2d 94, 97-98 (Tex. 1992)).  When the intervening illegal act is foreseeable, it does not negate the continuing proximate causation and consequent liability of the initial actor.  *Id.*  (citing *Nixon*, 690 S.W.2d at 550).

In a Colorado case with similar facts, the district court denied the defendant lawyer's motion to dismiss, which argued that the primary wrongdoer's dissipation of corporate assets acted as the superseding cause of damages.  The court held that "as an attorney" the defendant's duty to his client "may have entailed anticipating Chilcott's illicit plans and giving the Fund adequate warnings of Chilcott's actions or structuring the legal activities of the Fund in such a way as to prevent Chilcott's actions from dissipating the Fund's resources.  [Defendant] fails to demonstrate that his actions were free from causing the plaintiff's loss so as to sustain a motion for summary judgment".  *Johnson v. Miller*, 596 F.Supp. 768, 773 (D. Colo. 1984).

Moreover, the Fifth Circuit has stated,

> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or (c) the intervening act is a normal ***consequence of a situation created by the actor's conduct*** and the manner in which it is done is not extraordinarily negligent.

*Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 (5th Cir. 1992) (emphasis added; quoting *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464–65 (5th Cir. 1984)).

The district court in Madoff reached the same conclusion, holding that:

"With that in mind, the Defendants may not escape liability by pointing to Madoff's fraudulent undertakings. Put another way, Madoff's fraudulent activities do not constitute

a supervening cause that severs the causal link between the Defendants' above-mentioned breaches and the foreseeable resulting harm to BLMIS. More to the point, "when the intervening, intentional act of another is itself the foreseeable harm that shapes the duty imposed, the defendant who fails to guard against such conduct will not be relieved of liability when that act occurs."

*Picard,* 458 B.R. at 128.

Just like Madoff, Allen Stanford committed significant fraudulent and illegal acts. But the Defendants (a) knew that Stanford was so acting; and therefore (b) cannot be surprised that Stanford used their services to advance his fraudulent and illegal schemes. Stanford's illegal and illicit activity was a normal and foreseeable consequence of the U.S. – Antigua regulatory evasion structure created jointly by Stanford and the Defendants. Plaintiffs specifically allege that the Law Firms were the architects of the regulatory evasion structure that allowed Stanford to grow his fraudulent empire to the extent he did and without which he would have been powerless to direct the illegal and illicit activity that resulted in harm to the Stanford Entities. See e.g., Complaint at ¶400. Accordingly, any argument that Allen Stanford's conduct was a "superseding cause" of any harm done by the Law Firms is not credible.

### G.   Plaintiffs Have Stated Valid Fraudulent Transfer and Unjust Enrichment Claims

#### 1.   Defendants May Be Held Liable For Aiding and Abetting Fraudulent Transfers

Greenberg erroneously contends that Texas does not recognize a cause of action for aiding and abetting fraudulent transfers. Greenberg Brief at 3. To the contrary, numerous federal and state courts in Texas have recognized a cause of action for aiding and abetting

fraudulent transfers or conspiring to commit fraudulent transfers.[45]  *Matter of Educators Group Health Trust (Schertz-Cibolo-Universal City I.S.D. v. Wright)*, 25 F.3d 1281, 1285 (5th Cir. 1994); *Stonecipher v. Butts*, 591 S.W.2d 806, 808 (Tex. 1979); *Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008); *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 379 (Tex. App. – Houston [1st Dist.] 2012); *Ramirez v. Rodriguez (In re Ramirez)*, 413 B.R. 621, 629 (Bankr. S.D. Tex. 2009).  This Court has previously held that fraudulent transfers can provide a predicate for derivative liability and expressly recognized a cause of action for aiding and abetting fraudulent transfers.  *Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008).  Greenberg does not cite a single case that conflicts with this overwhelming authority.

Defendants also contend that they cannot be liable for aiding and abetting fraudulent transfers because they did not receive any transfers.  Hunton Brief at 29.  As noted above, this Court and others have expressly recognized a cause of action against non-transferees for aiding and abetting fraudulent transfers.  *See, e.g.*, *Biliouris*, 559 F. Supp. 2d at 740.  Hunton relies primarily upon *Mack v. Newton*, where the Fifth Circuit noted the "general rule" that parties who participate or conspire in fraudulent transfers are not liable unless they actually receive the fraudulently transferred property.  737 F.2d 1343, 1357 (5th Cir. 1984).  To the extent it holds that Texas does not recognize a cause of action against non-transferees for aiding and abetting fraudulent transfers, *Mack* is inconsistent with Texas law as articulated by the Texas Supreme Court and other Texas courts.  It also conflicts with subsequent Fifth Circuit decisions.  For example, in *Chu* the Texas Supreme Court held that a non-transferee defendant could be liable

---

[45]  In this context, the Texas Supreme Court has questioned whether there is any distinction between an aiding and abetting and conspiracy claim.  *Chu v. Hong*, 249 S.W.3d 441, 447 (Tex. 2008).

for conspiring to commit a fraudulent transfer.   249 S.W.3d at 444.   Similarly, in *Essex Crane* the Houston Court of Appeals held that a non-transferee "attorney may be held liable for conspiracy to defraud by knowingly assisting a client in evading a judgment through a fraudulent transfer."   371 S.W.3d at 379.   Subsequent to *Mack*, the Fifth Circuit recognized a claim for "conspir[ing] to commit fraudulent transfers."  *Educators Group*, 25 F.3d at 1285.   Accordingly, Plaintiffs have stated a cognizable claim for aiding and abetting fraudulent transfers under Texas law as interpreted both by the Fifth Circuit and by the Texas Supreme Court.

**2.      Plaintiffs Have Sufficiently Plead Their Aiding And Abetting Claim**

Defendants further argue that Plaintiffs have failed to plead their aiding and abetting claims with the particularity required by Rules 8 and 9(b).   Hunton Brief at 30.   As an initial matter, Rule 9(b) does not apply to Plaintiffs' fraudulent transfer claims.   While "[t]he Fifth Circuit has yet to address whether the heightened pleading standard of Rule 9(b) applies to claims for fraudulent transfer," "the trend in this district is to conclude that fraudulent consideration claims are not subject to Rule 9(b)'s pleading requirements."  *U.S. Bank. Nat. Ass'n v. Verizon Comm's Inc*., No. 3:10-cv-1842-G, 2012 WL 3100778, at *11 (N.D. Tex. Jul. 31, 2012); *see also Janvey v. Alguire*, No. 3:09-cv-0724-N, 2011 WL 7047035, at * 10 (N.D. Tex. Sep. 6, 2011) (Godbey, J.); *GE Capital Comm., Inc. v. Wright & Wright, Inc*., No., 2009 WL 5173954, at * 10 (N.D. Tex. Dec. 31, 2009) (Lindsay, J.).   As this Court has observed, there is "no principled reason for applying Rule 9's pleading requirements to [the Plaintiffs'] fraudulent transfer claims."  *Janvey v. Alguire*, 846 F. Supp. 2d 662, 676 (N.D. Tex. 2011) (quoting *Wing v. Horn*, No. 2:09-cv-00342, 2009 WL 2843342, at *3 (D. Utah 2009)).   "This is because fraud is simply not an aspect of a fraudulent transfer claim."  *U.S. Bank*, 2012 WL

3100778, at *11.   Plaintiffs' fraudulent transfer-based claims "need not satisfy Rule 9(b)." *Janvey*, 846 F.Supp.2d at 676-77.

Defendants argue that Plaintiffs have not met the requirements of Rule 8 either because the Complaint fails to contain sufficient facts that Defendants were aware of, and participated in, the fraudulent transfers at issue.   Hunton Brief at 30.   Plaintiffs allege that Stanford Financial entities transferred funds to various third parties, and for various reasons such as venture capital and Caribbean real estate deals, Caribbean airlines, and Allen Stanford himself, with actual intent to hinder, delay, or defraud creditors.   Complaint at ¶ 426.   Plaintiffs also allege that Defendants "knowingly or recklessly aided, abetted, or participated in these fraudulent transfers . . . ."  *Id.* at ¶ 427.   In support of this claim, Plaintiffs allege that Defendants, *inter alia*, knew that Stanford operated an offshore, unlicensed and unregulated investment company in violation of U.S. laws (*id.* at ¶¶ 49, 53, 165-68) that was consistently under investigation by various government agencies for violations of federal law (*id.* ¶¶ 97, 99-100, 192) and that exerted an inordinate and improper amount of control over its sole regulator within the Antiguan government, infamous as a haven for illicit financial activity as a result of lax regulation (*id.* at ¶¶ 64, 104, 112, 114-17, 122, 164).   Plaintiffs allege that Defendants knew that SIBL made enormous loans to Allen Stanford and the Antiguan government and invested in speculative Caribbean real estate and risky private equity companies, none of which were disclosed to SIBL investors, to whom SIBL's portfolio was consistently portrayed as conservatively held in safe and liquid investments.  *Id.* at ¶¶ 196-98.

Despite their knowledge of the foregoing facts (among many others set forth in detail throughout the Complaint), Defendants participated in Stanford's fraudulent scheme (and fraudulent transfers) by, *inter alia*, providing Stanford with legal advice and documentation in

furtherance of Stanford's regulatory and banking law violations (*id.* at ¶¶ 55, 81), in making improper loans to the Antiguan government (*id.* at ¶¶ 106, 207), in representing Stanford in making risky private equity and venture capital investments and speculative real estate investments (with knowledge that Stanford was likely funding the transactions with SIBL funds) (*id.* at ¶¶ 141-42, 345-50, 351-59, 361), and even in brokering and referring private equity and venture capital deals to Stanford (*id.* at ¶¶ 348-50, 364).

In summary, Plaintiffs allege that Defendants knew Stanford was operating an offshore bank in violation of federal law, making misrepresentations to investors, and misusing funds belonging to the Stanford Entities.   Plaintiffs further allege that, despite this knowledge, Defendants willingly participated in a multitude of transactions, including but not limited to loans to the Antiguan Government and illiquid real estate and private equity investments, that Stanford made with actual intent to defraud investors.   Plaintiffs allegations are more than sufficient to satisfy Rule 8's requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief."

### 3.    Plaintiffs Have Stated Claims For Fraudulent Transfers

Plaintiffs seek to recover approximately $10 million in CD Proceeds that were fraudulently transferred to Greenberg and Hunton between 2006 and 2009.   Complaint at ¶¶ 414-21.   Defendants contend that Plaintiffs' fraudulent transfer claims should be dismissed because Defendants received the payments in good faith **and** for reasonably equivalent value.   Hunton Brief at 25-26.

To state a claim for fraudulent transfer under the TUFTA, Plaintiffs only must show that the transferors made the transfers at issue with actual intent to hinder, delay, or defraud any creditor.   TEX. BUS. & COM. CODE § 24.005(a)(1).   Defendants do not dispute that, by

demonstrating that the Stanford Financial companies operated an immense Ponzi scheme (Complaint at ¶¶ 401-02, 414) and transferred to Defendants approximately $10 million in CD Proceeds between 2006 and 2009 (*Id.* at ¶ 416-18, Exhibit A), Plaintiffs have stated a fraudulent transfer claim as a matter of law.  *See Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011) ("In this circuit, proving that a transferor operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made.")

Defendants argue that Plaintiffs' fraudulent transfer claims nevertheless fail because Defendants received the transfers in good faith and for reasonably equivalent value.  Tex. Bus. & Com. Code § 24.009(a).  As an initial matter, it is Defendants, not Plaintiffs, who bear the burden of proving the affirmative defense that they received the transfers in good faith and for reasonably equivalent value.  *Id.*; *see also American Cancer Soc. v. Cook*, 675 F.3d 524, 527 (5th 2012).  Further, the Complaint is replete with factual allegations demonstrating that Defendants knew about Stanford's illicit activities and defrauding of investors, and thus did not receive the transfers in good faith.  *See, e.g.,* Complaint at ¶¶ 196-98 (Greenberg knew of misrepresentations to investors), 256 (Hunton knew Stanford bribed Antiguan officials), 319-326 (Hunton knew Stanford was violating laws of multiple countries).  Plaintiffs also allege that Defendants were instrumental to perpetuating Stanford's global Ponzi scheme.  *See, e.g.,* Complaint at ¶¶ 12-16. Services provided in furtherance of a Ponzi scheme, such as the legal services at issue here, do not constitute "reasonably equivalent value" within the meaning of TUFTA.  *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006); Order of January 22, 2013, *Janvey v. Alguire*, Case No. 3:09-cv-0724-n (N.D. Tex.) at 23 [Docket No. 909].  Accordingly, the Complaint contains sufficient allegations to demonstrate that Defendants cannot establish the good faith/fair value defense to Plaintiffs' fraudulent transfer claims.

4.      **Plaintiffs' Fraudulent Transfer Claims Are Not Time Barred**

Plaintiffs' fraudulent transfer claims have not, as Defendants contend, been "extinguished" and are not otherwise barred by the applicable statute of limitations.   Hunton Brief at 26-27.   Plaintiffs allege that Defendants' conduct and Plaintiffs' subsequent injuries – including the fraudulent transfers at issues – were inherently undiscoverable and that Plaintiffs did not discover the Defendants' conduct and the resulting injuries until sometime after the Receiver was appointed on February 16, 2009.   Complaint at ¶ 403.   Plaintiffs have also alleged that they entered into tolling agreements with Greenberg and Hunton that tolled limitations from February 1, 2011 through November 13, 2012.   *Id.* at ¶ 404.   Thus, Plaintiffs have sufficiently alleged that the applicable statutes of limitation were tolled and that Plaintiffs timely asserted their claims.

Furthermore, this Court has already held, and the Fifth Circuit Court of Appeals has affirmed, that the discovery rule applies to the Receiver's fraudulent transfer claims and that the Receiver could not, as a matter of law, have discovered all of the facts giving rise to such claims until sometime after he was appointed.   *Janvey v. Dem. Sen. Campaign Comm.*, 793 F. Supp. 2d 825, 837 (N.D. Tex. 2011), *affirmed*, 712 F.3d 185 (5th Cir. 2013).   As the Court noted, the Stanford fraud was "a complex, long-lasting, intentionally-concealed, international scheme involving billions of dollars and myriad transactions."   *Id.*   Accordingly, the Court held that the one-year period for asserting a fraudulent transfer claim after the transfer was or reasonably could have been discovered under Section 24.010(a)(1) of the TUFTA was applicable and that the  one-year period did not begin to run in this case, as a matter of law, until sometime after February 16, 2009.   *Id.*   "When a plaintiff knew or should have known of an injury is . . . a question of fact" that cannot be determined at the dismissal stage.   *Id.* at 836; *Brandau v.*

*Howmedica Osteonics Corp*., 439 Fed. Appx. 317, 322 (5th Cir. 2011); *USPPS, Ltd. v. Avery Dennison Corp*., 326 Fed. Appx. 842, 850-51 (5th Cir. 2009).  As a result, none of Plaintiffs' fraudulent transfer claims can be dismissed as time-barred.

### 5.    Unjust Enrichment/Money Had And Received Claims

Plaintiffs have stated claims for disgorgement under the doctrine of unjust enrichment and restitution under the theory of money had and received.  Defendants recognize that Plaintiffs pled these claims "[i]n the alternative" to their fraudulent transfer claim.  Complaint at ¶¶ 422, 425; Hunton Brief at 27.  These claims are not "unavailable" simply because Plaintiffs have pled an *alternative* claim for avoidance of fraudulent transfers under TUFTA.  Moreover, setting aside a fraudulent transfer under TUFTA is an equitable remedy.  *Chu*, 249 S.W.3d at 446; *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 26 (Tex. App. - Tyler 2000, pet. denied).  Accordingly, seeking to have the transfers to Greenberg and Hunton set aside under the equitable doctrines of unjust enrichment or money had and received is not inconsistent with, or precluded by, Plaintiffs' TUFTA claim.

Plaintiffs' unjust enrichment/money had and received claims are also well plead.  "Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits, regardless of whether the defendant engaged in wrongdoing." *Janvey v. Alguire*, 846 F. Supp. 2d 662, 673 (N.D. Tex. 2011)(citing *Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc*., 300 S.W.3d 348, 367 (Tex. App. – Dallas 2009, pet. denied)).  "Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Janvey*, 846 F. Supp. at 673.  Thus, a plaintiff is entitled to recover for unjust enrichment if he

demonstrates that the defendant provided services in furtherance of a Ponzi scheme and was paid with proceeds of the Ponzi scheme. *Id.* at 674-75.

The Complaint is replete with allegations that Defendants provided services in furtherance of the Stanford Ponzi scheme and that Greenberg and Hunton were paid with fraudulently-obtained CD Proceeds. Plaintiffs therefore have alleged that Greenberg and Hunton wrongfully secured a benefit, or passively received a benefit, from defrauded Stanford investors that would be unconscionable for Greenberg and Hunton to retain. This Court has expressly held that the Receiver states a claim for unjust enrichment by alleging that a defendant received CD Proceeds from defrauded investors. *Id.* at 674-75.

Because Plaintiffs allege that the CD Proceeds transferred to Greenberg and Hunton came from defrauded investors, the "voluntary payment" doctrine does not bar Plaintiffs' claims. Under the voluntary payment doctrine, "money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability.'" *Prime Income Asset Mgmt. Co. v. Waters Edge Living*, No. 3:07-cv-0102-D, 2007 WL 2229050, at *5 n.7 (N.D. Tex. Aug. 3, 2007) (quoting *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 768 (Tex. 2005)). First, the voluntary payment doctrine does not apply because Greenberg and Hunton did not receive the CD Proceeds "in the absence of fraud." *Id.* Second, the Fifth Circuit has unequivocally held that *in pari delicto*-based defenses do not bar the Receiver from bringing claims against parties who received funds from the Stanford Ponzi scheme. *Janvey v. Democratic Sen. Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013). The Receiver may bring these claims, even though he represents the very entities that made the transfers, because the Receiver is not bound by the entities' actions during the time of the

transfers.  Those actions were "coerced" by the principals of the Ponzi scheme who used the entities like "robotic tools" and "evil zombies."  *Id.* at 190-92.  The supposedly "voluntary" nature of Stanford's "payments to Greenberg and Hunton does not preclude the Plaintiffs from seeking to recover the funds transferred.  *Id.*

Because claims for unjust enrichment and money had and received are "substantively identical," Plaintiffs' claim for money had and received survives dismissal for the same reasons as their unjust enrichment claim.  *Id.*

### H.      Plaintiffs have Stated Valid Negligent Retention and Responeat Superior Claims

#### 1.      Negligent Retention

Contrary to Hunton's assertions, the Complaint is replete with facts supporting Plaintiffs' claim for negligent retention and supervision.  *See* Compl. ¶ 245-276, 284-396.  An employer is liable for negligent hiring, retention, or supervision if it hires or fails to adequately supervise an incompetent or unfit employee whom it knows, or by the exercise of reasonable care should have known, was incompetent or unfit, thereby creating an unreasonable risk of harm to others.  *See Kesler v King*, 29 F. Supp. 2d 356, 376-77 (S.D. Tex. 1998) (issue of fact as to defendants' negligent hiring and retention of employee precluded summary judgment).  "[P]laintiff must prove that the defendant owed the plaintiff a legal duty to supervise its employees, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injuries." *People's Choice Home Loan, Inc. v. Mora*, No. 3:06-CV-1709-G, 2007 WL 708872, *7 (N.D. Tex. March 7, 2007) (motion to dismiss for failure to state a claim denied) (citation omitted).  To prevail on its claim, "plaintiff also must prove that the employee committed an actionable tort" against plaintiff.  *Id.*

Plaintiffs sufficiently plead a claim for negligent retention and supervision.  First, Plaintiffs allege that Hunton owed Plaintiffs a legal duty to supervise its employees.  Compl. ¶ 428.  Second, it is clear that Hunton breached its duty to supervise its employees when it negligently allowed its employees to provide legal services to the Stanford Entities with full knowledge of all the illicit and illegal conduct Stanford was engaged in as described *supra* at pps. 17-27

Third, Hunton's breach proximately caused Plaintiffs' injuries.  Hunton's knowledge of Stanford's evasion of U.S. regulation, and its *laissez-faire* attitude toward its employees' work to facilitate Stanford's scheme caused injuries to the Stanford Entities.  Despite the damning information it obtained concerning Stanford during his time as a client of Hunton, Hunton allowed Loumiet to write recommendations to various governments in order for Stanford to establish operations in those countries and grow his Ponzi empire (*id.* ¶ 308).  Because Loumiet and other Hunton attorneys committed actionable torts by negligently and intentionally aiding and abetting Stanford Financial and SIBL in their continuing sales of unregistered, wholly unregulated and worthless CDs, Hunton is liable for negligent retention and supervision of Loumiet and its other attorneys.  Accordingly, Plaintiffs have sufficiently pled a claim for negligent retention and supervision.

The cases relied upon by Hunton are factually inapposite and provide no basis for dismissal.  In *Wansey v. Hole*, 379 S.W.3d 246 (Tex. 2012), the plaintiff presented insufficient evidence of any harm caused by the employee, or that the employee engaged in any inappropriate behavior or committed a tort.  379 S.W.3d at 248.  In *Wansey*, the plaintiff also failed to present "evidence that proper hiring and supervision policies would have prevented the incident."  *Id.*  Here, the allegations in the Complaint could not be clearer:  there was a plethora

of alarming facts available to Hunton about Stanford and the Stanford Entities – indeed, facts that made KPMG steer clear away from Stanford.  Complaint at ¶¶ 316-318.  Had Hunton had a proper supervision policy or properly supervised its employees, Hunton could have and should have prevented the harm inflicted by its employees on the Stanford Entities.

Further, in *Zarzana v. Ashley*, 218 S.W.3d 152 (Tex. App. – Houston [14th Dist.] 2007), unlike the case at bar, the plaintiff did not produce or point to any evidence that defendant knew or should have known of the employee's propensity for criminality.  *Id.* at 158.  As the Court in *Zarana* explained, the question of duty and proximate cause in a claim for negligent retention and supervision requires a foreseeability of harm, which is an injury of "a general character as might reasonably have been anticipated."  *Id.* (internal quotations omitted).  Given the devastating and far-reaching facts alleged in the Complaint, Plaintiffs' harm was foreseeable and should have been reasonably anticipated by Hunton.  Indeed, and as set forth above, Hunton was well aware of Stanford's violations of law and investigations by Federal authorities. Accordingly, based on these facts, Hunton could foresee the harm it would cause to Plaintiffs, and *Zarzana* is wholly inapposite.

Additionally, in *Schakosky v. Client Services, Inc.*, 634 F. Supp. 2d 732 (E.D. Tex. 2007), plaintiff failed to allege any facts to support his negligent hiring and supervision claim and merely recited legal conclusions in his complaint, thereby giving the court a basis for granting defendant's motion to dismiss.  634 F. Supp. 2d at 737-38.  Here, in clear contrast, Plaintiffs' Complaint abounds with specific facts supporting Hunton's negligence and misconduct. Accordingly, Plaintiffs have stated a cause of action for negligent retention and supervision.

### 2. *Respondeat Superior*

As to Plaintiffs' *respondeat superior* claim, Hunton raises only a trifling and derivative

argument: that "[t]he Court should dismiss [the *respondeat superior*] claim because the Receiver's and OSIC's <u>other</u> claims fail, for the reasons stated herein."  Hunton Motion at 35 (emphasis supplied).  Hunton does not – and cannot – assail Plaintiffs' *respondeat superior* claim on the merits.  Indeed, the actions of Loumiet and the other Hunton attorneys working on Stanford matters were indisputably within the scope of their employment.  And, in any event, whether an employee's actions were within such scope of employment is typically a "fact issue like negligence or proximate cause".  *Arbelaez v. Just Brakes Corp.*, 149 S.W.3d 717, 720 (Tex. App. – Austin 2004).

Loumiet is alleged to have acted within his general authority as an attorney/partner with Hunton in carrying out the representation of Stanford Financial, SIBL and other Stanford Entities on behalf of the law firm, i.e., he was acting not for his own benefit, but for the benefit of Hunton, his employer.   Complaint at ¶ 457.  Significantly, Loumiet attempted, on several occasions, to obtain more work for Hunton, including work for Hunton's other practice groups. *See id.* ¶¶ 288-90, 295-96, 357.  Dozens of Hunton attorneys worked on several Stanford matters and billed hundreds of thousands of dollars in fees per year. *Id.* ¶ 246.  Loumiet's alleged actions were taken within the scope of his employment inasmuch as they were (1) within the general authority given him by the law firm, (2) in furtherance of his law firm's business, and (3) for the accomplishment of the object for which he was employed.  *See Williams v. U.S.*, 71 F.3d 502, 506 (5th Cir. 1995).[46]

Plaintiffs have thus alleged that Loumiet acted within the course and scope of his

---

[46] Further, it is well-settled that the willful and malicious actions of an employee acting within the scope of his employment are imputed to the employer and subject the employer to liability under the doctrine of *respondent superior*.  *See Hooper v. Pitney Bowes, Inc.*, 895 S.W.2d 773, 778 (Tex. App.—Texarkana 1995, writ denied).

employment as a partner in, and therefore in furtherance of the business of, defendant Hunton.

Complaint at ¶ 457. These allegations are based on the specific facts set forth in the Complaint

and are more than sufficient to withstand Hunton's preliminary motion for dismissal.

## IV.   MOTION FOR LEAVE TO AMEND COMPLAINT

In the alternative, if the Court is inclined to grant Defendants' Motions in whole or in

part, Plaintiffs respectfully request leave to amend the Complaint under Rule 15(a) of the Federal

Rules of Civil Procedure, so that Plaintiffs can correct any pleading defects, including any issues

specifically identified in the Motions or this Response. When a trial court is considering a

motion to dismiss a complaint for failure to state a claim, granting leave to amend is especially

appropriate. See *Great Plains Trust Co., et al v. Morgan Stanley Dean Witter & Co*., 313 F.3d

305, 329 (5th Cir. 2002) ("[O]ur cases support the premise that 'granting leave to amend is

especially appropriate . . . when the trial court has dismissed the complaint for failure to state a

claim.") (citing *Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977) (per curiam)

(addressing Rule 12(b)(6) dismissal)). Rule 15(a) applies where plaintiffs expressly request to

amend even though the request is "not contained in a properly captioned motion paper." *Willard*

*v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (quoting *Balistreri v.*

*Pacifica Police Dep't*, 901 F.2d 696, 701 (5th Cir. 1988)). A formal motion is not required as

long as the requesting party has set forth with particularity the grounds for the amendment and

the relief sought. *Id.*

While Plaintiffs believe they have adequately pled facts sufficient to survive dismissal,

they nevertheless request leave to amend the Complaint if necessary, and to the extent relevant to

the Court's determination of this Motion, to address the allegedly deficient allegations that are

the subject of Defendant's asserted grounds for dismissal, including issues related to damages

and proximate cause.  The Court should not dismiss the Complaint with prejudice, which is a "drastic remed[y] [that] should be used only in extreme situations . . . ."  See *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (citing *Brown v. Thompson*, 430 F.2d 1214, 1216 (5th Cir. 1970)).  See also *Herrmann Holdings Ltd. v. Lucent Technologies Inc*., 302 F.3d 552, 567 (5th Cir. 2002) (upholding denial of leave to amend where plaintiffs had already filed original complaint and two amended complaints).

## V.  PRAYER

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order denying Defendants' Motions for Dismissal in their entirety, and grant Plaintiffs such other and further relief the Court deems just and proper.

Respectfully submitted,

CASTILLO SNYDER, P.C.

By:  s/ Edward C. Snyder
 Edward C. Snyder
 esnyder@casnlaw.com
 Jesse R. Castillo
 jcastillo@casnlaw.com
 300 Convent Street, Suite 1020
 San Antonio, Texas  78205
 (210) 630-4200
 (210) 630-4210 (Facsimile)

**LEAD COUNSEL FOR THE OFFICIAL STANFORD INVESTORS COMMITTEE**

NELIGAN FOLEY, LLP

By:  s/ Douglas J. Buncher
 Douglas J. Buncher
 dbuncher@neliganlaw.com
 Nicholas A. Foley
 nfoley@neliganlaw.com
 Republic Center
 325 N. St. Paul, Suite 3600
 Dallas, Texas  75201
 (214) 840-5320
 (214) 840-5301 (Facsimile)

**SPECIAL COUNSEL TO RECEIVER RALPH JANVEY**

**BUTZEL LONG, P.C.**

By:  s/ Peter D. Morgenstern

    Peter D. Morgenstern
    (*admitted pro hac vice*)
    morgenstern@butzel.com
    380 Madison Avenue
    New York, New York 10017
    (212) 818-1110
    (212) 818-0494 (Facsimile)

**STRASBURGER & PRICE, LLP**

By:  /s/ Edward F. Valdespino

    Edward F. Valdespino
    edward.valdespino@strasburger.com
    Andrew L. Kerr
    andrew.kerr@strasburger.com
    300 Convent Street, Suite 900
    San Antonio, Texas 78205
    (210) 250-6000
    (210) 250-6100 (Facsimile)

**COMMITTEE COUNSEL**

**COMMITTEE COUNSEL**

## CERTIFICATE OF SERVICE

    On June 28, 2013, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve Defendants individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

    /s/ Edward C. Snyder
        Edward C. Snyder