# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; SANDRA DORRELL; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated. | § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 3:12-cv-04641-N |
| vs. | § § | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ, | § § § § | |
| Defendants. | § § | |

---

## CLASS PLAINTIFFS' JOINT RESPONSE AND BRIEF TO MOTIONS TO DISMISS FILED BY DEFENDANTS GREENBERG TRAURIG, LLP AND HUNTON & WILLIAMS, LLP

---

## TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTS ............................................................................................................................... 3

ARGUMENT ..................................................................................................................... 4

I.      THE CLASS PLAINTIFFS' CLAIMS SATISFY ALL APPLICABLE
        PLEADING REQUIREMENTS................................................................................4

II.     THE CLASS PLAINTIFFS' CLAIMS ARE NOT BARRED BY TEXAS'
        QUALIFIED ATTORNEY IMMUNITY DOCTRINE....................................................8

        **A.**    The Attorney Immunity Doctrine Does Not Apply ....................................8

        **B.**    Attorney Immunity Does not Apply to Conduct Outside the Bounds of the
                   Law .........................................................................................................10

        **C.**    The Attorney Immunity Defense Requires Resolution of Fact Issues...................13

III.    THE CLASS PLAINTIFFS HAVE STATED VALID CLAIMS FOR AIDING
        AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT .......................14

        **A.**    Primary Violations of the TSA ............................................................16

        **B.**    The Law Firms' Knowledge of Primary Violations ...............................17

        **C.**    The Law Firms' Substantial Assistance to the Primary Violations ......................32

        **D.**    Texas Recognizes a Claim for Conspiracy to Violate the TSA............................37

        **E.**    The TSA Claims are not Preempted  by NSMIA .................................39

        **F.**    The TSA Claims are not Cabined by the TSA's Statutes of Repose ....................41

IV.     THE CLASS PLAINTIFFS STATE A VALID CLAIM FOR AIDING AND
        ABETTING BREACHES OF FIDUCIARY DUTY........................................................44

V.      THE CLASS PLAINTIFFS STATE A VALID CLAIM FOR AIDING AND
        ABETTING FRAUD ............................................................................................49

VI.     THE CLASS PLAINTIFFS STATE A VALID CLAIM FOR CONSPIRACY ..............52

VII.    MOTION FOR LEAVE TO AMEND COMPLAINT ......................................................59

PRAYER.................................................................................................................................... 60

## TABLE OF AUTHORITIES

**Cases**

*Adams & Reese*,
  [need full cite] *supra*, at 17 ............................................................ 54, 58, 59

*Aetna Cas. and Sur. Co. v. Leahey Const. Co.*,
  219 F.3d 519 (6th Cir. 2000) .......................................................... 52

*Alpert v. Crain, Caton & James, P.C.*,
  178 S.W. 3d 398, (Tex. App.—Houston [1st Dist.] 2005, pet denied) ................. 12

*Alpert v. Riley*,
  No. H–04–CV–3774, 2008 WL 304742 (S.D. Tex. 2008) ............................... 12

*American Bank of St. Paul v. TD Bank, N.A.*,
  713 F.3d 455 (8th Cir. 2013) .......................................................... 51

*Anheuser-Busch Cos. v. Summit Coffee Co.*,
  934 S.W.2d 705 (Tex. App.—Dallas 1996 ............................................. 38

*Balistreri v. Pacifica Police Dep't*,
  901 F. 2d 696 (5th Cir. 1988) ......................................................... 59

*Barnsdall Oil Co. v. Willis*,
  152 F.2d 824 (5th Cir. 1946) .......................................................... 46

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................... 4

*Biliouris v. Sundance Resources, Inc.*,
  559 F. Supp. 2d 733 (N.D. Tex. 2008) ................................................. 38

*Birdwell v. State*,
  No. 05-07-00258-CR, 05-07-00259-CR, 2008 WL 467271 (Tex. App.—Dallas Feb. 23, 2008,
  no pet.) ............................................................................... 17

*BP Am. Prod. Co. v. Marshall*,
  342 S.W.3d 59 (Tex. 2011) .......................................................... 42, 43

*Bradt v. Sebek*,
  14 S.W.3d 756 (Tex. App. – Houston [1st Dist.] 2000, pet. denied) .................... 55

*Brown v. Earthboard Sports USA, Inc.*,
    481 F.3d 901 (6th Cir. 2007) ................................................................ 40

*Buist v. Time Domain Corp.*,
    926 So. 2d 290 (Ala. 2005) ................................................................... 41

*Butler v. Lilly,*
    533 S.W.2d 130 (Tex. App.—Houston [1st Dist.] 1976 ........................... 9

*Byrd v. Vick, Carney & Smith LLP,*
    409 S.W. 3d 772 (Tex. App.—Ft. Worth 2013) ...................................... 11

*Carroll v. Timmers Chevrolet, Inc.,*
    592 S.W.2d 922 (Tex. 1980) ................................................................. 56

*Cathey v. First City Bank of Aransas Pass*,
    758 S.W. App.—Corpus Christi 1988, writ denied) ............................... 43

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
    511 U.S. 164 (1994) ............................................................................. 48

*Chapman Children's Trust v. Porter & Hedges, L.L.P.,*
    32 S.W.3d 429 (Tex. App.—Houston [14th Dist.] 2000, review denied ..... 9

*Chartwell Healthcare v. People's Home Health*,
    No. 3:96–CV–1938–G, 1997 WL 86435 (N.D. Tex. Feb. 19, 1997) ........... 5

*Commodity Futures Trading Comm'n v. Heritage Capital Advisory Servs., Ltd.,*
    823 F.2d 171 (7th Cir. 1987) ............................................................... 45

*Computer Assoc. Int'l, Inc. v. Altai, Inc.*,
    918 S.W.2d 453 (Tex. 1996) ................................................................. 42

*Consolidated Management Group, LLC v. Department of Corporations,*
    162 Cal. App. 4th 598, 75 Cal. Rptr. 3d 795 (2008) ............................... 41

*Cox Tex. Newspapers, L.P. v. Wootten,*
    59 S.W.3d 717 (Tex. App.—Austin 2001, pet. denied) ........................... 44

*Crescendo Investments, Inc. v. Brice*,
    61 S.W.3d 465 (Tex. App. – San Antonio 2001, pet. denied) ............. 39, 42

*Crisp v. Southwest Bancshares Leasing Co.*,
    586 S.W.2d 610 (Tex. App.—Amarillo 1979, pet. denied) ...................... 49

**CLASS PLAINTIFFS' JOINT RESPONSE TO MOTIONS TO DISMISS**        **iv**

*Darocy v. Abildtrup*,
    345 S.W.3d 129 (Tex. App.—Dallas 2011, no pet.) (citations omitted)............................ 15, 30

*Dexia SA/NV v. Bear, Stearns & Co., Inc.*,
    929 F. Supp. 2d 231 (S.D.N.Y. 2013) ................................................................................. 51

*Dixon Fin. Servs., Ltd. v. Greenberg, Peden, Siegmyer & Oshman, P.C.*,
    No. 01–06–696–CV, 2008 WL 746548  (Tex. App.—Houston [1st Dist.] Mar. 20, 2008, pet.
    denied) .................................................................................................................................... 9

*El Chico Corp. v. Poole*,
    732 S.W.2d 306 (Tex. 1987) ............................................................................................... 57

*Essex Crane Rental Corp. v. Carter*,
    371 S.W. 3d 366 (Tex. App.—Houston [1st Dis.] 2012, pet. denied) ................................... 11

*Experian Info. Solutions, Inc. v. Lexington Allen L.P.*,
    No. 4:10–cv–144, 2010 WL 4026823 (E.D. Tex. Aug. 27, 2010) ......................................... 5

*Fezzani v. Bear, Stearns & Co. Inc.*,
    527 Fed.Appx. 89 (2d Cir. 2013) ........................................................................................ 51

*Fisher v. Yates*,
    953 S.W.2d 370 (Tex. App.—Texarkana 1997, no pet) ........................................................ 43

*Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112 (Tex. 1971)........................................ 19, 38

*Floyd v. Hefner*,
    556 F. Supp. 2d 617 (S.D. Tex. 2008) ................................................................................. 44

*Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*,
    217 S.W.3d 653 (Tex. App. – Houston [14th Dist.] 2006, pet. denied)................................ 38

*Goldstein v. MCI WorldCom*,
    340 F.3d 238 (5th Cir.2003)................................................................................................... 8

*Goldstein v. Mortenson*,
    113 S.W.3d 769 (Tex. App.–Austin 2003, no pet.)............................................................... 54

*Gould v. American–Hawaiian S.S. Co.*,
    535 F.2d 761 (3d Cir. 1976 ................................................................................................. 18

*Great Plains Trust Co., et al., v. Morgan Stanley Dean Witter & Co.*,
    313 F.3d 305 (5th Cir. 2002)............................................................................................... 59

*Greenberg Traurig of New York, P.C. v. Moody*,
  161 S.W.3d 56 (Tex. App.—Houston [14 Dist.], 2004, rehearing overruled .................. 57, 58

*Griggs v. Hinds Junior College*,
  563 F.2d 179, (5th Cir. 1977) (per curiam) ........................................................... 59

*Grubka v. Web Access Int'l., Inc.*,
  445 F. Supp. 2d 1259 (D. Colo. 2006) ................................................................. 41

*Hamby v. Clearwater Consulting Concepts*,
  428 F. Supp. 2d 915 (E.D. Ark. 2006) ................................................................. 41

*Havner v. E–Z Mart Stores, Inc.*,
  825 S.W.2d 456 (Tex. 1992)) ............................................................................. 57

*HECI Exploration Co. v. Neel*,
  982 S.W.2d 881 (Tex. 1998) .............................................................................. 43

*Howard v. SEC*,
  376 F.3d 1136 (D.C. Cir. 2004) .......................................................................... 30

*Huddleston v. Herman & MacLean*,
  640 F.2d 534 (5th Cir. 1981) ............................................................................. 38

*Hunt v. BAC Home Loan Servicing, LP*,
  2012 WL 219330, No. C–11–261 (S.D. Tex. 2012) ................................................ 11

*In re Electronic Data Systems Corp.*
  305 F. Supp. 2d 658 (E.D. Tex. 2004) ................................................................ 46

*In re Enron Corp. Securities, Deriv. & Erisa Lit.*,
  491 F. Supp. 2d 690, (S.D. Tex. 2007) ............................................................ 31, 32

*In re Fossil, Inc.*,
  713 F. Supp. 2d 644 (N.D. Tex. 2010) .................................................................. 7

*In re Optimal US Litig.*,
  No. 10 Civ. 4095 (S.D.N.Y. Oct. 14, 2011) .......................................................... 48

*In re Seven Seas Petroleum, Inc.*,
  522 F.3d 575 (5th Cir. 2008) ............................................................................. 50

*International Bankers Life Ins. Co. v. Holloway*,
  368 S.W.2d 567 (Tex. 1963) .............................................................................. 55

*J.T.T. v. Chon Tri*
    111 S.W.3d 680 (Tex. App.—Houston [1st Dist.] 2003)...................................................... 55

*Janes v. CPR Corp.,*
    623 S.W.2d 733 (Tex. App.—Houston [1st Dist.] 1981 ...................................................... 46

*Janvey v. Adams,*
    588 F.3d 831 (5th Cir. 2009) ........................................................................................ 1, 52

*Janvey v. Dem. Sen. Camp. Comm.,*
    793 F. Supp. 2d 825 (N.D. Tex. 2011) ................................................................................ 1

*Kinzbach Tool Co. v. Corbett–Wallace Co.,*
    138 Tex. 565 (Tex.  1942) ................................................................................................. 56

*Kline v. O'Quinn*
    874 S.W.2d 776 (Tex. App.—Houston [14th Dist.] 1994, pet. denied)................................. 44

*KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,*
    988 S.W.2d 746 (Tex. 1998) ............................................................................................ 44

*Kramer v. Smith Barney,*
    80 F.3d 1080 (5th Cir. 1996) ........................................................................................... 46

*Lackshin v. Spofford,*
    not reported, 2004 WL 1965636 (Tex. App. – Hous. [14th Dis.] 2008, pet denied) ................ 14

*Laxson v. Giddens,*
    48 S.W.3d 408 (Tex. App. – Waco 2001, pet. denied) ........................................................ 38

*Likover v. Sunflower Terrace II, Ltd.,*
    696 S.W.2d 468 (Tex.App.-Houston [1st Dist.] 1985, no writ)............................................. 10

*Lormand v. US Unwired, Inc.,*
    565 F.3d 228 (5th Cir. 2009) ............................................................................................. 8

*Lowrey v. Tex. A & M Univ. Sys.,*
    117 F.3d 242 (5th Cir. 1997) .............................................................................................. 4

*McCoun v. Rea (In re Rea),*
    245 B.R. 77 (Bankr. N.D. Tex. 2000) ............................................................................... 45

*Meadows v. Hartford Life Ins. Co.,*
    492 F.3d 634 (5th Cir. 2007) ........................................................................................... 45

*Mendoza v. Fleming*,
    41 S.W. 3d 781 (Tex. App. – Corpus Christi 2001)................................................. 10

*Metz v. Unizan Bank*,
    No. 5:05 CV 1510, 2008 WL 2017574 (N.D. Ohio May 7, 2008....................................... 50

*Operation Rescue–National v. Planned Parenthood*,
    975 S.W.2d 546 (Tex. 1998) ................................................................. 56

*Paschal v. Great Western Drilling, Ltd.*,
    215 S.W.3d 437, 457 (Tex. App.–Eastland, 2006 pet. denied)................................. 56

*Pinnacle Commc'ns Int'l, Inc. v. Am. Family Mortg. Co.*,
    417 F. Supp.  2d 1073 (D. Minn.  2006) ...................................................... 40

*Poole v. Houston & T.C. Ry.*,
    58 Tex. 134 (Tex. 1882)..................................................................... 11

*Priester v. Lowndes County*,
    354 F.3d 414 (5th Cir. 2004)................................................................. 4

*Prostok v. Browning*,
    112 S.W. 3d 876 (Tex. App. – Dallas 2003, rev'd in part on other grounds, 165 S.W. 3d 336
    [Tex. 2005])............................................................................... 43

*Ramirez v. Walker*,
    199 F. App'x 302 (5th Cir. 2006)............................................................. 4

*Reagan Natl' Advertising of Austin, Inc. v. Hazen*,
    not reported, 2008 WL 298823 ............................................................... 12

*Reich v. Lancaster*,
    55 F.3d 1034 (5th Cir. 1995)................................................................ 46

*Renfroe v. Jones & Assoc.*,
    947 S.W. 2d 285 (Tex. App. – Ft. Worth 1997, writ denied) ................................. 13

*Rhodes Colleges Inc. v. Johnson*,
    No. 3:10–CV–0031–D, 2012 WL 627273 (N.D. Tex. Feb. 27, 2012)................................ 14

*Risdall v. Brown Wilbert, Inc.*,
    753 N.W.2d 723 (Minn. 2008) ............................................................... 41

*Rivet v. State Farm Mut. Auto. Ins. Co.*,
  316 Fed.Appx. 440 (6th Cir. 2009) ...................................................... 47

*SEC v. Brady*,
  No. 3:05-cv-1416-N (N.D. Tex. May 12, 2006) ...................................... 5

*SEC v. Diversified Indus. Inc.*,
  465 F. Supp. 104 (D.D.C. 1979) ........................................................... 8

*SEC v. Grendys*,
  579 F.Supp.2d 1 (D.D.C. 2008) ...................................................... 30, 47

*SEC v. Infinity Grp. Co.*,
  212 F.3d 180 (3d Cir. 2000) ................................................................ 48

*SEC v. Milan Group, Inc*.,
  962 F. Supp. 2d. 182 (D.C. 2013) .................................................. 11, 47

*SEC v. Sharp Capital, Inc.*,
  No. CIV.A.3:98CV2792G (N.D. Tex. Apr. 16, 1999) ........................... 5, 8

*SEC v. Stanford Int'l Bank, Ltd., et al.*,
  Case No. 3:09-cv-00298-N, [Doc 1858] ............................................ 2, 45

*SEC v. U.S. Envt.l, Inc.*,
  No. 94 Civ. 6608 (S.D.N.Y. July 21, 2003) .......................................... 48

*Sheddy v. JPMorgan Chase Bank NA*,
  2013 U.S. Dist. LEXIS 14089 (N.D. Tex. Sept. 6, 2013) ...................... 11

*Shields v. State*, 27 S.W.3d 267 (Tex. App. – Austin 2003, no pet.) ..................................... 19, 38

*SR Int'l Bus. Ins. Co. v. Energy Future Holdings Corp*.,
  539 F. Supp. 2d 871 (N.D. Tex. 2008) ................................................... 4

*State v. Standard Oil Co.*,
  130 Tex. 313 (1937)) ........................................................................... 57

*Steiner v. Southmark Corp.*,
  734 F. Supp. 269 (N.D. Tex. 1990) ........................................................ 5

*Sterling Trust Co. v. Adderley*,
  186 S.W.3d 835 (Tex. 2005), ............................................................... 18

*Stevenson v. Koutzarov,*
   795 S.W.2d 313 (Tex. App.—Houston [1st Dist.] 1990, writ denied) .................................... 43

*Strakos v. Gehring,*
   360 S.W.2d 787 (Tex. 1962) ........................................................................... 57

*Sundstrand Corp. v. Sun Chemical Corp.,*
   553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied*, 434 U.S. 875 (1977) .......................... 30, 47

*Swenson v. Engelstad,*
   626 F.2d 421 (5th Cir. 1980) .......................................................................... 40

*Temple v. Gorman,*
   201 F. Supp. 2d 1238 (S.D. Fla. 2002) ................................................................. 40

*Thornton v. Micrografx, Inc.,*
   878 F. Supp. 931 (N.D. Tex. 1995) ...................................................................... 8

*Tilton v. Marshall,*
   925 S.W.2d 672 (Tex. 1996) ........................................................................... 38

*Toles v. Toles,*
   113 S.W.3d 899 (Tex. App.—Dallas 2003, no pet.) ................................................... 9, 44

*Tompkins v. Cyr,*
   202 F.3d 770 (5th Cir. 2000) ....................................................................... 56, 57

*Transportation v. Olson,*
   980 S.W.2d 890 (Tex. App.—Fort Worth 1998 , no pet.) .................................................. 57

*U.S. for Use and Benefit of Canion v. Randall & Blake,*
   817 F.2d 1188 (5th Cir. 1987) .......................................................................... 7

*United States v. Del Valle,*
   587 F. 2d 699 (5th Cir. 1979) ......................................................................... 56

*United States v. Ferguson,*
   Nos. 08- 6211 (2d Cir. Dec. 19, 2011) ................................................................. 48

*United States v. Mann,* 161 F. 3d 840 (5th Cir. 1998) ................................................... 56

*United States v. Upton,* 559 F. 3d 3 (1st Cir. 2009) ................................................... 56

*W. Reserve Life Assurance Co. of Oh. v. Graben,*
   233 S.W.3d 360 (Tex. App.—Fort Worth 2007, no pet.) .................................................. 46

*Wells Fargo Bank Northwest, N.A. v. RPK Capital XVI, L.L.C.*,
    360 S.W.3d 691 (Dallas, 2012) ............................................................................. 42

*Westport Insurance Corp. v. Cotton Schmidt LLP*,
    605 F. Supp. 2d 796 (N.D. Tex. 2009) .................................................................. 10

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) .................................................................................... 50

*Willard v. Humana Health Plan of Texas, Inc.*,
    336 F.3d 375, (5th Cir. 2003) ................................................................................ 59

*Williams v. WMX Techs., Inc.*,
    112 F. 3d 175 (5th Cir. 1997) .................................................................................. 6

*YF Trust v. JP Morgan Chase Bank*,
    No. CV 07–567–PHX–MHM, 2008 WL 821856 (D. Ariz. Mar. 26, 2008) ........... 29

**Statutes**

15 U.S.C. § 78a .............................................................................................................. 48

15 U.S.C. § 78q-1 ............................................................................................................ 2

17 C.F.R. § 230.501 ....................................................................................................... 39

17 C.F.R. § 230.502 ....................................................................................................... 39

17 C.F.R. § 230.503 ....................................................................................................... 39

17 C.F.R. § 230.506 ....................................................................................................... 39

17 C.F.R. § 230.506(b) ................................................................................................... 39

TEX. REV. CIV. STAT. ANN. ART. 581–33F § 2 ............................................................. 15

TEX. REV. CIV. STAT. ANN. ART. 581-4(C) ................................................................... 16

TEX. REV. CIV. STAT. art. 581-10-1B ............................................................................ 19

Tex. Rev. Civ. Stat. art. 581-33(M) ............................................................................. 38

TEX. REV. CIV. STAT. art. 881-33H(1)) .......................................................................... 42

TEX. REV. CIV. STAT. art. 881-33H(2)) .......................................................................... 42

**Other Authorities**

COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES:
    FIDUCIARY DUTY PJC 104.2 (2003) ....................................................................................... 46

SEC Disclosure and Compliance Interpretation, Question 257.07 (Jan. 26, 2009)...................... 39

Plaintiffs Sandra Dorrell, Samuel Troice, and Michoacan Trust, individually and on behalf of all others similarly situated (collectively, hereinafter, the "Class Plaintiffs"), hereby file this joint response and brief in opposition to the motions to dismiss the complaint filed by Defendants Greenberg Traurig, LLP [Docs. 27 and 29] and Hunton & Williams, LLP [Doc. 90], and respectfully show the Court as follows:

## PRELIMINARY STATEMENT

This action arises out of the multi-billion-dollar Ponzi scheme perpetrated by R. Allen Stanford ("Stanford"), and other co-conspirators through a complex network of over 130 entities (the "Stanford Entities") in multiple countries over a period of more than 20 years. *See Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009); *Janvey v. Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d 825, 856-57 (N.D. Tex. 2011). As the MDL Court presiding over the Stanford Receivership and all Stanford-related litigation, the Court is well aware of the facts and circumstances surrounding Stanford's criminal and fraudulent conduct, and Plaintiffs will not restate them here.

Stanford, of course, could not (and did not) operate his schemes alone. Carlos Loumiet ("Loumiet"), a close personal confidant of Stanford for 20 years and a partner in the Defendant law firms Greenberg Traurig, LLP ("Greenberg") and later Hunton & Williams, LLP ("Hunton," and together with Greenberg, "Defendants" or the "Law Firms"), was a knowing and active participant in critical aspects of Stanford's long-standing fraud. Indeed, Loumiet and the Law Firms served as Stanford's trusted primary outside counsel and self-described "outside General Counsel" from 1988 all the way until Stanford was shut down by the SEC in February 2009.[1]

In a comprehensive, painstakingly detailed, and factually intensive 464-paragraph Complaint, Plaintiffs allege that Loumiet and each of the Law Firms served as the architects and

---

[1]      Complaint, Doc. 1, at ¶ 290.

legal "enforcers" of Stanford's fraudulent empire, carefully laying the groundwork for and abetting Stanford's fraud and theft of billions in CD customer funds.   Plaintiffs allege that, while working first at Greenberg and then at Hunton, Loumiet facilitated Stanford's achievement of his ultimate goal:  to operate his illicit offshore bank scheme without any proper regulatory oversight whatsoever, all while tricking investors into believing that his financial service empire was based in the United States and therefore regulated by - and compliant with - U.S. laws and regulations. Plaintiffs therefore allege that Defendants participated in Stanford's regulatory fraud and violations of banking and securities laws (including the Investment Company Act) in the United States and around the world by helping Stanford create, implement and perpetuate his complex "regulatory evasion" structure, ***none of which was ever disclosed to Stanford's investor victims***, thereby allowing Stanford to sell his fraudulent, unregistered securities from the U.S. for over 20 years.[2]

Like other Defendants in the Stanford saga, the instant Defendants attempt to divert the Court's focus away from the case that Plaintiffs have actually pled, and instead seek to "create" a case they *wish* Plaintiffs had pled.   Plaintiffs do not (and do not have to) allege that Defendants knew for a fact that Stanford was a Ponzi scheme (although Plaintiffs do allege at ¶293 of the Complaint that Loumiet knew that others had alleged that Stanford was a Ponzi scheme). Rather, Plaintiffs allege that Defendants knew that Stanford (1) was violating banking and

---

[2]     Of particular relevance, on April 25, 2013, this Court granted summary judgment for the Securities and Exchange Commission ("SEC") against Allen Stanford and several of the Stanford Entities, finding that they, *inter alia*, "committed serious violations of the securities laws, did so recurrently, and did so with a high degree of scienter." *SEC v. Stanford Int'l Bank, Ltd., et al.*, Case No. 3:09-cv-00298-N, [Doc 1858], p. 11.  The Court granted judgment in favor of the SEC and against Stanford and his entities for violations of: (i) §10(b) and 10b-5 of the Exchange Act; (ii) §17(a) of the Securities Act; (iii) §206(1) and (2) of the Investment Advisers Act; <u>and</u> (iv) §7(d) of the **Investment Company Act**.  *Id.*

securities laws and regulations in this country and other countries around the world; (2) Stanford was constantly under investigation by the U.S. and other foreign governments;  (3) Stanford had corrupted and exercised complete control over the government of the impoverished Caribbean island nation of Antigua that served as his offshore bank's sole regulator;  (4) Stanford was selling unregistered securities from Texas through various unlicensed and unregulated "feeder" sales offices;  and (5) most importantly, that none of the above was ever disclosed to Stanford's investors.    Based on those allegations, the Class Plaintiffs have stated claims (the "Class Claims") for:

- Aiding and Abetting Violations of the Texas Securities Act (*id.* ¶¶ 441-451);
- Participation in/Aiding and Abetting Breach of Fiduciary Duty (*id.* ¶¶ 452-454);
- Aiding and Abetting/Participation in a Fraudulent Scheme (*id.* ¶ 455); and
- Civil Conspiracy (*id.* ¶¶ 456-458).

Based on the facts alleged in the Complaint, and for the same reasons this Court denied another Stanford defendant's Motion to Dismiss Texas Securities Act claims in the *Kneese v. Pershing* case, Case No. 3:10-cv-01908-N-BL (Order dated November 14, 2012, dkt #21), this Court should deny Defendants' Motions [Docs. 29 and 90] in their entirety.[3]

## FACTS

The Complaint sets forth in exhaustive detail plausible facts supporting causes of action against Defendants for aiding and abetting violations of the Texas Securities Act, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and civil conspiracy.[4]    As

---

[3]    The Class Plaintiffs did not state claims against Suarez.

[4]    For the Court's convenience, Plaintiffs have created a 10 page summary of the relevant facts pled in the

demonstrated in the Complaint, Loumiet and other attorneys at Greenberg and Hunton (i) had knowledge of Stanford's illicit operations and "improper activities"; and (ii) materially assisted and conspired with Stanford and the Stanford Entities with respect to this misconduct during a period spanning 20 years.

Plaintiffs detail the Complaint's pertinent factual allegations below in response to Defendants' specific arguments.

## ARGUMENT

## I.   THE CLASS PLAINTIFFS' CLAIMS SATISFY ALL APPLICABLE PLEADING REQUIREMENTS

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded allegations as true and view them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co., v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *SEC v. Reynolds*, No. 3-08-CV-0384-B, 2008 WL 3850550, at *3 (N.D. Tex. Aug. 19, 2008). Motions to dismiss are viewed with disfavor and rarely granted. *Ramirez v. Walker,* 199 F. App'x 302, 306 (5th Cir. 2006); *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004); *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997); *SR Int'l Bus. Ins. Co. v. Energy Future Holdings Corp.*, 539 F. Supp. 2d 871, 874-75 (N.D. Tex. 2008). A motion under Rule 12(b)(6) should be granted only if the complaint does not include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the

---

Complaint as to each Defendants' knowledge and conduct, with citations to the corresponding paragraphs in the Complaint. The Summary of Facts is included in the Appendix as Exhibit "1".

assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Id*. at 545 (internal citations omitted).

The Class Plaintiffs allege that the Law Firms engaged in and/or aided and abetted significant fraudulent misconduct and regulatory violations. Accordingly, the Class Plaintiffs must meet the pleading standard outlined in FED R. CIV. P. 9(b). Rule 9(b), in turn, provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* As such, pleading circumstantial evidence of fraudulent intent meets the Rule 9(b) pleading standard. *See Experian Info. Solutions, Inc. v. Lexington Allen L.P.*, No. 4:10–cv–144, 2010 WL 4026823 at *3 (E.D. Tex. Aug. 27, 2010) (finding allegations in complaint "provide the slight circumstantial evidence of fraud required to support an inference of fraudulent intent") (citation omitted); *see also Chartwell Healthcare v. People's Home Health*, No. 3:96–CV–1938–G, 1997 WL 86435 at *2 (N.D. Tex. Feb. 19, 1997) (scienter adequately pled and "minimum allegations required by Rule 9(b) met" in two paragraphs of complaint) (citations omitted).

Significantly, Rule 9(b) is <u>not</u> intended "to procure punctilious pleading detail," and must be "read in conjunction with Rule 8['s]" notice pleading requirements. *SEC v. Brady*, No. 3:05-cv-1416-N, 2006 WL 1310320, at *3 (N.D. Tex. May 12, 2006); *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990); *see also SEC v. Sharp Capital, Inc.*, No. CIV.A.3:98CV2792G, 1999 WL 242691, at *2 (N.D. Tex. Apr. 16, 1999) (noting with respect to Rule 9(b) that "courts have never required a plaintiff to plead detailed evidence in its complaint") (citation omitted). In this regard, the Fifth Circuit's historical and contextual

explication of Rule 9(b) is particularly instructive.  As stated by the Fifth Circuit in *Williams v. WMX Techs., Inc.*, 112 F. 3d 175, 178 (5th Cir. 1997):

> the requirement for particularity in pleading fraud does not lend itself to refinement, and it need not in order to make sense. Directly put, the who, what, when, and where must be laid out before access to the discovery process is granted.  So today we neither set springs for the unwary nor insist on 'technical' pleading requirements.  We remind that this bite of Rule 9(b) was part of the pleading revolution of 1938.  In short, we apply the rule with force, without apology.  At the same time, we read Rule 9(b) as part of the entire set of rules, including Rule 8(a)'s insistence upon 'simple, concise, and direct' allegations.  Relatedly, while 9(b) stands as an exception to an overarching policy of immediate access to discovery, it did <u>not</u> reflect a subscription to fact pleading.

*Id.* (emphasis supplied.)  Here, the Class Plaintiffs have made specific allegations concerning <u>each</u> of the Law Firms' knowledge of and participation in fraudulent conduct – *see* attached Exhibit "1" – and, at the very least, have put forth more than enough "circumstantial" evidence of liability.

Blinding itself to Rule 9(b)'s actual pleading requirements and the specific allegations made against it, Hunton argues, as a threshold matter, that the Complaint does not specify what each of the Law Firms "knew and did" and "lumps" together all Defendants for pleading purposes.  *See* [Doc. 90] p. 10.  But that is simply not the case.  The Complaint – in 464 detailed paragraphs – takes pains to distinguish the conduct and knowledge of <u>each</u> of the Law Firm defendants.  Paragraphs 64-228 of the Complaint plead facts relating to Greenberg; paragraphs 229-392 pleads facts relating to Hunton.  *Compare* [Doc. 1] pp. 25-83 (<u>facts relating to Greenberg</u>), pp. 83-135 (<u>facts relating to Hunton</u>).   See also attached Exhibit "1" for summary of those facts, broken down by Defendant.

**CLASS PLAINTIFFS' JOINT RESPONSE TO MOTIONS TO DISMISS**                                    **6**

Hunton, however, harps disingenuously on discreet sentences in the Complaint, arguing that the Class Plaintiffs' recitation of its causes of action – which at times refers to "Defendants" and not each specific defendant – renders the entire prior factual pleading vague and void under Rule 9(b).  *See* [Doc. 90] p. 10-11 (selectively quoting the Class Plaintiffs' pleading of the elements of certain causes of action).  But in reciting the elements of their causes of action, the Class Plaintiffs are entitled to incorporate by reference earlier portions of the Complaint which specify the conduct and defendant at issue.  *See U.S. for Use and Benefit of Canion v. Randall & Blake*, 817 F.2d 1188, 1191 (5th Cir. 1987) ("The allegations of the complaint, both explicit and incorporated by reference, were adequate to notify the appellants that they were being sued under the Miller Act.  The complaint clearly set forth the three substantive elements of a Miller Act claim: the supplier supplied materials, the supplier was not paid, and the supplier intended the materials to be used on the government's project.  The substantive allegations of the complaint, not references to the Miller Act by name, determine whether the complaint sets forth a Miller Act claim.").  Moreover, the factual allegations made against each of the Law Firm defendants – which are, in fact, <u>itemized by defendant</u> in the body of the Complaint – must be considered "cumulatively" when evaluating the sufficiency of the Class Plaintiffs' overall pleading of misconduct and scienter.  *See In re Fossil, Inc.*, 713 F. Supp. 2d 644, 652 (N.D. Tex. 2010) (rejecting Defendant's argument of impermissible "group pleading," and ruling that "[t]he SAC sufficiently alleges scienter as to these individual Defendants. The SAC describes in detail, with respect to each individual, sufficient factual information that this Court finds a strong inference of scienter with respect to each individual Defendant because the inference of scienter is cogent and at least as compelling as any opposing inference of nonfraudulent intent.

Considering all of Plaintiffs' allegations cumulatively as the Court must, the Court concludes Plaintiffs sufficiently pleaded scienter.") (emphasis supplied) (citing *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 252 (5th Cir. 2009) and *Goldstein v. MCI WorldCom*, 340 F.3d 238, 247 (5th Cir.2003)).[5]

Accordingly, there is no basis for Hunton's assertion that the Complaint somehow does not specify the conduct and knowledge of each defendant. The Complaint gives ample – if not too much – notice of the facts and transactions at issue in this litigation, such that Hunton can prepare its defense. Indeed, nothing more is required under the Federal Rules. *See SEC v. Sharp Capital, Inc.*, 1999 WL 242691, at *4 (citing *SEC v. Diversified Indus. Inc.*, 465 F. Supp. 104, 111 (D.D.C. 1979) ("details of the scheme" were sufficient because they adequately apprised defendants of basic transactions and enabled them to prepare a defense)). Moreover, and as demonstrated below, each of the Class Plaintiffs' causes of action are plausible and properly pled as a matter of law.

## II.  THE CLASS PLAINTIFFS' CLAIMS ARE NOT BARRED BY TEXAS' QUALIFIED ATTORNEY IMMUNITY DOCTRINE

### A.  The Attorney Immunity Doctrine Does Not Apply

Hunton makes another threshold argument: that all the Class Plaintiffs' claims must be

---

[5]      *Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 937 (N.D. Tex. 1995), which Hunton cites in support of its argument, is inapposite, because there the plaintiff's "facts" section itself was vague and failed to describe any misconduct, such that the plaintiff's subsequent pleading in its "causes of action" of misconduct on behalf of unspecified "defendants" did not have any prior factual underpinning. *See id*. ("Conspicuously absent [from the "facts" section] are facts indicating that the Defendants' statements were false or materially misleading."). In contrast, the Class Plaintiffs herein have gone to great lengths to put before the Court a detailed narrative in the "Facts" section of the Complaint specifying the misconduct of <u>each</u> of the Law Firm defendants. Hunton's claim that it supposedly cannot parse out the facts stated against it should be disregarded.

dismissed as a matter of law because Hunton is supposedly immune from liability under the attorney "qualified immunity doctrine."  Specifically, Hunton argues that attorneys cannot be held civilly liable for damages to non-clients under any theory of recovery for actions taken in connection with representing a client. *See* [Doc. 90] p. 7.

Hunton, however, radically misstates the nature and applicability of the attorney immunity doctrine.  The doctrine applies only in the limited context of an adversarial proceeding involving the parties; it simply prevents a party to an existing litigation from subsequently suing the attorney representing the opponent. *See Toles v. Toles*, 113 S.W. 3d 899, 910 (Tex. App.—Dallas 2003, no pet.); *see also Dixon Fin. Servs., Ltd. v. Greenberg, Peden, Siegmyer & Oshman, P.C.,* No. 01–06–696–CV, 2008 WL 746548, at **9–11 (Tex. App.—Houston [1st Dist.] Mar. 20, 2008, pet. denied) (applying attorney immunity to conduct "in an adversarial context" of "post-arbitration proceedings, an adversarial process similar to litigation" involving actions both prior to and during litigation); *Butler v. Lilly,* 533 S.W.2d 130, 131–34 (Tex. App.—Houston [1st Dist.] 1976, writ dism'd) (an attorney is "qualifiedly immune" from civil liability, with respect to non-clients, for actions taken in connection with representing a client in litigation).  Because most jurisdictions already provide punishment for attorney misconduct in the form of sanctions, a third party has no independent cause of action against an attorney in an existing or subsequent action even if the attorney's conduct is frivolous or without merit. Otherwise, "an attorney's knowledge that he may be sued . . . would favor tentative rather than zealous representation of the client, which is contrary to professional ideals and public expectations." *Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 440 (Tex. App.—Houston [14th Dist.] 2000, review denied).

In the present case, the fraudulent conduct forming the basis of the Class Plaintiffs' Complaint is not wrongful litigation conduct with respect to actions taken by Hunton in connection with representing Stanford in a previous proceeding against the Class Plaintiffs. Rather, the Class Plaintiffs allege that the Law Firms took various overt acts that proximately caused damages to them and other Stanford CD-investors during their representation of Stanford, SGC, SIB, STC, and SFIS in unrelated matters.   Therefore, Hunton's attempted use of the attorney immunity defense as a basis to dismiss Plaintiffs' claims is improper on its face and should be rejected.

**B.       Attorney Immunity Does not Apply to Conduct Outside the Bounds of the Law**

Hunton further argues that the qualified attorney immunity doctrine applies even if its conduct was fraudulent.   Even assuming *arguendo* that the attorney immunity doctrine could possibly apply here, the "qualified" attorney immunity doctrine is, by its own terms, <u>qualified</u> and not absolute.   Thus, in *Westport Ins. Corp. v. Cotton Schmidt LLP*, 605 F. Supp. 2d 796 (N.D. Tex. 2009), Judge Means recognized that "an attorney's immunity is, in fact, limited."   *Id*. at 802.   Texas law is clear that an attorney is only immune to the extent his conduct is "<u>within the bounds of the law</u>."   *Mendoza v. Fleming*, 41 S.W. 3d 781, 787 (Tex. App.—Corpus Christi 2001, no pet.) (reversing summary judgment based on fact question of whether attorney was acting within the bounds of the law).   However, when an attorney engages in "fraudulent or malicious" acts "he is liable for injuries to third parties."   *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985, no writ); *see also*, *Toles*, 113 S.W. 3d at 911 (reversing summary judgment that dismissed aiding and abetting and conspiracy claims based on attorney litigation defense).   This is because fraud and illicit acts are "foreign to

the duties of an attorney." *Poole v. Houston & T.C. Ry.,* 58 Tex. 134, 137 (Tex. 1882).

Inherent in this line of cases is the notion that an attorney who conspires with his client to obstruct regulatory investigations of the client so as to allow the client to continue to violate the law by selling unregistered and fraudulent securities cannot then hide behind the shield of attorney immunity. *Cf. SEC v. Milan Group, Inc.*, 962 F. Supp. 2d. 182, 201-202 (D.C. 2013) (granting summary judgment for SEC against lawyer accused of aiding and abetting securities fraud scheme, and holding that the lawyer's "attempt to use her role as an attorney as a shield is particularly pernicious" given the gravity of the evidence against her, which the court found "went far beyond her role as an attorney"); *see also Sheddy v. JPMorgan Chase Bank NA*, No. 3:12-cv-2804, 2013 WL 5450288, at n.2 (N.D. Tex. Sept. 30, 2013) (Judge Lynn noting that "even assuming the [attorney immunity] doctrine applies, its reach does not appear to be as broad as [the law firm] claims," and citing *Hunt v. BAC Home Loan Servicing, LP*, 2012 WL 219330, No. C–11–261 (S.D. Tex. Jan. 24, 2012) (denying law firm's motion to dismiss because it failed to show it was entitled to immunity); *Byrd v. Vick, Carney & Smith LLP*, 409 S.W. 3d 772 (Tex. App.—Ft. Worth 2013, reh'g overruled) (reversing grant of summary judgment in favor of law firm based on attorney immunity); *Essex Crane Rental Corp. v. Carter,* 371 S.W. 3d 366 (Tex. App.—Houston [1st Dis.] 2012, pet. denied) (reversing grant of summary judgment based on attorney immunity). And Hunton can point to no case – **not a single case** – where a lawyer was found to be immune where he aided and abetted his client in violating the Texas Securities Act or common law fraud.

Indeed, even the principal cases cited by Hunton recognize that an attorney's illegal or fraudulent conduct destroys the attorney immunity shield precisely because an attorney is "**not**

protected from liability to third parties for every tort committed by a lawyer that may be tangentially related to his professional role or which may occur during litigation." *Alpert v. Riley*, No. H–04–CV–3774, 2008 WL 304742, at *18 (S.D. Tex. 2008) (emphasis supplied); *see also Reagan Nat'l Advertising of Austin, Inc. v. Hazen*, No. 03-05-00699-CV, 2008 WL 2938823, at *9 (Tex. App.—Austin, Jul. 29, 2008, no pet.); *Alpert v. Crain, Caton & James, P.C.*, 178 S.W. 3d 398, 407 (Tex. App.—Houston [1st Dist.] 2005, pet denied).

In this case, the Class Plaintiffs allege illicit and fraudulent conduct by Hunton – conduct that is outside the bounds of the law and foreign to the duties of a lawyer, and which place the Class Claims squarely within the exception to attorney immunity.   Indeed, the Complaint is replete with allegations that Hunton knowingly engaged in an array of conduct which allowed Allen Stanford to continue to sell - and to expand his sales of - the unregulated and bogus CDs.

While Greenberg helped Stanford take over the tiny, impoverished Caribbean island nation of Antigua, Hunton assisted Stanford to maintain control over Antigua by, e.g., helping Stanford ward off outside regulation of SIB by the ECCB by "ghost writing" arguments for SIB's chief regulator, Leroy King, and leading efforts to crush an Antiguan political opposition movement that was criticizing Stanford's "graft pyramid" scheme in Antigua.   Complaint, at ¶¶ 267-275;  329-334.   While such conduct may appear on its surface to be "regular" attorney representation, such conduct cannot be viewed in isolation as Hunton suggests, but rather must be viewed in context and against the totality of circumstances and the backdrop of Loumiet's, and hence Hunton's, historical knowledge of what Stanford had been doing in Antigua since 1991.

The same is true with regard to Hunton's assistance in helping Stanford to establish and

protect all of his U.S. marketing and sales "feeder" offices, including the illegal offshore "trust" representative offices of SFIS in Miami, Houston and San Antonio whose sole purpose was the sale of SIB CDs to Latin American investors to ultimately funnel billions of dollars into Stanford's Ponzi scheme (*see, e.g., id.* at ¶¶ 37, 54, 69, 88, 90-96, 136, 165-88, 241, 246, 365, 374, 387).   And the same is true of  Hunton's involvement in helping Stanford structure the transactions through which Stanford "invested" the money he pilfered from SIB, including massive investments in Caribbean real estate and speculative venture capital investments (*see e.g., id.* at ¶¶, 345-64).   Finally, there is no question that lying to regulators, whether in the U.S. or abroad, so as to help Stanford expand and otherwise continue his CD sales, is conduct that is beyond the pale in terms of an attorney's "zealous" representation of a client.  *Id.*, at ¶¶ 309-311 (Loumiet lying to foreign regulators to help Stanford establish SIB CD sales operations in Panama and Venezuela);   ¶ 374 (Loumiet lying to Florida state regulators to protect SFIS' operations). Under these circumstances, Texas law is clear the qualified attorney immunity doctrine cannot protect Hunton from liability.  *See, e.g., Chu v. Hong*, 249 S.W.3d 441, 446 (Tex. 2008) ("attorney who personally steals goods ***or tells lies on a client's behalf*** may be liable for conversion or *fraud* in some cases")(emphasis added); *Renfroe v. Jones & Assoc.*, 947 S.W. 2d 285 (Tex. App.—Ft. Worth 1997, writ denied) (lawyer immune only for actions which are "within the bounds of the law").

### C.    The Attorney Immunity Defense Requires Resolution of Fact Issues

Finally, Hunton's argument is premature and procedurally flawed because the "qualified attorney immunity doctrine" is an affirmative defense under Texas law, and must be pled and proven by Hunton, which bears the "heavy" burden of proof on this issue.  *See, e.g., Rhodes*

*Colleges Inc. v. Johnson*, No. 3:10–CV–0031–D, 2012 WL 627273, at *4 (N.D. Tex. Feb. 27,

2012) (J. Fitzwater) (denying summary judgment on attorney immunity affirmative defense);

*Reagan Nat'l Advertising of Austin Inc.*, 2008 WL 2938823, at *4; *Lackshin v. Spofford*, not

reported, No. 14-03-00977-CV, 2004 WL 1965636 (Tex. App.—Houston [14th Dis.] 2008, pet.

denied).  "When a party moves for summary judgment on a claim or defense on which she or it

will have the burden of proof at trial, the party must establish beyond peradventure all of the

essential elements of the claim or defense."  *Rhodes*, 2012 WL 627273, at *4.  Here, Hunton has

not even raised the qualified immunity doctrine in an answer, and there has been no discovery

and no evidentiary submission in support of this affirmative defense.  Accordingly, Hunton's

flawed and premature invocation of this affirmative defense should be disregarded.

## III.   THE CLASS PLAINTIFFS HAVE STATED VALID CLAIMS FOR AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT

The Class Plaintiffs have pled that the Law Firms aided and abetted the Stanford Entities'

primary violations of the Texas Securities Act ("TSA").  Specifically, the Class Plaintiffs allege

that the Law Firms aided and abetted the following violations: (i) the sale of unregistered

securities – SIB CDs – that were required to be registered under the TSA (*see* Complaint [Doc.

1] ¶¶ 441-444); (ii) the sale of securities by unregistered dealers (*see id.*, ¶¶ 445-447); and (iii)

the sale of securities through the use of untrue representations and materially misleading

missions (*see id.*, ¶¶ 448-450).

This Court has already had occasion to rule on investor TSA claims arising from the

Stanford fraud.  In its November 14, 2012 Order (dkt #21) in *Kneese v. Pershing,* Case No. 3:10-

cv-01908-N-BL, this Court held that the pleading in that case (which was an exact replica of the

Pershing Class Complaint drafted by the undersigned counsel and which incorporates many of the same claims as the present case) was sufficient to withstand Pershing's Motion to Dismiss. In particular the Court held that the *Kneese* plaintiffs had sufficiently pled Stanford's primary violations of the TSA for the sale of unregistered securities and for selling securities based on untrue statements. *Id.*, at p. 6. The Court further held that the *Kneese* plaintiffs had sufficiently pled that Pershing was aware of the violations, and that Pershing substantially assisted the violations. *Id.*, at pps. 7-10. As to the latter factor, the Court noted that the questions of "substantial assistance" or "material aid" were fact questions and thus inappropriate for resolution by dismissal motion. *Id.* at p. 10, footnote 6.

The TSA provides as to the liability of aiders and abettors in fraudulent securities transactions:

> A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

TEX. REV. CIV. STAT. ANN. ART. 581–33F § 2. To prove aider-and-abettor liability, a plaintiff must demonstrate: "(1) that a primary violation of the securities laws occurred; (2) that the alleged aider had general awareness of its role in this violation; (3) that the actor rendered substantial assistance in this violation; and (4) that the alleged aider either (a) intended to deceive plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator." *Darocy v. Abildtrup*, 345 S.W.3d 129, 138–39 (Tex. App.—Dallas 2011, no pet.) (citations omitted).

Here, the Class Plaintiffs have properly pleaded each of these elements:

## A.      Primary Violations of the TSA

The Class Plaintiff have adequately plead Stanford's and the Stanford Entities' primary violations of the TSA.  The Complaint, in over 35 detailed paragraphs, describes Stanford's far-reaching securities fraud and primary violations of the TSA.  *See* [Doc. 1] ¶¶ 23-48, 441-451.

Significantly, at this point in Stanford-related litigation, Stanford's primary violation of the TSA cannot credibly be disputed.  This Court has issued findings of fact that Stanford violated the federal securities laws (*see* Order, Case No. 3:09-cv-00298-N [Doc. 1858] (granting partial summary judgment to the Securities and Exchange Commission)), and that the "center of main interest" for Stanford's fraudulent activities was Texas.  *See* Order, Case No. 3:09-cv-0721-N [Doc. 176] (granting conditional and limited recognition to the Antiguan Joint Liquidators).

Furthermore, in *Kneese* this Court held that Stanford committed primary violations of the TSA by selling unregistered securities and by selling securities based on untruths or omissions of material facts.

In the instant case, Plaintiffs similarly allege that Stanford committed primary violations of the TSA in three ways:   (1) by selling unregistered securities (the SIB CDs);  (2) by selling the SIB CDs through unregistered dealers;[6] and (3) by selling the SIB CDs through untruths or

---

[6]      Hunton claims that there was no primary violation of the TSA for selling CDs through an unregistered broker-dealer because SGC was, in fact, a registered broker-dealer.  *See* [Doc. 90] p. 18 (noting that "[t]he TSA does not extend to securities sold through a registered dealer.") (citing TEX. REV. CIV. STAT. ANN. ART. 581-4(C)).  But SGC was not the only Stanford Entity involved in the sale and marketing of CDs to Texas and U.S. residents.  The Class Plaintiffs allege that the CDs were sold in the U.S. and abroad through a web of different Stanford "feeder" or promoter entities – such as, e.g., SFIS - and that all of the sales and marketing activities of those "feeder" entities were controlled by Stanford from Houston, Texas.  *See* Complaint [Doc. 1] ¶¶ 25, 27, 29, 31, 38.  At the very least,

omissions.   As to the latter claim, again, Class Plaintiffs allege that Stanford omitted to disclose

to the investors that he, *inter alia*, was violating and/or evading banking and securities laws

around the world; was under constant investigation by multiple agencies of the U.S. Government

(as well as foreign governments); and had taken over and corrupted the only government that

regulated the issuer of his fraudulent securities, SIB.   Clearly such information was material to

investors and would have affected their decision to invest with Stanford in the first place. See,

e.g., *Birdwell v. State*, No. 05-07-00258-CR, 05-07-00259-CR, 2008 WL 467271 (Tex. App.—

Dallas Feb. 23, 2008, no pet.) (not designated for publication) (an omitted fact is material if there

is a substantial likelihood that it would have assumed actual significance in the deliberations of a

reasonable investor, in that it would have been viewed by the reasonable investor as significantly

altering the total mix of available information used in deciding whether to invest).

> **B.      The Law Firms' Knowledge of Primary Violations**

The Class Plaintiffs have also properly plead that each of Greenberg and Hunton were

generally aware of the primary violations and Stanford's improper conduct for purposes of TSA

aider liability.

---

there is a fact issue as to whether or not the Stanford Entities were acting as a dealer selling securities from and through Texas based on the fact that all marketing and sales activities were directed and controlled from Houston. *See Citizens Ins. Co. of America v. Daccach*, 217 S.W.3d 430, 447 (Tex. 2007) (fact issue as to whether sales of securities to foreign nationals occurred in Texas based on substantial marketing efforts taking place in Texas). Another of Hunton's similar arguments – that there was no primary TSA violation because the TSA does not apply to a "conglomeration" – is even more suspect.  *See* [Doc. 90] p. 18.  The Class Plaintiffs have identified clearly in the Complaint which Stanford Entities were within the purview of the TSA.  *See, e.g.,* Complaint ¶¶ 24, 25, 27, 29-31, 38-42, etc.   That the Class Plaintiffs have characterized these entities as a "conglomeration" in a single paragraph in the complaint is of no moment.

In *Sterling Trust Co. v. Adderley*, 186 S.W.3d 835 (Tex. 2005), the Texas Supreme Court clarified that the TSA's "'reckless disregard for the truth or the law'" standard means that an alleged aider can only be held liable if it rendered assistance in the face of a **perceived risk** that its assistance would facilitate untruthful or illegal activity by the primary violator." *Sterling*, 168 S.W.3d at 842 (citations omitted). "In order to perceive such a risk, the alleged aider must possess a 'general awareness that his role was part of ***an overall activity that is improper***.'" *Id.* (emphasis supplied) (quoting *Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 780 (3d Cir. 1976)).

Importantly, the standard set by the Texas Supreme Court for recklessness based on a "perception of risk" only requires evidence showing that the aider had general awareness that the primary violator (here, Stanford) was generally engaged in an overall activity that is "improper", ***not***, as Hunton wrongly suggests,[7] that the plaintiff must prove that the alleged aider had actual knowledge of the exact nature of the primary violations. The Texas Supreme Court made this clear by noting that "[t]his standard does **not** mean that the aider must know of the ***exact*** misrepresentations or omissions made by the seller, but it does mean that the aider must be subjectively aware of the primary violator's improper activity." *Id.* at 837 (emphasis supplied). The Court even provided examples of when an aider might be found to have "general awareness" of "improper activities", including knowledge that the primary violator was "engaging in

---

[7]     Hunton apparently believes that the Texas Supreme Court in *Adderly* re-wrote the TSA to delete the "recklessness" standard and instead replace it with an "actual knowledge" standard.   See Hunton Motion, at p. 12 (arguing that the Supreme Court meant to say "actual awareness" as opposed to reckless disregard based on a "general awareness of improper activity" standard).

atypical business transactions" or was engaging in "irrational trading" while having "financial difficulties".  *Id*., at 845 (citing *State ex rel. Goettsch V. Diacide Distribs, Inc*., 561 N.W. 2d 369, 382 (Iowa 1997) and *Graham v. SEC*, 222 F. 3d 994, 1005 (D.C. Cir. 2000)).

The Texas Supreme Court easily could have written in *Adderly* that the evidence must show that the aider had "actual awareness" of the precise primary violations, as Hunton suggests, but it chose not to – most likely because requiring evidence of actual knowledge of the exact primary violation would effectively delete the recklessness standard from the TSA and replace it with a requirement that the aggrieved investor prove that the alleged aider not only knew about the primary violation but acted intentionally to assist the violation.  No Texas court has ever read the TSA so narrowly, and such a reading would be contrary to the legislative history of the statute and concomitant mandate that courts are to construe the TSA **broadly "to effectuate its general purposes *to protect investors*"**, TEX. REV. CIV. STAT. art. 581-10-1B; *Shields v. State*, 27 S.W.3d 267, 273 (Tex. App. – Austin 2003, no pet.); *Anheuser-Busch Cos. v. Summit Coffee Co.*, 934 S.W.2d 705, 708 (Tex. App.—Dallas 1996, writ dismissed by agr.)(quoting *Flowers v. Dempsey-Tegeler & Co*., 472 S.W.2d 112, 114 (Tex. 1971)).

Despite Defendants' claims to the contrary, the Complaint details both Greenberg's and Hunton's subjective awareness of Stanford's improper activity, including Stanford's violations of laws.  While much of Stanford's improper activity occurred on Greenberg's "watch", plenty occurred while Hunton was representing Stanford as well.  Moreover, any knowledge that Loumiet possessed when he left Greenberg and lateralled as a partner to Hunton migrated with him to Hunton.   Despite Hunton's best efforts to run away from its former partner Loumiet now, Loumiet simply did not check his knowledge at the door when he joined Hunton, and all of

the same knowledge he had acquired while representing Stanford for 13 years as a partner at Greenberg transferred with him to Hunton.

### The Law Firms' Knowledge of Stanford's "Improper Activities"

Loumiet and the Law Firms gained extensive and early knowledge of the illicit and fraudulent nature of the Stanford enterprise through their long-term representation of Stanford and the Stanford Entities on numerous matters, including knowledge of constant government investigations of Stanford as well as  allegations of fraud lodged against Stanford by various journalists, Antiguan citizens, and former Stanford employee whistleblowers. *See, e.g.,* Complaint [Doc. 1] at ¶¶ 57, 63 (U.S. Government accuses Stanford of violating banking laws and laundering money);  ¶¶ 97-100 (U.S. Government investigates Stanford for money laundering); ¶¶ 60-61 (Montserrat Government investigates Stanford and revokes his banking license there);[8] ¶¶ 72-73, 84 (Chase and other U.S. banks terminate their correspondent bank relationship with SIB); ¶¶ 77 (British journalist accuses Stanford of fraud with respect to Stanford's SIB CD marketing practices); ¶¶ 57, 63, 70, 74-75 (OCC investigates Stanford); ¶ 97 (FBI investigates Stanford); ¶ 192 (SEC investigates Stanford for violations of federal securities laws related to SIB CD sales); ¶¶ 214-217 (DEA investigates Stanford); ¶¶ 200-206 (former Stanford employee "whistle-blower" alleges fraud with respect to Stanford's SIB CD marketing

---

[8]     Importantly, Loumiet knew that one of the reasons the Montserrat Government revoked GIBL's banking license was because it found that GIBL's auditor, C.A.S. Hewlett ("Hewlett"), was not qualified. *Id.* at ¶¶ 60-61. The Montserrat Government noted that by using an unqualified auditor, Stanford had managed to "*influence the withholding of detailed information that would normally be expected in audited financial statements*." *Id.* at ¶ 61. Nevertheless, Loumiet and the Law Firms knew that Stanford continued to use Hewlett as SIB's sole auditor until the Stanford empire's collapse in 2009. *Id.* at ¶ 61.

practices); ¶¶ 110, 123 (Antiguan and U.S. journalists accuse Stanford of illicit conduct with respect to loans made to the Antiguan Government);  ¶¶ 247-251 (Antiguan investigation of Stanford's loans to the Antiguan Government); ¶¶ 264-265, 268-270 (Antiguan political party accuses Stanford of running a "graft pyramid scheme" in Antigua); ¶¶ 235, 325-326 (investigation by Ecuadorian Government with regard to Stanford's violations of Ecuadorian law related to SIB CD sales); ¶¶ 152, 154-155 (U.S. and British governments issue warnings about Antigua based on Stanford's control of the regulatory regime there);  ¶¶ 319-324 (Mexican criminal action against Stanford's Mexican operations related to SIB CD sales); ¶¶ 385, 387-392 (Federal Reserve Board investigation of Stanford Fiduciary Investor Services ("SFIS") related to SIB CD sales).

Indeed, the Law Firms, through Loumiet and other employees, knew during the *entire duration of their relationship with Stanford* that Stanford was under investigation by the U.S. Government in connection with a series of serious matters.  Thus, for example, in November 1990, Loumiet received a report compiled by a member of a committee established by the Antiguan Government to investigate Stanford's operations, which included a note from John Shockey at the OCC that Stanford had been "operating on the fringe of illegality for many years," and that Stanford was being investigated by the DEA, U.S. Customs and the Texas banking commission.  *Id*. at ¶¶ 70-71.  Twelve years later, Loumiet (while at Hunton) stated in a May 3, 2002 e-mail to Suarez: "*I have been told that Allen is being investigated again by 'the Feds'.  According to my calculations, this has to be the twentieth time.*"  *Id*. at ¶ 307 (emphasis supplied).  By 2008 Loumiet and Hunton knew that Stanford was under investigation by various U.S. federal agencies.  *Id*., at ¶¶ 385, 387.

From the very beginning of their relationship, Loumiet – first at Greenberg and later at Hunton – knew the type of individual Stanford was, and the type of business he operated. Loumiet was asked early on in 1988 to push what Stanford could do in the U.S. from an operational and regulatory perspective "to the legal limit." *Id.* at ¶ 54.[9] The Law Firms always knew that Stanford's ultimate goal and business model was to operate an offshore, unlicensed and unregulated investment company "bank" from the U.S. using U.S.-based marketing and sales offices while wholly evading U.S. laws and regulations.[10] *Id.*, at ¶¶ 49, 53, 165-166, 168.   In fact Loumiet and the Law Firms always knew that SIB was just a façade and its real banking operations were carried out from the U.S.   *Id.* at ¶ 50; 83-84.   Loumiet and the Law Firms also knew that Stanford nevertheless marketed his operation as being based in the U.S. and subject to U.S. laws and regulations in order to convey legitimacy and credibility on his offshore business, because the key to Stanford's success was his ability to market the business (particularly to Latin American clients) as being based in the U.S.   *Id.* at ¶¶ 11, 14, 27, 53.   Indeed, Loumiet was aware since 1991 that London's Financial Times had accused Stanford of defrauding Latin American investors by tricking them into believing his bank was based in Texas and fully regulated by the U.S. Government.   *Id.*, at ¶ 77.

---

[9]   Another Miami banking lawyer was solicited by Stanford to represent him with respect to the establishment of "feeder" sales offices in Miami to sell the SIB CDs to Latin Americans, but he refused the representation after Stanford indicated that **he did not want his business to be subjected to banking regulations or government examinations.**   Complaint, at ¶ 185.

[10]   By 1988, early on in their representation of Stanford, Loumiet and Greenberg knew that Stanford had been accused of violating banking laws in Texas by running an unlicensed feeder sales office in Houston for GIBL. *Id.* at ¶ 57.

The Law Firms always knew that Stanford had corrupted, co-opted and exercised complete dominion and control over the Antiguan Government that served as SIB's **_only_** regulator.[11]   Loumiet and the Law Firms knew that Stanford was systematically corrupting and bribing members of the Antiguan government through purported "loans" which were never repaid, and kickbacks disguised as political contributions in clear violation of the Foreign Corrupt Practices Act.[12] *Id.*, at ¶¶ 104, 112-117, 164, 218, 230.   Loumiet and Hunton knew that this corruption of Antiguan officials continued when they represented Stanford. *Id.*, at ¶ 256. Loumiet and the Law Firms were also well aware that Stanford was constantly accused of bribery and influence peddling in Antigua as reported in various news articles, including the Wall Street Journal which published an article in 2002 (when Hunton represented Stanford) highlighting Stanford's corrupt influence over Antigua and referred to Antigua as Stanford's "personal fief".[13] *Id*. at ¶¶ 122-129; 250-251; 255-256.

Perhaps even more shocking, the Law Firms knew, and were actively involved in, Stanford's orchestration of an economic stranglehold over the entire country of Antigua through Stanford's extension of tens of millions of dollars in loans to the Antiguan Government (using SIB investor money) for the building of a new hospital, airport improvements and general use

---

[11]     Indeed Loumiet and the Law Firms knew when Stanford moved his bank from Montserrat to Antigua in 1991 that Antigua had a reputation as a corrupt, unregulated pirate banking haven and international center for money laundering, and that Antigua's sordid reputation continued throughout the 1990s. *Id*. at ¶¶ 59, 62, 64, 102, 122.

[12]     In January 1996, Suarez sent Greenberg spreadsheets detailing money Stanford "lent" to senior Antiguan government officials. *Id*. at ¶ 116.

[13]     Incredibly, Loumiet told Stanford he thought the 2002 Wall Street Journal article was actually *good* for Stanford. Id. at ¶255.

that were secured by liens on the tax revenues of said Government.  *Id.*, at ¶¶ 66, 106, 254.  The Law Firms knew or had reason to know that the loans were in reality funded with SIB-investor deposits because they knew that the local Stanford bank in Antigua that made the loans on paper, the Bank of Antigua ("BoA"), did not itself have sufficient funds to make such loans without the participation of other, non-Stanford banks (which never happened, thereby violating Antiguan banking laws).  *Id.* at ¶¶ 92, 106, 107, 207, 223-224, 252.  In fact, in 1995 and 1996, Loumiet knew that Antiguan and U.S. journalists had accused Stanford of violating Antiguan banking laws by purporting to have BoA loan money it did not have to the Antiguan Government [*Id.* at ¶¶ 110, 123], and a 1996 press article that Loumiet read directly accused Stanford of making the loans using SIB investor money.  *Id.*, at ¶¶ 123, 128.  Hunton also became aware of the improprieties surrounding these loans through investigations by a commission established by Antigua's British Governor General in 2001.  *Id.* at ¶ 247-251.  Both Greenberg and Hunton represented Stanford in these loans to the Antiguan Government.

For its part, Hunton knew that Stanford was accused by the Antiguan political opposition party of running a "graft pyramid scheme" in Antigua with Lester Bird, engaging in corruption of government officials and having bought up some $250 million worth of real estate in Antigua.  *Id.* at ¶¶ 264-265, 268-270.  Hunton also knew that Stanford wanted to maintain his absolute hegemonic control over his Antiguan safe haven and keep other "outside" regulatory influences away.  For example, in 2006 Stanford informed Loumiet that he needed his help to avoid increased regulatory oversight of SIB by the Eastern Caribbean Central Bank ("ECCB") because it would be "no bueno" for his business.  *Id.* at ¶¶ 329-334.  In helping Stanford keep the ECCB

away, *Loumiet learned that the chief regulator of SIB in Antigua, Leroy King, would say or do whatever Stanford wanted* – even with respect to foreign regulatory officials.  *Id.*

Loumiet also knew in 1999 that Stanford was experiencing financial difficulties and was dependent on infusions of new investor cash to sustain his entities' operations (and to pay Greenberg's legal fees for representing the Antiguan Government).  *Id.*, at ¶¶223-224.

From a banking regulatory perspective, the Law Firms knew that SIB was, from the very beginning, just a façade and that SIB's real banking operations were carried out from the U.S., and that Stanford was operating "de facto" sales representative offices for SIB in the U.S. in violation of U.S. banking laws and had been doing so since 1988 when the OCC issued its first advisory about those same practices. *Id.* at ¶¶83-84, 167, 189-191.   Loumiet and Greenberg knew in 1998 that the real purpose of the SFIS "trust representative" offices they helped Stanford establish in Miami (and later on in Houston and San Antonio) was the same - to market and sell SIB CDs as unlicensed "de facto" sales offices for SIB in the U.S.  *Id.* at ¶168.[14]   Hunton quickly learned of Stanford's evasion of U.S. banking regulations during its involvement in defending Stanford in two lawsuits against Stanford Group Company and SIB filed by Mexican investors.  *Id.* at ¶ 258.   As part of Hunton's investigations into the lawsuits, it learned that Stanford was running SIB from the U.S. while evading federal and state laws.  *Id.* at ¶¶ 258-261.

---

[14]     Loumiet and Hunton later defended Stanford's SFIS in an investigation by Florida state banking authorities, during which Loumiet and Hunton learned that Florida regulators had accused SFIS of being uncooperative with their investigation and destroying documents related to SFIS' Miami operations and that Stanford was "stonewalling" Florida regulators' investigation by relying on Antiguan confidentiality laws to refuse to produce documents related to SIB. *Id.* at ¶¶ 371- 373.

From a securities regulatory standpoint, the Law Firms provided securities law representation to Stanford and knew that Stanford was marketing and selling unregistered securities from the U.S. and likely operating an unregistered investment company in violation of the Investment Company Act.  *Id.* at ¶ 50, 80-88, 140, 211-213 (Greenberg advises Stanford on securities registration issues and whether SIB needed to be registered as an Investment Company);[15] ¶ 365 (Hunton knew that Stanford was illegally selling unregistered SIB CDs through a prohibited general solicitation in the U.S. including a television ad campaign).

Indeed, Loumiet knew since the very beginning of his representation of Stanford in 1988 that Stanford was selling unregistered securities from his base in Texas.  *Id.*, at ¶ 58.   Loumiet and Greenberg on multiple occasions looked at the issue of whether Stanford's unlicensed U.S. "feeder" sales offices needed to be registered as investment advisers or brokers (i.e., dealers), and knew that Stanford wanted to avoid registering his businesses with the SEC at all costs, despite the fact that Stanford was illegally running a securities issuer (GIBL and then SIB) from the U.S.  *Id.*, at ¶¶ 82-88 (Greenberg looks at securities registration issues for SIB in 1992-1993), 140 (1996), 165-168 (1997-1998).[16]

By 2007, when Loumiet was at Hunton and serving as a member of Stanford's Advisory Board and attending meetings of Stanford's Top Performer's Club for the top sellers of the SIB

---

[15]     In 1998, Greenberg advised Stanford that he didn't need to register SIB as an investment company in the U.S. because it was operated as a commercial bank, despite the fact that Greenberg knew that SIB was not a commercial bank.  *Id*., at ¶¶ 50, 211-213.

[16]     Loumiet and Greenberg were also involved in an early, 1998, investigation by the SEC into Stanford's use of his newly-created U.S. broker-dealer to market and sell SIB CDs from the U.S.  *Id.*, at ¶¶ 192-199.

**CLASS PLAINTIFFS' JOINT RESPONSE TO MOTIONS TO DISMISS**                                    **26**

CDs, Loumiet knew that Stanford was offering the CDs on a massive scale through general solicitation via commercials on TV. *Id*., at ¶ 304.

Moreover, Loumiet prepared the Reg. D disclosures that Stanford used to sell the SIB CDs in the U.S., and thereby knew that said disclosures failed to disclose that Stanford and SIB had consistently been under U.S. Government investigation, were evading (and violating) U.S. laws, and that Stanford had corrupted Antiguan Government officials, made tens of millions in loans to the Antiguan Government and taken control of the Antiguan offshore bank regulatory system that regulated SIB. *Id*. at ¶¶ 139, 208-210.   These false and misleading disclosures were used by Stanford to sell the SIB CDs to U.S. investors from 1998 until Stanford's collapse in 2009. *Id*.

Finally, from an investor marketing and disclosure standpoint, Loumiet had knowledge of Stanford's sales practices, including the sales contests and incentives Stanford provided to the Stanford financial advisers for the sale of the CDs.    *Id*., at ¶43.   Indeed, given Loumiet's membership on Stanford's Advisory Board from 1993 all the way until 2009, and participation in Stanford's Top Performer's Club meetings – which were focused exclusively on the sale of the SIB CDs and during which Stanford handed out awards to the advisers that sold the most SIB CDs – it is preposterous to argue that Loumiet didn't know how Stanford was incentivizing his sales force to sell the CDs. *Id*., at ¶¶ 89, 302-303.

Since 1989, Loumiet regularly received and reviewed SIB's annual reports and financial statements, as well as Stanford's marketing materials used with investors, and therefore knew that Stanford was representing to SIB's depositors that SIB's portfolio was being invested conservatively in safe and liquid instruments, and that Stanford did not disclose to investors any

investments by SIB in loans to Stanford or the Antiguan Government, Caribbean real estate or private equity companies. *Id.* at Footnotes 2, 12 and ¶¶ 139, 196-198.   Loumiet and Greenberg were also confronted with evidence that Stanford was deceiving his investors with respect to the existence of insurance coverage for the SIB CDs.   *Id.* at ¶¶ 196-198, 203, 236.[17]    In fact, Greenberg was specifically tasked with crushing a former Stanford employee turned whistle-blower who alleged that she had been trained by Stanford to market the CDs as being fully insured, after she sent letters to her former investor clients informing them that their CDs were not insured. *Id.*, at ¶¶ 202-206.   The Law Firms knew that Stanford's private insurance did not protect investors in SIB CDs and that Stanford's statements about insurance were false and misleading.

Loumiet and the Law Firms also knew that Stanford was investing the funds deposited by SIB's investors in a manner contrary to what was represented, including in illiquid and highly risky Caribbean real estate and private equity deals, because the Law Firms performed all of the legal work on those transactions and also referred certain deals to Stanford. *Id.* at ¶¶ 141-142 (Greenberg's represents Stanford in Antiguan real estate deals), 242-244 (Greenberg represents Stanford in private equity deals), 345-350 (Hunton represents Stanford in Caribbean real estate deals), 351-360 (same), 361-364 (Hunton represents Stanford in private equity deals).   In particular, Hunton knew that the revenue streams for Stanford's global empire depended on SIB, and that SIB funded all investments by related Stanford affiliated companies, including private

---

[17]     Greenberg was aware that Stanford's marketing materials falsely claimed that SIB customers were protected by Stanford's "Depositary Insolvency" and "Excess FDIC Deposit" insurance policies so as to offer more insurance than available for FDIC insured deposits. *Id.* at ¶ 197.

equity and venture capital investments. *Id.* at ¶¶342-344. In addition, Hunton knew that Stanford continued to make massive investments in Antiguan and other Caribbean real estate (including purchasing whole islands and a Caribbean airline) as part of his master plan to develop a "super resort" for the wealthy. *Id.* at ¶¶ 296, 339, 347, 351-360. Loumiet and Hunton knew that Stanford's investments in Caribbean real estate and private equity/venture capital were contrary to what was disclosed to SIBL investors. *Id.* at ¶¶ 139, 356. While at Hunton, Loumiet also knew that Stanford was willing to stoop to even lower levels of marketing fraud by falsely claiming a familial relationship with the founder of Stanford University for the purpose of buying even more legitimacy. *Id.* at ¶ 285, 313-315.

In sum, Loumiet and the Law Firms knew from the outset and throughout their representation of Stanford that Stanford was engaged in, at the very least, "improper activities". This pleading of both Greenberg's and Hunton's knowledge of Stanford's improper activity more than suffices. *See YF Trust v. JP Morgan Chase Bank,* No. CV 07–567–PHX–MHM, 2008 WL 821856, at *5 (D. Ariz. Mar. 26, 2008) ("the knowledge element for aiding and abetting may be averred generally" and "such knowledge may be inferred from the circumstances.") (denying motion to dismiss aiding and abetting claim).

Incredibly, Hunton argues that some of the above described allegations simply demonstrate willful blindness to "red flags," for which no liability can attach under the TSA. *See* [Doc. 90] p. 12. But even if the Court credits Hunton's wildly baseless characterization of the Complaint, a pleading of willful blindness to "red flags" can constitute knowledge of improper activity as a matter of law. Indeed, a number of federal courts have held that an aider's "general awareness" can be established by showing "extreme recklessness," which may be found where

the aider encountered "red flags" or "suspicious events creating reasons for doubt."  *See, e.g., SEC v. Grendys*, 579 F.Supp.2d 1, 6 (D.D.C. 2008) (interpreting federal securities laws) (quoting *Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004)).  Indeed, the *Howard* court held that "extreme recklessness — or as many courts of appeals put it, 'severe recklessness' may be found if the alleged aider and abettor encountered 'red flags,' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct of the primary violator…or if there was a danger ... so obvious that the actor must have been aware of [the danger]."  *Howard*, 376 F. 3d at 1143; *see also Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied*, 434 U.S. 875 (1977).[18]

This is consistent with cases applying the TSA itself.  In *Darocy v. Abildtrup*, 345 S.W.3d 129 (Tex. App.—Dallas, 2011) the court concluded that an officer of the primary violator had "general awareness" of his role in the TSA violation and provided "substantial assistance" in the violation, because, among other things, he had access to the primary violator's accounts used to commit fraud, and was authorized to transfer funds from the accounts.  *Id.* at 139.

In *Goldstein v. Morstenson*, 113 S.W. 3d 769, 777 (Tex. App.—Austin, 2003), the court held that the evidence was sufficient to support a finding of aiding and abetting a violation of the TSA where the defendant arranged a loan and thereby "provided substantial assistance enabling [the primary violator company] to continue to operate."  The court in *Goldstein* went on to hold

---

[18]    Plaintiffs note that the Texas Supreme Court in *Adderly* relied on federal decisions from the D.C. Circuit, where SEC civil cases for "aiding and abetting" securities violations are regularly prosecuted.  *Sterling v. Adderly*, 168 S.W.3d at 845 (citing *Graham v. SEC*, 222 F. 3d 994, 1005 (D.C. Cir. 2000)).

that the alleged aider and abettor "was given enough information by [the primary violator's principal] to alert him to the possibility of [the primary violator company]'s illegal activity.  At the very least, his failure to conduct a minimal investigation and inquiry before assisting [the primary violator company] with the loan shows a reckless disregard for the truth or the law." *Id.*

In *In re Gas Reclamation, Inc. Sec. Lit.*, 659 F. Supp. 493 (S.D.N.Y. 1987), a New York federal court construing the TSA denied a motion to dismiss a claim for aiding and abetting a violation of the TSA against a group of bank lenders.  *Id.* at 519.  The Complaint pled that the banks were "reckless" and "knew or should have known" about the primary violation.  *Id.* at 504.  The "Court [found] that one might reasonably infer knowledge and intent from the allegations of substantial assistance, constituting circumstantial evidence and considered in combination, contained in several paragraphs of the Consolidated Complaint.  Such allegations include, among others, <u>participation in atypical financing transactions</u> and the sale, at a discount, of promissory notes among defendants." *Id.* at 504-05 (emphasis supplied) (citing *Ross v. A. H. Robins, Co.*, 607 F.2d 545, 558 (2d Cir. 1979); *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96–97 (5th Cir.1975)).

Finally, Judge Melinda Harmon denied a ***plaintiff's*** motion for summary judgment against Merrill Lynch for aiding and abetting liability under the TSA by holding that the elements of a TSA aiding and abetting violation, including "general awareness", "substantial assistance", and "intentional or reckless" conduct, were "***at a minimum…questions of fact that should be left to the jury***." *In re Enron Corp. Securities, Deriv. & Erisa Lit.*, 491 F. Supp. 2d 690, 698 (S.D. Tex. 2007).

The Class Plaintiffs have met the standard for pleading the Law Firms' knowledge of Stanford's primary TSA violations.  And as demonstrated below, the Law Firms – with reckless disregard for Stanford's primary violations – provided substantial assistance to these violations.

### C.     The Law Firms' Substantial Assistance to the Primary Violations

As a preliminary matter, and as this Court held in *Kneese*, questions of "substantial assistance" or "material aid" are fact questions and thus inappropriate for resolution by dismissal motion.  *Kneese v. Pershing,* Case No. 3:10-cv-01908-N-BL, Order (Dkt #21) at p. 10, footnote 6.  See also, *In re Enron Corp. Securities, Deriv. & Erisa Lit*., 491 F. Supp. 2d 690, 698 (S.D. Tex. 2007)(questions of "substantial assistance", and "intentional or reckless" conduct, are "*at a minimum…questions of fact that should be left to the jury*.").

Greenberg does not – because it cannot - argue that its conduct assisting Stanford to take over and control the Antiguan Government while at the same time helping Stanford establish its U.S.-based sales structure for the sales of the SIB CDs (such as creation of SGC, STC, and SFIS) constitutes "substantial assistance" under the TSA.   Only Hunton so argues.

But as to Hunton, the Complaint alleges sufficient activity from which a jury could find substantial assistance under the TSA, including:

(1)     representing Stanford in structuring $40 million in loans to the Antiguan government, despite Loumiet's knowledge that BoA didn't have that kind of money, that the money was likely coming from SIBL, and that previous Stanford loans to the Antiguan government were under investigation [Complaint at ¶¶ 252-254];

(2)     helping Stanford perpetuate his corrupt control over Antigua by, *inter alia*, sending undercover agents to infiltrate a meeting of an Antiguan opposition party in order to spy

on what was being said about Stanford, and to use that information to prepare a lawsuit designed to quash political speech and protect Stanford's stranglehold over Antigua [*id.* at ¶¶267-275];

(3)     sending letters to Panamanian and Venezuelan bank regulators endorsing Stanford and misrepresenting to those regulators that Stanford was compliant with laws and regulations despite knowledge that Stanford was in fact under constant U.S. government investigation [*id.* at ¶¶309-311];

(4)     assisting Stanford in evading increased regulatory oversight of SIBL by the Caribbean central bank authority, the ECCB, including communicating with and drafting the legal strategy for SIBL's corrupt Antiguan regulator, Leroy King, to use to counter the ECCB's legal basis for exercising regulatory oversight over SIBL [*id.* at ¶¶329-334];

(5)     helping extricate Stanford from criminal proceedings in Mexico that threatened to shutter Stanford's CD sales operation in Mexico (which were directed from Texas) [*id.* at ¶¶319-324];

(6)     representing Stanford Entities in making private equity and venture capital investments with knowledge that Stanford was likely funding the transactions with SIBL investor funds and was failing to disclose those investments to SIB investors [*id.* at ¶¶345-350, 361];

(7)     representing Stanford in Caribbean real estate deals with knowledge that Stanford was likely using SIB investor money to fund the transactions and was failing to disclose those real estate deals to SIB investors [*Id.*, at ¶¶351-359];

(8)     assisting SGC's expansion of its SIB CD sales operations in the U.S. despite knowing that the primary business purpose of SGC was to sell the unregulated SIB CDs [*id.* at ¶366];

(9)     assisting Stanford's expansion of U.S. sales of the unregulated SIB CDs through the establishment of new STC trust offices in various states [*id.* at ¶¶367-368];

(10)     lying to Florida regulators during their investigation of SFIS, and otherwise seeking to curtail said investigation by, *inter alia*, counseling Stanford to rely on Antiguan confidentiality statutes to avoid turning over SIB information and having SIB's corrupt regulator, Leroy King, provide information to the Florida regulators designed to ward them off [*id.*, at ¶¶374-382].

Agent Young also testified that Loumiet (and Hunton) provided a legal Memorandum to King for him to use as ammunition in responding to the ECCB, with the clear goal of preventing the ECCB from exercising increased regulatory oversight over SIBL.  Id. at 3933-3941;   see Complaint at ¶¶ 329-334.  Agent Young further testified (in cross-examination) that Loumiet clearly had an understanding of "what's going on between Mr. Stanford and Mr. King", and that Stanford and Loumiet's conduct in "helping" SIBL's regulator respond to the ECCB raised red flags.  Id. at 4004, 4009-4010.[19]

Class Plaintiffs' allegations [Complaint, ¶¶ 329-334] concerning Hunton's conduct in advising SIBL's Antiguan regulator, Leroy King, on how to avoid increased oversight of SIBL by the ECCB are particularly troubling because that conduct was discussed in detail during Allen Stanford's criminal trial.  IRS agent Kalford Young testified at length about Stanford's corrupt relationship with SIBL's lead regulator, Leroy King, and their joint effort to evade ECCB

---

[19] Hunton had previously, in conjunction with its Motion to Dismiss the Receiver's Complaint against it, asked this Court to take judicial notice of the transcript of Allen Stanford's criminal trial.  Hunton Brief in support of its Motion to Dismiss the Receiver's Complaint, at 7 and fn 8.

regulatory supervision over SIBL.  That joint effort included Stanford's having General Counsel

Mauricio Alvarado draft King's responses to the ECCB.  Transcript of Proceedings in U.S. v.

Robert Allen Stanford, Volume 13, at 3918.

As part of assisting Stanford's efforts to maintain control over his Antiguan safe haven,

Hunton also sent undercover agents to infiltrate a New York meeting of an Antiguan opposition

party in order to spy on what was said about Stanford and use it to prepare a lawsuit designed to

quash political speech and protect Stanford's control over Antigua.  Id. at ¶¶267-275.   As part of

that effort, Hunton actually sued a Catholic elementary school principal to quash his political

speech criticizing Stanford's corrupt influence over the Antiguan government.  Id. at ¶¶267, 275.

Furthermore, Loumiet's conduct in lying to foreign and domestic regulators about

Stanford was just a continuation of the same conduct he had been engaged in to protect Stanford

from regulatory interferences since 1989.   Complaint at ¶¶ 74-75 (Loumiet misleads the U.S.

Treasury Department about Stanford's problems with the Montserrat government); ¶ 91

(Loumiet misleads the U.S. Federal Reserve about Stanford's past problems with Montserrat); ¶¶

93-95 (Greenberg "ghost writes" letters to the Federal Reserve to be signed by members of the

Antiguan Government to help Stanford's goal of selling more CDs from proposed U.S.

representative office for BoA); ¶¶ 168-176 (Loumiet misleads, conceals facts from, and provides

fraudulent documents to Florida state banking regulators to help Stanford obtain a license to

operate offshore trust representative offices); ¶ 188 (Loumiet misleads Louisiana state regulators

about Stanford's troubles with the OCC and Montserrat government);  ¶ 194 (Greenberg lies to

SEC about scope of regulation of SIB in Antigua); ¶ 311 (Loumiet lies to Venezuelan regulatory

officials about Stanford's compliance with laws in order to help Stanford establish operations in

that country); ¶¶ 309-311 (Loumeit sends deceptive letters of recommendation to Panamanian and Venezuelan regulators endorsing Stanford and representing that Stanford was compliant with laws and regulations despite knowledge that Stanford was under constant U.S. government investigation).  ¶ 374 (Loumiet lies to Florida regulators during their investigation of SFIS by falsely representing that Stanford's trust operations had nothing to do with SIB); ¶ 382 (Hunton provides deceptive letter from Leroy King to Florida regulators attesting to Stanford's compliance with Antiguan law in bid to try and protect SFIS from being shut down).   As such, a jury could reasonably find that said conduct constitutes substantial assistance of Stanford's improper activities and fraud.

While Loumiet was lying to regulators for Stanford, he and Hunton were busy assisting Stanford in expanding his unregistered CD sales operations in the U.S. by referring Stanford to new brokerage and sales teams (*id.*, at ¶ 366), and assisting Stanford to expand CD sales in the U.S. by establishing new STC trust offices in various states (*id.* ¶¶ 367-368).

Finally, Hunton and Loumiet also substantially assisted Stanford in diverting and using Stanford Entity funds for improper and unlawful purposes.  Hunton (through Loumiet) knew that Stanford's business model was based on the sale of SIB CDs, which were represented to be safe, secure and liquid investments, yet Hunton represented Stanford on a wide range of risky and speculative investments while blindly and recklessly disregarding that the obvious and only known source of funding for such investments was money taken from SIB depositors, including: (i) representing Stanford in a new venture capital and real estate buying spree, including two multimillion dollar investments into a biotech company and a call center company,  *id.* at ¶ 345; (ii) representing Stanford in making private equity and venture capital investments (with

knowledge that Stanford was likely funding the transactions with SIBL investor funds), *id.* at ¶¶345-350, 361; (iii) representing Stanford in Caribbean real estate deals (with knowledge that Stanford was likely using SIBL investor money to fund the transactions), *id.* at ¶¶351-359;  and (iv) providing services to Stanford with knowledge of his heavy spending on Caribbean real estate projects, including a plan to start a $2 billion investment fund for the development of resort properties in the Eastern Caribbean.  *Id.* at ¶ 351.  There was no limit to Stanford's use of Stanford Entity funds, and while Stanford continued to boast that the SIB investments were "safe, secure, and liquid," the Law Firms knew that this money was strategically being used to fund these unrelated, dream projects of Stanford himself while providing contrary disclosures to SIB investors.  *Id.* at ¶ 356.

Accordingly, it cannot reasonably be disputed that both Greenberg and Hunton materially and substantially assisted the Stanford Entities in the sale of unregistered securities in violation of the TSA.  *See also Goldstein,* 113 S.W. 3d at 777 (finding of TSA aiding and abetting violation where the defendant arranged a loan and thereby "provided substantial assistance enabling [the primary violator company] to continue to operate."); *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. at 519 (finding allegations of "participation in atypical financing transactions" provided substantial assistance to primary TSA violation).

### D.     Texas Recognizes a Claim for Conspiracy to Violate the TSA

Greenberg's and Hunton's argument that there is no liability under Texas law for conspiracy to violate the TSA is misplaced.  *See* [Doc. 29] p. 15; [Doc. 90] p. 16.  The TSA by its terms explicitly preserves all common-law rights and remedies.  *See* TEX. REV. CIV. STAT.

ANN. ART.  581-33(M).[20]   Moreover, this Court has recognized that a violation of a Texas statute is sufficient to support a cause of action for civil conspiracy.  *See Biliouris v. Sundance Resources, Inc.*, 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008) (*citing Laxson v. Giddens*, 48 S.W.3d 408, 410-11 (Tex. App. – Waco 2001, pet. denied)); *see also Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 667 (Tex. App. – Houston [14th Dist.] 2006, pet. denied) (reversing summary judgment dismissing claim for conspiracy to violate the Texas Deceptive Trade Practices Act).  This accords with settled law that conspiracy is a "derivative tort" and a defendant's "liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable."  *Tilton v. Marshall*, 925 S.W.2d 672, 680 (Tex. 1996).

Although the Fifth Circuit has not yet had the occasion to issue a substantive ruling on a claim for conspiracy to violate the TSA, it issued an opinion following a jury verdict in which it noted without disapproval that one of the two "material" issues it was considering was a claim for conspiracy to violate the TSA.  *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 539 (5th Cir. 1981).  And, a Texas appellate court reviewed a district court's judgment following a trial in which a claim for conspiracy to violate the TSA was submitted to the jury for consideration.  *See Crescendo Investments, Inc. v. Brice*, 61 S.W.3d 465 (Tex. App. – San

---

[20]      Accordingly, there is no basis to Greenberg's and Hunton's argument that the statute itself precludes a claim for conspiracy to violate the TSA. *See* [Doc. 29] p. 15; [Doc. 90] p. 16.  Moreover, Texas courts have concluded that the TSA should be construed broadly to effectuate its general purposes to protect investors – *see Shields v. State*, 27 S.W.3d 267, 273 (Tex. App. – Austin 2003, no pet.); *Anheuser-Busch Cos. v. Summit Coffee Co.*, 934 S.W.2d 705, 708 (Tex. App.—Dallas 1996, writ dismissed by agr.) – and that as a remedial statute, the TSA should be given "the widest possible scope."  *Anheuser-Busch*, 934 S.W.2d at 708 (quoting *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 114 (Tex. 1971)).

Antonio 2001, pet. denied).[21]  Thus Texas courts, both state and federal, have allowed claims for conspiracy to violate the TSA to go to a jury.

### E.       The TSA Claims are not Preempted  by NSMIA

Hunton also argues that the Class Plaintiffs' TSA claims for aiding and abetting the sale of unregistered securities are preempted by the National Securities Markets Improvement Act of 1996, 15 U.S.C. §§ 77r, *et seq.* ("<u>NSMIA</u>").  *See* [Doc. 90] p. 17.  NSMIA preempts state registration laws insofar as they apply to, *inter alia*, securities exempt under SEC Regulation D. *See* 17 C.F.R. §§ 230.501, *et seq.*

Although the Class Plaintiffs allege that SIB filed for a Regulation D exemption to allow Stanford to sell SIB CDs to U.S. residents through SGC brokers in the United States (*see* Complaint [Doc. 1] ¶¶ 40-42), merely filing a Form D, as required by 17 C.F.R. § 230.503, does <u>not</u> make the exemption available.[22]  Instead, under 17 C.F.R. § 230.506, exemption requires compliance with all of the "general conditions" contained in Rules 501 and 502 (17 C.F.R. §§ 230.501 & 502), as well as specific conditions limiting the number of sales to non-accredited investors, and assuring that each non-accredited investor (either alone or with his purchaser representatives) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment.  *See* 17 C.F.R. § 230.506(b).

---

[21]      The court in *Crescendo* found no conflict between the jury's finding that a particular defendant did not violate the TSA and its finding of a conspiracy to violate the TSA, without ever suggesting that no cause of action exists in Texas for conspiracy to violate the TSA.  61 S.W.3d at 476-77.

[22]      As Hunton is well aware, a Form D filing is simply a notice filing and is neither granted nor denied by the SEC.  Rather, exemption from registration under Regulation D depends upon compliance with that regulation in the offer and sale of the securities for which exemption is claimed.  *See* SEC Disclosure and Compliance Interpretation, Question 257.07 (Jan. 26, 2009) (filing a Form D is not a condition to the availability of the exemption in Rule 506).

Of course, whether Stanford (or any party) actually abided by the "general conditions" contained in Rule 501 and 502 is a fact-intensive question not appropriate for a preliminary motion for dismissal. Moreover, the Class Plaintiffs do not bear the burden of pleading Stanford's failure to comply with Regulation D at this stage of the proceedings. Instead, compliance with Regulations D exemptions is an affirmative defense that must be raised in a pleading and proven by the <u>defendant</u>. *See Swenson v. Engelstad*, 626 F.2d 421, 425 (5th Cir. 1980); *see also Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007) (reversing summary judgment based on fact issue as to whether securities actually qualified for Regulation D exemption). Regardless, the Class Plaintiffs have alleged the precise manner in which SIB failed to comply with Regulation D. *See* Complaint [Doc. 1] ¶¶ 442, 444. SIB engaged in prohibited general solicitations of its CDs; its "offering" was far in excess of purported offering size disclosed in its Form D filings; and it sold CDs to unaccredited investors. *Id.*

Hunton bases its argument entirely on *Temple v. Gorman*, 201 F. Supp. 2d 1238, 1243-44 (S.D. Fla. 2002), where a district court dismissed a securities claims brought under Florida law because the securities purported to be sold pursuant to a Regulation D exemption.[23] But the reasoning in *Temple* has been rejected by the majority of courts which have considered this question, including by what appears to be the only federal appeals court to rule on this issue. *See Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 910 (6th Cir. 2007) (noting that "courts have roundly rejected *Temple's* reasoning."); *see also Risdall v. Brown Wilbert, Inc.*, 753 N.W.2d

_____

[23]    Hunton also cites to *Pinnacle Commc'ns Int'l, Inc. v. Am. Family Mortg. Co.*, 417 F. Supp. 2d 1073, 1087 (D. Minn. 2006), which relies exclusively on *Temple*.

723, 730-31 (Minn. 2008) ("Consistent with the plain language of 15 U.S.C. § 77r and Rule 506 and with the decisions of the majority courts that have considered this issue, we hold that federal law does not preempt state registration requirements with respect to securities that purport to be, but are not in fact, federal covered securities"); *Buist v. Time Domain Corp.*, 926 So. 2d 290, 295-98 (Ala. 2005) (defendants claiming NSMIA preemption must prove that securities actually qualified for a valid federal exemption); *Hamby v. Clearwater Consulting Concepts*, 428 F. Supp. 2d 915, 920-21 (E.D. Ark. 2006) (to assert federal preemption, defendant must show that exemption from federal registration actually applies); *Grubka v. Web Access Int'l, Inc.*, 445 F. Supp. 2d 1259, 1270 (D. Colo. 2006) (NSMIA does not indicate that a security is a "covered security" if it is sold pursuant to a putative exemption); *Consolidated Mgmt. Group, LLC v. Department of Corp.*, 162 Cal. App. 4th 598, 608, 75 Cal. Rptr. 3d 795, 804 (2008) (covered security is one that "is exempt" from registration, not one that is sold "pursuant to" a putative exemption).

Accordingly, because SIB CDs were not exempt from registration under Regulation D, the Class Plaintiffs' TSA claims are not preempted by NSMIA as a matter of law.

## F.   The TSA Claims are not Cabined by the TSA's Statutes of Repose

Finally, in an effort to limit or cabin their liability under the TSA, the Law Firms have attempted to set a date certain before which they can longer be held liable for aiding and abetting TSA violations.

Thus, Greenberg argues that it cannot be held liable for aiding and abetting Stanford's untruths and omissions for CD-sales occurring prior to February 1, 2006, based on the TSA's 5-year statute of repose for such TSA violations.  *See* [Doc. 29] p. 22 (citing TEX. REV. CIV.

STAT. ANN. ART. 881-33H(2)).  Greenberg also argues that it cannot be held liable for aiding

and abetting the sale of unregistered securities occurring after February 1, 2008, based on the

TSA's 3-year statute of repose for such violations.[24]  *See id.* (citing TEX. REV. CIV. STAT.

ANN. ART. 881-33H(1)).

But the Law Firms ignore that the Class Plaintiffs have also stated a claim for conspiracy

to violate the TSA.  *See* Argument, § III(D), *supra*.  And as to all their common law claims,

including their conspiracy to violate the TSA claim, the Class Plaintiffs have alleged the

applicability of the discovery rule.  *See* Complaint [Doc. 1] ¶¶ 403-06.

The discovery rule is available "when the nature of the plaintiff's injury is inherently

undiscoverable and the evidence of injury is objectively verifiable."  *Wells Fargo Bank*

*Northwest, N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 702 (Tex. App.—Dallas, 2012

reh'g overruled) (citing *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 65–66 (Tex. 2011);

*Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455–56 (Tex. 1996)).

"An injury is inherently undiscoverable if, by its nature, it is unlikely to be discovered

during the applicable limitation period despite the exercise of due diligence."  *Id.* (citing

---

[24]     Hunton goes even further and claims wrongly that the limitations period begins to run not from the date of
the sale of the securities, but from the date of the aider's bad acts. *See* [Doc. 90] p. 18 ("In addition, CD sales within
the repose period (*i.e.*, after February 1, 2008) cannot serve as the basis for a viable aiding and abetting or
conspiracy claim because the Class Plaintiffs do not allege that Hunton advised on or engaged in any conduct related
to securities sales, marketing, or registration (the premise of their TSA claims) after February 1, 2008."); *see also id.*
at p. 19 ("Again, however, the Class Plaintiffs allege no conduct by Hunton within the five-year repose period that
had anything to do with any representations to Stanford investors."). **However, the relevant TSA limitations
provisions refer <u>only</u> to dates running from the primary violator's "sale" of the securities, <u>not</u> the underlying
bad acts of the aider that induced the purchase.** *See* TEX. REV. CIV. STAT. art. 881-33H(2); TEX. REV. CIV. STAT.
art. 881-33H(1).  The case which Hunton cites in support – *Crescendo Investments, Inc. v. Brice*, 61 S.W.3d 465
(Tex. App. – San Antonio 2001, pet. denied) – does not discuss this proposition, nor does it even discuss the TSA's
limitations periods at all.

*Marshall*, 342 S.W.3d at 66; *S.V. v. R.V.*, 933 S.W.2d 1, 7 (Tex. 1996)). "The question is not whether the particular injury was actually discovered by the claimant within the limitation period, but whether 'it was the type of injury that is generally discoverable by the exercise of reasonable diligence.'" *Id.* (quoting *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998)).

Conspiracy is governed by a two-year statute of limitations.   *See Stevenson v. Koutzarov,* 795 S.W.2d 313, 318 (Tex. App.—Houston [1st Dist.] 1990, writ denied); *Cathey v. First City Bank of Aransas Pass*, 758 S.W.2d 818, 821–22 (Tex. App.—Corpus Christi 1988, writ denied).   And Texas courts have held that the discovery rule applies to civil conspiracy claims.  *See, e.g.*, *Prostok v. Browning*, 112 S.W. 3d 876, 896 (Tex. App.—Dallas 2003, *rev'd in part on other grounds*, 165 S.W. 3d 336 (Tex. 2005));  *Fisher v. Yates*, 953 S.W.2d 370, 380 (Tex. App.—Texarkana 1997, no pet.).

Further, the Fifth Circuit has ruled that facts relating to the Stanford Entities' operations could not reasonably have been discovered for statute of limitations purposes prior to the Receiver's appointment on February 16, 2009, and for a reasonable period thereafter.  *See Janvey v. Dem. Sen. Camp. Comm.,* 712 F.3d 185, 192-93 (5th Cir. 2013).

Consequently, because this action was commenced within two years of the Receiver's appointment and the Class Plaintiffs' discovery of the conspiracy,[25] the Class Plaintiffs can and should be allowed to recover damages in connection with their TSA claims for all CDs sold by

---

[25]     The parties entered into a tolling agreement effective February 1, 2011, and the Complaint was filed on the day after the tolling agreement expired on November 15, 2012.  *See* Complaint [Doc. 1] ¶ 404.

the Stanford Ponzi scheme during the time the Law Firms provided their purported legal services to the Stanford Entities.[26]

This is the right result given the equities of this case.  Class Plaintiffs were completely unaware of the existence of these Defendants prior to the collapse of Stanford of 2009 and were completely unaware of Defendants' extensive involvement, with and representation of Stanford, from 1988 through 2009.   Given Defendants' instrumental role in Stanford's schemes, it would be completely inequitable to allow Defendants to use the statutes of repose to escape liability for the large scale sales of CDs by Stanford they helped perpetuate over the years.

## IV.    THE CLASS PLAINTIFFS STATE A VALID CLAIM FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

The Class Plaintiffs also properly state a valid claim against the Law Firms for aiding and abetting Allen Stanford's and the Stanford entities' significant breaches of their fiduciary duties to SIB CD-investors.[27]

---

[26]    Moreover, it is well settled that a defendant moving for dismissal on limitations grounds has the burden of negating the discovery rule.  *See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1998).  The Law Firms have provided no evidentiary or legal basis to conclude that the discovery rule should not apply to the Class Plaintiffs' TSA conspiracy claim.

[27]    Although Greenberg argues that a claim for aiding and abetting a breach of fiduciary duty is not recognized in Texas (*see* [Doc. 29] p. 2), it is mistaken.  *See, e.g., Floyd v. Hefner*, 556 F. Supp. 2d 617, 654 (S.D. Tex. 2008) ("Texas recognizes a cause of action for aiding and abetting a breach of fiduciary duty.") (citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 160 S.W.2d 509, 514 (Tex. 1942), *Cox Tex. Newspapers, L.P. v. Wootten,* 59 S.W.3d 717, 721 (Tex. App.—Austin 2001, pet. denied), and *Kline v. O'Quinn,* 874 S.W.2d 776, 786 (Tex. App.—Houston [14th Dist.] 1994, pet. denied)); *Toles v. Toles*, 113 S.W.3d 899, 912 (Tex. App.—Dallas 2003, no pet.) (discussing claim for aiding and abetting breach of fiduciary duty).

"To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co.,* 492 F.3d 634, 639 (5th Cir. 2007).

Here, the Class Plaintiffs allege that Allen Stanford, and certain of the Stanford Entities, such as SGC and SFIS, owed fiduciary duties of care to SIB CD-investors. *See* [Doc. 1] ¶ 452-53. SGC was a registered Investment Adviser and as such owed investors a fiduciary duty as a matter of law. SFIS, the full name of which is "Stanford **Fiduciary** Investor Services", owed a fiduciary duty because it made investment recommendations as an investment adviser, even though it was not registered as such.

Moreover, this Court has ruled that Allen Stanford functioned personally as an "investment advisor" to all SIB CD investors because, among other things, he "controlled SGC and its investment advisors." *See SEC v. Stanford Int'l Bank, Ltd., et al.*, Case No. 3:09-cv-00298-N, Order [Doc. 1483] p. 11 (N.D. Tex. Nov. 30, 2011). Because Stanford and the Stanford Entities – operating as investment advisors – effectively exercised discretionary authority over customer funds during the relevant period, they were fiduciaries as a matter of law.[28]

---

[28]     Greenberg argues *ipse dixit* that there was no fiduciary relationship between the Stanford Entities and CD-investors during the relevant period. *See* [Doc. 29] p. 5. But under Texas law, an investment manager exercising discretionary authority over investment accounts owes a fiduciary duty of care to its clients. *See, e.g.*, *McCoun v. Rea (In re Rea)*, 245 B.R. 77, 88 (Bankr. N.D. Tex. 2000); *Commodity Futures Trading Comm'n v. Heritage Capital Advisory Servs., Ltd.*, 823 F.2d 171, 173 (7th Cir. 1987). An investment manager with discretionary

Both Greenberg and Hunton were well aware of Stanford's and the Stanford Entities' obligations as fiduciaries to SIB CD-investors. *See* [Doc. 1] ¶ 454. The Law Firms were also aware that Stanford was funneling SIB CD-customer funds into illiquid and risky "investments" and "projects," going far beyond the investment disclosures SIB made to CD-investors. *Id.* ¶ 356. Nevertheless, the Law Firms participated in Stanford's and the Stanford Entities' breach of their fiduciary duties to the CD-investors by knowingly and actively assisting Stanford in the unlawful sale and marketing of unregistered and unregulated bogus CDs. The Law Firms helped Stanford establish unlicensed feeder-fund sales entities in the U.S. – such as SFIS – and assisted Stanford in stonewalling and thwarting regulatory investigations into Stanford's illegal banking and investment advisory practices, to the significant detriment of CD investors in Texas, the U.S., and worldwide. *Id.* ¶¶ 57, 60, 61, 64-73, 165-182, 184, 197, 365, 374, 442, 445.

---

investment authority breaches his fiduciary duty if "he failed to show that he made reasonable use of the confidence that the Clients placed in him, that he acted in the utmost good faith and exercised the most scrupulous honesty toward the Clients, or that he fully and fairly disclosed all important information to the Clients concerning the transaction." *W. Reserve Life Assurance Co. of Oh. v. Graben*, 233 S.W.3d 360, 374 (Tex. App.—Fort Worth 2007, no pet.) (citing COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES: FIDUCIARY DUTY PJC 104.2 (2003)). Similarly, a fiduciary, "cannot put himself in a position antagonistic to his principal's interest." *Janes v. CPR Corp.*, 623 S.W.2d 733, 740 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e). "This requirement not only forbids conduct on the part of the broker which is fraudulent or adverse to his client's interest, but also imposes upon him the positive duty of communicating all information he may possess or acquire which is, or may be, material to his employer's advantage. *Id.* (citing *Barnsdall Oil Co. v. Willis*, 152 F.2d 824 (5th Cir. 1946). Stanford and the Stanford Entities were essentially acting as discretionary investment advisors to Stanford Entity customers, taking their deposits and "investing" them at will. As such, they acted as fiduciaries under Texas law. In any event, "[i]t is typically premature to determine a defendant's fiduciary status at the motion to dismiss stage of the proceedings. The issue of fiduciary status is a mixed question of law and fact." *In re Electronic Data Systems Corp. "ERISA" Litigation*, 305 F. Supp. 2d 658, 665 (E.D. Tex. 2004) (emphasis supplied) (citing *Kramer v. Smith Barney*, 80 F.3d 1080, 1084 n. 2 (5th Cir. 1996); *Reich v. Lancaster*, 55 F.3d 1034, 1044 (5th Cir. 1995)).

Hunton does not dispute these basic facts about its representation of the Stanford Entities. Instead, Hunton argues that there can be no legal liability for this misconduct under the qualified immunity doctrine.  *See* [Doc. 90] p. 19.  But as argued above, the qualified immunity doctrine does not shield Hunton and Greenberg from liability under Texas law.  *See* Argument § II; *see also Rivet v. State Farm Mut. Auto. Ins. Co.*, 316 Fed.Appx. 440, 445 (6th Cir. 2009) ("Silverman separately argues that he cannot be held liable for aiding and abetting Swagler's breach of fiduciary duty because Swagler's misconduct was in urging State Farm to 'pay [ ] too much money' in a series of settlement agreements and Silverman had no duty to 'avoid getting too good a deal' for his clients.  But there is a line between zealous representation and aiding and abetting fraud …") (emphasis supplied). [29]

Greenberg, for its part, argues that there can be no aiding and abetting liability for what it characterizes as "mere suspicion of improper activity after-the-fact."  *See* [Doc. 29], p. 5.  But the cases state otherwise.  As noted above, a number of federal courts have held that an aider's "general awareness" can be established by showing the aider encountered "red flags" or "suspicious events creating reasons for doubt."  *See, e.g.*, *SEC v. Grendys*, 579 F. Supp. 2d 1, 6 (D.D.C. 2008) (emphasis supplied) (citation omitted); *see also Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied,* 434 U.S. 875 (1977).  In any

---

[29]     Hunton's corollary argument that there can be no aiding and abetting liability for "grist of the mill" legal services is equally unfounded.  *See* [Doc. 90] p. 20.  Indeed, federal courts have held law firms liable for aiding and abetting theories of recovery.  *See SEC v. Milan Group, Inc*., 962 F. Supp. 2d. 182, 201-202 (D.D.C. 2013) (granting summary judgment for SEC against lawyer accused of aiding and abetting securities fraud scheme, and holding that the lawyer's "attempt to use her role as an attorney as a shield is particularly pernicious" given the gravity of the evidence against her, which the court found "went far beyond her role as an attorney").

event, the Class Plaintiffs have <u>not</u> pleaded that Greenberg only became aware of misconduct <u>after</u> Stanford's Ponzi scheme was exposed by the SEC.  Greenberg was consistently aware of significant illegal and fraudulent activity since 1988, well <u>before</u> the Ponzi scheme was shut down.[30]  *See* recitation of facts regarding Greenberg's knowledge *supra*.

Separately, Hunton also argues that the Class Plaintiffs' claim for aiding and abetting breaches of fiduciary duty is somehow barred by the United States Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).  *See* [Doc. 90] p. 20.  This argument, however, is truly nonsensical.  In *Central Bank*, the Supreme Court held that there can be no aiding and abetting liability <u>specifically for violations of **§ 10(b)**</u> <u>**of the Securities Exchange Act of 1934**</u>.  The Supreme Court in *Central Bank* did <u>not</u> bar private parties from suing under state common law theories of recovery, as Hunton suggests.[31] *Id.* at 191 ("Because the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit <u>under § 10(b)</u>") (emphasis supplied).

---

[30]     At best, Greenberg can argue that it was wilfully blind to obvious signs of misconduct during the relevant period.  But this too serves as a basis for pleading knowledge of fraud.  *See United States v. Ferguson,* Nos. 08-6211-cr, et seq., 2011 WL 6351862, at *10 (2d Cir. Dec. 19, 2011) ("<u>[r]ed flags … can be used to show both actual knowledge and conscious avoidance</u>") (emphasis supplied); *In re Optimal US Litig.*, No. 10 Civ. 4095, 2011 WL 4908745, at *8 (S.D.N.Y. Oct. 14, 2011) (allegations of "red flags" at Bernard's Madoff's operations can support inference that party was willfully blind); *SEC v. U.S. Envt.l, Inc.,* No. 94 Civ. 6608 (PKL), 2003 WL 21697891, at *24 (S.D.N.Y. July 21, 2003) (holding that defendants' assertion that objective factors did not and would not have raised any red flags "flies in the face of reality"); *SEC v. Infinity Grp. Co.,* 212 F.3d 180, 193 (3d Cir. 2000) ("A good faith belief is not a 'get out of jail free card' [and] will not insulate the defendants from liability if it is the result of reckless conduct.").

[31]     In fact, Hunton does not cite a single case in which a common law claim against a law firm has been dismissed as impermissibly duplicative of the federal securities laws, under *Central Bank* or otherwise.

**CLASS PLAINTIFFS' JOINT RESPONSE TO MOTIONS TO DISMISS**                                            **48**

Hunton appears to be conflating the Supreme Court's ruling in *Central Bank* with SLUSA, which seeks to impose the federal securities law as the exclusive means of recovery in certain class actions, and thus prohibits state common law claims against certain defendants accused of engaging in conduct in violation of the securities laws.[32]  But the Supreme Court has now held that SLUSA is <u>not</u> applicable in Stanford-related class actions.  *See Chadbourne & Park LLP v. Troice, et al.*, No. 12-79, 571 U.S. ____ (2014).  Accordingly, there is no longer any bar under the federal securities laws to the Class Plaintiffs maintaining state common law aiding and abetting claims against the Defendants herein.  To the extent Hunton's argument is a stealth attempt to re-litigate the SLUSA issue, *Chadbourne & Park LLP* is now effectively law of the case, and the Class Plaintiffs object.

## V.   THE CLASS PLAINTIFFS STATE A VALID CLAIM FOR AIDING AND ABETTING FRAUD

To prevail on a claim of aiding and abetting fraud, a plaintiff must show (1) the defendant had actual knowledge of the underlying fraud, and (2) the defendant provided "substantial assistance" to the fraud.  *See In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 800, 811 (S.D. Tex. 2007).  The Class Plaintiffs have alleged facts sufficient to sustain this claim.[33]

---

[32]  SLUSA provides that "[n]o covered class action based upon the statutory or common law of any State … may be maintained in any State or Federal Court by any private party alleging a misrepresentation of or omission of a material fact in connection with the purchase and sale of a covered security."  15 U.S.C. § 78bb(f)(1)(A).

[33]  Hunton, as a preliminary matter, argues that Texas does not recognize a claim for aiding and abetting fraud. *See* [Doc. 90] p. 21.  But this argument is meritless.  Courts regularly adjudicate claims for aiding and abetting a fraudulent scheme under Texas law.  For example, in *Crisp v. Southwest Bancshares Leasing Co.*, 586 S.W.2d 610, 615 (Tex. App.—Amarillo 1979, pet. denied), the court upheld a jury verdict that defendants "knowingly aided and abetted in a fraudulent scheme."  Other courts have similarly recognized that such a claim exists under Texas law.

Hunton argues generally that the Class Plaintiffs dot not specify the Law Firms' knowledge of and actual assistance to the fraud, except to briefly allege the elements of the claim in Count 6 of the Complaint.  *See* [Doc. 90], p. 21.  But as described above, the Complaint alleges in great detail how Loumiet – and thus the Law Firms – had actual knowledge of significant fraudulent misconduct by Stanford and the Stanford Entities.

These facts, considered in context as they must be,[34] give rise to a plausible inference that the Defendants had actual knowledge that Stanford was committing fraud.  *See, e.g., Metz v. Unizan Bank*, No. 5:05 CV 1510, 2008 WL 2017574, at **18-20 (N.D. Ohio May 7, 2008) (holding that the plaintiff had adequately alleged the knowledge element by "allegations of atypical banking procedures"); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 92 (2d Cir. 2000) (holding that plaintiffs satisfied the knowledge requirement of an aiding and abetting claim where they alleged that defendant's officers had close personal relationships with the primary tortfeasor, one of the defendant's officers testified regarding red flags ignored by the defendant, defendant received higher fees for servicing the primary tortfeasor's accounts than from other clients, and defendant continued to do business with the primary tortfeasor years after it discovered these red flags).

---

*See In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 586 (5th Cir. 2008) (holding that a claim for aiding and abetting a fraudulent scheme under Texas law is not part of a bankruptcy estate); *In re Today's Destiny, Inc.*, No. 05–90080, 2009 WL 1232140, at *10 (Bankr. S.D. Tex. May 1, 2009) (denying motion to dismiss aiding and abetting fraudulent scheme claim).

[34]      *See Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 536 (6th Cir. 2000) (upholding an aiding and abetting claim and noting that "[w]hen considered in context, however, otherwise legitimate conduct can give rise to a negative inference").

The plausible and detailed pleading in the complaint is more than enough to demonstrate that the Law Firms assisted Stanford in carrying out his fraud.  Indeed, courts have found that conduct far less than that stated in the Complaint satisfies the "participation" prong of a claim for an aiding and abetting fraud.  *See, e.g., Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F. Supp. 2d 231, 244 (S.D.N.Y. 2013) ("Throughout the Amended Complaint, Dexia alleges that high-level executives of the defendant entities knew and participated in creating policies that incentivized high-risk lending and reduced controls in order to increase profits by creating greater numbers of RMBS regardless of quality.  Such allegations are sufficient to satisfy the knowledge and participation requirements of aiding and abetting fraud."); *Accousti v. McKay Wolas*, No. 95–CV–5267 (JG), 1996 WL 1088218, at *2 (E.D.N.Y. Oct. 10, 1996) ("deceptions that stall or prohibit the discovery of the truth are material to the continuing vitality of the fraud.  Since Koehler's two misstatements concealing the reasons for bounced checks and one statement referring to Wolas' scheme as a 'flawlessly successful investment opportunity' can readily be viewed as efforts to conceal the Ponzi scheme, defendants' motion to dismiss under Rule 12(b)(6) is denied.") (emphasis supplied); *see also Fezzani v. Bear, Stearns & Co. Inc.*, 527 Fed.Appx. 89, 92 (2d Cir. 2013) ("This leaves only the state law claims—civil conspiracy to defraud and aiding and abetting fraud—to consider.  Although a close call, after reviewing the complaint, we are persuaded that plaintiffs sufficiently pleaded with particularity the involvement of Morris, Aaron, and Abraham Wolfson in the alleged conspiracy such that plaintiffs can survive a motion to dismiss…"); *American Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 463-64 (8th Cir. 2013) ("[h]ere, Mercantile's participation allowed the facility to close, allowed Mercantile to immediately recoup about $10 million of its investment, and gave

Mercantile a continuing interest in the new debt. Whether that, among all the facts here, constitutes aiding and abetting is a question for the jury.  Because of this court's deference to the verdict, Mercantile invites this court to rule that, as a matter of law, this type of participation is not substantial assistance.  This court declines."); *Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) (holding that a single loan constituted substantial assistance where the loan permitted the primary tortfeasor to "establish[] a vital and initial level of credibility" with lenders that later "served as the foundation for increased trust between the parties").

Accordingly, the Class Plaintiffs have more than satisfied their burden of pleading the Law Firms' liability for aiding and abetting fraud under Texas law.[35]

## VI.   THE CLASS PLAINTIFFS STATE A VALID CLAIM FOR CONSPIRACY

To prevail on a claim of conspiracy under Texas law, a plaintiff must prove the following elements:  "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, over acts; and (5) damages as a proximate result."  *Janvey v. Adams & Reese LLP*, No. 3:12-CV-0495-N [Doc. 58] at p. 17 (N.D. Tex. Sept. 11, 2013) (Godbey, J.).

Here, the Class Plaintiffs have plead that the Law Firms conspired with Stanford and the Stanford Entities and provided services to further critical aspects of the Ponzi scheme, to the significant detriment of the SIB CD-investors, including (1) assisting Stanford to obtain and

---

[35]     Hunton's final argument that the aiding and abetting claim is also barred by the Supreme Court's decision in *Central Bank*, is meritless for the same reason identified above.  *See* Argument, Section IV.

maintain absolute control over his Antiguan safe haven - without which he never could have carried out his fraud – **and** (b) assisting Stanford in his regulatory evasion gambit that allowed him to promote and market his overall business operation as being based in the U.S. and regulated by the U.S. Government, when in fact he was consistently (with Defendants' help) evading regulation by the U.S. Government.

In particular, the Law Firms knew that Stanford was illegally selling unregulated securities from a foreign investment company – SIB – through various unregistered "feeder-fund" sales offices in the United States. *See* Complaint [Doc. 1], at ¶¶ 49, 50, 53, 83-84, 165-182, 258-261, 365. Despite this, and in order to earn lucrative fees, the Law Firms conspired with Stanford to perpetuate this fraudulent sales practice, creating and maintaining the corporate and regulatory framework for this illegality. In particular, Greenberg assisted Stanford in expanding sales of SIB CDs by advising Stanford to establish representative sales offices in the U.S. *Id*. at ¶¶ 165-182, 186-188. Greenberg helped Stanford establish SFIS, and then helped Stanford expand the SFIS model by opening additional SFIS offices in Houston and San Antonio. *Id*. Later, when Florida state regulators began investigating SFIS, Loumiet and Hunton helped SFIS stonewall the investigators and falsely stated that "Stanford Trust has nothing to do with [SIB] or any other Stanford organization." *Id*. at ¶ 374.

Loumiet and Hunton took steps in furtherance of Stanford's conspiracy to control his Antiguan regulatory environment and protect Stanford's stranglehold over Antigua, including suing Antiguan political opposition figures in the U.S. (id., at ¶¶ 267-275) and insulating SIB from increased regulatory scrutiny by "outside" regulators in the Caribbean. *Id*. at ¶¶ 329-333. In that regard, Hunton worked closely with Leroy King – the Antiguan regulator on Stanford's

secret payroll – to thwart an effort by the ECCB to increase its regulatory oversight of SIB, researching Antiguan law and drafting memos for King's benefit. *Id.* Loumiet and Hunton also provided a letter from King to Florida regulators attesting to Stanford's compliance with Antiguan law in bid to try and protect SFIS from being shut down in response to a subpoena for records. *Id.* at ¶¶ 381-382. As a result of these and other efforts, Stanford staved off regulatory danger to his Ponzi scheme and his fraud continued to flourish.

This pleading states a valid claim for conspiracy under Texas law. *See, e.g., Adams & Reese*, *supra*, at 17 (denying motion to dismiss conspiracy claim where Receiver alleged, *inter alia*, that the defendants had longstanding relationships with Stanford, were aware of a number of red flags concerning Stanford's enterprise, profited from their dealings with Stanford, and nonetheless continued to do business with him); *Goldstein v. Mortenson*, 113 S.W.3d 769, 780 (Tex. App.–Austin 2003, no pet.) (upholding a conspiracy claim where the defendant "actively participated in procuring a loan for the purpose of presenting a false image" to regulators and investors of a company that was actually a Ponzi scheme).

Greenberg and Hunton raise various objections to the Class Plaintiffs' conspiracy claim. Greenberg and Hunton argue that: (i) the Class Plaintiffs have not properly pled a "meeting of the minds"; (ii) the Class Plaintiffs have not properly established causation; and (iii) allegations of incorrect legal advice or ignoring "red flags" do not rise to the level of conspiracy. *See* [Doc. 29] 16-19; [Doc. 90] 23-24. None of these arguments have merit.

First, when alleging a meeting of the minds for purposes of a conspiracy claim, this Court has recognized that "[t]he agreement may be tacit and can be alleged and proven by circumstantial evidence." *Adams & Reese LLP, supra,* at 17 (citing *Bradt v. Sebek*, 14 S.W.3d

756, 766 (Tex. App. – Houston [1st Dist.] 2000, pet. denied)).  Or as noted by Judge Harmon in the Enron litigation, the conspiratorial agreement "need not be formal; rather, the understanding may be tacit; and it is not essential that each conspirator have knowledge of the details [of the conspiracy]; <u>inferences of concerted action may be drawn from participation in the transactions</u>." *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 623 F. Supp. 2d 798, 810 (S.D. Tex. 2009) (emphasis supplied) (citing *J.T.T. v. Chon Tri,* 111 S.W.3d 680, 684 (Tex. App.—Houston [1st Dist.] 2003); *see also International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 581–82 (Tex. 1963) ("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators …. It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence that all combined at a give time prior to each transaction.  <u>Inferences of concerted action may be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions</u>.") (emphasis supplied).

In the present action, and as cited above, there is a wealth of circumstantial evidence, based on a 20 year history of well documented participation in numerous transactions and illicit activities with Stanford, to support the conclusion that the Law Firms had a tacit, if not actual, meeting of the minds with Stanford to market bogus, unregulated CDs on a mass scale.  The Law Firms knew Stanford's business model intimately; created the legal infrastructure for his unlawful sales practices; and regularly misled regulators in order to frustrate regulatory investigations of fraudulent conduct.  *See* Complaint [Doc. 1] ¶¶ 456, 457; *see also United States*

*v. Mann*, 161 F. 3d 840 (5th Cir. 1998) ("the central aim of the conspiracy extended to conceal the fraudulent nature of the transaction in order to evade taxes and maintain control over the institution in the face of continual regulatory oversight. <u>Frustration of investigatory efforts…in a highly regulated environment was central to the conspiracy</u>") (emphasis supplied); *United States v. Upton,* 559 F. 3d 3, 13-14 (1st Cir. 2009) (acts of concealment that facilitate the central aim of the underlying conspiracy are in furtherance of the underlying conspiracy). *United States v. Del Valle*, 587 F. 2d 699, 704 (5th Cir. 1979) ("concealment is sometimes a necessary part of a conspiracy, so that statements made solely to aid the concealment are in fact made during and in furtherance of the charged conspiracy.").

<u>Second</u>, the Class Plaintiffs' pleading of causation and damages resulting from the conspiracy is plausible and proper.  Stanford's and Loumiet's conspiracy and joint efforts to keep SIB completely unregulated allowed CD-investors to purchase unregulated and fraudulent CDs, which were worthless when issued.  The Law Firms also misled regulators investigating the Stanford Entities, prolonging the Ponzi scheme and thus facilitating the sale of bogus securities. Having conspired with Stanford for purposes of selling fraudulent and unregulated CDs, the Law Firms are jointly and severally liable with Stanford for <u>all</u> damages resulting from the Ponzi scheme.  *See, e.g.*, *Tompkins v. Cyr,* 202 F.3d 770, 783 (5th Cir. 2000); *In re Enron Co. Sec., Deriv. & "ERISA" Litig.,* 623 F. Supp. 2d 798, 832 (S.D. Tex. 2009); *Operation Rescue–National v. Planned Parenthood,* 975 S.W.2d 546, 561 (Tex. 1998); *Carroll v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 925 (Tex. 1980); *Kinzbach Tool Co. v. Corbett–Wallace Co.,* 138 Tex. 565, 160 S.W.2d 509, 514 (Tex.  1942); *see also Paschal v. Great Western Drilling, Ltd.*, 215 S.W.3d 437, 457 (Tex. App.–Eastland, 2006 pet. denied) ("upon joining a

conspiracy, a defendant becomes a party to every act previously or subsequently committed by any of the other conspirators in pursuit of the conspiracy.") (citing *State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W.2d 550, 560 (1937)).

In any event, the issue of causation need not be supported by direct evidence under Texas law. *Tompkins v. Cyr,* 202 F.3d 770, 782 (5th Cir. 2000). "Circumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation." *Id.* (*citing Olson,* 980 S.W.2d at 893; *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 459 (Tex. 1992)). Moreover these are typically questions "of fact particularly within the province of a jury" and inappropriate for a motion to dismiss. *See e.g., Transportation v. Olson*, 980 S.W.2d 890, 893 (Tex. App.—Fort Worth 1998, no pet.); *El Chico Corp. v. Poole,* 732 S.W.2d 306, 314 (Tex. 1987); *Strakos v. Gehring,* 360 S.W.2d 787, 792 (Tex. 1962).

Finally, and contrary to the Law Firms' claims, the conspiracy cause of action does not simply allege faulty or negligent legal advice. The Class Plaintiffs seek recovery for legal services provided specifically for the purpose of advancing a fraudulent and unlawful scheme. This pleading is consistent with a similar action filed by certain investors in another fraudulent scheme in which a jury returned a verdict for conspiracy against Greenberg for its role in providing purported legal services. *See Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56 (Tex. App.—Houston [14 Dist.], 2004, rehearing overruled). In *Moody*, the investors alleged that,

> Greenberg Traurig entered into an agreement to accomplish a legal purpose (an initial public offering) by illegal means, which they claim involved bringing other lawyers, auditors, and investment bankers (necessary to create the illusion of a forthcoming initial public offering) into IFT's service. The Investors further claim

Greenberg Traurig entered into a second agreement to accomplish
an illegal purpose (fraudulently obtaining cash to sustain IFT),
which involved assisting J. Summers in his scheme to defraud
investors by concealing his past, preparing various documents, and
using the illusion of an impending initial public offering. In
support of their contention that Greenberg Traurig conspired to
defraud them, the Investors rely on Greenberg Traurig's alleged
knowledge of, but failure to disclose, J. Summers' and IFT's prior
and then current problems, certain of which would prevent the
initial public offering from ever occurring.

*Id.* at 82-83.   The Court ultimately upheld the jury's finding of liability for conspiracy:

The evidence is legally sufficient to support a finding that
Greenberg Traurig agreed to be a part of the civil conspiracy to
commit common-law fraud. Specifically, the jury heard evidence
that Greenberg Traurig (1) **knew of J. Summers' myriad of
problems with the SEC, other IFT shareholders, and personal
bankruptcy,** (2) knew of IFT's financial position and potential
liability due to the necessity of the rescission offer, (3) knew that
predecessor companies of IFT had failed, and (4) actively pursued
financing for IFT and underwriting for the initial public offering.
The jury also heard evidence of J. Summers' misrepresentations to
the Investors with regard to the status of the impending initial
public offering, IFT's financial health, how the funds invested
would be used, and which investment bank allegedly would be
underwriting the initial public offering. After reviewing all
evidence and inferences in favor of the jury's findings, we
conclude the evidence is legally sufficient to support a finding that
Greenberg Traurig was part of a civil conspiracy and that
fraudulent acts that caused damage to the Investors were
committed by coconspirators in furtherance of the conspiracy.

*Id.* at 90 (emphasis added).   The parallels between *Moody* and the present action are striking.

The Law Firms' conscience avoidance of obvious red flags during their long tenure with

Stanford is also a basis for finding a conspiracy for pleading purposes.  As this Court held in the

*Adams & Reese LLP* case:

Essentially, the Director Defendants argue that the Receiver fails to
plead a meeting of the minds or any particular facts about the

Director Defendants individually that would serve to put them on notice regarding the Receiver's conspiracy claim. But the Receiver goes into some detail about Stanford's fraudulent enterprise generally.  And he alleges that **the Director Defendants were aware of a number of <u>red flags</u> about the enterprise, that the Director Defendants profited from the enterprise by way of directors' fees, that the Director Defendants came in contact with the directors for SFG and Stanford himself regularly, but that the Director Defendants did nothing until 2008 in the face of more <u>regulatory scrutiny</u>. Given the length of time the Director Defendants were involved in STC, and given what the Receiver alleges that they knew about Stanford's enterprise generally, the Court concludes that the Receiver pleads sufficient facts to imply a meeting of the minds.**

*Adams & Reese, LLP*, Case No. 3:12-cv-00495-N-BL [Doc. 58] at p. 18. (emphasis supplied).

The Court should sustain the Class Plaintiffs' similar pleading of a conspiracy herein.

## VII.   <u>MOTION FOR LEAVE TO AMEND COMPLAINT</u>

Finally, if the Court is inclined to grant Hunton's and/or Greenberg's motions in whole or in part, the Class Plaintiffs hereby request leave, pursuant to Federal Rule of Civil Procedure 15(a) ("<u>Rule 15(a)</u>"), to amend the Complaint to correct any defects identified in the pleading.

When a trial court is considering a motion to dismiss the complaint for failure to state a claim, granting leave to amend is especially appropriate.  *See Great Plains Trust Co., et al., v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th Cir. 2002); *See also Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977) (per curiam) (addressing Rule 12(b)(6) dismissal).  Rule 15(a) applies where plaintiffs expressly request to amend even though the request is "not contained in a properly captioned motion paper."  *Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (5th Cir. 1988)).

While the Class Plaintiffs believe they have adequately plead facts sufficient to survive dismissal, nevertheless, and to the extent relevant to this Court's determination of the motions to dismiss, the Class Plaintiffs request leave to amend the Complaint to address the grounds for dismissal asserted by the Defendant.

## **PRAYER**

For the foregoing reasons, the Class Plaintiffs respectfully request that the Court enter an Order denying the Law Firms' motions for dismissal in their entirety, and grant the Class Plaintiffs such other and further relief the Court deems just and proper.

Respectfully submitted,

**CASTILLO SNYDER, P.C.**

By: ___*/s/ Edward C. Snyder*_____
      Edward C. Snyder
      esnyder@casnlaw.com
      Jesse R. Castillo
      jcastillo@casnlaw.com
      300 Convent Street, Suite 1020
      San Antonio, Texas  78205
      (210) 630-4200
      (210) 630-4210 (Facsimile)

**NELIGAN FOLEY, LLP**

By: ___*/s/ Douglas J. Buncher*_____
      Nicholas A. Foley
      nfoley@neliganlaw.com
      Douglas J. Buncher
      dbuncher@neliganlaw.com
      Republic Center
      325 N. St. Paul, Suite 3600
      Dallas, Texas  75201
      (214) 840-5320
      (214) 840-5301 (Facsimile)

**BUTZEL LONG, P.C.**

By: ___*/s/ Peter D. Morgenstern*_____
      Peter D. Morgenstern (*admitted pro hac vice*)

**STRASBURGER & PRICE, LLP**

By: ___*/s/ Edward F. Valdespino*_____
      Edward F. Valdespino

morgenstern@butzel.com
230 Park Avenue, Suite 850
New York, New York 10169
(212) 818-1110
(212) 818-0494 (Facsimile)

edward.valdespino@strasburger.com
Andrew L. Kerr
andrew.kerr@strasburger.com
300 Convent Street, Suite 900
San Antonio, Texas  78205
(210) 250-6000
(210) 250-6100 (Facsimile)

**COUNSEL FOR THE CLASS PLAINTIFFS**


**<u>CERTIFICATE OF SERVICE</u>**

On this 2nd day of June, 2014, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve Defendants individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

<u>/s/Edward C. Snyder</u>
Edward C. Snyder
