# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford receivership estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; SANDRA DORRELL; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated, | § § § § § § § | |
| Plaintiffs. | § § | CIVIL ACTION NO. 3:12-cv-04641-L |
| vs. | § § | JURY TRIAL DEMANDED |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS LLP;  and YOLANDA SUAREZ, | § § § § | |
| Defendants. | § | |

---

## HUNTON & WILLIAMS LLP'S ANSWER & AFFIRMATIVE AND OTHER DEFENSES TO THE REMAINING CLAIMS IN PLAINTIFFS' ORIGINAL COMPLAINT

---

## PRELIMINARY STATEMENT

Defendant Hunton & Williams LLP ("Hunton"), through its undersigned attorneys, responds to Plaintiffs' Original Complaint – Class Action ("Complaint").   Before responding on a paragraph-by-paragraph basis to the Complaint, Hunton makes six preliminary points:

*First*, with respect to the Complaint in its entirety, Hunton denies that it engaged in any wrongful, illegal, or improper conduct; made any false or misleading statements or omissions; or caused or is responsible in any way for the injuries or damages allegedly suffered by any Stanford entities, the Official Stanford Investors Committee ("OSIC"), or any members of the putative class that certain Plaintiffs purport to represent.  More specifically, Hunton avers that, at all relevant times, it provided legitimate legal services in good faith and consistent with all ethical and professional standards, either to Robert Allen Stanford or to certain of the Stanford entities.  Those legal services consisted of individual matters and cases that were limited in scope and duration, and that were far removed from the criminal conduct of which Allen Stanford, James Davis, and three others have been convicted.  Hunton avers that its lawyers *never* prepared or advised on Stanford's marketing or disclosure materials, *never* advised on the securities laws that related to CD sales, and *never* represented Allen Stanford or any Stanford entity in any investigation by the U.S. Securities and Exchange Commission ("SEC").  Nor did Hunton *ever* have any knowledge of, or involvement with, any conduct by Allen Stanford (or his entities) involving the theft of investor monies, bribery of an Antiguan regulator, or "reverse engineering" of fake financials for the Stanford entities.  Under these circumstances, to hold Hunton liable for the results of a purported  fraud committed by one of its clients, which Hunton knew nothing about, would only be possible under a dramatic broadening of the scope of attorney liability.  The extraordinary standard Plaintiffs seek to impose on Hunton is unworkable and would fundamentally change the well-established roles and duties of attorneys.

*Second*, Hunton avers that, before the Stanford entities went into receivership in February 2009, they appeared to the outside world, including Hunton and its former partner, Carlos Loumiet, to be legitimate and successful, and Hunton did not know of the fraudulent conduct before it was revealed publicly by the SEC in February 2009. Hunton was not involved in that fraud, and did not have any intent to aid, conspire, assist, or participate in that fraud. Indeed, Plaintiffs have conceded that Hunton *did not know* about Stanford's Ponzi scheme. (Receiver and OSIC Resp. to Defs' Mots. to Dismiss [Dkt. 63] at 4; *see also* Putative Class Resp. to Defs.' Mots. to Dismiss [Dkt. 99] at 2.) To the contrary, extensive testimony from Allen Stanford's criminal trial and the trials of two other former Stanford employees confirms that only a handful of individuals—*not* including Hunton or any current or former Hunton attorneys—knew about that scheme. Hunton and its lawyers simply were not part of the so-called inner circle that knew about and effectuated the fraud. That means Hunton is *not* responsible for its fallout.

*Third*, in this Answer, Hunton responds only to the claims that remain after the Court's two decisions on Hunton's motions to dismiss. In the Court's December 17, 2014 order [Dkt. 114], the Court dismissed the claims asserted by the Receiver and OSIC for aiding and abetting fraudulent transfers and for breach of fiduciary duty. In the Court's February 4, 2015 order [Dkt. 123], the Court dismissed the claims asserted by the individual plaintiffs and the putative class for aiding and abetting or conspiracy to violate the Texas Securities Act ("TSA"), to the extent the claims are based on CD sales that took place before a statutory repose period. Hunton's Answer does not address these dismissed claims.

*Fourth*, Hunton is answering the Complaint to the best of its current knowledge and information and consistent with the applicable rules. Hunton's investigation in this matter continues, and it reserves the right to supplement or modify any portion of this Answer, including its affirmative and other defenses, at any time. Hunton also expressly denies all

allegations and characterizations contained in the headings in the Complaint, and expressly denies that the language Plaintiffs purport to quote in various allegations throughout the Complaint contains the emphasis added by Plaintiffs.

*Fifth*, because Plaintiffs wrongly assert that Hunton is somehow bound by any knowledge that Carlos Loumiet supposedly acquired while a shareholder at co-defendant Greenberg Traurig, LLP ("Greenberg"), Hunton is answering the portions of the Complaint that relate to that time period, which was before Hunton ever represented Allen Stanford or any Stanford entity. In responding to such allegations in the Complaint, Hunton does not concede Plaintiffs' position on Mr. Loumiet's knowledge or that such allegations are relevant to the claims against Hunton, and Hunton expressly reserves its right to argue and demonstrate to the contrary. To that end, certain of Hunton's responses to the allegations of the Complaint relate to documents that Hunton understands were produced by Greenberg to the Receiver before the Complaint was filed. Hunton avers that it received copies of certain of Greenberg's Stanford-related files with the Receiver's express permission.

*Sixth*, in this Answer, Hunton references a number of documents that are referenced or appear to be referenced in various paragraphs of the Complaint. Hunton does so in an effort to counter the numerous instances where Plaintiffs mischaracterize or misrepresent documents, omit necessary context, or rely on blatant hearsay or layers of hearsay. In referencing documents in this Answer, Hunton does not concede that such documents are relevant to Plaintiffs' claims, that such documents are or would be admissible in any proceeding against Hunton, or (particularly for those documents that are not found in Hunton's files) that such documents are authentic. Hunton does not waive and, indeed, explicitly preserves its ability to challenge on any ground any attempt to use these and any other documents in proceedings in this case. Further, Hunton refers to these documents in this Answer for what they state, and in general, Hunton

lacks knowledge or information sufficient to form a belief as to the truth or falsity of the statements contained in those documents. Hunton denies each and every allegation in the Complaint that is not expressly admitted herein.

## ANSWER

1.       Hunton admits that on February 16, 2009 (but filed on February 17, 2009), this Court issued an order in *SEC v. Stanford International Bank, Ltd.*, No. 3:09-CV-0298-N (N.D. Tex.) [Dkt. 10] appointing Ralph S. Janvey as Receiver for the Receivership Assets and Receivership Records, as those terms are defined in the order. Hunton admits that Mr. Janvey alleges he is asserting claims against Hunton in this Complaint in his capacity as Receiver under that order. Hunton refers to that order for what it states, and denies all allegations in paragraph 1 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 1.

2.       Hunton admits that on August 10, 2010, the Court entered an order in *SEC v. Stanford International Bank, Ltd.*, No. 3:09-CV-0298-N, Dkt. 1149, authorizing the creation of a committee "comprised of seven voting members including the Examiner and six other members, representing a cross-section of the Stanford Investors." Hunton refers to that order for what it states, and denies all allegations in paragraph 2 that are inconsistent with its contents. Hunton lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in the second and third sentences of paragraph 2 and therefore denies the allegations. Hunton denies the remaining allegations in paragraph 2.

3.       Hunton lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 3 and therefore denies the allegations.

4.      Hunton lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 4 and therefore denies the allegations.

5.      Hunton lacks knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 5 and therefore denies the allegations.

6.      Hunton admits that, in their Complaint, Plaintiffs have included allegations suggesting that they seek to certify a class of certain investors in certain investment products. Hunton otherwise lacks knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegations in paragraph 6 regarding their intentions for prosecuting this case and therefore denies the allegations.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 6.

7.      Based solely upon publicly available information, the accuracy of which Hunton has no basis to evaluate, Hunton admits that Greenberg Traurig LLP ("Greenberg") is a New York limited liability partnership.  Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 7 and therefore denies the allegations.

8.      Hunton admits that it is a limited liability partnership organized under the laws of the State of Virginia.  Hunton admits that it may be served within the State of Texas by serving Corporate Creations Network Inc., 4265 San Felipe #1100, Houston, Texas 77027.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 8.  Further answering, Hunton states that it agreed to waive formal service of the Complaint.

9.      Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 9 and therefore denies the allegations.

Response to Non-Numbered Allegations Under "Overview of Case" Heading:   Hunton admits that an email chain exists dated November 30-December 1, 2004 that purports to be between Carlos Loumiet and Allen Stanford.   Hunton denies that the first italicized passage under the Complaint heading "Overview of Case," attributed to an email from Allen Stanford dated December 1, 2004, accurately quotes that email.   Hunton admits that the second italicized passage under the Complaint heading "Overview of Case," attributed to an email from Carlos Loumiet to Allen Stanford dated December 1, 2004, accurately quotes a portion of that email. Hunton denies that Carlos Loumiet sent Allen Stanford an email in 2006 that stated "I am SO proud of you."

10.     Hunton admits that in March 2012, Robert Allen Stanford (herein, "Allen Stanford" or "Mr. Stanford") was convicted of ten federal criminal charges in the U.S. District Court for the District of Houston related to his conduct while he owned or controlled one or more Stanford entities and that, as of the date of this Answer, Mr. Stanford is appealing his convictions.   Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 10 and therefore denies the allegations.   Hunton specifically denies that it had any knowledge of any illegal or wrongful conduct by Mr. Stanford or that it assisted Mr. Stanford in committing wrongdoing of any kind whatsoever.

11.     Hunton admits that in March 2012, Allen Stanford was convicted of ten federal criminal charges in the U.S. District Court for the District of Houston related to his conduct

while he owned or controlled one or more Stanford entities and that, as of the date of this Answer, Mr. Stanford is appealing his convictions.  Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 11 and therefore denies the allegations.  Hunton specifically denies that it had any knowledge of any illegal or wrongful conduct or Ponzi scheme committed by Mr. Stanford or that it assisted Mr. Stanford in committing wrongdoing of any kind whatsoever.

12.     Hunton admits that Carlos Loumiet is a lawyer who practices in the Miami area, and that some of Mr. Loumiet's work at various points in his career has involved international banking law.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 12.  Hunton further specifically denies that it or Mr. Loumiet knew of or assisted in any illegal or wrongful conduct whatsoever committed by Mr. Stanford or any Stanford entity.

13.     Hunton admits that Carlos Loumiet became a partner at Hunton in May 2001, and that he remained a Hunton partner until he resigned from the partnership effective March 31, 2011.  Hunton admits that between 1984 and 2001, before Mr. Loumiet became a partner at Hunton, Mr. Loumiet was a shareholder at Greenberg Traurig, LLP ("Greenberg").  Hunton admits that, at various points in time while Mr. Loumiet was an attorney at Greenberg and later while he was an attorney at Hunton, Mr. Loumiet was one of multiple attorneys who provided legal services to certain Stanford entities.  Hunton admits that, at some point in time, Mr. Loumiet introduced Yolanda Suarez to Allen Stanford and that Ms. Suarez subsequently became employed by one or more Stanford entities.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 13.  Hunton specifically denies that Mr. Loumiet ever served as "outside general counsel" for the "Stanford Financial Group of companies," as that term is used

by Plaintiffs, as the factual record in this case directly contradicts such an allegation.  Hunton also specifically denies that all of the Stanford entities were "Texas-based" companies.

14.     Hunton denies the allegations in paragraph 14.  Hunton specifically denies that Carlos Loumiet ever served as "external general counsel for the Stanford Financial Group of companies" or was "deeply involved in virtually every facet of Stanford's business model and [was] always present on the front lines of Stanford's empire," as the factual record in this case directly contradicts these allegations.  Hunton further specifically denies that it or Mr. Loumiet knew of or assisted in any illegal or wrongful conduct whatsoever committed by Mr. Stanford or any Stanford entity.

15.     Hunton denies the allegations in paragraph 15.  Hunton specifically denies that it or Mr. Loumiet knew of or assisted in any illegal or wrongful conduct whatsoever committed by Mr. Stanford or any Stanford entity.

16.     Hunton denies the allegations in paragraph 16.  Hunton specifically denies that it or Mr. Loumiet knew of or assisted in any illegal or wrongful conduct whatsoever committed by Mr. Stanford or any Stanford entity.

17.     Paragraph 17 contains legal conclusions and concerns Defendant Suarez and not Hunton.  Therefore, no response from Hunton is required.  To the extent a response from Hunton is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 17 and therefore denies the allegations.

18.     Hunton admits that, as of the filing of the Complaint and as of the date of this Answer, it operates offices in Dallas and Houston, Texas.  Hunton further admits that it has conducted business in the State of Texas and that it has a registered agent for service of process in Texas.  Hunton admits that, as of the date of this Answer, and based solely on Greenberg's publicly available website, the accuracy of which Hunton has no basis to evaluate, Greenberg operates offices in Austin, Dallas, and Houston, Texas.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 18 insofar as they are asserted against Hunton. Hunton specifically denies it had extensive or specific contacts "with the State of Texas for over 21 years specifically with the Stanford Financial Group headquartered in Houston, Texas that give rise to Plaintiffs' causes of action," or that it has "committed torts in the State of Texas." Further answering, Hunton states that while Carlos Loumiet was employed by Hunton, Mr. Loumiet worked in Hunton's Miami office.

19.     Paragraph 19 contains legal conclusions as to which no response is required.  To the extent a response is required for the portion of paragraph 19 that concerns Hunton, Hunton states that it does not challenge the Court's personal jurisdiction over it in this matter.

20.     Paragraph 20 contains legal conclusions as to which no response is required.  To the extent a response is required, Hunton denies the allegations in paragraph 20 as they relate to Hunton.  Further answering, Hunton states that 15 U.S.C. §§ 754 and 1692 do not exist or do not relate to personal jurisdiction.

21.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the third sentence of paragraph 21 regarding the Receiver's filing of materials in Florida and Texas and therefore denies the allegations.  The remaining allegations

in paragraph 21 contain legal conclusions as to which no response is required.  To the extent a response is required, Hunton states that it does not challenge this Court's subject-matter jurisdiction over this matter and the propriety of this district as the venue for this matter.

22.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 22 concerning where members of the putative class are residents or citizens.  Paragraph 22 otherwise contains legal conclusions as to which no response is required.  To the extent a response is required, Hunton states that it does not challenge this Court's subject-matter jurisdiction over this matter.

23.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 23 and therefore denies the allegations.

24.     Hunton admits, as alleged in paragraph 24, that the Stanford entities gave Hunton "all the appearances of a highly successful operation."  Hunton admits, based solely on publicly available documents, the truth and veracity of which Hunton has no basis to evaluate, that: (i) in 2007, Allen Stanford was listed on the Forbes 400 list with an estimated net worth of $2 billion; (ii) in 2008, Mr. Stanford was listed on the Forbes 400 Richest Americans list with an estimated net worth of $2.2 billion; and (iii) also in 2008, Mr. Stanford was listed on the Forbes World's Billionaires list with an estimated net worth of $2 billion.  Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 24 and therefore denies the allegations.

25.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 25 and therefore denies the allegations.  Hunton

specifically denies that it was ever involved in the sale of a Stanford International Bank, Ltd. ("SIBL") CD to anyone.

26.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 26 and therefore denies the allegations.

27.     Hunton admits that an entity named Stanford Fiduciary Investor Services conducted business for some period of time in Miami, Florida.  Hunton admits that a signed Memorandum of Agreement exists dated December 14, 1998 that purports to be between Stanford Trust Company, Ltd. of Antigua and the Florida Department of Banking and Finance, and that such Memorandum of Agreement recites, among other things (emphasis added), (1) that Stanford Trust Company, Ltd. "desires to establish a trust representative office in the State of Florida *which comports in all respects with Florida law*"; (2) that the Florida Department of Banking and Finance "desires to establish a statement of understanding governing the expected operations of such an office to assure predictable and effective compliance with applicable laws"; and (3) that Stanford Trust Company Ltd. "agrees that the [Florida] Department [of Banking and Finance] *shall have the right to reasonably examine* any trust representative office established by Stanford Trust within the State of Florida to assure that no business prohibited by this Memorandum of Agreement is conducted in such office."   Hunton refers to the Memorandum of Agreement for what it states, and denies all allegations in paragraph 27 that are inconsistent with its contents.  Hunton denies that it assisted any Stanford entity in establishing SFIS, or that SFIS was established for the purpose of selling SIBL CDs.  Hunton further specifically denies that it knew of or assisted in any illegal or wrongful conduct whatsoever committed by Allen Stanford or any Stanford entity.  Further answering, Hunton states that it did

not represent Mr. Stanford or any Stanford entity in 1998.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 27 and therefore denies the allegations.

28.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 28 and therefore denies the allegations.

29.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 29 and therefore denies the allegations.

30.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 30 and therefore denies the allegations.

31.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 31 and therefore denies the allegations.

32.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 32 and therefore denies the allegations.

33.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 33 and therefore denies the allegations.

34.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 34 and therefore denies the allegations

35.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 35 and therefore denies the allegations.

36.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 36 and therefore denies the allegations.  Further answering, Hunton states that testimony from the criminal trials of Allen Stanford, Mark Kuhrt, and Gil Lopez confirms that only a handful of individuals—*not* including Hunton or Carlos Loumiet—knew about the true composition of SIBL's asset portfolio and, as Plaintiffs allege, that "SIBL's purported assets were fraudulently inflated to offset CD obligations and its revenues were 'reverse-engineered' to arrive at desired levels."

37.     Hunton denies the allegations in paragraph 37.  Hunton specifically denies that Allen Stanford operated his entities by "wholly evad[ing] U.S. laws and regulations," given that, among other things, the U.S. Securities and Exchange Commission ("SEC") has admitted in *SEC v. Stanford International Bank, Ltd.*, No. 3:09-CV-0298-N that Stanford Group Company was a registered broker-dealer and investment adviser subject to SEC regulation.  Hunton further specifically denies that it knew of or assisted in any illegal or wrongful conduct by Mr. Stanford or any Stanford entity.

38.     Hunton admits that an entity named Stanford Fiduciary Investor Services conducted business for some period of time in Miami, Florida.  Hunton admits that a signed Memorandum of Agreement exists dated December 14, 1998 that purports to be between Stanford Trust Company, Ltd. of Antigua and the Florida Department of Banking and Finance, and that such Memorandum of Agreement recites, among other things (emphasis added), (1) that Stanford Trust Company, Ltd. "desires to establish a trust representative office in the State of

Florida which **comports in all respects with Florida law**"; (2) that the Florida Department of Banking and Finance "desires to establish a statement of understanding governing the expected operations of such an office to assure predictable and effective compliance with applicable laws"; and (3) that Stanford Trust Company Ltd. "agrees that the [Florida] Department [of Banking and Finance] **shall have the right to reasonably examine** any trust representative office established by Stanford Trust within the State of Florida to assure that no business prohibited by this Memorandum of Agreement is conducted in such office."   Hunton refers to the Memorandum of Agreement for what it states, and denies all allegations in paragraph 38 that are inconsistent with its contents.  Further answering, Hunton states that it did not represent Allen Stanford or any Stanford entity in 1998.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 38 and therefore denies the allegations.

39.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 39 and therefore denies the allegations.

40.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 40 and therefore denies the allegations.  Further answering, Hunton states that it never represented Allen Stanford, SIBL, or any other Stanford entity in connection with the offer or sale of SIBL CDs to investors, and that it never represented any Stanford entity in connection with any Regulation D, Form D, or investor disclosure matter.

41.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 41 and therefore denies the allegations.  Further answering, Hunton states that it never represented Allen Stanford, SIBL, or any other Stanford

entity in connection with the offer or sale of SIBL CDs to investors, and that it never represented any Stanford entity in connection with any Regulation D, Form D, or investor disclosure matter.

42.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 42 and therefore denies the allegations.  Further answering, Hunton states that it never represented Allen Stanford, SIBL, or any other Stanford entity in connection with the offer or sale of SIBL CDs to investors, and that it never represented any Stanford entity in connection with any Regulation D, Form D, or investor disclosure matter.

43.     Hunton denies that it was aware of any unlawful or improper sales practices by any Stanford entity.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 43 and therefore denies the allegations.

44.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 44 and therefore denies the allegations.  Further answering, Hunton states that it never knew of, suspected, or assisted Allen Stanford, "his cronies," or any of the Stanford entities in committing wrongdoing of any kind.  Hunton further states that it never had any knowledge of Mr. Stanford's alleged "massive, worldwide Ponzi scheme," nor did it participate or assist in that scheme or profit from it.

45.     Paragraph 45 contains legal conclusions as to which no response is required.  To the extent a response is required, Hunton (1) denies that the quoted language in paragraph 45 accurately states the language in 15 U.S.C. § 80a-46(b), and (2) lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 45 and therefore denies the allegations.

46.     Hunton denies the allegations in the second sentence of paragraph 46.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 46 and therefore denies the allegations.  Further answering, Hunton states that it never represented Allen Stanford, SIBL, or any other Stanford entity in connection with the offer or sale of SIBL CDs to investors, and that it never represented any Stanford entity in connection with any Regulation D, Form D, or investor disclosure matter.

47.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 47 and therefore denies the allegations.  Further answering, Hunton states that it never represented Allen Stanford, SIBL, or any other Stanford entity in connection with the offer or sale of SIBL CDs to investors, and that it never represented any Stanford entity in connection with any Regulation D, Form D, or investor disclosure matter.

48.     Hunton admits that Allen Stanford, Jim Davis, Gilbert Lopez, and Mark Kuhrt were convicted of criminal acts related their conduct while working at one or more of the Stanford entities.  Hunton refers to the transcripts and exhibits from the criminal trials of Allen Stanford, Gilbert Lopez, and Mark Kuhrt for what they state, and denies all allegations in paragraph 48 inconsistent with their contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 48 and therefore denies the allegations.  Further answering, Hunton states that testimony from the criminal trials of Allen Stanford, Mark Kuhrt, and Gil Lopez confirms that only a handful of individuals—*not* including Hunton or Carlos Loumiet—knew about the true composition of SIBL's portfolio and that SIBL's financial information was purportedly fabricated.  Hunton also states that it did not know of, or participate or assist in, any

wrongful conduct committed by Messrs. Stanford, Davis, Lopez, and Kuhrt, or the Stanford entities.  Hunton further states that, as of the date of this Answer, Allen Stanford, Gilbert Lopez, and Mark Kuhrt are appealing their criminal convictions.

49.     Hunton admits that in 1988, Carlos Loumiet was 37 years old and had been practicing law for ten years.  Hunton admits that Mr. Loumiet joined Greenberg in 1982, became a shareholder in 1984, and became a principal shareholder in 1988.  Hunton admits that the primary focus of Mr. Loumiet's legal practice at times during his career has been international corporate and banking law.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second, sixth, and seventh sentences of paragraph 49 and therefore denies the allegations.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 49.

> Answer to Footnote 1, appended to Paragraph 49:   Hunton   admits   that   a document titled "Greenberg, Traurig New Client-New Matter Intake Memorandum" dated June 13, 1995 exists that lists under "Description of this Matter" "[d]raft offshore trust statute" and that lists "Stanford Financial Group, Ltd." with an address at 5050 Westheimer in Houston, Texas as the client. Hunton refers to that document for what it states, and denies all allegations in footnote 1 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 1 and therefore denies the allegations.

50.     Hunton admits that a letter dated March 25, 1988 exists that purports to be from Sidney Adler to Carlos Loumiet.  Hunton admits that the language appearing within quotation marks in paragraph 50 appears within that letter, but denies that paragraph 50 accurately reflects the context of such language.  Hunton refers to that March 25, 1988 letter for what it states, and denies all allegations in paragraph 50 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 50.

> Answer to Footnote 2, appended to Paragraph 50:     Hunton denies the allegations in the first sentence of footnote 2.  Hunton admits that a letter exists dated April 26, 1989 that purports to be from Sidney Adler to Carlos Loumiet, and that such letter purports to enclose "our audited Annual Report for 1988 and our Statement of Condition as of 31 Mar/89."  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 2 that the April 26, 1989 letter actually enclosed any documents, including but not limited to "GIBL's financial statements as of March 31, 1989."  Hunton denies that a "Statement of Condition" is the same as a "financial statement."  Hunton admits that a three-page document exists that is titled "Guardian International Bank Ltd. Statement of Condition" and dated March 31, 1989, and that such document appears to suggest that GIBL's assets as of March 31, 1989 were $31,147,745, client deposits were $30,088,887, and shareholders' equity was $1,003,541. Hunton refers to the April 26, 1989 letter and the "Guardian International Bank Ltd. Statement of Condition" dated March 31, 1989 for what they state, and denies all allegations in footnote 2 that are inconsistent with their contents. Hunton denies the remaining allegations of footnote 2.

51.     Hunton admits that a letter dated March 25, 1988 exists that purports to be from Sidney Adler to Carlos Loumiet.  Hunton refers to that March 25, 1988 letter for what it states, and denies all allegations in paragraph 51 that are inconsistent with its contents.  As one example of how the allegations in paragraph 51 are inconsistent with that letter, Hunton denies that the March 25, 1988 letter states or suggests that GIBL "conducted *all* of its sales and marketing" through a "'representative office' in Houston."   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 51 and therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 51.

> Answer to Footnote 3, appended to Paragraph 51:   Footnote 3 contains legal conclusions as to which no response is required.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in footnote 3 and therefore denies the allegations.

52.     Hunton admits that a letter dated March 25, 1988 exists that purports to be from Sidney Adler to Carlos Loumiet.  Hunton refers to that March 25, 1988 letter for what it states, and denies all allegations in paragraph 52 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 52.

53.     Hunton denies the allegations in the first sentence of paragraph 53.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second, third, and fourth sentences of paragraph 53 and therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 53.

54.    Hunton admits that a memorandum dated April 13, 1988 exists that purports to be from Sidney Adler to Carlos Loumiet.  Hunton refers to that April 13, 1988 memorandum for what it states, and denies all allegations in paragraph 54 that are inconsistent with its contents.  In particular, Hunton denies that the language Plaintiffs quote in paragraph 54 appears anywhere in the April 13, 1988 memorandum.  Hunton states that a letter dated April 6, 1988 exists that purports to be from Sidney Adler to Carlos Loumiet, and that that letter contains portions of the language appearing within quotation marks in paragraph 54.  Hunton refers to the April 6, 1988 letter for what it states, and denies all allegations in paragraph 54 that are inconsistent with its contents.  Further answering, Hunton states that the April 6, 1988 letter contains the following additional language not quoted by Plaintiffs in paragraph 54 (emphasis added):

- "We obviously would like to make just as much use of [GIIS's Miami office] as we possibly can *within the rules*."

- "We will however give *full disclosure in our offering memoranda* to avoid any charge of fraud."

- ". . . the Bank would like to come as close as possible to having [a representative] office *without violating the law*."

Except as expressly admitted herein, Hunton denies the allegations in paragraph 54.

Answer to Footnote 4, appended to Paragraph 54: Hunton admits that a memorandum exists dated April 13, 1988 that purports to be from Sidney Adler to Carlos Loumiet, and that that memo states in part, "Statements are mailed from the Houston office to the foreign customers, although this function is about to be moved to Montserrat."  Hunton refers to that April 13, 1988 letter for what it states and denies all allegations in footnote 4 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in footnote 4.

20

55.     Hunton admits that two memos dated May 12, 1988 exist that purport to be from Sidney Adler to Allen Stanford, and that those two memos discuss GIIS's Miami office.  Hunton admits that one May 12, 1988 memo contains the language "good self-serving document, frankly, in the event any questions are raised," but states that such language follows a discussion in the memo regarding uncertainties in aspects of the relevant legal landscape.  Hunton refers to the two May 12, 1988 memos for what they state, and denies all allegations in paragraph 55 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 55.

56.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 56 and therefore denies the allegations.

57.     Hunton admits that a document titled Banking Circular #171, Supplement 67 exists, and that such circular is dated January 7, 1988 and purports to have been issued by the U.S. Office of the Comptroller of the Currency (the "OCC").  Hunton admits that such banking circular states the OCC "has received information from State Banking Officials of Florida and California that the subject entity," referencing Guardian International Bank, Ltd., "is not authorized to have a banking address as indicated above," referencing addresses in Miami and San Diego.  Hunton refers to that banking circular for what it states, and denies all allegations in paragraph 57 that are inconsistent with its contents.  Hunton further admits that a document titled Banking Circular #171, Supplement 67a exists, and that such circular is dated January 5, 1989 and purports to have been issued by the OCC.  Hunton admits that such banking circular states that "[i]nformation has been received from the United States Treasury Department and from the State of Texas Banking Department that the subject entity," referencing Guardian International

Bank, Ltd., "is not authorized to have banking addresses as indicated above," referencing addresses in Houston and El Paso.  Hunton refers to that banking circular for what it states, and denies all allegations in paragraph 57 that are inconsistent with its contents.  Further answering, Hunton states that documents exist that suggest that efforts were made in the late 1980s to register Guardian entities with the U.S. Treasury Department and otherwise to address the banking circulars.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 57.

58.     Hunton lacks knowledge or information sufficient to form a belief as to truth or falsity of the allegation in paragraph 58 as to whether and when Mr. Loumiet, while at Greenberg, was provided "correspondence between Stanford Financial and the Texas Department of Banking and the U.S. Treasury Department."  Hunton admits that a memorandum exists dated June 17, 1988 that purports to be from Sidney Adler to "R. Allen Stanford (YOUR EYES ONLY)."  Hunton refers to that memorandum for what it states, and denies all allegations in paragraph 58 that are inconsistent with its contents.  In particular, Hunton denies that the memorandum states, as alleged in paragraph 58, that GIBL needed to "obtain a Class 'A' license in Montserrat" in order to open representative offices in the United States, or to prevent "Stanford Financial" from being "deemed to be selling unregistered securities from the U.S. in violation of U.S. securities laws."  Hunton also denies the allegation in paragraph 58 that "Adler went on to tell Stanford (and thereby Loumiet) via the June 17, 1988 Memo that 'there is no question'" that the GIBL CDs were securities" in part because such allegation omits the context for that language.  Hunton states that the June 17, 1998 memorandum states in part:

> Although the enclosed material does not mention this, it is imperative that we
> obtain the A-B License just as soon as possible, in order for us to fit under the
> doctrine of the <u>Wolf v. Banco Nacional de Mexico</u> case. Under that case, if

holders of certificates of deposit in a foreign bank are not fully protected by strict Government regulation of the foreign bank, then such certificates of deposit will be considered <u>securities</u> and subject to all the limitations applicable to dealing in securities. This means that no offer nor sale, etc., can be made within the U.S., meaning not even using the telephone nor the mail, etc., etc., to promote our business from the Houston or Miami office.

All that is needed to resolve the matter, in my considered opinion, is to obtain the A-B License, because then we can maintain to the authorities and anyone else that we are under the strict regulation of a Central Bank authority, that of the East Caribbean Central Bank.

*      *      *

However, I must repeat that the way things stand now, there is no question under established Federal case law, our 30-Day Deposits and their "Investment Certificates" are securities and all the restrictions applying to securities do presently apply to us. The only solution I see to this problem is to expedite as rapidly as possible the A-B License. This will also qualify us to register in Washington and remove any cloud over us that will exist in Austin as a result of our non-registry in Washington.

Hunton denies that the June 17, 1988 memorandum references Carlos Loumiet or reflects any legal advice provided by Mr. Loumiet.  Hunton denies the remaining allegations in paragraph 58.

59.    Hunton denies the allegation in paragraph 59 that Carlos Loumiet considered Montserrat "an 'outlaw' banking jurisdiction utilized primarily by fraudsters, con artists and money launderers, where anyone could buy a banking license for a couple thousand dollars, no questions asked."  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 59 and therefore denies the allegations.

<u>Answer to Footnote 5, appended to Paragraph 59:</u>   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 5 and therefore denies the allegations.

60.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 60 and therefore denies the allegations.

61.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 61 and therefore denies the allegations.

> Answer to Footnote 6, appended to Paragraph 61:   Hunton admits that a memorandum exists dated August 30, 1989 that purports to be from Allen Stanford to Carlos Loumiet, and that such memorandum references an "anonymous source within the Montserrat Government [who] allowed [Allen Stanford] to view Guardian's file which contained correspondence and notes that he felt were something [Mr. Stanford] should see." Hunton refers to the August 30, 1989 memorandum for what it states, and denies all allegations in footnote 6 that are inconsistent with its contents. In particular, Hunton denies that this memorandum refers to an "inside man." Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 6 and therefore denies the allegations.

62.     Hunton admits that a judgment exists dated September 5, 1994 of the High Court of Justice, County of Montserrat, Civil, Case No. 140 of 1991, captioned *James Stanford v. The Attorney General of Montserrat*, and that such judgment declared in part as follows (emphasis added):

(1) That the Guardian International bank Limited ceased to do business on the 19th December, 1990 with the voluntary surrender of its license to the Minister of Finance.

(2) That the licenses granted to Guardian International Bank Limited on 9th January, 1986 and 14th day of November, 1988 ***could not be revoked*** by the Governor-in-Council, since they did not exist.

(3) That the revocation referred to in a letter dated 19th June, 1991 purported to have been made on 31st day of May, 1991 is ***null and void and of no effect***. The striking off of the company from the Companies register was contrary to

the provision of the Companies Act and was therefore null and void and of no effect.

Hunton refers to that judgment for what it states, and denies all allegations in paragraph 62 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 62 and therefore denies the allegations.

63.     Hunton admits that a memorandum exists dated August 30, 1989 that purports to be from Allen Stanford to Carlos Loumiet, and that such memo contains the language "deal[] with Shockey in the most aggressive manner."  Hunton refers to that memorandum for what it states, and denies all allegations in paragraph 63 that are inconsistent with its contents.  In particular, Hunton states that language quoted in the last sentence of paragraph 63 follows a recitation in the memorandum of allegations purportedly made by John Shockey that the memorandum states were either acknowledged by Shockey not to be true or were ***not*** supported by "any factual evidence nor any client complaints."  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 63 and therefore denies the allegations.

64.     Hunton specifically denies that Allen Stanford had "absolute control over the island nation of Antigua" or its government.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 64 and therefore denies the allegations.

65.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 65 and therefore denies the

allegations.  Hunton admits that an email exists dated February 24, 1998 that purports to be from

Carlos Loumiet to an unspecified list of Greenberg shareholders and that such email states in its

entirety:

> For the past nine months, at the expense of a client with a sizable investment in the islands, we have been helping the Government of Antigua and Barbuda to clean up its international banking sector through the adoption of model legislation and regulations and the elimination of questionable financial institutions operating there.  That effort has won strong praise even from British monetary authorities (A&B remains part of the Commonwealth), who have acknowledged the quality of the proposed measures.  Another sector of the economy that has developed on those islands is internet gambling, and the Government of A&B now wishes us to help it be a pioneer in the adoption of model legislation and regulations to regulate that industry and eliminate many of the abuses that have been associated with it.  Our client has asked whether we represent any companies active in this field which would like to actively participate in, and help fund, an effort to adopt such regulation in order to give themselves and the over-all industry a better image.  One huge advantage to A&B in this regard is that we have sufficient support from its Government and it is a small enough jurisdiction to make it ideal as a "laboratory" for this type of effort.  Please let me know if you know of any clients which would like to be involved.

Hunton refers to that email for what it states, and denies all allegations in paragraph 65 that are

inconsistent with its contents.    Except  as  expressly  admitted  herein,  Hunton  denies  the

allegations in paragraph 65.

66.    Hunton denies the allegations in paragraph 66.  Hunton specifically denies that it

ever  knew  of,  participated  in,  or  assisted  Allen  Stanford  or  any  of  the  Stanford  entities  in

"hijack[ing]" the sovereign and independent nation of Antigua and Barbuda, in "install[ing]" a

"'shadow' government in Antigua," or in committing wrongdoing of any kind.

> Answer to Footnote 7, appended to Paragraph 66:    Hunton admits that an article
>
> appeared in the March 5, 2002 edition of the Wall Street Journal titled "R. Allen
>
> Stanford  Casts  Shadow  Over  Antigua,  Island  of  the  Sun";  that  such  article
>
> contained  the  statement  "This  sun-drenched  Caribbean  island,  famous  for  its

cricket stars, palm-flattening hurricanes and outsized corruption scandals, is fast gaining another reputation: as the personal fief of R. Allen Stanford, a Texas developer and international banker"; and that such article purports to quote opposition party leader Baldwin Spencer as saying "'This man has a lien on our whole country.'"  Hunton refers to the March 5, 2002 article for what it states, and denies all allegations in footnote 7 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in footnote 7.

67.   Hunton admits that a contract exists dated December 6, 1990, purportedly between the Government of Antigua and Barbuda and R. Allen Stanford, and that such agreement concerns the purchase of the Bank of Antigua, Ltd., which the agreement states was "now seriously insolvent."  Hunton admits that such agreement discusses Allen Stanford establishing "Guardian International Bank Limited" and "Guardian Trust Company Limited" and that such agreement identifies certain conduct that the Government of Antigua and Barbuda was to undertake.  Hunton refers to that agreement for what it states, and denies all allegations in paragraph 67 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 67.

68.   Hunton admits that an unsigned letter exists that purports to be from Carlos Loumiet to D.K.L. Hurst, that is dated October 16, 1990 but bears a notation "GTH Draft 10/16/90," and that states it is a "written proposal" to acquire Bank of Antigua, Ltd.  Hunton admits that the draft letter estimates that the capital required from Stanford was approximately E.C.$18 million, which the letter states was the amount required to cover the bank's existing debts plus ensure capital of E.C.$10 million.  Hunton also admits that the draft letter states that

Allen Stanford's proposal has "two prongs," one "involv[ing] certain concessions he is respectfully requesting from the Government relating to the purchase of the Bank," which concessions "are justified by business considerations relating to the investment," and the other "involv[ing] Mr. Stanford's agreement with the existing shareholders of the Bank."  Hunton admits that the draft letter states that the "certain concessions . . . . justified by business considerations" included income and import tax exemptions, the development of certain land (subject to a separate agreement on a purchase price), the grant of certain visas and work permits, and permanent residency and potentially citizenship for Allen Stanford.  Hunton refers to that draft letter for what it states, and denies all allegations in paragraph 68 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 68.

69.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and second sentences of paragraph 69 and therefore denies the allegations.  Hunton denies the allegations in the third sentence of paragraph 69.

70.     Hunton admits that a letter exists dated November 12, 1990 that purports to be from Bernard Percival to the Honorable John E. St. Luce, Minister of Finance for Antigua and Barbuda.  Hunton refers to that letter for what it states, and denies all allegations in paragraph 70 that are inconsistent with its contents.  Hunton admits that that letter contains language asserting that John Shockey "indicated that Guardian International has been operating on the fringes of illegality for many years" and "that although Guardian survived the shake-up of the off-shore banking business in Montserrat, the Montserrat operation is under scrutiny."  Further answering, Hunton states that the letter also states (emphasis added) that an investigator "conclude[d] that from the information received to date 'there is ***no tangible evidence*** to associate Guardian

International with any criminal activity,'" that another source "***found nothing*** to suggest that we should not be doing business with the company," and that Mr. Percival "recommend[ed] that we accept the proposal put forward by the Guardian group," pursuant to certain conditions.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 70.

71.     Hunton admits that a letter exists dated November 12, 1990 that purports to be from Bernard Percival to the Honorable John E. St. Luce, Minister of Finance for Antigua and Barbuda.  Hunton refers to that letter for what it states, and denies all allegations in paragraph 71 that are inconsistent with its contents.  Hunton further admits that a letter exists dated November 29, 1990 that purports to be from D. Keith L. Hurst, Financial Secretary of the Government of Antigua and Barbuda, to Errol Allen, Deputy Governor of East Caribbean Central Bank.  Hunton admits that that letter states that "the Government of Antigua and Barbuda has reluctantly agreed to accept the proposal as put forward by Allan [*sic*] Stanford for Guardian International Group," subject to certain conditions, including that (emphasis added): "[t]he Bank ***must adhere to all rules*** as indicated by the Banking Act and the East Caribbean Central Bank" and "[t]he bank ***must make information available*** to the Bank Examiner as he requests such information." Hunton refers to that letter for what it states, and denies all allegations in paragraph 71 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 71 and therefore denies the allegations.

72.     Hunton admits that a fax exists dated June 4, 1991 that purports to be from Citizens and Southern International Bank ("Citizens") to Bank of Antigua, Ltd., and that such fax purports to transmit a letter that states that Bank of Antigua's checking account number 000-

01-123 would be closed thirty banking days from the date of the fax.  Hunton admits that the fax

states in part that Citizens "is taking this action because of the significantly increased balances

which have appeared in your account lately, the nature of the checks that have been deposited,

and because many of the checks deposited are missing endorsements or contain endorsements of

Guardian International Bank, with which [Citizens] is not comfortable."  Hunton refers to the

June 4, 1991 fax and letter for what they state, and denies all allegations in paragraph 72

inconsistent with their contents.  Hunton lacks knowledge or information sufficient to form a

belief as to the truth or falsity of the allegations in the fourth sentence of paragraph 72 and

therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 72.

73.     Hunton admits that a letter exists dated May 29, 1992 that purports to be from

Carlos Loumiet to Donna Alexander at NationsBank International Miami ("NationsBank").

Hunton admits that the letter states in part that "[o]ur firm has represented R. Allen Stanford and

Guardian International Bank Limited ('Guardian') for approximately four years. Over that time,

we have not seen any behavior by our clients that would give rise to any concern regarding the

honesty, integrity, or law-abiding nature of the entities or individuals involved.  We can assure

you that, were this not the case, they would have ceased being business clients of our firm."

Hunton refers to the May 29, 1992 letter for what it states, and denies all allegations inconsistent

with its contents.   Except as expressly admitted herein, Hunton denies the allegations in

paragraph 73.   Hunton further specifically denies that it knew of or assisted in any illegal or

wrongful conduct whatsoever committed by Allen Stanford or any Stanford entities.

74.     Hunton lacks knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in the second sentence of paragraph 74 and therefore denies the

allegations.  Hunton admits that a letter exists dated October 29, 1990 that purports to be from Carlos Loumiet to Paul Allan Schott, General Counsel of the Office of the Comptroller of the Currency, and that the language appearing within quotation marks in paragraph 74 appears in that letter, except that in place of "seen," the letter uses the word "witnessed."  Hunton refers to the October 29, 1990 letter for what it states, and denies all allegations in paragraph 74 that are inconsistent with its contents.  Hunton denies the remaining allegations in paragraph 74.  In particular, Hunton specifically denies that Mr. Loumiet made any misrepresentations to the U.S. Treasury Department.

> Answer to Footnote 8, appended to Paragraph 74:    Hunton denies the allegations in footnote 8.

75.    Hunton admits that a letter exists dated November 13, 1990 that purports to be from Robert Serino, Deputy Chief Counsel (Policy) of the Office of the Comptroller of the Currency, to Carlos Loumiet.  Hunton admits that that letter states in part, "[a]t this time, I am not at liberty to confirm or deny the existence of any criminal investigation into Guardian and its owners," but also states "[t]he Office of the Comptroller of the Currency supervises the national banking system of the United states. In that capacity, we do not supervise the Guardian International Bank, Ltd., licensed by the Montserrat authorities. As such, we do not have an ongoing investigation into that entity."  Hunton refers to that November 13, 1990 letter for what it states, and denies all allegations in paragraph 75 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 75.

76.    Hunton admits that a letter exists dated November 8, 1990 that purports to be from Carlos Loumiet to Allen Stanford.  Hunton admits that the italicized language appearing

within quotation marks in paragraph 76 appears in that letter but denies that paragraph 76 accurately reflects the context of that language. Hunton refers to the November 8, 1990 letter for what it states, and denies all allegations in paragraph 76 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 76.

77.     Hunton admits that a document exists that purports to be a fax from Allen Stanford to Carlos Loumiet, dated September 23, 1991, and that purports to enclose a column dated September 1991 that purports to have been authored by Tony Hetherington for a publication called "The International." Hunton admits that a portion of the column concerns "Guardian International Bank" and its purported owner, "Mr. Alan Paul Stanford." Hunton refers to that fax and its purported enclosure for what they state, and denies all allegations in paragraph 77 that are inconsistent with their contents. In particular, Hunton denies that the column "report[s] that Stanford Financial did not have authorization to operate banking offices in the United States." Hunton further admits that an article exists titled "Monster rat in Montserrat," with a sub-heading, "Antigua, Houston, Piccadilly…or Bust!," and that such article purports to have been authored by Tony Hetherington, but Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 77 concerning where the article was allegedly published. Hunton admits that the language appearing in quotation marks in the last sentence of paragraph 77 appears in that article. Hunton refers to that article for what it states, and denies all allegations in paragraph 77 that are inconsistent with its contents. In particular, Hunton denies that the article states that "GIBL's advertisements offered CD rates 2-3 points higher than rates obtainable at any other financial institution," as alleged in paragraph 77. Hunton denies the remaining allegations in

paragraph 77.   In particular, Hunton specifically denies that Carlos Loumiet ever "assisted Stanford to silence" Tony Hetherington or any other journalist.

78.     Hunton denies the allegations in paragraph 78.

79.     Hunton admits that a letter exists dated December 17, 1991 that purports to be from James Stanford to Tony Hetherington and R. Lambert, Editor-in-Chief of the Financial Times; that such letter, over the course of seven pages, challenges many of the statements in Mr. Hetherington's article; and that such letter states that "full legal recourse" would be taken if the newspaper did not issue a retraction.   Hunton refers to the December 17, 1991 letter for what it states, and denies all allegations inconsistent with its contents.   Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 79 and therefore denies the allegations.

80.     Hunton admits that Carlos Loumiet introduced Yolanda Suarez to Allen Stanford, after which Ms. Suarez became employed by a Stanford entity.   Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 80 and therefore denies the allegations.

81.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 81 and therefore denies the allegations.   Hunton admits that a letter exists dated February 1, 1991 that purports to be from Carlos Loumiet to Allen Stanford.   Hunton denies the allegation in paragraph 81 that the letter discusses whether "GIIS was carrying out banking operations in the United States at its Houston

and Miami offices by providing bank 'representation' services to GIBL."   The letter actually states in part (emphasis added):

> 1.      The Service Agreement with Bank of Antigua, Ltd. should make it clear that Guardian International Investment Services, Ltd. ("Services") *will not sell the bank's services to residents of the United States.*   Whether or not CD's of Bank of Antigua, Ltd. would constitute "securities" for U.S. law purposes, which is arguable, the likelihood of getting in trouble with state banking and securities regulators is much greater if Services is promoting the sales of those deposits to residents of the U. S.   *I therefore do not recommend it.*

Hunton refers to the February 1, 1991 letter for what it states, and denies all allegations in paragraph 81 that are inconsistent with its contents.   Hunton denies the remaining allegations in paragraph 81.

> Answer to Footnote 9, appended to Paragraph 81:   Hunton   admits   that   a memorandum dated February 14, 1996 exists that purports to be from a Greenberg attorney (not Carlos Loumiet) to a non-Greenberg attorney, and that such memorandum purports to comment on what appears to be portions of a draft brief for proceedings in U.S. Tax Court related to Allen Stanford.   Hunton admits that one page that appears to be an excerpt from the draft brief states in part, "During 1990, the Stanfords and their immediate family were the sole owners of three foreign corporations (the 'Guardian Banking Companies') which jointly conduct the operations of an offshore bank, including its financial, management and marketing operations. These corporations were Guardian International Bank, Ltd. ('Guardian Bank'), Guardian International Investment Services, Ltd. ('Guardian Marketing Company') and Stanford Financial Group Ltd. ('Guardian Management Company')."   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the suggestion in footnote 9 that Greenberg lawyers signed the final brief to the U.S. Tax Court, or

that the language quoted in footnote 9 appeared in the final brief submitted to the court.  Further answering, Hunton states that, upon information and belief, the Stanford lawyers who appeared on the final Tax Court brief and who appear on the Tax Court's eventual opinion were not Greenberg lawyers.  Hunton denies the remaining allegations in footnote 9.  Hunton specifically denies the allegation, in paragraph 81 and footnote 9, to the effect that alleged statements in 1996 can somehow be used to show alleged knowledge in 1991.

82.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 82 and therefore denies the allegations.  Hunton admits that a letter exists dated March 25, 1992 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Yolanda Suarez.  Hunton specifically denies that that letter refers in any way to GIBL CDs or GIIS.  Hunton admits that that letter states in part:

> You have asked us whether compliance with Rule 3a4-1 (the "Rule") issued pursuant to the Securities Exchange Act of 1934 will exempt a corporate affiliate of an issuer, and the employees of the affiliate, from characterization as a broker-dealer. Footnote 5 of Securities Exchange Act Release No. 22172 (the "Release"), which relates to the issuance of the Rule, indicates by way of example that if employees of the corporate general partner of an issuer which is a limited partnership sell securities of the issuer in conformity with the Rule, then neither the employees of the corporate general partner, nor the corporate general partner itself, shall be considered a broker-dealer. This example should be generally applicable to affiliates of issuers, not just general partners, and should therefore operate to relieve such affiliates of the obligation to register as broker-dealers. I have enclosed a copy of the Release for your reference.

Hunton refers to the March 25, 1992 letter for what it states, and denies all allegations in paragraph 82 that are inconsistent with its contents.  Hunton denies the remaining allegations in paragraph 82.

83.     Hunton admits that a memorandum exists dated January 8, 1993 that purports to be from a Greenberg attorney (not Carlos Loumiet) to the "Guardian International File."  Hunton admits that such memorandum contains the language appearing within the first set of quotation marks in paragraph 83, except that the memorandum refers to "GIB," not "GIBL."  Hunton denies that the memorandum contains the language appearing within the second set of quotation marks in paragraph 83, and further answers that the memorandum states that the "various banking functions are conducted by separate corporate entities so that GIB would not be considered to be conducting banking business in the United States."  Hunton denies that paragraph 83 accurately reflects the context of the quoted language.  Hunton refers to that memorandum for what it states, and denies all allegations in paragraph 83 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 83.  Hunton specifically denies that it had any knowledge of the January 8, 1993 memorandum or its contents prior to proceedings and communications in connection with this litigation.

84.     Hunton admits that a memorandum exists dated January 8, 1993 that purports to be from a Greenberg attorney (not Carlos Loumiet) to the "Guardian International File."  Hunton admits that such memorandum contains the language appearing within quotation marks in paragraph 84, except that the second set of quoted language uses the phrase "try to" instead of "probably," but denies that paragraph 84 accurately reflects the context of this language.  Hunton refers to that memorandum for what it states, and denies all allegations in paragraph 84 that are inconsistent with its contents.  In particular, Hunton denies that the memorandum states, as alleged in paragraph 84, that Yolanda Suarez told the Greenberg attorney (not Carlos Loumiet) "that GIBL was a pass-through sham banking entity used as a front for Stanford's U.S.-based

unlicensed investment company securities sales operation."  Except as expressly admitted herein, Hunton denies the allegations in paragraph 84.   Hunton specifically denies that it had any knowledge of the January 8, 1993 memorandum or its contents prior to proceedings and communications in connection with this litigation.

85.     Hunton admits that a memorandum exists dated January 8, 1993 that purports to be from a Greenberg attorney (not Carlos Loumiet) to the "Guardian International File" and that such memorandum, in part, purports to summarize a conversation with Oreste Tonarelli.  Hunton refers to that memorandum for what it states, and denies all allegations in paragraph 85 that are inconsistent with its contents.  Hunton specifically denies that the memorandum states, as alleged in paragraph 85, that Oreste Tonarelli told the Greenberg attorney (not Carlos Loumiet) "that Stanford Financial had fully transitioned its primary business model away from real estate investment and development to private banking, and that its primary business and main product going forward was the sale of the GIBL CDs sold from Stanford's Miami and Houston offices, mostly to Latin American investors who bought the CDs using funds already on deposit in U.S. banks."  Instead, the memorandum states, "[p]roducts offered by GIB are: certificate of deposits, express accounts (which are similar to [money market] accounts) and a payable through program (which is new and in the process of being implemented)."  Except as expressly admitted herein, Hunton denies the allegations in paragraph 85.   Hunton specifically denies that it had any knowledge of the January 8, 1993 memorandum or its contents prior to proceedings and communications in connection with this litigation.

86.     Hunton admits that handwritten notes exist dated January 11, 1993 and that such notes reference "Ed Smith, From Antigua, General Manager" and "Jim Davis."  Hunton admits

that the notes state in part, "Alan doesn't want licenses – they can be revoked. Resistant to any registration." Hunton refers to the handwritten notes for what they state, and denies all allegations in paragraph 86 that are inconsistent with their contents. In particular, Hunton denies the allegation in paragraph 86 that the notes "reveal Greenberg's knowledge of Stanford's securities law violations," because the notes contain no such information. Except as expressly admitted herein, Hunton denies the allegations in paragraph 86. Hunton specifically denies that it had any knowledge of the January 11, 1993 notes or their contents prior to proceedings and communications in connection with this litigation.

87.     Hunton admits that an affidavit exists dated January 13, 1994 that purports to be from Carlos Loumiet and that concerns a criminal matter then pending against Lombard Credit Corp. Hunton further admits that a memorandum exists dated June 30, 1994 that purports to be from Yolanda Suarez to Oreste Tonarelli and that such memorandum discusses the Lombard matter and purports to state advice received by Ms. Suarez from Carlos Loumiet. Hunton refers to that affidavit and memorandum for what they state, and denies all allegations in paragraph 87 that are inconsistent with their contents. Further answering, Hunton states that Ms, Suarez's June 30, 1994 memorandum does not indicate that Carlos Loumiet received, approved, or reviewed its contents. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 87 and therefore denies the allegations.

88.     Hunton admits that a memorandum exists dated November 12, 1994 that purports to be from Carlos Loumiet and Patricia Menendez Cambo to "Yolanda Castro" of Stanford Financial, regarding "Relationship between International Bank and Florida Corporation."

Further answering, Hunton states that a letter exists dated November 14, 1994 that purports to be from Patricia Menendez Cambo to Yolanda Suarez and to enclose the November 12, 1994 memorandum, and that the letter describes that memorandum as "a memo we recently prepared in another matter with respect to the proposed relationship between an international bank and a Florida corporation which is not licensed as a representative office of the international bank." The November 12, 1994 memorandum also contains a stamp at the top that reads, "DRAFT FOR DISCUSSION PURPOSES."  Hunton refers to the November 12, 1994 memorandum and the November 14, 1994 letter for what they state, and denies all allegations in paragraph 88 that are inconsistent with their contents.  In particular, Hunton denies that the memorandum constitutes an opinion or legal advice regarding any Stanford-related operations.  Further answering, Hunton states that the memorandum states in part (emphasis added):

> As a threshold issue, we believe that the characterization of the Fla. Corp. as a representative office of the Int'l Bank may be prevented by simply ensuring that the Fla. Corp. does not assume the role of a representative or agent of the Int'l Bank either constructively or by contract.  **We understand that the Fla. Corp. does not plan to hold itself out to the public as a representative of the Int'l Bank.**

Hunton further states that the comments provided in the memorandum are expressly based on assumptions in the memorandum about the entities' roles and functions.  For example, the memorandum states (emphasis added):

> We assume that the only activities proposed by the Fla. Corp. that could be construed as activities of a "representative office" would be (i) the Fla. Corp.'s proposed role as a liaison for the Int'l Bank's customers and (ii) the referral of business to the Int'l Bank. The other activities of the Fla. Corp. – such as providing the services of an investment advisor – are not activities that are permissible for a "representative office" and, as a result, would not require the Fla. Corp. to be licensed as such. Further, we understand that the activities on behalf of the Int'l Bank would constitute **only a small fraction** of the over-all business activity at the Fla. Corp.'s Florida offices.

*       *       *

With regard to the Fla. Corp.'s proposal to refer customers to the Int'l Bank, we also bring to your attention that the statutory definition of the permissible activities for a "representative office" (§663.062) refers to "soliciting" business as opposed to merely "referring" business. Since the activity proposed by the Fla. Corp. would not involve entreating or trying to obtain new customers for the Int'l Bank – the essence of "solicitation" -- it can be argued that the Fla. Corp.'s proposed referral activity is not within the scope of the statute.

Except as expressly admitted herein, Hunton denies the allegations in paragraph 88.

89.     Hunton admits that a letter exists dated June 18, 1993 that purports to be from Allen Stanford to Carlos Loumiet and that the letter concerns an "Advisory Board of Stanford Financial Group Ltd."  Hunton admits the letter states that "[a]s a member of the Advisory Board, [Mr. Loumiet would] receive an annual payment of $3000," but Hunton denies that Mr. Loumiet received such annual payments.  Hunton refers to the June 18, 1993 letter for what it states, and denies all allegations in paragraph 89 that are inconsistent with its contents.  For example, Hunton denies that the letter states, as alleged in paragraph 89, that "all expenses associated with [Mr. Loumiet's] participation in the Advisory Board would be paid for by Stanford"; rather, the letter states that Mr. Loumiet's "expenses incurred in connection with" "one-day meetings held twice a year" would be "covered by Stanford Financial Group."  Except as expressly admitted herein, Hunton denies the allegations in paragraph 89.  Hunton specifically denies that Mr. Loumiet served on a Stanford Advisory Board from 1993 "until Stanford's collapse over fifteen years later."

90.     Hunton denies the allegations in paragraph 90.

91.     Hunton admits that a letter exists dated October 27, 1994 that purports to be from Greenberg attorney Patricia Menendez Cambo to Chapelle Davis at the Federal Reserve Bank of Atlanta.  Hunton admits that such letter contains the language appearing within quotation marks

in paragraph 91 but denies that paragraph 91 accurately reflects the context of this language. Hunton refers to the October 27, 1994 letter for what it states, and denies all allegations in paragraph 91 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 91.

92.     Hunton admits that a letter exists dated October 28, 1994 that purports to be from Yolanda Suarez to Greenberg attorney Patricia Menendez Cambo, and that purports to attach "the audited financial report for Bank of Antigua Ltd. for the year ended December 31, 1993," which itself purports to show assets of the Bank of Antigua Ltd. totaling EC$29,552,799. Hunton admits that the letter states in part that "[w]e anticipate that at year-end Bank of Antigua Ltd. will have a total equity of EC$20,000,000 and total assets of approximately EC$60,000,000."  Hunton refers to the October 28, 1994 letter and its attachment for what they state, and denies all allegations in paragraph 92 that are inconsistent with their contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the U.S. dollar equivalents of EC$30 million and EC$60 in 1993 and therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 92.

93.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 93 and therefore denies the allegations.  Hunton admits that a draft, unsigned letter exists that purports to be directed to Chapelle Davis, Assistant Vice President, Federal Reserve Bank of Atlanta, Department of Supervision & Regulation, and that bears blanks for the Eastern Caribbean Central Bank letterhead and Minister of Financial Affairs letterhead.  Hunton refers to that draft, unsigned

letter for what it states, and denies all allegations in paragraph 93 that are inconsistent with its contents.  Hunton denies the remaining allegations in paragraph 93.

94.     Hunton admits that a letter exists dated November 14, 1994 that purports to be from Patricia Menendez Cambo to Yolanda Suarez and that that letter purports to have enclosed a draft, unsigned letter that (1) purports to be directed to Chapelle Davis, Assistant Vice President, Federal Reserve Bank of Atlanta, Department of Supervision & Regulation, and (2) bears blanks for the Eastern Caribbean Central Bank letterhead and Minister of Financial Affairs letterhead.  Hunton admits that the italicized language in paragraph 94 is found in that draft letter.  Hunton refers to the November 14, 1994 letter for what it states, and denies all allegations in paragraph 94 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 94.

> Answer to Footnote 10, appended to Paragraph 94:  Hunton admits that a letter exists dated November 15, 1994 that purports to be from Patricia Menendez Cambo to Yolanda Suarez, and that such letter purports to enclose a "[d]raft letter to the FRB to be submitted by the Eastern Caribbean Central Bank and the Minister of Financial Affairs of Antigua."  Hunton admits that the November 15, 1994 letter states in part, "[w]ith respect to the draft letter to the FRB, this letter needs to be customized to reflect the supervisory authority of each of the regulatory authorities over the Bank of Antigua and Guardian International Bank Ltd."  Hunton refers to the November 15, 1994 letter for what it states, and denies all allegations in footnote 10 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to

form a belief as to the truth or falsity of the allegations in footnote 10 and therefore denies the allegations.

95.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 95 concerning Patricia Menendez Cambo.   Hunton denies the remaining allegations in paragraph 95.

96.     Hunton admits that a letter exists dated December 5, 1994 that purports to be from Patricia Menendez Cambo to Yolanda Suarez.   Hunton admits that the letter states in relevant part:

> As per our telephone conversation, enclosed please find the name check information sheet that needs to be completed by the two top executive officers of Stanford Financial Group Limited ("Stanford") and the proposed manager for the proposed representative office of the Bank of Antigua Ltd.   As you know, the Federal Reserve Bank of Atlanta ("FRB") takes some time in processing the name check information sheets often resulting in delays in the approval of the application.     Therefore, by completing and submitting the name check information sheet to the FRB (prior to filing the application), we will not only facilitate the processing of the ultimate application, but also bring to light (early on) any concerns or issues, if any, regarding the rumors surrounding Stanford.
>
> Upon completing the name check information sheets, please forward the same to me to submit to the FRB for processing.   I think this is a very inexpensive and simple solution to negate any and all rumors surrounding Stanford. Notwithstanding the filing of the name check information sheet, I still think it is important that we have a pre-filing meeting with the FRB.   Please let me know the dates and times that would be convenient for you and the Stanford group to meet with the FRB in the later part of December or beginning of January. I think there is a certain amount of momentum at this time with respect to this application and we should try to take advantage of that, if possible.
>
> If you have any questions, please do not hesitate to contact me.

Hunton refers to the December 5, 1994 letter for what it states, and denies all allegations in paragraph 96 that are inconsistent with its contents.   Hunton admits that the December 5, 1994 letter purports to enclose a form titled "Federal Reserve Bank of Atlanta Name Check

Information Sheet" and that such form seeks the disclosure of a variety of facts.  Hunton refers to

that form for what it states, and denies all allegations in paragraph 96 that are inconsistent with

its contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegation in paragraph 96 that "Stanford finally gave up on the efforts to obtain

Federal Reserve approval for a U.S. representative office for BoA after Menendez sent Suarez a

letter dated December 5, 1994" and therefore denies the allegation.  Hunton denies the remaining

allegations in paragraph 96.

97.     Hunton admits that a memorandum exists dated February 1, 1994 that purports to

be from Pat O'Brien to Mark Schnapp regarding "Stanford Financial."  Hunton admits that the

memorandum states in part, "During the past few months, I have been working with Yolanda

Suarez and Alan Stanford relative to Stanford/Guardian's ongoing problems with various law

enforcement agencies."   Further answering, Hunton states that the memorandum also states

(emphasis added), "We have determined that U.S. Customs in Florida apparently *has no interest*

*in them*."  Hunton admits that the memorandum further states:

> Last week, an FBI agent from Houston (S.D.T.) interviewed Alan Stanford and
> said that he was going to recommend closing their money laundering case down.
> The investigation apparently originated out of a lead from Louisiana and the
> disclosed no problem [*sic*].   We do not know whether the FBI visit was in
> response to a request from Charlie Strauss to tie up loose ends before our meeting
> or was just a coincidence.
>
> We (Alan, Yolanda, and I) think it is time for us (Alan, Yolanda, you and I) to
> meet with Charlie Strauss, as previously agreed.  They want to talk and he wants
> to listen.  Alan, Yolanda, and I think you are probably the best one to arrange for
> the meeting and we have been awaiting your return.
>
> I know that you are probably very busy, but I think a call to Charlie Strauss would
> go a long way toward ending this matter (and keeping our client happy).  Charlie
> appears to be a very pleasant fellow who considers us to be his lowest priority.

Hunton refers to the February 1, 1994 memorandum for what it states, and denies all allegations in paragraph 97 that are inconsistent with its contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 97 and therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 97.

98.     Hunton admits that a letter exists dated March 9, 1994 that purports to be from Patrick T. O'Brien to the Federal Bureau of Investigation, Attn: Freedom of Information/Privacy Act Section, and that requests information concerning Guardian International Bank, Ltd.  Hunton admits that three letters exist dated July 1, 1996 that purport to be from Patrick T. O'Brien to Tom Wingate, Drug Enforcement Administration, Freedom of Information Act Office; Sue Mitchell, Federal Reserve System, Freedom of Information Act Office; and the United States Custom Service, and that such letters request information concerning Guardian International Bank, Ltd.  Hunton admits that a letter exists dated October 3, 1996 that purports to be from Patrick T. O'Brien to the United States Customs Service and that requests information concerning Stanford Financial Group, Ltd., Guardian Trust Company, Inc., and Guardian International Investment Services, Ltd.  Hunton admits that a letter exists dated October 3, 1996 that purports to be from Patrick T. O'Brien to the Federal Reserve, Attn: Freedom of Information, and that requests information concerning Stanford Financial Group, Ltd., Guardian Trust Company, Inc., and Guardian International Investment Services, Ltd.   Hunton refers to those March 9, 1994, July 1, 1996, and October 3, 1996 letters for what they state, and denies all allegations in paragraph 98 that are inconsistent with their contents.   Hunton denies that it had any knowledge of these letters or their contents prior to proceedings and communications in connection with this litigation.  Hunton denies the allegation in paragraph 98 that issuing one or

more Freedom of Information Act requests constitutes "a counter-espionage campaign."  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 98 and therefore denies the allegations.

99.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 99 and therefore denies the allegations.  Hunton admits that a letter exists dated October 2, 1996 that purports to be from Patrick T. O'Brien to Yolanda Suarez regarding "Additional Response to FBI FOIA Request" and that such letter purports to enclose five heavily redacted pages, including some that reference an October 1991 search of a Stanford Hawker 900 Jet Aircraft and a page that contains the italicized language appearing within quotation marks in paragraph 99.  Further answering, Hunton states that the third page of the purported enclosure reports that the search "came up negative."  Hunton refers to that October 2, 1996 letter and its purported enclosure for what they state, and denies all allegations in paragraph 99 that are inconsistent with their contents.  Hunton denies the remaining allegations in paragraph 99.

100.     Hunton admits that a letter exists dated October 2, 1996 that purports to be from Patrick T. O'Brien to Yolanda Suarez regarding "Additional Response to FBI FOIA Request" and that such letter purports to enclose five heavily redacted pages, including one that states in part "[i]n essence, Guardian International functions as a bank for foreign depositors in the U.S. with a constant cash flow to Europe.  However there is no regulation on its activities."  Hunton refers to that October 2, 1996 letter and its purported enclosure for what they state, and denies all allegations in paragraph 100 that are inconsistent with their contents.

Hunton admits that an envelope postmarked January 15, 1997 exists that purports to be from the U.S. Department of Justice, Drug Enforcement Administration, addressed to Patrick O'Brien, that purports to enclose heavily redacted "copies of documents from FBI records," including portions that reference an agent's travel to London. Hunton denies that those documents show, as alleged in paragraph 100, that "Stanford had been under constant investigation for possible money laundering since 1989." Further answering, Hunton states that those documents state in part (emphasis added):

> San Antonio is **unaware of any illegal activities** being conducted by any of the above mentioned individuals or businesses. San Antonio is conducting no further investigation into this matter at this time and considers this case ruc'd.

and

> Investigation conducted by New Orleans and Houston has **failed to substantiate** the laundering of drug money. The U.S. Attorney's Office in New Orleans concurs that the laundering of drug money by the subjects in this matter have not been substantiated.

and

> New Orleans closed their investigation when they were **unable to substantiate** GIB was laundering drug proceeds.

and

> During 1992, NO **discontinued investigation** into this matter when they were unable to locate witnesses that could identify GIB or affiliates as being associated with specified unlawful activity.

Hunton refers to that January 15, 1997 envelope and its purported enclosures for what they state, and denies all allegations in paragraph 100 that are inconsistent with their contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 100.

101.   Hunton admits that a letter exists dated November 8, 1994 that purports to be from Carlos Loumiet to Allen Stanford and Yolanda Suarez, and that such letter purports to

enclose a transcript of a "Frontline" show that aired November 1, 1994, was titled "Hot Money," and referenced "Guardian Bank and Trust, Ltd. in Grand Cayman."   Hunton admits that the November 8, 1994 letter states in part "[t]he name 'Guardian' is a plague.   This is the same problem we have had on various occasions in the past.   It is little surprise that American Express panicked."   Hunton refers to that November 8, 1994 letter and its purported enclosure for what they state, and denies all allegations in paragraph 101 that are inconsistent with their contents. Hunton specifically denies that the letter explains any issue with American Express, or that the transcript mentions Montserrat, Guardian International Bank, Ltd., or Allen Stanford.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 101.

102.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 102 and therefore denies the allegations.

103.   Hunton admits that a letter exists dated September 19, 1994 that purports to be from Lester B. Bird, Prime Minister of the Government of Antigua and Barbuda, to Wayne L. Kelley, President of DSI International, and that such letter states in part:

> On behalf of the Government of Antigua and Barbuda I am pleased to announce the selection of DSI Investments, Inc. to develop and lease finance a new hospital with a proposed capacity of up to three hundred beds.   It is the understanding of the Government of Antigua and Barbuda that DSI will develop the proposed hospital on government land and shall lease finance the completed development project to the Government for a term of fifteen years and shall subsequently abandon its development.

Hunton refers to that letter for what it states, and denies all allegations in paragraph 103 that are inconsistent with its contents.   Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 103 and therefore denies the allegations.

104.    Hunton admits that a letter exists dated November 14, 1994 that purports to be from Lester Bird to Allen Stanford, and that such letter addresses medical treatment purportedly received by Mr. Bird in Texas.  Hunton denies the allegation in paragraph 104 that Mr. Bird stated or suggested in that letter that he was "forever indebted to Stanford."  Hunton refers to the November 14, 1994 letter for what it states, and denies all allegations in paragraph 104 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 104 and therefore denies the allegations.

105.    Hunton admits that a letter dated November 3, 1994 exists that purports to be from Allen Stanford to Lester Bird, and that such letter states in part:

> It was, indeed, a pleasure to meet with you and Dr. John last week regarding the Government's desire to see a new, state-of-the-art hospital built in Antigua.  After our discussions, it is now very clear to me that you, Dr. John, and I share the same vision for this sorely needed project to become a reality in the shortest possible time.  Not only do the citizens of Antigua and Barbuda deserve a world-class health care facility, but the country's future economic growth will certainly depend on the type and quality of medical care that is available in Antigua.

> *       *       *

> You asked me and my company, Mr. Bird, to assist the Government in any way that I deemed appropriate. . . .  I give you my commitment and that of my company to do whatever your Government desires us to do.  I feel that probably our greatest contribution would be in the role of a consultant or advisory function to give guidance and provide experience in each phase of this project.  We would feel honored to do this free of charge.

> To get things moving in the right direction, I have instructed Arnold Knoche, President of Stanford Development Corporation, to liaise with Dr. John and arrange meetings in Antigua next week with three separate internationally recognized architectural firms.  The principals of these firms will listen to what Dr. John wants built and then provide basic design plans and elevations for Dr. John to critique.  All expenses incurred during this phase of the architectural work are to be borne by the individual firms involved.  Upon selection of the architectural and engineering firms, we can then proceed to the cost estimates and financing phases.

Hunton admits that a letter dated February 21, 1995 exists that purports to be from Lester Bird to R. Allen Stanford and that such letter states in part:

> In particular, I welcome your commitment regarding the construction of a world-class medical facility in Antigua and accept the offer from [illegible] to provide the investment banking (financing) for this facility.

Hunton refers to the November 3, 1994 and February 21, 1995 letters for what they state, and denies all allegations in paragraph 105 that are inconsistent with their contents.  Except as expressly as admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 105 and therefore denies the allegations.

106.    Hunton admits that a letter exists dated February 27, 1995 that purports to be from R. Allen Stanford to Lester Bird, and that such letter states in part:

> I am in receipt of your letter of 21 February 1995 and understand that the Government of Antigua and Barbuda is desirous of Stanford Financial Group providing the investment banking (financing) for a new medical complex to be built in Antigua.  Please be advised that Stanford International Bank ("SIB") will provide an interim loan to the Government to finance 100% of the costs associated with architectural and engineering work on this project.

Hunton admits that a document exists dated August 14, 1998 that is titled "Loan Agreement" and that states it is made between and among (1) Mount St. John Medical Centre Limited, (2) the Government of Antigua and Barbuda, (3) the Medical Benefits Board of Control, (4) "BANK OF ANTIGUA LIMITED, a banking corporation duly incorporated under the laws of Antigua and Barbuda, and any other lenders party to this Agreement from time to time (each a 'Lender' and collectively the 'Lenders')"; and (5) "BANK OF ANTIGUA LIMITED, a banking corporation duly incorporated under the laws of Antigua and Barbuda, as administrative agent, documentation agent and syndication agent for the Lenders (the 'Agent')."   Hunton further admits that such document states "the Government and the Board have requested Lenders to

make available a loan facility in a principal amount of up to US$31,000,000 for the purpose of financing the construction and equipping of a medical centre for Antigua and Barbuda . . . ." Hunton refers to the February 27, 1995 letter and the August 14, 1998 agreement for what they state, and denies all allegations in paragraph 106 that are inconsistent with their contents.  In particular, Hunton denies the allegation in paragraph 106 that suggests the $31 million loan was made in 1995, given that the loan agreement is dated three years later, in 1998.  Hunton also incorporates by reference as if fully set forth herein its answers to paragraphs 72 and 90 through 96.  Except as expressly as admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 106 and therefore denies the allegations.

> Answer to Footnote 11, appended to Paragraph 106:    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of footnote 11 and therefore denies the allegations.

> Answer to Footnote 12, appended to Paragraph 106:    Hunton admits that a letter exists dated July 7, 1995 that purports to be from Yolanda Suarez to Carlos Loumiet and purports to enclose a copy of "Stanford International Bank's 1994 Annual Report."   Hunton admits that such report shows that SIBL held approximately $231 million in assets for the year ending December 31, 1994, and that the Report shows C.A.S. Hewlett & Co. is listed as an auditor.  Hunton refers to the July 7, 1995 letter and the Stanford International Bank 1994 Annual Report for what they state, and denies all allegations in footnote 12 that are inconsistent with their contents.  Hunton specifically denies that the July 7, 1995 letter states, as alleged in footnote 12, that it was being sent "[a]s part of the ordinary course of

Loumiet's service on the Stanford Advisory Board." Except as expressly admitted herein, Hunton denies the allegations in footnote 12.

107. Hunton admits that a letter exists dated November 18, 1994 that purports to be from Traeger Machetanz of Oles, Morrison & Rinker, to R. Allen Stanford, bearing the subject line "New Hospital for Antigua and Barbuda," and stating, on behalf of DSI, that an attempt on the part of Allen Stanford to make "an alternative proposal" to the Government of Antigua and Barbuda for the "construction and lease of a new hospital" "would constitute an intentional interference with the existing contractual relationship between DSI and the Government, and would also constitute a breach of your fiduciary duty." Hunton further admits that a letter exists dated November 30, 1994 that purports to be from Traeger Machetanz of Oles, Morrison & Rinker, to R. Allen Stanford, bearing the subject line "New Hospital for Antigua and Barbuda," and that such letter purports to threaten, on behalf of DSI, a lawsuit for "interference and breach of fiduciary duty."

Hunton admits that a letter exists dated December 12, 1994 that purports to be from Yolanda Suarez to Traeger Machetanz and that states it is in response to Mr. Machetanz's "[l]etters to R. Allen Stanford dated November 18 and 30, 1994." Hunton admits that that letter states in part:

> 4. Stanford Development Corporation is not involved, and will not be involved, in any manner whatsoever in the construction of the proposed hospital in Antigua, whether that construction is undertaken by your client or anyone else. Neither will Stanford Development Corporation, Mr. Stanford or any of the other companies in the Stanford Financial Group, receive any compensation whatsoever in connection with the hospital. The sole possible exception is that either Bank of Antigua or Guardian International Bank, both of which form part of the Stanford Financial Group, may participate in the financing of the hospital if a desirable and economically viable hospital facility is constructed.

> 5. Mr. Stanford will continue, in a voluntary and non-compensated manner, to give advise in any way that Prime Minister Bird or Dr. John may request in

connection with the proposed hospital. This may include introducing Mr. Bird or Dr. John to architectural firms which may be able to design a first-rate hospital for Antigua. If you know of any legal basis why Mr. Stanford and the Prime Minister or Dr. John may not discuss this or any other matter in their capacity as personal friends, please let me know what that basis is.

> 6.  Related to paragraphs 4 and 5, neither Mr. Stanford nor anyone in Stanford Development Corporation has "engaged" any architectural firm to provide a design for a new hospital for Antigua and Barbuda. At the request of Prime Minister Bird and Dr. John, Mr. Stanford did introduce the architectural firm of Falick & Kline to them. That architectural firm has no ownership or other relationship with Stanford Development Corporation or Mr. Stanford which would lead to either Mr. Stanford's or Stanford Development Corporation's profiting from the selection of that firm. By the way, to our knowledge that firm has not, as yet been "engaged" by the Government of Antigua and Barbuda either.

*      *      *

> As the foregoing indicates, the factual premises underlying your previous letters to Mr. Stanford could not be more erroneous. Given the correct facts, I do not know of any such cause of action; if you do, please let me know what the basis is for such an action.

> You may rest assured that if you and your client bring action against Mr. Stanford or Stanford Development Corporation without proper factual and legal basis for doing so, we will seek sanctions against both your client and yourselves.

> If you have any further questions regarding this matter, please contact me directly at (713) 964-5140.

Further answering, Hunton avers that the December 12, 1994 letter also states in part:

> 3.  In case you have not been informed, the hospital that was designed by your client's architectural firm was not deemed a first-class international medical facility by Prime Minister Bird or Dr. John. It is our understanding that the Government of Antigua and Barbuda is reluctant to accept at this time a second-class hospital. We understand the concern to be that such a facility would do little to help attract the type of affluent retiree and tourist that the government is hoping to lure to the islands in its effort to develop the island's economy.

> 7.  It appears to us that the Government of Antigua and Barbuda is under the impression that it does not have a bidding contract with DSI International at this time. Your own letter of November 18 states that "DSI is currently in the process of finalizing the contract documents." If, in fact, there is a bidding contract [*sic*] for the construction of the hospital between DSI International and the Government of Antigua and Barbuda, I would very much appreciate your pointing me to the documentation comprising that contract.

Hunton further states that two documents exist that purport to summarize sessions of the Cabinet of Antigua and Barbuda on November 23, 1994 and March 23, 1995, and that such documents state in part:

- November 23, 1994: "Cabinet considered the proposal to lease/finance the new hospital as presented by DSI Investments, Inc. and heard a report that the proposals were substantially incomplete and that the structure of the transaction was vague . . . Cabinet therefore rejected the proposals."

- March 23, 1995: the Cabinet "found that the DSI proposal was substantially incomplete and the financial structure vague.  Due to the incomplete nature of the proposal and financial structure vague [*sic*] which has made evaluation of the economics difficult, Cabinet rejected the DSI proposal. . ."

Hunton refers to the November 18, 1994, November 30, 1994, and December 12, 1994 letters, as well as the November 23, 1994 and March 23, 1995 cabinet summaries for what they state, and denies all allegations in paragraph 107 that are inconsistent with their contents.  Except as expressly as admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 107 and therefore denies the allegations.

108.    Hunton admits that an Associated Press article exists that is dated April 16, 1995 and titled "U.S. Senator Calls For Sanctions Against Antigua," and that such article states (1) that "DSI President Wayne Kelley claims that Antiguan officials asked him on Oct. 14 to pay a $3.5 million bribe, canceling the contract when he refused to do so," (2) that an Antiguan official called the allegation "absurd," and (3) that U.S. Senator Orrin Hatch called for "Sen. Jessie Helms, chairman of the Senate Foreign Relations Committee, to launch an investigation and to reconsider revoking Antigua's most favored nation status."   Hunton refers to that article for what it states, and denies all allegations in paragraph 108 that are inconsistent with its contents.  Hunton admits that a document exists titled "Greenberg, Traurig New Client-New

Matter Intake Memorandum," dated March 28, 1996, and that such document purports to concern a matter titled "Foreign Corrupt Practices Act investigation pertaining to the construction of a hospital in Antigua." Hunton refers to the April 16, 1995 article and the March 28, 1996 document for what they state, and denies all allegations in paragraph 108 that are inconsistent with their contents. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 108 and therefore denies the allegations.

109.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 109 and therefore denies the allegations.

110.    Hunton admits that an article exists dated March 31, 1995 that purportedly appeared in a publication called the "Outlet," titled "PM Lester Bird & Gang Seek Millions Off New Hospital," and that such article states in part that DSI International's president alleged that "he refused to pay a $3.5 million bribe to top government officials in Antigua," and that the article makes allegations against Bird, Antiguan Minister of Public Works Robin Yearwood, and Antiguan Press Chief Hartley Henry. Hunton admits that a purported letter to the editor from "The Watchman" exists, dated April 7, 1995, titled "What Does Mr. Stanford Want?," and purportedly appearing in the "Daily Observer." Hunton admits that such letter to the editor contains the language appearing within quotation marks in the last sentence of paragraph 110.

Hunton further admits that an article exists dated November 17, 1995, titled "Allen Stanford Antigua's New Massa," and purportedly published in a publication called the "Outlet," and that such article asserts (1) that Allen Stanford supposedly "run[s] things" in Antigua, and (2) purchased certain properties in Antigua "at a peppercorn price." Hunton further admits that

an article exists dated November 24, 1995, titled "Loans from Massa Could Spell Ruin," and purportedly published in a publication called the "Outlet," and that such article asserts (1) without citing a source, that Bank of Antigua loaned the Government of Antigua and Barbuda $40 million and asks where the money came from given speculation that that amount was more than Bank of Antigua had in deposits; (2) again without citing a source, that "U.S. officials" named Antigua and Barbuda as "among the world's worst offenders in money laundering" at an unspecified time; and (3) that the Antiguan government purportedly turned a "blind eye" to alleged wrongdoing.

Hunton refers to the March 31, April 7, November 17, and November 24, 1995 articles for what they state, and denies all allegations in paragraph 110 that are inconsistent with their contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 110 and therefore denies the allegations.

> Answer to Footnote 13, appended to Paragraph 110:     Hunton admits that a letter exists dated October 28, 1994 that purports to be from Yolanda Suarez to Greenberg attorney Patricia Menendez Cambo that purported to attach "the audited financial report for Bank of Antigua Ltd. for the year ended December 31, 1993," which purports to show assets of the Bank of Antigua Ltd. totaling EC$29,552,799.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the U.S. dollar equivalent of approximately EC$30 million in 1993.  Except as expressly admitted herein, Hunton denies the allegations in footnote 13.

56

111.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 111 and therefore denies the allegations.

112.    Hunton denies the allegation in the second sentence of paragraph 112 to the extent that allegation refers to Carlos Loumiet's knowledge.   Hunton admits that a signed document titled "Promissory Note" exists, dated February 24, 1992, that purports to have been executed by Molwyn Joseph and Paula Joseph in favor of Stanford Financial Group Ltd. for $30,000, payable with interest by June 24, 1992.  Hunton refers to that document for what it states, and denies all allegations in paragraph 112 that are inconsistent with its contents.  Hunton specifically denies that it had any knowledge of the February 24, 1992 document or its contents prior to proceedings and communications in connection with this litigation.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 112 and therefore denies the allegations.

113.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 113 and therefore denies the allegations.

114.    Hunton admits that a memorandum dated May 6, 1994 exists that purports to be from Allen Stanford to Jean Gilstrap, with the subject line "Molwyn Joseph Note," and that such memorandum states:

> Mark this note 'paid' on our books and carry it as an SFG political contribution. I was approached numerous times by both parties prior to the recent elections in Antigua, and I chose for the companies and myself to remain apolitical.
>
> The ALP has a sizeable debt to liquidate which was incurred prior to the elections, and instead of paying cash, I informed Mr. Joseph I would contribute to the ALP through him by liquidating his note. Therefore, the company has made a US$36,172.65 political contribution to the ALP.

It is important that it be noted in your records that this contribution was made after the elections.

As a further point, my personal philosophy and that which I will see that all our companies follow is to remain as near apolitical as possible and only contribute to any political cause that I have personally signed off on.

Hunton refers to the May 6, 1994 memorandum for what it states, and denies all allegations in paragraph 114 that are inconsistent with its contents. Hunton denies that it had any knowledge of the May 6, 1994 memorandum or its contents prior to proceedings and communications in connection with this litigation. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 114 and therefore denies the allegations.

115.   Hunton admits that a memorandum exists dated January 16, 1996 that purports to be from Jean A. Gilstrap to Yolanda Suarez and Mark Schnapp, and that such memorandum is stamped "ATTORNEY/CLIENT PRIVILEGED" and "WORK PRODUCT." Hunton admits that the memorandum states:

Per your request I have attached the documentation from my files which supports the following:

1) Disbursements of $48,217.17 for or directly related to medical expenses for Lester B. Bird.

2) Note Receivable on SFG Ltd.'s books due from Molwyn and Paula Joseph that was retired by political contribution after the election.

To the best of my knowledge these are the only items that I am aware of pertaining to the information you requested. Please let me know if you have any questions.

Hunton refers to the January 16, 1996 memorandum for what it states, and denies all allegations in paragraph 115 that are inconsistent with its contents. Hunton denies that it had any knowledge of the January 16, 1996 memorandum or its contents prior to proceedings and communications in

connection with this litigation.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 115 and therefore denies the allegations.

116.    Hunton admits that three pages of documents exist that purport to be dated January 9 or January 17, 1996, and that such pages purport to list then-existing "Debts to Senior Government Officials," "Credit Cards to Senior Government Officials," and "Government Affiliated Liabilities," including approximately $31 million to "Central Government," a loan of $101,830.02, granted June 24, 1994, to Molwyn and Paula Joseph, and a loan of $32,813.95 to Lester Bird, dated September 29, 1995 but bearing the notation "[f]ully paid."  Hunton refers to these three pages for what they state, and denies all allegations in paragraph 116 that are inconsistent with their contents.  Hunton specifically denies that it had any knowledge of these three pages or their contents prior to proceedings and communications in connection with this litigation.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 116 and therefore denies the allegations.

117.    Hunton denies that Carlos Loumiet ever knew or suspected that Allen Stanford or any of the Stanford entities bribed any regulator or official in Antigua.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 117 and therefore denies the allegations.

118.    Hunton admits that handwritten notes exist dated June 5, 1995 that purport to concern a telephone conference with Yolanda Suarez, but denies that the notes indicate their

author.  Hunton admits that those handwritten notes suggest that Ms. Suarez purportedly stated in part:

> has trust company in Antigua
>
> want to develop Antigua as platform
>
> have no trust legislation
>
> English common law

Hunton refers to those handwritten notes for what they state and denies all allegations in paragraph 118 that are inconsistent with their contents.  Hunton specifically denies that the notes indicate, as alleged in paragraph 118, that the Stanford entities "wanted to 'develop Antigua as a platform for offshore trust operations."

Hunton admits that a letter exists dated June 7, 1995 that purports to be from Yolanda Suarez to a Greenberg attorney (not Carlos Loumiet) regarding "Antigua Trust Legislation," and that the letter purports to enclose "a copy of the above referenced legislation that was prepared by an English law firm."  Hunton refers to the June 7, 1995 letter for what it states, and denies all allegations in paragraph 118 that are inconsistent with its contents.

Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 118 and therefore denies the allegations.

119.    Hunton admits that a letter exists dated July 26, 1995 that purports to be from Carlos Loumiet to Allen Stanford, and that the letter states in part:

> Our advice has been requested as to whether the Minister of Finance of Antigua and Barbuda (the "Minister") can, by regulation adopted under the International Business Corporations Act, 1982 of Antigua and Barbuda (the "Act"), require international business corporations chartered under the Act ("IBCs") and carrying on an international banking or international trust business (as defined in Section 4 of the Act), to maintain all or any portion of their

> minimum paid-up capital required under Sections 238 and 246 of the Act, respectively, invested in or through a local depository institution in Antigua and Barbuda. We understand this approach is being considered because of the Government's desire to more closely monitor the maintenance of minimum paid-up capital required for these IBCs under the Act, as well as to ensure that that minimum capital will be reachable by creditors of the IBCs.
>
> Since this matter is essentially governed by the laws of Antigua and Barbuda, we have consulted with L Errol Cort, Esq., an attorney admitted in that jurisdiction. We have relied upon Mr. Cort in all matters pertaining to Antiguan and Barbudan constitutional and administrative law, as well as statutory construction issues. Based upon that consultation and upon our experience with comparable statutes in other jurisdictions, we are of the opinion that, under Sections 3S1(1)(a), (f) and (i) and 371 (2) (a) of the Act, the Minister may, by regulation, require an IBC to maintain all or any portion of its required minimum paid-up capital under Section 238 or 246 of the Act invested in or through a local depository institution in Antigua and Barbuda.

Hunton refers to the July 26, 1995 letter for what it states, and denies all allegations in paragraph 119 that are inconsistent with its contents. In particular, Hunton denies that the July 26, 1995 letter indicates that Mr. Loumiet was asked to opine on any matter concerning Bank of Antigua, Ltd. Except as expressly admitted herein, Hunton denies the allegations in paragraph 119.

120. Hunton admits that a letter exists dated September 29, 1995 that purports to be from a Greenberg attorney to Yolanda Mellon Suarez and that purports to enclose an invoice from Greenberg "[f]or services rendered from June 30, 1995 to August 15, 1995 with respect to drafting legislation creating the Antigua Airport Authority." Hunton refers to that letter and its purported enclosure for what they state, and denies all allegations in paragraph 120 that are inconsistent with their contents. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 120 and therefore denies the allegations.

121.    Hunton admits that the December 1995 edition "American Lawyer" magazine contained an article that referenced Carlos Loumiet and stated in part that the international practice group Mr. Loumiet chaired at Greenberg was expected to "account for at least 20 percent of the firm's projected revenue in 1995."  Hunton refers to the article for what it states, and denies all allegations in paragraph 121 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 121 and therefore denies the allegations.

122.    Hunton admits that an article was printed in the February 26, 1996 issue of Time magazine titled "Caribbean Blizzard."  Hunton refers to that article for what it states, and denies all allegations in paragraph 122 that are inconsistent with its contents.  Hunton specifically denies that the articles says "50 new offshore banks" were "set up in one year alone"; instead, the article states that "[i]n one year, the number of offshore banks on Antigua has doubled to nearly 50. They operate quite openly, some legitimately."  Hunton also specifically denies that that article refers to or mentions Allen Stanford or any Stanford entity.  Hunton admits that the Miami Herald published an article dated March 21, 1996 titled "Target:  Offshore Scams."  Hunton refers to that article for what it states, and denies all allegations in paragraph 122 that are inconsistent with its contents.  Hunton specifically denies that that article refers to or mentions Antigua, Allen Stanford, or any Stanford entity.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 122 and therefore denies the allegations.

123.    Hunton admits that an article was purportedly published in the February 17-March 1, 1996 edition of "Caribbean Week," that was titled "Drugs and the economy," and that

purportedly was authored by Klaus de Albuquerque.  Hunton refers to that article for what it states, and denies all allegations in paragraph 123 that are inconsistent with its contents.  In particular, Hunton denies that the article "describ[ed] how Stanford's loans to the Antiguan Government were under investigation by U.S. authorities because the loans exceeded the capital in the Bank of Antigua and therefore the proceeds likely came from his offshore bank, SIBL, which was illegal under Antiguan law"; rather, the article states "[a]ccording to the *Outlet* story, US authorities are now probing to see if the loan money in question came from Stanford's offshore bank, Guardian Bank, another violation of banking regulations."  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 123 and therefore denies the allegations.

124.    Hunton admits that a letter dated March 4, 1996 exists that purports to be from Mark Schnapp to Tim Forsythe, President and Publisher, Caribbean Communications Inc., and Klaus de Albuquerque, and that such letter concerns an article purportedly published in the February 17-March 1, 1996 edition of "Caribbean Week" that was titled "Drugs and the economy" and purportedly authored by Klaus de Albuquerque.  Hunton admits that the letter provides notice that a libel action would be pursued and states in part that "[w]e are filing this action because the Article defames Stanford and [Bank of Antigua Ltd.] by falsely stating or implying that my clients are involved in narcotics trafficking, money-laundering and bribery of public officials."  Hunton refers to that letter for what it states, and denies all allegations in paragraph 124 that are inconsistent with its contents. Hunton admits that a complaint was filed in the United States District Court for the Southern District of Florida, Miami Division, on April 4, 1996, captioned *R. Allen Stanford and Bank of Antigua, Ltd. v. Klaus de Albuquerque and Caribbean Communications, Inc.*, that such complaint lists Mark Schnapp as the plaintiffs'

counsel (although another Greenberg attorney signed the complaint), and that such complaint sought, in part, "general, special, and punitive damages."  Hunton refers to the April 4, 1996 complaint for what it states, and denies all allegations in paragraph 124 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 124.

> Answer to Footnote 14, appended to Paragraph 124:  Hunton admits that a "Greenberg, Traurig New Client-New Matter Intake Memorandum" dated March 5, 1996 exists, that the "file title" in that document is "Allen Stanford, et al., vs. Caribbean Communications, Inc.," and that the document references an address at 5050 Westheimer, Houston, Texas.  Hunton refers to that document for what it states and denies all allegations in paragraph 124 and footnote 14 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 14 and therefore denies the allegations.

125.    Hunton admits that a memorandum exists dated March 20, 1996 that purports to be from Allen Stanford to Yolanda Suarez, and that purports to copy Carlos Loumiet, Mark Schnapp, and three other individuals.  Hunton admits that the language appearing in the first set of quotation marks in paragraph 125 and the words "a weekly if not daily report" appear in that March 20, 1996 memorandum.  Hunton refers to that memorandum for what it states, and denies all allegations in paragraph 125 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 125 and therefore denies the allegations.

126.    Hunton admits that a memorandum exists dated April 17, 1996 that purports to be from Allen Stanford to Mark Schnapp, with the subject line "Litigation matters," and that such memorandum states that Mr. Stanford would be willing to settle with Caribbean Week publishing an apology and paying $500,000 to Mr. Stanford and $500,000 to Bank of Antigua, Ltd.  Hunton admits that the memorandum contains the language appearing within quotation marks in the second and third sentences of paragraph 126, but denies that the allegations in paragraph 126 fully describe the context of those statements.  Hunton refers to the April 17, 1996 memorandum for what it states, and denies all allegations in paragraph 126 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 126.

127.    Hunton admits that a letter exists dated April 24, 1996 that purports to be from Klaus de Albuquerque to Steven Reisman, Esq., that such letter describes a diagnosis of cancer, and that such letter states in part, "I think you should make it painfully clear to Stanford's lawyers what my medical condition is and that they will get nothing from me."  Hunton admits that a letter exists dated April 25, 1996 that purports to be from Stephen H. Reisman to Mark Schnapp and that such letter states in part, "The retraction enclosed with your letter can be published as requested."  Hunton denies that the letter states, as alleged in paragraph 127, that Caribbean Week "agreed never to publish anything in the future about Allen Stanford or BoA"; instead, the letter states, "Under the circumstances, neither Caribbean Week nor Klaus De Albuquerque has any intention of publishing anything in the future about Mr. Stanford or the Bank of Antigua. I am concerned about the legality and practicality of an agreement and I am certain that such an agreement is unnecessary given the chilling effect of the pending lawsuit." Hunton further states that a letter dated March 21, 1996 exists that purports to be from Leslie

Haynes on behalf of Caribbean Communications Inc. to Mark Schnapp, and that such letter states in part, "Caribbean Week acknowledges that the majority of the professionals referred to are honest and law abiding and the article did not suggest otherwise of Mr. Allen Stanford. Caribbean week published the Drugs in the Caribbean series to increase public awareness of the drug trade and its potential impact on regional environments."  The March 21, 1996 letter further offers to print an apology that stated in part, "Our intention was for the picture to symbolize the economy, and we in no way intended to suggest or imply wrongdoing or illegal activity by the Bank of Antigua."

Hunton refers to the April 24, 1996, April 25, 1996, and March 21, 1996 letters for what they state, and denies all allegations in paragraph 127 that are inconsistent with their contents. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 127 and therefore denies those allegations.  Hunton denies the remaining allegations in paragraph 127.

128.    Hunton admits that a Statement of Claim exists captioned *Bank of Antigua Limited and R. Allen Stanford v. Leonard "Tim" Hector (Editor) and Leonard "Tim" Hector & Harold Lovell, trading as Outlet Publishers*, and that such Statement of Claim purports to be dated April 24, 1996 and to have been filed in the High Court of Justice Antigua and Barbuda. Hunton admits that the Statement of Claim concerns libel and purports to have been signed by Cort & Associates and to describe some of the allegations made by the "Outlet," including the Outlet's allegation that "U.S. authorities are probing to see if Stanford's off-shore bank, known as Guardian Bank, made the loans in question to the Government of Antigua, when off-shore banks have no authority for on-shore lending."  Hunton refers to the Statement of Claim for what it states, and denies all allegations in paragraph 128 that are inconsistent with its contents.

Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 128 and therefore denies those allegations.  Hunton denies the remaining allegations in paragraph 128.

129.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 129 and therefore denies the allegations.

130.    Hunton admits that letters exist dated May 3, 1996, May 9, 1996, and May 13, 1996 that purport to be from Allen Stanford to Stephen R. Snow, Counselor for Political and Economic Affairs at the U.S. Embassy in Barbados.  Hunton refers to those letters for what they state, and denies all allegations in paragraph 130 that are inconsistent with their contents. Hunton admits that a letter exists dated May 15, 1996 that purports to be from Allen Stanford to Carlos Loumiet regarding "U.S. Embassy, Bridgetown, Barbados."  Hunton refers to that May 15, 1996 letter for what it states, and denies all allegations in paragraph 130 that are inconsistent with its contents.  Hunton admits that a letter exists dated May 30, 1996 that purports to be from Allen Stanford to Stephen Snow, Counselor for Political and Economic Affairs at the U.S. Embassy in Barbados.  Hunton admits that that letter states "[i]f I have not received a response by May 31, 1996, I will file a formal complaint with the State Department.  Mr. Snow, if I am forced to file a complaint, I will pursue this matter in the most aggressive manner available to a U.S. citizen."  Hunton refers to that May 30, 1996 letter for what it states, and denies all allegations in paragraph 130 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 130 and therefore denies the allegations.

Answer to Footnote 15, appended to Paragraph 130:   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 15 and therefore denies the allegations.

131.    Hunton admits that a letter exists dated May 30, 1996 that purports to be from Allen Stanford to Carlos Loumiet and that the letter discusses Stephen Snow and Ambassador Hyde.  Hunton refers to that letter for what it states, and denies all allegations in paragraph 131 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 131 and therefore denies the allegations.

132.    Hunton admits that a letter exists dated July 11, 1996 that purports to be from Carlos Loumiet to Ambassador Jeanette W. Hyde at the U.S. Embassy in Barbados, and that such letter concerns Allen Stanford.  Hunton refers to the July 11, 1996 letter for what it states, and denies all allegations in paragraph 132 that are inconsistent with its contents.  Further answering, Hunton states that the July 11, 1996 letter provides a list of investigations "illustrative of the constant governmental prying" into Allen Stanford or Stanford entities and notes that "[n]ot one of these investigations has turned up any wrongdoing worth mentioning."  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 132 and therefore denies the allegations.

133.    Hunton admits that a letter exists dated July 23, 1996 that purports to be from Ambassador Jeanette Hyde to Carlos Loumiet and that concerns Allen Stanford.  Hunton refers to the July 23, 1996 letter for what it states, and denies all allegations in paragraph 133 that are

inconsistent with its contents.  Further answering, Hunton states that the letter states in part, "First of all, let me state unequivocally that neither I nor anyone at this Embassy possesses negative or unfavorable information regarding Mr. Stanford. This is truly an unfortunate misunderstanding – one which would, understandably, be disconcerting to your client; however, this is just not the case."  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 133 and therefore denies the allegations.

134.  Hunton admits that a letter exists dated March 9, 1994 that purports to be from Patrick T. O'Brien to Federal Bureau of Investigation, Attn: Freedom of Information/Privacy Act Section, and that such letter purports to request information about Guardian International Bank, Ltd.  Hunton admits that three letters exist dated July 1, 1996 that purport to be from Patrick T. O'Brien to Tom Wingate, Drug Enforcement Administration, Freedom of Information Act Office; Sue Mitchell, Federal Reserve System, Freedom of Information Act Office; and the United States Custom Service, and that such letters request information concerning Guardian International Bank, Ltd.  Hunton refers to the March 9, 1994 and July 1, 1996 letters for what they state, and denies all allegations in paragraph 134 that are inconsistent with their contents.  In particular, Hunton denies that these letters sought, as alleged in paragraph 134, "any and all information related to Stanford or his offshore banks," and avers that the requests sought "copies of any and all . . . materials of any kind relating to Guardian International Bank, Ltd."  Hunton further denies Plaintiffs' characterization of these FOIA requests as a "counter-espionage campaign" and a "counter-intelligence operation against the U.S. Government."  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a

belief as to the truth or falsity of the allegations in paragraph 134 and therefore denies the allegations.

135.    Hunton admits that an envelope postmarked January 15, 1997 exists that purports to be from the U.S. Department of Justice, Drug Enforcement Administration, addressed to Patrick O'Brien, and that purports to enclose heavily redacted "copies of documents from FBI records," including portions that reference an agent's travel to London.  Hunton admits that those documents state in part that (emphasis added):

> San Antonio is ***unaware of any illegal activities*** being conducted by any of the above mentioned individuals or businesses.  San Antonio is conducting no further investigation into this matter at this time and considers this case ruc'd.

and

> Investigation conducted by New Orleans and Houston has ***failed to substantiate*** the laundering of drug money. The U.S. Attorney's Office in New Orleans concurs that the laundering of drug money by the subjects in this matter have not been substantiated.

and

> New Orleans ***closed their investigation*** when they were unable to substantiate GIB was laundering drug proceeds.

and

> During 1992, NO ***discontinued investigation*** into this matter when they were unable to locate witnesses that could identify GIB or affiliates as being associated with specified unlawful activity.

Hunton refers to that January 15, 1997 envelope and its purported enclosures for what they state, and denies all allegations in paragraph 135 that are inconsistent with their contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 135 and therefore denies the allegations.

136.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 136 and therefore denies the allegations.

137.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 137 and therefore denies the allegations.

138.    Hunton admits that a letter exists dated June 10, 1996 that purports to be from Yolanda Suarez to a Greenberg attorney (not Carlos Loumiet), and that the letter requests legal advice on a "Service/Marketing Agreement" and "Referral agreements with foreign affiliates." Hunton further admits that a letter exists dated June 11, 1996 that purports to be from Yolanda Suarez to a Greenberg attorney (not Carlos Loumiet), and that the letter requests legal advice on aspects of the relationship between Stanford Group Company and Stanford International Bank, Ltd.  Hunton admits that a letter exists dated June 14, 1996 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Yolanda Suarez that purports to enclose "a proposed agreement between Stanford Financial Group and Stanford Group" for which further input was required on "matters which have been bracketed or left blank."  Hunton also admits that a letter exists dated August 8, 1996 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Yolanda Suarez that purports to enclose "a brief Agreement which is attached between Stanford Trust Company Ltd. and Stanford Group Company."  Hunton refers to the June 10, 1996, June 11, 1996, June 14, 1996, and August 8, 1996 letters and their purported enclosures, if any, for what they state, and denies all allegations in paragraph 138 that are inconsistent with their contents.

Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 138 and therefore denies the allegations.  In particular, Hunton lacks knowledge or information sufficient

to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 138 that suggest the draft proposed agreements were actually used by any Stanford entity in their same form and with their same content.

139.    Hunton admits that a fax cover sheet exists dated May 15, 1996 that purports to be from a Greenberg lawyer (not Carlos Loumiet) to Yolanda Suarez, and that such fax cover sheet purports to attach a one-page draft "Affiliate Relationship Disclosure."  Hunton refers to this fax cover sheet and its purported enclosure for what they state, and denies all allegations in paragraph 139 that are inconsistent with their contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 139 that suggest the one-page draft "Affiliate Relationship Disclosure" was actually used by any Stanford entity in its same form and with its same content.

Hunton admits that a draft, unsigned letter exists dated February 28, 1997 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Yolanda Suarez and that such letter states it is enclosing "a draft copy of the Subscription Agreement" for the "CD Program for Stanford International Bank, Ltd."  Further answering, Hunton states that the letter advises in part that "the Subscription Agreement should be reviewed and revised, if necessary, to ensure that the procedures in the Subscription Agreement coincide with the documentation that may be required by the Bank."  Hunton refers to the draft, unsigned letter dated February 28, 1997 and its purported enclosure for what they state, and denies all allegations in paragraph 139 that are inconsistent with their contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 139 that suggest the purported enclosure to the February 28, 1997 letter was actually used by any Stanford entity in its same form and with its same content.

Hunton admits that three drafts exist of a document titled "Stanford International Bank, Ltd. CD Investment Program Disclosure Statement," one bearing a notation at the top that states, "GT Draft 2/12/97"; a second bearing a notation at the top that states, "GT Draft 2/14/97"; and a third bearing a notation at the top that states, "GT Draft 2/21/97"; and that all three drafts contain numerous blanks for information to be filled in.  Hunton refers to these three drafts for what they state, and denies all allegations in paragraph 139 that are inconsistent with their contents. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 139 that suggest these three drafts were actually used by any Stanford entity in their same form and with their same content.

Hunton admits that two drafts exist of a "Stanford International Bank Ltd. Disclosure Statement" dated to July 1998, and that one draft bears handwritten comments and the other is a redline showing changes from an unspecified prior version of the document and additional handwritten edits.  Hunton refers to these two drafts for what they state, and denies all allegations in paragraph 139 that are inconsistent with their contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 139 that suggest these two drafts were actually used by any Stanford entity in their same form and with their same content.

Hunton denies the remaining allegations in paragraph 139.

140.     Hunton admits that an October 11, 1996 invoice exists that purports to have been issued by Greenberg concerning legal work performed related to Stanford Financial Group, and that such document contains narrative time entries dated to August 1996 by Greenberg lawyers (not Carlos Loumiet) for "legal research as to whether certificates of deposit issued by foreign bank are securities," "research regarding sale of certificates of deposit in U.S.", and "research

regarding Regulation S offering integration and investment company act issues." Hunton refers to the invoice and time entry narratives for what they state, and denies all allegations in paragraph 140 that are inconsistent with their contents. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 140 and therefore denies the allegations.

141.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 141 and therefore denies the allegations.

> Answer to Footnote 16, appended to Paragraph 141:    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 16 and therefore denies the allegations.

142.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 142 and therefore denies the allegations.

143.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 143 and therefore denies the allegations.

144.    Hunton denies the allegations in the first sentence of paragraph 144. Hunton admits that a letter exists dated September 18, 1996 that purports to be from Carlos Loumiet to "His Excellency Prime Minister Lester Bird" and that the letter's first paragraph states, "As previously discussed in person with you, I am taking the liberty of suggesting certain steps which could be taken by the Government of Antigua and Barbuda to foster the type of first rate reputation as a center for international banking and finance that you so strongly desire for your country." Hunton further admits that the letter purports to offer "some suggestions as to

immediate steps that should be taken in the banking and trust areas in order to build the type of

credibility you seek for your country," and that the letter thereafter contains 15 numbered

paragraphs (along with some sub-paragraphs) that state in part (emphasis added):

> 2.     Each bank and trust company (whether domestic or international) in Antigua and Barbuda should be ***required to produce annual audited financial statements*** within 120 days of the close of its fiscal year.  In addition, there should be a requirement for quarterly call reports within 45 days of the end of each quarter to the Supervisor from each bank.
>
> *        *        *
>
> 8.     Any knowing or reckless misstatement or misrepresentation in any report furnished to the Government of Antigua and Barbuda ***should be a felony***.
>
> 9.     Extensions of credit from banks and trust companies (whether domestic or international) in Antigua and Barbuda to or for the benefit of their affiliates as well as to or for the benefit of affiliates of their principal shareholders, directors and officers, ***should be carefully restricted***.
>
> *        *        *
>
> 14.     In general, violations of any of the foregoing laws and regulations ***should be severely sanctioned***, including as appropriate both prison time and significant fines.  Unfortunately, anything else will likely lead to disregard of these requirements.

Hunton refers to the September 18, 1996 letter for what it states, and denies all allegations in

paragraph 144 that are inconsistent with its contents.

 Hunton admits that a draft of the September 18, 1996 letter that is dated June 28, 1996

begins with the phrase, "[a]t the request of our mutual friend, Mr. R. Allen Stanford," and admits

that the September 18, 1996 signed version of the letter does not contain that statement.  Hunton

refers to the draft letter dated June 28, 1996 for what it states, and denies all allegations in

paragraph 144 that are inconsistent with its contents.

Except as expressly admitted herein, Hunton denies the allegations in paragraph 144.

145.    Hunton admits that in the late 1990s, Carlos Loumiet participated in an effort to reform the laws and regulations associated with banking in Antigua, but denies that such efforts occurred while Mr. Loumiet was a partner at Hunton.  Hunton admits that a draft, unsigned letter exists dated May 7, 1999 that purports to be from Carlos Loumiet to Undersecretary James E. Johnson, Office of Enforcement, Department of the Treasury, that discusses an effort to reform Antigua's banking laws and regulations in the late 1990s.  Hunton refers to that letter for what it states, and denies all allegations in paragraph 145 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 145 and therefore denies the allegations.

146.    Hunton admits that in the late 1990s, Carlos Loumiet participated in an effort to reform the laws and regulations associated with banking in Antigua, but denies that such efforts occurred while Mr. Loumiet was a partner at Hunton.  Hunton admits that a report dated January 1998 exists that purports to be from the Offshore Financial Sector Planning Committee to the Government of Antigua and Barbuda International Business Corporations Authority; that such report describes two task forces formed in connection with that committee; and that such report identifies the following individuals as members of a task force:  Michael Ancona, Jeffrey Balmer, Keith Ellenburg, and Barry Hersh of BDO Seidman LLP; Thomas Cash and Ivan Diaz of Kroll Associates; and Carlos Loumiet, Patrick O'Brien, and Mark Schnapp of Greenberg. Hunton refers to that report for what it states, and denies all allegations in paragraph 146 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 146 and therefore denies the allegations.

147.    Hunton admits that a memorandum dated September 15, 1997 exists that purports to be from Patrick O'Brien to Mike Ancona, Jeffrey Balmer, Tom Cash, Ivan Diaz, Keith Ellenburg, Barry Hirsch, Carlos Loumiet, and Mark Schnapp, with copies to Wrenford Ferrance and Allen Stanford, regarding "Report on August 29, 1997 Meeting of the Antigua Task Force to Prevent Money-Laundering through International Banks."   Hunton admits the memorandum states that, in connection with an August 29, 1997 meeting, "the Task Force formulated a series of recommendations for further development and eventual implementation by the Government of Antigua and Barbuda."  Hunton admits the memorandum states, under the heading "International Cooperation" (emphasis added):

> Because any money laundering in Antigua and Barbuda almost invariably involves criminal elements located in other nations, ***cooperation with the judicial, enforcement and regulatory authorities of other countries is critical to the effectiveness of the money laundering prevention effort.***  At the same time, it is essential that the Government of Antigua and Barbuda not permit the wealth of its people and businesses to become the targets of overly aggressive enforcement actions designed primarily to supplement the treasuries of foreign nations. This can be accomplished through the following measures.

> <u>Recommendations</u>

> A. Implementing regulations and procedures ***enabling the Minister of Finance to provide information*** to judicial, enforcement or regulatory agencies and officials of other countries pursing [*sic*] investigations of activities which are illegal under the laws of Antigua and Barbuda.

> B. Implementing regulations and procedures whereby foreign authorities pursuing money laundering and related investigations ***may provide evidence and request the seizure of monies and other property*** connected to money laundering activities when such activities constitute a violation of the laws of Antigua and Barbuda.

> C. Implementing regulations providing that any forfeited monies and other property connected to money laundering activities are remitted to the Government of Antigua and Barbuda.

> D. Reviewing and revising the list of "prescribed offences" in the Second Schedule to the Money Laundering (Prevention) Act to ensure that the provisions of the Act apply only to the most serious of crimes, as intended,

and not to lesser crimes which could conceivably be included under such vague terms as "fraud" or "false accounting."

Assignments

A. Greenberg Traurig will work with Wrenford Ferrance drafting appropriate regulations to enhance International cooperation and in drafting an order to be published in the *Gazette* revising the Second Schedule to the Act

B. Kroll Associates will work with Wrenford Ferrance drafting procedures to enhance international cooperation.

Hunton refers to that report and the September 15, 1997 memorandum for what they state, and denies all allegations in paragraph 147 that are inconsistent with their contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 147.

148.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 148 and therefore denies the allegations.

149.     Hunton denies the first sentence of paragraph 149.   Further answering, Hunton states that a report dated January 1998 that purports to be from the Offshore Financial Sector Planning Committee to the Government of Antigua and Barbuda International Business Corporations Authority states under the heading "Confidentiality":

The *Know Your Bank, Know Your Customer*, inspection, reporting and comprehensive supervision and international cooperation aspects of the program will result in the collection of substantial amounts of confidential information concerning financial institutions, customers of those institutions, financial transactions and international enforcement investigations.   This information is gathered only because it is necessary and should be disseminated only as necessary to achieve its purposes.

Recommendation

Amend the Money Laundering (Prevention) Act so as to impose criminal penalties of up to three years of imprisonment for the willful improper disclosure of any information gathered under the Act.  *See MLPA Amendment ¶4 at Tab J.*

The proposed amendment to the Money Laundering (Prevention) Act attached at Tab J to this report states in part (emphasis added):

> (2)      It shall be unlawful for any person to disclose any information relating to the business affairs of a financial   institution or a customer of a financial institution that he has   acquired  as  an  officer,  employee,  agent,  auditor, solicitor of the financial institution, or otherwise in  the performance of his duties or the exercise  of  his  functions  under  this  Act, ***except  in  the performance or exercise of  those duties or functions or pursuant to an order of a court of competent jurisdiction in Antigua and Barbuda.***

> (3)      It shall be unlawful for any person to disclose any information relating to the business affairs of a financial   institution or a customer of a financial institution that he has   acquired  as  an  official,  employee,  agent,  auditor, solicitor of the Government of Antigua and Barbuda, or otherwise in   the performance of his duties or the exercise  of his  functions  under  this  Act, ***except  in  the performance or exercise of those duties or functions.***

Hunton refers to the January 1998 memorandum and its attachments for what they state, and denies all allegations in paragraph 149 that are inconsistent with their contents.  In particular, Hunton denies that the January 1998 memorandum recommended that individuals be prohibited altogether from disclosing information to assist in international money laundering or other investigations.

Hunton admits that a draft memorandum exists dated August 16, 1998 that purports to be from Patrick O'Brien to the "Official Financial Sector Planning Committee Task Force II," encompassing Tom Cash, Ivan Diaz, Barry Hersh, Carlos Loumiet, and Mark Schnapp, and that such memorandum, which also contains handwritten comments, states in part under a heading "Money Laundering Prevention Act Amendments":

> Repeals the general exception providing that information can be providing [*sic*] to foreign  authorities  without  regard  to  any  of  the  confidentiality  laws  and regulations of Antigua.   The laws and regulations, as amended, are carefully designed  to  provide  access  when  justified,  making  a  general  exception unnecessary and unwarranted.

Hunton refers to the draft August 16, 1998 memorandum for what it states, and denies all allegations in paragraph 149 inconsistent with its contents.  Further answering, Hunton states that, a draft, unsigned letter exists dated May 7, 1999 that purports to be from Carlos Loumiet to Undersecretary James E. Johnson, Office of Enforcement, Department of the Treasury and that that letter states in part (emphasis added):

> Under the new regime, the IFSA is ***expressly allowed to share*** with banking authorities from any other country information concerning the management and operation of any Antiguan offshore bank, though not customer account information.  (This change allowed the meeting with representatives of the U.S. government in Washington in early January of this year discussed further below.) There was nothing like this under prior Antiguan law.

> \*       \*       \*

> [B]ased on the texts of the Treasury press release and FINCEN Advisory, as well as credible press reports in the U.S. and Antigua and Barbuda, the communications from Treasury seem to be inspired by a few "shortcomings". While I was not involved in the particular circumstances to which these "shortcomings" relate, I have informed myself of the background reasoning for them, which, with your permission, I will now take the liberty of conveying to you.

> First, the United States appears to object to a new statutory provision mandating that Antigua and Barbuda's confidentiality laws will now apply to information requests from foreign governments. With respect, this change appears to be only common sense. Under the law as it was, Antiguan authorities could not share information with each other because of the nation's confidentiality laws, but could share the same prohibited information with foreign authorities. I am sure you will agree that it would be politically difficult in our own country for privacy laws such as the Right to Financial Privacy Act of 1974 to apply to U.S. government authorities, protecting our citizens from intrusion into their affairs by those authorities, but for foreign authorities to not be held to comparable restrictions. It does not seem inappropriate for a country to draft its confidentiality statutes to apply to foreign government authorities as well as its own.  What is key is that both governments be able to obtain the information to which they are legitimately entitled.

> Second, the United States apparently also objects to the fact that the amended MLPA requires a court order prior to the dissemination of customer account information to foreign authorities. In fact, although a court order was not previously statutorily required, in practice offshore banks would not release information to Antiguan authorities without a court order. I understand this is why

the FBI and U.S. Customs were recently unable to obtain information from the records of European Union Bank and Caribbean American Bank (see discussion further below). The amended statute formalizes the requirement of a court order, but also facilitates it. Previously, because offshore banks refused to grant the information without it and the law was silent, a court order in practice was necessary for Antiguan authorities to examine bank records. This required U.S. authorities seeking such information from the Antiguan authorities, in turn, to obtain authenticated U.S. court documents to serve as the basis for obtaining the Antiguan court order. Under the amended statute, the IFSA examination can occur without a court order, and the information obtained through the examination itself can be used to obtain the Antiguan court order without the need for authenticated U.S. documentation. The Antiguan court order is now merely a safeguard to ensure that information is disseminated only in accordance with the law. This is as it should be, and as it is in the United States, where, under the federal bank privacy statute already mentioned, law enforcement officers cannot generally even obtain, let alone disseminate, bank customer information without court authorization.

Hunton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth and fifth sentences of paragraph 149 and therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 149.

> Answer to Footnote 17, appended to Paragraph 149:   Hunton admits that an August 14, 1998 invoice exists that purports to contain narrative time entries from Greenberg lawyers concerning legal work performed related to Stanford Financial Group, and that such document contains entries dated March and April 1998 by a Greenberg lawyer (not Carlos Loumiet) for "began research regarding U.S. authority to access information in Antigua through virtue of bank officers in U.S. and US computer access to information," "research regarding the ability of US authority to have access to documents protected under secrecy laws of another country by virtue of computer access to information through a computer terminal in the US," and "continued research on cases regarding subpoena of information accessible in the United States through a computer terminal from a country which has banking secrecy laws."  Hunton refers to the invoice and time entries for what

they state, and denies all allegations in footnote 17 that are inconsistent with their

contents.    Except as expressly admitted herein, Hunton lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the allegations in

footnote 17 and therefore denies the allegations.

150.    Hunton lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in the first and second sentences of paragraph 150 and therefore denies the

allegations.  Hunton admits that a fax exists dated September 5, 1997 that purports to be from

Carlos Loumiet to Pat O'Brien, and that that fax purports to include a draft letter dated "July __,

1997" and bearing the notation "[Wrenford Ferrance Letterhead]" at the top.  Hunton admits that

the letter states in part,

> As you may be aware, I recently was appointed Director of International Business
> Corporations in the Republic of Antigua and Barbuda.  This letter is being sent to
> all of the international banks licensed in our jurisdiction.
>
> In recent months there have been several international scandals involving
> international banks licensed in our country.  It is my determination to ensure that
> international banking carried out under the auspices of Antigua and Barbuda be
> devoid of such scandals, and on the contrary, be recognized worldwide as
> complying with the highest standards of the industry.
>
> To this end, my office is in the process of compiling information which will
> enable to us to more properly regulate and supervise the international banks
> licensed by Antigua and Barbuda, and to determine which banks currently
> licensed should continue to enjoy that status.

Hunton refers to that September 5, 1997 fax and its purported enclosure for what they state, and

denies all allegations in paragraph 150 inconsistent with their contents.  Except as expressly

admitted herein, Hunton denies the allegations in paragraph 150.

151.    Hunton admits that some documents exist bearing the email address

pobrien@stanfordeagle.com.  Hunton denies the characterization of any Task Force that involved

Carlos Loumiet as "Stanford's."  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 151 and therefore denies the allegations.

152.    Hunton admits that the October 3, 2009 edition of *The Miami Herald*, which edition appeared after the SEC sued Allen Stanford, contained an article titled "Allen Stanford Ponzi case puts lawyers in spotlight," and that the article contains the statement italicized in paragraph 152 and attributes that statement to Rodney Gallagher, a former member of the British High Commission in Barbados.  Hunton refers to that article for what it states, and denies all allegations in paragraph 152 inconsistent with its contents.  Hunton denies that Carlos Loumiet was a member of the International Financial Sector Authority.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 152 and therefore denies the allegations.

153.    Hunton admits that an article by Michael Bilton, "*The Texan Who Fell to Earth*", appears in The Sunday Times dated January 9, 2011, and that the article discusses Allen Stanford and an incident that allegedly occurred on February 8, 1999.  Hunton refers to the article for what it states, and denies all allegations in paragraph 153 that are inconsistent with its contents. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 153 and therefore denies the allegations.

> Answer to Footnote 18, appended to Paragraph 153:    Hunton admits that an article by Michael Bilton, "*The Texan Who Fell to Earth*", appears in The Sunday Times dated January 9, 2011, and that the article discusses Allen Stanford and an

incident that allegedly occurred on February 8, 1999. Hunton admits that an invoice dated April 19, 2000 exists that purports to be from Greenberg to Stanford Financial Group, Ltd., and that such invoice contains entries that reference a "Crick lawsuit" and purport to be related to timekeeper Patrick T. O'Brien in February and March 2000. Hunton further admits that an email exists dated November 30, 2000 that purports to be from Patrick O'Brien to croach@stanfordeagle.com that states in part, "Miss Crick had me served with papers suing me." Hunton refers to the article, invoice, and email for what they state, and denies all allegations in footnote 18 inconsistent with their contents. Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 18 and therefore denies the allegations.

154.    Hunton admits that an advisory exists dated April 1999 that was purportedly issued by the U.S. Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN"), concerning Antigua and Barbuda, and that such advisory contains the italicized language appearing within quotation marks or in block text in paragraph 154, except the advisory uses the word "Authority" rather than "IFSA" and "the government of Antigua and Barbuda" rather than "Antigua." Hunton denies that the April 1999 FinCEN advisory called the International Financial Sector Authority the "Antiguan government's new Stanford-created and Stanford-staffed regulatory agency." Hunton refers to the April 1999 FinCEN advisory for what it states, and denies all allegations in paragraph 154 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 154.

Further answering, Hunton states that, a draft, unsigned letter exists dated May 7, 1999 that purports to be from Carlos Loumiet to Undersecretary James E. Johnson, Office of Enforcement, Department of the Treasury, in response to the 1999 FinCEN Advisory and that that letter states in part:

What follows is a summary of the principal statutory and regulatory changes that were implemented last Fall to clean up Antigua and Barbuda's offshore banking sector:

o For the first time, Antigua and Barbuda now has an independent bank supervisory agency, the International Financial Sector Authority (IFSA), with its own budget and source of revenues. This is as required by the first of the Basle Core Principles for Effective Banking Supervision, discussed below.

o Under the new regime, an extensive "due diligence" investigation must be conducted into the ownership and management of all offshore financial institutions, and no "bearer share" ownership is permitted. Previously, "bearer shares" were allowed, there was no provision for ensuring that the government knew who actually owned or operated a financial institution, and frequently it did not.

o Under the new regime, all directors of all offshore financial institutions must be real persons, and at least one must reside in Antigua and Barbuda. Previously, corporations could serve as directors, which effectively shielded the real persons actually directing the institution, and there was no residency requirement, making supervision difficult.

o Under the new regime, no change of directors or of direct or indirect beneficial ownership of 5% or more is allowed without the IFSA's prior approval. There was no similar requirement under prior law.

o Under the new regime, there are broad requirements that an offshore bank and its owners, officers, directors and agents provide to the IFSA within 30 days all information requested as to the ownership and management of the bank. Nothing like this existed under prior law.

o Under the new regime, each offshore financial institution must appoint an individual as a Compliance Officer, responsible for ensuring compliance with the Money Laundering (Prevention) Act (MLPA), the International Business Corporations Act and all other Antiguan and Barbudan statutes and regulations. Previously, no single person was responsible for compliance, thereby enabling institutions to shirk their responsibilities.

o Under the new regime, all offshore banks must have a minimum of US$5 million in stated capital, of which U.S. $1.5 million must be physically

deposited in a domestic commercial bank in Antigua and Barbuda. In addition, equity of not less than 5% of assets must be maintained at all times. Previously, the capital requirement was frequently ignored, there was no minimum "leverage" requirement and there was no effective way of ensuring that any of the capital actually existed, which all-too-often it did not. These capital requirements by themselves will eliminate many of the "fly-by-night" financial institutions which have plagued the islands.

o   Under the new regime, no offshore financial institution can establish a subsidiary, or a branch or other office, anywhere in the world without prior approval of the International Financial Sector Authority (IFSA). Before granting that approval, the IFSA must take into account, among other things, whether there are adequate provisions of law for the IFS to obtain access to bank records located in that country, excluding customer account information. Moreover, foreign branches, offices and subsidiaries are subject to all the legal requirements of the parent corporation in Antigua. The objective is, of course, comprehensive supervision on a consolidated basis. Needless to say, nothing like this existed under prior Antiguan law.

o   Under the new regime, the IFSA is expressly allowed to share with banking authorities from any other country information concerning the management and operation of any Antiguan offshore bank, though not customer account information. (This change allowed the meeting with representatives of the U.S. government in Washington in early January of this year discussed further below.) There was nothing like this under prior Antiguan law.

o   Under the new regime, no offshore financial institution can engage in any Internet activity whatsoever without prior approval of the IFSA. Previously, Internet activities were entirely unregulated and too frequently used for fraud, including prominently fraud on citizens of our country.

o   Under the new regime, all loans to affiliates (5% or more common ownership) must be 100% collateralized, and no loans may be made to acquire a direct or indirect beneficial interest in the lending institution. No such requirements previously existed.

o   Under the new regime, each offshore bank must prepare and submit to the IFSA annual audited financial statements and quarterly call reports. In addition, each bank must use any accounting/reporting system required by the IFSA. There were no such requirements under prior law.

o   Under the new regime, if the Board of Directors of the IFSA has reasonable grounds for believing that a bank is not in a sound financial condition or is not operating in a reasonable and prudent manner, it may send in its examiners, and thereafter act on the result of that examination. No such power existed under prior law.

o   Under the new regime, all currency being physically transported into the country in excess of US$10,000 must be reported. Previously, there was no in-bound reporting requirement.

o   Under the new regime, offshore banks cannot accept any deposits whatsoever of currency or bearer negotiable instruments. Previously, there was no such restriction. Of course, this effectively prevents any offshore bank in Antigua from being used to introduce tainted funds into the legitimate international banking system. I know of no other country in the world which has taken such a far-reaching step.

o   Under the new regime, all offshore banks are subject to mandatory annual examinations, including customer account records. Previously, the bank supervisory authority could take no such action without a court order.

o   Under the new regime, offshore banks must keep their records for a minimum of five years. There was no record keeping requirement under prior law.

o   Under the new regime, the Money Laundering Supervisory Authority may unilaterally freeze tainted funds for up to 96 hours upon mere suspicion of money laundering. Previously, that authority could take no such action without a court order.

o   Under the new regime, a court can freeze tainted funds for up to 30 days, while awaiting the filing of criminal charges. Previously, such court-ordered freezes expired after 48 hours.

o   Under the new regime, all tainted funds are subject to forfeiture once criminal charges are filed.  Previously, only funds coming into the possession of a person after enactment of the law (May, 1998) were subject to forfeiture.

o   Under the new regime, all tainted funds located in Antigua and Barbuda are subject to forfeiture, regardless of where in the world a person is charged. Previously, the defendant had to be charged in Antigua and Barbuda.

o   Under the new regime, all tainted funds located anywhere in the world are subject to forfeiture once a person is criminally charged in Antigua and Barbuda. Previously, only funds located in Antigua and Barbuda were subject to forfeiture.

o   Under the new regime, in the case of fugitives charged under either foreign or Antiguan law tainted funds are automatically forfeited 180 days after the party is charged. Previously, the party had to be convicted before the funds could be forfeited, and in the case of fugitives, could remain under seizure without ever being forfeited.

o   Under the new regime, offshore banks can no longer open anonymous accounts and must follow strict "know your customer" procedures. These

requirements are based on, and very similar to, those recently proposed and withdrawn for implementation in this country. No such requirements previously existed in Antigua and Barbuda. Somewhat ironically, since the FINCEN proposal had to be withdrawn in the face of overwhelming popular opposition in the U.S., offshore banks in Antigua and Barbuda will actually have tougher know-your-customer legal requirements than the domestic banking industry in the U.S.

o   Under the new regime, offshore banks cannot engage in transactions which do not involve account-holders. Previously there was no such restriction, and I know of no other country in the world which has implemented a similar provision.

o   Finally, under the new regime a Forfeiture Fund is established to finance enforcement efforts and there is specific authorization for asset sharing with other nations. Previously, there was no Forfeiture Fund and no provision for asset sharing. As you know, Antigua and Barbuda, thanks to the new regime, recently turned over to DEA US$3 .1 million of tainted funds, thus becoming, to my know ledge, the first Caribbean nation to share such funds with the U.S.

The foregoing are only the principal changes, and they represent only a "work in progress" which, prior to the recent changes to IFSA's Board of Directors prompted by the Treasury Press release and the FINCEN Advisory, discussed below, were expected to be supplemented by additional tough requirements in the near future. . . .

155.    Hunton admits that the U.S. State Department's annual International Narcotics Control Strategy Report for 1999 states that the United Kingdom issued a financial advisory concerning Antigua in 1999.  Hunton refers to that report for what it states, and denies all allegations in paragraph 155 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 155 and therefore denies the allegations.

156.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 156 and therefore denies the allegations.  Hunton admits that an email chain exists dated June 22-24, 1999 that purports to be between Carlos Loumiet and a Greenberg attorney, and that such email chain contains an email

dated June 23, 1999 that purports to be from Carlos Loumiet and that asks whether Greenberg could represent "[t]he English-speaking Caribbean islands" in a World Trade Organization grievance against "the US and UK" involving "confidentiality laws in tax cases."  Hunton refers to that email chain for what it states, and denies all allegations in paragraph 156 that are inconsistent with its contents.  Hunton specifically denies that the June 22-24, 1999 email chain ever mentions Allen Stanford or the Stanford entities.  Hunton denies the remaining allegations in paragraph 156.

157.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 157 concerning Allen Stanford's purported reaction to the April 1999 FinCEN advisory regarding Antigua and Barbuda.  Hunton denies the remaining allegations in paragraph 157.

158.   Hunton admits that a document exists that purports to be an invoice from Greenberg to Stanford Financial Group dated August 20, 1999 and that such invoice purports to show a narrative time entry from a Greenberg attorney on June 28, 1999 for "full day meeting with client to discuss treasury advisory issued to Antigua and strategy session to reverse," and a narrative time entry from Carlos Loumiet that same day, for "conference with Y. Suarez, A. Stanford, [a Greenberg attorney], M. Schnapp, P. O'Brien, E. Cort."  Hunton admits that such invoice also purports to show a narrative time entry from a Greenberg attorney on July 2, 1999 that states in part "calls to Administration officials."  Hunton refers to that invoice for what it states, and denies all allegations in paragraph 158 that are inconsistent with its contents.  Hunton admits that an email exists dated on or before August 6, 1999 that purports to be from Carlos Loumiet to Pat O'Brien and that states in part that a Greenberg attorney "is going to be using his

well-honed diplomatic skills on Treasury, where he has excellent contacts, and needs the entire background."   Hunton refers to that email for what it states, and denies all allegations in paragraph 158 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 158 and therefore denies the allegations.

159.    Hunton admits that a document exists that purports to be an invoice from Greenberg to Stanford Financial Group dated April 19, 1999, and that such invoice purports to show a narrative time entry from Jim Miller on March 4, 1999 for 4.0 hours for "[s]etting up meetings with Hastert, Delay and Archer; talks with client to get background for meetings; arrangements for check to NRCC."  Hunton refers to that invoice for what it states, and denies all allegations in paragraph 159 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 159 and therefore denies the allegations.

160.    Hunton admits that October 11, 1999 edition of The Washington Post contained an article purportedly authored by Douglas Farah and titled "Texas Banker at Center of Reform Controversy."   Hunton denies that the article reports on a "scandal" and, further answering, states that the article states in part:

> Over 18 months, new laws to control money laundering were passed. One prohibited cash deposits in offshore banks, and another increased the minimum amount of capital needed to open a bank from $1 million to $5 million. Five of the nation's 54 offshore banks were shut and another 20 are under review, including several Russian banks that had attracted international scrutiny. "Know your customer" laws were strengthened. The International Financial Sector Authority (IFSA) was created to oversee offshore activities. . . . When the controversy erupted, Stanford and other bankers left the IFSA board. Some of the laws the United States and Britain objected to were rewritten to eliminate potential loopholes.

Hunton refers to the article for what it states, and denies all allegations in paragraph 160 that are inconsistent with its contents.  Further answering, Hunton states that a document exists that purports to be an invoice from Greenberg to Stanford Financial Group dated November 16, 1999 and that such invoice purports to show a narrative time entry from a Greenberg associate on October 4, 1999 – seven days *before* the date of Mr. Farah's article – for "[r]esearch on articles written by Doug Fara of Washington Post," and a narrative time entry from that same associate on October 5, 1999 for "[r]eview of research on Doug Fara."  Hunton further states that such invoice also purports to show narrative time entries from Carlos Loumiet on October 5 and 6, 1999 – also days *before* the date of Mr. Farah's article – for "review of materials on Farah," "preparation for tel con with D. Farah," and "telephone conference with D. Farah, Y. Suarez (2), A. Stanford, E. Cort, M. Schnapp."  Hunton refers to that invoice for what it states, and denies all allegations in paragraph 160 that are inconsistent with its contents.

Hunton admits that TPMMuckracker contains a post dated January 4, 2010 that was purportedly authored by Zachary Roth titled, "Top Stanford Aide Schmoozed Lawmakers, Sweet-Talked Journos," and that such article purports to discuss a dinner on an unknown date, attended by Yolanda Suarez, to which Mr. Farah was invited by a recently retired DEA agent. Hunton refers to that article for what it states, and denies all allegations in paragraph 160 that are inconsistent with its contents.

Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 160 and therefore denies the allegations.

> Answer to Footnotes 19-20, appended to Paragraph 160:    Hunton   incorporates by reference as if fully set forth herein its answer to paragraph 160.

161.     Hunton admits that the 1999 International Narcotics Control Strategy Report, purportedly issued by the U.S. State Department on March 1, 2000, states in part:

> Until early 1997, Antigua and Barbuda had a virtually unregulated offshore banking sector. The country took steps in 1997 and 1998 to address problems and assert control by passing sound anti-money laundering legislation. In 1998, individuals with a vested interest in lax regulation of the offshore sector used their considerable financial influence to weaken Antigua's anti-money laundering legislation. Certain amendments to the Money Laundering (Prevention) Act and the 1982 International Business Corporations Act (IBCA), passed in November 1998, undermined the ability of law enforcement to investigate and prosecute illegal financial dealings.
>
> This development resulted in the imposition of a financial advisory by the U.S. in April 1999. Shortly thereafter the UK issued a similar advisory, and France publicly expressed its concerns. Since the issuance of the advisories, the GOAB has endeavored to rescind most of the objectionable legislation, increased its bilateral and multilateral cooperation on various law enforcement initiatives, and seems to be headed towards compliance with international norms governing offshore banking sectors. To address international concerns, the GOAB is taking other steps to strengthen its laws governing the financial services sector.

Hunton refers to that report for what it states, and denies all allegations in paragraph 161 that are inconsistent with its contents.  In particular, Hunton denies the report mentions Allen Stanford. Except as expressly admitted herein, Hunton denies the allegations in paragraph 161.

162.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 162 and therefore denies the allegations.

163.     Hunton admits that an email exists dated February 24, 1998 that purports to be from Carlos Loumiet to Greenberg shareholders titled "Internet Gambling," and that such email states:

> For the past nine months, at the expense of a client with a sizable investment in the islands, we have been helping the Government of Antigua and Barbuda to clean up its international banking sector through the adoption of model legislation and regulations and the elimination of questionable financial institutions operating there. That effort has won strong praise even from British monetary authorities

(A&B remains part of the Commonwealth), who have acknowledged the quality of the proposed measures.  Another sector of the economy that has developed on those islands is internet gambling, and the Government of A & B now wishes us to help it be a pioneer in the adoption of model legislation and regulations to regulate that industry and eliminate many of the abuses that have been associated with it. Our client has asked whether we represent any companies active in this field which would like to actively participate in, and help fund, an effort to adopt such regulation in order to give themselves and the over-all industry a better image. One huge advantage to A & B in this regard is that we have sufficient support from its Government and it is a small enough jurisdiction to make it ideal as a "laboratory" for this type of effort. Please let me know if you know of any clients which would like to be involved.

Hunton refers to the February 24, 1998 email for what it states, and denies all allegations in paragraph 163 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 163.

164.    Hunton admits that a memorandum exists dated January 23, 1998 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Yolanda Suarez, with a copy to Mark Schnapp, and that such memorandum bears the subject line, "FCPA implications of contributions by Allen Stanford to or on behalf of Antiguan political party."   Hunton admits that the memorandum states in part (emphasis added):

You have inquired whether the Foreign Corrupt Practices Act ("FCPA" or the "Act") prohibits Mr. Stanford or any entity controlled by Mr. Stanford (collectively, "Stanford") from undertaking at the request of an Antiguan political party (the "Party") to pay to an American public relations firm (the "Firm") a portion of the fees charged or to be charged by the Firm for services rendered to the Party. You also have inquired whether the Act prohibits the making by Stanford of a political contribution to the Party upon the request of the Party.

For purposes of this memorandum, we have assumed that the Party's request for a contribution or for assistance in the payment of its public relations expenses is not accompanied by an offer or promise to Stanford of anything of value, i.e., a proposed quid pro quo arrangement; that Stanford has not conditioned and will not condition any payment or contribution by him upon his receipt from the Party of anything of value; and that any payment or contribution by Stanford would not violate the elections or other written law of Antigua.  *On the basis of these facts and assumptions* we conclude that Stanford would not violate the FCPA by making the proposed payment to the Firm.

However, we encourage Stanford not to pay any amount directly to the Firm, a measure that in our view would involve an appearance of impropriety and needlessly could entangle Stanford in sensitive or unpleasant matters arising between the Party and the Firm.

If there exists doubts as to the Party's ability to meet its obligations to the Firm, and if Stanford would violate no elections or other law by donating the requested amount directly to the Party, then in our judgment the most prudent course is for Stanford simply to make a donation to the Party, which in its discretion may forward that donation to the Firm as payment for services rendered. ***We further recommend that Stanford make any contribution to the Party openly and notoriously, thereby reducing the likelihood that such contribution will be perceived as improper.***

Hunton refers to the January 23, 1998 memorandum for what it states and denies all allegations in paragraph 164 that are inconsistent with its contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 164 and therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 164.

165.    Hunton denies the allegations in paragraph 165.

166.    Hunton denies the allegations in paragraph 166.  Hunton specifically denies the suggestion in paragraph 166 that no laws governed Stanford Trust Company in Antigua.

167.    Hunton admits that a memorandum exists dated November 5, 1997 that purports to be from Carl Fornaris to Carlos Loumiet, that such memorandum bears the subject line "Stanford Financial Group Ltd - Offshore Trust Company Activities in Florida," and that one version of such memorandum purports to be attached to a fax cover sheet from Carlos Loumiet to Yolanda Suarez.  Hunton admits that the memorandum begins with the following paragraph (emphasis added):

Stanford Financial Group Ltd., an Antigua-based financial services company, owns Stanford Trust Company, a trust company organized under the laws of Antigua (the "Trust Company"), and Stanford International Bank, a foreign bank organized under the laws of Antigua (the "Bank"). You have asked me to research whether the Trust Company may, under Florida and federal law, establish a trust services office in Florida that would engage solely in the provision of fiduciary services for its clients and *would refrain from engaging in banking activities such as taking deposits or extending loans.* This memorandum summarizes my research of Florida and federal law and concludes that: (1) although its statutory authority to do so is questionable, the Department purports to prohibit non-Florida trust companies (such as the Trust Company) from establishing a "trust service" office in Florida, but the Trust Company is allowed to establish a more limited "trust representative" office without the Department's approval, and (2) no approval from the Board of Governors of the Federal Reserve would be required to establish an office of the Trust Company in Florida.

Hunton admits that the memorandum further states that David Burgess, an official with the

Florida Department of Banking and Finance, confirmed that the Department

would only permit the establishment of a [trust representative office, or "TRO"] – which can only act as a representative of the Trust Company by soliciting business on its behalf.  Unlike a full "trust service" office, such a TRO would be prohibited from making discretionary decisions and administering accounts in Florida.  Such activities, Mr. Burgess said, could only take place at the main office of the Trust Company in Antigua.

Hunton further admits that the memorandum states that an interpretive letter provided by the

same Department official indicated that "the Department has no application procedure for the

establishment of a TRO; however, the Department appreciates a courtesy notification if a TRO is

established."  Hunton admits that the memorandum also states as follows:

Although the Bank (which is affiliated with the Trust Company) would be considered to be a foreign bank within the meaning of Regulation K because it engages directly in the banking business outside the United States, the Trust Company would not be viewed as a foreign bank as long as it does not engage in banking activities such as receiving deposits or extending credit.  Accordingly, the IBA and Regulation K do not apply to the Trust Company.

Hunton further admits that the memorandum states that a staff attorney at the Federal Reserve in

Washington, D.C., Jonathan Stoloff (emphasis added):

> confirmed for me that a foreign trust company with no banking operations in the United States that wishes to establish a presence in the United States ***does not need to obtain approval from the Federal Reserve.*** Mr. Stoloff reasoned that the foreign trust company is not a "foreign bank" under Regulation K because it does not engage in the business of banking. Mr. Stoloff counseled, however, that in order to avoid being deemed a representative office of the Bank – which does require Federal Reserve approval – the proposed Florida office of the Trust Company ***should not solicit business on behalf of the Bank.*** Of course, the same possibility of being viewed as a de facto "representative office" of the Bank also exists under Chapter 663, Florida Statutes, depending upon the activities the Trust Company conducts in Florida.

Hunton refers to the November 5, 1997 memorandum for what it states, and denies all allegations in paragraph 167 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 167.

168.   Hunton admits that a document exists that purports to be an invoice from Greenberg to Stanford Financial Group, Ltd. dated August 14, 1998. Hunton admits that such invoice purports to contain a time entry from a Greenberg associate for 2.0 hours of work on November 4, 1997, and that such time entry states, "[c]onferenced with Carlos Loumiet; researched SEC Opinion letters in connection with whetjher [*sic*] a Trust Company must reggister [*sic*] CD's issued by an offshorte [*sic*] affiliate being offered to the Trust's institutional clients." Hunton further admits that such invoice purports to contain a time entry from a Greenberg associate for 1.8 hours of work on November 5, 1997, and that such time entry states, "Researched whether a Trust Company must reggister [*sic*] CD's issued by an offshorte [*sic*] affiliate being offered to the Trust's institutional clients." Hunton further admits that such invoice purports to contain a time entry from Carlos Loumiet for 0.8 hours of work on November 5, 1997, and that such time entry states, "research regarding securities laws." Hunton also admits that such invoice purports to contain a time entry from a Greenberg attorney for 1.0 hours of work on November 7, 1997, and that such time entry states, "investigation of facts, use of

affiliate; telephone conferences."  Hunton denies that paragraph 168 is an accurate description of the context for these research activities.  Hunton refers to that invoice for what it states, and denies all allegations in paragraph 168 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 168.

169.    Hunton admits that a memorandum exists dated September 15, 1998 that purports to be from Carlos Loumiet and Carl Fornaris to Yolanda Suarez, bearing the subject line, "Relationship Between Florida Trust Representative Office and Affiliated Foreign Bank," and that such memorandum states in part:

> We understand that both Trust Companies [*i.e.*, one in Antigua and one in Louisiana] are considering establishing [trust representative offices] in Florida (the "Proposed TROs"). In that regard, you have asked us to what extent the Proposed TROs may work together with the Bank without being deemed an office or representative of an unlicensed foreign bank under applicable federal and Florida banking law.

Hunton refers to that memorandum for what it states, and denies all allegations in paragraph 169 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 169 and therefore denies the allegations.

170.    Hunton admits that a memorandum exists dated September 15, 1998 that purports to be from Carlos Loumiet and Carl Fornaris to Yolanda Suarez, bearing the subject line, "Relationship Between Florida Trust Representative Office and Affiliated Foreign Bank." Hunton admits that such memorandum states that under the Foreign Bank Supervision Enhancement Act of 1991 ("FBSEA"):

> a representative office is "any office of a foreign bank" located in any State of the United States that is not a branch, agency or subsidiary of the foreign bank. The Federal Reserve's foreign bank regulations (*i.e.*, Regulation K) that implement the

FBSEA further specify that a representative office is an "any place of business" that engages in <u>any</u> of the following types of representational and administrative functions in connection with the banking activities of a foreign bank:

- o   soliciting new business for the foreign bank;

- o   conducting research;

- o   acting as liaison between the foreign bank's head office and customers in the United States;

- o   soliciting loans on behalf of the foreign bank;

- o   assembling credit information on borrowers;

- o    making property inspections and appraisals;

- o   securing title information;

- o   preparing loan applications;

- o   making loan recommendations;

- o   soliciting loan purchases and loan servicing contracts;

- o   performing back-office functions; and

- o   serving as a regional administrative office that coordinates operations in a particular geographic region.

The Federal Reserve's definition of a representative office adheres to the traditional view that a representative office may engage only in limited functions that facilitate the banking activities of a foreign, [*sic*] bank and not in the banking activities themselves. [footnotes omitted]

Hunton also admits that the memorandum states (emphasis added):

As an affiliate of the Bank, a strong argument can be made that the Proposed TRO is not an entity that falls within the definition of a "representative office" of a foreign bank under the FBSEA or Regulation K. Under the definition, a representative office is an office or place of business "of a foreign bank" that is not a branch, agency or subsidiary of the foreign bank. The Proposed TROs would not be branches, agencies or subsidiaries of the Bank; nor would they be offices or places of business "of the Bank." It thus appears under the plain language of the FBSEA and Regulation K that an affiliate of a foreign bank was not intended to fall within the purview of the definition of "representative office." Further, for decades different bank holding company subsidiaries scattered throughout the United States have occasionally assisted each other with their business, without thereby being deemed to be "offices" of one another. Further,

even today we know of foreign banking groups active in the United States through a single bank member of that group which, in addition to carrying out its own business here, assists the other banks in the group with their United States activities, without thereby being converted into a "representative office" of those other banks. . . .

Nevertheless, there remains a possibility that the Federal Reserve, which enforces the FBSEA and Regulation K, might choose to view a foreign bank affiliate as a "constructive" office or place of business of the foreign bank under the FBSEA and Regulation K, as it appears to have done at least to some extent in the two enforcement actions cited above. For example, although the FBSEA and Regulation K do not define an "office" or "place of business," the Federal Reserve's staff has previously indicated that a single employee conducting business from any location in the United States could, under appropriate circumstances, constitute a branch, agency or representative office of a foreign bank. [footnote omitted]

Based on this reasoning, we believe that, *as long as they adhere to the list of the do's and don'ts attached hereto as Exhibit A,* the Proposed TROs will not be deemed to be "constructive" representative offices of the Bank for purposes of federal banking law. This is true even if, in their capacity as fiduciaries to their respective Trust Company customers, they advise their customers of the full choice of financial services and products available to them, including those available through the Bank. Although the Federal Reserve's list of representative office activities in Regulation K includes "soliciting new business" on behalf of the foreign bank, as well as "acting as a liaison" between the foreign bank's head office and its customers in the United States, we do not believe that language can be extended to prohibit a Trust Company's interaction with any foreign bank, whether affiliated to the Trust Company or not, on behalf of its own trust customers. [footnote omitted]

Hunton admits that the memorandum also states:

With regard to the Proposed TROs' possible reference to customers to the Bank, we also bring to your attention that the statutory definition of the permissible activities for a "representative office" ([Florida Statute] § 663.062) refers to "soliciting" business as opposed to merely "referring" business. Since the activity of the Proposed TROs would not involve entreating or trying to obtain new customers for the Bank – the essence of "solicitation" – it can be strongly argued that the Proposed TROs occasional referral activity is not within the scope of the statute.

Hunton further admits that the memorandum states:

Finally, we also understand that the customers that might be referred by the Proposed TROs to the Bank would largely be non-U.S. customers. We note, for your information, that the Florida Statutes do not make a distinction between U.S.

and non-U.S. customers. Therefore, the fact that the Proposed TROs might limit their referrals to the Bank to non-U.S. customers would not serve as an exemption from any requirement that they be licensed as "representative offices." Experience has shown us, however, that in practice Florida regulators, as is true of regulators in the U.S. generally, will naturally be more concerned with activities which involve their constituents – *i.e.*, citizens and residents of the U.S. – than foreigners. Moreover, we believe that where the Trust Companies and their Proposed TROs conduct their trust businesses lawfully, Florida banking regulators would have a difficult time attempting to argue that a Proposed TRO is an unlicensed representative office of the Bank.

Further answering, Hunton states that Exhibit A to the September 15, 1998 memorandum, titled "DO'S AND DON'TS FOR STANFORD TRUST COMPANY REPRESENTATIVE OFFICES IN FLORIDA," states in part, "<u>Don't</u> solicit business of any nature on behalf of any company other than your trust company.  In particular, do not solicit business on behalf of Stanford International Bank."  Hunton refers to the September 15, 1998 memorandum and its exhibit for what they state, and denies all allegations in paragraph 170 that are inconsistent with their contents.

Hunton further admits that a draft memorandum dated September 2, 1998 exists that purports to be from Carlos Loumiet and Carl Fornaris to Yolanda Suarez, and that such draft memorandum appears to have been attached to a fax cover sheet that states in part:

> As promised, attached is a working draft of the memorandum regarding the relationship between the proposed trust representative office in Florida and Stanford International Bank. Carlos Loumiet has not had a chance to review this memorandum for changes, but I understand that he will be prepared to discuss it with you tomorrow in Houston.

Hunton admits that the draft September 2, 1998 memorandum states in part that:

> It is also unlikely that the Proposed TRO's activity of referring the Trust Company's customers to the Bank would be considered "soliciting business" for the foreign bank within the meaning of the Federal Reserve's regulation, since the Proposed TRO would not be holding itself out to the public as a representative of the Bank. Also, we understand that the Proposed TRO's contact with potential customers of the Bank would not go beyond contact with the Trust Company's existing or potential customers. Thus, the Proposed TRO's activities would better be described as providing an accommodation to its own customers.

Hunton denies that this language from the September 2, 1998 memorandum appears in the September 15, 1998 memorandum discussed above in this answer to paragraph 170.  Hunton refers to the September 2, 1998 memorandum and its fax cover sheet for what they state, and denies all allegations in paragraph 170 that are inconsistent with their contents.

Except as expressly admitted herein, Hunton denies all allegations in paragraph 170.  Hunton specifically denies the allegation in paragraph 170 that Carlos Loumiet ever advised that a Stanford trust representative office should "solicit new CD customers for SIBL."

171.    Hunton admits that a memorandum exists dated September 15, 1998 that purports to be from Carlos Loumiet and Carl Fornaris to Yolanda Suarez, bearing the subject line, "Relationship Between Florida Trust Representative Office and Affiliated Foreign Bank," and that purports to attach an Exhibit A, titled "DO'S AND DON'TS FOR STANFORD TRUST COMPANY REPRESENTATIVE OFFICES IN FLORIDA."  Hunton admits that among the list of "DO'S" on such Exhibit A are the following:

4.  <u>Do</u> prepare and sign trust agreements with customers on behalf of your trust company, and accept money, securities or other assets to be held in trust by your trust company.

5.  <u>Do</u> make it clear to customers and potential customers that you work for and are legally authorized to represent <u>only</u> the trust company.

6.  In carrying out your fiduciary duties on behalf of your trust company's customers, <u>do</u> feel free to contact, do business and deal in any way with <u>any</u> company (including companies affiliated with you by substantial ultimate common ownership, like The Stanford Group or Stanford International Bank) where investments held in trust by your trust company are located, or to which they are to be sent as contemplated by the trust agreement with your customer. You may send money to any such company, or withdraw money from it, or give it instructions as to investments it may hold, but only on behalf of customers of the trust company.

Further answering, Hunton states that such Exhibit A also includes the following among its list

of "DON'TS" (bold, italicized emphasis added; underlining in original):

1. <u>Don't</u> cash checks drawn on Stanford International Bank or any other bank except for your established trust customers.

2. ***<u>Don't</u> deal with Stanford International Bank on behalf of persons who are not customers of the trust company.***  However, you may advise any such persons how they may themselves contact Stanford International Bank and obtain any information they wish regarding that bank.

3. <u>Don't</u> offer or market to customers or potential customers of the trust company products or services offered by any company (including Stanford International Bank) other than your trust company, unless the products and services are offered in the context of an existing or proposed trust relationship with your trust company.

4. ***<u>Don't</u> hold yourself out as the representative or agent of <u>any</u> company other than your own trust company***, or as in any way authorized to act or make decisions on behalf of <u>any</u> company other than your trust company.

5. <u>Don't</u> accept any money to be deposited with Stanford International Bank other than through a trust with your trust company.  In all other situations, advise the customer how he may himself arrange such a deposit directly with Stanford International Bank.

6. <u>Don't</u> solicit business of any nature on behalf of any company other than your trust company.  ***In particular, do not solicit business on behalf of Stanford International Bank.***

Hunton refers to the September 15, 1998 memorandum and its exhibit for what they state, and

denies all allegations in paragraph 171 that are inconsistent with their contents.  Except as

expressly admitted herein, Hunton denies the allegations in paragraph 171.

172.    Hunton admits that a letter exists dated October 12, 1998 that purports to be from

Carl Fornaris to David Burgess, Division of Banking, Florida Department of Banking and

Finance, and that such letter states in part:

As you and I have discussed in recent telephone conversations, our client, Stanford Trust Company Ltd, a trust company organized under the laws of the Government of Antigua and Barbuda (the "Antigua Trust Company"), expects to

open on Monday, October 19, 1998 a trust representative office ("TRO") in Miami, Florida. Consistent with the position of the Division of Banking of the Florida Department of Banking and Finance (the "Division of Banking"), the TRO would act only as a representative of the Antigua Trust Company and would not make discretionary investment decisions or accept, approve or otherwise administer fiduciary accounts in Florida. Moreover, consistent with the position of the Division of Banking, the TRO's representatives would meet with customers at the TRO and would facilitate the transfer of documents and assist in customer communications, but all of the actual trust or fiduciary business of the Antigua Trust Company would be conducted at its place of business in Antigua.

Hunton refers to the October 12, 1998 letter for what it states, and denies all allegations in paragraph 172 that are inconsistent with its contents. Further answering, Hunton states that the November 5, 1997 memorandum referenced above in Hunton's answer to paragraph 167 states that an interpretive letter provided by Mr. Burgess indicated that "the Department has no application procedure for the establishment of a TRO; however, the Department appreciates a courtesy notification if a TRO is established." Except as expressly admitted herein, Hunton denies the allegations in paragraph 172.

173.    Hunton admits that a memorandum, which may be a draft, exists that is dated November 2, 1998, that has no specific author or addressee, and that is titled, "Memorandum Regarding the Legal Authority of Stanford Trust Company Limited to Establish a Trust Representative Office in the State of Florida." Hunton admits that the memorandum states in part, "We now understand that the staff of the Banking Division is suggesting that Florida law may require the Trust Company to apply to the Banking Division for an international representative office license in order engage [*sic*] in the activities that it would have engaged in through the proposed TRO." Hunton refers to the November 2, 1998 memorandum for what it states, and denies all allegations in paragraph 173 that are inconsistent with its contents. Hunton denies the allegation in paragraph 173 that "[t]he Florida Department of Banking initially threw a wrench in Loumiet's plans." Except as expressly admitted or denied herein, Hunton lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 173 and therefore denies the allegations.

174.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegation in the first sentence of paragraph 174 that "Loumiet and Fornaris then asked Greenberg Tallahassee partner and Florida lobbying Ronald Laface to help out on the Stanford project."  Hunton admits that a memorandum, which may be a draft, exists that is dated November 2, 1998, that has no specific author or addressee, and that is titled, "Memorandum Regarding the Legal Authority of Stanford Trust Company Limited to Establish a Trust Representative Office in the State of Florida."  Hunton admits that the memorandum states in part, "Below, we explain why Florida law neither requires nor permits the Trust Company to obtain an international representative office license from the Banking Division. We then review the pertinent statutory authority and the Banking Division's historical approach to out-of-state trust companies seeking to establish an office in Florida."  Hunton further admits that the memorandum states in part, "The Trust Company Does Not Qualify for an International Representative Office License Under Chapter 663, Florida Statutes.  For the reasons explained more fully below, because the Trust Company is not an 'international banking corporation,' and because the TRO would not engage in 'banking business' in Florida, the Trust Company and the TRO fall outside of Chapter 663, Florida Statutes, altogether."  Hunton refers to the November 2, 1998 memorandum for what it states, and denies all allegations in paragraph 174 that are inconsistent with its contents.  Hunton denies the remaining allegations in paragraph 174.  Hunton specifically denies the allegation in the last sentence of paragraph 174 that Carlos Loumiet "knew the real purpose of SFIS was to act as a conduit to SIBL."  Hunton further specifically denies the allegations in paragraph 174 to the extent they assert that Mr. Fornaris's

November 5, 1997 memorandum, discussed more fully in Hunton's answer to paragraph 167, is

inconsistent with the November 2, 1998 memorandum discussed in Hunton's answer to this

paragraph 174.

175.   Hunton admits that a memorandum, which may be a draft, exists that is dated

November 2, 1998, that has no specific author or addressee, and that is titled, "Memorandum

Regarding the Legal Authority of Stanford Trust Company Limited to Establish a Trust

Representative Office in the State of Florida."   Hunton admits that such memorandum purports

to reference and attach an executed affidavit dated October 29, 1998 from Dr. L. Errol Cort, who

the affidavit states is "local counsel to Stanford Trust Company Limited (the 'Trust Company')

in connection with legal matters arising under the laws of Antigua and Barbuda," as well as "a

Director of the Trust Company."   Hunton admits that such affidavit states in part (emphasis

added):

> 3. The Trust Company is duly licensed under the International Business
> Corporations Act, Cap. 222 of the laws of Antigua and Barbuda and is duly
> authorised by the Government of Antigua and Barbuda through the
> International Business Corporations Department and under its Articles of
> Incorporation to carry on an international trust business.
>
> 4. Under the International Business Corporations Act (as amended), the Trust
> Company's business activities shall be examined at least once every year by
> representatives acting on behalf of the International Business Corporations
> Department.
>
> 5. Pursuant to sections 246 to 254 of the International Business Corporations Act
> aforesaid, the Trust Company does not and cannot engage in any general
> banking business and, accordingly, the Trust Company *does not accept
> deposits, cash cheques, make loans, or engage in any other banking
> activities.*   Moreover, under the laws of Antigua and Barbuda, the Trust
> Company is not a commercial bank, merchant bank or other institution that
> engages in banking activities.

Hunton further admits that the November 2, 1998 memorandum states in part that, "The Trust

Company is a trust company organized under the laws of Antigua and Barbuda. . . . As shown by

the affidavit of Errol Cort, Esq. attached hereto as <u>Exhibit A</u>, the Trust Company may not, under the laws of Antigua and Barbuda, act as a 'banking corporation' or otherwise engage in banking activities such as receiving deposits, paying checks, or making loans."   Hunton refers to the November 2, 1998 memorandum and its affidavit for what they state, and denies all allegations in paragraph 175 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 175.  Hunton specifically denies all allegations in the last sentence of paragraph 175, including the allegation that Carlos Loumiet knew that any statements in the November 2, 1998 memorandum were allegedly false.

176.    Hunton denies the allegations in paragraph 176.  Hunton specifically denies the suggestion in paragraph 176 that no laws governed trusts in Antigua or the Stanford Trust Company in Antigua.

> <u>Answer to Footnote 21, appended to Paragraph 176:</u>   Hunton admits that a memorandum exists dated January 27, 2000 that purports to be from Patrick T. O'Brien to Yolanda Suarez that bears the subject line, "Antigua Trust Legislation."  Hunton admits that that memorandum states in part, "I am writing in response to the request from your office for a copy of Antigua and Barbuda's trust legislation. Unfortunately, at the moment Antigua and Barbuda has no specific legislation governing trusts, and I do not know when such legislation will be enacted."  Hunton refers to that January 27, 2000 memorandum for what it states, and denies all allegations in footnote 21 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in footnote 21.  Hunton specifically denies the suggestion in footnote 21 that no laws governed trusts in Antigua or the Stanford Trust Company in Antigua.

177.   Hunton admits that a fax cover sheet exists dated November 23, 1998 that purports to be from Carl Fornaris to another Greenberg attorney and that such fax cover sheet purports to enclose a draft consent order related to Stanford Fiduciary Investor Services that contains handwritten edits to a draft created by the other Greenberg attorney, under the note "CEL/CAF comments."  Hunton admits that the typewritten portion of such consent order reads in part, "Stanford Trust Company Limited operates a bank authorized to do business in St. John's, Antigua," but that handwritten comments strike that language and replace it with, "is a trust company organized under the laws of the Government of Antigua and Barbuda."  Hunton also admits that the typewritten portion of such consent order states "[p]rovide information so that a customer or potential customer of Stanford may communicate directly with Stanford International Bank or other banking entities," but that handwritten comments strike that language and replace it with, "any of Stanford's affiliates."  Hunton refers to that November 23, 1998 fax cover sheet and its purported enclosure for what they state, and denies all allegations in paragraph 177 that are inconsistent with their contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 177 that (1) suggest the November 23, 1998 draft was "[t]h[e] first draft" of the consent order, and (2) assert that Carlos Loumiet, as opposed to someone else, made the edits alleged in the second and third sentences of paragraph 177.

Hunton admits that a letter exists dated November 24, 1998 that purports to be from Ronald LaFace to Richard T. Donnelin, Jr., Chief Banking Counsel, Office of the Comptroller, that such letter states "[w]e have enclosed a Consent Order which the Department and Stanford may enter into in order to allow Stanford to do business in Florida with proper authorization," and that such letter purports to enclose a draft consent order related to Stanford Fiduciary Investor Services.  Hunton further admits that such consent order does not mention Stanford

International Bank, Ltd., but avers that such consent order also does not contain the statement "[p]rovide information so that a customer or potential customer of Stanford may communicate directly with any of Stanford's affiliates," as appeared in the November 23, 1998 draft. Hunton refers to that November 24, 1998 letter and its purported enclosure for what they state, and denies all allegations in paragraph 177 that are inconsistent with their contents. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 177 and therefore denies the allegations. Hunton denies the remaining allegations in paragraph 177.

178. Hunton admits that an email chain dated November 18-19,1998 exists that contains an email dated November 19, 1998 that purports to be from Ronald LaFace to Carlos Loumiet and another Greenberg attorney, and that such email states in part, "[w]e have scheduled a meeting with Craig Kiser for Dec. 2nd." Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 178 as to when meetings purportedly occurred between Greenberg lawyers and officials at the Florida Department of Banking and Finance in relation to Stanford matters. Further answering, Hunton states that a fax cover sheet dated December 11, 1998 exists that purports to be from Mr. LaFace to Mr. Loumiet, and that such fax cover sheet contains a handwritten note stating "[t]he Department has largely re-written our Proposed Agreement." Hunton refers to the November 18-19, 1998 email chain and the December 11, 1998 fax cover sheet for what they state, and denies all allegations in paragraph 178 that are inconsistent with their contents.

Hunton admits that a Memorandum of Agreement exists that purports to be between Stanford Trust Company, Ltd. and the Florida Department of Banking and Finance, and that

contains what purports to be the signature, dated December 14, 1998, of Arthur M. Simon, Director, Division of Banking, on behalf of State of Florida Department of Banking and Finance, as well as what purports to be the signature of Yolanda Suarez, dated December 10, 1998, on behalf of Stanford Trust Company Limited. Hunton refers to that Memorandum of Agreement for what it states, and denies all allegations in paragraph 178 that are inconsistent with its contents.

Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 178 and therefore denies the allegations.

179.    Hunton admits that a Memorandum of Agreement exists that purports to be between Stanford Trust Company, Ltd. of Antigua and the Florida Department of Banking and Finance, and that contains what purports to be the signature, dated December 14, 1998, of Arthur M. Simon, Director, Division of Banking, on behalf of State of Florida Department of Banking and Finance, as well as what purports to be the signature of Yolanda Suarez, dated December 10, 1998, on behalf of Stanford Trust Company Limited. Hunton admits that such Memorandum of Agreement states in part:

> Stanford Trust agrees to apply to the State of Florida Department of State, Division of Corporations, to register to do business in the State of Florida as "Stanford Trust Company Limited, Inc. d/b/a Stanford Fiduciary Investor Services." Stanford Trust agrees to transact any and all business from its trust representative office in the State of Florida under the fictitious name "Stanford Fiduciary Investor Services" and under no other name, except to advise customers that any trust representative office established in Florida is only a trust representative office of Stanford Trust.

and

> Stanford Trust agrees that the Department shall have the right to reasonably examine any trust representative office established by Stanford Trust within the State of Florida to assure that no business prohibited by this Memorandum of

Agreement is conducted in such office. Stanford Trust agrees that no trust administration or any other discretionary investment activity related to any trust account will be permitted or suffered to be conducted at any such office located in the State of Florida as set forth in Paragraph 5 of this Agreement.

Hunton admits that such Memorandum of Agreement also states (emphasis added):

***The parties agree that the following enumerated activities will be deemed as permissible business activities*** to be conducted by the officers and employees at any trust representative office located in Florida:

a. distributing and communicating information as to various investment products available through trusts established with Stanford Trust and its affiliates;

b. Forwarding trust agreements and other documents executed in Florida by clients to Stanford Trust offices located outside the State of Florida, and vice versa;

c. As a convenience for customers only, forwarding money or securities to Stanford Trust Offices located outside of the State of Florida and receiving money or securities for customers from Stanford Trust offices located outside the State of Florida;

d. Facilitating communications between customers and companies where investments held in trust are located;

e. Obtaining rate quotes and other information and communicating such information at the request of existing and potential customers;

f. Responding to customer inquiries by communicating with persons or entities involved in trust accounts established at offices of Stanford Trust located outside of the State of Florida.

g. Acting as liaison between existing and potential customers and offices of Stanford Trust located outside of the State of Florida.

h. Providing information to customers concerning existing trust accounts established at offices of Stanford Trust located outside of the State of Florida.

i. Soliciting new fiduciary accounts on behalf of Stanford Trusts and affiliates, including providing brochures and other written information, and conducting meetings with prospective customers.

j. Reviewing past investment decisions and investment performance with customers.

Hunton refers to that Memorandum of Agreement for what it states, and denies all allegations in paragraph 179 that are inconsistent with its contents.  Hunton specifically denies the allegations in paragraph 179 to the extent that they allege that such Memorandum of Agreement specifically referenced Stanford International Bank or the CDs it issued.

180.     Hunton denies the allegations in the last sentence of paragraph 180.  Hunton admits that a May 17, 2010 post on The Miami Mirror Blog authored by self-described "independent journalist" David Arthur Walters contains a quotation purportedly from a December 7, 1998 email from Mr. Donelan to fellow regulator David Burgess, stating "I do not consider myself an expert on either the number of or the business of trust rep offices… As for talking with [the Greenberg attorney], you are under no obligation to chat with him.  [The Greenberg attorney] was asking me about what trust rep offices are all about.  He might as well have asked me about reconnaissance satellites…."   Hunton refers to that post for what it states, and denies all allegations in paragraph 180 that are inconsistent with its contents.  Further answering, Hunton states that the same Miami Mirror Blog post dated May 17, 2010 purports to quote Arthur Simon, who signed the 1998 Memorandum of Agreement more specifically described in Hunton's answer to paragraph 179, as stating:

> There is no documentary evidence whatsoever . . . to substantiate repeated assertions in The Miami Herald that I approved Stanford's trust representative office over the objections of the Department's chief banking counsel.... Needless to say, it is somewhat disquieting that the Department attorney who negotiated the Stanford MOA (Memorandum of Agreement) with opposing counsel, and who approved the agreement for form and legal sufficiency just prior to its submission to me, as Banking Division Director, for signing, now opines, over a decade later, that Stanford's trust representative office in Miami was illegal and/or that I never should have signed the MOA. . . .  If there was a sound legal reason why the MOA should NOT be signed, the bases for any such objections should have been set forth in writing and submitted to me by Mr. Donelan in a timely manner. But Mr. Donelan NEVER submitted any such documents. Therefore I signed the

MOA in my capacity as Director of the Division of Banking, in accordance with standard DBF operating policy.

Hunton further states that a subsequent post, dated May 22, 2010, on The Miami Mirror Blog, also authored by David Arthur Walters purports to quote Mr. Simon in part as follows (emphasis added):

> And the Office of Financial Regulation told you just a few days ago that there is no record of any memorandum written by attorney Donelan objecting to the Stanford trust representative office or the Stanford Memorandum of Agreement. Indeed, the OFR now acknowledges, after a diligent search of Department records, that no such memo was ever issued. Also, it is noteworthy that the respective House and Senate bill analyses for the new law the Florida Legislature enacted this year in response to the massive Stanford financial fraud both indicate clearly and unequivocally that the Department of Banking and Finance did not have any regulatory authority over international trust company representative offices. ***As such, Stanford Trust Company could lawfully open a representative office in this state without any prior approval or regulatory oversight from the Division of Banking and Finance.*** Obviously, then, the office was not illegal; and neither was the Memorandum of Agreement.

Hunton refers to that post for what it states, and denies all allegations in paragraph 180 that are inconsistent with its contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 180 and therefore denies the allegations.

181.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegation in paragraph 181 that "SFIS would ultimately collide with the Federal Reserve in 2007 after having funneled hundreds of millions of dollars to SIBL."  Hunton denies the remaining allegations in paragraph 181.  Hunton specifically denies that the allegation in paragraph 181 that the Memorandum of Agreement, which is described more specifically in Hunton's answer to paragraph 179 above, "purported to allow SFIS to accept deposits of money in Miami for subsequent transfer to SIBL to purchase the SIBL CDs," given that the Memorandum of Agreement nowhere mentions Stanford International Bank, Ltd.

or the CDs it issued.  To the contrary, the Memorandum of Agreement states that the trust representative office may, "[a]s a convenience for customers only, forward[] money or securities to Stanford Trust Offices located outside of the State of Florida and receiv[e] money or securities for customers from Stanford Trust offices located outside of the State of Florida."  Hunton refers to that Memorandum of Agreement for what it states, and denies all allegations in paragraph 181 that are inconsistent with its contents.

182.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 182 and therefore denies the allegations.

183.    Hunton admits that the October 3, 2009 edition of the Miami Herald included an article purportedly authored by Michael Sallah and Rob Barry titled "Allen Stanford Ponzi case puts lawyers in spotlight."  Hunton admits that such article states, without citing any specific support, "Stanford created a money pipeline between Miami and Antigua in 1998 that became a cornerstone of the banking empire" and "[o]ver the next decade, the Miami center sold millions in Stanford's key investments – certificates of deposit – the checks stuffed in pouches and sent in jets to Antigua."  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of such statements in The Miami Herald and therefore denies them.  Hunton denies the allegation in paragraph 183 that the October 3, 2009 article states "upwards of $1 billion in SIBL CDs" had been sold by SFIS in Miami, and avers that the October 3, 2009 article states instead that "[m]ore than $800 million was generated in Miami through 2007 – with estimates reaching $1 billion by the time the operation was shut down by federal agents in February [2009]."

Hunton admits that the July 5, 2009 edition of the Miami Herald included an article purportedly authored by Lucy Komisar, Michael Sallah, and Rob Barry titled "Florida aided Allen Stanford, suspect in huge swindle."  Hunton admits that that article states in part, "The state's decision allowed Stanford to expand his banking network by offering his prize investments – certificates of deposit – without reporting the purchases, according to state and court records" and "[i]n fact, employees shredded records of the trust agreements and CD purchases once the original documents were sent to Antigua, state records show."  Hunton further admits that the July 5, 2009 article purports to quote "Charles Hazlett, a stockbroker who worked for another Stanford firm – a brokerage – on the same floor," as saying, "'The trust office was one of the busiest in the Stanford operation . . . . Compared to us, they were a big office, 30 to 40 people, everyone selling CDs.'"  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of such statements in The Miami Herald and therefore denies them.

Hunton specifically denies that the either the July 5, 2009 or October 3, 2009 article state that SFIS was used to "market and sell SIBL CDs exclusively to Latin American investors," or that "Stanford's private jets" were used to move money, as alleged in paragraph 183.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in the paragraph 183 and therefore denies the allegations.

> Answer to Footnotes 22-26, appended to Paragraph 183:   Hunton incorporates by reference as if fully set forth herein its answer to paragraph 183.

184.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 184 and therefore denies the allegations.

185.    Hunton admits that the July 5, 2009 edition of the Miami Herald included an article purportedly authored by Lucy Komisar, Michael Sallah, and Rob Barry titled "Florida aided Allen Stanford, suspect in huge swindle."   Hunton admits that such article purports to quote from "Miami attorney Bowman Brown, who said he declined to represent Stanford" at an unspecified time, and that such article states in part, "'He wanted to set up an office in Miami to serve a business operation in the Caribbean,' said Brown. 'The idea was to attract a Latin American clientele as a platform to sell securities.'  But Brown said Stanford 'was not interested in undergoing any substantive banking regulations or submitting to government examiners.'  At the time, the Caribbean basin had a 'bad reputation as a pirate banking jurisdiction, and I just wasn't interested in taking part in this,' Brown said."   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the statements in the article, and therefore denies them.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 185.  Hunton specifically denies that it knew or assisted in any illegal or wrongful conduct committed by Allen Stanford or any Stanford entity.

> Answer to Footnote 27, appended to Paragraph 185:    Hunton incorporates by reference as if fully set forth herein its answer to paragraph 185.

186.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 186 and therefore denies the allegations.

187.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 187 and therefore denies the allegations.  Hunton admits that a letter exists dated April 13, 1998 that purports to be from Sidney Seymour, Chief Examiner of Financial Institutions, Office of Financial Institutions, State

of Louisiana, and that such letter bears the subject line, "Notice of Acquisition of Control of The Southern Trust Company, Ruston, Louisiana, by the Stanford Group Company."  Hunton admits that the letter states it is requesting certain information in connection with Stanford Group Company's "application to acquire The Southern Trust Company, Ruston, Louisiana," and that information requested included (1) information about Stanford Group Company, which under the proposed structure "will become a holding company as defined [by statute] by virtue of its ownership of the proposed state-chartered trust bank," and (2) information about "the extent of Stanford's involvement, either directly or indirectly through an affiliate or principal shareholder, with Guardian International Bank, Ltd. (Guardian), Montserrat, British West Indies," including information about OCC Banking Circular BC-171 dated January 5, 1989 and "a copy of any enforcement, termination, or other similar action initiated by any state, federal, or foreign licensing or chartering agency against Guardian or any of its affiliates."  Hunton denies the allegation in paragraph 187 that OCC Banking Circular BC-171 was "regarding unauthorized banking activities in the United States."  Hunton refers to that circular and the April 13, 1998 letter for what they state, and denies all allegations in paragraph 187 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 187.

188.    Hunton admits that a fax cover sheet exists dated May 15, 1998 that purports to be from Carlos Loumiet to Yolanda Suarez, and that such fax cover sheet purported to attach a draft, unsigned letter, bearing the notation "GT DRAFT 5/15/98" at the top, that purports to be from Carlos Loumiet to Sidney Seymour, Chief Examiner of Financial Institutions, State of Louisiana Office of Financial Institutions.  Further answering, Hunton states that the fax cover sheet contains a note that purports to be from Carlos Loumiet to Yolanda Suarez, and that such note

states, "Here is a first draft of the letter. Please review the letter with Allen, fill in blanks, make corrections and suggestions. I will be doing likewise.  Wasn't there a small problem in Florida as well in the mid-1980s?"  Hunton admits that the draft, unsigned letter, bearing the notation "GT DRAFT 5/15/98" at the top, states in part that "other offshore banks using that extremely common name (such as Guardian Reserve Bank of Montserrat and Guardian Bank of Cayman) – all of them unrelated to Mr. Stanford's Guardian International Bank, Ltd. – were the subject of different scandals and, on occasion, circulars issued by the OCC and other U.S. authorities" but, further answering, states that the draft letter begins with a statement acknowledging that Banking Circular 171 concerned Guardian International Bank, Ltd.: "This letter responds to the last paragraph of your letter with reference to the Stanford Group Company's involvement with Guardian International Bank, Ltd., Montserrat, British West Indies, which was the subject of OCC Banking Circular Banco Continental-171 dated January *5, 1989*."

Hunton also states that the draft letter provides explanation and description relating to Guardian International Bank, Ltd. in connection with the allegations in OCC Banking Circular 171.  Hunton admits that the draft letter asserts that Guardian International Bank, Ltd.'s representative office in Houston was closed in 1988, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegation in paragraph 188 that Stanford "never" closed that office.

Hunton admits that the draft letter states that "[t]he OCC never responded in writing" to a letter from Carlos Loumiet in 1990, that a letter exists dated November 13, 1990 that purports to be from Robert Serino, Deputy Chief Counsel (Policy) at the OCC to Carlos Loumiet, and that such letter states in part "At this time, I am not at liberty to confirm or deny the existence of any criminal investigation into the activities of Guardian or its owners," but Hunton avers that that 1990 letter is dated more than eight years before the draft letter to Sidney Seymour dated May

15, 1998.  Further answering, Hunton states that the draft May 15, 1998 letter states "DRAFT" on the face of the document, contains more than twenty blank spaces in need of additional information, was written approximately eight years after Greenberg purportedly received Serino's 1990 letter, and appears to have been attached to a fax cover sheet in which Mr. Loumiet expressly noted the need for corrections.  Hunton lacks knowledge or information sufficient to form a belief as to whether the draft May 15, 1998 letter was ever finalized and sent to Mr. Seymour.

Hunton refers to the May 15, 1998 draft letter for what it states, and denies all allegations in paragraph 188 inconsistent with its contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 188 and therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 188.

189.    Hunton admits that a memorandum exists dated December 2, 1997 that purports to be from two Greenberg attorneys (not Carlos Loumiet) to an attorney who, upon information and belief, was not a Greenberg attorney but was representing Allen Stanford and Susan Stanford in connection with an appeal to the Fifth Circuit from an adverse decision of the U.S. Tax Court captioned *Stanford v. Commissioner of Revenue* related to the couple's joint income tax returns for the 1989 and 1990 tax years.  Hunton admits that such memorandum purports to comment on a draft of a brief to be filed in that matter in the Fifth Circuit.  Hunton refers to the memorandum dated December 2, 1997 for what it states, and denies all allegations in paragraph 189 inconsistent with its contents.  Further answering, Hunton states that the publicly available opening brief on behalf of the Stanfords in the Fifth Circuit appeal, dated December 4, 1997, identifies other lawyers and not Greenberg lawyers as its author.  Hunton also admits that a

memorandum dated February 20, 1998 exists that purports to be from the same two Greenberg attorneys (not Carlos Loumiet) to the same attorney who, upon information and belief, was not a Greenberg attorney, and that such memorandum purports to attach handwritten comments on a draft reply brief on which no Greenberg lawyers are identified on the cover or in the signature block.  Hunton refers to the memorandum dated February 20, 1998 for what it states, and denies all allegations in paragraph 189 inconsistent with its contents.

Hunton denies the allegations in the first and last sentences of paragraph 189 to the extent they suggest that the Stanfords' argument at the Tax Court and the Fifth Circuit, as reflected in their briefs, was that Stanford Financial Group and Guardian International Investment Services were engaged in banking activities.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 189 and therefore denies the allegations.

190.   Hunton admits that a memorandum exists dated December 2, 1997 that purports to be from two Greenberg attorneys (not Carlos Loumiet) to an attorney who, upon information and belief, was not a Greenberg attorney but was representing Allen Stanford and Susan Stanford in connection with an appeal to the Fifth Circuit from an adverse decision of the U.S. Tax Court captioned *Stanford v. Commissioner of Revenue* related to the couple's joint income tax returns for the 1989 and 1990 tax years.  Hunton admits that such memorandum purports to comment on a draft of a brief to be filed in that matter in the Fifth Circuit.   Hunton admits that the memorandum states in part:

> we should make the point clear that but for Montserrat local law considerations, the income and deductions, which gave rise to the E&P deficits, would have been incurred within the same corporate entity.  This structure would not present the tax issue.  We then would assert that it is only due to local law that the artificial, three corporation structure was required.

Hunton refers to that memorandum for what it states, and denies all allegations in paragraph 190 that are inconsistent with its contents.  In particular, Hunton denies the allegations in the second and third sentences of paragraph 190 as inconsistent with the December 2, 1997 memorandum.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 190.

191.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 191 and therefore denies the allegations.

192.    Hunton admits that a fax cover sheet exists dated June 5, 1998 that purports to be from Yolanda Suarez to Carlos Loumiet, and that such fax cover sheet purports to have attached a letter dated May 27, 1998, from Hugh M. Wright, Assistant Administrator (Enforcement) of the SEC, and Karen E. Whitaker, Enforcement Attorney at the SEC, to Ellen McCorkle, Stanford Group Company.  Hunton further admits that the May 27, 1998 states in part (emphasis added):

> Information available to this office indicates that violations certain provisions of the federal securities laws may have occurred in connection with certain activities and/or transactions effected by Stanford Group Company ("Stanford Group") and certain Individuals associated therewith.  In order to properly discharge our responsibilities under the federal securities laws, this office is conducting an inquiry and is ***requesting your company's voluntary assistance*** in this matter.  Accordingly, we request that you provide the following information for the time period beginning September 1, 1995, through the date of this letter ("relevant time period[)]".

Hunton admits that the May 27, 1998 requests certain specified information concerning referrals between Stanford Group Company and Stanford International Bank, Ltd.  Hunton refers to the June 5, 1998 fax and the May 27, 1998 letter for what they state, and denies all allegations in paragraph 192 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 192.

193.    Hunton admits that a document exists that purports to be an invoice from Greenberg to Stanford Group Company dated August 21, 1998, and that such invoice purports to show narrative time entries from Carlos Loumiet for teleconferences with Allen Stanford and with Yolanda Suarez on June 17 and 18, 1998, though the entries do not reference the subject of the teleconferences.  Hunton further admits that such invoice purports to show a time entry from Carlos Loumiet on June 19, 1998, for 0.6 hours, for "telephone conference with Allen, Wayne, Jack, Lena," though the entry does not reference the subject of the teleconference.  Hunton refers to that invoice for what it states, and denies all allegations in paragraph 193 that are inconsistent with its content.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 193 and therefore denies the allegations.

194.    Hunton admits that a fax exists dated June 17, 1998 that purports to be from Carlos Loumiet to Wayne Secore, and that purports to have enclosed a memorandum dated the same date from Carlos Loumiet to Wayne Secore, with the subject line, "Letter to SEC."  Hunton admits that the memorandum states in part (emphasis added):

1.   I think we should avoid a defensive tone.  Instead, we should assert that we are *as or more anxious as the SEC to find out if any inappropriate sales practices have occurred at the BD, and if so, to rectify them immediately* and make any necessary amends to customers." . . .

3.   Point out that 98% (or whatever may be the appropriate percentage) of the two banks' customers are foreign, <u>not</u> U.S. citizens or residents.   Of the approximately 2,400 customers at SIB, some 2,100 predate the opening of the BD – only some 300 have been added as clients since the BD began operating.  Many of the others have been clients of SIB for many years.  (Do we keep stats on this?)  Although we intend to sell the SIB products in the U.S. in the near future, *to an appropriate clientele and with pertinent disclosures*, which we will be happy to discuss with the SEC, we have deliberately and voluntarily refrained from doing so to date. . . .

5.  SIB is audited annually by external auditors in accordance with GAAP.  (Attach past audited financial statements).  It is also examined annually by the Ministry of Finance in Antigua and by the Eastern Caribbean Central Bank.

6.  Because of our insistence that nothing inappropriate occur at the BD, *we wish to cooperate as fully as possible with the SEC's request*, assuming that the SEC itself will be sensitive to the legitimate privacy and confidentiality concerns for our offshore customers. . . .

Please doublecheck the figures and statistics above.

Hunton refers to the June 17, 1998 fax and memorandum for what they state, and denies all allegations in paragraph 194 that are inconsistent with their contents.   In particular, Hunton denies that the June 17, 1998 memorandum states that "SIBL was audited by CAS Hewlett," as alleged in paragraph 194.  Hunton denies the allegation appearing in parentheses in last sentence in paragraph 194 and the allegation that alleged knowledge in 2005 can be used to show alleged knowledge in 1998.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 194.

195.    Hunton admits that a fax exists dated June 17, 1998 that purports to be from Carlos Loumiet to Wayne Secore, and that purports to have enclosed a memorandum dated the same date from Carlos Loumiet to Wayne Secore, with the subject line, "Letter to SEC."  Hunton admits that the memorandum states in part (emphasis added):

Because of our insistence that nothing inappropriate occur at the BD, we wish to *cooperate as fully as possible with the SEC's request*, assuming that the SEC itself will be sensitive to the legitimate privacy and confidentiality concerns for our offshore customers. We will put our brokers at the SEC's disposal so that the SEC can inquire as to their sales practices, and will also explain our training processes for our brokers. However, we do not concede that the CDs sold by SIB are "securities" for U.S. law purposes. In this respect, we note that the standards cited by the Fifth Circuit Court of Appeals in its holding in <u>Wolf</u> (later approved by the Ninth Circuit Court of Appeals in <u>Wert</u>) for concluding that Mexican bank CDs are not "securities" for U.S. law purposes apply equally well to Bank of Antigua and SIB in Antigua. (If they try to argue this point in person with you at the future meeting, claiming that you can't compare Mexican bank regulation with that in Antigua, simply point out that Mexico has the dubious distinction of

being the only country in the world with two widespread, national bank collapses (1982 and 1995) in the past 15 years, as well as being a hotbed of drug money-laundering (witness the Salinas case and the recent arrest of dozens of Mexican bankers in Operation Casablanca.))

For your information, see page 3 of a letter of ours to another client on the issue of foreign bank CDs and "securities".

Hunton admits the June 17, 1998 memorandum purports to enclose page 3 from a letter, not involving Stanford International Bank Ltd. CDs, dated October 17, 1996.  Hunton refers to the June 17, 1998 fax and the June 17, 1998 memorandum and its attached one-page excerpt of an October 17, 1996 letter for what they state, and denies all allegations in paragraph 195 that are inconsistent with their contents.

Hunton admits that a fax cover sheet exists dated June 15, 1998 that purports to be from Carlos Loumiet to Yolanda Suarez and that such fax cover sheet purports to enclose a letter dated October 17, 1996, with client names redacted, addressing "the possible sale in the U.S. through N.A. of CD's issued by N.A.'s affiliate, [REDACTED] in Brazil ('Banco').  Because the CD's would be denominated in United States dollars, and deposits in Brazil, with few exceptions, must be denominated in reais, the CD's would largely be issued through the Nassau, Bahamas branch of Banco."  Hunton admits that the 1996 letter states in part, "[a]s in many issues you and I have discussed over the years concerning the sale of CD's generally, the law is somewhat 'gray' in this area," but Hunton denies that the allegations in paragraph 195 accurately reflect the context of that language or the content of the October 17, 1996 letter.  Hunton refers to the June 15, 1998 fax and October 17, 1996 letter for what they state, and denies all allegations in paragraph 195 that are inconsistent with their contents.  In particular, Hunton denies that the October 17, 1996 letter contains a conclusion, as alleged in paragraph 195, that "it was very likely that CDs issued from the Bahamas would be deemed to be securities and subject to SEC regulation."  Further answering, Hunton states that the October 17, 1996 letter states in part:

> As noted, to date all of the reported cases in this area have involved Mexico. However, there is no logical reason why the same conclusion would not apply to other countries which have adequate bank regulatory systems. For example, most knowledgeable people would suggest that if Mexico qualifies, so should Great Britain, France, Germany and Canada. Similarly, based on our limited knowledge of Brazil and its banking system, we see no reason why Brazil should not qualify if Mexico does.

> Based on these facts and authorities, we believe that the better view is that, absent unusual circumstances surrounding their sale, CD's issued by Banco in Brazil would not constitute "securities" under our federal securities laws. Although, as noted, there is some authority that states securities laws will not necessarily follow the federal holdings in this area, we believe that most state courts would follow the prevailing federal law precedents in this regard as well.

> Quite frankly, based on our past experience dealing with the Bahamas, we do not have the same comfort level that the Bahamian bank regulatory system would be viewed as favorably as the Brazilian one.  Therefore, the question arises whether CD's issued by Banco's Bahamas branch would more likely be deemed "securities" for federal and state securities law purposes, than CD's issued by Banco from Brazil. [footnotes omitted]

Hunton admits that, in a footnote to the first sentence in the third paragraph quoted above, the October 17, 1996 letter states in part, "The penchant in the Caribbean for such entities is too well-known for one to expect anything but an uphill fight if one seeks to convince courts and regulators in this country that the level of bank regulation and supervision in that region are adequate to extend" reasoning in case law holding that CDs were not securities for U.S. law. Ultimately, the October 17, 1996 letter states,

> Finally, based on our ongoing dealings with the OCC (N.A.'s primary regulator), the Federal Reserve Board, the FDIC and the SEC on behalf of a variety of clients, we feel comfortable that it is highly unlikely that any of these regulators would view the sale of Banco CD's as "securities" absent the presence of unusual circumstances, such as those in <u>Gary Plastics</u>. More likely, any difficulty Banco would encounter would be due to one or more unhappy purchasers.

Further, the October 17, 1996 letter advises on steps that could be taken to reduce the risk that Banco's CDs would be considered securities for purposes of U.S. law.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 195.

196.    Hunton admits that a letter exists dated July 22, 1998 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Wayne Secore with the subject line, "Re: Irma O'Bourke," and that such letter purports to enclose six categories of documents, including two Stanford interoffice memos, but not external "SIBL marketing materials" as alleged in paragraph 196.  Hunton admits that one purported enclosure to the July 22, 1998 letter is titled "Standard Operating Procedure No. 2000, Exhibit B1," and that such document states, in part (emphasis added):

> Stanford International Bank Ltd. manages its investment portfolio to ensure safety of capital and short-term liquidity.  The portfolio is concentrated in high quality bonds, securities, commercial paper, eurodollars, foreign currency deposits and United States treasury bills and notes.  The Bank diversifies its risk geographically to reduce its exposure in any one market.

> *          *          *

> Stanford International Bank Ltd. safeguards its clients' money with traditional protection plus innovative means not found in all international banks.  First, the Bank selects affiliates carefully, placing deposits only with such banks that have met Stanford's rigorous credit criteria.  Further, Stanford International Bank Ltd. maintains a depository insolvency bond, ***insuring these deposits against other banks' insolvency.***  In addition, Stanford International Bank Ltd. holds a Bankers Blanket Bond.

Hunton also admits that another purported enclosure to the July 22, 1998 letter is a Spanish-language document titled, "Standard Operating Procedure No. 2000, Exhibit B2," and that an English translation of such document states in part (bold, italicized emphasis added):

> The Bank's funds are invested in short-term monetary instruments in dollars and in other strong currencies, as well as in a portfolio mainly made up of bonds and fixed-yield bonds. Its highly conservative operating philosophy is to provide the greatest security, liquidity, and profitability to its investments.

> *          *          *

> **Stanford International Bank Ltd.** protects its clients' money by being very cautious in its operations. It carefully selects the correspondent banks through which it makes its investments and maintains an <u>insurance policy</u> ***that protects it***

125

***from these banks' possible insolvency.*** The Bank also has a <u>fidelity policy</u> ("Bankers Blanket Bond") with Lloyd's of London.

Hunton admits that another purported enclosure to the July 22, 1998 letter is a Spanish-language document titled, "Standard Operating Procedure No. 2000, Exhibit C," which may include an attachment titled "Stanford International Bank Ltd. Presentation," and that an English translation of such documents states in part (bold, italicized emphasis added):

> **Stanford International Bank Ltd.**, as an investment bank, does not grant loans (unless they are guaranteed by fixed term deposits) nor does it issue credit instruments of any type. Commercial banks invest their funds in loans and credit operations that entail risk and sometimes they are not able to recover the investment, resulting in significant losses. Consequently, **Stanford International Bank Ltd.** does not run this type of risk and thereby avoids the main cause of insolvency of commercial banks.

*      *      *

> Likewise, to provide greater security to its clients, **Stanford International Bank Ltd.** is beneficiary to an insurance policy that guarantees the funds the Bank has in its correspondent banks (Depository Insolvency Policy and Excess FDIC Deposit Policy). Each of these banks has been previously approved by the insurance company, ***which means that in the remote case of insolvency of these banks that are the depositories of the funds and investments, Stanford International Bank Ltd. would receive reimbursement of its deposits from the insurance company,*** protecting **Stanford International Bank Ltd.**'s clients at the same time.

> In addition, **Stanford International Bank Ltd.**, has a fidelity bond (Bankers Blanket Bond) underwritten by Lloyd's of London that covers the financial transactions of the Bank in the event of loss caused by fraud or theft. This policy is very difficult to acquire and very few international banks manage to comply with the financial stability requirements to obtain it.

*      *      *

> Stanford International Bank Ltd. offers even more guarantees as it has obtained through its insurance broker an insurance policy that guarantees the return of its deposits, in any currency and for any amount, that Stanford International Bank Ltd. has in its correspondent banks. Stanford International Bank Ltd.'s correspondent banks are all renowned institutions that have been previously approved by the insurance company.

> That is to say, if one day, for example, Stanford International Bank Ltd. has $10 million of its Clients money in its Barclay's Bank account ***and Barclay's goes***

126

> **bankrupt (which is highly unlikely), the insurance would reimburse Stanford International Bank Ltd. the $10 million.** Naturally the bonds and securities in the portfolio would not experience any problems related to the bankruptcy of the bank in which they are held.

Hunton admits that the materials purportedly enclosed with the July 22, 1998 letter do not state, as alleged in paragraph 196, "that SIBL was lending money to Allen Stanford and to the Antiguan Government, or that SIBL was investing in Caribbean real estate or making venture capital investments in private equity companies." Hunton refers to the July 22, 1998 letter and its purported enclosures for what they state, and denies all allegations in paragraph 196 that are inconsistent with their contents. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 196 that the July 22, 1998 letter and its purported enclosures were "part of preparing the response to the SEC." Hunton denies the remaining allegations in paragraph 196.

197.   Hunton admits that a letter exists dated July 22, 1998 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Wayne Secore with the subject line, "Re: Irma O'Bourke," and that such letter purports to enclose six categories of documents, including two internal Stanford memos, neither of which states it is from Yolanda Suarez to all Stanford financial advisers. Hunton admits that the July 22, 1998 letter purports to enclose a memorandum dated May 17, 1996 that purports to be from Oreste Tonarelli to "All IO's & Assist.," and that such memorandum states:

> Upon request from the Houston Office, we have reviewed and updated the information related to the safety and the insurance coverage offered by SIB.

> During the course of your presentations to prospects, and clients, discussing these sensitive issues, you are advised to strictly adhere to the concepts and notions indicated by the attached memo titled "SEGURIDAD."

> This will aid us in achieving a clear and consistent presentation in our marketing efforts.

Hunton refers to and incorporates by reference as if full set forth herein its answer to paragraph 196.  Hunton refers to the July 22, 1998 letter and its purported enclosures for what they state, and denies all allegations in paragraph 197 that are inconsistent with their contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 197 that the July 22, 1998 letter and its purported enclosures were "part of preparing the response to the SEC."  Hunton denies the remaining allegations in paragraph 197.

198.    Hunton admits that a letter exists dated July 22, 1998 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Wayne Secore with the subject line, "Re: Irma O'Bourke," and that such letter purports to enclose six categories of documents.  Hunton admits that a purported enclosure to the July 22, 1998 letter is a Spanish-language document titled, "Standard Operating Procedure No. 2000, Exhibit C," which may include an attachment titled "Stanford International Bank Ltd. Presentation," and that an English translation of such document states in part:

> Investing in an investment bank like Stanford International Bank is safer than a commercial bank due to the fact that the Bank does not have loan risks and its debtors are the large international banks, multinational companies or governments that issue the bonds or depository banks of the funds.

> Stanford International Bank Ltd. offers even more guarantees as it has obtained through its insurance broker an insurance policy that guarantees the return of its deposits, in any currency and for any amount, that Stanford International Bank Ltd. has in its correspondent banks. Stanford International Bank Ltd.'s correspondent banks are all renowned institutions that have been previously approved by the insurance company.

> That is to say, if one day, for example, Stanford International Bank Ltd. has $10 million of its Clients money in its Barclay's Bank account and Barclay's goes bankrupt (which is highly unlikely), the insurance would reimburse Stanford International Bank Ltd. the $10 million. Naturally the bonds and securities in the portfolio would not experience any problems related to the bankruptcy of the bank in which they are held.

> This policy compensates for and improves on the guarantee that American banks have with the FDIC, which only guarantees up to $100,000.00 per Client (and does not apply to Stanford International Bank Ltd. since it is a foreign bank).

Hunton refers to the July 22, 1998 letter and its purported enclosures for what they state, and denies all allegations in paragraph 198 that are inconsistent with their contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 198.

199.   Hunton admits that a letter exists dated June 12, 1998 that purports to be from Frederick G. Ferrera to Mark Schnapp and that such letter states in part:

> On a different but related matter, over the past several weeks I have had the opportunity to speak to the outside counsel (Deon Warner, Esq.) who handles general securities matters for the brokerage firm. Mr. Warner is presently working on a regulatory matter for us-one in which it is critical that the "separateness" of the brokerage firm (SGC) and the bank (SIB) be maintained, both in appearance as well as reality. As you know, the last couple of subpoenas from the DEA (the 4/24/98 subpoena from DEA Miami and I believe the one from DEA San Antonio as well) were erroneously addressed to "Stanford Group Company, ATTN: Yolanda Suarez." While Yolanda is the Senior Legal Officer for Stanford Financial Group, she, as you are aware, is not an employee of the brokerage firm (SGC). Accordingly, after some discussion, we believe it is imperative that you explicitly advise DEA Miami and San Antonio in writing that any future subpoenas, correspondence, etc. concerning SGC should not be addressed to Yolanda, but rather need to be addressed to my attention, to the attention of one of SGC's other officers, or to you as SGC's counsel, as the particular instance may require.

Hunton refers to the June 12, 1998 letter for what it states, and denies all allegations in paragraph 199 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 199.

200.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 200.   Hunton admits that a letter exists dated March 20, 1998 that purports to be from Jennifer Altman of Zack, Sparber, Kosnitzky, Spratt & Brooks to R. Allen Stanford, and that the letter states in part, "Ms. O'Bourke

believes that she was wrongfully terminated in violation of the Whistle Blower's Statute and, potentially in violation of state and federal laws against age discrimination. . . .   [T]he purpose of this letter is to resolve this matter amicably, if at all possible."  Hunton denies that the March 20, 1998 letter provides any detail about the basis for Ms. O'Bourke's alleged beliefs.  Hunton admits that a letter dated June 12, 1998 exists that purports to be from Jennifer Altman of Zack Kosnitzky to a Greenberg attorney (not Carlos Loumiet) and that such letter purports to set forth "a brief synopsis of the facts that support Ms. O'Bourke's whistle blower claim," but denies that paragraph 200 fully reflects the content of that letter.  Hunton refers to the March 20, 1998 and June 12, 1998 letters for what they state, and denies all allegations in paragraph 200 that are inconsistent with their contents.  Hunton denies the remaining allegations in paragraph 200.

201.    Hunton admits that a letter dated June 12, 1998 exists that purports to be from Jennifer Altman of Zack Kosnitzky to a Greenberg attorney (not Carlos Loumiet) and that such letter states in part that "Ms. O'Bourke was trained by Stanford and was told that all deposits were 100% insured.  According to Ms. O'Bourke, in 1997 she, for the first time, learned that the prior representations that all monies were insured was, in fact, false. Ms. O'Bourke expressed very grave concerns at the June meeting and thereafter to officers of the company."  Hunton denies that the June 12, 1998 letter states that Ms. O'Bourke "was terminated thereafter." Hunton refers to the June 12, 1998 letter for what it states, and denies all allegations in paragraph 201 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 201.

202.    Hunton admits that handwritten notes exist dated July 1, 1998 that bear the notation at the top, "TC w/ Yolanda Suarez," and that such notes contain the language appearing

within quotation marks in paragraph 202, although without the emphasis contained in paragraph 202.  Hunton refers to those handwritten notes for what they state, and denies all allegations in paragraph 202 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations of paragraph 202.

203.    Hunton admits that a Spanish letter dated August 21, 1998 exists that purports to be from Irma O'Bourke to unspecified persons and that such letter asserts that O'Bourke filed a lawsuit after being dismissed from employment "after I let them know that I had found out that deposits at the bank did not have insurance in case it went bankrupt.  The clients or depositors have no support of any kind as Oreste Tonarelli told many of you, and myself." Hunton admits that a fax cover sheet dated September 18, 1998 exists that purports to be from Yolanda Suarez to a Greenberg attorney (not Carlos Loumiet) and that purports to enclose a September 18, 1998 letter from Milton Antonio Salerno to Stanford International Bank, and that such letter states in part that O'Bourke had indicated in a letter "that the deposits of Stanford Bank are not insured, a fact that no one from the bank has ever told me."  Hunton refers to the August 21, 1998 letter and the September 18, 1998 fax cover sheet and its purported enclosure for what they state, and denies all allegations in paragraph 203 that are inconsistent with their contents.   Hunton specifically denies these letters themselves demonstrate that "Greenberg knew in 1998 that SIBL clients were being told by Stanford FAs that the SIBL CDs were insured," as alleged in paragraph 203.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 203.

204.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 204 and therefore denies the

allegations.  Hunton admits that a fax cover sheet exists dated September 13, 1998 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Yolanda Suarez, that such fax cover sheet purports to enclose a draft complaint by Stanford Group Company against Irma O'Bourke, and that such draft complaint purports to assert claims that included tortious interference and defamation.  Hunton refers to that fax cover sheet and its purported enclosure for what they state, and denies all allegations in paragraph 204 that are inconsistent with their contents.  Hunton denies the remaining allegations in paragraph 204.

205.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegation in paragraph 205 that "Loumiet then talked to the Greenberg litigation partner handling the case, and as a result of that conversation the litigation partner sent a letter to Yolanda Suarez."  Hunton admits that a letter exists dated September 20, 1998 that purports to be from a Greenberg attorney (not Carlos Loumiet) to Yolanda Suarez, and that such letter purports to describe aspects of the attorney's conversation with Mr. Loumiet concerning "strategic considerations on what counts we should pursue" involving Irma O'Bourke.  Hunton admits that the letter states in part:

> In light of that conversation, and given that we have no confidentiality agreement between O'Bourke and Stanford Group Company, I suggested a one count complaint for an injunction, without seeking damages at this time.  We cannot however be assured of any specific limitations on the scope of discovery even if we proceed with a one count complaint.
>
> You and discussed [*sic*] the possibility of sending O'Bourke the draft complaint with a warning that it will be filed if her improper conduct does not cease immediately. We must be willing to file, however, if she does not stop.  Also, if your business has been damaged (e.g. the letter you just sent me), do we need to proceed in any event in order to clear Stanford's name through the courts.
>
> . . . . Whatever decision the Company makes must be done with the knowledge that if O'Bourke wants to contest our action, there will be discovery regarding Stanford's referrals as well as discovery of the bank, even if no damages are sought.

Hunton refers to the September 20, 1998 letter for what it states, and denies all allegations in paragraph 205 that are inconsistent with its contents.  Hunton denies the remaining allegations in paragraph 205.

206.    Hunton admits that an email exists dated September 22, 1998 that purports to be from Yolanda Suarez to a Greenberg attorney and that such email states in relevant part:

I received your letter.  I have also discussed the matter with Carlos.  Right now I'm of the opinion that we should:

1.  Write Irma a nasty gram.  I asked Carlos to do this today in your absence.

2.  The cause of action against Irma should be brought by Stanford International Bank Limited, rather than SGC.

3.  The action should be limited to defamation and tortious interference.

4.  As we all agree that the employment counts are weak lets drop them altogether.

5.  I would prefer to keep the brokerage company out of any litigation and it appears to me that the Bank has a clearer case.

6.  Limit our remedies at this time to injunctive relief.

Please let me know your thoughts when you get back in to the office.

Hunton refers to the September 22, 1998 email for what it states, and denies all allegations in paragraph 206 that are inconsistent with its contents.

Hunton admits that a letter exists dated September 30, 1998 that purports to be from a Greenberg partner (not Carlos Loumiet) to Jennifer G. Altman, Esq. of Zack, Sparber, Kosnitzky, Truxton, Spratt & Brooks, that the letter states in part that "[w]e explained to you that those allegations [made by Ms. O'Bourke] were investigated and found to be wholly without merit," and that the letter states that legal proceedings would be commenced if Ms. O'Bourke did not "immediately cease contacting Stanford's referrals or anyone else with whom Stanford or the

Bank does business."   Hunton refers to the September 30, 1998 letter for what it states, and denies all allegations in paragraph 206 that are inconsistent with its contents.

Hunton admits that a letter exists dated October 1, 1998 that purports to be from Jennifer G. Altman, Esq. of Zack Kosnitzky, and that such letter states in part, "this firm no longer represents Ms. O'Bourke.  This notwithstanding, I will forward a copy of your letter to her by U.S. Mail."   Hunton refers to the October 1, 1998 letter for what it states, and denies all allegations in paragraph 206 that are inconsistent with its contents.

Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 206 and therefore denies the allegations.

207.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and second sentences in paragraph 207 and therefore denies the allegations.  Hunton admits that one page of handwritten notes exist that do not specify their author, that are dated June 24, 1998, and that state at the top, "BB tc with Errol Court."  Hunton admits that the notes state in part:

> Who's the lender?  Bank of Antigua or bank group.
>
> Violates banking laws → too big for asset base
>
> Bank of Antigua is just a participant.
>
> Maybe condition the commitment on getting enough participants.
>
> Or set up as "Agent" for co-lenders

Hunton admits that a memorandum dated July 9, 1998 exists that purports to be from Errol Cort to a Greenberg attorney (not Carlos Loumiet), and that such memorandum states in part:

> I express concern that Bank of Antigua Limited is the sole lender described in the
> said Agreement.  It would be contrary to the Banking Act of Antigua and Barbuda

for Bank of Antigua to lend or purport to lend US$31,000,000.00 to the Borrowers. In fact, there has been significant political discussion in Parliament and elsewhere in respect of this matter and the Government has publicly stated that the loan shall be provided by a consortium of banks including but not limited to Bank of Antigua. I am therefore of the view that the loan document ought to reflect that the loan funds shall be provided by a consortium of banks. It may also be necessary to draft the Agreement in terms of Bank of Antigua acting in a dual capacity namely, as being a part of the consortium of lenders and also as agent for the said consortium. It is not necessary in my view to list the financial institutions that will comprise the said consortium.

Hunton refers to the handwritten notes and the July 9, 1998 memorandum for what they state, and denies all allegations in paragraph 207 that are inconsistent with their contents. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 207 and therefore denies the allegations. Hunton denies the remaining allegations in paragraph 207.

208.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 208 and therefore denies the allegations.

209.    Hunton admits that a letter exists dated June 26, 1998 that purports to be from Yolanda Suarez to Carlos Loumiet, and that such letter states in part, "[a]s discussed, I would appreciate it if you would start a Blue Sky Review for the sale of CD's in the following jurisdictions: Florida; Texas; Colorado; Louisiana; and New York." Hunton refers to the June 26, 1998 letter for what it states, and denies all allegations in paragraph 209 that are inconsistent with its contents. Hunton otherwise lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 209 and therefore denies those allegations.

Hunton admits that a draft document exists titled "Stanford International Bank, Ltd. Disclosure Statement"; that such document, although undated, bears fax lines of July 9 and July

10, 1998 that appear to suggest the document came from "SFG Legal"; and that such document contains handwritten edits, some with comments requiring further information to be filled in. Hunton refers to this draft document for what it states, and denies all allegations in paragraph 209 that are inconsistent with its contents.  Hunton admits that a draft, unsigned letter dated July 16, 1998 that purports to be from a Greenberg lawyer (not Carlos Loumiet) to Yolanda Suarez, and that such draft letter states in part, "[a]ttached please find a redline version of the Disclosure Statement you forwarded to us for review and comments.  The redline version details additions, deletions and comments."  Hunton refers to this draft letter for what it states, and denies all allegations in paragraph 209 that are inconsistent with its contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in paragraph 209 regarding the specific version of a draft disclosure statement that was purportedly attached to this letter.

Hunton admits that the draft document titled "Stanford International Bank, Ltd. Disclosure Statement" bearing fax lines of July 9 and July 10, 1998 does not state, as alleged in paragraph 209, that "Stanford and SIBL had consistently been under U.S. Government investigation since the late 1980s"; that "Stanford had made loans to the Antiguan Government and to Antiguan Government officials"; or that "Stanford had written the laws and effectively taken control of the Antiguan offshore bank regulatory system that regulated SIBL."  Hunton admits that such draft disclosure document, under a section titled "Affiliate Transactions," states in part, as edited:

> At December 31, 1996, SIB had extended credit to R. Allen Stanford, an officer and director, in the aggregate amount of US$13,582,579.  At December 31, 1997 the balance outstanding was US$11,383,131.  The terms of the loans call for repayment in full in 24 months or less.  In the view of management, all credit transactions executed between SIB and related parties are extended on equitable terms and conditions as similar transactions with unaffiliated persons.

Further answering, Hunton states that handwritten edits to such draft disclosure statement include suggestions for the following additional disclosures:

> The CD deposits are not insured by the Federal Deposit Insurance Corporation or under any similar insurance program of the government of Antigua and Barbuda – BOLD

and

> No one who cannot bear the loss of their investment without its significantly affecting his or her lifestyle should invest in a CD deposit.

and

> No person or entity other than SIB is liable for the payment of any portion of the CD Deposits.

and

> Describe current regulation in A[ntigua] & B[arbuda].

Hunton also states that the draft disclosure statement includes handwritten edits that sought to add to the existing text the following underlined language:

> The insurance coverage held by SIB includes Property and Casualty, Exporter's Package, Vehicle, Workers' Compensation and Travel.  Fidelity coverages include Bankers' Blanket Bond and Directors' and Officers' Liability coverages. SIB also maintains Depository Insolvency and Excess FDIC Insurance.  The latter two insurances protect SIB against the possible insolvency of any financial institution where SIB may place its own funds.  These coverages were obtained by SIB after undergoing a risk analysis, mandated by the underwriter, to determine whether reasonable care is routinely exercised in the protection of SIB's assets.

Hunton denies the allegation in paragraph 209 that Carlos Loumiet "heavily edit[ed] and rewr[o]te" the disclosure statement "until the final product became, essentially, Loumiet's disclosures."  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 209 and therefore denies the allegations.  Hunton denies all remaining allegations in paragraph 209.

210.    Hunton admits that a draft memorandum exists dated July 15, 1998 that purports to be from a Greenberg attorney to Stanford Financial Group, Inc., titled "Blue Sky Research for Offshore Bank Certificate of Deposits for Stanford Financial Group Co."  Further answering, Hunton states that another version of the memorandum exists, dated July 21, 1998, and that such memorandum purports to be attached to a fax cover sheet dated July 24, 1998 that purports to be from a Greenberg attorney to Yolanda Suarez and states in part that the memorandum has a "revised Florida section."  Hunton refers to the draft July 15, 1998 memorandum, the July 21, 1998 memorandum, and the July 24, 1998 fax cover sheet for what they state, and denies all allegations in paragraph 210 that are inconsistent with their contents.

Hunton admits that the first two paragraphs of the July 21, 1998 version of the memorandum state:

> A certificate of deposit ("CD") is specifically defined as a security in Florida and Louisiana.  Due to the broad nature of the term "security" in Colorado, New York and Texas, it is safest to conclude that in those states a certificate of deposit can also qualify as a security, because it evidences indebtedness. None of the aforementioned states provides an exemption from registration for offshore bank CDs.

> Subject to the conditions identified in this Memorandum, Florida does not require a filing with its respective securities regulators. In Florida, the issuance of the CDs solely to "accredited investors" qualifies for a self-executing exemption. Colorado, Louisiana, New York and Texas do require a filing of a Form D, consent to service of process, and filing fee with their respective securities regulators, even if the CDs are sold solely to "accredited investors."

Hunton admits that the portions of the July 21, 1998 version of the memorandum addressing Texas law state in part:

> Texas requires that the purchaser provide a signed written agreement to the effect that the CDs will not be sold without registration under applicable securities laws or exemptions therefrom. In addition, a legend must be placed on the document evidencing the CDs stating to the effect that the CDs have not been registered under any securities laws setting forth or referring to the restrictions on the transferability and sale of the CDs.

\*     \*     \*

An offshore bank CD would qualify as a security as the term "security" is defined in § 4(A) Tx. Blue Sky. Laws. Ms. Patty Lautherback of the Texas State Securities Board confirmed that an offshore bank CD would qualify as a security because it serves as evidence of indebtedness.

Texas provides a limited offering exemption, under § 5(T) Tx. Blue Sky Laws and § 109.13(k) Tx. Blue Sky Regs, for offers and sales of securities made to "accredited investors" in reliance on Regulation D, Rule 505 and 506.

Hunton admits that the July 21, 1998 version of the memorandum states that "registration of offshore bank CDs can be avoided" in Colorado, Florida, Louisiana, New York, and Texas, but only "[s]ubject to the foregoing exemption" to registration discussed in the memorandum. Except as expressly admitted herein, Hunton denies the allegations in paragraph 210.

211.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 211 and therefore denies the allegations.

212.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 212 and therefore denies the allegations.  Hunton admits that a memorandum exists dated November 4, 1998 that purports to be from Deon Warner to Yolanda Suarez, bearing the stamp "DRAFT" at the top and the subject line "Registration under the Investment Company Act of 1940."  Hunton admits that such draft memorandum states in part, "[s]ince only 10-15 percent of SIBL's assets are from extensions of credit, it is very uncertain whether SIBL would be exempted from the definition of 'investment company' and thus registration under the 40 Act if it were to go ahead with the Private Offering."  Hunton admits that the draft memorandum recommends that Stanford International Bank, Ltd. "submit a request for a no-action letter to the SEC in order to dispel the uncertainty and eliminate the risk of SEC action with regard to the Private Offering" or "limit the number of

purchasers of the certificates of deposit in the Private Offering to under 100." Further answering, Hunton states that such memorandum analyzes only one possible exemption from registration as an investment company and not other potential exemptions, such as the exemption because of sales to qualified purchasers. Hunton further states that there is no indication on the draft November 4, 1998 memorandum that it was ever reviewed by or sent to any Greenberg lawyer, including Carlos Loumiet. Hunton refers to the draft November 4, 1998 memorandum for what it states, and denies all allegations in paragraph 212 that are inconsistent with its contents. Hunton denies the remaining allegations in paragraph 212.

213. Hunton admits that a memorandum exists dated November 11, 1998 that purports to be from Carlos Loumiet and another Greenberg attorney, bearing the subject line, "Exemption from Investment Company Act of 1940." Hunton admits that the first two paragraphs of this memorandum state (emphasis added):

> You asked us to confirm to you in writing that the private placement of certificates of deposits *to "qualified purchasers"* (as defined herein) by Stanford Financial Group Ltd. ("Stanford") does not require registration under the Investment Company Act of 1940 ("Investment Company Act" or "Act").

> As discussed below, the private placement of certificates of deposit *to an unlimited number of qualified purchasers* by Stanford does not require registration under the Act.

Hunton denies that the draft November 4, 1998 memorandum from Deon Warner, described more fully in Hunton's answer to paragraph 212, offers any opinion on whether Stanford Financial Group Ltd. was exempt from registration as an investment company because of the "qualified purchaser" exemption.

Hunton denies that the November 11, 1998 memorandum, as alleged in paragraph 213, "opined that Stanford's private placement of SIBL CDs to an 'unlimited number of qualified purchasers' did not require Stanford to register under the Investment Company Act, because as a

'foreign bank', SIBL was exempted under the Investment Company Act." Further answering, Hunton states that the November 11, 1998 memorandum analyzes the Rule 3a-6 foreign bank exemption separately from the qualified purchaser exemption, contrary to the allegations in paragraph 213. Hunton denies, as alleged in paragraph 213, that the memorandum provides an "opinion on the foreign bank exemption [that] was based entirely on the notion that the majority of SIBL's income was derived from making commercial loans." To the contrary, the memorandum indicates only the characteristics necessary to satisfy the foreign bank exemption and does not opine as to whether SIBL satisfied those characteristics (emphasis added):

> Hence, *assuming it meets the test of being "engaged substantially in commercial banking activity",* Stanford is not required to register or file with the Securities and Exchange Commission ("SEC") under the Investment Company Act because it is excluded from the definition of "investment company" by Rule 3a-6(b)(1)(i) as an Antigua bank regulated as a commercial bank by the Antiguan government as required under Rule 3a-6.

> The term "engages substantially in commercial banking activity" is defined by Rule 3a-6(b)(2) to mean: engages regularly in, and derives a substantial portion of its business from, extending commercial and other types of credit, and accepting demand and other types of deposits, that are customary for commercial banks in the country in which the head office of the banking institution is located. While "substantial" as used in Rule 3a-6 is not defined, it clearly means something less than "principal" or "primary" and permits foreign banks to issue equity as well as debt securities in reliance on the rule.

> Consequently, Stanford is excepted from the definition of "investment company" and exempt from the Investment Company Act *as long as it can demonstrate that it is "engaged substantially in commercial banking activity"*. Stanford will be characterized as such if: (l) it derives a substantial amount of its business from accepting demand and other deposits, and (2) it derives a substantial amount of its business from extending commercial and other types of credit. The SEC has traditionally looked to the issuer's statements concerning its historical development, its public representations of policy, the activity of its officers and directors, and most importantly, the nature of its present assets and the sources of its present income when determining whether a financial institution is engaged substantially in commercial banking activity.

Hunton refers to the November 11, 1998 memorandum for what it states, and denies all allegations in paragraph 213 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 213.

214.   Hunton admits that a document exists titled "Seizure Warrant to Freeze Accounts," Case No. 98-2517 in the U.S. District Court for the Southern District of Florida, that purports to have been signed by a district court judge on April 6, 1998 and to order the seizure of accounts listed as held at Stanford International Bank, Ltd., with an address at 201 S. Biscayne Blvd. in Miami, Florida, by Juan Zepeda, Jorge Bastida, Kadir Overseas, Ltd., and Radon Trading Ltd.  Hunton refers to that document for what it states, and denies all allegations in paragraph 214 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 214 and therefore denies the allegations.

215.   Hunton admits that a letter exists dated June 12, 1998 that purports to be from Frederick G. Ferrara to Mark Schnapp, bearing the subject line, "DEA Subpoenas," and that such letter states in part:

> On a different but related matter, over the past several weeks I have had the opportunity to speak to the outside counsel (Deon Warner, Esq.) who handles general securities matters for the brokerage firm.  Mr. Warner is presently working on a regulatory matter for us—one in which it is critical that the "separateness" of the brokerage firm (SGC) and the bank (SIB) be maintained, both in appearance as well as reality.  As you know, the last couple of subpoenas from the DEA (the 4/24/98 subpoena from DEA Miami and I believe the one from DEA San Antonio as well) were erroneously addressed to "Stanford Group Company, ATTN: Yolanda Suarez."  While Yolanda is the Senior Legal Officer for Stanford Financial Group, she, as you are aware, is not an employee of the brokerage firm (SGC).  Accordingly, after some discussion, we believe it is imperative that you explicitly advise DEA Miami and San Antonio in writing that any future subpoenas, correspondence, etc. concerning SGC should not be addressed to Yolanda, but rather need to be addressed to my attention, to the

attention of one of SGC's other officers, or to you as SGC's counsel, as the particular instance may require.

Hunton refers to that letter for what it states, and denies all allegations in paragraph 215 that are inconsistent with its contents.   Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 215 and therefore denies the allegations.

216.    Hunton admits that an article appeared in the July 22, 1998 edition of the Wall Street Journal titled "U.S. Freezes Accounts of Suspected Mexican Money Launderers --- Four Firms Affected In Drug Inquiry," purportedly authored by Michael Allen, and that such article states in part (emphasis added):

> In seizure warrants executed in April, the U.S. sought to freeze a total of $3.3 million in accounts at an Antigua affiliate of Stanford Group Co., a Houston stockbroker; Bear Stearns Cos., which clears trades for Stanford; Republic National Bank of Miami; and NationsBank Corp. ***The U.S. hasn't accused any of the companies of complicity with the alleged money launderers, and those that provided comment denied any wrongdoing.***

Hunton admits that a fax cover sheet exists dated August 24, 1998 that purports to be from Jay Comeaux to Mark Schnapp, bearing the subject line "Memo request on WSJ article," and asking for letters to four individuals.   Hunton admits that four letters exist dated August 28, 1998 that purport to be from Mark Schnapp to each of the following: Edward Goldsberry and Ron Kaiser of Pannell Kerr Forster of Texas and Guillermo Williams and Armando Mendez of Williams y Del Valle.   Hunton admits that these four letters state in relevant part (emphasis added):

> This firm is counsel to Stanford Group Company (the "Company").   In July, 1998, there were newspaper reports of the seizure of funds in various financial institutions in the United States.   In some of the articles, Stanford Group Company was mentioned as one of the entities which received funds that were alleged to be laundered narcotics proceeds from a Mexican narcotics organization.
>
> The Company checks the background of each customer and was unaware that the accounts of two related clients contained such tainted funds.   The Company has

143

been fully cooperative with the Drug Enforcement Administration since the commencement of this investigation.  As counsel for the Company, I personally have met with federal agents in Miami, Florida and in Houston, Texas concerning this matter.  ***At all times, we have been assured that Stanford Group Company is not a target of this investigation.***  The Company has been in full compliance with all subpoenas and its representatives also have been interviewed by the Drug Enforcement Administration.

Unfortunately, there are times when financial institutions of all levels find that a customer may have engaged in unlawful activities.  The Company does everything possible to screen its clients and monitor account activities to avoid the improper use of the accounts.  If further information is needed to verify our full and complete cooperation and the status of the Company, please feel free to contact me.  Further, the Drug Enforcement Administration will verify that the Company's cooperation has been exemplary and that it is not the target of a criminal investigation concerning the unlawful laundering of drug proceeds.

Hunton refers to the July 22, 1998 article, the August 24, 1998 fax cover sheet, and the four August 28, 1998 letters for what they state, and denies all allegations in paragraph 215 that are inconsistent with their contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 216 and therefore denies the allegations.

217.    Hunton admits that a letter exists dated February 23, 1999 that purports to be from Alvin Goodwin, Money Laundering Supervisory Authority, Ministry of Finance, Government of Antigua and Barbuda, to a Special Agent in Charge, Drug Enforcement Administration – Miami. Hunton admits that such letter states:

Enclosed herein is a check in the amount of US$3,138,211.97, representing the funds on deposit at Stanford International Bank in accounts held by Juan Alberto Zepeda Mendez, Jorge Fernando Bastida Gallardo, Kadir Overseas Corporation, Ltd., and Radon Trading, Ltd.

These funds are being transferred to the United States so they may be forfeited under United States law. Upon forfeiture, US$1,046,070.66, representing one third of the enclosed amount, without the assessment of an administrative charge, is to be returned to the Government of Antigua and Barbuda in accordance with the agreement encompassed in the letter from Prime Minister Lester B. Bird to

Donald Holm, Deputy Chief of Mission, and the response from Gerald McDowell, Department Justice.

We would hope that the forfeiture could be effected and funds returned as soon as possible to help defray the extraordinary expenses being incurred in our continuing effort to combat money laundering in our nation's offshore financial sector. Our equitable share of the funds should be remitted to the International Financial Sector Forfeiture Fund.

I sincerely hope that this is just the first of many joint efforts between our governments to combat money laundering and look forward to future opportunities to cooperate in such matters.

Hunton refers to the February 23, 1999 letter for what it states, and denies all allegations in paragraph 217 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief in the truth or falsity of the allegations in paragraph 217 and therefore denies the allegations.

218.   Hunton admits that an article dated February 26, 1999 exists, titled "Stanford Compels Workers to campaign for ALP," and purportedly published in a publication called the "Outlet."  Hunton admits that such article reports the rumor that, "Stanford is said to have spent some EC$3 million to purchase fridges, TVs and VCRs which are in three 40 ft containers for the ALP candidates to give away."  Hunton denies that the article "accus[es] Allen Stanford of forcing his Antiguan employees to actively campaign for Lester Bird's political party or else face dismissal or suspension," as alleged in paragraph 218.  Hunton admits that a document exists dated March 3, 1999 that purports to be a memorandum from R. Allen Stanford to "All Antigua-based Employees," and that such memorandum states in part, "I want to emphasize that at no time is your employment dependant [*sic*] or conditioned on your political party affiliation or involvement or lack thereof.  In conclusion, whatever your vote is next week, it is yours alone."  Hunton admits that an article exists dated March 4, 1999, titled "An Open Letter To The People of Antigua and Barbuda," and purportedly published in a publication called "The Daily

Observer."   Hunton denies that that article "basically admit[s] that Stanford's companies and employees had, in fact, campaigned for the Bird party, but that the Stanford employees had not been coerced into doing so," as alleged in paragraph 218.   Hunton refers to the February 26, 1999 article, March 3, 1999 memorandum, and March 4, 1999 article for what they state, and denies all allegations in paragraph 218 that are inconsistent with their contents.   Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 218 and therefore denies the allegations.

219.   Hunton admits that a letter exists dated March 4, 1999 that purports to be from Cort & Associates to Sen. Leonard "Tim" Hector, Outlet Publishers, McKinnons, and that such letter addresses the Outlet article dated February 26, 1999.   Hunton refers to that letter for what it states, and denies all allegations in paragraph 219 that are inconsistent with its contents. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 219 and therefore denies the allegations.

220.   Hunton denies that it or Carlos Loumiet, in August 1999, or at any time prior to the collapse of the Stanford entities in February 2009, ever "discovered that Stanford's Antiguan banking operations bore the hallmarks of a Ponzi scheme," as alleged in paragraph 220.   Hunton admits that an email exists dated August 6, 1999 that purports to be from pobrien@stanfordeagle.com to Carlos Loumiet, and that such email concerns proposed trust legislation and contains the language appearing in quotation marks in the third sentence of paragraph 220.   Hunton refers to the August 6, 1999 email for what it states, and denies all

allegations in paragraph 220 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 220.

221.    Hunton admits that an email dated August 9 or 10, 1999 exists that purports to be from Carlos Loumiet to pobrien@stanfordeagle.com, and that such email states, "On your bills, what happened with the $1 million the US was supposed to give Antigua as part of the $3.1 mm turned over?"  Hunton admits that an email dated August 10, 1999 exists that purports to be from Patrick O'Brien to Carlos Loumiet, and that such email states in part that the government "misappropriated $135,000 loaned by Stanford to pay Shandwick."  Hunton further admits that an email dated August 10, 1999 exists that purports to be from Patrick O'Brien to Carlos Loumiet, and that such email states in part, "there are a few signs down here that Allen could have some serious financial problems.  Just guessing, but several things make it look that way."  Hunton refers to these three emails for what they state, and denies all allegations in paragraph 221 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 221.

222.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegation that Carlos Loumiet responded to Patrick O'Brien's August 10, 1999 email "immediately," and therefore denies the allegation.  Hunton admits that an email exists that appears to be dated sometime on August 10, 1999 that purports to be from Carlos Loumiet to Patrick O'Brien, and that such email contains the language appearing within quotation marks in paragraph 222.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 222.

223.    Hunton admits that an email exists dated August 10, 1999 that purports to be from Patrick O'Brien to Carlos Loumiet, and that such email contains the italicized language appearing in paragraph 223, except the numbering used in paragraph 223 is not entirely consistent with such email.  Hunton denies that such email contains the bolding and underlining used for emphasis in the quoted language appearing in paragraph 223.  Hunton refers to the August 10, 1999 email for what it states, and denies all allegations in paragraph 223 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations of paragraph 223.  Hunton specifically denies that the August 10, 1999 email states, suggests, or otherwise indicates that the Stanford entities were a Ponzi scheme.

224.    Hunton denies the allegations in paragraph 224.

225.    Hunton admits that a draft document exists dated November 30, 2000 that is titled "Agreement and Plan of Merger" and that purports to be an agreement between Stanford Acquisition Corporation and Metro Savings Bank, F.S.B.   Hunton also admits that a draft, unsigned letter exists dated December 5, 2000 that purports to be from Carlos Loumiet to Carla Holiman, Office of Thrift Supervision, Department of the Treasury, and that such letter concerns a proposed agreement by which Stanford Acquisition Corporation would merge into Metro Savings Bank, F.S.B.  Hunton admits that a signed letter exists dated December 28, 2000 that purports to be from Carlos Loumiet to John E. Ryan, Regional Director, Office of Thrift Supervision, Southeast Regional Office, and that such letter concerns an "Interagency Bank Merger Act Application (the 'Application') submitted pursuant to Section 18(c)(2)(D) of the Federal Deposit Insurance Act of 1933, as amended, 18 U.S.C. § 1828(c)(2)(D), for approval from the Office of Thrift Supervision (the 'OTS') to effectuate the merger of a to-be-organized

interim federal savings bank wholly-owned by Mr. Stanford with and into Metro Savings Bank, F.S.B., Orlando, Florida." Hunton admits that a letter exists dated January 26, 2001 that purports to be from Kathryn E. Haney, Applications Department, Office of Thrift Supervision, Department of the Treasury, to Carlos Loumiet, that such letter purports to include a request for additional information concerning the merger application, and that such requests included, with respect to Robert A. Stanford:

> Please provide more detail for the response to question 4 of the IBFR. For each business interest, provide the following: a) description of business and its activities; b) listing of officers and directors; c) name and address of regulatory authority (if regulated); d) description of any sanctions and judgments; e) current financial statements, and f) Mr. Stanford's percent ownership. In addition, so that we may better understand the corporate structure of Mr. Stanford's companies, please provide a corporate organizational chart, which reflects all of these companies.

Hunton refers to the November 30, 2000 Draft Agreement and the December 5, 2000, December 28, 2000, and January 26, 2001 letters for what they state, and denies all allegations in paragraph 225 that are inconsistent with their contents. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 225 and therefore denies the allegations.

226.    Hunton admits that a letter exists dated February 5, 2001 that purports to be from Carlos Loumiet to John E. Ryan, Regional Director, Office of Thrift Supervision, Southeast Regional Office, and that such letter purports to address the requests for additional information set forth in Kathryn Haney's letter dated January 26, 2001 and to enclose exhibits providing additional information. Hunton admits that the February 5, 2001 letter states in part:

> The plans of Metro Savings Bank, F.S.B. (the "Savings Bank") more than three years after consummation of the merger will depend on various factors, including the success of the business plan for the initial three-year period and the prevailing national and regional business environments. The Savings Bank does not expect a significant deviation from the core plan of business set out in the business plan

149

after the initial three-year period. However, it is anticipated that the Savings Bank will look to grow its operations in Orlando and Miami, with additional offices planned for Houston, Texas and Baton Rouge, Louisiana (where the Stanford Financial Group maintains broker/dealer or trust offices).

Hunton refers to the February 5, 2001 letter and purported enclosures for what they state, and denies all allegations in paragraph 226 that are inconsistent with their contents. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 226 and therefore denies the allegations.

> Answer to Footnote 28, appended to Paragraph 226:   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 28 and therefore denies the allegations.

227.   Hunton admits that a letter exists dated February 21, 2001 that purports to be from John E. Ryan, Regional Director, Office of Thrift Supervision, Department of Treasury, to Carlos Loumiet, and that such letter states in part:

> We have reviewed the subject application ("Application") filed as of December 29, 2000 by Mr. Robert A. Stanford ("Applicant") and the additional information ("Additional Information") filed as of February 6, 2001. Based upon our review of the Application and Additional Information, we have determined that the Application is materially deficient. Accordingly, pursuant to 12 C.F.R. Section 516.2(c)(l)(iii), we decline to further process the Application.

> We noted that the Additional Information did not answer certain key questions that we asked after our review of the Application. In the event that the Applicant decides to file a new application with the OTS, at a minimum, it will be necessary for the Applicant to provide the following in the initial filing: 1) complete information about his previous bankruptcies; 2) current financial statements on all of his business interests; 3) a revamped Community Reinvestment Act ("CRA") plan as the proposed plan reflects a loan-to-deposit ratio of 50 percent that would result in the savings bank receiving no higher than a "Needs to Improve" rating for CRA; 4) a more in-depth explanation from the independent accountant regarding any material differences between generally accepted accounting principles and international accounting standards as applied to the financial statements of the Applicant's two banks; and 5) a more comprehensive business

> plan. The aforementioned deficiencies in the Application are the most significant ones noted.  Other issues and concerns, which are not detailed in this letter, were also noted. If the Applicant decides to file another application, we can provide you with additional details on these and other matters.

Hunton refers to the February 21, 2001 letter for what it states, and denies all allegations in paragraph 227 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 227.

228.   Hunton admits that an email exists dated March 4, 2001 that purports to be from Carlos Loumiet to Jim Miller, and that such email states in part (emphasis added):

> . . . . In January we received a very mild comment letter from the OTS on our application requesting additional information. All appearances and feedback were that everything was going smoothly.

> . . . . Fifteen days later we received a SHOCKING letter from the OTS saying our application was "materially deficient" and they were not processing it any more. The reasons given were rather silly, and largely unrelated to their prior (mild) comment letter. There was NO indication this was coming; it was completely out of the blue. The same day, the OTS "withdrew" the application "voluntarily" for us. While the letter they sent said, as a matter of rote, that we could refile, I figured this was a "drop-dead" letter, though I had never seen anything like it in 23 years of practice before banking regulators. I flew to Atlanta and met with Jack Ryan, head of OTS there, and others. Jack very nicely told me not to bother to reapply because, given where Allen did business and the nature of that business, "we" (presumably the OTS) could "never" get "comfortable" with him, and that we could not provide sufficiently "reliable" info to "ever" make them "comfortable." ***He was very clear to say that he was not saying Allen had done anything wrong.*** I mentioned firewalls, conditions in the approval, etc. which the OTS could impose to deal with this "problem", but it was like talking to the wall.

> While being "comfortable" with an applicant is not legal grounds to reject him, the fact is the OTS can drag out this application process for years and thereby force Metrobank to go away, making all of this moot. . . .

> Confidentially, AND NOT FOR DISCUSSION WITH OTS OR TREASURY, Ron LaFace is going to see if the Florida Comptroller would entertain a conversion by Metro to a state-chartered bank, followed by approval.  The people at Metro are pretty upset and still eager to do the deal with Allen if at all possible. . . .

What we would like from you is any information you can gather from Treasury as
to what really happened here.

Hunton refers to the March 4, 2001 email for what it states, and denies all allegations in
paragraph 228 that are inconsistent with its contents.  Hunton lacks knowledge or information
sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of
paragraph 228 and therefore denies the allegations.  Hunton denies the remaining allegations in
paragraph 228.

229.    Hunton admits that in May 2001, Carlos Loumiet and several other Greenberg
attorneys left Greenberg and became partners or attorneys at Hunton.  Except as expressly
admitted herein, Hunton denies the allegations in the first sentence of paragraph 229.  Hunton
lacks knowledge or information sufficient to form a belief as to the truth or falsity of the
allegations in the remaining sentences of paragraph 229 and therefore denies the allegations.

230.    Hunton states that no response is necessary to the allegations in paragraph 230
because they do not relate to any claims against Hunton.  To the extent a response is required,
Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the
allegations in paragraph 230 and therefore denies the allegations.

231.    Hunton states that no response is necessary to the allegations in paragraph 231
because they do not relate to any claims against Hunton.  To the extent a response is required,
Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the
allegations in paragraph 231 and therefore denies the allegations.

232.    Hunton states that no response is necessary to the allegations in paragraph 232
because they do not relate to any claims against Hunton.  To the extent a response is required,

Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 232 and therefore denies the allegations.

233.     Hunton states that no response is necessary to the allegations in paragraph 233 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 233 and therefore denies the allegations.

234.     Hunton states that no response is necessary to the allegations in paragraph 234 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 234 and therefore denies the allegations.

235.     Hunton states that no response is necessary to the allegations in paragraph 235 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 235 and therefore denies the allegations.

236.     Hunton states that no response is necessary to the allegations in paragraph 236 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 236 and therefore denies the allegations.

237.     Hunton states that no response is necessary to the allegations in paragraph 237 because they do not relate to any claims against Hunton.  To the extent a response is required,

Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 237 and therefore denies the allegations.

>Answer to Footnote 29, appended to Paragraph 237:   Hunton states that no response is necessary to the allegations in footnote 29 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in footnote 29 and therefore denies the allegations.

238.    Hunton states that no response is necessary to the allegations in paragraph 238 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 238 and therefore denies the allegations.

239.    Hunton states that no response is necessary to the allegations in paragraph 239 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 239 and therefore denies the allegations.

240.    Hunton states that no response is necessary to the allegations in paragraph 240 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 240 and therefore denies the allegations.

241.    Hunton states that no response is necessary to the allegations in paragraph 241 because they do not relate to any claims against Hunton.  To the extent a response is required,

Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 241 and therefore denies the allegations.

242.    Hunton states that no response is necessary to the allegations in paragraph 242 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 242 and therefore denies the allegations.

243.    Hunton states that no response is necessary to the allegations in paragraph 243 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 243 and therefore denies the allegations.

244.    Hunton states that no response is necessary to the allegations in paragraph 244 because they do not relate to any claims against Hunton.  To the extent a response is required, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 244 and therefore denies the allegations.

245.    Hunton admits that in May 2001, Carlos Loumiet and several other Greenberg attorneys left Greenberg and became partners or attorneys at Hunton.  Hunton admits that it represented Allen Stanford or certain Stanford entities in various discrete legal matters beginning with Mr. Loumiet's arrival at Hunton in May 2001.  Hunton denies the allegations in paragraph 245 that Mr. Loumiet "carried with him the Stanford client relationship, and also carried with him to Hunton all of the knowledge he had about Stanford's activities in Antigua and the United States," and further denies that "Loumiet basically 'infected' Hunton with his knowledge about

Stanford and its illegal operations when he joined Hunton in 2001." Hunton specifically denies that it or Mr. Loumiet ever knew of or assisted in any illegal or otherwise wrongful conduct allegedly committed by Allen Stanford or any of the Stanford entities. Except as expressly admitted herein, Hunton denies the allegations in paragraph 245.

246.    Hunton admits that various Hunton lawyers worked on discrete Stanford-related legal matters between Carlos Loumiet's arrival at the firm in May 2001 and February 2009. Except as expressly admitted herein, Hunton denies the allegations in paragraph 246. Hunton expressly denies that it or Carlos Loumiet "assist[ed] Stanford with all aspects of his illegal operations," as alleged in paragraph 246. Hunton also specifically denies that it billed "hundreds of thousands of dollars in fees per year" on Stanford matters, as alleged in paragraph 246. In addition, Hunton specifically denies that it or Mr. Loumiet ever knew of or assisted in any illegal or otherwise wrongful conduct allegedly committed by Allen Stanford or any of the Stanford entities. Hunton denies that after February 2003, all bills for its legal services were directed to "Stanford's legal department in Houston, Texas." Further answering, Hunton states that after 2003, legal bills were sent to offices in both Miami and Houston and addressed to recipients including "Stanford Financial Group" or "R. Allen Stanford."

247.    Hunton admits that a letter exists in its Stanford-related files that is dated December 17, 2001 and that purports to be from Anthony W. Astaphan, S.C. to Kenneth Allen, Q.C., and that such letter contains a list of twelve questions/issues, described as "the matters which concern Mr. Stanford." Hunton admits that appearing on the list are questions about a feasibility study and Allen Stanford's alleged service as Chairman of the Hospital Board. Hunton refers to the December 17, 2001 letter for what it states, and denies all allegations in

paragraph 247 that are inconsistent with its contents.  Hunton admits that this letter appears in its Stanford-related files, but lacks knowledge or information sufficient to form a belief as to when that letter was placed in those files.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 247 and therefore denies the allegations.

248.    Hunton admits that a letter exists that is dated December 17, 2001 and that purports to be from Anthony W. Astaphan, S.C. to Kenneth Allen, Q.C., and that such letter contains a list of twelve questions/issues, described as "the matters which concern Mr. Stanford." Hunton admits that appearing on the list are questions about who negotiated a $31 million loan and the payment of Cort & Associates' bills.  Hunton refers to the December 17, 2001 letter for what it states, and denies all allegations in paragraph 248 that are inconsistent with its contents. Hunton admits that this letter appears in its Stanford-related files, but lacks knowledge or information sufficient to form a belief as to when that letter was placed in those files.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 248 and therefore denies the allegations.

249.    Hunton admits that a printout exists, dated March 4, 2003, from the website http://www.antigua-barbuda.com/news_archive/epress/53_08.htm,   and   that   such   printout purports to contain an article titled "Report accuses Dr. Cort of conflict" that states it is "[e]xcerpted from the Antigua Sun."  Hunton admits that such printout purports to quote in part from "the final report of the forensic audit conducted by Allan S. Joseph, into the Medical Benefits Scheme" about (1) an alleged conflict of interest on the part of Errol Cort in acting as

"counsel for all of the parties to the contract" after he became attorney general in March 1999, and (2) the payment of Errol Cort's invoice for more than $1.2 million through the Minister of Health rather than the Medical Benefits Board of Control.  Hunton further admits that a printout exists, dated March 4, 2003, from the website http://www.antigua-barbuda.com/busnss_politics/body_pm_broadcast_ 070802.html, titled, "Broadcast Address to the Nation by Prime Minister Lester B. Bird on the Implementation of the Recommendations of the Commission of Inquiry into the Medical Benefits Scheme," August 7, 2002.  Hunton admits that such printout purports to quote from an address from Lester Bird in which he noted that he relieved Errol Cort from his "Ministerial portfolio."  Further answering, Hunton states that such printout purports to quote Lester Bird as stating, in part, that "the nation's elected representatives from both sides of the House voted for the terms of the [hospital] loan" and "the Commissioners have not suggested in any way whatsoever that there has been any wrong doing in relation to the loan or the way that it has been operating."

Hunton refers to the two website printouts for what they state, and denies all allegations in paragraph 249 that are inconsistent with their contents.  Hunton admits that the printouts appear in its Stanford-related files, but lacks knowledge or information sufficient to form a belief as to when those documents were placed in those files.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 249 and therefore denies the allegations.

250.    Hunton admits that an article exists that purportedly was published in the April 4, 2002 edition of The Miami Herald and that was titled, "Tiny Caribbean island confronts huge insurance fraud."  Hunton admits that this article appears in its Stanford-related files, but lacks knowledge or information sufficient to form a belief as to when that article was identified and

placed in those files.  Hunton admits that this article states that "[a]t the urging of the public, three investigating judges have been charged with figuring out where $230 million or more in state health insurance money has gone" and states that

> It is by way of the judges and the press that Antiguans have been learning that for years government officials treated the state insurance fund, called the Medical Benefits Scheme, like a personal checking account.  Instead of paying for medical services, evidence shows that money deducted from workers' salaries has gone for lavish parties, foreign travel for government cronies, thousands in kickbacks to the program's accountant, cosmetic surgery overseas for officials and even toys for the children of fund administrators.

Hunton denies that the article specifically states that Lester Bird was part of such activities. Hunton admits that the article states, "[i]n the meantime, independent auditors hired by the inquiry are forecasting the benefits fund will soon be completely drained to pay for the construction of a new hospital, a project so rife with corruption and mismanagement that a government bailout from general revenue or huge loans is needed."  Hunton refers to the article for what it states, and denies all allegations in paragraph 250 that are inconsistent with its contents.  Further answering, Hunton states that the article does not refer to or mention Allen Stanford, any Stanford entities, Carlos Loumiet, Greenberg, or Hunton.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 250.

251.    Hunton admits that an Associated Press article exists that is dated April 24, 2002 and titled "Texas millionaire 'willing to help' investigation into Antigua's medical benefits program" and that such article states in part:

> Texan millionaire Allen Stanford said Wednesday he is willing to answer questions from a commission investigating fraud at Antigua's medical benefits program. The commission had upbraided him for failing to appear. Stanford, a leading businessman on the Caribbean island, said his lawyers had advised the commission he was unable to testify.

> On Tuesday, Chief Commissioner Sir Alister McIntyre said the non-appearance was an insult to the country and warned Stanford that he was not above the law.

> In a telephone interview from the United States, Stanford said he had just returned home from Venezuela, dealing with crises including workers injured in rioting in last week's political unrest there.
>
> "This was relayed to this little commission going on in Antigua and the gentleman leading that commission was in fact informed of this and said it was understandable," Stanford said.
>
> McIntyre told the inquiry Wednesday that he had received a letter from Stanford's representatives and would respond.
>
> The letter, from Yolanda Suarez of Stanford Financial Group, said "Mr. Stanford has always indicated his complete willingness to help the Commission to the extent that he can contribute substantive information to its fact-finding efforts."

Hunton admits that this article appears in its Stanford-related files, but lacks knowledge or information sufficient to form a belief as to when that article was identified and placed in those files.  Hunton refers to that article for what it states, and denies all allegations in paragraph 251 that are inconsistent with its contents.  Further answering, Hunton states that a printout exists, dated March 4, 2003, from the website http://www.antigua-barbuda.com/busnss_politics/body_pm_broadcast_070802.html, titled, "Broadcast Address to the Nation by Prime Minister Lester B. Bird on the Implementation of the Recommendations of the Commission of Inquiry into the Medical Benefits Scheme," August 7, 2002, and that such printout purports to quote from an address from Lester Bird in which he stated, in part, that "there has been no evidence suggesting that Mr. Stanford abused [his] dual role" as lender and member of the Board of Directors of the Hospital.  Hunton refers to that printout for what it states, and denies all allegations in paragraph 251 that are inconsistent with its contents.  Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 251 and therefore denies the allegations.

252.     Hunton admits that a draft, unsigned letter exists in its Stanford-related files that purports to be from Carlos Loumiet to Bernard Ascencio, and that the draft letter is "Re: Your letter of June 17, 2002," and that the draft letter states in part that in 1990, Bank of Antigua "had negative capital," but "[i]t is my understanding that today the bank has over U.S.$40 million in capital."   Hunton refers to that draft letter for what it states, and denies all allegations in paragraph 252 that are inconsistent with its contents.   Hunton denies that the Bank of Antigua, Ltd. made the $40 million loan to the Government of Antigua and Barbuda referenced in paragraph 252.  Further answering, Hunton states that a draft document dated to June 2002 exists in its files that is marked "Execution Copy" and that such document lists Stanford Financial Group, not Bank of Antigua Ltd., as the lender on the loan.  Hunton refers to that draft document for what it states, and denies all allegations in paragraph 252 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 252.

253.     Hunton admits that certain Hunton attorneys were involved in late 2001 and 2002 in drafting or editing documents related to a $40 million loan from Stanford Financial Group to the Government of Antigua and Barbuda.   Hunton admits that certain of its billing records reference a matter titled "Loan by Bank of Antigua Limited to Government of Antigua and Barbuda."  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in the last sentence of paragraph 253 regarding the reasons Stanford Financial Group was the lender for the loan.   Hunton denies the remaining allegations in paragraph 253.

> <u>Answer to Footnote 30, appended to Paragraph 253:</u>     Hunton     denies     the allegations in footnote 30.

254.     Hunton admits that a draft document exists in its Stanford-related files, titled "Loan Agreement, Stanford Financial Group Company to the Government of Antigua and Barbuda," dated to June 2002 and marked "Execution Copy," and that such document contains provisions (1) suggesting the loan was to be secured by certain tax revenues and (2) suggesting the Government of Antigua and Barbuda was obligated to deposit certain tax revenues into a bank account with an unspecified financial institution as part of the repayment process for the loan.  Hunton refers to that document for what it states, and denies all allegations in paragraph 254 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 254.

255.     Hunton admits that an article appeared in the March 5, 2002 edition of the Wall Street Journal titled "R. Allen Stanford Casts Shadow Over Antigua, Island of the Sun"; that such article contained the statement "This sun-drenched Caribbean island, famous for its cricket stars, palm-flattening hurricanes and outsized corruption scandals, is fast gaining another reputation: as the personal fief of R. Allen Stanford, a Texas developer and international banker"; and that such article purports to quote opposition party leader Baldwin Spencer as saying "'This man has a lien on our whole country.'"  Hunton refers to the March 5, 2002 article for what it states, and denies all allegations in paragraph 255 that are inconsistent with its contents.  Hunton admits that an email exists dated March 5, 2002 that purports to be from Carlos Loumiet to astanford@stanfordeagle.com, with the subject line, "Dang, you're the lead story in the WSJ!!!," and that such email exists in Hunton's Stanford-related files.  Hunton admits that such email states:

As Virginia Slims used to say in their ads, you've come a long way.

As I told Yolanda, I think the negatives of the article are far outweighed by the positives of being featured like this in the nation's (world's) leading business

publication, mentioning the $14bn you guys have under management and your role and influence on the island. And even those "negatives" – so what, you want to buy a distressed property in Antigua if the Govt. takes it over and you have a lot of presence/influence there – are truly tame compared to things that you and I have seen in the past.

By the way, the stigmata part should play well with all Latinos, particularly Catholics.

Call me when you have a chance.

Hunton refers to the March 5, 2002 email for what it states, and denies all allegations in paragraph 255 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 255.

256.   Hunton admits that an email exists dated December 1, 2003 that purports to be from Carlos Loumiet to astanford@stanfordeagle.com and ysuarez@stanfordeagle.com, bearing the subject line "Allen, I know you're being calumnied in Antigua by the opposition. Here is what appeared in the Herald on Saturday, in case you hadn't seen it. Sorry. Best, Carlos." Hunton admits that such email exists in its files, and that the email purports to have attached a November 29, 2003 article from the Miami Herald titled "Minister's suspension called for over money." Hunton refers to the December 1, 2003 email and the November 29, 2003 article for what they state, and denies all allegations in paragraph 256 that are inconsistent with their contents. Hunton specifically denies that the allegations in paragraph 256 accurately describe the November 29, 2003 Miami Herald article, and denies that that article references $100,000 or $200,000 payments to anyone. Except as expressly admitted herein, Hunton denies the allegations in paragraph 256.

257.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 257 and therefore denies the allegations.

258.     Hunton admits that it provided legal services in defending against two lawsuits filed against Stanford Group Company and Stanford International Bank, Ltd., originally filed in Florida state court in Miami, the first filed by Juan Alberto Zepeda Mendez and Radon Trading, Ltd. on April 4, 2002 and the second filed by Kadir Overseas, Ltd. and Jorge Bastida Gallardo on July 26, 2002.  Hunton admits that the lawsuits alleged that Zepeda and Bastida were Mexican residents who placed funds with Stanford International Bank, Ltd. and that the U.S. Drug Enforcement Agency seized such funds in 1998.  Hunton admits that, as part of its representation in the *Zepeda* and *Kadir/Bastida* cases, Hunton attorneys interviewed Manuel Malvaez, Alvaro Trullenque, Fred Ferrara, and Lena Stinson.  Hunton denies that it or Carlos Loumiet ever "learned . . . that Stanford was running SIBL from the U.S. while evading U.S. laws," as alleged in paragraph 258.  Except as expressly admitted herein, Hunton denies the allegations of paragraph 258.

259.     Hunton lacks knowledge or information sufficient to form a belief as to the truth of the first sentence in paragraph 259 and therefore denies the allegations.  Hunton admits that a letter exists in its files dated August 5, 2002 that purports to be from Mauricio Alvarado to Carlos Loumiet, and that such letter purported to enclose copies of the complaints filed against SGC and SIBL in the *Zepeda* and *Kadir/Bastida* cases.  Hunton admits that, as part of its legal work in those matters, Hunton attorneys interviewed Manuel Malvaez, Alvaro Trullenque, Fred Ferrara, and Lena Stinson.  Hunton denies the remaining allegations in paragraph 259.

260.     Hunton denies the allegations in paragraph 260.

261.     Hunton admits that, as part of its representation in the *Zepeda* and *Kadir/Bastida* litigation, two of its lawyers interviewed Fred Ferrara.  Hunton admits that a memorandum exists

in its files that is dated April 24, 2003 and that purports to summarize relevant portions of the two lawyers' November 27, 2002 interview of Fred Ferrara.  Hunton admits that undated, unsigned handwritten notes exist in its files that purport to summarize an interview of Fred Ferrara.  Hunton refers to the April 24, 2003 memorandum and the handwritten notes for what they state, and denies all allegations in paragraph 261 that are inconsistent with their contents.  In particular, the memorandum states that Ferrara, Yolanda Suarez, Mark Schnapp, and Carlos Loumiet discussed on either April 29 or April 30, 1998 "conducting an internal investigation" into customer accounts brought into Stanford Group Company by broker Manuel Malvaez.  The memorandum further states that Carlos Loumiet "suggested keeping [Stanford executives Alvaro] Trullenque and [Jay] Comeaux out of the internal investigation we were planning."

Hunton denies the memorandum or handwritten notes state that Allen Stanford "outright rejected" the idea of an internal investigation, as alleged in paragraph 261.  The memorandum states, "Ferrara remembers that Lena Stinson talked to Alan Stanford about the idea of conducting an internal investigation," "Stanford Group did not end up conducting the internal investigation, probably because Alan Stanford [*sic*] did not want to do it," and "Alan Stanford [*sic*] was not thrilled about the idea of an internal investigation.  He probably talked to Yolanda Suarez about this."  Similarly, the handwritten notes state, "Alan not thrilled w/ idea of internal investigation – probably talked with Yolanda ab it."  Except as expressly admitted herein, Hunton denies the allegations in paragraph 261.

262.   Hunton admits that an email dated December 17, 2002 exists in its files that purports to be a transcription of a voicemail from Fred Ferrara to a Hunton attorney.  Hunton admits that the email states that the voicemail stated in part:

> I just remembered a couple of more things that may or may not be relevant to what you and [first name of Hunton attorney] are working on. . . . I guess the 2 basic ideas that I wanted to talk to you about are (1) why the brokerage firm at least and perhaps the Bank as well thought it was important to have 2 different attorneys representing both sides.  And I guess really that was in this particular case Dione [*sic*] Warner, myself and Lena Stinson but in general going back to the earlier decision that was made that Yolanda should not be an employee of the broker dealer.  To give you a little background on that and basically to try to give the entity separate so that no regulator or government could claim that the bank and the broker dealer are one and the same entity. . . .

Hunton refers to the December 17, 2002 email for what it states, and denies all allegations in paragraph 262 that are inconsistent with its contents.  In particular, Hunton denies that the email states that Ferrara "now recalled that Stanford was always trying to keep SGC and SIBL separate so no U.S. regulator could claim that SGC and SIBL were one and the same," as alleged in paragraph 262.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 262.

263.    Hunton admits that an email chain exists in its files that is dated March 14-March 17, 2003 that purports to be between Carlos Loumiet and two lawyers working on the *Kadir/Bastida* and *Zepeda* cases.  Hunton admits that a March 14, 2003 email from Mr. Loumiet states in part:

> Yolanda spoke to me at length yesterday to give me a heads-up. She is afraid that this litigation could be used by Mauricio and others at Stanford who have their own favorite outside counsel for Stanford, to direct work elsewhere. While my personal ties to Yolanda and Allen Stanford are very strong, they don't want to keep arguing [with] Mauricio over what outside firm to use.
>
> There is NO complaint over our quality. The concern is over our cost (the deposit amount was about $3mm, as I recall, and I believe our fees are already at about $300k at the motion to dismiss stage), whether the other side has not recently won some skirmishes, and whether we are giving them an accurate reading of what is happening and what is likely to happen.

Hunton refers to the March 14-March 17, 2003 email chain for what it states, and denies all allegations in paragraph 263 that are inconsistent with its contents.  In particular, Hunton denies

the allegation in paragraph 263 that the *Kadir/Bastida* and *Zepeda* cases "were still in the preliminary motion to dismiss stage" and states that the March 17, 2003 response by a Hunton attorney to Mr. Loumiet's March 14, 2003 email indicates that at least four substantive motions had been filed in the *Kadir/Bastida* case, along with an opposition brief to another substantive motion, and at least three substantive motions had been filed in the *Zepeda* case. Except as expressly admitted herein, Hunton denies the allegations in paragraph 263.

264. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 264 and therefore denies the allegations. Hunton admits that, at some point in January 2004, it was asked to provide legal representation to Allen Stanford in connection with allegations against him made by the Antigua & Barbuda Justice Movement ("Justice Movement"). Hunton denies the remaining allegations in paragraph 264.

265. Hunton admits that, upon its engagement in connection with allegations against Allen Stanford made by the Justice Movement, Hunton lawyers evaluated statements and materials published by the Justice Movement on its website. Hunton admits that the language appearing within quotation marks in paragraph 265 appeared in materials that were believed to be located at the time on the Justice Movement's website. Hunton refers to those materials for what they state, and denies all allegations in paragraph 265 that are inconsistent with their contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 265.

266. Hunton admits that a letter exists in its files dated January 21, 2004 that is signed by a Hunton attorney and addressed to "Mr. McChesney Emmanual, President, The Antigua and Barbuda Justice Movement." Hunton admits that the letter demanded that six statements be

removed from the website www.antiguandbarbudajusticemovement.com because they were "false and defamatory" and "convey[ed] false and defamatory implications concerning Mr. Stanford." Hunton admits that the letter threatened a lawsuit if the defamatory statements were not removed. Hunton refers to the January 21, 2004 letter for what it states, and denies all allegations in paragraph 266 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 266.

267. Hunton admits that a memorandum exists in its files dated January 28, 2004 that purports to be from Kroll employee Thomas Cash to a Hunton attorney, Allen Stanford, and Yolanda Suarez, and that such memorandum purports to summarize a January 24, 2004 Justice Movement meeting. Hunton admits that the memorandum states that the January 24, 2004 meeting was held at St. Pius V Parish School in the Bronx in New York; that Kroll personnel "attempted to speak with" one of the meeting's speakers, Senator Joanne Massiah of Antigua and Barbuda, following the meeting; and that "[t]here was a notebook passed out for future contact and a Kroll representative signed up so that we would be notified of future meetings." Hunton refers to the January 28, 2004 memorandum for what it states, and denies all allegations in paragraph 267 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 267.

268. Hunton admits that a memorandum exists in its files dated January 28, 2004 that purports to be from Kroll employee Thomas Cash to a Hunton attorney, Allen Stanford, and Yolanda Suarez, and that such memorandum purports to summarize a January 24, 2004 Justice Movement meeting. Hunton refers to the January 28, 2004 memorandum for what it states, and

denies all allegations in paragraph 268 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 268.

269.   Hunton admits that a memorandum exists in its files dated January 28, 2004 that purports to be from Kroll employee Thomas Cash to a Hunton attorney, Allen Stanford, and Yolanda Suarez, and that such memorandum purports to summarize a January 24, 2004 Justice Movement meeting.   Hunton admits that the January 28, 2004 memorandum states, in part, that "the meeting was political in nature, appreciated by most of those observed as very informative and free of any profanity, alcoholic beverages or emotional outbursts."   Hunton refers to the January 28, 2004 memorandum for what it states, and denies all allegations in paragraph 269 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 269.

270.   Hunton denies it received a report about the January 24, 2004 Justice Movement meeting from a "secret agent."   Hunton admits that an undated document titled "Antigua and Barbuda Justice Movement Observations," which does not identify its author, appears in Hunton's files and that such document states, in part, that Allen Stanford was described at the meeting by Mr. Emanuel as "a developer in Antigua who owns his own island and has over $250 million worth of investments in Antigua."   Hunton refers to this undated document for what it states, and denies all allegations in paragraph 270 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 270.

271.   Hunton admits that a letter exists in its files dated January 29, 2004 that purports to be from a Hunton attorney and is addressed to Conrad Airall, Esq.   Hunton admits that such letter states that McChesney Emanuel initially removed defamatory statements from his website

but then posted additional defamatory statements that "falsely accus[ed] Mr. Stanford of . . . trafficking in drugs; engaging in money laundering and gun smuggling; bribing government officials to obtain government land; participating in rape; and violating election laws."  Hunton further admits that such letter states that Mr. Emanuel made "damaging lies" about Allen Stanford at the January 24, 2004 Justice Movement meeting.  Hunton refers to the January 29, 2004 letter for what it states, and denies all allegations in paragraph 271 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 271.

272.    Hunton denies the allegations in paragraph 272.

273.    Hunton denies the allegation in paragraph 273 that "[u]ndercover agents acting under Hunton's direction thereafter infiltrated *another* meeting of the Justice Movement." Hunton denies the suggestion in paragraph 273 that Hunton was spying or engaging in other improper conduct related to the Justice Movement.  Hunton admits that an undated, unsigned report exists that purports to be a report, from an unknown author, of a Justice Movement meeting on February 6, 2004 held at St. Pius V Parish School in the Bronx in New York. Hunton refers to that report for what it states, and denies all allegations in paragraph 273 that are inconsistent with its contents.  Hunton admits that the language appearing in quotation marks in paragraph 273 appears in that undated, unsigned report, but denies that the allegations in paragraph 273 accurately report the context of the quoted phrases.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 273.

274.    Hunton admits that a letter dated February 10, 2004 exists in its files that purports to be from Conrad Airall to a Hunton attorney in response to letters dated January 21 and 29,

2004 and a telephone conversation dated January 26, 2004, and that the February 10, 2004 letter denies that the Justice Movement made false or defamatory statements about Allen Stanford. Hunton admits that the letter asserts that "[t]he alleged 'defamatory statements' referred to in your letter are in the nature of 'political speech' . . . ." Further answering, Hunton states that the letter also states that the Justice Movement and Mr. Emanuel "do not have any quarrel with Mr. Stanford's use of his considerable wealth to promote his business interests in Antigua and Barbuda" but that they had the right to criticize Mr. Stanford once he "align[ed] himself with the ruling political party" and "attempt[ed] to influence the political life and the economic life of the citizens of Antigua and Barbuda . . . ." Hunton refers to the February 10, 2004 letter for what it states, and denies all allegations in paragraph 274 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 274.

275.    Hunton admits that on March 9, 2004, it filed a complaint, captioned *Stanford v. Emanuel*, on behalf of Allen Stanford against McChesney Emanuel in the United States District Court for the Southern District of New York, asserting claims for libel and slander. Except as expressly admitted herein, Hunton denies the allegations in paragraph 275. Hunton specifically denies that it acted improperly in any way in connection with the *Stanford v. Emanuel* matter.

276.    Hunton denies the allegations in paragraph 276. Further answering, Hunton states that an email chain dated May 4 through May 27, 2004 between a Hunton attorney and McChesney Emanuel's attorney, Conrad Airall, discusses a proposed statement to be published on the Justice Movement's website and that such proposed statement states:

> When the Antigua and Barbuda Justice Movement was established during the election campaign, this Movement published statements and allegations concerning Mr. R. Allen Stanford that, among other things, criticized him for supporting the Antigua and Barbuda Labor Party regime.

> On Thursday, April 15, 2004, Mr. Stanford and Mr. Emanuel, in a gesture of reconciliation, pledged to let bygones be bygones. In a statement made to Julian Rogers of Radio Observer, Mr. Emanuel expressed his willingness to work along with Mr. Stanford and all persons of good will to develop Antigua and Barbuda. Mr. Stanford agreed also to stipulate to the dismissal of a lawsuit he filed against Mr. Emanuel for publishing what Mr. Stanford believed to be false and defamatory statements and comments.
>
> Remarks published on this web site and elsewhere during the political campaign were intended to mobilize all Antiguans and Barbudans to work for change. The views expressed never were believed to be defamatory nor intended to defame anyone. We apologize for any unintended personal harm that may have resulted from our remarks. Mr. Stanford, in particular, expressed the view that our statements and published material defamed him. Mr. Emanuel and the Antigua and Barbuda Justice Movement did not intend to defame Mr. Stanford or publish false statements or allegations about Mr. Stanford. Again, we regret any personal hurt felt by Mr. Stanford and apologize for any harm caused by our actions.
>
> In this new era, Mr. Emanuel and the Antigua and Barbuda Justice Movement call on Mr. Stanford to join us in working together to improve education, technology and healthcare in Antigua and Barbuda.

Hunton states that the *Stanford v. Emanuel* matter was dismissed without prejudice, by stipulation of the parties, on October 14, 2004.

277.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 277 and therefore denies the allegations.

278.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 278 and therefore denies the allegations.  Further answering, Hunton states that the allegations in paragraph 278 do not, on their face, reference or have anything to do with Hunton.

279.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 279 and therefore denies the allegations.  Further

answering, Hunton states that the allegations in paragraph 279 do not, on their face, reference or have anything to do with Hunton.

280.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 280 and therefore denies the allegations.   Further answering, Hunton states that the allegations in paragraph 280 do not, on their face, reference or have anything to do with Hunton.

281.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 281 and therefore denies the allegations.   Further answering, Hunton states that the allegations in paragraph 281 do not, on their face, reference or have anything to do with Hunton.

282.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 282 and therefore denies the allegations.   Further answering, Hunton states that the allegations in paragraph 282 do not, on their face, reference or have anything to do with Hunton.

283.    Hunton denies the characterization in paragraph 283 that it "structured" loans to be paid by the Antiguan Government.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 283 and therefore denies the allegations.

284.    Hunton denies the allegations in paragraph 284.

Answer to Footnote 31, appended to Paragraph 284:   Hunton admits that Carlos Loumiet had dinner in February 2002 with Allen Stanford and Louise Stanford. Except as expressly admitted herein, Hunton denies the allegations in footnote 31.

285.   Hunton admits that a letter dated November 26, 2001 exists in its files that purports to be from Carlos Loumiet to Allen Stanford, and that such letter states in part, "Good for you for embracing the (California) Stanford connection!"  Hunton denies that at that time, it or Mr. Loumiet knew or suspected that Allen Stanford's purported connection to Stanford University was fraudulent, as Plaintiffs allege in paragraph 285.  Hunton refers to the November 26, 2001 letter for what it states, and denies all allegations in paragraph 285 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 285.

286.   Hunton admits that an unsigned letter dated June 3, 2002 exists in its files and that such unsigned letter purports to be from Carlos Loumiet addressed to "To Whom It May Concern," and that the language appearing in quotation marks in paragraph 286 appears in that unsigned letter.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 286 that the unsigned letter is "related to Stanford's bid to purchase the Wackenhut castle in Coral Gables" and therefore denies the allegations.  Hunton refers to the unsigned letter for what it states, and denies all allegations in paragraph 286 that are inconsistent with its contents.  Hunton denies the remaining allegations in paragraph 286.

287.   Hunton admits that Carlos Loumiet was named as the manager of Casuarina 20 LLC.  Hunton admits that an email exists in its files dated April 6, 2004 that purports to be from

a Hunton attorney to Carlos Loumiet, and that such email contains a proposed email to Allen

Stanford suggesting options for the manager role of Casuarina 20 LLC, including as follows:

> The manager would be someone you trust implicitly, but someone who is not too
> close to you.  I would think that Carlos Loumiet would be a good choice.
> Yolanda would also be a good choice from several standpoints, but she and other
> employees of your companies may be too close to you, and therefore third parties
> may assume from their involvement that you are the owner of the LLC.

Hunton refers to the April 6, 2004 email for what it states, and denies all allegations in paragraph

287 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies

the allegations in paragraph 287.

288.    Hunton admits that, from time to time, Carlos Loumiet asked Allen Stanford to

send more legal work to Hunton, given that Hunton was being retained only for discrete legal

work on a periodic and inconsistent basis, and Carlos Loumiet understood that other law firms

were frequently being hired for significant Stanford-related legal work.  Hunton denies that there

is anything improper about seeking additional legal work consistent with the applicable rules of

professional conduct.  Hunton lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations in the second and third sentences of paragraph 288 and

therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 288.

289.    Hunton admits that an email exists in its files that is dated November 5, 2003 and

that purports to be from Carlos Loumiet to Allen Stanford and that, in the email, Mr. Loumiet

thanks Mr. Stanford for drinks the previous evening and for Mr. Stanford's "support on the use

of our firm instead of another US one unless [Hunton] really can't do the job."  Hunton refers to

that November 5, 2003 email for what it states and denies all allegations in paragraph 289 that

are inconsistent with its contents.  In particular, Hunton denies the allegation in paragraph 289

that Mr. Loumiet "extract[ed] a commitment from Stanford" to send any legal work to Hunton. Further answering, Hunton states that it was retained only for discrete legal work on a periodic and inconsistent basis.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 289.

290.    Hunton admits that an email chain exists in its files dated November 30, 2004 through December 1, 2004, and that such email chain contains an email dated November 30, 2004 that purports to be from Carlos Loumiet to Allen Stanford.  Hunton further admits that the language appearing in quotation marks in paragraph 290 appears in that November 30, 2004 email (without the emphasis or bracketed portions), but denies that the allegations in paragraph 290 reflect the full context and meaning of that language.  Hunton denies that it ever served as "outside General Counsel" to Allen Stanford or any Stanford entity.  Hunton admits that the November 30, 2004 email expresses concern about another law firm being hired for legal work, and that such email states in part that "[i]t would also be very sad if I had to stop bringing ideas and opportunities to the Stanford group altogether."  Hunton refers to the November 30-December 1, 2004 email chain for what it states, and denies all allegations in paragraph 290 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 290.  Hunton specifically denies that the November 30, 2004 email evidences any intent on the part of Mr. Loumiet to engage in or assist Allen Stanford or any Stanford entity in wrongdoing of any kind.

291.    Hunton admits that an email chain exists in its files dated November 30, 2004 through December 1, 2004, and that such email chain contains an email dated December 1, 2004 that purports to be from Allen Stanford to Carlos Loumiet.  Hunton denies that Plaintiffs have

accurately quoted the December 1, 2004 email in paragraph 291.   Hunton denies that the characterization "very best friends" accurately describes the connection between Allen Stanford and Carlos Loumiet.   Hunton refers to the November 30-December 1, 2004 email chain for what it states, and denies all allegations in paragraph 291 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 291.   Hunton specifically denies the suggestion in paragraph 291 that Carlos Loumiet ever knowingly assisted Allen Stanford or any Stanford entity in committing wrongdoing of any kind.

292.   Hunton admits that an email chain exists in its files dated November 30, 2004 through December 1, 2004, and that such email chain contains an email dated December 1, 2004 that purports to be from Carlos Loumiet to Allen Stanford.   Hunton further admits that the italicized language quoted in paragraph 292 appears in that December 1, 2004 email, but denies that the email contains the bolding and underlining that Plaintiffs have used in paragraph 292. Hunton refers to the November 30-December 1, 2004 email chain for what it states, and denies all allegations in paragraph 292 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 291.   Hunton specifically denies that the December 1, 2004 email evidences any intent on the part of Mr. Loumiet to engage in or assist Allen Stanford or any Stanford entity in wrongdoing of any kind.   Hunton also specifically denies the suggestion in paragraph 292 that Carlos Loumiet ever knowingly assisted Allen Stanford or any Stanford entity in committing wrongdoing of any kind.

293.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second and third sentences of paragraph 293 and therefore denies the allegations.   Hunton denies the remaining allegations in paragraph 293.   Hunton

specifically denies that it or Carlos Loumiet was aware of allegations, which Plaintiffs allege were made in 2005 by members of the board of the Florida International Bankers Association, that the Stanford entities were a "pyramid scheme."

294.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 294 and therefore denies the allegations.

295.    Hunton denies the allegations contained in the first sentence of paragraph 295. Hunton further denies that there is anything improper about seeking additional legal work consistent with the applicable rules of professional conduct.  Hunton admits that an email chain exists in its files dated April 28, 2005 and that such email chain contains an email dated April 28, 2005 that purports to be from Carlos Loumiet to Yolanda Suarez and Mauricio Alvarado. Hunton admits that that April 28, 2005 email contains the language appearing in quotation marks in paragraph 295, but denies that the allegations in paragraph 295 accurately reflect the full context and meaning of those statements.  Further answering, Hunton states that the April 28, 2005 email chain contains what purports to be a response from Mauricio Alvarado to Carlos Loumiet, in which Mr. Alvarado states, "Thank you Carlos.  We are already working on it.  Take care."   Hunton refers to the April 28, 2005 email chain for what it states, and denies all allegations in paragraph 295 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 295.

296.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegation in the first sentence of paragraph 296 that "Stanford purchased the Caribbean airlines, Caribbean Star and Caribbean Sun, in 2001 (using SIBL investor money)."   Hunton admits that Carlos Loumiet had dinner in February 2002 with

Allen Stanford and Louise Stanford.  Hunton admits that an email exists in its files dated February 27, 2002 that purports to be from Carlos Loumiet to Allen Stanford, and that such email references the capabilities of Hunton relevant to legal matters associated with the aviation industry.  Hunton further admits that an email exists in its files dated October 30, 2003 that purports to be from Carlos Loumiet to ysuarez@stanfordeagle.com and malvarado@stanfordeagle.com, and that such email references Hunton's practice in the area of legal issues associated with labor and references a Hunton lawyer with experience in handling legal matters associated with labor and airlines.  Hunton refers to the February 27, 2002 and October 30, 2003 emails for what they state, and denies all allegations in paragraph 296 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 296.

297.  Hunton denies the allegation in the first sentence of paragraph 297.  Hunton admits that an email exists in its files dated January 19, 2006 that purports to be from Carlos Loumiet to astanford@stanfordeagle.com and that such email states in part, "[h]ope this year we can also start saving you some serious money on taxes through the USVI.  Let me know if you're available any time for drinks and/or a meal, just the two of us.  My treat."  Hunton also admits that an email exists in its files dated January 12, 2007 that purports to be from Carlos Loumiet to astanford@stanfordeagle.com, and that such email states "I am SO proud of you" and purports to attach a four-page article titled "Sir Allen Stanford's 20/20 vision."  Hunton refers to the January 19, 2006 email and the January 12, 2007 email and its purported attachment for what they state, and denies all allegations in paragraph 297 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 297.

298.    Hunton admits that an email chain exists dated December 28-30, 2006 and that such email chain contains an email dated December 28, 2006 that purports to be from Carlos Loumiet to Allen Stanford.  Hunton admits that the italicized language appearing in quotation marks in the first sentence of paragraph 298 is found in that December 28, 2006 email.  Hunton further admits that the December 28-30, 2006 email chain contains an email dated December 30, 2004 that purports to be from Allen Stanford to Carlos Loumiet, and that the italicized language appearing in the second sentence of paragraph 298 is found in that December 30, 2004 email, except that the email uses the word "years" instead of "days" and lacks the bolding used for emphasis in paragraph 298.  Hunton refers to the December 28-30, 2006 email chain for what it states, and denies all allegations in paragraph 298 that are inconsistent with its contents.  Further answering, Hunton states that in a Final Decision & Order dated July 27, 2009, in the OCC administrative proceeding *In the Matter of Carlos Loumiet, Esq.*, Case No. OCC-AA-EC-06-102, the OCC dropped all of its charges against Mr. Loumiet related to the Hamilton Bank matter. Hunton also states that in a decision dated July 12, 2011 in *Loumiet v. Office of the Comptroller of the Currency*, the U.S. Court of Appeals for the District of Columbia entered an order instructing a lower court to award Mr. Loumiet the attorneys' fees he incurred to defend himself against the OCC's proceedings in the Hamilton Bank matter, with the court concluding in part the OCC "was not 'substantially justified' in bringing the underlying administrative proceedings against Loumiet."  Except as expressly admitted herein, Hunton denies the allegations in paragraph 298.

299.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 299 and therefore denies the allegations.

300.     Hunton admits that it provided certain legal services related to certain real estate transactions that were related to Allen Stanford, including (1) a lawsuit against Harbor Key Corp. and R. Allen Stanford related to the sale of a condo unit in Key Biscayne, Florida; (2) acquisition of a property at 160 Leucadendra Drive in Coral Gables by Harbor Key Corp. II; and (3) acquisition by Casuarina 20 LLC of the Wackenhut property in 2003.   Hunton admits that a Hunton attorney assisted in communicating with other counsel who represented Allen Stanford in connection with a traffic ticket.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 300.

301.     Hunton admits that an email dated November 30, 2006 exists in its Stanford-related files that purports to be from a Hunton attorney to Julie Hodge and that concerns the potential demolition of the Wackenhut property owned by Casuarina 20 LLC.   Hunton refers to that email for what it states, and denies all allegations in paragraph 301 that are inconsistent with its contents.   In particular, Hunton denies that the email states, as alleged in paragraph 301, that "the Historic Preservation Board had designated the home a landmark."   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the third sentence of paragraph 301 and therefore denies the allegations.   Hunton denies the remaining allegations in paragraph 301.

> Answer to Footnote 32, appended to Paragraph 301:   Hunton admits that an article titled "As Feds Closed In, Allen Stanford Scrambled to Keep Fraud Secret, Money Flowing," appeared in the December 6, 2009 edition of the *Miami Herald*. Hunton refers to that article for what it states and denies all allegations in footnote 32, and paragraph 301 to which footnote 32 is appended, that are inconsistent with the article's contents.   In particular, Hunton denies that the article states that

Allen Stanford purchased a home in St. Croix for over $8 million, as alleged in paragraph 301.   Except as expressly admitted herein, Hunton denies the allegations of footnote 32.

302.   Hunton admits that a letter exists in its files dated August 9, 2007 that purports to be from Carlos Loumiet to Yolanda Suarez, that purports to bear a counter-signature from Yolanda Suarez, and that states in part that the letter "will confirm our engagement as counsel to the Stanford Advisory Board, commencing September 1, 2007," with a retainer of $8,300 per calendar month.   Hunton refers to that letter for what it states, and denies all allegations in paragraph 302 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 302.   Hunton specifically denies the allegation that it received $100,000 per year for Mr. Loumiet's service as counsel to the Stanford Advisory Board.

303.   Hunton denies the allegations in the first sentence of paragraph 303.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 303 and therefore denies the allegations.

304.   Hunton admits that Carlos Loumiet attended a Stanford advisory board meeting in New York in September 2008, but denies the suggestion in paragraph 304 that Mr. Loumiet attended a Top Performers' Club meeting at the same time.   Hunton admits that an email exists in its files dated October 1, 2008 that purports to be from Carlos Loumiet to astanford@stanfordegle.com, and that such email states in part, "I can't help but see in my mind a TV ad talking about the Stanford Financial Group . . . and resulting down-to-earth and grounded philosophy  . . . ."   Hunton refers to that email for what it states, and denies all allegations in paragraph 304 that are inconsistent with its contents.   Except as expressly admitted

or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 304 and therefore denies the allegations.

305.    Hunton admits that Carlos Loumiet attended the 20/20 Cricket match in Antigua in October 2008.  Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 305 and therefore denies the allegations.

306.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 306 and therefore denies the allegations.

307.    Hunton admits that an email chain exists in its files dated May 3, 2002 that purports to be from Carlos Loumiet to ysuarez@stanfordeagle.com, that forwards an email concerning a company that was beginning a private charter airline, and that an English translation of that email contains language that is generally consistent with the language appearing within quotation marks in paragraph 307.  Hunton refers to that email chain for what it states, and denies all allegations in paragraph 307 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 307.  Hunton specifically denies the allegation that the email chain solicits an "investment" in the charter airline.  Hunton also specifically denies the allegation that it or Carlos Loumiet knew, at any time, that "SIBL victims' money" was being used for improper purposes.  Further answering, Hunton states that, before the receivership was created in February 2009, Hunton was not aware of (1) any U.S. law enforcement agency investigation into Allen Stanford or the Stanford entities for the type of misconduct at issue in the SEC's lawsuit or the Department of Justice's indictment against Allen Stanford, or (2) any U.S. law enforcement or regulatory agency

determination that Allen Stanford or the Stanford entities had actually engaged in any illegal or otherwise wrongful conduct.

308.    Hunton denies the allegations in paragraph 308.

309.    Hunton admits that a letter, written in Spanish and dated August 9, 2002, exists, that purports to be from Carlos Loumiet to Delia Cardenas, Superintendent of Banks for the Republic of Panama, and that an English translation of the letter states that it relates to the Stanford Financial Group's application "for a banking license in the Republic of Panama." Hunton further admits that an English translation of such letter states in part, "I dare say that during that time I have been the main outside counsel for Mr. Stanford and for many of his companies.  In all my time as their representative, I have always observed in Mr. Stanford and those companies full compliance with the law and, more importantly, a clear intention and willingness not only to obey the law but also to observe very high ethical standards."  Hunton refers to the August 9, 2002 letter for what it states, and denies all allegations in paragraph 309 that are inconsistent with its contents.  Hunton denies that Mr. Loumiet made false statements to Cardenas in the letter, and denies that it or Mr. Loumiet knew of or assisted Mr. Stanford or any Stanford entity in engaging in any kind of "illicit activities and investigations in Montserrat and Antigua."  Except as expressly admitted herein, Hunton denies the allegations in paragraph 309.

310.    Hunton admits that a letter, written in Spanish and dated August 15, 2002, exists in its Stanford-related files that purports to be from Carlos Loumiet to Delia Cárdenas, Superintendent of Banks for the Republic of Panama, and that an English translation of the letter states in part that it was written "at the request of the Stanford Financial Group, which is applying for a banking license in Panama, to give you references on Yolanda Suárez, who acts as

the Group's Chief of Staff."   Hunton admits that an email, written in Spanish and dated September 18, 2002, exists in its Stanford-related files, that purports to be from Carlos Loumiet to Roberto A. De Araujo López, and that an English translation of the email states in part, "I have the pleasure of hereby confirming the recommendations which you have already received from me for Mr. Allen Stanford and Ms. Yolanda Suárez."   Hunton admits that an unsigned letter, written in Spanish and dated January 22, 2004, exists in its Stanford-related files that purports to be from Carlos Loumiet to Delia Cárdenas, Superintendent of Banks for the Republic of Panama, and that an English translation of the subject line of the letter is, "Letter of Reference for Mr. R. Allen Stanford in Relation to Application for a Fiduciary License in Panama." Hunton refers to the August 15, 2002 letter, September 18, 2002 email, and January 22, 2004 letter for what they state, and denies all allegations in paragraph 310 that are inconsistent with their contents.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second and fourth sentences of paragraph 310 and therefore denies the allegations.   Hunton denies the remaining allegations in paragraph 310.

311.   Hunton admits that a letter, written in Spanish and dated October 1, 2004, exists in its Stanford-related files that purports to be from Carlos Loumiet to Dr. Trino Alcides Díaz, Superintendent's Office, Superintendence of Banks and Other Financial Institutions, Venezuela, and that an English translation of such letter contains language that is generally consistent with that appearing within quotation marks in paragraph 311.   Hunton refers to the letter for what it states, and denies all allegations in paragraph 311 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 311.   Hunton specifically denies that Mr. Loumiet "lie[d]" in the letter, as alleged in paragraph 311.

312.    Hunton denies that it or Carlos Loumiet had a "practice of trying to 'clear' Stanford's name," as alleged in paragraph 312.  Hunton admits that an email chain exists in its files dated December 16, 2004 through January 5, 2005 that contains an email dated December 16, 2004 that purports to be from Carlos Loumiet to "David Leppan, World-Check," and that such email discusses Allen Stanford's inclusion at the time on World-Check's list of "politically exposed persons" ("PEPs").  That email states in part:

> I note that your site supports the inclusion of Mr. Stanford as a PEP because of Caribbean press reports of a supposed 'close' association of [Mr. Stanford] with former Antiguan and Barbudan Prime Minister Lester Bird. . . . Of course, since the Bird Government was in power for the first 14 years of Mr. Stanford's involvement in Antigua and Barbuda, and the islands are relatively small, Mr. Stanford did have to deal with Mr. Bird and his Government on a recurring basis, just as he had to deal with the current Prime Minister, then Leader of the Opposition, Baldwin Spencer. . . . However, having to deal on a recurring basis with a Government should not in itself convert you into a PEP, or else every lawyer and lobbyist in Washington, DC (or any other capital of the world) would qualify.

The December 16, 2004 email further states that although "Mr. Stanford never had a relationship with Mr. Bird that would cause him to qualify as a PEP, [ ] even if that relationship could ever have been found to exist, it is completely irrelevant now" that Mr. Bird was no longer in power. Hunton admits that the language that appears in quotation marks in the fifth sentence of paragraph 312 appears in the December 16, 2004 email but denies that such allegations describe the full context of that language.

Hunton admits that the December 16, 2004 through January 5, 2005 email chain contains an email dated January 5, 2005 that purports to be from David Leppan to Carlos Loumiet in response to the email dated December 16, 2004, and that such January 5, 2005 email states in part, "I have read your email with great interest, reviewed the profile and considered the legislation and must concur.  As of this morning[,] I instructed our Chief Editor to please remove [Allen Stanford's] profile" as a PEP.  Further answering, Hunton states that the December 16,

2004 through January 5, 2005 email chain also contains an email dated January 5, 2005 that purports to be from Carlos Loumiet to astanford@stanfordeagle.com and ysuarez@stanfordeagle.com, and that such email states, "Allen is no longer on World-Check as a [PEP]," and "David Leppan also told me on the phone that he had checked with his own sources in the US Govt and that our Govt 'has nothing bad' on Allen."

Hunton refers to the December 16, 2004 through January 5, 2005 email chain for what it states, and denies all allegations in paragraph 312 that are inconsistent with its contents.  In particular, Hunton denies the allegation that the December 16, 2004 email states that Allen "Stanford was a model citizen and his companies were above approach."

Except as expressly admitted herein, Hunton denies the allegations in paragraph 312. Hunton specifically denies that Carlos Loumiet made any statements in the December 16, 2004 through January 5, 2005 email chain that he knew, believed, or even suspected were false.

313.    Hunton admits that on May 17, 2006, *Bloomberg* published an article titled "Stanford Financial's 'Family' Tie Fails to Impress University," and that in such article, a Stanford University official is quoted as stating, "'We are familiar with Stanford Financial but are not aware of any genealogical relationship between Allen Stanford and Leland Stanford,'" who is described in the article as the university's founder.  Hunton refers to that article for what it states, and denies all allegations in paragraph 313 that are inconsistent with its contents. Hunton admits that a letter exists in its files dated May 18, 2006 that purports to be from Julia Hodge, Stanford Financial Group, to Carlos Loumiet, and that such letter purports to attach "an article written by a Michael Forsythe at Bloomberg News, as well as an e-mail from him prior to the article being run, and our response."  Hunton refers to that letter and purported attachment for

what they state, and denies all allegations in paragraph 313 that are inconsistent with their contents.

Hunton admits that an email exists in its files dated May 5, 2006 that purports to be from mforsythe@bloomberg.net to Lisa Wolford, that such email addresses Bloomberg's intent to publish an article about Allen Stanford and Stanford Financial, and that such email states in part, "We quote a professor of marketing showing how those family links can instill trust and confidence in Stanford Financial" and "We cite company documents and training videos showing how such deposits more than doubled from 2003 to 2004, with the company targeting affluent people such as doctors to make deposits to SIBL, deposits which are not FDIC insured. These CDs make annual returns hundreds of basis points above rates found at US banks." Hunton refers to that May 5, 2006 email for what it states, and denies all allegations in paragraph 313 that are inconsistent with its contents. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of any of the above-identified statements in the May 5, 2006 email and therefore denies the allegations.

Hunton denies the remaining allegations in paragraph 313.

314.   Hunton admits that on May 17, 2006, *Bloomberg* published an article titled "Stanford Financial's 'Family' Tie Fails to Impress University," and that a portion of such article purports to quote from a State Department cable. Hunton refers to that article for what it states, and denies all allegations in paragraph 314 that are inconsistent with its contents. Hunton admits that a letter exists in its files dated July 28, 2006 that purports to be from Carlos Loumiet to Howard J. Krongard, Esq., Inspector General of the Department of State, Office of Inspector General, and that such letter raised concerns about disclosure of "confidential contents of State Department cables" to members of the media and requested an "investigation within the State

Department into how confidential cables fell into the hands of the press."  Hunton further admits that the letter refers to the May 17, 2006 *Bloomberg* article as a "derogatory article" and that such letter also states in part:

> The only way [the confidential State Department cables] can lawfully have become public would be through an appropriate Freedom of Information Act request.  To the extent such a request was made to the State Department, we request a copy.  Otherwise, we believe that these disclosures represent violations of the Right to Privacy Act, 5 U.S.C. § 552a, which Congress enacted precisely to protect our citizenry from uncontrolled disclosures by Federal agencies of confidential information, . . . and that both civil liability and criminal penalties may be involved.

Hunton refers to the July 28, 2006 letter for what it states, and denies all allegations in paragraph 314 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 314.

315.    Hunton denies that it or Carlos Loumiet were or ever acted as "Stanford's enforcers," as alleged in paragraph 315.  Hunton admits that an unsigned letter exists in its files dated June 28, 2006 that purports to be from Carlos Loumiet to Howard J. Krongard, Esq., Inspector General of the Department of State, Office of Inspector General, and that such letter raised concerns about disclosure of "confidential contents of State Department cables" to members of the media and requested an "investigation within the State Department into how confidential cables fell into the hands of the press."  Hunton refers to the draft June 28, 2006 letter for what it states, and denies all allegations in paragraph 315 that are inconsistent with its contents.  Hunton further admits that, according to its time records, certain of its attorneys conducted legal research regarding potential causes of action against "individual government employees" given the confidential State Department information included in the above-referenced *Bloomberg* article.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 315.

189

316.    Hunton admits that an email exists in its files dated April 13, 2005 that purports to be from Carlos Loumiet to apereira@kpmg.com and that such email states, "[f]ollowing up on our telcon, the Stanford folks tell me they want to talk to you promptly about auditing their two airlines, Caribbean Moon and Caribbean Star, both HQd in Ft. Lauderdale.  Let me know how we go about doing this."   Hunton denies that it or Carlos Loumiet knew or suspected that the Caribbean airlines were "acquired in 2001 using SIBL investor money," as alleged in paragraph 316.  Further answering, Hunton states that an email chain exists in its files dated April 13, 2005 through April 18, 2005 that contains emails that purport to show that Antonio Pereira of KPMG responded to Mr. Loumiet's April 13 email by asking for a meeting, that Mr. Loumiet forwarded such email to Mauricio Alvarado and Yolanda Suarez, and that Mr. Loumiet thereafter suggested, "btw, i'd suggest we hold the meeting at your miami offices, make a full powerpoint presentation on the Group and its companies, and have your new compliance guy (and former senior dea officer) make a cameo."

Hunton admits that an email chain exists in its files dated April 13, 2005 through April 19, 2005, and that such email chain contains emails that purport to show that Antonio Pereira of KPMG asked Mr. Loumiet, "Do you have any [of the] Stanford Group's Consolidate[d] Financial Information that you can share with us?" and that Mr. Loumiet forwarded Mr. Pereira's request to Mr. Alvarado.  That email chain further purports to show that Mr. Alvarado responded in an April 19, 2005 email stating in part that he would be "glad to provide you with as much information as needed," and listed nine items that Mr. Alvarado proposed to send KPMG, including, among other things: (1) annual reports and audited financials for SIBL, Bank of Antigua, Stanford Trust Company in Antigua, and Stanford Group Holdings Inc.; (2) approvals and licenses for SIBL, the Bank of Antigua, Stanford Trust Company in Antigua, Stanford Group Company, Stanford Bank (Panama) S.A., and the two airlines; (3) reports of the FSRC's

examinations of SIBL and Stanford Trust Company in Antigua; and (4) policies and procedures for SIBL, the Bank of Antigua, Stanford Trust Company in Antigua, and Stanford Group Company.

Hunton admits that an email chain exists in its files dated April 19, 2005 and that such email chain contains emails that purport to show that Mr. Loumiet forwarded to apereira@kpmg.com Mr. Alvarado's email offer to "provide you with as much information as needed," including the list of nine items, with a cover note stating, "[t]he four companies for which you're getting auditeds are among the largest and most prominent/visible in the group." Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the fourth sentence of paragraph 316 and therefore denies the allegations. Further answering, Hunton states that Mr. Loumiet's willingness to request and provide KPMG with financial information, including SIBL's audited financials, demonstrates that Hunton and Mr. Loumiet did not know or suspect that Mr. Stanford was using SIBL or any other Stanford entity to engage in illegal or otherwise wrongful conduct.

Hunton refers to the emails and email chains referenced in this answer to paragraph 316 for what they state, and denies all allegations in paragraph 316 that are inconsistent with their contents. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the fourth sentence of paragraph 316 and therefore denies the allegations.

Hunton denies the remaining allegations in paragraph 316.

317.    Hunton denies the allegations in the first and second sentences of paragraph 317. Hunton admits that KPMG declined to take on the Stanford engagement but denies that Hunton was informed of a specific reason for KPMG's decision. Hunton admits that an email exists in

its files dated May 6, 2005 that purports to be from Carlos Loumiet to Hector S. Mojena at

KPMG, and that such email requests "the opportunity to meet off-the-record and informally with

the persons at KPMG who had concerns about the Stanford Group" and then states in part:

[I]n terms of other character/integrity references, let me offer the following:

1.      Allen Stanford has been to the President's ranch in Crawford since Mr. Bush was elected President, as a personal guest. (It is my understanding that the White House and the Secret Service are pretty picky about such guests.)

2.      Mauricio Alvarado, the GC of the Group, who oversees compliance (including AML) for the Group and whom you met, is a close personal friend of the current Attorney General of the United States, Alberto Gonzales. In fact, Mr. and Mrs. Gonzales were introduced by Mr. Alvarado and his wife. Coincidentally, tomorrow afternoon Mr. Alvarado is hosting a family event in Houston for Mr. Gonzales and his family. If KPMG likes, we will provide a personal reference for Mr. Alvarado - in effect, the Group's Chief Compliance Officer - from the Attorney General himself. Through the Justice Department, of course, Mr. Gonzales is responsible for the FBI. I assure you he does not give personal references lightly, and it is difficult to imagine a better reference for any person's integrity and respect for the law

3.      A decorated retired FBI veteran in Texas, Lloyd Harrell, has worked with me and Allen Stanford on a variety of matters (including chasing down false rumors) over the past 20 years. I can put KPMG directly in touch with him.

4.      Some 10 years ago I introduced Allen Stanford and his folks to Tom Cash, then recently retired as the Head DEA Agent for Latin America, who had just joined Kroll Associates. Mr. Cash and Kroll have done much of the Group's background and outside compliance work since then. Mr. Cash will be glad to speak to anyone at KPMG about Mr. Stanford and the Group.

3. [sic]      You met Tom Raffinello, a career DEA Agent who was in charge of DEA's activities in the Caribbean until he joined the Stanford Group 6 months ago to oversee security. He, too, is a decorated former DEA agent. He, also, will be happy to speak to whoever at KPMG.

4. [sic]      Neither Allen Stanford nor anyone in his Group that I know of - certainly, none of the senior people -, nor any of his companies, has ever had any proceeding commenced against them for a violation even of a regulatory provision, much less a criminal one, anywhere.

5.      Aside from having been granted broker-dealer, trust company and other financial institution licenses in the U.S., Canada and Switzerland -- after exhaustive background checks, I can assure you -- post-9/11 Mr. Stanford was granted a license by the FAA for an airline flying into the U. S. If you want to talk

about scrutiny and background checks, you can just imagine just how hard it is to get such a license since September, 2001.

I could go on and on, but I think, looking at this objectively, the foregoing should be enough to outweigh some newspaper articles based on rumor and innuendo, at least to the extent of exploring the situation a little further to see if there's any merit to those articles.

Hunton admits that an email exists in its files dated May 17, 2005, that such email purports to be from Mr. Mojena responding to Mr. Loumiet's May 6, 2005 email, and that such email states, "I spoke with our risk management representative about this and forwarded the attached information. They are still of the view that we should not proceed with this relationship." Hunton refers to the May 6, 2005 and May 17, 2005 emails for what they state, and denies all allegations inconsistent with their contents.

Except as expressly admitted herein, Hunton denies the allegations in paragraph 317. Further answering, Hunton states that it or Mr. Loumiet never knew of, suspected, or assisted Mr. Stanford or any of the Stanford entities in engaging in any illegal or otherwise wrongful conduct.

318.   Hunton denies the allegations in paragraph 318.  Further answering, Hunton states that it never knew the specific reason or concern that prompted KPMG to decline the Stanford engagement.

319.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 319 and therefore denies the allegations.

Answer to Footnote 33, appended to Paragraph 319:   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in footnote 33, including the allegation in footnote 33 that

Gabriel Bauducco, *Imperio de Papel*, purportedly supports the allegations in paragraph 319.

320.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 320 and therefore denies the allegations.

321.    Hunton admits that an email dated October 19, 2005 exists in its Stanford-related files that purports to be from Carlos Loumiet to Julie Hodge and that states, "I'm on a flight to Mexico City at 8:25 pm tonight, per instructions from RAS."  Hunton admits that a Stanford-related invoice dated November 28, 2005 exists in its files that concerns legal services rendered between October 2 and October 31, 2005, and that such invoice purports to contain entries from Carlos Loumiet between October 19, 2005 and October 21, 2005 that reference "Mexico" and travel to and from Mexico.  Hunton admits that an email chain exists in its Stanford-related files dated October 25-26, 2005, that such email chain begins with an email dated October 25, 2005 that purports to be from a Hunton attorney to Yolanda Suarez and astanford@stanfordeagle.com concerning certain tax bills in Congress, and that such email chain continues with an email dated October 26, 2005 that purports to be from Carlos Loumiet to Yolanda Suarez and astanford@stanfordeagle.com and that states, "Hope you and your families are well. I left Miami with my family yesterday evening so that I could work. I'm in Orlando at the Sheraton Vistana Resort through Sunday. (Our offices in Miami reopen on Monday.)  Please call me at 305-505-1188 at your convenience so I can update you on Mexico."  Hunton refers to the October 19, 2005 email, November 28, 2005 invoice, and October 25-26, 2005 email chain for what they state, and denies all allegations in paragraph 321 that are inconsistent with their contents.

Hunton admits that an email exists in its Stanford-related files dated November 23, 2005 that purports to be from Carlos Loumiet to Yolanda Suarez, and that purports to forward a memorandum, written in Spanish, dated November 18, 2005 and purportedly authored by Ángel M. Junquera Sepúlveda.   Hunton admits that an English translation of such memorandum discusses the detainment in Mexico of Verónica Spindola Balandrano and possible defense strategies.   Hunton refers to the November 23, 2005 email and purported attachment for what they state, and denies all allegations in paragraph 321 that are inconsistent with their contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 321.

322.   Hunton admits that a document exists in its files that purports to be a copy of the Stanford Financial Group *Eagle* magazine, potentially dated sometime in 2007, and that such document states that the 2006 "Jean A. Gilstrap Award of Excellence" was given to Veronica Spindola.   Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 322 and therefore denies the allegations.   Hunton specifically denies any knowledge of or involvement in the activities alleged in the last three sentences of paragraph 322.

> Answer to Footnote 34, appended to Paragraph 322:   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegation in footnote 34 that Gabriel Bauducco, *Imperio de Papel*, purportedly supports the allegations in paragraph 322.

323.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 323 and therefore denies the allegations.

324.    Hunton admits that an email dated December 27, 2005 exists in its Stanford-related files that purports to be from Carlos Loumiet to Yolanda Suarez, and that an English translation of such email, partially in English and partially in Spanish, states in its entirety, "Yolanda, what with the problems in Mexico, keep the attached in mind. Hope youall [*sic*] had a terrific Christmas. Let me know when you can have lunch.  Take care, Carlos."  Hunton admits that such email purports to attach a one-page article from the January 2006 edition of *Corporate Counsel* titled "They Should Have Known Better," concerning Bank of New York's failure to comply with certain provisions of the Bank Secrecy Act.  Hunton refers to the December 27, 2005 email and purported attachment for what they state, and denies all allegations in paragraph 324 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 324.  Hunton specifically denies the allegation in paragraph 324 that "Loumiet recognized the illicit nature of what Stanford was doing in Mexico."

325.    Hunton denies the allegations in the first sentence of paragraph 325.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 325 and therefore denies the allegations.

> Answer to Footnote 35, appended to Paragraph 325:    Hunton admits that an article titled "Florida Regulators Failed to Stop Stanford's Miami Operations," purportedly authored by Michael Sallah, appeared in the August 8, 2009 edition of The Miami Herald, and that such article describes, in part, alleged violations of Ecuador law.  Hunton refers to that article for what it states, and denies all allegations in footnote 35 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations of footnote 35.

326.     Hunton denies the allegations in the first and second sentences of paragraph 326. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 326 and therefore denies the allegations.

327.     Hunton admits that it provided legal services in connection with a lawsuit styled *Guizzetti v. Manzano*, filed on November 9, 2005 against Stanford International Bank, Ltd. and Stanford Financial Group Company in the U.S. District Court for the Southern District of Florida.  Further answering, Hunton states that the lawsuit also named three defendants that were not Stanford entities who were represented by non-Hunton lawyers, and that the plaintiffs in *Guizzetti v. Manzano* alleged in the complaint that ***the non-Stanford defendants*** participated in a Ponzi scheme in Venezuela, and that SIBL and Stanford Financial Group ("SFG") aided and abetted the Ponzi scheme because they assisted in sheltering the "ill-gotten gains" from the scheme.  Hunton refers to the November 9, 2005 complaint in *Guizzetti v. Manzano* for what it states, and denies all allegations in paragraph 327 that are inconsistent with its contents.  Hunton avers that a settlement agreement dated January 19, 2006 exists in its Stanford-related files that purports to show that the case settled without SIBL or SFG paying any money to the *Guizzetti* plaintiffs.  Hunton refers to the January 19, 2006 settlement agreement for what it states, and denies all allegations in paragraph 327 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 327.

328.     Hunton admits that a memorandum dated November 30, 2005 exists in its Stanford-related files that purports to be from a Hunton attorney to "Stanford File," bearing the subject line "Notes re Conference Call with Mauricio Alvarado."  Hunton admits that the memorandum states in part, "[r]egulatory portion more concerning than actual lawsuit" and

"SFIS has never been sued in the states.  Want to keep it that way."  Further answering, Hunton states that the November 30, 2005 memorandum also states in part: (1) "[n]ever had any question as to source of funds.  Everything in order until press articles came out"; (2) "[n]o reason [*sic*] believe [non-Stanford defendant] was involved in questionable business"; and (3) "[p]roblem here is a PR issue."  Hunton refers to the November 30, 2005 memo for what it states, and denies all allegations in paragraph 328 that are inconsistent with its contents.  Hunton admits that a settlement agreement dated January 19, 2006 exists in its Stanford-related files for the *Guizzetti* matter, but denies that SIBL or SFG paid money to the plaintiffs as part of the settlement. Further answering, Hunton states that, according to the settlement agreement, the Stanford entities agreed to facilitate the transfer of settlement funds from the non-Stanford defendants to the plaintiffs, but did not agree to and did not make any settlement payments to the plaintiffs. Hunton refers to the January 19, 2006 settlement agreement for what it states, and denies all allegations in paragraph 328 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 328.

329.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 329 and therefore denies the allegations.

330.    Hunton admits that an email chain exists in its Stanford-related files dated July 7-8, 2006 that contains the following emails:

- An email dated July 7, 2006 that purports to be from Carlos Loumiet to Allen Stanford and that states, "Allen I reviewed the proposed MOU[.]  I'm certainly not an Antiguan/Eastern Caribbean lawyer, but I saw nothing in there allowing any imposition of reserves on banks in Antigua by the ECCB. In fact the MOU is focused not on banks, but on 'Affiliates' of banks licensed in Antigua, and the ECCB's right to monitor the same (presumably as part of its already-existing ability to monitor of the safety and soundness of the banks themselves, and driven by the prevailing international bank

regulation standard of 'consolidated supervision on a comprehensive basis').  Hope this is helpful" and

- A responsive email dated July 8, 2006 that purports to be from Allen Stanford to Carlos Loumiet and that states in its entirety, "The issue here Carlos is that the ECCB which is the regulator and supervisor for Bank of Antigua could be given the authority to step in as our regulator even though we are regulated and licensed by the Ministry of Finance under the FSRC because SIB and SIC are 'affiliates.' In other words what I am concerned about is that this is the ECCB's 'foot in the door' as they could say they are now our regulators etc. [N]ext thing you know the Ministry of Finance has turned the regulation and supervision of the offshore industry over to the ECCB. And make no mistake about this the ECCB has in the past and is now still trying to get their 'foot in the door'. I think if there was going to be consolidation on a global basis for affiliates the FSRC should be doing this for all licensed Antiguan entities. We need to be aggressive here as we have 16 years of history under the ECCB at Bank of Antigua and they jump to the tune of Big Brother.  The ECCB was asked by the Govt to assist in the clean up [of Antigua's banking sector] years back and they didn't lift a finger.  Now things are going well and we are the ONLY thriving offshore center in the Eastern Caribbean and look who now wants to step in.  No bueno.  Let's talk. RAS."

Hunton refers to the July 7-8, 2006 email chain for what it states, and denies all allegations in paragraph 330 that are inconsistent with its contents.  In particular, Hunton denies that the July 8, 2006 email describes Leroy King as Allen Stanford's "blood brother," as alleged in paragraph 330.  Rather, Leroy King is not mentioned in the email by name at all.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 330.

331.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 331 and therefore denies the allegations.

332.    Hunton admits that an email chain exists in its Stanford-related files dated July 17-18, 2006 and that such email chain contains the following emails:

- An email dated July 17, 2006 that purports to be from Allen Stanford to Carlos Loumiet and that states, "Carlos I just arrived in Antigua and Lee King said you never called. I sent the ECCB letter via fax to the number you gave me 5 minutes after we talked. Carlos this issue is of EXTREME importance as this represents a minefield for Antigua and Stanford. Thanks. RAS"' and

- A responsive email dated July 17, 2006 that purports to be from Carlos Loumiet to Allen Stanford and that states, "Allen, I apologize, I didn't realize you expected me to call today, and I first set out to gather the arguments against the ECBB's proposal (by gathering and reviewing Antigua law as well as the ECCB's own articles), thinking that would make my conversation with Mr. King more productive. I will call him tomorrow though right now I don't have a lot of arguments with which to arm him."

Hunton refers to the July 17-18, 2006 email chain for what it states, and denies all allegations in paragraph 332 that are inconsistent with its contents.  Hunton admits that an invoice dated August 22, 2006 exists in its files that concerns Stanford-related legal services provided by Hunton between July 3 and July 21, 2006.  Hunton admits that such invoice (1) contains a July 18, 2006 time entry for 1.30 hours that purports to be from Carlos Loumiet and that states, "E-mails R. Stanford and L. King; telephone conferences with L. King; meeting with F. Suarez"; and (2) contains time entries between July 18 and July 21, 2006 that purport to be related to research and review of unspecified Antiguan banking laws and ECCB materials.   Hunton refers to the August 22, 2006 invoice for what it states, and denies all allegations in paragraph 332 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 332.

333.   Hunton admits that a memorandum dated July 21, 2006 exists in its Stanford-related files that purports to be from Carlos Loumiet to Leroy King and that such memorandum states, in part:

> As the MOU itself states, the Banking Act of 2005 afforded the ECCB jurisdiction over domestic banking entities in Antigua and Barbuda.  It also allows the ECCB in the course of examinations to obtain from those domestic banks information in their possession regarding "affiliates," and to assert authority over those "affiliates" if such an examination shows they are doing something inappropriate.  See Section 21(1) of the Banking Act of 2005.  One can even agree with the statement in the MOU that the ECCB is entitled to examine "affiliates" of domestic banks which the ECCB is charged with regulating under the Banking Act of 2005, for purposes of determining the condition of these domestic banks.

However, I could find nothing in the Banking Act of 2005 nor in the International Business Corporations Act that authorizes your Commission nor the Government of Antigua and Barbuda generally to share information on such "affiliates" with the ECCB, much less that would authorize the ECCB to "monitor and participate in processes for the licensing and examination of affiliates and the resolution of regulatory matters," or any of the numerous matters that the MOU contemplates the ECCB will be allowed to do with respect to such "affiliates." It is therefore hard to see any legal basis under Antiguan and Barbudan law for the proposed expansion of the ECCB's jurisdiction.

Perhaps there is some other Antiguan or Barbudan statute of which I am not aware, but certainly neither the Banking Act of 2005 nor the International Business Corporations Act appear to serve as a legal basis for the proposed MOU.

Finally, please note that the MOU appears to digress from the Banking Act of 2005 by defining "persons" to include "natural persons" while the Banking Act of 2005 only encompasses legal entities. As a result, the definition of "affiliate" for purposes of the MOU, but not for purposes of the Banking Act of 2005, which the ECCB purports to be acting under, may seek to pick up "parallel" institutions -- i.e., those owned by a common natural person or unincorporated group of natural persons, like Bank of Antigua and Stanford International Bank Limited (SIBL), both of which are owned personally by Allen Stanford. There is no explanation given for this much broader definition of "persons" in the MOU, much less a statutory basis for it. Further, for purposes of "consolidated supervision on a comprehensive basis," which is the standard both the ECCB and the Banking Act of 2005 purport to be seeking to achieve, "parallel" institutions are not relevant, since they do not consolidate. There is therefore, if possible, even less basis for the ECCB to seek to assert authority over "parallel" institutions like SIBL.

Of course, I am not admitted as an attorney in Antigua and Barbuda, so I can only share the views I reached based on the review of the Antiguan and Barbudan statutes referred to above, and you should confirm with counsel in Antigua and Barbuda these observations.

Hunton refers to the memorandum for what it states, and denies all allegations in paragraph 333 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 333.

334.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 334 and therefore denies the allegations.

335.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first three sentences of paragraph 335 and therefore denies the allegations. Hunton admits that an email dated December 18, 2003 exists in its Stanford-related files that purports to be from Carlos Loumiet to Allen Stanford, and that such email states in relevant part, "the next time you come up for air in Miami, let me have a drink with you and my tax partner, Richard Razook.  First, you're going to like him. Second, he handles t & e matters for a lot of very wealthy individuals . . . . Third, this is going to be a process which will take some time while you weigh all the various options.  If you prefer, I can have someone from Virginia or DC come down to handle this."  Hunton refers to the December 18, 2003 email for what it states, and denies all allegations in paragraph 335 that are inconsistent with its contents. Hunton denies the remaining allegations of paragraph 335.

336.     Hunton admits that it provided certain legal services in connection with a proposal to move certain Stanford company operations and Allen Stanford himself to the U.S. Virgin Islands in order to benefit from certain rules and programs in that jurisdiction that potentially would have limited the Stanford tax burden.  Hunton admits that its former partner, Jim Miller, assisted with some lobbying efforts in Congress related to certain legislative developments that may have affected the U.S. Virgin Islands proposal.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 336.

337.     Hunton admits that it provided certain legal services in connection with a proposal to move certain Stanford company operations and Allen Stanford himself to the U.S. Virgin Islands in order to benefit from certain rules and programs in that jurisdiction that potentially would have limited the Stanford tax burden.  Except as expressly admitted herein, Hunton denies

the allegations in paragraph 337.  Hunton specifically denies the suggestion in paragraph 337 that there is something illegal or improper about commenting on potential legislative actions.

338.   Hunton admits that an email chain dated April 6-7, 2005 exists in its Stanford-related files and that such email chain includes the following emails:

- An email dated April 6, 2005 that purports to be from Jim Miller to Richard Razook, Carlos Loumiet, and two other Hunton attorneys and that states, "[t]he release of these proposed regs at this time shows that they were near completion when we were authorized to go forward.  Now we have to review them asap and get an analysis to Yolanda and Allen.  Then, if we are not satisfied, we need to get comments in and testify. This would track the legislative effort – again if made necessary by any disappointment in the proposed regs.  Tomorrow's meeting will be even more important now"; and

- A responsive email dated April 7, 2005 that purports to be from Carlos Loumiet to Jim Miller and Richard Razook and that states in part, "the client delayed inordinately in hiring us; however, since we were hired we haven't been all over it, either. we should not have been surprised by the issuance of these regs- we should have known in advance. . . . this is not the way to get the Stanford group's lobbying work in DC."

Hunton admits that an email chain dated April 8, 2005 exists in its Stanford-related files and that such email chain includes the following emails:

- An email dated April 8, 2005 that purports to be from Carlos Loumiet to Yolanda Suarez that states in relevant part, "It was great meeting Ben Barnes yesterday, after hearing about him for so long . . . . I liked him a lot and will thoroughly enjoy working with him, but . . . it might be advisable in going before the Republican-controlled Administration, House and Senate to ask for a legislative favor, to put a staunch Republican face on it as well.  Jim Miller . . . . would seem to be a good complement"; and

- A responsive email dated April 8, 2005 that purports to be from Yolanda Suarez to Carlos Loumiet that states in full, "I fully anticipated that Jim would be working on this, but his schedule was not very flexible.  I do want Jim fully on board, but we do need a team on this.  YS"

Hunton refers to the April 6-7, 2005 and April 8, 2005 email chains for what they state, and denies all allegations in paragraph 338 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 338.

339.    Hunton denies the allegations in paragraph 339, except that Hunton admits that a memorandum exists in its Stanford-related files dated May 13, 2005 that purports to be from Gil Lopez to Richard Razook and that purports to attach a one-page document titled, "Stanford Group of Companies, Selected Global Financial Information as of March 31, 2005" that purports to contain the following information related to eight Stanford entities:    (1) "[a]ssets," (2) "[e]quity,"    (3) "[h]ead   count,"    (4) "[b]ranches,"    (5) "[c]ustomers,"    (6) "[c]ountries," (7) "[c]ommencement   [d]ate,"   (8) "[a]cquired   [d]ate,"   and   (9) "[c]omments."    Under the "Assets" column, the one-page document states the following for each of the eight entities:

| | |
|---|---|
| Stanford International Bank, Ltd. | $3,307,538,220 |
| Bank of Antigua Ltd. | $155,635,120 |
| Stanford Trust Company Ltd. | $11,892,639 |
| Stanford International Bank Panama | $23,865,425 |
| Banco Galicia | $18,559,632 |
| Caribbean Sun Airlines Inc. | $17,526,878 |
| Caribbean Star Airlines Ltd. | $22,334,366 |
| Stanford Development Company Ltd. | $148,800,062 |

Hunton refers to the May 13, 2005 memorandum and its purported one-page attachment for what they state, and denies all allegations in paragraph 339 that are inconsistent with their contents. Further answering, Hunton states that the May 13, 2005 memorandum and its purported one-page attachment do ***not*** mention the over 132 ***other*** entities that Plaintiffs allege in paragraph 23 in the Complaint that Mr. Stanford ultimately owned and controlled.  Hunton further states that it never knew or suspected that the money of Stanford International Bank, Ltd. customers was being used improperly or illegally.    Except as expressly admitted herein, Hunton denies the allegations of paragraph 339.

340.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in the first sentence of paragraph 340 and the allegations in the last sentence of paragraph 340 that Stanford "blew millions of dollars on his

lobbying effort to get himself preferential tax treatment through residency status in the Virgin Islands." Hunton specifically denies the allegation in paragraph 340 that it charged $450,000 for its work related to the U.S. Virgin Islands tax proposal. Hunton denies the remaining allegations in paragraph 340.

341. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and last sentences of paragraph 341 and therefore denies the allegations. Hunton admits that it provided certain legal services in connection with a proposal to move certain Stanford company operations and Allen Stanford himself to the U.S. Virgin Islands in order to benefit from certain rules and programs in that jurisdiction that potentially would have limited the Stanford tax burden. Hunton denies the remaining allegations in paragraph 341.

342. Hunton admits that an email dated October 3, 2007 exists in its Stanford-related files that purports to be from Mark Kuhrt to Richard Razook; bears the subject line "Tentative Agreements"; states in part (ellipses in original), "[t]o recap our discussion and need . . . we discussed the potential transfer of employees from SFGC (US domestic) to SFGGM (STX). We would like to know the pros and cons of this potential company reorganization"; and purports to attach five draft agreements. Hunton admits that an email dated October 3, 2007 exists in its Stanford-related files that purports to be from Richard Razook to Carlos Loumiet, forwarding Mr. Kuhrt's email. Hunton refers to the October 3, 2007 emails and attachments for what they state, and denies all allegations in paragraph 342 that are inconsistent with their contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 342.

343.    Hunton admits that an email dated October 3, 2007 exists in its Stanford-related files that purports to be from Mark Kuhrt to Richard Razook and that bears the subject line "Tentative Agreements."  Hunton admits that the email states in part (emphasis added):

> Also we discussed the need for a review of our expected revenue streams. The attached agreements represent how we expect to source revenue into STX. ***These are draft form and legal names or specific descriptions have yet to be finalized but should serve as a basis for discussion.*** We expect to duplicate many of these agreements to the multiple of companies in the Stanford family as appropriate. In short the agreements are as follows:
>
> *        *        *
>
> 4.    Portfolio Advise Agreement between SFGGM and SIBL – ***this agreement is expected to be changed the most both in legal definitions and the parties to the agreement.*** Serves as the key revenue stream where STX provides portfolio management/advise/counsel to specific Stanford companies for the monies they have to invest.
>
> 5.    Capital Markets Agreement between SFGGM and SIBL – Serves as management of the Investment Portfolio companies where Stanford has placed venture capital.

Hunton refers to the October 3, 2007 email and purported attachments for what they state, and denies all allegations in paragraph 343 that are inconsistent with their contents.  In particular, Hunton denies the suggestion in paragraph 343 that anything about the October 3, 2007 email and its purported attachments provide any information about the way the Stanford group of companies operated at the time of the email.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 343.

344.    Hunton denies the allegations in paragraph 344.

345.    Hunton denies the allegations in paragraph 345, except that Hunton admits that it provided certain legal services in 2001 and 2002 in connection with transactions that involved: (1) a $2 million private placement investment in Senesco Technologies, Inc. by Stanford Venture

Capital Holdings Inc. with a signed purchase agreement dated November 30, 2001 and a subsequent $1 million private placement investment with a signed purchase agreement dated January 16, 2002; and (2) an approximately $1.5 million investment in Intercallnet, Inc. by Stanford Venture Capital Holdings, Inc. with a signed agreement dated February 28, 2002. Further answering, Hunton refers to the Appendix to Receiver's Motion to Appoint Private Equity Advisor, filed July 16, 2009 in *SEC v. Stanford International Bank, Ltd.*, No. 3:09-cv-00298-N (N.D. Tex.) [Dkt. 597], in which the Receiver lists numerous private equity transactions in which Stanford entities purportedly engaged but which Plaintiffs do not—and cannot—claim that Hunton was involved.

> Answer to Footnote 36, appended to Paragraph 345: Hunton denies the allegations in footnote 36.

346.    Hunton admits that a memorandum dated February 11, 2002 exists in its Stanford-related files that purports to have been authored by Hunton attorneys to another Hunton attorney and that states in part, "Stanford Financial is considering the possibility of transferring some or all of the portfolio company securities it receives in connection with its investments into a limited liability company subsidiary and issuing interests in the subsidiary to Stanford Financial employees." Hunton refers to that memorandum for what it states, and denies all allegations in paragraph 346 that are inconsistent with its contents. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 346 and therefore denies the allegations. Hunton denies the remaining allegations in paragraph 346.

347.   Hunton admits that a document titled "Caribbean Star Holdings Board of Leaders Meeting, Tuesday, April 15, 2003, Minutes" exists in its Stanford-related files, that such document does not list Carlos Loumiet as an attendee, and that such document states in part:

> Mr. Stanford welcomed the members of the Board and provided a brief overview of Caribbean Star and Caribbean Sun Airlines. Mr. Stanford described the reasons for the formation of the airlines and their role within the larger structure of the Stanford Caribbean Investment Fund. Mr. Stanford clarified to the Board that the airlines' existence was predicated on his intent to establish the Fund and the absolute need to have a reliable transportation link in the region. Mr. Stanford indicated that the purpose of this first meeting was to provide the board members with a basic introduction to the airlines.

*     *     *

> Questions were also asked regarding financial information.

> Mr. Stanford indicated that this meeting was only to serve as an introduction . . . .

Hunton refers to the minutes of the April 15, 2003 meeting for what they state, and denies all allegations in paragraph 347 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 347.  Hunton specifically denies the allegation in paragraph 347 that Carlos Loumiet attended board meetings in May 2003 for the Caribbean Star, Caribbean Sun, or the Caribbean Investment Fund.

348.   Hunton denies the allegations in paragraph 348.

349.   Hunton denies that it or Carlos Loumiet were ever involved in "deal-making with Stanford," as alleged in paragraph 349.  Hunton admits that an email chain dated December 27-28, 2007 exists in its Stanford-related files and that such email chain includes the following emails:

- An email dated December 27, 2007 that purports to be from a Hunton attorney to Danny Bogar, and that states:

Dear Danny,

I hope you are well and receive this email after an enjoyable holiday season.

I am certain you have been busy. I have been seeing the Stanford Group name everywhere (charitable events, cultural events, professional conferences, news release, etc. . . . ). It is remarkable how quickly you have grown the brand.

In addition to some of the capital market transactions I have mentioned to members of your team, I write to explore another type of potential business opportunity for Stanford. A number of my partners and I have assisted investment banks in the design of accelerated stock repurchase programs ("ASRPs"). Pursuant to ASRPs, an issuer repurchases a large amount of the issuer's common stock from an investment bank that borrows the stock from third parties. The investment bank makes a profit and covers its position through a variety of hedging and stock purchase techniques. I do not know if Stanford offers such services to clients and/or has an interest in offering such services.

Please let me know if you would like to explore this idea further.

- A responsive email dated December 28, 2007 that purports to be from Stanford employee Bill Fusselmann to the Hunton attorney that states, "I saw your note to Danny. We're not typically in a position to offer the services you described but very much appreciate the heads up on the ASRP.  Please keep us informed of any other creative ideas that we can use with our clients. Thanks."

- A responsive email dated December 28, 2007 that purports to be from a Hunton attorney to Bill Fusselmann that states in part, "If Stanford is not typically in the position due to limited ability to individually orchestrate the trading actions necessary to consummate an accelerated stock repurchase, we can assist you [to] secure the services of another bank to handle the trading functions. I would be happy to discuss this further with you or members of your team."

- A responsive email dated December 28, 2007 that purports to be from Bill Fusselmann to a Hunton attorney that states in part, "Since we clear through Pershing, this is probably not a feasible business for us at this time."

Hunton refers to the December 27-28, 2007 email chain for what it states, and denies all

allegations in paragraph 349 that are inconsistent with its contents.  Except as expressly admitted

herein, Hunton denies the allegations in paragraph 349.  In particular, Hunton denies that the

December 27-28, 2007 email chain demonstrates any knowledge of or participation in wrongdoing by Hunton, as the allegations in paragraph 349 appear to suggest.

350. Hunton denies the allegations in the first sentence of paragraph 350. Hunton admits that an email chain dated January 13, 2005 exists in its Stanford-related files and that such email chain includes the following emails:

- An email that purports to be from Danny Bogar to Mauricio Alvarado that contains the language appearing within quotation marks in the second sentence of paragraph 350 and that states in part, "Hunton and Williams should be brought up to speed with what we are doing as a firm on the institutional side" and suggests a meeting.

- A responsive email that purports to be from Mauricio Alvarado to Danny Bogar that states in part:

> We fully understand what the capital markets and investment banking groups do and the source of their deal flow. In fact, that is why I referred Talbert to you. Like Talbert, we have worked with and know many other prestigious lawyers in large law firms that could be a good source of business for our company's capital markets and investment banking groups.
>
> This is why legal is in charge of the retention and use of outside legal counsel. We need to find a way to have your group benefit from our long lasting relationships in the legal community. We are not trying to control what your groups are doing or will do, but to protect our company and RAS by fully supporting any deals your groups are or will be involved in and managing the legal work associated with them. This is also why, per company policy, legal is the one assigned the task to select and retain outside counsel.

- An email that purports to be from Mauricio Alvarado to a Hunton attorney, forwarding Alvarado's emails with Danny Bogar.

Hunton refers to the January 13, 2005 email chain for what it states, and denies all allegations in paragraph 350 that are inconsistent with its contents. Hunton admits that an email dated March 11, 2005 exists that purports to be between Hunton lawyers and to attach a presentation to be delivered to Stanford employees on March 14, 2005. Hunton refers to the March 11, 2005 email and purported attachment for what they state, and denies all allegations in paragraph 350 that are

inconsistent with their contents.   Further answering, Hunton states that such presentation provides a broad overview of Hunton and its areas of practice and provides no legal advice. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the fourth and fifth sentences of paragraph 350 and therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 350.

351.    Hunton denies the first sentence in paragraph 351.  Hunton admits that a fax cover sheet dated February 18, 2003 exists in its Stanford-related files that purports to be from Patricia Rodriguez to Carlos Loumiet and purports to enclose a one-page, undated document titled "Stanford Caribbean Investment Fund."   Hunton admits that the one-page document describes the Stanford Caribbean Investment Fund as "[a] $2 Billion Investment Fund Established to Stimulate and Grow the Economy of the Caribbean Region in Unprecedented Fashion Through Construction of World-Class Tourism Developments and Vital Infrastructure Projects with a 14% Minimum Return on Investment to the Fund's Investors," and states that the fund will be funded by "R. Allen Stanford initial seed money" in the amount of $100 million, "Investors" in the amount of $900 million, "Conventional Financing" in the amount of $700 million, and "Government Concessions" in the amount of $300 million.  The one-page document also states in part that "Stanford Development Company Ltd. will be the Fund's General Partner."  Hunton refers to fax cover sheet and one-page document for what they state, and denies all allegations in paragraph 351 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 351.

352.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 352 and therefore denies the allegations.

353.    Hunton denies that Carlos Loumiet attended a Stanford Caribbean Investment Fund meeting on April 16, 2003 in St. Kitts, as alleged in the first sentence of paragraph 353. Further answering, Hunton states that a document exists in its Stanford-related files titled "Stanford Caribbean Investment Fund Board of Leaders Meeting, Wednesday, April 16th, 2003, Minutes" and that such document does not list Carlos Loumiet among the meeting's attendees. Hunton refers to those meeting minutes for what they state, and denies all allegations in paragraph 353 that are inconsistent with their contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of paragraph 353 and therefore denies the allegations.

Hunton admits that an email dated May 1, 2003 exists in its Stanford-related files that purports to be from Mauricio Alvarado to Carlos Loumiet, and that such email states, "I am attaching a proposed structure for the Stanford Caribbean Investment Fund that I have prepared. Please take a moment to review it and provide me with any comments that you may have." Hunton admits that such email purports to attach a one-page document titled "Stanford Caribbean Investment Fund, Proposal for Corporate Structure."   Hunton admits that such document identifies Stanford International Bank Ltd. as the "Custodian and Administrator of the Fund," but, further answering, avers that the proposed structure also indicates that SIBL would be separate from the ownership structure of the fund and that the document does not indicate SIBL CD depositor money would be used in connection with the Caribbean fund.  Hunton also states that the one-page document states in part: "Arms-length contracts and full disclosure of the affiliated relationship between the Fund and the new Stanford management company and SIBL, respectively, will be required."  Hunton refers to the May 1, 2003 email and its purported one-page attachment for what they state, and denies all allegations in paragraph 353 that are

inconsistent with their contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 353.

354.    Hunton denies the allegations in paragraph 354.

355.    Hunton denies the allegations in paragraph 355.

356.    Hunton denies the allegations in paragraph 356, except that Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in the second and third sentences of paragraph 356 and the allegations in the last sentence of paragraph 356 that "[s]uch investments were totally contrary to what was being disclosed to the SIBL CD investors."

357.    Hunton denies the allegations in the first sentence of paragraph 357.  Hunton admits that a letter dated November 10, 2003 exists in its Stanford-related files that purports to be from a Hunton attorney to Allen Stanford, and that such letter states in part, "[i]t was exciting seeing the renderings your architect and you showed us last week, and hearing you both describe the plans for your new development project in Antigua and Grenada.  As I mentioned before, we would be delighted to be a part of your team working on this project . . . ."  Hunton admits that an email exists in its Stanford-related files dated August 27, 2004 that purports to be from Carlos Loumiet to Yolanda Suarez, and that such email forwards an email from another Hunton lawyer to a group of Hunton lawyers seeking assistance concerning a resort project for an unrelated and unspecified client and then states, "Yolanda - I am sending you this so you'll see that we do work in the field of 'exclusive resorts', 'timeshares', etc., the expertise for some of which may be relevant to Allen's proposed Super Club, when it kicks off."  Hunton refers to the November 10,

2003 letter and August 27, 2004 email for what they state, and denies all allegations in paragraph 357 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 357.

358.   Hunton admits that a document bearing the header "Draft 03.16.2004" exists in its Stanford-related files, and that such document purports to be a draft agreement between the Government of Grenada and an entity named Two Islands One Club (Grenada) Ltd. concerning the purchase of four parcels of land from the Government of Grenada for $22 million.  Hunton refers to that document for what it states, and denies all allegations in paragraph 358 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 358.  Further answering, Hunton denies that an executed version of such draft agreement exists in its Stanford-related files.

359.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and second sentences of paragraph 359 and therefore denies the allegations.  Hunton admits that an email dated September 18, 2006 exists in its Stanford-related files that purports to be from Stanford corporate paralegal Richard LaMothe to Richard Razook, and that such email states in part that Allen Stanford required Mr. Razook's "expert advise [*sic*]" on five questions related to "The Islands Club (a USVI entity) Corporate Structure" and one question related to "Personal Property owned by Mr. Stanford in the US Virgin Islands."  Hunton admits that such email seeks advice on tax issues related to The Islands Club and the potential transfer of assets to that entity.  Further answering, Hunton states that a memorandum dated September 20, 2006 exists that purports to be from a non-Hunton lawyer based in the U.S. Virgin Islands to Richard LaMothe, and that purports to have been drafted in

response to the questions set forth in Mr. LaMothe's September 18, 2006 email to Mr. Razook. Hunton refers to the September 18, 2006 email and September 20, 2006 memorandum for what they state, and denies all allegations in paragraph 359 that are inconsistent with their contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 359.

360.    Hunton admits that an email dated October 16, 2006 exists in its Stanford-related files that purports to be from Carlos Loumiet to Mr. Razook and a U.S. Virgin Islands attorney, and that such email contains the language appearing within quotation marks in paragraph 360, but denies that paragraph 360 accurately describes the context of that email.  Hunton denies that the October 16, 2006 email mentions Stanford International Bank, Ltd. or otherwise compares the "Super Club" to "all of Allen Stanford's different business interests," as alleged in paragraph 360.  Hunton admits that an email chain exists in its Stanford-related files dated May 19, 2008 that includes (1) an email that purports to be from Carlos Loumiet to Bill Fusselmann and Marcos Singer that forwards an email about a beach in Costa Rica and that states, "this beach has a great location, and Costa Rica is hot - any interest?", and (2) a responsive email that purports to be from Bill Fusselmann to Carlos Loumiet and Marcos Singer that states, "From time to time we look at various real estate projects but only consider those that are sponsored by substantial and long standing clients or, of course, those sponsored by RAS himself.    Under the circumstances, I don't think there would be an interest in the project you described."  Hunton refers to the October 16, 2006 email and May 19, 2008 email chain for what they state, and denies all allegations in paragraph 360 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 360.

361.    Hunton denies the allegations in paragraph 361, except that Hunton admits that a memorandum dated June 9, 2006 exists in its Stanford-related files that purports to be from a Hunton attorney to Marcos Singer and Moises Goihman at Stanford, and that such memorandum references a proposed "bridge financing in the amount of US$750,000 that Stanford International Bank Ltd. ('Stanford') intends to provide Golden Mortgage Bankers, Inc. ('GMB')" and "the convertible note or notes in the aggregate principal amount of US$2,200,000 . . . that Stanford intends to purchase from GMB." Hunton refers to the June 9, 2006 memorandum for what it states, and denies all allegations in paragraph 361 that are inconsistent with its contents. Further answering, Hunton denies that the structure and terms stated in the June 9, 2006 memorandum were the final structure and terms for any transaction with Golden Mortgage Bankers, Inc. Hunton states that it had no knowledge of, and did not assist in, any illegal or otherwise wrongful conduct allegedly committed by Allen Stanford or the Stanford entities, including but not limited to the alleged improper use of CD depositors' money.

362.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and last sentences of paragraph 362 and therefore denies the allegations. Hunton admits that an email dated June 28, 2006 exists in its Stanford-related files that purports to be from Stanford's Marcos Singer to four Hunton lawyers, and that such email states in relevant part

> SGC senior management has asked me to inquire about the expected regulatory approval process for Stanford International Bank Ltd. (SIBL) as a potential shareholder in GMB, and its potential ramifications for SIBL. In this regard, please provide us with a description of the regulator, the regulatory approval process (step by step), and the ultimate reporting lines from the regulator upward (including any connection to mainland regulatory authorities). The concern here is based on SIBL being an international bank that is regulated abroad, and what ramifications could there be if SIBL becomes a major shareholder of a regulated banking firm in PR, particularly as it pertains to US regulatory authorities.

Hunton admits that an email chain dated June 29, 2006 exists in its Stanford-related files that contains an email that purports to be from a Hunton attorney to Marcos Singer, with copies to other Hunton lawyers, a non-Hunton lawyer in Puerto Rico, and a Stanford employee, and that such email concerns U.S. regulatory matters involving Stanford International Bank, Ltd. and the potential Golden Mortgage Bankers transaction. Hunton refers to the June 28, 2006 email and June 29, 2006 email chain for what they state, and denies all allegations in paragraph 362 that are inconsistent with their contents. Except as expressly admitted herein, Hunton denies the allegations in the second and third sentences of paragraph 362.

363.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and second sentences of paragraph 363 and therefore denies the allegations. Hunton admits that an email dated May 4, 2008 exists in its Stanford-related files that purports to be from Stanford employee Moises Goihman to Carlos Loumiet and another Hunton lawyer, but Hunton denies that the allegations in the third sentence of paragraph 363 are an accurate description of the email's contents. Hunton refers to the May 4, 2008 email for what it states, and denies all allegations in paragraph 363 that are inconsistent with its contents. Except as expressly admitted herein, Hunton denies the allegations in the third and last sentences of paragraph 363. Hunton specifically denies that it billed "over $100,000" for its legal work in connection with the Vanquish transaction. Further answering, Hunton states that, upon information and belief, the Vanquish transaction never closed.

364.     Hunton denies the allegations in the first sentence of paragraph 364. Hunton admits that an email dated September 29, 2008 exists in its Stanford-related files that purports to be from Carlos Loumiet to Daniel Bogar, and that such email states "This is the sludge-cleaning

oil patent opportunity we discussed."  Hunton admits that an email dated October 6, 2008 exists in its Stanford-related files that purports to be from Carlos Loumiet to Daniel Bogar, and that such email states in part, "Danny, this follows up on Allen's statement in NY that you guys had set up a Water Fund.  What these guys do – water purification in Latin America . . . . I thought this might be of interest to Stanford, and specifically its Water Fund."  Hunton admits that an email dated October 14, 2008 exists in its Stanford-related files that purports to be from Carlos Loumiet to Daniel Bogar, that such email states "Danny, don't know if you guys have any interest in a non-market–related investment option like this one, but just in case, I thought I should pass it on," and that such email purports to forward an email addressed to Mr. Loumiet bearing the subject line, "Life Settlements Business Opportunity."  Hunton refers to the September 29, 2008, October 6, 2008, and October 14, 2008 emails for what they state, and denies all allegations in paragraph 364 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 364.

365.    Hunton denies the allegations in the first and second sentences of paragraph 365. Hunton admits that an email dated November 12, 2004 exists in its Stanford-related files that purports    to    be    from    Carlos    Loumiet    to    astanford@stanfordeagle.com, ysuarez@stanfordeagle.com, and jdavis@stanfordeagle.com, and that such email states in part "I want to tell you that I almost fell out of my chair the other evening when, watching Fox News, a very impressive Stanford Financial Group advertisement came on my TV.  To quote Virginia Slims, 'You've come a long way, baby!'"  Hunton admits that an email exists in its Stanford-related files dated December 16, 2004 that purports to be from Carlos Loumiet to David Leppan and that such email states in part, "[t]he financial companies [Allen Stanford] owns, which advertise on national TV in the US, have on deposit or under management approximately US$17

billion." Hunton refers to the November 12, 2004 and December 16, 2004 emails for what they state, and denies all allegations in paragraph 365 that are inconsistent with their contents. Hunton specifically denies these emails evidence that Hunton or Mr. Loumiet "knew that Stanford was selling the SIBL CDs via general solicitation in the U.S.," as alleged in paragraph 365. Further answering, Hunton states that it never knew of or assisted in any illegal or other wrongful conduct allegedly committed by Allen Stanford or any of the Stanford entities. Except as expressly admitted herein, Hunton denies the allegations in paragraph 365.

366.   Hunton admits that an email chain exists in its Stanford-related files dated November 17, 2003, and that such email chain contains an email that purports to be from Carlos Loumiet to Allen Stanford, Yolanda Suarez, and James Davis and that states, "I met with Raul Mas, formerly of American Express, who told me he knew of two asset managers in Miami who had about $1 billion under management and were unhappy with the non-US bank where they are now employed. Per Raul, they believe the vast majority of their clients would follow them wherever they go. Please let me know if this might be of interest." Hunton admits that such email chain contains an email that purports to be from James Davis to Carlos Loumiet and that states, "I would like to know more about these managers. There might just be a fit in our 'Partners' program with SGC."

Hunton admits that an email chain exists in its Stanford-related files dated March 27-28, 2006, and that such email chain contains an email that purports to be from Carlos Loumiet to Yolanda Suarez that states in part, "i had urged ernesto to meet with you, since i thought what he can do – expand the BD functions, products and visibility in the US and abroad – would complement nicely what you do."

Hunton admits that a draft letter of intent dated March 15, 2007 exists in its files, that purports to be written on behalf of "Stanford Group Holdings, Inc." to "Fred J. Hodges, Chairman" of "Consulting Services Group, LLC," located in Memphis, Tennessee, and that purports to concern the purchase of Consulting Services Group, LLC for $40 million, with potential payments totaling $14 million during the following three years upon satisfaction of certain conditions.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegation in paragraph 366 that such purchase transaction actually took place.  Further answering, Hunton affirmatively states that its invoices for legal services on the matter "CSG Acquisition" were for less than $2,500.

Hunton admits that an email dated October 23, 2008 exists in its Stanford-related files that purports to be from Carlos Loumiet to Danny Bogar, and that such email states, "Danny, is Jacksonville of interest to Stanford Group Company? There may be some Merrill folks available. I have a friend up there called Jim McGregor who you can contact.  Let me know how you want to handle it."  Hunton refers to the November 17, 2003 email chain, the March 27-28, 2006 email chain, the March 15, 2007 draft letter of intent, and the October 23, 2008 email for what they state, and denies all allegations in paragraph 366 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 366.

367.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 367 and therefore denies the allegations.  Hunton admits that certain documents dated to 2004 and 2007 exist in its Stanford-related files that concern the legal principles governing whether the Louisiana-based Stanford Trust Company could establish a trust representative office in Florida.  Hunton further admits that certain documents dated to 2007 exist in its Stanford-related files that concern the legal

principles governing whether the Louisiana-based Stanford Trust Company could establish a trust representative office in New York or New Jersey.  Hunton also admits that an email dated September 5, 2007 exists in its Stanford-related files that purports to be from a Hunton attorney to Zack Parrish, and that such email concerns Virginia law on offices of out-of-state trust companies.  Hunton refers to those 2004 and 2007 documents and that September 5, 2007 email for what they state, and denies all allegations in paragraph 367 that are inconsistent with their contents.  Hunton denies that it provided legal advice with respect to a trust representative office in North Carolina, as alleged in the last two sentences of paragraph 367.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegations in the last sentence of paragraph 367 that "Stanford successfully established a representative office of STC in North Carolina" and opened "trust offices in New York and New Jersey."  Hunton denies the remaining allegations in paragraph 367.

368.     Hunton denies the allegations in the first sentence of paragraph 368 insofar as the allegations relate to Carlos Loumiet; otherwise, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 368 and therefore denies the allegations.  Hunton admits that an email exists dated September 19, 2007 that purports to be from Carlos Loumiet to astanford@stanfordeagle.com, and that such email states in relevant part:

> The US Trust folks that you guys brought in recently believe they can get up to $1.5bn in business if Stanford had a "full" trust presence in this State.  I have been working with Zack Parrish and Danny Bogar in this regard.
>
> By way of background, right now your Louisiana trust company can open trust rep offices in Florida, but even after doing so it may not act as "executor" or "personal representative" in Florida court decedents' estate cases, and the US Trust folks feel this would severely limit their client-attracting abilities, given the advanced age of many Florida clients and their natural desire to have whoever

handles their funds serve as "executor" or "personal representative" of their estates on their demise.

Unfortunately, in order to have a full Florida trust presence, you personally would have to go through a thorough proctological examination by the Florida Office of Financial Institutions, including always the possibility of your being rejected by them as a "control" person for whatever reason, if we either try to (i) set up a de novo Florida trust company, or (ii) acquire an existing Florida trust company and leave it Florida-chartered after the acquisition.

Since I know how much you value your privacy and how reluctant you have been historically to have local (i.e., State) officials poking into all aspects of your private life and passing judgment on you, I suggested to Zack (and he concurred) that we should get your approval before pursuing either of these possibilities. Danny agreed.

There is another possibility that I am exploring with the Florida Office of Financial Institutions, though no one has ever done it before.  That would be for your Louisiana trust company to acquire an existing Florida trust company by merger, with your Louisiana trust company being the survivor of the merger.  I believe I can persuade the Florida officials that in this case, since there would be no Florida-chartered trust company left standing at the end, there is no requirement that any personal information of yours be submitted to Florida in connection with the merger – indeed, that Florida [would not have] to approve the merger at all (only Louisiana would do so).  In this scenario, the future Florida operations of your surviving Louisiana trust company would be supervised by Louisiana, not Florida, regulators.  Right now, this possibility looks pretty good, but there are still some hurdles to surmount.

Aside from updating you on what's going on, I wanted to make sure I was correct in my (and Danny's) perception that you would strongly prefer not to go any route that would require you to submit very extensive personal information to State of Florida regulators and be approved by them as a "control" person.  Obviously, if this perception is not correct, then the other alternatives, including seeking a de novo Florida-chartered trust company license, are back on the table.

Hunton refers to the September 19, 2007 email for what it states, and denies all allegations in paragraph 368 that are inconsistent with its contents.  Hunton denies the remaining allegations in paragraph 368.

369.    Hunton admits that an email chain exists in its Stanford-related files dated September 14, 2007 through October 25, 2007, that portions of the email chain concern Stanford

Trust Company Louisiana's activities in Florida, and that an email dated October 25, 2007 that purports to be from Rhonda Lear to a Hunton attorney states in part, "I do not believe we [*i.e.*, Stanford Trust Company Louisiana] have applied with Florida in any capacity." Hunton admits that a letter dated October 31, 2007 exists in its Stanford-related files that purports to be from a Hunton attorney to David Burgess, Office of Financial Regulation, Division of Financial Institutions in Tallahassee, Florida, and that such letter references prior email correspondence on August 21, 2007 and states in part that it "serves as notification to your office of the intention of our client, Stanford Trust Company, a Louisiana-chartered trust company, to establish trust representative offices in the State of Florida. The trust representative offices to be opened by Stanford Trust Company in Florida will operate within the parameters set forth by the Office of the Comptroller of the Currency for national banks, as outlined in 12 CFR 9.2(k)." Hunton refers to the September 14, 2007 through October 25, 2007 email chain and October 31, 2007 letter for what they state, and denies all allegations in paragraph 369 that are inconsistent with their contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 369.

370.    Hunton admits that an email exists in its Stanford-related files dated November 7, 2007 that purports to be from Steven Ferst, Assistant General Counsel for the Florida Office of Financial Regulation, to a Hunton attorney, and that such email states in full, "Your letter of October 31, 2007 to David Burgess, on behalf of Stanford Trust Company (Louisiana), has been forwarded to me. Please let me know whether you are also counsel to Stanford Trust Company Limited (Antigua) and other affiliates of Stanford Financial Group." Hunton admits that an email chain exists in its Stanford-related files dated November 8-12, 2007, and that such email

chain contains an email dated November 8, 2007 that purports to be from Mr. Ferst to a Hunton

attorney and that states in relevant part:

> In your letter dated October 31, 2007 to David Burgess, you notified this office that Stanford Trust Company, a Louisiana-chartered trust company, will establish trust representative offices in Florida.  As you are aware, Stanford Trust Company Limited, a trust company organized under the laws of Antigua and Barbuda, already operates a trust representative office under an Agreement with the Office of Financial Regulation (formally the Florida Department of Banking and Finance) dated December 14, 1998.
>
> Stanford Trust Company and Stanford Trust Company Limited are both part of the Stanford Financial Group.  Furthermore, the Agreement with Stanford Trust Company Limited states in paragraph 7:
>
>> This agreement shall be in effect for as long as Stanford Trust maintains or transacts business from any trust representative office located in the State of Florida.  This agreement shall have no further force or effect in the event that Stanford Trust gives notification of the closure of all trust representative offices in this State.   (Stanford Trust Company Limited is defined in this Agreement as Stanford Trust)
>
> Please let us know whether it is your client's intent to continue the trust representative offices of Stanford Trust Company Limited or whether the Agreement dated December 14, 1998 is terminated pursuant to paragraph 7.  The Agreement is not transferable to Stanford Trust Company.

Hunton further admits that such email chain contains an email dated November 8, 2007 that

purports to be from a Hunton attorney to Mr. Ferst and that states:

> We are aware of Stanford Trust Company Limited's agreement with the State of Florida and our notice relates only to Stanford Trust Company (Louisiana).  No action by Stanford Trust Company (Louisiana) is intended to affect the agreement of December 14, 1998.

Hunton further admits that such email chain contains an email dated November 9, 2007 that

purports to be from Mr. Ferst to a Hunton attorney and that states:

> Based on your response, we understand that you are not making any changes to the locations and operations of the representative offices of Stanford Trust Company Limited.   In the event these facts change we would appreciate immediate notice of any plans to close the offices of Stanford Trust Company Limited.  In addition, concerning the new offices of Stanford Trust Company,

please provide us with the location for each representative office and the dates they will be opened.

In the event that Stanford Trust Company and Stanford Trust Company Limited are going to locate in the same building or office, then we will need details how the offices intend to operate separately. In particular, whether these companies will share space and resources, including employees, information technology and communication resources, client contacts and client information. We will also need to know what measures will be taken to avoid confusion concerning the different companies. For example, will there be separate signage or entry doors. Finally, please explain any other steps that will be taken to avoid confusion as to which organization the public may be dealing with. See, Section 655.922(3), Florida Statutes.

Hunton further admits that such email chain contains an email dated November 12, 2007 that

purports to be from a Hunton attorney to Mr. Ferst and that states:

First, you are correct, we are not making any changes to the locations and operations of the representative offices of Stanford Trust Company Limited. Should those circumstances change, we, Stanford or someone authorized by Stanford will inform you of those changes.

Second, concerning the two new trust representative offices of Stanford Trust Company, the company intends to open them as of December 1, 2007. Their locations shall be as follows:

(1) 5200 Town Center Circle
    6th Floor
    Boca Raton, FL 33486

(2) 2801 Ocean Drive
    Suite 203
    Vero Beach, FL 32963

Third, Stanford Trust Company Limited and Stanford Trust Company shall have no overlap whatsoever.

I believe this should answer your questions raised below. Should you have any additional questions or concerns, please do not hesitate to contact me directly.

Further answering, Hunton states that Mr. Ferst did not object in the November 8-12, 2007 email

chain to the Louisiana trust company opening a representative office in Florida. Hunton refers to

the November 7, 2007 email and the November 8-12, 2007 email chain for what they state, and

denies all allegations in paragraph 370 that are inconsistent with their contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 370.

371.   Hunton admits that a November 30, 2007 letter exists in its Stanford-related files that purports to be from Linda Charity, Director, Division of Financial Institutions, Florida Office of Financial Regulation, to Rolando Parets, Deputy Director of SFIS, bearing the subject line "Request for Examination Documentation."   Hunton admits that such letter asserts that SFIS had not "reasonably cooperated with our examination of the activities of Stanford Trust or complied with the terms of the Memorandum of Agreement" dated to 1998, that such letter takes issue with "your stated destruction of records once received by the offices in Antigua, and then prohibiting or limiting our review of the records under Antigua confidentiality provisions," and that such letter includes requests for "[b]alances by account type . . . for all funds placed by Stanford Trust Company Limited, Antigua, at Stanford International Bank Limited, Antigua" and audit workpapers for the 2006 audits of "Stanford Trust Company Limited, Antigua and Stanford International Bank Limited, Antigua."   Hunton refers to the November 30, 2007 letter for what it states, and denies all allegations in paragraph 371 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 371.   Further answering, Hunton states that, based on its current investigation, SFIS did not consult Hunton with respect to the examination efforts of the Office of Financial Regulation that apparently preceded the November 30, 2007 letter.

372.   Hunton admits that an email chain exists in its Stanford-related files that is dated November 30, 2007 and that contains the following emails, in relevant part:

- An email that purports to be from Steven Ferst to a Hunton attorney, stating he is providing "a courtesy copy of a letter sent to your client."

- A responsive email that purports to be from Carlos Loumiet to Zack Parrish and Danny Bogar, stating "FYI, I already sent it to Yolanda and Mauricio – don't like the tone."

- A responsive email that purports to be from Zack Parrish to Carlos Loumiet and Danny Bogar, stating "[d]o you think they will stop us on the Stanford Trust Company . . . US?"

- A responsive email that purports to be from Carlos Loumiet to Zack Parrish and Danny Bogar, stating "[t]hey have no legal authority to do so but may try to give us a hard time with any pretext they can invent.  It sounds like the problem with Stanford trust in Antigua has been going on for a while.  Since I was the lawyer who set up the arrangement in Florida, and negotiated the agreement he referred to, I'm slightly surprised I hadn't heard anything."

Hunton refers to the emails in the November 30, 2007 email chain for what they state, and denies all allegations in paragraph 372 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 372.

373.    Hunton admits that an undated memorandum with no specified author exists in its Stanford-related files, titled "Stanford Fiduciary Investor Services, State of Florida/Office of Financial Regulation – Review, 4Q-2007."  Hunton admits that such memorandum purports to describe communications and meetings between SFIS and the Florida Office of Financial Regulation between September 14, 2007 and November 30, 2007.  Hunton denies that such memorandum "made clear that SFIS had been trying to stonewall the regulators with respect to SIBL by relying on the Antiguan confidentiality laws that Greenberg had crafted."  To the contrary, the memorandum states that on October 29, 2007, David Battle, the lead OFR official making requests of SFIS between September 14, 2007 and October 29, 2007, "sent an email to SFIS Deputy Director Rolando Parets and expressed (emphasis as used in the memorandum):

'***Mr. Parets: . . . If my Tallahassee office needs additional records I will be in touch, but otherwise I am done. I can't than you enough for your help. Dave Battle***.'"  Hunton admits that the undated memorandum states in part that Mr. Battle requested, on October 11, 2007, "[t]elevision advertisements for STCL and/or SFIS if available, and or any other for any Stanford

company in the U.S.," and also states that "[o]n 10/29/2007 SFIS sent via email, attachments that included electronic videos for the two available Stanford U.S. domestic Television advertisements. SFIS disclaimed that such advertisements were not produced by SFIS/STCL or that such entity was involved in any manner in the production of the same."  Hunton refers to the undated memorandum for what it states, and denies all allegations in paragraph 373 that are inconsistent with its contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 373.

374.    Hunton admits that a draft, unsigned letter exists dated December 4, 2007 that purports to be from Carlos Loumiet to Linda Charity, Director, Office of Financial Regulation, Division of Financial Institutions, and that such letter states:

> Thank you for your letter of November 30, 2007, (the "Letter"), requesting examination documentation from our client, Stanford Trust Company Limited, Inc. d/b/a Stanford Fiduciary Services, Inc. ("Stanford Trust").  From the outset, let me be clear that Stanford Trust is more than happy to comply with any reasonable request for information from the Office of Financial Regulation, Division of Financial Institutions (the "Office") to ensure that Stanford Trust is complying with its obligations under the Memorandum of Agreement executed December 14, 1998 between Stanford Trust and your predecessor agency, the Florida Department of Banking and Finance (the "Agreement").  It appears from your letter, however, that the documents requested by your Office fall well wide of those subject to review under the Agreement and are therefore not subject to disclosure by Stanford Trust as they do not relate to Stanford Trust's trust representative offices within the State of Florida.
>
> As you are aware, the Agreement was prepared to allow for oversight of Stanford Trust by the Office to ensure "that no trust administration or any other discretionary investment activity related to any trust account will be permitted or suffered to be conducted at any such office located in the State of Florida..." (Agreement, ¶3).  The Agreement entitles the Office to ensure that none of the enumerated discretionary trust and banking activities in ¶5 of the Agreement occur at any of the trust representative offices opened by Stanford Trust within the State of Florida.  Most importantly, the Agreement embodies a cooperative framework for Office oversight of Stanford Trust in the absence of any state jurisdiction to otherwise do so.

Each of the items requested in your Letter, numbered 1-7, are either irrelevant or inapplicable to the services rendered by Stanford Trust's trust representative offices in Florida.  Furthermore, the Office has no jurisdiction over Stanford Trust, as a foreign entity that has offices in the State of Florida, to request such information or documentation unrelated to the resident trust representative offices. Stanford Trust offices in the State of Florida do not engage in the business of banking, do not perform any banking functions, do not issue any CDs nor do they have any CD holders.  Besides the existence of indirect common ownership, Stanford Trust has nothing to do with Stanford International Bank, Antigua or any other Stanford organization.  Therefore, the documents and information requested in your Letter are not covered by the Agreement.

For the past ten years, Stanford Trust has operated its trust representative offices within the State of Florida without incident and pursuant to the terms and conditions of the Agreement.  Stanford Trust desires to maintain its cooperative track record with the Office and stands ready to fulfill any of its obligations under the Agreement.

Should you have any questions or comments about this letter, please do not hesitate to contact me directly to discuss your concerns.  Thank you for your courtesy in this matter.

Further answering, Hunton states that an email chain dated December 11-12, 2007 exists in its Stanford-related files that begins with an email that purports to be from a Hunton attorney to MAlvarado@StanfordEagle.com, with a copy to Carlos Loumiet, and that such email states:

It was a pleasure speaking with you yesterday on the phone. Attached, please find a draft of the above-referenced for your review. There are two comments we'd like to make in connection with this draft. First, although we have mentioned the lack of relevancy of the documents requested along with the apparent lack of authority the OFR has to request these documents, we do not over-emphasize this point due to the fact that most of the documents that have already been provided by SFS to the OFR are not relevant nor are they covered in the OFR's limited grant of authority to review SFS documents pursuant to the Agreement of December 1998. Second, we have not raised the issue of the nationality of SFS' clients because nowhere in the OFR's letter do they raise the issue. Therefore we do not want to argue a point that has not yet been raised by them.

We welcome your comments and any feedback on the attached.

Hunton further states that the next email in that chain is an email dated December 12, 2007 that purports to be from Carlos Loumiet to Yolanda Suarez, and that such email states in relevant part:

By the time we got involved, so much information had already been handed over to the State of Florida unrelated to the operation of the Florida rep office – see Exhibit 1 to the draft letter attached – , that it is silly to use the limited extent of the jurisdiction conferred on the State by the '98 Memo of Agreement as a rationale not to provide the remaining matters the State is seeking. In any case, we are instructed to offer the additional info reflected in the draft letter, even though it also is not germane to the Florida rep office's activities. In other words, unless we are forced somehow into litigation – and just in case, I restated the history and limited purpose of the '98 Agreement in the draft letter – , the ship has sailed on the issue whether Florida is entitled to know, and perhaps try to become involved in, aspects of Stanford Trust Company, Limited well beyond its very limited activities in Florida.

Even in litigation, a court might find that our having voluntarily turned over all of this material unrelated to what our Florida rep office does is a waiver or implicit amendment of the jurisdictional restrictions we had built into the Agreement.

Hunton refers to the December 4, 2007 unsigned letter and December 11-12, 2007 email chain for what they state, and denies all allegations in paragraph 374 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 374.

375.    Hunton admits that an email chain dated November 30, 2007 through December 12, 2007 exists in its Stanford-related files that contains a December 12, 2007 email that purports to be from a Hunton lawyer to Victor Hernandez.  Hunton admits that such December 12, 2007 email states:

As discussed last week, we are also going to need your recommendation of counsel in Antigua that can be retained to walk us through the applicable confidentiality and privacy restrictions imposed by Antiguan law.  We will need them to confirm our statements in our letter before we send it to OFR.

Please let us know how you would like to proceed with regards to Antiguan counsel.

Hunton further admits that an email exists in its Stanford-related files dated December 12, 2007 that purports to be from Victor Hernandez to a Hunton attorney, and that such email states, "I am obtaining the legal opinion from local Antiguan counsel.  However, you may want to read Article 54 of the A&B 2004 Trust Act attached hereto (page 33)."  Hunton refers to the

November 30, 2007-December 12, 2007 email chain and the December 12, 2007 email for what they state, and denies all allegations in paragraph 375 that are inconsistent with their contents. Except as expressly admitted herein, Hunton denies the allegations in paragraph 375.

376.    Hunton admits that an email exists in its Stanford-related files dated December 13, 2007 that purports to be from Victor Hernandez to a Hunton attorney and that purports to attach a letter dated December 12, 2007, from attorney Stacy A. Richards of Richards & Company, located in St. John's, Antigua.   This letter, titled "Request for Opinion on Trust Company Confidentiality Rules in Antigua and Barbuda," states (all italics in original):

> We confirm that Stanford Trust Company as an International Business Corporation incorporated in the jurisdiction of Antigua and Barbuda under the International Business Corporations Act Cap. 222 is bound by the Section 54 of the International Trust Act 2004 Laws of Antigua and Barbuda and also Sections 241 to 245 and Section 254 of the International Business Corporations Act, Cap 222, which individually speak to the obligation of confidentiality as it relates to the business of an international trust in Antigua and Barbuda.   A copy of the relevant sections of the latter statute is attached.

> Under the International Trust Act, it is an offence for a person "*to divulge or communicate to any other person information relating to the establishment, constitution, business undertaking or affairs of an international trust".*   No particulars of the offence have been given in the Act or in any regulation to the knowledge of this writer.

> Under the International Business Corporations Act all the obligations of a banking institution as they relate to confidentiality apply also to a trust corporation.   In this regard "*no person shall disclose any information relating to the affairs of the customer that has been acquired as a officer, employee, agent, auditor, solicitor of the [corporation]"* with the usual exceptions including a request pursuant to the Supervisory Authority under the Money Laundering Act.

Hunton refers to the December 13, 2007 email and its purported attachment for what they state, and denies all allegations in paragraph 376 that are inconsistent with their contents.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 376.

377.    Hunton admits that an unsigned letter exists in its Stanford-related files that is

dated December 14, 2007 that purports to be from Carlos Loumiet to Steven Ferst, Office of

Financial Regulation, Division of Financial Institutions, and that such letter states in part:

> From the outset, let me be clear that SFIS, as it has been for 9 years, is more than
> happy to comply with any reasonable request for information from the Office of
> Financial Regulation, Division of Financial Institutions (the "OFR") to ensure that
> SFIS is complying with its obligations under the Memorandum of Agreement (the
> "Agreement") executed in December, 1998 between SFIS and your predecessor
> agency, the Florida Department of Banking and Finance (the "Department").
>
> I was the attorney who, representing SFIS, negotiated the Agreement in the first
> place with the Department. By way of background, then and now neither Florida
> nor federal law prohibit the opening of a representative office in Florida by a non-
> U.S. trust company, as opposed to a non-U.S. bank.
>
> As a preamble to the Agreement notes, SFIS appears to have been the first non-
> U.S. trust company to establish an office in Florida. Given the lack of precedent,
> the Department understandably wanted to be able to ensure that SFIS's activities
> in Florida through its proposed representative office would be limited to those that
> the Department, as a matter of policy, permitted for out-of-state U.S. trust
> companies with such offices in Florida.
>
> . . . .  Simply stated, the Agreement created a cooperative framework for
> Department oversight of SFIS' Florida representative office(s) in the absence of
> any other jurisdiction to do so. It is my understanding that since being signed, the
> Agreement has operated to the satisfaction of both parties, and without incident.
>
> This background, of course, is reflected in the structure and language of the
> Agreement itself. Thus, the Agreement was prepared to allow for oversight of
> SFIS' Florida representative office(s) by the Department (now, the OFR) to
> ensure "that no trust administration or any other discretionary investment activity
> related to any trust account will be permitted or suffered to be conducted at any
> such office located in the State of Florida ..." (Agreement, 3). To this end, the
> Agreement entitles the OFR to examine any Florida representative office of SFIS
> to ensure that none of the prohibited activities listed in the Agreement occurs at
> any such office. That is the sole stated purpose of the examinations, as agreed
> by the Department and SFIS in ¶3 of the Agreement. In fact, in its ¶8, the
> Agreement makes it clear that it is not intended "to grant the Department
> authority or jurisdiction over business activities conducted by [SFIS] outside of
> the State of Florida."
>
> Respectfully, each of the items listed in the [November 30, 2007] Letter,
> numbered 1 - 7, is irrelevant to whether SFIS' representative office in Florida is
> engaging in any of the activities which the Agreement prohibits it from

conducting in Florida. And, beyond the four corners of the Agreement, we do not know of any statutory jurisdiction that the OFR has to examine SFIS, or that office. Nevertheless, as noted above, the Stanford Financial Group has a long-established track record of voluntarily cooperating with local regulators in the jurisdictions in which it operates. As an example, SFIS has already voluntarily turned over at the OFR' s request the information listed on Exhibit 1, much of which is also not germane to whether its representative office in Florida is engaging in any of the activities prohibited by the Agreement.

SFIS wishes to continue cooperating with the OFR and provide as many of the items requested in the Letter as possible, subject to applicable confidentiality and privacy restrictions imposed by the laws of Antigua and Barbuda, and by certain other considerations detailed below. As applicable, these restrictions and considerations are discussed below sequentially in the context of each of the items in the Letter:

1.  "Balances by account type (i.e. Fixed CD, Flex CD, Index-Linked CD, Performance, Premium, and Express) for all the funds placed by Stanford Trust Company Limited, Antigua at Stanford International Bank Limited, Antigua."

SFIS will provide the OFR with a list of balances for each of the above-referenced, by account type.

2.  "A copy of actual certificates of deposits or other account documents, if provided to clients."

None of this information is provided to customers by the Miami office of SFIS; rather, it is provided directly to the customer by Stanford Trust Company Limited, Antigua. Therefore, this information is not available at the SFIS representative office in Florida.

More importantly, insofar as this information pertains to any particular client, we are advised by Antiguan counsel that Stanford Trust Company, Limited, Antigua is bound by Section 54 of the International Trust Act 2004 Laws of Antigua and Barbuda and also Sections 241 to 245 and Section 254 of the International Business Corporations Act, Cap 222, which impose an obligation of confidentiality as it relates to the business of an international trust in Antigua and Barbuda. Specifically, Antiguan counsel have advised that pursuant to these laws, "it is an offense for a person to divulge or communicate to any other person information relating to the establishment, constitution, business undertakings or affairs of an international trust." For this reason, SFIS is unable to provide this information.

However, as an alternative, SFIS will provide the OFR with a list and the forms of documents that are provided to clients.

SFIS would also be happy to put you in contact with the relevant banking authorities in Antigua, so you can see if they can assist you in reviewing the information you have requested notwithstanding the aforementioned confidentiality laws.

\*      \*      \*

6. "Any and all records of Stanford Trust Company, Antigua, that pertain to accounts opened or maintained by the Florida representative office."

As indicated above, we are advised by Antiguan counsel that this information is subject to applicable confidentiality and privacy restrictions imposed by the laws of Antigua and Barbuda. For this reason, SFIS is unable to provide this information.

As mentioned above, SFIS would be happy to put you in contact with the relevant banking authorities in Antigua, so you can see if they can assist you in reviewing the information you have requested.

\*      \*      \*

Mauricio Alvarado, the General Counsel for the Stanford companies, and I are at your disposal for any further inquiries you may have. We would be happy to come to Tallahassee to discuss these matters with you at your convenience. Please let me know whether such a meeting would be of interest.

Hunton refers to the unsigned December 14, 2007 letter for what it states, and denies all allegations in paragraph 377 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 377.

378.   Hunton admits that emails exist dated January 3, 2008 that purport to be from Victor Hernandez to a Hunton attorney, purporting to send Hunton copies of "the documentation that was sent to Steven Ferst at the OFR on December 21, 2007."  Hunton refers to those emails and their purported attachments for what they state, and denies all allegations in paragraph 378 that are inconsistent with their contents.  Hunton specifically denies the allegation in paragraph 378 that these documents put it "on notice that Stanford was selling hundreds of millions of dollars in SIBL CDs in the United States to non-accredited investors through the SFIS offices."

Further answering, Hunton specifically denies that it knew of or assisted in any illegal or wrongful conduct committed by Allen Stanford or any of the Stanford entities. Except as expressly admitted herein, Hunton denies the allegations in paragraph 378.

379.     Hunton admits that an email exists in its Stanford-related files dated January 25, 2008 that purports to be from Yolanda Suarez to Carlos Loumiet, and that such email contains the language appearing within quotation marks in paragraph 379. Hunton admits that an email exists dated January 29, 2008 that purports to be from Carlos Loumiet to malvarado@stanfordeagle.com and that purports to attach materials concerning Hunton's Privacy and Information Management practice. Hunton refers to the January 25, 2008 email and the January 29, 2008 email and its purported attachment for what they state, and denies all allegations in paragraph 379 that are inconsistent with their contents. With respect to the allegations in the last sentence in paragraph 379, Hunton refers to and incorporates by reference as if fully set forth herein its answers to paragraphs 345-364 above. Except as expressly admitted herein, Hunton denies the allegations in paragraph 379.

380.     Hunton admits that an email chain dated February 8, 2008 exists that contains an email that purports to be from Carlos Loumiet to Mauricio Alvarado and that states in part:

> Mauricio, I was finally able to get Steven Ferst on the phone . . . [Ferst] made it very clear that they're not happy with our not having provided the information that we are unable to provide because of Antiguan confidentiality laws. He understands confidentiality law restraints, but that does not satisfy him. I suggested he speak directly with the Antiguan banking authorities about what was possible. He said he wanted us to have those authorities contact him, after we tell them that we would not ourselves object to the provision of the requested information.

Hunton further admits that the email chain contains an email that purports to be from Mauricio Alvarado to Carlos Loumiet that states in relevant part, "What do we need to do? We will follow

your recommendation?  Please tell us what we need to do."  Hunton refers to the February 8, 2008 email chain for what it states, and denies all allegations in paragraph 380 that are inconsistent with its contents.  Hunton denies the allegations in the third sentence of paragraph 380.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence in paragraph 380 and therefore denies the allegations. Hunton denies the remaining allegations in paragraph 380.

381.    Hunton admits that an email exists in its Stanford-related files that is dated February 18, 2008, that purports to be from Steven Ferst to Carlos Loumiet, and that purports to attach a letter and accompanying subpoena dated February 15, 2008 that purport to be from Linda Charity to Ronald Parets.  Hunton admits that the language appearing within quotation marks in the last sentence of paragraph 381 appears in the February 18, 2008 email.  Hunton admits that the language appearing within quotation marks in the second sentence of paragraph 381 appears in the February 15, 2008 letter.  Hunton refers to the February 18, 2008 email and purported attachments, including the February 15, 2008 letter and subpoena, for what they state, and denies all allegations in paragraph 381 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 381.

382.    Hunton admits that an email exists in its Stanford-related files dated February 20, 2008 that purports to be from Carlos Loumiet to Steven Ferst, and that such email states in part:

> I have been informed that SFIS' practices on what documents it keeps or does not keep in the Miami office have been the same since the office opened some 9 years ago.  Over that time, the office has been examined on several occasions by the Office of Financial Regulation (OFR), without comment on those practices. Further, as you may be aware, every paper related to a client that comes into the Miami SFIS office and that is sent on to Antigua is recorded on a daily log under the client's name, which log remains available for review by the OFR. I have also

been informed that specific client-related records are retained and available in Antigua, and subject to review by the authorities there.

We strongly disagree, therefore, with your characterization that SFIS has been "destroying records."   Notwithstanding, SFIS has begun retaining additional records in Miami.

As you will see from the attached correspondence, Stanford Trust Company Ltd. had already asked the Antiguan authorities to contact you and assist you regarding the information the OFR is seeking, and those authorities have apparently already reached out to you.

Hunton admits that the February 20, 2008 email purports to attach a letter dated February 13, 2008 that purports to be from Anthony D'Aniello to Leroy King, and a letter dated February 14, 2008 that purports to be from Leroy King to Steven Ferst.  Hunton admits that the February 14, 2008 letter states in part:

The Financial Services Regulatory Commission (FSRC) is the regulatory body that supervises and regulates STCL.  Please feel free to contact me with any questions you may have regarding STCL, or Antigua and Barbuda's regulatory and supervisory framework.

Please be advised that the FSRC examined STCL in February 2007 and found the company to be in compliance.

Kindly note that the Commission has a new Supervisor of International Banks and Trust Corporations in the name of Paul A. Ashe.  His contact information is . . . . You may also contact the Principal Examiner at . . . .

Please feel free to contact me directly or any of the individuals mentioned as you deem necessary.

Hunton refers to the February 20, 2008 email and its purported attachments for what they state, and denies all allegations in paragraph 382 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 382.  Further answering, Hunton states that an email exists in its Stanford-related files dated February 21, 2008 that purports to be from a Hunton attorney to Steven Ferst, and that such email states in part:

Thank you for speaking with me yesterday.  We have been assured by our client that all documents relevant to the subpoena dated February 15, 2008 to Stanford

Trust Company Limited, d/b/a Stanford Fiduciary Investor Services, Inc. are being kept and will continue to be kept in Miami until the resolution of the issue.

Hunton further states that an email exists in its Stanford-related files dated February 22, 2008 that purports to be from Steven Ferst to a Hunton attorney and that such email states:

This is the assurance we were looking for.  Therefore, the February 29 deadline is not applicable.  We should proceed as discussed the other day- agree on what we can accept and you can produce and if anything is left we can fight over that.

We are working on search terms and considering which people/positions we want to review emails on. As I understand, you are going to see what may be available in email or other form and how it can be produced. We just need to keep making steady progress.

Hunton refers to the February 21 and February 22, 2008 emails for what they state, and denies all allegations in paragraph 382 that are inconsistent with their contents.

383.    Hunton admits that an email chain exists in its Stanford-related files dated February 20, 2008 that contains an email that purports to be from Carlos Loumiet to adaniello@stanfordeagle.com and malvarado@stanfordeagle.com and that states in relevant part:

As I have previously mentioned to Anthony, if the OFR focuses on it once they understand better the flow of funds, I worry somewhat about the possible charge that SFIS was an unlicensed "de facto" office of SIBL in Miami, given the percentage of trust assets that wound up in SIBL.

This type of charge, though very rare, was brought by the Federal Reserve (civilly) and the Justice Department (criminally) in the case of Lombard Bank, a Guatemalan bank, for an affiliate's office here in Miami back in the late 80s (I was the after-the-fact expert for the bank defendant in that case, which settled); and also by the Federal Reserve in connection with Banque Julius Baer a few years later. This is an area I am very familiar with.

Hunton admits that such February 20, 2008 email chain contains an email that purports to be from Carlos Loumiet to two Hunton attorneys, and that such email forwards the email quoted above in this response to paragraph 383 and then states, "FYI.  I just found out that 98% of the trust company's assets are invested in the bank."  Hunton refers to the February 20, 2008 email

chain for what it states, and denies all allegations in paragraph 383 that are inconsistent with its contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 383. Hunton specifically denies the allegation in paragraph 383 that Carlos Loumiet knew, in 1998, "that the sole purpose of SFIS was to sell SIBL CDs."

384.    Hunton admits that an email chain exists in its Stanford-related files dated October 24, 2008 – more than eight months after the February 20, 2008 emails referenced in paragraph 383 herein – that includes the following emails:

- An email that purports to be from Carlos Loumiet to James Davis, which states  in its entirety, "Jim, just FYI, here's a copy of the expert affidavit I submitted for Lombard on this 'de facto' banking issue 14 years ago. (The law has not changed a lot.)," and which purported to attach an affidavit dated to 1994 from Carlos Loumiet;

- An email that purports to be from James Davis to Carlos Loumiet in response to Mr. Loumiet's email, and that states in its entirety, "Blessings"; and

- An email that purports to be from Carlos Loumiet to jdavis@stanfordeagle.com in response to Mr. Davis's email, and that states in part, "You'll see I demolish the legal case for the Govt, piece by piece. I think this contributed to a quick resolution."

Hunton refers to the October 24, 2008 email chain and the affidavit for what they state, and denies all allegations in paragraph 384 that are inconsistent with their contents.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 384.

385.    Hunton admits that an email chain exists in its Stanford-related files dated March 19, 2008 through March 25, 2008 that contains the following emails:

- An email dated March 19, 2008 that purports to be from Steven Ferst to a Hunton attorney that states, "In our subpoena we also asked for Stanford org charts.  I would like to get those fairly soon.  Please find out what they have and we can talk if necessary."

- A responsive email dated March 19, 2008 that purports to be from a Hunton attorney to Steven Ferst that states, "As I understand it they don't have any org charts. Is there some alternative documentation that might meet your needs?"

- A responsive email dated March 19, 2008 that purports to be from Steven Ferst to a Hunton attorney that states, "I would like to see how all these affiliated companies fit together. Much of the public information says they are part of the Stanford Financial Group but we would like to see who owns what and how they are connected."

- A later email dated March 19, 2008 that purports to be from Carlos Loumiet to a Hunton attorney and Mauricio Alvarado that states, "my understanding is that the Stanford Financial Group is a term used for marketing of various companies which are essentially horizontal affiliates, all owned by Allen Stanford, and all in the financial services sector, broadly defined. In other words, there is little vertical integration. I guess we could give a list of the companies which we publicly (for marketing purposes) consider as part of the Stanford Financial Group, showing who owns them - in most cases, Allen himself directly, as I understand it. . . . Maybe looking forward we should have a fact sheet available listing the companies that the Stanford folks themselves consider to be part of this group."

- A responsive email dated March 19, 2008 that purports to be from Mauricio Alvarado to Carlos Loumiet and a Hunton attorney that states, "It is simple the Stanford companies are independent from each other. There is not consolidation at any level. The only common link is that they are affiliated through the common ownership of R. Allen Stanford. There is not common holding company for the entire group of companies."

- A responsive email dated March 19, 2008 that purports to be from Carlos Loumiet to Mauricio Alvarado and a Hunton attorney that states, "Mauricio, can we provide a list of the companies to which we internally (and in marketing) commonly refer as members of the Stanford Financial Group of companies, noting this is subject to change at any time, plus a letter which simply says what you just said -there is no organizational chart."

- A later email dated March 25, 2008 that purports to be from a Hunton attorney to Carlos Loumiet that states, "[Mauricio] has resisted supplying anything like this to other government entities that subpoenaed them and does not want to do so now. He fears that if he puts something in writing here, he will have to send it to all the others that were requesting org charts."

Hunton refers to the March 19-25, 2008 email chain for what it states, and denies all allegations in paragraph 385 that are inconsistent with its contents. In particular, Hunton denies that anything in the March 19-25, 2008 email chain made it, as alleged in paragraph 385, "aware of

other simultaneously ongoing U.S. government investigations of Stanford Financial" or aware of then-current subpoenas served by the SEC.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 385.

386.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 386 and therefore denies the allegations.

387.    Hunton denies the allegations in the first sentence of paragraph 387.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 387 and therefore denies the allegations.

388.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 388 and therefore denies the allegations.  Hunton denies the allegations of the second sentence of paragraph 388.  Further answering, Hunton states that it was not involved in any investigation of SFIS by the Federal Reserve Board, or any activities by Proskauer lawyers in connection with such investigation.

389.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 389 and therefore denies the allegations.  Further answering, Hunton states that it was not involved in any investigation of SFIS by the Federal Reserve Board, or any activities by Proskauer lawyers in connection with such investigation.

390.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 390 and therefore denies the allegations.   Further

answering, Hunton states that it was not involved in any investigation of SFIS by the Federal Reserve Board, or any activities by Proskauer lawyers in connection with such investigation.

391.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 391 and therefore denies the allegations.   Further answering, Hunton states that it was not involved in any investigation of SFIS by the Federal Reserve Board, or any activities by Proskauer lawyers in connection with such investigation.

392.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the first and second sentences of paragraph 392 and therefore denies the allegations. Hunton denies the third sentence of paragraph 392.   Further answering, Hunton states that it was not involved in any investigation of SFIS by the Federal Reserve Board, or any activities by Proskauer lawyers in connection with such investigation.

393.    Hunton admits that an email exists dated November 12, 2008 that purports to be from Yolanda Suarez to Carlos Loumiet, and that such email forwards an email of the same date that purports to be from Yolanda Suarez to Allen Stanford.   Further answering, Hunton states that the November 12, 2008 email from Yolanda Suarez to Allen Stanford states:

> I have done what you asked and thought about our conversation of yesterday afternoon.  While I deeply regret that I was upset I cannot reconsider my decision. If my service of the last 17 years has had any value to you at all I implore you to respect my decision to resign.

> You have a structure and individuals in place that should be allowed and directed to do the full measure of their jobs not just the parts they select. If I thought for one moment that my resignation would put the company in jeopardy I would not do it, but that is not the case.

> The immediate crisis has passed and even with just a small modicum of attention and sense you and the company will get past the current issues in Venezuela. My only parting concerns are: (1) that Rene Buroz' commitment was to me. The

> meeting with Franco yesterday did not go well and unfortunately I do not think that he will be willing to continue to represent Stanford and I do think that will be a loss. Expect to have our retainer returned. I would suggest you try to reach out to him personally. Rene's number US number is 954 802 0017. (2) Morale in the asesores office is at an all time low. They are tired and upset and are waiting for a message from you.
>
> As I told you yesterday I wish only continued sucess [*sic*] for you and the Stanford companies. I will always be eternally grateful for the experiences and opportunities that Stanford gave me. Yolanda

Hunton refers to the November 12, 1998 email chain for what it states, and denies all allegations in paragraph 393 that are inconsistent with its contents.   Hunton denies that Ms. Suarez's resignation constituted a "major red flag."

Hunton admits that an email exists dated November 17, 2008 that purports to be from Carlos Loumiet to astanford@stanfordeagle.com, and that such email states in part, "let me again say how spectacular the 20/20 cricket match and week-end were. Thank you and hearty congratulations again."   Hunton admits that such email describes issues with the acquisition of Vanquish, an international banking entity in Puerto Rico, including the need for Allen Stanford to provide "certain personal information" and the need "to provide some personal references (I would be happy to be one) and bank references."   Hunton refers to the November 17, 2008 email for what it states, and denies all allegations in paragraph 393 that are inconsistent with its contents.   Further answering, Hunton states that, on information and belief, the Vanquish transaction never closed.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 393.

394.   Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of paragraph 394 and therefore denies the allegations.   Hunton admits that an email exists in its files dated February 4, 2009 that purports to be from Carlos Loumiet to two Hunton attorneys, that bears the subject line, "Stanford

Financial Group – CONFIDENTIAL," and that states, "Includes a broker-dealer with about 30 offices in the U.S., and a trust company in Louisiana. They do not have a bank in the US - only offshore banks.  Can you guys think of any way they could be eligible for funding under TARP?"  Further answering, Hunton states that its lawyers indicated that the answer to that question was no, and states that no Hunton lawyer sought TARP assistance for any Stanford entity.  Hunton refers to the February 4, 2009 email for what it states, and denies all allegations in paragraph 394 that are inconsistent with its contents.  Hunton denies the remaining allegations in paragraph 394.

395.    Hunton admits that an email chain exists in its files dated February 6, 2009 that includes an email that purports to be from a Hunton partner in the Richmond, Virginia office to Carlos Loumiet, and that such email states, "Stanford Group has recently opened an office in Richmond and a trust of which I am trustee is proposing to use them for investment advice.  I was trying to do a basic reference check on them with our Texas folks, none of whom know the firm.  I now see that we do legal work for Stanford.  I assume you can provide the good reference?"  Hunton admits that the email chain contains an email that purports to be a response from Mr. Loumiet to the Hunton partner, and that such email states, "they have been clients for about 22 years, and we've represented their La trust company in their interstate expansion (including Virginia)."  Hunton refers to the February 6, 2009 email chain for what it states, and denies all allegations in paragraph 395 that are inconsistent with its contents.

Except as expressly admitted herein, Hunton denies the allegations in paragraph 395. Hunton specifically denies the allegations in paragraph 395 that the February 6, 2009 email chain demonstrates any "reckless, willfully blind" action by Mr. Loumiet or constitutes an attempt to "shill" for Allen Stanford or any Stanford entity.   Hunton further specifically denies the

allegations that Mr. Loumiet's response was based on personal loyalty to an "old friend." Further answering, Hunton states that neither it nor Mr. Loumiet knew of any wrongdoing by Allen Stanford or any of the Stanford entities at the time of the February 6, 2009 email chain.

396.    Hunton admits that an email exists in its files dated February 12, 2009 that purports to be from Carlos Loumiet to astanford@stanfordeagle.com, and that such email contains the italicized language appearing within quotation marks in the second sentence of paragraph 396.  Hunton admits that an email exists in its files dated February 13, 2009 that purports to be from Carlos Loumiet to malvarado@stanfordeagle.com, and that an English translation of the text of such email (appearing in the email's subject line) is, "Mauricio, I want you to know that I'm thinking of you, I know this is all nonsense and that you will win."  Hunton admits that an email exists in its files dated February 13, 2009 that purports to be from Carlos Loumiet to jdavis@stanfordeagle.com, and that the subject line of such email contains the italicized language appearing within quotation marks in the last sentence of paragraph 396. Hunton refers to those emails for what they state, and denies all allegations in paragraph 396 that are inconsistent with their contents.  Hunton denies the characterization of the press reports at that time as covering "the implosion of Stanford," and, further answering, states that at the time Mr. Loumiet purportedly sent the three emails described in paragraph 396, neither he nor Hunton was aware of any wrongdoing by Mr. Stanford or any Stanford entity.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 396.

397.    Hunton admits that the SEC filed a lawsuit in the Northern District of Texas on February 17, 2009 against Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, R. Allen Stanford, James M. Davis, and Laura Pendergest-Holt.

Hunton denies that the complaint filed on February 17, 2009 alleges "a massive Ponzi scheme of staggering proportions." Hunton admits that on February 16, 2009 (but filed on February 17, 2009), this Court issued an order in *SEC v. Stanford International Bank, Ltd.*, No. 3:09-CV-0298-N (N.D. Tex.) [Dkt. 10] appointing Ralph S. Janvey as Receiver for the Receivership Assets and Receivership Records, as those terms are defined in the order. Hunton admits that on February 17, 2009, the Court issued a temporary restraining order and order freezing assets. Hunton further admits that an email chain exists dated February 17, 2009 that purports to contain an email from Hunton staff stating, "Why are we still working on this matter if they aren't paying and not likely to anytime soon?" and email from Carlos Loumiet in response, stating "We aren't any more." Hunton refers to the SEC complaint, this Court's order, and the February 17, 2009 email chain for what they state, and denies all allegations in paragraph 397 that are inconsistent with their contents. Except as expressly admitted or denied herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 397 and therefore denies the allegations.

> Answer to Footnote 37, appended to Paragraph 397: Hunton admits that an article exists from the February 23, 2009 edition of Businessweek titled "Law Firm Erases its Stanford Ties," purportedly authored by Matthew Goldstein. Hunton admits that the article alleges that Hunton removed references to Stanford Financial from its website after the Stanford receivership was initiated. Hunton otherwise incorporates by reference as if fully set forth herein its answer to paragraph 397. Except as expressly admitted herein, Hunton denies the allegations of footnote 37.

398.    Hunton admits that on January 8, 2010, the SEC filed a second amended complaint in the case captioned *SEC v. Stanford International Bank, Ltd.*, No. 3:09-cv-0298-N (N.D. Tex.), and that the Sixth Claim in such complaint alleges certain violations of the Investment Company Act.   Hunton refers to that complaint for what it states, and denies all allegations in paragraph 398 that are inconsistent with its contents.   Hunton further denies that it was responsible in any way for any of the acts or harm alleged in the SEC's Second Amended Complaint.   Except as expressly admitted herein, Hunton denies the allegations of paragraph 398.

399.    Based solely upon publicly available documents, Hunton admits the allegations in paragraph 399.   Further answering, Hunton states that, as of the date of this Answer, Allen Stanford is appealing his convictions and sentence.

400.    Hunton denies the allegations in paragraph 400 that growth in SIBL CD sales was made possible with Hunton's material assistance.   Further answering, Hunton states that it never assisted in sales of CDs by any of the Stanford entities; never represented Allen Stanford, SIBL, or any other Stanford entity in connection with the offer or sale of SIBL CDs to investors; and never knew of or assisted in any wrongdoing by Allen Stanford or any of the Stanford entities. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 400 and therefore denies the allegations.

401.    Hunton admits that the first two citations to the first sentence in paragraph 401 accurately quote the referenced document from *Janvey v. Alguire*, Case No. 3:09-cv-0724-N. Hunton denies that that order contains a finding from the Court "that the Stanford fraud was a Ponzi scheme," given that the order was issued only in connection with a motion for a

preliminary injunction.  Hunton denies that paragraph 401 accurately quotes the Court's July 30, 2012 order in *In re Stanford Int'l Bank, Ltd.*, Case No. 3:09-cv-0721-N [Dkt. 176].  Hunton admits that page 28 of the Court's July 30, 2012 order in *In re Stanford Int'l Bank, Ltd.*, Case No. 3:09-cv-0721-N [Dkt. 176], states in part that "SIB had been insolvent since at least 1999. . . ."  Hunton refers to the Court's June 10, 2010 preliminary injunction order in *Janvey v. Alguire* [Dkt. 456] and the Court's July 30, 2012 order in *In re Stanford Int'l Bank, Ltd.*, Case No. 3:09-cv-0721-N [Dkt. 176] for what they state, and denies all allegations in paragraph 401 that are inconsistent with their contents.  Hunton specifically denies that those orders are binding upon it in this litigation, or that Hunton was responsible in any way for any of the acts that are the subject of the alleged orders.  Hunton further lacks information sufficient to form a belief as to the truth or falsity of the allegation in paragraph 401 that Allen Stanford or the Stanford entities operated a Ponzi scheme and therefore denies that allegation.  Hunton denies the remaining allegations in paragraph 401.

402.    Hunton admits that the Fifth Circuit issued an order on December 5, 2010 in connection with an appeal of the Court's June 10, 2010 preliminary injunction order in *Janvey v. Alguire* [Dkt. 456], but, further answering, states that such opinion was withdrawn and superseded by the Fifth Circuit on July 22, 2011, in an opinion published at 647 F.3d 585 (5th Cir. 2011).  Hunton admits that the italicized language appearing in paragraph 402 appears in the Fifth Circuit's 2011 opinion in *Janvey v. Alguire*, 647 F.3d 585, but denies that such statements constitute "rulings on the nature of the Stanford fraud" by the Fifth Circuit, especially given the preliminary injunction posture of the *Alguire* appeal.  Hunton denies that any alleged factual findings from *Janvey v. Alguire* are binding upon Hunton in this litigation.  Hunton refers to the orders for what they state, and denies all allegations in paragraph 402 inconsistent with their

248

contents.   Hunton lacks information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 402 that Allen Stanford or the Stanford entities operated a Ponzi scheme and that the Stanford entities were "grossly undercapitalized" when they entered receivership, and therefore denies those allegations.   Hunton further denies that it was responsible in any way for any of the acts that are the subject of the alleged Fifth Circuit ruling.   Hunton denies the remaining allegations in paragraph 402.

403.   Hunton admits that the SEC filed a lawsuit against Allen Stanford, Stanford Group Company, Stanford International Bank, Ltd., Stanford Capital Management LLC, James Davis, and Laura Pendergest-Holt on February 17, 2009.   Hunton denies that the Receiver was appointed on February 17, 2009, and states that the order appointing Mr. Janvey as Receiver was signed February 16, 2009 and entered February 17, 2009 in *SEC v. Stanford International Bank, Ltd., et al*., Case No. 3:09-cv-0298-L, in the Northern District of Texas.   Hunton denies the allegations in paragraph 403 that Hunton performed any "wrongful acts," participated in what Plaintiffs characterize as "the Stanford Ponzi scheme," or was involved in causing any injury suffered by Plaintiffs.   Hunton further denies the allegations that Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered until more recently than February 17, 2009, the conduct by Hunton that they allege to constitute such "wrongful acts," "participation in the Stanford Ponzi scheme" and/or "involvement in causing the injury suffered by Plaintiffs."   The allegation in paragraph 403 that Hunton's alleged wrongful acts were "inherently undiscoverable" is a legal conclusion as to which no response is required, but to the extent a response is required, Hunton denies the allegation.   Except as expressly admitted herein, Hunton denies the allegations in paragraph 403.

404.    Hunton admits that it entered into a tolling agreement with Ralph Janvey, in his capacity as Receiver; the OSIC; and Samuel Troice, on his own behalf and on behalf of a putative class, with an effective date of February 1, 2011.  Hunton admits that such tolling agreement was amended twelve times and that the tolling agreement terminated on November 14, 2012.  Hunton refers to the tolling agreement, as amended, for its full content and meaning and denies all allegations in paragraph 404 that are inconsistent with its contents.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 404 concerning Greenberg and therefore denies the allegations.  Hunton denies the remaining allegations in paragraph 404.

405.    Hunton denies the allegations in paragraph 405.

406.    Hunton admits that, based solely on the allegation in paragraph 406, Plaintiffs appear to assert the doctrine of equitable tolling, but Hunton denies that Plaintiffs are entitled to any equitable tolling.  Except as expressly admitted herein, Hunton denies the allegations in paragraph 406, including but not limited to any suggestion that equitable tolling applies to Plaintiffs' claims and any suggestion that a factual basis exists to apply the doctrine.

407.    Hunton denies all allegations in paragraph 407 insofar as those allegations are asserted against Hunton, except as follows.  Hunton admits that the italicized language appearing in quotation marks in the third sentence of paragraph 407 appears in an email that exists in Hunton's files dated December 1, 2004 and that purports to be from Carlos Loumiet to Allen Stanford, but Hunton denies that such statement is represented in paragraph 407 with its full context, or that such statement accurately reflects Hunton's conduct in representing certain Stanford entities.  Hunton refers to the December 1, 2004 email for what it states, and denies all

allegations in paragraph 407 that are inconsistent with its contents.  Hunton lacks knowledge sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegation in the fifth sentence of paragraph 407 that "[Allen] Stanford and his co-conspirators [] misappropriate[d] billions of dollars in assets from Stanford Financial companies, including at least $1.8 billion in funds that were improperly diverted and subsequently misappropriated from Stanford Financial Companies."

408.    The first sentence of paragraph 408 consists of legal conclusions as to which no response is required.  To the extent a response is required, Hunton denies the allegations in the first sentence of paragraph 408.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 408 and therefore denies the allegations.

409.    Hunton denies all allegations in paragraph 409 insofar as those allegations are asserted against Hunton, except as follows.  Hunton admits that the italicized language appearing in quotation marks in the last sentence of paragraph 409 appears in an email that exists in Hunton's files dated December 1, 2004 and that purports to be from Carlos Loumiet to Allen Stanford, but Hunton denies that such statement is represented in paragraph 409 with its full context, or that such statement accurately reflects Hunton's conduct in representing certain Stanford entities.  Hunton refers to that email for what it states, and denies all allegations in paragraph 409 inconsistent with its contents.

410.    Hunton denies all allegations in paragraph 410 insofar as those allegations are asserted against Hunton.

411.    The allegations in paragraph 411 relate to a claim that the Court dismissed in its entirety in its December 17, 2014 order (Dkt. 114), and the Receiver and OSIC have not attempted to re-plead this claim.  As a result, Hunton is not required to answer the allegations in paragraph 411.

412.    The allegations in paragraph 412 relate to a claim that the Court dismissed in its entirety in its December 17, 2014 order (Dkt. 114), and the Receiver and OSIC have not attempted to re-plead this claim.  As a result, Hunton is not required to answer the allegations in paragraph 412.

413.    The allegations in paragraph 413 relate to a claim that the Court dismissed in its entirety in its December 17, 2014 order (Dkt. 114), and the Receiver and OSIC have not attempted to re-plead this claim.  As a result, Hunton is not required to answer the allegations in paragraph 413.

414.    Hunton denies the allegations in paragraph 414.  Further answering, Hunton incorporates by reference its answer to paragraphs 401 and 402.

415.    Hunton denies the allegations in paragraph 415 insofar as those allegations reference or are asserted against Hunton.

416.    Hunton admits that the complaint includes an Exhibit A with two pages titled "Payments made to Greenberg Traurig, LLP" and "Payments made to Hunton Williams, LLP" listing various Stanford entities or R. Allen Stanford as "Transferors."  Hunton admits that the "Amounts" identified on those two pages dated between January 2006 and February 16, 2009

total in the millions of dollars, but Hunton denies the allegation in paragraph 416 that these pages "identif[y] payments of CD Proceeds totaling millions of dollars from the Stanford Financial entities to Defendants from January 2006 through February 16, 2009."    Except as expressly admitted herein, Hunton denies the allegations of paragraph 416.

417.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 417 and therefore denies the allegations.

418.    Hunton denies the allegations in paragraph 418.  Further answering, Hunton states that more than $6 million of the alleged transfers between February 16, 2006 and January 9, 2009 involves funds that were held in escrow by Hunton in connection with a transaction involving Stanford Venture Capital Holdings and then distributed to third parties consistent with that transaction's terms in June 2007.  In other words, this more than $6 million was not paid to Hunton.  Hunton also states that $100,000 of the alleged $6,852,097.69 total listed on Exhibit A to the Complaint is listed in that exhibit with a date of August 5, 2004.

419.    Paragraph 419 contains a statement of the Receiver's alleged intentions, as to which Hunton is not in a position to evaluate.  To the extent a response is required from Hunton, Hunton denies the allegations in paragraph 419, including the suggestion that there exists "payments of CD proceeds" to Hunton.

420.    Hunton admits that this Court appointed Ralph S. Janvey as Receiver in the three orders listed in the citation to the first sentence of paragraph 420, all of which were entered in *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-CV-0298-N (N.D. Tex.).  Hunton denies that this Court "appointed" the OSIC, and avers that the order cited in the citation to the

second sentence of paragraph 420 states that the Receiver, the SEC, and certain investors "stipulated" and "agreed" to form an investor committee whose membership was "proposed" by investors, in consultation with the Examiner, "subject to the approval of the Receiver." Hunton refers to that order for what it states, and denies all allegations in paragraph 420 that are inconsistent with its contents. Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 420 and therefore denies the allegations. Hunton denies the remaining allegations in paragraph 420.

421. Hunton admits that paragraph 421 accurately quotes from the referenced orders. Except as expressly admitted herein, Hunton denies the allegations in paragraph 421.

422. Hunton denies the allegations in paragraph 422 insofar as those allegations are asserted against Hunton.

423. Hunton admits that the OSIC claims it seeks the relief asserted in paragraph 423, but denies that the OSIC is entitled to such relief.   Except as expressly admitted herein, Hunton denies the allegations of paragraph 423 insofar as those allegations are asserted against Hunton.

424. The first and second sentences of paragraph 424 contain legal conclusions to which no response is required. To the extent a response is required, Hunton denies the allegations insofar as they are asserted against Hunton. Hunton admits that the OSIC purports to seek the relief identified in the third sentence in paragraph 424, but denies that the OSIC is entitled to such relief.   Except as expressly admitted herein, Hunton denies the allegations of paragraph 424 insofar as those allegations are asserted against Hunton.

425.    Hunton denies the allegations in the third sentence of paragraph 425 insofar as those allegations are asserted against Hunton.  The first, second, fourth, and last sentences of paragraph 425 contain legal conclusions as to which no response is required.  To the extent a response is required, Hunton denies the allegations in the first, second, fourth, and last sentences of paragraph 425 insofar as those allegations are asserted against Hunton.

426.    The allegations in paragraph 426 relate to a claim that the Court dismissed in its entirety and with prejudice in its December 17, 2014 order (Dkt. 114).  As a result, Hunton is not required to answer the allegations in paragraph 426.

427.    The allegations in paragraph 427 relate to a claim that the Court dismissed in its entirety and with prejudice in its December 17, 2014 order (Dkt. 114).  As a result, Hunton is not required to answer the allegations in paragraph 427.

428.    Hunton denies the allegations in paragraph 428 insofar as those allegations are asserted against Hunton.

429.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 429 and therefore denies the allegations.

430.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 430 and therefore denies the allegations.

431.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 431 and therefore denies the allegations.

432.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 432 and therefore denies the allegations.

433.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 433 and therefore denies the allegations.

434.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 434 and therefore denies the allegations.

435.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 435 and therefore denies the allegations.

436.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 436 and therefore denies the allegations.

437.     Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 437 and therefore denies them.

438.     Hunton admits that the named class plaintiffs have requested that this case be certified as a class action pursuant to Federal Rule of Civil Procedure 23, but denies that such plaintiffs are entitled to such relief.   Except as expressly admitted herein, Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 438 and therefore denies the allegations.

439.     Hunton denies the allegations in paragraph 439.

440.    The first sentence of paragraph 440 contains legal conclusions to which no response is required.  To the extent a response is required, Hunton denies the allegations in the first sentence of paragraph 440.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 440 and therefore denies the allegations.

441.    Hunton denies the allegations in paragraph 441 insofar as those allegations are asserted against Hunton.

442.    Hunton denies the allegations in paragraph 442 insofar as those allegations are asserted against Hunton.

443.    Hunton denies all allegations in paragraph 443 insofar as they are asserted against Hunton, except as follows.  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of, and therefore denies, the allegation in the second sentence of paragraph 443 that "[n]one of the SIBL CDs sold to Plaintiffs were ever registered with the Texas State Securities Board."  The allegation in the second sentence of paragraph 443 that the SIBL CDs "were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act" contains legal conclusions as to which no response is required; to the extent a response is required, Hunton denies the allegation.

444.    The first and second sentences of paragraph 444 contain legal conclusions as to which no response is required.  To the extent a response is required, Hunton denies the allegations in the first and second sentences of paragraph 444.  Hunton lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 444 and therefore denies the allegations.

445.    Hunton denies the allegations in paragraph 445 insofar as they are asserted against Hunton, except that Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of paragraph 445 and therefore denies the allegations.

446.    Hunton denies the allegations in paragraph 446 insofar as they are asserted against Hunton.

447.    Hunton denies the allegations in paragraph 447 insofar as they are asserted against Hunton.

448.    Hunton denies the allegations in the first sentence of paragraph 448 insofar as those allegations are asserted against Hunton.  Hunton denies the allegation in the second sentence of paragraph 448 that the Court has "found" that "Stanford Financial was a massive Ponzi scheme that was perpetrated by the continued sales of the SIBL CDs to unsuspecting investors like Plaintiffs."  Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 448 and therefore denies the allegations.

449.    Hunton denies the allegations in paragraph 449 insofar as those allegations are asserted against Hunton.

450.    Hunton denies the allegations in paragraph 450 insofar as those allegations are asserted against Hunton.

451.    Hunton denies the allegations in paragraph 451 insofar as those allegations are asserted against Hunton.

452.    Hunton denies the allegations in paragraph 452 insofar as those allegations are asserted against Hunton, except as follows.  Hunton admits that on November 30, 2011, this Court issued an order in *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-CV-0298-N (N.D. Tex.) [Dkt. 1483] denying Allen Stanford's motion to dismiss and that, as part of that order, this Court held that the complaint adequately alleged, for purposes of surviving a motion to dismiss, that Mr. Stanford himself acted as an investment adviser under the terms of the Investment Advisers Act, but denies that the order specifically extended that holding to "all of the SIBL CD investors," as alleged in paragraph 452.  Hunton further denies that this Court found in that order that Mr. Stanford had acted as an investment adviser as a factual matter. Hunton refers to that order for what it states, and denies all allegations in paragraph 452 that are inconsistent with its contents.

453.    Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 453 and therefore denies the allegations.

454.    Hunton denies the allegations in paragraph 454 insofar as those allegations are asserted against Hunton.

455.     Hunton denies the allegations in paragraph 455 insofar as those allegations are asserted against Hunton.

456.     Hunton denies the allegations in paragraph 456 insofar as those allegations are asserted against Hunton.

457.     Hunton denies the allegations in paragraph 457 insofar as those allegations are asserted against Hunton, except that Hunton lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and second sentences of paragraph 457 and therefore denies the allegations.

458.     Hunton denies the allegations in paragraph 458 insofar as those allegations are asserted against Hunton.

459.     The first and fourth sentences of paragraph 459 contain legal conclusions to which no response is required.  To the extent a response is required, Hunton denies that Mr. Loumiet committed any tortious acts, that he had any knowledge of any wrongful conduct by Mr. Stanford or his co-conspirators, or that he assisted Mr. Stanford or his co-conspirators in committing wrongdoing of any kind whatsoever.  Hunton admits that Mr. Loumiet was employed by Greenberg between 1982 and May 2001.  Hunton admits that Mr. Loumiet was a partner at Hunton during the timeframe May 2001 and February 17, 2009.  Hunton denies that any facts exist that would make Hunton liable for the wrongdoing committed by Allen Stanford or the Stanford entities, and denies that Mr. Loumiet engaged in any "wrongful conduct" while "acting within the course and scope of his [] employment[]" with Hunton.  Except as expressly

admitted herein, Hunton denies the allegations of paragraph 459 insofar as those allegations are asserted against Hunton.

460.     Hunton denies the allegations in paragraph 460 insofar as they are asserted against Hunton, except that Hunton admits that the Receiver and OSIC claim damages as described in paragraph 460, but denies that they are entitled to collect such damages from Hunton.

461.     Hunton denies the allegations in paragraph 461 insofar as those allegations are asserted against Hunton.

462.     Paragraph 462 contains legal conclusions to which no response is required.  To the extent a response is required, Hunton denies the allegations in paragraph 462.

463.     Paragraph 463 contains a demand for a trial by jury, as to which no response is required.  To the extent a response is required, Hunton denies those allegations and denies that any of the Plaintiffs are entitled to proceed to a trial by jury on any of their claims.

464.     Hunton denies the allegations in paragraph 464 and further denies that any of the Plaintiffs are entitled to any of the relief they have requested in the Complaint.

## **AFFIRMATIVE AND OTHER DEFENSES**

Without admitting liability as to any of Plaintiffs' causes of action, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that otherwise would rest with Plaintiffs, Hunton asserts the following affirmative and other defenses.

## I.     DEFENSES TO ALL CLAIMS

1.     **Lack of Standing.**  The Receiver, OSIC, and the members of the putative class, or some of them, lack standing in whole or in part to assert the claims against Hunton set forth in the Complaint.  As one example, the Receiver and OSIC lack standing because (a) they cannot demonstrate that the Stanford entities, on whose behalf the Receiver and OSIC claim to sue, suffered any injury that is separate and distinct from the injury to the Stanford CD investors, including but not limited to lost investor funds, and (b) as alleged by them, the Stanford entities' primary or sole purpose was to perpetuate the alleged fraud upon investors.

2.     **Failure to State a Claim.**  The Complaint fails to state a claim upon which relief can be granted, including for the reasons set forth in Hunton's previously filed motions to dismiss and supporting memoranda of law.

3.     **Failure to Plead with Particularity.**  Plaintiffs have failed to plead their claims and the alleged Hunton conduct and/or knowledge that supports them with the particularity required by Rule 9(b), including for the reasons set forth in Hunton's previously filed motions to dismiss and supporting memoranda of law.

4.     **No Private Cause of Action.**  Plaintiffs' claims are barred, in whole or in part, to the extent there is no private right of action or derivative liability under the relevant provisions of the Investment Company Act, or any other Act, rule, or regulation upon which Plaintiffs purport to base their claims.  In particular, the putative class plaintiffs' claim for aiding and abetting a breach of fiduciary duty fails because it is really a claim for aiding and abetting a violation of Section 10(b) of the Securities Act of 1934 and/or a violation of the Investment Company Act of 1940, and no private cause of action exists for either of those two claims under applicable law.

5.     **Exemption from Registration/Preemption.**  Plaintiffs' claims are barred, in whole or in part, to the extent they are based on any alleged failure by Allen Stanford, Stanford

International Bank, Ltd. ("SIBL"), the Stanford entities, or any other person or entity to register the SIBL CDs with the U.S. Securities and Exchange Commission ("SEC") or any state regulatory agency.  Because Plaintiffs allege that the SIBL CDs were sold pursuant to Regulation D (17 C.F.R. § 230.506 *et. seq.*) and Regulation S (17 C.F.R. § 230.903 *et. seq.*), and the right under each exemption to make coincidental offers and sales, the SIBL CDs were exempt from registration under the federal securities laws, and state regulation of the SIBL CDs was preempted by the National Securities Market Improvement Act of 1966, 15 U.S.C. § 774 *et. seq.* In addition, and in the alternative, the CDs were exempt from Texas state registration under the Texas uniform limited offering exemption (7 TEX. ADMIN. CODE § 109.13(k)), the exemption for sales to nonresidents (7 TEX. ADMIN. CODE § 139.7), and/or the accredited investor exemption (7 TEX. ADMIN. CODE § 139.19).

6.      **No Claim Based on Failure to Register.**  Plaintiffs' claims are barred, in whole or in part, to the extent they rely on any alleged failure by SIBL, Stanford Group Company ("SGC"), or any other Stanford entity, to register as a securities dealer, investment company, or investment adviser because, among other things: (a) the Texas Securities Act does not apply to the conglomeration of companies that Plaintiffs allege constitute the Stanford entities; (b) SIBL was a foreign bank exempt from registration as an investment company under 17 C.F.R. § 270.3a-6; and (c) Plaintiffs allege that one or more Stanford entities that allegedly sold or issued CDs, including but not limited to SGC, was registered with the SEC as a broker-dealer.

7.      **Lack of Requisite State of Mind/Inability to Aggregate Knowledge.** Plaintiffs' claims are barred, in whole or in part, because Hunton did not act with the requisite state of mind with respect to any of the alleged wrongful conduct on which Plaintiffs' claims are based.  For example, Plaintiffs have conceded that Hunton did not know about the Ponzi scheme that Plaintiffs allege caused their injuries (Receiver and OSIC Resp. to Defs' Mots. to Dismiss

[Dkt. 63] at 4; *see also* Putative Class Resp. to Defs' Mots. to Dismiss [Dkt. 99] at 2), and Plaintiffs cannot prove that Hunton knew of or agreed to participate in any other type of allegedly fraudulent scheme that Plaintiffs allege caused their injuries.  At all times, Hunton acted in good faith and with due care, and performed lawful actions on behalf of its clients.  Further, the knowledge and/or conduct of individual attorneys, whether at Greenberg or at Hunton, cannot be aggregated and collectively attributed to Hunton in order to satisfy the knowledge, scienter, or other requisite state of mind element for any of Plaintiffs' claims.

8.    **Intervening/Superseding Causes.**   Plaintiffs' claims fail, in whole or in part, because there are one or more intervening and/or superseding causes of Plaintiffs' claimed injuries.   Those intervening and/or superseding causes include, but are not limited to: (a) the alleged fraudulent actions and other misconduct, including conduct giving rise to their criminal convictions, of persons including but not limited to Allen Stanford, James Davis, Mark Kuhrt, Gil Lopez, and Laura Pendergest-Holt; and (b) the failure for a number of years of the SEC to pursue inquiry or investigation into Allen Stanford or the Stanford entities, as described more fully in the March 31, 2010 Report of Investigation of the SEC's Office of Inspector General.

9.    **No Imputation.**   Plaintiffs' claims fail, in whole or part, to the extent they are based on the supposed knowledge or conduct of any person to the extent that person's knowledge was obtained, or the conduct occurred, when the person was not employed by Hunton.   For example, any knowledge that Carlos Loumiet or any other Hunton attorney supposedly gained while employed by Greenberg cannot be imputed to Hunton.  Similarly, any alleged conduct by Mr. Loumiet or any other Hunton attorney cannot be imputed to Hunton to the extent the conduct occurred when the attorney was not employed by Hunton.  Plaintiffs' claims against Hunton also fail to the extent they are based on the supposed knowledge or conduct of any person who was never a Hunton employee.

10. **No *Respondeat Superior* Liability.** The putative class plaintiffs' claim for *respondeat superior* fails because neither Carlos Loumiet nor any other Hunton attorney committed a tort that could form the basis for *respondeat superior* liability.

11. **Qualified Immunity.** Plaintiffs' claims are barred, in whole or in part, by the doctrine of qualified immunity. Qualified immunity bars certain of the Receiver's claims because, among other things: (a) Hunton never had any attorney-client relationship with many of the Stanford entities on whose behalf the Receiver purports to sue, and (b) Hunton's actions that supposedly form the basis of the Receiver's claims on behalf of these entities were lawful and taken in connection with Hunton's legitimate legal representation of Allen Stanford or one or more of the other Stanford entities. Qualified immunity bars the OSIC's claims because, among other things, (a) Hunton never had an attorney-client relationship with the OSIC or any of its members, and (b) Hunton's actions that supposedly form the basis of the OSIC's claim were lawful and taken in connection with Hunton's legitimate legal representation of Allen Stanford or one or more of the Stanford entities. Qualified immunity bars the named and putative class plaintiffs' claims, and the claims of any member thereof, because, among other things: (a) Hunton never had an attorney-client relationship with any of the named plaintiffs or any member of the putative class, and (b) Hunton's actions that supposedly form the basis of the named plaintiffs' or putative class plaintiffs' claims were lawful and taken in connection with Hunton's legitimate legal representation of Allen Stanford or one or more of the Stanford entities.

12. **Unlawful Acts Doctrine.** The Receiver's and OSIC's claims are barred, in whole or in part, by the unlawful acts doctrine because, among other things, the Receiver and OSIC must prove their claims by relying on the illegal, fraudulent or otherwise wrongful conduct of persons whose conduct is imputed to the Stanford entities, including but not limited to Allen

Stanford, James Davis, Mark Kuhrt, Gil Lopez, and Laura Pendergest-Holt.  The unlawful acts doctrine bars the Receiver's and OSIC's claims to the extent they are partially based or inextricably intertwined with the Stanford entities' own misconduct.  In addition, the claims of the named plaintiffs and the putative class plaintiffs, and those of any member thereof, are barred in whole or in part by the unlawful acts doctrine to the extent that such plaintiffs committed unlawful acts in the United States or abroad as part of, in relation to, or in connection with their alleged investments in SIBL CDs or other Stanford investment products.

13.    **Act of State Doctrine.**  Plaintiffs' claims are barred, in whole or in part, by the Act of State doctrine, to the extent Plaintiffs' claims challenge or contradict official actions of the Government of Antigua and Barbuda, including but not limited to that Government's licensing or regulation of Stanford International Bank, Ltd. as an Antigua-chartered bank, licensing or regulation of Stanford Trust Company, actions relating to construction of a hospital in Antigua, and actions relating to the sale of property in Antigua.

14.    **Petitioning of Governments.**  Plaintiffs' claims are barred, in whole or in part, by the Petition Clause of the U.S. Constitution, and related protections for petitioning activity, such as the Noerr-Pennington doctrine, to the extent Plaintiffs' claims are based on Hunton attorney conduct on behalf of clients petitioning the United States or foreign governments for legislative change.

15.    **Statutes of Limitation/Repose.**  Plaintiffs' claims are barred, in whole or in part, by the statutes of limitation and/or repose applicable to their claims, including but not limited to the limitations or repose periods set forth in FLA. STAT. ANN. §§ 95.11(3)(o) and § 95.031(2)(a) and TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) and § 16.004(a)(5).  To the extent the discovery rule applies to any of Plaintiffs' claims, those claims are still barred, in whole or in

part, because the time for filing after discovery has expired under applicable statutes of limitation.

16.      **Laches.**   Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches because Plaintiffs unreasonably delayed filing their claims against Hunton, and Hunton has been harmed as a result of the delay.

17.      **Failure to Mitigate Damages.**   Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to take reasonable steps to mitigate their alleged damages.

18.      **Res Judicata/Estoppel.**   Plaintiffs' claims are barred, in whole or in part, under principles of res judicata, collateral estoppel, judicial estoppel, quasi-estoppel, and any and all related doctrines.   One or more of these doctrines bars Plaintiffs' claims to the extent that, for example, Plaintiffs or any party in privity with them:  (a) have received adverse rulings in other litigation related to the alleged Stanford fraud on legal positions or facts the same as those that Plaintiffs have asserted in their suit against Hunton; or (b) attempt to take factual positions in this litigation that contradict or are inconsistent with the admissions and/or factual assertions Plaintiffs have made in other matters related to the fraudulent scheme that Plaintiffs allege caused their injuries.

19.      **Responsible Third Parties & Contributory/Comparative Responsibility.**   To the extent that any fault or liability is assessed against Hunton, which Hunton expressly denies, Hunton is entitled to a reduction, offset, or credit to the extent of the negligence, fault or liability of other persons or entities, including (a) the Receiver and/or OSIC, (b) the Stanford entities (in whose shoes the Receiver and OSIC bring their claims), (c) persons whose actions are imputed to the Stanford entities, including but not limited to Allen Stanford, James Davis, Mark Kuhrt, Gil Lopez, and Laura Pendergest-Holt, (d) members of the putative class, and (e) any other persons or entities who caused or contributed to the alleged injuries for which the putative class seeks

damages from Hunton injury.   Hunton is entitled to a reduction under the principles of proportionate responsibility articulated under applicable statutes, including but not limited to TEX. CIV. PRAC. & REM. CODE ANN. ch. 33, FLA. STAT. ANN. § 768.81, and/or FLA. STAT. ANN. § 768.31(2), as well as other non-statutory principles of contributory negligence, comparative fault, and contribution.

20.   **Offsets/Reductions/Credits.**   To the extent that any fault or responsibility is assessed against Hunton, which Hunton expressly denies, Hunton is entitled to an offset, reduction, or credit in the amount of any recovery that Plaintiffs obtain or are awarded for the same alleged injuries on which they base their claims against Hunton, including but not limited to any settlement amounts or court judgments obtained by or awarded to Plaintiffs in other matters related to the alleged Stanford fraud, as well as any other form of recovery obtained by or awarded to Plaintiffs, for their benefit or on their behalf, whether in the United States or in other countries.

21.   **No Exemplary Damages.**   While any award of exemplary damages would be contrary to the facts in this case, Plaintiffs' claims for exemplary damages are barred, in whole or in part, and/or limited by applicable constitutional and statutory provisions, including but not limited to those contained in the U.S. Constitution, the Texas Constitution, TEX. CIV. PRAC. & REM. CODE ANN. ch. 41, and/or FLA. STAT. ANN. § 768.72, including the provisions on applicability, standards for recovery, preclusions, prejudgment interest, and limitations on amount.

22.   **Other Defenses.**   Plaintiffs' claims fail or are barred, in whole or in part, by the affirmative and other defenses asserted by the other defendants who have been sued by Plaintiffs in this proceeding, and Hunton hereby expressly incorporates by reference the affirmative and other defenses asserted by Greenberg Traurig LLP and Yolanda Suarez.

## II.      DEFENSES TO CLAIMS ASSERTED BY THE RECEIVER AND/OR OSIC

23.      **Anti-Fracturing.**   The Receiver's claims other than his claim for professional negligence are barred, in whole or in part, under the anti-fracturing doctrine, to the extent they rely on conduct that the Receiver alleges demonstrates that Hunton failed to provide adequate legal representation.   The same is true of the OSIC's claims to the extent the OSIC asserts a claim for professional negligence against Hunton.

24.      **Failure to Follow Advice.**   The Receiver's and OSIC's claims are barred, in whole or in part, to the extent that Allen Stanford and/or one or more of the specific Stanford entities that Hunton represented (including the Stanford entities' officers, directors, managers, and other employees) failed to follow or heed the advice or recommendations that Hunton or any Hunton attorney provided in connection with the matters on which Hunton advised.

25.      **Ratification.**   The Receiver's and OSIC's claims are barred, in whole or in part, by the doctrine of ratification because, at various points in time, one or more directors, officers, or employees of certain Stanford entities (whose acts are imputed to the Stanford entities) approved Hunton's prior conduct in connection with its legal representation, with full knowledge of the nature and extent of that conduct and with the intention of giving validity to that conduct.

26.      ***In Pari Delicto*/Imputation of Wrongful Acts.**   The claims asserted by the Receiver and OSIC are barred, in whole or in part, by the doctrine of *in pari delicto* because the Receiver and OSIC have asserted that the Stanford entities, on whose behalf they claim to sue, were instrumental to the alleged fraud that caused the Receiver's and OSIC's claimed injuries, and have also asserted that persons including but not limited to Allen Stanford, James Davis, Mark Kuhrt, Gil Lopez, and Laura Pendergest-Holt, dominated and controlled the Stanford entities and used them as vehicles to perpetrate that alleged fraud.   Based on their control of the Stanford entities, the actions of these individuals, including the conduct of which they were

convicted criminally, can be imputed to the Stanford entities.  Therefore, the Stanford entities, and correspondingly the Receiver and/or OSIC, bear at least substantially equal, if not more, responsibility for the Receiver and OSIC's claimed injuries as compared to Hunton.  Under these circumstances, it would be improper and inequitable to allow the Receiver and/or OSIC to shift to Hunton responsibility for the Stanford entities' claimed injuries.

27.  **Fraud.**  The Receiver's and OSIC's claims are barred, in whole or in part, because, if certain of the Receiver's and OSIC's allegations are true, then the Stanford entities (on whose behalf the Receiver and OSIC bring their claims) committed a fraud on Hunton.  This is because the Stanford entities, through their respective officers and employees, represented to Hunton that they were operating successful and legitimate businesses in compliance with applicable laws, rules, and regulations.  The Stanford entities, on whose behalf the Receiver and OSIC sue, made these representations to Hunton knowing they were false and with the intention to cause Hunton to agree to provide legal representation or to continue to provide legal representation to one or more of the Stanford entities and/or Allen Stanford, and Hunton did in fact rely on the Stanford entities' false representations when it decided, at various points in time, to provide legal representation to certain of the Stanford entities and/or Allen Stanford.  These false representations have caused substantial injury to Hunton by, among other things, subjecting Hunton to suit in this court, forcing Hunton to incur considerable legal costs to defend itself, and casting an undeserved shadow on Hunton's reputation.

28.  **Unclean Hands.**  The Receiver and OSIC's claims are barred, in whole or in part, by the doctrine of unclean hands because the illegal and otherwise wrongful conduct of certain officers and employees of the Stanford entities, including Allen Stanford, James Davis, Mark Kuhrt, Gil Lopez, and Laura Pendergest-Holt, is imputed to the Stanford entities on whose behalf the Receiver and OSIC purport to bring their claims.  Such illegal and wrongful acts have injured

Hunton by, among other things, subjecting Hunton to suit in this court, forcing Hunton to incur considerable legal costs to defend itself, and casting an undeserved shadow on Hunton's reputation.

29.     **No Equitable Remedies.**     The Receiver's and OSIC's claims for unjust enrichment and money had and received are barred, in whole or in part, because the Receiver and OSIC are not entitled to equitable remedies given that they have an adequate legal remedy available to them to redress their claimed injuries.  This adequate legal remedy is demonstrated, at least in part, by the fraudulent transfer claim the Receiver and OSIC are pursuing against Hunton.

30.     **No Claim for Unjust Enrichment**.  The Receiver's and OSIC's claim for unjust enrichment fails because no such independent cause of action exists under applicable law, including but not limited to Texas law.

31.     **Good Faith/Reasonably Equivalent Value.**     The Receiver's and OSIC's fraudulent transfer claims are barred, in whole or in part, because Hunton accepted all payments it purportedly received from certain Stanford entities in good faith and without any knowledge of fraud or misconduct by the Stanford entities or any Stanford employees, and those transfers did not directly assist the alleged fraudulent scheme.  Further, the payments Hunton received were, at the time Hunton received them, reasonably equivalent to the value of the legitimate legal services that Hunton had provided to certain Stanford entities.

32.     **Not a Transferee.**  The Receiver and OSIC's fraudulent transfer claims are barred to the extent they are based on funds for which Hunton was not a transferee under applicable statutes, including TEX. BUS. CODE ANN. ch. 24.  Such funds include the more than $6 million in funds identified in Exhibit A to the Complaint yet placed with Hunton, as an escrow agent, only temporarily.  Hunton never, at any time, had dominion and/or control over funds not

271

paid to Hunton for its legal services, such as the funds it held in escrow.  Hunton had a relation to those funds only as an agent or conduit.

33.     **Voluntary Payment.**  The Receiver's and OSIC's fraudulent transfer claims are barred, in whole or in part, by the voluntary payment doctrine because when certain Stanford entities chose to make payments to Hunton, such entities, and correspondingly the Receiver and OSIC, had full knowledge of all the facts regarding Hunton's legal representation of one or more Stanford entities, including any facts known to one or more individual employees of the Stanford entities, which are imputed to the Stanford entities.  Hunton did not undertake any fraud or deception to obtain the money it received from the Stanford entities, and the Stanford entities were not under duress and did not face compulsion from Hunton when they made payments to Hunton.

34.     **Contributory Fault.**  To the extent that any fault or responsibility is assessed against Hunton, which Hunton expressly denies, the Receiver and OSIC cannot collect damages from Hunton because, under applicable common-law principles and statutes, including but not limited to TEX. CIV. PRAC. & REM. CODE ANN. § 33.001, the Stanford entities, in whose shoes the Receiver and OSIC bring their claims, are more than 50% responsible for the alleged damages that the Receiver and OSIC seek to recover from Hunton.

35.     **Statutes of Repose/Limitation.**  The Receiver's and OSIC's claims are barred, in whole or in part, by the statutes of limitation and/or repose applicable to those claims, including but not limited to TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a); TEX. BUS. & COM. CODE ANN. § 24.010(a)(1) and § 24.010(a)(2); and FLA. STAT. ANN. § 726.110(2), § 95.11(3)(a), § 95.11(3)(k), and § 95.11(4)(a).  To the extent the discovery rule applies to any of the Receiver and OSIC's claims, those claims are still barred, in whole or in part, because the time for filing after discovery has expired under applicable statutes of limitation.

## III.   DEFENSES TO CLAIMS ASSERTED BY THE PUTATIVE CLASS

36.   **No Harm Caused by Hunton.**   The named and putative class plaintiffs' claims are barred, in whole or in part, because they have not suffered any injury or harm as a result of any action, conduct, statement, or omission by Hunton.

37.   **No Claim for Conspiracy to Violate the TSA.**   The named and putative class plaintiffs' claim for civil conspiracy to violate the TSA fails because no such cause of action exists under applicable law, including but not limited to Texas law.   *See* TEX. CIV. CODE ANN. § 581-33(F).

38.   **No Claim for Aiding & Abetting Fraud.**   The named and putative class plaintiffs' claim for aiding and abetting a fraudulent scheme fails because no such cause of action exists under applicable law, including but not limited to Texas and Florida law.

39.   **No Primary TSA Violation.**   The named and putative class plaintiffs' claims for aiding and abetting/participating in violations of the TSA, and the claim for conspiracy to violate the TSA, fail because the named and putative class plaintiffs fail to plead a viable primary TSA violation, including under TEX. CIV. CODE ANN. § 581-33(A)(1) or (A)(2).

40.   **Preemption.**   The named and putative class plaintiffs' claims for aiding and abetting/participating in violations of the TSA, and the claim for conspiracy to violate the TSA, fail to the extent premised on the sale of unregistered securities, because regulation of SIBL CDs is preempted by the National Securities Market Improvement Act ("NSMIA"), 15 U.S.C. § 77r *et seq*.   The SIBL CDs constitute "covered securities" under NSMIA, including but not limited to because Stanford purported to sell the SIBL CDs pursuant to Regulation D (17 C.F.R. § 230.506 *et. seq.*) and Regulation S (17 C.F.R. § 230.903 *et. seq.*), and the CDs are therefore exempt from state registration.

41.     **Registration.**   The named and putative class plaintiffs' claims for aiding and abetting/participating in violations of the TSA, and the claim for conspiracy to violate the TSA, fail to the extent premised on sales of securities by an unregistered dealer, because Stanford Group Company was registered with the SEC as a broker-dealer.

42.     **Inapplicability of the TSA.**   The named and putative class plaintiffs' claims for aiding and abetting/participating in violations of the TSA, and their claim for conspiracy to violate the TSA, fail because the TSA does not apply to their claims, including because: (a) the TSA does not apply extraterritorially, and (b) the SIBL CDs do not constitute "securities" as defined by that act.   In addition, the CDs were exempt from Texas state registration under the Texas uniform limited offering exemption (7 TEX. ADMIN. CODE § 109.13(k)), the exemption for sales to nonresidents (7 TEX. ADMIN. CODE § 139.7) and/or the accredited investor exemption (7 TEX. ADMIN. CODE § 139.19).

43.     **Plaintiffs' Knowledge of Alleged Untruths or Omissions.**   The named and putative class plaintiffs' claims for aiding and abetting/participating in violations of the TSA, and their claim for conspiracy to violate the TSA, fail to the extent premised on sales of securities by untruths or omissions, because the named and putative class plaintiffs knew or reasonably should have known, or in the exercise of reasonable care and diligence could have known, of the alleged untruths or omissions upon which they purport to base their claims against Hunton.

44.     **Plaintiffs' Misrepresentations.**   The named and putative class plaintiffs' claims are barred to the extent that any plaintiff made misrepresentations, such as a misrepresentation that he or she was an "accredited investor" or a "qualified purchaser," in order to invest in SIBL CDs or other Stanford investment products.   To the extent any such plaintiff made misrepresentations to invest in a Stanford investment product, that constitutes an intervening cause and/or sole proximate cause for the plaintiff's losses and bars recovery from Hunton.

45.     **No "Holder" Claims Under the TSA.**  The TSA claims asserted by the putative class, and each member thereof, are barred to the extent they are based on a putative class member retaining or "reinvesting" (as that term is used in the Complaint) in a SIBL CD during the repose/limitations period when the class member's original CD purchase occurred outside the repose/limitations period.

46.     **Lack of Due Care by Plaintiffs.**  The named plaintiffs and/or the members of the putative class, or some of them, did not exercise due care and diligence and/or did not act reasonably to protect themselves from, or to mitigate, their losses or damages.

47.     **No Duty To Disclose.**  The named and putative class plaintiffs' claims for aiding and abetting/participating in violations of the TSA, and their claim for conspiracy to violate the TSA, are barred, in whole or in part, to the extent premised on sales of securities by untruths or omissions, because Hunton had no duty to disclose to the named and putative class plaintiffs, or any other SIBL CD investors, any of the facts the named and putative class plaintiffs allege should have been disclosed but were omitted from disclosures to them.

48.     **Statutes of Limitation/Repose.**  The named and putative class' claims are barred, in whole or in part, by the statutes of limitation and repose applicable to those claims, including but not limited to: TEX. CIV. CODE ANN. § 581-33(H)(1)(A), § 581-33(H)(2)(a), and § 581-33(H)(2)(b); TEX. CIV. PRAC. & REM. § 16.003(a) and § 16.004(4); and FLA. STAT. § 95.11(3)(f) and 95.11(3)(j).  To the extent the discovery rule applies to any of Plaintiffs' claims, those claims are still barred, in whole or in part, because the time for filing after discovery has expired under applicable statutes of limitation.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Hunton demands a trial by jury in this matter.

## CONCLUSION

WHEREFORE, Hunton respectfully requests that this Court enter judgment in favor of Hunton and against Plaintiffs and grant Hunton such other and further relief as the Court may deem just and proper.

Dated:  March 2, 2015

Respectfully submitted,

By:  s/ Jeffrey D. Colman
Jeffrey D. Colman (Ill. # 0491160)

Richard A. Sayles (Tex. # 17697500)          David Jiménez-Ekman (Ill. # 6210519)
Shawn Long (Tex. # 24047859)                 April A. Otterberg (Ill. # 6290396)
SAYLES WERBNER                               JENNER & BLOCK LLP
4400 Renaissance Tower                       353 N. Clark Street
1201 Elm Street                              Chicago, IL 60654-3456
Dallas, TX 75270                             jcolman@jenner.com
dsayles@swtriallaw.com                       (312) 923-2940
(214) 939-8701                               (312) 840-7340 (Facsimile)
(214) 939-8787 (Facsimile)

                                             *Counsel for Hunton & Williams LLP*
*Counsel for Hunton & Williams LLP*          *Admitted* Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2015, I electronically filed the foregoing **Hunton & Williams LLP's Answer & Affirmative and Other Defenses to the Remaining Claims in Plaintiffs' Original Complaint** with the clerk of the U.S. District Court, Northern District of Texas, using the electronic case filing (ECF) system of the court.  The ECF system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.  Copies will be sent to those indicated as non-registered participants by U.S. Mail or facsimile at the addresses of their counsel of record or last known residence.

s/ Jeffrey D. Colman
JEFFREY D. COLMAN