## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **RALPH S. JANVEY, in his capacity** | § | |
| **as court-appointed receiver for the** | § | |
| **Stanford Receivership estate;** | § | |
| **The OFFICIAL STANFORD** | § | |
| **INVESTORS COMMITTEE;** | § | |
| **SANDRA DORRELL;** | § | |
| **SAMUEL TROICE; and** | § | |
| **MICHOACAN TRUST; individually** | § | |
| **and on behalf of a class of all others** | § | **Civil Action No. 3:12cv4641-N** |
| **similarly situated,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | |
| | § | |
| **GREENBERG TRAURIG, LLP;** | § | |
| **HUNTON & WILLIAMS, LLP; and** | § | |
| **YOLANDA SUAREZ,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>GREENBERG TRAURIG, LLP's FIRST AMENDED ANSWER</u>

Defendant Greenberg Traurig, LLP files this first amended answer and states as follows.

## <u>OVERVIEW</u>

  **Who knew that Stanford was misappropriating depositor money and issuing false financial statements?** That is the critical question because the Texas Securities Act does not impose liability on anyone who did work for Stanford unless they had knowledge of his thefts and lies. The Texas Supreme Court says that one "must be aware of the primary violator's improper activities before it may be held liable for assisting in the securities violation." *Sterling Trust Company v. Adderly*, 168 S.W.3d 835, 841 (Tex. 2005).

  Thousands of people and companies worked for or provided services to Stanford and his companies. After four years and one of the most massive government investigations in decades,

it has now been revealed who actually knew of Stanford's thefts and frauds and knowingly

helped him to commit them:

> *Q. Mr. Davis, to your knowledge, who knew for a fact that Stanford International Bank was funding Mr. Stanford's personal lifestyle and his other companies?*
>
> *A. Mr. Stanford, myself, Mr. Harry Failing, Mr. Gil Lopez, Mr. Mark Kuhrt, Mr. Henry Amadio.*

> James Davis, Stanford's Chief Financial Officer
> Testifying for the Government under a plea agreement  (Oct. 19, 2012)

> *"There is no evidence whatsoever that anybody other than the five or six folks that Mr. Davis identifies at the beginning of his testimony knew word one that the original source of the funds from Mr. Stanford's lifestyle and companies was the bank."*

> Jeffrey A. Goldberg, Deputy Chief, Fraud Section
> U.S. Department of Justice Criminal Division  (Nov. 14, 2012)

> *"[O]nly Stanford and a handful of people in his inner circle knew that his outsized lifestyle and its trappings were entirely at the expense of his depositors, and not remotely close to the 'investments' into which depositors believed they had placed their savings based on Stanford's lies."*

> U.S. Government's Sentencing Memorandum,
> U.S. v. Stanford (June 6, 2012).

> *"Loumiet has nothing involved -- yeah.  Loumiet is not a target in Stanford."*

> Hon. Gregg J. Costa, United States Circuit Judge,
> Former Assistant U.S. Attorney and prosecutor of Allen Stanford
> (Feb. 8, 2012).

## PRELIMINARY STATEMENT

Greenberg Traurig sympathizes with the investors who lost money as a result of Allen

Stanford's criminal fraud, but the firm played no part in causing those losses.  Greenberg Traurig

has searched the 172-page Complaint in vain for the most basic and necessary allegation -- that

Greenberg Traurig knew about Allen Stanford's theft of depositor money, false financial reports or fraudulent sales practices.  Plaintiffs cannot in good faith make that claim because they know it is false.  If Greenberg Traurig knew of Stanford's frauds it would not take 172 pages to say so.

The plain fact is that Greenberg Traurig knew nothing about and is not responsible for the fraud committed by Stanford.  In the criminal trials of Stanford, Lopez and Kuhrt, the U.S. Government proved conclusively that only Stanford, his CFO and a few other specified insiders knew about his fraud.  **Greenberg Traurig could not have conspired with or aided and abetted unlawful conduct it did not know about.**

Greenberg Traurig is an international full-service law firm serving clients from offices in the United States, Latin America, Europe, the Middle East and Asia.  It was one of over twenty outside law firms that provided legal services for the many Stanford companies.  Greenberg Traurig's work for Stanford was proper, ethical and aboveboard.  It advised Stanford to deal openly with depositors and to comply with all applicable laws.

In early 1998, Greenberg Traurig was shown an early draft Disclosure Statement which had been written by someone else.  Greenberg Traurig recommended in writing that Stanford inform potential depositors up front about the CDs including the following Greenberg Traurig-recommended disclosures:

- **"THE CD DEPOSITS ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION OR UNDER ANY SIMILAR INSURANCE PROGRAM OF THE GOVERNMENT OF ANTIGUA AND BARBUDA."**

- **"NOT REGISTERED WITH THE SEC OR ANY STATE AGENCY"**

The Disclosure Statement ultimately issued by SIBL was the work of others.  In the years following the issuance of the Original Disclosure Statement at least six Amended Disclosure Statements were issued, each of which superseded and replaced all prior Disclosure Statements.  Each Amended Disclosure Statement was prepared with no involvement of Greenberg Traurig.

On information and belief all losses incurred on SIBL CDs that were sold with a Disclosure Statement involved one of the Amended statements for which Greenberg Traurig had no involvement whatsoever.

If any depositors were told that their CDs were insured, or were regulated by the U.S., it was contrary to Greenberg Traurig's recommendations, the written Disclosure Statement and to the written Subscription Agreement signed by U.S. investors.

When Stanford opened a trust representative office in Florida, Greenberg Traurig provided a written list of legal Do's and Don'ts including  "[D]o not solicit business on behalf of Stanford International Bank."  If Stanford used the trust office to solicit CD sales, he absolutely violated Greenberg Traurig's clear written instructions.

When Greenberg Traurig learned after the fact that Stanford had given contributions to Antigua officials it cautioned him and sent a copy of the Foreign Corrupt Practices Act prohibiting certain payments to foreign officials.

Greenberg Traurig lawyers helped the Government of Antigua strengthen its offshore banking laws to protect against money laundering and fraud.  **GT lawyers wrote and helped Antigua enact laws and regulations that would have prevented the very frauds for which Stanford was later convicted**, including the following:

- A regulation prohibiting banks like SIBL from loaning money to their owners "without securing collateral equal to one hundred percent of the amount of the loan."  This made it illegal for Stanford to take money from SIBL in the form of unsecured loans.

- Another GT-drafted regulation required banks to "maintain a ratio of equity to assets of five percent or greater."  Had this rule been enforced it would have ensured that SIBL kept sufficient assets to repay every depositor in full and still have five percent equity left over.

- Another regulation subjected banks like SIBL to annual on-site bank examinations to ensure compliance with all laws.

- An amended statute required banks like SIBL to furnish annual audited financial statements to the regulators.

Had Antigua enforced the laws and regulations Greenberg Traurig recommended, Stanford would have been unable to carry out his alleged Ponzi scheme and not one of the Plaintiffs would have lost anything.

Former Greenberg Traurig attorney Carlos Loumiet is a respected international business lawyer.  He provided honest and competent legal services to Stanford-owned businesses without knowledge of any fraud going on behind the scenes.  He also successfully defended Stanford against unfounded allegations of drug money laundering that were unrelated to Stanford's later fraud.  Loumiet left the firm in 2001, years before the issuance of the CDs on which plaintiffs' claims are based.  On the limited matters in which Greenberg Traurig attorneys were subsequently consulted, they properly advised Stanford entities.

The hefty volume of innuendo and misinformation in the Complaint cannot disguise this rather desperate attempt to implicate Greenberg Traurig for losses that for several years these same plaintiffs have accused others of causing.

## RESERVATION OF MOTION FOR PARTIAL DISMISSAL

Greenberg Traurig (GT) filed a motion for partial dismissal, which was granted in part and denied in part by this Court.  GT reserves for appeal the portions of its motion for dismissal that were overruled.  It therefore incorporates herein by reference its prior motion for partial dismissal and supporting briefs.

## ANSWER

Subject to and without waiving the foregoing partial motion to dismiss, GT answers Plaintiffs' Original Complaint as follows:

### General Denial

Pursuant to Rule 8(b), FED. R. CIV. P., GT denies generally all claims that are not specifically admitted herein.

## Specific Denials

SD-1.   GT denies that Plaintiffs' Original Complaint states a claim upon which relief can be granted.

SD-2.   GT denies that The Official Stanford Investors Committee has standing or a legal interest in any damage claims by depositors or professional liability claims against GT.

SD-3.   GT denies that the Receiver and the putative Investor Class each own all claims they seek to assert.   The Receiver and Investor Class are asserting overlapping and conflicting ownership claims to many of the same alleged actions, events and damages.

SD-4.   GT denies that it was the issuer, seller, broker or marketing agent for SIBL CDs or the financial advisor to any plaintiff.   GT neither issued nor vouched for any allegedly fraudulent securities, fraudulent marketing materials or financial advice, and is not liable for the actions of those who did.

SD-5.   GT denies that it provided any legal opinions or substantial assistance to SIBL's allegedly fraudulent CD program.   GT was not involved in designing the program and was not asked to provide a legal analysis of it.   Nor was GT asked to review or provide any legal analysis of SIBL's marketing program, investment program, loans including loans to Stanford, or SIBL's financial and regulatory reports.   GT is not liable for the actions of those who designed and carried out such programs.

SD-6.   GT denies that United States law or the Texas Securities Act applies to each of the CD's made the basis of this suit, including but not limited to any CDs issued by SIBL, an Antigua chartered bank, that were sold and delivered outside of the United States to non-U.S. residents.

SD-7.   GT denies that it represented or owed legal duties to the investor plaintiffs or the Official Stanford Investors Committee.

SD-8.   GT denies that it had any actual knowledge or awareness, at the time legal services were rendered, of Stanford's improper activities including any alleged fraud and securities violations.

SD-9.   GT denies that it rendered substantial assistance to Stanford's frauds or securities violations.

SD-10.   GT denies that it knowingly joined in or agreed with anyone to defraud or injure depositors or to injure any Stanford-owned business.

SD-11.  GT denies that the SIBL CDs constituted "securities" under applicable U.S. federal or state law.

SD-12.   GT denies that the SIBL CD's were required to be registered under either federal or Texas law.

SD-13.   GT denies that its respective clients were actually insolvent at the time they paid legal fees to GT.

SD-14.   GT denies the accuracy of the Appendix to the Complaint, a list of purported payments to GT.

SD-15.   GT denies that Texas substantive law governs or controls the claims asserted herein.

## Responses to Specific Averments

GT responds as follows to the averments contained in the following numbered paragraphs of Plaintiff's Original Complaint:

## Parties

1.      GT admits that Ralph S. Janvey was appointed Receiver by an order of this Court, the content of which speaks for itself.

2.      GT admits that the Official Stanford Investors Committee was formed by an order of this Court, the content of which speaks for itself.  GT denies that the Committee is or may be the assignee of damage claims by depositors or professional liability claims against GT.

3.      GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and therefore denies them.  See Rule 8(b)(5), Fed. R. Civ. P.

4.       GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 and therefore denies them.

5.      GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 and therefore denies them.

6.      GT admits Plaintiffs seek class certification but denies that certification is warranted.

7.      GT admits that it is a New York limited liability partnership.  GT has agreed to waive service.

8.      Does not require admission or denial by this Defendant.

9.      Does not require admission or denial by this Defendant.

Overview of Case

10.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 and therefore denies them.

11.     GT denies that it helped Stanford commit any wrongdoing.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 11 and therefore denies them.

12.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 and therefore denies them.  GT denies that Carlos Loumiet was complicit in any Stanford wrongdoing.

13.     GT admits that Carlos Loumiet performed legal services for certain Stanford related companies at various times between 1998 and May 1, 2001, at which time he left GT's employ.   GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13 and therefore denies them.

14.     Denied.

15.     Denied.

16.     Denied.

Personal Jurisdiction

17.     Does not require admission or denial by this Defendant.

18.     GT does not challenge personal jurisdiction in this court with respect to this case. The remainder of the allegations of paragraphs 18-20 are therefore moot.

19.     Does not require admission or denial by GT.

20.     Does not require admission or denial by GT.

Subject Matter Jurisdiction & Venue

21.     GT admits that this Court has subject matter jurisdiction and venue of this action by virtue of the Stanford Receivership orders.  GT denies all other asserted grounds of subject matter jurisdiction and venue.

22.     Denied.

Factual Background

23.     GT admits that R. Allen Stanford owned and operated a series of financial services companies which were placed into receivership in February 2009.   GT denies the remaining allegations and characterizations contained in paragraph 23.

24.     GT admits that R. Allen Stanford owned and operated a series of financial services companies.   GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 and therefore denies them.

25.     GT admits that SIBL sold Certificates of Deposit and that SIBL was owned by Allen Stanford.   GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 25 and therefore denies them.

26.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 and therefore denies them.

27.     GT admits SFIS was established in Miami.   GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 27 including Stanford's alleged improper plans for SFIS and therefore denies them.

28.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies them.

29.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies them.

30.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 and therefore denies them.

31.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies them.

32.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 and therefore denies them.

33.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 and therefore denies them.

34.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and therefore denies them.

35.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 and therefore denies them.

36.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 and therefore denies them.

37.     GT denies that it provided material assistance to any illegal or improper conduct. GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 37 and therefore denies them.

38.     GT admits that SFIS was established as a Miami trust representative office of STC.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38 and therefore denies them.

39.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and therefore denies them.

40.     GT admits, on information and belief from public records, that SIBL filed a form D notice with the SEC the content of which speaks for itself.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 40 and therefore denies them.

41.     GT admits, on information and belief from public records, that SIBL filed several amended Form D notices with the SEC the contents of which speaks for themselves.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 41 and therefore denies them.

42.     GT admits, on information and belief from public records, that SIBL filed an amended Form D notice with the SEC in 2007, the content of which speaks for itself.  GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 and therefore denies them.

43.     GT denies it was aware of any improper sales practices. GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 43 and therefore denies them.

44.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 and therefore denies them.

45.     GT denies that it conspired with Stanford.  GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 and therefore denies them.

46.     On information and belief, based on the Disclosure Statement and similar documents provided to depositors as found in the public record, GT denies the allegation that investors were told that Stanford was "regulated by the SEC" and FINRA and "backed by insurance coverage from the Securities Investor Protection Corporation ("SIPC")."   To the contrary:

The SIBL **Disclosure Statement** dated September 30, 2004 states in part as follows:

- "We have not registered the CD deposits provided in connection with the U.S. Accredited Investor CD (the "CD Deposits") or our related certificates of ownership (the "CD Certificates")  under the U.S. Securities Act of 1933, as amended, or securities laws of any state or other jurisdiction."

- "SIBL's products are not subject to the reporting requirements of any jurisdiction, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation…."

**FIRST AMENDED ANSWER - Page 12**
1515132.1

- "**the CD Deposits and the CD Certificates are not insured** by the Federal Deposit Insurance Corporation or any other agency of the United States Government or any state jurisdiction…."

- "We are regulated by the Financial Services Regulatory Commission and the Ministry of Finance of the Government of Antigua and Barbuda."

- "We also maintain Depository Insolvency insurance. **The latter insurance protects us** against the possible insolvency of any financial institution where we may place our own funds, **and is not the equivalent of the FDIC insurance** offered on deposits at many institutions in the United States."

- "We have not authorized any dealer, sales representative or any other person to give any information or to make any representations in connection with this offering other than those contained in this Disclosure Statement. If given or made, such information must not be relied upon as having been authorized by SIBL.

The **Subscription Agreement** for U.S. depositors states in part as follows:

- "As a condition of our accepting your subscription and any subsequent deposits in the case of a Flex CD, you state as follows:

    (a) You have received a Disclosure Statement and other relevant Offering Documents…. You have read and you understand the Offering Documents, particularly the discussion of the risks associated with the U.S. Accredited Investor CD."

The **Training and Marketing Manual** states in part as follows:

- "Since Stanford International Bank is not a U.S. Bank, it is not covered by the FDIC insurance."

- "What authority supervises Stanford International Bank?

    "The Financial Services Regulatory Commission (FSRC) has the responsibility to supervise and regulate the [international financial institutions] sector."

If someone represented to depositors that SIBL was regulated by the SEC and FINRA, or that CD depositors were insured, which is unknown to GT, it would be contrary to the written disclosures and investor-signed agreements and could not reasonably be relied upon. GT lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 46 and therefore denies them.

47.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 and therefore denies them.

48.     GT admits that Allen Stanford, Jim Davis, Gilbert Lopez and Mark Kuhrt were convicted of criminal acts.  The evidence admitted in their cases speaks for itself.

49.     GT denies that it knew Stanford's intent was to operate an unlicensed investment company or skirt U.S. law.  GT admits that in 1988 it opened a file for Guardian International Bank  Ltd., the content of which speaks for itself.  GT denies that it established an attorney-client relationship with an entity or group called "Stanford Financial."   GT admits that Loumiet joined GT in 1982 and made partner in 1984.  GT denies that GIBL's address was in Houston, Texas. GIBL correspondence, as well as paragraph 51 of the Complaint, reflect that GIBL was headquartered in Montserrat, British West Indies and had only a representative office in Houston.   GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 49 and therefore denies them.

50.     GT admits that Sidney Adler sent a letter to Loumiet in March 1988, the content of which speaks for itself.  GT denies the remaining allegations of paragraph 50.

51.     GT admits that Sidney Adler sent a letter to Loumiet in March 1988, the content of which speaks for itself, and that GIBL was chartered in Montserrat.  GT denies the remaining allegations of paragraph 51.

52.     GT admits that Sidney Adler sent a letter to Loumiet in March 1988, the contents of which speaks for itself.

53.     GT denies the first sentence of paragraph 53.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 53 and therefore denies them.

54.     GT admits that Sidney Adler sent memos to Loumiet in April 1988, the contents of which speaks for themselves.

55.     GT denies the first and last sentences of paragraph 55.  GT admits, on information and belief, that Sidney Adler sent a memo to Allen Stanford dated May 12, 1988, the content of which speaks for itself.

56.     Denied.

57.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57 and therefore denies them.

58.     GT denies that Loumiet knew Stanford intended to violate any laws.  GT admits that at some point it received copies of correspondence between Guardian International Bank Ltd. and the Texas Banking Department, the contents of which speaks for themselves.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 58 and therefore denies them.

59.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59 and therefore denies them.

60.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 and therefore denies them.

61.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 61 and therefore denies them.

62.     On information and belief based on court findings in the public record, GT denies that the Montserrat Government revoked Guardian's banking license.

63.    On information and belief, GT admits that Stanford prepared a memo to Loumiet in August 1989 stating that Shockey had been spreading false and defamatory rumors about Guardian, including false statements about Guardian's Sr. VP and General Counsel Sidney Adler that Shockey later acknowledged were false and referred to a different and unrelated Mr. Adler. GT denies that Stanford "told Loumiet that in the very near future he wanted to 'deal with Shockey in the most aggressive manner.'"  The actual language of the referenced passage is as follows:

> "As I see our position today and where we want to go in the future, several extremely important decisions must be addressed, which are:  1) Dealing with Shockey in the most aggressive manner, without creating further fall out from his defensive tactics…."

The balance of the referenced memo speaks for itself.

64.    Denied.

65.    GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 65 and therefore denies them.  GT denies the second sentence of paragraph 65.  GT admits that Loumiet sent an e mail dated February 24, 1998 but denies the gross mischaracterization of the memo as purportedly reflecting that Loumiet "viewed the corrupt island nation as the ideal location for a massive experiment in private sector self-governance."  To the contrary, the memo states as follows, in its entirety:

> **For the past nine months, as the expense of a client with a sizable investment in the islands, we have been helping the Government of Antigua and Barbuda to clean up its international banking sector through the adoption of model legislation and regulations and the elimination of questionable financial institutions operating there.  That effort has won strong praise even from British monetary authorities (A&B remains part of the Commonwealth), who have acknowledged the quality of the proposed measures.  Another sector of the economy that has developed on those islands is internet gambling, and the Government of A&B now wishes us to help it be a pioneer in the adoption of model legislation and regulations to regulate the industry and eliminate many of the abuses that have been associated with it. Our client has asked whether we represent any companies active in the field which would like to actively participate in, and help fund, an effort to adopt**

**such regulation in order to give themselves and the over-all industry a better image.  One huge advantage to A & B in this regard is that we have sufficient support from its Government and it is a small enough jurisdiction to make it ideal as a 'laboratory' for this type of effort. Please let me know if you know of any clients which would like to be involved."**

66.     Denied.

67.     Denied.

68.     GT admits that Loumiet sent a letter to D.K.L. Hurst dated October 16, 1990, the content of which speaks for itself.

69.     Denied.

70.     GT admits that Mr. Percival sent a letter to Mr. St. Luce dated Nov. 12, 1990, the content of which speaks for itself.  GT notes that the letter also includes the following statement which was omitted from the allegations in paragraph 70:   "**Mr. Spencer concludes that from the information received to date 'there is no tangible evidence to associate Guardian International with any criminal activity**.' "   GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 70 and therefore denies them.

71.     On information and belief, GT admits that the Cabinet approved the referenced proposal as set out in a document dated Nov. 28, 1990, and that Financial Secretary Hurst sent a letter to the Deputy Governor of the East Caribbean Central Bank dated Nov. 29, 1990 regarding Antigua's acceptance of the proposal with conditions.  The content of each document speaks for itself.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 71 and therefore denies them.

72.     GT admits that Loumiet was sent a copy of Citizens and Southern National Bank correspondence to Bank of Antigua dated June 4, 1991, the content of which speaks for itself.  GT denies the allegation that "Loumiet became aware that Stanford was using BoA as a platform

for GIBL's own business."  The referenced letter contains no such statement or reference.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 72 and therefore denies them.

73.     GT admits that Loumiet wrote a letter to NationsBank International Miami dated May 29, 1992, the content of which speaks for itself.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 73 and therefore denies them.

74.     GT admits that it represented Guardian in connection with false statements made by John Shockey.  GT admits that Loumiet wrote a letter to the General Counsel of the Office of Comptroller of the Currency dated October 29, 1990, the content of which speaks for itself.  The balance of paragraph 74 is denied.

75.     GT admits that the OCC sent a letter dated Nov. 13, 1990, the content of which speaks for itself.

76.     GT admits that Loumiet wrote a letter to Stanford dated Nov. 8, 1990, the content of which speaks for itself.  The balance of paragraph 76 is denied.

77.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77 and therefore denies them.

78.     Denied.

79.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79 and therefore denies them.

80.     GT denies the allegation that "Greenberg routinely provided U.S. securities law advice and counsel to Stanford."  GT admits that Yolanda Suarez is a former associate at Greenberg.  The balance of paragraph 80 is denied.

81.     GT admits that Loumiet sent Stanford a letter dated February 1, 1991, the content of which speaks for itself.   GT denies the mischaracterization of the letter as purportedly discussing whether GIIS was carrying out banking operations in the United States by providing "services to GIBL."   The letter actually refers to proposed services to <u>Bank of Antigua, Ltd.</u> and states as follows in pertinent part:

> **The Service Agreement with Bank of Antigua, Ltd. should make it clear that Guardian International Investment Services, Ltd. ('Services') will not sell the bank's services to residents of the United States.  Whether or not CD's of Bank of Antigua, Ltd. would constitute 'securities' for U.S. law purposes, which is arguable, the likelihood of getting in trouble with state banking and securities regulators is much greater if Services is promoting the sales of those deposits to residents of the U.S.  <u>I therefore do not recommend it</u>.**
> [emphasis added]

GT denies the mischaracterization that "Loumiet also warned Stanford about Stanford Financial's <u>sales of securities</u> in the U.S., which might require it to be registered as a securities broker."   The letter actually refers to proposed sales of <u>limited partnerships and bonds</u> by the Guardian Development Corporation and states as follows in pertinent part:

> My other concern is securities law relating to the services to be rendered by Services for Guardian Development Corporation (GDC).   Specifically, I am concerned about the 'marketing and support services' to be provided by Services <u>in connection with the sales by GDC of 'various limited partnerships and subordinated bond interests</u>.' [emphasis added]

The balance of paragraph 81 is denied.

82.     GT admits that a letter was sent to Guardian International dated March 25, 1992, the content of which speaks for itself.  GT denies the mischaracterization that this letter shows that GT knew "Stanford was offering GIBL CDs" through GIIS offices in the U.S.  The letter contains no such statement or reference.   GT denies that GT advised an entity defined by plaintiffs as "Stanford Financial."  The balance of paragraph 82 is denied.

83.     GT admits that a GT attorney wrote a memo to the file dated January 8, 1993, the content of which speaks for itself.

**FIRST AMENDED ANSWER - Page 19**

84.     GT denies the mischaracterization that Suarez "essentially told the Greenberg partner that GIBL was a pass-through sham banking entity used as a front for Stanford's U.S.-based unlicensed investment company securities sales operation."   The referenced memo contains no such statements or characterizations.   The balance of the memo speaks for itself. The remainder of paragraph 84 is denied.

85.     GT admits that a GT attorney wrote the referenced memo, the content of which speaks for itself.

86.     GT denies the mischaracterization that the referenced notes "reveal Greenberg's knowledge of Stanford's securities law violations."   The referenced notes contain no such statements or characterizations.   GT denies the mischaracterization that the notes reveal that "Stanford had told Greenberg" that he was resistant to any registration.   The referenced notes do not purport to reflect any discussions with Stanford.   GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 86 and therefore denies them.

87.     GT admits that Loumiet sent Suarez a copy of his affidavit dated January 13, 1994, the content of which speaks for itself.   GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 87 and therefore denies them.

88.     GT admits that Loumiet and Menendez Cambo prepared a Draft for Discussion Purposes memo dated November 12, 1994, the content of which speaks for itself.   The remainder of paragraph 88 is denied.

89.     GT admits that Stanford extended an invitation dated June 18, 1993, for Loumiet to become a member of the Advisory Board of Stanford Financial Group, Ltd., the content of

which speaks for itself.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 89 and therefore denies them.

90.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 and therefore denies them.

91.     GT admits that Menendez Cambo wrote a letter to a representative of the Federal Reserve Bank of Atlanta dated Oct. 27, 1994, the content of which speaks for itself.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 91 and therefore denies them.

92.     GT admits that Suarez sent a letter to Menendez Cambo dated Oct. 28, 1994, the content of which speaks for itself.

93.     GT denies the colorful but physically-challenging allegation that "Greenberg knew that Stanford had the Antiguan regulator, Molwyn Joseph, literally [sic] in his pocket."  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 93 and therefore denies them.

94.     GT admits that Menendez Cambo sent a letter to Suarez dated Nov. 14, 1994, the content of which speaks for itself.  GT denies the allegation that the draft attached to this letter purportedly "stated (with regard to GIBL) that:  We have adequate procedures for monitoring and controlling the Bank's activities worldwide."  The attached draft defines "Bank" as referring to Bank of Antigua not GIBL.

95.     Denied.

96.     GT admits that Menendez Cambo sent a letter to Suarez dated Dec. 5, 1994, the content of which speaks for itself.  GT denies that the Name Check Information Sheet asked if Stanford or any of his companies "**had ever been** the subject of any criminal investigation."  The actual language of the document states:

> **"If you are involved in any material pending administrative proceeding, civil litigation, either as plaintiff or defendant or have been advised that you are the subject of any actual or potential investigation conducted by, or to be conducted by, any regulatory agency or criminal justice agency, set forth (a) the title and nature of lawsuit or proceeding…"**

GT denies that the answer to such question was affirmative as of December 1994, and denies that GT knew the answer was affirmative.  GT denies that it knew in December 1994 of Stanford's prior bankruptcy.  GT further denies that Stanford or any of his companies had ever had any licenses revoked.  Plaintiffs acknowledge that the threatened revocation of a license by Montserrat -- the only potential revocation identified in the Complaint -- was rescinded and was not carried out.  *See* Complaint ¶ 62.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 96 and therefore denies them.

97.     GT admits O'Brien wrote a memo to Schnapp dated February 1, 1994, the content of which speaks for itself.  As noted in the memo, the FBI money laundering investigation was closed without any findings or charges being filed against Stanford.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 97 and therefore denies them.

98.     GT lacks knowledge or information sufficient to form a belief as to Stanford's motivations and therefore denies them.  GT admits that Pat O'Brien submitted requests under the Freedom of Information Act, the content of which speak for themselves.  GT denies the mischaracterization of a FOIA request as an act of "counter-espionage" against the United States.  According to the United States Department of Justice:

> "The FOIA is a law that gives you the right to access information from the federal government.  It is often described as the law that keeps citizens in the know about their government.  … As Congress, the President, and the Supreme Court have all recognized, the FOIA is a vital part of our democracy."

http://www.foia.gov/about.html.

99.     GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 and therefore denies them.  GT denies that any investigation ever found Stanford to be involved in drug money laundering.   As Plaintiffs acknowledge, the investigations found no support for any such claims and were closed without findings or charges being filed against Stanford.  *See, e.g.,* Complaint paragraph 97.

100.    GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 and therefore denies them.  This paragraph appears to refer to an FBI internal document dated Jan. 27, 1992 which states in part:   "**Extensive investigation to date has not put a drug nexus to the operation run by subjects**."   The purported quotes contained in paragraph 100 are taken out of context.  The complete passage states:  "In essence, Guardian International functions as a bank for foreign depositors in the U.S. with a constant cash flow to Europe.  However there is no regulation of its activities."  To GT's knowledge no investigation ever found that Stanford had engaged in drug money laundering or smuggling and no such charges were ever filed against him.

101.    GT admits the Loumiet sent Stanford and Suarez a letter dated Nov. 8, 1994, the content of which speaks for itself.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 101 and therefore denies them.

102.    GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 and therefore denies them.

103.    GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 and therefore denies them.

104.    GT denies the allegation that the Prime Minister "noted in his November 14, 1994 letter" that he "was forever indebted to Stanford."   The referenced letter contains no such

statement.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 104 and therefore denies them.

105.    GT admits that Lester Bird sent Stanford a letter dated Feb. 21, 1995, the content of which speaks for itself.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 105 and therefore denies them.

106.    GT admits the allegations in the first sentence of paragraph 106, and lacks sufficient knowledge and information to form a belief as to the truth of the allegations in the second sentence in paragraph 106, and therefore denies them.  GT admits it prepared loan documents for a loan made by a consortium of lenders to the Government of Antigua to fund construction of a new hospital, and billed the time on the matter to SFG.  GT denies all other allegations in paragraph 106.

107.    GT admits DSI threatened a tortious interference with contract claim against Stanford and that Suarez responded to the threat with a letter dated December 12, 1994, the content of which speaks for itself.  GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 107 and therefore denies them.

108.    GT admits DSI attempted to use U.S. political pressure to influence the Government of Antigua & Barbuda to award the financing and construction of the proposed hospital to DSI, and that Senator Hatch urged Congress to revoke Antigua's most favored nation status.  GT admits that Stanford was then investigated for his activities related to the Antiguan hospital dispute, that GT was retained to represent Stanford in connection with the investigation, and that a file was opened under the name "Foreign Corrupt Practices Act Investigation of Antiguan Hospital."  The investigation ended with no charges being filed.  GT denies the remaining allegations in paragraph 108.

109.    GT admits there was a joint defense agreement between Stanford and the Government of Antigua with respect to the FBI investigation, and it was through this matter that GT received documents showing Stanford loans to Antiguan Government officials and that Stanford had flown Prime Minister Bird to Houston for emergency medical care.  GT denies the remaining allegations in paragraph 109.

110.    GT admits there were "negative" press reports and articles concerning the Antiguan Hospital dispute, the content of which speak for themselves.  GT denies the remaining allegations in paragraph 110.

111.    GT admits the referenced articles in paragraph 111 were sent to Loumiet.  GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 111 and therefore denies them.

112.    GT denies the allegations in the first two sentences of paragraph 112.  GT admits it was provided documents showing loans or extensions of credit to the Antigua Government and Government officials and the repayment histories of those loans, the content of which speak for themselves.  GT denies the remaining allegations in paragraph 112.  GT denies knowledge that any such loans were illegal.

113.    GT admits the allegations of paragraph 113.

114.    GT lacks sufficient knowledge and information to form a belief as to the truth of the allegation in paragraph 114 that "the manner in which Stanford disguised his 'gifts' to government officials is evidenced by one May 6, 1994 memo" and therefore denies them.  GT denies knowledge that Stanford was planning to or engaged in illegal gifts or loans to government officials.  GT denies the remaining allegations in paragraph 114.

115.    GT admits the allegations in paragraph 115.

116.    GT admits that it received a spreadsheet in January 1996, regarding loans to the government and Government officials, the interest rates charged and the repayment history, the content of which speaks for itself.  GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 116 and therefore denies them.

117.    GT admits Loumiet faxed a copy of the Foreign Corrupt Practices Act to Suarez on or about February 7, 1996, but denies it was "in recognition of all the bribery going on in Antigua" as alleged in paragraph 117.

118.    GT admits it helped draft proposed trust legislation, that it was provided with a copy of trust legislation prepared by some English solicitors, and that it worked with Errol Cort on the project.  GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 118, and therefore denies them.

119.    GT admits that Loumiet prepared a letter dated July 26, 1995, the content of which speaks for itself.  GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 119, and therefore denies them.

120.    GT admits that  GT partner worked on drafting proposed legislation relating to the Antigua Airport Authority but denies the characterization of such work or its purpose.

121.    GT admits the allegations in paragraph 121.

122.    GT admits Loumiet and Schnapp from time to time sent articles to Suarez that related to the Caribbean offshore banking industry and money laundering, including the referenced Time magazine and Miami Herald articles relating to drug trafficking and to law enforcement cracking down on a Caribbean money laundering fraud.  GT denies the remaining allegations in paragraph 122.

123. GT admits that Caribbean Week published an article titled "*Drugs and the Economy*" written by Klaus Von Albuquerque, the content of which speaks for itself. GT denies the remaining allegations in paragraph 123.

124. GT admits it represented Stanford in connection with a claim against Klaus Von Albuquerque and the Caribbean Week newspaper for defamation and that Schnapp was lead counsel. GT denies the remaining allegations in paragraph 124, and specifically denies Schnapp "already knew that Stanford had bribed a slew of Antiguan Government officials, including the minister of Finance charged with regulating his banks."

125. GT admits Stanford instructed "I want no delay in our attacks on DSI, Caribbean Week, Klaus de Albuquerque, Shipman, the Outlet or the reporter the article in the Daily Observer" and that he ordered Suarez to report to him "on a weekly, if not daily" basis. GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 125, and therefore denies them.

126. GT admits that Stanford discussed with Schnapp a possible retraction by Caribbean Week but denies that paragraph 126 accurately summarizes or characterizes such discussions. GT denies the last two sentences of paragraph 126.

127. GT admits that in response to the defamation claim the Caribbean Week newspaper published a retraction that apologized for the statements it made about Stanford in the subject articles. GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 127, and therefore denies them.

128. GT lacks sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 128, and therefore denies them.

129.    GT admits that Stanford owned the Antiguan Sun newspaper. GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 129, and therefore denies them.

130.    GT admits that in April and May 1996, Stanford wrote several letters to individuals at the U.S. Embassy in Barbados seeking the source and details of the "negative" information about him that reportedly caused Ambassador Hyde to not wish to meet him, and indicating his intent to aggressively pursue the matter. GT denies the remaining allegations in paragraph 130.

131.    GT admits Stanford set a letter to Loumiet dated May 30, 1996, the content of which speaks for itself. GT denies the remaining allegations in paragraph 131.

132.    GT denies the allegations in the first sentence of paragraph 132. GT admits that Loumiet wrote a letter to Ambassador Hyde dated July 11, 1996, the content of which speaks for itself. GT denies the remaining allegations in paragraph 132.

133.    GT admits the allegations in paragraph 133.

134.    GT admits O'Brien sent freedom of information requests to the FBI, DEA, OCC, Federal Reserve and US Customs seeking information about Stanford, that the OCC and DEA withheld some information based on the "law enforcement" exception and the FBI redacted certain information and O'Brien appealed those decisions on behalf of the client. GT denies the remaining allegations in paragraph 134.

135.    GT admits that information produced by the FBI indicated Stanford had been investigated for alleged money laundering of drug money in the late 1980s and early 1990s, that the FBI had never been able to substantiate any connection between Stanford and drug money; that an investigation of Stanford by US Customs in 1992, did not substantiate any allegations of

wrongdoing; and that the FBI sent an agent to London in 1992, as part of its investigation.  GT denies the remaining allegations in paragraph 135.

136.   GT admits the SEC-licensed broker/dealer, SGC, was established in the United States on or about 1996.  GT lacks sufficient knowledge to form a belief as to the truth of the other allegations paragraph 136, and therefore denies them.

137.   GT admits the SEC-licensed broker/dealer, SGC, a Texas corporation, was established in the United States on or about 1996, with its principal place of business in Houston, Texas.  GT lacks sufficient knowledge to form a belief as to the truth of the other allegations in paragraph 137, and therefore denies them.

138.   GT admits it assisted in preparation of various service agreements between various Stanford owned companies, the content of which speak for themselves.  GT denies the remaining allegations in paragraph 138.

139.   GT admits it prepared an initial draft of a disclosure statement for a Reg D offering in February 1997 but denies that this draft was issued by SIBL as its Reg D disclosure statement.  GT admits that in July 1998, it provided comments on another draft disclosure statement received from SIBL.  GT attorneys had no further involvement in preparation of the disclosure statement ultimately used with the initial Reg D offering or subsequent Reg D disclosure statements. GT denies the remaining allegations in paragraph 139.

140.   GT admits it researched the law with respect to certain issues as reflected in its billing records and related documents, the contents of which speaks for themselves.  GT denies the remaining allegations in paragraph 140.

141.   GT lacks sufficient information to form a belief as to the truth of the allegations in paragraph 141 and footnote 16 and therefore denies them.

142.    GT admits it had a file opened under the name "Real Estate Joint Venture" that involved some legal work in connection with Pearn's Point.  GT lacks sufficient available knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 141, and therefore denies them.

143.    GT lacks sufficient available knowledge and information to form a belief as to the truth of the allegations in paragraph 143, and therefore denies them.

144.    GT admits that on September 18, 1996, Loumiet wrote a letter to Antigua's Prime Minister Bird offering fifteen suggested steps that could be taken by the government to "foster the type of first rate reputation as a center for international banking and finance that you [the Prime Minister] so strongly desire for your country."  The letter referenced recent articles in the Washington Post and Miami Herald that were "injurious" to Antigua's goal for a first rate reputation as a center for international banking and finance.  GT denies the remaining allegations in paragraph 144.

145.    GT admits an Advisory Board was formed and that Stanford, Loumiet and others were asked to serve on it.  GT admits that the OFSPC was formed and that Stanford was initially appointed chair.  GT admits two Task Forces were formed, one to review existing offshore banks and the other to review Antigua's money laundering prevention laws and regulations and offer suggestions to strengthen them and the offshore banking sector to foster Antigua's goal to have a first rate reputation as a center for international banking and finance. GT denies that paragraph 145 accurately summarizes or characterizes these events or their background and purpose.

146.    GT admits members of the Task Force included GT attorneys Loumiet, Schnapp, and O'Brien; Kroll executives Tom Cash and Ivan Diaz; and BDO Seidman partners Michael Ancona, Jeffrey Balmer, Keith Ellenburg and Barry Hirsch.  GT lacks sufficient information to form a belief as to the truth of the other allegations in paragraph 146, and therefore denies them.

147.     GT admits O'Brien authored a memo dated September 15, 1997, to members of the Task Force with copies to Stanford and Wrenford Ferrance, Antigua's Minister of Finance. The memo was very early in the process of the Task Force's work and contained planning and task assignments for Task Force members.  The memo included recommendations for such areas as development of an organizational structure for Antigua's money laundering prevention program; development of comprehensive oversight program for banks; and numerous regulations which if enforced would have prevented the frauds committed by Stanford.  The memo included recommendations for development of training manuals for use by the public and private sectors for implementation of and compliance with the money laundering prevention program which would include annual on-site inspections of banks and requirements for quarterly audited financial reports.  The memo recognized the difficulty of regulation of offshore banks because of the international nature or their operations and recommended specific steps to prevent offshore banks (like SIBL) from using their international character to circumvent licensing and supervision requirements.  With regard to international cooperation, the memo provided:

**10.     International Cooperation**

**Because any money laundering in Antigua and Barbuda almost invariably involves criminal elements located in other nations, cooperation with the judicial, enforcement and regulatory authorities of other countries is critical to the effectiveness of the money laundering prevention effort. At the same time, it is essential that the Government of Antigua and Barbuda not permit the Wealth of its people and businesses to become the targets of overly aggressive enforcement actions designed primarily to supplement the treasuries of foreign nations. This can be accomplished through the following measures.**

**<u>Recommendation</u>**

A..     Implementing regulations and procedures enabling the Minister of Finance to provide information to judicial, enforcement or regulatory agencies and officials of other countries pursuing investigations of activities which are illegal under the laws of Antigua and Barbuda.

B.     Implementing regulations and procedures whereby foreign authorities pursuing money laundering and related investigations may provide evidence and request the seizure of monies and other property connected to money laundering activities when such activities constitute a violation of the laws of Antigua and Barbuda.

C.     Implementing regulations providing that any forfeited monies and other property connected to money laundering activities are remitted to the Government of Antigua and Barbuda.

D.     Reviewing and revising the list of "prescribed offenses" in the Second Schedule to the Money Laundering (Prevention) Act to ensure that the provisions of the Act apply only to the most serious of crimes, as intended, and not to lesser crimes which could conceivably be included under such vague terms as "fraud" or "false accounting."

## Assignments

A.     Greenberg Traurig will work with Wrenford Ferrance drafting appropriate regulations to enhance international cooperation and in drafting an order to be published in the *Gazette* revising the Second Schedule to the Act.

B.     Kroll Associates will work with Wrenford Ferrance drafting procedures to enhance international cooperation.

GT admits the recommendation in section "D" above was included in the final recommendations to the Government of Antigua, but it was not among the recommendations accepted by the government and passed into law. GT denies the remaining allegations in paragraph 147.

148.     GT denies the allegation in paragraph 148.

149.     GT denies the allegations in paragraph 149. GT specifically denies that any GT-recommended amendments of existing confidentiality laws were ever used to thwart SEC subpoenas.

150.     GT admits Ferrance was appointed to serve as the Director of International Business Corporations, that the Task Force worked closely with him, and that Loumiet authored a letter for Ferrance's consideration to all offshore banks (including SIBL) as part of the enforcement effort of Task Force I. GT denies the remaining allegations of paragraph 150, and

specifically denies Ferrance "relied entirely on Loumiet and other Stanford agents on the Task Force to tell him what to do."

151.    GT admits O'Brien established a temporary residence in Antigua as part of his work for the Government of Antigua as a part of the OFSPC Task Force, and that he helped advocate passage of anti-money laundering laws and regulations, and after passage, he helped with implementation of the new laws and regulations.  GT admits O'Brien utilized an email address pobrien@stanfordeagle.com while on the island and that legal fee bills were sent to the Government of Antigua in care of SFG in Houston "attention Allen Stanford" for payment by the Government of Antigua.  GT denies the remaining allegations in paragraph 151.

152.    GT admits the 1998 Amendments to Antigua's International Business Corporations Act and Money Laundering Act of 1996 and created a new Antiguan regulatory authority, IFSA, that Stanford was the initial interim chair, and O'Brien and Errol Cort also served on the Board of IFSA.  GT denies the remaining allegations in paragraph 152.

153.    GT admits that Althea Crick was appointed as the Executive Director of IFSA. GT admits Crick unsuccessfully sued O'Brien in connection with his work on behalf of IFSA and that O'Brien wrote a memo to GT's General Counsel describing the factual background of the lawsuit.  GT denies the remaining allegations of paragraph 153.

154.    GT admits that FinCEN issued Advisory No. 11 in April 1999, the content of which speaks for itself.

155.    GT admits the allegations of paragraph 155.

156.    GT admits Loumiet emailed GT attorney, Jim Bacchus, seeking advice on making a WTO claim against the United States on behalf of the Government of Antigua, and Bacchus responded by email with advice on the topic.  The content of the emails speak for themselves. GT denies the remaining allegations in paragraph 156.

157.    GT denies the allegations of paragraph 157.

158.    GT admits Washington based GT attorneys were consulted in connection with developing a strategy to reverse the FinCEN Advisory.  GT lacks sufficient knowledge and information at this time to form a belief as to the truth of the allegation as to who attended the referenced June 28, 1999 meeting or who the GT attorney contacted afterwards.  GT denies the remaining allegations in paragraph 158.

159.    GT denies that GT attorney Jim Miller worked on a strategy for reversing the FinCEN Advisory which had not yet been issued at the time of the events alleged in paragraph 159 took place.  GT admits that Miller had a billing entry for four hours that read "Setting up meetings with Hastert, Delay and Archer; talks with client to get background for meetings; arrangements for check to NRCC."  GT denies the remaining allegations in paragraph 159.

160.    GT admits that Doug Farah wrote the article "*Texas Banker at Center of Reform Controversy*" as alleged and admits that a GT attorney researched other articles written by Farah, but denies the GT attorney "investigated" Farah.  GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations of paragraph 160, and therefore denies them.

161.    GT admits that in March 2000 the US State Department issued the INCSR 1999, which speaks for itself.  GT denies the truth of the statement quoted from the report.

162.    GT admits that in June 1999, GT attorney Ruth Espey-Romero made telephone calls to individuals with the Department of Treasury and U.S. State Department in connection with lifting the FinCEN advisory.  GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations of paragraph 162, and therefore denies them.

163.   GT admits Loumiet sent an email to GT shareholders on February 24, 1998, with a subject line "Internet Gambling," which is quoted in its entirety in the response to paragraph 65 above.

164.   GT denies the allegations in paragraph 164, other than to admit that it gave legal advice concerning the Foreign Corrupt practices Act (FCPA) in the form of a January 1998 memorandum to Suarez the content of which speaks for itself, and that Schnapp sent legal articles about the FCPA to Suarez in January 1998.

165.   GT denies the allegations of paragraph 165 other than to admit it gave legal advice regarding the establishment of trust representative offices of STC, Ltd. in the U.S.

166.   GT denies the allegations of paragraph 166.

167.   GT admits it gave legal advice in a memo dated November 5, 1997, to Suarez regarding the establishment of a trust representative office of STC, Ltd. in the U.S. which speaks for itself.  GT denies the remaining allegations in paragraph 167.  GT specifically denies the allegation Fornaris knew "the true purpose of the new representative offices was to serve as a 'pass through' marketing and sales vehicle for SIBL."

168.   GT denies the allegations in paragraph 168.

169.   GT denies the allegations of paragraph 169 other than to admit it provided legal advice through a memorandum to Suarez dated September 15, 1998, regarding potential activities of the trust representative offices, including a list of specific "Do's and Don'ts For Stanford Trust Company Representative Offices in Florida," which legal advice speaks for itself.

170.   GT denies the allegations of paragraph 170 other than to admit it provided a memorandum to Suarez dated September 15, 1998, regarding potential activities of the trust representative offices including a list of specific "**Do's and Don'ts For Stanford Trust Company Representative Offices in Florida.**"

171.    GT denies the allegations of paragraph 171 other than to admit it provided legal advice through a memorandum to Suarez dated September 15, 1998, regarding potential activities of the trust representative offices, including a list of specific "Do's and Don'ts For Stanford Trust Company Representative Offices in Florida," which legal advice speaks for itself.

172.    GT admits that by letter dated October 12, 1998, Fornaris represented that the proposed Florida trust representative office would "act only as a representative of" STC, Ltd., would "not make discretionary investment decisions or accept, approve or otherwise administer fiduciary accounts in Florida" and that "consistent with the Division of Banking" it would "meet with customers at the TRO and would facilitate the transfer of documents and assist customer communications."  The letter in its entirety speaks for itself.

173.    GT admits that at one point in time STC Ltd was incorrectly informed by the staff of the Florida Division of Corporations that STC Ltd needed to obtain "a charter" from the Division of Banking before the Division of Corporations could grant STC Ltd. a certificate for a foreign corporation to transact business in Florida.  Ultimately it was determined that a charter was not necessary and in December 1998, a Memorandum of Agreement between STC Ltd. and the Florida Department of Banking and Finance was entered into addressing that issue and other regulatory and operational issues of the trust representative office.

174.    GT admits it prepared a "Memorandum Regarding the Legal Authority of Stanford Trust Company Limited to Establish a Trust Representative Office in the State of Florida" dated November 2, 1998, which speaks for itself.  GT denies the remaining allegations in paragraph 174.

175.    GT admits an affidavit of Errol Cort was included with the November 2, 1998 memorandum to provide support for the arguments made in the memorandum.  The affidavit of Cort includes the statement "Pursuant to sections 246 to 254 of the International Business

Corporations Act foresaid, the Trust Company does not and cannot engage in any general banking business and, accordingly, the Trust Company does not accept deposits, cash cheques, make loans, or engage in other banking activities."  GT denies the remaining allegations in paragraph 175.

176.    GT denies the allegations in paragraph 176.

177.    GT denies the allegations in paragraph 177, except it lacks knowledge or information , to form a belief as to the truth the of the last sentence, and therefore denies them.

178.    GT lacks knowledge or information sufficient to form a belief as to the truth as to whether Ron Laface scheduled a meeting with the Florida Deputy Comptroller and whether he was the direct supervisor of the officials with whom GT was negotiating.   GT admits that in December 1998, a Memorandum of Agreement between STC Ltd. and the Florida Department of Banking and Finance was entered into addressing regulatory and operational issues of the proposed trust representative office.

179.    GT admits that in December 1998, a Memorandum of Agreement between STC Ltd. and the Florida Department of Banking and Finance was entered into addressing regulatory and operational issues of the proposed trust representative office, the terms of which speak for itself.  GT admits STC Ltd. agreed to apply to do business in the State of Florida as Stanford Trust Company Limited d/b/a Stanford Fiduciary Services, Inc. (SFIS).  STC Ltd. further agreed in the Memorandum of Agreement that the Florida Department of Banking and Finance had the right to reasonably examine any trust representative office established by STC Ltd. within the State of Florida to assure that no prohibited business is conducted in such office.  GT admits that under the Memorandum of Agreement, it was proper for the representative trust office to, among other things, solicit new fiduciary accounts on behalf of STC Ltd. and affiliates, including providing written information and conducting meetings with prospective customers.  GT further

admits that under the Memorandum of Agreement, it was proper for the representative trust office to, among other things, facilitate communications between customers and companies where investments held in trust are located; and act as liaison between existing and potential customers and offices of STC Ltd. located outside the State of Florida. GT denies the remaining allegations in paragraph 179.

180.    GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 180, except it specifically denies that GT "bamboozled" and "misled" state authorities about the true purpose of the new office.

181.    GT denies the allegations in paragraph 181.

182.    GT denies the allegations in paragraph 182.

183.    GT lacks knowledge or information sufficient to form a belief as to the truth allegations in paragraph 183, and therefore denies them.

184.    GT lacks knowledge or information sufficient to form a belief as to the truth allegations in paragraph 184, and therefore denies them.

185.    GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 185, except it specifically denies the allegation "Loumiet and Greenberg did not and continued to work at it until Stanford got exactly what he wanted."

186.    GT admits, on information and belief, that the initial directors of Stanford Trust Company in Louisiana (STC) were Jay Comeaux, J.D. Perry, Jay Zager, Jason Green and Suarez. GT denies the remaining allegations in paragraph 186.

187.    GT admits Sidney E. Seymour, Chief Examiner of Financial Institutions, sent a letter dated April 13, 1998, to a GT attorney requesting additional information in connection with the acquisition of The Southern Trust Company by SGC, including a request for additional information about Stanford's involvement with Guardian International Bank, an account of the

circumstances leading to the issuance of the OCC Banking Circular BC-171, and a copy of any enforcement, termination or any similar action by any foreign licensing or chartering agency against Guardian.  The letter speaks for itself.  GT denies the remaining allegations in paragraph 187.

188.    GT admits Loumiet prepared a draft response to the April 13, 1998 letter from Sidney Seymour regarding the "Notice of Acquisition of Control of the Southern Trust Company, Ruston, Louisiana, by the Stanford Group Company."  GT lacks knowledge or information sufficient to form a belief as to the truth as to whether Loumiet later forwarded the letter to OFI.  GT denies the remaining allegations in paragraph 188.

189.    GT admits it assisted in a tax dispute but denies that paragraph 189 accurately characterizes or summarizes its work.

190.    GT denies the allegations of paragraph 190.

191.    GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 191, and therefore denies them.

192.    GT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 192, and therefore denies them.

193.    GT admits Loumiet was consulted in connection with the SEC inquiry, that Loumiet reviewed a draft response dated June 17, 1998, prepared by Jack Ballard and provided input concerning the content.  The content of the draft response prepared by Ballard speaks for itself.  GT denies the remaining allegations in paragraph 193.

194.    GT admits Loumiet provided his input concerning the response to the SEC via a June 17, 1998 memo to Wayne Secore which speaks for itself.  GT denies the remaining allegations in paragraph 194.

195.    GT admits Loumiet's June 17, 1998 memo to Wayne Secore suggested informing the SEC "we do not concede that the CDs sold by SIB are 'securities' for U.S. law purposes" and that Loumiet's input included a brief discussion of the law and a copy of "page 3 of a letter of ours to another client on the issue of foreign bank CDs and 'securities'." The remainder of the June 17, 1998 memo speaks for itself. GT denies the remaining allegations in paragraph 195.

196.    GT admits that one of its attorneys provided information to Secore via letter dated July 22, 1998, that included the information described in and attached to the letter. The letter and the attachments speak for themselves. GT denies the remaining allegations in paragraph 196.

197.    GT admits that the attachments to the July 22, 1997 letter to Secore included an interoffice memo regarding "SIB safety and insurance" which speaks for itself. GT denies the remaining allegations in paragraph 197.

198.    GT admits that the attachments to the July 22, 1997 letter to Secore included a document titled "Seguridad" concerning insurance which speaks for itself. GT denies the remaining allegations in paragraph 198.

199.    GT admits that Fred Ferrara wrote a letter to Schnapp in June 1998, the content of which speaks for itself. GT denies the remaining allegations of paragraph 199.

200.    GT admits that Ms. O'Bourke's attorney sent several letters, the contents of which speak for themselves. GT denies that paragraph 200 accurately summarizes or characterizes the letters or their background.

201.    GT admits that Ms. O'Bourke's attorney sent a letter, the content of which speaks for itself.

202.   GT admits it was retained to respond to the allegations made by Ms. O'Bourke with instructions to zealously handle the matter.   GT denies the remaining allegations in paragraph 202.

203.   GT admits that it learned Ms. O'Bourke had sent letters to former clients, the content of which speak for themselves.  GT denies the remaining allegations of paragraph 203.

204.   GT admits it recommended a lawsuit against Ms. O'Bourke and it prepared a draft lawsuit.  GT denies the remaining allegations in paragraph 204.

205.   GT admits Loumiet and another GT attorney sent a letter to Suarez, the content of which speaks for itself.  GT denies the remaining allegations in paragraph 205.

206.   GT admits the allegations in paragraph 206.

207.   GT denies it "knew that no other banks participated in that loan other than BOA, and the loan was funded with SIBL investor money", but otherwise admits the allegations in paragraph 207 .

208.   GT denies the allegations in paragraph 208.

209.   GT admits Suarez requested a review of state securities laws in connection with the possible sale of SIBL CDs in Texas, Florida, Colorado, Louisiana, and New York.   GT admits that Loumiet provided comments on a partial draft of SIBL's Reg D Disclosures that was sent to him by Suarez in approximately July 1998.  To GT's knowledge Loumiet had no further involvement with the draft disclosures before they were completed by SIBL and issued on or about October 15, 1998.  GT denies the grossly inaccurate assertion that Loumiet "proceeded to heavily edit and rewrite [them] until the final product became, essentially, Loumiet's disclosures."  GT denies the remaining allegations in paragraph 209.

210.   GT admits that in July 1998, in a memorandum to Suarez its lawyers opined that "due to the broad nature of the term 'security' in Colorado, New York and Texas it is safest to

conclude that in those states a certificate of deposit can also qualify as a security, because it evidences an indebtedness."   The GT memorandum speaks for itself insofar as it addresses whether SIBL could avoid registration in a particular state by relying on the Reg D exemption. GT denies the remaining allegations in paragraph 210.

211.    GT admits GT attorneys looked into certain questions under the Investment Company Act.  GT denies the remaining allegations of paragraph 211.

212.    GT admits that in November 1998, Suarez asked GT for an opinion on the Investment Company Act issue, and that attorney Deon Warner had previously given an opinion on the issue, the content of which speaks for itself.  GT denies the remaining allegations in paragraph 212.

213.    GT admits that in November 1998, Suarez asked GT for an opinion on an Investment Company Act issue and that GT wrote a memorandum dated November 11, 1998, in which it opined that "the private placement of certificates of deposit to an unlimited number of qualified purchasers by Stanford does not require registration under the Act."  The reasoning in the memorandum speaks for itself.  GT denies the remaining allegations in paragraph 213, including specifically the allegation that GT's opinion was based "on the notion that the majority of SIBL's income was derived from making commercial loans."

214.    GT denies the allegations in paragraph 214.

215.    GT admits the allegations of paragraph 215, except it denies the last sentence of the paragraph.

216.    GT denies the DEA money laundering investigation was of Stanford, but rather was of certain customers.  GT admits that at the request of Jay Comeaux it sent letters to four PFK principals indicating Stanford was not a target of the investigation and was fully cooperating with the DEA.  GT denies the remaining allegations in paragraph 216.

217.    GT admits Stanford fully cooperated with the DEA investigation and in February 1999, Stanford and the Antiguan Government jointly turned over to the DEA over $3 million in money deposited into SIBL accounts by alleged criminals, and by agreement the U.S. shared with the Government of Antigua 1/3 of the forfeited money.  GT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 217, and therefore denies them.

218.    GT admits Stanford forwarded articles from Antiguan newspapers and published a letter addressed to the Antiguan people, the contents of which speak for themselves.

219.    GT admits that Errol Cort became Attorney General in Antigua.  GT denies that paragraph 219 accurately summarizes or characterizes the referenced events or their background.

220.    GT denies the allegation that through an e mail dated August 6, 1999, "Greenberg discovered that Stanford's Antiguan banking operation bore the hallmarks of a Ponzi scheme." The referenced e mail contains no such statements or characterizations.  GT admits an email exchange between O'Brien and Loumiet took place on August 6, 1999, the content of which speaks for itself.  GT denies the remaining allegations in paragraph 220.

221.    GT admits O'Brien informed Loumiet that "Allen has personally guaranteed" payment of GT fees, but that there were a few signs "Allen could have some serious financial problems."  GT denies the remaining allegations in paragraph 221.

222.    GT admits the allegations of paragraph 222.

223.    GT admits that without the added emphasis of bold type, italics and underlining, the email is accurately quoted.

224.    GT denies the allegations in paragraph 224.

225.    GT admits the allegations in paragraph 225.

226.    GT admits the allegations of paragraph 226, except it is without knowledge and information sufficient to form a belief as to the truth of the allegations in footnote 28, and therefore denies them.

227.    GT admits that the OTS rejected the application and notified Loumiet via letter dated February 21, 2001, the content of which speaks for itself.  GT denies the remaining allegations in paragraph 227.

228.    GT admits Loumiet wrote an e mail regarding his meeting with the OTS, the content of which speaks for itself.

229.    GT admits Loumiet left the firm in 2001.  His last day with GT was May 1, 2001.  GT admits Loumiet moved his practice to Hunton & Williams, and thereafter, GT only periodically represented various Stanford companies in specific matters.  GT admits it sought to retain Stanford business when Loumiet left, and considered the experience of O'Brien as a former U.S. Customs official and Schnapp as a former Assistant U.S. Attorney to be a GT advantage in that effort.  GT denies the remaining allegations in paragraph 229.

230.    GT admits it received at an unknown time a copy of a news article in which alleged bribes of Gaston Browne and Molwyn Joseph are denied by Stanford, as well as political contributions Stanford admits that he made and would make to Gaston Browne and Molwyn Joseph.  GT denies the remaining allegations in paragraph 230.

231.    GT admits the allegations in paragraph 231.

232.    GT admits the allegations in paragraph 232.

233.    GT denies the allegations in paragraph 233.

234.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 234, and therefore denies them.

235.     GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 235, and therefore denies them.

236.     GT admits that file materials in the Tirado matter included an email dated October 7, 2005, the content of which speaks for itself.  GT denies that the e mail reflects that "Greenberg also received more evidence that Stanford was promising investors that the SIBL CD deposits were insured…."  The referenced email states that when a potential client in Venezuela asked if his CD would be insured, Tirado determined to "**check who gave that wrong information, in order to avoid this situation happening again.**"  GT denies the remaining allegations in paragraph 236.

237.     GT is without knowledge and information sufficient to determine the truth of the allegations in paragraph 237, and therefore denies them.

238.     GT admits the allegations in paragraph 238.

239.     GT admits the allegations in paragraph 239.

240.     GT admits Schnapp was informed the Miami Herald was considering publishing an article and attempted to contact the Miami Herald.  GT otherwise lacks sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 240 and therefore denies them.

241.     GT admits it provided legal services for Stanford in opening a trust representative office for STC in Florida and assisted in the preparation of a business plan for lawful business activities.  GT lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 241, and therefore denies them.

242.     GT denies the allegations in paragraph 242.

243.     GT admits it provided legal services to Stanford companies in connection with acquisitions of Tangible Asset Galleries, Inc.; Miller Golf; U.S. Farm & Ranch; Telecom

Wireless Solutions; and Greystone Pharmaceutical. GT denies the remaining allegations in paragraph 243.

244. GT admits it provided legal services to Stanford in connection with the movie "The Ultimate Gift" and that one of its early bills for work on the project was approximately $162,000. GT denies the remaining allegations in paragraph 244.

245. GT admits Loumiet and several partners left the firm in 2001 and moved their practice to Hunton Williams, and this included Loumiet's client relationship with Stanford. GT denies that Loumiet had, or carried with him, knowledge of fraudulent or illegal activities by Stanford.

246. GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 246, and therefore denies them.

247. GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 247, and therefore denies them.

248. GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 248, and therefore denies them.

249. GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 249, and therefore denies them.

250. GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 250, and therefore denies them.

251. GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 251, and therefore denies them.

252. GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 252, and therefore denies them.

253.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 253, and therefore denies them.

254.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 254, and therefore denies them.

255    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 255, and therefore denies them.

256.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 256, and therefore denies them.

257.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 257, and therefore denies them.

258.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 258, and therefore denies them.

259.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 259, and therefore denies them.

260.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 260, and therefore denies them.

261.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 261, and therefore denies them.

262.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 262, and therefore denies them.

263.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 263, and therefore denies them.

264.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 264, and therefore denies them.

265.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 265, and therefore denies them.

266.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 266, and therefore denies them.

267.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 267, and therefore denies them.

268.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 268, and therefore denies them.

269.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 269, and therefore denies them.

270.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 270, and therefore denies them.

271.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 271, and therefore denies them.

272.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 272, and therefore denies them.

273.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 273, and therefore denies them.

274.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 274, and therefore denies them.

275.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 275, and therefore denies them.

276.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 276, and therefore denies them.

277.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 277, and therefore denies them.

278.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 278, and therefore denies them.

279.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 279, and therefore denies them.

280.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 280, and therefore denies them.

281.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 281, and therefore denies them.

282.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 282, and therefore denies them.

283.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 283, and therefore denies them.

284.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 284, and therefore denies them.

285.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 285, and therefore denies them.

286.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 286, and therefore denies them.

287.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 287, and therefore denies them.

288.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 288, and therefore denies them.

289.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 289, and therefore denies them.

290.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 290, and therefore denies them.

291.   GT admits the allegations in paragraph 291.

292.   GT admits the email from Loumiet email is correctly quoted with the exception of the italics and bold emphasis.

293.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 293, and therefore denies them.

294.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 294, and therefore denies them.

295.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 295, and therefore denies them.

296.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 296, and therefore denies them.

297.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 297, and therefore denies them.

298.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 298, and therefore denies them.

299.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 299, and therefore denies them.

300.   GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 300, and therefore denies them.

301.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 301, and therefore denies them.

302.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 302, and therefore denies them.

303.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 303, and therefore denies them.

304.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 304, and therefore denies them.

305.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 305, and therefore denies them.

306.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 306, and therefore denies them.

307.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 307, and therefore denies them.

308.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 308, and therefore denies them.

309.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 309, and therefore denies them.

310.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 310, and therefore denies them.

311.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 311, and therefore denies them.

312.    GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 312, and therefore denies them.

313.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 313, and therefore denies them.

314.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 314, and therefore denies them.

315.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 315, and therefore denies them.

316.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 316, and therefore denies them.

317.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 317, and therefore denies them.

318.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 318, and therefore denies them.

319.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 319, and therefore denies them.

320.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 320, and therefore denies them.

321.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 321, and therefore denies them.

322.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 322, and therefore denies them.

323.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 323, and therefore denies them.

324.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 324, and therefore denies them.

325.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 325, and therefore denies them.

326.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 326, and therefore denies them.

327.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 327, and therefore denies them.

328.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 328, and therefore denies them.

329.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 329, and therefore denies them.

330.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 330, and therefore denies them.

331.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 331, and therefore denies them.

332.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 332, and therefore denies them.

333.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 333, and therefore denies them.

334.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 334, and therefore denies them.

335.     GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 335, and therefore denies them.

336.    GT admits Jim Miller also left the firm and joined Hunton.   GT is without knowledge and information sufficient to form a belief as to  the truth of the remaining allegations in paragraph 336, and therefore denies them.

337.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 337, and therefore denies them.

338.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 338, and therefore denies them.

339.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 339, and therefore denies them.

340.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 340 and therefore denies them.

341.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 341 and therefore denies them.

342.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 342 and therefore denies them.

343.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 343 and therefore denies them.

344.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 344 and therefore denies them.

345.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 345 and therefore denies them.

346.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 346 and therefore denies them.

347.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 347 and therefore denies them.

348.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 348 and therefore denies them.

349.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 349 and therefore denies them.

350.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 350 and therefore denies them.

351.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 351 and therefore denies them.

352.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 352 and therefore denies them.

353.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 353 and therefore denies them.

354.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 354 and therefore denies them.

355.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 355 and therefore denies them.

356.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 356 and therefore denies them.

357.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 357 and therefore denies them.

358.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 358 and therefore denies them.

359.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 359 and therefore denies them.

360.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 360 and therefore denies them.

361.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 361 and therefore denies them.

362.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 362 and therefore denies them.

363.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 363 and therefore denies them.

364.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 364 and therefore denies them.

365.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 365 and therefore denies them.

366.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 366 and therefore denies them.

367.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 367 and therefore denies them.

368.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 368 and therefore denies them.

369.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 369 and therefore denies them.

370.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 370 and therefore denies them.

371.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 371 and therefore denies them.

372.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 372 and therefore denies them.

373.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 373 and therefore denies them.

374.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 374 and therefore denies them.

375.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 375 and therefore denies them.

376.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 376 and therefore denies them.

377.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 377 and therefore denies them.

378.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 378 and therefore denies them.

379.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 379 and therefore denies them.

380.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 380 and therefore denies them.

381.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 381 and therefore denies them.

382.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 382 and therefore denies them.

383.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 383 and therefore denies them.

384.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 384 and therefore denies them.

385.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 385 and therefore denies them.

386.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 386 and therefore denies them.

387.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 387 and therefore denies them.

388.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 388 and therefore denies them.

389.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 389 and therefore denies them.

390.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 390 and therefore denies them.

391.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 391 and therefore denies them.

392.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 392 and therefore denies them.

393.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 393 and therefore denies them.

394.   GT is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 394 and therefore denies them.

395.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 395 and therefore denies them.

396.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 396 and therefore denies them.

397.    GT admits the SEC filed suit and obtained an injunction as alleged, and the Court appointed Ralph S. Janvey as Receiver.  GT is without knowledge and information sufficient to form a belief as to  the truth of the remaining allegations in paragraph 397 and therefore denies them.

398.    GT admits the SEC filed its Second Amended Complaint on January 08, 2010, and said Complaint speaks for itself.

399.    GT admits the allegations in paragraph 399.

400.    GT is without knowledge and information sufficient to form a belief as to  the truth of the allegations in paragraph 400 and therefore denies them.

401.    The Court's findings in Stanford-related cases are of record and speak for themselves.  GT denies that these findings have any *res judicata* effect in this case.

402.    The 5th Circuit's rulings in Stanford related cases are of record and speak for themselves. GT denies that these findings have any *res judicata* effect in this case.

403.    GT admits the first sentence of paragraph 403, but denies the remaining allegations.

404.    GT admits it entered into tolling agreements with plaintiff that were consistently extended though November 14, 2012 as alleged in paragraph 404.  The terms of the tolling agreement speak for themselves.

405.    GT denies the allegations in paragraph 405.

406.    GT denies the allegations in paragraph 406.

407.    GT denies the allegations in paragraph 407.

408.    GT denies the allegations in paragraph 408.

409.    GT denies the allegations in paragraph 409.

410.    GT denies the allegations in paragraph 410.

411.    GT denies the allegations in paragraph 411.

412.    GT denies the allegations in paragraph 412.

413.    GT denies the allegations in paragraph 413.

414.    GT denies the allegations in paragraph 414.

415.    GT denies the allegations in paragraph 415.

416.    GT denies the allegations in paragraph 416.

417.    GT denies the allegations in paragraph 417.

418.    GT lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 418 and therefore denies them.

419.    GT denies the allegations in paragraph 419.

420.    GT admits the court's orders concerning the Receiver and Committee, the contents of which speak for themselves.  GT denies the remaining allegations in paragraph 420.

421.    GT admits the court's orders concerning the Receiver, the contents of which speak for themselves.  GT denies the remaining allegations in paragraph 421.

422.    GT denies the allegations in paragraph 422.

423.    GT denies the allegations in paragraph 423.

424.    GT denies the allegations in paragraph 424.

425.    GT denies the allegations in paragraph 425.

426.    GT denies the allegations in paragraph 426.

427.    GT denies the allegations in paragraph 427.

428.    GT denies the allegations in paragraph 428.

429.    GT denies the allegations in paragraph 429.

430.    GT denies the allegations in paragraph 430.

431.    GT denies the allegations in paragraph 431.

432.    GT lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 432 and therefore denies them.

433.    GT lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 433 and therefore denies them.

434.    GT lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 434 and therefore denies them.

435.    GT lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 435 and therefore denies them.

436.    GT lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 436 and therefore denies them.

437.    GT lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 437 and therefore denies them.

438.    GT denies the allegations in paragraph 438.

439.    GT denies the allegations in paragraph 439.

440.    GT denies the allegations in paragraph 440.

441.    GT denies the allegations in paragraph 441.

442.    GT denies the allegations in paragraph 442.

443.    GT denies the allegations in paragraph 443.

444.    GT denies the allegations in paragraph 444.

445.    GT denies the allegations in paragraph 445.

446.    GT denies the allegations in paragraph 446.

447.   GT denies the allegations in paragraph 447.

448.   GT denies the allegations in paragraph 448.

449.   GT denies the allegations in paragraph 449.

450.   GT denies the allegations in paragraph 450.

451.   GT denies the allegations in paragraph 451.

452.   GT admits the Court's orders, the contents of which speak for themselves.   GT denies the remaining allegations in paragraph 452.

453.   GT denies the allegations in paragraph 453.

454.   GT denies the allegations in paragraph 454.

455.   GT denies the allegations in paragraph 455.

456.   GT denies the allegations in paragraph 456.

457.   GT denies the allegations in paragraph 457.

458.   GT denies the allegations in paragraph 458.

459.   GT admits the allegations in the second sentence of paragraph 459.   GT lacks sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 459, and therefore denies them.

460.   GT denies the allegations in paragraph 460.

461.   GT denies the allegations in paragraph 461.

462.   GT lacks sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 462, and therefore denies them.

**Affirmative Defenses**

1.      Plaintiffs' claims are barred, in whole or part, under the statutes of limitations and repose applicable to each asserted claim including but not limited to the three-year and five-year statutes of repose under the Texas Securities Act.  To the extent that the discovery rule is applicable to any claim, GT asserts that the claim was or could have been discovered prior to February 1, 2011, and is therefore time-barred.

2.      Plaintiffs' claims are barred, in whole or part, under the doctrine of *in pari delicto*, also referred to as the unlawful acts doctrine.

3.      Plaintiffs' claims are precluded by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. §77p(b), 78bb(f)(1) et seq.  GT acknowledges that the Supreme Court held SLUSA inapplicable to certain Stanford-related lawsuits based on the facts and circumstances of those cases.  GT reserves its right to assert the application of SLUSA subject to the final allegations and facts of this case.

4.      GT is immune from one or more of Plaintiffs' claims under applicable doctrines of qualified immunity or judgmental immunity attaching to a lawyer's legal services and advice to clients and to the conduct of litigation.  GT is further immune under the Noerr-Pennington doctrine to the extent of its assistance to clients seeking to lawfully influence government action.

5.      Plaintiffs' claims are barred, in whole or part, to the extent that Stanford failed to follow or heed the information, advice and warnings provided by GT on matters for which GT was consulted.   GT is not responsible for any failures by Stanford and his companies to follow legal advice.

6.      If GT is held to have the burden to establish an exemption from registration, which is denied,[1] GT would show that the CDs made the basis of this action were exempt from

---

[1] *See Akin v. Q-L Investments, Inc.*, 959 F.2d 521, 532 (5th Cir. 1992)(while a "seller" bears the burden of proving an exemption from registration, "there is no authority for imposing on an

federal securities registration pursuant to Reg. D (17 C.F.R §230.506 et. seq.), Reg. S (17 C.F.R. §230.903 et seq.) and the right to make coincident offers and sales under each exemption. Plaintiffs' claims are also preempted by the National Securities Markets Improvements Act of 1996 (15 U.S.C. §77r et seq.), which provides in pertinent part that State securities registration laws may not directly or indirectly prohibit, limit, or impose conditions on the sale of covered securities.

7.      In addition, and in the alternative, the CDs were exempt from Texas state registration under the Texas uniform limited offering exemption (7 Tex. Admin. Code §109.13(k)), the exemption for sales to nonresidents (7 Tex. Admin. Code §139.7) and/or the accredited investor exemption (7 Tex. Admin. Code §139.19).

8.      Any claims premised on SIBL allegedly operating as, or failing to register as, an investment company or investment advisor are barred, in whole or part, because SIBL was a foreign bank exempt from registration as an investment company. *See* 17 C.F.R. §270.3a-6 et seq.  In addition, and in the alternative, such claims are barred or rendered moot by the SEC registrations maintained by Stanford Group Company and related entities.

9.      To the extent that Plaintiffs' claims would challenge or contradict official actions of the Government of Antigua and Barbuda, including but not limited to that Government's licensing of SIBL as an Antigua-chartered bank, such claims are barred by the Act of State Doctrine under which U.S. courts will not sit in judgment on the actions of a foreign government within its own territory.

10.     Plaintiffs' claims are barred, in whole or part, because they constitute the improper fracturing or splitting of claims and the assertion of redundant, unnecessary or non-cognizable claims, including but are not limited to the following:

---

alleged aider and abettor the burden of establishing eligibility for an exemption from registration.").

**FIRST AMENDED ANSWER - Page 64**

(a) Civil conspiracy to violate the Texas Securities Act, in addition to/redundant of the claim for aiding and abetting violations of the TSA;

(b) Breach of fiduciary duty, aiding and abetting/participation in breach of fiduciary duty and negligent retention/supervision, in addition to/redundant of the claim for professional negligence;

(c) Aiding and abetting/participation in fraudulent transfers (as to money transferred by Stanford to himself or third parties), in addition to/redundant of the claim for professional negligence and the claim for aiding and abetting/participation in breach of fiduciary duty. Also redundant of – and in direct conflict with – the Investor plaintiffs' claims for damages for the same conduct;

(d) Aiding and abetting/participation in a fraudulent scheme, in addition to/redundant of the claim for aiding and abetting violations of the Texas Securities Act based on the same fraudulent scheme. Also in addition to/redundant of the claim for civil conspiracy to commit fraud; and

(e) Unjust enrichment and money had and received (as to legal fees paid to GT), in addition to/redundant of the claim for fraudulent transfer.

11.     Plaintiffs' claims are barred, in whole or part, by Plaintiffs' failure to mitigate their alleged damages.

12.     The Receiver's fraudulent transfer and related claims are barred, in whole or part, because the alleged transfers -- payments for legal services rendered --  were received in good faith and in exchange for reasonably equivalent value and did not directly assist Stanford's frauds.

13.     To the extent that any fault or responsibility is assessed on account of the acts or omissions of Carlos Loumiet, which is denied, Plaintiffs' claims against GT are barred, in whole or part, because Mr. Loumiet was no longer an employee of GT after May 1, 2001.  GT had no right to control, or vicarious liability for, the conduct of Mr. Loumiet after such date.  Any conspiracy claims based on Mr. Loumiet's actions or knowledge are denied but are, in any event, barred under the doctrine of withdrawal after May 1, 2001.  On information and belief, all of the

CDs and other investments made the basis of this suit were issued and sold long after Mr. Loumiet had left GT.

14.     One or more of Plaintiffs' claims are barred, in whole or part, under principles of *res judicata*, collateral estoppel and/or judicial estoppel.

15.     To the extent that any fault or responsibility is assessed against GT, which is denied, GT is entitled to a reduction, offset or credit for the negligence or fault of the Plaintiffs and all others who caused or contributed to the alleged harm for which Plaintiffs seek damages. GT is entitled to such reduction under principles of contributory negligence, comparative causation, comparative fault, proportionate responsibility and, to the extent Texas law is applicable, under Chapter 33 of the Texas Civil Practice & Remedies Code and the rules regarding apportionment of liability to Responsible Third Parties.  GT is not liable for any injury or damage caused by such persons and entities.

16.     To the extent that any fault or responsibility is assessed against GT, which is denied, GT is entitled to offsets and credits including but not limited to credit for any settlements entered into by other persons or entities on account of Stanford's frauds.

17.     As described above, GT did not know of the fraud that injured the putative class. To the extent that any claims are governed by state laws that include a "could not have known" element, Greenberg further states that it both did not know and, in the exercise of reasonable care could not have known, of the existence of the conduct by reason of which the liability is alleged to exist.

18.     The injuries at issue were not proximately caused by any act or omission of GT. Or they were the result of a new and independent cause not reasonably foreseeable by GT, which destroyed the causal connection, if any, between any act or omission of GT and the injuries at issue.

19.   The acts or omissions of persons not a party to this suit including but not limited to Robert Allen Stanford, James Davis, Laura Pendergest-Holt, Gilbert Lopez, Mark Kuhrt, Leroy King, C.A.S. Hewlett and the United States Securities and Exchange Commission (SEC), were the sole proximate cause of the injuries at issue.

## DENIALS AND DEFENSES APPLICABLE TO PLAINTIFFS' CLAIM FOR CLASS CERTIFICATION

In addition to the denials and defenses stated above, class certification is precluded by one or more of the following:[2]

1.   On information and belief, facts or admissions contained in class certification discovery in the following Stanford-related cases including but not limited to depositions and exhibits, documents produced by Plaintiffs and class representatives, documents and information produced by the Receiver or the OSIC, and expert declarations and reports:

    a.    Troice v. Proskauer Rose LLP, No. 3:09-cv-01600-N-BG ("Proskauer")
    b.    Troice v. Willis of Colorado Inc., No. 3:09-cv-01274 ("Willis")
    c.    Turk v. Pershing LLC, No. 3:09-cv-02199 ("Pershing")
    d.    Rotstain v. Trustmark, No. 3:09-cv-02384-N-BG. ("Trustmark")

2.   On information and belief, the varied individual experiences and reliance of putative class members including but not limited to the putative class representatives in Proskauer, Willis, Pershing and Trustmark.

3.   The judicial admissions, assertions and positions taken in motions and supporting evidence, and the findings and orders issued by the Court, in connection with the settlement of putative class claims against BDO and Adams & Reese. Civil action nos. 3:09-CV-0298-N; 3:12-cv-01447-N; 3:11-cv-00329-N.

---

[2] Greenberg Traurig reserves its right to submit a response to Plaintiffs' motion for class certification pursuant to the class scheduling order.

4.      Plaintiffs' predominant claims for common law causes of action, which require individual determinations.  Individual issues include (a) what misrepresentations were made to each claimant, (b) what material facts actually existed and were not disclosed to each claimant, (c) whether each claimant had reasonable and justified reliance on the misrepresentation or omission; (d) whether each claimant actually relied on the alleged misrepresentations or omissions, or relied on other things like communications about insurance coverage or the recommendations and statements of trusted Financial Advisors that are unique to each investor; and (e) whether each common law claim was a proximate cause of the claimant's individual damages and if so in what amount.

5.      Variations in timing, which require individual determinations.  The alleged class claims span many years during which the alleged facts changed constantly.  Each claimant must prove, at the time of each CD purchase, what representations were made and how they were false at that moment, what material undisclosed facts existed at that moment, and what the claimant relied upon at the time of each purchase.  Evidence of events after a particular purchase, and evidence of Mr. Loumiet's work after he left Greenberg on May 1, 2001, is not admissible to show Greenberg Traurig's knowledge or material assistance to wrongful conduct at the time of every purchase.

6.      Plaintiffs' ongoing and necessary reliance on affirmative misrepresentations that induced CD purchases, in addition to nondisclosures, which require individual proof as to the elements of each claim and at the time of each purchase.

7.      One or more actual or potential members of the putative class are alleged by the Receiver to have acted in bad faith or with actual or imputed knowledge of the fraud.  Cause no. 3:09-cv-00724-N-BG and related cases.  If true, the Receiver's allegations would constitute a defense to class claims requiring individual determination.

8.      The existing court findings of Stanford's primary violations involve affirmative misrepresentations.  They do not reference or include findings of the alleged omissions asserted for the first time in the present action as the basis for class claims against Greenberg Traurig.

9.      The negligent or inequitable conduct of one or more putative class members, including but not limited to failing to perform due diligence before investing; failing to read written disclosures and information they received before their purchase; falsely certifying that they had read and understood written disclosures and information provided, which certification was a condition to their purchase and/or by misrepresenting themselves to be qualified purchasers or accredited investors which was for certain purchasers a condition to their purchase. GT is entitled to individual determination of such issues in order to (a) determine each claimant's percentage of responsibility for claims to which Chapter 33 applies; and (b) determine the percentage of responsibility of Responsible Third Parties.  Chapter 33, Tex. Civ. Prac. & Rem. Code.

10.     One or more putative class members including Michoacan Trust are fiduciaries and owed a heightened duty to perform due diligence before investing in Stanford CDs on behalf of their clients or beneficiaries.  The levels of heightened responsibility, and failures of those parties to satisfy their responsibilities, require individual assessment.

11.     The proposed class contains foreign class members.  A judgment on the merits would not be given preclusive effect in one or more foreign countries of which putative class members are citizens or legal residents.

12.     On information and belief, one or more putative class members had actual knowledge of some of the allegedly nondisclosed facts and are therefore barred from bringing a claim under the Texas Securities Act.  Tex. Rev. Civ. Stat. Ann. art. 581-33A(2).  This requires individual determinations.

13.     The putative class includes claims that are not cognizable because they are "holder" claims not based on a new CD purchases.  GT asserts that "holder" claims include CD rollovers/renewals and additional investments into previously purchased CDs including FlexCDs.

14.     Individualized choice-of-law issues preclude certification, as do variations in state and international law.

15.     On information and belief some putative class claims have been sold.  The current owners of such claims are not "persons who invested money in SIBL" and are not part of the proposed class.  Nor are they "the person buying the security from [a seller who violates the TSA]" under TSA Section 33A.  And, to the extent that any personal claims including fraud have been sold or assigned, such assignments are void as against public policy.

16.     One or more items of proffered evidence supporting class certification postdates Mr. Loumiet's departure from GT on May 1, 2001 or is otherwise inadmissible against GT.

17.     The lack of a specifically described and legally-permitted methodology for (a) setting a formula for, and (b) measuring the damages incurred by, each putative class member based on the facts of their specific cases.  And for the amount of prior settlements received or allocated to each class member, which was not based on an individual assessment of the facts including what was said or not disclosed to each one, what they relied on, etc.

18.     The reliance on the Receiver to identify and certify class members and determine their individual damage claims.

19.     The proffered evidence supporting class certification is not factually sufficient.  It does not say what the Plaintiffs claim and does not contain evidentiary proof that the factual allegations are capable of class treatment.

20.     The proffered evidence supporting class certification is not legally sufficient.  It does not establish or plausibly allege an illegal "common course of conduct and uniform scheme to evade banking and securities laws and regulations" apart from lawful actions and the Ponzi scheme itself, of which GT had no knowledge.  Nor does it establish or plausibly allege an improper act that is causally connected to the Ponzi scheme that injured the putative class.  Nor does it establish or plausibly allege that GT knowingly provided assistance to the same wrongful conduct that injured the putative class.

Wherefore, GT prays that the Court grant its motion for partial dismissal as set forth above, that Plaintiffs take nothing, that GT recover its costs, and for such other and further relief to which GT may show itself to be justly entitled.

Respectfully submitted,

By: /s/  Jim E. Cowles
    **JIM E. COWLES**
    Texas Bar No. 04931000
    **SIM ISRAELOFF**
    Texas Bar No. 10435380

**COWLES & THOMPSON, P.C.**
901 Main Street, Suite 3900
Dallas, TX 75202
(214) 672-2000
(214) 672-2020 (Fax)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 19th day of October, 2015, a true and correct copy of the foregoing document was delivered via electronic means using the ECF system pursuant to FED. R. CIV. P. 5(b)(2)(D) and Local Rule 5.1, to all counsel of record.

_/s/ Sim Israeloff_____
**SIM ISRAELOFF**