## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated. | § § § § § § § § | |
| Plaintiffs, | § | CIVIL ACTION NO. 3:12-cv-04641-N |
| | § | |
| vs. | § | |
| | § | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ, | § § § § | |
| Defendants. | § | |

## BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSED MOTION FOR CLASS CERTIFICATION, FOR DESIGNATION OF CLASS REPRESENTATIVES AND CLASS COUNSEL

EDWARD C. SNYDER
State Bar No. 00791699
JESSE R. CASTILLO
State Bar No. 03986600
**CASTILLO SNYDER, P.C.**
One Riverwalk Place, Suite 405
700 N. St. Mary's Street
San Antonio, TX 78205
Telephone:  (210) 630-4200
Facsimile: (210) 630-4210

PETER D. MORGENSTERN
(*admitted pro hac vice*)
morgenstern@butzel.com
JOSH ABRAHAM
(*admitted pro hac vice*)
abraham@butzel.com
**BUTZEL LONG, P.C.**
230 Park Avenue, Suite 850
New York, New York 10169
(212) 818-1110
(212) 818-0494 (Facsimile)

i

DOUGLAS J. BUNCHER
State Bar No. 03342700
JOHN D. GAITHER
State Bar No. 24055516
**NELIGAN FOLEY, LLP**
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone: (214) 840–5320
Facsimile:  (214) 840–5301

JUDITH BLAKEWAY
State Bar No. 02434400
MERRITT CLEMENTS
State Bar No. 04369500
**STRASBURGER & PRICE, LLP**
2301 Broadway
San Antonio, Texas 7821
Telephone: (210) 250-6000
Facsimile: (210) 250-6100

**Counsel for the Plaintiffs and the
Putative Class**

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT .................................................................. 1

II.  PROCEDURAL HISTORY ...................................................................... 4

III. FACTS AND ALLEGATIONS SUPPORTING CLASS CERTIFICATION ...................... 5

    A.   Stanford's Improper Activities and Defendants' General Awareness of Same Present Common Issues that Predominate ................................................................. 6

        *1.   Stanford's Pervasive Regulatory Evasion Campaign* .......................................... 8

        *2.   Stanford's Corruption of Antigua* ........................................................... 15

        *3.   Stanford's Efforts to Shield SIBL from Scrutiny* .............................................. 22

    B.   Summary of Defendants' Knowledge of Stanford's Improper Activities ................. 32

    C.   Defendants' Substantial Assistance ...................................................... 34

    D.   Stanford Failed to Disclose his Improper Activities .................................... 35

IV.  PROPOSED CLASSES ......................................................................... 35

V.   ARGUMENT AND AUTHORITIES ............................................................ 36

    A.   Legal standard ........................................................................... 36

    B.   Rule 23(a)'s requirements are satisfied ................................................ 38

        *1.   The class is sufficiently numerous, numbering in the thousands* ........................... 38

        *2.   Common questions of law and fact pervade* .................................................. 39

        *3.   The claims of the representative Plaintiffs are typical of the class* ..................... 41

        *4.   Class representatives and class counsel will adequately represent the class* .... 43

            a.   Class counsel will zealously and competently represent the class ......... 43

            b.   Named plaintiffs' are qualified to represent the class ............................ 44

    C.   Rule 23(b)(3)'s requirements are satisfied .............................................. 46

        *1.   Questions of law common to the proposed class predominate over any questions affecting only individual members* ........................................................ 46

            a.   Relevant substantive law ........................................................ 47

                1.   Aider liability under Texas law ............................................ 47

                    i.   Primary Violation .................................................. 49

                    ii.   The aiders' substantial assistance in the fraud ...................... 55

iii.  Scienter ................................................................................. 56

2.  *Questions of fact common to the proposed class predominate over any questions of fact affecting only individual members.* ......................................... 59

D.  Class resolution is superior to all alternative methods of adjudication ................... 61

1.  *Class members' interests in individually controlling the prosecution of separate actions is minimal* ............................................................................ 62

2.  *There is no additional litigation already begun by class members* ................... 64

3.  *The Northern District of Texas is the most desirable forum* ............................. 64

a.  A single forum is superior to multiple forums ........................................ 64

b.  The Northern District of Texas is superior to other forums .................. 65

4.  *Texas law will govern this action* ........................................................................ 65

5.  *Courts in foreign jurisdiction will likely enforce a judgment entered here* ....... 68

a.  United Kingdom, Canada, and other common law jurisdictions ............ 70

b.  The Latin American jurisdictions .......................................................... 71

1.  *There are no unusual difficulties to managing this class action* ............ 72

a.  Additional Matters Required by Local Rule 23.2. ................................ 73

VI.  CONCLUSION ................................................................................................. 73

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Affiliated Ute Citizens of Utah v. United States*,
　406 U.S. 128 (1972) ................................................................... 54

*Amchem Products, Inc. v. Windsor*,
　521 U.S. 591 (1997) ........................................................... passim

*Amstadt v. U.S. Brass Corp.*,
　919 S.W.2d 644 (Tex. 1996) .................................................. 40, 48

*Anwar v. Fairfield Greenwich Ltd.*,
　728 F. Supp. 372 (S.D.N.Y. 2010) ..................................... 57, 58, 59

*Anwar v. Fairfield Greenwich, Ltd.*,
　289 F.R.D. 105 at 112 (S.D.N.Y. 2013) ......................... 41, 70, 71, 72

*Arthur Andersen & Co. v. Perry Equip. Corp.*,
　945 S.W.2d 812 (Tex. 1997) ...................................................... 40

*Arthur Young & Co. v. U.S. District Court*,
　549 F.2d 686 (9th Cir. 1977) .................................................... 53

*Berger v. Compaq Computer Corp.*,
　257 F.3d 475 (5th Cir. 2001). .................................... 43, 45, 46, 63

*Berger v. Compaq Computer Corp.*,
　No. 98-1148, 2000 WL 33993309 (S.D. Tex. July 18, 2000) .................. 63

*Bersch v. Drexel Firestone, Inc.*,
　519 F.2d 974 (2d Cir. 1975) ...................................................... 69

*Billitteri v. Securities America, Inc.*,
　No. 3:09-CV-01569-F, 2011 WL 3586217 (N.D. Tex. 2011) .............. 41, 52

*Blackie v. Barrack*,
　524 F. 2d 891 (9th Cir. 1975) .................................................... 61

*Bruhl v. Price Waterhousecoopers Intern.*,
　257 F.R.D. 684 (S.D. Fla. 2008) ................................................ 50

*Citizens Insurance Co. of America v. Daccach*,
　217 S.W.3d 430 (Tex. 2007) ...................................................... 66

*Cromer Fin. Ltd. v. Berger*,
　137 F. Supp. 2d 452 (S.D.N.Y. 2001) ....................................... 56, 63

*Darocy v. Abildtrup*,
　345 S.W.3d 129 (Tex. App. 2011) ....................................... 55, 56, 58

*Dodona I, LLC v. Goldman, Sachs & Co.*,
　296 F.R.D. 261 (S.D.N.Y. 2014) ............................................ 53, 60

*Dodona I, LLC v. Goldman, Sachs & Co.*,
　847 F. Supp. 2d 624 (S.D.N.Y. 2012) ...................................... 53, 54

iv

*Dodson v. Hillcrest Sec. Corp.*,
  95 F.3d 52 (5th Cir. 1996) ...................................................................... 44

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179  (2011) ........................................................................ 47

*Feder v. Elec. Data Sys. Corp.*,
  429 F.3d 125 (5th Cir. 2005) ........................................................... 42, 44

*Fraternity Fund*,
  479 F. Supp. 2d at 367 ..................................................................... 57, 58

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*,
  695 F.3d 330 (5th Cir. 2012) ............................................ 37, 46, 47, 61

*Goldstein v. Mortenson*,
  113 S.W.3d 769 (Tex. App. 2003) (TSA) ............................................ 54

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
  313 F.3d 305 (5th Cir. 2002) ............................................................... 56

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) .......................................... 68, 69, 70, 71

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
  140 F.R.D. 425 (D. Ariz. 1992) ....................................................... 52, 53

*In re Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981) ............................................................... 45

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) .......................................................... 39, 60

*In re Enron Corp. Sec.*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) ........................................... passim

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  491 F. Supp. 2d 690 (S.D. Tex. 2007) ................................................. 48

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ............................................................... 50

*In re Great So. Life Ins. Co. Sales Practices Lit.*,
  192 F.R.D. 212 (N.D. Tex. 2000) ........................................................ 50

*In re HealthSouth Corp. Sec. Lit.*,
  261 F.RD. 616 (N.D. Ala. 2009) .............................................. 50, 51, 53

*In re Monumental Life Ins. Co.*,
  365 F.3d 408 (5th Cir. 2004) ............................................................... 38

*In re Park Central Global Lit.*,
  No. 3:09-cv-765-M, 2014 WL 4261950 (N.D. Tex. 2014) .................... 60

*In re Stanford International Bank, Ltd.*,
  Case 3:09-cv-00721-N, Doc. No. 176 .................................................... 7

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
   209 F.R.D. 353 (S.D.N.Y. 2002) ......................................................................... 68

*In re TWL Corp.*,
   712 F.3d 886 (5th Cir. 2013) ............................................................... 38, 61, 64

*In re Vivendi Universal, S.A.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ................................................... 68, 69, 70, 72

*In re Westcap Enterprises*,
   230 F.3d 717 (5th Cir. 2000) ........................................................................ 50, 59

*In re Wilborn*,
   609 F.3d 748 (5th Cir. 2010) ................................................................................ 46

*In re Worldcom Inc. Securities Litigation*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ......................................................................... 52

*Janvey v. Alguire*,
   No. 09-0724, 2013 WL 2451738 (N.D. Tex. Jan. 22, 2013) ................... 65, 66, 67, 68

*Janvey v. Brown*,
   767 F.3d 430 (5th Cir. 2014) .................................................... 65, 66, 67, 68

*Janvey, et al. v. Proskauer Rose LLP, et al.*,
   No. 3:13-cv-00477 (N.D. Tex., filed Jan. 31, 2013) ............................................... 65

*Janvey, et al. v. Willis of Colorado, Inc., et al.*,
   No 13-03980 (N.D. Tex. Dec. 5, 2014) .................................................................. 66

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
   916 F. Supp. 2d 442 (S.D.N.Y. 2013) .................................................................. 53

*Klay v. Humana, Inc.*,
   382 F.3d 1241 (11th Cir. 2004) ........................................................................... 50

*Langbecker v. Elec. Data Sys. Corp.*,
   476 F.3d 299 (5th Cir. 2007) ....................................................................... 41, 42

*Lehocky v. Tidel Technologies, Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004) ........................................................ 37, 42, 43, 62

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) ............................................................ 40, 48, 49, 56

*Longden v. Sunderman*,
   123 F.R.D. 547 (N.D. Tex. 1988) .................................................................. 37, 52

*McFarland v. Memorex*,
   96 F.R.D. 357 (N.D. Cal. 1982) ........................................................................... 60

*McManus v. Fleetwood Enterprises, Inc.*,
   320 F.3d 545 (5th Cir. 2003) ............................................................................... 64

*Melo v. Gardere Wynne Sewell, LLP*,
   No. 04-2238, 2007 WL 92388 (N.D. Tex. Jan. 12, 2007) ....................................... 41

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ........................................................................................ 69

*Mullen v. Treasure Chest Casino, LLC*,
   186 F.3d 620 (5th Cir. 1999) ............................................................... 37, 38, 39

*N. Am. Acceptance Corp. Sec. Cases v. Arnall, Golden & Gregory*,
   593 F.2d 642 (5th Cir. 1979) ......................................................................... 44

*Nichols v. Mobile Bd. of Realtors, Inc.*,
   675 F.2d 671 (5th Cir. 1982) ......................................................................... 60

*Pulaski & Middleman, LLC v. Google, Inc.*,
   2015 WL 5515617 (9th Cir. 2015) ................................................................ 61

*Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.*,
   482 F.3d 372 (5th Cir. 2007) .................................................................... 40, 51

*Robinson v. Texas Auto. Dealers Ass'n*,
   387 F.3d 416 (5th Cir. 2004) .................................................................. passim

*Rohlfing v. Manor Care, Inc.*,
   172 F.R.D. 330 (N.D. Ill. 1997) .................................................................... 50

*Roper v. Consurve, Inc.*,
   578 F.2d 1106 (5th Cir. 1978) ................................................................. 63, 64

*Rotstain et al v. Trustmark National Bank, et al*,
   Civil Action No. 3:09-cv-02384 ................................................................... 68

*Schlumberger Tech. Corp. v. Swanson*,
   959 S.W.2d 171 (Tex. 1997) ......................................................................... 50

*SEC v. Stanford Int'l Bank, Ltd., et al.*,
   Case No. 3:09-cv-00298-N, Order [Doc. 1483] (N.D. Tex. Nov. 30, 2011) ............ 55

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ............................................................................ 37, 46, 73

*Shipes v. Trinity Indus.*,
   987 F.2d 311 (5th Cir. 1993) ......................................................................... 43

*Shores v. Sklar*,
   647 F. 2d 462 (5th Cir. 1981) .................................................................. 51, 52

*Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*,
   237 S.W.3d 379 (Tex. App. 2007) ................................................................ 49

*St. Stephen's School v. PricewaterhouseCoopers Accountants N.V.*,
   570 Fed. App'x 37 (2d Cir. 2014) ................................................................ 41

*Sterling Trust Co. v. Adderley*,
   168 S.W.3d 835 (Tex. 2005) ................................................................... passim

*Stott v. Capital Fin. Servs., Inc.*,
   277 F.R.D. 316 (N.D. Tex. 2011) ................................................................. 41

*T.J. Rainey v. Ft. Cobb Okla. Irrig. Fuel Author.,*
   717 F.2d 1330 (10th Cir. 1983) ....................................................................... 53

*The Official Stanford Investors Committee, et al. v. Greenberg Traurig, LLP, et al.,*
   No. 12-04641, Doc. 123 (N.D. Tex., Feb. 4, 2015) ....................................... 48

*Tri v. J.T.T.,*
   162 S.W.3d 552 (Tex. 2005) ............................................................... 55, 56, 58

*Troice, et al. v. Proskauer Rose LLP, et al.,*
   No. 09-1600, Doc. 176 (N.D. Tex. Mar. 4, 2015) ......................................... 57

*Troice, et al. v. Willis of Colorado, Inc., et al.,*
   No. 09-01274 ............................................................................................. 66, 68

*W. Reserve Life Assur. Co. of Ohio v. Graben,*
   233 S.W.3d 360 (Tex. App. 2007) .................................................................. 54

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011) ............................................................................. 39, 40

*Westways World Travel, Inc. v. AMR Corp.,*
   218 F.R.D. 223 (C.D. Cal. 2003) .................................................................... 60

*Willis v. Marshall,*
   401 S.W.3d 689 (Tex. App. 2013), *reh'g overruled* (July 3, 2013) ................. passim

*Zeidman v. J. Ray McDermott & Co.,*
   651 F.2d 1030 (5th Cir. 1981) ........................................................................ 38

*ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Maryland,*
   917 So. 2d 368 (Fla. 5th DCA 2005) .............................................................. 48

RULES

Fed. R. Civ. P. 23 .......................................................................................... passim

Fed. R. Civ. P. 23(a) ............................................................................................ 46

Fed. R. Civ. P. 23(a)(1) ....................................................................................... 38

Fed. R. Civ. P. 23(a)(2) .................................................................................. 39, 47

Fed. R. Civ. P. 23(a)(3) ....................................................................................... 42

Fed. R. Civ. P. 23(a)(4) .................................................................................. 43, 44

Fed. R. Civ. P. 23(b) .................................................................................. 37, 46, 61

Fed. R. Civ. P. 23(b)(1) ....................................................................................... 36

Fed. R. Civ. P. 23(b)(2) ....................................................................................... 36

Fed. R. Civ. P. 23(b)(3) .................................................................................. passim

Fed. R. Civ. P. 44.1 .............................................................................................. 69

<u>Other Authorities</u>

15 U.S.C. § 77a .................................................................................................................. 54

7 Tex. Admin. Code § 113.1 ............................................................................................... 54

N.D. Tex. LR23.2 ................................................................................................................ 73

N.D. Tex. LR23.2(e) ........................................................................................................... 73

N.D. Tex. LR23.2(g) ........................................................................................................... 73

Newberg on Class Actions § 3.05 ....................................................................................... 38

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| RALPH S. JANVEY, in his capacity as | § |
| Court-appointed receiver for the Stanford | § |
| Receivership Estate; the OFFICIAL | § |
| STANFORD INVESTORS COMMITTEE; | § |
| PAM REED; SAMUEL TROICE; and | § |
| MICHOACAN TRUST; individually and on | § |
| behalf of a class of all others similarly | § |
| situated. | § |
|                            Plaintiffs, | § |
| | § |
| vs. | § |
| | § |
| GREENBERG TRAURIG, LLP; HUNTON | § |
| & WILLIAMS, LLP; AND YOLANDA | § |
| SUAREZ, | § |
|                            Defendants. | § |

**BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSED**
**MOTION FOR CLASS CERTIFICATION, DESIGNATION OF**
**CLASS REPRESENTATIVES AND CLASS COUNSEL**

Plaintiffs Pam Reed, Samuel Troice, and Michoacan Trust, on behalf of themselves and on behalf of all others similarly situated (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby file this Brief in Support of their Motion for Class Certification, Designation of Class Representatives and Class Counsel pursuant to Federal Rule of Civil Procedure ("FRCP") 23.[1]  In support of their request for class certification, Plaintiffs state as follows:

## I.      PRELIMINARY STATEMENT

This case is easily certifiable under FRCP 23 because it involves common answers to the same question that ALL former Stanford investors uniformly ask:   how in the world did

---

[1]      Plaintiffs only seek to certify claims against the Defendant law firms because co-defendant Yolanda Suarez is only sued by the Receiver and Official Stanford Investors Committee in this case.

1

Stanford[2] get away with his fraud scheme for 20 years?  The answer to that question is common to all investors, and provides the basis for Plaintiffs' and the putative class of Stanford investors' claims against Defendants Greenberg Traurig LLP ("Greenberg") and Hunton & Williams LLP ("Hunton") (Greenberg and Hunton sometimes referred to collectively as "Defendants").

The evidence presented below and in the attached Appendix demonstrates that from at least 1988 and all the way until 2009 Stanford engaged in a common course of conduct and uniform scheme to evade banking and securities laws and regulations and deceive regulators in the United States and around the world in order to enable Stanford to operate his offshore bank Stanford International Bank Ltd. ("SIBL") as an unregistered investment company and market and sell its unregistered and fraudulent securities from the United States.[3]  As part of that scheme to wholly evade regulation of SIBL, Stanford corrupted government officials in the impoverished island nation of Antigua (where SIBL was located and purportedly regulated by the Antiguan government) and engaged in a pattern of abusive and deceptive tactics to shield his fraudulent offshore bank operations from prying regulators, investigators, and journalists.

Stanford did not disclose his common and uniform scheme of regulatory evasion to the putative class of SIBL investors, and none of the investors knew what Stanford and these Defendants were doing "behind the scenes" to enable Stanford to continue and expand his illegal operations.  As a result, there are no material differences between Plaintiffs and the putative class

---

[2]  Based on his sole ownership and absolute control over his group of companies, the term "Stanford" is used interchangeably herein to refer to either or both of Allen Stanford and his group of companies.

[3]  The SEC has consistently taken the position that the primary reason it did not shut down Stanford's operations prior to 2009 was because of the unique offshore regulatory structure Stanford had established.  *See* SEC Office of Inspector General's ("OIG") March 31, 2010 Report of Investigation, attached as **Exhibit "3"**, at pps. 38-39, App. 108-109 (SEC closed 1998 investigation of Stanford because of jurisdictional hurdles); 81-82, App. 151-152 (Stanford represented to the SEC it could not provide any information about SIBL's portfolio because Antiguan bank secrecy laws prevented it from producing such information).

with respect to their investment experiences with Stanford.  Plaintiffs and the putative class of SIBL investors share in common that they were all the victims of Stanford's fraud scheme and victims of Stanford's uniform failure to disclose the conduct described herein.

Plaintiffs and the putative class of SIBL investors are also united by the conduct of Defendants in uniformly aiding Stanford's common course of conduct described herein.  The evidence recited below establishes that Defendants knew virtually every facet of Stanford's common scheme to evade regulation of his enterprise and that they nevertheless provided substantial assistance to enable Stanford to expand and perpetuate his illegal offshore bank empire.  With Defendants' assistance, Stanford was able to hijack an entire country and insulate himself from regulatory scrutiny, which enabled him to operate an unregistered investment company issuing unregistered securities from the United States devoid of regulation while deceiving his customers into believing that his global operations were legitimate and properly regulated because Stanford was based in the United States.

As a result, Plaintiffs hereby seek class certification for their class-wide claims that Defendants aided and abetted Stanford's violations of the Texas Securities Act ("TSA"), including Stanford's sales of unregistered securities by an unregistered dealer, and conspired and participated in Stanford's fraudulent schemes and breaches of duties.  More specifically, Plaintiffs seek certification of a class of **all** SIBL investors who invested money in SIBL and whose claims have been allowed by the Receiver, as well as subclasses of (i) all SIBL investors who invested money in SIBL after February 1, 2006, and (ii) all investors who invested money in SIBL after February 1, 2008.  In the alternative, Plaintiffs seek certification of alternative classes and subclasses based on the nationalities of the class members as determined by the Court.

Class certification is appropriate because ***Stanford*** is the common nexus in this case and the intersection through which these Plaintiffs collided with these Defendants.  The Court should certify the classes because Stanford's undisclosed common course of conduct of regulatory evasion and violations of securities laws is the "center of gravity" and the "glue" that binds all of these class members together.  The Plaintiffs will be able to establish Stanford's regulatory fraud—and omission to disclose it to the class of CD investors—at trial through common evidence, and will also be able to prove through common evidence that the Defendants provided substantial assistance to Stanford's common scheme and violations of the TSA, making them jointly and severally liable to all Stanford CD investors under the TSA and common law.

As the Court is aware, over 17,000 investors from around the world invested in the SIBL CDs and joinder of all such investors is wholly impracticable.  There are questions of law and fact common to the class – namely whether Stanford and these Defendants engaged in a common course of deceptive conduct aimed at insulating SIBL from regulatory (or any kind of) scrutiny so as to keep Stanford in business selling unregistered SIBL CDs to the investors - and these common questions predominate over individual issues.  The Plaintiffs' claims are typical of the class claims, as they seek redress for the same injury. The Plaintiffs have no interest adverse to the interests of other members of the class, and will fairly and adequately protect the class' interests.  The Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international securities litigation.  Finally, and as described below, a class action concentrated in this forum and working in tandem with the SEC Receiver and Court-appointed Investors Committee is the preferred and superior method of litigating these claims.

## II.   PROCEDURAL HISTORY

Plaintiffs filed their original Complaint on November 15, 2012. Doc. 1 at ¶1.  The Defendants filed motions to dismiss the investor class claims on February 21, 2013 (Doc. No.

27) and April 18, 2014 (Doc. No. 90).

On February 4, 2015, the Court issued its Order (Doc. No. 123) largely denying the Defendants' motions to dismiss the class claims (the "Order").  In its Order, the Court held that Plaintiffs had sufficiently plead claims against both Defendants for (i) aiding and abetting Stanford's sales of unregistered securities in violation of the TSA occurring after February 1, 2008; (ii) aiding and abetting Stanford's sales of securities by an unregistered dealer in violation of the TSA occurring after February 1, 2008; (iii) aiding and abetting Stanford's sales of securities through untruths or omissions in violation of the TSA occurring after February 1, 2006; (iv) aiding and abetting a fraudulent scheme; (v) participation in breach of fiduciary duty; and (vi) civil conspiracy.  *Id.*

More specifically, the Court held that Defendants' knowledge that Stanford's primary intent was to evade regulation, coupled with their familiarity with Stanford's personal history and the duration and depth of the relationship between Defendants and Stanford, raised a "*plausible inference that [Defendants] knew of impending underlying wrongdoing, yet nevertheless agreed to support it and insulate it from oversight*".  Order, at p. 7.  The Court also held that "*misleading regulators is the kind of assistance that allowed Stanford to "continue to operate" and indeed grow*".  *Id.*, 17.

## III.   FACTS AND ALLEGATIONS SUPPORTING CLASS CERTIFICATION[4]

The following facts are common to all members of the putative class because they support Plaintiffs' case for liability against Stanford for primary violations of the TSA and breach

---

[4]   Plaintiffs include the following summary of relevant facts and allegations to provide the Court with the information necessary "to make a meaningful determination of the certification issues."  *See Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004); *see also id.* (instructing that at the class certification stage, "the district court must look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues" (quotation marks omitted)).

of common law duties, and against Defendants for aiding and abetting and participating in Stanford's improper conduct. These common facts will inform a jury's consideration of the common jury questions to be presented at trial, including (1) did Stanford violate the TSA and/or commit fraud; and (2) did Defendants aid and abet or participate in Stanford's fraud or TSA violations, with concomitant consideration of whether Defendants were generally aware that Stanford was involved in improper conduct and whether Defendants provided substantial assistance.

### A. Stanford's Improper Activities and Defendants' General Awareness of Same Present Common Issues that Predominate

Unknown to Plaintiffs and the putative class of SIBL investors, Stanford engaged in a pervasive, wide-ranging scheme to evade regulation and regulatory scrutiny of his offshore bank operations in the United States for over 20 years. Stanford's former head of global compliance, Lena Stinson, describes in her Declaration how Stanford did not want the U.S. Government "looking into" what Stanford was doing. See Declaration of Lena Stinson, attached hereto as **Exhibit "1"**, at ¶6, App. 3. Stinson also describes how she was present in many meetings with Allen Stanford himself over the years wherein he expressed disdain and disrespect for the U.S. Government and regulators in general, and that Stanford was "*very wary of the Government and regulators, and seemed to have a phobia about the Government*" and didn't want "*government regulators snooping around in his businesses*". *Id.*, at ¶22, App. 9.

Another of SGC's compliance officers, Jane Bates, testified in an SEC deposition that every time she questioned or made suggestions concerning Stanford's compliance with securities regulations, she was shot down. See Deposition of Jane Bates, **Exhibit "2"**, at pp. 7-15, 85-86, 99-102, 130-132, App. 42-50, 52-53, 54-57, 59-61. She also testified that she was ultimately terminated by Stanford for asking too many questions. *Id.*, at 131-132, App. 60.

Stanford's consistent business model from the 1980s all the way to 2009 was to operate an offshore, unlicensed and unregulated investment company (essentially a type of hedge fund) disguised as a "bank" from the United States using U.S.-based marketing and sales and administrative offices while wholly evading U.S. laws and regulations.  As discussed below, in 1998 and again in 2003 different Stanford outside securities lawyers advised Stanford that SIBL should register with the SEC as an investment company since SIBL wasn't really a bank. Stanford refused to do so. In 2006 the SEC accused Stanford of violating the Investment Company Act, and said claim was included in the SEC's 2009 Complaint against Stanford.  In 2013 this Court granted summary judgment in favor of the SEC for Stanford's violations of the Investment Company Act.  See April 25, 2013 Order, Docket No. 1858, Civ. Action No. 3:09-CV-0298-N, at p. 9-10.

As this Court found in its Chapter 15 ruling,[5] SIBL was just a façade and the alter ego of Stanford Financial Group ("SFG") based in the U.S., and SIBL's principal place of business was based in the U.S. because its real banking operations were carried out from the U.S. *In re Stanford International Bank, Ltd*., Case 3:09-cv-00721-N, Doc. No. 176, at pps. 19-50.  The Court further noted that even the Antiguan Government admitted that SIBL was in reality run from Houston, Texas, and that Antigua was a mere "transit point".  *Id.*, at 49.

Stanford's ability to operate and market and sell the SIBL CDs from the U.S. created a veneer of legitimacy for his offshore bank and the Stanford brand generally.[6]  As the SEC

---

[5]     Plaintiffs ask the Court to take judicial notice of its Chapter 15 Order.

[6]     By basing his operations in the U.S., Stanford successfully created a veneer of legitimacy for his offshore bank that enticed investors such as the named class plaintiffs.  See Declarations of Class Plaintiffs, attached hereto as **Exhibit "4"**, App. 223-231 (testifying that they were always led to believe that Stanford was a U.S. operation).  In fact, in 1991 a British journalist published an article entitled "*Monster Rat in Montserrat*" questioning how Stanford could sell its offshore bank products from the U.S. since it had no banking license there, and also hypothesized that Latin American depositors might be

observed in its 2005 Enforcement Referral memorandum on Stanford, Stanford's "ability to sell through a U.S. based broker-dealer gives SIB an *imprimatur* of legitimacy to foreign investors." *See* SEC OIG Report, **Exhibit "3"**, at p. 116, App. 186. Stanford's fraudulent business model succeeded wildly, allowing him to run an unlicensed, unregulated offshore "bank" from the U.S. selling unregistered securities for over 20 years.

As the common evidence below establishes for class certification purposes, Stanford engaged in his regulatory evasion campaign consistently and uniformly.  Moreover, Stanford never disclosed to SIBL investors that he was not compliant with U.S. banking and securities laws, that he was constantly under investigation by the U.S. Government for such non-compliance and other potentially criminal matters, or that he was engaged in a campaign to evade regulation of his activities and deceive regulators worldwide so that he could illegally operate an offshore investment company – disguised as a bank - in the U.S. selling unregistered securities.  **That uniform omission to disclose is common to all SIBL investors.**

### 1. *Stanford's Pervasive Regulatory Evasion Campaign*

In 1988, Stanford's Houston-based General Counsel at the time, Sidney Adler, informed Greenberg Traurig partner Carlos Loumiet ("Loumiet") that Stanford's business model was centered around Stanford's offshore bank (and predecessor to SIBL) Guardian International Bank Ltd. ("GIBL"), based at the time in the Caribbean island of Montserrat, which Adler described as an "investment bank" and <u>not</u> a commercial bank *because it did not make loans*.[7]  Receivership Documents, **Exhibit "6"**, App. 235-237.  Adler told Loumiet that "*we obviously do not want to*

---

tricked by such advertisements into believing that, in dealing with [SIBL's predecessor, GIBL], they were dealing with "*Texans who have been checked out by the authorities and granted a banking license*". Receivership Documents, **Exhibit "5",** App. 233.

[7]     Loumiet's early knowledge that GIBL/SIBL was an investment bank that did not make loans is crucial given Greenberg's later legal opinion that SIBL did not need to register as an investment company because it was a commercial bank that derived most of its income from making loans.  See infra at p. 13.

be under Federal S.E.C. supervision, nor that of the state of Florida, **as the entire operation is designed to avoid such requirements**."   Receivership Documents, **Exhibit "7",** App. 239-243. Adler explained to Loumiet that GIBL had a "representative office" in Houston called Guardian International Investment Services ("GIIS") through which GIBL conducted <u>all</u> of its sales and marketing efforts.  *Id.*, App. 241-243.

During this same time frame, Greenberg learned that Stanford had been accused of violating banking laws in Texas by running unlicensed bank sales offices (the GIIS offices) in Houston and El Paso for GIBL, and in 1988 and 1989 the U.S. Office of the Comptroller of the Currency ("OCC") had issued advisories concerning Stanford's similar violations of banking laws in Florida and California.   Receivership Documents, **Exhibit "8"**, App.245-285. Nevertheless, Greenberg advised Adler that Stanford could continue to effectively operate GIBL's banking activities from the U.S. by utilizing GIIS as a "liaison" office providing "administrative services" for GIBL through a "Management Service Contract", as long as Stanford kept "Montserrat…in the picture, ***at least on paper***".  Receivership Documents, **Exhibit "9"**, App. 287-288.  **This became the blueprint for SIBL going forward.**

Besides evading compliance with U.S. banking laws, Stanford also wanted to avoid compliance with U.S. securities laws.  In a June 17, 1988 Memo from Adler to Stanford, which was discovered in Greenberg's files, Adler informed Stanford that "***there is no question***" that the GIBL CDs were securities.   Receivership Documents, **Exhibit "10",** App. 290-292.   In a February 1, 1991 letter to Stanford, Loumiet noted that Stanford's sales of GIBL CD securities from the U.S. might require it to be registered as a securities broker, which Loumiet reminded Stanford was something that "**I am sure you would like to avoid**".  Receivership Documents, **Exhibit "11"**, App. 294-297.

Greenberg knew that Stanford never wavered in his goal of operating his offshore bank securities scheme from the U.S. while evading proper registration and regulation.  In 1993, a Greenberg lawyer interviewed Stanford's General Counsel Yolanda Suarez ("Suarez") and the head of GIIS, Oreste Tonarelli, as part of a DEA money laundering investigation.  In her Memo to the file, the Greenberg lawyer described Suarez's explanation of GIBL and its role within the Stanford organization in stark terms:  "*GIBL is basically an 'operations department', has **no real contact with clients** and **does not engage in investment of funds***".  Receivership Documents, **Exhibit "12"**, App. 299-303.  She went on to describe how Suarez told her that all business promotion was performed by Houston-based GIIS, and how all investment decisions were made by Houston-based Stanford Financial, and that Stanford had structured the bank's operations in this manner to evade banking regulations in the U.S.  *Id*. 299.

Handwritten notes taken by the same Greenberg lawyer during a meeting with Stanford CFO Jim Davis on January 11, 1993 also reveal that Stanford and Greenberg were considering whether GIIS needed to register as an investment adviser in the U.S., and that Stanford had told Greenberg in no uncertain terms that he did not want to register with the U.S. Government, and was "***resistant to any registration***".  Receivership Documents, **Exhibit "13",** App. 305-315, at App. 305.

In order to maintain the "veneer of legitimacy" for SIBL, Stanford was always looking for more ways to sell his fraudulent offshore bank CDs from unregistered bank "representative" offices in the United States.  In 1994 he attempted to open a branch office for his Bank of Antigua ("BoA") in the U.S. to directly market SIBL (at the time GIBL) CDs in the U.S.  Greenberg lawyer Patricia Menendez ("Menendez") applied to the Federal Reserve in Atlanta for such a license on Stanford's behalf, informing the Federal Reserve that BoA wanted to establish

a representative office in Miami "*primarily to act as a liaison between foreign customers, the Bank of Antigua and the affiliated Guardian International Bank Ltd*."  Receivership Documents, **Exhibit "14",** App. 317-18 at App. 317.  As part of her application, Menendez tried to distance Stanford from his prior problems with the OCC by misleadingly suggesting to the Federal Reserve that those problems were related to name confusion with a *different* Guardian bank, *not* GIBL.  *Id.*  App. 317-318.  As discussed below, this was not the last time Defendants would misrepresent Stanford's shady past to government regulators.

As part of this BoA application, Menendez prepared a letter of support for Stanford that was to be signed by one of GIBL's principal Antiguan regulators from the Antiguan Minister of Finance, Molwyn Joseph, who (as discussed below) Greenberg knew had accepted bribes ("loans", later forgiven) from Stanford.  The fake regulator letter Greenberg drafted purported to represent to the Federal Reserve that, *inter alia*, "*we believe both [BoA and GIBL] are being operated in a safe and sound matter*".  Receivership Documents, **Exhibit "15",** App. 321. Stanford eventually dropped his Federal Reserve application for BoA after the Fed asked for information about any prior bankruptcies.[8]

In 1997 Stanford and Greenberg explored other avenues through which Stanford could market and sell SIBL CDs in the U.S. without exposing SIBL to formal regulation by the U.S. Government.  In 1997 and 1998, Stanford and Greenberg set up operations for 3 new "feeder" companies for Stanford to market and sell the unregistered SIBL CDs from the United States without proper registration of SIBL as a bank or investment company: (1) a broker-dealer in

---

[8]    In 2000-2001, Stanford and Greenberg once again made an attempt to gain control of a U.S. bank, this time an S&L, but the U.S. Office of Thrift Supervision foreclosed that effort based on concerns about Stanford's personal bankruptcy and the accounting practices of SIBL's auditor CAS Hewlett.  **Exhibit "16"**, App. 334-337.

Houston called Stanford Group Company ("SGC");[9] (2) an IRA trust company in Louisiana called Stanford Trust Company ("STC"); and (3) a "representative" office in Miami of Stanford Trust Company Antigua called Stanford Fiduciary Investor Services ("SFIS").   The primary purpose of those 3 entities was to market and sell SIBL CDs.

In late June 1998, as part of their work on securities regulatory issues to support SGC's sale of SIBL CDs to U.S. citizens under a Reg. D offering, Stanford General Counsel Suarez asked Greenberg to perform a review of the state securities laws.  Greenberg produced a Memo to Suarez dated July 15, 1998, in which Greenberg lawyer Bonnie Moncada opined that the SIBL CDs would most likely be considered securities under the laws of the states under review. Receivership Documents, **Exhibit "19"**, App. 357-364, at 358.   In fact, and based on a conversation she had with the Texas State Securities Board, **Moncada opined that the SIBL CDs would definitely qualify as securities under Texas law**.  *Id.*, at App. 363.

According to the SEC OIG Report, following the SEC's first broker/dealer ("B/D") examination of SGC in 1997, the SEC B/D examination staff concluded that the SIBL CDs were "not legitimate CDs" and that Stanford was deceiving investors into believing the CDs were low risk, safe and secure investments.  **Exhibit "3"**, App. 87.  In May 1998, the SEC Enforcement division opened a Matter Under Investigation ("MUI") on Stanford.   As part of this SEC investigation of Stanford, Loumiet instructed Stanford's outside securities counsel Wayne Secore to represent to the SEC that the SIBL CDs were ***not*** securities and that only foreign investors purchased the CDs.  **Exhibit "20"**, App. 373-374.  One of the SEC B/D exam staff members testified to the SEC's OIG that the SEC closed the 1998 investigation based on representations

---

[9]     Both Greenberg and Hunton were aware that the primary (if not sole) purpose of SGC was to market and sell the SIBL CDs.  See **Exhibit 17,** App. 339-347, at 341 (Greenberg describing SGC's principal business as referring customers to SIBL) and **Exhibit 18**, App. 349-355, at 351 (Hunton referring to SGC as the "marketing agent" for SIBL).

made by Wayne Secore, including representations that only foreigners invested in the SIBL CDs. OIG Report, **Ex. 3**, at 38-39, 41, App. 108-111.

During that same time frame in 1998, Suarez also asked Greenberg and another law firm to determine whether SIBL needed to register as an investment company under the Investment Company Act of 1940. Suarez first received an opinion from a Houston securities lawyer and former Andrews Kurth partner Deon Warner, who concluded that Stanford would need to register as an investment company because SIBL likely did not qualify for an exemption to registration as a foreign "commercial bank" since it *did not make loans*. Receivership Documents, **Exhibit "21"**, App. 377-379. Stanford asked Greenberg to provide a second legal opinion. Greenberg provided a Memorandum to Suarez dated November 11, 1998, in which Greenberg opined that Stanford did **not** have to register SIBL under the Investment Company Act because, as a "foreign bank", SIBL was exempted under the Investment Company Act since *the majority of SIBL's income was derived from making commercial loans*. Receivership Documents**, Exhibit 22**, App. 381-389.

In his deposition taken in 2014, former Stanford General Counsel Mauricio Alvarado testified that he relied on Greenberg's 1998 opinion that SIBL did not need to register as an investment company under the Investment Company Act when he ignored contrary advice from a securities lawyer from Kirkpatrick & Lockhart, who advised Stanford compliance officer Jane Bates in 2003 that Stanford might need to register SIBL as an investment company. Deposition of Mauricio Alvarado, attached as **Exhibit "23"** at 217-219, App. 392-394. When asked about the factual basis for Greenberg's 1998 conclusion that SIBL did not need to register as an investment company – that SIBL was a commercial bank making loans – Alvarado testified that he disagreed with that statement and description of SIBL's business and that Greenberg's legal

opinion was based, in part, on a false premise. *Id.* at 220-223, App. 395-398. Alvarado also testified that Loumiet likely knew that such statements were false because Loumiet knew that SIBL didn't make loans.[10] *Id.*, at 221-222, App. 396-397.[11]

Also in 1998, Greenberg reviewed and revised SIBL's Reg. D Disclosures, which were thereafter used by SGC to market and sell the SIBL CDs to U.S. investors. The Disclosures as revised by Greenberg omitted to disclose that Stanford and SIBL had consistently been under U.S. Government investigation since the late 1980s and were evading proper registration and regulation, or that Stanford had corrupted Antiguan Government officials and effectively taken control of the Antiguan regulatory system that regulated SIBL. Receivership Documents, **Exhibit "24"**, App. 401-441. The Reg. D disclosures that Greenberg revised also disclosed that SIBL's primary business was investing in securities, not making loans. *Id.,* at 14-15, App. 415-416.

In late 1997 Greenberg recommended to Stanford that he could use Stanford's Antiguan trust company, STC Ltd., as a platform to establish "trust representative offices" in the U.S. in order to sell the SIBL CDs to Latin American investors, and Stanford and Greenberg thereafter set about establishing the Miami offices of SFIS. Early on in the process of establishing SFIS, Greenberg lawyer Carl Fornaris concluded in a draft Memorandum that in order to avoid any entanglements with the Federal Reserve, SFIS should "refrain from doing any business or soliciting any business on behalf of SIBL", but Loumiet deleted this conclusion from the final

---

[10]     Indeed, as described *supra*, Stanford's former General Counsel Adler had specifically told Loumiet that the bank was an "investment bank" that did not make commercial loans. See **Exhibit 6**, App. 236.

[11]     In 2006 the SEC accused Stanford of violating the Investment Company Act, and said claim was included in the SEC's 2009 Complaint against Stanford. In 2013 this Court granted summary judgment in favor of the SEC for Stanford's violations of the Investment Company Act. See April 25, 2013 Order, Docket No. 1858, Civ. Action No. 3:09-CV-0298-N, at p. 9-10.

draft of the Memo he sent to Suarez.  Receivership Documents, **Exhibit "25"**, compare App. 444 with App. 451-452.

Greenberg knew that if SFIS solicited CD sales for SIBL, SFIS could be found to be an unlicensed "de facto" representative office of a foreign bank, SIBL, and subject to federal law. Yet Greenberg lawyers knew that was Stanford's intention the entire time.  Greenberg's billing records from November 1997 reveal that Greenberg lawyers researched whether SFIS would need to register the SIBL CDs as securities.  Receivership Documents, **Exhibit "26"**, App. 461-464.  And Stanford's former General Counsel Alvarado has testified that there was "no doubt" in his mind that Loumiet knew that the primary purpose of SFIS was to market and sell SIBL CDs. Alvarado Depo., **Exhibit "23",** at 231, App.  399.

In October 1998, Greenberg notified the Florida Department of Banking that Stanford was preparing to open the SFIS office in Miami.  In order to get the approval of the Florida regulators for SFIS, Greenberg sent letter and a Memo to the Florida Department of Banking representing that SFIS would not be engaged in the "banking business" in Florida and would only act for STC Ltd.  Receivership Documents, **Exhibit "27"**, App. 466-467.  Based on their deceit, Greenberg was eventually able to convince the Florida regulators to allow the establishment of SFIS.

### 2.  *Stanford's Corruption of Antigua*[12]

Defendants helped Stanford essentially take over the country of Antigua in order to use it as a safe haven for his offshore fraud.  Following the surrender of his bank license for GIBL in Montserrat in late 1990 after he came under too much regulatory scrutiny there (discussed

---

[12]     For a summary narrative of Stanford's corrupt influence over the Antiguan Government, see Direct Testimony of Ralph S. Janvey, Doc. 116-11 in the Chapter 15 Proceeding (Case 3:09-CV—0721-N), courtesy copy of which (without exhibits) is attached to the Appendix as **Exhibit "109"**, App. 2068-2096.

below), Greenberg assisted Stanford to set up his offshore bank operations in Antigua, which included Stanford's agreement to purchase the ailing Bank of Antigua ("BoA").   Complaint at ¶59-73.

Once installed in Antigua, Stanford thereafter set about co-opting and corrupting local Antiguan Government officials.  As reflected in documents found in Greenberg's files, Stanford's various companies loaned tens of thousands of dollars to various Antiguan Government officials. As just one example, in 1992 Stanford loaned $30,000 to the Antiguan Minister of Finance responsible for regulating GIBL, Molwyn Joseph, as evidenced by a Promissory Note found in Greenberg's files.[13] Receivership Documents, **Exhibit "28"**, App. 479-482.  Joseph, who as the Antiguan Minister of Finance *was charged with overseeing GIBL*, never paid a dime on that loan, as evidenced by a 1994 memo from Stanford to his personal assistant Jean Gilstrap, also found in Greenberg's files, in which Stanford instructed Gilstrap to mark as "paid" the same Promissory Note for the Molwyn Joseph loan and to carry it on SIBL's books as a political contribution.  Receivership Documents, **Exhibit "29"**, App. 484.

In 1994, Stanford paid to fly Antiguan Prime Minister Lester Bird out of Antigua on a private jet to St. Luke's Hospital in Houston when he thought he was suffering a heart attack. Stanford paid all of the Prime Minister's hospital and treating physician bills (roughly $48,000). Stanford Receivership Documents, **Exhibit "30"**, App. 486-521. As noted in his November 14, 1994 letter to Allen Stanford, copy of which was located in Greenberg's files, Prime Minister Bird was forever indebted to Stanford.  *Id.* at App. 486.

Thereafter Prime Minister Bird asked Stanford to represent the Antiguan Government as

---

[13]     Documents attached as Appendix Exhibits hereto that bear Bates labelling beginning with "GT" are documents produced to the Receiver by Greenberg Traurig; documents with Bates labelling beginning with "HW" were produced by Hunton & Williams.

the "investment banker" and provide the financing for a large hospital construction project. Receivership Documents, **Exhibit "31"**, App. 523-524.  Stanford offered that *SIBL* would provide an interim loan to the Government of Antigua to finance 100% of the architectural and engineering costs for the project, which Stanford estimated to be $40-50 million. Receivership Documents, **Exhibit "32"**, App. 526-528.  Eventually Stanford, purportedly through his BoA, lent the Antiguan Government $31 million for the new hospital.  This was on top of additional BoA loans to the Antiguan Government for airport improvements ($20 million) and general use ($10 million).[14]

Stanford's involvement in the Antiguan hospital project resulted in separate U.S. Congressional and Justice Department criminal investigations of corruption in Antigua and, in particular, Stanford's involvement in that corruption. Receivership Documents, **Exhibit "34"**, App. 536-543.  Greenberg was retained as Stanford's counsel for that investigation and entered into a "joint defense" agreement with the Government of Antigua with respect to the investigation.  Receivership Documents, Exhibit **"35",** App. 545-552.

The Antiguan Hospital scandal also set off a firestorm of negative press reports in Antigua about Lester Bird, Antiguan corruption and Stanford's overwhelming influence in Antigua.  A pair of November 1995 front page articles in Antigua's "Outlet" newspaper entitled, respectively, "*Allen Stanford: Antigua's New Massa*" and "*Loans From Massa Could Spell Ruin*", located in Greenberg's files, reported that Stanford's BoA had loaned the Antiguan

---

[14]     Greenberg  lawyers prepared and finalized the loan documentation for the hospital loan with Stanford's Antiguan counsel, Errol Court.  In a Memo to Greenberg dated July 9, 1998, Cort objected to the Loan Agreement listing Stanford's BoA as the *sole* lender, because that "would be contrary to the Banking Act of Antigua" because the $31 million loan was "*too big for the asset base*" of BoA. Receivership Documents, **Exhibit "33",** App. 530-534.  Based on an August 1999 e-mail from Greenberg partner Pat O'Brien, Greenberg knew that the loan violated Antiguan banking laws and that the money for the loan likely came from SIBL depositors.  See **Exhibit "42",** App. 779-781**.**

Government $40 million, and *questioned where that money really came from because the Bank of Antigua did not publish its financial statements as required by Antiguan banking law, and likely did not even have that kind of money* [of course the money really came from SIBL investors].  Receivership Documents, **Exhibit "36"**, App. 554-559. The article pointed out that the Bird government had turned a blind eye to Stanford's violations of Antiguan banking laws, and that the U.S. Government had recently named Antigua as one of the worst offenders in money laundering.  *Id.*  The article also complained that Lester Bird's government had basically allowed Allen Stanford to gain control over Antigua and to "run things", and that the government had been giving away Antiguan land to Stanford, including the Antiguan airport and contiguous land. *Id.*

In January, 1996, apparently as part of the Justice Department investigation of Stanford, his personal assistant Gilstrap sent a Memo to Greenberg partner Mark Schnapp informing him of the "retirement" of the Molwyn Joseph Note, as well as Stanford's payments of $48,217.17 for medical expenses incurred by Prime Minister Bird.  Receivership Documents, **Exhibit "37"**, App. 561.  Suarez also sent several spreadsheets to Greenberg detailing money Stanford had lent to senior Antiguan Government officials, either through direct loans or through credit cards, as well as loans made to the Antiguan Government.  Receivership Documents, **Exhibit "38"**, App. 563-574.  That document revealed that, at that time in January 1996, the Antiguan Government owed Stanford's banks $31 million, and that eleven  senior Antiguan Government officials, including Lester Bird and Molwyn Joseph (who had received a new $100,000 loan from Stanford), owed Stanford a combined $140,000.00.  *Id.*, App. 564-566.

Having "befriended" the major players in the Antiguan Government, in 1996 Stanford moved to take control of the Antiguan banking regulatory system.   In September 1996

Greenberg's Loumiet sent a letter to Prime Minister Bird pointing out that Antigua had recently been the subject of some disturbing reports in the press and suggesting ways Antigua could establish some credibility for its financial sector.  Receivership Documents, **Exhibit "39"**, App. 576-579.

In response, Prime Minister Bird then formed an Advisory Board for Antigua's offshore business sector, and asked Stanford and Loumiet to head it.  The Advisory Board then appointed the "Antiguan Offshore Financial Sector Planning Committee" and Stanford himself was appointed as its chair.  Complaint at ¶¶143-163; Janvey Direct Testimony, **Exhibit "109"**, at 7-11, App. 2074-2078.  Complaint at ¶143-163.  The Committee then formed two Task Forces, to which Stanford appointed every member and every one of them was on Stanford's pay roll.  *Id.* No Antiguan citizen served on the Task Forces.  *Id.*

The goal of the Task Forces was to re-write Antigua's banking laws to make Antigua look better and to help insulate Stanford from foreign (i.e., U.S.) regulatory scrutiny.  As just one example, Greenberg partner and member of the Task Force Pat O'Brien recommended that Antigua avoid "*overly aggressive enforcement actions*" by foreign regulators by amending the list of "prescribed offenses" in Antiguan law such that the Antiguan Government would only be required to cooperate with foreign governments with respect to the "*most serious of crimes, as intended, and **not to lesser crimes which could conceivably be included under such vague terms as 'fraud' or 'false accounting'**".[15]  Receivership Documents, **Exhibit "40"**, App. 581-692, at App. 590-591, and App. 634.  Another provision on "Confidentiality" proposed by

---

[15]     Greenberg lawyers became so accustomed to Stanford paying them to write Antiguan laws that in an October 18, 2001 e-mail to a fellow Greenberg partner, Greenberg partner Pat O'Brien stated that they should try and gin up some new business from Stanford, including that "*[w]e might  also be able to generate some work writing Antiguan laws with them [Stanford] paying for it*."  Receivership Documents, **Exhibit "44"**, App. 797.

Greenberg made it "unlawful" for any person, **including any Antiguan Government official**, to disclose "any information relating to the business affairs of a financial institution".[16]  *Id.,* at App. 678-679.

Stanford's regulatory reforms in Antigua created a new Antiguan regulatory body, the International Financial Sector Authority ("IFSA"), that was placed in charge of supervising and regulating the offshore bank sector.  Amazingly, Stanford was appointed as the initial interim Chair of the IFSA and Pat O'Brien served on it along with Stanford's Antiguan lawyer, Errol Cort.  Complaint at ¶152.  Stanford actually loaned the Antiguan Government the money to fund the operations of IFSA.  Receivership Document, Exhibit **"41"**, App. 694-777, at App. 704 (listing loans for IFSA).  Greenberg knew that Stanford funded the activities of IFSA and that the source of the funds was likely SIBL depositors, as evidenced by an August 1999 e-mail from Pat O'Brien to Loumiet.[17]  Receivership Documents, **Exhibit "42"**, App. 779-781.   The e-mail reveals that no other banks had participated in the $31 million hospital loan, in violation of Antiguan law, and that Stanford was experiencing cash flow problems and was constantly "asking how much money came in that day" and complaining about delays in the delivery of checks from the U.S. to Antigua.  *Id.*

At the same time that Greenberg was helping Stanford rewrite Antiguan laws that regulated Stanford's business, Greenberg continued to receive reports about Stanford's bribery of

---

[16]     During this same time period, specifically in March and April 1998, a Greenberg lawyer performed research for Stanford on whether Antigua's bank secrecy laws would prevent U.S. authorities from gaining access to SIBL's information, even if U.S.-domiciled personnel had computer access to said information.  Receivership Documents, **Exhibit "45"**, App. 799-848, at App. 813.

[17]     It is hard to imagine how a law firm like Greenberg could allow itself to be involved in having an offshore bank client pay Greenberg's legal fees to purportedly represent a foreign government to draft the laws and sit on Committees established by the foreign government to regulate the offshore bank client, while at the same time assisting the offshore bank client to make loans to the foreign government secured by its tax revenues.  But that is exactly what Greenberg (and later Hunton) did in Antigua.

Antiguan officials.  In late 1997, Greenberg learned that Stanford was making payments to outside contractors on behalf of Prime Minister Bird's political party.  In January, 1998, a Greenberg lawyer sent a Memo to Suarez, with copy to Greenberg partner Schnapp, regarding whether Stanford's continued "donations" to the Lester Bird political party violated the Foreign Corrupt Practices Act.  Receivership Documents, **Exhibit "43"**, App. 783-795.  In March 1999 Stanford forwarded to Greenberg certain articles from Antiguan newspaper the "Outlet" accusing Allen Stanford of forcing his Antiguan employees to actively campaign for Lester Bird's political party or else face dismissal or suspension, and of "buying" votes for Bird by giving away EC$3 million in televisions and VCRs to voters. Receivership Documents, **Exhibit "46"**, App. 854-856.

Despite the scandal involving the previous $31 million hospital loan Stanford had made to the Antiguan Government, in 2002  Loumiet – now at Defendant Hunton – represented Stanford in a new $40 million loan to the Antiguan Government.  Receivership Documents, **Exhibit "47"**, App. 858-990.  This time, and perhaps because of the ongoing investigation of the $31 million BoA loan to Antigua, Stanford instructed Hunton to change the loan documents on the new loan so that Stanford Financial Group Company ("SFG") appeared as the lender in the loan transaction instead of BoA.  As drafted by Hunton, the $40 million loan was secured by the Antiguan Government's tax revenues;  in fact the Antiguan Government was required to open up a bank account at Stanford's BoA to deposit and maintain its tax revenues with BoA as collateral for the loan.[18]  *Id.*, App. 870, 872-873, 940-951.

Later in December 2003, Loumiet came across an article in the Herald newspaper that

---

[18]     According to a Stanford loan schedule for Antiguan Government Loans, as of June 30, 2008, the Antiguan Government owed Stanford over **$86 million** based on loans from SFG and BOA. Receivership Documents, **Exhibit "48",** App. 992.

accused Stanford of having bribed Antigua's Minister of Tourism (and old Stanford crony) Molwyn Joseph and Planning Minister Gaston Browne as inducement for their help in a land swap Stanford was trying to orchestrate. Receivership Documents, **Exhibit "49"**, App. 994-996. The newspaper article reported that Stanford had given the two Antiguan Government officials $74,000 each and that members of the Antiguan opposition party had brought motions to suspend both ministers. A related article received by Greenberg further reported that Stanford's response to these accusations was to hold a press conference in which he "surprised" the audience by cavalierly declaring that he was going to donate an *additional* $200,000 to each of the two Antiguan officials.[19] Receivership Documents, **Exhibit "50"**, App. 998-1001. Loumiet forwarded the article to Stanford and Suarez on December 1, 2003, with a note that said, *inter alia*, "Sorry". *Id.*

### 3. *Stanford's Efforts to Shield SIBL from Scrutiny*

Stanford went to great lengths to protect his safe haven in Antigua and shield SIBL from the prying eyes of anyone who threatened to expose his fraudulent operations. In 1990, he surrendered his bank license for GIBL and moved his offshore bank operation out of Montserrat to Antigua when the Montserrat government began asking too many questions, including about GIBL's selection of C.A.S. Hewlett as its auditor, and accused Stanford of *operating [the Bank] in a manner "detrimental to its depositors"* and *"withholding…detailed information that would normally be expected in audited financial statements"*. Receivership Documents, **Exhibit "51"**, App. 1003-1092, at App. 1023-1024.

Stanford consistently went on the offensive against U.S. regulators to keep them from

---

[19]     Greenberg filed away a copy of this article with the notation: "accused of bribery". **Exhibit "50",** App. 998.

digging too deeply into his or SIBL's activities.   In August 1989 Stanford informed Greenberg that an official from the OCC named of John Shockey had accused Stanford of being based in Montserrat because he was involved in drugs or money laundering.[20]   Receivership Documents, **Exhibit "52"**, App. 1094-1100.   After Stanford moved his bank to Antigua and Shockey warned the Antiguan Minister of Finance about Stanford being under investigation for money laundering, Loumiet sent a letter to the OCC accusing Shockey of engaging in "*as gross an example of defamation and tortious interference with a prospective business relationship as I have seen in fifteen years of practicing law*".   In the same letter Loumiet misrepresented to OCC that Stanford had "not had any difficulties with" the Montserrat government (which he knew was blatantly false).   Receivership Documents, **Exhibit "53"**, App. 1102-1113, at App. 1104. Loumiet then threatened the OCC and Mr. Shockey with federal court action to "call…to task…overstepping regulators".   *Id.*, at App. 1104-1105.

The OCC responded to Loumiet's complaints via letter dated November 13, 1990 from the OCC's deputy chief counsel to Loumiet, informing Loumiet that "*[a]t this time, I am not at liberty to confirm or deny the existence of any criminal investigation into Guardian and its owners*".   Receivership Documents, **Exhibit "54"**, App. 1115-1116.

As a result of continued U.S. Government investigations of Stanford, in 1995 or 1996 Stanford asked Greenberg to initiate what amounted to a counter-espionage campaign of Freedom of Information ("FOIA") requests on the U.S. Government in an attempt to uncover what the "Feds" knew about Stanford and his activities.   Greenberg served FOIA requests on the FBI, DEA, OCC, Federal Reserve, and U.S. Customs between 1995 and 1997.   Receivership

---

[20]      What is perhaps most disturbing about this Memo from Stanford to Loumiet is that in it Stanford mentioned to Loumiet that he had an "anonymous source" within the Montserrat Government that had allowed Stanford to review the Government's file on GIBL.   **Exhibit "52"**, App. 1094-1100, at App. 1095, 1097.

Documents, **Exhibit "55",** App. 1118-1145.  Responsive documents produced by the U.S. Government revealed more of Stanford's potential wrongdoing to Greenberg, including that following a U.S. Customs search of Stanford's private aircraft upon return from the Caribbean in 1991 "*the Stanfords proceeded to fire a number of employees whom they suspected might be providing information to the authorities.*" Receivership Documents, **Exhibit "56",** App. 1147-1156, at App. 1149.  Another document received by Greenberg described GIBL as having "constant cash flow" from foreign depositors but "**no regulation of its activities**", and indicated that U.S. Customs also had taken an interest in the "possible smuggling activities of principals in the Stanford organization".  *Id,* at App. 1151.  Additional documents received by Greenberg from the FBI in January 1997 revealed that Stanford had been under constant investigation for possible money laundering since 1989, and that the FBI had even sent an agent to London as part of the investigation in September 1992.  Receivership Documents, **Exhibit "57",** App. 1158-1168.

The investigations of Stanford never ceased.  On May 3, 2002, Loumiet sent an e-mail to Suarez regarding a potential aviation-related investment opportunity for Stanford and closed the e-mail by informing Suarez, in Spanish, that "*by the way, although I cannot divulge my sources, I have been told that Allen is being investigated again by "the Feds".   According to my calculations, this has to be the twentieth time*". [21] Receivership Documents, **Exhibit "58",** App.

---

[21]   Despite his knowledge of U.S. Government investigations of Stanford over the years, just a few months after sending that 2002 e-mail to Suarez, Loumiet sent a letter of recommendation for Stanford to the Panamanian Superintendent of Banking informing the Panamanian banking regulators that *Stanford always adhered strictly to the law and observed very high ethical standards*.  Receivership Documents, **Exhibit "59",** App. 1174-1178 (certified English translation at App. 1176-1177).  In 2004, Loumiet helped Stanford expand into Venezuela by sending the same type of recommendation letter to support Stanford's application for a banking license there.  In his October 1, 2004 letter to the Venezuelan banking regulatory authority, Loumiet stated he had always found Stanford to be compliant with all laws and that he *did not "know of a single instance in which the [Stanford Group] has been criticized by any*

1170-1172 (certified English translation at App. 1171).

Stanford also regularly went on the offensive against journalists.  In September, 1991 Stanford sent Greenberg a copy of an article written by a British journalist, "*Monster Rat in Montserrat*", in which the author questioned how GIBL could be selling its bank products from the U.S. since it had no banking license there, and predicting that Latin American depositors might be tricked by such advertisements into believing that, in dealing with GIBL, they were dealing with "*Texans who have been checked out by the authorities and granted a banking license*".  Receivership Documents, **Exhibit "5"**, App. 233.  In response, Greenberg helped Stanford's father, James Stanford, draft a threatening letter to the Financial Times, demanding a full public retraction or else Greenberg would take "full legal recourse" against all parties involved.  Receivership Documents, **Exhibit "61"**, App. 1186-1193.

In 1996 the "Caribbean Week" newspaper published an article entitled "*Drugs and the Economy*".  The article prominently featured a front page photograph of Stanford's BoA and referenced the 1995 reporting by the Antiguan newspaper, the "Outlet", describing how Stanford's loans to the Antiguan Government were under investigation by U.S. authorities because the loans exceeded the capital in BoA and *therefore the proceeds likely came from his offshore bank, SIBL, which was illegal under Antiguan law*.  Receivership Documents, **Exhibit "62"**, App. 1195-1198.

Stanford blew up and ordered Greenberg to sue the Caribbean Week newspaper and the reporter for defamation.  Greenberg filed suit against the newspaper and reporter in federal court in Miami seeking millions of dollars in damages, including punitive damages.  In a March 4, 1996 demand letter Greenberg sent to the newspaper and reporter prior to the lawsuit being filed,

---

*regulatory authority*".   Receivership Documents, **Exhibit "60",** App. 1180-1184 (certified English translation at App. 1182-1183).

Greenberg accused them of "falsely stating or implying" that Stanford was involved in "bribery of public officials". Receivership Documents, **Exhibit "63"**, App. 1200-1224.   On March 20, 1996, Stanford told Suarez and Greenberg:   *I want no delay in our attacks on...Caribbean Week, [the reporter] Klaus de Albuquerque, Shipman, the Outlet or the reporter that wrote the article in the Daily Observer.*" Receivership Documents, **Exhibit "64"**, App. 1226.   Stanford told Greenberg that he would pursue his attacks on the journalists and others who questioned him "*regardless of the time, energy and money it may take*" and that he wanted to "*go for the individuals' and/or business jugular in every instance.*"[22]   Receivership Documents, **Exhibit "65"**, App. 1228-1229.

Stanford then went after the U.S. Ambassador to the region when she refused to meet with him due to rumors about his illicit business activities in Antigua.   He sent five separate demand letters to the U.S. Embassy in Barbados in April and May, 1996, with copies to Loumiet, threatening to file a formal complaint with the State Department and pursue the matter "in the most aggressive manner available" if the Embassy did not disclose the "source and details" of any negative information about Stanford.   Receivership Documents, **Exhibit "67"**, App. 1244-1259, at App. 1253.   Stanford then turned the matter over to Loumiet at Greenberg and Stanford prepared a draft letter to the Ambassador that he asked Loumiet to put on his letterhead and send. Receivership Documents, **Exhibit "68"**, App. 1261-1268.   Loumiet edited and sent the letter to the Ambassador, copying the Undersecretary of State at the State Department, complaining about the Embassy's treatment of Stanford and demanding that the Ambassador reprimand the

---

[22]    Stanford also sued the Antiguan "Outlet" newspaper, along with its editor and publisher, for libel in Antiguan court, citing in the complaint some of the allegations that the Outlet had made, including that Stanford's offshore bank SIBL had been the "real" lender (using BoA as intermediary) of the $40 million in loans to the Antiguan Government.   Receivership Documents, **Exhibit "66"**, App. 1231-1242, at App. 1235-1236.

Embassy staff involved in spreading rumors about Stanford.  Receivership Documents, **Exhibit "69"**, App. 1270-1280.  He closed the letter by threatening the Ambassador with the filing a formal protest with the State Department.  As a result of this action, the Ambassador backed down and agreed to meet Stanford.

When he wasn't threatening government officials on Stanford's behalf, Loumiet was misrepresenting Stanford's past to them.  In 1997 Greenberg spearheaded Stanford's efforts to establish the Stanford Trust Company ("STC") in Baton Rouge for Stanford to use to sell SIBL CDs to the IRA accounts of U.S. investors.  As part of the application for that business, Louisiana regulators asked Greenberg about the extent of Stanford's involvement with GIBL in Montserrat and the OCC Banking Circular in 1989 regarding Stanford's unlicensed banking activities in the United States.  Receivership Documents, **Exhibit "70"**, App. 1282-1283.  In a draft response letter, and similar to what Greenberg lawyer Menendez did with the Federal Reserve in 1994 (described *supra*), Loumiet sought to mislead the Louisiana regulators by insinuating that the 1989 OCC warning was about a different bank, _not_ Stanford's GIBL, and that Stanford had not experienced any issues with the Montserrat Government.  Receivership Documents, **Exhibit "71"**, App. 1285-1292.

Stanford also went on the offensive against former employees who threatened to blow the whistle on his fraud.  In June 1998, a former Stanford Financial Adviser ("FA") named Irma O'Bourke alleged that she had witnessed Allen Stanford fraudulently alter SIBL financial statements and that Stanford had trained the FAs to market the SIBL CDs as being 100% insured, but that in 1997 O'Bourke had learned that the representations about the CDs being insured were false, and that she had been terminated after she expressed her concerns about this falsehood to Stanford executives.  Receivership Documents, **"Exhibit "72"**, App. 1294-1295.

By August 1998 Suarez discovered that O'Bourke had begun sending letters to her former Stanford clients informing them that their investments in the SIBL CDs were **not** insured. Receivership Documents, **"Exhibit "73"**, App. 1297-1317.  As a result of O'Bourke's letters to her Stanford clients, at least one such client sent a letter to Stanford – which Stanford's Suarez provided to Greenberg on September 18, 1998 -- expressing concern about the allegations that the SIBL CDs were not insured.  Receivership Documents, **Exhibit "74"**, App. 1319-1320.

Handwritten notes found in Greenberg's files reveal that Suarez told Greenberg to make O'Bourke *"very, very unhappy"; "severe pain inflicted on her"; "prosecuted zealously"; "no expense spared"; "no stone left unturned"*.[23]  Receivership Documents, **Exhibit "75"**, App. 1322-1328, at App. 1322.  Greenberg recommended that Stanford sue O'Bourke for tortious interference and for defamation and Greenberg lawyers prepared a draft lawsuit against O'Bourke that alleged that SGC's whole business model was to "solicit" investors and refer them to SIBL, and that O'Bourke had damaged SGC's relations with its investors by telling them that the SIBL CDs were not insured.  Receivership Documents, **Exhibit "77"**, App. 1333-1346, at App. 1339-1341.

Stanford's reliance on extreme measures to protect his Antiguan safe haven is perhaps best exemplified by the lengths he and Hunton went to contain an Antiguan political "liberation" movement's efforts to change the corrupt political order in Antigua.  In January 2004, right before the Antiguan elections, Stanford became aware of the existence of an expatriate Antiguan political dissent movement, the "Antigua and Barbuda Justice Movement", based in New York, that was criticizing Stanford's control and corrupt influence over Lester Bird's government.

---

[23]     The handwritten notes are dated July 1, 1998 and reference a teleconference with Yolanda Suarez.  Based on Greenberg's billing records, the author of the notes appears to be Greenberg lawyer Jennifer Demberg who recorded a teleconference with Suarez on July 1, 1998 and prepared notes to the file.  Receivership Documents, **Exhibit "77"**, App. 1331.

Receivership Documents, **Exhibit "78"**, App. 1348-1352.

Stanford called in Loumiet and Hunton to deal with them.  Hunton began an investigation of the Justice Movement and printed out and reviewed political advocacy pieces they found on the Movement's website.  Receivership Documents, **Exhibit "79"**, App. 1354-1376.  Some of the pieces included commentary on Prime Minister Bird's corrupt regime and how he had "sold" Antigua to Stanford, who was the "de facto prime minister of Antigua".  Other pieces described how Bird and Stanford were the leaders of a "Graft Pyramid Scheme" in Antigua.  *Id.*

Hunton sent a demand letter to the leader of the Justice Movement, McChesney Emanuel, accusing the Justice Movement of defaming Stanford and threatening that if the pieces were not removed from the Internet Stanford would sue the Movement and Mr. Emmanuel, personally, for libel and slander.  Receivership Documents, **Exhibit "80"**, App. 1378-1380.

Hunton thereafter retained and sent a pair of undercover agents to infiltrate the Justice Movement in a meeting held at a Catholic Elementary School.  The agents who surreptitiously attended the meeting made a list of those present, including their age and gender, and prepared a report to Hunton describing the content of the meeting, including how Mr. Emmanuel criticized the relationship between Lester Bird and Allen Stanford, which he characterized as being illicit and involving "gross misappropriations" and transfers of land to Stanford.  Receivership Documents, **Exhibit "81"**, App. 1382-1386. An additional report sent to Hunton by one of the "secret" agents described how the meetings discussed Stanford's invasive and corrupting role in Antigua, and how the Justice Movement claimed to have evidence to support a Foreign Corrupt Practices Act claim against Stanford for bribing Antiguan Government officials. Receivership Documents, **Exhibit "82"**, App. 1388-1392.

Following the receipt of the undercover reports, on January 29, 2004, Hunton sent

another demand letter to Mr. Emmanuel's lawyer, demanding that he halt his activities. Receivership Documents, **Exhibit "83"**, App. 1394-1397.   Undercover agents acting under Hunton's direction thereafter infiltrated yet *another* meeting of the Justice Movement (which one of the agents described as a "liberation movement" in his report) on February 6, 2004. Receivership Documents, **Exhibit "84"**, App. 1399-1400.  Thereafter, on March 9, 2004 Hunton filed a lawsuit for defamation on behalf of Stanford, personally, against Emmanuel, personally, in federal district court in New York.  Receivership Documents, **Exhibit "85"**, App. 1402-1429.

In June 2006, the Eastern Caribbean Central Bank ("ECCB") issued a proposal to grant the ECCB increased regulatory powers (including review and examinations) over SIBL.  FSRC's Leroy King immediately sent the draft proposal to Stanford.  Receivership Documents, **Exhibit "86"**, App. 1431-1456.  On July 8, 2006, Stanford wrote to Loumiet about his concern that, instead of being regulated by the FSRC headed by his "blood brother" Leroy King, SIBL could end up being regulated by the ECCB, who Stanford said "jumped to the tune of 'Big Brother'" (i.e., the U.S.).   Receivership Documents, **Exhibit "87"**, App. 1458-1459.   Stanford told Loumiet that this would be "*no bueno*" for his business if that were to happen.  Stanford sent an e-mail out to Loumiet dated July 17, 2006, in which he again relayed to Loumiet that it was urgent that Loumiet immediately contact Leroy King at the FSRC because it was "of EXTREME importance as this [the ECCB proposal] represents a minefield for Antigua and Stanford". Receivership Documents, **Exhibit "88"**, App. 1461.  Evidencing his knowledge that Stanford was in cahoots with SIBL's primary regulator, Loumiet responded that he was gathering materials to create arguments to "arm" Leroy King to defeat the ECCB regulatory proposal.  *Id.*

Loumiet then prepared a Memo to Leroy King dated July 21, 2006 (copied to Stanford) in which he and Hunton offered legal advice to King on the points King could argue to forestall the

ECCB's proposal, including that there was no basis for the FSRC to share information about SIBL with the ECCB, much less for the ECCB to examine SIBL.[24]   Receivership Documents, **Exhibit "89",** App. 1463-1466.   King thereafter used those legal arguments to rebuff the ECCB's attempted intrusion into the FSRC's regulation of SIBL, including in letters King sent (but which were drafted by Alvarado) to the ECCB in early August 2006.[25]

Beginning in November 2007, Hunton assisted Stanford to keep Florida regulators at bay in their investigation of Stanford's SFIS office in Miami that Loumiet had helped Stanford set up 9 years earlier while at Greenberg.  In a November 30, 2007 letter from the Director of Florida's Office of Financial Regulation ("OFR") to SFIS Director Rolando Parets, the OFR accused SFIS of not cooperating with the Florida regulator's examinations by refusing to provide requested information, destroying documents and prohibiting the Florida OFR from gaining access to documents in Antigua based on Antiguan confidentiality laws.   Receivership Documents, **Exhibit "93"**, App. 1671-1672. The OFR demanded that SFIS provide documents that included SIBL account balances and C.A.S. Hewlett's audit work papers for SIBL.  *Id.*

Loumiet took charge of the situation for Stanford and prepared a draft response letter to the OFR dated December 4, 2007 in which he argued that the OFR's document requests fell well

---

[24]     During Allen Stanford's criminal trial, IRS agent Kalford Young testified at length about Stanford's corrupt relationship with SIBL's lead regulator, Leroy King, and their joint effort to evade ECCB regulatory supervision over SIBL, including Loumiet (and Hunton)'s provision of the Memorandum to King for him to use as ammunition in responding to the ECCB, with the clear goal of preventing the ECCB from exercising regulatory oversight over SIBL. Transcript of Proceedings in U.S. v. Robert Allen Stanford, Volume 13, at 3933-3941, **Exhibit "90",** App. 1468-1588.  Agent Young further testified (in cross-examination) that Loumiet clearly had an understanding of "what's going on between Mr. Stanford and Mr. King".  *Id.* at 4004, 4009-4010, App. 1554, 1559-1560.

[25]     For example, on August 1, 2006, Alvarado drafted King's response letter to the ECCB, which was calculated to mislead the ECCB as to the financial bona fides of SIBL and so prevent additional regulatory scrutiny of SIBL by the ECCB.  See Davis Plea Agreement, **Exhibit "91"** at p. 16, App. 1605. King sent a draft back to Alvarado via facsimile transmission with the following handwritten words: "***Please do not bill me (laugh), Thanks a million, Lee***".  Receivership Documents, **Exhibit "92"**, App.1651-1669, at App. 1663.

outside its jurisdiction over SFIS; that OFR had no jurisdiction over Stanford Trust Ltd; and that SFIS did not engage in any banking business and did not issue any CDs.  Loumiet even went so far as to misrepresent that "***Stanford Trust has nothing to do with [SIBL] or any other Stanford organization***".  Receivership Documents, **Exhibit "94"**, App. 1674-1676.

Thereafter in February 8, 2008, Loumiet wrote to Alvarado that he had spoken with the OFR by telephone and that the OFR was "not happy" with Stanford's position that it could not provide the requested documents due to Antiguan confidentiality laws.  Receivership Documents, **Exhibit "95"**, App. 1678.  As he had done on prior occasions, Loumiet recommended that Stanford get his corrupt cronies in the Antiguan Government (i.e., Leroy King) to provide a "regulator-to-regulator" letter to the OFR to allay any concerns.  Receivership Documents, **Exhibit "96"**, App. 1680-1690 (certified English translation at App. 1682). Loumiet then participated in that deception  by sending the OFR a letter from Leroy King dated February 14, 2008 in which King told the OFR that STC Ltd. was in compliance with Antiguan regulations.  Receivership Documents, **Exhibit "97"**, App. 1692-1695.

### B.  Summary of Defendants' Knowledge of Stanford's Improper Activities

Defendants' knowledge or "general awareness" of Stanford's improper activities clearly presents a common question, the answer to which will apply equally to all members of the putative class and inform a jury's consideration of the common jury questions of whether Defendants are liable to Plaintiffs and the Class for aiding and abetting or participating in Stanford's fraud, violations of the TSA and breaches of fiduciary duties.

As described above and in the Complaint, Defendants (primarily, albeit not exclusively, through Loumiet) acquired extensive and early knowledge of the illicit and fraudulent nature of the Stanford enterprise through their long-term representation of Stanford, including knowledge of Stanford's evasion of laws and regulation, constant government investigations, Stanford's

corruption of Antiguan Government officials and economic stranglehold over Antigua through Stanford's extension of tens of millions of dollars in loans to the Antiguan Government that were secured by liens on its tax revenues,[26] as well as constant allegations of fraud and illicit conduct lodged against Stanford by various journalists, Antiguan citizens, and former Stanford employee whistleblowers.

From a securities regulatory standpoint, the evidence outlined above will, at a minimum, create fact issues regarding Defendants' securities law advice and representation and whether Defendants knew that Stanford was marketing and selling unregistered securities from the U.S. and operating an unregistered investment company in violation of the Investment Company Act.

From an investor marketing and disclosure standpoint, Defendants knew what Stanford was disclosing (and not disclosing) to investors. Loumiet helped prepare the Reg. D disclosures that Stanford used to sell the SIBL CDs in the U.S., and therefore knew that said disclosures failed to disclose that Stanford had consistently been under U.S. Government investigation and was evading (and violating) U.S. laws, and that Stanford had corrupted Antiguan Government officials. Defendants were also confronted over the years with evidence that Stanford was deceiving his investors with respect to the existence of insurance coverage for the SIB CDs. Complaint at ¶¶ 196-198, 203, 236. In fact, as described above, Greenberg was specifically tasked with crushing a former Stanford employee-turned-whistle-blower who alleged that she

---

[26]     Plaintiffs have alleged in the Complaint and will present evidence at trial sufficient to prove that Defendants knew or had reason to know that the loans were in reality funded with SIBL investor deposits because they knew that BOA did not itself have sufficient funds to make such loans without the participation of other, non-Stanford banks (which never happened, thereby violating Antiguan banking laws). Complaint, Doc. 1, at ¶¶ 92, 106, 107, 207, 223-224, 252. In fact, in 1995 and 1996, Loumiet knew that Antiguan and U.S. journalists had directly accused Stanford of violating Antiguan banking laws by purportedly having BoA loan money it did not have to the Antiguan Government and accused Stanford of making the loans using SIBL investor money. Complaint, at ¶¶ 123, 128. Hunton also became aware of the improprieties surrounding these loans through investigations by a commission established by Antigua's British Governor General in 2001. Id. at ¶ 247-251.

had been trained by Stanford to market the CDs as being fully insured after she sent letters to her former SIBL investor clients informing them that the CDs were not insured.  *Id.*, at ¶¶ 202-206.

Defendants also knew that Stanford was investing the funds deposited by SIBL's investors in a manner contrary to what was represented, including in illiquid and highly risky Caribbean real estate and venture capital deals.  Plaintiffs have alleged and will present evidence at trial that Defendants knew that SIBL was the ultimate source that funded all investments by related Stanford affiliated companies, including real estate, private equity and venture capital investments.  Complaint, at ¶¶242-244, 345-364.

### C.  Defendants' Substantial Assistance

Whether or not Defendants rendered substantial assistance to Stanford is likewise a common issue that predominates over individual issues and will inform a jury's consideration of the ultimate issue of whether Defendants are liable for aiding and abetting Stanford's fraud. As demonstrated by the litany of evidence recited above, there is really no question that Defendants provided substantial assistance, and at any rate, as the Court noted in its Order, a consideration of the "substantial assistance" element of a TSA claim raises fact issues that must be decided on summary judgment or at trial.  Order, at footnote 10.

At a minimum, and as the Court noted in its Order, Defendants' conduct in lying to and misleading regulators constitutes substantial assistance that helped Stanford continue and expand his operations.  Order at 16-17.  Defendants lied to and misled regulators (and others) about Stanford from at least 1990 all the way until 2008.[27]  As such, a jury could reasonably find that

---

[27]     *See e.g.,* Complaint at ¶¶74-75 (Loumiet misleads the OCC about Stanford's problems with the Montserrat government); ¶91 (Loumiet misleads the U.S. Federal Reserve about Stanford's past problems with Montserrat); ¶¶93-95 (Greenberg "ghost writes" letters to the Federal Reserve to be signed by members of the Antiguan Government to help Stanford's goal of selling more CDs from proposed U.S. representative office for BoA);  ¶¶168-176 (Loumiet misleads, conceals facts from, and provides

said conduct constitutes substantial assistance of Stanford's improper activities and fraud, which finding would be common for all members of the Class.

### D.  Stanford Failed to Disclose his Improper Activities

For obvious reasons, Stanford never disclosed to SIBL investors that he was engaged in a campaign to evade U.S. laws and regulations governing his investment company business and deceive (or co-opt and corrupt) regulators around the world, or that he was under constant U.S. Government investigation.  See Declarations of Class Representatives, attached as **Exhibit "3"**, App. 186-196.  Moreover none of Stanford's marketing materials disclose that Stanford was constantly under investigation by the U.S. Government, or was evading U.S. laws and regulations, or deceiving or corrupting regulators.  See, e.g., SIBL marketing brochure attached as **Exhibit "98"**, App. 1697-1727.  Indeed the SIBL Reg D disclosure document that was given to U.S. accredited investors as part of Stanford's sales of the SIBL CDs in the U.S. likewise does not disclose that Stanford was constantly under investigation by the U.S. Government, or was evading U.S. laws and regulations, or corrupting the Antiguan government.  See Stanford Reg. D Disclosure Statement, attached as **Exhibit "99,"** App. 1729-1751.  Those material omissions are common to all of the members of the Class.

### IV.   PROPOSED CLASSES

---

fraudulent documents to Florida state banking regulators to help Stanford obtain a license to operate offshore trust representative offices); ¶188 (Loumiet misleads Louisiana state regulators about Stanford's troubles with the OCC and Montserrat government);   ¶194 (Greenberg lies to SEC about scope of regulation of SIBL in Antigua); ¶311 (Loumiet lies to Venezuelan regulatory officials about Stanford's compliance with laws in order to help Stanford establish operations in that country); ¶¶309-311 (Loumiet sends deceptive letters of recommendation to Panamanian and Venezuelan regulators endorsing Stanford and representing that Stanford was compliant with laws and regulations despite knowledge that Stanford was under constant U.S. government investigation).  ¶374 (Loumiet lies to Florida regulators during their investigation of SFIS by falsely representing that Stanford's trust operations had nothing to do with SIBL);¶382 (Hunton provides deceptive letter from Leroy King to Florida regulators attesting to Stanford's compliance with Antiguan law in bid to try and protect SFIS from being shut down).

Pursuant to Rule 23, Plaintiffs move to certify the following class and subclasses:

1. For purposes of prosecuting the claims for civil conspiracy, aiding and abetting a fraudulent scheme, and participation in breach of fiduciary duty, a primary class of all persons who invested money in SIBL and whose claims for losses related to investments in SIBL have been allowed by the United States Receiver for the Stanford Entities, Ralph S. Janvey;

2. For purposes of prosecuting the claims for aiding and abetting Stanford's sales of securities through untruths or omissions under the TSA, a subclass of all persons who invested money in SIBL from February 1, 2006 – February 16, 2009, inclusive,[28] and whose claims for losses related to investments in SIBL have been allowed by the United States Receiver for the Stanford Entities, Ralph S. Janvey; and

3. For purposes of prosecuting the claims for aiding and abetting Stanford's sales of unregistered securities and sales by an unregistered dealer under the TSA, a subclass of all persons who invested money in SIBL from February 1, 2008 – February 16, 2009, inclusive, and whose claims for losses related to investments in SIBL have been allowed by the United States Receiver for the Stanford Entities, Ralph S. Janvey.

4. Such other classes or sub-classes as the Court may determine, including based on considerations of foreign law.

Excluded from the class are:

1. Defendants, and their employees and agents; and

2. Any officer, director, employee, or promoter of SFG, SIBL, and SGC, and any other Stanford Entity, as those entities have been defined herein.

## V.   ARGUMENT AND AUTHORITIES

### A.  Legal standard

"To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Funeral Consumers*

---

[28]   Based on this Court's prior ruling in the Order, Plaintiffs' TSA claims are subject to the TSA's statute of repose, which is five years for claims related to sales of securities by fraud or omission, and 3 years for the unregistered securities and unregistered dealer claims.  Order, Doc. 123, at pp. 11–12.

*Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 345 (5th Cir. 2012) (quotation marks omitted). Once its requirements are met, however, Rule 23 "creates a categorical rule entitling a plaintiff . . . to pursue his claim as a class action." *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Courts in the U.S. Fifth Circuit—including this Court—have consistently admonished that "Rule 23 is a remedial rule which should be construed liberally to permit class actions, especially in the context of securities fraud suits, where the class action device can prove effective in deterring illegal activity." *Lehocky v. Tidel Technologies, Inc.*, 220 F.R.D. 491, 504 (S.D. Tex. 2004) (quoting *Longden v. Sunderman*, 123 F.R.D. 547, 551 (N.D. Tex. 1988)).

To meet Rule 23(a)'s prerequisites, a plaintiff must demonstrate: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *see Shady Grove Orthopedic Associates*, 559 U.S. at 398. Rule 23(b) further requires the plaintiff to show that her action "fit[s] into one of . . . three categories." *Shady Grove Orthopedic Associates*, 559 U.S. at 398. Here, Plaintiffs invoke Rule 23(b)(3), which requires proof that common questions of law or fact "predominate over any questions affecting individual members," and that maintaining a class action "is superior to other available methods" of adjudication. Fed. R. Civ. P. 23(b)(3); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

A district court's decision to certify a class will be reversed only for abuse of discretion or application of incorrect legal standards. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999). "District courts are permitted to limit or modify class definitions to provide

the necessary precision." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004); *see also id.* at n.7.

### B. Rule 23(a)'s requirements are satisfied

Rule 23(a)'s requirements are satisfied and the class should be certified.

### 1. The class is sufficiently numerous, numbering in the thousands

Rule 23(a)(1) states that "One or more members of a class may sue . . . as representative parties on behalf of all members only if . . . the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[T]o satisfy his burden with respect to this prerequisite, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981). Although, there is no bright line rule by which the numerosity requirement is satisfied, *see In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013), the U.S. Fifth Circuit has indicated that a class of more than 40 members "raise[s] a presumption that joinder is impracticable." *Mullen*, 186 F.3d 624 (quoting 1 Newberg on Class Actions § 3.05, at 3–25 (3d ed. 1992)).

Here, the proposed class and subclasses are limited to include only those investors who (1) invested in SIBL and whose claims have been allowed by the Receiver; (2) invested in SIBL after February 1, 2006 and whose claims have been allowed by the Receiver; and (3) invested in SIBL after February 1, 2008 and whose claims have been allowed by the Receiver.

The primary class consists of approximately 17,000 investors with roughly $4.5 billion in approved claims. See Janvey Declaration, **Exhibit "105"**, at ¶13, App. 1791-1934. The post-February 2006 subclass consists of "at least" 3,000 investors whose claims have been allowed by the Receiver, while the post-February 2008 subclass consists of "at least" 2,000 investors whose claims have been allowed by the Receiver. Declaration of Mark Russell, **Exhibit "100"**, at ¶6,

App.1753-1761.  Clearly, joinder of all putative class members is impracticable.  *Mullen*, 186 F.3d 624.

### 2.   *Common questions of law and fact pervade*

Rule 23(a)(2) requires the plaintiff to show "commonality"—that is, "that 'there are questions of law or fact common to the class.'"  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550–51 (2011) (quoting Fed. R. Civ. P. 23(a)(2)).  Recently, the U.S. Supreme Court provided additional guidance on this element, explaining that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Wal-Mart*, 131 S. Ct. at 2551.  This standard requires that class members' claims "depend upon a common contention" and, moreover, that the "common contention . . . [is] of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  Still, "a single common question" will satisfy Rule 23(a)'s commonality requirement.  *In re Deepwater Horizon*, 739 F.3d 790, 812 (5th Cir. 2014) (quoting *Wal-Mart*, 131 S. Ct. at 2556).

Here, Plaintiffs' action is permeated with common questions of law and fact.  Most important, the class members' claims against the Defendants reduce to the "common contention" that the Defendants substantially assisted Stanford's common scheme.  To prove that the Defendants are liable on this basis requires, in turn, an assessment of multiple common questions including: (1) whether the Defendants were "generally aware" that their roles were "part of an overall activity that [was] improper," and "rendered assistance in the face of a perceived risk that [their] assistance would facilitate untruthful or illegal activity"; (2) whether the Defendants conspired with Stanford to defraud investors; (3) whether the Defendants provided substantial assistance in furtherance of Stanford's illegal scheme. *See Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 842 (Tex. 2005) (discussing elements of aider liability under the TSA); *see also*

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (discussing elements of aider liability under the common law).

Finally, resolution of the class members' claims will require the Court to assess "what damages were sustained by the putative class members; and what is the appropriate measure of damages."[29]  *See In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 673 (S.D. Tex. 2006), *overturned on other grounds by Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007).

In sum—and as will be addressed in more detail in Plaintiffs' discussion of Rule 23(b)(3)'s predominance requirement, *infra*—the claims of the proposed class clearly arise from common contentions the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke," *Wal-Mart*, 131 S. Ct. at 2551.  Thus, the commonality requirement is satisfied.  *See Enron*, 529 F. Supp. 2d at 673) ) (commonality requirement satisfied where class plaintiff asserted that various defendants "participated in an umbrella *Ponzi* scheme," which required the Court to determine, among other things, "whether Defendants violated the federal securities statutes," "whether Defendants misrepresented material facts," and "whether Defendants knew or recklessly disregarded that the statements

---

[29]     The TSA's measure of damages applies equally to "aiders" as to "primary violators."  *Sterling Trust*, 168 S.W.3d at 839 ("[Under the TSA] aiders are jointly and severally liable with the primary violator to the same extent as if they were the primary violator." (quotation marks and alterations omitted)).

Texas common law provides a similar measure of damages for victims of fraud.  "Under Texas common law, direct damages for misrepresentation are measured in two ways.  Out-of-pocket damages measure the difference between the value the buyer has paid and the value of what he has received; benefit-of-the-bargain damages measure the difference between the value as represented and the value received. . . . Both measures of damages are determined at the time of sale."  *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (citations omitted).  **As under the TSA, an aider of fraud under common law is liable to the same extent as the fraudfeasor**.  *Cf. Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 654 (Tex. 1996) (instructing that when tort damages "[cannot] be apportioned with reasonable certainty, then the plaintiffs' injuries [are] indivisible, and the defendants are jointly and severally liable for the whole.").

made by them were false and misleading"); *Anwar v. Fairfield Greenwich, Ltd.*, 289 F.R.D. 105 at 112–13 (S.D.N.Y. 2013) (hereinafter *Anwar II*) (commonality requirement satisfied in class action related to Bernard Madoff *Ponzi* scheme where plaintiffs alleged numerous common issues of law and fact including whether: "(1) Defendants were complicit in Madoff's Ponzi scheme; (2) Defendants omitted or misrepresented material facts; (3) Defendants knew or recklessly disregarded that these statements were false or misleading; (4) Defendants breached duties owed to the Plaintiffs; and (5) Plaintiffs suffered damages and the extent and appropriate measure of damages"), *vacated on other grounds by St. Stephen's School v. PricewaterhouseCoopers Accountants N.V.*, 570 Fed. App'x 37 (2d Cir. 2014).[30]

### 3. The claims of the representative Plaintiffs are typical of the class

Next, "Rule 23(a) requires that the named representatives' claims be typical of those of the class." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007). Typicality is closely related to commonality: each of the criteria "serve as guideposts for determining . . . whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Products*, 521 U.S. at 626 n.20; *see Enron*, 529 F. Supp. 2d at 673) ("[T]he test for typicality is satisfied if the class representatives' claims or defenses are typical of, but not necessarily identical to, those

---

[30]     *See also Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 324-25 (N.D. Tex. 2011) (commonality requirement satisfied where investors sought recovery against broker of fraudulent securities because "all of the class members invested in Provident through Capital Financial, creating at least one major issue of fact in common with all class members," and because "the class members [claims were] replete with common questions of law . . . including whether Capital Financial as a broker-dealer can be held liable for the misrepresentations in the PPMs issued by Provident"); *Billitteri v. Sec. Am., Inc.*, No. 09-01568, 2011 WL 3586217, at *4 (N.D. Tex. Aug. 4, 2011) (same); *Melo v. Gardere Wynne Sewell, LLP*, No. 04-2238, 2007 WL 92388, at *1 (N.D. Tex. Jan. 12, 2007) (commonality requirement satisfied where "[t]he question of whether defendants materially aided and abetted Sharp Capital in transferring money to an offshore company without the knowledge or approval of investors [was] common to all members of the proposed class").

of the class; class representatives should have the same interests and have suffered the same injuries as others in the class, and the representatives' and class members' claims need only share the same essential characteristics, *i.e.*, arise from a similar course of conduct and share the same legal theories."); *Lehocky*, 220 F.R.D. at 500 ("[T]ypicality may be satisfied where the representative plaintiffs' claims arise out of the same event or course of conduct as the other members' claims and are based on the same legal theory.").  The Fifth Circuit has provided an additional guidepost, instructing that "the key typicality inquiry is whether a class representative would be required to devote considerable time to rebut Defendants' claims."  *Langbecker*, 476 F.3d at 314 (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005)). However, the Fifth Circuit has also cautioned that even "the presence of an arguable unique defense [does not] necessarily destroy[] typicality."  *Feder*, 429 F.3d at 137; *see also Enron*, 529 F. Supp. 2d at 674 ("The major concern under Rule 23(a)(3) is if unique defenses against a named plaintiff threaten to become the *focus of the litigation*, and the key inquiry is whether a class representative would be required to devote considerable time to rebut the Defendants' claims." (quotation marks and citations omitted)).

Here, the claims of the proposed class representatives are typical of the class members' claims because they arise from the same set of omissions that defrauded all investors, and because they are grounded in the same legal theory—specifically, that the Defendants provided substantial assistance to Stanford despite "general awareness" of Stanford's improper conduct. *See Enron*, 529 F. Supp. 2d at 674.  Nor are there any unique defenses that the Defendants may assert against the named plaintiffs that they could not also assert against any member of the putative class.  *See Feder*, 429 F.3d at 137; *Langbecker*, 476 F.3d at 314; *Enron*, 529 F. Supp. 2d at 674.  Accordingly, and for the reasons stated with regard to the commonality requirement,

*supra*, the typicality requirement is also satisfied.  *See Amchem Products*, 521 U.S. at 626 n.20;

*Enron Corp.*, 529 F. Supp. 2d at 673)  ("The claims of the proposed class representatives are

typical because they arise from the same alleged *Ponzi* scheme, material misrepresentations and

course of conduct to defraud investors and they are grounded in the same legal theory.");

*Lehocky*, 220 F.R.D. at 500–02 (typicality requirement satisfied where named plaintiffs

"purchased Tidel common stock during the class period at artificially inflated prices and were

injured because of Defendants' omissions and misrepresentations"; "all class members invested

in Tidel"; the proposed class asserted multiple securities violations; and "the alleged injuries to

the class members ha[d] a common source: the alleged misrepresentations and omissions of Tidel

directors to the investing public"); *cf. Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir. 1993)

("The threshold requirements of commonality and typicality are not high; Rule 23(a) requires

only that resolution of the common questions affect all or a substantial number of the class

members.").

### 4. Class representatives and class counsel will adequately represent the class

Finally, Rule 23(a) demands that "the representative parties will fairly and adequately

protect the interests of the class."  *Fed. R. Civ. P. 23(a)(4)* . The adequacy element requires proof

(1) of "the zeal and competence of the representatives' counsel" and (2) that the representative

plaintiffs are qualified to ably represent the proposed class.  *Berger v. Compaq Computer Corp.*,

257 F.3d 475, 479 (5th Cir. 2001).

### a. Class counsel will zealously and competently represent the class

To demonstrate class counsels' zeal and competence, Plaintiffs must show (1) "class

counsel is qualified, experienced, and generally able to conduct the proposed litigation," and (2)

class counsels' interests do not conflict with the interests of the proposed class.  *See N. Am.*

*Acceptance Corp. Sec. Cases v. Arnall, Golden & Gregory*, 593 F.2d 642, 644 (5th Cir. 1979) (quotation marks omitted); *see also Feder*, 429 F.3d at 133; *Dodson v. Hillcrest Sec. Corp.*, 95 F.3d 52, at *6 (5th Cir. 1996).

These requirements are satisfied here. Plaintiffs' attorneys are qualified, experienced and capable. *See* Declaration of Edward C. Snyder, attached as **Exhibit "101",** App. 1763-1769; Declaration of Peter Morgenstern, attached as **Exhibit "102"**, App. 1771-1776; Declaration of Edward F. Valdespino, attached as **Exhibit "103",** App. 1778-1783; Declaration of Douglas Buncher, attached as **Exhibit "104",** App. 1785-1789. *See also* Declaration of John Little, attached as Exhibit **"106"**, at ¶¶17-21, App. 1936-1943, at App. 1940-1943.

Plaintiffs' attorneys have vigorously pursued these claims since 2012, and have pursued other related Stanford litigation - including the successful SLUSA appeal to the 5th Circuit and U.S. Supreme Court – since 2009. Plaintiffs' attorneys have adequately represented classes in other complex class actions and securities litigations and are committed to carrying this case forward to trial. Therefore, Plaintiffs' attorneys are qualified for the purposes of Rule 23(a)(4) . Additionally, no conflicts of interest between the Plaintiffs and members of the class have been raised by any of the parties here. Accordingly, Plaintiffs have satisfied the adequacy requirement of Rule 23(a)(4).

### b. Named plaintiffs' are qualified to represent the class

To show that the putative class representatives are qualified to represent the proposed class, Plaintiffs must prove: (1) "the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees"; (2) that there are no "conflicts of interest between the named plaintiffs and the class they seek to represent"; and (3) "that the due process rights of all class members [will be] safeguarded through adequate

representation at all times." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). In sum, the interests of the putative class representatives must be adequately aligned to the interests of the unnamed class members. "[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981); *see also Berger*, 257 F.3d at 480 & n.9 ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only where those differences create conflicts between the named plaintiffs' and the class members' interests.").

Here, again, each element of the adequacy inquiry is satisfied. The putative class representatives have all testified via declaration that they understand their roles as class representatives, including the duty to appear for depositions and testify at trial, and will do all that is necessary to vindicate their rights and the rights of absentee Stanford victims. *See generally* Declarations of Class Representatives, **Exhibit "4"**, App. 223-231. *See Enron*, 529 F. Supp. 2d at 675); *see also Berger*, 257 F.3d at 484.

Further, there is no conflict of interest between the named plaintiffs and the unnamed class members because "all class members are united in . . . achieving the maximum possible recovery for the class." *Corrugated Container Antitrust Litig.*, 643 F.2d at 208; *see Enron*, 529 F. Supp. 2d at 674) (adequacy of representation satisfied where "[t]he interest of the proposed class representatives, like that of the other putative class members, [was] to achieve the maximum possible recovery for the class"). Finally, because the proposed class representatives are knowledgeable and highly invested in achieving the maximum possible recovery, and because class counsel is qualified, experienced and capable, "the due process rights of all class

members [will be] safeguarded through adequate representation at all times." *See Berger*, 257 F.3d at 479.

In sum, each of Rule 23(a)'s threshold requirements is satisfied, thereby supporting class certification in this action.

### C.  Rule 23(b)(3)'s requirements are satisfied

In addition to satisfying Rule 23(a)'s four threshold requirements, plaintiffs seeking class certification must satisfy the criteria stated in Rule 23(b) .  *Funeral Consumers Alliance*, 695 F.3d at 345.  Here, Plaintiffs seek to certify the proposed class pursuant to Rule 23(b)(3), which "requires a party . . . to demonstrate both (1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy." *Id.* at 347–48 (quotation marks omitted).  For the reasons explained below, Rule 23(b)(3)'s predominance and superiority requirements are also satisfied.  Thus, Plaintiffs are entitled to pursue their claims as a class action. *Shady Grove Orthopedic Associates*, 559 U.S. at 398.

#### 1.  *Questions of law common to the proposed class predominate over any questions affecting only individual members*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products*, 521 U.S. at 623.  Stated differently, "[t]he predominance inquiry requires courts to consider how a trial on the merits would be conducted if a class were certified." *Funeral Consumers Alliance*, 695 F.3d at 348 (quotation marks omitted).  This "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010); *see also Funeral Consumers Alliance*, 695 F.3d at 348 ("Considering whether 'questions of law or fact common to

class members predominate' begins, of course, with the elements of the underlying cause of action." (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011)).  "In evaluating the predominance requirement, [the Court must] inquire into the substance and structure of the underlying claims without passing judgment on their merits."  *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004).

Although Rule 23(b)(3)'s predominance requirement is "far more demanding than Rule 23(a)(2)'s  commonality requirement," *Funeral Consumers Alliance*, 695 F.3d at 348 (quotation marks and alterations omitted), "[p]redominance is a test readily met in certain cases alleging . . . securities fraud," *Amchem*, 521 U.S. at 625.

### a.   Relevant substantive law

In this case, Plaintiffs allege various causes of action related to the Defendants' roles in Stanford's fraud scheme.  The central question is whether the Defendants are liable as aiders of investment fraud, either under the TSA or the common law.  Whether the Defendants are liable for having aided investment fraud "predominate[s] over questions affecting only individual members" because: (1) Plaintiffs' aider claims are common to all Defendants; (2) the elements that Plaintiffs must satisfy to prove aiding investment fraud under *either* the TSA *or* the common law are common to all members of the Class; and (3) as demonstrated by the recitation of the evidence above, the common evidence that Plaintiffs will present to prove their aider claims is uniform as to each Defendant and is the same evidence that will prove Plaintiffs' additional claims.  *Funeral Consumers Alliance*, 695 F.3d at 345.

### 1.   Aider liability under Texas law

As between the common law and the TSA, the elements required to prove liability for aiding fraud are substantially the same.  Under the TSA, a plaintiff must show:

(1) that a primary violation of the securities laws occurred; (2) that the alleged aider had general awareness of its role in this violation; (3) that the alleged aider rendered substantial assistance in this violation; and (4) that the alleged aider either (a) intended to deceive plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

*Willis v. Marshall*, 401 S.W.3d 689, 704 (Tex. App. 2013), *reh'g overruled* (July 3, 2013); *see also The Official Stanford Investors Committee, et al. v. Greenberg Traurig, LLP, et al.*, No. 12-04641, Doc. 123 at p. 9 (N.D. Tex., Feb. 4, 2015) (same, quoting *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 491 F. Supp. 2d 690, 691 n.2 (S.D. Tex. 2007)). Similarly, a plaintiff alleging that a defendant aided fraud under the common law must show: "(1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *see also ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Maryland*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005) ("Virtually all courts that have acknowledged the existence of aiding and abetting a fraud state that the following are the elements that must be established by the plaintiff: 1. There existed an underlying fraud; 2. The defendant had knowledge of the fraud; 3. The defendant provided substantial assistance to advance the commission of the fraud.").

Under either the TSA or the common law, a plaintiff that proves aider liability may recover against the aider "to the same extent as if they were the primary violator." *See Sterling Trust*, 168 S.W.3d at 839 ("[Under the TSA] aiders are jointly and severally liable with the primary violator to the same extent as if they were the primary violator." (quotation marks and alterations omitted)); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 654 (Tex. 1996) (instructing that when tort damages "[cannot] be apportioned with reasonable certainty, then the plaintiffs' injuries [are] indivisible, and the defendants are jointly and severally liable for the whole.").

### i.   Primary Violation

A plaintiff alleging aider liability under the TSA must show, first, that Stanford commited a primary violation of the TSA, including whether Stanford (i) sold unregistered securities, (ii) sold securities through an unregistered dealer; or (iii) sold securities through material untruths or omissions.  *See Willis*, 401 S.W.3d at 704.  Here the common evidence recited above presents a *prima facie* case that Stanford sold unregistered securities (the SIBL CDs) from Texas and that Defendants knew that the CDs constituted securities that likely needed to be registered yet nevertheless helped Stanford continue to sell the unregistered securities.[31]  The evidence further demonstrates that SIBL, directly and through its similarly unregistered agents STC and SFIS, was operating as an unlicensed and unregistered investment company "dealer" selling its securities from Texas and that Defendants knew that and aided and furthered such conduct.

With respect to the TSA fraud claim, the same facts and elements support a claim of aider liability under the common law.  *Lerner*, 459 F.3d at 292.  Under the common law or the TSA, fraud occurs when a person (among other things) sells a security by means of "an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."  *Sterling Trust*, 168 S.W.3d at 839 (quoting TSA art. 581-33A(2)); *cf. Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App. 2007) ("[Common law] [f]raud by omission is a subcategory of fraud because an omission or non-disclosure may be as misleading as a positive misrepresentation of fact when a party has a duty to disclose.").

---

[31]     In October 2004 the SEC concluded Stanford was violating "numerous federal securities laws", and that (1) the SIBL CDs constituted unregistered securities and were only called CDs to "*circumvent U.S. federal securities laws requiring registration*"; (2) the SIBL CDs were the basis for *a "very large Ponzi scheme"* evading federal regulation; and (3) that Stanford's marketing campaign surrounding the CDs was designed to "lull investors into a false sense of security" by comparing the SIBL CDs to traditional U.S. bank CDs.  SEC OIG Report, **Exhibit 3**, at 72-73, App. 142-143.

Notably, proof of a violation under the TSA does not require an investor to show that she relied on a defendant's omissions when purchasing the fraudulent security.  *In re Westcap Enterprises*, 230 F.3d 717, 726 (5th Cir. 2000). And while justifiable reliance is an element of common law "fraud by non-disclosure," *see Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997), courts routinely certify classes for common-law fraud claims based on uniform misrepresentations made as part of a "common fraudulent scheme" or "common course of conduct."  *See, e.g., In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1258-59 (11th Cir. 2004); *In re HealthSouth Corp. Sec. Lit.*, 261 F.R.D. 616, 645 (N.D. Ala. 2009); *Bruhl v. Price WaterhouseCoopers Intern.*, 257 F.R.D. 684, 694 (S.D. Fla. 2008); *In re Great So. Life Ins. Co. Sales Practices Lit.*, 192 F.R.D. 212, 220 (N.D. Tex. 2000); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 338 (N.D. Ill. 1997); *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 334 (S.D. Fla. 1996).  "When the fraud was perpetrated in a uniform manner against every member of the class…courts typically hold that individual reliance questions do not predominate." *Rohlfing*, 172 F.R.D. at 338.

Under the "common fraudulent scheme" theory, a court may presume investor reliance where the "same or substantially similar misrepresentations were made to the putative class" and "they were of such a nature that it can be presumed that all members of the class relied upon them either to invest in the first instance, to remain in the investment, or to redeem their interest in the investment." *Bruhl*, 257 F.R.D. at 696.  Thus, "[a] prominent factor in determining if reliance can be presumed . . . is whether all the plaintiffs received the same or substantially the same message from the defendants." *Id.*

The presumption of reliance that underlies the "common fraudulent scheme" theory is based on "considerations of fairness, public policy, and probability, as well as judicial economy."

*HealthSouth*, 261 F.R.D. at 645.   The presumption "is supported by common sense and probability[;] . . . courts presume reliance where it is logical to presume that reliance in fact existed." *Id*. at 645-46 (internal citations and punctuation omitted).   Where the "complete mix of publicly available information" is "based on an extensive fraud that fooled the . . . market as a whole," it is "reasonable and probable to find that the purchasers of [the fraudulent securities] relied on [the seller's] misrepresentations and relied on the integrity of the market place . . . ." *Id*. at 646.

In the seminal case of *Shores v. Sklar*, the Fifth Circuit established the "fraud created the market" theory.   647 F. 2d 462 (5th Cir. 1981).   In *Shores*, the court determined that the underlying fraud scheme was so pervasive as to support a finding that the securities complained of were "fraudulently marketed" and could not have been offered at any price but for the fraud. Therefore the court presumed reliance by the purchasers of the fraudulently marketed bonds despite the fact that the class representative plaintiff admitted that he never saw—or was even aware of—the allegedly fraudulent offering circular.   *Id*. at 468-71 & n.2.   The Fifth Circuit accepted proof that "the existence of the security in the marketplace resulted from the successful perpetration of a fraud on the investment community", such that the purchasers of the securities were entitled to rely on the integrity of the market.   *Id.* at 469, 471.[32]

---

[32]     *Shores* is still good law in the Fifth Circuit.   *See Regents of the University of California v. Credit Suisse First Boston*, 482 F. 3d 372, 391-92 (5th Cir. 2007) (affirming that *Shores* was still good law and harmonizing its holding with *Shores*).   To invoke this theory, the plaintiffs must show that (1) the defendants conspired to bring to market securities that were not entitled to be marketed at all, such that, but for the fraudulent scheme, they would not have been offered for sale; (2) the plaintiffs reasonably relied on the securities' availability in the market as an indication of their genuineness; and (3) the scheme to defraud caused them to suffer a loss.   Upon proof of these elements, whether any plaintiffs actually read or relied on the offering materials becomes irrelevant because investors are entitled to rely on the integrity of the market to furnish only securities that are entitled to be marketed.   *Shores*, 647 F.2d at 469-70.

Since *Shores* was decided, federal courts have had little difficulty certifying investor class actions based on pervasive securities frauds and Ponzi schemes like Stanford. *See e.g., Jenson v. Fiserv Trust Co.*, 256 Fed. Appx. 924 (9th Cir. 2007) (affirming certification of investor class based on finding that the "center of gravity" of the underlying Ponzi fraud predominated over individual oral representations made to investors and holding that the knowledge and assistance of the alleged aider and abettor predominated as a common issue for all class members); *Katz v. MRT Holdings LLC*, No. 07-61438-CIV, 2008 WL 4725284 (S.D. Fla. 2008) (finding that common issues predominated in pervasive fraud Ponzi scheme and granting class certification); *Walco Inv. v. Thenen*, 168 F.R.D. 315 (S.D. Fla. 1996) (granting class certification in case involving underlying Ponzi scheme based on finding of common, unified fraudulent scheme and common issues of aiding and abetting); *Billitteri v. Sec. America, Inc.*, No. 3:09-CV-01569-F, 2011 WL 3586217 (N.D. Tex. 2011)(certifying class for settlement purposes based on underlying common fraud and Ponzi scheme); *Longden v. Sunderman*, 123 F.R.D. 547 (N.D. Tex. 1988) (granting class certification in fraudulent securities "common scheme" based on pervasive, continuous course of conduct that was uniformly fraudulent and involved a "standardized sales plan"); *In re Worldcom Inc. Sec. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003) (class certification granted based on "pervasive accounting fraud"); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425 (D. Ariz. 1992) (court focused on the "breadth and magnitude" of the fraud and held that the underlying fraud scheme was the predominant issue and the "center of gravity" that transcended the "specific details of oral communications").

Relatedly, courts have also presumed reliance on the regulatory process because purchasers of securities are presumed to rely, at least indirectly, on the integrity of the regulatory

process.  *See*, *e.g.*, *Arthur Young & Co. v. U.S. District Court*, 549 F.2d 686, 695 (9th Cir. 1977); *T.J. Rainey v. Ft. Cobb Okla. Irrig. Fuel Author.*, 717 F.2d 1330 (10th Cir. 1983); *In re HealthSouth*, 261 F.R.D. at 644 (investing public should be able to rely upon SEC regulation to ensure that the securities being offered are legitimate); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 434 (D. Ariz. 1992) (holding that investors were entitled to a presumption of reliance where they relied on the integrity of the regulatory process and the alleged regulatory fraud "was designed to prevent regulators from stepping in to protect the public interest").

Here, investors clearly relied on Stanford's uniform failure to disclose to them that he was:  (1) wholly evading U.S. banking and securities laws and regulations and deceiving regulators around the world so that he could operate SIBL as an unregistered investment company selling unregistered and fraudulent securities from the United States; and (3) corrupting Antiguan government officials so that he could control the local government and insulate SIBL from regulation and use said country as his safe haven to ward off foreign (e.g., U.S.) regulators.

The investors' reliance on Stanford's failure to disclose such improper conduct is self-evident because knowledge of this material information would preclude *any* investor from investing in SIBL or would have caused any investor to cash out his or her investment in SIBL. *E.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 652 (S.D.N.Y. 2012) (class plaintiffs alleging securities fraud under New York common law entitled to presumption of reliance where fraudfeasor's omission was material); *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 452 (S.D.N.Y. 2013) (applying presumption of reliance to plaintiffs' allegations of aiding and abetting fraud under New York common law); *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269–70 (S.D.N.Y. 2014) (certifying class to

include federal and New York common law securities fraud claims where question of whether plaintiffs were entitled to *Affiliated Ute*[33] presumption of reliance predominated over individual questions).

Plaintiffs further allege that Stanford's failure to disclose his above-described improper conduct was a material omission, particularly where, as here (1) this material omission was uniform, consistent, and clearly intended to induce investors' to purchase SIBL CDs, (2) various statutes applicable to the Stanford Entities' required disclosure of this fact, *e.g.*, 7 Tex. Admin. Code § 113.1, *et seq.*; 15 U.S.C. § 77a; and (3) a fiduciary relationship existed between Stanford and SIBL CD purchasers. *See W. Reserve Life Assur. Co. of Ohio v. Graben*, 233 S.W.3d 360, 374 (Tex. App. 2007) (a financial advisor owes a fiduciary duty to his clients). Thus, Plaintiffs assert that they have satisfied the first element of aider liability under the TSA and the common law. *See Goldstein v. Mortenson*, 113 S.W.3d 769, 783 (Tex. App. 2003) (TSA); *Dodona I*, 847 F. Supp. 2d at 652 (common law).

In any event, the issue at this stage is not the veracity of Plaintiffs' allegations, but instead their "substance and structure." *See Robinson*, 387 F.3d at 421. Because Plaintiffs' intend to prove that Stanford committed fraud when he and his entities sold SIBL CDs by means of an omission to state a material fact, an integral component of the "substance and structure" of Plaintiffs' aider liability claims will be the nature and extent of Stanford's fraud scheme. *See Robinson*, 387 F.3d at 421. Stated differently, because the occurrence of fraud is an element of of Plaintiffs' aider liability claims, the details of Stanford's fraud will predominate over questions

---

[33]     In *Affiliated Ute*, the U.S. Supreme Court held that under the under the federal securities laws, class plaintiffs alleging fraud by omission are entitled to a presumption of reliance. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972) ("Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.").

related to individual class members.

Proof of Stanford's fraud, and its nature, is also vital to the "substance and structure" of Plaintiffs' additional claims against the Defendants, which include: (1) civil conspiracy and (2) participating in a breach of fiduciary duty. For example, under Texas law civil conspiracy requires proof of one or more unlawful, overt acts, and damages as a proximate result. *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). Proof of Stanford's fraud scheme satisfies each of these elements. Likewise, the predicate for Plaintiffs' claim of participating in a breach of fiduciary duty—*i.e.*, that a third party breached a fiduciary duty, *Darocy v. Abildtrup*, 345 S.W.3d 129, 137–38 (Tex. App. 2011)—is proved by Stanford's deception of investors and misappropriation of investor CD funds.[34]

In sum, proof of Stanford's fraud scheme—the prerequisite for Plaintiffs' claims of aider liability under the TSA and common law—is also a central component of each of Plaintiffs' additional claims against the Defendants. This supports a determination that Plaintiffs' aider liability claims predominate over any questions affecting only individual class members. *See Robinson*, 387 F.3d at 421.

### ii. The aiders' substantial assistance in the fraud

Next, a plaintiff alleging aider liability under the TSA is required to show that the alleged aider rendered "substantial assistance" in furtherance of the fraud. *See Willis*, 401 S.W.3d at 704.

---

[34]     This Court has already ruled that "arguments concerning the nature and extent of the relationship between the [Stanford] brokers and investors…are left for consideration at the summary judgment stage." *See* Order (Doc. No. 123), at 20. The Court has also held in the context of its denial of a 12(b)(6) motion to dismiss that Allen Stanford himself acted as an investment adviser, and therefore owed a fiduciary duty to *all* Stanford investors because he approved of Stanford's marketing materials for the SIBL CDs and earned money from the sale of the CDs through his ownership and control of all of the Stanford entities. *See SEC v. Stanford Int'l Bank, Ltd., et al.*, Case No. 3:09-cv-00298-N, Order [Doc. 1483] p. 11 (N.D. Tex. Nov. 30, 2011). Plaintiffs have made that same allegation in their Complaint. See Complaint, Doc. 1, at ¶¶452-454. As such, Allen Stanford owed a fiduciary duty to the Class of Stanford investors and breached said duty.

The same is true of a claim of aider liability under the common law. *Lerner*, 459 F.3d at 292. Neither the TSA nor the common law requires a plaintiff to prove that the aider had direct dealings with the defrauded party to show substantial assistance. *Sterling Trust*, 168 S.W.3d at 843 (substantial assistance under the TSA "may be established even in the absence of direct dealing with the defrauded party"); *see Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) ("[S]ubstantial assistance . . . exist[s] where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." (quotation marks omitted)); *cf. Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 323 (5th Cir. 2002) ("Texas does not require that there be privity between the alleged target of the fraud and the fraudfeasor.").

Further, it is significant that the element of substantial assistance for purposes of Plaintiffs' aider liability claims overlap considerably with elements that Plaintiffs must prove in their additional claims. For example, participation in a breach of fiduciary duty requires proof that the defendant "participat[ed] in the third party's breach of its duty," *Darocy*, 345 S.W.3d at 138; and civil conspiracy requires proof of "one or more unlawful, overt acts," *Tri*, 162 S.W.3d at 556.

Thus a necessary element of Plaintiffs' aider liability claims—specifically, whether the Defendants provided substantial assistance in furtherance of Stanford's fraud—is also a critical component of Plaintiffs' additional claims that is common to all members of the putative class. This reinforces a determination that Plaintiffs' aider liability claims predominate over any questions affecting only individual class members. *See Robinson*, 387 F.3d at 421.

### iii. Scienter

The remaining elements of Plaintiffs' claims for aider liability focus on the aider's scienter. Under the TSA, a Plaintiff must show "that the alleged aider had general awareness of

its role in [the] violation," and "that the alleged aider either (a) intended to deceive plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator." *Willis*, 401 S.W.3d at 704 (emphasis added).[35]   Interpreting these elements in tandem, the Texas Supreme Court has instructed that plaintiffs seeking to prove aider liability under the TSA must show that the alleged aider "rendered assistance in the face of a perceived risk that its assistance would facilitate untruthful or illegal activity by the primary violator," which, in turn, requires proof "the alleged aider . . . possess[ed] **a general awareness that his role was part of an <u>overall activity that is improper</u>**." *Sterling Trust*, 168 S.W.3d at 842 (quotation marks omitted); *see also Troice*, No. 09-1600, Doc. 176 at p. 15 n.5 ("[T]he TSA's 'reckless disregard for the truth or the law' element require[s] an aider to possess a 'general awareness that his role was part of an overall activity that is improper.'" (quoting *Sterling Trust*, 168 S.W.3d at 842)).

Similarly, aiding common law fraud requires a Plaintiff to prove "a strong inference of actual knowledge [of the underlying fraud] **or conscious avoidance**." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010) (hereinafter *Anwar I*); *see also Fraternity Fund*, 479 F. Supp. 2d at 367–68.   "Conscious avoidance . . . occurs when it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *Id.* at 368.

The substance and structure of the scienter elements of aider liability under the TSA and the common law are consistent, and will be satisfied by common proof.   Certainly proof that the

---

[35]      In most cases, the TSA's two scienter elements overlap substantially: indeed, this Court has noted that "[t]he 'general awareness' element and the 'intent to deceive' element . . . can be viewed as two halves of a single scienter requirement." *Troice, et al. v. Proskauer Rose LLP, et al.*, No. 09-1600, Doc. 176 at p. 15 n.5 (N.D. Tex. Mar. 4, 2015).

Defendants were generally aware that their roles were part of an overall activity that was improper—*see Sterling Trust*, 168 S.W.3d at 842—would also show that the Defendants each "suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge"—the standard for proving "conscious avoidance" under the common law, *Fraternity Fund*, 479 F. Supp. 2d at 367–68; *Anwar I*, 728 F. Supp. 2d at 442.

The commonality between the scienter elements of Plaintiffs' aider liability claims means that these elements, and their proof, will predominate over issues related to individual class members.  And the substance and structure of the scienter elements for Plaintiffs' aider liability claims subsume the scienter elements that Plaintiffs must prove in their additional claims against the Defendants.  For example, participation in breach of fiduciary duty requires proof that the defendant "was aware of his participation in the third party's breach of its duty," *Darocy*, 345 S.W.3d at 138.  Where, as here, the alleged breach of fiduciary duty is Stanford's deceit of his customers and misappropriation of their funds, proof that the Defendants either knew of, or were consciously indifferent to confirming the existence of the Stanford fraud scheme goes hand-in-hand with proof that the Defendants were aware of their participation in Stanford's breach of duty.  *See* Order (Doc. No. 123), at pps. 19-20.

Finally, civil conspiracy requires proof of "a meeting of the minds" to accomplish an unlawful object.  *See Tri*, 162 S.W.3d at 556.  Given the nature of Stanford's fraud as described herein and the nature, breadth and scope of Defendants' involvement since 1988,[36] this element is closely related to the TSA's requirement that the Defendants' intended to assist Stanford to, e.g., sell unregistered securities and deceive the class members, *see Willis*, 401 S.W.3d at 704, and the common law's requirement that the Defendants' knew about the fraud, *Anwar I*, 728 F.

---

[36]      See Order (Doc. No. 123), at pps. 7-8.

Supp. 2d at 442.

In sum, each element necessary to prove Plaintiffs' claims of aider liability is also a critical component of *all* of Plaintiffs' additional claims. Thus the "substance and structure" of Plaintiffs' aider liability claims predominates over each of Plaintiffs' additional claims, as well as any questions affecting only individual class members. *See Robinson*, 387 F.3d at 421.

### 2. Questions of fact common to the proposed class predominate over any questions of fact affecting only individual members.

Establishing liability in this case hinges on (1) Stanford's conduct in evading proper registration and regulation around the world so as to operate an unlicensed, unregulated investment company from the U.S. which in turn enabled Stanford to commit his Ponzi scheme; and (2) the Defendants' conduct, which uniformly involved helping Stanford continue to evade regulation which thereby enabled Stanford's overall fraud scheme. The inquiry into Stanford's primary wrongful conduct, on the one hand, and Defendants' conduct in aiding Stanford, on the other hand, will not vary among class members. Thus, and because Plaintiffs will rely on the exact same class-wide evidence described above to establish Stanford's and Defendants' conduct, common factual and evidentiary issues will predominate over individual issues.

The trial of this lawsuit will therefore focus on the defendants' "knowledge and actions with respect to the [Stanford] Ponzi scheme," which involves a "cluster of common questions best resolved in a single class suit." *Getty*, 1998 WL 919368 at *3. Because common questions predominate with respect to Stanford's common fraud and the plaintiffs' TSA claims, any individual issues regarding reliance with regard to the common law claims (only) are insufficient to defeat predominance.[37] *See Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 239

---

[37]     Of course, the TSA claims do not require proof of reliance. *In re Westcap*, at 726.

(C.D. Cal. 2003) (quoting *McFarland v. Memorex*, 96 F.R.D. 357, 363-64 (N.D. Cal. 1982) ("The mere presence of potential individual issues does not defeat the predominance of common questions.").

The "class-wide, generalized nature of [Plaintiffs'] proffered proof" further supports a determination that questions related to the class predominate over any questions affecting only individual class members. *See Dodona I*, 296 F.R.D. at 269; *see also Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982) ("[T]he issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.").

This is true as to presentation of damages evidence as well. In *In re Deepwater Horizon*, the Fifth Circuit held that all that is required in terms of damages for class certification is that the plaintiffs' proposed measure of damages be consistent with the liability theory and be capable of determination on a classwide basis. *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014); *see also In re Park Central Global Lit.*, No. 3:09-cv-765-M, 2014 WL 4261950, *13 (N.D. Tex. 2014). Here, Plaintiffs' damage theory consists of the class members' lost net investments in SIBL as approved by the Receiver, less any distributions received to date. See Complaint at ¶450. Given that the Receiver and his team of forensic accountants at FTI have already undertaken and completed the extensive claims review and approval analysis, the Receiver and FTI will be able to submit **one** damage number at trial based on allowed claims for the main class of investors, a separate damage number based on allowed claims for the subclass of investors who invested in SIBL after February 1, 2006, and a separate damage number based on allowed claims for the subclass of investors who invested in SIBL after February 1, 2008. See Declaration of Ralph Janvey, **Exhibit "105",** at ¶13, App. 1794; Declaration of Mark Russell,

Exhibit "100", at ¶5-6, App. 1755.  It is irrelevant that such a calculation is an aggregation of

the class members' individual damage claims because that is entirely permissible.  *See, e.g.,*

*Deepwater Horizon*, 739 F. 3d at 815-816 (noting that courts routinely certify classes despite the

need for individualized calculations of damages.[38]

In sum, the proposed class is "sufficiently cohesive to warrant adjudication by

representation," and Rule 23(b)(3)'s predominance inquiry is satisfied.  *Amchem Products*, 521

U.S. at 623; *see also id.* at 625 ("Predominance is a test readily met in certain cases alleging

consumer or securities fraud or violations of the antitrust laws.").

### D.  Class resolution is superior to all alternative methods of adjudication

Finally, Rule 23(b)(3) requires the plaintiff to show "that class resolution is superior to

alternative methods for adjudication of the controversy."  *Funeral Consumers Alliance*, 695 F.3d

at 348 (quotation marks omitted); *see* Fed. R. Civ. P. 23(b).  This inquiry includes an assessment

of: (A) the class members' interests in individually controlling the prosecution of separate

actions; (B) the extent and nature of any litigation concerning the controversy already begun by

class members; (C) the desirability of concentrating the litigation of the claims in the particular

forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). "In

requiring a court to find that a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy, Rule 23 necessarily suggests a comparative process."

*TWL Corp.*, 712 F.3d at 896) (quotation marks and citations omitted).  In other words, the Court

---

[38]     *See also Pulaski & Middleman, LLC v. Google, Inc.*, 2015 WL 5515617 (9th Cir. 2015); *Blackie v. Barrack*, 524 F. 2d 891, 905 (9th Cir. 1975) (holding that the calculation of damages in a securities class action is "invariably" an individual question and does not defeat class action treatment because in the securities context it is typically "virtually a mechanical task"); *In re Beacon Assoc. Litig.*, 282 F.R.D. at 333 (S.D.N.Y. 2012) (although the specific calculation of damages for each investor will be individualized, both the methodology and the documents involved will be common to the class, which is sufficient to establish predominance).

must "assess the relative advantages of alternative procedures for handling the total controversy." *Id.* (quotation marks omitted). "[T]he superiority analysis is fact-specific and will vary depending on the circumstances of any given case." *Id.* (quotation marks omitted).

### 1. Class members' interests in individually controlling the prosecution of separate actions is minimal

Where, as here, only economic losses are at issue, individual class members' interests in personally controlling the litigation are slight. *Lehocky*, 220 F.R.D. at 510 ("When only economic losses are at issue, the interest to personally control the litigation is small. As long as the named plaintiffs seek to maximize the recovery for the class, little else matters."). Because this case involves economic damages only, and because (as will be discussed, *infra*) the "amounts at stake for [many] individuals may be so small that separate suits would be impracticable," Fed. R. Civ. P. 23 (Advisory Notes to Subdivision (b)(3)), a class action is superior to class members' interests in prosecuting individual actions.

Many Stanford victims have claims too small and/or finances too limited to pursue individual suits against the Bank Defendants. *See* Declaration of John Little, **Exhibit "106",** at ¶7-8, App. 1938. The Supreme Court has admonished:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem Products*, 521 U.S. at 617 (quotation marks omitted). Because thousands of Stanford victims stand to recoup only "relatively paltry potential recoveries" by proceeding individually, class resolution is, again, superior to individual class members' interests in prosecuting separate actions. *Id.*

Further, R.A. Stanford's victims—the putative class members—are geographically

dispersed. The largest concentrations of Stanford investors are located in the United States,

Mexico, Venezuela, Colombia, and Peru. *See* Declaration of Karyl Van Tassel, **Exhibit "107"** at

p. 35, App. 1978. However, this tells only part of the story: by his own estimation, Stanford's

empire "serve[d] over 4,000 clients [residing] in 79 countries on six continents." *See Id.* at p. 36,

App. __. The scattering of Stanford's victims around the world dilutes their "effective strength

to bring [the Defendants] into court" because it limits the victims' individual abilities to

exchange information and compile evidence. *Cf. Amchem Products*, 521 U.S. at 617 (observing

that when drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication

of the rights of groups of people who individually would be without effective strength to bring

their opponents into court at all." (quotation marks omitted)). The far-flung nature of the

putative class members favors a determination that class resolution is superior to individuals'

interests in controlling the prosecution of separate actions.

Finally, on a related note, "[t]o force [these geographically dispersed class members] to

litigate separately would risk disparate results among those seeking redress, . . . would

exponentially increase the costs of litigation for all, and would be a particularly inefficient use of

judicial resources." *See Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 133 (S.D.N.Y. 2001); *see*

*also Berger v. Compaq Computer Corp.*, No. 98-1148, 2000 WL 33993309, at *8 (S.D. Tex. July

18, 2000) (determining that "numbers of individuals and the geographic diversity of potential

plaintiffs" favored a determination that "a class action is superior to other methods of

adjudication"), *reversed on other grounds by Berger*, 257 F.3d at 484; *cf. Roper v. Consurve,*

*Inc.*, 578 F.2d 1106, 1114 (5th Cir. 1978) ("Even assuming Arguendo that multiple individual

actions were feasible, they would be wasteful and uneconomical. This is precisely the problem

that Rule 23 was designed to prevent. The very purpose to be served by a class action is the

opportunity it affords to prevent a multiplicity of suits based on a wrong common to all."), *aff'd*

445 U.S. 326 (1980).

In sum, all relevant factors support a determination that a class action is superior to class

members' interests in individually prosecuting separate actions and/or "alternative procedures for

handling the total controversy" at issue.  *See TWL Corp.*, 712 F.3d at 896) ) (quotation marks and

citations omitted).

### 2. There is no additional litigation already begun by class members

To the knowledge of the undersigned counsel, there are no other pending lawsuits filed

against the Defendants by putative class members in the United States other than the current

class action suit.    In response to discovery requests, Defendants have admitted that they have

not been sued by any Stanford investors outside of the United States.    Defendants' Discovery

Responses, **Exhibit "110"**, App. 2098-2103.

### 3. The Northern District of Texas is the most desirable forum

#### a. A single forum is superior to multiple forums

A class action avoids multiple individual actions and trial on the same liability issues.

*McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 549 (5th Cir. 2003) ("The procedural

device of a class action eliminates the necessity of adducing the same evidence over and over

again in a multitude of individual actions . . . .").  Further, a single class action in one forum will

minimize the possibility of inconsistent rulings.   *Cf. Roper*, 578 F.2d at 1114.   Thus, it is

judicially efficient for Plaintiffs to bring their claims against the Defendants in one action in one

forum.   This is particularly true given that the instant case is being prosecuted in one case in

tandem with the Receiver and the Official Stanford Investors Committee. See Janvey

Declaration, **Exhibit "105"**, at ¶18-19, App. 1795-1796; Little Declaration, **Exhibit "106"**,

¶¶12-16, App. 1939-1940.

### b.  The Northern District of Texas is superior to other forums

The Northern District of Texas, in particular, is a superior forum for various reasons. First, as determined by this Court (and affirmed by Fifth Circuit), Stanford's principal place of business was in Texas, most of the alleged wrongdoing occurred here, and many of the victims and most of the documentary evidence is located here.  *See Janvey v. Brown*, 767 F.3d 430, 436 (5th Cir. 2014) ("The *Ponzi* scheme was operated out of Texas, the Receiver is in Texas, many of the Stanford entities are in Texas, and some of the defrauded creditors and Net Winners are Texan."); *Janvey v. Alguire*, No. 09-0724, 2013 WL 2451738, at *3 (N.D. Tex. Jan. 22, 2013) ("[A]lthough Stanford Entities were located nationally and internationally, the Court finds that, when aggregated, those entities were headquartered in Houston, Texas.").  Further, the Northern District of Texas is the forum of the Stanford Receivership proceeding, as well as the Stanford MDL proceeding that includes the multitude of Stanford-related cases (including this one) involving the Receiver, the Official Stanford Investors Committee, and the putative investor classes. *E.g.,  Janvey, et al. v. Proskauer Rose LLP, et al.*, No. 3:13-cv-00477 (N.D. Tex., filed Jan. 31, 2013).   Both the Receiver and Examiner have indicated that for administrative manageability purposes, it is preferable to have the investors' litigation against common sets of defendants concentrated in the same forum as the Receiver's and OSIC's actions.  See Janvey Declaration, **Exhibit "105"**, at ¶18-19, App. 1795-1796; Little Declaration, **Exhibit "106"**, ¶¶12-16, App. 1939-1940.

### 4.  *Texas law will govern this action*

Additionally, Texas law will govern this action because Stanford's scheme was "centered in and operated out of Houston, Texas," and as a result Texas has a "substantial interest in the application of its [financial] laws."  *Janvey v. Brown*, 767 F.3d at 436.  Further, this Court has held that "the Texas Legislature intended the TSA to apply to transactions emanating from within

Texas." *Janvey, et al. v. Willis of Colorado, Inc., et al.*, No 13-03980, Doc. 64 pp. 19–21 (N.D. Tex. Dec. 5, 2014) (citing *Citizens Insurance Co. of America v. Daccach*, 217 S.W.3d 430 (Tex. 2007)); *see also Troice, et al. v. Willis of Colorado, Inc., et al.*, No. 09-01274, Doc. 208 at p. 15 (N.D. Tex. Dec. 15, 2014) (holding that the "the TSA applies extraterritorially").

By contrast, any other potential jurisdiction lacks a significant interest in this adjudication.  For example, this Court has found (and the Fifth Circuit has agreed) that "Antigua has no actual interest in this dispute" because "[a]lthough [Plaintiffs'] purchased CDs from an Antiguan corporation, that corporation was a sham, existing solely to perpetuate a worldwide fraud."  *Janvey v. Alguire*, No. 09-0724, 2013 WL 2451738, at *4; *see also Janvey v. Brown*, 767 F.3d at 436 (affirming that "Antigua has no interest in the application of its laws to the Stanford *Ponzi* scheme" because "[t]he scheme's only connection to Antigua is that SIB was incorporated and ostensibly operated from there").  This determination is reinforced by the fact that "few Stanford investors, if any, were located in Antigua" because "Antiguan law . . . prohibited [SIBL] from serving Antiguans."  *Janvey v. Alguire*, No. 3:09-0724, 2013 WL 2451738, at *4; *see also Janvey v. Brown*, 767 F.3d at 436 (observing that "no Antiguan citizen has been identified as a defrauded investor").[39]  Likewise, this Court has already determined (and, again, the Fifth Circuit has agreed) that Texas's interest in applying its statutory financial laws to claims of Stanford's victims is superior to the interests of other states because, as between Texas and other

---

[39]     Even the Antiguan government has acknowledged that SIBL was run from the United States and that Antigua was merely a pass-through:  "The business of Stanford International Bank Ltd. was run from Houston, Texas, and its books maintained in Memphis, Tennessee.  The bank was operating in Antigua as a transit point and for purposes of registration and regulation."  Van Tassel Dec., **Ex. 107** at p. 16, App. 1960.  The Antiguan government admitted that the Stanford Entities in Antigua "were highly dependent on massive monthly injections of capital from Houston, Texas."  *See id.*  Prime Minister W. Baldwin Spencer separately stated that "[t]he business of Stanford International Bank was run from Houston, Texas," and that none of the Stanford Entities in Antigua were profitable, since "they were dependent on massive monthly injection of cash from Houston, Texas."  *Id.*

states, there is no conflict regarding the laws at issue. *See Janvey v. Alguire*, No. 3:09-07242013, WL 2451738, at *3–5; *Janvey v. Brown*, 767 F.3d at 436.

Importantly, the Stanford Entities developed and executed all of SIBL's marketing and sales strategies, practices and materials from Texas. Declaration of Lena Stinson, **Exhibit "1"**, at ¶11-13, App. 5-6. Stanford owned his own publishing company, Idea Advertising, also based in Houston, which designed, prepared and published all of the written marketing materials for the different Stanford Entities—including SIBL—in Houston. *Id.* All of these materials were reviewed and approved by Stanford's Houston-based legal team. *Id.* Eventually Idea Advertising closed shop and these marketing functions were internalized at SFG in Houston. *Id.*

Dr. Courtney Blackman, a member of SIBL's board of directors from 1999 forward, confirmed that "Antigua had nothing at all to do with the marketing or investment of – marketing of CDs or the investment of proceeds from CDs." Deposition of Courtney Blackman, Exhibit **"108"**, at 20, App. 2049. Instead, he explained: "The marketing originated in Houston." *Id.* at 20, App. 2049.

Houston, Texas was also the headquarters of Stanford's worldwide sales force, and all the sales practices of Stanford Mexico and Stanford Venezuela and other foreign countries were managed under the overall direction, supervision, and control of the Houston headquarters. For example, many of the brokers selling SIBL CDs in Mexico, Venezuela, and other Latin American countries were actually licensed in the United States and under contract with SGC in Houston. Stinson Dec., **Ex. "1"**, at ¶8, App. 4, (Stinson Aff.). The President of Stanford-Mexico, David Nanes, was a direct employee of SGC in Houston. *Id.* at ¶9, App. 4-5. Stanford "financial advisors" from Houston regularly traveled to Mexico City, Caracas, and other Latin American cities to sell CDs. *Id.* at ¶¶7-10, App. 3-5. In sum, all sales, marketing, and promotional

activities for sale of the SIBL CDs was orchestrated from Texas.  *Id.* at ¶13, App. 6.

Stanford headquartered his scheme in Texas, from where the Stanford Entities solicited investors' money and directed its flow to and through SIBL, and into Stanford's various pet projects and personal indulgences.  *See Janvey v. Alguire*, No. 3:09-0724, 2013 WL 2451738, at *2–3; *see also Janvey v. Brown*, 767 F.3d at 436.  The overwhelming Texas nexus strongly favors a determination that Texas's laws should govern this action.

### 5.   *Courts in foreign jurisdiction will likely enforce a judgment entered here*

As a preliminary matter, for the sake of judicial efficiency Plaintiffs hereby adopt and incorporate, and request that the Court take judicial notice of, all evidence, briefing and argument on foreign law and the issue of recognition of a class judgment by foreign tribunals previously submitted to the Court by the plaintiffs in *Troice v. Willis of Colorado, Inc., et al.*, Civil Action No. 3:09-CV-1274, *Troice v. Proskauer Rose, LP, et al.*, Civil Action No. 3:09-CV-1600, and *Rotstain et al v. Trustmark National Bank, et al*, Civil Action No. 3:09-cv-02384.

Where, as here, the proposed class action involves class members consisting of U.S. citizens *and* foreign citizens, courts frequently "assess the risk of nonrecognition by . . . foreign court[s]" when determining whether a class action is superior to other forms of adjudication.  *See In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 93, 95 (S.D.N.Y. 2007) ("[R]es judicata concerns have been appropriately grafted onto the superiority inquiry.").  Courts that have considered the issue of nonrecognition by foreign tribunals have held that a class including foreign citizens should be certified where the plaintiffs show: (1) "there is some possibility that a class action judgment would be enforceable—or at least have some substantial effect—in the foreign jurisdiction at issue,"  *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 360 (S.D.N.Y. 2002); *or* (2) "foreign court recognition is more likely than not," *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 282 (S.D.N.Y. 2008).  *See also Vivendi Universal*, 242 F.R.D. at 95)

("Where plaintiffs are able to establish a probability that a foreign court will recognize the res judicata effect of a U.S. class action judgment, plaintiffs will have established this aspect of the superiority requirement.").   Stated in the alternative, a class consisting of U.S. and foreign citizens should *not* be certified only if it is nearly certain that foreign courts would not recognize a judgment or settlement entered in a U.S. tribunal.  *See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir. 1975), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010); *see also Vivendi Universal*, 242 F.R.D. at 95) ("The closer the likelihood of non-recognition is to being a 'near certainty,' the more appropriate it is for the Court to deny certification of foreign claimants.").   Generally, if it is nearly certain that a certain foreign jurisdiction will not recognize a U.S. class action judgment, the proper course is to certify a class consisting only of those claimants whose native jurisdictions would likely recognize a U.S. judgment.  *See Vivendi Universal*, 242 F.R.D. at 95).

Determining whether a foreign tribunal will enforce a U.S. class action judgment requires an assessment of foreign law.  "When determining foreign law, courts 'may consider any relevant material or source,' including determinations by other courts, and the fact that United States courts have generally certified proposed classes which included . . . lead plaintiffs and class members [of particular nationalities], is particularly persuasive."  *Alstom*, 253 F.R.D. at 291 (quoting Fed. R. Civ. P. 44.1).  "Although plaintiffs often submit expert declarations regarding issues of foreign law, such declarations are not necessary for plaintiffs to carry their burden of establishing aspects of foreign law." *Id.*

Here, the proposed class includes significant concentrations of members from the United States, Mexico, Venezuela, Colombia, Peru, Panama, and Canada.  See Van Tassel Dec., **Ex. "107"**, p. 35, App. 1978**.**  Additionally, the named Plaintiffs consist of a U.S. citizen (Pam Reed),

a citizen of Mexico (Samuel Troice), and a trust established by a Mexican citizen through SFIS (Michoacan Trust).  As shown below, the jurisdictions where a substantial majority of Stanford investors reside would more likely than not enforce a U.S. class action judgment, thereby supporting a determination that a U.S. class action is superior to other forms of adjudication.

### a.  United Kingdom, Canada, and other common law jurisdictions

U.S. courts consistently find that courts of the United Kingdom, Canada, and other common law jurisdictions will likely give preclusive effect to U.S. class action securities judgments.  *E.g.*, *Anwar II*, 289 F.R.D. at 116-17; *Alstom*, 253 F.R.D. at 289; *Vivendi*, 242 F.R.D. at 103).  Particularly instructive on this point is a recent order from the U.S. District Court for the Southern District of New York, where Judge Marrero considered the likelihood that U.K. tribunals would enforce a U.S. judgment against various financial institutions related to their roles in the Bernard Madoff *Ponzi* scheme.  Judge Marrero held that:

> After examining the expert declarations and considering the parties' arguments concerning English law and other common law jurisdictions, the Court re-adopts the rationale set forth in *Alstom* and concludes that Plaintiffs have sufficiently demonstrated that the courts of the United Kingdom, Canada, and other common law countries would more likely than not recognize, enforce, and give preclusive effect to any judgment rendered in this case by this Court involving absent class members from these jurisdictions. Furthermore, this Court has already concluded that both the United Kingdom and Canada would more likely than not recognize a United States class action judgment and bar absent class members from bringing later actions against the defendants. *Alstom*, 253 F.R.D. at 289; *Vivendi*, 242 F.R.D. at 103. Accordingly, the Court will certify a class which includes British, Canadian, and other common law country class members.

*Anwar II*, 289 F.R.D. at 117–18; *see also Alstom*, 253 F.R.D. at 289; *Vivendi*, 242 F.R.D. at 103).

Here, as in *Anwar*, *Alstrom*, and *Vivendi*, the Court should find that the United Kingdom, Canada, and other common law countries would likely give preclusive effect to a U.S. class action judgment.  *See Alstom*, 253 F.R.D. at 291 ("[T]he fact that United States courts have generally certified proposed classes which included . . . lead plaintiffs and class members [of

particular nationalities] is particularly persuasive.").

### b. The Latin American jurisdictions

The Latin American jurisdictions with the largest concentration of class members involved in this litigation—specifically, Venezuela, Mexico, Colombia, Peru, Ecuador, Panama and El Salvador—would also likely give preclusive effect to a U.S. class action judgment. Judge Marrero considered the same issue as it related to the Bernard Madoff scheme and determined that each of the above-mentioned Latin American jurisdictions (and more) would give preclusive effect to a U.S. class action judgment. Judge Marrero concluded:

> After examining the expert declarations and considering the parties' arguments concerning the law of the relevant Latin American countries, the Court concludes that, under the present circumstances, Plaintiffs have made a sufficient presumptive showing that courts in the relevant Latin American countries would more likely than not recognize a class-action judgment rendered in this case by this Court. While the majority of Latin American courts have not specifically addressed the enforcement of United States class-action judgments, the Court finds that the general policy of the relevant Latin American countries inclines to favor granting recognition to judgments of United States courts. **The Court also takes into account the unlikely ability of plaintiffs from the relevant Latin American countries to bring a duplicative action in their home countries, and the absence in the record before the Court of any authority from the relevant Latin American countries expressly stating that the enforcement of a United States opt-out class action judgment would manifestly violate the public policy of any of the relevant Latin American countries.** These considerations make it more likely than not that the courts of the various jurisdictions would recognize, enforce, and give preclusive effect to a judgment in this action. (See Gordon Decl. ¶¶ 29, 100.) Accordingly, the Court will certify a class which includes class members from the relevant Latin American countries.

*Anwar II*, 289 F.R.D. at 119–20.  Again, the Court should follow this "particularly persuasive" authority and find that the relevant Latin American jurisdictions would likely give preclusive effect to a class action judgment entered by this Court.  *Alstom*, 253 F.R.D. at 291.

In sum, it is more likely than not that courts of the various jurisdictions at issue would recognize, enforce, and give preclusive effect to a judgment entered in this action.  Accordingly, res judicata considerations also support a determination that a U.S. federal class action is

superior to any other method for adjudicating Plaintiffs' claims, *see Anwar II*, 289 F.R.D. at 116–20; *Vivendi Universal*, 242 F.R.D. at 95), and the Court should certify a class which includes, at a minimum, class members from the U.S., the U.K., Canada, and other common law jurisdictions, and Latin American countries including (but not limited to) Mexico, Venezuela, Colombia, Peru, Ecuador, Panama and El Salvador.

### 1. *There are no unusual difficulties to managing this class action*

The final consideration under the superiority prong is the potential difficulty of managing the proposed class action. *See* Fed. R. Civ. P. 23(b)(3)(4). Here, the difficulty of managing a class action is minimal. The proposed class is defined to include only investors whose claims have been recognized and allowed by the Receiver in the SEC Action. Thus, class members are persons that have filed claims and submitted to the jurisdiction of this court. The Receiver is already administering distributions to class members, with Court–approved notices and what effectively amounts to an "opt-in" class of investors from around the world. See Janvey Declaration, **Exhibit "105"**, at ¶7-16, App. 1792-1795; Little Declaration, **Exhibit "106"**, ¶12, App. 1939. Thus no one will have to "re-create the wheel" in order to efficiently administer the Class.

Finally, questions of damages can be proven on a class-wide basis by the Receiver's team, specifically the Receiver's retained forensic accounting firm, FTI. See Janvey Declaration, **Exhibit "105"**, at ¶13, 17, App. 1794-1795; Declaration of Mark Russell, **Exhibit "100"**, at ¶5-6, App. 1755.

In sum, there are no unusual difficulties to managing this class action. In any event, the administrative challenges inherent to all class actions are preferable to duplicating judicial resources in thousands of individual lawsuits, or denying access to the courts for thousands of

class members.  *See Amchem Products*, 521 U.S. at 617 (quotation marks omitted).

### a.    Additional Matters Required by Local Rule 23.2.

Certain additional matters must be addressed pursuant to Local Rule 23.2.  First, Plaintiffs propose that the type and estimated expense of notice to be given to class members will be the same as has been previously approved with respect to the Receiver's Distribution Plan.  Class counsel will pay costs of providing notice.  N.D. Tex. LR23.2(e).

Second, Plaintiffs' attorneys' fees are based on contingent fee contracts between the representative Plaintiffs and class counsel.  N.D. Tex. LR23.2(g).  These contracts provide for a contingent fee of no greater than 25% of any recoveries.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons Plaintiffs have satisfied each of Rule 23's requirements for class certification.  Thus Plaintiffs are entitled to pursue their claims as a class action.  *Shady Grove Orthopedic Associates*, 559 U.S. at 398.  Accordingly, Plaintiffs request that the Court certify the proposed class and/or subclasses, appoint Plaintiffs as class representatives, and appoint Plaintiffs' lawyers as class counsel.


Dated: February 18, 2016

Respectfully submitted,

**CASTILLO SNYDER, P.C.**

By:   __*/s/ Edward C. Snyder*_____
    Edward C. Snyder
    esnyder@casnlaw.com
    Jesse R. Castillo
    jcastillo@casnlaw.com
    700 N. St. Mary's Street, Suite 405
    San Antonio, Texas  78205
    (210) 630-4200
    (210) 630-4210 (Facsimile)

**NELIGAN FOLEY, LLP**

By:   __*/s/ Douglas J. Buncher*_____
    Douglas J. Buncher
    dbuncher@neliganlaw.com
    Republic Center
    325 N. St. Paul, Suite 3600
    Dallas, Texas  75201
    (214) 840-5320
    (214) 840-5301 (Facsimile)

**BUTZEL LONG, P.C.**                    **STRASBURGER & PRICE, LLP**

By: */s/ Peter D. Morgenstern*          By: */s/ Judith R. Blakeway*

    Peter D. Morgenstern (*admitted pro hac vice*)    Judith R. Blakeway

    morgenstern@butzel.com    judith.blakeway@strasburger.com

    Josh Abraham    Merritt Clements

    abraham@butzel.com    merritt.clements@strasburger.com

    230 Park Avenue, Suite 850    2301 Broadway

    New York, New York 10169    San Antonio, Texas  78215

    (212) 818-1110    Telephone: (210) 250-6000

    (212) 818-0494 (Facsimile)    Facsimile: (210) 250-6100

**COUNSEL FOR THE PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

       On February 26, 2016, I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

            By:    */s Edward C. Snyder*

                  Edward C. Snyder