**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated. | § § § § § § § § § | CIVIL ACTION NO. 3:12-cv-04641-N |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ, | § § § § | |
| Defendants. | § | |

**CLASS PLAINTIFFS' REPLY BRIEF**
**IN FURTHER SUPPORT**
**<u>OF THEIR MOTION FOR CLASS CERTIFICATION</u>**

---

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT AND AUTHORITIES IN REPLY ...................................................... 5

   I.      PREDOMINANCE IS SATISFIED ......................................................... 5

        A.    Individual Issues of Reliance Do Not Preclude Certification ................ 5

        B.    Choice of Law Considerations Do Not Preclude Certification ........... 18

        C.    The Class Plaintiffs' Damages Methodology is Sound and Consistent with Their Liability Theory ...................................................... 31

        D.    Damages can be Calculated and the Class Ascertained by Referencing the Receiver's Claims Process .......................................... 38

        E.    Trial Plan. ........................................................................................... 45

   II.     SUPERIORITY IS SATISFIED ........................................................... 47

        A.    *Res Judicata* Concerns do not Preclude Certification; Foreign Courts Will Likely Grant Preclusive Effect to a Judgment in This Case ................ 47

        B.    The Class Action Mechanism is Clearly Preferable to Individual Suits ............. 55

   III.   TYPICALITY IS SATISFIED ............................................................. 59

   IV.   ADEQUACY IS SATISFIED ............................................................... 62

        A.    Pam Reed .............................................................................................. 62

        B.    Samuel Troice ...................................................................................... 67

        C.    Michoacan Trust .................................................................................. 70

CONCLUSION & PRAYER ................................................................................... 72

## TABLE OF AUTHORITIES

**Cases**                                                                     **Pages**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) .................................................................................... 10

*Alexander v. Centrafarm Group, N.V.*,
    124 F.R.D. 178 (N.D. Ill. 1988) .............................................................. 17

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ............................................................ 56

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
    140 F.R.D. 425 (D. Ariz. 1992) ....................................................... 15, 16

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) ...................................................................... 11, 37

*Anheuser-Busch Cos., Inc. v. Summit Coffee Co.*,
    858 S.W.2d 928 (Tex. App.—Dallas 1993, writ denied) ................. 7, 34

*Anwar v. Fairfield Greenwich Ltd.*,
    289 F.R.D. 105 (S.D.N.Y. 2013) .............................................. 48, 49, 50, 56

*Anwar v Fairfield Greenwich Ltd.*,
    No. 09 Civ. 0118(VM), 2015 WL 935454 (S.D.N.Y. 2015) ........................... 12, 50

*Aquaplex, Inc., v. Rancho la Valencia, Inc.*,
    297 S.W. 3d 768 (Tex. 2009) ................................................................. 32

*Arthur Young & Co. v. U.S. District Court*,
    549 F.2d 686 (9th Cir. 1977) ........................................................... 16, 44

*Ass'n of Flight Attendants v. Texas Int'l Airlines, Inc.*,
    89 F.R.D. 52 (S.D. Tex. 1981) .............................................................. 64

*Barnebey v. E.F. Hutton & Co.*,
    715 F. Supp. 1512 (M.D. Fla. 1989) ..................................................... 20

*Barnett v. Home of Texas and Warranty Underwriters Ins. Co.*,
    2011 WL 665309 (Tex. App. – Hous. [14th Dis.] 2011, no pet.) .......... 35

*Baron v. Strassner*,
    7 F. Supp. 2d 871 (S.D. Tex. 1998) ...................................................... 22

*In re Beacon Assoc. Litig.*,
    282 F.R.D. 315 (S.D.N.Y. 2012) ............................................................... 12, 44

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ........................................................................ 37

*Bell v. Ascendant Solutions, Inc.*,
    Case No. 3:1-cv-0166-N, 2004 WL 1490009 (N.D. Tex. July 1, 2004)................................. 11

*Bentley v. Bunton*,
    94 S.W.3d 561 (Tex. 2002)........................................................................... 34

*Billitteri v. Sec. America, Inc.*,
    No. 3:09-CV-01569-F, 2011 WL 3586217 (N.D. Tex. 2011)............................................. 15

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir.1975) ........................................................................ 43

*Bobbitt v. Milberg LLP*,
    801 F.3d 1066 (9th Cir. 2015) ...................................................................... 28

*In re BP P.L.C. Sec. Litig.*,
    922 F.Supp.2d 600 (S.D. Tex. 2013) ............................................................... 19

*Bradford v. Moench*,
    809 F. Supp. 1473 (D. Utah 1992)........................................................ 68, 69, 70, 71

*Bresson v. Thomson McKinnon Sec. Inc.*,
    118 F.R.D. 339 (S.D.N.Y. 1988) .................................................................... 25

*Brown v. Kelly*,
    609 F.3d 467 (2d Cir. 2010).................................................................... 41, 44

*Bruhl v. Price WaterhouseCoopers Intern.*,
    257 F.R.D. 684 (S.D. Fla. 2008).................................................................. 13, 14

*Butler, Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ........................................ 38

*Cameron v. E.M. Adams & Co.*,
    547 F. 2d 473 (9th Cir. 1976) ...................................................................... 18

*Canada Post Corp. v. Lépine*
    (2009) 1 S.C.R. 549 (S.C.C.) ....................................................................... 48

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013)..................................................................... 39, 40

*Carroll v. Timmers Chevrolet, Inc.*
   592 S.W.2d 922 (Tex. 1979)...........................................................................34

*CGC Holding Co., LLC, v. Broad and Cassel,*
   773 F.3d 1076 (10th Cir. 2014) ...................................................................17

*Challenger Gaming Solutions, Inc. v. Earp,*
   402 S.W. 3d 290 (Tex. App. – Dallas 2013, no pet.)..................................35

*Chantier Naval Voison v. M/Y Daybreak*,
   677 F. Supp. 1563 (S.D. Fla. 1988) ...........................................................47

*Chrysler Capital Corp. v. Century Power Corp.*,
   No. 91 Civ. 1937, 1992 WL 163006 (S.D.N.Y. Jun. 24, 1992).................20

*In re Citigroup Inc. Sec. Litig.*,
   987 F.Supp.2d 377 (S.D.N.Y. 2013)....................................................28, 30

*Citizens Ins. Co. of America v. Daccach*,
   217 S.W.3d 430 (Tex. 2007)...................................18, 21, 22, 26, 27, 29

*Comcast v. Behrend*,
   133 S. Ct. 14265 (2013) .......................................................31, 32, 37

*Crescendo Invs. V. Brice*,
   61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied) ................7, 8

*Cromeans v. Morgan Keegan & Co.*,
   303 F.R.D. 543 (W.D. Mo. 2014) ..............................................................20

*Cromer Finance Ltd v. Berger*,
   205 F.R.D. 113 (S.D.N.Y. 2001) .........................................................50, 55

*Currie v. McDonald's Restaurants of Canada Ltd.*
   74 O.R. (3d) 321 (Can. Ont. C.A.) (2005) ...............................................48

*In re Cyrus II P'ship*,
   392 B.R. 248 (Bankr. S.D. Tex. 2008) .....................................................47

*Davis v. Estridge*,
   85 S.W. 3d 308 (Tex. App. – Tyler 2001, pet. denied).............................35

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ..........................................................32, 37, 44

*Dekro v. Stern Bros. & Co.*,
   540 F. Supp. 406 (W.D. Mo. 1982) ...........................................................24

*Deloitte & Touche Netherlands Antilles & Aruba v. Ulrich*,
    172 S.W.3d 255 (Tex. App. – Beaumont 2005, pet. denied) .......................................... 22, 29

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) .................................................................... 13

*Dornberger v. Metro. Life Ins. Co.*,
    182 F.R.D. 72 (S.D.N.Y. 1998) ............................................................................ 1

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d (5th Cir. 2008) ..................................................................................... 34

*Duncan v. Lichtenberger*,
    671 S.W. 2d 948 (Tex. App. – Ft. Worth 2007, writ ref'd n.r.e.) .......................................... 32

*Duperier v. Texas State Bank*,
    28 S.W.3d 740 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) ..................... 9, 33, 35

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ........................................................................................... 2

*In re Enron Corp. Sec.*,
    529 F.Supp.2d 644 (S.D. Tex. 2006) ................................................................ 60, 61

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) .............................................................. 22, 29

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    761 F. Supp. 2d 504 (S.D. Tex. 2011) .................................................................. 9

*Farno v. Ansure Mortuaries of Ind.*,
    953 N.E.2d 1253 (Ind. App. 2011) ...................................................................... 57

*Fed. Hous. Fin. Agency v. Deutsche Bank AG*,
    903 F. Supp. 2d 285 (S.D.N.Y. 2012) .................................................................. 20

*Federal Treasury Enter. Sojuzplodoimport v. SPI Spirits, Ltd.*,
    726 F.3d 63 (2d Cir. 2013) .................................................................................. 72

*In re First Alliance Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) .............................................................................. 13

*In re First Republic Bank Securities Litigation*,
    Case No. 3-88-0641-H, 1989 WL 108795 (N.D. Tex. Aug. 1, 1989) ...................... 24, 31, 62

*Frey v. First Nat'l Bank Southwest*,
    No. 13-10375, 2015 WL 728066 (5th Cir. 2015) ......................................... 41, 45, 46

*GE Capital Commercial Inc. v. Worthington Nat'l Bank*,
  2011 WL 5025153 (N.D. Tex. 2011) (J. Lindsay) ................................................. 35

*Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*,
  97 S.W.3d 779 (Tex. App.—Dallas 2003) ............................................... 7, 9, 33, 34

*Getty v. Harmon*,
  No. 09-178, 1998 WL 919368 (W.D. Wash. Oct. 23, 1998) ........................... 10, 14

*In re Goodyear Tire & Rubber Co. Sec. Lit.*,
  No. 5:03 CV 2166, 2004 WL 3314943 (N.D. Ohio 2004) ................................... 55

*Graham Mort. Corp. v. Hall*,
  307 S.W.3d 472 (Tex. App.—Dallas 2010, no pet.) ......................................... 10

*In re Great So. Life Ins. Co. Sales Practices Lit.*,
  192 F.R.D. 212 (N.D. Tex. 2000) .................................................................. 13

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968) ........................................................................... 5

*Greenberg Traurig v. Moody*,
  161 S.W.3d 56 (Tex. App.–Houston [14th Dist.] 2004, no pet.) ...................... 1, 28

*Gregory v. Finova Capital Corp.*,
  442 F.3d 188 (4th Cir. 2006) ........................................................................ 59

*Gutierrez v. Advanced Medical Optics*,
  640 F.3d 1025 (9th Cir. 2013) ....................................................................... 54

*Gutierrez v. Cayman Islands Firm of Deloitte & Touche*,
  100 S.W.3d 261 (Tex. App.—San Antonio 2002, pet. dism'd) .................... 22, 29

*Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*,
  No. 3:02-CV-1245-N, 2003 WL 21339279 (N.D. Tex. Jun. 3, 2003) ............ 12, 23

*In re HealthSouth Corp. Sec. Lit.*,
  261 F.RD. 616, 645 (N.D. Ala. 2009) .............................................................. 13

*In re HealthSouth Corp. Securities Litigation*,
  261 F.R.D. 616 (N.D. Ala. 2009) ........................................................... 14, 15, 16

*Hendricks v. Thornton*,
  973 S.W.2d 348 (Tex. App.—Beaumont 1998, pet. denied) ................................ 7

*Highland Capital Mgmt L.P. v. Ryder Scott Co.*,
  402 S.W.3d 719 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ................... 8, 34

*Highland Crusader Offshore Partners L.P. v. Motient Corp.*,
    281 S.W.3d 237 (Tex. App.–Dallas 2009, pet. denied) ...................................... 27

*In re Home-Stake Prod. Co. Sec. Litg.*,
    76 F.R.D. 351 (D. Okla. 1977) ....................................................................... 10

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981) ..................................................................... 13, 45

*Janvey v. Alguire*,
    2013 WL 2451738 (N.D. Tex. Jan. 22, 2013) .............................................. 18, 61

*Janvey v. Alguire, et al.*,
    No. 3:09-CV-0274-N ...................................................................................... 18

*Janvey v. Brown*,
    767 F.3d 430 (5th Cir. 2014) ............................................................ 19, 21, 62

*Janvey v. Democratic Senatorial Campaign Committee, Inc.*,
    712 F.3d 185 (5th Cir. 2013) ......................................................................... 57

*Janvey v. IMG Worldwide, Inc.*,
    Case No. 3:11-cv-00117-N Order .................................................................. 57

*Janvey v. The University of Miami*,
    Case No. 3:11-cv-00041-N-BL ...................................................................... 18

*Janvey v. Willis*,
    Case 3:13-cv-03980 ...................................................................................... 21

*Jenson v. Fiserv Trust Co.*,
    256 F. App'x 924 (9th Cir. 2007) ........................................................ 11, 15, 56

*Joint Equity Comm. of Inv. of Real Estate Partners, Inc., v. Coldwell Bankr Real
    Estate Corp.*, 281 F.R.D. 422 (C.D. Cal. 2012) ............................................... 11

*Kalodner v. Michaels Stores, Inc.*,
    172 F.R.D. 200 (N.D. Tex. 1997) .................................................................. 70

*Katz v. MRT Holdings, LLC*,
    No. 07-61438-CIV, 2008 U.S. Dist. LEXIS 114421 (S.D. Fla. 2008) ................. 10

*Katz v. MRT Holdings LLC*,
    No. 07-61438-CIV, 2008 WL 4725284 (S.D. Fla. 2008) ................................... 15

*Keasler v. Natural Gas Pipeline Co. of America*,
    84 F.R.D. 364 (S.D. Tex. 1979) ............................................................... 37, 70

*King Cnty., Wash. v. IKB Deutsche Industriebank AG,*
    916 F. Supp. 2d 442 (S.D.N.Y. 2013)..................................................................... 13

*King v. Kansas City Southern Industries, Inc.,*
    519 F.2d 20 (7th Cir. 1975) .................................................................................... 5

*Kinzbach Tool co. v. Corbett-Wallace Corp.,*
    160 S.W.2d 509 (Tex. 1942).............................................................................. 10, 34

*Kirkpatrick v. J.C. Bradford & Co.,*
    827 F.2d 718 (11th Cir. 1987) ............................................................................... 15

*In re Kirschner Medical Corp. Sec. Litig.,*
    139 F.R.D. 74 (D. Md. 1991).................................................................................. 18

*Klay v. Humana, Inc.,*
    382 F.3d 1241 (11th Cir. 2004) ............................................................................. 13

*LandAmerica Commonwealth Title Company v. Wido,*
    2015 WL 6545685 (Tex. App. – Dallas 2015, pet. filed) ...................................... 35

*Lehocky v. Tidel Tech. Inc.,*
    220 F.R.D. 491 (S.D. Tex. 2004)............................................................................ 64

*Leyva v. Medline Indus. Inc.,*
    716 F.3d 510 (9th Cir. 2013) ................................................................................. 38

*Lintz v. Carey Manor Ltd.,*
    613 F.Supp. 543 (W.D. Va. 1985) .......................................................................... 20

*In re Lloyd's Am. Trust Fund Litig.,*
    96 Civ. 1262, 1998 WL 50211 (S.D. N.Y. Feb. 4, 1998) ...................................... 51

*Loewen Group Incorporated and Loewen (Raymond L.) v. United States,* Award,
    ICSID Case No. ARB(AF)/98/3, (2005) 7 ICSID Rep 442, (2003) 42 ILM
    811, (2003) 15(5) World Trade and Arb Mat 97, IIC 254 (2003), 25 June 2003 .................. 54

*Longden v. Sunderman,*
    123 F.R.D. 547 (N.D. Tex. 1988) .................................................................. 5, 15, 24

*Marsden v. Select Medical Corp.,*
    246 F.R.D. 480 (E.D. Pa. 2007)........................................................................ 53, 54

*Melo v. Gardere Wynne Sewell, LLP,*
    Case No. 04-2238, 2007 WL 92388 (N.D. Tex. Jan. 12, 2007) ............................ 11

*Minexa Arizona, Inc. v. Staubach,*
    667 S.W.2d 563 (Tex. App. 1984)........................................................................... 22

*In re Monumental Life Ins. Co.*,
   365 F.3d 408 (5th Cir. 2004) ........................................................................... 4, 45

*Myers v. Walker*,
   61 S.W. 3d 722 (Tex. App. – Eastland 2001, pet.denied) ....................................... 32

*In re Nat'l Century Enter. Inc.*,
   No. 2:03–md–1565, 2008 WL 1995216 (S.D. Ohio May 2, 2008) ........................... 26

*In re Nexium Antitrust Litig.*,
   777 F.2d 9 (1st Cir. 2015) .................................................................................. 38

*In re Nigeria Charter Flights Contract Litig.*,
   233 F.R.D. 297 (E.D.N.Y. 2006) ........................................................................... 4

*Nuveen Premium Income Fund 4, Inc. v. Morgan Keegan & Co.*,
   200 F.Supp.2d 1313 (W.D. Okla. 2002) ............................................................... 20

*Onyung v. Onyung*,
   2013 WL 3875548 (Tex. App. – Hous. [1st Dist] 2013, pet. denied) ...................... 35

*In re ORFA Sec. Litig*,
   654 F.Supp. 1449 (D.N.J. 1987) ........................................................................... 18

*Oxford v. Williams Companies, Inc.*,
   137 F. Supp. 2d 756 (E.D. Tex. 2001) .................................................................. 24

*In re Park Central Global Lit.*,
   No. 3:09-cv-765-M, 2014 WL 4261950 (N.D. Tex. 2014) ...................................... 32

*Petrites v. J. C. Bradford & Co.*,
   646 F.2d 1033 (5th Cir. 1981) ....................................................................... 21, 70

*In re Petrobras Sec. Litig.*,
   2016 WL 413122 (S.D.N.Y. Feb. 2, 2016) .................................. 11, 50, 54, 56, 57, 67, 73

*Pollack v. Laidlaw Holdings, Inc.*,
   1995 WL 261518 (S.D.N.Y. May 3, 1995) ............................................................ 68

*Pulaski & Middleman, LLC v. Google, Inc.*,
   2015 WL 5515617 (9th Cir. 2015) ....................................................................... 44

*Rahman v. Mott's LLP*,
   No. 13–cv–03482–SI, WL 6815779 (N.D. Cal. Dec. 3, 2014) ............................... 41

*Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*,
   482 F.3d 372 (5th Cir. 2007) ............................................................................... 10

*In re Revco Sec. Litig.*,
   142 F.R.D. 659 (N.D. Ohio 1992) ..................................................................... 69

*Ries v. Arizona Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) ..................................................................... 41

*Rio Grande Oil Co. v. State*,
   539 S.W.2d 917 (Tex. Civ. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.) ................... 23

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)............................................................................. 38

*Robinson v. Texas Auto. Dealers Ass'n*,
   387 F.3d 416 (5th Cir. 2004) ............................................................................. 2

*Rodriguez by Rodriguez v. Berrybrook Farms, Inc.*
   672 F.Supp. 1009 (W.D. Mich. 1987) ................................................................ 70

*Rohlfing v. Manor Care, Inc.*,
   172 F.R.D. 330 (N.D. Ill. 1997)........................................................................ 13

*Rubenstein v. Collins*,
   162 F.R.D. 534 (S.D. Tex. 1995) ..................................................................... 64

*S.E.C. v. SBM Inv. Certificates, Inc.*,
   2007 WL 609888 (D. Md. Feb. 23, 2007) ........................................................... 68

*Sanderson v. Roethenmund*,
   682 F. Supp. 205 (S.D.N.Y. 1988)................................................................... 68

*SEC v. Associated Gas & Elec. Co.*,
   24 F.Supp. 899 (S.D.N.Y.1938)...................................................................... 69

*SEECO, Inc. v. Hales*,
   954 S.W.2d 234 (Ark. 1997)............................................................................ 18

*Sgalambo v. McKenzie*,
   268 F.R.D. 170 (S.D.N.Y. 2010) ..................................................................... 54

*Shelter Realty Corp. v. Allied Maintenance Corp.*,
   574 F.2d 656 (2d Cir. 1978)............................................................................... 2

*Shores v. Sklar*,
   647 F. 2d 462 (5th Cir. 1981) .......................................................................... 15

*Simms Inv. Co. v. E.F. Hutton & Co.*,
   699 F. Supp. 543 (M.D.N.C. 1988) .................................................................. 20

*Simms v. Jones,*
   296 F.R.D. 485 (N.D. Tex. 2013) ...................................................................... 44

*Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   482 F.2d 880 (5th Cir. 1973) ...................................................................... 5, 12

*Southwestern Bell Telephone Co. v. Marketing on Hold Inc.,*
   308 S.W.3d 909 (Tex. 2010) .......................................................................... 12

*In re Stanford International Bank, Ltd.,*
   Case No. 3:09-cv-00721-N .................................................................. 21, 59, 60

*State v. Standard Oil Co.,*
   107 S.W.2d 550 (Tex. 1937) .......................................................................... 34

*Sterling Trust Co. v. Adderley,*
   168 S.W. 3d 835 (Tex. 2005) ............................................................. 4, 7, 34, 60

*Strougo v. Barclays PLC,*
   No. 1:14-cv-05797-SAS .................................................................................. 10

*Summers v. WellTech, Inc.,*
   935 S.W.2d 228 (Tex. App. – Houston [1st Dist.] 1996, no writ) ...................... 33

*T.J. Rainey v. Ft. Cobb Okla. Irrig. Fuel Author.,*
   717 F.2d 1330 (10th Cir. 1983) ...................................................................... 16

*Texas Capital Securities, Inc. v. Sandefer,*
   108 S.W. 3d 923 (Tex. App.—Texarkana 2003, pet. denied) ............................. 35

*Tompkins v. Cyr,*
   202 F.3d 770 (5th Cir. 2000) .......................................................................... 34

*Torres v. S.G.E. Management, LLC,*
   805 F.3d 145 (5th Cir. 2015) .......................................................................... 16

*Torres v. SGE Management LLC,*
   2014 WL 129793 (S.D. Tex. 2014) .................................................. 14, 15, 16, 17

*Troice et al. v. Proskauer Rose, LLP, et al.,*
   Case No. 3:09-cv-01600-N-BG .............................................................. 45, 62, 67

*In re TWL Corp.,*
   712 F.3d 886 (5th Cir. 2013) .......................................................................... 57

*Twohy v. First Nat'l Bank,*
   758 F.2d 1185 (7th Cir. 1985) ........................................................................ 47

*In re U.S. Fin. Sec. Litig.*,
  69 F.R.D. 24 (S.D. Cal. 1975) ................................................................. 51, 53, 54

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) ........................................................................... 12

*United Heritage Life Ins. Co. v. First Matrix Investment. Servs. Corp.*,
  No. CV 06-0496, 2009 U.S. Dist. LEXIS 91245, 2009 WL 3229374 (D. Idaho
  Sep. 30, 2009) ................................................................................................... 20

*United States v. Riedel*,
  126 F.2d 81 (7th Cir. 1942) .............................................................................. 69

*In re United Telecom. Inc. Sec. Litig.*,
  No. 90-2251-0, 1992 WL 309884 (D. Kan. 1992) ............................................. 18

*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ..................................................... 49, 53, 54, 56

*Walco Investments Inc. v. Thenen*,
  168 F.R.D. 315 (S.D. Fla. 1996) ......................................................... 10, 13, 15

*Warfield v. Carnie*,
  2007 WL 1112591 (N.D. Tex. Apr. 13, 2007) .................................................. 26

*Weatherly v. Deloitte & Touche*,
  905 S.W.2d 642 (Tex. App.—Houston [14th Dist.] 1995, pet. denied) ...................... 9, 12, 34

*In re Westcap Enters.*,
  230 F.3d 717 (5th Cir. 2000) ........................................................................ 7, 8

*In re Worldcom Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ................................................................. 15, 56

**Statutes**

Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ Aɴɴ. Chapter 33 .................................................. 35, 36

Tᴇx. Rᴇv. Cɪv. Sᴛᴀᴛ. art. 581–33(A)(2) ................................................................. 33

Tᴇx. Rᴇv. Cɪv. Sᴛᴀᴛ. art. 581-10-1(B) ................................................................. 29

Tᴇx. Rᴇv. Cɪv. Sᴛᴀᴛ. art. 581-33(F)(2) ................................................................. 34

Texas Securities Act art. 581-33(D) ..................................................................... 36

**Other Authorities**

Fed. R.Civ. P. 9(b) ............................................................................................ 69

Fed. R. Civ. P. 17(a)(3) .................................................................................... 72

Fed. R. Civ. P. 23 ............................................. 1, 2, 5, 7, 17, 18, 24, 38, 56, 57, 60, 62, 67, 71, 72

Fed. R. Civ. P. 44.1 ......................................................................................... 48

NEWBERG ON CLASS ACTIONS § 1:9 (5th ed.) ................................................. 57

5 NEWBURG ON CLASS ACTIONS § 8800 (1977) .............................................. 5

North American Free Trade Agreement art. 1102 ......................................... 54, 55

Restatement (Second) of Conflict of Laws § 6 ............................................... 27, 30

Restatement (Second) of Conflict of Laws § 148(2) ...................................... 25

Pam Reed, Samuel Troice, and Michoacan Trust, individually and on behalf of all others similarly situated (collectively, "Class Plaintiffs") file this Reply Brief in support of their Motion for Class Certification, and for Designation of Class Representatives and Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure, and in support respectfully state as follows:

## PRELIMINARY STATEMENT

The Court has already denied the defendants' motions to dismiss and ruled that the Class Plaintiffs have properly pled that Greenberg Traurig, LLP ("Greenberg") and Hunton & Williams, LLP ("Hunton," and together with Greenberg, the "Defendants") violated the Texas Securities Act ("TSA") by aiding and abetting (i) Stanford International Bank Ltd.'s ("SIB's") operation of an unregistered investment company, (ii) SIB's issuance of unregistered securities, and (iii) SIB's sale of securities through untruth or omission, with certain time limitations placed upon each of these TSA claims. *See* [Doc 123, Order on Motions to Dismiss.]  In addition, the Court also ruled that Class Plaintiffs have adequately pled common law claims for aiding and abetting breach of fiduciary, aiding and abetting a fraudulent scheme, and civil conspiracy. *Id.*

Consequently, the only issue before this Court is whether SIB's investors can prosecute their claims against the Defendants as a class action pursuant to Rule 23, or if instead these investors must file potentially 17,000 individual suits against the Defendants in this MDL Court.

Greenberg has responded to the Class Plaintiffs' motion for class certification by rearguing the merits of its previous motion to dismiss and taking issue with certain factual allegations made in the Complaint.  This opposition is improper and distracting to the central issues before the Court at this particular stage of the proceedings.[1]  *See, e.g., Dornberger v.*

---

[1]     Indeed, Greenberg is aware that this opposition is improper, but apparently could not help itself. *See* Greenberg's Brief p. 16 ("While this is not the time and motion for merits issues to be argued, Greenberg Traurig will not let the unfounded accusations sit without response.").  In contrast, the Class Plaintiffs' recitation of the facts stated in the Complaint was limited to apprising the Court of the operative facts governing their TSA and other

*Metro. Life Ins. Co.*, 182 F.R.D. 72, 76 (S.D.N.Y. 1998) ("In considering the certification of a potential class, the district court is not, at this stage, to assess the merits or the substance of the claims at issue but, rather, is to limit its inquiry to the satisfaction of the requirements under [Rule 23]."); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met") (internal quotation marks and citations omitted).   The Court has already denied the entirety of Defendants' motions to dismiss, except to limit the time period of sales that are actionable under the TSA.   Therefore, the facts stated in Plaintiffs' Complaint are deemed to be true for purposes of this motion.   *See Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n.15 (2d Cir. 1978) ("Determinations of class action certification are properly based on the allegations set forth in the complaint.").

Accordingly, at this juncture, Pam Reed, Samuel Troice, and Michoacan Trust simply seek to serve and represent a group of investors who share one meaningful experience in common: they are all the victims of Greenberg's and Hunton's furtive violations of the TSA. SIB never revealed to the Class Plaintiffs that it was operating a fraudulent scheme for decades, precisely because Greenberg and Hunton were so successful in fraudulently insulating SIB and related Stanford entities from regulatory scrutiny in Texas and other jurisdictions.[2]   And as a

---

claims, so that the Court can properly assess or shape the nature of the proposed classes and "make a meaningful determination of the certification issues."   *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004).   Greenberg's opposition, by its own admission, goes far beyond this.

[2]     *See e.g.,* Complaint at ¶¶ 74-75 (Greenberg and Hunton attorney Carlos Loumiet ("Loumiet") misleads the U.S. Department of Treasury about Stanford's legal and regulatory problems with the Montserrat government); ¶ 91 (Loumiet misleads the U.S. Federal Reserve about Stanford's past problems with the Montserrat government); ¶¶ 93-95 (Greenberg ghost writes letters to the Federal Reserve to be signed by members of the Antiguan Government to help Stanford's goal of selling more CDs from proposed U.S. representative office for Bank of Antigua, another Stanford entity); ¶¶ 168-176 (Loumiet misleads, conceals facts from, and provides fraudulent documents to Florida state banking regulators to help Stanford obtain a license to operate offshore trust representative offices); ¶ 188

direct result of SIB's material omissions – for which the Defendants provided direct assistance – SIB was able to operate illegally as an unregistered investment company, issuing tens of thousands of unregistered securities from Texas, and deceiving the Class Plaintiffs into believing that its operations were legitimate.  In this regard, the Class Plaintiffs were uniformly the victims of the Defendants' misconduct and suffered massive damages as a result.

In opposing class certification, Greenberg and Hunton seek to do everything they can to chip away at this unity of experience.  Without citing a shred of evidence, the Defendants point the Court to speculative, meaningless, and immaterial differences between the investors within the proposed investor classes, such as supposed differences in the financial products these parties invested in; supposed differences in Stanford's oral statements or SIB marketing materials purportedly relied upon by the Class Plaintiffs; supposed differences in the harm suffered by each of the putative class members; and supposed differences in the substantive laws of the states and foreign jurisdictions from which Stanford's investors hail.  But none of this is availing because none of these purported distinctions have any relevance to the claims properly brought by the Class Plaintiffs under the TSA.

Certification is clearly appropriate in this action because, as the Defendants concede (but then ignore), *the TSA does not require individualized showings of reliance or loss causation*. Under the TSA, the Class Plaintiffs (who all invested in substantially the same CD product) have no obligation to show that they relied on any specific statement or omission by Stanford or the

---

(Loumiet misleads Louisiana state regulators about Stanford's troubles with the OCC and Montserrat government); ¶ 194 (Greenberg lies to SEC about scope of regulation of SIBL in Antigua); ¶ 311 (Loumiet lies to Venezuelan regulatory officials about Stanford's compliance with laws in order to help Stanford establish operations in that country); ¶¶ 309-311 (Loumiet sends deceptive letters of recommendation to Panamanian and Venezuelan regulators endorsing Stanford and falsely representing that Stanford was compliant with laws and regulations despite knowledge that Stanford was under constant U.S. government investigation);   ¶ 374 (Loumiet lies to Florida regulators during their investigation of a local Stanford trust corporation by falsely representing that its operations had nothing to do with SIB); ¶ 382 (Hunton provides a deceptive letter from Leroy King to Florida regulators attesting to Stanford's compliance with Antiguan law in an attempt to protect Stanford's Florida operations from being shut down).

Defendants when they purchased SIB CDs; nor do they have to prove the proportionate harm caused by the Defendants' as a result of their participation in the Stanford Ponzi scheme. Plaintiffs do not even have to show they ever had any direct dealings with the Defendants as aiders and abettors. *See Sterling Trust Co. v. Adderley*, 168 S.W. 3d 835, 843 (Tex. 2005). Instead, all that is required is that the Class Plaintiffs show (i) that the TSA applies on a class basis – alone or in conjunction with the Blue Sky laws of other states; (ii) that the Defendants, as aiders and abettors of Stanford' primary TSA violations, are jointly and severally liable for all the losses suffered by the Class Plaintiffs as a result of those violations; (iii) that sufficient data exists to calculate and distribute recoveries to each class member (as those classes are defined in the pleadings or ultimately shaped by the Court); and (iv) that a judgment against the Defendants will *likely* have a preclusive effect in the Class Plaintiffs' home jurisdictions.  As demonstrated below, the Class Plaintiffs have made these showings with exacting specificity.

The Defendants' responses – which offer an array of quibbles, many of which are based on unsupported speculation – fail to present <u>any</u> practical or substantive basis whatsoever for a denial of certification.  At most, the Defendants raise certain very discreet issues that may possibly result in a redefinition of the classes proposed by the Class Plaintiffs, as the Court sees fit.  Indeed, trial courts are given substantial discretion in determining whether to grant class certification because "'the district court is often in the best position to assess the propriety of the class and has the ability ... to alter or modify the class, create subclasses, and decertify the class whenever warranted.'" *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 301 (E.D.N.Y. 2006) (quoting *In re Sumitomo Copper Litig.*, 262 F.3d 134, 139 (2d Cir. 2001); *see also In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("District courts are permitted to limit or modify class definitions to provide the necessary precision.").  The Class

Plaintiffs may also need to work with the Receiver during the damages phase of this case to supplement the Receiver's investor-related data, the vast majority of which has already been collected, analyzed, and carefully vetted as part of the Receiver's Court-approved investor claims process.  But neither of these conditions are actual impediments to class certification as a matter of law.

"Rule 23 is a remedial rule which should be construed liberally to permit class actions, especially in the context of securities fraud suits, where the class action device can prove effective in deterring illegal activity."  *Longden v. Sunderman*, 123 F.R.D. 547, 556 (N.D. Tex. 1988) (citing *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *King v. Kansas City Southern Industries, Inc.*, 519 F.2d 20, 26 (7th Cir. 1975); *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973); *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); 5 NEWBURG ON CLASS ACTIONS § 8800 (1977).

Clearly, the most orderly and effective way for this case to proceed is through the class action mechanism set forth in Rule 23.  And because the Class Plaintiffs have demonstrated each of Rule 23's prerequisites, the motion for certification should be granted.

## ARGUMENT AND AUTHORITIES IN REPLY

### I.   PREDOMINANCE IS SATISFIED

#### A.   Individual Issues of Reliance Do Not Preclude Certification

The Defendants – at almost every turn – insist that supposedly unique factual issues will prevent the common adjudication of this action.   In relevant part, the Defendants seek to completely re-draw and re-cast the Class Plaintiffs' case and trumpet the fact that each of the putative class representatives and class members supposedly relied on different affirmative

statements made variously by Stanford, Stanford financial advisors, SIB materials, and of course the Defendants themselves.

The Court should not countenance such a re-write of the Class Plaintiffs' liability case. In the 165-page Complaint filed in 2012, the Class Plaintiffs painstakingly detailed the conduct for which they seek to hold the Defendants liable.   That conduct is based on the Defendants' active participation in Stanford's **undisclosed** regulatory fraud, regulatory evasion, and corruption of the island nation of Antigua.   This Court already considered, and in large part denied, the Defendants' motions seeking to dismiss the case that the Class Plaintiffs plead based on that conduct.   The case that the Class Plaintiffs plead, and which this Court considered at the motion to dismiss stage, was <u>not</u> premised on affirmative misrepresentations made by Stanford about, *e.g.*, the reasons for higher interest rates, available insurance, or the risk of investing in the CDs.   *See, e.g.*, Hunton's Response at pps. 32-25.   The Class Plaintiffs' case is premised on Stanford's uniform omission to disclose the nature and degree of illicit conduct he was involved in, aided by these Defendants, as outlined in the Complaint and in the Appendix accompanying the Class Plaintiffs' opening Brief.   The Court should reject the Defendants' invitation to consider class certification based on a *different* case than the one plead and presented by the Class Plaintiffs.

But, and even allowing for the Defendants' wholesale rewrite of the Class Plaintiffs' case, the Defendants are wrong that this presents any obstacle whatsoever to certification. Reliance is <u>not</u> an element of Class Plaintiffs' TSA claims, their aiding and abetting breach of fiduciary duty claim, or their conspiracy claim.   Furthermore, this case is focused on a single, massive and sweeping material **<u>omission</u>**, specifically, that SIB was a $7 billion regulatory fraud – a fact well hidden from the Class Plaintiffs but known to the Defendants by virtue of their

long-standing relationships with and material assistance to Stanford and his entities.  There is no other individual question of reliance that should disturb this case from proceeding as a class action under Rule 23.

It is well-settled that individual reliance is not an element of an aiding and abetting claim under the TSA.  *See e.g., Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 97 S.W.3d 779, 783 (Tex. App.—Dallas 2003), *rev'd on other grounds*, 161 S.W.3d 482 (Tex. 2005); *Hendricks v. Thornton*, 973 S.W.2d 348, 360 (Tex. App.—Beaumont 1998, pet. denied); *Anheuser-Busch Cos., Inc. v. Summit Coffee Co.*, 858 S.W.2d 928, 936 (Tex. App.—Dallas 1993, writ denied), *vacated on other grounds*, 514 U.S. 1001 (1995) ("An investor is not required to prove that he would have acted differently but for the omission or misrepresentation.") (emphasis supplied); *In re Westcap Enters.*, 230 F.3d 717, 726 (5th Cir. 2000) ("Nor does the Act require a buyer's reliance on the misrepresentations or omissions.") (emphasis supplied).

Nor are the Class Plaintiffs required to show they ever had any direct dealings with the Defendants as aiders and abettors.  *See Sterling Trust*, 168 S.W. at 843 ("[T]he TSA does not require the aider to have had any direct dealing with the defrauded party; indeed, a person who 'materially aids a seller' may have no contact at all with the investors.").

Hunton tries to get around long-standing Texas law on the TSA by citing *Crescendo Invs. V. Brice*, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied) for the supposed proposition that in order for an "omission" to be actionable under the TSA, it must have "induced" the plaintiff to invest with the defendant.  *See* Hunton Br. p. 39. The validity of this opinion is questionable in light of the substantial authority to the contrary cited above and below in footnote 3.  Nonetheless, even if this were a correct statement of the law, *Crescendo* does <u>not</u>

state that inducement is required with respect to <u>omissions</u> under the TSA; it states this only with respect to <u>affirmative misrepresentations</u>.  *Id.* at 475 ("Crescendo must introduce evidence of misleading <u>statements</u> by BFI/ICBIY that relate to the security purchased and <u>induced</u> the purchase thereof.") (emphasis supplied) (citing *Nicholas v. Crocker*, 687 S.W.2d 365, 368 (Tex. App.—Tyler 1984, writ ref'd n.r.e.); *Pitman v. Lightfoot*, 937 S.W.2d 496, 531(Tex. App.—San Antonio 1996, writ denied) (construing article 581–33B (liability of buyers) of the Texas Securities Act in light of Nicholas)). The Court should resist Hunton's apparent attempt to establish new elements or criteria for liability for omissions under the TSA.

Hunton also cites *In re Westcap Enters.*, 230 F.3d 717, 726 (5th Cir. 2000) for its new "inducement" argument – despite the fact that *In re Westcap* does not mention inducement at all – as well as for the proposition that an omission under the TSA is "material" only "if there was an appreciable likelihood that it could have significantly affected the investment decisions of a reasonable investor by substantially altering the information available to him in deciding whether to invest." *Id.* (citations omitted).  Given that the omission alleged in this case – Stanford's regulatory fraud campaign that enabled him to operate a massive Ponzi fraud scheme for over twenty years – would certainly have affected any reasonable investor's investment decision, Hunton's reliance on *In re Westcap* does not help it.  In attempting to graft a new "inducement" requirement on to the Class Plaintiffs' TSA claim through their materiality argument, the Defendants fail to recognize that materiality in connection with a TSA claim is viewed from the objective standpoint of a reasonable investor, not any particular subjective standard of any actual investor.  *Id.* at 726; *see also Highland Capital Mgmt L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 743 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("For purposes of the TSA, an omission or misrepresentation is material if there is a substantial likelihood that a ***reasonable investor*** would

consider it important in deciding to invest.") (emphasis supplied).   Thus, this case is not dominated by individual inquiries.

Consequently, and contrary to the Defendants' arguments, the Class Plaintiffs' TSA claims do not depend in <u>any way</u> on purported individual representations – divergent or otherwise – that require individualized inquiry into materiality, reliance, or loss causation.[3]   The Class Plaintiffs' case – as alleged in the Complaint and affirmed in the Court's Order denying the motions to dismiss – is simply that: (1) Stanford was engaged in regulatory fraud and evading and obstructing regulatory oversight of SIB's activities so as to conceal his massive fraud and Ponzi scheme, even corrupting and co-opting the government of the impoverished island nation of Antigua; (2) Stanford intentionally hid that regulatory fraud, evasion, and illegal activities from the class; and (3) the Defendants materially assisted Stanford's regulatory fraud, evasion, and illegal activities.   Reliance and loss causation do not play a role in the Class Plaintiffs' case in chief under the TSA, which involves losses suffered by the class due to Stanford's material omissions, aided and abetted by the Defendants.

Reliance is also not an element of Class Plaintiffs' claim against the Defendants for aiding and abetting Stanford's breach of fiduciary duties or their conspiracy claim.   The only elements to such claim is (1) the existence of a fiduciary duty; (2) the defendants' knowledge of the fiduciary relationship, (3) the Defendants' awareness that it was participating in the breach of

---

[3]      Indeed proof of loss causation is <u>immaterial</u> to a plaintiff's case under the TSA.  *See e.g., Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 649 (Tex. App.—Houston [14th Dist.] 1995, pet. denied) ("[T]here is nothing in the Act, the Comment, or any case interpreting the Act to suggest that section 33(F)(2) imposes an additional causation requirement on the buyer to establish the aider's liability."), *abrogated on other grounds by Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord Geodyne*, S.W.3d at 785 ("Article 581-33A(2) does not require the buyer to prove the misrepresentation or omission caused his injury."); *Duperier v. Texas State Bank*, 28 S.W.3d 740, 753 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) ("Article 581-33A(2) establishes the elements and defenses available under the [TSA].  <u>Loss causation is not an element of or a defense to a claim brought under this particular provision of the Act.</u>") (emphasis supplied); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 544 (S.D. Tex. 2011) ("<u>The TSA does not require a buyer to prove reliance on the sellers's misrepresentation or omission, nor does it require proof of scienter or have a causation requirement.</u>") (emphasis supplied).

fiduciary duty; and (4) injury to the Class Plaintiffs or benefit to the Defendants.  *See* Order on Motion to Dismiss [Doc. 123] p. 19; *see also Kinzbach Tool co. v. Corbett-Wallace Corp.,* 160 S.W.2d 509, 513-14 (Tex. 1942); and *Graham Mort. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.).  The elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.  *See id.*, p. 6.  Thus, reliance is only relevant, if at all, to the Class Plaintiffs' claims for aiding and abetting a fraudulent scheme.

However, with respect to Class Plaintiffs' fraud-based claim – as argued in the Class Plaintiff's motion for certification – the Class Plaintiffs can take <u>full</u> advantage of the *Affiliated Ute* presumption of reliance.[4]  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972) (a class-wide presumption of reliance may be appropriate in cases involving "primarily" omissions).  In fact, courts regularly apply the *Affiliated Ute* presumption where, as here, plaintiffs allege a fraudulent Ponzi scheme.  *See e.g., Katz v. MRT Holdings* LLC, No. 07-61438-CIV, 2008 U.S. Dist. LEXIS 114421 (S.D. Fla. 2008); *Getty v. Harmon*, No. 09-178, 1998 WL 919368, *5 (W.D. Wash. Oct. 23, 1998); *Walco Investments Inc. v. Thenen*, 168 F.R.D. 315, 331-32 (S.D. Fla. 1996); *In re Home-Stake Prod. Co. Sec. Litg.*, 76 F.R.D. 351, 371 (D. Okla. 1977).

---

[4]    Hunton's argument that the *Affiliated Ute* presumption is applicable only in cases that are "primarily based on omissions" – *see* Hunton Br. p. 39 (citing *Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007) – appears to be the result of Hunton's misconception of the Class Plaintiffs' claims.  The Class Plaintiffs allege precisely that Stanford and those aiding and abetting his Ponzi scheme – including Greenberg and Hunton – <u>omitted</u> to the Class Plaintiffs the fact that Stanford was engaged in a regulatory fraud on CD investors.  While *Hunton*, not Plaintiffs, stresses the supposed role that certain affirmative statements by Stanford financial advisors may have played in the Class Plaintiffs' decisions to invest in CDs, this does nothing to minimize the fact that the material omissions at issue in this case clearly predominate.  *See Strougo v. Barclays PLC*, No. 1:14-cv-05797-SAS [Doc. 78] p. 24 (S.D.N.Y. Feb. 2, 2016) ("While that fact makes it debatable whether investors would have considered affirmative statements about LX material, <u>it appears far more likely that investors would have found the omitted conduct material</u>.") (emphasis supplied) (granting motion for class certification; applying the *Affiliated Ute* presumption).

Accordingly, common issues clearly predominate in this putative class action because reliance is not an element of any of Class Plaintiffs' claims other than aiding and abetting a fraudulent scheme.  With respect to all of the Class Plaintiffs' claims, "questions of [the defendant's] assistance and knowledge focus on [the defendant], not the alleged victims." *Joint Equity Comm. of Inv. of Real Estate Partners, Inc., v. Coldwell Bankr Real Estate Corp.*, 281 F.R.D. 422, 434 (C.D. Cal. 2012) (decided under California law).  Thus, whether the Defendants provided substantial assistance to the Stanford scheme is a uniform class-wide issue relevant to all of the Class Plaintiffs' claims.  The Defendants "either knew of [or acted with reckless disregard for Stanford's] scheme to defraud and took steps substantially to advance the scheme or [they] didn't.  Either way, [their] knowledge and assistance . . . predominates as a common issue." *Jenson v. Fiserv Trust Co.*, 256 F. App'x 924, 926 (9th Cir. 2007); *see also In re Petrobras Sec. Litig.*, 2016 WL 413122, at *3 (S.D.N.Y. Feb. 2, 2016) ("Common questions of law and fact in this case include the truth of the bribery and kickback allegations against Petrobras, the accuracy of Petrobras's statements in connection with the allegations, [and] the knowledge of individual defendants regarding these matters . . . ."); *Melo v. Gardere Wynne Sewell, LLP*, Case No. 04-2238, 2007 WL 92388, at *1 (N.D. Tex. Jan. 12, 2007) ("[t]he question of whether defendants materially aided and abetted Sharp Capital in transferring money to an offshore company without the knowledge or approval of investors [was] common to all members of the proposed class").[5]

---

[5]     Greenberg and Hunton each cite to and heavily invoke *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) for the proposition that reliance supposedly cannot be proved on a class-wide basis through evidence common to the class.  This citation is misleading because *Amgen* affirmed the availability of a presumption of reliance in securities fraud cases alleging omissions of fact, and went one step further to hold that "proof of materiality [of the alleged omission] is not required to establish that a proposed class is sufficiently cohesive to warrant adjudication by representation." *Amgen*, 133 S. Ct. at 1196 (emphasis supplied).  Thus, *Amgen* clearly favors the Class Plaintiffs' position that a class may be certified, and not the defendants' position that individual issues of reliance defeat certification.  In fact, none of the federal authorities cited by Greenberg and Hunton – including this Court's decisions in *Bell v. Ascendant Solutions, Inc.*, Case No. 3:1-cv-0166-N, 2004 WL 1490009 (N.D. Tex. July

Even were the focus properly placed on questions concerning the Class Plaintiffs' knowledge of facts related to Stanford's fraud, as the Defendants mistakenly insist, neither Greenberg nor Hunton have presented any evidence that <u>any</u> of Stanford's 17,000 investors who have filed claims with the Receiver and had those claims approved knew that Stanford was engaged in regulatory fraud, evasion, or illegal conduct, or that the Defendants were assisting him in that endeavor.  *See, e.g., Anwar v Fairfield Greenwich Ltd.*, No. 09 Civ. 0118(VM), 2015 WL 935454, *8 (S.D.N.Y. 2015) (finding that the defendants failed to present sufficient evidence to rebut inference created by facts in favor of class certification); *In re Beacon Assoc. Litig.,* 282 F.R.D. 315, 330 (S.D.N.Y. 2012) (once class plaintiffs establish omission, defendants have burden to demonstrate that plaintiffs did not in fact rely upon the omission when they made their investment decision).  So while the Defendants speculate, insinuate and cite to press reports and other so-called "evidence" of knowledge (none of which is appended to their Response) there is no testimony or other evidence whatsoever that <u>any</u> of the members of *this* putative class knew or even suspected that Stanford was engaged in any of the conduct alleged in the Complaint. Even with respect to the Class Plaintiffs' claims for aiding and abetting a fraudulent scheme, individual issues of investor reliance do not preclude certification.[6]  Indeed, investors' common

---

1, 2004) and *Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*, No. 3:02-CV-1245-N, 2003 WL 21339279 (N.D. Tex. Jun. 3, 2003) – stand for that categorical rule.  Rather, each of these cases instructs that "the proposed class fails Rule 23(b)(3)'s predominance requirement" when "the circumstances surrounding each plaintiff's alleged reliance on fraudulent representations differ." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (emphasis added). This rule is consistent with the Texas Supreme Court's admonition that "[c]lass-wide proof of reliance is possible when class-wide evidence of reliance exists." *Southwestern Bell Telephone Co. v. Marketing on Hold Inc.*, 308 S.W.3d 909, 922-23 (Tex. 2010).  Here, class wide evidence of reliance exists because there is no "material variation" in Stanford's failure to divulge his Ponzi scheme, nor is there variation in the Class Plaintiffs' "degrees of reliance thereupon." *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1970). Furthermore, reliance is not an element of most of Class Plaintiffs' claims.  Accordingly, individual issues of reliance will not defeat predominance.

[6]      And to the extent causation may be an element of the Class Plaintiffs' non-TSA claims, the relevant inquiry is <u>not</u> whether the Class Plaintiffs would have sustained their losses but for Defendants' conduct; rather, it is whether the Class Plaintiffs' would have sustained their losses but for <u>Stanford's</u> fraud. *See e.g., Weatherly*, 905 S.W.2d at 649 ("Even if we were to recognize a causation requirement, that standard only requires the plaintiffs to

---

reliance on Stanford's material omissions are self-evident and presumed because knowledge of the Ponzi scheme would have, by definition, caused the Class Plaintiffs <u>not</u> to invest. *See, e.g.,* *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 652 (S.D.N.Y. 2012) (class plaintiffs alleging securities fraud under New York common law entitled to presumption of reliance where fraudfeasor's omission was material); *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 452 (S.D.N.Y. 2013) (applying presumption of reliance to plaintiffs' allegations of aiding and abetting fraud under New York common law).

In addition, courts regularly certify classes for common-law fraud claims based on uniform misrepresentations made as part of a "common fraudulent scheme" or "common course of conduct." *See, e.g., In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1258-59 (11th Cir. 2004); *In re HealthSouth Corp. Sec. Lit.*, 261 F.RD. 616, 645 (N.D. Ala. 2009); *Bruhl v. Price WaterhouseCoopers Intern.*, 257 F.R.D. 684, 694 (S.D. Fla. 2008); *In re Great So. Life Ins. Co. Sales Practices Lit.*, 192 F.R.D. 212, 220 (N.D. Tex. 2000); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 338 (N.D. Ill. 1997); *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 334 (S.D. Fla. 1996). Thus, "[w]hen the fraud was perpetrated in a uniform manner against every member of the class…courts typically hold that individual reliance questions do not predominate." *Rohlfing*, 172 F.R.D. at 338.

As such, under the "common fraudulent scheme" theory, a court may presume investor reliance where the "same or substantially similar misrepresentations were made to the putative class" and "they were of such a nature that it can be presumed that all members of the class

---

prove that the untruth was in some reasonably direct or proximate way responsible for their loss. In other words, the plaintiffs must prove that but for the fraud, they would not have incurred the loss.") (quotation marks and citations omitted); *see also Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981) (in securities fraud action causation requires proof that "the untruth was in some reasonably direct, or proximate, way responsible for [the investor's] loss"), *rev'd in part on other grounds* 459 U.S. 375 (1983). And here, because no SIB investor would knowingly invest in a Ponzi scheme, this test is clearly met.

relied upon them either to invest in the first instance, to remain in the investment, or to redeem their interest in the investment." *Bruhl*, 257 F.R.D. at 696.  Thus, "[a] prominent factor in determining if reliance can be presumed . . . is whether all the plaintiffs received the same or substantially the same message from the defendants."[7] *Id.*

Here, the Court may presume the Class Plaintiffs' reliance based on Stanford's common fraudulent scheme against, and omissions to disclose same to, <u>all</u> investors.   Although Defendants attempt to portray SIB's investment materials and publications as containing varying, non-standardized representations – and claim that even the putative class representatives supposedly received differentiated disclosures from SIB or their personal financial advisors – the Class Plaintiffs' common law fraud claims, as discussed above, are based primarily on Stanford's <u>material omissions</u> regarding its overall regulatory fraud, evasion, and illicit conduct. Clearly, <u>no investor would have invested with Stanford if he or she knew how Stanford was</u> <u>actually operating, and no materials given to any investor contained any disclosure to the effect</u> <u>that Stanford was engaged in a massive Ponzi scheme</u>.   "At the heart of the scheme alleged by [P]laintiffs here is a major omission regarding the true nature of the investment."   *Getty v. Harmon*, No. 09-178, 1998 WL 919368, *5 (W.D. Wash. Oct. 23, 1998); *see also*, *Torres v. SGE Management LLC*, 2014 WL 129793 at *8-9 (S.D. Tex. 2014) (certifying class based on fraud-

---

[7]     The presumption of reliance that underlies the "common fraudulent scheme" theory is based on "considerations of fairness, public policy, and probability, as well as judicial economy." *In re HealthSouth Corp. Securities Litigation*, 261 F.R.D. 616, 645 (N.D. Ala. 2009).  The presumption "is supported by common sense and probability[;] . . . courts presume reliance where it is logical to presume that reliance in fact existed."  *Id.* at 645-46 (internal citations and punctuation omitted).  Where the "complete mix of publicly available information" is "based on an extensive fraud that fooled the . . . market as a whole," it is "reasonable and probable to find that the purchasers of [the fraudulent securities] relied on [the seller's] misrepresentations and relied on the integrity of the market place . . . ."  *Id.* at 646.

on-the-market theory and the "common sense inference" that no one would invest in an unlawful venture").[8]

"[T]he existence of a Ponzi scheme not disclosed to the investors" is a "material omission" regarding a "common fraudulent scheme sufficient to establish the predominance of common questions," and it is both "reasonable and probable" that investors relied on Stanford's uniform omissions when deciding to invest. *HealthSouth*, 261 F.R.D. at 646. Stanford's failure to disclose the existence of his massive fraud scheme, and the regulatory fraud, evasion and obstruction he engaged in with the Defendants' assistance is a "material omission" and is sufficient to establish the predominance of common questions regarding Plaintiffs' reliance. *Id.*; *see also Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718 (11th Cir. 1987) (in light of defendants' dissemination of "materially misleading information" about the financial condition of company as part of "a single conspiracy and fraudulent scheme against a large number of individuals," "the factual issue of individual reliance could not render the claims unsuitable for class treatment").[9]

---

[8]     Plaintiffs note that Judge Hoyt's decision in *Torres* to certify the class was ultimately reversed by the Fifth Circuit, but only because, as discussed in more detail *infra*, the record on appeal contained evidence that some investors joined in the scheme despite the fact that they knew (and perhaps in some cases precisely because they knew) it was a pyramid scheme.  The Fifth Circuit otherwise did not question the rationale for Judge's Hoyt's "common sense inference" basis for a presumption of reliance.

[9]     Significantly, since the Fifth Circuit's decision in *Shores v. Sklar*, 647 F. 2d 462 (5th Cir. 1981) – which established the "fraud created the market" theory – federal courts have had little difficulty certifying investor class actions based on securities frauds and Ponzi schemes like Stanford.  *See e.g., Jenson*, 256 Fed. Appx. at 926-27(affirming certification of investor class based on finding that the "center of gravity" of the underlying Ponzi fraud predominated over individual oral representations made to investors and holding that the knowledge and assistance of the alleged aider and abettor predominated as a common issue for all class members); *Katz v. MRT Holdings LLC*, No. 07-61438-CIV, 2008 WL 4725284 (S.D. Fla. 2008) (finding that common issues predominated in pervasive fraud Ponzi scheme and granting class certification); *Walco Inv. v. Thenen*, 168 F.R.D. 315 (S.D. Fla. 1996) (granting class certification in case involving underlying Ponzi scheme based on finding of common, unified fraudulent scheme and common issues of aiding and abetting); *Billitteri v. Sec. America, Inc.*, No. 3:09-CV-01569-F, 2011 WL 3586217 (N.D. Tex. 2011)(certifying class for settlement purposes based on underlying common fraud and Ponzi scheme); *Longden v. Sunderman*, 123 F.R.D. 547 (N.D. Tex. 1988) (granting class certification in fraudulent securities "common scheme" based on pervasive, continuous course of conduct that was uniformly fraudulent and involved a "standardized sales plan"); *In re Worldcom Inc. Sec. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003) (class certification granted based on "pervasive accounting fraud"); *In re Am. Cont'l Corp./Lincoln*

---

Hunton seeks to focus the Court on the Fifth Circuit's recent decision in *Torres v. S.G.E. Management, LLC*, 805 F.3d 145 (5th Cir. 2015) as a supposed instance in which a court declined to certify a class seeking recoveries under RICO based on the plaintiffs' supposed exposure to different and differing oral representations by the company and its representatives. But Hunton's portrayal of *Torres* does not account for a dispositive distinguishing fact of that case: many of the plaintiffs in *Torres* were admittedly *aware* that the defendant was operating a "pyramid scheme" *but chose to invest anyway*, hoping they could withdraw profits before other members of the putative class. *Id.* at 157-58 ("an investor could reasonably choose to knowingly invest in a pyramid scheme in the hope that they would make money…. many of the Plaintiffs chose to invest in the scheme in the belief that, legal or illegal, it provided them with an opportunity to make money."). Indeed, that is the *advertised* nature of what is commonly known as a "pyramid scheme": the company recruits early participants and trains them to recruit and leverage others (such as friends and family members) to work below them in the sales chain – and the early participants are aware that those lower in the sales chain eventually will be unable to sell enough product to profit from the arrangement and will lose the fees advanced to the company. *Id.*

In stark contrast, here there is no evidence whatsoever that <u>any</u> of the putative class members were aware that Stanford was operating a fraud scheme or engaging in regulatory fraud

---

*Sav. & Loan Sec. Litig.*, 140 F.R.D. 425 (D. Ariz. 1992) (court focused on the "breadth and magnitude" of the fraud and held that the underlying fraud scheme was the predominant issue and the "center of gravity" that transcended the "specific details of oral communications"). Relatedly, courts have also presumed reliance on the regulatory process because purchasers of securities are presumed to rely, at least indirectly, on the integrity of the regulatory process. *See, e.g., Arthur Young & Co. v. U.S. District Court*, 549 F.2d 686, 695 (9th Cir. 1977); *T.J. Rainey v. Ft. Cobb Okla. Irrig. Fuel Author.*, 717 F.2d 1330 (10th Cir. 1983); *In re HealthSouth*, 261 F.R.D. at 644 (investing public should be able to rely upon SEC regulation to ensure that the securities being offered are legitimate); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 434 (D. Ariz. 1992) (holding that investors were entitled to a presumption of reliance where they relied on the integrity of the regulatory process and the alleged regulatory fraud "was designed to prevent regulators from stepping in to protect the public interest").

and evasion or corrupting Antiguan officials.[10]   Because Stanford was a Ponzi scheme, not a

"pyramid scheme," there would be no logical reason for any investor to invest in Stanford if they

knew it was a Ponzi scheme, as they would have no means to profit from doing so, in contrast to

the early investors in a "pyramid scheme" whose primary revenue stream is knowingly built on

the backs of those below them.   This fact alone distinguishes this case from *Torres*.   Unlike the

defendant in *Torres*, Stanford didn't advertise or market his company as a "pyramid scheme" or

reveal the true nature or structure of his operations to investors.   The better case (approved of in

*Torres*) is *CGC Holding Co., LLC, v. Broad and Cassel*, 773 F.3d 1076 (10th Cir. 2014) where

the plaintiffs remitted payments to the defendant in exchange for loan commitments.   The

defendant had no intention of actually making the loans, and the court found that the plaintiffs all

relied on this material omission for purposes of the predominance prong of Rule 23.   *Id.* at 1093

("In this case, the victims of Hutchens's fraud were completely deprived of any benefit from their

transaction because Hutchens allegedly did not intend to or have the ability to fund any of the

loans. This fact, if proved at trial, will resolve a central, predominating issue that is common to

all class members.").

In any event, because the Class Plaintiffs' common-law claims arise from the same facts

and require the same evidence as their TSA claims, the Court should certify a class with respect

to those claims as well, regardless of the reliance issue which is relevant, if at all, to only one of

Class Plaintiffs' claims (aiding and abetting a fraudulent scheme).   *See e.g., Alexander v.*

*Centrafarm Group, N.V.*, 124 F.R.D. 178 (N.D. Ill. 1988) (allowing pendent common-law fraud

---

[10]      Again, the Defendants rely solely on innuendo and speculation about what investors **might** have known.
*See e.g.*, Hunton Brief at 36, and footnote 53.  But they provide no evidence that any actual member of *this* putative
class – defined as persons who filed approved claims with the Receiver – knew of any of Stanford's conduct, and the
Court can make the common sense inference that any investor who did have an inkling about Stanford's illicit
conduct withdrew their money from SIBL prior to February 2009 and so suffered no losses and therefore never filed
a claim with the Receiver.  Such an inference is entirely proper here where, unlike in *Torres*, the Defendants have no
offered **no evidence** to the contrary.

claim in securities action; reliance would not create significant individual issues because alleged misrepresentations uniform to all class members); *SEECO, Inc. v. Hales*, 954 S.W.2d 234, 240-41 (Ark. 1997) (upholding certification of class with respect to common law fraud claims in light of "the common question relating to the allegation of a scheme perpetrated by the [defendants]"); *Cameron v. E.M. Adams & Co.*, 547 F. 2d 473, 478 (9th Cir. 1976); *In re Kirschner Medical Corp. Sec. Litig.*, 139 F.R.D. 74, 83 (D. Md. 1991) (same); *In re ORFA Sec. Litig*, 654 F.Supp. 1449, 1461-62 (D.N.J. 1987); *In re United Telecom. Inc. Sec. Litig.*, No. 90-2251-0, 1992 WL 309884, *4-5 (D. Kan. 1992) (citing cases).

## B.    Choice of Law Considerations Do Not Preclude Certification

With respect to the predominance test under Rule 23, the Defendants also argue that purported variations in state laws arguably applicable to the Class Plaintiffs' securities and common law claims preclude certification.[11]   The Defendants, however, are mistaken because Texas law clearly applies to the Class Plaintiff's TSA and common law claims.[12]

---

[11]    Of course the Defendants have failed to affirmatively provide the Court with any reason to believe that the laws of different jurisdictions will apply, much less any analysis of how these common law claims actually differ by jurisdiction.  *See e.g.*, *Janvey v. The University of Miami*, Case No. 3:11-cv-00041-N-BL [Doc. 44] Order p. 7 (The University asserts that Florida law applies to the case because it has the most significant relationship to the dispute. But the University fails to indicate how or why Florida law is different from Texas law); *Janvey v. Alguire, et al.*, No. 3:09-CV-0274-N, *et al.*, 2013 WL 2451738, at *4 (N.D. Tex. Jan. 22, 2013) ("[T]he failure to provide adequate proof [of choice of law] . . . results in a presumption that the law of the foreign jurisdiction is identical to the law of Texas."). Hunton, for its part, refers the Court to a 50-state choice of law analysis attempted by the defendants in another pending class action (*Rotstain et al. v. Trustmark Nation Bank et al.*), and then selectively cites to a handful of results contained in the analysis.  Accordingly, to the extent Hunton incorporates this analysis, the Class Plaintiffs incorporate the reply of the Class Plaintiffs in *Rotstain* herein.

[12]    The Defendants argue reflexively that the Class Plaintiffs' choice of law analysis is "bare bones" and that the Class Plaintiffs allegedly failed in their opening brief to demonstrate that Texas law applies to this case.  The Class Plaintiffs' opening brief, however, contains lengthy and separately enumerated facts and choice of law sections that detail the factual and legal basis for the application of the TSA and Texas common law to this action.  By providing the Court with this extensive list and analysis of Texas contacts, the Class Plaintiffs fulfilled their obligation to furnish the information necessary to make an informed decision that Texas law controls this dispute.  *Cf. Citizens Ins. Co. of America v. Daccach*, 217 S.W.3d 430, 442 (Tex. 2007) ("Daccach was not required to present a global overview of potentially applicable securities registration laws to pursue a claim against Citizens for selling or offering securities in or from Texas as an unregistered dealer.") (emphasis supplied) (citing Irving L. Faught & Z. Faye Martin Morton, Recent Developments in Securities Law: USA 2002—Something Old, Something New ..., 60 CONSUMER FIN. L.Q. REP. 58, 60 (2006); Larry Kramer, Choice of Law in Complex Litigation, 71

The Fifth Circuit recently addressed the correct procedure for determining what law applies in Stanford-related litigation.  *See Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014).  In that regard, the Court applies the choice of law rules of the forum state, Texas.  *Id.* Texas, in turn, follows the most significant relationship test set forth in the Restatement (Second) of Conflict of Laws.  *Id.*  Under Texas law, the first step is to conduct a "false conflict" analysis, and only then to apply the Second Restatement's most significant relationship test where a true conflict exists.[13]  *Id.*

In *Janvey v. Brown*, the Fifth Circuit considered whether the Texas Uniform Fraudulent Transfer Act ("TUFTA") applied to the Receiver's claims.  The Fifth Circuit affirmed this Court's finding that there was a "false conflict" as to the TUFTA provisions at issue because UFTA-enacting states had identical language.  *Id.* at 435.  Accordingly, the panel held that there was no need to apply the "most significant relationship" test and this Court was correct in declining to perform such an analysis.  *Id.*

This same result is warranted here in connection with the Class Plaintiffs' TSA claims. Indeed, there is no actual conflict whatsoever between the TSA and other Blue Sky Laws, because all state securities statutes are "additive" – i.e., they are intended to supplement other remedies available to defrauded investors.  *See, e.g., In re BP P.L.C. Sec. Litig.*, 922 F.Supp.2d 600 (S.D. Tex. 2013) ("Blue Sky laws do not present a conflict-of-laws problem, so long as a territorial nexus with a given state's law has been alleged . . . The Court declines to impose the 'most significant relationship' test to Plaintiff's claims under the Ohio Securities Act.");

---

N.Y.U. L. REV. 547, 549 (1996); Larry Kramer, Rethinking Choice of Law, 90 COLUM. LAW REV. 277, 284–87 (1990) (reasoning that the choice of law analysis of the class's claim should not be evaluated differently than it would be if brought by an individual)).

[13]    A "false conflict" exists when the laws of the various jurisdictions are compatible with Texas law.  *See Janvey v. Brown*, 767 F.3d at 436.

*Cromeans v. Morgan Keegan & Co.*, 303 F.R.D. 543, 556-557 (W.D. Mo. 2014) ("[T]he putative Plaintiffs' claim under the Missouri Blue Sky Law is additive and does not diminish their rights under other security laws."); *see also Fed. Hous. Fin. Agency v. Deutsche Bank AG*, 903 F. Supp. 2d 285, 291 (S.D.N.Y. 2012) (despite not providing for a private right of action under the Martin Act, "New York has no interest in precluding claims" under other states' Blue Sky Laws); *Nuveen Premium Income Fund 4, Inc. v. Morgan Keegan & Co.*, 200 F.Supp.2d 1313 (W.D. Okla. 2002) ("The court concludes this case does not call for a traditional conflict of laws analysis, however. Instead, the court finds persuasive those cases which hold that multiple states' Blue Sky laws can potentially apply to a single securities transaction."); *Lintz v. Carey Manor Ltd.*, 613 F.Supp. 543, 551 (W.D. Va. 1985) ("[j]ust as the same act can violate both federal and state law simultaneously, or a state statute as well as state common law, so too can it violate several Blue Sky laws simultaneously"); *Simms Inv. Co. v. E.F. Hutton & Co.*, 699 F. Supp. 543, 546 (M.D.N.C. 1988) ("[T]he securities laws of two or more states may be applicable to a single transaction without presenting a conflict of laws question."); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1536 (M.D. Fla. 1989) ("[N]o reason to apply a traditional conflicts of laws analysis" when suit was brought under a state Blue Sky law"); *Chrysler Capital Corp. v. Century Power Corp.*, No. 91 Civ. 1937, 1992 WL 163006, *2 (S.D.N.Y. Jun. 24, 1992) ("[B]ecause application of multiple state securities laws to a single securities transaction does not present a conflict of laws issue, [defendant]'s argument that only New York law may apply to the transaction at issue is rejected."); *United Heritage Life Ins. Co. v. First Matrix Investment. Servs. Corp.*, No. CV 06-0496, 2009 U.S. Dist. LEXIS 91245, 2009 WL 3229374, *4 (D. Idaho Sep. 30, 2009) ("[M]ore than one state's securities laws can apply to a transaction.").

In this regard, as long as there is a territorial nexus with the law chosen by a plaintiff, no conflict analysis is required with respect to state securities claims. And as demonstrated by the foregoing case law, although the Blue Sky laws are designed to govern transactions within a particular state, if a transaction implicates multiple or many states, the Blue Sky laws of those states may jointly apply – i.e., there is no actual conflict.

Here, there is a clear territorial nexus with Texas. Significantly, this Court has already ruled (following an extensive evidentiary hearing) in the case filed by the Antiguan Joint Liquidators under Chapter 15 of the Bankruptcy Code that Texas was the center of main interest of the Stanford Entities.[14] *See In re Stanford International Bank, Ltd.*, Case 3:09-cv-00721-N, [Doc. 176] pp. 19-50. Further, this Court has also held that the TSA applies to *foreign* purchasers of the SIB CDs. *See Janvey v. Willis*, Case 3:13-cv-03980 [Doc. 64], Order at 19-21.[15] Finally, and as detailed in the Class Plaintiffs' opening Brief and the extensive evidence cited therein, Texas was clearly the headquarters and administrative nerve center for all of the Stanford Entities' fraudulent operations and activities.[16] *See* Class Plaintiffs' Brief in Support of Motion for Class Certification, pp. 5-33.

Accordingly, the TSA plainly applies to this action, and as in *Janvey v. Brown*, no further conflict analysis is required. *See, e.g., Daccach*, 217 S.W.3d 446-47 (Texas nexus established despite "none of the class members [being] from Texas") (emphasis supplied); *Petrites v. J. C.*

---

[14]    Indeed, even the Antiguan Government has admitted that SIB was actually operated out of Houston, Texas, and that Antigua was a mere "transit point" for SIB money flows. *See In re Stanford International Bank, Ltd.*, Case 3:09-cv-00721-N, [Doc. 176] at p. 49.

[15]    Hunton's halting attempt to distinguish *Willis* on the grounds that this Court allegedly did not conduct a "fulsome choice of law analysis" prior to entering its Order is unavailing.

[16]    As described in Plaintiffs' opening Brief and the evidence cited there and attached to the Appendix, Stanford's operation were headquartered in Texas; all of Stanford's marketing activities, including marketing activities in foreign countries, were directed from Texas; all of Stanford's financial advisors were trained in Texas; and employees in Texas drafted and prepared the training manuals for all financial advisors worldwide. *See* Plaintiffs' Opening Brief at pps. 65-68 and the evidence cited therein and attached to the Appendix.

*Bradford & Co.*, 646 F.2d 1033 (5th Cir. 1981) (Florida Blue Sky Law applied to fraudulent securities transactions negotiated in Georgia where "there were significant contacts with Florida"); *Baron v. Strassner*, 7 F. Supp. 2d 871, 875-76 (S.D. Tex. 1998) ("[T]here are sufficient allegations in Plaintiffs' pleading that the misrepresentations which underlie Plaintiffs' state law securities fraud claims originated, and were advanced, in the State of Texas."); *Minexa Arizona, Inc. v. Staubauch*, 667 S.W.2d 563, 566 (Tex. App. 1984) (personal jurisdiction established where foreign class plaintiffs alleged that Arizona corporation violated TSA's registration requirements).

Hunton's argument that the TSA cannot apply on class wide basis because it "cannot be a violation to sell an unregistered security to a non-Texan" is simply wrong.[17]  Texas has a strong interest in regulating the sale of securities from the state to other jurisdictions – which is precisely what Stanford did during the relevant period.  *See e.g., Daccach*, 217 S.W.3d at 440 ("Texas has a strong interest in regulating the sale of securities in and from the state"); *Deloitte & Touche Netherlands Antilles & Aruba v. Ulrich*, 172 S.W.3d 255, 269 (Tex. App. – Beaumont 2005, pet. denied) (Texas has interest in claims arising from securities fraud involving offshore bank where group controlling bank was based in Texas); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 691-92 (S.D. Tex. 2002) ("[T]he [TSA] is a broad remedial statute intended not only to protect Texas residents but also non-Texas residents from fraudulent securities practices emanating from Texas.") (quoting *Baron*, 7 F. Supp. 2d 871 at 875); *Gutierrez v. Cayman Islands Firm of Deloitte & Touche*, 100 S.W.3d 261, 274 (Tex. App.—San

---

[17]       Significantly, elsewhere in its brief, Hunton concedes that the Texas Supreme Court in *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430 (Tex. 2007) has held otherwise.  *Id.* at 442, 446 ("Daccach was not required to present a global overview of potentially applicable securities registration laws to pursue a claim against Citizens for selling or offering securities in or from Texas as an unregistered dealer …. we conclude the Texas Legislature intended section 12 of the Texas Securities Act to prohibit the unregistered sale of securities from Texas, even when the purchasers are nonresidents.") (emphasis added).

Antonio 2002, pet. dism'd) ("Texas has a strong interest in assuring the integrity of investment firms that choose to operate in the state, and we cannot permit this state to be used as a base of operations by corporations seeking shelter from our securities laws or from lawsuit"); *Rio Grande Oil Co. v. State*, 539 S.W.2d 917, 921 (Tex. Civ. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.) ("A state is damaged if its citizens are permitted to engage in fraudulent practices even though those injured are outside its borders").  And as demonstrated by the forgoing cases, the TSA is regularly applied in cases involving the purchase of unregistered securities by non-residents.  It should similarly be applied here.

In their responses, the Defendants cite to and rely heavily on this Court's decision in *Gyarmathy & Assocs., Inc. v. TIG Ins. Co.*, No. 3:02-CV-1245, 2003 WL 21339279 (N.D. Tex. Jun. 3, 2003) (Godbey, J.), as an instance in which a court denied certification to a putative class action on the grounds that the laws of multiple jurisdictions would apply.  *Gyarmathy*, however, involved claims brought against the issuer of workers compensation insurance policies.  In that case this Court was clear to rule that in the specific context of workers compensation insurance, the Restatement mandates the application of the laws of the state of the policy holder, not the laws of the issuer's domicile.  *See Gyarmathy*, 2003 WL 21339279 at *2. ("Under section 193 of the Restatement, the validity of and rights under a workers compensation insurance contract are generally determined by the local law of the state that is the principal location of the risk. Section 193 suggests that the local law of the class member's domicile would apply.").  This ruling obviously has no application to the present case which does not involve claims under workers compensation policies, and therefore, the specific directive of the Restatement is not

applicable. Instead, the Class Plaintiffs seek recoveries under the TSA for which there is no false conflict with the Blue Sky laws of other states, as demonstrated above.[18]

And because the TSA applies, and the Class Plaintiffs' Texas common law claims are comprised of substantially the same elements as the TSA claim, and the same evidence supports multiple elements across all of Plaintiffs' claims (knowledge/participation/aiding and abetting Stanford's primary TSA violations, misrepresentations and omissions), the Court should also certify all of the Class Plaintiffs' common law claims. *See In re First Republic Bank Securities Litigation*, Case No. 3-88-0641-H, 1989 WL 108795, at *11 (N.D. Tex. Aug. 1, 1989) ("the Court finds that Plaintiffs' negligent misrepresentation claims are predicated upon the same alleged fraudulent acts and material misrepresentations and omissions forming the basis of Plaintiffs' federal securities law claims. Class action treatment will be more efficient as it seems likely that the evidence regarding certain elements of these claims will overlap to a great extent. The Court, therefore, concludes that at this time Plaintiffs' pendent state law claims appear to present common questions of law and fact that predominate over individual issues.") (citing *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15 (N.D. Cal. 1986)).

Indeed, "[c]lass treatment of [all] claims will permit efficient presentation of proof on overlapping issues," such as the nature of Stanford's fraud and breach of fiduciary duties, the Defendants' knowledge of and participation in the fraud and breaches of fiduciary duties, and the Class Plaintiffs' damages. *See, e.g., Dekro v. Stern Bros. & Co.*, 540 F. Supp. 406, 418 (W.D. Mo. 1982) (certifying federal securities fraud claim and common law fraud claim); *Longden v.*

---

[18]     Hunton also cites to *Oxford v. Williams Companies, Inc.*, 137 F. Supp. 2d 756, 764 (E.D. Tex. 2001) as a supposed instance in which a court declined to certify a class that was comprised of residents of all 50 states. But this citation is hardly on point given that that there was no actual motion for certification under Rule 23 in *Oxford* (the judge addressed the issue *sua sponte*) and the choice of law issues were not raised or otherwise briefed by the parties. *Id.* Moreover, in *Oxford* the conduct of the defendant (common law trespass) was alleged to have taken place in *each* of the 50 states. In contrast, Stanford's Ponzi scheme – as this Court has already determined – was orchestrated from Houston, Texas.

*Sunderman*, 123 F.R.D. 547, 556 (N.D. Tex. 1988) (certifying 1934 Securities Act, RICO claim and common law fraud claims); *Bresson v. Thomson McKinnon Sec. Inc.*, 118 F.R.D. 339, 343-344 (S.D.N.Y. 1988) (certifying pendent common law fraud and breach of fiduciary duty claims).

But should the Court undertake the conflict of laws analysis set forth in the Restatement with respect to the Class Plaintiffs' common law claims, Texas law would clearly be applicable. As stated in the Restatement, when the claim on which there is a conflict of laws is based on fraud and misrepresentation, and the plaintiffs' actions in reliance took place in a different state from the one in which misrepresentations were made, Texas courts consider the following factors in determining which state has the most significant relationship to the occurrence and the parties:

    (a)    the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

    (b)    the place where the plaintiff received the representations,

    (c)    the place where the defendant made the representations,

    (d)    the domicile, residence, nationality, place of incorporation and place of business of the parties,

    (e)    the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

    (f)    the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2).

Applying these facts to the present case shows the following: (a) any reliance by the Class Plaintiffs would have occurred where they purchased their CDs; (b) the Class Plaintiffs received the representations in their home states or countries; (c) the representations were made

from Texas; (d) Stanford's operations were headquartered in Texas; (e) this case involves only intangibles; and (f) there is no contract to be performed by the Class Plaintiffs.

Analysis of these factors shows many of the class members received the misrepresentations and purchased their CDs outside Texas, but this factor is outweighed by the fact that a Texas-based financial conglomerate made, approved and issued the subject misrepresentations and omissions from Texas. *See Daccach*, 217 S.W.3d at 447 ("[Daccach alleged that] all defendants are Texas residents, Citizens maintains its principal place of business in Texas, advertising and sales materials were created and sent from Texas, a significant portion of the activities related to the marketing and creation of the instruments happened in Texas, and Citizens devised, implemented, and administered the securities "scheme" in Texas. Although Daccach admits that none of the class members are from Texas, he maintains that all CICA policies were sold from Texas …. Because Texas has a significant aggregation of contacts to the business activities alleged to have occurred within the state, we conclude that the application of Section 12 to this lawsuit falls comfortably within the constitutional constraints on the extraterritorial application of Texas laws."); *Warfield v. Carnie*, 2007 WL 1112591 (N.D. Tex. Apr. 13, 2007) (holding Washington law applied in action by receiver of entity operating a fraudulent securities scheme with over 1,300 investors from 34 states "since every investor's relationship was 'centered' in Washington. Washington State is where RDI prospectuses and solicitations originated; where investors sent their completed applications to participate in the RDI program; where they sent their money; and where their investment contracts were executed. Washington addresses also appeared on all preprinted letterhead that the Receiver has discovered. For these reasons, the Court concludes that Washington law should govern the Receiver's fraudulent transfer claim."); *In re Nat'l Century Enter. Inc.*, No. 2:03–md–1565, 2008

WL 1995216 (S.D. Ohio May 2, 2008) (finding Ohio had the most significant relationship under Section 148 where opinion letter, which contained alleged misrepresentation, was drafted in Ohio by an Ohio law firm for an Ohio corporation and mailed to out–of–state investors).

Here, similar to *Daccach*, Stanford's fraud scheme itself was masterminded and orchestrated from Texas, and the sale of all of the SIB CDs were managed and directed from Texas, even though technically issued from an Antiguan Bank. As the Court has already found in the context of the Chapter 15 dispute, the Antiguan Bank was a sham instrumentality of the people and entities directing all of the Stanford operation from Texas.

If the application of § 148 does not resolve the issue, the additional factors set forth in § 6 apply:

(a)    the needs of the interstate and international systems,

(b)    the relevant policies of the forum,

(c)    the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d)    the protection of justified expectations,

(e)    the basic policies underlying the particular field of law,

(f)    certainty, predictability and uniformity of result, and

(g)    ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2).

In the context of securities fraud, "the need of the interstate and international systems," is to guarantee the provision of truthful and complete information necessary for potential investors to determine the risks and benefits of investing. The state of the issuer's location has the greatest opportunity and incentive to regulate the issues to meet the needs of the interstate and international systems. Accordingly, this factor favors application of Texas law. *See Highland*

*Crusader Offshore Partners L.P. v. Motient Corp.*, 281 S.W.3d 237 (Tex. App.–Dallas 2009, pet. denied) (applying Section 148 and Section 6 to conclude that Texas had the most significant relationship to claims under Texas Securities Act, noting that "the general purpose of the Texas Securities Act is to protect investors, and that almost none of the other states involved 'are as interested in providing a remedy for the alleged fraud in this case as Texas is….'""); *Greenberg Traurig v. Moody*, 161 S.W.3d 56, 73–75 (Tex. App.–Houston [14th Dist.] 2004, no pet.) (analyzing Section 148 in complex securities fraud case brought by Texas investors against a New York law firm that allegedly made affirmative misrepresentations concerning investment and holding New York law applied because "the written communications from Greenberg Traurig alleged to be part of the fraud and conspiracy emanated from the law firm's offices in New York" and thus New York had a "substantial interest in regulating fraudulent conduct occurring in New York.); Restatement at §145 cmt. c. ("If the primary purpose of the tort rule involved is to deter or punish misconduct,. . . the state where the conduct took place may be the state of dominant interest."); *In re Citigroup Inc. Sec. Litig.*, 987 F.Supp.2d 377, 389 (S.D.N.Y. 2013) ("common law fraud rules seek to deter the intentional deception of stockholders[,]. . . [a]nd New York has the greater interest in regulating its vast securities industry to ensure that the application of the law leads to the appropriate admonitory effects on industry participants."); *Bobbitt v. Milberg LLP*, 801 F.3d 1066, 1071 (9th Cir. 2015) ("Our inquiry focuses not on the place where the victim feels the consequences of the injury, but on the location of injury itself …. Although the district court correctly concluded that the various defendant law firms and attorneys performed legal services across several states, the critical conduct causing the injury was the failure to meet court deadlines in Arizona. Arizona has a strong interest in regulating attorney conduct in courts within its borders.").

The second factor, "the relevant policies of the forum," is set out in article 581-10-1 of the TSA: "This Act may be construed and implemented to effectuate its general purposes to protect investors and consistent with that purpose, to encourage capital formation, job formation, and free and competitive securities markets and to minimize regulatory burdens on issuers and persons subject to this Act, especially small businesses."   TEX. REV. CIV. STAT. art. 581-10-1(B).   As described above, the Legislature's statement of the general purpose "to protect investors" is not limited to Texans and those purchasing securities in Texas.   *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 691-92 (S.D. Tex. 2002) ("[T]he [TSA] is a broad remedial statute intended not only to protect Texas residents but also non-Texas residents from fraudulent securities practices emanating from Texas.") (quoting *Baron*, 7 F. Supp. 2d 871 at 875) (emphasis supplied).   This factor also favors application of Texas law.

The third factor, "the relevant policies of other interested states and their relative interests in determining this issue," also favors Texas because although foreign countries have an interest in protecting their residents, some investors reside in Texas and no state (or country) has a greater interest in preventing fraudsters from using the forum to perpetrate a fraud than the one from which the fraud emanated.   *See Daccach*, 217 S.W.3d 430, 440 (Tex. 2007); *Ulrich*, 172 S.W.3d 255, 269 (Tex. App.—Beaumont 2005, pet. denied); *Gutierrez*, 100 S.W.3d at 274.

The fourth factor is "the protection of justified expectations."   The evidence is undisputed that Stanford investors generally believed they were investing and dealing with a Texas-based financial conglomerate.   *See* Declarations of Class Plaintiffs Pam Reed, Samuel Troice and Jorge Salgado, attached as Exhibit 4 to the Opening Brief Appendix, at App. 224 (Reed Dec., §6); App. 227 (Troice Dec., §5); and App. 230 (Salgado Dec., §6).   Investors from other countries purchasing CDs from a group of companies headquartered in Texas would be justified in

expecting that they could rely upon Texas laws.  *See Citigroup Inc. Sec. Litig.*, 987 F.Supp.2d at 389 (holding New York law applied when "the allegedly fraudulent statements or omissions. . . occurred in New York" so "'[a]ll parties could reasonably expect New York law to govern the conduct within its borders that forms the basis of both claims,' whereas the defendants would not have reasonably expected Florida law to apply—at least no more so than the law of any jurisdiction in which a Citigroup investor resided").

The fifth factor, "the basic policies underlying the particular field of law," is the protection of investors from fraudulent misrepresentations and omissions.  Both Texas and other states have an interest in supporting this policy.  "In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy...."  Restatement (Second) of Conflict of Laws § 6 cmt. h.   The TSA's aiding-and-abetting provision, with its long limitations period, joint and several liability standard, and lack of reliance element, is one of the most supportive of investor protections.  Accordingly, this factor supports applying Texas law.

The sixth factor, "certainty, predictability and uniformity of result," is best served by allowing all investors to enjoy the protections provided by the Texas securities laws.  *See In re Citigroup Inc. Sec. Litig.*, 987 F.Supp.2d 377, 389 (S.D.N.Y. 2013) ("The considerations listed in Section 6 of the Restatement, in particular, counsel in favor of the application of New York law. The comparative strong interest of New York in determining this issue, the protection of parties' justified expectations, and a concern for uniformity and predictability are important to this determination.").

The final factor, "ease in the determination and application of the law to be applied," is concerned with the ideal of choice-of-law rules being "simple and easy to apply."  *Id.,* cmt. j. This factor also supports the application of Texas law.

Accordingly, the Court should declare that Texas law applies to this case in its entirety. *See In re First Republic Bank Securities Litigation*, 1989 WL 108795, at *10 ("Defendants have submitted extensive briefs indicating that the substantive elements of Plaintiffs' negligent misrepresentation claims vary from state to state, but Defendants have not demonstrated that Texas law on negligent misrepresentation materially conflicts with the laws of another jurisdiction connected with this case.   Plaintiffs, however, have set forth several factors to demonstrate that Texas has substantial contacts with this case. At this stage in the proceedings, it appears that <u>Plaintiffs have established the **possibility** that Texas has substantial contacts with this case</u> such that the application of Texas law to Plaintiffs' negligent misrepresentation claims would not be arbitrary or unfair. <u>Defendants have not demonstrated that Texas common law materially conflicts with the law of other states</u> having substantial contacts with this litigation or even that other states have substantial contacts with this case.") (emphasis supplied) (certifying class).  The same holds true in this case.  In fact, Class Plaintiffs have established more than a possibility that Texas law applies to their claims.   Class Plaintiffs have presented strong arguments, authority and evidence that Texas law does in fact apply to all of their claims.

### C.    The Class Plaintiffs' Damages Methodology is Sound and Consistent with Their Liability Theory

The Defendants also assail the Class Plaintiffs' damages theory and the data and means available at this stage of the proceedings for ascertaining and quantifying the Class Plaintiffs' damages claims. The Defendants are mistaken on the law and the facts, and their arguments are, at best, premature.   In fact the majority of their arguments appear better suited for cross-examination of an expert damages witness at trial.

As an initial matter, Greenberg argues that the Class Plaintiffs' damages theory in general "runs afoul" of the Supreme Court's decision in *Comcast v. Behrend*, 133 S. Ct. 14265 (2013)

which – according to the Defendants – requires the Class Plaintiffs to have a precise damages model in place. But Greenberg misconstrues *Comcast* because "[n]othing in *Comcast* mandates a formula for classwide measure of damages." *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014). All *Comcast* requires is that the **plaintiffs' proposed measure of damages be consistent with the liability theory and be capable of determination on a class-wide basis**. *Id*. at 817; *see also In re Park Central Global Lit.*, No. 3:09-cv-765-M, 2014 WL 4261950, *13 (N.D. Tex. 2014).

In this regard – and despite the Defendants' unsupported arguments to the contrary – the Class Plaintiffs' proposed measure of damages is <u>entirely</u> consistent with their liability theory. In their Complaint, the Class Plaintiffs' plead damages under the TSA's statutory rescission measure of damages, with a reduction or offset based on any distributions received from the Receiver. *See e.g.*, Complaint [Doc. 1] at ¶ 451. Similarly, for the Class Plaintiffs' common law claims, the Class Plaintiffs appropriately plead "out of pocket" damages – to be placed back into the position they occupied had they not invested with Stanford (*i.e.*, return of their principal). *Id*., at ¶ 456.[19] Such a measure of damages is entirely consistent with the Class Plaintiffs' fraud and fiduciary duty based causes of action.[20]

The Class Plaintiffs' damages calculations are co-extensive with, and indeed depend on, the Receiver's claims and distribution process. As the Court is aware, the Receiver's claims process measures how much money each investor invested with Stanford and deducts any amounts of principal each investor received back as well as discounts any "phantom" interest the

---

[19]    Under Texas law, "out of pocket" damages are general damages and do not have to be specifically plead. *Myers v. Walker*, 61 S.W. 3d 722, 730 (Tex. App. – Eastland 2001, pet.denied).

[20]    *See, e.g., Duncan v. Lichtenberger*, 671 S.W. 2d 948, 953 (Tex. App. – Ft. Worth 2007, writ ref'd n.r.e.) (affirming measure of damages based on return of money paid to purchase stock as appropriate for a breach of fiduciary duty case); *Aquaplex, Inc., v. Rancho la Valencia, Inc.*, 297 S.W. 3d 768, 775 (Tex. 2009) (out of pocket damages, measured as the difference between what the plaintiff gave and what it received, are appropriate for fraud-based cases).

investors might have received from SIB.  It is a "money in and money out" analysis, which is the same analysis that would be required for a rescission measure of damages under the TSA or an "out of pocket" measure of damages under the Class Plaintiffs' common law claims.

As they do with respect to the Class Plaintiffs' liability case, where they seek to unilaterally convert the Class Plaintiffs' omission case into an affirmative misrepresentation case, the Defendants wholly ignore the measures of damages that the Class Plaintiffs plead and instead argue that the Class Plaintiffs *should* be seeking a different measure of damages.  The Defendants' expert, Quentin Mimms, essentially argues that the Classs Plaintiffs should be seeking a "lost profits" type measure of damages based on what they would have earned (perhaps in the stock market, *see* Hunton Brief at p. 49) had they not invested with Stanford. But the Class Plaintiffs have not plead such a theory of damages.  **They just want their money back** – and the Receiver's claims analysis provides the analytical data necessary to calculate that measure of damages.  The Defendants' arguments should be seen in that light as irrelevant and/or geared more to the merits of the Class Plaintiffs' damages at trial.

Part of the Defendants' argument is that the Receiver's claims analysis does not take into account causation.   But under the TSA – which is a strict liability statute – the Class Plaintiffs are not required to prove that Stanford's underlying fraud and primary violations caused them to purchase the CDs or caused their losses.[21]  *Geodyne*, 97 S.W.3d 779, 783, 785 ("Article 581-33A(2) does not require the buyer to prove the misrepresentation or omission caused his injury."); *Duperier v. Tex. State Bank*, 28 S.W.3d 740, 753 (Tex. App.—Corpus Christi 2000,

---

[21]      Thus, under the TSA, investors have no duty of due diligence; the TSA merely requires proof of a misrepresentation or omission by the *seller*.  *See* TEX. REV. CIV. STAT. art. 581–33(A)(2); *Summers v. WellTech, Inc.,* 935 S.W.2d 228, 234 (Tex. App. – Houston [1st Dist.] 1996, no writ).  And contrary to the implications Hunton peppers throughout its responding brief, it is <u>no</u> defense that an investor could have discovered the truth by exercising ordinary care.  *Id.* at 234.

pet. dism'd) ("Loss causation is not an element of or a defense to a claim brought under [article 581-33A(2) ] of the [TSA]."); *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 648-49 (Tex. App. – Houston [14th Dist.] 1995, writ dism'd w.o.j.); *Anheuser-Busch Cos.*, 858 S.W.2d at 936. To the contrary, courts have held that requiring a plaintiff to show causation would be "an impermissible attempt to introduce reliance upon the misrepresentations and omissions . . .." *Geodyne*, 97 S.W.3d at 784 (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)).

Moreover, under the TSA, aiders and abettors such as the Defendants are "jointly and severally with the seller, buyer, or issuer, and to the same extent as if [they] were the seller, buyer, or issuer."[22] Tex. Rev. Civ. Stat. art. 581-33(F)(2); *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d at 333 (5th Cir. 2008); *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 839 (Tex. 2005); *Highland Cap. Mgmt., L.P. v. Ryder Scott Co*., 402 S.W.3d 719, 733 (Tex. App. – Houston [1st Dist.] 2012, no pet.).   Accordingly, if the jury finds the Defendants liable as co-conspirators or aiders and abettors of Stanford's fraudulent scheme, breaches of fiduciary duties and violations of the TSA, then the Defendants are responsible for <u>all</u> of the Class Plaintiffs' losses to the same degree as Stanford.

---

[22] The same is applicable to the Class Plaintiffs' common-law claims.  For example, under Texas law, "[o]nce a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Carroll v. Timmers Chevrolet, Inc.*  592 S.W.2d 922, 925-26 (Tex. 1979) (*quoting* W. Prosser, *Handbook of the Law of Torts* § 46 at 293 (1971)); *State v. Standard Oil Co.,* 107 S.W.2d 550, 559 (Tex. 1937).  Moreover, joint and several liability is imposed on all conspirators for actual damages resulting from acts in furtherance of the conspiracy.  *Carroll*, 592 S.W.2d. at 925.  Significantly, Texas "does not require the trial court to separately submit each co-conspirator's civil conspiracy damages.  When the jury found that liability for a civil conspiracy existed, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators."  *Bentley v. Bunton,* 94 S.W.3d 561, 619 (Tex. 2002); *see also Tompkins v. Cyr,* 202 F.3d 770, 783 (5th Cir. 2000) ("[E]ach of the losing defendants is jointly and severally liable for the actions of the others because all were found to be co-conspirators in a civil conspiracy.").  Similarly, it has long been "settled as the law of this State that where a third party knowingly participates in the breach of a fiduciary duty, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."  *Kinzbach,* 160 S.W.2d at 514.

Mr. Mimms also opines that the Class Plaintiffs' damages model does not account for Hunton's *specific* role in the fraud – or what Mr. Mimms confusingly refers to as the "but-for world" in which Hunton's conduct is isolated and damages caused specifically by Hunton are calculated with precision.[23]  *See* Mimms Decl. ¶ 15-24.  <u>Mr. Mimms, however, ignores the fact that this analysis is completely irrelevant to claims for damages under the TSA, which does not require a showing of loss causation</u>.  *See Duperier*, 28 S.W.3d at 753 ("Loss causation is not an element of or a defense to a claim brought under [article 581-33A(2) ] of the [TSA].").  Because it is liable jointly and severally with Stanford, Hunton as an aider and abettor of Stanford's primary TSA violations will be required to compensate the Class Plaintiffs for all of the losses regardless of any "but-for" inquiry.

The Defendants' corollary argument that a designation or finding of responsible third parties under Chapter 33 of the TEX. CIV. PRAC. & REM. CODE ANN. will require an inquiry of individualized damages under the TSA is also of no moment.[24]  Chapter 33 does not apply to the Class Plaintiffs' TSA claims.[25]  *Id*.; *Texas Capital Securities, Inc. v. Sandefer*, 108 S.W. 3d 923,

---

[23]    Again, Mr. Mimms' entire expert opinion seems more geared to a "lost profits" breach of contract type of case, where the injured party must prove what benefit it would have obtained had the contract not been breached and not an investment fraud case like this where the injured parties are seeking rescission damages – being the return of the money they invested in Stanford.

[24]    Greenberg filed a motion to designate responsible third parties under Chapter 33 [Doc. 152], but was not joined by Hunton.  Hunton states that it "intends" to file such a motion.

[25]    Chapter 33 also doesn't apply to the Class Plaintiffs common law claims that provide for joint and several liability. *See, e.g.*, *Challenger Gaming Solutions, Inc. v. Earp*, 402 S.W. 3d 290, 293 (Tex. App. – Dallas 2013, no pet.) (concluding that Chapter 33 does not apply to fraudulent transfer claims under TUFTA because it conflicts with the liability scheme of the TUFTA statute); *Barnett v. Home of Texas and Warranty Underwriters Ins. Co.*, 2011 WL 665309 at n. 11 (Tex. App. – Hous. [14th Dis.] 2011, no pet.) (noting that Chapter 33 is "generally not applicable to cases…wherein two defendants were held jointly and severally liable for the same damages"); *Onyung v. Onyung*, 2013 WL 3875548 at *11 (Tex. App. – Hous. [1st Dist] 2013, pet. denied) (same); *LandAmerica Commonwealth Title Company v. Wido*, 2015 WL 6545685 at *11 (Tex. App. – Dallas 2015, pet. filed) (Chapter 33 does not apply to claims of statutory fraud); *Davis v. Estridge*, 85 S.W. 3d 308, 311 (Tex. App. – Tyler 2001, pet. denied); *see also GE Capital Commercial Inc. v. Worthington Nat'l Bank*, 2011 WL 5025153 at *6 (N.D. Tex. 2011) (J. Lindsay) (acknowledging cases holding that Chapter 33 does not apply to claims for statutory fraud or claims under the TSA).

---

925-26 (Tex. App.—Texarkana 2003, pet. denied) (holding that Chapter 33 does not apply to TSA claims because the TSA provides for joint and several liability).[26]   Moreover, even if Chapter 33 does apply here, the Defendants do not explain, much less prove, how the conduct of the alleged responsible third parties they would designate would result in individualized issues that would swamp the common issue in this case.   As just an example, a designation of Allen Stanford or SIBL (or BDO Seidman for that matter) as RTPs would not change the commonality or typicality calculus one iota, as the conduct of those parties arguably impacted all members of the class equally.

Furthermore, because the Class Plaintiffs seek rescission damages under the TSA, at trial they will be seeking the return of their principal investment in SIB CDs.   Thus, upon proof that the Defendants are aiders under the TSA, the <u>TSA's rescission measure of damages is the methodology for computing the Class Plaintiffs' losses</u>.   The TSA provides that when, as here, defrauded investors seek rescission of the fraudulent securities transaction, the measure of damages is "(a) the consideration . . . paid for the security plus interest thereon at the legal rate from the date of payment . . ., less (b) the amount of any income . . . received on the security" plus "costs," plus "reasonable attorney's fees."   TSA art. 581-33(D).[27]   This is a simple calculation that can be readily made from the data collected by the Receiver.

Of course, the precise amount of each of the Class Plaintiffs' loss of principal necessitates an individual inquiry (as in every securities class action) – and the Defendants spill a great deal of ink trying to demonstrate what they believe are an array of supposed individual

---

[26]     And even if Chapter 33 applies to the Class Plaintiffs TSA and common law claims and the defendants' damages exposure is ultimately reduced accordingly, the Class Plaintiffs can quickly implement a *pro rata* reduction in the amount due to each plaintiff in the class.

[27]     An aggrieved investor is also entitled to recovery of costs, as well as attorneys' fees at the Court's discretion.   *See* TSA at 581-33(D)(6)-(7).

issues relating the Class Plaintiffs' damages claims.  But this line of argument truly misses the mark.  "Few motions to certify a class fail because of disparities in the damages suffered by the class members."  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003).  And damages at this stage of the proceedings "need not be exact."  *Comcast*, 133 S. Ct. at 1433.

Indeed, on class certification, courts in the Fifth Circuit are typically more concerned with the plaintiffs' liability theories rather than the precise allocation of damages, which necessarily takes place at a later stage.  As stated by the Fifth Circuit in *In re Deepwater Horizon*:

> BP and the Objectors are quite correct to suggest that, although the analysis of BP's injurious conduct gives rise to numerous common questions, the class members' damage calculations give rise primarily to individual questions that are not capable of classwide resolution. But this is not fatal to class certification. As we stated in *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003), "[e]ven wide disparity among class members as to the amount of damages" does not preclude class certification "and courts, therefore, have certified classes even in light of the need for individualized calculations of damages." Accordingly, as we recognized in *Steering Committee v. Exxon Mobil Corp.,* 461 F.3d 598, 603 (5th Cir. 2006), it is indeed "possible to satisfy the predominance ... requirements of Rule 23(b)(3) in a mass tort or mass accident class action" despite the particular need in such cases for individualized damages calculations. On this basis, therefore, we have previously affirmed class certification in mass accident cases, as in other cases in which "virtually every issue prior to damages is a common issue."

739 F.3d 790, 815-816 (5th Cir. 2014).  As argued above and elsewhere herein, the Class Plaintiffs' liability theory – violation of the TSA and other common law claims – do not require inquiries of individual reliance as a matter of law, and therefore the Class Plaintiffs' liability theory is common – in fact, identical – throughout the class.  Individualized questions of recoveries owed to each plaintiff can quickly be resolved at a later time through existing data and calculations available through the Receivership's claims process.  *See Keasler v. Natural Gas*

*Pipeline Co. of America*, 84 F.R.D. 364, 368 (S.D. Tex. 1979) ("It is well established that differences among class members in the amount of damages suffered cannot constitute a lack of common issue predominance so as to prevent certification.").

For the foregoing reasons, courts have routinely held that class certification under Rule 23(b)(3) is not foreclosed even when the damages inquiry might be individualized. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("Comcast, then, did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis."); *In re Nexium Antitrust Litig.*, 777 F.2d 9, 23 (1st Cir. 2015) ("Comcast did not require that plaintiffs show that all members of the putative class had suffered injury at the class certification stage—simply that at class certification, the damages calculation must reflect the liability theory."); *Butler, Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."), *cert. denied*, 134 S. Ct. 1277 (2014); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3).")).

### D. Damages can be Calculated and the Class Ascertained by Referencing the Receiver's Claims Process

Knowing this, the Defendants proceed to assail the quality of the Receiver's claims process and the data concerning the losses incurred by Stanford's CD investors, which the Class Plaintiffs will utilize to calculate their damages. Specifically, the Defendants argue that the Receiver's data is incomplete and unreliable – apparently to the point where damages are impossible to prove. In this regard, the Defendants truly protest too much.

In fact, Hunton disparages the Receiver's data to such an extent that Hunton claims that a class cannot even be "ascertained" based on the supposed poor quality of the Receiver's records. The Defendants' arguments, if adopted by the Court, would make a mockery of the very claims and distribution process this Court has already approved and upon which the Receiver has spent millions of dollars in an effort to allow only legitimate investor claims in accurate amounts against the Receivership Estate.   Notably, the claims process was subject to the investors' right to object and challenge the Receiver's claim amount determinations (a fact which, bizarrely, Defendants also criticize as, e.g., making Samuel Troice ineligible to serve as a class representative).   *See* Greenberg Response at p. 76.   Then the investors were required to sign a confirmation form, confirming the amount of their claim.   *See* Janvey Declaration, Exhibit 105 to Opening Appendix, at ¶¶ 6-16, App. 1792-1795; *see also* App. 1808-1818 (Court's Order describing and authorizing the Receiver's claims procedure).   Given this added layer of direct investor verification and confirmation, the Court should have comfort that the Receiver's claims data is accurate.   The Court should also not allow the fact there are two claims processes and two proceedings, one in the U.S. and one in Antigua, to prejudice the investors' rights to pursue their claims in this U.S. court using the data and claims and distribution process developed by the only representative recognized in this Court to act on behalf of the Stanford Receivership Estate.

In support of its legal argument, Hunton selectively cites case law involving consumer products class actions from jurisdictions outside the Fifth Circuit[28] – such as *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) – that take an extremely stringent approach to class

---

[28]    The ascertainability issue typically arises in consumer products class actions where plaintiffs have to prove that they, e.g., purchased a bottle of aspirin during a certain time period, precisely because most people don't retain sales receipts when they buy products at Walgreen's or Safeway.   It is a huge leap (and indeed ludicrous) for Defendants to attempt to raise ascertainability as an issue in the Stanford securities litigation when the Court is overseeing a complex claims procedure run by an SEC Receiver and *the class definition is based on the Receiver's exact same claims process.*

ascertainability – although Hunton concedes that the Fifth Circuit has not yet spoken on this issue.

The better rule is that applied by the Ninth Circuit, which (dealing with arguments similar to those made by Hunton) has explicitly rejected *Carrera* in favor of a more practical approach:

> A class is ascertainable if the class is defined with 'objective criteria' and if it is 'administratively feasible to determine whether a particular individual is a member of the class.'" *Werdebaugh v. Blue Diamond Growers*, No. 12–CV–2724–LHK, 2014 WL 2191901, at *9 (N.D.Cal. May 23, 2014), citing *Wolph v. Acer America Corp.*, No. 09–1314, 2012 WL 993531, at *1–2 (N.D. Cal. Mar. 23, 2012). Mott's objects to finding the class ascertainable … Mott's argues that the proposed class is not ascertainable because Mott's does not keep records to identify individuals who have purchased 100% Apple Juice, and **because consumers are unlikely to have kept purchase receipts.** Defendant relies in part on *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir.2013), a case in which the Third Circuit found a proposed class to be unascertainable because the use of affidavits to identify class membership would deprive the defendant of due process rights, and because it would be impracticable to assure the accuracy of the claims. *Id.* 309–10. "While this may now be the law in the Third Circuit, it is not currently the law in the Ninth Circuit ... In this Circuit, it is enough that the class definition describes a set of common characteristics sufficient to allow a prospective plaintiff to identify himself or herself as having a right to recover based on the description." *McCrary v. Elations Co.*, LLC, No. EDCV 13–00242 JGB OP, 2014 WL 1779243, at *8 (C.D. Cal. Jan. 13, 2014); *see also Werdebaugh*, No. 12–CV–2724–LHK, 2014 WL 2191901, at *11; *Astiana v. Kashi Co.*, 291 F.R.D. 493, 500 (S.D. Cal. 2013), citing *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012) ("If class actions could be defeated because membership was difficult to ascertain at the class certification stage, there would be no such thing as a consumer class action."). In light of the precedent set by many other district courts in this Circuit, the Court declines to follow *Carrera. See Lilly v. Jamba Juice Co.*, No. 13–CV–02998–JST, 2014 WL 4652283, at *4 (N.D. Cal. Sept. 18, 2014) ("Yet it is precisely in circumstances like these, where the injury to any individual consumer is small, but the cumulative injury to consumers as a group is substantial, that the class action mechanism provides one of its most important social benefits.").

*Rahman v. Mott's LLP*, Case No. 13–cv–03482–SI, WL 6815779, at *4 (N.D. Cal. Dec. 3, 2014).

Here, it is clearly "administratively feasible" to ascertain what investors filed claims with the Receiver and had those claims approved by the Receiver. *Id.*  Additionally, any concerns about subclasses or investor citizenship can be handled *via* supplemental investor questionnaires or certifications as part of a bifurcated damages phase following a favorable jury verdict in the trial on the common liability issues. *See Frey v. First Nat'l Bank Southwest*, No. 13-10375, 2015 WL 728066 at *6 (5th Cir. 2015) (court can ascertain class membership by requiring class members to answer threshold questions); *Brown v. Kelly*, 609 F.3d 467, 486 (2d Cir. 2010) (describing various tools district courts can use to manage class certification issues).

 Indeed, in advancing their damages-related quibbles and arguments, the Defendants insist at every turn on making the perfect the enemy of the good.  The supposed legal and forensic standards the Defendants would have the Court impose essentially make any class action impossible to certify.  *See Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012) ("If class actions could be defeated because membership was difficult to ascertain at the class certification stage, there would be no such thing as a consumer class action.").

In actuality, the Receiver's data was compiled and constructed after a painstaking review of Stanford Entity records, an array of bank records from third party financial institutions, and a team of dedicated forensic financial experts over a period of years.  The result was a detailed and sophisticated claims and distribution process that included the additional layer of investor input, right to object and confirmation, and was approved by this Court.  *See* Order Approving's Interim Distribution Plan in Case 3:09-cv-00298 [Doc. 1877] at ¶¶ A(12), B(1) (Court order explaining that damages are to be calculated through a net-loss methodology); [Doc. 2037] at ¶

B(1) (recognizing same); *see also* [Doc. 1766] at 13-15 (explaining calculation of net loss); [Doc. 1766-1] at 7 (showing $5,131,224,932.65 in net losses as of January 2, 2012); [Doc. 2012] at 3-5 (proposing same net-loss approach); [Doc. 2012-1] at 2 (same).

Moreover, the Receiver's forensic accountant, Mark Russell, testified in this case that the Receiver's forensic team undertook an extensive "tracing analysis" of Stanford CD transactions and matched that information with existing data in the Temenos and Data Pro databases.[29]  The Temenos and Data Pro systems were used by the various Stanford Entities to account for CD and other transactions.[30]  Stanford's data systems – including those that accounted for CD purchases and sales – were taken over by the Receiver upon his appointment and then subjected to a thorough analysis and review.  Although not retained to do an "audit," the Receiver's forensic experts have "done a lot of testing and review of the underlying transactions to confirm that they occurred."[31]  This included a review and comparison with banking and other financial records provided by Stanford's third-party banking and financial services providers, such as Trustmark National Bank, TD Bank and HSBC.[32]  To date, Mr. Russell has not seen any discrepancies with the data that the Receiver maintains and the data maintained by the Antigua Joint Liquidators.[33]

The data maintained by the Receiver includes information of the CD holder's nationality.[34]  And to the extent the Receivership requires additional information from CD holders and Receivership claimants (concerning, for example, additional citizenship information)

---

[29]     Transcript of Deposition of Mark Russell at 59:21-60:4 [Reply App. 68-69].

[30]     Russell Tr. 8:23-9:5 [Reply App. 64].

[31]     Russell Tr. 61:15-18 [Reply App. 68].

[32]     Russell Tr. 20:16-21:5 [Reply App. 66].

[33]     Russell Tr. 11:16-20 [Reply App. 65].

[34]     Russell Tr. 47:12-49:13 [Reply App. 67].

it has the ability to quickly contact them and obtain such additional information.[35]   Based on the

foregoing, Mr. Russell testified that the Receiver's forensic accountants are well-equipped to

provide the Class Plaintiffs with whatever data outputs are requested based on any ranges or

limits established by the class.[36]   "[T]he transaction information is detailed enough to allow the

[Receiver] to do that."[37]   Accordingly, the work undertaken by the Receiver – in term of data

collection and analysis – has resulted in a reliable claims process.[38]   When asked under oath by

the Defendants' counsel, Mr. Russell testified that if he were a victim of the Stanford Ponzi

scheme, he would have confidence in the reliability of systems put in place by the Receivership

and in the claims process developed to date.[39]

While the Receiver's investor-loss calculations may require him to review and possibly

update his claims information to account for such things as country of citizenship, such work is

ministerial in nature and is certainly not fatal to class certification.[40]   *See, e.g., Deepwater*

*Horizon*, 739 F. 3d at 815-816 (noting that courts routinely certify classes despite the need for

individualized calculations of damages); *Blackie v. Barrack*, 524 F. 2d 891, 905 (9th Cir. 1975)

(holding that the calculation of damages in a securities class action is "invariably" an individual

---

[35]       Russell Tr. 78:10-16 [Reply App. 69].

[36]       Russell Tr. 137:15-138:2 [Reply App. 70].

[37]       Russell Tr. 169:5-6 [Reply App. 72].

[38]       Russell Tr. 160:2-161:8 [Reply App. 71].

[39]       *Id.*

[40]       Hunton selectively cites the testimony of Mark Russell to the effect that the Receiver does not have a "damages model" that would determine the losses suffered by each of the CD purchasers in connection with the conduct of *each* of the defendants.  But the Class Plaintiffs have never pleaded or represented to the Court that they are relying on any *legal* model of damages or causation adopted by the Receiver; rather, they are utilizing forensic data collected by the Receiver through SIB's records, bank records, and the claims determination process to apply the TSA's rescission measure of damages and calculate their damages.  To the extent the defendants are jointly and severally liable under the TSA for causing the Class Plaintiffs' damages – the loss of their entire principal investment – the Receiver's claims data is well-suited to capture the extent of the Class Plaintiffs' losses.  Once again, the Defendants attempt to improperly graft a non-existent loss causation requirement on Class Plaintiffs' TSA claims.

question and does not defeat class action treatment because in the securities context it is typically "virtually a mechanical task"); *In re Beacon Assoc. Litig.*, 282 F.R.D. at 333 (S.D.N.Y. 2012) (although the specific calculation of damages for each investor will be individualized, both the methodology and the documents involved will be common to the class, which is sufficient to establish predominance); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 2015 WL 5515617 (9th Cir. 2015).

Finally, if the Court is concerned that individual damages issues may swamp common issues, then the solution is to bifurcate the trial into separate liability and damages phases. *Deepwater Horizon*, 739 F.3d at 816 (bifurcation of damages phase and liability phase satisfies predominance concerns); *Arthur Young*, 549 F.2d at 696-97. While the Class Plaintiffs do not believe this will be necessary given the involvement of the Receiver and his ability to testify as to class-wide damages based on the class definition of "claims allowed by the Receiver," bifurcation is one of the tools the Court can employ to efficiently manage trial of this matter. *Brown v. Kelly*, 609 F.3d at 486. Indeed, any other limited or additional concerns that cannot be addressed through the methods described above can easily be resolved or quickly addressed in a bifurcated damages proceeding conducted by a special master with powers to subpoena accurate information of class members. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 553-54 (5th Cir. 1981); *see also Simms v. Jones*, 296 F.R.D. 485, 499 n.5 (N.D. Tex. 2013) (describing range of options available for expediting damages proceedings in large class actions).

Finally, Hunton's argument that the Receiver lacks thorough pre-2003 CD investment data is a complete red herring. As is clear from the pleadings and the Class Plaintiff's motion for class certification, the Class Plaintiffs seek certification of classes of purchasers of SIB CDs *well after* 2003. Specifically, the Class Plaintiffs seek certification of a class of all SIB investors who

invested money in SIBL, as well as subclasses of (i) all SIB investors who invested money in SIBL after February 1, 2006, and (ii) all investors who invested money in SIB after February 1, 2008.  And to the extent earlier periods apply to different claims, the Receiver's access to SIB's post-2003 transaction records clearly provide sufficient account data for the Receiver to identify pre-2003 existing CD investments.[41]

In sum, the Class Plaintiffs' damages methodology is fully consistent with its liability theory.  And (perhaps unlike other securities class actions at this early state of the proceedings), the Class Plaintiffs actually have the data to calculate their damages, and can easily supplement their data at the appropriate time if necessary.  The Defendants' arguments concerning the damages to be calculated and claimed in this action are therefore unduly speculative and meritless as a matter of law and fact, and improperly attempt to graft a non-existent loss causation requirement onto Class Plaintiffs' TSA claims.

### E.    Trial Plan.

Because the predominance inquiry requires the court to consider how a trial on the merits would be conducted if a class were certified, *Frey v. First Nat'l Bank Southwest*, No. 13-10375, 2015 WL 728066, *5 (5th Cir. 2015), the Class Plaintiffs offer the following brief trial plan.

The trial of this case will be relatively simple.  The Class Plaintiffs will put on common evidence of Stanford's long history of regulatory fraud, evasion, and other illicit acts alongside

---

[41]    Similarly, and contrary to the Defendants' claims, whether or not an investor is a "holder" (as opposed to a purchaser) of a SIB CDs does not impede the Class Plaintiffs' damages methodology or otherwise defeat class certification.  Although holders have no cognizable claims under the TSA – *see Troice et al. v. Proskauer Rose, LLP, et al.*, Order [Doc. 176] at 9-10 – the Court can modify the class definition to exclude "holders" by, *e.g.*, re-defining the class as "*all investors who purchased or renewed whole or partial interests in SIB CDs after February 1, 2006*," or "*all investors who purchased or renewed whole or partial interests in SIBL CDs after February 1, 2008*." *See, e.g., In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 & n.7 (citing *Robidoux v. Celani*, 987 F.2d. 931, 937 (2d Cir. 1993) ("A court is not bound by the class definition proposed in the complaint"); *Harris v. Gen. Dev. Corp.*, 127 F.R.D. 655, 659 (N.D. Ill. 1989) ("[I]t is certainly within this court's discretion to limit or redefine the scope of the class"); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class…to defining the scope of the class.")).  This issue can also be handled in a bifurcated damages phase of the trial, as discussed below.

evidence of Stanford's fraud and Ponzi scheme, because evidence of Stanford's fraud and Ponzi scheme is highly relevant to explain why Stanford needed to evade government regulators, and is relevant to every one of the Class Plaintiffs' claims.

The Class Plaintiffs will then put on common evidence that Greenberg and Hunton, respectively, aided Stanford's regulatory fraud, evasion, and other illegal and illicit conduct as described in the Class Plaintiffs' Opening Brief for class certification and the documentary evidence attached in the opening Appendix.  The jury will then answer questions as to (1) whether Stanford engaged in fraud and other violations of the TSA and (2) whether the Defendants conspired with Stanford and materially aided Stanford's fraud and violations of the TSA and/or participated in Stanford's fraudulent schemes and breaches of fiduciary duties.  The answers to those questions will affect all class members' claims equally.  *Frey*, 2015 WL 728066 at *6.

The Class Plaintiffs will also put on common evidence of class-wide damages in the form of evidence from the Receiver and/or his professionals from FTI  and/or some other expert relying on the Receiver's claims data as to the amount of damages suffered by the members of the class, measured as the amount of money they deposited into SIBL CDs and netting out any funds they withdrew and any fictitious interest they received.  Since the Receiver has already performed this analysis as part of his claims approval process, this task should not require much additional work from the Receiver and his team.  The Receiver's evidence of damages can be presented either in the main case, or in a separate, bifurcated damages phase.

Should the Court decide to create a subclass for U.S. investors, then the Class Plaintiffs believe that Pam Reed, as the U.S.-investor class representative, can present her case alongside the other two plaintiffs.  The Defendants can present their alleged "unique" defenses as to Ms.

Reed, to the extent they have any, and separate questions of liability as to Ms. Reed (*i.e.*, separate and apart from the liability questions presented by Mr. Troice and Michoacan Trust) can be presented to the jury.

## II.   SUPERIORITY IS SATISFIED

### A.   *Res Judicata* Concerns do not Preclude Certification; Foreign Courts Will Likely Grant Preclusive Effect to a Judgment in This Case

The Defendants' next line of attack focuses on theoretical issues relating to foreign law.

As Greenberg notes, the Class Plaintiffs and Greenberg have agreed to rely upon the briefing and declarations of foreign law experts previously submitted in other Stanford-related class actions in support of their competing arguments with respect to the preclusive effect in foreign jurisdictions of a class action judgment in this case. [42] This approach taken by the parties is sound particularly in this MDL venue in which the Court is uniquely positioned to determine controlling issues of law applicable to multiple and related cases.

The fact of the matter is that no court from the foreign jurisdictions from which the vast majority of the putative class members hail has ruled that a U.S. class action judgment would <u>not</u> be given preclusive effect in that respective foreign jurisdiction.   The Defendants know this because they have failed to cite any such reported decision in their Responses and rely primarily

---

[42]    Pursuant to Rule 44.1, the Class Plaintiffs rely on the expert declarations concerning foreign law previously submitted to the Court by the class plaintiffs in *Troice v. Willis of Colorado, Inc., et al.*, No. 3:09-cv-1274, *Troice v. Proskauer Rose, LP, et al.*, No. 3:09-cv-1600, and *Rotstain v. Trustmark National Bank, et al.*, No. 3:09-cv-02384-N.   In addition, in determining issues of foreign law, the Court may conduct its own research and is not bound by the evidence submitted by the parties, including any expert opinions. *See, e.g., In re Cyrus II P'ship*, 392 B.R. 248, 251-52 (Bankr. S.D. Tex. 2008) ("Although expert testimony is the most common way to determine foreign law, it is no longer an invariable necessity in establishing foreign law, and indeed, federal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities. In making its determination of foreign law the court may rely on foreign case law decisions, treatises, and learned articles, even if they are not generally admissible under the Federal Rules of Evidence. The Court, therefore, has wide latitude in determining foreign law.") (quotation marks and citations omitted); *see also Twohy v. First Nat'l Bank*, 758 F.2d 1185, 1193 (7th Cir. 1985); *Chantier Naval Voison v. M/Y Daybreak*, 677 F. Supp. 1563, 1567 (S.D. Fla. 1988).

on expert declarations submitted in other actions or opinions from their own experts that offer

conjecture and what is ultimately a theoretical guess.

Hunton has submitted 11 declarations in support of its position (some from other actions),

but none of these declarations cite case law <u>directly</u> on point. *See Anwar v. Fairfield Greenwich

Ltd.*, 289 F.R.D. 105, 115 (S.D.N.Y. 2013) ("*Anwar I*") (court criticizing the parties' use of

"reams of esoteric legal analysis" compiled by "high-priced arm-chair oracles" as amounting to

pure conjecture that provided little assistance to the court concerning preclusive effect of class

action judgments in foreign jurisdictions). The screaming lack of authority on point from foreign

jurisdictions demonstrates that courts in Latin America and other counties *would* in fact give a

judgment in this case preclusive effect.

If anything, courts in relevant foreign jurisdictions – such as Canada – that have actually

addressed this issue have concluded that a U.S. class action judgment <u>would</u> have a preclusive

effect, provided proper notice is given to class members. *See Currie v. McDonald's Restaurants

of Canada Ltd.*, (2005), 74 O.R. (3d) 321 (Can. Ont. C.A.); *Canada Post Corp. v. Lépine*, (2009)

1 S.C.R. 549 (S.C.C.)

In this context, the Court now has to make its best determination as to how various

foreign jurisdictions will treat a U.S-based class action judgment – as courts across the United

Stated are now doing with ever increasing frequency given the growing international scope of

financial fraud and the resulting litigation. And in this regard, the Defendants cannot credibly

deny that the clear trend in U.S. class action jurisprudence is to presume that class action

judgments would be given a preclusive effect.

The most recent federal court decision to address this issue – and arguably the most

relevant considering that it arises from the Madoff Ponzi scheme – is *Anwar I*. In that case,

Judge Marrero of the United States District Court for the Southern District of New York certified

a class that included investors from the Netherlands, Curacao, Belgium, England, Canada, Spain

and virtually every country in Latin America.  Citing *In re Vivendi Universal, S.A. Sec. Litig.*,

242 F.R.D. 76 (S.D.N.Y. 2007), Judge Marrero considered the very same foreign *res judicata*

preclusion issue raised by the Defendants herein utilizing the "probability standard," along with

other factors.  *Id.* at 115.

> Judge Marrero then concluded by adopting a standard such that:

>> where a plaintiff sufficiently demonstrates that the stated policy of
>> a foreign country is to recognize and enforce foreign judgments, or
>> that its law is generally inclined to favor that course of action, such
>> a showing would create a rebuttable presumption that, absent an
>> affirmative showing to the contrary, recognition of a particular
>> United States judgment, even in class action litigation, does not
>> violate a foreign country's public policy. Such a presumption is
>> especially warranted in situations where the relevant Foreign
>> Courts do not routinely address the underlying substantive or
>> procedural issues considered and embodied in the United States
>> court judgment, and therefore have not had the occasion to
>> explicitly embrace, or reject, a particular question of procedure or
>> substance.

*Id.* at 115.[43]

With respect to his inclusion of Latin American investors in the class, Judge Marrero

took into account "the unlikely ability of plaintiffs from the relevant Latin American countries to

bring a duplicative action in their home countries, and the absence in the record before the Court

of any authority from the relevant Latin American countries expressly stating that the

enforcement of a United States opt-out class action judgment would manifestly violate the public

---

[43]     Although, as noted above, Judge Marrero applied a "probability standard," it should be noted that other
courts have held that plaintiffs in a class action are not required to establish a probability of recognition of a
judgment in foreign countries to satisfy the superiority requirement.  *See In re Petrobras Sec. Litig.*, No. 14-cv-9662
(JSR), 2016 WL 413122, at *7 (S.D.N.Y. Feb. 2, 2016) ("Defendants argue that plaintiffs must demonstrate 'a
probability that a foreign court will recognize the res judicata effect of a U.S. class action judgment' to satisfy
superiority. The Court is not aware of any binding precedent that sets out such a requirement.") (citation omitted).

policy of any of the relevant Latin American countries" in concluding that these "real world" practical considerations "make it more likely than not that the courts of the various jurisdictions would recognize, enforce, and give preclusive effect to a judgment in this action." *Id.* at 120 (citing to the Gordon Dec. at ¶¶ 29, 100).

*Anwar I* is how modern courts analyze this issue.[44]   Indeed, the *Anwar I* and *Vivendi* decisions exemplify a natural progression that focuses on "practical" realities rather than hypotheticals (which is the province of foreign law expert opinions) and favors inclusion of foreign class members, particularly where there is no solid proof that a foreign country will refuse to grant *res judicata* effect to a U.S. class judgment.

For example, in *In re Lloyd's Am. Trust Fund Litig.*, 96 Civ. 1262, 1998 WL 50211 (S.D. N.Y. Feb. 4, 1998), the court rejected the defendants' argument concerning the lack of *res judicata* effect in foreign countries, finding that (i) there was no evidence the foreign courts would refuse to enforce a U.S. class judgment, and (ii) the court could fashion a mechanism to bind participating class members and discourage re-litigation abroad. *Id.* at *15.   In *Cromer Finance Ltd v. Berger*, 205 F.R.D. 113, 135-136 (S.D.N.Y. 2001), the district court also included foreign class members based on the lack of authoritative law with respect to the *res judicata* effect in the respective foreign countries and held that defendants had not presented arguments sufficient to "outweigh" the benefits of the class mechanism.[45]

---

[44]    In fact, Hunton's <u>only</u> criticism of *Anwar* appears to be that the case was not decided by a court in the Fifth Circuit.  But Judge Marrero's decision in such a strikingly similar case – and upon consideration of the opinions of many of the same experts that have opined herein – is particularly persuasive.  Notably, Greenberg's Response does not even bother to distinguish *Anwar* or otherwise address the holding of *Anwar* in this context.

[45]    The court further pointed out that "many events have to occur before Deloitte would be prejudiced by an inability to assert the defense of *res judicata* successfully.  Specifically, (1) the class action would have to be tried to judgment, despite the greater likelihood that the case would instead be settled; (2) the class would have to lose on the merits; (3) an absent class member would have to bring a subsequent lawsuit in an English or Swiss court, despite such practical deterrents as the unavailability of contingent-fee representation or a class action vehicle in those courts; (4) the absent class member would have to succeed in establishing jurisdiction over the defendants in

Perhaps the case that best exemplifies a federal court's pragmatic approach to this issue is *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. 24 (S.D. Cal. 1975).  There the court rejected "theoretical" evaluations of the *res judicata* effect of a class judgment in foreign countries and instead focused on the practical realities and "real world" risk of re-litigation in the foreign countries, noting that "every material witness and every aspect of the alleged fraud" and all of the documents necessary to prove the case against the defendant were located in the U.S. (and, like in the instant case, under the control of the court), and that U.S.-style discovery was non-existent in the foreign countries and that without discovery it would be impossible for foreign class members to prosecute such a complex case.  *Id.* at 48-49.

The court discounted the defendant's alleged "fear" of a future foreign lawsuit because it completely ignored the reality that two years after the collapse of the company, no lawsuits had been filed against the defendant outside of the U.S. *Id.* at 49. The court concluded that the defendant "would have this Court ignore reality and deny class status because of theoretical difficulties having no practical substance" just so it could "escape its liability" to those foreign investors.  *Id.* at 52.  Here, there is no evidence that any foreign investor has filed suit against Greenberg or Hunton in any of their home countries, despite Stanford having been placed in receivership over 7 years ago.  That fact should lend substantially less importance to the preclusive effect of a judgment in a foreign country.

This practical approach makes even more sense given the realities inherent in the modern world.  For example, and since many Stanford investors might be citizens of one country (e.g., Mexico) but reside in the United States, how will the Court consider *res judicata* issues with respect to them?  What about a U.S. citizen residing in Mexico?  What about investors with dual

---

that foreign court; (5) the absent class member would have to convince the foreign court to ignore this Court's ruling and render judgment in its favor on the merits; and (6) the absent class member would have to then convince the Bermuda court to enforce the foreign judgment and ignore the judgment rendered by this Court.  *Id.* at n.32.

nationalities?   What about the possibility that an investor from Venezuela might choose to sue Greenberg or Hunton in England?   Will the Court have to examine the laws of every single country in the world to rule out those countries as potential follow-on litigation venues?

Another reality-based practicality arises with respect to Hunton's erroneous assertion that there are $1.5 billion in claims from Antiguan citizens.   *See* Hunton's Response, at 66, 77-78. As this Court is aware from the Chapter 15 litigation, since SIB was an offshore bank, under Antiguan law it could not take deposits from Antiguan citizens.   *See* Direct Testimony of Hugh Dickson in Case No. 3:09-cv-007289 [Doc. 107-1] at pps. 13-14 (courtesy copy attached at Reply App. 31); *see also* SIBL Disclosure Statement, Exhibit 99 to the Class Plaintiffs' opening Appendix, at p. 10, App. 1741 ("As an international business corporation, [SIBL] may not take deposits from persons resident in Antigua Barbuda").

As explained by Antiguan Liquidator Hugh Dickson, those $1.5 billion in Antiguan claims cited by Defendants mostly pertain to trusts administered by Stanford Trust Company Ltd in Antigua ("STCL"), which served as the Trustee for all of the trusts created through, e.g., the Miami, Houston and San Antonio offices of Stanford Fiduciary Investor Services ("SFIS") such as Plaintiff Michoacan Trust.   *See* Supplemental Direct Testimony of Hugh Dickson in Case No. 3:09-cv-007289 [Doc. 124-1] at pps. 1-2 (courtesy copy attached at Reply App. 60) (testifying that of the 3,176 depositors the Joint Liquidators had listed as being from Antigua, 2,600 of them are trusts administered by STCL with claims worth roughly $1.2 billion);  Complaint [Doc. 1] at ¶¶ 165-185, 369-391 (describing how Defendants helped set up - and then shield - SFIS as the representative office of STCL in the U.S. to enable Stanford to sell SIB CDs to primarily Latin American residents).

Given Ralph Janvey's appointment as the Receiver for STCL in the United States, Mr.

Janvey is now the Trustee for all of the roughly $1.2 billion in trust claims. *See* Receiver's Notice Regarding Michoacan Trust's Claims [Doc. 173].   As such, and contrary to the Defendants' speculative arguments, the reality is that because Mr. Janvey resides in Dallas and serves in his STCL Receiver capacity under the supervision of this Court, there will be no *res judicata* claim preclusion issue with respect to those $1.2 billion in STCL-administered trust claims.

In any event, whether a foreign court will give preclusive effect to a U.S. opt-out class judgment is just one factor to consider.   In *Vivendi*, the district court noted that *res judicata* preclusion in foreign countries was a factor in the superiority analysis but was not dispositive without consideration of other factors that impact the superiority determination. *See* 242 F.R.D. at 95; *see also, In re Petrobras Securities Litig*., No. 14-cv-9662 (JSR), 2016 WL 413122 at *7 (S.D.N.Y. Feb. 2, 2016).

Here, for example, it is highly unlikely that a foreign court would even have jurisdiction over this case, involving as it does the alleged participation by U.S. law firms in a U.S.-based fraud, or personal jurisdiction over the defendant law firms because they are not domiciled in those foreign countries.   It is doubtful that Mexican courts would have jurisdiction over the Defendants. *See Gutierrez v. Advanced Medical Optics*, 640 F.3d 1025 (9th Cir. 2013) (vacating and remanding *forum non conveniens* dismissal of claim by Mexican citizens following dismissal of subsequent lawsuit filed in Mexican courts based on lack of jurisdiction over the U.S. domiciled defendant corporation); *see also Marsden v. Select Medical Corp*., 246 F.R.D. 480, 486 (E.D. Pa. 2007) (noting that it was "far from clear" how an Austrian court would have jurisdiction over a suit arising from the fraud in that case).

Relatedly – and since these U.S. law firm Defendants likely have no assets abroad – it is

unclear why any Stanford investor would sue them outside of the U.S. or how they could collect on a foreign judgment against the Defendants. As the *Vivendi* court underscored, any absent class members who filed subsequent lawsuits abroad would face "the risk that defendants would be able to invoke this Court's jurisdiction to prevent recovery." *Vivendi,* 242 F.R.D. at 107; *see also In re U.S. Financial Sec. Litig.*, 69 F.R.D. at 49, 52-53.

Finally the exclusion of foreign nationals from this litigation would arguably violate international treaties, such as NAFTA, that the U.S. has in place with many of the foreign countries at issue, all of which mandate the equal treatment of foreign investors.  *See, e.g.,* NAFTA Article 1102, North American Free Trade Agreement (requiring equal treatment of Mexican and Canadian investors).[46]

Federal courts have considered the effect of such treaties in refusing to exclude foreign nationals from U.S. class actions based on concerns about res judicata preclusion in the foreign countries. *See, e.g.*, *Sgalambo v. McKenzie*, 268 F.R.D. 170, 176-77 (S.D.N.Y. 2010) (noting the existence of a treaty between the U.S. and Belgium that provides for equal protection of Belgian nationals); *In re Goodyear Tire & Rubber Co. Sec. Lit.,* No. 5:03 CV 2166, 2004 WL 3314943, *5 (N.D. Ohio 2004) (noting that by treaty Austrians are entitled to the same rights and privileges before U.S. courts as U.S. citizens); *Marsden*, 246 F.R.D. at 486 (same).

Thus, this Court should not exclude from this class action Stanford investors who reside in countries with which the U.S. has international trade treaties, including Mexico, Colombia, Peru, Chile, Panama, Israel, and (as a result of the Central American Free Trade Agreement), El Salvador, Guatemala, Honduras, Nicaragua, Costa Rica, and the Dominican Republic.

---

[46]      *See Loewen Group Incorporated and Loewen (Raymond L.) v. United States*, Award, ICSID Case No. ARB(AF)/98/3, (2005) 7 ICSID Rep 442, (2003) 42 ILM 811, (2003) 15(5) World Trade and Arb Mat 97, IIC 254 (2003), 25 June 2003 (NAFTA Article 1102(3) require most favorable treatment of foreign litigants accorded to a U.S. person in like situation to that litigant).

In sum, given that there are no judicial decisions from the courts of any foreign country in which Stanford investors reside expressly refusing to enforce a U.S. class action judgment, and that the only "evidence" before this Court consists of highly speculative and hypothetical opinions from retained lawyers, which opinions are contested by the Class Plaintiffs' experts, this Court should base its decision on superiority on the "practical" realities described above and err in favor of inclusion of foreign investors.  Moreover, the Court should give consideration to decisions from other U.S. courts that have previously certified proposed classes that include foreign nationals because such decisions "are particularly persuasive," and therefore the Court should include investors from those countries in the requested class.[47]  *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 291 (S.D.N.Y. 2008).

**B**.       **The Class Action Mechanism is Clearly Preferable to Individual Suits**

Greenberg also argues (although Hunton does not) that the resolution of the claims filed against the Defendants through individual suits rather that the certification under Rule 23 would be more efficient.  Greenberg would have the Court believe than an avalanche of over 17,000 suits filed by individual investors in this venue would be more manageable than a single action.[48]

---

[47]       Those countries include: England, France, the Netherlands, Canada, Switzerland, Curacao, Spain, Panama, Uruguay, Colombia, Brazil, Chile, Venezuela, Argentina, Ecuador, El Salvador, Peru, Dominican Republic, Mexico, and Bolivia. *Vivendi*, 242 F.R.D. 76 (including investors from France in class action); *Cromer*, 205 F.R.D. 113 (including Switzerland); *Anwar I*, 289 F.R.D. 105 (including investors from the other countries cited).

[48]       The Receiver's 26th Report Regarding the Claims Distribution Process [Doc. 2260, at p. 9] states there are 17,900 unique, timely CD claims.  The Class Plaintiffs take great exception to Greenberg's claims that because the individual plaintiffs were supposedly affluent enough to invest in SIB CDs they therefore currently have the resources to maintain individual actions against the defendants.  Many members of the putative class lost their life savings to Stanford's Ponzi scheme.  This is precisely why many of the investor claims are so large.  The misery and hardship already caused by Stanford would be deepened and compounded by a requirement that these investors – many of whom are elderly and from foreign countries – now have to prosecute individual actions rather than a class action through contingency counsel.  Moreover, the fact that some individual investors (presumably with adequate remaining resources) have filed individual cases against third-parties (although not against these particular Defendants) does not militate against certification.  Quite the opposite, as it underscores how vast the remaining class actually is.  *See Petrobras*, 2016 WL 413122, at *3 ("the volume of sophisticated opt-outs does not indicate that a class action is inappropriate or that the Classes are insufficiently numerous. Instead, the volume of opt-outs underscores just how vast the Classes are. Hundreds of opt-outs is a large number, but a conservative estimate would place the size of the proposed Classes in the thousands. Judicial economy will be served by a joint trial because of

But this is truly implausible on its face and departs from long-settled legal presumptions:

> Rule 23 prevents multiplicity of actions, and thus conserves both judicial and party resources, by enabling a single litigation through representatives on common issues of law and fact where joinder would be impracticable. As the Supreme Court has stated, 'A federal class action is … a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions.' By resolving common legal and factual issues in a single adjudication, class actions utilize judicial resources more efficiently than piecemeal individual litigation. Put simply, it is less expensive and time consuming to process one class action than many individual actions.

NEWBERG ON CLASS ACTIONS § 1:9 (5th ed.) (citing *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 550, 94 S. Ct. 756 (1974)); *see also In re Worldcom*, 219 F.R.D. at 304 (individual suits "would risk disparate results, threaten to increase the cost of litigation for all parties exponentially, pose an enormous burden for courts throughout the land, and encourage a race to judgment to obtain the limited funds that are available to fund any recovery that plaintiffs may win here"); *Jenson*, 256 Fed. Appx. at 926 (noting that it is inefficient to force individual investors to have to prove the fraud scheme over and over in separate litigations); *see also In re Petrobras Litig.*, 2016 WL 413122 at *3 (S.D.N.Y. 2016) (certifying class despite large number of opt out lawsuits filed by sophisticated investors and noting that judicial economy "does not extend to a joint trial for thousands upon thousands of individual actions").

Greenberg's corollary argument that the Receiver is equally capable of pursuing claims against the Defendants and achieving recoveries for the investor-plaintiffs ignores the limits of the Receiver's Court-imposed authority.   Indeed, the Fifth Circuit has made clear that the Receiver does not have standing under the common law or the Court's Receivership Order to sue

---

the similarities between the individual actions and the present action, but, contrary to defendants' suggestion, this would not extend to a joint trial for thousands upon thousands of individual actions.").

third-parties for the claims of Stanford's creditor-investors, such as claims under the TSA.[49]  *See Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185, 190, 192 (5th Cir. 2013) ("a federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors.") ("The district court's order appointing the Receiver invests him with the full powers of an equity receiver under common law as well as certain enumerated powers, including the power to take and have complete control, possession, and custody of the receivership estate and over any assets traceable to assets owned by the estate; to collect, marshal, and take custody of all assets of the estate, wherever situated, and all sums of money owed to the estate; and to institute actions or proceedings to impose a constructive trust, obtain possession, and recover judgment with respect to persons or entities who received assets or records traceable to the receivership estate. The district court's order, however, does not authorize the Receiver to represent the creditors of the corporations in receivership in asserting claims against third persons.") (emphasis supplied).[50]

Consequently, the claims brought by the Class Plaintiffs – such as the TSA claims – cannot be maintained by the Receiver.  The TSA claim is one of the most powerful claims

---

[49]     Greenberg claims that the Receiver has been "extended the right to sue for the Investor Plaintiff' common injuries" – but it cites no authority that actually states this.  *See* Greenberg Br. p 36.  Greenberg also claims, without any meaningful elaboration, that the action brought by the Official Stanford Investors Committee ("OSIC") is a "superior" vehicle to prosecute the claims against the defendants.  *Id.*, p. 28.  Greenberg appears to argue that since the *quantum* of damages sought by OSIC is similar to that sought by the Class Plaintiffs, the Class Plaintiffs' case could just as well be disregarded.  *Id.*  Of course, the actual *claims* brought by OSIC and the Class Plaintiffs differ in substance.  Further, Greenberg's sudden preference for OSIC's action rings hollow in light of its previous opposition to the plaintiffs' motion to defer class certification and allow the Receiver's and OSIC's claims to proceed. [Doc. 132.]  In any event, should Greenberg propose, in the interest of judicial economy, that OSIC be permitted to represent the Class Plaintiffs and maintain their claims – including TSA claims - in this action under Rule 23 or otherwise, the parties would consider such a stipulation.  *See Janvey v. IMG Worldwide, Inc.*, Case No. 3:11-cv-00117-N [Doc. 33] Order (finding OSIC has standing to represent the interests of Stanford investors).

[50]     The cases cited by Greenberg in support of its argument that the class action should be summarily dismissed in favor of the Receiver's separate claims are not applicable.  In *In re TWL Corp.*, 712 F.3d 886 (5th Cir. 2013), the plaintiffs filed a class action (opposed by the Trustee) *against the debtor itself.*  Here, the investor-plaintiffs are not suing the Receivership Estate for recoveries, they are suing third-parties.  The same conditions were present in *Farno v. Ansure Mortuaries of Ind.*, 953 N.E.2d 1253 (Ind. App. 2011).  Unlike in the present case, the class plaintiffs in *Farno* filed a lawsuit against companies for which a receiver was subsequently appointed.

---

asserted against the Defendants by any of the Class Plaintiffs because of its remedial nature, joint and several liability standard, rescission damages, and lack of any element of loss causation or reliance, and it belongs solely to the investors. So, it is entirely disingenuous for the Defendants to argue that the Receiver and OSIC claims, which do not include a TSA claim, are somehow a superior means of resolving this dispute than the Class Plaintiffs' claims. The Class Plaintiffs hold unique and valuable claims that only they can assert, and they should not be precluded from bringing the claims they alone own because the Receiver and OSIC are simultaneously pursuing claims that belong solely to the Receivership Estate. The two unique sets of claims are being prosecuted in tandem, and the Receiver's claims should no more be barred by the pendency of the Class Plaintiffs' claims, than the Class Plaintiffs' claims should be barred because of the pendency of the Receiver's claims.

Moreover, the TSA claims require the development of a different body of evidence and law than the Receiver's legal negligence claims and may result in different recoveries.[51] Finally, and contrary to Greenberg's arguments, there is no real or additional burden on the Receivership case in the maintenance of a separate class action.[52] The attorneys for the Class Plaintiffs are

---

[51]     The following claims survived the defendants' motions to dismiss:

| Category | Claim |
|----------|-------|
| Estate Claims | Negligence (all Defendants) |
| | Aiding and Abetting Breach of Fiduciary Duty (all Defendants) |
| | Breach of Fiduciary Duty (defendant Suarez only) |
| | Fraudulent Transfer / Unjust Enrichment (Greenberg/Hunton only) |
| | Negligent Retention / Negligent Supervision (Greenberg/Hunton only) |
| Class Claims | Aiding and Abetting Violations of the TSA |
| | Aiding and Abetting / Participating in Breach of Fiduciary Duty |
| | Aiding and Abetting / Participating in a Fraudulent Scheme |
| | Civil Conspiracy |

While much of the proof required to prosecute these disparate claims overlap, many of the Receiver's claims – such as negligence, negligent retention, and fraudulent transfer – require varying legal and factual inquiries.

[52]     In fact, the court's decision in *Gregory v. Finova Capital Corp.*, 442 F.3d 188 (4th Cir. 2006) – cited by Greenberg – was primarily based on principles of efficiency and cost to the bankruptcy estate. *Id.* at 191 ("the

prosecuting the class claims on the same contingency basis as the lawyers representing the Receiver and OSIC – and if the class action was in fact burdensome, the Receiver would not have joined as a plaintiff in this lawsuit.  The fact that recoveries will be distributed through the Receivership Estate – which already has a sophisticated and Court-approved claims process in place – only underscores the economies of scale and efficiencies of the pending actions and actually militates heavily in favor of certification.

## III.    TYPICALITY IS SATISFIED

None of the Defendants' challenges to the typicality requirement of Rule 23 have merit.

Perhaps the Defendants' most curious argument is the claim that each class member supposedly purchased "different" financial products from Stanford, such as plain vanilla CDs or so-called Flex CDs.  Of course, this assumption perpetuates the myth that Stanford did not operate a Ponzi scheme by lending credence to the fictitious labels Stanford gave to his supposed financial products.  Even assuming there are material or meaningful differences between these products in the abstract, in actuality Stanford himself treated these products singularly as tools to funnel funds from unsuspecting investors into his own pockets.  *See In re Stanford International Bank, Ltd.*, Case No. 3:09-cv-00721-N, Order [Doc. 176] at pp. 27-28 ("The evidence demonstrates that SIB was nothing like a typical commercial bank.  Although it officially offered six deposit products, it had one principal product line – certificates of deposit ("CDs") – and one principle source of funds – customer deposits from CD purchases.").

In any event, Flex CDs allowed purchasers to add funds on a continuing basis to their CD account.  Investors in Flex CDs were purchasing smaller mini-CDs or partial interests in CDs every time they deposited money into that CD.  The Defendants fail to offer any reason why the

adversary proceeding will avoid many of the expenses and complexities associated with having the class action and the adversary proceeding pending simultaneously").  In any event, *Finova* appears to be an outlier; the dissent in *Finova* would have allowed the class action to proceed.

Court should treat these products in a materially different way. *In re Enron Corp. Sec.*, 529 F.Supp.2d 644, 697 (S.D. Tex. 2006) ("Efficiency is clearly served here because Defendants' alleged course of conduct and fraudulent scheme to misrepresent Enron's financial status affected the investing public's perception in evaluating the purchase of Enron securities, regardless of what type of Enron investments they ultimately chose.") (emphasis supplied).

Relatedly, Hunton attempts to draw out from the testimony of the putative class representatives taken in this action that each of them may have understood Stanford's operations to be located in different jurisdictions, such as Antigua, Tennessee, Miami, and/or Texas. This Court, however, has determined that Texas was the nerve center of Stanford's operations. *See In re Stanford International Bank, Ltd*., Case 3:09-cv-00721-N, [Doc. 176] pp. 19-50. Stanford's well-documented efforts in masking the locus of his fraud – which effort was known to the Defendants – should have no bearing on any Rule 23-related issue.

In addition, the Defendants argue that the "sophistication" of the proposed class representatives somehow "puts them on different footing" than the rest of the putative class for typicality purposes; yet in an another breath the Defendants argue that the proposed class representatives cannot adequately represent the class because they are not sufficiently informed about the lawsuit. In support of their adequacy argument, the Defendants point to the deposition testimony of the proposed class representatives regarding whether they had ever interacted with or heard of the Defendants before the lawsuit was filed, completely ignoring Texas law which holds that it is not required that a plaintiff under the TSA show that they ever interacted with the defendant aider and abettor. *See Sterling*, 168 S.W. 3d at 843.

Hunton argues that as a result of the named plaintiffs' "sophistication," they may have had different reliance-based experiences in connection with their Stanford investments. But a

court in this District has previously rejected such an argument in the context of a claim for damages due to material omissions:

> The Court also rejects Defendants' "sophisticated investor" arguments. Taking Plaintiffs' claims as true that Defendants omitted to state or affirmatively misstated material facts, all investors would have been misled by the same operative facts. *Gibb v. Delta Drilling Co.*, 104 F.R.D. 59, 78 (N.D. Tex. 1984). Stated another way, 'Where an investor is sophisticated ... he would have his sophistication thrown up as a defense to his claims as to the interpretation of financial statements. <u>But it makes no difference if you are the most or least knowledgeable investor in the market if facts are omitted</u> or misrepresented in financial statements. It is impossible to arrive at a sound decision whether or not to invest if material facts are omitted or misrepresented.' *Id.* (*quoting Rifkin v. Crow*, 80 F.R.D. 285, 286 (N.D. Tex. 1978)).

*In re First Republic Bank Securities Litig.*, 1989 WL 108795, at *11 (certifying class) (emphasis supplied). Stanford's and the Defendants' material omissions regarding the Ponzi scheme damaged all investors equally, regardless of their sophistication.

In sum, the claims of the class representatives are typical for the class. Their experiences mirror those of the class because each of the class representatives and the class members are victims of Stanford's fraud. "The claims of the proposed class representatives are typical because they arise from the same alleged Ponzi scheme, material misrepresentations and course of conduct to defraud investors . . . and they are grounded in the same legal theory . . . ." *Newby v. Enron Corp.*, 529 F.Supp.2d 644, 673 (S.D. Tex. 2006); *see also Janvey v. Brown*, 767 F.3d at 439 (noting that it is "well-established" that Stanford operated a Ponzi scheme); *Janvey v. Alguire*, 2013 WL 2451738, at *6 (N.D. Tex. Jan. 22, 2013) ("Here, the Court again holds that, as a matter of law, Stanford operated a Ponzi scheme."). Accordingly, typicality is satisfied.

## IV.     ADEQUACY IS SATISFIED

A party seeking class certification must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).   Each of the proposed class representatives satisfies this requirement, as follows:

### A.     Pam Reed

Ms. Reed, a U.S. citizen, is an appropriate class representative.  She spent many years as a public servant, as the Travis County Commissioner, and as a commissioner on the Texas Water Commission and the Texas Natural Resources Commission.[53]  She is attentive and extremely dedicated to serving those like her who suffered devastating losses as a result of the Defendants' misconduct.  Ms. Reed is also a member of the Official Stanford Investors Committee, formed by this Court to represent victims of the Stanford Ponzi scheme and to work with the Receiver in pursuing actions against third-parties.

Ms. Reed has already successfully served as a class representative in an action filed against BDO USA, LLP, *et al*. that ended in a favorable settlement.  *See* Case No. 3:12-cv-01447-N [Doc. 79] (Final Judgment and Bar Order).  In addition, Ms. Reed is seeking to serve as a class representative in a putative class action filed by Stanford investors against another law firm, Proskauer Rose LLP.  *See* Case No. 3:09-cv-01600-N-BG.

To that end, Greenberg argues that Ms. Reed's services in the *Proskauer* case may require her to take positions that conflict with positions taken in this case, although Greenberg fails to provide any examples or even any elaboration whatsoever.  Of course, the class plaintiffs in *Proskauer* also seek recoveries under the TSA, such that individual questions of reliance and

---

[53]     Transcript of Deposition of Pamela G. Reed at 6:3-13 [Reply App. 75].

causation – as here – will not be at issue in that action.  Accordingly, there is no reasonable risk whatsoever that Greenberg's fear in this regard are justified.

Greenberg also argues that Ms. Reed is not an appropriate representative because she happened to have met Allen Stanford on one occasion in Antigua.  Greenberg blatantly misrepresents Ms. Reed's testimony by telling this Court that Ms. Reed testified in deposition (although she did not so testify) that she went to Antigua with the express purpose "to personally meet with Allen Stanford and to discuss her investments with various bank officials."  Greenberg Brief at 72.  Hunton similarly states that Ms. Reed "interacted with Allen Stanford in the course of making [her] investment decision."  Hunton Brief at 58.  This is not true.  Ms. Reed testified unequivocally in her deposition that the trip was a boondoggle organized by her broker and that she didn't discuss her specific investments in SIB at all on that trip and only met Allen Stanford briefly.[54]  Hunton also misrepresents to the Court that Reed admitted that she referred other persons to her Stanford broker to purchase SIB CDs.  Hunton Response at p. 101.    That is likewise a fabrication.  Reed testified that she referred some acquaintances to her broker when he was at Smith Barney, prior to his joining Stanford.[55]

Hunton, for its part, makes great hay over what it believes is an admission that Ms. Reed could not recall reviewing interrogatory responses served in this action.  But Ms. Reed testified during her deposition that she has been actively involved in the prosecution of this action since she was asked – relatively recently – to serve as a class representative.[56]  Ms. Reed prepared her

---

[54]      Reed Tr. at 53:10 [Reply App. 78]. Relatedly, both Greenberg and Hunton argue that Ms. Reed supposedly relied on certain specific representations made by her financial advisor prior to purchasing her CDs.  But as discussed above, even if true, any individualized questions of reliance and causation are immaterial under the Class Plaintiffs' TSA claims.

[55]      Reed Tr. at 81:2-7 [Reply App. 82].

[56]      *See* September 11, 2015 Order Granting Unopposed Motion to Substitute Reed as Named Plaintiff [Doc. 146].

---

declaration in support of this motion; carefully reviewed all the pleadings and her testimony from other Stanford-related class actions; and has studied the pending motion to certify a class and supporting documents.[57]   In any event, "[c]lass representatives are merely asked to have a general understanding of their position as plaintiffs with respect to the cause of action and the alleged wrongdoing perpetrated against them by the defendants." *Rubenstein v. Collins*, 162 F.R.D. 534, 538 (S.D. Tex. 1995).   Further, "the named plaintiffs' lack of knowledge of specific policies or the conduct of the litigation is not relevant to the question of the adequacy of class representative." *Ass'n of Flight Attendants v. Texas Int'l Airlines, Inc.*, 89 F.R.D. 52, 61 (S.D. Tex. 1981).   As demonstrated by her efforts to date, Ms. Reed has gone far beyond what the typical class representative is required to do.   *See, e.g.*, *Lehocky v. Tidel Tech. Inc.*, 220 F.R.D. 491, 503 (S.D. Tex. 2004) (approving adequacy of class representatives who were committed to the action, understood their duties as representatives, and had reviewed court papers and understood the allegations).   Understanding all of the nuances and legal issues involved in litigation as complex as this litigation involving the Stanford Ponzi scheme is not a requirement of class representative adequacy.   In fact, the Defendants on the one hand claim Ms. Reed is not a typical investor because she is sophisticated (thus implying less sophisticated investors should serve as class representatives), then complain she is not adequate because she doesn't know enough about the case.   Would Defendants expect some less sophisticated investor that satisfies the typicality requirement from their viewpoint to be a more adequate representative?   Or would the Defendants argue that such an unsophisticated investor is inadequate because they know even less than Ms. Reed and the current class representatives?   The Defendants' double-speak on these issues should be self-evident.

---

[57]        Reed Tr. at 69:17-71:7 [Reply App. 80].

The Defendants also argue that because all the named plaintiffs including Ms. Reed are the subject of suits filed by the Antiguan Joint Liquidators ("JLs") they are not capable of serving as a class representatives.   As she testified in this action, Ms. Reed has been sued by the JLs *in Antigua under Antiguan law* (as have the other named plaintiffs) – despite her undisputed status as a "net loser" under U.S. law – for supposed "preference" payments that she received – i.e., withdrawals she made in the ordinary course prior to termination of the Ponzi scheme.  Ms. Reed is one of numerous victims of the Stanford Ponzi scheme who, after losing her investment, was then sued by the JLs based on withdrawals she made in the 6 months prior to the collapse of Stanford.   She has not been sued by the U.S. Receiver and there is no accusation in the U.S. that she received any "preference" payments under U.S. law.  In this regard, she is similarly situated to many class members who also were unjustifiably sued by the JLs for alleged "preferences" under Antiguan law (which is apparently any payment received within 6 months of the commencement of the liquidation under Antiguan law).  In any event, the lawsuits filed by the JLs against Ms. Reed and many others do not allege that these investors had any knowledge of the Ponzi scheme or any of the conduct described in the Complaint in this case.  Rather these lawsuits seek the application of Antigua's technical laws that allow the JLs to "claw back" as "preference payments" money withdrawn from SIB by investors up to 6 months prior to the filing of the SEC action in February 2009 – despite the fact that such withdrawals were not of "net winnings."  Aside from noting the existence of this lawsuit, the Defendants do not state how this lawsuit has any bearing whatsoever on Ms. Reed's ability to serve and represent in this action 17,000 other Stanford investors, who, like Ms. Reed, suffered losses investing in SIB CDs, and many of whom like Ms. Reed are also being sued by the Antiguan JLs for alleged preferences.

The Defendants also argue that Ms. Reed does not satisfy the typicality requirement because the Defendants believe that she may have received a separate U.S. accredited investor disclosure and that she otherwise is not entitled to maintain a claim under the TSA based upon her purchase of unregistered securities.  But the Defendants have produced no evidence that Ms. Reed actually received any such accredited investor disclosure. [58]  Further, Ms. Reed could not recall receiving such a disclosure when asked about it during her deposition.[59]  In any event, whether or not Ms. Reed received the disclosure is irrelevant because the disclosure does not state that Stanford was engaged in a massive regulatory fraud.  And to the extent it emerges in discovery that accredited investors did receive such a disclosure, the Court has the ability to modify the existing class or certify a sub-class of accredited investors.

Greenberg's parting shot concerning Ms. Reed – that she supposedly "destroyed documents relevant to her claims" – is truly repugnant.  At her deposition, Ms. Reed testified that she provided her entire file concerning her SIB investments to her undersigned counsel in preparation for this action.  Ms. Reed was then asked by Greenberg's counsel "whether [she] might have thrown away any [SIB] disclosure statements," to which she replied, "I don't – I have no idea what I threw away."[60]  To extract from this testimony the conclusion that Ms. Reed somehow purposefully destroyed documents relevant to her legal claims is a distortion of the highest order.   Greenberg, apparently, will allege anything to defeat certification.  In any event, unsubstantiated allegations of discovery abuse by proposed class representatives do not prevent

---

[58]     Hunton's related argument – that accredited investors cannot pursue TSA registration claims – assumes that all Stanford CD purchasers during the relevant period were, in fact, accredited investors.  Hunton, however, has made no evidentiary showing whatsoever in support of this assertion, and therefore, Hunton's argument should not be credited by the Court at this stage of the proceedings.

[59]     *Id.* at 19:10-20, 49:11 – 50:2. [Reply App. 77, 78].

[60]     *Id.* at 54:11-24. [Reply App. 79].

certification of a class.   *See Petrobras*, 2016 WL 413122, at *6.  "If defendants felt that plaintiffs . . . were behaving so badly [in discovery], they should have notified the Court sooner than their opposition to plaintiffs' motion for class certification."   *Id*.   As in *Petrobras*, Greenberg has never complained to the Court about Ms. Reed's alleged discovery abuse.  "The argument thus smacks more of strategy than substance."  *Id*.

### B.      Samuel Troice

The Defendants offer substantially the same critiques of Mr. Troice's adequacy to serve as a class representative under Rule 23 as they do of Ms. Reed [61] – and those challenges fall equally short.

The only unique claim made with respect to Mr. Troice is Greenberg's assertion that Mr. Troice's CD purchase history supposedly preceded 2005, and therefore his claims are barred by the TSA's statutes of limitation.  Greenberg's challenge, however, is wrong in two respects.

First, like many SIB investors, Mr. Troice purchased a Flex-CD which allowed him to make new investments using new proceeds into the Flex CD after the initial 2005 purchase.  Mr. Troice continued to invest in SIB CDs well after 2005, and thus his claims are not barred by the TSA's statute of repose.[62]   As an initial matter, Greenberg's characterization of Mr. Troice's continued investments in SIB CDs as a "rollover" of an existing CD is incorrect.  As set forth in the Rebuttal Declaration of Samuel Troice, Mr. Troice "made investments in SIBL CDs on multiple dates and in varying amounts after February 2005, including investments of $350,230.00 in November 2006," "$134,130.00 in September 2007," and $110,000 in May

---

[61]      Mr. Troice is also a class representative in the *Proskauer* case.

[62]      Transcript of Deposition of Samuel Troice at 56:20-58:9 [Reply App. 85]; Rebuttal Declaration of Samuel Troice at ¶¶ 4-5 [Reply App. 2]. Thus, Greenberg's contention that Mr. Troice's last purchase occurred in 2005 is simply wrong.

2008."[63]   Mr. Troice "considered each of these investments to be 'new' investments in SIBL

CDs, as [he] could have invested [his] money elsewhere and each time [he] put new money into

the CDs [he] made an independent investment decision to do so."[64]   Mr. Troice "was not

obligated to make these investments with SIB."[65]   Thus, these new investments were not the

"rollover" of an expiring SIB CD but continued investment in SIB CDs over time.

Regardless of the characterization of the CDs in which Mr. Troice invested, it is clear that

each purchase of (or investment into) SIB CDs was a "new" purchase.   While courts have split

on the issue of whether a "rollover" constitutes a new purchase for purposes of a statute of

limitations analysis, the weight of authority holds that a rollover is a new purchase.   In *Bradford*

*v. Moench*, the court held that a rollover constitutes a new purchase because the investor in

exchange for the additional investment the investor receives new value and extends the maturity

date of the CD.   809 F. Supp. 1473, 1492 (D. Utah 1992).[66]   In *Pollack v. Laidlaw Holdings,*

*Inc.*, the court concluded that a rollover of promissory notes constituted a new purchase because

the risk associated with the investment in the notes changed at the time of the rollover.   1995 WL

261518, at *8 (S.D.N.Y. May 3, 1995);[67] *see also S.E.C. v. SBM Inv. Certificates, Inc.*, 2007 WL

---

[63]     Rebuttal Declaration of Samuel Troice at ¶¶ 4-5 [Reply App. 2].

[64]     *Id*.

[65]     *Id*.

[66]     Courts have also held that the exchange of securities constitutes a new sale of securities even where the new obligations are virtually identical to the old ones.   *See SEC v. Associated Gas & Elec. Co.*, 24 F.Supp. 899, (S.D.N.Y.1938), *aff'd*, 99 F.2d 795 (2d Cir. 1938); *United States v. Riedel*, 126 F.2d 81, 83 (7th Cir. 1942).

[67]     The court in Pollack reasoned that

    . . . a renewal would constitute a significant change in the investment risks. At the point just prior to maturity, the risk level of the mortgage is dependent solely on the ability of the mortgagee to pay the principal at that moment. At the point just after the rollover, the risk level is dependent on the solvency of the mortgagee over the entire period of the mortgage.

*Id*.

---

609888, at *10 (D. Md. Feb. 23, 2007) (following reasoning of Pollack and holding that rollover of CDs constituted new purchase).

The only authority to the contrary arises from completely distinguishable facts.   In determining that a rollover was not a new purchase, the court in *Sanderson v. Roethenmund* noted that the rollovers were automatic and that "each rollover represented merely a periodic interest rate and maturity date adjustment . . . [that] was something contemplated by the [plaintiffs] when they made the initial purchases."  682 F. Supp. 205, 209 (S.D.N.Y. 1988).[68]  As set forth above, Mr. Troice's post-2005 investments into SIB CDs (or "rollovers" to the extent they can be characterized as such) were neither automatic nor obligatory.[69]  Like the plaintiffs in *Bradford*, Mr. Troice was free to invest his money elsewhere but made an independent investment decision each time he put new money into SIB CDs.  809 F. Supp. at 1492.  Mr. Troice's post-2005 investments are much more similar to the investments in *Bradford* and, therefore, should be considered new purchases of SIB CDs.  Accordingly, his claims are not time barred.

Second, questions about the statute of limitations of a particular claim are substantive in nature and are not appropriately raised on a motion for class certification.  *See e.g.*, *In re Revco Sec. Litig.*, 142 F.R.D. 659, 663 (N.D. Ohio 1992) ("In arguing that the statute of limitations issue predominates over the common issues, defendants for all practical purposes are seeking a determination as to the viability of Arsam's 1933 Act claims.  Such inquiry is outside the scope of Rule 23 and indeed defies the principle enunciated in *Eisen*, that a court may not review the substantive issues raised in a class complaint when determining the claims' suitability for class

---

[68]    The Sanderson court also based its decision to dismiss the plaintiffs' claims on its determination that plaintiffs failed to plead fraud adequately under Fed. R.Civ. P. 9(b).  *Id.* at 207–08.

[69]    Rebuttal Declaration of Samuel Troice at ¶¶ 4-5 [Reply App. 2].

treatment.") (citing *Linton v. Shearson Lehman/American Express, Inc. (In re Baldwin–United Corp. Litigation*), 122 F.R.D. 424, 427 (S.D.N.Y. 1986)); *Keasler*, 84 F.R.D. at 367 (<u>Regardless of the applicable period of limitations, the availability of this defense cannot defeat certification. The possibility of a limitations defense involves factual and legal issues that will be dealt with at trial.</u>) (emphasis supplied); *Rodriguez by Rodriguez v. Berrybrook Farms, Inc*. 672 F.Supp. 1009, 1016 (W.D. Mich. 1987) ("it is permissible that the underlying facts of the case may fluctuate over the class period and vary among the individual class members.").

Consequently, there is no basis to exclude Mr. Troice on the grounds raised by the Defendants.  *See Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200, 208 (N.D. Tex. 1997) ("The hypothetical conflict between early and late purchasers does not destroy typicality.").

### C.     Michoacan Trust

The Defendants offer substantially the same critiques of Michoacan Trust's adequacy to serve as a class representative under Rule 23 – and they are equally non-meritorious.

In particular, Hunton's attempt to smear Jorge Salgado, settlor of the Michoacan Trust, by alleging he did not make appropriate tax filings under Mexican law is completely unfounded. Michoacan Trust was the investor in Stanford CDs under the laws of the BVI, not Mr. Salgado, and there is no evidence that Mr. Salgado personally received any net revenues from the Trust that would be subject to tax reporting requirements in Mexico.[70]

As with Mr. Troice, Defendants incorrectly argue that Michoacan Trust's claims are barred by limitations.  Michoacan Trust purchased numerous SIB CDs after 2005.[71]  And not all of these purchases were "rollovers" or additional investments in existing SIB CDs.  Many were

---

[70]     *See* Transcript of Deposition of Jorge Salgado pp. 96:10—97:7 [Reply App. 89].

[71]     Rebuttal Declaration of Jorge Salgado at ¶¶ 4-5 [Reply App. 12].

purchases of new, stand-alone SIB CDs with unique account numbers.[72]   Thus, Greenberg's assertion that Michoacan Trust is subject to a statute of limitations defense is simply wrong.

Finally, Greenberg argues for the first time in its Response to the Class Certification Motion (served on Class Plaintiffs on January 19) that a trust does not have capacity to sue under Texas law.  Greenberg did not raise this issue in its Motion to Dismiss.  The Michoacan Trust was a trust set up through STCL, an Antiguan trust company that is one of the Receivership Entities controlled by Stanford, for which Ralph Janvey is now the Receiver.[73]   Jorge Salgado, along with his wife, was a Settlor of the Trust, which was set up solely for the purpose of investing in SIBL CDs.[74]  STCL was designated as Trustee.   The Receiver is the legal representative of STCL, the appointed Trustee of Michoacan Trust under the documents creating the trust.  As the Receiver for STCL, the Receiver has not objected, and does not object, to Michoacan Trust pursuing in its own name claims against the Greenberg Defendants.[75]

Further, pursuant to Federal Rule of Civil Procedure 17(a)(3), the Receiver ratified the lawsuit commenced in the name of Michoacan Trust against the Defendants, authorizing its continuation and agreeing to be bound by its result.  *See* Receiver's Notice Regarding Michoacan Trust's Claims [Doc. 173]; FED. R. CIV. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.

---

[72]      *Id*.  To the extent any of Michoacan Trust's post-2005 purchases could be characterized as "rollovers," they would constitute new purchases for purposes of Class Plaintiffs' TSA claims for the same reasons discussed above in connection with Mr. Troice.  *See, e.g., Bradford*, 809 F. Supp. at 1492.

[73]      *See* Trust Agreement [Reply App. 90].

[74]      *See* Trust Agreement at ¶ 1 [Reply App. 101]; *see also* Transcript of Deposition of Jorge Salgado, 38:23 – 39:16 [Reply App. 88].

[75]      *See* Receiver's Notice Regarding Michoacan Trust's Claims [Doc. 173].

After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest."); *Federal Treasury Enter. Sojuzplodoimport v. SPI Spirits, Ltd.*, 726 F.3d 63, 83 (2d Cir. 2013) ("To ratify a suit, the real party in interest must '(1) authorize continuation of the action and (2) agree to be bound by its result.'") (internal citation omitted).  Thus, Michoacan Trust is authorized to prosecute the claims asserted in this lawsuit.

In sum, all the proposed class representatives meet the adequacy requirement of Rule 23.  But should the Court deem otherwise, the solution would be the appointment of other class representatives, not a denial of class certification.  *See Petrobras* at * 5 ("the solution to USS's putative adequacy problem would not be to deny certification of the Exchange Act Class but rather to appoint another class representative alongside USS").

## CONCLUSION & PRAYER

For all the foregoing reasons, the Class Plaintiffs respectfully request that the Court enter an Order certifying the proposed class, appointing the named plaintiffs as class representatives, and appointing the plaintiffs' lawyers as class counsel.

Dated: February 18, 2016

Respectfully submitted,

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
     Edward C. Snyder
     esnyder@casnlaw.com
     Jesse R. Castillo
     jcastillo@casnlaw.com
     300 Convent Street, Suite 1020
     San Antonio, Texas  78205
     (210) 630-4200
     (210) 630-4210 (Facsimile)

**NELIGAN FOLEY, LLP**

By: */s/ Douglas J. Buncher*
     Douglas J. Buncher
     dbuncher@neliganlaw.com
     Republic Center
     325 N. St. Paul, Suite 3600
     Dallas, Texas  75201
     (214) 840-5320
     (214) 840-5301 (Facsimile)

**BUTZEL LONG, P.C.**

By: */s/ Peter D. Morgenstern*
     Peter D. Morgenstern (*admitted pro hac vice*)
     morgenstern@butzel.com
     477 Madison Avenue, Suite 1230
     New York, New York 10022
     (212) 818-1110
     (212) 818-0494 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: */s/ Judith R. Blakeway*
     Judith R. Blakeway
     judith.blakeway@strasburger.com
     2301 Broadway
     San Antonio, Texas  78215
     Telephone: (210) 250-6000
     Facsimile: (210) 250-6100

**COUNSEL FOR THE PLAINTIFFS**

## CERTIFICATE OF SERVICE

On February 18, 2016 and February 24, 2016, I hereby certify that I served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

     By:    */s Joshua E. Abraham*
               Joshua E. Abraham