# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated. | § § § § § § § § § | |
| Plaintiffs, | § | CIVIL ACTION NO. 3:12-cv-04641-N |
| | § | |
| vs. | § § | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ, | § § § § | |
| Defendants. | § | |

---

## APPENDIX TO THE CLASS PLAINTIFFS' REPLY
## IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

---

| DOCUMENT | PAGE |
|---|---|
| Rebuttal Declaration of Samuel Troice | 1 |
| Rebuttal Declaration of Jorge Salgado Aguilar | 11 |
| Joint Liquidators' Direct Examination of Hugh Dickson (Case No. 3:09-cv-00721-N) | 31 |
| Supplemental Direct Examination of Hugh Dickson (Case No. 3:09-cv-00721-N) | 60 |

| | |
|---|---|
| Excerpts from the Deposition of Mark Russell (December 17, 2015) | 63 |
| Excerpts from the Deposition of Pamela G. Reed (December 3, 2015) | 73 |
| Excerpts from the Deposition of Samuel Troice (December 14, 2015) | 84 |
| Excerpts from the Deposition of Jorge Salgado (December 4, 2015) | 87 |
| Michoacan Trust Agreement (Class Plaintiffs' Production, Bates Nos. P1304-P1306) | 90 |

Dated: February 18, 2016

Respectfully submitted,

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
    Edward C. Snyder
    esnyder@casnlaw.com
    Jesse R. Castillo
    jcastillo@casnlaw.com
    300 Convent Street, Suite 1020
    San Antonio, Texas  78205
    (210) 630-4200
    (210) 630-4210 (Facsimile)

**NELIGAN FOLEY, LLP**

By: */s/ Douglas J. Buncher*
    Douglas J. Buncher
    dbuncher@neliganlaw.com
    Republic Center
    325 N. St. Paul, Suite 3600
    Dallas, Texas  75201
    (214) 840-5320
    (214) 840-5301 (Facsimile)

**BUTZEL LONG, P.C.**

By: */s/ Peter D. Morgenstern*
    Peter D. Morgenstern (*admitted pro hac vice*)
    morgenstern@butzel.com
    477 Madison Avenue, Suite 1230
    New York, New York 10022
    (212) 818-1110
    (212) 818-0494 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: */s/ Judith R. Blakeway*
    Judith R. Blakeway
    judith.blakeway@strasburger.com
    2301 Broadway
    San Antonio, Texas  78215
    Telephone: (210) 250-6000
    Facsimile: (210) 250-6100

**COUNSEL FOR THE PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

On February 18, 2016, and February 24, 2016, I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

By:   */s Joshua E. Abraham*
       Joshua E. Abraham

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; SANDRA DORRELL; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated.<br><br>            Plaintiffs,<br><br>vs.<br><br>GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ,<br>            Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:12-cv-04641-N |

## REBUTTAL DECLARATION OF SAMUEL TROICE

1.    My name is Samuel Troice.  I am over eighteen (18) years of age and competent to testify to the matters set forth herein.

2.    I am filing this Rebuttal Declaration to rebut certain arguments made by the above listed Defendants related to the timing of some of my investments in CDs issued by Stanford International Bank, Ltd. ("SIBL CDs").  I have personal knowledge of each of the facts stated in this Declaration, and they are true and correct.  If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

3.    I attach hereto as Exhibit "1" a true and correct copy of the April 16, 2013 determination of my SIBL CD claim by the Antiguan Joint Liquidators at Grant Thornton.  Said claim determination sets forth the dates and dollar amounts of CD deposits I made with SIBL

000001

over the years.  I reviewed said claim determination at the time I received it in 2013 and compared it with my own records and believe that said claim determination is largely accurate.

4.    The Grant Thornton claim determination confirms that I made investments in SIBL CDs on multiple dates and in varying amounts after February 2006, including investments of $350,230.00 in November 2006 and of $134,130.00 in September 2007.  I considered each of these investments to be "new" investments in SIBL CDs, as I could have invested my money elsewhere and each time I put new money into the CDs I made an independent investment decision to do so; I was not obligated to make these investments with SIBL.

5.    The Grant Thornton claim determination also confirms that I made investments in SIBL CDs on multiple dates and in varying amounts after February 2008, including an investment of $110,000 on May 19, 2008. I considered each of these investments to be "new" investments in SIBL CDs, as I could have invested my money elsewhere, and each time I put new money into the CDs I made an independent investment decision to do so; I was not obligated to make these 2008 investments in SIBL.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2016.

SAMUEL TROICE

8099-v.1

000002

# EXHIBIT "1"

 **GrantThornton**

Our Ref CJS/KTM/MW/SIBL

Lois S..
300 Covent Street, Bank Of America Plaza,
Suite 1020 San Antonio, Texas 78205-3789
United States

Grant Thornton (British Virgin Islands)
Limited
2nd Floor, The Barracks
171 Main Street
PO Box 4259
Road Town, Tortola
British Virgin Islands

T +1 284 494 9162
F +1 284 494 3529

By Email:       frontdesk@caenlaw.com

16 April 2013

Dear Sir / Madam:

**Stanford International Bank Limited – in Liquidation ("the Company")**
**Re: Claim submitted under Primary Express Account 185734**

Take notice that the claim made by you against the Company has been allowed in the amount of US$1,610,940.7L Please see attached transaction report showing how your claim was calculated. Please note that the Joint Liquidators reserve the right to withhold distributions and/or modify this claim subject to any preference claims that may be pursued against creditors/victims.

Please note that this claim has been filed by a legal representative on your behalf. If you are dissatisfied with this please notify us in writing at stanford.claims.support@uk.gt.com.

In the event that you are dissatisfied with the amount of your claim that has been allowed, you may apply to the court for the decision to be reversed or varied. The application must be made within 21 days of receiving this notice under Rule 4.83(1) of the 1986 UK Insolvency Rules[1].

All future communication regarding this claim should include the Primary Express Account Number. This will serve as your claim number.

Yours sincerely
For and on behalf of Stanford International Bank Limited

// Marcus Wide and Hugh Dickson
Joint Liquidators

---

1. Further assistance with the formalities of the claims process, including appealing any decision of the Joint Liquidators with regard to your claim can be found in the 1986 UK Insolvency Rules which apply where the Antigua and Barbuda International Business Corporations Act is silent on any aspect of the claims process. Any and all claims filed with Stanford International Bank Limited in Antigua will be governed by the law applicable in and subject to the authority of the Antiguan court overseeing the liquidation. Anyone who files a claim that is disallowed by the Joint Liquidators will be advised of their right of appeal to the Court for a judicial determination of their claim.

# Transaction Detail for Primary E/A 185734

**Account No:** 114555

| Date | | Deposits | Payments |
|------|---|---------|---------|
| 10-Dec-2003 | | 46,000.00 | 0.00 |
| 14-Jan-2004 | | 0.00 | 46,000.00 |
| 14-Jan-2004 | | 0.00 | 154.51 |
| | Sum | 46,000.00 | 46,154.51 |

Net In  USD  -154.51

1.0000

Converted to USD  -154.51

Summary for 'Account No' = 114555 (3 transactions)

**Account No:** 115137

| Date | | Deposits | Payments |
|------|---|---------|---------|
| 12-Jan-2004 | | 345,623.43 | 0.00 |
| 14-Jan-2004 | | 0.00 | 345,823.43 |
| 14-Jan-2004 | | 0.00 | 64.40 |
| | Sum | 345,823.43 | 345,687.83 |

Net In  USD  -64.40

1.0000

Converted to USD  -64.40

Summary for 'Account No' = 115137 (3 transactions)

**Account No:** 115328

| Date | Deposits | Payments |
|------|---------|---------|
| 14-Jan-2004 | 391,842.34 | 0.00 |
| 20-Apr-2004 | 325,689.12 | 0.00 |
| 07-Sep-2004 | 0.00 | 19,480.42 |
| 07-Sep-2004 | 0.00 | 20,538.58 |
| 06-Oct-2004 | 0.00 | 3,140.48 |
| 06-Oct-2004 | 0.00 | 22,859.52 |
| 28-Oct-2004 | 8,718.00 | 0.00 |
| 05-Nov-2004 | 0.00 | 22,848.58 |
| 05-Nov-2004 | 0.00 | 3,153.42 |
| 15-Nov-2004 | 24,294.58 | 0.00 |
| 06-Dec-2004 | 0.00 | 22,741.23 |
| 06-Dec-2004 | 0.00 | 3,258.77 |
| 28-Dec-2004 | 17,873.10 | 0.00 |
| 19-Jan-2005 | 7,588.73 | 0.00 |
| 16-Feb-2005 | 224,524.01 | 0.00 |
| 27-Apr-2005 | 42,152.46 | 0.00 |
| 15-Jun-2005 | 0.00 | 9,884.23 |
| 15-Jun-2005 | 0.00 | 10,335.77 |
| 28-Jun-2005 | 0.00 | 2,452.35 |
| 28-Jun-2005 | 0.00 | 26,172.65 |
| 08-Jul-2005 | 24,735.81 | 0.00 |
| 19-Jul-2005 | 18,400.00 | 0.00 |
| 09-Aug-2005 | 12,380.00 | 0.00 |
| 15-Aug-2005 | 35,781.45 | 0.00 |
| 24-Aug-2005 | 7,392.00 | 0.00 |

000005

## Transaction Detail for Primary E/A 185734

| Date | Debit | Credit |
|---|---|---|
| 25-Aug-2005 | 10,000.00 | 0.00 |
| 28-Sep-2005 | 9,161.00 | 0.00 |
| 04-Oct-2005 | 11,700.45 | 0.00 |
| 18-Oct-2005 | 8,216.89 | 0.00 |
| 24-Oct-2005 | 22,925.78 | 0.00 |
| 25-Nov-2005 | 0.00 | 32,451.67 |
| 25-Nov-2005 | 0.00 | 47,548.33 |
| 30-Dec-2005 | 0.00 | 7,580.30 |
| 30-Dec-2005 | 0.00 | 2,419.70 |
| 23-Jan-2006 | 5,229.47 | 0.00 |
| 13-Feb-2006 | 9,504.00 | 0.00 |
| 20-Feb-2006 | 12,085.00 | 0.00 |
| 01-Jun-2006 | 19,670.40 | 0.00 |
| 22-Aug-2006 | 20,121.00 | 0.00 |
| 24-Aug-2006 | 8,976.00 | 0.00 |
| 16-Oct-2006 | 8,851.68 | 0.00 |
| 02-Nov-2006 | 350,000.00 | 0.00 |
| 02-Nov-2006 | 0.00 | 350,000.00 |
| 14-Nov-2006 | 350,230.19 | 0.00 |
| 29-Dec-2006 | 8,151.68 | 0.00 |
| 09-Jan-2007 | 9,504.00 | 0.00 |
| 05-Feb-2007 | 7,407.00 | 0.00 |
| 06-Feb-2007 | 5,901.12 | 0.00 |
| 05-Mar-2007 | 70,000.00 | 0.00 |
| 17-Apr-2007 | 8,151.68 | 0.00 |
| 10-May-2007 | 50,000.00 | 0.00 |
| 17-May-2007 | 7,868.16 | 0.00 |
| 29-May-2007 | 50,000.00 | 0.00 |
| 07-Jun-2007 | 11,138.30 | 0.00 |
| 25-Jul-2007 | 7,868.16 | 0.00 |
| 30-Aug-2007 | 11,592.00 | 0.00 |
| 06-Sep-2007 | 39,998.57 | 0.00 |
| 12-Sep-2007 | 9,990.00 | 0.00 |
| 12-Sep-2007 | 179,999.88 | 0.00 |
| 16-Nov-2007 | 7,868.16 | 0.00 |
| 30-Nov-2007 | 0.00 | 70.00 |
| 20-Dec-2007 | 0.00 | 1,749.48 |
| 20-Dec-2007 | 9,000.00 | 0.00 |
| 11-Jan-2008 | 0.00 | 21,487.96 |
| 24-Jan-2008 | 0.00 | 6,652.66 |
| 25-Jan-2008 | 0.00 | 9,000.00 |
| 05-Feb-2008 | 8,000.00 | 0.00 |
| 20-Feb-2008 | 0.00 | 3,000.00 |
| 22-Feb-2008 | 0.00 | 10,202.84 |
| 25-Feb-2008 | 7,868.16 | 0.00 |
| 28-Feb-2008 | 28,877.52 | 0.00 |
| 07-Mar-2008 | 8,000.00 | 0.00 |
| 12-Mar-2008 | 0.00 | 110,000.00 |
| 20-Mar-2008 | 0.00 | 3,000.00 |
| 25-Mar-2008 | 6,000.00 | 0.00 |
| 28-Mar-2008 | 0.00 | 13,238.72 |
| 02-Apr-2008 | 7,000.00 | 0.00 |
| 15-Apr-2008 | 0.00 | 1,640.46 |
| 18-Apr-2008 | 7,000.00 | 0.00 |

000006

## Transaction Detail for Primary E/A 185734

| Date | | |
|---|---:|---:|
| 18-Apr-2008 | 0.00 | 3,000.00 |
| 30-Apr-2008 | 0.00 | 56,590.00 |
| 15-May-2008 | 34,990.00 | 0.00 |
| 15-May-2008 | 0.00 | 8,354.39 |
| 19-May-2008 | 110,000.00 | 0.00 |
| 20-May-2008 | 0.00 | 3,000.00 |
| 10-Jun-2008 | 0.00 | 8,791.23 |
| 20-Jun-2008 | 0.00 | 3,000.00 |
| 23-Jun-2008 | 7,868.16 | 0.00 |
| 10-Jul-2008 | 0.00 | 1,522.97 |
| 17-Jul-2008 | 6,000.00 | 0.00 |
| 18-Jul-2008 | 22,376.51 | 0.00 |
| 21-Jul-2008 | 0.00 | 3,000.00 |
| 11-Aug-2008 | 0.00 | 2,316.09 |
| 13-Aug-2008 | 9,990.00 | 0.00 |
| 20-Aug-2008 | 4,990.00 | 0.00 |
| 20-Aug-2008 | 0.00 | 3,000.00 |
| 10-Sep-2008 | 0.00 | 15,272.35 |
| 22-Sep-2008 | 0.00 | 3,000.00 |
| 24-Sep-2008 | 0.00 | 6,740.09 |
| 07-Oct-2008 | 0.00 | 5,740.09 |
| 10-Oct-2008 | 0.00 | 27,036.34 |
| 20-Oct-2008 | 0.00 | 3,000.00 |
| 04-Nov-2008 | 0.00 | 11,535.00 |
| 10-Nov-2008 | 0.00 | 28,244.44 |
| 20-Nov-2008 | 0.00 | 3,000.00 |
| 26-Nov-2008 | 0.00 | 11,535.00 |
| 05-Dec-2008 | 0.00 | 24,259.91 |
| 10-Dec-2008 | 0.00 | 8,272.99 |
| 22-Dec-2008 | 0.00 | 3,000.00 |
| 05-Jan-2009 | 0.00 | 11,535.00 |
| 12-Jan-2009 | 0.00 | 4,527.13 |
| 20-Jan-2009 | 0.00 | 3,000.00 |
| 02-Feb-2009 | 0.00 | 11,635.00 |
| 17-Feb-2009 | 0.00 | 32,858.25 |
| 23-Feb-2009 | 0.00 | 298.12 |

Sum    2,781,420.10    1,098,731.49

Net In  USD    1,652,688.61

1.0000

Converted to USD    1,652,688.61

*Summary for 'Account No' = 115328 (115 transactions)*

Account No:   185734

| Date | Deposits | Payments |
|---|---:|---:|
| 22-Feb-2008 | 16,202.84 | 0.00 |
| 22-Feb-2008 | 0.00 | 16,202.84 |
| 07-May-2008 | 7,868.16 | 0.00 |
| 02-Jun-2008 | 0.00 | 7,868.16 |

000007

## Transaction Detail for Primary E/A 185734

|  | Sum | 24,071.00 | 24,071.00 |
|---|---|---|---|
|  | Net In  USD |  | 0.00 |
|  |  |  | 1.0000 |
|  | Converted to USD |  | 0.00 |

*Summary for 'Account No' = 185734 (4 transactions)*

Account No:   2119957

| Date | Deposits | Payments |
|---|---|---|
| 30-Apr-2002 | 124,885.66 | 0.00 |
| 08-May-2002 | 21,500.00 | 0.00 |
| 22-May-2002 | 37,700.00 | 0.00 |
| 10-Feb-2003 | 39,643.04 | 0.00 |
| 28-Aug-2003 | 108,640.00 | 0.00 |
| 14-Nov-2003 | 0.00 | 109.34 |
| 14-Nov-2003 | 0.00 | 29,890.68 |
| 31-Dec-2003 | 30,000.00 | 0.00 |
| 12-Jan-2004 | 0.00 | 344,768.46 |
| 12-Jan-2004 | 0.00 | 854.95 |
| Sum | 362,646.90 | 375,623.43 |

|  | Net In  USD | -13,074.53 |
|---|---|---|
|  |  | 1.0000 |
|  | Converted to USD | -13,074.53 |

*Summary for 'Account No' = 2119957 (10 transactions)*

Account No:   2519957

| Date | Deposits | Payments |
|---|---|---|
| 30-Apr-2002 | 526.93 | 0.00 |
| 12-Jul-2002 | 0.00 | 526.93 |
| 25-Sep-2002 | 594,522.33 | 0.00 |
| 27-Sep-2002 | 0.00 | 594,587.49 |
| 29-Jan-2003 | 210,500.00 | 0.00 |
| 18-Feb-2003 | 0.00 | 198.20 |
| 18-Feb-2003 | 0.00 | 210,730.80 |
| 19-Aug-2003 | 952,652.79 | 0.00 |
| 22-Aug-2003 | 0.00 | 10,000.00 |
| 22-Aug-2003 | 0.00 | 15,000.00 |
| 25-Aug-2003 | 0.00 | 44,000.00 |
| 25-Aug-2003 | 0.00 | 38,000.00 |
| 25-Aug-2003 | 0.00 | 34,000.00 |
| 27-Aug-2003 | 0.00 | 70,000.00 |
| 28-Aug-2003 | 0.00 | 108,640.00 |
| 28-Aug-2003 | 0.00 | 378,000.00 |
| 28-Aug-2003 | 0.00 | 92,000.00 |
| 28-Aug-2003 | 0.00 | 11,354.00 |
| 01-Sep-2003 | 0.00 | 130,000.00 |
| 24-Oct-2003 | 0.00 | 4,000.00 |
| 24-Oct-2003 | 0.00 | 3,299.47 |
| 24-Oct-2003 | 0.00 | 9,000.00 |
| 24-Oct-2003 | 0.00 | 3,500.00 |
| 14-Jan-2004 | 46,154.51 | 0.00 |

000008

## Transaction Detail for Primary E/A 185734

| Date | Deposits | Payments |
|---|---|---|
| 14-Jan-2004 | 0.00 | 391,842.34 |
| 14-Jan-2004 | 345,887.83 | 0.00 |
| 29-Jan-2004 | 580,500.00 | 0.00 |
| 05-Feb-2004 | 0.00 | 88,416.00 |
| 08-Feb-2004 | 20,000.00 | 0.00 |
| 10-Feb-2004 | 0.00 | 24,500.00 |
| 10-Feb-2004 | 0.00 | 88,416.00 |
| 18-Feb-2004 | 0.00 | 18,416.00 |
| 18-Feb-2004 | 0.00 | 88,416.00 |
| 18-Feb-2004 | 0.00 | 125,000.00 |
| 27-Feb-2004 | 0.00 | 45,456.00 |
| 12-Mar-2004 | 44,500.00 | 0.00 |
| 16-Mar-2004 | 154,000.00 | 0.00 |
| 20-Apr-2004 | 0.00 | 254.20 |
| 20-Apr-2004 | 0.00 | 325,689.12 |
| 05-Jan-2005 | 1,980.00 | 0.00 |
| 04-Feb-2005 | 576,000.00 | 0.00 |
| 11-Feb-2005 | 0.00 | 66,000.00 |
| 11-Feb-2005 | 0.00 | 13,820.00 |
| 11-Feb-2005 | 0.00 | 96,000.00 |
| 11-Feb-2005 | 0.00 | 20,000.00 |
| 11-Feb-2005 | 0.00 | 104,850.00 |
| 11-Feb-2005 | 0.00 | 43,900.00 |
| 14-Feb-2005 | 0.00 | 5,000.00 |
| 14-Feb-2005 | 0.00 | 5,000.00 |
| 16-Feb-2005 | 0.00 | 224,624.01 |
| 02-Nov-2006 | 350,000.00 | 0.00 |
| 14-Nov-2006 | 0.00 | 350,230.19 |
| 14-Nov-2006 | 0.00 | 230.19 |
| 18-May-2007 | 1,637.88 | 0.00 |
| 07-Jun-2007 | 0.00 | 11,136.30 |
| 07-Jun-2007 | 9,500.00 | 0.00 |
| 03-Sep-2007 | 39,990.00 | 0.00 |
| 06-Sep-2007 | 0.00 | 39,996.57 |
| 10-Sep-2007 | 0.00 | 6.57 |
| 11-Sep-2007 | 45,860.00 | 0.00 |
| 11-Sep-2007 | 134,130.00 | 0.00 |
| 12-Sep-2007 | 0.00 | 9.86 |
| 12-Sep-2007 | 0.00 | 179,999.86 |
| Sum | 4,108,142.25 | 4,111,045.10 |

Net In  USD | -2,902.85 |

| 1.0000 |

Converted to USD | -2,902.85 |

Summary for 'Account No' = 185734 (63 transactions)

Account No:   3519957

| Date | Deposits | Payments |
|---|---|---|
| 30-Apr-2002 | 588,187.97 | 0.00 |
| 25-Sep-2002 | 0.00 | 594,522.33 |
| 27-Sep-2002 | 594,587.49 | 0.00 |
| 15-Jan-2003 | 135,000.00 | 0.00 |
| 22-Jan-2003 | 135,000.00 | 0.00 |

000009

## Transaction Detail for Primary E/A 185734

| | | | |
|---|---|---|---|
| 03-Feb-2003 | | 100,000 00 | 0 00 |
| 12-Feb-2003 | | 0.00 | 488,000 00 |
| 03-Mar-2003 | | 0 00 | 507,185 11 |
| 12-May-2003 | | 1,195,208 90 | 0 00 |
| 10-Jul-2003 | | 0 00 | 250,000 00 |
| 19-Aug-2003 | | 0 00 | 952,652 78 |
| 19-Aug-2003 | | 0 00 | 1,173 74 |
| 09-Dec-2003 | | 46,000 00 | 0 00 |
| 09-Dec-2003 | | 0 00 | 46,000 00 |
| | Sum | 2,793,962.36 | 2,819,633.97 |

Net In  USD    -25,661.81

1.0000

Converted to USD    -25,561.81

Summary for 'Account No' = 3519957 (14 transactions)
Summary for Primary EA' = 185734 (212 transactions)

Overall Net In USD:    1,610,940.71

000010

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated. | § § § § § § § § § § § | |
| Plaintiffs, | | CIVIL ACTION NO. 3:12-cv-04641-N |
| vs. | § § § | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ, | § § § § | |
| Defendants. | § | |

## REBUTTAL DECLARATION OF JORGE SALGADO AGUILAR

1.  My name is Jorge Salgado Aguilar.  I am over eighteen (18) years of age and competent to

    testify to the matters set forth herein.

2.  I am the settlor and primary beneficiary of Michoacan Trust ("the Trust").  I formed the Trust

    with Stanford Trust Company in 2001 at the recommendation of my Stanford Financial Adviser

    from Miami, Marie O Bautista Nieves, who told me that it was necessary to open a trust to

    proceed with the investment and the purchase process of CDs Issued by Stanford International

    Bank Ltd. ("SIBL CDs").  I thereafter made all my investments with Stanford via the Trust, and


    the sole purpose of the Trust (which was a "single purposes" trust) was to invest in the SIBL

    CDs.

000011

3. I am filing this Rebuttal Declaration to rebut certain arguments made by the above listed Defendants related to the timing of some of the Trusts' investments in CDs issued by Stanford International Bank, Ltd. ("SIBL CDs"). I have personal knowledge of each of the facts stated in this Declaration, and they are true and correct. If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

4. I attach hereto as Exhibit "1" a true and correct copy of the March 27, 2013 determination of the Trust's SIBL CD claim by the Antiguan Joint Liquidators at Grant Thornton. Said claim determination sets forth the dates and dollar amounts of CD deposits the Trust made with SIBL over the years. I reviewed said claim determination at the time I received it in 2013 and compared it with my own records and believe that said claim determination is largely accurate.

5. The Grant Thornton claim determination confirms that the Trust made investments in SIBL CDs on multiple dates and in varying amounts after February 2006, including the purchase of a CD in the amount of $96,973.46 on April 7, 2006, and the purchases of 2 CDs in 2008: one for $40,279.49 on February 5, 2008 and another one for $11,425.06 on April 10, 2008. I attach hereto as Exhibit "2" true and correct copies of the CD certificates I received from SIBL confirming CD purchases after February 2006.

6. I considered each of these investments to be "new" investments in SIBL CDs, as I, on behalf of the Trust, could have invested money elsewhere and each time I, through the Trust, put  new money into the CDs I made an independent investment decision to do so; neither I nor the Trust were obligated to make these investments with SIBL.

I declare under penalty of perjury that the foregoing is true and correct.

000012

MICHOACAN TRUST

JORGE SALGADO AGUILAR

000013

EXHIBIT "1"

# GrantThornton

Our Ref CJS/KTM/MW/SIBL

Michoacan Trust
Bank Of America Plaza
Suite 1020
300 Covent Street
San Antonio, Texas 78205-3789
United States

Grant Thornton (British Virgin Islands)
Limited
2nd Floor, The Barracks
171 Main Street
PO Box 4259
Road Town, Tortola
British Virgin Islands

T +1 284 494 6182
F +1 284 494 2536

By Email:  frontdesk@casnlaw.com

27 March 2013

Dear Sir / Madam:

**Stanford International Bank Limited – in Liquidation ("the Company")**
**Re: Claim submitted under Primary Express Account 186023**

Take notice that the claim made by you against the Company has been allowed in the amount of
US$ 179,286.12. Please see attached transaction report showing how your claim was calculated.
Please note that the Joint Liquidators reserve the right to withhold distributions and/or modify
this claim subject to any preference claims that may be pursued against creditors/victims.

Please note that this claim has been filed by a legal representative on your behalf. If you are
dissatisfied with this please notify us in writing at stanford.claims.support@uk.gt.com.

In the event that you are dissatisfied with the amount of your claim that has been allowed, you
may apply to the court for the decision to be reversed or varied.  The application must be made
within 21 days of receiving this notice under Rule 4.83(1) of the 1986 UK Insolvency Rules[1].

All future communication regarding this claim should include the Primary Express Account
Number.  This will serve as your claim number.

Yours sincerely
For and on behalf of Stanford International Bank Limited

Marcus Wide and Hugh Dickson
Joint Liquidators

1. Further assistance with the formalities of the claims process, including appealing any decision of the Joint
Liquidators with regard to your claim can be found in the 1986 UK Insolvency Rules which apply where the Antigua
and Barbuda International Business Corporations Act is silent on any aspect of the claims process. Any and all claims
filed with Stanford International Bank Limited in Antigua will be governed by the law applicable in and subject to the
authority of the Antiguan court overseeing the liquidation. Anyone who files a claim that is disallowed by the Joint
Liquidators will be advised of their right of appeal to the Court for a judicial determination of their claim.

## Transaction Detail for Primary E/A 186023

**Account No:** 118009

| Date | | Deposits | Payments |
|------|---|---------|---------|
| 07-Apr-2004 | | 10,000.41 | 0.00 |
| 24-May-2004 | | 10,000.00 | 0.00 |
| 10-Jun-2004 | | 10,002.46 | 0.00 |
| 12-Jul-2004 | | 10,001.23 | 0.00 |
| 11-Aug-2004 | | 9,990.82 | 0.00 |
| 09-Sep-2004 | | 9,990.00 | 0.00 |
| 28-Oct-2004 | | 9,990.41 | 0.00 |
| 13-Dec-2004 | | 9,991.23 | 0.00 |
| 14-Jan-2005 | | 18,265.52 | 0.00 |
| 07-Apr-2006 | | 0.00 | 91,518.49 |
| 07-Apr-2006 | | 0.00 | 5,454.97 |
| 10-Apr-2006 | | 0.00 | 11,425.06 |
| | Sum | 98,232.08 | 108,398.52 |

Net In  USD   -10,166.44

1.0000

Converted to USD   -10,166.44

Summary for 'Account No' = 118009 (12 transactions)

**Account No:** 145103

| Date | | Deposits | Payments |
|------|---|---------|---------|
| 07-Apr-2006 | | 98,973.46 | 0.00 |
| | Sum | 98,973.46 | 0.00 |

Net In  USD   98,973.46

1.0000

Converted to USD   98,973.46

Summary for 'Account No' = 145103 (1 transaction)

**Account No:** 182923

| Date | | Deposits | Payments |
|------|---|---------|---------|
| 06-Oct-2006 | | 0.01 | 0.00 |
| 06-Oct-2006 | | 0.00 | 143,921.13 |
| | Sum | 0.01 | 143,921.13 |

Net In  USD   -143,921.12

1.0000

Converted to USD   -143,921.12

Summary for 'Account No' = 182923 (2 transactions)

**Account No:** 186023

| Date | | Deposits | Payments |
|------|---|---------|---------|
| 05-Feb-2006 | | 0.00 | 40,270.49 |
| 10-Apr-2006 | | 11,425.06 | 0.00 |
| 10-Apr-2006 | | 0.00 | 11,425.06 |

000016

# Transaction Detail for Primary E/A 186023

|  | Sum | 11,425.06 | 51,695.55 |
|---|---|---|---|
|  | Net In  USD | -40,270.49 | |
|  |  | 1.0000 | |
|  | Converted to USD | -40,270.49 | |

*Summary for 'Account No' = 186023 (3 transactions)*

**Account No:**   300236

| Date | | Deposits | Payments |
|---|---|---|---|
| 05-Feb-2008 | | 40,270.49 | 0.00 |
| | Sum | 40,270.49 | 0.00 |
| | Net In  USD | 40,270.49 | |
| | | 1.0000 | |
| | Converted to USD | 40,270.49 | |

*Summary for 'Account No' = 300236 (1 transaction)*

**Account No:**   304780

| Date | | Deposits | Payments |
|---|---|---|---|
| 10-Apr-2008 | | 11,425.06 | 0.00 |
| | Sum | 11,425.06 | 0.00 |
| | Net In  USD | 11,425.06 | |
| | | 1.0000 | |
| | Converted to USD | 11,425.06 | |

*Summary for 'Account No' = 304780 (1 transaction)*

**Account No:**   2220478

| Date | | Deposits | Payments |
|---|---|---|---|
| 30-Apr-2002 | | 116,032.97 | 0.00 |
| 04-Oct-2007 | | 0.00 | 11,567.75 |
| 04-Oct-2007 | | 0.00 | 28,432.25 |
| | Sum | 116,032.97 | 40,000.00 |
| | Net In  USD | 76,032.97 | |
| | | 1.0000 | |
| | Converted to USD | 76,032.97 | |

*Summary for 'Account No' = 2220478 (3 transactions)*

**Account No:**   2520478

| Date | Deposits | Payments |
|---|---|---|
| 06-Apr-2004 | 10,000.00 | 0.00 |
| 07-Apr-2004 | 0.00 | 10,000.41 |
| 07-Apr-2004 | 0.00 | 0.41 |
| 19-May-2004 | 10,000.00 | 0.00 |
| 24-May-2004 | 0.00 | 10,000.00 |
| 09-Jun-2004 | 10,000.00 | 0.00 |
| 10-Jun-2004 | 0.00 | 0.41 |
| 10-Jun-2004 | 0.00 | 10,002.46 |
| 12-Jun-2004 | 0.00 | 1.23 |

000017

# Transaction Detail for Primary E/A 186023

| Date | | Deposits | Payments |
|---|---|---:|---:|
| 12-Jun-2004 | | 1.23 | 0.00 |
| 12-Jun-2004 | | 0.00 | 1.23 |
| 09-Jul-2004 | | 10,000.00 | 0.00 |
| 12-Jul-2004 | | 0.00 | 1.23 |
| 12-Jul-2004 | | 0.00 | 10,001.23 |
| 00-Aug-2004 | | 9,990.00 | 0.00 |
| 11-Aug-2004 | | 0.00 | 0.82 |
| 11-Aug-2004 | | 0.00 | 9,990.82 |
| 00-Sep-2004 | | 9,990.00 | 0.00 |
| 09-Sep-2004 | | 0.00 | 9,990.00 |
| 27-Oct-2004 | | 9,990.00 | 0.00 |
| 28-Oct-2004 | | 0.00 | 0.41 |
| 28-Oct-2004 | | 0.00 | 9,990.41 |
| 10-Dec-2004 | | 9,990.00 | 0.00 |
| 13-Dec-2004 | | 0.00 | 9,991.23 |
| 13-Dec-2004 | | 0.00 | 1.23 |
| 13-Jan-2005 | | 18,264.77 | 0.00 |
| 14-Jan-2005 | | 0.00 | 18,265.52 |
| 04-Oct-2007 | | 40,000.00 | 0.00 |
| | Sum | 138,226.00 | 98,238.05 |

Net In  USD  | 39,988.95 |
| 1.0000 |
Converted to USD | 39,988.95 |

*Summary for 'Account No' = 2520478 (28 transactions)*

Account No:   12220478

| Date | | Deposits | Payments |
|---|---|---:|---:|
| 30-Apr-2002 | | 108,955.24 | 0.00 |
| | Sum | 108,955.24 | 0.00 |

Net In  USD  | 108,955.24 |
| 1.0000 |
Converted to USD | 108,955.24 |

*Summary for 'Account No' = 12220478 (1 transaction)*
*Summary for Primary EA = 186023 (52 transactions)*

Overall Net In USD: | 179,286.12 |

000018

EXHIBIT "2"

000019



P1350

000020



P1351

000021



P1352

000022



P1343

000023



P1344

000024



P1345

000025



P1346

000026



P1347

000027



P1348

000028



P1349

000029



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | § | |
|---|---|---|
| In re | § | Chapter 15 |
| | § | |
| Stanford International Bank, Ltd., | § | Case No. 3:09-cv-00721-N |
| | § | |
| Debtor in a Foreign Proceeding | § | |

## JOINT LIQUIDATORS' DIRECT EXAMINATION OF HUGH DICKSON

### BACKGROUND

**Q:** Please state your full name for the record?

**A:** Hugh Dickson.

**Q:** Who is your current employer?

**A:** Grant Thornton Specialist Services (Cayman) Limited.

**Q:** What is your current business address?

**A:** My office is located at 48 Market Street, George Town, Grand Cayman KY1-9006.

**Q:** I am going to refer to Grant Thornton Specialist Services (Cayman) Limited simply as Grant Thornton Cayman. Is that acceptable to you?

**A:** Yes.

**Q:** Does Grant Thornton Cayman specialize in insolvency matters?

**A:** Yes. Grant Thornton Cayman specializes in handling a wide range of insolvency matters, including, primarily, overseeing the liquidations of solvent and insolvent businesses, implementing insolvency procedures, conducting fraud investigations, and recovering assets for the benefit of creditors and/or victims of financial fraud.

000031

Q: What is your position at Grant Thornton and practice area do you work in?

A: I am a Partner with Grant Thornton UK LLP and the Managing Director of its wholly owned subsidiary Grant Thornton Cayman. I also oversee the operations of Grant Thornton (British Virgin Islands) Limited, another wholly owned subsidiary of Grant Thornton UK LLP. Operationally, the Grant Thornton offices in the Cayman and the British Virgin Islands are currently limited to performing restructuring and insolvency work, with a particular emphasis on offshore banking and financial services.

Q: When did you begin working at Grant Thornton Cayman?

A: I began working at Grant Thornton Cayman in December 2006.

## BACKGROUND AND QUALIFICATIONS

Q: Where did you receive your formal education?

A: I received a Joint Masters in Economics and Accounting from the University of Edinburgh in 1985.

Q: Please describe for the Court your employment history prior to joining Grant Thornton?

A: From 1985 to 2001, I worked at Arthur Andersen, starting as a graduate trainee and being promoted to Partner in 1995. While at Arthur Andersen, I worked in various practice groups, including Corporate Recovery, dealing in formal insolvency, and the European Emerging Markets, and Global Emerging Markets. In each instance my work focused on financially distressed organizations, including both formal insolvency proceedings as well as advisory work related to the restructuring of entities and the regulatory and jurisdictional basis governing insolvency. I was a lead member of the team that developed Andersen's in-house manual on the investigation, restructuring and sale of insolvent and distressed companies.

JOINT LIQUIDATORS' DIRECT EXAMINATION OF HUGH DICKSON

2

From 1995 onwards, my work was primarily focused on banking intervention and crisis resolution in the financial sector, with a particular emphasis on emerging markets. My work during that period included the establishment of work out departments for state owned banks, advice to national governments and regulatory organizations on banking intervention and insolvency regulation, and the realization of value from intervened banks. I worked closely with the World Bank and International Monetary Fund on a number of major projects in that field. These included:

a) the design and execution of the Thai government's intervention into 56 of its largest financial institutions covering some $21 billion of intervened assets, and running the advisory team handling the subsequent operation of its intervention body, the Financial Restructuring Authority;

b) the development of a work out department for Korea's largest state owned bank who were the lead creditor on two of Korea's 5 largest corporate groups, including Daewoo group who had over $60 billion in non performing debt; and

c) running the advisory team supporting the Indonesian governments operation of its banking intervention agency, IBRA, who had intervened into a number of Indonesian banks and taken over responsibility for the realization of value from an estimated $47 billion in intervened assets.

After my time at Arthur Andersen and before joining Grant Thornton, I worked as a consultant specializing in advisory work to national governments, regulatory bodies and central banks on issues related to insolvency, restructuring and related issues. My clients during that period included the International Monetary Fund and the Turkish, South African and Hong Kong governments, on projects ranging from the intervention into or

restructuring of major Turkish banks through to recommendations for the improvement of operations of the Hong Kong Official Receiver's Office.

Q: How long have you been an insolvency practitioner?

A: I have specialized in insolvency and related work since 1986. I passed the United Kingdom's Joint Insolvency Examination Board examinations in 1994. Passing the exam is a necessary requirement to be certified by one of the regulatory bodies to act as an officer holder on insolvency appointments in the United Kingdom – that is, being appointed as an individual who exercises direct and personal authority under law for the conduct of an insolvent estate, personal or corporate, whether by appointment of the Court or under the terms of a security interest. I formally qualified as an insolvency practitioner in the Cayman Islands when that jurisdiction introduced formal requirements under the Insolvency Practitioner Regulations 2008. My practical experience between 1986 and 1995 was almost exclusively in the conduct of UK insolvency cases. From 1995 to 2006 my work has largely focused on restructuring, advisory work outs and formal insolvency appointments, but also included assignments advising governments and regulatory bodies on the development, revision, implementation, or regulation of insolvency law in a number of jurisdictions, including Hong Kong, Korea, Thailand, Romania and Bulgaria. Since 2006 my work has been almost exclusively associated with formal insolvency appointments, principally to hedge funds, banks and corporate entities incorporated in Caribbean jurisdictions.

Q: Are you a member of any professional organizations?

A: Yes. I am a Member of the Institute of Charted Accountants of Scotland and of the Cayman Islands Society of Professional Accountants.

JOINT LIQUIDATORS' DIRECT EXAMINATION OF HUGH DICKSON                                                      4

Q:   What other relevant qualifications or experience do you possess?

A:   I currently hold office as a liquidator in a number of insolvency proceedings in the British Virgin Islands, Curacao and the Cayman Islands.   My experience within these jurisdictions includes dealing with high value fraud and Ponzi scheme cases.  Many of the cases I have worked on are large and complex cross-border insolvencies that involve asset tracing, asset recovery, and litigation in multiple jurisdictions, and consequent issues of cross border recognition.   I have direct experience dealing with offshore banking and financial regulatory authorities and as well as onshore law enforcement agencies such as the UK Financial Services Authority, the UK Serious Fraud Office, the Royal Canadian Mounted Police, the German police and the Autorité de Marchés Financiers.

I also have significant experience advising governments on financial sector issues with a focus on intervention and regulation of financial institutions and the consequent inter relationship with insolvency law, practice and regulation.   In this regard, I have worked on cases that involve the International Monetary Fund, the World Bank, the European Union, the Thai Financial Sector Restructuring Authority, the Korean Financial Services Commission, the Central Bank of Egypt, the Indonesian Bank Restructuring Authority, the Turkish Banking Regulation and Supervision Agency, the Turkish Deposit Insurance Agency, the Monetary Authority of Hong Kong, and the Hong Kong Official Receiver.

Q:   In approximately how many countries do you have experience handling insolvency and/or asset recovery matters?

A:   I have experience dealing with insolvencies and tracing and recovering assets in excess of 30 jurisdictions across Europe, Asia, and the Americas, including the Caribbean.

JOINT LIQUIDATORS' DIRECT EXAMINATION OF HUGH DICKSON                                             5

Q:     In your capacity as a court appointed liquidator, have you ever been formally recognized as a foreign representative by a foreign jurisdiction?

A:     Yes, in six jurisdictions: UK, Switzerland, Bahamas, Bermuda, Jersey and Australia.

Q:     In dealing with these multi-jurisdictional assignments, have you been required to work alongside other insolvency practitioners on the same matter?

A:     No – in the sense that the jurisdictions concerned did not require the formal joint appointment of a local insolvency practitioner in the same or a parallel proceeding as a condition of recognition.  In one case – Australia –the Court requested that we designate a local Grant Thornton partner as a local contact for the Court.  In the remaining cases, the jurisdictions recognized my authority, and that of my joint appointees, as a foreign practitioner under provisions in their domestic insolvency law without requiring co-appointment or a collaborative arrangement with a local practitioner.

Q:     Please tell the Court about your experience in working with other insolvency practitioners appointed in other jurisdictions involved in the same matter.

A:     Notwithstanding my answer to the previous question, I have worked with insolvency practitioners from other jurisdictions on a single matter.  Some jurisdictions require as a matter of law or practice for a local practitioner to be appointed over locally incorporated entities.  That is a separate matter from their recognition of foreign practitioners appointed over foreign entities with interests in their jurisdiction.  In addition, where my firm has a complex, cross border matter it is common practice for us to have joint appointees, with insolvency practitioners in key foreign jurisdictions appointed jointly with a practitioner or practitioners appointed in the country of incorporation.  I currently hold joint appointments with insolvency practitioners in Canada, British Virgin Islands, Antigua, Ireland, UK and Hong Kong.  With the exception of the Hong Kong matter all

such joint appointments are with insolvency practitioners from Grant Thornton firms. Given the executory authority held by appointees over estate assets, and issues of joint and several liability, as a matter of good practice and risk management it is comparatively rare for firms such as Grant Thornton to deal in joint appointments on a single matter with other firms except where there are very clear limitations of relative roles and responsibilities. It can also be a problematic issue in regards to professional indemnity insurance cover.

Q:   Please describe your primary functions and responsibilities as an insolvency practitioner.

A:   The functions and responsibilities of an insolvency appointment will vary according to the nature of the appointment and the law under which one is appointed.   However typically it involves the protection, collection and realization of assets, followed by distribution to the creditors, and possibly shareholders, according to their rights against the estate under law.   In addition to preserving and gathering the estate, the insolvency practitioner is typically charged with ensuring its distribution to those parties with legitimate claims against the assets, according to the priorities set out by law.   This involves both checking the validity and ranking of claims against the estate, as well as the actual act of distribution to those entitled to a distribution. Overlying the latter obligation is the need to comply with the appropriate laws and regulations governing the transfers of monies, including money laundering regulations.

The insolvency practitioner acts as a fiduciary on behalf of those with claims against the estate, and from his appointment to the date of his discharge the insolvency practitioner has an obligation, whether by statute, regulation or simple professional obligation, to keep those parties in interest – typically creditors – advised of his activities

and the financial position of the estate.   There is usually a concomitant obligation to ensure that his fees and costs of administering the estate are overseen by another party — usually either the court or administrative body that appointed him — to provide a check and balance against the commercial self interest in his charging fees for services, and to thereby ensure that the activities undertaken are in the commercial interests of the estate or necessitated by statutory obligation.

Put simplistically, the insolvency practitioners job is to protect the estate under his hand, maximize the estate by gathering extant assets, properly pursuing choses of action, assessing and adjudicating claims against the realized estate, and then properly distributing the realized estate to those with valid claims against it according to their priority under law, whilst ensuring that he respects that everything he does should be in accordance with the obligations of the law and the best interests of the estate.

The assets of the estate also include contingent and prospective assets which may require litigation or enforcement action to realize, such as the right of recovery of the estate for damages inflicted against the estate, the recovery of assets misappropriated from the estate, and the reduction or reversal of transactions that have improperly deprived the estate of assets or are otherwise reversible consequent to the insolvency, such as preferences, ultra vires transactions and the like. An insolvency practitioner will normally review the circumstances of the company's failure to determine whether there are specific issues that warrant further investigation to determine whether such choses of action or potential assets exist and are commercially pursuable.  This is a standard step, but where there is clear evidence of fraud, misappropriation, wrong doing or payments based either on a fundamentally mistaken or deliberate misstatement of the entity's actual

financial worth, such as would arise in a Ponzi scheme, there is a comparatively greater emphasis on investigation of such areas.

Q:   Have these investigations led to any legal proceedings?

A:   I have had direct experience of a number of cases in the last 5 years which I have dealt with the recovery of monies or assets from third parties.   These include a wide range of issues, including both actions for damages against responsible, whether directly or through negligence, for damage or loss to the company, such as directors and professional advisors, as well as recovery action against those who received monies which, had the correct financial circumstances of the company been known, would not have done.   I have also actively defended claims against estates by parties whom I considered did not have legitimate claims, and sought the recovery of collateral seized by secured creditors whose claims I considered overvalued or where enforcement action was not in accordance with their security rights.   I am currently involved in formal court proceedings in one case in Cayman defending a $9 billion plus claim against one estate, and recovery action against professional advisors for €282 million in Ireland.   I am in discussions with my legal advisors regarding lodging claims against the auditors and/or directors in 3 separate cases in 3 different jurisdictions, other than this case, concerning breach of fiduciary duty and fraud, with likely claim values in each instance ranging from $14 million to in excess of $500 million, as well as a potential claw back action for $100 million involving wrongful distribution in a hedge fund case.

Q:   Have you ever been required to testify in court with respect to insolvency proceedings?

A:   No, other than the submission of witness statements or evidence by way of affidavit.

JOINT LIQUIDATORS' DIRECT EXAMINATION OF HUGH DICKSON                                        9

Q:   As a court appointed liquidator on other matters, have you ever conducted a claims resolution process?

A:   Yes. For example, I have conducted a claims resolution process in the Cayman Islands covering claims of $90 million governed by Cayman Islands law prior to the revisions of law that became effective in 2009. At that time, I understand the law governing the claims process was substantially the same as that of other British overseas territories or former British Caribbean colonies, such as Antigua and Barbados, and had the same reliance on the guidance offered by the UK Insolvency Act 1986 Rules in so far as they did not differ from the primary local statutes. I also am familiar with the UK Insolvency Act 1986 Rules, both in the context of its application to the Cayman Islands and from my prior experience as a qualified UK insolvency practitioner, which necessitated detailed understanding of the provision of the Rules.

## LIQUIDATION OF STANFORD INTERNATIONAL BANK, LTD.

Q:   Please tell the Court the basis for your testimony regarding SIB and its operations.

A:   I am testifying in my capacity as a Joint Liquidator of SIB. My knowledge relating to SIB, its records, and its operations are based on my own personal knowledge in that I and my team have engaged in extensive investigations regarding SIB and its books and records since the appointment of the Joint Liquidators. I and my team also have engaged in extensive interviews and discussions with current and former employees of SIB. It is important to note that our investigations are ongoing and our determination and identification of assets, choses in action, etc. for the benefit of SIB's victims/creditors is ongoing and continues to expand.

000040

Q:   I am going to refer to the High Court of Justice for Antigua and Barbuda, of the Eastern Caribbean Supreme Court, as the High Court. Is that acceptable to you?

A:   Yes.

Q:   I also am going to refer to Stanford International Bank, Ltd. as SIB. Is that acceptable to you?

A:   Yes.

Q:   I also am going to refer to Antigua and Barbuda as Antigua and Barbuda or simply as Antigua interchangeably. Is that acceptable to you?

A:   Yes.

Q:   When did the High Court appoint you as one of SIB's liquidators?

A:   The High Court entered an appointment order on May 13, 2011, appointing me and my colleague, Mr. Marcus A. Wide, who heads Grant Thornton's Recovery and Reorganization practice in the British Virgin Islands, as Co-Joint Liquidators.

Q:   I am going to refer to you and Mr. Wide as the JLs. Is that acceptable to you?

A:   Yes it is.

## SIB FACTS AND FINANCIAL OPERATIONS

Q:   Please tell us what line of business SIB was in and the nature of its operations.

A:   SIB is an international business corporation, incorporated and regulated under the International Business Corporations Act, Cap 222 of the Laws of Antigua and Barbuda, referred to as the IBCA. It is an offshore banking institution that purportedly dedicated itself to offering banking services to customers throughout the world, primarily the issuance of certificates of deposit, or CDs, as well as deposit accounts, private banking services, loans, letters of credit, guarantees, and credit card services, among other things.

000041

Q:     Where were SIB's customers located?

A:     SIB's customers were located all over the world.  Specifically, customers were located in
       106 different countries spread out over every continent.

Q:     How many customers did SIB have?

A:     As of February 2009, SIB had 21,738 customers.

Q:     What was the total amount of the deposits made by these customers?

A:     The total amount claimed to be on deposit was approximately $7.25 billion, including
       accrued interest. In fact, it is the JLs' view at this time that the accrued interest included
       in this number should not be recoverable.  Clearly, once the JL's have backed out the
       interest component this number will be reduced.

Q:     What was the total amount of deposits made with SIB by customers?

A:     $10.02 billion was deposited by customers into SIB over the period 2001 to February
       2009. The JL's understand that the vast majority of these funds were invested into CDs.

Q:     Please provide the Court with a regional breakdown of SIB's customers by number
       and percentage of the total as of February 2009?

A:     For purposes of simplicity, I will be rounding numbers and percentages up or down, as
       applicable, depending on whether the next number in the figure is greater than or less
       than 5.  With that in mind, by amount and percentage, the customers originated from the
       following regions in the following percentages of the total:

       (a)     13,071 customers in Latin America, constituting approximately 60.13% of the
               total;

       (b)     4,212 customers in the Caribbean, constituting approximately 19.38% of the total;

       (c)     3,450 customers in the United States, including Puerto Rico and the U.S. Virgin

Islands, constituting approximately 15.87% of the total;

(d)    678 customers in Europe, constituting approximately 3.12% of the total;

(e)    159 customers in Canada, constituting approximately 0.73% of the total

(f)    97 customers in Asia, including Australia and the South Pacific, constituting

approximately 0.45% of the total; and

(g)    71 customers in Africa, constituting approximately 0.33% of the total.

Pictorially, the breakdown of the number of customers by region appears as follows:



Q:    How many of SIB's bank customers were Antiguan in nationality or had a mailing
address in Antigua?

A:    As a general rule, SIB was not allowed, pursuant to applicable regulations, to accept
depositors from Antigua.   However, SIB's deposits did include deposits of certain
expatriates from other countries residing in Antigua; deposits from trusts maintained by
Stanford Trust Company Limited, an Antiguan company, of which the JLs also are
receivers, and whose funds originated from numerous foreign jurisdictions; and SIB

000043

employees, who were allowed, pursuant to applicable law, to deposit funds with SIB.  At present, the JLs' best information is that, in total, these deposits constituted 3,176 of the deposits as of February 2009, being 14.61% of the total number of deposits, and are incorporated in the breakdown of customers by region I previously explained.

Q:   Do any of the current customers of SIB hold accounts with balances of less than EC$20,000, Eastern Caribbean Currency, being approximately US$7,450?

A:   Yes.

Q:   What is the total amount in US dollars of the account balances under EC$20,000, as shown in SIB's records?

A:   US$2,847,535.97, being 0.04% of the total value of claimed deposits as shown in SIB's records.

Q:   How many customers of SIB hold accounts with balances of less than EC$20,000?

A:   1,924, being 8.85% of the total number of customers.

Q:   Please provide the Court with a regional breakdown of SIB's customers' account balances as shown in SIB's records by amount and percentage of the total deposited as of February 2009?

A:   For purposes of simplicity, I will once again be rounding the numbers and percentages up or down in the manner I explained before.  With that in mind, by amount and percentage, the deposits (inclusive of interest that will be netted out in the claims process) originated from the following regions in the following percentages of the total:

   (h)   $3.16 billion was deposited by individuals and entities from Latin America, constituting approximately 43.59% of the total;

   (i)   $1.99 billion was deposited by individuals and entities in the Caribbean, constituting approximately 27.38% of the total;

   (j)   $1.62 billion was deposited by individuals and entities domiciled in the United

States, including Puerto Rico and the U.S. Virgin Islands, constituting approximately 22.39% of the total;

(k)   $293.96 million was deposited by individuals and entities in Europe, constituting approximately 4.05% of the total;

(l)   $79.44 million was deposited by individuals and entities in Africa, constituting approximately 1.10% of the total;

(m)   $62.76 million was deposited by individuals and entities in Asia, including Australia and the South Pacific, constituting approximately .87% of the total; and

(n)   $45.79 million was deposited by individuals and entities domiciled in Canada, constituting approximately .63% of the total.

Pictorially, the breakdown of the account balances by amount, appears as follows:



000045

Q:    Did SIB enter into any loans with individuals, businesses, or other entities?

A:    Yes. As of February 2009, SIB was a party to loan agreements with approximately 491 individuals and companies located throughout the world totaling approximately $104.4 million. Of the 491 loan agreements, 265 of them were loans drawn by individuals or companies that held CDs with SIB and these loans have been set off against the CDs held. The remaining 226 loans were made to individuals and companies that did not directly hold CDs with SIB. These loans were secured against other SIB CDs. The JLs are taking steps to recover these loans. Of the 491 loans, 71 of them were with individuals and companies located in Antigua, mostly trusts maintained by STC domiciled in Antigua, which totaled approximately $18 million.

      Loans were authorized, pursuant to SIB's policies, only to customers, who had submitted an application to SIB in Antigua and been accepted by SIB's staff in Antigua, and who were issued a promissory note from Antigua governed by Antiguan law. Furthermore, loans were required to be fully secured by funds on deposit at SIB.

Q:    Please provide the Court with a regional breakdown of these loans which SIB entered into.

A:    The 491 loan agreements that SIB was a party to as of February 2009, using the same rounding methodology I used before, can be broken down into number of loans by region, and as a percentage of the total as follows:

      (a)    342 loans with individuals and companies throughout Latin America, for a total of approximately $65.77 million, constituting 63% of the total loaned amounts and 69.65% of the total number of loans;

      (b)    100 loans with individuals and companies in the Caribbean, for a total of approximately $26.14 million, constituting 25.04% of the total loaned amounts

JOINT LIQUIDATORS' DIRECT EXAMINATION OF HUGH DICKSON                                    16

000046

and 20.37% of the total number of loans;

(c)     39 loans with individuals and companies in the United States, for a total of approximately $7.47 million, constituting 7.16% of the total loaned amounts and 7.94% of the total number of loans;

(d)     5 loans with individuals and companies in Europe, for a total of approximately $2.85 million, constituting 2.73% of the total loaned amounts and 1.02% of the total number of loans;

(e)     2 loans with individuals and companies in Asia/Pacific, for a total of approximately $1.48 million, constituting 1.41% of the total loaned amounts and 0.41% of the total number of loans;

(f)     2 loans with individuals and companies in Canada, for a total of approximately $435,000, constituting 0.42% of the total loaned amounts and 0.41% of the total number of loans; and

(g)     1 loans with individuals and companies in Africa, for a total of approximately $254,000, constituting 0.24% of the total loaned amounts and 0.2% of the total number of loans.

000047



**Outstanding Loans By Region**
(Based on amount owed at February 2009)

USA, 7.16%
Europe, 2.73%
Caribbean, 25.04%
Latin America, 63.00%
Canada, 0.42%
Asia / Pacific, 1.41%
Africa, 0.24%

Q:   Is SIB a party to any loans with the Government of Antigua and Barbuda?

A:   This issue is still under investigation.   At the time the Joint Liquidators took over SIB, there were no loans to the Government of Antigua and Barbuda on the books of SIB.   However, there is anecdotal evidence that funds were provided to the Government of Antigua and Barbuda by Stanford and there is almost no doubt that those funds originated from SIB funds.   Thus, the funds, presumably in the form of loans, possibly through Bank of Antigua, would have to have been given to the Government of Antigua and Barbuda by an entity other than SIB.   If it is discovered that fraudulent transfers of SIB funds were made to other entities and then passed onward as loans to the Government of Antigua and Barbuda, appropriate actions will be taken to recover those funds.

Q:   Did SIB enter into any other loans with anyone else?

A:   While not registered in the books and records of SIB as such, I understand from the Receivers reports that loans in the amount of approximately $1.8 billion were made either directly or indirectly to Robert Allen Stanford. The JLs have no further information with respect to that matter. Of course, the JLs do not concede that any such transfers were loans as opposed to embezzlements.

Q:   Did SIB enter into any other contractual agreements with anyone else?

A:   Yes. SIB entered into contractual agreements with each of its customers, all of which indicated that SIB was located in Antigua and in various instances, called for the application of the law of Antigua and Barbuda and for resolution of disputes in Antigua. With respect primarily to marketing and investment functions, SIB also had agreements with Stanford Financial Group, which, as of January 2008 changed to Stanford Financial Group Global Mgmt. LLC, US Virgin Islands, and other related entities for the provision of such services and contracted with independent companies and other Stanford owned companies such as Stanford Group Company, which I will refer to as SGC, for the referral of customers to SIB. SIB also had a contract with Stanford Development Company Limited to maintain the grounds and building as well as the provision of security services. SIB utilized Sun Printing and Publishing, an affiliated company, for printing its forms, envelopes, and letterhead, as well as advertising in the local paper and various magazines it published. There also were agreements, locally, between SIB and Terminix for pest control services; Business Systems and Supplies for maintenance of the various photocopying and large printers; Antigua ERA Services for air conditioning equipment maintenance; Jakes Cleaning Services for janitorial services; Raeburn

000049

Generator Services to maintain the back-up generator on site; Sagicor Insurance Company for staff health insurance and retirement benefit plan agreement, the British American Insurance Company for similar service prior to December 2008; and other similar local providers, as needed.

Q:   On average, how much was invoiced to SIB pursuant to the agreements with Stanford Financial Group and Stanford Group Company, later Stanford Financial Group Global Mgmt. LLC, US Virgin Islands, on a yearly basis?

A:   In administration, advisory, and similar fees, the amount ranged from approximately $11.8 million in 2000, steadily increasing up to approximately $178.2 million in 2008. In referral fees, the amount ranged from approximately $18 million in 2000, steadily increasing up to approximately $157.7 million in 2008.

Q:   I am handing you what has been marked as Exhibit HD1?  Please identify this document.

A:   This is a summary created by SIB of the expenses incurred by SIB from 2000 through 2008.

Q:   Did SIB enter into any leases for either premises or equipment?

A:   SIB had a twenty year lease, for which it made a $6 million advance payment, with Stanford Development Company Limited, referred to as SDC, in Antigua and in which company it may have an equitable interest based on the foregoing payment. The building at which SIB's sales office in Montreal, Canada was located also was leased, though that lease was terminated by the former JLs.  We have found nothing with respect to equipment leases in our review.

Q:   Did SIB have any creditors other than depositors?

A:   Yes – the other creditors of SIB are the former employees and trade creditors. Based on

000050

the information received to date, the amount and number of claims is as follows:

(a) employees – there are 82 employees entitled to severance, notice and vacations pay

   totaling approximately $766,000

(b) trade creditors – the JLs have received 37 proof of debt forms from trade creditors

   totaling approximately $5.34 million

Q:   What percentage (in dollars) of total claims do these other creditors constitute when compared with the amount of claims by depositors?

A:   The employee and trade creditor claims total approximately 0.084% of the total claims in the liquidation.



Q:   Who was SIB owned by?

A:   SIB was directly and wholly owned by Stanford International Bank Holdings Limited, an Antiguan incorporated company, which, in turn, was wholly owned by R. Allen Stanford. There were no other equity owners.

Q:   Did SIB have an external auditor and, if so, who?

A:   Yes. SIB's sole external auditor was C.A.S. Hewlett & Co. in Antigua. SIB was not

JOINT LIQUIDATORS' DIRECT EXAMINATION OF HUGH DICKSON                                         21

000051

required to report to any entity outside Antigua.

## SIB ASSETS AND FINANCIAL OPERATIONS

Q:   Does SIB have any assets and, if so, where?

A:   Yes.  SIB has assets in Antigua, Switzerland, the United Kingdom, Canada, the United States, Panama, Columbia and Venezuela.  As noted previously our forensic review to account for the depositors money has only recently started and today we do not know if there are other pockets of cash or other assets located in other jurisdictions.

Q:   Please tell the Court what SIB's assets consisted of, in general terms, at the time of its liquidation.

A:   SIB has a number of parcels of real property in Antigua; bank accounts at Bank of Antigua, HSBC in London, Toronto Dominion Bank in Canada, which I will refer to as TD Bank, Trustmark Bank in Houston, Bank of Houston, Comerica in Houston, Société Générale S.A., in Switzerland, RBS Coutts in Switzerland, Banque Franck Galland & Cie SA in Switzerland, Credit Suisse in London, and Lehman Brothers; and accounts receivables in the form of loans, as I previously explained, though, again, those loans were fully secured by the deposits of the customers to whom those loans had been extended.  Investigations as to additional funds or amounts due to SIB are ongoing.

Q:   Please tell the Court about SIB's real estate holdings.

A:   SIB has 5 real estate holdings in Antigua.  Specifically, it owns a freehold interest in land at 1000 Airport Boulevard, Coolidge, St. John's, Antigua, comprising approximately 3.14 acres, which is the current site of what was the Bank of Antigua, now known as Eastern Caribbean Amalgamated Bank, which is subject to agreement of purchase and sale for approximately $4.1 million.  SIB also owned two parcels of property at Coolidge, each

000052

comprising of approximately 0.2 acres, and one at St. Phillips North, known as Pelican Island Properties, comprising of approximately 29 acres. There is another large island with adjoining mainland acreage, totaling over 1,500 acres. SIB also holds the ground lease of the Antiguan Athletic Club. There are also a number of other properties in Antigua held in the name of other Stanford related entities which are believed to have been purchased with funds derived from SIB, in which case we will, at the appropriate time, seek to recover these properties for the benefit of SIB's creditors/victims. These include, among others, the Pavilion Restaurant, the 5,000-seat Stanford Cricket Ground and the Sticky Wicket, a bar and restaurant, among others. The fire sale value of all these properties is estimated at least $110 million, and considerably more if sold on a more considered basis. To date, it does not appear that SIB has any real estate holdings outside of Antigua, but if it is discovered that other properties may be traced to funds derived from SIB, we will seek to recover those as well.

Q:    Does the governments of Antigua and Barbuda currently have control, ownership, or some claim over these assets?

A:    No. On February 21, 2009, the Secretary to the Cabinet of Antigua and Barbuda made a declaration of its intent to acquire approximately 28 parcels of property owned by Stanford and Stanford related entities, including SIB, pursuant to the Antigua and Barbuda Land Acquisition Act, Capt. 233, which provides for the acquisition of property by the government in exchange for payment of the fair market value of such property, plus interest and costs in appropriate circumstances. On May 20, 2010, the Governor-General of Antigua made formal notice of abandonment, in the Official Gazette that certain properties of those subject to the February 21, 2009, declaration were being abandoned. All properties owned by SIB were designated to be abandoned in said

000053

resolution, which was published in the official Gazette of Antigua and Barbuda on May 20, 2010, and May 27, 2010. Some of the other properties owned by Stanford and Stanford related entities also have been abandoned in the same fashion. Additionally, to preserve our interest in all properties in the name of Stanford and Stanford related entities other than SIB, we have placed liens on such properties such that they cannot be sold without our prior knowledge and ability to act thereon, if need be.   To the extent any properties determined to have been purchased with funds derived with SIB are still subject to restrictions by the Government of Antigua & Barbuda, we will seek to have those properties abandoned or to have the Government pay the fair market value thereof, as required by law.

Q:   Please describe for the Court the SIB's bank account holdings at the time of liquidation.

A:   SIB has bank accounts or funds traceable to SIB in Antigua, Canada, London, the United States, Panama, and Switzerland.   Specifically, SIB had a bank account at the Bank of Antigua, which, as of December 2008, held a balance of $12,464,000 and at the time of liquidation contained approximately $9,984,971, and from which petty cash, local creditors and expenses, insurance, and similar types of expenses were paid.  SIB also had bank accounts at HSBC in London, to which customers making deposits in Euros, Pound Sterling and Swiss Franks by wire were directed to send their funds, and which, as of the date of the JL's appointment, were estimated to amount to approximately $4 million.  SIB also had bank accounts at TD Bank in Canada, to which customers making deposits in U.S. dollars or Canadian dollars by wire were directed to send their funds, and which are estimated currently to amount to approximately $18 million.   When funds were to be returned to customers, either due to maturity or other instructions by the customer, they

000054

were primarily directed to be sent by personnel in Antigua through the SWIFT banking system from one of these two institutions. SIB also had bank accounts at Trustmark Bank in Houston, through which, after customer checks for deposit were received and logged in Antigua, they were sent for clearance and a further account at Comercia. These accounts appear to have been paid out to the US Receiver. There was also an account at HSBC Panama in the approximate amount of $3.2 million. All the foregoing accounts were accessible to and managed by SIB personnel in Antigua in furtherance of SIB's banking operations with its customers.

SIB also had investment accounts at several financial institutions throughout the world. Specifically, SIB had an investment account at Bank of Houston and at Comerica in Houston, over which the US Receiver since has asserted control. SIB also had investment funds at Société Générale S.A., headquartered in Switzerland; RBS Coutts, headquartered in Switzerland; and Banque Franck Galland & Cie SA, headquartered in Switzerland, with a current collective balance in the region of $130 million. Also at Credit Suisse, headquartered in Switzerland, at the branch office in London, with estimated current value of $110 million

Q:   Other than the investment funds and loans, does SIB have any other assets in its name outside of Antigua?

A:   Not that we have identified to date.

Q:   Was there a discrepancy between the assets recorded in the banks books and records as having been invested and those that actually exist?

A:   Yes.

JOINT LIQUIDATORS' DIRECT EXAMINATION OF HUGH DICKSON                              25

000055

Q:   Please tell the Court about that discrepancy.

A:   In its last report to the FSRC, SIB declared the value of its investments to be approximately $8.5 billion, which was overstated, whereas the actual value of the investment assets are presently determined to be in the region of $350 million, leaving in excess of $8 billion unaccounted for.

Q:   Please describe what "a run on the bank" is.

A:   Any bank draws upon deposits made with it to source funds that it then lends to other parties. The duration or call terms of the deposit are commonly far shorter than the duration of the loans made by the bank or the bank's ability to liquidate such loans. The position is often exacerbated by further borrowing on commercial terms by the bank. In cash flow terms the bank relies on its depositors and lenders not demanding the money simultaneously, as a practical matter it would be impossible to either liquidate its own lending to meet the demands for withdrawal of deposits and loans, or solicit replacement deposits. This is common to most banks, and a recognized potential risk in banking. However, in the ordinary course of events depositors do not call their deposits on strict maturity, but typically allow the deposits to remain pending a future requirement to recover the money. Their primary intention in placing the money on relatively short duration is not with the specific intention of accessing the funds on maturity, but to provide comfort that funds will be available if required at short notice. Provided not every depositor requires funds at the same time, this is generally true. This so called intermediation function, taking a large number of small, relatively short term (in strict terms if not in practice) loans and utilizing those to extend longer term credit of larger, consolidated loans is a central feature of banking and a valuable tool for any economy in

accessing savings. The risks are controlled by banking regulators requiring certain minimum amounts of liquidity to be maintained by banks to meet unanticipated demands for funds withdrawal, as well as rules on the ratio of allowable investments by the bank to deposits and reserves, but even the strictest of regulatory regimes allows the bank to lend a considerable multiple of its ability to immediately repay its depositors and other creditors. There is not a financial institution in the world that can survive all its depositors and lenders simultaneously demanding the return of their money. A "run on the bank" is exactly such a scenario — where there is a collapse in confidence by depositors or lenders leading to demands for immediate payment. Any indication that the bank is struggling to meet any initial demands simply further erodes confidence and leads to an expansion of the demands for repayment, which in turn further erodes confidence. Unless very rapidly addressed by liquidity support from a central bank or other financial institutions, the run will exhaust the banks liquid reserves and force it to suspend payment. That in turn usually triggers the collapse of the bank, either through breach of local law or regulatory provisions, or through a fundamental and irreparable loss in confidence in the bank, even if a bank is balance sheet solvent i.e. its assets are worth more than its liabilities to repay depositors and lenders. Of course, where a bank is involved in a Ponzi scheme or its assets have been misappropriated, the bank is even more vulnerable to a run.

000057

Q:  Was there a "run on the bank" with respect to SIB prior to its liquidation?

A:  Yes.  After the worldwide financial meltdown in late 2008, greatly exacerbated by the news that the Securities and Exchange Commission filed an enforcement action in an attempt to freeze SIB's banking operations, a large number of CD holders sought to withdraw all of their investment from SIB causing a "run on the bank."

Q:  How much money was withdrawn from SIB during the run on the bank?

A:  It is difficult to define the period of the run, but based on the substantial increase in certificate of deposit redemptions commencing in October 2008, and continuing to the collapse in February 2009, the approximate amount of cash leaving the bank was $1.4 billion of which $350 million was in 2009.

Q:  Are you able to identify the total amount of money that flowed into SIB from customers?

A:  Yes – we are preparing a global cash flow showing money that flowed into and out of SIB.  All customer deposits and withdrawals were made via bank accounts held by SIB at the following banks:

> (a) TD Bank – received all US$ wire deposits and Canadian dollar deposits
>
> (b) HSBC, UK – received all Euros, Pounds Sterling and Swiss Francs deposits
>
> (c) Trustmark Bank – received all US$ check deposits.

Our analysis to date indicates that during the period 2001 to 2009, SIB received $10.02 billion in deposits from customers and made $5.63 billion in funds transferred out of the bank.  This resulted in net cash of approximately $4.39 billion remaining in SIB and to be accounted for.

Q:  Are you able to account for the net cash of $4.39 billion that remained in SIB?

As mention previously, due to financial constraints we have only recently been able to

start a detailed forensic investigation to account for this money. However, following our preliminary review and examination of the records at SIB we are confident that we have sufficient records at SIB to enable us to account for all of the funds that flowed through SIB. We are currently conducting an analysis on the SIB's accounting and banking data, in conjunction with the data from the Swift banking systems that were run from Antigua, to determine the destination of all the funds that were transferred out of SIB.

Included in the above are transfers into other Stanford entities via SFG. We hold 65 boxes of transactions records that detail these through flows from SIB via SFG to other Stanford entities. We are in the process of completing an analysis of these records, along with the electronic data, to confirm specifically how SIB's funds, and how much of them, flowed to the Stanford related parties.

I have executed this written direct testimony under penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, this 5ᵗʰ day of December 2011.

HUGH DICKSON

000059

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | § | |
|---|---|---|
| In re | § | Chapter 15 |
| | § | |
| Stanford International Bank, Ltd., | § | Case No. 3:09-cv-00721-N |
| | § | |
| Debtor in a Foreign Proceeding | § | |

---

## JOINT LIQUIDATORS' DIRECT EXAMINATION OF HUGH DICKSON

---

**Q:**   Is there anything you would like to add to your written direct testimony?

**A:**   Yes. In that testimony I provided a breakdown of countries of residence of the remaining depositors of the bank, to provide an indication of the geographical distribution of creditors and the point of origin of the monies used to finance the Ponzi scheme. That testimony was based on the records held at SIB. Those records included a substantial number and value of deposits from trusts maintained by Stanford Trust Company (STC). The breakdown designated monies deposited from Antiguan trusts or corporate entities, whether controlled by STC or otherwise, as being Antiguan in origin. Mr. Wide and I were appointed as Receivers of STC on 4 November 2011. Since the drafting of my original testimony our staff have had access to STC records, which have enabled a more accurate consideration of the place of residence of the beneficiaries of the trusts controlled by STC.

**Q:**   What changes have you made to the analysis, and why?

**A:**   The original analysis included some 3,176 deposits from trusts or individuals shown as

000060

being Antiguan on SIBs records.  These included some 2,600 Antiguan trusts controlled by STC, 31 individuals resident in Antigua, and a further 546 trusts or corporate entities registered in Antigua but not controlled by STC.   There were a further 475 trusts controlled by STC who were shown on SIBs books as being from some jurisdiction other than Antigua.  Having now examined STCs client records we have been able to identify the country of residence of the beneficial interest in those 3,075 STC controlled trusts.  I believe that analysis provides a more accurate consideration of the origin of the monies claimed by depositors.  My staff have therefore re-performed the analysis of country of origin by value and amount, removing the original country of allocation and replacing it with the identified point of residence of the beneficiaries of those trusts.

Q:   How does that change the analysis?

A:   Inspection of the STC records indicated that the substantial majority of the beneficial interest in the trusts controlled by STC was actually of Latin American origin, particularly Venezuela, Mexico and Columbia.  These are reflected in a reallocation of approximately 11% of the depositor base by headcount and 16% by value from the Caribbean section to the Latin American section.  To put it another way, the proportion of beneficiaries originating in Latin American countries increased from the last analysis showing 60% by volume and 43% by value to now showing 71% by volume and 59% by value.  The impact on other categories, including the United States, was not material.  The revised allocation can be shown pictorially as indicated in the attached revised charts.

Q:   Does the analysis make a significant difference to individual countries ranking?

A:   The reallocation significantly reduces Antigua from 3,176 entities to 578 entities, being

31 individuals and 547 trusts and corporate entities. As the latter are not STC controlled entities a further examination of the individual client account forms to determine country of beneficial interest. However, as the total value of deposits held is some $292 million – being approximately 4% of the total value of depositor claims and 2% of the number of depositors – this should not make a substantial difference to the revised analysis. In terms of the 4 largest countries of origin, Venezuela is by far the largest depositor country with nearly 9,300 depositors and approximately $2 billion in deposits, totalling more in number of depositors terms than the next three – Mexico, The USA and Colombia – combined. The 4 largest countries can be summarized as follows:

| Country | Number of depositors | Value of claims $ million |
|---------|---------------------|---------------------------|
| Venezuela | 9,278 | $1,999 |
| Mexico | 3,604 | $1,258 |
| USA | 3,409 | $1,605 |
| Colombia | 887 | $293 |

Hugh Dickson

Mark Russell

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, et al.,          )
                                  )
          Plaintiffs,             )
                                  )
vs.                               ) CIVIL ACTION
                                  ) NO.
GREENBERG TRAURIG, LLP, HUNTON &  ) 3:12cv-4641-N
WILLIAMS, LLP; and YOLANDA        )
SUAREZ,                           )
                                  )
          Defendants.             )

------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

MARK RUSSELL

December 17, 2015

------------------------------------

ORAL DEPOSITION of MARK RUSSELL, produced as a

witness the instance of the Defendant Greenberg

Traurig, and duly sworn, was taken in the above styled

and numbered cause on December 17, 2015, from 9:06 a.m.

to 3:17 p.m., before Jeff L. Foster, a Certified

Shorthand Reporter in and for the State of Texas, at

the offices of Baker Botts, LLP, 2001 Ross Avenue,

Suite 1100, Dallas, Texas 75201, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record.

000063

Mark Russell

1   receivership?
2   A. So through my involvement we're contracted
3   through FTI for the receivership.
4   Q. Are you doing something different at Ernst &
5   Young than you had been doing at FTI?
6   A. No, it's the same role.
7   Q. Tell us what that role is.
8   A. Okay. So primarily we act as the receiver's
9   forensic accountant, so to the extent that the receiver
10  needs analysis done, investigation done from like a
11  financial and accounting perspective, we'll review the
12  records, put together the analysis that he needs,
13  compile that kind of information and do the
14  investigation.
15     We also support Karyl Van Tassel in her
16  role generally as the designated expert whenever the
17  receivership has some kind of a case where an opinion
18  needs to be given regarding like the Ponzi scheme, cash
19  tracing, those kinds of things.
20   Q. Have you appeared as an expert witness in
21  connection with the Stanford entities?
22   A. I have not.
23   Q. And I take it the declaration that you
24  submitted in this case and your appearance here today
25  is not as an expert witness; is that correct?

1   is your understanding that the Antigua joint
2   liquidators have at their disposal?
3   A. I kind of have an understanding. I don't know
4   that I would have direct knowledge of exactly what they
5   have. But from some conversations we've had with them
6   in the past they have electronic data related to the
7   SIB CD database. We've been told by them, though we
8   haven't verified it ourselves, that they have backup
9   tapes of databases that were not live down there. So
10  they have kind of backup tapes of the old databases.
11  And then they also have file rooms of general
12  accounting type records, client records, client
13  folders, that kind of information related to the
14  SIB CD investors.
15   Q. And have you reviewed or examined the Antigua
16  joint liquidators' cache of electronic and paper
17  records?
18   A. Not in any specific detail. On one visit we
19  had down there we kind of just looked through it to see
20  what type of information was there. But not any type
21  of organized manner to say exactly what was there and
22  what wasn't.
23   Q. What is the electronic SIB CD database?
24   A. So the one that was — the one that was
25  operating when the receivership took over in February

1   A. That's correct.
2   Q. You're not rendering any opinions on anything
3  to do with the Stanford litigation?
4   A. That's correct.
5   Q. I understand that before your recent move that
6  FTI was receiving for your services $436 per hour; is
7  that correct?
8   A. That's correct.
9   Q. What is Ernst & Young receiving now?
10   A. It's the same rate.
11   Q. Do you have any contracts or connections with
12  what I will call the putative class action plaintiffs
13  in this case?
14   A. No, we do not.
15   Q. Who is paying your fee for the appearance you
16  have today?
17   A. The receiver.
18   Q. All right. We've gotten your background and
19  all the rest of it from other depositions   So let's
20  just skip forward, if we might.
21   A. Okay.
22   Q. The first large-scale question I would have
23  for you is can you explain what sort of data and
24  records are held with respect to the Stanford
25  enterprises? Let's start first down in Antigua   What

1   2009 was a Temenos database. So that was kind of like
2  the software that over lied the data and the underlying
3  tables. There was also information available kind of
4  live on their server from the previous database, which
5  was referred to as Data Pro.
6   Q. It's my understanding that the receiver,
7  Mr. Janvey, has a copy of that Temenos database; is
8  that correct?
9   A. That's correct.
10   Q. And that was obtained from Houston through
11  computer connections?
12   A. That's correct.
13   Q. Is there anything about the Temenos database
14  and Data Pro that are held by the joint liquidators
15  down in Antigua that are not held also by Mr. Janvey
16  here?
17   A. We haven't done — we don't have access to
18  everything that they have in terms of like — I can't
19  see a copy of what it is that they're operating, so we
20  haven't been able to do a comparison of here's exactly
21  what we have, here's exactly what they have to
22  determine whether there are or are not any differences
23  between the two.
24   Q. Why not?
25   A. Because we just — we don't have their data.

3 (Pages 6 to 9)

000064

Mark Russell

**10**

1 We don't have a copy of what they're operating off of.
2 Q. Well, it was my understanding that there was
3 an agreement to share information that was signed
4 between the two parties?
5 A. There is.
6 Q. So why hasn't Mr. Janvey been able to get
7 copies of that and make those comparisons?
8 A. I don't know that he's asked for copies in
9 order to do it. So I don't know that he — I don't
10 know that he can't or hasn't been able to. I don't —
11 I don't know if he's even asked for a copy to compare
12 it to.
13 Q. Have you or the receiver asked to see the
14 backups of the old SIB database held in Antigua?
15 A. We have not. We have not asked for them or
16 looked at them.
17 Q. Do you know why?
18 A. I don't.
19 Q. The data that you have up here from the
20 Temenos database only goes back to a certain prior
21 date, right?
22 A. Correct.
23 Q. What date?
24 A. So kind of generally the earliest information
25 we have is from August of 2003. Scattering here and

**12**

1 you want like more specific to the CD-related ones or
2 just in general?
3 Q. Go ahead in general.
4 A. Okay. So in general it's just normal business
5 records, so like stuff you would expect at any
6 business, contracts, accounting, all those types of
7 business type documents, accounting and finance
8 documents. And then in addition to that they have a
9 client file room that contains folders for all of the
10 different SIBL CD investors and then within those
11 folders there's the account statement and account
12 opening information and SIBL CD type agreement copies
13 that they have down there.
14 Q. Does the client file room down in Antigua hold
15 copies of signed subscription agreements?
16 A. I don't recall if it specifically does or
17 doesn't.
18 Q. Have you had occasion to request any
19 particular client file from Antigua?
20 A. I don't know if that's happened or not.
21 Q. Who would know?
22 A. I'd assume somebody that works for the
23 receiver would know. I couldn't tell you specifically
24 who would know.
25 Q. Are there any other paper files that you

**11**

1 there we'll see some transactions that predate that
2 date, but primarily all of our transactions begin in
3 August of 2003.
4 Q. But the receiver has not asked the Antigua
5 joint liquidators to give data prior to that date,
6 right?
7 A. I don't know whether he's asked for it
8 specifically or not. I know that I haven't seen a copy
9 of it from them.
10 Q. Well, if he had gotten a copy, you would have
11 seen it, right? That's your job?
12 A. We would have seen it if he would have then
13 asked us to do a comparison. So I know I haven't been
14 asked to do that. So I haven't — I haven't seen a
15 copy of it.
16 Q. Does that mean there is a possibility that the
17 Temenos database that you have up here has some spots
18 where it does not agree with the database held down in
19 Antigua, but you just don't know it?
20 A. I mean, it's always a possibility. We haven't
21 seen any instances of that, though.
22 Q. Let's next talk about the paper files that you
23 say are held down in Antigua. What do you understand
24 them to consist of?
25 A. So our understanding is that they have — do

**13**

1 understand are being held down in Antigua?
2 A. Not that I — not that I have direct knowledge
3 on, no.
4 Q. Next let me ask if you know what sort of
5 either indexes or computer files are searchable among
6 the documents and records held down in Antigua?
7 A. I don't know if — like electronic searchable
8 kind of format? I don't know.
9 Q. What about with respect to the papers held in
10 the client file room? Are there any indexes that you
11 know of about what is in that client file room?
12 A. I don't know.
13 Q. Have you seen the client file room that time
14 you went to Antigua?
15 A. I did.
16 Q. What did it look like?
17 A. It's like a big — big room, kind of shelves
18 lined out, and then kind of alphabetically — I think
19 it was alphabetically; it may have been by CD number.
20 There's folders kind of in those shelves of various
21 client files.
22 Q. Did you have occasion to look at a sample of
23 what was in one of those folders?
24 A. I know I looked through a few. I don't
25 specifically remember everything that was in there.

4 (Pages 10 to 13)

000065

Mark Russell

18

have to sign if they wanted their claim to be
recognized up here?

A.  I don't — I don't know if that's been
formally put together yet or not.

Q  Let's just finish out this section.  Is there
anything else that you're aware of with regard to the
Stanford International Bank that's being held by the
joint liquidators down in Antigua?

A.  In terms of like documents and records and
data?

Q  Documents, records, anything of importance
to — for example, claims against law firms.

A.  I mean, without knowing specifics, like just
general business type documents that you'd expect to be
kept by an entity.  So, you know, there's vendor files
and that kind of stuff down there, so — but I kind of
consider that a part of the accounting records.

Q.  What about e-mails?  Are you aware of whether
either the U.S. receiver or the Antigua joint
liquidators have possession of e-mail records?

A.  I know the U.S. receivership does, I don't
know whether or not the joint liquidators do.

Q.  We'll get to the receiver in a moment.  And
that moment should be right now.  Very good.  Let's
move on now to the second question, which is what sort

of that e-mail system?

A.  I know that they had a lot of e-mail like on
an exchange server.  I don't know — I don't know
specifically if they were running Microsoft.  I think
they were, but — like a Microsoft exchange, but they
had servers with the live e-mail on it.

Q.  Okay.

A.  And then —

Q.  I know in other cases parties have had
searches run and I just don't recall the name of
that — either the database or the system they were
using.

All right.  Please keep going.  What
other records or material of the Stanford bank and
Stanford empire does the U.S. receiver currently have?

A.  And then we also have — like we discussed
earlier, we have a copy set of the SIDL CD database
that was live at the time that we took over, so it's
tables and information from the Temenos and the
Data Pro databases.

We've also received from several of the
banking institutions that the Stanford entities used
wire information and bank statements and check images.
So that's primarily going to be from Toronto Dominion,
Trustmark National Bank, Bank of Houston.  I believe

of data and records the receiver, Mr. Janvey, has with
regard to the Stanford International Bank and related
entities?

A.  Oh, that's a big question.  So I'll kind of
give broad categories.  So there's electronic
information, which I would kind of describe as we have
some of the underlying accounting kind of general
ledger Oracle type system accounting records.  Those
generally include general ledger detail.  We also have
like vendor payment detail.  Those are kind of the two
primary ones that we've used in our investigation so
far.  There's other tables that we just haven't used as
much from that Oracle database.

We also have more — more electronic type
accounting records that we've received over time from
the various — like various accounting people at
Stanford.  We have e-mail records, so when the
receivership took over there was an effort to image and
preserve the e-mail and computer and hard drive
information of a large number of individuals.  I don't
know the specifics on it.  I know that FTI has a record
of what's been done.  And then some of that has been
loaded and is available from a review perspective.

Then we also have the —

Q.  What is — I don't recall.  What was the name

we've also gotten some stuff from HSBC.  And then we
also have a lot of paper records of the paper records
that were in the various Stanford offices when the
receivership took over.  So there's a warehouse that
has boxes of information from the paper documents.

Q.  Down in Houston?

A.  Yes, it's down in Houston.

Q.  Are there any indexes to the warehouse in
Houston?

A.  My understanding is there's like kind of a
high-level index that says generically kind of what's
available in the various boxes down there.

Q.  Has either the receiver or FTI created a more
detailed index?

A.  Not that I'm aware of.

Q.  Have you had occasion or FTI to search for
records in that warehouse?

A.  I haven't personally searched for records.  I
don't — I'm trying to think if anybody from FTI would
have ever gone there to look for anything specifically.
I know that nobody from FTI has done like a
comprehensive review of all the records that are in the
warehouse, but I don't know whether or not anybody has
ever gone down to go pull a specific box to see if
there's something that they were looking for or not.

(Pages 18 to    )

DepoTexas, Inc.

000066

Mark Russell

**Page 46**

1  MR. ISRAELOFF: Let's break for a change
2  of tape and we'll pick it up here in a moment
3  THE WITNESS: Okay
4  THE VIDEOGRAPHER: The time is 10:07. We
5  are off the video record.
6  (Recess taken.)
7  THE VIDEOGRAPHER: The time is 10:30. We
8  are back on the video record, tape number two
9  Q. (BY MR. ISRAELOFF) Before the break we were
10  talking about what information the receiver has with
11  regard to an individual claimant's nationality. Let me
12  ask it this way. If the receiver was asked what
13  nationality a particular claimant has, where would you
14  go to get that information?
15  A. So there's — there's two different
16  possibilities I could foresee when we're talking about
17  claimants. One would be the field that we just
18  discussed in the Temenos/Data Pro database. There's a
19  field that refers to nationality. And then also
20  potentially like he could send out a request that
21  actual claimants with approved claims in request that
22  information kind of as a confirmatory process.
23  Q. Now, that's something new I haven't heard
24  before. Where in all of this process is the receiver
25  requiring somebody to answer new requests like what is

**Page 48**

perspective.
Q. Similarly we know, for example, from our named
plaintiff, Mr. Troice, he has two citizenships, one in
Mexico and one in the United States. If a claimant
5  like Mr. Troice has two nationalities, which one would
be in the receiver's available data?
7  A. I don't know what would be populated in the
nationality field. I know there's some other fields in
9  the database that refer to like legal document I.D.,
10  identification, that's populated about 80 percent of
11  the time in the database. I don't know one way or the
12  other whether that would contain additional nationality
13  information or not, though.
14  Q. Well, which nationality would be contained in
15  the receiver's answer to such a question?
16  A. I don't know whether that determination has
17  been reached yet. So I think that would still be up
18  for consideration, a determination the receivership —
19  the receiver would have to make that I don't think he's
20  made yet.
21  Q. Is the nationality field filled out for a
22  hundred percent of the claim records?
23  A. The nationality field is filled out a hundred
24  percent in the Temenos database for the accounts, and
25  so since the claims are based on the account numbers,

**Page 47**

your nationality? Where is that?
A. So I haven't seen anything where it's been
required, but it's more of is it a possibility. Could
he ask that information and could he ask the question?
5  And I think the answer is, yes, but I don't know. Like
in terms of has he ever — has he asked that question
or required that answer before, I don't — I don't
think so.
9  Q. All right. Let's stick with the available
information as the receiver has it today.
11  A. Okay.
12  Q. And I'll ask the question again. If the
receiver was asked today what the nationality of a
particular claimant was, would he have that
15  information?
16  A. He would have the nationality as reflected in
17  the Temenos and Data Pro database.
18  Q. And you don't know at what point in time that
19  field in the database was filled, right?
20  A. Yeah, correct.
21  Q. Do you know what checking — fact checking, if
22  you will, was made on the field for nationality when it
23  was first entered in the Temenos database?
24  A. I don't specifically know where from an application
25  nationality field was coming from an application

**Page 49**

yes. I had to walk through that in my head to make
sure.
Q. Is the nationality field filled out in the
database for accounts in the name of entities?
5  A. It's filled out for all of the accounts. So
to the extent that there's entity accounts and entity
7  clients, then there would be a nationality associated
with it, yes.
9  Q. Do you know what SIBL did, if anything, to
10  check on the declaration of nationality?
11  A. From a verification standpoint?
12  Q. Yes.
13  A. I don't know one way or the other.
14  Q. If somebody moves and immigrates to another
15  country between the time they open their account and
16  today, is there anything in the receiver's data that
17  would disclose that?
18  A. So like if they change their citizenship?
19  Q. Yes.
20  A. I don't know — I don't know one way or the
21  other whether that nationality field would be
22  reflective of their new nationality or not.
23  Q. Related to that question, let me go to the
24  physical location that an individual customer would
25  have had. Is there anything in the receiver's database

13 (Pages 46 to 49)

Mark Russell

| | |
|---|---|
| Q. That was done for some of the net winner claims, but not all of them?<br>A. Yeah, again, on a — for specific net winners from that — from that level.<br>Q. All other claimants who are not in that net winners category, --<br>A. Uh-huh.<br>Q. -- that sort of tracing has not been done for any of them, correct?<br>A. It has been done for — I know it's been done for some through the objections process. But it hasn't -- we haven't undertaken to do that for every single one of the claimants.<br>Q. All right. That means, therefore that the receiver cannot rule out the possibility that one or more CD claimant files show ny up in the Temenos database are completely fictitious?<br>MR. ARLINGTON: Objection, vague and mischaracterizes the prior testimony.<br>A. Yeah, again, I think -- I'm trying to ascertain whether or not you're saying is there a claim that's been allowed, that the claimant is fictitious or that the underlying information driving the allowed amount is fictitious?<br>Q. (BY MR. ISRAELOFF) The entire account. We u | holistically done a comparison of transactions that we have in the bank information of transactions and matched them up to transactions in the Temenos and Data Pro information.<br>Q. Is that everything or just on a sample type basis or what you say when you have that transfer information?<br>A. So it depends on which bank we're talking about, so for TD it was a comparison holistically of all the wire data that we have. Which I think if I remember right a lot of our TD wire data goes back as far as 2002. So that would cover all the periods that we have data for Data Pro and Temenos.<br>Q. But that's only relating to wire deposits as opposed to any other kind of deposit?<br>A. It would be for wire deposits and U.S. dollars, Canadian dollars, I think there's one other denomination that ran through TD. So that would be on the wire side.<br>Q. My question was, it would not include deposits from customers who made their payment other than through a wire transfer, right?<br>A. Correct. That particular comparison would not, correct.<br>Q. All right. What other banks were reviewed to |

## 55

| | |
|---|---|
| know, do we not, that some Allen Stanford entries into their financial books were fictitious.<br>A. Correct.<br>Q. Hence my question. Has the receiver been able to rule out the possibility that some of the CD claims are also fictitious claim amounts?<br>MR. ARLINGTON: Objection, vague<br>A. So I'll answer it, I think, kind of the same way I did and it's the best answer I give you, is we have done comparison analysis and we haven't seen anything of that nature. But we haven't done a specific analysis to say that one way or the other. So I don't know whether the receiver could rule it out if that analysis was done or not. But I can't agree that he can't rule it out. It's just we haven't — unless we've done the analysis, I can't say that one way or the other.<br>Q. (BY MR. ISRAELOFF) Let me broaden this line of questioning to the entire Temenos database<br>A. Okay.<br>Q. What, if any, activities has the receiver undertaken to determine if the Temenos database is reliable?<br>A. So, again -- so like we discussed before, what we've done is the cash tracing analysis, where we've | match up transfer data?<br>A. So the other bank that we looked at was Trustmark, which handled the check deposits from customers. So that wasn't done on a hundred percent basis, but we looked at — that was done more on a sampling type basis where we gathered large checks on a large — I can't remember the exact numbers off the top of my head, but a large portion of the checks and compared them to check deposits in a civil database.<br>Q. You're familiar with what an audit means under Generally Accepted Accounting Principles, right?<br>A. Correct.<br>Q. Has the Temenos database been audited since the receiver's appointment?<br>A. We haven't been retained to do an audit or an assurance on it. We've done a lot of testing and review of the underlying transactions to confirm that they occurred.<br>Q. But that's not an audit under Generally Accepted Accounting Principles, is it?<br>A. Right. And we weren't retained to do an audit. It's a very specific --<br>Q. Was anybody else retained to audit the Temenos database?<br>A. Not that I'm aware of. |

16 (Pages 58 to 61)

DepoTexas, Inc.

Mark Russell

78

```
 1    A.  Uh-huh.
 2    Q.  Let's explore that.  What you're trying to say
 3  in paragraph five is that you can do a formula based on
 4  data that's already in the receiver's hands  That
 5  would be --
 6    A.  Correct.
 7    Q  -- the first part of it.  And you're saying
 8  for data that is not currently in the receiver's
 9  database, how would that information be obtained?
10    A.  So -- so my understanding is right now the
11  proposed class is some -- is either the claimants that
12  have allowed amounts or some subpopulation of that.
13  And so the receivership has the ability to contact
14  those individuals, request the additional information
15  if it's necessary, and then once it's obtained we could
16  then factor that into our analysis.
17    Q.  But as you sit here today, if there is an item
18  in the damages methodology that is not currently in the
19  receiver's database, the receiver could not generate a
20  report as of today with respect to items that aren't in
21  that database; isn't that right?
22    A.  I would agree with that.
23    Q.  So for anything in terms of a damages
24  methodology that is not currently in the Temenos
25  database or the claims database, the receiver is simply
```

79

```
 1  saying trust me, I can get that additional information.
 2    MR. ARLINGTON:  Objection, calls for --
 3    Q.  (BY MR. ISRAELOFF)  Is that right?
 4    MR. ARLINGTON:  Objection, calls --
 5  mischaracterizes the testimony.
 6    A.  I would say that the receiver -- what we're
 7  saying is that the receiver has the ability to request
 8  and obtain that information.  I don't know how the
 9  court would rule on people that failed to respond.  But
10  on those that then we receive responses on, we could
11  add that information and then limit our damages
12  calculation as required.
13    Q.  (BY MR. ISRAELOFF)  Approximately how many
14  individual claimants are there?
15    A.  So I think there's somewhere in the
16  neighborhood of, what is it, 17,000 claim -- unique
17  claims that have received -- that -- sorry, that have
18  received certifications to date.  So it's somewhere a
19  little bit north of that.  So through our regular
20  claims process there's a certification that's required
21  for a different -- for a different issue, for them to
22  receive a distribution.  There's about 17,000 and
23  change that have received that certification to date.
24  So it's somewhere a little bit north of that.
25    Q.  If the damages methodology required some sort
```

80

```
 1  of a request from the receiver for more information,
 2  that kind of request would require a determination
 3  individually for each of those 17,000 plus claimants,
 4  right?
 5    A.  It would require obtaining that information
 6  for them.  But it could be factored into a calculation
 7  all at once, kind of in one holistic calculation.
 8    Q.  I think I see where you're going.  But the
 9  first part of that statement is -- is true, is it not,
10  that if the receiver has to request and obtain
11  additional information, that would have to be done
12  individually for each claimant, wouldn't it?
13    A.  I mean, there would be a request per claimant.
14    Q.  Yes, sir.
15    A.  But the request -- but in both the request and
16  anything that we do it could be done holistically, so
17  it wouldn't be a matter -- the receiver is not going to
18  have to lick an envelope for every single
19  claimant.  I see -- yeah, so each -- each claimant gets
20  their own request, but it's not -- it's not like we
21  have to send out each request individually like one at
22  a time.  I don't know if that's making sense.  Like we
23  can send them out in batches.  But, yes, each claiman
24  gets their own individual request.
25    Q.  Well, paragraph five says a little bit more
```

81

```
 1  than that, doesn't it?  If you'll read down that first
 2  long sentence, "While FTI has not been specifically
 3  retained to determine the damages methodology in this
 4  case as of this date of this declaration, FTI has the
 5  ability and receivership data necessary to limit any
 6  such damages calculation to those investors who
 7  invested money in SIBL after certain dates."
 8    A.  Correct.
 9    Q.  That's not really an accurate statement with
10  regard to obtaining additional information, is it?
11    A.  Well, we wouldn't need to obtain any
12  additional information to limit it to those date
13  ranges.
14    Q.  Okay.  But if the damages methodology requires
15  additional information -- let's just say nationality of
16  the time a CD was purchased and let's say that the
17  nationality field in Temenos might or might not relate
18  to the day when each CD was purchased, so that
19  additional information has to be obtained.  Let's just
20  use that as a simple example.
21    FTI does not have receivership data
22  necessary to generate a complete list within those
23  dates today, does it?
24    A.  I would agree with that.
25    Q.  All right.  The last sentence in paragraph
```

21  (Pages 78 to 81)

DepoTexas, Inc.

000069

Mark Russell

**134**

1  on the claims database for a second, --
2    A. Uh-huh.
3    Q. -- is there a set number of fields -- you
4  know, is there a database structure that has a hundred
5  fields or 200 fields?
6    A. I don't know enough to speak to specifics on
7  it, because that claims information is maintained by
8  Gilardi. I know that there are specific fields like
9  related to like the claimant's name, their address, the
10  CD accounts that they're claiming, the claim number,
11  those -- that type of information. I can't speak to a
12  hundred percent of everything that is contained from a
13  field's perspective.
14    Q. And so you don't know whether that information
15  would be available or not? In other words, a list of
16  every single field that's in the claims database?
17    A. I don't know if that exists right now. And it
18  would have to be an assumption, but I would assume that
19  Gilardi would be able to say here are the fields that
20  are in our database, though.
21    Q. And I think you've described --
22    A. Uh-huh.
23    Q. -- your knowledge of a subset of them, but --
24    A. Correct.
25    Q. -- you don't know what the exhaustive list is?

**135**

1    A. Correct.
2    Q. So Sim asked you a number of questions that --
3  for example, focusing on the state where a particular
4  claimant might have received representations. Do you
5  remember those --
6    A. I do.
7    Q. -- questions? And so there were a number of
8  times when you said, well, there may -- there may be
9  information in some of the particular files for
10  particular people, correct?
11    A. Correct.
12    Q. But as it relates to the things that he asked
13  about, like the state where they may have received
14  representations, those are not things as far as you
15  know that are part of the claims database that could be
16  electronically queried. Fair?
17    A. That's fair, not to my knowledge, yeah.
18    Q. And so in order to figure out whether there
19  was information in a particular category such as a
20  state where these things were received, somebody would
21  have to go do a manual investigation of some kind to
22  figure that out, true?
23    A. If we're speaking about what the receiver
24  currently has on hand, I believe that would be true.
25    Q. All right. So leaving open the possibility of

**136**

1  some kind of future additional information development
2  are there any plans to develop additional information
3  as part of the claims database?
4    A. Not to my knowledge. I don't know one way or
5  the other.
6    Q. And as you sit here, I mean, you haven't
7  performed any assessment of the qualitative accuracy of
8  what random things might be in these files, right?
9    A. I mean, have I reviewed the files to see what
10  exactly exists in them?
11    Q. For example.
12    A. I have not.
13    Q. I may be retreading a little ground here, but
14  if we look again at paragraph five --
15    A. Okay.
16    Q. -- of Exhibit 4, which is your declaration.
17  That last sentence there says, "Further, FTI has the
18  ability and receivership data necessary to perform the
19  calculation of damages, once the damages methodology is
20  determined, whether that determination is made by FTI
21  or another third-party damages expert." Did I read
22  that correctly?
23    A. You did.
24    Q. What did -- what, if anything, did you do to
25  investigate that ability before including that

**137**

1  statement in your declaration?
2    A. So primarily what I focused on was what --
3  what CD information do we have, what are some of the
4  limits that currently exist in any of our databases to
5  any -- to that extent, and what other sources of
6  information potentially do we have that we could then
7  go to augment our data for it.
8    And then with the understanding that in a
9  damages methodology you can -- an expert -- you know,
10  you can kind of make certain assumptions and you can
11  make certain different caveats as long as you're able
12  to support them. Did I feel that we had, A, data and
13  enough outside data from the database to be able to run
14  calculations and do limits on that data.
15    I believe like my primary focus was on
16  date ranges and do we have the ability to exclude one
17  way or the other. And so I may not have contemplated
18  every potential possibility, which I think was -- when
19  I was discussing it with Mr. Sim. But like the primary
20  focus was like on transactionally do we have the data,
21  can we then -- do we have the information that allows
22  us to identify dates, can we identify when money is
23  moving between accounts. And the level of detail that
24  we have, I felt comfortable with being able to say that
25  if somebody puts limits on what information needs to be

**35   (Pages 134 to 137)**

DepoTexas, Inc.

Mark Russell

**Page 158**

1  Q  So there are different levels depending on
2  what level of reliability you might need, correct?
3  A  And, again, I don't mean to mince words, but
4  you keep using audit, which has a very specific
5  connotation, especially like with CPAs. Like we're
6  not — we're not doing an audit, which is — which is
7  us giving an opinion regarding something.
8       And so like for the purposes of what
9  we're doing, we've done a lot of analysis that does
10 match up those records. And we haven't seen a reason
11 to say — we haven't seen anything that tells us that,
12 well, I've got a deposit over here that says it's a
13 million, but that same one over here is only showing up
14 as a hundred thousand. And so we haven't seen things
15 that lead us to believe that that information is not
16 reliable.
17      But the direction that we've done it in
18 doesn't allow me to give you a, hey, I've looked at
19 this and attempted to identify everything, so I can't
20 really give you a percentage breakdown.
21      MR. JIMENEZ-EKMAN: We have to change the
22 tape.
23      THE VIDEOGRAPHER: The time is 2:15.
24 We're off the video record.
25      (Recess taken.)

**Page 159**

1      THE VIDEOGRAPHER: The time is 2:24. We
2  are back on the video record, tape number four.
3      Q  (BY MR. JIMENEZ-EKMAN) Mr. Russell, when the
4  receiver — or FTI is looking at a claim, I think we
5  talked about the information supplied by the claimant
6  is reviewed and it's compared against the SIBL
7  databases, correct?
8      A  That's correct.
9      Q  But then it, generally speaking, is not going
10 to be compared against the external bank data unless
11 there's an objection or something that needs to be
12 tracked down, true?
13     A  That would be true, yes.
14     Q  And then we were going back and forth and I
15 realize I'm using the word audit, which does mean
16 something, you know, quite specific or can mean
17 something quite specific in the context of, for
18 example, audited financial statements.
19      But if we're just talking about means of
20 testing reliability of the data — well, first let me
21 ask you this. Have you personally — were you
22 personally involved in that holistic attempt to figure
23 out whether this was a Ponzi scheme that has yielded
24 some information about the reliability of the SIBL
25 data?

**Page 160**

1      A  I was.
2      Q  Okay. So I'll ask a pointed question, then.
3  If it were your personal money that was at issue, would
4  you consider the SIBL database to be reliable enough to
5  rely on for the distribution of that money?
6      A  You know, considering the additional costs it
7  would take to kind of augment our missing information,
8  you know, personally I kind of think I kind of fall
9  with where the receiver is, that that additional
10 expense doesn't make sense from a claims perspective.
11 It may cost more to do that than kind of in the
12 aggregate it's going to benefit the claimants, like
13 just as a whole.
14     Q  I appreciate that answer from a systemic
15 perspective. It was if it was your money at stake, —
16     A  Uh-huh.
17     Q  — is the database reliable enough to rely on
18 to figure out who gets what?
19      MR. ARLINGTON: Objection, overbroad and
20 vague.
21     A  I think it's reliable enough to do what the
22 receivership needs to do. I think if it was — if I
23 was a claimant, then depending upon whatever that
24 answer came out for me, then I may or may not object

**Page 161**

1  depending upon what the answer was.
2      Q  (BY MR. JIMENEZ-EKMAN) And why do you think
3  its reliable enough to do what the receiver needs to
4  do?
5      A  Because it's providing sufficient information
6  to allow the receivership to calculate the position
7  based on his determination of how to do that
8  calculation.
9      Q  But we've already talked about he's only using
10 two pieces of data, unless there's an objection, what
11 the claimant provides and the SIBL database, right?
12     A  Correct.
13     Q  So the claimant — you know, there's —
14 there's no way to check — well, let me step back.
15      Unless there's an objection or some
16 problem nobody is independently investigating the truth
17 or falsity of anything that's on these claim forms or
18 electronic forms, right?
19      MR. ARLINGTON: Objection, you're
20 mischaracterizing his testimony.
21     A  I mean, my understanding, you know, the one
22 thing that they do is they do verify that the person
23 making the claim does own the account that they're
24 claiming.
25     Q  (BY MR. JIMENEZ-EKMAN) Based on the SIBL

41 (Pages 158 to 161)

DepoTexas, Inc.

000071

Mark Russell

165

1  instances where an account just all of a sudden appears
2  like with a balance at 12-31-2006. So we treat the
3  balance and the principal for those accounts similarly
4  that we do for the '03. That gets treated as what we
5  call an initial balance and it's treated as money in.
6      Additionally then we have the actual cash
7  transfers that you're referring to, so like deposits of
8  checks, deposits of wire transfers that are coming in
9  to the accounts. Those get treated as money in.
10     There's also situations where two
11 unrelated investors may transfer money amongst
12 themselves. So money going from me to David per se
13 would be treated as if I took money out and he got
14 money in. So when we're trying to calculate his
15 position, he received the benefit of money from me
16 that -- and we're unrelated people. So for his purpose
17 that would be money in.
18     Q.  How common are those transactions?
19     A.  I don't have a count, to be honest with you.
20 It's something we could derive at, because our query
21 allows us to identify them. I don't remember offhand
22 like how pervasive it would be across the groups.
23     Q.  How many -- sorry. How many CD accounts
24 existed as of August 2003 in the Temenos database?
25     A.  I'm trying to remember what -- because I know

166

1  database structure,
2      A.  Uh-huh.
3      Q.  -- what other -- other than -- other than
4  putting in date restrictions and getting out money in
5  and money out, what else would the database yield?
6  What else -- how could you query it that you can think
7  of that might be a proper damages measure?
8      MR. ARLINGTON:  Objection, overbroad and
9  vague.
10     A.  I don't know about proper damages model. I
11 can think of other -- like, you know, one of the things
12 that I considered when I was saying can we do something
13 is if it became necessary to say the dollar amounts
14 that are being allowed by the receivership come from
15 what deposits, like would we be able to trace specific
16 dollars throughout the database to get to -- well, is
17 this dollar from this deposit from 2006
18 actually in that allowable amount, or in theory what's
19 the composition of the allowable amount, what deposits
20 does it consist of.
21     And so the question I kind of asked
22 myself and asked my team is could we develop a way to
23 do that, kind of trace dollars throughout, and it would
24 be possible. There would be certain assumptions that
25 would have to be made and agreed upon in terms of what

167

1  we did this. I'm trying to remember what the number
2  are. I know that there's about -- and I cannot
3  remember the counts, but I know the dollar amount.
4  There was about $1.6 billion worth of principal balance
5  at that point in time. Roughly 900 million of that is
6  in groups that are in like -- or accounts that are in
7  groups that have -- that are a part of the claims
8  process. And then the other 7,750 million are on
9  accounts that have never been claimed as part of the
10 receivership claims process.
11     Q.  Sorry, I'm jumping around a little bit here,
12 but that's what happens with cleanup people sometimes.
13     A.  That's fine.
14     Q.  If -- so if we go back to the ability to
15 calculate --
16     A.  Uh-huh.
17     Q.  -- damages and what you've said in your
18 declaration, we've talked about date restrictions,
19 right?
20     A.  Uh-huh.
21     Q.  And we've talked about us an output the
22 money -- the net money in/money out calculation,
23 correct?
24     A.  Correct.
25     Q.  As you sit here based on your knowledge of the

168

1  order do transactions move out of accounts, like a last
2  in/first out method, a first in/first out. Do
3  transactions and interest move like on an allocation
4  basis. Those are all determinations that would have to
5  be made. But the transaction information is detailed
6  enough to allow us to flow that through.
7      Q.  (BY MR. JIMENEZ-EKMAN)  So --
8      A.  So that's one of the contemplations is do we
9  need -- potentially -- potentially maybe -- I can't
10 talk right now. Potentially may we be required to
11 speak to the composition of the allowed amount and/or
12 any net winning amount, however it needs to be
13 determined.
14     Q.  Okay. Can you think of anything else?
15     MR. ARLINGTON:  Same objection.
16     A.  I mean, as I sit here today I haven't really
17 tried to think of anything else.
18     Q.  (BY MR. JIMENEZ-EKMAN)  This is my chance to
19 test you based on your pretty broad statement in your
20 declaration.
21     A.  Uh-huh. I mean --
22     Q.  So --
23     MR. ARLINGTON:  And it's also required
24 that we have a specific question as opposed to can you
25 think of anything you could do with the database.

43  (Pages 166 to 169)

000072

Pamela G. Reed

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, et al.,            )
                                    )
            Plaintiffs,             )
                                    )
vs.                                 )  CIVIL ACTION
                                    )  NO.
GREENBERG TRAURIG, LLP, HUNTON &    )  3:12cv-4641-N
WILLIAMS, LLP; and YOLANDA          )
SUAREZ,                             )
                                    )
            Defendants.             )

---------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

PAMELA G. REED

December 3, 2015

---------------------------------------

ORAL DEPOSITION of PAMELA G. REED, produced as a
witness the instance of the Defendant Greenberg
Traurig, and duly sworn, was taken in the above styled
and numbered cause on December 3, 2015, from 9:00 a.m.
to 11:41 a.m., before Jeff L. Foster, a Certified
Shorthand Reporter in and for the State of Texas, at
the offices of Strasburger & Price, 901 Main Street,
Suite 4400, Dallas, Texas 75202, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record.

000073

Pamela G. Reed

**2**

```
1
2    APPEARANCES
3
     FOR THE PLAINTIFFS:
4
        Mr. Edward C. Snyder
        CASTILLO & SNYDER
5       Bank of America Plaza, Suite 1020
        300 Convent Street
6       San Antonio, Texas 78205-3789
        (210) 630-4200
        rsnyder@casnlaw.com
7
     -and-
8
        Mr. Douglas J. Buncher
9       NELIGAN FOLEY, LLP
        325 N. St. Paul Street, Suite 3600
10      Dallas, Texas 75201
        (214) 840-5300
11      dbuncher@neliganlaw.com
12   FOR THE DEFENDANT GREENBERG TRAURIG:
13      Mr. Jim E. Cowles
        Mr. Sam Israeloff
14      COWLES & THOMPSON, P.C.
        901 Main Street, Suite 3900
15      Dallas, Texas 75202
        (214) 672-2000
16      jcowles@cowlesthompson.com
        sisraeloff@cowlesthompson.com
17   FOR THE DEFENDANT HUNTON & WILLIAMS:
        Ms. Laura C. Bishop
18      Mr. Andrew W. Vail
        JENNER & BLOCK
19      353 North Clark Street
        Chicago, Illinois 60654-3456
20      (312) 222-9350
        lbishop@jenner.com
21      avail@jenner.com
22   ALSO APPEARING
23      Mr. Randy Johnson, videographer
        Mr. Jorge Salcedo
24
25
```

**3**

```
1            INDEX
                              PAGE
2    Appearances ........................
3    PAMELA G. REED
        Examination by Mr. Cowles      5
4       Examination by Ms. Bishop      88
5    Signature Page .................... 108
     Reporter's Certificate ............ 111
6
7          EXHIBITS
8
     NO. DESCRIPTION                   PAGE
9    Exhibit 1 ........................... 9
        Plaintiffs' first amended class action
10      complaint
     Exhibit 2 ........................... 12
11      Stanford Group Company client agreement
     Exhibit 3 ........................... 22
12      Plaintiffs' original petition in Gibbins
        et al., vs. Nigel Bowman
13   Exhibit 4 ........................... 30
        Disclosure statement
14   Exhibit 5 ........................... 41
        Disclosure statement
15   Exhibit 6 ........................... 41
        Subscription agreement investor
16      questionnaire
     Exhibit 7 ........................... 48
17      Correspondence from Stanford Grou Company
     Exhibit 8 ........................... 51
18      Unopposed motion to substitute nam d
        plaintiff and putative class represent. tive
19   Exhibit 9 ........................... 76
        Memo from Miguel Pacheco to Pam Reed,
20      dated February 16, 2008, with attach ment
     Exhibit 10 .......................... 88
21      Correspondence from Grant Thornto
     Exhibit 11 .......................... 105
22      Confidential Stanford inv estment po cy
        questionnaire
23
24
25
```

**4**

```
1              PROCEEDINGS
2         THE VIDEOGRAPHER:  We are now on the
3    record for the video deposition of Pam Reed.  The time
4    is 9:00 o'clock a.m., dated December 3rd, 2013, in the
5    matter of Ralph S. Janvey, et al., versus Greenberg
6    Traurig, et al., Civil Action Number 3:12-CV-4641-N,
7    being held in the United States District Court for the
8    Northern District, Dallas Division.
9         The court reporter is Jeff Foster and the
10   videographer is Randy Johnson, both representatives o
11   DepoTexas.  Will counsel please state their appearances
12   for the record?
13        MR. SNYDER:  Ed Snyder on behalf of
14   plaintiffs.
15        MR. BUNCHER:  Doug Buncher for the
16   plaintiffs.
17        MR. COWLES:  Jim Cowles for defendant
18   Greenberg.
19        Mr. Israeloff:  Sim Israeloff for
20   defendant Greenberg.
21        MS. BISHOP;  Laura Bishop for defendant
22   Hunton & Williams.
23        MR. VAIL:  Andrew Vail for defendant
24   Hunton.
25        THE VIDEOGRAPHER:  Will the court
```

**5**

```
1    reporter please administer the oath?
2              PAMELA G. REED,
3    having been first duly sworn, testified as follows:
4              EXAMINATION
5    BY MR. COWLES:
6    Q.  Give us your full name, please, ma'am.
7    A.  Pamela Gail Reed.
8    Q.  You were married to Bob Gibbins?
9    A.  I was.
10   Q.  Where do you reside today?  Is it in Austin?
11   A.  It is.
12   Q.  Okay.  Can you give me an address?
13   A.  1502 Harbor View, Westlake Hills, Texas 78746.
14   Q.  Your husband Bob passed away in 2013, did he
15   not?
16   A.  He did.
17   Q.  Have I got the year right?
18   A.  Yes, sir.
19   Q.  All right.  Quite a loss to you.  He was a
20   great man.  Tell us just briefly your education, just
21   say, from high school on real briefly.
22   A.  I went to high school in Austin, undergraduate
23   University of Colorado, law school at the University o
24   Texas.
25   Q.  And you started practicing law first where?
```

2 (Pages 2 to 5)

Pamela G. Reed

**6**

1  A.  In Austin.

2  Q.  Run off where you've practiced real quickly?

3  A.  Okay.  I was at the city attorney's office in

4  Austin for four years, I believe, and then went to

5  Davis & Davis and was there for four years.  And then

6  I started running for office.

7  Q.  Started running for office?

8  A.  Yes, sir.

9  Q.  Which office would that be?

10  A.  I was county commissioner, Travis County in

11  Austin, and then I was a commissioner on the Texas

12  Water Commission and then the Texas Natural Resources

13  Commission.

14  Q.  I want to do something here, Ms. Reed, if we

15  might to try to save some time.  You have been and are

16  a party to other lawsuits involved in this

17  receivership, aren't you?

18  A.  As a representative plaintiff, --

19  Q.  As a representative plaintiff, --

20  A.  Yes, sir.

21  Q.  -- correct?  Let me take one of those, if I

22  can.  I'm going to talk to you just a moment so we can

23  get an overall picture of the story you and your

24  husband had.

25  A.  Okay.

**7**

1  Q.  I am not going to introduce any of these into

2  evidence, but I'm going to mark them just so we know

3  what we're talking about.  Fair enough?

4  A.  Yes, sir.

5  Q.  Let me hand you what's been marked -- excuse

6  me, let me mark it -- as Defendants' Exhibit 1.

7  A.  Thank you.

8  Q.  And tell you that that is, I think everybody

9  at this table will agree, a copy of that particular

10  lawsuit in which you are a representative plaintiff

11  against BDO?

12  A.  Yes, sir.

13  Q.  All right.  I want to see if we can pin down

14  very quickly and broadly and generally your story in

15  this matter.  Would you turn to page 38?

16  A.  (The witness complied.)

17  Q.  Let me read some of this to you.  I have it

18  highlighted so you can go right to it, if you would,

19  please.

20  A.  Yes.

21  Q.  Paragraph 82.  "In early 2007 plaintiff Pam

22  Reed and her husband Bob Gibbins were convinced by

23  their Austin-based financial advisor to relocate their

24  investments from Smith Barney to Stanford Financial

25  Group when their financial advisor joined SGC."  And

**8**

1  think in the rest of the petition SGC means Stanford

2  Group Company, --

3  A.  Correct.

4  Q.  -- right?

5  A.  Yes, sir.

6  Q.  All right.  That is correct, you first got

7  involved really in early 2007, is it not?

8  A.  Yes, sir.

9  Q.  "In April of 2007 after their financial

10  advisor joined SGC, Gibbins and Reed moved their

11  investment portfolio from Smith Barney to SGC."  Prior

12  to that time your financial advisor had been at Smith

13  Barney for a long time, hadn't he?

14  A.  Yes, sir.

15  Q.  And you-all had used him at that institution?

16  A.  Yes, sir.

17  Q.  Paragraph 83.  "Gibbins and Reed's financial

18  advisor then convinced them to invest their money in

19  SBI -- SIBL CDs.  On May the 11th, 2007 Gibbins and

20  Reed invested $2,416,958 with SGC following the advice

21  of their financial advisor."  Is that correct?

22  A.  Yes, sir.

23  Q.  "Purchased one SIBL fixed CD in the amount of

24  160,000 pounds."  That equals about $300,000, does it

25  not, something like that?

**9**

1  A.  I believe so, something like that.

2  Q.  Okay.  "And another SIBL fixed CD in the

3  amount of $2,156,286," and it gives the account

4  numbers.  "Both CDs were issued in the name of Gibbins

5  and Reed jointly and had a one-year term maturing in

6  May 2008."  Is all that correct?

7  A.  I believe so.

8  Q.  So you bought the CDs and they had a one-year

9  maturing -- maturity date and would mature in May 2008?

10  A.  I believe so.

11  Q.  Okay.  Skip down to the last sentence in

12  paragraph 84.  "The financial advisor also told

13  Reed and Gibbins that SIBL was part of SGC."  SIBL, you

14  know that is the bank, that's the initials for the

15  Stanford International Bank in Antigua, don't you?

16  A.  Yes, sir.

17  Q.  And it was part of Stanford Group Companies;

18  is that right?

19  A.  That's what we understood.

20  Q.  That's what he said?

21  A.  Yes, sir.

22  Q.  And SGC was a licensed broker/dealer just like

23  Smith Barney.  You have no reason to question that.

24  That's correct, isn't it?

25  A.  Correct.

3 (Pages 6 to 9)

Pamela G. Reed

18

1    A.  I can't say that I specifically knew that.
2    Q.  That's fine.  "And is a full service
3  broker/dealer registered with the SEC and state
4  jurisdictions and as such is obligated to comply with
5  all applicable rules, laws and regulations, including
6  those of the SEC and other regulatory and
7  self-regulatory agencies."  Were you aware of all that
8  when you entered into this agreement?
9    A.  I don't know that I was aware of those things
10 specifically, but, again, I was assured that they were
11 just like Smith Barney, were subject to any -- were
12 complying with any laws and regulations that they were
13 supposed to.
14   Q.  And Smith Barney did that.
15   A.  Yes, sir.
16   Q.  Turn over to page 8 just a moment.
17   A.  (The witness complied.)
18   Q.  Paragraph J.  It's entitled, "Written
19 Disclosure Statements."  It says, "Simultaneously with
20 full execution of this agreement Stanford will deliver
21 to client" -- that's you and your husband --
22 "Stanford's schedule H of form ADV and sub-advisor's
23 schedule H of form ADV or part two of form ADV or
24 similar disclosure document as its brochure pursuant to
25 Rule 204.3 of the Advisers Act.  The client will

19

1  receive prospective -- prospectus for each of the
2  mutual funds in which the assets in the account are
3  invested."  Did they comply with that provision?
4    A.  I have no memory if they did or not.
5    Q.  Could they have?
6    A.  Sorry?
7    Q.  They could have, but you don't have memory of
8  it?
9    A.  Yes, sir.
10   Q.  Well, that brings the question right straight
11 up.  Do you have any memory at all of receiving any
12 disclosure statement in connection with your
13 investments in the Stanford Group Company?
14       MR. SNYDER:  Of any -- just objection,
15 form.  CDs or any investments whatsoever?
16       MR. COWLES:  Well, any investments.
17       MR. SNYDER:  Okay.
18   Q.  (BY MR. COWLES)  Did you or not?
19   A.  Well, I'm sure we did.  I don't remember
20 specifically which ones.
21   Q.  Okay.  Did Mr. Bowman state to you and your
22 husband, your husband in your presence, that the CDs
23 were FDIC insured?
24   A.  I believe he did.
25   Q.  Do you know when?

20

1    A.  I would assume it was sometime prior to our
2  purchasing the CDs.
3    Q.  Okay.  Did he state to you that these CDs were
4  securities that were regulated by the U.S. government?
5    A.  I believe he did.
6    Q.  Can you refer us, Ms. Reed, to a document
7  anywhere stating those two facts, that he said that to
8  you?
9    A.  No, sir, I don't know where that document
10 would be.
11   Q.  Do you have anything in writing anywhere,
12 anywhere in this whole world of ours, that says the
13 CDs were FDIC insured?
14   A.  Not that I know of.
15   Q.  Do you have any document anywhere in the world
16 that says the bank regulated these CDs by the U.S.
17 government -- was regulated by the U.S. government?
18   A.  I don't know.
19   Q.  Okay.  Well, you and your husband came to a
20 parting of the ways with Mr. Bowman, didn't you?
21   A.  Yes, sir.
22   Q.  Been a longtime friend?
23   A.  Yes, sir.
24   Q.  A man you trusted?
25   A.  I did.  We both did.

21

1    Q.  Did anyone with the Stanford Group, even
2  including Allen Stanford, ever orally say to you these
3  CDs are FDIC insured?
4    A.  Mr. Bowman did.
5    Q.  Other than Mr. Bowman.
6    A.  I don't remember anyone else.
7    Q.  Okay.  Did anyone -- the same question as to
8  regulation of the bank by U.S. government.  Anybody
9  ever say to you that was a fact other than Mr. Bowman?
10   A.  I'm not sure if anybody other than Mr. Bowman
11 said that.
12   Q.  Okay.  That's great.  You ended up having to
13 bring a lawsuit against Mr. Bowman, didn't you, you and
14 your husband?
15   A.  We did.
16   Q.  And that was filed in August of 2010; is that
17 right?
18   A.  I'm not sure of the date.  Whatever date it
19 says on the petition.
20   Q.  Well, I can't tell.  The Travis district clerk
21 is a little bit funny the way they stamp these things.
22 I can't tell what they're saying, but it looks like
23 that.
24   A.  Okay.
25   Q.  And it was styled Bob Gibbins, Pam Reed.

6  (Pages 18 to 21)

000076

Pamela G. Reed

**46**

1    A.  I think — yes, that would be — we would have
2    been the depositors.
3    Q.  This is very hard to read.  It is the —
4    A.  Indeed.
5    Q.  It is a blown up copy.  You wouldn't believe
6    the original.  It's the best we could do.  All right.
7    These are stated to be depositor representations and
8    they're stated to be, "As a condition to our accepting
9    your subscription and any subsequent deposits in the
10   case of a Flex CD, you state as follows," and then it
11   gives several statements.  See that?  Can you read that
12   much?
13   A.  I can barely see it.
14   Q.  Okay.
15   A.  Yes.
16   Q.  Paragraph little B under that says, "The
17   information set forth on the — in the accompanying
18   investor questionnaire is accurate and complete as of
19   the date of this subscription agreement."  Do you
20   remember filling out the questionnaire?
21   A.  I don't independently remember, no.
22   Q.  Okay.  The next paragraph, "You are an
23   accredited investor" — wait a minute — "as provided
24   in the qualification, conditions and accompanying
25   investor questionnaire and you understand and

**47**

1    acknowledge that the U.S. Accredited Investor has not
2    been and will not be registered under the Securities
3    Act of 1933 in reliance on exemptions or private
4    offerings."  Were you given that information?  Other
5    than right here now.
6    A.  I don't believe so, sir.
7    Q.  Okay.  Look down at E, if you would.  "You and
8    your duly appointed advisor" — that would be
9    Mr. Bowman, wouldn't it?
10   A.  Correct.
11   Q.  — "have knowledge and experience in
12   financial, tax and business matters such that you or
13   your advisor are capable of making an informed decision
14   to acquire a U.S. Accredited Investor CD in light of
15   its merits and risks."  Is that a representation that
16   you can make or did make?
17   A.  If we signed this, I guess we did make it.
18   Q.  Okay.  Would you look back at 5037
19   A.  (The witness complied.)
20   Q.  And we're not going to read any of this, it's
21   so light you barely can.  But that's the Investor
22   questionnaire attached to the subscription agreement.
23   A.  (Witness nods head.)
24   Q.  But you don't have a memory of that —
25   A.  No, sir.

**48**

1    Q.  — one way or the other.
2    A.  Not one way or another.
3        MR. BUNCHER:  That was Exhibit 6; is that
4    right?
5        MR. COWLES:  It was.
6        (Deposition Exhibit 7 marked.)
7        MR. COWLES:  This is 7.
8        MR. BUNCHER:  All right.
9    A.  Thank you.
10   Q.  (BY MR. COWLES)  Ms. Reed, Defendants' Exhibit
11   7 are three separate documents stapled together and
12   we'll see why in just a minute.  Up in the left-hand
13   corner it has "Stanford Group Company," right-hand
14   corner, "Pershing."  And it appears to be documents
15   where you have opened accounts with Stanford Group
16   Company.  Take a look at it just a moment.
17   A.  Yes, sir.
18   Q.  And they're identical except they're for
19   individual accounts.  There's three different ones, so
20   they sent you one for each it looks like.  Do you have
21   any memory of this?
22   A.  No, sir, I don't.
23   Q.  Okay.  You don't know whether you got them or
24   not?
25   A.  I don't know whether we got them or not.

**49**

1    Q.  Would you look at the first sentence?  That
2    states, "The above-referenced introducing firm has
3    opened an account in your name."  That would be
4    Stanford Group Company.  That's the above name.  "We
5    suggest that you read the enclosed disclosure
6    statement."
7    A.  Yes, sir.
8    Q.  And that particular sentence is in each one of
9    these, is it not?
10   A.  Yes, sir.
11   Q.  Does that indicate to you that you've got the
12   disclosure statement with a document like this?
13       MR. SNYDER:  Objection, form.  What
14   disclosure statement, sir?  Do you have one that's
15   attached to this?
16   A.  I would ask the same question.  I don't know
17   what disclosure statement they're referring if it's
18   not —
19   Q.  (BY MR. COWLES)  That's fair.
20   A.  — part of —
21   Q.  Okay.
22   A.  — these documents.
23   Q.  You don't have any memory of receiving the
24   disclosure statement like we just went through.
25   A.  Correct.  I don't have any memory of

13 (Pages 46 to 49)

Pamela G. Reed

50

```
1    receiving --
2        Q.  Okay.
3        A.  -- these documents or the disclosure
4    statement.
5        Q.  That's fair.  All right.  By the way, have you
6    seen a disclosure statement that was signed by you or
7    your husband since August of 2010 or 2009 or anytime?
8    Have you seen one?
9            MR. SNYDER:  Objection, form.  As to the
10   CDs or as to any disclosure statements?
11           MR. COWLES:  As to the CDs.
12       A.  As to the CDs?  Everything that we had in our
13   file went to Mr. Snyder, so I don't know that I've seen
14   one or not.
15       Q.  (BY MR. COWLES)  Well, did you look at the
16   documents yourself before you sent them somewhere?
17       A.  I probably went through them with my
18   assistant.
19       Q.  And do you recall you or your assistant
20   noticing a disclosure statement that was signed by you?
21       A.  No, sir.  I do not recall noticing a
22   disclosure statement.
23       Q.  So if you did, you don't know where it is.
24       A.  Correct.
25       Q.  All right.
```

52

```
1        A.  It is a statement of facts.
2        Q.  Is it in affidavit style?
3        A.  Yes, sir.
4        Q.  Okay.
5        A.  It's not notarized, but it's affidavit style.
6        Q.  Do you understand under the federal rules you
7    don't need to notarize a declaration?
8        A.  Yes, sir, I do now understand that.
9        Q.  Okay.  And that is filed in this case.
10       A.  Yes, sir.
11       Q.  All right.  Let's look at that just a moment.
12   You said on page 1 at the bottom, "My husband Bob
13   Gibbins, now deceased, and I invested in the Stanford
14   Financial Group of companies."  We've already gone over
15   that, haven't we?
16       A.  Yes, sir.
17       Q.  "For approximately 18 years, Nigel Bowman had
18   been our trusted financial advisor at Smith Barney,"
19   right?
20       A.  Correct.
21       Q.  Did you meet Allen Stanford?
22       A.  Yes, sir.
23       Q.  You took a trip to Antigua, didn't you?
24       A.  I did.
25       Q.  And your friends, the Gables?
```

51

```
1            MR. COWLES:  You got the next one?  Okay.
2            MR. ISRAELOFF:  8.
3            MR. COWLES:  Well, I don't have a sticker
4    on it.
5            MR. ISRAELOFF:  I don't either.
6            MR. COWLES:  We don't need to introduce
7    it.  It's the declaration anyway.
8        Q.  (BY MR. COWLES)  So I'm just going to hand you
9    this document.
10           MR. COWLES:  Give them one.
11           MR. ISRAELOFF:  I did.
12           MR. COWLES:  It shouldn't be in evidence
13   anyhow.
14       Q.  (BY MR. COWLES)  Do you recognize this
15   document?
16       A.  Yes, sir, I do.
17       Q.  It is a declaration of Pam Reed.
18       A.  Correct.
19       Q.  You know who that is.
20       A.  I remember that one.
21       Q.  Okay.  For the nonlawyers, what's a
22   declaration?  You are a lawyer.
23       A.  Well, I'm not practicing.  I'm a recovering
24   lawyer.  I haven't practiced in a long time.
25       Q.  Okay.
```

53

```
1        A.  The Gales.
2        Q.  Gales?
3        A.  Yes, sir.
4        Q.  The Gales went with you?  And you flew down
5    there on his executive jet?
6        A.  Yes, sir.
7        Q.  Spent two or three days there?
8        A.  I think it was two and a half.  Yes, two and a
9    half, three days.
10       Q.  And during that time you did actually meet
11   Stanford himself.
12       A.  I did.
13       Q.  Did you have any discussion about the CDs with
14   him down there?
15       A.  No, sir.
16       Q.  Mr. Bowman rode with you, didn't he?
17       A.  Yes, sir.
18       Q.  All right.  Look at paragraph six just a
19   moment.
20       A.  (The witness complied.)
21       Q.  This is your declaration, affidavit if you
22   want to call it that.  "In making decisions to invest
23   in the SIBL CDs, I received and reviewed various
24   Stanford financial and marketing materials and
25   brochures regarding SIBL and Stanford Financial as a
```

14 (Pages 50 to 53)

Pamela G. Reed

54

1  whole, including materials that described Stanford as a
2  Houston, Texas based financial services conglomerate."
3  Is that a current and true statement? Did you receive
4  financial and marketing materials and brochures
5  regarding SIBL when you were considering making an
6  investment in the CDs?
7  A. Yes, sir.
8  Q. You did.
9  A. Yes, sir.
10  Q. Do you have a single one of those anywhere?
11  A. Everything that we have we've turned over to
12  Mr. Snyder.
13  Q. The reason I'm asking you is we tried to go
14  through every single thing and I haven't seen one. I
15  just wondered if — you had a time when you kind of
16  threw things —
17  A. I sure did.
18  Q. — away when you got mad.
19  A. Yes, sir, I did.
20  Q. Do you know whether you might have thrown away
21  disclosure statements, subscription agreements?
22  A. I don't — I have no idea what I threw away.
23  Q. Brochures, anything like that?
24  A. I don't know.
25  Q. Okay. "We were told that our CDs and

55

1  investments had the same government protections as any
2  investment we had at Smith Barney." Mr. Bowman told
3  you that?
4  A. Yes, sir.
5  Q. Paragraph seven, "No one at Stanford ever
6  informed me that Stanford was under investigation by
7  the U.S. Government." When are you talking about, an
8  investigation by the U.S. Government? When?
9  A. That they had been under investigation by the
10  U.S. Government at any time.
11  Q. Do you know — from 1990 or '91 up until 2007,
12  do you know whether they were under investigation or
13  not?
14  A. I don't know exactly when, but from things
15  I've read going forward, I know that they were under
16  many investigations during that time probably.
17  Q. And do you know what the investigations were
18  for at that time?
19  A. No, sir.
20  Q. Have you ever read that they were under
21  investigation for drug money laundering,
22  Allen Stanford was?
23  A. I've read all these things since all this
24  happened, yes.
25  Q. Yeah. Do you know what the conclusion of

56

1  those investigations were, —
2  A. No, sir.
3  Q. — those specific ones?
4  A. No, sir.
5  Q. Okay.
6  MR. SNYDER: That's all the documents?
7  MR. COWLES: Yeah.
8  MR. SNYDER: Cool.
9  MR. COWLES: Why not? Do you want me to
10  go get 50 more? I can.
11  MR. SNYDER: I sure don't. Unless you
12  want to go ahead and get into the merits of the case
13  and then, you know —
14  MR. COWLES: I don't play the dancing
15  game of merits and class.
16  MR. SNYDER: It's a fine — it's a fine
17  line.
18  MR. COWLES: Yeah.
19  (Discussion out of the hearing of the
20  reporter.)
21  Q. (BY MR. COWLES) I'm going to hand you — I'm
22  not having it marked. I'm handing it to you to look
23  at.
24  A. Okay.
25  Q. Check a couple of things on — it's your

57

1  deposition in Proskauer.
2  A. Yes, sir.
3  Q. By the way, do you happen to know how many of
4  these lawsuits you are a representative plaintiff in?
5  A. Three.
6  Q. Three?
7  A. Three? Yes.
8  Q. He doesn't know.
9  MR. SNYDER: Well, one settled. BDO
10  settled, so she's no longer really a class
11  representative on that one.
12  A. Thank you.
13  Q. (BY MR. COWLES) That's a copy of your
14  deposition in the Proskauer case taken February 5th,
15  2015, this year.
16  A. Yes, sir.
17  Q. Okay. I'm going to try to just make this as
18  short as possible, because the people down there want
19  to get after you. Excuse me, want to ask you a few
20  questions.
21  A. Okay.
22  Q. Do you have — let me ask you one other thing.
23  I asked you if you had any of those documents,
24  disclosures, subscription, questionnaire, brochure, and
25  you said, no, you don't recall having any of those.

15  (Pages 54 to 57)

Pamela G. Reed

Page 66

1    A.  I believe I accepted what Mr. Bowman told us.
2    Q.  Okay.  Have you ever seen – excuse me.  Did
3  you ever see before making this investment or before
4  2009 any document with the name Greenberg Traurig on it
5  involving these CDs?
6    A.  Yes, sir.  I don't remember whether I did or
7  not.
8    Q.  Did you ever see any document with the name
9  Carlos Loumiet on it, the same frame of 2009?
10    A.  I don't remember if I did or not.
11    Q.  Do you recall anybody, Bowman or – Nigel
12  Bowman or anybody else giving you any information
13  from – that originated with the law firm Greenberg
14  Traurig or the lawyer Carlos Loumiet at all?
15    A.  I don't remember.
16    MR. COWLES:  Got anything else?
17    MR. ISRAELOFF:  No.
18    MR. COWLES:  One last look, because I've
19  got five more minutes.
20    MR. BUNCHER:  You're setting your own
21  time limits, huh?
22    MR. COWLES:  What?
23    MR. BUNCHER:  You're setting your own
24  time limits.
25    MR. COWLES:  Yes, I always do.

Page 67

1    MR. BUNCHER:  I like that.
2    MR. SNYDER:  That's great.
3    MR. COWLES:  Why diddle around?  To be
4  honest, I would have taken a little bit longer in other
5  stuff had Ms. Reed not been under the gun to catch that
6  flight.
7    THE WITNESS:  Thank you.
8    MR. COWLES:  But I think it would just be
9  repetitious.
10    MR. BUNCHER:  That's a pretty long
11  deposition you've got sitting right there.
12    MR. COWLES:  Yeah, and I've got a lot of
13  markings in it too.
14    MR. SNYDER:  And like I said, Jim, y'all
15  are free to file this today.
16    MR. COWLES:  I understand.  I appreciate
17  that.  I'm going to pass the witness.
18    MR. SNYDER:  Can we take a quick break?
19    MR. VAIL:  Yes, of course, please.
20    THE VIDEOGRAPHER:  We're off the record
21  at 10:34 a.m.
22    (Recess taken.)
23    THE VIDEOGRAPHER:  We're on the record at
24  10:53.
25    MS. BISHOP:  This is Laura Bishop for

Page 68

1  Hunton & Williams.
2    EXAMINATION
3  BY MS. BISHOP:
4    Q.  Now, Ms. Reed, Mr. Cowles asked you earlier
5  about the deposition testimony that you gave in the
6  Proskauer litigation.  And have you had a chance to
7  review that testimony since you gave it?
8    A.  I have.
9    Q.  And did you see anything in there that looked
10  wrong or that needed to be corrected?
11    A.  I don't think so.
12    Q.  And when were you asked to serve as a class
13  representative in this case?
14    A.  A few weeks ago.
15    Q.  Do you know about when that was, like the
16  month maybe?
17    A.  It was probably either the end of October,
18  sometime in there, November.
19    Q.  Okay.  Would it refresh your recollection if
20  I showed you a copy of the motion asking the court –
21    A.  It probably would.  Thank you.
22    (Deposition Exhibit 8 marked.)
23    Q.  (BY MS. BISHOP)  This is Defendants' 8.
24    A.  Thank you.
25    MR. SNYDER:  Thanks.

Page 69

1    Q.  (BY MS. BISHOP)  And if you can flip to page
2  2 – or page 4 of this document.  Sorry, bottom of page
3  3.  And you see the – this is a motion asking the
4  court to substitute you as a class representative in
5  this litigation?
6    A.  Yes.
7    Q.  And do you see the September –
8    A.  September, yes.  Thank you.
9    Q.  And so based on this document, when do you
10  think you were asked to serve as a class
11  representative?
12    A.  It was probably shortly before that.  So
13  sometime in August most likely.
14    Q.  Okay.  And who asked you to serve as a class
15  representative?
16    A.  Mr. Snyder.
17    Q.  And why did you agree to serve?
18    A.  Because I feel like it's important that we
19  have somebody representing us, the class, who cares
20  what's going on with everyone in the class and is
21  interested and has the time to do it.
22    Q.  And how much time have you put into this case
23  since you agreed to serve?
24    A.  I have probably put about ten hours into this.
25  It's been short from the time that I became a class

18 (Pages 66 to 69)

000080

Pamela G. Reed

70

1   representative until now.
2   Q.   And what did you do during those ten hours?
3   A.   I have reviewed the initial petition, I have
4   looked at my deposition in the Proskauer case, and I
5   looked at the motion to create the class.
6   Q.   And did you prepare a declaration for this
7   case?
8   A.   I believe I did. I believe that's what we
9   went through earlier, yes.
10  Q.   And how much time did you spend putting
11  together that declaration?
12  A.   I would say an hour or so.
13  Q.   And did you work with anyone to prepare that?
14  A.   Mr. Snyder.
15  Q.   And what did you do to work with Mr. Snyder?
16  Did you have a telephone call or did you meet in
17  person?
18  A.   No, it would have been a telephone call.
19  Q.   And did you do anything to respond to
20  interrogatories in this case?
21  A.   I have talked to Mr. Snyder about them, but I
22  haven't done anything personally.
23  Q.   Did you review the interrogatory responses
24  that were served in this case?
25  A.   I'm not sure if I've seen those or not.

71

1   Q.   And there were also responses to document
2   requests that were served in this case. Did you review
3   those?
4   A.   I believe I went over those with Mr. Snyder.
5   Q.   Okay. And was everything in the document
6   responses correct, to the best of your knowledge?
7   A.   To the best of my knowledge, yes.
8   Q.   And what did you do to prepare for today's
9   deposition?
10  A.   I — as I said, I went over the documents that
11  have been filed, I looked at my deposition, and I met
12  with Mr. Snyder.
13  Q.   Okay. And how much time did you spend to
14  prepare for today's deposition?
15  A.   Probably — well, in reading everything —
16  well, a couple of hours, and then I met with Mr. Snyder
17  for about an hour.
18  Q.   And is that in addition to the ten hours of
19  preparation you mentioned earlier or is that included?
20  A.   It's inclusive.
21  Q.   And who was present for the document preparation
22  session with Mr. Snyder? Was there anyone else there?
23  A.   No, just the two of us.
24  Q.   And before you agreed to serve as a class
25  representative in this litigation, were you aware of

72

1   the case?
2   A.   I heard the style of the case and I knew that
3   it existed, yes.
4   Q.   And when did you first become aware of the
5   case?
6   A.   I have been following all cases that have been
7   filed in relation to Stanford in terms of knowing that
8   they existed. So whenever it was filed, I knew that it
9   existed.
10  Q.   And do you know who the other class
11  representatives are in this case?
12  A.   I know that Jorge is one and I'm not sure who
13  the other one is.
14  Q.   Does Samuel Troice ring a well?
15  A.   Yes.
16  Q.   So is he another class representative?
17  A.   Yes.
18  Q.   And have you met Mr. Troice before?
19  A.   I have not.
20  Q.   And have you met Jorge Salgado before today?
21  A.   Yes.
22  Q.   And when had you met Mr. Salgado?
23  A.   Last night.
24  Q.   And did you speak with Mr. Salgado last night?
25  A.   A little, yes.

73

1   Q.   And did you discuss this case?
2   A.   I didn't, no.
3   Q.   And was counsel present during that
4   discussion?
5   A.   Yes.
6   Q.   Was there anybody else present?
7   A.   Yes, Jorge's grandson, Jorge.
8   Q.   And did you discuss anything related to
9   Stanford during that discussion?
10  A.   I think — I did not do much discussion last
11  night with all of them. They were all speaking
12  Spanish.
13  Q.   And did you understand what was being said?
14  A.   I understood some of it, yes.
15  Q.   And was any of what you understood related to
16  Stanford?
17  A.   Some of it was, yes.
18  Q.   And what — what was discussed that was
19  related to Stanford?
20  A.   I think they were discussing how Jorge had
21  initially been enticed to buy CDs and that was just
22  about all I got. Then we wandered on to other things.
23  Q.   And about how long did that discussion last?
24  A.   Probably about 20 minutes.
25  Q.   And did you discuss any particular individuals

19 (Pages 70 to 73)

000081

Pamela G. Reed

**78**

1  that information correct?
2  A. Yes.
3  Q. And so Mr. Cowles also asked you about a trip
4  that you took to Antigua?
5  A. Yes.
6  Q. -- during the deposition earlier. And when
7  did that trip take place?
8  A. We have it somewhere. I believe it was in
9  2008.
10  Q. Does February 2008 sound right?
11  A. Thank you. Yes.
12  Q. And who else went on that trip with you?
13  A. Mr. Bowman, Michael and Lara Gale and Carol
14  McCann.
15  Q. I'm going to hand you what's marked
16  Defendants' Exhibit 9.
17  (Deposition Exhibit 9 marked.)
18  A. Okay. Should I put these away? Are we done?
19  Q. (BY MS. BISHOP) Yeah, we're done with those.
20  And is this document familiar to you?
21  A. I think these are the -- this is the itinerary
22  from that trip.
23  Q. Okay. And if you can flip to page 2.
24  A. I'm not flipping -- there.
25  Q. And it has a list of passengers there?

**79**

1  A. Yes.
2  Q. And does that -- does that passenger list look
3  accurate --
4  A. It does.
5  Q. -- as to who was on the trip?
6  A. Also Elizabeth Schurig and Carolyn Beckett
7  were on the trip.
8  Q. Okay. And how were you invited to go on the
9  trip?
10  A. Mr. Bowman invited me to go.
11  Q. And do you know how the Gales were invited?
12  A. They were considering purchasing CDs, and I
13  think that was why he invited them.
14  Q. Okay. So did the invitation come from you or
15  from Nigel?
16  A. Oh, from Mr. Bowman. He invited everyone.
17  Q. Okay. And did you know the Gales at that
18  time?
19  A. I met them on this trip.
20  Q. Okay. And do you know how Mrs. Schurig was
21  invited?
22  A. Again, Mr. Bowman invited everyone.
23  Q. And did you know Mrs. Schurig before --
24  A. I did know --
25  Q. -- that trip?

**80**

1  A. -- her, yes.
2  Q. And had you ever discussed Stanford CDs with
3  Mrs. Schurig before the trip?
4  A. I'm not sure if I had before the trip or not.
5  Q. And did you know Mrs. Beckett before the trip?
6  A. I did.
7  Q. And had you ever discussed Stanford CDs with
8  Mrs. Beckett before this trip?
9  A. I don't know if I had before this trip or not.
10  Q. Is it possible that you might have?
11  A. It's possible, but I'm not sure.
12  Q. Okay. Under what circumstances do you think
13  you might have discussed it?
14  A. I can't -- can't postulate. I don't know that
15  I did or not.
16  Q. Okay. Did you ever talk about your
17  investments in Stanford CDs with other people you knew?
18  A. Not really, no.
19  Q. And why not?
20  A. Because I didn't talk about my investments
21  with people particularly.
22  Q. And did you talk about Mr. Bowman ever with
23  people you knew?
24  A. Yes, I did.
25  Q. And what would you say about Mr. Bowman?

**81**

1  A. That he was really good and that we had
2  appreciated working with him.
3  Q. And did you ever recommend to anyone you knew
4  that they work with Mr. Bowman?
5  A. I did.
6  Q. And did you recommend that when he was at
7  Smith Barney or when he was with Stanford or at both?
8  A. I know I did at Smith Barney and I cannot --
9  I'm not sure if I did at Stanford or not.
10  Q. Do you know if anyone that you recommended to
11  work with Mr. Bowman did, in fact, work with Mr. Bowman
12  as a financial advisor?
13  A. I think some people did when he was at
14  Smith Barney.
15  Q. And about how many people would you guess that
16  was?
17  A. Maybe two.
18  Q. And do you know how many clients Mr. Bowman
19  had?
20  A. I have no idea.
21  Q. And who is it that you recommended to work
22  with Mr. Bowman --
23  A. Oh, gosh.
24  Q. -- who may have?
25  A. I have no idea who it was, who the names were.

21 (Pages 78 to 81)

Pamela G. Reed

**10**

1  Q. All right. 85. "In February 2008 before
2  their CDs matured the FA, financial advisor, invited
3  Gibbins and Reed to visit SIBL, in Antigua," is that
4  correct?
5  A. Yes, sir.
6  Q. Reed met with Allen Stanford and SIBL
7  president Juan Rodriguez Tolinio" -- how do you
8  pronounce that?
9  MR. SNYDER: Tokmino.
10  MR. COWLES: Tokmino.
11  Q. (BY MR. COWLES) -- "who provided Reed with a
12  tour of SIBL, and once again assured Reed that SIBL's
13  CDs were in an entirely safe and liquid product."
14  Those facts are true, are they not?
15  A. Yes, sir.
16  Q. All right. Paragraph 8! "Upon their return
17  from Antigua, financial advisor sought to convince
18  Gibbins and Reed to roll over and reinvest their
19  SIBL CD proceeds into new SIBL CDs when the CDs matured
20  in May of 2008." So in May when they matured you
21  rolled them over into new CD-; is that correct?
22  A. I believe we did, yes.
23  Q. "During these discussions near the end of
24  April or early May 2008, financial advisor, one,
25  reaffirmed the safety, security and low risk of the

**11**

1  SIBL CDs"; is that correct?
2  A. Yes, sir.
3  Q. "Reiterated that the SIBL CDs were insured
4  against the loss"; is that correct?
5  A. Yes, sir.
6  Q. "And represented that SIBL CDs were completely
7  backed by SIBL assets, which had been audited by an
8  international audit firm." Correct fact as you
9  understand it?
10  A. At I remember it, yes, sir.
11  Q. And the last paragraph we're going to talk
12  about here, 87. "In May 2008 as a result of their
13  financial advisor's misrepresentations about the safety
14  and low risk of SIBL CDs, Gibbins and Reed rolled over
15  and reinvested proceeds from their maturing SIBL CDs to
16  purchase new SIBL CDs. The new SIBL CDs were issued in
17  their names jointly and Reed invested an additional
18  100,000 into SIBL CDs." Are those matters in your
19  first amended class action complaint in the BDO case --
20  as far as you know and understand they were correct?
21  A. Yes, sir, as far as I know and understand.
22  Q. Thank you. So you moved the investment funds
23  from Smith Barney to Stanford Group Company.
24  A. Yes, sir.
25  Q. The financial advisor at that time was a man

**12**

1  named Nigel Bowman, wasn't he?
2  A. Yes, sir.
3  Q. You had known him a long time.
4  A. Yes, sir.
5  Q. He was a friend.
6  A. Yes, sir.
7  Q. And I assume you had great respect for his
8  ability as a financial advisor.
9  A. I did. We both did.
10  Q. And he did change from Smith Barney to
11  Stanford Group Companies in May 2007.
12  A. I believe that was the date, yes. Uh-huh.
13  Q. I think it is.
14  A. (Witness nods head.)
15  Q. And you and your husband changed with him and
16  moved your investment funds to Stanford, right?
17  A. Yes, sir.
18  Q. Let me hand you what's been marked Defendants'
19  Exhibit 2. Ask you if you recognize that as the
20  agreement with Stanford Group Company and you and your
21  husband?
22  A. It purports to be, yes.
23  Q. Did you read the agreement when it was first
24  presented to you?
25  A. I'm sure I skimmed it. I don't know if I read

**13**

1  it or not.
2  Q. It's got a lot of small print, doesn't it?
3  A. Correct.
4  Q. Would you look over on page 3 under capital
5  B -- paragraph capital B entitled "Financial Advisor"?
6  See that?
7  A. Yes, sir.
8  Q. And I think I have it highlighted on here, do
9  I not?
10  A. No, sir.
11  MR. SNYDER: I think mine does. Here you
12  go. Gave me the wrong one.
13  A. On page 3?
14  Q. (BY MR. COWLES) Yeah, right here is the
15  three.
16  A. Uh-huh. It's not highlighted on this one
17  either. But it's B, financial advisor; is that
18  correct?
19  Q. Let's try this one. Now, did you find it,
20  B, entitled, "Financial Advisor"? Well, you can read
21  it without it being highlighted. Look at B,
22  A. Yes, sir.
23  Q. It states, does it not, that, "Stanford's
24  financial advisors will be available to meet with the
25  client" -- client would be your and your husband,

4 (Pages 10 to 13)

DepoTexas, Inc.

000083

Samuel Troice

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION


RALPH S. JANVEY, ET AL.,       *
                               *
      Plaintiffs,              *
                               *
VS.                            *     CIVIL ACTION NO.
                               *       3:12cv4641-N
GREENBERG TRAURIG, LLP;        *
HUNTON & WILLIAMS, LLP; AND*
YOLANDA SUAREZ,                *
                               *
      Defendants.              *

*********************************
    ORAL AND VIDEOTAPED DEPOSITION OF
              SAMUEL TROICE
            DECEMBER 14, 2015
*********************************

            ORAL AND VIDEOTAPED DEPOSITION of

SAMUEL TROICE, produced as a witness at the instance of

the Defendants Greenberg Traurig, LLP, and Hunton &

Williams, LLP, and duly sworn, was taken in the

above-styled and numbered cause on the 14th day of

December, 2015, from 8:36 a.m. to 11:12 a.m., before

Brenda R. Gardner, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of

Strasburger & Price, LLP, 901 Main Street, Suite 4400,

in the City of Dallas, Dallas County, Texas, pursuant

to the Federal Rules and the provisions stated on the

record or attached hereto.

000084

Samuel Trolce

**54**

1  under investigation many years ago but that no charges
2  were filed, would you have invested with Stanford?
3      THE INTERPRETER: I'm sorry, "charges"
4  about what? Or just "charges," like that, nr under
5  someone, or just like that?
6      MR. ISRAELOFF: Just like that.
7      THE INTERPRETER: Okay.
8      MR. SNYDER: Objection, calls for
9  speculation.
10     I think you're messing up the
11  translation.
12     I think she's saying that they did
13  have charges against them. Do you want to reask the
14  question?
15     Q.  (BY MR. ISRAELOFF) If you were told that
16  Stanford International Bank was investigated to
17  determine if it was engaged in drug-money laundering
18  many years ago but that no money laundering was found,
19  would you still have invested?
20     A.  If I had learned that they had been under
21  any kind of investigation, right then or before,
22  previously, by any agency, no, I'd have not done it.
23     Q.  Do you know whether any of your current five
24  banks have ever been under government investigation?
25     A.  No, I don't know.

**55**

1      Q.  Have you investigated to find out if any of
2  those five banks have ever been under government
3  investigation?
4      A.  No.
5      Q.  Do you understand, from your work in this
6  lawsuit, that Stanford International Bank was
7  investigated by the Securities and Exchange Commission?
8      MR. SNYDER: "Securities and
9  Exchange."
10     A.  Yes, I did learn about it through all this
11  process. Yes, I did.
12     Q.  (BY MR. ISRAELOFF) What do you now
13  understand the Securities and Exchange Commission did?
14     A.  To passess the offices in Houston and Miami,
15  review the documents, make a process for Stanford, --
16     MR. SNYDER: Allen Stanford.
17     A.  -- Allen Stanford --
18     (Reporter clarification.)
19     A.  -- and determine that this has been a fraud.
20     Q.  (BY MR. ISRAELOFF) Do you understand that
21  the "SEC" -- can I use that term for the Securities and
22  Exchange Commission?
23     A.  Yes.
24     Q.  Do you now understand that the SEC was aware
25  that Stanford might be a fraud as early as 1997?

**56**

1      A.  I didn't know that it was since that date.
2  I would have not made any investments. I learned about
3  this -- I learned that they were under investigation
4  when everything came out.
5      Q.  Do you now know that the SEC had concerns
6  about Stanford International Bank since the year 1997?
7      A.  I didn't know about the date, but now I
8  learned that it has been a while.
9      Q.  Do you understand that in all those years,
10  the SEC took no action to close down Stanford
11  International Bank?
12     A.  Yes, I did learn about it.
13     Q.  If you were allowed to sue the SEC for the
14  Stanford problems, would you do that?
15     A.  If I could, if I had the documents and --
16  and I would see a possibility to win, possible.
17     Q.  Let me ask you about "rollovers." Do you
18  understand what that term means?
19     A.  Not exactly.
20     Q.  The CDs you purchased from Stanford, do you
21  understand that when they matured, if you did nothing,
22  they would automatically roll over into a new CD?
23     A.  Yes.
24     Q.  Is that something that you used, that is,
25  automatic rollovers?

**57**

1      A.  "Rollover," like to renew?
2      Q.  Yes.
3      A.  Yes.
4      Q.  A number of your Stanford CDs were
5  automatically renewed, were they not?
6      A.  Yes.
7      Q.  Why did you allow your CDs to roll over and
8  renew?
9      A.  Number one, because the money that I had
10  there was for one specific need, and I didn't need it
11  in that moment.
12     Q.  What was the specific need?
13     A.  Medical expenses for my daughter.
14     Q.  Was it your plan to let each CD
15  automatically renew until you needed the money for your
16  daughter's medical care?
17     A.  Yes.
18     Q.  Each time one of your CDs automatically
19  renewed, did it renew as another CD?
20     A.  Let me explain it with -- you know, a little
21  bit longer. Okay. I did my investment in Stanford,
22  okay. The movements that they will do about the CDs --
23  there was a movement with the CDs with different
24  accounts. Okay. The CDs will go -- the money will go
25  to one CD, and then they will move it into another

15  (Pages 54 to 57)

DepoTexas, Inc.

Samuel Troice

## Page 58

```
 1   account.
 2        The only thing that I asked to Nanes
 3   is to be able to have liquidity whenever I would
 4   request -- whenever I would request anything that I
 5   would need for my daughter's medical expenses.
 6        Okay. So the topic about it, without
 7   talking too much, it was an accident; that's all for my
 8   daughter. So I needed the money. I needed it --
 9   today. These expenses are every day and for life.
10        Q.  I forgot to ask you: Do you have an
11   occupation, or do you work at a business or trade
12   today?
13        A.  Yes. I have my own business.
14        Q.  What is that?
15        A.  It's a paint factory.
16        Q.  Does the company have a company name?
17        A.  Yes.
18        Q.  What is the paint factory's name?
19        A.  Do you want me to give it to you in English?
20        Q.  Please.
21             THE WITNESS: (In English) It is
22   Industrial -- Industrial, I-N-D-U-S-T-R-I-A-L,
23   Industrial, T-E-C-N-I-C-A, D-E, Pinturas, P-I-N-T-U-A-S
24   [sic]. Industrial Tecnica.
25             MR. ISRAELOFF: Pintura -- is it
```

## Page 59

```
 1   "Pinturas"?
 2             THE WITNESS: (In English) Pinturas.
 3             MR. ISRAELOFF: "Pinturas." Okay.
 4             THE WITNESS: (In English) Yes,
 5   "Pinturas."
 6             MR. ISRAELOFF: Thank you very much.
 7             THE WITNESS: (In English) like
 8   Sherwin-Williams. Not as small as Sherwin-Williams.
 9             MR. ISRAELOFF: Yes.
10             THE INTERPRETER: Did you get it?
11   I'll give it to you.
12        Q.  (BY MR. ISRAELOFF) When you made your
13   investments in 2001, I saw copies of some checks from
14   Chase. Did you have accounts with Chase at that time?
15        A.  I don't remember the dates, but I remember
16   in a certain time I had an account with them.
17             (Deposition Exhibit 5 marked.)
18        Q.  (BY MR. ISRAELOFF) Exhibit Number 5 is a
19   copy of one of the documents that your lawyers provided
20   in this lawsuit. Do you recognize these two checks?
21             THE INTERPRETER: Sí.
22             MR. SNYDER: In English.
23             THE INTERPRETER: Sorry. He said
24   "yes."
25             MR. ISRAELOFF: You translated from
```

## Page 60

```
 1   English to Spanish.
 2        A.  Yes.
 3        Q.  (BY MR. ISRAELOFF) It also looks like one
 4   of these checks came from a bank called Hemisphere
 5   National Bank.
 6        A.  Yes.
 7        Q.  Do you still have bank accounts at either
 8   one of these banks?
 9        A.  No.
10        Q.  Why not?
11        A.  Because the account is under my wife's name,
12   and she decided to switch banks for just -- for
13   comfortable.
14             MR. JIMINEZ-EKMAN: To Wells Fargo,
15   right?
16             THE WITNESS: (In English) Yes.
17             THE WITNESS: Can I take a break?
18             MR. ISRAELOFF: Sure.
19             MR. SNYDER: Oh, that's good. I need
20   to go, too.
21             VIDEOGRAPHER: Off the record, 10:46.
22             (Recess.)
23             VIDEOGRAPHER: Back on the record at
24   10:52 for the start of tape number 3, the videotaped
25   deposition of Samuel Troice.
```

## Page 61

```
 1        Q.  (BY MR. ISRAELOFF) I am not sure I
 2   understood what you were saying earlier about hearing
 3   the name Carlos Loumiet. In what type of conversation
 4   did you hear that name?
 5        A.  It was an informal conversation with David
 6   Nanes.
 7        Q.  Did that conversation have to do with
 8   Stanford CDs?
 9        A.  No. No.
10        Q.  Okay. I have seen reference in this case to
11   a Stanford business in Mexico with the name Stanford
12   Bolsa y Banca, S.A. Did you ever have any dealings
13   with that group?
14             MR. SNYDER: And let me just object,
15   Sim. I think you got confused. I think that's
16   Ecuador. I don't think that's Mexico.
17             MR. ISRAELOFF: Well, --
18             MR. SNYDER: There's a Stanford Fundos
19   in Mexico.
20        Q.  (BY MR. ISRAELOFF) Do you have any
21   knowledge about a company called Stanford Bolsa y
22   Banca?
23        A.  No.
24        Q.  Mr. Nanes' business card says he was with a
25   company called Stanford Group Mexico, S.A. de C.V. Do
```

16 (Pages 58 to 61)

DepoTexas, Inc.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, et al.,          )
                                  )
          Plaintiffs,             )
                                  )
vs.                               ) CIVIL ACTION
                                  ) NO.
GREENBERG TRAURIG, LLP, HUNTON &  ) 3:12cv-4641-N
WILLIAMS, LLP; and YOLANDA        )
SUAREZ,                           )
                                  )
          Defendants.             )


-------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

JORGE SALGADO

December 4, 2015

-------------------------------------------


     ORAL DEPOSITION of JORGE SALGADO, produced as a

witness the instance of the Defendant Hunton &

Williams, and duly sworn, was taken in the above styled

and numbered cause on December 4, 2015, from 8:32 a.m.

to 2:07 p.m., before Jeff L. Foster, a Certified

Shorthand Reporter in and for the State of Texas, at

the offices of Strasburger & Price, 901 Main Street,

Suite 4400, Dallas, Texas 75202, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record.

Jorge Salgado

**38**

1  class representatives?
2  A. No.
3  Q. And do you know how many class representatives
4  there are in this lawsuit?
5  A. We are three.
6  Q. And you mentioned that Ms. Pam —
7  A. Well, three — well, no, four because there
8  also exists a liquidator — liquidator.
9  Q. And you mentioned you know Ms. Pam Reed. Have
10  you met her before?
11  A. No. We went to have dinner the day before,
12  yesterday — yesterday when she had her deposition.
13  Q. And if I told you the last class
14  representative was Sam Troice, does that sound right to
15  you?
16  MR. SNYDER: Samuel.
17  MS. BISHOP: Samuel.
18  MR. SNYDER: He doesn't go by Sam.
19  (Pause.)
20  MR. SNYDER: Troice.
21  THE INTERPRETER: Troice.
22  A. I don't know him.
23  Q. (BY MS. BISHOP) So, Mr. Salgado, I'd like to
24  talk with you about the formation of the Michoacan
25  Trust.

**39**

1  A. Correct.
2  Q. And when was that created?
3  A. When I didn't shape my investment, my broker
4  assistant, he told me that it was necessary to create a
5  trust. It was just like an invention, because really
6  from the judicial way there's no such trust —
7  Michoacan Trust.
8  MR. SNYDER: Objection to the
9  translation. Can you —
10  A. Yes, for me I mentioned Michoacan Trust, like
11  I could have said X. Because it was something
12  necessary to make the investment.
13  Q. (BY MS. BISHOP) And you said your broker
14  assistant told you this?
15  A. Yes, that I had to make a trust, but she
16  didn't suggest the name.
17  Q. And what was the name of your broker
18  assistant?
19  A. Mary Bautista, B-A-U-T-I-S-T-A.
20  Q. And how did you meet Ms. Bautista?
21  A. She was working for Sun Trust Bank. And I was
22  working for this club, Royal Holiday Club. And we have
23  an account in Miami at the Sun Trust Bank. So she was
24  my contact to have operations or transactions.
25  Q. And she was located in Miami?

**40**

1  A. Yeah, she was living in Miami.
2  Q. And you were in Mexico at that time?
3  A. In Mexico. Yes, in Mexico.
4  Q. And approximately what year was that?
5  A. 2000 — well, no, it was at the end of the
6  years 90.
7  Q. And how did Ms. Bautista come to be your
8  broker?
9  A. Because she moved from Sun Trust Bank to
10  Stanford.
11  Q. And was she your broker before she moved to
12  Stanford?
13  A. No. No.
14  Q. And so why did she become your broker once she
15  moved to Stanford?
16  A. Because I have my personal check account in
17  Sun Trust Bank and she invited me to make the
18  investment.
19  MR. COWLES: I maybe just can't hear it,
20  but I never did hear a year. Was a year given?
21  MR. BUNCHER: '90s, late '90s.
22  MR. COWLES: Late '90s is what he said?
23  Okay. Thank you.
24  Q. (BY MS. BISHOP) And what year did
25  Ms. Bautista move to Stanford?

**41**

1  A. My understanding is that when she invited me
2  to join it in 2001, she had been there only for a
3  while.
4  Q. Would that be for a few months or —
5  A. No, I don't know.
6  Q. And how long had you known Ms. Bautista before
7  she moved to Stanford?
8  A. Two, three years.
9  Q. And did she handle your personal account at
10  Sun Trust?
11  A. Well, there was a group here in Sun Trust and
12  they will assist me, you know, different people.
13  Q. So how close was your relationship while she
14  was at Sun Trust?
15  A. She came to visit us in Mexico on one
16  occasion, but that conversation would be frequently
17  because of the business.
18  Q. And when you said she came to visit you, was
19  that to visit you personally or to visit your business?
20  A. It was just a visit to the business and it was
21  not maybe only to the club, but some other businesses.
22  Q. And when was that visit?
23  A. Around 2000.
24  Q. And when did Ms. Bautista first contact you
25  about investing in Stanford?

11 (Pages 38 to 41)

DepoTexas, Inc.

000088

Jorge Salgado

94

1  percent — anyhow she has proof, because I have been
2  withdrawing the money. Because I did receive that
3  money.
4      Q.  But the thing she told you about your
5  investments on that call weren't true, right?
6      A.  Now I've come to realize it, that it was not.
7  But back those days she did assure me that that was
8  true.
9      Q.  And did you ever speak to anyone else involved
10  with Stanford besides Mary Bautista? And to clarify my
11  question, did you ever speak with anyone involved with
12  Stanford before February 2nd, 2009?
13      MR. SNYDER:  And objection.  When you say
14  "involved with Stanford," what do you mean by that?
15  I mean, an investor?  Are you talking about an
16  employee?  What are you talking about?
17      A.  And from where?
18      Q.  (BY MS. BISHOP)  Did you ever speak to any
19  other brokers affiliated with Stanford before February
20  2009?
21      A.  Only this Stanford funds in Mexico and with
22  this employee that is only just there like customer
23  service, you know, trying to find out what's going on,
24  I mean, to the people.  But nobody related to finances
25      Q.  And that was in February 2009?

95

1      A.  Yes.
2      Q.  And do you recall what that person's name was?
3      A.  No.
4      Q.  Did you ever meet any other Stanford employees
5  prior to February 2009?
6      A.  No.
7      Q.  And did you ever travel to the United States
8  in connection with your Stanford CD investments?
9      A.  No.
10      Q.  Did forming a trust have any reporting
11  obligations in Mexico?
12      MR. SNYDER:  Objection, form.
13      A.  In this case an entity was not created.  We
14  just named a name.
15      Q.  (BY MS. BISHOP)  So how did you report your
16  investment obligation — or your investment in Stanford
17  CDs on your taxes?
18      A.  I will have to report it if I have had a
19  profit, but I had a loss.
20      Q.  Did you ever report your investments prior to
21  the collapse of the Stanford entities?
22      MR. SNYDER:  Objection, form.
23      A.  No.
24      MR. SNYDER:  This gentleman did not have
25  the investment in his personal name.  You can ask him

96

1  if Michoacan Trust reported it in Mexico.  But you're
2  asking him personally is the way I'm understanding your
3  question.
4      Q.  (BY MS. BISHOP)  Did the Michoacan Trust file
5  any forms with the government of Mexico?
6      A.  No.
7      Q.  Did the Michoacan Trust ever file tax forms
8  with any government entity?
9      A.  No.
10      Q.  Did you ever individually report any income
11  that came from the trust?
12      MR. SNYDER:  Objection, form.
13      A.  When you — when I was receiving my salary in
14  Mexico religiously, I will have to pay the taxes
15  because the company doesn't give you the exact amount.
16  If I'm making a hundred pesos, they're not going to
17  give me 100 pesos, they're going to give me just the
18  net amount, because the other amount goes straight to
19  the taxes.  So once I receive that money, that money
20  belongs to me.  That is after taxes.
21      Q.  (BY MS. BISHOP)  So did you report income from
22  the Michoacan Trust as part of your personal taxes?
23      MR. SNYDER:  Objection, form.  Assumes
24  facts not in evidence.
25      A.  But I didn't receive any profit.  I lost.

97

1      Q.  (BY MS. BISHOP)  So did you ever report the
2  interest that the Michoacan Trust earned during the
3  time period of your investments?
4      MR. SNYDER:  Objection, form.
5      A.  Well, you have a profit when you obtain
6  something, but I never got anything.  It was just in
7  paper.
8      MS. BISHOP:  I think now is a good time
9  for a lunch break if you agree.
10      MR. SNYDER:  No, I think we keep going.
11      MS. BISHOP:  Okay.
12      MR. SNYDER:  Take your lunch break at
13  12:30 or 1:00.  How much longer do you have?  We can
14  take a short break if y'all need to take a break short.
15      MR. VAIL:  Let's take a short break.  I
16  need to do a quick call.
17      MR. SNYDER:  Okay.
18      THE VIDEOGRAPHER:  We're off the record
19  at 12:03.
20      (Recess taken.)
21      THE VIDEOGRAPHER:  We're on the record at
22  12:05.
23      MS. BISHOP:  Let the record reflect I'm
24  handing the witness what's been marked Defendants'
25  Exhibit 15.

25 (Pages 94 to 97)

DepoTexas, Inc.

000089

The undersigned requests STANFORD TRUST COMPANY LIMITED of St. John's, Antigua and its designated co-trustees (The Trustees), to act as Trustees for account of the following:

El firmante solicita a STANFORD TRUST COMPANY LIMITED de St. John's, Antigua, y a sus cofideicomisarios designados (Los Fideicomisarios), que actúen como Fideicomisarios para cuenta de lo siguiente:

I. Settlor/Primary Beneficiary(ies)/Fideicomitente/Beneficiario(s) Principal(es)
(INCLUDE A CLEAR PHOTOCOPY OF PASSPORT OR OTHER PHOTO ID FOR EACH)
(INCLUYA UNA FOTOCOPIA CLARA DEL PASAPORTE U OTRA IDENTIFICACIÓN CON FOTOGRAFÍA DE CADA UNO DE ELLOS)

1. Last Name/Apellido Paterno   SALGADO AGUILAR   First Name/Nombre   JORGE
Legal Address (not a P.O. Box)/Domicilio Legal (no Apartado Postal)  SAN ANDRES 89 COL. CAMPESTRE CHURUBUSCO
City/Ciudad MEXICO D. F. 04200 Country/País   MEXICO   Passport #/No. de Pasaporte  00330039399

2. Last Name/Apellido Paterno   SALGADO SORIA   First Name/Nombre   MARGARITA G.
Legal Address (not a P.O. Box)/Domicilio Legal (no Apartado Postal)  SAN ANDRES 89 COL. CAMPESTRE CHURUBUSCO
City/Ciudad MEXICO D.F. 04200 Country/País   MEXICO   Passport #/No. de Pasaporte

3. Last Name/Apellido Paterno   First Name/Nombre
Legal Address (not a P.O. Box)/Domicilio Legal (no Apartado Postal)
City/Ciudad   Country/País   Passport #/No. de Pasaporte

II. Ultimate Beneficiary(ies)/Beneficiario(s) Final(es)
(INCLUDE A CLEAR PHOTOCOPY OF PASSPORT OR OTHER PHOTO ID FOR EACH)
(INCLUYA UNA FOTOCOPIA CLARA DEL PASAPORTE U OTRA IDENTIFICACIÓN CON FOTOGRAFÍA DE CADA UNO DE ELLOS)

1. Last Name/Apellido Paterno   SORIA LICEA   First Name/Nombre   EMILIA
Passport #/No. de Pasaporte   (Country)/(País)   MEXICO   ) Relationship/Relación  CONYUGE

2. Last Name/Apellido Paterno   First Name/Nombre
Passport #/No. de Pasaporte   (Country)/(País)   ) Relationship/Relación

3. Last Name/Apellido Paterno   First Name/Nombre
Passport #/No. de Pasaporte   (Country)/(País)   ) Relationship/Relación

4. Last Name/Apellido Paterno   First Name/Nombre
Passport #/No. de Pasaporte   (Country)/(País)   ) Relationship/Relación

III. Name of the Trust/Nombre del Fideicomiso   MICHOACAN TRUST

IV. Instructions for Correspondence/Instrucciones para la Correspondencia (check one/indique uno):

☐ Monthly/Mensual   ☐ Quarterly/Trimestral   ☐ Semi-Annual/Semestral

☐ Except in case of special circumstances left on the Trustee's discretion mail to:
Excepto en caso de circunstancias especiales y a discreción de los Fideicomisarios, enviar a:

Name/Nombre
Address/Dirección

☐ Hold at Stanford Trust Company, Antigua. (Note: this must be distributed a minimum of once a year.)
Retener en Stanford Trust Company, Antigua (Aviso: la correspondencia debe ser distribuida por lo menos una vez al año).

V. Investment Instructions/Instrucciones de Inversión

| Institution/Institución | Type of Account/Tipo de Cuenta | Deposit Amount/Monto del Depósito | Currency/Tipo de Moneda | Term/Plazo |
|---|---|---|---|---|
| | FlexCD | 100,000.00 | DOLARES | 01 AÑO |
| | | | | |
| | | | | |
| | | | | |

P1304

000090

VI. Other Requests/Otras Solicitudes _____

F. I authorize Trustee to deduct setup and management fees from my _____ account.
Autorizo al Fiduciario a deducir de mi _____ FlexCD _____ La honorarios de apertura y administración.

* (Note: Please specify which bank account if more than one)
* (Nota: Por favor sírvase especificar la cuenta bancaria si es más de una)

G. Enclosed is my check in the amount of US$135 payable to Stanford Trust Company. Please invoice any future management fees.
Adjunto mi cheque por la cantidad de US$135 pagadero a Stanford Trust Company. Por favor sírvase facturar cualquier honorario de administración futuro.

Initials of all Settlors/Iniciales de todos los Fideicomitentes:
(1) ___SAJ___          (2) ____SSH____          (3) _____

Introduced by/Presentado por: _____ ThirdTrade _____

Settlor's Professional Advisor, if any/Asesor Profesional del Fideicomitente si lo hay: _____

---

## Single Purpose Trust Agreement

This revocable SINGLE PURPOSE TRUST AGREEMENT is made BETWEEN THE SETTLOR(S):

_____ (a) _____

_____ (a) _____

_____ (a) _____

(hereinafter called "the Primary Beneficiary(ies)") of the one part

AND STANFORD TRUST COMPANY LIMITED of St. John's, Antigua and its designated co-trustee ALEMAN, CORDERO, GALINDO & LEE TRUST (BVI) LIMITED of Tortola, British Virgin Islands (hereinafter collectively called "the Trustee") of the other part.

WHEREAS. The Primary Beneficiary has transferred or caused to be transferred to the Trustee the sum of $ _____

_____ to be held upon the trusts and subject to the terms of this Agreement

IT IS HEREBY AGREED as follows:

1. The Fund. In this Agreement the expression "Fund" shall mean the property from time to time held by or to the order of the Trustees pursuant to this Agreement together with any additions or accretions thereto, the proceeds thereof or such part or parts thereof as shall for the time being remain undistributed.

2. Trust. Subject to the exercise by the Primary Beneficiary of any power reserved to him by the Standard Provisions referred to in Clause 3 hereof, the Trustees shall hold the income of the Fund UPON TRUST for the Primary Beneficiary during his lifetime and after his death shall hold the Fund and its income UPON TRUST absolutely for each of the Ultimate Beneficiaries named or described in the Application to this Agreement as shall then be in existence in equal shares (if more than one) or as otherwise stipulated in the Application. The trust period shall commence on the date of execution of this Agreement and end at such date as the Trustees shall by instrument in writing specify (not being a date earlier than the date of execution of such instrument), but in no event so as to exceed a period of 100 years following the date of execution of this Agreement.

3. Standard Provisions. The contents of the documents issued by the Trustees and entitled "Standard Provisions Applicable to Single Purpose Trust Agreements" as amended by the Trustees from time to time shall apply to this Agreement as though expressly incorporated herein. The Primary Beneficiary hereby acknowledges that he has received, read and understood a copy of the Standard Provisions ("the Provisions") and does expressly declare that the Provisions (which include a power reserved to the Trustees to modify them from time to time) shall at all times govern the implementation of this Agreement.

4. Assignment. The rights and benefits conferred upon the Primary Beneficiary shall not be capable of assignment without the prior written consent of the Trustees and the Trustees shall not recognise or be bound by any such assignment to which they shall not have consented and shall only be required to recognise the Primary Beneficiary as entitled to the rights of the Primary Beneficiary as set forth herein. Subject to the foregoing this Agreement shall bind and enure to the benefit of the heirs, successors and assigns of the Primary Beneficiary and the Trustee as the case may be.

5. Proper Law and Place of Administration. This trust is established under the laws of the British Virgin Islands, and shall be deemed for all purposes to be proper law administered in the British Virgin Islands.

P1305

000091

IN WITNESS WHEREOF the parties hereto have duly executed this trust Agreement under their respective seals as their act and deed.

EN TESTIGO DE LO CUAL las partes ejecutan han firmado sus Contrato bajo sus firmas respectivas y sello de su propia voluntad

SIGNED, SEALED and DELIVERED by/FIRMADO, ACORDADO Y ENTREGADO por:

| | | |
|---|---|---|
| JORGE SALGADO AGUILAR | _[signature]_ | MARZO 26, 2001 |
| Full Name of Settler/Nombre Complete del Fideicomitente | Signature of Settler/Firma del Fideicomitente | Date/Fecha |
| MARGARITA G. SALGADO SORIA | _[signature]_ | MARZO 26, 2001 |
| Full Name of Settler/Nombre Complete del Fideicomitente | Signature of Settler/Firma del Fideicomitente | Date/Fecha |
| | | |
| Full Name of Settler/Nombre Complete del Fideicomitente | Signature of Settler/Firma del Fideicomitente | Date/Fecha |

In the presence of/En la presencia de

| | | |
|---|---|---|
| Full Name of Witness/Nombre Complete del Testigo | Signature of Witness/Firma del Testigo | Date/Fecha |

SIGNED, SEALED and DELIVERED by:

FIRMADO, ACORDADO y ENTREGADO por:
Stanford Trust Company, Ltd.

In the presence of/En la presencia del

| | |
|---|---|
| Witness/Testigo | Date/Fecha |

SIGNED, SEALED and DELIVERED by

FIRMADO, ACORDADO y ENTREGADO por:
Alonzo, Cardozo, Orlando & Lee Trust (BVI) Limited

In the presence of/En la presencia de

| | |
|---|---|
| Witness/Testigo | Date/Fecha |

STANFORD TRUST COMPANY LTD.
A MEMBER OF THE STANFORD FINANCIAL GROUP

1000 Airport Blvd., P.O. Box 315
St. John's, Antigua, West Indies
Tel (268) 480-3730
Fax (268) 480-3739

REPRESENTATIVE OFFICE
Miami, Florida (305) 167-4135

P1306

000092