IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:12cv4641-N |
| GREENBERG TRAURIG, LLP, | § | |
| HUNTON & WILLIAMS, LLP; and | § | |
| YOLANDA SUAREZ, | § | |
| | § | |
| Defendants. | § | |

_____

**GREENBERG TRAURIG, LLP'S RESPONSE AND BRIEF IN OPPOSITION TO
MOTION FOR CLASS CERTIFICATION**
_____

## TABLE OF CONTENTS

Page

Table of Contents................................................................................................2

Table of Authorities ...........................................................................................4

Summary.............................................................................................................11

Legal standard....................................................................................................13

Procedural background ......................................................................................13

Factual background............................................................................................16

      A.     Stanford's fraud has no connection to the Investor Plaintiffs' claim against Greenberg Traurig............................................................... 16

      B.     The Investment Company Act Opinion Letter................................... 18

      C.     The Florida Trust Representative Office ........................................... 19

      D.     Loumiet's one-time review of an early draft Reg. D Disclosure......................... 20

Argument and Authority....................................................................................22

I.     Superiority: This action is not a superior means of resolving the controversy................. 24

      A.     The Receiver and Investor Committee Litigation is a Superior Method for Resolving This Controversy. ..................................... 25

      B.     Foreign Courts Will Not Grant Preclusive Effect to a Judgment in This Case................................................................................... 29

      C.     Individual Suits Are a Feasible Alternative and Have Actually Occurred. .......... 33

      D.     The Proposed Class is Unmanageable. ............................................. 35

      E.     The Receiver has been extended right to sue for the Investor Plaintiffs' common injuries.................................................... 36

II.    Predominance:  Questions affecting individual class members will predominate. .......... 37

      A.     The Supreme Court's Decision in *Comcast* Requires Denial of Certification. .... 38

           1.     The Receiver has no damages theory and even if he did – it would not apply to the Investor Plaintiffs................................ 38

           2.     The Receiver's data is incomplete and unreliable. ................................. 43

           3.     Causation cannot be accounted for by any damage model ...................... 45

B.  Individual Issues of Reliance Defeat Class Certification. .................................... 45

    1.  Reliance cannot be shown on a class-wide basis. .................................... 45

    2.  The limited record demonstrates individual issues of reliance. ................ 47

    3.  The *Affiliated Ute* presumption of reliance is not available. ................... 50

C.  The Determination of Whether Investors Made a "Purchase" Under the TSA Creates Individual Issues. ........................................................................ 51

D.  Issues of Proportionate Responsibility Will Predominate. ................................... 53

E.  Choice-Of Law Issues Will Predominate. ............................................................ 56

F.  Individual Issues Relating to the Discovery Rule Will Predominate. .................. 59

G.  Individual Issues Will Predominate For Breach of Fiduciary Duty .................... 62

H.  The asserted "uniform campaign" does not establish common issues. ................ 63

III.  Adequacy and typicality: The class representatives are not appropriate. ......................... 69

A.  The Proposed Class Representatives Are Not Acting in Class Members' Best Interests. ....................................................................................... 69

B.  Significant Differences Between the Plaintiffs Prevent a Finding of Typicality. ........................................................................................................ 71

C.  Pam Reed is Not an Appropriate Class Representative. ...................................... 72

D.  Troice is Not an Appropriate Class Representative. ............................................ 76

E.  The Michoacan Trust is Not An appropriate Class Representative. ..................... 77

F.  There is No Evidence That the Named Plaintiffs Can Adequately Perform Their Duties. ......................................................................................... 79

Incorporation of Other Responses ................................................................................. 80

Conclusion ...................................................................................................................... 80

Certificate of Service ..................................................................................................... 81

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  269 F.R.D. 252 (S.D.N.Y. 2010) ........................................................48

*Allison v. Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) ...........................................33, 34, 35, 36

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................30

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997).....................................................................33, 71

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
  133 S. Ct. 1184 (2013)...................................................................45, 46

*Anwar v. Fairfield Greenwich Ltd.*,
  306 F.R.D. 134 (S.D.N.Y. 2015) ........................................................50

*In re Aqua Dots Prods. Liability Litigation*,
  654 F.3d 748 (7th Cir. 2011) ..............................................................70

*Baffa v. Dolandson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000)..................................................................73

*Barsky v. Arthur Andersen, LLP*,
  No. 02-cv-1922-H, 2002 WL 32856818 (S.D. Tex. Aug. 16, 2002).....................52

*Berger v. Compaq Computer Corp.*,
  257 F.3d 475 (5th Cir. 2001) .................................................13, 69, 79

*In re BP p.l.c. Sec. Litig.*,
  2014 WL 2112823 (S.D. Tex. May 20, 2014) ............................................40, 41

*Bradford v. Moench*,
  809 F. Supp. 1473 (D. Utah 1992) ......................................................52

*Bradley v. Ingalls (In re Bradley)*,
  501 F.3d 421 (5th Cir. Tex. 2007) ......................................................77

*Brooks v. Lincoln Nat'l Life Ins. Co.*,
  No. 5:03CV256, 2008 U.S. Dist. LEXIS 121483 (E.D. Tex. Feb. 12, 2008).........................60

*Brown v. Charles Schwab & Co., Inc.*,
  No. 07-CV-03852, 2009 WL 4809426 (D.S.C. Dec. 9, 2009), *amended*, 2010
  WL 424031 (D.S.C. 2010)........................................................27

*Bruhl v. Price WaterhouseCoopers Intern.*,
  257 F.R.D. 684 (S.D. Fla. 2008) ....................................................................47

*Buettgen v. Harless*,
  263 F.R.D. 378 (N.D. Tex. 2009) ...................................................................29

*Casa Orlando Apts., Ltd. v. Fed. Nat. Mortgage Ass'n*,
  624 F.3d 185 (5th Cir. 2010) .........................................................................57

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) .................................................................... *passim*

*Ciresi v. Citicorp*,
  782 F. Supp. 819 (S.D.N.Y. 1991) ..................................................................67

*Cole v. GMC*,
  484 F.3d 717 (5th Cir. 2007) .........................................................................56

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ............................................................................ *passim*

*Corley v. Orangefield Indep. Sch. Dist.*,
  152 Fed. Appx. 350 (5th Cir. 2005) ...............................................................45

*Crawford v. Equifax Payment Servs., Inc.*,
  201 F.3d 877 (7th Cir. 2000) .........................................................................70

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir.2014) ..........................................................................42

*Ditta v. Conte*,
  298 S.W. 3d 187 (Tex. 2009)..........................................................................78

*Dvorin v. Chesapeake Expl., LLC*,
  No. 3:12-CV-3728-G, 2013 WL 6003433 (N.D. Tex. 2013) ..................................34

*In re Enron Corp. Sec.*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) .......................................................51, 58

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  490 F. Supp. 2d 784 (S.D. Tex. 2007) .............................................................51

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  761 F. Supp. 2d 504 (S.D. Tex. 2011) .............................................................58

*Farno v. Ansure Mortuaries of Ind.*,
  953 N.E.2d 1253 (Ind. App. 2011) .......................................................26, 27, 28

*Farrie v. Charles Town Races, Inc.*,
901 F. Supp. 1101 (N.D. W. Va. 1995) ...................................................................37

*Fulford v. Transp. Serv. Co.*,
No. 03-2472, 2004 U.S. Dist. LEXIS 9955 (E.D. La. May 27, 2004).....................54

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990)........................................................................................72

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*,
55 F.3d 768 (3d Cir. 1995)...........................................................................................70

*Goodman v. Genworth Fin. Wealth Mgmt., Inc.*,
300 F.R.D. 90 (E.D.N.Y. 2014) .................................................................................47

*Gregory v. Finova Capital Corp.*,
442 F.3d 188  (4th Cir. 2006) ..............................................................................27, 28

*Griffin v. Box*,
1996 WL 255296 (5th Cir. May 2, 1996) .................................................................50

*Griffin v. GK Intelligent Sys., Inc.*,
196 F.R.D. 298 (S.D. Tex. 2000).................................................................................71

*Gyarmathy & Assocs., Inc. v. TIG Ins. Co.*,
2003 WL 21339279 (N.D. Tex. June 3, 2003) (Godbey, J.) ................46, 50, 58, 64

*Hunn v. Dan Wilson Homes, Inc.*,
789 F.3d 573 (5th Cir. Tex. 2015) .............................................................................62

*Johnson v. Kan. City S. Ry. Co.*,
208 Fed. App'x 292 (5th Cir. 2006) ..........................................................................59

*Jones v. Well Fargo Bank, N.A.*,
666 F.3d 955 (5th Cir. 2012) .....................................................................................29

*Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000) .................................................................................51

*Kamm v. Cal. City Dev. Co.*,
509 F.2d 205 (9th Cir. 1975) .....................................................................................27

*King-White v. Humble Indep. Sch. Dist.*,
No. 14-20778, 2015 U.S. App. LEXIS 18199 (5th Cir. Tex. Oct. 20, 2015) .........60

*Kline v. Coldwell, Banker & Co.*,
508 F.2d 226 (9th Cir. 1974) .....................................................................................35

*In re Kosmos Energy Ltd. Sec. Litig.*,
    299 F.R.D. 133 (N.D. Tex. 2014) ................................................................. *passim*

*Kurczi v. Eli Lilly & Co.*,
    160 F.R.D. 667 (N.D. Ohio 1995) .............................................................31, 74, 75

*London v. Wal-Mart Stores, Inc.*,
    340 F.3d 1246 (11th Cir. 2003) ...........................................................................35

*Ludlow v. BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) .................................................................41, 42, 45

*Mace v. Van Ru Credit Corp.*,
    109 F.3d 338 (7th Cir. 1997) ...............................................................................33

*McGowan v. Faulkner Concrete Pipe Co.*,
    659 F.2d 554 (5th Cir. 1981) ...............................................................................76

*McManus v. Fleetwood Enters., Inc.*,
    320 F.3d 545 (5th Cir. 2003) ...............................................................................50

*Mick v. Ravenswood Aluminum Corp.*,
    178 F.R.D. 90 (S.D. W. Va. 1998)........................................................................71

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)........................................................................64, 68

*O'Sullivan v. Countrywide Home Loans, Inc.*,
    319 F.3d 732 (5th Cir. 2003) ...............................................................................38

*In re Park Cent. Glob. Litig.*,
    2014 WL 4261950 (N.D. Tex. Aug. 25, 2014).....................................................46

*Patterson v. Mobil Oil Corp.*,
    241 F.3d 417 (5th Cir. 2001) ...............................................................................23

*Perron v. GMAC*,
    232 F.3d 433 (5th Cir. 2000) ...............................................................................38

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
    100 F. App'x 296 (5th Cir. 2004) .........................................................................44

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
    725 F.3d 244 (D.C. Cir. 2013).......................................................................41, 42

*Ray Malooly Trust v. Juhl*,
    186 S.W.3d 568 (Tex. 2006)................................................................................77

*Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007) ..............................................................51

*In re Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ..............................................................34

*Rivers v. Chalmette Med. Ctr., Inc.*,
    No. 06-8519, 2010 U.S. Dist. LEXIS 67495 (E.D. La. June 4, 2010)..................54

*Roeder v. Alpha Industries, Inc.*,
    814 F.2d 22 (1st Cir. 1987)..................................................................67

*In re Safeguard Scientifics*,
    216 F.R.D. 577 (E.D. Pa. 2003)....................................................74, 75

*Samuel v. United Health Servs.*,
    No. 06-7234, 2010 U.S. Dist. LEXIS 67632 (E.D. La. June 4, 2010)..................54

*Sanderson v. Roethenmund*,
    682 F. Supp. 205 (S.D.N.Y. 1998) .......................................................52

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ................................................................29

*Simms v. Jones*,
    296 F.R.D. 485 (N.D. Tex. 2013) .........................................................50

*Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    482 F.2d 880 (5th Cir. 1973) ...............................................................46

*Spence v. Glock*,
    227 F.3d 308 (5th Cir. 2000) ...............................................................57

*Spencer v. Central States, Se. & Sw. Areas Pension Fund*,
    778 F. Supp. 985 (N.D. Ill. 1991) .........................................................72

*Sterling Trust Co. v. Adderley*,
    168 SW 3d 835 (Tex. 2005).................................................................56

*Stevenson v. Koutzarov*,
    795 S.W.2d 313 (Tex. App.—Houston [1st Dist.] 1990, writ denied) ...............60

*Stillmock v. Weis Mkts., Inc.*,
    385 Fed. Appx. 267 (4th Cir. 2010) (Wilkinson, J., concurring)......................35

*Stirman v. Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002) ...............................................................73

*In re Sunrise Sec. Litig.*,
   916 F.2d 874 (3d Cir. 1990)............................................................................36, 37

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   No. 05 Civ. 1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ............................51

*Test Masters Educ. Servs. v. Singh*,
   428 F.3d 559 (5th Cir. 2005) ...........................................................................75

*Teta v. Chow (In re TWL Corp.)*,
   712 F.3d 886 (5th Cir. 2013) ..................................................................13, 26, 27

*Tex. Commerce Bank, N.A. v. Grizzle*,
   96 S.W.3d 240 (Tex. 2002)...............................................................................55

*Tooke v. City of Mexia*,
   197 S.W.3d 325 (Tex. 2006)..............................................................................77

*Torres v. S.G.E. Mgmt., L.L.C.*,
   805 F.3d 145 (5th Cir. 2015) ........................................................................37, 38

*Turnbow v. Life Partners, Inc.*,
   2013 WL 3479884 (N.D. Tex. July 9, 2013) ..................................................41, 46

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) .....................................................................13, 38, 53

*United States v. Matthews*,
   787 F.2d 38 (2d Cir. 1986)...............................................................................67

*United Teachers Ass'n Ins. Co. v. MacKeen & Bailey, Inc.*,
   99 F.3d 645 (5th Cir. 1996) .............................................................................62

*In re Vivendi Universal, S.A.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) .....................................................................29, 30

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)............................................................................. *passim*

*Wilcox v. Commerce Bank of Kansas City*,
   474 F.2d 336 (10th Cir. 1973) ..........................................................................35

## Statutes, Rules and Regulations

FED. R. CIV. P. 5(b)(2)(D) ...............................................................................81

FED. R. CIV. P. 23................................................................................... *passim*

FOIA, 5 U.S.C. § 552 .....................................................................................65

Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, et seq. ........................................................65

Investment Company Act of 1940 Section 3(c)(7), 15 U.S.C. § 80a–3(c)(7) ..............................19

Rules Enabling Act, 28 U.S.C. § 2072(b) .....................................................................................50

TEX. CIV. PRAC. & REM. CODE § 33.002 ......................................................................................54

TEX. CIV. PRAC. & REM. CODE § 33.003(a) ..................................................................................54

TEX. CIV. PRAC. & REM. CODE § 33.011(5) ..................................................................................54

TEX. CIV. PRAC. & REM. CODE § 33.013(b) ..................................................................................55

TEX. REV. CIV. STAT. art. 581-33(D)(7) .......................................................................................34

7 TEX. ADMIN. CODE § 139.7 ...............................................................................................57, 59

7 TEX. ADMIN. CODE § 169.16 .....................................................................................................73

## Other Authorities

5 MOORE'S FEDERAL PRACTICE—CIVIL ¶ 23.46[1]........................................................................24

5 MOORE'S FEDERAL PRACTICE—CIVIL § 23.24[2].......................................................................71

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145.................................................................58

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148. ........................................................57, 58

## SUMMARY

While the Investor Plaintiffs attempt to cast this suit as a run-of-the-mill securities class action, even a cursory review of the Brief for certification reveals it to be anything but that.  To begin with, in a typical securities class action, the investors would identify a particular security trading on an efficient market supporting a presumption of reliance.  In this action, the plaintiffs complain about a fraud that involved a vast array of different investments, not traded in any efficient market, and they have not even attempted to prove the value of the securities at the time they were sold.   In a typical securities class action, the plaintiffs would identify misrepresentations in marketing publications uniformly distributed to all investors.   In this action, the named plaintiffs admit that their investment decisions were based on the advice of their trusted financial advisors, all of whom made different representations in the course of highly individualized conversations.  In fact, one of the class representatives has a separate suit against one of these third-party advisors.  In a typical securities class action, the plaintiffs would come forward with a damages theory based on readily available and reliable trading history and price data.  In this action, the plaintiffs instead report that the Receiver will somehow compute damages—even though the Receiver's representative testified no damages methodology has yet been established, that the data needed to calculate damages may not yet be available, and that were he a claimant in this action, he might object to the reliability of the Receiver's loss calculations.

The problems with this class action are all the more significant given that a far more efficient vehicle for resolving the controversy is pending before this very Court.  The Receiver and Investor Committee have asserted claims that are based on substantially the same conduct on the part of defendants and seek to recover the same losses, as demonstrated by the Investor Plaintiffs' own submissions in their Brief.  Indeed, the Investor Plaintiffs have admitted that the

Receivership is more efficient than a class action, which is why they have agreed that any recovery by the class will be turned over to the Receiver for subsequent distribution. Nor is this admission surprising, as investor plaintiffs have represented at least twice to this Court that, compared to the Receiver's action, a class action is not even a superior method of handling a *settlement*, let alone litigation of the claims at issue here.

The Investor Plaintiffs have not even satisfied the basic requirements of Rule 23(a). With a class so riddled with individualized issues and conflicts of interest, it is unsurprising that the proposed named plaintiffs are neither adequate representatives nor typical of the proposed class. For instance, while the class maintains that Stanford concealed the fact that his operations were based in Antigua, one of the proposed representatives in this action actually flew to Antigua to tour the headquarters and meet with Allen Stanford. Another representative rejected the very method of damage calculation that the class purports to rely on, accepting the Receiver's loss calculation only after he successfully objected to the Receiver's determination and received a revised claim amount. The third representative is a trust, which is not even allowed to bring the claims asserted here.

In addition, because of the Court's prior rulings with respect to the statute of repose, these class representatives do not have claims affected by that ruling against Greenberg Traurig, and it is impossible on this record to even find that there is an ascertainable, numerous class of investors who do have such claims against Greenberg Traurig.

In these circumstances, the proposed class cannot be certified consistent with Fifth Circuit and Supreme Court law.

## LEGAL STANDARD

### Rule 23 requires evidence, not promises.

Class action litigation is "an exception to the usual rule that litigation" is conducted on behalf of the named parties only. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011). Plaintiff bears burden of proof to show that Rule 23 is met. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481 (5th Cir. 2001). To grant certification, the Court must "find" facts in support of each Rule 23 requirement by a preponderance of the evidence. *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005); *Teta v. Chow (In re TWL Corp.)*, 712 F.3d 886 (5th Cir. 2013) (remanding due to inadequate findings).

"By far the most significant development in class action litigation, however, from approximately the 1990s going forward has been the steady departure by federal courts away from a presumptively favorable approach toward class certification to a more skeptical view coupled with a more exacting review process." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 138 (N.D. Tex. 2014). "This rigorous review process . . . requires [plaintiffs] to produce actual evidence that they are entitled to class status." *Id.* Now, plaintiffs "must affirmatively demonstrate compliance with Rule 23(a) by showing that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation. *Id.* at 139.

## PROCEDURAL BACKGROUND

The proposed class action is one part of a three-headed effort to recover funds on behalf of Stanford investors by asserting tort claims against Greenberg. The principal litigation is brought by the Receiver for the Stanford funds. This Court has held, over strong objections, that the Receiver has standing to litigate tort claims against Greenberg. D.E. 114 at 9–10. Additionally, this Court found that the Receiver's claim fit within an exception to the *in pari*

*delicto* rule (which would otherwise preclude the claims) because the Receiver here only "seeks to reclaim assets for innocent investors." *Id.* at 10. The Court ultimately dismissed the Receiver's claims for breach of fiduciary duty and for aiding and abetting fraudulent transfers, but allowed the Receiver to pursue claims sounding in negligence, aiding and abetting a breach of fiduciary duty, and fraudulent transfer.

The second part of the effort is litigation by the Official Stanford Investors' Committee, which largely overlaps with the Receiver's action. As the Court is aware, the Committee was formed to appease a contingent of investors who lost faith in the Receiver and moved to put this case into formal bankruptcy. *See, e.g.*, *SEC v. SIBL*, No. 3:09-cv-00298, D.E. 772. After this motion was fully briefed but before the Court ruled, the parties reached a Stipulation to form a committee giving the investors some of the rights they wanted while preserving the Receivership. *GT Ex. 24 (Stipulation to form OSIC) (APP 0844).* Crucially, the Committee gave investors a voice in the Receiver's pursuit of claims against third parties, a formal process for making the Receiver initiate such claims, and an express right to litigate claims on behalf of investors.

The Committee itself has no independent authority to bring any claims in this litigation, but this Court has held that it can litigate claims that the Receiver assigns to it, *see* D.E. 114 at 10, and it furthermore it can oversee claims brought by the investors. When the Committee identifies a claim that should be brought against a third party, it first notifies the Receiver. The Receiver can then: (1) bring those claims himself, on behalf of the Estate; (2) assign the claim to the Committee to bring on behalf of the Estate (while the Receiver appears as a nominal plaintiff and does anything else necessary to allow the Committee to proceed); or (3) do nothing. *SEC v. SIBL*, No. 3:09-cv-00298, D.E. 1149 at 6-8. In the event the Receiver does nothing, then the

Receiver may not object if the Committee designates individual investors to pursue the claim on behalf of the investors themselves (as opposed to the Estate) at no cost to the Estate. *Id.* at 7. In any litigation by investors, the Receiver has a right to "be heard on any proposed settlement of any class action with respect to matters of distribution of settlement proceeds." *Id.* In this litigation, the Committee appears to be pursuing all of the Receiver's assignable tort claims, although Defendants have yet to see a document evidencing the assignment of any such claims.

This putative class action is the final piece of the effort: a lawsuit brought by Pam Reed, Samuel Troice, and the Michoacan Trust, who propose to represent a class of those individual investors whose claims have been allowed by the Receiver. These plaintiffs assert claims that Greenberg Traurig aided and abetted a breach of fiduciary duty, aided and abetted a fraudulent scheme, and participated in a civil conspiracy. They also bring claims under the Texas Securities Act, although this Court dismissed such claims relating to sales of unregistered securities before February 1, 2008 and those relating to sales through an untruth and omission prior to February 1, 2006. D.E. 123 at 22.

The Investor Plaintiffs seek the same damages as the Receiver, and intend to use the Receiver's determination of allowed amounts to determine the damages in this action. *Pl. Brief at 60.* Moreover, "[t]he factual allegations and legal theories asserted by the Receiver and the OSIC against the Greenberg Defendants are substantially the same as, and intertwined with, the factual and legal theories asserted by the Stanford Investor Plaintiffs in support of the class claims asserted in the *Greenberg* Action." *Pl. Ex. 106 at ¶ 13.*[1] The Investor Plaintiffs have also reached an agreement with the Receiver and the Investor Committee "that any proceeds

---

[1] Many of the exhibits supporting Plaintiffs' motion are inadmissible against Greenberg Traurig. For purposes of this Response all exhibits are treated "as if" they were admissible. Greenberg Traurig reserves all objections to exhibits hereafter.

recovered from the class claims asserted in the *Greenberg* Action will be distributed through the Receiver's existing (and already approved and operating) mechanism for identifying and approving claims and making distributions." *Id. at ¶ 12*. We are unaware of any class action being certified with admissions such as these and these circumstances.

## FACTUAL BACKGROUND

Although this is a Rule 23 motion, the Investor Plaintiffs argue the merits of their claim that Carlos Loumiet, and thus Greenberg Traurig, knew about and knowingly aided Stanford's "scheme of regulatory evasion," *Pl. Brief at 2*. While this is not the time and motion for merits issues to be argued, Greenberg Traurig will not let the unfounded accusations sit without response. Rather than address at this stage every exhibit filed with the Brief, Greenberg will limit this factual response to three of the primary exhibits as illustrative of the inaccuracies in Plaintiff's narrative. Greenberg Traurig's advice on legal issues was correct and Greenberg Traurig had no knowledge that Stanford was engaged in running a Ponzi scheme or any other illegal act enabling his Ponzi scheme.

### A.      Stanford's fraud has no connection to the Investor Plaintiffs' claim against Greenberg Traurig

Stanford's fraud is well documented but has no connection to the lawsuit against Greenberg Traurig. This is why. Stanford was convicted of the following illegal acts:

> soliciting funds under false pretenses, failing to invest those funds as promised, misappropriating funds for personal use, creating and disseminating false and fraudulent documents to investors falsely showing how their funds had been invested, and [from January 2003] funneling bribes to Antiguan regulators and the Outside Auditor to conceal the scheme.

*GT Ex. 1(Allen Stanford Indictment) at pp. 4, 21 of 30 (APP 0013, 0030)*. The false pretenses were "representations falsely describing SIB CDs to potential and existing investors [and documents] that falsely described the make-up and performance of SIB's investment portfolio,

including SIB's financial statements and other periodic reports." *Id.* at 4, 5 *(APP 0013-14)*. Stanford was also convicted of obstructing an SEC investigation starting in June 2005, *Id.* at 22, *(APP 0031)* and money laundering the funds he stole from depositors. *Id.* at 22-23 *(APP 0031-32)*.

The criminal conviction also supported this Court's grant of partial summary judgment in favor of the SEC. *GT Ex. 2 (Order, case no. 3:09-cv-0298, D.E. 1858 (Apr. 25, 2013))(APP 0040)*.[2]

**Plaintiffs do not claim that Mr. Loumiet or Greenberg Traurig knew about "the fraud**." *See, e.g.,* D.E. 99 at 2.  Indeed, the U.S. Government proved that only Stanford and Davis and a handful of insiders knew of the fraud and kept it secret from everyone else.  "[O]nly Stanford and a handful of people in his inner circle knew that his outsized lifestyle and its trappings were entirely at the expense of his depositors, and not remotely close to the 'investments' into which depositors believed they had placed their savings based on Stanford's lies." *GT Ex. 23 (United States' Sentencing Memorandum, U.S. v. Stanford (June 6, 2012) p. 11(APP 0820)).*  The prosecutor Gregg J. Costa stated on the record that "**Loumiet has nothing involved**."  *GT Ex.* 3 *(Trial Transcript, U.S. v. Robert Allen Stanford* (Feb. 8, 2012)) *p. 4039* (emphasis added) *(APP 0059)*.

It is also undisputed that neither Loumiet nor Greenberg Traurig did any legal work or had any other connection with regard to Stanford's marketing materials or financial statements, how Stanford invested depositor funds, Stanford's misappropriation of those funds, dissemination of documents falsely showing how funds had been invested, or the bribes listed in

---

[2] The Investor Plaintiffs offer this ruling as evidence against Greenberg that SIBL violated the Investment Company Act.  *Pl. Brie. at 7.*  Greenberg was not a party to the SEC case.  And the ruling as to SIBL was  based on SIBL's failure to respond.  *Id*. at 3.

Stanford's indictment.  Put simply, **Greenberg Traurig could not have conspired with or aided and abetted unlawful conduct it did not know about.**

The conduct that Greenberg Traurig is alleged to have aided is different.  Plaintiffs' assert another crime, a twenty-one year long "uniform scheme of regulatory evasion."  *Pl. Brief at 2.* Such a crime or tort, if it is one, was not mentioned in the Indictment, Stanford's conviction or this Court's summary judgment.

Plaintiffs' evidentiary submission touches on the merits including the claim that Greenberg Traurig knew about and knowingly aided Stanford's "scheme of regulatory evasion," Rather than address at this stage every exhibit filed with the Brief, Greenberg Traurig will limit this factual response to three of the primary exhibits as illustrative of the inaccuracies in Plaintiff's narrative.

### B.     The Investment Company Act Opinion Letter

Movants make much of Loumiet's 1998 letter regarding the Investment Company Act. *Pl. Brief at 13-14, 33*; *Pl. Ex. 22.*  The Brief characterizes the letter as one

> "in which Greenberg opined that Stanford did **not** have to register SIBL under the Investment Company Act because, as a "foreign bank", SIBL was exempted under the Investment Company Act since *the majority of SIBL's income* was derived from making commercial loans."

*Pl. Brief at 13* (emphasis and underlining in original); s*ee also id. at fn 7* (the letter contains a "legal opinion that SIBL did not need to register as an investment company because it was a commercial bank that derived most of its income from making loans.").  Both assertions are false.  The referenced letter does not contain the asserted opinions.

The letter opens with the specific question asked by the client and a direct answer by Loumiet:

> You have asked us to confirm to you in writing that the private placement of certificates of deposit to "qualified purchasers" (as described herein) by Stanford

> Financial Group, Ltd. ("Stanford") does not require registration under the Investment Company Act of 1940 ("Investment Company Act" or "Act").
>
> As discussed below, the private placement of certificates of deposit to an unlimited number of **qualified purchasers** by Stanford does not require registration under the Act.

*Pl. Ex. 22, at 1* (emphasis added). The opinion rendered was an absolutely correct statement of the law with regard to sales to Qualified Purchasers. Investment Company Act of 1940 Section 3(c)(7), 15 U.S.C. § 80a–3(c)(7), Qualified Purchaser Exemption.

The letter goes on to discuss other exemptions to the ICA including the Foreign Bank Exemption. The letter quotes the exemption, the definitions of key terms, and concludes with an accurate and qualified opinion:

> Consequently, Stanford is exempted from the definition of "investment company" and exempt from the Investment Company Act **as long as it can demonstrate** that it is "engaged substantially in commercial banking activity."

*Id*. at 2 (emphasis added). Contrary to the Investor Plaintiffs' suggestions, *Pl. Brief at 13-14*, the letter does not assert or opine that Stanford was engaged substantially in commercial banking activity.

## C.    The Florida Trust Representative Office

In 1997, Loumiet was asked to research whether Stanford Trust Company (in Antigua) could establish a trust services office in Florida "that would engage solely in the provision of fiduciary services for its clients and would refrain from engaging in banking activities such as taking deposits or extending loans." *Pl. Ex. 25 at GT 03-22-2011 ST0004378 p.[*4379]* (research memo forwarded to Stanford). The resulting memo includes a summary of discussions with the Federal Reserve, which warned that "in order to avoid being deemed a representative office of the Bank—which does require Federal Reserve approval—*the proposed Florida office*

*of the Trust Company should not solicit business on behalf of the Bank*." *Id. at* [*4382]
(emphasis added).

Citing this memo, the Brief asserts that "Greenberg recommended to Stanford that he
could use Stanford's Antiguan trust company, STC Ltd., as a platform to establish 'trust
representative offices' in the U.S. *in order to sell the SIBL CDs to Latin American investors.*"
*Pl. Brief at 14* (emphasis added).  This assertion is simply false; the memo says the opposite.

The Brief next cites a redline draft of the memo and quibbles over one of Loumiet's edits
but ignores the express warning quoted above which was not edited.  *Pl. Brief at 14 and Pl. Ex.
25 starting at [*4399]*.  Loumiet was later asked specifically "to what extent the Proposed TROs
may work with together with the Bank without being deemed an office or representative of an
unlicensed foreign bank under applicable federal and Florida banking law."  Loumiet provided a
lengthy analysis culminating in an explicit list of DO's and DON'Ts which included the
following:

> "6.    Don't solicit business of any nature on behalf of any company other
> than your trust company.  In particular, do not solicit business on behalf of
> Stanford International Bank."

*GT Ex. 4 at [*4458]* (emphasis in original) *(APP 0077)*.  If an employee of the trust
representative office solicited sales of SIBL CDs, it was in violation of Loumiet's legal advice
and instructions.

### D.    Loumiet's one-time review of an early draft Reg. D Disclosure

Stanford did not use Greenberg Traurig to prepare the Reg. D offerings of CDs in the
United States.  But in July 1998, Loumiet was asked to review and comment on an early draft of
a Reg. D Disclosure Statement provided by Stanford.  *Pl. Ex. 24 at [*526]* ("Attached please
find a redline version of the Disclosure Statement you forwarded to us for review and
comments.").

Loumiet suggested numerous additional disclosures. Tellingly, his recommendations would have informed the named plaintiffs of material facts they claim they did not know. The recommendations started on the important first page and included the following:

- Just below STANFORD INTERNATIONAL BANK LTD. on the masthead add in all caps "REPUBLIC OF ANTIGUA AND BARBUDA."

  - ➢ *Compare with* Salgado/Michoacan Trust, *GT Ex. 5 (Salgado Depo.) pp. 48-49 (Salgado claims he was told that his CD's were issued by "A bank located in the United States with relations in Antigua.") (APP 0080-81).*

- Set off in a separate paragraph, and call attention further with bold face type, add "**THE CD DEPOSITS ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION OR UNDER ANY SIMILAR INSURANCE PROGRAM OF THE GOVERNMENT OF ANTIGUA AND BARBUDA**."

  - ➢ *Compare with GT Ex. 6 (Reed Depo.) pp. 19-20 (Reed claims she was told her CDs were "FDIC insured") (APP 0097-98).*

*Pl. Ex. 24 at [*9393].*

After receiving Loumiet's advice to make full and conspicuous disclosures, and probably because of it, ***Stanford never again asked for Loumiet's advice*** as to the Reg D offerings. The draft Disclosures Loumiet commented on were reviewed and revised without his involvement before being issued by SIBL. Indeed, the Disclosures submitted with the Brief do not use Loumiet's recommendation to set off in a separate paragraph and call attention with bold face type the warning that the CDs were not insured by the FDIC. *Pl Ex. 99 at p. 3 of 24.* Plaintiffs offer no evidence—and Greenberg Traurig is aware of none—that Loumiet even saw the final Disclosures before they were issued.

The Original Disclosure Statement dated October 15, 1998, was not prepared or reviewed by Loumiet. And it was thereafter amended and superseded six times without Loumiet's involvement. *See id.* (listing dates of each Amendment). The Amended Disclosure Statements materially changed the offering of CDs from the one shown to Loumiet. The original offering

was limited to a maximum of $50 million (D.E. 1, ¶ 40) and was only open for one year.  *Pl. Ex. 99, at 18*.[3]  The Amended Disclosures extended the offering period to "indefinitely" (*Id*.) and the maximum offering was increased in steps to $2 billion.  D.E. 1, ¶¶ 40-42.

Jane Bates, the chief compliance officer for SGC, explained that Stanford wanted to "make them more—in the disclosure document, make it more friendly, you know, make it more readable. It was all legalese."  *GT Ex. 7 (Bates Depo.) 13-14 (APP 0133-34)*.  Instead of asking Loumiet, the lawyer who recommended ever more disclosures, Stanford hired another lawyer and another law firm for the Amended Disclosures. *Id*.  The Investor Plaintiffs are simply wrong to suggest that "Greenberg reviewed and revised SIBL's Reg. D Disclosures, *which were thereafter used by SGC to market and sell the SIBL CDs to U.S. investors*."  *Pl. Brief at 14* (emphasis added).

## ARGUMENT AND AUTHORITY

The proposed class cannot be certified under Rule 23(b)(3).  As discussed in detail below, a class action is not superior to other methods for adjudicating this controversy, given the far more efficient action by the Receiver and Investor Committee pending before this very Court, as well as the significant obstacles to managing a sprawling class of investors from all over the world about whom little is known beyond the sparse data in the Receiver's claims-administration data.  Moreover, because a host of individual issues (including causation, damages, and limitations periods) cannot be resolved on a class-wide basis, this action would be dominated by individual issues varying among each of the supposed 17,000 investors within the class.  These investors would be represented by inadequate, atypical named plaintiffs, whose own conflicts of

---

[3] Each offering came with its own Amended Disclosure Statement and, with it, the opportunity and obligation of SIBL to correct any errors in the previous Disclosure and disclose all material facts then in existence.  Loumiet did no work on any of the Amended Disclosure Statements. And no evidence is offered that any putative U.S. class member bought CDs during the 1998-99 Original Offering and still held them in February 2009.

interest would prevent them from properly pursuing the case even if they were not subject to unique defenses likely barring their claims.

In addition to these global problems, a closer inspection of the Investor Plaintiffs' individual claims reveals that none is suitable for class treatment. "[C]onsideration of class certification should proceed on a claim by claim basis … ." *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001). Consider the claims remaining after this Court's order on the motions to dismiss:

- *Texas Securities Act Claims Based on the Sale of Unregistered Securities or Sale by Unregistered Dealers*: No named plaintiff can represent a class pursuing these claims against Greenberg Traurig. Pam Reed is an accredited investor, exempted from the Act's prohibition against the sale of unregistered securities (*GT Ex.* 6 (*Reed Depo*)) at p. 30 (APP 0103), and she purchased her investments through a registered dealer. Samuel Troice made his last purchase in 2005, *GT Ex. 8 (Troice Depo. in Proskauer) at pp. 103-04(APP 0137-138)*, but this Court has dismissed these claims based on sales before February 1, 2008. Finally, because trusts are not allowed to pursue these claims at all, the Michoacan Trust cannot represent the investors on these claims.

- *Texas Securities Act Claims Based on Sale of Securities Through an Untruth or Omission*: Again, no named plaintiff can represent the investors on these claims against Greenberg Traurig. For the reasons discussed above, neither Troice nor the Michoacan Trust can properly represent investors pursuing these claims. First, trusts may not bring suit on such claims at all. Second, Troice's most recent purchase was in 2005. This Court has already dismissed all such claims based on sales prior to February 1, 2006. Reed is not an appropriate representative for claims based on an untruth or omission either: whereas the class claims that they were fooled by Stanford's failure to disclose that his operations were based in Antigua, Reed actually visited the Antiguan headquarters, met with Allen Stanford, and received presentations from various Stanford employees while there.

- *Common-Law Claims*: The remaining common-law claims will require the Investor Plaintiffs to demonstrate reliance, an individualized issue that will overwhelm any common issues presented here. No presumption of reliance will mitigate this problem, as these securities did not trade on an efficient market, nor have the investors identified a misrepresentation that "created" any such market (let alone a misrepresentation facilitated by Greenberg Traurig). Moreover, Texas does not allow a presumption of reliance in omission cases (unlike the *Affiliated Ute* presumption

available in claims under federal law) and, even if it did, the claims here center on affirmative misrepresentations.

These problems—which would preclude certification of any of these claims—are even more significant in light of the global problems mentioned above, and especially given that the action by the Receiver and Investor Committee suffers from none of these flaws.

## I.   SUPERIORITY: THIS ACTION IS NOT A SUPERIOR MEANS OF RESOLVING THE CONTROVERSY.

As an exception to the usual rule of individual lawsuits, a class action under Rule 23(b)(3) is permitted only if it "is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). "[A] class action must be **better than**, and not merely as good as, other methods of adjudication," to justify class treatment. 5 MOORE'S FEDERAL PRACTICE—CIVIL ¶ 23.46[1]. The Investor Plaintiffs have failed to demonstrate that this action is a superior method of resolving the controversy, especially given their own concession that the Receiver's action is a more efficient vehicle for handling matters in this case. Additionally, the Plaintiffs propose a class with members from dozens of foreign countries with no proof that those countries would recognize a judgment in this case. They likewise offer no reason to believe that the amounts at issue here are too small to support individual litigation—an implausible suggestion given that Stanford's high minimum purchase amounts and the preponderance of litigation *already initiated* by numerous Stanford investors. Moreover, by deferring to the Receiver's cost-benefit decisions about data collection, the Investor Plaintiffs find themselves unable to craft a manageable definition of the class or any proposed subclasses that would result. In light of the pending action by the Receiver and the Investor Committee against Greenberg Traurig, which suffers from none of these flaws, this Court should decline to find the superiority requirement satisfied.

### A.   The Receiver and Investor Committee Litigation is a Superior Method for Resolving This Controversy.

This Court need not look far to find a superior way of resolving this controversy: the action by the Receiver and Official Investors' Committee, pending before this very Court, seeks a materially identical damages award from the same defendants, based on the same conduct and for the benefit of the same[4] people—but without the cost and complexity of dealing with the individual issues raised by a shareholder class action.[5]   This is particularly true here where the investors already have a voice in the Receiver's action and, as discussed below, the Investor Plaintiffs are attempting to defer entirely to the Receiver on critical issues such as damages.

Indeed, the Investor Plaintiffs in the actions against BDO and Adams & Reese, including Pam Reed, have already told this Court that the Receivership is a superior means of resolving this controversy.  In their own words:

> There would be uncertainty and delay in certifying a settlement class involving all Stanford Investors who reside in multiple countries throughout the world, and such a class would be duplicative with respect to the Stanford Investors who are already participating in the Receivership claims and distribution process. … **It is far more efficient and saves substantial costs to distribute the settlement funds through the court-approved Receivership distribution process rather than create an entirely separate and parallel class action claims and settlement distribution process.  A class action settlement process would result in substantial delay and less money flowing to investors.**   The Receivership settlement and bar order, together with a dismissal of the Investor Lawsuit, protects all interested parties, both the Defendants and the Stanford investors.

---

[4] Any class certified here would represent a subset of the investors due to issues of foreign law and limitation periods.  *See* Parts I.B & II.C & E, *infra*.

[5] Greenberg continues to assert (and hereby preserves its argument) that the Receiver's tort claims are improper for a host of reasons, including because those claims belong to the investors, and because the claims are barred by the doctrine of in pari delicto.  But in light of this Court's rulings on these issues, *see* D.E. 114 at 9-11, the Receiver is proceeding apace with receivership claims, and thus at this time presents a superior vehicle for resolving this controversy.  Moreover, given the significant issues with the proposed class, as discussed throughout this memorandum, the Receiver's action against Greenberg is a superior means of resolving the controversy *even if* there is some risk that Greenberg's arguments against that action might carry the day at some later point in time.

*GT Ex. 9 (Motion to approve the settlement with BDO), at 17* (emphasis added) *(APP 0155).* The Investor Plaintiffs in this litigation agree, which is why they have agreed that any recovery in this litigation will be distributed through the Receivership: as the court-appointed Examiner and chairperson of the Official Investors' Committee explained, "[u]sing the Receiver's existing process will be far more efficient, and likely result in larger distributions to Stanford Investors, than the alternative of creating one or more parallel claim and distribution process(es) for class actions." *Pl. Ex. 106, at ¶ 12.*

Faced with class actions that mostly duplicate a more efficient and less expensive process for resolving claims, courts have unsurprisingly refused to find the superiority requirement satisfied. For example, the Fifth Circuit has held that bankruptcy courts must weigh the superiority of a class action against potentially more efficient proof-of-claim processes available in bankruptcy. *See In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013). Thus, the Court must "consider the cost to the debtor's estate of a class adversary proceeding simply because the expense of adjudicating the controversy via a class action depletes the debtor's assets, which in turn diminishes the funding available to creditors, including, possibly, the very claimants pursuing the class action." *Id.* And in a situation similar to the present case, an Indiana court held that a class action could not satisfy Indiana's equivalent of Rule 23's superiority requirement, because an action by a Receiver bringing distinct (albeit similar) claims was superior. *Farno v. Ansure Mortuaries of Ind.*, 953 N.E.2d 1253, 1274-76 (Ind. App. 2011). The *Farno* court rejected arguments that the class asserted different claims with different elements and different chances for obtaining relief, finding that the Receiver's claims were similar enough to defeat superiority.

Likewise, in *Gregory v. Finova Capital Corp.*, the Fourth Circuit refused to certify a class action brought by unsecured creditors of a bankrupt entity, because it found that an adversary action brought in the bankruptcy proceeding by the committee of unsecured creditors against the same defendant was clearly superior to the class action. 442 F.3d 188, 191 (4th Cir. 2006).  After finding that the district court abused its discretion by failing to compare the class action against the adversary proceeding, the majority explained:  "It would be inefficient and needlessly duplicative to allow the class action to go forward when the adversary proceeding will likely adjudicate this controversy in the normal course of TGI's bankruptcy. …   Also, the adversary proceeding will avoid many of the expenses and complexities associated with having the class action and the adversary proceeding pending simultaneously … ."  *Id.* at 191.  Rejecting the dissent's contention that the claims and possible damages in the two proceedings were distinct, the majority held that it was sufficient that the two cases challenged the same conduct and that the damages in the adversary proceeding would make the plaintiffs "more or less whole."  *Id.* at 191-92 & n.5.  Thus, like *TWL* and *Farno*, this case makes clear that a class action is not superior when there is a more efficient process for resolving similar claims providing similar relief.  *See also Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 211-13 (9th Cir. 1975) (finding that an action by California officials providing partial relief to many proposed class members would prevent a finding that the proposed class was the superior way of resolving the controversy); *Brown v. Charles Schwab & Co., Inc.*, No. 07-CV-03852, 2009 WL 4809426, at *9 (D.S.C. Dec. 9, 2009) (finding an investor class action superior in part because "[t]he court is not aware of other litigation pending against Schwab involving the same or similar claims by Parish investors.  *In particular, the receiver has not brought such claims*." (emphasis added.)), *amended*, 2010 WL 424031 (D.S.C. 2010).

Like the class actions rejected in *Farno* and *Gregory*, the proposed class here offers no advantages over the Receiver and Investor Committee litigation, while it might significantly reduce the investors' potential recovery by the amount of class counsel's fees and expenses. Indeed, the Investor Plaintiffs make no secret that they are seeking precisely the same damages as the Receiver seeks: their "damage theory consists of the class members' lost net investments in SIBL **as approved by the Receiver**, less any distributions received to date." *Pl. Brief at 60* (emphasis added). In other words, any class member's potential recovery will be no more than the amount that the Receiver has approved for that class member's claims, suggesting that this class action has even fewer advantages than the actions rejected in *Gregory* and *Farno*. *See Gregory*, 442 F.3d at 191 n.5 (noting that class action was not superior even if it offered greater potential relief to class members); *Farno*, 953 N.E. at 1276 (same). Moreover, the Court-appointed examiner and chair of the Official Investors' Committee has explained that "[t]he factual allegations and legal theories asserted by the Receiver and the OSIC against the Greenberg Defendants are substantially the same as, and intertwined with, the factual and legal theories asserted by the Stanford Investor Plaintiffs in support of the class claims asserted in the *Greenberg* Action." *Pl. Ex. 106 at ¶ 13*; *cf. Gregory*, 442 F.3d at 191 n.5 ("The conduct that could cause the court to put Finova behind the noteholders in line for TGI's assets in the adversary proceeding includes the same conduct that could give rise to Finova's direct liability to the noteholders."). Finally, the Investor Plaintiffs have agreed that "any proceeds recovered from the class claims asserted in the *Greenberg* Action will be distributed through" the Receivership, because as the chair of the Investors' Committee stated, that process "will be far more efficient, and likely result in larger distributions to Stanford Investors, than the alternative of creating one or more parallel claim and distribution process(es) for class actions." *Pl. Ex. 106,*

*at ¶ 12*.  In short, the class action is simply a less efficient way of doing what the Receivership already accomplishes.

In fact, the Receiver is permitted to bring tort claims against Greenberg Traurig ***precisely because*** it is a more efficient way of providing recovery to investors like the class members here. This Court has held that the Receiver's action fits within an exception to the *in pari delicto* doctrine that applies "when a receiver seeks to reclaim assets for innocent investors." D.E. 114 at 10.  The Fifth Circuit has explained that this exception allows actions by Receivers, which are the most practical method for resolving controversies like this:  "The conceivable alternatives to these suits for getting the money back into the pockets of its rightful owners are a series of individual suits by the investors, which, even if successful, would multiply litigation; ***a class action by the investors—and class actions are clumsy devices***; or, most plausibly, an adversary action, in bankruptcy … ."  *Jones v. Well Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012) (emphasis added) (quoting *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995)).  In other words, a principal reason for allowing the Receiver's action notwithstanding the *in pari delicto* doctrine is to ***avoid*** the use of such "clumsy" devices as the class action proposed here.

**B.      Foreign Courts Will Not Grant Preclusive Effect to a Judgment in This Case.**

A class action involving foreign class members is generally not superior to other methods of resolving a controversy unless the putative class can demonstrate that foreign courts would probably "recognize the res judicata effect of a U.S. class action judgment."  *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007); *see also Buettgen v. Harless*, 263 F.R.D. 378, 382-83 (N.D. Tex. 2009).  The Investor Plaintiffs suggest that this analysis matters "only if it is nearly certain that foreign courts would not recognize a judgment," *Pl. Brief at 68*, but this "near-certainty" test has been rejected by the very authorities on which they rely.  *E.g.*, *Vivendi*, 242 F.R.D. at 95 ("[T]he Court does not find the 'near certainty' standard to be a particularly

useful analytical tool. …   [T]here is no indication that only this degree of certitude calls into question the superiority of a class action."); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 282 (S.D.N.Y. 2008) ("A foreign court's potential nonrecognition of a United States judgment need not be a near certainty before the superiority of a United States class action is called into question.").   Courts have similarly rejected the Investor Plaintiffs' suggestion that a class should be certified as long as there is "some possibility" of foreign enforcement. *See, e.g.*, *Alstom*, 253 F.R.D. at 282 ("[A] plaintiff who can demonstrate only that recognition of a United States judgment is a 'mere possibility' does not necessarily establish superiority.").   Rather, "[w]here plaintiffs are unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority," this factor must be given even greater weight in the superiority analysis as the likelihood of nonrecognition approaches "near certainty."   *Vivendi*, 242 F.R.D. at 95; *accord Alstom*, 253 F.R.D. at 282.

The Investor Plaintiffs and Greenberg Traurig have agreed to rely upon the prior briefing and declarations of foreign law experts previously submitted in other cases filed in this Court.[6] These submissions make clear that the Investor Plaintiffs have not met their burden and cannot meet their burden.   As to five of these countries—France, Spain, Germany, Switzerland, and the Netherlands Antilles—the Investor Plaintiffs have not yet designated any responsive expert to rebut the defendants' submissions demonstrating that these countries would not recognize a judgment obtained in an American opt-out class action.   The defendants' expert submissions regarding Latin American countries where many of the investors resided demonstrates that recognition is highly unlikely in Venezuela, Columbia, Mexico, Peru, Ecuador, Panama, or El

---

[6] The declarations of foreign law experts are in the Appendix labeled as originally filed, *Trustmark Exhibits 74-81(APP 1124-1451) and 83-87 (APP 1452-1906); Proskauer Exhibits 32-35 (APP 0953-1123); Pershing Exhibit 81(APP 0862) and Willis Exhibit AA (APP 1907).*

Salvador.  For the reasons explained in other briefing, the Investor Plaintiffs' experts on Latin American countries address the wrong question: they explain only that these countries recognize U.S. judgments generally, not judgments produced in an opt-out class action. *See, e.g., GT Ex. 19 (Proskauer Br. In Opp.) at 40-41 (APP 0535-536).*  Additional defense experts have explained that common-law countries like England and Canada likely would not recognize a U.S. class-action judgment, and the Plaintiffs' rebuttal experts offered only half-hearted speculation in response—even conceding that depending on the outcome of the Joint Liquidators' action, Canada likely would not enforce a judgment rendered in these actions.  *GT Ex. 18 (Trustmark Br. In Opp.) at pp. 28-29 (APP 0409-410).*  The Plaintiffs, who have the burden of proof on this issues, have simply failed to produce evidence that a host of other countries where investors reside would recognize a U.S. class-action judgment, including countries such as Austria, Belgium, Bosnia and Herzegovina, Bulgaria, Croatia, Cyprus, Denmark, Greece, Hungary, Iceland, Ireland, Isle of Man, Italy, Latvia, Macedonia, the Netherlands, Norway, Poland, Portugal, Romania, Serbia, Sweden, Turkey, and Ukraine.

These problems cannot be resolved simply by excluding class members of certain nationalities, which would produce conflicts of interest for the proposed class representatives and the Receiver.  The Receiver, after all, has a duty to pursue assets for the benefit of investors from all of these countries, whereas class representatives and their counsel must maximize recovery for the class.  *Cf. Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678 (N.D. Ohio 1995) (noting the risk of conflicting settlement demands when class representatives are part of parallel actions with partially overlapping parties).  These conflicting duties will seriously interfere with any potential settlement of the matter, especially since the Receiver has a "right to be heard" in any settlement of the class action and given that, in related cases, settlements have been achieved when Investor

Plaintiffs agreed to forego their claims in exchange for a settlement payment made to the Receiver. *See, e.g.*, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298, D.E. 2137 at 16-17. Indeed, the Investor Plaintiffs' current agreement to turn over any recovery in this action to the Receiver for distribution, *Pl. Ex. 106, at ¶ 12*, would be frustrated to the extent class members are excluded from the class definition.

Additionally, there is no straightforward or manageable manner to determine the nationality of each class members. Although the Receiver has the SIBL database which included data on each member's "nationality," the Receiver's representative testified that he did not know how this data was determined—for example, he did not know whether it reflected an investor's nationality at the time they made their first purchase, their most recent purchase, the time they submitted a claim, or potentially a combination of different time periods depending on who input the data for a particular claimant. *GT Ex. 10 (Russell Depo.) at 44-47(APP 0189-192)*. The Receiver did not know whether SIBL verified the depositor's claimed nationality, *Id. at 49(APP 0194)*, nor could the Receiver explain how the database would characterize the nationality of someone like named plaintiff Troice, who is a citizen of the United States and Mexico, *Id. at 48(APP 0193)*. And of course, the Receiver has no data to determine where an investor opened a particular account or received any particular representation from a bank employee or financial advisor. *Id. at 50 (APP 0195)*. Even the mailing address maintained by the Receiver provides no useful proxy for determining nationality, since many investors have their correspondence sent to representatives: named plaintiff Troice, for instance, has correspondence sent to his lawyer. *GT Ex. 11 (Troice Depo.) at 27 (APP 0218)*. In short, the Receiver currently lacks the data to exclude class members of any nationality from the class on a systematic basis, and the individual

data collection necessary to do so would pose a formidable challenge for "approximately 17,000 investors." *Pl. Brief at 38.*

### C.  Individual Suits Are a Feasible Alternative and Have Actually Occurred.

A class action is not the superior method for resolving a controversy if individual lawsuits are both feasible and financially prudent. Because the investments at issue here had high minimum purchase requirements, individual damages in this action are large, and thus "[t]he most compelling rationale for finding superiority in a class action—the existence of a negative value suit—is missing in this case." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996). The availability of "relatively substantial" awards for individual litigants weighs heavily against a finding of superiority, *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420 (5th Cir. 1998), because such cases fall outside the central concern of Rule 23(b)(3) class actions: enabling plaintiffs to litigate collectively cases that could not feasibly be pursued individually. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").

Because of Stanford's minimum purchase requirements, the amounts of individual losses are significant. The Michoacan Trust recites CD purchases in excess of $300,000. *See Pl. Ex. 4* (declaration of Salgado). Pam Reed recites investments in excess of $2 million. *See Pl. Ex. 4* (declaration of Reed). Samuel Troice testified that his losses are $2.3 million. *GT Ex. 8 at 18 (APP 0136).* Notably, the Investor Plaintiffs rely heavily on the Examiner's declaration that "almost 85% of Stanford Investors had total investments (and losses) of less than $500,000, and that Stanford Investors with SIBL CD balances over $500,000 represent only 15% of all Stanford Investors." *Pl. Ex. 106, ¶ 7.* The Fifth Circuit has suggested that claims with a statutory

*maximum* of only $300,000 per plaintiff are sufficiently valuable to weigh against a finding of superiority, at least where a statute (such as the Texas Securities Act, TEX. REV. CIV. STAT. art. 581-33(D)(7)) provides the possibility for recovering attorneys' fees. *Allison*, 151 F.3d at 420 ("The relatively substantial value of these claims (for the statutory maximum of $300,000 per plaintiff) and the availability of attorneys' fees eliminate financial barriers that might make individual lawsuits unlikely or infeasible. … Thus, the principles underlying the (b)(3) class action counsel against (b)(3) certification in this case."); *accord Dvorin v. Chesapeake Expl., LLC*, No. 3:12-CV-3728-G, 2013 WL 6003433, at *9 (N.D. Tex. 2013) ("The plaintiffs argue that the size of their claims would make it difficult for them to bring their claims absent a class action, but they acknowledge that their claims would each be for several thousand dollars. ... This amount is not so small as to render a class action a superior method of adjudication.").

It is thus no surprise that the putative class members, including named representative Pam Reed, have ***actually filed their own separate actions*** against third parties to recover their losses. *GT Ex. 6 (Reed Depo.) at 21 (APP 0099).* Furthermore, some putative class members have sold their claims to third parties allowing those third parties to aggregate the claims and bring individual suits. Perhaps the most likely reason that there are not more individual suits today is that most class members are content to seek recovery through the Receivership which, as already discussed, seeks the same damages as the class.

Where individual suits are a feasible, practical alternative to the class action, plaintiffs may not demonstrate superiority by suggesting that a class action will reduce burdens on the judiciary compared to individual actions. *See, e.g.*, *Castano*, 84 F.3d at 747-48; *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995) ("With the aggregate stakes in the tens or hundreds of millions of dollars, or even in the billions, it is not a waste of judicial resources to

conduct more than one trial, before more than six jurors, to determine whether a major segment of the international pharmaceutical industry is to follow the asbestos manufacturers into Chapter 11.").  Any supposed judicial efficiency created by the class action is at best speculative, especially given the complexities of proceeding as a class in this case and the availability of the Receivership as an avenue for the putative class members to seek relief.[7]

### D.    The Proposed Class is Unmanageable.

The Court must consider whether a class action is efficient and manageable. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408-09 (5th Cir. 1998).  The Investor Plaintiffs rely on the Receiver for this, proposing to adopt the Receiver's class definitions and damages calculations.  But the Receiver simply lacks the data to facilitate a manageable class action.  As already noted, for instance, the Receiver cannot exclude investors of any given nationality, because that data has not been gathered in a uniform manner.  Likewise, the Receiver has chosen not to collect transaction history from before *2003*, even though the Investor Plaintiffs concede that Loumiet left Greenberg Traurig in *2001*.

Indeed, the Receiver has not even submitted a total number of class members in the primary proposed class or either of the proposed subclasses.  Instead, the Receiver's declaration speaks to the number of *claims* allowed.  But claims are not the same as claimants, and even the

---

[7] Moreover, when a class action threatens to create oppressive liability out of proportion to the defendant's conduct, courts have concluded the class action device is not superior.  *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 n.5 (11th Cir. 2003) (expressing doubt as to superiority due to potential aggregate damages being out of proportion to conduct at issue); *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 234 (9th Cir. 1974) (refusing to certify where joint and several liability increased damages in geometric progression to three quarters of a billion dollars); *Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336, 347 (10th Cir. 1973) (class certification not proper where aggregate damages would be oppressive); *see also Stillmock v. Weis Mkts., Inc.*, 385 Fed. Appx. 267, 278 (4th Cir. 2010) (Wilkinson, J., concurring) (advocating that courts consider annihilative damage potential as part of superiority inquiry). The potential joint and several liability against Greenberg on a respondeat superior basis for the entirety of the putative class's damages is out of proportion to the harm suffered with respect to any one plaintiff.

Receiver's process for grouping various claims together but systematic.  *See GT Ex.10 (Russell Depo.) at 177-79 (APP  0211-213)  (explaining that deciding whether to group various claims together is a "more manual" process in which the Receiver looks at whether "everybody kind of looks like they really do have their own distinctive activity," in which case claims would be treated separately.*  And the Receiver's only mechanism for identifying members of the proposed subclasses is to identify amounts "deposited" after 2006 or 2008—which is not the same as the class definitions, based on this Court's dismissal of barred Texas Securities Act claims, looking to whether investors ***purchased securities*** on or after February 1, 2006 or 2008.  D.E. 123 at 22.

Notably, the Investor Plaintiffs have not submitted a proposal as to how they envision trying their claims.  The facts in this case make it even less manageable than the one in *Allison* where class certification was denied. *See Allison,* 151 F.3d at 419.

### E.     The Receiver has been extended right to sue for the Investor Plaintiffs' common injuries.

Now that the Court has ruled on the motions to dismiss, the Examiner's declaration supporting class certification in this matter admits that the class members are bringing essentially the same claims as the Receiver: "The factual allegations and legal theories asserted by the Receiver and the OSIC against the Greenberg Defendants are substantially the same as, and intertwined with, the factual allegations and legal theories asserted by the Stanford Investor Plaintiffs … ." *Pl. Ex. 106 at ¶ 13.*  This helps explain why the Investor Plaintiffs are content to seek only those losses calculated and allowed by the Receiver, and why they have agreed that any recovery in this action will be turned over to the Receiver.  The investors here assert that they lost their deposits as a result of Allen Stanford's fraud.  When such an injury is common to all depositors, the cause of action is derivative and belongs to the receivership.  *See, e.g., In re*

*Sunrise Sec. Litig.*, 916 F.2d 874, 887 (3d Cir. 1990).[8]  And indeed, that is precisely the claim

that the Receiver has been authorized to bring: "This Court has held that the Receiver may assert

tort claims against third parties based on allegations that the third parties' torts contributed to the

liabilities of the Receivership Estate… In the *Adams & Reese* Order, the Court held that claims

against lawyer and director-defendants could go forward where the Receiver alleged that the

defendants failed to prevent the Stanford Ponzi scheme and thus 'harmed the Stanford Entities'

ability to repay their creditor-investors.'"  Order, D.E. 114, at 9-10.  In sum, the class action is

merely a less efficient means of bringing the claims that the Receiver is already litigating.  *See*

*Farrie v. Charles Town Races, Inc.*, 901 F. Supp. 1101, 1111 (N.D. W. Va. 1995) ("[T]he action

against the employer is derivative and any recovery from the entire case will inure to the benefit

of the Plan, and through it, to the benefit of all of the participants and beneficiaries. Maintenance

of a class action would create additional complication and expense, and may not be necessary, as

the issue is simple and determinative.").

## II.     PREDOMINANCE:  QUESTIONS AFFECTING INDIVIDUAL CLASS MEMBERS WILL PREDOMINATE.

Predominance requires that the proposed class is sufficiently cohesive to warrant

adjudication by representation.  *Torres v. S.G.E. Mgmt., L.L.C.*, 805 F.3d 145, 150 (5th Cir.

2015).  "For the class-wide matters to predominate, the 'common issues must constitute a

significant part of the individual cases.'"  *Kosmos*, 299 F.R.D. at 150.  Even a single disputed

---

[8] The facts in *Sunrise* bear similarity to those in the present case.  In *Sunrise,* the plaintiffs sued former directors, officers, auditors, *and attorneys* of the bank. *Id.* at 879.  They argued that the defendants had made misrepresentations (affirmatively and by omission) that caused them to purchase CDs.  Among the misrepresentations was that the defendants held the bank out as legitimate, well-run and secure, with attractive interest rates and they failed to disclose that the bank was not financially secure and not well-managed. *Id.* at 877.  The plaintiffs also asserted that the bank understated the value of loans, improperly classified construction loans, and employed deceptive operating practices designed to mislead regulators. *Id.* at 883.

factual element of a claim may defeat class action status.  *See, e.g., Perron v. GMAC*, 232 F.3d 433, 440 (5th Cir. 2000) (reliance element was individual and precluded certification).

Predominance requires the Court to determine **how** the case will be tried. *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003).  Accordingly, the Court must identify the controlling substantive law and elements of the claims and defenses. *Torres*, 805 F.3d at 150-51; *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).  The Investor Plaintiffs are required to produce "quality evidence" to support predominance. *Kosmos*, 299 F.R.D. at 151.  "Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any problems with predominance or superiority can be overcome." *Castano*, 84 F.3d at 742; *accord Unger v. Amedisys Inc.* 401 F.3d 316, 321 (5th Cir. 2005) (requiring findings of fact, not assumptions, to support certification).

Here, a significant number individuals issues of preclude class certification, including (1) damages; (2) reliance; (3) whether each CD rollover constituted a new sale of a security; (4) comparative fault; (5) choice of law; and (6) the discovery rule.  Each one of these issues requires individualized considerations concerning a supposed 17,000 investors that would outweigh class-wide determinations, and together—overwhelm any common issues.

**A.    The Supreme Court's Decision in *Comcast* Requires Denial of Certification.**

1.  The Receiver has no damages theory and even if he did – it would not apply to the Investor Plaintiffs.

"Without presenting" an appropriate methodology to compute damages on a class-wide basis, a plaintiff "cannot show Rule 23(b)(3) predominance:  Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  The Investor Plaintiffs have placed complete reliance on the Receiver's claims process in lieu of presenting an actual damages model.  With respect to

damages, the Brief states as follows:  "Given that the Receiver and his team of forensic accountants at FTI have already undertaken and completed the extensive claims review and approval analysis, the Receiver and FTI will be able to submit one damage number at trial based on allowed claims for the main class of investors, a separate damage number based on allowed claims for the subclass of investors who invested in SIBL after February 1, 2006, and a separate damage number based on allowed claims for the subclass of investors who invested in SIBL after February 1, 2008."  *Pl. Brief at 60*.  This position is fatal to the Investor Plaintiffs' bid for class certification for several reasons.

First, the Receiver does not have a damages theory.  Mark Russell of FTI testified as the designee of the Receiver.  Russell confirmed that FTI has not been hired to devise a damages methodology and the Receiver has not yet devised one either.  *GT Ex. 10 (Russell Depo.) at 76 (APP  0203)*.  Mr. Russell went on to explain that "a damages methodology **will be** established. That damages methodology will have different factors that may or may not need to place limits on the data.  It may or may not need to treat certain transactions different ways depending upon what the expert says."  *Id. at 76-77 (APP 0203-204)*.  Mr. Russell also admitted that, depending on the methodology, the Receiver might not have sufficient information to perform the required calculations.  *See id.* at 77 *(APP 0204)* ("And if [the damages methodology] requires us to obtain information that we may not have that we could then limit our damages calculation on how much of that  information  we're able to subsequently get.").   However,  without an actual damages methodology in place, Mr. Russell conceded that at this time he cannot say whether the Receiver has sufficient information to perform the necessary calculations:

> Q. Without knowing what the damages methodology is or is going to be, you don't know if the receiver has receivership data necessary to perform the calculation today, do you?

A. I would agree with that –

Q. Okay.

A. -- as we sit here today, yeah.

*Id.* at 82 *(APP 0205)*.  Indeed, Mr. Russell confirmed that the calculations he is able to perform

are designed for the claims process – not to calculate damages tied to liability:

> Q. You understand that the claims process that the receiver has decided upon does not necessarily reflect what the damages measure against any particular defendant might be, correct?
>
> A. Yes, I do.
>
> Q. Okay.
>
> A. Yes.
>
> Q. So, for example, you might need to know when purchases were made depending on the legal theory for a particular plaintiff against a particular defendant, right?
>
> A. Potentially, yes.

*Id.* at 148 *(APP 0206)*.  What the Investor Plaintiffs call the Receiver's "damage theory" is not

tied to any legal claim at issue in this case—either by the Receiver or the investors.  *See*

*Comcast*, 133 S. Ct. at 1433 (holding that where a plaintiff's model "does not even attempt" to

measure "only those damages attributable to [movant's] theory" of liability, the movant "cannot

possibly establish that damages are susceptible of measurement across the entire class for

purposes of Rule 23(b)(3)"); *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *1 (S.D. Tex. May

20, 2014) ("The Court must determine whether [p]laintiffs' proposed damages methodologies (1)

quantify the injury caused by [d]efendants' alleged wrongful conduct, and (2) can be deployed

on a classwide basis such that common issues will predominate over individualized ones.").

Instead, the Receiver has created a claims process that is not tied to any particular legal claim or

based on the losses caused by any particular defendant.  And the Receiver has admittedly not

developed an actual damages methodology.  This "wait and see" approach is no longer permitted

in federal court after *Comcast*.  *See, e.g., Kosmos*, 299 F.R.D. at 151 (denying class certification where plaintiff argued that proof of damages "**will be offered** on a uniform, [c]lass-wide basis") (emphasis in original); *In re BP*, 2014 WL 2112823, at *12 ("The Court is left . . . with a conclusory assertion that damages will be calculated on a classwide basis. Plaintiffs bear the burden of proving all relevant elements of Rule 23.  That burden is not met by asking the Court simply to trust them.").  For this reason alone, the Motion must be denied.  *See id.* at 151 ("That Lead Plaintiff's submissions are akin to no evidence at all, under *Comcast,* ought to end the Court's predominance inquiry here.").

Courts in this Circuit and others regularly deny class certification based on plaintiffs' failure to meet the *Comcast* test to show that damages for the plaintiffs' claims can be calculated on a class-wide basis.  *See, e.g., Ludlow v. BP, P.L.C.*, 800 F.3d 674, 691 (5th Cir. 2015) (certification improper where damages "model cannot be applied uniformly across the class, as *Comcast* requires, because it lumps together those who would have bought the stock at the heightened risk with those who would not have" and "[i]t also presumes substantial reliance on factors other than price, a theory not supported by *Basic* and the rationale for fraud-on-the-market theory"); *Turnbow v. Life Partners, Inc.*, 2013 WL 3479884, at *17 (N.D. Tex. July 9, 2013) ("Plaintiffs' proposed damages model does not measure damages resulting from the particular injury on which Plaintiffs' liability action is premised."); *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("It is now clear, however, that Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it.".

Second, even if the Receiver were to devise a damages methodology, the Investor Plaintiffs and the Receiver are pursuing different legal theories.  "*Comcast* held that a district

court errs by premising its Rule 23(b)(3) decision on a formula for classwide measurement of damages whenever the damages measured by that formula are incompatible with the class action's theory of liability." *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir.2014).   In *Comcast*, the Supreme Court explained:

> [A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory [of liability].  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3). Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case . . . .

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (internal citations and quotations omitted).  Accordingly, even if the Receiver had a damages methodology, it would not apply to the distinct claims being pursued by the Investor Plaintiffs.

This total inability to tie a damages methodology to any theory of liability will prevent the Investor Plaintiffs from connecting their asserted damages to any alleged conduct by Loumiet while he was working for Greenberg Traurig, which ended on May 1, 2001.  Although the Plaintiffs would like to hold Greenberg responsible for the entire net loss, damages must of course be causally tied to particular conduct for which Greenberg is liable.  *Ludlow*, 800 F.3d at 690 (refusing to certify where damages model could not distinguish losses "causally linked to the misrepresentation" from those that were not); *see also In re Rail Freight Fuel Surcharge*, 725 F.3d at 253 ("Predicating class certification on a model divorced from the plaintiffs' theory of liability . . . indicates a failure to conduct the rigorous analysis demanded by Rule 23.").  The Investor Plaintiffs allege that Greenberg assisted the fraud in numerous ways, at different points in time, with different results.  If a jury decides that Greenberg is liable for some portion of the conduct asserted, which is denied, the Investor Plaintiffs are simply without any methodology for limiting the damages to those proximately caused by that particular conduct.  Likewise, if

(hypothetically) Greenberg were found liable only for conduct beginning in 1999, the Investor

Plaintiffs would simply lack the data to exclude the portion of losses attributable to investments

made before 1999.  These problems simply reinforce the basic lesson of *Comcast*, and since the

Investor Plaintiffs have failed to present a damages theory that "measure[s] only those damages

attributable to" their theory of liability, the class cannot be certified.  *Comcast*, 133 S. Ct. at

1433.

>    2.   The Receiver's data is incomplete and unreliable.

There is a critical problem with the Receiver's data related to the claims asserted against

Greenberg Traurig.  Even though the claims against Greenberg based on Loumiet's conduct run

from approximately 1988 to 2001 when Loumiet left the firm, the Receiver's "data starts in

August of 2003, so there's some accounts that begin in our data with a principal and interest

balance." *GT Ex. 10 (Russell Depo.) at 65 (APP 0202).*  Significantly, for these accounts, the

Receiver's data does not "show when the original CD account began or how it was funded[.]"

*Id.*  The amount of purchases before August of 2003 represents a huge amount of potential

damages that the Investor Plaintiffs are seeking to foist onto defendants without sufficient detail:

"There was about $1.6 billion worth of principal balance at that point in time. Roughly 900

million of that is in groups that are in like—or accounts that are in groups that have—that are a

part of the claims process. And then the other 7,   750 million are on accounts that have never

been claimed as part of the receivership claims process." *Id.* at 166-67 *(APP 0209-210).*

Therefore, to the extent that Greenberg is found liable as of a certain date, there is no way

to determine whether a plaintiff's purchases of CDs took place before or after that date.  Mr.

Russell's testimony confirms this to be the case:

>    Q. Does the receiver have documents sufficient to show when each putative class
>    member purchased their CDs, including the date and dollar amount of each CD
>    purchase?

A. I think it would -- I think it's going to ultimately -- that depends on what the actual class is determined to be. So as we discussed earlier, like we know that there's information that doesn't exist prior to August of 2003. So for -- if those individuals are determined to need to be in the putative class, then we wouldn't have information on when their specific CDs were purchased.

*Id.* at 98 *(APP 0205a)*.

Finally, the Receiver's calculation of a claim amount is not always calculated on a consistent basis and his data is not reliable enough to calculate the damages of the Investor Plaintiffs.  *See GT Ex. 10 (Russell Depo.) at 51-54 (APP 0196-199)*.  For example, if a claim is submitted that is less than the Receiver's calculation, the amount claimed is used if the difference is less than $100,000.  *See id.* at 52  *(APP 0197)* ("To the extent that they're claiming something less than what we've calculated, we would then allow the amount that they've claimed.").  The Receiver's rationale for this is simply a cost-benefit analysis:  "the receiver made kind of a cost benefit determination that anything that has a variance below—within this dollar range we're not going to do any additional review on . . . ."  *Id.* at 53 *(APP 0198)*.  Although such inaccuracies may be acceptable in a claims process, the underlying data is not sufficiently reliable for a legal damages analysis, particularly where such errors would be compounded in a potential class of over 17,000 investors.  *See Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 300 (5th Cir. 2004) (affirming denial of class certification where "plaintiffs and their expert did not persuade the district court, and do not persuade us, that a reliable formula for damages can be devised which will yield statistically significant results, that the data that would have to be plugged into such a formula can be assembled, [and] that the relevant variables . . . can be quantified," in order to measure damages "for each of the many thousands of members of the proposed class").  Indeed, the Receiver's own 30(b)(6) witness would not commit to relying on the data if his own money was on the line:  "I think it's reliable enough to do what the

receivership needs to do. I think if it was—if I was a claimant, then depending upon whatever that answer came out for me, then I may or may not object." *Id.* at *160-161 (APP 0207-208).*

   3.   Causation cannot be accounted for by any damage model

When there are multiple potential alleged causes of a class member's damages—as there are here—the proposed damage methodology must be capable of isolating a particular cause or causes that might be found by a jury and eliminating those causes that might not be found to be causes and provide a proper means of calculating damages across the entire class without labyrinthine individual calculations. *Comcast*, 133 S. Ct. at 1534; *Ludlow*, 2015 U.S. App. LEXIS 15938, *34-35; *see, e.g., Corley v. Orangefield Indep. Sch. Dist.*, 152 Fed. Appx. 350, 355 (5th Cir. 2005).   The Complaint recites numerous causal mechanisms, including lack of registration of financial advisors, lack of registration as investment companies, various affirmative misrepresentations by Stanford or a financial advisor, various misrepresentations by omission by Stanford or financial advisors.   No damage model could possibly account for every permutation of the possible jury findings as to the many alleged causal mechanisms and ascertain what the damages should be for any particular permutation.

   **B.    Individual Issues of Reliance Defeat Class Certification.**

   1.   Reliance cannot be shown on a class-wide basis.

Ordinarily, fraud claims not involving sales on a public, efficient securities market cannot be certified because there is no way to establish reliance on a class-wide basis.   The Supreme Court stated as much in *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1193 (2013):   "Absent the fraud-on-the-market theory, the requirement that [fraud] plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class."   Here, there fraud-on-the-market theory does not apply because the CDs were not traded

on an exchange—but rather through individual transactions, often involving third-party brokers and varied, oral representations.   For this reason, the instant case is a poor vehicle for class treatment.   *See Gyarmathy & Assocs., Inc. v. TIG Ins. Co.*, 2003 WL 21339279, at \*3 (N.D. Tex. June 3, 2003) (Godbey, J.) (denying certification where the "record reflect[ed] that at least some potential class members received varying representations from their brokers above and beyond what is contained in the [written materials]"); *see also Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) ("If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action."); FED. R. CIV. P. 23 Advisory Committee Notes (1966 Amendment, Subdivision (b)(3)) ("[F]raud case[s] may be unsuited for treatment as a class action" because of "material variation[s] in the representations made").

        The Investor Plaintiffs cite a string of cases for the proposition that "courts routinely certify classes for common-law fraud claims based on uniform misrepresentations made as part of a 'common fraudulent scheme' or 'common course of conduct.'"   *Pl. Brief at 49-50*. However, none of those cases post-date the Supreme Court's decisions in *Amgen* and *Wal-Mart* and most were decided long before federal courts began to require plaintiffs to "prove" that the proposed class "in fact" satisfies Rule 23's requirements by a preponderance of the evidence. *Wal-Mart*, 131 S. Ct. at 2551.   More recent cases have rejected plaintiffs' efforts to presume reliance where the fraud-on-the-market theory is unavailable.   *See, e.g., In re Park Cent. Glob. Litig.*, 2014 WL 4261950, at \*13 (N.D. Tex. Aug. 25, 2014) ("Because there are individualized issues as to what information different limited partners received, and the extent to which they relied on such information, common issues do not predominate."); *Turnbow v. Life Partners, Inc.*, 2013 WL 3479884, at \* 18 (N.D. Tex. July 9, 2013) (reliance precluded certification where

"individual investors would have to prove reliance on [the defendant's] alleged misrepresentation or omission" and accordingly there would have to be a multitude of "minitrials to prove whether class members would have made purchases and for what amount had they received more information"); *Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 108 (E.D.N.Y. 2014) (holding "it would be pure speculation to assume that every member of the putative class relied upon defendants' representations in deciding to invest with Genworth" and "it is reasonable to assume that at least some members of the putative class invested in the BJ Group Services portfolios for other reasons").

Furthermore, the facts and circumstances of this case do not support a presumption of reliance. For example, the Investor Plaintiffs cite *Bruhl v. Price WaterhouseCoopers Intern.*, 257 F.R.D. 684, 694 (S.D. Fla. 2008), to argue that "a court may **presume investor reliance**" (*Pl. Brief at 50*) where "all the plaintiffs received the same or substantially the **same message** from the defendants." *Bruhl*, 257 F.R.D. at 696. However, the distinctions between this case and *Bruhl* show exactly why class treatment is not appropriate here. *Bruhl* was based on the "dissemination of fraudulent Net Asset Value ('NAV') statements to investors," *id.* at 687, which was, in essence, the "price" or "value" of the investments at issue that was communicated to **all** investors in uniform monthly accounting statements. Conversely, this case involves a myriad of alleged misrepresentations that were communicated in various ways, including individual meetings with brokers involving different oral representations, over the course of more than a decade. This case does not fit into the paradigm of the "same" information being communicated and relied upon by "all" investors.

2. The limited record demonstrates individual issues of reliance.

The Investor Plaintiffs are asking this Court to certify a class of some 17,000 investors and "presume" that they all relied on the same misinformation. However, a presumption of

reliance is not appropriate where "record evidence reveals material differences among investors with regard to their decision making processes, investment guidelines, due diligence inquiries, and communications with those involved in selling" the investment at issue.  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 269 F.R.D. 252, 261 (S.D.N.Y. 2010).  "These dissimilarities require an assessment of reliance on an investor-by-investors basis." *Id.*  Even in the limited discovery obtained from three proposed class representatives, it is clear that representations they relied on in deciding the purchase the CDs was far from the "same."

For example, unlike most Stanford investors, Reed flew to Antigua to personally meet with Allen Stanford and to discuss her investments with various bank officials. *GT Ex. 6 (Reed Depo.) at 52-53 (APP 0105-106)*.  Moreover, because Reed is a U.S. accredited investor, she received different Stanford materials with different disclosures than many of the other class members received.  *See, e.g., Pl. Ex. 99* (Disclosure Statement, U.S. Accredited Investor Certificate of Deposit Program) *at p. 3 of 24 (first page disclosures)*.  Therefore, Stanford was required to provide her with a disclosure expressly stating that the CDs ***were not*** FDIC insured, and that Stanford was ***not regulated*** by the U.S. government.  Not all CD purchasers received Reg D disclosures.

Although Reed likely received more information than most Stanford investors, she testified that she relied solely upon representations by her longtime financial advisor, Nigel Bowman, who Reed is suing individually in a separate action.  *GT Ex. 6 at 21 (APP 0099)*. Bowman advised Reed to invest in Stanford shortly after Bowman himself began working with Stanford.  Reed testified that Bowman misrepresented (1) that SIBL was part of SGC, (2) that her investments were FDIC insured, and (3) that Stanford was regulated by the U.S. government. *GT Ex. 6 at 9, 19-20, 52-53 (APP 0095, 0097-98, 0105-106)*.  Despite this testimony, Reed was

unable to say that she would not have invested but for those misrepresentations. *Id. at 33 (APP 0104)*. Indeed, she testified that had she been fully informed of many items that the class believes were not disclosed—for instance, the fact that the no U.S. regulatory authority had approved her investments or their sale—she "might still have invested," although she would have asked more questions. *GT Ex. 6 at 33 (APP 0104)*.

Troice also relied heavily on affirmative misrepresentations by his advisor in making his investment decisions. Troice has alleged, for instance, that his financial advisor assured him that SIB's investments were liquid and diversified, and therefore that the CDs themselves could be redeemed with just a few days' notice. *See GT Ex. 12 (*Second Amended Complaint, *Troice v. Proskauer Rose*, No. 3:09-cv-01600-N-BG, D.E. 6) *at ¶ 41 (APP 0223)*. Troice also alleged that Stanford Financial represented that it was a Texas-based financial services group. *Id.* at ¶ 89 *(APP 0225)*. Troice alleges that he relied upon these representations in making his investments. *Id.* at ¶ 89-90 *(APP 0225-226)*.

Jorge Salgado, the settlor of the Michoacan Trust, testified that he set the trust up because his financial advisor told him he had to do so in order to buy CDs—something that other investors were not told. *GT Ex. 5 (Salgado Depo.) at 39, 112 (APP 0078d, APP 0089)*. Moreover, the trustee was and still is Stanford Trust Company, one of the entities in the Stanford receivership. *Id. at 114 (APP 0090)*. Therefore, the fact that the trustee and responsible party for the Michoacan Trust was the Stanford Trust Company, the trust is in a position quite unlike that of most Investor Plaintiffs.

Class certification would deprive Greenberg Traurig of the right to obtain evidence concerning individual class members through discovery, and to litigate the reliance issues based on such evidence. Depriving Greenberg of that right would "abridge" Greenberg's "substantive

right" to present its individual defenses, such as reliance, in violation of the Rules Enabling Act, 28 U.S.C. § 2072(b), and the Due Process Clause. *See Wal-Mart*, 131 S. Ct. at 2561.

### 3.  The *Affiliated Ute* presumption of reliance is not available.

As a threshold matter, courts have refused to apply the *Affiliated Ute* presumption to common law fraud claims, holding that it is appropriate only for federal securities claims. *See Gyarmathy & Assocs., Inc. v. TIG Ins. Co.*, No. 3:02-CV-1245-N, 2003 WL 21339279 (N.D. Tex. June 3, 2003) (Godbey, J.) ("The Fifth Circuit has rejected extending an *Affiliated Ute* presumption beyond fraud on the market securities theories to this sort of class action context."); *see also McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 549 (5th Cir. 2003) ("Reliance may not be presumed under Texas law."); *Simms v. Jones*, 296 F.R.D. 485, 498, 510 (N.D. Tex. 2013) (holding that "there is no basis to extend *Affiliated Ute*'s reliance presumption to a case" involving common law fraud); *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 145 (S.D.N.Y. 2015) ("Courts in this District have found consistently that the *Affiliated Ute* presumption applies only to federal securities laws, but is 'not appropriate in the common law context.'").

Moreover, the "*Ute* presumption applies only to rule 10b-5 actions based primarily upon omissions rather than misrepresentations." *Griffin v. Box*, 1996 WL 255296, at *16 n.17 (5th Cir. May 2, 1996). Here, the complaint alleges affirmative misrepresentations regarding whether the CDs regulated, insured and liquid. *See, e.g.*, D.E. 1, ¶¶ 34-35, 47-48, 429, 448.[9]  The Investor Plaintiffs attempt to turn these misrepresentations into an omission by contending that

---

[9] For example, the Investor Plaintiffs allege several affirmative misrepresentations, including that "(1) an investment in SIBL was safer than investing in U.S. banks because SIBL did not make loans but instead invested in safe and highly liquid instruments; (2) Stanford Financial was a U.S.-based business regulated by the U.S. Government; and (3) that an investment in SIBL was completely safe and secure because it was guaranteed and insured by Lloyd's, was thoroughly regulated, was audited by an 'outside' audit firm and subjected to regular, 'stringent' risk management examinations." D.E. 1, ¶ 429.

"Stanford did not disclose his common and uniform scheme of regulatory evasion" to the investors. *Pl. Brief at 2*. But concealing an alleged fraudulent scheme that involves material misrepresentations does not transform this into an omissions case. *See Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007) (explaining that "[m]erely pleading that [a] defendant[] failed to fulfill [a] duty [to disclose material information] by means of a scheme or an act, rather than by a misleading statement, does not entitle plaintiffs to employ the *Affiliated Ute* presumption."); *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000) ("We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely."); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898, 2006 WL 2161887, at *9 (S.D.N.Y. Aug. 1, 2006) (*Affiliated Ute* does not apply where the "alleged omissions . . . are simply the flip side" of the alleged misstatements). As the court reasoned in *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 682 (S.D. Tex. 2006):

> Such non-disclosure suits are those in which the complaint is grounded primarily in allegations that the defendant has failed to disclose any information whatsoever relating to material facts about which the defendant has a duty to the plaintiff to disclose. *Ute*, however, does not require the burden of persuasion to shift in cases where the plaintiffs allege either that the defendant has made false statements or has distorted the truth by making true, but misleading, incomplete statements.

Because the Investor Plaintiffs allege common law claims based on false and misleading statements, the *Affiliated Ut*e presumption does not apply.

### C.   The Determination of Whether Investors Made a "Purchase" Under the TSA Creates Individual Issues.

A significant number of the claims under the TSA in the proposed class would be barred by the statute of repose if they are determined to be holder claims. *See, e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, at 818 (S.D. Tex. 2007) ("[T]he express

language of the [TSA] excludes 'holder' claims from coverage."); *Barsky v. Arthur Andersen, LLP*, No. 02-cv-1922-H, 2002 WL 32856818, at *2 n.3 (S.D. Tex. Aug. 16, 2002).  The critical issue is whether a CD rollover constitutes a new sale of a security for purposes of the statute of repose.  However, making this determination requires individualized consideration of each rollover.

Courts have reached different results on this issue, depending on the particular facts surrounding the rollover.  For example, in *Sanderson v. Roethenmund*, 682 F. Supp. 205, 209 (S.D.N.Y. 1998), the court held that a CD rollover does not constitute a "new sale of a security" for purposes of the statute of repose.  The court reasoned that, because there was no "significant change in the nature of the investment," there was no new sale under securities law where a CD rolled over from year to year.  *Id.*  Conversely, in *Bradford v. Moench*, 809 F. Supp. 1473 (D. Utah 1992), the court held that a rollover did constitute a sale for purposes of the statute of limitations.  The court reasoned that where a CD is rolled over, an investor 1) "gets new value each time they reinvest[] the proceeds of mature certificates," and (2) extends the maturity of the CD, both of which the court interpreted as indicative of a "sale" for purposes of a securities action.  *Id.* at 1492.

The only material factual difference in the two cases is that the *Bradford* plaintiffs said they, unlike the *Sanderson* plaintiffs, did not "contemplate the automatic rollover of their certificates.  Instead, plaintiffs state that on each occasion they decided to invest the proceeds from a mature certificate in a new certificate, they considered whether some other investment might be more desirable."  809 F. Supp. at 1492.  The *Bradford* plaintiffs also asserted that each decision to invest was "based on the favorable interest rates."  *Id.*

Here, the Receiver's data is insufficient to make the individualized determination of whether plaintiffs contemplated an automatic rollover or considered their investment options at the time of each CD rollover.  For example, Mr. Russell testified as follows:

> Q. So you're not able to really say one way or the other, are you, that for each renewal transaction the receiver would be able to say if the customer had a discussion with their financial advisor or simply stayed quiet and let the automatic renewal take place?
>
> A. As I sit here today, I don't know whether we'd be able to say that or not.
>
> Q. More broadly, does the receiver have any information to indicate for each rollover why the customer allowed the CD to be rolled over as opposed to cashed in?
>
> A. Again, I think it would be the same as the previous question. The databases aren't going to contain anything. That information may be available in other types of records, but I don't know whether or not it would exist for every single instance of a rollover or not.

*GT Ex. 10 at 63-64 (APP 0200-201).*

Of course, other issues are impacted by any determination of whether a roll-over is a purchase.  For example, if a roll-over is a purchase, separate inquiry will be required to ascertain whether there was any misrepresentation (or any communication at all) in connection with the roll-over/purchase.  In many cases, roll-overs occur simply because the investor takes no action. *See, e.g., GT Ex. 11 (Troice Depo.) at 56-57 (APP 0220-221).*  Salgado, for example, testified that he simply received the new information relating to the rate and amount. *GT Ex. 5 at 80 (APP 0082).*  Reliance, materiality, and limitations are also impacted by this determination.

The Court will need to make individualized determinations about the circumstances involved in each CD rollover and, therefore, class treatment is inappropriate.

### D.     Issues of Proportionate Responsibility Will Predominate.

Texas' proportionate responsibility system requires individualized determinations that will predominate over any common issues.  *Castano v. American Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996); *Unger*, 401 F.3d at 321.   Comparative responsibility requires individual

resolution and prevents predominance of any common issues. *See Rivers v. Chalmette Med. Ctr., Inc.*, No. 06-8519, 2010 U.S. Dist. LEXIS 67495, *28 (E.D. La. June 4, 2010); *Samuel v. United Health Servs.*, No. 06-7234, 2010 U.S. Dist. LEXIS 67632, *29 (E.D. La. June 4, 2010); *Fulford v. Transp. Serv. Co.*, No. 03-2472, 2004 U.S. Dist. LEXIS 9955, *12 (E.D. La. May 27, 2004).

Each Investor Plaintiffs' claim is subject to Texas Civil Practice and Remedies Code Chapter 33.   *See* TEX. CIV. PRAC. & REM. CODE § 33.002 (Chapter applies to "any cause of action based on tort").[10]   As to each Investor Plaintiff and "as to each cause of action," Civil Practice and Remedies Code Section 33.003(a) requires the jury to determine the percentage responsibility of (1) *each* plaintiff; (2) *each* defendant, (3) *each* settling person;[11] and (4) *each* responsible third party. TEX. CIV. PRAC. & REM. CODE § 33.003(a).   On its face, Section 33.003(a) requires a separate comparative responsibility determination for each plaintiff's claim.

The evidence regarding different plaintiffs will vary, necessitating individual responsibility submissions.   For example, some investors purchased their CDs through a financial advisor who allegedly made affirmative representations to the plaintiff about the CD. Others did not purchase through such a financial advisor.   Some investors (such as Reed and Salgado) failed to perform any due diligence prior to purchasing the CDs.[12] *See, e.g., GT Ex. 6 at 27-30, 62, 65-66 (APP 0100-103, 0108, 0109-110); GT Ex. 5 at 48 (APP 0080).*   Some, such as

---

[10] Greenberg incorporates by reference the argument and authority contained in its motion to designate responsible third parties and its reply to Plaintiffs' response in opposition to designation of responsible third parties. [D.E.153 & 165.].

[11] "Settling person" includes anyone who has paid or promised to pay money for the same harm, and there is no requirement that the payor or promisor have been sued. TEX. CIV. PRAC. & REM. CODE § 33.011(5).

[12] Pam Reed flew to Antigua on Stanford's private jet and met Stanford personally but never inquired about the CDs. *GT Ex. 6 at 52-53 (APP 0105-106).*

trustees or fund managers, have heightened responsibilities with respect to due diligence,[13] but may have failed to conduct their due diligence. Some investors read the Reg D disclosure statements; some did not. Some putative class members held express accounts—not CDs (i.e. securities) and some received no Reg D disclosure statements at all. There will be evidence from which a jury could conclude that some of the putative class members bear responsibility for their own injuries. For example, some have complained about affirmative misrepresentations, which contradict what had been handed to them in writing, and which they did not read. In addition, many CD investors dealt with financial advisors, who are responsible third parties as to that individual's claim. Individual assessments of responsibility will be required in those instances. In each of these instances, Greenberg Traurig is entitled to have a jury assess the conduct of the investor and the conduct of the defendants and assign a percentage responsibility to it. Thus, individual inquiry will be necessary to assign responsibility.

The Investor Plaintiffs obfuscate this issue by asserting that liability for aiding and abetting and conspiracy is joint and several—as if this statement somehow means that the jury need not assess proportionate responsibility. The Investor Plaintiffs are wrong. As reflected in Civil Practice and Remedies Code Chapter 33, joint and several liability is different from proportionate responsibility. *See* TEX. CIV. PRAC. & REM. CODE § 33.013(b) (defining joint and several liability in terms of persons more than 50% responsible). Joint and several liability is not determined until *after* a proportion of the responsibility has been assigned to the various persons who may have caused the plaintiff's damages in some way. **The jury charge used in the**

---

[13] *See Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 248-49 (Tex. 2002) (discussing duties owed under Texas law and exemptions from duties owed as contained in the trust instrument).

*Sterling Trust*[14] **case to submit claims under the Texas Securities Act included questions on proportionate responsibility.** *GT Ex. 13 (APP 0227)*

By way of illustration, a jury could decide that Allen Stanford is responsible for 75% of the putative class member's damages, with the remaining 25% responsibility spread between the financial advisor (those who made their own false representations or failed to do due diligence), the SEC and FINRA (for failing in their responsibility to shut Stanford down despite repeated opportunities), and in some individual cases the putative class members themselves.   A defendant found to have aided and abetted Stanford in violating the TSA would only be jointly responsible for Stanford's assigned responsibility, and this calculus requires an individualized determination based on the responsibilities for a particular investor and investment.

E.      **Choice-Of Law Issues Will Predominate.**

Variations in applicable law will swamp any common issues and defeat predominance. *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996).   A class certification inquiry under Rule 23(b)(3) *must* consider how variations in state law affect predominance. *Cole v. GMC*, 484 F.3d 717, 724 (5th Cir. 2007).   The movants must provide an "extensive analysis" of how state law variations affect predominance.   *Id.*   The Investor Plaintiffs fail to meet their burden.

**The Plaintiff Investors' motion and brief do not address choice of law for the "primary" class regarding their common-law causes of action.**   With respect to the proposed subclasses, the Investor Plaintiffs refer to the Court's rulings in *Janvey v. Willis*, in which the Court concluded that the Texas Securities Act applies to transactions "emanating from Texas." *Pl. Brief at 65.*   The Court's prior rulings, however, do not resolve the issue for several reasons. First, the rulings are not binding on Greenberg Traurig since it was not a party to either

---

[14] *Sterling Trust Co. v. Adderley*, 168 SW 3d 835 (Tex. 2005).

proceeding.  Second, the Court's rulings expressly indicate that they are preliminary.  Third, the rulings globally address the various TSA allegations (registration and misrepresentations) and acknowledge that the allegations are different than those involved in a Texas Supreme Court decision relied upon.  Fourth, the Court's rulings do not address Title 7 of the Texas Administrative Code Section 139.7, which rejects the concept because if offering materials are prepared in Texas, a dealer must register in Texas.[15]  Likewise, the offer itself is exempt from Texas registration requirements when the offer is made to a non-resident.  7 TAC § 139.7(a).[16]

Multiple jurisdictions' laws may apply to this case since the Investor Plaintiffs reside in various states and various countries throughout the world.  Indeed, even the Complaint alleges violations of Mexican law and Ecuadorian law. D.E. 1, at ¶¶ 319-29.  CD purchases were made through different Stanford entities abroad and from entities based in Texas, Florida, Louisiana, and Antigua.  In determining which jurisdiction's laws apply, the Court must apply the choice-of-law rules of the forum state.   In determining which jurisdiction's laws apply, the Court must apply the choice-of-law rules of the forum state.  Texas law requires that the choice-of-law analysis be undertaken on an issue-by-issue basis.  *Casa Orlando Apts., Ltd. v. Fed. Nat. Mortgage Ass'n,* 624 F.3d 185, 191 (5th Cir. 2010); *Spence v. Glock,* 227 F.3d 308, 311 (5th Cir. 2000).  Texas follows the RESTATEMENT (SECOND) OF CONFLICT OF LAWS.

Putative class members' claims involving misrepresentations are subject to analysis under Section 148 of the RESTATEMENT (SECOND) OF CONFLICTS OF LAW.  Such claims would include

---

[15] "An offer is not deemed to be made from Texas merely because offering material is prepared in Texas, if such material is still in the possession of the issuer or its selling agent when it leaves the state."  7 TAC § 139.7(b).

[16] "The offer and sale of securities by an issuer or its selling agent to a non-Texas resident not present in Texas when the offer is made is exempt from the securities registration provisions of the Securities Act."

the claims for aiding and abetting fraud, conspiracy to commit fraud, misrepresentations under the TSA, and conspiracy to commit misrepresentations under the TSA.[17]

Under Section 148's standards, if the putative class member was a Texas resident and received the alleged misrepresentations in Texas, then Texas law would apply.  If the putative class member resided outside of Texas, then there are a host of predominating factors that must be considered, and the analysis will vary from one investor to the next. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 148 (requiring consideration of place of reliance, place where representation is made, residence and nationality of parties, location of the subject of the transaction, and place of performance).

This Court previously denied class certification to a putative class of purchasers of worker's compensation insurance policies because the policies were sold in multiple states and some were sold through brokers.  *Gyarmathy*, 2003 WL 21339279 (Godbey, J.).  Here, putative class members are located throughout the world and there are significant variations in the type of investment made, the representations relied upon, and the degree of assistance by third party brokers or financial advisors.

The Investors Plaintiffs' common-law claims for aiding and abetting breach of fiduciary duty and conspiracy to commit breach of fiduciary duty are governed by the general tort rule in the Restatement.  Considerations there require examination of where the injury occurred, where the conduct causing the injury occurred, the residence and nationality of the parties, and the place where the relationship between the parties is centered.  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145.  It is apparent from these factors that the applicable law will vary

---

[17] The *Enron* Court applied Restatement Section 148 to the TSA claims form untruths and omissions.  *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 761 F. Supp. 2d 504, 534 (S.D. Tex. 2011).

from plaintiff to plaintiff.    Indeed, just the threshold question of whether a fiduciary relationship existed between the Stanford financial advisor and the investor will differ depending on the location of the financial advisor.   There is no reason why Texas law would ever intercede to establish the existence of a fiduciary relationship between a broker or financial advisor in another state and an investor in another jurisdiction where that relationship has no connection to Texas. Rather, the law of the jurisdiction where the investor resides or the law of the jurisdiction where the financial advisor is located controls the breach of fiduciary duty claim.   Moreover, as to those putative class members who held only express accounts, there may be no financial advisor and therefore no potential fiduciary relationship.

Finally, with respect to the proposed subclass for TSA registration claims, a non-Texas resident who was not present in Texas when the offer of sale was made, cannot rely upon the TSA's registration requirement to bring a claim, because such circumstances are expressly exempt from TSA registration requirements. 7 TAC § 139.7.   Further, an offer is not deemed to be made from Texas merely because offering material is prepared in Texas, if such material is still in the possession of the issuer or its selling agent when it leaves the state.   *Id.*   Moreover, a sale is not deemed to be made in Texas merely because a purchaser sends his purchase money to Texas, or because clerical functions connected with the closing of a sale are performed in Texas. *Id.*   Although the putative class members who purchased CDs expressly invoke the TSA in defining these subclasses, presumably some putative class members intend to invoke some other jurisdiction's registration requirements to the extent that Texas's requirement does not apply. Either way, individual issues exist.

### F.    Individual Issues Relating to the Discovery Rule Will Predominate.

Individual issues relating to the statute of limitations defense will predominate and preclude certification.   *See, e.g., Johnson v. Kan. City S. Ry. Co.*, 208 Fed. App'x 292, 296-97

(5th Cir. 2006); *Brooks v. Lincoln Nat'l Life Ins. Co.*, No. 5:03CV256, 2008 U.S. Dist. LEXIS 121483, *98 (E.D. Tex. Feb. 12, 2008) ("timeliness of each Proposed Class member's claim is one in a number of issues requiring individualized determinations that will predominate over issues common to the class").   Greenberg Traurig has pleaded that the applicable statute of limitation applies to each of the claims pleaded.   In response, the Investor Plaintiffs have raised the discovery rule.  *See* D.E. 1, *¶¶ 403-06.*

A cause of action generally accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury.   The discovery rule applies if the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.  *King-White v. Humble Indep. Sch. Dist.*, No. 14-20778, 2015 U.S. App. LEXIS 18199, *23 (5th Cir. Tex. Oct. 20, 2015).   In such a circumstance, the cause of action does not accrue until the plaintiff knows or reasonably should have known of the legal injury.  *King-White*, 2015 U.S. App. LEXIS 18199, at *23.

The first issue—whether the discovery rule applies—is a question for the Court to decide. If the discovery rule applies, the second question is a question of fact that requires individual inquiry.   Specifically, a jury would be asked to find the date on which each investor knew or reasonably should have known of his or her injury.  *Cf.* TEXAS PATTERN JURY CHARGE PJC 102.23 (2014) (submitting limitations under DTPA, which incorporates discovery rule).

The Investor Plaintiffs' claims for conspiracy are governed by a two-year statute of limitation.  *See Stevenson v. Koutzarov*, 795 S.W.2d 313, 318 (Tex. App.—Houston [1st Dist.] 1990, writ denied) Pam Reed testified that her financial advisor told her that the CD was FDIC insured.  Yet, as a U.S. investor Reed would have received a Disclosure advising her that the CD

was <u>not</u> FDIC insured.  A jury will have to determine when Reed knew or should have known of this alleged misrepresentation.

Shortly before the Receivership, SIBL stopped allowing early redemptions of CDs, which were permitted before but with a penalty.  Investors who tried to redeem their CDs early were denied and suffered injury weeks before the Receivership. *See, e.g. GT Ex. 14  (Testimony from Allen Stanford's criminal trial) (APP 0279)*; *GT Ex. 23 at pp. 18-19 (redemptions blocked in January 2009) (APP 0827-828).*

Some putative class members discovered that the SEC was investigating Stanford as early as 2005, when the SEC sent letters and questionnaires to Stanford investors.  *Pl. Ex. 3 at p. 33/160; GT Ex. 15 (SEC questionnaire )(APP 0284).*  A vice president and financial adviser at Stanford said that his phone "lit up like a Christmas tree the morning [the questionnaire] went out" and "led to 'significant concerns' by investors." *Pl. Ex. 3 at page 34/160*.  In July 2008 a Bloomberg article entitled "SEC Investigating Stanford Group Offshore-Bank CDs" reported that the SEC had issued subpoenas to former Stanford employees "asking for information about the CD sales." *GT Ex. 16 (APP 0288)*.  According to the Complaint, there were various media reports from which investors may have learned of their legal injuries. D.E. 1, at ¶ 230 (referencing 2003 article); ¶ 250-251 (a 2002 article referencing investigations involving Stanford); ¶ 256 (2003 article allegedly accusing Stanford of bribery); ¶¶ 313-314 (2006 article allegedly disclosing Stanford's "take-over" of Antiguan banking regulatory system).  Investors who read these reports and received these SEC letters and questionnaires would have actually discovered their legal injury.  Thus, individual inquiry is required.

Jorge Salgado complains that his financial advisor told him that SIBL was a U.S. Bank and that the trust's CD purchases were insured. *GT Ex. 5 at 47 ("Totally insured. There was no*

*risk at all.") (APP 0079); 48-49 (He was told his CD's were issued by "A bank located in the United States with relations in Antigua.")(APP 0080-81)*.   Yet he admitted that in February 2008, he began receiving monthly statements that disclosed that SIBL was an Antigua bank and was not insured by the FDIC. *Id. at 89-90 (APP 0082a-82b)* .  An individual inquiry is needed to determine when he knew or was put on inquiry notice.

### G.    Individual Issues Will Predominate For Breach of Fiduciary Duty

The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant.  *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 581 (5th Cir. Tex. 2015).  In evaluating whether there is a fiduciary relationship, courts look at the extent, nature and duration of the relationship to determine whether one party has become accustomed to being guided by judgment or advice of the other or whether the person is justified in placing confidence in the other party.  *United Teachers Ass'n Ins. Co. v. MacKeen & Bailey, Inc.*, 99 F.3d 645, 649 (5th Cir. 1996).  Aiding and abetting a breach occurs where a third party knowingly participates in the breach of duty by the fiduciary.  Such a participant becomes a joint tortfeasor with the fiduciary and is liable as such.  *Hunn*, 789 F.3d at 581.

The threshold requirement of showing existence of a fiduciary relationship and the element of knowing participation will predominate.  In ruling on the Defendants' motions to dismiss, the Court held that Plaintiffs could argue that an investment advisor assumed a position of trust and became a fiduciary by lobbying the investor to invest in a fraudulent CD.  Order, D.E. 123 at 19-20.  Thus, individual inquiry will be required to determine which Investors Plaintiffs purchased CDs through an investment advisor and which ones formed a fiduciary relationship under the particular facts of their relationship.

### H.    The asserted "uniform campaign" does not establish common issues.

The Investor Plaintiffs attempt to get around these individualized issues by claiming that all class members are united by a supposedly "uniform campaign of regulatory evasion."  Of course the class members have one thing in common: they were all defrauded by Stanford's Ponzi scheme.  But because that fraud was carried out in individualized settings, at different times, for different investors, and because the Investor Plaintiffs do not even suggest that Greenberg Traurig had any awareness of the Ponzi scheme, their Brief instead attempts to tie Greenberg's liability to a separate, collateral scheme: an amorphous but supposedly common campaign of regulatory evasion.  The problem is that this separate "campaign" is really just a collection of disparate, unconnected actions over two decades that affected investors (if at all) in different ways and at different times.

Moreover, where a class is united only by a supposedly uniform policy, class plaintiffs must offer *significant proof* of the policy at the class-certification stage.  *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2553 (2011).  *Dukes* sets out the requirement of evidence to establish the four prerequisites of Rule 23(a):

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recognized in *Falcon* that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," 457 U. S., at 160, and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," *id.*, at 161; *see id.*, at 160 ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable") Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped..

*Id.* at 2551–52.  And under the predominance requirement of Rule 23(b)(3), this test is "even more demanding."  *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1428-29 (2013) ("The same

analytical principles [set out in *Dukes*] govern Rule 23(b).   If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).").

Here, the Investor Plaintiffs rely ***not*** on Stanford's Ponzi scheme, of which Greenberg Traurig admittedly had no knowledge, but rather a collateral conspiracy that was not found or prosecuted by the U.S. Government.  Movants posit the following:

> [F]rom at least 1988 and all the way until 2009 Stanford engaged in a common course of conduct and uniform scheme to evade banking and securities laws and regulations and deceive regulators in the United States and around the world in order to enable Stanford to operate his offshore bank Stanford International Bank Ltd. ("SIBL") as an unregistered investment company and market and sell its unregistered and fraudulent securities from the United States.
>
> Stanford engaged in his regulatory evasion campaign consistently and uniformly. Moreover, Stanford never disclosed to SIBL investors that he was not compliant with U.S. banking and securities laws, that he was constantly under investigation by the U.S. Government for such non-compliance and other potentially criminal matters, or that he was engaged in a campaign to evade regulation of his activities and deceive regulators worldwide so that he could illegally operate an offshore investment company – disguised as a bank - in the U.S. selling unregistered securities. **That uniform omission to disclose is common to all SIBL investors.**

*Pl. Brief at 8* (emphasis in original).  But the proffered evidence shows that this alleged scheme was anything but uniform, and courts routinely reject such attempts to turn individualized misrepresentations into class concerns simply by referring to amorphous common campaigns. *See, e.g.*, *Gyarmathy*, 2003 WL 21339279, at *3 (refusing to certify class where "documents were not delivered to the putative class members in identical contexts" and "potential class members received varying representations from their brokers"); *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255–56 (2d Cir. 2002) ("Plaintiffs provided substantial evidence of a centralized sales scheme. … But this evidence does not answer the relevant question—whether members of the class received materially uniform misrepresentations. … The common scheme presented here

does not demonstrate that the individual misrepresentations made were uniform; therefore, standing alone, the scheme does not provide a sufficient basis to justify class certification.").

The Brief offers documents and testimony from other proceedings discussing how Stanford:

- Did not trust the government and wanted to avoid regulation. *Pl. Brief at 6*.
- Chartered SIBL in Antigua and managed it from Houston. *Id. at 7-10*.
- Opened a U.S. broker-dealer, an IRA trust company in Louisiana and a trust representative office in Florida with the assistance of lawyers. *Id. at 11-15*.
- Loaned money and made political contributions to Antigua officials, and paid to fly then Prime Minister Lester Bird to Houston for emergency medical care. *Id. at 15-17*.
- Loaned money to Antigua to build a hospital. *Id. at 16-17*.
- Organized a task force to help Antigua rewrite its offshore banking laws. *Id. at 18-20*.
- Responded to accusations from a U.S. government official. *Id. at 22-23*.
- Sought information on U.S. government investigations. *Id.at 23-24; 25-26*.
- Responded to media attacks. *Id. at 24-25*.
- Complained to the U.S. Embassy. *Id. at 26*.
- Retained attorneys to represent Stanford Financial Group in a dispute with an ex employee. *Id. at 27-28*, and
- Engaged in other events after Loumiet left Greenberg Traurig on May 1, 2001. *Id. at 28-32*.

Unlike the larger Ponzi scheme, these disparate actions did not affect the investors uniformly, and the Investor Plaintiffs have not even shown that they were unlawful. For instance, a desire to avoid regulation is lawful, and so are loans to government officials in the absence of an improper *quid pro quo*, which the evidence does not support.[18] Operating a bank chartered in Antigua and a U.S. registered broker-dealer are lawful, as is petitioning the government, exercising rights granted in FOIA,[19] and the other actions listed above.

---

[18] *Cf.* The Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, et seq.
[19] 5 U.S.C. § 552. "The Freedom of Information Act (FOIA) is a law that gives you the right to access information from the federal government. It is often described as the law that keeps citizens in the know about their government." http://www.foia.gov/

BRIEF IN OPPOSITION TO MOTION TO CERTIFY - Page 65
1519673.1

Moreover, contrary to Plaintiffs' theory of uniform regulatory evasion, Stanford actually was subject to U.S. regulation in many ways while running his Ponzi scheme. In 1996, for example, he registered Stanford Group Company (SGC) as a U.S. regulated broker/dealer and investment adviser (D.E. 1, at ¶26). In 1998 he opened a regulated IRA trust company in Louisiana called Stanford Trust Company (D.E. 1, at ¶ 28), and a state-regulated trust representative office in Florida called Stanford Fiduciary Investor Services (D.E. 1, at ¶38). As sole director of SGC, he was *personally* subject to regulatory jurisdiction of NASD, now known as FINRA. *GT Ex.* 17[20] *(APP 0290)* These actions are inconsistent with Plaintiffs' claim of a 21-year "uniform scheme of regulatory evasion."

Finally, no evidence is offered to connect these collateral actions to the individual class members, such as proof that but for the campaign of regulatory evasion, the Ponzi scheme would have been discovered or prevented. At most, each of these actions would have affected investors in different ways and at different times. Plaintiffs suggest that causation can be resolved on a class-wide basis with the implausible theory that "full compliance and registration would have led to more government scrutiny of his offshore bank and exposed the fraudulent nature of the CD program." D.E. 1, at ¶ 11. No evidence is offered for such wishful thinking, and this theory is contrary to the Investor Plaintiffs' additional claim that Stanford was, in fact, under "constant investigation" by the government. Moreover, there is no evidence to link the Investor Plaintiffs'

---

[20] "As a director of the firm [SGC], Stanford would be deemed to be an 'associated person,' and FINRA accordingly had jurisdiction over Stanford individually. Thus, the staff could have questioned Stanford personally about the CD program, including the composition of the bank's portfolio and the accuracy of the marketing materials distributed by the Stanford firm." FINRA Report p. 19 at fn. 16.

theory to the defendants' actions in this case, even though different defendants performed different services over the course of more than 20 years.

The Investor Plaintiffs also assert that Stanford uniformly failed to disclose that he "was constantly under investigation by the U.S. Government for … non-compliance and other potentially criminal matters…." *Pl. Brief at 8*. But securities laws generally do not require disclosure of "investigations." *See Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 28 (1st Cir. 1987) (no duty to disclose bribery payments by executives which were the subject of a grand jury investigation until indictment was probable); *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) (dismissing Exchange Act claims in part because "the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement"); *Cf. United States v. Matthews*, 787 F.2d 38, 49 (2d Cir. 1986) ("[S]o long as uncharged criminal conduct is not required to be disclosed by any rule lawfully promulgated by the SEC, nondisclosure of such conduct cannot be the basis of a criminal prosecution.").

The Investor Plaintiffs cannot identify any investigations that should have been disclosed, and therefore they cannot identify a wrongful scheme to conceal these investigations—much less that the failure to disclose them affected investors in uniform ways subject to class-wide treatment. For example, the Brief identifies an SEC investigation that opened in May 1998, *Pl. Brief at* 12, *Pl. Ex. 3 p. 27/160*, but three months later the SEC closed its investigation without charges. *Id*. The Brief also asserts that "Stanford's involvement in the Antiguan hospital project resulted in separate U.S. Congressional and Justice Department criminal investigations of corruption in Antigua ***and, in particular, Stanford's involvement in that corruption***. *Pl. Brief at* 17; *see also Pl. Ex. 34* (emphasis added). A review of the exhibit, however, reveals only allegations that the government of Antigua demanded bribes from a U.S. contractor, with no

mention of any Congressional or Justice Department investigations of "Stanford's involvement in that corruption."

The Investor Plaintiffs also point to a couple of drug-related investigations even more obviously disconnected from the Ponzi scheme. Even if they could identify some duty to disclose these investigations, the Investor Plaintiffs could not show that such disclosures would have affected investors uniformly. For example, one (heavily redacted) exhibit refers to an investigation of possible drug smuggling, although this "came up negative." *Pl. Ex. 56 at [*4512]*. In 1989, there was investigation of Guardian Bank for possible drug money laundering that was "closed … when they were unable to substantiate GIB was laundering drug proceeds." *Pl. Ex. 57 at [*4448]*. A similar memo reports that the FBI had investigated a money laundering tip, although the investigation "disclosed no problem." *Pl. Ex. 55 at [*4322]*. Another exhibit explains that "[d]uring 1992 NO (New Orleans) discontinued investigation into this matter when they were unable to locate witnesses that could identify GIB or affiliates as being associated with specified unlawful activity." *Pl. Ex. 567 at [*4454]*. All of the investigations were closed before SIBL issued its first Disclosure Statement. The only other evidence offered is a 2002 e-mail from Loumiet saying "I have been told that Allen is being investigated again by 'the Feds.' According to my calculations, this has to be the twentieth time." *Pl. Brief at 24 & Pl. Ex. 58*. These drug-related investigations cannot help the Investor Plaintiffs demonstrate a common scheme connecting Greenberg Traurig to their losses. *See Moore*, 306 F.3d at 1255 ("[A] common course of conduct is not enough to show predominance, because a common course of conduct is not sufficient to establish liability of the defendant to any particular plaintiff.").

The proffered evidence of an "uniform campaign of regulatory evasion" would not even establish commonality under the *Dukes* standard, and certainly does not permit a class action under Rule 23(b)(3).

## III.   ADEQUACY AND TYPICALITY: THE CLASS REPRESENTATIVES ARE NOT APPROPRIATE.

### A.   The Proposed Class Representatives Are Not Acting in Class Members' Best Interests.

Federal Rule of Civil Procedure 23 requires an affirmative finding that the named representatives of the putative class will "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4).   "[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times." *Berger,* 257 F.3d at 480.   Affirmative evidence is required and the defendants are not required to disprove a presumption of adequacy.   *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 146 (N.D. Tex. 2014).

The class representatives have not shown that they are adequately protecting the unrepresented class members' interests.   First, by their own admission, they are pursuing litigation that is less efficient than the Receivership, *e.g.*, *SEC v. Stanford Int'l Bank, Ltd.*, Case No. 3:09-cv-00298, D.E. 2137, at 17, without adding any meaningfully different theories of liability or damages, *Pl. Ex. 106, at ¶ 13* ("The factual allegations and legal theories asserted by the Receiver and the OSIC against the Greenberg Defendants are substantially the same as, and intertwined with, the factual and legal theories asserted by the Stanford Investor Plaintiffs in support of the class claims asserted in the *Greenberg* Action.").   Indeed, because they believe the Receivership to be more efficient, the representatives have agreed that any recovery in this action

will go not to the class they purport to represent, but to the Receiver—who will then distribute the funds according to his own methodology. *Pl. Ex. 106, at ¶ 12*. By pursuing litigation that does little but add transaction costs at the investors' expense, the proposed representatives have demonstrated their inadequacy, since "[a] representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain [relief] that already is on offer is not adequately protecting the class members' interests." *In re Aqua Dots Prods. Liability Litigation*, 654 F.3d 748, 752 (7th Cir. 2011).

Moreover, the class representatives have litigated this action in a manner calculated to benefit the Receiver more than the class members they are supposed to represent. For example, the Receiver has admitted that when an Investor submits a claim amount that is lower than the loss that the Receiver calculates for that Investor, ***the Receiver simply accepts the lower amount*** rather than allowing the amount determined through the Receiver's calculations. *GT Ex. 10 at 51-52 (APP 0196-197)*. Binding investors to their own mistaken calculations may be permissible for an administrative claims process, but it falls far short of the scrupulous duties that class representatives and their counsel owe to unrepresented class members. *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 880 (7th Cir. 2000) ("A representative plaintiff acts as fiduciary for the others."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed."). Rather than performing the loss calculations themselves or even requesting independent verification, the class representatives simply accept this process, and indeed proudly announce their willingness to seek only the amounts allowed by the Receiver. *Pl. Brief at 60*.

Finally, the proposed class is plagued with so many internal conflicts of interest that no class representative could adequately represent all the diverse interests. *See, e.g.*, *Amchem Pods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997) (explaining that adequacy generally cannot be established if "the interests of those within the single class are not aligned"). For example, the various standards for determining whether a rollover is a new "purchase" (discussed earlier) might favor different members depending on which test is applied and which factors are given the greatest weight—and some investors should favor the exclusion of others who would be barred under more stringent tests. Likewise, depending on when they invested, different investors will prefer to tie Greenberg's liability to different portions of the time period of Stanford's fraud. *See Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 301 (S.D. Tex. 2000) (finding typicality not established where "Griffin necessarily must contend that the stock price at that time was not artificially inflated, while Farrell must attempt to establish that the stock price was, at virtually the same time, artificially inflated").

### B. Significant Differences Between the Plaintiffs Prevent a Finding of Typicality.

Partly overlapping with the adequacy element, the Investor Plaintiffs must prove typicality: that their "claims arise from the same events, practice, or conduct, and are based on the same legal theory, as those of other class members." 5 MOORE'S FEDERAL PRACTICE—CIVIL § 23.24[2]. The evidence reveals that each of these proposed representatives made their investment decisions based on highly individualized representations from their financial advisors, precluding a finding that any of these representatives are "typical" of a larger group of investors. *See, e.g.*, *Mick v. Ravenswood Aluminum Corp.*, 178 F.R.D. 90, 92 (S.D. W. Va. 1998) (rejecting typicality where "representatives' claims are based on oral representations made in the course of one-on-one conversations … [e]ach of these private conversations was different,

… and each Plaintiff came away from the conversation with different understandings of what the Defendants' representatives had promised …"); *Spencer v. Central States, Se. & Sw. Areas Pension Fund*, 778 F. Supp. 985, 991 (N.D. Ill. 1991) (rejecting typicality "[b]ecause the oral representations allegedly were communicated to 27 different groups of Kroger employees, the substance and presentation of which most likely varied from group to group").  For example, while some of the class representatives claim that they invested only on the belief that Stanford's operations were headquartered in the United States, another representative ***actually flew to Antigua*** to tour the headquarters, meet with Allen Stanford, and receive presentations about her investments.  *GT Ex. 6 at 10 (APP 0096)*.  Some of the plaintiffs claim that they were unaware of regulatory problems, while others claim that they brought these issues up with their financial advisors but were repeatedly reassured by those advisors—or even told not seek independent legal advice. *GT Ex. 5 at 91(APP 0083)*.

Moreover, the representatives are subject to "unique defenses which threaten to become the focus of the litigation."  *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("[T]here is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.").  The unique factual circumstances surrounding each of the named plaintiffs' decisions to invest, to conduct due diligence (or not), and to accept the calculations of their net losses (or not)—as well as the level of sophistication of each of the named plaintiffs—prevents any of these proposed representatives from demonstrating typicality.

### C.     Pam Reed is Not an Appropriate Class Representative.

Pam Reed is a sophisticated investor, an attorney, and an elected official in county and state government.  *GT Ex. 6 at 5-6 (APP 0091-92)*.  Unlike most Stanford investors, Reed flew to Antigua to personally meet with Allen Stanford and to discuss her investments with various bank

officials. *Id. at 10 (APP 0096)*.  Moreover, because Reed is a U.S. accredited investor, she received different Stanford materials with different disclosures than many of the other class members received.  For example, a Disclosure expressly stating that the CDs **were not** FDIC insured, and that Stanford was ***not regulated*** by the U.S. government.  *Pl. Ex. 99*.  Not all CD purchasers received Reg D disclosures.  The substance of Reed's discussions in Antigua and the unique disclosures in those additional investment materials will be a focus of any defense at trial, making Reed an atypical and inadequate representative.  *See Baffa v. Dolandson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000) (rejecting class representative who "was a sophisticated broker who had access to more information than other investors in the putative class").

Additionally, because accredited investors like Reed may not bring Texas Securities Act claims based on the sale of unregistered securities, 7 TEX. ADMIN. CODE 169.16, Reed cannot be an adequate representative with respect to those claims.  *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002).  Even if this limitation did not apply, Reed actually purchased her investments through Stanford Group Company, which the Investor Plaintiffs concede is a registered company. D.E. 1, at ¶ 23.

Moreover, as already described, Reed's testimony indicates that her claim is based on affirmative misrepresentations, rather than the omissions asserted by class members.  Although Reed likely received more information than most Stanford investors, she testified that she did not conduct her own diligence before deciding to invest with Stanford; instead she relied solely upon representations by her longtime financial advisor, Nigel Bowman, who advised her to invest in Stanford shortly after Bowman himself began working with Stanford. *GT Ex. 6 at 7-8 (APP 0093-94)*.  Reed testified that Bowman financial advisor misrepresented (1) that SIBL was part

of SGC, (2) that her investments were FDIC insured, and (3) that Stanford was regulated by the U.S. government.  These unique conversations between Reed and her trusted financial advisor will not only support individualized, unique defenses, but also show that Reed cannot adequately represent a class whose claim is supposedly based on omissions rather than misrepresentations.

Despite this testimony, Reed was unable to say that she would not have invested but for those misrepresentations.  Indeed, she testified that had she been fully informed of many items that the class believes were not disclosed—for instance, the fact that the no U.S. regulatory authority had approved her investments or their sale—she "might still have invested," although she would have asked more questions.  *GT Ex. 6 at 33 (APP  0104)*.  As discussed elsewhere, this admission undermines the proposed class-wide proof of reliance, and it further suggests that Reed (unlike the class members) likely cannot adequately prove the materiality of those omissions if the class is certified. *See In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (rejecting adequacy and typicality of plaintiff who "would have made—and in fact did—purchase stock regardless of the fraudulent omission").

Reed is also currently involved in other litigation, in state and federal court, against people and entities supposedly responsible for the same damages she asserts against Greenberg, creating potential conflicts of interest.  *See Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678 (N.D. Ohio 1995) ("Because … the named plaintiffs in this action are also bringing an identical, individual cause of action in state court, there is a significant risk that these plaintiffs will not adequately represent those absent class members who have not individually joined the parallel state court action.").  For example, she has sued Bowman (her former investment advisor) in state court. *GT Ex. 6a (Reed Depo. Exhibit 3 -  Plaintiffs Original Petition, Gibbins v. Bowman, No. D-1-GN-10-002715 (200th Judicial Dist. Ct., Travis County, Texas, filed 8/4/10)) (APP*

*0113)*. Although this Court enjoined Reed from pursuing that lawsuit, she has chosen only to abate, and not to dismiss, the action. Reed has also filed other litigation in this Court against alleging that other parties are responsible for the damages asserted here. *See, e.g.*, *Troice, Reed & Punga Punga Financial Ltd. v. Proskauer Rose*, *Case 3:09-cv-01600-N-BG*. Any positions taken in one of these cases might affect the resolution of issues such as causation or proportionate liability in the rest. Moreover, any potential settlement in that suit could give rise to unique defenses of proportional responsibility and set-off not applicable to other class members. *See Safeguard*, 216 F.R.D. at 583 (finding inadequacy of plaintiff who "brought arbitration proceedings against his broker, PaineWebber, for improper and misleading financial advice and unauthorized trades"); *Kurczi*, 160 F.R.D. at 678 (noting that named plaintiff who is party to parallel suits may not be adequate due to conflicting settlement objectives). Nor is the risk of conflict merely hypothetical: as discussed above, Reed has already admitted, in a related lawsuit, that the Receivership is more efficient than a class action. *GT Ex. 9 at ¶ 39(APP 0155)* . Finally, collateral estoppel will apply to any adverse determination and to determinations that should have been obtained in those other suits. *Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005).

Reed is also subject to claims by the Antiguan Joint Liquidators, who determined that she received preference payments in the form of withdrawals in 2008 and 2009. *GT Ex. 6 at 86-87 (APP 0111-112)*. Reed disagrees with the Antiguan Liquidators' determination, and does not intend to repay the money, based on her belief that "[p]reference payments are when you take out more money than you put in." *Id. at 87 (APP 0112)*. When asked how she reached this determination, she testified, "I made it up." *Id.* In short, Reed is ***currently facing*** a dispute over her net loss. Particularly in light of the many problems that the Investor Plaintiffs face in

proving damages here, this unique problem of determining Reed's net loss renders her an inadequate and atypical representative.

Additionally, Pam Reed testified that she destroyed documents relevant to her claims. *Id. at 53-54 (APP 0106-107)*. In assessing the adequacy of a proposed named representative, the court may take into consider the representative's handling of discovery matters. *See McGowan v. Faulkner Concrete Pipe Co.,* 659 F.2d 554, 559 (5th Cir. 1981).

### D.   Troice is Not an Appropriate Class Representative.

Troice is subject to unique defenses and has conflicts of interest that will prevent him from representing the class.  First, Troice's Texas Securities Act claims are barred by the statute of repose, making him an inadequate and atypical class representative.  His most recent purchase was 2005[21], and whether characterized as a new purchase or a rollover, any Texas Securities Act claim related to this purchase is barred.  D.E. 123 (Order on motions to dismiss) at 11-12.

Moreover, Troice has already expressed his disagreement with the class's proposed damages methodology.  Originally, the Receiver had grouped Troice's accounts with his sister's; those amounts were later ungrouped only after Troice ***objected*** to the Receiver's allowed claim amount.  *GT Ex. 11 at 24-26 (APP 0215-217)*.  This incident, of course, highlights the danger of the Receiver's essentially discretionary grouping decisions when calculating damages.  *See GT Ex. 10 at 177-78(APP 0211-212)* (explaining that ungrouping was a "more manual" process in which the Receiver looked at whether "everybody kind of looks like they really do have their own distinctive activity," in which case a group might be divided into individuals).  Just as fundamentally, however, a named plaintiff cannot adequately represent a class when he has already expressly objected to the class's proposed method of calculating damages.

---

[21] *See GT Ex. 8 (APP 0135).*

Moreover, Troice is inadequate and atypical for many of the same reasons as Reed.  As already discussed, Troice also relied heavily on affirmative misrepresentations in making his investment decisions.  Troice has alleged, for instance, that Stanford Financial represented that it was a Texas-based financial services group.  Troice relied upon these representations in making his investments. Also, like Reed, Troice is an active participant and named plaintiff in litigation against other parties potentially responsible for the same damages as those asserted by the Investor Plaintiffs here.  For the reasons discussed above, the potential conflicts arising from simultaneously pursuing these actions—especially to the extent he does not represent the same class members in these cases—prevent him from adequately protecting the interests of the Investor Plaintiffs.

### E.      The Michoacan Trust is Not An appropriate Class Representative.

The Michoacan Trust is subject to a unique and ultimately fatal defense: trusts are not allowed to bring the claims at issue here.  Paragraph 5 of the Complaint states that the Michoacan Trust is an offshore trust that was established by Stanford Trust Company, Ltd. through Stanford Fiduciary Investor Services.  Texas law holds that trusts must sue through the trustee. *Bradley v. Ingalls (In re Bradley)*, 501 F.3d 421, 433 (5th Cir. Tex. 2007); *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006); *see also Tooke v. City of Mexia,* 197 S.W.3d 325, 334 (Tex. 2006) (identifying trusts as something "that could sue or be sued only through a personal representative").

Moreover, the trustee was and still is Stanford Trust Company, one of the entities in the Stanford receivership.  *GT Ex. 5 at 114 (APP 0090).*  The fact that the trustee of this entity is currently in receivership and has not been replaced only underscores the extent to which this plaintiff's interests are aligned entirely with the Receiver rather than an independent class of investors.  And Jorge Salgado, the settlor of the trust, testified that he set the trust up because his

financial advisor told him he had to do so in order to buy CDs—something that other investors were not told.

Moreover, issues of calculating the Trust's losses will support unique and atypical defenses against the Trust.  While the U.S. Receiver has allowed a claim of about $197,000 for the Trust (*GT Ex. 5 at 100*) *(APP 0085),* the Antiguan Joint Liquidators have allowed only about $179,000 or possibly $192,000 (*Id. at 99*) *(APP 0084)* and they are seeking return of a $144,000 withdrawal which they characterize as a preference payment (*Id. at 101-02*) *(APP 0086-87).*  The Trust disputes this characterization (*Id*.), highlighting the sort of unique disputes applicable only to the Trust.

Finally, the Michoacan Trust is subject to unique statute-of-limitations defenses.  The Trust made its last new investment in and 2004, *GT Ex. 5 at 74(APP 0081a)*, so these CD purchases and the alleged misrepresentations accompanying them are subject to the TSA's statute of repose.  D.E. 123 at 11-12.  As discussed elsewhere in this brief, subsequent "roll-over" investments are not new "purchases" sufficient to restart the statute of repose.  But even if they are considered purchases, the Trust would be required to connect these later purchases to Greenberg's earlier conduct, subject to the defense that the Trust's successful initial investment (rather than any new misrepresentation) was the primary factor influencing the decision to roll over the investment.

Even the Trust's settlor, Jorge Salgado, would not be an appropriate representative.  First, his claims involve the unique relationship between a trustee and a beneficiary, and are thus atypical in this litigation.  *See, e.g.*, *Ditta v. Conte*, 298 S.W. 3d 187, 191 (Tex. 2009) ("High fiduciary standards are imposed on trustees … .").  Furthermore, like Reed, he is a sophisticated investor—an accountant and the former finance director of Royal Holiday Club, *GT Ex. 5 at 10-*

*12 (APP 0078a-78c)* —but he relied entirely on representations made by a longtime financial advisor, Marie Bautista, whom he met before she started working for Stanford. *Id. at 39 (APP 0078d)*. He testified, for example, that he was told that his investments would be "[t]otally insured" and had "no risk at all." *Id. at 47 (APP 0079)*. He concedes that he received statements from Stanford stating that deposits were not insured, but he ignored those statements because Bautista told him that "you are protected a hundred percent in United States." *Id.* at 91 *(APP 0083)*. Indeed, he explained that on multiple occasions he raised concerns about Stanford with Bautista, but she told him "There is no problem. That is not true. Don't go to a lawyer." *Id.(APP 0083)*. Again, the unique circumstances of Salgado's conversations with his advisor— and his decision to rely on those misrepresentations without conducting any diligence—not only support defenses unique to Salgado and not applicable to other class members, but also reveal that Salgado's claim is based on ***affirmative misrepresentations*** rather than the omissions supposedly common to the class members.

### F.   There is No Evidence That the Named Plaintiffs Can Adequately Perform Their Duties.

Additional problems prevent a finding of adequacy for any of these plaintiffs. First, there is no affirmative proof of the willingness and ability of the named representatives to take an active role in and control of the litigation and protect the interests of the absentee class members, as required to satisfy the adequacy requirement. *Berger v. Compaq Computer Corp*., 257 F.3d 475, 482 (5th Cir. 2001). "[P]laintiffs seeking certification must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves—not the lawyers—actually directing the litigation." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. at 145. Using boilerplate language of the sort rejected in *Kosmos*, the movants' declarations simply state that they understand the duties expected and that they are

ready, willing, and able to do what is necessary to achieve a maximum recovery for the putative class. *Pl. Ex. 4.*  Moreover, the declarations fail to state that the named plaintiffs are in any way controlling and directing the litigation, rather than merely meeting with their lawyers and following the progress of the case.  The representatives' decisions to accept the Receiver's allowed amounts rather than performing their own loss calculations, and to simply hand over any recovery in this action to the Receiver for distribution, are just two examples suggesting that counsel, rather than the representatives, are really directing this litigation.

## INCORPORATION OF OTHER RESPONSES

Plaintiffs' counsel have sought class certification for the same or substantially similar classes in other cases involving the Stanford fraud.  The specific claims and causes of action are unique to each case, and some of the class defenses discussed above may not be applicable in the other cases.  The Defendants in those cases have, however, submitted exceptional responses and briefs addressing why the proposed worldwide class should not be certified.  For the sake of judicial efficiency Greenberg Traurig hereby adopts and incorporates herein, and requests that the Court take judicial notice of, the evidence, briefing and arguments filed by Defendants in response to the motions to certify a class in the following cases: *Troice v. Proskauer Rose LLP*, No. 3:09-cv-01600-N-BG ("Proskauer"); *Troice v. Willis of Colorado Inc.*, No. 3:09-cv-01274 ("Willis"); *Turk v. Pershing LLC*, No. 3:09-cv-02199 ("Pershing"); and *Rotstain v. Trustmark*, No. 3:09-cv-02384-N-BG. ("Trustmark").  *GT Ex. 18-22 (APP 0370-0809).*

## CONCLUSION

The proposed class action falls well short of the high bar set by Rule 23(b)(3), and would do little to facilitate resolution of the controversy here while drastically increasing the cost and complexity of securing relief for Stanford investors.

For all of the reasons stated above, Greenberg Traurig respectfully requests that the Court

deny the  Motion.

Respectfully submitted,

By: /s/ Jim E. Cowles

**JIM E. COWLES**
Texas Bar No. 04931000
jcowles@cowlesthompson.com
**SIM ISRAELOFF**
Texas Bar No. 10435380
sisraeloff@cowlesthompson.com
**R. MICHAEL NORTHRUP**
Texas Bar No. 15103250
mnorthrup@cowlesthompson.com
**COWLES & THOMPSON, P.C.**
901 Main Street, Suite 3900
Dallas, TX 75202
(214) 672-2000 (Tel)
(214) 672-2301 (Fax)

**ATTORNEYS FOR DEFENDANT
GREENBERG TRAURIG, LLP**

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 19th day of January, 2016, a true and correct copy

of the foregoing document was delivered via electronic means pursuant to FED. R. CIV. P.

5(b)(2)(D) and Local Rule 5.1, to all counsel of record.

/s/ Sim Israeloff
**SIM ISRAELOFF**