# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **RALPH S. JANVEY, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:12cv4641-N** |
| **GREENBERG TRAURIG, LLP,** | § | |
| **HUNTON & WILLIAMS, LLP; and** | § | |
| **YOLANDA SUAREZ,** | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF SIM ISRAELOFF IN SUPPORT OF GREENBERG TRAURIG, LLP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Pursuant to 28 U.S.C. §1746, I declare the following:

1.      My name is Sim Israeloff.  I am a shareholder in the law firm of Cowles & Thompson, P.C. and am admitted to practice before this Court.  I am one of the counsel of record for Greenberg Traurig, LLP in the above cause of action.  I believe that the following testimony is solely a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition. The facts stated herein are within my personal knowledge and are true and correct.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Superseding Indictment of Robert Allen Stanford obtained through the Federal Courts' PACER online access service.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Order on the SEC's motion for summary judgment in case 3:09-cv-0298 (N.D. Tex.) obtained through the Federal Courts' PACER online access service.

DECLARATION OF SIM ISRAELOFF - Page 1

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the Trial Transcript of Allen Stanford's criminal trial, case 4:09-cr-00342 (S.D. Tex.), Vol. 13 (Feb. 8, 2012), obtained through the Federal Courts' PACER online access service.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a Sept. 15, 1998 letter from Carlos Loumiet and Carl Fornaris of Greenberg Traurig to Yolanda Suarez of Stanford Financial Group Ltd. obtained from business records of Greenberg Traurig and previously produced to the Plaintiffs.

6.      Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the deposition of Jorge Salgado/Michoacan Trust dated December 4, 2015.

7.      Attached hereto as Exhibit 6 is a true and correct copy of excerpts from the deposition of Pam Reed dated December 3, 2015.

8.      Attached hereto as Exhibit 6a is a true and correct copy of Exhibit 3 to the deposition of Pam Reed December 3, 2015.

9.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts from a document produced by the Plaintiffs, testimony of Jane Bates dated September 29, 2010.

10.     Attached hereto as Exhibit 8 is a true and correct copy of excerpts from a document produced by the Plaintiffs, the deposition of Samuel Troice in *Troice v. Proskauer Rose, LLP ("Proskauer"),* No. 3:09-cv-01600-N (N.D. Tex.) dated February 3, 2015.

11.     Attached hereto as Exhibit 9 is a true and correct copy of a motion to approve the settlement with BDO, filed in case no. 3:09cv0298 (N.D. Tex.) dated May 15, 2015, obtained through the Federal Courts' PACER online access service.

12.     Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the deposition of Mark Russell as designee of Ralph Janvey dated December 17, 2015.

13.     Attached hereto as Exhibit 11 is a true and correct copy of excerpts from the deposition of Samuel Troice dated December 14, 2015.

DECLARATION OF SIM ISRAELOFF - Page 2

14.     Attached hereto as Exhibit 12 is a true and correct copy of excerpts from the Second Amended Class Action Complaint in *Proskauer* dated Oct. 9, 2009, obtained through the Federal Courts' PACER online access service.

15.     Attached hereto as Exhibit 13 is a true and correct copy of the signed Jury Charge and verdict returned in *Adderly et al. v. numerous defendants including Sterling Trust Company*, no. 236-169214-97, 236th District Court, Tarrant County, Texas and part of the record on appeal to the Texas Supreme Court in *Sterling Trust Company v. Adderly*, 168 S.W.3d 835 (Tex. 2005), obtained from one of the attorneys in that case.

16.     Attached hereto as Exhibit 14 is a true and correct copy of excerpts from the Trial Transcript of Allen Stanford's criminal trial, case 4:09-cr-00342 (S.D. Tex.), Vol. 4 (Jan. 26, 2012), obtained through the Federal Courts' PACER online access service.

17.     Attached hereto as Exhibit 15 is a true and correct (redacted) copy of a 2005 SEC Stanford Investor Questionnaire, filed on April 19, 2010 in case no. 3:09-cv-00724 (N.D. Tex.) at Document 393, page 241 of 291, obtained through the Federal Court's PACER online access service.

18.     Attached hereto as Exhibit 16 is a true and correct copy of a Bloomberg article, "SEC Investigating Stanford Group Offshore-Bank CDs" (July 3, 2008), filed on April 20, 2010 in case no. 3:09-cv-01600 (N.D. Tex.) at Document 198-1, page 127 of 136, obtained through the Federal Court's PACER online access service.

19.     Attached hereto as Exhibit 17 is a true and correct copy of Report Of The 2009 Special Review Committee On FINRA's Examination Program In Light Of The Stanford And Madoff Schemes (September 2009), a publicly available record posted at and obtained from http://www.finra.org/sites/default/files/Corporate/p120078.pdf (last accessed Jan. 18, 2016).

20.     Attached hereto as Exhibit 18 is a true and correct copy of Defendants' Opposition To Plaintiffs' Motion For Class Certification, *Rotstain et al. v. Trustmark et al.*

DECLARATION OF SIM ISRAELOFF - Page 3

("Trustmark"), case no. 3:09-CV-02384-N (N.D. Tex.) dated Nov. 2, 2015, obtained through the Federal Court's PACER online access service.

21.     Attached hereto as Exhibit 19 is a true and correct copy of the Opposition Of Defendants Proskauer Rose LLP et al. to Plaintiffs' Opposed Motion for Class Certification in *Proskauer* dated April 20, 2015, obtained through the Federal Court's PACER online access service.

22.     Attached hereto as Exhibit 20 is a true and correct copy of Willis of Colorado, Inc., Willis Limited, and Amy S. Baranoucky's Opposition To Plaintiffs' Motion For Class Certification in *Samuel Troice, et al. v. Willis of Colorado, Inc. et al. ("Willis")*, case no. 3:09-cv-01274 (N.D. Tex.) dated April 20, 2015, obtained through the Federal Court's PACER online access service.

23.     Attached hereto as Exhibit 21 is a true and correct copy of Defendant Bowen, Miclette & Britt, Inc.'s Opposition To Plaintiffs' Motion For Class Certification in *Willis* dated April 20, 2015, obtained through the Federal Court's PACER online access service.

24.     Attached hereto as Exhibit 22 is a true and correct copy of Pershing's Opposition to Plaintiffs' Motion For Class Certification in *Turk et al. v. Pershing, LLC ("Pershing")*, case no. 3:09-cv-02199 (N.D. Tex.) dated Aug. 10, 2015, obtained through the Federal Court's PACER online access service.

25.     Attached hereto as Exhibit 23 is a true and correct copy of the United States' Sentencing Memorandum in U.S. v. Robert Allen Stanford, case no. 4:09-cr-00342 (S.D. Tex.) (June 6, 2012), obtained through the Federal Court's PACER online access service.

26.     Attached hereto as Exhibit 24 is a true and correct copy of the Notice Of Filing (Stipulation And Proposed Order) filed in case 3:09-cv-0298 (N.D. Tex.), obtained through the Federal Courts' PACER online access service.

DECLARATION OF SIM ISRAELOFF - Page 4

27.     Attached hereto as Trustmark Exhibits 74-81 and Trustmark Exhibits 83-87 are true and correct copies of Declarations of thirteen (13) experts on foreign law, filed in *Trustmark* on November 2, 2015, obtained through the Federal Court's PACER online access service.

28.     Attached hereto as Proskauer Exhibits 32-35 are true and correct copies of Declarations of four (4) experts on foreign law, filed in *Proskauer* on April 20, 2015, obtained through the Federal Court's PACER online access service.

29.     Attached hereto as Pershing Exhibit 81 is a true and correct copy of a Declaration of one (1) expert on foreign law, filed in *Pershing* on August 10, 2015, obtained through the Federal Court's PACER online access service.

30.     Attached hereto as Willis Exhibit AA is a true and correct copy of a Declaration of one (1) expert on foreign law, filed in *Willis* on April 20, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2016.

/s/ Sim Israeloff

APP 0009

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

MAY 0 4 2011

David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| v. | § |
| | § |
| ROBERT ALLEN STANFORD | § Cr. No. H-09-342-01-S |
| a/k/a Sir Allen Stanford, | § |
| a/k/a Allen Stanford, | § |
| | § |
| Defendant. | § |

## SUPERSEDING INDICTMENT

The Grand Jury charges that at all times relevant to this Superseding

Indictment, unless otherwise specified:

### INTRODUCTION

### Relevant Entities and Individuals

1.  Stanford Financial Group ("Stanford Financial") was a corporation

that provided its affiliated companies in the financial services industry with professional

support services, including accounting and investment research. Stanford Financial was

incorporated in both Florida and Antigua (a Caribbean island nation), and it maintained

offices in, among other locations, Houston, Texas and Memphis, Tennessee. Stanford

Financial had several affiliated companies. Two of Stanford Financial's subsidiary

companies were Stanford International Bank, Ltd. ("SIB") and Stanford Group Company

("SGC").

GT
EXHIBIT 001

APP 0010

2.     SIB was an Antiguan banking corporation which maintained offices in various countries. SIB was originally organized in or about 1985 on Montserrat, a Caribbean island and independent nation, under the name Guardian International Bank ("Guardian Bank"). In or about 1990, following notification that Montserrat intended to revoke its banking license, Guardian Bank relocated to Antigua and subsequently changed its name to SIB. SIB was a private, offshore bank that sold various financial products. SIB's primary product was a Certificate of Deposit ("CD") which the bank marketed to investors by promising substantially higher rates of return than were generally offered at banks in the United States.

3.     SGC was a Texas corporation organized in or about 1995 and headquartered in Houston, Texas, which maintained offices in 25 locations throughout the United States. SGC was registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer of securities and investment advisor.

4.     SGC employed numerous financial advisors who, among other things, marketed and sold SIB CDs to investors. As an incentive to sell the CDs, the commissions that SGC's financial advisors earned from sales of the CDs were substantially higher than those earned from the sale of other financial products.

5.     Although SIB marketed and sold its CDs within the United States, SIB, as an Antiguan-based bank, was not regulated by any United States banking authority. Instead, SIB was regulated by an agency of the Antiguan government known as the Financial Services Regulatory Commission (the "Antiguan Regulatory

2

APP 0011

Commission"), which claimed to conduct inspections to determine the solvency of banks, to review the quality of banks' investments, and to confirm the accuracy of banks' reported returns.

6.      ROBERT ALLEN STANFORD, the defendant, founded and was the sole shareholder of Stanford Financial and its affiliated companies, including SGC and SIB.  In addition to being the sole owner of SIB, STANFORD also served as chairman of the SIB Board of Directors.

7.      James M. Davis, a co-conspirator not named as a defendant herein, was the Chief Financial Officer ("CFO") of Stanford Financial.

8.      Laura Holt, a co-conspirator not named as a defendant herein, was the Chief Investment Officer ("CIO") of Stanford Financial.

9.      Gilberto Lopez, a co-conspirator not named as a defendant herein, was the Chief Accounting Officer of Stanford Financial.

10.      Mark Kuhrt, a co-conspirator not named as a defendant herein, was the Global Controller of Stanford Financial Group Global Management, an affiliate of Stanford Financial and SIB.

11.      Leroy King, a co-conspirator not named as a defendant herein, was the Administrator and Chief Executive Officer for the Antiguan Regulatory Commission.  Among other things, King was responsible for Antigua's regulatory oversight of SIB's investment portfolio, which involved reviewing SIB financial reports

3

APP 0012

for the Antiguan Government and responding to requests by foreign regulators, including the SEC, for information and documents about SIB's operations.

12. In addition to oversight by the Antiguan Regulatory Commission, SIB also publicized that it had retained an independent accounting firm based in Antigua (the "Outside Auditor") which supposedly performed audits that verified the accuracy of SIB's financial statements, which were in turn disseminated to investors in SIB CDs.

## Overview of the Fraudulent Scheme

13. From in or about 1990 through in or about February 2010, STANFORD, together with others, perpetrated a scheme to defraud investors who purchased SIB CDs of billions of dollars by soliciting funds under false pretenses, failing to invest those funds as promised, misappropriating funds for personal use, creating and disseminating false and fraudulent documents to investors falsely showing how their funds had been invested, and funneling bribes to Antiguan regulators and the Outside Auditor to conceal the scheme.

14. To execute their scheme, STANFORD and his co-conspirators disseminated and caused others to disseminate various representations falsely describing SIB CDs to potential and existing investors. According to those representations, which STANFORD reviewed and approved, SIB invested the proceeds from the sales of its CDs in a portfolio consisting of various assets, and the performance of that investment portfolio generated returns that SIB then paid to the purchasers of the CDs. Therefore, the return earned by investors who purchased the CDs depended on SIB's strategy in

APP 0013

investing proceeds from the sale of the CDs, as returns on the CDs were contingent on SIB's investment portfolio.

15.     STANFORD and his co-conspirators disseminated documents to current SIB CD investors as well as to prospective investors that falsely described the make-up and performance of SIB's investment portfolio, including SIB's financial statements and other periodic reports.  STANFORD and his co-conspirators also made presentations regarding the financial condition of SIB and its investment portfolio directly to: (a) prospective and existing investors; and (b) financial advisors employed by SGC, who functioned as a sales force for SIB CDs because they marketed the CDs to their customers.

16.     The representations that STANFORD and his co-conspirators made regarding the operation and nature of SIB CDs, as well as the roles played by the Outside Auditor and Antiguan regulators to protect investors, were false.  Specifically, STANFORD and his co-conspirators executed their scheme by making and causing others to make to investors the following misrepresentations, among others:

a.      All of the proceeds from the sales of the CDs would be invested with professional money managers in conservative, highly liquid assets, such as stocks, bonds, and foreign currencies, when, in truth and in fact, as STANFORD and his co-conspirators well knew, billions of dollars were funneled to STANFORD in the form of undisclosed personal "loans";

b.      SIB was earning substantial rates of return on its investment portfolio, when, in truth and in fact, as STANFORD and his co-conspirators well knew, SIB was steadily losing money because its  investment portfolio was not invested in

5

profitable assets as represented, and because STANFORD did not repay the loans he had made to himself from SIB;

c.    STANFORD had personally invested hundreds of millions of dollars of cash into SIB to provide capital, when, in truth and in fact, as STANFORD and his co-conspirators well knew, no such investment ever took place and in fact STANFORD had borrowed approximately $2 billion from SIB; and

d.    The Antiguan Regulatory Commission regulated SIB, and the Outside Auditor verified the accuracy of the disclosures in SIB's financial statements, when, in truth and in fact, as STANFORD and his co-conspirators well knew, STANFORD bribed both King and the Outside Auditor to conceal his fraudulent scheme from investors and the SEC.

17.    Contrary to their representations to investors, STANFORD and his co-conspirators misappropriated a significant percentage of the proceeds from the CD sales to finance STANFORD's personal business ventures and lavish lifestyle.  By in or about December 2008, SIB represented to investors that it had approximately $8.5 billion in assets when in fact approximately $2 billion of that total consisted of undisclosed personal "loans" to STANFORD, who had misappropriated those funds to finance his personal, failing business ventures and for his own use and enjoyment, including personal living expenses, several yachts and private jet airplanes, and numerous residences around the world.

## Misrepresentations Regarding Investment Strategy

18.    STANFORD and his co-conspirators reviewed and caused the issuance of SIB's periodic annual, quarterly and monthly financial reports, which were provided to investors and used by SGC's financial advisors in marketing SIB CDs,

APP 0015

together with various other SIB documents and brochures that claimed to describe SIB's investment portfolio. The periodic reports and other documents falsely represented that the CDs were safe and secure investments. For example, the SIB December 2008 Monthly Report emphasized that SIB was "strong, safe and fiscally sound" and that its investment strategy for the CDs consisted of a "conservative approach" that was "long term, hands on and globally diversified with strong liquidity and minimal leverage."

19.    Specifically, STANFORD and his co-conspirators made false and misleading misrepresentations regarding the management of SIB's investment portfolio. According to those false statements, SIB's entire investment portfolio was closely managed by a global network of independent money managers who worked outside the bank. In truth and in fact, as STANFORD and his co-conspirators well knew, only a fraction of SIB's reported investment portfolio was invested as SIB represented.

20.    STANFORD and his co-conspirators made similarly false and misleading representations concerning SIB's investment strategy. For example, SIB's CD Disclosure Statement described SIB's investment strategy as seeking to "minimize risk and achieve liquidity" through asset diversification in "readily marketable" securities. In various periodic reports issued by SIB, STANFORD and his co-conspirators falsely represented the different types of asset classes into which investor proceeds had purportedly been invested, specifically misidentifying the percentages held in stocks, bonds, foreign currencies, and other financial assets.

7

APP 0016

## Falsified Financial Statements

21.    To induce investors to purchase the CDs and to conceal their fraud, STANFORD and his co-conspirators falsified the financial statements for SIB that were disseminated to potential and existing CD investors, misrepresenting, among other material facts, the value and performance of SIB's investment portfolio.

22.    Beginning at least as early as in or about 1990, when SIB was still known as Guardian Bank, the value and performance of the bank's assets were less than it reported to CD investors.  Over time, that gap steadily grew.  To conceal this discrepancy, STANFORD and his co-conspirators misrepresented the nature and value of the assets in SIB's investment portfolio.  For example, in or about June 2008, STANFORD and his co-conspirators caused SIB to report that SIB's investment portfolio contained approximately $8 billion in assets consisting of stocks, bonds, foreign currencies, and other financial assets.  In fact, SIB had only invested a fraction of this amount in such assets, and the balance of the portfolio had been misappropriated by STANFORD in the form of undisclosed personal loans to finance his various personal business ventures.

23.    STANFORD and his co-conspirators also made and caused to be made false and misleading representations concerning SIB's financial condition by touting year-by-year percentage and dollar amount increases in the supposed value of its earnings, revenue, and assets.  According to SIB's fabricated financial disclosures, the purported value of SIB's assets rose from approximately $1.2 billion in 2001 to

8

APP 0017

approximately $8.5 billion in December 2008. In truth and in fact, as STANFORD and his co-conspirators well knew, those values were entirely fictional and designed to deceive investors into believing that SIB's investment portfolio was performing as represented.

### Misrepresentations Regarding STANFORD's Personal Investment

24.     STANFORD also misrepresented to investors the size of his own investment in SIB. As the financial crisis grew in 2008, investors began to redeem their CDs. Between in or about May 2008 and in or about December 2008, STANFORD directed SGC's financial advisors to inform their clients that STANFORD had increased SIB's capital to approximately $1 billion by investing an additional approximately $740 million that year into the bank's capital. In truth and in fact, as STANFORD and his co-conspirators well knew, STANFORD never made any such investments in SIB.

25.     STANFORD and his co-conspirators repeatedly represented to investors that he had invested approximately $740 million in SIB, and they caused the internal records of SIB to be falsified to reflect the non-existent investments. For example, STANFORD caused to be sent to investors SIB's monthly report for December 2008, which falsely represented that SIB had received a "contribution" of approximately $541 million from STANFORD. Similarly, on or about February 12, 2009, STANFORD sent an email to SGC's financial advisors in which STANFORD made representations that SIB "remains a strong institution" and that he had recently made "two capital infusions" into SIB, which the financial advisors then relayed to investors.

9

APP 0018

26.     In late 2008 and early 2009, STANFORD and his co-conspirators began formulating a plan to engage in a fraudulent revaluation of real estate in an attempt to generate artificial bookkeeping entries to support Stanford's supposed 2008 capital infusions and to offset the more than $2 billion in loans Stanford owed SIB by this time. The plan contemplated using a series of related-party transactions between Stanford, SIB and other Stanford-entities that would result in ascribing a value of $3.2 billion to real estate SIB had purchased only a few months earlier for $67.5 million.

### Misrepresentations Regarding
### Regulatory Oversight and the Outside Auditor

27.     STANFORD and his co-conspirators made false and misleading representations regarding the nature and extent of regulatory oversight of SIB, including that SIB's operations and financial condition were being closely overseen by the Antiguan Regulatory Commission and that SIB's financial statements were subject to annual audits and regulatory inspections by Antiguan regulators.  Similarly, STANFORD and his co-conspirators falsely represented that the Outside Auditor periodically reviewed and approved of the accuracy of SIB's financial statements.  In truth and in fact, as STANFORD and his co-conspirators well knew, they bribed King and the Outside Auditor to ensure that they did not accurately audit SIB's financial statements by verifying the existence or value of SIB's purported assets.

28.     In addition to ensuring that Antiguan regulators whom he supervised did not effectively scrutinize SIB, King also assisted STANFORD in obstructing an

APP 0019

investigation by the SEC.  In or about 2005, the SEC initiated an investigation of Stanford Financial and began making official inquiries with the Antiguan Regulatory Commission headed by King regarding the value and content of SIB's purported investments.  As part of that investigation, the SEC confidentially requested the assistance of King in determining whether SIB and Stanford Financial had perpetrated a fraud upon investors.

29.     In or about September 2006, the SEC submitted a letter to the Antiguan Regulatory Commission confidentially requesting, among other things, copies of the Antiguan Regulatory Commission's exam reports regarding SIB.  King provided the SEC's confidential requests for information to STANFORD and his co-conspirators. King then made false representations in response to official inquiries from the SEC and allowed employees of Stanford Financial to assist in preparing the Antiguan Regulatory Commission's response to the SEC's confidential inquiry.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud and Mail Fraud)

### THE CONSPIRACY

30.     From in or about 1990 through on or about March 3, 2009, in the Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, did knowingly combine, conspire, confederate and agree with Holt, Lopez, Kuhrt, King, Davis, and with others,

APP 0020

known and unknown to the Grand Jury, to commit certain offenses against the United

States, that is:

      a.    to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and causing to be delivered certain mail matter by the United States Postal Service and any private or commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1341;

      b.    to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343; and

## PURPOSE OF THE CONSPIRACY

31.    It was a purpose of the conspiracy that the defendant and his co-

conspirators would solicit and obtain billions of dollars of investors' funds through false

pretenses, representations and promises, all in order to obtain substantial economic

benefits for themselves and others through the payment of fees, wages, bonuses, and

other monies, and unauthorized diversions, misuse, and misappropriation of funds.

APP 0021

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

32.     It was a part of the conspiracy that the defendant and his co-conspirators would make and cause to be made false and misleading representations in various documents regarding, among other things, the investment strategy, management, and composition of SIB's investment portfolio.

33.     It was further a part of the conspiracy that the defendant and his co-conspirators would create and cause to be created false and misleading accounting and other records concerning the value and performance of SIB's investment portfolio.

34.     It was further a part of the conspiracy that the defendant and his co-conspirators would divert hundreds of millions of dollars from SIB's accounts into a numbered Swiss bank account held by Stanford Financial (the "Swiss Bank Account"), from which STANFORD and Davis would then transfer funds to finance STANFORD's various personal ventures and lifestyle.

35.     It was further a part of the conspiracy that the defendant and his co-conspirators would make and cause to be made false and misleading representations to investors regarding, among other things, personal investments by STANFORD in SIB.

13

APP 0022

36.     It was further a part of the conspiracy that STANFORD would make regular secret corrupt payments of thousands of dollars in cash and other items of value, including Super Bowl tickets, to King, the Administrator and CEO of the Antiguan Regulatory Commission.

37.     It was further a part of the conspiracy that STANFORD and Davis would regularly use the Swiss Bank Account to make secret corrupt payments of thousands of dollars to SIB's Outside Auditor.

## OVERT ACTS

38.     In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one of the conspirators committed and caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

a.     At various times between in or about December 1987 and in or about October 2008, STANFORD approved for dissemination to existing and potential CD investors annual reports and quarterly updates issued by SIB that supposedly contained accurate disclosures regarding the management, composition, and performance of SIB's investment portfolio.

b.     Between on or about October 1, 2003 and on or about October 8, 2003, STANFORD and Davis wire transferred approximately $22 million from the Swiss Bank Account into one of STANFORD's personal bank accounts located in Houston, Texas.

c.     On or about April 24, 2006, STANFORD and Davis caused two wire transfers from the Swiss Bank Account, consisting of one for approximately $2.9 million and another for $3.5 million, into two of STANFORD's personal bank accounts located in Houston, Texas, and Miami, Florida, respectively.

14

APP 0023

d.   On or about September 25, 2006, King delivered official and confidential correspondence to STANFORD and Davis that the Antiguan Regulatory Commission had received from the SEC.

e.   On or about May 18, 2008, STANFORD and Davis increased the monthly wire transfers from the Swiss Bank Account to the Outside Auditor, which were in addition to on-the-books payments that Stanford Financial made to the Outside Auditor, from approximately 15,000 sterling pounds per month to approximately 20,000 sterling pounds per month.

f.   In or about December 2008, STANFORD, Holt, Davis and others caused to be sent to investors in Houston, Texas, and elsewhere SIB's Monthly Report for December 2008, which falsely represented that SIB had received a "capital infusion" of $541 million from STANFORD.

g.   On or about February 11, 2009, STANFORD caused a letter to be sent to investors, in which STANFORD made representations that the pending regulatory investigations were "routine examinations," that SIB "remains a strong institution" and that he had "already added two capital infusions into the bank."

h.   On or about February 12, 2009, STANFORD sent an email to Stanford Financial's global employees, including financial advisors employed by SGC in Houston, Texas, in which STANFORD repeated the false representations that he made in the February 11, 2009 letter to investors.

i.   The acts alleged in Count Two through Count 18 of the Indictment are re-alleged and incorporated herein as additional overt acts in furtherance of the conspiracy and to achieve the objects and purpose thereof.

All in violation of Title 18, United States Code, Section 1349.

15

## COUNTS TWO THROUGH SIX
### (Wire Fraud)

37.    Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

38.    From in or about at least 1990 through in or about February 2009, in the Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, aided and abetted by Holt, Lopez, Kuhrt, King, Davis, and others, known and unknown to the Grand Jury, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

### PURPOSE OF THE SCHEME AND ARTIFICE

39.    It was a purpose of the scheme and artifice that the defendant and his co-conspirators would solicit and obtain billions of dollars of investors' funds through false pretenses, representations and promises, all in order to obtain substantial economic benefits for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.

### SCHEME AND ARTIFICE

40.    Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference herein as a description of the scheme and artifice.

APP 0025

## USE OF THE WIRES

41.     On or about the dates specified as to each Count below, the
defendant, for the purpose of executing the scheme and artifice to defraud described
above, and attempting to do so, did knowingly transmit and cause to be transmitted, by
means of wire communications in interstate and foreign commerce, certain writings,
signs, signals, pictures and sounds, as more particularly described below:

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| Two | February 2, 2006 | $9,000 purchase of Super Bowl tickets by STANFORD for King from an entity located in California using a credit card account located in Houston, Texas |
| Three | April 24, 2006 | Wire transfer of approximately $2.9 million from Stanford Financial account #8731 located in Switzerland to STANFORD's personal checking account #2134 located in Houston, Texas |
| Four | December 24, 2008 | Wire transmission of approximately $700,000 from SGC account #4183 located in Houston, Texas, to an SIB account located in Houston, Texas, regarding Investor WJ's purchase of SIB CDs |
| Five | January 5, 2009 | Email from Kuhrt in St. Croix, U.S. Virgin Islands, to Lopez in Houston, Texas, attaching spreadsheet concerning artificial "roundtrip" real estate transaction to transfer interests in island properties back to SIB |
| Six | February 12, 2009 | Email from STANFORD to Stanford Financial Employees transmitted to employees in Houston, Texas, Memphis, Tennessee, and elsewhere representing that SIB "remains a strong institution" and that he had recently made "two capital infusions" into the bank |

In violation of Title 18, United States Code, Sections 1343 and 2.

17

## COUNTS SEVEN THROUGH ELEVEN
### (Mail Fraud)

42.     Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

43.     From in or about at least 1990 through in or about February 2009, in the Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, aided and abetted by Holt, Lopez, Kuhrt, King, Davis, and others known and unknown to the Grand Jury, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

### PURPOSE OF THE SCHEME AND ARTIFICE

44.     It was a purpose of the scheme and artifice that the defendant and his co-conspirators would solicit and obtain billions of dollars of investors' funds through false pretenses, representations and promises, all in order to obtain substantial economic benefits for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.

### SCHEME AND ARTIFICE

45.     Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference herein as a description of the scheme and artifice.

18

APP 0027

## USE OF THE MAILS

46.    On or about the dates specified as to each count below, the defendant, for the purpose of executing the scheme and artifice to defraud described above, and attempting to do so,  knowingly deposited and caused to be deposited the matters and things listed below to be sent and delivered, and caused the matters and things to be sent and delivered, by private and commercial interstate carrier and by the United States Postal Service:

| COUNT | APPROX. DATE | DESCRIPTION OF MAIL MATTER |
|-------|-------------|---------------------------|
| Seven | February 22, 2008 | Package of documents, including investor subscription information, sent and delivered  via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |
| Eight | August 13, 2008 | Package of documents, including investor subscription information, sent and delivered  via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |
| Nine | September 18, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |
| Ten | October 16, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |
| Eleven | December 16, 2008 | Package of documents, including investor subscription information, sent and delivered via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua |

In violation of Title 18, United States Code, Sections 1341 and 2.

19

APP 0028

## COUNT TWELVE
### (Conspiracy to Obstruct SEC Investigation)

47.     Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference herein as though fully set forth herein.

48.     From in or about June 2005 through in or about February 2009, in the Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, did knowingly combine, conspire, confederate and agree with Holt, King, Davis, and others, known and unknown to the Grand Jury, to commit a certain offense against the United States, that is: to corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, in whole or in part, a pending proceeding before any department and agency of the United States of America, that is, the United States Securities and Exchange Commission, in violation of 18 U.S.C. § 1505.

### PURPOSE OF THE CONSPIRACY

49.     It was a purpose of the conspiracy that the defendant and his co-conspirators would corruptly influence, obstruct and impede the SEC's investigation of Stanford Financial, including the SEC's efforts to ascertain SIB's true financial condition and the content and value of SIB's investment portfolio, all in an effort to, among other things, perpetuate and prevent detection of an ongoing fraud and continue receiving economic benefits from the fraud.

APP 0029

## MANNER AND MEANS OF THE CONSPIRACY

50.    Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the manner and means by which the defendants and their conspirators sought to accomplish the objects and purpose of the conspiracy.

## OVERT ACTS

51.    In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one of the conspirators committed and caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

    a.    Paragraphs 1 through 29 and 30 through 38 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein as overt acts.

    b.    At various times in or about 2005 and in or about 2006, King shared with STANFORD and his co-conspirators confidential requests from the SEC to the Antiguan Regulatory Commission for information relating to SIB.

    c.    From in or about January 2003 through in or about February 2009, King deposited more than approximately $300,000 in cash in various accounts that he held in the United States.

    d.    On or about June 21, 2005, King falsely represented in a letter to the SEC that if STANFORD were running a Ponzi scheme then the Antiguan Regulatory Commission's examination of SIB would have detected it.

    e.    On or about February 2, 2006, STANFORD purchased Super Bowl tickets for $9000 for King.

APP 0030

f.  On or about February 23, 2009, King caused approximately $150,000 to be transferred from his investment account in New York, New York, to a bank account he controlled in Antigua.

g.  On or about February 26, 2009, an attorney at the SEC sent a letter to King seeking assistance of the Antiguan Regulatory Commission ("SEC Request for Assistance Letter") to determine, among other things, the amount of investor funds which were in SIB accounts and to identify persons who had been involved in the fraudulent scheme or had been victims of the scheme.

h.  On or about March 2, 2009, King caused approximately $410,000 to be transferred from his investment account in New York, New York, to a bank account he controlled in Antigua.

i.  On or about March 3, 2009, in response to the SEC Request for Assistance Letter, King sent a letter to the SEC denying the request and stating that the Antiguan Regulatory Commission had "no authority to act in the manner requested and would itself be in breach of law if it were to accede to your request."

All in violation of Title 18, United States Code, Section 371.

## COUNT THIRTEEN
### (Obstruction of SEC Investigation)

52.  Paragraphs 1 through 29, 31 through 38, and 51 of this Indictment are re-alleged and incorporated by reference herein as though fully set forth herein.

53.  From in or around June 2005, through in or about February 2009, in the Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, aided and abetted by Holt,

22

APP 0031

King, Davis, and others, known and unknown to the Grand Jury, did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, in whole or in part, a pending proceeding before any department and agency of the United States of America, that is, the Securities and Exchange Commission.

In violation of Title 18, United States Code, Sections 1505 and 2.

## COUNT FOURTEEN
### (Conspiracy to Commit Money Laundering)

54.     Paragraphs 1 through 29 and 31 through 38 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### THE CONSPIRACY

55.     Beginning in or around 1990 through on or about February 17, 2009, in the Southern District of Texas and elsewhere, the defendant, ROBERT ALLEN STANFORD, a/k/a Sir Allen Stanford, a/k/a Allen Stanford, did knowingly and intentionally conspire, combine, confederate, and agree with Holt, Kuhrt, Lopez, King, Davis, and others, known and unknown to the Grand Jury, to commit the following offenses:

    a.    to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, wire fraud and mail fraud, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

    b.    to knowingly engage in monetary transactions in criminally derived property of a value greater than $10,000 that was

23

derived from specified unlawful activity, that is wire fraud
and mail fraud, in violation of Title 18, United States Code,
Section 1957.

### MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-

conspirators sought to accomplish the objects of the conspiracy included, among others,

the following:

56.     It was a part of the conspiracy that STANFORD, Holt, Kuhrt, Lopez,

King, Davis and others would cause the movement of millions of dollars of fraudulently

obtained investors' funds from and among bank accounts located in the Southern District

of Texas and elsewhere in the United States to various bank accounts located outside of

the United States as follows:

> a.     STANFORD, Holt, Kuhrt, Lopez, Davis and others would
> cause investors in SIB CDs to transfer the investors' funds
> into bank accounts located in the Southern District of Texas
> which were maintained by STANFORD;
>
> b.     STANFORD, Holt, Kuhrt, Lopez, Davis and others would
> subsequently cause the transfer of the investors' funds in
> amounts exceeding $10,000 from bank accounts located in
> the Southern District of Texas into intermediary bank
> accounts located outside of the United States; and
>
> c.     STANFORD, Holt, Kuhrt, Lopez, Davis and others, would
> cause the transfer of investors' funds from intermediary bank
> accounts into other bank accounts located outside of the
> United States in order for STANFORD, Holt and Davis to
> exercise exclusive control over the investors' funds.

APP 0033

57.     It was further a part of the conspiracy that STANFORD would make corrupt payments in excess of $10,000 to King who would then cause the deposit of those funds into financial institutions located throughout the United States.

All in violation of Title 18, United States Code, Section 1956(h).

### NOTICE OF FORFEITURE
### 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C);
### 18 U.S.C. § 982(a)(1)

#### NOTICE AS TO COUNTS ONE THROUGH ELEVEN AND FOURTEEN

58.     The United States gives notice to the defendant, ROBERT ALLEN STANFORD, that in the event of his conviction of any of the offenses charged in Counts One through Eleven of this Superseding Indictment, pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(l)(C), the United States intends to forfeit the following property:

> All property, real or personal, which constitutes or is
> derived from proceeds traceable to each such offense,
> including the conspiracy to commit such offenses.

59.     The United States gives notice to the defendant, ROBERT ALLEN STANFORD, that in the event of his conviction of the offense charged in Count Fourteen, pursuant to Title 18, United States Code, Section 982(a)(1), the United States intends to forfeit the following property:

> All property, real or personal, involved in a money laundering
> conspiracy as charged in Count Fourteen, and any property,
> real or personal, traceable to such property.

APP 0034

## MONEY JUDGMENT

60.     The United States gives notice to the defendant, ROBERT ALLEN STANFORD, that upon his conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

### PROPERTY SUBJECT TO FORFEITURE

61.     The United States gives notice to the defendant, ROBERT ALLEN STANFORD, that the property subject to forfeiture includes, but is not limited to, the following property:

a.     at least $7 billion in United States dollars;

b.     all funds on deposit in the following accounts:

### Union Bancaire Privee UBP, Geneva

| Account Holder | Account Number |
|---|---|
| Bank of Antigua Ltd. | XXXX203 |

### HSBC Bank, PLC, London, United Kingdom

| Account Holder | Account Number |
|---|---|
| Stanford International Bank Ltd. | XXXX0160 |
| | XXXX3136 |
| | XXXX8105 |
| | XXXX0538 |

APP 0035

### Credit Suisse, United Kingdom

| Account Holder | Account Number |
|---|---|
| Stanford International Bank, Ltd. | LDXXX051 |
| | LDXXX465 |
| | LDXXX830 |
| | 2LFXXX651 |
| | LDXXX909 |

### SG Private Banking, Geneva, Switzerland

| Account Holder | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XXX 800 |
| Stanford International Bank (Antigua) | XXX 801 |
| Stanford Financial Group LTD, Lausanne | XXX 731 |
| Robert Allen Stanford | X XXX 600 |
| Bank of Antigua Ltd. | XXX732 |

### Banque Franck, Galland, Geneva, Switzerland

| Account Holder | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XXX 058 |

### Julius Baer, Zurich, Switzerland

| Account Holder | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XX.XXX.6744 |

APP 0036

## RBS Coutts, Zurich, Switzerland

| Account Holder | Account Number |
|---|---|
| Stanford International Bank (Antigua) | XX XXX 375 |
| | XX XXX560 |
| | XX XXX565 |

## Toronto Dominion Bank, Canada

| Account Holder | Account Number |
|---|---|
| Stanford International Bank, Ltd. | XXXXXX-XXX1573 |
| | XXXXXX-XXX1670 |
| | XXXXXX-XXX4235 |
| | XXXXXX-XXX0513 |
| | XXXXXX-XXX0380 |
| | XXXXXX-XXX5558 |
| | XXXXXX-XXX5569 |
| | XXXXXX-XXX5624 |

## Friends Provident International Limited

| Account Holder | Account Number |
|---|---|
| The Prophecy Trust | XX8097 |

## Coutts Bank Ltd.

| Account Holder | Account Number |
|---|---|
| Southpac Life Insurance Limited | XXXX7443.1000 |

28

## Credit Suisse, Zurich

| Account Holder | Account Number |
|---|---|
| Stanford Group (Suisse) SA | XXXX-XXX X50-4 |

## First Bank Virgin Islands

| Account Holder | Account Number |
|---|---|
| C.A.S. Hewlett | XXXXXXX131 |

## First Citizens Bank dba Sun American Bank, Boca Raton, Florida

| Account Holder | Account Number |
|---|---|
| Rebecca Reeves-Stanford | XXXXXX306 |

## Marex Financial Limited

| Account Holder | Account Number |
|---|---|
| Bank of Antigua | XX885 |
| Stanford International Bank, Limited | XX886 |
| Stanford Financial Group, Limited | XX889 |

### SUBSTITUTE ASSETS

In the event that property subject to forfeiture, as a result of any act or omission of the defendant, ROBERT ALLEN STANFORD,

(A)    cannot be located upon the exercise of due diligence;

(B)    has been transferred or sold to, or deposited with, a third party;

APP 0038

(C)     has been placed upon the jurisdiction of the court;

(D)     has been substantially diminished in value; or

(E)     has been commingled with other property that cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the

defendant up to the total value of the property subject to forfeiture, pursuant to Title 21,

United States Code, Section 853(p), incorporated by reference in Title 28, United States

Code, Section 2461(c), and Title 18, United States Code, Section 982(b)(1).


A TRUE BILL

ORIGINAL SIGNATURE ON FILE
FOREPERSON


JOSE ANGEL MORENO
UNITED STATES ATTORNEY

GREGG COSTA
ASSISTANT UNITED STATES ATTORNEY


GREG ANDRES
Deputy Assistant Attorney General
Criminal Division
U.S. Department of Justice

WILLIAM STELLMACH
Deputy Chief
ANDREW H. WARREN
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice

30

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., *et al.* | § § § | |
| Defendants. | § § | |

## ORDER

This Order addresses Plaintiff Security and Exchange Commission's ("SEC") motion for partial summary judgment [1779]. The Court grants the motion. The Court also denies Defendant R. Allen Stanford's motion for extension of time [1807].

## I. THE SEC'S CIVIL ACTION AGAINST STANFORD

The Commission filed this action against R. Allen Stanford, his associates, and various entities on February 17, 2009. The SEC alleged a host of securities law violations committed by Stanford, his businesses, and his associates. Since that time, a federal grand jury in Houston indicted Stanford, and a superseding indictment charged Stanford with wire fraud, mail fraud, and obstruction of an SEC investigation. The indictment also charged Stanford with conspiracy to commit these same offenses as well as conspiracy to commit money laundering. On March 6, 2012, a jury convicted Stanford of conspiracy to commit mail and write fraud, four counts of wire fraud, five counts of mail fraud, one count of



conspiracy to obstruct an SEC investigation, one count of obstruction of an SEC proceeding, and one count of conspiracy to commit money laundering.  Following the conviction, the court conducted a forfeiture trial in which a jury found that assets in various Stanford-related accounts were proceeds from Stanford's fraudulent scheme.  The Houston trial court sentenced Stanford to 110 years in prison and ordered Stanford to forfeit more than $5.9 billion.  Stanford has appealed the rulings.  Stanford's accomplice, James Davis, also pled guilty to mail fraud, wire fraud, and conspiracy to obstruct an SEC investigation.  Davis was sentenced to sixty months in federal prison and three years of supervised release.

Based on these developments, the SEC moves for summary judgment on some of the counts alleged in its second amended complaint.  Specifically, the SEC moves for summary judgment on its Exchange Act § 10(b) and Rule 10b-5 claims against Stanford, Davis, Stanford International Bank ("SIB"), and Stanford Group Company ("SGC"); its Securities Act § 17(a) claims against Stanford, Davis, SIB, and SGC, its Advisers Act § 206(1) and 206(2) claims against Stanford and SGC, and its Investment Company Act § 7(d) claims against SIB and SGC.

## II.  SUMMARY JUDGMENT STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369

APP 0041

U.S. 654, 655 (1962). Courts, however, need not sift through the record in search of triable issues. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Indeed, courts resolve factual controversies in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

SIB, SGC, and Davis failed to respond to the SEC's motion. Because these parties did not respond to the SEC's motion, the Court accepts the SEC's facts as to these defendants as undisputed. *Eversley v. Mbank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988). Normally, "[a] summary judgment nonmovant who does not respond to the motion is relegated to [its] unsworn pleadings, which do not constitute summary judgment evidence." *Bookman v. Schubzda*, F. Supp. 999, 1002 (N.D. Tex. 1996). If a "fail[s] to respond to a [] motion for summary judgment, the inquiry must be whether the facts presented by the [moving party]

APP 0042

create an appropriate basis to enter summary judgment against the" nonmoving party. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

### III. THE SEC IS ENTITLED TO PARTIAL SUMMARY JUDGMENT

The SEC argues that it is entitled to summary judgment because Stanford and Davis are collaterally estopped from litigating facts established in the related criminal proceeding. Collateral estoppel applies when "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the determination." *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 397 (5th Cir. 2004). When the government seeks to utilize the results of a prior criminal proceeding as collateral estoppel, courts look to the respective indictments and complaints to determine whether the civil complaint and criminal indictment actually involve identical issues. *SEC v. Blackwell*, 477 F. Supp. 2d 891, 900 (S.D. Ohio 2007) (citing *SEC v. Gruenberg*, 989 F.2d 977, 978 (8th Cir. 1993)); *see also Matter of Lewisville Properties, Inc.*, 849 F.2d 946, 949 (5th Cir. 1988) (analyzing similarities of indictment and complaint to determine whether to apply collateral estoppel).

A court may give issues litigated in the criminal proceeding preclusive effect even where, like here, the criminal proceeding is on appeal. *See Smith v. SEC,* 129 F.3d 356, 362 (6th Cir. 1997) (noting that the pendency of an appeal does not preclude a judgment's res judicata effect); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO,* 905 F.2d 610, 621 (2d Cir. 1990) ("The pendency of a criminal appeal generally 'does not deprive a judgment of its preclusive effect'") (citations omitted);

ORDER – PAGE 4

**APP 0043**

*SEC v. Namer,* No. 97 Civ. 2085(PKC), 2004 WL 2199471 at *8 (S.D.N.Y. Sept. 30, 2004) ("But the fact that [defendant's] criminal conviction is currently under consideration by the United States Court of Appeals for the Sixth Circuit does not foreclose the prior judgment from having preclusive effect."); *SEC v. Pace,* 173 F. Supp. 2d 30, 33 (D.D.C. 2001) ("The fact that Pace's appeal from his conviction is still pending does not affect the application of collateral estoppel."); *see also* 18 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 4433 (2d ed.) ("The bare act of taking an appeal is no more effective to defeat preclusion than a failure to appeal.").

The SEC argues that the civil complaint and the indictments of Stanford and Davis seek to prove the same facts, that those facts were litigated in the government's favor during Stanford's criminal trial and as a result of Jim Davis's guilty plea, and that the SEC is entitled to rely on those factual findings in this proceedings.

### A. The SEC's Exchange Act § 10(b), Rule 10b-5 and Securities Act § 17(a) Claims

**1. The SEC Is Entitled to Summary Judgment on Its Exchange Act § 10(b), Rule 10b-5 and Securities Act § 17(a) Claims Against Stanford Based on the Jury Verdict in Stanford's Criminal Proceeding.** – Rule 10b-5 and section 17(a) are substantially identical. *See Landry v. All Am. Assurance Co.*, 688 F.2d 381, 386 (5th Cir. 1982) ("Rule 10b-5, adopted under § 10(b) of the Securities and Exchange Act of 1934, is substantially identical to § 17(a)."). Under either provision, the SEC must show that Stanford, by the use of any means or instrumentality of interstate commerce or of the mails, (1) used a fraudulent device, made a material misrepresentation or omission, or committed an act that operated as a fraud

APP 0044

or deceit; (2) in connection with the purchase or sale of securities; and (3) acted with scienter. *See SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

In Stanford's criminal trial, the jury found that: (1) Stanford knowingly created a scheme to defraud or to obtain money and property by means of materially false or fraudulent pretenses, representations, or promises; (2) Stanford acted with a specific intent to defraud; (3) Stanford used interstate or foreign wire communications or caused another person to use interstate or foreign wire communications for the purpose of carrying out the scheme; (4) Stanford mailed something through the United States Postal Service or a private or commercial interstate carrier for the purpose of carrying out the scheme; and that (5) Stanford's scheme to defraud employed false material representations. App. Supp. Pl.'s Mot. Summ. J. 188-93. These factual findings of the Stanford criminal court, necessary to the judgment in that proceeding, conclusively establish that the SEC is entitled to summary judgment on its Exchange Act § 10(b), Rule 10b-5, and Securities Act § 17(a) claims against Stanford.

In response, Stanford argues only that his criminal trial was deficient. Specifically, Stanford argues that the criminal trial involved a number of constitutionally deficient procedures. Because of these constitutional deficiencies, according to Stanford, Stanford did not have the opportunity to fully and fairly litigate these issues in the criminal proceeding. But even if Stanford's criminal proceeding was constitutionally infirm – a matter on which the Court expresses no opinion – such arguments are questions for the appellate court in the criminal procedure. *See* 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H.

APP 0045

COOPER, FED. PRAC. & PROC. § 4423 (2d ed.) ("The values of preclusion would be destroyed if proof of the quality of decision were required of the party asserting preclusion or permitted to the party opposing it."). And although appeal stays execution of the criminal trial judgment, the judgment is still final and may be utilized to collaterally estop Stanford from re-litigating facts already litigated in that criminal trial. *See SEC v. Blackwell*, 477 F. Supp. 2d 891, 901 (S.D. Ohio 2007) (applying preclusive effect of criminal judgment on appeal); *SEC v. Pace*, 173 F. Supp. 2d 30, 33 (D.D.C. 2001) (same). Accordingly, the Court applies the doctrine of collateral estoppel and holds that the SEC is entitled to Summary Judgment on its Exchange Act § 10(b), Rule 10b-5 and Securities Act § 17(a) claims against Stanford based on the facts adjudicated in Stanford's criminal proceeding.

*2. The SEC is Entitled to Summary Judgment on Its Exchange Act § 10(b), Rule 10b-5 and Securities Act § 17(a)claims against SIB and SGC Based on Undisputed Evidence.* – Stanford admits to wholly owning and controlling SIB and SGC. Stanford's Answer First Am. Compl. ¶ 15. Stanford used SCB and SGC to sell his CDs, the tool used to perpetuate his massive Ponzi scheme. *See* Direct Testimony of Karyl Van Tassel, *in* App. Supp. Pl.'s Mot. Summ. J. 314-15. Accordingly, the SEC is entitled to summary judgment on its Exchange Act § 10(b), Rule 10b-5 and Securities Act § 17(a) claims against SIB and SGC.

*3. The SEC is Entitled to Summary Judgment on its Exchange Act § 10(b), Rule 10b-5 and Securities Act § 17(a) Claims Against Davis Based on Davis's Guilty Plea.* – In Stanford's criminal proceeding, Davis pled guilty. In his plea agreement, Davis admitted

APP 0046

that he (1) conspired with Stanford to solicit investor funds and misappropriate them for personal use; (2) falsely told investors that SIB's investment were well-managed, safe and secure, and invested in a strategy to minimize risk and achieve liquidity; (3) falsely told investors that SIB's returns increased year by year through investment strategy; (4) falsely told investors that SIB had certain returns when he and other were fabricating those returns; (5) created and disseminated false and fraudulent documents to investors that misrepresented how they were invested; and (6) concealed the lack of regulatory scrutiny by the Antiguan regulators and outside auditor. These admissions conclusively prove that the SEC is entitled to summary judgment against Davis on the SEC's Exchange Act § 10(b), Rule 10b-5 and Securities Act § 17(a) claims.

### B. The SEC's Advisers Act Claims

**1. The SEC is Entitled to Summary Judgment on Its Advisers Act § 206(1) and 206(2) Claims Against Stanford Based on Stanford's Criminal Proceeding and the SEC's Undisputed Facts.** – Section 206(1) of the Adviser's Act prohibits investment advisers from employing "any device, scheme, or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6(1). Section 206(2), likewise, prohibits investment advisors from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." *Id.* § 80b-6(2). Stanford was an investment adviser. *See id.* § 80b-2(11) ("'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities,

or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities"); *see also* Van Tassel Decl., *in* Pl.'s App. 314 (asserting that Stanford's only income was from Stanford entities, including the sale of CDs). The jury in Stanford's criminal proceeding necessarily determined that Stanford engaged in fraud through the sale of CDs. Accordingly, the SEC is entitled to summary judgment on its Adviser's Act sections 206(1) and 206(2) claims against Stanford.

> **2. The SEC Is Entitled to Summary Judgment on Its Advisers Act § 206(1) and 206(2) Claims Against SGC Based on Stanford's Criminal Proceeding and the SEC's Undisputed Facts.** – Stanford admitted that SGC was a registered investment advisor. First Am. Compl. ¶¶ 13, 14; Stanford's Answer ¶¶ 13, 14. Stanford controlled SGC and utilized SGC to sell his fraudulent CDs to U.S. investors. *See* Van Tassel Decl., *in* Pl.'s App. 315. Accordingly, the SEC is entitled to summary judgment on its § 206(1) and 206(2) claims against SGC.

> ### C. The SEC is Entitled to Summary Judgment on its Investment Company Act § 7(d) claims against SIB and SGC

Section 7(d) of the Investment Company Act requires a foreign investment company to obtain an order from the SEC allowing it or its underwriter to publicly offer securities for sale in this country before doing so. 15 U.S.C. § 80a-7(d). SIB publicly sold securities, the CDs, in this country without first obtaining an SEC order. *See* Aff. Curtis Francisco, *in* Pl.'s App. 135. Thus, SIB violated section 7(d). SGC is an underwriter as defined by the statute. *See* 15 U.S.C. § 80a-2(40) ("'Underwriter' means any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any

APP 0048

security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking."). Stanford admits that SIB sold its CDs through SGC. *See* First Am. Compl. ¶¶ 12, 13; Stanford's Answer ¶¶ 12, 13 (admitting that Stanford sold SIB CDs through SGC). Thus, SGC also violated section 7(d). Accordingly, the SEC is entitled to summary judgment on its section 7(d) claims against both SIB and SGC.

## IV. THE SEC'S REQUESTED REMEDIES

### A. *The Court Grants the SEC's Request for an Injunction*

The Court has found that the SEC is entitled to summary judgment against Stanford for violations of the Securities Act, the Exchange Act, the Advisers Act, and the Investment Advisors Act. The Court has found that the SEC is entitled to summary judgment against Davis for violations of the Securities Act and the Exchange act. The Court has found that the SEC is entitled to summary judgment against SIB for violations of the Securities Act, Exchange Act, and Investment Company Act. And the Court has found that the SEC is entitled to summary judgment against SGC for violations of the Securities Act, Exchange Act, Investment Company Act, and Advisers Act. All of these statutes provide that a permanent injunction may issue following a violation of any of their provisions. *See* 15 U.S.C. § 77t(b); *id.* § 78u(d); *id.* § 78u-1; *id.* § 80b-9(d); *id.* § 80a-41.

To show entitlement to an injunction, the SEC must show that there is a reasonable likelihood that the wrong will be repeated, but the SEC need not show irreparable injury or lack of a legal remedy. *See SEC v. Scott*, 565 F. Supp. 1513, 1536 (S.D.N.Y. 1983). Courts

ORDER – PAGE 10

look to various factors to determine whether the SEC is entitled to the injunction, including (1) the seriousness of the original violation; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved on the part of the defendant; (4) the defendant's recognition of his or her wrongful conduct and the sincerity of assurance against future violations; and (5) the likelihood that the defendant's occupation will present opportunities for future violations. *See, e.g.*, *SEC v. Resnick*, 604 F. Supp. 2d 773, 782 (D. Md. 2009). "Essentially, a court makes a prediction of the likelihood of future violations based on an assessment of the totality of the circumstances surrounding the particular defendant and the past violations that were committed." *SEC v. Bonastia*, 614 F.2d 908, 912 (citing *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir. 1978)). Although no single factor is determinative, the degree of scienter "bears heavily" on the decision to issue an injunction. *See SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993)

Stanford, Davis, SIB, and SGC committed serious violations of the securities laws, did so recurrently, and did so with a high degree of scienter. Given these factors, the Court finds that the SEC is entitled to injunctive relief against Stanford prohibiting future violations of Exchange Act § 10(b), Rule 10b-5, Securities Act § 17(a), and Advisers Act § 206(1) and (2), against Davis prohibiting future violations of Exchange Act § 10(b), Rule 10b-5, and the Securities Act § 17(a), and against SGC and SIB prohibiting future violations of Exchange

APP 0050

Act § 10(b), Rule 10b-5, Securities Act § 17(a), Advisers Act § 206(1) and (2), and Investment Company Act § 7(d).[1]

## B. The Court Grants the SEC's Requested Disgorgement

To justify disgorgement, the SEC must establish only a reasonable approximation of the amount of gains causally connected to the fraud. *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989); *Resnick*, 604 F. Supp. 2d at 782. A criminal money judgment is a reasonable approximation of the ill-gotten gains. *See SEC v. Gordon*, 822 F. Supp. 2d 1144, 1158 (N.D. Okla. 2011). Here, the criminal proceedings establish a forfeiture figure of $5.9 billion. Although Stanford could have introduced evidence to show that the criminal forfeiture figure is unreasonable, he failed to do so. *See id.* ("Once the SEC shows that the amount of disgorgement sought is a reasonable approximation of defendant's ill-gotten gains, the burden shifts to the defendant to prove that the SEC's estimate is not reasonable."). Thus, the Court finds that $5.9 billion is a reasonable approximation of the gains connected to Stanford's fraud. Accordingly, the Court finds Stanford is liable to disgorge the $5.9 billion that he obtained as a result of his fraudulent scheme. The Court exercises its discretion to hold SGC, SIB, and Davis jointly and severally liable for this amount.[2] *See SEC v. First*

---

[1] Although Stanford was sentenced to a 110-year prison term, a prison sentence is not sufficient, standing alone, to show lack of a reasonable likelihood of future violations. *SEC v. Mark*, 427 F. Supp. 2d 583, 591 (M.D.N.C. 2006); *see also U.S. v. Mihaly*, 67 F.3d 894 (10th Cir. 1995) (appeal regarding guilty plea of wire fraud while serving prison sentence).

[2] As the SEC recognizes, it may be necessary to offset any disgorgement owed by Stanford, Davis, SGC, and SIB by any recovery obtained against them by the Receiver or any assets obtained by the Department of Justice in forfeiture proceedings. The sum also may

APP 0051

*Pacific Bancorp*, 142 F. 3d 1186, 1192 (9th Cir. 1998); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475-76 (2d Cir. 1996); *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993).

### C. The Court Grants the SEC Prejudgment Interest

The Court may award prejudgment interest on disgorgement amounts, in its discretion, to prevent parties from benefitting from what is, in essence, an interest-free loan resulting from illegal activity. *See, e.g.*, *SEC v. Jakubowski*, 1997 WL 598108, at *2 (N.D. Ill. Sept. 19, 1997) (citation omitted). Courts generally consider (1) the need to fully compensate the wronged party for actual damages suffered; (2) considerations of fairness and relative equities of the award; (3) the remedial purpose of the statute involved; and (4) such other general principles as deemed relevant. *See First Jersey*, 101 F.3d 1476. In federal securities cases, courts generally calculate prejudgment interest by applying the underpayment rate published by the Internal Revenue Service. *See, e.g.*, *SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007).

The SEC requests $861,189,969.06 in prejudgment interest, based on calculations of the IRS underpayment rate on $5.9 billion from the time of the SEC's complaint until the time of the filing of the SEC's motion. The Court finds the SEC's time period and calculation reasonable and, accordingly, adds the SEC's requested prejudgment interest to the defendant's disgorgement liability.

---

be offset by money returned to investors from the Receiver. *See SEC v. AmeriFirst Funding, Inc.*, No. 3:07-CV-1188-D, 2008 WL 1959843, at *3 (N.D. Tex. May 5, 2008).

ORDER – PAGE 13

### D.  The Court Imposes a Civil Penalty on Stanford and Davis

"Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007). "Without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains." *Koenig*, 532 F. Supp. 2d at 995.  The Securities Act, Exchange Act, Investment Company Act, and Advisers Act all set three tiers of civil penalties in SEC civil actions.  15 U.S.C. § 77t(d); *id.* § 78u(d); *id.* § 80a-41(e);  *id.* § 80b-9(e).  A third-tier penalty, the highest of the three, is proper if the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial loss to other persons." *See, e.g.*, 15 U.S.C. § 78u(d)(3)(B).  Based on the extraordinary facts of this extraordinary fraud, the Court finds that third-tier penalties are appropriate as against Stanford, SIB, SGC, and Davis.

The third-tier penalty, for an individual, should not exceed the greater of (1) $130,000 for each violation or (2) the gross amount of the defendant's pecuniary gain. *See* 15 U.S.C. § 78u(d)(3)(B); *id.* § 77t(d)(2) *see* 17 C.F.R. § 291.1004 (increasing penalty to $130,000). For any entity, the third-tier penalty should not exceed the greater of (1) $650,000 for each violation or (2) the gross amount of the defendant's pecuniary gain.  *See* 15 U.S.C. § 78u(d)(3)(B); *id.* § 77t(d)(2) *see* 17 C.F.R. § 291.1004 (increasing penalty to $650,000).  In determining the proper amount of the civil penalty, courts consider a number of factors, including:

APP 0053

(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Opulentica*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (citing *SEC v. Coates*, 137 F.Supp.2d 413, 428-29 (S.D.N.Y.2001) (listing factors)). Courts sometimes also consider additional factors such as the cooperation of the defendant with law enforcement authorities or the adequacy of other criminal or civil sanctions to punish the defendant. *See SEC v. Lewis*, 492 F. Supp. 2d 1173, 1174 (D.S.D. 2007); *SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045, 1050-51 (S.D. Ind. 2005).

As to each defendant, most factors tilt toward a higher third-tier penalty. The fraud perpetrated was obviously egregious, was done with a high degree of scienter, caused billions in losses, and occurred over the course of a decade. Thus, the Court is inclined to impose a penalty that corresponds with the seriousness of the offenses at issue. However, the Court notes the difficulty in determining a proper fine as to each defendant because the SEC has not provided the Court with any method of calculation other than asking the Court to enter "the maximum third-tier penalty" of $5.9 billion – the amount found by the criminal court as proceeds of Stanford's scheme – against both Stanford and Davis. The SEC seeks an indeterminate amount against SIB and SGC.

The Court agrees that the $5.9 billion penalty is warranted as to Stanford as the amount of his gross pecuniary gain. Accordingly, the Court imposes a civil penalty of $5.9

ORDER – PAGE 15

billion against Stanford. However, the Court declines to enter such a penalty against Davis, SIB, and SGC.

The SEC makes no attempt to segregate Davis's conduct from Stanford's conduct. The SEC further fails to consider that Davis cooperated with authorities and that Davis's guilty plea has been utilized heavily in this proceeding as well as in Stanford's criminal proceeding. Further, there is simply no indication that because Stanford profited from the fraud to the tune of $5.9 billion, Davis did as well. Although Davis was unquestionably integral to the fraud, it is impossible to determine from this record what Davis's gross pecuniary gain was from the fraud or how many violations Davis committed for purposes of imposing a third-tier penalty. Given this lack of information, the Court imposes a $5 million civil penalty against Davis for his actions in connection with the Stanford fraud.[3]

The Court also declines to enter a penalty against SIB or SGC. First, the gains those entities acquired from the fraud are likely reflected in the penalty levied against Stanford because Stanford owned and controlled both entities and used them to acquire his fraudulent gains. Second, any difference in the amount of penalty imposed is likely moot. SIB and SGC are in the lengthy process of liquidation. Given the discrepancy between money owed by those entities and money currently in hand, those Receivership entities have no ability to pay any fine.

---

[3]The Court assumes that this sum is less than the statutory maximum.

APP 0055

## CONCLUSION

For the reasons stated above, the Court grants the SEC's motion for summary judgment. The Court enjoins Stanford from violating the Exchange Act § 10(b), Rule 10b-5, the Securities Act § 17(a), and the Advisers Act § 206(1) and (2), enjoins Davis violating the Exchange Act § 10(b), Rule 10b-5, the Securities Act § 17(a), and enjoins SGC and SIB from violating the Exchange Act § 10(b), Rule 10b-5, the Securities Act § 17(a), the Advisers Act § 206(1) and (2), and the Investment Company Act § 7(d). The Court finds Stanford, Davis, SGC, and SIB jointly and severally liable to disgorge the $5.9 billion fraudulently acquired by Stanford's scheme. The Court adds $861,189,969.06 of prejudgment interest to this total, for a total disgorgement liability of $6,761,189,969.06. Finally, the Court imposes a civil penalty of $5.9 billion on Stanford and $5 million on Davis.

Signed April 25, 2013.

David C. Godbey
United States District Judge

APP 0056

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF TEXAS
2                 HOUSTON DIVISION

3

4   UNITED STATES OF AMERICA    *    09-CR-342
                                *    Houston, Texas
5   VS.                         *
                                *    February 8, 2012
6   ROBERT ALLEN STANFORD       *    10:09 a.m.

7
                       JURY TRIAL
8
                       VOLUME 13
9

10        BEFORE THE HONORABLE DAVID HITTNER
           UNITED STATES DISTRICT JUDGE
11

12  APPEARANCES: APPEARANCES:

13  **FOR THE GOVERNMENT:**
    Gregg J. Costa
14  Assistant US Attorney
    PO Box 61129
15  Houston, Texas 77208-1129

16  William Stellmach
    Andrew Howard Warren
17  U.S. Department of Justice
    1400 New York Avenue NW
18  Washington, DC 20005

19

20  **FOR THE DEFENDANT:**
    Ali R. Fazel
21  Robert Scardino
    Scardino & Fazel
22  1004 Congress Street
    3rd Floor
23  Houston, Texas 77002

24

25

GT
EXHIBIT 003

*Recross-Young/By Mr. Fazel*

1 **A.**   No.

2 **Q.**   Is he charged with a crime?

3 **A.**   Not that I'm aware of.

4 **Q.**   Okay.  Are you going to take the position that he --

04:59:52  5         MR. COSTA:  Your Honor, may we approach.

6         THE COURT:  Sure.  Come on up.

7         **(The following was held at the bench)**

8         THE COURT:  Okay.

9         MR. COSTA:  He's going down this line with

05:00:12  10 Mr. Alvarado, we don't want to reveal who our targets

11 investigations, but he is still being looked at in this

12 investigation.  He's working down in Colombia now.

13         It's putting me in a bind because it's

14 against our policy to bring out who are targets of

05:00:26  15 continuing criminal investigations.  Yet, he's -- Mr. Fazel

16 is asking questions leaving the impression that

17 Mr. Alvarado is somehow -- his conduct is not being

18 questioned at all in this matter.  So I would -- unless

19 he -- do you understand the bind I'm in?

05:00:41  20         THE COURT:  I understand completely.

21         MR. COSTA:  I don't want it publicly to come

22 out who are targets of this continuing Stanford

23 investigation.

24         MR. FAZEL:  If I could comment, Judge, and with

05:00:50  25 all due respect, Mr. Costa brought it out first.

```
 1              THE COURT:  How?

 2              MR. FAZEL:  He mentioned that he was a target.

 3              MR. COSTA:  No, I didn't.  We're talking about

 4    Mr. Loumiet was a -- we're talking Mr. Alvarado now.

 5              MR. FAZEL:  We're talking about two

 6    different --

 7              MR. COSTA:  Loumiet has nothing involved --

 8    yeah.  Loumiet is not a target in Stanford.  It's a totally

 9    different issue.

10              THE COURT:  What's your response?

11              MR. FAZEL:  My response is I have the right to

12    cross-examine somebody, and if the agent is not aware of

13    it, thea gent's not aware of it.  I mean, there's not much

14    I can do it about it.

15              MR. COSTA:  But we've limited -- it's against

16    DOJ's procedure to out someone as a target of a pending

17    investigation.

18              MR. FAZEL:  I appreciate that.

19              MR. COSTA:  I don't see how it's relevant

20    either.

21              MR. FAZEL:  Well, it's very relevant because,

22    on recross, he took the position this lawyer was somehow

23    corrupt or --

24              MR. COSTA:  Mr. Loumiet.

25              MR. FAZEL:  I understand that.
```



GREENBERG
ATTORNEYS AT LAW
TRAURIG

## PRIVILEGED AND CONFIDENTIAL MEMORANDUM
## ATTORNEY-CLIENT COMMUNICATION
## ATTORNEY WORK PRODUCT

To   Yolanda Suarez, Esq.
     STANFORD FINANCIAL GROUP LTD.

From  Carlos E. Loumiet, Esq.
      Carl A. Fornaris, Esq.
      GREENBERG TRAURIG, P.A.

Date  September 15, 1998

Re   *Relationship Between Florida Trust Representative Office and Affiliated*
     *Foreign Bank*

### BACKGROUND

Stanford Financial Group Ltd., an Antigua-based financial services company, owns

Stanford Trust Company Ltd., a trust company organized under the laws of Antigua (the

"Antigua Trust Company"); Stanford Trust Company, a trust company organized under the laws

of the State of Louisiana (the "Louisiana Trust Company," and, together with the Antigua Trust

Company, the "Trust Companies"); and Stanford International Bank Ltd., a foreign bank

organized under the laws of Antigua (the "Bank"). In our memorandum to you dated November

5, 1997, we advised you that: (1) although its statutory authority to do so is questionable, the

Florida Department of Banking and Finance ("Department") purports to prohibit non-Florida

GT
EXHIBIT 004

GT02-23-2011ST 0004440
APP 0060

**To**     Yolanda Suarez
**Date**   September 15, 1998
**Page**   2

trust companies (such as the Trust Companies) from establishing a "trust service" office in Florida, but the Trust Companies are allowed by the Department to establish a more limited trust representative office ("TRO") without the Department's approval, and (2) no approval from the Board of Governors of the Federal Reserve System ("Federal Reserve") would be required to establish a TRO of either of the Trust Companies in Florida. As you recall, unlike a full "trust service" office, a TRO would be prohibited from making discretionary decisions and administering accounts in Florida. Such activities, according to the staff of the Department, could only take place at the head office of the Trust Companies in Antigua and Baton Rouge, respectively. Instead, the activities of a Florida-based TRO would be limited to soliciting business, liaising with customers and facilitating the transfer of documents to the Trust Companies' head offices.[1]

We understand that both Trust Companies are considering establishing TROs in Florida (the "Proposed TROs"). In that regard, you have asked us to what extent the Proposed TROs may work together with the Bank without being deemed an office or representative of an unlicensed foreign bank under applicable federal and Florida banking law.

This memorandum provides: (A) our views regarding applicable federal banking law; and (B) our views regarding applicable Florida law. In addition, attached hereto as Exhibit A you will find, for your convenience and that of the officers and staff of the Proposed TROs, a list of "do's and don'ts" for the TROs in order to comply with the guidelines set forth herein.

---

[1]   As we also advised you in the November 5, 1997 memorandum, the Department has no application procedure for the establishment of a TRO; however, the Department appreciates a courtesy notification if a TRO is established.

APP 0061

**To**    Yolanda Suarez
**Date**    September 15, 1998
**Page**    3

## DISCUSSION

### A.    Applicable Federal Banking Law

The International Banking Act of 1978, as amended ("IBA"),[2] provides that no foreign

bank may establish a branch, agency or representative office in the United States without the

prior approval of the Federal Reserve.[3]  A foreign bank is defined as any company organized

under the laws of a foreign country that engages in the business of banking, is recognized as a

bank by the bank supervisory or monetary authority of its home country, receives deposits to a

substantial extent in the regular course of its business, and has the power to accept demand

deposits.[4]  Foreign banks include foreign commercial banks, foreign merchant banks and other

foreign institutions that engage in activities usual in connection with the business of banking.[5]

The Bank, a bank chartered under the laws of Antigua and regulated as a commercial bank by the

Government of Antigua, would clearly constitute a foreign bank for purposes of the IBA.

### 1.    U.S. Branches and Agencies of Foreign Banks

A branch is any office or other place of business of a foreign bank located in any State of

the United States at which deposits are received.[6]  An agency is any office or other place of

---

[2]    12 U.S.C. §§ 3101 to 3111.

[3]    Id. §§ 3105(d)(1) and 3107(a)(1).  In the case of branches and agencies to be chartered under federal law, the approval of the Office of the Comptroller of the Currency also would be required and, in the case of branches and agencies to be chartered under state law, the approval of the relevant state banking supervisors also would be required.

[4]    Id. § 3101(7); 12 C.F.R. § 211.2(j).  We understand that the Antigua Trust Company itself, under Antiguan law, does not meet these conditions.

[5]    12 U.S.C. § 3101(7).

[6]    12 U.S.C. § 3101(3); 12 C.F.R. § 211.21(d).

GT03-22-2011ST-0004442
**APP 0062**

**To**   Yolanda Suarez
**Date**   September 15, 1998
**Page**   4

business of a foreign bank located in any State of the United States at which credit balances are

maintained incidental to or arising out of the exercise of banking powers, checks are paid, money

is lent or deposits are accepted (to the extent permitted by applicable state or federal law) from

persons or entities not citizens or residents of the United States.[7]

The Proposed TROs will not, on behalf of the Bank or otherwise, engage in any of the

activities mentioned above that take place at branches or agencies of foreign banks.

Accordingly, this memorandum analyzes the extent to which the Proposed TROs' relationship to

and interaction with the Bank might or might not be deemed to constitute "representative office"

activities.

2.   <u>U.S. Representative Offices of Foreign Banks</u>

In 1991, the Foreign Bank Supervision Enhancement Act of 1991 ("FBSEA") amended

the IBA to create a definition for the term "representative office" as that term applies to foreign

banks. Under the statutory definition, a representative office is "any office of a foreign bank"

located in any State of the United States that is not a branch, agency or subsidiary of the foreign

bank.[8] The Federal Reserve's foreign bank regulations (*i.e.*, Regulation K) that implement the

FBSEA further specify that a representative office is an "any place of business" that engages in

---

[7]   12 U.S.C. § 3101(1); 12 C.F.R. § 211.21(b). Credit balances that an agency may maintain must be incidental to or arise out of the exercise of other lawful banking powers, must serve a specific purpose, must not be solicited from the general public, must not be used to pay routine operating expenses in the United States (such as salaries, rent or taxes), must be withdrawn within a reasonable period of time after the specific purpose for which they were placed has been accomplished, and must be drawn upon in a manner reasonable in relation to the size and nature of the account. <u>See</u> 12 C.F.R. § 211.21(b).

[8]   12 U.S.C. § 3101(15); 12 C.F.R. § 211.21(v).

**To**    Yolanda Suarez
**Date**  September 15, 1998
**Page**  5

any of the following types of representational and administrative functions in connection with the

banking activities of a foreign bank:

- soliciting new business for the foreign bank;

- conducting research;

- acting as liaison between the foreign bank's head office and customers in the United States;

- soliciting loans on behalf of the foreign bank;

- assembling credit information on borrowers;

- making property inspections and appraisals;

- securing title information;

- preparing loan applications;

- making loan recommendations;

- soliciting loan purchases and loan servicing contracts;

- performing back-office functions; and

- serving as a regional administrative office that coordinates operations in a particular geographic region.[9]

The Federal Reserve's definition of a representative office adheres to the traditional view

that a representative office may engage only in limited functions that facilitate the banking

activities of a foreign, bank and not in the banking activities themselves.[10]

---

[9]  12 C.F.R. §§ 211.24(d) and 250.141(h) .

[10]  See Board of Governors of the Federal Reserve System, Foreign Banking Organizations, Final Rule, 61 Fed. Reg. 2,899, 2,900 (Jan. 30, 1996).  It is likely that the Federal Reserve would conclude that

GT02-22-2011 ST 0004444
APP 0064

**To**    Yolanda Suarez
**Date**  September 15, 1998
**Page**  6

3.    <u>Relevant Enforcement Actions by the Federal Reserve</u>

Since the enactment of the FBSEA, the Federal Reserve has taken a more aggressive posture in enforcing laws applicable to foreign banks operating in the United States. Two published Federal Reserve enforcement actions may be relevant.

In 1994, the Federal Reserve entered into a consent cease and desist order with three individuals and Lombard Bank Ltd., Republic of Vanuatu, and Lombard Credit Corporation.[11] Lombard Bank was a foreign bank and the Federal Reserve found Lombard Credit Corporation, Miami, Florida to be "an unlicensed branch of a foreign bank." The Federal Reserve alleged that the parties illegally engaged or participated in the business of banking without the approval of the Federal Reserve in violation of Section 21(a)(2) of the Banking Act of 1933[12] and Section 7(d)(1) of the IBA[13] through the following activities conducted at Lombard Credit:  (1) the receipt of cash deposits and check deposits; (2) the issuance of certificates of deposit; (3) the payment authorization of checks drawn on Lombard Bank's "payable-through" account at a U.S. bank; and (4) the maintenance of books, records, and account statements relating to the above-described accounts. The Federal Reserve's order required the termination of all of the activities

---

a United States office of a foreign bank that engages in activities beyond those permissible for representative offices is a branch, an agency or other type of office.

[11]    <u>See</u> <u>In re Lombard Bank Ltd., Republic of Vanuatu, Order</u>, 1994 WL 573044 (F.R.B. Aug. 8, 1994) ("<u>Lombard</u>").

[12]    <u>Id</u>. § 378(a)(2).

[13]    <u>Id</u>. § 3105(d)(1).

GT03-22-2014ST-0004445

APP 0065

**To**   Yolanda Suarez
**Date**  September 15, 1998
**Page**  7

of Lombard Bank and Lombard Credit in the United States. No civil or criminal penalties are reported in the order.

The other decision illustrating policing by the Federal Reserve of foreign banks operating without a license in the United States was released on March 21, 1996, relating to activities of Banque Worms, S.A., Paris, France ("BW"), and Banque Worms Capital Corporation, New York ("BWCC").[14] The two organizations agreed to pay a civil money penalty of $100,000 and entered into a written agreement relating to allegations of unauthorized deposit-taking activities in the United States. BW had closed a new licensed branch in January 1987 and the Federal Reserve's decision indicates that certain funding activities of BW had continued through BWCC in the United States after the closing of the BW branch. The decision cited the fact that BW and BWCC had adopted an extensive compliance program that was being approved by the Federal Reserve Bank of New York and Federal Reserve staff that included:

    (a)    a complete description of each of the functions performed by BWCC and all subsidiaries and affiliates in the United States, together with the procedures for carrying out those functions in compliance with all applicable federal and state laws, rules, and regulations;

    (b)    certain affirmative commitments designed to ensure that neither BW, BWCC, nor any of BW's other subsidiaries or affiliates, would be engaged directly or indirectly in deposit-taking or other unauthorized banking activity in the United States;

    (c)    a comprehensive system of internal controls to ensure on-going compliance;

---

[14]   See In re Banque Worms, S.A., Paris, France, Order, 1996 WL 125956 (F.R.B. Mar. 19, 1996) ("Banque Worms").

**To**     Yolanda Suarez
**Date**   September 15, 1998
**Page**   8

(d)   designation of an individual or individuals at BWCC and BW who are responsible for coordinating and monitoring compliance; and

(e)   a training program conducted at BWCC to ensure that all personnel are exposed to the compliance procedures, and that each person is aware of his or her duties and functions with respect to the compliance program.

Neither the Lombard decision nor the Banque Worms decision gives any indication how long the alleged activities were engaged in or the volume of the transactions involved.  Nor is there any indication if the transactions involved retail or institutional customers.  Other than the Lombard and Banque Worms decisions, we are not aware of any published Federal Reserve enforcement actions that have considered the extent to whether the U.S. activities of a foreign bank constitute unlicensed or unauthorized branch, agency or representative office activities.

4.   Application of "Representative Office" Definition to the Proposed TRO

As an affiliate of the Bank, a strong argument can be made that the Proposed TRO is not an entity that falls within the definition of a "representative office" of a foreign bank under the FBSEA or Regulation K.  Under the definition, a representative office is an office or place of business "of a foreign bank" that is not a branch, agency or subsidiary of the foreign bank.  The Proposed TROs would not be branches, agencies or subsidiaries of the Bank; nor would they be offices or places of business "of the Bank."  It thus appears under the plain language of the FBSEA and Regulation K that an affiliate of a foreign bank was not intended to fall within the purview of the definition of "representative office."  Further, for decades different bank holding company subsidiaries scattered throughout the United States have occasionally assisted each other with their business, without thereby being deemed to be "offices" of one another.  Further,

**To**    Yolanda Suarez
**Date**  September 15, 1998
**Page**  9

even today we know of foreign banking groups active in the United States through a single bank member of that group which, in addition to carrying out its own business here, assists the other banks in the group with their United States activities, without thereby being converted into a "representative office" of those other banks.  Finally, piercing the corporate veil in any industry is difficult, but in the banking industry it could easily be particularly dangerous.

Nevertheless, there remains a possibility that the Federal Reserve, which enforces the FBSEA and Regulation K, might choose to view a foreign bank affiliate as a "constructive" office or place of business of the foreign bank under the FBSEA and Regulation K, as it appears to have done at least to some extent in the two enforcement actions cited above.  For example, although the FBSEA and Regulation K do not define an "office" or "place of business," the Federal Reserve's staff has previously indicated that a single employee conducting business from any location in the United States could, under appropriate circumstances, constitute a branch, agency or representative office of a foreign bank.[15]

The Federal Reserve has also noted, for example, in the commentary to its final rule implementing the FBSEA[16], that both the FBSEA and its legislative history evidence a general

---

[15]   See Letter dated November 30, 1995 from Kathleen M. O'Day, Associate General Counsel of the Federal Reserve, to John L. Walker. In that interpretive letter, the Federal Reserve's staff addressed the question of whether an employee of a foreign bank working at home under the bank's telecommuting program would be deemed an office of the bank. The staff stated that, based on certain representations made by the bank with regard to the structure and limitations of the program, the staff would not object to the establishment of the work-at-home program without the prior approval of the Federal Reserve.  The implication in that case was that, absent the limitations, the activities of an employee working at home could be deemed an office "of the foreign bank" subject to the prior approval requirements of the IBA.

[16]   58 Fed. Reg. 6,348 (Jan. 28, 1993).

**To**     Yolanda Suarez
**Date**   September 15, 1998
**Page**   10

intent to require foreign banks to conduct all of their direct U.S. activities through a regulated

office.  The Federal Reserve stated that the expression of the definition of representative office in

terms of what is not – a branch, agency or subsidiary of a foreign bank – was intended to render

"representative office" a catch-all category of office, through which all direct activities of a

foreign bank that are not branch or agency activities of a foreign bank must be conducted.

The Federal Reserve did note in its commentary that one commenter on the Federal

Reserve's interim rule[17] regarded the exclusion of a subsidiary from the definition of

representative office as inappropriate because a foreign bank seeking to conduct representative

office activities may simply form a subsidiary to perform such activities and thereby avoid

Federal Reserve regulation.  In response, the Federal Reserve wrote:

> The [Federal Reserve] wishes to make clear that a subsidiary,
> whether formed to conduct representative functions or otherwise,
> may not be used to avoid the banking laws.  If the [Federal
> Reserve] becomes aware of any such abuses or evasions of the
> banking laws through any such means, it will take further action to
> regulate those subsidiaries as banking offices.

This statement by the Federal Reserve appears to raise two points.  The first point is that

the Federal Reserve does not generally intend to regulate subsidiaries of foreign banks under the

FBSEA.  It is therefore likely that the Federal Reserve does not intend to regulate affiliates of

foreign banks either, particularly since affiliates are not even mentioned within the definition of

representative offices.  The second point is that the Federal Reserve is concerned with attempts

by foreign banks to evade the banking laws through the use of other vehicles.  Putting this all

---

[17]   57 Fed. Reg. 12,992 (Apr. 15, 1992).

GT03-23-2011ST 0004449

APP 0069

**To**    Yolanda Suarez
**Date**  September 15, 1998
**Page**  11

together, it is clear to us that the Federal Reserve's intention is to supervise all direct activities *in* the U.S. of foreign banks, however structured. However, the Federal Reserve does not seek to interfere with foreign bank subsidiaries or affiliates which are conducting <u>their</u> <u>own</u> <u>lawful</u> <u>activities</u> in the United States, even if those activities at times incidentally involve a foreign bank. Further, we note that the Federal Reserve has no regulatory authority over the activities of a trust company and its offices, including at a TRO.

Based on this reasoning, we believe that, as long as they adhere to the list of the do's and don'ts attached hereto as Exhibit A, the Proposed TROs will not be deemed to be "constructive" representative offices of the Bank for purposes of federal banking law. This is true even if, in their capacity as fiduciaries to their respective Trust Company customers, they advise their customers of the full choice of financial services and products available to them, including those available through the Bank. Although the Federal Reserve's list of representative office activities in Regulation K[18] includes "soliciting new business" on behalf of the foreign bank, as well as "acting as a liaison" between the foreign bank's head office and its customers in the United States, we do not believe that language can be extended to prohibit a Trust Company's interaction with any foreign bank, whether affiliated to the Trust Company or not, on behalf of its own trust customers.

---

[18]    See 12 C.F.R. § 211.24(d)(1) and page five above.

**To**     Yolanda Suarez
**Date**   September 15, 1998
**Page**   12

**B.**   **Applicable Florida Banking Law**

Florida law defines the term "representative office" broadly. Specifically, Florida Statute Section 663.01(8) defines a representative office as "an office of a representative of an international banking corporation established for the purpose of engaging in the activities described in § 663.062."[19]

In turn, Florida Statutes § 663.062 reads as follows:

> "An international representative office may promote or assist the deposit-taking, lending or other financial or banking activities of an international banking corporation; an international representative office may serve as a liaison in Florida between an international banking corporation and its existing and potential customers. Representatives and employees based at such office may solicit business for the international banking corporation and its subsidiaries and affiliates, provide information to customers concerning their accounts, answer questions, receive applications for extensions of credit and other banking services, transmit documents on behalf of customers, and make arrangements for customers to transact business on their accounts, but a representative office may not conduct any banking business in the state."

As is evident from the language of § 663.01(8), in defining a "representative office," Florida law first focuses upon whether a person serves as a "representative" of the Bank and not, as under the FBSEA and Regulation K, on whether such person is an "office" or "place of business" of a foreign bank. A plain reading of the statutory definition would suggest that any person who serves as a "representative" of the Bank falls within the ambit of the law.

---

[19]   The relevant portion of Florida Statute Section 663.01(6) defines an international banking corporation as "a banking organization organized and licensed under the laws of a foreign country . . . ." The Bank, a bank organized under the laws of Antigua, would be deemed a foreign bank for purposes of § 663.01(6).

APP 0071

**To**   Yolanda Suarez
**Date**  September 15, 1998
**Page**  13

As a threshold issue, we believe that the possible characterization of the Proposed TROs as a "representative" office of the Bank may largely be prevented by simply ensuring that the Proposed TROs and its staff do not assume the role of a "representative" or "agent" of the Bank either constructively, or explicitly by contract.

A second consideration raised by the Florida statutory definition of "representative office" is the requirement that the office be <u>established</u> for the purpose of engaging in the activities of a representative office. In this connection, we understand that the Proposed TROs will not be "established" for the purpose of engaging in banking representative activities. Instead, the Proposed TROs will be "established" to engage as representatives of their respective Trust Companies. Because the Proposed TRO would not be "established" for the purpose of engaging in the activities of a Bank "representative office," and the performance of any such activities is merely incidental to the Proposed TRO's business purpose, the Proposed TRO and its staff fall outside the purview of the subject definition on this basis as well.

Third, the critical consideration under Florida law in determining whether a license as a "representative office" is required is whether the activities proposed or being performed are the activities of a "representative office," as such are defined in the law. Under § 663.062, set forth above, a "representative office" may engage in various activities — ranging from the solicitation of business on behalf of the Bank to providing information to potential and existing customers regarding the Bank and the customers' accounts at the Bank. Traditionally, a "representative office" performs a broad range of activities relating to the deposit-taking, lending or other financial or banking activities of a foreign bank.

**To**   Yolanda Suarez
**Date**   September 15, 1998
**Page**   14

Furthermore, Section 3C-15.004 of the Florida Administrative Code states as follows:

"**Permissible Activities for a Representative Office.** A representative office of
an international banking corporation may <u>solicit and negotiate with existing and
potential customers</u> of the corporation for the purpose of <u>generating loans,
deposits, letters of credit, and other business for such international banking
corporation</u>. A representative office shall not function as a branch office of a
bank, but <u>shall be any representative entity -- engaged in nonbanking functions of
a parent banking organization</u>. In addition to solicitation and loan production
activities, the functions of a representative office may include -- but are not
limited to -- <u>research</u> and <u>acting as a liaison</u> between the home office and its
customers in Florida." (emphasis added)

Given this emphasis on various activities, and the fact that the definition of a

"representative office" in § 663.01(8), as well as in Fla. Adm. Code § 3C-15.004, also refers to

activities and functions in the plural, it is an open question as to what number or volume of

activities of the kind identified in F.S. § 663.062 and Fla. Adm. Code § 3C-15.004 must be

present for an otherwise independent person to be deemed a "representative office." In other

words, there is no statutory or regulatory indication that parties engaging in only one or a few of

the many permissible activities of a "representative office" would be required to obtain a license.

In fact, since the language of the definition does not specify that "any one or more" of the subject

activities are the activities of a "representative office," we believe that the better view is that

engagement in merely one, or perhaps two, of the activities would not require a person to be

licensed as a "representative office," particularly if that engagement constituted a relatively small

percentage of the purported "representative's" over-all business activities.

As the foregoing suggests, we believe that the Department would find it difficult to

establish that a "representative office" license was necessary for an independent entity such as

GT03-23-2011ST_0004453
**APP 0073**

**To**   Yolanda Suarez
**Date**   September 15, 1998
**Page**   15

either of the Proposed TROs merely because they occasionally act as a liaison with, or refer business to, the Bank.

Although Fla. Adm. Code § 3C-15.004 states that a representative office may "solicit and negotiate with existing or potential customers . . ." the same is phrased in the conjunctive. This would lend further support to the argument that an entity which merely refers its own customers to its foreign bank affiliate, without "negotiating" with them on behalf of that affiliate, is not covered under the ambit of F.S. § 663.062.

With regard to the Proposed TROs' possible reference to customers to the Bank, we also bring to your attention that the statutory definition of the permissible activities for a "representative office" (§ 663.062) refers to "soliciting" business as opposed to merely "referring" business.  Since the activity of the Proposed TROs would not involve entreating or trying to obtain new customers for the Bank -- the essence of "solicitation" -- it can be strongly argued that the Proposed TROs occasional referral activity is not within the scope of the statute.

Legislative developments in Florida in 1993 also would lend support to an interpretation of § 663.062 to exclude the referral of business.  During the 1993 session of the Florida Legislature, the Department focused on the weakness of the solicitation language in § 663.062 when it proposed a bill to expand the definition of a representative office to close the door on the reciprocal "referral" of customers by U.S. companies to foreign banks. The primary objective of the 1993 proposed amendment was to expand the scope of the powers of the Department to monitor the activities of non-licensed U.S. corporations with foreign banks.

GT03-22-2011ST_0004454

APP 0074

**To**      Yolanda Suarez
**Date**    September 15, 1998
**Page**    16

The Florida Legislature declined to act on the proposed bill. We believe that the bill's failure -- and the fact that the Department considered it necessary to propose such legislation -- suggests that the Florida Statutes presently do not require the licensing of a person merely engaging in the reciprocal referral of business with a foreign bank. As you surely can imagine, the practical implications of such a law would impose requirements of licensure on a vast number of persons, including members of the real estate brokerage, legal and accounting professions.

Finally, we also understand that the customers that might be referred by the Proposed TROs to the Bank would largely be non-U.S. customers. We note, for your information, that the Florida Statutes do not make a distinction between U.S. and non-U.S. customers. Therefore, the fact that the Proposed TROs might limit their referrals to the Bank to non-U.S. customers would not serve as an exemption from any requirement that they be licensed as "representative offices." Experience has shown us, however, that in practice Florida regulators, as is true of regulators in the U.S. generally, will naturally be more concerned with activities which involve their constituents – i.e., citizens and residents of the U.S. – than foreigners. Moreover, we believe that where the Trust Companies and their Proposed TROs conduct their trust businesses lawfully, Florida banking regulators would have a difficult time attempting to argue that a Proposed TRO is an unlicensed representative office of the Bank.

*      *      *

We trust the foregoing is responsive to your request. If you have any questions regarding this memorandum, please call Carlos Loumiet at 305-579-0726 or Carl Fornaris at 305-579-626.

GT03-22-2011ST-0004455
APP 0075

EXHIBIT A

### DO'S AND DON'TS FOR STANFORD TRUST
### COMPANY REPRESENTATIVE OFFICES
### IN FLORIDA

**DO'S**

1.  <u>Do</u> feel free to meet, correspond and communicate with customers or potential customers of your trust company in the United States or abroad.

2.  <u>Do</u> feel free to have available in the office or on your person, and provide to customers, information as to the different investment products available for customers of your trust company through other entities, including entities affiliated through substantial ultimate common ownership (i.e., The Stanford Group, Stanford International Bank, etc.). This information can include brochures on the entire Stanford group of companies, or on individual companies in the group, as well as unaffiliated companies through or together with which your trust company's products or services are offered.

3.  <u>Do</u> document for your files and records that the administration and discretionary decision-making on trust accounts you handle takes place at the head office of your trust company outside the State of Florida.

4.  <u>Do</u> prepare and sign trust agreements with customers on behalf of your trust company, and accept money, securities or other assets to be held in trust by your trust company.

5.  <u>Do</u> make it clear to customers and potential customers that you work for and are legally authorized to represent <u>only</u> the trust company.

6.  In carrying out your fiduciary duties on behalf of your trust company's customers, <u>do</u> feel free to contact, do business and deal in any way with <u>any</u> company (including companies affiliated with you by substantial ultimate common ownership, like The Stanford Group or Stanford International Bank) where investments held in trust by your trust company are located, or to which they are to be sent as contemplated by the trust agreement with your customer. You may send money to any such company, or withdraw money from it, or give it instructions as to investments it may hold, but only on behalf of customers of the trust company.

7.  <u>Do</u> feel free, on behalf of a customer or potential customer of your trust company - but not on behalf of other people - to obtain rate quotes and other information from any company, including The Stanford Group or Stanford International Bank.

APP 0076
GTAPP-20119 0004457

8.  Do liaise with any company (including The Stanford Group or Stanford International Bank) in any way involved in a trust created through your trust company, on behalf of the settlor, beneficiaries or other parties to that trust.

## DON'TS

1.  Don't cash checks drawn on Stanford International Bank or any other bank except for your established trust customers.

2.  Don't deal with Stanford International Bank on behalf of persons who are not customers of the trust company. However, you may advise any such persons how they may themselves contact Stanford International Bank and obtain any information they wish regarding that bank.

3.  Don't offer or market to customers or potential customers of the trust company products or services offered by any company (including Stanford International Bank) other than your trust company, unless the products and services are offered in the context of an existing or proposed trust relationship with your trust company.

4.  Don't hold yourself out as the representative or agent of any company other than your own trust company, or as in any way authorized to act or make decisions on behalf of any company other than your trust company.

5.  Don't accept any money to be deposited with Stanford International Bank, other than through a trust with your trust company. In all other situations, advise the customer how he may himself arrange such a deposit directly with Stanford International Bank.

6.  Don't solicit business of any nature on behalf of any company other than your trust company. In particular, do not solicit business on behalf of Stanford International Bank.

7.  Don't help any company other than your trust company to engage in any business of any nature whatsoever, unless that business involves a trust relationship through your trust company.

8.  Don't administer any trust accounts or make discretionary decisions as to trust accounts. Both of these activities must be done at head offices. While you are free to make recommendations to head office, administration and decisions must take place there.

9.  Don't engage in administrative, data processing, recordkeeping or other "back-office" activities on behalf of any company other than your trust company.

GTAPP-0057 70004458

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3    RALPH S. JANVEY, et al.,          )
                                        )
 4                 Plaintiffs,          )
                                        )
 5    vs.                               ) CIVIL ACTION
                                        ) NO.
 6    GREENBERG TRAURIG, LLP, HUNTON &  ) 3:12cv-4641-N
      WILLIAMS, LLP; and YOLANDA        )
 7    SUAREZ,                           )
                                        )
 8                 Defendants.          )

 9

10          -------------------------------------

11            ORAL AND VIDEOTAPED DEPOSITION OF

12                      JORGE SALGADO

13                    December 4, 2015

14          -------------------------------------

15

16        ORAL DEPOSITION of JORGE SALGADO, produced as a

17    witness the instance of the Defendant Hunton &

18    Williams, and duly sworn, was taken in the above styled

19    and numbered cause on December 4, 2015, from 8:32 a.m.

20    to 2:07 p.m., before Jeff L. Foster, a Certified

21    Shorthand Reporter in and for the State of Texas, at

22    the offices of Strasburger & Price, 901 Main Street,

23    Suite 4400, Dallas, Texas 75202, pursuant to the

24    Federal Rules of Civil Procedure and the provisions

25    stated on the record.
```

GT
EXHIBIT 005

1    different jobs.  I was not working -- I was not working

2    as an accountant at the beginning.  It was maybe when

3    I was 20, 21 after I finished my high school and that's

4    when I start studying accounting.  Something else?

5        Q.   And are you retired now?

6        A.   Yes, since 2004.

7             THE INTERPRETER:  May the interpreter

8    tell him something about when he's talking too long?

9    Because --

10            MR. SNYDER:  Okay.  Sure.

11            THE INTERPRETER:  -- I cannot retain

12   everything.

13            MR. SNYDER:  I was wondering why you let

14   him go on for so long.

15            (Pause.)

16            THE INTERPRETER:  Thank you.

17       Q.   (BY MS. BISHOP)  And what was your last job

18   before you retired?

19       A.   During ten years this is like a club resort by

20   the name Royal Club.

21       Q.   And what was your job there?

22       A.   I was a treasurer.

23       Q.   And what sort of duties did you have at that

24   job?

25       A.   Well, I was handling or managing the cash.

1    That company had very serious problems of liquidity.

2        Q.   And what sort of liquidity problems?

3        A.   Well, just as a background I have been working

4    for more than 30 years also in a commercial business, a

5    group commercial business.  And a coworker -- a

6    previous coworker had been working already in this

7    group.  So he asked me to call -- I mean, he called me

8    and he asked me to work for them, and I helped them

9    maybe between six and eight months.  This took place in

10   1994 in the month of September.  And they thought that

11   we could go to the stock market in 1995 in the month of

12   February.  And they wanted for me to be assisting them

13   because of the experience that I had.

14            But then Mexico had a problem that was in

15   December of 1994.  But then we have our new president,

16   Mr. Cedillo, C-E-D-I-L-L-O, and along with his minister

17   of treasury didn't do proper work, so we have the

18   problem.

19            MR. SNYDER:  Wait.  Objection.  He said

20   that he caused the economy to collapse in Mexico.

21            THE INTERPRETER:  Sorry.

22            MR. SNYDER:  A little bit bigger than

23   just a problem.

24       A.   Do you want me to keep going with this, or do

25   you think this information that I'm giving you is not

1    that relevant?

2        Q.   (BY MS. BISHOP)  Yeah, I think if we can keep

3    it more closely tied to what you were doing at your

4    job, that would be helpful.

5        A.   Well, I was trying to organize what in reality

6    was just something -- just disastrous, I mean,

7    terrible, totally out of control.  And after this

8    economical crisis I was asked not to leave them after

9    just six months.  And that's the reason why I stayed

10   there until 2004 working for them.

11              So I worked there for ten years and my

12   job was about to receive from different places and

13   different sales for the company.  And then just to make

14   a good program from all the income.  So make a good --

15   a proper job with the cash.

16       Q.   And were you the primary person responsible

17   for the company's financials?

18       A.   It was the general manager, general director,

19   and I was -- but I was making decisions for the

20   treasury.

21       Q.   And how big was that business?

22       A.   Sales were 55 or 60 millions of dollars

23   annually.

24       Q.   And you said that before that job you worked

25   for 30 years in a commercial business?

1      A.    Correct.

2      Q.    And when was that created?

3      A.    When I didn't shape my investment, my broker

4  assistant, he told me that it was necessary to create a

5  trust.  It was just like an invention, because really

6  from the judicial way there's no such trust --

7  Michoacan Trust.

8            MR. SNYDER:  Objection to the

9  translation.  Can you --

10     A.    Yes, for me I mentioned Michoacan Trust, like

11 I could have said X.  Because it was something

12 necessary to make the investment.

13     Q.    (BY MS. BISHOP)  And you said your broker

14 assistant told you this?

15     A.    Yes, that I had to make a trust, but she

16 didn't suggest the name.

17     Q.    And what was the name of your broker

18 assistant?

19     A.    Mary Bautista, B-A-U-T-I-S-T-A.

20     Q.    And how did you meet Ms. Bautista?

21     A.    She was working for Sun Trust Bank.  And I was

22 working for this club, Royal Holiday Club.  And we have

23 an account in Miami at the Sun Trust Bank.  So she was

24 my contact to have operations or transactions.

25     Q.    And she was located in Miami?

1    generally about Stanford Group or about this particular

2    investment product?

3        A.   Well, more concretely, no.  I mean, she was

4    telling me about the times like, you know, how much

5    money I would be receiving, how she will be sending me

6    the statements and also along, you know, with the time.

7    And she was explaining it to me, the percentage that I

8    would receive in time.  It could be three months, six

9    months, one year, different percentages.

10       Q.   Did she tell you anything about the insurance

11   on those products during the first visit?

12       A.   Totally insured.  There was no risk at all.

13       Q.   And did she tell you what country the

14   investment products were from?

15       A.   Which country what?

16       Q.   Which country the investment products were

17   from.

18            MR. SNYDER:  And objection, form.  What

19   products?  Are we talking just about the CDs?

20       Q.   (BY MS. BISHOP)  Sorry, if we can strike that

21   last question.  To go back to my question before, you

22   said -- you said that Ms. Bautista told you the

23   investments were totally insured.

24       A.   A hundred percent.

25       Q.   And after the visit, did you do anything to

```
1    check up on that?

2         A.   No.  No.  I mean, there were proof and --

3    there was proof and no.

4         Q.   And where was the proof that you saw?

5         A.   Well, I was -- I had this trust for this

6    broker.  And what can you know about, you know, a

7    company like that unless I would have had a big amount

8    of money.  Then I would have hired someone to

9    investigate the company.

10        Q.   How much money would you consider to be enough

11   to hire an investigator?

12             MR. SNYDER:  Objection, form.  Calls for

13   speculation.

14        A.   I wouldn't know that.

15        Q.   (BY MS. BISHOP)  But that's not something you

16   did for your investment in the CDs?

17        A.   I didn't do anything.

18        Q.   And did you have anyone else look into the

19   investment for you?

20        A.   No.

21        Q.   And what else did Ms. Bautista tell you about

22   the investments?

23        A.   As I told you, that it was a wonderful

24   investment.

25        Q.   Did she tell you anything about what bank was
```

1    issuing the investment products?

2        A.    A bank located in the United States with

3    relations in Antigua.

4        Q.    And did she tell you anything about who

5    regulated the investment products?

6        A.    No.

7        Q.    Did you ask about who regulated the investment

8    products?

9        A.    No.

10       Q.    Did you ask Ms. Bautista any questions about

11   the investment products in your first meeting?

12              MR. SNYDER:  And, again, objection.

13   We're still talking about the CDs?

14              MS. BISHOP:  Talking about Stanford

15   investment products.

16              MR. SNYDER:  Well, then I object until

17   you define what those are.

18       A.    So what was the question?

19       Q.    (BY MS. BISHOP)  Did you ask Ms. Bautista any

20   questions about the Stanford investment products she

21   was telling you about?

22              MR. SNYDER:  Objection, form.

23       A.    Well, it's because I do know the market in

24   Mexico.  And she was offering me something similar to

25   that in the United States.  It was a dollars investment

Jorge Salgado

1      Q.    And so you did not invest any money with

2   Stanford after 2004?

3      A.    No, only the renewals.   Nothing new, no

4   "news."

5      Q.    Going back to your first investment, you said

6   that was for a hundred thousand dollars?

7      A.    Yes.

8      Q.    And what was the source of that money?

9      A.    My savings.

10     Q.    And did you take that money from any other

11  investment or was it in cash previously?

12     A.    Well, I had my check account in Sun Trust and

13  then I have in Mexico another kind of investment.

14     Q.    And what was the other kind of investment?

15     A.    In Mexico?

16     Q.    Yes.

17     A.    Well, investments in savings with that due

18  time.  So I changed that in dollars to be able to send

19  it.

20     Q.    Before you invested with Stanford, had you

21  ever purchased any CDs?

22     A.    No.

23     Q.    Had you ever purchased any stocks?

24     A.    A long time before from the old company I was

25  working for, Salinas and Rocha, you know, they went to

Jorge Salgado                                                                                          80

```
 1        A.   Yes.

 2        Q.   Was anything else ever discussed on those

 3   calls?

 4        A.   No.

 5        Q.   Did you have to do anything else to renew the

 6   CD?

 7        A.   No.  Just to agree, just to say yes.  Just to

 8   agree, yeah.

 9        Q.   Did you send anything in writing?

10        A.   No.

11        Q.   Did she send you anything in writing?

12        A.   Yes.

13        Q.   And what did she send you?

14        A.   My balances.

15        Q.   And was there anything different about the

16   balances she sent you when you were renewing a CD as

17   opposed to normal account statements?

18        A.   It will be different because of the amount,

19   because of the interest, and also a different due date.

20             MS. BISHOP:  Let the record reflect I'm

21   handing the witness what's been marked Defendants'

22   Exhibit 13.

23        A.   Yes.

24        Q.   (BY MS. BISHOP)  And, Mr. Salgado, do you

25   recognize this document?
```

1    November, December, January.

2         Q.    (BY MS. BISHOP)   Mr. Salgado -- sorry.

3                   THE INTERPRETER:   No.

4         Q.    (BY MS. BISHOP)   Mr. Salgado, do you have a

5    copy of the February 29th, 2008 statement in your

6    files?

7         A.    I have a copy here.

8         Q.    And that copy is in your files?

9         A.    Yes.

10        Q.    And the version of the account statement that

11   you have in your files has that language on it?

12        A.    Yes.

13        Q.    And do you recall seeing this language when

14   you received the account statement?

15        A.    I didn't put any attention to that.   It's of

16   no importance.

17        Q.    Would you have read that language?

18                   MR. SNYDER:   Objection, form.   Would you

19   or did you?

20        A.    I was interested about the numbers.

21        Q.    (BY MS. BISHOP)   So did you read that language

22   when you received this account statement?

23        A.    I don't remember.   And that is in English,

24   so --

25        Q.    Did you ask anyone to translate that language

1    for you?

2         A.    No.

3         Q.    And if you'll take a look at that first

4    sentence there.   Do you see that it says, "Stanford

5    International Bank, Limited is a private financial

6    institution chartered under the laws of Antigua and

7    Barbuda"?

8         A.    I do understand it now.

9         Q.    And if you had read that language at the time,

10   would it have affected your decision to renew your

11   Stanford CDs?

12        A.    I pay no attention to that.   I give no

13   importance to that.   That's the reason why I kept

14   renewing it.

15        Q.    If you had known that SIBL was chartered under

16   the laws of Antigua and Barbuda, would you have renewed

17   your CDs?

18        A.    Just don't forget, keep in mind that I was

19   always protected.   According to what I knew and

20   according to what my broker told me, I have been

21   protected in the United States.

22        Q.    Mr. Salgado, if you had known that SIBL was

23   chartered in Antigua, would you have renewed your

24   investment?

25        A.    Well, it's because -- yes, I did -- I did know

1    about it, but I always thought that this was -- Bermuda

2    (sic) was only like a branch.  But I was protected here

3    in the United States.  That was just something

4    independent from the United States.

5        Q.   And do you see the second half of that

6    sentence that says, "Deposits are not covered by

7    deposit insurance protection provided by U.S. Federal

8    Deposit Insurance Corporation"?

9        A.   But always we go back to the same -- the

10   broker's argument was you are protected a hundred

11   percent in United States.

12       Q.   If you had read that language, would it have

13   caused you to question what your broker was telling

14   you?

15            MR. SNYDER:  Objection, form.

16       A.   Well, let me tell you it's because I always

17   have the same response from her.  Like -- like, for

18   example --

19            MR. SNYDER:  Hold on.

20       A.   Like, for example, in February '9 the problem

21   from Stanford exploded and then I talked to her.  And I

22   said, "What's going" -- and I said, "What's going on?"

23   And she told me, "There is no problem.  That is not

24   true.  Don't go to a lawyer.  The proof of that is that

25   Stanford -- Mr. Stanford is free.  And there is no

```
 1        A.    Well, yes, because you see -- you can see the

 2   amount here 179,286, because we were asked to say how

 3   much we have made as an investment, not how much money

 4   we have lost from that investment.

 5        Q.    And is this a letter from the joint

 6   liquidators to the Michoacan Trust?

 7        A.    Yes.

 8        Q.    And it lists the amount of the claim that's

 9   been allowed as $179,286.12 in U.S. dollars?

10        A.    Yes, 179.   And then there was a response from

11   them, because there had been a mistake and they realize

12   that it had been 193 or 192 instead of 179.

13        Q.    And there was a response from the joint

14   liquidators raising it to 192?

15        A.    Yes.

16        Q.    And did you provide that letter to Mr. Snyder?

17        A.    I don't remember, but I'm sure he has it.

18              MS. BISHOP:   Let the record reflect I'm

19   showing the witness what's been marked Defendants'

20   Exhibit 16.

21        Q.    (BY MS. BISHOP)   And, Mr. Salgado, do you

22   recognize this document?

23        A.    I think I had seen it before.

24        Q.    And did you file a claim for your CD losses on

25   behalf of the Michoacan Trust with the receiver in the
```

```
1    United States?

2              MR. SNYDER:  Reclamacion.

3         A.   Yes, I filed a claim, but with the help

4    already -- with the assistance of my lawyer.  And I

5    didn't do it myself specifically, it was with the whole

6    group.

7         Q.   (BY MS. BISHOP)  And if you'd turn to page --

8    and is this -- is this document a notice of

9    determination from the receiver?

10             MR. SNYDER:  We will so stipulate.

11        A.   Yes.

12        Q.   (BY MS. BISHOP)  And do you see on page 1055

13   an amount listed for 197,315.02?

14        A.   Yes.

15        Q.   And when you spoke earlier about a response

16   from the joint liquidators raising the claim amount, is

17   this what you were referring to or is it something

18   else?

19        A.   Yes.  Yes.

20        Q.   But this was issued by the U.S. receiver, not

21   the joint liquidators, right?

22        A.   Well, it's stated here who sent it to me, and

23   it says Securities and Exchange Commission.

24             MS. BISHOP:  Let the record reflect I'm

25   handing the witness what's been marked Defendants'
```

1    Exhibit 17.

2        Q.   (BY MS. BISHOP)  Mr. Salgado, do you recognize

3    this document?

4        A.   I might have received it, yes.

5        Q.   And is this also a letter to the Michoacan

6    Trust from the joint liquidators?

7        A.   Well, you cannot see here.  Who was this

8    document sent to?

9        Q.   Do you recognize this?

10       A.   No, I don't remember.

11       Q.   Do you see at the top that it says, "Payee

12   name Michoacan Trust," above the line section?

13       A.   Yes.

14       Q.   And underneath that it says, "Your allowed

15   amount has been amended"?

16       A.   Yes.

17       Q.   And at the bottom of the page it shows that

18   this is from the joint liquidators?

19       A.   Exactly.

20       Q.   And have you heard the term "preference

21   payment" before?

22       A.   No.

23       Q.   Have you -- have you read this letter before?

24       A.   I don't remember.

25       Q.   Do you see in paragraph three that starts,

1    "According to the company records"?

2        A.    Uh-huh.

3        Q.    And then it says, "You have received

4    preference payments of U.S. dollars, 143,921.13, which

5    must be -- which we require to be repaid to the

6    estate"?

7        A.    But I don't understand it.

8              MR. SNYDER:  Hold on.  She's translating

9    estate as the state.  If you can use a different word

10   than estate, because there is no translation for estate

11   in Spanish.  She's translated it as the state, like

12   he's got to pay some government.

13             MS. BISHOP:  It's the language of the

14   letter, so --

15             MR. SNYDER:  Well, I understand that, but

16   if you want him to answer the question, you need to

17   help the translator.

18       Q.    (BY MS. BISHOP)  Do you recall being asked by

19   the joint liquidators to return money to them?

20       A.    Yes.  I did receive a notice, yes.

21       Q.    And did you return money to the joint

22   liquidators?

23       A.    I didn't have the money.  I couldn't return

24   the money.

25       Q.    If you had the money, would you return it?

1    A.    No.    It was my money.

2    Q.    Why wouldn't you return it?

3    A.    Well, because I had invested 300 and something

4    thousand dollars and on top of that I have received

5    some profits.    So the withdrawal that I had made was my

6    money and that money didn't belong to anybody in this

7    world.    I demand for the rest of the money.

8    Q.    Do you understand why the joint liquidators

9    asked you to return that money?

10              MR. SNYDER:   Objection, form.

11   A.    I don't know on what grounds they asked me

12   that.

13   Q.    (BY MS. BISHOP)   Do you see in paragraph two

14   of this letter, the second sentence?

15   A.    Yes.

16   Q.    It states, "We consider that these payments

17   were unfairly prejudicial to the other creditors"?

18   A.    And I don't see any reason for that, because I

19   never took one peso from anybody.

20   Q.    So turning back to the exhibits before this,

21   the first letter from the joint liquidators and the

22   notice of determination from the receiver, which would

23   be Exhibit --

24              THE INTERPRETER:   What is the number?

25              MS. BISHOP:   16 and 15.

Jorge Salgado

1    A.    Number 9.

2    Q.    (BY MS. ISRAELOFF)  Thank you.  What did you

3    understand was going to work -- how the trust was going

4    to work?

5              MR. SNYDER:  Objection, form.

6    A.    Well, I will make an investment for a certain

7    period of time for a certain money for certain

8    interest, so I will have certain amount at the end of

9    that period.

10   Q.    (BY MR. ISRAELOFF)  What did you understand

11   the trust was supposed to do with you?

12   A.    The reason -- what was my wish for that trust

13   or why I wanted that money for or what is your

14   question?

15   Q.    How was the trust going to be different than a

16   bank account in your name?

17              MR. SNYDER:  As he understood it or what

18   was told to him?

19   A.    Well, actually the investment, I wanted to do

20   it under my name, but then the broker told me that it

21   had to be under the trust name.

22   Q.    (BY MR. ISRAELOFF)  How did you understand the

23   difference between an account in your name and an

24   account in the trust's name?

25   A.    That -- the difference will be the money that

1    trust today?

2              MR. SNYDER:  Fiduciario.

3         A.   We don't have Stanford anymore.

4         Q.   (BY MR. ISRAELOFF)  I understand.  Who do you

5    believe is the trustee of Michoacan Trust today?

6         A.   Stanford Company Limited.  Stanford Trust

7    Company, Limited.

8         Q.   They're not there anymore, are they?

9              MR. BUNCHER:  Object to form.

10        A.   That's why we're filing the suit.

11        Q.   (BY MR. ISRAELOFF)  Have you spoken to the

12   U.S. receiver about this lawsuit?

13             THE INTERPRETER:  How do you say

14   receiver?

15             (Mr. Snyder answers the interpreter in

16   Spanish.)

17        A.   No, sir, I have talked to my lawyer and he's

18   the one who does it.

19        Q.   (BY MR. ISRAELOFF)  Are your CD holdings still

20   in the trust today?

21        A.   Yes.

22        Q.   I understand that Ms. Bautista told you all of

23   your investments with Stanford would be insured; is

24   that correct?

25        A.   Yes, in Stanford in United States.

Pamela G. Reed                                                                    5

```
 1    reporter please administer the oath?

 2                        PAMELA G. REED,

 3    having been first duly sworn, testified as follows:

 4                        EXAMINATION

 5    BY MR. COWLES:

 6        Q.   Give us your full name, please, ma'am.

 7        A.   Pamela Gail Reed.

 8        Q.   You were married to Bob Gibbins?

 9        A.   I was.

10        Q.   Where do you reside today?  Is it in Austin?

11        A.   It is.

12        Q.   Okay.  Can you give me an address?

13        A.   1502 Harbor View, Westlake Hills, Texas 78746.

14        Q.   Your husband Bob passed away in 2013, did he

15    not?

16        A.   He did.

17        Q.   Have I got the year right?

18        A.   Yes, sir.

19        Q.   All right.  Quite a loss to you.  He was a

20    great man.  Tell us just briefly your education, just

21    say, from high school on real briefly.

22        A.   I went to high school in Austin, undergraduate

23    University of Colorado, law school at the University of

24    Texas.

25        Q.   And you started practicing law first where?
```

GT
EXHIBIT 006   APP 0091

Pamela G. Reed

6

```
 1        A.    In Austin.

 2        Q.    Run off where you've practiced real quickly?

 3        A.    Okay.  I was at the city attorney's office in

 4   Austin for four years, I believe, and then went to

 5   Davis & Davis and was there for four years.  And then

 6   I started running for office.

 7        Q.    Started running for office?

 8        A.    Yes, sir.

 9        Q.    Which office would that be?

10        A.    I was county commissioner, Travis County in

11   Austin, and then I was a commissioner on the Texas

12   Water Commission and then the Texas Natural Resources

13   Commission.

14        Q.    I want to do something here, Ms. Reed, if we

15   might to try to save some time.  You have been and are

16   a party to other lawsuits involved in this

17   receivership, aren't you?

18        A.    Yes, sir.

19        Q.    As a representative plaintiff, --

20        A.    Yes, sir.

21        Q.    -- correct?  Let me take one of those, if I

22   can.  I'm going to talk to you just a moment so we can

23   get an overall picture of the story you and your

24   husband had.

25        A.    Okay.
```

1    Q.   I am not going to introduce any of these into

2    evidence, but I'm going to mark them just so we know

3    what we're talking about.  Fair enough?

4    A.   Yes, sir.

5    Q.   Let me hand you what's been marked -- excuse

6    me, let me mark it -- as Defendants' Exhibit 1.

7    A.   Thank you.

8    Q.   And tell you that that is, I think everybody

9    at this table will agree, a copy of that particular

10   lawsuit in which you are a representative plaintiff

11   against BDO?

12   A.   Yes, sir.

13   Q.   All right.  I want to see if we can pin down

14   very quickly and broadly and generally your story in

15   this matter.  Would you turn to page 38?

16   A.   (The witness complied.)

17   Q.   Let me read some of this to you.  I have it

18   highlighted so you can go right to it, if you would,

19   please.

20   A.   Yes.

21   Q.   Paragraph 82.  "In early 2007 plaintiff Pam

22   Reed and her husband Bob Gibbins were convinced by

23   their Austin-based financial advisor to relocate their

24   investments from Smith Barney to Stanford Financial

25   Group when their financial advisor joined SGC."  And I

Pamela G. Reed                                                                8

```
 1    think in the rest of the petition SGC means Stanford
 2    Group Company, --
 3         A.    Correct.
 4         Q.    -- right?
 5         A.    Yes, sir.
 6         Q.    All right.   That is correct, you first got
 7    involved really in early 2007, is it not?
 8         A.    Yes, sir.
 9         Q.    "In April of 2007 after their financial
10    advisor joined SGC, Gibbins and Reed moved their
11    investment portfolio from Smith Barney to SGC."   Prior
12    to that time your financial advisor had been at Smith
13    Barney for a long time, hadn't he?
14         A.    Yes, sir.
15         Q.    And you-all had used him at that institution?
16         A.    Yes, sir.
17         Q.    Paragraph 83.   "Gibbins and Reed's financial
18    advisor then convinced them to invest their money in
19    SBI -- SIBL CDs.   On May the 11th, 2007 Gibbins and
20    Reed invested $2,416,958 with SGC following the advice
21    of their financial advisor."   Is that correct?
22         A.    Yes, sir.
23         Q.    "Purchased one SIBL fixed CD in the amount of
24    160,000 pounds."   That equals about $300,000, does it
25    not, something like that?
```

```
 1        A.    I believe so, something like that.

 2        Q.    Okay.  "And another SIBL fixed CD in the

 3   amount of $2,156,286," and it gives the account

 4   numbers.  "Both CDs were issued in the name of Gibbins

 5   and Reed jointly and had a one-year term maturing in

 6   May 2008."  Is all that correct?

 7        A.    I believe so.

 8        Q.    So you bought the CDs and they had a one-year

 9   maturing -- maturity date and would mature in May 2008.

10        A.    I believe so.

11        Q.    Okay.  Skip down to the last sentence in

12   paragraph 84.  "The financial advisor also told

13   Reed and Gibbins that SIBL was part of SGC."  SIBL, you

14   know that is the bank, that's the initials for the

15   Stanford International Bank in Antigua, don't you?

16        A.    Yes, sir.

17        Q.    And it was part of Stanford Group Companies;

18   is that right?

19        A.    That's what we understood.

20        Q.    That's what he said?

21        A.    Yes, sir.

22        Q.    And SGC was a licensed broker/dealer just like

23   Smith Barney.  You have no reason to question that.

24   That's correct, isn't it?

25        A.    Correct.
```

1    Q.   All right.  85.  "In February 2008 before

2    their CDs matured the FA, financial advisor, invited

3    Gibbins and Reed to visit SIBL in Antigua."  Is that

4    correct?

5        A.   Yes, sir.

6        Q.   Reed met with Allen Stanford and SIBL

7    president Juan Rodriguez Tolinto" -- how do you

8    pronounce that?

9            MR. SNYDER:   Tolentino.

10           MR. COWLES:   Tolentino.

11       Q.   (BY MR. COWLES)  -- "who provided Reed with a

12   tour of SIBL, and once again assured Reed that SIBL's

13   CDs were in an entirely safe and liquid product."

14   Those facts are true, are they not?

15       A.   Yes, sir.

16       Q.   All right.  Paragraph 86.  "Upon their return

17   from Antigua, financial advisor sought to convince

18   Gibbins and Reed to roll over and reinvest their

19   SIBL CD proceeds into new SIBL CDs when the CDs matured

20   in May of 2008."  So in May when they matured you

21   rolled them over into new CDs; is that correct?

22       A.   I believe we did, yes.

23       Q.   "During these discussions near the end of

24   April of early May 2008, financial advisor, one,

25   reaffirmed the safety, security and low risk of the

 1    receive prospective -- prospectus for each of the

 2    mutual funds in which the assets in the account are

 3    invested."  Did they comply with that provision?

 4        A.   I have no memory if they did or not.

 5        Q.   Could they have?

 6        A.   Sorry?

 7        Q.   They could have, but you don't have memory of

 8    it?

 9        A.   Yes, sir.

10        Q.   Well, that brings the question right straight

11    up.  Do you have any memory at all of receiving any

12    disclosure statement in connection with your

13    investments in the Stanford Group Company?

14              MR. SNYDER:  Of any -- just objection,

15    form.  CDs or any investments whatsoever?

16              MR. COWLES:  Well, any investments.

17              MR. SNYDER:  Okay.

18        Q.   (BY MR. COWLES)  Did you or not?

19        A.   Well, I'm sure we did.  I don't remember

20    specifically which ones.

21        Q.   Okay.  Did Mr. Bowman state to you and your

22    husband, your husband in your presence, that the CDs

23    were FDIC insured?

24        A.   I believe he did.

25        Q.   Do you know when?

Pamela G. Reed

20

1       A.    I would assume it was sometime prior to our

2   purchasing the CDs.

3       Q.    Okay.  Did he state to you that these CDs were

4   securities that were regulated by the U.S. government?

5       A.    I believe he did.

6       Q.    Can you refer us, Ms. Reed, to a document

7   anywhere stating those two facts, that he said that to

8   you?

9       A.    No, sir, I don't know where that document

10  would be.

11      Q.    Do you have anything in writing anywhere,

12  anywhere in this whole world of ours, that says the

13  CDs were FDIC insured?

14      A.    Not that I know of.

15      Q.    Do you have any document anywhere in the world

16  that says the bank regulated these CDs by the U.S.

17  government -- was regulated by the U.S. government?

18      A.    I don't know.

19      Q.    Okay.  Well, you and your husband came to a

20  parting of the ways with Mr. Bowman, didn't you?

21      A.    Yes, sir.

22      Q.    Been a longtime friend?

23      A.    Yes, sir.

24      Q.    A man you trusted?

25      A.    I did.  We both did.

1       Q.    Did anyone with the Stanford Group, even

2    including Allen Stanford, ever orally say to you these

3    CDs are FDIC insured?

4       A.    Mr. Bowman did.

5       Q.    Other than Mr. Bowman.

6       A.    I don't remember anyone else.

7       Q.    Okay.  Did anyone -- the same question as to

8    regulation of the bank by U.S. government.  Anybody

9    ever say to you that was a fact other than Mr. Bowman?

10      A.    I'm not sure if anybody other than Mr. Bowman

11   said that.

12      Q.    Okay.  That's great.  You ended up having to

13   bring a lawsuit against Mr. Bowman, didn't you, you and

14   your husband?

15      A.    We did.

16      Q.    And that was filed in August of 2010; is that

17   right?

18      A.    I'm not sure of the date.  Whatever date it

19   says on the petition.

20      Q.    Well, I can't tell.  The Travis district clerk

21   is a little bit funny the way they stamp these things.

22   I can't tell what they're saying, but it looks like

23   that.

24      A.    Okay.

25      Q.    And it was styled Bob Gibbins, Pam Reed,

Pamela G. Reed                                                                    27

```
 1    representations," talking about what Mr. Bowman told

 2    you, "were inaccurate or false.  Plaintiff relied upon

 3    the truthfulness and accuracy of these facts and the

 4    assurance -- assurances of defendant" -- again, that's

 5    Mr. Bowman, right?

 6         A.    Correct.

 7         Q.    -- "that they had performed their required due

 8    diligence on the operations of SIB and the

 9    representations made by SIB to defendant to determine

10    the truthfulness of these facts."  A little further

11    down there, "Defendant never made the proper inquiries

12    and as a result violated their duties to plaintiff."

13    Again, the defendant, Mr. Bowman, isn't it?

14         A.    Yes, sir.

15         Q.    "Plaintiffs alleged that defendant failed at

16    all times to inform plaintiffs that defendants had not

17    made these due diligence inquiries on behalf of

18    plaintiff -- on plaintiff's behalf and defendant had no

19    knowledge one way or another whether the

20    representations that were being made to plaintiff were

21    accurate."  You are, of course, a lawyer and you've

22    practiced law and are familiar with the concept that in

23    making an investment due diligence needs to be

24    performed to investigate it and make sure it is a

25    proper investment; isn't that correct?
```

1    A.   I'm familiar with the concept.

2    Q.   Yes.  And here did you -- other than talking

3  to Mr. Bowman, did you do anything in the way of due

4  diligence?

5    A.   No, sir.

6    Q.   Did your husband, Bob?

7    A.   No, sir.

8    Q.   You relied on Mr. Bowman?

9    A.   Yes, sir.

10   Q.   Is it true Mr. Bowman was getting these high

11  commissions on the sale of CDs, as far as you know?

12   A.   Well, from what I've read after the fact.

13   Q.   Okay.  And that he was really working in

14  connection with the Stanford Group people, wasn't he,

15  as a financial advisor?

16   A.   Yes, sir.

17   Q.   With SGC, Stanford Group Company?

18   A.   Yes, sir.

19   Q.   Did you feel that you would get -- that he

20  didn't have some reason to tell you you ought to invest

21  in those if he was going to get a high commission?

22        MR. SNYDER:  Objection, form.

23   A.   Well, at the time I didn't know anything about

24  a commission.  And we had always trusted Nigel, so I

25  didn't feel that I couldn't at that occasion.

Pamela G. Reed                                                                    29

```
 1        Q.   (BY MR. COWLES)  Well -- right.  As it turned

 2   out he was getting a high commission and, according to

 3   what you remember he told you, he did not correctly

 4   represent --

 5        A.   Yes, sir.

 6        Q.   -- the facts about the CDs and Stanford, did

 7   he?

 8        A.   Especially about the CDs and Stanford, yes,

 9   sir.

10        Q.   Did you make any attempt at all to get an

11   independent -- get independent assistance in performing

12   the due diligence for this investment?

13        A.   No, sir.

14        Q.   You invested the -- close to two and a half

15   million dollars, then, based on one thing and that was

16   the statements of Nigel Bowman.

17        A.   Correct.  That was the only knowledge that we

18   had at the time.

19        Q.   Yes.  And a man that was connected to and his

20   income came from the Stanford Group Companies,

21   including the bank, SIBL.

22        A.   Yes, sir.

23        Q.   All right.  Did you even go on the Internet

24   and look the companies up?

25        A.   No, sir, at the time didn't do much Internet
```

Pamela G. Reed

30

1    due diligence.

2        Q.   I saw in your deposition where you said you

3    couldn't Google it at that time.  Actually, you could.

4        A.   I couldn't.

5        Q.   Well, okay.  Googling started in 1998.  This

6    was 2007.  So it had been around for nine years or so.

7    But you couldn't -- why couldn't you do it?

8        A.   I didn't -- I didn't use the computer very

9    much.

10       Q.   Okay.  No question but that you understand

11   that you were in the category of an accredited

12   investor, you and Bob, your husband.

13       A.   I do understand that, yes.

14       Q.   And you understand what that means.  You were

15   told what that means.

16       A.   Yes, sir.

17       Q.   So have you ever looked at the disclosure

18   statement that was being passed out by the Stanford

19   Group Company at that time for the sale of CDs?

20       A.   I'm sure I have at sometime, but I don't

21   remember when.

22                MR. COWLES:  4?  4?

23                MR. ISRAELOFF:  Yes.

24       Q.   (BY MR. COWLES)  Let me hand you what's been

25   marked Defendants' Exhibit 4.  And, Ms. Reed, if I

1   deposition and these kind of things in the prior cases,

2   you've been asked about them, --

3        A.   Yes, sir.

4        Q.   -- and the attorney asking the questions would

5   then follow that with the question would that have made

6   a difference to you in effect or what would you have

7   done if you had known that.  You answered, and I

8   counted them up, I think it was about 14 times, that I

9   would have asked more questions.

10       A.   Yes, sir.

11       Q.   Do you remember that?

12       A.   Yes, sir, I do.

13       Q.   And that was a very honest answer on your

14   part, wasn't it?

15       A.   Yes, sir.

16       Q.   If you had known something like that you would

17   have asked more questions.

18       A.   Yes.

19       Q.   Might still have invested, but you would have

20   asked more questions.

21       A.   Correct.

22       Q.   Okay.  If you look at the next paragraph, "The

23   SIBL products," that's what these CDs were, "are not

24   subject to reporting requirements of any jurisdiction,

25   nor are they covered by the investor protection or

1        A.    It is a statement of facts.

2        Q.    Is it in affidavit style?

3        A.    Yes, sir.

4        Q.    Okay.

5        A.    It's not notarized, but it's affidavit style.

6        Q.    Do you understand under the federal rules you

7    don't need to notarize a declaration?

8        A.    Yes, sir, I do now understand that.

9        Q.    Okay.  And that is filed in this case.

10       A.    Yes, sir.

11       Q.    All right.  Let's look at that just a moment.

12   You said on page 1 at the bottom, "My husband Bob

13   Gibbins, now deceased, and I invested in the Stanford

14   Financial Group of companies."  We've already gone over

15   that, haven't we?

16       A.    Yes, sir.

17       Q.    "For approximately 18 years, Nigel Bowman had

18   been our trusted financial advisor at Smith Barney,"

19   right?

20       A.    Correct.

21       Q.    Did you meet Allen Stanford?

22       A.    Yes, sir.

23       Q.    You took a trip to Antigua, didn't you?

24       A.    I did.

25       Q.    And your friends, the Gables?

1     A.   The Gales.

2     Q.   Gales?

3     A.   Yes, sir.

4     Q.   The Gales went with you?  And you flew down

5  there on his executive jet?

6     A.   Yes, sir.

7     Q.   Spent two or three days there?

8     A.   I think it was two and a half.  Yes, two and a

9  half, three days.

10    Q.   And during that time you did actually meet

11 Stanford himself.

12    A.   I did.

13    Q.   Did you have any discussion about the CDs with

14 him down there?

15    A.   No, sir.

16    Q.   Mr. Bowman rode with you, didn't he?

17    A.   Yes, sir.

18    Q.   All right.  Look at paragraph six just a

19 moment.

20    A.   (The witness complied.)

21    Q.   This is your declaration, affidavit if you

22 want to call it that.  "In making decisions to invest

23 in the SIBL CDs, I received and reviewed various

24 Stanford financial and marketing materials and

25 brochures regarding SIBL and Stanford Financial as a

1    whole, including materials that described Stanford as a

2    Houston, Texas based financial services conglomerate."

3    Is that a correct and true statement?  Did you receive

4    financial and marketing materials and brochures

5    regarding SIBL when you were considering making an

6    investment in the CDs?

7         A.   Yes, sir.

8         Q.   You did.

9         A.   Yes, sir.

10        Q.   Do you have a single one of those anywhere?

11        A.   Everything that we have we've turned over to

12   Mr. Snyder.

13        Q.   The reason I'm asking you is we tried to go

14   through every single thing and I haven't seen one.  I

15   just wondered if -- you had a time when you kind of

16   threw things --

17        A.   I sure did.

18        Q.   -- away when you got mad.

19        A.   Yes, sir, I did.

20        Q.   Do you know whether you might have thrown away

21   disclosure statements, subscription agreements?

22        A.   I don't -- I have no idea what I threw away.

23        Q.   Brochures, anything like that?

24        A.   I don't know.

25        Q.   Okay.  "We were told that our CDs and

Pamela G. Reed

```
 1              MR. COWLES:  Lord only knows.

 2       Q.   (BY MR. COWLES)  Would you look on page 93?

 3       A.   Yes, sir.

 4       Q.   In fact, page 90, line 24, you were asked that

 5  same question by the lawyer.  That's the only time

 6  I've noticed that he asked the same question twice.

 7  "Were you provided any sort of written materials prior

 8  to investing in the Stanford CDs?"  And your answer

 9  again was, "I'm sure I was.  And whatever I provided to

10  you-all is what we have left."  That's still correct,

11  isn't it?

12       A.   Yes, sir.

13       Q.   Yeah.  Now, look on page 93, --

14       A.   Okay.

15       Q.   -- line 6.  "Other than information Mr. Bowman

16  provided you, did you do any diligence or investigation

17  concerning the SIB CDs prior to purchasing them?"  And

18  your answer was what?

19       A.   I said, "I don't remember.  That was -- I

20  didn't Google then.  So" -- it's a disjointed answer.

21  "So I'm sure that there -- no, that I relied on Nigel.

22  Performing due diligence now is very different than it

23  was then."  And it was.

24       Q.   I wasn't about to say that was a disjointed

25  answer.  Look on page 95.
```

```
 1    you said that, but it makes sense.
 2                  MR. COWLES:  I'm about through.
 3         Q.   (BY MR. COWLES)  You did have Internet access
 4    in 2007, didn't you?
 5         A.   Yes, sir.
 6         Q.   Turn to page 151, please.
 7         A.   Yes, sir.
 8         Q.   Look at line 11.  And the background is he's
 9    quoting a Stanford document here.
10         A.   Okay.
11         Q.   So it says, "Because this disclosure statement
12    cannot be all inclusive, we recommend you conduct
13    further, 'due diligence,' including examination of
14    supplemental data and information available through us
15    before making a -- making definitive commitments.  We
16    will make available to you for inspection during normal
17    business hours relevant -- our relevant business,
18    financial and other information and data, which you may
19    reasonably request to make informed judgments with
20    request -- respect to investing in the U.S. Accredited
21    Investor CD, including, but not limited to, our most
22    recently published annual report."
23                  Did you ever make any request for any
24    additional information or just accept what Mr. Bowman
25    told you?
```

1      A.   I believe I accepted what Mr. Bowman told us.

2      Q.   Okay.  Have you ever seen -- excuse me.  Did

3  you ever see before making this investment or before

4  2009 any document with the name Greenberg Traurig on it

5  involving these CDs?

6      A.   Yes, sir.  I don't remember whether I did or

7  not.

8      Q.   Did you ever see any document with the name

9  Carlos Loumiet on it, the same frame of 2009?

10     A.   I don't remember if I did or not.

11     Q.   Do you recall anybody, Bowman or -- Nigel

12  Bowman or anybody else giving you any information

13  from -- that originated with the law firm Greenberg

14  Traurig or the lawyer Carlos Loumiet at all?

15     A.   I don't remember.

16          MR. COWLES:  Got anything else?

17          MR. ISRAELOFF:  No.

18          MR. COWLES:  One last look, because I've

19  got five more minutes.

20          MR. BUNCHER:  You're setting your own

21  time limits, huh?

22          MR. COWLES:  What?

23          MR. BUNCHER:  You're setting your own

24  time limits.

25          MR. COWLES:  Yes, I always do.

Pamela G. Reed

```
 1    it since filing the complaint?

 2         A.   No.

 3         Q.   Are you still seeking recovery in that

 4    lawsuit, though?

 5         A.   Yes.

 6         Q.   So, Ms. Reed, in your deposition in the

 7    Proskauer litigation, you spoke some with the

 8    questioning attorney about a preference payment that

 9    the Antiguan JLs were seeking to recover from you.  Do

10    you recall that?

11         A.   I do.

12         Q.   And what was that preference payment?

13         A.   I had taken some money out of our CD to live

14    on and that was what they termed a preference payment.

15         Q.   And do you recall when you took that money

16    out?

17         A.   It was sometime between when we bought the

18    CDs and when it failed.  So between the 2008, 2009 time

19    frame.

20         Q.   And your position in the February deposition

21    was that you were not going to repay that preference

22    payment; is that correct?

23         A.   That's correct.

24         Q.   And is that still your position today?

25         A.   It is.
```

Pamela G. Reed                                                                87

1    Q.    And have you repaid any money to the Antiguan

2    joint liquidators?

3    A.    I have not.

4    Q.    And have you had any further communication

5    with the joint liquidators about that payment since the

6    February deposition?

7    A.    I have not.

8              MR. SNYDER:   And I'll instruct the

9    witness not to answer any attorney/client privileged

10   communications she's had with me about that.

11   Q.    (BY MS. BISHOP)   And have you received any

12   recovery checks from the joint liquidators?

13   A.    I don't believe so.

14   Q.    And why do you feel that you are not going to

15   repay the money that they have requested?

16   A.    Because it was not a preference payment.

17   Preference payments are when you take out more money

18   than you put in.  I took out a minor portion of what I

19   had put into the CD.

20   Q.    And where did you get that definition of the

21   preference payment that you just -- the explanation of

22   the preference payment that you just gave me?

23   A.    I made it up.  It's what a preference payment

24   is.  It's what you read about in all of these schemes,

25   the Ponzi schemes that we've seen.  Preference payments

Filed
10 August 4 P3:33
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-10-002715

No. _____

| | | |
|---|---|---|
| **BOB GIBBINS, PAM REED,** | § | **IN THE DISTRICT COURT** |
| **MICHAEL GALE, AND** | § | |
| **LARA GALE** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **VS.** | § | **_____ JUDICIAL DISTRICT** |
| | § | |
| **NIGEL BOWMAN** | § | |
| | § | |
| **DEFENDANT.** | § | **TRAVIS COUNTY, TEXAS** |

---

## PLAINTIFFS' ORIGINAL PETITION

---

TO THE HONORABLE COURT:

COME NOW **BOB GIBBINS, PAM REED, MICHAEL GALE, AND LARA GALE** Plaintiffs, and file this, their Plaintiffs' Original Petition against Defendant **NIGEL BOWMAN** ("**BOWMAN**") and for cause of action would show the Court as follows:

### I. DISCOVERY CONTROL PLAN DESIGNATION

1.

Plaintiffs hereby notify the Court and Defendant that they intend discovery in this case to be conducted pursuant to Level 3 Tex. R. Civ. P. 190, and they will move the Court for a discovery control plan by court order pursuant to Tex. R. Civ. P. 190.2.

### II. PARTIES

2.

Plaintiff Bob Gibbins (hereinafter "Plaintiff") is an individual residing in Travis County, Austin, Texas.

3.

PLAINTIFFS' ORIGINAL PETITION                                                                 PAGE 1



DEFENDANT'S EXHIBIT
3
Reed

GT
EXHIBIT 006a

P1353
APP 0113

Plaintiff **Pam Reed** (hereinafter "Plaintiff") is an individual residing in Travis County, Austin, Texas.

### 4.

Plaintiff **Michael Gale** (hereinafter "Plaintiff") is an individual residing in Travis County, Austin, Texas.

### 5.

Plaintiff **Lara Gale** (hereinafter "Plaintiff") is an individual residing in Travis County, Austin, Texas.

### 6.

Defendant **Nigel Bowman** ("Defendant") is an individual residing in Austin, Travis County, Texas. Bowman may be served with process at his home, 1915 Holly Hill Dr., Austin, Texas 78746, or place of business IMS Securities, Inc., 6836 Bee Caves Road, Austin ,Texas 78746.

## III. VENUE

### 7.

Venue is proper in Travis County, Texas, pursuant to Texas Civil Practice and Remedies Code §§ 15.002 because all or a substantial part of the events or omissions giving rise to the claim occurred in Travis County.

## IV. FACTUAL BACKGROUND

### 8.

Plaintiffs are investor clients of the Stanford Financial group of companies. Defendant previously acted as Plaintiffs' investment adviser and was employed by Smith Barney before

P1354
APP 0114

joining Stanford Financial as a financial advisor.

9.

In early 2007 Plaintiffs, Bob Gibbins and Pam Reed were convinced by Defendant to leave Smith Barney and relocate their investments to Stanford. Defendant assured Gibbins and Reed that Stanford was a reputable investment management firm. In May 2007, Gibbins and Reed moved their investment funds from Smith Barney to Stanford Group Company. Defendant thereafter convinced Plaintiffs to invest their money in CDs issueed by a related company in Antigua called Stanford International Bank Ltd. ("SIB").

10.

In order to market and sell the SIB CDs, Stanford had established a commission structure that provided huge incentives for Defendant and other Stanford brokers and advisers to "push" the SIB CDs on investor like Plaintiffs. SIB paid disproportionately large commissions to SGC for the sale of CDs; SGC received a 3% trailing fee from SIB on sales of CDs by SGC advisers. In turn, SGC paid high commissions to its advisers, like Defendants. SGC advisers like Defendant received a 1 % commission upon the sale of the CDs, and were eligible to receive as much as a 1 % trailing commission throughout the term of the CD. SGC used this generous commission structure to recruit established financial advisers to the firm, and to reward those advisers for aggressively selling the CDs to investors.

11.

Like all other Stanford brokers and advisers, Defendant received these above-market commissions on the sale of the SIB CD's to Plaintiffs. Due to this built-in incentive to "push" the SIB CDs on prospective clients, Defendant failed to inquire about material facts and risks of

the SIB CD's that Defendant, had he exercised reasonable diligence and fulfilled his fiduciary duties to Plaintiffs, should have known and understood as an investment adviser representing Plaintiffs.

### 12.

In marketing the SIB CD'S, Stanford, through its brokers and advisers like Defendant, touted the liquidity of its investment portfolio. For example, in its marketing brochure, SIB emphasized the importance of the liquidity of the SIB CD, stating, under the heading "Depositor Security," that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors" and that the bank's assets are "invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks." Likewise, SIB trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients..." To ensure that depositors could redeem their CDs, Stanford, through its brokers and advisers like Defendant, assured the investor clients that SIB's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice. But in fact, nearly 80% of SIB's investments were concentrated in just two high-risk, illiquid categories: private equity and real estate. In fact, what Allen Stanford was really running was a Caribbean real estate investment fund. None of that was disclosed to Plaintiffs.

### 13.

Contrary to SIB's representations regarding the liquidity of its portfolio, SIB did not

invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the bank's portfolio were misappropriated by Stanford's sole shareholder, R. Allen Stanford, and used by him to acquire private equity and real estate. In fact, at year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to Mr. Stanford; (ii) private equity; and (iii) over-valued real estate.   By February 2009, Mr. Stanford had misappropriated at least $1.6 billion of investor money through bogus personal loans and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled by solely by himself.

14.

Although SIB purported to have an independent board of directors, an investment committee, a chief investment officer and teams of global portfolio advisers and analysts, in truth and in fact the vast majority of the bank's assets were managed exclusively by Mr. Stanford and his right hand man and former college roommate Jim Davis. Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants. Accordingly, there existed no meaningful independent oversight over SIB's assets, something that Defendant never disclosed to Plaintiffs, even they were aware of it.

15.

By year-end 2008, SIB had sold approximately $8 billion worth of CDs by touting: (i) the bank's safety and security; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States.

16.

Based on the representations made to them by Defendant, Plaintiffs made the decision to invest their retirement savings in the SIB CDs.

### Bob Gibbins and Pam Reed

17.

On April 11, 2007, Plaintiffs, Bob Gibbins and Pam Reed invested $2,416,958.01 with Defendant. With that money, Plaintiffs, Gibbins and Reed following the advice of Defendant purchased one SIB "Fixed CD" in the amount of £160,104.07 (SIBL Acc # 304808); and also purchased another SIB "Fixed CD" also in the amount of $2,156,286.10 (SIBL Acc # 168069).

### Michael Gale and Lara Gale

18.

The Gales also invested in the SIB CDs through SGC at the recommendation and advice of Defendant. At their initial meeting with Defendant, Defendant explained to the Gales the Stanford offerings and the financial status of the firm. Nigel explained that there was a US based operation (SGC) and one based in Antigua (SIB) and Defendant recommended that the Gales visit the SIB facilities in Antigua. The Gales asked Defendant if these Stanford entities were all audited and he said "yes". At the Texas meetings and the meetings in Antigua, Defendant explained that there were two parts of the portfolio he recommended they invest in. One was a high growth FDIC insured set of assets and the other was the SIB CD protected by SIB's significant assets. The Gales inquired as to why the interest rate was so much higher than current market offerings, Defendant's response was that the CD was backed by SIB's assets and these assets were extremely well managed as was illustrated in the audited accounts. When asked who the SID auditor was, Defendant replied it was a major international firm.

P1358
APP 0118

On returning from the Antigua visit, Defendant re-affirmed the stable asset base of the bank in Antigua and that the CDs, while open to market change, were completely backed by the bank's assets which had been audited by an international firm. Accordingly, the Gales' invested £160,104.07 on January 14, 2009.  With that money, Plaintiffs, Gibbins and Reed following the advice of Defendant purchased one SIB "Fixed CD" in the amount of £504,500.00 (SIBL Acc # 305783)

19.

On February 17, 2008 the United States Securities and Exchange Commission ("SEC") launched an investigation of Stanford and SIB and filed a Complaint against said companies, as well as against Mr. Stanford and Mr. Davis, in the U.S. District Court for the Northern District of Texas. The SEC obtained an injunction and froze the assets of the Stanford group and appointed a receiver, Ralph Janvey to liquidate the companies.

## V.  CAUSES OF ACTION

### A. PRIMARY VIOLATIONS OF THE TEXAS SECURITIES ACT

#### 1. SALES OF UNREGISTERED SECURITIES

20.

Defendant is liable as a primary violator of the Texas Securities Act for the sales of unregistered securities to Plaintiffs, being the SIB CDs.  Defendant acted as a vital "link" in the chain of the selling process, and but for Defendant's participation, Stanford and SIB could not have sold unregistered securities to Plaintiffs.   The SIB CDs were never registered as securities in the State of Texas.  Moreover, and despite SGC's scheme to evade compliance with the Texas

Act by claiming a Reg D exemption, the global offering of CDs by Houston-based Stanford Financial to "accredited" U.S. investors was in fact an unregistered public offering made in violation of Article 581 of the Texas Act.  It was an integrated offering under Texas securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from registration:

a. The integrated offering involved general solicitation. This general solicitation by Stanford Financial through SGC and its U.S. affiliates, agents and brokers, as well by the foreign financial advisors, included general public advertisements, publicly distributed magazine articles and other communications and media published in print in Houston, Texas and distributed broadly for general distribution in the United States and abroad to offerees and purchasers of the CDs.

b. The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas and Florida, of Stanford Financial's products, including the CDs.

c. The integrated offering involved seminars and meetings conducted in the United States (including Texas and Florida), Mexico and Venezuela and elsewhere in Latin America.  The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

d. The integrated offering involved offers to thousands of offerees and purchases by thousands of offerees involving sums of money far in excess of that disclosed to the SEC in SIB's Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of Texas and Florida residents or those otherwise

subject to Texas or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of Stanford Financial.

e. The aggregate size of the sales of CDs during this period was approximately $7.2 billion. The aggregate size of the sales in Texas from this period was at least several hundred millions of dollars. The aggregate size of the sales in Florida from this period was at least several hundred millions of dollars.

f. The offering was made to investors with whom Stanford Financial/SGC had no pre-existing relationship, through brokers or affiliates of Stanford Financial who were paid substantial and excessive undisclosed commissions in connection with the CDs.

g. The offering was made to persons who did not qualify as "accredited United States investors"; and far more than 35 persons who did not qualify as "accredited United States investors" purchased the CDs; indeed the vast majority, at least $6 billion of the CDs, were sold to foreign citizens that did not qualify as "accredited United States investors".

21.

## 2. SALES OF SECURITIES THROUGH UNTRUTHS OR OMISSIONS

22.

Section 33(A) of the Texas Securities Act provides civil liability for persons who sell securities by means of untrue statements or omissions. Defendant qualifies as a "seller" under the Act because he acted as a vital "link" in the chain of the selling process, and but for Defendant's participation, Stanford and SIB could not have sold the CDs to Plaintiffs.

23.

APP 0121

Defendant sold the securities to Plaintiffs using untruths of omissions.   In particular, Defendant told Plaintiffs that their money was being invested in safe, liquid investments, which was a material misstatement.

### 24.

As a result of the Defendant's conduct, Plaintiffs have lost their investments. Defendant's violations of the Texas Securities Act is a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiffs will received from the receivership distribution.

### B. AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT

#### 1. SALES OF UNREGISTERED SECURITIES

### 25.

Defendant is liable as an "aider" for sales of unregistered securities to Plaintiffs.  In particular, by his actions described herein, Defendant materially aided Stanford and SIB sell unregistered securities to Plaintiffs in Texas.  The CDs that the Defendant sold to Plaintiffs satisfy the definition of securities as defined in the Texas Securities Act.  Defendant knew or should have known that he was selling unregistered securities to Plaintiffs in Texas.  But for Defendant's participation, SIB could not have sold unregistered securities to Plaintiffs in Texas.

### 26.

As a result of the Defendant's conduct in materially aiding Stanford and SIB sell unregistered securities in Texas, Plaintiffs have lost their investments. Defendant's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in as stated in their last account statement and the amount

Plaintiff may receive from the receivership distribution.

## 2. SALES OF SECURITIES BY UNREGISTERED DEALERS

### 27.

Defendant aided and abetted SIB in the sale of securities in the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act.  Specifically, and as alleged herein, Defendant knew or should have known that SIB was functioning as an unregistered investment company, selling mutual fund participation units to investors in Texas and then pooling its customers' money together to make illiquid, speculative investments.

### 28.

SIB, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, in connection with a public offering, securities of which SIB was the issuer, without obtaining an order from the Commission permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

### 29.

Defendant intentionally and actively aided and abetted SIB to operate as an illegal mutual fund in Texas and sell securities in Texas, by means of the conduct described herein. With full knowledge that SIB was pooling its customer's money together and selling securities in Texas,

Defendant aided and abetted and perpetuated SIB's violations of the Texas Securities Act by continuing to lure new customers like Plaintiffs and sell them the worthless CDs.

30.

In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendant acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law.  In fact, in their zeal to assist SIB, an offshore bank operating completely outside the regulatory purview of U.S. securities and banking laws, sell its debt obligation securities in Texas, Defendant acted with wanton and arrogance disregard for the protections afforded by the Texas Securities Act.  As a result of the Defendant's conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### 3. UNTRUTH OR OMISSION

31.

Defendant, acting with intent to deceive or with reckless disregard for the truth or the law, materially aided SIB, Stanford and its principals in the sale of securities through the use of untrue representations or materially misleading omissions.  In particular, and as set forth in the SEC's Amended Complaint, Stanford was a massive Ponzi scheme that was perpetuated by the continued sales of the SIB CDs to unsuspecting investors like Plaintiffs.  In particular, Stanford told Plaintiffs, verbally (through Defendant) and through written marketing materials prepared

APP 0124

and disseminated via Stanford's Austin office, that their money was being invested in safe, liquid investments, which was a material misstatement because the money was not invested in safe, liquid investments, but rather was pooled together with other investors' money and used to finance Stanford's principals' profligate lifestyles and/or invest in long term, illiquid and high risk investments like private equity and real estate.

32.

With knowledge of the above, or with reckless disregard for the truth, Defendant materially aided SIB's sales of securities through the use of untruths and materially misleading omissions. Specifically, with general awareness of SIB's and Stanford's fraudulent activities and violations of federal and state securities laws, including SIB's commingling of Plaintiffs' money, hypothecation of Plaintiffs' securities, failure to register as a dealer, and failure to register securities, Defendants engaged in the conduct described herein, which conduct was primarily designed to perpetuate and allow SIB and Stanford to carry out the activities described herein. Defendants' actions as described herein allowed SIB and Stanford to continue to sell securities through the use of untruths and materially misleading omissions.

33.

In performing the acts described herein to aid and abet the sale of securities through the use of untruths and materially misleading omissions, Defendant acted with the intent to perpetuate the sale of securities by SIB, or acted with reckless disregard for the truth or the law. In fact, in their zeal to earn outsized commissions, Defendant acted with wanton and arrogance disregard for the protections afforded by the Texas Securities Act by engaging in the conduct described herein. Defendant's actions in aiding and abetting SIB and Stanford's fraud caused

---

Plaintiffs to enter into transactions or maintain their investments with SIB. As a result of Defendant's conduct in aiding and abetting the sale of securities in Texas through the use of untruths and materially misleading omissions, Plaintiffs have lost their investments. Defendant's violations of the Texas Securities Act is a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### C. BREACH OF FIDUCIARY DUTY

#### 34.

As a registered investment advisor, Defendant owed fiduciary duties to Plaintiffs as a matter of law. Defendant breached his fiduciary duties to Plaintiffs by recommending that Plaintiffs invest their life savings and roll their Smith Barney investment account into the SIB CDs. More interested by the high commissions he was receiving on the sales of the CDs than the fiduciary duties he owed to Plaintiffs, Defendant breached his duties in failing to fully investigate the CDs and to question his superiors and confirm material information related to rates of return on the CDs; the source of repayment on the CDs; SIB's and the CD's liquidity; the investment strategies and assets of SIB; related party transactions and other material information.

#### 35.

The Defendant's breaches of fiduciary duties are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution. Moreover, in breaching his fiduciary duties as alleged herein, Defendant acted with malice and in conscious indifference to Plaintiffs' rights. Defendant knew or should have known that their conduct of

putting their own interest in high commissions above the interests of their clients likely would result in extraordinary harm to the Plaintiffs. Accordingly, Plaintiffs are entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this court.

## D. FRAUD/PARTICIPATION IN A FRAUDULENT SCHEME

### 36.

Defendant committed direct fraud against Plaintiffs and also participated in the overall fraudulent scheme of Stanford. To wit, Defendant represented to Plaintiffs that, *inter alia*, (i) SIB's used investors money to invest in highly liquid financial instruments, which could be redeemed with just a few days notice with a minimum penalty; (ii) that Defendant had evaluated the management and investment committees of SIB and, based upon Defendant's evaluation, felt that the management and investment committees were competent and proficient to operate SIB; (iii) SIB's employed a sizeable team of skilled and experienced analysts to monitor and manage the portfolio; (iv) SIB's financial statements were audited and that the value of SIB's assets was independently verified by independent auditors and appraisers; (v) Defendant had knowledge of the companies in which SIB had invested funds and believed the companies in which SIB had invested had sufficient capital and cash flow to serve any debt or preferred return to SIB and had adequate debt to capital ratios which would satisfy the Plaintiffs that those companies were not overleveraged; (vi) SIB was a bank regulated by the Antiguan government and was examined on a regular basis by the bank authorities; (vii) SIB had several layers of insurance coverage and was safer even than an FDIC guaranteed bank in the United States; (viii) the SIB CD's were a safe investment vehicle suitable for long term investment with little or no risk relating to the repayment and redemption of the SIB CD's; (ix) Defendant had verified SIB's safety and security

and the consistent, double-digit returns on the bank's investment portfolio and there was little or no risk the money would not be repaid given the type of investment strategies that were employed; (x) all of SIB's investments were arms length transactions and there were no insider dealings between any affiliate of Stanford Group Company and Stanford Capital Management, including Allen Stanford, and SIB.

37.

Moreover Defendant omitted to inform Plaintiffs that the CDs were being marketed and sold in the United States by an unregistered dealer, and that SIB was operating as an unregistered and illegal mutual fund or hedge fund.

38.

All of the above representations were inaccurate or false. Plaintiffs relied upon the truthfulness and accuracy of these facts and the assurances of Defendant that they had performed the required due diligence on the operations of SIB, and the representations made by SIB to the Defendant to determine the truthfulness of these facts. In truth and in fact, Defendant never made the proper inquires and as a result violated their duties to Plaintiffs. In the alternative, Plaintiffs allege that Defendant failed at all times to inform Plaintiffs that (i) Defendant had not made these due diligence inquiries on Plaintiffs' behalf, and (ii) Defendant had no knowledge, one way or another, whether the representations that were being made to the Plaintiffs were accurate.

39.

Furthermore, by his conduct described herein, Defendant participated with SIB, the Stanford group of companies and the principals of said companies in the fraudulent schemes described herein making Defendant directly liable for fraud. In particular, Defendant made the

P1368
APP 0128

conscious decision to participate in the fraudulent Bank scheme and actively engaged in conduct (the sales of the CD products) to perpetuate said scheme.

### 40.

Defendant's actions in participating in the fraudulent Stanford Group Company's scheme is a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiff may receive from the receivership distribution.

### F. NEGLIGENCE/GROSS NEGLIGENCE

### 41.

Defendant had a duty to properly oversee the Plaintiffs' investments and to manage Plaintiffs' accounts in a manner consistent with Plaintiffs' financial circumstances, goals and objectives. Defendant breached this duty and was grossly negligent in failing to properly direct the investments of the Plaintiffs and by advising Plaintiffs to invest in Stanford Group Company that were unsuitable for and in total disregard to Plaintiffs' investment goals. Blinded by the high commissions he was receiving on the sales of the CDs, Defendant was grossly negligent in failing to fully investigate the CDs and to question his superiors and confirm material information related to rates of return on the CDs; the source of repayment on the CDs; SIB's and the CD's liquidity; the investment strategies and assets of Stanford; and other material information. As a direct and proximate result of the Defendant's negligence and gross negligence, Plaintiffs have suffered damages for which Defendants are liable.

### VI. ACTUAL DAMAGES

APP 0129

42.

Plaintiffs have to date suffered the loss of millions of dollars that were proximately caused by the wrongful conduct of Defendant described herein. Plaintiffs are entitled to recover the loss of their investment, plus interest thereon. In addition, Plaintiffs are entitled to recover their just and reasonable attorneys' fees, for it would be inequitable not to award such fees to them. Plaintiffs have retained the undersigned attorneys and have agreed to pay them a reasonable attorneys' fee for their work.

## VII. PUNITIVE DAMAGES

43.

The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of ' 41.003, Tex. Civ. Prac. & Rem. Code. Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

44.

All conditions precedent to filing this Petition have been met.

## VIII. JURY DEMAND

45.

Plaintiffs demand a trial by jury.

## PRAYER

WHEREFORE, Plaintiffs pray the Defendant be summoned to answer this Petition, that the case be tried before a jury and that upon final judgment Plaintiffs recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of

P1370
APP 0130

suit, including reasonable attorneys' fees.  Plaintiffs pray for such other relief to which they may

be justly entitled.

<div style="margin-left: 40%;">

Respectfully submitted,

**CASTILLO SNYDER, P.C.**
Bank of America Plaza, Suite 1020
300 Convent Street
San Antonio, TX 78205
Telephone:  (210) 630-4200
Facsimile: (210) 630-4210


By:

    EDWARD C. SNYDER
    State Bar No. 00791699
    JESSE R. CASTILLO
    State Bar No. 03986600

**ATTORNEYS FOR PLAINTIFFS**

</div>

PJ 371
APP 0131

Bates_Jane_20100929

```
 1   UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 2
 3   In the Matter of:          )
 4                              )  File No. FW-02973-A
 5   STANFORD GROUP COMPANY    )
 6
 7   WITNESS:  Jane Bates
 8   PAGES:    1 through 159
 9   PLACE:    Securities and Exchange Commission
10             801 Cherry Street, 19th Floor
11             Fort Worth, Texas
12   DATE:     Wednesday, September 29, 2010
13
14       The above-entitled matter came on for hearing, pursuant
15   to notice, at 10:07 a.m.
16
17
18
19
20
21
22
23
24             Diversified Reporting Services, Inc.
25                       (202) 467-9200
```

Page 1

**GT**
**EXHIBIT 007**

APP 0132

Bates_Jane_20100929

12   they truthful and accurate?

13       A   Yes, sir.

14       Q   Okay.  With respect to the e-mail that Mauricio

15   provided you, did it relate to whether or not Stanford

16   International Bank should be registered as a foreign

17   investment company?

18       A   It related to my asking those questions.

19       Q   All right.  And those questions -- I want to make

20   sure I understand the scope of what your questions were

21   concerned with.

22       One of your concerns was marketing of the CD to

23   U.S. investors, is that correct?

24       A   Yes.

25       Q   Okay.  And was one of your concerns as to -- did it

1   relate to whether or not SIB should be registered in some

2   fashion with the SEC?

3       A   It related to more did it fit the 40 Act exemption.

4       Q   Okay.  Fair enough.

5       Following Mauricio -- his last name is?

6       A   Alvarado.

7       Q   Alvarado.  I know that, it just escaped me.

8       A   I'm sure you do.

9       Q   Following his e-mail to you, did you seek an

10   outside legal opinion with respect to the issues covered in

11   his e-mail?

12       A   I was not authorized to seek outside legal advice.

13   I did at that time -- what raised the question for me was

14   that I had brought in some -- Mr. Stanford had wanted to

Page 13

Bates_Jane_20100929

15  simplify the offering document.  The subscription agreement,

16  make them more -- in the disclosure document, make it more

17  friendly, you know, make it more readable.  It was all

18  legalese, okay.

19          He asked me if I knew anyone.  I told him I did.

20  This is what this memo was actually about chastising me.  I

21  brought an acquaintance of mine from my VALIC days in, to

22  assist in that review.  And throughout those types of

23  discussions, this issue came up.

24      Q    And was that person Diane Ambler?

25      A    Yes, it was.


 1      Q    And she was at Kirkpatrick & Lockhart at the time?

 2      A    Yes, she was.

 3      Q    You and I are going to do this throughout the day,

 4  but we're going to try not to talk over one another for his

 5  benefit.  I guarantee you we won't be successful, but we're

 6  going to try.

 7          All right.  As I understand it then, you had some

 8  conversations, some concerns and some conversations with

 9  Diane that precipitated Mauricio's communication to you, is

10  that right?

11      A    Correct.

12      Q    Okay.  After the e-mail, there wasn't -- did you

13  share Mauricio's e-mail with Diane?

14      A    The e-mail itself, I don't recall.

15      Q    Did you have conversations with her about

16  Mauricio's response?

17      A    About the e-mail?

18      Q    Yes.

Page 14

**APP 0134**

1               TROICE - 2/3/15
2          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
   ------------------------------
4  SAMUEL TROICE, HORACIO MENDEZ,
   ANNALISA MENDEZ, and
5  PUNGA PUNGA FINANCIAL, LTD.,
   individually and on behalf
6  of a class of all others
   similarly situated,
7                    Plaintiffs,
8  vs.                CIVIL ACTION NO.
                      3:09-CV-1600-N
9  PROSKAUER ROSE, LLP,
   THOMAS V. SJOBLOM,
10 P. MAURICIO ALVARADO, and
   CHADBOURNE & PARKE LLP,
11
                     Defendants.
12 ------------------------------
13
14     VIDEOTAPED DEPOSITION OF SAMUEL TROICE
15              DALLAS, TEXAS
16            FEBRUARY 3, 2015
17
18
19
20
21
22
23
24 Reported by:  Susan S. Klinger, RMR-CRR, CSR
25 Job No. 89573

GT
EXHIBIT 008

APP 0135

TROICE - 2/3/15

1
2     Q.   Mr. Troice, how much money are you
3  trying to recover for yourself in this lawsuit?
4     A.   I would like to recover 100 percent
5  and it is 2.3 million dollars.
6     Q.   Mr. Troice, who represents you in
7  this action?
8        MR. SNYDER:  Objection, asked and
9     answered.
10    Q.   Sorry, you are right.
11       MR. SNYDER:  Senor Doug.
12       THE WITNESS:  Sorry.
13       MR. BUNCHER:  That is fine.
14       THE WITNESS:  Don't ask me for many
15    words that I can say in English.
16    Q.   Mr. Troice, do you know what each of
17  the 3 law firms that is representing you in
18  this action what their various roles are?
19       MR. SNYDER:  Objection, form.
20    A.   I know what Ed Snyder is doing, the
21  one with whom I signed the contract.  And
22  Mr. Snyder is a partner with the other law
23  firms.
24    Q.   And you don't know what the other
25  law firms are doing?

APP 0136

Page 103

1                 TROICE - 2/3/15
2        A.    Yes.
3        Q.    And that is the only CD that you and
4    your wife held as of February 2009; correct?
5        A.    Yes.
6        Q.    And is this CD part of your claim to
7    the receiver?
8        A.    Yes.
9        Q.    Did you purchase or renew any other
10   CDs after April of 2005?
11       A.    After 2005, there was a lot of
12   movement.
13       Q.    But did you --
14       A.    Income and then also outcome or
15   withdrawals.
16          MR. SNYDER:  Deposits and
17   withdrawals.
18       A.    Deposits and withdrawals.
19       Q.    Other than this one, this flex CD,
20   did you purchase or renew any other CDs after
21   you purchased or renewed this CD in April of
22   2005.
23       A.    I don't remember if they were CD
24   purchases, but there were deposits that I made
25   into the account.

APP 0137

1  **TROICE - 2/3/15**
2  Q.   So you don't recall any other
3  purchases of CDs after April of 2005?
4  A.   As far as a purchase, no, but
5  deposits, yes.
6  Q.   In terms of the other 2 accounts
7  that are shown on this page P120, the account
8  at the top is number 185734; is that correct?
9  A.   Correct.
10  Q.   And what kind of account is that?
11  A.   An express account.
12  Q.   And as of February of '09, that
13  account had a balance of 2 cents; is that
14  correct?
15  A.   Correct.
16  Q.   Do you recall when you stopped using
17  this account?
18  A.   At the beginning ever since I opened
19  it, we had an account where the money was
20  deposited, and then, then it would be
21  transferred to the flex account.
22  Q.   But again, do you recall when you
23  stopped using this account?
24  A.   No, I don't remember dates.
25  Q.   And is this account part of your

APP 0138

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Cause No. 3:09-CV-0298-N |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § | |
| Defendants. | § § | |
| THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Cause No. 3:12-cv-01447-N |
| BDO USA, LLP, *et al.*, | § § | |
| Defendants. | § § § | |

**EXPEDITED REQUEST FOR ENTRY OF SCHEDULING ORDER[1]
AND MOTION TO APPROVE PROPOSED SETTLEMENT WITH BDO
USA, LLP, TO APPROVE THE PROPOSED NOTICE OF SETTLEMENT
WITH BDO USA, LLP, TO ENTER THE BAR ORDER, TO ENTER THE FINAL
JUDGMENT AND BAR ORDER, AND FOR PLAINTIFFS' ATTORNEYS' FEES**

COME NOW Ralph S. Janvey, the Receiver for the Receivership Estate in *Securities and*

*Exchange Commission v. Stanford International Bank, Ltd., et al.*, Civil Action No. 3:09-CV-

0298-N (the "SEC Action"); the Official Stanford Investors Committee (the "Committee"), as a

---

[1] Movants request that the Court promptly enter the Scheduling Order, without waiting the twenty-one (21) days contemplated by Local Rule 7.1(e) for interested parties to respond to this Motion, because such Scheduling Order merely approves the notice and objection procedure and sets a final hearing, and does not constitute a final approval of the Settlement Agreement.

GT
EXHIBIT 009

1

**APP 0139**

party to the SEC Action and as plaintiff in *The Official Stanford Investors Committee v. BDO USA, LLP, et al.*, Civil Action No. 3:12-cv-01447-N (the "Committee Litigation"); and Philip A. Wilkinson and Pam Reed (the "Investor Plaintiffs"), the plaintiffs in *Philip Wilkinson, et al. v. BDO USA, LLP, et al.*, Civil Action No. 3:11-CV-01115-N (the "Investor Litigation") (movants are, collectively, the "Plaintiffs"), and move the Court to approve the settlement (the "BDO Settlement") among and between Plaintiffs and BDO USA, LLP and other BDO entities[2] (the "BDO Entities") as defendants in the Committee Litigation and the Investor Litigation. Plaintiffs further request, as more fully set out below, that the Court enter the Scheduling Order, approve the Notices, and enter the Bar Order and the Judgment and Bar Order attached to and incorporated by reference into the BDO Settlement Agreement, attached as Exhibit 1 to the Appendix in Support of this Motion.[3] Plaintiffs jointly request this Court to find the BDO Settlement is in the best interest of all involved, and to approve the BDO Settlement. Plaintiffs further request that the Court approve payment of Plaintiffs' attorneys' fees in accordance with the contingency fee agreements between Plaintiffs' counsel and the Committee. In support thereof, Plaintiffs respectfully state the following:

## I. INTRODUCTION

1.    As part of their lengthy and thorough investigation of the Stanford Ponzi scheme and after many years of investigating and pursuing claims against third parties, including the BDO Entities, Plaintiffs have reached a major settlement with BDO USA, the auditor of Stanford

---

[2] BDO International Ltd. ("BDO International"), BDO Global Coordination, B.V. ("BDO Global"), and Brussels Worldwide Services BVBA ("Brussels Worldwide").

[3] Capitalized terms not otherwise defined herein shall have the meaning set forth in the BDO Settlement Agreement. To the extent of any conflict between this Motion and the terms of the BDO Settlement Agreement, the BDO Settlement Agreement shall control.

**MOTION TO APPROVE SETTLEMENT WITH BDO**                    2

Group Company and certain other Stanford companies, as well as BDO USA's foreign affiliates BDO International, BDO Global, and Brussels Worldwide. Under the agreement, once approved and effective, BDO USA has agreed to pay $40 million to the Receiver for distribution to customers of Stanford International Bank, Ltd. ("SIBL"), who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL ("Stanford Investors") who have submitted claims that have been allowed by the Receiver.

2.      In return, the BDO Entities seek a global release and settlement of all claims that have been asserted, or could have been asserted, against the BDO Released Parties[4] arising from or relating to Allen Stanford, the Stanford Entities, or any conduct by the BDO Entities and other BDO Released Parties relating to Allen Stanford or the Stanford Entities. Accordingly, the BDO Settlement is conditioned, in significant part, on the Court in the SEC Action entering the Bar Order attached to the BDO Settlement Agreement, and in the Committee Litigation entering the Judgment and Bar Order. These bar orders would bar and enjoin other parties from asserting against the BDO Released Parties any action, lawsuit, cause of action, claim, investigation, demand, complaint, or proceeding of any nature, including but not limited to litigation, arbitration, or other proceeding, in any Forum, whether individually, derivatively, on behalf of a class, as a member of a class, or in any other capacity whatsoever, that in any way relates to, is

---

[4] "BDO Released Parties" means the BDO Entities, and each of their respective past, present, and future directors, officers, legal and equitable owners, shareholders, members, managers, principals, employees, associates, representatives, distributees, agents, attorneys, trustees, general and limited partners, lenders, insurers and reinsurers, direct and indirect parents, subsidiaries, affiliates, related entities, divisions, partnerships, corporations, executors, administrators, heirs, beneficiaries, assigns, predecessors, predecessors in interest, successors, and successors in interest. "BDO Released Parties" shall not include any Person, other than the BDO Entities, who is on the Agreement Date a named defendant in any litigation filed by any of the Plaintiffs, and shall not include any Person who becomes employed by, related to, or affiliated with the BDO Entities after the Agreement Date and whose liability, if any, arises out of or derives from actions or omissions before becoming employed by, related to, or affiliated with the BDO Entities.

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                               3

based upon, arises from, or is connected with the Stanford Entities; the SEC Action; the Investor Litigation; the Committee Litigation; the subject matter of the SEC Action, the Investor Litigation, or the Committee Litigation; or any Settled Claim.[5] The foregoing specifically would include any claim, however denominated, seeking contribution, indemnity, damages, or other remedy where the alleged injury to such Person, entity, or Interested Party, or the claim asserted by such Person, entity, or Interested Party, is based upon such Person's, entity's, or Interested Party's liability to any Plaintiff, Claimant, or Interested Party arising out of, relating to, or based in whole or in part upon money owed, demanded, requested, offered, paid, agreed to be paid, or required to be paid to any Plaintiff, Claimant, Interested Party, or other Person or entity, whether pursuant to a demand, judgment, claim, agreement, settlement or otherwise.

3.      Plaintiffs request the Court to approve the BDO Settlement Agreement and enter the Bar Order in the SEC Action and the Judgment and Bar Order in the Committee Litigation.

4.      Plaintiffs further request that the Court approve payment of attorneys' fees to the counsel whose efforts resulted in the BDO Settlement consistent with their contractual twenty-five percent (25%) contingency fee agreements with the Committee and the Investor Plaintiffs.

---

[5] "Settled Claim" means any action, cause of action, suit, liability, claim, right of action, or demand whatsoever, whether or not currently asserted, known, suspected, existing, or discoverable, and whether based on federal law, state law, foreign law, common law, or otherwise, and whether based on contract, tort, statute, law, equity or otherwise, that a Releasor ever had, now has, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity, for, upon, arising from, relating to, or by reason of any matter, cause, or thing whatsoever, that, in full or in part, concerns, relates to, arises out of, or is in any manner connected with (i) the Stanford Entities; (ii) any certificate of deposit, CD, depository account, or investment of any type with any one or more of the Stanford Entities; (iii) any one or more of the BDO Entities' relationship with any one or more of the Stanford Entities; (iv) the BDO Entities' provision of services to the Stanford Entities; or (v) any matter that was asserted in, could have been asserted in, or relates to the subject matter of the SEC Action, the Investor Litigation, the Committee Litigation, or any proceeding concerning the Stanford Entities pending or commenced in any Forum. *See* Paragraph 19 of the BDO Settlement Agreement for a complete definition of Settled Claim.

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                                4

## II. BACKGROUND

### A.    *Authority of the Receiver and the Committee*

5.      On February 17, 2009, the Securities & Exchange Commission ("SEC") filed this action and the Court appointed Ralph S. Janvey as Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *See* Order Appointing Receiver ¶ 4 [SEC Action ECF No. 10].[6] The Second Amended Order Appointing Receiver, entered on July 19, 2010, is the current order setting forth the Receiver's rights and duties (the "Second Order"). [SEC Action ECF No. 1130]. The Receiver's primary duty is to marshal and preserve the assets of the Receivership Estate, and minimize expenses, "in furtherance of maximum and timely disbursement thereof to claimants." Second Order ¶ 5.

6.      The Receiver is not only authorized but required to pursue outstanding liabilities and claims for the Estate. *Id.* ¶¶ 3, 5(b)-(c). The Court vested Ralph S. Janvey with "the full power of an equity receiver under common law as well as such powers as are enumerated" by the Court. *Id.* ¶ 2. The Receiver can assert claims against third parties and "recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *SEC v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 326 (N.D. Tex. 2011). The Court has directed the Receiver to institute, prosecute, defend, and compromise actions that the Receiver deems necessary and advisable to carry out his mandate. Second Order ¶ 5(i).

7.      On April 20, 2009, the Court also appointed John J. Little as Examiner, to advocate on behalf of "investors in any financial products, accounts, vehicles or ventures

---

[6]      All Docket Items are from *SEC v. Stanford International Bank, Ltd.*, No. 3:09-CV-298-N (N.D. Tex.), unless otherwise noted.

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                                 5

APP 0143

sponsored, promoted or sold by any Defendant in this action." [SEC Action ECF No. 322]. Although he is not a party to the Committee Litigation or the Investor Litigation, the Examiner signed the BDO Settlement Agreement as chair of the Committee, and as Examiner solely to evidence his support and approval of the BDO Settlement and the obligation to post Notice of the BDO Settlement on his website.

8.       On August 10, 2010, this Court entered its order (the "Committee Order") creating the Committee and appointing the Committee to "represent[] in [the SEC Action] and related matters" the Stanford Investors. [SEC Action ECF No. 1149]. The Committee Order confers upon the Committee the right to investigate and pursue claims on behalf of the Stanford Investors and for the Receivership Estate (by assignment from the Receiver). *Id.* ¶ 8(d). This Court has recognized the Committee's standing to pursue litigation claims such as the claims against the BDO Entities that are the subject of the BDO Settlement. *See* September 24, 2012 Order, Dkt. No. 33, in *Janvey & Official Stanford Investors Committee v. IMG Worldwide Inc. & Int'l Players Championship, Inc.*, Civ. Action No. 3:11-CV-0117-N, at pp. 4-6 (the Committee has standing to pursue claims based on the Court's grant of such authority to the Committee as an unincorporated association representing the interests of the Stanford Investors).

**B.    *The Investigation of Claims Against the BDO Entities***

9.       Counsel to the Receiver, the Committee and the Investor Plaintiffs have spent several years and thousands of hours investigating and pursuing claims against the BDO Entities on behalf of the Stanford Receivership Estate and Stanford Investors. As part of their investigation of the claims against the BDO Entities, counsel to the Receiver, the Committee and the Investor Plaintiffs have reviewed voluminous documents, emails, audit work papers and

<u>**MOTION TO APPROVE SETTLEMENT WITH BDO**</u>                                          6
EAST\97590543.2

depositions obtained from the SEC during its investigation of BDO, which the Receiver obtained through a cooperation agreement with the SEC. The materials reviewed by Plaintiffs' counsel included, among other materials, thousands of pages of the SEC and other investigation materials, thousands of pages of deposition testimony of BDO personnel and other relevant witnesses together with all of the exhibits to those depositions, thousands of emails of BDO personnel, and the audited financial statements and the detailed audit work papers of BDO for all of the relevant audit years. Counsel was also required to research all relevant case law and GAAS standards governing the potential audit malpractice claims belonging to the Receivership Estate, as well as the potential Texas Securities Act ("TSA") and other claims belonging to the Stanford Investors, to determine how the facts surrounding BDO's audits supported those claims. Because the potential claims against the BDO Entities involved claims of professional negligence, counsel was also required to retain and work with a consulting audit malpractice expert to formulate the basis of the potential claims to be asserted against the BDO Entities. The investigation further required formulation of viable damage models and causation theories for both the Receivership Estate and Stanford Investor claims.

10. Investigation and prosecution of the Receivership Estate and Stanford Investor claims against the BDO Entities also necessarily required thousands of hours investigating and understanding the background and history of the complex web of Stanford companies, the financial transactions, interrelationship and dealings between and among the various Stanford entities, and the complex facts relating to the Ponzi scheme and how it was perpetrated through the various Stanford entities. Without a comprehensive investigation and understanding of this background, it would not have been possible to formulate viable claims against the BDO

**MOTION TO APPROVE SETTLEMENT WITH BDO** 7

EAST\97590543.2

Entities. The Committee's counsel have also spent thousands of hours since the Committee's formation in 2010 in support of the joint effort with the Receiver to investigate and prosecute numerous third party claims, including the claims against the BDO Entities, pursuant to an agreement between the Receiver and the Committee. The Receiver, the Committee and the undersigned law firms have done an immense amount of work investigating and analyzing the Stanford Ponzi scheme since the commencement of this receivership case, all of which allowed the Receiver, the Committee and the undersigned counsel to formulate and file the claims against the BDO Entities that led to the BDO Settlement for which approval is sought by this Motion. But for the diligent efforts of the Receiver, the Committee and their counsel since the commencement of this receivership proceeding, the BDO Settlement would never have been achieved, and the Receivership Estate and the Stanford Investors would not have achieved this $40 million settlement.

11.     Plaintiffs and their counsel have conducted a thorough analysis of the potential claims against the BDO Entities, considering:

      a.  claims available under both state and federal law;

      b.  the viability of those claims considering the facts underlying the BDO Entities' business dealings with Stanford and this Court's previous rulings; and

      c.  the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere.

### C.   *The Investor Litigation*

12.     Investor Plaintiffs' Original Complaint in the Investor Litigation was filed on May 26, 2011, against BDO USA and BDO International. Philip Wilkinson and Pam Reed were the named Investor Plaintiffs, suing individually and on behalf of a putative class of Stanford

**APP 0146**

Investors. Pam Reed is also a member of the Committee.[7] The Investor Plaintiffs asserted claims against the BDO Entities for aiding and abetting violations of the TSA, aiding and abetting breach of fiduciary duty, aiding and abetting a fraudulent scheme, civil conspiracy, single business enterprise, alter ego and respondeat superior.

13.    On August 12, 2011, BDO USA filed its Motion to Dismiss the claims asserted in the Investor Litigation, alleging primarily that SLUSA[8] preempted all causes of action asserted. BDO USA also contended that Plaintiffs' fraud allegations were not pled with specificity pursuant to Rule 9(b), that Plaintiffs' TSA claims were barred by limitations, and that Plaintiffs failed to plead the requisite scienter by BDO USA necessary to establish aider and abettor liability under the TSA. BDO USA's motion also urged that Plaintiffs' TSA claims were based upon non-existent co-conspirator theories of liability, and that Plaintiffs had failed to allege sufficient facts to demonstrate that BDO USA knowingly aided and assisted SGC's and STC's breaches of fiduciary duty. BDO USA also took issue with Plaintiffs' conspiracy claims, arguing that Texas does not recognize a cause of action for aiding and abetting a fraudulent scheme separate from conspiracy, that Plaintiffs had failed to allege particularized facts establishing BDO USA knowingly aided and assisted in the Stanford Ponzi scheme, that Plaintiffs' conspiracy claim was barred by a two-year limitations period and that Plaintiffs failed to allege particularized facts to demonstrate BDO USA had the requisite meeting of the minds with the alleged co-conspirators to engage in a Ponzi scheme.

14.    BDO International filed a separate Motion to Dismiss the Investor Plaintiffs'

---

[7] Pam Reed became a member of OSIC in July 2013.
[8] The Securities Litigation Uniform Standards Act of 1998 forbids the bringing of large securities class actions "based upon the statutory or common law of any State" in which the plaintiffs allege "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1).

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                                      9

claims on August 22, 2011, asserting that it was not subject to personal jurisdiction and should therefore be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. BDO International also asserted that it did not exist as an entity at the time of the events giving rise to the Investor Plaintiffs' claims and therefore should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. BDO International also contested the adequacy of Plaintiffs' vicarious liability allegations attempting to hold it liable for the actions of BDO USA through theories of joint enterprise, alter ego or respondeat superior. BDO International further incorporated all of the dismissal arguments made in BDO USA's Motion to Dismiss.

15.     Plaintiffs filed a First Amended Complaint in the Investor Litigation on September 2, 2011, adding BDO Global and Brussels Worldwide as Defendants.

16.     On August 31, 2011, the Court issued a Final Judgment and Order in a related case, *Roland v. Green*, No. 3:10-cv-00224-N (N.D. Tex., Aug. 31, 2011) (Godbey) [Docket # 72 and # 73] that dismissed the *Roland* plaintiffs' claims with prejudice based on the Court's interpretation and application of SLUSA (the "*Roland* Order"). Therefore, on September 15, 2011, the parties to the Investor Litigation filed an Agreed Motion to Stay Proceedings for a 120-day period in anticipation that some of the questions relating to the application of SLUSA and the *Roland* Order to the Investor Plaintiffs' claims against the BDO Entities might be clarified or resolved during this period. An Agreed Order granting the requested stay was entered on September 16, 2011.

17.     On January 6, 2012, the parties filed an Agreed Motion to Extend Stay of Proceedings, based upon the appeal of the *Roland* Order to the Fifth Circuit, along with similar orders entered in *Troice v. Proskauer Rose, LLP,* No. 3:09-cv-01600-N, and *Troice v. Willis of*

**APP 0148**

*Colorado, Inc., et al.*, No. 3:09-cv-01274-N. All three matters were consolidated for appeal at the Fifth Circuit. The parties sought to stay the Investor Litigation until May 31, 2012, which the parties believed would give them time to consider the ruling of the Fifth Circuit and its impact on this case. An Agreed Order staying the case until May 31, 2012 was entered on January 13, 2012.

18.     On May 25, 2012, the parties filed another Agreed Motion to Extend the Stay until October 12, 2012, because the Fifth Circuit had reversed the *Roland* Order on March 19, 2012, and had denied appellees' Petition for Rehearing En Banc. It was understood that one or more of the appellees intended to file a Petition for Writ of Certiorari with the United States Supreme Court. The Court granted the stay on May 30, 2012, staying the proceedings until October 12, 2012.

19.     Beginning on October 12, 2012, the parties filed a series of agreed motions to extend the stay, ultimately agreeing to extend the stay until 30 days after the Supreme Court's determination on the SLUSA issue.

20.     All of the counsel involved in the prosecution of the litigation against the BDO Entities were also involved in the successful appeals of the SLUSA issue to the Fifth Circuit and the United States Supreme Court. But for counsel's efforts to win the SLUSA appeal, the Investor Litigation against the BDO Entities could not have proceeded. Fortunately, the SLUSA appeal was won by the investor plaintiffs in the *Roland*, *Willis* and *Proskauer* cases, allowing the Investor Litigation to proceed. *See Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014).

21.     Following the Supreme Court's SLUSA decision allowing the Stanford class action cases to proceed, the parties entered into a Stipulated Order regarding the time for the

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                                    11

BDO Entities to respond to the First Amended Complaint and a briefing schedule.

22.     BDO USA, BDO International, BDO Global and Brussels Worldwide filed their Motions to Dismiss Plaintiffs' First Amended Complaint on July 11, 2014. BDO USA's Motion raised the same arguments in support of dismissal as their Motion to Dismiss Plaintiffs' Original Complaint. BDO International, BDO Global and Brussels Worldwide each moved to dismiss under Rule 12(b)(2) alleging they were not subject to the Court's personal jurisdiction, and BDO International and Brussels Worldwide sought dismissal under Rule 12(b)(6) on the ground that they did not exist at the time of the events giving rise to Plaintiffs' causes of action. They also incorporated all of the arguments made by BDO USA in favor of dismissal.

23.     Before the deadline for Plaintiffs to respond to the Motions to Dismiss, counsel for the BDO Entities contacted Plaintiffs' counsel to indicate they would be seeking to compel arbitration of the claims in the Committee Litigation pursuant to the engagement agreements between BDO USA and the Stanford audit clients, which engagement agreements also required the parties to mediate in advance of arbitration. Thus, the parties agreed that it made sense to mediate all of the claims asserted in the Investor Litigation and Committee Litigation simultaneously to attempt to reach a global resolution of the issues between all Plaintiffs and the BDO Entities.

24.     That mediation, which resulted in the BDO Settlement, occurred on August 28, 2014, and is discussed in more detail below. The BDO Settlement resolves both the Investor Litigation and the Committee Litigation.

**D.     *The Committee Litigation***

25.     The Committee's Original Complaint in the Committee Litigation was filed on

---

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                              12

May 9, 2012. The same four BDO entities named in the Investor Litigation were named in the Original Complaint in the Committee Litigation. The primary claim asserted by the Committee against the BDO Entities was the audit malpractice (negligence) claim; however, the Committee also asserted claims against the BDO Entities for aiding, abetting or participation in breaches of fiduciary duty, aiding, abetting or participation in fraudulent transfers, aiding, abetting or participation in conversion, and civil conspiracy. The Committee asserted all claims against the BDO Entities pursuant to an Assignment of such claims from the Receiver to the Committee. Additionally, the Committee asserted the claims as a representative of the Stanford Investors, pursuant to this Court's holdings that the Committee has independent standing as an unincorporated association.

26.     The Committee Litigation was not reassigned within the Northern District to this Court until September 5, 2012.

27.     On October 12, 2012, the parties filed an Agreed Motion for Extension of Time for the BDO Entities to answer or otherwise respond to the Complaint. On October 19, 2012, the Court entered a Stipulated Order setting a deadline of February 15, 2013, for the BDO Entities to respond to the Complaint.

28.     The Committee then determined that the Complaint would be amended, so the Court entered a Joint Stipulation and Order relieving the BDO Entities of the obligation to respond until the Committee filed an Amended Complaint. The Committee filed a First Amended Complaint on May 13, 2014.

29.     Before the BDO Entities' deadline to respond to the First Amended Complaint, Defendant BDO USA informed the Committee that it intended to file a motion to compel

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                                    13

arbitration pursuant to the terms of the engagement letters between BDO and the Stanford audit clients SGC, STC and SGH. After careful consideration of the pros and cons of arbitration, the Committee agreed to arbitrate the Committee claims against BDO USA, as the Committee believed the claims were meritorious and that arbitration would result in a quicker and more efficient resolution of the claims.

30.     Pursuant to the BDO USA engagement agreements, the parties were required to mediate before going to arbitration. Thus, the parties selected former United States District Judge Layn Phillips to mediate the dispute, and the Investor Plaintiffs agreed to participate in an effort to achieve a global resolution of the Investor Litigation and the Committee Litigation.

## E.     *Mediation*

31.     Mediation was held with the Hon. Layn Phillips in New York on August 28, 2014. Former Judge Phillips, then with the law firm Irell & Manella, has extensive experience mediating accounting and audit malpractice cases, having mediated and successfully resolved some of the largest accounting and audit malpractice cases in recent U.S. history.

32.     Prior to mediation, Plaintiffs' counsel continued its investigation of both the Committee's and Investor Plaintiffs' claims against the BDO Entities, including review of the BDO depositions, documents, emails and work papers obtained by the SEC, as well as other investigation materials. Counsel also worked with an audit malpractice expert to further evaluate, refine and formulate the basis of Plaintiffs' claims against the BDO Entities, including the applicable GAAS principles that Plaintiffs contended were violated. That led to the production of a draft expert report that was confidentially shared with the mediator and was instrumental in the settlement process.

**APP 0152**

33.     Layn Phillips required the parties to exchange mediation position papers, together with exhibits and supporting authorities on July 22, 2014, so that each side could see the other side's arguments, evidence and authorities in support of their claims and defenses in advance of the mediation. He also required the parties to exchange reply papers with supporting exhibits and authorities on August 19, 2014. Finally, he required that the parties exchange proposed "term sheets" to identify issues that would need to be addressed in any final settlement agreement.

34.     The mediation lasted a full day with numerous back and forth offers and demands, ultimately resulting in the $40 million settlement for which approval is sought in this motion. Without the tireless effort of the Receiver, the Committee, Investor Plaintiffs and their counsel in investigating and prosecuting these claims as part of the overall effort to recover money from third parties for the benefit of Stanford Investors, the settlement could never have been achieved, and the Committee and Investor Litigation would have dragged on for years with an uncertain outcome and great expense to the parties.

35.     But for the BDO Settlement, the parties had agreed that the Committee Litigation would be dismissed and an arbitration complaint filed with AAA in Houston, Texas, as required by the BDO USA engagement letters. While arbitration might be more efficient in terms of getting to trial more quickly, arbitration would also have involved the substantial expense of paying three arbitrators (the agreement called for one arbitrator to be selected by each side and a third to be selected by those two) as well as the administrative fees of AAA. The Investor Litigation would almost certainly have taken several years to resolve, with an uncertain outcome.

36.     Since mediation on August 28, 2014, the Parties have spent over 8 months drafting, revising and negotiating the form and terms of the BDO Settlement Agreement, the Bar

APP 0153

Order, the Judgment and Bar Order, the Notice and the Scheduling Order, for which the Parties now move for approval.

## F.    *Plaintiffs' and Examiner's Support of Settlement*

37.    Plaintiffs are confident that the investigation of the BDO Entities' activities related to Stanford performed by their counsel has been thorough and are confident that said investigation has provided them with sufficient information to enter into and endorse the BDO Settlement. Plaintiffs are also confident that the BDO Settlement is fair and reasonable taking into consideration not only the merits of the claims, but also the risks, uncertainties, and expenses associated with litigation. Further, due to the limits of BDO's insurance, and the competing demands on the same insurance from other sources, Plaintiffs believe that the BDO Settlement fairly balances considerations of collectability of any judgment that could be obtained. Therefore, Plaintiffs believe that the BDO Settlement is in the best interests of the Stanford Receivership Estate and the Stanford Investors and should be approved by the Court. The Chairman of the Committee, who oversaw the Committee Litigation and participated in the settlement negotiations and mediation, is also the Court-appointed Examiner, and he supports this Motion in both capacities, as does the Receiver, who assigned the Receiver's claims to the Committee for prosecution.

38.    The Investor Plaintiffs also support the BDO Settlement and believe it is in the best interests of all Stanford Investors, and request that the Court approve it. As part of the BDO Settlement, the Investor Plaintiffs have agreed to dismiss the Investor Litigation with prejudice. All Stanford Investors have been given notice of the Receivership and the claims process, and the vast majority of them have filed claims and are participating in the Receivership distribution

**APP 0154**

process. Furthermore, Stanford Investors who wish to participate in a distribution of the proceeds of the BDO Settlement but have not submitted claims to the Receiver or to the Antiguan Joint Liquidators as of the date of the Notice ("Outstanding Claims") are being provided the opportunity to submit Outstanding Claims to the Receiver for review and consideration. The BDO Settlement therefore "permits [Stanford Investors] to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013). The BDO Settlement, Bar Order, Judgment and Bar Order, and the dismissal of the Investor Litigation, protects all interested parties, both the BDO Released Parties and the Stanford Investors.

39.     There would be uncertainty and delay in certifying a settlement class involving all Stanford Investors who reside in multiple countries throughout the world, and such a class would be duplicative with respect to the Stanford Investors who are already participating in the Receivership claims and distribution process.  All Stanford Investors have been given years to file claims with the Receiver, and the Receiver is giving the Outstanding Claims another opportunity to file a claim for review and consideration by the Receiver.  It is far more efficient and saves substantial costs to distribute the settlement funds through the court-approved Receivership distribution process rather than create an entirely separate and parallel class action claims and settlement distribution process.  A class action settlement process would result in substantial delay and less money flowing to investors.  The Receivership settlement and bar order, together with a dismissal of the Investor Lawsuit, protects all interested parties, both the Defendants and the Stanford investors.

**APP 0155**

### G.    The BDO Settlement

40.    The proposed BDO Settlement is the result of many years and thousands of hours of work by the Receiver, the Committee, Investor Plaintiffs and the undersigned counsel, and was negotiated and entered into as a result of arm's-length negotiation at mediation facilitated by the Hon. Layn Phillips.

41.    The essential terms of the BDO Settlement Agreement, attached as Exhibit 1 to the Appendix, are that:

a)    BDO USA will pay $40 million, which will be deposited with the Receiver as required pursuant to the Settlement Agreement;

b)    Plaintiffs will fully release the BDO Released Parties from Settled Claims, e.g. claims arising from or relating to Allen Stanford, the Stanford Entities, or any conduct by the BDO Released Parties relating to Allen Stanford or the Stanford Entities;

c)    The BDO Settlement requires entry of a Judgment and Bar Order in the Committee Litigation and entry of a Bar Order in the SEC Action, each of which permanently enjoins Interested Parties, including all Stanford Investors and Claimants, as well as Stanford Investors with Outstanding Claims (see Paragraph f), from bringing any legal proceeding and/or asserting, encouraging, assisting, or prosecuting any cause of action, including contribution claims, arising from or relating to a Settled Claim against the BDO Released Parties;

d)    The Receiver will disseminate notice of the BDO Settlement to Interested Parties, through one or more of the following as set forth in the BDO Settlement Agreement, ¶¶ 29-30: mail, email, international delivery, CM/ECF notification, facsimile transmission, and/or publication on the Examiner (www.lpf-law.com/examiner-stanford-financial-group/) and Receiver (http:// www.stanford financialreceivership.com) web sites;

e)    The Receiver will develop and submit to the Court for approval a plan for disseminating the Settlement Amount ("Distribution Plan"); [9]

---

[9] In the motion seeking approval of the Distribution Plan, the Receiver will seek authority to distribute $5,000 of the settlement amount to Philip Wilkinson and $21,500 of the settlement amount to Pam Reed in acknowledgement of their participation as named plaintiffs.  To the extent these amounts exceed the amounts distributed to other investors in the same distribution, the excess amounts will be treated as advances towards future distributions to Mr.

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                             18

    f)   Any Stanford Investor who has not submitted a claim to either the Receiver or to the Joint Liquidators as of the date of the Notice ("Outstanding Claims"), may seek to participate in the Distribution Plan, and potentially to participate in future distributions of funds obtained by the Receivership as a result of future litigation settlements or recoveries, by submitting a Proof of Claim Form within 75 days of the Court's entry of the Scheduling Order, which Proof of Claim will be subject to review and determination by the Receiver.

    g)   Under the Distribution Plan, once approved, the Net Settlement Amount will be distributed by the Receiver, under the supervision of the Court, to Stanford Investors who have submitted claims that have been allowed by the Receiver;

    h)   Stanford Investors who accept funds from the BDO Settlement Amount will, upon accepting the funds, fully release the BDO Released Parties from any and all Settled Claims; and

    i)   The Investor Litigation will be dismissed with prejudice, with each party bearing their own costs and attorneys' fees, and the Judgment and Bar Order will be entered in the Committee Litigation.

Copies of the BDO Settlement Agreement, this Motion, and other supporting papers may be obtained from the Court's docket, and are also available on the websites of the Receiver (http://www.stanfordfinancialreceivership.com) and the Examiner (www.lpf-law.com/examiner-stanford-financial-group/). Copies of these documents may also be requested by email to Ruth Clark, at rclark@neliganlaw.com, or by calling Ruth Clark at 214-840-5315.

    42.    For the reasons described herein, the BDO Settlement is fair, equitable, and reasonable, and is in the best interests of the Receivership Estate and all those who would claim substantive rights to distribution of its assets. Plaintiffs urge the Court to approve it.

## III. REQUEST FOR APPROVAL OF THE BDO SETTLEMENT AGREEMENT

### A.   *Legal Standards*

    43.    "'[T]he district court has broad powers and wide discretion to determine the

---

Wilkinson and Ms. Reed.

**MOTION TO APPROVE SETTLEMENT WITH BDO**             19
EAST\97590543.2

appropriate relief in an equity receivership.'" *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (quoting *Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982)). "These powers include the court's 'inherent equitable authority to issue a variety of "ancillary relief" measures in actions brought by the SEC to enforce the federal securities laws.'" *Id.* (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)). "Such 'ancillary relief' includes injunctions to stay proceedings by non-parties to the receivership." *Id.* (citing *Wencke* and *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011)). "[N]o federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate." *Id.* (quoting *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009)). Congress enacted a "loose scheme" for federal equity receivers "on purpose" and "wished to expand the reach and power of federal equity receivers, especially in the context of consolidation." *Janvey v. Alguire*, No. 3:09-cv-00724, slip op. at 31, 34 (N.D. Tex. July 30, 2014).

44.     Moreover, "courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership," and in such cases for the court to act as a court in equity for the benefit of defrauded investors. *See id.* at 35 (internal quotation marks omitted); *see also* 15 U.S.C. § 80a-41(d). "Now . . . the corporations created and initially controlled by [Stanford] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors." *Janvey v. Alguire*, slip op. at 44 (quoting *Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 191 (5th Cir. 2013) (quoting *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995)).

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                    20

APP 0158

45. The Receivership Order in the SEC Action closely reflects and furthers all of the above objectives, directing the Receiver to prosecute, defend, and compromise actions in order to maximize timely distributions to claimants. Second Order ¶ 5; *see supra* ¶¶ 2-3.

46. The ability to compromise claims is critical to this Receivership. Courts have long emphasized that public policy favors settlement. *See, e.g.*, *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 297 n.43 (5th Cir. 2010). That is especially true here, where the victims of Stanford's Ponzi scheme await recovery, further costs would come directly out of those victims' pockets, and the BDO Settlement would allow the Receiver to make a significant distribution.

47. Consistent with all of the foregoing purposes, this Court has the authority to enter a bar order prohibiting litigation against settling third parties in receivership cases. *Kaleta*, 530 F. App'x. at 362-63 (approving bar order). Bar orders are commonly used in receivership cases to achieve these purposes. *See, e.g.*, *Gordon*, 336 F. App'x at 549; *SEC v. Parish*, No. 2:07-cv-00919, 2010 WL 8347143, at *4-7 (D.S.C. Feb. 10, 2010) (Norton, C.J.), *modified*, 2010 WL 8347144 (D.S.C. Apr. 8, 2010); *SEC v. Enterprise Trust Co.*, No. 1:08-cv-01260, slip op. at 2 (N.D. Ill. Jan. 29, 2009); *Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at *4-5 (E.D. Pa. Dec. 28, 2007); *CFTC v. Equity Fin. Grp.*, No. 04-1512, 2007 WL 2139399, at *2 (D.N.J. July 23, 2007).

48. The bar order will "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and "protect the [settling parties] from re-litigation of potentially duplicative liabilities." *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399, at *2

(E.D. Tex. Apr. 16, 2014) (following *Kaleta* and approving bar order).

49.     In fact, the Fifth Circuit in *Kaleta* stated that a district court was within its discretion to enter a bar order, such as the ones requested here, if (i) the bar order is "necessary . . . for securing" the settlement payment; (ii) the settlement agreement "expressly permits" those affected by the bar order "to pursue their claims by 'participating in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate'"; and (iii) the scope of the bar order is appropriately tailored to achieve these objectives. *See Kaleta*, 530 F. App'x at 362-63. The BDO Settlement satisfies each of these requirements.

50.     District courts in this Circuit have also looked to factors such as: (1) the value of the proposed settlement; (2) the value and merits of the receiver's potential claims; (3) the risk that litigation would dissipate the receivership assets; (4) the complexity and costs of future litigation; (5) the implications of any satisfaction of an award on other claimants; (6) the value and merits of any foreclosed parties' potential claims; and (7) other equities incident to the situation. *SEC v. Kaleta*, No. 4:09-3674, 2012 WL 401069, at *4 (S.D. Tex. Feb. 7, 2012), *aff'd*, 530 F. App'x 360 (5th Cir. 2013).[10]

51.     In *Kaleta*, the court approved a receivership settlement and entered a bar order prohibiting litigation, including claims of investors, against the settling parties. *Id.* at *4. The

---

[10] This is neither a class action nor a case under Title 11 of the United States Code. Thus, though they are not binding here, both class action and Title 11 cases define tests for approving the aggregate settlements that may be tailored for a receivership case such as this one. *See, e.g., Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (class action); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (Title 11 bankruptcy). Broadly speaking, before approving a global settlement the Court must determine that the settlement (i) is reached after arm's-length negotiations; (ii) provides relief commensurate with the risks and expenses of litigating the claim to judgment; and (iii) represents the considered opinions of the parties and their counsel, and has the support of persons appointed to represent those who ultimately benefit from the settlement. For the same reasons that the BDO Settlement satisfies the factors set forth in the decision of the district court in *Kaleta*, and as set forth herein, the BDO Settlement easily satisfies the tests set out in *Newby* or *Moore*.

Fifth Circuit's opinion noted that, like the BDO Settlement here, "the settlement expressly permits Appellants and other investors to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *Id.* at 362.

**B.     The BDO Settlement Satisfies the Factors for Settlement Approval**

> ### (1)     Value of the Proposed Settlement

52.     The $40 million payment in the BDO Settlement is substantial, representing the largest Stanford litigation settlement to date. "A proposed settlement need not obtain the largest conceivable recovery . . . to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010). In the absence of evidence otherwise, a district court may conclude that a proposed settlement amount is sufficient. *Kaleta*, 2012 WL 401069, at *4. Moreover, no federal rules prescribe a particular standard for approving settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate. *Gordon*, 336 F. App'x at 549. The value of the BDO Settlement to the Receivership Estate and Stanford's victims is significant.

> ### (2)     Value and Merits of the Receiver and Stanford Investors' Potential Claims

53.     Plaintiffs of course believe that the claims filed against the BDO Entities in the Committee and Investor Litigation are meritorious and would be successful. However, they are not without substantial risk and uncertainty, and the ability to collect a judgment is also not without risk and uncertainty, particularly in light of the BDO Entities' diminishing insurance proceeds. Needless to say, the BDO Entities vigorously dispute the validity of the claims asserted in the Committee and Investor Litigation, and have filed motions to dismiss those claims on

which there have been no rulings.

54.     The primary claim in the Committee Litigation is a negligence claim for audit malpractice.  While the Receiver and the Committee believe strongly in the viability of the audit malpractice claim because of the interrelationship and size of transactions between the BDO audit clients (SGC, STC and SGH) and their affiliate bank in Antigua, SIBL, BDO disputes liability on those claims because it was not the auditor for SIBL,

55.     BDO further contended, despite the Committee's contention that the discovery rule applied to toll the two-year statute of limitations, that the audit malpractice claim was time barred.  While the Committee takes comfort in this Court and the Fifth Circuit's prior decisions with regard to the applicability of the discovery rule with respect to the Receiver's claims, the factual issue of when the Receiver in the exercise of reasonable diligence should have discovered the basis of the claims asserted against BDO creates some uncertainty and risk with respect to the audit malpractice claims.

56.     Finally, even if the Committee obtained a favorable judgment on its claims, there are issues as to the collectability of the judgment.  Because accounting firms, like law firms, distribute their income to the partners annually and only make money by the partners and employees continuing to work to generate additional revenue and receivables, the only assets of an accounting firm other than insurance that are really available to satisfy a judgment are furniture, fixtures and equipment of limited value, cash, and receivables that are uncollected at the time of execution on a judgment.  Thus, availability of insurance is the primary driver of collectability of any judgment in a case such as this.

57.     BDO's insurance policies and limits were confidentially disclosed to the

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                    24

Committee's counsel and the mediator prior to the mediation, and the settlement amount represents a significant portion of BDO's available insurance limits when taking into consideration competing claims against BDO, which claims were made within the same insurance policy period applicable to the Committee's claims. One of the competing claims against BDO during the same policy period involved an alleged claim of $20 million in damages and was set for trial in December 2014 at the time of the mediation. While that case has been reset for trial later this year, it remains pending. In contrast, the Investor Litigation has not yet been set for trial and the Committee Litigation would have to be filed with AAA in Houston if there were no settlement, with an uncertain final hearing date. Even in arbitration, it is unlikely the Committee could get to a final hearing sooner than a year from now. Furthermore, dismissal motions remain pending in the Committee and Investor Litigation, with uncertain outcomes. Thus, there was substantial risk that an adverse judgment in the competing case, together with defense costs of several hundred thousand dollars per month being incurred by BDO, would significantly deplete the insurance available to pay the Committee's claims if and when they resulted in a favorable judgment. All of these factors favored settlement at the amount achieved, and Movants believe they obtained in settlement every available dollar of the insurance that BDO and its insurers would be willing to devote to the settlement of the Committee and Investor Litigation without leaving themselves exposed with no remaining insurance to cover other claims and defense costs that fall within the same policy period.

58. Among others, the following issues are hotly contested and promise years of uncertain litigation:

      a. whether the Committee could prevail on its audit malpractice claim even

**MOTION TO APPROVE SETTLEMENT WITH BDO**      25

though the BDO Entities were not the auditor for SIBL;

b. whether the discovery rule tolled the limitations periods applicable to Plaintiffs' claims and for how long after the receivership was filed;

c. whether the BDO Entities had sufficient knowledge under the TSA to meet the recklessness standard for an aiding-and-abetting claim; and

d. whether, after a successful judgment, Plaintiffs would be able to collect any more than the Settlement already offers.

59. For these and other reasons, but for the BDO Settlement, the Investor Litigation and the Committee Litigation would be vigorously defended, they would be expensive and protracted further depleting available insurance, and the ultimate outcome of such litigation would be uncertain. In light of these issues, Plaintiffs believe that the BDO Settlement very much reflects a fair and reasonable compromise between the parties.

60. While Plaintiffs believe they would ultimately prevail on both liability and damages, success is far from assured and would only be possible after years of litigation. The settlement payment represents a significant recovery for the Stanford Investors, while avoiding the burden, costs, delay, and risks incident to continued litigation, with an uncertain outcome.

*(3)* ***The Risk that Litigation Would Dissipate Receivership Assets***

61. The BDO Entities would undoubtedly vigorously defend themselves in the Committee and Investor Litigation. Plaintiffs believe that litigation against the BDO Entities would most likely go on for years, with no guaranty of a recovery. Arbitration of the Committee's claims would dissipate Receivership assets due to the expense of paying three arbitrators at their hourly rates as well as the AAA administration fees. While Plaintiffs'

<u>**MOTION TO APPROVE SETTLEMENT WITH BDO**</u> 26

EAST\97590543.2

litigation counsel have entered into contingent fee arrangements with Plaintiffs to prosecute the claims, the Receiver and the Examiner are paid by the hour and are involved in overseeing the litigation and coordinating strategy with the overall Stanford Receivership case and other litigation. The BDO Settlement avoids further expense associated with the arbitration and continued monitoring and oversight of this case by the Receiver and the Committee Chairman/Examiner.

62.     Furthermore, as part of their fee agreement with their counsel, the Committee has agreed with the Receiver that the Receiver would fund or reimburse all expenses associated with the Committee's litigation against the BDO Entities, including, inter alia, expert fees and out of pocket litigation expenses (depositions, court reporters, videographers, travel, copy expenses, etc.). Because the case against the BDO Entities involves claims of professional malpractice, expert witness testimony is necessary, and would be significant going forward if the Lawsuits are not settled. Expert testimony would be needed to prove the details of the Stanford Ponzi scheme, as well as the audit malpractice, causation and damages. Absent the BDO Settlement, expert witness fees could easily have run into the hundreds of thousands of dollars. Other out of pocket litigation costs would be substantial (given that formal discovery has not even begun in these Lawsuits ) if the Lawsuits are not settled, including costs of oral and video depositions of all fact and expert witnesses, production of voluminous records and emails and other electronically stored information, travel associated with depositions, preparation of expert witness reports, trial graphics, cost of reproduction of documents and trial exhibits, retrieval and storage of email and other electronically stored information, and attendance of experts at trial. Total out of pocket costs to prosecute the litigation could easily reach $1 million or more due to the complex nature

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                    27

EAST\97590543.2

**APP 0165**

of the claims, the need for expert testimony and the voluminous nature of the records involved.

### (4)    *The Complexity and Costs of Future Litigation*

63.    The prosecution of the Committee and Investor Litigation would undoubtedly be challenging and expensive, as discussed above. As the Court is aware, the facts and legal analysis of Stanford's Ponzi scheme are extraordinarily complex, as evidenced by the Direct Testimony of Karyl Van Tassel in the Chapter 15 proceeding, as well as all of the lengthy Declarations with voluminous supporting exhibits that she has filed with this Court to prove the facts of the Stanford Ponzi scheme. There is no question that the Committee and Investor Litigation involving claims of audit malpractice and aiding and abetting under the TSA, involving billions of dollars in damages and an international Ponzi scheme involving a complex web of interrelated international companies that spanned nearly 20 years, is extraordinarily complex, and would cause the Receivership Estate to incur substantial expense to litigate to final judgment. As stated above, litigation costs could easily exceed $1 million.

### (5)    *The Implications of the BDO Entities' Settlement Payment on Other Claimants*

64.    As the Fifth Circuit stressed in *Kaleta*, "investors [can] pursue their claims by 'participating in the claims process for the Receiver[ship].'" *Kaleta*, 530 F. App'x at 362. The Receiver is not collecting the BDO Entities' settlement payment for Allen Stanford or for Mr. Janvey, but for the Stanford Investors. Indeed, as part of the BDO Settlement, the Receiver has agreed to give notice to Stanford Investors with Outstanding Claims who wish to participate in a distribution of the proceeds from the BDO Settlement of a deadline by which they must submit a claim to the Receiver for review and consideration, so that they have a potential opportunity to participate in the BDO settlement and future receivership litigation settlements and recoveries.

**APP 0166**

Thus, the relief Plaintiffs request will further "[t]he primary purpose of the equitable receivership [which] is the marshaling of the estate's assets for the benefit of all the aggrieved investors and other creditors of the receivership entities." *Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order). For the reasons stated, the Investor Plaintiffs support the structure of the settlement, as it saves substantial time and expense over a class settlement which would require a duplicative claims and distribution process.

### *(6)* *The Value and Merits of Any Foreclosed Parties' Potential Claims*

65.    Plaintiffs are conscious of the fact that the Bar Order they are requesting, and which is a condition to the BDO Settlement, will preclude Stanford Investors and others from asserting claims against the BDO Entities in connection with its involvement with the Stanford enterprise. However, no investors (other than the Investor Plaintiffs) have asserted any claims against the BDO Entities in the six years since the Receivership was created, the cost of doing so in any individual investor lawsuit would be prohibitive, and any such investors asserting claims would face the same legal, factual and collectability challenges faced by the Plaintiffs, as discussed above.

66.    Given that all Stanford Investors have been put on notice of the Receivership, have been given the opportunity to file claims in the Receivership, and that the vast majority of the Stanford Investors have filed claims and are already participating in the distribution process, the Stanford Investors' rights are not being prejudiced in any way by the BDO Settlement. They have all had the opportunity to participate through the pre-existing receivership claims process. It would be detrimental to the Stanford Investors to reinvent the wheel through a class settlement procedure, which would result in the same pool of Stanford Investors having the right they

APP 0167

already have through the Receivership claims and distribution process to participate in the BDO Settlement.

67.     Plaintiffs believe that the Bar Order should be approved because it is in the collective best interest of all Stanford Investors. The Bar Order should not be rejected based upon the theoretical possibility that some individual investor(s) or counsel might have otherwise wished to pursue individual claims against the BDO Entities in the future, particularly given that no such claims have been filed for six years since the Receivership was created. *See Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021, at \*4 (E.D. Pa. Dec. 28, 2007) (approving bar order which would not "in any realistic sense, preclude any investors rights, but [would] give the settling parties the assurance of peace and [eliminate] any future claim that might be filed out of spite or for some other vindictive or improper reason").

68.     It should also be noted that the Receiver, and the Committee as assignee of the Receiver's claims and as the Court-appointed representative of the Stanford Investors, is the only party with standing to pursue the most valuable claim, with the lowest burden of proof, in this litigation: the negligence claim based on the BDO Entities' alleged audit malpractice. No potential individual litigant owns or could assert that claim. Any such litigant would be required to bring a TSA or other fraud based claim involving a significantly greater burden of proof. It is primarily, if not entirely, the threat of the Receiver's audit malpractice claim, which involves a simple negligence standard, that has caused the BDO Entities to agree to settle for $40 million.

69.     For all these reasons, "it is highly unlikely that any such investor could obtain a more favorable settlement than that proposed in the Settlement Agreement, nor one that could benefit as many aggrieved investors as stand to be benefited under the Settlement Agreement."

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                                     30

*Parish*, 2010 WL 8347143, at *6 (approving settlement and bar order)

70.     It also is unlikely that any potential claimant could or would spend the time and resources necessary to pursue an individual claim against the BDO Entities, especially considering the expense of such an action would far outweigh any likely individual recovery against the BDO Entities. Plaintiffs believe that enjoining these speculative and unlikely claims is, on balance, fair and appropriate to all interested parties, especially when necessary to gain an immediate and substantial recovery for the Receivership Estate.

71.     The proposed BDO Settlement represents the best opportunity to provide funds quickly to Stanford's victims and to distribute those funds in an orderly fashion, without consumption of additional expenses or a race to the courthouse by various counsel. Against this backdrop, the Court should approve the BDO Settlement and enter the Bar Order.

### *(7)     Other Equities Attendant to the Situation*

72.     The entry of the bar orders is a material term under the BDO Settlement Agreement to the BDO Entities, and a necessary condition to the obligations set forth in the BDO Settlement Agreement. The bottom line is that there is no BDO Settlement without it. The BDO Entities "would not otherwise secure 'peace' from other litigation if any investors were able to institute their own suit against [the BDO Entities], potentially in other, including foreign, jurisdictions." *Harmelin*, 2007 WL 4571021, at *4 (approving settlement and bar order).

73.     The BDO Entities have made clear that in consideration of paying $40 million, they must achieve "global peace" with respect to all Stanford-related claims through the BDO Settlement, wholly and finally. The BDO Entities have stated that they would not enter into the BDO Settlement without securing global peace and the avoidance of the expense of further

<u>**MOTION TO APPROVE SETTLEMENT WITH BDO**</u>                                              31

litigation, particularly given what it believes are its strong factual and legal defenses. The Receiver and the Committee were appointed to protect the interests of the defrauded investors and other creditors of the Receivership Estate, and to act in a manner that will maximize the eventual distribution to Estate claimants. The proposed Bar Order will help maximize the eventual distribution to Estate claimants of BDO USA's $40 million payment and provide the BDO Entities the global resolution of Stanford-related litigation that is a necessary condition for that settlement payment by BDO USA. Plaintiffs believe that the entry of the Bar Order is fully justified by the settlement amount being paid by BDO USA.

74. This Court has already enjoined actions against the Stanford Defendants, the Receiver, and the Receivership Estate, ordering that "all ... persons are hereby restrained and enjoined from" without leave:

> . . . commenc[ing] or continu[ing] . . . any judicial, administrative, or other proceeding against the Receiver, any of the defendants, the Receivership Estate, or any agent, officer, or employee related to the Receivership Estate, arising from the subject matter of this civil action . . . .

Second Order ¶ 9(a). Plaintiffs ask the Court to extend this stay into a permanent injunction and bar of all claims and potential claims against the BDO Released Parties in order to effectuate the BDO Settlement.

75. Plaintiffs and their counsel spent considerable time and effort to reach a settlement that is fair and equitable to the Receivership Estate and the defrauded Stanford Investors. Plaintiffs firmly believe that they could prosecute viable causes of action against the BDO Entities, though the BDO Entities vigorously deny any wrongdoing or liability, and have indicated that they firmly believe they would successfully defend any claims against them. The

BDO Entities also have the resources to defend themselves and to litigate the issues through a final trial court judgment or arbitration award, and appeal if necessary, which means the litigation would take years to be resolved without a settlement.

76.     Plaintiffs believe that the terms of the BDO Settlement Agreement offer the highest net benefit to the Receivership Estate, in terms of maximizing Receivership assets and minimizing the expense to obtain them.

77.     The overall context of the MDL and Stanford Receivership also are relevant to the equities of the situation. The Stanford Ponzi scheme collapsed in February 2009, and the six years since have yielded numerous motions and a delay in any substantial recovery for Stanford's victims. The parties – on both sides – are confronted by uncertainty, risk and delay. In this circumstance, the example of settlement is to be encouraged.

78.     It additionally bears on the equities that Stanford's victims, including a vast number of retirees, are aging. For many of Stanford's victims, recovery delayed is recovery denied. The time that Stanford's victims have waited to date should not be extended further in pursuit of additional uncertainty and delay.

79.     The equities of the BDO Settlement, including its necessary bar order, are also enhanced by the participation and endorsement of the various parties specially constituted to pursue recovery for Stanford's victims. The Receiver, the Examiner, the Committee, and the Investor Plaintiffs have cooperated and joined together in the BDO Settlement.  In this complex international fraud, this level of coordination and quality of resolution are eminently desirable. The roles and obligations of each of the foregoing parties enhance the equities attending this outstanding conclusion to many years of litigation. The result of this coordination will be the

most orderly distribution to Stanford's victims that possibly can be achieved.

80.     The Court is well within its discretion to approve the BDO Settlement. In *Kaleta*, for example, the SEC filed suit against the defendants for violating federal securities laws and defrauding investors. *Kaleta*, 2012 WL 401069, at *1. The trial court appointed a receiver with similar rights and duties to the Stanford Receiver, including the duty "to preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursements to claimants." *Id*. The *Kaleta* receiver settled with third parties, and agreed to a bar order precluding claims against them related to the receivership. The trial court approved the settlement and the bar order, and the Fifth Circuit affirmed. *Kaleta*, 530 F. App'x at 362-63.

81.     In approving the bar order, the district court noted the receiver's "goal of limiting litigation" related to the settling third parties and the Receivership Estate. *Kaleta*, 2012 WL 401069, at *7. "The Bar Order advances that goal by arranging for reasonably prompt collection of the maximum amount of funds possible from the [settling third parties] under the present litigation and financial circumstances." *Id*.

82.     In another recent case, a Texas federal district court approved a receivership settlement and entered a bar order preventing litigation against the settling parties. *SEC v. Temme*, No. 4:11-cv-655, 2014 WL 1493399 (E.D. Tex. Apr. 16, 2014). The bar order was intended to "prevent duplicative and piecemeal litigation that would only dissipate the limited assets of the Receivership Estate and thus reduce the amounts ultimately distributed by the Receiver to the claimants" and to "protect the [settling third parties] from re-litigation of potentially duplicative liabilities." *Id.* at *2.[11]

---

[11]     The *Temme* court also approved a similar settlement agreement and bar order preventing litigation against

# IV. REQUEST FOR APPROVAL OF ATTORNEYS' FEES

*A.*     ***Terms of Plaintiffs' Counsel's Engagement***

83.     In addition to approving the BDO Settlement, Plaintiffs also request that the Court approve an award of attorneys' fees to Neligan Foley LLP ("Neligan Foley"), Castillo Snyder, P.C. ("Castillo Snyder"), Strasburger & Price, LLP ("Strasburger"), and Butzel Long ("Butzel Long") (collectively "Plaintiffs' Counsel") under the terms of the fee agreement between Plaintiffs' Counsel and the Committee. As reflected in the Declaration of Douglas J. Buncher (the "Buncher Declaration"), attached as Exhibit 2 to the Appendix in Support of this Motion, Plaintiffs' counsel have been jointly handling the Committee and Investor Litigation pursuant to 25% contingency fee agreements with the Committee (in the Committee Litigation) and the Investor Plaintiffs (in the Investor Litigation). *See also* Declarations of Edward Snyder, Edward Valdespino and Peter Morgenstern attached to the Appendix as Exhibits 3, 4 and 5, respectively.

84.     Pursuant to the fee agreements, the Committee and Investor Plaintiffs seek Court approval to pay attorneys' fees to Plaintiffs' Counsel equal to an aggregate of 25% of the Net Recovery from the BDO Settlement (*i.e.*, the settlement amount less allowable disbursements). The gross amount of the settlement to be paid by BDO USA is $40,000,000.00. The disbursements to be deducted from the settlement amount to calculate the Net Recovery from the BDO Settlement are $174,938.07, which are expenses previously reimbursed by the Receiver pursuant to the parties' fee agreement. Thus, the Net Recovery from the BDO Entities is $39,825,061.93. 25% of the Net Recovery is $9,956,265.48. This is the fee agreed to be paid to Plaintiffs' Counsel by the Committee and the Investor Plaintiffs, and this is the amount of the fee

---

another settling party. *See SEC v. Temme*, No. 4:11–cv–655, [Doc. 162] (E.D. Tex. November 21, 2012).

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                          35

for which approval is sought in this Motion.

**B.**      **The Proposed Fee is Reasonable as a Percentage of the Overall Recovery**

85.      Trial courts can determine attorneys' fee awards in common fund cases such as this one[12] using different methods. One is the percentage method, under which a court awards fees based on a percentage of the common fund. *Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642–43 (5th Cir. 2012). The Fifth Circuit is "amenable to [the percentage method's] use, so long as the *Johnson* framework is utilized to ensure that the fee award is reasonable." *Id.* at 643 (citing *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).[13] Thus, when considering fee awards in class action cases "district courts in [the Fifth] Circuit regularly use the percentage method blended with a *Johnson* reasonableness check." *Id.* (internal citations omitted); *see Schwartz v. TXU Corp.*, No. 3:02–CV–2243–K (lead case), 2005 WL 3148350, at *25 (N.D. Tex. Nov. 8, 2005) (collecting cases).[14]

86.      While the BDO Settlement is not a class action settlement, because the settlement is structured as a settlement with the Committee, with a Bar Order and dismissal of the Investor Litigation, this Motion analyzes the award of attorneys' fees to Plaintiffs' Counsel under the law applicable to class action settlements in an abundance of caution. Whether analyzed under the

---

[12]      The common-fund doctrine applies when "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *In re Harmon*, No. 10-33789, 2011 WL 1457236, at *7 (Bankr.S.D. Tex. April 14, 2011) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

[13] The *Johnson* factors are discussed in Subsection C below.

[14] While the Fifth Circuit has also permitted analysis of fee awards under the lodestar method, both the Fifth Circuit and other courts in the Northern District have recognized that the percentage method is the preferred method of many courts. *Dell*, 669 F.3d at 643; *Schwartz*, 2005 WL 3148350, at *25. In *Schwartz*, the court observe that the percentage method is "vastly superior to the lodestar method for a variety of reasons, including the incentive for counsel to 'run up the bill' and the heavy burden that calculation under the lodestar method places upon the court." 2005 WL 3148350, at *25. The court also observed that, because it is calculated based on the number of attorney hours spent on the case, the lodestar method deters early settlement of disputes, such as the settlement in this case. *Id.* Thus, there is a "strong consensus in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery." *Id.* at *26.

<u>**MOTION TO APPROVE SETTLEMENT WITH BDO**</u>                                                                    36

EAST\97590543.2

common fund approach, the *Johnson* framework, or both, the 25 percent fee sought by Plaintiffs'

Counsel pursuant to their fee agreements is reasonable and should be approved by the Court.

87.     The proposed 25% amount is a reasonable percentage of the common fund (i.e.

the $40 million settlement). "The vast majority of Texas federal courts and courts in this District

have awarded fees of 25%–33% in securities class actions." *Schwartz*, 2005 WL 3148350, at *31

(collecting cases). "Indeed, courts throughout this Circuit regularly award fees of 25% and more

often 30% or more of the total recovery under the percentage-of-the recovery method." *Id*.[15]

Combined with the *Johnson* analysis set forth below, the proposed fee award is reasonable and

appropriate under the common fund doctrine as applied in the Fifth Circuit.

## C.     *The Proposed Fee is Reasonable Under the Johnson Factors*

88.     The *Johnson* factors include: (1) time and labor required; (2) novelty and

difficulty of the issues; (3) required skill; (4) whether other employment is precluded; (5) the

customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount

involved and the results obtained; (9) the attorneys' experience, reputation and ability; (10) the

"undesirability" of the case; (11) the nature and length of the professional relationship with the

client; and (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-19. A review of these

factors also reveals that the proposed 25% fee is reasonable and should be approved.

---

[15] As set forth in *Schwartz*, courts in the Northern District have routinely approved such awards. *See, e.g, Southland Secs. Corp. v. INSpire Ins. Solutions, Inc*., No. 4:00–CV–355y (N.D. Tex. Mar. 9, 2005) (Judge Means) (approving fee of 30% fee in securities class action); *Scheiner v. i2 Techs., Inc., et al*., Civil Action No. 3:01–CV–418–H (N.D. Tex. Oct. 1, 2004) (Judge Sanders) (approving fee of 25% of $80 million settlement in securities class action); *Hoeck v. Compusa, Inc. et al*., Civil Action No. 3:98–CV–0998–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee); *In re Firstplus Fin. Group, Inc. Sec. Litig*., Master File No. 3:98–CV–2551–M (N.D. Tex. Oct. 14, 2003) (Judge Lynn) (awarding 30% fee in securities class action); *Warstadt v. Hastings Entm't, Inc., et al*., Civil Action No. 2:00–CV–089–J (N.D. Tex. Mar. 10, 2003) (Judge Robinson) (awarding 30% fee in securities class action); *Silver v. UICI, et al*., No. 3:99CV2860–L (N.D. Tex. Mar 3, 2003) (Judge Lindsay) (awarding 30% fee in securities class action); *In re Unistar Fin. Serv. Corp. Sec. Litig*., No. 3:99–CV–1857–D (N.D. Tex. Aug. 17, 2001) (approving 30% fee in a securities class action); *Kisilenko v. STB Sys., Inc*., No. 3:99–CV–2872–M (N.D. Tex. Nov. 3, 2000) (approving 30% fee in a securities class action).

---

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                      37

EAST\97590543.2

### (1)    Time and Labor Required

89.    As reflected in the Buncher, Snyder, Valdespino and Morgenstern Declarations, Plaintiffs' Counsel invested a tremendous amount of time and labor in this case. Even a cursory review of the Court's docket in all of these cases reveals the immense amount of work that Plaintiffs' counsel have put into the prosecution of all of these lawsuits since 2009. However, the docket and pleadings only reveal the work that is filed with the Court. As discussed further herein, and as the Court is aware, the prosecution of lawsuits of this magnitude and complexity has required a tremendous amount of time and effort to investigate the facts, research the relevant legal issues, coordinate and strategize with counsel and clients regarding the handling of the cases, conduct discovery, prepare the briefs and motions, attempt to negotiate settlements, and prepare cases for summary judgment and/or trial. Plaintiffs' counsel have spent thousands of hours since 2009 in their investigation and prosecution of the lawsuits referenced above, including the Committee and Investor Litigation that are the subject of the settlement.

90.    Plaintiffs' counsel have spent over six years and thousands of hours investigating and pursuing claims against third parties, including the BDO Entities, on behalf of the Stanford Receivership Estate and the Stanford Investors. Neligan Foley has nearly 7,000 hours and over $2.8 million worth of attorney and paralegal time invested in the Stanford lawsuits, including the Committee and Investor Litigation. Neligan Foley was lead counsel among Plaintiffs' Counsel in the Committee and Investor Litigation. Neligan Foley has almost 1,200 hours and over $600,000 of unpaid attorney and paralegal time invested in the Committee and Investor Litigation, alone. *See* Buncher Declaration.  Strasburger & Price also has thousands of hours and millions of dollars of time invested in pursuing claims against third parties related to the Stanford

**APP 0176**

Receivership, and 1,507 hours of attorney and paralegal time worth $818,652 attributable to the BDO litigation. *See* Valdespino Declaration. Castillo Snyder has over $7 million invested in the Stanford cases overall, and 696 hours and $402,430 in time invested in the BDO litigation. *See* Snyder Declaration. Butzel Long has devoted thousands of hours of time worth several million dollars to Stanford-related matters since 2009, and has 78.6 hours of time worth $56,500 invested in the BDO cases alone. *See* Morgenstern Declaration.

91.     The tremendous amount of work required by Plaintiffs' counsel to successfully prosecute the Committee and Investor Litigation against BDO is described in the Buncher, Snyder, Valdespino and Morgenstern Declarations, the billing records accompanying those Declarations, and this Motion [*See, e.g.*, Motion ¶¶ 9-11].

### (2)     Novelty and Difficulty of the Issues

92.     The issues presented in this lawsuit were difficult and complex. Plaintiffs' Counsel's investigation revealed that since 1995, BDO USA was the auditor of the most important businesses of the Stanford empire, including Stanford Group Company ("SGC"), Stanford's NASD registered broker-dealer that marketed and sold the SIBL CDs in the United States, Stanford Trust Company (Louisiana) ("STC"), which Stanford used to sell the CDs to IRA account holders, and Stanford Group Holdings ("SGH"), the holding company that owned both SGC and STC. The investigation revealed that while BDO USA conducted an operational review of Stanford International Bank Ltd. ("SIBL") in the 1990s in an effort to secure business from SIBL, and several BDO partners served on the Stanford Antiguan Task Force that was involved in re-writing the financial regulations of Antigua, BDO USA was not hired for the business it had solicited from SIBL, and BDO USA was never the auditor for SIBL.

**APP 0177**

Investigation further revealed that BDO International, BDO Global, and Brussels Worldwide were foreign affiliates of BDO USA that formulated policies and procedures for BDO member firms worldwide, including BDO USA.

93.     As part of their investigation, Plaintiffs' Counsel conducted a thorough analysis of the potential claims against the BDO Entities, considering: claims available under both state and federal law; the viability of those claims considering the facts underlying the BDO Entities' business dealings with Stanford and this Court's previous rulings; the success of similar claims in other Ponzi scheme cases, both in the Fifth Circuit and elsewhere; as well as defenses raised by the BDO Entities in their motions to dismiss and mediation position papers. The Investor Plaintiffs and the Committee commenced their actions by filing their Original Complaints in this Court on May 26, 2011 (the Investor Litigation) and May 9, 2012 (the Committee Litigation), respectively. Among other claims, Plaintiffs asserted causes of action against the BDO Entities for negligence, aiding and abetting violations of the Texas Securities Act (the "TSA"), aiding and abetting breaches of fiduciary duty, participation in a fraudulent scheme, and conspiracy. These claims raised complicated and novel issues of law and fact and would have required intensive discovery and voluminous briefing had they been litigated, many of which were the subject to the BDO Entities' comprehensive motions to dismiss in the Investor Litigation. The BDO Entities had also stated their intention to file similar motions to dismiss in the Committee Litigation, as well as a motion to compel arbitration, had the Committee Litigation moved forward.

94.     The foregoing summary of the issues identified in Plaintiff's Counsel's investigation of the claims against the BDO Entities, as well as the legal issues raised in the

dismissal pleadings, illustrate the novelty, difficulty and complexity of the issues in the Committee and Investor Litigation and supports the approval of the proposed fee.

### (3)     Skill Required

95.     Given the complexity of the factual and legal issues presented in this case, the preparation, prosecution, and settlement of this case required significant skill and effort on the part of Plaintiffs' Counsel. Plaintiffs' Counsel have represented receivership and bankruptcy estates on numerous occasions, and are currently serving as counsel for both the Receiver, the Committee and other investor plaintiffs, both individually and as representatives of putative classes of Stanford Investors, in multiple other lawsuits pending before the Court. Buncher Decl. ¶¶ 7-9. Plaintiffs submit that the favorable result in this case is indicative of Plaintiff's counsel's skill and expertise in matters of this nature. *Id*. at ¶¶ 1, 4.

### (4)     Whether Other Employment is Precluded

96.     Although participation in the Committee and Investor Litigation did not necessarily preclude Plaintiffs' Counsel from accepting other employment, the sheer amount of time and resources involved in investigating, preparing, and prosecuting the Committee and Investor Litigation, as reflected by the hours invested in the Committee and Investor Litigation and the Stanford case generally, significantly reduced Plaintiffs' Counsel's ability to devote time and effort to other matters.

### (5)     The Customary Fee

97.     The 25% fee requested is substantially below the typical market rate contingency fee percentage of 33% to 40% that most law firms would demand to handle cases of this complexity and magnitude. *See Schwartz*, 2005 WL 3148350, at *31 (collecting cases and noting

**MOTION TO APPROVE SETTLEMENT WITH BDO**                    41

that 30% is standard fee in complex securities cases). In certain instances, including the Committee and Investor Litigation prior to the retention of Neligan Foley, the Committee interviewed other potential counsel who refused to take on the lead counsel role in the Committee and Investor Litigation without a higher percentage fee. Buncher Decl. at ¶ 34. In fact, Plaintiffs' Counsel initially requested a larger percentage in all of the Stanford lawsuits because of the complexity and magnitude of the lawsuits, the length of time that it could take to prosecute the cases to conclusion, the thousands of hours Plaintiffs' counsel would have to invest in these cases, and the risk that there might ultimately be no recovery. *Id*. The Committee and Investor Litigation and the other third-party lawsuits are extraordinarily large and complex, involving voluminous records and electronic data and requiring many years of investigation, discovery and dispositive motions to get to trial. The lawsuits involve significant financial outlay and risk by Plaintiffs' Counsel, the risk of loss at trial after years of work for no compensation, and an almost certain appeal following any victory at trial. Plaintiffs' Counsel submit that these factors warrant a contingency fee of more than 25%. Nonetheless, Plaintiffs' Counsel agreed to handle the Committee and Investor Litigation on a 25% contingency basis, and that percentage is reasonable given the time and effort required to litigate these cases, their complexity and the risks involved.

**(6)      Whether the Fee is Fixed or Contingent**

98.      As set forth above, the fee was contingent upon success against the BDO Entities. As a result, Plaintiffs' counsel bore significant risk in accepting the engagement.

**(7)      Time Limitations**

99.      At the time of the BDO Settlement, Plaintiffs were not subject to significant time

**APP 0180**

limitations in the Committee and Investor Litigation, as the lawsuits were at the dismissal stage. However, had the cases not settled, the BDO Entities intended to compel arbitration of the Committee case [Buncher Decl. at ¶¶ 17-18], and arbitration would have proceeded on a much faster track to a final hearing. However, the class action case would have remained pending before the Court and would likely have taken years to resolve. Furthermore, given the magnitude and complexity of the cases, even if a final arbitration in the Committee Litigation was set a year in the future, Plaintiffs' Counsel would have been under significant time pressure to complete all the investigation and discovery to prepare the case for final hearing within a year.

(8)    **The Amount Involved and Results Obtained**

100.    As discussed further herein, $40 million represents a substantial settlement and value to the receivership. This factor also supports approval of the requested fee.

(9)    **The Attorneys' Experience, Reputation and Ability**

101.    As noted above, Plaintiffs' Counsel have represented numerous receivers, bankruptcy trustees, and other parties in complex litigation matters related to equity receiverships and bankruptcy proceedings similar to the Stanford receivership proceeding. *See* Buncher Decl. ¶¶ 1, 4. See also Snyder, Valdespino and Morgenstern Declarations. Indeed, Plaintiffs' Counsel have been actively engaged in the Stanford proceeding since its inception. Given the complexity of the issues in the Committee and Investor Litigation, Plaintiffs submit that the BDO Settlement is indicative of Plaintiffs' Counsel's ability to obtain a favorable result in such proceedings.

(10)    **The Undesirability of the Case**

102.    The Commercial and Investor Litigation are not undesirable.

<u>**MOTION TO APPROVE SETTLEMENT WITH BDO**</u>                                          43

**(11)    Nature and Length of Professional Relationship with the Client**

103.    As the Court is aware, Plaintiffs' Counsel have represented the Receiver, the Committee, and Investor Plaintiffs in numerous actions pending before the Court since 2009. *See* Buncher Decl. at ¶¶ 6-8. Plaintiffs' counsel has handled all of these cases on the same 25% contingency fee arrangement that has previously been approved by the Court. *See* SEC Action ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement, SEC Action ECF No. 1208, p. 3 (providing a "contingency fee" of twenty-five percent (25%) of any Net Recovery in actions prosecuted by the Committee's designated professionals). This factor also weighs in favor of approval of the requested fee.

**(12)    Awards in Similar Cases**

104.    As noted above, a 25% contingency fee has previously been approved as reasonable by this Court in its order approving the Receiver's agreement with the Committee regarding the joint prosecution of fraudulent transfer and other claims by the Receiver and the Committee (the "OSIC-Receiver Agreement"). *See* SEC Action ECF No. 1267, p. 2 ("The Court finds that the fee arrangement set forth in the Agreement is reasonable."); *see also* OSIC-Receiver Agreement SEC Action ECF No. 1208, Ex. A, p. 3 (providing a "contingency fee" of 25% of any Net Recovery in actions prosecuted by the Committee's designated professionals). The Court's order approving the OSIC-Receiver Agreement also provided that the Committee need not submit a fee application seeking an award of fees consistent with the percentage authorized under the Court's previous order unless required by Rule 23. *See* SEC Action ECF No. 1267, p. 2.

APP 0182

105.    The OSIC-Receiver Agreement further provided that the Committee "would prosecute certain fraudulent transfer claims and other actions for the benefit of Stanford investors/creditors in cooperation with Ralph S. Janvey, as receiver." *See* OSIC-Receiver Agreement, SEC Action ECF No. 1208, Ex. A, p. 1. The Agreement further provided that "this proposal will apply to the litigation of all fraudulent transfer and similar claims that may be brought under common law, statute … or otherwise…" and "unless otherwise agreed, the terms of this agreement will likewise apply to the pursuit of any other claims and causes of action that the Receiver and the Committee determine to jointly pursue." *Id*. at pp. 1-2.

106.    The contingency fee agreements with Plaintiffs in the Committee and Investor Litigation similarly provide for a fee of 25% of the Net Recovery (defined as the total recovery after deducting allowable expenses and disbursements), and were modeled after the OSIC-Receiver Agreement since the parties knew that the Court had already approved a 25% contingency fee agreement.

107.    The 25% contingency fee arrangement that was approved by the Court in the context of the OSIC-Receiver Agreement became the framework for all of the 25% contingency fee agreements that the Committee entered into with Plaintiffs' Counsel in the Committee and Investor Litigation, as well as the twenty-five prevent (25%) contingency fee agreements that the Receiver entered into with Neligan Foley in certain of the other third party lawsuits.

108.    As set forth in *Schwartz*, courts in this district have routinely approved 25%, and more often 30%, fee awards in complex securities class actions. 2005 WL 3148350, at *27 (collecting cases). Under the circumstances of this case, such an award is appropriate here as well.

**MOTION TO APPROVE SETTLEMENT WITH BDO**                                                45

APP 0183

#### D.      *The Proposed Fee Should Be Approved*

109.    For the same reasons the Court previously found the 25% contingency fee OSIC-Receiver Agreement to be reasonable, *see* SEC Action No. 1267, p. 2, the Court should find the 25% contingency fee applicable to the settlement of the Committee and Investor Litigation to be reasonable and approve it for payment. Here, there is even more reason to find the fee to be reasonable than in the fraudulent transfer lawsuit context, as the Committee and Investor Litigation and the other larger third-party cases are extraordinarily more complex, time consuming and risky, involving numerous factual and legal issues and claims when compared to the relatively straight-forward fraudulent transfer claims. The settlement of the Committee and Investor Litigation has yielded an enormous benefit to the Stanford Receivership Estate and the Stanford Investors and is the largest settlement of a third-party lawsuit in the over six-year history of the Stanford receivership. Thus, Plaintiffs submit that an award of attorneys' fees equal to 25% of the net recovery from the BDO Settlement, as requested, is reasonable and appropriate and should be approved under applicable Fifth Circuit law, whether using a common fund approach, the *Johnson* factor approach, or a blended approach.  A proposed form of Order Approving Attorneys' Fees is attached as Exhibit 6 to the Appendix to this Motion.

#### E. Examiner Support for Fee Award

110.    John J. Little in his capacity as Court-appointed Examiner also supports the award of Plaintiffs' attorneys' fees, and requests that the Court approve them.  *See* Declaration of Examiner John J. Little, attached as Exhibit 7 to the Appendix to this Motion.

### V. CONCLUSION & PRAYER

111.    The BDO Settlement represents a substantial and important recovery for the

Receivership Estate and the Stanford Investors. The large amount of the recovery, the time and costs involved in pursuing litigation against the BDO Entities, and the uncertain prospects for obtaining and then recovering a judgment against the BDO Entities, all weigh heavily toward approving the BDO Settlement, entering the Bar Order and approving the attorneys' fees of Plaintiffs' Counsel.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request this Court:

a.  Enter the proposed Scheduling Order providing for notice and a hearing on this Motion;

b.  Grant this Motion;

c.  Approve the BDO Settlement Agreement;

d.  Enter the Bar Order in the SEC Action;

e.  Enter the Judgment and Bar Order in the Committee Litigation;

f.  Approve the attorneys' fees of Plaintiffs' Counsel; and

g.  Grant Plaintiffs all other relief to which they are entitled.

Date:   May 15, 2015.

APP 0185

Respectfully submitted:

**NELIGAN FOLEY, LLP**

By: ___*/s/ Douglas J. Buncher*_____

      Douglas J. Buncher
      dbuncher@neliganlaw.com
      Patrick J. Neligan
      pneligan@neliganlaw.com

      Republic Center
      325 N. St. Paul, Suite 3600
      Dallas, Texas 75201
      Telephone: (214) 840-5320
      Facsimile: (214) 840-5301

**ATTORNEYS FOR RALPH S. JANVEY,
IN HIS CAPACITY AS RECEIVER FOR
THE STANFORD RECEIVERSHIP ESTATE**

**CASTILLO SNYDER, P.C.**

By: ___*/s/ Edward C. Snyder*_____
      Edward C. Snyder
      esnyder@casnlaw.com
      Jesse R. Castillo
      jcastillo@casnlaw.com
      300 Convent Street, Suite 1020
      San Antonio, Texas 78205
      (210) 630-4200
      (210) 630-4210 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: *ureborders /s/ Edward F. Valdespino*_____
      Edward F. Valdespino
      Texas Bar No. 20424700
      edward.valdespino@strasburger.com
      300 Convent Street, Suite 900
      San Antonio, Texas 78205
      Telephone: (210) 250-6000

**APP 0186**

Facsimile: (210) 250-6100

**BUTZEL LONG PC**

By:    */s/ Peter D. Morgenstern*           
         Peter D. Morgenstern (*admitted pro hac vice*)
         morgenstern@butzel.com
         380 Madison Ave
         22nd Floor
         New York, NY 10017
         (212) 818-1110
         (212) 818-0494 (Facsimile)


**ATTORNEYS FOR THE OFFICIAL
STANFORD INVESTORS COMMITTEE**


## CERTIFICATE OF SERVICE

On May 15, 2015, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. All parties who have appeared in this proceeding will be served via ECF. Investors and other interested parties will be served and given notice of the hearing on this Motion as approved by the Court.


         /s/ Douglas J. Buncher               
         Douglas J. Buncher

80802v.12

**APP 0187**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3    RALPH S. JANVEY, et al.,            )
                                          )
 4                  Plaintiffs,           )
                                          )
 5    vs.                                 ) CIVIL ACTION
                                          ) NO.
 6    GREENBERG TRAURIG, LLP, HUNTON &    ) 3:12cv-4641-N
      WILLIAMS, LLP; and YOLANDA          )
 7    SUAREZ,                             )
                                          )
 8                  Defendants.           )

 9

10         --------------------------------------

11           ORAL AND VIDEOTAPED DEPOSITION OF

12                     MARK RUSSELL

13                   December 17, 2015

14         --------------------------------------

15

16        ORAL DEPOSITION of MARK RUSSELL, produced as a

17   witness the instance of the Defendant Greenberg

18   Traurig, and duly sworn, was taken in the above styled

19   and numbered cause on December 17, 2015, from 9:06 a.m.

20   to 3:17 p.m., before Jeff L. Foster, a Certified

21   Shorthand Reporter in and for the State of Texas, at

22   the offices of Baker Botts, LLP, 2001 Ross Avenue,

23   Suite 1100, Dallas, Texas 75201, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record.
```

**GT EXHIBIT 010**

44

 1     Q.    Have estates filed claims for CD losses,

 2   estates of deceased persons?

 3     A.    I believe I've seen that, yes.

 4     Q.    As far as the law of formation or governing

 5   law for estate claims, would your answer be the same,

 6   that is, the receiver hasn't asked for that

 7   information, but you don't know if he might have gotten

 8   it?

 9     A.    I know that if -- if the owner of the account

10   that -- in the database is the one -- if somebody other

11   than the owner of the account in our Temenos/Data Pro

12   database is filing a claim on an account, part of that

13   initial intake review process is to then have them

14   verify ownership that they are the allowed recipient of

15   that account.  So I don't know specifically what

16   information is being provided as part of that

17   verification process.  But, again, it would have been

18   on more of an ad hoc basis as those are filed.  It

19   wasn't part of the initial claims request.

20     Q.    Let's move on to individual claimants where

21   you have the name of Mr. Smith or Mr. Gutierrez.  What

22   information does the receiver have as to the

23   nationality of those claimants?

24     A.    So there's kind of two different primary data

25   pieces that we have.  One, we have the legal mailing

1    address of all the accounts, so that can provide some

2    information.  And then I know in the Temenos database

3    there's actually a field that's -- that's represented

4    to be in the database to be the nationality for the

5    account.  And so that's populated for all the accounts

6    as well.

7        Q.    Do you know when the Temenos field for

8    nationality was created?

9        A.    Like when a customer purchased it when would

10   the nationality field be --

11       Q.    Yes.

12       A.    -- input?  I don't have specific knowledge.

13       Q.    If a person who was -- listed their

14   nationality as, let's say, Venezuela, when they first

15   opened an account a number of years ago, if they have

16   since moved to another country, is that information

17   anywhere in the receiver's database?

18       A.    So the database does track the address for the

19   account, so like the mailing address for the account.

20       Q.    No, I'm not talking about address, I'm talking

21   about nationality.

22              MR. ARLINGTON:  Then I object as vague.

23       A.    I don't know that somebody's nationality would

24   change, though, just because they moved.  I guess I'm

25   not understanding.

Mark Russell                                                                    46

```
 1                    MR. ISRAELOFF:  Let's break for a change
 2    of tape and we'll pick it up here in a moment.
 3                    THE WITNESS:  Okay.
 4                    THE VIDEOGRAPHER:  The time is 10:07.  We
 5    are off the video record.
 6                    (Recess taken.)
 7                    THE VIDEOGRAPHER:  The time is 10:30.  We
 8    are back on the video record, tape number two.
 9         Q.   (BY MR. ISRAELOFF)  Before the break we were
10    talking about what information the receiver has with
11    regard to an individual claimant's nationality.  Let me
12    ask it this way:  If the receiver was asked what
13    nationality a particular claimant has, where would you
14    go to get that information?
15         A.   So there's -- there's two different
16    possibilities I could foresee when we're talking about
17    claimants.  One would be the field that we just
18    discussed in the Temenos/Data Pro database.  There's a
19    field that refers to nationality.  And then also
20    potentially like he could send out a request to the
21    actual claimants with approved claims to request that
22    information kind of as a confirmatory process.
23         Q.   Now, that's something new I haven't heard
24    before.  Where in all of this process is the receiver
25    requiring somebody to answer new requests like what is
```

Mark Russell

47

1   your nationality?  Where is that?

2       A.    So I haven't seen anything where it's been

3   required, but it's more of is it a possibility.  Could

4   he ask that information and could he ask the question?

5   And I think the answer is, yes, but I don't know.  Like

6   in terms of has he ever -- has he asked that question

7   or required that answer before, I don't -- I don't

8   think so.

9       Q.    All right.  Let's stick with the available

10  information as the receiver has it today.

11      A.    Okay.

12      Q.    And I'll ask the question again.  If the

13  receiver was asked today what the nationality of a

14  particular claimant was, would he have that

15  information?

16      A.    He would have the nationality as reflected in

17  the Temenos and Data Pro database.

18      Q.    And you don't know at what point in time that

19  field in the database was filled, right?

20      A.    Yeah, correct.

21      Q.    Do you know what checking -- fact checking, if

22  you will, was made on the field for nationality when it

23  was first entered in the Temenos database?

24      A.    I don't specifically know where that

25  nationality field was coming from from an application

Mark Russell                                                                          48

1    perspective.

2        Q.   Similarly we know, for example, from our named

3    plaintiff, Mr. Troice, he has two citizenships, one in

4    Mexico and one in the United States.  If a claimant

5    like Mr. Troice has two nationalities, which one would

6    be in the receiver's available data?

7        A.   I don't know what would be populated in the

8    nationality field.  I know there's some other fields in

9    the database that refer to like legal document I.D.,

10   identification, that's populated about 80 percent of

11   the time in the database.  I don't know one way or the

12   other whether that would contain additional nationality

13   information or not, though.

14       Q.   Well, which nationality would be contained in

15   the receiver's answer to such a question?

16       A.   I don't know whether that determination has

17   been reached yet.  So I think that would still be up

18   for consideration, a determination the receivership --

19   the receiver would have to make that I don't think he's

20   made yet.

21       Q.   Is the nationality field filled out for a

22   hundred percent of the claim records?

23       A.   The nationality field is filled out a hundred

24   percent in the Temenos database for the accounts, and

25   so since the claims are based on the account numbers,

1    yes.  I had to walk through that in my head to make

2    sure.

3         Q.   Is the nationality field filled out in the

4    database for accounts in the name of entities?

5         A.   It's filled out for all of the accounts.  So

6    to the extent that there's entity accounts and entity

7    clients, then there would be a nationality associated

8    with it, yes.

9         Q.   Do you know what SIBL did, if anything, to

10   check on the declaration of nationality?

11        A.   From a verification standpoint?

12        Q.   Yes.

13        A.   I don't know one way or the other.

14        Q.   If somebody moves and immigrates to another

15   country between the time they open their account and

16   today, is there anything in the receiver's data that

17   would disclose that?

18        A.   So like if they change their citizenship?

19        Q.   Yes.

20        A.   I don't know -- I don't know one way or the

21   other whether that nationality field would be

22   reflective of their new nationality or not.

23        Q.   Related to that question, let me go to the

24   physical location that an individual customer would

25   have had.  Is there anything in the receiver's database

1    which indicates where physically a customer was when

2    they opened an account with Stanford bank?

3         A.   So what we have available is the mailing and

4    legal address that were provided for that account

5    opening.

6         Q.   I don't know if that answered my question or

7    not.  Do you have any data that says customer A was

8    physically in Venezuela when they opened their account

9    as opposed to where their mailing address might be?

10        A.   I don't believe so.  Like at a point in time

11   when they actually were signing the document where were

12   they physically standing?  I don't think that that

13   would be a record that's in the database.

14        Q.   Similarly does the receiver have any records

15   indicating where the customer was when they were given

16   the sales pitch typically by a financial advisor?

17        A.   Specifically where they were?

18        Q.   Yes.

19        A.   Unless it's somewhere like in an e-mail

20   somewhere, not -- not documented as like a field in the

21   database, no.

22        Q.   Okay.  You are aware, are you not, that some

23   customers who live in a particular country,

24   particularly Latin America, might have a different

25   mailing address either of a family member or relative

1    in another country?  You're aware of that, aren't you?

2              MR. ARLINGTON:  Objection, vague.

3         A.   I don't have any specific knowledge of that in

4    this -- in this case one way or the other.  It wouldn't

5    surprise me, though.

6         Q.   (BY MR. ISRAELOFF)  All right.  Let's return

7    to the previous question asking you to outline the

8    steps in the process of determining a claim.  I think

9    we left off with grouping claims into the groups.  What

10   is the next step after the receiver receives claims,

11   checks them out to make sure they're complete and then

12   decides how to group them?  What's the next step?

13        A.   So once the claims are grouped, the claim

14   groups that are ready are then run through the claims

15   calculation, so it's a query that determines the net

16   position of the group.  So total money in, total money

17   out, what's its net position.

18              And so it's going to come up with an

19   amount that this is the net position per our query.

20   Once the query amount is determined, it's compared to

21   the aggregate amount being claimed by the claims in

22   that group, so we're comparing what's our determination

23   of the claim versus what the claim group is claimed in

24   total.

25              To the extent that they match, we would

1   then say your allowable amount is what our query has

2   produced.   To the extent that they're claiming

3   something less than what we've calculated, we would

4   then allow the amount that they've claimed.   To the

5   extent that our claim calculation is less than what

6   they've claimed, depending upon the difference between

7   the two, it would go to different levels of review.

8                  So if it's just a small difference, I

9   think like a hundred thousand or less, it would

10  automatically be allowed based on our calculation.   I

11  believe if it was between hundred thousand and 250,000,

12  it would go through kind of a review from Gilardi, the

13  receivership staff and then FTI if needed.   Generally

14  it's looking to see if there's any -- anything obvious

15  that we may need to adjust for or just look into more

16  in depth.   Generally those are all going to be allowed

17  at the calculation amount.

18                  And then if it had like a 250,000 or more

19  variance between what was being calculated and what was

20  being claimed it would go through all levels of review,

21  both Gilardi's initial, the receivership personnel and

22  FTI.   And then the allowed amount again would end up

23  being the amount calculated by our query.

24      Q.   Have you actually seen instances in which a

25  claimant requests less money than the receiver shows in

```
 1    its money in/money out calculation?

 2         A.    That has occurred.

 3         Q.    Do you know any examples of why that would be

 4    the case?

 5         A.    Not off the top of my head.  I don't -- I

 6    don't remember.

 7         Q.    If the amount that somebody is claiming

 8    exceeds your calculation, money in versus money out,

 9    and the excess of the claim is up to a hundred thousand

10    dollars greater, that claim is allowed?

11         A.    The claim is allowed.  The allowable amount is

12    the amount calculated by our query.

13         Q.    Then what makes any difference if it's a

14    hundred thousand dollars over or under?  You're only

15    going to allow the same amount for every one of these

16    categories?

17         A.    It just determines -- it -- my understanding

18    is the receivership -- the receiver made kind of a cost

19    benefit determination that anything that has a variance

20    below -- within this dollar range we're not going to do

21    any additional review on, we're going to go with our

22    query calculation and then rely on the objections

23    process to do any additional review for claimants that

24    object to our determination.

25                   But the amounts that had higher variances
```

1    we wanted to do at least an additional -- some

2    additional manual review to make sure that everything

3    was working the way that we expected it to before

4    issuing our allowable amount on the calculated amount.

5                    MR. JIMENEZ-EKMAN:   I apologize.   Can I

6    have the question and answer back?

7                    (Record read.)

8                    MR. JIMENEZ-EKMAN:   Thank you.

9    Q.   (BY MR. ISRAELOFF)   Does that mean the

10   receiver will not do any further manual review if the

11   amount claimed is less than a hundred thousand dollars

12   more than the calculated amount?

13   A.   It means we'd only do additional review if the

14   claimant objected to our claimed amount and provided us

15   like information that alloyed us to do more review.

16   But we wouldn't do it without an objection.

17        Q.   Now, we all understand that some of the

18   Stanford International Bank financial records were

19   simply fraudulent, right?

20        A.   Correct.

21        Q.   That's why Mr. Stanford is now in prison.

22   What, if anything, has the receiver done to determine

23   if the claims information in the Temenos database is

24   real or if it contains some fraudulent content?

25        A.   So as part of -- not specific to the claims

Mark Russell                                                                    63

1     A.    So for the automatic rollovers where it's the

2     same CD account, there's actually -- within the SIB CD

3     databases, Temenos and Data Pro, there are renewal or

4     rollover transactions, so you can see the point in time

5     when a CD rolls over.  There's actually a transaction

6     for that in the underlying detail.

7     Q.    Does the receiver's records indicate in

8     connection with these rollover transactions whether the

9     customer had discussions with their broker or financial

10    advisor or simply stayed quiet and let the CD

11    automatically roll over?

12    A.    So the receivership's records in general, that

13    level of discussion potentially could be in the client

14    files and/or e-mail with their brokers.  But the

15    underlying SIBL database itself is not going to keep a

16    record of that one way or the other.

17    Q.    Well, have you ever seen such a piece of

18    information in a client file?

19    A.    I know I've seen discussions regarding

20    renewal.  I could not give you a specific instance.

21    Just over the last seven years I vaguely remember

22    seeing that in an e-mail or document before.  But I

23    don't -- I don't -- I couldn't tell you specifically

24    which one or who.

25    Q.    So you're not able to really say one way or

1    the other, are you, that for each renewal transaction

2    the receiver would be able to say if the customer had a

3    discussion with their financial advisor or simply

4    stayed quiet and let the automatic renewal take place?

5         A.    As I sit here today, I don't know whether we'd

6    be able to say that or not.

7         Q.    More broadly, does the receiver have any

8    information to indicate for each rollover why the

9    customer allowed the CD to be rolled over as opposed to

10   cashed in?

11        A.    Again, I think it would be the same as the

12   previous question.  The databases aren't going to

13   contain anything.  That information may be available in

14   other types of records, but I don't know whether or not

15   it would exist for every single instance of a rollover

16   or not.

17        Q.    For those CD accounts where the records show

18   rollovers, was there anything significant in the nature

19   of that investment or did it stay essentially the same

20   kind of investment?

21        A.    I'm trying -- the only thing that potentially

22   could have changed is it may have gotten a new interest

23   rate on the current interest rates whenever it rolled

24   over.  But other than that, it would have stayed the

25   same.  From a transactional perspective, all you see is

1    the interest being now rolled into principal so it has

2    a new principal amount transactionally.

3         Q.   Do you know whether any of the CD customers

4    considered whether some other investment might be more

5    desirable when the time came for a CD to mature?

6         A.   I don't know what they -- what they would have

7    been thinking.  So unless they've documented it in

8    something that would be in their client file, we

9    wouldn't have a way of knowing what the investors were

10   thinking themselves.

11        Q.   Does the Temenos database include CD accounts

12   that were already in existence when the Temenos

13   database began?

14        A.   And when you say "Temenos," you mean Temenos

15   and Data Pro?

16        Q.   And Data Pro.

17        A.   Yes.  So our data starts in August of 2003, so

18   there's some accounts that begin in our data with a

19   principal and interest balance.

20        Q.   Does the data show when the original CD

21   account began or how it was funded?

22        A.   It does not.

23        Q.   What do you do in those situations?

24        A.   So for purposes of the receiver calculating

25   the allowable amounts and calculating their net

Mark Russell

```
1    that would be helpful.

2         A.    Yeah.

3         Q.    Let's start with paragraph five, if we could.

4         A.    Okay.

5         Q.    In paragraph five the first sentence states

6    that, "FTI has not been specifically retained to

7    determine the damages methodology in this case as of

8    the date of the declaration."  Has it been retained to

9    do that through today?

10        A.    No.

11        Q.    Do you know what damages methodology is going

12   to be used in this lawsuit?

13        A.    Not specifically yet, no.

14        Q.    Then I have to say I've never before come

15   across a witness who says in a sworn statement I don't

16   know what the damages methodology is, but I have the

17   ability and receivership data necessary to do such a

18   calculation.

19        A.    Uh-huh.

20        Q.    And yet that's what paragraph five says,

21   doesn't it?

22        A.    It does.

23        Q.    Can you explain that a little bit more?

24        A.    So the purpose of the statement is to

25   basically say a damages methodology will be
```

Mark Russell

77

1    established.  That damages methodology will have

2    different factors that may or may not need to place

3    limits on the data.  It may or may not need to treat

4    certain transactions different ways depending upon what

5    the expert says.

6                But what it's basically saying is that

7    the people at FTI have the ability to take what those

8    assumptions are and those determinations are that that

9    damages -- that damages expert says we need to place

10   these types of limits and filters on our data.  We can

11   then take that information and apply it to the data we

12   have and filter it to calculate the damage -- the

13   damage amount in the manner that he has instructed us

14   to.

15       Q.   Okay.  I think I see where you're headed.

16   What you're really saying in paragraph five is that if

17   the damages methodology requires some sort of

18   calculations of the data that is available to the

19   receiver, then it can be done.  Is that -- is that

20   fair?

21       A.   And if it requires us to obtain information

22   that we may not have that we could then limit our

23   damages calculation on how much of that information

24   we're able to subsequently get.

25       Q.   Well, that's a little different.

1   five really says that in a shorter form, doesn't it?

2   It says, "Further, FTI has the ability and receivership

3   data necessary to perform the calculation of damages

4   once the damages methodology is determined," and that's

5   not completely accurate, is it?

6       A.   I would agree with you that in terms of what

7   we were just discussing.  There may be a potential need

8   to request more information from the claimants, yes.

9       Q.   Without knowing what the damages methodology

10  is or is going to be, you don't know if the receiver

11  has receivership data necessary to perform the

12  calculation today, do you?

13      A.   I would agree with that --

14      Q.   Okay.

15      A.   -- as we sit here today, yeah.

16      Q.   Let's go to paragraph six.  You've started

17  putting in some numbers.

18      A.   Uh-huh.

19      Q.   What did you do to generate these numbers in

20  paragraph six?

21      A.   Okay.  So for the first piece -- so the

22  $4.7 billion that was deposited in the SIBL accounts,

23  what we did is we performed a query on the Temenos and

24  Data Pro transaction information to identify money and

25  transactions that were specific to wire deposits and

1      Q.    Thank you.  Does the same answer really

2  fall -- does the same answer really apply to request

3  actually from one all the way down to number seven?

4      A.    Yes, except for four and six.  To redo those

5  numbers you'd also need information related to claim

6  groups and the client IDs in those claim groups from

7  the claims database.

8      Q.    Okay.  Let's turn, if you would, please, to

9  request number eight.

10     A.    Okay.

11     Q.    Does the receiver have documents sufficient to

12  show when each putative class member purchased their

13  CDs, including the date and dollar amount of each

14  CD purchase?

15     A.    I think it would -- I think it's going to

16  ultimately -- that depends on what the actual class is

17  determined to be.  So as we discussed earlier, like we

18  know that there's information that doesn't exist prior

19  to August of 2003.  So for -- if those individuals are

20  determined to need to be in the putative class, then we

21  wouldn't have information on when their specific CDs

22  were purchased.

23          What we do have is for the transaction

24  information that we had from August forward we know the

25  dates of money coming in as well as the dates when --

Mark Russell                                                                              148

1    step back for a second.

2              You understand that the claims process

3    that the receiver has decided upon does not necessarily

4    reflect what the damages measure against any particular

5    defendant might be, correct?

6         A.    Yes, I do.

7         Q.    Okay.

8         A.    Yes.

9         Q.    So, for example, you might need to know when

10   purchases were made depending on the legal theory for a

11   particular plaintiff against a particular defendant,

12   right?

13        A.    Potentially, yes.

14        Q.    Okay.  In any case, as far as you know, the

15   pre 2003 information has not been collected by anybody

16   in the United States --

17        A.    Correct.

18        Q.    -- as opposed to the joint liquidators?

19        A.    Correct.

20        Q.    And when you went down there, did they

21   indicate whether they even still had the hardware and

22   the software to fire these things up?

23        A.    I don't think it was discussed one way or the

24   other.

25        Q.    Okay.

Mark Russell

```
1        A.    I was.
2        Q.    Okay.  So I'll ask a pointed question, then.
3   If it were your personal money that was at issue, would
4   you consider the SIBL database to be reliable enough to
5   rely on for the distribution of that money?
6        A.    You know, considering the additional costs it
7   would take to kind of augment our missing information,
8   you know, personally I kind of think I kind of fall
9   with where the receiver is, that that additional
10  expense doesn't make sense from a claims perspective.
11  It may cost more to do that than kind of in the
12  aggregate it's going to benefit the claimants, like
13  just as a whole.
14       Q.    I appreciate that answer from a systemic
15  perspective, but my question was a little bit
16  different.  It was if it was your money at stake, --
17       A.    Uh-huh.
18       Q.    -- is the database reliable enough to rely on
19  to figure out who gets what?
20             MR. ARLINGTON:  Objection, overbroad and
21  vague.
22       A.    I think it's reliable enough to do what the
23  receivership needs to do.  I think if it was -- if I
24  was a claimant, then depending upon whatever that
25  answer came out for me, then I may or may not object
```

Mark Russell

1    depending upon what the answer was.

2        Q.   (BY MR. JIMENEZ-EKMAN)   And why do you think

3    it's reliable enough to do what the receiver needs to

4    do?

5        A.   Because it's providing sufficient information

6    to allow the receivership to calculate the position

7    based on his determination of how to do that

8    calculation.

9        Q.   But we've already talked about he's only using

10   two pieces of data, unless there's an objection, what

11   the claimant provides and the SIBL database, right?

12       A.   Correct.

13       Q.   So the claimant -- you know, there's --

14   there's no way to check -- well, let me step back.

15            Unless there's an objection or some

16   problem nobody is independently investigating the truth

17   or falsity of anything that's on these claim forms or

18   electronic forms, right?

19            MR. ARLINGTON:   Objection, you're

20   mischaracterizing his testimony.

21       A.   I mean, my understanding, you know, the one

22   thing that they do do is they do verify that the person

23   making the claim does own the account that they're

24   claiming.

25       Q.   (BY MR. JIMENEZ-EKMAN)   Based on the SIBL

1    instances where an account just all of a sudden appears

2    like with a balance at 12-31-2006.  So we treat the

3    balance and the principal for those accounts similarly

4    that we do for the '03.  That gets treated as what we

5    call an initial balance and it's treated as money in.

6              Additionally then we have the actual cash

7    transfers that you're referring to, so like deposits of

8    checks, deposits of wire transfers that are coming in

9    to the accounts.  Those get treated as money in.

10             There's also situations where two

11   unrelated investors may transfer money amongst

12   themselves.  So money going from me to David per se

13   would be treated as if I took money out and he got

14   money in.  So when we're trying to calculate his

15   position, he received the benefit of money from me

16   that -- and we're unrelated people.  So for his purpose

17   that would be money in.

18       Q.   How common are those transactions?

19       A.   I don't have a count, to be honest with you.

20   It's something we could derive at, because our query

21   allows us to identify them.  I don't remember offhand

22   like how pervasive it would be across the groups.

23       Q.   How many -- sorry.  How many CD accounts

24   existed as of August 2003 in the Temenos database?

25       A.   I'm trying to remember what -- because I know

1    we did this.  I'm trying to remember what the numbers

2    are.  I know that there's about -- and I cannot

3    remember the counts, but I know the dollar amount.

4    There was about $1.6 billion worth of principal balance

5    at that point in time.  Roughly 900 million of that is

6    in groups that are in like -- or accounts that are in

7    groups that have -- that are a part of the claims

8    process.  And then the other 7, 750 million are on

9    accounts that have never been claimed as part of the

10   receivership claims process.

11        Q.   Sorry, I'm jumping around a little bit here,

12   but that's what happens with cleanup people sometimes.

13        A.   That's fine.

14        Q.   If -- so if we go back to the ability to

15   calculate --

16        A.   Uh-huh.

17        Q.   -- damages and what you've said in your

18   declaration, we've talked about date restrictions,

19   right?

20        A.   Uh-huh.

21        Q.   And we've talked about as an output the

22   money -- the net money in/money out calculation,

23   correct?

24        A.   Correct.

25        Q.   As you sit here based on your knowledge of the

1    Q.   (BY MR. JIMENEZ-EKMAN)   As scintillating as

2    this has been -- and I may be confusing it as well.

3    A.   Yeah.

4    Q.   So people -- it's from your description -- I

5    did hear this today, that there are objections to the

6    grouping from time to time.

7    A.   Correct.  Yeah.  There's a process that allows

8    the claimants to object to our determinations.  Some of

9    those objections are on how we've chosen to group their

10   accounts together.

11   Q.   And have those objections been related in any

12   way to the quality of the data or is there some other

13   reason that you've received a large number of

14   objections about a grouping?

15   A.   So a lot of times like what we're getting from

16   a grouping perspective is -- is a lot of it relates to

17   our net winner/loser -- or preset winner/loser

18   analysis.  So in that analysis we -- a lot of times we

19   would end up grouping family members together, because

20   a lot of it was driven by not just client I.D., but are

21   people transferring accounts between each other so it

22   looks like these people are related.  Do they have

23   similar last names?  Do they live at the same address?

24   So there was a more manual kind of grouping review done

25   during that process.  And so in the claims review a lot

1    of what we see is we may have grouped somebody in that

2    process, they ended up not being a net winner, so we

3    don't pursue any litigation with them.  They kind of

4    stay in that group and what we'll get is an objection

5    where they'll say, hey, this is really -- you know,

6    this is a mom, a dad, a son, a sister and a brother.

7    You've grouped all -- you know, all of our client IDs

8    together because we've got a common address, but we

9    really should be looked at separately.

10                And then the receiver has gone in and

11   sometimes they've agreed and said, okay, yes, all of

12   your accounts are distinct, they don't transfer with

13   each other.  Like everybody kind of looks like they

14   really do have their own distinctive activity, and then

15   we'll split the groups up and then recalculate each one

16   independently.

17       Q.    And that's a judgment made by FTI at the

18   direction of the receiver?

19       A.    The decision to ungroup or --

20       Q.    Yes.

21       A.    -- the original grouping decision?

22       Q.    Either one, both.

23       A.    So FTI is not making the decision to ungroup.

24   The receiver is making that decision.  I would say that

25   the grouping decision initially under the net

1    winner/loser process was based on decisions and

2    direction received from the receiver on -- on this is

3    how we're going to group and assess for a net

4    winner/loser perspective.

5        Q.   Sim asked you some questions about claim

6    transfers.  Do you remember those generally?

7        A.   (Witness nods head.)

8        Q.   And so some of the transferees asked for

9    acknowledgment of the transfer?

10       A.   I know that some do.  I don't know if everyone

11   does.

12       Q.   Is FTI or the receiver doing anything to keep

13   track of these aggregators and how much they've

14   aggregated at this point?

15       A.   I don't know if they're doing it -- I don't

16   know one way or the other -- I don't know way or the

17   other whether they're doing it by each claim purchaser.

18   I know that the receiver keeps track of the claims that

19   have been transferred.  And so then they would also

20   know who they were transferred to.  And so you could

21   get to that.  I just don't know if that's being kept

22   separately.  I do know we know the total at any given

23   point.  We know these are the claim groups that have

24   been transferred, this is their allowed claim amount,

25   and this is the number of claims and claim groups that

Samuel Troice                                                                    1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4

5    RALPH S. JANVEY, ET AL.,    *
                                 *
6          Plaintiffs,           *
                                 *
7    VS.                         *    CIVIL ACTION NO.
                                 *      3:12cv4641-N
8    GREENBERG TRAURIG, LLP;     *
     HUNTON & WILLIAMS, LLP; AND*
9    YOLANDA SUAREZ,             *
                                 *
10         Defendants.           *

11              ************************************
                  ORAL AND VIDEOTAPED DEPOSITION OF
12                        SAMUEL TROICE
                        DECEMBER 14, 2015
13              ************************************

14                      ORAL AND VIDEOTAPED DEPOSITION of

15   SAMUEL TROICE, produced as a witness at the instance of

16   the Defendants Greenberg Traurig, LLP, and Hunton &

17   Williams, LLP, and duly sworn, was taken in the

18   above-styled and numbered cause on the 14th day of

19   December, 2015, from 8:36 a.m. to 11:12 a.m., before

20   Brenda R. Gardner, CSR in and for the State of Texas,

21   reported by machine shorthand, at the offices of

22   Strasburger & Price, LLP, 901 Main Street, Suite 4400,

23   in the City of Dallas, Dallas County, Texas, pursuant

24   to the Federal Rules and the provisions stated on the

25   record or attached hereto.

GT
EXHIBIT 011

```
 1   customer service they have, because it's very easy to

 2   do different operations.  I mean, the investments, they

 3   will be much easier.  It was much easier -- it was

 4   easier -- it was like a smaller bank.  And they -- and,

 5   also, the percentage, they were paying 1 percent more.

 6   It was not that much more, but it was very easy to work

 7   with them.

 8        Q.   After Stanford collapsed, you submitted a

 9   claim to the U.S. receiver; is that right?

10        A.   Yes.

11                  (Deposition Exhibit 1 marked.)

12                  MS. BISHOP:  Let the record reflect I

13   am showing the witness what's been marked Defendants'

14   Exhibit 1.

15        Q.   (BY MS. BISHOP)  Mr. Troice, do you

16   recognize this document?

17        A.   Yes.

18        Q.   What is this?

19        A.   I'm showing here, I am presenting here my

20   numbers, my CD numbers, the amount, the lost amount,

21   and that's when I am stating everything relating to the

22   lawsuit.

23        Q.   And this document is titled Notice of

24   Determination; is that right?

25        A.   Yes.
```

Samuel Troice

```
 1        Q.    And it's dated February 22nd, 2013?
 2        A.    Yes.
 3        Q.    And if you will flip to the second page,
 4   which is labeled P6, the fifth column states "Allowed
 5   Claim Amount."  And do you see the amount there?
 6        A.    Yes.
 7        Q.    And after you received this notice of
 8   determination, did you file any sort of objection with
 9   the receiver?
10        A.    Yes.
11        Q.    What was that objection?
12        A.    The difference between the claim amount and
13   the amount that they state in there.
14        Q.    Did the receiver respond to your objection?
15        A.    I don't remember his answer, but I know that
16   the amount they state was the one that is on the fifth
17   column.
18              (Deposition Exhibit 2 marked.)
19              MS. BISHOP:  Let the record reflect I
20   am handing the witness what's been marked Defendants'
21   Exhibit 2.
22        Q.    (BY MS. BISHOP)  Mr. Troice, do you
23   recognize this document?
24        A.    Yes.
25        Q.    And what is this?
```

Samuel Troice                                                                              26

1          A.     It is a second claim where the names of my

2    sister have been removed, and then the amount goes

3    down, because for any problem and mistake, they had

4    included --

5                    THE INTERPRETER:   I'm sorry.

6          A.     -- they had included my sister's amounts of

7    my sister's accounts.

8          Q.     (BY MS. BISHOP)  Did you ask the receiver to

9    take out your sister's accounts?

10         A.     Yes.

11         Q.     And have you received any additional letters

12   from the receiver since this notice of determination?

13         A.     No.

14         Q.     Have you filed any objections to this notice

15   of determination?

16         A.     From this second one, no.

17         Q.     Do you plan to file any objections?

18         A.     No.

19         Q.     Why not?

20         A.     Because the amount that is stated there is,

21   more or less, correct after removing the amounts of my

22   sister's.

23                    (Deposition Exhibit 3 marked.)

24                    MS. BISHOP:  Let the record reflect I

25   am handing the witness what's been marked Defendants'

```
 1    Exhibit 3.

 2         Q.    (BY MS. BISHOP)   Do you recognize this

 3    document?

 4         A.    Yes.

 5         Q.    And what is this?

 6         A.    This is the amount that has been claimed;

 7    it's a liquidation.

 8         Q.    And this is addressed to Lois S.?

 9         A.    Yes.

10         Q.    Who is that?

11         A.    Lois is my wife.

12         Q.    The address on this is in San Antonio,

13    Texas.   Do you know why that address is used as a

14    mailing address?

15         A.    Uh-huh.   Yes.

16         Q.    Why?

17         A.    This is my lawyer's office.

18         Q.    And do you see on the second line of the

19    letter, it states an allowed claim amount?

20         A.    Yes.

21         Q.    And that amount is $1,610,940?

22         A.    Yes.

23         Q.    And if you will take a look at Exhibit 2 and

24    compare that number with the allowed claim amount in

25    column 5, --
```

```
 1    from Stanford, yes, that made me do my investment.
 2         Q.    Would you have made your investment if you
 3    had not received brochures?
 4                   THE INTERPRETER:  Just one thing.
 5                   MR. SNYDER:  That is "insurance."
 6                   THE INTERPRETER:  "Insurance," okay.
 7         A.    All the brochures, plus all the letters
 8    with -- stating, you know, that it have been insured,
 9    yes.
10         Q.    (BY MR. ISRAELOFF)  If I understand what you
11    are saying, the things that motivated you to make this
12    investment were all the brochures, the insurance
13    letters, including a letter from Lloyd's of London, and
14    the information you got from Mr. Nanes.  Is that what
15    motivated you to make this investment?
16         A.    Plus the fast service that was offered.
17                   MR. ISRAELOFF:  Say again?
18                   THE INTERPRETER:  Plus the -- the
19    service that had been offered.
20                   (Reporter clarification.)
21         Q.    (BY MR. ISRAELOFF)  So all of those things
22    together is what motivated you to buy the Stanford CDs?
23         A.    Yes.
24         Q.    What are your feelings towards Mr. Nanes
25    today?
```

1        A.      I didn't know that it was since that date.

2   I would have not made any investments.  I learned about

3   this -- I learned that they were under investigation

4   when everything came out.

5        Q.      Do you now know that the SEC had concerns

6   about Stanford International Bank since the year 1997?

7        A.      I didn't know about the date, but now I

8   learned that it has been a while.

9        Q.      Do you understand that in all those years,

10  the SEC took no action to close down Stanford

11  International Bank?

12       A.      Yes, I did learn about it.

13       Q.      If you were allowed to sue the SEC for the

14  Stanford problems, would you do that?

15       A.      If I could, if I had the documents and --

16  and I would see a possibility to win, possible.

17       Q.      Let me ask you about "rollovers."  Do you

18  understand what that term means?

19       A.      Not exactly.

20       Q.      The CDs you purchased from Stanford, do you

21  understand that when they matured, if you did nothing,

22  they would automatically roll over into a new CD?

23       A.      Yes.

24       Q.      Is that something that you used, that is,

25  automatic rollovers?

Samuel Troice

1    A.    "Rollover," like to renew?

2    Q.    Yes.

3    A.    Yes.

4    Q.    A number of your Stanford CDs were

5    automatically renewed, were they not?

6    A.    Yes.

7    Q.    Why did you allow your CDs to roll over and

8    renew?

9    A.    Number one, because the money that I had

10   there was for one specific need, and I didn't need it

11   in that moment.

12   Q.    What was the specific need?

13   A.    Medical expenses for my daughter.

14   Q.    Was it your plan to let each CD

15   automatically renew until you needed the money for your

16   daughter's medical care?

17   A.    Yes.

18   Q.    Each time one of your CDs automatically

19   renewed, did it renew as another CD?

20   A.    Let me explain it with -- you know, a little

21   bit longer.  Okay.  I did my investment in Stanford,

22   okay.  The movements that they will do about the CDs --

23   there was a movement with the CDs with different

24   accounts.  Okay.  The CDs will go -- the money will go

25   to one CD, and then they will move it into another

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SAMUEL TROICE, | § | |
| HORACIO MENDEZ, | § | |
| ANNALISA MENDEZ, | § | |
| PUNGA PUNGA FINANCIAL, LTD. | § | |
| individually and on behalf of a class | § | |
| of all others similarly situated | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:09-cv-01600-F |
| | § | |
| PROSKAUER ROSE, LLP, | § | |
| THOMAS V. SJOBLOM, | § | |
| P. MAURICIO ALVARADO, and | § | |
| CHADBOURNE & PARKE, LLP | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

NOW COME PLAINTIFFS, SAMUEL TROICE, HORACIO MENDEZ, ANNALISA MENDEZ, and PUNGA PUNGA FINANCIAL, LTD., individually and on behalf of a class of all others similarly situated, (collectively hereinafter "Plaintiffs"), and file this their Second Amended Class Action Complaint against Defendants, PROSKAUER ROSE, LLP, THOMAS V. SJOBLOM, P. MAURICIO ALVARADO and CHADBOURNE & PARKE, LLP (collectively hereinafter "Defendants"), and in support thereof would show the Court the following:

## I.    PREFACE

### 1.

This putative class action is filed in representation of a putative class of defrauded investor clients of Houston, Texas-based Stanford Financial Group ("Stanford Financial"). This action has been filed in this Court because it is related to Civil Action No. 309-CV-0298, *Securities &*

---

GT
EXHIBIT 012
APP 0222

high risk assets worldwide – the very definition of an investment company. As such, in reality Stanford Financial was operating as a type of unregistered mutual or hedge fund and selling "shares" or participation interests to Plaintiffs and others from, by and through Houston, Texas.

40.

Any former SEC lawyer, especially one like Sjoblom with 20 years experience in enforcement, could see that Stanford Financial was operating an unlicensed, unregulated mutual or hedge fund directly in and from the United States. Indeed the SEC, in its July 21, 2005 investigatory referral letter to FINRA, concluded that Stanford was running an investment company and selling "shares" or participation interests in said investment company to unwitting investors. More recently, in its Complaint against Stanford and his entities, the SEC has alleged that SIB and SGC violated §7(d) of the Investment Company Act. Neither Stanford Financial nor SIB were registered or authorized to operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs or the Class, who were consistently and uniformly told verbally and via the Stanford Financial promotional materials that SIB was part and parcel of the Stanford Financial group based in Houston, Texas, authorized and regulated by the SEC and FINRA and backed by SIPC and Lloyd's of London insurance coverage. Nor were Plaintiffs ever told that Stanford Financial was engaged in a massive Ponzi scheme conspiracy that included, as a central component, evading and obstructing regulation and enforcement in the U.S. and Antigua.

41.

Besides the fraud committed on Plaintiffs and the Class based on the marketing of Stanford Financial and SIB as being one and the same and completely regulated, Stanford Financial also touted the high liquidity of SIB's investment portfolio. For example, in its marketing materials, Stanford Financial emphasized the importance of the liquidity of the SIB CD, stating, under the

heading "Depositor Security," that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors" and that the bank's assets are "invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks." Likewise, Stanford Financial trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients…" To ensure that depositors could redeem their CDs, Stanford, through its brokers and advisers, assured the investor clients that SIB's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice. But in fact, nearly 80% of SIB's investments were concentrated in high-risk, illiquid categories: (1) unsecured loans to Allen Stanford in the amount of $1.6 billion; (2) private equity and (3) real estate. None of that was ever disclosed to Plaintiffs or the Class.

42.

Contrary to Stanford Financial's representations (both verbal and via the promotional materials) to Plaintiffs and the Class regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the bank's portfolio were misappropriated by SIB's sole shareholder, Allen Stanford, and used by him to acquire private equity and real estate. In fact, at year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to Mr. Stanford; (ii) private equity; and (iii) over-valued real estate. By February 2009, Mr. Stanford had misappropriated at least $1.6 billion of investor money through bogus personal loans and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled solely by himself, including massive investments in real estate and other private business ventures in Antigua. The rest of the money

selling unregistered securities by, from and through Houston, Texas; (4) that their money invested in

SIB was not invested in safe secure and liquid instruments; and (5) that 80% of SIB's assets were

invested in illiquid, high risk investments that included an unsecured $1.6 billion loan to Allen Stanford;

(6) SIB was not regulated or supervised by the Antiguan Government and was only audited by a one

man "mom and pop" audit shop under the control of Allen Stanford; and (6) that Stanford Financial

(assisted by Defendants and others) was perpetuating a massive Ponzi scheme by, *inter alia*, engaging in

conduct designed to evade regulation in various countries, including by the SEC, and was actively

engaged in efforts to thwart SEC investigations of Stanford Financial and SIB from 2005 through

February 2009.

88.

Based on the representations and omissions of material fact made to Plaintiffs repeatedly and

uniformly over the years, both in person by Stanford Financial sales representatives and via Stanford

Financial promotional materials, Plaintiffs decided to, and did, invest money in, and maintain

investments in, the SIB CDs.

## VIII.  PLAINTIFF CLASS

89.

Plaintiffs are persons who in many cases, invested their life savings and retirement funds

with Stanford Financial (through SIB) because they considered Stanford Financial a safe investment

company because it was allegedly "based" in the United States and therefore subject to U.S. laws

and regulations. In reliance on Stanford Financial's fraudulently crafted "image" as a Texas-based

financial services group, and in further reliance on the illusion of safety and security, Plaintiffs and

the Class transferred billions of dollars to Stanford for investment in SIB.

90.

Throughout this time period, and up until the SEC intervention into Stanford Financial in February 2009, Plaintiffs continued to receive monthly account statements from Stanford showing that their money had been invested in the SIB CDs and were in fact profitable. At no time were Plaintiffs ever advised that Stanford Financial had invested their money in risky, "illiquid" ventures similar to a hedge fund; that SIB had no real insurance that would protect Plaintiffs' investments; that the only "oversight" SIB was subjected to was a one man "mom and pop" audit firm in Antigua that was completely dominated by Stanford; and that people like Defendants and Leroy King were complicit in protecting and insulating Stanford from regulatory scrutiny. Instead, and lacking the type of information that might be gained from a full regulatory disclosure, Plaintiffs were led to believe by Stanford Financial that an investment in SIB was safer than any other investment in the market. Now Plaintiffs stand to lose all of their investments.

## IX.     CLASS ALLEGATIONS

91.

Plaintiffs request this case be certified as a class action pursuant to FRCP 23. Thousands of investors have money invested with Stanford Financial through SIB. The number of affected investors are so numerous that joinder of all members is impracticable. There are common questions of law and fact that are common to the class and these common questions predominate over individual issues. The Named Plaintiffs' claims are typical of the class claims. The Named Plaintiffs have no interest adverse to the interests of other members of the Class. The Named Plaintiffs will fairly and adequately protect the class' interests. The Named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international litigation.

ORIGINAL

No. 236-169214-97

| | |
|---|---|
| Roderick Adderley, Individually and On Behalf of the Estate of Elsie Westmoreland; Jim and Vicki Allison; Hilda Banta; Sadye Millie Barbee, Individually and as Trustee of the Sadye M. Bridges Barbee Revocable Living Trust; Ray and Barbara Bissell; Diana Boyd; Margaret Maness Bridges, Individually and On Behalf of the Estate of J. T. Maness; George Emory Bridges; Dorothy Claunch; Clarence and Iva Davis; Carol Ann and Charles Denson, Sr.; Patsy and Raymond Dixon; Hercules and Ruby Echols; Gary Farish; Martin and Patsy Hardin; Nancy Harris; Willie Harris, Individually and On Behalf of the Estate of Bennie Harris; James E. and Ina Dell Hill; Maxine Jackson; Nancy Kaufmann; Walter and Glenda Kaufmann; Bill and Galya Keith; Essie Lacy, Individually and on behalf of the Estate of Swarn Lacy, Jr.; Joe Langdon; Manuel and Margaret Marin; Gary and Winifred McDermott; Marjorie and Arthur McDonald; W. C. and Rose Mary McGee; H. L. and Janis Merrill; H. L. Merrill & Son Construction Co., Inc.; Don and Edith Mobley; Mary K. Parham; Buck and Martha Pigg; Gene W. Preston, as Independent Executor of the Estate of Gladyce P. Acers; Jaquitta M. Putman; Joann Russell; Camille Sanders, Individually and as Independent Executrix of the Estate of Fred Sanders; Rolland Sanders; Norman G. and Eileen Watson; Donna Whittenton; Joe D. Willcox, Jr., Individually and as Independent Executor of the Estate of Kenneth R. Willcox. | IN THE DISTRICT COURT |
| | COPY |
| VS. | |
| Advanced Financial Services, Inc.; Norman Greg Cornelius; Douglas Gilliland; Bobby L. Hoover; Van Lewis, III; Sterling Trust Co.; Sunpoint Securities, Inc.; The Triwest Group, Inc.; Triwest Enterprises, Inc.; and Larry Tyler. | OF TARRANT COUNTY, TEXAS |
| | 236TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

1

GT
EXHIBIT 013

2

APP 0227

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1.      Do not let bias, prejudice or sympathy play any part in your deliberations.

2.      In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the court, that is, what you have seen and heard in this courtroom, together with the law as given you by the court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3.      Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

4.      You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

5.      You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

6.      You may render your verdict upon the vote of eleven or more members of the jury. The same eleven or more of you must agree upon all of the answers made and to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority or any other vote of less than eleven jurors. If the verdict and all of the answers therein are reached by unanimous agreement, the presiding juror shall sign the verdict for the entire jury. If any juror disagrees as to any answer made by the verdict, those jurors who agree to all findings shall each sign the verdict.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

3

APP 0228

When words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." The term preponderance of the evidence" means the greater weight and degree of credible testimony or evidence introduced before you and admitted in this case. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless otherwise instructed.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

"Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such type a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result thereon. There may be more than one proximate cause of an event.

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

4

APP 0229

Question 1:

Did the following Defendants commit securities fraud against the following Plaintiffs?

"Securities fraud" occurs when a Defendant sells or offers to sell a security by means of an untrue statement of material fact or the omission to state a material fact necessary in order to make the statements made, if any, in light of the circumstances under which they were made not misleading.

The term "security" includes stock or promissory notes.

A "seller" is a person or entity that offers or sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading.

The term "sell" means any act by which a sale is made.        *unanimous*

**For each Plaintiff, answer "Yes" or "No" as to each of the Defendants listed below.**

Roderick Adderley          Sterling Trust Company *No*          Norman Cornelius *Yes*
                           Sunpoint Securities, Inc. *Yes*          Van Lewis *Yes*

Jim Allison                Sterling Trust Company *No*          Norman Cornelius *Yes*
                           Sunpoint Securities, Inc. *Yes*          Van Lewis *Yes*

Vicki Allison              Sterling Trust Company *No*          Norman Cornelius *Yes*
                           Sunpoint Securities, Inc. *Yes*          Van Lewis *Yes*

Hilda Banta                Sterling Trust Company *No*          Norman Cornelius *Yes*
                           Sunpoint Securities, Inc. *Yes*          Van Lewis *Yes*

Sadye Millie Barbee,
Individually and as
Trustee of the Sadye M.
Bridges Barbee
Revocable Living Trust     Sterling Trust Company *No*          Norman Cornelius *Yes*
                           Sunpoint Securities, Inc. *Yes*          Van Lewis *Yes*

Ray Bissell                Sterling Trust Company *No*          Norman Cornelius *Yes*
                           Sunpoint Securities, Inc. *Yes*          Van Lewis *Yes*

4

5

**APP 0230**

Barbara Bissell          Sterling Trust Company _No_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

Diana K. Boyd            Sterling Trust Company _No_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

George Emory Bridges     Sterling Trust Company _No_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

Margaret Maness Bridges,
Individually and On
Behalf of the Estate
of J. T. Maness          Sterling Trust Company _No_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

Dorothy Claunch          Sterling Trust Company _No_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

Earl R. Crider           Sterling Trust Company _NO_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

Leta Crider              Sterling Trust Company _NO_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

Clarence Davis           Sterling Trust Company _NO_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

Iva Davis                Sterling Trust Company _NO_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

Carol Ann Denson         Sterling Trust Company _NO_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

Charles Denson, Sr.      Sterling Trust Company _NO_      Norman Cornelius _Yes_
                         Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

**6**

APP 0231

Raymond Dixon       Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

Patsy Dixon         Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

Hercules Echols     Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

Ruby Echols         Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

Gary Farish         Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

Martin Hardin       Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

Patsy Hardin        Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

Nancy Harris        Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

Willie Harris, Individually
and On Behalf of the
Estate of Bennie Harris    Sterling Trust Company _NO_     Norman Cornelius _Yes_
                           Sunpoint Securities, Inc. _Yes_ Van Lewis _Yes_

James E. Hill       Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

Ina Dell Hill       Sterling Trust Company _NO_       Norman Cornelius _Yes_
                    Sunpoint Securities, Inc. _Yes_    Van Lewis _Yes_

6

7

Maxine Jackson

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_

Nancy Kaufmann

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_

Walter Kaufmann

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_

Glenda Kaufmann

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_

Bill Keith

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_
Larry Tyler _Yes_  Advanced Financial Services, Inc. _Yes_

Galya Keith

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_
Larry Tyler _Yes_  Advanced Financial Services, Inc. _Yes_

Essie Lacy, Individually and
On Behalf of the Estate
of Swarn Lacy, Jr.

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_

Joe Langdon

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_

Jack R. Mann

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_

Manuel Marin

Sterling Trust Company _NO_  Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_  Van Lewis _Yes_

7

8

APP 0233

Margaret Marin
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_

Gary McDermott
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_

Winifred McDermott
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_

Arthur McDonald
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_

Marjorie McDonald
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_

W. C. McGee
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_

Rose Mary McGee
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_

H. L. Merrill
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Larry Tyler _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_
Advanced Financial Services, Inc. _Yes_

Janis Merrill
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Larry Tyler _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_
Advanced Financial Services, Inc. _Yes_

H. L. Merrill & Son
Construction Co., Inc.
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Larry Tyler _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_
Advanced Financial Services, Inc. _Yes_

Don Mobley
Sterling Trust Company _NO_
Sunpoint Securities, Inc. _Yes_
Norman Cornelius _Yes_
Van Lewis _Yes_

8

**9**

APP 0234

| Edith Mobley | Sterling Trust Company _NO_ | Norman Cornelius _Yes_ |
| | Sunpoint Securities, Inc. _Yes_ | Van Lewis _Yes_ |

| Mary K. Parham | Sterling Trust Company _NO_ | Norman Cornelius _Yes_ |
| | Sunpoint Securities, Inc. _Yes_ | Van Lewis _Yes_ |

| Buck Pigg | Sterling Trust Company _NO_ | Norman Cornelius _Yes_ |
| | Sunpoint Securities, Inc. _Yes_ | Van Lewis _Yes_ |

| Martha Pigg | Sterling Trust Company _NO_ | Norman Cornelius _Yes_ |
| | Sunpoint Securities, Inc. _Yes_ | Van Lewis _Yes_ |

Gene W. Preston,
as Independent Executor
of the Estate of
Gladyce P. Acers

Sterling Trust Company _NO_   Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

| Jaquitta M. Putman | Sterling Trust Company _NO_ | Norman Cornelius _Yes_ |
| | Sunpoint Securities, Inc. _Yes_ | Van Lewis _Yes_ |

| Joann Russell | Sterling Trust Company _NO_ | Norman Cornelius _Yes_ |
| | Sunpoint Securities, Inc. _Yes_ | Van Lewis _Yes_ |

Camille Sanders,
Individually and as
Independent Executrix of
the Estate of Fred Sanders

Sterling Trust Company _NO_   Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_   Van Lewis _Yes_

| Rolland Sanders | Sterling Trust Company _NO_ | Norman Cornelius _Yes_ |
| | Sunpoint Securities, Inc. _Yes_ | Van Lewis _Yes_ |

| Norman G. Watson | Sterling Trust Company _NO_ | Norman Cornelius _Yes_ |
| | Sunpoint Securities, Inc. _Yes_ | Van Lewis _Yes_ |

9

10

APP 0235

If you found in Question 1 that Norman Cornelius committed securities fraud, then answer the following question.  Otherwise, do not answer the following question.

Question 2:

When Norman Cornelius committed the conduct found by you in Question 1, was Norman Cornelius acting on behalf of Sterling Trust Company?

To find that Norman Cornelius was acting on behalf of Sterling Trust Company when he committed the conduct that you found in Question 1, you must find that Norman Cornelius was acting with Sterling Trust Company's authority or apparent authority.

**ANSWER "YES" OR "NO" FOR EACH PLAINTIFF:**          *unanimous*

Roderick Adderley                         *NO*

Jim Allison                               *NO*

Vicki Allison                             *NO*

Hilda Banta                               *NO*

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges
Barbee Revocable Living Trust             *NO*

Ray Bissell                               *NO*

Barbara Bissell                           *NO*

Diana K. Boyd                             *NO*

George Emory Bridges                      *NO*

Margaret Maness Bridges, Individually
and On Behalf of the Estate of
J. T. Maness                              *NO*

11

**12**

If you found in Question 1 that any Defendant committed securities fraud, then answer the following question.  Otherwise, do not answer the following question.

Question 3:

Determine the percentage of responsibility attributable to each of the following persons or entities for the conduct you found in Question 1.

You should only assign percentages to the persons or entities you find caused the harm for which the Plaintiffs seek to recover damages for securities fraud.  The percentages you find must total 100 percent.  The percentages must be expressed in whole numbers.  The responsibility attributable to any one named below is not necessarily measured by the number of acts or omissions found.

| Roderick Adderley | Sterling Trust Company | 0 % | Norman Cornelius | 60 % |
| | Sunpoint Securities, Inc. | 18 % | Van Lewis | 22 % |

| Jim Allison | Sterling Trust Company | 0 % | Norman Cornelius | 60 % |
| | Sunpoint Securities, Inc. | 18 % | Van Lewis | 22 % |

| Vicki Allison | Sterling Trust Company | 0 % | Norman Cornelius | 60 % |
| | Sunpoint Securities, Inc. | 18 % | Van Lewis | 22 % |

| Hilda Banta | Sterling Trust Company | 0 % | Norman Cornelius | 60 % |
| | Sunpoint Securities, Inc. | 18 % | Van Lewis | 22 % |

| Sadye Millie Barbee, Individually and as Trustee of the Sadye M. Bridges Barbee Revocable Living Trust | Sterling Trust Company | 0 % | Norman Cornelius | 60 % |
| | Sunpoint Securities, Inc. | 18 % | Van Lewis | 22 % |

| Ray Bissell | Sterling Trust Company | 0 % | Norman Cornelius | 60 % |
| | Sunpoint Securities, Inc. | 18 % | Van Lewis | 22 % |

| Barbara Bissell | Sterling Trust Company | 0 % | Norman Cornelius | 60 % |
| | Sunpoint Securities, Inc. | 18 % | Van Lewis | 22 % |

16

**17**

APP 0237

Diana K. Boyd          Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

George Emory Bridges   Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Margaret Maness Bridges,
Individually and On
Behalf of the Estate
of J. T. Maness        Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Dorothy Claunch        Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Earl R. Crider         Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Leta Crider            Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Clarence Davis         Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Iva Davis              Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Carol Ann Denson       Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Charles Denson, Sr.    Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Raymond Dixon          Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                       Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

**18**

APP 0238

Patsy Dixon

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Hercules Echols

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Ruby Echols

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Gary Farish

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Martin Hardin

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Patsy Hardin

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Nancy Harris

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Willie Harris, Individually
and On Behalf of the
Estate of Bennie Harris

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

James E. Hill

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Ina Dell Hill

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Maxine Jackson

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

**19**

APP 0239

Nancy Kaufmann        Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                      Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Walter Kaufmann       Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                      Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Glenda Kaufmann       Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                      Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Bill Keith            Sterling Trust Company _0_ %   Norman Cornelius _25_ %
                      Sunpoint Securities, Inc. _8_ %   Van Lewis _22_ %
          Larry Tyler _35_ %   Advanced Financial Services, Inc. _10_ %

Galya Keith           Sterling Trust Company _0_ %   Norman Cornelius _25_ %
                      Sunpoint Securities, Inc. _8_ %   Van Lewis _22_ %
          Larry Tyler _35_ %   Advanced Financial Services, Inc. _10_ %

Essie Lacy, Individually and
On Behalf of the Estate
of Swarn Lacy, Jr.    Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                      Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Joe Langdon           Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                      Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Jack R. Mann          Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                      Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Manuel Marin          Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                      Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Margaret Marin        Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                      Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

**20**

APP 0240

Gary McDermott          Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                        Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Winifred McDermott      Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                        Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Arthur McDonald         Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                        Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Marjorie McDonald       Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                        Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

W. C. McGee             Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                        Sunpoint Securities, Inc. _78_ %   Van Lewis _22_ %

Rose Mary McGee         Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                        Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

H. L. Merrill           Sterling Trust Company _0_ %   Norman Cornelius _25_ %
                        Sunpoint Securities, Inc. _8_ %   Van Lewis _22_ %
            Larry Tyler _35_ %      Advanced Financial Services, Inc. _10_ %

Janis Merrill           Sterling Trust Company _0_ %   Norman Cornelius _25_ %
                        Sunpoint Securities, Inc. _8_ %   Van Lewis _22_ %
            Larry Tyler _35_ %      Advanced Financial Services, Inc. _10_ %

H. L. Merrill & Son
Construction Co., Inc.  Sterling Trust Company _0_ %   Norman Cornelius _25_ %
                        Sunpoint Securities, Inc. _8_ %   Van Lewis _22_ %
            Larry Tyler _35_ %      Advanced Financial Services, Inc. _10_ %

Don Mobley              Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                        Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Edith Mobley            Sterling Trust Company _0_ %   Norman Cornelius _60_ %
                        Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

**21**

APP 0241

Mary K. Parham

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Buck Pigg

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Martha Pigg

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Gene W. Preston,
as Independent Executor
of the Estate of
Gladyce P. Acers

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Jaquitta M. Putman

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Joann Russell

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Camille Sanders,
Individually and as
Independent Executrix of
the Estate of Fred Sanders

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Rolland Sanders

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Norman G. Watson

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

Eileen V. Watson

Sterling Trust Company _0_ %   Norman Cornelius _60_ %
Sunpoint Securities, Inc. _18_ %   Van Lewis _22_ %

**22**

APP 0242

Question 4:

Did Sterling Trust Company aid Norman Cornelius in committing securities fraud against the following plaintiffs?

"Aiding in securities fraud" occurs when a person or entity directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller of a security.

A "seller" is a person or entity that offers or sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading.

The term "sell" means any act by which a sale is made.

ANSWER "YES" OR "NO" FOR EACH PLAINTIFF:

*NO - Shannon & Joe*

Roderick Adderley — *Yes*

Jim Allison — *Yes*

Vicki Allison — *Yes*

Hilda Banta — *Yes*

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges
Barbee Revocable Living Trust — *Yes*

Ray Bissell — *Yes*

Barbara Bissell — *Yes*

Diana K. Boyd — *Yes*

George Emory Bridges — *Yes*

APP 0243

If you have answered Question 1 "YES" as to Norman Cornelius or Question 4 "YES", answer the following question. Otherwise, do not answer the following question.

Question 5:

Was Sterling Trust Company part of a conspiracy that damaged Plaintiffs?

INSTRUCTION:

To be part of a conspiracy, Sterling Trust Company and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to the Plaintiffs. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

ANSWER "YES" OR "NO" FOR EACH PLAINTIFF: ~~UNANIMOUS~~

Roderick Adderley                    _No_

Jim Allison                          _No_

Vicki Allison                        _No_

Hilda Banta                          _No_

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges
Barbee Revocable Living Trust        _No_

Ray Bissell                          _No_

Barbara Bissell                      _No_

Diana K. Boyd                        _No_

George Emory Bridges                 _No_

Margaret Maness Bridges, Individually

28

**29**

**APP 0244**

If you have answered Question 1 or Question 4 or Question 5 "YES" as to any Plaintiff, answer the following question.  Otherwise, do not answer the following question.

Question 6:

Do you find by clear and convincing evidence that the harm to each of the following Plaintiffs resulted from malice of Sterling Trust Company, if any?

"Clear and convincing evidence" means the measure of the degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means:

(a)    a specific intent by Sterling Trust Company to cause substantial injury to the following Plaintiffs; or

(b)    an act or omission by Sterling Trust Company,

        (i)    which, when viewed objectively from the standpoint of Sterling Trust Company at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

        (ii)    of which Sterling Trust Company had actual, subjective awareness of the risk involved, but nevertheless, proceeded with conscious indifference to the rights, safety, or welfare of others.

You may find malice based on the acts of a principal or its agent.  However, the principal is only bound, for the purposes of malice, by the acts of an agent if:

(a)    the principal authorized the doing and the manner of the act, or

(b)    the agent was unfit and the principal was reckless in employing him, or

(c)    the principal or manager of the principal ratified or approved the act.

**ANSWER "YES" OR "NO" FOR EACH PLAINTIFF:**    *UNANIMOUS*

Roderick Adderley    *No*

Jim Allison    *No*

Vicki Allison    *No*

APP 0245

If you have answered "YES" to Question 1, answer the following question. Otherwise, do not answer the following question.

Question 7:

Did the Plaintiffs know of the untrue statement or of the failure to state a material fact you found in Question 1 at or before the time they purchased the security?

ANSWER "YES" OR "NO" FOR EACH PLAINTIFF:   *UNANIMOUS*

Roderick Adderley                    *No*

Jim Allison                          *No*

Vicki Allison                        *No*

Hilda Banta                          *No*

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges    *No*
Barbee Revocable Living Trust

Ray Bissell                          *No*

Barbara Bissell                      *No*

Diana K. Boyd                        *No*

George Emory Bridges                 *No*

Margaret Maness Bridges, Individually
and On Behalf of the Estate of       *No*
J. T. Maness

Dorothy Claunch                      *No*

**40**

APP 0246

If you answered "YES" to Question 1, answer the following question.  Otherwise, do not answer the following question.

Question 8:

Did Sterling Trust Company lack knowledge of the untrue statement or failure to state a material fact you found in Question 1?

Sterling Trust Company lacked knowledge of an untrue statement or failure to state a material fact if it did not know, and in the exercise of reasonable care, could not have known of the untruth or omission.

**ANSWER "YES" OR "NO" FOR EACH PLAINTIFF:**   *unanimous*

Roderick Adderley _____ Yes _____

Jim Allison _____ Yes _____

Vicki Allison _____ Yes _____

Hilda Banta _____ Yes _____

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges
Barbee Revocable Living Trust _____ Yes _____

Ray Bissell _____ Yes _____

Barbara Bissell _____ Yes _____

Diana K. Boyd _____ Yes _____

George Emory Bridges _____ Yes _____

Margaret Maness Bridges, Individually
and On Behalf of the Estate of
J. T. Maness _____ Yes _____

**45**

APP 0247

If you have answered "YES" for any Plaintiff in Question 1 or Question 2 or Question 4 or Question 5, then answer the following question as to that Plaintiff. Otherwise, do not answer the following question.

Question 9:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiffs for their damages, if any?

INSTRUCTION:

Consider the following elements of damage and none other:

The amount that the Plaintiff paid for the security plus interest thereon at the legal rate from the date of payment by him less the amount of any income or dividends or other money that he or she received from the security. You are instructed that the legal rate of interest is 10%.

You may consider all amounts a Plaintiff paid for a security after June 26, 1995. You may not consider any amounts a Plaintiff paid for a security before June 26, 1993. You may consider amounts a Plaintiff paid for a security between June 26, 1993 and June 26, 1995 if you find that the Plaintiff did not discover and by the exercise of reasonable diligence should not have discovered the untruth or omission until after June 26, 1995.

Do not include in your answer any amount that you find a Plaintiff could have avoided by the exercise of reasonable care. *No Vote — Joe + Shannon*

**ANSWER IN DOLLARS AND CENTS, IF ANY.**

| | AMOUNT PAID LESS PAYMENTS | INTEREST |
|---|---|---|
| Roderick Adderley | $ 75,837 | $ 26,728.00 |
| Jim Allison | $ 102,274.00 | $ 43,498.00 |
| Vicki Allison | $ —— | $ —— |
| Hilda Banta | $ 190,229 | $ 100,129.00 |
| Sadye Millie Barbee, Individually and as Trustee of the Sadye M. Bridges Barbee Revocable Living Trust | $ 373,805.00 | $ 148,122.00 |
| Ray Bissell | $ 287,557.00 | $ 117,920.00 |

49

**50**

APP 0248

| | | |
|---|---|---|
| Barbara Bissell | $ _____ | $ _____ |
| Diana K. Boyd | $ 139,874.⁰⁰ | $ 62,447.⁰⁰ |
| George Emory Bridges | $ 3,500.⁰⁰ | $ 3,164.⁰⁰ |
| Margaret Maness Bridges, Individually and On Behalf of the Estate of J. T. Maness | $ 50,614.⁰⁰ | $ 24,042.⁰⁰ |
| Dorothy Claunch | $ 7,000.⁰⁰ | $ 6,203.⁰⁰ |
| Earl R. Crider | $ _____ | $ _____ |
| Leta Crider | $ 28,911.⁰⁰ | $ 12,153.⁰⁰ |
| Clarence Davis | $ 82,161.⁰⁰ | $ 26,773.⁰⁰ |
| Iva Davis | $ _____ | $ _____ |
| Carol Ann Denson | $ 92,361 | $ 69,671.⁰⁰ |
| Charles Denson, Sr. | $ _____ | $ _____ |
| Raymond Dixon | $ 127,292.⁰⁰ | $ 76,399.⁰⁰ |
| Patsy Dixon | $ _____ | $ _____ |
| Hercules Echols | $ 37,945.⁰⁰ | $ 24,330.⁰⁰ |
| Ruby Echols | $ _____ | $ _____ |
| Gary Farish | $ 94,737.⁰⁰ | $ 51,550.⁰⁰ |
| Martin Hardin | $ 180,685.⁰⁰ | $ 77,807.⁰⁰ |
| Patsy Hardin | $ 24,121.⁰⁰ | $ 12,525.⁰⁰ |
| Nancy Harris | $ 26,962.⁰⁰ | $ 15,048.⁰⁰ |
| Willie Harris, Individually and On Behalf of the Estate of Bennie Harris | $ 43,429.⁰⁰ | $ 31,554.⁰⁰ |
| James E. Hill | $ 55,333.⁰⁰ | $ 31,393.⁰⁰ |

**51**

APP 0249

| | | |
|---|---|---|
| Ina Dell Hill | $ _____ | $ _____ |
| Maxine Jackson | $ 14,000 | $ 10,777.00 |
| Nancy Kaufmann | $ 10,581.00 | $ 7,501.00 |
| Walter Kaufmann | $ 70,762.00 | $ 31,852.00 |
| Glenda Kaufmann | $ _____ | $ _____ |
| Bill Keith | $ 69,290.00 | $ 30,374.00 |
| Galya Keith | $ _____ | $ _____ |
| Essie Lacy, Individually and On Behalf of the Estate of Swarn Lacy, Jr. | $ 138,528.00 | $ 51,826.00 |
| Joe Langdon | $ 80,452.00 | $ 42,484.00 |
| Jack R. Mann | $ 46,852.00 | $ 15,796.00 |
| Manuel Marin | $ 51,785.00 | $ 21,323.00 |
| Margaret Marin | $ _____ | $ _____ |
| Gary McDermott | $ 20,500.00 | $ 9,155.00 |
| Winifred McDermott | $ _____ | $ _____ |
| Arthur McDonald | $ 86,664.00 | $ 61,515.00 |
| Marjorie McDonald | $ 51,710.00 | $ 36,068.00 |
| W. C. McGee | $ 97,941.00 | $ 55,651.00 |
| Rose Mary McGee | $ _____ | $ _____ |
| H. L. Merrill | $ _____ | $ _____ |
| Janis Merrill | $ _____ | $ _____ |
| H. L. Merrill & Son Construction Co., Inc. | $ 165,531.00 | $ 82,125.00 ~~$ _____~~ |

51

APP 0250

| | | |
|---|---|---|
| Don Mobley | $ 37,160.00 | $ 13,892.00 |
| Edith Mobley | $ ——— | $ ——— |
| Mary K. Parham | $ 96,051.00 | $ 213,827.00 |
| Buck Pigg | $ 99,239.00 | $ 62,012.00 |
| Martha Pigg | $ ——— | $ ——— |
| Gene W. Preston, as Independent Executor of the Estate of Gladyce P. Acers | $ 23,350 | $ 19,072.00 |
| Jaquitta M. Putman | $ 49,700.00 | $ 31,330.00 |
| Joann Russell | $ 203,455.00 | $ 99,817.00 |
| Camille Sanders, Individually and as Independent Executrix of the Estate of Fred Sanders | $ 468,493.00 | $ 177,523.00 |
| Rolland Sanders | $ 8,200.00 | $ 3,792.00 |
| Norman G. Watson | $ 179,987.00 | $ 78,591.00 |
| Eileen V. Watson | $ ——— | $ ——— |
| Donna Whittenton (Carlberg) | $ 324,342.00 | $ 156,455.00 |
| Joe D. Willcox, Jr., Individually and as Independent Executor of the Estate of Kenneth R. Willcox | $ 152,469.00 | $ 57,947.00 |

**53**

APP 0251

Question 10:

Did Sterling Trust Company fail to comply with its fiduciary duty to any of the following Plaintiffs?

Sterling Trust Company failed to comply with its fiduciary duty if:

a.    Sterling Trust Company did not make reasonable use of the confidence that the plaintiffs placed in it; or

b.    Sterling Trust Company did not act in the utmost good faith and did not exercise the most scrupulous honesty toward the plaintiffs; or

c.    Sterling Trust Company did not place the interests of the plaintiffs before its own, used the advantage of its position to gain benefit for itself at the expense of the plaintiffs, and placed itself in a position where its self-interest might conflict with its obligations as a fiduciary.

**ANSWER "YES" OR "NO" AS TO EACH PLAINTIFF:**

JOE - No Vote

Roderick Adderley                                    Yes

Jim Allison                                          Yes

Hilda Banta                                          Yes

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges
Barbee Revocable Living Trust                        Yes

Ray Bissell                                          Yes

Diana Boyd                                           Yes

Dorothy Claunch                                      Yes

Clarence Davis                                       Yes

53

**54**

APP 0252

If your answer to Question 10 for any Plaintiff is "Yes," then answer the following question. Otherwise, do not answer the following question.

Question 11:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiffs for their damages, if any, that were proximately caused by such conduct?

Consider the following elements of damages, if any, and none other.

Answer separately in dollars and cents, if any, for each of the following:

a.      The Plaintiffs economic damages.

b.      The Plaintiffs mental anguish, if any, sustained in the past.

You are instructed that each Plaintiff's economic damages are the amount that Plaintiff invested and lost, if any.

You are instructed that you may not consider amounts a Plaintiff invested and lost based on conduct that occurred before June 26, 1994, unless, with regards to such amounts, the Plaintiff did not know and should not have known until after June 26, 1994 of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act.

In answering questions about damages, answer each question separately.  Do not increase or reduce the amount in any answers to an issue because of your answers to any other issues about damages.  Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.  Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find a Plaintiff could have avoided by the exercise of reasonable care.      *JOE - NO VOTE*

**ANSWER IN DOLLARS AND CENTS FOR EACH OF THE FOLLOWING:**

| | | |
|---|---|---|
| Roderick Adderley | Economic Damages _75,837.00_ | Mental Anguish _0_ |
| Jim Allison | Economic Damages _0_ | Mental Anguish _0_ |
| Hilda Banta | Economic Damages _190,229.00_ | Mental Anguish _0_ |

Sadye Millie Barbee,
Individually and as
Trustee of the
Sadye M. Bridges
Barbee Revocable

**57**

APP 0253

Living Trust        Economic Damages  16,473.°°  Mental Anguish  O

Ray Bissell         Economic Damages  229,548.°°  Mental Anguish  O

Diana Boyd          Economic Damages  102,849.°°  Mental Anguish  O

Dorothy Claunch     Economic Damages  7,000.  Mental Anguish  O

Clarence Davis      Economic Damages  82,161.  Mental Anguish  O

Hercules Echols     Economic Damages  37,945.  Mental Anguish  O

Gary Farish         Economic Damages  94,737.  Mental Anguish  O

Martin Hardin       Economic Damages  180,685.  Mental Anguish  O

Patsy Hardin        Economic Damages  24,121.  Mental Anguish  O

Willie Harris,
Individually
and On Behalf of
the Estate of
Bennie Harris       Economic Damages  35,013.  Mental Anguish  O

James E. Hill       Economic Damages  39,524.  Mental Anguish  O

Walter Kaufmann     Economic Damages  23,587.  Mental Anguish  O

Glenda Evatt
Kaufmann            Economic Damages  ———  Mental Anguish  O

Bill Keith          Economic Damages  ———  Mental Anguish  O

Galya Keith         Economic Damages  ———  Mental Anguish  O

Essie Lacy,
Individually and
On Behalf of the
Estate of Swarn
Lacy, Jr.           Economic Damages  138,528.  Mental Anguish  O

Jack R. Mann        Economic Damages  46,852.  Mental Anguish  O

Manuel Marin        Economic Damages  51,785.  Mental Anguish  O

Arthur McDonald     Economic Damages  86,664.  Mental Anguish  O

**58**

APP 0254

Marjorie McDonald    Economic Damages _51,710._ Mental Anguish _O_

W. C. McGee    Economic Damages _97,946._ Mental Anguish _O_

Don Mobley    Economic Damages _____ Mental Anguish _O_

Mary K. Parham    Economic Damages _14,892.00_ Mental Anguish _O_

Buck Pigg    Economic Damages _99,239._ Mental Anguish _O_

Joann Russell    Economic Damages _127,255.00_ Mental Anguish _O_

Camille Sanders,
Individually and
as Independent
Executrix of the
Estate of Fred
Sanders    Economic Damages _106,844._ Mental Anguish _O_

Norman G. Watson    Economic Damages _179,987._ Mental Anguish _O_

Joe D. Willcox,
Jr., Individually
and as Independent
Executor of the
Estate of Kenneth
R. Willcox    Economic Damages _51,288._ Mental Anguish _O_

**59**

APP 0255

If you have answered Question 10 "YES" as to any Plaintiff, answer the following question. Otherwise, do not answer the following question.

Question 12:

Do you find by clear and convincing evidence that the harm to each of the following Plaintiffs resulted from malice of Sterling Trust Company, if any?

"Clear and convincing evidence" means the measure of the degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means:

(a) a specific intent by Sterling Trust Company to cause substantial injury to the following Plaintiffs; or

(b) an act or omission by Sterling Trust Company,

(i) which, when viewed objectively from the standpoint of Sterling Trust Company at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which Sterling Trust Company had actual, subjective awareness of the risk involved, but nevertheless, proceeded with conscious indifference to the rights, safety, or welfare of others.

You may find malice based on the acts of a principal or its agent. However, the principal is only bound, for the purposes of malice, by the acts of an agent if:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the principal or manager of the principal ratified or approved the act.

ANSWER "YES" OR "NO" AS TO EACH PLAINTIFF:

_SHANNON AND_
_~~SEAN~~ - NO VOTE_
_JOE_

Roderick Adderley _____Yes_____

Jim Allison _____Yes_____

Hilda Banta _____Yes_____

**60**

APP 0256

Question 13:

Did the following Defendants commit fraud against the following plaintiffs?

Fraud occurs when—

a.   A Defendant conceals or fails to disclose a material fact within the knowledge of that Defendant,

b.   the Defendant knows that the Plaintiff is ignorant of the fact and does not have an equal opportunity to discover the truth,

c.   the Defendant intends to induce the Plaintiff to take some action by concealing or failing to disclose the fact, and

d.   the Plaintiff suffers injury as a result of acting without knowledge of the undisclosed fact.                    UNANIMOUS

**For each Plaintiff, answer "YES" or "NO" at to each of the Defendants listed below:**

Roderick Adderley
Sterling Trust Company _NO_        Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_        Van Lewis _Yes_

Jim Allison
Sterling Trust Company _No_        Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_        Van Lewis _Yes_

Hilda Banta
Sterling Trust Company _NO_        Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_        Van Lewis _Yes_

Sadye Millie Barbee,
Individually and as
Trustee of the Sadye M.
Bridges Barbee
Revocable Living Trust
Sterling Trust Company _NO_        Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_        Van Lewis _Yes_

Ray Bissell
Sterling Trust Company _NO_        Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_        Van Lewis _Yes_

Diana K. Boyd
Sterling Trust Company _NO_        Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_        Van Lewis _Yes_

Dorothy Claunch
Sterling Trust Company _NO_        Norman Cornelius _Yes_

APP 0257

|  | Sunpoint Securities, Inc. _Yes_ | Van Lewis _Yes_ |
|--|--|--|
| Clarence Davis | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_ |
| Hercules Echols | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_ |
| Gary Farish | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_ |
| Martin Hardin | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_ |
| Patsy Hardin | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_ |
| Willie Harris, Individually and On Behalf of the Estate of Bennie Harris | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_ |
| James E. Hill | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_ |
| Walter Kaufmann | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_ |
| Glenda Evatt Kaufmann | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_ |
| Bill Keith | Sterling Trust Company _No_<br>Sunpoint Securities, Inc. _Yes_<br>Larry Tyler _Yes_ | Norman Cornelius _Yes_<br>Van Lewis _Yes_<br>Advanced Financial Services, Inc. _Yes_ |

**65**

APP 0258

Galya Keith

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_
Larry Tyler _Yes_     Advanced Financial Services, Inc. _Yes_

Essie Lacy, Individually and
On Behalf of the Estate
of Swarn Lacy, Jr.

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

Jack R. Mann

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

Manuel Marin

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

Arthur McDonald

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

Marjorie McDonald

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

W. C. McGee

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

Don Mobley

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

Mary K. Parham

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

Buck Pigg

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

Joann Russell

Sterling Trust Company _No_     Norman Cornelius _Yes_
Sunpoint Securities, Inc. _Yes_     Van Lewis _Yes_

**66**

APP 0259

If you found in Question 13 that Norman Cornelius defrauded any Plaintiff, then answer the following question. Otherwise, do not answer the following question.

Question 14:

When Norman Cornelius committed the conduct that you found in Question 13, was Norman Cornelius acting on behalf of Sterling Trust Company?

INSTRUCTION:

To find that Norman Cornelius was acting on behalf of Sterling Trust Company when he committed the conduct that you found in Question 13, you must find that Norman Cornelius acted with Sterling Trust Company's authority or apparent authority.

*UNANIMOUS*

ANSWER "YES" OR "NO" AS TO EACH PLAINTIFF:

Roderick Adderley                                    *No*

Jim Allison                                          *No*

Hilda Banta                                          *No*

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges              *No*
Barbee Revocable Living Trust

Ray Bissell                                          *No*

Diana Boyd                                           *No*

Dorothy Claunch                                      *No*

Clarence Davis                                       *No*

Hercules Echols                                      *No*

**68**

APP 0260

If you found in Question 13 that any Defendant committed fraud, then answer the following question. Otherwise, do not answer the following question.

Question 15:

Determine the percentage of responsibility attributable to each of the following persons or entities for the conduct you found in Question 13.

You should only assign percentages to the persons or entities you find caused the harm for which the Plaintiffs seek to recover damages for fraud. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The responsibility attributable to any one named below is not necessarily measured by the number of acts or omissions found.

| Roderick Adderley | Sterling Trust Company _25_ % | Norman Cornelius _50_ % |
| | Sunpoint Securities, Inc. _10_ % | Van Lewis _15_ % |

| Jim Allison | Sterling Trust Company _25_ % | Norman Cornelius _50_ % |
| | Sunpoint Securities, Inc. _10_ % | Van Lewis _15_ % |

| Hilda Banta | Sterling Trust Company _25_ % | Norman Cornelius _50_ % |
| | Sunpoint Securities, Inc. _10_ % | Van Lewis _15_ % |

| Sadye Millie Barbee, Individually and as Trustee of the Sadye M. Bridges Barbee Revocable Living Trust | Sterling Trust Company _25_ % | Norman Cornelius _50_ % |
| | Sunpoint Securities, Inc. _10_ % | Van Lewis _15_ % |

| Ray Bissell | Sterling Trust Company _25_ % | Norman Cornelius _50_ % |
| | Sunpoint Securities, Inc. _10_ % | Van Lewis _15_ % |

| Diana K. Boyd | Sterling Trust Company _25_ % | Norman Cornelius _50_ % |
| | Sunpoint Securities, Inc. _10_ % | Van Lewis _15_ % |

| Dorothy Claunch | Sterling Trust Company _25_ % | Norman Cornelius _50_ % |
| | Sunpoint Securities, Inc. _10_ % | Van Lewis _15_ % |

**71**

APP 0261

Clarence Davis

Sterling Trust Company _25_ %   Norman Cornelius _50_ %
Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Hercules Echols

Sterling Trust Company _25_ %   Norman Cornelius _50_ %
Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Gary Farish

Sterling Trust Company _25_ %   Norman Cornelius _50_ %
Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Martin Hardin

Sterling Trust Company _25_ %   Norman Cornelius _50_ %
Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Patsy Hardin

Sterling Trust Company _25_ %   Norman Cornelius _50_ %
Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Willie Harris, Individually
and On Behalf of the
Estate of Bennie Harris

Sterling Trust Company _25_ %   Norman Cornelius _50_ %
Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

James E. Hill

Sterling Trust Company _25_ %   Norman Cornelius _50_ %
Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Walter Kaufmann

Sterling Trust Company _25_ %   Norman Cornelius _50_ %
Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Glenda Kaufmann

Sterling Trust Company _25_ %   Norman Cornelius _50_ %
Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Bill Keith

Sterling Trust Company _25_ %   Norman Cornelius _30_ %
Sunpoint Securities, Inc. _4_ %   Van Lewis _15_ %
Larry Tyler _20_ %   Advanced Financial Services, Inc. _6_ %

Galya Keith

Sterling Trust Company _25_ %   Norman Cornelius _30_ %
Sunpoint Securities, Inc. _4_ %   Van Lewis _15_ %

APP 0262

Larry Tyler _20_ %     Advanced Financial Services, Inc. _6_ %

Essie Lacy, Individually and
On Behalf of the Estate
of Swam Lacy, Jr.        Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Jack R. Mann             Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Manuel Marin             Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Margaret Marin           Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Arthur McDonald          Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Marjorie McDonald        Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

W. C. McGee              Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Don Mobley               Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Mary K. Parham           Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Buck Pigg                Sterling Trust Company _25_ %   Norman Cornelius _50_ %
                         Sunpoint Securities, Inc. _10_ %   Van Lewis _15_ %

Joann Russell            Sterling Trust Company _25_ %   Norman Cornelius _50_ %

APP 0263

If your answer to Question 13 or Question 14 is "Yes," then answer the following question. Otherwise, do not answer the following question.

Question 16:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiffs for their damages, if any, that were proximately caused by such fraud?

Consider the following elements of damages, if any, and none other.

Answer separately in dollars and cents, if any, for each of the following:

a.    The Plaintiff's economic damages.

b.    The Plaintiff's mental anguish, if any, sustained in the past.

You are instructed that each Plaintiff's economic damages are the amount that Plaintiff invested and lost, if any.

You are instructed that you may not consider amounts a Plaintiff invested and lost based on conduct that occurred before June 26, 1994, unless, with regards to such amounts, the Plaintiff did not know and should not have known until after June 26, 1994 of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in any answers to an issue because of your answers to any other issues about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find a Plaintiff could have avoided by the exercise of reasonable care.    *No — Joe + Shannon*

**ANSWER IN DOLLARS AND CENTS FOR EACH OF THE FOLLOWING:**

Roderick Adderley    Economic Damages _75,837_ Mental Anguish _0_

Jim Allison    Economic Damages _102,274_ Mental Anguish _0_

Hilda Banta    Economic Damages _190,229_ Mental Anguish _0_

Sadye Millie Barbee,
Individually and as
Trustee of the
Sadye M. Bridges
Barbee Revocable

**75**

APP 0264

| | | |
|---|---|---|
| Living Trust | Economic Damages _373,805_ | Mental Anguish ___ |
| Ray Bissell | Economic Damages _287,557_ | Mental Anguish ___ |
| Diana Boyd | Economic Damages _134,874_ | Mental Anguish ___ |
| Dorothy Claunch | Economic Damages _7,000_ | Mental Anguish ___ |
| Clarence Davis | Economic Damages _82,161_ | Mental Anguish ___ |
| Hercules Echols | Economic Damages _37,945_ | Mental Anguish ___ |
| Gary Farish | Economic Damages _94,737_ | Mental Anguish ___ |
| Martin Hardin | Economic Damages _180,685.00_ | Mental Anguish ___ |
| Patsy Hardin | Economic Damages _24,121._ | Mental Anguish ___ |
| Willie Harris, Individually and On Behalf of the Estate of Bennie Harris | Economic Damages _43,429_ | Mental Anguish ___ |
| James E. Hill | Economic Damages _55,333_ | Mental Anguish ___ |
| Walter Kaufmann | Economic Damages _70,762_ | Mental Anguish ___ |
| Glenda Evatt Kaufmann | Economic Damages ___ | Mental Anguish ___ |
| Bill Keith | Economic Damages _69,290_ | Mental Anguish ___ |
| Galya Keith | Economic Damages ___ | Mental Anguish ___ |
| Essie Lacy, Individually and On Behalf of the Estate of Swarn Lacy, Jr. | Economic Damages _138,528_ | Mental Anguish ___ |
| Jack R. Mann | Economic Damages _46,852._ | Mental Anguish ___ |
| Manuel Marin | Economic Damages _51,785._ | Mental Anguish ___ |
| Arthur McDonald | Economic Damages _86,664._ | Mental Anguish ___ |

**76**

APP 0265

Marjorie McDonald   Economic Damages _51,710._   Mental Anguish _0_

W. C. McGee   Economic Damages _97,941._   Mental Anguish _0_

Don Mobley   Economic Damages _37,160._   Mental Anguish _0_

Mary K. Parham   Economic Damages _96,051_   Mental Anguish _0_

Buck Pigg   Economic Damages _99,239._   Mental Anguish _0_

Joann Russell   Economic Damages _203,455._   Mental Anguish _0_

Camille Sanders,
Individually
and
as Independent
Executrix of the
Estate of Fred
Sanders   Economic Damages _468,493. 00_ Mental Anguish _0_

Norman G. Watson   Economic Damages _179,987._ Mental Anguish _0_

Joe D. Willcox,
Jr., Individually
and as Independent
Executor of the
Estate of Kenneth
R. Willcox   Economic Damages _152,469._ Mental Anguish _0_

APP 0266

If you have answered "YES" to Question 13 or Question 14 as to any Plaintiff, then answer the following question. Otherwise, do not answer the following question.

Question 17:

Do you find by clear and convincing evidence that the harm to the Plaintiffs resulted from fraud, if any, on the part of Sterling Trust Company?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

You may find fraud based on the acts of a principal or its agent. However, the principal is only bound, for the purposes of fraud, by the acts of an agent if:

(a)    the principal authorized the doing and the manner of the act, or

(b)    the agent was unfit and the principal was reckless in employing him, or

(c)    the principal or manager of the principal ratified or approved the act.

ANSWER "YES" OR "NO" AS TO EACH PLAINTIFF:    *UNANIMOUS*

Roderick Adderley    _No_

Jim Allison    _No_

Hilda Banta    _No_

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges    _No_
Barbee Revocable Living Trust

Ray Bissell    _No_

Diana Boyd    _No_

Dorothy Claunch    _No_

78

APP 0267

Question 18:

Did Sterling Trust Company secure the execution of a document by deception and was the value of the property affected $1,500.00 or more?

"Securing the execution of a document by deception" occurs when a person causes another person to sign any document affecting property, and does so by deception, with the intent to defraud or harm any person.

A person acts with intent with respect to the nature of his conduct or to a result of his conduct when it is the conscious objective or desire to engage in the conduct or cause the result.

"Deception" means creating or confirming by words or conduct a false impression of law or fact this is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true.

"Property" means: (a) real property; (b) tangible or intangible personal property, including anything severed from land; or (c) a document, including money, that represents or embodies anything of value.

You may answer "yes" only if an employee of Sterling Trust secured the execution of such a document by deception and:

    a.    Sterling Trust authorized the doing and the manner of such act of an employee, or

    b.    the employee was employed in a managerial capacity and was acting in the scope of employment.

An "employee" is a person in the service of another with the understanding, express or implied, that such other person has the right to direct the details of the work and not merely the result to be accomplished.   *unanimous*

**Answer "YES" or "NO."**

Answer: _NO_

APP 0268

Question 19:

Did Sterling Trust Company intentionally misapply fiduciary property in a manner that involved substantial risk of loss to plaintiffs and was the value of the property $1,500 or greater?

"Misapply" means a person deals with property contrary to an agreement under which the person holds the property.

"Substantial risk of loss" means it is more likely than not that loss will occur.

A person acts with intent with respect to the nature of his conduct or to a result of his conduct when it is the conscious objective or desire to engage in the conduct or cause the result.

You may answer "yes" only if an employee of Sterling Trust secured the execution of such a document by deception and:

a.   Sterling Trust authorized the doing and the manner of such act of an employee, or

b.   the employee was employed in a managerial capacity and was acting in the scope of employment.

An "employee" is a person in the service of another with the understanding, express or implied, that such other person has the right to direct the details of the work and not merely the result to be accomplished.

*unanimous*

Answer "Yes" or "No."

Answer: _No_

81

82

Question 20:

Did the Plaintiffs waive the right to assert claims against Sterling Trust?

INSTRUCTION:

You are instructed that Plaintiffs waived their right to assert their claims against Sterling Trust Company if they intentionally surrendered a known right or engaged in intentional conduct inconsistent with claiming the right.

*Unanimous*

**ANSWER "YES" OR "NO" FOR EACH PLAINTIFF:**

Roderick Adderley                                     *No*

Jim Allison                                               *No*

Vicki Allison                                             *No*

Hilda Banta                                              *No*

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges
Barbee Revocable Living Trust                   *No*

Ray Bissell                                               *No*

Barbara Bissell                                          *No*

Diana K. Boyd                                           *No*

George Emory Bridges                              *No*

Margaret Maness Bridges, Individually
and On Behalf of the Estate of
J. T. Maness                                             *No*

APP 0270

Question 21:

Are the Plaintiffs estopped to assert claims against Sterling Trust?

INSTRUCTION:

You are instructed that a Plaintiff is estopped to assert his or her claims against Sterling Trust if the Plaintiff made a representation to Sterling Trust and Sterling Trust justifiably and reasonably relied on that representation to its detriment to such an extent that it would be unfair to allow Plaintiff to assert his or her claim.

ANSWER "YES" OR "NO" FOR EACH PLAINTIFF:                    UNANIMOUS

Roderick Adderley                          No

Jim Allison                                No

Vicki Allison                              No

Hilda Banta                                No

Sadye Millie Barbee, Individually
and as Trustee of the Sadye M. Bridges
Barbee Revocable Living Trust              No

Ray Bissell                                No

Barbara Bissell                            No

Diana K. Boyd                              No

George Emory Bridges                       No

Margaret Maness Bridges, Individually
and On Behalf of the Estate of
J. T. Maness                               No

APP 0271



After you retire to the jury room, you will select your own presiding juror. ~~The first thing the presiding juror will do is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked~~.

It is the duty of the presiding juror—

1.  to preside during your deliberations,

2.  to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge,

3.  to write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the judge,

4.  to vote on the questions,

5.  to write your answers to the questions in the spaces provided, and

6.  to certify to your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all the questions you are required to answer under the instructions of the judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

_signature_ 4/10/00

JUDGE PRESIDING

**93**

APP 0272

## CERTIFICATE

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____

PRESIDING JUROR

(To be signed by those rendering the verdict if not unanimous.)

93

**94**

No. 236-169214-97

ORIGINAL

| | |
|---|---|
| Roderick Adderley, Individually and On Behalf of the Estate of Elsie Westmoreland; Jim and Vicki Allison; Hilda Banta; Sadye Millie Barbee, Individually and as Trustee of the Sadye M. Bridges Barbee Revocable Living Trust; Ray and Barbara Bissell; Diana Boyd; Margaret Maness Bridges, Individually and On Behalf of the Estate of J. T. Maness; George Emory Bridges; Dorothy Claunch; Clarence and Iva Davis; Carol Ann and Charles Denson, Sr.; Patsy and Raymond Dixon; Hercules and Ruby Echols; Gary Farish; Martin and Patsy Hardin; Nancy Harris; Willie Harris, Individually and On Behalf of the Estate of Bennie Harris; James E. and Ina Dell Hill; Maxine Jackson; Nancy Kaufmann; Walter and Glenda Kaufmann; Bill and Galya Keith; Essie Lacy, Individually and on behalf of the Estate of Swarn Lacy, Jr.; Joe Langdon; Manuel and Margaret Marin; Gary and Winifred McDermott; Marjorie and Arthur McDonald; W. C. and Rose Mary McGee; H. L. and Janis Merrill; H. L. Merrill & Son Construction Co., Inc.; Don and Edith Mobley; Mary K. Parham; Buck and Martha Pigg; Gene W. Preston, as Independent Executor of the Estate of Gladyce P. Acers; Jaquitta M. Putman; Joann Russell; Camille Sanders, Individually and as Independent Executrix of the Estate of Fred Sanders; Rolland Sanders; Norman G. and Eileen Watson; Donna Whittenton; Joe D. Willcox, Jr., Individually and as Independent Executor of the Estate of Kenneth R. Willcox. | IN THE DISTRICT COURT |
| VS. | OF TARRANT COUNTY, TEXAS |
| Advanced Financial Services, Inc.; Norman Greg Cornelius; Douglas Gilliland; Bobby L. Hoover; Van Lewis, III; Sterling Trust Co.; Sunpoint Securities, Inc.; The Triwest Group, Inc.; Triwest Enterprises, Inc.; and Larry Tyler. | 236TH JUDICIAL DISTRICT |

**CHARGE OF THE COURT**

1079

APP 0274

QUESTION 1:

What sum of money, if any, if paid now in cash, should be assessed against Sterling Trust Company and awarded to each Plaintiff listed below as exemplary damages, if any, for the conduct of Sterling Trust Company you found to be malicious in Question 12 of the Court's Charge from the first phase of the trial?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are —

a.  The nature of the wrong.
b.  The character of the conduct involved.
c.  The degree of culpability of Sterling Trust Company.
d.  The situation and sensibilities of the parties involved.
e.  The extent to which such conduct offends a public sense of justice and propriety.
f.  The net worth of Sterling Trust Company.

In answering this question, you may consider only the conduct of Sterling Trust Company.

Answer in dollars and cents, if any, for each Plaintiff:

| Plaintiff | Amount |
|---|---|
| Roderick Adderley | $ 8064.50 |
| Jim Allison | $ 8064.50 |
| Hilda Banta | $ 8064.50 |
| Sadye Millie Barbee, Individually and as Trustee of the Sadye M. Bridges Barbee Revocable Living Trust | $ 8064.50 |
| Ray Bissell | $ 8064.50 |
| Diana K. Boyd | $ 8064.50 |
| Dorothy Claunch | $ 8064.50 |
| Clarence Davis | $ 8064.50 |
| Hercules Echols | $ 8064.50 |
| Gary Farish | $ 8064.50 |
| Martin Hardin | $ 8064.50 |
| Patsy Hardin | $ 8064.50 |

1081

APP 0275

Willie Harris, Individually
and On Behalf of the
Estate of Bennie Harris $ 8064.50

James E. Hill $ 8064.50

Walter Kaufmann $ 8064.50

Glenda Kaufmann $ 8064.50

Bill Keith $ 8064.50

Galya Keith $ 8064.50

Essie Lacy, Individually
and On Behalf of the
Estate of Swarn Lacy, Jr. $ 8064.50

Jack R. Mann $ 8064.50

Manuel Marin $ 8064.50

Arthur McDonald $ 8064.50

Marjorie McDonald $ 8064.50

W. C. McGee $ 8064.50

Don Mobley $ 8064.50

Mary K. Parham $ 8064.50

Buck Pigg $ 8064.50

Joann Russell $ 8064.50

Camille Sanders, Individually
and as Independent Executrix
of the Estate of Fred Sanders $ 8064.50

Norman G. Watson $ 8064.50

Joe D. Willcox, Jr., Individually
and as Independent Executor of the
Estate of Kenneth R. Willcox $ 8064.50

1082

APP 0276

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all the questions you are required to answer under the instructions of the judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

JUDGE PRESIDING

1083

## CERTIFICATE

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
PRESIDING JUROR

(To be signed by those rendering the verdict if not unanimous.)

1084

APP 0278

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3    UNITED STATES OF AMERICA      .
                                    . H-09-CR-342-1
 4           vs.                    . HOUSTON, TEXAS
                                    . JANUARY 26, 2012
 5                                  . 10:00 A.M.
      ROBERT ALLEN STANFORD         .
 6    . . . . . . . . . . . . . . .

 7
                       TRANSCRIPT OF JURY TRIAL
 8              BEFORE THE HONORABLE DAVID HITTNER
                   UNITED STATES DISTRICT JUDGE
 9                          VOLUME 4

10

11    A P P E A R A N C E S:

12    FOR THE GOVERNMENT:

13         Gregg J. Costa
           Assistant US Attorney
14         PO Box 61129
           Houston, TX  77208-1129
15
           William Stellmach
16         Andrew Howard Warren
           U.S. Department of Justice
17         1400 New York Avenue NW
           Washington, DC 20005
18
      FOR THE DEFENDANT:
19
           Ali R. Fazel
20         Robert Scardino
           Scardino Fazel
21         1004 Congress Street
           3rd Floor
22         Houston, TX 77002

23

24    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.
25                             - - - - -
```

*Cheryll K. Barron, CSR, CM, FCRR*

GT
EXHIBIT 014

713.250.5585

APP 0279

04:49   1   A.  Well, I remember one advisor, Tony Perez, specifically
        2   asked him about the condition of Stanford International Bank.
        3   He had a lot of clients' monies deposited there, and he wanted
        4   to know how it was doing.  And Mr. Stanford assured him it was
04:49   5   doing great, it was fine, it was, you know, sound, a lot of
        6   what we heard on the video up there.
        7   Q.  And moving through 2009, coming up into February, what was
        8   happening in terms of redemptions of CDs by clients?
        9   A.  They were still increasing.  We were seeing far more
04:49  10   redemptions than we were deposits.
       11   Q.  Were you discussing that with Mr. Stanford, or did you
       12   speak with him at all after that January meeting in Phoenix?
       13   A.  The only time I recall speaking with him after that meeting
       14   was when he called a meeting to change a provision to disallow
04:50  15   the early surrender of CDs.  So, he was going to do a
       16   conference call with all of the financial advisors and he spoke
       17   with Danny Bogar and I briefly about that call and then we did
       18   the call with all the financial advisors, announcing that there
       19   would be no more early distributions -- or you couldn't
04:50  20   surrender your CD early anymore, you had to wait till it
       21   matured to get it out.
       22   Q.  Was that call recorded?
       23   A.  Yes, it was.
       24   Q.  Have you listened to that recording?
04:50  25   A.  Yes, I have.

04:50 1    Q.  You also reviewed a transcript that was prepared of that
    2    recording?
    3    A.  Yes, I did.
    4         MR. STELLMACH:  I'm showing the witness Government
04:51 5    Exhibit 152 and transcripts of two excerpts on that recording
    6    that are labeled 152A-T and 152B-T.
    7    BY MR. STELLMACH:
    8    Q.  Just first looking at the envelope, Government Exhibit 152,
    9    do you recognize it?
04:51 10   A.  Yes.
    11   Q.  How do you recognize it?
    12   A.  It was shown to me.
    13   Q.  Did you listen to it?
    14   A.  Yes, I did.
04:51 15   Q.  How do you know that's the tape that you listened to?
    16   A.  I initialed it and dated it.
    17   Q.  And looking at the transcripts, 152A-T and 152B-T, do you
    18   recognize those?
    19   A.  Yes, I do.
04:51 20   Q.  How do you recognize those?
    21   A.  My initials are on them.
    22   Q.  Are those transcripts a true and accurate description of
    23   the words that are depicted --
    24   A.  Yes.
04:51 25   Q.  -- and the attributions that are made?

04:51  1              In other words, when certain comments are

2    attributed to individuals speaking on the tape, are those

3    attributions accurate?

4    A.   Yes, they are.

04:52  5              MR. STELLMACH:  Your Honor, at this time we would like

6    to play Government's Exhibit 152A, which is the first clip,

7    with 152A-T as an aid to the jury for them to follow along.

8              MR. FAZEL:  No objection, your Honor.

9              THE COURT:  Okay.  So, it's 152, that's the entire

04:52  10   tape?

11             MR. STELLMACH:  The entire call.

12             THE COURT:  And 152A-T and B-T are the transcripts?

13             MR. STELLMACH:  That's correct, your Honor.

14             THE COURT:  Okay.  Go on.

04:52  15      (Tape playing)

16   BY MR. STELLMACH:

17   Q.   And so, there's a comment by Mr. Stanford in that call

18   that, "We're going to have to do something we haven't done in

19   25 years."  What was he referring to?

04:53  20   A.   The discontinuation of allowing clients to surrender their

21   CDs prior to maturity.

22             THE COURT:  What about -- could they surrender them

23   prior to maturity with a penalty?

24             THE WITNESS:  They could have prior to this call.  But

04:53  25   post this call, they could not surrender them early for any

04:53    1    reason, penalty or no penalty.

         2            THE COURT:  Okay.  And that was stated in the original

         3    document?

         4            THE WITNESS:  There was a provision in the disclosure

04:53    5    statement we reviewed earlier, that allowed for that.

         6    BY MR. STELLMACH:

         7    Q.  Was that a selling point when you were selling the CDs, the

         8    fact that people could redeem early without penalties?

         9    A.  No, no.  They always had to pay penalties.

04:54   10    Q.  Oh, okay.

        11    A.  But, yes, it was a selling point that people could get

        12    access to their money early with a penalty if they had to.

        13            MR. STELLMACH:  And turning to the second excerpt,

        14    152B, if we could play that.

04:54   15        (Tape playing)

        16    BY MR. STELLMACH:

        17    Q.  And in the excerpt we just heard, Mr. Stanford said, "We

        18    need to keep our core capital over a billion dollars."  Had he

        19    explained how that objective related to the decision not to

04:57   20    allow early redemptions from the CD program?

        21    A.  Not really.  I don't think he had explained it in that call

        22    other than, you know, again, the goal was to prevent a run on

        23    the bank.  And so, if you did not allow people to pull their

        24    money out early, they could not erode the assets of the bank

04:58   25    and, you know, the capital, as well.

---

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

APP 0283

*[handwritten top: and put in mail    Aank's copy    5]*

## STANFORD INVESTOR QUESTIONNAIRE

I. **INFORMATION ABOUT YOU**

Your name: _____ REDACTED _____

Your address: _ REDACTED _____

_____

Your telephone number: _ REDACTED _____

Your age: 62    Your employment (If retired, when did you retire and from what occupation): Retired 6/02, President & CEO, OSCA, Inc. (NASDAQ) Currently Partnered in two closely held businesses & Active Investor

Your education level: BSBA - UL - Lafayette

Is your net worth or joint net worth with your spouse greater than $1,000,000?
YES ✓ NO___

Have you had an individual income in excess of $200,000 in each of the two most recent years or joint income with your spouse in excess of $300,000 in each of those two years, and do you have a reasonable expectation of reaching that same income level in the current year? YES ✓ NO___  
*[handwritten: 2002 Adjusted Gross Income 4,910,317  2003 " " 128,129  2004 " " 485,859]*

Before you invested in the Stanford program, did anyone request any information about your financial status or your previous investment experience? YES ✓ NO___

Prior to your Stanford investment, what types of investments had you made? Public Equities, Municipal Bonds (TaxFree), CDs, Real Estate, Annuities and Private Closely held businesses

II. **INFORMATION ABOUT YOUR INVESTMENTS**

Did you invest in Stanford's Certificate of Deposit Program ("CD Program")? YES ✓ NO___ If yes, why did you invest in the CD program? _____
_____ Higher Rate of Return on certificate of deposit _____
_____
_____

How did you first find out about the investment opportunity in Stanford's CD program? __
_____ REDACTED _____ Business Partner  Novosep told me about Stanford after one of meetings

When and how were you contacted about Stanford, and by whom? _____
August 04 Met with Hank Mills And Tiffany Augelle at A
Meeting Set up by [REDACTED] _____

Who did you deal with at Stanford? Tiffany Augelle And Hank Mills

What was the date of your initial investment in Stanford's CD Program? _____
September 17, 2004

How much money did you initially invest in Stanford's CD Program? _____
$ 100,000.00

Please describe how you paid for your initial investment in Stanford's CD Program (*e.g.*, by check, wire transfer, etc. and indicate the bank name). If you paid by check, please provide a copy of the cancelled check to the staff. Morgan Keegan - MOR
Check No. 1041 (Attached)

Did you subsequently increase your investment in Stanford's CD Program? YES ✓
NO ___ If yes, how much have you invested to date? $300,000 personally and an
additional $100.00 thru Hollan Pinnacle Group LLC, a partnership
of which I own ⅓ interest.
Prior to investing, who told you about Stanford's CD Program, and what were you told? __
[REDACTED] + Business Partner told me About Excellent
CD Rate.

What documents, offering materials, or contracts did you receive? Please provide copies of the documents to the staff? Stanford Internat'ional Bank LTD information Package
including index linked CD, Flex CD Fixed CD, Subscription Agreement,
Disclosure statement & 2003 Annual Report (Attached)

Did you receive a document entitled "Disclosure Statement, U.S. Accredited Investor Certificate of Deposit Program"? YES ✓ NO ___ If yes, when and from whom? _____
August 2004, From Tiffany Augelle

Describe any communications you had with anyone regarding the above referenced Disclosure Statement, if any. Please include who the communication was with, when, where, and the circumstances of the communication. Discussed Disclosure Statement
with Tiffany Augelle And Hank Mills in August 04. They urged
me to do my own due deligence And offered to set up Meeting
with Stanford Financial Group to help me better understand Stanford's
investment strategy.

STANFORD INVESTOR QUESTIONNAIRE

Have you ever received a copy of Stanford's annual report? If so, when did you receive such report(s), who sent it to you and for what year(s), and what were the circumstances of your receiving such report? Yes in August 2004 during 1st meeting with Tiffany Angelle and Hank Mills which was set up by Mike Robicheaux. I was given a copy of Stanford's 2003 Annual Report. This was the same report that [REDACTED] had shown me at his office

What did you understand you were investing in? Uninsured Certificate of Deposit in an International Bank

Please describe in full what were you told, if anything, about the risk of this investment. Include who told you, how they told you, when, the circumstances of the communication, etc. I was told that although the CD's were uninsured that Stanford had never defaulted in the past due to the success of their investment strategy which is Capital Preservation

Did anyone guarantee the return of your principal investment? YES___ NO √ If yes, fully describe the circumstances of the communication (e.g., who made the guarantee, when was it made, where, how it was made, and what was said about it). _____

_____

Did anyone guarantee a specific return on your investment? YES___ NO √ If yes, please describe fully what return you promised, who made the guarantee and when, what you were told, how it was communicated to you, and any other details you can recall. _____
I was quoted a specific Rate of Return on an uninsured CD which I clearly understood was not a guarantee.

Did anyone tell you where Stanford was going to invest your funds in order to generate returns for CD Program Investors? YES √ NO___ If yes, please describe fully what you were told about where investor funds where going to be invested, when and how it was communicated to you, and any other details you can recall. At a teleconference with Laura Pendergast, Managing Director, Stanford Financial on December 30 2004. Attended by myself, two of my partners Tiffany Angelle, Hank Mills and Jason Green of Stanford from their Houston office. Ms Pendergast managed 30+ (outside) money managers with certain mandates for Capital Preservation which obviously contributed to consistent returns in the 12-13% range even 2001 & 2002 when many investors

Did anyone tell you that funds invested in the CD Program were insured against loss? YES___ NO ✓ If yes, please describe fully what you were told, who made the statements and when, how it was communicated to you, and any other details you can recall (e.g., who was insuring the investment). _____

_____
_____
_____
_____
_____
_____

If you received investment returns on your CD Program investment, please specify the amount of returns you received and the period of time involved? Hollan Pinnacle Group LLC Received a Return of $102,514.40 for a 6 month Investment of $100,000.

How do you receive your investment returns (e.g., by check, direct deposit, account credits, etc.)? Direct Deposit _____

Have you ever attempted to liquidate, withdraw, cancel or redeem your investment in the CD Program? YES ✓ NO ___ If yes, please describe any difficulties or problems you experienced in attempting to liquidate, withdraw, cancel or redeem your investment. _____ No difficulty - The Hollan Pinnacle Group LLC Funds Plus interests were rendered promptly and without difficulty upon maturity (April 9, 2005)

What is the current status of your investment? Still have $300,000 Personally Invested in Stanford's Certificates of Deposits

When was the last time you discussed your investment with a representative of Stanford? _ Monday Tuesday May 31, 2005 _____

Who did you speak to and what did he or she tell you about your investment? Tiffany Angelle. She called to notify me that Stanford International Bank was increasing CD rate by 50 basic points effective June 1, 2005 on Deposits greater than $250,000.

Did you make any recordings of conversations you had with representatives of Stanford concerning your investment? YES___ NO ✓ If yes, please produce a copy of them to the staff.

Did you take notes of your conversations with representatives of Stanford concerning your investment? YES___ NO ✓ If yes, please produce a copy of them to the staff.

Please provide copies of your account statements for the Stanford CD Program for the time period January 1, 2005 to the present. (attached)

**APP 0287**



# SEC Investigating Stanford Group Offshore-Bank CDs (Update1)

By Alison Fitzgerald - Jul 03, 2008

July 3 (Bloomberg) -- The U.S. Securities and Exchange Commission is investigating sales of certificates of deposit by Stanford Group Company at its offshore bank, which has $6 billion in assets in Antigua.

The SEC issued subpoenas yesterday to two former Stanford Group employees asking for information about the CD sales by its offshore bank, Stanford International Bank Ltd. The subpoenas also demanded sales-training materials for the CDs and so-called mutual fund wrap programs, which are portfolios of diversified mutual funds. Houston-based Stanford Group is owned by billionaire R. Allen Stanford. Its companies have more than $43 billion under management or advisement, according to its Web site.

The subpoenas were provided to Bloomberg News by Mike O'Brien, the Houston-based attorney for two former employees, Charles Rawl and Mark Tidwell. They are both suing Stanford Group, accusing the company of forcing them to resign because they did not want to participate in illegal activities that they say Stanford Group was requiring them to carry out.

Stanford Group spokeswoman Lula Rodriguez said the company is ``not aware of any formal actions by the SEC related to either Mr. Tidwell or Mr. Rawl or connected to any of our clients.''

Rodriguez said the allegations ``have been made by disgruntled employees and are totally without merit.''

SEC spokesman John Nester said the agency does not confirm or deny the existence of an investigation. Rawl and Tidwell were both investment advisers for Stanford Group in Houston.

`Leave That Place'

``All we wanted to do was leave that place, get out of there and get our clients out safe and sound,'' Rawl said in an interview.

**GT EXHIBIT 016**

**APP 0288**

App. 278

In the lawsuit, Rawl and Tidwell claim that the company failed to file forms to the U.S. Treasury Department disclosing its clients' offshore holdings and did not advise its clients to file those forms.

The lawsuit also alleges that Stanford Group purged files and destroyed documents as early as last year related to what Tidwell and Rawl claim is an ongoing SEC investigation regarding the CD sales practices. The lawsuit alleges that the company gave clients false historical performance data for its securities.

In court papers, Stanford Group said it had fired Tidwell and Rawl and that the two owe the company repayment of loans made to them.

Rawl said he owes Stanford Group $579,441. He said the company paid him a bonus upon his hiring in 2005 that would vest over time and that he was required to pay back when he left the company early. Tidwell owes the company $155,598, according to court papers filed by Stanford Group.

R. Allen Stanford was ranked the 605th-richest person in the world by Forbes Magazine this year, with an estimated net worth of $2.0 billion. The Texas native holds dual citizenship after becoming a citizen of Antigua in 1999. Stanford International Bank had $6 billion in assets as of July, 2007, according to its Web site.

To contact the reporter on this story: Alison Fitzgerald in Washington at Afitzgerald2@bloomberg.net

To contact the editor responsible for this story: Michael Forsythemforsythe@bloomberg.net

©2010 BLOOMBERG L.P. ALL RIGHTS RESERVED.

APP 0289
App. 279

**REPORT OF THE 2009 SPECIAL REVIEW COMMITTEE ON FINRA'S EXAMINATION PROGRAM IN LIGHT OF THE STANFORD AND MADOFF SCHEMES**

SEPTEMBER 2009

SPECIAL REVIEW COMMITTEE

Charles A. Bowsher (Chairman)

_____

Ellyn L. Brown

_____

Harvey J. Goldschmid

_____

Joel Seligman

_____

INDUSTRY GOVERNOR ADVISERS
Mari Buechner
W. Dennis Ferguson
G. Donald Steel

OF COUNSEL
Paul V. Gerlach
Griffith L. Green
Dennis C. Hensley
Michael A. Nemeroff
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005

GT
EXHIBIT 017

APP 0290

## TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ........................................................................ 1

    A.   The Stanford Case ................................................................................ 2

    B.   The Madoff Case .................................................................................. 4

    C.   Recommendations ................................................................................ 6

II.   BACKGROUND ON FINRA EXAMINATION PROGRAM ..................... 9

III.   EXAMINATIONS OF MEMBER FIRMS INVOLVED IN THE
    STANFORD AND MADOFF SCANDALS ................................................ 11

    A.   The Stanford Case ................................................................................ 12

        1.   Background .................................................................................. 12

        2.   Daniel Arbitration and 2003 Cycle Examination ..................... 13

        3.   2003 Anonymous Tip Letter ..................................................... 14

        4.   Basagoitia Arbitration and Notice of SEC Investigation ......... 17

        5.   2005 Cycle Examination ........................................................... 18

        6.   Meeting with SEC and the SEC Referral Letter ...................... 23

        7.   Conclusion of the 2005 Cycle Examination ............................ 27

        8.   2005 Cause Examination ........................................................... 28

        9.   2007 Cycle Examination ........................................................... 38

        10.   2007 Miami Branch Examination and 2009 Unannounced Branch
           Examinations .............................................................................. 39

    B.   The Madoff Case .................................................................................. 46

        1.   Background .................................................................................. 46

        2.   Registration of the Madoff Firm as an Investment Adviser ..... 50

        3.   2007 Cycle Examination ........................................................... 51

        4.   2003 and 2005 Cycle Examinations ......................................... 56

APP 0291

      5.      Assessment of the Madoff Firm Examinations ......................................... 57

      6.      Examinations of Cohmad Securities .......................................................... 61

**IV.**    **OVERVIEW OF FINRA'S JURISDICTION** ................................................. 65

**V.**    **FINRA ACTIONS SINCE THE STANFORD AND MADOFF SCHEMES** ............ 69

**VI.**    **RECOMMENDATIONS** .............................................................................. 71

    1.      Jurisdiction ........................................................................................... 71

    2.      Examination Process and Personnel ..................................................... 73

    3.      Coordination with the SEC and Other Regulatory Agencies................. 75

    4.      Training of FINRA Personnel................................................................. 76

    5.      Plan of Action ....................................................................................... 76

APP 0292

## I.      EXECUTIVE SUMMARY

On April 13, 2009, the Board of Governors ("Board") of the Financial Industry Regulatory Authority, Inc. ("FINRA") established a Special Review Committee ("Special Committee")[1] to review FINRA's examination program, with particular emphasis on the examinations of FINRA member firms associated with R. Allen Stanford and Bernard L. Madoff.  The Board was particularly concerned by the significant harm to investors caused by Stanford and Madoff.  Pursuant to a resolution approved by the Board, the Special Committee was asked to "recommend . . . changes in the examination program, where appropriate, to improve member oversight and FINRA's fraud detection capability," and to consider management's "monitoring [of] compliance with examination program policies."[2]

The Special Committee, acting through outside counsel, reviewed relevant examination files from 2003 to 2009 of the principal member firms associated with Stanford and Madoff. Interviews were conducted with the examiners, supervisors, and managers still employed by FINRA who were involved in the examinations.   In addition, outside counsel interviewed numerous headquarters staff and senior management to enable the Special Committee to develop factual findings and recommendations.[3]   In total, outside counsel conducted 60 interviews of FINRA staff.  Because of ongoing civil and criminal actions involving the Stanford and Madoff schemes, counsel did not interview persons other than current FINRA employees or obtain information directly from the implicated firms or from the Securities and Exchange Commission ("SEC").

---

[1] All members of the Special Committee are public governors of FINRA.

[2] The Charter of the Special Committee is attached as Appendix A to this report.  In making its recommendations regarding FINRA's examination program, the Special Committee was not asked to comment on personnel matters.

[3] The Special Committee solicited the input of FINRA senior executive staff prior to finalizing the recommendations presented in this report.

APP 0293

The Ponzi schemes allegedly perpetrated by Stanford and admitted to by Madoff are striking because of their size and duration.[4]   Madoff's scheme spanned decades, defrauded thousands of investors, and caused an estimated $64 billion in investor losses.  According to the SEC, Stanford sold numerous investors approximately $7.2 billion of fraudulent products, purported to be certificates of deposit ("CDs"), over at least a decade.

FINRA's examinations of the Madoff and Stanford firms did not uncover these frauds.  The histories of the examinations of these firms present distinct lessons for improving FINRA's examination program.

A.      The Stanford Case

Between 2003 and 2005, the National Association of Securities Dealers—FINRA's predecessor entity—received credible information from at least five different sources claiming that the Stanford CDs were a potential fraud.  The most striking was a July 2005 five-page referral letter from the SEC's Fort Worth office that explained in detail why the purported investment strategy of the offshore bank could not have produced the consistently high returns being paid by the CDs.  The letter stated that the CD program was a "possible fraudulent scheme" and that the returns were "too good to be true."  According to this letter, "as of October 2004, [the Stanford firm's] customers held approximately $1.5 billion of CDs."  Despite the existence of this "red flag" and others described in the body of this report, FINRA did not launch an investigation of whether the Stanford CD program was a fraud until January 2008.[5]  By the time the CD program was shut down by the SEC in February 2009, the alleged amount of

---

[4] Bernard Madoff has confessed and pled guilty.  As of the publication of this report, Allen Stanford is contesting the charges against him.

[5]  As discussed in the body of the report, FINRA's 2005 cause examination did result in a charge against the Stanford firm for advertising violations relating to the CD program and a $10,000 fine.

APP 0294

investor funds had grown to approximately $7.2 billion.   According to the court appointed receiver in the Stanford matter, the vast majority of these funds will never be recovered.

FINRA missed a number of opportunities to investigate the Stanford firm's role in the CD scheme.   First, FINRA's Dallas office staff curtailed a 2005 investigation prompted by the SEC referral letter because of a concern that the offshore CDs were not "securities" regulated under federal securities laws.   Facts surrounding the decision not to pursue the fraud investigation indicate that certain of FINRA's examination staff were then, and may remain, unsure of the full scope of the organization's investigative authority, are reluctant to pursue investigations where jurisdiction questions arise, and are not adequately trained to identify alternate bases of jurisdiction.

Second, although the CD program involved billions of dollars of investor funds, FINRA procedures, at the time and now, do not set forth criteria for escalation of a matter to senior management or the use of specially-trained investigators based on the gravity and substance of the fraud allegations.   The Dallas staff did not provide the SEC referral letter to senior management in Washington, DC, until December 2008.

Third, FINRA's member examination program focuses the majority of member regulation resources on routine "cycle" exams.   Although SEC-required cycle exams play a role in ensuring that member firms are adequately capitalized and compliant with regulatory requirements, they are not an effective means for uncovering complex frauds such as the alleged CD scheme.

Fourth, FINRA's Dallas staff did not adequately document communications with the SEC, or discussions within FINRA itself, regarding the CD program.   As a result, critical

APP 0295

decisions regarding the course of examinations were influenced by misunderstandings and incomplete exchanges of information.

Finally, FINRA did not—and still does not—have a centralized database that gives examiners direct, electronic access to all relevant complaints and referrals associated with a member firm.  As a result, no single FINRA staff member was ever aware of all of the "red flags" related to the Stanford firm that are discussed in this report.

The Special Committee recommends that FINRA's examination program should be revamped to ensure that fraud detection and prevention are core elements.  This is particularly critical when the potential fraud poses risk of significant harm to investors.  Allegations of the magnitude and gravity of those in the Stanford case should be given the highest priority, immediately escalated to FINRA senior management, and vigorously pursued by well-trained FINRA staff with all necessary investigative tools and techniques.  The Special Committee agrees with and supports the plan of FINRA senior management to create a dedicated fraud detection unit.  The Special Committee believes the unit should centrally manage fraud cases involving potentially significant investor losses and ensure that cause exams involving significant allegations of fraud receive the highest priority in terms of staffing and resources.

### B.     The Madoff Case

The Madoff case provides a different perspective on FINRA's examination program.  In contrast to the Stanford matter, the Special Committee did not find evidence that FINRA received any whistleblower complaints regarding the Madoff scheme or that the SEC shared any concerns or specific allegations about Madoff with FINRA prior to the time when Madoff admitted his fraud.  Indeed, the broker-dealer records provided to FINRA contained no indication that the Madoff firm was operating an investment advisory business.  Madoff maintained separate bank accounts, cordoned off the investment advisory business to a separate

APP 0296

floor of his firm's office space, and deliberately failed to disclose his investment advisory activity in broker-dealer forms submitted to FINRA.

In 2006, the SEC caused the Madoff firm to register as an investment adviser and to submit information on its advisory business to the Investment Adviser Registration Depository ("IARD"), a system operated by FINRA pursuant to a contract with the SEC. The Madoff firm continued to represent to FINRA that it was not involved in investment advisory activity, and—more generally—that it did not maintain any customer accounts. FINRA examiners did not have direct access to the Madoff firm's IARD entries.

In the course of their cycle examinations, FINRA examiners did come across several facts worthy of inquiry associated with the Madoff scheme that, with the benefit of hindsight, should have been pursued. Most notably, in the course of examining a related firm—Cohmad Securities Corporation[6]—that brought investors into the Madoff Ponzi scheme, FINRA staff observed records of substantial, recurring payments from the Madoff firm to Cohmad. In addition, in a 2007 examination of the Madoff firm, FINRA staff uncovered commissions from a London affiliate that now appear to have served as a money laundering operation for Madoff's investment advisory business. If FINRA's examiners had fully investigated these transactions, it is possible that they would have developed suspicions and investigated further regarding Madoff's business.

In the final analysis, however, the most notable fact about the Madoff case is that FINRA's ability to effectively examine firms registered as both broker-dealers and investment advisers would be greatly enhanced if FINRA had jurisdiction to enforce the requirements of the

---

[6] As explained in the report, Cohmad was partially owned by Madoff and was located in the offices of the Madoff firm. On June 22, 2009, the SEC filed a lawsuit against Cohmad accusing it and its principals of "participating in Bernard L. Madoff's Ponzi scheme by raising billions of dollars from hundreds of investors under a shroud of secrecy." Complaint in *SEC v. Cohmad Securities Corp. et al.*, S.D.N.Y. 09 Civ. 5680.

APP 0297

Investment Advisers Act of 1940 ("Investment Advisers Act").   This additional jurisdiction would enable FINRA to be more effective in detecting fraud in both broker-dealers and investment advisers.   In addition, to uncover frauds such as that perpetrated by Madoff, FINRA must amend and improve its examination process and examiner training.   The Madoff case underscores the need for FINRA's examination program to develop means to verify independently the data submitted by member firms.   At present, cycle exams principally rely on the representations of member firms, and, thus, are heavily dependent on the honesty and completeness of the member firm's response.   The Madoff case also highlights the need to improve the exchange of information within FINRA and between the SEC and FINRA, including the sharing of information about potentially fraudulent conduct at member firms.   Finally, the Madoff case demonstrates the need for FINRA to clarify the extent of its jurisdiction, and to more aggressively exercise that jurisdiction.

## C.    Recommendations

The issues identified above and further described in this report are the basis for the recommendations of the Special Committee.   The recommendations are described in detail in this report at pages 71-76.   Virtually all of these recommendations will require FINRA management and the Board to make key decisions on resource allocations.   Some of these recommendations will require action by the SEC or Congress.   The most important of these recommendations include:

FINRA should clarify and expand its jurisdiction to enable it to be more effective in detecting fraud and protecting investors.   FINRA is fundamentally hampered by its lack of jurisdiction over investment advisory activities.   FINRA should proactively seek new jurisdiction from Congress to regulate activities under the Investment Advisers Act to give it more effective means to detect future Madoff-like situations.   FINRA also should clarify its current jurisdiction

6

APP 0298

to regulate member firms and associated persons and more aggressively seek information, especially where there are indications of fraud.  FINRA should expand its jurisdiction to enable it to obtain information from affiliates of member firms in its enforcement of the Securities Exchange Act of 1934 and FINRA rules when it believes there is evidence of fraud.

FINRA should restructure its examination program to make fraud detection a core element.  The Special Committee supports FINRA management's plan to create a dedicated fraud detection unit.  Examinations should be prioritized to expedite any investigation involving potential fraud, serious harm to investors, or continuing serious misconduct.  This restructuring should strengthen the cause examination program and revise the cycle examination program.  In taking these steps to improve its examination program, FINRA will need to make greater use of personnel with specialized skills and improve its internal exam-related procedures.  In particular, FINRA should improve its documentation of legal and regulatory issues, including its internal communications and communications with other regulators.

FINRA should improve the technology available to its examination staff, enhancing systems and access so that examiners are empowered to easily locate and analyze all data and documents within FINRA regarding a member firm.  Such tools could have significantly improved the staff's ability to grasp the pattern of complaints against Stanford.

FINRA should end its virtual total reliance on data provided by member firms.  FINRA should adopt procedures to test and confirm certain member-provided data against third-party sources such as independent auditors and non-affiliated banks.  FINRA also should cross-check data provided to FINRA in various submissions by the same firm.  Third-party verification and cross-checking could have provided examiners additional means to uncover the Madoff fraud.

APP 0299

FINRA should work with the SEC and other regulators to expand FINRA's access to and use of available data about member firms and their associated persons.  Such data sharing will assist FINRA in obtaining more complete information on those that it regulates.  FINRA also should enhance its training program for the examination staff, focusing on fraud training and requiring formal continuing education and training.

The Special Committee believes the recommendations above should be implemented by means of a Plan of Action developed by FINRA management and presented for consideration by the Board.  Management has agreed to present a Plan of Action for approval or ratification at the December 2009 Board meeting.

APP 0300

## II.     BACKGROUND ON FINRA EXAMINATION PROGRAM

FINRA is a non-governmental, self-regulatory organization subject to SEC oversight under Section 15A of the Securities Exchange Act of 1934 ("Exchange Act").  It was created in 2007 through the merger of the National Association of Securities Dealers ("NASD") and the member regulation, enforcement, and arbitration functions of New York Stock Exchange Regulation, Inc. ("NYSE").  It is responsible for overseeing broker-dealers, who must register with the SEC and become members of FINRA, and registered representatives, who must pass examinations demonstrating their knowledge and expertise.  As of December 31, 2008, there were 4,895 broker-dealers and 664,975 registered representatives subject to FINRA's oversight. FINRA also engages in oversight of various securities markets and facilities.  FINRA has approximately 2,800 employees and operates from Washington, DC, and New York, NY, as well as from 15 district offices around the nation.

FINRA has an active enforcement program designed to promote compliance with the Exchange Act and FINRA rules.  In each year between 2004 and 2008, FINRA and its predecessors, NASD and NYSE, expelled an average of 21 firms and banned an average of 433 registered representatives from the industry.  In each of these years, FINRA also suspended 396 registered representatives, collected approximately $97.4 million in fines, and obtained restitution for broker-dealer customers amounting to $105 million on average.  In 2008, the settlement of its auction-rate securities cases returned $1.172 billion to investors.  Each year FINRA receives about 25,000 complaints, tips, and similar items, which are processed by an organization called Central Review Group-Front End Cause.  This organization handles about 20,000 of these items and refers the remaining 5,000 to district offices for processing.

APP 0301

FINRA's examination program is presently organized into two basic departments: Member Regulation and Market Regulation.  Market Regulation, the smaller of the two departments, is not considered in this report because its responsibilities are not relevant to the Stanford and Madoff schemes.

The Member Regulation department is charged with oversight of FINRA member firms and is subdivided into Sales Practice, Risk Oversight and Operational Regulation ("Risk Oversight"), and Shared Services.  Sales Practice is the largest of these three groups.  It is charged with the oversight of about 4,800 member firms.  It had about 560 examiners and 106 supervisors as of December 31, 2008, located in 15 district offices across the United States. The examiners are supported by enforcement lawyers also located in the district offices who report separately to the Enforcement department.

Sales Practice is responsible for conducting onsite examinations of financial operations and sales practices—called "cycle exams"—as well as "cause exams," which stem from customer complaints, anonymous tips, referrals from the SEC and other sources.  Sales Practice conducts more that 2,100 cycle exams each year.  Sales Practice's policy is to complete all cycle exams each year, although this goal is not always met.  Firms are scheduled for cycle examinations every year, every two years, or every four years based on an annual risk assessment that incorporates numerous factors.  Firms judged to be the most prone to regulatory concerns are examined each year.  Sales Practice district offices also complete about 5,000 cause examinations each year.

Risk Oversight is responsible for overseeing the financial solvency of approximately 500 of the largest FINRA member firms and those with the most complex operations.  For example, almost all clearing and carrying firms are examined by Risk Oversight.  Risk Oversight

APP 0302

also is assigned large proprietary trading firms with over $100 million in annual revenues.  The Madoff firm was scheduled to be examined by Risk Oversight in March 2009, but this exam was obviated by Madoff's confession.  Most firms examined by Risk Oversight are located in the New York metropolitan area, and most of the subdivision's 140-person examination staff is located in its office in New York City.

Shared Services is primarily responsible for planning the annual cycle examination program and for developing policies that control both cycle and cause examinations.  This includes detailed monitoring and budgeting of examination hours.  Shared Services also is responsible for the quality assurance program, Sales Practice policies, training for Sales Practice examiners and other staff, and the administration of Member Regulation.

Prior to FINRA's formation in 2006, the member firms associated with Stanford and Madoff that are discussed in this report were members of NASD.  For ease of reference, except where otherwise noted, this report generally refers to both NASD and FINRA as "FINRA."

APP 0303

### III.    EXAMINATIONS OF MEMBER FIRMS INVOLVED IN THE STANFORD AND MADOFF SCANDALS

#### A.    The Stanford Case

1.    <u>Background</u>

According to civil and criminal actions brought in 2009 by the SEC and the United States Department of Justice, respectively, R. Allen Stanford ("Stanford") and his closest associates have engaged in a massive and long-running fraudulent scheme.  Acting through a series of companies under their control, Stanford and his co-defendants are alleged to have sold financial products, purported to be CDs, and to have diverted investors' funds to illiquid, high-risk investments.  As evidenced by sales brochures provided to FINRA and the SEC, the Stanford companies issuing and marketing the CDs represented to investors that their money was being placed in safe and liquid investments.  These companies also claimed consistent double digit rates of return for the purported CDs.  According to allegations in the SEC's case against Stanford, the claimed rates of return were virtually impossible under the Stanford bank's stated investment strategy, and were fabricated out of whole cloth by Stanford and his co-defendants. The defendants allegedly defrauded investors of approximately $7.2 billion.

The purported CDs, issued by Stanford International Bank, Ltd. ("the Stanford bank"),[7] were marketed by, among other entities, Stanford Group Company ("the Stanford firm"), a Houston-based company with numerous offices in the United States.  The Stanford firm was established in 1995, registered with the SEC as a broker-dealer, and became a member of FINRA.  As a FINRA member, the Stanford firm was subject to periodic cycle and cause exams. Because the firm's home office is located in Texas, many of these exams were conducted by

---

[7] The Stanford bank was founded in Montserrat and, since 1985, has been based in Antigua and Barbuda ("Antigua").

APP 0304

FINRA's Dallas office.[8]  Between 2003 and 2008, commissions from the sales of offshore CDs constituted from 38 to 68 percent of the Stanford firm's total revenues reported to FINRA.[9]

### 2.   Daniel Arbitration and 2003 Cycle Examination

In June 2003, a FINRA arbitration took place between the Stanford firm and Gregory Daniel, a former employee of the firm.  Mr. Daniel alleged that he was wrongfully terminated, that he "was pressured to direct [his] clients['] assets to the off shore bank in Antigua," and that he was forced to sell "proprietary managed money products with no track record, cash inflows or clear investment objective."  The arbitration concluded in a settlement between the parties, but the arbitrators referred the matter to FINRA's Enforcement department in August 2003 for investigation of possible rule violations by the firm or, alternately, possible abuse of the arbitration process by Daniel.

FINRA's Enforcement department, in November 2003, referred the Daniel matter to the then-Associate Director of the Dallas office, "for your review and whatever action you deem appropriate."  According to email records from 2003, the Associate Director informed the examiners involved in the 2003 cycle exam of the Stanford firm about the allegations raised by Daniel.  When interviewed, however, neither the Associate Director nor the Dallas Director recalled inquiring about the disposition of the Daniel arbitration referral until 2009, when news

---

[8] FINRA's Dallas office is a long-standing NASD-legacy office.  From 1999 to 2003, the office was headed by Bernerd Young.  In 2003, Young was replaced.  The new Dallas Director implemented new procedures to increase both productivity and the diligence of examiners.  Witnesses noted that Young's departure and the changes implemented by the new Director precipitated a significant change in personnel within the Dallas office—approximately half of the staff, including many examiners and exam managers, resigned their positions shortly after Young left.  The office remained understaffed for some period of time.  Witnesses noted that, by 2005, the staffing situation stabilized due to new hires and transfers from other FINRA offices.

After serving for a period of time as a securities industry consultant, Young was hired as the Managing Director of Compliance for the Stanford firm in June 2006, a position he held through 2009.  The interviews of current FINRA employees and review of exam files identified no information to suggest that Young's presence at the firm compromised FINRA's subsequent examinations of the firm discussed in this report.

[9] These commissions are reported in FINRA's cycle exam reports of the Stanford firm under the heading "Solicitor of time deposits in a financial institution."

APP 0305

of the Stanford scandal broke and the Dallas Director sought to identify all files related to the firm.

The 2003 cycle exam of the Stanford firm was completed on December 15, 2003.  The exam file contains no indication that Daniel was contacted by anyone on the exam team to determine what he knew about the CDs, or that FINRA took any action against the firm based on Daniel's allegations.  The 2003 exam report indicated that 68 percent of the firm's revenues were generated from commissions from the sale of Stanford bank CDs.  The 2003 exam file does not indicate that any of the examiners questioned the Stanford firm about the fact that it generated upwards of two thirds of its total revenue from the sale of these CDs.

        3.       <u>2003 Anonymous Tip Letter</u>

In September 2003, FINRA received an anonymous letter describing an ongoing fraud within Stanford's business empire.  The author claimed to be an insider.  In bold capital font, the letter stated that Stanford Financial Group, the parent company of the Stanford bank and firm, "**IS THE SUBJECT OF A LINGERING CORPORATE FRAUD SCANDAL PERPETUATED AS A 'MASSIVE PONZI SCHEME' THAT WILL DESTROY THE LIFE SAVINGS OF MANY, DAMAGE THE REPUTATION OF ALL ASSOCIATED PARTIES, RIDICULE SECURITIES AND BANKING AUTHORITIES, AND SHAME THE UNITED STATES OF AMERICA.**"  The letter continues as follows:

> The Stanford Financial Group of Houston, Texas has been selling to the people of the United States and Latin America, offshore certificates of deposit issued by Stanford International Bank, a wholly owned unregulated subsidiary.  With the mask of a regulated US Corporation and by association with Wall Street giant Bear Stearns, investors are led to believe these CD's are absolutely safe investments.  Not withstanding this promise, investor proceeds are being directed into speculative investments like stocks, options, futures, currencies, real estate, and unsecured loans.

APP 0306

For the past seventeen years or so, Stanford International Bank has reported to clients in perfect format and beautifully printed material of the highest quality, consistent high returns on the bank's portfolio, with never a down year, regardless of the volatile nature of the investments.  By showing these unbelievable returns, Stanford has justified the expense spent on luxury, lavish styles of management, high bonuses, and generous contributions to all sorts of causes.

The questionable activities of the bank have been covered up by an apparent clean operation of a US Broker-Dealer affiliate with offices in Houston, Miami, and other cities that clears through Bear Stearns Securities Corporation.  Registered Representatives of the firm, as well as many unregistered representatives that office within the B-D, are unreasonably pressured into selling the CD's. Solicitation of these high risk offshore securities occurs from the United States and investors are misled about the true nature of the securities.

The offshore bank has never been audited by a large reputable accounting firm, and Stanford has never shown verifiable portfolio appraisals.  The bank portfolio is invested primarily in high risk securities, which is not congruent with the nature of safe CD investments promised to clients.

A copy of the Stanford bank's annual financial statement was attached to the letter, which also described Stanford's close association with Antigua, and referenced certain investigations and press articles suggesting that Stanford had engaged in bribery and money laundering.  The letter concluded by urging regulators to focus on the "real market value" of the Stanford bank's investment portfolio, "*which is believed to be significantly below the bank's obligations*." (Emphasis in original.)  A carbon copy notation indicated that, in addition to FINRA, copies of the letter were sent to the SEC, a U.S. Senate Committee, the Office of the Comptroller of the Currency, and various media outlets.

The anonymous letter was processed by FINRA's Central Review Group-Front End Cause department in Washington, DC.[10]  An analyst in that department determined that FINRA lacked jurisdiction over the matter, and referred the letter to the SEC.  When interviewed, the analyst explained that he had concluded that FINRA lacked jurisdiction because he had been

---

[10] At the time, the department was known simply as "Front End Cause."

APP 0307

instructed, as part of his training, that CDs generally were not "securities" as defined under the Exchange Act.  In reaching this determination, the analyst did not focus on the offshore nature of the Stanford bank's CD program, nor did he consider alternate bases of FINRA jurisdiction.  The conclusion whether an offshore CD will be considered a security is not self-evident and depends, in large part, on the specific protections provided by the regulatory system in the jurisdiction in which the product is issued.[11]

The analyst wrote a short description of his handling of the matter in FINRA's internal electronic records database (in 2003, known as "MERIT"; now known as "STAR").  The description notes that "Product listed is 'offshore CDs' and Certificates of Deposit" and that the investigation concluded with "No Juris[diction].  Referred to SEC, 10/20/2003."  This comment is the only substantive description regarding the Front End Cause investigation that anyone in the Dallas office would have seen when searching for files related to the Stanford firm in the MERIT or STAR databases.  The MERIT and STAR databases did not contain a copy of the anonymous insider letter, although staff would have seen a reference to the letter and could have obtained a copy from the office where the entry was made.[12]

In her interview, the Dallas Director noted that her staff typically consulted the STAR database in preparing for an upcoming exam, but that, after seeing an entry finding no

---

[11] For a discussion of the SEC's position that the Stanford CD are "securities," see pages 24-25 and footnote 52 below.

[12] STAR is a matter tracking system used by FINRA to track investigations, examinations, alerts, sweeps, reviews, referrals, membership applications, filings, disclosures, tips and complaints.  The primary users of STAR are FINRA's Enforcement, Market Regulation and Member Regulation departments.  Advertising and Corporate Finance also track matters in STAR.  Departments such as Office of Disciplinary Affairs, Registration and Disclosure and Finance update matters in STAR as well with information relevant to their business practices.

Numerous matter-related data elements are tracked in STAR.  These include the following: matter type, staff, source or origin, contacts (firms, individuals, registered representatives, entities), securities products, markets, comments, correspondence (including relevant dates), high level allegations, rule violations, milestone or matter dates, dispositions or resolutions, billable entities, disciplinary actions (appeals, decisions, sanctions, fines, undertakings, restitution), information requests to firms as well as responses, time and activities.  Those with access to the system are able to track down related documentation by contacting the person or office that input the relevant information.

APP 0308

jurisdiction, they likely would not have attempted to retrieve the anonymous letter.  According to email records, no one in the Dallas office saw the letter until May 2009, when it was mentioned in newspaper articles regarding Stanford.  At that time, Dallas staff searched various FINRA databases and uncovered a copy of the letter.[13]

> 4.   Basagoitia Arbitration and Notice of SEC Investigation

In December 2004, the Associate Director of the Dallas office received an email from a FINRA enforcement attorney.  The email referenced an arbitration between the Stanford firm and Leyla Basagoitia, a former Stanford financial adviser based in Texas.  The Stanford firm had terminated Basagoitia and brought the arbitration to recover a balance on an employment promissory note issued to her.  Basagoitia countered by alleging that she was improperly terminated.  The email also indicated that the FINRA enforcement official had received a call from an SEC attorney from Fort Worth regarding the matter.  The email further indicates that the SEC attorney

> is involved in the investigation of the claimant firm (Stanford Group Company) involving, among other things, the firm's coercion of representatives to sell Antigua CD's—Respondent's claim is that she was fired because she refused to sell the CD's without documentation and due diligence.  [The SEC attorney] wanted to let [FINRA] know that [the SEC Attorney—*sic*, likely Basagoitia] has provided much assistance to the SEC in their investigation and that they believe there is a problem with selling the CD's—that the instruments are and were securities, etc.

The Associate Director forwarded the FINRA enforcement attorney's email to the Dallas Director and to four exam managers in the Dallas office, stating that he "was not aware of the SEC investigation re:  Sale of Antigua CDs," and that he would call the SEC unless the Dallas Director or the managers already knew something about the investigation.  When interviewed,

---

[13] The system described in footnote 12 does not give staff direct, electronic access to all regulatory information related to a member firm.

APP 0309

however, the Associate Director had no recollection of the above email and did not recall calling the SEC about the matter.[14]

A March 2005 email from an attorney in the SEC's Fort Worth office indicates that the Associate Director of FINRA's Dallas office was communicating with SEC staff regarding the Stanford firm.  In the email, the SEC attorney wrote: "If you have any thoughts about the suitability issue I raised in connection with Stanford, or ideas about the firm generally, I would love to hear from you."  The Associate Director has no recollection of this email or the referenced communication with the SEC attorney.

     5.     2005 Cycle Examination

FINRA performed its next cycle exam of the Stanford firm in 2005.  The exam team consisted of a lead examiner and three junior examiners.  The lead examiner had been with FINRA's Dallas office since 2000.  Each of the junior examiners had less than a year of experience with FINRA.

For approximately a year leading up to the 2005 cycle exam, the lead examiner had been assigned as the Stanford firm's core examiner.  At the time, a core examiner was responsible for reviewing a firm's FOCUS[15] reports and its annual audited financial statements.  The core examiner was also FINRA's primary contact with the member firm.

When interviewed, the lead examiner noted that he had developed numerous concerns about the Stanford firm in his capacity as its core examiner.  In particular, he noted that most of the firm's revenues were derived from the sale of CDs issued by the Stanford bank.  He also indicated being troubled by the size of the commissions paid by the bank to the firm for CD

---

[14] Other than an occasional email reference and one reference in an internal memorandum, based on interviews and records provided, the Dallas office did not memorialize its communications with the SEC about the Stanford matter.

[15] The Financial and Operational Combined Uniform Single ("FOCUS") report is a basic financial and operational report required of broker-dealers subject to minimum net capital requirements set forth in SEC Rule 15c3-1.  The report contains figures on capital, earnings, and other financial details.

APP 0310

referrals.  In his experience, commissions typically were not paid for CD referrals, and if a commission was paid, it was generally no more than $50 per referral.  By contrast, the Stanford bank paid the Stanford firm an *annual* fee equal to *three percent of the deposit sum* for every CD account referred by the firm.

The lead examiner also reported having had concerns about the Stanford firm's net capital position, and he noted that the firm had received periodic capital contributions from Stanford.  He also indicated that, about every two to three months, the firm's FOCUS report generated an "exception"—an event caused by data the FOCUS system deems irregular—associated with these capital infusions.  The lead examiner further expressed the opinion that the firm was "hemorrhaging" money and was being kept afloat with capital contributions.  He stated that he periodically questioned the firm's Chief Financial Officer about these capital infusions. The Chief Financial Officer tried to reassure him by noting that Stanford was a prominent and wealthy individual, as evidenced by his inclusion in the Forbes 400.  The lead examiner never asked the Stanford firm to provide a personal financial statement from Stanford.[16]

Finally, when reviewing FINRA's files prior to the 2005 exam, the lead examiner came across a memorandum from the Texas State Securities Board and a *Wall Street Journal* article. The Texas State Securities Board memorandum was written in the mid-1990s and expressed concern that the high return rates and commissions for CDs made it difficult for the Stanford bank to make a legitimate profit on the CDs.  The *Wall Street Journal* article reported that

---

[16] Based on representations in the Stanford firm's filings with FINRA, R. Allen Stanford was identified to the staff as the firm's sole director.  In particular, in connection with the capital contributions made to the firm by Stanford, the firm submitted to FINRA corporate resolutions approving the contributions.  These resolutions were executed by Stanford and identify Stanford as the sole director of the firm, as well as the sole shareholder of a holding company that owned 100 percent of the Stanford firm.  As a director of the firm, Stanford would be deemed to be an "associated person," and FINRA accordingly had jurisdiction over Stanford individually.  Thus, the staff could have questioned Stanford personally about the CD program, including the composition of the bank's portfolio and the accuracy of the marketing materials distributed by the Stanford firm.

APP 0311

Stanford possessed immense influence in Antigua.   The lead examiner indicated that the Securities Board memorandum and the *Wall Street Journal* article were not the kinds of items typically found in a FINRA case file.

The lead examiner represented that he decided to inspect virtually every area of the Stanford firm's business in the 2005 cycle exam, but to give special attention to the CD issue. He believed that prior examiners had not paid sufficient attention to the CD program.   His supervisor—an exam manager in the Dallas office—agreed with this approach.   According to the manager, there were substantial concerns in the Dallas office regarding the Stanford firm and the CD program in particular.   According to the lead examiner, he and his manager decided that it made sense to take a broad look and "see what we reel in."[17]

While the exam team was preparing for the 2005 cycle exam, an enforcement attorney in the Dallas office joined the discussion on the CD issue.   The enforcement attorney had worked for the SEC prior to joining FINRA.   When interviewed, she indicated that, during her time with the SEC, she had worked on a matter involving Stanford's CD program.   She also reported working on cases involving brokered CDs, which had tested the bounds of the SEC's (and FINRA's) jurisdiction under the federal securities laws.   From the moment she became involved in discussions regarding the CD aspect of the 2005 Stanford cycle exam, the enforcement attorney reportedly expressed the view that the Stanford CDs were *not* "securities" regulated under the federal securities laws, and were therefore outside of FINRA's jurisdiction.

As part of the pre-exam process for the 2005 cycle exam, the lead examiner sent the Stanford firm a questionnaire.   In response to a question about underwriting, the firm indicated that it was offering the CDs under the SEC's Regulation D ("Reg. D"), which exempts securities

---

[17] The manager was one of the individuals who, in late 2004, had received a copy of the email discussing the Basagoitia arbitration and the SEC's investigation of the Stanford firm.   Prior to the 2005 cycle exam, the manager informed the lead examiner for the 2005 cycle exam that the SEC was looking into the CD program.

APP 0312

offered in private placements to specified investors from the registration requirements of the Securities Act of 1933.  The examiner noted that he decided to further investigate the Reg. D claim during the onsite portion of the exam.

The onsite portion of the cycle exam took place in late April and early May 2005.  The lead examiner focused his time on the CD program, and delegated other portions of the exam to the junior examiners on the team.  He asked the Stanford firm to provide due diligence materials on the Stanford bank and the CDs.  In response, the firm supplied only the bank's annual report.  The examiner noted that he was surprised to learn that, according to the annual report, commercial loans constituted less than five percent of the bank's assets.  He asked the Stanford firm about this fact and was told that the bank's profits came from trading operations and investments.  Given the advertised rates of return on the CDs, he stated that he found this hard to believe.  Although it might have been possible to make high returns on investments in developing markets, according to the annual report, the Stanford bank mostly invested in developed markets.  In his interview, the examiner expressed the opinion that, if the Stanford firm was really making the high return rates on the CDs through investments in developed markets, then they were "smarter than Goldman Sachs."

Junior members of the exam team reviewed certain Stanford customer accounts, but did not come across any evidence of funds going directly from a customer account at the broker-dealer to a CD purchase.[18]  The exam team did not, however, look for evidence that customers of the Stanford firm were liquidating securities to buy into the CD program; for instance, they did

---

[18] FINRA's 2001 cycle exam report on the Stanford firm indicates that, "For existing broker dealer clients, funds are wired by Bear Stearns from the client's brokerage account to [the Stanford bank]."  While this is not direct evidence that customers of the firm were liquidating securities to purchase CDs, it is an issue that should have been investigated.  It is unclear whether any of the examiners for the 2005 cycle exam ever reviewed the 2001 exam file.  For a description of how the SEC ultimately asserted jurisdiction over the Stanford CDs based, in part, on the argument that Stanford firm customers sold securities in connection with the purchase of CDs, see footnotes 20 and 52.

APP 0313

not cross-check CD purchases with sales of securities by the same customers. Such checks would have identified customers who sold securities and bought CDs through an intermediary step such as depositing the proceeds of securities sales in a bank. A showing that the firm's customers were liquidating securities in order to buy into the CD program would have provided FINRA's staff with jurisdiction[19] to proceed against the firm under the antifraud provisions of the federal securities laws, regardless of whether the CDs themselves constituted "securities."[20]

The lead examiner also looked into the firm's claim that the CDs were a Reg. D private offering. As a general matter, SEC rules prohibit companies from engaging in a general solicitation for Reg. D offerings. However, the examiner noted that the website of the Stanford bank contained a significant amount of information about the CDs, including interest rates. He asked the Stanford firm about this and was told that the firm had no control over the content on the bank's website. The examiner did not believe that the firm's lack of control over the bank excused the apparent violation of the Reg. D restrictions, and requested that the firm provide a written statement explaining why the bank's website was not a general solicitation.[21]

On June 9, 2005, the Stanford firm responded to the lead examiner's concerns, asserting that "[w]e believe that the descriptions of CD Products on the website of Stanford International

---

[19] See footnote 52 below.

[20] In late 2008, FINRA's Boca Raton office obtained records during their exam of the Stanford firm's Miami office that indicated that a number of Stanford firm customers sold securities and simultaneously purchased CDs. Similarly, the SEC's motion in support of a temporary restraining order against Stanford indicates that "From August 2008 through December 2008 alone, approximately 50 [Stanford firm] clients liquidated approximately $10.7 million in stocks, bonds, and other similar securities and invested that money in [the Stanford bank's] CDs." Memorandum In Support of Motion for TRO, Prelim. Injunction and Other Emergency Relief, *SEC v. Stanford International Bank, Ltd. et al.*, N.D. Tex. 3:09-cv-0298-N.

[21] As referenced in the Stanford firm's audited financial statements dating back to at least fiscal year 2003, the firm had entered into a joint marketing arrangement with the Stanford bank. Specifically, the firm's annual audited financial statements indicate that "Pursuant to joint marketing agreements, the Company and an affiliated foreign financial institution agreed to jointly market and offer fixed income and trust products to their respective customers. In connection therewith, the Company is entitled to referral fees based upon percentages of the referred portfolio as defined in the respective agreements." It does not appear that FINRA staff confronted the Stanford firm with the existence of this joint marketing agreement.

APP 0314

Bank do not constitute a form of general solicitation.  This is only general information on the Bank and its products and no current interest rates are posted on this site.  An investor cannot purchase any CD product via the website."  The letter also indicated that the firm did not believe the CDs to be securities subject to U.S. federal or state laws, and that the firm elected to treat the CDs as a Reg. D offering "because of the possibility that the CD deposits or CD certificates could be deemed to be 'securities' by US regulatory or judicial authority."  The examiner was not persuaded by the firm's assertion that the CDs were not securities; however, he was uncertain as to whether FINRA could show that they were securities.  This issue was not pursued further in the 2005 cycle exam.[22]

6.    Meeting with SEC and the SEC Referral Letter

Shortly after the onsite portion of the 2005 cycle exam, on June 21, 2005, the Dallas Director and Associate Director attended a general meeting at the SEC's Fort Worth office.  At that meeting, the SEC Assistant District Administrator informed the Dallas Director that the SEC was concerned about Stanford but was having difficulty pursuing the matter.  The Assistant District Administrator then told the Dallas Director that the SEC would send FINRA a letter to see if it could help with the investigation.

When interviewed, the Dallas Director indicated that she was shocked that the SEC would refer the Stanford case to FINRA.  If the SEC, with its subpoena power, was having problems bringing the case, she said she failed to understand how FINRA—which does not have

---

[22] There is no indication that the Dallas staff made any formal requests to identify the assets comprising the investment portfolio that allegedly supported the performance of the CDs or to interview Stanford firm employees regarding their knowledge of the CDs or the investment portfolio.

APP 0315

subpoena power—could be more successful.  She did not, however, inform the SEC of these concerns at the time of the meeting.[23]

According to email records, in the days after the June meeting, Fort Worth SEC staff and the Dallas Director and Associate Director participated in at least one, and possibly several, telephone calls regarding the Stanford CD program.  The Dallas Director could not recall whether she personally participated in the call(s), and noted that it was not unusual for the SEC to contact her staff directly.  The Associate Director had no recollection of the substance of the call(s).[24]

On July 21, 2005, an attorney in the SEC's Fort Worth office sent a five-page letter to the Associate Director of FINRA's Dallas office.  The letter began by referencing "our phone conversation," and provided "further information from [the SEC's] October 2004 examination of Stanford Group Company."  The SEC letter also noted that, in the latter part of 2004, approximately 63 percent of the Stanford firm's revenues were derived from the sale of the CDs, and that the firm's customers held approximately $1.5 billion of the CDs as of October 2004. The SEC letter also indicated that, despite the dependence of its business on the CD sales, the Stanford firm "claims that it keeps no records regarding the portfolios into which [the Stanford bank] places investor funds and that it can not get this information from [the bank]. . . .  [The Stanford firm's] admitted inability to get information from [the bank] about the investments underlying the CDs suggests that [the firm] may be violating NASD Rule 2310 (Suitability)."

The letter went on to indicate that, while the firm and the bank claimed that the investments offered were CDs, "[i]n reality, the offerings are either an investment contract or

---

[23]  As discussed further at pages 36 and 65 of this report, FINRA Rule 2010 provides authority for FINRA to sanction member firms and registered representatives for conduct that fails to meet "just and equitable principles of trade," which can involve conduct that does not involve securities.

[24]  No record of the substance of these calls was maintained by the Dallas office.

APP 0316

interests in an unregulated investment company."  In a footnote, the letter set forth the SEC's

legal argument as to why the CDs are securities subject to the federal securities laws:

> Neither [the bank] nor [the firm] are entitled to rely upon certain United States
> case law that holds that a certificate of deposit is not a security.  First, [the bank],
> which is located in Antigua, does not meet the definition of a bank under Section
> 3 of the Securities Act of 1933 ("Securities Act").  Certainly [the bank] is not
> subject to regulatory oversight in the U.S.  Although there are cases that have held
> that CDs issued by foreign banks may not be securities, (*Wolfe* [*sic*] *v. Banco
> Nacional de Mexico*, 739 F.2d 1458 (1984)) *these cases turn on the degree of
> protection offered by the bank regulatory system of the country of the issuing
> bank. . . .  It is unlikely that Antigua's bank regulatory structure offers depositors
> a degree of protection from loss that corresponds to that which exists in the
> United States*.  In contrast to bank CDs offered by banks in the United States, it
> appears that funds invested in [the bank's] CDs bear a significant risk of loss.
> Indeed, one document in [the bank's] marketing materials (as discussed below)
> notes that the investor's entire investment is at risk and that [the bank's] ability to
> continue to pay back principal and interest is dependent on [the bank] "continuing
> to make consistently profitable investment decisions."

(Emphasis added.)

Another section of the letter, under the heading "Possible Fraudulent Scheme," indicated

that "[t]he CDs being offered appear too good to be true."  The section also chronicled a variety

of concerns associated with the CD program, including the highly unusual three percent annual

concession paid for each CD referral, and the consistently high reported performance of the

Stanford bank's investments during periods when most of the markets in which the bank claimed

to invest were down substantially.  The section also indicated that the Stanford firm engaged in

sales practices commonly associated with fraudulent schemes, including "push[ing] its

[registered representatives] to sell the CDs by engaging in aggressive sales contests," and

possibly terminating representatives for refusing to sell the CDs.

In    the    final    section    of    the    letter,    under    the    heading    "Possible

Misrepresentations/Omissions," the SEC indicated that it had requested, but was never provided

with, specific information regarding how the Stanford bank's funds are invested.  The SEC letter

APP 0317

also noted that the Stanford firm provides U.S. investors with only a limited—and potentially misleading—disclosure statement regarding the bank's investment portfolio and associated risks, while foreign investors receive even less information on the risks associated with their investments.

When interviewed, every member of the Dallas office who was asked about the SEC letter agreed that it was unlike any letter they had received in the past.  Ordinary SEC referrals bear a referral number, contain little factual information, and begin with the phrase "we are referring the following matter."  Despite the absence of this boilerplate language, the Dallas office staff understood the SEC letter to be a referral.

The leadership of the Dallas office decided to open a cause exam to investigate the allegations in the SEC referral letter.  On August 5, 2005, the Dallas Director wrote to the SEC's Forth Worth office, acknowledging receipt of the SEC's letter, and indicating that FINRA had opened an examination to look into the matter.  The August 5, 2005 letter also indicated that FINRA would notify the SEC's Fort Worth office of the outcome of its investigation.

On September 12, 2005, the SEC's Fort Worth office sent a request letter to the President of the Stanford firm.  The letter indicated that the SEC staff believed the "CDs sold by the firm to be securities," and outlined a number of areas related to the CD program that required corrective action by the firm.[25]  The letter also demanded that the firm halt and correct these violations, and report in writing how this was to be achieved.  The letter expressly instructed that

---

[25] These included misrepresentations and omissions in statements to investors (in violation of SEC Rule 10b-5), excessive commissions (in violation of NASD Rules 2440, 2810, and 2830), failure to establish, maintain, and enforce written supervisory procedures (NASD Rule 3010(b)(1)), failure to conduct periodic reviews of customer account activity (NASD Rule 3010(c)), failure to develop and implement an adequate anti-money-laundering program (NASD Rule 3011), failure to file Treasury form 90-22.1 (Bank Secrecy Act), and failure to meet continuing education requirements (NASD Conduct Rule 1120).

APP 0318

the firm's response be sent not only to the SEC's Forth Worth office, but also to FINRA's Dallas Director.

### 7.   Conclusion of the 2005 Cycle Examination

The lead examiner for the 2005 cycle exam was not assigned to the cause exam triggered by the SEC referral letter.  His manager provided him with a copy of the referral letter, but did not inform him about the conversations with the SEC that took place at the June meeting or in any subsequent phone calls.  The lead examiner stated that he reviewed the letter quickly in 2005 and believed it to be an "exam report."  He thought the letter signaled that the SEC had taken over the CD case, and that it had referred only an advertising case to FINRA.  As a result, he stopped focusing on the CD issues he had identified.  He did not discuss his interpretation of the SEC letter, or his decision to curtail the cycle exam's inquiry into the CD program, with his superiors.

In an interview, the lead examiner was shown a copy of the SEC referral letter.  He indicated that this document was what he had referred to as the SEC's "exam report."  He stated that his characterization of the SEC letter as an exam report was clearly inaccurate, and agreed that the letter was a straight SEC referral on the CD issue.  He also indicated that he had seen the September 12, 2005, letter from the SEC to the Stanford firm, and that this letter may have contributed to forming his opinion that the SEC was pursuing the CD case.  He expressed regret that he had misinterpreted the SEC referral letter to FINRA, and indicated that, in light of his misinterpretation, he did not do all he could have done on the CD issue.

In January 2006, because of the lead examiner's case overload, his exam manager reassigned responsibility for completing the 2005 cycle exam to another examiner.  The lead examiner transferred his files to the new examiner, after which his involvement in the exam

APP 0319

ended.  The lead examiner never discussed his concerns about the CDs described herein with the examiner in charge of the 2005 cause exam.  The 2005 cycle exam was completed in 2007.  The exam resulted in a fine to the Stanford firm,[26] but did not result in any action related to the CD program.

        8.     <u>2005 Cause Examination</u>

The Dallas office initiated a cause exam of the Stanford firm to address the CD issue in the summer of 2005.  The same manager who had supervised the 2005 cycle exam, and had expressed concerns regarding the CDs, supervised the cause exam.  The Dallas Director and Associate Director received periodic briefings on the progress of the exam.  The cause exam was assigned to a senior examiner in the Dallas office who specialized in cause exams.

The same Dallas office enforcement attorney who had told the lead examiner for the 2005 cycle exam that the Stanford CDs were not securities was involved in the 2005 cause exam from its early stages.  She was shown the SEC referral letter, likely just after the cause exam was initiated.  After learning of the referral, she told the cause examiner and other FINRA staff that the SEC and other federal agencies, including the Postal Service and the FBI, had been looking at Stanford's CD program for some time.  The enforcement attorney also told the cause examiner that none of these agencies were able to develop and initiate an enforcement proceeding against the Stanford firm.  As chronicled below, during the cause exam, the enforcement attorney repeatedly expressed the view that the CDs were *not* securities, and that FINRA therefore lacked jurisdiction to pursue a suitability case related to the CD program.

Shortly after the Dallas office opened the 2005 cause exam, the cause examiner went to the SEC's Fort Worth office to inspect their case files on Stanford.  Among those files, she found

---

[26] As a result of the 2005 cycle exam, the Stanford firm was fined $20,000 for improper check holding, including checks related to CD purchases.

APP 0320

a note, apparently from Leyla Basagoitia to an SEC attorney, chronicling a lack of transparency and due diligence within the Stanford firm regarding the CD program.  The note also explained that the offshore CDs were "being primarily sold to unsophisticated investors in Latin America who have been led to believe that these investments are of a safe nature because they are being offered by a subsidiary of a regulated U.S. Corporation."  The note surmises that, despite the extremely high advertised CD rates, "the value of the bank's assets are well below the value of its obligations to its clients.  If this assumption proves to be true, Stanford has engaged in a very large Ponzi scheme."  The cause examiner incorporated this letter into the exam file, but no further action appears to have been taken to determine what Basagoitia knew about the CD program.[27]

In October 2005, counsel for the Stanford firm sent FINRA's Dallas office a copy of a letter, which had also been sent to the SEC's Fort Worth office, disputing the SEC's assertion that the offshore CDs were securities.  The letter cited case law from the Supreme Court indicating that CDs issued by banks in the United States and insured by the Federal Deposit Insurance Corporation were not "securities" for purposes of the federal securities laws.[28]  The letter also emphasized two cases from the Ninth Circuit (including *Wolf v. Banco Nacional De*

---

[27] In August 2005, the NYSE received a letter from Maria Perdomo of Venezuela regarding Stanford's CD program. The Perdomo letter indicates that Stanford had been "operating in Venezuela for several years without proper supervision and with sales people that are neither registered in the U.S. nor in Venezuela."  The letter also indicates that these representatives

> offer an offshore product to clients that they are told the product is a Certificate of Deposit of a bank, when in reality the product is simply a "hedge fund."  The public does not know in reality what they are investing in, thus are being deceived.  This product, I believe if sold in the U.S. must have "prospectus", explaining all the risks involved and thoroughly explaining the product itself. . . .  This bank, obviously doesn't lend money, it just takes money in so they can invest it in many things (bonds, commodities, margin purchases of stocks, etc, etc) all this happening without the client knowing the scope of their supposed "certificate of deposit."

NYSE forwarded the letter to FINRA.  Ultimately, the Perdomo letter was incorporated into the 2005 cause exam. It does not appear that anyone associated with the exam followed up on the allegations raised in the letter.

[28] *Marine Bank v. Weaver*, 455 U.S. 551 (1982).

APP 0321

*Mexico*,[29] which were discussed in the SEC referral letter).  These cases held that certain CDs issued in Mexico were not securities, despite the fact that the Mexican government only provided deposit holders with priority claim status—and not actual insurance—if the issuing bank became insolvent.  The Ninth Circuit cases concluded that, despite this limitation, the availability of bank regulation in Mexico and that nation's history of successful banks rendered the CD investments virtually guaranteed.  The Ninth Circuit also declined to address a claim that Mexican authorities were not enforcing Mexican bank regulations, citing the traditional respect paid to foreign governments by U.S. courts.

In the letter, Stanford's counsel argued that Antigua, like Mexico, provided CD holders with priority claim status.  Stanford's counsel also argued that the Stanford bank was subject to comprehensive regulation in Antigua, and that U.S. courts were bound to show respect to this regulatory system.[30]

Although the examiner assigned to the 2005 cause exam was not an attorney, she assumed responsibility at the district level to assess the strength of the SEC's claim that the CDs were securities and the Stanford firm's response to the contrary.  She was assisted in this task by a paralegal.  It does not appear that the cause examiner or the paralegal consulted any case law concerning offshore CDs other than the cases referenced in the SEC referral letter and the Stanford firm's response.[31]  Although the question whether the CDs were "securities" was

---

[29] 739 F.2d 1458 (9th Cir. 1984).  The other Ninth Circuit case cited by the Stanford firm's counsel is *West v. Multibanco Comerex, S.A.*, 807 F.2d 820 (9th Cir. 1987).

[30] The Stanford bank's CD program differed in several respects from CDs issued by federally regulated banks in the United States.  First, in contrast to the insurance provided in the United States by the Federal Deposit Insurance Corporation, the Antiguan government does not guarantee any portion of the CD deposits or interest.  Second, in contrast to most U.S. banks, the Stanford bank did not engage in much commercial lending, which might have brought an increased measure of stability to the CD program.

[31] The only other case consulted by the cause examiner—*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*, 756 F.2d 230 (2d Cir. 1985)—involved brokered CDs issued in the United States.  This case does not appear to have any bearing on the question of whether offshore CDs issued by a bank in Antigua are securities, but the cause examiner found it to be significant.  In general, a brokered CD refers to the practice of a broker

ultimately referred to Sales Practice Policy and the Office of General Counsel, no comprehensive legal analysis of the issue was ever conducted.[32]

The cause examiner stated that, based on her review of these materials, she was unable to conclude that the Stanford bank CDs were securities under the federal securities laws. The Dallas enforcement attorney involved in the 2005 cause exam agreed with this assessment. In her interview, the enforcement attorney explained that, earlier in her career, she had come across the "securities" issue in the context of brokered CDs. She recalled that the SEC and FINRA had only prevailed on the "securities" element in cases where brokered CDs were sold to the public through fractional interests. The CDs marketed by the Stanford firm were not fractionalized.

When interviewed, neither the enforcement attorney nor other staff involved in the 2005 cause exam could explain why the brokered CD analysis was determinative of the question whether the offshore Stanford CDs were securities. According to the enforcement attorney, the brokered CD cases showed that regulatory agencies did not always prevail in arguing that CDs were securities. The enforcement attorney explained that her job was to serve as a "gatekeeper" to prevent cases from moving forward to the enforcement stage unless they truly warranted formal action. She also indicated that, in her experience, Ponzi schemes do not last as long as ten years, and that the fact that the Stanford bank had been selling the CDs for such a long period of time gave the CD program some measure of credibility.[33]

---

purchasing CDs from banks and reselling them to the public. The SEC and FINRA were concerned with the practice because investors did not necessarily purchase the CD itself, and often bought a fractional interest in the package of CDs held by the broker.

[32] See below at pages 33-35.

[33] In her interview, the enforcement attorney claimed that she considered the offshore element as part of her analysis of the issue, and that she bore suspicions regarding the regulatory regimes in certain Caribbean nations. However, there is no indication that she ever discussed these concerns with anyone involved in the 2005 cause exam; rather, all participants in the staff discussion regarding the cause exam recall that their analysis relied on the brokered CD case law. The enforcement attorney also does not appear to have created any documentation regarding her legal analysis of the CD issue in connection with the 2005 cycle or the 2005 cause exam.

APP 0323

In January 2006, the cause examiner referred a portion of the exam to FINRA's advertising regulation staff.  The advertising regulation staff found a number of deficiencies with the Stanford firm's sales brochures, including insufficient warnings about the principal risks to U.S. investors and the absence of FDIC insurance for the CD program.

According to email records, the cause examiner also conferred with the lead examiner on the 2005 cycle exam regarding the CDs.  Specifically, in February 2006, she emailed him to ask whether he had "any information about what customers were liquidating to purchase Stanford CD's from your routine exam?"  The lead cycle examiner responded that he "recall[ed] that most of the trades that we looked at involved new clients who bought the CDs using cash, and they did not cash out other products or securities positions."  When interviewed, the lead cycle examiner acknowledged that his response was not entirely accurate, as he failed to note that the 2005 cycle exam team did not check to see if CD purchases were being indirectly funded with proceeds from liquidated securities.

The cause examiner and the enforcement attorney discussed the "securities" issue at several meetings with other staff in the Dallas office, including with the Dallas Director and Associate Director.  The Dallas Director recalls that the discussions focused on the brokered CD analysis.  The discussions culminated in the preparation of an investigative conference report on the 2005 cause exam in April 2006.[34]  The cause examiner drafted the report, but failed to include the fact that, according to the SEC's July 2005 referral letter, $1.5 billion in investor funds were potentially at risk.  The report's jurisdiction analysis simply excerpted portions of the SEC referral letter and the Stanford firm's response to the SEC.  The conference report's

---

[34] The investigative conference is a required element of every potential formal disciplinary matter.  According to FINRA's Member Regulation Handbook, "the primary goal of the conference is to enable Enforcement and Member Regulation to reach consensus on the key aspects of an investigation, including issues, appropriate scope, and required evidence about the appropriate treatment of each matter."

APP 0324

discussion of the state of banking regulation in Antigua quotes from, and is based in significant part on, the representations of Stanford's counsel.  The report concluded that, "Based on past cases and the documented protections that are offered by Antigua, the staff does not believe [FINRA] can adequately prove that the CD's are securities."  This conclusion is debatable.  As described below at footnote 52, the SEC in its case against Stanford reiterated its argument that the Stanford CDs are "securities."

The conference report also described the advertising portion of the cause exam, noting that Antiguan law does not in fact provide true priority claim status for CD holders, and described the protections offered by Antiguan law as "limited."  Specifically, the advertising section indicates that Antiguan corporate law gives the payment of wind-up costs, the payment of officers and employees for up to three months prior to the seizure of the bank; all taxes due; and the "fees and assessments owing to the appropriate officer" priority over any portion of time deposit funds.  In addition, the advertising section indicates that time deposit holders are only given preference over other creditors for up to $20,000 in deposit funds.[35]

In May 2006, the Dallas Associate Director forwarded the conference report to an attorney in FINRA's Sales Practice Policy group of the Member Regulation department in Washington, DC.[36]  The Sales Practice Policy attorney had only been in that position since January 2006.  When interviewed, she indicated that her job was to field legal questions from district offices, but that this role overlapped with the function of FINRA's Office of General Counsel, and that only the Office of General Counsel was authorized to develop the

---

[35] The conference report ultimately identified three potential violations of FINRA's advertising rules: (1) the brochures failed to contain the name of the Stanford firm and failed to make clear the firm's relationship with the bank; (2) the brochures failed to present a fair and balanced treatment of the risks and potential benefits of the CD program; and (3) the brochures claimed, inconsistent with the assertions made by the firm to FINRA, that the bank was not subject to the reporting requirements of any jurisdiction and that CD holders were not entitled to depositor protection.

[36] At the time, the group was known as "Regulation Policy."

APP 0325

organization's position on legal issues.  Sales Practice Policy did not then and does not now have an internal handbook to guide its staff in fielding inquiries from district offices.

The Sales Practice Policy attorney was asked to review the conference report's conclusion that the "staff does not believe [FINRA] can adequately prove that the CD's are securities."  She called an attorney in the Office of General Counsel to discuss the issue.  During this call, which reportedly lasted about five minutes, the Office of General Counsel attorney indicated that CDs are typically not considered securities.  The Sales Practice Policy attorney did not provide a copy of the conference report or inform the Office of General Counsel attorney that the CDs in question were issued by an offshore bank.  Because the conference report did not reference $1.5 billion in potentially at-risk investor funds, neither attorney was aware of the magnitude of the potential fraud.  In an interview, the attorney from the Office of General Counsel stated that she found it hard to believe that neither the Dallas office nor Sales Practice Policy perceived the foreign element of the CDs as the key issue in determining whether the CDs were securities.  When presented with the conference report and the SEC referral letter for the first time in her interview, the Office of General Counsel attorney indicated that, had she known the facts outlined therein, she would have focused the securities inquiry on the degree of protection offered by the Antiguan regulatory system, and that her conversation with the Sales Practice Policy attorney would surely have lasted more that five minutes.[37]

After the phone call described above, the Sales Practice Policy attorney recalls that she contacted the Dallas office and indicated that she and the Office of General Counsel attorney were unable to confirm that the Stanford bank CDs were securities.  In June 2006, the Dallas Associate Director sent an email to the Dallas Director and other office staff indicating that Sales

---

[37] Neither attorney documented their communications with each other, nor did they create any written record memorializing what, if any, legal analysis they conducted.

APP 0326

Practice Policy and the Office of General Counsel agreed with the staff's assessment of the securities issue.

Meanwhile, in June 2006, Bernerd Young—the former head of FINRA's Dallas office who had left in 2003—joined the Stanford firm as Managing Director of Compliance. The Dallas staff did not consider Young's presence to have compromised the 2005 cause exam.

In 2006 and 2007, while the cause exam was still ongoing, the manager overseeing the exam attended several general meetings with the SEC's Fort Worth office.[38] At one of these meetings, he informed the SEC that FINRA's enforcement staff could not endorse the proposition that the CDs were securities. According to the manager, the SEC staff questioned whether FINRA could bring anything more than an advertising charge.[39]

During interviews, the Dallas staff were questioned repeatedly regarding the conclusion that the CDs were not securities. The Director, the Associate Director, and the manager who oversaw the cause exam expressed reliance on the opinion of the enforcement attorney, as well as the confirmation by Sales Practice Policy and the Office of General Counsel. The enforcement attorney expressed the view that, even in 2009, she is not sure that the Stanford bank's CDs are securities.

---

[38] Minutes maintained by the SEC's Fort Worth office of a February 17, 2006 meeting attended by staff from the SEC, FINRA and the Texas State Securities Board note that, "[FINRA] is pursuing concerns regarding Stanford Group's advertising. The brochure used to sell its affiliates supposed CDs is unbalanced regarding the risks and benefits. Whether or not the CDs are securities is irrelevant in terms of the advertising rules because it covers all communications." This occurred approximately three months before the Dallas office contacted the Sales Practice Policy attorney to get input on the Dallas staff's assessment that they could not pursue a suitability case against the Stanford firm.

Minutes maintained by the SEC's Fort Worth office of a March 16, 2007 meeting attended by the SEC, FINRA and various state regulators notes in reference to FINRA and the Stanford firm that "This matter was referred by the SEC. The firm's sales materials were run through the [FINRA] advertising department and serious disclosure and advertising deficiencies were noted. [FINRA] expects that their case will be strictly a 2210 Communications with the Public case. The SEC is looking at the issues related to whether the firm's products, which are sold as CDs, are securities."

[39] The Stanford firm ultimately settled the advertising charge for $10,000.

APP 0327

Dallas staff were also asked whether they ever considered bringing an enforcement action under FINRA Rule 2010—formerly NASD Rule 2110—which allows the organization to enforce "just and equitable principles of trade" at member firms. This Rule is not limited to fraud in connection with the sale or purchase of securities, and has been used by FINRA in a series of cases involving a variety of fraudulent conduct at member firms not involving "securities." The cause exam manager recalled considering this rule at the start of the exam, and could not recall why it was not pursued. The Associate Director had no recollection of considering the Rule, and expressed doubt as to whether it could serve as the basis for an enforcement proceeding. The Dallas Director expressed the opinion that Rule 2010 was not a stand alone rule and that FINRA can only bring 2010 enforcement actions if the member firm has violated some other FINRA Rule. This interpretation of Rule 2010 is not substantiated by the text of the rule, or by FINRA practices in prior enforcement actions.[40]

Finally, the Dallas Director, the cause examiner, and the enforcement attorney all noted their views that, as of 2005 and 2006, they did not have sufficient indication that the Stanford CDs were a fraudulent scheme to justify taking further action at that time. The SEC referral letter, however, contains numerous indications of fraud in connection with the CD program which were not investigated by the Dallas office.[41] The Dallas Director did not share the SEC

---

[40] Other FINRA employees also differed in their understanding of Rule 2010. The Regional Chief Counsel of FINRA's New Orleans office—who serves as the enforcement attorney's supervisor—indicated that FINRA takes a conservative approach to using the rule in enforcement matters. By contrast, the attorney from the Office of General Counsel indicated that Rule 2010 can be used expansively. The Office of General Counsel attorney also indicated that, when she had been employed at the SEC, SEC attorneys noted that the SEC did not have a provision like FINRA Rule 2010. For a general discussion of Rule 2010, see page 65 of this report.

[41] In particular, the letter indicates the following:

> SIB [the Stanford bank] claims it is investing in "foreign and U.S. investment grade bonds and securities, and Eurodollar and foreign currency deposits" and "securities from established, quality companies and governmental agencies from around the world." Yet, SIB's high interest rates are inconsistent with its claimed portfolio. Minimum guaranteed interest rates since 2000 have ranged from approximately 3.5% to over 6% for short-term investments. For the Index-Linked CD tied to the S&P 500, the minimum guarantee has been approximately 3.5% or a percentage of the return

APP 0328

referral letter or her office's decision not to investigate the CDs with senior FINRA management until December 2008.

The Dallas staff would have faced substantial hurdles in obtaining information from a non-member offshore entity such as the Stanford bank.   While the Special Committee understands that the issue of whether the CDs were in fact "securities," as defined under the Exchange Act, is debatable, there were sources of information regarding the potential fraudulent scheme available from the Stanford firm—the U.S. broker-dealer—that the Dallas staff did not investigate in 2005 and 2006.   In addition, the Dallas staff could have sought expert analysis of the advertised CD rates (coupled with the annual three percent concession and overhead costs) and their consistency with the claimed portfolio, as well as the claim of consistent profitability over the prior ten years.

---

of the S&P 500, whichever is higher.   The brochures given to investors indicate that that percentage of participation may vary at SIB's direction, but suggest a participation rate of *125%* of the S&P 500.  We are unaware of any legitimate short-term investment that not only guarantees a return significantly higher than a CD, but allows you to participate in up to 125% of equity market returns.  Moreover, SIB pays an *annual* 3% trailer, which is troubling, as it adds significant, on-going costs which SIB must meet before it can generate a profit.   We are unaware of any legitimate, short-term, low or no-risk investments that will pay a 3% concession every year an investor keeps his funds invested in any product.

Further, SIB's annual audit casts doubt upon its claims of consistent profitability over the last 10 years.   For example, from 2000 through 2002, SIB reported earnings on investments of between 12.4% and 13.3%.   This return seems remarkable when you consider that during this same time frame SIB supposedly invested at least 40% of its customer's assets into the global equity market.   Ten of 12 global equity market indices were *down substantially* during the same time frame.   The indices we reviewed were down by an average of 11.05% in 2000, 15.25% in 2001 and 25.87% in 2002.  It is equally unlikely that the portion of the portfolio invested into debt instruments (approximately 60%) could make up the expected losses in the equity portion of the portfolio.  For example, in 2002, when the global indices were down 25%, the debt portion of the portfolio would have to generate an approximately 40% return for SIB to generate the 12.4% overall return it claimed in 2002.

Finally, the Staff learned from persons formerly associated with SGC [the Stanford firm] that it also appears to be engaged in sales practices that are commonly associated with fraudulent activities.   The firm pushes its RRs to sell the CDs by engaging in aggressive sales contests.  Prizes offered include trips to Antigua and automobiles.   One RR has stated that she was fired for her refusal to sell SIB CDs.   Moreover, the SGC has refused to provide to the selling RRs any further disclosure other than the minimal information it provides to potential investors regarding the specifics of SIB's investment portfolio.

It is impossible to say whether, if the staff had taken these steps, they would have developed evidence sufficient to bring a fraud case against the Stanford firm.  However, the Dallas staff may well have learned that employees of the Stanford firm were not adequately informed about the investments underlying the CD program, that material representations made in the marketing materials for the CDs were, in fact, false, and that Stanford firm customers were liquidating securities to purchase CDs based on those false representations.  This information would have been relevant in building a case against the Stanford firm and its registered and associated persons, including Stanford himself, for violations of the anti-fraud provisions of Section 10(b) of the Exchange Act and Rule 10b-5.

9.     2007 Cycle Examination

The next cycle exam of the Stanford firm occurred in 2007, at which time approximately 43 percent of the total revenues of the firm were attributable to the CD program.  Although the lead examiner assigned had worked as an examiner since 2004 and had been in the Dallas office since 2006, she had no prior experience with the Stanford firm.[42]  Other staff on the cycle exam included one other relatively senior examiner and two examiner trainees.[43]

In preparing for the 2007 exam, the exam team decided not to investigate the CDs.  When asked to explain this decision, the lead examiner indicated that she did not see the utility of repeating the work that was done during the 2005 cause exam.  She also indicated that the exam manager who had overseen the 2007 cycle exam made the decision not to look at the CDs.

---

[42] Similarly, the manager who supervised the 2007 cycle exam had little prior experience with the Stanford firm, though he was aware of the 2005 cause exam because the exam had been discussed at certain management meetings of the Dallas office.

[43] No member of the 2007 cycle exam team had been with the Dallas office while Bernerd Young was in charge.

APP 0330

When interviewed, the manager did not recall making this decision, but agreed that a decision to exclude the CDs from the exam could not have been made without his input.[44]

When interviewed, the 2007 cycle examiner indicated that her manager had called the SEC prior to the 2007 exam and inquired about the status of the SEC's investigation.  The examiner recalled that the SEC told the manager that it was currently awaiting information from the Stanford firm, and that there were no particular steps that they wanted FINRA to take regarding the CDs.  The manager had no recollection of the call, and the call is not documented in the exam file.  The manager indicated that the decision to exclude the CD program from the 2007 cycle exam was driven by the results of the 2005 cause exam, and not by any deference to the SEC's parallel investigation.[45]  The 2007 cycle exam report contains no documentation of the decision to exclude the CD program from the exam.

> 10.    2007 Miami Branch Examination and 2009 Unannounced Branch Examinations

In late 2007, a new Associate Director and the manager responsible for the 2007 cycle exam in Dallas decided to refer an examination of the Stanford firm's Miami office to FINRA's office in Boca Raton, Florida.  When interviewed, they indicated that the branch exam was necessary to follow up on certain deficiencies in the firm's research reports that had been uncovered during the 2007 cycle exam.  In their view, the Boca office was best positioned to conduct the exam because the office was closer to Miami, and the referral would spare Dallas staff from an extended examination outside of their home district.

---

[44] It does not appear that the focus of the 2007 exam was approved by anyone above the exam manager.  At the time the exam was focused, the Associate Director had left the Dallas office, and his replacement had not yet arrived.  In addition, during this period, the Dallas Director began splitting her time between managing the office and her new responsibilities as Regional Director.

[45] Numerous FINRA staff noted the organization's longstanding practice of not deferring action on issues regarding a member firm unless specifically requested by the SEC.

APP 0331

The Dallas office did not transmit any of the information regarding the CDs—such as the SEC referral letter—to the Boca office.  In an email to the Boca office, the manager responsible for the Dallas 2007 cycle exam indicated that the firm's Miami office "was selected for two reasons: (1) large # of reps working in the branch office (I think it's over a 100) and (2) they perform market making activities in the branch.  In our quest to conduct more branch exams, we decided to pick a branch of this firm during the main office field work.  Other than that, *there are no red flags* or specific people to focus on during the branch."  (Emphasis added.)

Although the branch exam referral from Dallas did not mention the CDs, the Director of FINRA's Boca Raton office told his exam team to look into the CD program.  He had observed a number of advertisements in the Miami area press touting the financial success of the Stanford firm, and also was familiar with Young and another individual in Stanford's compliance department, which led him to conclude that the firm warranted further attention.  In contrast to the approach employed by the Dallas office, the Boca office decided to focus their exam on the CDs regardless of whether they ultimately turned out to be securities.

The Boca exam team consisted of an exam manager, an examiner with two years of experience, and an examiner who had just been elevated from trainee status.  The most junior examiner had participated as a trainee in the 2007 cycle exam of the Stanford firm conducted by the Dallas office and knew generally that the SEC had looked into the CD program.  However, neither he, nor any member of the Boca exam team, was aware at any point during the branch exam of the existence of the SEC referral letter or of any of the key details regarding the CD program that were then known by the Dallas office.  Thus, the Boca exam team was required to assemble the examination of the CD program from scratch.

APP 0332

In December 2007, the Boca exam team went to the Stanford firm's Miami branch office. The exam team was precluded by the firm from speaking with its employees unless a member of the firm's compliance staff was present in person or via telephone. During the exam, the team inspected documentation related to the CDs, including logs of customer files that had been "pouched" from the firm to the Stanford bank. The team also discovered that representatives of the Stanford firm were engaged in sales contests involving the CDs. Finally, the team discovered that, at the time, roughly 90 percent of the revenues of the Stanford firm's Miami office were derived from the sale of the CDs.

On January 3, 2008, the Boca exam team sent a document request under FINRA Rule 8210 to the Stanford firm.[46] The request sought information about the Stanford bank's investment portfolio. In response, the firm provided some materials regarding the CDs, but did not provide any substantive information about the investment portfolio.[47]

---

[46] Rule 8210 allows FINRA to inspect the books and records of the member firm, as well as certain owners of the member firm. The rule is a critical tool in FINRA's investigative arsenal. Because FINRA lacks subpoena power, Rule 8210 has been characterized as "one of the staff's primary tools for carrying out its regulatory responsibilities." (NASD Notice to Members 99-45 (November 1999)).

The rule itself states:

> For the purpose of an investigation, complaint, examination, or proceeding authorized by the FINRA By-Laws or rules, an Adjudicator or FINRA staff shall have the right to: (1) require a member, person associated with a member, or person subject to FINRA's jurisdiction to provide information orally, in writing, or electronically (if the requested information is, or is required to be, maintained in electronic form) and to testify at a location specified by FINRA staff, under oath or affirmation administered by a court reporter or a notary public if requested, with respect to any matter involved in the investigation, complaint, examination, or proceeding; and (2) inspect and copy the books, records, and accounts of such member or person with respect to any matter involved in the investigation, complaint, examination, or proceeding.

FINRA's By-Laws define the phrase "person associated with a member" to include "(1) a natural person who is registered or has applied for registration under the Rules of the Corporation; (2) a sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with the Corporation under these By-Laws or the Rules of the Corporation; and (3) for purposes of Rule 8210, any other person listed in Schedule A of Form BD of a member." In general, Schedule A of Form BD requires disclosure of the direct owners and executive officers of the broker-dealer.

[47] The exam team viewed the portfolio information as being critical, but did not consult with resident enforcement attorneys regarding the Stanford firm's failure to produce it.

APP 0333

In the summer of 2008, the Boca Director came across news stories indicating that the SEC had issued subpoenas to former Stanford firm employees Charles Rawl and D. Mark Tidwell.[48]   The Boca Director immediately asked the branch exam team for an update on the status of the exam.   The team informed him that the Stanford firm was resisting document requests related to the Stanford bank on the grounds that the firm and the bank were separate legal entities.   The Boca Director instructed the team to send another Rule 8210 request to the firm, again asking for information regarding the bank's investment portfolio.   The team sent the second 8210 request on August 27, 2008.

In December 2008, news of the Madoff investment scheme broke.   Prompted in part by this news, the Boca Director again asked the exam team for a progress update.   The team showed him the response to the August 27, 2008 document request.   This response consisted of advertising materials for the CDs, but did not include any information concerning the Stanford bank's portfolio.   The exam team indicated that Young did not appear to know what was in the bank's portfolio, even though he claimed to have done personal due diligence on the bank.   In his interview, the Boca Director described Stanford's response material as mere "propaganda."

The refusal of the Stanford firm to provide information on the bank's investment portfolio prompted the Boca Director to research the firm's website.   He found nothing of substance other than a report on the Stanford firm's charitable activities.   He also inspected the bank's annual report and found it devoid of any substantive information regarding the bank's assets.   In addition, the Boca Director inspected the Stanford firm's recent financial statements and was surprised to find that the firm claimed to be thriving at a time when the economy was in recession and peer firms were struggling.   The Boca Director contacted a senior colleague at

---

[48] Rawl and Tidwell had been terminated by the Stanford firm, and, according to an exam team member, both had negative sales figures with respect to the CDs at the time of their termination.

APP 0334

FINRA's national office who had substantial experience in fraud cases, who agreed that the information regarding the Stanford firm was troubling.

The Boca Director then contacted the Dallas Director and Associate Director to relay his concerns about the Stanford firm.  According to the Boca Director, the Dallas Director informed him that her office had already looked into the CDs and had determined that there was nothing for FINRA to pursue.  The Boca Director then contacted the SEC's Miami office.  The SEC's Miami office, in turn, put him in contact with the SEC's Fort Worth office.  In mid to late December, the Boca Director spoke to the Regional Director of the SEC's Fort Worth office and was told that the SEC was looking into the Stanford firm.

At this point, the Boca Director decided that significant action was necessary.  He conferred with the Dallas Director about the possibility of conducting unannounced onsite exams of various branch offices of the Stanford firm, and obtained permission to devote additional resources to the branch exam, including a forensic computer consultant.  The Boca office also began interviewing former employees of the Stanford firm, including those who had been subpoenaed by the SEC.

Concurrently, the Boca exam team was furthering their inquiry into the CD program.  As part of this effort, the exam team searched the SEC's EDGAR database for companies in which the Stanford bank might have invested.  They uncovered only 13 such companies, which suggested to the team that the bank was not investing primarily in stocks, but rather in illiquid assets.  The Boca examiners also reviewed FINRA's Central Registration Depository ("CRD")[49] to determine if any registered representatives were employed at the Stanford firm in addition to the Stanford bank or other Stanford companies.  The examiners noted that a search for dually

---

[49] CRD is an electronic database that functions as the central licensing and registration system for the U.S. securities industry and its regulators.  It contains the registration records of more than 4,800 registered broker-dealers and the qualification, employment, and disclosure histories of more than 660,000 active registered individuals.

APP 0335

employed representatives was a way of trying to get around the firm's claims that it had no access to information regarding the bank's portfolio.[50]

On December 30, 2008, the Boca examiners, together with two employees from the Dallas office, interviewed Rawl and Tidwell (the former Stanford firm employees who were the subject of SEC subpoenas). Rawl and Tidwell addressed the CD program, and indicated their belief that the Stanford bank was merely a dumping ground for Allen Stanford's failed investments. They also noted that the bank's portfolio was managed by an individual based in the Stanford firm's office in Tupelo, Mississippi. This information provided the exam team with another possible avenue for seeking information about the portfolio.

On January 9, 2009, the Boca office spearheaded six simultaneous, unannounced exams of Stanford firm branch offices.[51] Staff from the Dallas office assisted in some of these exams. Interviews conducted during these exams disclosed that the investment portfolio underlying the CDs was comprised of three tranches. Tier 1, which totaled approximately $200 million, were cash equivalent assets; Tier 2, which totaled approximately $300 million, were monitored by Stanford Financial Group analysts. No one but Stanford and one colleague had information about Tier 3 investments, which represented the vast bulk of the bank's $7.2 billion of claimed assets. After the unannounced exams, FINRA turned over the materials it had uncovered in the branch offices to the SEC. On February 16, 2009, the SEC filed a civil complaint alleging securities fraud against Stanford and his associates. The complaint named the Stanford firm and

---

[50] Certain marketing materials obtained by the Boca examiners from the Stanford firm's Miami office indicated that Stanford Financial Group ("SFG") provided management services in connection with the investment portfolio for the CDs. The examiners identified a number of U.S. based employees that were Stanford firm employees with series 7 registrations and that were also employed as analysts for SFG. As registered employees of the Stanford firm, FINRA had authority to question such employees about their outside business activities, even if such activities were not "securities" related. This investigative step was not taken during the prior Stanford exams.

[51] The Boca Director intended to conduct an examination of the Stanford firm's main office in Houston as well, but the Director of SEC's Forth Worth requested that FINRA refrain from doing so because the SEC wished to enter that office.

APP 0336

the Stanford bank as defendants.  On the same day, the SEC obtained a temporary restraining order freezing Stanford's assets.[52]

In an interview, the Dallas Director was asked what had changed by 2009 to warrant FINRA's shift in attitude toward the Stanford firm.  She indicated that she realized since 2005 that there was something wrong with the Stanford firm and that it was not the "cleanest" firm.  She maintained, however, that FINRA did not have enough evidence of fraud in 2005.  She acknowledged that the Stanford bank's claimed rates of return were a "red flag," but questioned how FINRA could have proven the fraud without access to the bank's records.  She could not explain why the Boca office was able to pursue the investigation of the CDs in 2008 in ways that the Dallas office had not in 2005 and 2006.

---

[52] In the civil case against Stanford and his associates, the SEC has set forth detailed argument as to the manner in which the Stanford CD program implicates the anti-fraud provisions of the Securities Exchange Act of 1934.  First, the SEC alleges that customers of the Stanford firm sold millions of dollars of stocks and bonds in order to invest in the CDs.  Based on this allegation, the SEC argues that the Stanford case involves fraud in connection with the sale of securities.  See *SEC v. Zandford*, 535 U.S. 813, 825 (2002) (holding that the "in connection with" element of section 10(b) of the Securities Exchange Act of 1934 is satisfied by "a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide.").

In the alternative, the SEC maintains that the Stanford bank CDs themselves constitute "securities" subject to the anti-fraud rules of the 1934 Act.  The SEC's argument is based principally on *Reves v. Ernst & Young*, 494 U.S. 56 (1990).  Although *Reves* did not involve CDs or foreign-based instruments, the case sets forth the analysis as to whether instruments denominated as "notes" are "securities."  As in prior "securities" cases, the *Reves* opinion emphasized the need to "examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* at 67.  The *Reves* opinion, however, focuses specifically on availability of federal regulation.  *Id.* at 69 (observing that "the notes here would escape federal regulation entirely if the Acts were held not to apply.").  According to the SEC, CDs issued by foreign banks necessarily fail to meet this element.  The SEC acknowledges in a footnote that pre-*Reves* lower court cases—including the pair of Ninth Circuit cases discussed above at pages 25 and 29-30—had excluded certain foreign CDs from the securities laws, but argues that those cases are inconsistent with *Reves*.  See Memorandum In Support of Motion for TRO, Prelim. Injunction and Other Emergency Relief, *SEC v. Stanford International Bank, Ltd. et al.*, N.D. Tex. 3:09-cv-0298-N.

It also should be noted that, although the Stanford bank was nominally subject to regulation and inspection by the Financial Services Regulatory Commission of Antigua, according to the indictment in one of the pending criminal cases, Stanford bribed the Commission's Chief Executive Officer not to audit the bank.  In addition, Stanford and the Commission's Chief Executive Officer allegedly conspired to thwart inquiries by U.S. enforcement authorities into the bank's portfolio and operations.

APP 0337

B.    **The Madoff Case**

1.    Background

In 1960, Bernard L. Madoff ("Madoff") founded Bernard L. Madoff Investment Securities, LLC ("the Madoff firm") and registered it with the SEC as a broker-dealer.  Madoff was at all times the chairman and sole owner of the Madoff firm.  The firm was a pioneer in the electronic trading of equities and was one of the first firms to join the NASDAQ.  The firm became a prominent and well-respected market maker—a firm that facilitates trading in a particular security by simultaneously offering both to buy and sell the security from other broker-dealers, with the goal of making a profit from the spread between its purchases and sales. Indeed, the firm, which was never a member of the NYSE, is often credited with helping to invent the "third market"—*i.e.*, the trading of NYSE-listed stocks over-the-counter rather exclusively than on the NYSE.  The firm also engaged in substantial proprietary trading for its own account.   The firm's market making and proprietary trading operations constituted a successful broker-dealer business for many years.  According to the firm's broker-dealer filings, neither the market making nor proprietary trading activities involved the maintenance of customer accounts.[53]

In addition to his broker-dealer businesses, Madoff also operated an investment advisory business through the same firm.  The investment advisory business was, in actuality, a gigantic Ponzi scheme.  According to his March 2009 plea allocution in federal court, Madoff solicited money from investors, representing to most of them that the money would be invested in stocks

---

[53] Madoff and some members of his family became well-known members of the financial community.  Madoff served as Chairman of NASDAQ in the early 1990s.  His brother, Peter Madoff, served on the NASD Board, including as Vice Chair, as well as various committees.  Madoff's son, Mark Madoff, served on the NASD's National Adjudicatory Council.  In 2008, his niece, Shana Madoff, served on FINRA's Compliance Advisory Committee.  Interviews of FINRA staff and review of exam files identified no information to suggest that the Madoff firm received preferential or lenient treatment because of Madoff's prominence or his family's history of service to NASD and FINRA.

APP 0338

and options using a "split strike conversion strategy" which, he promised, would yield consistent, above-market rates of return.[54]   Instead, Madoff deposited the money into bank accounts and used the principal contributed by later investors to pay returns to earlier investors.  According to the SEC, the Madoff firm never executed a single securities trade in the course of the investment advisory business, nor did it engage other brokers to execute such trades.  The client account statements, order tickets, trade confirmations, and other documentation relating to the investment advisory business were wholly fabricated and completely fictitious.

Madoff went to considerable lengths to conceal his investment advisory scheme and keep it separate from the broker-dealer business of the firm.  For example, the market making and proprietary trading side of the Madoff firm used bank accounts held at the Bank of New York.  These accounts were reflected in the firm's books and records, the FOCUS reports that it filed with FINRA, and the audited financial statements that it filed with both FINRA and the SEC.[55]  The investment advisory business, on the other hand, used accounts at JP Morgan Chase, which were not reflected in regulatory filings made by the Madoff firm in connection with its broker-dealer operations.  Similarly, the fictitious trading activity and securities positions that Madoff reported to his investment advisory clients did not appear in the records of the firm's broker-dealer business.

Although FINRA's New York-based staff examined the Madoff firm on a regular basis, FINRA did not learn of the Ponzi scheme—or see the firm's records of its purported investment activities—until after Madoff confessed to his sons and was arrested by the FBI on December 11,

---

[54] As explained by Madoff to his investment advisory clients, the "split strike conversion strategy" consisted of buying a subset ("basket") of common stocks in the Standard & Poor's 100 Index ("S&P 100") before an expected run-up in the S&P 100 and selling the basket after the index had risen.  The downside risks of this effort to time the market were purportedly hedged—and the consistent returns achieved—by purchasing put options on the S&P 100 funded by sales of call options on that index.

[55] According to filings in a recent action by the SEC, the auditor of the Madoff firm produced and signed these audit reports, but did not actually perform any audits of the Madoff firm.

APP 0339

2008.  The next day, a team of FINRA examiners joined staff from the SEC and FBI at the Madoff firm offices where, for the first time, they reviewed records related to the Ponzi scheme, much of it gathered from Madoff's personal desk and the firm's secret office space on the 17th floor of the Lipstick Building in New York.

In the 1980's, Madoff established a United Kingdom corporation, Madoff Securities International Ltd. ("MSI"), that operated as an affiliate of the Madoff firm.  MSI was registered with the U.K. Financial Services Authority and engaged principally in proprietary trading. Bernard Madoff owned 30 percent of MSI, served as Chairman of its Board of Directors, and, according to public reports, exercised control over its operations.  MSI was identified as an affiliate in the Madoff firm's Form BD.[56]

A third broker-dealer—Cohmad Securities Corporation ("Cohmad")—is also relevant to FINRA's oversight of Madoff.  Cohmad was founded in 1985 by Madoff and Maurice Cohn. Madoff and his brother, Peter, together owned 24 percent of the firm.[57]  Cohmad operated out of the 18th floor of the Madoff firm's offices, reportedly renting both space and equipment from the Madoff firm.  It did not have a separate reception desk or signs; a visitor to the Madoff firm would have been unaware that Cohmad was there.

During the period relevant to this report, Cohmad was registered as a broker-dealer and reported having approximately 750 to 850 customer accounts, which were held by and cleared through Bear Stearns Securities Corporation.  These accounts usually generated roughly 300 transactions per month, mostly in equities and, to a lesser extent, municipal bonds.

---

[56] Form BD is the Uniform Application for Broker-Dealer Registration.  Broker-dealers use Form BD to register with the SEC, FINRA, and other self-regulatory organizations through the CRD system.  A broker-dealer is required to update its Form BD by submitting amendments whenever the information on file becomes inaccurate or incomplete for any reason.

[57] The Madoff ownership interests were disclosed in Cohmad's Form BD.

APP 0340

Cohmad derived the vast majority of its revenues from the Madoff firm.  For example, its audited financial statements for the year ended June 30, 2005, showed that more than 90 percent of its revenue ($7.1 million out of $7.8 million) was derived from the Madoff firm.  By the end of 2005, its revenue from the Madoff firm had grown to 95 percent of its total revenues. Cohmad characterized these revenues as "fees for account supervision" in its internal accounting records and as "brokerage service fees" in its audited financial statements.[58]  According to FINRA's 2004 examination report, Cohmad represented to FINRA that

> [A]pproximately 85 percent of the firm's revenue is generated from the execution services it provides to Bernard Madoff, a non-affiliated broker dealer. . . . Cohmad through its clearing firm, has access to the DOT [Designated Order Turnaround] system whereby it can route its listed securities for execution to the floor of the New York Stock Exchange ("NYSE").  Madoff utilizes this service through Cohmad because it is not a member of the NYSE.  Cohmad earns fees from Madoff for this service, however, there are no written contracts between Madoff and Cohmad.

The Madoff firm apparently paid these fees by writing a single check each month for a specific amount, calculated down to the penny.  These "brokerage service fees" —which would have been expected to vary depending on the volume of the trades routed to the NYSE—were frequently the same from month to month.  For example, these payments, as reflected in Cohmad's internal financial records, were as follows during 2005:

| | | | | | |
|---|---|---|---|---|---|
| Jan. | $548,092.82 | May | $581,150.17 | Sept. | $581,150.17 |
| Feb. | $548,092.82 | June | $581,150.17 | Oct. | $581,150.17 |
| Mar. | $889,676.83 | July | $604,914.24 | Nov. | $581,150.17 |
| April | $581,150.17 | Aug. | $581,150.17 | Dec. | $581,150.17 |

After the Madoff scandal broke in December 2008, Cohmad admitted to FINRA staff that these fees were, in fact, compensation for bringing clients into Madoff's investment advisory business.  The Cohmad representatives stated that this compensation was originally tied to NYSE

---

[58] In its FOCUS filings, Cohmad recorded these revenues on the line identified as "Fees for account supervision, investment advisory and administrative services."

trades that the Madoff firm routed though Cohmad, but eventually just became a "number" selected by Madoff based on the number of clients referred and the amount of new funds invested.[59]  Cohmad further stated that this change from one type of compensation to another had come about due to the decimalization of trading on the NYSE.  Between 2000 and 2008, these payments totaled over $67 million.

### 2.    Registration of the Madoff Firm as an Investment Adviser

According to public reports, from 2003 to 2005, SEC staff examined the Madoff firm in response to complaints that the firm was running an unregistered, multi-billion dollar investment advisory business that operated as a Ponzi scheme.[60]  In January 2006, the SEC's Enforcement Division opened an investigation of the matter.  The investigation was closed without formal action after the Madoff firm agreed to register as an investment adviser.  FINRA was never informed of the complaints, the SEC's investigation, or its resolution.[61]

In September 2006, the Madoff firm registered with the SEC under the Investment Advisers Act by filing Form ADV through IARD, an electronic database system which FINRA has contractually agreed to operate and maintain on behalf of the SEC.  The Madoff firm's Form ADV represented, among other things, that it had approximately $17 billion under management for 23 clients, and was compensated through commissions.  The Madoff firm also

---

[59]  According to lawsuits filed by the SEC and the Massachusetts Securities Division, these fees were calculated as a percentage of the total cumulative amount of principal that Cohmad had brought into Madoff's Ponzi scheme, less any amounts withdrawn by clients.

[60]  Based on a review of the available evidence, it appears that FINRA never received any similar complaints about the Madoff firm.

[61]  In May 2006, SEC staff contacted FINRA to request data on over-the-counter options positions held by the Madoff firm and also spoke to the Vice President and Deputy Director of the FINRA Amex Regulation Division to gather background information on various options trading strategies.  The SEC staff informed the Vice President that they were preparing for a deposition of Madoff (implying that an investigation was under way), but did not disclose what they were investigating or why.

APP 0342

represented that it (rather than a related person or third party) had custody of its advisory clients' funds and securities.

The Madoff firm did not update its registration as a broker-dealer to reflect this investment advisory business.  Its Form BD, maintained in FINRA's CRD database, continued to disclose its types of business *only* as "Broker or dealer making inter-dealer markets in corporation securities over-the-counter" and "Trading securities for own account."  In fact, even though it had registered as an investment adviser, the Madoff firm never disclosed to FINRA that it was engaged in any business other than market making and proprietary trading.[62]

### 3.   2007 Cycle Examination

As a registered broker-dealer and FINRA member, the Madoff firm was subject to periodic cycle exams by FINRA's Member Regulation department.  As discussed above, the frequency of cycle examinations is generally based on an assessment of the risk of violations posed by a particular firm.  At all times relevant to this report, the Madoff firm held itself out to FINRA as a market-making and proprietary trading firm that did not have any customers or maintain any customer accounts.  Over the years, examinations of the firm had found only a few, relatively minor, regulatory violations even though the firm usually processed more than two million transactions per month.  As one FINRA staff member explained, the Madoff firm was viewed as a "clean" firm with an excellent examination history.  In light of this, the firm was designated as Category 2 and was examined every other year.  The most recent—and most relevant, in light of the investment adviser registration and certain financial information in its broker-dealer records—examination is discussed in detail below.

---

[62] The Madoff firm filed its form ADV with the IARD system.  Although FINRA operates both the CRD system (as a self-regulatory organization) and the IARD system (as a vendor), the systems are separate and data in the two systems are not reconciled.  There are, for example, no automated checks to ensure that information in a firm's Form BD is consistent with its Form ADV.

APP 0343

FINRA conducted its most recent cycle examination of the Madoff firm in January and February 2007. The examination was performed by a single examiner from FINRA's New York district office. The examiner had several years of experience and was considered by his superiors to be highly-skilled and thorough.

In accordance with FINRA's normal practices, the 2007 cycle examination began with a standard pre-examination phase in which the examiner gathered information about the firm from FINRA's internal sources. This phase included reviews of the prior (2005) cycle examination report, the firm's FOCUS filings and audited financial statements, its examination history as reflected in the STAR system, and records of its corporate bond trading as reflected in the TRACE system.[63]

As part of the normal pre-examination process, the examiner accessed FINRA's CRD system and printed out a paper version of the Madoff firm's Form BD. Because the Madoff firm had not updated this form to reflect its investment advisory business, the printout contained no indication that the firm had registered as an investment adviser. The only hint that the examiner might have seen in FINRA's internal records that the firm was an investment adviser would have been a link, "View IA Record," that would have been displayed in some, but not all, of the screens in the CRD system. This link appeared only on CRD screens for firms that had a record in the IARD database. The 2007 cycle examiner (like the vast majority of FINRA examiners) did not have direct access to the IARD system and, accordingly, could not have viewed the firm's record in IARD even if he had clicked the link. The examiner did not notice the link and,

---

[63] According to the cycle examiner and other personnel from the New York district office, as of 2007, except for confirming the internet address of a firm's website, FINRA did not routinely run internet searches prior to conducting a examination. The cycle examiner ran a Google search prior to the exam to find out more about Madoff, whom he understood to be an innovator in electronic trading and a prominent member of the financial community. His Google search did not reveal that Madoff was managing money or acting as an investment adviser. The use of pre-examination internet searches has increased since the Madoff scandal broke, but FINRA has not issued any guidelines on how such searches should be conducted or the kinds of information they should target.

APP 0344

in any event, reviewing a firm's Form ADV was not required or even recommended under FINRA's pre-examination procedures at the time.[64]

In early January 2007, the examiner contacted the Madoff firm to inform it that FINRA would be conducting an onsite examination and sent an email to Shana Madoff, the firm's Compliance Counsel (and Madoff's niece) requesting that the firm provide information about the types of business in which it engaged by answering a web-based information request ("WebIR"). The firm completed the form the next day, indicating that it engaged only in market making (10 percent of revenues) and proprietary trading (90 percent of revenues). It did not check the box on the form for "Investment advisory services" or indicate that it had any revenues from any type of "retail" business—*i.e.*, from transactions with persons other than broker-dealers or institutional investors. In response to an email following-up on its WebIR response, the firm stated that its transactions were all "RVP/DVP [receive versus payment/deliver versus payment]," meaning it did not regularly hold customers' cash or securities as part of its trading activities.

FINRA's examination staff planned the 2007 cycle examination believing that the Madoff firm was, as it claimed, strictly a market maker and proprietary trader. Accordingly, the examination covered only the mandatory elements for such a firm—*e.g.*, verification of its net capital, review of its written procedures and supervisory controls, and examination of its trade reporting (corporate bonds were selected). The entire examination required 78.5 hours of work, the bulk of which was devoted to verifying the firm's net capital computation and reviewing its corporate bond trades.

---

[64] Although very few examiners had access to the IARD system, the public versions of the Forms ADV of registered investment advisers were available through the SEC's website.

APP 0345

The onsite portion of the 2007 cycle examination started on January 24, 2007 with a background interview of Bernard and Shana Madoff.   During this interview, the FINRA examiner was (again) informed that the firm engaged only in market making and proprietary trading, did not receive customer funds, and did not receive customer securities.   Although the firm disclosed its London affiliate, it did not mention Cohmad during this interview.

The Madoff firm also gave the examiner a tour of its offices on the 18th and 19th floors of the Lipstick Building, which were connected by an internal staircase and appeared to house the entirety of the firm's operations.   The examiner was not shown the firm's offices on the 17th floor, on which its investment advisory business was located.   Those offices were not connected to the internal staircase and—according to press reports—were not marked by a sign. The examiner never had any indication that the offices on the 17th floor existed.

The examiner spent an entire week at the Madoff firm performing the field work for the examination.   He recalled that the firm promptly answered his questions, was responsive to his requests for documents, and gave him no reason to be suspicious.   Madoff stopped by to speak to the examiner every day, but did not hover or attempt to steer the examiner toward or away from any areas of inquiry.

Throughout the examination, the Madoff firm provided the examiner with documents and records *only* from the market making and proprietary trading side of its business, not from its investment advisory operation.   For example, in advance of his field work, the examiner had sent a written records request for "Bank Statements and Cancelled Checks" for the third quarter of 2006.   The examiner was given statements only from the Bank of New York accounts (used by the broker-dealer business), not from JP Morgan Chase (used by the investment advisory business).   The records request also asked for information about customers who had opened new

APP 0346

accounts since the last cycle examination (in 2005).  The Madoff firm indicated that it had no customers and no customer accounts.[65]  And, although the examiner reviewed the firm's trading records, those documents did not reflect the fictitious trades that Madoff represented to his advisory clients he had made on their behalf.

Audited annual financial statements prepared by the auditor of the Madoff firm—Friehling & Horowitz CPA'S P.C.—did not disclose the existence of any of the investment advisory accounts.  In a pending case against Friehling & Horwitz, the SEC has alleged that the auditor was financially dependent on Madoff, that it knowingly or recklessly made false statements related to its audits of the firm, and that it failed to perform any meaningful evaluation of the firm's customer accounts and internal controls.  FINRA's procedures for confirming auditor independence were limited to confirming that the auditing firm was licensed and was a different legal entity from the broker dealer being audited.

The records provided by the Madoff firm to the examiner during his field work contained no indication that the firm was engaged in an investment advisory business or had advisory clients.  To the contrary, they were entirely consistent with the normal records of a broker-dealer engaged solely in market making and proprietary trading, as the firm claimed to be.  Based on the firm's representations and the absence of evidence contradicting those representations, the examination report noted that many of the mandatory examination elements related to customer protection were simply inapplicable because "[t]he firm . . . does not have any customers."

The examiner completed his field work on February 1, 2007, and the examination report on February 8, 2007.  The examination report found that two violations of applicable regulations had occurred.  First, the Madoff firm had understated its net capital (of more than $543 million)

---

[65] The Madoff firm appears to have disclosed that it had accounts for seven of its employees, but that these accounts had been completely inactive during the examination period.

APP 0347

by $7,201.68 (a 0.001 percent error) because it had omitted dividends earned in September 2006 on a money market account held at another broker-dealer. (The firm's minimum required net capital was $1 million, so even with the error, its excess net capital was $542 million.) Second, the examination found certain delays and errors in the firm's reporting of corporate bond trades, which were a small part of its proprietary trading operations. The examiner communicated these findings to Madoff during an exit conference on February 8, 2007.

The examiner then submitted the examination report—which recommended that FINRA issue a letter of caution to the Madoff firm for the bond trading violations—to the exam manager. After requesting minor revisions, the manager approved the report and submitted it to the Associate Director, who approved it on May 9, 2007. The Associate Director signed the recommended letter of caution on May 15, 2007, ending the examination.

4.    2003 and 2005 Cycle Examinations

FINRA also conducted routine, cycle examinations of the Madoff firm in 2003 and 2005. These examinations—which took place before the firm had registered as an investment adviser—were very similar to the 2007 cycle examination: they were each conducted by a single examiner, covered only FINRA's mandatory examination elements, and found only minor regulatory violations (if any at all). During these examinations, the firm represented to FINRA examiners that it was engaged solely in market making and proprietary trading and, accordingly, did not have any customers or customer accounts, did not hold customer securities, and did not receive customer funds. The firm also concealed its investment advisory activities from the examiners by, for example, not providing them with bank account statements from JP Morgan Chase where the investment advisory funds were maintained.

APP 0348

5.     Assessment of the Madoff Firm Examinations

The 2003, 2005, and 2007 cycle examinations of Madoff did not find any evidence that the firm was operating an investment advisory business, much less a Ponzi scheme.  As noted above, the firm concealed its investment advisory operations from FINRA and took elaborate steps to keep that business separate from its broker-dealer business.  Its investment advisory business consisted, at bottom, of a bank account and fictitious customer accounts that were not reflected on the broker-dealer's books.  FINRA's examination program during the relevant period was not designed to detect the type of fraudulent activities in which the Madoff firm engaged.[66]

Nonetheless, FINRA's examinations of the Madoff firm—particularly the 2007 examination—presented several opportunities to have gathered more information about the firm's investment advisory business.  During the 2007 cycle examination, FINRA staff did not obtain or review the Madoff firm's Form ADV.[67]  When interviewed, FINRA staff involved in the Madoff firm examinations stated that they would have asked more questions if they had known the firm was an investment adviser.  A comparison of the firm's Form ADV would have shown inconsistencies with the representations it made to FINRA.  For example, the Form ADV stated that the firm had 23 customers (it actually had thousands more), even though it told FINRA it had none.  The Form ADV stated that the firm (rather than a related person or third

---

[66] To take one example, FINRA's verification of a firm's net capital—a mandatory element of every cycle examination—is principally aimed at confirming the existence of the assets reflected on the firm's books, not at detecting undisclosed assets such as the accounts of the Madoff firm at JP Morgan Chase.

[67] Under existing law, FINRA does not have jurisdiction to regulate activities under the Investment Advisers Act. FINRA's examination program did not focus on identifying and reviewing the investment advisory activities of its members for possible violations of the Exchange Act and FINRA's own rules.  Until recently, FINRA's pre-examination procedures did not require examiners to determine whether a firm was registered as an investment adviser, and its computer systems did not permit most examiners to access the IARD.  Even where a broker-dealer disclosed that it was also an investment adviser, FINRA's examination program did not contain any specific guidance as to which elements should be added to an examination in that situation.

APP 0349

party) had custody of $17 billion of assets belonging to those customers, even though it represented to FINRA that it did not hold any customer assets. Finally, the Form ADV stated that the Madoff firm executed trades for its customers—trades that were not reflected in the firm's broker-dealer records because they had not, in fact, taken place. A careful review of the Form ADV would have led to questions about where advisory clients' assets were being kept and how transactions for those clients were being executed. Such questions would not necessarily have uncovered the fraud, but would have provided the 2007 examiner with highly relevant lines of inquiry.

FINRA's review of the financial records of the Madoff firm presented additional opportunities. An important part of FINRA's regulatory mission is ensuring that member firms have adequate capital and are not at risk of financial collapse. During each cycle examination, examiners devote a substantial amount of time to verifying a firm's net capital computations by, among other things, tracing all of the firm's assets to third-party documents such as bank statements and account records. As several FINRA staff members explained, because of the importance of the net capital requirement, cycle examinations tend to focus intensively on analyzing and testing a firm's balance sheet (its assets and liabilities), but devote little attention to the firm's income statement (its revenues and expenses). For Category 2 firms, at least, FINRA's examination program did not require that revenues or expenses—even very large ones—be specifically analyzed, much less traced to supporting documents. As one examiner explained, FINRA examiners are expected to ask questions if they notice unusual revenues or expenses, but such inquiries are incidental to the net capital review and need not be pursued beyond receiving facially reasonable answers. A more comprehensive approach to examining

APP 0350

revenues and expenses might have provided two opportunities to have uncovered information regarding the firm's undisclosed investment advisory business.

First, although it had never done so before, the Madoff firm began to report "commission" revenue in its monthly FOCUS reports starting in September 2006—the same month in which it filed a Form ADV stating that it was compensated for its investment advisory services through commissions.[68]   As alleged in the various criminal cases arising from the Madoff scandal, these "commissions" were actually the result of round-trip transactions in which Madoff transferred money from one of the Madoff firm's off-the-books accounts at JP Morgan Chase to the London affiliate, and then transferred it to one of the Madoff firm's on-the-books accounts at Bank of New York.   These "commissions" totaled approximately $8 million, $108 million, and $90 million in the years ended September 30, 2006, 2007, and 2008 respectively.   During 2007, they constituted more than 60 percent of the Madoff firm's reported revenue.

Commissions are a somewhat unusual source of revenue for a firm engaged solely in market making and proprietary trading, which normally would generate revenues from buying and selling securities for its own account, not from charging commissions to execute trades. FINRA's computer systems screen firms' FOCUS filings using certain algorithms to identify unusual or potentially problematic activity and generate exception reports which are reviewed and investigated by FINRA staff.   The Madoff firm's FOCUS filings underwent this screening, but the system did not flag these commission revenues as a potential problem.   For example, the legacy NASD FOCUS system, whose algorithms had not been updated since the mid-1990's,

---

[68] The Madoff firm reported "commission" revenue of nearly $8 million (out of total revenues of more than $34 million) in its September 2006 FOCUS report.

APP 0351

screened for new (*i.e.*, previously unreported) types of revenue, but created an exception report only if the new revenue was greater than 25 percent of a firm's total revenue in the period.[69]

During the 2007 cycle examination, the examiner reviewed the Madoff firm's financial records and its consolidated FOCUS report for the period from July through September 2006. The examiner noticed the new "commission" revenue of approximately $8 million—amounting to 23 percent of the Madoff firm's total revenue during the period—and asked about it.  When interviewed, he recalled that someone, probably Shana Madoff, explained that the commissions had been paid by the firm's London affiliate on trades that the firm had executed for it. Although this might have signaled a shift in the firm's business, the answer seemed reasonable to the examiner, did not relate to any of the examination elements he was performing, and did not raise any "red flags."  The examiner did not further pursue the matter and did not, for example, request supporting documentation for the commissions or proof of the underlying trades.

Second, as part of the 2007 cycle examination, the examiner made a standard request for the Madoff firm's bank statements (along with copies of its cancelled checks) that were needed to verify the firm's net capital computations.[70]  Most of the cancelled checks were unremarkable and were for only a few hundred or few thousand dollars.  However, one of the cancelled checks, to "Cohmad Securities," was for a much larger amount, $524,611.03.  The examiner had never heard of Cohmad, had not seen any indication that it was operating out of the same office space as the Madoff firm, and was unaware that Madoff was an owner of Cohmad.[71]  He did not recall

---

[69] FINRA is currently in the process of transitioning legacy-NASD firms from NASD's Centralized FOCUS ("cFOCUS") system to the NYSE's Electronic FOCUS ("eFOCUS") system, which includes more sophisticated screening algorithms.

[70] As noted above, the firm provided the requested information only for its accounts at Bank of New York and not for its accounts at JP Morgan Chase.

[71] In FINRA's New York district office, firms are assigned to groups of examiners (each headed by an examination manager) alphabetically.  The Madoff firm was assigned to the group handling the "B's" while Cohmad was assigned to a different group handling the "C's."

APP 0352

noticing this check or asking about it, but also stated that he did not believe he would have thought that a check in this amount from one broker-dealer to another was significant or relevant to the examination he was performing.  Although this was the single largest check provided to the examiner, FINRA's procedures—which did not emphasize review of a firm's expenditures—would not have required him to inquire about it or request backup documentation.

      6.     <u>Examinations of Cohmad Securities</u>

Cohmad was a small broker-dealer.  For most of the period relevant to this report, it was designated as a Category 2 firm and examined by staff from FINRA's New York office every other year—*e.g.*, 2002, 2004, and 2006.  These examinations found only relatively minor regulatory violations and either were closed with a letter of caution or simply filed without action.  At some time after the 2006 cycle examination, Cohmad was moved to Category 3, whose firms are examined every fourth year.  FINRA, accordingly, did not perform a cycle examination of Cohmad in 2008.[72]

FINRA's 2006 cycle examination of Cohmad took place during February through April 2006.  It was performed by two relatively junior examiners, one of whom led the examination while the other focused principally on Cohmad's municipal securities business.

The 2006 Cohmad cycle examination began with a pre-examination phase in which the lead examiner gathered information about the firm.  During this process, he reviewed Cohmad's FOCUS filings and its audited financial statements, which disclosed that Cohmad's principal source of revenue came from the Madoff firm.  The notes to Cohmad's audited financial statements for the year ended June 30, 2005, discussed these revenues under the heading "related party transactions and revenues" and specifically disclosed that they had been earned by

---

[72] FINRA did conduct an Alternative Municipal Examination ("AME") of Cohmad's municipal securities business in 2008, as required by the Municipal Securities Rulemaking Board.  The AME did not include any field work and focused solely on Cohmad's (then-inactive) municipal securities business.

APP 0353

"provid[ing] brokerage services to an entity owned by a minority shareholder of [Cohmad]." Cohmad's response to the WebIR indicated that 95 percent of its revenue came from "brokerage fees."   The lead examiner recalled that, during the background interview at the start of the examination field work, Cohmad representatives explained these revenues by stating that they related to trades Cohmad performed on the NYSE for the Madoff firm.

The "brokerage services" rendered to the Madoff firm were the single most important part of Cohmad's business.  As noted above, the payments for these services also followed an unusual pattern.  The 2006 cycle examination's review of these "brokerage fees" was limited to asking about them during the background interview.   The lead examiner recalled that his manager had instructed him not to review them because the Regulatory Coordinator for the section—who was responsible for reviewing Cohmad's FOCUS filings and audited financial statements—was already aware of them.   The manager had little recollection of the 2006 examination and could neither confirm nor deny that such instructions had been given.   It is possible that the manager based this decision on the results of prior examinations, including the 2004 cycle examination which had obtained the detailed explanation for these revenues (quoted above at page 49).

For whatever reason, the 2006 cycle examination did not review the "brokerage fees" paid from the Madoff firm to Cohmad by, for example, requesting documentation of how the fees had been calculated or of the underlying trades in NYSE-listed stocks.   Although the examination did review Cohmad's trading records—a mandatory examination element—that review was limited to transactions in municipal securities, an area for which Cohmad had received letters of caution in the past.   Cohmad's equities transactions were removed from the examination's focus and were not reviewed during the 2006 cycle examination, apparently

62

APP 0354

because prior examinations had not found problems in this area.  This normally mandatory element was also omitted from the 2004 cycle examination.[73]

FINRA's review of the areas that were included in the examination plan appears to have been thorough and complete.  The 2006 cycle examination found a variety of minor regulatory violations, mostly related to Cohmad's written supervisory procedures and its handling of municipal securities transactions.  The examination was concluded with a letter of caution to the firm.

FINRA's failure to examine the "brokerage fees" paid to Cohmad by the Madoff firm was a missed opportunity.  Unlike the Madoff firm examiners, the Cohmad examiners were aware that Cohmad and the Madoff firm were related parties.  The pattern of payments between these parties—often for identical amounts each month—was facially inconsistent with their being based on actual equities transactions.  Moreover, because of their size, for these revenues to have been actual "brokerage fees," Cohmad would had to have handled a very significant volume of transactions on behalf of the Madoff firm.  A request for documentation underlying these purported "brokerage fees" might have uncovered the fact that the fees were for referring clients to Madoff's undisclosed investment advisory business.  This discovery alone may not have uncovered the Ponzi scheme, but it would have undermined the Madoff firm's longstanding representations to FINRA that it did not maintain any customer accounts.

In conclusion, the examinations of both the Madoff and Cohmad firms provided FINRA examiners with opportunities which, in hindsight, might have led to the discovery of Madoff's

---

[73] The report of the 2004 cycle examination explained:

> Staff reviewed the results of the firm's 2002 examination and noted no evidence or concerns regarding the firm's equity transactions.  Considering that there has been no major changes to the firm's business and/or procedures, that there were no previous issues regarding the reporting of the firm's equity securities, and that all of the firm's equity transactions are reported by its clearing firm, Bear Stearns, no further review was warranted.

APP 0355

Ponzi scheme if they had been pursued.  However, FINRA's examination program did not focus on the areas in which these opportunities arose.  Because of its lack of jurisdiction over investment advisory activities, FINRA's examination program did not require its examiners to obtain or review the Madoff firm's Form ADV.  Because of the program's focus on verifying net capital and completing specific exam elements, the examiners did not review significant revenues claimed by the Madoff and Cohmad firms beyond seeking oral explanations of what the revenues were.  FINRA's procedures did not require the examiners to go further by, for example, requesting supporting documentation or testing the firms' representations against third-party information.  Although FINRA's examinations did present the opportunities discussed above, its examination program did not exploit them because it was not designed to ferret out a sophisticated fraud, like Madoff's Ponzi scheme, that was kept almost entirely "off the books" of a member firm.

APP 0356

## IV.    OVERVIEW OF FINRA'S JURISDICTION

FINRA lacks jurisdiction to regulate a significant percentage of the financial institutions, products and transactions in our country.  Of particular relevance for purposes of this review, FINRA lacks the authority to inspect for or enforce compliance with the Investment Advisers Act.  In addition, FINRA lacks jurisdiction to directly obtain information from or regulate banks, insurance companies, savings and loan institutions, mutual funds or hedge funds.

FINRA's jurisdiction generally extends to any securities activity by a FINRA member firm or associated person that is governed by the Exchange Act or FINRA's rules.[74]  This includes jurisdiction to enforce the anti-fraud provisions of the Exchange Act and SEC rules, such as Rule 10b-5.[75]

Under FINRA Rule 2010, FINRA has the authority to enforce "just and equitable principles of trade" with respect to member firms and associated persons.  The SEC has held that this authority permits FINRA to sanction member firms and associated persons for a broad range of unlawful or unethical activities, including those that do not implicate "securities."  For example, the SEC has approved FINRA disciplinary actions involving conduct related to insurance applications[76] and premiums,[77] tax shelters,[78] the general entrepreneurial activity of member firms,[79] and even to a member firm employee's improper use of a co-worker's credit card.[80]

---

[74] See Exchange Act § 15A(b).  FINRA also has jurisdiction to enforce compliance with the rules of the Municipal Securities Rulemaking Board.

[75] Rule 10b-5 is limited to implicating the sale or purchase of "securities" as defined by the Exchange Act.

[76] *In the Matter of Thomas E. Jackson*, 45 SEC 771 (June 16, 1975).

[77] *In the Matter of Ernest A. Cipriani, Jr.*, 51 SEC 1004 (February 24, 1994).

[78] *In the matter of Daniel C. Adams*, 47 SEC 919 (June 27, 1983).

[79] *In the matter of DWS Securities*, 51 SEC 814 (November 12, 1993).

[80] *In the matter of Daniel D. Manoff*, SEC Release No. 34-46708 (October 23, 2002).

APP 0357

FINRA's jurisdiction is limited to activities subject to the Exchange Act and FINRA rules occurring anywhere in the legal entity, regardless of whether the activity is carried out by the nominal broker-dealer unit or by some other unit within the member firm.  For example, to enforce compliance with the Exchange Act or FINRA rules, FINRA has jurisdiction to obtain information about securities transactions executed as part of an investment advisory business that is conducted within the legal entity registered as the broker-dealer.[81]  FINRA, however, has not utilized the full extent of its jurisdiction.

The Exchange Act and SEC rules require FINRA to regulate the conduct of certain persons associated with a member firm.  Specifically, the Exchange Act and SEC rules require FINRA to regulate the conduct of "securities persons"—that is, partners, officers, or certain employees of the member firm.  The Exchange Act and SEC rules also require FINRA to regulate the conduct of "control persons"—that is, those who have the power to direct or cause the direction of the management or policies of the member firm.  These definitions can encompass legal as well as natural persons—*i.e.*, both companies and human beings—and are not limited to domestic entities or individuals.[82]

Certain of FINRA's own rules and bylaws, however, limit its jurisdiction—other than for purposes of inspections and review of books and records—to natural persons associated with the member firm.[83]  By contrast, NYSE's old rules—which FINRA has only implemented for firms who are members of NYSE—assert broader jurisdiction over certain associated entities.  In

---

[81] See Exchange Act §§ 15A & 19(g); SEC Rule 19g2-1, and Adopting Release No. 34-12994 (November 18, 1976); see also FINRA Rule 2010, NASD Rule 2210, and FINRA Regulatory Notice 08-66 (October 2008) (stating that "[FINRA Rule 2010] applies to all of the business of a broker-dealer, not only to its securities and investment banking business," and that "[NASD] Rule 2210 is not limited to a broker-dealer's securities and investment banking business.").

[82] See Exchange Act § 19(g)(2); SEC Rule 19g2-1.

[83] See FINRA Rule 0140; FINRA's By-Laws at Article I(rr); see also FINRA Regulation, Inc.'s By-Laws at Article I(gg).

APP 0358

particular, NYSE Rule 304 asserts jurisdiction over any legal or natural person who either controls a member firm, or engages in a securities business and is controlled by or under common control with a member firm.  The Exchange Act would not preclude FINRA from applying this type of authority to all FINRA member firms, and not just NYSE members.

FINRA is required to enforce compliance with the Exchange Act, Exchange Act rules and FINRA's own rules by each member, its "securities persons" (partners, officers, or certain employees of the member firm), and any person who controls the member.  SEC rules relieve FINRA from the obligation to conduct examinations of control persons or other associated persons who are not "securities persons."[84]  FINRA is, however, not relieved of the duty to enforce compliance by control persons.  SEC rules do not prohibit FINRA from conducting examinations of a member firm's control persons and other associated persons if FINRA carefully considers the related burdens on its resources and on the examined entities.

To date, FINRA has not asserted broad authority to examine entities associated with a member firm.  Rule 8210 only permits it to inspect the books and records of certain direct owners of a member firm.  This review has not found any cases or SEC proceedings addressing this right to inspection, suggesting that FINRA has been reluctant to push the boundaries of Rule 8210.  This review also has not found any reported case in which FINRA has attempted to assert inspection authority over indirect owners or affiliates of member firms.

FINRA has broad authority to adopt rules governing the natural persons who carry out member firms' broker-dealer business, imposing qualification standards on those individuals and regulating the substantive conduct of that business.  FINRA's ability to regulate individuals' non-broker-dealer activities is more circumscribed.  The SEC and the courts have upheld the

---

[84] See SEC Rule 19g2-1.

APP 0359

application of certain FINRA rules to the non-broker-dealer portions of firms' businesses. Examples include FINRA rules that (a) require individuals to provide their employer with advance notice of outside securities and non-securities activities;[85] (b) prohibit individuals from engaging in certain outside securities activities without their employer's approval;[86] and (c) require that certain outside securities activities be supervised and recorded on the employer's books and records as if the activity were being performed on behalf of the employer firm itself.[87]

---

[85] NASD Rules 3030 and 3040(b).

[86] NASD Rule 3040(c)(3).

[87] NASD Rule 3040(c)(2).

APP 0360

## V.      FINRA ACTIONS SINCE THE STANFORD AND MADOFF SCHEMES

The Special Committee has been informed by FINRA staff that, prior to the completion of this review and subsequent to the Madoff and Stanford schemes coming to light, FINRA has made changes to its regulatory programs to strengthen its efforts in a number of areas.  These include the following:  enhancing fraud training for examiners; developing more detailed procedures which will better support examiners' efforts to detect potential fraud during examinations; enhancing use of publicly available information during the pre-examination process; reviewing a sub-set of closed cases to evaluate whether they were the product of sound analysis and appropriately documented in the files; and expanding its review of arbitrations to include employer-employee disputes in the event of whistleblower allegations.

In addition, in March 2009, FINRA created the Office of the Whistleblower.  The purpose of this initiative was to offer an improved way for those providing complaints or tips to reach senior staff who can quickly assess the level of risk involved and make sure each complaint or tip is properly evaluated.  Those complaints warranting additional review and investigation are subject to an expedited regulatory response and are reviewed by experienced senior staff upon receipt.  The Office of the Whistleblower can be reached through a toll-free number and through an internet address.  This initiative has resulted in twelve referrals to the SEC, three referrals to other self-regulatory organizations and five referrals to other FINRA departments.

Finally, the staff has indicated its plan to develop a financial fraud unit.  The purpose of this unit, which will combine the Office of the Whistleblower, Central Review Group, enforcement resources and industry experience, is to heighten FINRA's review of incoming allegations of serious frauds; provide a centralized point of contact internally and externally on

APP 0361

fraud issues; have a real-time platform for discussion of potential fraud within the organization; develop internal expertise in expedited fraud detection and investigation; and better consolidate regulatory information.

APP 0362

## VI.   RECOMMENDATIONS

The recommendations below are intended to enhance the effectiveness of FINRA's examination program by increasing its ability to detect fraud and improve its investor protection functions.  In analyzing these recommendations for implementation, FINRA management should seek to achieve the following strategic objectives:  (i) greater emphasis should be placed on the detection of fraud; (ii) potential fraud situations and other situations presenting serious potential risk to investors should be escalated promptly and properly; (iii) examination staff should be diligent in pursuing potentially serious issues, exercising an appropriate degree of skepticism; (iv) all FINRA operating units should closely coordinate and communicate in carrying out the examination program; and (v) FINRA should provide additional resources to strengthen its cause examination program.

While a number of these recommendations can be effected by FINRA alone, others will require the concurrence of the SEC and a critical recommendation as to the expansion of FINRA's jurisdiction will require Congressional action.  Virtually all of these recommendations will require FINRA management and the Board to make decisions about resource allocation and adequacy.  FINRA should continue to move quickly to implement those recommendations that it can undertake unilaterally.

1.     Jurisdiction

*A.     Seek Jurisdiction to Regulate Activities Under the Investment Advisers Act.* FINRA's examination program is fundamentally hampered by its lack of jurisdiction over investment advisory activities.   A large number of firms and a significant percentage of registered persons are also registered under the Investment Advisers Act.[88]  In providing these

---

[88] As of August 2009, there were 925 firms registered both as broker-dealers and investment advisers.

APP 0363

services and managing investors' assets, therefore, these firms and individuals are largely beyond the reach of FINRA and under a less robust regulatory scheme.  FINRA should proactively seek jurisdiction to regulate activities under the Investment Advisers Act.  This additional jurisdiction would enable FINRA to be more effective in detecting fraud in both broker-dealers and investment advisers.  If FINRA had an investment adviser examination program, it might well have identified the Madoff fraud at the time of his registration as an investment adviser.  If Congress grants FINRA the authority to implement an examination program under the Investment Advisers Act, it will be able to conduct a joint exam and analyze and compare data on both broker-dealer and investment adviser activities to confirm the accuracy of data and identify problematic patterns and potential frauds.  This recommendation requires action by Congress.

B.      *Clarify FINRA's Current Jurisdiction; Expand Jurisdiction to Affiliates of Member Firms.*  FINRA should clarify the extent of its jurisdiction to examine member firms and bring actions to enforce the Exchange Act and FINRA rules and it should utilize that jurisdiction fully in appropriate circumstances.  FINRA should determine those situations warranting the exercise of jurisdiction beyond broker-dealer activities, such as situations in which there are indications of fraud involving potential serious harm to investors.  FINRA should more aggressively exercise its authority to investigate member firms and associated persons and to gather evidence as a basis for enforcement action.  In the Stanford case, for example, by more aggressively using its authority, FINRA could have obtained evidence of wrongdoing much earlier than it did.  FINRA should also amend its by-laws or rules to enable it to obtain information from or investigate affiliates of member firms to enforce such firms' compliance with the Exchange Act and FINRA rules.  This authority is particularly important to enable

72

**APP 0364**

FINRA to pursue enforcement actions against member firms or registered persons when it believes there is evidence of fraud or potential serious harm to investors.  This recommendation will require SEC approval to expand FINRA's jurisdiction.

2.    Examination Process and Personnel

A.    *Focus the Examination Program on Fraud; Establish a Fraud Detection Unit.*  A core element of FINRA's examination program should be the detection and prevention of fraud. The Special Committee agrees with and supports the plan of FINRA senior management to create a dedicated fraud detection unit.  That unit should include highly trained fraud examiners.

B.    *Prioritize Examinations and Resources According to the Seriousness of Misconduct.*  FINRA should revise the examination program to assure that examinations are properly prioritized and resources allocated accordingly.  In particular, the program should expedite any examination that identifies possible fraud involving potential serious harm to investors or continuing serious misconduct.

C.    *Strengthen the Cause Examination Program; Revise the Cycle Examination Program.*  FINRA should strengthen the cause examination program and revise the cycle examination program, shifting resources from low-risk cycle examinations to higher risk cause examinations.  If FINRA is to be more effective at protecting investors from fraud and Ponzi schemes, it will need to significantly expand the resources devoted to cause examinations.  This will also require strengthening the procedures for evaluating complaints, tips and other information and improving coordination among various FINRA departments responsible for such evaluation.  This recommendation requires SEC concurrence to revise the cycle program.

D.    *Assess Structure and Management of District Offices*.  FINRA should assess the structure and performance of its district offices to assure that each office is carrying out the

APP 0365

examination program efficiently and effectively.  Our review of the Stanford and Madoff cases suggested significant inconsistencies in levels of performance and operational standards in the district offices that we reviewed.  In particular, evaluation of the program should emphasize quality of examinations and not focus primarily on the quantity of examinations.

E.      *Improve Documentation and Tracking of Enforcement Referrals to and from the SEC and Other Authorities.*  FINRA should improve its process to record and track enforcement referrals to other agencies and those received by FINRA from the SEC or any other regulatory authority.

F.      *Improve Procedures to Assure Legal and Regulatory Issues Are Properly Escalated, Addressed and Documented.*  FINRA should revise its procedures for addressing and documenting important legal and regulatory issues that arise in connection with an examination. These include legal issues involving a large amount of funds or having an impact on many members.  Such issues, which require legal research and analysis, should be addressed by attorneys, not by examiners or paralegals, and the legal analysis for any significant issue should be documented, reviewed, and approved by a supervising attorney.

G.      *Increase Use of Examination Staff with Specialized Qualifications.*  FINRA should make greater use of employees with specialized training (*e.g.,* certified public accountants with public accounting and auditing experience in the securities industry; experienced internal auditors and fraud examiners; traders and trading assistants with extensive experience in and understanding of, among other things, trading markets, derivative products, complex financial instruments and financial statement analysis).

H.      *Enhance FINRA's Information Technology and Systems.*  Technological improvements should be made to the principal information technology systems utilized by the

APP 0366

examination staff.  The goal should be to make more member firm data readily available to the examination staff, including all significant changes in member firms, regulatory actions, and significant documents.  FINRA should also improve examiners' capability to analyze firms' financial data electronically.

*I.        Confirm Member-Provided Information with Independent Third Parties; Cross-check Data Provided by Member Firms.*  FINRA should require its examination program to include procedures to test member-provided information against information from independent sources, rather than relying almost exclusively on data from member firms.  FINRA also should confirm the consistency of data provided to it by each firm by cross-checking data in various submissions by a firm.  FINRA should work with the SEC, and other appropriate regulatory agencies such as the Public Company Accounting Oversight Board, to secure consent from third parties (*e.g.,* independent auditors) to provide means for FINRA to validate data provided by its member firms.

3.        <u>Coordination with the SEC and Other Regulatory Agencies</u>

*A.        Expand Access to and Use of Information from the SEC and Other Agencies.*  To improve the effectiveness and efficiency of the examination program, and for investor protection reasons, FINRA should have more complete information on other authorities' actions against FINRA member firms and registered persons.  FINRA should be provided with greater access to such information that is available from the SEC and other regulatory and law enforcement agencies.  FINRA should continue to provide information to other regulatory agencies as appropriate.  This recommendation requires concurrence by the SEC and other agencies.

APP 0367

      *B.*      *Clarify Policies Regarding Concurrent SEC and FINRA Examinations.*  FINRA should revise and standardize its policies to clarify the effect of a concurrent SEC examination or investigation on the scope of a FINRA examination of the same member firm.

      4.      <u>Training of FINRA Personnel</u>

      *A.*      *Enhance FINRA's Current Training Program.*  FINRA should implement new continuing education standards, requiring the examination staff to complete a defined number of training programs or hours over a specified period.  FINRA should also expand training initiatives focused on fraud detection and investigation techniques.

      5.      <u>Plan of Action</u>

      The Special Committee believes the recommendations above should be implemented by a Plan of Action developed by management and presented for consideration by the Board. Management has agreed to present a Plan of Action for approval or ratification at the December 2009 Board meeting.  Execution of the Plan of Action should be monitored by a designated committee of the FINRA Board.

APP 0368

## <u>APPENDIX A</u>

### 2009 FINRA Special Review Committee Charter

**Composition**
The 2009 FINRA Special Review Committee (Committee) will be composed of four FINRA Board members.

**Purpose**
The purpose of the Committee will be to review FINRA's examination program, in particular with respect to Ponzi schemes operated by the unregistered affiliates of Madoff Investments and Stanford Financial.

**Duties and Responsibilities**
The Committee shall have the following duties and responsibilities:

(i)     Review and discuss with management the operation of the FINRA examination program, in particular with respect to the Ponzi scheme activities of Madoff Investments and Stanford Financial.

(ii)    Recommend to the Board and to management changes in the examination program, where appropriate, to improve FINRA's member oversight and fraud detection capability.

(iii)   Review and discuss with management its policies and procedures relating to monitoring compliance with examination program policies.

The Committee shall have the authority to obtain advice and assistance from internal or external legal or other consultants and advisors, and to incur such expenses as the Committee in its discretion determines necessary and appropriate in carrying out the Committee's work.

*Approved April 3, 2009; amended April 13, 2009*

### FINRA Special Review Committee Roster

<u>Committee Members</u>:

- Charles A. Bowsher, Chair
- Ellyn L. Brown
- Harvey J. Goldschmid
- Joel Seligman
..
<u>Board Advisors to the Committee</u>
.
- Mari Buechner
- W. Dennis Ferguson
- G. Donald Steel

**APP 0369**