**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, *et al., on behalf of themselves and all others similarly situated,*<br><br>Plaintiffs,<br><br>and<br><br>THE OFFICIAL STANFORD INVESTORS COMMITTEE,<br><br>Plaintiff-Intervenor,<br><br>-against-<br><br>TRUSTMARK NATIONAL BANK, HSBC BANK PLC, THE TORONTO-DOMINION BANK, INDEPENDENT BANK F/K/A BANK OF HOUSTON, SG PRIVATE BANKING (SUISSE) S.A., and BLAISE FRIEDLI,<br><br>Defendants. | Case No. 3:09-CV-02384-N<br><br>(Oral Argument Requested) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, FOR DESIGNATION OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

CONTAINS CONFIDENTIAL MATERIAL PROTECTED
BY AGREED CONFIDENTIALITY ORDER

GT
EXHIBIT 018

APP 0370

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND ..... 4

A. Plaintiff's and OSIC's Claims in This Action ..... 4

B. Defendants' Alleged Roles in Stanford's Business Were Varied and Limited ..... 5

C. Plaintiffs Ask to Certify A Global Class of Over 17,000 Investors in SIBL CDs ..... 6

D. Putative Class Members Received and Relied on Varying and Individualized Information From Disparately-Situated Financial Advisors ..... 7

ARGUMENT ..... 14

I. PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(b)(3) ..... 15

A. Plaintiffs Have Not Shown Superiority ..... 15

1. Plaintiffs Have Argued That a Class Action Is Inferior ..... 15

2. Plaintiffs Have Not Proven That The Foreign Jurisdictions Involved Would Recognize and Give Preclusive Effect to a Class Action Judgment in This Case ..... 17

a. European and Caribbean Civil Law Countries Would Not Give Preclusive Effect to a Judgment in This Action ..... 18

(i) France and Spain ..... 19

(ii) Germany and Switzerland ..... 20

(iii) The Former Netherlands Antilles (Including Aruba) ..... 21

b. Latin American Countries Would Not Give Preclusive Effect to a Judgment in This Action ..... 21

(i) Venezuela, Colombia and Mexico ..... 22

(ii) Perú and Ecuador ..... 24

(iii) Panama and El Salvador ..... 26

c. Common Law Countries Would Not Give Preclusive Effect to a Judgment in This Action ..... 27

(i) England ..... 27

(ii) Canada ..... 28

3. Plaintiffs Have Not Shown that Putative Class Members Are Unable or Unwilling to Bring Individual Actions ..... 30

B. Plaintiffs Have Not Shown Predominance ..... 32

1. Choice-of-Law Considerations Preclude Certification of a Global or a Nationwide Class ..... 33

a. Different Jurisdictions' Laws Apply to The Putative Class Members' Claims .......... 33

b. Significant Differences in Applicable Laws Defeat Predominance .......... 37

2. Individual Issues of Misrepresentations and Omissions to Putative Class Members Predominate .......... 42

3. Individual Issues of Reliance Predominate .......... 44

a. Courts Refuse to Certify Classes Based On Reliance Grounds .......... 45

b. There Is No Presumption of Reliance .......... 46

4. Individual Issues of Causation Predominate .......... 47

5. Plaintiffs Did Not Provide a Methodology for Calculating Damages on a Class-Wide Basis .......... 49

C. Adjudicating Plaintiffs' Claims Against Five Banks and One Individual Under the Banking Laws of Four Countries and the Substantive Laws of 106 Countries and 47 States Would Be Wholly Unmanageable .......... 55

II. PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(a) .......... 57

A. Plaintiffs Have Not Established Commonality .......... 58

B. Plaintiffs Have Not Established Typicality .......... 59

C. Plaintiffs Have Not Established Adequacy .......... 61

1. There Are Serious Questions About the Integrity, Honesty, Credibility, and Conscientiousness of the Class Representatives .......... 61

a. Diana Suarez .......... 62

b. Salim Estefenn .......... 64

c. Sarah Elson-Rogers .......... 66

d. Ruth Alfille de Penhos .......... 67

e. Steven Queyrouze .......... 69

f. Guthrie Abbott .......... 71

2. Conflicts of Interest Between the Class Representatives and Other Class Members Negate Adequacy .......... 72

III. THE PROPOSED CLASS IS NOT CLEARLY ASCERTAINABLE .......... 74

CONCLUSION .......... 75

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) ........................................ 46, 47

*Albright v. Attorney's Title Ins. Fund*,
No. 2:03-cv-517, 2008 WL 2952260 (D. Utah July 28, 2008) ........................................ 38

*Alliance Grp. Servs., Inc. v. Grassi & Co.*,
406 F. Supp. 2d 157 (D. Conn. 2005) ........................................ 39

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ........................................ 52

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................ 30, 72

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013) ........................................ 45

*Ansari v. New York Univ.*,
179 F.R.D. 112 (S.D.N.Y. 1998) ........................................ 17, 20

*Anwar v. Fairfield Greenwich, Ltd.*,
289 F.R.D. 105 (S.D.N.Y. 2013) ........................................ passim

*Armour v. City of Anniston*,
89 F.R.D. 331 (N.D. Ala. 1997) ........................................ 61

*ASARCO LLC v. Americas Min. Corp.*,
382 B.R. 49 (S.D. Tex. 2007) ........................................ 36

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ........................................ 49, 54

*Bell v. Ascendant Solutions, Inc.*,
No. 301-CV-0166-N, 2004 WL 1490009 (N.D. Tex. July 1, 2004) (Godbey, J.), *aff'd*, 422 F.3d 307 (5th Cir. 2005) ........................................ 18, 46

*Bennett v. McKibben*,
915 P.2d 400 (Okla. Civ. App. 1996) ........................................ 39

*Berger v. Compaq Computer Corp.*,
257 F.3d 475 (5th Cir. 2001) ........................................ 61

*Berry v. Indianapolis Life Ins. Co.*,
No. 3:08-CV-0248-B, 2009 WL 424545 (N.D. Tex. Feb. 19, 2009) ........................................ 35

*Bersch v. Drexel Firestone, Inc.*,
519 F.2d 974 (2d Cir. 1975) .......... 21

*Broyles v. Cantor Fitzgerald & Co.*,
No. CIV.A. 10-854-JJB, 2014 WL 6886158
(M.D. La. Dec. 8, 2014) .......... 38

*Buettgen v. Harless, et al.*, 263 F.R.D. 378 (N.D. Tex. 2009) .......... 20

*Calpetco 1981 v. Marshall Exploration, Inc.*,
989 F.2d 1408 (5th Cir. 1993) .......... 45, 49

*Carrera v. Bayer Corp.*,
727 F.3d at 308 .......... 75

*Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortgage Ass'n*,
624 F.3d 185 (5th Cir. 2010) .......... 34, 35, 36, 41

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) .......... 30, 46, 55, 56

*Citizens Ins. Co. of Am. v. Daccach*,
217 S.W.3d 430 (Tex. 2007) .......... 37

*CL-Alexanders Laing & Cruickshank v. Goldfeld*,
127 F.R.D. 454 (S.D.N.Y. 1989) .......... 17

*Cole v. Gen. Motors Corp.*,
484 F.3d 717 (5th Cir. 2007) .......... 3, 33

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) .......... 4, 53, 54

*Community Title Co. v. U.S. Title Guar. Co.*,
965 S.W.2d 245 (Mo. Ct. App. 1998) .......... 40

*Consor v. Occidental Life Ins. Co. of Cal.*,
469 F. Supp. 1110 (N.D. Tex. 1979) .......... 61

*Corley v. Entergy Corp.*,
220 F.R.D. 478 (E.D. Tex. 2004) .......... 41

*Corley v. Orangefield Indep. Sch. Dist.*,
152 F. App'x 350 (5th Cir. 2005) .......... 41

*Crescendo Invs., Inc. v. Brice*,
61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied) .......... 45, 49

*Curley v. AMR Corp.*,
153 F.3d 5 (2d Cir. 1998) .......... 40

*Darvin v. Int'l Harvester Co.*,
610 F. Supp. 255 (S.D.N.Y. 1985) ....................69

*DeBremaecker v. Short*,
433 F.2d 733 (5th Cir. 1970)....................74

*Dvorin v. Chesapeake Exploration, LLC*,
No. 3:12-CV-3728-G, 2013 WL 6003433
(N.D. Tex. Nov. 13, 2013) ....................31, 32, 59

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*,
51 S.W.3d 573 (Tex. 2001)....................45

*Fed. Ins. Co. I.C. v. Banco de Ponce*,
751 F.2d 38 (1st Cir. 1984) ....................40

*Fed. Mgt. Co. v. Coopers & Lybrand*,
137 Ohio App. 3d 366, 738 N.E.2d 842 (2000) ....................38

*Fleming v. Travenol Labs., Inc.*,
707 F.2d 829 (5th Cir. 1983)....................57

*Gardner v. Best Western Int'l, Inc.*,
929 S.W.2d 474 (Tex. App.—Texarkana 1996, writ denied) ....................41

*Gibson v. City Yellow Cab Co.*,
No. 20167, 2001 WL 123467 (Ohio Ct. App. Feb. 14, 2001) ....................39

*Grant Thornton LLP v. Prospect High Income Fund, ML CBO IV (Cayman), Ltd.*,
314 S.W.3d 913 (Tex. 2010)....................38

*Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*,
No. 3:02-CV-1245, 2003 WL 21339279
(N.D. Tex. June 3, 2003)....................passim

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014)....................44

*Ibarra v. Izaguirre*,
985 So.2d 1117 (Fla. Dist. Ct. App. 2008) ....................39

*In re Alstom SA Secs. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008)....................17, 19, 20

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*,
228 F. Supp. 2d 348 (S.D.N.Y. 2002)....................30

*In re BP P.L.C. Sec. Litig.*,
No. 4:12-CV-1256, 2013 WL 6383968 (S.D. Tex. Dec. 5, 2013) ....................40, 51, 53

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) ........................................ 56

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ........................................ 53

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
511 F. Supp. 2d 742 (S.D. Tex. 2005) ........................................ 34

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
761 F. Supp. 2d 504 (S.D. Tex. 2011) ........................................ 37

*In re Enron Corp.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ........................................ 45, 59, 62

*In re Estate of Dugger*,
No. 224629, 2000 WL 1528710 (Del. Ch. Sept. 29, 2000) ........................................ 39

*In re Estate of Kindsfather*,
108 P.3d 487 (Mont. 2005) ........................................ 39

*In re Felt Mfg. Co., Inc.*,
371 B.R. 589 (Bankr. D.N.H. 2007) ........................................ 38

*In re Ford Motor Co. Vehicle Paint Litig.*,
182 F.R.D. 214 (E.D. La. 1998) ........................................ 47

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133, 152 (N.D. Tex. 2014) ........................................ 51, 52

*In re Park Cent. Global Litig.*,
No. 3:09-cv-765-M, 2014 WL 4261950 (N.D. Tex. Aug. 25, 2014) ........................................ 43

*In re Parmalat Sec. Litig.*,
No. 04 MD 1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ........................................ 20

*In re Vioxx Prods. Liab. Litig.*,
239 F.R.D. 450 (E.D. La. 2006) ........................................ 60

*In re Vivendi Universal, S.A. Sec. Lit.*,
242 F.R.D. 76 (S.D.N.Y. 2007) ........................................ 17, 20

*Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667 (Tex. 1998) ........................................ 42

*Jackson, et al. v. Cox, et al.*,
No. 3:10-cv-00328-N-BG (M.D. La. Jan. 11, 2010) ........................................ 31

*Janvey v. Alguire*,
No. 3:09-CV-0724-N, 2013 WL 2451738 (N.D. Tex. Jan. 22, 2013) ........................................ 34

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) .....58

*Jo Ann Howard & Assocs.*,
*P.C. v. Cassity*, No. 4:09-cv-01252, 2012 WL 3984486 (E.D. Mo. Sept. 11, 2012) .....38

*John v. Nat'l Sec. Fire & Cas. Co.*,
501 F.3d 443 (5th Cir. 2007) .....74

*Karnes v. Fleming*,
No. H-07-0620, 2008 WL 4528223 (S.D. Tex. July 31, 2008) .....62

*Kelley v. Galveston Autoplex*,
196 F.R.D. 471 (S.D. Tex. 2000) .....41

*King County, Wash. v. IKB Deutsche Industriebank AG*,
916 F. Supp. 2d 442 (S.D.N.Y. 2013) .....47

*Langbecker v. Electronic Data Sys., Corp.*,
476 F.3d 299 (5th Cir. 2007) .....72

*Lee v. American Airlines, Inc.*,
No. CIV.A.3:01-CV-1179-P, 2002 WL 31230803 (N.D. Tex. Sept. 20, 2002) .....33, 34, 56

*Ludlow v. BP, P.L.C.*,
No. 14-20420, 2015 WL 5235010 (5th Cir. Sept. 8, 2015) .....53, 54

*M.D. ex rel. Stukenberg v. Perry*,
675 F.3d 832 (5th Cir. 2012) .....58

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) .....75

*Martin v. Pac. Parking Sys. Inc.*,
583 F. App'x 803 (9th Cir. 2014) .....75

*McClure v. Owens Corning Fiberglas Corp.*,
720 N.E.2d 242 (Ill. 1999) .....39

*Melo v. Gardere Wynne Sewell*,
No. 04-cv-2238-BD, 2007 WL 92388 (N.D. Tex. Jan. 12, 2007) .....59

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010) .....19, 37

*Ned-Sthran v. Methodist Hosps. of Dallas (d/b/a Methodist Health Sys.), et al.*,
No. 3:08-CV-0072, 2008 WL 5420601 (N.D. Tex. Nov. 25, 2008) .....32

*Newman v. RVN Telecom Servs., Inc.*,
238 F.R.D. 57 (S.D.N.Y. 2006)....................60

*Nola v. Exxon Mobil Corp.*,
No. 13-439-JJB, 2015 WL 2338336 (M.D. La. May 13, 2015)....................48

*Norwood v. Raytheon Co.*,
237 F.R.D. 581 (W.D. Tex. 2006)....................33, 40, 41

*O'Sullivan v. Countrywide Home Loans, Inc.*,
319 F.3d 732 (5th Cir. 2003)....................14, 52

*O'Neill v. The Home Depot U.S.A., Inc.*,
243 F.R.D. 469 (S.D. Fla. 2006)....................59

*Ogden v. AmeriCredit Corp.*,
225 F.R.D. 529 (N.D. Tex. 2005)....................61, 62

*Orem v. Ivy Tech State Coll.*,
711 N.E.2d 864 (Ind. Ct. App. 1999)....................40

*OSIC v. BDO USA, LLP, et al.*,
No. 3:12-cv-91447-N-BG (N.D. Tex. May 15, 2015)....................1

*Ostalkiewicz v. Guardian Alarm, Div. of Colbert's Sec. Servs., Inc.*,
520 A.2d 563 (R.I. 1987)....................39

*Owner Operator Indep. Drives Ass'n, Inc. v. FFE Transp. Servs., Inc.*,
245 F.R.D. 253 (N.D. Tex. 2007)....................14

*PCR Contractors, Inc. v. Danial*,
354 S.W.3d 610 (Ky. Ct. App. 2011)....................39

*Pemex Exploracion y Produccion v. BASF Corp.*,
No. H-10-1997, 2011 WL 9523407 (S.D. Tex. Oct. 20, 2011)....................36

*Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*,
277 S.W.3d 255 (Ky. Ct. App. 2008)....................38

*Proppant Solutions, LLC v. Delgado*,
2015 WL 4299503, No. 01-14-00800–CV (Tex. App.—Houston [1st Dist.] 2015, no pet.)....................45

*Ramsay v. Boeing Co.*,
432 F.2d 592 (5th Cir. 1970)....................41

*Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*,
482 F.3d 372 (5th Cir. 2007)....................15, 44, 45

*Robertson v. Monsanto Co.*,
287 F. App'x 354 (5th Cir. 2008)....................48

*Sandwich Chef, Inc. v. Nat'l Ins. Co.*,
319 F.3d 205 (5th Cir. 2003)....................................................................................45

*Savino v. Computer Credit, Inc.*,
164 F.3d 81 (2d Cir. 1998)........................................................................................61

*SEC v. Stanford Int'l Bank, Ltd.*,
No. 3:09-cv-00298 (N.D. Tex. May 12, 2015)........................................................1, 27, 54

*Serrano v. Serrano*,
No. 1 CA-CV 10-0649, 2012 WL 75639 (Ariz. Ct. App. Jan. 10, 2012)...........................40

*Simms v. Jones*,
296 F.R.D. 485 (N.D. Tex. 2013)..............................................................................47

*Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
482 F.2d 880 (5th Cir. 1973).................................................................15, 42, 43, 45

*Smith v. Ayres*,
845 F.2d 1360 (5th Cir. 1988)...............................................................................44, 47

*Spence v. Glock, Ges.m.b.H.*,
227 F.3d 308 (5th Cir. 2000)....................................................................................33

*Springs Indus., Inc. v. Am. Motorists Ins. Co.*,
137 F.R.D. 238 (N.D.Tex.1991)...............................................................................18

*Steering Comm. v. Exxon Mobil Corp.*,
461 F.3d 598 (5th Cir. 2006)..................................................................................47, 48

*Stirman v. Exxon Corp.*,
280 F.3d 554 (5th Cir. 2002)....................................................................................37

*Stott v. Capital Fin. Servs., Inc.*,
277 F.R.D. 316 (N.D. Tex. 2011).............................................................................59

*Stuart v. Freiberg*,
116 A.3d 1195 (Conn. 2015).....................................................................................39

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014)....................................................................................59

*Ticknor v. Rouses Enterprises, LLC*,
592 F. App'x 276 (5th Cir. 2014)............................................................................31, 56

*Tremco, Inc. v. Holman*,
No. C8-96-2139, 1997 WL 423575 (Minn. Ct. App. July 29, 1997).................................39

*Troice v. Proskauer Rose LLP*,
No. 3:09-CV-1600-N, 2015 WL 1219522 (N.D. Tex. Mar. 4, 2015)
(Godbey, J.)...........................................................................................................47

*Tyson Foods v. Davis*,
66 S.W.3d 568 (Ark. 2002) .......... 39

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) .......... 45, 62

*United States v. Green*,
46 F.3d 461, 465 n.3 (5th Cir. 1995) .......... 18

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) .......... 14, 58

*Warren v. Reserve Fund, Inc.*,
728 F.2d 741 (5th Cir. 1984) .......... 60

*Winn Fuel Serv., Inc. v. Booth*,
34 So.3d 515 (La. Ct. App. 2010) .......... 39

*Zorrilla v. Aypco Constr. II, LLC*,
No. 14-0067, 2015 WL 3641299 (Tex. June 12, 2015) .......... 42

**Rules**

17 C.F.R. 240.10b-5 .......... 46

Fed. R. Civ. P. 23 .......... passim

FED. R. CIV. P. 23 Advisory Committee Notes (1966 Amendment, Subdivision (b)(3) .......... 42

Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(1) (2015) .......... 75

Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (2015) .......... 42, 44, 49

Tex. Rev. Civ. Stat. Ann. art. 581-33(F)(2) (2015) .......... 60

Tex. State Sec. Bd., Rule 139.7(a) (2015) .......... 36, 73

**Other Authorities**

7 Tex. Admin. Code. § 139.19 (2015) .......... 60

Miss. Code Ann. § 75-71-719 (1981) .......... 38

Moore's Federal Practice – Civil § 23.24 .......... 59

Restatement (Second) of Conflict of Laws § 145 .......... 34, 35, 36

Restatement (Second) of Conflict of Laws § 148 .......... 34, 36

Restatement (Second) of Conflict of Laws § 6 .......... 35

Texas Securities Act .......... 36, 38, 44, 48

xi

APP 0381

Defendants The Toronto-Dominion Bank ("TD Bank"), Trustmark National Bank ("Trustmark"), HSBC Bank plc ("HSBC"), Independent Bank, successor by merger to Bank of Houston ("IB"), Société Générale Private Banking (Suisse) S.A. ("SG Suisse") (collectively, the "Banks"), and Blaise Friedli (together with the Banks, the "Defendants") respectfully submit this opposition to Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel (the "Motion").[1]

**PRELIMINARY STATEMENT**

This Motion presents the Court with an unusual situation: the investor-Plaintiffs ask the Court to certify this case as a class action, yet the same Plaintiffs previously argued that a suit by the Receiver is *better than* a class action and that a class action is plagued by various drawbacks, uncertainties and costs. In *Adams & Reese* and *BDO*, Plaintiffs argued that class certification would be "duplicative" of the Receiver action; certification would cause "uncertainty and delay"; and it would be "*far more efficient and save substantial costs*" not to pursue class claims.[2] This Court has also questioned whether "the individual class actions [are] duplicative of efforts by the Receiver or the Investors Committee to seek recovery."[3] While Defendants have significant issues with the Receiver-assigned claims asserted by The Official Stanford Investors Committee ("OSIC") in this case,[4] Defendants agree that the Court should not certify a class.

On top of Plaintiffs' statements regarding the inferiority of a class action, Plaintiffs cannot meet their required showings under Rule 23. Plaintiffs indisputably bear the burden of proving

---

1 HSBC, SG Suisse and Blaise Friedli submit this opposition subject to, and without waiving, the defense that they are not subject to personal jurisdiction in Texas.

2 Motion For Order Approving Proposed Settlement with Adams & Reese LLP, BSW, Cordell Haymon and Lynette Frazer ("*Adams & Reese* Settlement Mot.") ¶ 21 (emphasis added), *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298 (N.D. Tex.), Dkt. No. 2134; Expedited Request for Entry of Scheduling Order and Motion To Approve Proposed Settlement with BDO USA, LLP, To Approve the Proposed Notice of Settlement with BDO USA, LLP ("*BDO* Settlement Mot.") ¶¶ 38-39 (emphasis added), *OSIC v. BDO USA, LLP, et al.*, No. 3:12-cv-01447-N-BG (N.D. Tex.), Dkt. No. 52.

3 Appendix in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, For Designation of Class Representatives and Class Counsel ("App.") at 1272 [Excerpt of Aug. 21, 2014 Status Hr'g Tr. at 4:6-8].

4 Defendants do not waive, and expressly preserve, their arguments that OSIC lacks standing to assert tort claims on behalf of individual investors in this Action. *See* Dkt. Nos. 154, 157, 159, 162, 172, 174, 176, 177.

that certification of a global class of investors from more than 100 different countries spanning every continent (including Antarctica) is appropriate. Plaintiffs come nowhere close to carrying that burden. Defendants submit expert reports from thirteen renowned scholars, practitioners, arbitrators, and foreign judges affirming that key Latin American, European and common law countries would not recognize, enforce or give preclusive effect to a judgment in this Action against absent class members. Plaintiffs do not even contest Defendants' proof with respect to five of these countries. For others, Plaintiffs have designated experts who address the wrong question—namely, whether these foreign jurisdictions would enforce a judgment against Defendants, *not* the absent class members. Plaintiffs' experts fail to examine whether, if Defendants win in this Action, class members unhappy with that outcome could simply bring new claims in their home jurisdictions. Conversely, Plaintiffs' experts do not address whether, if the class prevails or settles, dissatisfied class members could sue elsewhere for more. The Court should not certify a global class because this Court's adjudication of claims will not preclude class members from relitigating the same issues in another forum and Defendants would face the potential for duplicative litigation around the world.[5]

The Court should also refuse to certify a nationwide class given the material differences among the applicable state laws. Tellingly, only Defendants present a fifty-state comparative analysis, which demonstrates that substantial differences among the state laws applicable to various members of the class hopelessly compound the disparities among class members' claims. Even for a class limited to U.S. investors, this Court would potentially have to instruct a jury on four different countries' banking laws as applied to common law claims under the unique

---

5 For example, TD Bank is already the subject of duplicative litigation brought by the Antiguan Joint Liquidators in Canada seeking even greater damages for losses related to the same conduct alleged by Plaintiffs here. *See* Fresh as Amended Statement of Claim, *Joint Liquidators of SIBL. v. TD Bank*, No. CV-12-9780-00CL, May 16, 2014 (Can. Ont. Sup. Ct. J.), attached as Exhibit 5 to the Appendix in Support of TD Bank's Supplemental Opposition Brief To Plaintiffs' Motion.

substantive laws of fifty states.[6] The jury instructions could involve hundreds of issues and sub-issues. The Fifth Circuit presumes that the impact of material variances in state law will create "insuperable obstacles" weighing against class certification. *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007). It was Plaintiffs' burden to address this conflict of laws issue, but they made no attempt to do so.

A host of individualized fact issues further defeats predominance, making certification of *any* class improper. Plaintiffs fail to make their required showing that common evidence can support the putative class' claims and that individualized questions of reliance, causation, and damages will not overwhelm common questions. Unlike traditional 10b-5 class actions, this case does not involve public statements that affected an efficient market. Instead, each class member's purchase of and loss from Stanford certificates of deposit ("CDs") is unique. Differences among the proposed class representatives illustrate the infinite variety of broker relationships, personal relationships, oral sales pitches, printed sales materials, outside research (or lack thereof), and other information provided to or relied on by each individual purchaser of the CDs issued by Stanford International Bank Limited ("SIBL"). Each class member's decision to purchase a CD from a CD seller—some of whom were Stanford employees and others of whom were not—was as varied as the two people involved. In addition, Plaintiffs' damages theory has shifted twice already and is presented now merely as a prospective plan without any discernible methodology for how to quantify the injury supposedly caused by Defendants' conduct on a class-wide basis. The predominance of so many individualized inquiries into each of the idiosyncratic claims alleged by the disparate class of worldwide plaintiffs renders certification wholly inappropriate.

Finally, this matter is unsuitable for class certification because Plaintiffs have failed to prove that each of the basic Rule 23(a) requirements has been met. Specifically, the different and

---

6 For a global class, the Court would have to identify and provide legal instructions on the laws of over a hundred foreign jurisdictions.

unique circumstances underlying each individual class member's claims, as well as the lack of common allegations regarding Defendants' banking activities, demonstrate that there is no common contention that will drive the resolution of the case, nor does any class representative's claim qualify as typical of the claims held by the thousands of absent putative class members. Moreover, there are serious questions about the credibility and adequacy of each of the six proposed class representatives, who have submitted erroneous declarations, given inaccurate testimony, and exhibited conflicts with the class. Plaintiffs' over-reaching attempt to throw a world-wide net over 17,000 global investors and call them an undifferentiated "class" recalls the Supreme Court's admonishment that class actions are an "exception to the usual rule" that litigation involves an individual assertion of unique claims. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). For the reasons set forth below and in the accompanying papers, the Court should deny Plaintiffs' Motion.

## FACTUAL BACKGROUND

### A. Plaintiff's and OSIC's Claims in This Action

In this case, six named investor-Plaintiffs attempt to assert common law and statutory claims against five Banks and one retired bank executive.[7] OSIC moved to intervene—*with Plaintiffs' support*—to prosecute various claims against Defendants.[8] In support of OSIC's request, Plaintiffs stated:

> Plaintiffs and [OSIC] share identical fraudulent transfer claims against Defendants; and any recovery of fraudulent transfers from Defendants will be distributed to Plaintiffs from the Receivership Estate pursuant to the Receiver's distribution protocol regardless of which party is first to prevail.[9]

Plaintiffs emphasized that the "identity of interest between the investor-Plaintiffs and [OSIC]

---

[7] *See* Pls.' Second Am. Class Action Compl. ("SAC"), Dkt. No. 279, ¶¶ 12-24, 432-48.

[8] *See* Mot. of OSIC to Intervene, Dkt. No. 96; Plaintiffs' Mot. Under Rule 20(A) to Join OSIC as a Plaintiff, Dkt. No. 112; Order, Dkt. No 129.

[9] Reply in Further Support of Pls.' Mot. to Join OSIC as a Pl. Under Rule 20(A), Dkt. No. 118, at 1-2.

could not be more complete."[10]

In its intervenor complaints, which were filed in late 2012 and early 2013, OSIC asserts claims against Defendants for fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), aiding and abetting fraudulent transfers, aiding and abetting fraud, aiding and abetting conversion, and civil conspiracy.[11] After OSIC's intervention, Plaintiffs amended their petition to incorporate by reference OSIC's allegations.[12] On June 23, 2015, Plaintiffs filed their operative Second Amended Class Action Complaint (the "SAC"), asserting claims against Defendants for aiding and abetting common law fraud; aiding and abetting violations of the Texas Securities Act ("TSA"); aiding and abetting breach of fiduciary duty; aiding and abetting conversion; and civil conspiracy.[13] Plaintiffs' filing of the SAC, over five years after this case was commenced, marked the first time that Plaintiffs asserted claims for aiding and abetting breach of fiduciary duty and aiding and abetting TSA violations against Defendants TD Bank, Trustmark, HSBC, and IB.[14] Defendants have moved to dismiss the SAC.[15]

The overlapping claims asserted by Plaintiffs and OSIC in this Action rest upon the theory that at some undefined point Defendants should have heeded various warnings and severed their relationships with Stanford.[16]

### B. Defendants' Alleged Roles in Stanford's Business Were Varied and Limited

According to Plaintiffs' allegations, the Banks in this case provided different banking services in different countries to different entities in the Stanford organization.[17] Plaintiffs allege

---

10 *Id.* at 5.

11 Intervenor Compl., Dkt. No. 130, ¶¶ 92-117; Intervenor Compl., Dkt. No. 133, ¶¶ 75-99.

12 *See* Pls.' Mot. for Leave to Amend the Compl., Dkt. No. 131; Class Pls.' Mot. for Leave to Amend, Dkt. No. 182.

13 *See* SAC ¶¶ 432-48.

14 *See* Pls.' First Am. Pet., Dkt. No. 1-5, ¶¶ 80-148; Intervenor Compl., Dkt. No. 130, ¶¶ 92-117.

15 *See* Dkt. Nos. 293, 295, 296, 297, 298, 299.

16 *See* SAC ¶¶ 4, 10; Intervenor Compl., Dkt. No. 133, ¶¶ 4, 8, 46-47, 53-54, 65-69; App. 2595 [Pls.' Interrog. Resp. at Pls.' Answers to Interrog. No. 3].

17 *See* SAC ¶ 222.

that some Banks performed banking services that allowed SIBL to take in foreign currency; some provided depository services that moved funds among various entities owned or controlled by Stanford (the "Stanford Entities"); some provided investment services to Stanford Entities; and some provided a combination of the above.[18] TD Bank allegedly processed wires in U.S. and Canadian dollars related to investor deposits and interest payments and also managed certain investment portfolios.[19] HSBC allegedly processed wires in Euros and Pounds Sterling related to investors' transactions.[20] Trustmark allegedly processed checks that SIBL received from investors and otherwise facilitated the transfer of funds among the Stanford Entities.[21] IB allegedly provided investment and depository services regarding the CD sales and made transfers to various Stanford Entities.[22] Finally, SG Suisse allegedly oversaw investment accounts for Stanford Entities and Stanford personally, and Mr. Friedli allegedly acted as a senior banker on the Stanford accounts for SG Suisse.[23]

### C. Plaintiffs Ask to Certify A Global Class of Over 17,000 Investors in SIBL CDs

In this Motion, Plaintiffs ask the Court to certify a class consisting of:

> All persons who invested in SIBL CD(s) from August 23, 2004–February 16, 2009, inclusive, and whose claims for losses related to SIBL CDs are recognized, authorized, and calculated by the United States Receiver for the Stanford Entities, Ralph S. Janvey.[24]

Plaintiffs have not identified the citizenship or the residency of the proposed class members (other than the six named Plaintiffs[25]) and simply state that the proposed class is comprised of "more

---

18 *See id.* ¶¶ 100-01, 238, 314, 388.

19 *See id.* ¶¶ 314, 323, 349.

20 *See id.* ¶¶ 388, 225.

21 *See id.* ¶¶ 168, 238, 261-67, 349.

22 *See id.* ¶¶ 101, 360, 373-75.

23 *See id.* ¶¶ 277, 279. SG Suisse is not alleged to have had any contact with CD investors.

24 Memorandum Supporting Plaintiffs' Motion ("Pls.' Br.") at 17; *see also* SAC ¶ 420. References in this opposition to "Pls.' App." are to the Appendix to Plaintiffs' Motion.

25 *See* SAC ¶¶ 12-17. By Order dated May 4, 2015, the Court permitted Plaintiffs Sarah Elson-Rogers, Salim Estefenn Uribe, Ruth Alfille de Penhos, and Gabriel Suarez to replace four previously-named Plaintiffs. *See* Dkt. No. 237. The Court further permitted Plaintiffs to substitute Diana Suarez as a class representative in place of her son,

than 17,000 SIBL investors from around the world."[26] Through discovery, Defendants have learned that the putative class includes investors from 106 countries spread across all seven continents (including a claimant from Bouvet Island, which is a reportedly uninhabited island in Antarctica) and 47 states in the U.S.[27] Appendices A through D to this brief contain charts demonstrating the geographic dispersion of the SIBL investors and the relative size of their claims. Plaintiffs have not even tried to demonstrate that these individuals fall within the Court's jurisdiction or what their local laws state with respect to their claims.

**D. Putative Class Members Received and Relied on Varying and Individualized Information From Disparately-Situated Financial Advisors**

There is incredible diversity among the Stanford financial advisors, the information that they provided to putative class members, and the circumstances in which putative class members received such information and decided to make their investments. Some financial advisors were based in the United States, but many were based in Latin America, Europe and elsewhere.[28] Some had been with Stanford for years, had high-level executive positions and were experienced with Stanford's business practices,[29] while others had just started at Stanford when they recommended the SIBL CDs.[30] Others were not Stanford employees at all, but independent financial advisors.[31]

---

Gabriel Suarez, in June 2015. *See* Dkt. Nos. 238, 278, 279. Plaintiffs' withdrawal of class representatives after five years of litigation and insertion of newly-located individuals raises questions about the legitimacy of the original representatives and the motivations of the new designees.

26 Pls.' Br. at 7. *See also id.* at 10.

27 *See* App. 649 [ABBOTT_000006]. Defendants' country data comes from information provided by the Joint Liquidators and produced by investor-Plaintiffs in another *Stanford MDL* proceeding, *Troice v. Proskauer Rose LLP, et al.* App. 651 ["Stanford International Bank Limited – in Liquidation: Summary of Claims by Country and Status"]. The data provides information about the investors' *citizenship* for the *total* population of claimants, but the Receiver's representative testified the country breakdown is a good proxy for *allowed* claimants. *See* App. 2928-32 [Russell Dep. Tr. at 125:17-129:21]. The Receiver apparently has gathered information about the *residence* of *allowed* claimants, but contends that it is incomplete and has not produced it. App. 2921-25, 2933-34, 2935, 2939-40 [Russell Dep. Tr. at 115:19-119:14, 130:16-131:19,136:13-17, 140:22-141:5. Defendants' analysis thus focuses on the available data from the Joint Liquidators.

28 *See, e.g.*, Pls.' Br. at 9.

29 *See* App. 1528-29, 1530, 1534, 1538-39 [Penhos Dep. Tr. at 27:17-28:13, 36:4-19, 54:14-20, 60:17-61:4] (testifying that she was provided oral, written, and video representations regarding Stanford from senior, president-level executives).

30 *See* App. 1672-75 [Estefenn July 2, 2015 Dep. Tr. at 37:22-40:6] (testifying that he purchased Stanford CDs primarily on the oral recommendation of a financial advisor who had just started working at Stanford).

Putative class members' relationships with their financial advisors and with Stanford employees were unique and varied widely.[32]

Plaintiffs have offered no evidence that financial advisors followed the same model or script in selling SIBL CDs. Nor can they, as the circumstances under which putative class members received information concerning SIBL CDs were wide-ranging. The class representatives dramatically illustrate these differences:

- Mr. Abbott is a Mississippi-based attorney and former law professor who started purchasing SIBL CDs in 2006 when his financial advisor, John Mark Holliday, who had advised Mr. Abbott since 1999, joined the Stanford Group.[33] Mr. Abbott purchased REDACTED SIBL CDs worth REDACTED between REDACTED, and stated that he relied "blindly" on the oral representations of his financial advisor, conveyed during in-person meetings in Oxford, Mississippi, when he initially decided to invest REDACTED in his first CD with Stanford.[34]

- Ms. Suarez is a former chocolatier from Venezuela who made all REDACTED of her SIBL CD purchases with her financial advisor between REDACTED, initially investing REDACTED.[35] She met with her financial advisor at a Stanford office in Miami, Florida.[36] Ms. Suarez purchased these CDs in Miami out of a fear that, because of Hugo Chavez's election, it was unstable to keep her money in Venezuela.[37] She never received any written Stanford materials prior to purchasing SIBL CDs and only considered her financial advisor's oral representations when deciding to invest.[38]

- Ms. Elson-Rogers is a global consultant who purchased REDACTED SIBL CDs between REDACTED REDACTED while living in Greece and North Carolina.[39] Among other reasons for making her initial investments, Ms. Elson-Rogers believed she was holding

---

31 *See* App. 1467 [Elson-Rogers Dep. Tr. at 38:16-24] (testifying that she was given information and materials about Stanford CD purchases by an independent, non-Stanford financial advisor).

32 *See*, *e.g.*, App. 1548 [Penhos Dep. Tr. at 88:22-23] (testifying she loved her financial advisor, David Nanes, "like a son"); App. 1620-22, 1623 [Suarez July 1, 2015 Dep. Tr. at 78:22-80:18, 82:3-20] (testifying that she invested in a SIBL CD in reliance on Maria Villanueva, her financial advisor, whom she "trusted completely" and "relied on exclusively").

33 *See* App. 1404-05, 1413 [Abbott Dep. Tr. at 25:24-26:11, 42:9-20].

34 *See* App. 1406-11, 1414-16, 1449 [Abbott Dep. Tr. 30:14-31:24, 32:8-33:14, 34:14-35:20, 44:2-46:18; 241:11-13].

35 *See* App. 1620-21, 1625, 1628, 1630-31 [Suarez July 1, 2015 Dep. Tr. at 78:22:-79.21, 89:10-15, 114:12-18, 119:25-120:13,
236:12-19].

36 *See* App. 1621 [Suarez July 1, 2015 Dep. Tr. 79:6-21].

37 *See* App. 1625-26 [Suarez July 1, 2015 Dep. Tr. 89:16-90:11].

38 *See* App. 1623 [Suarez July 1, 2015 Dep. Tr. 82:3-20].

39 *See* App. 1479-80 [Elson-Rogers Dep. Tr. at 68:8-23, 69:20-23]; App. 1016 [Dep. Ex. 67]; App. 2603 [Pls.' Interrog. Resp. at Elson-Rogers' Answers to Interrog. No. 1].

too much money in Greece and wanted to invest somewhere safer.[40] She was mailed a brochure by her independent financial advisor, but based her investment decision on the oral representations of two financial advisors, conveyed initially during a meeting at her home in Greece in April 2005, and subsequent assurances made by her financial advisors over email, as well as the written materials.[41] She initially invested in a CD worth REDACTED and in total invested about REDACTED with Stanford.[42]

- Ms. Penhos is a former clothing factory employee from Mexico who first learned about Stanford in 1993 or 1994[43] and ultimately invested REDACTED in SIBL CDs.[44] Ms. Penhos and her family received a video and insurance papers at an initial meeting with her financial advisor, David Nanes, at her home in Mexico.[45] She relied on a combination of these materials and the oral representations of Mr. Nanes, a high-ranking Stanford executive who had been with the company since the 1990s.[46]

- Mr. Queyrouze is a former owner of Ruth's Chris Steak House franchises who purchased REDACTED CDs worth REDACTED from his Louisiana-based financial advisor.[47] Mr. Queyrouze made these purchases in REDACTED, based exclusively on the oral representations of his financial advisor during in-person meetings—either over lunch or at his financial advisor's office—in New Orleans.[48]

- Mr. Estefenn is a former employee at a publishing company started by his father in Colombia. Mr. Estefenn testified that he purchased SIBL CDs on behalf of two separate trusts and, accordingly, did not submit personal claims to the Receiver.[49] Mr. Estefenn purchased SIBL CDs for the trusts starting in 2002 solely as a result of his father's recommendations and the oral advice of his father's long-time financial advisor, who had started working at Stanford in 1999.[50] Mr. Estefenn visited this advisor numerous times in Miami with his father, as well as in connection with his trusts' SIBL CD purchases, which totaled over REDACTED.[51]

The variation among the six named Plaintiffs is further demonstrated by the differences in their Stanford-related claims. For example, the chart attached as Appendix G to this brief shows

---

40 *See* App. 1477-78 [Elson-Rogers Dep. Tr. at 62:5-63:1].

41 *See* App. 1467- [Elson-Rogers Dep. Tr. 38:16-20, 39:6-40:21, 45:6-48:1, 122:11-123:4]; App. 654 [Dep. Ex. 64]; App. 713 [Dep. Ex. 66].

42 *See* App. 1512-13, 1515 [Elson-Rogers Dep. Tr. at 199:12-16, 224:5-9, 240:11-20].

43 *See* App. 1530-31 [Penhos Dep. Tr. at 36:20-37:12].

44 *See* App. 1578-87 [Penhos Dep. Tr. at 201:2-210:19]; App. 976 [Dep. Ex. 91]; App. 669 [PENHOS_000282].

45 *See* App. 1530-31, 1538, 1540 [Penhos Dep. Tr. at 36:4-37:8; 60:17-21, 62:1-3].

46 *See* App. 1530-31, 1534, 1536-379, 1544-45, 1549 [Penhos Dep. Tr. at 36:4-37:3, 54:14-20, 56:16-57:1, 60:17-61:1, 79:12-80:5, 99:10-17].

47 *See* App. 1339-42, 1354-54, 1357-58 [Queyrouze Dep. Tr. at 12:4-13:22, 17:20-18:21, 54:1-15, 55:7-24, 62:12-18, 64:5-11].

48 *See* App. 1341, 1355, 1367 [Queyrouze Dep. Tr. at 17:20-21:1, 56:19-24, 157:1-158:6].

49 *See* App. 1673, 1745-46 [Estefenn July 2, 2015 Dep. Tr. at 38:20-24, 286:3-287:22].

50 *See* App. 1692-95 [Estefenn July 2, 2015 Dep. Tr. at 117:2-6, 118:9-119:25, 120:10-15].

51 *See* App. 1688-91, 1725 [Estefenn July 2, 2015 Dep. Tr. at 112:5-115:13, 224:7-15].

the amounts claimed and "allowed" by both the Receiver and the Joint Liquidators. As the Court will see, the amounts recognized across the two different claims processes differ significantly, sometimes higher in the U.S., sometimes higher in Antigua. In all cases, the allowed amount was less than the amounts claimed by the named representatives, raising questions about the validity of their applications. And at least REDACTED of the six named representatives have been asked to repay funds to the Joint Liquidators because of preferential payments, but have refused to do so.[52] Since the Joint Liquidators are seeking the return of approximately $600 million paid to investors in the last six months that SIBL operated,[53] this creates a clear conflict between those who have received such demands and those who have not. As an example, Mr. Abbott redeemed a REDACTED CD in REDACTED and testified that, unless ordered by a court, he would not repay that amount despite the Joint Liquidators' demand that he do so.[54] Mr. Estefenn similarly withdrew over REDACTED from his Stanford account in REDACTED, and his mother received a letter regarding preference payments for one of his trusts; however, Mr. Estefenn testified that he has not repaid any funds to the Joint Liquidators, nor does he intend to do so.[55] Ms. Penhos received over REDACTED in preference payments during the final months of Stanford's operations, which she has refused to repay despite the Joint Liquidators' demand.[56] Ms. Suarez received a demand to repay over REDACTED in preference payments received

---

52 *See* App. 1643-44 [Suarez July 1, 2015 Dep. Tr. at 165:17-166:20]; App. 1156 [Dep. Ex. 20]; App. 1422-25, 1428 [Abbott Dep. Tr. at 79:18-82:7, 104:1-13]; App. 1164 [Dep. Ex. 52]; App. 1701-04 [Estefenn July 2, 2015 Dep. Tr. 158:20-161:5]; App. 780 [Dep. Ex. 123]; App. 1161 [PENHOS_000270]; App. 1575-76 [Penhos Dep. Tr. at 198:9-199:8].

53 *See* App. 3047 [*Stanford International Bank – In Liquidation (the Bank) Preference Payments to Creditors in the run up to insolvency*, available at http://www.sibliquidation.com/faq/preference-payments/ (last visited Oct. 1, 2015)].

54 *See* App. 1422-25, 1428, 1442-44, 1453-55 [Abbott Dep. Tr. at 79:18-82:7, 104:1-13, 200:18-202:13, 318:25-320:15]; App. 1164 [Dep. Ex. 52].

55 *See* App. 1701-04, 1685-87 [Estefenn July 2, 2015 Dep. Tr. at 158:20-161:5, 88:15-90:10]; App. 816 [Dep. Ex. 123 at URIBE_000151].

56 *See* App. 1575-76 [Penhos Dep. Tr. at 198:9-199:8].

REDACTED, but has refused.[57] Separately, Ms. Elson-Rogers withdrew over REDACTED from her Stanford account in REDACTED, but testified that she has not received a repayment demand from the Joint Liquidators.[58]

The substance of the representations made to individual putative class members also varied significantly. For instance, Ms. Elson-Rogers and Ms. Penhos were both allegedly assured by their financial advisors that the SIBL CDs were insured by Lloyd's of London,[59] whereas other putative class members were told nothing about insurance for the investments.[60] Putative class members also received different representations concerning how Stanford secured its interest rates—information used by financial advisors to convince investors of the strength of the CDs. Ms. Penhos, for example, was told by her financial advisor that interest rates were high because SIBL did not have any local branches, resulting in low expenses,[61] whereas Mr. Abbott was told that the high rates were due to "really strong international investments."[62] Mr. Queyrouze was told that Stanford was able to provide higher returns because it was subject to less regulation than domestic banks.[63] Ms. Elson-Rogers, on the other hand, did not have any understanding concerning the higher rates offered by SIBL CDs as compared to other CDs on the market; rather, she was assured by her financial advisor that the SIBL CDs were safe and that the risk exposure was low because Stanford was a private bank, with no retail outlets and overhead costs.[64]

With respect to Defendants, the named representatives have either no connections or

---

57 *See* App. 1643-44 [Suarez July 1, 2015 Dep. Tr. at 165:17-166:20]; App. 1156 [Dep. Ex. 20]; App. 740 [Dep. Ex. 12].

58 *See* App. 1481-82, 1503-04 [Elson-Rogers Dep. Tr. at 84:14-85:4, 145:13-146:18]; App. 1016 [Dep. Ex. 67].

59 *See* App. 1474, 1510, 1511 [Elson-Rogers Dep. Tr. at 47:6-11, 190:10-22, 191:3-7]; App. 1521-22, 1542, 1543 [Penhos Dep. Tr. at 38:25-39:5, 74:11-17, 75:11-18].

60 *See, e.g.*, App. 1627 [Suarez July 1, 2015 Dep. Tr. at 101:4-10]; App. 1695-96 [Estefenn July 2, 2015 Dep. Tr. at 120:20-121:11].

61 *See* App. 1535-36 [Penhos Dep. Tr. at 55:20-56:9].

62 App. 1415 [Abbott Dep. Tr. at 45:19-25].

63 *See* App. 1315016, 1367[Queyrouze Dep. Tr. at 56:25-57:11, 157:12-23].

64 *See* App. 1469, 1476, 1507-08 [Elson-Rogers Dep. Tr. at 40:17-41:4, 52:9-21, 169:15-170:12].

tangential ones. Most of the named representatives testified that they had no knowledge of or communications with the Banks until their lawyers told them post-facto about the lawyers' desire to sue the Banks.[65] One named Plaintiff testified that she wired money to HSBC in connection with her investment in SIBL CDs, but she admitted that she did not know or inquire whether HSBC was providing services to Stanford when she did so, and she acknowledged that HSBC did not make any representations to her, at any time, concerning Stanford or the SIBL CDs.[66] In sum, the named Plaintiffs' decisions to invest in SIBL CDs were not based on Defendants.

Finally, *all* of the named Plaintiffs have acted in ways that call into question their truthfulness and reliability. Specifically:

• REDACTED
67 REDACTED
68 REDACTED
REDACTED
69
• REDACTED
Mr. Queyrouze has already recovered REDACTED
approximately REDACTED from the Joint Liquidators, REDACTED

---

[65] *See* App. 1429-30, 1450, 1452 [Abbott Dep. Tr. at 120:19-121:4 (admitting "I've never dealt with any of these five banks"), 275:14-25 ("I've had no dealings with any of these—of the five banks that are defendants in this lawsuit"), 312:2-6]; App. 1612, 1651-52, 1657-68 [Suarez July 1, 2015 Dep. Tr. at 36:5-13, 200:6-12, 208:5-19, 282:6-283:20] (testifying that any knowledge she has concerning the Banks was told to her by her attorneys); App. 1359-61 [Queyrouze Dep. Tr. at 92:15-94:16 (admitting that he cannot name a specific wrongful act of the Banks)]; App. 1705-06, 1713, 1726-27, 1728, 1731 [Estefenn July 2, 2015 Dep. Tr. at 166:3-167:22, 198:8-13 ("Q. None of these banks made any representations to you, did they? A. No."), 245:24-246:17, 247:17-22, 270:15-17] (testifying that he did not know about or have communications with the Banks).

[66] *See* App. 1514 [Elson-Rogers Dep. Tr. at 239:12-25]; *see also* App. 1507-09 [Elson-Rogers Dep. Tr. at 169:6-12, 170:13-17, 171:11-15].

[67] *See* App. 1680-81 [Estefenn July 2, 2015 Dep. Tr. at 62:17-63:19]; App. 1639-40 [Suarez July 1, 2015 Dep. Tr. at 160:10-161:22]; App. 1572073, 1587-88 [Penhos Dep. Tr. at 186:12-187:18, 210:20-211:6].

[68] *See* App. 1680-82 [Estefenn July 2, 2015 Dep. Tr. at 62:17-64:11]; App. 1639-40 [Suarez July 1, 2015 Dep. Tr. at 227:23-229:22]; App. 740 [Dep. Ex. 12]; App. 828[Dep. Ex. 142]; App. 2853-54, 2855-57, 2864-68 [Suarez Aug. 28, 2015 Dep. Tr. at 65:3-66:14, 67:13-69:4, 116:19-118:13, 119:11-120:18]; App. 1170 [Dep. Ex. 151].

[69] *See* App. 1572-73, 1587-88 [Penhos Dep. Tr. at 186:12-187:18, 210:20-211:6]; App. 870 [Dep. Ex. 90 at PENHOS_000011].

REDACTED[70] And Mr. Abbott, REDACTED filed an administrative claim against the U.S. Securities and Exchange Commission (the "SEC") under the Federal Tort Claims Act ("FTCA").[71]

- Ms. Elson-Rogers also filed an FTCA administrative claim against the SEC REDACTED REDACTED.[72]

- Mr. Queyrouze, Mr. Abbott and Ms. Elson-Rogers made loss claims on their tax returns in connection with their SIBL CDs, with Mr. Abbott estimating that, by claiming a loss, he avoided approximately REDACTED in taxes that he otherwise would have had to pay. [73] REDACTED [74]

- Mr. Abbott[75] and Ms. Suarez[76] testified that, in some or all years, they did not report interest income earned on their SIBL CDs on their tax returns filed in the United States, and they have not amended their tax returns to do so.

- Mr. Estefenn, Ms. Elson-Rogers and Ms. Penhos all signed and submitted declarations in this Action concerning their SIBL CD purchases that they later admitted were inaccurate.[77]

- Mr. Estefenn used his Stanford account for purposes that raise issues as to his credibility and integrity, namely round-trip and currency exchange transactions.[78] Mr. Estefenn also testified that he solicited and received confidential investment information from other Stanford investors in connection with purportedly helping them manage their Stanford-related claims on the condition that he would not provide such information to third parties.[79] REDACTED

---

70 *See* App. 2617-18 [Pls.' Interrog. Resp. at Pl. Queyrouze's Answer to Interrog. Nos. 7, 8]; App. 1376-80, 1385-92 [Queyrouze Dep. Tr. at 222:3-226:6, 233:8-235:25, 267:5-269:22, 270:10-271:12]; App. 677 [Dep. Ex. 44].

71 *See* App. 1425-27 [Abbott Dep. Tr. at 82:18-84:23]; App. 2599 [Pls.' Interrog. Resp. at Pl. Abbott's Answer to Interrog. No. 7]; App. 673 [Dep. Ex. 53].

72 *See* App. 2599 [Pls.' Interrog. Resp. at Pl. Elson-Rogers' Answer to Interrog. No. 7]; App. 1441, 1447-48 [STAN_TDBANK_000649-51].

73 *See* App. 1369-70 [Queyrouze Dep. Tr. at 186:21-187:16]; App. 1441, 1147-48 [Abbott Dep. Tr. at 194:7-22, 237:24-238:14]; App. 1505-06 [Elson-Rogers Dep. Tr. at 149:23-150:5].

74 *See* App. 677 [Dep. Ex. 44]; App. 673 [Dep. Ex. 53]; App. 1125-27 [STAN_TDBANK_000649-51].

75 *See* App. 1439-70 [Abbott Dep. Tr. at 192:8-194:1].

76 App. 2848-52, 2871 [Suarez Aug. 28, 2015 Dep. Tr. at 60:11-25, 61:13-62:21, 63:22-64:17, 151:6-15].

77 *See* App. 1322 [Dep. Ex. 127]; App. 1733-49 [Estefenn July 2, 2015 Dep. Tr. at 274:10-290:15]; App. 1318 [Dep. Ex. 70]; App. 1483-88, 1518-20 [Elson-Rogers Dep. Tr. at 86:11-91:25, 293:4-295:23]; App. 1325 [Dep. Ex. 88]; App.1559-61 [Penhos Dep. Tr. 169:7-171:4].

78 *See* App. 1714-24 [Estefenn July 2, 2015 Dep. Tr. at 203:6-213:10].

79 *See* App. 2964, 2968-71 [Estefenn Sept. 10, 2015 Dep. Tr. at 329:11-330:2, 336:5-339:17]; App. 895-96 [Dep. Ex. 159 at URIBE_009022-23]; App. 891 [Dep. Ex. 160 at URIBE_009025].



- Ms. Penhos falsely testified that she was not a party to any other litigation and only admitted that she was involved in other cases when confronted with details of three other lawsuits in Mexico.[81]  In addition, she falsely denied having filed Stanford-related claims other than with the Receiver and the Joint Liquidators.[82]  Two months after her deposition, Defendants learned that Ms. Penhos has filed a Stanford-related arbitration against the United States under the North American Free Trade Agreement ("NAFTA").[83]

- REDACTED

These named representatives should not be deputized as the leaders of a global class.  The chart attached as Appendix E to this brief provides an overview of their issues.

## ARGUMENT

"The party seeking certification bears the burden of demonstrating that the requirements of Rule 23 have been met."  *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737-38 (5th Cir. 2003).  In determining whether a movant has satisfied its burden, a court "must undertake a rigorous analysis of Rule 23's prerequisites by probing beyond the pleadings to understand the claims, defenses, and relevant facts."  *Owner Operator Indep. Drives Ass'n, Inc. v. FFE Transp. Servs., Inc.*, 245 F.R.D. 253, 254 (N.D. Tex. 2007) (Godbey, J.); *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard.").[87]

---

[80]     *See* App. 2972-75, 2976-79 [Estefenn Sept. 10, 2015 Dep. Tr. at 350:23-353:16, 358:15-360:11]; App. 970 [Dep. Ex. 162 at URIBE_011178].

[81]     *See* App. 1590-93 [Penhos Dep. Tr. at 231:23-234:5].

[82]     *See* App. 1567-68 [Penhos Dep. Tr. at 181:16-182:17].

[83]     *See* App. 2611 [Pls.' Interrog. Resp. at Pl. Penhos's Answer to Interrog. No. 7]; App. 685 [PENHOS_000285-308].

[84]     *See* App. 684 [Dep. Ex. 95].

[85]     *See id.*; App. 1647-48 [Suarez July 1, 2015 Dep. Tr. at 169:18-170:4].

[86]     *See* App. 1645-46 [Suarez July 1, 2015 Dep. Tr. 167:16-168:12].

[87]     Defendants adopt and incorporate by reference the relevant arguments made by the defendants in *Troice v. Proskauer Rose LLP, et al.*, *Troice v. Willis of Colorado Inc., et al.* and *Turk v. Pershing, LLC* in their oppositions to

APP 0395

## I. PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(b)(3)

Plaintiffs seek class certification pursuant to Rule 23(b)(3), which requires proof "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). But this is, at core, a fraud case, and courts in this and other circuits have consistently held that where multiple individualized inquiries are required, fraud cases are generally inappropriate for class certification. *See Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) ("If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action."); *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 383 (5th Cir. 2007) (same). The same is true here. Because Plaintiffs fail to adequately carry their burden on the necessary elements under Rule 23(b)(3), class certification should be denied.

### A. Plaintiffs Have Not Shown Superiority

Plaintiffs have not met their burden of proving that class resolution is a superior alternative to adjudicate this controversy. *See* FED. R. CIV. P. 23(b)(3). Plaintiffs have failed to establish that (a) their proposed class action is the superior method for resolving their claims; (b) the hundred-odd foreign jurisdictions from which putative class members hail will each recognize, enforce, and grant preclusive or *res judicata* effect to a judgment in this Action; and (c) putative class members are either unable or unwilling to bring individual suits.

#### 1. Plaintiffs Have Argued That a Class Action Is Inferior

Plaintiffs have repeatedly denounced a class action as an inferior mechanism for resolving their claims in connection with other *Stanford MDL* actions in this Court. Specifically, in

---

class certification. Dkt. No. 197, *Troice v. Proskauer Rose LLP, et al.*, Civil Action No. 3:09-cv-01600 (N.D. Tex.); Dkt. Nos. 243, 253, 255, 256, *Troice v. Willis of Colorado Inc., et al.*, Civil Action No. 3:09-cv-01274-N-BG (N.D. Tex.); Dkt. No. 159, *Turk v. Pershing, LLC*, Civil Action No. 3:09-cv-02199 (N.D. Tex.).

requesting this Court's approval of settlements in *Adams & Reese* and *BDO*, investor-Plaintiffs argued that a proceeding brought by the Receiver and/or OSIC is *superior* to putative investor class actions:

> *There would be uncertainty and delay in certifying a settlement class involving all Stanford Investors who reside in multiple countries throughout the world, and such a class would, at any rate, be duplicative* with respect to the Stanford Investors who are already participating in the Receivership claims and distribution process. It is far more efficient and saves substantial costs to distribute the settlement funds through the court-approved Receivership distribution process rather than create an entirely separate and parallel class action claims and settlement distribution process. *Moreover, a class action settlement process would result in substantial delay and less money flowing to investors.* The Receivership settlement and bar order, together with a dismissal of the Investor Lawsuit, protects all interested parties, both the Defendants and the Stanford Investors.[88]

Here, the proposed class definition is limited to include only those Stanford investors "whose claims for losses . . . are recognized, authorized, and calculated by the United States Receiver."[89] Plaintiffs have stated that distributions of any potential recoveries will not be done through a class process, but through the Receiver process,[90] and they take the position in their Motion that the Receiver can calculate damages in this case.[91] Indeed, Plaintiffs contend that the claims asserted by the class in the SAC are virtually identical to those pursued by OSIC.[92] The Court has also questioned the extent to which "the individual class actions [are] duplicative of efforts by the Receiver or the Investors Committee to seek recovery."[93]

Plaintiffs nevertheless ask the Court to certify a class. It is telling that Plaintiffs (a) ask this Court to engage in the enhanced oversight required by a class action and to "look after the

---

88 *Adams & Reese* Settlement Mot. ¶ 21 (emphasis added); *see BDO* Settlement Mot. ¶¶ 38-39 (emphasis added).

89 Pls.' Br. at 17; *see also id.* at 19, 54.

90 *See* Reply In Further Support of Plaintiffs' Mot. To Join OSIC As A Plaintiff Under Rule 20(A), Dkt. No. 118, at 1("[A]ny recovery of fraudulent transfers from Defendants will be distributed to Plaintiffs from the Receivership Estate pursuant to the Receiver's distribution protocol *regardless of which party is first to prevail*.") (emphasis added).

91 *See* Pls.' Br. at 6, 55.

92 *See* Memorandum in Support of Plaintiffs' Sealed Motion for Leave to Amend Complaint, Dkt. No. 238, at 6-8.

93 App. 1272 [Excerpt of Aug. 21, 2014 Status Hr'g Tr. at 4:6-8].

welfare of class members”[94] yet (b) simultaneously disavow this judicial oversight in other *Stanford MDL* actions because it would be too time-consuming and expensive.

**2. Plaintiffs Have Not Proven That The Foreign Jurisdictions Involved Would Recognize and Give Preclusive Effect to a Class Action Judgment in This Case**

Plaintiffs are “required to demonstrate” under Rule 23 that foreign jurisdictions will “probably,” *i.e.*, “more likely than not,” recognize and give preclusive effect to a class action judgment in the action at issue. *See, e.g., Anwar v. Fairfield Greenwich, Ltd.*, 289 F.R.D. 105, 114-15 (S.D.N.Y. 2013) (plaintiffs must show that foreign courts would “probably recognize as preclusive” a U.S. judgment); *In re Alstom SA Secs. Litig.*, 253 F.R.D. 266, 282 (S.D.N.Y. 2008) (requiring plaintiffs to demonstrate a reasonable “probability”); *In re Vivendi Universal, S.A. Sec. Lit.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007) (plaintiffs must show that foreign courts would “more likely than not” recognize and give preclusive effect to any judgment rendered); *see also Ansari v. New York Univ.*, 179 F.R.D. 112, 116-17 (S.D.N.Y. 1998); *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 127 F.R.D. 454, 459-60 (S.D.N.Y. 1989). Plaintiffs have not carried their burden. Nor can they. Defendants’ evidence establishes that, if Defendants prevail on the merits, class members who did not affirmatively participate in this lawsuit will be able to bring individual claims against Defendants in a host of foreign jurisdictions and seek damages for the same losses and based on the same alleged conduct at issue in this Action. And class members dissatisfied with a settlement could sue for more elsewhere. As a result, whether Defendants win or lose in this Court, they will be forced to face the expense and uncertainty of relitigating Plaintiffs’ claims in untold foreign jurisdictions.

In their Motion, Plaintiffs provided no expert evidence on this topic (or on any topic, for that matter). In this Opposition, Defendants submit thirteen expert reports from highly respected

[94] App. 2671 [Oquendo Decl. at 34].

legal authorities opining on the laws in seven Latin American jurisdictions (Colombia, Ecuador, El Salvador, Mexico, Panama, Perú, and Venezuela), as well as expert reports opining on the laws in seven additional jurisdictions in North America, Europe and the Caribbean (Canada, France, Germany, Spain, Switzerland, England, and the former Netherlands Antilles, which includes Aruba).[95] Defendants' experts include distinguished scholars in the field of international enforcement of judgments, highly experienced practitioners, international arbitrators, and the former Chief Judge of the Supreme Court of Panama. Appendix F to this brief is a chart showing Defendants' experts and their credentials.

In their reply brief, Plaintiffs may attempt to rely on testimony from three individuals dealing with eight countries, partially.[96] Because U.S. opt-out class actions under Rule 23(b)(3) conflict with an important premise of many foreign legal systems, Plaintiffs cannot meet their burden by offering only scant and admittedly "speculative" rebuttal reports and citing non-binding U.S. cases that Plaintiffs' expert agreed would not be looked at by foreign courts.[97]

**a. European and Caribbean Civil Law Countries Would Not Give Preclusive Effect to a Judgment in This Action**

It is uncontroverted that European and Caribbean civil law jurisdictions would not recognize and grant preclusive or *res judicata* effect to an opt-out class action judgment. Defendants submitted five expert reports on (i) France; (ii) Spain; (iii) Germany; (iv) Switzerland; and (v) the Netherlands Antilles (including Aruba), demonstrating that these countries would not recognize a judgment in this Action. Plaintiffs have not designated any experts to rebut this

---

95 *See* App. 1751 to 2587 [Expert Declarations attached in full].

96 The Court should not accept Plaintiffs' expert reports submitted *in reply* to Defendants' opposition submission. Plaintiffs waived their right to submit expert testimony by not including it in their case-in-chief. *See United States v. Green*, 46 F.3d 461, 465 n.3 (5th Cir. 1995) (evidence raised for the first time on reply is waived); *Bell v. Ascendant Solutions, Inc.*, No. 301-CV-0166-N, 2004 WL 1490009, at *1 n.1 (N.D. Tex. July 1, 2004) (Godbey, J.) (denying plaintiffs' motion for class certification, and stating that the Court "discourages" plaintiffs from offering expert testimony "for the first time" on reply), *aff'd*, 422 F.3d 307 (5th Cir. 2005); *Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 240 (N.D. Tex. 1991) ("'[A] movant should not be permitted to cure by way of reply what is in fact a defective motion.'").

97 *See* App. 2890 [Harris Dep. Tr. at 299:15-23].

conclusion. Plaintiffs also fail to address a host of other European countries with purported class members, including Austria, Belgium, Bosnia and Herzegovina, Bulgaria, Croatia, Cyprus, Denmark, Greece, Hungary, Iceland, Ireland, Isle of Man, Italy, Latvia, Macedonia, the Netherlands, Norway, Poland, Portugal, Romania, Serbia, Sweden, Turkey, and Ukraine. Individuals from these countries cannot be part of a class.

**(i) France and Spain**

George Bermann is a distinguished professor at both Columbia Law School and the Parisian *Institut des Sciences Politiques*, who explains that the French government itself has made clear that "French courts would *almost certainly* refuse to enforce a court judgment in a U.S. 'opt out' class action because it violates . . . French constitutional principles and public policy."[98] Even the case law on which Plaintiffs rely in their Motion excluded putative French class members. *See, e.g.*, *Anwar*, 289 F.R.D. at 117-18; *Alstom*, 253 F.R.D. at 282-87.

David Arias, a professor of procedural law and arbitration in Madrid, international practitioner and law firm founder, explains that Spanish public policy—as evidenced in the Spanish Constitution, the Spanish Civil Code, and the limited collective actions permitted by law—would not permit recognition or enforcement of a judgment in this Action.[99] Plaintiffs offer nothing to show that Spanish courts would enforce a judgment in this Action.[100]

---

98 App. 1854 [Bermann Decl. ¶ 32] (quoting Brief for the Republic of France as *Amicus Curiae* Supporting Respondents, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)) (emphasis added). France would find it "deeply offensive" for class members to be bound without their consent. App. 1862 [Bermann Decl. ¶ 47]. The French Constitutional Council has made it "abundantly clear" that opt-out class actions do not pass muster in French courts, and the former Chief Justice of the French Supreme Court has stated that opt-out actions are "too far removed from [France's] own legal reflexes." App. 1844, 1850-51-53 [Bermann Decl. ¶¶ 3, 25-26, 28, 31]. Any judgment in this Action purporting to bind absent French class members would violate French constitutional and public policy principles of *consentement*, requiring affirmative consent to an action, and *autonomie des parties*, giving claimholders the right to make essential litigation decisions. *See* App. 1848, 1850-51[Bermann Decl. ¶¶ 16-17, 23-24, 27].

99 *See* App. 1821-23 [Arias Decl. ¶¶ 22-35]. Spanish courts would not recognize this Court's jurisdiction over absent class members who have not manifested their consent to the court's jurisdiction through any "concrete procedural actions" as required by the Spanish Constitution, App. 1821 [Arias Decl. ¶¶ 22-24], and whose "right to intervene and actively participate" have not been met in an opt-out setting, App. 1822, 1823 [Arias Decl. ¶¶ 28, 35].

100 Plaintiffs may argue that this Court should include Spanish class members on the basis of *Anwar*, but that would be a mistake. In *Anwar*, the defendants "fail[ed] to identify an explicit conflict with Spanish public policy that would bar recognition of the judgment." 289 F.R.D. at 118. Here, Professor Arias explicitly describes the conflicts of

### (ii) Germany and Switzerland

Dr. Stephan Wilske, a reputed German law firm partner and international practitioner, explains that enforcement of a judgment in this Action would violate German laws on personal jurisdiction, national rules of civil procedure and the German Code of Civil Procedure based on the failure of service of process, infringement on German *ordre public* (public policy), and inadequate notice under binding provisions of the Hague Service Convention.[101] German investors would not be barred from relitigating their claims in Germany, as numerous courts have recognized, including *Anwar*, *Alstom* and *Vivendi*, as well as *Ansari v. New York Univ.*, 179 F.R.D. 112 (S.D.N.Y. 1998), and *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).

Isabelle Romy, a former Swiss federal Supreme Court judge and current law professor and Zurich law firm partner, explains that Swiss courts would not enforce or give preclusive effect to a judgment in this Action against their own citizens and residents because it would violate Swiss constitutional law and public policy.[102] Many courts, including those cited by Plaintiffs, have refused to certify a global class with Swiss members. *E.g.*, *Anwar*, 289 F.R.D. at 117; *Buettgen v. Harless, et al.*, 263 F.R.D. 378, 382-83 (N.D. Tex. 2009; *Bersch v. Drexel Firestone, Inc.*, 519

---

a judgment in this Action with the "procedural guarantees" in the Spanish Constitution. App.1818-19 [Arias Decl. ¶ 15].

101 *See* App. 2202 [Wilske Decl. ¶ 50]. Under German law, this Court lacks jurisdiction over absent German class members because German law requires an affirmative submission to a court's jurisdiction, and "[a]n unnamed class member's failure to opt out . . . does not and cannot establish personal jurisdiction." App. 2196 [Wilske Decl. ¶¶ 23-24]. A judgment against German investors who did not "wilfully, knowingly, and actively" participate would *per se* infringe the German *ordre public* because Germany recognizes a "constitutional right to be heard, the principle of 'correct representation,' and the principle that the parties determine and delimit the scope of proceedings." App.2197-99 [Wilske Decl. ¶¶ 28-36]. Moreover, service not in compliance with the Hague Service Convention would infringe German sovereignty and preclude recognition. *See* App. 2200 [Wilske Decl. ¶¶ 41, 43].

102 *See* App. 2569, 2581 [Romy Decl. ¶¶ 2, 45]. Opt-out class actions violate Swiss public policy because they dispose of class members' procedural autonomy and substantive rights without active participation in the proceeding. *See* App. 2573 [Romy Decl. ¶ 17]. Swiss absent class members would not be barred from instituting duplicative suits because class members who do not opt out are not "parties" to the proceeding. *See* App. 2575 [Romy Decl. ¶¶ 22-26]. A judgment in this Action would be unrecognizable for want of jurisdiction because Swiss law does not consider an absent class member's silence as a submission to the jurisdiction of the foreign court. *See* App. 2576-77 [Romy Decl. ¶¶ 27-31]. Moreover, service of notice not in accordance with the Hague Service Convention is grounds for non-recognition. *See* App. 2579-80 [Romy Decl. ¶¶ 36-41].

F.2d 974, 996-97 (2d Cir. 1975).

**(iii) The Former Netherlands Antilles (Including Aruba)**

Rogier F. van den Heuvel, a renowned Dutch attorney and lecturer on private international law at the University of Curaçao, explains that the former Netherlands Antilles—which includes Aruba, Bonaire, Curaçao, Saba, Sint Eustatius, and Sint Maarten—would not recognize or enforce a judgment in this Action because opt-out class actions violate several facets of established public policy.[103] Plaintiffs submit no evidence of record, nor any case law, to suggest otherwise.

**b. Latin American Countries Would Not Give Preclusive Effect to a Judgment in This Action**

Plaintiffs' putative class includes thousands of investors scattered across numerous Latin American countries, yet Plaintiffs fail to address whether most of these countries would recognize and give preclusive effect to a judgment in this Action.[104] To date, no Latin American country has recognized and enforced an opt-out class action judgment.[105] Nor would they be expected to, because opt-out class actions violate established public policy, constitutional principles requiring internationally-acceptable service of process, and international law standards of jurisdiction over absent class members, as assessed on a country-by-country basis.[106]

---

[103] *See* App. 1962, 1969 [van den Heuvel Decl. ¶¶ 2-4, 41]. As Professor van den Heuvel explains, the former Netherlands Antilles holds the right to self-determination with respect to individuals' legal interests, the right to access to court, and the right to be heard as "fundamental principles" of public policy. App.1967 [van den Heuvel Decl. ¶ 34]. The notion that a party is bound simply for failing to opt out of a class he did not affirmatively consent to contravenes public policy. *See* App. 1969 [van den Heuvel Decl. ¶ 41]. U.S. class actions also violate the former Netherlands Antilles' public policy on allowable damages, as the limited collective actions permitted (which do not bind non-parties) "expressly exclude the possibility of a pecuniary damage award." App. 1965 [van den Heuvel Decl. ¶¶ 24-25].

[104] Plaintiffs' Latin American designee, Professor Oquendo, addresses only Panama, Venezuela, Mexico, Colombia, Ecuador, and Perú, but does not address the rest of the Latin American countries with CD investors—including Argentina, Bolivia, Brazil, Chile, Costa Rica, Cuba, the Dominican Republic, El Salvador, Guadeloupe, Guatemala, Haiti, Honduras, Martinique, Nicaragua, Paraguay, and Uruguay. Nor does Professor Oquendo address a swath of Caribbean and Central American countries falling within Plaintiffs' class, such as Anguilla, Antigua and Barbuda, Bahamas, Barbados, Belize, Bermuda, Cayman Islands, Grenada, Jamaica, Montserrat, St. Lucia, St. Kitts and Nevis, Suriname, St. Vincent and Grenadines, and Trinidad and Tobago. Without any proof as to enforcement in these countries, individuals from there cannot be part of a class here.

[105] *See* App. 1929 [Gidi Decl. ¶ 17].

[106] *See* App. 1931, 1934, 1937 [Gidi Decl. ¶¶ 26, 42, 57].

### (i) Venezuela, Colombia and Mexico

Plaintiffs have not shown that Venezuelan, Colombian and Mexican courts would give preclusive effect to a judgment in this case. With respect to Venezuela, Defendants submit two expert reports: one from James Otis Rodner, a Venezuelan law firm founder with a Harvard Law J.D., and another from Antonio Gidi, a law professor and drafter of Latin American class action legislation, showing that U.S. opt-out class actions are "at complete odds with Venezuelan conceptions of civil procedure, fundamental fairness, and public policy."[107] In an attempt to rebut the testimony of Defendants' experts, Plaintiffs proffer a University of Connecticut law professor, Ángel Oquendo, who opines that Venezuelan courts would recognize a judgment because Venezuelan law permits a limited subset of collective group actions, and Venezuelan due process draws from U.S. notions of due process.[108] Yet Professor Oquendo acknowledges, as he must, that collective group actions differ from U.S. class actions (opt-out or opt-in).[109] As Professors Rodner and Gidi explain, comparing the two is like comparing apples to oranges. Binding absent group members without consent on a claim belonging to the public in Venezuela is fundamentally different than binding an absent member on his or her individual claim without his or her consent in the U.S.[110] Professor Oquendo's testimony falls short of meeting Plaintiffs' burden to show that

---

[107] App. 1762 [Rodner Decl. ¶ 30]. Venezuelan public policy protects the constitutional right of defense and due process, both of which require that a party be served and afforded all procedural guarantees under Venezuelan law, including the right to be heard and present individual claims and defenses. *See* App. 1760 [Rodner Decl. ¶ 25. Venezuelan courts would not consider absent class members to have participated before this Court, and any binding judgment entered against such class members would violate Venezuelan public policy by limiting the class members' constitutional right of defense. *See* App. 1760 [Rodner Decl. ¶ 26]. American class actions are also contrary to Venezuelan civil procedure, since falling within a defined class "does not make [an individual] a recognized plaintiff in Venezuela, much less a party to the litigation." App. 1756 [Rodner Decl. ¶ 15]. Venezuelan law does not permit an individual to be bound by a judgment in an action to which they were not a party, *see* App.1757 [Rodner Decl.¶ 17], and while third parties can participate in proceedings under Venezuela law, they must "incorporate themselves" by expressly consenting to the action, App. 1756 [Rodner Decl.¶ 16]; *see also* App. 1939 [Gidi Decl. ¶ 65].

[108] *See* App. 2706 [Oquendo Decl. at 69].

[109] Venezuelan group actions are limited to injunctive relief on "matters of collective or social interest," not monetary relief for class members' private injuries, and—more importantly—are brought to protect "collective rights." App. 1757-58 [Rodner Decl. ¶¶ 18-20]. Professor Oquendo agrees that such actions are different from U.S. class actions but, with little explanation or analysis, suggests that the difference is only in "minimal respect[s]." App. 2696-97, 2703-04 [Oquendo Decl. at 59-60, 66-67]. He is wrong for the reasons described above.

[110] *See* App. 1757-58 [Rodner Decl. ¶¶ 18-20] App. 1932- 1938 [Gidi Decl. ¶¶ 28-30, 62].

it is “more likely than not” that Venezuela would recognize a foreign, class-action judgment.[111]

Plaintiffs have likewise failed to meet their burden to show that Colombian courts would give preclusive effect to a judgment in this Action. As noted by Eduardo Zuleta, an esteemed practitioner and former law professor, the Colombian Supreme Court would deny recognition of a judgment here because opt-out class actions violate Colombian due process and public policy by depriving absent Colombian class members of the opportunity to affirmatively and expressly join the proceeding, and the ability to opt out of a judgment in which they did not participate.[112] In rebuttal, Professor Oquendo asserts that Latin American due process has the same “essential components” as U.S. due process, and that Colombian opt-in collective actions are “comparable” to opt-out actions.[113] This, however, does not show that Colombian courts are likely to recognize a judgment in this Action. Plaintiffs fail to take on Professor Zuleta’s reasoning as to why collective actions satisfy Colombian due process in ways that U.S. opt-out actions do not—*e.g.*, by affording both an opportunity for absent members to join the proceeding with acceptable means of service of process (*e.g.*, letters rogatory), as well as a discretionary due process right to be excluded from a decision after having been given a right of access to justice under Colombian procedural law.[114] Plaintiffs fail to meet their burden to show that binding Colombian residents to a judgment in this Action would not, therefore, constitute a “flagrant and grave violation” of Colombian due process, as Professor Zuleta testifies.[115]

Plaintiffs also fail to show that Mexican courts would give preclusive effect to a judgment

---

111 Moreover, Professor Oquendo does not have the necessary qualifications to be accepted as an expert on the laws of Venezuela, Columbia, Mexico, and the other three countries on which he opines. He is not admitted to practice in any of these jurisdictions, has never litigated in any of them, has only a shallow understanding of their legal systems from his academic readings in Connecticut, opined erroneously on many basic aspects of their legal practice, and has never been accepted as an expert on these topics. If Plaintiffs continue to proffer him with their Reply, Defendants will file an appropriate *Daubert* motion.

112 *See* App. 2553 [Zuleta Decl. ¶ 74].

113 *See* App. 2689, 2706 [Oquendo Decl. at 52, 69].

114 *See* App. 2573-46, 2550-51 [Zuleta Decl. ¶¶ 36-46, ¶¶ 62-67].

115 App. 2551 [Zuleta Decl. ¶ 66].

in this Action. Eduardo Siquieros, a highly-reputed Mexican law professor and practitioner with over 35 years of experience, has explained that opt-out class actions are "fundamentally at odds with Mexican public policy," and enforcement against absent class members of a judgment in this Action would violate specific Mexican constitutional law, Supreme Court precedent, and "unwaivable" legislation.[116] In response, Professor Oquendo points to Mexico's opt-in collective actions and claims that the "differences in the details should not affect the analysis."[117] But in Mexican courtrooms, they make all the difference because Mexico's opt-in statute is a mandatory public order provision and under Mexican law, failure to opt out is not deemed to be implied consent to class treatment.[118] The importance of consent is underscored by the fact that the original Mexican class action bill provided for an opt-out model, but was rejected by the Mexican Congress in favor of an opt-in mechanism.[119] Plaintiffs do not rebut this record evidence, which weighs heavily against a finding that a Mexican court would give preclusive effect to a judgment in this Action.

**(ii) Perú and Ecuador**

Plaintiffs fail to demonstrate that Peruvian and Ecuadorian courts would likely give preclusive effect to a judgment in this Action. Defendants submit two expert reports, including one by J. Domingo Rivarola Reisz, a Peruvian law professor and practitioner, explaining that Peruvian courts would not recognize such a judgment because it would contravene Peruvian

[116] App. 1773, 1781, 1788, 1789 [Siqueiros Decl. ¶¶ 3-4, 27, 50, 57-60]. The Mexican Constitution, Mexican case law, and the Mexican class action statute all treat autonomy, self-determination and consent as matters of public policy. *See* App. 1783-87 [Siqueiros Decl. ¶¶ 35-47]. Article 594 of the Federal Code of Civil Procedure, which sets forth Mexico's opt-in procedure, is a public order statute that sets a "mandatory rule of procedure," meaning consent is an "unwaiveable" requirement for class treatment. App. 1787 [Siqueiros Decl. ¶¶ 45-46]. Any judgment against class members who did not affirmatively consent to class treatment would violate Mexican public policy. *See* App. 1782, 1787, 1788-89 [Siqueiros Decl. ¶¶ 32, 47, 51-55]. Mexican courts also would not enforce a judgment against a party that was not served with process. *See* App. 1782 [Siqueiros Decl. ¶ 33].

[117] App. 2690 [Oquendo Decl. at 53].

[118] *See* App. 1787, 1775-76 [Siqueiros Decl. ¶¶ 48, 13-14].

[119] *See* App. 1786 [Siqueiros Decl. ¶¶ 42-43].

public order and constitutional principles of due process.[120] Peruvian due process mandates that "no person shall be deemed a default or absent member of a non-consumer protection collective action."[121] A judgment in this Action would additionally fail the reciprocity requirement under Peruvian law.[122] Again, Professor Oquendo does not address a majority of the barriers to recognition and enforcement in the record, but rather concludes that Peruvian group actions are "comparable enough" that Peruvian courts would find U.S. class actions "compatible with the public order."[123] This conclusion is unsupportable because Peruvian group actions are "fundamentally different" mechanisms that are brought by public agencies and intended to offer a means to address public harms (*e.g.*, environmental issues).[124]

Plaintiffs also have not shown that Ecuadorian courts would more likely than not recognize a judgment in this Action. Professor Gidi demonstrated that enforcement of an opt-out class action judgment in Ecuador would result in a violation of Ecuadorian policies of international notice and personal jurisdiction.[125] Plaintiffs' assertion that jurisdiction and service by rogatory letters are only required for defendants[126] ignores that absent class members' rights are affected by opt-out class actions in the same way as traditional defendants' rights. As Professor Gidi explains, in the case of class actions, where absent Ecuadorian class members do not take any affirmative steps to bring an action and consent to the Court's jurisdiction, Ecuadorian courts would not consider them to have submitted to the Court's jurisdiction.[127] Because Plaintiffs fail to analyze

---

[120] App. 2144 [Reisz Decl. ¶ 35]; App. 1940 [Gidi Decl. ¶ 73].

[121] App. 2144 [Reisz Decl.¶ 36].

[122] App. 2142-43, 2144 [Reisz Decl. ¶¶ 26-28, 36-37]; *see also* App. 1940[Gidi Decl. ¶¶ 71-73] (noting in addition that Peruvian courts would deem this Court to lack jurisdiction over absent class members without service through letters rogatory).

[123] App. 2690 [Oquendo Decl. at 53].

[124] App. 2139 [Reisz Decl. ¶¶ 17-19].

[125] *See* App. 1944 [Gidi Decl. ¶ 90].

[126] *See* App. 2660, 2678-79 [Oquendo Decl. at 23, 41-42].

[127] *See* App. 1936, 1944 [Gidi Decl. ¶¶ 46, 89]. Moreover, Ecuadorian due process demands that Ecuadorian class members "receive notice of the class action proceeding through rogatory letters." 1944 [Gidi Decl. ¶ 88].

the relevant issue in this case—how Ecuadorian courts would treat absent class members in opt-out class action judgments—they have not met their burden as to the preclusive effect of a judgment in this Action.

**(iii) Panama and El Salvador**

Plaintiffs fail to meet their burden of showing that Panamanian and El Salvadorian courts will give preclusive effect to a judgment in this case. As noted by the former Chief Justice of the Supreme Court of Panama—one of Defendants' two experts on Panamanian law—any judgment in this Action would "fundamentally contradict Panamanian laws and public policy (*orden publico*)."[128] Plaintiffs' reliance on historical due process similarities and distinguishable Panamanian group actions[129] does not demonstrate that Panamanian courts will more likely than not enforce this Court's judgments.

Plaintiffs' Professor Oquendo does not address, and was explicitly instructed by Plaintiffs' counsel not to opine on, El Salvador.[130] It is thus undisputed that courts in El Salvador would find that opt-out class actions violate public policy, that this Court lacked jurisdiction over El Salvadoreans, and that there was improper notice to El Salvadorian class members.[131]

---

Because U.S. opt-out class actions provide no such notice, Ecuadorian courts would deny recognition. *See* App. 1933-34, 1944 [Gidi Decl. ¶¶ 35-42, 88, 90].

128 *See* App. 1990 [Hoyos Decl. ¶ 43]. This Court would lack jurisdiction over Panamanian class members who do not opt in because, under Panamanian law, failure to opt out does not confer jurisdiction over absent Panamanians. *See* App. 1987 [Hoyos Decl. ¶ 40]. And Panamanian courts would not deem the submission of a Proof of Claim in the SEC Receivership action to constitute consent to participate in Plaintiffs' opt-out class action. *See* App. 1990 [Hoyos Decl. ¶ 42]. Moreover, Panamanian class members would not be properly served by letter rogatory and would not have sufficient notice of the action to permit them to "opt in" (a required element of due process), thus depriving them of their right to present evidence and assert allegations. *See* App. 1987 [Hoyos Decl. ¶ 40]; *see also* App. 1942 [Gidi Decl. ¶ 79].

129 *See* App. 2706 [Oquendo Decl. at 69].

130 *See* App. 2997-98 [Oquendo Dep. Tr. at 65:17-66:10].

131 *See* App. 1942-43 [Gidi Decl. ¶¶ 80-85]. El Salvador does not recognize opt-out class actions, nor does it recognize that a non-party may be bound by a judgment in a proceeding to which it did not participate or have knowledge of. *See id.* ¶ 82. Moreover, this Court would lack jurisdiction over El Salvadorian absent class members because mere silence or the failure to opt out is not considered a submission to this Court's jurisdiction. *See* App. 1935-46, 1943 [Gidi Decl. ¶¶ 44-46, 84]. Additionally, El Salvadorian law would require service to be effected through rogatory letters. *See* App. 1943 [Gidi Decl. ¶ 83].

### c. Common Law Countries Would Not Give Preclusive Effect to a Judgment in This Action

Plaintiffs have not shown that it is more likely than not that England, Canada, and other common law countries would recognize and give preclusive effect to a judgment in this Action.

#### (i) England

Adrian Briggs, a renowned Barrister, professor of private international law at Oxford University and author of the leading English treatise on the enforcement of foreign judgments, opines that the recognition and enforcement of an opt-out class action judgment would violate English private international law and English common law. The law of England would find that U.K. absent class members were not subject to this Court's jurisdiction without their consent or territorial presence.[132] [133]

Plaintiffs present Jonathan Harris, one of Professor Briggs' former students, who notes an "absence of any binding authority" and believes that "one can only speculate" as to how an English court would rule in this "new [and] uncertain terrain."[134] This half-hearted opinion does not satisfy Plaintiffs' burden of proving by a preponderance of the evidence that English courts

---

132 *See* App. 1917 [Briggs Decl. ¶ 105]. As a matter of English private international law, this Court does not have jurisdiction over U.K. absent class members. *See* App. 1897 [Briggs Decl. ¶ 17].. English case law demonstrates that jurisdictional competence is assessed "by reference to the person said to be bound by the foreign decision (whether plaintiff or defendant)." App. 1899 [Briggs Decl. ¶¶ 27-29]. And English private international law requires "either that the person was present within the territorial jurisdiction of the foreign court when the proceedings were commenced, or that person submitted, by prior agreement or by actual appearance, to the jurisdiction of the foreign court." App. 1898 [Briggs Decl. ¶ 22]. Here, absent U.K. class members are not deemed to have submitted to this Court's jurisdiction simply by doing nothing because, under English law, failure to respond to notice of the action does not signify submission to jurisdiction. *See* App. 1900, 1903, 1905 [Briggs Decl. ¶¶ 30, 43-45, 54-55].

133 Plaintiffs' argument in their moving brief that the Proof of Claim submissions to the Receiver constitute an implied submission to the Court's jurisdiction for *this* Action, Pls.' Br. at 54, is both misplaced and belied by the evidence. This Court's prior ruling specifically ordered that the "consent to jurisdiction" language in the Proof of Claim form be expressly limited to claims in the Receivership Action. *See* Order at 1, *SEC v. Stanford Int'l Bank, Ltd., et al.*, No. 3:09-CV-298-N (N.D. Tex. May 4, 2012), Dkt. No. 1584. Plaintiffs have effectively conceded this point, as their experts uniformly agreed with Defendants' experts that the "consent" to the Receivership proceeding was inapplicable to this Action. *See* App. 2881[Harris Dep. Tr. at 142:5-18]; App. 3001 [Oquendo Dep. Tr. at 183:18-24]; App. 2992 [Black Dep. Tr. at 87:9-19]; App. 1848-49 [Bermann Decl. ¶¶ 19-22]; App. 2199-2200 [Wilske Decl. ¶¶ 37-40]; App. 2578 [Romy Decl. ¶¶ 33-35]; App. 1821-22 [Arias Decl. ¶¶ 25-27]; App. 1788-89 [Siqueiros Decl. ¶¶ 51-55]; App. 1990 [Hoyos Decl. ¶ 42]; App. 1936-49 [Gidi Decl. ¶¶ 47-53]; App. 1909 [Briggs Decl. ¶¶ 67-69]; App. 2171-73 [Walker Decl. ¶¶ 64-70].

134 App. 2716-17 [Harris Decl. ¶¶ 20, 21]; App. 2882 [Harris Dep. Tr. at 154:14-25, 239:11, 52:4-8].

*would* recognize and *would* give preclusive effect to a judgment here. Mr. Harris admits that "there are reasonable and respectable arguments that can be made for and against [] recognition," and this is if one assumes that adequate notice was provided to *each English class member*. He stated that his opinion would change if such notice was not provided.[135] Mr. Harris was not prepared to say anything more than "the law is completely uncertain"; he stated he was not capable of saying that England would "more likely than not" recognize a judgment in this Action.[136] On this record, Plaintiffs lose.

**(ii) Canada**

Plaintiffs have not met their burden to show that Canadian courts will give preclusive effect to a judgment in this Action. Janet Walker, a prominent law professor in Toronto and author of the foremost book on Canadian conflicts law (*Castel & Walker: Canadian Conflict of Laws* (6th Ed.)), demonstrates that any judgment in this Action would not be given preclusive effect by Canadian courts because (a) the Canadian courts have already deputized the Joint Liquidators to pursue claims regarding assets for the Stanford estate, including a case against TD Bank; (b) class notice in this Action would have to advise class members of the differences between the Canadian and U.S. actions and that they were forfeiting all potential entitlements in Canada, and a Canadian court would not find it reasonable to bind class members who were silent in response; and (c) significant issues exist regarding the adequacy of representation in this Action, including the lack of a named Canadian Plaintiff.[137] Moreover, Professor Walker explains

---

135 App. 2716, 2751 [Harris Decl. ¶¶ 19, 106]; App. 2878-80 [Harris Dep. Tr. at 50:22-52:8]. Mr. Harris also admitted that the Supreme Court of the United Kingdom has reasoned that a U.S. class action judgment would *not* be recognized if English class members had not received adequate notice, in the only English case that explicitly considered this issue. *See* App. 2885-87 [Harris Dep. Tr. at 157:10-159:25].

136 App. 2884-85, 2888 [Harris Dep. Tr. at 156:20-157:3, 160:2].

137 *See* App. 2164, 2169 [Walker Decl. ¶¶ 38, 55-56]; App. 3042-44 [Walker Dep. Tr. at 144:16-146:4]. The Superior Court of Québec ruled in August 2011 that the Joint Liquidators have exclusive authority to initiate and pursue litigation in Canada against TD Bank and related parties regarding the Stanford matter. *See* App. 2154, 2164-65 [Walker Decl. ¶¶ 3, 38-42]. The Québec court's order "is independently determinative" in Canada "unless and until it is varied," meaning a Canadian court would have to depart from the Québec court's order to permit other proceedings. App. 2165 [Walker Decl. ¶¶ 43-44]. Such variation is unlikely because Canadian jurisprudence strongly

why Plaintiffs' assertion that no other jurisdiction has a significant interest in the Action, Pls.' Br. at 45, is "patently contrary" to the ongoing action in Canada and the Canadian courts' numerous rulings regarding the Stanford estate and the pending case against TD Bank.[138] Significantly, Plaintiffs' professor on Canadian law, Vaughan Black, *concedes* that Canada would likely *not* enforce a plaintiffs-favoring judgment in this Action if it is rendered *after* the Joint Liquidators' case reaches a conclusion.[139] This proves Defendants' point; this Court cannot expect its judgment to be enforced in Canada.

To the extent that Plaintiffs try to piggy-back on earlier, non-binding decisions of other district courts like *Anwar* to meet their burden with respect to common law countries such as Canada, these efforts fail. *Anwar* and other New York cases were decided under different circumstances and in reliance on different records and without the significant expert proof submitted by Defendants here. For example, several of the foreign jurisdictions have a reciprocity test that must be met prior to recognizing and according preclusive effect to a U.S. opt-out class action judgment.[140] The reciprocity test analyzes whether the law of the state where the judgment is issued—here, Texas—would provide for a similar judgment in the foreign jurisdiction to be equally recognized and enforced.[141] The New York cases Plaintiffs cite do not consider this analysis under Texas law, which is the required inquiry before this Court (and which Defendants' experts do assess).[142] In short, the Court should not certify a global class. Plaintiffs have not carried their burden under Rule 23, and Defendants would unfairly face the risk of relitigation in

---

favors cross-border adjudication "in the jurisdiction in which the investors would reasonably expect [the case] to be decided," and Canadian courts are "unlikely to endorse the abandonment of the JL's Canadian Action in favour of the proposed U.S. Class Action because the SIB investors would reasonably expect the claims at issue to be decided in accordance with Canadian law." App. 2168-69 [Walker Decl. ¶ 53-54]. Indeed, Plaintiffs allege in their SAC that TD Bank is governed by Canadian banking laws. *See* SAC ¶¶ 65-70.

138 *E.g.*, App. 2170 [Walker Decl. ¶ 58].

139 *See* App. 2825-26 [Black Decl. ¶¶ 26-29]; *see also* App. 2993 [Black Dep. Tr. at 152:10-153:2].

140 *See, e.g.*, App. 2143-44 [Reisz Decl. § VIII] (Perú); App. 2546-51 [Zuleta Decl. § 5C] (Colombia); App. 1816 [Arias Decl. ¶8] (Spain); App. 2195 [Wilske Decl. ¶ 20] (Germany); App. 1778 [Siqueiros Decl. ¶ 22] (Mexico).

141 *See* App. 2552 [Zuleta Decl. at ¶ 71].

142 *See, e.g.*, App. 2552-53 [Zuleta Decl. ¶¶ 71-73].

each of the relevant foreign jurisdictions. *See In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 364 (S.D.N.Y. 2002) (relying on two prior cases which found it "unfair" to certify a class with significant foreign membership where class could "litigate abroad in their home countries should they lose in this forum").

**3. Plaintiffs Have Not Shown that Putative Class Members Are Unable or Unwilling to Bring Individual Actions**

Plaintiffs fail to establish that a class action is the superior vehicle for adjudicating CD investor claims because the evidence does not show that the putative class members are either unable or unwilling to sue Defendants individually. Indeed, the record demonstrates the opposite: individual Stanford investors are both sufficiently incentivized and capable of directly prosecuting their claims. Hundreds—including *named putative class representatives in this Action*—have already done so. Class certification under these circumstances is inappropriate. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) (decertifying a class and noting a lack of superiority where "there is reason to believe that individual suits are feasible").

Plaintiffs allege that putative class members' losses are too small to justify bringing stand-alone suits. *See* Pls.' Br. at 6, 42. But Plaintiffs' only purported proof is an October 2014 declaration from the Examiner, John J. Little, stating that a 2010 investigation "revealed that almost 85% of Stanford Investors had total investments (and losses) of less than $500,000." Pls.' App., Ex. 12 at ¶¶ 6-7, 12. Neither that declaration nor Plaintiffs' Motion provides any further details or backup documentation concerning this investigation.

Tellingly, elsewhere Plaintiffs highlight that the putative class "exceeds 17,000 investors with over $4.4 billion in approved claims." Pls.' Br. at 19. REDACTED

REDACTED[143] Furthermore, data regarding the named class representatives contradicts Plaintiffs' assertions that class members' claims are "too small" to sufficiently motivate them. REDACTED

REDACTED

REDACTED Courts routinely find that claims for far smaller amounts provide individuals with sufficient interest in prosecuting separate actions. *See, e.g., Ticknor v. Rouses Enters., LLC*, 592 F. App'x 276, 277 (5th Cir. 2014) (affirming denial of class certification where plaintiffs stood to recover damages between $100 and $1,000, attorney's fees, and potentially punitive damages); *Dvorin v. Chesapeake Exploration, LLC*, No. 3:12-CV-3728-G, 2013 WL 6003433, at *9 (N.D. Tex. Nov. 13, 2013) (plaintiffs' claims for "several thousand dollars" each were "not so small as to render a class action a superior method of adjudication, as the size of individual claims is generally only sufficient to persuade courts that class actions are superior when those individual claims are very small").

The record demonstrates that hundreds of Stanford investors have commenced individual lawsuits against various individual and corporate third-party defendants—including against one of the Defendants named in this Action—to recover losses allegedly suffered in connection with Stanford's Ponzi scheme.[144] For example, in a case filed in Louisiana, six plaintiffs individually sued Trustmark and others for their Stanford losses.[145]

In addition, *five of the six named putative class representatives in this Action* have asserted claims outside of the Receivership process. Mr. Abbott sued his third-party financial advisor in Mississippi state court to recover $750,000 that he and others allegedly lost on purchases of SIBL

---

143 *See* App. 253 [Spreadsheet from Receiver].

144 *See, e.g.,* Opp. of Defs.' Proskauer Rose LLP et al. to Pls.' Opposed Mot. for Class Certification at 13, n.7, *Troice v. Proskauer Rose LLP, et al.*, No. 3:09-cv-01600 (N.D. Tex.), Dkt. No. 197; Willis & Amy Baranoucky's Opp. To Pls.' Mot. for Class Certification at 55 n.45, *Troice v. Willis of Colorado Inc., et al.*, No. 3:09-cv-01274-N-BG (N.D. Tex. Apr. 20, 2015), Dkt. No. 243.

145 *See* Notice of Removal, Dkt. No. 1, *Jackson, et al. v. Cox, et al.*, No. 3:10-cv-00029-EEF-DEK (M.D. La. Jan. 11, 2010); *see also* Opp. of Defs.' Proskauer Rose LLP *et al*. to Pls.' Opposed Mot. for Class Certification at 13, *Troice v. Proskauer Rose LLP*, No. 3:09-cv-01600-N-BG (N.D. Tex), Dkt. No. 197 (April 20, 2015).

CDs.[146] REDACTED

[147] Mr. Abbott and Ms. Elson-Rogers have brought FTCA administrative claims against the SEC, and Ms. Alfille de Penhos has submitted a NAFTA Arbitration claim against the United States.[148] Mr. Estefenn testified that there is a group action pending against a Stanford entity in Colombia, from which he could potentially recover money damages.[149]

That hundreds of putative class members have filed individual lawsuits against a wide range of third-party defendants—from individual financial planners to securities brokers and law firms—is proof that individual investors are sufficiently motivated and equipped to pursue recoveries outside of a class action.

**B. Plaintiffs Have Not Shown Predominance**

Plaintiffs fail to show that common questions of law or fact will predominate over questions affecting only individual class members. *See* FED. R. CIV. P. 23(b)(3). Adjudication of putative class members' claims will require individualized inquiries, including with respect to (1) the law applicable to a putative class member's claims; (2) whether a putative class member has shown reliance; (3) what misrepresentations or omissions were made to a putative class member; (4) whether a putative class member's losses were caused by Defendants' alleged conduct; (5) a putative class member's damages; and (6) application of defenses. When a trial on the proposed class members' claims will require such separate analyses, predominance does not exist. *See Dvorin*, 2013 WL 6003433 at *8; *Ned-Sthran v. Methodist Hosps. of Dallas (d/b/a Methodist Health Sys.), et al.*, No. 3:08-CV-0072, 2008 WL 5420601, at *4-5 (N.D. Tex. Nov. 25, 2008).

---

146 *See* App. 883 [Dep. Ex. 61 ¶ 21]; App. 2599 [Pls.' Interrog. Resp. at Pl. Abbott's Answer to Interrog. No. 7].

147 *See* App. 1376, 1391-92 [Queyrouze Dep. Tr. at 222:3-225:9, 270:10-271:12]; App. 2617-18 [Pls.' Interrog. Resp. at Pl. Queyrouze's Answer to Interrog. Nos. 7, 8].

148 *See* App. 2600, 2605, 2611 [Pls.' Interrog. Resp. at Pls.' Answers to Interrog. No. 7].

149 *See* App. 2979-84 [Estefenn Sept. 10, 2015 Dep. Tr. at 394:24-399:7].

### 1. Choice-of-Law Considerations Preclude Certification of a Global or a Nationwide Class

The laws of numerous jurisdictions apply to the putative class members' claims. Plaintiffs' failure to undertake a choice-of-law analysis is, as a matter of law, fatal to predominance. *See Cole*, 484 F.3d at 724 ("Failure to engage in an analysis of state law variations is grounds for decertification."); *Norwood v. Raytheon Co*., 237 F.R.D. 581, 594 (W.D. Tex. 2006); *Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*, No. 3:02-CV-1245, 2003 WL 21339279, at *1 n.1 (N.D. Tex. June 3, 2003) (Godbey, J.).[150] Although they have no burden, Defendants present an analysis of Texas choice-of-law rules (which Plaintiffs fail to perform) and a comparison of foreign laws (which Plaintiffs fail to undertake) to demonstrate that significant differences between the laws of the numerous jurisdictions that are applicable to claims by putative class members preclude certification. Unlike in federal securities cases, certification of a nationwide class is improper here because, *inter alia*, (a) there is no overriding federal law to apply, (b) the securities at issue were sold in one-on-one transactions instead of on a regulated exchange, and (c) reliance cannot be presumed for the class. Plaintiffs here assert distinctly state law claims regarding individualized purchases that occurred in widely varying circumstances.

#### a. Different Jurisdictions' Laws Apply to The Putative Class Members' Claims

Plaintiffs globally argue that Texas law applies to every cause of action, but they are wrong. Texas federal courts sitting in diversity follow Texas choice-of-law rules, which apply the "most significant relationship" test from the Restatement (Second) of Conflict of Laws ("Restatement") to tort claims. *Spence*, 227 F.3d at 311. Under this test, "the Court must apply an

---

[150] *See also Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 316 (5th Cir. 2000) ("By not providing the district court with a sufficient basis for a proper choice of law analysis or a workable sub-class plan, the plaintiffs failed to meet their burden of demonstrating that common questions of law predominate."); *Lee v. Am. Airlines, Inc.*, No. 3:01-CV-1179-P, 2002 WL 31230803, at *12 (N.D. Tex. Sept. 20, 2002) ("Because Plaintiff has not provided the Court with the factual information necessary to conduct a proper choice-of-law analysis, . . . the Court finds that Plaintiff has not sustained its burden of establishing the element of predominance and that certification is proper.").

individualized choice-of-law analysis to each plaintiff's claims" and with respect to each cause of action. *Lee*, 2002 WL 31230803, at *11; *see also Janvey v. Alguire*, No. 3:09-CV-0724-N, 2013 WL 2451738, at *3 (N.D. Tex. Jan. 22, 2013) (Godbey, J.) (finding an individual choice of law is necessary "for each plaintiff"); *Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortgage Ass'n*, 624 F.3d 185, 191 (5th Cir. 2010) ("The choice of law is evaluated issue by issue."). Application of this test shows that the laws of a panoply of jurisdictions apply to the claims of putative class members residing in the U.S. and internationally.

For aiding and abetting fraud claims, Restatement § 148 applies. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 793 (S.D. Tex. 2005). Section 148 provides for application of the law where the investor received false representations and acted on them: "[w]hen the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state [or country] determines the rights and liabilities of the parties."[151] The testimony of the six proposed representatives confirms that they received sales information and made purchases all over the map.[152] Accordingly, each of Plaintiffs' fraud-related claims is governed by a different state's or

---

[151]     Restatement § 148(1). If "the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made," the above-referenced presumption is inapplicable and the court should consider: "(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." *Id.* at § 148(2).

[152]     For example, Mr. Abbott met his financial advisor and purchased his SIBL CDs in Mississippi. *See* App. 1445-46 [Abbott Dep. Tr. at 215:18-216:21]. Ms. Suarez met with her financial advisor in Florida and made deposits from Florida or Venezuela. *See* App. 1620-21, 1624-25, 1656 [Suarez July 1, 2015 Dep. Tr. at 78:22-79:21, 88:20-23, 89:10-15, 236:12-19]. Ms. Elson-Rogers purchased SIBL CDs when living in Greece, after meeting with her financial advisors in her home there, and in North Carolina based on repeated email assurances from her advisor. *See* App. 1471, 1489-94, 1495-96, 1499 [Elson-Rogers Dep. Tr. at 44:18-25, 92:1-97:10, 98:11-99:6, 106:18-21]. Mr. Queyrouze met with his financial advisor and decided to purchase SIBL CDs in Louisiana. *See* App. 1341-45, 1355, 1367-68 [Queyrouze Dep. Tr. at 17:20-21:1, 56:19-24, 157:1-158:6]. Mr. Estefenn met with his financial advisor in Miami and made purchases while living in Colombia. *See* App. 1688-91 [Estefenn July 2, 2015 Dep. Tr. at 112:5-115:13]; App. 2627 [Pls.' Interrog. Resp. at Pl. Estefenn's Answer to Interrog. No. 1]. Ms. Penhos invested from

country's laws.

Separate choice-of-law analyses are required for Plaintiffs' other causes of actions as well. Turning to the claim for aiding and abetting breach of fiduciary duty, the Court must consider the factors applicable to tort claims generally, which are set forth in Restatement § 145: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *See Casa Orlando*, 624 F.3d at 191 (applying Restatement § 145 to breach of fiduciary duty claim); *Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2009 WL 424545, at *3 (N.D. Tex. Feb. 19, 2009) (Boyle, J.) ("In tort cases, 'the applicable law will usually be the local law of the state where the injury occurred.'"). Plaintiffs' SAC alleges the breach of a fiduciary duty owed by the Stanford entities and their directors and officers to investors.[153] While Defendants have demonstrated in their motions to dismiss that no such fiduciary relationship exists, the law that would govern such a claim is the law of the investors' domicile or the domicile of SIBL and its directors and officers.[154] Again, because the investors were domiciled all over the world, the laws of multiple jurisdictions are implicated. First, putative class members were injured in their place of domicile. Second, the conduct causing the injury occurred in investors' domicile or that of SIBL, which was domiciled

Mexico. *See* App. 1530-31, 1538, 1540 [Penhos Dep. Tr. at 36:4-37:8, 60:17-21, 62:1-3]; App. 2609 [Pls.' Interrog. Resp. at Pl. Penhos's Answer to Interrog. No. 1]. None of their meetings or purchases took place in Texas.

153 *See* SAC ¶¶ 439, 442. Plaintiffs also claim that SIBL's officers and directors breached a fiduciary duty to SIBL, Dkt. No. 304 at 26, and that Stanford financial advisors breached a fiduciary duty to investors. *See* Dkt. No. 309 at 8-9. Defendants continue to contest that any of Plaintiffs' alleged fiduciary duties exist and incorporate by reference their motion to dismiss arguments. *See* Dkt. Nos. 293, 297, 298, 299, 307, 309, 311, 314. To the extent that a fiduciary relationship exists between SIBL and its directors, Plaintiffs lack standing to bring this claim as CD investors. *See* Dkt. No. 297 at 22 n.29.

154 Because Restatement § 145 provides for specific factors to be weighed when evaluating tort claims, the Court need not rely on the general principles set forth in Restatement § 6. However, the § 6 principles further support the application of multiple jurisdictions' laws. The first, and "most important," interest enumerated in § 6 is "the needs of the interstate and international systems." *See* Restatement (Second) Conflict of Laws § 6 and Cmt. d. This requires the Court to respect the laws of all jurisdictions interested in this dispute. *See Casa Orlando*, 624 F.3d at 193 ("[T]he needs of the interstate system direct us not to ignore relevant states' interests . . . by applying [law of the jurisdiction of Defendant's headquarters] to all matters of this case.").

in St. Johns, Antigua. *See* Compl. ¶ 19, *Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.*, *et al.*, No. 3:09-cv-0298-N (N.D. Tex. Feb. 16, 2009), Dkt. No. 1. The alleged aiding and abetting by the Banks supposedly occurred in Defendants' places of business, which are also geographically dispersed. *See* SAC ¶¶ 19–24. Third, the domicile of the parties favors the application of the law of the investor's domicile or Defendants' four different places of incorporation. Finally, the alleged fiduciary relationships between SIBL and the Stanford directors and officers, on the one hand, and the investors, on the other hand, were also centered in investors' domiciles or in Antigua. Given Stanford's geographically-dispersed sales activities, Fifth Circuit precedent indicates the Court should apply the law where the investors were located. *See Casa Orlando*, 624 F.3d at 193 (holding that "no single jurisdictional law [] can be applied to the class as a whole" for breach of fiduciary duty claim against Washington, D.C.-headquartered defendant that contacted putative class members through regional offices nationwide).

Plaintiffs' claims for aiding and abetting conversion and conspiracy are also tort claims that require application of the Restatement § 145 factors. *See Pemex Exploración y Producción v. BASF Corp.*, No. H-10-1997, 2011 WL 9523407, at *7 (S.D. Tex. Oct. 20, 2011) (applying § 145 to conversion claim); *ASARCO LLC v. Ams. Min. Corp.*, 382 B.R. 49, 73-74 (S.D. Tex. 2007) (applying § 145 to conspiracy claim). As discussed above, these factors favor application of the laws of numerous jurisdictions around the country and world where investors lived and formed and maintained relationships with SIBL and their Stanford financial advisors.

As for Plaintiffs' Texas Securities Act ("TSA") claim, the applicable choice-of-law inquiry depends on the nature of the TSA violation Plaintiffs allege, which cannot be determined from Plaintiffs' vague pleading. *See* Dkt. No. 307. To the extent Plaintiffs claim the primary violation was the sale of unregistered securities, SAC ¶ 235, the claim cannot be brought by putative class members who are non-Texans or who were not present in Texas when the offer of sale was made.

*See* Tex. State Sec. Bd., Rule 139.7(a) (2015). Given that fewer than 1,300 Receivership claimants are from Texas (less than 7.4% of the class), the vast majority of the putative class members likely made their purchases outside of Texas, which would bar them from bringing this claim.[155] To the extent Plaintiffs claim the primary TSA violation was the sale of securities through untruths and omissions, Restatement § 148 may apply.[156] *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 761 F. Supp. 2d 504, 534 (S.D. Tex. 2011) (applying Restatement § 148 to TSA claim for untruths and omissions). However, an "extensive analysis" is still required, because the TSA does not automatically apply "in every securities case involving facts touching Texas or its residents." *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 442 (Tex. 2007). Indeed, to apply Texas law to the entire class would be "contrary to the policies of other state 'blue sky' laws." *Id*. (Jefferson, J., concurring). While the TSA may apply to Texas investors who purchased CDs and sustained losses in Texas, under Restatement § 148, the law applicable to claims by other class members can only be determined by an extensive analysis of the local fraud laws of the 106 countries and 47 states where the putative class members live.

**b. Significant Differences in Applicable Laws Defeat Predominance**

Plaintiffs must demonstrate that a choice-of-law analysis does not reveal variances in applicable laws that defeat predominance. *See Stirman v. Exxon Corp.*, 280 F.3d 554, 564-65 & n.9 (5th Cir. 2002) (in order for common issues to predominate, "[t]he relevant state laws must be uniform in [] necessary aspects"). Plaintiffs fail to undertake any such analysis, blithely ignoring major differences in numerous jurisdictions' laws. Defendants, however, have undertaken a

---

155 *See* App. 649 [ABBOTT_00006].

156 Defendants also contest the extraterritorial application of the TSA to foreign purchases of Stanford CDs by foreign individuals in light of the Supreme Court's decision in *Morrison v. Nat'l Austl. Bank, Ltd.*, 561 U.S. 247 (2010). Although this Court has previously held that the TSA's untruth or omission provision may be applied extraterritorially, the Court has also acknowledged that Texas courts have not addressed the issue. *See Janvey v. Willis of Colorado*, No. 13-cv-03980-N-BG (N.D. Tex.), Dkt. No. 64, at 19-21. Defendants believe that extraterritorial application of the TSA is an improper and unconstitutional extension of this state statute to foreign transactions brought by foreign individuals involving foreign securities.

comprehensive analysis of state law variances across all fifty states with respect to the four common law claims in this Action. Defendants attach an executive summary of the results as Appendix H to this brief and include the complete results as Exhibits 9 to 12 in the Appendix. As demonstrated by this survey, and as highlighted below, there is considerable variation in the laws applicable to Plaintiffs' claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, aiding and abetting conversion, and civil conspiracy. Many states do not recognize certain of these claims, while others differ significantly as to their required elements.

For example, some states, such as Louisiana and Ohio, do not recognize aiding and abetting tort claims at all. *See Broyles v. Cantor Fitzgerald & Co.*, No. 10-854-JJB, 2014 WL 6886158, at *5 (M.D. La. Dec. 8, 2014); *Fed. Mgt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 853 (Ohio Ct. App. 2000). Other states, including Texas, Kentucky, Utah, and Missouri, question the scope, if not the existence, of such claims. *Grant Thornton LLP v. Prospect High Income Fund, ML CBO IV (Cayman), Ltd.*, 314 S.W.3d 913, 930 n.28 (Tex. 2010); *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 260 (Ky. Ct. App. 2008); *Albright v. Attorney's Title Ins. Fund*, No. 2:03-cv-517, 2008 WL 2952260, at *12 (D. Utah July 28, 2008); *Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 4:09-cv-01252, 2012 WL 3984486, at *6 (E.D. Mo. Sept. 11, 2012). Still others only speculate as to the existence of such claims. *In re Felt Mfg. Co., Inc.*, 371 B.R. 589, 615 (Bankr. D.N.H. 2007).

Likewise, domestic blue sky laws can vary significantly from state to state. For instance, when Mr. Abbott sued his financial advisor in Mississippi, he brought claims under the Mississippi Securities Act (the "MSA").[157] The TSA and the MSA conflict on key issues. Significantly, the MSA permits aiding and abetting claims only against employees of the seller, broker-dealers, or agents. Miss. Code Ann. § 75-71-719 (1981). Plaintiffs thus cannot bring

[157] *See* App. 885 [Dep. Ex. 61 ¶¶ 29-30]; App. 2599 [Pls.' Interrog. Resp. at Pl. Abbott's Answer to Interrog. No. 7]; Miss. Stat. Ann. § 75-71-101 *et seq.* (1981).

claims against Defendants under the MSA.

Material variations permeate state fraud claims. For example, the standards of proof for the elements of fraud vary by state. *Compare Stuart v. Freiberg*, 116 A.3d 1195, 1203-04 (Conn. 2015) (noting that elements of fraud must be "show[n] by clear and convincing evidence"); *In re Estate of Dugger*, No. 224629, 2000 WL 1528710, at *4 (Del. Ch. Sept. 29, 2000) (same); *Ibarra v. Izaguirre*, 985 So.2d 1117, 1119 (Fla. Dist. Ct. App. 2008) (same), *with In re Estate of Kindsfather*, 108 P.3d 487, 490 (Mont. 2005) (fraud must be proven by a "preponderance of the evidence"); *Tyson Foods v. Davis*, 66 S.W.3d 568, 577 (Ark. 2002) (same); *Ostalkiewicz v. Guardian Alarm, Div. of Colbert's Sec. Servs., Inc.*, 520 A.2d 563, 569 (R.I. 1987) (same). There are also marked differences in the required elements: some states permit fraud claims where the statement is made "recklessly without any knowledge of its truth," *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 615 (Ky. Ct. App. 2011), while other states require actual knowledge that the statement is false, *see Alliance Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 167 (D. Conn. 2005).

The standards for a conspiracy claim also vary significantly. Some states require clear and convincing evidence, *see McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999); while others require specific intent, *Tremco, Inc. v. Holman*, No. C8-96-2139, 1997 WL 423575, at *4 (Minn. Ct. App. July 29, 1997); and others still require malice, *see Gibson v. City Yellow Cab Co.*, No. 20167, 2001 WL 123467, at *3 (Ohio Ct. App. Feb. 14, 2001). Differences for the conversion and breach of fiduciary duty claims are addressed in the executive summary at Appendix H to this brief and the detailed 50-state surveys.

States also vary widely as to the applicable statutes of limitations. *See, e.g.*, *Winn Fuel Serv., Inc. v. Booth*, 34 So.3d 515, 519 (La. Ct. App. 2010) (one year for fraud); *Bennett v. McKibben*, 915 P.2d 400, 405 (Okla. Civ. App. 1996) (two years for fraud); *Orem v. Ivy Tech*

*State Coll.*, 711 N.E.2d 864, 870 n.7 (Ind. Ct. App. 1999) (six years for fraud); *Serrano v. Serrano*, No. 1 CA-CV 10-0649, 2012 WL 75639, at *6 (Ariz. Ct. App. Jan. 10, 2012) (two years for breach of fiduciary duty); *Cmty. Title Co. v. U.S. Title Guar. Co.*, 965 S.W.2d 245, 253 (Mo. Ct. App. 1998) (five years for breach of fiduciary duty). Accordingly, this Court would be required to analyze the relevant statute of limitations for each claim under each jurisdiction's law and then apply a dizzying patchwork of different time bars.

What is more, because Plaintiffs seek certification of a worldwide class, the Court must also consider foreign countries' laws. *See Norwood*, 237 F.R.D. at 596. England, for instance, where many putative class members are domiciled, "does not recognize claims for aiding and abetting common law fraud." *In re BP P.L.C. Sec. Litig.*, No. 4:12-CV-1256, 2013 WL 6383968, at *36 (S.D. Tex. Dec. 5, 2013) (dismissing claims after determining English law applies). Plaintiffs' Professor Oquendo admitted that civil conspiracy is not a recognized claim in Latin America and did not know whether conversion was a recognized claim in the six countries on which he opined.[158] In other instances, the foreign jurisdiction defines the claim with substantially different elements, standards, or degrees of fault. *See In re BP P.L.C. Sec. Litig.*, 2013 WL 6383968, at *36 (discussing differences between common law claims and English law). Civil law jurisdictions comprise a significant portion of Plaintiffs' putative class, yet "[t]he civil law simply contains no relevant concept comparable to that of conversion." *Fed. Ins. Co. I.C. v. Banco de Ponce*, 751 F.2d 38, 41-42 (1st Cir. 1984) (noting the significant differences in the degrees of fault required under civil law and acknowledging that "the history of conversion reveals that it is a quintessential common law claim").[159]

---

158 *See* App. 2999-3000 [Oquendo Dep. Tr. at 154:3-155:11].

159 As another example, in Mexico, "specific common law torts are not recognized." *Curley v. AMR Corp.*, 153 F.3d 5, 14 (2d Cir. 1998). Courts therefore attempt to map U.S. common law claims onto Mexico's Civil Code provision prohibiting acts "against good customs and habits." *Id.* Moreover, Mexico follows a federal system, in which individual Mexican states have their own civil codes, which may require distinct analyses for claims brought by

The Court must also consider foreign statutes of limitations. A Texas court applying the law of a different jurisdiction must apply the foreign jurisdiction's statute of limitations if "the foreign jurisdiction's statute creates a right and also incorporates a limitation upon the time within which the suit is to be brought." *Ellis v. Great Sw. Corp.*, 646 F.2d 1099, 1111 (5th Cir. 1981). The Court would thus be faced with the daunting prospect of determining the statutes of limitations for four different claims under the laws of more than 150 jurisdictions. *See, e.g.*, *Ramsay v. Boeing Co.*, 432 F.2d 592, 595 (5th Cir. 1970) (applying Belgian statute of limitations that was incorporated into the substantive law of the cause of action). This alone makes the putative class too unwieldy to warrant certification.

Numerous courts have already held that application of materially different foreign and state laws and their respective statutes of limitations overwhelms common issues and precludes certification. *See Casa Orlando*, 624 F.3d at 185, 196 (5th Cir. 2010) (affirming denial of certification where multiple jurisdictions' laws applied to putative class members' claims); *Kelley v. Galveston Autoplex*, 196 F.R.D. 471, 478 (S.D. Tex. 2000) (finding "class action is an inappropriate vehicle" because of individualized determinations necessary with respect to statute of limitations and tolling); *Gyarmathy*, 2003 WL 21339279, at *1 (finding that because "a Texas court would apply the law of each insureds' states of residence . . . [plaintiff] has . . . failed to show that common issues of law predominate"); *Norwood*, 237 F.R.D. at 602 ("Defendants have demonstrated numerous variations in state and foreign laws that could swamp the proffered common issues and defeat predominance for each cause of action."); *Corley v. Entergy Corp.*, 220 F.R.D. 478, 488 (E.D. Tex. 2004) ("[V]arying statutes of limitations, as well as their differing effects on Plaintiffs' claims, slay predominance."), *aff'd sub nom. Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350 (5th Cir. 2005). This Court should reach the same conclusion.

---

residents of different states. *See, e.g., Gardner v. Best Western Int'l, Inc*., 929 S.W.2d 474, 479-80 (Tex. App.—Texarkana 1996, writ denied).

### 2. Individual Issues of Misrepresentations and Omissions to Putative Class Members Predominate

To establish fraud-based claims under Texas law, Plaintiffs generally must show that "a material representation was made" and that such representation "was false." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998); *see also Zorrilla v. Aypco Constr. II, LLC*, No. 14-0067, 2015 WL 3641299, at *7 (Tex. June 12, 2015).[160] Similarly, to establish a fraud-by-omission claim under Texas law, Plaintiffs must show that a party failed to disclose a material fact that it had a duty to disclose. *See Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex. 1998); *see also* Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (2015) (stating that omission must concern "a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading"). Unique, individualized issues with respect to representations and omissions received by putative class members are grounds for not certifying a class. *See* FED. R. CIV. P. 23 Advisory Committee Notes (1966 Amendment, Subdivision (b)(3); *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) (class certification is inappropriate where "writings contain material variations, emanate from several sources, or do not actually reach the subject investors").

Here, class certification is inappropriate because this Action involves a multitude of widely varying representations that were allegedly communicated to individual putative class members in different ways under a wide range of circumstances. Indeed, sworn testimony by the proposed class representatives demonstrates dramatic variations in the substance and circumstances of the representations upon which individual putative class members purportedly relied. Moreover, given that four of the class plaintiffs testified that they relied exclusively on oral representations when initially purchasing SIBL CDs and that the CDs were sold through individual financial

---

[160] While Defendants cite to Texas law for illustrative purposes, Defendants reiterate that the elements of fraud will vary based on the applicable law of the foreign country or state that applies to each investor.

advisors,[161] the Court may conclude that a vast portion of the class purchased CDs based on oral statements. Courts deny class certification in such scenarios. *See, e.g.*, *Simon*, 482 F.2d at 882 ("[C]ourts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action").

Plaintiffs themselves have acknowledged that: (1) Stanford could have provided different materials and information to different investors; (2) the 17,000 class members could thus be relying on a "different mix of materials"; and (3) to determine what the 17,000 class members relied on, one would need to go talk to each one.[162] This Court has denied class certification in substantially similar circumstances. *See Gyarmathy*, 2003 WL 21339279.

In *Gyarmathy*, the plaintiff purchased a worker's compensation policy from an insurance company. *Id.* at *1. Seeking to certify a class action based on alleged misrepresentations and omissions in the insurance company's printed materials, the *Gyarmathy* plaintiff alleged—like Plaintiffs here—that those written materials "omitted the same material information," and therefore the actionable misrepresentations were identical. *Id.* at *2. This Court rejected that argument, explaining that

> While the text of the [written materials] may have been identical, the record before the Court shows that those documents were not delivered to the putative class members in identical contexts. Many of the potential class members placed their coverage through brokers. The record reflects that at least some potential class members received varying representations from their brokers above and beyond what is contained in the [written materials]. . . . Accordingly, the Court finds that common issues of fact do not predominate.

*Id.* at *3. Other courts have reached similar conclusions. *See, e.g.*, *In re Park Cent. Global Litig.*, No. 3:09-cv-765-M, 2014 WL 4261950, at *13 (N.D. Tex. Aug. 25, 2014).

Plaintiffs argue that Stanford made a single, purportedly common "omission," *i.e.*, that he

---

[161]    *See, e.g.*, App. 1367-68 [Queyrouze Dep. Tr. at 157:1-158:6]; App. 1415-16 [Abbott Dep. Tr. at 45:14-46:18]; App. 1623 [Suarez July 1, 2015 Dep. Tr. at 82:3-23]; App. 1693, 1695 [Estefenn July 2, 2015 Dep. Tr. at 118:17-19, 120:10-15].

[162]    *See* App. 1497-98 [Elson-Rogers Dep. Tr. at 103:18-104:7]; App. 1368 [Queyrouze Dep. Tr. at 158:7-20]; App. 1698-99 [Estefenn July 2, 2015 Dep. Tr. at 132:21-133:6].

"misappropriated investors' deposits to bankroll other Stanford Entities and for his personal use," Pls.' Br. at 33, and that this satisfies the predominance requirement. But that allegedly common omission was made in the context of over 17,000 widely varying sales pitches that were laced with different combinations of words, assurances, and explanations for high yields and manageable risks.[163] For example, Mr. Abbott bought because his advisor, John Mark Holliday, assured him that Stanford was safe.[164] Ms. Suarez bought because her advisor, Maria Villanueva, said the CDs were secure and offered high interest rates.[165] Mr. Estefenn bought because his father and his financial advisor said the CDs were a good investment.[166] In a trial in this Action, individualized inquiries into the nature of the representations and omissions on which Plaintiffs allegedly relied, and the circumstances in which they occurred, will clearly predominate over any common issues.

**3. Individual Issues of Reliance Predominate**

In addition to individualized inquiries regarding misrepresentations, unique reliance issues will prevent common adjudication. Because Stanford CDs were not traded in an efficient market, Plaintiffs cannot satisfy this obligation by presuming that every alleged misstatement was reflected in the CDs' prices. *See generally Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014). Moreover, Plaintiffs admit that they must also show that their reliance on any omission was justifiable. *See* Pls.' Br. at 31. Whether any reliance was justifiable is an inherently individualized question. To prove fraud, a plaintiff must generally show that "the party acted in reliance upon" an alleged representation or omission. *E.g.*, *Johnson & Higgins*, 962 S.W.2d at 524. Plaintiffs' civil conspiracy claim also requires a showing of reliance because it requires proof

---

[163] Cases, such as this one, that are grounded in misrepresentations cannot be automatically transformed into omissions cases through artful re-characterization. *See, e.g.*, *Regents of Univ. of Cal.*, 482 F.3d at 384 (5th Cir. 2007) (finding that "[m]erely pleading that defendants failed to fulfill . . . [a] duty [to disclose material information] by means of a scheme or an act, rather than by a misleading statement, does not entitle plaintiffs to employ" *Affiliated Ute* presumption); *Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988) (stating that *Affiliated Ute* presumption does not apply where "[n]on-disclosure is relevant only as it makes the statements either false or misleading").

[164] *See* App. 1416-17 [Abbott Dep. Tr. at 46:13-47:7].

[165] *See* App. 1622, 1629-30 [Suarez July 1, 2015 Dep. Tr. at 80:2-11, 118:23-119:21].

[166] *See* App. 1678 [Estefenn July 2, 2015 Dep. Tr. at 47:5-20].

of an underlying tort (here, fraud). *See,e.g.*, *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577, 582-83 (Tex. 2001) (if underlying fraud claim fails, the fraud-based conspiracy claim fails as well). Thus, Plaintiffs will need to demonstrate that each of the roughly 17,000 Stanford investors who make up the proposed class relied upon common misrepresentations or omissions in making their purchases of SIBL CDs.[167] The evidence, however, demonstrates that the putative class members bought CDs following tens of thousands of widely varying conversations that took place in innumerable conference rooms, offices, and investors' kitchens and living rooms, as well as over the phone, in emails, faxes, and other writings.

**a. Courts Refuse to Certify Classes Based On Reliance Grounds**

"The element of reliance cannot be proved on a class-wide basis through evidence common to the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013); *Sandwich Chef, Inc. v. Nat'l Ins. Co.*, 319 F.3d 205, 219-20 (5th Cir. 2003). Courts in the Fifth Circuit—including this Court—have consistently held that "a fraud class action cannot be certified when individual reliance will be an issue." *Regents of Univ. of Cal.*, 482 F.3d at 383; *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 321-22 (5th Cir. 2005) (same); *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973) ("If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action."); *In re Enron Corp.*, 2006 WL 1662596, at *17 (S.D. Tex. June 7, 2006).

---

[167] Although Plaintiffs argue that the TSA "does not require an investor to show that she relied on a defendant's omissions when purchasing the fraudulent security," Pls.' Br. at 31, the TSA explicitly provides for liability only when a person buys a security that was sold "by means of" an untruth or omission. Art. 581-33(A)(2). Courts have interpreted that language to mean that the alleged untruth or omission must have "induced" the purchase. *See Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied); *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1419 n.24 (5th Cir. 1993). As a consequence, at a minimum, it will be an individualized issue for each class member whether he or she indeed was not told about or did not know or suspect the alleged omission. That is, an omission as to each individual class member cannot simply be assumed under the law; it must be proven individually. *See, e.g.*, *Proppant Solutions, LLC v. Delgado*, 2015 WL 4299503, No. 01–14–00800–CV, at *14 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (stating that plaintiff must prove in omissions case both that it was ignorant of alleged omission and did not have equal opportunity to discover truth).

Indeed, in *Gyarmathy*, this Court rejected a plaintiff's request for the Court "to infer class-wide reliance and avoid the problems in individualized proof." The Court concluded that "[i]ndividual issues of reliance or cause in fact preclude class certification of fraud [claims]." 2003 WL 21339279 at *2. This Court reached a similar ruling in *Bell v. Ascendant Solutions*, commenting that, "[l]acking the presumption of reliance, the question of individual reliance must be proved for each Plaintiff, and the Rule 23 requirement of predominance is not established." 2004 WL 1490009, at *5.

Here, as in *Gyarmathy* and *Bell*, determining whether and to what extent each putative class member relied on alleged misrepresentations and/or omissions will require individualized inquiries into, *inter alia*: (i) the specific representations and/or omissions made to each investor (which varied greatly); (ii) when each investor invested and what information was available to such investor at that time; (iii) what diligence each investor performed in connection with his or her investment; (iv) each investor's risk tolerance; and (v) each investor's sophistication. These individualized inquiries defeat predominance. *See, e.g.*, *Castano*, 84 F.3d at 743 n.15 (describing how numerous "factual differences"—*e.g.*, differences in class members' knowledge, risk exposure, and relevant time periods—predominate over common problems).

**b. There Is No Presumption of Reliance**

Plaintiffs argue that the Court "may" apply a "presumption of reliance" because they have alleged a purportedly "uniform" and "consistent" omission. Pls.' Br. at 31-32. But that is not the law. Numerous courts in this Circuit, again including this Court, have made it clear that presumptions of reliance apply only in discrete and unique situations, none of which is present here. For instance, the *Affiliated Ute* presumption applies only to federal securities cases brought under 17 C.F.R. 240.10b-5 ("Rule 10b-5"), not to common law fraud claims, such as those asserted in this Action. *See Gyarmathy*, 2003 WL 21339279, at *3 n.6 ("The Fifth Circuit has rejected extending an *Affiliated Ute* presumption beyond fraud on the market securities theories to

this sort of class action context. This Court declines to rush in where the Fifth Circuit fears to tread."); *Simms v. Jones*, 296 F.R.D. 485, 509-10 (N.D. Tex. 2013).[168] Nor does the *Affiliated Ute* presumption apply to claims for affirmative false and misleading statements or "mixed claims" that Plaintiffs allege here, which consist of both affirmative misrepresentations and omissions. *See Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988).[169] In fact, "the vast majority of states have never adopted a rule allowing reliance to be presumed in common law fraud cases, and some states have expressly rejected such a proposition." *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 221-22 (E.D. La. 1998) (collecting cases). Because Plaintiffs are not entitled to a presumption of reliance, individualized inquiries into each putative class member's reliance will defeat predominance.

**4. Individual Issues of Causation Predominate**

Predominance is also lacking when questions of causation require individualized inquiry. *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602-04 (5th Cir. 2006). For each of their claims, Plaintiffs must show a nexus between Defendants' alleged wrongful conduct and their purported injury. *See, e.g.*, *Troice v. Proskauer Rose LLP*, No. 3:09-CV-1600-N, 2015 WL 1219522, at *9, *11-12 (N.D. Tex. Mar. 4, 2015) (Godbey, J.) (noting that causation is question of fact for claims for aiding and abetting fraud, aiding and abetting violations of the TSA, and civil conspiracy). Plaintiffs try to plead causation by asserting that "Defendants' actions, in combination with the actions of R.A. Stanford and Jim Davis, are a *proximate cause* of actual damages to Plaintiffs and the Class."[170] Plaintiffs' Motion argues that "*but for* the Banks having

---

168 Plaintiffs' reliance on various Southern District of New York cases, *see* Pls.' Br. at 32, is likewise misplaced. These cases speak only to individual plaintiffs with an evidentiary record of reasonable reliance. *See, e.g.*, *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 452 (S.D.N.Y. 2013). These cases cannot be applied here given that approximately 17,000 global investors bought SIBL CDs in differing circumstances.

169 *Affiliated Ute* does not apply where the omission is relevant only to the extent it renders the affirmative statements false or misleading, as is the case here where Stanford allegedly failed to state or omitted his role in a Ponzi scheme. *See Smith*, 845 F.3d at 1363.

170 SAC ¶¶ 432 (emphasis added); *see also id.* ¶ 442.

provided the critical infrastructure and services by which investors' funds flowed to and through SIBL and into R.A. Stanford's pockets, R.A. Stanford's scheme could not have begun, much less persisted as long as it did." Pls.' Br. at 20 (emphasis added).

The requisite causation inquiry, however, requires evaluation of the allegations behind Plaintiffs' claims. Here, Defendants are alleged to have performed different services for SIBL, had different interactions with different investors (or none at all), and were supposedly aware of Stanford's fraud in different ways.[171] Putative class members' claims also vary in terms of how putative class members interacted with Defendants, where they lived, when they purchased SIBL CDs, how they paid for the SIBL CDs, and how SIBL treated the funds.[172] These differences make it impossible for the Court to resolve causation on a class-wide basis. *See Steering*, 461 F.3d at 602-04; *Robertson v. Monsanto Co.*, 287 F. App'x 354, 362-63 (5th Cir. 2008); *Nola v. Exxon Mobil Corp.*, No. 13-439-JJB, 2015 WL 2338336, at *7 (M.D. La. May 13, 2015).

Plaintiffs' theory is that Defendants should have realized that Stanford was operating a Ponzi scheme and severed all ties with him, at which point, they contend, the scheme would have stopped and their injury would have been prevented. *See* Pls.' Br. at 4, 20-21. In order to prevail on this theory, Plaintiffs must demonstrate for each putative class member that each Bank's separation from Stanford would have prevented that investor's losses. This is a highly individualized inquiry. And the record indicates that Plaintiffs could not carry their burden. For example, Ms. Penhos was warned in 2007 that Stanford was involved in money laundering, but kept on investing.[173] Mr. Abbott was warned in 2008 that his Stanford investments were uninsured and his money was at risk, but he also continued to invest new money.[174] Indeed, Plaintiffs allege that both Bank of America and Chase severed their relationships with Stanford in

---

171 *See, e.g.*, *id.* ¶¶ 100-01, 168, 238, 261-67, 277, 279, 314, 323, 325, 348-49, 360, 373-75, 388-89, 401-04.

172 *See, e.g.*, *id.* ¶¶ 12-17, 127-30, 420.

173 *See* App. 1546-48 [Penhos Dep. Tr. at 86:11-88:5].

174 *See* App. 1418-21 [Abbott Dep. Tr. at 72:23-75:14]; App. 834 [Dep. Ex. 51].

the 1990s, but putative class members kept on investing.[175] Given how Plaintiffs frame their claims, they cannot prove causation on a class-wide basis.

In addition, Plaintiffs are wrong that the TSA operates as a type of strict liability statute that immunizes them from the need to prove a link between Defendants' conduct and their purported injuries. The language of the TSA provides for liability only when a person buys a security that was sold "by means of" an untruth or omission. Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2). Courts have consistently interpreted this language to mean that the alleged untruth or omission must have "induced" the purchase.[176] Moreover, to establish "aider" liability, Plaintiffs must prove that Defendants materially aided Stanford in committing the underlying securities violation. That requires proof of an additional causal link between the Defendants' conduct and the purchases at issue. Plaintiffs thus err in suggesting that the possibility of "joint and several" liability relieves them of the need to prove causation.[177]

#### 5. Plaintiffs Did Not Provide a Methodology for Calculating Damages on a Class-Wide Basis

Class certification is also inappropriate because Plaintiffs have not provided a damages methodology that can be applied on a class-wide basis and thus have not established that common issues of damages will predominate. *See Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 308 (5th Cir. 2003) ("class certification is not appropriate" where plaintiffs have "clearly failed to demonstrate that the calculation of individualized actual economic damages, if any, suffered by the class members can be performed in accordance with the predominance requirement").

In their moving papers, Plaintiffs did not submit a damages expert declaration and dealt with damages only in passing, saying that the "Receiver's team" would figure them out. Pls.' Br.

---

[175] SAC ¶¶ 212-15, 367.

[176] *Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied); *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1419 n.24 (5th Cir. 1993).

[177] As Plaintiffs' damages expert was forced to concede, "joint and several" liability is a "method of recovery" that potentially applies after liability attaches; it does not eliminate a plaintiff's need to prove causation. *See* App. 3036, 3037-38 [Alexander Dep. Tr. at 135:3-12, 136:16-137:2]; App. 2807 [Alexander Decl. ¶ 15].

at 55. Plaintiffs indicated that they would follow the Receiver's net loss calculations, by which the Receiver adds up the investors' deposits of principal, subtracts all interest, and subtracts all payouts or withdrawals of any kind, to reach a net number of "deposited cash lost."[178] But the Receiver's calculations take into account investments that could go back to the 1990s.[179] Thus, the Receiver does not limit himself to purchases during the August 24, 2004 – February 16, 2009 class period in this case.

Defendants responded with the declaration of highly-reputed Professor Kenneth Lehn, a professor at the business school at the University of Pittsburgh and the former chief economist of the SEC.[180] Professor Lehn opines that (1) "Plaintiffs fail to present a damages methodology that can be applied on a class-wide basis"; (2) the Receiver's net loss methodology "is not an appropriate methodology for calculating damages resulting from … [Defendants'] alleged misconduct on a class-wide basis"; and (3) "Plaintiffs fail to address potential conflicts among members of the purported class that make a class-wide damages methodology inappropriate."[181]

Plaintiffs then tried to repair their case by serving a seven-page rebuttal declaration from Mr. Lester Alexander, who generally opines that there is "sufficient data and information" to calculate damages on a class-wide basis.[182] This declaration is untimely given Plaintiffs' burden and can be set aside on that basis alone. *See, e.g.*, *Green*, 46 F.3d at 465. Moreover, it contradicts Plaintiffs' prior assertions that they would rely on the claims calculations in the Receivership

---

178 *See, e.g.*, App. 2913 [Russell Dep. Tr. at 92:3-23].

179 *See, e.g.*, App. 2914-15 [Russell Dep. Tr. 93:15-94:18].

180 *See* Appendix F for Professor Lehn's credentials. *See also* App. 2080 [Lehn Decl. ¶¶ 1-2, Ex. A].

181 App. 2081 [Lehn Decl. ¶ 9].

182 App. 2804 [Alexander Decl. ¶ 8]. Plaintiffs' selection of Mr. Alexander, an accountant, as their damages rebuttal spokesperson is interesting given his background. Mr. Alexander previously testified for banks in another Ponzi case that sophisticated fraudulent schemes, during the time period of the Stanford Ponzi scheme, are difficult for banks to detect and that internal controls, internal and external audits, bank monitoring, and other traditional risk management activities do not generally detect such frauds. *See* App. 3013-15, 2017-18 [Alexander Dep. Tr. at 28:4-30:18, 32:18-33:15]; App. 913, 915, 917-18 [Alexander Dep. Ex. 3 ¶¶ 6-7, 11, 14]. Mr. Alexander stated in this Action that he continues to agree with these statements. *See* App. 2013-15, 2017-18 [Alexander Dep. Tr. at 28:4-30:18, 32:18-33:15].

process. *See* Pls.' Br. at 6, 55.

Plaintiffs now argue that Mr. Alexander's team "will use data, records and information available to the Receiver" to calculate damages at some future date.[183] This belatedly-asserted position is still defective.

First, any damages calculation based on the Receiver's records will necessarily turn on unreliable information submitted by each purported class member with respect to issues such as their accounts, deposits, withdrawals, and collateral sources of recovery.[184] REDACTED

[185] Moreover, the discrepancies between the Receiver's calculations and the Joint Liquidators' calculations should set off alarm bells. REDACT REDACTED[186] REDACTED [187] In short, Plaintiffs intend to build a damages model using fatally tainted records.

Second, Plaintiffs cannot satisfy their burden on class certification through conclusory predictions that "common proof [of damages] *will be* offered at a later stage in the proceedings." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 152 (N.D. Tex. 2014); *see also In re BP P.L.C. Sec. Litig.*, No. 4:10-md-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (plaintiffs "failed to meet their burden of showing that damages can be measured on a class-wide basis consistent with their theories of liability" with proposed damages calculations via an event

---

183 App. 2807 [Alexander Decl. ¶ 16].

184 *See, e.g.*, App. 2092-95 [Lehn Decl. ¶¶ 32-39].

185 *See, e.g.*, App. 1388-93 [Queyrouze Dep. Tr. at 267:5-272:14].

186 *See* App. 35.

187 *See id.*

study that had yet to be created). Plaintiffs now concede that the Receiver's claim calculations do not measure their supposed damages, but Mr. Alexander does not provide any alternative methodology for conducting such computations for each class member. Moreover, he acknowledges that there are gaps in the Receiver's records, but weakly suggests they can be "remediated."[188] As in *Kosmos,* Plaintiffs' "submissions are akin to no evidence at all" and "ought to end the Court's predominance inquiry." 299 F.R.D. at 151.

Third, Fifth Circuit precedent mandates the denial of certification where "plaintiffs' damage claims 'focus almost entirely on facts and issues specific to individuals rather than the class as a whole,'" making "individualized calculations of damages predominate." *O'Sullivan*, 319 F.3d at 744-45; *accord Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998). Here, the Receiver's net loss approach requires precisely these verboten "calculations that are performed and adjusted based on the investment history and supporting documents provided by each investor."[189] Mr. Alexander's yet-to-be-created damages model relies on this same investor-specific information.[190] Mr. Alexander's calculations also will need to "include adjustments for the amount claimants received through other forums," and he concedes that this information needs to be obtained, at least in part, from each claimant.[191] Discovery from the proposed class representatives has already demonstrated that this information is unreliable and inaccurate.[192]

These individualized facts and issues also create potential conflicts among the members of the proposed class.[193] For instance, Mr. Alexander baldly asserts that "[t]he Plaintiffs' individual

---

188 App. 3020 [Alexander Dep. Tr. at 69:11-23]; App. 2806-07 [Alexander Decl. ¶ 13]; *see also* App. 2941-43 [Russell Dep. Tr. at 150:21-152:10]. Mr. Alexander admitted that he had "not tested the reliability of what … [he had] been told by the [R]eceiver's experts" about the available data, nor had he independently verified whether any additional gaps in the Receiver's records exist. App. 3033-34 [Alexander Dep. Tr. at 131:17-132:9].

189 App. 2092 [Lehn Decl. ¶ 31].

190 *See* App. 2805-07 [Alexander Decl. ¶¶ 11-12, 16].

191 *See* App. 2805 [Alexander Decl. ¶10]; *see also* App. 3031-32 [Alexander Dep. Tr. at 116:18-117:25].

192 *See* App. 2092-05 [Lehn Decl. ¶¶ 32-39].

193 *See* App. 2095-96, 2103-06 [Lehn Decl. ¶¶ 39-41, 57-63].

tax status is irrelevant to the determination of class-wide damages,"[194] but the testimony of the Receiver's representative makes clear that investors' tax benefits directly impact who gets paid.[195] Mr. Alexander concedes that there is potential variability in putative class members' ability to claim theft loss deductions based on the jurisdictions in which they pay taxes, and also variability in their ability to use such losses to offset income.[196] Additionally, putative class members who return so-called "preference payments" pursued by the Joint Liquidators will be situated differently from those who retain such payments, yet Mr. Alexander makes no mention of how his approach will address such differences.[197]

Fourth, to survive class certification, Plaintiffs' theory of damages "must be consistent with its liability case." *Comcast*, 133 S. Ct. at 1433.[198] The Supreme Court has rejected the argument that "at the class-certification stage any method of measurement is acceptable so long as it can be applied class-wide, no matter how arbitrary the measurements may be." *Id.* "Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* Under *Comcast* and its progeny, a reliable class-wide damages methodology must consider losses incurred by investors "but for" "Defendants' alleged wrongful conduct." *In re BP P.L.C. Sec. Litig.*, No. 4:10-md-2185, 2014 WL 2112823, at *1 (S.D. Tex. May 20, 2015) (noting *Comcast* provides this mandate). Mr. Alexander opines that the "but for" world is "irrelevant" to any damages methodology here because he assumes that "Defendants' liability is joint and several

---

[194] *See* App. 2807-08 [Alexander Decl. ¶ 17].

[195] *See* App. 2916-20[Russell Dep. Tr. at 107:11-108:3, 112:16-114:5].

[196] *See* App. 3026-28 [Alexander Dep. Tr. at 85:1-86:21, 88:1-14].

[197] *See* App. 2095-96 [Lehn Decl. ¶¶ 40-41].

[198] *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) (Pls.' Br. at 20), does not provide for a different analysis. In that case, the Fifth Circuit declined to apply *Comcast*, as the district court had previously determined that liability and damages determinations would be bifurcated, class counsel was moving for final class certification for settlement purposes, and "the district court's inquiry into predominance was never premised on … a [damages] formula." *Id.* at 817. None of these circumstances applies here, as Plaintiffs have not requested bifurcation, class certification is not premised on settlement proceedings, and Plaintiffs claim that damages can be calculated on a class-wide basis. *See* Pls.' Br. at 55. Indeed, the Fifth Circuit recently stated that "by its terms *Deepwater Horizon* applies only to classes where predominance was based on the commonality of liability, not, as here, liability and damages, where we ask whether in operation the commonality is undone by the damages theory." *Ludlow v. BP, P.L.C.*, No. 14-20420, 2015 WL 5235010, at *5 n.36 (5th Cir. Sept. 8, 2015).

with Stanford when liability attaches."[199] However, the cases cited in Mr. Alexander's declaration and in Plaintiffs' brief do not support this proposition,[200] and they do not remove Plaintiffs' burden at the class certification stage to provide a damages model "consistent with . . . [their] liability case." *Comcast*, 133 S. Ct. at 1433. An appropriate damages methodology must assess the effect of Defendants' alleged misconduct on investor losses, which here would require inquiry into each investor's background, knowledge and experience, and individual investing decisions.[201]

Plaintiffs also make no effort to calculate damages based on the proposed class period or to tie damages to Defendants' alleged acts during the class period. For example, Plaintiffs claim that "the proposed class is limited to include only those investors whose claims have been allowed by the Receiver," but the Receiver's determination of allowed claim amounts includes investments that took place prior to the start of the class period.[202] As a result, Plaintiffs' proposed class includes individuals and losses that need to be excluded from any damages determination. *See Ludlow*, 2015 WL 5235010, at *10-11 (affirming denial of class certification where damages model could not be applied on class-wide basis because it failed to separate plaintiffs who did not fall within theory of liability). Plaintiffs' Motion further does not explain how putative class members with barred "holder" claims as of August 23, 2004 would be identified and excluded from the proposed class.[203] Similarly, Plaintiffs' proposed class would need to exclude any "net

---

[199] App. 2807 [Alexander Decl. ¶ 15]. Mr. Alexander testified that Plaintiffs' counsel instructed him that "the TSA applies and liability judgments can be enforced joint [and] severally," and he proceeded from those instructions in rendering his opinion in this action. App. 3030 [Alexander Dep. Tr. at 98:5-25, 132:24-133:15].

[200] App. 2807 [Alexander Decl. ¶ 15]; Pls.' Br. at 21 n.7, 29-30.

[201] *See* App. 2097-2103 [Lehn Decl. ¶¶ 42-56.]; *see also Bell Atl. Corp.*, 339 F.3d at 306 ("[a]ny reasonable approximation of the damages actually suffered by the various class members would instead require a much tighter inquiry" into circumstances of individual class members, resulting in "individual issues concerning damages predominat[ing] over questions common to the proposed class").

[202] *See* Pls.' Br. at 19; *see also* App. 2087 [Lehn Decl. ¶ 21]; Order, *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298-N (N.D. Tex. May 4, 2012), Dkt. No. 1584, at 46-47.

[203] Here, Plaintiffs define the class as *purchasers* of SIBL CDs during the class period, *not* holders. *See* Pls.' Br. at 17; *see also* SAC ¶ 420. This definition differs from the way plaintiffs have defined the proposed class in the *Proskauer*, *Willis*, and *Pershing* cases. *See, e.g.*, Br. in Supp. of Pls.' Opposed Mot. for Class Certification, For Designation of Class Representatives and Class Counsel at 29-30, *Troice v. Proskauer Rose LLP*, No. 3:09-cv-01600 (N.D. Tex. Apr. 20, 2015), Dkt. No. 193; Br. in Supp. Of Pls.' Opposed Mot. for Class Certification And For

winners," as such investors have not suffered any damages and thus cannot recover funds as part of a proposed class. *See Janvey v. Brown*, 767 F.3d 430, 441 (5th Cir. 2014). Plaintiffs fail to explain how any of these categories of investors could be identified and excluded from the proposed class, other than Mr. Alexander's vague claim that he believes there is "sufficient" information available from a "warehouse" and "backup tapes" to calculate damages.[204] Empty "assurances" do not meet Plaintiffs' burden to demonstrate that damages can be determined on a class-wide basis. *See Castano*, 84 F.3d at 742 ("Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any problems with predominance … can be overcome.").

**C. Adjudicating Plaintiffs' Claims Against Five Banks and One Individual Under the Banking Laws of Four Countries and the Substantive Laws of 106 Countries and 47 States Would Be Wholly Unmanageable**

Under Plaintiffs' vision of this case, the Court and the jury will be required to adjudicate the liability of six Defendants under four countries' banking regulatory regimes and the substantive laws of over 150 jurisdictions, taking into account the different timelines and fact patterns asserted against each Defendant. No jury in the world could handle such a task. Nor should one have to.

Courts have broad discretion within the Rule 23 framework to determine whether to certify a class action, including determining whether a class action is manageable under the factors set forth in Rule 23(b)(3)(A) – (D). *See Castano*, 84 F.3d at 740. When conducting the manageability inquiry, "[p]ertinent difficulties encompass [] the whole range of practical problems that may render a class action format inappropriate in a particular suit." *Ticknor*, 592 F. App'x at

Designation of Class Representatives and Class Counsel, at 20-21, *Troice v. Willis of Colorado Inc.*, No. 3:09-cv-01274-N-BG (N.D. Tex. Apr. 20, 2015), Dkt. No. 227; Pls.' Mot. for Class Certification, For Designation of Class Representatives and Class Counsel at 2-3, *Turk v. Pershing, LLC*, No. 3:09-cv-02199 (N.D. Tex. Aug. 10, 2015), Dkt. No. 156.

204 App. 2804-05 [Alexander Decl. ¶ 8]; App. 3029, 3025 [Alexander Dep. Tr. at 64:6-20, 76:5-16]. Mr. Alexander has never accessed the warehouse records maintained by the Receiver, nor the backup tapes from the Joint Liquidators (tapes that the Receiver's forensic accountants also have never accessed or even requested). *See* App. 2944-47 [Alexander Dep. Tr. at 64:6-20, 72:15-73:14, 74:3-76:16]; App. 3019, 3021-25 [Russell Dep. Tr. at 174:16-175:3, 242:5-243:10].

278. In particular, Rule 23(b)(3)(D)'s manageability factor requires courts to ascertain whether variations in state law make the action unsuitable for class treatment. *See Castano*, 84 F.3d at 743-44 (finding that the lower court "failed to perform its duty to determine whether the class action would be manageable in light of state law variations"); *Lee*, 2002 WL 31230803, at *6 n.3 (citing *Castano* and noting that "manageability problems arise when the Court must engage in [] difficult choice-of-law determinations").

Plaintiffs highlight that the putative class here is "geographically dispersed" and comprised of Stanford investors from countries "around the world"—not to mention nearly all of the U.S. states.[205] Moreover, according to Plaintiffs' allegations, the applicable banking and regulatory standards that govern each Defendant's conduct are the laws of the foreign jurisdictions in which each Defendant is based—*i.e.*, Canadian standards for TD Bank; U.K. standards for HSBC; Swiss standards for SG Suisse; and U.S. standards for Trustmark and IB.[206] This means that numerous different countries' and states' substantive laws will apply to the claims asserted by different putative class members, as well as the defenses asserted by each Defendant.

If the proposed class is certified, the difficulties that this Court and, importantly, a jury will face in wading through the variations of applicable, and potentially conflicting, substantive laws and determining each of the asserted claims and defenses under the correct standards will be extraordinary. Indeed, Defendants' arguments regarding variations in governing law related to "predominance" likewise demonstrate that this class action is unmanageable. *See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.").

Plaintiffs recognize that the ultimate focus is how a class action could be tried on the

205 *See* Pls.' Br. at 7, 42, 50, 55.

206 *See* SAC ¶¶ 39, 45, 65, 70-71, 82-83.

merits.[207] Instead of grappling with these issues, however, Plaintiffs address manageability in cursory fashion, stating that "there are no unusual difficulties to managing this class action" because (i) the proposed class is comprised of individuals who have submitted claims to the Receiver for determination and (ii) distributions will be made pursuant to the Receiver's existing process.[208] This blithe response was never tenable given the individualized legal and factual issues in this Action, but now collapses given Plaintiffs' concession that the Receiver's claims process cannot be used as a proxy for their damages. Forced to confront this problem, Plaintiffs lean on Mr. Alexander's seven-page declaration to say "they'll figure it out in the future."[209] But this does not provide the Court with a workable plan for either adjudicating the liability of five Banks or determining damages for 17,000 individuals. By flat-out ignoring the insurmountable difficulties that this Court and a jury would face in adjudicating their claims, Plaintiffs fail to meet their burden of establishing that a class action is both manageable and superior.

## II. PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(a)

Under Rule 23(a), a class may only be certified if Plaintiffs show "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). Plaintiffs fail to satisfy these elements.[210]

---

207 *See* Pls.' Br. at 27.

208 *Id*. at 54-55.

209 *See* App. 2807 [Alexander Decl. ¶ 16].

210 Defendants disagree with Plaintiffs' contention that numerosity is satisfied because the Receiver has allowed over 17,000 claims in an alternate, non-class proceeding. *See* Pls.' Br. at 19. The group of Receiver "allowed" claimants is not co-extensive with Plaintiffs' proposed class because it is not limited by the class period or by the purchaser requirement or the necessity of having damages tied to Defendants' alleged misconduct. It is sheer speculation how many investors fit within the class definition. Add to this the large volume of investors that would have to be excluded from the class (foreign citizens, accredited investors, net winners, etc.), and Plaintiffs have failed to carry their burden on numerosity. *See Fleming v. Travenol Labs., Inc.*, 707 F.2d 829, 833 (5th Cir. 1983) (finding certification inappropriate where there is "no factual basis for determining whether the numerosity requirement has been met").

### A. Plaintiffs Have Not Established Commonality

Plaintiffs have failed to show that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2. To satisfy commonality, there must be a "common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 838 (5th Cir. 2012); *see also Wal-Mart Stores*, 131 S. Ct. at 2551 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."). "Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised." *Jimenez v. Allstate Ins. Co*., 765 F.3d 1161, 1165 (9th Cir. 2014).

Plaintiffs claim commonality is satisfied because the putative class members "suffered the same injury" based on the Banks "knowingly provid[ing] substantial assistance in furtherance of Stanford's scheme." Pls.' Br. at 20-21. This is just a recitation of elements from Plaintiffs' aiding and abetting fraud claim. If commonality required only that class members satisfy the same claim elements—which is not the case here given the differences in applicable laws—every putative class action would satisfy commonality. The Supreme Court rejected this tautological approach. *See Wal-Mart*, 131 S. Ct. at 2551 ("[T]he mere claim by employees of the same company that they have suffered . . . a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor.").

While Plaintiffs assert that the common driving question is whether "the Bank Defendants knowingly provided substantial assistance in furtherance of Stanford's scheme," Pls.' Br. at 21, Plaintiffs' allegations show this is not the case. This Action involves a hodge-podge of facts concerning five different Banks and one individual each having a unique set of reasons why it is

not responsible for Stanford's secret scheme.[211] These separate narratives cannot be globally combined into one forced trial. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("Where the defendant's allegedly injurious conduct differs from plaintiff to plaintiff … no common answers are likely to be found."); *Dvorin*, 2013 WL 6003433, at *6 (no commonality where plaintiffs' allegations do not address individualized circumstances regarding defendant's alleged duties to potential class members and non-uniform injuries); *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 478 (S.D. Fla. 2006) (finding a lack of commonality where there were "differences identified in the proposed class members' individual experiences").[212]

**B. Plaintiffs Have Not Established Typicality**

Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "[T]ypicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Dvorin*, 2013 WL 6003433, at *9. Important to this inquiry is "whether the class representative's claims have the same essential characteristics as those of the putative class." 5 Jerold S. Solovy *et al.*, Moore's Federal Practice § 23.24 (3d Ed. 2015).

Here, Plaintiffs assert that the named class representatives' claims "arise from the same set of omissions that defrauded all investors." Pls.' Br. at 23. This assertion is belied by Plaintiffs' deposition testimony, which shows that Plaintiffs received different information concerning the SIBL CDs in varying formats and from disparately-situated financial advisors. These variations

---

[211] *See* SAC ¶¶ 100-01, 168, 238, 261-67, 277, 279, 314, 323, 325, 348-49, 360, 373-75, 388-89, 401-04.

[212] The cases cited by Plaintiffs do not support a finding of commonality where, as here, the putative class members are dissimilar vis-à-vis Defendants. Plaintiffs rely on cases predating *Wal-Mart* and cases where all class members were similarly affected by the same conduct of the defendant(s). *See Anwar*, 289 F.R.D. at 109,111 (defendants engaged in a "common course of conduct" involving "similar material misrepresentations and omissions" in four feeder funds operated by the same partnership in which the plaintiffs invested); *Stott v. Capital Fin. Servs., Inc*., 277 F.R.D. 316, 324 (N.D. Tex. 2011) ("[A]ll of the class members invested in Provident through Capital Financial, creating at least one major issue of fact in common with all class members."); *Melo v. Gardere Wynne Sewell LLP*, No. 3-04-cv-2238-BD, 2007 WL 92388, at *1 (N.D. Tex. Jan. 12, 2007) (pre-*Wal-Mart* case brought by investors against single lawyer and his law firm that served as legal counsel to investment company); *In re Enron Corp. Sec*., 529 F. Supp. 2d 644, 672 (S.D. Tex. 2006) (pre-*Wal-Mart* case applying an "undemanding test" for commonality).

defeat typicality. *See In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459-60 (E.D. La. 2006); *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006).

All of the named Plaintiffs testified that they relied on oral assurances provided by their financial advisors in choosing to purchase SIBL CDs.[213] Since these oral assurances, coupled with the financial advice and information provided to investors, were unique and as idiosyncratic as the written materials received, typicality cannot be established. *See, e.g., Spencer v. Cent. States, Se. and Sw. Areas Pension Fund*, 778 F. Supp. 985, 989-91 (N.D. Ill. 1991) (finding that class did not meet typicality requirement when there were varied oral representations made to 2,000 employees at 27 different meetings).

The proposed class representatives also fail to satisfy the typicality requirement of Rule 23(a)(3) as they meaningfully differ from the absent class members with respect to the legal claims and defenses available to them. For example, certain putative class members are accredited investors who received different materials and are treated legally as sophisticated investors. *See Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) (finding certification was properly denied where representative was sophisticated investor, which "might make him a weak representative since the Fund could argue that [he] did not exercise due diligence in relying on any reckless omissions or misrepresentations"). Mr. Queyrouze, for example, produced different sales materials in this case and testified that he is a "sophisticated investor" with the ability to "analyze risk somewhat better than a nonaccredited investor."[214] Accredited investors may not bring claims for aiding and abetting the sale of an unregistered security under the TSA as a matter of law. *See* 7 Tex. Admin. Code. § 139.19 (2015); Tex. Rev. Civ. Stat. Ann. art. 581-33(F)(2) (2015). While Plaintiffs allege that all U.S. investors had to be accredited, the same was not required of investors

---

[213] *See, e.g.*, App. 1623 [Suarez July 1, 2015 Dep. Tr. at 82:9-20]; App. 1412 [Abbott Dep. Tr. at 37:11-23]; App. 1683-84 [Estefenn July 2, 2015 Dep. Tr. at 84:19-85:2]; App. 1549 [Penhos Dep. Tr. at 99:10-15] App. 1355 [Queyrouze Dep. Tr. at 56:4-8].

[214] *See* App. 1365-66 [Queyrouze Dep. Tr. at 137:25-138:22]; App. 715-38 [Dep. Ex. 41].

residing outside of the United States.[215] As a result, Mr. Queyrouze would be barred from bringing this claim and is not typical of the broad class. *See Consor v. Occidental Life Ins. Co. of Cal.*, 469 F. Supp. 1110, 1115 (N.D. Tex. 1979) (finding named representative plaintiff who did not have claim under relevant statute "does not possess the same interest and suffer the same injury as other potential class members"). Any other accredited investors would similarly be precluded from asserting this claim, placing them in conflict with other members of the class.

### C. Plaintiffs Have Not Established Adequacy

Class certification should further be denied because Plaintiffs have not shown that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The adequacy requirement mandates an inquiry into the willingness and ability of the putative class representatives to "take an active role in and control the litigation to protect the interests of the absentees." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532 (N.D. Tex. 2005). In addition, "[t]he adequacy inquiry . . . serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *Ogden*, 225 F.R.D. at 532.

#### 1. There Are Serious Questions About the Integrity, Honesty, Credibility, and Conscientiousness of the Class Representatives

Courts examine integrity, honesty, conscientiousness, and other affirmative personal qualities to determine whether a named individual is an adequate class representative. *See Ogden*, 225 F.R.D. at 536; *Armour v. City of Anniston*, 89 F.R.D. 331, 332 (N.D. Ala. 1997) (same); *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (same). In addition, "[c]lass representatives must satisfy the court that they, and not counsel, are directing the litigation. To do

---

[215] Plaintiffs allege that SIBL CDs were sold in the U.S. to accredited investors only. *See* SAC ¶ 235; *see also* App. 1294 [Aff. of Beverly M. Jacobs, sworn Nov. 13, 2014, at ¶ 56, *Marcus Wide and Hugh Dickson v. The Toronto-Dominion Bank*, Court File No. CV-12-9780-00CL (Can. Ont. Sup. Ct.)] ("[T]here were special rules in place for U.S. residents who wished to purchase SIB products. In particular, U.S. residents had to qualify as 'accredited investors' pursuant to Regulation D of the *Securities Act of 1933*.").

this, class representatives must show themselves sufficiently informed about the litigation to manage the litigation effort." *Unger*, 401 F.3d at 321; *see Ogden*, 225 F.R.D. at 535 (class representatives "should understand the action in which [they are] involved, and [that] understanding should not be limited to derivative knowledge acquired solely from counsel"); *In re Enron Corp. Secs.*, 529 F. Supp. 2d at 726; *Karnes v. Fleming*, No. H-07-0620, 2008 WL 4528223, at *3 (S.D. Tex. July 31, 2008). In this case, there are troubling issues regarding the integrity, honesty, credibility, and conscientiousness of each of the class representatives.

**a. Diana Suarez**

Diana Suarez chose to become involved in this Action as a named Plaintiff only in June of this year. During discovery, serious questions emerged regarding her trustworthiness and reliability. For example, REDACTED .[216] REDACTED [217] REDACTED [218] With respect to her claim form submitted to the Joint Liquidators, Ms. Suarez initially said that the signature was hers, then said it was not hers, then said it might be hers; REDACTED [219] REDACTED [220] REDACTED

[216] *See* App. 684 [Dep. Ex. 95]; App. 1637-38, 1647-48 [Suarez July 1, 2015 Dep. Tr. at 158:9-21, 159:6-14, 169:18-170:4].

[217] *See* App. 1645-46, 1649-50 [Suarez July 1, 2015 Dep. Tr. at 167:16-168:12, 172:18-173:2].

[218] *See id.*

[219] *See* App. 1074 [Dep. Ex. 19 at SUAREZ_000160]; App. 1645, 1650 [Suarez July 1, 2015 Dep. Tr. at 170:12-17, 173:3-11]; App. 1101-03 [Dep. Ex. 150]; App. 2858-622 [Suarez Aug. 28, 2015 Dep. Tr. at 108:15-109:7, 109:22-110:25, 111:20-112:9].

[220] *See* App. 1637. 1639-40, 1642 [Suarez July 1, 2015 Dep. Tr. at 158:9-16, 160:10-161:22, 163:4-16].

REDACTED

Ms. Suarez also testified that she did not report interest received on her SIBL CDs on her U.S. tax returns for at least 2007 and was uncertain whether she reported interest income in other years.[221] REDACTED REDACTED [222] Ms. Suarez testified at the start of her deposition that she did not make any withdrawals, other than of earned interest, from her Stanford accounts before Stanford entered into receivership.[223] Later, REDACTED she admitted that her earlier testimony was incorrect.[224] These actions establish that Ms. Suarez is willing to misrepresent her circumstances—whether intentionally or inadvertently due to a lack of diligence—in order to cement her own recovery, even if doing so comes at the expense of the other SIBL CD investors whose interests she now seeks to represent.

In connection with her role as a putative class representative, Ms. Suarez has demonstrated a similar lack of diligence and interest in adequately representing the interests of absent class members. For example, Ms. Suarez failed to diligently search for and produce documents in advance of her deposition. She ultimately produced documents, many of which were in Spanish, *on the night before her deposition*,[225] and also produced certain critical documents *after* her initial deposition took place, requiring the parties to incur the time and expense to continue her deposition in Houston two months later. Even then, Ms. Suarez testified at her second deposition

---

221 *See* App. 2848, 2849-52, 2871 [Suarez Aug. 28, 2015 Dep. Tr. at 60:11-25, 63:22-64:17, 61:13-62:21, 151:6-15].

222 *See* App. 1641-42 [Suarez July 1, 2015 Dep. Tr. at 162:11-22, 163:17-21]; App. 710-11 [Dep. Ex. 154]; App. 2869-70 [Suarez Aug. 28, 2015 Dep. Tr. at 131:1-132:20].

223 *See* App. 1632-33 [Suarez July 1, 2015 Dep. Tr. at 139:23-140:2].

224 App. 1653-55 [Suarez July 1, 2015 Dep. Tr. at 227:23-229:22]; App. 766-68 [Dep. Ex. 12 at 28-30]; App. 828-32 [Dep. Ex. 142]; App. 2853-57, 2864-68 [Suarez Aug. 28, 2015 Dep. Tr. at 65:3-66:14, 67:13-69:4, 116:19-118:13, 119:11-120:18]; App. 1105-08 [Dep. Ex. 151].

225 *See* App. 1607-11 [Suarez July 1, 2015 Dep. Tr. at 11:15-15:21].

that she still had not searched for requested responsive documents.[226] Ms. Suarez repeatedly indicated during her deposition that she would defer to her lawyers instead of actively directing this litigation[227] and she could not articulate the substantive allegations that Plaintiffs have asserted against Defendants.[228] Ms. Suarez admitted that she has not spent much time on the case[229] and is not aware of the basic procedural history in the case—for example, that some of the original named class representatives have withdrawn[230] or that OSIC intervened and is a party to this Action.[231] Ms. Suarez's lack of knowledge regarding this case, as well as her own claims,[232] is not surprising in light of her admission that she at one point "gave up" on the Stanford matter and assigned a power of attorney for all of her Stanford claims to her son, Gabriel.[233] REDACTED

REDACTED[234]

**b. Salim Estefenn**

Mr. Estefenn's credibility and trustworthiness are also in doubt. Like Ms. Suarez, Mr. Estefenn submitted a proof of claim form that included misrepresentations concerning his Stanford accounts. REDACTED

---

[226] App. 2846-47 [Suarez Aug. 28, 2015 Dep. Tr. at 23:1-14, 25:19-25]; *see* App. 2589-91 [July 16, 2015 Letter from L. Neuner to Plaintiffs' Counsel at 1-3]; App. 3004 [Sept. 16, 2015 Letter from L. Neuner and P. Kazanoff to Plaintiffs' Counsel at 2].

[227] *See, e.g.*, App. 1615-16 [Suarez July 1, 2015 Dep. Tr. at 65:6-15 ("But, really, we have the lawyers, because they are the ones that know more about all this stuff, and I let them to—to do what they should do."), 66:12-23 (testifying that she merely skimmed the operative Complaint, explaining that "it was too much to read and I wouldn't understand everything, and that's why I hired [counsel]")].

[228] *See* App. 1617 [Suarez July 1, 2015 Dep. Tr. at 67:4-68:10].

[229] *See* App. 1613 [Suarez July 1, 2015 Dep. Tr. at 53:14-17].

[230] *See* App. 1614 [Suarez July 1, 2015 Dep. Tr. at 55:13-19].

[231] *See* App. 1618-19 [Suarez July 1, 2015 Dep. Tr. at 68:19-69:3].

[232] *See* App. 1634-35 [Suarez July 1, 2015 Dep. Tr. at 152:15-23 (testifying that she was not aware that her son, Gabriel Suarez, had filed an objection to the Receiver's notice of determination of her claim), 154:13-155:24 (testifying incorrectly that she had only received one check from the Receiver)]; App. 1094-99 [Dep. Ex. 15].

[233] *See* App. 2862-63, 2872[Suarez Aug. 28, 2015 Dep. Tr. at 112:18-113:19, 159:13-24]. Plaintiffs initially substituted Gabriel Suarez as a class representative in this Action in May 2015, but subsequently sought the Court's permission to withdraw him and substitute Ms. Suarez as a class representative. *See* Dkt. Nos. 237, 238, 278, 279. During his deposition, Mr. Suarez testified that he was only eighteen years old when his mother first bought SIBL CDs in 2006. *See* App. 1332-33 [Gabriel Suarez Dep. Tr. at 40:5-11, 102:24-25].

[234] *See* App. 946 [SUAREZ_001522 – SUAREZ_001530 at SUAREZ_00525].



REDACTED [235] In addition, Mr. Estefenn testified that he used his Stanford account for purposes that raise questions concerning his credibility, REDACTED .[236] After Stanford went into receivership, Mr. Estefenn solicited and received money and confidential investment information from other investors, purportedly to help them manage their Stanford-related claims.[237] REDACTED [238] REDACTED [239] His receipt of money for assisting other claimants is also antithetical to Rule 23.

In connection with this Action, Mr. Estefenn signed a declaration that included numerous false statements regarding his CD purchases; he later admitted that it was inaccurate.[240] Although Mr. Estefenn signed a revised declaration *the night before his deposition* that purported to correct some of the errors in the original declaration, he testified that even the revised declaration was still inaccurate.[241] Mr. Estefenn, like Ms. Suarez, failed to diligently search for and produce

---

235 *See* App. 999-1014 [Dep. Ex. 117]; App. 1676-82 [Estefenn July 2, 2015 Dep. Tr. at 45:21-47:4, 59:4-13, 62:17-64:14].

236 *See* App. 1714-24 [Estefenn July 2, 2015 Dep. Tr. at 203:6-213:10] (discussing suspicious round-trip and currency exchange transactions).

237 *See* App. 2964-65, 2968-71 [Estefenn Sept. 10, 2015 Dep. Tr. at 329:11-330:2, 336:5-339:17 (claiming that money was used for expenses he incurred, but stating that he did not keep track of the funds or segregate them from his personal savings)].

238 *See id.*; App. 895 [Dep. Ex. 159 at URIBE_009022]; App. 891-93 [Dep. Ex. 160].

239 *See* App. 2972-78 [Estefenn Sept. 10, 2015 Dep. Tr. at 350:23-353:16, 358:15-360:11]; App. 970 [Dep. Ex. 162 at URIBE_011178].

240 *See* App. 1322-23 [Dep. Ex. 127]; App. 1733-49 [Estefenn July 2, 2015 Dep. Tr. at 274:10-290:15].

241 *See* App. 1661-62 [Dep. Ex. 128]; App. 1747-49 [Estefenn July 2, 2015 Dep. Tr. at 288:11-290:15].

documents prior to his first deposition,[242] requiring Defendants to depose him a second time two months later after forcing a more complete production.

There are other serious questions concerning Mr. Estefenn's ability to represent absent class members. Although Mr. Estefenn testified that he seeks to recover the interest earned on his SIBL CDs, he stated that he does not know if other putative class members should recover their interest and, moreover, believes that it is their own responsibility to pursue.[243] When asked about the amount of time he has spent working on this case, Mr. Estefenn testified that it is class counsel's work, not his.[244] Indeed, while Mr. Estefenn quickly tabbed through one of the two complaints filed by OSIC,[245] he admitted that he has reviewed neither the operative SAC nor Plaintiffs' Motion.[246] Mr. Estefenn joined this case only in May of this year and could not articulate even a basic understanding about the various Banks' involvement with Stanford, again deferring to counsel.[247] Mr. Estefenn's demonstrated lack of regard for the legal process and the interests of the absent class members renders him an inadequate class representative.

**c. Sarah Elson-Rogers**

Sarah Elson-Rogers also submitted a false declaration regarding her CD purchases.[248] Although her declaration consists of less than two pages, Ms. Elson-Rogers testified that she simply did not review a number of factual statements in the declaration concerning her CD purchases before she signed it.[249] Furthermore, like other named Plaintiffs, Ms. Elson-Rogers is

---

242 *See* App. 167-71 [Estefenn July 2, 2015 Dep. Tr. at 9:21-10:13].

243 *See* App. 1729-30 [Estefenn July 2, 2015 Dep. Tr. at 259:16-260:3].

244 *See* App. 1707 [Estefenn July 2, 2015 Dep. Tr. at 171:19-25] ("Not too much. It's [class counsel's] work, it's not mine.").

245 *See* App. 1708-11 [Estefenn July 2, 2015 Dep. Tr. at 172:9-12, 173:6-10, 174:21-175:6].

246 *See* App. 1711 [Estefenn July 2, 2015 Dep. Tr. at 175:2-6].

247 *See* App. 1726-28, 1730-31 [Estefenn July 2, 2015 Dep. Tr. at 245:24-246:13, 247:17-22 ("As I said, it's their investigation, not my responsibility."), 270:11-17 ("The whole investigation about the bank – has been done by lawyers."), 272:8-17].

248 *See* App. 1319-20 [Dep. Ex. 70]; App. 1483-88, 1518-20 [Elson-Rogers Dep. Tr. at 86:11-91:25, 293:4-295:23].

249 *See id.*

unsure whether she reviewed key documents, including Plaintiffs' Motion, and admitted that she has not reviewed any of the complaints filed by OSIC or any of the exhibits to the Motion.[250] Ms. Elson-Rogers has not reviewed her own U.S. tax returns and is unsure whether she reported interest earned on her SIBL CDs when she filed her taxes in the United States.[251] She confirmed, however, that she made a loss claim on her tax returns in connection with her SIBL CDs.[252] Ms. Elson-Rogers REDACTED ,[253] nor has she complied with Defendants' requests that she produce her tax returns in this Action. REDACTED [254] Ms. Elson-Rogers said she does not have *any* understanding of how the Receiver calculated her allowed claim amount, even though Plaintiffs' Motion states that they will rely on the Receiver's calculations to make distributions.[255] Unsurprisingly, Ms. Elson-Rogers admitted that she still has reservations about serving as a class representative.[256]

**d. Ruth Alfille de Penhos**

Ms. Penhos submitted an inaccurate declaration in this Action, which she admitted she did not read completely before signing under oath, reasoning that the declaration was sent to her by her lawyers and she would not distrust their direction.[257] Similarly, Ms. Penhos submitted an inaccurate proof of claim form to the Joint Liquidators. REDACTED

---

250 *See* App. 1463-65 [Elson-Rogers Dep. Tr. at 28:14-30:3].

251 *See* App. 1505 [Elson-Rogers Dep. Tr. at 149:1-16].

252 *See* App. 1505-06 [Elson-Rogers Dep. Tr. at 149:23-150:5].

253 *See* App. 1126 [STAN_TDBANK_000649-51 at STAN_TDBANK_000650].

254 App. 2605 [Pls.' Interrog. Resp. at Pl. Elson-Rogers' Answer to Interrog. No. 7]; App. 1125-27 [STAN_TDBANK_000649-51].

255 *See* App. 1502 [Elson-Rogers Dep. Tr. at 142:20-23].

256 *See* App. 1516-17 [Elson-Rogers Dep. Tr. at 290:19-291:10].

257 *See* App. 1325 [Dep. Ex. 88]; App. 1559-60, 1562-64 [Penhos Dep. Tr. at 169:14-170:8, 172:23-174:22] ("It's just that I cannot see well. With my glasses and everything, I cannot see well. And I will not distrust whatever the lawyers, Blue and Morgenstern [sic], are sending me.").

REDACTED [258] Ms. Penhos's omission would increase her recovery at the expense of other class members. Given Ms. Penhos's lack of concern over misrepresentations and her acknowledgement that she was not the decision-maker in her family with respect to her Stanford investment,[259] it is not surprising that she is willing to defer completely to her counsel, even if it meant that she provided false information. Indeed, during her deposition, Ms. Penhos erroneously testified that she was not a party to any other litigation.[260] Only when confronted with details of three other lawsuits in Mexico did she admit her involvement.[261] Moreover, Ms. Penhos never testified about her filing of a Stanford-related arbitration against the United States under NAFTA. When asked directly whether she has filed Stanford-related claims anywhere other than with the Receiver and the Joint Liquidators, Ms. Penhos testified that she had not.[262] Two months after her deposition, the pending NAFTA claim was revealed in her written discovery responses.[263]

Ms. Penhos also displayed a remarkable lack of knowledge about this case. For instance, she testified that she believed that this Action, which has been pending for nearly six years, was filed approximately two months before her July deposition.[264] She admitted that she had not received or reviewed any documents about this case and had not met with class counsel before executing her declaration and agreeing to serve as a class representative.[265] In fact, Ms. Penhos testified that she has *never* reviewed any of the filings made by class counsel.[266] When handed

---

258 *See* App. 1566, 1570, 1572-73 [Penhos Dep. Tr. at 180:2-24, 184:1-8, 186:12-187:18]; App. 836 [Dep. Ex. 90].

259 *See* App. 1533, 1541 [Penhos Dep. Tr. at 39:10-12, 64:5-25] (testifying that her husband and children made the decision to invest in Stanford).

260 *See* App. 1590 [Penhos Dep. Tr. at 231:23-234:5].

261 *See id.*

262 *See* App. 1567-68 [Penhos Dep. Tr. at. 181:16-182:17].

263 *See* App. 2611 [Pls.' Interrog. Resp. at Pl. Penhos's Answer to Interrog. No. 7] (identifying the NAFTA Arbitration Claim).

264 *See* App. 1550, 1553 [Penhos Dep. Tr. at 127:1-10, 153:17-19].

265 *See* App. 1551-52 [Penhos Dep. Tr. at 143:9-144:24].

266 *See* App. 1555 [Penhos Dep. Tr. at 156:11-16].

copies of the operative SAC and the Motion, Ms. Penhos was not familiar with either document.[267] Ms. Penhos was unaware that class counsel had designated other class representatives[268] and could not articulate, even at a basic level, how the class was defined.[269] Significantly, Ms. Penhos repeatedly threatened to walk out of her deposition when asked basic questions.[270] Her uncooperative demeanor during her deposition and her other failings demonstrate that she is ill-equipped to serve as a class representative. *See, e.g.*, *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257-58 (S.D.N.Y. 1985) (holding that plaintiff's refusal to answer relevant questions at his deposition indicated that he was not suitable to fulfill fiduciary obligations of class representative).

**e. Steven Queyrouze**

There are also questions concerning Mr. Queyrouze's truthfulness and adequacy to serve as a class representative. Mr. Queyrouze failed to make required disclosures in connection with the claim he submitted to the Receiver. REDACTED

[271]

REDACTED

[272] In addition, Mr. Queyrouze testified that he filed a claim with and received an initial distribution of REDACTED from the Joint Liquidators. REDACTED

REDACTED

[273] To date, Mr. Queyrouze still has not produced his claims correspondence with the Joint Liquidators showing the amounts of his submitted and allowed claim. Moreover, Mr. Queyrouze could not say whether he has reported interest earned on his

---

267 *See* App. 1557-58, 1565 [Penhos Dep. Tr. at 159:16-160:5, 177:10-17].

268 *See* App. 1553-54 [Penhos Dep. Tr. at 153:20-154:1].

269 *See* App. 1556-57 [Penhos Dep. Tr. at 158:10-159:13].

270 *See* App. 1594-95 [Penhos Dep. Tr. at 239:15-240:3] ("Whenever I want to, I will stop answering.").

271 *See* App. 678 [Dep. Ex. 44 at QUEYROUZE_003073].

272 *See* App. 1377-79, 1391-92 [Queyrouze Dep. Tr. at 222:3-10, 223:13-225:9, 270:5-271:12]; App. 2617-18 [Pls.' Interrog. Resp. at Pl. Queyrouze's Answer to Interrog. Nos. 7, 8].

273 *See* App. 1385-90 [Queyrouze Dep. Tr. at 233:8-20, 234:11-235:25, 267:5-21, 268:22-269:22].

SIBL CDs on his U.S. tax returns,[274] but did confirm that he made a loss claim on his tax returns in connection with his SIBL CDs.[275] REDACTED [276]

Although Mr. Queyrouze has been involved in this litigation as a named Plaintiff since the start of this Action in 2009, he lacks knowledge about the basic facts of the case. For example, he was unable to articulate what any of the Banks allegedly did wrong in connection with Stanford.[277] He also incorrectly asserted that Credit Suisse is a Defendant, mistakenly asserted that Karyl Van Tassel is one of the named Plaintiffs, could not name any of the other named Plaintiffs in this case, and could not estimate the number of members in the proposed class—other than to venture a guess that it was in the thousands.[278] Mr. Queyrouze also has had insufficient contact with class counsel to adequately direct this litigation. He testified, for example, that from March 2014 to March 2015, he spoke to counsel only "a couple of times" and did not remember reviewing any documents.[279] During this period, Plaintiffs fully briefed their request for leave to amend their Complaint, opposed certain Defendants' requests for reconsideration of the Court's dismissal and jurisdictional orders, and participated in a status hearing on the *Stanford MDL* cases.[280] This level of detachment is inappropriate for a class leader.

---

274 *See* App. 1374-75[Queyrouze Dep. Tr. at 213:6-214:4].

275 *See* App. 1369-70 [Queyrouze Dep. Tr. at 186:21-187:11].

276 *See* App. 678 [Dep. Ex. 44 at QUEYROUZE_003073].

277 *See* App. 1359-60 [Queyrouze Dep. Tr. at 92:17-93:21] (answering, when asked about the Banks, that, "I'm leaving that to my attorneys to pursue"); *see also* App. 1349-52 [Queyrouze Dep. Tr. at 46:25-49:4].

278 *See* App. 1362-63, 1364, 1381 [Queyrouze Dep. Tr. at 134:10-135:2, 136:13-21, 229:2-10].

279 *See* App. 1347-48 [Queyrouze Dep. Tr. at 44:23-45:19]. Mr. Queyrouze's lack of diligence as a class representative in a related case further calls into question his ability to represent any class in this case. Specifically, he testified that he is a named class representative in a lawsuit against the Bank of Antigua related to Stanford, yet he could not explain what the Bank of Antigua lawsuit was about (*see* App. 1346-47 [Queyrouze Dep. Tr. at 43:25-44:17]), could not articulate what he had done as a class representative in that case (*see* App. 1371-72 [Queyrouze Dep. Tr. at 195:20-196:1]), did not know the status of the case, including whether a class had been certified (*see* App. 1372 [Queyrouze Dep. Tr. at 196:5-25]), and has not discussed that case with counsel for the last two years (*see* App. 1373 [Queyrouze Dep. Tr. at 197:1-11]).

280 *See* Dkt. Nos. 182, 192, 210, 219; App. 1273-74 [Excerpt of Aug. 21, 2014 Status Hr'g Tr. at 37:17-38:8].

f. **Guthrie Abbott**

Mr. Abbott failed to provide material information in connection with the claim he submitted to the Receiver.[281] REDACTED

[282] To date, Mr. Abbott has not produced claims correspondence showing the amount of his submitted claim to the Joint Liquidators. Mr. Abbott also never reported the interest earned on his SIBL CDs on his U.S. tax returns, nor has he corrected his filings to disclose this source of income.[283] Mr. Abbott did report a loss on his tax returns in connection with his SIBL CDs and estimated that, by claiming this loss, he did not have to pay approximately REDACTED REDACTED in taxes that he otherwise would have had to pay.[284] REDACTED REDACTED[285] nor has he produced copies of his requested tax returns. Significantly, the Receiver's representative testified that claimants who received a tax benefit related to their Stanford losses are currently being put on a suspense list and are not receiving distributions from the Estate.[286] REDACTED

While Mr. Abbott is a lawyer who was named in the original Petition, he testified that he did not meet with counsel about the case until May 27, 2015—*the day before his deposition*.[287] Moreover, Mr. Abbott has never read OSIC's complaints and did not know whether the Court

---

[281] *See* App. 673 [Dep. Ex. 53]; App. 1425-27 [Abbott Dep. Tr. at 82:18-84:23].

[282] *See id.*

[283] *See* App. 1439-41 [Abbott Dep. Tr. 192:8-194:1].

[284] *See* App. 1441, 1447-48 [Abbott Dep. Tr. at 194:7-22, 237:24-238:14].

[285] *See* App. 673 [Dep. Ex. 53].

[286] *See* App. 2916-27, 2918-2920 [Russell Dep. Tr. at 107:11-108:3, 112:16-114:4].

[287] *See* App. 1431 [Abbot Dep. Tr. at 131:9-14].

allowed Plaintiffs to adopt the allegations therein.[288] Mr. Abbott could not recall whether he reviewed a draft of the Motion before it was filed.[289] He also did not review any of the exhibits to the Motion and stated that he does not view it as part of his role as a class representative "unless some controversy arose that I needed to be looking at it."[290] His lack of oversight raises serious questions about his capacity to direct this case.

In short, there are serious concerns about the reliability, truthfulness and credibility of the putative class representatives. Each has demonstrated a lack of diligence with respect to this Action and an improper willingness to defer to counsel on matters of importance instead of personally directing the litigation. None qualifies as an adequate representative for the class.

**2. Conflicts of Interest Between the Class Representatives and Other Class Members Negate Adequacy**

"Numerous courts have held that intraclass conflicts may negate adequacy under Rule 23(a)(4)." *Langbecker v. Elec. Data Sys., Corp.*, 476 F.3d 299, 315-16 (5th Cir. 2007) (finding "[t]he trial court too readily succumbed to [plaintiffs'] minimization of the intraclass problems"). Indeed, class representatives must "possess the same interest and suffer the same injury as the class members." *Amchem Prods.*, 521 U.S. at 625-26 (finding that serious intraclass conflicts precluded class from meeting adequacy of representation requirement).

The named Plaintiffs' claims differ in substantial and material ways from the claims of other class members, creating numerous conflicts of interest among class members:

- REDACTED [291] REDACTED In total, the

[288] *See* App. 1432-33 [Abbott Dep. Tr. at 161:15-162:13].

[289] *See* App. 1434 [Abbott Dep. Tr. 173:13-24].

[290] App. 1435-38 [Abbott Dep. Tr. at 181:24-184:5].

[291] *See* App. 1422-25, 1428, 1442-44, 1453-55 [Abbott Dep. Tr. at 79:18-82:7, 104:1-13, 200:18-202:13, 318:25-320:15]; App. 1164 [Dep. Ex. 52]; App. 1643-44 [Suarez July 1, 2015 Dep. Tr. at 165:17-166:20]; App. 1156 [Dep. Ex. 20]; App. 740 [Dep. Ex. 12]; App. 1685-87, 1701-04 [Estefenn July 2, 2015 Dep. Tr. at 88:15-90:4, 158:20-161:5]; App. 1161 [PENHOS_000270]; App. 1575-76 [Penhos Dep. Tr. at 198:9-199:8].

Joint Liquidators are seeking approximately $600 million in preferential transfers.[292] The class members who did not receive such payments have a huge vested interest in seeing repayment to the estate, creating a significant rift within the class.

- Certain class members, including Mr. Queyrouze,[293] were accredited investors who had a more sophisticated understanding of their investments and received materials concerning SIBL that were not provided to class members in foreign jurisdictions who were not required to be accredited investors.

- Plaintiffs' claims hinge on an argument that Defendants should have detected Stanford's fraud and ceased doing business with Stanford. But to prove damages, Plaintiffs will have to select a date certain on which each Defendant should have severed ties with Stanford. Determination of this severance date will have disparate implications for the calculation of each class member's damages—meaning that some class members will favor an earlier severance date and others a later severance date to maximize their respective damages.[294]

- The assurances, advice and information the putative class members used in deciding whether to initially invest in SIBL CDs were unique and as varied as the putative class members themselves. For example, Mr. Abbott and Ms. Suarez both decided to invest based exclusively on the oral representations of their financial advisors,[295] putting them in conflict with members of the putative class who may have relied on Stanford's written materials.

- Some members of the putative class are able to assert certain claims under the TSA, while others are not. For example, putative class members who were not Texas residents or were not present in Texas when the offer of sale was made—which includes all of the named class representatives—cannot bring claims for violations of the TSA based on the sale of unregistered securities. *See* Tex. State Sec. Bd., Rule 139.7(a) (2015); SAC ¶ 235. As a result, the named class representatives have neither the ability nor the incentive to assert such claims on behalf of absent class members who may be able to.

- Many putative class members purchased SIBL CDs in foreign jurisdictions that will not enforce a U.S. judgment in this Action. These class members have different incentives in litigating this case. If they are dissatisfied with the Court's judgment, they could relitigate their claims against Defendants in another jurisdiction, hoping for better results.

In sum, these conflicts divide the members of the putative class and reflect tensions and

---

292 *See* App. 3047 [*Stanford International Bank – In Liquidation (the Bank) Preference Payments to Creditors in the run up to insolvency*, available at http://www.sibliquidation.com/faq/preference-payments/ (last visited Oct. 1, 2015)].

293 *See* App. 1365-66 [Queyrouze Dep. Tr. at 137:21-138:2]; s*ee supra*, Section II.B.

294 *See* App. 2103-05 [Lehn Decl. ¶¶ 57-63].

295 *See* App. 1408-11, 1414-16, 1449 [Abbott Dep. Tr. at 32:8-33:14, 34:14-35:12, 44:2-46:18, 241:11-13]; App. 1623 [Suarez July 1, 2015 Dep. Tr. at 82:3-23].

divided ambitions among competing class members. Plaintiffs' failure to address these conflicts of interest is fatal to the adequacy requirement.

## III. THE PROPOSED CLASS IS NOT CLEARLY ASCERTAINABLE

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). Indeed, "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative[s] is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).

Plaintiffs have not put forth any reliable way of identifying the putative class members during the proposed class period, instead punting that responsibility to the Receiver who, in turn, has indicated it would be very difficult to decide who fits inside the class.[296] Moreover, because Plaintiffs have now disavowed using the Receiver's claim methodology to determine damages, there is a fatal conflict between the proposed class and their legal theories.

[297] [298] [299] The Receiver's representative testified that he does not have the information required to identify class members and would have to go through a series of queries and decision-points in order to try to generate a potential list.[300]

296 *See* App. 2948-56 [Russell Dep. Tr. at 248:9-256:12].

297 *See* App. 7253 [Spreadsheet from Receiver].

298 *See id.*

299 *See id.*

300 *See* App. 2948-56 [Russell Dep. Tr. at 248:9-256:12].

Even then, the Receiver's representative stated that class members could not be identified as individuals, but only as the "groups" that the Receiver has constructed for calculating claims.[301]

Plaintiffs' failure to address this issue, which makes it wholly impossible for Defendants and the Court to determine which claimants are arguably members of the class, should doom their proposed class. *See Carrera v. Bayer Corp.*, 727 F.3d at 308; *Martin v. Pac. Parking Sys. Inc.*, 583 F. App'x 803, 804 (9th Cir. 2014) ("Given these difficulties identifying the members of the proposed class, and the fact that [plaintiff] proposed no plan to the district court for manageably determining which individuals are members, we conclude that the court did not abuse its discretion in denying class certification.").

Moreover, excluding the claimants from foreign countries that would not enforce this Court's judgment would likely be impossible. The Receiver testified that the geographic data he has about most investors is meaningless because his claim "groups" may aggregate the claims of multiple, geographically-dispersed individuals; people's addresses have changed; and many claimants used mailing addresses outside their countries of residence.[302] Likewise, parsing out class members who are "accredited investors" and therefore unable to pursue a TSA claim under Article 581-33(A)(1) would involve highly individualized inquiries—as would elimination of class members based on the statute of limitations, lack of reliance, and lack of causally-connected damages. "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

## CONCLUSION

For all of the reasons stated above, Defendants respectfully request that the Court deny the Motion.

---

301 *See* App. 2948-50 [Russell Dep. Tr. at 248:9-250:17].

302 *See* App. 2911-12, 2921-25, 2933-34 [Russell Dep. Tr. at 38:10-39:24, 115:19-119:14, 130:1-131:19].

Dated: October 1, 2015

Respectfully submitted,

By: /s/ Rodney Acker

Rodney Acker
State Bar No. 00830700
Ellen Sessions
State Bar No. 00796282
James V. Leito IV
State Bar No. 24054950
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
T: (214) 855-8000
F: (214) 855-8200
rodney.acker@nortonrosefulbright.com
ellen.sessions@nortonrosefulbright.com
james.leito@nortonrosefulbright.com

Of Counsel:

Lynn K. Neuner (*pro hac vice*)
Peter E. Kazanoff (*pro hac vice*)
Katherine A. Helm (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
T: (212) 455-2000
F: (212) 455-2502
lneuner@stblaw.com
pkazanoff@stblaw.com
khelm@stblaw.com

*Attorneys for Defendant*
*The Toronto-Dominion Bank*

By: /s/ Jeffrey C. Kubin
Robin C. Gibbs
State Bar No. 07853000
Jeffrey C. Kubin
State Bar No. 24002431
Robert J. Madden
State Bar No. 07853000
Ashley McKeand Kleber
State Bar No. 24060263
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
T: (713) 650-8805
F: (713) 750-0903
rgibbs@gibbsbruns.com
jkubin@gibbsbruns.com
rmadden@gibbsbruns.com
akleber@gibbsbruns.com

*Attorneys for Defendant Trustmark National Bank*

By: /s/ Roger B. Cowie
Edwin R. DeYoung
State Bar No. 05673000
Roger B. Cowie
State Bar No. 00783886
Taylor F. Brinkman
State Bar No. 24069420
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
T: (214) 740-8000
F: (214) 740-8800
edeyoung@lockelord.com
rcowie@lockelord.com
tbrinkman@lockelord.com

*Attorneys for Defendant HSBC Bank PLC*

By: /s/ Noelle M. Reed
Noelle M. Reed
State Bar No. 24044211
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
T: (713) 655-5122
F: (713) 483-9122
noelle.reed@skadden.com

George A. Zimmerman (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
T: (212) 735-3000
george.zimmerman@skadden.com

*Attorneys for Defendant Société Générale Private Banking (Suisse) S.A.*

By: /s/ Brad Repass
Brad Repass
State Bar No. 16786700
HAYNIE RAKE REPASS & KLIMKO P.C.
Wellington Centre
14643 Dallas Parkway, Suite 550
Dallas, Texas 75254
T: (972) 716-1855
F: (972) 716-1850
brad@hrrpc.com

Paul C. Watler
State Bar No. 20931600
Jeffrey G. Hamilton
State Bar No. 00793886
JACKSON WALKER LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
T: (214) 953-6000
F: (214) 953-5822
pwatler@jw.com
jhamilton@jw.com

*Attorneys for Defendant Independent Bank, successor by merger to Bank of Houston*

By: /s/ Brian A. Herman

Brian A. Herman (*pro hac vice*)
Stephanie Gamiz (*pro hac vice*)
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
T: (212) 309-6000
F: (212) 309-6001
bherman@morganlewis.com
sgamiz@morganlewis.com

Aaron C. Christian
State Bar No. 24076089
MORGAN LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
T: (214) 446-4000
F: (214) 466-4001
achristian@morganlewis.com

Ryan C. Wooten
State Bar No. 24075308
MORGAN LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5006
T: (713) 890-5000
rwooten@morganlewis.com

*Attorneys for Defendant Blaise Friedli*

## APPENDIX A

## CLAIMANTS BY CONTINENT

Source: Data taken from information provided by the Joint Liquidators and produced by investor-Plaintiffs in *Troice v. Proskauer* regarding the country of citizenship for claimants who submitted claims to the Joint Liquidators. *See* App. 2926-27, 2928-32 [Russell Dep. Tr. at 122:17-123:22, 125:17-129:21]; App. 651-52 ["Stanford International Bank – In Liquidation: Summary of Claims by Country and Status"]; *Troice v. Proskauer Rose LLP, et al.*, No. 09-cv-01600-N-BG, Dkt. No. 198-8 at 105-06, Dkt. No. 197 at 55, Dkt. No. 193 at 45-46.

## APPENDIX B

### CLAIMANTS IN TOP 6 COUNTRIES

United States
$1.6 B
3,438 claimants
Mexico
$976 M
3,077 claimants
Venezuela
$1.6 B
8,313 claimants
Peru
$122 M
378 claimants
Haiti
$234 M
294 claimants
Antigua & Barbuda
$1.5 B
3,176 claimants
ARCTIC OCEAN
NORTH PACIFIC OCEAN
ATLANTIC OCEAN
INDIAN OCEAN
SOUTHERN OCEAN
NORTH PACIFIC OCEAN
Greenland (Denmark)
Canada
United States of America
Alaska (U.S.A.)
Russian Federation
China
Brazil
Australia
Antarctica

Source: Data taken from information provided by the Joint Liquidators and produced by investor-Plaintiffs in *Troice v. Proskauer* regarding the country of citizenship for claimants who submitted claims to the Joint Liquidators. *See* App. 2926-27, 2928-32 [Russell Dep. Tr. at 122:17-123:22, 125:17-129:21]; App. 651-52 ["Stanford International Bank – In Liquidation: Summary of Claims by Country and Status"]; *Troice v. Proskauer Rose LLP, et al.*, No. 09-cv-01600-N-BG, Dkt. No. 198-8 at 105-06, Dkt. No. 197 at 55, Dkt. No. 193 at 45-46.

APP 0461

# APPENDIX C

## CLASS COMPOSITION—106 COUNTRIES

| Country | Total Value of Claimants in US Dollars | Percentage of Total Dollars | No. of Claimants | Percentage of Total Claimants |
|---|---|---|---|---|
| Venezuela | 1.6B | 22% | 8313 | 38% |
| United States | 1.6B | 22% | 3438 | 16% |
| Antigua and Barbuda | 1.5B | 20% | 3176 | 15% |
| Mexico | 976M | 13% | 3071 | 14% |
| Haiti | 234M | 3% | 294 | 1% |
| Peru | 122M | 2% | 378 | 2% |
| Colombia | 105M | 1% | 384 | 2% |
| Virgin Islands (British) | 91M | 1% | 102 | .4% |
| Panama | 90M | 1% | 99 | .4% |
| Aruba | 76M | 1% | 268 | .1% |
| The Netherlands | 75M | 1% | 116 | .5% |
| Ecuador | 65M | 1% | 378 | .2% |
| El Salvador | 63M | .9% | 77 | .4% |
| Netherlands Antilles | 63M | .8% | 235 | 1% |
| Libyan Arab Jamahiriya | 58M | .8% | 2 | .009% |
| United Kingdom | 56M | .7% | 158 | .7% |
| Canada | 45M | .6% | 159 | .7% |
| France | 34M | .4% | 37 | .2% |
| Argentina | 29M | .4% | 122 | .5% |
| Spain | 29M | .5% | 106 | .5% |
| Guatemala | 27M | .4% | 87 | .4% |
| Germany | 21M | .3% | 29 | .1% |
| Singapore | 17M | .2% | 11 | .5% |
| Israel | 16M | .2% | 40 | .1% |
| Bahamas | 15M | .2% | 4 | .2% |
| Italy | 15M | .2% | 49 | .2% |

| Country | Total Value of Claimants in US Dollars | Percentage of Total Dollars | No. of Claimants | Percentage of Total Claimants |
|---|---|---|---|---|
| Nicaragua | 15M | .2% | 30 | .1% |
| New Zealand | 14M | .2% | 11 | .5% |
| Jamaica | 12M | .2% | 14 | .06% |
| Guyana | 11M | .1% | 22 | .1% |
| Russian Federation | 11M | .1% | 21 | .09% |
| Brazil | 10M | .1% | 32 | .1% |
| Bolivia | 9M | .1% | 24 | .1% |
| Cayman Islands | 9M | .1% | 6 | .03% |
| Costa Rica | 9M | .1% | 16 | .07% |
| Egypt | 9M | .1% | 42 | .1% |
| Latvia | 9M | .1% | 6 | .03% |
| Portugal | 8M | .1% | 17 | .08% |
| Belgium | 7M | .1% | 24 | .1% |
| Switzerland | 7M | .1% | 28 | .1% |
| Dominican Republic | 6M | .08% | 36 | .2% |
| United Arab Emirates | 6M | .09% | 6 | .02% |
| Barbados | 5M | .08% | 14 | .06% |
| Trinidad and Tobago | 5M | .07% | 30 | .1% |
| Ireland | 3M | .05% | 6 | .03% |
| Isle of Man | 3M | .05% | 3 | .01% |
| Saint Kitts and Nevis | 3M | .05% | 7 | .03% |
| Virgin Islands (U.S.) | 3M | .04% | 4 | .02% |
| Chile | 2M | .03% | 12 | .05% |
| Guadeloupe | 2M | .03% | 2 | .01% |
| Kenya | 2M | .04% | 8 | .04% |
| Liberia | 2M | .03% | 2 | .01% |

Source: Data taken from information provided by the Joint Liquidators and produced by investor-Plaintiffs in *Troice v. Proskauer* regarding the country of citizenship for claimants who submitted claims to the Joint Liquidators. *See* App. 2926-27, 2928-32 [Russell Dep. Tr. at 122:17-123:22, 125:17-129:21]; App. 651-52 ["Stanford International Bank – In Liquidation: Summary of Claims by Country and Status"]; *Troice v. Proskauer Rose LLP, et al.*, No. 09-cv-01600-N-BG, Dkt. No. 198-8 at 105-06, Dkt. No. 197 at 55, Dkt. No. 193 at 45-46.

| Country | Total Value of Claimants in US Dollars | Percentage of Total Dollars | No. of Claimants | Percentage of Total Claimants |
|---|---|---|---|---|
| Senegal | 2M | .03% | 1 | .001% |
| Australia | 1M | .02% | 4 | .02% |
| Bahrain | 1M | .02% | 2 | .01% |
| Bermuda | 1M | .03% | 4 | .02% |
| Greece | 1M | .01% | 8 | .03% |
| Honduras | 1M | .02% | 4 | .02% |
| Lebanon | 1M | .03% | 5 | .02% |
| Montserrat | 1M | .01% | 2 | .01% |
| Namibia | 1M | .02% | 4 | .02% |
| People's Republic of China | 1M | .01% | 3 | .01% |
| Puerto Rico | 1M | .03% | 8 | .03% |
| Sweden | 1M | .02% | 18 | .08% |
| Suriname | 1M | .02% | 5 | .02% |
| Ukraine | 1M | .03% | 6 | .03% |
| Uruguay | 1M | .02% | 6 | .03% |
| Paraguay | 917K | .01% | 7 | .03% |
| Austria | 873K | .01% | 14 | .06% |
| Tanzania | 828K | .01% | 1 | .01% |
| Denmark | 767K | .01% | 7 | .03% |
| India | 752K | .01% | 6 | .03% |
| Belize | 721K | .01% | 4 | .02% |
| Martinique | 572K | .008% | 2 | .01% |
| South Africa | 572K | .008% | 3 | .01% |
| Bulgaria | 507K | .007% | 3 | .01% |
| Cyprus | 448K | .006% | 6 | .03% |
| Saint Lucia | 447K | .006% | 5 | .02% |
| Cuba | 354K | .005% | 3 | .01% |
| Romania | 345K | .005% | 2 | .01% |
| Taiwan | 331K | .005% | 1 | .01% |
| Bosnia and Herzegovina | 305K | .004% | 1 | .01% |
| Grenada | 257K | .004% | 3 | .01% |
| Ghana | 238K | .003% | 2 | .01% |
| Poland | 239K | .003% | 2 | .01% |
| Saudi Arabia | 266K | .004% | 1 | .01% |
| Syrian Arab Republic | 235K | .003% | 4 | .02% |
| Macedonia | 212K | .003% | 3 | .01% |
| Kuwait | 197K | .003% | 1 | .01% |
| Anguilla | 158K | .002% | 4 | .02% |
| Turkey | 116K | .002% | 2 | .01% |
| Iceland | 101K | .001% | 1 | .01% |
| Angola | 96K | .001% | 1 | .01% |
| Croatia (Hrvatska) | 56K | .001% | 1 | .01% |
| Norway | 53K | .001% | 1 | .01% |
| Nigeria | 49K | .001% | 1 | .01% |
| Serbia | 43K | .001% | 1 | .005% |
| Saint Vincent and The Grena | 34K | .000% | 1 | .005% |
| Hungary | 26K | .000% | 1 | .005% |
| Congo (Democratic Republic | 25K | .000% | 1 | .005% |
| Uganda | 20K | .000% | 1 | .005% |
| Chad | 19K | .000% | 1 | .005% |
| Malta | 18K | .000% | 1 | .001% |
| Azerbaijan | 13K | .000% | 1 | .005% |
| Bouvet Island | 55.78 | .000% | 1 | .005% |
| Yemen | 52.11 | .000% | 1 | .005% |
| **TOTAL** | **7.2B** | | **21,738** | |

# APPENDIX D

## CLASS COMPOSITION—47 STATES

| State | Dollars | % of Dollars | # of Claimants | % of Claimants |
|---|---|---|---|---|
| FL | 857M | 33.26% | 2,409 | 34.02% |
| TX | 582M | 22.59% | 1,290 | 18.22% |
| LA | 561M | 21.77% | 1,810 | 25.56% |
| TN | 83M | 3.22% | 196 | 2.77% |
| MS | 64M | 2.48% | 125 | 1.77% |
| GA | 62M | 2.41% | 160 | 2.26% |
| CA | 60M | 2.33% | 177 | 2.50% |
| NC | 59M | 2.29% | 125 | 1.77% |
| CO | 44M | 1.71% | 72 | 1.02% |
| AR | 35M | 1.36% | 88 | 1.24% |
| AZ | 35M | 1.36% | 28 | 0.40% |
| SC | 25M | 0.97% | 20 | 0.28% |
| NY | 16M | 0.62% | 71 | 1.00% |
| MD | 13M | 0.50% | 26 | 0.37% |
| NJ | 8M | 0.31% | 45 | 0.64% |
| PR | 8M | 0.31% | 39 | 0.55% |
| MI | 8M | 0.31% | 24 | 0.34% |
| CT | 8M | 0.31% | 11 | 0.16% |
| MA | 7M | 0.27% | 30 | 0.42% |
| VA | 6M | 0.23% | 31 | 0.44% |

| State | Dollars | % of Dollars | # of Claimants | % of Claimants |
|---|---|---|---|---|
| OK | 5M | 0.19% | 26 | 0.37% |
| OH | 4M | 0.16% | 14 | 0.20% |
| NV | 4M | 0.16% | 9 | 0.13% |
| MO | 3M | 0.12% | 14 | 0.20% |
| NM | 2M | 0.08% | 14 | 0.20% |
| AL | 2M | 0.08% | 12 | 0.17% |
| DC | 2M | 0.08% | 9 | 0.13% |
| UT | 2M | 0.08% | 5 | 0.07% |
| OR | 2M | 0.08% | 4 | 0.06% |
| KY | 2M | 0.08% | 2 | 0.03% |
| WA | 1M | 0.04% | 22 | 0.31% |
| WI | 1M | 0.04% | 6 | 0.08% |
| IN | 1M | 0.04% | 5 | 0.07% |
| HI | 1M | 0.04% | 3 | 0.04% |
| KS | 1M | 0.04% | 3 | 0.04% |
| AK | 546K | 0.02% | 2 | 0.03% |
| NH | 501K | 0.02% | 4 | 0.06% |
| WV | 352K | 0.01% | 1 | 0.01% |
| VT | 323K | 0.01% | 2 | 0.03% |
| VI | 286K | 0.01% | 3 | 0.04% |

| State | Dollars | % of Dollars | # of Claimants | % of Claimants |
|---|---|---|---|---|
| SD | 254K | 0.01% | 1 | 0.01% |
| D.C. | 128K | 0.00% | 1 | 0.01% |
| DE | 66K | 0.00% | 2 | 0.03% |
| IA | 56K | 0.00% | 1 | 0.01% |
| WY | 50K | 0.00% | 1 | 0.01% |
| Unkown | 37K | 0.00% | 71 | 1.00% |
| MN | 25K | 0.00% | 1 | 0.01% |
| IL | 23K | 0.00% | 33 | 0.47% |
| PA | 7K | 0.00% | 31 | 0.44% |
| MT | 0 | 0.00% | 2 | 0.03% |
| ID | 0 | 0.00% | 1 | 0.01% |

| 47 States | $2.6B | 7,082 |
|---|---|---|

Source: Data taken from chart produced by the U.S. Receiver providing the allowed claimants' state of residence for the allowed claims in the United States. *See* App. 2936-39 [Russell Dep. Tr. at 137:18-140:2]; App. 649 [ABBOTT_000006].

<u>**APPENDIX E**</u>

**OVERVIEW OF PROPOSED CLASS REPRESENTATIVES**

**GUTHRIE ABBOTT**

U.S. citizen; Mississippi resident

- Filed lawsuit against financial advisor in Mississippi

REDACTED

REDACTED

- Did not report interest from Stanford CDs on tax returns

**RUTH ALFILLE DE PENHOS**

Mexican citizen and resident

- Admitted her class representative declaration is wrong
- Wrongly testified she is not party to any other lawsuit, but is part of three suits in Mexico and a NAFTA arbitration
- Repeatedly threatened to walk out of deposition

REDACTED

**SARAH ELSON-ROGERS**

U.K. citizen; North Carolina resident

- Submitted inaccurate information in declaration to be class representative

REDACTED

REDACTED

**STEVEN QUEYROUZE**

U.S. citizen; Louisiana resident

REDACTED
REDACTED
REDACTED
REDACTED

**DIANA SUAREZ**

Venezuela citizen; Florida resident

REDACTED

- Gave Power of Attorney for all Stanford-related matters to her son
- Put money in U.S. to avoid Hugo Chavez Administration

REDACTED
REDACTED

- Did not declare interest on Stanford CDs on U.S. tax returns

**SALIM ESTEFENN URIBE**

Colombian citizen and resident

- Submitted erroneous class representative declaration regarding Trusts that purchased CDs

REDACTED

- Used his Stanford accounts for suspicious round-trip and currency exchange transfers

 

## APPENDIX F

**DEFENDANTS' CLASS CERTIFICATION EXPERTS**

| Subject Matter of Legal Opinion | Expert | Notable Qualifications/Affiliations |
|---|---|---|
| **Canadian Law** | Janet Walker | • Professor of Law and past Associate Dean of *Osgoode Hall Law School* in Toronto and former visiting professor at universities across the globe focused on private international and comparative law<br>• Author of leading authoritative treatise, *Castel & Walker: Canadian Conflict of Laws*, 6th Edition |
| **Colombian Law** | Eduardo Zuleta | • Named Senior Partner at a Bogotá law firm with 25+ years of practice<br>• Vice President of the International Court of Arbitration of the International Chamber of Commerce, active arbitrator across numerous foreign jurisdictions<br>• Former Professor of International Law at two Colombian law schools |
| **English Law** | Adrian Briggs | • Barrister at the bar of England and Wales<br>• Professor of Private International Law at the *University of Oxford*<br>• Author of authoritative texts on *Civil Jurisdiction and Judgments*; *Private International Law in English Courts*; *Agreements on Jurisdiction and Choice of Law*; and section editor for Dicey, Morris & Collins, *The Conflict of Law* |
| **French Law** | George A. Bermann | • Professor of Law and of European Union law at *Columbia Law School*, focus includes comparative and international law<br>• Distinguished Chair holder and Affiliated Professor of Law at the *Institut des Sciences Politiques* (Paris, France)<br>• Council Member of the European Law Institute |

| German Law | Stephan Wilske | • Partner at German law firm with specialized practice in international disputes and cross-border litigation, including the recognition and enforcement of foreign judgments<br>• Dual U.S. and German licensed, multi-lingual practitioner of private international law |
|---|---|---|
| **Latin American Law, with focus on: Ecuador, El Salvador, Mexico, Panama, Peru, and Venezuela** | Antonio Gidi | • Drafter of model class action code for Latin America / Civil Law countries and of comprehensive class action legislation for Mexico and Brazil<br>• Visiting Professor of International Law at universities throughout the U.S., Brazil, Italy, Belgium, France<br>• Reputed scholar on the recognition and enforcement of U.S. class actions abroad |
| **Mexican Law** | Eduardo Siqueiros | • Partner at Hogan Lovells LLP in Mexico City and former founding partner of prominent Mexican law firm with 30+ years of practice<br>• Professor of Law at two Mexican law schools on matters of private international commercial law<br>• Chairman of the Board of Arbitration before the International Court of Arbitration of the International Chamber of Commerce |
| **Former Netherlands Antillean Law (including Aruba)** | Rogier F. van den Heuvel | • Attorney at a Curaçao law firm, specializing in corporate litigation, international disputes and the recognition and enforcement of foreign awards<br>• Visiting lecturer in Private International Law at the *University of Curaçao* School of Law |
| **Panamanian Law** | Arturo Hoyos | • Former Chief Justice of the Supreme Court of Justice of Panama, with longest tenure in Panamanian history (16 years)<br>• Eight years sitting on Fourth Chamber of Supreme Court that governs recognition of foreign judgments<br>• 40 years' experience in Panamanian courts and abroad<br>• Current law firm founder and practitioner at *Hoyos & Associates* |

| **Peruvian Law** | J. Domingo Rivarola Reisz | • Drafter of Peruvian legislation concerning class action litigation for consumer protection issues<br>• Partner at a Lima law firm, Fulbright Scholar with extensive experience in international commercial litigation<br>• Professor at Law at *Pontificia Universidad Católica del Perú* |
|---|---|---|
| **Spanish Law** | David Arias | • Founding partner of Madrid law firm *Arias SLP*, head of international dispute resolution practice<br>• Professor of Law at *Universidad Francisco de Vitoria*<br>• Drafter of model rules for international dispute resolution, arbitrator and counsel in international conflicts |
| **Swiss Law** | Isabelle Romy | • Former Deputy Judge at Swiss Federal Supreme Court<br>• Partner at Zurich law firm<br>• Associate Professor of Law at the *University of Fribourg* and the *Federal Institute of Technology* in Lausanne, focus includes Swiss and European Private International Law |
| **Venezuelan Law** | James Otis Rodner | • Founding partner of highly-ranked Venezuelan law firm *Rodner Martínez & Asociados*<br>• Harvard J.D. and M.B.A., former professor of law at numerous universities in Caracas<br>• Former principal member of International Court of Arbitration of the International Chamber of Commerce |

| | | |
|---|---|---|
| **Damages** | Kenneth M. Lehn<br> | • Former Chief Economist of the U.S. Securities and Exchange Commission<br>• Samuel A. McCullough Professor of Finance at the University of Pittsburgh, Joseph M. Katz Graduate School of Business<br>• Former Director of the Center for Research on Contracts and the Structure of Enterprise, University of Pittsburgh |

## APPENDIX G

### PROPOSED CLASS REPRESENTATIVES' ALLOWED CLAIM AMOUNTS

REDACTED

Source: Data taken from documents produced by the six plaintiffs and the U.S. Receiver, and plaintiffs' deposition testimony. *See* App. 675 [ABBOTT_000433]; App. 1059 [STAN_TDBANK_000383]; App. 1051 [STAN_TDBANK_000553]; App. 1055 [STAN_TDBANK_000654]; App. 1165 [ABBOTT_000011]; App. 1111 [PENHOS_000095]; App. 1574-75 [June 10, 2015 Penhos Dep. Tr. at 195:18-25, 198:9-11]; App. 671 [ELSON-ROGERS_000790]; App. 903-04 [ELSON-ROGERS_000639-40]; App. 1087, 1090 [URIBE_000013, URIBE_000016]; App. 1113 [URIBE_000083]; App. 1121 [URIBE_000090]; [STAN_TDBANK_000089]; App. 1137 [STAN_TDBANK_000210]; App. 1063 [STAN_TDBANK_000657]; App. 1381-84 [May 27, 2015 Queyrouze Dep. Tr. at 229:18-232:18]; App. 1071 [SUAREZ_000158]; App. 1156 [SUAREZ_000167]; App. 1083 [SUAREZ_000204].

APPENDIX H

**EXECUTIVE SUMMARY OF STATE LAW DIFFERENCES**

This Executive Summary provides examples of state law variations regarding the common law claims in this Action, which involve aiding and abetting tort liability; aiding and abetting a fraud; aiding and abetting conversion; aiding and abetting a breach of fiduciary duty; and civil conspiracy. The complete analysis of the state laws on these claims is set forth in Exhibits 9 to 12 in the Appendix.

| **I. STATE VARIATIONS IN THE LAW OF AIDING AND ABETTING TORTS** |
|---|
| **A. Examples of States that Do Not Recognize Aiding and Abetting Tort Liability** |
| **Alabama –** *Continental Casualty Co. v. Compass Bank*, No. CIV.A. 04-0766-KD-C, 2006 WL 566900, at *11 (S.D. Ala. Mar. 6, 2006) (noting “it does not appear that Alabama recognizes the claim of aiding and abetting common law torts” and commenting that “[w]hen aiding and abetting is discussed in Alabama cases it is almost exclusively in the context of a criminal case or in reference to a specific civil statutory provision”). |
| **Louisiana –** *Guidry v. Bank of LaPlace*, 661 So. 2d 1052, 1057 (La. Ct. App. 1995) (“In the absence of a conspiracy, there is no distinct cause of action for aiding and abetting under Louisiana law.”). |
| **Ohio –** *Wells Fargo v. Smith*, No. 2012-04-006, 2013 WL 938069, at *7 (Ohio Ct. App. Mar. 11, 2013) (“Ohio does not recognize a cause of action for aiding and abetting a tortious act.”); *DeVries Dairy, L.L.C. v. White Eagle Coop. Assn., Inc.*, 974 N.E.2d 1194 (Ohio 2012) (holding that Ohio has never recognized an action for tortious acts in concert under the Restatement (Second) of Torts § 876). |
| **B. Examples of States that Recognize Aiding and Abetting Tort Liability** |
| **Alaska –** *Beal v. McGuire*, 216 P.3d 1154, 1174 (Alaska 2009) (“aiding and abetting liability occurs when the actor knows that the other’s conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other”). |
| **California –** *Casey v. U.S. Bank Nat’l Ass’n*, 26 Cal. Rptr. 3d 401, 405 (Ct. App. 2005) (“California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort.”). |
| **Maine –** *Barnes v. McGough*, 623 A.2d 144, 145 (Me. 1993) (the claim of aiding and abetting a tort is recognized in Maine). |
| **New Mexico –** *GCM, Inc. v. Kentucky Cent. Life Ins. Co.*, 947 P.2d 143, 147 (N.M. 1997) (“New Mexico recognizes tort liability for aiding and abetting another’s tortious conduct.”). |

| | |
|---|---|
| **C.** | **Examples of States That Have Not Explicitly Addressed Aiding and Abetting Tort Liability** |
| **Missouri –** *Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 09 CV 1252, 2012 WL 3984486, at *6 (E.D. Mo. Sept. 11, 2012) ("[T]he Missouri Supreme Court has not squarely decided whether to recognize the tort of aiding and abetting."). | |
| **II.** | **STATE VARIATIONS IN THE LAW OF AIDING AND ABETTING FRAUD** |
| **A.** | **Examples of State Law Variations With Respect to States' Recognition of a Cause of Action for Aiding and Abetting Fraud** |
| **Ohio –** *Fed. Mgt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 853 (Ohio Ct. App. 2000) ("Ohio does not recognize a claim for aiding and abetting common-law fraud."). | |
| **New Jersey –** *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l*, Inc., 904 A.2d 775, 782 (N.J. Super Ct. App. Div. 2006) ("[A]iding and abetting fraud is a cognizable civil cause of action under New Jersey law." ) | |
| **Hawaii –** *Television Events & Mktg., Inc. v. Amcon Distrib.* Co., 488 F. Supp. 2d 1071, 1077 (D. Haw. 2006) ("the courts recognized that Hawaii had not indicated whether a cause of action for aiding and abetting fraud existed, but neither court reached the issue because the respective plaintiffs failed to make any allegations to support such a claim"). | |
| **B.** | **Examples of State Law Variations With Respect to the Injured Party's Reliance on the Fraudulent Statement** |
| **Texas –** *Miller Global Props., LLC v. Marriott Int'l, Inc.*, 418 S.W.3d 342, 347-48 (Tex. App.—Dallas 2013, pet. denied) (plaintiffs "must have both actually and *justifiably* relied on the alleged misrepresentation to suffer a compensable injury"). | |
| **Kansas –** *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 532 (1987) ("The injured party's reliance on a fraudulent misrepresentation must be reasonable, justifiable and detrimental."). | |
| **Massachusetts –** *Mass. v. Mylan Labs.*, 608 F. Supp. 2d 127, 156-57 (D. Mass 2008) (a plaintiff "must also prove that it relied upon the representation as true" and that reliance was reasonable). | |
| **Iowa –** *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 736 (Iowa 2009) (noting that "justifiable reliance is an essential element of a claim for fraud"). | |
| **New Mexico –** *Papatheofanis v. Allen*, 242 P.3d 358, 361 (N.M. Ct. App. 2010) (noting there must be detrimental reliance). | |
| **Oregon –** *Or. Pub. Emples. Ret. Bd. v. Simat, Helliesen & Eichner*, 83 P.3d 350, 361 (Or. Ct. App. 2009) (to prevail on a fraud claim, "reliance in fact must be reasonable, but such reasonableness is measured in the totality of the parties' circumstances and conduct"). | |

**North Dakota** – *Phoenix Assurance Co. v. Runck,* 366 N.W.2d 788, 792 (N.D. 1985) ("In actions for fraud it is not required that a defendant's representations be the sole cause of the damage. If they are a substantial factor in inducing the plaintiff to act, even though he also relies in part upon the advice of others, reliance is sufficiently shown.").

**C. Examples of State Law Variations Regarding Required Level of Knowledge and Intent of Party Making the Fraudulent Statement**

**1. Example of States Requiring Actual Knowledge of Falsity**

**Alaska** – *Lightle v. State, Real Estate Comm'n*, 146 P.3d 980, 983-84 (Alaska 2006) ("To be 'fraudulent,' then, a representation need only be made with 'scienter,' in other words, the necessary 'knowledge of the untrue character.'").

**Connecticut** – *Alliance Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 167 (D. Conn. 2005) ("[A] defendant must know what he or she represents as true is not true. A reckless allegation will not suffice.").

**2. Example of States Requiring Only Recklessness**

**Minnesota** – *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986) ("even if a misrepresentation is made without purpose to deceive or without knowledge of its falseness, 'the fraud is as great as if the party knew his statement to be untrue'").

**Tennessee** – *Davis v. McGuigan*, 325 S.W.3d 149, 154 (Tenn. 2010) (statement needs to have been made with knowledge of falsity or recklessness or without belief that it was true).

**West Virginia** – *State v. Berkeley*, 23 S.E. 608, 609 (W. Va. 1985) ("[A] false representation may be made [with] scienter, in contemplation of law, in any of the following ways: (1) With actual knowledge of its falsity; (2) without knowledge either of its truth or falsity; or (3) under circumstances in which the person making it ought to have known, if he did not know, of its falsity.")

**3. Example of States Requiring Actual Knowledge Plus Intent to Deceive**

**New Jersey** – *Desi, poLink Court Reporting & Litig. Support Servs. v. Rochman*, 64 A.3d 579, 586 (App. Div. 2013) (plaintiff must demonstrate "defendant's knowledge of the falsity and intent to obtain an undue advantage").

**North Carolina** – *Latta v. Rainey*, 689 S.E.2d 898, 909 (N.C. Ct. App. 2010) ("required scienter is not present without both knowledge and an intent to deceive, manipulate, or defraud").

**4. Example of States Requiring Actual Knowledge or Recklessness, Plus Intent to Deceive**

**Kentucky** – *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (knowledge or recklessness, coupled with intent to induce reliance is required for fraud claims).

**Louisiana –** *Sys. Eng'g and Sec., Inc. v. Sci. & Eng's Ass'ns, Inc.*, 962 So. 2d 1089, 1091 (La. Ct. App. 2007) (knowing misrepresentation and intent to deceive required).

**New Mexico –** *Papatheofanis v. Allen*, 242 P.3d 358, 361 (N.M. Ct. App. 2010) (there must be knowledge of the falsity of the representation or recklessness in making the representation and intent to deceive and to induce reliance).

### D. Examples of State Law Variations With Respect to the Required Standard of Proof for Fraud

#### 1. Examples of States That Require Clear and Convincing Evidence

**Connecticut –** *Stuart v. Freiberg*, 116 A.3d 1195, 1203-04 (Conn. 2015) (noting that the elements of fraud must be "show[n] by clear and convincing evidence").

**Delaware –** *In re Estate of Dugger*, No. 224629, 2000 WL 1528710, at *4 (Del. Ch. Sep. 29, 2000 (same)

**Florida –** *Ibarra v. Izaguirre*, 985 So.2d 1117, 1119 (Fla. Dist. Ct. App. 2008) (same).

**Mississippi –** *Moore v. Bailey*, 46 So. 3d 375, 383-384 (Miss. Ct. App. 2010) ("To demonstrate a prima facie case of fraud, otherwise known as intentional misrepresentation, a plaintiff must demonstrate by clear and convincing evidence the following nine elements [of fraud].").

#### 2. Examples of States That Require Proof by a Preponderance of the Evidence

**Arkansas –** *Tyson Foods v. Davis*, 66 S.W.3d 568, 577 (Ark. 2002) ("The tort of fraud or deceit consists of five elements that the plaintiff must prove by a preponderance of the evidence.").

**Montana –** *In re Estate of Kindsfather*, 108 P.3d 487, 490 (Mont. 2005) ("A mere suspicion of fraud is not sufficient, fraud must be proven by a preponderance of the evidence.").

**Rhode Island –** *Ostalkiewicz v. Guardian Alarm, Div. of Colbert's Sec. Servs., Inc.*, 520 A.2d 563, 569 (R.I. 1987) ("[F]raud in a civil suit need only be proven by a fair preponderance of the evidence.").

#### 3. Examples of States That Apply Other Standards of Proof

**Alabama –** *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 17 (Ala. 2004) ("[A] party can prove fraud by 'substantial evidence' without having the "clear and convincing evidence" described in the statute as necessary to justify punitive damages in a fraud action.").

**Iowa –** *Hoelscher v. Sandage*, 462 N.W.2d 289, 291 (Iowa Ct. App. 1990) (each element of fraud must be proved "by a preponderance of clear, satisfactory, and convincing evidence").

| |
|---|
| **South Carolina –** *Moseley v. All Things Possible, Inc.*, 694 S.E.2d 43, 45 (S.C. Ct. App. 2010) (“To prevail on a cause of action for fraud, a Plaintiff must prove [the elements] by clear, cogent and convincing evidence.”). |
| **E. Examples of State Law Variations With Respect to the Applicable Statute of Limitations for Fraud** |
| **Louisiana –** *Winn Fuel Serv., Inc. v. Booth*, 34 So.3d 515, 519 (La. Ct. App. 2010) (one-year statute of limitations for fraud). |
| **Ohio –** *Bennett v. McKibben*, 915 P.2d 400, 405 (Okla. Civ. App. 1996 (two-year statute of limitations for fraud). |
| **Georgia –** *Hamburger v. PFM Capital Mgmt., Inc.*, 286 Ga. App. 382, 387 (2007) (four-year statute of limitations for fraud claims). |
| **Indiana –** *Orem v. Ivy Tech State Coll.*, 711 N.E.2d 864, 870 n.7 (Ind. Ct. App. 1999) (six years for fraud). |
| **III. STATE VARIATIONS IN THE LAW OF AIDING AND ABETTING CONVERSION** |
| **A. Examples of State Law Variations With Respect to Recognition of a Cause of Action for Aiding and Abetting Conversion** |
| **Kentucky –** *Budsgunshop.com, LLC v. Security Safe Outlet, Inc.*, No. 10-cv-00390-KSF, 2012 WL 1899851, at *18-19 (E.D. Ky. May 23, 2012) (noting that the court was unable to find a Kentucky state court case recognizing a civil action for aiding and abetting conversion). |
| **New York –** *Dickinson v. Igoni*, 76 A.D.3d 943, 945 (N.Y. App. Div. 2010) (New York law “permits a claim for aiding and abetting conversion”). |
| **Utah** – *Albright v. Attorney’s Title Ins. Fund*, No. 2:03-cv-517, 2008 WL 2952260, at *12 (D. Utah July 28, 2008) (“Although Utah appears to recognize aiding and abetting liability for intentional torts . . . Utah courts have not specifically recognized a cause of action for aiding and abetting conversion.”). |
| **B. Examples of State Law Variations With Respect to Required Intent for Conversion** |
| **Hawaii –** *Brooks v. Dana Nance & Co.*, 153 P.3d 1091, 1100 (Haw. 2007) (plaintiff must prove that defendant had “a constructive or actual intent to injure”); *accord. Newcomb v. Cambridge Home Loans, Inc.*, 861 F. Supp. 2d 1153, 1164 (D. Haw. 2012). |
| **Colorado –** *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1199 (Colo. App. 2009) (for conversion claim, a plaintiff must show a defendant “intentionally exercised dominion or control over a chattel”); *but see Holmes v. Young*, 885 P.2d 305, 310 (Colo. App. 1994) (“There is a |

| |
|---|
| divergence of authority [in Colorado] as to whether actual knowledge is required or whether constructive knowledge of the breach will suffice.”). |
| **Delaware –** *Segovia v. Equities First Holdings*, LLC, No. CIV.A.06C09-149-JRS, 2008 WL 2251218, at *19 (Del. Super. May 30, 2008) (“Conversion need not be accompanied by a subjectively wrongful intent to be actionable . . . . A person who mistakenly believes that his or her conduct is legal may nonetheless commit conversion.”). |
| **C. Examples of State Law Variations in Rules Governing Claims for Conversion of Money** |
| **Delaware –** *AM Gen. Holdings LLC ex rel. Ilshar Capital LLC v. Renco Grp., Inc.*, No. CV 7639-VCN, 2013 WL 5863010, at *16 (Del. Ch. Oct. 31, 2013) (“Under Delaware law, an action in conversion will not lie to enforce a claim for the payment of money.”). |
| **California –** *Sanowicz v. Bacal*, 184 Cal. Rptr. 3d 517, 529 (Ct. App. 2015) (money cannot be the subject of a conversion action “*unless there is a specific, identifiable sum involved*”). |
| **Wyoming –** *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 978 (Wyo. 1994) (money may be the subject of a conversion action, but the money needs to be “identifiable” and “there must also be an obligation to deliver that money in a specific manner”). |
| **Alaska –** *Burseth v. Weyerhaeuser Mortgage Co.*, No. S-5075, 1993 WL 13563649, at *5 (Alaska Oct. 13, 1993) (the Supreme Court of Alaska has recognized “an action for conversion where the allegedly converted property is money”). |
| **D. Examples of State Law Variations With Respect to the Required Interest in the Allegedly Converted Property** |
| **Vermont –** *Miller v. Merchants Bank*, 415 A.2d 196, 199 (Vt. 1980) (“To make out a claim for conversion . . . plaintiff must show an immediate right to possession.”). |
| **Connecticut –** *Devitt v. Manulik*, 410 A.2d 465, 467 (Conn. 1979) (in an action for conversion, plaintiff must prove “an immediate right to possession at the time of conversion”). |
| **Alaska –** *McKibben v. Mohawk Oil Co.*, 667 P.2d 1223, 1229 (Alaska 1983) (“A future possessory interest is sufficient for a plaintiff to maintain an action for conversion.”). |
| **E. Examples of State Law Variations With Respect to the Applicable Statute of Limitations for Conversion** |
| **Louisiana –** La. Rev. Stat. Ann. 10:3-420 (one-year statute of limitations for conversion of an instrument). |
| **Mississippi, Texas, Tennessee, Washington –** Tex. Bus. & Com. Code Ann. § 3.118(g) (West) (three-year statute of limitations); Tenn. Code Ann. § 47-3-118(g) (West) (same); Wash. Rev. Code Ann. § 62A.3-118 (g) (West) (same); Miss. Code. Ann. § 75-3-118 (g)(West) (same). |

| |
|---|
| **New York** – *Doukas v. Ballard*, 972 N.Y.S.2d 143 (N.Y. Sup. Ct. 2013) (three-year statute of limitations for conversion under N.Y. C.P.L.R. § 214(3)). |
| **Florida** – *Feingold v. Am. Rack & Stack, Inc.*, 734 So.2d 479, 480 (Fla. Dist. Ct. App. 1999) (applying Fla. Stat. Ann. § 95.11(3)(h)'s four-year statute of limitations for conversion). |
| **Iowa, Virginia** – *Husker News Co. v. Mahaska State Bank*, 460 N.W.2d 476, 477 (Iowa 1990) (applying five-year statute of limitations to claim for conversion of an instrument); *Willard v. Moneta Bldg. Supply, Inc.*, 551 S.E.2d 596, 599 (Va. 2001) (noting that it is "well-established" that conversion actions constitute claims of injury to property and applying the five-year statute of limitations under Va. Code. Ann. § 8.01-243(B)). |
| **Oregon** – Or. Rev. Stat. Ann. § 73.0118(7)(a) (West) (six-year statute of limitations for conversion of an instrument). |
| **IV. STATE VARIATIONS IN THE LAW OF AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** |
| **A. Examples of State Law Variations With Respect to States' Recognition of a Claim for Aiding and Abetting Breach of Fiduciary Duty** |
| **1. Examples of States That Do Not Recognize This Cause of Action** |
| **Louisiana** – *Broyles v. Cantor Fitzgerald & Co.*, No. 10-854-JJB, 2014 WL 6886158, at *5 (M.D. La. Dec. 8, 2014) ("This Court has ruled before that aiding and abetting the breach of a fiduciary duty is not a cause of action recognized in Louisiana."). |
| **Indiana** – *Crystal Valley Sales, Inc. v. Anderson*, 22 N.E.3d 646, 656 (Ind. Ct. App. 2014) (noting that "Indiana does not recognize . . . a cause of action" for aiding and abetting a breach of fiduciary duty). |
| **Kentucky** – *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 260 (Ky. Ct. App. 2008) ("Kentucky law has never recognized a civil cause of action for aiding and abetting a breach of fiduciary duty."). |
| **2. Examples of States That Recognize This Cause of Action** |
| **Oregon** – *Granewich v. Harding*, 985 P.2d 788, 793 n.3 (Or. 1999) (recognizing claim for aiding and abetting a breach of a fiduciary duty as a "subcategory of a broader theory of vicarious tort liability"). |
| **South Carolina** – *Vortex Sports & Entm't, Inc. v. Ware*, 662 S.E.2d 444, 448 (S.C. Ct. App. 2008) (setting out elements for aiding and abetting a breach of fiduciary duty). |
| **Washington** – *Vanguard Int'l, Inc. v. Guangdong Fully, Ltd.*, No. 57396-9-I, 2008 WL 116268, at *4 (Wash. Ct. App. 2008) (describing "well settled" rule that a person who "knowingly assists another in violating his fiduciary" obligation is "liable as an aider and abettor"). |

| **3. Examples of States Where This Is an Open Question** |
|---|
| **Connecticut –** *Flannery v. Signer Asset Fin. Co.*, 94 A.3d 553, 560 n.12 (Conn. 2014) (noting that this issue is an open question in Connecticut and commenting that "[t]he Appellate Court assumed, without deciding, 'that Connecticut recognizes an action for aiding and abetting in the breach of a fiduciary duty'"). |
| **New Hampshire –** *In re Felt Mfg. Co., Inc.*, 371 B.R. 589, 615 (Bankr. D.N.H. 2007) (noting that New Hampshire has not addressed whether a claim for aiding and abetting a breach of fiduciary duty exists under New Hampshire law). |
| **B. Examples of State Law Variations With Respect to the Required Level of Knowledge and Intent by an Alleged Aider and Abettor** |
| **Georgia –** *Wright v. Apartment Inv. & Mgmt. Co.*, 726 S.E.2d 779, 788 (Ga. Ct. App. 2012) (plaintiff must establish that defendant had knowledge of fiduciary duty owed between primary wrongdoer and plaintiff and that "the defendant acted purposely and with malice and the intent to injure"). |
| **New Jersey –** *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 307 (D.N.J. 2012) (New Jersey law requires that a defendant had "actual knowledge" of the breach of fiduciary duty). |
| **Minnesota –** *Park Midway Bank, N.A. v. R.O.A., Inc.*, No. A11-2092, 2012 WL 3263866, at *4 (Minn. Ct. App. Aug. 13, 2012) (requiring plaintiff demonstrate that defendant had "actual knowledge that the [primary tortfeasor was] engaging in tortious conduct"). |
| **Connecticut –** *Katcher v. 3V Capital Partners LP*, No. 05CV085008383S, 2011 WL 1105724, at *13 (Conn. Super. Ct. Feb. 1, 2011) (in a claim for aiding and abetting breach of fiduciary duty, "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"). |
| **South Dakota –** *Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756, 775 (S.D. 2007) ("Although in some instances actual knowledge may be required, constructive knowledge will often suffice. Constructive knowledge is adequate when the aider and abettor has maintained a long-term or in-depth relationship with the fiduciary.") |
| **C. Examples of State Law Variations With Respect to the Applicable Statute of Limitations for Breach of Fiduciary Duty** |
| **Tennessee –** Tenn. Code Ann. § 48-18-601 (one-year statute of limitations applies to breach of fiduciary duty claims). |
| **Arizona, Pennsylvania –** *Serrano v. Serrano*, No. 1 CA-CV 10-0649, 2012 WL 75639, at *3, 6 (Ariz. Ct. App. Jan. 10, 2012) (two-year statute of limitations for breach of fiduciary duty claims); *Pierce v. Rossetta Corp.*, No. 88-5873, 1992 WL 165817, at *10 (E.D. Pa. June 12, 1992) (same). |

| |
|---|
| **California, Massachusetts** – Cal Code Civ Proc § 338; *William L. Lyon & Associates, Inc. v. Superior Court*, 204 Cal. App. 4th 1294, 1313 (Cal. App. 3d Dist. 2012) (three-year statute of limitations for aiding and abetting breach of fiduciary duty); M.G.L.A. 260 § 2A; *O'Connor v. Redstone*, 452 Mass. 537, 551 (Mass. 2008) (same). |
| **Georgia, Utah** – O.C.G.A. § 9-3-25; *Hendry v. Wells*, 650 S.E.2d 338, 343-44 (four-year statute of limitations applicable to breach of fiduciary duty claims); *United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880, 890 (Utah 1993) (citing Utah Code Ann. § 78B-2-307) (same). |
| **Colorado, Missouri** – *Johnston v. CIGNA Corp.*, 916 P.2d 643, 652 (Colo. App. 1996) (five years for breach of fiduciary duty); *Cmty. Title Co. v. U.S. Title Guar. Co.*, 965 S.W.2d 245, 253 (Mo. Ct. App. 1998) (same). |
| **Minnesota, New Jersey** – *O'Leary ex rel. Lakeland Printing Co., Inc. v. Carefree Living of Am. (Minnetoka)*, No. C5-00-2072, 2001 WL 1083757, at *3 (Minn. Ct. App. Sep. 18, 2001) (Minnesota imposes a six-year statute of limitations for "allegations of breach of fiduciary duty based on" fraud claims); *Balliet v. Fennell*, 845 A.2d 168, 170, 172 (N.J. Super. Ct. App. Div. 2004) (six-year statute of limitations for breach of fiduciary duty causing purely economic loss). |
| **V. STATE VARIATIONS IN THE LAW OF CIVIL CONSPIRACY** |
| **A. Examples of State Law Variations With Respect to Civil Conspiracy as an Independent Cause of Action** |
| **1. Examples of States that Do Not View Civil Conspiracy as a Stand-Alone Cause of Action** |
| **Michigan** – *Early Detection Ctr., P.C., v. New York Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. Ct. App. 1986) ("[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable, tort."). |
| **Mississippi** – *Bradley v. Kelley Bros. Contractors*, 117 So.3d 331, 339 (Miss. Ct. App. 2013) ("A conspiracy standing alone, without the commission of acts causing damage is not actionable."). |
| **North Carolina** – *New Bar P'ship v. Martin*, 729 S.E.2d 675, 682 (N.C. Ct. App. 2012) ("[I]t is well established that there is not a separate civil action for civil conspiracy in North Carolina. Instead, civil conspiracy is premised on the underlying act. Thus, where a plaintiff's underlying claims fail, its claim for civil conspiracy must also fail."). |
| **Pennsylvania** – *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000) ("[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act."). |

| 2. Examples of States That May View Civil Conspiracy as an Independent Cause of Action |
|---|
| **Delaware –** *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 805 n. 149 (Del. Ch. 2009) (stating that "civil conspiracy is an independent wrong," and noting that that while "[s]ome jurisdictions have abandoned the independent tort of conspiracy," "Delaware has never done so"). |
| **Florida –** *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977) (in specific circumstances, Florida law does not require an independent, underlying tort for a claim for civil conspiracy to be maintained: "[I]f the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess, then conspiracy itself becomes an independent tort."). |
| **B. Examples of State Law Variations With Respect to the Required Level of Knowledge and Intent** |
| **1. Examples of States That Require Specific Intent** |
| **Alabama –** *First Bank of Childersburg v. Florey*, 676 So.2d 324, 327 (Ala. Civ. App. 1996) (to establish an agreement, "[t]he plaintiff must allege and prove that the claimed conspirators had actual knowledge of, and the intent to bring about, the object of the claimed conspiracy"); |
| **Arkansas –** *Faulkner v. Arkansas Children's Hosp.*, 69 S.W.3d 393, 406 (Ark. 2002) (civil conspiracy in Arkansas is an "intentional tort which requires specific intent to accomplish the contemplated wrong"). |
| **Minnesota –** *Tremco, Inc. v. Holman*, No. C8-96-2139, 1997 WL 423575, at *4 (Minn. Ct. App. July 29, 1997 (plaintiff must demonstrate that defendants had a "specific intent to achieve an unlawful purpose"). |
| **Mississippi –** *S. Health Corp. of Houston v. Crausby*, No. 2014-CA-00603-COA, 2015 WL 3541907, at *3 (Miss. Ct. App. May 26, 2015) (a meeting of the minds requires not just an agreement, but an agreement "to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully"). |
| **2. Example of States That Require Malice** |
| **Florida –** *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977) (for species of conspiracy claim not requiring an underlying tort, conspiracy requires "malicious motive"). |
| **Ohio –** *Cook v. Kudlacz*, 974 N.E.2d 706, 725 (Ohio Ct. App. 2012) (civil conspiracy requires a "malicious combination"); *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996) ("The 'malice' in 'malicious combination' is legal or implied malice . . . and is defined as 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'"). |

| |
|---|
| **Pennsylvania –** *Rutherford v. Presbyterian-Univ. Hosp.*, 612 A.2d 500, 508 (Pa. Super. Ct. 1992) ("Proof of malice, i.e., an intent to injure, is an essential part of a conspiracy cause of action; this unlawful intent must also be without justification."). |
| **C. Examples of State Law Variations With Respect to the Standard of Proof** |
| **1. Examples of States That Require Proof by Clear and Convincing Evidence** |
| **Arizona –** *Law Corp. of Brian Finander, P.C. v. Alexander*, No. 1 CA-CV 08-0290, 2009 WL 449233, at *4 (Ariz. Ct. App. Feb. 24, 2009) ("The agreement to commit a tort must be proven by clear and convincing evidence." ). |
| **Illinois –** *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) ("If a conspiracy is shown by circumstantial evidence, however, that evidence must be clear and convincing."). |
| **Missouri –** *Chmieleski v. City Prods. Corp.*, 660 S.W.2d 275, 289-90 (Mo. Ct. App. 1983) (proof of a civil conspiracy must be "supported by clear and convincing evidence") |
| **Oklahoma –** *Shadid v. Monsour*, 746 P.2d 685, 688 (Okla. Civ. App. 1987) (proof of a conspiracy must be with clear and convincing evidence). |
| **Utah –** *Crane Co. v. Dahle*, 576 P.2d 870, 872 (Utah 1978) (the burden of proof for conspiracy "is higher than mere preponderance," as a plaintiff must establish civil conspiracy "by clear and convincing evidence"). |
| **Virginia –** *Waytec Elec. Corp. v. Rohm & Haas Elec. Materials, LLC*, 459 F. Supp. 2d 480, 492 (W.D. Va. 2006) ("[A] civil conspiracy must be shown by clear and convincing evidence."). |
| **2. Example of States That Require Proof by a Preponderance of the Evidence** |
| **Rhode Island –** *Stubbs v. Taft*, 149 A.2d 706, 708-09 (R.I. 1959) ("[T]he doctrine of reasonable doubt has no place in a civil suit for damages where it is sufficient if the evidence is full, clear and satisfactory, and the conspiracy established by a preponderance of the evidence. This degree of proof, however, is necessary. The evidence must do more than raise a suspicion. It must lead to belief."). |
| **Washington –** *Sterling Bus. Forms, Inc. v. Thorpe*, 918 P.2d 531, 533 (Wash. Ct. App. 1996) ("A plaintiff in a civil conspiracy action has the burden of proving the case by a preponderance of the evidence, and must establish the existence of the conspiracy by clear, cogent and convincing evidence."). |

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2015, the foregoing document was delivered electronically to all counsel of record who have consented to electronic service.

/*s*/ James V. Leito IV
James V. Leito IV

Case 12-04041-bjh Document 1-27 Filed 04/27/16 Page 1 of 8 PageID 4334

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SAMUEL TROICE, HORACIO MENDEZ, ANNALISA MENDEZ, and PUNGA PUNGA FINANCIAL, LTD., individually and on behalf of all others similarly situated,

Plaintiffs,

- against -

PROSKAUER ROSE LLP, THOMAS V. SJOBLOM, P. MAURICIO ALVARADO, and CHADBOURNE & PARKE LLP,

Defendants.

Civil Action No. 3:09-cv-01600-N

[Oral Argument Requested]

**OPPOSITION OF DEFENDANTS PROSKAUER ROSE LLP, CHADBOURNE & PARKE LLP AND THOMAS V. SJOBLOM TO PLAINTIFFS' OPPOSED MOTION FOR CLASS CERTIFICATION, FOR DESIGNATION OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

GT
EXHIBIT 019

APP 0483

Case 3:12-cv-04641-N-BG Document 181-7 Filed 02/26/16 Page 12 of 89 PageID 4032

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ........................................................................ 4

A. The SIB CDs at Issue Were Marketed to Investors Around the World Through a Variety of Marketing Materials and Oral Representations. ....... 4

1. The Alleged Omissions and Misrepresentations Made to SIB CD Investors Were Not Uniform. ........................................ 5

a. Investors Were Not Uniformly Told that SIB Was a "U.S.-Based Business." ........................................ 5

b. Investors Were Not Uniformly Told that SIB CDs Were Subject to U.S. Government Regulation or Backed by U.S. Government Insurance. ........................................ 6

c. The Representations about the Liquidity and Safety of the SIB CDs Were Not Uniform. ........................................ 8

2. As Far Back as 2005, Putative Class Members Had Information about the SEC's Investigation of Stanford. ........................................ 9

3. The Putative Class Members Varied in Their Purchases of the SIB CDs. ........................................ 10

B. Putative Class Members Have Filed Numerous Individual Litigations Against Defendants ........................................ 13

C. The Instant Proceedings ........................................ 14

ARGUMENT ........................................................................ 15

I. Movants Have Not Satisfied and Cannot Satisfy Rule 23(b)(3)'s Requirements Because Individualized Issues Predominate Over Common Issues ........................................ 16

A. Material Differences in the Alleged Misrepresentations or Omissions to Putative Class Members Preclude Certification. .... 17

B. Individual Issues of Reliance Will Predominate with Respect to Plaintiffs' Remaining Common Law Causes of Action. .............. 19

1. Plaintiffs' Remaining Common Law Claims Require Proof of Reasonable or Justifiable Reliance, Precluding Certification. .......... 19

2. Movants Are Not Entitled to a Presumption of Reliance Under Affiliated Ute.......... 22

C. Individual Issues of Knowledge Will Predominate With Respect to Plaintiffs' Claims Under the TSA. .......... 23

D. Individual Issues Will Predominate in Determining Which of the Putative Class Members' Claims Are Barred Holder Claims. .......... 25

E. Movants Have Not Established that Common Issues of Damages Predominate. .......... 27

1. Movants Fail to Offer Any Viable Classwide Damages Model.......... 27

2. Movants Fail to Offer a Damages Approach Consistent with Any Theory of Liability. .......... 30

F. Choice-of-Law Considerations Preclude Class Certification. ...... 31

G. Individual Issues of Timeliness Will Predominate.......... 35

II. A Class Action Is Not Superior to Individual or Joined Actions.......... 36

A. Foreign Jurisdictions Would Not Recognize, or Give Preclusive Effect to, a Class Action Judgment Against the Putative Class. .......... 37

1. Movants Have Not Satisfied Their Burden with Regard to Foreign Putative Class Members. .......... 39

2. On the Undisputed Evidence, Courts in the Foreign Jurisdictions at Issue Are Highly Unlikely to Give Preclusive Effect to a Judgment of the Court, or to a Settlement, in this U.S. Opt-Out Class Action. .......... 45

B. Movants Have Not Proven, and Cannot Prove, that Putative Class Members Lack Sufficient Motive to Bring Individual Actions. .......... 53

III. Movants Have Not Provided and Cannot Provide Any Evidence that a Class Is Ascertainable.......... 56

IV. Movants Cannot Satisfy Rule 23's Adequacy or Typicality Requirements ............ 61

A. The Proposed Class Representatives Have Not Satisfied, and Cannot Satisfy, Rule 23(a)(4)'s Adequacy Requirement............ 62

B. The Proposed Class Representatives Have Not Satisfied, and Cannot Satisfy, Rule 23(a)(3)'s Typicality Requirement. ............ 67

V. Movants Have Not Demonstrated that Investors Who Were Citizens or Residents of the United States Are Sufficiently Numerous to Form a Class............ 69

VI. In the Alternative, If the Court Does Not Deny Class Certification, It Should Limit the Proposed Class ............ 70

CONCLUSION............ 73

**TABLE OF AUTHORITIES**

CASES

PAGE(S)

Abby v. City of Detroit,
218 F.R.D. 544 (E.D. Mich. 2003) .......... 53, 55

Abell v. Potomac Ins. Co.,
858 F.2d 1104 (5th Cir. 1988) .......... 22

Affiliated Ute Citizens of Utah v. U. S.,
406 U.S. 128 (1972) .......... 22

Alaska Elec. Pension Fund v. Flowserve Corp.,
572 F.3d 221 (5th Cir. 2009) .......... 16–17

In re Alstom SA Sec. Litig.,
253 F.R.D. 266 (S.D.N.Y. 2008) .......... 37, 38

Amchem Prods., Inc. v. Windsor,
521 U.S. 591 (1997) .......... 17, 43, 54, 61

Am. Tobacco Co. v. Grinnell,
951 S.W.2d 420 (Tex. 1997) .......... 17, 20

Amgen Inc. v. Conn. Ret. Plans & Trust Funds,
133 S. Ct. 1184 (2012) .......... 19

Ansari v. New York Univ.,
179 F.R.D. 112 (S.D.N.Y. 1998) .......... 38

Anwar v. Fairfield Greenwich Ltd.,
289 F.R.D. 105 (S.D.N.Y. 2013), vacated on other grounds & remanded sub nom. by St. Stephen's Sch. v. PricewaterhouseCoopers Accountants N.V.,
570 F. App'x 37 (2d Cir. 2014) .......... 43, 44

Askanase v. Fatjo,
130 F.3d 657 (5th Cir. 1997) .......... 13, 20

In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.,
228 F. Supp. 2d 348 (S.D.N.Y. 2002) .......... 38

Barasich v. Shell Pipeline Co.,
Civ. A. No. 05-4180, 2008 WL 6468611 (E.D. La. June 19, 2008) .......................... 53

Barnett v. Experian Info. Solutions,
No. Civ .A. 2:00CV175, 2004 WL 4032909 (E.D. Tex. Sept. 30, 2004)................... 71

Barsky v. Arthur Andersen, LLP,
No. Civ. A H-02-1922, 2002 WL 32856818 (S.D. Tex. Aug. 16, 2002)............. 25–26

Bell v. Ascendant Solutions, Inc.,
No. Civ. A. 301CV0166N, 2004 WL 149009 (N.D. Tex. July 1, 2004).................... 19

Bell Atl. Corp. v. AT&T Corp.,
339 F.3d 294 (5th Cir. 2003)....................................................................... 29, 31

Berger v. Compaq Computer Corp.,
257 F.3d 475 (5th Cir. 2001)...................................................................61, 62, 63, 66

Bersch v. Drexel Firestone, Inc.,
519 F.2d 974 (2d Cir. 1975), abrogated on other grounds by
Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010) .................................. 37, 38

In re BP p.l.c. Sec. Litig.,
No. MDL No. 10-md-2185, Civ. A. No. 4:10-md-2185,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ........................................................... 29

In re BP p.l.c. Sec. Litig.,
Civ. A. No. 4:10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) ......... 29, 30

Buettgen v. Harless,
263 F.R.D. 378 (N.D. Tex. 2009)................................................................................ 37

Calnin v. Hilliard,
Nos. 05-C-69, 05-C-1092, 05-C-784, 05-C-1148, 05-C-958,
2008 WL 336892 (E.D. Wis. Feb. 5, 2008) ............................................................. 68

Carrera v. Bayer Corp.,
727 F.3d 300 (3d Cir. 2013)........................................................................................ 56

Castano v. Am. Tobacco Co.,
84 F.3d 734 (5th Cir. 1996)....................................................................... passim

City of San Antonio v. Hotels.com,
Civ. No. SA-06-CA-381-OG, 2008 WL 2486043 (W.D. Tex. May 27, 2008) .......... 67

CL-Alexanders Laing & Cruickshank v. Goldfeld, 127 F.R.D. 454 (S.D.N.Y. 1989) .......... 39

Cole v. Gen. Motors Corp., 484 F.3d 717 (5th Cir. 2007) .......... 31, 33

Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013) .......... passim

Conger v. Danek Medical, Inc., 27 F. Supp. 2d 717 (N.D. Tex. 1998) .......... 72

Corley v. Entergy Corp., 220 F.R.D. 478 (E.D. Tex. 2004) .......... 35, 36

Crescendo Invs., Inc. v. Brice, 61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied) .......... 72

DeBremaecker v. Short, 433 F.2d 733 (5th Cir. 1970) .......... 56, 59, 61

In re Deepwater Horizon, 739 F.3d 790 (5th Cir. 2014) .......... 28

Del Fierro v. Pepsico Int'l, 897 F. Supp. 59 (E.D.N.Y. 1995) .......... 39

Duperier v. Tex. State Bank, 28 S.W.3d 740 (Tex. App.—Corpus Christi 2000) .......... 23

Dvorin v. Chesapeake Exploration, LLC, Civ. A. No. 3:12-CV-3728-G, 2013 WL 6003433 (N.D. Tex. Nov. 13, 2013) .......... 55

Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am., Civ. A. No. 7:12-cv-00133-O, 2014 WL 3744976 (N. D. Tex. July 30, 2014) .......... 44

Eagle Props., Ltd. v. Scharbauer, 807 S.W.2d 714 (Tex. 1990) .......... 36

Eatmon v. Palisades Collection, LLC, No. 2:08-CV-306-DF-CE, 2010 WL 1189571 (E.D. Tex. Mar. 5, 2010) .......... 36

Ellis v. Great Sw. Corp., 646 F.2d 1099 (5th Cir. 1981) .......... 35

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
529 F. Supp. 2d 644 (S.D. Tex. 2006) .................................................... 23, 63, 64, 71

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
Civ. A. Nos. H-01-3624, G-02-0299, 2007 WL 789141
(S.D. Tex. Mar. 12, 2007) .................................................... 25, 26

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
490 F. Supp. 2d 784 (S.D. Tex. 2007) .................................................... 25

EQT Prod. Co. v. Adair,
764 F.3d 347 (4th Cir. 2014) .................................................... 58

Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,
51 S.W.3d 573 (Tex. 2001) .................................................... 17

In re FEMA Trailer Formaldehyde Prods. Liab. Litig.,
No. MDL 071873, 2008 WL 5423488 (E.D. La. Dec. 29, 2008) .................................................... 70

In re Ford Motor Co. Bronco II Prod. Liab. Litig.,
177 F.R.D. 360 (E.D. La. 1997) .................................................... 64

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,
479 F. Supp. 2d 349 (S.D.N.Y. 2007) .................................................... 35

Frey v. First Nat'l Bank S.W.,
--- F. App'x ---, 2015 WL 728066 (5th Cir. Feb. 20, 2015) .................................................... 58

Gene & Gene LLC v. BioPay LLC,
541 F.3d 318 (5th Cir. 2008) .................................................... 25, 26

Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.,
97 S.W.3d 779 (Tex. App.-Dallas 2003),
rev'd in part on other grounds by 161 S.W.3d 482 (Tex. 2005) .................................................... 72

Goodman v. Harris Cnty.,
571 F.3d 388 (5th Cir. 2009) .................................................... 13

G. Prop. Mgmt., Ltd. v. Multivest Fin. Servs. of Tex., Inc.,
219 S.W.3d 37 (Tex. App. [San Antonio] 2006, no pet.) .................................................... 36

Griffin v Box Griffin v. Box,
85 F.3d 625, 1996 WL 255296 (5th Cir. May 2, 1996) .................................................... 22

Guardian Angel Credit Union v. MetaBank,
No. 08-cv-261-PB, 2009 WL 2489325 (D.N.H. Aug. 12, 2009) .................................................... 34

Gyarmathy & Assocs., Inc. v. TIG Ins. Co.,
No. Civ. A. 3:02-cv-1245,
2003 WL 21339279 (N.D. Tex. June 3, 2003)..................................17–18, 22, 32, 33

Halliburton Co. v. Erica P. John Fund, Inc.,
134 S. Ct. 2398 (2014)........................................................................ 15, 19, 22

Hancock v. Chi. Title Ins. Co.,
263 F.R.D. 383 (N.D. Tex. 2009) ..................................................................26

Haralson v. E.F. Hutton Grp., Inc.,
919 F.2d 1014 (5th Cir. 1990)........................................................................71

In re Hartmarx Sec. Litig.,
No. 01 C 7832, 2002 WL 31103491 (N.D. Ill. Sept. 19, 2002)................................71

Henry Schein, Inc. v. Stromboe,
102 S.W.3d 675 (Tex. 2003)..........................................................................20

Holmes v. Serv. Corp. Int'l,
Civ. Act. No. H-10-4841, 2014 WL 3046971 (S.D. Tex. July 3, 2014) ....................70

Intercontinental Hotels Corp. v. Girards,
No. 05-02-01604-CV, 2004 Tex. App. LEXIS 2178 (Tex. App.—Dallas [5th Dist.] 2004) (no pet)..........................................................................................58

John v. Nat'l Sec. Fire & Cas. Co.,
501 F.3d 443 (5th Cir. 2007)................................................................... 56, 60

Joseph v. Wiles,
223 F.3d 1155 (10th Cir. 2000).......................................................................23

Karnes v. Fleming,
Civ. Act. No. H-07-0620, 2008 WL 4528223 (S.D. Tex. July 31, 2008) ..................33

Kelley v. Galveston Autoplex,
196 F.R.D. 471 (S.D. Tex. 2000) ............................................................ 35, 36

In re Kosmos Energy Ltd. Sec. Litig.,
299 F.R.D. 133 (N.D. Tex. 2014)........................................................... passim

Kottler v. Deutsche Bank AG,
No. 05 Civ. 7773 (PAC), 2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010)...................53

Krogman v. Sterritt,
202 F.R.D. 467 (N.D. Tex. 2001)........................................................................22

Lam v. Alpha Realtors, Inc.,
Civ. A. No. H-09-3041, 2010 WL 4569995 (S.D. Tex. Nov. 4, 2010)......................20

Lee v. Am. Airlines, Inc.,
No. Civ. A.3:01-CV-1179-P, 2002 WL 31230803 (N.D. Tex. Sept. 30, 2002).........33

Longden v. Sunderman,
123 F.R.D. 547 (N.D. Tex. 1988)........................................................................64

In re LTV Sec. Litig.,
88 F.R.D. 134 (N.D. Tex. 1980) ........................................................................63

Maldonado v. Ochsner Clinic Found.,
493 F.3d 521(5th Cir. 2007)..............................................................................36

Martin v. Home Depot U.S.A., Inc.,
225 F.R.D. 198 (W.D. Tex. 2004) .......................................................................25

McManus v. Fleetwood Enters., Inc.,
320 F.3d 545 (5th Cir. 2003)..............................................................................22

Morrison v. Nat'l Austl. Bank Ltd.,
561 U.S. 247 (2010) ...........................................................................................71

Neilson v. Union Bank of Cal., N.A.,
290 F. Supp. 2d 1101 (C.D. Cal. 2003) ...............................................................35

Nicholas v. Crocker,
687 S.W.2d 365 (Tex. App.—Tyler 1984, writ ref'd n.r.e.).....................................72

Norwood v. Raytheon Co.,
237 F.R.D. 581 (W.D. Tex. 2006)............................................................ 33, 34, 35

Ogden v. AmeriCredit Corp.,
225 F.R.D. 529 (N.D. Tex. 2005) ........................................................................63

Ortiz v. Collins,
203 S.W.3d 414 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ..........................20

O'Sullivan v. Countrywide Home Loans, Inc.,
319 F.3d 732 (5th Cir. 2003)..............................................................................43

In re Park Cent. Global Litig.,
No. 3:09–cv-765–M, 2014 WL 4261950 (N.D. Tex. Aug. 25, 2014)................. 19, 22

Patterson v. Mobil Oil Corp.,
241 F.3d 417 (5th Cir. 2001)........................................................................ 20

Pfeffer v. HSA Retail, Inc.,
Civ. A. No. SA-11-CV-959-XR,
2012 WL 1910034 (W.D. Tex. May 24, 2012)........................................... 56, 58, 59

Phillips Petroleum Co. v. Shutts,
472 U.S. 797 (1985) ................................................................................ 33, 61

Pitman v. Lightfoot,
937 S.W.2d 496 (Tex. App.—San Antonio 1996, writ denied)................................ 72

Pitts v. Greenstein,
Civ. A. No. 10-635-JJB-SR, 2011 WL 2193398 (M.D. La. June 6, 2011) .......... 67, 69

Prospect High Income Fund v. Grant Thornton, L.L.P.,
203 S.W.32 602, 616 (Tex. App.—Dallas 2006),
rev'd in part on other grounds,
314 S.W.3d 913 (Tex. 2010)........................................................................ 20

Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.,
482 F.3d 372 (5th Cir. 2007)........................................................................ 23

Robertson v. Monsanto Co.,
287 F. App'x 354 (5th Cir. 2008) ................................................................. 31

Schlumberger Technology Corp. v. Swanson,
959 S.W.2d 171 (Tex. 1997)........................................................................ 20

Shiring v. Tier Techs., Inc.,
244 F.R.D. 307 (E.D. Va. 2007) ................................................................... 65

Simms v. Jones,
296 F.R.D. 485 (N.D. Tex. 2013)...................................................... 16, 22

Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
482 F.2d 880 (5th Cir. 1973)....................................................... 17, 19, 21

Smith v. Ayres,
845 F.2d 1360 (5th Cir. 1988)..................................................................... 23

Spence v. Glock, Ges.m.b.H.,
227 F.3d 308 (5th Cir. 2000)........................................................................ 32, 34

Steering Comm. v. Exxon Mobil Corp.,
461 F.3d 598 (5th Cir. 2006)........................................................................ 27, 28

Sterling Trust Co. v. Adderley,
168 S.W.3d 835 (Tex. 2005)........................................................................ 24, 35

Stirman v. Exxon Corp.,
280 F.3d 554 (5th Cir. 2002)........................................................................ 62, 68

Stoudt v. E.F. Hutton & Co.,
121 F.R.D. 36 (S.D.N.Y. 1988).......................................................................... 54

In re Superior Offshore Int'l, Inc. Sec. Litig.,
No. CIV.A.H-08-0687, 2010 WL 2305742 (S.D. Tex. June 8, 2010) ...................... 25

Supernova Sys., Inc. v. Great Am. Broadband, Inc.,
Cause No. 1:10-CV-319, 2012 WL 425552 (N.D. Ind. Feb. 9, 2012)....................... 68

Taylor v. CSX Transp., Inc.,
264 F.R.D. 281 (N.D. Ohio 2007)........................................................................ 53

TCA Bldg. Co. v. Entech, Inc.,
86 S.W.3d 667 (Tex. App.—Austin 2002, no pet.)........................................... 20, 72

Ticknor v. Rouse's Enters., L.L.C.,
592 F. App'x 276 (5th Cir. 2014) ........................................................................ 55

Union Asset Mgmt. Holding A.G. v. Dell, Inc.,
669 F.3d 632 (5th Cir. 2012)........................................................................ 59, 70

In re Vivendi Universal, S.A.,
242 F.R.D. 76 (S.D.N.Y. 2007)..........................................................37, 38, 42, 43

Wal-Mart Stores, Inc. v. Dukes,
131 S. Ct. 2541 (2011)........................................................................ 15, 36, 43

Walsh v. Ford Motor Co.,
807 F.2d 1000 (D.C. Cir. 1986) .......................................................................... 32

Warren v. Reserve Fund, Inc.,
728 F.2d 741 (5th Cir. 1984).............................................................................. 67

STATUTES & RULES

7 Tex. Admin. Code § 139.16 ........................................ 67

Fed. R. Civ. P. 23 ........................................ passim

Fed. R. Civ. P. 26(a)(2)(d)(ii) & advisory committee's note ........................................ 44

Fed. R. Evid. 702 ........................................ 44

Tex. Civ. Prac. & Rem. Code § 16.003 et seq. ........................................ 36

Tex. Rev. Civ. Stat. Ann. art. 581-5T ........................................ 67

Tex. Rev. Civ. Stat. Ann. art. 581-33 ........................................ passim

OTHER AUTHORITIES

Restatement (Second) Of Conflict Of Laws § 145 (1971) ........................................ 34

## PRELIMINARY STATEMENT

Plaintiffs and proposed plaintiff Pam Reed (collectively, the "Movants") seek certification of an amorphous worldwide class composed of "[a]ll persons or entities that held [certificates of deposit ("CDs")] or other investment accounts with [Stanford International Bank Ltd. ("SIB")]." The proposed class would include, according to Movants, thousands of unidentified individuals from dozens of different countries, who purchased different kinds of investment products from different entities, at different times, for different reasons, from different brokers and on the basis of different oral representations, marketing materials and offering documents written in different languages. The proposed class seeks billions of dollars in recovery not from the perpetrators of the fraud—Allen Stanford and SIB (Stanford's wholly owned bank)—but rather from two law firms that are alleged to be liable only on a theory of respondeat superior based on the alleged conduct of a single lawyer, Thomas V. Sjoblom ("Sjoblom"), whom none of the proposed class members is alleged ever to have met, heard of, or interacted with in any way before filing this lawsuit.

The proposed class—and the alternative classes or subclasses Movants proffer—do not meet the requirements of Federal Rule of Civil Procedure 23, and should not be certified. "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quotation marks omitted). Proponents of the class must prove each of Rule 23's requirements by a preponderance of the evidence. Only by ignoring their burden under Rule 23 can Movants here assert that "[t]he instant case is easily certifiable under Rule 23"—an assertion that finds no support in the evidentiary record.

First, Movants have failed to satisfy their burden of proving Rule 23(b)(3)'s predominance requirement. The putative class's claims—and Defendants' affirmative defenses to those claims—turn on proof of misrepresentations or omissions, reliance, and class members' knowledge about the Securities and Exchange Commission ("SEC") investigation of SIB and public allegations that SIB was operating a Ponzi scheme. These matters can be established only through individualized inquiries that will depend on what particular class members were told by different financial advisors at different times, what written materials they received or had access to, and which of these diverse pieces of information they considered in deciding to purchase different CD products. No common evidence can establish what any individual class member was told or relied on in deciding whether to invest, or what additional knowledge they had about the alleged misrepresentations and omissions—which is why claims and defenses that require proof of fraud, reliance, and investor knowledge cannot be certified for class action treatment, as the Supreme Court and Fifth Circuit have repeatedly held. Under Texas choice-of-law rules, moreover, this Court cannot simply apply Texas common law to the claims of putative class members. Instead, it must undertake a fact-specific investigation to determine the applicable law of the jurisdiction with the most significant relationship to each class member's purchase. The individualized nature of these inquiries will swamp any common questions of law or fact, precluding certification of any class under controlling law.

Similarly, Movants have proposed no common methodology for determining whether putative class members were, in fact, damaged by Defendants' alleged conduct, and if so, by how much. The only evidence in the record conclusively establishes that individualized inquiries will be necessary to determine the fact and amount of damages (if any) sustained by any putative class member. While Movants assert that the Receiver can compute classwide damages using

the same methodology he used to approve claims on the Receivership estate, that methodology bears no relation to the damages available under any theory of liability asserted in this case, and, therefore undermines—rather than supports—a finding of predominance.

Second, Movants have not demonstrated that a class action is superior to individual or joined actions, as Rule 23(b)(3) requires. At a minimum, the Court should decline to certify any class that includes citizens or legal residents of countries outside the United States that would neither recognize nor accord res judicata effect to any judgment rendered in this action. That includes the thousands of proposed class members who hail from Venezuela, Mexico, Colombia, Ecuador, El Salvador, Panama, and Peru. Movants have failed to present any evidence establishing that any of these foreign jurisdictions would recognize and give res judicata effect to the judgment of this Court in this opt-out class action, and the unrebutted testimony of Defendants' experts establishes that they would not. In similar situations, federal courts have recognized that class certification is inappropriate because defendants should not be left to face the prospect of repeat litigation of the same issues against the same plaintiffs or class members in jurisdictions outside the United States after a United States court has rendered a final judgment that is intended to bind the entire class. Additionally, hundreds of putative class members—including hundreds of foreign citizens and legal residents—have already brought individual lawsuits against Defendants, demonstrating that such actions are feasible and that a class action is not a superior alternative.

Third, Movants cannot satisfy Rule 23's other requirements. Movants cannot demonstrate that the members of their class or alternative classes are ascertainable because no reliable methodology exists to identify putative class members. And Movants' proposal to assign this task to the Receiver would require him to conduct the very type of individualized,

Case 3:12-cv-04641-N-BG Document 109-7 Filed 02/26/16 Page 17 of 189 PageID 4370

fact-intensive analysis of complex and potentially inaccurate records that courts routinely find to fail the ascertainability test. Indeed, these hurdles would exist even if the class were limited solely to U.S. CD purchasers because such a class would still require the Court to identify and exclude "accredited investors," who cannot bring claims under the Texas Securities Act for aiding and abetting unregistered securities sales. For the same reason, a U.S.-only subclass would be insufficiently numerous to warrant class treatment under Rule 23(a)(1). Further, no proposed class representative satisfies Rule 23(a)'s adequacy or typicality requirements as they have failed to participate meaningfully in the litigation, have deferred too readily to proposed class counsel or are subject to unique legal and factual defenses that render them unsuitable to represent a class. For all these reasons, and additional reasons explained below, this Court should not certify a class in this case.

## FACTUAL BACKGROUND

### A. The SIB CDs at Issue Were Marketed to Investors Around the World Through a Variety of Marketing Materials and Oral Representations

This case arises from Plaintiffs' claims that Sjoblom aided and abetted the sale of fraudulent CDs by SIB (the "SIB CDs") through his representation of SIB and its affiliates in an SEC investigation. The SIB CDs were marketed to investors in the United States and over 100 foreign jurisdictions throughout the world. (Br. 45.)[1] These investors each had different relationships and communications with Stanford Financial and their respective Stanford Financial advisors, received different marketing materials from different Stanford Financial

[1] Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated October 31, 2014, is referred to as "Motion" or "Mot." The Brief in Support of Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated October 31, 2014, is referred to as "Brief" or "Br." All citations to Defendants' Appendix ("App.") referenced herein are attached to the declaration of James P. Rouhandeh, dated March 20, 2015.

entities, and purchased different types of SIB CDs in different amounts over different periods from the 1990s through February 2009.

1. The Alleged Omissions and Misrepresentations Made to SIB CD Investors Were Not Uniform.

In their Second Amended Complaint ("Complaint" or "Compl."), Plaintiffs allege that SIB investors were "uniformly" told, and relied on, representations by Stanford representatives and in Stanford marketing materials that, among other things, SIB was a "U.S.-based business," (Compl. ¶ 86); "investments in the SIB CDs were . . . subject to regulation by the United States government (the SEC and FINRA)," (id. at ¶ 24; see also id. at ¶¶ 40, 86); "SIB was . . . backed by [Securities Investor Protection Corporation ("SIPC")] . . . insurance coverage" (id. at ¶ 40); and investments in SIB CDs "were liquid" and "could be redeemed at any time because SIB, through Stanford Financial, only invested the money in safe, secure and liquid assets" (id. at ¶ 24). Plaintiffs have attempted, but fail, to re-characterize these alleged misrepresentations as omissions. Regardless of how they are characterized, the record is clear that Stanford's alleged misrepresentations to investors were not "uniform." (See id. at ¶¶ 86–88.)

a. Investors Were Not Uniformly Told that SIB Was a "U.S.-Based Business."

Despite Plaintiffs' allegation that all investors were told, and relied on, statements that SIB was a "U.S.-based business" (id. at ¶¶ 86, 88), many investors were repeatedly told that SIB was an Antiguan bank, chartered under the laws of Antigua and Barbuda, and with offices located solely in Antigua and Barbuda. See, e.g., Receiver's Reply Supp. TRO, Prelim. Inj., in the Alternative, Attach., Concerning Accounts of Former Stanford Employees, Janvey v. Alguire, No. 3:09-cv-00724-N-BG (N.D. Tex. May 24, 2010), ECF No. 444-2, at Ex. 1, at Ex. KVT-3 ("2008 Brochure") at 2, 13. (See also App. 14, 2003 SIB Brochure; App. 32–33, SIB

U.S. Accredited Investor Disclosure Statement); App. 52, December 2008 Monthly Report.) Indeed, one of the Spanish-language Stanford documents produced by named plaintiff and proposed class representative Samuel Troice ("Troice") clearly states that SIB "is not a United States bank." (App. 58, SIB Q&A.) Proposed class representative Pam Reed ("Reed") acknowledged knowing that SIB CDs were issued from Antigua (App. 71–72, Dep. of Pam Reed ("Reed Dep.") Tr. 80:24–81:6),[2] an unsurprising fact given that each CD indicated that it was executed from "St. John's, Antigua, West Indies" and that SIB had an Antiguan address (e.g., (App. 109, Reed SIB CD, dated July 4, 2007; App. 111, Reed SIB CD, dated Apr. 14, 2008). Troice, however, received oral representations from his Stanford Financial advisor that the CDs were issued by a U.S. bank. (App. 127–128, Dep. of Samuel Troice ("Troice Dep.") Tr. 66:14–22, 68:11–14.)[3]

b. Investors Were Not Uniformly Told that SIB CDs Were Subject to U.S. Government Regulation or Backed by U.S. Government Insurance.

Despite Plaintiffs' allegation that all investors were told, and relied on, statements that their investments in SIB CDs were subject to regulation by the U.S. government (Compl. ¶ 24; see also id. at ¶¶ 40, 86), Stanford made a number of express disclosures to the contrary. Stanford repeatedly told investors that SIB: (1) was regulated by the Financial Services Regulatory Commission ("FSRC") and the Ministry of Finance of the Government of Antigua and Barbuda (App. 166, SIB 2007 Annual Report; App. 33, 42, SIB U.S. Accredited Investor

---

[2] Reed's admission in her deposition starkly contrasts with her declaration, stating that "Stanford led [her] husband and [her] to believe that Stanford, including SIBL, was a U.S-based operation." (App. 107, Declaration of Pam Reed, dated Feb. 13, 2015 ("Reed Decl.") ¶ 8; see also App. 79–80, Reed Dep. Tr. 101:20–102:6.)

[3] Further, both Troice and Reed conceded that if they had known—as some putative class members plainly knew—that SIB was not a "U.S.-based business," it would have altered their investment decisions. (See App. 126–127, Troice Dep. Tr. 65:20–66:2 (stating that he would not have invested in an "offshore bank"); App. 81–82, Reed Dep. Tr. 103:6–22, 105:3–23 (stating that she would have asked "more questions" of her Stanford financial advisor had she seen an SIB brochure stating that SIB "is an Antiguan bank").)

Disclosure Statement; App. 52, SIB December 2008 Monthly Report); and (2) was not subject to the restrictions or the reporting requirements of any jurisdiction other than Antigua and Barbuda (2008 Brochure at 13; App. 14, 2003 SIB Brochure; see also App. 29, 34, SIB U.S. Accredited Investor Disclosure Statement). Moreover, numerous Stanford documents disclosed that the SIB CDs were not registered under U.S. federal securities laws or the securities laws of any state or other jurisdiction. (E.g., App. 34, SIB U.S. Accredited Investor Disclosure Statement; see also App. 14, 2003 SIB Brochure.)

In fact, the testimony of proposed class representative Troice confirms that investors were not uniformly told that SEC and FINRA regulated the SIB CDs. Troice claimed he had "not heard" that SIB was regulated by FINRA and was not told anything about whether SIB was regulated by the SEC. (See App. 134, Troice Dep. Tr. 77:3–14.)[4]

Furthermore, despite Plaintiffs' allegations to the contrary, (Compl. ¶ 40), putative class members were not uniformly told that SIB CDs were backed by SIPC or other U.S. government insurance. Troice, for one, was completely unfamiliar with SIPC. (App. 141–142, Troice Dep. Tr. 89:23–90:9.) Indeed, Stanford disclosed to many investors that SIB deposits, including the CDs, were not "covered by the investor protection or securities insurance laws of any jurisdiction such as [SIPC] or the bonding requirements thereunder" (App. 14, 2003 SIB Brochure; App. 29, 34, SIB U.S. Accredited Investor Disclosure Statement), "by deposit insurance protection provided by U.S. Federal Deposit Insurance Corporation," (2008 Brochure at 8, 13; App. 14, 2003 SIB Brochure); see also App. 29, 34, SIB U.S. Accredited Investor Disclosure Statement),

[4] Although Troice testified that his Stanford financial advisor, David Nanes, told him that SIB was subject to generic U.S. regulations (App. 131–132, Troice Dep. Tr. 73:13–74:2), Nanes never discussed how SIB actually was regulated (App. 133, Troice Dep. Tr. 76:8–11). Troice claimed that, had he received and reviewed Stanford's 2008 marketing brochure, he would have known that SIB CDs were not regulated by the U.S. government and would have discontinued his investment. (App. 134–135, Troice Dep. Tr. 77:21–24, 80:2–23.)

or by "any other agency of the United States government or any state jurisdiction, or by any insurance program of the government of Antigua and Barbuda," (App. 34, SIB U.S. Accredited Investor Disclosure Statement).

c. The Representations about the Liquidity and Safety of the SIB CDs Were Not Uniform.

Despite Plaintiffs' contrary allegations, (Compl. ¶ 24), Stanford investors were not uniformly told that investments in SIB CDs were liquid, redeemable at any time, and safe. Indeed, an SEC employee observed that Stanford was "[t]elling foreign investors there is no risk but American investors are being told there is complete risk." (App. 87, OIG Report.) To its U.S. accredited investors, Stanford disclosed, inter alia, that:

- "Operating results could be adversely affected by . . . management's investment decisions with regard to the U.S. Accredited Investor CD or any products [SIB] offer[s]" (App. 33, SIB U.S. Accredited Investor Disclosure Statement);

- "[T]he ability of SIBL to pay principal and interest on the CD Deposits are dependent on our ability and the ability of our portfolio managers to consistently make profitable global investment decisions. There can be no assurance that these decisions will continue to yield profitable results for SIBL, or cause the investments made in the U.S. Accredited Investor CD or any other products we offer to produce returns sufficient to fund the payment obligations of the CD Deposits" (id.);

- "YOU MAY LOSE YOUR ENTIRE INVESTMENT UNDER CIRCUMSTANCES WHERE WE MAY BE FINANCIALLY UNABLE TO REPAY THOSE AMOUNTS. PAYMENTS OF PRINCIPAL AND INTEREST ARE SUBJECT TO RISK" (App. 35, SIB U.S. Accredited Investor Disclosure Statement); and

- "Conservation of principal and interest rates on the CD Deposits are dependent upon returns in our investment portfolios . . . . If these returns on the bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the U.S. Accredited Investors CD" (id.).

Yet other investors claim that Stanford made no such disclosures. For example, both Troice and Isaac Green ("Green"), principal of named plaintiff and proposed class representative Punga Punga Financial, Ltd. ("Punga Punga"), claim to have relied on oral representations by their

Stanford financial advisor and the head of Stanford Mexico, David Nanes, that there was no risk of losing their investment in SIB CDs. (App. 143–144, Troice Dep. Tr. 92:22–93:7; App. 249, Dep. of Isaac Green ("Green Dep.") Tr. 72:14–21.) Troice claims Nanes told him that he would be able to access and use the money he invested "whenever [he] wanted." (App. 124, Troice Dep. Tr. 56:3–6.) As a result, Troice believed the CDs to be "zero risk"; he would not have invested in them had he understood otherwise. (App. 122–123, 144, Troice Dep. Tr. 48:22–49:16, 93:4–7.)

2. As Far Back as 2005, Putative Class Members Had Information about the SEC's Investigation of Stanford.

Movants also assert that SIB investors were never told that Stanford was under investigation by the SEC. (E.g., Br. 6; see also Compl. ¶ 87.) Yet at least some putative class members had access to public information regarding the SEC's investigation going back to 2005. In or around June 2005—before Stanford retained Sjoblom—the SEC sent letters and questionnaires to Stanford investors asking about the SIB CDs and the way in which they were marketed to investors. (Br. 15; App. 267, Lena Stinson Aff. ¶ 16; App. 206, 208, 229–230, OIG Report; Janvey v. Alguire, No. 3:09-cv-00724-N, ECF No. 393 at 219–222.) The letters and questionnaires put investors—both those who received the documents and those who heard about them—on notice that the SEC was examining the SIB CDs. Indeed, a vice president and financial adviser at Stanford said that his phone "lit up like a Christmas tree the morning [the questionnaire] went out" and "led to 'significant concerns' by investors." (App. 208, 229–230, OIG Report.)

The press also covered the SEC's investigation of the SIB CDs and the potential fraud. For example, in July 2008, a Bloomberg article entitled "SEC Investigating Stanford Group Offshore-Bank CDs" reported, among other things, that the SEC had issued subpoenas to former

Stanford employees "asking for information about the CD sales" by SIB. (App. 278, Bloomberg article, SEC Investigating Stanford Group Offshore-Bank CDs (July 3, 2008); see also App. 281, The Daily Telegraph article, The Greatest Final Ever, July 7, 2008.) A January 2009 article by financial analyst Alex Dalmady published in a Venezuelan magazine also alleged that Stanford was operating a Ponzi scheme. (App. 283–287, VenEconomy article, Duck Tales, Jan. 2009.)

Knowledge of this public information would have affected some investors' decisions to invest or remain invested in the SIB CDs. For example, had he known that Stanford was under investigation by the SEC, Troice would not have invested in the CDs. (App. 136–137, Troice Dep. Tr. 81:15–82:6.) And, had he heard about the SEC questionnaires or the July 2008 article, he would have withdrawn his money or looked into the issue further. (App. 139, 140, Troice Dep. Tr. 85:16–20, 86:5–20.) Similarly, Reed "[m]ost likely" would have altered her investment decisions had she seen press reports of the SEC's investigation, and she would have altered them had she known of the SEC questionnaire. (App. 73, Reed Dep. Tr. 82:9–18.) In contrast to the other Movants, however, Green was aware, prior to Stanford's collapse, of the Dalmady article and nonetheless chose to keep his money with Stanford based on his financial advisor's oral assurances. (App. 235–236, Green Dep. Tr. 51:16–52:16.)

3. The Putative Class Members Varied in Their Purchases of the SIB CDs.

In addition to a lack of uniformity as to the alleged misrepresentations and omissions investors received regarding the SIB CDs, there was a lack of uniformity as to the characteristics of the CD investments by putative class members.

SIB sold CD products with varying terms and characteristics. The available CD maturities ranged from one- to sixty-months. Some CD products automatically renewed upon maturity, while others did not. Some CD products allowed additional deposits with a minimum

deposit, while others did not. Withdrawals from the various CDs were allowed, but with varying limitations and penalties. (2008 Brochure at 11; see also App. 25, 2003 SIB Brochure; App. 181, 2007 SIB Annual Report; App. 32, 36, SIB U.S. Accredited Investor Disclosure Statement; App. 289–308, Troice SIB CDs.)

Purchases of the SIB CDs by members of the proposed class varied significantly, as illustrated by the purchases of the proposed class representatives:

Troice: Troice invested in SIB CDs through Stanford's Mexico City offices beginning in 1997. (App. 310–311, Declaration of Samuel Troice, dated Oct. 27, 2014 ("Troice Decl.") ¶ 4.) Although Troice had a long investment history with Stanford, during which he purchased and renewed a number of CDs, (see App. 314–402, Troice SIB Account Statements; App. 289–308 Troice SIB CDs), the only CD that he held as of February 2009 was a single FlexCD that he originally purchased in January 2004 and renewed in April 2005 (before Stanford retained Sjoblom) for a sixty-month period (see App. 343–344, 308, Troice SIB Account Statements; App. 381, Troice SIB CD; see also App. 465–466, Declaration of Paul Gompers ("Gompers Decl.") Ex. 2). Troice continued to make deposits into and withdrawals from that FlexCD through February 2009. (See App. 324–325, Troice SIB Account Statements; App. 475–477, Troice SIB Transaction Detail).

Punga Punga: From 1999 through 2004, Green, the principal shareholder of Punga Punga, invested in SIB CDs in his own name. (App. 243–244, Green Dep. Tr. 64:17–65:3.) Green formed Punga Punga in Panama in 2004 with the assistance of David Nanes, (App. 482–483, Declaration of Isaac Green, dated Oct. 20, 2014 ("Green Decl.") ¶¶ 4, 5; App. 237–238, 241, Green Dep. Tr. 53:10–54:17, 59:17–25), who recommended that Green invest through a corporation, (App. 237–240, Green Dep. Tr. 53:17–56:20). Punga Punga then invested in SIB

CDs through Stanford's Mexico City offices.  (App. 483, Green Decl. ¶ 5.)  As of February 2009, Punga Punga held (1) a sixty-month FixedCD purchased in September 2004, (2) a sixty-month FlexCD purchased in November 2004, and (3) a second, sixty-month FlexCD purchased in June 2006.  (See App. 488–489, 491–497, Punga Punga Transaction Detail; see also (App. 465–466, Gompers Decl. Ex. 2).

    Reed:  Reed began investing in SIB CDs from the U.S. in 2007, when she and her husband followed their long-time financial advisor, Nigel Bowman, to Stanford.  (See App. 106–107, Reed Decl. ¶ 4.)  In order to invest in the SIB CDs in the U.S., Reed was required to be, and was in fact, an accredited investor.[5]  (See App. 501, 505 , SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire; App. 29, 32 SIB U.S. Accredited Investor Disclosure Statement; App. 76–78, Reed Dep. Tr. 95:10-14, 99:19-100:12.)  Reed invested in two SIB CDs that she continued to hold as of February 2009:  (1) a sixty-month FixedCD in July 2007; and (2) a three-month FixedCD in Apr. 2008, which was repeatedly renewed, including in January 2009.  (See, e.g., App. 109, Reed SIB CD, dated July 4, 2007; App. 111, Reed SIB CD, dated Apr. 14, 2008; App. 509–510; Reed SIB Transaction Detail; App. 512–513 Reed Statement of Account; see also App. 465–466, Gompers Decl. Ex. 2.)

---

    [5] An "accredited investor" was defined to include, among other categories, a natural person who, at the time the CD was acquired, had:  (1) an individual net worth, or joint net worth with his or her spouse exceeding US$1,000,000; or (2) individual income in excess of $200,000, or joint income with his or her spouse in excess of $300,000, in each of the prior two calendar years and a reasonable expectation of reaching the same income level in the current calendar year.  (App. 505, SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire; see also App. 36 SIB U.S. Accredited Investor Disclosure Statement (noting that the "U.S. Accredited Investor CD" was available only to those who qualify as an "[a]ccredited [i]nvestor" under "Rule 501(a) of Regulation D of the Securities Act").)  An "accredited investor" also included an entity that, at the time the CD was acquired, had total assets in excess of $5,000,000 and was not formed for the specific purpose of purchasing the CD.  (App. 505, SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire.)

Case 3:09-cv-04641-N-BG Document 18097 Filed 02/26/15 Page 20 of 34 PageID 4336

## B. Putative Class Members Have Filed Numerous Individual Litigations Against Defendants

Movants incorrectly assert that "there are no other pending lawsuits filed against these Defendants by Stanford investors other than the current class action." (Br. 46; see also App. 526, Declaration of Edward F. Sherman, dated Oct. 31, 2014 ("Sherman Decl.") ¶ 33.)[6] That is false. In fact, hundreds of putative class members—including proposed class representative Reed—have filed multiple cases against Defendants, acting through the same counsel who represent Plaintiffs in this case. Many of these individual actions remain pending in federal and state courts, although some have been dismissed without prejudice.[7]

---

[6] The Court should exclude the Declaration of Edward F. Sherman ("Sherman Declaration") and Responsive Declaration of Edward F. Sherman ("Sherman Rebuttal Decl."), upon which Movants rely, because they are no more than impermissible legal briefs dressed up as expert testimony. In his declarations, Professor Sherman offers no more than bare legal conclusions as to whether Movants have satisfied their burden under the rules. (See generally App. 518–527, Sherman Decl. ¶¶ 7–37; App. 541–549, Sherman Rebuttal Decl. ¶¶ 2–10.) Such conclusions are barred under the well-settled law of this Circuit. See Goodman v. Harris Cnty., 571 F.3d 388, 399 (5th Cir. 2009) ("An expert may never render conclusions of law."); Askanase v. Fatjo, 130 F.3d 657, 673 (5th Cir. 1997) ("There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge." (citation and quotation marks omitted)). For this reason, courts regularly exclude expert testimony as to legal conclusions. E.g., Askanase, 130 F.3d at 673 (affirming district court's decision to exclude, as impermissible legal opinion, expert's proposed testimony that defendants breached their fiduciary duties). Defendants have not filed a motion to exclude the Professor Sherman's declarations so as to avoid burdening the Court at this juncture but respectfully request leave to do so if the Court is inclined to rely on them.

[7] See, e.g., Gale v. Proskauer Rose LLP, No. 3:12-cv-1803 (N.D. Tex.) (pending before this Court) (48 plaintiffs); Green v. Proskauer Rose LLP, No. 3:12-cv-1808 (N.D. Tex.) (pending before this Court) (29 plaintiffs); Ibarra v. Proskauer Rose LLP, No. 3:12-cv-1805 (N.D. Tex.) (pending before this Court) (49 plaintiffs); Martin v. Proskauer Rose LLP, No. 3:12-cv-1809 (N.D. Tex.) (pending before this Court) (48 plaintiffs); Reed v. Proskauer Rose LLP, No. 3:12-cv-1806 (N.D. Tex.) (pending before this Court) (49 plaintiffs); Garza v. Proskauer Rose LLP, No. 2011-77793 (Harris Cnty. [281st Dist.]) (dismissed without prejudice for lack of prosecution) (49 plaintiffs); Arista Trust v. Proskauer Rose LLP, No. 2012-CI-02423 (Bexar Cnty. [131st Dist.]) (pending) (46 plaintiffs); Canuta Trust v. Proskauer Rose LLP, No. 2012-CI-02422 (Bexar Cnty. [73d Dist.]) (dismissed without prejudice for lack of prosecution) (49 plaintiffs); Soledad Trust v. Proskauer Rose LLP, No. 2012-09838 (Harris Cnty. [152d Dist.]) (dismissed without prejudice for lack of prosecution) (49 plaintiffs); MFR Inversiones, C.A. v. Proskauer Rose LLP, No. 2012-09824 (Harris Cnty. [113th Dist.]) (dismissed without prejudice for lack of prosecution) (45 plaintiffs); Rubiano v. Proskauer Rose LLP, No. 2012-CI-02425 (Bexar Cnty. [166th Dist.]) (dismissed without prejudice for lack of prosecution) (49 plaintiffs); and Valenzuela de Jimenez v. Proskauer Rose LLP, No. 2012-CI-02424 (Bexar Cnty. [150th Dist.]) (dismissed without prejudice for lack of prosecution) (25 plaintiffs).

Case 3:09-cv-04641-N-BG Document 179 Filed 04/26/16 Page 27 of 84 PageID 4237

### C. The Instant Proceedings

Plaintiffs' claims against Defendants rest upon their theory that, but for Sjoblom's defense of his client, Stanford Financial, in an SEC Enforcement Division investigation, "the SEC would have intervened and shut the Ponzi scheme down prior to 2009." (Compl. ¶ 97.) Plaintiffs have asserted claims against Defendants for allegedly: (1) aiding and abetting Stanford Financial's alleged violations of the registration and antifraud provisions of the Texas Securities Act (the "TSA"); (2) aiding and abetting Stanford Financial's alleged common law fraud; and (3) conspiring with Stanford Financial to defraud the putative class. (Id. at ¶¶ 97–113.) Following this Court's dismissal of Plaintiffs' claims for negligent hiring and retention, (Order, ECF No. 176, at 1, 26), the only remaining theory of liability against Defendants is that they are liable on a respondeat superior theory for Sjoblom's conduct. (Compl. ¶¶ 114–115.) The Court also dismissed Plaintiffs' TSA claims for sales of unregistered securities and sales of securities by unregistered dealers based on sales taking place prior to October 9, 2006. (Order, ECF No. 176, at 12–13.)

Plaintiffs claim that damages to the putative class—"the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution"— total "between $4 billion and $7 billion." (Compl. ¶¶ 105, 107–109, 117.)

Movants seek to certify a class consisting of "[a]ll persons or entities that held CD or other investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action . . . ." (Id. at ¶ 92; Mot. 4–5.)[8] In the alternative,

[8] Elsewhere in the Complaint, Plaintiffs seek "certification of a class of all investors who purchased or held Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International Bank Ltd. as of February 2009" (Compl. ¶ 6 (emphasis added).) Movants appear to have abandoned this inconsistent definition of the proposed class. (See Br. 29–30.)

Plaintiffs and proposed class representatives Troice and Punga Punga seek to certify a class composed of "all Mexican citizens and legal residents, or entities owned or controlled by Mexican citizens or legal residents, that held investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action" (Compl. ¶ 94; see also Mot. 6), and proposed plaintiff and class representative Reed seeks to certify a class composed of "all United States citizens and legal residents, or entities owned or controlled by United States citizens or legal residents, that held investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action" (Compl. ¶ 95; see also Mot. 5).[9] As of the date of this memorandum, Reed is not a named plaintiff in this action. See infra Part IV.A.[10]

**ARGUMENT**

"[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23[.]" Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2412 (2014) (emphasis in original). The Court must employ a "rigorous analysis" to determine whether the prerequisites of Rule 23 are established and, where appropriate, "probe behind the pleadings before coming to rest on the certification question." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quotation marks

---

[9] In their Motion, Movants propose an additional alternative class of investors composed of "all Latin American citizens and legal residents, or entities owned or controlled by Latin American citizens or legal residents, that had purchased and still held CDs or other depository accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action." (Mot. 6.) Yet nowhere do Movants specify which countries fall within the term "Latin American" in their proposed alternative class definition. In any event, Plaintiffs did not plead such an alternative class in their Complaint, (see Compl. ¶¶ 92, 94–95), nor did Movants argue that such an alternative class should be certified in their Brief in support of the Motion. See Br. 29–31; see also Opposed Mot. to Add Named Pl. & Putative Class Representative, ECF No. 163, at ¶¶ 4, 7–9.)

[10] On January 29, 2015, Plaintiffs filed their Opposed Motion to Add Named Plaintiff and Putative Class Representative, Pam Reed. (ECF No. 163.) Plaintiffs' opposed motion was fully briefed as of March 5, 2015, and remains sub judice. Plaintiffs' Motion to Quash and Motion for Protective Order on Defendants' Notices of Depositions of Annalisa Mendez and Horacio Mendez (ECF No. 164) also remains sub judice; no reply was filed.

Case 3:12-cv-04641-N-BG Document 197 Filed 04/20/15 Page 24 of 89 PageID 4339

omitted). Because Movants have failed to satisfy their burden to prove each of the predominance and superiority requirements of Rule 23(b)(3), the ascertainability of any class, or the threshold requirements of Rule 23(a), class certification should be denied.

Specifically, as demonstrated below, Movants have failed to satisfy their burden of establishing that common issues predominate over individualized ones with respect to any of their claims for liability. They likewise have failed to prove, as they must under controlling law, that common issues relating to damages predominate over individualized ones and that their proposed methodology for calculating damages to the putative class is consistent with their theory of liability. Second, Movants have failed to establish that a class action is a superior mechanism for adjudicating this case, particularly when Movants have proposed a class that includes thousands of individuals from foreign countries that are not likely to recognize or grant res judicata effect to the judgment of a United States court in this opt-out class action. Third, Movants have failed to show that their proposed class or any of their alternative subclasses is readily ascertainable. Fourth, Movants have failed to establish that they satisfy the adequacy or typicality requirements of Rule 23(a). Fifth, Movants have failed to demonstrate that an alternative class or subclass of U.S. investors who can actually assert viable claims would be large enough to satisfy the numerosity requirement of Rule 23(a). And, finally, in the event any class is certified (which one should not be), it must be far more limited than the unwieldy worldwide class that Movants have proposed.

## I. Movants Have Not Satisfied and Cannot Satisfy Rule 23(b)(3)'s Requirements Because Individualized Issues Predominate Over Common Issues

Movants have not met their burden of proving, by a preponderance of the evidence, that common questions of law or fact predominate over individual issues affecting individual putative class members. See, e.g., Fed. R. Civ. P. 23(b)(3); Alaska Elec. Pension Fund v. Flowserve

Corp., 572 F.3d 221, 227 (5th Cir. 2009) (per curiam); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623–24 (1997) (describing the predominance requirement as "far more demanding" than Rule 23(a)'s commonality requirement). Specifically, they fail to account for a number of individual issues that will predominate over common ones, including issues related to: (1) misrepresentations and omissions; (2) reliance; (3) knowledge; (4) holder claims; (5) damages; (6) choice of law; and (7) timeliness of claims. For this reason, the Court should deny the Motion.

A. Material Differences in the Alleged Misrepresentations or Omissions to Putative Class Members Preclude Certification.

Movants cannot satisfy Rule 23(b)(3)'s predominance requirement as to the remaining common law claims and the claim for aiding and abetting violations of TSA Article 581-33A(2). This is not a garden variety securities fraud class action in which a group of investors alleges that it purchased a single type of security following a company's misrepresentation or omission in a regulatory filing or offering document. In this case, there are numerous individual issues as to which alleged misrepresentations or omissions were made to which putative class members. For each of these claims, the putative class representatives must prove that a misrepresentation or omission was made to them. Tex. Rev. Civ. Stat. Ann. Art. 581-33A(2); Ernst & Young, L.L.P v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001); Am. Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 438 (Tex. 1997). Where there are fundamental differences in the alleged misrepresentations or omissions made, courts consistently decline to certify a class, finding that common issues of fact do not predominate. See, e.g., Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880, 882 (5th Cir. 1973) (explaining that class certification is inappropriate where "writings contain material variations, emanate from several sources, or do not actually reach the subject investors"); Gyarmathy & Assocs., Inc. v. TIG Ins. Co., No. Civ. A. 3:02-cv-

1245, 2003 WL 21339279, at *2–3 (N.D. Tex. June 3, 2003) (Godbey, J.) (finding that "common issues of fact [did] not predominate" where "documents were not delivered to the putative class members in identical contexts"); see also Fed. R. Civ. P. 23 Advisory Committee Notes (1966 Amendment, Subdivision (b)(3)) ("[F]raud case[s] may be unsuited for treatment as a class action" because of "material variation[s] in the representations made"). The presence of alleged oral misrepresentations or omissions makes denial of class certification only more likely. See, e.g., Gyarmathy, 2003 WL 21339279, at *3 (denying class certification, notwithstanding movant's allegations of uniform written disclosures because the "record reflect[ed] that at least some potential class members received varying representations from their brokers above and beyond what [was] contained in the [written material]"). This Court should decline to certify a class here for the same reasons.

Even the limited factual record compiled to date disproves Movants' allegations that misrepresentations and omissions were "uniform" or "consistent" across the proposed class. (See, e.g., Compl. ¶¶ 40, 86; see also Br. 6, 33, 42.) Movants' proposed class definition includes purchasers from different countries, who speak different languages, who invested over a period of approximately two decades in consultation with different investment advisors, and who read and reviewed (or did not read or review) different materials in connection with their decisions to invest in SIB CDs. Proposed class representatives acknowledged that they consulted different financial advisors and reviewed different written materials in making their decisions to invest. See supra Facts.A.1. Through these conversations with financial advisors and reviews of Stanford materials, putative class members received non-uniform substantive information.

Indeed, in stark contrast to Plaintiffs' allegations, even the proposed class representatives professed ignorance of certain of the supposed "uniform" misrepresentations put forth in the

Complaint. (See supra Facts.A.1; compare Compl. ¶ 24 (alleging that class members "were uniformly informed by Stanford Financial . . . that . . . investments in SIB CDs were safe and sound because SIB was . . . subject to regulation by the United States government (the SEC and FINRA)"), with App. 134, Troice Dep. Tr. 77:3–14 (asserting that he had "not heard" that SIB was regulated by FINRA and that his advisor "didn't touch on the subject of the SEC").)

Therefore, these and other individualized issues predominate over common issues and preclude certification of a class including the remaining common law claims and the claim for aiding abetting violations of TSA Article 581-33A(2).

B. Individual Issues of Reliance Will Predominate with Respect to Plaintiffs' Remaining Common Law Causes of Action.

Individual issues of reliance should preclude class certification in this case because each of Plaintiffs' remaining common law causes of action requires proof of putative class members' reasonable or justifiable reliance on alleged misrepresentations and omissions, and no classwide presumption of reliance applies.

1. Plaintiffs' Remaining Common Law Claims Require Proof of Reasonable or Justifiable Reliance, Precluding Certification.

Absent any applicable presumption, "the element of reliance cannot be proved on a classwide basis through evidence common to the class," and thus individualized issues of fact or law will overwhelm common ones. Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1195 (2012); In re Park Cent. Global Litig., No. 3:09–cv-765–M, 2014 WL 4261950, at *10–11 (N.D. Tex. Aug. 25, 2014); see also Halliburton, 134 S. Ct. at 2416 ("Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)."); Bell v. Ascendant Solutions, Inc., No. Civ. A. 301CV0166N, 2004 WL 149009, at *5 (N.D. Tex. July 1, 2004) (Godbey, J.) (denying class

certification on predominance grounds because plaintiffs failed to demonstrate the applicability of a presumption of reliance). As a result, "[c]laims for money damages in which individual reliance is an element are poor candidates for class treatment, at best." Patterson v. Mobil Oil Corp., 241 F.3d 417, 419 (5th Cir. 2001).

Here, Plaintiffs must prove reliance to recover on their claims for aiding and abetting fraud,[11] and civil conspiracy.[12] See Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 693 (Tex. 2003) ("Reliance is an element of . . . fraud"); Ortiz v. Collins, 203 S.W.3d 414, 422–23 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding that where summary judgment was proper on underlying fraud claim due to lack of justifiable reliance, summary judgment was also proper on conspiracy to defraud claim); TCA Bldg. Co. v. Entech, Inc., 86 S.W.3d 667, 674 (Tex. App.—Austin 2002, no pet.) (explaining that common law fraud requires "reasonable or justifiable" reliance); Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 181 (Tex. 1997) (holding that reliance is an element of fraud by nondisclosure because fraud by nondisclosure is a subcategory of fraud). Indeed, "a fraud class action cannot be certified when individual reliance will be an issue." Castano v. Am. Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996)

[11] In its March 4, 2015 Order on Defendants' motions to dismiss, the Court "assume[d] at [the motion to dismiss] stage" that a cause of action for aiding and abetting common law fraud is cognizable under Texas law. (Order, ECF No. 176, at 19.) Defendants reiterate that such a cause of action is not recognized under Texas law. See, e.g., Prospect High Income Fund v. Grant Thornton, L.L.P., 203 S.W.3d 602, 616 (Tex. App.—Dallas 2006) ("The Texas Supreme Court has not recognized a separate tort of aiding and abetting fraud."), rev'd in part on other grounds, 314 S.W.3d 913 (Tex. 2010).

[12] Civil conspiracy requires proof of an underlying tort. Askanase, 130 F.3d at 676 (noting that "because the fraud claim fails[,] the fraud based conspiracy claim must fail also"); see also Am. Tobacco Co., 951 S.W.2d at 438 (granting summary judgment on conspiracy claim and noting that "[a]llegations of conspiracy are not actionable absent an underlying [tort]"). Thus, where, as here, individualized issues of reliance overwhelm common issues of fact or law with respect to the underlying tort, see infra Part I.B, they necessarily overwhelm common issues with respect to causes of action predicated on the underlying tort. See, e.g., Lam v. Alpha Realtors, Inc., Civil Action No. H-09-3041, 2010 WL 4569995, at *20 (S.D. Tex. Nov. 4, 2010) ("[Plaintiffs'] failure to establish a genuine dispute of material fact with regard to the reliance element for their fraudulent-inducement claim necessarily defeats their attempt to establish a civil conspiracy.").

(citing Simon, 482 F.2d at 880). And, as explained below, see infra Part I.B.2, no presumption of classwide reliance applies.

Thus, even assuming that each putative class member received the same Stanford documents with the same alleged misstatements and omissions—which is not the case, see supra Facts A.1; Part I.A[13]—the proposed class representatives would still have to demonstrate whether each putative class member relied on those alleged misstatements and omissions, the degrees of their reliance,[14] and whether the reliance was "reasonable or justifiable." Such factors are fatal for class certification in virtually all cases. And here the need for individualized inquiry is heightened by the fact that there are material differences among putative class members with regard to due diligence inquiries,[15] risk tolerances and profiles,[16] sophistication,[17] and accredited investor status[18]—all of which affect the underlying reliance inquiry. These individual, fact-intensive issues would swamp any common issues with respect to the putative class members'

---

[13] The wide variety of materials that the putative class members received and reviewed creates an additional reason why Plaintiffs' reliance claims are not susceptible to classwide proof. See, e.g., Simon, 482 F.2d at 882.

[14] For example, Green relied on monthly brochures, letters regarding insurance coverage, and print and electronic advertisements (App. 246–247, 248, 250, 256, 257, Green Dep. Tr. 67:2–68:7, 71:3–11, 80:4–11, 124:10–22, 125:4–14), whereas Troice thought it "better to listen to [Stanford broker David Nanes] than to read the [written materials]" (App. 124–125, Troice Dep. Tr. 56:7–57:9).

[15] For example, Green testified that he reviewed his investments daily (App. 253, Green Dep. Tr. 110:5–8), and frequently met with Nanes to discuss his finances (App. 244–245, Green Dep. Tr. 65:25–66:13), while Troice testified that he did not perform any due diligence on the SIB CDs himself (App. 138, Troice Dep. Tr. 83:2–6). Reed traveled to Antigua with her financial advisor and discussed her potential investment with several Stanford employees, including Allen Stanford. (App. 86–87, 74, 93, Reed Dep. Tr. 155:19–156:16, 88:16–23, 166:8–10.)

[16] For example, Reed's investment objective was to pursue "low risk" investments that would "retain capital." (App. 70, Reed Dep. Tr. 79:4–8.) Yet other U.S. accredited investors who reviewed Stanford disclosures likely had higher risk tolerances because they were told, among other things, that they "may lose [their] entire investment under circumstances where we may be financially unable to repay those amounts." (App. 35, SIB U.S. Accredited Investor Disclosure Statement; see also supra Facts.A.1.)

[17] For example, both Troice and Reed have advanced degrees. (See App. 114, Troice Dep. Tr. 10:16–17; App. 64, Reed Dep. Tr. 7:4–8.)

[18] U.S. accredited investors were provided with additional disclosures not given to all putative class members. (See App. 551, August 2007 letter to Reed; App. 28–50 SIB U.S. Accredited Investor Disclosure Statement.)

common law claims. Accordingly, no class including those claims should be certified. See, e.g., Halliburton, 134 S.Ct. at 2416; In re Park Cent. Global Litig., 2014 WL 4261950, at *10–11.

2. Movants Are Not Entitled to a Presumption of Reliance Under Affiliated Ute.

Movants cannot avoid the individualized nature of the reliance inquiry through the presumption of classwide reliance on material omissions recognized in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 152–54 (1972). The Affiliated Ute presumption does not apply, for two reasons.

First, the Affiliated Ute presumption simply does not apply to the common law fraud claims asserted on behalf of the class. Gyarmathy, 2003 WL 21339279, at *3 n.6 ("The Fifth Circuit has rejected extending an Affiliated Ute presumption beyond fraud on the market securities theories to this sort of class action context."); see also McManus v. Fleetwood Enters., Inc., 320 F.3d 545, 549 (5th Cir. 2003) ("Reliance may not be presumed under Texas law."); Simms v. Jones, 296 F.R.D. 485, 498, 510 (N.D. Tex. 2013) (holding that "there is no basis to extend Affiliated Ute's reliance presumption to a case" involving common law fraud); see also Griffin v. Box, No. 94-10348, 1996 WL 255296, at *16 n.17 (5th Cir. May 2, 1996) (noting that the "Ute presumption applies only to rule 10b-5 actions based primarily upon omissions rather than misrepresentations" (quotation marks omitted)).

Second, by its own terms, Affiliated Ute does not apply to claims that are based on affirmative misrepresentations. See Abell v. Potomac Ins. Co., 858 F.2d 1104, 1119 (5th Cir. 1988) ("As our subsequent cases have taught, the Ute presumption attaches only to those rule 10b–5 actions based primarily upon omissions rather than misrepresentations"), vacated on other grounds sub nom. Fryar v. Abell, 492 U.S. 914 (1989). As alleged in the Complaint, the claims here turn primarily on affirmative misrepresentations made by Stanford brokers to putative class

members about the regulation, risks, and liquidity of the SIB CDs. (See, e.g. Compl. ¶¶ 24, 40, 86–88.) For the presumption to apply, however, the claim must (1) be grounded primarily in allegations that the defendants failed to disclose any information whatsoever relating to material facts, and (2) demonstrate that the defendants owed the plaintiffs a duty to disclose those facts. Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372, 384 (5th Cir. 2007). The Affiliated Ute presumption does not apply where, as here, "[n]on-disclosure is relevant only [insofar] as it makes the statements either false or misleading." Smith v. Ayres, 845 F.2d 1360, 1363 (5th Cir. 1988); Krogman v. Sterritt, 202 F.R.D. 467, 478–79 (N.D. Tex. 2001). Moreover, alleged concealment of a purported fraudulent scheme does not transform a misrepresentation case into an omissions case. Joseph v. Wiles, 223 F.3d 1155, 1163 (10th Cir. 2000); In re Enron Corp. Sec., 529 F. Supp. 2d 644, 682 (S.D. Tex. 2006); see also Regents of Univ. of Cal., 482 F.3d at 384 (explaining that "[m]erely pleading that [a] defendant[] failed to fulfill [a] duty [to disclose material information] by means of a scheme or an act, rather than by a misleading statement, does not entitle plaintiffs to employ the Affiliated Ute presumption."). Because the Complaint is premised on false and misleading statements, not pure omissions, no presumption of reliance is available under Affiliated Ute.

C. Individual Issues of Knowledge Will Predominate With Respect to Plaintiffs' Claims Under the TSA.

Movants cannot satisfy Rule 23(b)(3)'s predominance requirement with respect to certain claims brought under the TSA. Specifically, Defendants cannot be held liable under Article 581-33A(2) of the TSA to an investor who knew the information allegedly omitted or that the alleged misstatement was false at the time of the purchase. Tex. Rev. Civ. Stat. Ann. art. 581-33A(2); see also Duperier v. Tex. State Bank, 28 S.W.3d 740, 753 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) (noting the TSA "excludes from liability any defendant who can prove the

plaintiff knew the misrepresentations or the omissions."). Thus, knowledge is an affirmative defense under the TSA. Sterling Trust Co. v. Adderley, 168 S.W.3d 835, 843 (Tex. 2005).

Given the inherently individual nature of the inquiry as to what an investor knew at the time of purchase, even if one or more class representatives were to succeed in presenting evidence to overcome this defense, they would do so only for themselves. Conversely, if one or more class representatives were to fail in presenting evidence overcoming this defense, that would prove nothing regarding absent class members' ability to overcome the defense.

Here, evidence in the record demonstrates how different putative class members could have had different knowledge of the alleged misrepresentations or omissions at the times of their respective purchases. For example, while proposed class representatives have alleged that they were never informed that Stanford was under investigation by the SEC or that the SEC believed Stanford might be a fraud, (Br. 2, 33, App. 106–107, Reed Decl. ¶ 8; App. 311, Troice Decl. ¶ 6; App. 483, Green Decl. ¶ 8), the record shows that information about both the SEC investigation and the possibility that SIB was a perpetrating a fraud were available in the public record and were in fact known to at least one of the proposed class representatives. Indeed, Green testified at his deposition that he was aware, prior to Stanford's ultimate collapse, of an article in a Venezuelan magazine by Alex Dalmady alleging that Stanford was perpetrating a Ponzi scheme. (App. 235–236, Green Dep. Tr. 51:16-52:16.) As discussed at Facts.A.2, supra, other information suggesting Stanford may have been under investigation, including SEC questionnaires delivered to numerous putative class members, was also publicly available prior to February 2009.

Where, as here, the public record suggests that individual class members could have known the information purportedly giving rise to a violation of the TSA, Defendants are entitled

to try to prove applicability of the knowledge defense as against putative class members on an individualized basis. See, e.g., In re Kosmos Energy Ltd. Sec. Litig., 299 F.R.D. 133, 154 (N.D. Tex. 2014) ("[A]ffirmative defenses such as investor knowledge are clearly relevant to the predominance analysis."); In re Superior Offshore Int'l, Inc. Sec. Litig., No. CIV.A.H-08-0687, 2010 WL 2305742, at *5 (S.D. Tex. June 8, 2010) (holding that where facts underlying alleged misrepresentations and omissions appeared to be publicly known, "[p]laintiffs ha[d] not satisfied their burden to demonstrate that those issues predominate over the knowledge issue [under Section 11 of the Securities Act of 1933]—an issue that must be determined on an individualized basis as to each investor"). Those individualized inquiries will overwhelm common issues of fact and law. See Gene & Gene LLC v. BioPay LLC, 541 F.3d 318, 329 (5th Cir. 2008) (concluding that need to hold mini-trials on the affirmative defense of consent defeats possibility of class certification); Castano, 84 F.3d at 742 n.15 (finding that individualized issues of knowledge with respect to the effects of smoking rendered a class inappropriate for certification); Martin v. Home Depot U.S.A., Inc., 225 F.R.D. 198, 202 (W.D. Tex. 2004) ("Knowledge is highly individualistic and cannot be determined on a classwide basis." (citation and quotation marks omitted)).

D. Individual Issues Will Predominate in Determining Which of the Putative Class Members' Claims Are Barred Holder Claims.

This Court should decline to certify a class in this case because individual issues of fact will predominate in determining which of the putative class members' claims are holder claims, and therefore barred.[19] The proposed class, however, explicitly includes these disallowed holder

[19] As this Court acknowledged in its Order regarding Defendants' motions to dismiss, courts have held that holder claims are not cognizable under the TSA. (Order, ECF No. 176, at 9–10); see In re Enron Corp. Sec., Derivative & "ERISA" Litig., 490 F. Supp. 2d at 818 ("[T]he express language of the [TSA] excludes 'holder' claims from coverage."); accord In re Enron Corp. Sec., Derivative & "ERISA" Litig., Civil Action Nos. H-01-3624, G-02-0299, 2007 WL 789141, at *1 (S.D. Tex. Mar. 12, 2007); Barsky v. Arthur Andersen, LLP, No. Civ. A

claims. (Compl. ¶ 92 (seeking certification of a class of "[a]ll persons or entities that held CD or other investments accounts with SIB as of February, 2009" (emphasis added)); Mot. at 4–5 (same); cf. Pls.' Joint Resp. & Br. in Opp'n to Defs.' Mots. to Dismiss Pls.' Compl. &, in the Alternative, Mot. for Leave to Amend, ECF No. 50, at 77 (seeking to amend Complaint to allege "the timing of [p]laintiffs' purchases of CDs and that they are not alleging 'holder claims in this lawsuit'").) Thus, certification of the proposed class would require the Court to weed out putative class members' non-cognizable holder claims, which will cause individual inquiries to overwhelm common ones. See, e.g., Gene & Gene LLC, 541 3d at 329 (denying class certification on predominance grounds where court would need to hold "mini-trials" to determine an issue on an individual basis); Hancock v. Chi. Title Ins. Co., 263 F.R.D. 383, 390 (N.D. Tex. 2009) (same).

Movants have not met, and cannot meet, their burden of showing that individualized issues involved in identifying putative class members' holder claims would not predominate over common issues. The individualized issues include: (1) when each investor purchased each CD; (2) the type of CD purchased; (3) whether and when the CD was automatically or otherwise renewed prior to February 17, 2009; and (4) whether the investor deposited additional funds, other than principal or interest from another Stanford investment, into the CD. (App. 432–435, 436, Gompers Decl. ¶¶ 40–44, 47.) Because these inquiries require individualized review of each proposed class member's account records, individualized questions of fact would predominate over common issues, rendering class certification inappropriate.

---

H-02-1922, 2002 WL 32856818, at *2 n.3 (S.D. Tex. Aug. 16, 2002). It is doubtful whether holder claims are cognizable under Texas common law. See In re Enron Corp. Sec., Derivative & "ERISA" Litig., 2007 WL 789141, at *13 ("[T]he Texas Supreme Court would limit, if not totally exclude, holder claims under Texas common law fraud.").

Indeed, these individualized issues exist even among the proposed class representatives themselves. For example, both the principal of Punga Punga and Troice began investing in the Stanford CDs in the late 1990s. (App. 243–244, Green Dep. Tr. 64:17–65:3; App. 310–311, Troice Decl. ¶ 4.) Prior to Sjoblom's retention by Stanford, both Punga Punga and Troice purchased or renewed FlexCDs that they continued to hold as of February 2009, and into which they continued to make deposits of funds which, in turn, may have come from other Stanford investments made prior to Sjoblom's retention. (See App. 343–344, Troice SIB Statement of Account; App. 488–489, Punga Punga SIB Transaction Detail; App. 474–480; Troice SIB Transaction Detail; App. 491–497, Punga Punga SIB Transaction Detail; App. 253–255, 258–259, Green Dep. Tr. 110:20–112:19, 139:2–140:2.) Thus, individualized inquiries would be required on a number of issues to determine whether Punga Punga and Troice's claims involving additional CD deposits should be considered holder claims and therefore disallowed.

E. Movants Have Not Established that Common Issues of Damages Predominate.

Movants do not, and cannot, demonstrate that common issues predominate over individual issues with respect to the putative class members' alleged damages. Movants state in passing that "questions of damages can be proven on a class-wide basis" (Br. 54–55), but they do not even attempt to meet their burden to identify such proof. Indeed, Movants have not proposed any methodology for calculating damages, nor have they presented a damages approach consistent with any theory of liability.

1. Movants Fail to Offer Any Viable Classwide Damages Model.

"[W]here individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class." Steering Comm. v. Exxon Mobil Corp., 461 F.3d 598, 602 (5th Cir. 2006). Indeed,

"[w]ithout presenting [a] [damages] methodology, [the proponents of a class] cannot show Rule 23(b)(3) predominance. Questions of individual damage calculations will inevitably overwhelm questions common to the class." Comcast, 133 S. Ct. at 1433. That is the case here, where Movants have asserted that classwide damages can be calculated according to a common methodology, but have failed to propose any methodology for computing those damages. [20]

Movants assert that "questions of damages can be proven on a class-wide basis by the Receiver's team, specifically FTI," (Br. 54–55 ), but they offer no supporting "evidence" for this contention beyond the Receiver's conclusory say so in his accompanying declaration. (App. 558, Janvey Decl. ¶ 17.) The Receiver provides no explanation of how he or FTI would purport to quantify damages for any individual class member. Instead, the Receiver opaquely states that FTI can do so based on unspecified "data gathered and relied upon as part of the Receivership claims process." (Id.)[21]

---

[20] In re Deepwater Horizon, 739 F.3d 790 (5th Cir. 2014), does not command a different analysis. There, the court declined to apply Comcast because, among other reasons, the "district court's inquiry into predominance was never premised on . . . a damages formula." Id. at 817. Here, by contrast, Movants assert that damages can and will be computed on a classwide basis, thus triggering the Comcast analysis. Because the Receiver has not explained his or his team's damages methodology, Movants have not "establish[ed] that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." Comcast, 133 S. Ct. at 1433. Additionally, the court in In re Deepwater Horizon declined to apply Comcast because the district court had bifurcated liability and damages. 739 F.3d at 817. But here, Movants have not asked the court to bifurcate liability and damages, nor should the Court bifurcate the issues sua sponte (especially where, as here, no showing has been made that such bifurcation is possible). See, e.g., Steering Comm., 461 F.3d at 603–04 (declining to consider bifurcation as "remedy for the obstacles preventing a finding of predominance" where plaintiffs had not proposed bifurcation to the district court and where plaintiffs failed to demonstrate that common issues of damages, among others, predominated). Indeed, for the multiple reasons explained herein, certification of any class, let alone a liability-only class, would be inappropriate.

[21] No other document in this case or in the SEC Action bears on the methodology for calculating damages in this case. Defendants respectfully submit that any suggestion to the contrary by Magistrate Judge Koenig in her March 9, 2015 Order was in error. (See ECF No. 179 at 5–6.) The Court's Orders in the SEC Action each relate to the claims against, and distributions from, the Receivership Estate, not claims against, and damages (if any) attributable to Defendants in this case. See, e.g., Order Approving Receiver's Interim Distribution Plan, SEC v. Stanford Int'l Bank, Ltd., Case No. 3:09-cv-0298-N (N.D. Tex. May 30, 2013) ECF No. 1877 (defining "Claim" as "a potential or claimed right to payment . . . against one or more of the Receivership Entities" or "a potential or claimed right to an equitable remedy . . . against one or more of the Receiver Entities"). The distribution plans approved in such Orders have nothing to do with the separate claims and calculation of damages, if any, in this action—let alone establish a reliable common damages methodology under Rule 23.

A plaintiff does not satisfy its burden under Comcast through an empty assurance that proof of damages "will be offered on a uniform, [c]lass-wide basis." In re Kosmos Energy Ltd. Sec. Litig., 299 F.R.D. 133, 151 (N.D. Tex. 2014) (emphasis in original). Rather, where, as here, "Lead Plaintiff[s'] submissions are akin to no evidence at all, under Comcast, [that] ought to end the Court's predominance inquiry . . . ." Id. As yet another federal court in Texas has explained:

> The Court is left . . . with a conclusory assertion that damages will be calculated on a classwide basis. Plaintiffs bear the burden of proving all relevant elements of Rule 23. That burden is not met by asking the Court simply to trust them.

In re BP p.l.c. Sec. Litig., Civil Action No. 4:10-md-2185, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014) ("BP II"); see also Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 308 (5th Cir. 2003) (holding that "class certification is not appropriate" where plaintiffs "failed to demonstrate that the calculation of individualized actual economic damages, if any, suffered by the class members can be performed in accordance with the predominance requirement of Rule 23(b)(3)"); In re BP p.l.c. Sec. Litig., Civil Action No. 4:10-md-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("Plaintiffs cannot avoid th[e] hard look [required under Comcast] by refusing to provide the specifics of their proposed methodology."). Movants' failure to identify any specific methodology for calculating damages in this case defeats any predominance argument premised upon common damages.

In contrast to Movants, who offer "no proof from which to draw an inference that individual inquiries may not be required if the Court were to certify this putative class," In re Kosmos, 299 F.R.D. at 154, Defendants have presented the declaration of Professor Gompers.[22] Professor Gompers' unrebutted declaration shows that individualized issues predominate the

---

[22] Professor Gompers is the Eugene Holman Professor of Business Administration and Faculty Chair of the M.B.A. Elective Curriculum at the Harvard Business School, and a Research Associate at the National Bureau of Economic Research. (App. 412, Gompers Decl. ¶ 1.)

damages inquiry here. Specifically, determining the existence and nature of any damages would depend on what each putative class member knew, when he or she knew it, on what sources of information he or she relied, and what investment decisions he or she made and would have made as a result. (See, e.g., App. 427–430, 432–433, 434–435, 436, Gompers Decl. ¶¶ 29–33, 40–41, 44–45, 47.)[23]

2. Movants Fail to Offer a Damages Approach Consistent with Any Theory of Liability.

At the class certification stage, "any model supporting a [movant's] damages case must be consistent with its liability case." Comcast, 133 S. Ct. at 1433 (internal quotation marks omitted). Where a movant's model "does not even attempt" to measure "only those damages attributable to [movant's] theory" of liability, the movant "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." Id.; see also BP II, 2014 WL 2112823, at *1 ("The Court must determine whether [p]laintiffs' proposed damages methodologies (1) quantify the injury caused by [d]efendants' alleged wrongful conduct, and (2) can be deployed on a classwide basis such that common issues will predominate over individualized ones." (citations omitted)). Movants fail to offer a damages approach consistent with any of their theories of liability.

In their Complaint, Plaintiffs allege that damages can be measured by reference to a putative class member's out-of-pocket losses. (See Compl. ¶¶ 105, 107). As explained by Professor Gompers, however, an out-of-pocket approach is inappropriate for determining economic damages, in part, because it is not tied to Plaintiffs' own theory of liability. (App.

[23] Based on the limited data produced by Movants and the Receiver (see App. 468, Gompers Decl. Ex. 3), Professor Gompers has opined that a "reliable [damages] calculation may be impossible" and that if investor data is indeed missing, it would be "impossible to reliably disentangle contributions from investors from purported interest earned," thereby rendering the out-of-pocket damages approach unusable here (App. 438, Gompers Decl. ¶¶ 53–54).

422–431, Gompers Decl. ¶¶ 17-37.) The out-of-pocket approach inappropriately totals the putative class members' losses, without any "coherent theory of liability" linking such losses to any alleged actions or omissions by Sjoblom, (App. 417, Gompers Decl. ¶ 8.f.), as distinguished from the many other parties whom plaintiffs and the Receiver have sued claiming that they bear full or partial responsibility for Stanford investor losses. Movants have presented no evidence or expert testimony to rebut Professor Gomper's conclusions.

In particular, Movants fail to offer any reliable methodology to calculate damages purportedly caused by Sjoblom's alleged actions or omissions, because their damages are not measured relative to any but-for world in which Sjoblom acted differently. Merely labelling all losses from all causes as Sjoblom-related damages is "clearly inadequate." Bell Atl., 339 F.3d at 307.

Movants' failure to advance any damage methodology "consistent with [their] liability case," Comcast, 133 S. Ct. at 1433, dooms their predominance argument, see, e.g., Robertson v. Monsanto Co., 287 F. App'x 354, 362–63 (5th Cir. 2008) (holding that individualized issues of causation and damages precluded certification); see also id. ("Although the alleged cause of the plaintiffs' injuries is a single incident . . . each plaintiff still must show that [defendant's] negligence . . . was proximately connected to the specific injuries complained of.").

F. Choice-of-Law Considerations Preclude Class Certification.

The Motion should be denied for the additional reason that Plaintiffs' claims raise individualized choice-of-law issues that defeat predominance.

The Fifth Circuit has repeatedly held that "variations in state law may swamp any common issues and defeat predominance." Cole v. Gen. Motors Corp., 484 F.3d 717, 724 (5th Cir. 2007) (quotation marks omitted); Castano, 84 F.3d at 741. "A district court's duty to

determine whether the plaintiff has borne its burden on class certification requires that a court consider variations in state law when a class action involves multiple jurisdictions." Castano, 84 F.3d at 741. "Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any problems with predominance . . . can be overcome." Id. at 742. Instead, a plaintiff must "credibly demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'" Id. (quoting Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986)); see also Gyarmathy, 2003 WL 21339279, at *1-2 (rejecting, in the class certification context, the "defendant lives here" approach to choice-of-law analysis in favor of examining the policies of each state with contacts).

Movants seek to certify a sprawling worldwide class that includes putative class members in potentially all U.S. jurisdictions and over 100 foreign countries. (Br. 45.) They thus bear the burden of presenting a sufficient choice-of-law analysis in order to demonstrate that common issues predominate. Spence v. Glock, Ges.m.b.H., 227 F.3d 308, 313 (5th Cir. 2000). Yet, Movants have provided no choice-of-law analysis. They have discussed only the application of Texas law without undertaking any analysis of the substantive laws of the foreign or U.S. jurisdictions where putative class members reside or are citizens. (Br. 46–51.)[24] This is plainly inadequate under controlling law. See, e.g., Spence, 227 F.3d at 313 (explaining that plaintiffs may not "attempt to finesse the choice of law by omitting comparison of laws" and finding that the district court "could not discharge its duty because plaintiffs did not supply adequate

[24] A nationwide class or subclass would potentially implicate the laws of all fifty states, the District of Columbia, and other U.S. territories; a "Latin American" class or subclass would implicate the laws of at least seven countries; and a Mexican class or subclass would involve the laws of potentially thirty-one different states and the Federal District. (See App. 622, Declaration of Dr. Claus von Wobeser, Esq. ("von Wobeser Decl.") at 3 n.4 (noting that Mexico has "a federal government integrating 31 States and 1 Federal District," all of which have a "Civil Code and a Code of Civil Procedure.") Thus, without any evidence or analysis from Movants, the Court is left without the tools to conduct an adequate choice-of-law analysis even as to the proposed alternative classes.

information on the policies of other interested states"); Karnes v. Fleming, Civil Action No. H-07-0620, 2008 WL 4528223, at *4–7 (S.D. Tex. July 31, 2008) (holding that "conclusory assertions" that Texas law governed the claims of all class members were no substitute for the "rigorous analysis required under established law"). Further, as the Supreme Court has emphasized, application of a single jurisdiction's laws to every class member in a nationwide, let alone worldwide, class action may be so "arbitrary and unfair" as to violate a defendant's constitutional due process rights. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 816–18, 821–23 (1985) (concluding that it was error for state court to apply its own substantive law to all class members without conducting a choice-of-law analysis).

Movants' failure to present a choice-of-law analysis "in and of itself is sufficient to defeat predominance" as to their proposed class and alternative classes. See Norwood v. Raytheon Co., 237 F.R.D. 581, 594 (W.D. Tex. 2006). The Fifth Circuit and federal district courts in Texas routinely deny class certification on these grounds. See, e.g., Castano, 84 F.3d at 752 (concluding that district court abused its discretion in certifying class where plaintiffs had failed to properly address variations in state law such that finding of predominance was based on speculation); Cole, 484 F.3d at 724-25 (holding that plaintiffs did not sufficiently demonstrate predominance because they failed to undertake the required "extensive analysis" of variations in state law concerning their claims and to consider how those variations impact predominance); Gyarmathy, 2003 WL 21339279, at *2 n.1 (noting that a court could conclude its analysis where plaintiff had failed to carry its burden); Lee v. Am. Airlines, Inc., No. Civ. A.3:01-CV-1179-P, 2002 WL 31230803, at *12 (N.D. Tex. Sept. 30, 2002) ("Because [p]laintiff has not provided the [c]ourt with the factual information necessary to conduct a proper choice-of-law analysis, the

[c]ourt can only speculate as to whether the common issues might predominate over what appear to be these individual issues."). This Court should similarly deny class certification here.

Moreover, under Texas choice-of-law rules, which this Court must apply, determining the applicable substantive law requires a detailed analysis of numerous factors that necessarily will differ for each putative class member, all but precluding a finding of predominance here. [25] And even if there were some way for the Court to readily determine the legal regimes applicable to different class members' claims, substantial differences among the potentially applicable laws would generate still more individualized inquiries. Even a cursory review of relevant case law demonstrates significant variations in state law governing vicarious liability—Plaintiffs' only asserted basis for recovery against the law firm Defendants[26]—as well as the law governing Plaintiffs' common law claims for aiding and abetting fraud and civil conspiracy. [27] See, e.g., Castano, 84 F.3d at 742 (noting "defendants' extensive analysis of how state law varied on fraud"); Norwood, 237 F.R.D. at 598–600 (denying class certification and stating that the law relating to fraud and civil conspiracy differs in U.S. jurisdictions); Guardian Angel Credit Union v. MetaBank, No. 08-cv-261-PB, 2009 WL 2489325, at *6 (D.N.H. Aug. 12, 2009) ("Differences in state laws governing vicarious liability could affect the disposition of class

[25] "In diversity cases, federal courts are obliged to apply the choice of law rules of the forum state." Spence, 227 F.3d at 311. Texas's adoption of the most significant relationship test requires a court to consider: "'(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'" Id. at 312 (quoting Restatement (Second) of Conflict of Laws § 145 (1971)). That test also requires that "[t]he policies of each state with contacts must be examined." Id. at 313 (citation omitted).

[26] Because the Court dismissed Plaintiffs' claims for negligent retention/negligent supervision, all of Plaintiffs' surviving claims against Proskauer and Chadbourne are premised on respondeat superior. (See Order, ECF No. 176, at 24-26.)

[27] Because the law of fraud varies from one jurisdiction to another, it follows *a fortiori* that the showing required for aiding and abetting fraud, which requires proof of the underlying fraud, would also differ.

claims and preclude class-wide analysis.").[28] Movants, moreover, completely ignore potential variations in the substantive laws of foreign jurisdictions, where many putative class members allegedly reside. Such differences exponentially compound the individualized inquiries necessary to determine what law applies to any given class member's claims, making this case especially unsuitable for class treatment. See Norwood, 237 F.R.D. at 600.[29]

G. Individual Issues of Timeliness Will Predominate.

Individual issues concerning the timeliness of each putative class member's claims would further defeat a finding of predominance. As discussed in Part I.C, supra, the availability of affirmative defenses that present individualized issues of fact precludes certification. See, e.g., Corley, 220 F.R.D. at 488 (holding that "varying statutes of limitations, as well as their differing effects on [p]laintiffs' claims, slay predominance"); Kelley v. Galveston Autoplex, 196 F.R.D. 471, 477 (S.D. Tex. 2000) (holding that predominance was defeated because of "individualized issues concerning the statute of limitations that would overshadow any potential common issues."). That is the case here.

Assuming arguendo that Texas law even applies here,[30] at least three different statutes of limitations would apply to the putative class's claims:

[28] For example, for aiding and abetting liability, Texas requires only that "the alleged aider must possess a general awareness that his role was part of an overall activity that is improper," Sterling Trust Co. v. Adderley, 168 S.W.3d 835, 842 (Tex. 2005) (quotation marks omitted), while other states require actual knowledge, see, e.g., Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007) (New York law requires that plaintiffs "allege actual knowledge" to bring an aiding and abetting claim); Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1118–19 (C.D. Cal. 2003) (stating that California law requires actual knowledge).

[29] Variations in the laws of the various jurisdictions also affect the superiority inquiry. See Castano, 84 F.3d at 750 (holding that the complexity of the choice-of-law inquiry in a multi-state class action "makes individual trials a more attractive alternative and, ipso facto, renders class treatment not superior").

[30] Although statutes of limitations are generally procedural rather than substantive, an exception exists where a "foreign jurisdiction's statute creates a right and also incorporates a limitation upon the time within which the suit is to be brought," in which case the foreign statute of limitations applies even though Texas may provide for a longer limitations period. Ellis v. Great SW, 646 F.2d 1099, 1111 (5th Cir. 1981). As discussed in Part I.F, supra,

Case 3:09-cv-04641-N-BG Document 18097 Filed 02/26/15 Page 40 of 89 PageID 4392

- two years for civil conspiracy, Tex. Civ. Prac. & Rem. Code § 16.003; G. Prop. Mgmt., Ltd. v. Multivest Fin. Servs. of Tex., Inc., 219 S.W.3d 37, 44 (Tex. App.—San Antonio 2006, no pet.);

- three years for aiding and abetting Stanford's alleged use of untruths or omissions to sell securities, Tex. Rev. Civ. Stat. Ann. art. 581-33H(2)(a); and

- four years for aiding and abetting common law fraud, Tex. Civ. Prac. & Rem. Code § 16.051; Eagle Props., Ltd. v. Scharbauer, 807 S.W.2d 714, 725 (Tex. 1990).

If a class is certified in this case, the Court will therefore be left to grapple with whether each putative class member's claims fall outside of each of the relevant statutes of limitations. See Kelley, 196 F.R.D. at 477. These determinations are fact-intensive and individualized, Corley, 220 F.R.D. at 487, causing individual issues to swamp common ones and therefore precluding a finding of predominance.

## II. A Class Action Is Not Superior to Individual or Joined Actions

In addition to satisfying the other requirements of Rule 23, Movants must establish, by a preponderance of the evidence, that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see also Wal-Mart Stores, 131 S. Ct. at 2558. In assessing superiority, a court must probe "the relevant claims, defenses, facts, and substantive law presented in the case." Maldonado v. Ochsner Clinic Found., 493 F.3d 521, 525 (5th Cir. 2007) (quotation marks omitted).

Here, there are two principal reasons why a class action would not be superior to other available means of adjudication. First, although Movants seek to certify a worldwide class including putative class members from over 100 countries (Br. 45), they have not met their burden of establishing that a judgment in this opt-out class action would be given preclusive

---

the presence of foreign putative class members requires additional inquiry into the nature and length of the limitations period in foreign jurisdictions in order to determine which limitations periods apply.

effect in those foreign jurisdictions. The undisputed evidence in the record is to the contrary. Thus, the Court cannot certify a class including non-U.S. investors, and for other reasons discussed herein, no U.S.-only investor class should be certified. Second, putative class members have sufficient incentives to bring—and, indeed, numerous members of the proposed class have already brought—individual actions based on the same claims asserted here.[31]

A. Foreign Jurisdictions Would Not Recognize, or Give Preclusive Effect to, a Class Action Judgment Against the Putative Class.

"Plaintiffs bear the burden of establishing superiority and whether foreign claimants should be included in the putative class." (Order, ECF No. 179, at 5.) A class action with foreign class members is not "superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), if a judgment on the merits would not be given preclusive effect in a foreign country of which a putative class member is a citizen or legal resident, see also Buettgen v. Harless, 263 F.R.D. 378, 382–83 (N.D. Tex. 2009); In re Vivendi Universal, S.A., 242 F.R.D. 76, 95 (S.D.N.Y. 2007) (finding that "res judicata concerns have been appropriately grafted onto the superiority inquiry"); In re Alstom SA Sec. Litig., 253 F.R.D. 266, 281 (S.D.N.Y. 2008) ("Courts may properly consider res judicata concerns when evaluating the [s]uperiority [r]equirement with respect to a proposed class that includes foreign class members.").

This rule is grounded in fairness, reflecting the concern that defendants should not be subjected to repeat litigation of the same issues against the same plaintiffs or class members. See, e.g., Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 996 (2d Cir. 1975) (reasoning that "if defendants prevail against a class[,] they are entitled to a victory no less broad than a defeat

[31] Defendants reserve all arguments and defenses they may assert in any of these individual actions.

Case 3:12-cv-04641-N-BG Document 197 Filed 02/26/15 Page 51 of 89 PageID 4194

would have been"), abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010); In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig., 228 F. Supp. 2d 348, 364 (S.D.N.Y. 2002) (collecting cases finding that "it would be unfair to certify a class" if the class members "would not be precluded from litigating abroad in their home countries should they lose in [the U.S.] forum").

Where plaintiffs "are unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority." In re Vivendi Universal, S.A., 242 F.R.D. at 95 (refusing to certify a class that included members from Germany and Austria); In re Alstom SA Sec. Litig., 253 F.R.D. at 282 (stating that the standard is whether plaintiffs are able to establish a reasonable probability that a foreign court will recognize the res judicata effect of a U.S. class action judgment). "The closer the likelihood of non-recognition is to being a 'near certainty,' the more appropriate it is for the [c]ourt to deny certification of foreign claimants." In re Vivendi Universal, S.A., 242 F.R.D. at 95. Indeed, courts routinely refuse to certify proposed classes that include foreign class members where plaintiffs fail to establish that the foreign courts where those putative class members are citizens or residents will grant preclusive effect to a judgment in the proposed class action. See, e.g., Bersch, 519 F.2d at 996–97 (declining to certify class where the "record contain[ed] uncontradicted affidavits that England, the Federal Republic of Germany, Switzerland, Italy, and France would not recognize a [U.S.] judgment in favor of the defendant as a bar to an action by their own citizens"); Ansari v. N.Y. Univ., 179 F.R.D. 112, 116–17 (S.D.N.Y. 1998) (declining to certify class where plaintiffs had "not submitted any

affidavits on what preclusive effect, if any, a Rule 23(b)(3) class action w[ould] have in the various countries of which the prospective class members are citizens”).[32]

Here, Movants seek to certify a worldwide class. But they offer no evidence, much less a preponderance, that a judgment in this case based on Rule 23’s “opt out or you are bound” approach would be enforceable in any foreign jurisdiction. By contrast, Defendants have submitted declarations from two international law scholars and from practitioners in Mexico and Venezuela, who have concluded that courts in the seven foreign jurisdictions where Movants claim the majority of class members reside would not afford preclusive effect to a class action judgment in this action. (See generally App. 701–729, Declaration of Professor Antonio Gidi (“Gidi Decl.”); App. 731–772, Declaration of Professor Manuel A. Gomez (“Gomez Decl.”); App. 620–699, von Wobeser Decl.; App. 774–789, Declaration of Pedro Alberto Jedlicka (“Jedlicka Decl.”).) Movants have failed to rebut the declarations of Defendants’ experts on the very question of whether courts in the seven jurisdictions at issue would recognize and give preclusive effect to a U.S. class action judgment in this case in favor of Defendants.

a. Movants Have Not Satisfied Their Burden with Regard to Foreign Putative Class Members.

As Plaintiffs have acknowledged, the relevant issue for this Court’s superiority analysis is “whether the courts of the countries in which [putative class members] reside will give preclusive effect to a United States court’s judgment” in this case. (Pls.’ Resp. to Mot. of Defs. Proskauer & Chadbourne to Compel Producs. of Docs. from Receiver Ralph S. Janvey & Br. in Supp. Thereof (“Pls.’ Mot. to Compel Resp.”), ECF No. 165, at 6.) For the overwhelming

[32] Accord Del Fierro v. Pepsico Int’l, 897 F. Supp. 59, 64 (E.D.N.Y. 1995) (dismissing action, in part, on the grounds that courts in the Philippines would not “inevitably” give res judicata effect to a foreign judgment in an opt-out class action); CL-Alexanders Laing & Cruickshank v. Goldfeld, 127 F.R.D. 454, 459-60 (S.D.N.Y. 1989) (declining to certify class where British courts would not recognize a foreign judgment in an opt-out class action).

majority of jurisdictions in which putative class members allegedly reside (see Br. 45), however, Movants submitted no evidence whatsoever. And, for seven Latin American countries for which Movants purport to have proffered evidence—Venezuela, Mexico, Colombia, Ecuador, El Salvador, Panama, and Peru—their evidence does not address whether any of these countries will recognize, and grant res judicata effect to, a judgment in this opt-out class action. Movants' expert, Professor Alejandro Garro, made no attempt to analyze the laws of any country other than these seven.[33] Moreover, he limited his opinion to the enforceability of a U.S. money judgment against a defendant (see generally App. 791–856, Decl. of Professor Alejandro M. Garro ("Garro Decl.")),[34] even though he recognized that "[i]t should not be readily assumed that a U.S. judgment obtained in a class action . . . will be recognized . . . in any of the Latin American countries in question in the same manner as [those countries] have recognized typical money judgments resulting from individualized litigation" (App. 921, Second Decl. of Professor Alejandro M. Garro ("Garro Rebuttal Decl." or "Rebuttal Declaration") ¶ 28.) Indeed, even on rebuttal, Professor Garro was "unable to make a firm representation" as to whether any of the seven countries on which he opined would recognize a "U.S. class action judgment against the putative members of the class" who did not opt out. (App. 917, Garro Rebuttal Decl. ¶ 20.)

---

[33] In his declaration, Professor Garro relied on a declaration by Felipe Torres. (App. 811, Garro Decl. at 20, ¶ 40), who addressed only Mexico (see generally id. at Attachment A (Torres Decl.).) Although Professor Garro expressed a generic opinion about the "enforcement of foreign judgments in general for . . . all of the countries of Latin America," he did not examine the laws of countries other than the seven referred to in the text and had no opinion as to whether "exceptions" might apply. (App. 862–863, Garro Dep. Tr. 41:21–42:21.) Professor Garro was also unaware that Movants were seeking to certify a worldwide class in this case. (App. 862, Garro Dep. Tr. 41:2–11.)

[34] Although Professor Garro paid lip service to "recognition" in his declaration, he conflated the term with "enforcement" based on the faulty assumption that "enforcement of a judgment presumes recognition." (App. 861, Garro Dep. Tr. 34:9–11; see also App. 799, Garro Decl. at 8, ¶ 27 n.3.) Yet even Professor Garro acknowledged that this assumption is problematic. For instance, he acknowledged that the Bustamante Code, described infra n.36, and on which he and Movants rely, could "impose a stricter standard for recognition than for enforcement." (App. 864–867, Garro Dep. Tr. 69:15–72:8.)

Professor Garro thus offered no opinion on the relevant issue in this case: whether courts in any of these countries would grant res judicata effect to a judgment in this opt-out class action to preclude relitigation by one of its own citizens or residents on the same issues against the same Defendants. (See App. 895, Dep. of Professor Alejandro M. Garro ("Garro Dep.") Tr. 125:9–24.) In fact, Professor Garro offered no opinion as to the res judicata effect of a U.S. judgment in any type of case (id.),[35] let alone in an opt-out class action, even though he, like Plaintiffs, acknowledged that "what really needs to be proven in this case is to which extent the judgment rendered in the United States will be given res judicata effects in the Latin American countries in question." (App. 884, Garro Dep. Tr. 97:11–17; see also Pls.' Mot. to Compel Resp. at 6.)[36] When asked why he was not offering an opinion on this critical question, Professor Garro testified that Plaintiffs' counsel instructed him not to address it and, instead, to address only whether seven Latin American countries would be willing to enforce a generic money judgment rendered by a U.S. court. (See App. 859, 860, 872, 873, 875, 901–902, Garro Dep. Tr.

---

[35] Although Professor Garro misleadingly stated in his Rebuttal Declaration that he previously had opined on whether seven Latin American countries would "recognize the res judicata effect of a final money judgment rendered in the United States" (App. 920, Garro Rebuttal Decl. ¶ 26), his deposition testimony belies that assertion (App. 895, Garro Dep. Tr. 125:9–24).

[36] For example, Professor Garro acknowledged that Article 396 of the Bustamante Code states that "the plea of res judicata founded on a judgment of another contracting party shall lie only when the judgment has been rendered in the presence of the parties or their legal representatives" and that, by its terms, the article applies to both defendants and plaintiffs. (App. 868, 877–878, Garro Dep. Tr. 74:15-22, 85:24–86:8.) However, Professor Garro did not research how Latin American courts interpret that article. (App. 878, Garro Dep. Tr. 86:9–23.) He also acknowledged that "it is a proper question to ask" whether, under the Bustamante Code, "a person who became a class member by virtue of receiving notice of a class action and failing to expressly opt out of the class would be considered to have been present or have their legal representatives present in the case where the class action judgment is rendered." (App. 869, Garro Dep. Tr. 75:15–78:7.) However, it was not a question that he considered in preparing his declaration. (Id.) Likewise, Professor Garro testified that it is "extremely relevant" whether, under the Bustamante Code, "a person domiciled in a Latin American country who receives notice of a class action in the United States and remains silent in response to that notice would be considered to have been summoned for the trial personally or through their legal representative[.]" (App. 873–874, Garro Dep. Tr. 79:21–80:15.) Here, too, Professor Garro offered no opinions because he "was not asked to address [the] question." (Id.; see also App. 874–875, 875, Garro Dep. Tr. 80:20–81:2, 84:10–17.)

18:3–8, 21:9–15, 78:8–20, 79:4–11, 81:3–9, 148:16–21, 148:25-149:12; App. 920, Garro Rebuttal Decl. ¶ 26.)[37]

In his Rebuttal Declaration, Professor Garro speculated that it is "highly unlikely" that putative class members would ever re-litigate this case "in their home countries" because of, among other things, "the running of the statute of limitations" in those countries. (Garro Rebuttal Decl. ¶ 10.) But he did not identify the relevant statutes of limitations or whether any such statute could be tolled by any number of legal or equitable mechanisms. Moreover, the likelihood of re-litigation is not the relevant inquiry under Rule 23(b)(3); rather, the inquiry is whether courts would grant res judicata effect to a judgment in the case in the event that an absent class member does attempt to re-litigate. See, e.g., In re Vivendi Universal, S.A., 242 F.R.D. at 95. If an absent class member brings the same lawsuit against Defendants and is potentially barred by a statute of limitations, the parties would have to litigate that issue in the course of the foreign lawsuit. Even if Defendants were to prevail in that litigation, they still would have suffered the prejudice of having to litigate the same claims two times (or more).

Because Movants have offered no evidence on the issue of whether a judgment in this case would preclude relitigation by foreign class members in their home jurisdictions, Movants have not met their burden of proving that the proposed worldwide class or any of the alternative classes or subclasses would be superior to individual or joined actions under Rule 23(b).

[37] In particular, Movants' counsel told Professor Garro not to address a number of issues that Professor Garro suggested to Movants were directly relevant to whether courts in the countries under consideration would accord res judicata effect to a judgment in this case, including: (1) "whether a person domiciled in a Latin American country who receives notice of a [U.S.] class action . . . and remains silent in response to that notice would be considered to have been summoned for the trial personally or through their legal representative"; (2) the extent to which foreign courts would consider class members to be parties to the case; and (3) the extent to which a court would analyze the actual ability of class members to participate in the case. (App. 873–875, 901–903, Garro Dep Tr. 79:21–81:9, 148:5–150:10.)

To the extent that Movants seek to rely on Anwar v. Fairfield Greenwich Ltd., 289 F.R.D. 105 (S.D.N.Y. 2013), vacated on other grounds & remanded sub nom. by St. Stephen's Sch. v. PricewaterhouseCoopers Accountants N.V., 570 F. App'x 37 (2d Cir. 2014), as support for certifying a class in this case, such reliance would be misplaced. In Anwar, the court certified a class with members from several foreign jurisdictions, including some at issue here, applying a standard that allowed the plaintiff to create a "rebuttable presumption" that countries would recognize a foreign judgment by showing only that the countries were "generally inclined to favor that course of action," thereby shifting the burden to defendants to show by "clear and convincing evidence" that a judgment in the actual class action at issue would not be given preclusive effect in those countries. 289 F.R.D. at 115. By placing such a burden on defendants, however, the Anwar court placed itself in direct conflict with both the Supreme Court—which has expressly held that the "party seeking class certification must affirmatively demonstrate [its] compliance with . . . Rule [23]," Wal-Mart Stores, 131 S. Ct. at 2551; see also Amchem Prods., Inc. 521 U.S. at 614 (holding that "parties seeking certification must show that the action is maintainable under Rule 23(b)[(3)]")—and this Circuit, see O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 737-38 (5th Cir. 2003) (holding that "[t]he party seeking certification bears the burden of demonstrating that the requirements of [R]ule 23 have been met"). The Anwar decision cites no precedent supporting the burden-shifting standard it applies, and no other court has followed Anwar in applying such a standard.

To the contrary, every other court to address this issue has held that a plaintiff bears the burden of establishing that a judgment in the specific case in which a class is to be certified will be preclusive in class members' home jurisdictions. See, e.g., In re Vivendi Universal, S.A., 242 F.R.D. at 95 (noting that the relevant question is "whether foreign courts would grant preclusive

effect to a United States judgment or settlement in this action" (emphasis added)). Whether "the general policy of the [foreign] countr[y] inclines to favor granting recognition to judgments of United States courts," Anwar, 289 F.R.D. at 120 (emphasis added)—has no bearing on whether a specific class action before a specific court satisfies the superiority requirement of Rule 23(b). Rather, a court must ask whether the foreign jurisdictions would recognize a judgment in the particular type of case at issue—here, an opt-out class action. This Court should not be the first to follow Anwar to the contrary.

Even if this Court were to apply Anwar's burden-shifting standard, which it should not, this Motion should still be denied. As detailed below, Defendants have presented undisputed, affirmative evidence—supported by the deposition testimony of Movants' own expert, Professor Garro—establishing that courts in the foreign jurisdictions at issue would be highly unlikely to recognize, and grant res judicata effect to, a class judgment in this case.[38]

[38] The Court should not consider the declaration of purported "non-retained expert" Michael Wallace Gordon (the "Gordon Declaration"), which was proffered by Movants as a rebuttal expert declaration. As an initial matter, the Gordon Declaration is inadmissible as "non-retained" expert testimony because he is not a percipient witness or an individual possessing first-hand knowledge of the factual events at issue in this case—the only circumstances in which "non-retained" expert testimony is permitted. See Eagle Oil & Gas Co. v. Travelers Prop. Cas. Co. of Am., Civil Action No. 7:12-cv-00133-O, 2014 WL 3744976, at *8 (N. D. Tex. July 30, 2014) (striking a "non-retained" expert report). Moreover, the Gordon Declaration is not proper rebuttal testimony because it does not respond to the opinions of any of Defendants' experts, nor could it, given that it was filed more than three years earlier in a different case—Anwar. See Anwar, No. 09-cv-118 (VM) (Jan. 11, 2012), ECF No. 780; see also Fed. R. Civ. P. 26(a)(2)(d)(ii) & advisory committee's note (1993 Amendments) (explaining that rebuttal expert testimony is "used solely to contradict or rebut the testimony that may be presented by another party's expert"). Nor does the declaration consider the facts of this particular case, as it must to be considered proper expert testimony. See Fed. R. Evid. 702. In any event, the declaration is of limited value given that not even the Anwar court made findings based on it. See Anwar, 289 F.R.D. at 119–20 (declining to decide whether Latin American jurisdictions would recognize a judgment in a U.S. class action and impermissibly shifting the burden to defendant to prove the point).

      b. On the Undisputed Evidence, Courts in the Foreign Jurisdictions at Issue Are Highly Unlikely to Give Preclusive Effect to a Judgment of the Court, or to a Settlement, in this U.S. Opt-Out Class Action.

In response to this Motion, Defendants have submitted declarations from four experts who address whether a class judgment, or settlement, in this case would be recognized, and accorded res judicata effect, in the Latin American jurisdictions discussed by Professor Garro:

- Professor Antonio Gidi, the author of a Model Class Action Code for Civil Law Countries. (App. 703, Gidi Decl. ¶ 7.) Professor Gidi is one of three General Reporters of the Class Action Model Code for Latin American Countries (id.) and an author of three articles "about preclusion in the context of class actions and the recognition of class action judgments abroad" (App. 704, Gidi Decl. ¶ 9). He has made class actions "the object of [his] continuous research for the past twenty-five years." (App. 702, Gidi Decl. ¶ 4.) Professor Gidi opines on whether Latin American countries generally—and Peru, Panama, El Salvador, and Ecuador in particular—would accord res judicata effect to a judgment in this case.

- Professor Manuel A. Gomez, a tenured associate professor and a practicing attorney in Venezuela who has "conducted research and published scholarly works on the status and development of aggregate and collective litigation in Latin America." (App. 701, 702, 703, Gomez Decl. ¶¶ 2, 3, 7.) Professor Gomez opines on whether Latin American countries generally—and Mexico, Venezuela, and Colombia in particular—would accord res judicata effect to a judgment in this case.

- Dr. Claus von Wobeser, a practicing attorney in Mexico and former law professor who has served as the President of the Mexican Bar Association. (App. 620, von Wobeser Decl. ¶ 1.) Dr. von Wobeser addresses whether Mexican courts would accord res judicata effect to a judgment in this case.

- Mr. Pedro Alberto Jedlicka, a practicing attorney in Venezuela and former law professor who has taught Venezuelan civil procedure. (App. 775, Jedlicka Decl. ¶¶ 9, 11.) Mr. Jedlicka addresses whether Venzuelan courts would accord res judicata effect to a judgment in this case.

As explained in detail below, each of these experts reached the same conclusion: the jurisdictions on which they opine would not recognize, and grant res judicata effect to, a class judgment or settlement in this action, and therefore would not preclude relitigation of the same claims against Defendants by putative class members who are citizens or residents of those

jurisdictions. Not only have Movants failed to rebut this conclusion with any contrary evidence or expert opinions, Movants' expert, Professor Garro, agreed with this conclusion in certain respects at his deposition.

Courts in Latin American countries would be highly unlikely to recognize a judgment in this U.S. opt-out class action because doing so would violate, among other things: (1) the countries' public policies; (2) the countries' due process and notice requirements; and/or (3) the countries' jurisdictional rules. (See, e.g., App. 705–706,707, 708, Gidi Decl. ¶¶ 19(1)–(3), 21, 25, 29.) In addition, Latin American courts—in contrast to U.S. courts—do not recognize issue preclusion, such that class members who are citizens or residents of Latin American countries would be free to relitigate factual issues previously adjudicated by this Court. (App. 885, Garro Dep. Tr. 98:18-19.) Finally, as Movants' expert Professor Garro testified, Latin American courts cannot be counted on to apply their own law consistently due to extensive corruption, among other issues. See infra Part II.A.2 at 52.

First, public policy creates a barrier to the recognition of an opt-out class action judgment in this case. As Movants' expert, Professor Garro, testified, the public policy exception presents "a serious obstacle" to foreign judgment recognition in the countries he addressed. (App. 881–882, Garro Dep. Tr. 93:20–94:17; see also App. 879–880, Garro Dep. Tr. 91:20–92:22; App. 882–883, Garro Dep. Tr. 94:18–95:24 (explaining that courts in Central America are "far less" likely than U.S. or European courts to give foreign judgments res judicata effect).) Yet despite recognizing this undisputed principle, Professor Garro submitted a Rebuttal Declaration in which he makes the unsupported assertion that Defendants' experts' conclusions regarding the public policy exception are "purely speculative." (App. 918, Garro Rebuttal Decl. ¶ 21; see also App. 911, Garro Rebuttal Decl. ¶ 5.) Such a conclusory assertion is not evidence, and it is flatly

contradicted by the declarations of Defendants' experts, which set forth in detail their opinions and the authorities on which they are based. Nowhere in his Rebuttal Declaration does Professor Garro seriously dispute the myriad points in Defendants' experts' declarations as to the public policy reasons for non-recognition in the jurisdictions on which Professor Garro opines.

For example, Professor Garro does not even try to respond to or rebut Defendants' showing as to why Latin American countries that do not have class actions for damages, such as Peru and El Salvador, or countries that have only opt-in class actions, such as Mexico, would find recognizing a class action judgment to violate their respective public policies. (App. 706–707, 708, 713, 716 Gidi Decl. ¶¶ 21–25, 29, 57, 71; see also App. 628, 629, 632–633, von Wobeser Decl. ¶¶ 23, 24, 37–39.) Professor Garro's superficial statement that some countries' recent legal scholarship and class action laws make them less hostile to collective actions (App. 914–915, Garro Rebuttal Decl. ¶ 13) is not a response to Defendants' experts' actual analyses of these laws.

Likewise, Professor Garro does not dispute that Peru, which has only injunctive class actions, will not even grant preclusive effect to a Peruvian class action judgment—let alone, a U.S. class action judgment—against Peruvian citizens or legal residents who are absent class members. (App. 713, 714, Gidi Decl. ¶¶ 57, 59.)[39] Professor Garro provides no reason to believe that a country like Peru would give greater binding effect to a U.S. class action judgment than it would to its own class action judgments.

[39] In other Latin American countries with class actions, it also is often the case that a judgment is not binding on a class where it is favorable to the defendants or favorable to the class but for less than the full amount requested. (App. 707, Gidi Decl. ¶ 26.) Furthermore, in some Latin American countries, individuals who were class members in a foreign action will not be bound by a judgment in that action if they simply present so-called "new evidence or facts," including evidence or facts that were previously available but not produced. (App. 707, Gidi Decl. ¶ 27.)

Case 3:09-cv-04610-N-BG Document 180-2 Filed 04/26/16 Page 174 of 492 PageID 43404

Nor does Professor Garro dispute Defendants' experts' well-supported analyses of Mexico's legal regime.[40] As Defendants' experts' explained, and Professor Garro acknowledged, Mexican courts will not recognize a foreign judgment for res judicata purposes if doing so would violate Mexican public policy or "domestic public order." (App. 626–627, von Wobeser Decl. ¶ 16; see App. 904, Garro Dep. Tr. 160:12–19.) It is undisputed that, under Mexican law, "silence cannot produce any legal effect." (App. 631, von Wobeser Decl. ¶ 33; see also App. 631–632, von Wobeser Decl. ¶¶ 34–36.) Thus, in analyzing a judgment in a foreign opt-out class action, a Mexican court "would find particularly problematic" a legal regime in which absent class members are bound to a class action judgment by silence—i.e., without consenting to be part of the class or to be represented by plaintiffs' counsel. (App. 628–329, von Wobeser Decl. ¶¶ 23– 24; see App. 734–735, Gomez Decl. ¶ 15.) It is for these reasons that the opt-out system, which operates to bind absent class members "by virtue of their silence, is illegal in Mexico . . . ." (App. 628, von Wobeser Decl. ¶ 23; see App. 737, 759, Gomez Decl. ¶¶ 23, 76.) In fact, Mexico considered and "expressly declined to enact" an opt-out class action system, instead adopting an opt-in system, which requires putative class members' express consent in order to be part of the class. (App. 632–633, von Wobeser Decl. ¶¶ 37–38; cf. App. 905–906, Garro Dep. Tr. 167:23–168:7 (stating that drafts of the class action law in Mexico are relevant to the res judicata inquiry).) Professor Garro did not acknowledge this, either in his initial declaration or in his rebuttal.

Similarly, Professor Garro completely ignored Defendants' experts' conclusions that Venezuelan public policy would prevent Venezuelan courts from "recognize[ing] a judgment of

---

[40] Indeed, although Professor Garro acknowledged reviewing the declaration of Defendants' expert on Mexican law—Dr. von Wobeser—he did not mention or address any of Dr. von Wobeser's opinions. (See App. 919, Garro Rebuttal Decl. ¶ 23(f).)

a foreign court in a case [such as this one].” (App. 777, Jedlicka Decl. ¶ 16; see also App. 774, 778, Jedlicka Decl. ¶¶ 2(a), 17.) Venezuelan courts would find that only they, and not this Court, are competent to render a judgment in this case because it involves the banking sector, which on public policy grounds is heavily regulated by Venezuelan public law. (App. 779–780, Jedlicka Decl. ¶¶ 22–25; see also App. 923, Garro Rebuttal Decl. ¶ 32 (“It is beyond controversy that Venezuelan law will not recognize a foreign judgment rendered in a case in which Venezuelan courts claim exclusive jurisdiction . . . .”).) It is also undisputed that Venezuelan courts would find that only they, and not this Court, are competent to render a judgment in this case, because a class action is a case type affecting public policy and reserved for Venezuelan courts. (App. 780, Jedlicka Decl. ¶¶ 27–29.) [41]

Second, courts in most Latin American countries will refuse to recognize, and grant preclusive effect to, a foreign judgment in this U.S. opt-out class action because of those countries’ due process and notice requirements. (App. 709, Gidi Decl. ¶ 33.) As Movants’ expert, Professor Garro, rightly recognizes, Latin American courts would focus on “whether the American procedure, subject to the law of the forum, ensured adequate protection of the absent members of the class at all stages of the litigation . . . .” (App. 916, Garro Rebuttal Decl. ¶ 16.) Applying this standard, courts in most Latin American countries would find anything short of service by rogatory letter deficient (App. 709, Gidi Decl. ¶ 33),[42] depriving absent class members

[41] Professor Garro’s assertion that “Venezuelan jurisdictional principles and rules will accept the jurisdiction of the foreign U.S. courts in cases such as this one” (App. 923–924, Garro Rebuttal Decl. ¶ 32) cannot be taken seriously because Professor Garro acknowledged that Venezuela “will not recognize a foreign judgment rendered in a case in which Venezuelan courts claim exclusive jurisdiction” (id.) and did not dispute Mr. Jedlicka’s conclusion that Venezuelan courts would have exclusive jurisdiction over this case because it involves the banking sector and is a class action (see App. 779–780, Jedlicka Decl. ¶¶ 22–25, 27–29).

[42] Although Professor Garro acknowledged that each of the countries on which he opined would “closely scrutinize whether the due process rights of the parties had been respected,” he argued, without support, that only defendants are required to be served by letters rogatory to bind them to a U.S. judgment. (App. 915–916, Garro Rebuttal Decl. ¶ 14; see also App. 916, Garro Rebuttal Decl. ¶ 15.) This argument misses the mark, completely

of a real opportunity to protect their interests by directly participating in the action (App. 709, Gidi Decl. ¶¶ 34–37; see also App. 781, 782, Jedlicka Decl. ¶¶ 31, 34, 37 (Venezuelan courts would find deficient the type of notice typical in U.S. opt-out class actions because Venezuela has strict, in-person notice requirements and does not permit notice by mail);[43] App. 714, Gidi Decl. ¶¶ 58-60 (in Peru, binding an absent class member without formal service of process would violate the constitutional principle of due process); App. 716, Gidi Decl. ¶ 72 (Salvadoran courts would find any type of typical opt-out class action notice insufficient to satisfy El Salvador's notice requirement); App. 715, Gidi Decl. ¶ 65 (same with respect to Panama); App. 717, Gidi Decl. ¶ 77 (same with respect to Ecuador); App. 734, 770, Gomez Decl. ¶¶ 14, 105 (same with respect to Colombia).)

Third, Latin American courts will refuse to recognize a class action judgment in this case because they will find that their citizens did not subject themselves to the jurisdiction of this Court in this action. (App. 710–718, Gidi Decl. ¶¶ 38–79 (reaching this conclusion for "the vast majority of, if not all, Latin American countries"); see also App. 633, von Wobeser Decl. ¶ 40 (explaining that, under Article 594 of the Federal Code of Civil Procedure, "a Mexican judge cannot assume jurisdiction over [class members] who did not expressly agree to be a part of [the] class").) Indeed, Movants' expert testified that it would be "very unthinkable" for a Venezuelan court to find that a U.S. court had jurisdiction where a class member resided outside the U.S. and

---

ignoring Professor Gidi's considered opinion that, in the context of a U.S. opt-out class action, "the absent class member's rights are affected in much the same way as a traditional defendant's rights" because "absent class members do not take affirmative steps to bring a class action" but nonetheless have their interests affected. (App. 710–711, Gidi Decl. ¶ 41.)

[43] Even Professor Garro acknowledged that a Venezuelan court would not recognize a U.S. opt-out class judgment against a class member where that class member did not actually receive notice of the U.S. class action. (App. 896, Garro Dep. Tr. 139:7–13.)

made an investment outside the U.S. based on communications with people outside the U.S. (App. 897–898, 899–900, Garro Dep. Tr. 142:21–143:12, 144:16–145:16.)

In his Rebuttal Declaration, Professor Garro stated that "it seems reasonable to conclude" that "it is more likely than not that the same Latin American [putative class members]" who consented to the jurisdiction of this Court in the SEC Action "will find [it] equally expedient to bring, before the same forum, claims against" Defendants. (App. 912, Garro Rebuttal Decl. ¶ 7.) That is irrelevant. The relevant question is whether such individuals would be barred from filing the same claims in their home countries against Defendants if they are unsatisfied with the result of this action. Further, even Professor Garro acknowledged that putative class members' consent to the jurisdiction of this Court was only for "claims against the Stanford Entities" and "in [the] Receivership proceedings." (Id.) Yet he failed to address how a foreign court would treat an absent class member's argument that he did not submit to the jurisdiction of this Court in this action merely by filing a proof of claim in the SEC Action "for claims asserted against the Receivership entities." (App. 601, Janvey Decl., Ex. A.) Despite Movants' contrary assertion (Br. 54), foreign putative class members never consented to the jurisdiction of the Court in this case, and foreign courts would not consider these putative class members' consent in the SEC Action when considering whether to recognize, and grant preclusive effect to, a class judgment in this case. (App. 633–634, von Wobeser Decl. ¶ 41; App. 711–712, Gidi Decl. ¶¶ 42–50.)[44]

Fourth, according to Movants' expert, Professor Garro, no Latin American country would preclude class members from bringing new actions involving the same issues against the same

[44] Indeed, if consent to this Court's jurisdiction for the SEC Action constituted consent for this action, Defendants would be able to sue any foreign claimants in the SEC Action for a declaratory judgment that Defendants owe them nothing relating to the claims in this case. Such a prospect makes all too clear the flawed nature of Movants' argument.

defendants because issue preclusion is "nonexistent in Latin America." (App. 885, Garro Dep. Tr. 98:18–19.)

Fifth, as Professor Garro also explained, throughout Latin America (including the seven countries on which he opined), corruption is a "significant issue" that "impedes an impartial determination of litigated issues." (App. 886–887, 890–891, Garro Dep. Tr. 108:5–109:14, 113:21–114:5.) In many of these countries, "there are . . . pressures exercised by the executive branch" where "an important issue [is] at stake" (App. 892, Garro Dep. Tr. 116:8–20), and "[i]t goes without saying" that courts in each of these countries are more likely to side with their own nationals than with foreigners (App. 894, Garro Dep. Tr. 118:6–11). Therefore, "any statement" about the law in Latin America "has to be considered in light of . . . how [courts] are going to interpret those laws." (App. 888, Garro Dep. Tr. 111:8–14; see also App. 889–890, Garro Dep. Tr. 112:2–113:19 (stating that "the judge in this case[] has to take . . . into consideration" that "the rule in the books as opposed to [the] rule in action are two different worlds" and that the gap between the two is "extraordinarily wide").) In Venezuela, for instance, corruption would be very likely to interfere with a court's ability to recognize, and grant res judicata effect to, a U.S. judgment in this action. (App. 748–749, Gomez Decl. ¶ 55 (concluding that Venezuelan court would be highly unlikely to recognize a class action judgment in this action due to "rampant levels of corruption that affect all levels of government" within Venezuela); App. 893, Garro Dep. Tr. 117:12–19 (concluding that "it is well known" that judicial independence from the executive branch has "essentially disappeared" in Venezuela).)

Based on the foregoing, courts in the jurisdictions for which Movants have purported to present evidence would be highly unlikely to recognize, or to accord res judicata effect to, a class judgment (or settlement) in this action. Accordingly, the Court should decline to certify

Movants' proposed worldwide class and its proposed alternative class of Mexican (or Latin American) investors.

B. Movants Have Not Proven, and Cannot Prove, that Putative Class Members Lack Sufficient Motive to Bring Individual Actions.

Class certification is also inappropriate where, as here, hundreds of putative class members—including numerous foreign citizens and residents—have already demonstrated their willingness and ability to bring individual lawsuits. See, e.g., Fed. R. Civ. P. 23(b)(3)(B) (listing as a matter pertinent to superiority "the extent and nature of any litigation concerning the controversy already begun by or against class members"); Kottler v. Deutsche Bank AG, No. 05 Civ. 7773 (PAC), 2010 WL 1221809, at *5 (S.D.N.Y. Mar. 29, 2010) (finding plaintiffs failed to satisfy Rule 23(b)(3)'s superiority requirement where "approximately 25 class members have already brought individual lawsuits"); Barasich v. Shell Pipeline Co., Civil Action No. 05-4180, 2008 WL 6468611, at *6 (E.D. La. June 19, 2008) (denying class certification, noting "existence of [seven] separate federal and state court cases" arising from the same nucleus of common facts "likely eliminates any advantage of a class action device"); Taylor v. CSX Transp., Inc., 264 F.R.D. 281, 296 (N.D. Ohio 2007) (denying class certification, finding "class certification is not the superior method of adjudication," in part, because putative class members had already filed individual lawsuits against defendants); Abby v. City of Detroit, 218 F.R.D. 544, 550 (E.D. Mich. 2003) (denying class certification on superiority grounds where over 100 putative class members had brought individual lawsuits).

Contrary to Movants' bald statement that "there are no other pending lawsuits filed against these Defendants by Stanford investors other than the current class action suit" (Br. 46), as well as a similar statement by Movants' expert, Edward F. Sherman (App. 526, Sherman Decl. ¶ 33), Plaintiffs' own counsel has filed multiple cases against Defendants on behalf of hundreds

of putative class members, including hundreds of foreign citizens and residents, in federal and state courts—many of which remain pending. For example, in December 2011, approximately 250 putative class members filed six parallel lawsuits in Texas state courts. See Advisory to the Court from Castillo Snyder P.C. Regarding Filing of Individual State Court Lawsuits, Troice v. Proskauer Rose LLP, No. 3:09-cv-01600-N (N.D. Tex. Jan. 4, 2012), ECF No. 101. Five of these cases, including one filed by proposed class representative Reed, were removed and transferred to this Court. See supra Facts.B. In addition, in February 2012, six other lawsuits were filed by approximately 250 other putative class members. Of these cases, one is still pending. Id. Thus, the fact that hundreds of putative class members have already filed individual actions against Defendants—including hundreds of foreign citizens and residents as well as proposed class representative Reed—shows that individual litigations are a feasible alternative to a class action suit, thereby defeating a finding of superiority.

In drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." Amchem Prods., Inc., 521 U.S. at 617 (quotation marks omitted); (see Br. 45). But "[w]hen the size of each claim is significant, and each proposed class member therefore possesses the ability to assert an individual claim, the goal of obtaining redress can be accomplished without the use of the class action device." Stoudt v. E.F. Hutton & Co., 121 F.R.D. 36, 37-38 (S.D.N.Y. 1988) (denying certification on superiority grounds where each class member had claims in the tens of thousands of dollars).

Here, Movants make the conclusory statement that "[m]any Stanford securities investors . . . have claims too small and their finances are too limited to pursue individual suits against the alleged wrongdoers." (Br. 44–45.) But Movants themselves have produced data that

undermines that assertion and, if credited, suggests that the average claim of a putative class member would be sufficiently large to motivate individual lawsuits. Based on a summary of claims from the Antiguan Joint Liquidators, produced by Plaintiffs (App. 926–927, Joint Liquidators' Summary of Claims), the average claim for putative class members could be as high as $470,712 in the U.S., $318,125 in Mexico, and $194,303 in Venezuela.[45] And each of the three proposed class representatives has claims that are each potentially worth millions of dollars, as calculated by the Receiver.[46]

In sum, hundreds of putative class members, including hundreds of foreign citizens and residents, have been motivated to actually file individual actions, and most putative class members in the instant case appear to have claims exceeding several thousand dollars, if not several hundreds of thousands of dollars, giving them sufficient incentive to pursue individual litigation. Therefore, a class action is not the superior litigation mechanism, and Movants have failed to carry their burden to prove this factor under Rule 23(b)(3).

---

[45] Other materials provided by Movants suggest slightly different results, but all the data they submit point to the existence of many sizeable claims. (See, e.g., Br. 45; App. 963, Direct Test. of Karyl Van Tassel.) As discussed herein, see infra Part VI, such claims are based in part on CD purchases pre-dating Sjoblom's retention by Stanford in August 2005.

[46] (See App. 1016, 1019, 1022, Notices of Determination) (showing that Troice's (and his family's) approved claim is $1,879,818.58, Punga Punga's is $6,022,131.78, and Reed's is $2,150,000).) Movants rely on a declaration submitted by the Examiner of the Stanford Financial Receivership Estate, John J. Little, who briefly notes that a 2010 investigation "revealed that almost 85% of Stanford Investors had total investments (and losses) of less than $500,000." (App. 1027, Decl. of John. J. Little ¶ 7.) Mr. Little provides no further detail about the investigation, nor are the results of this investigation appended to his declaration or to the Motion. This evidence does not satisfy Movants' burden to demonstrate that a class action would be a superior mechanism. In fact, courts have found that claims under $500,000 are more than sufficient to motivate putative class members to file individual lawsuits, thereby defeating superiority. See, e.g., Ticknor v. Rouse's Enters., L.L.C., 592 F. App'x 276, 277 (5th Cir. 2014) (affirming district court's denial of class certification on superiority grounds where individuals could recover between $100 and $1,000, as well as attorneys' fees, costs, and punitive damages); Dvorin v. Chesapeake Exploration, LLC, Civil Action No. 3:12-CV-3728-G, 2013 WL 6003433, at *9 (N.D. Tex. Nov. 13, 2013) (stating that where plaintiffs' claims each would be for several thousand dollars, "[t]his amount is not so small as to render a class action a superior method of adjudication"); Abby, 218 F.R.D. at 549 (denying class certification on superiority grounds, in part, because settlement amounts ranging from $1,000 to $550,000 indicated that individuals had a "substantial stake" in litigation).

## III. Movants Have Not Provided and Cannot Provide Any Evidence that a Class Is Ascertainable

This Court should deny certification for the additional reason that Movants have not proposed any ascertainable class or subclass. No ready way exists to identify putative members of any class without resort to an extensive and complicated review of potentially inaccurate records. Movants have identified no methodology or data through which members of alternative, country-specific classes or subclasses could reliably be determined. And even identifying members of a U.S.-investors-only class would still present insurmountable hurdles because it would require the Court to identify and exclude "accredited" investors, who cannot bring claims for aiding and abetting unregistered CD sales under TSA Article 581-33(A)(1).

"It is elementary that . . . the class sought to be represented must be adequately defined and clearly ascertainable." DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970); see also John v. Nat'l Sec. Fire & Cas. Co., 501 F.3d 443, 445 (5th Cir. 2007) (stating that "[t]he existence of an ascertainable class" is "an implied prerequisite of Federal Rule of Civil Procedure 23"). A class is not sufficiently ascertainable where inclusion turns on definitions that are "patent[ly] uncertain[]," DeBremaecker, 433 F.2d at 734, or would require "fact-intensive, individualized factual inquiries," Pfeffer v. HSA Retail, Inc., Civil Action No. SA-11-CV-959-XR, 2012 WL 1910034, at *3 (W.D. Tex. May 24, 2012). Moreover, a "plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful," but, rather, "must demonstrate [that] his purported method for ascertaining class members is reliable and administratively feasible, and permits a defendant to challenge the evidence used to prove class membership." Carrera v. Bayer Corp., 727 F.3d 300, 306, 308 (3d Cir. 2013). Movants fail to meet these requirements.

Case 3:09-cv-04641-N-BG Document 18097 Filed 02/26/16 Page 783 of 849 PageID 4374

Here, Movants have proposed a class definition that turns entirely on untestable, individualized determinations by the Receiver based on voluminous and potentially inaccurate records. Specifically, Movants propose to certify a class of "[a]ll persons or entities that held CD or other investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action." (Mot. 4–5 .) Movants themselves put forth no evidence that this class is readily ascertainable and disclaim any ability to identify its members; instead they assert that the Receiver can do so using data purportedly in his possession. (App. 982, Pls.' Resps. to Defs.' First Set of Interrogs.) But Movants do not propose a specific methodology for identifying class members, and the Receiver has consistently maintained that he lacks the necessary information and resources to identify individual investors who purchased SIB CDs.[47] For example, the Receiver has confirmed that the claims he approved do not correspond to individual CD holders, but rather may aggregate the accounts of multiple individuals for whom he does not have detailed information. (See App. 1038, E-mail from Kevin Sadler to Craig Reiser.) In refusing to provide Defendants with discovery regarding the identity of claimants on the Receivership Estate, the Receiver repeatedly insisted that he would need "to collect the information requested," and that it would be "unduly burdensome, time consuming and expensive" to do so. (App. 1046, Receiver's Resps. & Objections to Def. Chadbourne's Third Party Subpoena to Produce Documents.) Further, in opposing Defendants' motion to compel production of that information, the Receiver represented that information about claimant identity requires "revisions or updates," that much of it is not stored in a "readily

[47] Even the limited discovery Defendants have been provided to date confirms that the Receiver's data cannot be relied upon to identify claims of individual investors with any degree of accuracy. For example, Troice testified that although his claim has been approved by the Receivership Estate, he has yet to receive a single distribution because the Receiver has incorrectly aggregated his claim with that of his three sisters despite that his sisters invested in Stanford separate and apart from Mr. Troice. (App. 147–151, 119–120, Troice Dep. Tr. 111:4-115:7, 39:23-40:8.)

searchable" format, and that he would have to create "custom databases and reports" to work

with it. (Receiver's Resp. to Proskauer's and Chadbourne's Motion to Compel, ECF No. 167, at

8, 9.)

Clearly, neither Movants nor the Receiver can say who is or is not in the class without

additional, intensive analysis of data that the Receiver does not have readily available and is

unwilling or unable to produce. As the Fifth Circuit recently indicated, a class that can be

identified only through this type of detailed review of voluminous, individual and potentially

inaccurate account records raises serious doubts about whether the class is sufficiently

ascertainable to be certified. See Frey v. First Nat'l Bank S.W., --- F. App'x ---, 2015 WL

728066, at *5 (5th Cir. Feb. 20, 2015) (affirming class certification because "there [was] nothing

to suggest that a lengthy individualized analysis of each account and all of its individual

transactions would be necessary to identify class members"). Indeed, both within this Circuit

and elsewhere, courts have refused to certify classes that could be ascertained only through the

individualized review of bank records and transaction data, local land records, and telephone

number logs, among other data-intensive records. See Pfeffer, 2012 WL 1910034, at *3

(individualized analysis of voluminous bank and personal account records and ATM transactions

defeated ascertainability because no "straightforward administrative procedure" existed to

identify class members); see also EQT Prod. Co. v. Adair, 764 F.3d 347, 358–60 (4th Cir. 2014)

("resolving owernship" of gas leases "based on land records can be a complicated and

individualized process" and "pose[d] a significant administrative barrier to ascertaining" class

membership); Intercontinental Hotels Corp. v. Girards, No. 05-02-01604-CV, 2004 WL 423115,

at *2 (Tex. App.—Dallas [5th Dist.] Mar. 2, 2004) (no pet.) ("[T]here is nothing in the record to

show it is possible, much less administratively feasible, to ascertain the identity of class members

from the voluminous list of telephone numbers generated by the daily fax confirmation logs.") While the Receiver states that he will be able to quantify damages for a class, "assuming the class definition is based on investors whose claims have been allowed by the Receivership" (App. 558, Janvey Decl. ¶ 17), this conclusory assertion does not in any way negate the individualized and fact-intensive nature of the required inquiry. See Pfeffer, 2012 WL 1910034, at *4 n.5 (rejecting plaintiff's "lone conclusory statement, without . . . any evidence or elaboration, that 'there will be no difficulty in determining the putative members of the class'"). Nor does it remove the "patent uncertainty" from the Receiver's unilateral determination of who is in the class, which is based on an unspecified methodology using unspecified data that seemingly allows for variation and judgment calls. See DeBremaecker, 433 F.2d at 734 (rejecting class that included "broad spectrum of positions and activities which could conceivably be lumped under" the class definition).

Moreover, as set forth above, determining who is in the class would require still further individualized analysis to exclude holders, accredited U.S. investors, and individuals who purchased CDs only before October 2006. See supra Part I.D; infra Part IV.A at 67; Part VI. Determining who must be excluded from the class on these bases thus would require "individualized 'mini-trials,'" and cannot be accomplished using the sort of "mechanical objective standard" on which the Fifth Circuit has insisted for proof of ascertainability. Union Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 640 (5th Cir. 2012) (affirming certification where class could be ascertained through a "quick look at [the] trading records" (internal quotation marks omitted)).

Movants' alternative, geographic-based subclasses merely compound the ascertainability problem. (Mot. 5–7.) Movants' proposed subclasses turn on the countries of citizenship or legal

residence of CD holders. As Magistrate Judge Koening recently held, "[Movants] bear the burden of establishing . . . whether foreign claimants should be included in the putative class." (Order, ECF No. 179, at 5.) Movants, however, have not met their burden because they have offered no evidence about the countries of citizenship or legal residence of any class members. Again, Movants declare that the Receiver can perform this analysis. But, no evidence exists that the Receiver has even collected data regarding the citizenship or lawful permanent residence of individuals whose claims he approved. The Bar Date Order and Proof of Claim Form did not solicit information about citizenship or lawful permanent residence. (App. 603–606, Janvey Decl., Ex. A.) The Receiver acknowledges possessing data about the locations of groups of claimants, (App. 1035, E-mails between Kevin Sadler and Craig Reiser), but this information is not sufficient to determine whether a proposed class member would be bound by the preclusive effect of a U.S. class action judgment in this case. Part II.A, supra. In any event, the Receiver admits that the data he has about the geographic location of CD investors is "almost meaningless" because single claim numbers may aggregate the claims of multiple, geographically dispersed individuals, people's addresses have changed, and many claimants used mailing addresses outside their countries of residence.[48] Id. The Receiver's declaration makes no representations at all about his ability to identify the countries of citizenship or permanent residence of CD investors. Movants proposed alternative classes therefore fall well short of the requisite standard for demonstrating an ascertainable class. John, 501 F.3d at 445.

[48] For example, Punga Punga is a Panamanian corporation with a principal (Green) who is a Mexican citizen. (App. 482–483, Green Decl. ¶¶ 3-4.) Green's claim with the Receiver, however, lists his "permanent mailing address" as the office of his attorneys in Texas. (App. 1019, Punga Punga Notice of Determination.) Meanwhile, the address listed on his claim form with the Antiguan Joint Liquidators is an apartment he owns in Florida. (App. 251–252, Green Dep. Tr. 96:25–97 :22; App. 1064, Punga Punga Proof of Debt Form.)

Moreover, even if the Court were to exclude all foreign investors and consider certifying a U.S.-only alternative class, such a class still could not be properly ascertained. As discussed infra Part IV.B at 67, accredited U.S. investors cannot assert claims under the TSA for the sale of unregistered securities. Determining whether investors are accredited would require assessing their net worth, income or assets, see supra n.5—inquiries that by definition are individualized. The Receiver does not claim—and Movants offer no evidence—that records even exist that would allow him or his team to differentiate between accredited U.S. CD purchasers and non-accredited ones (if there are any). Because no formulaic and objective analysis exists to reliably ascertain any class in this case, no class can be certified. See, e.g., DeBremaecker, 433 F.2d at 734.

## IV. Movants Cannot Satisfy Rule 23's Adequacy or Typicality Requirements

A class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a)(4). To satisfy this requirement, Movants must prove that putative class representatives are not only "part of the class" but also "possess the same interest and suffer the same injury as the class members." Amchem Prods., Inc., 521 U.S. at 625–26 (citation and quotation marks omitted). The adequacy inquiry thus "'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.'" Berger v. Compaq Computer Corp., 257 F.3d 475, 479-80 (5th Cir. 2001) (quoting Amchem, 521 U.S. at 625). Courts in this Circuit undertake a "robust review" of adequacy issues, "incorporating the due process considerations inherent in the concept, making certain that the representative[s] possess[] the character traits necessary to guarantee [their] commitment to [their] fiduciary duties to the class." In re Kosmos, 299 F.R.D. at 145; see also Phillips Petroleum Co., 472 U.S. at 812 ("The Due Process Clause of course requires that the named

Case 3:09-cv-00461-N-BG Document 180-97 Filed 04/26/16 Page 75 of 892 PageID 4345

plaintiff at all times adequately represent the interests of the absent class members."); Berger, 257 F.3d at 484 ("Precedent and due process concerns require that courts protect potential class members by ensuring that the named plaintiffs demonstrate their adequacy.").

Similarly, a class may be certified only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). As the Fifth Circuit has recognized, "[t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members." Stirman v. Exxon Corp., 280 F.3d 554, 563 n.7 (5th Cir. 2002) (citation and quotation marks omitted).

Movants have not met their burden of proving that the proposed class representatives would be adequate class representatives with claims typical of the proposed class.

A. The Proposed Class Representatives Have Not Satisfied, and Cannot Satisfy, Rule 23(a)(4)'s Adequacy Requirement.

Movants have not demonstrated that Reed, Troice, and Punga Punga will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[P]laintiffs seeking certification must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves—not the lawyers—actually directing the litigation." In re Kosmos, 299 F.R.D. at 145 (purported securities class action subject to PSLRA's pleading standards); see also Berger, 257 F.3d at 482–83 (explaining that, under precedent pre-dating the enactment of the PSLRA, class representatives must "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation"); id. at 483 n.18 ("[p]laintiffs should understand the actions in which they are

involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel").[49]

Movants' sole evidence of the proposed class representatives' purported adequacy are the conclusory and boilerplate assertions, set forth in their respective declarations, that each has "been actively involved" in this litigation and is "prepared to do what is necessary and appear and testify at trial in this case to vindicate [his or her] rights and the rights of other Stanford victims." (App. 107, Reed Decl. ¶ 10; App. 312, Troice Decl. ¶ 11; App. 486, Green Decl. ¶ 15.) These assertions are insufficient to sustain Movants' burden of proof. See In re Kosmos, 299 F.R.D. at 146–47, 150 (finding class representative inadequate in part because "the only evidence . . . in support of its claims of adequacy" was a declaration that "contain[ed] little more than formulaic, boiler-plate assertions" and "conclusory pronouncements"). Movants' conclusory assertions of adequacy are particularly insufficient in light of the following:

Reed: Reed's delay in seeking to join this case as a named plaintiff raises substantial doubt as to her "willingness and ability . . . to take an active role in and control the litigation and to protect the interests of absentees." Berger, 257 F.3d at 479 (citation omitted); see also In re LTV Sec. Litig., 88 F.R.D. 134, 151 (N.D. Tex. 1980) (finding that proposed class representative was inadequate in part because she filed complaint three weeks after other plaintiffs had already filed a class certification motion involving the same allegations). Despite learning about this case in 2011 (App. 66, Reed Dep. Tr. 14:12–18), Reed has never attempted to join as a named plaintiff; rather, the Plaintiffs made an untimely motion to have her added at the end of January 2015. (See generally Opposed Mot. to Add Named Pl. & Putative Class Representative, ECF

[49] Although the "demanding" Berger standard arose in the federal securities context, it has "since been applied to cases" outside of that context. In re Enron Corp. Sec., 529 F. Supp. 2d at 675 n.43, 725; accord Ogden v. AmeriCredit Corp., 225 F.R.D. 529, 532 (N.D. Tex. 2005).

No. 163.) Reed admitted in her deposition that she did not read the Complaint until 2015 (App. 67 Reed Dep. Tr. 22:6–9)—months after signing a sworn declaration in support of the motion for class certification in October 2014 (App. 1072, Declaration of Pam Reed, dated Oct. 25, 2014 ("Original Reed Decl."); see, e.g., In re Enron Sec., 529 F. Supp. 2d at 733 (finding class representatives inadequate in part because they "ha[d] not read the majority of documents given to them by their attorneys, nor even read the complaints carefully"). In her original sworn declaration, Reed misrepresented her investments in the CDs, suggesting, at a minimum, her lack of diligence. (Compare App. 1071, Original Reed Decl. ¶ 5 (stating that she purchased one "SIBL 'Fixed CD' in the amount of $2,156,286.10" and another "SIBL 'Fixed CD' for the amount of £160,104.07"), with App. 106, Reed Decl. ¶ 5 (stating that she purchased one "SIBL 'Fixed CD' in the amount of $2 million" and another "SIBL 'Fixed CD' for the amount of £150,990.00"). (See also App. 97–103, Reed Dep. Tr. 174:7–180:22.)

Reed further failed to search her e-mails and other electronic files for documents responsive to Defendants' discovery requests until after her deposition and over a month after counsel represented that her document production was complete (App. 68, Reed Dep. Tr. 49:10–50:7; App. 1074–1075, Correspondence between Ed Snyder and Jonathan K. Chang; App. 1077–1078, Letter from Jonathan K. Chang to Ed Snyder; App. 1082–1083, Letter from Daniel J. Schwartz to Ed Snyder), which provides an additional "basis to find a class representative inadequate," Longden v. Sunderman, 123 F.R.D. 547, 558 (N.D. Tex. 1988); see also In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360, 367 (E.D. La. 1997) ("Failure to cooperate in discovery may support a finding that class representatives are inadequate."). And, in response to a direct question at her deposition, Reed failed to mention her involvement in two other Stanford-related lawsuits, including one against Defendants. (See App. 65, Reed Dep. Tr.

9:15–24).[50] Such a response, combined with the inaccuracies in her original declaration, call Reed's overall credibility into question. See Shiring v. Tier Techs., Inc., 244 F.R.D. 307, 317 (E.D. Va. 2007) (stating that, "to be appointed class representative, a plaintiff must demonstrate that he exhibits honesty, conscientiousness, and other affirmative personal qualities" (citation and internal quotation marks omitted)).

Troice: Troice admitted that he did not verify the accuracy of the allegations in the Complaint, did not know how the proposed class is defined (or even that there is a proposed class definition in the Complaint), and failed to correct an incomplete statement of his citizenship in the Complaint. (App. 116–117, Troice Dep. Tr. 23:19-24: 25; App. 118, 121, Troice Dep. Tr. 30:10–15, 47:2–13.) Troice also does not have "any idea" of the methodology the Receiver is using to calculate damages (App. 145, Troice Dep. Tr. 94:8–11), which is particularly troubling because Movants have proposed that damages in this case be calculated according to the Receiver's methodology. (Br. 54–55). Nor does Troice know why he and the other Plaintiffs are seeking to add Reed as a class representative. (App. 115, Troice Dep. Tr. 16:6–10.) Like Reed, Troice failed to search his e-mails for documents responsive to Defendants' discovery requests until after his deposition (App. 146, Troice Dep. Tr. 99:12-18), and only produced relevant e-mail correspondence ten days after his deposition and over a month after proposed class counsel represented to Defendants that Troice's document production was complete. (App. 68, Reed Dep. Tr. 49:10–50:7; App. 1074–1075, Correspondence between Ed Snyder and Jonathan K.

[50] Reed testified that she was a plaintiff in two lawsuits—one involving construction on her home and Wilkinson v. BDO USA, LLP, No. 3:11-cv-01115 (N.D. Tex.). (App. 65, Reed Dep. Tr. 9:15–24.) However, in response to a direct question as to whether she had been named as a plaintiff in any other lawsuits, Reed testified that she had not been (id.), despite the fact that in December 2011, she filed a state court action asserting the same claims against defendants in this action, see Petition, Reed v. Proskauer Rose LLP, No. 2011-CI-20426 (225th Dist. Ct., Bexar Cnty., Tex. Dec. 30, 2011), which was later removed to this Court, and in August 2010, she and others filed a state court action against her Stanford financial advisor, Nigel Bowman, see Petition, Gibbins v. Bowman, No. D-1-GN-10-002715 (200th Dist. Ct., Travis Cnty., Tex. Aug. 4, 2010).

Chang; App. 1077–1078, Letter from Jonathan K. Chang to Ed Snyder; App. 1082–1083, Letter from Daniel J. Schwartz to Ed Snyder).

Punga Punga: Green admitted that Punga Punga does not control how the litigation is conducted (App. 234, Green Dep. Tr. 44:6–19), and that he neither reads nor understands the materials in this case (App. 234, Green Dep. Tr. 44:14–16 ("If I were reading and understanding about all of this I wouldn't even be able to [conduct] my business.")). Punga Punga's willingness to defer to counsel belies Movants' contention that Punga Punga would be an "adequate" class representative. See Berger, 257 F.3d at 483 n.18 ("Plaintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel."). In addition, Green's declaration states that Punga Punga began investing in Stanford Financial in the 1990s (App. 484, Green Decl. ¶ 9), yet Punga Punga was not even formed until 2004 (App. 243–244, Green Dep. Tr. 64:17–65:3).

As a Panamanian corporation owned by a Mexican citizen (Compl. ¶ 5; App. 1085, Punga Punga Articles of Incorporation), Punga Punga would not be a member, much less an adequate representative, of an alternative U.S.-investor-only class, or an adequate or typical representative of a Mexican-investor-only class. Issues related to Punga Punga's corporate structure, control, and citizenship may also give rise to other unique and relevant questions of fact not shared by other members of the class.[51]

[51] At his deposition, Green testified—incorrectly—that he and his wife were and always had been the only directors of Punga Punga. (App. 242, Green Dep. Tr. 60:6–12.) Movants have submitted no documentary evidence that Green has ever been a director of Punga Punga, and the evidence suggests that Green is neither an officer nor a director of Punga Punga. (See App. 1104, Punga Punga Custody Agreement.) In fact, the officers and directors of Punga Punga are three Panamanian individuals, Edgardo Díaz, María Vallarino, and Myrna de Navarro (App. 1091, Punga Punga Articles of Incorporation), who also serve as directors of a Panamanian company named Leinada, (App. 1114, Leinada Articles of Incorporation), which has been implicated in illegal money laundering in connection with bribes paid to associates of a son of former Libyan dictator, Muammar el-Qaddafi. (Id.; App. 1127, N.Y. Times Article, "Libyan Fund Sues French Bank over $1.5 Billion in Losses on Derivatives"). Furthermore, while Movants' proposed alternative class definition purports to encompass not just "citizens and legal residents" of Mexico but also "entities owned or controlled by Mexican citizens or legal residents," (Mot. 6), Movants offer no

B. The Proposed Class Representatives Have Not Satisfied, and Cannot Satisfy, Rule 23(a)(3)'s Typicality Requirement.

Class certification may be denied where "the facts surrounding the named plaintiff are sufficiently different than other members of the class," in recognition that "representation of the class will suffer if the named plaintiff is preoccupied with a defense which is applicable only to himself." Pitts v. Greenstein, Civil Action No. 10-635-JJB-SR, 2011 WL 2193398, at *5 (M.D. La. June 6, 2011); see also Warren v. Reserve Fund, Inc., 728 F.2d 741, 747 (5th Cir. 1984) ("[T]he presence of [a] characteristic peculiar to the named plaintiff does present a sufficient question of typicality to justify a district court's decision to deny class certification."); City of San Antonio v. Hotels.com, Civil No. SA-06-CA-381-OG, 2008 WL 2486043, at *6 (W.D. Tex. May 27, 2008) ("If the representative plaintiff's claim is subject to a unique defense that is reasonably likely to be a major focus on the litigation, the claim is atypical."). The proposed class representatives' claims are not typical of those of the proposed class for several reasons.

First, because Reed was an "accredited investor" when she invested in the SIB CDs (App. 76, Reed Dep. Tr. 95:10–14), she cannot bring a TSA claim for the sale of unregistered securities. The TSA "exempts from the securities registration requirements . . . the offer and sale by the issuer or a registered dealer without advertising of any security to an individual accredited investor." 7 Tex. Admin. Code § 139.16 (emphasis added); see also Tex. Rev. Civ. Stat. Ann. art. 581-5T (providing that the Texas State Securities Board may issue rules, regulations, or

---

justification for why a Panamanian corporation such as Punga Punga might properly be included in a class of Mexican citizens merely because its largest shareholder is a citizen of Mexico. Because Punga Punga is a Panamanian citizen, a central issue with respect to whether Punga Punga may be included in the class is whether Panama's courts would accord res judicata effect to a U.S. class judgment. See supra Part II.A. That Punga Punga's largest shareholder may be a Mexican citizen is of no particular import to any question relevant to the issue of certification.

orders setting forth exemptions to the TSA's registration requirements).[52] Accordingly, Reed, as an accredited investor, cannot bring a claim for the sale of unregistered securities under the TSA. See Calnin v. Hilliard, Nos. 05-C-69, 05-C-1092, 05-C-784, 05-C-1148, 05-C-958, 2008 WL 336892, at *10–11 (E.D. Wis. Feb. 5, 2008) (granting summary judgment in part in favor of defendants on plaintiffs' "failure to register claims" under Wisconsin and Florida Blue Sky laws because plaintiffs were accredited investors and both laws exempted from registration securities sold to accredited investors); see also Supernova Sys., Inc. v. Great Am. Broadband, Inc., Cause No. 1:10-CV-319, 2012 WL 425552, at *4–6 (N.D. Ind. Feb. 9, 2012) (same, under Indiana's Blue Sky law). For this reason, Reed cannot adequately represent putative class members on those claims. See Stirman, 280 F.3d at 563 n.7 (noting that proposed class representative "has no incentive to fully litigate those claims not applicable to her").

Reed also is not typical of putative class members from other countries because, as a U.S. accredited investor, she: (1) was required to sign a subscription agreement and make certain representations not required of putative class members from other countries (see App. 501–502, SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire); (2) received different Stanford materials—with additional disclosures—than putative class members from other countries (see, e.g., App. 551, August 2007 letter to Reed; App. 499–501, SIB U.S. Accredited Investor Subscription Agreement Investor Questionnaire Reed; App. 28–50 SIB U.S. Accredited Investor Disclosure Statement.); and (3) likely has greater sophistication than some other putative class members.

[52] Indeed, U.S. accredited investors, like Reed, who participated in SIB's CD program were specifically told that the CDs "have not been nor will they be registered under the U.S. Federal Securities Act of 1933 . . . or the securities laws of any state within the United States." (App. 84–85, Reed Dep. Tr. 152:16–153:3; see also App. 29, SIB U.S. Accredited Investor Disclosure Statement.)

Second, Troice held only SIB CDs purchased prior to Stanford's retention of Sjoblom in August 2005. (See, e.g., App. 465–466, Gompers Decl. Ex. 2.) Therefore, Troice cannot show a causal connection under the TSA between his purchases of the SIB CDs and Sjoblom's alleged actions or omissions, nor can he satisfy the reliance requirements of Plaintiffs' common law claims. See supra Part I.B; infra Part VI. For these reasons, he will be unable to represent the class.

Third, Punga Punga and Reed are not typical of the putative class due to the unique circumstances under which they invested in Stanford. See Pitts, 2011 WL 2193398, at *5. Green began investing through Punga Punga—a foreign corporation—to mask his identity as a Stanford investor. (App. 237–238, Green Dep. Tr. 53:10–54:24.) Reed began investing in SIB CDs because of her nearly two-decade-long relationship with her longtime broker, Nigel Bowman, whom she followed to Stanford. (App. 105–106, Reed Decl. ¶ 4; see App. 75, Reed Dep. Tr. 93:2–5.) Further, in mid-February 2008, prior to purchasing a new SIB CD, Reed, Bowman and others flew to Antigua to see SIB firsthand. (App. 86, 89, 92, 95–96, Reed Dep. Tr. 155:19–23, 159:10–13, 163:3-16, 172:21–173:24.) Reed went to the bank to discuss the CDs, met and received presentations from various bank employees, and also spoke with Allen Stanford during the trip. (App. 88–89, 90–91, 93, 94, Reed Dep. Tr. 158:17–159:9, 160:2–161:9, 166:8–10, 167:2–3.)

## V. Movants Have Not Demonstrated that Investors Who Were Citizens or Residents of the United States Are Sufficiently Numerous to Form a Class

Finally, Movants cannot meet their burden of establishing numerosity for their proposed class of U.S. citizens and legal residents because they have not provided any "evidence" of, or even a "reasonable estimate" of, the number of purported class members who can bring a claim

under the TSA for aiding and abetting the sale of unregistered securities.[53] See Holmes v. Serv. Corp. Int'l, Civ. Act. No. H-10-4841, 2014 WL 3046971, at *5 (S.D. Tex. July 3, 2014); In re FEMA Trailer Formaldehyde Prods. Liab. Litig., No. MDL 071873, 2008 WL 5423488, at *4–5 (E.D. La. Dec. 29, 2008) (finding that plaintiffs had not met their burden as to numerosity where they "alleged that numerosity exists . . . as to the proposed class as a whole" but "fail[ed] to demonstrate or offer any evidence as to whether numerosity exists as to each proposed sub-class."). An accredited investor cannot bring a claim for the sale of unregistered securities under the TSA. See infra Part IV.B. Movants, however, provide no evidence as to the number of non-accredited, U.S. citizen or resident investors who purchased CDs; indeed, it is doubtful there are any non-accredited U.S. purchasers, because the CDs were sold in the United States pursuant to Regulation D, and by law, such securities can only be sold to accredited investors. Supra n.5. In fact, the only proposed class representative who purchased CDs in the United States—Pam Reed—is an accredited investor. Supra Part IV.A. If, as Movants claim, Reed is "typical" of U.S. purchasers, then there will be few, if any, such purchasers who were not accredited and can assert TSA registration claims, rendering any U.S.-only class insufficiently numerous to warrant class status.

## VI. In the Alternative, If the Court Does Not Deny Class Certification, It Should Limit the Proposed Class

If the Court does not deny class certification, which it should, the Court alternatively should narrow the proposed class.

Rule 23(a) contains an implied requirement that the class be adequately defined. Union Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 639 (5th Cir. 2012). Where, as here, a

[53] For the reasons set forth above, see supra Part I.D , certification also would be inappropriate for a class of U.S. citizens and legal residents bringing any other of Plaintiffs' claims.

class definition is overbroad, "[d]istrict courts are permitted to limit or modify class definitions to provide the necessary precision." In re Enron Corp. Sec., 529 F. Supp. 2d at 671 (internal quotation marks omitted); Eatmon v. Palisades Collection, LLC, No. 2:08-CV-306-DF-CE, 2010 WL 1189571, at *4 (E.D. Tex. Mar. 5, 2010) (modifying class definition to exclude categories of individuals). A class is overbroad, for example, where it encompasses untimely claims, Barnett v. Experian Info. Solutions, No. Civ .A. 2:00CV175, 2004 WL 4032909, at *2 (E.D. Tex. Sept. 30, 2004) (limiting temporal scope of class to include only misrepresentations made within statute of limitations), or where it includes individuals whose alleged injuries could not have been caused by the defendants, In re Hartmarx Sec. Litig., No. 01 C 7832, 2002 WL 31103491, at *6 (N.D. Ill. Sept. 19, 2002) (excluding investors who purchased stock prior to first alleged misrepresentation).

Movants' proposed class is overbroad for several reasons. First, the proposed class encompasses claims that are barred by statutes of limitation or statutes of repose. See supra Part I.G. Second, the proposed class includes non-cognizable holder claims. See supra Part I.D. Third, the proposed class includes claims of investors from jurisdictions that would not recognize, and give preclusive effect to, a class judgment or settlement in this action. See supra Part II.A.[54] Fourth, the proposed class includes accredited investors' invalid claims for the sale of unregistered securities under the TSA. See supra Part IV.B.

Finally, the proposed class includes claims based on CD purchases pre-dating Sjoblom's retention by Stanford in August 2005, which are barred due to lack of at least a causal connection. For a plaintiff to prevail under Article 581-33A(2) of the TSA, a "causal

[54] If the Court does not deny class certification as to the claims of investors from foreign jurisdictions, it should nevertheless exclude these investors' TSA claims from the class. The TSA should be interpreted and applied consistent with federal securities laws, see Haralson v. E.F. Hutton Grp., Inc., 919 F.2d 1014, 1032 n.9 (5th Cir. 1990), which laws do not apply extraterritorially. Morrison, 561 U.S. at 265.

connection" is required—namely, that "any misrepresentation or omission was made in connection with the sale of the [security] prior to the sale." Geodyne Energy Income Prod. P'ship I-E v. Newton Corp., 97 S.W.3d 779, 784 (Tex. App.—Dallas 2003) (emphasis added), rev'd in part on other grounds by 161 S.W.3d 482 (Tex. 2005); see also id. (explaining that "a statement made by the seller after the purchase of a security is not the 'means' by which the security was sold and is thus insufficient to establish a violation of the TSA"); Crescendo Invs., Inc. v. Brice, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied) ("A statement made after purchase of the securities could not induce purchase and is therefore not relevant."); Pitman v. Lightfoot, 937 S.W.2d 496, 531 (Tex. App.—San Antonio 1996, writ denied) ("[T]he plaintiff must show the untrue statements were made before the sale occurred."); Nicholas v. Crocker, 687 S.W.2d 365, 368 (Tex. App.—Tyler 1984, writ ref'd n.r.e.) (explaining that "untrue statements made . . . when the buyer has already purchased the security are not the 'means' by which the security was sold"). The same is true of Plaintiffs' conspiracy and aiding and abetting fraud claims, which each have a causation element based on the fraud cause of action on which they are predicated. See Conger v. Danek Med., Inc., 27 F. Supp. 2d 717, 721–22 (N.D. Tex. 1998); TCA Bldg. Co. v. Entech, Inc., 86 S.W.3d 667, 674 (Tex. App.—Austin 2002, no pet.).

To the extent that putative class members purchased CDs prior to Stanford's retention of Sjoblom in August 2005 and/or prior to Sjoblom's alleged actions or omissions—as did proposed class representatives Troice and Punga Punga (App. 465–466, Gompers Decl. Ex. 2)—they cannot show a causal connection under the TSA or satisfy the causation element of their common law claims. Therefore, they do not have cognizable TSA, aiding and abetting fraud, or conspiracy claims prior to at least August 2005, if not later, and those claims should be excluded from the class.

Case 3:12-cv-04641-N-BG Document 180-7 Filed 04/26/15 Page 80 of 89 PageID 4846

## CONCLUSION

The powerful tool of class certification is made available only upon the Plaintiffs' clear satisfaction of stringent criteria. The sprawling proposed class here of dissimilar members scattered across numerous countries of the globe, with widely varying circumstances and legal issues, sought to be represented by atypical and uninterested representatives, is a paradigmatic example of what Rule 23's requirements were designed to avoid.

For all of these reasons, the Motion for Class Certification, for Designation of Class Representatives and Class Counsel should be denied.

Dated: March 20, 2015

CARRINGTON, COLEMAN,
SLOMAN & BLUMENTHAL, L.L.P.

By: /s/ Neil R. Burger
Neil R. Burger
Texas Bar No. 24036289
nburger@ccsb.com
Bruce W. Collins
Texas Bar No. 04604700
bcollins@ccsb.com
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone: (214) 855-3000
Facsimile: (214) 855-1333

DAVIS POLK & WARDWELL, LLP

/s/ James P. Rouhandeh
James P. Rouhandeh*
New York Bar No. 2211837
rouhandeh@davispolk.com
Daniel J. Schwartz*
New York Bar No. 4159430
daniel.schwartz@davispolk.com
Jonathan K. Chang*
New York Bar No. 4500484
jonathan.chang@davispolk.com
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
* admitted *pro hac vice*

*Attorneys for Defendant Proskauer Rose LLP*

Case 3:12-cv-04641-N-BG Document 109-7 Filed 02/26/15 Page 87 of 89 PageID 4347

VINSON & ELKINS LLP

By: /s/ Harry M. Reasoner
Harry M. Reasoner
Texas Bar No. 16642000
hreasoner@velaw.com
William D. Sims, Jr.
Texas Bar No. 24036289
bsims@velaw.com
1001 Fannin Street, Suite 2500
Houston, Texas 77002
Telephone: (713) 758-2222
Facsimile: (713) 758-2346

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

/s/ Daniel J. Beller
Daniel J. Beller*
New York Bar No. 1643741
dbeller@paulweiss.com
Daniel J. Leffell*
New York Bar No. 1883776
dleffell@paulweiss.com
William B. Michael*
New York Bar No. 4296356
wmichael@paulweiss.com
1285 Avenue of the Americas
New York, New York 10019-6065
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
* admitted *pro hac vice*

*Attorneys for Defendant Chadbourne & Parke LLP*

FISH & RICHARDSON P.C.

By: /s/ William B. Mateja

William B. Mateja
Texas Bar No. 13185350
mateja@fr.com
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091

McKENNA LONG & ALDRIDGE LLP

/s/ Mindy L. Rattan

Joshua R. Hochberg*
D.C. Bar No. 495732
jhochberg@mckennalong.com
Mindy L. Rattan*
D.C. Bar No. 467553
mrattan@mckennalong.com
1900 K Street NW
Washington, DC 20006-1108
Telephone: (202) 496-7400
Facsimile: (202) 496-7756
* admitted pro hac vice

*Attorneys for Thomas V. Sjoblom*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2015, I caused the foregoing document to be served on counsel of record for all parties of record via electronic mail or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ James P. Rouhandeh

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SAMUEL TROICE, *et al.*, individually and on behalf of a class of all others similarly situated, | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. 3:09-cv-01274-N |
| | § | |
| v. | § | *In re: Stanford Entities Securities Litigation MDL 2099* |
| | § | |
| WILLIS OF COLORADO INC., et al., | § | |
| | § | |
| Defendants. | § | |

**WILLIS AND AMY BARANOUCKY'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

T. Ray Guy
Texas Bar No. 08648500
Sandra Y. Fusco
Texas Bar No. 24069744
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201-6950
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

OF COUNSEL:
Jonathan D. Polkes
Joshua S. Amsel
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**ATTORNEYS FOR DEFENDANTS WILLIS OF COLORADO, INC. AND WILLIS LIMITED**

GT
EXHIBIT 020

Mark D. Manela
State Bar No. 12894500
Manela Law Firm
440 Louisiana Street, Suite 2300
Houston, Texas  77002
Telephone:  (713) 240-4843
Facsimile:  (713) 228-6138

**ATTORNEY FOR DEFENDANT
AMY S. BARANOUCKY**

Case 3:12-cv-04641-N-BG Document 180-23 Filed 04/20/16 Page 3 of 72 PageID 3338

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1

RELEVANT BACKGROUND ..... 10

I. Plaintiffs Seek to Certify a Worldwide Class of More Than 17,000 Investors Based on Stanford's Alleged Marketing Scheme ..... 10

II. The Evidence Shows that Stanford's Financial Advisors Communicated with Each Investor Privately and Individually ..... 11

III. The Evidence Shows that Stanford Published Non-Uniform Marketing Materials ..... 13

IV. Willis's Alleged Role in Stanford's Scheme is Limited to Creating Letters ..... 14

V. The Record Demonstrates the Willis Letters Only Went to a Very Small Minority of the Proposed Class ..... 16

VI. Plaintiffs Put Forth No Evidence of the Purported Significance of the Willis Letters to Stanford's Scheme ..... 18

ARGUMENTS AND AUTHORITIES ..... 19

I. Legal Standards for Class Certification ..... 19

A. Plaintiffs Must Prove Six Elements for Their Proposed Rule 23(b)(3) Class Action ..... 20

B. The Court Must Conduct a "Rigorous Analysis" and Plaintiffs Must Establish with Evidentiary Proof That Rule 23 Is Satisfied ..... 20

II. Plaintiffs Have Not Established the Prerequisites of Rule 23(a) ..... 22

A. Plaintiffs Fail to Demonstrate Commonality ..... 22

B. Plaintiffs' Claims Are Not Typical of the Proposed Class ..... 29

C. The Proposed Class Representatives Are Not Adequate Representatives ..... 31

III. Plaintiffs Have Not Proved the Additional Requirements of Rule 23(b)(3) ..... 34

A. Individual Inquiries Predominate Over Common Questions ..... 35

1. Stanford's Oral Communications About Insurance Coverage for the CDs Were Verbal and Therefore Non-Uniform ..... 36

2. Individual Inquiries Regarding the Written Disclosures Will Be Required ..... 43

3. Plaintiffs' Experiences with Stanford Are Unique and Individualized ..... 49

B. Plaintiffs Fail to Demonstrate That a Class Action "Is Superior ..... 51

1. The Large Alleged Value of Individual Claims Defeats Superiority ..... 51

a. The average claim of an investor who received a Willis letter is over $1 million, and, even for those

who did not receive a letter, the damages at issue are significant. ........ 53

b. The vast majority (or all) of those who potentially received a Willis letter have already brought individual suits. ........ 55

2. A Class Action Is Not Superior Given the Significant Risk That Foreign Jurisdictions Would Not Recognize a Judgment ........ 56

CONCLUSION AND REQUESTED RELIEF ........ 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998)....52

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008)....57

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997).... 35, 51

*Andrews v. Chevy Chase Bank*,
545 F.3d 570 (7th Cir. 2008)....52

*Anheuser-Busch Cos., Inc. v. Summit Coffee Co.*,
858 S.W.2d 928 (Tex. App.—Dallas 1993, writ denied)....49

*Ansari v. New York Univ.*,
179 F.R.D. 112 (S.D.N.Y. 1998).... 57, 58

*Berger v. Compaq Computer Corp.*,
257 F.3d 475 (5th Cir. 2001)....31

*Buettgen v. Harless*,
263 F.R.D. 378 (N.D. Tex. 2009)....58

*Burkett v. Bank of Am., N.A.*,
No. 1:10CV68-HSO-JMR, 2012 WL 3811741 (S.D. Miss. Sept. 4, 2012)....36

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....19

*Calpetco 1981 v. Marshall Exploration, Inc.*,
989 F.2d 1408 (5th Cir. 1993).... 40, 49

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013).... 19, 25

*Castano v. American Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996).... 49, 52

*Comcast v. Behrend*,
133 S. Ct. 1426 (2013).... 5, 20, 21

*Crescendo Invs., Inc. v. Brice*,
61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied)........................................ 40, 49

*Duperier v. Texas State Bank*,
28 S.W.3d 740 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.)................................ 46, 49

*Dvorin v. Chesapeake Exploration, LLC*,
Civil Action No. 3:12-CV-3728-G, 2013 WL 6003433 (N.D. Tex. Nov. 13, 2013)......................23

*In re Enron Corp.*,
490 F. Supp. 2d 784 (S.D. Tex. 2007)........................................................................49

*In re Enron Corp.*,
529 F. Supp. 2d at 692 n.43, 725.............................................................................. 31, 32

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*,
No. H-05-3394, 2008 WL 7356272 (S.D. Tex. Nov. 24, 2008) ........................................37

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................................................................................................26

*Gene & Gene LLC v. BioPay LLC*,
541 F.3d 318 (5th Cir. 2008).........................................................................................47

*Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*,
97 S.W.3d 779 (Tex. App.—Dallas 2003), *rev'd in part*, 161 S.W.3d 482 (Tex. 2005)......................49

*Grainger v. State Sec. Life Ins. Co.*,
547 F.2d 303 (5th Cir. 1977).........................................................................................36

*Granader v. McBee*,
23 F.3d 120 (5th Cir. 1994)...........................................................................................49

*Griffin v. GK Intelligent Sys., Inc.*,
196 F.R.D. 298 (S.D. Tex. 2000) .............................................................................. 31, 52

*Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*,
No. Civ. A 3:02-CV-1245, 2003 WL 21339279 (N.D. Tex. June 3, 2003)............................ 3, 8, 41

*Hall v. F.E.R.C.*,
691 F.2d 1184 (5th Cir. 1982) .......................................................................................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ..................................................................................................48

*Hancock v. Chicago Title Ins. Co.*,
263 F.R.D. 383 (N.D. Tex. 2009), *aff'd*, 636 F.3d 699 (5th Cir. 2011) ............................................21

*Hansberry v. Lee*,
311 U.S. 32 (1940) ........ 19

*Inland Royalty Co. v. Heruth*,
No. 05-99-01684-CV, 2000 WL 792406 (Tex. App.—Dallas June 21, 2000, no pet.) ........ 47, 48

*Italian Cowboys Partners v. Prudential Ins.*,
341 S.W.3d 323 (Tex. 2011) ........ 46

*Johnson v. Arkema, Inc.*,
685 F.3d 452 (5th Cir. 2012) ........ 27

*Karnes v. Fleming*,
Civil Action No. H-07-0620, 2008 WL 4528223 (S.D. Tex. July 31, 2008) ........ 31

*Keyes v. Guardian Life Ins. Co. of Am.*,
194 F.R.D. 253 (S.D. Miss. 2000) ........ 37

*In re Kosmos Energy*,
299 F.R.D. 133 (N.D. Tex. 2014) ........ 22, 48

*In re LifeUSA Holding Inc.*,
242 F.3d 136 (3d Cir. 2001) ........ 37

*Mabary v. Hometown Bank, N.A.*,
Civ. No. 4:10-cv-2936, 2011 WL 5864325 (S.D. Tex. Nov. 22, 2011) ........ 52

*Madison v. Chalmette Refining, L.L.C.*,
637 F.3d 551 (5th Cir. 2011) ........ 21

*Martin v. Home Depot U.S.A., Inc.*,
225 F.R.D. 198 (W.D. Tex. 2004) ........ 48

*Nguyen v. Excel Corp.*,
197 F.3d 200 (5th Cir. 1999) ........ 19

*Nichols v. Mobile Board of Realtors, Inc.*,
675 F.2d 671 (5th Cir. 1982) ........ 35

*Ogden v. AmeriCredit Corp.*,
225 F.R.D. 529 (N.D. Tex. 2005) ........ 31

*In re Park Cent. Global Litig.*,
No. 3:09-cv-765-M, 2014 WL 4261950 (N.D. Tex. Aug. 25, 2014) ........ 36, 49

*Paull v. Capital Res. Mgmt., Inc.*,
987 S.W.2d 214 (Tex. App.—Austin 1999, writ denied) ........ 47

*Peltier Enterprises, Inc. v. Hilton*,
51 S.W.3d 616 (Tex. App.—Tyler 2000, pet. denied) .......... 47

*Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.*,
482 F.3d 372 (5th Cir. 2007) .......... 48

*Robinson v. Texas Auto. Dealers Ass'n*,
387 F.3d 416 (5th Cir. 2004) .......... 21

*Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*,
319 F.3d 205 (5th Cir. 2003) .......... 35, 48

*Shivangi v. Dean Witter Reynolds, Inc.*,
825 F.2d 885 (5th Cir. 1987) .......... 36

*Simms v. Jones*,
296 F.R.D. 485 (N.D. Tex. 2013) .......... 35

*Simon v. Merrill Lynch, Pierce, Fenner & Smith*,
482 F.2d 880 (5th Cir. 1973) .......... *passim*

*Estate of Sowell v. United States*,
198 F.3d 169 (5th Cir. 1999) .......... 28

*Sterling Trust Co. v. Adderley*,
168 S.W.3d 835 (Tex. 2005) .......... 49

*M.D. ex rel. Stukenberg v. Perry*,
675 F.3d 832 (5th Cir. 2012) .......... 21, 23

*Sun v. United States*,
No. 93-1399, 1994 WL 144643 (5th Cir. 1994) .......... 12

*Texas Instruments Inc. v. Citigroup Global Mkts., Inc.*,
266 F.R.D. 143 (N.D. Tex. 2010) .......... 47

*Ticknor v. Rouse's Enters., L.L.C.*,
No. 14–30550, 2014 WL 6440397 (5th Cir. Nov. 18, 2014) .......... 35, 39, 47, 52

*Transp. Ins. Co. v. Faircloth*,
898 S.W.2d 269 (Tex. 1995) .......... 46

*In re Vivendi Universal, S.A.*,
242 F.R.D. 76 (S.D.N.Y. 2007) .......... 57, 61

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) .......... *passim*

*Warren v. Reserve Fund, Inc.*,
728 F.2d 741 (5th Cir. 1984) .......... 30

*Weatherly v. Deloitte & Touche*,
905 S.W.2d 642 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.) .......... 49

*In re Westcap Enterprises*,
230 F.3d 717 (5th Cir. 2000) .......... 46

*Young v. United States*,
181 F.R.D. 344 (W.D. Tex. 1997) .......... 58

**Statutes**

Tex. Rev. Civ. Stat. art. 581-33A(2) .......... 30, 46, 48, 49

**Other Authorities**

Fed. R. Civ. P. 23(a) .......... *passim*

Fed. R. Civ. P. 23(a)(2) .......... 5, 22

Fed. R. Civ. P. 23(a)(3) .......... 6

Fed. R. Civ. P. 23(a)(4) .......... 7

Fed. R. Civ. P. 23(b)(3) .......... passim

William B. Rubenstein, Newberg on Class Actions § 4:88 (5th ed. 2014) .......... 20

Defendants Willis of Colorado, Inc., Willis Limited, and Amy S. Baranoucky (together, Willis) respectfully submit this opposition to Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel (the Motion).

## PRELIMINARY STATEMENT

The seven named Plaintiffs claim they were defrauded by their Stanford financial advisors (FAs) into believing that the certificates of deposit (CDs) they bought from Stanford International Bank, Ltd. (SIB) were protected by FDIC-like insurance. Plaintiffs claim that, had they known the CDs were not insured, they would not have bought them. Plaintiffs claim that Willis, Stanford's third-party insurance broker, aided in that insurance marketing scheme by providing letters to Stanford (not to Plaintiffs) that set forth certain lines of insurance that Stanford had purchased for its own corporate operations (not for the protection of CD purchasers). Plaintiffs allege that the letters were misleading and were available to the Stanford FAs to potentially show to CD purchasers to help convince them to purchase or keep their CDs.

The five proposed Class Representatives[1] seek to represent a class against Willis consisting of more than 17,000 victims of Stanford's Ponzi scheme, each of whom, it is alleged, was defrauded in exactly the same way through the use of uniform false representations that the CDs were insured. These allegedly uniform false representations, however, do not come from the Willis letters themselves. Rather, Plaintiffs seek to certify a class based on the allegedly uniform *oral* representations made by hundreds of different Stanford FAs over several years, who may or may not have used the Willis letters (or any other marketing materials for that matter). In fact, although the

[1] Although the Motion, as written, seeks the appointment of all seven named Plaintiffs as class representatives, two of those Plaintiffs—Paula Gilly-Flores and Promotora Villa Marino, C.A.—are no longer seeking such appointment. (*See* APP. at 971, 974.)

An appendix in support of Willis's opposition to Plaintiffs' Motion is being filed contemporaneously herewith. Citations to Willis's appendix are denoted as "APP. at __" and refer to the specific page of the consecutively-numbered appendix. Citations to deposition testimony further contain page/line notations in brackets.

five proposed Class Representatives allege that they were duped by their FAs into believing their CD purchases were insured, they *admit* that they have no idea whether the other 17,000-plus putative class members were similarly duped by their FAs (or anyone else for that matter) into believing the CDs were insured. In other words, based on the record evidence, it is entirely possible that the vast majority of the 17,000-plus other proposed class members purchased their CDs without any representations by a Stanford FA or anyone else about insurance and without any belief or understanding that the CDs were insured, and, further, may very well have understood the CDs were *not* insured, but bought them anyway.

Based on this lack of evidence, Plaintiffs cannot possibly meet the Rule 23 requirements to have a class certified. Unsupported allegations are meaningless in the context of a class certification motion under Rule 23. Instead, to certify a class, the United States Supreme Court requires a plaintiff to demonstrate by a preponderance of the evidence that the elements of Rule 23 have been proved. It similarly requires that the district court undertake a probing inquiry of the evidence and make findings of fact that the plaintiff has met its burden. The principal *evidence* in the record here, however, is what the five proposed Class Representatives testified they were told by three Stanford FAs in their own, private, closed-door meetings about how *they* claim to have been duped by *their* particular FA. Plaintiffs also submitted 85 untested declarations from U.S-based investors, vaguely claiming that they were generally misled by their FAs about insurance (although none of them claim to have ever seen a Willis letter or even knew of Willis at all).[2] But there were several hundred Stanford FAs who sold CDs to *17,000-plus* putative class members in more than 100 countries over the course of eight years. The named Plaintiffs and declarants together constitute approximately 0.5% of the 17,000-plus members of the proposed class. There is no evidence as to

[2] In addition, as discussed below, there are 225 other investors claiming to have seen a Willis letter, who would not be members of this proposed class action because they have brought individual lawsuits.

what the other 99.5% of investors in the proposed class were told by their FAs, what the circumstances were, or whether their experiences were at all in common with those of the proposed Class Representatives.

And, fatal to Plaintiffs' Motion is the fact that the proposed Class Representatives have admitted that they have no idea what each of the 17,000-plus other people in the proposed class were told by their FAs in those tens of thousands of meetings. They do not know if any of those 17,000-plus people were told that the CDs were insured, or if any of them believed that the CDs were insured, or if any of them invested because they believed the CDs were insured. Indeed, the proposed Class Representatives admitted on the record that other putative class members (i) may well have been told different things by their FAs and (ii) may have been shown different marketing materials, some of which clearly disclosed that the CDs were *not* insured, and (iii) may have believed that the CDs were *not* insured. And, critically, each of the proposed Class Representatives admitted that to find out the answers to any of those questions—what other FAs told other investors; what the other investors understood about CD insurance from their private meetings; and what disclosures other investors read—you would have to ask *each and every* proposed class member *individually*.

These admissions preclude class certification because an action, such as this one, based on individual alleged oral misrepresentations, "cannot be maintained as a class action." *Simon v. Merrill Lynch, Pierce, Fenner & Smith*, 482 F.2d 880, 882 (5th Cir. 1973). Indeed, this Court itself has denied class certification in nearly identical circumstances. In *Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*, No. Civ. A 3:02-CV-1245, 2003 WL 21339279, at *1 (N.D. Tex. June 3, 2003), notwithstanding the movant's allegations of uniform written disclosures, the Court denied class certification because, as here, "the record reflects that at least some potential class members received varying representations from their brokers above and beyond what is contained in the [written materials]." *Id.* at *3. The

record here shows that the proposed Class Representatives have made the same admissions: they received private, unrecorded, individual oral communications from their Stanford FAs—above and beyond any Willis letter or other written material—and it is these oral communications that Plaintiffs now claim were misleading. Accordingly, whether viewed through the prism of commonality, typicality, predominance, or any other requirement of Rule 23, the proposed Class Representatives' on-the-record admissions show that this is a class that cannot possibly be certified consistent with controlling law.

Nor can Plaintiffs resuscitate their claims by suggesting that the Willis letters are the common glue that holds the class together. Plaintiffs have long alleged that Willis's letters were a cornerstone of the Ponzi scheme and that the scheme would not have survived without them. The Court accepted those *allegations* for purposes of denying defendants' motions to dismiss. But now that class discovery is complete, the record demonstrates that Plaintiffs never had any basis to make those assertions. As Plaintiffs and the Receiver admit, they have no idea how many Willis letters were provided by the Stanford FAs to members of the putative class. In fact, they have offered no evidence and done no analysis that shows who among the investors received letters, when they were received, whether the investors purchased CDs before or after receiving the letters (or not at all) and, if so, when and in what amount, or what anyone who received a letter actually understood the letter to mean (including whether any members of the putative class correctly understood that the CDs were not insured). Nor have Plaintiffs offered any evidence or performed any analyses tracing the funds from those investors' purchases to substantiate their speculation that the letters were the linchpin of the Ponzi scheme. Simply put, Plaintiffs have done no analysis and have no "evidentiary proof"—facts, statistics, or otherwise—that supports Plaintiffs' speculation that the Willis letters were the sustaining force behind Stanford's fraud and essential to its propagation. In fact, the record evidence here shows that Plaintiffs can only demonstrate that, at most, 225 individuals out of the

17,000-plus proposed class members ever saw a Willis letter (all of whom have already instituted their own individual actions and, thus, would not be part of any certified class). As the principal of named Plaintiff Punga Punga Financial, Ltd. (Punga) admitted, the vast majority of investors who did not receive a Willis letter are in a different position from those who did: those investors "would have to file a suit regarding something else."

Moreover, Plaintiffs *concede* that even the very small number of investors who claim they *did* receive letters based their understandings about the insurance applicable to the CDs on what their respective Stanford FAs told them, not on anything stated in the Willis letters themselves. After all, as Plaintiffs also concede, the Willis letters do not say on their face that the CDs were insured, or even mention the CDs at all, and Plaintiffs have no idea specifically who among the proposed class actually saw a Willis letter. Further, Plaintiffs claim that the letters were misleading because they *omitted* to state that the CDs were *not* covered by insurance, but this only demonstrates that *Stanford's* oral communications are central to this case: omissions are actionable only to the extent that they make what was actually said misleading (in this case, by the Stanford FAs). In other words, the Willis letters can only be misleading if intentionally misused by the Stanford FAs, who, unlike Willis, directly communicated with investors and allegedly made affirmative verbal misrepresentations about insurance.

In short, at class certification, Plaintiffs must demonstrate—and this Court must find—"evidentiary proof" that the factual allegations and legal questions raised are capable of class treatment. *Comcast v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Considering the proposed Class Representatives' binding admissions and other record evidence, this Court cannot make the necessary on-the-record factual findings to support the "rigorous" Rule 23 requirements.

*First*, Plaintiffs cannot meet the prerequisite that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As the Supreme Court recently reiterated in *Wal-Mart*

*Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), at class certification, Plaintiffs must show, *with "significant proof*,*"* that they "suffered the same injury"—*i.e.*, Plaintiffs must show that the defendants' conduct caused them the same harm, and in the same way, so that there are common answers to common questions. *See id.* at 2551 (citation omitted). On this record and in light of the admissions made by the proposed Class Representatives that the alleged misrepresentations were in material part verbal and made in private, it is simply not possible for the Court to conclude that such commonality exists. Plaintiffs themselves admit that there will not be common answers to core questions concerning what the thousands of FAs told the tens of thousands of individual investors in private meetings; what questions those individual investors asked; what answers they received; what, if any, marketing materials they received or reviewed; and what understandings about the CDs or any insurance related to the CDs the investors came away with. Moreover, at an equally fundamental level, there is no evidence that upwards of 99% of the proposed class ever even received a Willis letter, so the significance of the Willis letter is not something the thousands of putative class members share in common. Plaintiffs concede, too, that there is no evidence demonstrating how the lion's share of investors who did not receive a letter suffered the same injury, in the same way, as the tiny fraction that did. In the end, the issues of law and fact critical to Plaintiffs' claims against Willis are not only unsupported by evidence, but are also way too varied to be amenable to common, class-wide resolution.

*Second*, for many of the same reasons, the proposed Class Representatives cannot show that their claims and defenses are "typical" of the putative class. Fed. R. Civ. P. 23(a)(3). Most damaging to Plaintiffs' efforts to establish typicality are the on-the-record binding admissions that *there is no way to know*, *without asking each and every one of the absent class members,* whether what the proposed Class Representatives were told in their private meetings with their Stanford FAs was typical of what the thousands upon thousands of absent class members were told. Based on this

admission alone, class certification would be inappropriate. And, although Plaintiffs *allege* that FAs made "uniform" oral representations based on a common training manual, there is no *evidence* supporting that each of the hundreds of FAs across eight years of time and more than 100 countries had access to the same manual, or used it in the same manner, if at all. Rather, there is a complete absence of evidence in the record that would demonstrate the typicality of the alleged misrepresentations. And, although six of the seven named Plaintiffs claim to have received Willis letters, the evidence in the record here demonstrates that, at most, only the other 225 investors who have brought individual suits may have received one as well. Accordingly, to the extent the proposed Class Representatives' claims rest on alleged misrepresentations or omissions concerning the Willis letters, their claims are by definition atypical of the class they purportedly represent.

*Third*, the proposed Class Representatives cannot show that they are "adequate" representatives of the putative class. Fed. R. Civ. P. 23(a)(4). To the contrary, the evidence shows that the proposed Class Representatives have only rudimentary knowledge of the facts and theories alleged in their complaint, and have instead relied on their attorneys to formulate and articulate their allegations. Courts have held that such "derivative" knowledge is insufficient for class certification. For example, Plaintiff Diaz, who does not speak English, could not name the defendants she sued in this action nor confirm that the information in her English-language declaration was accurate. Plaintiff Gomez demonstrated a gross misunderstanding of Plaintiffs' theory of the case by mistakenly believing this is an insurance coverage action. Mr. Gomez further testified that he communicated with his attorneys primarily through Plaintiff Canabal and signed whatever document Mr. Canabal put in front of him. And Mr. Canabal could not identify the Mexican Plaintiffs, and erroneously believed some of the named Plaintiffs were American. Plaintiff Troice mistakenly believed he was representing a class consisting only of recipients of Willis letters. Similarly, as noted above, Plaintiff Punga's principal went so far as to explain that individuals who did not receive a

Willis letter would *not* be part of the class and would have to file a separate lawsuit. Put simply, the named Plaintiffs here do not have sufficient knowledge of the basic facts underlying this action—or even of the relief they are seeking through the instant class certification motion—to adequately serve as class representatives.

*Fourth*, for many of these same reasons, Plaintiffs cannot satisfy the additional requirements of Rule 23(b)(3), including that "questions of law or fact common to the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Although Plaintiffs assert that the entire putative class received a "uniform" sales pitch and "uniform" communications concerning Stanford investments, the *evidence* shows the opposite. Indeed, this Court denied the defendants' motions to dismiss in part because "there are too many factual issues surrounding the manner of distribution of the disclosure statements, including which investors received the statements and in what format." (*See* APP. at 921 [Order on Mot. to Dismiss at 12].) Discovery has not only confirmed this Court's observation, but also exposed a host of additional individual factual issues that predominate over common issues, including:

- As Plaintiffs concede, to the extent they were misled, it was based on information orally communicated to them by their Stanford FAs in private meetings, and the only way to know what was said in the tens of thousands of meetings between the Stanford FAs and the other 17,000-plus members of the putative class is to ask each investor individually. As the Fifth Circuit held in *Simon*, it is virtually impossible to certify a class based on oral misrepresentations, *see* 482 F.2d at 882, a reality this Court itself recognized in denying class certification in *Gyarmathy*, a case on all fours with this one, *see* 2003 WL 21339279, at *3;

- There is no way to determine what written disclosures an investor received without asking each investor individually, and discovery has demonstrated that the written disclosures were dissimilar, with some being completely inconsistent with the notion that the deposits were insured. Indeed, several Plaintiffs admitted they would not have invested if they received certain of the disclosures that were sent to other investors;

- Each individual investor has unique and varying levels of direct experience dealing with Stanford and, thus, will have a different basis from which to evaluate the statements made by the FAs and in the Willis letters. Notably, Stanford FAs told several of the Plaintiffs that CD proceeds were being used to invest in real estate—something this Court found to be one of the most important "red flags" of wrongdoing, which caused it to permit the case to survive

> the motions to dismiss. However, two of the Plaintiffs (themselves real estate developers) even toured some of Stanford's real estate developments in Antigua and received in-person presentations from several senior Stanford executives, including the President of SIB. Accordingly, each individual's experience with Stanford will vary and will have to be individually explored.

In sum, given the overwhelming predominance of these individual inquiries, there is no evidentiary basis for this Court to make the factual findings required to support class certification.

*Fifth*, Plaintiffs cannot satisfy the other Rule 23(b)(3) requirement that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). For one thing, the class action device was created to give parties an incentive to bring claims collectively when it would otherwise be cost-prohibitive to bring an individual action because of the small amount in controversy. This is not such a case. The evidence establishes that Stanford generally would not consider sending insurance letters to investors who had less than $1 million to invest. And many (if not all) of the investors who claim they *did* receive a Willis letter are pursuing individual actions against Willis. Those individual actions would be allowed to proceed even if no class were certified here.

In addition, Plaintiffs cannot meet their burden to show that the class action device is "superior" for this proposed worldwide class because they cannot show that the relevant foreign courts would respect a U.S. class-action judgment. Rather, the evidence shows the opposite: countries like Venezuela, Columbia, and Mexico—home to 71% of the putative class members (*see* Pls.' Br. at 35)—would likely *not* give preclusive effect to a class-action judgment in this action, leaving Willis unfairly exposed to re-litigating these issues in other countries (most of which are openly hostile to the U.S. and its litigants) if Willis achieves a favorable outcome here.

Moreover, the approximately 225 individuals who claim to have received Willis insurance letters have ongoing lawsuits that will be unaffected by the outcome of Plaintiffs' Motion. If class certification is denied—as on this record we respectfully submit it must be—any

Case 3:09-cv-01274-N-BG Document 143 Filed 02/26/15 Page 19 of 79 PageID 3450

putative class member that wishes to join those lawsuits would be free to do so. The only issue here is whether it is lawful and proper to force Willis to defend against more than 17,000 individuals who will never have to appear in discovery or in court, who will never have their cases tested, who may never have even heard of Willis (let alone received a Willis letter) or been misled about whether the CDs were insured, and who—as Plaintiffs in this class action have admitted—could have radically different accounts of what they were told by their Stanford FAs.

## RELEVANT BACKGROUND

### I. Plaintiffs Seek to Certify a Worldwide Class of More Than 17,000 Investors Based on Stanford's Alleged Marketing Scheme

Plaintiffs allege that Stanford, through its FAs, "used the illusion of insurance coverage for the SIBL CDs in their marketing pitches to clients." (Third Am. Compl. (TAC) ¶¶ 106, 159.) Plaintiffs allege that Stanford (not Willis) induced investors to purchase the SIB CDs by misrepresenting that the "SIB CDs were safe and sound because SIB was part of the Stanford Financial group based in Houston, Texas and therefore subject to regulation by the United States government." (*Id.* ¶ 34.) Plaintiffs allege that Stanford's representations were false because Stanford was "nothing but a massive, worldwide Ponzi scheme." (*Id.* ¶ 106.)

Plaintiffs also allege that Stanford—not Willis—affirmatively misrepresented that the SIB CDs carried deposit insurance. Specifically, Plaintiffs claim that "Stanford FAs uniformly used the illusion of insurance coverage for the SIB CDs in their marketing pitches to clients." (*Id.* ¶ 159.) Each named Plaintiff claims to have been told by Stanford salesmen that the CDs were insured. (*See, e.g., id.* ¶ 139 ("Troice . . . was informed by [Stanford executive David] Nanes that his investments in SIB were insured."), ¶ 142 ("Nanes always convinced Diaz and her husband to invest" in the CDs "by touting . . . the fact that the investments were insured."); *see also id.* ¶¶ 148, 152, 154 (similar allegations concerning Plaintiffs Punga, Canabal and Gomez).) Further, Plaintiffs allege that

Stanford distributed uniform written marketing materials that were misleading in regard to insurance coverage. (*Id.* ¶¶ 34, 44.)

*Willis is conspicuously and entirely absent from all of these allegations*. Nevertheless, Plaintiffs seek to certify a worldwide class of more than 17,000 investors against Willis[3] irrespective of when they bought a CD and whether they knew the CDs were not insured. (*See* Pls. Br. at 20–21.)[4]

**II. The Evidence Shows that Stanford's Financial Advisors Communicated with Each Investor Privately and Individually**

The proposed Class Representatives testified that their Stanford FAs—*not Willis*—affirmatively misrepresented that the SIB CDs carried deposit insurance. (*See, e.g.*, APP. at 531, 535 [Troice Dep. dated Feb. 2, 2015 (Troice) Tr.152:25-153:11, 167:20-22]; APP. at 564 [Diaz Dep. dated Feb. 4, 2015 (Diaz) Tr. 52:14-22].) Further, the 85 untested declarations from U.S. investors submitted by Plaintiffs also affirmatively assert: "*My Stanford FA led me to believe*, verbally, and/or via written materials, that my investments in the SIBL CDs were insured." (*See* Pls.' Br., Ex. 13 (emphasis added).) Other than the named Plaintiffs and the additional declarants—together constituting a miniscule proportion (0.5%) of the proposed class—there is no evidence in this case as to what, if anything, the other members of the 17,000-plus proposed class were told by their FAs about insurance. Further, Plaintiffs provide no evidence establishing that Willis had any involvement

---

[3] Plaintiffs have two surviving class claims for which they seek to certify a class against Willis: (1) aiding and abetting violations of the Texas Securities Act (TSA); and (2) participation in a fraudulent scheme. (*See* APP. at 923-27 [Order on Mot. to Dismiss at 14-18].)

[4] Plaintiffs also seek three alternative classes of individuals who held SIB CDs as of February 2009 comprised of (i) Latin American investors, (ii) Mexican investors, and (iii) Venezuelan investors. (*See* Pls.' Br. at 20-21.) These proposed sub-classes (or any sub-classes) are also defective in light of the admissions and facts described more fully throughout which show that this case is based on the verbal misrepresentations of Stanford's FAs and that there are no "uniform" oral or written representations for any class of investor. Rather, as admitted by the proposed Class Representatives, each individual investor has to be examined and cross-examined to determine what verbal representations their FA may or may not have made to them, what version of written materials they may or may not have saw, and how that information affected each investor.

whatsoever in directing Stanford's FAs to make representations of any kind. Indeed, not one of the 85 declarants claims to have ever even heard of Willis at all. (*See id.*)

In addition, the Class Representatives testified that the Stanford FAs made these representations in person during meetings that took place *privately* with their FAs. (*See, e.g.*, APP. at 515-16 [Troice Tr. 89:17-25; 91:11-14]; APP. at 564 [Diaz Tr. 52:3-10]; APP. at 873 [Punga Punga Financial, Ltd. Dep. dated Feb. 25, 2015 (Green) Tr. 92:24-93:6].) *Each and every proposed Class Representative admitted that he, she, or it did not know and could not possibly guess what various Stanford FAs told each of the 17,000-plus other investors, what questions investors asked, or what responses were given during these closed-door meetings.* (*See* APP. at 541-42 [Troice Tr. 193:15-21, 194:20-195:7]; APP. at 571, 588-89 [Diaz Tr. 81:2-18, 148:19-151:15]; APP. at 782 [Canabal Dep. dated Feb. 23, 2015 (Canabal) Tr. 129:16-24]; APP. at 845 [Gomez Dep. dated Feb. 24, 2015 (Gomez) Tr. 146:15-147:17]; APP. at 879-80 [Green Tr. 117:13-118:13].) *The proposed Class Representatives further admitted that the only way to determine what investors were told by their FAs is to ask each individual investor.* (*See id.*)

Plaintiffs therefore provide no evidence for their claim that "Stanford's insurance scheme was carried out through . . . uniform sales pitches by Stanford's financial advisor sales force." (Pls.' Br. at 2.).[5] Indeed, the opposite is true: it is now indisputable based on the record before the Court for this Motion that Stanford's FAs met one-on-one with individual investors, made oral representations to each of them, and that there is no record as to what was said in those meetings.

---

[5] Nor may Plaintiffs rely on the administrative law judge's initial decision in *Bolgar*, which found that SIB's disclosures discussing its insurance "were literally true but misleading." Willis was not present in that proceeding and therefore such findings have no evidentiary value and cannot be used by Plaintiffs to satisfy their burden of proof. *See Sun v. United States*, No. 93-1399, 1994 WL 144643, at *2 (5th Cir. 1994); *Hall v. F.E.R.C.*, 691 F.2d 1184, 1194 (5th Cir. 1982).

## III. The Evidence Shows that Stanford Published Non-Uniform Marketing Materials

In addition, contrary to Plaintiffs' claim that Stanford perpetrated its insurance scheme "through uniform marketing materials and brochures" (*see* Pls.' Br. at 2), the Stanford marketing materials and disclosures produced thus far contain widely varying statements regarding the security of the CD investments and the insurance applicable to those investments, some of which actually disclose that investors' CD deposits were not insured. For example, Stanford published the following statements, each in separate marketing materials:

- The insurance coverage held by SIBL includes . . . Bankers' Blanket Bond, Directors' and Officers' Liability, and Errors and Omissions Liability coverages. We also maintain Depository Insolvency Insurance. We maintain excess FDIC and Depository Insolvency insurance, currently in the amount of US$20 million, for each of our major U.S. and foreign correspondent banks. The latter insurance protects us against the possible insolvency of specified financial institutions where we may place our own funds. *This insurance does not insure customer deposits and is not the equivalent of the FDIC insurance offered on deposits at many institutions in the United States*. (APP. at 196 (emphasis added).)

- Investment Risk . . . You may lose your entire investment (principal and interest) under circumstances where we may be financially unable to repay those amounts. (APP. at 37.)

- Conservation of principal . . . on the CD deposits [is] dependent upon returns in our investment portfolio. . . . If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD. . . . There is no guarantee investors will receive interest distributions or the return of their principal. (APP. at 217, 223.)

Some investors saw these documents and some did not. (*See* APP. at 425 (investor email); APP. at 545 [Troice Tr. 207:4-21]; APP. at 781, 785 [Canabal Tr. 124:8-17; 138:20-23]; APP. at 881 [Green Tr. 124:15-24].) And other marketing materials distributed to certain investors lacked these statements altogether. (*See, e.g.,* APP. at 60.) Moreover, the record is clear that Stanford distributed the materials differently to different investors. (*See* APP. at 871 [Green Tr. 84:21-85:6] (Green received marketing materials from his FA, David Nanes, and reviewed magazines and brochures at Stanford's Mexico City office when he was waiting to see Mr. Nanes); APP. at 832-33 [Gomez Tr. 97:10-17, 98:9-19] (Gomez discarded marketing materials after receiving them during in person

Case 3:09-cv-04641-N-BG Document 243 Filed 04/26/15 Page 23 of 72 PageID 5654

meetings with his FA, Freddy Fiorillo, or by courier); APP. at 529 [Troice Tr. 142:7-143:23] (Troice received marking materials personally from his FA, David Nanes, and saw other Stanford brochures and magazines in the Mexico City office, but was not given them); APP. at 575 [Diaz Tr. 94:20-96:5] (Diaz received marketing materials from her FA by mail); APP. at 780 [Canabal Tr. 119:23-121:4] (Canabal received and was shown (without being given) marketing materials from both Tony Courtois and Freddy Fiorillo, some of which were thrown away).

Further, as with Stanford FAs' oral representations, Plaintiffs provide no evidence establishing that Willis had any involvement whatsoever in creating or approving Stanford's marketing materials.

## IV. Willis's Alleged Role in Stanford's Scheme is Limited to Creating Letters

Willis is an insurance broker that places lines of commercial insurance for its clients with various independent insurance companies. In August 2004, seven years after the start of the class period, Willis began serving as Stanford's insurance broker for Directors and Officers Liability and Banker's Blank Bond policies.[6] (*See* APP. at 287 [Baranoucky Dep. dated Oct. 7, 2010 (Baranoucky) Tr. 91:11-19].) In accordance with industry custom, Willis was paid a standard commission (a percentage of Stanford's insurance premiums) by Stanford's insurers (not by Stanford) for procuring those policies. (*See* TAC ¶ 66.) Willis's compensation was not connected in any way to the sale of the SIB CDs.

[6] Directors and Officers Liability insurance is generally intended to protect directors and officers against allegations of wrongful conduct when they are acting as company executives. A Banker's Blanket Bond is a fidelity bond that is intended to protect a bank against losses from a variety of criminal acts carried out by employees. *See, e.g., Property, Casualty and Liability Insurance—Professional and Director Liability,* Investopedia, http://www.investopedia.com/exam-guide/cfp/property-casualty-liability-insurance/cfp9.asp (last visited Mar. 18, 2015); *Banker's Blanket Bond*, Investopedia, http://www.investopedia.com/terms/b/bankers-blanket-bond.asp (last visited Mar. 18, 2015). Neither type of insurance protects—or even purports to protect—investment products, like the CDs at issue here, from financial losses.

In approximately August 2004, very shortly after Willis became Stanford's insurance broker, Stanford employee Barbara Fortin (who was responsible for insurance matters for SIB) requested that Amy Baranoucky (an employee of an affiliated Willis entity) send letters to Stanford listing certain insurance policies that Willis had placed on Stanford's behalf. (*See* APP. at 290 [Baranoucky Tr. 101:17-103:4].) In response, Ms. Baranoucky sent Stanford letters stating the following (with non-substantive variations):

> We are the insurance broker for Stanford International Bank and find them to be first class business people. We have placed the following coverages that are currently in effect:
>
> > 1. Directors and Officers Liability Insurance with Lloyds of London (Expiration 8/15/05);
> >
> > 2. Bankers Blanket Bond with Lloyds of London (Expiration 8/15/05);
>
> All of these coverages have been in effect for various terms for the past six to twelve years; however, no representations can be made that such coverages will remain in effect.
>
> In order to qualify for the above coverages, the Bank underwent a stringent Risk Management Review conducted by an outside audit firm.
>
> We have found that all our dealings with the Bank have been conducted in a professional and satisfactory manner.

(*See, e.g.,* APP. at 180.) Over the next two years, Willis sent similar letters to Stanford—never to putative class members—at Ms. Fortin's request, which accurately identified the coverages Willis had obtained for Stanford.

Notably, as every proposed Class Representative admitted, *the letters said nothing about the SIB CDs or deposit insurance.* (*See* APP. at 513 [Troice Tr. 81:20-23] (admitting letters did not state his investments were insured); APP. at 872 [Green Tr. 88:15-89:4] (admitting that letters did not state SIB had special private insurance that was better than FDIC insurance); *see also* APP. at 583 [Diaz Tr. 129:13-17]; APP. at 840 [Gomez Tr. 128:5-11]; APP. at 769 [Canabal Tr. 76:14-23].)

The evidence demonstrates that *Stanford*—not Willis—subsequently presented unknown numbers of these letters to certain investors. The proposed Class Representatives confirm that they never communicated directly with, or received letters from, Willis. (*See* APP. at 509 [Troice Tr. 62:11-13]; APP. at 778-79 [Canabal Tr. 113:24-114:10]; APP. at 847 [Gomez Tr. 156:16-19]; APP. at 876 [Green Tr. 104:17-105:8].)

On August 6, 2007, Ms. Fortin informed Ms. Baranoucky that she did not want any more letters and that "[Stanford was] trying to do away with this process." (APP. at 206.) Thus, the only period during which Willis sent the letters to Stanford was August 2004 to August 2007.

## V.    The Record Demonstrates the Willis Letters Only Went to a Very Small Minority of the Proposed Class

Plaintiffs and the Receiver admit that they have no idea how many Willis letters were provided by the Stanford FAs to members of the putative class. They have offered no evidence and done no analysis that shows who among the investors received letters and when they were received.

The evidence shows that Willis produced, at most, only a few hundred letters over a short time period, not the thousands upon thousands of letters for numerous years that Plaintiffs have long speculated. In particular, Ms. Baranoucky testified to creating approximately 100 letters a year between 2004 and 2006, and that Stanford stopped requesting letters altogether one year later (in 2007). (*See* APP. at 293, 313 [Baranoucky Tr. 115:11-116:4, 195:1-6]; APP. at 206.) Moreover, the documents reflect (and Plaintiffs have alleged) that it was Stanford's policy to distribute letters only to high-value investors who had at least $1 million to invest and conditioned their investment on receiving a letter. (*See* APP. at 11, 20 [Stanford emails]; *see also* TAC ¶ 101 (noting "the insurance letters could only be sent to potential clients that had a [sic] least $1 million to invest in SIB").)

The evidence thus demonstrates that only a small number of individuals ever received or saw a Willis letter. In fact, Ms. Baranoucky's testimony and Stanford's undisputed policy is entirely consistent with the number of individual plaintiffs who have stepped forward and asserted

individual claims based on a Willis letter. Two hundred and twenty-five (225) individual plaintiffs in nine other actions have alleged—in vague and as yet untested allegations—that they received a Willis letter. No one else has ever claimed to have seen a Willis letter, including, notably, not one of the 85 additional declarants identified by Plaintiffs. (*See* Pls.' Br., Ex. 13.) Thus, not only are Plaintiffs unable to demonstrate that more than 225 other individuals received a Willis letter, the evidence strongly suggests that the actual number of other people seeing a letter is limited to 225.

Yet, Plaintiffs seek to certify a class against Willis that includes more than 17,000 investors from over 100 different countries.[7] (*See* Pls.' Br. at 35.) Some of those investors purchased CDs *before* Willis sent letters to Stanford; some purchased CDs *after* Stanford ceased asking Willis for letters. (*See, e.g.*, Pls.' Br., Ex. 13.) A small fraction of the proposed class members received Willis letters, but there is no evidence that the rest—upwards of 99%—did. More importantly, the proposed Class Representatives acknowledge there is no way to determine, as an evidentiary matter, short of asking each of the 17,000-plus investors individually, who among the proposed class received letters and readily admit that they do not know how many Stanford investors received a Willis letter. (*See* APP. at 539-40 [Troice Tr. 185:22-186:4]; APP. at 586 [Diaz Tr. 140:13-16]; APP. at 795 [Canabal Tr. 180:19-181:2]; APP. at 844 [Gomez Tr. 144:3-6]; APP. at 878 [Green Tr. 111:16-19].)

In a "responsive" declaration put forward by one of Plaintiffs' experts, Professor Edward F. Sherman claims "there is evidence a *very large number* of persons actually received, saw, or learned the contents of the Willis letters." (*See* Prof. Sherman Resp. Decl. at 3-4 (emphasis added).) However, Professor Sherman says nothing about what "a very large number" actually means, and he fails to cite any actual evidence supporting his vague estimate. Of course, Professor Sherman's mere

[7] The proposed class is defined as "those investors whose claims have been allowed by the Receiver." (Pls.' Br. at 23.) Plaintiffs assert that there are 17,023 such investors (out of the approximately 18,000 investors who ever purchased an SIB CD). (*Id.* at 3, 23.)

say-so that a "very large number" exists is not evidence, and cannot meet Plaintiffs' burden of proof. The actual evidence shows that only the "230" plaintiffs noted by Professor Sherman,[8] who have brought individual claims, can be identified on this record as having some connection to a Willis letter; not the 17,000-plus proposed class members sought to be certified by Plaintiffs.

## VI. Plaintiffs Put Forth No Evidence of the Purported Significance of the Willis Letters to Stanford's Scheme

Plaintiffs have also *alleged* that the Willis letters were essential to luring in new investors and for perpetuating Stanford's Ponzi scheme. (*See* TAC ¶ 180.) They further *allege* that "Stanford's fraud could not have existed or flourished were it not for . . . the fraud Stanford committed by misleading investors into believing that their investments in SIB were insured." (*Id.* ¶ 162.). However, both Plaintiffs and the Receiver have offered zero *evidence*—and have admitted that they have no analysis to offer—regarding the claim that the Willis letters were the sustaining force behind Stanford's fraud and essential to its propagation. Plaintiffs admit that they do not know, nor, indeed, have they even undertaken any analysis to determine, (i) how many investors received Willis letters, (ii) how many people who received the letters chose to invest, (iii) of those who did invest, how much they invested, (iv) how funds invested by letter recipients were used by Stanford, or (v) what the funds' economic impact was on the Ponzi scheme. (*See* APP. at 520 [Troice Tr. 106:4-108:13]; APP. at 588 [Diaz Tr. 146:16-21]; APP. at 795-96 [Canabal Tr. 181:20-182:16]; APP. at 844 [Gomez Tr. 144:3-9].)[9]

---

[8] Professor Sherman identifies the number of plaintiffs in the nine other suits as being 230, not 225. This appears to be a mere oversight or difference in how Professor Sherman is adding up the plaintiffs in the other cases, and the difference is inconsequential, but noted here for clarity.

[9] The Receiver, after testifying that he too has no "personal" knowledge of these issues, (*see, e.g.*, APP. at 887 [Janvey Dep. dated Mar. 5, 2015 (Janvey) Tr. 12:2-20]), claimed privilege over, and intends to maintain as confidential, anything his counsel (or others working under his direction, including his forensic accountants at FTI) has or has not done to investigate them. (*See, e.g.*, APP. at 887-89, 891, 904 [Janvey Tr. 12:21-14:10, 17:22-20:8, 26:10-29:23, 79:6-80:10].) Having chosen to hide behind privilege, the Receiver and, in turn, Plaintiffs are precluded from making any further

Again, the only evidence in the record with regard to how many people received a Willis letter, in addition to six (of seven) of the named Plaintiffs, is the 225 individuals that have sued Willis in individual actions. Indeed, the 85 additional persons who submitted declarations in support of Plaintiffs' Motion (*see* Pls.' Br., Ex. 13) do not claim to have seen a Willis letter or to have known about Willis at all. Plaintiffs thus do not offer a shred of proof—and the burden is entirely theirs—that anyone beyond these 225 other people already suing in individual lawsuits received a letter, and they admit that they have done no analysis in this regard, notwithstanding that they, their counsel, and the Receiver control all of the relevant records. Rather, the allegations they have made are always that Willis sent the letters to Stanford, and Stanford passed them on to the investors. How many people Stanford provided the Willis letters to is a question only the Receiver and Plaintiffs can answer. The reality is they simply do not know.

## ARGUMENTS AND AUTHORITIES

### I. Legal Standards for Class Certification

Class actions are an "*exception* to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979) (emphasis added). This is because due process mandates that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). Further, a defendant has its own due process right "to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates [that] right or masks individual issues." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013).

---

showing regarding, among other things, the prevalence of the Willis letters and the role they played, if any, in Stanford's fraud. *See, e.g.*, *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n. 18 (5th Cir. 1999) (a party may not "at once, employ the privilege as both a sword and a shield. . . . Attempts at such improper dual usage of the privilege result in waiver by implication."). Indeed, as already discussed, the record before the Court on these issues is completely barren.

A. **Plaintiffs Must Prove Six Elements for Their Proposed Rule 23(b)(3) Class Action**

To overcome the usual rule of individual litigation,[10] a party seeking to maintain a class action must satisfy the requirements of Federal Rule of Civil Procedure 23. At the threshold, the movant must first demonstrate four "prerequisites": "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, a party moving for class certification must show that the proposed class action satisfies one of the prongs of Rule 23(b). Plaintiffs here attempt to certify a class under Rule 23(b)(3), (*see* Pls.' Br. at 22, 27), which requires that a movant establish two additional requirements (consecutively numbered here) for a class action to be maintained: (5) that "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (6) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

B. **The Court Must Conduct a "Rigorous Analysis" and Plaintiffs Must Establish with *Evidentiary Proof* That Rule 23 Is Satisfied**

Unlike the standards governing a motion to dismiss, "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores,* 131 S. Ct. at 2551. Rather, at class certification, a party must "affirmatively demonstrate" their compliance with each requirement of the Rule and "[a]ctual, not presumed, conformance . . . remains indispensable." *Id.* (citation omitted). This means the movant must not only "be prepared to prove" that, "in fact," the Rule 23(a) prerequisites are met, but also demonstrate "through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp.*, 133 S. Ct. at 1432. The party seeking certification has the burden to establish that all

---

[10] *See* William B. Rubenstein, Newberg on Class Actions § 4:88 (5th ed. 2014).

the requirements of Rule 23 are met by a "preponderance of the evidence." *Hancock v. Chicago Title Ins. Co.*, 263 F.R.D. 383, 387 (N.D. Tex. 2009), *aff'd*, 636 F.3d 699 (5th Cir. 2011).

As a corollary to the movant's burden to come forward with evidence, it is incumbent upon a court at the class certification stage to conduct a rigorous analysis of the record and make findings of fact that Rule 23 has been satisfied. In other words, a district court must "probe behind the pleadings before coming to rest on the certification question," and "certification is proper only if the trial court is satisfied, after a *rigorous analysis*, that the prerequisites of [the rule] have been satisfied." *Comcast Corp.*, 133 S. Ct. at 1432 (emphasis added) (editing and citations omitted). Indeed, the Fifth Circuit has not hesitated to reverse a district court's certification of a class when it has failed to conduct a "rigorous analysis" beyond the pleadings. *See M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 842 (5th Cir. 2012).

Such an analysis will often "overlap with the merits of the plaintiff's underlying claim…because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp.*, 133 S. Ct. at 1432. Thus, "[t]o make a determination on class certification, a district court must conduct an *intense factual investigation*," *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 420-21 (5th Cir. 2004) (emphasis added), and the "court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 554-55 (5th Cir. 2011) (citation omitted). This type of analysis is required because "[t]he plain text of Rule 23 requires the court to '*find*,' not merely assume, the facts favoring class certification." *Id.* (emphasis added).

In sum, as Judge Boyle of this Court succinctly summarized the Supreme Court's recent guidance:

> Going forward, the clear directive to plaintiffs seeking class certification—in any type of case—is that they will face a rigorous analysis by the federal courts, will not be

afforded favorable presumptions from the pleadings or otherwise and must be prepared to prove *with facts*—and by a preponderance of the evidence—their compliance with the requirements of Rule 23.

*In re Kosmos Energy*, 299 F.R.D. 133, 139 (N.D. Tex. 2014) (emphasis in original).

As explained below, Plaintiffs are plainly incapable of meeting this directive: they have not established three of the four Rule 23(a) prerequisites, nor have they fulfilled the additional requirements under Rule 23(b)(3) to show that common inquiries "predominate" over individual ones and that a class action is a "superior" method of resolving this dispute.

## II.    Plaintiffs Have Not Established the Prerequisites of Rule 23(a)

Plaintiffs have failed to demonstrate by a preponderance of the evidence that the proposed class meets three of the four prerequisites of Rule 23(a): commonality, typicality and adequacy. As explained in more detail below, Plaintiffs have admitted in discovery that this is an oral misrepresentation case; a case based on what 17,000-plus investors were told by hundreds of different FAs in tens of thousands of private meetings over the course of eight years. It is, as Plaintiffs themselves have described it, not one based on Willis's letters. As the proposed Class Representatives each testified in binding deposition testimony, because these communications were oral and private, understanding what happened at any of the other tens of thousands of private meetings requires individual examination of each one. The law simply does not allow a class to be certified on this record.

### A.    Plaintiffs Fail to Demonstrate Commonality

Plaintiffs cannot satisfy the Rule 23(a) prerequisite that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Although Plaintiffs inexplicably characterize the commonality requirement as an "un-demanding test," (Pls.' Br. at 23), the Supreme Court has confirmed it is subject to the same "rigorous analysis" as any of the other Rule 23 requirements. *See Wal-Mart,* 131 S. Ct. at 2552. Indeed, as the Fifth Circuit has observed, *Wal-Mart* "heightened the

standards for establishing commonality." *M.D. ex rel. Stukenberg*, 675 F.3d at 839. It is no longer enough to merely assert, as Plaintiffs do here (Pls.' Br. at 23), that "there are questions of law or fact common to the class and that resolution of at least one issue" will affect the class.[11] Rather, as dictated by the Supreme Court:

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." . . . This does not mean merely that they have all suffered a violation of the same provision of law. . . . Their claims must depend upon a common contention. . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.
>
> "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."

*Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original) (citations omitted).

*Wal-Mart* itself demonstrates why Plaintiffs' effort to certify this class—based on oral misrepresentations by hundreds of FAs in tens of thousands of private, individuals meetings with investors—fails to satisfy this key threshold. In *Wal-Mart*, the plaintiffs sought to certify a class of current and former female employees from over 3,400 Wal-Mart stores nationwide, alleging that the company's "uniform" policy of leaving pay and promotion decisions to the discretion of local managers resulted in a disparate impact upon female employees in violation of Title VII. *Id.* at 2546, 2548. The Supreme Court, however, found that the very fact that local managers made *individual* employment decisions precluded class-wide resolution of the claims. As the Supreme Court explained, the plaintiffs "wish to sue about literally millions of employment decisions at once," but "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible

[11] *See Dvorin v. Chesapeake Exploration, LLC*, Civil Action No. 3:12-CV-3728-G, 2013 WL 6003433, at *5 (N.D. Tex. Nov. 13, 2013) ("The commonality prerequisite now requires 'more than the presentation of questions that are common to the class.' . . . It is not sufficient merely to show that the resolution of one issue 'will affect all or a significant number of the putative class members.'").

to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* at 2552 (emphasis in original).

This case is just like *Wal-Mart*, in that here, too, there are tens of thousands of separate investment decisions that were made by investors, each one based on a unique set of facts and circumstances. Paraphrasing the language from *Wal-Mart*, without some glue holding the alleged *reasons* for all those investment decisions together, it will be impossible to say that examination of all the putative class members' claims for relief will produce a common answer to the crucial question "*what representations made by whom caused me to invest in the CD?*"

And, here, there are two additional factors not present in *Wal-Mart* that further militate *against* class certification. *First*, in *Wal-Mart*, the moving parties there at least claimed their experience was similar to that of every other putative class member. Here, in contrast, Plaintiffs have *admitted* that their experience—informed by private, oral communications from their individual FAs—cannot be extrapolated to the class of more than 17,000 investors. Specifically, whether Plaintiffs have all suffered the same injury and in the same way, will depend on what the thousands of absent class members were told, orally, by their hundreds (if not thousands) of individual FAs over eight years, and what, if any, reliance on the Willis letters they placed, or whether they fully understood the CDs were *not* insured but bought them anyway. Yet the entirety of the evidence in this regard is the testimony of the five proposed Class Representatives (each of whom claims that he, she or it saw a Willis letter) as to what three FAs told them about insurance in private closed-door meetings. Plaintiffs have also submitted 85 *untested* boilerplate declarations from U.S.-based investors that they were generally misled about insurance by their "Stanford FA," without any

indication of what they were told or what written disclosures they received.[12] Nevertheless, all together they total approximately 0.5% of the entire proposed class.

With regard to the accounts of the five proposed Class Representatives, even if they were similar (and, as discussed below, they vary in material respects), this provides no basis to conclude that hundreds of other FAs made "uniform" oral statements to more than 17,000 other investors in 100 countries over eight years in other closed-door meetings, and how, if at all, the Willis letters (or any other written material for that matter) played any role in these meetings and in the investors' investment decisions. *Plaintiffs themselves admit this.* The proposed Class Representatives all testified that, because their own individual meetings with their FAs occurred in person and in private, they do not know—and so obviously have not proved—that the absent class members were in fact told the same things by their FAs about insurance (or anything else). As Mr. Canabal succinctly put it: "I don't know what the advisors told other people whom I don't know." (APP. at 782 [Canabal Tr. 129:14-24].)[13]

[12] Plaintiffs submitted 85 declarations from persons who all say they bought CDs in the U.S. and that a "Stanford FA led me to believe, verbally, and/or via written materials, that my investments in the SIBL CDs were insured." (*See* Pls.' Br., Ex. 13.) However, they do not mention a Willis letter (or Willis at all) and the evidence shows that U.S. investors in particular may have received written disclosures disclaiming such insurance. (*See, e.g.*, APP. at 37, 44; *infra* at pp. 43-49.) Thus, if anything, the declarations further establish this case is based on oral representations and highlights why a class cannot be certified—each and every person in the proposed class needs to be examined and cross-examined to determine what they were told, considered, and relied upon. If a class is certified, Willis will be deprived of the opportunity to test the claims of thousands upon thousands of people who may not have been misled at all, which will obviously violate Willis's right to due process. *See, e.g.*, *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) (noting a defendant has a due process right "to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates [that] right or masks individual issues.").

[13] *See also* APP. at 571 [Diaz Tr. 81:5-14] ("Q. Do you know what information Mr. Nanes provided to those other investors? A. No. Q. Do you know what questions those other investors may have asked Mr. Nanes? A. No. Q. And if they did ask any questions, you wouldn't know what answers Mr. Nanes gave; correct? A. No."); APP. at 516 [Troice Tr. 92:3-7] ("Q. . . . [Y]ou do not know the exact words Mr. Nanes used with other investors besides yourself in private meetings; correct? A. No."); APP. at 541-42 [Troice Tr. 193:15-25, 194:20-195:7]; APP. at 836 [Gomez Tr. 110:19-22]

Case 3:09-cv-04641-N-BG Document 1243 Filed 02/26/15 Page 35 of 72 PageID 37066

*Second*, in *Wal-Mart*, the moving parties at least offered statistical evidence from which they (unsuccessfully) tried to show that it was possible to extrapolate from the named plaintiffs' situation to that of the absent class members. Here, Plaintiffs have not offered any statistical evidence purporting to demonstrate that, notwithstanding the individual oral communications, there are common threads tying the individual class members together. The Willis letters, Plaintiffs' only effort, plainly are not sufficient. Significantly, *the evidence demonstrates that the Willis letters were not common to the members of the putative class—based on the record evidence, they were only provided to approximately 1% of the putative class members at most*. The *only* "evidence" of who received a Willis letter beyond six of the named Plaintiffs is the 225 other individuals that have sued Willis, claiming, generally, to have received a letter between August 2004 and August 2006.[14] In his "responsive" declaration, Plaintiffs' expert, Prof. Sherman, conclusorily characterizes these 225 investors who have stepped forward and claimed to have seen a Willis letter (or knew of its contents) as only a "small fraction" of the actual proposed class members that fall into that category—estimated by him, vaguely, to be a "very large number of persons." (*See* Prof. Sherman Resp. Decl. at 3-4.) However, Prof. Sherman—like Plaintiffs—presents no evidence to support that claim, and his mere say-so is not evidence.[15] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

---

("Q. So you don't know what specifically Mr. Fiorillo told other investors; correct? A. No, I don't know what he said.").

[14] Ms. Baranoucky's testimony is that, while Willis was Stanford's insurance broker, she produced (to Stanford) approximately 100 letters each year from 2004 to 2006. (*See* APP. at 293 [Baranoucky Tr. 115:11-116:4].) By August 6, 2007, however, Ms. Fortin informed Ms. Baranoucky that Stanford no longer wanted insurance letters because it was ending the practice of using them. (*See* APP. at 206.) This record is consistent with the fact that only 225 other individuals have come forward to claim that they received Willis letters. There is no evidence in the record offered by Plaintiffs—and the burden is entirely theirs—that anyone else ever received a Willis letter.

[15] Prof. Sherman appears to make these statements in support of the certification of an alternative class of letter recipients. Even putting aside that such an alternative class is nowhere referenced, much less advocated for, in Plaintiffs' Motion, there is still no proof of who among the class actually would fall into that alternative definition. The number of letters created by Willis—whether "several hundred" or a more specific number in the hundreds—is not itself proof of how many investors in

(rejecting evidence "connected to existing data only by the *ipse dixit* of the expert"); *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 467 (5th Cir. 2012) (affirming exclusion of opinion when expert failed to present evidence upon which statements were based). Thus, Plaintiffs have offered not one iota of proof that anyone other than the 225 litigants in the individual suits against Willis ever received a Willis letter, and the burden is entirely theirs.

Plaintiffs, of course, have the burden under Rule 23 to demonstrate that Willis's letters were the crucial common underpinning tying together the entire 17,000-plus members of the proposed class, as they have long suggested. Because the evidence shows that Willis provided its letters to Stanford, not to individual investors, only the Receiver (standing in the shoes of Stanford) would know how many letters were sent and their economic impact on the Ponzi scheme. Yet he has not analyzed (or has simply hid behind privilege regarding): (i) who exactly in the proposed class saw a Willis letter, (ii) who of those decided to invest (or not to invest) because of the letter, (iii) how much money can be traced to the letters, or (iv) how that money was used by Stanford (*i.e.*, for misappropriation or to pay off other investors). (*See, e.g.*, APP. 887-88, 893-99, 903 [Janvey Tr. 12:2-14:22, 35:2-36:8, 41:4-46:5, 47:8-48:23, 50:19-55:5, 61:17-25, 77:6-18]; *see also* APP. at 977-81 (Janvey Dep. Ex. 37); APP. at 967.) Thus, Plaintiffs fail to meet their burden of proof that the entire class has suffered the same injury in the same way, such that a class can be certified.

In his "responsive declaration," Prof. Sherman asserts (as Plaintiffs presumably will in their reply) that whether an investor received a Willis letter is irrelevant to the certification of Plaintiffs' proposed class because it is enough to show that Willis aided the scheme by providing the letters to Stanford. (*See* Prof. Sherman Resp. Decl. at 2.) Setting aside that an expert opinion on

---

the proposed class actually received a Willis letter, given that it was Stanford who controlled distribution of the letters. In other words, it is irrelevant how many letters Willis provided to Stanford; all that matters is how many letters Stanford provided to investors. Plaintiffs have provided no proof whatsoever in this regard.

Case 3:09-cv-01274-N-BG Document 180-2 Filed 04/26/15 Page 238 of 492 PageID 6374

domestic law is improper and must be disregarded,[16] Prof. Sherman confuses what is at issue. The substantive standard for aiding and abetting liability is not the question before the Court on Plaintiffs' motion for class certification. Rather, the question is whether Plaintiffs have satisfied the "rigorous" requirements of Rule 23 by demonstrating that the claims of 17,000-plus investors—as to which there is no evidence that 99% of whom saw a Willis letter—are susceptible to class-wide resolution. The statement of Willis's expert, Prof. Fox, that Prof. Sherman took issue with merely notes that whether or not an investor saw a letter is an important factual issue that clearly varies between the proposed Class Representatives and the vast majority of absent class members.[17] In this proper context, Prof. Sherman's attempted rebuttal rings hollow: he nowhere addresses any of the Rule 23 requirements in regard to this factual disparity,[18] nor acknowledges, much less deals with, the substantial hurdles to class certification created by the proposed Class Representatives' own admissions; which are, among other things, that the named Plaintiffs admit their cases may be entirely different from the 17,000-plus other investors, and the only way to know is to ask each class member individually. Prof. Sherman does not purport to know anything about the absent class members and, instead of addressing Plaintiffs' critical admissions, ignores them entirely.

---

[16] Professor Sherman does not suggest his discussion of aiding and abetting law is not a pure legal standard that the Court alone is competent to determine. (*See* Prof. Sherman. Resp. Decl. at 2 (questioning what is or is not a "correct statement of the law.").) Thus, his opinion on the law of aiding and abetting must be disregarded. *See, e.g.*, *Estate of Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999) (excluding expert testimony amounting to a legal opinion on the issue of "reasonable cause").

[17] *See* Prof. Sherman. Resp. Decl. at 2 (noting that Prof. Fox's argument was made "in reference to the opinion that this class action is not manageable because 'it will involve the *factual question*, with respect to each of the proposed class members, of whether he or she saw the Willis letter'") (emphasis added).

[18] Prof. Sherman does separately address the Rule 23(b)(3) "superiority" requirement in the context of discussing whether the claims are "negative value" cases and whether foreign courts would enforce a U.S. class-action judgment. (*See* Prof. Sherman Resp. Decl. at 3–9.) But as noted *infra* p. 58, there too he ignores the actual evidentiary record and instead relies solely on allegation and speculation, which are decidedly insufficient bases for certifying a class.

Prof. Sherman also completely relies on this Court's decision on the defendants' motion to dismiss, which was based on *allegations* this Court was required to accept as true. He ignores the factual record in this case. But class certification requires proof—not just allegations—and Prof. Sherman's contentions have no foundation in the evidence adduced in class discovery. For all the reasons previously stated, Plaintiffs' alleged "broader marketing scheme" based on the Willis letters has not materialized. Instead, the only thing discovery has shown is that five people—out of more than 17,000—claim to have been lied to by three FAs. There is no evidence that the vast majority of the remaining 17,000-plus putative class members were lied to at all, much less that they even claim to have been lied to in the same way so as to make class treatment of their claims appropriate under Rule 23.

Indeed, the record shows that many investors purchased CDs before Willis ever provided a single letter to Stanford in 2004 and that many continued to purchase CDs after Stanford stopped using the letters in 2007. Willis's actions obviously had no impact on those investors and Plaintiffs provide nothing to connect them to their allegations. As acknowledged by Isaac Green, the principal of named Plaintiff Punga, those who did not receive a Willis letter are obviously not in the same position as those who did, and it would not be fair to treat them as if they were:

> Q. But if [other investors] never received or even heard about a Willis or BMB letter, how were they defrauded by Willis or BMB?
>
> . . . .
>
> A. *If they didn't receive it*, I have the understanding that in some countries they didn't deliver those letters. *They—then they would have to file a suit regarding something else.* We're talking about what would be fair, right?

(APP. at 879 [Green Tr. 114:6-20] (emphasis added).)

**B. Plaintiffs' Claims Are Not Typical of the Proposed Class**

For many of these same reasons, Plaintiffs also cannot demonstrate that their claims or defenses are "typical" of the proposed class. First and foremost, by conceding that they have no

idea what Stanford's FAs told other investors—and that the only way to know would be to ask each one individually, which they have not done (and which they seek to deny Willis the opportunity to do through the misuse of the class action mechanism)—the proposed Class Representatives have admitted that they have no *proof*, which is required at this stage, that their claims are typical of the class they purport to represent. *Their testimony is dispositive of this issue*. They simply do not know, and so necessarily have not proved, that what they were told by their FAs, what questions they asked, and what answers they received, are typical of the same disclosures, questions and responses given to other class members. Plaintiffs' counsel's conjecture that what they were told is typical of the class because of an allegedly common training manual Stanford FAs used is not evidence. There is no actual evidence that the single training manual Plaintiffs cite, dated in December 2004 (*see* Pls.' Ex. 7), was in fact seen by the hundreds of Stanford FAs, let alone that each orally repeated verbatim what is in the manual to 17,000-plus investors in more than 100 countries over eight years.[19]

Second, *all five of the proposed Class Representatives*, unlike nearly 99% of the class members they purport to represent, received Willis letters. Their claims therefore necessarily are atypical of those class members who never saw a Willis letter. Those investors who never received a letter, of course, cannot allege, much less prove, that: they were misled by a Willis letter; they relied on a Willis letter; the Willis letter was material to their investment decisions; or they were injured or damaged by representations in a Willis letter (the same is true regarding any other insurance-related material). Plaintiffs therefore fail the typicality inquiry on this fundamental level: they seek to represent a class of people in a lawsuit against Willis who have absolutely no connection to Willis whatsoever. No class can be certified on this basis.[20]

---

[19] *See infra* pp. 42-43.

[20] The claims of Plaintiffs Diaz, Canabal, Gomez and Punga are atypical for the additional reason that these Plaintiffs are subject to a unique defense. *See Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) ("representation of a class will suffer if the named plaintiff is preoccupied with a

## C. The Proposed Class Representatives Are Not Adequate Representatives

The proposed Class Representatives also cannot show that they are "adequate" representatives of the proposed class because they lack knowledge of the most basic facts and theories of the case and have relied almost entirely on counsel for the investigation and prosecution of the case. Rule 23 requires that "Plaintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 n.18 (5th Cir. 2001).[21] Like the other certification requirements, "Plaintiffs bear the burden of proof on the adequacy of representation of the proposed class." *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 302 (S.D. Tex. 2000). Because "[inadequacy] of . . . representation alone is sufficient basis for denial of . . . class certification," *Karnes v. Fleming*, No. H-07-0620, 2008 WL 4528223, at *3 (S.D. Tex. July 31, 2008), their Motion must be denied.

In *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532-33 (N.D. Tex. 2005), the court denied class certification after finding that the named plaintiff there was not an adequate representative because her deposition testimony indicated that "there [were] many instances in which she ha[d] little or no knowledge outside of that given to her by her attorneys." *Id.* at 533. In

---

defense which is applicable only to himself"; thus, the peculiar applicability of an affirmative defense "to the named plaintiff does present a sufficient question of typicality to justify a district court's decision to deny class certification."). This Court held the insurance letters actionable at the pleading stage, and held that Plaintiffs adequately alleged scienter against Willis, in large part based on allegations that Willis, but *not* Plaintiffs, knew about Stanford's supposedly secret real estate investments. (*See* APP. at 959 [Order on *Janvey* Mot. to Dismiss at 28].) Discovery has revealed, however, that Plaintiffs Diaz, Canabal, Gomez and Punga knew that Stanford was investing in real estate; in fact, Plaintiffs Canabal and Gomez, *who were themselves real estate developers*, personally toured Stanford's Antiguan real estate developments. (*See* APP. at 574 [Diaz Tr. 91:7-12, 92:6-9]; APP. at 874 [Green Tr. 94:8-13]; APP. at 786, 791-92 [Canabal Tr. 144:2-23, 165:8-166:19].) These Plaintiffs are thus subject to the unique defense that they "knew of the untruth or omission." Tex. Rev. Civ. Stat. art. 581-33A(2).

[21] While this "demanding" standard arose in the federal securities context, it has "since been applied to cases not involving securities fraud." *In re Enron Corp.*, 529 F. Supp. 2d at 692 n.43, 725.

that case, the plaintiff could not "articulate why the proposed class beg[an] and end[ed] when it [did]" and was "unable to identify who would be included within the putative class." *Id.* at 534. And courts have held that representatives are deficient when they rely completely and totally on counsel "for investigation and prosecution of the case," as evidenced by their inability "to articulate specific facts supporting their vague allegations." *In re Enron Corp.*, 529 F. Supp. 2d 644, 732 (S.D. Tex. 2006) (disqualifying six class representatives as inadequate).

Based on this well-reasoned law, the proposed Class Representatives here must be deemed inadequate class representatives. They admit that they had no original thought of suing Willis at all; instead, their lawyers investigated potential deep pocket defendants and ultimately identified Willis. (*See* APP. at 501-02 [Troice Tr. 33:6-35:20]; APP. at 762, 764 [Canabal Tr. 48:18-25, 54:3-56:7]; APP. at 229, 247 (attorney retainer contracts).) Plaintiffs also admit that they did not know when BMB and Willis started and stopped issuing letters or whether Stanford sold CDs before or after the letters were issued. (*See* APP. at 519-20 [Troice Tr. 104:18-106:3]; APP. at 589 [Diaz Tr. 151:20-153:2]; APP. at 844 [Gomez Tr. 142:5-18]; *see also* APP. at 875 [Green Tr. 100:12-101:21].) And, further, Plaintiffs admitted to the following deficiencies, making each of them inadequate representatives:

<u>Plaintiff Diaz:</u>

- Admitted that the first time she had read any complaint in this action was in preparation for her deposition on February 4, 2015, which occurred nearly four years after the operative complaint was filed on April 1, 2011 and five-and-a-half years after the original complaint was filed on July 2, 2009. (*See* TAC [Dkt. No. 115]; Pls.' Original Class Action Compl. [Dkt. No. 1].)
- Unable to identify the defendants in this case—when asked who the defendants were, responded, "Stanford, Willis, Willis and Brown. I'm not sure." (APP. at 554 [Diaz Tr. 13:11-13].)
- Admitted she could not read English (id. at 573 [Tr. 88:2]), did not recall whether she signed an English version of her declaration, and when asked whether the information in

her declaration was accurate, responded "I don't know." (Id. at 566 [Tr. 60:15-17; 60:23-61:5].)

Plaintiff Gomez:

- Grossly misunderstood the theory of the case, mistakenly believing this to be an insurance coverage action. (APP. at 835-36 [Gomez Tr. 109:10-110:1] ("Q. Mr. Gomez, is it because Willis and BMB did not pay you under the insurance policies applicable to your CDs that you decided to sue Willis and BMB? . . . A. Yes.")

- Admitted that prior to his deposition, he had only spoken to his attorney twice by telephone (and had never met with him in person) since the lawsuit was filed in 2009 (Id. at 812 [Tr. 16:23-17:2].)

- Testified that he communicated with his attorneys primarily through Mr. Canabal. (Id. at 812 [Tr. 17:7-9] ("I did not communicate with him. It was Mr. Canabal that communicated with him, but not me. And then later he would inform me.").)

- Admitted that Mr. Canabal recommended to him courses of action that should be taken in this lawsuit. (Id. at 816 [Tr. 31:9-13].)

- Testified that he generally signed whatever document Mr. Canabal put in front of him. (Id. at 813 [Tr. 20:6-21] ("Q. Mr. Gomez, do you recall whether you ever signed an agreement similar to the one that has been put in front of you as Defendants' Exhibit 16? . . . A. Well, if that document was sent to Caracas and Mr. Canabal told me to sign it, then yes. If not, then no.").)

- Could not identify any of the Mexican Plaintiffs or any of the Defendants by name. (Id. at 811-12 [Tr. 13:19-14:18].)

- Admitted he did not know how many people were in the proposed class or the criteria for being a member of the class he is seeking to represent. (Id. at 844 [Tr. 143:4-144:2].)

Plaintiff Punga Punga Financial, Ltd.:

- Testified that an investor who never saw a Willis letter could not be a member of the class and "would have to file a suit regarding something else." (APP. at 878-79 [Green Tr. 113:19-114:15].)

- Admitted that his declaration incorrectly stated Punga invested with Stanford from 1999 through 2009 because Punga was not formed until 2004. (Id. at 863 [Tr. 52:8-53:12].)

- Admitted that, although he reviewed drafts of his declaration in English, he did not provide any edits "because [his] English is not very good." (*Id.* [Tr. 50:20-:51:7].)

Plaintiff Canabal:

- When asked whether there were more than 15,000 class members, answered "I don't have any idea." (APP. at 795 [Canabal Tr. 180:11-14].)

- Did not know whether an investor who did not receive, was not shown, and did not hear about a Willis letter would be a member of the proposed class. (Id. at 796 [Tr. 182:24-183:12].)

- Could only name some of the named Plaintiffs and mistakenly believed that certain of the named Plaintiffs were from the United States. (*Id.* at 759-60 [Tr. 36:18-38:17].)

Plaintiff Troice:

- Did not know which countries class members were from or whether the class included United States citizens.22 (APP. at 539 [Troice Tr. 183:15-184:7].)

- Mistakenly believed that the purported class he sought to represent included only individuals who either received or saw a Willis letter. (Id. at 541 [Tr. 191:9-20].)

- Admitted that when he signed the retainer with his counsel, he did not know which third parties, if any, he would sue and "didn't know that there was a possibility to look for third parties until [he] spoke with [class counsel]." (Id. at 502 [Tr. 34:10-17].)

- Admitted he had no basis for the allegation that "Stanford's insurance brokers agreed to participate in a fraudulent and misleading insurance letter distribution campaign." (Id. at 508-09 [Tr. 60:13-19, 61:19-62:4].)

- Did not know the basis for the allegation that "perhaps no other third party had as much knowledge of Stanford Financial's worldwide operations as BMB and Willis." (Id. at 509 [Tr. 63:4-64:8].)

Accordingly, Plaintiffs lack the fundamental knowledge to act as class representatives, and it appears to have been counsel, *not* Plaintiffs, who initially suggested suit against Willis. Plaintiffs have therefore failed to carry the burden of establishing that their proposed representatives are adequate under Rule 23, and certification should be denied on this basis alone.

## III. Plaintiffs Have Not Proved the Additional Requirements of Rule 23(b)(3)

For many of the same reasons why Plaintiffs cannot satisfy any of the Rule 23(a) prerequisites, Plaintiffs also cannot meet the additional requirements of Rule 23(b)(3). To certify a

[22] In their class certification briefing, Plaintiffs claim that class members would include "investors from over 100 countries." (Pls.' Br. at 35.)

Case 3:12-cv-04641-N-BG Document 180-2 Filed 02/26/15 Page 245 of 492 PageID 6334

class under Rule 23(b)(3), as Plaintiffs here seek to do (*see* Pls.' Br. at 22, 27), Plaintiffs must establish that common issues predominate over individual ones and that a class action is a "superior" means of litigating this case. Plaintiffs have not and, based on the record here, cannot carry their burden of establishing, by a preponderance of the evidence, that either of these criteria is met.

**A. Individual Inquiries Predominate Over Common Questions**

The predominance requirement is an inquiry "far more demanding" than even the rigorous analysis courts must conduct in regard to the "commonality" prerequisite, as Plaintiffs themselves concede. (*See* Pls. Br. at 28 (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997).) In analyzing the predominance requirement, courts are directed to "consider how a trial on the merits would be conducted if a class were certified." *Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003). In order to find that common questions predominate, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole must predominate over those issues that are subject only to individualized proof." *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982); *see also Simms v. Jones*, 296 F.R.D. 485, 504 (N.D. Tex. 2013) ("In deciding which issues predominate, the Court conducts a *qualitative*, and not a quantitative, analysis.") (emphasis added). In particular, if the members of a proposed class will need to present evidence that varies from member to member, then there are individual questions that make the case not appropriate for class certification. *See Ticknor v. Rouse's Enters., L.L.C.*, No. 14–30550, 2014 WL 6440397, at *2 (5th Cir. Nov. 18, 2014).

As discussed further below, Plaintiffs fail to establish that common questions of fact or law predominate over individual questions for three core reasons: (i) Stanford's communications about insurance coverage from hundreds of different FAs to tens of thousands of investors were oral and private, and Plaintiffs themselves concede that individual inquiries will be required to determine what information was communicated in those meetings; (ii) the disclosures investors

received were so varied that, as Plaintiffs admit, individual inquiries will be required to determine who received what disclosures (some of which undermine Plaintiffs' allegations of misrepresentations); and (iii) there are individual questions concerning each individual's varying experiences with, and knowledge of, Stanford.

Given the factual record developed in this case, particularly the admissions of the proposed Class Representatives, there is no basis on which this Court could conclude that common questions predominate over individual inquiries.

**1. Stanford's Oral Communications About Insurance Coverage for the CDs Were Verbal and Therefore Non-Uniform**

It is axiomatic that class certification is precluded when plaintiffs cannot establish that the communications to putative class members were uniform. As the Fifth Circuit has held, "[i]f there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action." *Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307-08 (5th Cir. 1977); *see also Simon*, 482 F.2d at 882–83 (same). Further, "the key concept in determining the propriety of class action treatment is the existence or nonexistence of material variations in the alleged misrepresentations." *Grainger*, 547 F.2d at 307–08; s*ee also Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 890 (5th Cir. 1987) (denying motion for class certification when plaintiffs "did not establish that Dean Witter uniformly failed to disclose account executive compensation. . . . Thus, we cannot fault the district court's conclusion that the critical fact of nondisclosure was not common to the putative class."); *In re Park Cent. Global Litig.*, No. 3:09-cv-765-M, 2014 WL 4261950, at *13 (N.D. Tex. Aug. 25, 2014) ("In light of the evidence of significant differences in the amount and substance of information received by the limited partners, the Court finds that individualized questions as to the receipt of false or misleading information by the investors will predominate."); *Burkett v. Bank of Am., N.A.*, No. 1:10CV68-HSO-JMR, 2012 WL 3811741, at *8 (S.D. Miss. Sept. 4, 2012) ("Class certification of misrepresentation claims involving

nonuniform representations and issues of individual reliance is generally inappropriate."); *Keyes v. Guardian Life Ins. Co. of Am.*, 194 F.R.D. 253, 256 (S.D. Miss. 2000) ("individual issues, particularly relating to the specific sales presentations to individual class members and individual class members' reliance, substantially predominate over those common issues and render class certification inappropriate"); *cf. Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, No. H-05-3394, 2008 WL 7356272, at *13 (S.D. Tex. Nov. 24, 2008) (denying motion for class certification when "Plaintiffs do not allege that the same statements were communicated to every putative class member; thus, proof of disparagement necessarily will be highly individualized and inherently unsuitable for class certification").

And, as particularly relevant here, the Fifth Circuit has expressly held that "courts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action." *Simon*, 482 F.2d at 882; *see also, e.g.*, *In re LifeUSA Holding Inc.*, 242 F.3d 136, 145–46 (3d Cir. 2001) (holding claims based on oral misrepresentations failed to satisfy predominance requirement where statements were made to over 200,000 people by over 30,000 individuals). Moreover, even when the misrepresentations are alleged to exist in written form only, individual issues still predominate "if the writings contain material variations, emanate from several sources, or do not actually reach the subject investors." *Simon*, 482 F.2d at 882.

The present action is precisely the type of case that the Fifth Circuit had in mind when articulating those standards. As is clear from the record, Plaintiffs' arguments for class certification are based on the oral representations made by Stanford FAs, not Willis's letters. The Plaintiffs' brief describes the conduct in this way: "All of the Named Plaintiffs were *told* by their Stanford financial advisors that their investments in the SIBL CDs were insured. . . ." (Pls.' Br. at 20 (emphasis added); *see also id.* at 12 (same).) Putting aside the fact that Plaintiffs cannot show that what the other 17,000-plus purported class members were told was uniform, there is no allegation in

the complaint, no argument in Plaintiffs' brief, and no evidence in the record, that Willis represented that the CDs were insured, in the insurance letters or otherwise.

More important, because it is absolutely binding against Plaintiffs, the proposed Class Representatives admit they formed their opinions about the security of the CDs *based on what they were told by their Stanford FAs—not the Willis letters (or any other marketing material) themselves*. Mr. Troice conceded that his "*complete* understanding for the insurance that was applicable" to his Stanford investments was what he was told by his FA, David Nanes. (APP. at 533 [Troice Tr. 161:9-14] (emphasis added).) Ms. Diaz testified that her understanding of the Willis letters—including the meaning of "Directors and Officers Liability Insurance" and a "Banker's Blanket Bond"—was based on what Mr. Nanes told her (in no small part because she does not read English, but was nevertheless provided written materials *exclusively* in English). (*See* APP. at 581-82, 585-86 [Diaz Tr. 118:25–119:19; 121:22-122:5, 134:4-14; 139:5-19].) Mr. Gomez likewise testified that his FA, Mr. Fiorillo, "orally said that these letters were guaranteeing, one way or another, our investments in the CDs." (APP. at 838 [Gomez Tr. 121:14-20].)[23] Indeed, all 85 of the boilerplate declarations submitted by Plaintiffs from U.S.-based investors each affirmatively assert that they were misled *by their Stanford FA* into believing the CDs were insured. (*See* Pls.' Br., Ex. 13.)

And, of course, it should come as no surprise that the investors relied on their FAs' communications—not the letters—to form their belief about insurance because, as the proposed

---

[23] *See also* APP. at 834, 836 [Gomez Tr. 104:20-25, 105:16-20, 110:3-14] ("Q. Mr. Gomez, did Mr. Fiorillo tell you that your CD investments were insured? A. Yes, he told me that because if he hadn't, I wouldn't have invested my money there."), APP. at 838-41 [Gomez Tr. 120:19-122:11, 128:23-129:4, 131:12-19]; APP. at 872 [Green Tr. 88:15-89:4] (". . . It doesn't say that in the letter, but—but when they gave us the letters and the insurance policies that they were selling, they said that those insurance policies were better than FDIC insurance policies. Q. Who is 'they'? A. David, David Nanes."), APP. at 877 [Green Tr. 106:22-107:12] (stating that he did not understand the letters, but David Nanes "sort of calmed me down, because he would explain to me what the letters meant and also about the insurance"); APP. at 769 [Canabal Tr. 77:12-18] (admitting his FAs were the ones who told him CDs were insured: "Yes. Every time that we touched on that point."); *see also* APP. at 776, 780-81, 782-83 [Canabal Tr. 104:20-25, 120:19-122:11, 128:23-129:4, 131:12-19].

Class Representatives also all admit, the letters themselves do not say they insure the CDs (or even mention the CDs at all). (*See, e.g.*, APP. at 583 [Diaz Tr. 128:20-129:17] ("Q. Ms. Diaz, does the letter that was just translated for you state that your CDs were insured? . . . A. Well, no.").)[24]

But perhaps most fatal to Plaintiffs' effort to certify this class is their common-sense admission that the only way to find out what happened in the tens of thousands of individual meetings they did not attend would be to ask each and every investor individually. (*See, e.g.*, APP. at 517 [Troice Tr. 96:15-20] ("Q. But if we really wanted to know what other investors were told about insurance with respect to their Stanford investors, we would have to talk to those other investors, wouldn't we? A. That's correct.").)[25] Indeed, testimony would be needed from each and every one of the more than 17,000 putative class members to see if they even claim to have been misled regarding insurance, let alone whether the Willis letters had anything to do with it. Here, as admitted by Plaintiffs themselves, it could not be any clearer that class issues do not predominate over individual issues. *See, e.g.*, *Ticknor*, 2014 WL 6440397, at *2 ("We have held that class issues do not predominate when 'transaction-by-transaction' determinations are required.") (citing *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 307 (5th Cir. 2009). Rather, as is apparent from the vague declarations made by the 85 additional persons in support of Plaintiffs' Motion (*see* Pls.' Br., Ex. 13), each and every

---

[24] *See also* APP. at 514 [Troice Tr. 82:21-83:2] ("Q. But the letters themselves . . . did not say anything about your investments being 100 percent insured, did they? A. No."); APP. at 513 [Troice Tr. 81:20-23 ("Q. . . . Where in the letter does it state that your investments were 100 percent insured? A. It doesn't say that in this letter."); APP. at 769 [Canabal Tr. 75:4-7 ("Q. Do the words 'CD' or 'certificate of deposit' appear anywhere in [the Willis letters] that you were just referring to? A. No."); APP. at 872 [Green Tr. 88:15-89] (". . . It doesn't say that in the letter . . . ."); APP. at 840 [Gomez Tr. 128:5-11] ("Q. But did the letters, as far as you are aware, state explicitly that your CDs were insured? . . . A. The letter—the letters don't say that explicitly. . . .").

[25] *See also* APP. at 542 [Troice Tr. 194:20-195:7]; APP. at 571 [Diaz Tr. 81:15-18] ("Q. If we wanted to know about the substance of those communications [with other investors] we would have to ask those other investors; correct? A. Yes."); APP. at 588-89 [Diaz Tr. 148:19-151:15]; APP. at 782 [Canabal Tr. 129:16-24]; APP. at 845 [Gomez Tr. 146:15-147:17]; APP. at 879-80 [Green Tr. 117:13-118:13].

investor would have to be examined and cross-examined in their own "mini-trial" to determine exactly what they were told.

Plaintiffs may try to fall back in their reply papers on the argument that the Willis letters themselves constitute uniform false statements holding the class together. But as stated above, they did not allege this in the complaint, did not argue this in their moving papers, and their testimony precludes this argument, clearly stating that the false statements about insurance were made by their FAs. Moreover, contrary to the allegations Plaintiffs haphazardly made at the beginning of this case, Plaintiffs have not offered a single piece of evidence with regard to how many investors received a Willis letter, and they have admitted that they do not know and did no analysis to determine as much. There is no evidence of anyone receiving a letter outside of six named Plaintiffs and the 225 individuals that have alleged as much in their own individual lawsuits. Because the record indicates that as little as 1% of the putative class[26] received a letter, and because the claims of an investor who received a Willis letter necessarily are materially different from the claims of investors who did not,[27] the Willis letters cannot be the uniform element holding this class together. In the case of this large majority of the putative class, it is solely the statements of the FAs that possibly could have misled them regarding insurance. And, again, we do not know exactly what the FAs said or did not say to all but five of the more than 17,000 class members (and potentially 85

[26] *See*, *supra*, note 14.

[27] The thousands of investors who did not get a letter could not have been misled by what they did not receive. *See Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied) ("Crescendo must introduce evidence of misleading statements by BFI/ICBIY that relate to the security purchased and *induced* the purchase thereof."); *see also Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1419 n.24 (5th Cir. 1993) ("Article 581–33A(2) has been construed to mean that the alleged misrepresentation must relate to the security and '*induce* the purchase thereof.'") (emphasis added). Indeed, the evidence shows some of the proposed Class Representatives themselves decided to invest before ever seeing a Willis letter. (*See* APP. at 583 [Diaz Tr. 126:22-128:2] (admitting all her CDs were purchased *before* receiving a Willis insurance letter); APP. at 838 [Gomez Tr. 119:19-22] (same).)

additional U.S. investors—constituting approximately 0.5% of the class), or if and how many of the FAs made use of the Willis letters (other than the 225 who allege they received one).

In any event, the fact that a tiny percentage of the class saw the letters, and had the letters described to them by the FAs, does not alter the fundamentally oral nature of the alleged fraud here. In *Simon v. Merrill Lynch*, the Fifth Circuit was presented with a case where misrepresentations were allegedly made both orally and in writing—and it affirmed denial of class certification when the named plaintiff's testimony in that case, just as here, revealed the claims were actually based primarily on the oral representations. 482 F.2d at 882-83.

This Court arrived at the same conclusion in *Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*, 2003 WL 21339279. There, as here, the plaintiffs sought to certify a Rule 23(b)(3) class action based on alleged misrepresentations and omissions in written material provided to purchasers of insurance policies. *Id.* at *1. But the *factual record* demonstrated that, notwithstanding the alleged "identical" written material, many potential class members bought their policies through intermediaries who, like here, provided "varying representations . . . above and beyond what is contained" in the written materials. *Id.* at *3. Because the communications from the brokers occurred on an individual basis—much like the individual communications from Stanford FAs here—the Court found that individual issues predominated, precluding class certification. As the Court explained, in light of the individual brokers' communications, class certification would deny defendants the opportunity to "legitimately argue that in the context of a specific class member, the [written materials] were not misleading and did not omit material information or that the class member did not rely on the proposal in making its decision." *Id.* at *3. This case is precisely the same. Willis is entitled to argue that specific class members (the vast majority) never saw or knew about the Willis letter, let alone relied on it.

Case 3:09-cv-01474-N-BG Document 143 Filed 02/26/15 Page 51 of 72 PageID 3468

Plaintiffs also may fall back in reply on their conclusory argument that Stanford used a "uniform" sales pitch based on a "common training manual." (*See* Pls.' Br. at 33).[28] But, as stated previously, evidence is required at this stage, not mere allegation, and there is no evidence that each member of the *entire* 17,000-plus proposed class received uniform oral communications from FAs. Rather, Plaintiffs merely *assume* that hundreds of Stanford FAs, over eight years, and in 100 countries, all: (i) looked at a common Stanford training manual, (ii) gleaned the same exact information from the Stanford manual, and (iii) uniformly passed it along verbatim to every investor with whom they dealt. That attenuated chain of assumptions, completely devoid of record evidence, is insufficient to meet Plaintiffs' factual burden to prove by a preponderance of actual *evidence* that the proposed class received uniform oral communications regarding insurance.

The record in fact demonstrates the opposite of such assumptions—that Stanford's FAs made varying oral representations to investors, many of which contradict the allegations of fraud. Plaintiffs cite such proof in their own brief when noting that some FAs believed the CDs were "wholly insured," while others told clients they were protected only from "fraud and embezzlement," or that some clients were told the CDs were not insured at all. (*See* Pls.' Br. at 10-12.). Plaintiffs in fact repeatedly admitted that they have no idea what other FAs told other investors. There certainly is not the slightest bit of evidence about what transpired in the tens of thousands of meetings over eight years between putative class members and hundreds of FAs. The only evidence here at all concerns five investors and three FAs, with no basis to conclude (let alone to conclude by a preponderance of the evidence) that their experiences are representative of the tens

[28] In the complaint, Plaintiffs also ambiguously alleged there was a "script" that FAs were required to use for oral representations to investors, and noted the existence of a training manual. (*See* TAC ¶ 30.) In discovery, Willis specifically requested that Plaintiffs produce, among other things, all documents "supporting Plaintiffs' contention that the Court should certify a class of [CD purchasers]." In response, Plaintiffs confirmed they had produced all documents they intend to rely on to certify a class (*see* APP. at 993-94), which does not include any such "script."

of thousands of others. Indeed, contrary to Plaintiffs' contentions of common training, Danny Green, head of Stanford Group Company's retail operations, testified in the *Bogar* ALJ proceeding that "in the training sessions Green orally stressed that the insurance *does not provide depositor insurance*," which the court credited when it "found that Green did not tell clients to whom he sold the SIB CD that their investment was insured."(APP. at 396 [*Bogar* Decision at 11] (emphasis added).)[29] A class surely cannot include investors who knew the CDs were not insured. Yet there is no evidence that anyone other than the named Plaintiffs, a small amount of untested declarants, and the other individual investors who have sued Willis even claim they were not fully aware of that fact. Again, without asking each and every purported class member, the Court cannot make a finding that more than 17,000 people were orally misled by the same misrepresentations, and the proposed Class Representatives cannot represent them.

**2. Individual Inquiries Regarding the Written Disclosures Will Be Required**

Individual inquiries also will be required to determine what written disclosures each investor received. Indeed, this Court recognized in its order on the defendants' motions to dismiss that those disclosures raise individualized fact questions, concluding that "there are too many factual issues surrounding the manner of distribution of the disclosure statements, including which investors received the statements and in what format, to support a dismissal of Plaintiffs' claims." (APP. at 921 [Order on Mot. to Dismiss at 12].) And the record shows that the Court's observation was right. Squarely refuting Plaintiffs' assertion that Stanford used "uniform" marketing materials, (*see* Pls.' Br. at 2), Stanford had "very strict mandates as to which client gets what information" (APP. at 16.) As the record shows, the marketing materials, provided to different investors in different languages, contained widely varying disclosure language, some of which expressly

[29] Although it was noted previously that this *Bolgar* decision itself is not binding and does not constitute evidence, Green's testimony under oath cited therein is nonetheless persuasive here.

confirmed the CDs *did not* carry insurance. (*See* APP. at 536 [Troice Tr. 173:16-21] (admitting that "[i]n English a brochure says one thing, but the brochure in Spanish lacks some information, it is missing some information").)

For example, one brochure had a disclosure plainly stating under the heading "Investment Risk . . . *You may lose your entire investment* (principal and interest) under circumstances were we may be financially unable to repay those amounts." (APP. at 37 (emphasis added).) A different pamphlet explicitly informs and warns:

> The insurance coverage held by SIBL includes . . . Bankers' Blanket Bond, Directors' and Officers' Liability, and Errors and Omissions Liability coverages. We also maintain Depository Insolvency Insurance. We maintain excess FDIC and Depository Insolvency insurance, currently in the amount of US$20 million, for each of our major U.S. and foreign correspondent banks. The latter insurance protects us against the possible insolvency of specified financial institutions where we may place our own funds. *This insurance does not insure customer deposits* and is not the equivalent of the FDIC insurance offered on deposits at many institutions in the United States.

(APP. at 196 (emphasis added).)

Similarly, other Stanford marketing material stated that "[c]onservation of principal . . . on the CD deposits are dependent upon returns in our investment portfolio. . . . If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD." (APP. at 217.) Later in those same materials, Stanford emphasized that "[t]here is *no guarantee investors will receive . . . the return of their principal*." (*Id.* at 223 (emphasis added).) Indeed, the document Plaintiffs identify in their brief as "SIBL's principal marketing brochure" (Pls.' Br. at 9) itself does not state anywhere that investor CDs were insured. (*See* Pls.' Br., Ex. 11 at 171.) These risk disclosures are materially different from those that Plaintiffs allege to be "uniformly" misleading in their class certification brief. And, as described above, some of these materials clearly disclose that the CDs are not insured. That some of these materials clearly disclaim the insured and risk-free nature of the CDs is material because the proposed Class Representatives themselves admit they would not have invested had they received the Stanford

brochures described above. (*See* APP. at 781-82 [Canabal Tr. 125:25-126:17] ("we would not have invested because it would be clear that the insurance policies would not cover the deposits. . . ."); APP. at 545 [Troice Tr. 207:13-25] (stating he "would not have invested" if he had seen risk disclosures).) Surely, the proposed Class Representatives cannot represent investors who received such materials and knew the CDs were not insured, but decided to invest anyway.

Moreover, the record reveals there is no way to uniformly determine on a class-wide basis which investors received what specific marketing materials or written risk disclosures. Although the named Plaintiffs claimed to have received and relied upon a host of written Stanford materials over numerous years, they produced very little of such material; some produced nothing at all. During depositions, the proposed Class Representatives by and large could not even remember with any specificity what versions of the marketing materials they may or may not have received or what those materials said. (*See, e.g.*, APP. at 570 [Diaz Tr. 76:2-77:7] (stating she was unable to recall having seen documents produced from her own files for this litigation), 576 [Diaz Tr. 98:7-11] (did not recall whether she reviewed materials sent to her by Stanford).) Moreover, none of them were able to state, under oath, that they even read the materials they received cover-to-cover. (*See, e.g.*, APP. at 832 [Gomez Tr. 97:10-17] ("[W]hatever I got as far as marketing materials, I would throw them away"), 834 [Gomez Tr. 102:14-18] (admitting he did not read marketing materials).)[30] As conceded by the proposed Class Representatives, if one wanted to know what different marketing materials the thousands of putative class members received, then "you would have to ask *all* of them." (APP. at 535 [Troice Tr. 168:4-22] (emphasis added); *see also, e.g.*, APP. at 781 [Canabal Tr.

[30] *See also* APP. at 529 [Troice Tr. 143:7-23] (stating he did not remember if English materials were received), [Troice Tr. 145:5-13] (noting financial reports and other materials "would go into the trash basically"); APP. at 780 [Canabal Tr. 120:16-121:4] (stating that marketing materials were thrown away or not found for production); APP. at 869 [Green Tr. 75:24-76:8] (stating that, before 2009, he threw away everything).

122:6-17, 123:11-21] (when asked if he knew what materials other investors received, stating: "No, I don't know. How could I know that?").

The widely varying written disclosures—together with the proposed Class Representatives' on-the-record admissions that they would not have invested had they seen disclosures provided to other investors—also demonstrates that individual inquiries will be required to adjudicate several of the essential elements and affirmative defenses of Plaintiffs' TSA and fraud claims.

*First*, determining whether any of the purported misrepresentations or omissions is "material" to any one investor will require individual inquiries in light of the different written disclosures and the varying "total mix" of information available to any particular investor. Materiality, of course, is an element of both Plaintiffs' burden to show a primary violation of the TSA and their general fraud claim. *See* Tex. Rev. Civ. Stat. art. 581-33A(2);[31] *Italian Cowboys Partners v. Prudential Ins.*, 341 S.W.3d 323, 337 (Tex. 2011). And in assessing whether a statement is material to an investor, particularly statements that can be characterized as opinions,[32] courts must assess "the statement's specificity and the *relative knowledge* of the speaker and the recipient," *In re Westcap Enterprises*, 230 F.3d 717, 726 (5th Cir. 2000) (emphasis added), and whether the statement would "significantly [alter] the total mix of information made available" to the investor. *Duperier v. Texas*

[31] To establish a primary violation under the TSA, Plaintiffs must prove that the CDs were sold "by means of an untrue statement of a *material fact* or an omission to state a *material fact* necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Tex. Rev. Civ. Stat. art. 581-33A(2) (emphasis added).

[32] Expressions of opinion are not actionable, but the determination in the first instance of whether a statement is material fact or an opinion requires consideration of the individual circumstances of each investor. *See Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995) ("Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made. Among the relevant circumstances are the statement's specificity, the speaker's knowledge, *the comparative levels of the speaker's and the hearer's knowledge*, and whether the statement relates to the present or the future.") (emphasis added).

*State Bank*, 28 S.W.3d 740, 745 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.).[33] Here, the

widely varying disclosures—including disclosures received by some investors *disclaiming* insurance

coverage for the CDs—and the fact that only an exceedingly small percentage of the putative class

may have ever seen a Willis letter (which contains truthful statements itself), demonstrates that there

was no uniform "total mix" of information available to all investors at the time each made their

investment decisions.[34] Courts have held that where, as here, "'transaction-by-transaction'

determinations are required" to assess what information each investor had access to, individual

issues predominate and class certification must be denied. *Ticknor*, 2014 WL 6440397, at *2 (citing

*Mims*, 590 F.3d at 307).[35] Again, sitting here today, it is entirely possible that the vast majority of the

proposed class of 17,000-plus were fully aware the CDs were not insured.

   *Second*, and relatedly, the varying written disclosures mean that individual questions

concerning each investor's knowledge—an affirmative defense under the TSA—will be required.[36]

Willis cannot be liable to any investor who "knew of the misrepresentation or omission before"

investing in CDs, *Inland Royalty Co. v. Heruth*, No. 05-99-01684-CV, 2000 WL 792406, at *2 (Tex.

---

[33] *See also Texas Instruments Inc. v. Citigroup Global Mkts., Inc.*, 266 F.R.D. 143, 153 (N.D. Tex. 2010) ("Any representations, misrepresentations, or omissions…made by any defendant would affect [plaintiff's] relative level of knowledge in its dealings with all defendants. Thus, any statements made by one of the defendants to [the plaintiff] could be used to prove [the plaintiff's] level of knowledge not only relative to that defendant but also relative to the other two defendants.").

[34] To the extent FAs made representations that could be considered puffery—for example, that Stanford's insurance was "better" than FDIC protection or that "no other offshore bank was good enough to qualify for it" (*see* Pls.' Br. at 2)—the law demands individual inquiries into the "relative knowledge" of each investor. *See Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 218-19 (Tex. App.—Austin 1999, writ denied).

[35] *See also Peltier Enterprises, Inc. v. Hilton*, 51 S.W.3d 616, 623 (Tex. App.—Tyler 2000, pet. denied) (individual issues predominate when determining the materiality of the omission "required [the] cross-examination of each plaintiff" to figure out what was important to each in making their decision).

[36] *See Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) ("[T]he predominance of individual issues necessary to decide an affirmative defense may preclude class certification.").

App.—Dallas June 21, 2000, no pet.), or who fully understood the CDs were not insured.[37] And the fact that investors received widely varying disclosures, including some clearly providing that "You may lose your entire investment," means that individual, case-by-case inquiries are required to determine what investors knew that might undermine their claim that supposed misrepresentations received from their FAs were untrue. In essence, this exercise would require thousands of "mini-trials with different witnesses and evidence for each plaintiff. Presenting and resolving this defense for each plaintiff is likely to be an overwhelming and unmanageable task for a single jury." *Id.*

*Third*, the varying written disclosures also mean that individual inquiries will be required concerning reliance and inducement, other critical elements of Plaintiffs' fraud and TSA claims.[38] As the Supreme Court has observed, "[i]f every plaintiff had to prove direct reliance on the defendant's misrepresentation, individual issues then would . . . overwhelm the common ones, making certification under Rule 23(b)(3) inappropriate." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) (editing and quotations omitted). As well, the Fifth Circuit has held numerous times that cases involving fraud claims are not suited for class treatment because each class member's reliance cannot be determined without individual inquiries, thereby failing the predominance test. *See Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 391 (5th Cir. 2007) ("A fraud class action cannot be certified when individual reliance will be an issue.").[39]

[37] *See also In re Kosmos Energy*, 299 F.R.D. at 152 ("affirmative defenses such as investor knowledge are clearly relevant to the predominance analysis"); *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 202 (W.D. Tex. 2004) ("Knowledge is highly individualistic and cannot be determined on a classwide basis."). In particular, Section 33(A)(2) of the TSA provides an affirmative defense when "the buyer knew of the untruth or omission" Tex. Rev. Civ. Stat. art. 581-33A(2).

[38] Plaintiffs' bold assertion that reliance is not an issue completely ignores the fact that they have also pled a cause of action for "participation in a fraudulent scheme." Reliance, of course, is a basic element of any fraud claim, and will therefore be a core issue in this litigation.

[39] *See also Sandwich Chef of Texas*, 319 F.3d at 211 ("Fraud actions that require proof of individual reliance cannot be certified as Fed. R. Civ. P. 23(b)(3) class actions because individual, rather than

Similarly, although the TSA does not have a reliance element, the TSA does provide for primary liability only when a person buys a security that was sold "by means of" an untruth or omission. Tex. Rev. Civ. Stat. art. 581-33A(2). Texas courts have interpreted that language to mean that the untruth or omission must have "induced" the purchase. *See Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied); *see also Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1419 n.24 (5th Cir. 1993).[40] Willis thus is entitled to pursue a defense that the Willis letters did not induce the purchase of the CDs (nor, indeed, could the misstatements made by Stanford FAs) for someone who read a disclosure saying that they could lose all of their principal, as the proposed Class Representatives have themselves admitted.

**3. Plaintiffs' Experiences with Stanford Are Unique and Individualized**

Finally, in addition to any verbal communications and disclosures investors received, determining each putative class member's experience with and knowledge of Stanford and the CDs requires an individual inquiry. For example, the record shows that four of the five proposed Class

---

common, issues will predominate."); *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue."); *see also In re Park Cent. Global Litig.*, 2014 WL 4261950, at *13 ("Because there are individualized issues as to what information different limited partners received, and the extent to which they relied on such information, common issues do not predominate.").

[40] The cases cited by Plaintiffs are therefore inapposite because they each involve representations made by the primary violator and disseminated to a single purchaser or in a public fashion to all investors. *See Granader v. McBee*, 23 F.3d 120, 122 (5th Cir. 1994) (bank and its president making representations to an individual borrower/investor); *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 838 (Tex. 2005) (broker/business owner making misrepresentations to his personal clients and friends); *In re Enron Corp.*, 490 F. Supp. 2d 784, 820 (S.D. Tex. 2007) (misrepresentations made by Enron to the public in its financial reports); *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 97 S.W.3d 779 (Tex. App.—Dallas 2003), *rev'd in part*, 161 S.W.3d 482, 486 (Tex. 2005) (misrepresentation by seller of oil-and-gas interests to auction purchaser made by way of an auction catalog and accompanying well-data-profile sheet); *Duperier v. Texas State Bank*, 28 S.W.3d 740, 748 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr. (oral misrepresentations by a bond salesman to a bank client); *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 646 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.) (misrepresentations in prospectuses circulated in public offering); *Anheuser-Busch Cos., Inc. v. Summit Coffee Co.*, 858 S.W.2d 928, 932 (Tex. App.—Dallas 1993, writ denied) (misrepresentations in sale of company to purchaser).

Representatives knew that Stanford was investing in real estate: Plaintiffs Diaz and Punga learned as much from their FAs. (*See* APP. at 574 [Diaz Tr. 91:7-12, 92:6-9]; APP. at 874 [Green Tr. 94:8-13].) And Plaintiffs Canabal and Gomez, who were themselves real estate developers, personally *toured* Stanford's Antiguan real estate developments, including a cricket stadium and resort hotels, while visiting Stanford's headquarters in Antigua. (*See* APP. at 786, 791-92 [Canabal Tr. 144:2-23, 165:8-166:19]; APP. at 174-77 (travel itinerary).) Similarly, during their visit to Stanford's Antiguan operations (paid for and arranged by Stanford), Plaintiffs Canabal and Gomez met personally with several senior Stanford executives, including the President of SIB, and attended a presentation by the Chief Architect of Stanford Development Company. (*See* APP. at 176-77 (travel itinerary).)

Importantly, this Court allowed the complaint to survive the defendants' motions to dismiss in part because Plaintiffs alleged that Willis "knew 'Stanford's rampant spending on Antiguan real estate development projects was not consistent with what was being disclosed to Stanford International Bank's ("SIBL") clients.'" (APP. at 944 [*Janvey* Order on Mot. to Dismiss at 13].) But, as noted above, discovery has shown that some investors *did* have knowledge about Stanford's real estate activities, defeating any inference that Willis "had specialized knowledge that Class Plaintiffs lacked, including knowledge that the CD proceeds were being misused to invest in Antiguan real estate." (*Id.* at 959 [Order at 28].) Indeed, if, as Plaintiffs alleged and the Court assumed true at the pleading stage, Stanford's real estate investments were a "red flag" suggesting that "the statements in the letters were false," then individual inquiries will be needed to determine how many other investors knew about those investments. And given how varied the experiences of just the five proposed Class Representatives were regarding Stanford's investments, the detailed inquiry of every other class member would almost certainly reveal additional information relevant to investor knowledge of the truth.

**B. Plaintiffs Fail to Demonstrate That a Class Action "Is Superior**

Rule 23(b)(3) also requires Plaintiffs to demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiffs cannot meet this burden. Two recurrent scenarios in which class actions are often found not to meet the "superiority" test is when the individual damage amounts at issue are large and when foreign jurisdictions would not recognize a class action judgment from the United States, nor apply *res judicata* to bar re-litigation of class claims. Both considerations apply with special force here.

**1. The Large Alleged Value of Individual Claims Defeats Superiority**

This case does not involve the typical class action where the persons harmed by the alleged fraud suffered such a small economic impact that it does not make economic sense to bring individual claims—where it would cost more to prosecute claims individually than could be recovered. To the contrary, as demonstrated by indisputable evidence, the vast majority of claims submitted to the Receiver are for large amounts. Furthermore, the evidence indicates that virtually all those to whom Stanford would have even considered giving an insurance letter had at least $1 million invested (or to invest). In such a case, the law counsels against certifying a class because individual litigation is a "feasible" alternative. And, here, we know it is feasible because 225 people have filed suit.

The Supreme Court has articulated, in regard to Rule 23(b)(3)'s superiority requirement, that "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quotations omitted). Indeed, the Supreme Court stated that the "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* The Fifth Circuit, too, has recognized that "the

existence of a negative value suit"—*i.e.*, one that would cost more to prosecute than litigants could hope to recover—is the "most compelling rationale for finding superiority in a class action." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996)

Accordingly, courts not only routinely find that small-value claims weigh in favor of class certification, *see, e.g.*, *Mabary v. Hometown Bank, N.A.*, No. 4:10-cv-2936, 2011 WL 5864325, at *4 (S.D. Tex. Nov. 22, 2011) ("Potential recovery is small, making class adjudication particularly appropriate."), they just as regularly find that large-value claims are inappropriate for class resolution. *See, e.g.*, *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577–78 (7th Cir. 2008) (class action not superior means of litigating Truth in Lending Act rescission claims worth more than $50,000 plus attorney's fees and costs); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420 (5th Cir. 1998) (finding superiority not met where the "relatively substantial value of these claims (for the statutory maximum of $300,000 per plaintiff) and the availability of attorneys' fees eliminate financial barriers that might make individual lawsuits unlikely or infeasible.") *Castano*, 84 F.3d at 748 (same, when there was "reason to believe that individual suits are *feasible*," including because "individual damage claims are high, and punitive damages are available in most states" at issue).[41]

Professor Merritt Fox, distinguished professor of law at Columbia University and holder of a Ph.D. in Economics, explains the history of the class action device in his declaration attached hereto as Exhibit BB (APP. at 705). Like the Fifth Circuit, he notes that the "unique U.S. Rule 23(b)(3) 'opt out' class action for damages was primarily designed by its drafters to address the problem of 'negative value' cases," *i.e.*, those that would be too costly to prosecute given the

---

[41] *See also Ticknor*, 2014 WL 6440397, at *3 (the "district court did not abuse its discretion by relying on these factors to find that superiority was lacking"); *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 305-06 (S.D. Tex. 2000) (denying class certification where "Plaintiffs claim substantial compensatory and punitive damages, as well as recovery of their expenses, including attorneys' fees. These factors 'eliminate financial barriers that might make individual lawsuits unlikely or infeasible.'") (citation omitted).

potential recovery, and, further, that it was the "most adventuresome innovation" in the 1966 amendments to Rule 23. (APP. at 709, 717 [Prof. Fox Decl. at 4, 12] (quoting *Amchem*).) Thus, rather than establishing a new norm, class actions were designed to be "exceptional in nature," and individual suits remain preferred if "practically feasible" because they are more in accord with the "deep-rooted historic tradition that everyone should have his own day in court." (*Id.* at 717-18 [Prof. Fox Decl. at 12-13] (*citing* Newberg on Class Actions).)

**a. The average claim of an investor who received a Willis letter is over $1 million, and, even for those who did not receive a letter, the damages at issue are significant.**

In this case, the investments at issue and, thus, the proposed class members' individual damage claims, are very large. According to Plaintiffs, there are 17,023 claims approved by the Receiver for a total of $4,467,387,745.66, (*see* Pls. Br. at 23 (citing Pls.' Ex. 56 ¶ 13)), which averages to $262,432.16 per claim. Moreover, in the list of approved claims produced by the Receiver, the average claim amount per group is $341,295.74. (*See* APP. at 965; *see also* APP. at 7 [Fusco Aff. ¶ 4].) In addition, in the United States, CDs were sold only to accredited investors. (*See* APP. at 103, 365, 425.) Accordingly, those individuals in Plaintiffs' proposed class of 17,000-plus who truly had thought to blame Willis for their losses (and were not drummed up instead by the lawyers' proposals to sue tangential third parties like Willis),[42] certainly have claimed damages in an amount sufficient to incentivize them to bring their own suits and to attract individual counsel if their claims have any merit.[43]

---

[42] *See* APP. at 501-02 [Troice Tr. 33:12-34:17] (stating that one purpose of attorney's contract was to find third parties to sue and that he did not consider doing so until after attorney's contacted him).

[43] This is not intended to suggest that any members of the proposed class have meritorious claims. Rather, it is meant to highlight the fact that the vast majority of the proposed class *did not receive a Willis letter* and, thus, (i) would never have thought to blame Willis for their losses to begin with and (ii) probably could not attract an attorney to prosecute their claims individually precisely because they never received a Willis letter.

Moreover, according to Plaintiffs' allegations, the damages at issue are much higher as it pertains to Willis and the, at most, 225 other recipients of the Willis letters. Plaintiffs acknowledge in their petition that Stanford's policy was that "the insurance letters could only be sent to potential clients that had a [sic] least *$1 million* to invest in SIB." (TAC ¶ 101 (emphasis added).) Internal Stanford emails confirm as much. (*See* APP. at 20 (January 2004 email stating letters would only be sent to "a client that has at least $1,000,000 deposited with us"); APP. at 11, 13, 26 (same); *see also* APP. at 16 (October 2003 email directing BMB not to send insurance letter directly to inquirer because Stanford has "very strict mandates as to which client gets what information").) Thus, the typical investor who actually received an insurance letter on Willis letterhead certainly is not one whose damages are so small that there would be no incentive to bring an individual suit or to join with others who are already suing Willis.[44] Simply put, such investors do not need the likes of these five proposed Class Representatives to sue on their behalf. They can do it on their own if they are truly motivated to do so, and 225 have done so.

The proposed Class Representatives in this case prove the point. All but one has sought the recovery of over $1 million through the Receiver, ranging from $2,547,365 to $8,169,107. (*See* APP. at 467 (Troice Interrog. Resps.); APP. at 443 (Punga Interrog. Resps.).) The propose Class Representative who claims to have received a Willis letter and falls below that threshold—Ms. Diaz at $441,658 (*see* APP. at 491 (Diaz Interrog. Resps.))—is still not in the same ballpark as having a claim that could be characterized as a "negative value" suit. And Ms. Diaz was clear that she would continue to prosecute her individual claim against Defendants in the event that class certification is denied. (APP. at 590 [Diaz Tr. 155:19-156:3].)

---

[44] *See* APP. at 878 [Green Tr. 110:4-25] (testifying he knew an individual who invested $9,000 did not receive a letter).

**b. The vast majority (or all) of those who potentially received a Willis letter have already brought individual suits.**

In addition, the evidence demonstrates that, in practice, those persons who received a Willis letter have a very strong incentive to prosecute their own claims, to attract their own counsel, and in fact seek to control their own individual claims. As acknowledged by Plaintiffs, there are already at least nine other litigations involving individual claimants bringing suit against Willis who claim to have received an insurance letter. (*See* Pls.' Br. at 36-37.)[45] As expected, all of those suits involve significant damage claims. For example, in the *Rishmague* suit, two plaintiffs allege $9.2 million in damages; in *Zacarias*, ten plaintiffs allege over $12.5 million in damages; and in *Rupert*, 94 plaintiffs allege $79 million in damages. Even the proposed Class Representatives in this case all unambiguously acknowledge they would continue to pursue their individual claims against Willis regardless of whether a class is certified here. (*See* APP. at 542 [Troice Tr. 195:13-17]; APP. at 590 [Diaz Tr. 155:19-156:3]; APP. at 798 [Canabal Tr. 190:3-11]; APP. at 845-46 [Gomez Tr. 149:15-150:8]; APP. at 880 [Green Tr. 119:2-6].)

Moreover, as Prof. Fox questions in his expert report: who among those that received a Willis insurance letter (other than the named Plaintiffs) would actually be left in this class if it is certified? (*See generally* APP. at 710 [Prof. Fox Decl. at 5].) There are approximately 225 Stanford investors already prosecuting individual claims against Willis, through the nine other lawsuits that have been filed around the country, on the basis that they received a letter. As far as the

[45] *Casanova, et al. v. Willis of Colorado, Inc., et al.*, No. 3:10-cv-01862 (N.D. Tex.) (7 plaintiffs); *Barbar, et al. v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05666CA27 (Miami-Dade County, FL) (34 plaintiffs); *Nuila de Gadala-Maria, et al. v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05669CA30 (Miami-Dade County, FL) (63 plaintiffs); *MacArthur v. Winter, et al.*, No. 2013-07840 (Harris County, TX) (2 plaintiffs); *Ranni v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05673CA06 (Miami-Dade County, FL) (2 plaintiffs); *Rishmague, et al. v. Winter, et al.*, No. 2011-CI-02585 (Bexar County, TX) (2 plaintiffs); *Rupert, et al. v. Winter, et al.*, No. 2009-CI-15137 (Bexar County, TX) (94 plaintiffs); *Tisminesky, et al. v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05676CA09 (Miami-Dade County, FL) (11 plaintiffs); *Zacarias, et al. v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05678CA11 (Miami-Dade County, FL) (10 plaintiffs).

evidence is concerned, this encompasses the vast majority, if not all, of the investors who received or ever saw one of the letters created by Willis. That statistical overlap is compelling evidence that all of the investors who received a Willis letter and have some basis to want to sue Willis—keeping in mind that virtually all of those investors have over $1 million at stake—have already brought an individual suit in the traditional manner. Accordingly, there is no reason to think, and Plaintiffs provide absolutely no evidence to support the conclusory assertion, that a class action is superior or even helpful in this case.

To the contrary, as analyzed and summarized by Prof. Fox, "this is a case where individual actions or joinder would clearly be superior to the action proceeding on a class basis." (APP. at 711 [Prof. Fox Decl. at 6].) Prof. Fox concludes that, in his expert opinion, the evidence in this case not only shows that Plaintiffs have not met their burden to prove by a preponderance of the evidence that a class action is "superior" in the circumstances of this case, it actually proves the opposite—not only are individual lawsuits "practically feasible," they are the present reality. Accordingly, this Court must deny Plaintiffs' Motion to certify a class because they have failed to prove the "superiority" element of Rule 23(b)(3).

**2. A Class Action Is Not Superior Given the Significant Risk That Foreign Jurisdictions Would Not Recognize a Judgment**

A class action is not a superior means of adjudicating this dispute because a large number of the proposed class members are citizens of countries that will likely not give preclusive effect to a U.S. class action judgment, exposing Willis to the possibility of having to re-litigate these issues in foreign courts.[46] In the superiority context, *res judicata* "becomes an issue when . . . the members of the prospective class are foreigners and conceivably could file separate suits against the

[46] The proposed class action consists of 8,405 members from Venezuela, 3,287 from Mexico, 860 from Colombia, 443 from Peru, 150 from Panama, 160 from El Salvador and 393 from Ecuador. (Pls.' Br. at 35.)

defendants in the courts of their home countries." *Ansari v. New York Univ.*, 179 F.R.D. 112, 116 (S.D.N.Y. 1998). Thus, as here, the question arises "whether the foreign courts will recognize the preclusive effect of an 'opt-out' class action of the sort contemplated by Rule 23(b)(3)." *Id.* If the foreign court "would refuse to recognize the preclusive effect of such an action, this fact, although not dispositive, counsels against a finding that the class action is superior to other forms of litigation." *Id.*; (*see also* APP. at 708 [Prof. Fox Decl. at 3] (noting that "the U.S. legal system has a deep aversion to defendants facing double jeopardy, which is exactly what would happen if a judgment in favor of the defendant (or one in favor of the plaintiff but for an amount smaller than was sought) would not be recognized in a country should a class member choose to relitigate there").) Accordingly, courts have found that if a meaningful number of the proposed class members are citizens of foreign countries, class treatment will not be a superior method of adjudication, at least as to the foreign claimants, unless the *plaintiff* can show that "it is more likely than not" that the courts of the relevant foreign jurisdiction will give full preclusive effect to any judgment entered in the class action.[47]

Plaintiffs have again failed to carry that burden: their expert declarations do not establish that foreign court recognition is more likely than not in this action or any class action for that matter. (*See* APP. at 709 [Prof. Fox Decl. at 4] ("Tellingly, despite the centrality of the preclusion issue to the Rule 23(b)(3) superiority inquiry in any proposed class that includes a significant number of persons from abroad, neither of the plaintiffs' experts, Adjunct Professor

[47] *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 282 (S.D.N.Y. 2008) (holding that "Plaintiffs carry the burden of demonstrating that foreign court recognition is more likely than not") (internal citation omitted); *see also In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007) ("Where plaintiffs are unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority").

Alejandro Garro and Professor Edward Sherman, chose to address the matter in their opinions.").)[48] The question is not whether a foreign court will enforce any judgment of a United States court, but whether a foreign court will give preclusive effect to an "'opt-out' class action of the sort contemplated by Rule 23(b)(3)." *Ansari*, 179 F.R.D. at 116; *see also Buettgen v. Harless*, 263 F.R.D. 378, 382 (N.D. Tex. 2009)(finding that proposed lead plaintiff was not the most adequate plaintiff because of the risk that Swiss citizens would not be bound by a class action judgment "unless they affirmatively opted out of the plaintiff class"). Indeed, Plaintiffs' own expert, Prof. Sherman, agrees in a rebuttal declaration that "a number of American cases have [] held" that class actions are not superior where, as here, foreign courts would not enforce U.S. class action judgments, but contends that there is "less certainty" on this issue "as time goes on" and that whether an American judgment will have preclusive effect is highly "uncertain." (Prof. Sherman Resp. Decl. at 8-9.) Plaintiffs cannot hide behind this supposed "uncertainty"; on class certification, they bear the burden to prove, with evidence, that the Rule 23 requirements are met. Uncertainty, if anything, militates against class certification.

Plaintiffs' comparative law expert, Professor Alejandro Garro, actually demonstrates that Plaintiffs have not carried their burden here.[49] He agrees that the fact this case is being pursued

[48] *See also* APP. at 655-56 [Prof. Gomez Decl. ¶¶ 28-31] (noting that, while Professor Garro acknowledges that, in addition to mere hospitality, "certain conditions must be met for foreign judgments to be recognized and enforced," his report does not address whether these conditions are likely to be met when the foreign judgment resolves a class action litigation).

[49] In discovery, Plaintiffs also served a declaration created over four years ago by Professor Michael Gordon that was filed in a completely different case in New York, and claimed that Professor Gordon was their "non-retained expert." Counsel for Willis contacted Professor Gordon to inquire about his designation and he stated unambiguously that (i) Plaintiffs never asked his permission, (ii) he knows nothing about the facts of this case, (iii) he is retired and does not consent to be an expert witness in this case, and (iv) he does not approve the use of conclusions he reached in a different case being offered as his opinions in this case, which he knows nothing about. (APP. at 996-97.) Plaintiffs' attempt to designate a non-fact witness such as Professor Gordon as their "non-retained" expert is improper. *See, e.g.*, *Young v. United States*, 181 F.R.D. 344, 346 (W.D. Tex. 1997) (striking designation of treating physician as non-retained expert and stating: "In the absence of a statute to

as a class action is relevant to the question of whether a judgment of a United States court would be enforced in Latin America. (*See* APP. at 620 [Garro Tr. 80:20-23].) But, tellingly, Plaintiffs' counsel did not ask Prof. Garro to address this question in his primary report. (*Id.* at 605, 620 [Garro Tr. 18:3-8, 19:3-12, 78:8-20, 79:4-11].) Rather, when Prof. Garro initially raised this issue with Plaintiffs' counsel, he was specifically told to focus only on enforcement of foreign judgments generally and not enforcement of "opt-out" class action judgments. (*Id.* at 620, 637-38 [Garro Tr. 81:2-9; 148: 22-150-10].) It is only in a "second declaration," after Prof. Garro was deposed, that he considers the class action issue finds "disagreement" with the defendants' experts, asserting that he believes there is a "strong chance" an opt-out class action judgment would be enforced in Latin America because the class members submitted claims through the U.S.-based Receiver (and the form on the website apparently had a jurisdiction clause in small print). (*See* Prof. Garro Second Decl. ¶¶ 21-22.)[50] Yet, Prof. Garro appropriately had to note that he cannot be sure one way or the other "[d]ue to the absence of any judicial decision coming even close to considering the preclusive effect of U.S. class action judgments." (*Id.* ¶ 20.) Thus, Plaintiffs' Motion is facially deficient in this respect because Plaintiffs' own expert cannot provide a factual basis to conclude it is more likely than not that a class action judgment of the sort contemplated by Rule 23(b)(3) would be enforced in Latin America.

In the specific cases of Venezuela and Mexico, class action judgments will almost certainly not be recognized. (APP. at 651 [Prof. Gomez Decl. ¶ 13].) According to both Venezuelan

---

the contrary, a professional witness may not generally be compelled to testify as an expert at the request of a private litigant, as such testimony is a matter of contract or bargain."). Professor Gordon's four-year-old declaration—addressing a different case and a different factual scenario—should be disregarded.

[50] Prof. Garro also attempts to predict the future, based on some unspecified "facts furnished to me by Counsel for the Plaintiffs," that it is "highly unlikely . . . that the Latin American class members would ever re litigate [sic] these cases in their home countries." (Prof. Garro Second Decl. ¶ 10.) As with everything else in this case impacting the decisions made by individual investors, no one can know what any absent class member who turns out to be dissatisfied with the result in this case will attempt do in their home forum.

and Mexican law, final judgments have *res judicata* effect *only with respect to the named parties*—that is, those who were formally incorporated as full participants in the litigation and, thus, given an opportunity to present their case and have their day in court. (*Id.* [¶ 15].) As a matter of both Venezuelan and Mexican law, a judgment cannot have any effect on those who were not properly served, including any potential absent class members that have been merely given notice of the litigation. (APP. at 651-52 [¶ 15].)

Furthermore, the systematic dysfunction of the Mexican and Venezuelan judiciary systems, both in terms of undue delays, and manipulation and corruption by political forces make it virtually a certainty that a class action judgment will not be given preclusive effect in these countries.[51] As Prof. Gomez notes, numerous reports authored by reputable organizations have described in great detail the dire state of Venezuela's legal institutions, the rampant levels of corruption that affect all levels of government, and the political manipulation of the judiciary. (APP. at 665-72 [Prof. Gomez Decl. ¶¶ 53-69].) This latter problem has become evident through the constant "interference and public pressure that judicial officers have been subject to on the part of members of other branches of the State—including the President of the Republic." (APP. at 666 [Prof. Gomez Decl. ¶ 55] (citation omitted).) Indeed, the President of the United States recently issued an executive order declaring Venezuela in particular to be "an unusual and extraordinary threat to the national security and foreign policy of the United States" due to its rights abuses and corruption.[52]

---

[51] Prof. Garro's declaration does not even address this concern, despite his testimony that corruption is a significant issue in the judicial systems of any Latin American countries, including every country discussed in his declaration. (APP. at 628-29 [Garro Tr. 112:13-114:15].) In the specific case of Venezuela, for example, Prof. Garro stated in his deposition that it is "very well known" that "judicial independence has disappeared." (APP. at 629 [Garro Tr. 116:8-117:4].)

[52] *See* Betsy Klein, "White House sanctions Venezuela for rights abuses, corruption," CNN, Mar. 9, 2015, http://www.cnn.com/2015/03/09/politics/venezuela-sanctions-white-house/ (last visited Mar. 18, 2015).

The legal and practical impediments to enforcing a United States class action judgment in Mexico and Venezuela are such that, despite Prof. Gomez's exhaustive research, he was not able to find *a single* Venezuelan or Mexican case in which a United States class action judgment was enforced to bar re-litigation of the same claims by Venezuelan citizens in Venezuela or by Mexican citizens in Mexico. (APP. at 657, 673 [Prof. Gomez Decl. ¶¶ 32, 70].) Neither has Plaintiffs' expert, Prof. Garro. (APP. at 633 [Garro Tr. 132:2-12] (admitting he did not find any cases enforcing class action judgments in Venezuela); *see also* Prof. Gomez. Second Decl. ¶ 20.) Courts "evaluate the risk of nonrecognition along a continuum." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007). The "closer the likelihood of non-recognition is to being a 'near certainty,' the more appropriate it is for the Court to deny certification of foreign claimants." *Id.* It is hard to imagine two jurisdictions closer to the "near certainty" end of the spectrum than Venezuela and Mexico, where the vast majority of the putative class members reside, and where recognition of a United States class action judgment is unprecedented. Accordingly, the Court, at the very least, should deny certification of Venezuelan and Mexican claimants.

## CONCLUSION AND REQUESTED RELIEF

As shown above, Plaintiffs cannot and do not come even close to satisfying their burden of establishing the prerequisites for class certification under Rule 23. Plaintiffs' Motion should be denied. Willis further requests any other relief to which it may be justly entitled.

Dated: March 20, 2015

Respectfully submitted,

s/ T. Ray Guy
T. Ray Guy
Texas Bar No. 08648500
ray.guy@weil.com
Sandra Y. Fusco
Texas Bar No. 24069744
sandra.fusco@weil.com

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201-6950
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

OF COUNSEL:
Jonathan D. Polkes
jonathan.polkes@weil.com
Joshua S. Amsel
joshua.amsel@weil.com

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**ATTORNEYS FOR DEFENDANTS WILLIS
OF COLORADO, INC. AND WILLIS
LIMITED**

s/ Mark D. Manela
Mark D. Manela
State Bar No. 12894500
mmanela@manelalawfirm.com

Manela Law Firm
440 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 240-4843
Facsimile: (713) 228-6138

**ATTORNEY FOR DEFENDANT
AMY S. BARANOUCKY**

**CERTIFICATE OF SERVICE**

On April 20, 2015, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that, on March 20, 2015, I served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

s/ Sandra Y. Fusco
Sandra Y. Fusco

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SAMUEL TROICE, *et al.*, individually and on behalf of a class of all others similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:09-CV-01274-N |
| | § | |
| WILLIS OF COLORADO INC., *et al.* | § | *In re: Stanford Entities Securities Litigation MDL 2099* |
| | § | |
| Defendants. | § | |

---

**DEFENDANT BOWEN, MICLETTE & BRITT, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

---

Bradley W. Foster
State Bar No. 07283200
Matthew G. Nielsen
State Bar No. 24032792
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone: (214) 659-4400
Facsimile: (214) 659-4401

David P. Whittlesey
State Bar No. 00791920
Andrews Kurth LLP
111 Congress Ave., # 1700
Austin, Texas 78701
Telephone: (512) 320-9321
Facsimile: (512) 320-9200

Nicholas J. Lanza
State Bar No. 11941225
McCormick, Lanza & McNeel, LLP
4950 Bissonnet Street
Bellaire, Texas 77401
Telephone: (713) 523-0400
Facsimile: (713) 668-6417

**ATTORNEYS FOR DEFENDANT BOWEN, MICLETTE & BRITT, INC.**

GT EXHIBIT 021

Case 3:09-cv-04641-N-BG Document 18-26 Filed 04/28/15 Page 2 of 71 PageID 1505

## TABLE OF CONTENTS

Page(s)

**I.** INTRODUCTION ....................1

**II.** RELEVANT FACTUAL BACKGROUND ....................3

**III.** CLASS CERTIFICATION IS IMPROPER BECAUSE PLAINTIFFS CANNOT SATISFY THE RULE 23 REQUIREMENTS ....................7

**A.** Plaintiffs Fail to Establish Predominance under Rule 23(b). ....................8

**1.** Plaintiffs cannot establish predominance through allegations of a "uniform fraudulent scheme" ....................9

**2.** The elements of a TSA aiding and abetting claim demonstrate that common issues of law or fact do not predominate over individual issues ....................11

**a.** Individual issues predominate over common issues in assessing whether Plaintiffs can establish a primary violation of the TSA ....................13

i. Individualized issues predominate in evaluating the essential elements of the TSA primary violation .................... 14

ii. A primary violation cannot be established through allegations of a uniform scheme ....................17

iii. Assuming, *arguendo*, evidence of a uniform scheme could be used to establish a primary violation, certification is improper because Plaintiffs have no evidence of a uniform scheme ....................20

**b.** Establishing a "substantial causal connection" in this case would require individualized determinations on an investor-by-investor basis ....................30

**3.** Plaintiffs are not pursuing and cannot pursue a claim for "participation in a fraudulent scheme," nor is this a recognized cause of action ....................34

**B.** Plaintiffs' Class Definitions Fail to Establish Superiority Under Rule 23(b) ....................35

**1.** Plaintiffs Class Definitions are Incapable of Creating a Class that Satisfies the Requirements of Rule 23 ....................35

**a.** Plaintiffs' proposed classes necessitate substantial individual inquiry ....................36

**b.** The Texas Securities Act's statute of repose precludes class certification ....................38

**2.** Superiority Cannot be Established Since Foreign Jurisdictions Will Not Recognize a Class Action ....................44

**C.** Plaintiffs Fail to Satisfy the Requirements of Rule 23(a) ....................50

**1.** Plaintiffs cannot satisfy the numerosity requirement ....................51

**2.** Plaintiffs fail to satisfy the commonality requirement ....................52

**3.** Class representatives are not typical of the class as a whole ....................54

**4.** Class representatives do not adequately protect class interests ....................56

**a.** Proposed class representatives offer no proof of knowledge of the case ....................56

**b.** Proposed class representatives are subject to different defenses than the class as a whole ....................60

**c.** Proposed class representatives are inadequate representatives of investors who received U.S. disclosures ....................60

**IV.** CONCLUSION ....................61

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Affiliated Computer Servs. Derivative Litig.*,
540 F.Supp.2d 695 (N.D. Tex. 2007) ....................................................................................40

*Ahmad v. Old Republic Nat. Title Ins. Co.*,
690 F.3d 698 (5th Cir. 2012) ..............................................................................................8

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ..............................................................................................8

*In re Alston SA Sec. Litig.*
253 F.R.D. 266 (S.D.N.Y 2008) ........................................................................................45

*Amchem Prods. Inc. v. Windsor*,
521 U.S. 591 (1997).......................................................................................................9, 56

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*,
133 S.Ct. 1184 (2013).........................................................................................................18

*Anheuser-Busch Companies, Inc. v. Summit Coffee Co.*
934 S.W.2d 705 (Tex. App.–Dallas 1996, writ dism'd) .....................................................19

*Anwar v. Fairfield Greenwich Ltd.*,
289 F.R.D. 105 (S.D.N.Y. 2013), *vacated*, 570 Fed. Appx. 37 (2d. Cir. 2014), *remanded to* No. 09 Civ. 0118(VM), 2015 WL 935454 (S.D.N.Y. March 3, 2015) ..........................................................................................................46, 47, 48, 49

*Askanase v. Fatjo*,
130 F.3d 657 (5th Cir. 1997) ........................................................................................50, 51

*Basic v. Levinson*,
485 U.S. 224 (1988)...........................................................................................................18

*Berger v. Compaq Computer Corp.*,
257 F.3d 475 (5th Cir. 2001) ........................................................................................56, 57

*Bersch v. Drexel Firestone, Inc.*,
519 F.2d 974 (2d Cir. 1975)................................................................................................44

*Billitteri v. Secs. Am., Inc.*,
No. 3:09-cv-01568-F, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011)..........................13, 26, 27

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
754 F.2d 57 (2d Cir. 1985)..................................................................................................30

*In re BP P.L.C. Securities Litig.*,
No. 4:10-md-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ..........................................53

*Brown v. E. F. Hutton Group, Inc.*,
735 F. Supp. 1196 (S.D.N.Y. 1990), *aff'd*, 991 F.2d 1020 (2d Cir. 1993) .............................17

*Buettgen v. Harless*,
263 F.R.D. 378 (N.D. Tex. 2009) ..........................................................................44, 46

*Calpetco 1981 v. Marshall Exploration, Inc.*,
989 F.2d 1408 (5th Cir.1993) ..........................................................................14

*Camp v. Dema*,
948 F.2d 455 (8th Cir. 1991) ..........................................................................30

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3rd Cir. 2013) ..........................................................................60

*Caviness v. Derand Resources Corp.*,
983 F.2d 1295 (4th Cir. 1993) ..........................................................................41

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013)..........................................................................7, 8, 9, 52

*Costano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ..........................................................................7

*Crescendo Investments, Inc. v. Brice*,
61 S.W.3d 465 (Tex. App.–San Antonio 2001, pet. denied) ............................................30, 31

*CTS Corp. v. Waldburger*,
134 S. Ct. 2175 (2014)..........................................................................39

*Davidson v. Wilson*,
973 F.2d 1391 (8th Cir. 1992) ..........................................................................17

*DeBremaecker v. Short*,
433 F.2d 733 (5th Cir. 1970) ..........................................................................35

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
135 F.3d 837 (2d Cir. 1998)..........................................................................19

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) ..........................................................................30

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
310 F.Supp.2d 819 (S.D. Tex. 2004) ..........................................................................40, 41

*Fed. Deposit Ins. Corp. v. Lenk*,
361 S.W.3d 602 (Tex. 2012) ....................39, 41

*Feder v. Elec. Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) ....................56

*Fernea v. Merril Lynch Pierce Fenner & Smith, Inc.*,
2011 WL 2769838 ....................32

*First Fed. Sav. and Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*,
629 F. Supp. 427 (S.D.N.Y. 1986) ....................32

*Gen. Telephone Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ....................8

*Goldstein v. Morenson*,
113 S.W.3d 769 (Tex.App.–Austin 2003, no pet.) ....................33

*Granader v. McBee*,
23 F. 3d 120 (5th Cir. 1994) ....................15

*Green v. CBS Broad., Inc.*,
3:98-CV-2740-T, 2000 WL 33243748 (N.D. Tex. Dec. 19, 2000) ....................50

*Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*,
No. 3:02-CV-1245, 2003 WL 21339279 (N.D. Tex. June 3, 2003) ....................1, 10, 27, 28

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S.Ct. 2398 (2014) ....................11, 15

*In re Heartland*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ....................8

*Highland Capital Mgmt., L.P. v. Ryder Scott Co.*,
402 S.W.3d 719 (Tex. App.–Houston [1st Dist.] 2012, no pet.) ....................15

*Holmes v. Service Corp.*,
No. H-0-4841, 2014 WL 3046971 (S.D. Tex. July 3, 2014) ....................51, 52

*Holubec v. Brandenberger*,
111 S.W.3d 32 (Tex. 2003) ....................39, 41

*James v. City of Dallas*,
254 F.3d 551 (5th Cir. 2001) ....................55

*Janvey, et al. v. Greenberg Traurig, LLP, et al.*,
No. 3:12-cv-04641-N-BG (N.D. Tex.) ....................39, 41

Case 3:09-cv-00724-N-BG Document 1242-6 Filed 02/20/15 Page 7 of 21 PageID 43509

*Janvey, et al. v. Willis of Colorado Inc., et al*,
No. 3:13-cv-3980 (N.D. Tex.) ....................20, 37, 38

*Krim v. pcOrder.com*,
210 F.R.D. 581 (W.D. Tex. 2002) ....................57

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
501 U.S. 350 (1991)....................40, 41

*Langbecker v. Electric Data Sys*.,
476 F.3d 299 (5th Cir. 2007) ....................12, 60

*Lightbourn v. County of El Paso*,
118 F.3d 421 (5th Cir. 1997) ....................54

*Longden v. Sunderman*,
123 F.R.D. 547 (N.D. Tex. 1998) .................... *passim*

*Madison v. Chalmette Refining, L.L.C.*,
637 F.3d 551 (5th Cir. 2011) ....................8, 9

*Maldonado v. Oschner Clinic Found.*,
493 F.3d 521 (5th Cir. 2007) ....................8, 12

*Martin v. Dahlberg, Inc.*,
156 F.R.D. 207 (N.D. Cal. 1994)....................26, 29

*In re Merrill Lynch Auction Rate Secs. Litig.*,
851 F.Supp.2d 512 (S.D.N.Y. 2012)....................17

*Mims v. Stewart Title Guaranty Co.*,
590 F.3d 298 (5th Cir. 2009) ....................3, 28

*In re Monumental Life Ins. Co.*,
365 F.3d 408 (5th Cir. 2004) ....................36

*Myers v. Finkle*,
950 F.2d 165 (4th Cir. 1991) ....................7

*Nathenson v. Zonagen, Inc.*,
267 F.3d 400 (5th Cir. 2001) ....................17

*Navarro v. Grant Thornton, LLP*,
316 S.W.3d 715 (Tex.App.–Houston [14th Dist.] 2010, no pet.) ....................34

*Nicholas v. Crocker*,
687 S.W.2d 365 (Tex.App.–Tyler 1984, writ re'f n.r.e.)....................14

*O'Sullivan v. Countrywide Home Loans, Inc.*,
319 F.3d 732 (5th Cir. 2003) ....................................................................................9, 12

*Ogden v. AmeriCredit Corp.*,
225 F.R.D. 529 (N.D. Tex. 2005) ...............................................................................57

*In re Park Cent. Global Litig.*,
No. 3:09-cv-765-M, 2014 WL 4261950 (N.D. Tex. Aug. 25, 2014) .......................................9

*Pederson v. La. State Univ.*,
213 F. 3d 858 (5th Cir. 2000) ...........................................................................38, 51, 52

*Peoples v. Am. Fidelity Life Ins. Co.*,
176 F.R.D. 637 (N.D. Fla. 1998) ...............................................................................26

*Phillips v. LCI Int'l*,
190 F.3d 609 (4th Cir. 1999) .....................................................................................7

*Pitman v. Lightfoot*,
937 S.W.2d 496 (Tex. App.–San Antonio 1996, writ denied)..........................................14

*Porter v. Shearson Lehman Bros., Inc.*,
802 F. Supp. 41 (S.D. Tex. 1992) ...........................................................................17, 21

*In re Prudential Ins., Co. of Am. Sales Practices Litig.*,
962 F. Supp. 450 (D. N.J. 1997) ................................................................................6

*Regents of University of California v. Credit Suisse First Boston (USA), Inc.*,
482 F.3d 372 (5th Cir. 2007) .....................................................................................19

*Robinson v. Texas Auto. Dealers*,
387 F.3d 416 (5th Cir. 2004) .....................................................................................12

*Schlumberger Tech v. Swanson*,
959 S.W.2d 171 (Tex. 1997)...................................................................................55, 61

*SEC v. Ogle*,
No. 99-C-609, 2000 WL 45260 (N.D. Ill. Jan. 11, 2000)................................................41

*SEC v. SIPC*,
D.C. Cir. Case No. 12-5286 .......................................................................................23

*Simon v. Merrill Lynch, Pierce, Fenner & Smith*,
482 F.2d 880 (5th Cir. 1973) ...........................................................................1, 10, 27, 35

*Estate of Sowell v. United States*,
198 F.3d 169 (5th Cir. 1999) .....................................................................................50

Case 3:12-cv-04641-N-BG Document 180-26 Filed 04/20/16 Page 28 of 72 PageID 7511

*Steering Comm. v. Exxon Mobil*,
461 F.3d 598 (5th Cir. 2006) ....................................................................................9

*Sterling Trust Co. v. Adderley*,
168 S.W.3d 835, 840 (Tex. 2005)....................................................................30, 33, 34

*Town North Bank v. Shay Fin. Servs., Inc.*,
No. 3:11-CV-3125-L, 2014 WL 4851558 (N.D. Tex. Sept. 30, 2014)...................................40

*Turner v. First Wis. Mortgage Trus*t,
454 F. Supp. 899 (E.D. Wis. 1978)...........................................................................21

*In re U.S. Fin. Sec. Litig.*,
69 F.R.D. 24 (S.D. Cal. 1975) .......................................................................19, 26

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) .....................................................................8, 27, 35

*United States v. Stanford*,
Case No. 12-20411..................................................................................................33

*In re Vivendi Universal, S.A. Sec. Litig.*,
242 F.R.D 76 (S.D.N.Y. 2007) ...................................................................................45

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)........................................................................................ *passim*

*West v. Prudential Secs., Inc.*,
282 F.3d 935 (7th Cir. 2002) .....................................................................................18

*In re Westcap Enters.*,
230 F.3d 717 (5th Cir. 2000) ...............................................................................14, 30

*Willis v. Marshall*,
401 S.W.3d 689 (Tex.App.–El Paso, 2013, no pet.)...................................................34

*Wolfe v. Bellos*,
No. 3:11-CV-02015-L, 2012 WL 652090 (N.D. Tex. Feb. 28, 2012)....................................40

*Woodard, et al. v. Andrus, et al.*,
No. 03-2098 (W.D. La. Jan. 20, 2009) .........................................................................51

*Woodard v. Andrus*,
CIV. A. 03-2098, 2009 WL 140527 (W.D. La. Jan. 20, 2009) ...........................................51

*Young v. United States*,
181 F.R.D. 344 (W.D. Tex. 1997) ...............................................................................49

**Statutes**

17 C.F.R. § 230.506(b)(2)(i) .......................................................................................20

FED. R. CIV. P. 12(b)(6) .......................................................................................36

FED. R. CIV. P. 23 ....................................................................................... *passim*

FED. R. EVID. 403 .......................................................................................50

FED. R. EVID. 702 .......................................................................................50, 51

TEX. REV. CIV. STAT ANN. Art. 33(A)(2) (Vernon 2008) ....................................... *passim*

TEX. REV. CIV. STAT ANN. Art. 581-33(F)(2) (Vernon Supp. 2010) ....................................... *passim*

TEX. REV. CIV. STAT ANN. Art. 581-33H (Vernon 2008) .......................................39

**Other Authorities**

1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS, 229-30 (5th ed. 2011) ......................53

5E Disclosure & Remedies Under the Sec. Laws § 21:64 (March 2015) ......................................19

## I. INTRODUCTION

Plaintiffs' motion is deeply flawed. Plaintiffs allege that BMB aided Stanford's fraud based on a series of insurance coverage letters that it issued from 1996-2004. They claim that Stanford utilized BMB's letters, and similar letters from Willis, in connection with a marketing scheme designed to convince investors that their CD investments were insured. They further claim that this "uniform" marketing scheme satisfies the requirements of Rule 23, and they ask the Court to certify a worldwide class of approximately 17,000 investors.

In reality, however, the putative class is overrun with individual issues. There was no "uniform" scheme, and certainly not one involving BMB. Plaintiffs' claims are fundamentally based on ***oral*** misrepresentations by their Stanford financial advisors. Samuel Troice, for example, testified that his "complete understanding" of the insurance allegedly protecting his CDs came from his Stanford broker in Mexico, David Nanes:

> Q. Is it fair to say that your complete understanding for the insurance that was applicable or that you believed to be applicable to your Stanford investments was through Mr. Nanes?
> A. Yes.

APP. at 1139 [Troice Tr. 161:9-14].

Indeed, the Spanish-speaking plaintiffs' entire understanding of Stanford's insurance coverage, including the supposed meaning of BMB's English-language coverage letters, came from oral representations made during private meetings with their individual financial advisors. APP. at 362 [Diaz Tr. 137:5-19], APP. at 862-63 [Green Tr. 106:22-107:12].

Such claims are ill-suited for class treatment. "[C]ourts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action." *Simon v. Merrill Lynch, Pierce, Fenner & Smith*, 482 F.2d 880, 882 (5th Cir. 1973); *see also Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*, No. 3:02-CV-1245, 2003 WL 21339279 (N.D. Tex. June 3, 2003) (denying certification because "individual fact issues likely

will predominate" where "the record reflects that at least some potential class members received varying representations from their brokers above and beyond what is contained in the [written materials]").

Plaintiffs' claims are based on the alleged oral misrepresentations of just ***three*** Stanford financial advisors in Mexico and Venezuela. And yet even in this limited sample set, there are remarkable differences in the plaintiffs' testimony regarding what they were told, what written materials they received, and whether and in what context they were shown or provided with copies of BMB or Willis letters. *See* Section III.A, *infra*. And despite this striking lack of uniformity among 5 investors who spoke to 3 FAs, the plaintiffs nevertheless seek to extrapolate their claims to a worldwide class of 17,000 investors – all of whom had varying discussions with Stanford employees and received varying written materials.

Moreover, plaintiffs have no idea how many investors received BMB letters. *See* APP. at 964-67 [Janvey Tr. 80:19-82:5]. From the record, it is apparent that most investors did *not* receive BMB letters. Plaintiffs concede that BMB did not issue any letters after mid-2004. *See* Third Am. Compl. ("TAC") ¶ 78. And they also concede that BMB's letters "**wouldn't be worth anything**" after their August 15, 2004 expiration date. APP. at 1198 [Troice Tr. 220:8-12]. Even prior to mid-2004, insurance letters were not uniformly distributed to investors, even in Mexico and Venezuela. Mr. Canabal specifically testified that "**they didn't give that letter to everybody**." APP. at 162-63 [Canabal Tr. 162:12 – 163:2].

The proposed class contains more than 17,000 investors, all over the world, who spoke with hundreds of different Stanford financial advisors. Plaintiffs have no idea what these investors were told in their oral conversations with Stanford, or what written marketing materials or disclosures they may have received, or whether they received a BMB or Willis insurance letter, or in what context. As a matter of law, the factual record in this case does not support a

class certification decision. The law is clear in the Fifth Circuit -- when putative class members were provided with different information, from different individuals, and at different times, the class cannot be certified. *See Mims v. Stewart Title Guaranty Co.*, 590 F.3d 298, 306 (5th Cir. 2009). Plaintiffs' motion should be denied.

## II. RELEVANT FACTUAL BACKGROUND

This is a putative class action brought by Mexican and Venezuelan citizens who invested in certificates of deposit ("CDs") offered by Stanford International Bank ("SIB"). The principal focus of the complaint is on Stanford itself, namely Stanford's FAs. TAC ¶¶ 21-49; 106-35. Plaintiffs do not allege facts showing that BMB, a Houston-based insurance brokerage firm that procured insurance coverage for SIB between 1996 and 2004, had actual knowledge of the Stanford Ponzi scheme. Nor could they. According to the SEC's Complaint, Allen Stanford and his inner circle took extreme precautions to prevent the spread of information about SIB's true financial condition.[1] The idea that they would have handed over this information to an insurance broker is preposterous.

Nevertheless, Plaintiffs allege that BMB aided Stanford's fraud -- and should be held liable for billions of dollars in investor losses -- because it procured insurance policies for Stanford, and prepared coverage letters describing these insurance policies, many years before Stanford was closed by the SEC. TAC, at Ex. 4. For multiple reasons, these allegations are meritless.

As a preliminary matter, the Stanford fraud ***was not about insurance***. According to the Plaintiffs, Stanford lured investors in by using an expertly crafted insurance sales pitch designed

[1] According to the SEC, the steps that were taken to hide SIB's financial information included transferring all SIB-related financial information on thumb drives so that it did not appear on servers in the U.S., keeping files on a portable hard drive, flying paper files to Antigua for burning, and protecting spreadsheets with passwords distributed via text message to avoid detection on email servers. *See* SEC Second Amended Complaint (Doc # 490-2 in Case No. 3:09-cv-00298), at ¶ 55.

to make investors believe SIB carried multiple insurance policies designed to ensure that investments in SIB CDs were safer and more secure than investments in CDs issued by U.S. banks insured by the FDIC. Pls.' Br. at 5-10.

But the SIB Disclosure Statement provided to CD investors clearly states -- over and over again -- that the CDs were not insured. *See* Section III, *infra*. And the SEC's Second Amended Complaint ***never*** mentions the words "insurance," or "SIPC," or "Lloyds." Instead, the SEC states that Stanford made the following misrepresentations to investors:

> In selling the CD, SIB told investors that: (i) their assets were safe and secure because the bank invested in a "globally diversified portfolio" of "marketable securities;" (ii) the bank had averaged double-digits returns on its investments for over 15 years; (iii) Stanford had solidified SIB's capital position in late 2008 by infusing $541 million in capital into the bank; (iv) the bank's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee; (v) the bank, in early 2009, was stronger than at any time in its history; and (vi) the bank did not have exposure to losses from investments in the Madoff fraud scheme.

SEC Sec. Am. Compl. (Doc # 490-2 in Case No. 3:09-cv-00298), ¶ 32. Likewise, the U.S. Department of Justice never mentioned "insurance" in Allen Stanford's superseding indictment.

Only here -- and in other similar suits brought against deep-pocketed third parties -- does an insurance broker, or some other corporate defendant, suddenly become an "integral" part of the alleged fraud.

According to Plaintiffs, BMB allegedly participated in Stanford's fraud through a handful of single-page insurance coverage letters written between 1996 and 2004. TAC Ex. 4. The gravamen of Plaintiffs' case is the claim that BMB (and later, Willis) included material misrepresentations and omissions in the letters, and that these "fraudulent" letters assisted Stanford in carrying out its scheme of deceptively marketing the CDs as being fully secured and protected by insurance. Pls.' Br. at 2-3. The class representatives confirm that the only

assistance BMB is alleged to have provided is in writing the letters. *See* Pls.' Br. at 2; *see also* APP. at 1075-76 [Troice Tr. 97:2-5, 97:17-98:6].

But the coverage letters say nothing about the SIB CDs, nor do they attest to the safety, security, and protection of SIB deposits. *See* Pls.' Br. at 7. In fact, the named Plaintiffs admit that the letters say nothing about the SIB CDs.[2] To the contrary, the coverage letters accurately describe various insurance policies that BMB placed for SIB. BMB's final letter, dated April 6, 2004, states as follows:

> I have been doing business with Stanford International Bank for over fifteen years and find them to be first class business people. We have placed the following coverages that are currently in effect:
>
> 1) Directors and Officers Insurance with Lloyds of London (Expiration 8/15/04);
>
> 2) Bankers Blanket Bond with Lloyds of London (Expiration 8/15/04);
>
> 3) Depository Insolvency with Great American Insurance Co. (Expiration 8/15/04).
>
> All of these coverages have been in effect for various terms for the past six to twelve years; however, no representations can be made that such coverages will remain in effect.
>
> In order to qualify for the above coverage, the Bank underwent a stringent Risk Management Review conducted by an outside audit firm.
>
> We have found that all our dealings with the Bank have been conducted in a professional and satisfactory manner.

*See* TAC, Ex. 4, at 6.

Moreover, there is simply no evidence of a fraudulent scheme involving BMB's letters. Rather, the only evidence is what three Stanford FAs told the five proposed class representatives about what the BMB/Willis letters meant.[3] Plaintiffs admit that they do not know what any of

---

[2] *See, e.g.,* APP. at 1060-63 [Troice Tr. 82:21-83:2, 84:22-85:7].

[3] APP. at 1139; 1060-63 [Troice Tr. 161:9-14, 82:21-83:2, 84:22-85:7]; APP. at 279; 318; 364 [Diaz Tr. 54:16-19, 93:4-22, 139:5-19]; APP. at 855-56 [Green Tr. 99:22-100:7]; APP. at 715 [Gomez Tr. 119:19-22]; APP. at 77 [Canabal Tr. 77:12-18].

the other 17,000 investors were told about insurance, which or how many people received BMB and/or Willis letters, or how many of those people invested.[4] In addition, Plaintiffs do not know whether there is actual evidence of uniform marketing materials: they have not shown which investors got insurance letters from BMB and/or Willis, they cannot identify any requirements for receiving a letter, and they recognize that the only way to establish these facts is through individual inquiry of every investor.[5] Indeed, Plaintiffs were aware of some investors who did receive a letter. And Plaintiffs were not aware that other investors received SIB materials that specifically stated that the CDs were not insured.[6] Plaintiffs admit that they only know what their FA told them about insurance, and that it would be necessary to ask each investor what, if anything, they were told about insurance.[7]

Plaintiffs' claims are solely based on alleged misrepresentations and omissions of three individual Stanford FAs – two in Venezuela and one in Mexico – and the alleged distribution of letters by BMB and/or Willis in Mexico and Venezuela. Yet, the proposed class representatives[8] are seeking to certify a class of "over 18,000 investors from around the world," (Pls.' Br. at 3), which would include any person anywhere who invested in SIB CDs, regardless of whether they were ever shown letters on BMB and/or Willis letterhead.[9] TAC ¶ 161; Pls.' Br. at 3, 20.

---

[4] APP. at 1164 [Troice Tr. 186:5-7]; APP. at 742-44 [Gomez Tr. 146:11-148:17]; APP. at 305-06, 373-77 [Diaz Tr. 80:14-81:18, 148:10-152:19]; APP. at 187-89 [Canabal Tr. 187:3-189:11].

[5] APP. at 1149-1150; 1164 [Troice 171:24-172, 186:5-7]; APP. at 306, 373 [Diaz Tr. 81:2-18, 148:10-22]; APP. at 872-74 [Green Tr. 116:7-118:13]; APP. at 737-44 [Gomez Tr. 141:10-148:17].

[6] *See* APP. 1185 [Troice Tr. 207:13-21]; APP. at 126 [Canabal Tr. 126:12-17].

[7] APP. at 1149-50; 1164 [Troice 171:24-172:15, 186:5-7]; APP. at 306, 373 [Diaz Tr. 81:2-18, 148:10-22]; APP. at 872-74 [Green Tr. 116:7-118:13]; APP. at 737-45 [Gomez Tr. 141:10-148:17].

[8] Since the TAC was filed, Plaintiffs have removed Paula Gilly-Flores and Promotora Villa Marino, C.A. as proposed class representatives.

[9] Plaintiffs alternatively seek to certify a class or classes of Latin American investors who purchased CDs from, or maintained accounts with, Stanford as of February 2009, but again, without regard to whether the class members saw or relied upon so-called Insurance Letters. Pls.' Br. at 20-21. As a third alternative, Plaintiffs seek to certify a class or classes of Venezuelan investors, and, separately, of Mexican investors, who purchased CDs from or

On October 31, 2014, Plaintiffs served their Motion for Class Certification, setting forth unsubstantiated, conclusory allegations that they had met their burden to establish certification is proper. Plaintiffs sought certification of claims for "primary violations of the [Texas Securities Act], aiding and abetting of the Texas Securities Act, and civil conspiracy." Pls.' Br. at 4.

On December 15, 2014, the Court dismissed Plaintiffs' claims for primary violations of the Texas Securities Act ("TSA") and civil conspiracy. Order on Mot. to Dismiss [Dkt. 208]. Therefore, the only cause of action Plaintiffs are now seeking certification in is their claim for aiding violations of the TSA. As set forth below, certification is inappropriate because Plaintiffs have not and cannot meet the requirements of Rule 23.

## III. CLASS CERTIFICATION IS IMPROPER BECAUSE PLAINTIFFS CANNOT SATISFY THE RULE 23 REQUIREMENTS

As set forth more fully herein, class certification is improper because Plaintiffs have not and cannot meet the requirements of Rule 23. Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). In order to comply with Rule 23, the moving party must meet the four Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy. FED. R. CIV. P. 23(a)(1-4). In addition, the moving party must also fall within one of the Rule 23(b) categories. In this case, Plaintiffs must satisfy Rule 23(b)(3), which requires proof that common issues predominate over individualized issues, and that class adjudication is superior to other available methods for resolving the controversy. FED. R. CIV. P. 23(b)(3). In the Fifth Circuit, the proponent of class certification has the burden of proving that certification is appropriate by a preponderance of the evidence. *See, e.g.*, *Costano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th

maintained accounts with Stanford as of February 2009 -- again, without regard to whether the class members saw or relied upon Insurance Letters. Pls.' Br. at 21.

Cir. 1996); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228–29 (5th Cir. 2009); *In re Heartland*, 851 F. Supp. 2d 1040, 1052 (S.D. Tex. 2012).

When determining whether this elevated burden has been met, a trial court must conduct a "rigorous analysis" beyond the mere pleadings to decide certification. *Comcast*, 133 S.Ct. at 1432 (citing *Gen. Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982)); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005)). Stated another way, Plaintiffs "must affirmatively demonstrate [their] compliance" with Rule 23. *Comcast*, 133 S.Ct. at 1432 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–52 (2011)). As part of its "rigorous analysis," the court's analysis will necessarily "overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 131 S.Ct. at 2551. It "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Comcast*, 133 S.Ct. at 1432. Unlike in a motion to dismiss, when making this rigorous analysis, "[t]he plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification." *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 554-55 (5th Cir. 2011).

Plaintiffs proposed class is improper on numerous grounds, perhaps most strikingly so because individual factual and legal issues overwhelmingly predominate over common ones.

**A. Plaintiffs Fail to Establish Predominance under Rule 23(b)**

To support class certification, the "named plaintiff must demonstrate, and the Court must find, 'that the questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Comcast*, 133 S.Ct. at 1436 (quoting FED. R. CIV. P. 23(b)(3)); *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 703 (5th Cir. 2012). "The predominance inquiry is 'far more demanding than the commonality requirement of Rule 23(a)'" *Maldonado v. Oschner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301, 302 (5th Cir. 2003)). Indeed, it "is one of the most stringent

prerequisites to class certification," and it is incumbent upon the [c]ourt to carefully scrutinize the predominance standard to ensure that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The predominance requirement "prevents the class from degenerating into a series of individual trials." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003).

To determine whether individual issues will predominate, a court "must consider how the case will be tried on the merits if the class is certified, 'identifying substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.'" *In re Park Cent. Global Litig.*, No. 3:09-cv-765-M, 2014 WL 4261950 (N.D. Tex. Aug. 25, 2014) (quoting *Madison*, 637 F.3d 551). This will "frequently entail overlap with the merits of the plaintiffs' underlying claim," as it will generally "involve[] considerations that are enmeshed in the factual and legal issues comprising the plaintiffs cause of action." *Comcast*, 133 S.Ct at 1432 (citing *Wal-Mart*, 131 S.Ct at 2551; *Falcon,* 102 S.Ct. at 2364). Even if the Plaintiffs were able to prove liability on a class-wide basis, that proves only that some common issues exist across the class. *Steering Comm. v. Exxon Mobil*, 461 F.3d 598, 603 (5th Cir. 2006).

**1. Plaintiffs cannot establish predominance through allegations of a "uniform fraudulent scheme"**

The putative class representatives' deposition testimony makes clear this case is not based on a uniform marketing scheme, but rather on examination of what each investor was (or was not) verbally told regarding insurance by their individual Stanford FA. *See, e.g.,* APP. at 1139 [Troice Tr. 161:9-14] ("Q. Is it fair to say that your complete understanding for the insurance that was applicable or that you believed to be applicable to your Stanford investments was through Mr. Nanes? A. Yes."); APP. at 364 [Diaz Tr. 139:5-10, 16-19] ("Q. But it was your understanding at the time you were investing with Stanford, that both the directors and officers

Case 3:09-cv-04641-N-BG Document 18246 Filed 04/26/15 Page 19 of 29 PageID 43582

liability insurance policy and the bankers blanket bond insured your CDs; correct? A. Yes….Q. Was your understanding based on anything other than what Mr. Nanes told you, your husband, and your son? A. No."). This type of claim is inarguably inappropriate for class certification. *See Simon*, 482 F.2d at 882 ("courts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action."); *Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*, No. 3:02-CV-1245, 2003 WL 21339279 (N.D. Tex. June 3, 2003) (denying certification when "the record reflects that at least some potential class members received varying representations from their brokers above and beyond what is contained in the [written materials].").

In an apparent attempt to deflect from this fatal flaw, Plaintiffs argue that predominance is satisfied with a proposed class of over 17,000 investors located around the world because Stanford allegedly used "uniform marketing and sales materials and sales pitches based on a common training manual." (Pls.' Br. at 33). According to Plaintiffs' Brief, this establishes a "uniform scheme" through which FAs purportedly duped investors into believing the SIB CD's themselves were fully insured by claiming SIB's private insurance was "better-than-FDIC" insurance and that no other offshore bank had such coverage. *Id*. at 5-11. Based on this alleged "uniform sales practice," Plaintiffs argue common issues predominate and there is no need to evaluate what was actually said to each investor, what information the investor relied upon in making its decision to invest (*i.e.*, the materiality of any alleged misrepresentation or omission), whether the investor actually received any information from BMB, or whether BMB knew of or had any intention to assist in the alleged material misrepresentations and omissions made by the FAs or the FAs sale of unregistered securities. *Id*. at 33.

There is no evidence of "uniform marketing and sales materials and sales pitches," let alone a uniform scheme – particularly not one through which BMB substantially and knowingly

assisted in. Instead, the claims of the putative class members all involve ***different*** questions of law and fact involving each investors' decision to invest and BMB's role in that decision, defeating the predominance requirement. Even if this detrimental defect in Plaintiffs' certification motion could be ignored, a uniform marketing scheme is insufficient to establish common issues predominate in connection with Plaintiffs' causes of action.

**2. The elements of a TSA aiding and abetting claim demonstrate that common issues of law or fact do not predominate over individual issues**

Plaintiffs gloss over the Rule 23(b) predominance requirement, merely concluding it is satisfied because the only question at issue is an inquiry common to all proposed class members: "whether Stanford and these Defendants engaged in a common course of deceptive conduct aimed at selling SIB CDs to the investors…" Pls.' Br. at 3. Plaintiffs' lackluster assertion falls far short of establishing predominance by a preponderance of the evidence, as required to obtain class certification. *See, e.g., Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2413 (2014) ("plaintiffs wishing to proceed through a class action must actually ***prove*** – not simply plead – that their proposed class satisfies each requirement of Rule 23, including [if applicable] the predominance requirement of Rule 23(b)(3).").

As the Supreme Court has stressed: "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Id*. at 2184. To establish that BMB materially aided the alleged primary violations of Stanford, Plaintiffs must show that: (i) a primary violation of the TSA occurred; (ii) BMB had a "general awareness" of its role in the violation; (iii) BMB rendered "substantial assistance" in achieving the violation; and (iv) BMB either intended to deceive or defraud Plaintiffs or acted with reckless disregard for the law or the truth or the law, *i.e.*, acted with scienter. TEX. REV. CIV. STAT ANN. Art. 581-33(F)(2) (Vernon Supp. 2010). Plaintiffs'

Case 3:09-cv-04641-N-BG Document 124 Filed 02/24/15 Page 21 of 29 PageID 3524

predominance arguments wholly ignore these elements, instead focusing on the fact that reliance is not an element of the TSA. Pls.' Br. at 32-34.

In evaluating the necessary elements, it is apparent that individual issues overwhelmingly predominate and class certification is improper. Indeed, these questions require individualized determinations that preclude class certification on at least three different levels. First, there must be a determination as to whether a primary violation of the TSA occurred as to each proposed class member. Second, even if the primary violation is established, whether BMB substantially assisted in that sale or misrepresentations turns on the unique conditions of each sale and requires an investor-by-investor analysis to determine whether the investor actually received BMB's letter (the only form of assistance it is alleged to have provided). Third, whether BMB had knowledge of its participation in that particular unregistered sale or misrepresentation, as well as the requisite scienter, are questions that will need to be resolved as to each proposed class member.

The need for such individualized findings defeats any claim that the primary legal and factual issues to be tried are common to all class members. The Fifth Circuit routinely holds that the presence of individual questions such as these precludes a putative class from meeting the predominance requirement. *See, e.g., O'Sullivan*, 319 F.3d 732 (finding plaintiffs could not establish predominance because individualized fact-finding would be required for each transaction involved despite common question of law asking whether defendant's uniform actions violated Texas statutes); *Langbecker v. Electric Data Sys*., 476 F.3d 299, 312 (5th Cir. 2007) (reversing certification of a fiduciary class due to individualized nature of potential defenses); *Maldonado*, 493 F.3d at 524 (reasonableness requirement depended on several factor individual to each proposed class member, rendering certification improper); *Robinson v. Texas Auto. Dealers*, 387 F.3d 416, 424 (5th Cir. 2004) ("[A] court would have to hear evidence

Case 3:09-cv-02174-N-BG Document 124-2 Filed 04/26/16 Page 22 of 72 PageID 3525

regarding ***each purported class member and his transaction***. Such an individual examination would destroy any alleged predominance present in the proposed class.") (emphasis original).

It is telling that Plaintiffs only cite to one case in which the court found plaintiffs satisfied the predominance requirement in connection with a secondary liability TSA claim -- a control person as opposed to aiding claim that involved a request for settlement-only class certification. *Billitteri v. Secs. Am., Inc.*, No. 3:09-cv-01568-F, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011). Putting this aside, the facts of this case are easily distinguished, just like the federal securities class actions discussed below, the *Billitteri* claims were based on identical or near-identical alleged written misrepresentations or omissions that were set forth within Private Placement Memoranda distributed to *all* investors. *Id*. at *7. Unlike *Billitteri*, the evidence here establishes that Stanford investors received substantially different information.

***a. Individual issues predominate over common issues in assessing whether Plaintiffs can establish a primary violation of the TSA***

As set forth below, the question of whether a primary violation of the TSA has been established is an individualized question of fact, not a common one. Amongst other things, the evidence establishes the proposed class members (and even Plaintiffs) were told vastly different stories about how SIB used CD proceeds, and received substantially different written materials (if at all). Moreover, some investors were given written disclosures stating clearly that the CDs were neither insured nor guaranteed, while others, like the proposed class representatives, apparently did not. As a primary violation of the TSA cannot be, and has not been, established through allegations of a "fraudulent marketing scheme," as a way of overlooking these individualized issues, certification is improper.

### i. Individualized issues predominate in evaluating the essential elements of the TSA primary violation

In their Brief, Plaintiffs are vague on what TSA primary violation BMB purportedly assisted with. Rather, they broadly refer to assistance with "Stanford's common scheme to mislead investors about insurance." Pls.' Br. at 2. BMB assumes that Plaintiffs are relying on Stanford's alleged misrepresentations or omissions with the sales of the a security, or TSA § 33(A)(2), as the primary violation.

Establishing a primary violation of Section 33(A)(2) requires evidence that Stanford sold or offered to sell a security ***by means*** of an untrue statement or omission. *Pitman v. Lightfoot,* 937 S.W.2d 496, 531 (Tex. App.–San Antonio 1996, writ denied). In other words, "the plaintiff must show the untrue statements were made ***before*** the sale occurred." *Id*.; *see also Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1418 (5th Cir.1993) ("Article 581-33A(2) has been construed to mean that the alleged misrepresentation must relate to the security and 'induce the purchase thereof'"); *Nicholas v. Crocker,* 687 S.W.2d 365, 368 (Tex.App.–Tyler 1984, writ re'f n.r.e.) (finding buyer of an interest in oil and gas wells failed to establish a violation of article 581–33(A)(2) because he did not show the seller's representations were made before the sale); *see also In re Westcap Enters.*, 230 F.3d 717, at 726 n. 11 (5th Cir. 2000). This is an individualized question as to what representations were made to each investor prior to their purchase and the answer is not common to each class member, as established by the class representatives who were told different things by their FAs and did not even receive BMBs letters prior to their initial CD purchases.[10] The named Plaintiffs testified that, if anything, each

[10] APP. at 1139, 1060-63 [Troice Tr. 161:9-14, 82:21-83:2, 84:22-85:7]; APP. at 279, 318, 364 [Diaz Tr. 54:16-19, 93:4-22, 139:5-19]; APP. at 855-856 [Green Tr. 99:22-100:7; APP. at 715 [Gomez Tr. 119:19-22]; APP. at 77 [Canabal Tr. 77:12-18].

investor would have to be questioned about what their FAs represented to them regarding insurance.[11] For this reason alone, Plaintiffs cannot establish predominance.

In addition, Plaintiffs must establish materiality. *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 743 (Tex. App.–Houston [1st Dist.] 2012, no pet.) (internal citations omitted).[12] The crux of Plaintiffs' claim is not that the Defendants made affirmative false statements; rather it is that Defendants omitted or failed to disclose certain information regarding insurance. Pls.' Br. at 14. An omitted fact is material if, there is a:

> substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Granader v. McBee*, 23 F. 3d 120, 123 (5th Cir. 1994) (analyzing TSA) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Alleged misstatements or omissions cannot serve as the basis for securities fraud claim if they did not affect the total mix of information provided to investors. *Highland Capital Mgmt., L.P.*, 402 S.W.3d at 744. Accordingly, there is no way to evaluate this element without understanding the "total mix" of information each investor received.

The evidence establishes that individual issues predominate in assessing materiality. As reflected by the named Plaintiffs' own testimony, they were each exposed to a different "total mix" of information, in that they were provided different materials, told different things by their FAs, provided different information by third persons, and conducted different due diligence.

[11] APP. at 1074 [Troice Tr. 96:15-20]; *see also* APP. at 306 [Diaz Tr. 81:2-18].

[12] BMB notes that establishing materiality of alleged misrepresentations is not a prerequisite to class certification in a federal securities fraud action based on a fraud on the market theory. *Halliburton*, 134 S.Ct. at 2416. However, this is not such a case. The fraud-on the market theory does not apply as, *inter alia*, the CDs were not traded on an effective market and there is not a known mix of publicly available information through which to assess materiality. *See Id*. at 2416 ("Given that the other *Basic* requirements [publicity and market efficiency] must still be proved at the class certification stage, the common issue of materiality can be left to the merits state without risking the certification of classes in which individual issues will end up overwhelming common ones.").

Based on this variation in the total mix of information relevant to each investor, there are disparities in what each considered "material." For instance, as discussed below, some investors, including all U.S. investors, received certain disclosure statements within marketing materials, including that the CDs were not insured or guaranteed. *See* Section III.B.1, *supra*. The proposed class representatives, on the other hand, stated that they did not receive this information. Plaintiffs testified had they received these materials that other investors received, Plaintiffs would not have invested in the SIB CDs. APP. at 1185 [Troice Tr. 207:13-21]; APP. at 126 [Canabal Tr. 126:12-17]. As another example, Diaz was told that Stanford would use proceeds from CD investments to invest in real estate and a diversified pool of investments APP. at 314-17 [Diaz Tr. 89:22-92:12]. Troice, on the other hand, was not. Rather, he was told that SIB was just a bank and only lent money to people who invested in the bank. APP. at 1064-67 [Troice Tr. 86:7-11, 20-25; 87:2-8; 88:15-23; 89:9-11]. He testified that had he known what Diaz knew, *i.e.*, that SIB was using proceeds to invest in real estate, he would not have invested. *Id*. In comparison, Canabal and Gomez did not recall whether they were told Stanford was using CD proceeds to invest in real estate, but that they were told Stanford used CD proceeds to invest in petroleum projects in Texas. APP. at 70-71 [Canabal Tr. 70:22-71:8]; APP. at 728-29 [Gomez Tr. 132:4-133:11]. These significant disparities – revealed by talking to just five named Plaintiffs – would be multiplied exponentially amongst the entire proposed class.

Moreover, the cautionary statements and disclaimers set forth in the materials that many investors received render any misleading statements immaterial. As a matter of law, a representation is not actionable if it conflicts with statements made in a written offering document. Instead, such statements are "immaterial" because they do not alter the total mix of

information available to investors.[13] A Texas federal court has rejected almost identical claims, namely an investor's claims that his broker told him his investment was "insured," where – as here – the disclosure document contained a description of the partnership's insurance coverage (which was underwritten by Lloyds of London) and the insurance coverage was designed to protect the partnership's operations, rather than the investors' capital. *Porter v. Shearson Lehman Bros., Inc.*, 802 F. Supp. 41, 55-58 (S.D. Tex. 1992). In finding that the written disclosures rendered the alleged verbal misrepresentations immaterial, the court noted "any reasonable investor knows to be somewhat wary of a selling agent's oral representations and check them against written materials." *Id*. at 58 (internal citations omitted).

**ii. A primary violation cannot be established through allegations of a uniform scheme**

Plaintiffs' attempt to sidestep these overwhelming individualized issues by invoking a "fraud-on-the-market" theory similar to the one used in federal securities class actions. In a typical federal securities fraud case, reliance can be presumed with respect to the publicly-disseminated statements of companies whose shares are traded on a well-developed, efficient market. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 413 (5th Cir. 2001). In order to invoke the rebuttable presumption of reliance, plaintiffs must prove that the alleged misrepresentations were publicly known, that the stock traded in an efficient market, and that the transaction in question

[13] *See, e.g.*, *Phillips v. LCI Int'l*, 190 F.3d 609, 617 (4th Cir. 1999) ("'[E]ven lies are not actionable' when an investor possesses information sufficient to call the misrepresentation into question. After all, the securities laws impose liability only when there is a 'substantial likelihood' that an alleged misrepresentation 'significantly altered the total mix of information' a reasonable investor (the market) possesses."); *In re Merrill Lynch Auction Rate Secs. Litig.*, 851 F.Supp.2d 512, 536-37 (S.D.N.Y. 2012) (investor could not justifiably rely on written representations when it had at its disposal offering materials and public disclosures); *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir. 1991) ("[i]nvestors are charged with constructive knowledge of the risks and warnings contained in the private placement memoranda [for their investments]"); *Davidson v. Wilson*, 973 F.2d 1391, 1401 (8th Cir. 1992)(investor's reliance on alleged oral misrepresentations concerning limited partnership was "unjustified as a matter of law" because such misrepresentations were contradicted in the written subscription agreement); *Brown v. E. F. Hutton Group, Inc.*, 735 F. Supp. 1196, 1202 (S.D.N.Y. 1990), *aff'd*, 991 F.2d 1020 (2d Cir. 1993)(In discussing "the alleged oral representations by [the plaintiffs' stockbroker] that the investment was low-risk," the court concluded: "Any investor who relied on those statements, which flew in the face of numerous cautionary statements in the written offering materials, clearly did so unreasonably.").

took place between the time of the misrepresentation and the time the truth was revealed. *Haliburton*, 131 S.Ct. at 2185. As the Supreme Court explained in *Basic*, "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action." *Basic v. Levinson*, 485 U.S. 224, 247 (1988). "The theme of *Basic* and other fraud-on-the-market decisions is that public information reaches professional investors, whose evaluations of that information and trades quickly influence securities prices." *West v. Prudential Secs., Inc.*, 282 F.3d 935 (7th Cir. 2002).

This litigation, however, is ***not*** a typical federal securities fraud case involving alleged written misrepresentations or omissions that were publicly disseminated into an efficient market. Rather, as set forth above, each proposed class member was allegedly presented with different information, by different people, at different times, verbally rather than in writing. The fraud-on-the-market theory is inapplicable to cases involving non-public statements that were only made to certain investors. *See, e.g., West v. Prudential Secs., Inc.*, 282 F.3d 935 (7th Cir. 2002) (reversing order certifying securities class action, holding district court improperly applied fraud-on-the-market theory where the record did not support a finding of market efficiency because the defendant had not released the complained-of information publicly, but only to certain clients).

Leaving aside the fact that no public written misstatements or omissions are at issue, Plaintiffs' scheme argument also ignores the fact that this case involves alleged violations of the TSA, not federal securities laws. *See, e.g., Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S.Ct. 1184, 1193 (2013) ("Although fraud on the market is a substantive doctrine of ***federal securities-fraud law*** that can be invoked by any ***Rule 10b–5 plaintiff***…") (emphasis added). As one authority explained, establishing predominance based on a uniform scheme is a concept that is based on the specific language of the federal securities laws:

> Some courts have indicated that an action based on a number of different documents released at different times can be maintained as a class action if the action is based on the same or similar misrepresentations or nondisclosures throughout the class period. Other courts have held that where a common scheme of deception has been alleged, a common question exists even if the plaintiff's suit is based on otherwise unrelated nondisclosures or misrepresentations.
>
> This concept of a common course of action to satisfy predominance is consistent with clauses (1) and (3) of Rule 10b-5. Those clauses make it unlawful "to employ any device, scheme, or artifice to defraud" or "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

5E Disclosure & Remedies Under the Sec. Laws § 21:64 (March 2015) (citing *In re U.S. Fin. Sec. Litig*., 69 F.R.D. 24, 40 (S.D. Cal. 1975) ("[T]he language of Rule 10b–5(a) and (b) makes it unlawful 'to employ any device, ***scheme*** or artifice to defraud' or 'to engage in any act, practice, or ***course of business*** which operates or would operate as a fraud or deceit upon any person.' Pursuant to this Rule, the relevant inquiry could focus upon the existence of a broad course of fraudulent conduct, which, in the instant action, has been alleged.") (emphasis original)).

The "scheme" and "course of business" language that courts have interpreted to allow plaintiffs to establish predominance based on a uniform "scheme" or common "course of business" is glaringly omitted from the TSA. § 581-33. Interpretations of federal securities laws may be reliable guidelines in interpreting TSA when they contain virtually ***same wording***, but when, as here, the statutes use materially different language, courts must not follow the case law interpreting the federal statutes and instead must base their interpretation of the TSA on legislature's language. *Anheuser-Busch Companies, Inc. v. Summit Coffee Co*. 934 S.W.2d 705 (Tex. App.–Dallas 1996, writ dism'd).[14]

---

[14] Likewise, the TSA precludes "scheme" liability as a theory of secondary liability. As set forth in BMB's previous briefing, the statutory language and the comments to the TSA state that secondary liability under the TSA is limited to the forms of liability listed in § 33F. TEX. CIV. STAT. ANN. Art. 581-33F, cmts. ("§33F provides quite specifically who, besides a person who buys or sells, is liable and the criteria for such liability."). Aiding and "scheme" liability are similar, but distinct, forms of secondary liability, just as conspiracy is. *See, e.g. Regents of University of California v. Credit Suisse First Boston (USA), Inc.,* 482 F.3d 372, 392 (5th Cir. 2007); *see also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 842 (2d Cir. 1998). Plaintiffs'

While in their Motion, Plaintiffs do not rely upon Stanford's alleged sale of unregistered securities or sales of securities by unregistered dealers as the primary violation,[15] to the extent they do, certification is likewise improper. At the outset, Plaintiffs have not presented evidence that Stanford actually sold unregistered securities to any of the proposed class members, or was an unregistered dealer when effectuating such sales. Instead, there is evidence that at least a portion of the SIB CDs were properly sold in accordance with the Regulation D exception to registration. SEC Sec. Amend. Compl. at ¶ 27 ("SIB marketed the CD to investors in the United States exclusively through SGC advisers pursuant to a Regulation D private placement. In connection with the private placement, SIB filed several Forms D with the Commission.").[16] Even if such violation were established, this could not serve as a sufficient basis for liability against BMB because it is nonsensical to argue that the Insurance Letters somehow furthered the sale of unregistered securities by an unregistered dealer. Even Plaintiffs do not see a connection. APP. at 736 [Gomez Tr. 140:19-24]. In addition, the TSA's strict statute of repose bars claims for unregistered sales, or sales by unregistered agents three years after the sale.[17]

**iii. Assuming, *arguendo*, evidence of a uniform scheme could be used to establish a primary violation, certification is improper because Plaintiffs have no evidence of a uniform scheme**

Putting aside the fact that evidence of a uniform marketing scheme cannot serve as the basis for establishing predominance as it relates to a primary violation of the TSA, Plaintiffs have not met their burden because there is no evidence of a "uniform sales practice," particularly

---

conspiracy claim has been dismissed and Plaintiffs should not be able to backdoor such a claim through the guise of "scheme liability."

[15] *See, e.g.,* APP. at 1078 [Troice Tr. 100:21-25] (admitting never inquired about whether the CDs were registered or needed to be).

[16] The Court has previously ruled that Regulation D had not been satisfied because there were more than 35 investors. Order on *Janvey* Mot. to Dismiss, *Janvey, et al. v. Willis of Colorado Inc., et al*, No. 3:13-cv-3980 (N.D. Tex.) [Dkt. No. 64], at 25. However, Regulation D only limits the number of ***unaccredited*** investors to 35. 17 C.F.R. § 230.506(b)(2)(i). There is no limit on the total number of investors.

[17] *See* Section III.B.1(b), *infra*.

not one that involved BMB. As Plaintiffs' handful of authorities state, courts have occasionally found evidence of a common scheme of deception "may indicate predominance" in the context of publicly disseminated misrepresentations and omissions. *In re Prudential Ins., Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 513 (D. N.J. 1997). In doing so, courts look at, *inter alia*, what evidence, as opposed to conclusory allegations, Plaintiffs have presented to establish the uniform scheme. *See, e.g., Longden v. Sunderman*, 123 F.R.D. 547, 552 (N.D. Tex. 1998). Even in the 10(b) context, Plaintiffs cannot prove predominance merely by alleging a common course of conduct in their complaint without particularizing the misconduct. *Turner v. First Wis. Mortgage Trus*t, 454 F. Supp. 899, 909 (E.D. Wis. 1978).

Plaintiffs' "evidence" of such a practice centers on a half-page excerpt from a December 2004 Stanford Financial Group Training and Marketing Manual (the "2004 Manual") – meaning a manual that is dated ***after*** BMB's alleged participation ceased. Without any evidence, Plaintiffs claim that Stanford FAs across the world relied upon this 2004 Manual in implementing a standardized "better-than-FDIC" insurance sales pitch that was used with all potential SIB CD investors. Plaintiffs have not offered any evidence that the statements within the 2004 Manual were false or misleading (and evidence shows they were in fact true), or that FAs used the statements with potential investors. Regardless, one training manual is insufficient to establish an overall scheme that was perpetrated by all Stanford FAs (and BMB) worldwide over a 15-year span and impacted all 17,000 plus proposed class members, as alleged. *See, e.g., Porter*, 802 F. Supp. at 54 (language in internal memorandum, amongst other things, insufficient to support claims centered upon alleged oral misrepresentations made by brokers regarding insurance).

Plaintiffs do not have any evidence as to how the 2004 Manual was used, or who it was used by, or how long it was used. In particular, there is no evidence that the three Spanish-

speaking, Latin American-based FAs that sold the CD to the named Plaintiffs ever received similar training. The only link that Plaintiffs try to make is through an affidavit submitted by a former U.S.-based Stanford Group Company employee, which says nothing about the materials actually provided to the FAs in question.

Plaintiffs contend that the scheme is further evidenced by "uniform marketing materials [that] repeat the Stanford line about insurance." Pls.' Br. at 8. However, Plaintiffs have only identified ***two*** documents that contain similar representations, both of which are alleged to be a Spanish marketing piece. *Id*. (citing APP Ex. 9 at 152-58); *id*. at 9 (citing APP Ex. 10 at 162). According to Plaintiffs, these documents are sufficient to establish that such "materials" were "distributed in Mexico and Venezuela from roughly 1995 through 2009." *Id*. But Canabal, Gomez, and Green (Punga Punga) did not receive these materials and Diaz only received one, and even she only saw it after making her first investment. APP. 393-95 at [Diaz Tr. 168:18-170:21].

In support of the alleged scheme, Plaintiffs also include unauthenticated correspondence from ***1998*** that is presumed to be Stanford's outside litigation counsel to Stanford's securities counsel. Pls.' Br. at 11. Again, none of the class representatives indicated they had seen any of these materials. Attached to the letter are unauthenticated copies of documents described, in relevant part, as:

> 2. [Stanford's] Standard Operating Procedures regarding insurance deposits - lays out Stanford's policy with regard to representing insurance deposits;
>
> 3. Interoffice Memo dated May 17, 1996 regarding SIB safety and insurance;
>
> 4. Interoffice Memo dated May 8, 1997 regarding seguridad - ***both memos demonstrate the high importance placed on <u>accurately</u> representing the insurance on deposits.***

APP. Ex. 18 at 462 (emphasis added). Far from a "scheme" to "dupe" investors, these documents represent that Stanford was trying to ensure investors were receiving accurate

information regarding what insurance coverage was in place. In fact, the Standard Operating Procedures say nothing about FDIC insurance, risk management assessments, or the CDs themselves being insured. *Id*. at 468-71.

Plaintiffs' additional "evidence" of uniform marking materials likewise fails. Plaintiffs point to what is referred to as SIB's "***principal*** marketing brochure," (APP. Ex. 11 at 171) as more evidence of the alleged uniform marketing scheme, yet ***none*** of the putative class representatives received it. *See, e.g.,* APP. at 124-25 [Canabal Tr. 124:21-125:13]. The brochure merely sets forth a bullet point list of three insurance coverages maintained by SIB itself: a "depository insolvency policy, "bankers' blanket bond," and a "directors' and officers' liability policy." APP. Ex. 11 at 171 (included as Tr. Ex. 7); *see also* Pls.' Br. at 9. Yet there is no mention of FDIC insurance or risk management assessments within the brochure, and again, Plaintiffs cannot establish which, if any, of the 17,000 investors actually received this.

In fact, the only evidence of a group of SIB CD investors receiving the same or substantially similar marketing materials are the U.S. investors, who all received the SIB Disclosure Statement. *See* Tr. Ex. 19; *see also* SEC Sec. Amend. Compl. at ¶ 27. In the Subscription Agreements that all U.S. SIB CD investors executed,[18] the investors certified that they had received, read, and understood the Disclosure Statement. *See* SIPC Letter to the D.C. Circuit (Doc # 1463094 in DC Cir. Case No. 12-5286) ("The parties' submissions to the District Court included a Subscription Agreement that CD purchasers were required to sign, in which purchasers acknowledged that they 'ha[d] received a Disclosure Statement and other relevant Offering Documents.'). The SIB Disclosure Statement clearly and repeatedly stated that the CDs

[18] The judicial record reflects that all CD investors were required to sign subscription agreements. *See* OSIC Amicus Brief (Doc # 1416746 in *SEC v. SIPC*, D.C. Cir. Case No. 12-5286), at 16-17 ("Stanford constructed his scheme to require prospective CD investors to sign subscription agreements with [SIB]."); Davis Plea Agreement (Doc # 30 in in Case No. 4:09-cr-00335 in the Southern District of Texas), at ¶ 17(d) ("Prior to purchasing [SIB] CDs, potential investors were required to provide their basic biographical and financial information in the form of a Subscription Agreement.").

were not insured. *See* Tr. Ex. 19, Disclosure Statement, at 12 ("The insurance coverage held by [SIB] … does not insure customer deposits and is not the equivalent of the FDIC insurance offered on deposits at many institutions in the United States."). The proposed class representatives said that if they had received this document, they would not have invested in [SIB] CDs. APP. at 1185 [Troice Tr. 207:13-21]; APP. at 126 [Canabal Tr. 126:12-17].

Furthermore, the Disclosure Statement explained in considerable detail that the CDs were uninsured, and that CD purchasers could lose their entire investments. *Id*., at Introductory Page, 4, and 12.

- "[SIB'S] PRODUCTS ARE NOT … COVERED BY THE INVESTOR PROTECTION OR SECURITIES INSURANCE LAWS OF ANY JURISDICTION SUCH AS THE U.S. SECURITIES INVESTOR PROTECTION INSURANCE CORPORATION .... THE CD DEPOSITS AND THE CD CERTIFICATES ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") OR ANY OTHER AGENCY OF THE UNITED STATES GOVERNMENT ...." (Introductory Page)
- "THE CD DEPOSITS AND THE CD CERTIFICATES ARE NOT INSURED BY THE FDIC OR ANY OTHER AGENCY OF THE UNITED STATES GOVERNMENT …" (Page 4 under heading "No U.S. Federal or Other Governmental Guarantee of Principal or Interest")
- "The insurance coverage held by [SIB] includes Property and Casualty, Exporter's Package, Vehicle, Worker's Compensation and Travel. Fidelity coverages include Bankers' Blanket Bond, Directors' and Officers' Liability, and Errors and Omissions Liability coverages. We also maintain Depository Insolvency Insurance. We maintain excess FDIC and Depository Insolvency insurance, currently in the amount of US$20 million, for each of our major U.S. and foreign correspondent banks. The latter insurance protects us against the possible insolvency of specified financial institutions where we may place our own funds. **This insurance does not insure customer deposits and is not the equivalent of the FDIC insurance offered on deposits at many institutions in the United States.**" (Page 12)(emphasis added).[19]

The Disclosure Statement also told investors that their principal was at risk:

- "The viability of the U.S. Accredited Investor CD and the ability of [SIB] to pay principal and interest on the CD Deposits are dependent on our ability and the ability of our portfolio managers to consistently make profitable global investment decisions. There can be no assurance that these decisions will continue to yield profitable results

[19] This language from the SIB Disclosure Statement was actually quoted in the SEC's Initial Decision regarding the Stanford executives' role in the Stanford Ponzi scheme, which Plaintiffs made of record in this lawsuit. Pls.' Supplemental Br. in Resp. and Opp'n to Defs.' Mots. to Dismiss Pls.' TAC, Ex. 1 at 10 [Dkt. 199-1] (internal citations omitted).

for [SIB] or cause the investments made in the U.S. Accredited Investor CD or any other products we offer to produce returns sufficient to fund the payment obligations of the CD Deposits." (Page 2)

- "YOU MAY LOSE YOUR ENTIRE INVESTMENT UNDER CIRCUMSTANCES WHERE WE MAY BE FINANCIALLY UNABLE TO REPAY THOSE AMOUNTS. PAYMENTS OF PRINCIPAL AND INTEREST ARE SUBJECT TO RISK." (Page 5, under heading "Investment Risk and Strategy")

*See* Tr. Ex. 19, at 3.

These types of disclosures were not limited to U.S. investment materials. SIB included similar disclosures in other marketing materials, such as an English brochure that contained the following statements:

- Conservation of principal and interest rates on the CD deposits are dependent upon returns in our investment portfolios.… If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD." (Ex. 6 at 5);
- Stanford International Bank Limited CDs are not FDIC-Insured and are not subject to regulation or oversight of any agency of the U.S. government, nor are they subject to any restrictions on how portfolios are invested. (*Id*. at 8);
- SIB's products are ordinary bank deposit obligations and are not securities under U.S. federal or state law. Therefore, they are not subject to the reporting requirements of any jurisdiction outside of Antigua and Barbuda, nor are they covered by the investor protection or securities insurance law of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation or the banking requirements thereunder. There is no guarantee investors will receive interest distributions or the return of their principal. (*Id*. at back page).

Tr. Ex. 6. The named Plaintiffs wholly admit that if they had seen these materials, which confirm, *inter alia*, that there "is no guarantee investors will receive interest distributions or return of their principal," they would not have invested. APP. at 1185 [Troice Tr. 207:13-21]; APP. at 126 [Canabal Tr. 126:12-17]. As such, it is apparent that an investor's receipt of this disclosure would alter the "total mix" of information available to that investor.

In short, because there is no evidence that the proposed class representatives, let alone the entire proposed class of investors, received the same or similar marketing materials, Plaintiffs cannot establish a "uniform marketing scheme" in satisfaction of the predominance requirement.

Furthermore, certification is inappropriate because there is no evidence that, assuming the class members received any marketing materials, they received marketing materials touting the "better-than-FDIC" insurance "mantra," as required to establish a "uniform marketing scheme" in the class certification context. *See Martin v. Dahlberg, Inc.*, 156 F.R.D. 207, 214-16 (N.D. Cal. 1994) (denying certification finding lack of predominance because, unlike other cases in which "each plaintiff was exposed to ***uniform*** written misrepresentations," there was a "lack of evidence of the existence of a fixed set of written materials or even a somewhat standardized sales pitch") (emphasis original).

Plaintiffs have cited less than a handful of cases in which courts have found evidence of a uniform marketing scheme sufficient to satisfy the predominance requirement, all of which are inapposite to the facts at issue. First, all but one of Plaintiffs' cases cited for this issue allege primary violations of the federal securities laws.[20] As discussed previously, these cases are not applicable to TSA claims in this context based on the plain language of the federal versus state statutes. *See, e.g., In re U.S. Fin. Sec. Litig.*, 69 F.R.D. at 40. And, each of these cases other than *Longden* involve classes that were certified as part of a settlement. Furthermore, in contrast to the TSA aiding claim predicated upon representations in insurance letters that may or may not have been shown to a limited number of investors, "[i]n securities class action litigation it is generally accepted that there is a great class-wide commonality in the content of the sales presentation because the written prospectus is essentially the presentation." *Peoples v. Am. Fidelity Life Ins. Co.*, 176 F.R.D. 637, 644 (N.D. Fla. 1998). Absent evidence of the same or similar written representations being made through prospectuses or Private Placement Memoranda ("PPM") that were provided to ***every*** proposed class member, it is inappropriate to

[20] *See* Pls.' Br. at 33-34 (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450 (federal securities laws), *aff'd in part, rev'd in part*, 148 F.3d 283 (3d Cir. 1998); *Duhamie v. John Hancock Mut. Life Ins.*, 177 F.R.D. 54 (D. Mass. 1997) (same); *Longden v. Sunderman*, 123 F.R.D. 547 (N.D. Tex. 1988) (same); *Billitteri v. Securities Am., Inc.*, No. 3:09-cv-01568-F, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) (TSA)).

find any type of uniform marketing scheme. This is apparent in Plaintiffs' authorities, which involved "similar or identical misrepresentations" and omissions allegedly set forth in PPMs that, despite being issued at different times, were in fact issued to all investors. *Billitteri*, 2011 WL 3586217, at *7 (plaintiffs met Rule 23(a) predominance requirement ***for purposes of settlement-only class certification*** based on allegations that all investors received similar PPMs, ***as well as*** marketing materials, which contained identical or near-identical alleged misrepresentations or omissions); *Longden*, 123 F.R.D. at 552-53 (finding a common course of conduct of substantially similar misrepresentations and omissions sufficient to meet commonality requirement of Rule 23(a)(2) when all investors received PPMs, evidence established uniformity of allegedly misleading financial information and property descriptions across all PPMs, and the PPMs were prepared by similar means and their format was almost identical). Indeed, evidence that all investors were in fact given essentially identical materials may be insufficient. *Gyarmathy*, 2003 WL 21339279, at *2.

Nor can Plaintiffs establish the proposed class members were verbally presented with the alleged "better-than-FDIC mantra." Doing so would require asking each and every class member to evaluate what representations were made to them (and what disclosures they received), establishing individual issues predominate and certification is improper. *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (If the circumstances surrounding each plaintiff's alleged reliance on fraudulent representations differ, then reliance is an issue that will have to be proven by each plaintiff, and the proposed class fails Rule 23(b)(3)'s predominance requirement); *see also Simon*, 482 F.2d at 882.

Plaintiffs essentially concede that individual testimony is necessary, offering a stack of uniform, boilerplate declarations from approximately 85 SIB investors who stated that their financial advisors led them to believe that investments in SIB CDs were insured. Pls.' Br. at 10

(citing APP. Ex. 13 at 267-434). These declarations say nothing regarding what materials the declarants received, if any, what the materials actually stated, or whether the investor received disclosures that investments were not insured or guaranteed, nor do the 85 investors even mention BMB. In short, they do not withstand scrutiny.[21] Furthermore, the declarations establish nothing as to what the 17,000 other proposed class members were told by their FAs.

Fifth Circuit law is clear on predominance: when proposed class members were provided with different information, from different individuals, at different times, they cannot satisfy the predominance requirement of Rule 23(b)(3). For example, in *Mims*, the Fifth Circuit found that plaintiffs failed to establish predominance by identifying how such claims were "capable of being tested on a class-wide basis without individualized inquiries into the circumstances of each transaction." 590 F.3d at 306. In doing so, the Fifth Circuit noted the inconsistency in the district court's decision to certify, as prior to certifying the class, the district court had concluded in ruling on a motion to dismiss that, in order to establish the class, "the plaintiff in each individual case" would have to provide evidence supporting his or her claim. *Id.*; *see also Gyarmathy v. TGI Ins. Co.*, No. Civ. A. 3:02-CV-1245, 2003 WL 21339279 (N.D. Tex. 2003) (finding individual fact issues likely to predominate, despite the fact that each plaintiff was given identical marketing materials because "those documents were not delivered to the putative class members in identical contexts," meaning the defendant would necessarily need to dig into the individual factual situation of each proposed class member). Although both *Mims* and *Gyarmathy* rest on different underlying claims than Plaintiffs assert against BMB, the essential

[21] Nor, for that matter, do the signed statements of the named Plaintiffs. The five proposed class representatives also signed off on formulaic declarations supporting the idea of a "uniform" marketing scheme... APP. Ex. 12 at 199-201, 208-09, 212-13, 229, 245-46, 252-54, 260-62, 267. But when deposed, each of the Plaintiffs actually testified that they were told different things and that the marketing materials provided to them were different from one another.

question remains the same: can the instant claims be efficiently and effectively resolved on a class-wide basis? The answer is no.

In fact, Plaintiffs' testimony wholly defeats any concept of a "uniform marketing scheme" that supports certification of a class composed of all SIB CD investors:

- Only two of the Plaintiffs deposed received the same or substantially similar marketing materials, while others did not receive any marketing materials at all. APP. at 841-42 [Green Tr. 85:19-86:25].

- None of the proposed class representatives received marketing materials that affirmatively represented that the SIB CDs carried deposit insurance. APP. 661-62 [Gomez Tr. 65:8-66:9].

- All understanding regarding insurance for the SIB CDs, including what the Insurance Letters actually meant, came from representations from each investors' FA made during private meetings. APP. at 362 [Diaz Tr. 137:5-19], APP. at 862-63 [Green Tr. 106:22-107:12].

- Each of the proposed class representatives admitted that they ***do not know and could not possibly guess*** what various Stanford FAs told other individual investors, what questions investors asked, what responses were given, what materials they read, or what information they relied upon. APP. at 1070, 1172-73 [Troice Tr. 92:3-7, 194:20-195:7]; APP. at 306, 373-76 [Diaz Tr. 81:2-18, 148:19-151:15]; APP. at 138-39 [Canabal Tr. 138:20-139:19]; APP. at 742-43 [Gomez Tr. 146:15-147:17]; APP. at 873-74 [Green Tr. 117:24-118:13].

- Each of the proposed class representatives admits that the only way to determine what investors were told by their FAs is to ask each individual investor. *Id.*; *see also* APP. at 873-74 [Green Tr. 117:13-118:13] ("Q. Isn't this correct that if we wanted to get answers to the questions I've been asking you over the last several minutes, we would have to, in fact, ask those questions to Mr. Nanes' other clients? A. Well, yes, but -- but you can't have 18,000 people here asking them questions.")

- Insurance Letters discussing old, expired policies were irrelevant to later investment or re-investment decisions APP. at 1198 [Troice Tr. 220:8-12], APP. at 879 [Green Tr. 123:11-14]).

Ultimately, the class-related discovery that has been conducted has revealed that "a myriad of factors … have influenced the decisions of putative class members," precluding certification of the claims. See *Martin v. Dahlberg*, 156 F.R.D. 207, 215 (N.D. Cal. 1994).

Therefore, Plaintiffs cannot establish that common issues predominate in determining whether there was a primary violation of the TSA.

***b. Establishing a "substantial causal connection" in this case would require individualized determinations on an investor-by-investor basis***

Similarly, material and substantial assistance is an element of an aiding claim under the TSA that requires individualized determinations on an investor-by-investor basis. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 344 (5th Cir. 2008). To satisfy this element, "[t]here must be a 'substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff.'" *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991) (quoting *Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985)); *accord Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62–63 (2d Cir. 1985).[22] Knowledge of general wrongdoing by the primary violator is insufficient to establish such a causal connection; rather, "[t]o be an aider and abettor, there must be evidence of general awareness and substantial assistance of the ***violation*** with the necessary intent." *Crescendo Investments, Inc. v. Brice,* 61 S.W.3d 465, 472 (Tex. App.–San Antonio 2001, pet. denied) (finding knowledge the primary violator was stealing money from investors insufficient for TSA aiding liability because the defendant "did not assist [primary violator] in selling fraudulent securities or diverting money.").

The question of whether BMB "materially" and "substantially" assisted in each sale to each investor is not a "common question" within the meaning of Rule 23 because it does not yield a uniform legal or factual response. Rather, Plaintiffs must establish a connection between BMB's actions and each of the proposed class members, including whether BMB issued a letter

[22] The TSA's aider liability provision is construed in harmony with federal aiding/abetting law that developed in pre-*Central Bank* securities cases. *See Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 840 (Tex. 2005); *see also Westcap Corp. v. City Colleges (In re Westcap Enters.)*, 230 F.3d 717, 726 (5th Cir. 2000). Indeed, in enacting the TSA, "the Legislature intended the TSA to be interpreted in harmony with federal securities law, and the TSA itself instructs that '[t]his Act may be construed and implemented to effectuate its general purpose to maximize coordination with federal and other states' law and administration." *Sterling Trust Co.,* 168 S.W.3d at 840 (citing federal case law, including, *Woodward v. Metro Bank of Dallas,* 522 F.2d 84 (5th Cir. 1975), for guidance on the elements of aiding and abetting liability).

in connection with that investor and whether BMB knew that Stanford was either making material misrepresentations or omissions to that investor by means of BMB's letter or somehow effectuating the sale of unregistered securities to that investor by means of BMB's letter.

Based on the Plaintiffs' own testimony, it is apparent that BMB's purported role varied amongst the investors, to the extent it had any involvement whatsoever. The named Plaintiffs actually testified that they do not know how many investors received a BMB letter APP. at 1183-84 [Troice Tr. 205:2-206:2]; APP. at 373-78 [Diaz Tr. 148:20-153:11]; APP. at 867 [Green Tr. 111:16-19]), and know that some investors actually did ***not*** receive BMB letters. APP. at 867 [Green Tr. 111:16-19]; APP. at 26-30, 213 [Canabal Tr. 26:5-30:20, 213:4-21]. In addition, Plaintiffs testified that BMB's letters had nothing to do with Stanford's alleged misrepresentations regarding whether the CDs were actually insured and were not the basis for their belief that the CDs were insured. APP. at 1060-61, 1139 [Troice Tr. 82:21-83:2, 161:9-14]; APP. at 279, 364 [Diaz Tr. 54:16-19, 139:5-19]. More importantly, they testified they did not even see a BMB letter prior to making their initial investments. APP. at 318 [Diaz Tr. 93:4-22]; APP. at 855-56 [Green Tr. 99:22-100:7]; APP. at 193 [Canabal Tr. 193:3-20]; APP. at 715 [Gomez Tr. 119:19-22]; APP. at 1191 [Troice Tr. 213:20-24].

While Plaintiffs are correct that they do not have to prove Stanford's fraud caused their losses, they must demonstrate a substantial causal connection between BMB's letters and the primary violation. *See, e.g., Crescendo Investments,* 61 S.W.3d at 472. Meaning they must prove that BMB actually assisted in *each sale* by providing a letter, or furthered Stanford's misrepresentations to *each investor* because that investor was shown or received a BMB letter.

There is a fundamental disconnect between BMB's 1996-2004 letters (*i.e.*, its alleged aiding) and investors' post-2004 SIB CD purchases. The Complaint makes clear that BMB ceased to function as SIB's insurance broker for the financial lines coverage after July 6, 2004

(TAC ¶¶ 63-65), and that it issued no insurance letters after that date. *Id*. ¶¶ 75, 82-88. Moreover, BMB's final letter ***expired on its face*** on August 15, 2004 and the document made clear that it was of no effect after August 14, 2004 as all of the insurance policies were stated to expire on that date. TAC Ex. 4 (Dkt. No. 115-1, at 28).

Nevertheless, Plaintiffs are seeking certification of a class that includes investors who ***only*** made purchase decisions ***after*** the expiration of BMB's letters, as well as those that made new purchase decisions ***after*** the expiration of BMB's letters (such as the class representatives).[23] As discussed further in Section III.B.1(b), *infra.*, it is illogical and fundamentally implausible to conclude that BMB "materially and substantially assisted" Stanford's post-2004 CD sales.[24] Therefore, an individual assessment of each proposed class members' investment history is required to evaluate Plaintiffs' TSA aiding claim.

This creates an extremely high burden. For example, in *Fernea*, the court found an investment firm charged with aiding under the TSA did not have a "general awareness" of its role in the primary violating -- *i.e.*, the sale of unregistered securities, despite the fact that a letter indicated the firm knew the primary violator was trying to sell an unregistered security. *Fernea v. Merril Lynch Pierce Fenner & Smith, Inc.*, 2011 WL 2769838, at *14, Blue Sky L. Rep. P. 74,931 (Tex.App.–Austin July 12, 2011). The court emphasized that these facts, even when viewed in the light most favorable to the plaintiff and indulging all reasonable inferences in his

---

[23] *See, e.g.,* TAC ¶ 142 ("Diaz renewed her investments in the CDs on an annual basis."); TAC ¶ 146 ("On or about October 9, 2007, Gilly invested all of her inheritance in SIB CDs."); TAC ¶ 1468("Punga Punga continued to renew (*i.e.*, repurchase) the SIB CDs year after year from 1999 through 2009."); TAC ¶ 152 ("Canabal relied on those statements [that investments in SIB were insured] in making the decision to invest in the CDs and in deciding to maintain his investments in SIB CDs over the years."); TAC ¶ 142 ("[H]is advisor always convinced Ferreiro to invest and reinvest in the SIB CDs by touting the bank's safety and solidity and the fact that the investments were insured."); TAC ¶ 156 ("Promotora thereafter received the BMB and/or Willis letters every single year that it maintained investments with Stanford Financial, and continued to invest in SIB CDs …").

[24] *See, e.g., First Fed. Sav. and Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.,* 629 F. Supp. 427, 442 (S.D.N.Y. 1986)(dismissing securities fraud claim when alleged misrepresentations made to induce investors were "too remote in time by some months").

favor, did not create more than a mere suspicion or surmise that the firm knew of the specific transaction, let alone "its role in the ***violation***." *Id*. (emphasis original). Similarly, the Texas Supreme Court has noted disapproval for an appellate court opinion finding an aiding violation, indicating the court applied too low of threshold for these elements and contradicted the requirements of the Securities Act, even though the evidence established the aider "arranged" an $8.6 million loan for the primary violator that "enable[ed] [the primary violator] to continue to operate, as well as…delay[ed] the Securities Board's discovery of wrongdoing." *Sterling Trust*, 168 S.W.3d at 841-43 (discussing *Goldstein v. Morenson*, 113 S.W.3d 769, 767-77 (Tex.App.–Austin 2003, no pet.)).

As discussed above, there is confusion regarding what the alleged primary violation is. *Compare* TAC ¶¶ 173-83; *with* Order on Mot. to Dismiss [Dkt. No. 208] (indicating "Plaintiffs allege that the broker Defendants and their employees participated and contributed to the Stanford Ponzi scheme…"). To the extent the primary violation alleged is Stanford's fraudulent scheme, Plaintiffs' claims must fail because there is no evidence BMB was aware of Stanford's scheme. Indeed, the United States government even admits that BMB did not have knowledge of Stanford's scheme. *See, e.g.*, *United States v. Stanford*, Case No. 12-20411, March 3, 2015 Brief of the United States [Dkt. 00512955799] at 17 ("Only six people in Stanford's entire organization knew of the shareholder funding reports that demonstrated the misuse of depositor funds – Stanford, Davis, Lopez, Kuhrt, Amadio, and Stanford's personal CPA, Henry Failing (USCA5 Supp. 6 6743)."); *compare Sterling Trust*, 168 S.W.3d at 845 (finding it immaterial that defendant did not know the exact misrepresentations made by the primary violator because defendant allegedly had knowledge of the primary violator's illegal scheme).

To the extent Plaintiffs contend that the primary violation is Stanford's misrepresentation during the sale of the CDs regarding whether the CDs were insured, individualized issues

predominant in making such determination. First, Plaintiffs must establish that BMB was aware Stanford personnel were allegedly misrepresenting to investors that their investments were insured. Plaintiffs cannot rely on BMB's purported title as "risk manager" in an attempt to plead that BMB should have had access to the requisite knowledge. *Navarro v. Grant Thornton, LLP*, 316 S.W.3d 715 (Tex.App.–Houston [14th Dist.] 2010, no pet.) (granting summary judgment as to TSA aiding claim upon finding accounting firm lacked general awareness or requisite intent despite allegations and evidence indicating it failed to disclose, *inter alia,* fact that securities offering was actually a Ponzi scheme); *Willis v. Marshall*, 401 S.W.3d 689 (Tex.App.–El Paso, 2013, no pet.) (affirming summary judgment dismissing TSA aiding claim asserted against accounting firm that provided services to partnership in connection with securities offering, finding no evidence firm knew of unregistered offering). Second, Plaintiffs must establish that BMB was aware of its own role in the misrepresentations, meaning that BMB knew Stanford used the insurance letters to bolster its alleged misrepresentations in connection with each sale. *Sterling Trust*, 168 S.W.3d at 842. This is also an individual issue that is not common to the class.

**3. Plaintiffs are not pursuing and cannot pursue a claim for "participation in a fraudulent scheme," nor is this a recognized cause of action**

As set forth above, the only class claim remaining in this case is an aiding claim under the TSA. Nevertheless, in its December 15, 2014 Order on BMB's Motion to Dismiss, the Court indicated Plaintiffs have also asserted a claim for "participation in a fraudulent scheme." Order at 17-18. Plaintiffs, however, are not seeking certification of this claim. Pls.' Br. 4. Even if they were to do so, Plaintiffs cannot obtain certification as to such a claim. First and foremost, "participation in a fraudulent scheme" is not a cause of action recognized under Texas law, rather it is merely a theory of vicarious liability. Second, as set forth above, the TSA precludes scheme

and conspiracy theories as attempts to impose additional secondary liability violations of the TSA.

In addition, even if it were a permissible cause of action, Plaintiffs' individual questions would swamp any common issues and preclude certification on such a claim. In its Order, the Court identifies the following elements of this cause of action: fraudulent intent, justifiable reliance, and causation. Order on Mot. to Dismiss [Dkt. No. 208] at 17-18 (internal citations omitted). Certification is inappropriate because individual issues predominate in evaluating the justifiable reliance and causation elements.

As previously discussed, Plaintiffs appear to argue a "fraud-on-the-market" theory in order to avoid these fatal flaws, but that argument is unavailing as, amongst other things, this is not a case involving public statements or the federal securities laws. Accordingly, individual reliance would have to be established as to each proposed class member. "If the circumstances surrounding each plaintiff's alleged reliance on fraudulent representations differ, then reliance is an issue that will have to be proven by each plaintiff, and the proposed class fails Rule 23(b)(3)'s predominance requirement." *Unger*, 401 F.3d at 321 (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir.1996)); *Simon*, 482 F.2d at 882.

**B. <u>Plaintiffs' Class Definitions Fail to Establish Superiority Under Rule 23(b)</u>**

In addition to proving that the proposed class action involves predominantly class-based issues, Plaintiffs must also demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Plaintiffs have failed to carry that burden.

**1. Plaintiffs' Class Definitions are Incapable of Creating a Class that Satisfies the Requirements of Rule 23**

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433

F.2d 733, 734 (5th Cir. 1970). Where a proposed class is inadequate, courts "are permitted to limit or modify class definitions to provide the necessary precision." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004).

Plaintiffs propose a class of "[a]ll persons or entities that had purchased and still held CD or other depository accounts with SIB (excluding purchasers of shares in SGC's SAS mutual fund program) as of February 2009, and whose claims are recognized and authorized by the Receiver in the SEC Action," while also excluding any employees or agents of Stanford, BMB, or Willis. Pls.' Br. at 20. Alternatively, Plaintiffs suggest that the Court could also certify a class of all Latin American investors, all Mexican investors, or all Venezuelan investors that fall within the class definition. *Id*. at 20-21.

Plaintiffs, on their own behalf and on behalf of other foreign investors, are attempting to assert TSA claims that they have no standing to bring. In sum, the TSA does not apply to foreign sales of foreign investments to foreign nationals. The proposed classes are flawed because each seeks to include investors who have no standing to assert claims under the TSA. (In addition, the proposed class representatives are not adequate because they lack standing to assert aiding claims under the TSA). *See* Section III.C.4, *infra*. Because the issue has been previously briefed, BMB adopts by reference its Rule 12(b)(6) briefing that the TSA does not apply extraterritorially, as well as Defendant Willis' Motion to Amend the Court's December 5, 2014 Order [Dkt. No. 67] to Certify for an Interlocutor Appeal. Dkt. Nos. 128, 145, 202, and 67.

***a. Plaintiffs' proposed classes necessitate substantial individual inquiry***

The scope of the proposed class is overly broad and unsuitable for certification under Rule 23(b)(3). While Plaintiffs allege a massive potential class that essentially includes all investors who still held CDs on the date of Stanford's collapse, they have failed to make necessary exclusions of investors whose involvement is not rightfully included in any case

against BMB. Instead, Plaintiffs create a universe of class members that is wholly incompatible with class-wide resolution and presents the Court with the false choice of alternative classes, differentiated from the proposed class only based on geographic location. Essentially, Plaintiffs present this Court with the class action equivalent of Russian nesting dolls, differing from one to the next only in size. As such, the flaws present in the proposed class of all investors are carried through into each of the alternative classes Plaintiffs offer.

Insurance letters were not provided to each and every investor and certainly BMB letters were not provided to any investors after July 2004 at the latest. TAC ¶ 58; 65. In fact, while Plaintiffs attempt to tie BMB to Stanford's Ponzi scheme based solely on these insurance letters, many investors never received a BMB letter and Plaintiffs have made no attempt to identify how many potential class members invested without ever seeing any insurance letter at all. When asked at their depositions, each proposed class representative testified that they had no idea and had done no investigation as to how many other investors were given insurance letters. *See* APP. at 1164 [Troice Tr. 186:5-18]; APP. at 742-44 [Gomez Tr. 146:11-148:17]; APP. at 305-06, 373-77 [Diaz Tr. 80:14-81:18, 148:10-152:19]; APP. at 187-89 [Canabal Tr. 187:3-189:11]. More importantly, both Canabal and Punga Punga's principal, Green, know for a fact that some investors were not given insurance letters before investing with SIB. *See* APP. at 26-30, 213-14 [Canabal Tr. 26:5-30:20, 213:4-214:21]; APP. at 866-868 [Punga Punga (Green) Tr. 110:4-112:12]. Moreover, Ralph Janvey, the SEC Receiver, who has access to the entirety of Stanford's files, testified in his deposition that he has undertaken no investigation of the alleged letter-writing campaign and that outside of the *Janvey v. Willis* case, he has "no personal knowledge" regarding:

1. "how many BMB letters that Stanford sent to investors;"
2. "what specific investors received BMB insurance letters;"

3. "how many of each type of letter from BMB or Willis that a particular investor may have received;"

4. "when a particular investor may have received an insurance letter from BMB or Willis;"

5. "the countries of residence of BMB letter recipients;" or

6. "whether Stanford had specific criteria to determine whether a particular investor would receive an insurance letter."

APP. at 964-66 [Janvey Tr. 80:19-82:5].

As such, Plaintiffs have wholly failed to provide a "reasonable estimate of the number of purported class members." *Pederson*, 213 F.3d at 868. No attempt is made by Plaintiffs to differentiate between BMB letters and Willis letters; between investors who received letters and investors who did not; or between investors who were given disclosures that there was no insurance or guarantee on their CDs and those who were not, leaving Plaintiffs to simply proclaim that "[t]he numerosity requirement is clearly satisfied." Pls.' Br. at 23.

***b. The Texas Securities Act's statute of repose precludes class certification***

Plaintiffs' proposed class definitions also fail to satisfy both the predominance and superiority requirements of Rule 23(b)(3). Under the Texas Securities Act, Plaintiffs allege secondary violations by BMB for "aiding and abetting: (1) the sale of unregistered securities; (2) the sale of securities by unregistered dealers; and (3) the sale of securities through untruth or omission." TAC ¶¶ 76-83. The only assistance Plaintiffs accuse defendants of providing, in fact the entirety of Plaintiffs claims, stems from the provision of insurance letters during sales meetings with Stanford financial advisors. Since the TSA requires that Plaintiffs prove a primary violation in order to establish a claim for aider and abettor liability, each alleged act by BMB must necessarily tie to an act by Stanford -- in this case, the sale of each CD that was accompanied by a BMB insurance letter.

"The TSA includes an absolute statute of repose." Order on Greenberg Mot. To Dismiss (Dkt. No. 123 *Janvey, et al. v. Greenberg Traurig, LLP, et al.*, No. 3:12-cv-04641-N-BG (N.D. Tex.)) citing TEX. REV. CIV. STAT. ANN. ART. 581-33H. Sales of unregistered securities or by unregistered dealers cannot be brought more than three years after "the sale." *Id*. ART. 581-33H(2)(a). Sales based on alleged untruths or omissions are barred more than five years after "the sale." *Id*. ART. 581-33H(2)(b).

The Texas Supreme Court has been explicit: when the legislature enacts a statute of repose, the statute serves as "an absolute bar to suit." *Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 609 (Tex. 2012). "The purpose of repose statutes is to give absolute protection to certain parties from the burden of indefinite potential liability." *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003).

In order to identify which investors' claims would be barred under the statute, the Court would necessarily have to undertake individual examination of each investor's transaction history. As such, the statute itself precludes certification since individual issues will predominate before the Court can even reach the merits.

Determining the relevant date to begin the repose period is a matter of identifying the last culpable act of the defendant. The United States Supreme Court has recognized that the statute of repose "is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant." *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2183 (2014). Moreover, the statute itself uses the phrase "the sale" when determining the relevant repose period. TEX. REV. CIV. STAT. ANN. Art. 581-33H. This indicates that each sale underlying secondary liability is viewed individually to determine what specific date the repose period would begin.

Even when an alleged fraudulent scheme theory − also described as a continuing wrong − underlies a claim, statutes of repose remain an absolute bar to suit, since "it is evident that the equitable tolling doctrine is fundamentally inconsistent" with the purpose of such temporal limitations. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991). Courts in the Fifth Circuit reject the "arguments that the 'continuing wrong' theory applies to toll repose until the last alleged misrepresentation was made." *In re Affiliated Computer Servs. Derivative Litig.*, 540 F.Supp.2d 695, 701 (N.D. Tex. 2007); *Wolfe v. Bellos*, No. 3:11-CV-02015-L, 2012 WL 652090, at *6 (N.D. Tex. Feb. 28, 2012); *Town North Bank v. Shay Fin. Servs., Inc.*, No. 3:11-CV-3125-L, 2014 WL 4851558, at *8 (N.D. Tex. Sept. 30, 2014).

In one of the Enron derivative suits, the proposed class sought to apply a "continuing violation theory." *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 310 F.Supp.2d 819, 842 (S.D. Tex. 2004). In that case, plaintiffs wanted to tie the acts of certain bank defendants to the broader scheme claiming they propped up and facilitated the continuing wrongdoing by Enron. *Id*. at 843. At the same time, the defendant banks pointed to discrete acts with ascertainable end dates to support their argument that the statute of repose should bar the claims. *Id*. at 837.

That court took pains to meticulously search both the factual record of the case as well as any guiding precedent in the courts and found that there are no grounds for allowing such a theory to extend or toll the statutory repose period in securities cases. *Id*. at 845-86. That search yielded the inescapable truth: continuing wrong theory does not belong in securities fraud litigation. The continuing wrong theory originated in Title VII employment discrimination cases where only a statute of limitations, subject to equitable tolling, and "no statute of repose that provides an arbitrary and final cut-off" exists. *Id*. at 845. The Fourth Circuit considered and rejected applying the continuing wrong theory in securities fraud claims. *Id*. at 846 (discussing *Caviness v. Derand Resources Corp.*, 983 F.2d 1295, 1301-02 (4th Cir. 1993)). The *Enron* court

distinguished the single case in support of such a theory since it wholly "ignored the existence of the statute of repose, which the *Lampf* court emphasized serves as a final cutoff." *Id*. at 846 (distinguishing *SEC v. Ogle*, No. 99-C-609, 2000 WL 45260, *4-5 (N.D. Ill. Jan. 11, 2000)).

The Texas Supreme Court has been clear: when the legislature enacts a statute of repose, the statute serves as "an absolute bar to suit." *Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 609 (Tex. 2012). "The purpose of repose statutes is to give absolute protection to certain parties from the burden of indefinite potential liability." *Holubec*, 111 S.W.3d at 37.[25]

The only aiding Plaintiffs allege is the issuance of the insurance letters, which ceased in 2004. The latest BMB letter identified in the Complaint, or during the Plaintiffs' depositions, was dated April 6, 2004. This letter contains the following text:.

> **I have been doing business with Stanford International Bank for over fifteen years and find them to be first class business people. We have placed the following coverages that are currently in effect:**
>
> **1) Directors and Officers Insurance with Lloyds of London (Expiration 8/15/04);**
>
> **2) Bankers Blanket Bond with Lloyds of London (Expiration 8/15/04);**
>
> **3) Depository Insolvency with Great American Insurance Co. (Expiration 8/15/04)**
>
> **All of these coverages have been in effect for various terms for the past six to twelve years, however, no representations can be made that such coverages will remain in effect.**

TAC Ex. 27 at 207.

---

[25] In its December 15, 2014 Order, the Court analyzed BMB's statute of repose argument under a standard that is inconsistent with *Holubec*, as well as its orders in other Stanford cases. Rather than basing the relevant date on the last culpable act, the Court focused on the last date on which Stanford sold a CD. This is a form of tolling, which is inconsistent with the "purpose of repose statutes." In *Hunton*, the Court properly recognized that even a civil conspiracy claim could not revive a TSA claim barred under the statute of repose. Order on *Greenberg* Mot. to Dismiss at 11 (Dkt. No. 123, *Janvey, et al. v. Greenberg Traurig, LLP, et al.*, No. 3:12-cv-04641-N-BG (N.D. Tex.)). Likewise, in *Proskauer*, the Court barred TSA aiding claims for the sale unregistered securities and sales by unregistered dealers that fell outside the three year period of repose. Order on Proskauer Motion to Dismiss (Dkt. No. 176, *Troice, et al. v. Proskauer Rose LLP*, et al., No. 3:09-CV-1600-N (N.D. Tex.)). And the *Proskauer* defendants' involvement with Stanford did not *begin* until 2005, a year after BMB's alleged aiding ceased. *Id*. at 2. BMB respectfully submits that the Court's initial ruling on the TSA statue of repose should be reconsidered.

Therefore, the last culpable act that BMB could, for the sake of argument, be accused of, occurred when the final BMB insurance letter was provided on April 6, 2004. By its express terms, this letter *expired* on August 15, 2004.

When shown copies of these letters during their depositions, proposed class representatives testified that they knew the insurance coverage expired[26] and could not be relied upon after the expiration date in their letters. *See* APP. at 1127, 1198 [Troice Tr. 149:9-13, 220:8-12]; APP. at 879 [Green Tr. 123:11-14]; APP. at 749-51 [Gomez Tr. 153:22-155:7]; APP. at 94, 201 [Canabal Tr. 94:16-23; 201:24-202:4].

Proposed class members' claims against BMB stemming from the sale of unregistered securities or by unregistered dealers must be excluded under the statute of repose. Whether the Court applies the date the letter was issued, or the date the letter expired, the three-year repose period was exhausted in 2007, well before the first case against BMB was filed by the proposed Mexican class representatives on July 7, 2009. As it did in the Order on Proskauer's Motion to Dismiss, this Court should recognize that any claims for unregistered securities outside of the three-year repose period cannot be considered timely and therefore should not be included in any potentially certified case.

For any claims based the sale of securities through untruth or omission, any claim would be barred by the statute of repose after April 6, 2009, three months prior to Troice's original complaint against BMB. Under this application of the statute of repose, no claims against BMB would remain, thus precluding class certification against BMB.

If, however, this Court chooses to construe the expiration date of the letter, rather than the issuance of the letter, as BMB's last culpable act, then the repose calculation changes. It is clear that BMB made no representations about SIB's insurance coverage after August 15, 2004 and

[26] In her deposition, Diaz recognized that the insurance policies expired, but offered no testimony as to the reliability of the letters, since she falsely asserts that no policies actually existed. APP. at 388-89 [Diaz. Tr. 163:23-164:24].

Plaintiffs have made no such allegation. In their depositions, each proposed class representative testified that they understood that their insurance letters included expiration dates. More importantly, although this Court mentioned that "Plaintiffs allege the Stanford scheme's success was due in large part to BMB's letters, even after BMB ceased providing them," Plaintiffs make no such allegations. Order on Mot. to Dismiss [Dkt. No. 208] at 17. In fact, Troice noted in his deposition that after its expiration date, "[t]he letter, then, wouldn't be worth anything." APP. at 1198 [Troice Tr. 220:8-12].

To apply an insurance expiration date analysis, the Court must look to both the date of purchase, as well as the type of CD selected. Working backwards five years from the date that Troice filed his first complaint, a CD purchased between July 2, 2004 and August 15, 2004 could potentially satisfy the statute of repose. However, not every type of CD would satisfy both the statute of repose as well as Plaintiffs' class definition, which indicates that class members must have still held their investments with SIB in February 2009 when Stanford collapsed. Pls.' Br. at 20. If an investor purchased anything less than a five-year CD, he would be excluded under Plaintiffs' class definitions from asserting a claim against BMB, since those investments would have necessarily matured prior to February 2009. Those investors would either have received their CD proceeds and have no claim, or they would have made new CD purchases, in which case, even if they held CDs as of February 2009, they would not be based on alleged misrepresentations and omissions embodied in BMB letters. It is possible that, under this analysis, some hypothetical investor, or small group of investors, who purchased a five-year CD between July 2, 2004 and August 15, 2004 may exist. Even assuming that such a hypothetical investor exists, Plaintiffs cannot establish superiority of class adjudication in light of the exceedingly small class that could assert claims against BMB.

**2. Superiority Cannot be Established Since Foreign Jurisdictions Will Not Recognize a Class Action**

Plaintiffs also fail to establish the superiority of class adjudication since they attempt to include foreign investors in their proposed class. Courts have recognized that a class action is "superior" only if the judgment rendered would be recognized in the Plaintiff class members' home countries. *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir. 1975) (recognizing that "if defendants prevail against a class they are entitled to a victory no less broad than a defeat would have been."); *Buettgen v. Harless*, 263 F.R.D. 378, 382 (N.D. Tex. 2009) ("[I]f this Court's judgment on the merits does not protect a prevailing Defendant against relitigation in [the foreign country], nor grants a prevailing [foreign country] plaintiff an enforceable damage judgment, then for those litigants a class action is not 'superior to other available methods for the fair and efficient adjudication of the controversy."). In this regard, Plaintiffs acknowledge that they have the burden to demonstrate that it is "more likely than not" that foreign courts will recognize a class action judgment rendered in this case. Pls.' Br. at 45. If they are unable to establish this, they further acknowledge that this factor weighs ***against*** a finding of superiority in the class action context. *Id*. Here, Plaintiffs fail to meet their burden.

In one of the cases cited by Plaintiffs, the Southern District of New York indicated that it would exclude foreign claimants from the class if the plaintiffs were unable to show that the foreign court was "more likely than not" to recognize the *res judicata* effect of any U.S. class judgment. The court explained:

> Where plaintiffs are able to establish a probability that a foreign court will recognize the *res judicata* effect of a U.S. class action judgment, plaintiffs will have established this aspect of the superiority requirement . . . . Where plaintiffs are unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority, and taken in consideration with other facts, may lead to the exclusion of foreign claimants from the class.

*In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D 76, 95 (S.D.N.Y. 2007); s*ee also, In re Alston SA Sec. Litig*., 253 F.R.D. 266, 282 (S.D.N.Y 2008).

In an apparent attempt to comply with the *Vivendi* standard, Plaintiffs make the bold and unfounded assertion that "[c]ourts in the relevant Latin American countries would ***more likely than not*** recognize a class action judgment rendered in this case." Pls.' Br. at 46. (emphasis added.).

The problem is that they have no evidence to support this statement. They designated an expert on the topic, Adjunct Professor Alejandro Garro. Nowhere in his report does Garro state that it is "more likely than not" that any of the foreign courts in question would recognize a class action judgment rendered in this case. *See* Ex. 55 to Pls.' Br. To the contrary, Professor Garro goes to great lengths in his report to ***avoid*** offering an opinion concerning enforceability of class action judgments. The reason for this became abundantly clear when he was deposed, where Professor Garro admitted that (1) he recognized the class action aspect is an important issue that will impact the determination of enforceability of any judgment rendered in this case in any of the Latin American countries involved, (2) he raised the class action issue with Plaintiffs' counsel in the case, and (3) he was told not to research that issue, but instead to limit his analysis to the question of whether a normal money judgment (not a class action judgment) would be enforceable in the Latin American countries at issue here. *See* APP. at 431, 433-34, 490-94, 561-63 [Garro Tr. 18:3-8; 20:20-21:15, 77:12-78:20, 79:4-11, 80:20-81:9, 148:5-150:12].

Perhaps one of the reasons he was not asked to look into the issue for his first declaration is the fact that Professor Garro has ***never*** (1) published anything that discusses foreign recognition of a United States class action judgment, (2) taught any classes relating to recognition of a class action judgment in Latin America, or (3) researched or analyzed foreign

recognition of judgments rendered in a United States class action. *See* APP. at 463-64, 466 [Garro Tr. 50:11-14, 51:8-16, 53:7-11].

The only evidence before this Court supports the inescapable conclusion that a class action judgment would ***not*** be recognized or enforced by the Latin American countries in question. Defendant Willis has supplied declarations of two highly qualified and superbly credentialed expert witnesses who discuss these facts in detail. After a reasoned analysis, one of those experts (Professor Manuel Gomez) concluded:

> [N]one of the Latin American countries at issue in this litigation would give *res judicata* effect to an "opt-out" class action judgment rendered in this case to preclude one of their own citizens from re-litigating individual claims against the United States-based Defendants.[27]

The other defense expert (Professor Merritt B. Fox) similarly concludes based on the analysis of Professor Gomez and his own independent research and analysis, that the preclusion portion of the superiority inquiry for this putative class action cannot be established with respect to the proposed Latin American class members.[28] In his report, Professor Fox also provides a helpful history of the preclusion issue in connection with securities litigation involving foreign plaintiffs. And he gives a very helpful overview of the law in this area for the Court's review and consideration for purposes of framing the issues to be decided.

Plaintiffs also cite *Anwar* to support certification in the face of foreign plaintiffs. *Anwar v. Fairfield Greenwich Ltd.*, 289 F.R.D. 105 (S.D.N.Y. 2013), *vacated*, 570 Fed. Appx. 37 (2d. Cir. 2014), *remanded to* No. 09 Civ. 0118(VM), 2015 WL 935454 (S.D.N.Y. March 3, 2015).[29]

---

[27] APP. at 2229 Ex. C, Declaration of Professor Manuel Gomez, at ¶ 110. The Gomez report is incorporated by reference as if fully set forth herein.

[28] APP. at 2183 Ex. A, Declaration of Professor Merritt B. Fox, at 4. The Fox report is incorporated by reference as if fully set forth herein.

[29] Although there is no Fifth Circuit case addressing this issue directly, courts in the Northern District of Texas have touched on the issue, and appear to contradict the reasoning of *Anwar*. In *Buettgen v. Harless*, the court found that the proposed lead class action plaintiff, a Swiss entity, did not adequately represent a class of investors because the

*Anwar* was an outlier to begin with, and the district court commented on the difficulty of making an assessment about recognition of a U.S. class action judgment where countries have not yet addressed the point. *Id*. at F.R.D. at 115. In order to address that difficulty, the court fashioned a "rebuttable presumption" standard. It found that, where a plaintiff demonstrates that the stated policy of a foreign country is to recognize and enforce foreign judgments, or that the foreign country's law is generally inclined to favor enforcing judgments generally, such a showing would create a "rebuttable presumption" that, absent an affirmative showing to the contrary, recognition of a particular United States judgment, even in class action litigation does not violate a foreign country's public policy. *Anwar*, 289 F.R.D. at 115. The court in *Anwar* improperly lumped all "Latin American" countries (including Mexico and Venezuela) together, and held that the "general policy of the relevant Latin American countries inclines to favor granting recognition to judgments of United States courts." *Id*. at 120. Importantly, there was no discussion of the differences in applicable laws and standards of the various countries, which is a major issue here.[30] After interlocutory appeal to the Second Circuit, the district court did certify a class, but only after sufficient factual analysis to determine if commonality could be established. *Anwar*, 2015 WL 935454 at *1.

As noted by Professor Gomez in his declaration, the *Anwar* case entirely misses the point regarding the preclusion analysis in a case like this.[31] Most importantly, it completely ignores the difference between an opt-out class action judgment and a normal judgment where all parties are served and personally appear. For that reason, the ruling does not appear sound.

---

lead plaintiff "might be plagued" with preclusion issues because Switzerland would not recognize a U.S. class action judgment. The interests of the entire class are jeopardized if defendants' *res judicata* arguments were to prevail. *Buettgen*, 263 F.R.D. at 382-83.

[30] *See generally,* the expert declarations of Professor Gomez (APP. at 2229, Ex. C) and Adjunct Professor Garro (APP. at 1831).

[31] APP. at 2229 Ex. C, at page 9, n.15.

But even if the *Anwar* "rebuttable presumption" standard were applied here, the Plaintiffs nevertheless fail to establish superiority requirement because any "presumption" that the Plaintiffs might contend has been established has been more than rebutted by the well-reasoned expert declarations of Professor Gomez and Professor Fox.[32]

In response to Defendants' expert declarations, Plaintiffs once more tasked Professor Garro with addressing the foreign law questions present in this case. While it is clear that the professor has no experience or particular expertise with class action law in the United States or any of the relevant Latin American countries, even he concluded that "the Latin American jurisdictions in question will scrutinize even more closely a U.S. [class action] judgment … especially if such a judgment has been rendered against the interest of class members who failed to appear personally in the class action." Garro Decl. ¶ 28.

When he was deposed regarding his original declaration, Professor Garro identified several areas of additional research he would need to conduct before he could offer an opinion on the matter of class actions in Latin America[33] given the "myriad of issues that [he thought] would be important." APP. at 578 [Garro Tr. 165:22-24]. Yet, when Plaintiffs proffered Professor Garro's rebuttal declaration, it included no additional research. Professor Garro does not provide a single source to support his baseless conclusions.[34]

---

[32] *See* APP. at 2229 Ex. C; APP. at 2183 Ex. A.

[33] First, he noted that he would need to educate himself on the basic law of *res judicata* in each country to identify "the understanding of each one of these jurisdictions and what *res judicata* means, whether it has to be the identity of parties, a cause of action, to which extent the parties to the action may include a potential class member who, just by silence, was considered to be bound by the decisions of the American court." APP. at 577 [Garro Tr. 164:16-23].

In addition, Professor Garro testified that he would need to then apply that knowledge to "notions of due process" and public policy in each country, especially in regard notice and involvement of absent class members. APP. at 577-78 [Garro Tr. 164:24-165:8-24]. To facilitate this research Professor Garro indicated that he would review the law in each country regarding class actions and *res judicata*, any relevant case law, proposed legislation, and scholarly articles. APP. at 580-81 [Garro Tr. 167:2-168:7].

[34] Garro -- despite his own lack of research, understanding, or legal expertise in the matter of class actions -- does see fit, without apparent irony, to lambast defense experts for their conclusions simply because he does not consider them to be well-researched. Garro Decl. ¶ 5.

Professor Garro wholly misunderstands the *res judicata* issue present in this case at the class certification stage. All of the experts in this case agree that determining the *res judicata* effect of this litigation is a necessary component of the superiority analysis. But, where Plaintiffs' and their experts err is in the purpose of the *res judicata* analysis. BMB does not claim that litigation in each plaintiff's home country would be the best way to resolve this dispute; rather, BMB recognizes that an American opt-out class action is inferior to individual claims by investors in a U.S. court.

Plaintiffs also submit the declaration of Professor Gordon as a "non-retained" rebuttal expert in support of class certification. However, that declaration was written in the *Anwar* case, which rested on completely different facts and was decided more than four years ago in a different circuit. Professor Gordon's involvement in this case came as a complete surprise to him, since he did not consent to serve as an expert. APP. at 2309-10 [Gordon Decl.] Professor Gordon did not review any documents in relation to this case, nor did he give Plaintiffs permission to obtain his prior declaration in *Anwar* and submit it to this Court. He has "no knowledge of the parties, facts, or issues [in this case] whatsoever." APP. at 2310 [Gordon Decl.]. More importantly, when defense counsel contacted Professor Gordon, he stated unequivocally that he "would not offer an expert opinion in any case without first understanding the unique facts applicable to that case." APP. at 2310 [Gordon Decl.]. He further declared:

> I have no desire to be involved in this litigation in any manner and reject Plaintiffs' attempt to force me to be their "nonretained" expert witness here… Accordingly, I do not condone the use of any conclusions I may have reached in a prior case as if they are my opinions here.

APP. at 2310 [Gordon Decl.].

Plaintiffs' designation as Professor Gordon as a non-retained fact witness is improper. *See, e.g.*, *Young v. United States*, 181 F.R.D. 344, 346 (W.D. Tex. 1997) ("In the absence of a statute to the contrary, a professional witness may not generally be compelled to testify as an

expert at the request of a private litigant, as such testimony is a matter of contract or bargain."). The Court, therefore, should exclude Professor Gordon's declaration.

Plaintiffs' burden is to prove that class resolution is superior to other types of litigation. In this case, where there is no evidence that any of the Latin American countries in question would give preclusive effect to an American class action judgment, yet there seems to be significant evidence that all of the countries in question would give effect to traditional individual litigation in the U.S. courts. APP. at 1813-47. BMB makes no attempt to disagree with Professor Garro's initial conclusions regarding *res judicata* effect in individual actions. Plaintiffs however, have failed to likewise prove that a class action would be given *res judicata* effect and Professors Gomez and Fox offer significant evidence that *res judicata* would not apply for class actions. As such, for proposed foreign class members in this case, individual action in the U.S. is superior to class action in the U.S. and Plaintiffs have failed to carry their burden under Rule 23(b)(3).

**C. Plaintiffs Fail to Satisfy the Requirements of Rule 23(a)**

In addition to their burden under Rule 23(b), the party seeking class certification must also satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Wal-Mart*, 131 S. Ct. at 2558 (2011).

Plaintiffs proffer the "expert opinion" of Professor Sherman to support their class certification motion. However, Sherman's proposed testimony is nothing more than his legal opinion as to whether certification would be proper in this case. Certification determinations are legal conclusions, and it is axiomatic that "legal opinions are not a proper subject of expert testimony." *Green v. CBS Broad., Inc.*, 3:98-CV-2740-T, 2000 WL 33243748, at *4 (N.D. Tex. Dec. 19, 2000); FED. R. EVID. 403, 702; s*ee also Estate of Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999); *Askanase v. Fatjo*, 130 F.3d 657, 669 (5th Cir. 1997). As stated by the

Fifth Circuit in *Askanase*: "There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge." 130 F.3d at 672, (citing *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) (internal citations omitted) (emphasis added)). Expert testimony on such issues seeks to usurp the role of the trial judge. Sherman's legal testimony would be superfluous at best and will not assist the Court to understand the evidence or to determine a fact in issue. *Id*. As such it should be excluded.

Indeed, another district court has previously excluded Professor Sherman's nearly identical proffered opinions regarding class certification under Rule 23. Order and Reasons, *Woodard, et al. v. Andrus, et al*., No. 03-2098 (W.D. La. Jan. 20, 2009), Dkt. No. 359. There, the court properly excluded Professor Sherman's testimony on exactly the grounds BMB contests here, finding that "[Sherman's] proffered testimony is focused exclusively on whether the legal standard for class certification has been satisfied," and that such testimony does not meet the requirements of Rule 702. *Woodard v. Andrus*, CIV. A. 03-2098, 2009 WL 140527, at *2 (W.D. La. Jan. 20, 2009) (citing *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1212 (D.C. Cir. 1997)).

**1. Plaintiffs cannot satisfy the numerosity requirement**

To satisfy the numerosity requirement, "a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Pederson v. La. State Univ.*, 213 F. 3d 858, 868 (5th Cir. 2000). Moreover, the party must also establish that "joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Holmes v. Service Corp.*, No. H-0-4841, 2014 WL 3046971, at *4 (S.D. Tex. July 3, 2014) (citing *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981)). In determining whether the proponent of class certification has met its burden, the Fifth Circuit "considers 'the geographical dispersion of the class, the ease with which class members may be

identified, the nature of the action, and the size of each plaintiff's claim.'" *Holmes*, 2014 WL 3046971 at *4 (quoting *Zeidman v. J. Ray McDermott*, 651 F.2d 1030, 1045–46 (5th Cir. 1981)).

As much as Plaintiffs may wish to gloss over the numerosity requirement of Rule 23, the Supreme Court has been clear that the Rule is "more than a mere pleading convention," which is what Plaintiffs' argument would reduce it to. *Comcast*, 133 S. Ct. at 1432 (quoting *Wal-Mart* at 2551–52). While Plaintiffs claim that there are 17,023 investors who have approved claims with the Receiver, defining the class on such broad terms is untenable. Pls.' Br. at 23. To certify a class against BMB, Plaintiffs cannot simply sweep every aggrieved Stanford investor into a single group and claim that, because there are so many investors, numerosity is satisfied.

As discussed above, Plaintiffs' proposed classes, when properly redefined, result in a tiny and unsubstantiated class of hypothetical investors. As discussed in reference to the superiority of class adjudication in this case,[35] Plaintiffs' provide no evidence that they could satisfy the numerosity requirement once the class is properly defined. In fact, in 2004, the only year during which any claims could remain against BMB given the TSA statute of repose, Plaintiffs have only provided four insurance letters from BMB. TAC Ex. 27 at 207, 250, 2132, 2125. This is an entirely insufficient showing to establish numerosity in this case. Given this failure to carry their burden, the Court should reject certification as Plaintiffs have ignored the requirement to provide a "reasonable estimate of the number of purported class members." *Pederson*, 213 F.3d at 868.

**2. Plaintiffs fail to satisfy the commonality requirement**

The commonality prong requires the proponent of class certification "to demonstrate that the class members have suffered the same injury." *Wal-Mart*, 131 S. Ct. at 2551. A class action suit must be able "to generate common answers apt to drive the resolution of the litigation." *Id.* Stated differently, "the determination of the truth or falsity of the so-called 'common contention'

[35] *See* Section III.B., s*upra*.

must 'resolve an issue that is central to the validity of each and every one of the claims in one stroke.'" *In re BP P.L.C. Securities Litig.*, No. 4:10-md-2185, 2013 WL 6388408, at *5 (S.D. Tex. Dec. 6, 2013) (citing *Wal-Mart*, 131 S. Ct. at 2551)). Simply showing that the all parties "suffered a violation of the same provision of law" is not sufficient. *Id.* "Put simply, commonality [requires] (1) that the proposed class representative has the burden of proving, that (2) there is at least one common question of law or fact shared by the class, and (3) that the common question not be peripheral but important to most of the individual class member's claims." 1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS, 229-30 (5th ed. 2011).

Here, Plaintiffs have failed to carry their burden across the board for, amongst others, the same reasons set forth above regarding Plaintiffs' failure to establish predominance. Plaintiffs ask this Court to reduce the commonality inquiry into a "mere pleading standard," going so far as to describe the requirement as "un-demanding." Pls.' Br. at 23. However, Plaintiffs misapprehend the commonality requirement. The commonality requirement is not "un-demanding" as they claim *Wal-Mart* establishes, rather *Wal-Mart's* discussion of commonality serves to distinguish it from the Rule 23 (b)(3) predominance requirement. *Wal-Mart*, 131 S. Ct. at 2556.

Plaintiffs cite *Longden v. Sunderman* as a case where "commonality [was] established by allegations of uniform marketing and planning including use of substantially similar sales materials." Pls.' Br. at 24. However, *Longden* does no such thing. Instead of resting on bare "allegations," the decision in *Longden* was based on the plaintiffs' "evidence showing the results of an extensive analysis done by their CPA expert…, demonstrating the high incidence of similarly misleading financial information common [throughout the class], which also [reflected] the uniform structure of the deals." *Longden v. Sunderman*, 123 F.R.D. 547, 552 (N.D. Tex. 1998). Similarly, in *Wal-Mart*, the plaintiffs claimed that uniform discriminatory practices

Case 3:12-cv-04641-N-BG Document 180-2 Filed 02/26/16 Page 33 of 72 PageID 7526

resulted in violations of the law and submitted statistical evidence which they argued supported class-wide adjudication. The *Wal-Mart* court eventually rejected the commonality argument, noting that individual inquiry was necessary to determine the validity of each claim. *Wal-Mart*, 161 S. Ct. at 2546.

Here, unlike the *Longden* and *Wal-Mart* plaintiffs, Plaintiffs have offered no evidence beyond their unsubstantiated claims that there was a unified marketing scheme. In fact, Canabal and Punga Punga's principal, Green, testified that they knew certain investors who did not receive insurance letters. APP. at 26-30, 213-14, 866-68 [Canabal Tr. 26:5-30:20, 213:4-214:21; APP. at 1088-90 [Punga Punga (Green) Tr. 110:4-112:12]. The only question common to any of the proposed classes is what marketing materials were provided to each investor, yet even that question does not "resolve an issue that is central to the validity of each and every one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. Rather, it simply raises a host of other individual questions that defeat any claim of commonality.

Plaintiffs propose a class of 17,023 individuals who spoke to hundreds of different financial advisors, in 100 different countries, some of whom received an insurance letter from BMB and/or Willis and some of whom did not, and some of whom were given disclosure statements disclaiming CD insurance. Plaintiffs ask this Court to certify a class simply because they have a single trait in common as Stanford investors. But, as previously discussed in the predominance and superiority sections, individual questions rest at the center of this case. *See* Sections III.A and III.B, *supra*.

**3. Class representatives are not typical of the class as a whole**

The typicality analysis "focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they purport to represent." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997). Therefore, the "the claims

of all class members need not be identical [but] must arise from a similar course of conduct and share the same legal theory." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001). The proponent of class certification must show that "under the particular circumstances[,] maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n.13.

Plaintiffs contend that typicality is satisfied because the named plaintiffs were allegedly subjected to "the same deceptive sales techniques regarding insurance allegedly employed by Stanford against other class members." Pls.' Br. at 23. However, they have failed to establish by a preponderance of the evidence what course of conduct was even typically followed by Stanford financial advisors since none of the deposed named plaintiffs allege identical behavior.

To be typical of the class, Plaintiffs would need to establish first that there was a uniform marketing scheme, then that each proposed class representative was subjected to it. Yet, as discussed, each of them testified at their deposition that they were shown different marketing materials, told different things, and that they do not know what information was provided to other proposed class members.[36] Proposed class representatives in this case further claim that they are typical of all investors, yet they themselves recognize that not all investors received the insurance letters they rest their entire case upon.[37] In addition, Defendants have unique defenses against any investor who was shown disclosure documents, including but not limited to all U.S. investors. In Texas, oral misrepresentations that conflict with written disclosures are not actionable as a matter of law. *See Schlumberger Tech v. Swanson*, 959 S.W.2d 171, 180 (Tex. 1997).

---

[36] *See* Sections III.A and III.B, *supra*.

[37] *See* Section.III.A, *supra*.

In light of the undisputed facts available in this case, Plaintiffs fail to establish typicality and thus certification should be denied.

**4. Class representatives do not adequately protect class interests**

Finally, in order to certify a class, the court must be satisfied that "the representative parties fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Determining the adequacy of proposed class representatives is a two-fold process. First, the court must consider whether the representative has "the willingness and ability…to take an active role in and control the litigation." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005). Second, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem*, 521 U.S. at 625-26. When the interest of proposed class representatives do not align with those of absent class members, certification must fail on adequacy grounds. *Id*. at 626.

Although Plaintiffs claim that each named plaintiff is an adequate class representative, once again, they inappropriately attempt to reduce the inquiry to a mere pleading convention.[38]

***a. Proposed class representatives offer no proof of knowledge of the case***

In the Fifth Circuit, proposed class representatives bear the burden of proving, by a preponderance of the evidence, that each individual "possess[es] a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001). Although "class representatives need not be legal scholars and are entitled to rely on counsel, [they] do need to know more than

[38] As discussed in reference to the proposed class definitions, the proposed class representatives are also inadequate because they lack standing to assert aiding claims under the TSA. *See* Section III.B.1, *supra*.

that they were 'involved in a bad business deal.'" *Id*. at 483 (quoting *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 410 (W.D. Okla. 1990)); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 534 (N.D. Tex. 2005). Further, regardless of how competent class counsel may be, proposed class representatives are inadequate under the Rule if their understanding is "limited to derivative knowledge acquired solely from counsel." *Krim v. pcOrder.com*, 210 F.R.D. 581, 587 (W.D. Tex. 2002) (citing *Berger*, 257 F.3d at 483 n. 18); *Ogden*, 225 F.R.D. at 535.

In this case, none of the proposed class representatives demonstrate that they have sufficient knowledge to control or prosecute this case. Moreover, whatever knowledge they do possess is derived solely from class counsel. This is an exceedingly complex case, yet proposed named plaintiffs could not even testify to the basic facts of their case. None of them could accurately describe the alleged "uniform marketing" scheme that underpins this litigation. None of them could testify regarding the different disclosure statements that U.S. and other investors, whom they claim to adequately represent, were all given prior to investing in Stanford CDs. And only Canabal and Punga Punga (Green) could identify when BMB stopped covering the Stanford financial lines. As such, this Court should deny class certification on adequacy grounds.

In her deposition, Diaz:

1. Testified that neither she nor her husband speak English and that she never received a translated version of the TAC until her son prepared one shortly before her deposition. APP. at 272 [Diaz Tr. 47:13-25].

2. Cannot recall whether she ever reviewed any drafts of the TAC, or any earlier complaints in this case. APP. at 261-62 [Diaz Tr. 36:20-37:14].

3. Erroneously identified Stanford as a defendant in the lawsuit. APP. at 238 [Diaz Tr. 13:22-24].

4. Could not testify whether everything in her declaration is accurate. APP. at 285-86 [Diaz Tr. 60:25-61:5].

5. Was unable to describe the marketing practices Nanes allegedly used with other investor-clients. APP. at 306 [Diaz Tr. 81:2-18].

6. Failed to recall what types of documents she was shown during her initial investment meeting with Nanes. APP. at 404 [Diaz Tr. 179:5-11].

7. Had no knowledge of other class members' investing background with Stanford, the marketing practices used by other financial advisors in Mexico, or the marketing practices used in Venezuela. APP. at 373-78 [Diaz Tr. 148:10-153:11].

8. Could not identify when BMB started or stopped issuing insurance letters for Stanford. APP. at 373-78 [Diaz Tr. 148:10-153:11].

In his deposition, Troice:

1. Was unable to articulate whether Plaintiffs' TAC was an accurate expression of his claim. APP. at 1042-45 [Troice Tr. 64:9-13, 65:15-22, 66:12, 67:10-14, 24].

2. Was unaware of when BMB started or stopped issuing insurance letters for Stanford. APP. at 1083 [Troice Tr. 105:4-9].

3. Did not know if Stanford sold CDs before or after BMB issued insurance letters. APP. at 1083-84 [Troice Tr. 105:16-106:3].

4. Has no idea how many investors did not receive letters, how many investors did receive letters, or how Stanford used the proceeds of investments. APP. at 1083-87 [Troice Tr. 105:12-109:13].

5. Could not identify how many investors are alleged to have received BMB letters. APP. at 1164 [Troice Tr. 186:5-7].

6. Could not describe the marketing practices Nanes allegedly used with his other investor-clients. APP. at 1074 [Troice Tr. 96:15-20].

In his deposition for Punga Punga, Green:

1. Could not identify how many investors received a BMB letter. APP. at 867 [Punga Punga (Green) Tr. 111:16-19].

2. Did not know what Nanes told other investors or what other financial advisors in Mexico or other countries told their investor-clients about insurance. APP. at 872-74 [Punga Punga (Green) Tr. 116:7-118:13].

3. Does not know anything about the documents provided to U.S. investors, or what financial investors told U.S. investors, or who received the U.S. disclosure statement. APP. at 879-81 [Punga Punga (Green) Tr. 123:15-125:2].

In his deposition, Canabal:

1. Could not identify where Stanford International Bank was located (even though Stanford flew him to its Antiguan headquarters), erroneously stating that the bank was based in Texas. APP. at 63-64 [Canabal Tr. 63:22-64:25].

2. Could not recall whether the first insurance letter he saw was from BMB or Willis. APP. at 71-72 [Canabal Tr. 71:23-72:11].

3. Testified that he still does not believe that his financial advisors lied to him about his CD investment being insured. APP. at 78-79 [Canabal Tr. 78:22-79:3].

4. Was unaware of how many potential class members he was seeking to represent, stating when asked that he did not "have any idea." APP. at 180 [Canabal Tr. 180:9-14].

5. Could not say what information was given to other investors. He noted the added difficulty of finding that information with regard to non-Venezuelan investors, stating "If I don't know about the [investors] in Venezuela, it would be more difficult to know about ones in Mexico." APP. at 188-89 [Canabal Tr. 188:21-189:11].

In his deposition, Gomez:

1. Admitted that he had only ever spoken to his attorney twice by phone. APP. at 612-13 [Gomez Tr. 16:23-17:2].

2. Disclosed that he relies on Canabal for all communication with his attorney in this case, stating, "I did not communicate with [Mr. Valdespino]. It was Mr. Canabal that communicated with him, not me. And then later he would inform me." APP. at 613 [Gomez Tr. 17:3-9].

3. Could not identify where Stanford International Bank was located (even though Stanford flew him to its Antiguan headquarters), erroneously stating that the bank was based in Texas. APP. at 650-51 [Gomez Tr. 54:3-55:9].

4. Had no input in the declaration he submitted or the drafts of any complaints in this case, stating, "No, I didn't put any comment. Why am I going to correct something that a lawyer has written up or created, the lawyer who is going to be defending me." APP. at 666 [Gomez Tr. 70:15-21].

5. Did not know when BMB started or stopped issuing insurance letters. APP. at 737 [Gomez Tr. 141:10-25].

6. Could not specify how many investors the proposed class would encompass, how class members would be identified, what countries they come from, or whether they received any insurance letters (either from BMB or Willis). APP. at 739-40 [Gomez Tr. 143:4-144:6].

7. Testified that he could not describe what other investors (in Venezuela, or in other countries) were told by their financial advisors, or what marketing materials were provided to other investors. APP. at 740, 741-44 [Gomez Tr. 144:3-9, 145:2-148:17].

***b. Proposed class representatives are subject to different defenses than the class as a whole***

In addition, proposed class representatives should not be subject to affirmative defenses that are not common to the entire class, otherwise the risk that the case will be diverted into a mini-trial specific to the class representative is too great.[39] In any case, a defendant's due process rights must be preserved. In the context of class actions, this necessitates that defendants are afforded the opportunity "to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates [that] right or masks individual issues." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3rd Cir. 2013). In this case, as previously discussed, the TSA statute of repose is a significant affirmative defense that BMB will raise against each of the proposed class representatives since none of them purchased CDs during the sliver of time that BMB could face potential liability. BMB incorporates its TSA statute of repose arguments in full into its objections against each of Plaintiffs' proposed class representatives. Moreover, those class representatives who never received a BMB letter, like Troice, are further subject to unique defenses not common to other class members.

***c. Proposed class representatives are inadequate representatives of investors who received U.S. disclosures***

Adequacy of proposed class representatives is further precluded when there are "'conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Langbecker*, 476 F.3d at 314 (quoting *Berger*, 257 F.3d at 479-80 (quoting *Amchem*, 521 U.S. at 625)). Here, the proposed class representatives cannot adequately represent any investor who received the U.S. Accredited Investor Disclosure Statement, which clearly stated that Stanford's

[39] These same facts also caution against certification on commonality grounds.

insurance policies did not insure customer deposits, or other SIB marketing materials with similar disclosures. APP. at 1435-51, 1574-96; *see also* Section III.B.1, *supra*.

Both Troice and Canabal, for example, testified that had they been aware of such a disclosure, they would not have invested. APP. at 1144 [Troice Tr. 166:10-24]; APP. at 126 [Canabal Tr. 126:12-17]. As previously discussed in Section III.C.3, *supra*, in Texas, such oral representations are not actionable as a matter of law. *See Schlumberger*, 959 S.W.2d at 180. Allowing such representatives to proceed for any class including investors who received or viewed such documents would fail to preserve and protect the rights of any absent class members who saw those disclosures and invested anyway. Defendants have unique defenses against investors who allege that they relied on oral misrepresentations regarding insurance that conflicted with such written disclosures. Troice and Canabal could not represent absent class members in this regard since they essentially agree with BMB: those individuals should have relied on the disclosure statements and could not have reasonably relied on any oral representations made in conflict with those disclosures. Allowing a class representative who is not subject to the same defenses as the class -- in addition to indicating once again that the proposed class itself is too disjointed to justify certification -- is improper under Rule 23.

## IV. CONCLUSION

For all the reasons set forth herein, this Court should not certify a class action claim against BMB. BMB additionally adopts and incorporates herein by reference Willis's Opposition to Plaintiffs' Motion for Class Certification, together with all supporting evidence. For the reasons that Willis articulates in its opposition, Plaintiffs cannot meet the prerequisites of Rule 23 as to Willis – or BMB.

Moreover, Plaintiffs' attempt to combine their putative class claims against Willis and BMB is wholly improper. No evidence has been provided as to which investors received letters

from BMB, which investors received letters from Willis, which investors received both, and which investors received neither. Plaintiffs are attempting to combine four different categories of investors, all of which are undefined. Even within these disparate groups, individual issues predominate. *See* Section III.A., *supra*. Combining their claims against Willis and BMB simply compounds this error. The putative class is fundamentally defective, and Plaintiffs' motion should be denied.

Respectfully submitted,

s/ Bradley W. Foster

Bradley W. Foster
State Bar No. 07283200
Matthew G. Nielsen
State Bar No. 24032792
Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone: (214) 659-4400
Facsimile: (214) 659-4401

David P. Whittlesey
State Bar No. 00791920
Andrews Kurth LLP
111 Congress Avenue, Suite 1700
Austin, Texas 78701
Telephone: (512) 320-9321
Facsimile: (512) 320-9200

Nicholas J. Lanza
State Bar No. 11941225
McCormick, Lanza & McNeel, LLP
4950 Bissonnet Street
Bellaire, Texas 77401
Telephone: (713) 523-0400
Facsimile: (713) 668-6417

**ATTORNEYS FOR DEFENDANT BOWEN, MICLETTE & BRITT, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of April, 2015, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. The electronic case file system sent a "Notice of Electronic Filing" to all counsel of record, each of whom have consented in writing to accept this Notice as service of this document by Electronic means.

s/ Bradley W. Foster

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **LYNNE TURK, et al.** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 3:09-cv-02199** |
| | § | |
| **PERSHING LLC,** | § | |
| | § | |
| **Defendant.** | § | |

**PERSHING'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND FOR DESIGNATION OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

GT
EXHIBIT 022

Case 3:12-cv-04641-N-BG Document 130-29 Filed 02/21/16 Page 24 of 95 PageID 4357

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

TABLE OF ABBREVIATIONS .......... xii

PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 2

A. Clearing Firms Play a Very Limited Role in the Securities Industry .......... 2

B. As Plaintiffs Acknowledge, Pershing's Narrow Role As a Clearing Firm Circumscribes Any Class That Could Ever Be Considered .......... 5

C. Even as Circumscribed, Plaintiffs Seek to Certify a Sprawling, World-Wide Class on Highly Individualized Facts .......... 8

1. The Proposed Class Members are Geographically Scattered .......... 8

2. The Proposed Class Members Present Widely Divergent Circumstances, Characteristics, and Investments .......... 9

3. The Alleged Untruths and Omissions Varied Significantly Across the Class .......... 10

4. The Unique Liability Theory Against Pershing Implicates Even More Individualized Questions .......... 13

5. Remedies and the Role of Other Actors Raise Many Individualized Issues .......... 15

D. Multiple Individual and Mass Actions Against Pershing Confirm That Class Certification is Neither Necessary Nor Appropriate .......... 19

ARGUMENT .......... 22

I. Choice-Of-Law Issues Preclude Certification .......... 22

A. No Prior Decision in Any Stanford Case Excuses Plaintiffs' Failure to Present a Detailed Conflicts Analysis .......... 24

B. An Appropriate Conflicts Analysis Would Have Revealed That Texas Law Cannot be Applied Globally on a Class-Wide Basis .......... 28

1. The TSA Does Not Apply Across-the-Board to All Unregistered-Securities Claims .......... 31

2. The TSA Does Not Apply Across-the Board to All Untruth-and-Omission Claims .......... 33

3. The TSA Does Not Apply Across-the-Board to All Unregistered Dealer Claims ........ 42

C. Material Differences in Applicable Law Present Insuperable Obstacles to Class Certification ........ 44

II. Even Under Texas Law, Plaintiffs Cannot Demonstrate That Common Questions Will Predominate ........ 50

A. Individual Issues Will Predominate On Liability ........ 52

B. Individual Issues Will Predominate On Causation and Remedies ........ 59

III. Plaintiffs Fail To Demonstrate That A Class Action Is "Superior" ........ 60

A. The Availability of Alternative Forums and The Vast Number of Investors Who Have Chosen Those Forums Preclude Class Certification ........ 61

1. The Nature of the Claims and the Available Forums Reveal Viable Alternatives to Certification ........ 62

2. Well Over a Thousand Investors Have Flocked to Alternative Forums to Pursue Pershing ........ 65

B. A Class Action Is Not Superior Given the Risk That Foreign Jurisdictions Would Not Recognize a Judgment or Settlement ........ 67

C. The Proposed Class is Unmanageable ........ 70

IV. There Are Serious Questions About The Adequacy Of The Class Representatives ........ 71

A. Susan Blount is Not an Adequate Class Representative ........ 72

B. Dale Quisenberry is Not an Adequate Class Representative ........ 73

C. Lynne Turk is Not an Adequate Class Representative ........ 74

D. All Three Named Plaintiffs Are Inadequate Class Representatives ........ 76

V. Plaintiffs' Proposed Class Definitions Are Flawed ........ 80

CONCLUSION ........ 81

Case 3:09-cv-02199-N-BG Document 181-5 Filed 02/26/16 Page 349 of 492 PageID 4358

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Agape Litig.*,
773 F. Supp. 2d 298 (E.D.N.Y. 2011) ....79

*Ahmad v. Old Republic Nat'l Title Ins. Co.*,
690 F.3d 698 (5th Cir. 2012) ....50

*Alabama v. Blue Bird Body Co.*,
573 F.2d 309 (5th Cir. 1978) ....63

*Allison v. Citgo Petro. Corp.*,
151 F.3d 402 (5th Cir. 1998) ....63, 70

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ....67, 68

*In re Am. Med. Sys.*,
75 F.3d 1069 (6th Cir. 1996) ....23

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....61, 71

*Andrews v. Chevy Chase Bank*,
545 F.3d 570 (7th Cir. 2008) ....63

*Ansari v. N.Y. Univ.*,
179 F.R.D. 112 (S.D.N.Y. 1998) ....68

*Anvil Inn Ltd. v. Thornhill Condos*,
407 N.E. 2d 641 (Ill. App. Ct. 1980) ....48

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*,
228 F. Supp. 2d 348 (S.D.N.Y. 2002)....67

*Baum v. Great Western Cities, Inc.*,
703 F.2d 1197 (10th Cir. 1983) ....64

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d. Cir. 2013)....57

*Benson v. JPMorgan Chase Bank, N.A.*,
No. C-09-5272, 2010 WL 3168390 (N.D. Cal. Aug. 10, 2010) ....79

*Berger v. Compaq Computer Corp.*,
257 F.3d 475 (5th Cir. 2001) .......... 73-74

*Bersch v. Crexel Firestone, Inc.*,
519 F.2d 974 (2d Cir. 1975).......... 67, 68

*Bishop v. Fla. Specialty Paint Co.*,
389 So. 2d 999 (Fla. 1980) .......... 24, 28

*Brown v. Ticor Title Ins. Co.*,
982 F.2d 386 (9th Cir. 1992) .......... 71

*Buettgen v. Harless*,
263 F.R.D. 378 (N.D. Tex. 2009) .......... 67

*Calpetco 1981 v. Marshall Exploration, Inc.*,
989 F.2d 1408 (5th Cir. 1993) .......... 51

*Camp v. Dema*,
948 F.2d 455 (8th Cir. 1991) .......... 56

*Carothers v. Rice*,
633 F.2d 7 (6th Cir. 1980) .......... 48

*Carr v. CIGNA Sec., Inc.*,
95 F.3d 544 (7th Cir. 1996) .......... 57

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) .......... 22, 60-61, 62

*Cates v. Creamar*,
431 F.3d 456 (5th Cir. 2005) .......... 43

*Citigroup Global Markets v. Salerno*,
445 F. Supp. 2d 124 (D. Mass. 2006) .......... 48

*Citizens Ins. Co. of Am. v. Daccach*,
217 S.W.3d 430 (Tex. 2007).......... *passim*

*Cox Texas Newspapers, L.P. v. Wootten*,
59 S.W.3d 717 (Tex. App. 2001).......... 57

*CPC Int'l Inc. v. McKesson Corp.*,
70 N.Y.2d 286 (1987) .......... 45

*Crescendo Investments, Inc. v. Brice*,
61 S.W.3d 465 (Tex. App. 2001).......... 50-51

*Culbertson v. Lykos*,
No. 13-20569, 2015 U.S. App. LEXIS 10454 (5th Cir. Jun. 22, 2015)....................................26

*In re Deepwater Horizon*,
732 F.3d 326 (5th Cir. 2013) ....................................................................................80

*In the Matter of Delmar Fin. Servs.*,
Admin Proc. File No. 3-9959, 2011 SEC LEXIS 1737 (ALJ Aug. 14, 2001)...........................8

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) ..............................................................................51, 56

*Drake v. Morgan Stanley & Co.*,
No. CV-09-6467, 2010 WL2175819 (C.D. Cal. Apr. 30, 2010) ...........................................64

*Drennan v. PNC Bank, NA*,
622 F.3d 275 (3d Cir. 2010)..........................................................................................15

*Drimmer v. WD-40 Co.*,
No. 06-CV-900, 2007 WL 2456003 (S.D. Cal. Aug. 24, 2007) ............................................76

*East Tex. Motor Freight Sys., Inc. v. Rodriguez*,
431 U.S. 395 (1977)....................................................................................................72

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)....................................................................................................50

*In re Enron Corp. Sec., Derivative, and ERISA Litig.*,
761 F. Supp. 2d 504 (S.D. Tex. 2011) ...........................................................................34

*F.F.P. Operating Partners L.P. v. Duenez*,
237 S.W.3d 680 (Tex. 2007)..........................................................................................59

*Farmers Ins. Exch. v. Leonard*,
125 S.W.3d 55 (Tex. App. 2003)....................................................................................78

*Faust v. Comcast Cable Commc'ns Mgmt., LLC*,
Nos. WMN–10–2336, WMN–12–2909, 2014 WL 3534008
(D. Md. July 15, 2014)................................................................................................77

*Feinstein v. Firestone Tire & Rubber Co.*,
535 F. Supp. 595 (S.D.N.Y. 1982)..................................................................................76

*Fezzani v. Bear, Stearns & Co.*,
592 F. Supp. 2d 410 (S.D.N.Y. 2008)...............................................................................8

*In re Ford Motor Co., Bronco II Prod. Liab. Litig.*,
177 F.R.D. 360 (E.D. La. 1997).....................................................................................74

*Georgine v. Amchem Products, Inc.*,
83 F.3d 610 (3d Cir. 1996)....................23, 71

*Grainger v. State Sec. Life Ins. Co.*,
547 F.2d 303 (5th Cir. 1977)....................51

*Granader v. McBee*,
23 F.3d 120 (5th Cir. 1994)....................46

*Grant Thornton LLP v. Suntrust Bank*,
133 S.W.3d 342 (Tex. App. 2004)....................34

*Green v. Green*,
293 S.W.3d 493 (Tenn. 2009)....................46

*Gregory v. Finova Capital Corp.*,
442 F.3d 188 (4th Cir. 2006)....................61

*Griffin v. G.K. Intelligent Sys., Inc.*,
196 F.R.D. 298 (S.D. Tex. 2000)....................63

*Gyarmathy & Assocs. v. TIG Ins. Co.*,
No. 3:02-cv-1245, 2003 WL 21339279 (N.D. Tex. June 3, 2003)....................23, 24

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014)....................27

*Highland Crusader Offshore Partners, L.P. v. Motient Corp.*,
281 S.W.3d 237 (Tex. Civ. 2009)....................34

*Hughes Wood Prods., Inc. v. Wagner*,
18 S.W.3d 202 (Tex. 2000)....................24, 28

*James v. Home Constr. Co. of Mobile, Inc.*,
621 F.2d 727 (5th Cir. 1980)....................15

*Janvey v. Adams & Reese, LLP*,
Case No. 3:12-cv-00495 (N.D. Tex. Sept. 11, 2013)....................28, 39

*Janvey v. Brown*,
767 F.3d 430 (5th Cir. 2014)....................24, 25, 80

*Janvey v. Proskauer Rose LLP*,
No. 3:13-cv-477 (N.D. Tex. June 23, 2015)....................27

*Janvey v. Rebecca Reeves-Stanford*,
No. 3:09-cv-2151 (N.D. Tex. Nov. 18, 2010)....................28

*Janvey v. Suarez*,
978 F. Supp. 2d 685 (N.D. Tex. 2013) ........................................................................27

*Janvey v. Willis of Colorado*,
No. 3:13-cv-03980 (N.D. Tex. Dec. 5, 2014)..................................................................25, 26

*Keogler v. Krasnoff*,
601 S.E.2d 788 (2004) .............................................................................................46

*Kottler v. Deutsche Bank, AG*,
AG, No. 05 Civ. 7773, 2010 WL1221809 (S.D.N.Y. Mar. 29, 2010)....................................65

*Kurczi v. Eli Lilly & Co.*,
160 F.R.D. 667 (N.D. Ohio 1995) ...............................................................................72

*Levias v. Pac. Mar. Ass'n*,
No. 08-CV-1610-JPD, 2010 WL 358499 (W.D. Wash. Jan. 25, 2010) .................................72

*Levitt v. J.P. Morgan Securities, Inc.*,
710 F.3d 454 (2d Cir. 2013).........................................................................................8

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
350 F.3d 1018 (9th Cir. 2003) .....................................................................................77

*Lutheran Bhd. v. Kidder Peabody & Co.*,
829 S.W.2d 300 (Tex. App. 1992)................................................................................59

*Madison v. Chalmette Refining LLC*,
637 F.3d 551 (5th Cir. 2011) .......................................................................................60

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995).....................................................................................................64

*McClain v. Lufkin Indus., Inc.*,
519 F.3d 264 (5th Cir. 2008) .......................................................................................78

*Mielo v. Bob Evans Farms, Inc*.,
No. 14–1036, 2015 WL 1299815 (W.D. Pa. Mar. 23, 2015) ..............................................76

*Mims v. Stewart Title Guar. Co.*,
590 F.3d 298 (5th Cir. 2009) .......................................................................................50

*Minneapolis Empl. Ret. Fund v. Allison Williams Co.*,
519 N.W.2d 176 (Minn. 1994).....................................................................................46

*Morrison v. National Australia, Ltd.*,
561 U.S. 247 (2010)...............................................................................................26, 67

*Morrow v. Washington*,
277 F.R.D. 172 (N.D. Tex. 2011) ....................................................................................63

*In re National Century Financial Enterprises, Inc.*,
755 F. Supp. 2d 857 (S.D. Ohio 2010) ..........................................................................23

*Navarro v. Grant Thornton, LLP*,
316 S.W.3d 715 (Tex. App. 2010)........................................................................51, 56

*Norwood v. Raytheon Co.*,
237 F.R.D. 581 (W.D. Tex. 2006) ................................................................................28

*OSIC v. Breazeale Sachse & Wilson*,
No. 3:11-cv-329 (N.D. Tex Mar. 24, 2015)...................................................................27

*In re Perry*,
404 B.R. 196 (Bankr. S.D. Tex. 2009) ..........................................................................50

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)........................................................................................................23

*Phillips Petroleum Co. v. Yarbrough*,
405 S.W.3d 70 (Tex. 2013)............................................................................................78

*Quest Medical, Inc. v. Apprill*,
90 F.3d 1080 (5th Cir. 1996) ..........................................................................................63

*Rosenthal v. Dean Witter Reynolds, Inc.*,
908 P.2d 1095 (Colo. 1995)............................................................................................46

*Rotstain, et al. v. Trustmark Nat'l Bank, et al.*,
No. 3:09-cv-02384 (N.D. Tex. Nov. 13, 2009)..............................................................19

*Rowden v. Pac. Parking Sys., Inc.*,
282 F.R.D. 581 (C.D. Cal. 2012) ....................................................................................62

*Sanchez v. Wal-Mart Stores, Inc.*,
No. 2:06-CV-02573, 2009 WL 1514435 (E.D. Cal. May 28, 2009) ...........................77

*Spence v. Glock, Ges.m.b.H.*,
227 F.3d 308 (5th Cir. 2000) ....................................................................................23, 24

*In re STEC Inc. Sec. Litig.*,
CV 09–8536, 2012 WL 6965372 (C.D. Cal. Mar. 7, 2012) .........................................76

*Steering Committee v. Exxon Mobil Corp.*,
461 F.3d 598 (5th Cir. 2006) ....................................................................................60, 70

*In re Stephen Thorlief Rangen*,
52 S.E.C. 1304 (April 18, 1997) ....................17

*Stoneridge Inv. Partners, LLC v. Scientific Atlanta, Inc.*,
552 U.S. 148 (2008) ....................44

*In re Teflon Prods. Liab. Litig*.,
254 F.R.D. 354 (S.D. Iowa 2008) ....................76

*Telco Group v. Ameritrade, Inc*.,
No. 8:05-CV-3876, 2006 U.S. Dist. LEXIS 83475 (D. Neb. Nov. 6, 2006) ....................64

*Ticknor v. Rouse's Enter*.,
592 Fed. Appx. 276 (5th Cir. 2014) ....................60, 61, 62

*Tirapelli v. Advanced Equities, Inc*.,
813 N.E.2d 1138 (Ill. App. Ct. 2004) ....................46

*Tracker Marine LP v. Ogle*,
108 S.W.3d 349 (Tex. App. 2003) .................... 34-40

*Transamerica Mortgage Advisors, Inc., et al. v. Lewis*,
444 U.S. 11 (1979) ....................44

*In re Tremont Sec. Law, State Law, and Ins. Litig*.,
Nos. 08civ11117, 11civ1687, 2013 WL 2257053 (S.D.N.Y. May 23, 2013) ....................34

*Troice, et al. v. Proskauer Rose LLP, et al.*,
No. 3:09-cv-01600 (N.D. Tex. Apr. 20, 2015) .................... 11-12

*Troice, et al, v. Willis of Colorado, Inc., et al.*,
No. 3:09-cv-01274 (N.D. Tex. Apr. 20, 2015) ....................11, 69

*Valentino v. Carter-Wallace, Inc*.,
97 F.3d 1227 (9th Cir. 1996) ....................61

*In re Vivendi Universal, S.A. Sec. Litig.*,
242 F.R.D. 76 (S.D.N.Y. 2007) ....................67, 68

*In re Warfarin Sodium Antitrust Litig*.,
391 F.3d 516 (3d Cir. 2004) ....................71

*Weatherly v. Pershing LLC*,
No. 3:14-cv-00366 (N.D. Tex. June 23, 2015) ....................45

*Wilson v. Home Depot U.S.A., Inc.*,
225 F.R.D. 198 (W.D. Tex. 2004) ....................77

*Yadlofsky v. Grant Thornton L.L.P.*, 197 F.R.D. 292 (E.D. Mich. 2000) .....31

*Zachery v. Texaco Exploration and Production, Inc.*, 185 F.R.D. 230 (W.D. Tex. 1999) .....78

**Statutes & Rules**

Ariz. Rev. Stat. Ann. § 44-2004.....49

D.C. Code § 31-5006.05(f) .....49

Fed. R. Civ. P. 23 ..... *passim*

FINRA Rule 2111 .....17, 54

FINRA Rule 3230 .....4, 5

FINRA Rule 4311 .....4, 5

FINRA Rule 12200 .....20

FINRA Rule 12213(a).....66

FINRA Rules 12400-404 .....64

FINRA Rule 12506 .....64

FINRA Rule 12800 .....64

Fla. Stat. Ann. § 517.211(1).....47

815 Ill. Comp. Stat. 5/13A .....46

La. Rev. Stat. Ann. § 51:714.A.....48

N.C. Gen. Stat. Ann. § 78A-56 .....49

N.D. Cent. Code 10-04-17(5) .....49

Nev. Rev. Stat. 90.670 .....49

N.J. Stat. Ann. § 49:3-71.....46, 48

70 Pa. Stat. § 1-501 .....48

S.D. Codified Laws § 47-31B-509(j).....49

Tenn. Code Ann. § 48-1-122 .....47, 48

Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013 .................................................. *passim*

Tex. Civ. Prac. & Rem. Code § 41.003 ..........................................................................63

Tex. Rev. Civ. Stat. art. 581-33 .................................................................................. *passim*

Tex. State Sec. Bd., Rule 139.7(a) ..............................................................................32

Utah Code Ann. § 61-1-22(2) ......................................................................................47

15 U.S.C. § 78q-1 ..........................................................................................................5

**Other Authorities**

Steven M. Lipsman, *Exemptions Under the Texas Securities Act: A Logical Framework for the Practicing Attorney*, 22 HOUS. L. REV. 725 (1985) ................................32

JOSEPH C. LONG, BLUE SKY LAW (2014) ................................................................... *passim*

Chrystal Loyer (FINRA), *Considering Attorneys' Fees Using FINRA's Award Information Sheet*, THE NEUTRAL CORNER, Vol. 4, 2014 ..............................................64

Henry F. Minnerop, *Clearing Arrangements*, 58 BUS. LAW. 917 (2003) ....................................3

Henry F. Minnerop, *The Role and Regulation of Clearing Brokers*, 48 BUS. LAW. 841 (1993) ...................................................................................................3

Restatement (Second) Conflict of Laws .......................................................................29

Texas Pattern Jury Charges (Business) ....................................................51, 57, 58, 59

## TABLE OF ABBREVIATIONS

The following abbreviations are used in this Brief:

- "Pershing" refers to Pershing LLC, the defendant.
- "Plaintiffs" refers to Lynne Turk, Dale Quisenberry, and Susan Blount.
- "SIBL" refers to Stanford International Bank, Ltd.
- "SGC" refers to Stanford Group Company, the FINRA registered broker dealer with whom Pershing had a clearing agreement.
- "SIBL CDs" or "CDs" refers to the certificate of deposit issued by SIBL that are the subject of this suit.
- "Receiver" refers to Ralph Janvey in his capacity as court-appointed receiver for various Stanford entities.
- "Opening Brief" or "Op. Br." refers to Plaintiffs' Brief in Support of Plaintiffs' Motion for Class Certification for Designation of Class Representatives and Class Counsel, served on Pershing on June 3, 2015.
- "SAC" refers to Plaintiffs' Second Amended Complaint, ECF No. 138-1, filed on February 6, 2015, ECF No. 140.
- "Pl. App." refers to Plaintiffs' Appendix to Brief in Support of Plaintiffs' Motion for Class Certification [and] for Designation of Class Representatives and Class Counsel, served on Pershing on June 3, 2015.
- "Def. App." refers to Pershing's Appendix to Opposition to Class Certification, served by Pershing on July 13, 2015.
- "Clearing Agreement" refers to the Fully Disclosed Clearing Agreement, dated as of December 27, 2005, between Pershing and SGC. (Def. App. at 756-790.)
- "Account Agreement" refers to Pershing's Margin and Account Agreement with SGC end investors. (*See, e.g.*, Def. App. at 147-48.)
- "TSA" refers to the Texas Securities Act.

Pershing opposes Plaintiffs' Motion for Class Certification and for Designation of Class Representatives and Class Counsel as follows:

## PRELIMINARY STATEMENT

This case is unique when compared to the other putative class actions pending against secondary actors accused of aiding the Stanford Ponzi scheme. Notwithstanding the occasional references in Plaintiffs' Opening Brief to the staggering scope of Stanford's overall fraud, the proposed class here is quite different than the other pending cases. It covers only investors who purchased CDs after December 27, 2005. It is limited to investors who had brokerage accounts with SGC that were introduced to Pershing for the provision of clearing services. And, the proposed class only reaches those investors who paid for their CDs with funds wire-transferred from accounts held on the Pershing platform.

With these limitations, the proposed class involves nowhere near the 18,000 claims or the $4 to $5 billion in losses that have been referenced in the Receiver's declaration and elsewhere. That said, Plaintiffs still seek certification of a disparate class that could cover more than 1,300 investors from as many as 33 states and 26 foreign countries. Yet, Plaintiffs have failed to present any meaningful choice-of-law analysis, which by itself dooms their motion for certification.

Even if the law of a single state could govern the claims here, there are more than 30 highly individualized questions that will predominate in the determination of whether and to what extent Pershing is liable to the members of the proposed class. These issues swamp the few common questions that Plaintiffs have identified, both by number and by importance.

And, for reasons that will become quickly apparent, a class action is not the superior means of resolving investor claims against Pershing. Class certification is generally not

appropriate where class members would be motivated, by the size of their claims or otherwise, to control their own destinies, either by filing individual suits or by joining with other plaintiffs in mass actions. Here, one need not speculate on this point. A total of 1,697 Stanford investors have already filed 59 arbitrations and lawsuits against Pershing on the same theories that Plaintiffs assert here (and on a number of additional theories that Plaintiffs have not asserted). Quite clearly, members of the proposed class have both the incentive and the means to pursue Pershing individually, which demonstrates that certification of a class is neither necessary nor appropriate.

This point is dispositive. Plaintiffs cannot get around it by suggesting that a class is somehow necessary to protect the interests of those investors who have not already elected to sue Pershing. Stanford victims have been aggressively solicited by lawyers seeking clients to pursue non-class claims against Pershing. That solicitation campaign resulted in the dozens of non-class proceedings discussed above. The only reasonable inference to draw is that the absent class members who have not already filed individual suits or arbitrations have made a conscious decision not to pursue Pershing, a choice that should be respected.

For these and the other reasons discussed below, including serious questions about the adequacy of the named class representatives and the manageability (or lack thereof) of the proposed class, class certification must be denied.

## FACTUAL BACKGROUND

### A. Clearing Firms Play a Very Limited Role in the Securities Industry.

As the Court well knows, SIBL CDs were marketed and sold to investors for many years through many different means. For much of its history, SIBL sold CDs mainly to investors outside of the United States, without any involvement by a U.S.-registered broker-dealer. (Def.

App. at 35-37, 1290-91.) In 1995, Stanford created SGC, a FINRA-registered broker-dealer (and also an SEC-registered investment advisor) and encouraged its financial advisors to promote and sell SIBL CDs to their brokerage clients. (*Id.* at 34-35, 1281-82.) The SIBL CDs that these financial advisors recommended were sold in the United States under an exemption from registration requirements, referred to as Regulation D. (*Id.* at 38-39, 811.)

SGC, however, did much more than promote SIBL CDs. SGC was a retail brokerage firm that offered the wide variety of services and products that most retail brokerages offer. (Def. App. at 4-5, 1281.) SGC recruited financial advisors from other brokerage firms (Merrill Lynch, Goldman Sachs, and others), and those advisors and their clients came to SGC with existing brokerage accounts, consisting of exchange-traded stocks, bonds, mutual funds, and the other types of investments that are part of a traditional brokerage business. (*Id.* at 6-7, 10, 222.)

Like many broker-dealers, SGC elected to outsource to a third-party certain administrative functions associated with traditional securities accounts, such as clearing trades, holding custody of assets, and generating account statements. Under SEC and FINRA rules, a retail broker like SGC can outsource these functions to another broker-dealer, referred to as a clearing firm, so long as the retail customers (often referred to as "end investors") are informed of the roles and responsibilities of each firm.[1] Under these rules, the clearing firm is only responsible for the administrative functions assigned to it. It does not assume any responsibility (fiduciary or otherwise) for the investment advice given to the end investors or for determining the suitability of their investments.

[1] For a helpful summary of the development of this body of law and support for the discussion in the text regarding the role of clearing firms, see Henry F. Minnerop, *Clearing Arrangements*, 58 BUS. LAW. 917 (2003); Henry F. Minnerop, *The Role and Regulation of Clearing Brokers*, 48 BUS. LAW. 841 (1993). In addition, the roles and responsibilities of clearing firms and introducing brokers, as discussed in the text, are documented and disclosed in a variety of places, including: the Clearing Agreement (Def. App. at 756-57); account agreements with end investors (*id.* at 147); account statements sent to end investors (*id.* at 169.); and regulatorily mandated disclosure documents (*id.* at 792-805).

In this arrangement, the retail firm (like SGC) is referred as the "introducing" firm, and it is said to "introduce" its clients and their accounts to the clearing firm for the provision of administrative clearing services. By FINRA and SEC rules, all client-facing responsibilities (*e.g.*, understanding the client and his investment objectives; communicating with the client; determining the suitability of investments; making investment recommendations; verifying client information) remain with the retail firm (here, SGC). The clearing firm, moreover, has no duty to supervise the financial advisors employed by the retail broker. *See, e.g.*, NYSE Rule 382; FINRA Rule 3230; FINRA Rule 4311.

The clearing firm will typically hold custody of certain of the end investors' assets, such as stocks, bonds, and mutual funds. If an end investor wants to convert assets in his account to cash and to access that cash, the end investor deals exclusively with the retail broker and the financial advisors employed by it. Only after investment decisions are made, based on whatever advice or recommendations the retail broker deems appropriate, the retail broker instructs the clearing firm to perform the ministerial tasks necessary to execute them. (Def. App. at 147, 159, 756, 759, 792-93.)

The applicable agreements and regulations provide (as end investors are informed) that the clearing firm has no duty to determine the suitability or advisability of the transactions it is asked to execute or to verify any of the information that the retail broker provides to it. (*Id.* at 147, 159, 759, 793.) If these instructions include a request to transfer cash by wire from an end investor's account to a third-party, the clearing firm will follow that instruction, with no obligation to know or to ask why the money is being wired (or the suitability of any investment or other purchase that it may be funding). (*Id.* at 159, 756, 759, 765, 792-93.)

A clearing firm only clears trades and maintains custody of certain investment products (such as traditional stocks, bonds, and mutual funds)—*i.e.*, those that are said to be "on its platform." If an end investor were to own non-traditional investment products not on the clearing firm's platform, the clearing firm would typically have nothing to do with them. Absent special arrangements, a clearing firm does not clear trades or hold custody of off-platform products and does not report those products on account statements generated by the clearing firm.

Congress, the SEC, and FINRA have all endorsed this model as necessary to the efficient operation of the securities markets. Consistent with this model, they have enacted regulations that limit the duties imposed on clearing firms and under which clearing firms are not liable for the misdeeds of their introducing brokers. *See* 15 U.S.C. § 78q-1; NYSE Rule 382; FINRA Rule 3230; FINRA Rule 4311.

**B. As Plaintiffs Acknowledge, Pershing's Narrow Role As a Clearing Firm Circumscribes Any Class That Could Ever Be Considered.**

Pershing is a FINRA-registered broker dealer that provides clearing services, under the model described above, to retail brokerage firms. In 2005, having decided to move at least some of its clearing business from its existing clearing firm (Bear Stearns), SGC approached Pershing to discuss a potential business relationship. (Def. App. at 34-35, 182-84.) After a period of due diligence and negotiation, Pershing and SGC entered into a non-exclusive Fully Disclosed Clearing Agreement effective December 27, 2005. (*Id.* at 183-84, 756-790.) Over the ensuing months, the accounts of certain new SGC clients were introduced to Pershing for the provision of clearing services and some (but not all) of the accounts of existing SGC clients were transferred from Bear Stearns to Pershing. (*Id.* at 182-85, 756-90, 831-32.) From late 2005 until early 2009, Pershing served as one of SGC's clearing firms and provided clearing services to some of SGC's

clients; Bear Stearns remained as the clearing firm for a significant number of SGC's end investors. (*Id*.)

In its role as clearing firm, and as described above, Pershing cleared trades by some SGC end investors, held custody of certain of their assets, and issued account statements to them, but only for assets that were on Pershing's platform. As Plaintiffs concede: the SIBL CDs at the heart of this case were never on Pershing's platform; Pershing never entered into any agreement with SIBL; and Pershing never cleared trades in SIBL CDs, never held custody of SIBL CDs, and never reported SIBL CDs on Pershing-generated account statements. Pershing, moreover, never communicated with end investors about SIBL CDs and played no role in the creation or marketing of them. (Def. App. at 906, 1060-61, 1168-69.) Because it had no role in the creation, marketing, sale, or custody of the CDs, Pershing (not surprisingly) received no compensation from or related to the CDs.

In light of Pershing's limited role as a clearing firm for SGC, Plaintiffs, quite sensibly, have not taken on the impossible burden of demonstrating that Pershing bears responsibility for all of the SIBL CDs sold from 2005 to 2009. Excluded from the proposed class are the many SIBL CDs that were sold with no SGC involvement. Also excluded are the many CDs bought by investors who did not have brokerage accounts introduced to Pershing (and who were thus complete strangers to Pershing). Similarly, the proposed class does not include the many investors who, though they may have had accounts introduced to Pershing, funded their CD purchases by writing checks or by wire transfers from accounts at financial institutions other than Pershing.

That said, Plaintiffs have tried to cobble together a certifiable class by seizing on a ministerial function that Pershing, when requested, performed for SGC's end investors, just as it

does for the end investors of all of its introducing firms: processing wire-transfer instructions.[2] As discussed above, when end investors seek to access funds in their introduced accounts by wire transfer, and when their financial advisors submit to Pershing signed authorizations for those transfers, Pershing will process the requests and wire the funds, as directed. (Def. App. at 147-48, 241, 243-44, 246, 792-94.) The request may be to wire money to a title company to fund the purchase of a house, to a dealership to buy a used car, to a university to pay a child's tuition, or to an offshore bank to buy a non-traditional CD product. In these examples, the applicable agreements and regulations allow, and indeed obligate, Pershing to process the requests without appraising the house, reviewing the car's repair records, assessing whether the school is a good fit for the student, or determining whether the CD is a viable and suitable investment. (*Id.* at 147-48, 159, 792-94.)

Here, Plaintiffs have identified from Pershing's records that Pershing processed instructions for some SGC end investors to wire funds from introduced accounts that (through intermediate banks) ended up in Antigua and were presumably used for the purchase of SIBL CDs. The processing of these wire-transfer instructions is the sole basis on which Pershing is alleged to have aided the Stanford Ponzi scheme. (Def. App. at 259-60.) This, by definition, limits the proposed class to those investors who had accounts introduced to Pershing and for whom Pershing in fact processed wire instructions.

Plaintiffs claim that Pershing should not have processed these instructions (and that by doing so Pershing assumed full responsibility for the losses on CD purchases funded by them) because Pershing was on notice of "red flags" suggesting problems with the CDs. This claim

---

[2] Plaintiffs have proposed an alternative class that perhaps could include investors for whom Pershing did not process wire instructions. (Op. Br. at 18, alternative (ii).) But, Plaintiffs have failed to provide any meaningful discussion about the scope of that alternative class, how its membership would be determined, or how Pershing's alleged conduct relates to it. Without this information, it is essentially impossible for the Court or for Pershing to evaluate it. *See* Section V below.

Case 3:12-cv-04641-N-BG Document 189 Filed 02/10/15 Page 21 of 59 PageID 43596

will ultimately fail on the merits, in large part because it is foreclosed by decades of precedent holding (under a series of rules carefully constructed at Congress's insistence to ensure the efficient operation of the securities markets) that clearing firms cannot be liable to end investors in these circumstances. *See, e.g.*, *Levitt v. J.P. Morgan Securities, Inc.*, 710 F.3d 454, 466 (2d Cir. 2013); *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 425 (S.D.N.Y. 2008); *see also In the Matter of Delmar Fin. Servs.*, Admin Proc. File No. 3-9959, 2011 SEC LEXIS 1737, at 102 (ALJ Aug. 14, 2001) (Initial Decision Release No. 188).

For now, it is enough to show, as discussed below, that Plaintiffs cannot even attempt to prove this claim without implicating a host of individualized inquiries that preclude class certification.

**C. Even as Circumscribed, Plaintiffs Seek to Certify a Sprawling, World-Wide Class on Highly Individualized Facts.**

**1. The Proposed Class Members are Geographically Scattered.**

To identify members of the proposed class, Plaintiffs rely solely on records produced by Pershing reflecting wire transfers from accounts on Pershing's platform that traveled through intermediate banks to SIBL in Antigua. The address fields in those records reveal that there are proposed class members who, when they instructed Pershing to wire their funds for the purchase of SIBL CDs, resided in at least 33 separate states and 26 foreign countries. (Def. App. at 425-26.)[3]

Plaintiffs contend that all of these investors from around the globe can recover under Texas law, but they offer no meaningful choice-of-law analysis to support that claim and they

[3] In some cases, Pershing's data does not reflect the addresses of account holders for whom wires were processed. (Def. App. at 426.) Once the addresses of those investors are determined, the list of implicated jurisdictions will likely grow beyond the 59 states and countries identified so far.

ignore the many material differences among the laws of the nearly 60 (or more) jurisdictions with vital interests in these claims.

**2. The Proposed Class Members Present Widely Divergent Circumstances, Characteristics, and Investments.**

The proposed class members, in addition to living in nearly 60 different states and countries, present a dizzying array of differing circumstances, characteristics, and investments. As just one example of this, the Pershing records on which Plaintiffs rely to identify the class show wire transfers (purportedly for CD purchases) as low as $5,000 and as high as $9,000,000. (Pl. App. at 680-709.) For some end investors, there are multiple wires over many years (which suggests multiple CD purchases or investments over time); for others, there is but a single wire transfer. (*Id.* at 680-81, 683-709.)

As another example, significant differences exist among the proposed class members with respect to their financial status and their eligibility to purchase SIBL CDs. Under the subscription documents, and in an apparent effort to comply with Regulation D exemption criteria, Stanford required potential CD investors (at least those from the U.S.) to confirm that they were "accredited investors," meaning they had a substantial net worth (or income) exceeding stated levels. (Def. App. at 266.) According to the Second Amended Complaint, some investors satisfied these criteria and others did not. (SAC ¶ 105(g).) As discussed below, this difference has a material impact on liability, because a CD purchaser who either misrepresented or failed to confirm his status as an accredited investor is likely precluded from making a claim.

There are many other differences among the circumstances of proposed class members that bear directly on the viability of the claims that have been asserted against Pershing. While Plaintiffs ignore these circumstances, Pershing's experience to date and public information

reveal that SIBL CD purchasers range from the mega-rich to retirees and disabled workers with very modest savings. Some invested with retirement funds; others did not. Some SIBL investors had 100% of their savings in SIBL CDs, while others had only a tiny percentage of their investment portfolios in this product. They range from extraordinarily sophisticated investors who fully understood (and often independently investigated) the risks inherent in offshore CDs from Antigua to those with no prior investing experience and no appreciation of the risks. For some, given their circumstances, SIBL CDs would never have been suitable investments, even if all of Stanford's representations about them had been true; for still others, an investment in some amount of offshore CDs may have been appropriate and consistent with their investment objectives and risk tolerances. (Def. App. at 431-32, 1770, 1773-76, 1778-82, 1784-87, 1789-90.)

These differences, which are manifest in the circumstances of the three named class representatives,[4] materially impact whether and to what extent Pershing can be liable for CD losses. (*See* Section II, below.)

**3. The Alleged Untruths and Omissions Varied Significantly Across the Class.**

Plaintiffs contend that at trial they will offer "common proof" of the misrepresentations and omissions that Stanford used to market SIBL CDs. But, Plaintiffs do not cite to any document or testimony to suggest what that "common proof" might be. Pershing and (the Court) are left to guess, six years into this litigation, based on Plaintiffs' *ipse dixit* legal brief. Certainly, Plaintiffs do not identify uniform marketing materials that were shown to the class

[4] Susan Blount was approaching retirement with an income of less than $100,000 when she invested in CDs. Dale Quisenberry, on the other hand, is a venture capitalist who had a substantial net worth and a "high/aggressive" risk tolerance when he bought CDs. Lynne Turk told her advisors that she was only interested in completely safe investments and bought two CDs in complete reliance on their advice. (Def. App. at 892-93, 925, 1027, 1030, 1131.)

representatives or other class members, and the class representatives have neither produced nor identified any such materials in their document production or testimony or even in their lawyer-drafted declarations.

In fact, the class representatives in their sworn deposition testimony tell a story far different than the brief their lawyers have filed. The class representatives have confirmed that SIBL CDs were sold "by means" of oral representations, not uniform written marketing materials.[5] Written marketing materials may exist, but they are only relevant to the extent they were used to sell the CDs. Here, the class representatives either never received any written materials or simply do not recall any written materials. (Def. App. at 887-88, 1025-26, 1142-44.) They do confirm, however, purchasing SIBL CDs based almost exclusively on the oral representations made to them by their financial advisors. (*Id.* at 887-88, 892, 1021, 1026, 1144.)

Their testimony on this point is consistent with the evidence that has been developed in the other Stanford-related class actions that are pending in this Court and that have advanced to the point of class-certification briefing. In the *Willis* case and in *Chadbourne Park*, the class representatives have likewise confirmed that they were convinced to buy SIBL CDs "by means" of oral representations made by their Stanford financial advisors and that written marketing materials played no substantial role in the process. (*See* Willis and Amy Baranoucky's Opposition to Plaintiffs' Motion for Class Certification (ECF No. 243), *Troice, et al, v. Willis of Colorado, Inc., et al.*, No. 3:09-cv-01274 (N.D. Tex. Apr. 20, 2015), at pp. 2-4; Opposition of Defendants Proskauer Rose, LLP, Chadbourne & Parke LLP and Thomas V. Sjoblom to Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and

---

[5] Under the Texas Securities Act, Plaintiffs must prove that the CDs were sold "by means" of untrue material statements or omissions. *See* Tex. Rev. Civ. Stat. art. 581-33A(2).

Case 3:12-cv-04641-N-BG Document 152 Filed 08/26/15 Page 275 of 492 PageID 4500

Class Counsel (ECF No. 197), *Troice, et al. v. Proskauer Rose LLP, et al.*, No. 3:09-cv-01600 (N.D. Tex. Apr. 20, 2015), at pp. 18-19, 21 n.14.)

Additional evidence available from public sources further confirms this reality. A number of Stanford investors have testified in other proceedings, and their testimony there again confirms the critical role that oral representations from financial advisors played in the investment process. (Def. App. at 2459-65, 2493-94, 2499-2504, 2531-37, 2569-71.)

Ignoring this reality, Plaintiffs in their Opening Brief provide no discussion—and certainly no evidence—of the oral representations that were made to them, nor do they provide any basis on which to conclude that the oral representations used to sell SIBL CDs were uniform across the class or can be proven on a class-wide basis.

The circumstances, moreover, strongly suggest that the oral representations used to sell SIBL CDs varied significantly across the class and are <u>not</u> susceptible to class-wide proof. Stanford employed hundreds of financial advisors around the world. (Def. App. at 4-5, 35-38.) Each of them likely had his own reasons for recommending the purchase of SIBL CDs and his own method (sometimes in English, sometimes in other languages) of communicating these reasons to his clients.

As just one example, the record reflects that Doug Shaw, a Texas based financial advisor who has been sanctioned by Texas and Florida regulators for his SIBL sales practices, had more than twenty-five reasons (having nothing to do with Pershing) for recommending that clients purchase SIBL CDs. (Def. App. at 810-53.)[6] His sales pitch—and which of these reasons he would have touted to which clients—would obviously have varied, depending on the circumstances and the interest level of each client.

---

[6] These reasons, summarized in the Appendix, help to illustrate the vast number of other actors who could be accused of validating SIBL CDs. (Def. App. at 2610-11.) They also highlight the complex and individualized issues that will be inherent in resolving Pershing's proportionate-fault defense.

It follows that there were almost certainly material differences in the oral representations made by Shaw to induce his clients to buy SIBL CDs, and there is every reason to believe that other financial advisors are similarly situated. When considered across a proposed class of over 1,300 investors advised by hundreds of different financial advisors, cataloging the different sales pitches and representations would present a herculean task that, although necessary to determine liability, would be anathema to class treatment. In these circumstances, it is next to impossible to believe that Plaintiffs can establish the "means" by which SIBL CDs were sold through any kind of "common proof."

#### 4. The Unique Liability Theory Against Pershing Implicates Even More Individualized Questions.

As Plaintiffs have articulated their liability theory against Pershing, they have undertaken the burden to prove at least two key elements: (1) that processing wire-transfer instructions materially and substantially aided Stanford's fraud; and (2) that Pershing processed wire instructions with at least reckless disregard, borne of a general awareness that Pershing's role was part of improper activity by Stanford. (Op. Br. at 9-18.) On the latter point, Plaintiffs rely on the fact that, from 2005 to 2009, Pershing asked SGC a series of questions about the income that SGC was deriving from the sale of SIBL CDs and about the sustainability of that income stream. According to Plaintiffs' characterizations, the answers that Pershing received raised red flags, indicating that Pershing had a level of awareness necessary for the imposition of liability under the TSA. (*Id.*)

This theory will ultimately fail for a number of reasons, not the least of which is that, as a matter of law, the ministerial processing of wire-transfer instructions by a financial institution does not constitute substantial or material assistance. That said, while this claim is in all events legally deficient, the alleged factual support for it shifts and evolves with the passage of time.

Plaintiffs try to paint a picture in their Opening Brief that Pershing had suspicions that deepened over time, as Pershing asked more questions and got answers that, according to Plaintiffs, were inadequate to allay concerns. Plaintiffs allege in their Opening Brief that this process lasted from 2005 through early 2009. (*Id.* at 9-18.)

This theory is not valid, but it is the sole theory to which Plaintiffs have hitched their wagon. Plaintiffs are thus stuck with the fact that the theory is not susceptible to uniform, class-wide application. Under this theory, an investor who bought a CD early in 2006, just after Pershing entered into the Clearing Agreement, has by definition a weaker case (if a case at all) than an investor who bought a CD early in 2009, after (Plaintiffs would say) the alarm bells were ringing much more loudly.

Simply put, if Plaintiffs survive motions for summary judgment and get their case to a jury, the liability theory they have posited will require detailed inquiry into the state of Pershing's "awareness" on the date of each class member's CD purchase. Plaintiffs have alleged that Pershing's "awareness" evolved over time in material ways, which necessarily means that individualized inquiries will be necessary to assess what Pershing knew on each transaction date.

Moreover, in an effort to get around the case law holding that clearing firms are not liable for performing routine or ministerial acts, Plaintiffs have alleged that Pershing executed discretion and professional judgment in connection with the purchase of SIBL CDs by class members. (SAC at ¶ 86.) In fact, Plaintiffs convinced the Court to deny Pershing's motion to dismiss through heavy reliance on Pershing's alleged exercise of discretion and judgment in deciding whether to loan money or "whether or not to accept an order for processing, [and] whether to execute a transaction in a customer account." (Def. App. at 284-85.)

Pershing does not concede the validity of this theory, but it nevertheless constitutes the horse Plaintiffs have chosen to ride. To prove this theory, Plaintiffs will have to show that Pershing actually engaged in these activities and, if so, in connection with which transactions. Specifically, Plaintiffs will need to present individualized, transaction-by-transaction proof regarding whether Pershing exercised "discretion" or "judgment" or extended credit in the manner alleged. In this additional way, Plaintiffs' chosen theory of liability implicates many individualized questions not amenable to class-wide resolution.

**5. Remedies and the Role of Other Actors Raise Many Individualized Issues.**

Plaintiffs' proposed class is limited to persons who still hold their SIBL CDs. (Op. Br. at 2, 8.) Thus, if Plaintiffs were to succeed on their TSA claims, their only remedy would lie in rescission. *See* Tex. Rev. Civ. Stat. art. 581-33A(2). Rescission is a uniquely personal and individualized remedy.[7] Further, the amount due to any investor on rescission (and the amount of damages for allegedly aiding and abetting a breach of fiduciary duty) would necessarily be offset by amounts paid before the receivership, by amounts paid to class members on CD claims by the U.S. Receiver or the Antiguan Joint Liquidator, and by amounts recovered in any of the dozens of class and individual actions against a variety of other parties (some of which have already reached preliminary settlements) in which putative class members are involved. As a result, it is clear that the assessment of any remedy will involve individualized issues not amenable to class treatment.

The circumstances of Susan Blount, one of the named Plaintiffs, illustrates this point. On behalf of the putative class, Blount is only pursuing claims against Pershing. Yet, for herself, she

[7] As a result, rescission claims are inherently unsuitable for class treatment. *See, e.g., James v. Home Constr. Co. of Mobile, Inc.*, 621 F.2d 727, 731 (5th Cir. 1980); *see also Drennan v. PNC Bank, NA*, 622 F.3d 275, 308 n.27 (3d Cir. 2010).

has filed a separate action in state court against her financial advisor, Ray Deragon. (Def. App. at 1764-68.) That has profound implications on whether she is an adequate class representative. (*See* Section IV.A, below.) But, it also clearly means that, for her, an individualized inquiry will be necessary to determine any remedy to which she may be entitled. In a rescission context under the TSA, how is she going to tender her CDs (a pre-requisite to recovery) to both Pershing and to Deragon? How much has she recovered (or is she likely to recover) against Deragon and how does any such recovery impact her remedies (if any) against Pershing? These questions, which cannot be answered from the Receiver's records, will have to be addressed before any relief could be fashioned for Susan Blount.

These same questions will have to be answered, individually, for other class members who are pursing individual claims against financial advisors or other parties. While Pershing has not exhaustively searched the dockets of all state and federal courts around the country to find individual suits by Stanford investors, Pershing is aware of a number of cases in which hundreds of investors, like Susan Blount, are pursuing their financial advisors. (Def. App. at 302-321, 1558-90, 1592-1625, 1627-84.) If a class were ever certified here, individualized discovery would be required of each class member regarding the existence, circumstances, status, and potential outcome of such suits. Again, these questions are not answerable from the Receiver's records; answers would have to come individually from individual class members.

Indeed, even as to class members who have not separately sued third parties, the alleged involvement by other actors reveals significant individualized complexities that Plaintiffs fail to acknowledge. If this case continues, Pershing can, and will, file motions to designate other individuals and companies as "responsible third parties." *See* Tex. Civ. Prac. & Rem. Code § 33.004. Under Texas law, Pershing will be entitled to have the jury assess the relative fault of

each of these responsible third parties. *Id.* at § 33.003. The fault assigned to these parties will operate to reduce Pershing's liability, if any. *Id.* at § 33.013.

The parties designated, the evidence necessary to show their responsibility, and the proportion of responsibility of each them will vary greatly over the putative class members, depending on individualized circumstances. For example, the individual financial advisors assigned to each investor, as associated persons of a FINRA member (SGC), each had an independent obligation to determine the suitability of SIBL CDs as investments for each client. *See* FINRA Rule 2111. That suitability determination would have required the individual financial advisors to have, among other things, a reasonable basis for believing: (1) that a SIBL CD was a suitable investment for at least some investors; (2) that a SIBL CD was a suitable investment for each advisor's particular clients (based on age, other investments, risk tolerance, and other factors); and (3) that each investor's portfolio was not too heavily concentrated in SIBL CDs. *See generally* FINRA Rule 2111; *In re Stephen Thorlief Rangen*, 52 S.E.C. 1304, 1308 (April 18, 1997) (discussing undue concentration). As noted, many investors have separately sued their financial advisors alleging breaches of this suitability obligation. (Def. App. at 318, 1656-57, 1669.)

Whether each financial advisor met his suitability obligation with respect to each individual class member will necessarily require an individualized assessment of the diligence performed by each financial advisor and the circumstances of each investor. As the FINRA rules themselves reference, a major component of the suitability analysis is "customer-specific." Assessing compliance with that component requires a "customer-specific" inquiry. *See* FINRA Rule 2111, n.5(b).

These types of suitability inquiries will be critical to the resolution of this case. For a retiree with no income and only a small portfolio, any amount of investment in offshore CDs (even non-fraudulent ones) may well have been unsuitable. If a financial advisor nevertheless recommended that the retiree buy SIBL CDs, that breach of the suitability obligation would likely be the sole proximate cause of the investor's losses, thereby trumping any liability that could otherwise have been assessed against Pershing. Similarly, to the extent a financial advisor breached suitability obligations by causing a client's account to be over-concentrated in SIBL CDs, that suitability breach could operate to eliminate or reduce any liability assessed against Pershing. That is particularly important here because, as the class representatives admit, they would not have bought SIBL CDs but for the oral recommendations of their financial advisors. (Def. App. at 892, 1016, 1153-54.)

Further, the record demonstrates that many (if not all) financial advisors were aware of the same so-called red flags that Pershing is accused of ignoring, asked many of the same questions that Pershing asked, and received many of the same answers. (Def. App. at 1285, 1417-33.)[8] The liability theory Plaintiffs have asserted against Pershing (although not valid against a clearing firm) has great force against the financial advisors who, by law, owed independent suitability obligations to each client. Pershing is entitled to develop as a defense that the financial advisors are to blame for Plaintiffs' losses and to demonstrate that its liability (if any) should be reduced based on the proportionate fault of individual financial advisors who may have ignored red flags and proceeded in the face of unanswered questions. Pershing cannot

[8] The Receiver's expert witness, Karyl Van Tassel, has detailed (in a 30-page report supported by multiple exhibits) the case against the financial advisors for ignoring red flags and selling CDs without an adequate basis. (Def. App. at 1417-33.) As noted, some of the financial advisors were even speculating openly that Stanford was running a Ponzi scheme as they continued to sell SIBL CDs. (*Id.* at 296-300.)

Case 3:09-cv-00721-N-BG Document 180-9 Filed 03/20/15 Page 27 of 59 PageID 4366

possibly do so without individualized inquiries regarding each class member and his financial advisor.

There are still other examples of individualized inquiries that will be necessary to assess the proportionate fault of responsible third parties. As the Court is well aware, the Willis and Bowen entities issued insurance letters that played a role in the marketing of SIBL CDs. That said, not all investors received such letters, and the impact of these letters may well vary among the investors who did receive them. (Def. App. at 2124-25, 2190-91.) Pershing is entitled to develop the role that Willis and Bowen played and to have the jury assess their proportionate fault, but that is an assessment that will turn on individual facts.

The role of other financial institutions is also in play. Pershing is a defendant in this lawsuit primarily because it processed wire transfers that ultimately were sent to SIBL. (Def. App. at 259-60.) But, as shown by other cases pending in this Court, Pershing was not alone in processing such wire transfers. TD Bank, Bank of Houston, Hancock Bank of Louisiana, and HSBC were also involved in one way or another in processing wire transfers for the purchase of CDs and have been accused of doing so in the face of "red flags." *See* Plaintiffs' Original Petition (ECF No. 1-4), *Rotstain, et al. v. Trustmark Nat'l Bank, et al.*, No. 3:09-cv-02384 (N.D. Tex. Nov. 13, 2009), at p. 3. Thus, if the theory against Pershing survives until trial, Pershing may well present evidence that these other financial institutions are also responsible third parties. But, different banks processed wires for different putative class members at different times, which will require an individualized assessment of Pershing's comparative-fault defense.

**D. Multiple Individual and Mass Actions Against Pershing Confirm That Class Certification is Neither Necessary Nor Appropriate.**

As this Court knows only too well, the collapse of the Stanford Ponzi scheme has spawned countless lawsuits and other legal proceedings against dozens of parties, including "net

winners," fraudulent transferees, accountants, banks, insurance brokers, financial advisors, trust companies, lawyers, former Stanford officers and directors, and foreign sovereigns, to name a few. In the six-plus years since the scandal broke, there has been much public discussion, in the blogs and newsletters of Stanford victim groups and elsewhere, about remedies and lawsuits that are potentially available to defrauded investors. (Def. App. at 1997-2001, 2003-04.) Not surprisingly, lawyers seeking clients have been key participants in this dialogue. (*Id.* at 2006-09, 2011-13.)

Pershing has been the target of much of this activity. As the Court is aware, certain lawyers have aggressively solicited Stanford investors to pursue claims on a contingent-fee basis against Pershing. (Def. App. at 1686-87.) This Court, in fact, has been asked to police that activity and has issued an order requiring that certain information be disclosed in those solicitations. (*Id.* at 1792, 1994-95.)

The solicitation efforts have proven successful. Since the collapse of the Stanford Ponzi scheme, a total of approximately 1,697 Stanford investors (1,376 arbitration claimants and 321 civil opt-out plaintiffs) have filed actions against Pershing. (Def. App. at 428, 430, 433-36, 716-17.) That is larger, by several hundred investors, than the number of class members Plaintiffs seek to certify. (*See* Op. Br. at 21-22 (identifying 1,389 putative class members).) Pershing has been named as a defendant or as a respondent in 59 FINRA arbitrations,[9] federal court actions, and/or state court actions in which Stanford investors have sued to recover losses on SIBL CDs. (Def. App. at 428, 430, 433-36, 716-17.) Almost all of these are mass actions in which a single law firm represents multiple investors, thereby allowing the lawyers to achieve economies of scale and to spread the costs of litigation over a large group. (*Id.*)

---

[9] As a FINRA member, Pershing is obligated to arbitrate with customers of an introducing firm whose accounts are introduced to Pershing. *See* FINRA Rule 12200.

The FINRA arbitrations filed against Pershing illustrate the point. Two law firms are primarily responsible for the vast majority of the 47 FINRA arbitrations filed against Pershing. One of those firms filed a total of 20 arbitrations, with approximately 486 investors as claimants. (*Id.* at 428, 433-36.) The other firm filed a total of 19 arbitrations, with approximately 695 claimants. (*Id.*) These firms typically named 30 to 40 claimants in each case. The remaining FINRA arbitrations against Pershing were filed by six law firms, each of which named a number of investors (as many as 100) as claimants in each case. (*Id.*)

The experience in federal court has been much the same. A single law firm is handling most (nine) of the federal-court actions filed against Pershing, having named 20 or so investors as plaintiffs in each case. (Def. App. at 430, 716-17.)

As this track record amply demonstrates, Stanford investors have both the incentive and the means to pursue non-class remedies against Pershing. The market has determined that non-class cases against Pershing are not the kind of "negative value" suits that Rule 23 was designed to address. Literally hundreds of claimants have pursued opt-out claims despite being below the threshold deemed too "small" by Plaintiffs here. (Def. App. at 429-30.) One plaintiff had CD losses of as little as $45,000, but she still found a lawyer willing to take her case and to file it as a single-investor, stand-alone suit. (*Id.* at 430, 729-54.) And, since most of these cases are over, with the rest being actively litigated, history teaches that non-class cases present an alternative that is far more efficient than any class resolution will prove to be, especially given that this putative class, some six years after the collapse of the Stanford Ponzi scheme, is essentially still in its infancy.[10]

---

[10] Former class representatives Annalisa and Horacio Mendez actually withdrew from this case, voluntarily relinquishing their role as class representatives, to join one of the arbitrations against Pershing, the *Crowell* case. (Def. App. at 428, 437-519.) Apparently, they shared the view of putative class counsel that this class action had become an "endless nightmare." (*Id.* at 1853-58) At one point, even putative class counsel had planned to abandon

Case 3:09-cv-04641-N-BG Document 18-59 Filed 02/10/15 Page 35 of 95

Of the 1,697 investors who have already filed non-class claims against Pershing, 653 would have fallen within Plaintiffs' proposed class definition (having had accounts introduced to Pershing and having instructed Pershing to process wire transfers), had they not already taken action to effectively opt themselves out of any class that may be certified. (Op. Br. at 22.) In other words, more than 32% of the class members Plaintiffs sought to represent when they filed this case have already voted with their feet. The vast majority of these "opt-out" claims have already been concluded—and the rest will be resolved—in a way that preserved Pershing's right to an individualized assessment of its alleged liability, while also preserving each investor's right to control his own claim. (*Id*. at 428, 430, 433-36, 716-17.)

**ARGUMENT**

**I. Choice-of-Law Issues Preclude Certification.**

Plaintiffs seek to represent a sprawling class that includes investors from across the country and around the world.[11] Plaintiffs thus have the burden to "credibly demonstrate, through an 'extensive analysis' of state law variances, that 'class certification does not present insuperable obstacles.'" *Castano v. Am. Tobacco Co*., 84 F.3d 734, 742 (5th Cir. 1996) (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986)). As the Fifth Circuit has repeatedly recognized, "variations in state law may swamp any common issues and defeat predominance." 84 F.3d at 741. For example, if the law of more than a few states would govern,

this class action and to instead file FINRA arbitrations against Pershing. (*Id.*) While they never followed through on that plan, their serious consideration of it serves to confirm that FINRA arbitrations constitute an available and efficient alternative to class certification.

[11] Plaintiffs say very little in their Opening Brief about the geographic dispersion of the proposed class members. As mentioned above, Pershing's records reveal that the proposed class consisting of investors for whom Pershing processed wire-transfer instructions would encompass class members in at least 33 different states and 26 different countries. (Def. App. at 425-26.). The alternative class proposed by Plaintiffs (involving all investors with SGC accounts or STC IRA accounts) would presumably capture investors from even more states and foreign countries, as it would include the states and countries already identified and numerous others.

"the district judge would face an impossible task of instructing the jury on the relevant law." *In re Am. Med. Sys.*, 75 F.3d 1069, 1085 (6th Cir. 1996). For these and other reasons, including constitutional concerns,[12] a multi-jurisdictional class cannot be certified absent a detailed and rigorous choice-of-law analysis. *See*, *e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985).

Plaintiffs cannot satisfy their choice-of-law burden with a broad-brush, "class-wide" approach. *Gyarmathy & Assocs. v. TIG Ins. Co*., No. 3:02-cv-1245, 2003 WL 21339279, at *1-2 (N.D. Tex. June 3, 2003). The analysis must focus on the claims asserted on behalf of "each member of the plaintiff class." *Cf. Shutts*, 472 U.S. at 821. Plaintiffs ignore that this court "must apply an individualized choice of law analysis" to the claims of each putative class member. *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 311 n.5 (5th Cir. 2000) (quoting *Georgine v. Amchem Products, Inc*., 83 F.3d 610, 627 (3d Cir. 1996), *aff'd*, 521 U.S. 591 (1997)). "[A] wholesale 'defendant lives here' approach" to choice of law is neither sufficient nor appropriate. *Gyarmathy*, 2003 WL 21339279, at *2.

Simply put, choice-of-law cannot be "finessed" through conclusory assertions that the law of a single state should govern, even if the defendant lives or is based in that forum. *See Spence*, 227 F.3d at 313. A plaintiff seeking certification of a multi-state class bears the burden of presenting the district court with the information necessary to "examin[e] 'the policies of each state with contacts'" to each class member's claims and to assess the laws of each such state. *Gyarmathy*, 2003 WL 21339279, at *2. If putative class plaintiffs fail to "present[] a sufficient

[12] Any decision to apply the TSA on a class-wide basis to the claims of all putative class members would raise serious due process concerns, *see Shutts*, 472 U.S. at 814-23, and would likely violate the Commerce Clause. *See In re Nat'l Century Fin. Enter., Inc*., 755 F. Supp. 2d 857, 888 (S.D. Ohio 2010). Pershing hereby asserts and intends to preserve all constitutional objections to the application of the TSA to the claims of investors who were not citizens of the State of Texas when they purchased SIBL CDs and who purchased SIBL CDs outside of the State of Texas.

choice of law analysis they have failed to meet their burden of showing that common questions of law predominate." *Spence*, 227 F.3d at 313.

Here, Plaintiffs have done little more than offer a variant of the "defendant lives here" approach rejected in *Gyarmathy*. They say that Texas law should apply to all claims in this case because Allen Stanford "lived and worked principally in Houston" and because various Stanford companies represented that they were "headquartered" in Houston. (Op. Br. at 41-43.) But, Plaintiffs have offered no evidence or analysis of the interests, policies, or laws of the dozens of other jurisdictions that have contacts with the claims of putative class members. Plaintiffs have not even acknowledged, let alone analyzed, the factors set forth in the Restatement (Second) Conflict of Laws that govern the choice-of-law analysis in Texas and in Florida.[13]

Plaintiffs seem to suggest that they can forego the rigorous choice-of-law analysis that is normally required because this Court and the Fifth Circuit have already determined that Texas law should govern all claims of all Stanford investors. (Op. Brief at 40.) As demonstrated below, Plaintiffs are wrong on that point. And, had Plaintiffs performed an appropriate choice-of-law analysis, insuperable obstacles to class certification would have quickly emerged, notwithstanding Plaintiffs' suggestion that Allen Stanford and some of his companies have a Texas connection.

**A. No Prior Decision in Any Stanford Case Excuses Plaintiffs' Failure to Present a Detailed Conflicts Analysis.**

To support the blanket application of Texas law to all claims and all investors, Plaintiffs cite to the Fifth Circuit's opinion in *Janvey v. Brown*, 767 F.3d 430, 436 (5th Cir. 2014), and to

[13] Texas choice-of-law principles apply to the claims of Dale Quisenberry and Susan Blount, who filed their claims in Texas. Florida's choice-of-law principles arguably apply to the claims asserted by Lynne Turk, who originally filed her putative class claims in Florida. Both Texas and Florida follow the Restatement approach. *See, e.g.*, *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000) (Texas); *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) (Florida).

an order of this Court in *Janvey v. Willis of Colorado*, No. 3:13-cv-03980 (N.D. Tex. Dec. 5, 2014). Neither case excuses Plaintiffs' failure to submit a detailed choice-of-law analysis.

In *Janvey v. Brown*, the Fifth Circuit affirmed this Court's decision to apply Texas's version of the Uniform Fraudulent Transfer Act ("UFTA") to the Receiver's claims against certain "net winners." But, the only issue presented there was whether Texas law or the law of Antigua should apply. 767 F.3d at 435. Because there are no material differences among the potentially applicable versions of UFTA, the Fifth Circuit was not called upon to assess whether to apply the law of any state other than Texas. As the court said, the "UFTA-enacting states have identical language governing the issues in this appeal." *Id*. at 436.

No similar conclusion can be reached here because, as shown below, there are material differences among the laws of the various states with interests in the claims of the putative class members. Here, it is necessary to determine, for example, which state's version of the Uniform Securities Act should apply, as those versions differ significantly from state to state.

The Fifth Circuit's affirmance in *Janvey v. Brown* of this Court's refusal to apply the law of Antigua is likewise of no significance here. The Fifth Circuit determined that "Antigua has no interest in the application of its law to this case," largely because "no Antiguan citizen has been identified as a defrauded investor, nor has the Receiver brought suit against an Antiguan citizen as a 'net winner' of the Ponzi scheme." *Id.* at 436. In this case, Pershing does not argue for the application of the law of Antigua, but instead identifies a number of jurisdictions that without question do have serious interests in this dispute, in large part because their citizens have been identified as defrauded investors.

This Court's order in *Willis* is of no greater help to Plaintiffs. In *Willis*, a Mexican citizen and a Venezuelan citizen brought claims under the Texas Securities Act based on SIBL CDs that

were purchased, respectively, in Mexico and Venezuela. *Willis*, No. 3:13-cv-03980, ECF No. 64, at 17. Willis argued that the TSA claims had to be dismissed because, even if the fraudulent conduct emanated from the United States, the TSA could not apply to securities transactions occurring outside of the United States. *Id.* at 19-21. To support this argument, *Willis* relied almost exclusively on *Morrison v. National Australia, Ltd.*, 561 U.S. 247 (2010), and its conclusion that Section 10(b) of the Securities Exchange Act of 1934 cannot be applied extraterritorially to non-U.S. securities transactions. Significantly, since Willis's argument was made in a Rule 12(b)(6) motion, Willis had the burden to demonstrate that there was no plausible basis for the TSA cause of action alleged in the complaint. *See Culbertson v. Lykos*, No. 13-20569, 2015 U.S. App. LEXIS 10454, at *51 (5th Cir. Jun. 22, 2015).

This Court denied Willis's motion, noting that Willis had "failed to carry its burden." *Willis*, ECF No. 64, at 20. The Court found *Morrison* inapposite because it deals with the reach of the federal securities laws, not the TSA. *Id.* at 19. Moreover, based on *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430 (Tex. 2007), the Court determined that there are some circumstances under which some provisions of the TSA "could apply extraterritorially to claims based on securities sold from Texas to purchasers abroad." *Id.* Based on allegations that "Stanford's base of strategic operations was located within Texas, and that Willis NA drafted and provided the safety and soundness letters to Stanford within Texas,"[14] the Court determined that there was enough "at this stage" to allow the TSA allegations to proceed. *Id.* at 20.

For multiple reasons, the denial of the Rule 12(b)(6) motion in *Willis* is of little relevance here. First, in this case, we are now past the point of assessing whether mere allegations are sufficient to state a claim; we are rather at the stage where Plaintiffs have the burden to

---

[14] The allegation that Willis aided and abetted Stanford's Ponzi scheme is based largely on its promulgation of certain letters, regarding the availability of insurance coverage, that Stanford used to market SIBL CDs. *Id.* at 3-4.

demonstrate with proof—not allegations—that class certification is appropriate. *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014). And, as this Court has recognized, preliminary choice-of-law determinations made at the pleadings stage are either premature or do not necessarily control later phases of the case. *See, e.g.*, *Janvey v. Suarez*, 978 F. Supp. 2d 685, 693-94 (N.D. Tex. 2013) (presuming for purposes of motion to dismiss that Texas law applies, but "reserv[ing] judgment" on a final choice-of-law determination); *OSIC v. Breazeale Sachse & Wilson*, No. 3:11-cv-329 (N.D. Tex Mar. 24, 2015) (declining to make a choice-of-law determination at the pleadings stage; choice-of-law determinations "are generally inappropriate for resolution on a motion to dismiss"); *Janvey v. Proskauer Rose LLP*, No. 3:13-cv-477 (N.D. Tex. June 23, 2015) (same).

Second, the issue in *Willis* was narrower than the issue here. *Willis* dealt only with the application of the TSA to securities transactions that, although they may in some sense have emanated from Texas, were consummated in a foreign country. As discussed in more detail below, a different analysis is required when assessing application of the TSA to the purchase and sale of securities that occur within <u>this country</u> and that implicate the policies and interests of states other than Texas.

Third, and as again discussed in more detail below, the briefing in *Willis* did not cover all of the relevant arguments and authorities. Pershing is not a party to the *Willis* case and has not, until now, had the opportunity to present these arguments and authorities to the Court. The authority cited below, much of which was not cited in the *Willis* briefing, precludes the blanket application of Texas law to the claims of all class members. Finally, the *Willis* order speaks only to claims under the TSA and cannot in any event serve as a proxy for the choice-of-law analysis

that Plaintiffs should have performed (but failed to) on their common-law claim for participation in fiduciary breach.

In sum, there has been no blanket determination by any court that Texas law necessarily applies to <u>all</u> claims arising from the Stanford Ponzi scheme. To the contrary, this Court has recognized that the laws of other states must be applied to some Stanford-related claims, depending on the issues and the interests of the relevant jurisdictions. *See, e.g.*, *Janvey v. Rebecca Reeves-Stanford*, No. 3:09-cv-2151 (N.D. Tex. Nov. 18, 2010) (applying Florida law to Receiver's conversion claim); *Janvey v. Adams & Reese, LLP*, No. 3:12-cv-00495 (N.D. Tex. Sept. 11, 2013) (applying Louisiana law to Receiver's breach-of-fiduciary-duty claims and claims against lawyer defendants). Accordingly, a rigorous and extensive choice-of-law analysis is required as a pre-requisite to the certification of any class.

**B. An Appropriate Conflicts Analysis Would Have Revealed That Texas Law Cannot be Applied Globally on a Class-Wide Basis.**

Plaintiffs' failure to present a detailed choice-of-law analysis by itself requires the denial of their motion for class certification. *See, e.g.*, *Norwood v. Raytheon Co.*, 237 F.R.D. 581, 594 (W.D. Tex. 2006). That said, while under no burden to do so, Pershing will demonstrate below that, once subjected to a proper choice-of-law analysis, the far-flung, multi-jurisdictional class that Plaintiffs propose could not possibly be certified.[15]

The analysis starts with identifying the applicable choice-of-law principles. Texas and Florida follow the Restatement approach. *See, e.g.*, *Wagner*, 18 S.W.3d at 205 (Texas); *Bishop*, 389 So. 2d at 1001 (Florida). Under that approach, the Court must first identify and follow (to

---

[15] To the extent Plaintiffs submit in their Reply Brief the kind of detailed choice-of-law analysis that should have been in their Opening Brief, Pershing may seek leave to submit a sur-reply. Since Plaintiffs have the burden on this issue, addressing it for the first time in a Reply Brief, in an effort to deny Pershing the opportunity to respond, would be unfair.

the extent constitutionally permissible) any statutory directives on choice of law. In the absence of statutory directives, the Court must determine, on a claim-by-claim basis, which jurisdiction has "the most significant relationship to the occurrence [or transaction] and the parties." Restatement (Second), Conflicts of Laws, §§ 145, 188.

Plaintiffs' case against Pershing is built mostly on statutory claims for aiding and abetting violations of Blue Sky laws, so Pershing will focus primarily on these claims.[16] In each version of their complaint, Plaintiffs have recognized that the application of Blue Sky statutes will likely turn on the residence of each investor—*i.e.*, that a Texas investor would have to sue under the Texas act, a Florida investor would have to sue under the Florida act, and so on.[17] But, after the Court dismissed their claims under the Florida act for failure to state a claim, *see* Def. App. at 289-90, Plaintiffs abruptly shifted focus and now argue that the Texas act should apply to all claims of all investors, no matter the residence of the investor and regardless of the contacts and interests of other jurisdictions.

The Texas Supreme Court's decision in *Daccach* is of course relevant to this analysis, but it does not support Plaintiffs' position. To understand *Daccach* and its application to this case, it is important to recognize that, generally speaking, civil liability under the TSA can arise from three distinct types of violations: (a) a Section 12 violation for selling securities without registering as a dealer; (b) a Section 7 violation for selling unregistered securities; and (c) selling securities through untruths or omissions. Two of these violations are registration based, but one (Section 12) applies to registration of the person selling the securities, while the other (Section 7)

[16] The term "Blue Sky laws" is a generic description of the various acts enacted by state legislatures to regulate the sale of securities in their respective states. *Daccach*, 217 S.W.3d at 441 n.6.

[17] *See* Def. App. at 2390-91 (proposing subclasses of Texas residents for claims under the Texas Securities Act and of Florida residents for claims under the Florida Securities Act); *id*. at 2398-99, 2442-2449 (same); SAC at 4, 1102-12, 113-17 (same).

focuses on the registration of the securities themselves. The third type of violation, which addresses fraud in the sales process, applies without regard to whether the dealers or securities are registered.

In *Daccach*, the plaintiffs alleged only one type of TSA violation: the failure of the issuer of the securities, a Texas resident, to register as a dealer. 217 S.W.3d at 436. The *Daccach* plaintiffs did not allege an untruth-or-omission claim or an unregistered-securities claim. *Id.* Focusing solely on the limited claim before it, the Texas Supreme Court found, in the language of Section 12 of the TSA, a statutory directive to apply its provisions, even though the plaintiffs were from Latin America and sought to represent a world-wide class of other investors who had purchased the same securities. *Id*. at 444-45.

Given the facts of *Daccach* and the language of Section 12, this result is not necessarily surprising.[18] In *Daccach*, the defendant was the issuer of the securities at issue. The defendant had its principal place of business in Texas. It was undisputed that the defendant "was doing business in Texas" and "physically present in Texas when it sold the [securities] to class members." *Id*. at 440. Because Section 12 requires that an issuer register with the Texas Securities Board before "directly or through agents, offer[ing] . . . any securities in this state," and because the defendant was accused of offering securities in this state from its principal place of business in this state, the court concluded that Section 12 of the TSA could apply, notwithstanding that the plaintiffs were foreign investors. *Id*. at 445 (emphasis added).

The Texas Supreme Court was careful to stress the limited scope of its holding. On page 441 of its opinion, the court said: "We do not hold that that the Texas Securities Act directs the application of Texas Blue Sky Laws in every securities case involving facts touching Texas or its

[18] That said, there was a vigorous dissent in *Daccach* in which it was argued that a traditional Restatement analysis was required—one that would assess, not just the intent of the TSA, but the interests and policies of other jurisdictions. 217 S.W.3d at 464-65.

residents. The question is one of legislative intent as to the particular provision at issue, subject to constitutional limitations." 217 S.W. 3d at 441 (emphasis added). The court emphasized this point again on page 446 of its opinion, where it repeated: "This . . . does not mean that the Texas Securities Act directs the application of the Texas Blue Sky laws in every securities case involving facts touching Texas or its residents. The question is one of legislative intent as to the particular provision at issue, subject to constitutional limitations." *Id*. at 446 (emphasis added).

Specifically, the court highlighted that a claim based on Blue Sky untruth-and-omission provisions would likely be subject to a different analysis and a different result. *Id*. at 441 ("We recognize that violations of other securities laws, such as those based on misrepresentation, may well be subject to a different analysis."). In fact, the court cited with approval *Yadlofsky v. Grant Thornton L.L.P*., 197 F.R.D. 292, 301 (E.D. Mich. 2000), in which the court refused to certify a nationwide class of defrauded investors under the Michigan Securities Act, in part because of the likelihood that the applicable Blue Sky laws would be determined by each investor's state of residence.

Here, Plaintiffs have asserted all three of the distinct TSA violations discussed above. Count 2.A of the Second Amended Complaint (pp. 43-46) seeks relief for the sale of unregistered securities, a claim not asserted in *Daccach*. Count 2.B (pp. 46-48) references the sale of securities by unregistered dealers, similar to the sole claim asserted in *Daccach*. Finally, Count 2.C (pp. 48-50) asserts an untruth-and-omission claim, which again was not raised in *Daccach*. As *Daccach* mandates, each of these claims must be separately analyzed.

**1. The TSA Does Not Apply Across-the-Board to All Unregistered-Securities Claims.**

Plaintiffs' assertion that Section 7 of the TSA, which prohibits the sale of unregistered securities, applies to the claims of all putative class members is directly foreclosed by statutory

directive. The Texas Securities Board ("TSB") is empowered to administer the TSA, and its rules and interpretations are viewed by the Texas Supreme Court as authoritative. *Daccach*, 217 S.W.3d at 444. In *Daccach*, for example, the court gave great weight to section 139.7(b) of the TSB's rules and regulations in determining the scope of Section 12's requirement for the registration of dealers. That very same section of the TSB regulations, in subpart (a), deals with the reach of the TSA's separate requirement that securities (as opposed to dealers) be registered.

Subsection (a) makes clear that the TSA's provisions on the registration of securities, unlike the rules for the registration of dealers, apply only to securities that are sold to Texas residents: "The offer and sale by an issuer or its selling agent to a non-Texas resident not present in Texas when the offer is made is exempt from the securities registration provisions of [the TSA]." Tex. State Sec. Bd., Rule 139.7(a) (2015) (Def. App. at 422). In other words, the TSA, as authoritatively interpreted by the TSB, does not require the registration of securities sold to non-Texans, which necessarily means that selling an unregistered security to a non-Texan cannot constitute a violation of the TSA.

In fact, the legislative history of Section 139.7 reveals that it was enacted to prevent the precise misuse of the TSA that Plaintiffs offer in this case. Section 139.7 was

> adopted in response to *Rio Grande Oil Co. v. State*, 539 S.W. 2d 917 (Tex. Civ. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e), which held that it was not necessary that a purchaser reside in Texas in order for the TSA to apply. The [provision] is based on: (1) the infringement on interstate commerce that would result from one state regulating the sales of securities taking place in another state; and (2) the fact that the purchaser of securities in another state is adequately protected by such other state's own blue sky laws.

Steven M. Lipsman, *Exemptions Under the Texas Securities Act: A Logical Framework for the Practicing Attorney*, 22 HOUS. L. REV. 725, 778-79 (1985). When faced with the broad TSA interpretation proffered by Plaintiffs here—that the TSA applies to the registration of securities

sold to non-Texans—the TSB acted quickly, decades ago, to reject that view and to clarify that the TSA only purports to regulate the registration of securities sold to Texans.

It follows that, as to the claim that SIBL CDs were sold unlawfully because they were not registered, the TSA can only apply to those CDs that were purchased by Texas residents or by persons who were present in Texas when they purchased the CDs. By statutory directive, the TSA provisions on the registration of securities (as opposed to dealers) do not apply to those class members who lived outside of Texas or who were not physically present in Texas when they bought their CDs. On this claim, the fact that the sales—or the marketing materials—in some sense emanated from Texas is plainly not enough to make the TSA applicable.

Investors from states other than Texas will have to look to the Blue Sky laws in their home states to determine whether they are entitled to any relief based on the failure to register SIBL CDs.

**2. The TSA Does Not Apply Across-the Board to All Untruth-and-Omission Claims.**

This conclusion applies equally to Plaintiffs' untruth-and-omission claim. In *Daccach*, the Texas Supreme Court was careful, as noted above, to clarify that its Section 12 analysis did not apply to an untruth-or-omission claim. 217 S.W.3d at 441. Although no untruth-or-omission claim was asserted in *Daccach*, the court strongly indicated that a court faced with a putative class action asserting such claims should apply a traditional Restatement-based conflicts analysis, considering the interests and policies of all affected jurisdictions, even if the alleged misrepresentations emanated from Texas. For example, the court referenced with approval the observation by a noted commentator (the draftsman of the Uniform Securities Act) that "the conflict of laws rules for anti-fraud aspects of the Blue Sky Laws are not too different from the

'rules for common-law deceit or rescission.''' *Id*. at 441 (citing Louis Loss, *The Conflict of Laws and the Blue Sky Laws*, 71 HARV. L. REV. 139, 209 (1957)).

The *Daccach* court also cited *Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349 (Tex. App. 2003), as supplying the type of Restatement-based analysis that should govern the determination of whether the TSA could apply to all of the claims in a nationwide class alleging untruths and omissions on behalf of investors from around the country.[19]

In addition, most cases that have directly addressed the question have determined whether to apply the TSA to untruth-and-omission claims by reference to Restatement principles—particularly those covering fraud and misrepresentation causes of action. *See, e.g.*, *In re Tremont Sec. Law, State Law, and Ins. Litig.*, Nos. 08civ11117, 11civ1687, 2013 WL 2257053, at *3 (S.D.N.Y. May 23, 2013); *In re Enron Corp. Sec., Derivative, and ERISA Litig.*, 761 F. Supp. 2d 504, 534-35 (S.D. Tex. 2011); *Highland Crusader Offshore Partners, L.P. v. Motient Corp.*, 281 S.W.3d 237, 249-50 (Tex. App. 2009); *Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 358 (Tex. App. 2004). As these cases make clear, there is no statutory directive mandating the application of the TSA to untruth-and-omission claims by out-of-state purchasers. Accordingly, a Texas nexus is not by itself a sufficient basis for applying the TSA; rather, the TSA can only be applied to such claims when Texas, as compared to other relevant jurisdictions, has the most significant relationship—not just a relationship—to the issues.

Applying a traditional Restatement analysis to the untruth-and-omission claims alleged here leads inevitably to the conclusion that the TSA can only apply to the claims of Texas residents.

---

[19] In *Tracker Marine*, the court reversed the certification of a nationwide class action under Missouri's consumer protection statute arising from misrepresentations in the sale of boats, finding the claims of individual class members to be governed by the laws of the states where they bought the boats, notwithstanding that the defendant was based in Missouri. 108 S.W.3d at 357.

*Tracker Marine*, 108 S.W.3d 349, cited with approval by the Texas Supreme Court in *Daccach*, sets forth the appropriate analytical approach. In *Tracker Marine*, the plaintiffs sought to certify a nationwide class of purchasers of allegedly defective pontoon boats. In an apparent effort to downplay issues that could be viewed as individualized, the plaintiffs avoided contract, warranty, product-liability, and common-law fraud claims. Instead, they asserted a single cause of action under the Missouri Unlawful Merchandising and Practices Act. *Id.* at 351. The claim was based on alleged misrepresentations and omissions in the brochures used to sell the boats. The boat manufacturer was a Missouri company. It made all of the boats in Missouri, and it issued all of the brochures in Missouri. Based on these facts, the plaintiffs argued that the law of Missouri should apply to the claims of all class members, regardless of where they received the brochures or purchased the boats. The trial court agreed and certified a nationwide class. *Id.*

The Court of Appeals reversed. *Id*. The court noted that each of the fifty states has its own consumer protection statute and that, under the Restatement approach, the claim of each class member would be governed by the statute of the state in which she lived when she purchased an allegedly defective boat. *Id.* at 357-58. Because of material differences among the various consumer protection laws of the fifty states, the court held that a nationwide class should not have been certified. *Id.* at 352-55.

The *Tracker Marine* court considered two sections of the Restatement: Section 148, which applies specifically to claims based on misrepresentations, and Section 6, which supplies general choice-of-law principles. As the court noted, the Section 148 factors, being more specific, are the most relevant. *Id.* at 355.

Section 148 lists six factors, but only five are implicated here: (a) the place where the plaintiff acted in reliance on the defendant's representations; (b) the place where the plaintiff

received the representations; (c) the place where the defendant made the representations; (d) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.[20]

In *Tracker Marine,* the court identified at least three principles important to the application of these factors:

- "First, the place where the defendant made the representations and the place where the plaintiff received them are of equal importance, but both are outweighed by the place where the plaintiff acted in reliance." *Id*. at 356.

- "Second, the residence of the plaintiff is more important than that of the defendant, as the financial loss involved will usually be of greatest concern there." *Id*.

- Third, "if any two of the . . . contacts, apart from the defendant's domicile, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues." *Id*. (quoting Restatement (Second) § 148, cmt j).

Because each putative class member likely received and relied on the boat manufacturer's representations in her home state, and obviously resided in her home state, more than two of the Section 148 factors pointed away from Missouri. The manufacturer's location in Missouri and the fact that it made the alleged misrepresentation in Missouri were, under the Section 148 analysis, simply not enough to tip the balance in favor of applying Missouri law to all claims of all class members. Accordingly, the court found that each class member's claim would be governed by the law of her home state. *Id.*

Here, even more of the Section 148 factors point towards applying the law of each investor's home jurisdiction (and away from a blanket application of Texas law).

---

[20] The sixth factor, listed as Subpart (e) of Section 148, is the "place where a tangible thing which is the subject of the transaction between the parties was situated at the time." 108 S.W.3d at 356.

First, each investor obviously resides in his home state. (Def. App. at 869-70, 994-95, 1102.) Second, each investor received the alleged misrepresentations and the communications from which information was allegedly omitted in his home state. (*Id.* at 883, 1014, 1021, 1140.) Third, each investor relied on the alleged misrepresentations in his home state. (*Id.* at 884, 1014, 1016, 1172.)

Fourth, each investor rendered his performance (executing subscription documents containing required representations about accredited-investor status and transmitting funds for the purchase of CDs) from his home state. (*Id.* at 871, 884, 1056, 1172, 1176-77, 1765.) Fifth, the defendant here (Pershing) is not incorporated in Texas, does not have its principal place of business in Texas, and in fact does not maintain any physical place of business in Texas. (SAC at ¶ 5.) Pershing, it follows, performed all of the activities that allegedly provided material assistance to Stanford's fraud (processing wire-transfer instructions and deciding to maintain its relationship with SGC notwithstanding red flags) in New Jersey.[21]

The Section 148 factors, as in *Tracker Marine*, dictate that Texas does not have the most significant relationship to the untruth-and-omission claims of non-Texans. And, as in *Tracker Marine*, the general principles set forth in Section 6 of the Restatement do nothing to alter this conclusion. *Tracker Marine's* analysis of the Section 6 factors is summarized below:

| **FACTOR** | **IMPACT** |
|---|---|
| Needs of the interstate and international systems | Supports application of the laws of each purchaser's home state: applying the law of a single state might encourage a "race to the bottom" under which manufacturers might intentionally locate in jurisdictions with lax regulations. *Id.* at 358. |

[21] In addition, Plaintiffs' allegations regarding Pershing's knowledge of red flags is focused—not on Texas—but primarily on trips that Pershing made to Tennessee and Antigua. (SAC at ¶¶ 50, 71-73.)

| | |
|---|---|
| Relevant policies of the forum | Supports application of the laws of each purchaser's home state: when states strike different balances between the interests of sellers and buyers, the policy of each state is promoted by applying its policies to its citizens. *Id.* |
| Relevant policies of other interested states and the relative interests of those states in the determination of the particular issue | Supports application of the laws of each purchaser's home state: when states strike different balances between the interests of sellers and buyers, the policy of each state is promoted by applying its policies to its citizens. *Id.* |
| Protection of justified expectations | Supports application of the laws of each purchaser's home state: a purchaser who shops and buys in one state would expect that state's laws to apply; a manufacturer who sets up a distribution system in states other than its home state would expect the laws of each such state to govern products distributed in that state. *Id.* at 358. |
| Basic policies underlying the particular field of law | Supports application of the laws of each purchaser's home state: when states strike different balances between the interests of sellers and buyers, the policy of each state is promoted by applying its policies to its citizens. *Id.* at 358. |
| Certainty, predictability and uniformity of result | Supports application of the laws of each purchaser's home state: applying the law of the jurisdiction where the harm occurred is certain, predictable, and uniform. *Id.* |

| | |
|---|---|
| Ease in the determination and application of the law to be applied | Supports application of the laws of each purchaser's home state: most consumers shop and sue in the same state, and each state can easily apply its own laws. *Id.* at 357. |

Based on the foregoing, the court in *Tracker Marine* concluded that the general choice-of-law principles in Section 6 of the Restatement served only to confirm the conclusion reached from application of the Section 148 factors: that it would be inappropriate to apply Missouri law to a nationwide class of boat buyers. *Id.* at 357, 359.

The same conclusion applies with even greater force here. In *Tracker Marine*, there was only one party that allegedly engaged in wrongdoing: the boat manufacturer, based in Missouri. It was thus simple in *Tracker Marine* to identify a single state—Missouri—that could have an interest in regulating the conduct of a local company that was allegedly engaging in wrongdoing from within its borders. Here, to prove their case, Plaintiffs must demonstrate multiple levels of wrongdoing by multiple parties. They must show, first, that some Stanford entity committed a primary violation of the Blue Sky laws. Then, they must show that Pershing engaged in conduct that gives rise to secondary liability.

Thus, unlike in *Tracker Marine*, there is more than one jurisdiction here that could claim an interest in regulating wrongdoing allegedly committed within that jurisdiction's borders or by entities formed under its laws: Texas, where SGC was incorporated and had its principal place of business; Louisiana, where STC was incorporated and had its principal place of business;[22] Delaware, under whose laws Pershing was formed; and New Jersey, where Pershing has its principal place of business. (SAC at ¶ 5.) The existence of a single such jurisdiction in *Tracker Marine* was not enough to override the interests of the individual states where buyers made their

[22] *See Janvey v. Adams & Reese, LLP*, Case No. 3:12-cv-00495 (N.D. Tex. Sept. 11, 2013), ECF No. 58 at 9.

purchases and suffered their injuries. The fact that there are multiple such jurisdictions implicated in this case provides even less justification for ignoring the interests of each purchaser's home state.

In addition, there is another factor here, not present in *Tracker Marine,* that weighs heavily against the application of Texas law across the board to all claims. While Pershing has not been sued for breach of contract, it is undisputed that all of the activity through which Pershing is alleged to have aided the Stanford Ponzi scheme was undertaken under contracts that expressly call for the application of New York law.

As Plaintiffs have defined their class, it only includes investors who would have had Account Agreements with Pershing, and those Account Agreements are expressly governed by New York law. (Def. App. at 148, 151.) To the extent Pershing processed wire-transfer instructions, it did so under these New York based agreements. Moreover, Pershing's relationship with SGC is itself governed by a written agreement with a New York choice-of-law clause. (*Id.* at 783.) These choice-of-law clauses, even if they do not directly control the specific causes of action asserted by Plaintiffs, implicate a number of the Restatement factors, including the justified expectations of the parties and predictability and certainty. The existence of these clauses is yet another reason that Texas law should not be applied globally to all claims.

None of the points made in Plaintiffs' Opening Brief about the nexus between Stanford's Ponzi scheme and Texas alters the conclusion that Texas law should not be applied globally on a class-wide basis. Plaintiffs say that Allen Stanford lived and worked principally in Houston, Texas. That conclusion is directly at odds with the district court's findings in Stanford's criminal case (affirmed on appeal by the Fifth Circuit) that, from 2005 to 2009 (the period of Pershing's involvement with SGC), Allen Stanford spent little or no time in the United States and that his

alleged ties to Houston and to Texas were of "recent vintage," established after his indictment and for the apparent purpose of supporting his request for pre-trial release. (Def. App. at 1754, 1760-61.)

Plaintiffs also point to the fact that various Stanford entities represented that they were headquartered in Texas and that some of their administrative functions were performed in Texas. While that may be true, and while it may provide some nexus to Texas, the importance of those Texas contacts pales when compared to the far more significant contacts that other jurisdictions had to the Stanford Ponzi scheme. Virtually everyone who has analyzed the Stanford Ponzi scheme—the Receiver, the SEC, various plaintiffs, and the courts—have reached the same conclusion: control over the fraud at the heart of the scheme was limited to three key actors, Allen Stanford, Jim Davis, and Laura Pendergest-Holt, and could not have been sustained without the corrupt support of Leroy King (the head of Antigua's Financial Services Regulatory Commission). (Def. App. at 2015-2019.) Davis and Pendergest-Holt lived and worked mostly in Tennessee and Mississippi. (*Id.* at 1729-30.) Stanford (during the relevant period) was rarely in the United States at all; when he was in the United States, he was more often in Florida than in Texas. (*Id.* at 1473-74.)[23] And, Leroy King's support for the scheme was provided, obviously, from and in Antigua. (*Id.* at 2019.)

It follows that, for the most part, this Ponzi scheme was conceived and controlled outside of Texas. The jurisdictions where the corrupt decisions were made and from which they were directed (Tennessee, Mississippi, Florida, and Antigua) have at least as great an interest in these issues as does the state (Texas) in which various administrative and support functions may have been performed.

[23] Indeed, Mrs. Turk, one of the named Plaintiffs, met with Allen Stanford in Florida. (Def. App. at 890.)

Finally, Plaintiffs suggest that Texas has the most significant interest in this dispute because the marketing materials used to sell SIBL CDs were developed and printed in Texas. (Op. Br. at 42.) But, that assertion misses the point. The inquiry should focus on where the corrupt decision was made to create bogus CDs and to sell them through fraudulent brochures, not where the brochures may have been assembled or mailed. That jurisdiction has a far greater interest in the dispute than does the state where, for example, an innocent printing company was asked to produce a brochure containing the misrepresentations that were conceived and directed elsewhere.

The Texas State Securities Board has recognized as much in its rules and regulations. Under those regulations, a dealer must register in Texas before offering securities from Texas, but "an offer is not deemed to be made from Texas merely because offering material is prepared in Texas." Tex. State Sec. Bd., Rule 139.7(b) (2015) (Def. App. at 422). Likewise, a "sale is not deemed to be made in Texas merely because a purchaser sends his purchase money to Texas, or because clerical functions connected with the closing of a sale are performed in Texas." *Id.* These rules reflect the policy judgment of the State of Texas that the site of substantive activity and decisions, not the location of administrative and ministerial functions, is the most important. Since this fraud was conceived and directed by Stanford, Davis, and Pendergest-Holt, and because they frequently engaged in their fraudulent conduct from outside of Texas, it cannot be said that Texas necessarily has the greatest interest in this dispute.

For all of these reasons, Texas does not have the most significant relationship to the untruth-and-omission claims asserted in this case on behalf of non-Texans.[24]

[24] For the same reasons, Texas does not have the most significant relationship to the common-law claim for knowing participation in fiduciary breach.

### 3. The TSA Does Not Apply Across-the-Board to All Unregistered Dealer Claims.

That leaves for discussion only Plaintiffs' claim for the sale of securities by an unregistered dealer. This claim, like Plaintiffs' other Blue Sky claims, has two components: (1) that there was a primary violation committed by a Stanford entity; and (2) that Pershing is liable for having aided and abetted that primary violation. Pershing concedes that, under *Daccach*, the TSA could potentially apply to the first component of this claim—whether a primary violation occurred—even when asserted on behalf of non-Texans. Plaintiffs appear to assume that, if the TSA could apply to the primary violation, the TSA aiding-and-abetting provisions necessarily apply to the second component of the claim—whether Pershing is liable for the primary violation.

This assumption, for which plaintiffs have offered no support, is not accurate. As the Fifth Circuit has recognized, an appropriate conflicts analysis under the Restatement can lead to the application of one state's law to the question of whether a primary actor is liable for a wrong and a different state's law to the question of whether another party is secondarily or vicariously liable for that wrong. *Cates v. Creamar*, 431 F.3d 456, 465-66 (5th Cir. 2005). Here, as noted, Pershing is a New Jersey-based company that has no physical presence in Texas. It is accused of turning a blind eye to red flags that it allegedly discovered in meetings in Tennessee and Antigua. It supposedly aided Stanford's scheme, notwithstanding these red flags, by making decisions and processing wire transactions in and from New Jersey under agreements governed by New York law. It is thus far from clear, even under *Daccach*, that the Texas Supreme Court would sanction the application of Section 12 of the TSA to claims that Pershing aided the sale of securities by an unregistered dealer, even if it would apply Section 12 to the primary claim against the unregistered dealer itself.

Case 3:09-cv-02384-N-BG Document 159 Filed 03/20/15 Page 51 of 59 PageID 3496

In any event, this claim (even if governed wholly by Texas law) is too slender a reed on which to certify a world-wide class. As made clear in Plaintiffs' Opening Brief, the entire case against Pershing is built on Pershing's relationship with SGC and Pershing's processing of wire-transfer instructions from clients of SGC who had brokerage account introduced to Pershing. Yet, it is undisputed that SGC—the only entity with whom Pershing had a contract and the sole means through which Plaintiffs try to tie Pershing to Stanford's fraud—was in fact appropriately registered during the entirety of its relationship with Pershing. (Def. App. at 2016-17.)

What's more, Plaintiffs' complaint reveals that the real registration requirement on which they rely is set forth, not in the TSA, but in federal law. For example, in paragraphs 32, 33, and 106 of the Second Amended Complaint, Plaintiffs clarify that their main complaint is that Stanford Financial Group failed to register as required, not by the TSA, but by the Investment Company Act, 15 U.S.C. §§ 80a-1-80a-64. However, there is no private cause of action for damages arising from a primary violation of the Investment Company Act. *See, e.g.*, *Transamerica Mortgage Advisors, Inc., et al. v. Lewis*, 444 U.S. 11, 19 (1979). Likewise, there is no private cause of action for aiding and abetting violations of the federal securities laws (even those that allow private claims for primary violations). *See, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific Atlanta, Inc.*, 552 U.S. 148, 166 (2008). Plaintiffs simply do not have any substantial claim for the sale of securities by unregistered dealers. This throw-away claim, which is really an invalid federal cause of action disguised as a state-law claim, cannot support class certification.

**C. Material Differences in Applicable Law Present Insuperable Obstacles to Class Certification.**

This Court has already recognized that there are material differences among the Blue Sky laws of the various states with interests in this dispute. The Court has twice dismissed aiding-

and-abetting claims against Pershing under the Florida securities act. (Def. App. at 289-90; Order, *Weatherly v. Pershing LLC*, No. 3:14-cv-00366 (N.D. Tex. June 23, 2015), ECF No. 47 at 4.) Unlike the Texas act, the Florida act severely limits the class of actors who can be secondarily liable and requires that those actors have been in privity with the purchasers and have personally participated in the securities sales at the points of purchase. *Id.* As the Court has already ruled, there is no allegation or proof that Pershing personally participated in any CD sales at the point of purchase, thus immunizing Pershing from secondary liability under the Florida act. *Id.*

This is hardly the only difference between the various Blue Sky laws of the jurisdictions in which the putative class members resided when they bought their CDs. Adoption of the Uniform Securities Act has been anything but uniform. *See, e.g.*, 12A JOSEPH C. LONG, BLUE SKY LAW § 12-3 (2014) (chart showing that 20 states have adopted the 1956 USA version; 4 states have the 1985 version; 16 have the 2002 version; 10 states have Blue Sky laws based on some "other" source). On virtually every key issue, from the burden of proof at trial, to the standards for primary liability, to the availability of aider claims, to the available remedies, to the time periods in which claims must be asserted, there are material differences among the Blue Sky laws enacted across the country.

Under the New York securities act, investors do not have a private right of action at all, with enforcement being left to regulators and prosecutors. *See, e.g.*, *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 277 (N.Y. 1987). Notably, New York law, by contract, governs the Clearing Agreement between Pershing and SGC and the Account Agreements between Pershing and investors with brokerage accounts introduced to Pershing. (Def. App. at 148, 151, 783.)

While most other states do recognize a private right of action under their Blue Sky laws, there is a vast array of differences among them. In some states, a primary violation can only be established with proof that a seller or dealer acted with scienter. *See, e.g.*, N.J. Stat. Ann. § 49:3-71a (2015) (New Jersey). Yet, in other states, the plaintiff can prove a primary violation without any proof of scienter, with the burden shifting to the defendant to prove as an affirmative defense that it lacked a culpable mental state. *See, e.g.*, Tex. Rev. Civ. Stat. Ann. art. 581-33A(2). In still other states, primary liability for the sale of securities through untruths and omissions may be absolute, with no scienter requirement and no ability for the primary violator to assert an affirmative defense based on lack of knowledge. *See* 815 Ill. Comp. Stat. 5/13A (2015) (Illinois).

Among the states in which the plaintiff must prove scienter, the required level of proof varies significantly from negligence to recklessness to knowing and intentional misconduct. *See, e.g.*, *Minneapolis Empl. Ret. Fund v. Allison-Williams Co.*, 519 N.W.2d 176 (Minn. 1994) (Minnesota—negligence, recklessness); N.J. Stat. Ann. § 49:3-71 (New Jersey—intent to deceive).

In some states, the plaintiff must prove that she relied on an untruth or omission. *See, e.g.*, *Keogler v. Krasnoff*, 601 S.E.2d 788, 791-92 (Ga. Ct. App. 2004) (Georgia); *Green v. Green*, 293 S.W.3d 493, 508 (Tenn. 2009) (Tennessee); *Tirapelli v. Advanced Equities, Inc.*, 813 N.E.2d 1138, 1142 (Ill. App. Ct. 2004) (Illinois). In other states, reliance is not a separate element of a primary violation. *See, e.g.*, *Granader v. McBee*, 23 F.3d 120, 123 (5th Cir. 1994) (Texas).

Causation is a required element of a Blue Sky claim in some jurisdictions. *See, e.g.*, *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1100-01 (Colo. 1995) (Colorado). In

other jurisdictions, it is not. *See, e.g.*, 12A JOSEPH C. LONG, BLUE SKY LAW § 12.5. Further complicating things, in a significant number of states, the issue of whether a plaintiff must prove causation in a Blue Sky case remains undecided. *Id.*

Among the states that do recognize secondary liability for Blue Sky violations, there are material differences among the classes of actors who can be liable and on the level of participation or involvement necessary to create liability. Texas, in fact, is an outlier—one of just seven states that does not limit those who can be secondarily liable to specific categories of actors (such as directors, officers, and control persons). 12A JOSEPH C. LONG, BLUE SKY LAW §§ 12-30 - 12-37. In some of these states, Pershing as a matter of law does not occupy a status that could ever give rise to aiding liability. *Id.* (noting multiple jurisdictions where only control persons, directors, officers, or employees of the seller can be secondarily liable). In others, the availability of secondary-liability claims against Pershing would turn on investor-by-investor fact findings of an individualized nature. *See, e.g.*, Fla. Stat. Ann. § 517.211(1) (2014) (requiring personal participation at the point of sale).

In the jurisdictions where aider liability can be imposed on secondary actors, there are important differences in the level of scienter that must be shown and on the allocation of the burden of proof on that issue. In some states, the plaintiff must prove that a secondary actor aided a violation with intent to deceive or at least recklessness. *See, e.g.*, Tex. Rev. Civ. Stat. Ann. art. 581-33F(2). In other states, the plaintiff need not prove scienter to establish a secondary violation, with the burden on the defendant to prove as an affirmative defense that it lacked a culpable mental state. *See, e.g.*, Tenn. Code Ann. § 48-1-122 (2014) (Tennessee).

In some jurisdictions, Blue Sky violations can be proven by a preponderance of the evidence; in others, proof by clear and convincing evidence is required, at least on some elements of the claim. *See, e.g.*, Utah Code Ann. § 61-1-22(2) (2014).

Some states limit the remedies for plaintiffs to those that are specifically stated in the statute—often rescission for a buyer who still owns the security; in other states, implied remedies beyond those expressed in the statute are available. *See, e.g.*, *Carothers v. Rice*, 633 F.2d 7, 9-10 (6th Cir. 1980) (Kentucky).

In a rescission context, most states allow the plaintiff, upon tender of the security, to recover the principal paid for the security plus interest. But, there are material differences among the states concerning the source of the interest rate (statute, market, or the rate stated in the security itself); the percentage interest rate; and whether interest is calculated on a simple or compound basis. 12A JOSEPH C. LONG, BLUE SKY LAW at § 12.11.

Blue Sky violations in some states give rise to the potential for punitive damages. *See, e.g.*, *Anvil Inn Ltd. v. Thornhill Condos*, 407 N.E.2d 645, 654 (Ill. App. Ct. 1980). In other states, punitive damages are not available. *See, e.g.*, *Citigroup Global Markets v. Salerno*, 445 F. Supp. 2d 124, 127 (D. Mass. 2006).

Some jurisdictions do not allow for the recovery of attorneys' fees in Blue Sky cases. *See, e.g.*, N.J. Stat. Ann. § 49:3-71(c) (New Jersey); 70 Pa. Stat. § 1-501 (Pennsylvania). Among the states that do provide for attorneys' fees, there is wide divergence. In some states, recovery of attorneys' fees is a two-way proposition, with either a prevailing plaintiff or a prevailing defendant entitled to recoup them. *See, e.g.*, Tenn. Code Ann. § 48-2-122(f) (Tennessee). In other states, only a prevailing plaintiff is eligible to recover fees. *See, e.g.*, La. Rev. Stat. Ann. § 51:714.A (Louisiana). Sometimes, the award of fees to a prevailing party is automatic; other

times it is within the discretion of the court or the jury. *See, e.g.*, Tex. Rev. Stat. Ann. art. 581-33(D)(7) (Texas—discretionary); N.C. Gen. Stat. Ann. § 78A-56(a) (2015) (North Carolina—mandatory).

Finally, most states apply two different periods when assessing the timeliness of a Blue Sky claim—a limitations period typically running from when the violation was or should have been discovered and a repose period running from the date of sale. But, there is no uniformity among the states on the duration or application of these time periods. Limitations periods vary from as short as one year to as long as five years. *Compare* D.C. Code § 31-5006.05(f) (2015) *with* N.D. Cent. Code 10-04-17(5) (North Dakota). In some states, the limitations period runs from actual discovery of the violation; in other states, the period runs from when the violation should have been discovered. *Compare* N.C. Gen. Stat. § 78A-56(f) (2015) (North Carolina—actual discovery) *with* Nev. Rev. Stat. 90.670 (2014) (Nevada—should have discovered). There are similar variations in periods of repose, ranging from one year to five years. *Compare* Ariz. Rev. Stat. Ann. § 44-2004 (2015) (Arizona) *with* S.D. Codified Laws § 47-31B-509(j) (2015) (South Dakota).

The above analysis is not exhaustive, and it is of course one that Plaintiffs—not Pershing—had the burden to perform. It does explain, perhaps, why Plaintiffs failed to bother with the analysis. In light of these wide variances, and if Plaintiffs cannot convince the Court to adopt the blanket application of Texas law, certification of a class will be impossible in this case.[25]

[25] Much of the information in the text is drawn from general discussions in treatises and elsewhere about the differences in Blue Sky laws from around the country and from efforts certain commentators have made to summarize those differences in chart form. This exercise—which is nothing but an overview from a 30,000-foot level—is sufficient to make the point that there are material differences among the various statutes in play. But, this high-level summary is no substitute for the detailed, state-by-state analysis that Plaintiffs were required to perform before seeking certification of a nationwide class. Charts and summaries do not capture the details and nuances of how each state has interpreted and applied its own version of the Uniform Securities Act—and those details and

## II. Even Under Texas Law, Plaintiffs Cannot Demonstrate That Common Questions Will Predominate.

Certification of a class under Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Pertinent to this issue is "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). Such difficulties "encompass[] the whole range of practical problems that may render a class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). Class issues do not predominate when "transaction-by-transaction" determinations are required. *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 307 (5th Cir. 2009). The Court must therefore assess at the certification stage the various factual issues that will need to be proven by the plaintiffs at trial and whether individual questions will predominate. *See, e.g.*, *Ahmad v. Old Republic Nat'l Title Ins. Co.*, 690 F.3d 698, 705 (5th Cir. 2012) (reversing district court's grant of class certification because "common questions will not predominate at trial").

Plaintiffs devote a scant three pages of their Opening Brief to the critical question of predominance. Largely, they take refuge in the fact that reliance is not a separately stated element of a cause of action under the TSA. (Op. Br. at 33.) They ignore, however, that the TSA nevertheless requires proof that securities were sold "by means" of untruths and omissions, which necessarily requires them to identify specific misrepresentations that actually played a role in the purchases and sales at issue. *See, e.g.*, *In re Perry*, 404 B.R. 196, 212 (Bankr. S.D. Tex. 2009) ("Normally, the plaintiff must introduce evidence of a material misrepresentation or omission that related to the security and induced its purchase . . . ."); *Crescendo Investments, Inc.*

---

nuances would of course be critical to the evaluation and trial of investor clams against Pershing and specifically to whether any trial could ever be conducted on a class-wide basis. Plaintiffs have likewise offered no analysis of state-law differences on their common-law claim for participation in fiduciary breach, and there is no basis on which to assume that fiduciary law is uniform across the 59 jurisdictions implicated by the proposed class.

*v. Brice*, 61 S.W.3d 465, 475 (Tex. App. 2001) (holding that the plaintiff "must introduce evidence of misleading statements . . . that relate to the security purchased and induced the purchase thereof"); *see also Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1418 (5th Cir. 1993).

They also ignore altogether the fact that an aiding claim under the TSA requires proof that the secondary actor (*i.e.*, Pershing) provided material and substantial aid—not just to the violator generally—but to the violation specifically. *See, e.g.*, *Navarro v. Grant Thornton, LLP*, 316 S.W.3d 715, 720-22 (Tex. App. 2010) (failure to prove "substantial assistance in the primary violations" of the TSA); *Crescendo Invs.*, 61 S.W.3d at 473 ("substantial assistance of the [TSA] *violation* . . . with the necessary intent"). That, in turn, requires Plaintiffs to prove the specific untruths and omissions at issue and that Pershing did something to assist the sale of securities through those specific untruths and omissions. *See, e.g.*, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 344 (5th Cir. 2008). Further, Plaintiffs do not even acknowledge, let alone address, that their common-law fiduciary claims require proof of causation; to prevail on these claims, Plaintiffs will have to show what actually caused each class member to purchase their SIBL CDs. *See, e.g.*, Texas Pattern Jury Charges (Business) 115.18 (2014). Finally, Plaintiffs' predominance analysis, such as it is, ignores that their case is built on oral misrepresentations (without any evidence of uniformity in those representations) and that such cases are rarely, if ever, suitable for class treatment. *See, e.g.*, *Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307-08 (5th Cir. 1977).

Under a proper predominance analysis, Plaintiffs' claims are simply not susceptible to class certification. Here, as set forth below, there are more than 30 separate, key issues that will

require individualized determination. These individualized questions will predominate over the common questions Plaintiffs have identified.

**A. Individual Issues Will Predominate On Liability.**

| ISSUE | RELEVANCE |
|---|---|
| What specific misrepresentations did the seller of the securities make to each investor? | Required under the TSA to prove a primary violation. *See* Tex. Rev. Civ. Stat. art. 581-33A(2). |
| Did each investor know that the matters allegedly misrepresented were untrue? | An affirmative defense under the TSA to a primary-violation claim. *See* Tex. Rev. Civ. Stat. art. 581-33A(2)(a). Available to Pershing as an alleged aider because an aider is liable, if at all, "to the same extent as if [it] were the seller." *Id.* at 581-33F(2). Also directly relevant to Pershing's proportionate-fault defense. *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. Relevant too on accrual of the statute of limitations under the TSA, which runs from when the misrepresentation was or should have been discovered. *See* Tex. Rev. Civ. Stat. art. 581-33H. |
| Did the Financial Advisor to each investor know that the allegedly misrepresented matters were untrue? | Plaintiffs have testified to near total reliance on their Financial Advisors. There is evidence that the Financial Advisors were aware of and ignored some of the same red flags that Pershing is accused of ignoring. To the extent the Financial Advisors are viewed as Plaintiffs' agents, their knowledge would be imputed to Plaintiffs, giving rise to an affirmative defense to a primary-violation claim, available to Pershing as an alleged aider. *See* Tex. Rev. Civ. Stat. art. 581-33A(2)(a), 581-33F(2). Also directly relevant to Pershing's proportionate-fault defense. *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. |

| ISSUE | RELEVANCE |
|---|---|
| In the exercise of reasonable care, could the Financial Advisors to each investor have known that the allegedly misrepresented matters were untrue? | Pershing is accused of aiding primary violations of the TSA and breaches of fiduciary duty by the Financial Advisors. The Financial Advisors may well have been ignorant of some of the misrepresentations at issue, which would give rise to an affirmative defense under the TSA. *See* Tex. Rev. Civ. Stat. art. 581-33A(2)(b). Available to Pershing as an alleged aider because an aider is liable, if at all, "to the same extent as if [it] were the seller." *See id*. at 581-33F(2). Also directly relevant to Pershing's proportionate-fault defense. *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. |
| What specific matters did the seller of the securities fail to disclose to each investor? | Required under the TSA to prove a primary violation. *See* Tex. Rev. Civ. Stat. art. 581-33A(2). |
| Was each investor or the Financial Advisor to each investor aware of the allegedly undisclosed matters? | Plaintiffs have testified to near total reliance on their Financial Advisors. There is evidence that the Financial Advisors were aware of and ignored some of the same red flags that Pershing is accused of ignoring. To the extent the Financial Advisors are viewed as Plaintiffs' agents, their knowledge would be imputed to Plaintiffs, giving rise to an affirmative defense to a primary-violation claim, available to Pershing as an alleged aider. *See* Tex. Rev. Civ. Stat. art. 581-33A(2)(a) & 581-33F(2). Also directly relevant to Pershing's proportionate-fault defense. *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. Relevant too on accrual of the statute of limitations under the TSA, which runs from when the misrepresentation was or should have been discovered. *See* Tex. Rev. Civ. Stat. art. 581-33H. |

| ISSUE | RELEVANCE |
|---|---|
| In the exercise of reasonable care, could the Financial Advisor to each investor have known of the allegedly undisclosed matters? | Pershing is accused of aiding primary violations of the TSA and breaches of fiduciary duty by the Financial Advisors. The Financial Advisors may well have been ignorant of some of the misrepresentations at issue, which would give rise to an affirmative defense under the TSA. *See* Tex. Rev. Civ. Stat. art. 581-33A(2)(b). Available to Pershing as an alleged aider because an aider is liable, if at all, "to the same extent as if [it] were the seller." *Id.* at 581-33F(2). Also directly relevant to Pershing's proportionate-fault defense. *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. |
| Were the allegedly misrepresented matters material? | Required under the TSA to prove a primary violation. *See* Rev. Civ. Stat. art. 581-33A(2). |
| Were the allegedly undisclosed matters material? | Required under the TSA to prove a primary violation. *See* Tex. Rev. Civ. Stat. art. 581-33A(2). |
| What were the circumstances (age, employment status, net worth, investment goals, risk profile) of each investor at the time of each CD investment? | Required to assess whether SIBL CDs and the concentration in SIBL CDs were "suitable" for each investor, which goes to the heart of Pershing's proportionate-responsibility defense (applicable to both TSA and common-law fiduciary claims) and whether the acts and omissions of the Financial Advisors were the sole proximate cause or an additional proximate cause of any damages flowing from fiduciary breaches that Pershing is accused of aiding. *See* FINRA Rule 2111 (suitability); *see also* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. |
| Were the securities sold "by means of" the allegedly misrepresented matters? | Required under the TSA to prove a primary violation. *See* Tex. Rev. Civ. Stat. art. 581-33A(2). |
| Were the securities sold "by means of" the allegedly undisclosed matters? | Required under the TSA to prove a primary violation. *See* Tex. Rev. Civ. Stat. art. 581-33A(2). |

| ISSUE | RELEVANCE |
|---|---|
| Was each investor an "accredited" investor? | Unaccredited investors were not eligible to purchase SIBL CDs. When unaccredited investors purchased SIBL CDs by misrepresenting or failing to confirm their accredited-investor status, they committed their own violations of the securities laws, which constitutes an absolute bar to any recovery by them under the TSA. *See* Tex. Rev. Civ. Stat. art. 581-33K. This would also show that the investors' misrepresentations were the sole proximate cause or an additional proximate cause of any damages flowing from fiduciary breaches that Pershing is accused of aiding and goes to the heart of Pershing's proportionate-responsibility defense (applicable to both TSA and common-law fiduciary claims). *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. |
| Did each investor misrepresent his status as an "accredited" investor? | Unaccredited investors were not eligible to purchase SIBL CDs. When unaccredited investors purchased SIBL CDs by misrepresenting or failing to confirm their accredited-investor status, they committed their own violations of the securities laws, which constitutes an absolute bar to any recovery by them under the TSA. *See* Tex. Rev. Civ. Stat. art. 581-33K. This would also show that the investors' misrepresentations were the sole proximate cause or an additional proximate cause of any damages flowing from fiduciary breaches that Pershing is accused of aiding and goes to the heart of Pershing's proportionate-responsibility defense (applicable to both TSA and common-law fiduciary claims). *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. |

| ISSUE | RELEVANCE |
|---|---|
| What role, if any, did Pershing play in the purchase of each SIBL CD? | Under the TSA, Plaintiffs must show that Pershing substantially and materially aided the violation; aid of a general nature to the violator is not sufficient. *See, e.g.*, *Navarro*, 316 S.W.3d at 720-22. Under this test, Plaintiffs must show that Pershing's role was a substantial factor in bringing about the sale. *See, e.g.*, *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991); *see also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 344 (5th Cir. 2008). Plaintiffs have indicated that they will attempt to meet their burden with proof that Pershing exercised discretion and judgment and loaned money to investors to buy CDs. |
| Was Pershing's role a substantial factor in bringing about the sale of each CD? | Under the TSA, Plaintiffs must show that Pershing substantially and materially aided the violation; aid of a general nature to the violator is not sufficient. *See, e.g.*, *Navarro*, 316 S.W.3d at 720-22. Under this test, Plaintiffs must show that Pershing's role was a substantial factor in bringing about the sale. *See, e.g.*, *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991); *see also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 344 (5th Cir. 2008). Plaintiffs have indicated that they will attempt to meet their burden with proof that Pershing exercised discretion and judgment and loaned money to investors to buy CDs. |
| Was the role of other parties a factor in bringing about the sale of each CD? | Goes to the heart of Pershing's proportionate-responsibility defense (applicable to both TSA and common-law fiduciary claims). *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. |

Case 3:12-cv-04641-N-BG Document 158-9 Filed 02/10/16 Page 70 of 94 PageID 5336

| ISSUE | RELEVANCE |
|---|---|
| What was Pershing's level of awareness at the point of each CD purchase? | Plaintiffs' own theory is one of suspicions that deepened over time, as questions went unanswered and more red flags became apparent. By definition, the strength of this theory, from a factual standpoint, varies from investor to investor, depending on when CD purchases were made and the level of Pershing's alleged awareness or concern on each transaction date. |
| In each transaction, was the investor's Financial Advisor acting as a broker-dealer or as an investment advisor? | The role played by the Financial Advisor will determine whether and to what extent the Financial Advisor owed a fiduciary duty to the investor; brokers generally do not owe such duties, but investment advisors generally do. *See, e.g.*, *Carr v. CIGNA Sec., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996); *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 501 (3d Cir. 2013). This is critical to resolution of Plaintiffs' claim that Pershing knowingly participated in fiduciary breaches. If no fiduciary duty was owed, Pershing could not knowingly have participated in a breach. |
| In each transaction, did Pershing know the role that the investor's Financial Advisor was playing? | To be liable for having participated in a fiduciary breach, Pershing must have known that a fiduciary duty was owed. *See, e.g.*, *Cox Texas Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721-22 (Tex. App. 2001). To know whether a fiduciary duty was owed, Pershing would had to have known the circumstances of the Financial Advisor's role and relationship with the investor. |
| In each transaction, did the Financial Advisor act in good faith? | Under Texas law, this is a required inquiry in determining whether there was an underlying breach of fiduciary duty. *See* Texas Pattern Jury Charges (Business) 104.2, 104.3 (2014). To prove that Pershing knowingly participated in a fiduciary breach, Plaintiffs must obviously prove the underlying breach. |

| ISSUE | RELEVANCE |
|---|---|
| In each transaction, did the Financial Advisor disclose to the investor all information considered important by the investor? | Under Texas law, this is a required inquiry in determining whether there was an underlying breach of fiduciary duty. *See* Texas Pattern Jury Charges (Business) 104.2, 104.3 (2014). To prove that Pershing knowingly participated in a fiduciary breach, Plaintiffs must obviously prove the underlying breach. |
| In each transaction, did the Financial Advisor make reasonable use of the confidence placed in him by the investor? | Under Texas law, this is a required inquiry in determining whether there was an underlying breach of fiduciary duty. *See* Texas Pattern Jury Charges (Business) 104.2, 104.3 (2014). To prove that Pershing knowingly participated in a fiduciary breach, Plaintiffs must obviously prove the underlying breach. |
| In each transaction, did the Financial Advisor place his own interests ahead of the investor's interest in order to gain an advantage for himself at the expense of the investor? | Under Texas law, this is a required inquiry in determining whether there was an underlying breach of fiduciary duty. *See* Texas Pattern Jury Charges (Business) 104.2, 104.3 (2014). To prove that Pershing knowingly participated in a fiduciary breach, Plaintiffs must obviously prove the underlying breach. |
| For each CD purchase, was the claim asserted within the applicable period of repose? | Under the TSA, untruth-and-omission claims are absolutely barred if not brought within 5 years of the date of sale. *See* Tex. Rev. Civ. Stat. art. 581-33H. Registration claims are absolutely barred if not brought within 3 years of the date of sale. *Id.* |
| For each CD purchase, was the claim asserted within the applicable period of limitation? | Under the TSA, untruth-and-omission claims are barred if not brought within 3 years after the investor discovered or in the exercise of reasonable diligence should have discovered the untruth or omission. *See* Tex. Rev. Civ. Stat. art. 581-33H. |

**B. Individual Issues Will Predominate On Causation and Remedies.**

| ISSUE | RELEVANCE |
|---|---|
| In each transaction, were Pershing's acts and omissions a cause or a proximate cause of the investor's losses? | Under Texas law, proximate cause is a required element of Plaintiffs' claim for knowing participation in breach of fiduciary duty. *See* Texas Pattern Jury Charges (Business) 115.18 (2014). |
| In each transaction, does the investor bear any responsibility for his or her own losses? | Comparative fault of the plaintiff is an available defense in fiduciary claims under Texas law. *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013. |
| In each transaction, were the acts and omissions of other parties a cause or a proximate cause of plaintiff's losses? | Proportionate-fault of third parties is an available defense to Pershing on both the TSA claims and the common-law fiduciary claims. *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013; *see also F.F.P. Operating Partners L.P. v. Duenez*, 237 S.W.3d 680, 692 (Tex. 2007) (Chapter 33 of the Texas Civil Practice and Remedies Code applies to statutory torts); *Lutheran Bhd. v. Kidder Peabody & Co.*, 829 S.W.2d 300, 307 (Tex. App. 1992) (a TSA claim is a statutory tort claim). |
| In each transaction, on a percentage basis, how does Pershing's responsibility (if any) compare to the responsibility of the investor and other parties? | Proportionate-fault of third parties is an available defense to Pershing on both the TSA claims and the common-law fiduciary claims. *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004, 33.013; *see also F.F.P. Operating Partners L.P.*, 237 S.W.3d at 692 (Chapter 33 of the Texas Civil Practice and Remedies Code applies to statutory torts); *Lutheran Bhd.*, 829 S.W.2d at 307 (a TSA claim is a statutory tort claim). |
| Would each investor tender the CDs to Pershing in order to receive the remedy of rescission? | Under the TSA, an investor must tender the security to the defendant in order to obtain rescission; rescission is the only remedy available to an investor who still owns the security. *See* Tex. Rev. Civ. Stat. art. 581-33D(1). |

| ISSUE | RELEVANCE |
|---|---|
| How much income did each investor receive on each CD prior to the Receivership? | Under the TSA, income on the security must be deducted from any recovery. *See* Tex. Rev. Civ. Stat. art. 581-33D(1). |
| How much income has each investor received on each CD since the Receivership? | Under the TSA, income on the security must be deducted from any recovery. *See* Tex. Rev. Civ. Stat. art. 581-33D(1). |
| Would it be equitable in the circumstances to award each investor attorneys' fees? | Under the TSA, an award of attorney' fees is not mandatory, but depends on a finding that "the recovery would be equitable in the circumstances." *See* Tex. Rev. Civ. Stat. art. 581-33D(7). |

Even assuming the blanket application of Texas law, Plaintiffs cannot prevail without individualized proof on each of the questions identified above. These individualized questions are numerous, and they are critical. Clearly, common issues of law and fact do not predominate.

## III. Plaintiffs Fail to Demonstrate That a Class Action is "Superior."

Plaintiffs bear the burden of demonstrating that a class action is superior to other methods of fairly and efficiently adjudicating whether Pershing bears any responsibility for their individual CD losses. *Madison v. Chalmette Refining LLC*, 637 F.3d 551, 555 (5th Cir. 2011); *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006). Determining whether the superiority requirement is met requires a fact-specific analysis that varies with the unique circumstances of each case. *Madison*, 637 F.3d at 555.

In this case, Plaintiffs argue that the superiority test is met based on the size of the class (1,400 putative class members) and vague assertions of efficiency. (Op. Br. at 38-39.) But class size is only one non-dispositive factor in the superiority analysis. *Ticknor v. Rouse's Enter.*, 592 Fed. Appx. 276, 279 (5th Cir. 2014) (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 747 (5th

Cir. 1996)). Simply noting that there is a class of a certain size is not sufficient to carry Plaintiffs' burden on superiority. *See Ticknor*, 592 Fed. Appx. at 279. And Plaintiffs' speculative assertions of judicial efficiency, which are belied by the actual history of the Stanford litigation, cannot trump the individual interests of putative class members, hundreds of whom have already demonstrated (by filing multiple suits and arbitrations) that class certification is neither necessary nor appropriate.

Plaintiffs' claim of superiority fails for three reasons.

**A. The Availability of Alternative Forums and The Vast Number of Investors Who Have Chosen Those Forums Preclude Class Certification.**

Courts evaluating class certification must consider whether class members have realistic alternatives through which to pursue their claims. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996) ("A class action is the superior method for managing litigation if *no realistic alternative exists*." (emphasis added)); *see also Gregory v. Finova Capital Corp.*, 442 F.3d 188, 191 n.3 (4th Cir. 2006) ("A necessary condition to certification under Rule 23(b)(3) is the class action's *superiority to all other methods* for the fair and efficient adjudication of the controversy." (emphasis added)).

For this reason, Rule 23 specifically lists "the extent and nature of any litigation concerning the controversy already begun by and against class members" as an important part of the superiority inquiry. *See* Fed. R. Civ. P. 23(b)(3)(B). In fact, in drafting Rule 23(b)(3)(B), "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quotation marks omitted).

When there are realistic alternatives that class members have the incentive and the means to pursue, a class action is not the superior method of resolving the dispute, and class

certification should be denied. *See, e.g.*, *Rowden v. Pac. Parking Sys., Inc.*, 282 F.R.D. 581, 586-87 (C.D. Cal. 2012).

Class certification is normally determined relatively early in a case's life. *See* Fed. R. Civ. P. 23(c)(1) (certification should be addressed at "an early practicable time"); *see also* N.D. Tex. LR 23.2 (requiring a certification motion within 90 days of filing the complaint). At that stage, the availability of alternatives often has to be assessed in the abstract, based on remedies and forums hypothetically available to class members. In this context, courts normally look at factors such as the average claim size (including evaluating whether an individual suit would have "negative value" because of the potential to recover less than the costs of litigation) and whether the possibility of attorneys' fees, punitive damages, or other remedies in alternative forums might motivate individual suits. *See Ticknor*, 592 Fed. Appx. at 279; *Castano*, 84 F.3d at 748; *Rowden*, 282 F.R.D. at 586-7.

Here, by contrast, class certification is being assessed more than six years after Stanford's fraud was exposed and after the filing of literally hundreds of Stanford-related legal proceedings around the world. In this case, the availability and efficiency of alternative forums—and the motivation for individual class members to avail themselves of these alternatives—can be evaluated based on a real-world track record.

In this case, both the abstract nature of the claims and real-world experience compel the same conclusion: a class action is not the superior way to resolve Stanford-related claims against Pershing.

**1. The Nature of the Claims and the Available Forums Reveal Viable Alternatives to Certification.**

Even Plaintiffs acknowledge that the average claim size exceeds $250,000. (Op. Br. at 39, citing Pl. App. at 505.) By definition, this takes any "negative value" concern off the table.

*See Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577-78 (7th Cir. 2008) (class action not superior means of litigating statutory claims worth $50,000 or more); *Allison v. Citgo Petro. Corp.*, 151 F.3d 402, 420 (5th Cir. 1998) (superiority claim not met for claims with a $300,000 maximum award), *abrogated on other grounds as noted in FPX, LLC v. Google, Inc.*, 276 F.R.D. 543, 552 (N.D. Tex. 2011) and *Morrow v. Washington*, 277 F.R.D. 172, 202 (N.D. Tex. 2011); *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 328 n.37 (5th Cir. 1978) ("[T]here is every indication that it would be financially reasonable for the Plaintiffs to pursue their own remedies."); *Griffin v. G.K. Intelligent Sys., Inc.*, 196 F.R.D. 298, 305 (S.D. Tex. 2000) (substantial damages claims eliminated financial barriers to individual claims).

Further, as Plaintiffs also acknowledge, attorneys' fees are potentially available on the main claim on which they seek to represent a class—a TSA aiding claim. *See* Tex. Rev. Civ. Stat. art. 581-33(d)(7) ("On rescission or as a part of damages a buyer may recover reasonable attorneys' fees if the court finds the recovery would be equitable."). And, while investors cannot obtain exemplary damages on their TSA claims, *Quest Medical, Inc. v. Apprill*, 90 F.3d 1080, 1091-93 (5th Cir. 1996), exemplary damages are potentially available on Plaintiffs' claim for knowing participation in breach of fiduciary duty (if Plaintiffs can prove fraud, malice, or gross negligence). *See* Tex. Civ. Prac. & Rem. Code § 41.003.

In addition, since the class here is limited to investors who had accounts introduced to Pershing, and since Pershing is a FINRA member, class members have available to them an alternative forum that may not be available to other investors: FINRA arbitration.[26]

[26] Indeed, the Court-appointed Examiner in this case has recognized that, because Pershing can be sued in FINRA arbitrations, Pershing is in a unique position when compared to other defendants. (Def. App. at 1986.) The Examiner, moreover, has noted that investor options on forum selection should be respected: "Both the Examiner and the OSIC support the right of each Stanford Investor to choose between: (a) membership in the putative class . . . ; and (b) the pursuit of that Investor's individual contract right to pursue his or her case against Pershing with FINRA arbitration." (*Id.* at 1987.)

There are, of course, valid reasons for some investors to favor FINRA arbitrations. FINRA arbitrations are typically resolved much more quickly than civil suits. FINRA, moreover, provides for: (1) arbitration before a panel with expertise in the securities industry; (2) streamlined discovery; (3) *pro se* proceedings; and (4) fast-track resolution for smaller claims and claims by elderly or ill investors. *See* FINRA Rules 12400-404 (arbitrator selection); 12208(a) (*pro se* proceedings); 12506 (uniform document production list); 12800 (simplified arbitration for claims involving $50,000 or less). Yet, investors can avail themselves of FINRA arbitrations without forfeiting their rights to seek attorneys' fees and punitive damages, which FINRA arbitrators are authorized to award. *See generally Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 61 (1995) (affirming award of punitive damages); Chrystal Loyer (FINRA), *Considering Attorneys' Fees Using FINRA's Award Information Sheet*, THE NEUTRAL CORNER, Vol. 4, 2014, at 1-4 ("Panels may also award reasonable attorneys' fees to claimants who prevail under statutes that provide for attorneys' fees, including . . . many state securities statutes.").

For these reasons, courts have repeatedly held that the availability of FINRA arbitrations weighs heavily against a finding of superiority in securities cases. *See, e.g.*, *Drake v. Morgan Stanley & Co.*, No. CV-09-6467, 2010 WL 2175819, at *9 (C.D. Cal. Apr. 30, 2010) (declining to certify class of 1,600 financial advisors because the availability of FINRA arbitrations meant that there are more efficient methods of adjudicating claims); *Telco Group v. Ameritrade, Inc.*, No. 8:05-CV-3876, 2006 U.S. Dist. LEXIS 83475, at *32-33 (D. Neb. Nov. 6, 2006) (declining to find superiority in light of availability of NASD (later FINRA) arbitrations); s*ee also Baum v. Great Western Cities, Inc.*, 703 F.2d 1197, 1202 (10th Cir. 1983) (affirming denial of class

certification when there was an arbitration program available for landholders' claims by virtue of a consent decree).

Thus, even if there were no litigation track record to assess, the Court could easily conclude, in the light of available alternatives, that class certification is not a superior means of resolving this dispute.

**2. Well Over a Thousand Investors Have Flocked to Alternative Forums to Pursue Pershing.**

Moving from the abstract to the real world, the actual facts on the ground serve only to confirm that a class action is not the superior method for resolving these claims. By now, more than 1,697 individual investors have sued Pershing in 59 FINRA arbitrations or civil opt-out actions. (Def. App. at 428, 430, 433-36, 716-17.) These non-class actions, which dwarf the class by several hundred members, have been predicated on a variety of different legal theories, including those advanced by Plaintiffs and other theories that Plaintiffs have carefully avoided. (Op. Br. at 22; Def. App. at 431.) Of the investors who have already sued Pershing, approximately 653 would have fallen within Plaintiffs' proposed class definition. (Op. Br. at 22.) By suing separately, they have effectively opted out of the class.

Superiority is lacking when as few as twenty-five class members of a proposed class have filed their own actions. *See Kottler v. Deutsche Bank, AG*, No. 05 Civ. 7773, 2010 WL 1221809, at *5 (S.D.N.Y. Mar. 29, 2010). Here, 26 times that number have effectively opted themselves out of the proposed class. Pershing is aware of no case—and challenges Plaintiffs to find one—where a court has found the superiority requirement met when so many putative class members have already decided they do not want to be part of a class action.[27] Ironically, the proposed

[27] Many of the individual investors pursuing FINRA arbitrations and opt-out civil actions have small claims, some even lower than $50,000, with more than 500 having allowed claims of less than $257,000, which is the threshold, according to Plaintiffs at p. 39 of their Opening Brief, necessary to incentivize individual actions. (Def. App. at

class here is actually smaller than the number of claimants who have already chosen non-class methods of adjudication; no authority supports class certification in these unique circumstances.

Balanced against this track record, Plaintiffs' unsupported assertion that a class action will be judicially efficient rings hollow. (Op. Br. at 39.) The 653 putative class members who have rejected the class are geographically diverse, from multiple states and countries, just like the class members. FINRA has hearing locations around the country, and FINRA has easily accommodated the geographic diversity of Stanford investors by scheduling arbitration hearings in over 13 different cities, close to where investors live. *See generally* FINRA Rule 12213(a) (FINRA Director generally selects hearing closes to the customer's residence at the time of the events in question); *see also* FINRA Hearing Locations, *available at* www.finra.org/arbitration_ and_mediation/finra_hearing_locations (listing FINRA hearing locations).

In these arbitrations and opt-out actions, the claimants have also sought punitive damages and attorney's fees and have thus suffered no detriment by choosing a FINRA forum over court. (Def. App. at 431.) In the opt-out cases that have already been tried—several FINRA arbitrations—the claimants (former putative class members) attended the hearings and through counsel presented both fact and expert witnesses with a full and fair opportunity to air their claims. *Id.* Further evidence of the efficiency of these alternatives is the simple fact that, of the 59 FINRA arbitrations and opt-out actions, 44 have already been concluded. (*Id.* at 428, 430, 433-36, 716-17.) This putative class action, by contrast, is still in its infancy.

At this point, 653 potential class members have already affirmatively stated they do not want to be part of the proposed class. The rest of the investors who could conceivably be in the proposed class, having been aggressively solicited to sue Pershing, appear to have made a

429-30.) These opt-out plaintiffs and claimants have had no trouble securing counsel. (*Id.* at 428, 430, 433-36, 716-17.)

conscious decision to refrain from pursuing claims against Pershing. On the flip side, two former class representatives—Annalisa and Horacio Mendez—have abandoned the class to pursue an arbitration against Pershing; only three class representatives (one of whom joined the class only this year) still want to proceed against Pershing through a class action; and at least some of the lawyers seeking appointment as class counsel harbor grave doubts about the class process. (Def. App. at 1853-61.)

On these facts, no finding of superiority is possible.

### B. A Class Action Is Not Superior Given the Risk That Foreign Jurisdictions Would Not Recognize a Judgment or Settlement.

If a judgment on the merits would not be given preclusive effect in foreign countries where putative class members are citizens or legal residents, a class action with foreign class members is not superior to other available methods for fairly and efficiently adjudicating the controversy. *See Buettgen v. Harless*, 263 F.R.D. 378, 382-83 (N.D. Tex. 2009); *In re Vivendi Universal, S.A., Sec. Litig.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007) (finding that "res judicata concerns have been appropriately grafted onto the superiority inquiry"); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 281 (S.D.N.Y. 2008) ("Courts may properly consider res judicata concerns when evaluating the [s]uperiority [r]equirement with respect to a proposed class that includes foreign class members.").

This rule is grounded in fairness. *See, e.g., Bersch v. Crexel Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir. 1975) (reasoning that "if defendants prevail against a class[,] they are entitled to a victory no less broad than a defeat would have been"), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 561. U.S. 247 (2010); *In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 364 (S.D.N.Y. 2002) (collecting cases finding that "it

would be unfair to certify a class" if the class members "would not be precluded from litigating abroad in their home countries should they lose in [the U.S.] forum").

Where plaintiffs "are unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority." *In re Vivendi Universal, S.A.*, 242 F.R.D. at 103-05 (refusing to certify a class that included members from Germany and Austria); *In re Alstom SA Sec. Litig.*, 253 F.R.D. at 282 (the standard is whether plaintiffs are able to establish a reasonable probability that a foreign court will recognize the *res judicata* effect of a U.S. class action judgment). "The closer the likelihood of non-recognition is to being a 'near certainty,' the more appropriate it is for the [c]ourt to deny certification of foreign claimants." *In re Vivendi Universal, S.A.*, 242 F.R.D. at 95.

Indeed, courts routinely refuse to certify proposed classes that include foreign class members where plaintiffs fail to establish that the foreign courts where those putative class members are citizens or residents will grant preclusive effect to a judgment in the proposed class action. *See, e.g.*, *Bersch*, 519 F.2d at 996-97 (declining to certify class with evidence "that England, the Federal Republic of Germany, Switzerland, Italy, and France would not recognize a [U.S.] judgment in favor of the defendant as a bar to an action by their own citizens"); *Ansari v. N.Y. Univ.*, 179 F.R.D. 112, 116-17 (S.D.N.Y. 1998) (declining to certify class where plaintiffs had "not submitted any affidavits on what preclusive effect, if any, a Rule 23(b)(3) class action w[ould] have in the various countries of which the prospective class members are citizens").

Here, Plaintiffs seek to certify a worldwide class that could include investors from more than 26 foreign countries. (Def. App. at 425-26.) But they offer no evidence, much less a preponderance, that a judgment in this case based on Rule 23 would be enforceable in any

foreign jurisdiction. Their Opening Brief is completely silent on this point. They offer no argument and no evidence to suggest that the foreign jurisdictions implicated by the class they seek to certify would give preclusive effect to a judgment entered by this Court. Plaintiffs have not even acknowledged the issue, let alone purported to meet their burden of proof.

Plaintiffs cannot be surprised by this issue, and their failure to address it must have been a conscious choice. Some of the lawyers representing these Plaintiffs and seeking appointment as class counsel are also representing putative class representatives in the *Willis* and *Chadbourne Park* cases, where this issue has been the subject of extensive briefing and expert testimony.[28] These lawyers know full well that, to certify a class with foreign class members, they must address whether a judgment in this case will have preclusive effect in the foreign jurisdictions where foreign class members reside. Indeed, based on the experience and qualifications they tout in the declarations they have submitted, counsel would have independently known this, even had they not been involved in *Willis* and *Chadbourne Park*.

Pershing respectfully suggests, in these circumstances, that Plaintiffs should be deemed to have affirmatively waived the request to include foreign investors in any class the Court might otherwise consider certifying. As to foreign investors, there has been a conscious and deliberate failure of proof, which indicates that Plaintiffs, at least implicitly, have withdrawn any request to include foreign investors in any class.

Nevertheless, out an abundance of caution, Pershing is submitting a declaration from an international law scholar, Professor Antonio Gidi, who has concluded that courts in Mexico, Venezuela, and Panama would not afford preclusive effect to a class action judgment in this case. (Def. App. at 2596.) These are the foreign jurisdictions with some of the heaviest

[28] Castillo Snyder and Strasburger Price represent the Plaintiffs in this case, as well as the plaintiffs in *Willis* and in *Chadbourne Park.*

concentrations of potential class members, at least according to Pershing's records. (Pl. App. at 686-705.) As to these jurisdictions, and with no countervailing evidence from Plaintiffs, the Court simply cannot include any residents of Mexico, Venezuela, or Panama in any class certified in this case.[29]

**C. The Proposed Class is Unmanageable.**

For at least two reasons, this case would be unmanageable if certified as a class action. First, the predominance of individualized issues detracts from the superiority of the class action device in resolving these claims. *See, e.g.*, *Steering Committee* v. *Exxon Mobil Corp.*, 461 F.3d 598, 604-05 (5th Cir. 2006); *Allison v. Citgo Petro. Corp.*, 151 F.3d 402, 419 (5th Cir. 1998). All of the factors discussed above concerning predominance also weigh against a finding of superiority.

Second, Plaintiffs have defined the class in a way that will necessarily lead to the splitting of claims by class members. The class on its face is limited to persons for whom Pershing processed wire-transfer instructions. But having a wire transfer processed by Pershing was not the only way to buy a CD—investors could also send checks directly to SIBL or have any financial institution in the world send a wire transfer that was not routed through Pershing. (Def. App. at 429.) The circumstances of class representative Quisenberry (who is alleged to be typical of other class members) makes this clear. Quisenberry bought a CD with a $250,000 investment in 2006 with a wire processed by Pershing; he later in 2008 made another $200,000 investment with funds that were not wired by Pershing.

[29] If the Court is inclined to relieve Plaintiffs of their default on this issue, and if Plaintiffs submit any argument or evidence on this point in a Reply Brief, Pershing reserves the right to seek leave to file a sur-reply and to submit expert declarations addressing other foreign jurisdictions. Plaintiffs have the burden on this issue and should not be allowed to hide behind the proverbial log.

Pershing's experience in the opt-out litigation discussed above confirms that this is a common circumstance. Many of the investors who filed FINRA arbitrations against Pershing purchased some CDs with funds wired from a Pershing account and purchased other CDs with checks or wire transfers drawn on accounts at other financial institutions. (Def. App. at 429.) In fact, some of the FINRA opt-out proceedings involved far more CDs purchased without Pershing wires than with Pershing wires, with checks being the far more prevalent means of payment. (*Id.* at 429.)

Plaintiffs make no effort to address this added complexity. If a class is certified, class members who bought 100% of their CDs with Pershing-processed wires will have the entirety of their CD claims resolved in this case. On the other hand, class members who funded CD purchases in multiple ways (sometimes with Pershing wires and sometimes without) will be partially in the class and partially outside the class. This odd circumstance raises significant manageability issues and is yet another reason that no class should be certified here.

**IV. There Are Serious Questions About the Adequacy of the Class Representatives.**

Rule 23(a)(4)'s adequacy inquiry has two prongs, both "designed to ensure that absentees' interests are fully pursued." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630 (3d Cir. 1996), *aff'd* 521 U.S. 591. The first prong considers the qualifications of the counsel representing the class. *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 532 (3d Cir. 2004). The second prong "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).

At a minimum, adequacy requires "an absence of antagonism [and] a sharing of interests between representatives and absentees[.]" *Brown v. Ticor Title Ins. Co*., 982 F.2d 386, 390 (9th Cir. 1992) (quotation omitted). Accordingly, "a class representative must . . . possess the same

interest and suffer the same injury as the class members." *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation omitted).

Here, class certification should be denied because there are serious questions about the adequacy of each named Plaintiff as well as a more global issue that affects the adequacy of all three of them.

**A. Susan Blount is Not an Adequate Class Representative.**

On behalf of the putative class, Plaintiff Susan Blount is pursuing only claims against Pershing. Yet, for her own account, Blount has filed a separate lawsuit (in state court) against her financial advisor, Ray Deragon. (Def. App. at 1044-45, 1764-68.)

Susan Blount thus has an irreconcilable conflict that will preclude her from adequately representing the class. In her state-court suit, she will have every incentive to prove that Ray Deragon is solely responsible for her losses. In this case—where Pershing will be arguing for the assessment of some or all of the blame to Deragon—Blount will have the exact opposite incentive, with a motivation to downplay the significance of Deragon's role.

Blount is in an impossible situation, torn between her own individual interests in state court and her duty to serve a broader interest (for all class members) in this Court.

Given this conflict, Blount is, by definition, an inadequate class representative. *See, e.g.*, *Levias v. Pac. Mar. Ass'n*, No. 08-CV-1610-JPD, 2010 WL 358499, at *6 (W.D. Wash. Jan. 25, 2010) ("[A] favorable settlement in the individual action could provide a disincentive to vigorously prosecute this action on behalf of the class."); *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678-79 (N.D. Ohio 1995) (finding named plaintiffs inadequate class representatives because of involvement in related state court lawsuit that created conflict of interest due to possible disincentive to vigorously represent interests of absent class members).

**B. Dale Quisenberry is Not an Adequate Class Representative.**

Dale Quisenberry is not an adequate class representative either. Mr. Quisenberry became a class representative in 2014, more than five years into the case. He consulted class counsel in 2009, but only chose to participate in this case in 2014 after counsel urged him to do so. (Def. App. at 1180-81.) Mr. Quisenberry had no apparent interest in this case until he was urged to join by Plaintiffs' counsel, no doubt discouraged by the class representatives who left this case.

Once he agreed to join the case, Mr. Quisenberry has made little effort to inform himself of the case. He believes that the proposed class for certification is every investor who purchased a CD (Def. App. at 1187), when in fact he is seeking certification of a much narrower class of persons who bought CDs using funds wire transferred from Pershing accounts. (Op. Br. at 2, 18.)

Nor does Mr. Quisenberry take his responsibilities as a class representative seriously. Both he and his wife jointly purchased the CD that is the basis of their claim and she will share in any recovery, but only he chose to be involved in this lawsuit. (Def. App. at 1145.) Moreover, Mr. Quisenberry was not candid in discovery, as he failed to disclose a lawsuit that he brought and is currently ongoing, and he made no effort to search email servers and other mail archives that he controls for responsive documents. (*Id*. at 1115-18, 1200-1204.) Mr. Quisenberry even acknowledged that he got rid of documents related to his CD purchase in the last five years, long after this lawsuit was pending and long after he consulted with counsel. (*Id.* at 1200.)

These are not isolated lapses. Rather, the delay in joining the case, the failure to understand the case, and the lack of candor in discovery casts doubt on Mr. Quisenberry's willingness and ability to be a class member. *Berger v. Compaq Computer Corp.*, 257 F.3d 475,

479-80 (5th Cir. 2001); *In re Ford Motor Co., Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 367 (E.D. La. 1997) ("Failure to cooperate in discovery may support a finding that class representatives are inadequate.").

**C. Lynne Turk is Not an Adequate Class Representative.**

Lynne Turk testified in her deposition that actively participating in the litigation, complying with court orders, meeting deadlines, and being truthful are all critical roles a class representative must play. (Def. App. at 959-60.) She is right, but she has a history that demonstrates that she is unlikely to be able to discharge these critical responsibilities.

Mrs. Turk testified in her deposition that her interrogatory answers are complete and accurate. (*Id*. at 953.) Specifically, she confirmed the accuracy of her answer to Interrogatory No. 4, which asked her to list other litigation (civil or criminal) to which she has been a party since January 1, 2000, and in response to which she listed just three prior proceedings. (*Id*. at 953-55.) Mrs. Turk's sworn answer to that interrogatory, and her sworn confirmation of it in her deposition, are both not accurate. Mrs. Turk has been a party to at least two additional civil lawsuits that she failed to disclose and to a criminal case that is likewise not listed in her sworn interrogatory answer. (*Id*. at 252, 1511, 1513-14, 1516-21, 1526-27.)

The circumstances surrounding the criminal matter that Mrs. Turk failed to list in her interrogatory answer are particularly troubling. Mrs. Turk testified in her deposition that there is nothing in her prior litigation experience suggesting that she has had difficulty complying with court orders. (Def. App. at 960.) Yet, the criminal record reflects that Mrs. Turk was arrested for driving under the influence and causing injury to person or property on June 30, 2009; that just a few days later, on July 2, 2009, she was cited for speeding; that she was convicted of the DUI offense on December 2, 2009; and that, just two months later (on February 1, 2010) she was

cited for driving with a suspended, cancelled, or revoked drivers' license. (*Id.* at 1516-21, 1526-27, 1529-30.) This record strongly suggests that Mrs. Turk simply elected to disregard an order revoking her driving privileges that was imposed as a consequence of her DUI conviction.

What's more, one of the prior lawsuits that Mrs. Turk did disclose is further suggestive of a propensity on her part to ignore court orders. In that case, Mrs. Turk failed to appear for a court hearing on July 1, 2009, resulting in an Order of Dismissal in which the case was "dismissed for lack of prosecution due to Plaintiff [Mrs. Turk's] failure to appear." (*Id.* at 1548.) She may have failed to appear because she was still in jail on the DUI arrest that occurred on June 30, 2009, but the fact remains that her case appears to have been dismissed for failure to observe a court order.

Mrs. Turk's adamant testimony in her deposition that she is capable of serving as a class representative—and that there is nothing in her litigation history that would suggest otherwise—is also contradicted by the record in yet another case. In that case, Mrs. Turk (who was then known as Lynne Caponera, prior to her marriage to Abraham Turk) was held in contempt of court for failing to comply with a court order. (*Id.* at 1550-51.) The Order for Contempt specifically found that Mrs. Turk's failure to obey the court's order was "willful," and it sentenced her to fifteen days in county jail. (*Id.* at 1550.) When specifically asked in her deposition whether she had ever before had difficulty complying with court orders, Mrs. Turk did not reveal this circumstance, even though being sentenced to jail for contempt of court is not something one is likely to forget. (*Id.* at 960.)

Simply put, Mrs. Turk—based on her own understanding of the responsibilities of a class representative—is not suited to serve in that role.

### D. All Three Named Plaintiffs Are Inadequate Class Representatives.

All three Plaintiffs are inadequate class representatives for a separate reason.

Because the proposed class representatives are pursuing only two particular claims on a class-wide basis, and seek only the remedy of rescission, they are jeopardizing the unnamed class members' ability to pursue other related claims and remedies arising from the Stanford Ponzi scheme. Federal courts across the country have consistently held that a conflict exists—and therefore have denied certification—where the named plaintiffs fail to assert certain claims or remedies that may be available to absent members of the proposed class. *See, e.g.*, *Mielo v. Bob Evans Farms, Inc.*, No. 14–1036, 2015 WL 1299815, at *9-10 (W.D. Pa. Mar. 23, 2015) (there is "a conflict of interest when the named representative does not assert certain claims that may be available and advantageous to the absent putative class members"); *In re STEC Inc. Sec. Litig.*, CV 09–8536, 2012 WL 6965372, at *6 (C.D. Cal. Mar. 7, 2012) ("Proposed class representatives have a conflict of interest with the absent putative class members if they . . . refuse to assert certain claims that may be available and advantageous to the absent putative class members.").[30]

In *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982), the plaintiffs sought to certify a class of plaintiffs injured by allegedly defective tires. Prior to trial, plaintiffs' counsel narrowed the claims asserted on behalf of the class to only claims for breach of an implied warranty and asserted no claims for death, injury, or property damage. *Id.* at 599. In denying class certification, the court stated: "[P]laintiffs so tailored the class claims in an effort to improve the possibly of demonstrating commonality. But that improvement . . . was

---

[30] *See also In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 368 (S.D. Iowa 2008) ("[A]ny *possibility* that a subsequent court could determine that [unasserted] claims . . . were barred by *res judicata* prevents the named plaintiffs' interests from being fully aligned with those of the class."); *Drimmer v. WD-40 Co.*, No. 06-CV-900, 2007 WL 2456003, at *3 (S.D. Cal. Aug. 24, 2007), *aff'd* 343 Fed. App'x 219 (9th Cir. 2009) (denying class certification and noting the "[class representative] cannot maintain a class action without seeking all available remedies for the class members").

purchased at the price of presenting putative class members with significant risks of being told later that they had impermissibly split a single cause of action." *Id*. at 606.

This impermissible conflict arises both where the named plaintiff is unable to assert the claims and where the named plaintiff simply chooses not to bring them. *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022-23 (9th Cir. 2003) ("Stated another way, if Lierboe has no stacking claim, she cannot represent others who may have such a claim, and her bid to serve as a class representative must fail."); *Faust v. Comcast Cable Commc'ns Mgmt., LLC*, Nos. WMN–10–2336, WMN–12–2909, 2014 WL 3534008, at *10 (D. Md. July 15, 2014) ("Plaintiffs' unexplained decision to abandon the claims of some potential class members calls into question the adequacy of the Named Plaintiffs' representation.").

In either scenario, not asserting certain claims or abandoning them, the conflict causes the same result: the named plaintiff's failure to pursue claims that may be available to absent class members means that those claims may be lost forever. *Wilson v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 204 (W.D. Tex. 2004) ("Plaintiffs [pursue] only some of the [potential claims] and have effectively waived [others]. Upon a final judgment, unasserted [claims] will be forever barred by operation of res judicata—for all class members. Therefore, this Court refuses to certify Plaintiffs . . . as class representatives.").

For this reason, courts have held that this kind of "claim-splitting" by the named plaintiffs precludes class certification because it creates an impermissible conflict between the named plaintiffs and absent class members. *See, e.g.*, *Sanchez v. Wal-Mart Stores, Inc.*, No. 2:06-CV-02573, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009) (holding that "strategic claim-splitting decision creates a conflict between Plaintiff's interests and those of the putative class, and renders Plaintiff an inadequate class representative").

Courts within the Fifth Circuit adhere to this principle. *See Zachery v. Texaco Exploration and Production, Inc*., 185 F.R.D. 230, 245 (W.D. Tex. 1999); *see also McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 283 (5th Cir. 2008) ("We agree with *Zachery* and with the district court's conclusion [denying certification] here that if the price of a Rule 23(b)(2) disparate treatment class both limits individual opt outs and sacrifices class members' rights to avail themselves of significant legal remedies, it is too high a price to impose.").

Texas state courts applying Texas procedural law hold similarly. Under Texas law, a class representative's decision to pursue some claims and abandon others must be part of a court's decision in determining potential class representative adequacy. *Daccach*, 217 S.W.3d at 430, 457-58.[31] In *Daccach*, the Texas Supreme Court found that the named plaintiff was not an adequate class representative because he had explicitly abandoned previously-filed claims before seeking class certification. According to the court, certifying the plaintiff's proposed class would unfairly force potential class members to choose class membership at the cost of giving up otherwise viable claims that could be asserted individually. *Id.*; *see also Phillips Petroleum Co. v. Yarbrough*, 405 S.W.3d 70, 81-82 (Tex. 2013) (endorsing *Daccach* and reversing class certification due to, *inter alia*, lower court's failure to consider the preclusive effect of abandoned claims arising from the same set of facts).

Here, Plaintiffs fail to satisfy Rule 23(a)'s adequacy requirement because they have selected only a few claims at the exclusion of others. In an obvious attempt to minimize the already significant number of individual questions among proposed class members, the Plaintiffs

[31] In *Daccach*, the court applied the state rule governing class actions, Texas Rule of Procedure 42, which the court noted is "identical" to Federal Rule of Civil Procedure 23. *Daccach*, 217 S.W.3d at 437. Because the state rule of civil procedure governing class actions was patterned after the federal rule, federal decisions and authorities interpreting federal class action requirements are persuasive in Texas actions. *See, e.g.*, *Farmers Ins. Exch. v. Leonard*, 125 S.W.3d 55, 61 (Tex. App. 2003).

seek to certify a class on only two causes of action: one statutory claim (Texas Securities Act violation), and one common law claim (aiding and abetting breach of fiduciary duty). Yet, the individual investors and victims of the Stanford Ponzi scheme have a demonstrated history of pursuing numerous other claims against Pershing—including common law fraud, breach of contract, and others—all of which Plaintiffs' counsel have noticeably omitted from this case. (Def. App. at 431.) Indeed, victims of other CD-related Ponzi schemes also have a demonstrated history of pursuing other claims beyond those asserted by the class representatives here.[32] *Res judicata* will bar unnamed plaintiffs from later asserting any of those potential claims.

In addition, opt-out claimants in non-class cases filed against Pershing have sought a number of remedies that Plaintiffs here do not seek, including claims for consequential damages and for mental anguish and emotional distress. (Def. App. at 431.) Pershing does not concede that claimants can show entitlement to these damages, but investors controlling their own claims have demonstrated an incentive and a desire to seek them. Plaintiffs, on the other hand, have avoided seeking them (for the obvious reason that they present individualized questions). If a class is certified, class members will be deprived, by operation of *res judicata*, from pursuing these additional remedies, which counsels strongly against class certification.

The named Plaintiffs are therefore inadequate class representatives, as federal and state case law makes abundantly clear.

---

[32] *See, e.g.*, *In re Agape Litig.*, 773 F. Supp. 2d 298, 302 (E.D.N.Y. 2011) (Ponzi scheme victims filed class action suit against bank conducting perpetrator's wire transfers and handling deposits, alleging: aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and aiding and abetting conversion); *Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272, 2010 WL 3168390, at *2 (N.D. Cal. Aug. 10, 2010) (victims of fraudulent CD Ponzi scheme filed class action against bank conducting wire transfers and handling deposits, alleging: aiding and abetting fraud, aiding and abetting conversion, aiding and abetting breach of fiduciary duty, conspiracy to commit fraud and conversion, and violation of California Business & Professions Code).

**V. Plaintiffs' Proposed Class Definitions Are Flawed.**

For all of the reasons set forth above, the main class that Plaintiffs propose (investors who purchased SIBL CDs with wire transfers from introduced accounts) should not be certified. In the unlikely event the Court were to conclude otherwise, certain technical problems with the class definition would have to be corrected before issuance of any certification order.

First, the class definition would have to be modified to exclude "net winners." In *Janvey v. Brown*, 767 F.3d 430, 441 (5th Cir. 2014), the Fifth Circuit affirmed this Court's order that "net winners" must give back the funds paid to them in excess of their original investments. Those investors, however, should not be permitted to recover those excess funds from Pershing or any other source, as this would result in an unjustified windfall. The Fifth Circuit has held that a court should not include, even in a settlement class, persons who have sustained no losses or losses unrelated to the events at issue. *See In re Deepwater Horizon*, 732 F.3d 326, 343 (5th Cir. 2013). These "net winners" have sustained no damages at the hands of Pershing or anyone else. Second, the class definition does not exclude co-conspirators of Allen Stanford, Jim Davis, and others. Stanford is alleged to have conspired with a host of third parties outside his companies. (Def. App. at 2017-19, 2073.) Despite the fact that co-conspirators are routinely excluded from proposed classes, Plaintiffs made no effort to exclude them here.

As to the alternative class Plaintiffs half-heartedly propose, little discussion is necessary. The alternative is defined to include "all investors who, as of February 16, 2009, had purchased and still held SIBL CDs and/or otherwise maintained deposit accounts with SIBL through brokerage accounts at SGC or IRA accounts at STC." (Op. Br. at 18, alt. (ii).) Alternative classes are usually narrower than the main class being advocated and are offered as a way of alleviating barriers to certification that may apply to the broader definition. This alternative, on

the other hand, is broader than the primary class Plaintiffs purpose—and it would only exacerbate the impediments to certification.

In any event, this alternative should be rejected out of hand, as Plaintiffs have made no effort to explain the scope of the class, how its membership would be determined, or how Pershing's conduct relates to it. For example, this alternative is not tied to Pershing-processed wire transfers, but Plaintiffs nowhere discuss what other role Pershing may have played in the purchase of a CD "through brokerage accounts at SGC" or through "IRA accounts at STC." In the absence of such a discussion, it is simply impossible to assess the liability issues that would be raised by this alternative class and how, if at all, common issues would be any more predominant in the analysis.

**CONCLUSION**

For all of these reasons, Plaintiffs' Motion for Class Certification should be denied.

Respectfully submitted,

*/s/Thomas M. Farrell*
Texas Bar Number 06839250
MCGUIREWOODS LLP
600 Travis St., Suite 7500
Houston, TX 77002
(713) 571-9191
(713) 571-9652 Fax

Jeffrey J. Chapman
New York Bar Number 2955896
(*pro hac vice*)
MCGUIREWOODS LLP
1345 Avenue of the Americas, 7th Fl.
New York, NY 10105-0106
(212) 548-2100

*Attorneys for Pershing LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2015, a copy of the foregoing Opposition to Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel was served on Plaintiffs through their counsel of record, electronically and/or First Class Mail, or by other means authorized by the Court or the Federal Rules of Civil Procedure..

*/s/ Thomas M. Farrell*
Thomas M. Farrell

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | **CR. NO. 4:09-342-01** |
| **v.** | § | |
| | § | |
| **ROBERT ALLEN STANFORD** | § | |

## UNITED STATES' SENTENCING MEMORANDUM

Robert Allen Stanford is a ruthless predator responsible for one of the most egregious frauds in history, and he should be sentenced to the statutory maximum sentence of 230 years' imprisonment. For more than twenty years, Stanford orchestrated an epic, multibillion dollar fraud to indulge an extraordinarily lavish lifestyle and to finance a personal business empire, with devastating consequences for thousands of victims who entrusted him with their savings.

Displaying an audacity that only further illustrates his depravity, Stanford seeks a sentence of time-served, brazenly arguing that there are no losses and resorting to the same baseless, self-serving arguments that the jury squarely

GT
EXHIBIT 023

rejected when it convicted him.[1] As explained below, the nature, scope, and duration of his crimes render Allen Stanford exceptionally deserving of the maximum punishment permitted by law—the Guidelines advisory sentence of 230 years' imprisonment.

## RELEVANT FACTS

### A. STANFORD OVERSAW THE FRAUD FOR TWENTY YEARS

#### 1. OVERVIEW OF STANFORD'S SCHEME

As the proof at trial established, Stanford's fraud began prior to 1990 when he was operating Guardian International Bank ("GIB") on Montserrat. Although the bank later relocated to Antigua and changed its name to Stanford International Bank ("SIB"), the core fraud remained the same. The bank's business revolved around one product: it issued certificates of deposit which averaged a return 3-4% higher than CDs from domestic U.S. banks, supposedly because of low taxes and

---

[1] Stanford requests a sentence in the range of 31-44 months (Dkt. # 849, at 79), which amounts to time-served because he will have been in custody for three years at the time of sentencing. *See* 18 U.S.C. § 3585(b)(1) (providing credit toward service of a term of imprisonment for any time in official detention prior to sentencing). A sentence within Stanford's requested range therefore would result in his immediate release (even at the upper end of that range, given the standard 15% discount for good behavior which the BOP would apply).

the bank's low overhead.[2] Through various marketing materials and purportedly audited annual reports, Stanford claimed that the bank: invested in highly liquid, safe, conservative stocks, bonds, and precious metals; made no loans unless they were secured by an equal amount in cash, and therefore incurred no credit risk; and was rigorously audited by an independent accountant and regulated by authorities even tougher than in the United States. In short, Stanford painted a completely false picture of the bank. None of those claims were true.

Prior to 1990, Stanford began diverting depositor funds into various speculative real estate ventures he personally owned. By late 1990, at least half the bank's reported assets did not exist, as James Davis, Stanford's chief financial officer, discovered. Davis testified that Stanford predicted that his real estate bets would pay off and allow him to fill the "hole"—the gaping difference between the principal and accrued interest owed to depositors and the bank's actual, much lower assets. Stanford would repeat that empty claim for two decades.

In reality, Stanford secretly funneled depositor funds from the bank into a web of companies which he owned, using various overseas bank accounts to launder the misappropriated funds. By February 2009, Stanford had sunk over $2

---

[2] Contrary to the defense claim that SIB's CDs paid only fractionally higher premiums, SIB's marketing materials represented that its CDs averaged 3.9% higher returns than U.S. CDs. (GX 136.)

billion in depositor funds into various failing businesses he owned, including, among other things: restaurants, regional airlines, a newspaper, and a host of companies which were not even actual businesses but which existed solely to hold title for tax purposes to Stanford's fleet of jets and boats. Contrary to his repeated claims to depositors that the bank's portfolio was globally diversified, these "assets" were concentrated primarily in the Caribbean.

Because Stanford's failing businesses hemorrhaged money, he was regularly stealing money from the bank in the form of undisclosed "loans." As the trial showed, Stanford's corporate treasurer, Patricia Maldonado, regularly advised Stanford of the cash needs of his businesses, and he would then approve the transfer of depositor funds to one of his Swiss accounts, from which the funds would be routed to various Stanford-owned companies or to cover his personal expenses. Despite the constant infusions of stolen CD proceeds, the businesses remained unprofitable, and Stanford kept doubling down with his depositor's money. By 2008, Stanford was stealing $1 million a day from the bank to keep his failing personal businesses open.

Throughout the twenty years of his scheme, the financial advisors selling the CDs and their clients repeatedly asked whether any CD proceeds were being invested in Stanford's businesses or loaned to Stanford. Stanford consistently

lied, unequivocally denying any connection between the CD program and his personal businesses.

### 2. STANFORD CLOSELY SUPERVISED THE FRAUD

Despite his claims at trial to be an absentee owner, Stanford was intimately involved in overseeing every step of the fraud, particularly his review of the marketing materials and CD sales. He understood that the lifeline for his bank, like any Ponzi scheme, was the continued flow of fresh funds from new depositors to repay any redeeming depositors, and he was highly focused on painting the best picture of the bank and the rate of new CD sales. In 1990, when the Montserrat authorities notified him of their intent to revoke GIB's banking license, Stanford masterfully manipulated the system. He relocated to Antigua and surrendered GIB's license before it was formally revoked, then falsified that year's annual report to make it appear the decision had been made prior to the Montserrat notification letter, and informed depositors and his CD sales staff that the bank moved to Antigua because of Hurricane Hugo.

Virtually every Stanford employee who testified, including defense witnesses, confirmed CD sales were a constant topic of conversation with Stanford. At one point Stanford even directed members of his CD sales team to increase sales no matter what: "Do whatever you need to do. I don't care how you

do it, just do it, but don't tell me. I don't want to know." (Tr. 687.) Stanford practiced what he preached. When Michelle Chambliess, a veteran salesperson who was one of his first employees, lost several clients who redeemed their CDs, Stanford had someone else unceremoniously fire her. In 1995, Stanford opened Stanford Group Company, a U.S.-based brokerage firm, and opened sales offices across this country staffed with financial analysts who he incentivized to sell CDs issued by SIB. As the Court knows, the evidence at trial was overwhelming concerning how tightly Stanford monitored CD sales, down to daily spreadsheets which he reviewed with regional managers. (GX 922-A.) He also set up sales competitions, organizing different financial advisors into teams (the Miami Money Machine, the Aztec Eagles, etc.), and he awarded generous bonuses and commissions based solely on CD sales.[3] For financial advisors who sold more than $1 million in CDs each year, there were also quarterly boondoggles at luxury hotels called Top Producer Club meetings where prizes and awards were distributed, and Stanford and his top lieutenants repeated the same lies about the

---

[3] The defense mistakenly contends that Stanford Group Company's commissions were in line with those of other financial institutions. (Dkt. #849, ¶ 4.) In fact, Michael Callahan, a defense expert witness on brokerage practices, testified on cross-examination that it was standard industry practice for a brokerage firm like Stanford Group Company to pay commissions on securities, *not* CDs. (Tr. 6779-80.)

Case 4:09-cr-00342 Document 1166 Filed in TXSD on 06/06/14 Page 7 of 34

composition and performance of SIB's investment porfolio.

In addition to misrepresenting the fundamental nature of the bank's business, Stanford also lied to his sales staff about the existence of insurance for deposits. At one point, in the early 1990s, he actually produced a fake insurance policy which was shown to the sales staff and even provided to depositors to allay their concerns about the risks of buying a CD from an offshore bank that lacked FDIC insurance. Leo Mejia, a marketing chief for Stanford, described how Stanford asked him to create a new fake policy and admitted that the policy had no real value. (Tr. 833.) Stanford even cavalierly joked to Mejia that it was amazing the risks people were prepared to take for an extra 2 percent return on their CDs. (Tr. 796-97.) When a potential depositor wanted to confirm the existence of the purported issuer of the insurance policy, Stanford admitted to Davis that the policy was fake and had Davis fly to London for a day to fax a false confirmation of the insurance company's existence from a cubicle which Stanford rented. (Tr. 2780.) Again, the fake policy and elaborate precautions to perpetuate it predated Davis' arrival and were entirely the handiwork of Stanford.

Stanford was similarly hands-on in the fabrication of the bank's purported investment returns. Although he employed Davis and several accountants to fake financial numbers for the bank's annual statements, Stanford also regularly

reviewed the fake numbers and pushed Davis repeatedly to inflate the fictitious profits. Three different witnesses involved in marketing—Mejia, Ron Rossi, and Kelley Hawkins—also testified that they each, at different times, saw Stanford personally doctoring numbers in the draft financial statements. (Tr. 816-18, 4566-68, 5808.)

During the fraud, Stanford boasted he was the "hardest working person at the company" in a speech delivered to employees in Antigua. (GX 1535-F.) He was certainly the hardest working person in the fraud: at every step, from the marketing materials to the faked financials to the bank transfers, Stanford was in charge and the prime beneficiary.

### B. STANFORD USED THE PROCEEDS OF HIS FRAUD TO FINANCE HIS BUSINESSES AND A LAVISH LIFESTYLE

Unlike many other major financial frauds such as Enron or Madoff, this scheme overwhelmingly benefitted one person: Allen Stanford. While certainly Stanford's co-conspirators received inflated compensation or even bribes, it was Stanford who directly misappropriated $2 billion in depositor funds to keep his personal businesses afloat. As shown at trial, if any of these businesses had miraculously become profitable, Stanford alone would have reaped the windfall,

not the CD depositors who had been funding these companies for years.[4]

In addition to the $2 billion, Stanford also routed another $116 million in CD proceeds through a Swiss slush fund he controlled at Societe Generale ("Soc Gen"). Stanford frittered away the CD money he laundered through the Soc Gen account on a lavish lifestyle replete with private planes and multiple homes around the world. Nothing was too expensive. He purchased suits from Bijan, a private Beverly Hills clothier that advertised itself as the world's "most expensive" mens clothing store, spending more than $400,000 in CD proceeds at the store between 2000 and 2002. (GX 1319-G.) He used his planes to fly a tailor from Bergdorf Goodman to his Miami and Antigua homes for measurements, regularly flew bottled artesian water to his home in St. Croix, flew fish for his koi pond to St. Croix, and had a Stanford IT employee fly to Antigua just to bring him laptops

---

[4] At trial, there was testimony concerning a proposed "reorganization" involving several of Stanford's personal businesses. As the Court may recall, there was internal discussion between Davis and several Stanford accountants regarding a reorganization which would transfer several money-losing businesses to the bank's ownership. That reorganization was never even begun, much less completed. Moreover, if the reorganization had been completed, an artificially inflated value for these worthless companies would have been "credited" against the $2 billion in real CD proceeds that Stanford stole. The reorganization therefore would have enabled Stanford to realize a double benefit: he could transfer some of his doomed businesses directly to the bank's balance sheet and also write-off part of his skyrocketing loan from the bank.

because Stanford destroyed his repeatedly.

In Antigua, he became a one-man stimulus package, eventually becoming the largest employer after the government. He developed a massive complex adjacent to the airport, constructing large, impressive buildings to headquarter his various businesses, complete with their own water treatment facility. Stanford also became a leading patron of cricket, building an enormous stadium and sponsoring the Stanford 20/20 cricket tournament with a $20 million prize. The Court may recall the publicity photographs of Stanford standing in front of a case housing the money, all of which secretly came from his depositors.

On sea, the story was similar. Stanford owned several boats, including a 112 foot yacht which he spent approximately $13 million refitting to his exacting specifications. The yacht even required support vessels. Indeed, Stanford purchased a British naval frigate which he planned to carry supplies for the yacht in a proposed trip up the Amazon.

To promote the mirage of Stanford as a successful businessman, he frequently and publicly touted his supposed wealth, boasting of his billionaire status in the media, including interviews with *Forbes* and CNBC, and even a University of Houston commencement address (where Stanford also stressed the importance of integrity and warned that "BS may get you to the top, but it won't

keep you there." (GX 1531.)) During a speech in Antigua to his employees, Stanford openly bragged that he lived a lifestyle few people on the planet would ever know. (GX 1536-E.) But only Stanford and a handful of people in his inner circle knew that his outsized lifestyle and its trappings were entirely at the expense of his depositors, and not remotely close to the "investments" into which depositors believed they had placed their savings based on Stanford's lies.

## C. STANFORD ORCHESTRATED AN ELABORATE COVER-UP

A twenty year fraud on this scale requires a careful and thorough cover-up, which Stanford oversaw both within his organization and outside of it.

### 1. STANFORD PROMOTED A SECRETIVE CULTURE IN HIS ORGANIZATION

Stanford clearly promoted a secretive culture within his organization. To assuage any concerns about oversight, Stanford represented in marketing materials at the Top Producer Club meetings to the financial analysts that Stanford Financial Group employed a group of expert research analysts in Memphis, supervised by Laura Holt, his Chief Investment Officer, who oversaw the bank's entire portfolio and monitored the network of global money managers who purportedly managed the portfolio on a day to day basis. In fact, Holt's group of research analysts managed only about 15-20% of the bank's portfolio and had no access to

Case 4:09-cr-00342 Document 1866 Filed in TXSD on 06/06/12 Page 12 of 34

information about the various undisclosed investments in Stanford's personal businesses. As Mark Collinsworth, one of the research analysts testified, he and his Memphis colleagues were expressly instructed not to ever tell the financial advisors or anyone else that the bulk of the bank's portfolio was not managed from Memphis.

Similarly, Henry Amadio, an internal accountant at Stanford Financial Group who tracked the undisclosed $2 billion in "loans" to Stanford, was informed that, if anyone ever learned of his tracking spreadsheet, he would be fired. Stanford also instructed employees on numerous occasions not to communicate anything in email that was confidential or related to him personally (DX 13-19), including any statements from Stanford's personal Bank of Antigua account (GX 641-B).

Thus, to ensure that only a relative handful of insiders knew about the fraud, Stanford engaged in a pattern of intimidation to ensure secrecy in his organization.

### 2. STANFORD CORRUPTED SIB'S EXTERNAL AUDITOR

Controlling outsiders required outright bribes. From the beginning when it was still based on Montserrat, the bank had one auditor: C.A.S. Hewlett, who ran a small accounting firm in St. John's, Antigua. Despite constant questions from the Montserrat regulators, Stanford Group Company financial advisors and CD

depositors, Stanford resolutely refused to hire a larger, more reputable accounting firm, for a simple reason: Hewlett accepted bribes to rubber-stamp the bank's faked financial statements without doing an iota of actual auditing—a fact that led Stanford to tell Davis that "God led me to Hewlett." (Tr. 3086.)

Through his Swiss slush fund at Soc Gen, Stanford paid Hewlett more than $3.4 million, nearly three times as much as the enormous fees paid on the books. (GX 1610.) Stanford was regularly copied on transmittal letters to Soc Gen (GX 1220), including a letter increasing the monthly bribes (GX 1220-A).

### 3. Stanford Corrupted the Antiguan Regulators

After relocating to Antigua in 1990, Stanford quickly proceeded to undermine and eventually eliminate any meaningful regulation of his bank. The entry price for the island was steep: Stanford spent $50 million in CD proceeds to the government to purchase the Bank of Antigua, an insolvent commercial bank, and loaned the government an additional $40 million which he then forgave. In return, he received a new license just in time to surrender voluntarily the license that the Montserratians were about to revoke, and a considerable reservoir of goodwill on which he regularly drew to obstruct any meaningful regulation of his bank.

First, he removed Althea Crick, the chief banking regulator in the early

years on Antigua. After declining a free airline upgrade from Stanford for a European trip and criticizing his interference with regulators, Crick made herself a target. Crick specifically recommended that Stanford step back from the day to day back and forth with the regulators, and Stanford told her, "I don't operate that way." (Tr. 1852.) Instead, Stanford supervised the after hours removal of bank exam files from Crick's office, and she then found herself dispatched on a round of tours through the Caribbean by the government. As Crick testified, the rat was watching the cheese.

After her resignation, Stanford planted two U.S. citizens into the Antiguan regulatory body, Patrick O'Brien and Lloyd Harrell. Each of these gentlemen had previously worked for Stanford and continued to do so on the side while also ostensibly regulating SIB. While on Antigua, they also resided for free at Stanford Development Corporation housing.

Eventually, Leroy King became head of the Antiguan Financial Services Regulatory Commission (the "FSRC"), and Stanford found an ideal partner and, according to testimony, a literal "blood brother."[5] The Court is familiar with the

---

[5] Davis' description of the blood brother ceremony which Stanford recounted to him is corroborated. In envelopes (GX 672) located in Stanford's home containing confidential FSRC documents, King addressed his notes to "Big B," or "Big Brother"—the nickname which Davis testified King used when referring to Stanford.

various bribes which Stanford paid to King, including kickbacks from the Soc Gen account in Switzerland to various King accounts in the United States (GX 1615), free flights on Stanford-owned planes, and expensive Super Bowl tickets (GX 2). King was a critical conspirator, reflected in the fact that Stanford had a dozen different phone numbers in his address book (GX 1500) for King to ensure he could be reached at any hour of the day.

King provided value for the fraud. He shared numerous internal FSRC documents with Stanford, including confidential memoranda (GX 618, 672) relating to regulatory policy and hiring decisions for bank examiners clearly labeled "Confidential," and he ran interference for the fraud. When Paul Ashe, an examiner and Government witness, pressed for corroboration of the bank's assets, Stanford provided forged account statements which King prevented Ashe from verifying.

### 4. STANFORD OBSTRUCTED THE SEC INVESTIGATION

More importantly, as the jury found, Stanford effectively used King to obstruct the U.S. Securities and Exchange Commission's investigation of the CD program at SIB. In 2005, the SEC began a series of confidential requests to the FSRC for information regarding the bank (GX 668), and King promptly shared those requests and allowed Stanford and his attorney to write the FSRC's response

(GX 671). Through his bribes and other gifts, Stanford effectively turned the FSRC into his puppet.

After the SEC investigation heated up again in 2008, on two separate occasions Stanford personally directed Kelly Taylor, the manager of his St. Croix estate, to fill empty barrels with Stanford's bank records and other personal financial information, and he then torched the documents.

In early 2009, the SEC issued actual subpoenas for testimony regarding SIB's entire investment portfolio. Despite clear instructions from the bank's own outside counsel that the SEC wanted testimony concerning all of the bank's assets, Stanford unsuccessfully sought to have SIB's president testify and ultimately secured Laura Holt's agreement to testify even though neither she nor SIB's president knew about the 80% of SIB's reported assets which Stanford had diverted into his own pockets. With characteristic hubris, Stanford told Davis that the SEC would not uncover anything because they were not that smart.

This fraud lasted as long as it did, to the cost of additional thousands of victims each year, largely because Stanford orchestrated an effective, comprehensive cover-up, relying on intimidation, bribes, and obstruction.

## D. THE SCHEME UNRAVELS

As the financial crisis hit in 2008, redemptions of CDs at SIB sharply

increased and new sales flatlined—a deadly combination that caused Stanford's scheme to unravel. His failing businesses generated only losses and consequently were illiquid and could not readily be sold. In a series of emails throughout 2008, his Corporate Treasurer, Patricia Maldonado, constantly updated Stanford on the bank's dwindling stockpile of cash and liquid securities. Stanford's reaction was to engage in another round of fraudulent statements and prodigal spending.

In late 2008, Stanford informed several financial advisors that he had personally injected $741 million into SIB, thereby increasing its capital to more than $1 billion. In conversations with a Stanford Group Company executive, Jason Green, Stanford explicitly stated that his capital contribution consisted of cash he had saved for an islands resort project. The news of Stanford's purported capital contribution was promptly broadcast publicly in marketing materials (GX 138) which Stanford personally edited and approved.

In fact, Stanford did not add a penny. By 2008, his personal businesses were consuming more than $1 million a day in misappropriated CD proceeds, and there was no cash coming in from new CD sales. Instead, Stanford planned a real estate "flip" to back up the announcement of the capital contribution. In June 2008, the bank paid $63.5 million to acquire undeveloped real estate in Antigua

for a resort for billionaires which Stanford had talked about building for years.[6]

Because of an impending divorce, Stanford kept title in the bank's name, contrary to his typical practice with undisclosed use of CD proceeds.  The proposed flip would have led to the land then being transferred to Stanford, marked up to $3.2 billion, and then transferred back to SIB at this artificially inflated price, at which point it would be "credited" to repay Stanford's $2 billion in loans from SIB and to support the announced capital contribution.  Although this proposed sham transaction never took place (title was never even transferred to Stanford), Stanford knew that this "deal" was the basis for his public announcement to depositors—one last attempt to perpetuate his fraud.

SIB's depositors, however, continued to press for redemptions.  James Flynn, a Vietnam veteran who had invested his life savings into the CD program, testified that in January 2009 he attempted to redeem.  Jason Green, a financial advisor, testified that he had a client who also attempted to redeem at the same

---

[6]    The project was intended to be a compound with approximately 30 residences.  The entry fee was going to be $50 million, with additional annual dues of approximately $15 million.  Giselle James, a defense witness, testified that the proposed project never got off the drawing board and the land at issue remains to this day undeveloped jungle.

time. But it was too late: no one could get out because the money was gone.[7]

Stanford's conduct throughout 2008 and into 2009 was telling. In December 2008, en route to California, he made a $1 million pledge to Jason Green's church (which was never honored), and then he arrived for a Christmas vacation in the Napa Valley wine country. Knowing the end was near, Stanford flew his children from his various families on his private jets, and they spent the holiday together (for the first time) at a luxury resort that cost more than $250,000. At the same time SIB was imploding and depositors were desperate to redeem their CDs, Stanford indulged in an epic splurge.

After the Napa Valley holiday, Stanford spent a week in January 2009 in Las Vegas, proving as successful a gambler as he was a businessman. Stanford burned through more than $515,000—again, all depositor money—at the Bellagio, both in gambling and jewelry for his then-girlfriend. (GX 1317.) After that trip, he went to Libya in an unsuccessful bid to obtain additional funds from the Muammar Gaddafi regime. Until the bitter end, Stanford was still attempting to continue his fraud and burning through CD funds with abandon.

---

7 This evidence also flatly belied Stanford's later claims at trial that all depositors were repaid while he ran the bank.

## E. STANFORD'S MISCONDUCT FOLLOWING EXPOSURE OF HIS FRAUD

Even following the exposure of his misconduct and the collapse of SIB, Stanford persisted in his pattern of deceit on a number of fronts.

In this very case, as the Court knows, Stanford tried to manipulate his medical treatment in BOP custody purely to delay trial. Exploiting his medical treatment at Butner, Stanford pretended to have a unique form of amnesia, which apparently ceased the moment this Court declined to grant a continuance. As this Court determined after a thorough hearing, the medical record clearly established that Stanford was not only "competent to stand trial, but also that he was **malingering**." (Dkt. #577, at 2 (emphasis in original)).

Stanford's blatant attempt to game the system in this case is also paralleled in his conduct in the civil case before Judge Godbey, where Stanford has shown a consistent contempt for the legal process and his own victims. From the beginning, Stanford has refused to provide any court-ordered financial information (including a specific accounting of all of his assets) or to cooperate with the Receiver by repatriating assets to the United States. While the Receiver has publicly disclosed that he can only locate approximately $500 million in assets against the $7.2 billion in principal which SIB owed its depositors, Stanford has refused to provide any assistance in the recovery process. Indeed, during trial,

throughout questioning of defense experts, Stanford's counsel even suggested in their questions that the Receiver had not seized all of Stanford's assets, implicitly suggesting his strategy to conceal assets had worked. (Hollander Tr. 7441-47; Lyons Tr. 7522-25, 7539-45, 7593, 7643, 7647-50.)

Remarkably, as recently as last week, Stanford suggested that he could sign over assets in Antigua to the United States in exchange for a lower sentence.[8] Stanford's proposal is putrescent. Despite the fact that those assets were purchased with victim money, Stanford nevertheless attempted to leverage them for a lower sentence. Moreover, Stanford, who apparently believed he still controlled these assets, should have disclosed them when seeking bail from this Court repeatedly—in fact, Stanford has consistently represented to the Court that *all* of his assets were frozen.[9]

In sum, Stanford's post-arrest conduct in this case revealed a profound lack of remorse and continuing contempt for the law, further emphasizing the need for a Guidelines sentence.

---

8 As we understand it, those assets in fact were previously frozen by an Antiguan court.

9 Stanford should also have disclosed the existence of any assets in response to Judge Godbey's order in the civil action and when applying for CJA funds in this case.

## F. THE EFFECTS OF STANFORD'S FRAUD

As of February 2009, SIB reported approximately $10.2 billion in deposits, overstating the amount by billions. The Receiver later discovered the actual amount on deposit was $7.2 billion, of which $1.3 billion was fictitious interest, meaning that the bank owed $5.9 billion in principal to its depositors. Ultimately, the Receiver determined that the market value for all Stanford entities, including SIB, amounted to merely $500 million.

In short, Stanford has inflicted massive financial losses on his depositors with devastating consequences for them, as reflected in trial testimony from several victims and the many victim impact statements submitted to this Court. Nothing the United States can write here can convey as clearly as those victim impact statements the horrific consequences of Allan Stanford's greed and crimes.

# DISCUSSION

## A. APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 125 S. Ct. 738, 760 (2005).

In furtherance of that goal, a sentencing court is required to "consider the

Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *United States v. Booker*, 125 S. Ct. at 764 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner....

Section 3553(a) further directs the Court—in determining the particular sentence to impose—to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the

sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## B. THE GUIDELINES CALCULATION RESULTS IN A LIFE SENTENCE

Application of the sentencing factors to Stanford's conduct calls for a Guidelines sentence of 230 years or, alternatively, a term of years that would both assure that Stanford will remain in prison for life and emphatically promote general deterrence.[10]

Because each of the offenses of conviction is fraud-related and grouped, Section 2B1.1 of the Guidelines determines the applicable offense level. Under Section 2B1.1, and including applicable Chapter Three adjustments, the defendant's offense level is calculated as follows: base offense level of six (§ 2B1.1(a)(2)); thirty levels for a loss of more than $400 million (§ 2B1.1(b)(1)(P));[11] six levels for 250 or more victims (§ 2B1.1(b)(2)(C)); six levels

---

[10] Stanford's various objections to the PSR and his Guidelines arguments were addressed separately in the United States' Response to Stanford's PSR Objections filed on May 25, 2012 (Dkt. # 855).

[11] As addressed in the United States' response to Stanford's PSR objections, the loss amount in this case is $5.9 billion—a sum nearly fifteen times greater than the maximum loss threshold established in the Guidelines. Notably,

because Stanford relocated the bank to Antigua to evade regulatory officials (§ 2B1.1(b)(10)(A)); two levels because the offense endangered the solvency or financial security of 100 or more victims (§ 2B1.1(b)(15)(B)(iii)).[12] *See* PSR, ¶¶ 99-109.

Because Stanford's web of bribery and obstruction concealed his crimes for twenty years, he is in Criminal History Category I and has an adjusted offense level of 56, which is outside the parameters of the Guidelines sentencing chart and therefore automatically reduced to an offense level of 43. At that reduced level, the Guidelines sentence is life imprisonment. *See* U.S.S.G. § Ch. 5, Pt. A. Because Stanford is not charged with any offense that carries a maximum term of life imprisonment, the Guidelines call for the applicable statutory maximums on all counts of conviction to be added together, which results in a Guidelines sentence of 230 years' imprisonment. *See* U.S.S.G. § 5G1.2(d).

Although no longer binding upon the Court, the Guidelines sentence in this

---

although the loss amount is responsible for 30 of the 56 offense levels attributed to Stanford, the applicable Guidelines range reflects numerous other enhancements that apply due to Stanford's conduct and role. Given the base offense level and those enhancements, any finding of a loss greater than $120,000 would yield an identical sentencing range of 230 years' imprisonment.

[12] Although this enhancement normally calls for a four-level increase, only two levels are added due to a reduction for overlapping enhancements pursuant to U.S.S.G. § 2B1.1(b)(14)(C).

case reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to Stanford's conduct.

### C. CONSIDERATION OF ALL OF THE SECTION 3553(A) FACTORS HEAVILY FAVOR A LIFE SENTENCE

Allan Stanford is responsible for one of the largest and most brazen frauds in history. The sheer magnitude of the money stolen, the duration of the crime, and the extent to which Stanford lived a life steeped in deceit are almost unrivaled. He has earned a place among the greediest, most selfish, and utterly remorseless criminals. Accordingly, under the factors set forth in Section 3553(a), the nature and circumstances of Stanford's fraud, his own role and personal history, and the need for forceful deterrence calls for the most severe punishment permitted by law.

#### 1. NATURE AND CIRCUMSTANCES OF THE OFFENSE

Stanford's crimes were serious, long-running, and highly orchestrated, with horrific consequences to investors around the country and overseas. Through two decades of lies, Stanford caused billions in depositor funds to flow through his bank and then laundered stolen funds through a web of accounts around the world. By February 2009, even after the flurry of redemptions caused by the financial crisis, Stanford had still managed to retain over $5.9 billion in depositor principal,

Case 4:09-cr-00342 Document 1866 Filed in TXSD on 06/06/12 Page 27 of 34

at least in part by falsely touting that he had personally increased the bank's capital to more than a billion dollars. In the end, however, the Receiver ultimately valued all of the Stanford entities at only approximately $500 million—a sliver of the amount owed.

Referring to these enormous losses captures only a part of the harm Stanford inflicted on his victims, as illustrated by their impact statements and the trial testimony of several victims. As the Court recalls, James Flynn was a Vietnam veteran suffering from congestive heart failure who invested his life's savings into the CD program to ensure a safe financial future for his wife; they now sell their belongings on eBay and subsist on macaroni and cheese. Diane Hammer was an Air Force veteran and single mother who invested her life's savings, together with that of her father who now suffers from Alzheimer's. These are just two of the thousands of victims of this crime, and their story reflects that the dollar amount of loss in this case only conveys a fraction of the harm Stanford caused with his greed.

These crimes also depended on an intricate layer of corruption which Stanford masterminded to cover-up and perpetuate his fraud. In addition to lying repeatedly for years to depositors and numerous employees, Stanford also aggressively corrupted gatekeepers critical to concealing his scheme. Relying on

his secret Swiss slush fund, Stanford funneled millions in kickbacks—all from stolen CD money—to SIB's auditor and chief regulator, and effectively eliminated any meaningful oversight of his banking operation. When the SEC attempted to investigate the CD program, Stanford successfully stonewalled them for years, using Leroy King at the FSRC as his mouthpiece to buy time and ensuring depositor losses multiplied.

Stanford's fraudulent conduct was repetitive and constant for twenty years, not the product of an aberrant act or temporary moral lapse. Abusing the many positions of trust he held in almost every conceivable way, Stanford enriched himself with billions of dollars of stolen funds, and as a direct result his victims are currently out-of-pocket approximately $5.9 billion. The scope and duration of this fraud weigh heavily in favor of a life sentence.

### 2. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Stanford's history and characteristics also strongly support a lengthy sentence in this case. For twenty years, Stanford looted his bank while blatantly lying to depositors and others who placed their trust in him. Stanford masterminded this scheme and was also its prime beneficiary. Although several co-conspirators clearly profited from generous compensation and bonuses, no one remotely approached the more than $2 billion which Stanford personally stole.

Unlike many criminals who come before the Court who began life with almost nothing, Stanford began with and continued throughout his life to enjoy virtually every advantage. *See* PSR, ¶¶ 117, 137-138 (summarizing Stanford's good relationship with his parents, comfortable upbringing and education at Baylor University). Notwithstanding his advantages in life, he committed his crimes simply to satisfy his own greed and vanity. Unable to succeed legitimately as a businessman, Stanford simply robbed thousands of depositors to finance the trappings of a billionaire lifestyle, complete with yachts, planes, mansions and assorted businesses emblazoned with his name. As described above, in the final weeks when SIB's collapse was imminent, Stanford indulged one last spending spree from Napa Valley to the Bellagio. Consistent with his selfishness, Stanford radiated contempt for others, particularly his depositors.[12]

Among the many incredible claims Stanford makes in his sentencing submission is that he is a "first time offender." (Dkt. #849, at 78.) To be clear, he is in Criminal History Category I (PSR, ¶¶ 110-112), but that categorization does

---

[12] As discussed above, in discussing the fake insurance policy he had created and distributed to depositors, Stanford laughed to Leo Mejia, his then-marketing chief, that it was incredible the risks people were willing to take to earn an extra two percent on SIB's CDs. Similarly, Stanford lectured a group of financial advisors that "[p]eople are stupid, they're greedy, they're lazy, they don't stick to their core values." (GX 1532.1 (video recording of a Top Producer Club meeting in October 2008.))

not come *close* to telling the whole story. For twenty years, Stanford organized and led a massive, international criminal organization masquerading as a bank. On a daily basis, he directly defrauded depositors, bribed auditors, corrupted regulators, and obstructed justice. The criminal history category here therefore grossly understates Stanford's criminality, and his attempt to exploit it is misleading to the Court.

As if more proof were required, nothing speaks more eloquently of Stanford's character than his sentencing arguments in this case. Stanford denies any loss from his fraud, complains that he was "stripped of all his assets," and requests a sentence amounting to time-served. (Dkt. #849, at 78-80.) After everything that he has done to so many innocent victims, Stanford does not show a hint of remorse for his misconduct, only the same arrogant, narcissistic behavior that led to it. Stanford's character and role in the offense, from the inception of his fraud through this sentencing, fully justifies the maximum sentence.

### 3. The Need To Afford Adequate Deterrence

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered. Here, the Government respectfully submits that a lengthy sentence is necessary to serve this purpose. There are numerous executives in the financial

Case 4:09-cr-00342 Document 1860 Filed in TXSD on 06/06/12 Page 31 of 34

services industry and major international companies who are afforded tremendous trust by their investors and control over vast assets. Imposing a long term of imprisonment in this case will serve to deter other executives and money managers who are tempted to break that trust to enrich themselves. The need for an emphatic deterrent message is particularly acute in this case where Stanford, after masterminding a multi-billion dollar Ponzi scheme, never accepted responsibility and continued to game the system even after arrest.[13] Any sentence other than life imprisonment would positively incentivize others to commit the same crimes as Stanford, and the aggravating factors surrounding his conduct justify the strongest possible deterrent message—the maximum sentence.

**4. THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES**

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid

---

[13] Aside from clearly bearing no rational relation to the circumstances of his offenses, Stanford's requested sentencing range is also inconsistent with sentences for other Ponzi defendants, including those who accepted responsibility and pleaded guilty. *See, e.g., United States v. Bernard Madoff,* 09 Cr. 213 (S.D.N.Y. 2009) (150 years for $13 billion scheme following plea and cooperation in recovering assets); *United States v. Scott Rothstein,* 09 Cr. 60331 (S.D.F.L. 2010) (50 years for $429 million scheme with 250 victims); *United States v. Robert Stinson,* 10 Cr. 724 (E.D.P.A. 2012) (33 years for $14 million scheme). Ponzi defendants who, like Stanford, proceeded to trial have received much stiffer sentences for *significantly* smaller loss amounts. *See, e.g., United States v. Edward Okun,* 08 Cr. 132 (E.D.V.A. 2009) (100 years for $126 million scheme); *United States v. Richard Harkless,* 07 Cr. 18 (C.D.C.A. 2009) (100 years for $39 million scheme with 600 victims).

unwarranted sentencing disparities." We respectfully submit that, given Stanford's role as the sole shareholder and chief executive of an offshore bank, and overwhelming beneficiary of the fraud, there are few defendants who compare with him and the scope of his offenses. Given his position and role, the scope and complexity of his schemes, the egregious manner in which he carried them out, and his personal use of almost all of the proceeds, a very substantial sentence would simply not implicate any "unwarranted" disparity.

**5. OTHER FACTORS**

None of the other factors identified in Section 3553(a) appear to be applicable to the case at hand. *See* 18 U.S.C. § 3553(a)(2)(D) ("vocational training, medical care, or other correctional treatment"); § 3553(a)(3) ("the kinds of sentences available"); § 3553(a)(5) ("any pertinent policy statement").

## CONCLUSION

Accordingly, a reasonable sentence in this case would be the Guidelines sentence of 230 years or, alternatively, a term of years that would ensure that Robert Allen Stanford remains in prison for life.

Respectfully submitted,
KATHLEEN McGOVERN
Acting Chief, Fraud Section

/s/ William Stellmach
WILLIAM STELLMACH
Deputy Chief, Fraud Section
ANDREW H. WARREN
Trial Attorney, Fraud Section
Department of Justice

JASON VARNADO
Assistant United States Attorney
Southern District of Texas

**CERTIFICATE OF SERVICE**

I certify this Sentencing Memorandum was served to counsel for Stanford via ECF on June 6, 2012.

/s/ Andrew H. Warren
ANDREW H. WARREN

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § | |
| | § | |
| Defendants. | § | |

## NOTICE OF FILING (STIPULATION AND PROPOSED ORDER)

The Receiver hereby submits the Stipulation and Proposed Order attached to the concurrently filed Appendix. The Stipulation and Proposed Order is submitted as agreed among the Receiver, Movants, the Examiner, and the SEC and would resolve the pending motions [Docs. 367 and 772] to lift the bankruptcy injunction.

GT
EXHIBIT 024

Dated:  March 30, 2010                  Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: /s/ Kevin M. Sadler
     Kevin M. Sadler, Lead Attorney
     Texas Bar No. 17512450
     kevin.sadler@bakerbotts.com
     Robert I. Howell
     Texas Bar No. 10107300
     robert.howell@bakerbotts.com
     David T. Arlington
     Texas Bar No. 00790238
     david.arlington@bakerbotts.com
     1500 San Jacinto Center
     98 San Jacinto Blvd.
     Austin, Texas 78701-4078
     Tel: 512.322.2500
     Fax: 512.322.2501

     Timothy S. Durst
     Texas Bar No. 00786924
     tim.durst@bakerbotts.com
     2001 Ross Avenue
     Suite 600
     Dallas, Texas 75201-2980
     Tel: 214.953.6500
     Fax: 214.953.6503

**ATTORNEYS FOR RECEIVER
RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On March 30, 2010, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kevin M. Sadler
Kevin M. Sadler

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., ET AL., | § | |
| | § | |
| Defendants. | § | |

---

**APPENDIX IN SUPPORT OF**
**NOTICE OF FILING (STIPULATION AND PROPOSED ORDER)**

---

Case 3:12-cv-04641-L Document 180-2 Filed 03/26/16 Page 479 of 492 PageID 2124

Dated: March 30, 2010

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: /s/ Kevin M. Sadler
Kevin M. Sadler, Lead Attorney
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4078
Tel: 512.322.2500
Fax: 512.322.2501

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Suite 600
Dallas, Texas 75201-2980
Tel: 214.953.6500
Fax: 214.953.6503

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On March 30, 2010, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kevin M. Sadler
Kevin M. Sadler

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-0298-N |
| | § | |
| STANFORD INTERNATIONAL BANK, LTD., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**STIPULATION AND**
**[PROPOSED] ORDER**

WHEREAS, on or about February 16, 2009, this action was commenced by the Securities and Exchange Commission (the "SEC"); and

WHEREAS, at the request of the SEC, this Court, by Order dated as of February 16, 2009, as amended March 12, 2009 (as so amended, the "Amended Receivership Order"), appointed Ralph Janvey, Esq. (the "Receiver") as Receiver for all the assets and records (the "Receivership Estate") of Stanford International Bank, Ltd. ("SIBL"), Stanford Group Company, Stanford Capital Management, LLC, R. Allen Stanford, James M. Davis and Laura Pendergest-Holt and of all entities they own or control; and

WHEREAS, by Order dated as of April 20, 2009 (the "Examiner Order"), this Court appointed John J. Little (the "Examiner") as the Examiner in this case; and

WHEREAS, by Motion (the "Bankruptcy Motion") dated September 10, 2009, Dr. Samuel Bukrinsky, Jaime Alexis Arroyo Bornstein, and Mario Gebel (the "Movants"), requested that this Court enter an Order lifting the injunction contained in paragraph 10(e) of the Amended Receivership Order; and

WHEREAS, the Receiver and the SEC opposed the relief sought in the Bankruptcy Motion; and

WHEREAS, the Examiner filed a Report setting forth the Examiner's position with respect to the Bankruptcy Motion; and

WHEREAS, the Receiver, the SEC, and the Movants, with the consent and support of the Examiner, wish to consensually resolve the Bankruptcy Motion, and believe that the relief set forth in this Stipulation and Order is in the best interests of all constituencies in this case; and

WHEREAS, it is the intent of the parties to this Stipulation that the Receiver and representatives of the Movants establish reasonable cooperation and coordination of their efforts to identify and prosecute potential claims against third-parties that may inure to the benefit of the Receivership Estate and the customers of SIBL who, as of February 16, 2009, had funds on deposit at SIBL and/or were holding certificates of deposit issued by SIBL (the "Stanford Investors"); now, therefore, it is hereby

**STIPULATED, AGREED, AND ORDERED THAT:**

***The Committee***

1. The Stanford Investors will hereafter be represented in this case and related matters by an official committee (the "Committee");

   a. The Committee shall be comprised of seven voting members including the Examiner and six other members, representing a cross-section of the Stanford Investors.

   b. The Movants, in consultation with the Examiner, shall propose the initial composition of the Committee subject to the approval of the Receiver, who may reject the designation of any proposed Committee member in

good faith for cause.  Committee members may be Stanford Investors or attorneys representing one or more Stanford Investors.

c.        The Committee shall be governed by formal by-laws, and shall have regular meetings.  The by-laws shall include provisions that:

(i) define and limit the Committee's access to privileged information;

(ii)  prohibit a Committee member with a "conflict of interest" on a particular subject from reviewing privileged or non-discoverable documents or information on that subject or participating in any Committee discussion or vote on that subject.  The by-laws shall define "conflict of interest" as coextensive with, or inclusive of, "adverse interest" as that term is used in 11 U.S.C. § 1103(b); and

(iii) shall contain provisions for the replacement of Committee members who are unable or unwilling to continue to serve.

d.        The Examiner shall act as the initial chairperson of the Committee, pending a vote on a permanent chairperson, and will assist in coordinating the activities of the Committee.

e.        The Receiver shall have the right to review and comment on the by-laws.

f.        Each member of the Committee shall agree to be bound by an appropriate confidentiality agreement, the terms of which will be negotiated by the Committee and the Receiver.

g.        Neither the Committee nor its members shall be entitled to retain attorneys or other professionals at the expense of the Receivership Estate. Committee members, however, shall be entitled to be reimbursed from the

Receivership Estate for their reasonable out-of-pocket expenses, subject to periodic review by the Court. Permissible out-of-pocket expenses shall be limited to customary items such as telephone and facsimile charges, filing fees, transcript costs, postage, travel for court appearances and Committee meetings, and similar expenditures, relating directly to the work of the Committee, but not for expenses incurred solely in connection with litigation commenced by the Committee or members of the Committee against third parties. Committee members will attempt to minimize such expenses and only appropriate expenses will be reimbursed.

h. Except for the Examiner, the members of the Committee shall owe fiduciary duties to Stanford investors in the same way that members of a bankruptcy committee owe fiduciary duties to unsecured creditors.

i. The Committee members' liability shall be limited to the same extent as that of the Receiver.

2. The Committee shall have rights and responsibilities similar to those of a committee appointed to serve in a bankruptcy case under title 11 of the United States Code (the "Bankruptcy Code"), including the right to:

a. raise and appear and be heard on any issue in the Receivership proceedings;

b. consult on a regular basis with the Receiver concerning the administration of the case; and

c. investigate the acts, conduct, assets, liabilities, and financial condition of the Stanford entities pre-Receivership.

3. The Examiner's membership role on the Committee shall not alter or amend his duties, rights and responsibilities under the Examiner Order which shall remain in full force and effect, including provisions governing compensation to be paid to the Examiner.

4. Under his appointment by the Court, the Examiner has responded to each of the Receiver's previous fee applications and will, in consultation with the Committee, continue to file responses to future fee applications, when he considers it appropriate to do so; therefore, the Committee will not lodge separate responses or objections to the Receiver's future fee applications.

5. Within thirty (30) days after the entry of this Order, the Receiver and the Committee shall establish a written protocol governing cooperation, information sharing, and confidentiality between the Committee and the Receiver, and permitting the Committee reasonable access to all non-privileged documents, books, records, and other information currently in the Receiver's possession or under his control. This protocol will preserve the Receiver's attorney-client privilege with his retained experts and advisors, as well as the confidentiality of attorney work product, but will provide the Committee access, subject to a confidentiality agreement, to the experts' work product and underlying source documents necessary to support the Committee's analysis and pursuit of claims. To the extent the parties are unable to agree on such a protocol within that time, they shall request that the Court resolve any outstanding issues or disputes on an expedited basis. Notwithstanding the foregoing, immediately upon the entry of this Order the Receiver will use reasonable efforts to respond to informal, targeted document requests propounded by the Committee.

6. The Committee and the Receiver shall use their best efforts not to duplicate each other's work, or that of their respective professionals.

***Claims Against Third Parties***

7. The Receiver and the Committee shall consult regularly, but meet not less than monthly, concerning the Receivership Proceedings and the status of litigation that may be brought by the Receiver, the Committee, or jointly, and shall each apprise the other of their litigation efforts.

8. The Receiver and the Committee will cooperate in the identification and prosecution of actions and proceedings for the benefit of the Receivership Estate and the Stanford Investors, and endeavor to consensually determine which such actions shall be brought by the Receiver, and which shall be brought on a class and/or contingency fee basis, at no direct cost or expense to the Receivership Estate, by the Committee or one or more of its members, or one or more Stanford Investors designated by the Committee.

a. If at any time the Committee determines that there are potential third-party claims that should be asserted on behalf of the Receivership Estate or the Stanford Investors, the Committee shall advise the Receiver of that determination in writing (the "Claims Notice").

b. Within thirty (30) days of the Receiver's actual receipt of a Claims Notice, the Receiver shall notify the Committee in writing whether the Receiver intends to prosecute the third-party claims identified in the Claims Notice and, if so, shall commence an action or proceeding on such claims within sixty (60) days thereafter, or such additional time as may be agreed to by the Receiver and the Committee.

c. In the event that the Receiver: (i) does not respond to the Claims Notice; (ii) declines to pursue the claims identified in the Claims Notice; (iii) determines, in his judgment, that such claims would be more

appropriately pursued by the Committee; or (iv) fails to commence an action or proceeding within sixty (60) days of serving his response to the Claims Notice, then the Receiver will not object to the Committee's pursuit of such claims on a class and/or contingency fee basis, at no direct cost or expense to the Receivership Estate, on behalf of the Stanford Investors, subject to the supervision of the Court. The Committee may designate one or more of its members, and/or one or more Stanford Investors, to prosecute such claims. To promote efficiency and uniformity of any distribution of recovered funds to investors, the Receiver may be heard on any proposed settlement of any class action with respect to matters of distribution of settlement proceeds.

d. To the extent that the Committee pursues such claims on behalf of the Receivership Estate with the consent of the Receiver, the Receiver shall either assign such claims or causes of action to the Committee, agree to be named as a nominal plaintiff or co-plaintiff, or take other actions as may be reasonably requested by the Committee to ensure that the Committee (or one of its members, or designees, as the case may be) is able to pursue such claims on a class or other basis.

9. Notwithstanding anything in the foregoing paragraph, the Receiver agrees that the Committee may prosecute (either directly, or through one or more of its members or designees), claims on a class and/or contingency fee basis, at no direct cost or expense to the Receivership Estate, against:

a. Stanford's pre-receivership professionals (including but not limited to accountants, insurance brokers, and attorneys) that are in the nature of malpractice, professional negligence, breach of fiduciary duty, breach of contract, or similar claims arising out of such professionals' rendition of professional services to any of the Stanford entities prior to February 16, 2009; and

b. Any officer, director, or employee of any Stanford entity for fraud-related claims, breach of fiduciary duty, breach of contract, unjust enrichment, or other claims that arose prior to February 16, 2009 to the extent not duplicative of claims already brought by the Receiver;

and the Claims Notice procedure described in the foregoing paragraph (6) shall not apply to such claims.

10. The Committee will not interfere with, or seek to have any role in, the prosecution of the Receiver's claims against investors that have been commenced prior to the date of this Order.

11. The Committee shall have no role in the prosecution of claims or actions that have already been commenced by the Receiver, and the Receiver shall have no role in the prosecution of claims or actions that have already been commenced by investors, except to the extent described in paragraph 7(d) of this stipulation.

***Cooperation and Case Administration***

12. Nothing in this stipulation constitutes a waiver of the Receiver's attorney-client privilege with his retained experts and advisors. In particular, the Receiver will not provide the Committee with access to privileged communications with his retained experts and advisors. Subject to a confidentiality agreement, the Committee shall have reasonable access to the non-

privileged materials of the professionals retained by the Receiver, including analyses, memoranda, and other materials previously prepared, or prepared in the future, by such professionals for the benefit of the Receiver, or in connection with the joint litigation efforts of the Receiver and the Committee hereafter, provided however that nothing contained in this paragraph shall require such professionals to act solely on behalf of the Committee or to undertake significant projects on behalf, or at the request, of the Committee.

13. Upon reasonable notice, the Receiver will make available an appropriate Receivership representative to provide reasonable assistance to the Committee during the next sixty (60) days with respect to the Committee's efforts to obtain a favorable disposition from the SEC and the Securities Investor Protection Corporation ("SIPC") in connection with the Stanford Investors' efforts to obtain a determination that they are entitled to compensation under the Securities Investor Protection Act, provided that doing so does not impose an undue financial cost on the Receivership and does not conflict with any duty imposed by the Order or Amended Order Appointing Receiver.

14. The Receiver shall consult with the Committee concerning the development of a protocol for the submission and adjudication of creditor claims against the Receivership Estate and distribution of assets to creditors. In the event that the Receiver and the Committee are unable to agree on such procedures, the Committee reserves the right to make objections and propose amendments to any proposal made by the Receiver.

15. The Bankruptcy Motion shall be denied as moot. Nothing in this stipulation affects the parties' rights to seek relief from or oppose relief from paragraph 10(e) of the Amended Order Appointing Receiver.

Signed March ______, 2010

______________________________
David C. Godbey
United States District Judge

**AGREED:**

**MORGENSTERN & BLUE, LLC**

By: ______________________________
PETER D. MORGENSTERN
(*pro hac vice*)
pmorgenstern@mfbnyc.com
GREGORY A. BLUE
(*pro hac vice*)
gblue@mfbnyc.com
885 Third Avenue, 24th Floor
New York, NY 10022
(212) 750-6776
(212) 208-6874 (facsimile)

**ATTORNEYS FOR THE MOVANTS**

**BAKER BOTTS L.L.P.**

By: ______________________________
KEVIN M. SADLER
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
ROBERT I. HOWELL
Texas Bar No. 10107300
robert.howell@bakerbotts.com
DAVID T. ARLINGTON
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

**ATTORNEYS FOR RECEIVER**

**U.S. SECURITIES AND EXCHANGE COMMISSION**

By: ____________________
STEPHEN J. KOROTASH
Oklahoma Bar No. 5102
J. KEVIN EDMUNDSON
Texas Bar No. 24044020
DAVID B. REECE
Texas Bar No. 24002810
MICHAEL D. KING
Texas Bar No. 24032634
D. THOMAS KELTNER
Texas Bar No. 24007474
JASON ROSE
Texas Bar No. 24007946
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6476
(817) 978-4927 (fax)

**PLAINTIFF**

____________________
JOHN J. LITTLE
Texas Bar No. 12424230
LITTLE PEDERSEN FANKHAUSER, LLP
901 Main Street, Suite 4110
Dallas, Texas 75202
(214) 573-2300
(214) 573-2323 (fax)

**EXAMINER**

**U.S. SECURITIES AND EXCHANGE COMMISSION**

By: [signature]
STEPHEN J. KOROTASH
Oklahoma Bar No. 5102
J. KEVIN EDMUNDSON
Texas Bar No. 24044020
DAVID B. REECE
Texas Bar No. 24002810
MICHAEL D. KING
Texas Bar No. 24032634
D. THOMAS KELTNER
Texas Bar No. 24007474
JASON ROSE
Texas Bar No. 24007946
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6476
(817) 978-4927 (fax)

**PLAINTIFF**

JOHN J. LITTLE
Texas Bar No. 12424230
LITTLE PEDERSEN FANKHAUSER, LLP
901 Main Street, Suite 4110
Dallas, Texas 75202
(214) 573-2300
(214) 573-2323 (fax)

**EXAMINER**