# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SAMUEL TROICE,** | § | |
| **HORACIO MENDEZ,** | § | |
| **ANNALISA MENDEZ,** | § | |
| **PUNGA PUNGA FINANCIAL, LTD.** | § | |
| **individually and on behalf of a class** | § | |
| **of all others similarly situated** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 3:09-cv-01600-F** |
| | § | |
| **PROSKAUER ROSE, LLP,** | § | |
| **THOMAS V. SJOBLOM,** | § | |
| **P. MAURICIO ALVARADO, and** | § | |
| **CHADBOURNE & PARKE, LLP** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

NOW COME PLAINTIFFS, SAMUEL TROICE, HORACIO MENDEZ, ANNALISA MENDEZ, and PUNGA PUNGA FINANCIAL, LTD., individually and on behalf of a class of all others similarly situated, (collectively hereinafter "Plaintiffs"), and file this their Second Amended Class Action Complaint against Defendants, PROSKAUER ROSE, LLP, THOMAS V. SJOBLOM, P. MAURICIO ALVARADO and CHADBOURNE & PARKE, LLP (collectively hereinafter "Defendants"), and in support thereof would show the Court the following:

## I.   PREFACE

### 1.

This putative class action is filed in representation of a putative class of defrauded investor clients of Houston, Texas-based Stanford Financial Group ("Stanford Financial"). This action has been filed in this Court because it is related to Civil Action No. 309-CV-0298, *Securities &*

PROSKAUER
COMPLAINT D.E. 6
**APP 0893**

*Exchange Commission v. Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management LLC, et al*., in the United States District Court for the Northern District of Texas– Dallas Division (the "SEC Action"). This action alleges participation by these Defendants in the massive, ongoing investment fraud Ponzi scheme conspiracy perpetrated by the Stanford Financial Group and its principals from, by and through Texas that led to the intervention by the SEC in Texas and appointment of Ralph Janvey as Receiver.

## II.   PARTIES

2.

Plaintiff, SAMUEL TROICE, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

3.

Plaintiff, HORACIO MENDEZ, is a dual citizen of the Untied States of America and Venezuela and is currently residing in Travis County, Texas.

4.

Plaintiff, ANNALISA MENDEZ, is a citizen of the Untied States of America and is currently residing in Travis County, Texas.

5.

Plaintiff, PUNGA PUNGA FINANCIAL, LTD., is a Panamanian company with its principal place of business in Mexico City, Mexico which is wholly owned and controlled by Mexican citizens from Mexico City, Mexico.

6.

Additionally, this case seeks certification of a class of all investors who purchased or held Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International

Bank Ltd. as of February 2009, and, in the alternative, seeks certification of (i) a class of Mexican investors who purchased or held Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International Bank Ltd. as of February 2009; and (ii) a separate class of United States investors who purchased or held Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International Bank Ltd. as of February 2009.

7.

Defendant Proskauer Rose, LLP, ("Proskauer") is a limited liability partnership organized under the laws of the State of New York. Proskauer may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure. Proskauer may be served by serving its registered agent/chairman Allen I. Fagin at 1585 Broadway, New York, New York, 10036-8299.

8.

Defendant Thomas V. Sjoblom, ("Sjoblom") is an individual currently employed at Proskauer Rose, LLP at both the Washington D.C. and New York offices at 1001 Pennsylvania Avenue, NW Suite 400 South, Washington D.C. 20004-2533 and 1585 Broadway, New York, New York 10036-8299. Sjoblom may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.

9.

Defendant P. Mauricio Alvarado, ("Alvarado") is an individual who resided in Texas during the time in questions but how is currently believed to be residing in Miami, Florida. Alvarado may be served with service of process by serving him at his place of residence at 3593 Royal Palm Avenue, Miami, Florida, 01331.

10.

Defendant Chadbourne & Parke, LLP, ("Chadborne") is a limited liability partnership organized under the laws of the State of New York.  Chadbourne may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.  Chadbourne may be served by serving its registered agent/general managing partner Charles K. O'Neill at 30 Rockefeller Plaza, New York, New York, 10112.

### III.  SUBJECT MATTER JURISDICTION

11.

This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(B) because this is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of the Republic of Mexico and all Defendants are citizens of a State within the United States.

### IV.  PERSONAL JURISDICTION

12.

This Court has personal jurisdiction over the non resident Defendants under the Texas Long Arm Statute.  Defendants have conducted continuous and systematic business in the State of Texas for many years and are therefore subject to general jurisdiction.  Furthermore, as described herein, Defendants have engaged in specific jurisdiction contacts with the State of Texas, specifically with the Stanford Financial group headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore Defendants have done business and committed torts, in part, in the State of Texas.  Since at least 2005 Defendants served as the attorneys for the Stanford Financial group headquartered in Houston, Texas, and in that capacity engaged in extensive contacts with Stanford

Financial personnel based in Houston, Texas, including the General Counsel of Stanford Financial, and Defendants traveled to Houston and Fort Worth, Texas to service said Texas-based client. In conjunction with the provision of their professional services to Stanford Financial, Defendants engaged in contacts with the State of Texas designed to assist and perpetuate the Stanford Ponzi scheme described herein, including obstructing an SEC investigation, as described herein. Based on their general and specific contacts with the State of Texas, Defendants have purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Long Arm Statute.

**V.**     **VENUE**

13.

Venue is mandatory in this Court pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action.

**VI.**     **FACTUAL BACKGROUND**

**A.**     **The Stanford Financial Empire**

14.

From the mid-1980s through February 2009, R. Allen Stanford ("Stanford"), a former gym owner from Mexia Texas, built a financial service empire that at its height boasted 30,000 customers in 130 countries allegedly managing $50 billion dollars in investment funds. The empire was comprised of over 140 companies from across the globe that operated under the brand name "Stanford Financial" with its worldwide headquarters located in Houston, Texas. The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial") included the main operating companies: Houston, Texas-based Stanford Group Company ("SGC") and Stanford Capital Management, LLC ("SCM"); Stanford International Bank ("SIB") and Stanford

Trust (one in Louisiana and another in Antigua), all of which were controlled and managed from the United States, principally Houston, Texas. In Mexico, Stanford Financial operated under the names Stanford Group Mexico S.A. and Stanford Fondos S.A. de C.V., while in Venezuela Stanford Financial operated under the name Stanford Group Venezuela Asesores de Inversion, C.A.

15.

Begun initially as an offshore banking operation in the mid-1980s, Stanford Financial grew over the years into a full service financial services group, offering clients private banking and U.S.-based broker dealer and investment advisory services worldwide from its headquarters base in Houston, Texas. Stanford Financial gave all the appearances of a highly successful outfit, with lavish offices in some of the world's premier cities. Stanford himself made the Forbes' list of the richest people in the world with a personal fortune estimated at $2.2 billion.

16.

The most important facet underlying the Stanford Financial empire, and the key to its success and sustainability, was the carefully crafted Stanford Financial image. The Stanford Financial image was one of success, prestige, and, most importantly, safety and solidity. The Stanford Financial image was centered around and built upon money – the money Stanford Financial received from its investor clientele. With the money it received from its clients, Stanford Financial was able to project an image of success and solidity. From the marble and mahogany of the Houston headquarters, to the huge bonuses paid to lure and retain top producers, to the $500 lunches for clients in Mexico City, to the helicopters and private jets that flew the Stanford Financial executives around, Stanford Financial oozed money, thus lending an air of legitimacy to the Stanford image.

17.

Part of the Stanford legend was that Stanford Financial was a continuation of the insurance

business begun by Stanford's grandfather, Lodis Stanford, during the Great Depression. Based on that connection, Stanford Financial boasted to the world that it had over 70 years history of growing and protecting people's wealth. Of course, this legend, like most of the Stanford image,[1] was false, as Stanford's father sold the old insurance business in 1983. Yet Stanford continued to foster that image of decades of family tradition and work ethic as late as a 2008 edition of the *Stanford Eagle* magazine.

18.

Charitable giving and sponsorships of sporting events and teams, as well as massive political contributions, constituted additional pillars supporting the Stanford Financial image. As with everything else, Stanford spent lavishly on philanthropic endeavors, giving to hospitals, theaters and museums, and sponsoring sports teams and celebrities such as the Miami Heat and Vijay Singh, all with the objective, once again, of sustaining the Stanford Financial image. Stanford made a huge splash in the world cricket establishment in particular. Stanford also gave generously to political campaigns and urged his employees to do the same as well, to the tune of millions of dollars.

19.

Stanford Financial obtained the money it needed to perpetuate its image from one primary source: the sale of Certificates of Deposit from the Antiguan offshore bank wholly owned and controlled by Stanford himself – SIB. Clients who were introduced to the Stanford Financial group quickly found out that the main financial product being peddled by the group was the SIB CD. The SIB CDs were sold worldwide by a web of different Stanford Financial promoter companies whose sole function was the sale of the SIB CDs. By 2009, SIB had sold over $7.2 billion in CDs.

20.

---

[1]     Stanford's claim to be a descendent of the founder of Stanford University, a claim which he disseminated widely, was also false.

**B.    Stanford Financial's Texas Base**

Houston, Texas was the administrative nerve center and principal base for Stanford Financial/SIB, and all of the sales and marketing practices of Stanford Financial and SIB were managed under the overall direction, supervision, and control of the Houston offices of Stanford Financial.  SIB itself never had a sales force or marketing or promotional arm in Antigua.  The head of the global sales force for SIB was located in the United States, principally in Houston, Texas.

21.

Importantly, SIB's Annual Reports disclosed that SIB paid "referral fees" to Houston-based SGC based as a percentage of SIB's "managed client portfolio", and also disclosed the existence of a "management fee agreement" between SIB and SGC related to marketing and services, including "treasury–related functions, establishing and implementing trading policy, client communications, research, marketing and branding, government and public relations, technology and other related administrative services".  SGC's audited financial statements dating back to at least fiscal year 2003 also disclosed that SGC had entered into a joint market arrangement with SIB, and that "Pursuant to joint marketing agreements, the Company [SGC] and the affiliated foreign financial institution [SIB] agreed to jointly market and offer fixed income and trust products to their respective customers.  In connection therewith, the Company [SGC] is entitled to referral fees based upon percentages of the referred portfolio as defined in the respective agreements."

22.

All of the Stanford Financial/SIB sales practices, directives, techniques, strategies and reward programs were developed and crafted in Houston and disseminated to the Stanford Financial branch offices around the world, including in Mexico and Venezuela, to be implemented there.  All of the sales force training manuals, promotional literature and materials for SIB, including the

Spanish-language promotional materials, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other Stanford Financial sales offices around the world to be utilized by the local sales force in each country.

23.

In addition, mandatory sales training for the Stanford Financial sales force for SIB was conducted principally in Houston (known to the foreign financial advisers as the "Houston experience") by Stanford Financial personnel like Oreste Tonarelli, Monica Manzanares and David Charner.  In those mandatory training sessions, sometimes twice a year, the foreign financial advisers were trained to sell the Stanford Financial image.  The Stanford Financial "script" for why SIB was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled and drilled again into their heads.  The advisers were thereafter subjected to examinations to reinforce the script and sent back to their home countries to aggressively sell the SIB CDs.  Therefore all of the sales, marketing and promotional activities for Stanford Financial and SIB occurred in Texas.

24.

As part of the Stanford Financial sales process, investors like Plaintiffs and the Class were uniformly "sold" the Stanford Financial "image".  They were uniformly informed by the Stanford Financial brokers and advisers, whether from Stanford Mexico, Stanford Venezuela or from SGC in Houston, that, *inter alia*, investments in the SIB CDs were safe and sound because SIB was part of the Stanford Financial group based in Houston, Texas and therefore subject to regulation by the United States government (the SEC and FINRA).  Indeed many foreign investors in SIB to this day never understood that they had invested in CDs issued by an Antiguan bank, but always thought their money was invested in Houston, Texas.  Investors like Plaintiffs were also uniformly told by

Stanford Financial sales agents that the CDs issued by SIB were safer even than U.S. bank–issued CDs because Stanford Financial had unique Lloyds of London insurance policies in place that went above and beyond FDIC insurance; and that investments in the CDs were liquid and the CDs could be redeemed at any time because SIB, through Stanford Financial, only invested the money in safe, secure and liquid assets. All of this was false. These exact, uniform sales representations are contained almost verbatim in the Stanford Financial Training Manuals as well as in the uniform promotional materials for Stanford Financial and SIB that were designed and prepared in and issued from Houston, Texas.

25.

The Stanford Financial/SIB sales and promotional materials created in Texas and distributed uniformly throughout the world intentionally blurred the lines between Antigua-based SIB and the other U.S.-based Stanford Financial entities, including SGC, and intentionally created the false impression that SIB and Stanford Financial (SGC ) were one and the same and therefore that SIB enjoyed the same regulation and protections as a U.S.-regulated company, including regulation by the SEC and coverage by SIPC. As the U.S. Receiver has stated, "Stanford's financial advisors used the apparent legitimacy offered by U.S. regulation of Stanford's U.S. brokerage subsidiary in order to generate sales of SIBL CDs worldwide."[2] Little did the investors like Plaintiffs and the Class know that Allen Stanford, Jim Davis and others were engaged in a long running conspiracy to ensure that Stanford Financial and SIB evaded SEC regulation, and regulation from any other governmental agency, foreign or domestic, at all costs.

C.     The Stanford Reality

26.

The reality of the Stanford Financial empire was that, since at least 1988, it was nothing but a

massive, worldwide Ponzi scheme that for its very existence and success depended on concealment and the evasion of government regulations and regulators around the world. The Stanford Financial companies operated together as a single business joint enterprise investment company called "Stanford Financial" dedicated to the fraudulent sale of its own, internal product/mutual fund "shares" or participation interests denominated as "CDs", which sales were the lifeblood of the entire enterprise. The master marketing manipulator and salesman, Stanford reached new heights in terms of creating and perpetrating the ultimate "confidence" scam on a global level, convincing thousands of people worldwide to invest their money in his Stanford Financial investment company Ponzi scheme. Stanford became a true international financial "pirate", absolutely intent on operating an "outlaw" investment company from his Caribbean safe haven completely outside the regulatory confines of the laws of any country, whether the United States, Antigua, Mexico or elsewhere. In 2005 Stanford and Defendant Mauricio Alvarado ("Alvarado"), the former General Counsel of Stanford Financial, specifically hired Defendant Tom Sjoblom, at that time employed by Defendant Chadbourne & Parke LLP ("Chadbourne"), to help Stanford Financial evade and obstruct securities regulation and enforcement in the United States.

27.

Allen Stanford's personal history, by itself, was cause enough to question the veracity of the image he created for the Stanford Financial empire. His first business, a chain of Waco, Texas-based gyms called "Total Fitness", collapsed into bankruptcy in 1982. Allen Stanford declared personal bankruptcy as well in 1984 and was discharged from $13.6 million in obligations.[3] Stanford fled to the Cayman Islands where he became a scuba diving instructor. It was there that he met Dutch ex pat Frans Vingerhoedt, who introduced him to the world of offshore banking.

---

2   "Report of the Receiver Dated April 23, 2009" in the SEC Action [docket #336], at 7.
3        *Business Week*, March 5, 2009, "Stanford's Rocky Start."

28.

By 1985 Stanford opened his first bank, Guardian International Bank ("Guardian"), on the tiny (12,000 residents) Caribbean island of Montserrat, which at that time was known mostly for its extremely lax banking regulations. Virtually all of the banks that were opened in Montserrat in the 1980s were "paper" banks dedicated to fraud. In fact David Marchant, the editor of "Offshore Alert", was quoted as stating that "the only reason you opened a bank in Montserrat was to commit fraud."[4]

29.

Guardian served as the starting point roadmap for the creation of the Stanford Ponzi scheme. Stanford brought in his old college roommate James Davis ("Davis") as Controller for Guardian to help run operations, and also established representative offices for Guardian in Miami and Houston, under the name of Guardian International Investment Services, designed to cater to wealthy Latin American clients.[5] Guardian offered CDs with rates typically 2-3% above the average rates available in the market, all with the confidentiality associated with offshore private banking.

30.

What no one realized, precisely because part and parcel of Stanford's Ponzi scheme was a massive anti-regulatory concealment campaign from at least 1991 all the way through February 2009, was that beginning in 1988 Stanford and Davis had begun fabricating the investment returns for Guardian for the purpose of reporting false revenues and false investment portfolio balances to the banking regulators in Montserrat. Davis has himself now admitted making false entries into the bank's general ledger and otherwise falsifying SIB's financial records for some twenty years. See Plea Agreement of James Davis, a true and correct copy of which is attached hereto as **Exhibit "1"**

---

[4]     As quoted in Bryan Burroughs, "*Pirate of the Caribbean*", Vanity Fair, at 81 July 2009.
[5]     *BusinessWeek*, Feb. 24, 2009, "Did Court Ruling Prolong Stanford Probe?"

and incorporated herein for all purposes, at ¶17(a).  For almost twenty years, Stanford and Davis just made up the numbers for SIB as they pleased.

31.

But even with such anti-regulatory concealment efforts, in 1989 the banking system in Montserrat, and Stanford's Guardian Bank in particular, came under investigation by British and U.S. authorities for money laundering.  As a result of this heightened regulatory scrutiny, Stanford began casting about for another, more amicable location for his outlaw Ponzi bank.  In December 1990 Stanford settled on Antigua because of its reputation for extremely lax regulatory oversight and enforcement and so he incorporated Guardian Bank there.  By May 1991 Stanford's banking charter was revoked by Montserrat.  So Stanford moved his entire banking operations to Antigua, and simply continued the same basic business plan that had proven so profitable for Stanford in Montserrat.  Stanford eventually changed the name of the bank from Guardian to Stanford International Bank ("SIB") in 1994.

32.

Once established in Antigua, Stanford quickly set about ensuring that he would not be subjected to the same regulatory scrutiny he received in Montserrat.  At that time, in 1991, Stanford entered into conspiratorial meeting of the minds with Davis, that grew to include others within Stanford Financial, including Laura Pendergest-Holt, SIB President Juan Rodriguez Tolentino, and General Counsel Mauricio Alvarado, as well as members of the Antiguan Government and other professionals and service providers to Stanford Financial, to do whatever was necessary to evade regulatory scrutiny of SIB's activities and otherwise conceal the true nature of Stanford Financial's activities from regulators worldwide.  In furtherance of this concealment conspiracy that was part and parcel of, and central to, the overall Ponzi scheme conspiracy, Stanford moved to establish a

symbiotic relationship with the local government in Antigua, and, through corruption, bribes and kickbacks, placed the family of the Prime Minister Lester Bird firmly in his back pocket. In return for political cover and no oversight or regulation of his business, Stanford eventually became a major source of funding for the entire island, loaning hundreds of millions of dollars to the Antiguan government over the years. Stanford even bought the Antiguan newspaper, the Antiguan Sun. By 2004, the island government owed Stanford Financial over $87 million – nearly half of its annual tax revenues. In that same year, SIB had grown to over $3 billion in deposits.

33.

So tight was the relationship between Stanford and the Antiguan government that, when Stanford Financial was accused of money laundering in 1999, the Antiguan government turned to Stanford himself to rewrite the country's banking laws. Stanford and his agents were then named to the commission, the Antiguan Financial Services Regulatory Commission ("FSRC"), created and charged with supervising Antigua's banks. Stanford then used the new commission to wrest control of Antigua's offshore banking industry from the Government. As a result, the U.S. State Department issued an advisory to U.S. banks to scrutinize all financial transactions coming in or out of Antigua for evidence of money laundering.[6]

34.

Jonathan Winer, then-head of the State Department's Bureau for International Narcotics and Law Enforcement Affairs, said at the time that Antigua is "one of the most attractive financial centers in the Caribbean for money launderers", and that "Antigua has long been one of the worst regulated offshore centers in the world."[7] Winer was recently quoted as saying that when he asked

---

6     *Houston Chronicle*, July 16, 2000, Banker drawing scrutiny / Houstonian's Antigua empire raises questions
7     Statement to the US Congressional House Committee on Banking Financial Services, Jonathon Winer, US State Department, June 11, 1998.

an Antiguan banking official in the late 1990s why anyone would choose that country for banking as opposed to New York, London, Tokyo or Paris: "he scratched his head and after a while he said 'I guess would have to be the secrecy…I'd say it's the secrecy plus the lack of standards or real controls."[8]

35.

Stanford's anti-regulatory conspiracy with members of the Antiguan Government is borne out by the Plea Agreement entered by Stanford CFO Jim Davis, Exhibit "1", as well as by the June 18, 2009 federal grand jury Indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and the former head of Antigua's FSRC, a true and correct copy of which is attached hereto as **Exhibit "2"** and incorporated herein for all purposes (the "Indictment"). The Plea Agreement and Indictment allege that for years King, while acting as the CEO of the Antiguan FSRC, accepted bribes from Stanford and/or his associates in return for ensuring that the FSRC "looked the other way" and did not properly perform its regulatory functions or supervise SIB. King even entered into a bizarre Voodoo-like "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford. As part of the blood brother relationship and bribery, King became Stanford's regulatory spy and "inside man" in terms of relaying information to Stanford concerning the SEC's investigations of Stanford Financial and SIB from 2005 all the way until 2009. All of this was just part and parcel of Stanford's broader conspiracy to keep his Ponzi scheme alive by evading and obstructing regulation of SIB's activities at every turn and in every county.

36.

---

[8] "Stanford arrives for his Houston hearing", By MARY FLOOD and TOM FOWLER HOUSTON CHRONICLE, June 24, 2009.

Stanford Financial began to grow exponentially beginning in 2000.  In 2001, Stanford filed for an SEC Regulation D exemption to allow Stanford Financial to sell SIB CDs to U.S. residents through SGC brokers in the United States. Stanford thereafter began the practice of "head hunting" for U.S. brokers and financial advisers, paying enormous signing bonuses to financial advisers to leave their jobs at other firms and transfer their book of clients over to Stanford Financial.  Once at Stanford Financial, these same financial advisers were then pressured into promoting and selling SIB CDs to their clients, and were rewarded with outsized bonuses.  If a financial adviser refused to sell the CDs, or otherwise questioned what was really going on at Stanford Financial, they were fired, sued to recover the bonuses and blackballed in the industry.  Fueled by this influx of veteran brokers and investment advisers, Stanford Financial grew from 6 branch offices in the United States to more than 25 between 2004 and 2007, during the time that Defendants represented Stanford Financial.

37.

From 2000 to 2008 Stanford Financial grew into a high-powered sales and marketing juggernaut.  The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars".  In order to market and sell the SIB CDs, Stanford established a commission structure that provided huge incentives for the Stanford Financial brokers and financial advisers, including those in Mexico, to "push" the SIB CDs on investors like Plaintiffs.  SIB paid disproportionately large commissions to its Stanford Financial brokers and advisers for the sale of CDs; they received a 1 % commission upon the sale of the CDs, and were eligible to receive as much as a 1 % trailing commission throughout the term of the CD.  Stanford Financial used this generous commission structure to recruit established financial advisers to the firm, and to reward those advisers for aggressively selling the CDs to investors.

38.

Beginning in 2003 Stanford's strategic plan to lure top financial advisers away from their employers to work for Stanford Financial began to back-fire as several U.S. advisers renounced their new position with Stanford and lodged complaints with FINRA f/k/a the NASD, including charges that Stanford Financial was running a massive Ponzi scheme. Some of the advisers were fired or otherwise resigned for refusing to promote and sell the SIB CDs to their clients or for questioning what was going on at Stanford Financial. Between 2003 and 2008 over a dozen Stanford Financial advisers and employees, including Leyla Basagoitia and Charles Hazlett in 2003; Lawrence J. DeMaria in 2006; Charles Satterfield in 2007; and Mark Tidwell and Charles Rawl in 2008, were discharged or resigned amid allegations of fraudulent practices at Stanford Financial. All of these employees, none of whom had 20 years legal experience working in enforcement for the SEC, quickly figured out that Stanford Financial was nothing but a Ponzi scheme; De Maria came to that conclusion in just a few months of working as a copy writer for Stanford Financial.

39.

The ultimate reality of Stanford Financial is that it was, at all times, illegally operating an investment company hedge fund or mutual fund (called "Stanford Financial") from, by and through Houston, Texas and issuing "shares" or participation interests (called "CDs") in the investment company via an offshore bank in Antigua. At the end of the day, investors like Plaintiffs and the Class purchased participation interests in Stanford Financial and SIB's investment portfolio, just like any mutual or hedge fund. SIB, acting through the Stanford Financial international network of brokers and advisers, lured money from investors like Plaintiffs; gave them an "IOU" piece of paper called a "Certificate of Deposit" in return; and then pooled all of the investors' money together and scattered it throughout the Stanford Financial enterprise to make investments in various illiquid and

high risk assets worldwide – the very definition of an investment company.  As such, in reality Stanford Financial was operating as a type of unregistered mutual or hedge fund and selling "shares" or participation interests to Plaintiffs and others from, by and through Houston, Texas.

40.

Any former SEC lawyer, especially one like Sjoblom with 20 years experience in enforcement, could see that Stanford Financial was operating an unlicensed, unregulated mutual or hedge fund directly in and from the United States.  Indeed the SEC, in its July 21, 2005 investigatory referral letter to FINRA, concluded that Stanford was running an investment company and selling "shares" or participation interests in said investment company to unwitting investors.  More recently, in its Complaint against Stanford and his entities, the SEC has alleged that SIB and SGC violated §7(d) of the Investment Company Act.  Neither Stanford Financial nor SIB were registered or authorized to operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs or the Class, who were consistently and uniformly told verbally and via the Stanford Financial promotional materials that SIB was part and parcel of the Stanford Financial group based in Houston, Texas, authorized and regulated by the SEC and FINRA and backed by SIPC and Lloyd's of London insurance coverage.  Nor were Plaintiffs ever told that Stanford Financial was engaged in a massive Ponzi scheme conspiracy that included, as a central component, evading and obstructing regulation and enforcement in the U.S. and Antigua.

41.

Besides the fraud committed on Plaintiffs and the Class based on the marketing of Stanford Financial and SIB as being one and the same and completely regulated, Stanford Financial also touted the high liquidity of SIB's investment portfolio.  For example, in its marketing materials, Stanford Financial emphasized the importance of the liquidity of the SIB CD, stating, under the

heading "Depositor Security," that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors" and that the bank's assets are "invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks." Likewise, Stanford Financial trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients…" To ensure that depositors could redeem their CDs, Stanford, through its brokers and advisers, assured the investor clients that SIB's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice. But in fact, nearly 80% of SIB's investments were concentrated in high-risk, illiquid categories: (1) unsecured loans to Allen Stanford in the amount of $1.6 billion; (2) private equity and (3) real estate. None of that was ever disclosed to Plaintiffs or the Class.

42.

Contrary to Stanford Financial's representations (both verbal and via the promotional materials) to Plaintiffs and the Class regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the bank's portfolio were misappropriated by SIB's sole shareholder, Allen Stanford, and used by him to acquire private equity and real estate. In fact, at year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to Mr. Stanford; (ii) private equity; and (iii) over-valued real estate. By February 2009, Mr. Stanford had misappropriated at least $1.6 billion of investor money through bogus personal loans and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled solely by himself, including massive investments in real estate and other private business ventures in Antigua. The rest of the money

from investors was just blown by Stanford on creating and perpetuating the image charade with lavish offices, outsized bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial image of wealth, power and prestige. None of this was disclosed to Plaintiffs and the Class.

43.

As alleged in the Davis Plea Agreement (Exhibit 1) and in the Indictment of Allen Stanford, Leroy King and the others (Exhibit 2), Stanford and his CFO Jim Davis "fabricated the performance of the bank's investment portfolio and lied to investors about the nature and performance of the portfolio. Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the financial statements. Using a pre-determined return on investment number, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn. Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank investments. SIB's financial statements and annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and Kuhrt. Stanford and Davis signed these falsified financial statements."[9]

44.

At the end of the day, the entire Stanford Financial empire was dominated completely by one man—Allen Stanford. Although SIB purported to have an independent board of directors, an investment committee, a chief investment officer and teams of global portfolio advisers and analysts, in truth and in fact the vast majority of the bank's assets were managed exclusively by Mr. Stanford and his right hand man and former college roommate Jim Davis.

45.

In running the Stanford Financial empire from the United States, Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants. The SIB Board of Directors included Stanford's 81 year old father and his 85 year old friend, O.Y. Goswick, a former rancher who was listed in Stanford Financial's annual reports as being somehow in charge of SIB's "investments", but who in reality, and according to his own son, did not have sufficient financial knowledge to understand SIB's operations and had suffered a stroke in 2000 that left his ability to communicate "nonexistent".[10]

46.

Moreover nepotism predominated within Stanford Financial, where the upper level management team was comprised of a tightly linked web of friends and family of Stanford and Davis. Just as Stanford brought in his old friend Davis, Davis in turn brought in his protégé, the young Laura Pendergest-Holt, whom Davis had met at the Mississippi Baptist church where Davis was a Sunday school teacher. In turn, Pendergest-Holt's cousin Heather Sheppard was an "equity specialist" at Stanford Financial, while her sister's husband, Ken Widen, was Stanford Financial's managing director for investments and research. Jim Davis' brother in law, Danny Bogar, served as SGC's President and ran Stanford Financial's operations for the entire United States. Davis' son Zack also worked for Stanford Financial as an "equity specialist".

47.

Pendergest-Holt's resume, in particular, was an instant red flag. As the Chief Investment Officer allegedly in charge of investments for SIB and overseeing an $8 billion portfolio, she had no real business or finance education or training. Lawrence Lieberman, senior managing director at

---

9      SEC Second Amended Complaint, at ¶4.
10    Jamie Stengle, "*Dad, 81, to Stanford: 'Do the Right Thing'*", Associated Press, February 20, 2009.

Orion Group, an executive recruiter firm for the money management industry, was quoted as saying that Pendergest-Holt was hired for the position as Chief Investment Officer probably because Stanford and Davis "needed someone they could trust and not someone who could pick stocks".[11] Davis recruited Pendergest-Holt to work at Stanford Financial in 1997 when she was a recent 22 year old college graduate from Mississippi State, where she earned a degree in Math. She quickly worked her way up the ranks from research analyst to managing director of research and investments until she became Chief Investment Officer when she was 30 years old, all with no degree or background in finance whatsoever. According to Lieberman, Stanford "may not have wanted a legitimate CIO because that person might have asked a lot more questions and not played ball".[12]

48.

The same is true of the lead accountants for Stanford Financial, both of whom were recently indicted as well. As alleged in the Indictment and the SEC's Second Amended Complaint, Gilberto Lopez was the Chief Accounting Officer for Stanford Financial, and yet he was not a licensed CPA. Mark Kuhrt, also indicted, served as the Global Controller for Stanford Financial, and yet was not a licensed CPA either. These two non-CPAs were in charge of accounting for a global financial services company with (allegedly) $50 billion "under advisement".

49.

By year-end 2008, Stanford Financial had sold approximately $7.2 billion worth of SIB CDs by touting: (i) the bank's safety and security; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States. SIB sold between $4 billion and $5 billion in CDs between 2005 and February 2009. It was at the end of 2008, in the midst of the worldwide financial

---

11    Ana Driver and Svea Herbst-Bayliss, "*Stanford's CIO's Fast Path to Top a Red Flag*", Reuters, March 8, 2009.
12    *Id.*

meltdown, that Stanford Financial began to stumble.

### 50.

As alleged in the Indictment (Exhibit 2) and admitted to by Davis in the Plea Agreement (Exhibit 1), in 2008 Stanford and Davis, aided by Defendant Alvarado and other, concocted a bogus $541 million shareholder equity infusion, in order to cover up a gaping hole in SIB's balance sheet that would cause it to fall below minimum capital requirements, by manufacturing a series of fraudulent "roundtrip" real estate deals whereby Stanford took a piece of property he purchased for $63 million and transferred it to some entities who "booked" it at $3.2 billion and then transferred shares in those entities back to SIB. This fraudulent transaction was just a continuation of the persistent falsification of SIB's financial condition and performance over the preceding 20 years. But the entire operation was finally coming unhinged.

### 51.

In December 2008 Stanford Financial's clearing firm, Pershing, informed Stanford Financial that it would no longer process wire transfers from SGC to SIB for the purchase of CDs. Earlier in 2008, Pershing had requested that Stanford Financial provide it with an independent report of SIB's financial condition, which Stanford Financial refused to do. Furthermore, and due to some $500 million in CD redemptions spurred by the global economic meltdown, Stanford Financial began suffering liquidity problems that prevented SIB from complying with client requests for transfers of funds. This had a huge impact on the ability of the Stanford's financial advisers to keep clients pacified.

### 52.

In January 2009, in the wake of the Madoff scandal, Venezuelan financial analyst Alex Almay performed a rudimentary review of SIB's returns over the years as a favor for a friend, and

then published his findings in a Venezuelan magazine under the title "Duck Tales", which was then re-published in various blog postings. Dalmady concluded that Stanford Financial was nothing but another Ponzi scheme – a Ponzi "duck". The cat was out of the bag.[13]

53.

The U.S. federal authorities then issued subpoenas to Stanford Financial. In advance of a deposition before the SEC, Stanford Financial officials met with Defendants in Miami on February 3-8, 2009. During those meetings, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Allen Stanford an e-mail, copying the head of Stanford Mexico David Nanes, that reads in part, that "*things are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means. There are real bullets out there with my name on, David's name and many others and they are very real…[w]e are all in this together.*"

54.

On February 17, 2009 the United States Securities and Exchange Commission ("SEC") filed a Complaint against SGC and SIB, as well as against Mr. Stanford and Mr. Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions". The SEC obtained an injunction and froze the assets of the Stanford Financial group and appointed a receiver, Ralph Janvey to liquidate the companies.

55.

The SEC, through its Second Amended Complaint, has now alleged a fraud of shocking magnitude. The SEC alleges that Stanford, together with his co-conspirators, engineered and carried out a decades-long scheme to convert Plaintiffs' and the Class' investments in Stanford Financial and SIB

---

[13] *Id.*

into his own personal "piggy bank" to fund his extravagant lifestyle, including paying for his private

harem of women and their children; a fleet of jets; yachts; and mansions in several different countries.

On June 18, 2009 Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts

including wire and mail fraud, obstruction of an SEC investigation and money laundering. Exhibit "2".

On August 27, 2009 CFO Jim Davis admitted to running a Ponzi scheme for 20 years and plead guilty

to, *inter alia*, securities and wire fraud. Exhibit "1".

56.

### D. Defendants' Participation in Stanford's Conspiracy

Central to Stanford's ability to perpetuate and keep alive a massive Ponzi scheme was the

ability to shield SIB from regulators and conceal the true nature of Stanford Financial's activities

and investment portfolio by blocking regulatory scrutiny at every level and in every country. After

having learned the lessons of Montserrat, Stanford determined that he did not want his fraudulent

banking operations to be upended by a regulatory investigation again. Once ensconced in his

Antiguan safe haven, from at least 1991 on Stanford, in conspiracy with Davis and others, embarked

on a campaign to protect his Ponzi scheme from outside regulatory interference, convinced that his

schemes absolutely depended on his ability to conceal SIB's true nature and activities and to keep

the regulators at bay around the world. The success of Stanford's Ponzi scheme required

concealment, and concealment inherently became part of and in furtherance of the main objectives

of the Ponzi scheme conspiracy. In order to accomplish that concealment, and as described herein,

Stanford resorted to lies, trickery, bribery, "blood brother" voodoo rituals, obstruction of regulatory

investigations and other machinations to throw off or otherwise co-opt regulators and insulate

himself and his operations from regulatory scrutiny in several countries.

57.

Of course, Stanford could not keep the regulators at bay by himself, and so from 1991 onwards he entered into a meeting of the minds with Davis, Leroy King and others (including, later, Defendants) whose central objective was the continued evasion and concealment of Stanford Financial's activities from regulatory authorities.  Frustration of investigatory efforts by the SEC, in particular, and other agencies in a highly regulated environment such as securities was central to the overall Stanford Ponzi scheme conspiracy, and Stanford and his co-conspirators' efforts to hinder and obstruct regulators was essential to, and therefore in furtherance of, the survival of the overall Stanford Ponzi scheme.

58.

The conspiracy to conceal, hinder and obstruct gained a sense of urgency in the summer of 2005, when the SEC and FINRA initiated investigations of Stanford Financial, SGC and SIB.  On July 21, 2005 the SEC sent an investigatory referral letter to FINRA in which the SEC outlined its concerns that, *inter alia*, (1) Stanford was committing securities fraud; (2) the CDs constituted "securities" under U.S. law; (3) Stanford appeared to be illegally operating an unregistered investment company (a mutual or hedge fund) in the United States; (4) as of 2004, 63% of SGC's revenues were derived from the sales of CDs;  and that (5) Stanford had sold over $1.5 billion in CDs, making it a potentially large problem.

59.

In response to the SEC investigation initiated in the summer of 2005, and as alleged in the Indictment (Exhibit 2), Allen Stanford, Davis and their co-conspirators, as part of the ongoing conspiracy to conceal, hinder and obstruct regulators, blocked and obstructed the SEC investigation at all turns from the summer of 2005 through February 2009.  The Indictment alleges that from June

2005 through March 3, 2009, Stanford, Pendergest-Holt, Davis and others engaged in a conspiracy in the Southern District of Texas to "corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, in whole or in part, a pending proceeding before…the SEC, in violation of 18 U.S.C. §1505". See Indictment, Ex. "2", at pps. 41-45. The Indictment alleges that the object of the conspiracy was to obstruct the SEC's investigation of Stanford Financial and SIB so as to "perpetuate and prevent detection of an ongoing fraud" so that Stanford Financial and SIB could "continue receiving economic benefits from the fraud." *Id*., at 42-43.

60.

In order to aid their conspiracy to obstruct the SEC investigation, on or before August 2005 Stanford retained Chadbourne & Parke, LLP and partner Thomas Sjoblom, Defendants herein, as outside counsel to represent the interests of Stanford Financial and SIB in the SEC investigation of Stanford Financial and SIB. Importantly, Stanford hired Sjoblom because Sjoblom had been an SEC enforcement trial lawyer for some 20 years, and as such had experience in securities fraud schemes and SEC investigations and enforcement actions. Upon hiring Sjoblom, there was a meeting of the minds as between Sjoblom (acting on behalf of Chadbourne), Stanford, Davis, Alvarado and Leroy King as to the objective of the conspiracy – being the obstruction of SEC investigations so as to allow Stanford Financial and SIB to evade SEC regulation – and Sjoblom thereafter worked closely with Stanford, Davis, King, Defendant Alvarado and others at Stanford Financial to advance Stanford Financial and SIB's interests in the SEC investigation, being to continue to evade and avoid SEC regulation of Stanford Financial and SIB's activities and obstruct the ongoing SEC investigation from 2005 through February 2009.

61.

As part of his retention, in August 2005, Sjoblom, acting as an employee of Chadbourne,

traveled to the SIB facility in Antigua where he met with Stanford, Davis, Antigua's head of the FSRC Leroy King and others to familiarize himself with the operations and finances of SIB. Shortly prior to that meeting, in June 2005, King had received a confidential letter from the SEC in his capacity as head of the FSRC wherein the SEC had requested the FSRC's assistance in the investigation of Stanford Financial and SIB. King had provided the confidential SEC letter to Stanford and Stanford, together with others, had assisted King prepare a false and misleading response to the SEC.

62.

It was in this atmosphere that Sjoblom traveled to Antigua to meet with Stanford and King in August 2005. At that time, Sjoblom reviewed SIB's disclosures to investors in its CD program. Thus by August 2005 Sjoblom had an understanding of Stanford Financial's business operations, including that it was operating a securities marketing and sales operation from Houston, Texas issuing CDs from an offshore bank, and Sjoblom also understood that Stanford Financial was under investigation by the SEC and that the head of the SEC's counterpart in Antigua, King, was meeting and working together with Stanford, and that King was passing insider, confidential information about the SEC investigation to Stanford. Thus by that time in August 2005, Sjoblom, a former SEC enforcement lawyer with 20 years experience, knew that Stanford was at the very least running an unregulated investment company mutual or hedge fund from his base in Houston, Texas in the guise of issuing CDs from a wholly owned bank in one of the most corrupt offshore tax and fraud havens in the Caribbean. Instead of passing on this assignment, Sjoblom eagerly agreed to help.

63.

In October 2005, Sjoblom sent a letter to the SEC's Fort Worth office, with copy to the Dallas office of FINRA, in which he argued that the SEC did not have jurisdiction over Stanford

Financial's CD sales program because the CDs did not constitute securities under U.S. law. Sjoblom's letter cited case law from the U.S. Supreme Court indicating that CDs issued by banks in the United States and insured by the FDIC were not "securities" for purposes of the federal securities laws, and also highlighted case law holding that certain foreign bank-issued CDs did not constitute securities due to the availability of satisfactory bank regulation in the foreign country. In the letter, Sjoblom argued that Antiguan law provided CD holders with priority claim status. Sjoblom also argued to the SEC that SIB was subject to comprehensive regulation in Antigua, and that U.S. courts were bound to show respect to this regulatory system.

64.

All of Sjoblom's representations to the SEC and FINRA about Antiguan law were false. Antiguan law does not in fact provide true priority claim status for CD holders, and, as has become clear now, the protections offered by Antiguan law for the investors in the SIB CDs are, in fact, non-existent. Specifically, Antiguan corporate law gives the payment of wind-up costs, the payment of officers and employees for up to three months prior to the seizure of the bank; all taxes due; and the "fees and assessments owing to the appropriate officer" priority over any portion of time deposit funds. In addition, Antiguan law provides that time deposit holders are only given preference over other creditors for up to $20,000 in deposit funds.

65.

Furthermore, by the time he sent this letter in October 2005, Sjoblom had already been to Antigua and had met with Stanford's "blood brother", Leroy King, the head Antiguan "regulator" for SIB, and therefore was aware of the cozy relationship between King and Stanford, to such an extent that King was passing confidential, government-to-government regulatory communications concerning Stanford to Stanford. Sjoblom also knew that the CD program was being marketed to

potential investors purely for investment – and no other -- purposes; that SIB was not a commercial bank and, instead of making loans, SIB took the money it received from the sale of CDs and itself invested in an allegedly diversified portfolio that included stocks, bonds, notes, private equity, precious metals and other commodities , much like a mutual fund; and that SIB itself, including its portfolio, was being managed and run from the United States. He also knew that SIB had applied for and been granted a securities Regulation "D" exemption for sales to qualified U.S. investors. With his 20 years of experience working in enforcement for the SEC, Sjoblom knew that Stanford was running an unregistered investment company disguised as an offshore bank; that the SIB CDs more than likely constituted securities under U.S. law; and that the CDs were being marketed and sold illegally from within the United States.

66.

As part of the ongoing conspiracy to obstruct the efforts of regulator worldwide, on July 30, 2006, Leroy King transmitted to Defendant Alvarado, in his capacity as Stanford Financial's General Counsel in Houston, Texas, a letter dated July 11, 2006 from the Director of the Bank Supervision Department at the Eastern Caribbean Central Bank ("ECCB") to the FSRC in Antigua concerning, *inter alia*, the affiliate relationship of SIB to the Bank of Antigua. Similarly, on August 1, 2006, King faxed to Defendant Alvarado in Houston, Texas, a proposed response to the ECCB letter which sought the input of Defendant Alvarado in crafting a response by the FSRC calculated to mislead the ECCB as to the financial bona fides of SIB to prevent legitimate scrutiny of SIB by the Eastern Caribbean bank regulator. Recognizing that he had willingly ceded his regulatory authority and responsibilities to Allen Stanford's lawyers, King jokingly concluded the August 1, 2006 facsimile transmission with the following handwritten words: "Please do not bill me (laugh), Thanks a million, Lee"

67.

On September 25, 2006, King provided to Stanford and Defendant Alvarado another confidential letter he had received from the SEC wherein the SEC again sought records and information regarding SIB's CD investment portfolio. Upon information and belief, Defendant Alvarado, in turn, consulted with Sjoblom regarding the contents of this new confidential SEC letter. Stanford, Davis, and Defendant Alvarado then proposed various responses designed to mislead the SEC and requested that King insert same into the FSRC's official response to the SEC's confidential letter, which King did. Discovery will reveal what role Sjoblom had in the contents of that response letter.

68.

In late September of 2006, Sjoblom contacted the SEC and represented that he had "heard through the grapevine" that the FSRC had not been provided with an appropriate request from the SEC for documents; that the SEC should "go to Antigua" to review the SIB examination reports issued by the FSRC; that the SEC had "no basis" to request documents regarding SIB's investment portfolio from SIB; that he (Sjoblom) had spent 15 years investigating fraud for the SEC and was "well-equipped" to recognize the "hallmarks of fraud"; that he (Sjoblom) found SIB to be credible in all their business dealings; and that, based upon his review of the situation and personal visit to SIB, Sjoblom found SIB to be an "incredible institution." Of course the "grape vine" that Sjoblom referred to was the insider, confidential information regarding the SEC investigation provided by King to Stanford and Defendant Alvarado.

69.

In response to the SEC investigation in 2005, Stanford Financial developed policies for use in the U.S. offices of SGC designed to evade, hinder and obstruct said SEC investigation. Upon

information and belief, Defendants were involved in the development of these policies in conjunction with others at the SGC offices in Houston, Texas.  The policies implemented in 2005 and 2006 included the destruction of Stanford Financial records that might be uncovered in the SEC investigation.

70.

As alleged by former Stanford Financial brokers D. Mark Tidwell and Charles W. Rawl in their Harris County lawsuit against SGC, the new policies adopted by Stanford Financial included ordering the removal or destruction of information contained in client or company files in response to an ongoing SEC investigation into SGC's CD sales practices, and purging electronic data from its computers in response to the SEC investigation.  In particular, Rawl and Tidwell became concerned when, in the summer of 2006 (right around the same time Sjoblom was calling the SEC to tell the SEC to leave Stanford Financial alone), all of the assistants to the Stanford Financial Advisers were told to remove any information that wasn't on Stanford Financial letterhead, including notes and inter-office e-mail, from their client files, just ahead of an SEC inspection.  Then in March 2007, Rawl and Tidwell were called into a meeting with management, in which they were told to stop enumerating any concerns they had about SIB in inter-company e-mails because the e-mails could fall into the hands of the SEC.  Rawl and Tidwell announced to their supervisor, Jay Comeaux, that they wanted to resign, but instead they were terminated by Stanford Financial and then sued, in what had become a common practice at Stanford Financial for anyone who questioned what was really going on.

71.

During this same 2005-2007 time period, when Defendants were representing Stanford Financial to counter the SEC investigation, another Stanford Financial employee, Charles

Satterfield, was terminated and thereafter alleged in a 2007 FINRA arbitration suit that Stanford Financial executives held the SEC in "utter contempt" and refused to file required documents, hid information from the SEC and destroyed files. Satterfield alleged that he received more training from Stanford Financial in what _not_ to discuss in archived company e-mails (thus circumventing the intent of records retention requirements) than he was given in how to comply with anti-money laundering statutes. Indeed, Satterfied was eventually fired, in part, because he continued to raise issues of Stanford Financial's non-compliance in e-mail exchanges with his superiors.

72.

By June 2008, various agencies of the United States government were investigating Stanford Financial, including the SEC, FBI, IRS and U.S. Postal Inspection Service.  See Affidavit of FBI Special Agent Vanessa G. Walther, attached hereto as **Exhibit "3"** and incorporated herein for all purposes.  In late 2008, Sjoblom was informed that SIB's CD investment portfolio included a previously undisclosed third tier of investments (Tier III) that was not "managed" by Pendergest-Holt. Subsequently, in early January 2009, Sjoblom was informed that this third tier included real estate investments and private equity.  Sjoblom, through his prior review of SIB's disclosures knew and understood that this third tier of investments, including the real estate investments, had not been disclosed to investors.  In early January of 2009 Sjoblom further learned that this undisclosed third tier of investments constituted approximately 80% of SIB's investment portfolio, or approximately $6 billion.

73.

On January 14, 2009, the SEC served, through Sjoblom, investigatory subpoenas to Stanford, Davis and Pendergest-Holt seeking testimony and documents related to SIB's investment portfolio. Sjoblom understood that the SEC inquiry would require Stanford, Davis and Pendergest-Holt to

make a complete and transparent presentation to the SEC, under oath, regarding all of the assets related to SIB's CD program, including Tier III.

74.

On January 21, 2009, Sjoblom met with Stanford, Davis, Pendergest-Holt and others at the SIB airplane hangar in Miami, Florida, to discuss the SEC investigation and to determine who should testify before the SEC. At that meeting, and despite their knowledge that only Stanford and Davis were in a position to discuss the assets in the Tier III portfolio, Stanford, Davis, Pendergest-Holt, and Sjoblom all agreed that Sjoblom would lie to the SEC and seek to convince the SEC that Stanford and Davis didn't know anything about SIB's assets and that Pendergest-Holt and another SIB executive, SIB President Rodriguez Tolentino, were the best individuals to present testimony and evidence to the SEC regarding SIB's entire investment portfolio. The participants also agreed to participate in a series of meetings in Miami, Florida during the week of February 2, 2009, to bring Pendergest-Holt and Rodriguez Tolentino "up to speed on Tier 3" before their testimony to the SEC.

75.

On January 22, 2009, Sjoblom met with several SEC attorneys at a restaurant in Houston, Texas to discuss issues related to the SEC investigation of Stanford Financial and SIB. The SEC attorneys reiterated that their investigation was seeking to determine where and how the entire portfolio of SIB assets were invested and managed, and that in order to do so they needed to depose Stanford Financial executives with the most knowledge of the "entire investment portfolio". Sjoblom falsely represented to the SEC lawyers that Allen Stanford and Davis did not "micro-manage" the portfolio and that Pendergest-Holt and Rodriguez Tolentino were the "better people to explain the details" about SIB's <u>entire</u> portfolio. Sjoblom also represented to the SEC attorneys that SIBL was "not a criminal enterprise" and that "all assets are there."

76.

The next day, January 23, 2009, Sjoblom met again with an SEC attorney at SFG's offices in Houston, Texas.  Sjoblom requested that the SEC attorney defer the SEC subpoenas to Allen Stanford and Davis, and once again lied to the SEC and represented that Pendergest-Holt and Rodriguez Tolentino would be better witnesses than Stanford and Davis, whom Sjoblom claimed were executive level officers of the company not involved in the "nuts and bolts" of the operations and who would not be able to tell the SEC attorneys about details of SIB 's assets.  As a result of Sjoblom's misleading statements, the SEC attorneys agreed to postpone the testimony of Stanford and Davis and to instead take the testimony of Pendergest-Holt and Rodriguez Tolentino on February 9-10, 2009, respectively.

77.

On January 24, 2009, Sjoblom sent an email to Defendant Alvarado, which Defendant Alvarado then forwarded on January 25, 2009 to Davis, Pendergest-Holt and Allen Stanford, in which Sjoblom stated that he had persuaded the SEC that Pendergest-Holt and SIB President Rodriguez-Tolentino, not Stanford and Davis, would be better witnesses to testify about SIB's entire portfolio of assets.  Sjoblom further stated that "[w]e can fully anticipate that the SEC will want [Rodriguez Tolentino] to testify under oath that the bank is 'real,' the CDs are 'real,' that the money is actually invested as described in our documents, and that client funds in the CDs are safe and secure.  The [SEC] staff will want to be protected against obstruction and perjury … [Rodriguez Tolentino] will have to be fully and carefully prepared so that he can provide details as best as humanly possible".  Sjoblom further stated in the e-mail that Pendergest-Holt would have to explain to the SEC her management and supervision of the bank portfolio and that, since she knew little about Tier 3, she would  "have to get up to speed on Tier 3 before the SEC investigation".  Sjoblom

finished the e-mail by stating that he wanted to make sure that Rodriguez Tolentino and Pendergest-Holt had enough time to "prepare and practice" the week before the SEC meeting.

78.

On or about January 27, 2009, Sjoblom sent an email to Pendergest-Holt and Rodriguez Tolentino, with a copy to Davis, regarding the need to address all three tiers of the SIBL asset portfolio, stating that they (Pendergest-Holt and Rodriguez Tolentino) needed to "rise to the occasion" and that "our livelihood depends on it." Sjoblom at that point was clearly intent on doing whatever was necessary to keep his client Stanford Financial (and SIB) in business.

79.

In the last week of January 2009, right in the midst of the red hot SEC investigation, Davis traveled to Antigua to meet with FSRC CEO King. King appeared very stressed, and related to Davis that he had once again been contacted by the SEC. King asked Davis if "we were going to make it?", to which Davis responded that he thought they were going to be ok.

80.

On February 3, 4, 5 and 6, 2009, Sjoblom met with Davis, Pendergest-Holt, Rodriguez Tolentino, Defendant Alvarado, and, ultimately, Stanford himself (on February 5) and others at the Stanford Financial offices in Miami in order to "prep" the witnesses for their testimony to the SEC. During those meetings, Pendergest-Holt disclosed that the value of the assets she actually managed in Tier II totaled approximately $350 million, down from $850 million in June of 2008. At the meetings, Davis further revealed that the purported value of Tier III of SIB's investment portfolio was made up of: (1) real estate valued at in excess of $3 billion which allegedly had been acquired earlier that year by SIBL for less than $90 million; (2) $1.6 billion in "loans" to Allen Stanford; and (3) various other private equity investments. Several of the Miami meeting participants

acknowledged that if this disclosure was accurate, then the bank was insolvent. At that point, Rodriguez Tolentino stated that he would not testify before the SEC. SGC President Danny Bogar broke down crying, and declared that he would have to go the SEC and disclose the information. Instead, Sjoblom suggested that they pray together.

81.

The next day, February 5, 2009, Stanford himself made an appearance at the meetings and falsely informed the participants that despite what they had just been told, SIB had "at least $850 million more in assets than liabilities." Later in the day of February 5, 2009, Stanford, Davis and Sjoblom attended a separate meeting where Stanford acknowledged that SIB's assets and financial health had been misrepresented to investors, and were overstated in SIB's financials. After that meeting, Sjoblom entered the office of another Stanford Financial executive, Lena Stinson, and declared that the "party is over".

82.

On February 9, 2009 Sjoblom sent Defendant Alvarado an email admitting he'd helped Pendergest-Holt prepare the presentation she was going to give to the SEC. Sjoblom further stated that she would be asked "lots of questions" about all players, SIB, marketing materials, and a little about Tier III to the extent she knew. Defendant Alvarado responded with frustration about the presentation, saying it "needs to be complete, accurate and correct. Thus you need to postpone her appearance before the SEC." Sjoblom opted instead to go forward with the presentation.

83.

During her testimony to the SEC on February 10, 2009 in Fort Worth, Texas, in which she, as an executive of Stanford Financial, was represented by Sjoblom, Pendergest-Holt committed perjury over and over while Sjoblom sat there, clearly aware of the outright lies being spun by his

client to the SEC. In fact Sjoblom actively suborned Pendergest-Holt's perjury. In answering a direct question about who she had met with previously to help prepare for her testimony, Pendergest-Holt responded that she had only met with Sjoblom and no one else. When the SEC lawyers pressed her a little more about whether anyone else was present during her meetings with Sjoblom, Sjoblom interrupted Pendergest-Holt as she started to answer the question and intentionally steered her to answer "no" by improperly recasting the question to narrow it to "when we were preparing *last night*, was there a third person present?", to which she answered "no". Testimony of Laura Pendergest-Holt, February 10, 2009, at 13:7-14:15. In addition to failing to disclose the Miami meetings the prior week and the participants at the meetings, Pendergest-Holt falsely stated in her SEC testimony that she was unaware of the assets and allocations of assets in Tier III of SIB's portfolio, including specifically the existence of the $1.6 billion loan to Allen Stanford that was included in Tier III.

84.

On February 12, 2009 Defendants Sjoblom and Proskauer sent a letter to the SEC informing that they were withdrawing from further representation of Stanford Financial and SIB in all enforcement and other regulatory matters before the SEC. Two days later, on February 14, 2009 Sjoblom sent an e-mail to SEC attorney Kevin Edmundson in which he disaffirmed "all prior oral and written representations made" by Sjoblom to the SEC regarding Stanford Financial and its affiliates from the beginning of his retention in 2005 (while at Chadbourne) through February 2009. See Sjoblom 2/12/09 letter and 2/14/09 e-mail, true and correct copies of which are attached hereto as **Exhibit "4".**

85.

On February 25, 2009, Pendergest-Holt was criminally charged with lying to the SEC during the testimony she gave on February 10, 2009.  In late March, 2009, Pendergest-Holt filed a lawsuit against Defendants Sjoblom and Proskauer for legal malpractice and breach of fiduciary duty, and alleged that, unbeknownst to Pendergest-Holt at the time, the night before Sjoblom met with her to prepare her to testify before the SEC, Sjoblom had solicited a multimillion-dollar retainer from Allen Stanford to represent Allen Stanford personally.

## VII.    PLAINTIFFS' INVESTMENTS

86.

All Plaintiffs invested in the Stanford Financial/SIB Ponzi scheme by purchasing CDs or placing their money in other investment accounts from and with SIB.  Over the years that Plaintiffs purchased and maintained investments in SIB, Plaintiffs were repeatedly and uniformly told, either directly by Stanford Financial representatives or via Stanford Financial promotional materials, that, inter alia:  (1) an investment in SIB was safer than investing in U.S. banks because SIB did not make loans but instead invested in safe and highly liquid instruments; (2) SIB and Stanford Financial were U.S.-based businesses regulated by the U.S. Government; and (3) that an investment in SIB was completely safe and secure because it was guaranteed and insured by Lloyd's, was regulated by the Antiguan banking regulatory commission and by an "outside" audit firm and subjected to regular, "stringent" risk management examinations.  All of this was false.

87.

During the time that Plaintiffs purchased and maintained investments in SIB, Stanford Financial sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*:  (1) SIB was not regulated by the U.S. Government; (2) Plaintiffs' investments in SIB were not insured; (3) SIB was operating illegally as an unregistered investment company soliciting and

selling unregistered securities by, from and through Houston, Texas; (4) that their money invested in SIB was not invested in safe secure and liquid instruments; and (5) that 80% of SIB's assets were invested in illiquid, high risk investments that included an unsecured $1.6 billion loan to Allen Stanford; (6) SIB was not regulated or supervised by the Antiguan Government and was only audited by a one man "mom and pop" audit shop under the control of Allen Stanford; and (6) that Stanford Financial (assisted by Defendants and others) was perpetuating a massive Ponzi scheme by, *inter alia*, engaging in conduct designed to evade regulation in various countries, including by the SEC, and was actively engaged in efforts to thwart SEC investigations of Stanford Financial and SIB from 2005 through February 2009.

88.

Based on the representations and omissions of material fact made to Plaintiffs repeatedly and uniformly over the years, both in person by Stanford Financial sales representatives and via Stanford Financial promotional materials, Plaintiffs decided to, and did, invest money in, and maintain investments in, the SIB CDs.

## VIII.   PLAINTIFF CLASS

89.

Plaintiffs are persons who in many cases, invested their life savings and retirement funds with Stanford Financial (through SIB) because they considered Stanford Financial a safe investment company because it was allegedly "based" in the United States and therefore subject to U.S. laws and regulations.  In reliance on Stanford Financial's fraudulently crafted "image" as a Texas-based financial services group, and in further reliance on the illusion of safety and security, Plaintiffs and the Class transferred billions of dollars to Stanford for investment in SIB.

90.

Throughout this time period, and up until the SEC intervention into Stanford Financial in February 2009, Plaintiffs continued to receive monthly account statements from Stanford showing that their money had been invested in the SIB CDs and were in fact profitable. At no time were Plaintiffs ever advised that Stanford Financial had invested their money in risky, "illiquid" ventures similar to a hedge fund; that SIB had no real insurance that would protect Plaintiffs' investments; that the only "oversight" SIB was subjected to was a one man "mom and pop" audit firm in Antigua that was completely dominated by Stanford; and that people like Defendants and Leroy King were complicit in protecting and insulating Stanford from regulatory scrutiny. Instead, and lacking the type of information that might be gained from a full regulatory disclosure, Plaintiffs were led to believe by Stanford Financial that an investment in SIB was safer than any other investment in the market. Now Plaintiffs stand to lose all of their investments.

## IX.  CLASS ALLEGATIONS

91.

Plaintiffs request this case be certified as a class action pursuant to FRCP 23. Thousands of investors have money invested with Stanford Financial through SIB. The number of affected investors are so numerous that joinder of all members is impracticable. There are common questions of law and fact that are common to the class and these common questions predominate over individual issues. The Named Plaintiffs' claims are typical of the class claims. The Named Plaintiffs have no interest adverse to the interests of other members of the Class. The Named Plaintiffs will fairly and adequately protect the class' interests. The Named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international litigation.

92.

Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses:

     i.     All persons or entities that held CD or other investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action; and

     ii.     Such other classes or sub-classes as the Court may determine.

     Excluded from the class are:

     a.     Defendants, and their employees and agents; and

     b.     Any officer, director, employee, or promoter of Stanford Financial, including SIB and SGC, as those entities have been defined herein

93.

The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy. Indeed, this is a case of fraud on the regulators. Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

94.

Pleading in the alternative, Plaintiffs SAMUEL TROICE and PUNGA PUNGA FINANCIAL, LTD, on their own behalf and on behalf of a class of all those similarly situated, request that the Court certify a class composed of all Mexican citizens and legal residents, or entities owned or controlled by Mexican citizens or legal residents, that held investment accounts with SIB

as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action and such other classes or sub-classes as the Court may determine, but excluding Defendants, and their employees and agents; and any officer, director, employee, or promoter of Stanford Financial, including SIB, SGC and Stanford Venezuela, as those entities have been defined herein. The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy. Indeed, this is a case of fraud on the regulators. Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

95.

Pleading in the alternative, Plaintiffs HORACIO MENDEZ, and ANNALISA MENDEZ on their own behalf and on behalf of a class of all those similarly situated, request that the Court certify a class composed of all United States citizens and legal residents, or entities owned or controlled by United States citizens or legal residents, that held investment accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action and such other classes or sub-classes as the Court may determine, but excluding Defendants, and their employees and agents; and any officer, director, employee, or promoter of Stanford Financial, including SIB and SGC, as those entities have been defined herein. The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy. Indeed, this is a case of fraud on the regulators. Many of the investors who are class members have

amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

## X.  STATUTE OF LIMITATIONS DEFENSES

### Discovery Rule/Inquiry Notice

#### 96.

The SEC filed an action against Allen Stanford and SIB *et al*. on February 17, 2009, and on that same day the Receiver was appointed. Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial, SIB or Defendants until then. Moreover, the wrongful acts and conspiracy by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Defendants' role in Stanford's fraud and conspiracy until now.

## XI.  CLASS CAUSES OF ACTION

### (THE FOLLOWING CAUSES OF ACTION ARE PLEAD ON BEHALF OF ALL PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED)

### A.  AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT

#### 1.  SALES OF UNREGISTERED SECURITIES

#### 97.

Defendants are liable as "aiders" for sales of unregistered securities to Plaintiffs. In particular, by their actions described herein, Defendants provided substantial assistance to SIB and Stanford Financial and materially aided Stanford Financial and SIB to sell unregistered securities to Plaintiffs from, by and through Texas. As argued by the SEC in its original Complaint, the CDs offered and sold by Stanford Financial and SIB constitute "securities" under the relevant securities law jurisprudence. By agreeing to assist Stanford Financial evade regulatory scrutiny by

intentionally misleading the SEC during its 2005-2006 investigation of Stanford, and continuing into 2008-2009, Defendants knew or should have known that they were assisting and perpetuating the sale of unregistered securities to Plaintiffs from, by and through Texas. But for Defendants' participation, Stanford Financial and SIB could not have continued to sell unregistered securities to Plaintiffs from, by and through Texas because the SEC would have intervened and shut the Ponzi scheme down prior to 2009. Upon information and belief, SIB sold well in excess of $4 billion in CDs between the summer of 2005 and February 2009.

98.

Defendants had general awareness that they were assisting an offshore, unregistered investment company sell unregistered securities from, by and through Texas. Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct. In assisting an offshore bank sell securities through a Houston-based investment company enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality. None of the CDs sold to Plaintiffs were ever registered with the Texas Securities Commission and therefore they were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act. Defendants acted intentionally or with reckless disregard for the truth and the law. As a result of Defendants' conduct in materially aiding Stanford Financial and SIB to sell unregistered securities from, by and through Texas, Plaintiffs have lost their investments. Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

2.   S<small>ALES OF</small> S<small>ECURITIES BY</small> U<small>NREGISTERED</small> D<small>EALERS</small>

99.

Defendants aided and abetted SIB and Stanford Financial in the sale of securities to Plaintiffs from, by and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act. Specifically, and as alleged herein, Defendants knew or should have known that Stanford Financial and SIB were collectively functioning as an unregulated, unregistered investment company, called "Stanford Financial", selling hedge or mutual fund participation units from, by and through Texas to investors and then pooling its customers' money together to make illiquid, speculative investments.

100.

Stanford Financial, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, including Defendants, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, securities of which SIB was the issuer on behalf of Stanford Financial, without obtaining an order from the Texas State Securities Board permitting it to register as an investment company "dealer".

101.

Defendants intentionally and actively aided and abetted Stanford Financial to operate as an illegal hedge or mutual fund in Texas and sell securities from, by, and through Texas, by means of the conduct described herein. With full knowledge that Stanford Financial and SIB were collectively acting as an unregistered securities investment company "dealer" in Texas selling securities from, by, and through Texas, and that Stanford Financial and SIB were being operated and "run" from Texas, Defendants aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial and SIB's violations of the Texas Securities Act by their conduct described herein.

102.

Defendants had general awareness that they were assisting an offshore, unregistered investment company "dealer" sell unregistered securities from, by and through Texas and otherwise engage in illegal conduct. Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in intentionally engaging in conduct designed to mislead the SEC and thwart the SEC's investigation of Stanford Financial from 2005 through February 2009. In assisting an offshore bank deceive the SEC so that it could continue to sell securities through a Houston-based investment company enterprise, Defendants were, in fact, absolutely aware they were engaged in illegal conduct. In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendants acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law. In fact, in their zeal to assist SIB, an offshore bank operating completely outside the regulatory purview of U.S. securities and banking laws, to sell its securities from, by, and through Texas via Stanford Financial, Defendants acted with wanton and arrogant disregard for the protections afforded by the Texas Securities Act. As a result of Defendants' conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments. Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

3.     UNTRUTH OR OMISSION

103.

Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial and SIB and their principals in the sale of

securities through the use of untrue representations or materially misleading omissions. In particular, and as set forth in the SEC's Amended Complaint, the Davis Plea Agreement (Exhibit 1), and the Indictment (Exhibit 2), Stanford Financial was a massive Ponzi scheme that was perpetuated by the continued sales of the SIB CDs to unsuspecting investors like Plaintiffs. In particular, Stanford Financial uniformly led Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial's Houston office, to believe that their money was being invested in safe, liquid investments that were completely insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and used to finance Stanford Financial's principals' profligate lifestyles and to invest in long term, illiquid and high risk investments like private equity and real estate and unsecured loans to Allen Stanford. Moreover, Stanford Financial omitted to inform Plaintiffs that it was selling them unregistered securities and that it was operating as an unregistered, illegal mutual fund in violation of the Investment Company Act and the Texas Securities Act.

104.

Defendants had general awareness that they were involved in improper activity and that they were assisting an offshore, unregistered investment company sell unregistered securities from, by and through Texas. With knowledge that Stanford Financial and SIB, acting in concert as an unregistered investment company, were misleading investors about the scope and nature and extent of regulatory oversight over Stanford Financial and SIB, and with reckless disregard for the truth and the law, Defendants provided substantial assistance to SIB and Stanford Financial in agreeing to mislead the SEC so as to thwart the SEC's investigation of Stanford Financial from 2005 through February 2009 and thereby materially aided the sales of securities through the use of untruths and

materially misleading omissions. Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in agreeing to assist Stanford and his criminal operation. In assisting an offshore bank deceive the SEC so that it could continue to sell securities through a Houston-based investment company enterprise, Defendants were, absolutely aware they were engaged in illegal conduct. Defendant's conduct described herein was designed to perpetuate the Stanford Financial's Ponzi Scheme; indeed Sjoblom himself stated that "our livelihood" depended on Pendergest-Holt's ability to deceive the SEC during her presentation. Defendants' actions as described herein allowed Stanford Financial and SIB to continue to sell securities to Plaintiffs from, by and through Texas using untruths and materially misleading omissions.

105.

In performing the acts described herein to aid and abet the sale of securities through the use of untruths and materially misleading omissions, Defendants acted with the intent to perpetuate the sale of securities by Stanford Financial, or acted with reckless disregard for the truth or the law. In fact, Defendants acted with wanton and arrogant disregard for the truth and for the protections afforded by the Texas Securities Act by engaging in the conduct described herein. Defendants' actions in aiding and abetting Stanford Financial's fraud by helping Stanford obstruct regulatory investigations allowed Stanford Financial and SIB to continue in business and thereby caused Plaintiffs to enter into transactions or maintain their investments with SIB, which they have now lost. As a result of Defendants' conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments. Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

4.    CO-CONSPIRATOR LIABILITY

106.

Defendants are jointly and severally liable as co-conspirators for Stanford Financial and SIB's primary violations of the Texas Securities Act. In particular, the central aim of Stanford's Ponzi scheme conspiracy extended to concealing the fraudulent nature of Stanford Financial and SIB and their operations and activities from regulators around the world. There was a meeting of the minds between Stanford, Davis and others beginning in 1991 and extending until February 2009 as to the need to conceal Stanford Financial's true nature and activities and to evade regulatory scrutiny at all levels and in all countries. This meeting of the minds grew to include other participants,

including Pendergest-Holt, Defendant Alvarado, Rodriguez Tolentino, members of the Antiguan Government, and, eventually, Defendants Chadbourne, Proskauer and Sjoblom. Defendant Sjoblom, while employed by Chadbourne, joined the conspiracy and had a meeting of the minds with the principals of Stanford Financial in August 2005 and agreed to assist Stanford Financial to conceal the fraudulent nature of its activities by evading regulatory scrutiny from 2005 through February 2009, which concealment was crucial and central to the perpetuation of Stanford's Ponzi scheme. Sjoblom continued to be actively involved in furthering the objective of the conspiracy upon his employment with Proskauer later in 2006. Defendants therefore knowingly combined together and with the principals of Stanford Financial to assist Stanford Financial to frustrate the investigatory efforts of the SEC and other U.S. regulatory agencies so as to enable Stanford Financial to continue operating as an "outlaw", unregulated, unregistered investment company/dealer, and to sell unregistered securities from, by and through the State of Texas from 2005 through 2009.

107.

As described herein, Defendants took various overt acts designed to assist Stanford Financial and SIB to accomplish the goal of shielding Stanford Financial and SIB from regulatory scrutiny and therefore allow Stanford Financial and SIB to continue selling CDs from, by and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas. These overt acts in furtherance of the conspiracy included lying to the SEC about Stanford Financial and SIB and encouraging others to lie to and otherwise mislead and deceive the SEC in an ongoing SEC investigation. By doing so, Defendants acted pursuant to their meeting of the minds with Stanford, Davis and others in pursuit of the common purpose of the conspiracy – to conceal the fraudulent nature of Stanford Financial's activities and shield Stanford Financial from regulatory scrutiny by thwarting an active investigation by the SEC so as to allow Stanford Financial and SIB

to continue in business and continue perpetuating the Ponzi scheme. Even though Defendants (with the exception of Alvarado) joined the conspiracy late, in 2005, under Texas law a party who joins in a conspiracy is jointly and severally liable "for *all acts done by any of the conspirators* in furtherance of the unlawful combination." Defendants' conspiracy with Stanford Financial to violate the Texas Securities Act is a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

108.

Defendants' actions in furthering the conspiracy to conceal, hinder and obstruct regulatory investigations were taken during the conspiracy's operation. Indeed Defendants' actions were taken to protect the Stanford Financial scheme and to assist Stanford Financial to avoid regulatory intervention so that Stanford Financial and SIB could continue in business and continue selling CDs and continue paying Defendants' legal bills. Therefore Defendants' actions were part of a continuing activity that was illegal in nature and that was essential to and therefore in furtherance of the survival of an ongoing Ponzi scheme conspiracy. But for the overt acts taken by the members of the regulatory obstruction conspiracy to further the objectives of the Ponzi conspiracy described herein, Stanford would not have been able to carry out his Ponzi scheme, and billions of dollars belonging to the Plaintiffs and the Class would not have been lost.

**B.  AIDING AND ABETTING/PARTICIPATION IN A FRAUDULENT SCHEME**

109.

By their conduct described herein, Defendants aided and abetted and participated with Stanford Financial and SIB in a fraudulent scheme, making Defendants directly liable for fraud. In particular, Defendants made the conscious decision in August 2005 and continuing through 2009 to

assist and enable Stanford Financial to continue to sell SIB CDs in a massive Ponzi scheme based on the misrepresentations that investments in Stanford Financial and SIB were regulated because SIB was subject to audits and risk management reviews by the Antiguan FSRC and because Stanford Financial was regulated by the SEC. Defendants, with full knowledge of the cozy relationship between Stanford and Leroy King in Antigua, participated in the fraudulent scheme by agreeing to assist Stanford Financial shield itself from regulatory scrutiny and thwart active investigations by the SEC, all with the goal of perpetuating Stanford Financial's business. Said actions by Defendants in combination with Stanford Financial are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in Stanford Financial as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### C.    CIVIL CONSPIRACY

110.

Defendants conspired with each other and with Allen Stanford, Jim Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others to commit the wrongful conduct described herein, including fraud, theft of fiduciary property, breach of fiduciary duty, and violations of the Texas Securities Act. Defendants are each responsible for all wrongdoing done by each and the other members of the conspiracy, including Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, SIB, and others, in furtherance of the unlawful conspiracy and enterprise.

111.

Together with Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others, the Defendants joined in a conspiracy (which had been ongoing since at least 1991) to shield Stanford Financial from regulatory scrutiny and thwart active investigations by the SEC so as to allow Stanford Financial and SIB to continue to sell SIB CDs in a massive Ponzi scheme for the

pecuniary benefit of Stanford and Stanford Financial and, thereby, Defendants. The object of the ongoing conspiracy was to help insulate and shield Stanford Financial and SIB from regulatory scrutiny and so assist said entities to continue to sell the SIB CDs and conceal Stanford Financial's ongoing fraudulent activities. Central to Stanford's ability to perpetuate a massive Ponzi scheme was the ability to conceal the true nature of Stanford Financial's activities and investment portfolio by blocking regulatory scrutiny at every level and in every country. There was a meeting of the minds in August 2005 between Defendant Sjoblom (while employed at Chadbourne) and Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others as to the central objective of evading and concealing Stanford Financial's activities from regulators and a meeting of the minds between Defendants and Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others, as to the means for carrying out the scheme, being the active obstruction of an ongoing regulatory investigation into Stanford Financial's business affairs by the SEC and other governmental agencies, between August 2005 and February 2009. Sjoblom carried this meeting of the minds and agreement to conspire over to Proskauer when he joined that firm later in 2006.

112.

During all relevant times, Defendants, in furtherance of the conspiracy and/or aiding or abetting Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others, in furtherance of the common enterprise, engaged in specific overt acts as described herein. Defendants engaged in overt acts in furtherance of the Stanford Financial CD conspiracy and assisted Allen Stanford, Davis, Pendergest-Holt, Rodriguez Tolentino, King, and others to effectuate their illicit scheme to conceal Stanford Financial's activities by obstructing regulatory investigation and enforcement in order to perpetuate and keep Stanford Financial and SIB alive and in business.

113.

Defendants conspired to conduct, and participated in conduct including violations of securities laws and fraud. To wit, over the span of almost four years, from August 2005 through February 2009, Defendant Sjoblom, while employed at Chadbourne and later at Proskauer, engaged in a conspiratorial meeting of the minds with Allen Stanford, Davis, Pendergest-Holt, Defendant Alvarado, Rodriguez Tolentino, King, and others, and in furtherance thereof knowingly participated in conduct designed to perpetuate and keep alive a massive Ponzi scheme by agreeing to assist, and actively assisting, Stanford Financial to obstruct SEC investigations and shield Stanford Financial and SIB from regulators, as described herein. Defendants' conduct was part of continuing activity that was essential to and therefore in furtherance of the survival of the Stanford Ponzi scheme, which was an ongoing operation when Defendants joined the conspiracy. Frustration of investigatory efforts by the SEC and other agencies in a highly regulated environment such as securities was central to the success and longevity of the overall Stanford Ponzi scheme conspiracy. Stanford's Ponzi scheme proximately caused Plaintiffs to lose their investments, and Defendants, by joining in conduct designed to conceal and facilitate Stanford Financial's illicit conduct, which concealment was central to the perpetration of the Stanford Ponzi scheme, are jointly and severally liable with Stanford, Stanford Financial and SIB for all of Plaintiffs' losses.

## D.    NEGLIGENT RETENTION/NEGLIGENT SUPERVISION

114.

Defendants Proskauer Rose and Chadbourne Parke are directly liable to Plaintiffs for negligent retention and supervision of their employee Sjoblom. From the time that Sjoblom joined the conspiracy described here in August 2005 until sometime in September 2006, Sjoblom was employed by Chadbourne Parke. Thereafter, from September 2006 through the present time, Sjoblom has been an employee of Proskauer Rose. Defendants Proskauer Rose and Chadbourne

Parke owed a duty to Plaintiffs to use ordinary care in the hiring, supervision and retention of their agents and employees and in monitoring the activities of their employee representing an offshore bank selling financial products in the United States that was under investigation by the SEC. Defendants Proskauer Rose and Chadbourne Parke knew or should have known that Sjoblom had been specifically retained by Stanford Financial to help it thwart an active SEC investigation of its activities. As a result, Defendants Proskauer Rose and Chadbourne Parke breached the duty owed to Plaintiffs by not exercising ordinary care in the hiring, supervision and retention of Sjoblom and in not monitoring his activities with regard to this specific, inherently high risk, client matter. Defendants' breach of their duties and failure to supervise has proximately caused damages to Plaintiffs.

## XII.  RESPONDEAT SUPERIOR

### 115.

Defendants Proskauer Rose and Chadbourne Parke are liable for the tortious acts of their employee, Sjoblom, and all contacts with the State of Texas by said employee should be attributed to Proskauer Rose and Chadbourne Parke for purposes of the personal jurisdiction analysis. From the time that Sjoblom joined the conspiracy described herein in August 2005 until sometime in September 2006, Sjoblom was employed by Chadbourne Parke. Thereafter, from September 2006 through the present time, Sjoblom has been an employee of Proskauer Rose. Sjoblom was acting within the course and scope of his respective employments with Proskauer Rose and Chadbourne Parke, and in furtherance of said law firms' respective businesses, when he engaged in the wrongful conduct described herein.

## XIII.   ACTUAL DAMAGES

### 116.

Plaintiffs and the putative Class have suffered the loss of well in excess of $7 billion that was proximately caused by the wrongful conduct of Defendants in conspiracy with Allen Stanford as described herein.  In the alternative, Defendants are liable for all damaged caused to Plaintiffs and the putative Class during the time period 2005-2009 during which Defendants participated in the conspiracy to obstruct the SEC investigation into Stanford Financial and SIB's fraudulent sales practices, amounting to well in excess of $4 billion in SIB CDs sales to Plaintiffs and the Class.  In addition, Plaintiffs are entitled to recover their just and reasonable attorneys' fees, for it would be inequitable not to award such fees to them.  Plaintiffs have retained the undersigned attorneys and have agreed to pay them a reasonable attorneys' fee for their work.

### 117.

The exact amount of maximum damages proximately caused by Defendants' wrongful conduct is unknown, but Plaintiffs believe that those damages total between alternatively between $4 billion and $7 billion.

## XIV.   PUNITIVE DAMAGES

### 118.

The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code.  Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

### 119.

All conditions precedent to filing this Complaint have been met.

## XV.   **JURY DEMAND**

120.

Plaintiffs demand a trial by jury.

## **PRAYER**

WHEREFORE, Plaintiffs pray the Defendants be summoned to answer this Complaint, that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the classes and sub-classes as set forth in each cause of action hereof recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Plaintiffs pray for such other relief to which they may be justly entitled.

Respectfully submitted,

**CASTILLO SNYDER, P.C.**
300 Convent Street, Suite 1020
San Antonio, Texas 78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210

By: s/ Edward C. Snyder
     EDWARD C. SNYDER
     State Bar No. 00791699
     esnyder@casnlaw.com
     JESSE R. CASTILLO
     State Bar No. 03986600
     jcastillo@casnlaw.com

**LEAD CLASS COUNSEL AND
ATTORNEYS IN CHARGE FOR
PLAINTIFFS AND THE PUTATIVE
CLASS**

Nicholas A. Foley
State Bar No. 07208620
Douglas J. Buncher
State Bar No. 03342700
**NELIGAN FOLEY, LLP**
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301
dbuncher@neliganlaw.com
nfoley@neliganlaw.com

EDWARD F. VALDESPINO
State Bar No. 20424700
edward.valdespino@strasburger.com
ANDREW L. KERR
State Bar No. 11339500
andrew.kerr@strasburger.com
**STRASBURGER & PRICE, LLP**
300 Convent Street, Suite 900
San Antonio, Texas 78205
Telephone: (210) 250-6000
Facsimile: (210) 250-6100

     DAVID N. KITNER
     State Bar No. 11541500
     david.kitner@strasburger.com
     STRASBURGER & PRICE, LLP
     901 Main Street, Suite 4400
     Dallas, Texas 75202
     Telephone: (214) 651-4300
     Facsimile: (214) 651-4330

## **CERTIFICATE OF SERVICE**

     I hereby certify that on this 9th day of October, 2009.  I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to all counsel of records, each of whom have consented in writing to accept this Notice as service of this document by Electronic means.

<u>s/ Edward C. Snyder</u>

# EXHIBIT 32

PROSKAUER
EXHIBIT 32

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| SAMUEL TROICE, HORACIO MENDEZ, ANNALISA MENDEZ, PUNGA PUNGA FINANCIAL, LTD. Individually and on behalf of a class of all others similarly situated,<br><br>                       Plaintiffs,<br><br>        v.<br><br>PROSKAUER ROSE, LLP,<br>THOMAS V. SJOBLOM,<br>P. MAURICIO ALVARADO, AND<br>CHADBOURNE & PARKE LLP,<br><br>                       Defendants. | Civil Action No. 3:09-cv-01600 |

**DECLARATION OF DR. CLAUS VON WOBESER, ESQ.**

    **1.**  I, Claus von Wobeser, am a Mexican citizen duly authorized to practice law in Mexico. My detailed qualifications to issue the legal opinions contained in this Declaration are reflected in the Statement of Qualifications and Curriculum Vitae attached hereto as **Exhibit "A."** In summary, I am managing partner of the firm *Von Wobeser y Sierra, S.C.* and have over 35 years of experience in dispute resolution matters in Mexico. I have litigated cases in domestic and federal courts, including several before the Mexican Supreme Court of Justice. I graduated with merit as a bachelor of law from the *Escuela Libre de Derecho* in Mexico City and as an S.J.D. from the *Universidad de Droit, d'Economie et de Sciences Sociales de Paris*. I was a Constitutional

Law professor at the *Escuela Libre de Derecho* and I currently teach International Commercial Arbitration in this law school. My professional activities have also included involvement with various different domestic and international organizations. For instance, I have acted as President of the Mexican Bar Association, as Vice-President of the International Court of Arbitration of the International Chamber of Commerce, and as Co-Chair of the Arbitration Committee of the International Bar Association.

2.  I have been retained by Defendants Chadbourne & Parke LLP and Proskauer Rose LLP to provide my opinion on whether, under Mexican law, a Mexican judge would recognize a judgment eventually issued in *Troice v. Proskauer Rose LLP,* Civil Action No. 3:09-cv-01600, against the interests of members of the plaintiff class domiciled in Mexico, who would be part of the class by virtue of an *opt-out* mechanism under U.S. law.

3.  I understand the *opt-out* mechanism to be a form of implied acceptance (i) to become a member of the plaintiff class and (ii) to be represented by the attorneys of record for the plaintiffs in the corresponding case. Further, I understand that plaintiffs' counsel gives the *opt-out* notice to potential class members in a manner determined by the Court, and, in the event a potential class member expressly agrees to become part of the class, <u>or does not expressly manifest opposition to becoming part of the class within a specified time</u>, that person will be considered part of the class and will be bound by the judgment issued in the corresponding trial.

4.  In order to issue the legal opinions contained in this Declaration, I reviewed the documents listed in **Exhibit "B."** For the Court's convenience, the authorities I relied upon in this Declaration, and their English translations, are included in the Compendium of Legal Authorities submitted herewith as **Exhibit "C."** The English translations found in this Declaration and in Exhibit C are my own.

5.  For purposes of organization, I divide this Declaration into four sections. In the first section I identify and describe the specific statute that would govern a Mexican court's decision as to whether to recognize a judgment issued in Civil Action No. 3:09-cv-01600. In the second and third sections, I explain how Mexican law and domestic public order would impact a Mexican court's review of a U.S. judgment in Civil Action

APP 0955
App. 621

No. 3:09-cv-01600 using an *opt-out* mechanism. And finally, in the fourth section, I conclude that such a judgment would not be recognized in Mexico on grounds of the constitutional law principles and the judicial criteria explained herein, and by reason of Articles 12, 13 and 1803 of the Federal Civil Code[1] and Articles 564, 569, 571(III), 578 and 594 of the Federal Code of Civil Procedure.[2]


## I.    RECOGNITION AND ENFORCEMENT OF FOREIGN JUDGMENTS IN MEXICO

**6.** In general, the recognition and enforcement of foreign judgments in Mexico is governed by the Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards ("Convention"). However, because the United States of America is not a party to the Convention, the Convention is not applicable to judgments issued by U.S. courts. It is Mexico's domestic law that applies to the enforcement of these judgments.

**7.** Under Mexican domestic law, depending on the case circumstances, the procedures related to the recognition and enforcement of foreign judgments may be governed by (i) the Commerce Code[3], (ii) the Federal Code of Civil Procedure or (iii) one of the Codes of Civil Procedure of the States of the Mexican Republic, or of the Federal District,[4] where recognition and enforcement is sought. The application of one of these codes excludes the application of the others.

---

[1] The Federal Civil Code establishes substantive rules of law governing legal relationships between persons. As relevant to this opinion, the Federal Civil Code regulates how individuals and entities in Mexico express their consent to affect their juridical sphere.

[2] The Federal Code of Civil Procedure governs the judicial proceedings by which controversies relating to the substantive rights governed by the Federal Civil Code are settled. Relevant to this opinion, the Federal Code of Civil Procedure establishes a mechanism by which foreign judgments are recognized and enforced in Mexico. As later explained, the Federal Code of Civil Procedure would be applicable to the recognition of a judgment issued in Civil Action No. 3:09-cv-01600.

[3] The Commerce Code establishes both substantives rules of law that apply to merchants and rules of procedure that apply to trials by which controversies of a mercantile nature are resolved.

[4] Mexico has a federal government integrating 31 States and 1 Federal District. The Federation, the States and the Federal District all have a Civil Code and a Code of Civil Procedure.

APP 0956
App. 622

**8.** The code that would apply to the recognition and enforcement of a judgment issued in the case at hand is the Federal Code of Civil Procedure.[5]

**9.** The Commerce Code is inapplicable because, under Mexican law, (i) the judgment would not resolve a commercial dispute[6] and (ii) the defendants are not merchants.

**10.** The Commerce Code applies only to commercial judicial proceedings, which, under Article 1049 of said code, are those types of proceedings where the subject matter of the dispute arises from an act of commerce. *See* art. 1049 of the Commerce Code (*"Commercial trials are those that resolve disputes that, in accordance with Articles 4o., 75 and 76, derive from acts of commerce"*)[7].

**11.** Acts of commerce from which commercial disputes may derive are defined in Articles 75[8] and 76[9] of the Commerce Code. These articles are self-explanatory and read as follows:

> *Article 75*. The law considers acts of commerce:
> *I. All acquisitions, disposals and rentals done for the purpose of commercial speculation, of maintenance, items, furniture or goods, either in their natural state, or after having been worked or manufactured;*
> *II. Purchases and sales of real estate, when made for such purpose of commercial speculation;*
> *III. Purchases and sales of parts, shares and bonds of corporations;*
> *IV. Credit contracts relating, State obligations or other instruments of credit in stream of commerce;*
> *V. Supplies and provisions companies;*
> *VI Construction, and public and private works companies;*
> *VII. Factoring and manufacturing companies;*

---

[5] As later indicated, I disagree with the opinion of Mr. Alejandro Garro and Mr. Felipe Torres on this point.

[6] Under Mexican law, the subject matter of the dispute in Civil Action No. 3:09-cv-01600 relates to alleged unlawful activities performed by professional service providers (*i.e.*, law firms and their attorney partners) within the scope of their services. Professional services are not a commercial activity governed by the Commerce Code. In Mexico, any claim for damages and lost profits based on alleged unlawful conduct relating to professional services is governed by either the Federal Civil Code or the Civil Code of the state having jurisdiction over the dispute. Articles 2606 to 2615 of the Federal Civil Code regulate professional service agreements.

[7] *See* Commerce Code [CC], *as amended*, Federal Official Gazette [DO], December 13, 1889 (Méx.), **art. 1049**. *See* attached as **CLA 1.**

[8] *See* Commerce Code [CC], *as amended*, Federal Official Gazette [DO], December 13, 1889 (Méx.), **art. 75.** *See* attached as **CLA 2.**

[9] *See* Commerce Code [CC], *as amended*, Federal Official Gazette [DO], December 13, 1889 (Méx.), **art. 76.** *See* attached as **CLA 3.**

APP 0957
App. 623

*VIII. Companies for the transportation of persons or things, by land or water; and tourism companies;*

*IX. Libraries, and publishing and typographical companies;*

*X. Committees Companies, agencies, commercial businesses offices, pawn shops and establishments of sales by public auction;*

*XI. Public entertainment companies;*

*XII. Commercial commission operations;*

*XIII. Mediation in commercial business transactions;*

*XIV. Bank operations;*

*XV. All contracts relating to maritime commerce and domestic and foreign navigation;*

*XVI. Insurance contracts of all kinds;*

*XVII. Deposits related to trade;*

*XVIII. Deposits in General Warehouses and all transactions made on certificates of deposit and pledge bonds issued by them;[10]*

*XIX. Checks, bills of exchange or remittances of money from one place to another, among all sorts of people;*

*XX. Vouchers or other instruments to order or to bearer, and traders obligations, unless it is proved they arise from a cause different to trade;*

*XXI. Obligations between traders and bankers, if they do not have an essentially civil nature;*

*XXII. Contracts and obligations of employees of the traders in regard to the business of the trader who has them in his service;*

*XXIII. The transfer of property by the owner or farmer of the products of their farm or crops;*

*XXIV. The operations contained in the General Law of Negotiable Instruments and Credit Transactions;*

*XXV. Any other acts of a similar nature to those expressed in this Code. In case of doubt, the commercial nature of the act shall be determined by judicial discretion.*

**Article 76**. *The purchase of goods or merchandise done by merchants for their use or consumption, or that of their family, are not acts of commerce: neither the resale made by workers when it is a natural consequence of the practice of their profession.*

**12.** According to the judicial criterion of the Second Collegiate Tribunal of the Third Circuit, acts of commerce shall be expressly recognized as such by statutory

---

[10] General Warehouses are warehouses authorized by the Ministry of Finance to store goods (*e.g.*, commodities or any other goods). In this context, certificates of deposit are documents that demonstrate title over the goods stored at the General Warehouse. These documents can be endorsed to any third party to transfer the property over the stored goods (without the goods leaving the warehouse). Both General Warehouses and Certificates of Deposits are regulated under the General Act for Credit Titles and Transactions and the General Act of Credit Institutions.

APP 0958
App. 624

law.[11] Only the acts individually described in the two articles above are deemed acts of commerce under Mexican law. Hence, based on the specific definitions found in the two articles quoted above, any obligations related to the type of allegations in this case are not commercial in nature, and are not governed by the Commerce Code.[12] Article 1910 of the Federal Civil Code regulates non-contractual unlawful acts, including the type of acts described by plaintiffs in the case at hand. *See* art. 1910 of the Federal Civil Code[13] (*"That who acting illegally or against good customs causes damage to another is obliged to repair it, unless he demonstrates that the damage was caused as a consequence of the fault or inexcusable negligence of the victim"*).

**13.** Law firms in Mexico are considered partnerships that, while having a predominantly economic purpose, do not engage in acts of commerce that would subject them to the Commerce Code. All law firms in Mexico should be constituted under the legal form of "*Sociedades Civiles,*" which are governed by the Civil Code. Article 2688 of the Federal Civil Code[14] defines a "*Sociedad Civil*" as an agreement by which "*partners are mutually obligated to combine efforts and resources to achieve a common goal with a preponderant economic character, but without incurring in acts of commercial speculation.*"

**14.** The Codes of Civil Procedure of the States of the Mexican Republic are also not applicable here. Various Codes of Civil Procedure of the States of the Mexican Republic provide that the Mexican judge who has jurisdiction to enforce a foreign judgment is the judge who would have had jurisdiction in Mexico to issue the judgment for which enforcement is being sought. *See, e.g.,* art. 516 of the Code of Civil Procedure of Jalisco ("*The judge that would be competent to follow the trial in which a judgment was issued, is competent to enforce a judgment issued abroad*"); art. 494 of the Code of Civil Procedure of

---

[11] *See* **MERCANTILE CONTRACTS. THE MANNER TO ESTABLISH WHEN PARTES ARE IN PRESENCE OF OBLIGATIONS OF SUCH NATURE.** Second Collegiate Tribunal of the Third Circuit, Judicial Weekly of the Federation, Ninth Epoch, Volume XXIV, July of 2006, Page 1176 (Méx). *See* attached as **CLA 4**.

[12] For an additional explanation of what a commerce act is under Mexican law, see: VICENTE FERNÁNDEZ FERNÁNDEZ, DERECHO PROCESAL MERCANTIL 11-13 (2010).. *See* attached hereto as **CLA 5**

[13] *See* Federal Code of Civil Procedure [CFPC], *as amended,* Federal Official Gazette [DO], February 24, 1943 (Méx.), **art. 1910**. *See* attached as **CLA 6.**

[14] *See* Federal Civil Code [CCF], *as amended,* Federal Official Gazette [DO], May 26, July 14, August 3 and 31, 1928 (Méx.), art. 2688. See attached as **CLA 7.**

6

Nuevo Leon ("*The judge that would be competent to follow the trial in which a judgment was issued according to the second title of this book, is competent to enforce a sentence issued abroad*"). In Mexico, all matters pertaining to class action proceedings, including the recognition or enforcement of foreign judgments issued in such cases, are of federal jurisdiction. *See* art. 17 of the Mexican Constitution ("*The Congress of the Union shall issue the laws that will govern class actions. Such laws shall determine the areas of application, court procedures and mechanisms for the compensation for damage. <u>Federal judges will exclusively exercise jurisdiction over these procedures and mechanisms.</u>*") (emphasis added)[15]; art. 578 of the Federal Code of Civil Procedure ("*The defense and protection of collective rights and interests shall be exercised before the Courts of the Federation with the modalities indicated in this Title, and may only be promoted in consumption of goods or services relationships, public or private, and environment.*")[16]. Hence, it is Mexico's federal judges who have jurisdiction to recognize or enforce a U.S. class action judgment because they have exclusive jurisdiction over class action claims in Mexico.

**15.** Based on the above, I respectfully differ from the opinion of Mr. Alejandro Garro and Mr. Felipe Torres, who appear to assume that the Commerce Code or the Codes of Civil Procedure of the States of the Mexican Republic, including that of the Federal District, are relevant to the case at hand.[17]

**16.** The Federal Code of Civil Procedure regulates the recognition and enforcement of foreign judgments in its Fourth Book, Chapters I (arts. 559-563), V (arts. 564 -568) and VI (arts. 569-577). Under these rules, Mexican judges shall not recognize and enforce foreign judgments that are considered contrary to domestic public order. *See* art. 569 ( "*judgments, private noncommercial arbitral awards and other foreign judicial rulings will be effective and recognized in the Republic in all that is not contrary to domestic public order*").[18] Also, Mexican judges shall not recognize the jurisdiction of foreign tribunals that assumed jurisdiction for reasons that are incompatible with or dissimilar to

---

[15] *See* Political Constitution of the United Mexican States [Const.], *as amended,* Federal Official Gazette [D.O.], February 5, 1917 (Mex.), **art. 17**. *See* attached hereto as **CLA 8**.

[16] *See* Federal Code of Civil Procedure [CFPC], *as amended*, Federal Official Gazette [DO], February 24, 1943 (Méx.), **art. 578**. *See* attached as **CLA 9.**

[17] *See* paragraph 34 of the declaration of Mr. Alejandro Garro dated 30 October 2013; paragraphs 6 and 7 of the declaration of Mr. Felipe Torres dated 24 October 2014.

[18] *See* Federal Code of Civil Procedure [CFPC], *as amended*, Federal Official Gazette [DO], February 24, 1943 (Méx.), **art. 569**. *See* attached as **CLA 10.**

APP 0960
App. 626

domestic law or the Federal Code of Civil Procedure. *See* art. 564 (*"The jurisdiction assumed by a foreign tribunal will be recognized in Mexico for the enforcement of the judgment when said jurisdiction was assumed for reasons that are compatible or analogous to national law, unless the cases in question are of the exclusive jurisdiction of Mexican Courts"[19]*); art. 571(III) (*"Judgments, private noncommercial arbitral awards and other foreign judicial rulings may be enforced if they comply with the following conditions: (…) III. That the trial judge or court had jurisdiction to hear and rule the matter in accordance with the recognized rules of international law which are consistent with those adopted by this Code. The foreign trial court or judge has no jurisdiction when the legal acts underlying the judgment that is sought to be enforced include a clause surrendering to the jurisdiction of the Mexican tribunals only"*)[20].

**17.** Also of relevance, the Supreme Court of Justice in Mexico has stated that in order for a foreign judgment to be enforced in Mexican territory, it must have been issued in a trial in which the party against whom the judgment is to be enforced was heard and defeated.[21]  This is so because of the principles of rule of law and legal certainty provided in the Mexican Constitution.  *See* Mexican Constitution, art. 14, second paragraph (*"No one shall be deprived of freedom or property, possessions or rights without a trial before previously established courts in which due process is observed and in accordance to the laws enacted before the fact."*)[22]

**18.** Under Mexican law, there is no specific statutory statement of what domestic public order is. However, it has been defined through case law by the Judiciary, which has stated that domestic public order includes all the statutory provisions and legal principles that cannot be derogated by private agreement. The Supreme Court of Justice has stated that *"for public order to be involved, it is mandatory for the corresponding interests to be so important that, disregarding the lack of damage and even the acquiescence of*

---

[19] *See* Federal Code of Civil Procedure [CFPC], *as amended*, Federal Official Gazette [DO], February 24, 1943 (Méx.), **art. 564**. *See* attached as **CLA 11.**

[20] *See* Federal Code of Civil Procedure [CFPC], *as amended*, Federal Official Gazette [DO], February 24, 1943 (Méx.), **art. 571**. *See* attached as **CLA 12.**

[21] See **FOREIGN JUDGMENTS (LEGISLATION OF VERACRUZ).** Auxiliary Chamber of the Supreme Court of Justice [S.C.J.N.] [Auxiliary Chamber] Judicial Weekly of the Federation, Fifth Epoch, Volume CXIV, October, 29152, Page 153 (Méx). *See* attached as **CLA 13.**

[22] *See* Constitución Política de los Estados Unidos Mexicanos [Const.], *as amended,* Diario Oficial de la Federación [D.O.], 5 de febrero de 1917 (Mex.), **art. 14**. *See* attached hereto as **CLA 14.**

**APP 0961**
App. 627

*the interested party, the forbidden act may cause damage to the community, the State or the nation."*[23]

**19.** Also, the Supreme Court of Justice has highlighted the importance and role of public order by stating that "*public order provisions are unwaivable, precisely because of the society's interest in their observance and compliance."*[24]

**20.** Mexican scholars have interpreted domestic public order as "*all provisions established in an imperative manner by the congressmen to safeguard the best interests of the community*" and also as "*a remedy that prevents the application of a foreign law because, if applied, it would provoke social unrest, prevent the satisfaction of a collective need or deprive a benefit to the population."*[25]

**21.** Freedom of choice and the liberty to willingly affect one's juridical sphere are legal principles protected by the Mexican Constitution and, therefore, a principle that warrants public policy enforcement. The Supreme Court of Justice has stated that "*the freedom of choice principle enjoys a constitutional rank and must not be reduced to a simple civil law principle,"* and that "*respect for the individual as a person requires respect for individual self-determination, so if the individual has no freedom to structure its legal relationships according to its wishes, then that person's self-determination is not respected."*[26]

**22.** In line with the above, the rules regarding the formation of consent, freedom of choice and self-determination are essential to the Mexican legal system, and safeguard rights that warrant public policy protection.

**23.** As I will explain below, the *opt-out* system, which operates to include individuals and corporations domiciled in Mexico in the plaintiffs' class by virtue of their silence, is illegal in Mexico, and the corresponding class members in Mexico would not be legally bound under said *opt-out* mechanism.

---

[23] *See* **PUBIC ORDER, LAWS OF.** Third Chamber of the Supreme Court of Justice [S.C.J.N] [Third Chamber] Judicial Weekly of the Federation, Fifth Epoch, Volume *XXXVII*, March 30, 1933, Page 1835 (Mex). *See* attached as **CLA 15**.

[24] *See* **PUBLIC ORDER LAWS.** Auxiliary Chamber of the Supreme Court of Justice [S.C.J.N.] [Auxiliary Chamber] Judicial Weekly of the Federation, Fifth Epoch, Volume CXX, 1954, Page 590 (Méx). *See* attached as **CLA 16**.

[25] *See* Carlos Arellano García, Derecho Internacional Privado 931, 934 (2011). *See* attached as **CLA 17**.

[26] *See* **FREEDOM OF CHOICE. IT IS A PRINCIPLE OF CONSTITUTIONAL RANK.** First Chamber of the Supreme Court of Justice [S.C.J.N.] [First Chamber] Judicial Weekly of the Federation, Tenth Epoch, Book 13, Volume *I*, December 2014, Page 219 (Méx). *See* attached as **CLA 18**.

APP 0962
App. 628

**24.** In my opinion, a Mexican judge would refuse to recognize a judgment eventually issued in Civil Action No. 3:09-cv-01600 against the interests of a class member domiciled in Mexico due to a violation of domestic public order. A Mexican judge would find particularly problematic the lack of consent from the individuals and corporations domiciled in Mexico to be part of the class and to be represented by the law firms appointed by the plaintiffs. Therefore, a Mexican judge would find that recognizing the judgment would be giving legal effect to an act that was not consented to by the class members domiciled in Mexico, which would undermine Mexico's legal certainty, due process and self-determination principles. Also, a Mexican judge would find that recognizing the judgment would violate the absent Mexican class members' right to be represented by counsel of their own choosing.

**25.** To determine whether there would be a lack of consent to become part of the class in the U.S. class action proceeding and to be represented by the plaintiffs' counsel, and therefore to determine if there would be a violation of domestic public order, a Mexican judge would have to determine whether the class members domiciled in Mexico validly accepted the consequences of the *opt-out* notice by virtue of (i) the communication sent by the plaintiffs' counsel and (ii) the silence or omission of the individuals and corporations that are domiciled in Mexico and received said communication as potential class members.

## II.  MEXICAN LAW APPLICABLE TO THE *OPT-OUT* MECHANISM

**26.** In order to determine whether a potential class member agreed to be part of the class and to be represented by the counsel of record, in accordance with Mexican freedom of choice and self-determination principles, the first step is to analyze which law is applicable to such a situation.

**27.** The *opt-out* notice would be issued in the United States and received in Mexico. Under Mexican law, all persons located in Mexican territory, and all juridical acts occurring in it, shall be governed by Mexican law. Article 12 of the Federal Civil Code provides that "*Mexican law applies to all people present in the Republic, as well as to the acts and events occurring within its territory or jurisdiction and those who are subject to such laws,*

10

*except when these laws provide the application of a foreign law and also except the provisions of treaties and conventions to which Mexico is a party.*[27]

**28.** Under Article 13 of the Federal Civil Code, the formalities of any juridical act are governed by the law of the place where they are executed. Article 13 of the Federal Civil Code provides that "*the formalities of juridical acts shall be governed by the law of the place where they are executed. However, they may be subject to the formalities prescribed in this Code if the act is to take effect on the Federal District or in the Republic for federal issues.*"[28]

**29.** Given that the *opt-out* notice is received in Mexico and its acceptance (through silence) is given in Mexico, the acceptance, if any, is perfected in Mexico. Therefore the place of execution of said juridical act is Mexico.

**30.** Per Articles 12 and 13 of the Federal Civil Code, quoted above, a juridical act, and its formalities, are governed by the law of the "place of execution," which in this case is Mexico. Consequently, the juridical act in this case—involving whether to be a part of a class and be represented by the plaintiffs' counsel—is governed by Mexican law and protected by the Mexican Constitutional principles of self-determination, freedom of choice, legal certainty and due process.

### III.   PUBLIC ORDER IMPLICATIONS OF THE *OPT-OUT* MECHANISM IN MEXICO

**31.** Under Mexican law, any voluntary modification of one's juridical sphere can be manifested in an express or tacit manner. Article 1803 of the Federal Civil Code provides that "*consent can be express or tacit, according to the following: I. It will be express when stated verbally, in writing, by electronic means or any other technology, or by unmistakable signs, and II. Tacit consent will result from facts or acts that presuppose or*

---

[27] *See* Federal Civil Code [CCF], *as amended*, Federal Official Gazette [DO], May 26, July 14, August 3 and 31, 1928 (Méx.), **art. 12**. *See* attached as **CLA 19**.

[28] *See* Federal Civil Code [CCF], *as amended*, Federal Official Gazette [DO], May 26, July 14, August 3 and 31, 1928 (Méx.), **art. 13**. *See* attached as **CLA 20**.

**APP 0964**
App. 630

*authorize its presumption, except in cases in which per law or agreement the will must be expressly stated."*[29]

**32.** In the *opt-out* mechanism, for the reasons described below, there is neither express nor tacit consent to be included in the class or to be represented by plaintiffs' counsel. Further, in Mexico, the Supreme Court of Justice has declared the rules governing the expression of consent as rules of public order because they are *"norms set to guarantee the defense of the general interest"*[30] and that *"define the essence of (…) juridical acts in general."*[31]

**33.** If a Mexican judge were to recognize the foreign judgment issued in the present action, he would be granting legal effect to the class members' failure to manifest, within a specific time, their opposition to being a part of the class and being represented by the counsel of record. This is illegal in Mexico because, under Mexican law, silence cannot produce any legal effect.

**34.** Mexican statutory provisions governing the formation of consent do not recognize silence as a type of acceptance or as a way to manifest approval. Mexican courts have stated that silent behavior does not produce, by itself, any positive legal effect whatsoever, and the inactivity of an offer's receiver cannot, by itself, constitute an expression of will to accept that offer. The only cases in which silence can have legal effects are (i) when established by Mexican law, or (ii) when the parties to a contract expressly agree that, with respect to their legal relationship, silence will have a specific meaning and will produce legal effects, but these two exceptions are irrelevant to the case at hand.[32]

---

[29] *See* Federal Civil Code [CCF], *as amended*, Federal Official Gazette [DO], May 26, July 14, August 3 and 31, 1928 (Méx.), **art. 1803**. *See* attached as **CLA 21**.

[30] See **ABSOLUTE NULITY AND NONEXISTANCE. THEIR DIFFERENCES ARE ONLY CONCEPTUAL AND SIMPLY THEORICAL, AND THEIR PENALTIES ARE SIMILAR.** Third Chamber of the Supreme Court of Justice [S.C.J.N.] [Third Chamber] Judicial Weekly of the Federation, Seventh Epoch, Volume 205-216, Fourth Part, Page 116 (Méx). *See* attached as **CLA 22**.

[31] See **INSURANCES. ARTICLE 45 OF THE INSURANCE CONTRACT LAW, REGARDING THE NULITY IT PROVIDES, APPLIES TO BOTH GOOD'S INSURANCE AND LIFE INSURANCE.** Third Chamber of the Supreme Court of Justice [S.C.J.N.] [Third Chamber], Judicial Weekly of the Federation, Sixth Epoch, Volume XI, Fourth Part, Page 170 (Méx). See attached as **CLA 23.**

[32] *See* **CONTRACTUAL SILENCE. ITS MEANING AND SCOPE.** Eight Collegiate Court in Civil Matters of the First Circuit. Judicial Weekly of the Federation and its Gazette, Tenth Epoch, Book IX, June 2012, Page 913 (Mex). *See* attached as **CLA 24**.

**APP 0965**
App. 631

**35.** Mexican scholarship generally recognizes that silence alone does not produce any legal effects and cannot be considered as a form of expression of intent.[33]

**36.** Considering the above, there is no express or tacit consent from the individuals and corporations domiciled in Mexico that are to be included in the class. Therefore, the legal acts by which they are considered part of the class and by which they are represented by the counsel of record are nonexistent under Mexican law. Any judgment, foreign or domestic, recognizing legal effects of this nonexistent acceptance would be against the principles of legal certainty, due process and self-determination, and would constitute a violation of Mexican public order. Therefore, any such judgment would not be recognized in Mexico.

**37.** Consequently, *opt-out* mechanisms in class action proceedings are not allowed in Mexico. The Federal Code of Civil Procedure mandatorily requires all potential plaintiffs to expressly manifest their will to be considered a part of the class. Article 594 of the Federal Code of Civil Procedure provides that "*In the case of class actions in strict sense, and in individual homogenous class actions, any affected individual may join the proceeding through an express communication sent to the representative. Those affected may voluntarily join the class during the substantiation of the process and up to eighteen months after the judgment or settlement agreement has acquired the status of res judicata. Within this period, the interested party will forward his express and simple consent to the representative, who in turn will submit it to the judge*" (emphasis added).[34]

**38.** Moreover, Mexico expressly declined to enact an *opt-out* class action mechanism. When the Federal Code of Civil Procedure was being amended to permit class actions in Mexico, a proposed bill and congressional declaration of purpose were submitted to the Senate that included the *opt-out* mechanism for class formation purposes.[35] However, once the Senate studied this bill, it resolved not to adopt the *opt-out* mechanism and to implement an *opt-in* mechanism instead. The decision of the

---

[33] *See* **JOAQUÍN MARTÍNEZ ALFARO,** TEORÍA DE LAS OBLIGACIONES 86 (2003). *See* attached as **CLA 25**. *See* **JAVIER MARTINEZ ALARCÓN,** TEORÍA GENERAL DE LAS OBLIGACIONES 36 (2000). *See* attached as **CLA 26.** *See* **RAMÓN SÁNCHEZ MEDAL,** DE LOS CONTRATOS CIVILES 27-28 (2010). *See* attached as **CLA 27.**

[34] *See* Federal Code of Civil Procedure [CFPC], *as amended*, Federal Official Gazette [DO], February 24, 1943 (Méx.), **art. 594**. *See* attached as **CLA 28.**

[35] S*ee* Bill and congressional declaration of purpose submitted by Senator Jesús Murillo Karam to the Senate on September 7, 2010. *See* attached as **CLA 29.**

**APP 0966**
App. 632

United Commissions of Government and Legislative Studies to modify the bill and to limit the formation of the plaintiff class only through an express statement of consent is consistent with Mexican law and with its domestic public order considerations, as explained herein.[36]

**39.** Article 594 of the Federal Code of Civil Procedure is a mandatory rule of procedure. In Mexico, rules of procedure are considered "of public order" and are not renounceable, as demonstrated by a judicial decision of the Third Collegiate Tribunal of the Sixth Circuit, which held that "*the rules of procedure cannot be waived because they are of public order, hence, a judgment holding that such rules can be unobserved for equitable reasons is an incorrect juridical ruling.*"[37]

**40.** Under Article 594 of the Federal Code of Civil Procedure, based on public order considerations, a Mexican judge cannot assume jurisdiction over plaintiffs who did not expressly agree to be a part of class. Therefore, under Articles 564 and 571(III) of said Code, the enforcing judge in Mexico cannot recognize the jurisdiction that the U.S. Court in this action would assume over the individuals and corporations domiciled in Mexican territory and who would become part of the plaintiff class through silence and by virtue of an *opt-out* mechanism. The jurisdiction of the U.S. Court assumed through an *opt-out* mechanism would be incompatible with, and dissimilar to, the mandatory *opt-in* jurisdictional rule regulating class actions in Mexico. Hence, a Mexican judge could not recognize and enforce such a judgment in Mexico.

**41.** Finally, the reasoning above is not altered by the fact that the potential class members domiciled in Mexico had previously submitted a claim to the Receiver appointed in *SEC v. Stanford Int'l Bank Ltd., et al.*, Civil Action No. 3-09-CV-0298N, which is an entirely different action before the U.S. District Court of the Northern District of Texas, Dallas Division. The fact that these potential class members in this

---

[36] *See* the ruling submitted by the Government and Legislative Studies United Commissions to the Senate on December 9, 2010. *See* attached as **CLA 30**.

[37] *See* **PROCEDURAL RULES. THEY CANNOT STOP BEING OBSERVED FOR REASONS OF EQUITY. (LEGISLATION OF THE STATE OF PUEBLA).** Third Collegiate Court of the Sixth Circuit. Judicial Weekly of the Federation, Eight Epoch, Volume V, Second Part-1, January-June, 1990, Page 304 (Mex). *See* attached as **CLA 31**.

**APP 0967**

App. 633

case submitted claims to the Receiver in an altogether different action does not imply a written or tacit consent to participate as a class member in this case.

## IV.  CONCLUSION

**42.** Based on public order considerations, and  the constitutional law principles and judicial criteria of the Highest Courts in Mexico explained herein, and based on Articles 12, 13 and 1803 of the Federal Civil Code and Articles 564, 569, 571(III), 578 and 594 of the Federal Code of Civil Procedure, I conclude that any judgment issued in Civil Action No. 3:09-cv-01600 would be neither recognized nor executed by a court in Mexico against the interests of class members domiciled in Mexico.

* * * * *

I declare, under penalty of perjury under the laws of the United States of America, that all the foregoing is, in my opinion, true and correct.  Executed on February 13, 2015.

Dr. Claus von Wobeser, Esq.

15

# Exhibit A

EXHIBIT "A"

## STATEMENT OF QUALIFICATIONS OF
## DR. CLAUS VON WOBESER

Dr. Claus von Wobeser is the managing partner of the law firm "Von Wobeser y Sierra S.C." in Mexico City.

He has practiced law in Mexico for more than 35 years and has been a Professor of Law at several of the most recognized law schools in Mexico teaching, among other subjects, Constitutional Law and International Commercial Arbitration. He currently teaches post graduate courses in International Commercial Arbitration at the *Escuela Libre de Derecho* in Mexico.

His expertise in dispute resolution matters is internationally acknowledged and he has been invited to speak at numerous conferences all over the world. He has litigated a wide variety of cases before Mexican Courts, and he has acted as advisor or as an expert on Mexican law in judicial proceedings followed before the Courts of other countries.

After receiving his law degree from the *Escuela Libre de Derecho* in Mexico in 1979, he went on to study his doctorate in International and European Law in *Universidad de Droit, d'Economie et de Sciences Sociales de Paris*, which he received in 1983.

From 2006 to present he has been a Vice-President of the Court of International Arbitration of the International Chamber of Commerce, and he is currently President of the Arbitration Commission Mexican Chapter of the International Chamber of Commerce. He has been Sole Arbitrator, Co-Arbitrator and Chairman of Arbitral Tribunals in many arbitration cases, most of them related to international commercial law. He has also served as consultant to many private and governmental organizations in the matters of comparative law, international commercial law and other areas. He has been a member of, among other organizations, the consulting Committee on Private Dispute Resolutions of the North America Free Trade Agreement, and the Advisory Council of the Commercial Practice Section of the Ministry of Commerce and Industrial Development in Mexico.

Dr. von Wobeser has written many articles on a wide range of legal topics, which have been published in various magazines and journals in Mexico, Latin America, the USA and several European Member States.

EXHIBIT "A" (CONT.)

## CURRICULUM VITAE

## CLAUS VON WOBESER

Von Wobeser y Sierra, S.C.
G. Gonzalez Camarena 1100, 7th floor,
Col. Santa Fe Centro de Ciudad,
C.P.01210 Mexico, D.F.
Tels. (5255) 52 58 1011 and (5255) 52 58 1012
Fax: (5255) 52 58 1098 and (5255) 5258 1099
E-mail: cvonwobeser@ vwys.com.mx
Nationality:          Mexican
Date of Birth:        ███████ 1954
Present Position:     Managing Partner, Von Wobeser y Sierra, S.C.
Languages:            Spanish, English, German and French

EDUCATION

- Law Degree (J.D. equivalent), Escuela Libre de Derecho (ELD), Mexico City, 1979.

- Doctorate of Law in Commercial and European Law Studies (Ph.D. equivalent), Université de Droit, d´Economie et de Sciences Sociales de Paris (Paris 2), Paris, 1983.

DISPUTE RESOLUTION EXPERIENCE

| | |
|---|---|
| • Member of the Court of Arbitration of the ICC | 1982-1988 |
| • President Arbitration Commission Mexican Chapter I.C.C. | 1987 to present |
| • Member Consulting Committee on Private Dispute Resolutions of NAFTA | 1994-2000 |
| • Fellow of the Chartered Institute of Arbitrators. | 1998 to present |
| • Member LCIA Latin American Council | 1998 - 2009 |
| • Member of the Mexican Institute of Mediation | 2000 to present |
| • Chair Mediation Sub Committee of the I.B.A. | 2003 – 2004 |

- Member Board of Directors AAA        2003 to present

- Co-Chair Arbitration Committee        2005 - 2006
of the International Bar Association

- Vice Chairman ICC Court of Arbitration        2006 to present

- Has acted as *ad hoc* judge of the Interamerican Human Rights Court.

- Has acted as counsel to claimants and defendants in various types of judicial proceedings in Mexico involving civil, commercial, administrative and constitutional law disputes. He has acted before federal and domestic Courts, and has acted before the Mexican Supreme Court of Justice in several occasions.

- Has represented many Mexican and foreign companies in important international arbitrations as per the rules of the ICC, AAA, UNCITRAL Arbitration Rules, ICSID, NAFTA and Mex.-Spain Bilateral Investment Treaty.

- Has acted as expert witness on Mexican and International Law in several international arbitrations as well as in U.S. and English Courts.

- Has served as arbitrator under the rules of the ICC, AAA, ICDR, Inter-American Commercial Arbitration Commission, NAFTA Chapter XI, ICSID and ICSID Additional Facility Mechanism, Hong Kong International Arbitration Centre, LCIA, Energy Charter Treaty, Stockholm Chamber of Commerce and the Permanent Court of Arbitration.

- Designated to serve on the Panel of Arbitrators of ICSID by the Chairman of the Administrative Council.

CAREER

- Law Clerk in the Legal Department        1975 - 1977
of Union Carbide Mexicana, S.A.

- Law Clerk and Attorney with the        1977 - 1980
Mexican law firm of Goodrich,
Riquelme and Associates

- Managing Partner of the Paris office of        1980 - 1983
Goodrich, Riquelme and Associates, and
Representative of the Association of
Latin American law firms of "Bomchil,
Castro, Goodrich, Claro, Arosemena and

Associates"

- Partner of the law firm of Goodrich                    1983 - 1985
  Riquelme and Associates, in Mexico

- Managing Partner of the law firm Von                   1986 to present
  Wobeser & Sierra, S.C., in México

- President of the Mexican Bar Association               2001 – 2003

# Exhibit B

APP 0974
App. 640

EXHIBIT "B"

LIST OF DOCUMENTS REVIEWED IN ORDER TO ISSUE THE LEGAL
OPINIONS CONTAINED IN THE DECLARATION OF DR. CLAUS VON
WOEBSER, ESQ.

The following documents were reviewed in order to issue the legal opinions
contained in the declaration of Dr. Claus von Wobeser, Esq.

| Doc No. | Description |
|---------|-------------|
| 1 | Plaintiff's Second Amended Class Action Complaint filed on October 9, 2009 |
| 2 | Declaration of Mr. Felipe Torres executed on October 24, 2014. |
| 3 | Declaration of Professor Alejandro M. Garro executed in New York on October 30, 2014 |
| 4 | Plaintiff's Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel dated October 31, 2014. |

# Exhibit C

**APP 0976**
App. 642

EXHIBIT "C"

COMPENDIUM OF LEGAL AUTHORITIES ("CLA") CITED IN THE DECLARATION
OF DR. CLAUS VON WOEBSER, ESQ.

For the Court's convenience, along with each authority included in this Compendium
there is an English translation of such authority.

| CLA No. | Description of Authority |
|---------|--------------------------|
| CLA 1 | Commerce Code [CC], *as amended*, Federal Official Gazette [DO], December 13, 1889 (Méx.), art. 1049. |
| CLA 2 | Commerce Code [CC], *as amended*, Federal Official Gazette [DO], December 13, 1889 (Méx.), art. 75. |
| CLA 3 | Commerce Code [CC], *as amended*, Federal Official Gazette [DO], December 13, 1889 (Méx.), art. 76. |
| CLA 4 | MERCANTILE CONTRACTS. THE MANNER TO ESTABLISH WHEN PARTES ARE IN PRESENCE OF OBLIGATIONS OF SUCH NATURE. Second Collegiate Tribunal of the Third Circuit, Judicial Weekly of the Federation, Ninth Epoch, Volume XXIV, July of 2006, Page 1176 (Méx) |
| CLA 5 | VICENTE FERNÁNDEZ FERNÁNDEZ, DERECHO PROCESAL MERCANTIL 11-13 (2010). |
| CLA 6 | Federal Civil Code [CCF], *as amended*, Federal Official Gazette [DO], May 26, July 14, August 3 and 31, 1928 (Méx.), art. 1910. |
| CLA 7 | Federal Civil Code [CCF], *as amended*, Federal Official Gazette [DO], May 26, July 14, August 3 and 31, 1928 (Méx.), art. 2628. |
| CLA 8 | Political Constitution of the United Mexican States [Const.], as amended, Federal Official Gazette [D.O.], February 5, 1917 (Mex.), art. 17 |
| CLA 9 | Federal Code of Civil Procedure [CFPC], *as amended*, Federal Official Gazette [DO], February 24, 1943 (Méx.), art. 578. |
| CLA 10 | Federal Code of Civil Procedure [CFPC], as amended, Federal Official Gazette [DO], February 24, 1943 (Méx.), art. 569. |

| CLA No. | Description of Authority |
|---------|-------------------------|
| CLA 11 | Federal Code of Civil Procedure [CFPC], as amended, Federal Official Gazette [DO], February 24, 1943 (Méx.), art. 564. |
| CLA 12 | Federal Code of Civil Procedure [CFPC], as amended, Federal Official Gazette [DO], February 24, 1943 (Méx.), art. 571. |
| CLA 13 | FOREIGN JUDGMENTS (LEGISLATION OF VERACRUZ). Auxiliary Chamber of the Supreme Court of Justice [S.C.J.N.] [Auxiliary Chamber] Judicial Weekly of the Federation, Fifth Epoch, Volume CXIV, October, 29152, Page 153 (Méx). |
| CLA 14 | Constitución Política de los Estados Unidos Mexicanos [Const.], as amended, Diario Oficial de la Federación [D.O.], 5 de febrero de 1917 (Mex.), art. 14. |
| CLA 15 | PUBIC ORDER, LAWS OF. Third Chamber of the Supreme Court of Justice [S.C.J.N] [Third Chamber] Judicial Weekly of the Federation, Fifth Epoch, Volume XXXVII, March 30, 1933, Page 1835 (Mex). |
| CLA 16 | PUBLIC ORDER LAWS. Auxiliary Chamber of the Supreme Court of Justice [S.C.J.N.] [Auxiliary Chamber] Judicial Weekly of the Federation, Fifth Epoch, Volume CXX, 1954, Page 590 (Méx). |
| CLA 17 | CARLOS ARELLANO GARCÍA, DERECHO INTERNACIONAL PRIVADO 931, 934 (2011). |
| CLA 18 | FREEDOM OF CHOICE. IT IS A PRINCIPLE OF CONSTITUTIONAL RANK. First Chamber of the Supreme Court of Justice [S.C.J.N.] [First Chamber] Judicial Weekly of the Federation, Tenth Epoch, Book 13, Volume I, December 2014, Page 219 (Méx). |
| CLA 19 | Federal Civil Code [CCF], as amended, Federal Official Gazette [DO], May 26, July 14, August 3 and 31, 1928 (Méx.), art. 12. |
| CLA 20 | Federal Civil Code [CCF], as amended, Federal Official Gazette [DO], May 26, July 14, August 3 and 31, 1928 (Méx.), art. 13. |
| CLA 21 | Federal Civil Code [CCF], as amended, Federal Official Gazette [DO], May 26, July 14, August 3 and 31, 1928 (Méx.), art. 1803 |

2

| CLA No. | Description of Authority |
|---------|--------------------------|
| CLA 22 | ABSOLUTE NULITY AND NONEXISTENCE. THEIR DIFFERENCES ARE ONLY CONCEPTUAL AND SIMPLY THEORETICAL, AND THEIR PENALTIES ARE SIMILAR. Third Chamber of the Supreme Court of Justice [S.C.J.N.] [Third Chamber] Judicial Weekly of the Federation, Seventh Epoch, Volume 205-216, Fourth Part, Page 116 (Méx). |
| CLA 23 | INSURANCES. ARTICLE 45 OF THE INSURANCE CONTRACT LAW, REGARDING THE NULITY IT PROVIDES, APPLIES TO BOTH GOOD'S INSURANCE AND LIFE INSURANCE. Third Chamber of the Supreme Court of Justice [S.C.J.N.] [Third Chamber], Judicial Weekly of the Federation, Sixth Epoch, Volume XI, Fourth Part, Page 170 (Méx). |
| CLA 24 | CONTRACTUAL SILENCE. ITS MEANING AND SCOPE. Eight Collegiate Court in Civil Matters of the First Circuit. Judicial Weekly of the Federation and its Gazette, Tenth Epoch, Book IX, June 2012, Page 913 (Mex). |
| CLA 25 | JOAQUÍN MARTÍNEZ ALFARO, TEORÍA DE LAS OBLIGACIONES 86 (2003). |
| CLA 26 | JAVIER MARTINEZ ALARCÓN, TEORÍA GENERAL DE LAS OBLIGACIONES 36 (2000). |
| CLA 27 | RAMÓN SÁNCHEZ MEDAL, DE LOS CONTRATOS CIVILES 27-28 (2010). |
| CLA 28 | Federal Code of Civil Procedure [CFPC], as amended, Federal Official Gazette [DO], February 24, 1943 (Méx.), art. 594. |
| CLA 29 | Bill and congressional declaration of purpose submitted by Senator Jesús Murillo Karam to the Senate on September 7, 2010. |
| CLA 30 | Ruling submitted by the Government and Legislative Studies United Comissions to the Senate on December 9, 2010. |
| CLA 31 | PROCEDURAL RULES. THEY CANNOT STOP BEING OBSERVED FOR REASONS OF EQUITY. (LEGISLATION OF THE STATE OF PUEBLA). Third Collegiate Court of the Sixth Circuit. Judicial Weekly of the Federation, Eight Epoch, Volume V, Second Part-1, January-June, 1990, Page 304 (Mex). |

3

CLA 1

| Spanish | English |
|---|---|
| "**Artículo 1049**.- Son juicios mercantiles los que tienen por objeto ventilar y decidir las controversias que, conforme a los artículos 4o., 75 y 76, se deriven de los actos comerciales." | **Article 1049**.- Commercial trials are those that resolve disputes that, in accordance with Articles 4o., 75 and 76, derive from acts of commerce. |

4

CLA 2

| Spanish | English |
|---|---|
| "**Artículo 75**.- La ley reputa actos de comercio:<br>I.- Todas las adquisiciones, enajenaciones y alquileres verificados con propósito de especulación comercial, de mantenimientos, artículos, muebles o mercaderías, sea en estado natural, sea después de trabajados o labrados;<br>II.- Las compras y ventas de bienes inmuebles, cuando se hagan con dicho propósito de especulación comercial;<br>III.- Las compras y ventas de porciones, acciones y obligaciones de las sociedades mercantiles;<br>IV.- Los contratos relativos y obligaciones del Estado ú otros títulos de crédito corrientes en el comercio;<br>V.- Las empresas de abastecimientos y suministros;<br>VI.- Las empresas de construcciones, y trabajos públicos y privados;<br>VII.- Las empresas de fábricas y manufacturas;<br>VIII.- Las empresas de trasportes de personas o cosas, por tierra o por agua; y las empresas de turismo;<br>IX.- Las librerías, y las empresas editoriales y tipográficas;<br>X. Las empresas de comisiones, de agencias, de oficinas de negocios comerciales, casas de empeño y establecimientos de ventas en pública almoneda;<br>XI.- Las empresas de espectáculos públicos;<br>XII.- Las operaciones de comisión mercantil; | **Article 75**. The law considers acts of commerce:<br>I. All acquisitions, disposals and rentals done for the purpose of commercial speculation, of maintenance, items, furniture or goods, either in their natural state, or after having been worked or manufactured;<br>II. Purchases and sales of real estate, when made for such purpose of commercial speculation;<br>III. Purchases and sales of parts, shares and bonds of corporations;<br>IV. Credit contracts relating, State obligations or other instruments of credit in stream of commerce;<br>V. Supplies and provisions companies;<br>VI Construction, and public and private works companies;<br>VII. Factoring and manufacturing companies;<br>VIII. Companies for the transportation of persons or things, by land or water; and tourism companies;<br>IX. Libraries, and publishing and typographical companies;<br>X. Committees Companies, agencies, commercial businesses offices, pawn shops and establishments of sales by public auction;<br>XI. Public entertainment companies;<br>XII. Commercial commission operations;<br>XIII.- Mediation in commercial business transactions; |

5

| | |
|---|---|
| XIII.- Las operaciones de mediación de negocios mercantiles;<br>XIV.- Las operaciones de bancos;<br>XV.- Todos los contratos relativos al comercio marítimo y a la navegación interior y exterior;<br>XVI.- Los contratos de seguros de toda especie;<br>XVII.- Los depósitos por causa de comercio;<br>XVIII.- Los depósitos en los almacenes generales y todas las operaciones hechas sobre los certificados de depósito y bonos de prenda librados por los mismos;<br>XIX.- Los cheques, letras de cambio o remesas de dinero de una plaza a otra, entre toda clase de personas;<br>XX.- Los vales ú otros títulos a la orden o al portador, y las obligaciones de los comerciantes, a no ser que se pruebe que se derivan de una causa extraña al comercio;<br>XXI.- Las obligaciones entre comerciantes y banqueros, si no son de naturaleza esencialmente civil;<br>XXII.- Los contratos y obligaciones de los empleados de los comerciantes en lo que concierne al comercio del negociante que los tiene a su servicio;<br>XXIII.- La enajenación que el propietario o el cultivador hagan de los productos de su finca o de su cultivo;<br>XXIV. Las operaciones contenidas en la Ley General de Títulos y Operaciones de Crédito;<br>XXV.- Cualesquiera otros actos de naturaleza análoga a los expresados en este código.<br>En caso de duda, la naturaleza comercial del acto será fijada por arbitrio judicial." | XIV.- Bank operations;<br>XV. All contracts relating to maritime commerce and domestic and foreign navigation;<br>XVI. Insurance contracts of all kinds;<br>XVII. Deposits related to trade;<br>XVIII. Deposits in General Warehouses and all transactions made on certificates of deposit and pledge bonds issued by them;<br>XIX. Checks, bills of exchange or remittances of money from one place to another, among all sorts of people;<br>XX. Vouchers or other instruments to order or to bearer, and traders obligations, unless it is proved they arise from a cause different to trade;<br>XXI. Obligations between traders and bankers, if they do not have an essentially civil nature;<br>XXII. Contracts and obligations of employees of the traders in regard to the business of the trader who has them in his service;<br>XXIII.- The transfer of property by the owner or farmer of the products of their farm or crops;<br>XXIV. The operations contained in the General Law of Negotiable Instruments and Credit Transactions;<br>XXV. Any other acts of a similar nature to those expressed in this Code.<br>In case of doubt, the commercial nature of the act shall be determined by judicial discretion. |

6

APP 0982<br>App. 648

CLA 3

| Spanish | English |
|---|---|
| "**Artículo 76**.- No son actos de comercio la compra de artículos o mercaderías que para su uso o consumo, o los de su familia, hagan los comerciantes: ni las reventas hechas por obreros, cuando ellas fueren consecuencia natural de la práctica de su oficio." | **Article 76**. The purchase of goods or merchandise done by merchants for their use or consumption, or that of their family, are not acts of commerce: neither the resale made by workers when it is a natural consequence of the practice of their profession. |

APP 0983
App. 649

CLA 4

| Spanish | English |
|---|---|
| "Época: Novena Época<br>Registro: 174761<br>Instancia: Tribunales Colegiados de Circuito<br>Tipo de Tesis: Aislada<br>Fuente: Semanario Judicial de la Federación y su Gaceta<br>Tomo XXIV, Julio de 2006<br>Materia(s): Civil<br>Tesis: III.2o.C.118 C<br>Página: 1176 | Epoch: Ninth Epoch<br>Registry: 174761<br>Instance: Collegiate Circuit Courts<br>Type of Precedent: Isolated<br>Source: Judicial Weekly of the Federation<br>Volume XXIV, July 2006<br>Matter(s): Civil<br>Precedent: III.2o.C.118 C<br>Page: 1176 |
| **CONTRATOS MERCANTILES. FORMA DE ESTABLECER QUE SE ESTÁ EN PRESENCIA DE OBLIGACIONES DE TAL NATURALEZA.** | **MERCANTILE CONTRACTS. THE MANNER TO ESTABLISH WHEN PARTES ARE IN PRESENCE OF OBLIGATIONS OF SUCH NATURE.** |
| Para poder definir cuándo un contrato es de naturaleza civil o mercantil, debe tenerse en cuenta que el Código de Comercio define al derecho mercantil desde una concepción objetivista, esto es, lo define a partir de los actos que la propia norma cataloga como comerciales y no necesariamente en función de los sujetos que los desarrollan (comerciantes). El mencionado cuerpo de leyes, en su artículo 75, enumera en veinticuatro fracciones, los actos que considera mercantiles, a los que clasifica como tales ya sea por el objeto, por los sujetos que intervienen o por la finalidad que se persigue con su realización, y, en su fracción XXV, precisa que serán mercantiles cualesquiera otros actos de naturaleza análoga a los expresados en ese código, concluyendo que, en caso de duda, la naturaleza comercial del acto | To define when a contract is of a civil or commercial nature, it should be kept in mind that the Commercial Code defines commercial law from an objective point of view, ie it defines it from acts that the rule itself categorizes as commercial and non-necessarily based on the subjects that perform them (traders). The mentioned Code, in Article 75, enumerates in twenty-four fractions, the acts it considers commercial, which it classifies as such either by the object, persons involved or the intended purpose of execution, and, fraction XXV, establishes that any other acts of a similar nature to those expressed in the code will be commercial, concluding that, in case of doubt, the commercial nature of the act shall be determined by judicial discretion. The enumeration |

8

**APP 0984**<br>App. 650

será fijada por arbitrio judicial. La enumeración que se hace en el artículo 75 del Código de Comercio, comprende una gran variedad de actos cuya naturaleza deriva de distintas razones, por lo cual, no es posible obtener una definición única de acto de comercio, al igual que tampoco puede darse un concepto unitario de contrato mercantil; luego, dado que el único rasgo que identifica a los actos de comercio, es que lo son, por disposición expresa del legislador, para establecer cuándo se está en presencia de obligaciones de esa naturaleza, deberá indagarse si el acto jurídico en cuestión encuadra en aquellos que el legislador catalogó expresamente como actos de comercio. De donde se sigue, que deben calificarse como contratos mercantiles todas las relaciones jurídicas sometidas a la ley comercial; lo que implica, que serán mercantiles los contratos, aun cuando el acto sea comercial sólo para una de las partes, tal como se preceptúa en el artículo 1050 del código en consulta.

contained in Article 75 of the Commercial Code, includes a variety of acts which nature derives from different reasons, so it is not possible to obtain a single definition of an act of commerce, as an equally unitary concept of commercial contract cannot be given; then, since the only feature that identifies commercial acts is that they are so, by express provision of the legislature, to determine when you are in the presence of such obligations, it should be analyzed whether the legal act in question falls within those that the legislature expressly categorized as acts of commerce. Whence it follows, all legal relationships under commercial law should be qualified as commercial contracts; implying that contracts will be commercial, even if the act is commercial only for one party, as is established in Article 1050 of the aforementioned Code..

SEGUNDO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL TERCER CIRCUITO.
Amparo directo 50/2006. Desarrollos Turísticos de Manzanillo, S.A. de C.V. 17 de febrero de 2006. Unanimidad de votos. Ponente: Gerardo Domínguez. Secretario: Jair David Escobar Magaña.

SECOND COLLEGIATE TRIBUNAL OF THE THIRD CIRCUIT.
Direct Amparo 50/2006. Desarrollos Turísticos de Manzanillo, S.A. de C.V. February 17, 2006. Unanimity of votes. Rapporteur: Gerardo Domínguez. Secretary: Jair David Escobar Magaña.

9

CLA 5

| Spanish | English |
|---|---|
| VICENTE FERNÁNDEZ FERNÁNDEZ, DERECHO PROCESAL MERCANTIL 11-13 (2010). | VICENTE FERNÁNDEZ FERNÁNDEZ, DERECHO PROCESAL MERCANTIL 11-13 (2010). |
| "…Delimitación de la Materia Procesal Mercantil<br>El delimitar la materia procesal mercantil es de vital importancia en especial para distinguir y encaminar un proceso regido por las leyes procesales mercantiles y no por las civiles, sobre todo por la íntima relación existente entre una y otra. Ahora bien, aquí se plantea el análisis de las normas que regularán el procedimiento, es decir, si será un proceso mercantil o uno civil, ello dependiendo del derecho sustancial aplicable al caso concreto. | Delimitation of the Commercial Procedural Matters<br>Delimitating commercial litigation matters is vital especially to distinguish and lead a proceeding governed by commercial procedural law and not by civil law, particularly because of the close relationship between them. Now, here the analysis of the rules governing the procedure, i.e. whether it will be a commercial or a civil proceeding is presented, this depending on the substantive law applicable to the case. |
| 1. Criterio Subjetivo.<br>La doctrina intenta explicar la delimitación de la materia procesal mercantil, mediante tres criterios, siendo el primero de ellos el criterio subjetivo, que se refiere a la calidad de los sujetos que celebraron el acto jurídico del cual emana el litigio, en este caso, cuando tienen el carácter de comerciantes. Ahora bien, determinar qué personas tienen el carácter de comerciantes, es otro problema que nuestro Código de Comercio intenta resolver, estableciendo una presunción en el sentido de reputar o considerar comerciantes, para efectos legales, a: i) las personas que ejercen el comercio como ocupación ordinaria; ii) las sociedades constituidas conforme a las leyes mercantiles, es decir, bajo alguna de las formas reguladas por la Ley | 1. Subjective criterion<br>Scholars try to explain the definition of commercial procedural matters, by three criteria, being the first one being the subjective criterion, which refers to the quality of the individuals who executed the legal act from which the proceeding emanates, in this case, when they have the nature of traders. Now, to determine who has the character of a merchant, is another problem that our Commerce Code tries to solve, establishing a presumption consisting in classifying or considering traders, for legal purposes: i) people who engage in trade as their ordinary occupation; ii) companies incorporated under commercial law, i.e. under any of the forms regulated by the General Law of Business Corporations and; iii) |

10

General de Sociedades Mercantiles y; iii) las sociedades extranjeras o sus agencias y sucursales que realicen actos de comercio. De este primer criterio, es de observarse que salvo el caso de las sociedades mercantiles, serán comerciantes todos los que realicen actos de comercio como ocupación cotidiana u ordinaria, desembocando en el segundo criterio.

2. Criterio Objetivo.
El criterio objetivo tiene su explicación en el objeto o acto del cual surge el litigio, es decir, que emane de un acto de comercio, originándose el problema de que no existe doctrinariamente un concepto completo de acto de comercio.

Desde el punto de vista objetivo […] los actos de comercio se califican como tales atendiendo a las características inherentes de los mismos, sin importar la calidad de los sujetos que lo realizan y […] el acto será mercantil o de comercio, cuando lo ejecute un comerciante, llegando al lugar común o más bien circulo vicioso en el que comerciante es quien realiza actos de comercio y actos de comercio los que realizan los comerciantes. Por ello, es acertada la aseveración de […] que aun cuando todos los legisladores han desistido del propósito de dar una definición de acto de comercio, probablemente por reputarla imposible, muchos ambiciosos mercantilistas se han propuesto reducir a unidad la variada congerie de los declarados por las leyes actos de comercio, y han creído encontrar un concepto al cual reducir todos", y después de un análisis realizado por dicho jurista, concluye

foreign corporations or their agencies and branches that execute acts of trade. Regarding this first criterion it is to be noted that except in the case of corporations, anyone who executes acts of trade every day or as an ordinary occupation will be a trader, leading to the second criterion.

2. Objective criterion.
The objective criterion is explained by the object or act from which the dispute arises, ie emanating from a commercial act, giving rise to the a problem that a complete doctrinal interpretation of an act of commerce does not exist. .

From an objective point of view [...] commercial transactions qualify as such in response to the inherent characteristics of the same, no matter the quality of the individuals who perform them and [...] the act is commercial or trade when executed by a merchant, leading to the same or rather vicious circle in which dealer is who performs acts of trade and commercial transactions are performed by the merchants. Therefore, it is correct in its assertion [...] that even if all lawmakers have abandoned the purpose of giving a definition of act of commerce, probably because they consider it impossible, many ambitious mercantilist have proposed to unify the varied classes of declared by law acts of commerce, and have believed to find a concept which reduces all ", and after an analysis by said jurist, he

11

que "resulta claramente que no es posible en el estado actual de la ciencia jurídica, un concepto unitario del acto de comercio.

Efectivamente, no podemos llegar a encerrar los actos de comercio en una definición, sino simplemente considerar qué actos la ley considera como tales; así, en nuestro derecho, el artículo 75 del Código de Comercio proporciona una lista de las actividades que precisamente el legislador determinó debían considerarse o reputarse como actos de comercio, lista que se ha ido extendiendo a lo largo del tiempo, tratando de adecuarse a la realidad social […], siendo necesario destacar que la última fracción (XXV) deja claro que no es una relación limitativa, sino solamente enunciativa, debido a que queda abierta la posibilidad de considerar actos de comercio a "cualesquiera otros actos de naturaleza análoga a los expresados en este código", pero solamente será el juzgador el que tenga la facultad o potestad de resolver, si un acto que no esté expresamente contenido o descrito en alguna de las XXIV fracciones del referido artículo 75, será considerado como mercantil o de comercio, tal y como se prescribe en el párrafo final de dicho precepto legal. En el artículo 76 del mismo ordenamiento jurídico, se establece un caso de excepción, referido al hecho de que no todos los actos que realicen los comerciantes serán actos de comercio, sino que queda exceptuada la compra de artículos o mercancías

concludes that" it is clear that it is not possible in the current state of legal science, a unitary concept the act of commerce.

Indeed, we cannot get to enclose acts of commerce in a definition, but simply consider what acts the law deems as such; so, in our law, Article 75 of the Commercial Code provides a list of the activities determined precisely by the legislature that should be considered or regarded as acts of commerce, list that has spread over time, trying to adapt to the social reality [...], being necessary to emphasize that the last subsection (XXV) makes clear that it is not an exhausting list, but only enunciative, because the possibility of considering acts of commerce "any other acts of a similar nature to the ones expressed in this code" remains open, but the judge will be the only one with the authority or power to decide, if an act that is not expressly contained or described in any of the XXIV fractions of the said Article 75, shall be considered as an act of commerce or trade as prescribed in the final paragraph of that legal precept. Article 76 of the same law, provides an exception, based on the fact that not all acts performed by traders will be acts of trade, excluding the purchase of items or goods purchased for their use or consumption, i.e. not purchased in order to trade with such products.

12

adquiridas para su uso o consumo, esto es, que no se adquieran con la finalidad de especular con tales productos.

[…] clasifica los actos mercantiles en: 1.- Actos absolutamente mercantiles (siempre y necesariamente están regidos por el derecho mercantil) y 2.- actos de mercantilidad condicionada (no son esencialmente civiles o mercantiles, sino que dependerá de las circunstancias en que se realicen), los cuales a su vez pueden ser a) actos principales de comercio, atendiendo al sujeto, al fin o al objeto de dicho acto y, b) actos accesorios o conexos, es decir, que dependerán de la relación que tengan con otro acto que por sí mismo haya adquirido el carácter de mercantil.

3. Los Actos Mixtos

Finalmente, el tercer criterio se refiere al llamado acto mixto o unilateralmente mercantil, es decir, que un acto pueda ser considerado como civil para una parte y mercantil para la otra, criterio que recoge y resuelve el artículo 1050 del Código de Comercio, en el sentido de que cuando se actualice ese supuesto, la controversia que de dicho acto se derive "se regirá conforme a las leyes mercantiles". Un caso donde suele presentarse comúnmente ese problema, es tratándose del contrato de compraventa, operación que será calificada de mercantil o no, atendiendo a la intención o finalidad de los contratantes, de la cosa vendida y de la calidad de las partes, pero si para una de ellas, el acto es mercantil, el proceso deberá de ser mercantil y no civil, resolviendo el probable conflicto de determinar que legislación procesal

[...] Classifies commercial acts in: 1. Absolutely-commercial acts (provided they are necessarily governed by commercial law) and 2. Commercially conditional acts (not essentially civil or commercial, but will depend on the circumstances in which are executed), which in turn can be a) main acts of trade, considering the subject, the purpose or object of the act and, b) acts accessories or related, i.e. they depend on the relation they have with other act which itself has acquired the status of commercial.

3. Mixed Acts

Finally, the third criterion concerns the so-called mixed or unilaterally commercial act, i.e. an act to be considered civil to one party and commercial for the other, criterion that collects and solves Article 1050 of the Commercial Code, in the sense that when this scenario presents, the controversy arising from such act "shall be governed by commercial law". One case where this issue usually arises, is the case of the purchase agreements, contracts that will be classified as commercial or not, based on the intent or purpose of the parties, of the thing sold and the quality of the parts, but if for one of them, the act is commercial, the proceeding will be commercial and not civil, solving the conflict to determine which procedural law applies, whether civil or commercial. The problem that may be pending, is the one regarding which substantive rules will the judge apply, i.e., whether civil or commercial

13

aplicar, si la civil o la mercantil. El problema que quizás quede en suspenso, es respecto a qué normas sustantivas aplicará el juzgador, es decir, si las normas civiles o mercantiles, […] aplicar la regla al fondo mercantil o civil a los actos mixtos no presentará dificultades especiales cuando la materia en disputa sólo está regulada en la legislación civil o mercantil. Se aplicará la regulación jurídica existente…En el caso de duplicidad de regulación, el juez tendrá que decidirse por una u otra. Tal decisión será resultado de la aplicación de los artículos que regulan las lagunas legales.

Para concluir este punto, tenemos que un juicio será mercantil, cuando las partes sean comerciantes o el acto del que emane la controversia sea un acto de comercio o que lo sea solamente para una de las partes, tal y como lo refieren los artículos 1049 y 1050 del Código de Comercio, en relación con los artículo 4, 75 y 76 del mismo dispositivo legal. En consecuencia, desde el punto de vista de su significado gramatical, entendemos por juicios mercantiles aquellos en los que el juez conoce de una controversia entre partes para dictar sentencia sobre cuestiones relativas al sujeto comerciante, a mercancías o tratos comerciales…"

provisions, […] applying commercial or civil law to the substance of the dispute to mixed acts will not present special difficulties when the matter in dispute is only regulated in civil or commercial law. The existing legal regulation shall apply ... In the case of double regulation, the judge will have to decide on one or the other. This decision will result from the application of the articles governing loopholes.

To conclude this point, we find that a trial will be commercial, when the parties are merchants or the act from which the controversy emanates is an act of trade or it is so only for one party, as referred to in Articles 1049 and 1050 of the Commerce Code, in relation to Articles 4, 75 and 76 of said Code. Consequently, from the point of view of its grammatical meaning, we understand commercial trials as those in which the judge hears a dispute between parties to rule on questions relating to merchants, goods or commercial transactions.

APP 0990
App. 656

CLA 6

| Spanish | English |
|---|---|
| "**Artículo 1910**.- El que obrando ilícitamente o contra las buenas costumbres cause daño a otro, está obligado a repararlo, a menos que demuestre que el daño se produjo como consecuencia de culpa o negligencia inexcusable de la víctima." | **Article 1910**.- That who acting illegally or against good customs causes damage to another is obliged to repair it, unless he demonstrates that the damage was caused as a consequence of the fault or inexcusable negligence of the victim. |

15

CLA 7

| Spanish | English |
|---------|---------|
| "**Artículo 2688**.- Por el contrato de sociedad los socios se obligan mutuamente a combinar sus recursos o sus esfuerzos para la realización de un fin común, de carácter preponderantemente económico, pero que no constituya una especulación comercial. | **Article 2688**. By the contract of society the partners are mutually obliged to combine efforts and resources to achieve a common goal with a preponderant economic character, but without incurring in acts of commercial speculation." |

APP 0992
App. 658

CLA 8

| Spanish | English |
|---|---|
| "**Artículo 17**. […]<br>El Congreso de la Unión expedirá las leyes que regulen las acciones colectivas. Tales leyes determinarán las materias de aplicación, los procedimientos judiciales y los mecanismos de reparación del daño. <u>**Los jueces federales conocerán de forma exclusiva sobre estos procedimientos y mecanismos**</u>…" | **Article 17** […]<br>The Congress of the Union shall issue the laws that will govern class actions. Such laws **shall** determine the areas of application, court procedures and mechanisms for the compensation for damage. <u>**Federal judges will exclusively exercise jurisdiction over these procedures and mechanisms**</u> |

17

APP 0993

CLA 9

| Spanish | English |
|---------|---------|
| "**Artículo 578**.- La defensa y protección de los derechos e intereses colectivos será ejercida ante los Tribunales de la Federación con las modalidades que se señalen en este Título, y sólo podrán promoverse en materia de relaciones de consumo de bienes o servicios, públicos o privados y medio ambiente." | **Article 578**.- The defense and protection of collective rights and interests shall be exercised before the Courts of the Federation with the modalities indicated in this Title, and may only be promoted in consumption of goods or services relationships, public or private, and environment. |

18

CLA 10

| Spanish | English |
|---|---|
| "**Artículo 569**.- Las sentencias, los laudos arbitrales privados de carácter no comercial y demás resoluciones jurisdiccionales extranjeros tendrán eficacia y serán reconocidos en la República en todo lo que no sea contrario al orden público interno en los términos de este código y demás leyes aplicables, salvo lo dispuesto por los tratados y convenciones de los que México sea parte.<br>Tratándose de sentencias, laudos o resoluciones jurisdiccionales que sólo vayan a utilizarse como prueba ante tribunales mexicanos, será suficiente que los mismos llenen los requisitos necesarios para ser considerados como auténticos.<br>Los efectos que las sentencias, laudos arbitrales privados de carácter no comercial y resoluciones jurisdiccionales extranjeros produzcan en el territorio nacional, estarán regidos por lo dispuesto en el Código Civil, por este código y demás leyes aplicables." | **Article 569**. Judgments, private noncommercial arbitral awards and other foreign judicial rulings will be effective and recognized in the Republic in all that is not contrary to domestic public order in the terms of this code and other applicable law, except for the provisions of the treaties and conventions to which Mexico is a party.<br><br>In the case of judgments, awards or judicial rulings that are going to be used only as evidence in Mexican courts, it is sufficient that they fulfill the requirements to be considered authentic.<br><br>The effects that judgments, private non-commercial arbitration awards and foreign judicial decisions produce in the country, will be governed by the provisions of the Civil Code, by this code and other applicable laws. |

19

APP 0995<br>App. 661

CLA 11

| Spanish | English |
|---------|---------|
| "**Artículo 564**.- Será reconocida en México la competencia asumida por un tribunal extranjero para los efectos de la ejecución de sentencias, cuando dicha competencia haya sido asumida por razones que resulten compatibles o análogas con el derecho nacional, salvo que se trate de asuntos de la competencia exclusiva de los tribunales mexicanos." | **Article 564**.- The jurisdiction assumed by a foreign tribunal will be recognized in Mexico for the enforcement of the judgment when said jurisdiction was assumed for reasons that are compatible or analogous to national law, unless the cases in question are of the exclusive jurisdiction of Mexican Courts. |

20

APP 0996
App. 662

CLA 12

| Spanish | English |
|---|---|
| "**Artículo 571**.- Las sentencias, laudos arbitrales privados de carácter no comercial y resoluciones jurisdiccionales dictados en el extranjero, podrán tener fuerza de ejecución si cumplen con las siguientes condiciones: | **Article 571**. Judgments, private noncommercial arbitral awards and other foreign judicial rulings may be enforced if they comply with the following conditions: |
| I.- Que se hayan satisfecho las formalidades previstas en este Código en materia de exhortos provenientes del extranjero; | I. That the formalities prescribed in this Code for warrants from abroad have been complied with; |
| II.- Que no hayan sido dictados como consecuencia del ejercicio de una acción real; | II.- That they have not been issued as a consequence of the exercise of a real action; |
| III.- Que el juez o tribunal sentenciador haya tenido competencia para conocer y juzgar el asunto de acuerdo con las reglas reconocidas en el derecho internacional que sean compatibles con las adoptadas por este Código. El Juez o tribunal sentenciador extranjero no tiene competencia cuando exista, en los actos jurídicos de que devenga la resolución que se pretenda ejecutar, una cláusula de sometimiento únicamente a la jurisdicción de tribunales mexicanos; | III.- That the trial judge or court had jurisdiction to hear and rule the matter in accordance with the recognized rules of international law which are consistent with those adopted by this Code. The foreign trial court or judge has no jurisdiction when the legal acts underlying the judgment that is sought to be enforced include a clause surrendering to the jurisdiction of the Mexican tribunals only; |
| IV.- Que el demandado haya sido notificado o emplazado en forma personal a efecto de asegurarle la garantía de audiencia y el ejercicio de sus defensas; | IV.- That the defendant had been summoned or subpoenaed in person in order to ensure the right to a hearing and the exercise of his defenses; |
| V.- Que tengan el carácter de cosa juzgada en el país en que fueron dictados, o que no exista recurso ordinario en su contra; | V. That they have the force of res judicata in the country in which they were issued, or that there is no ordinary appeal against it; |
| VI.- Que la acción que les dio origen no sea materia de juicio que esté pendiente entre las mismas partes ante tribunales mexicanos y en el cual hubiere | VI. That the action that originated them is not pending between the same parties before Mexican court and in which the Mexican court had known before or at least that the warrant of letter rogatory to service notice had been processed |

21

| | |
|---|---|
| prevenido el tribunal mexicano o cuando menos que el exhorto o carta rogatoria para emplazar hubieren sido tramitados y entregados a la Secretaría de Relaciones Exteriores o a las autoridades del Estado donde deba practicarse el emplazamiento. La misma regla se aplicará cuando se hubiera dictado sentencia definitiva;<br>VII.- Que la obligación para cuyo cumplimiento se haya procedido no sea contraria al orden público en México; y<br>VIII.- Que llenen los requisitos para ser considerados como auténticos.<br>No obstante el cumplimiento de las anteriores condiciones, el tribunal podrá negar la ejecución si se probara que en el país de origen no se ejecutan sentencias o laudos extranjeros en casos análogos." | and delivered to the Ministry of Foreign Affairs or the authorities of the State where the service of notice should be done. The same rule will be applied when a final sentence has been issued;<br><br>VII.   That   the   obligation   whose fulfilment is being has proceeded is not contrary to public order in Mexico; and<br><br>VIII.- That the requirements to be considered authentic are met.<br>Despite the fulfilment of the foregoing conditions, the court may, however deny execution if it is proved that in the country of origin no foreign judgments or awards in similar cases are executed. |

22

APP 0998

CLA 13

| Spanish | English |
|---|---|
| "Época: Quinta Época<br>Registro: 341926<br>Instancia: Sala Auxiliar<br>Tipo de Tesis: Aislada<br>Fuente: Semanario Judicial de la Federación<br>Tomo CXIV<br>Materia(s): Civil<br>Tesis:<br>Página: 153 | Epoch: Fifth Epoch<br>Registry: 341926<br>Instance: Auxiliary Chamber<br>Type of Precedent: Isolated<br>Source: Judicial Weekly of the Federation<br>Volume CXIV<br>Matter(s): Civil<br>Precedent:<br>Page: 153 |
| **SENTENCIAS EXTRANJERAS (LEGISLACION DE VERACRUZ).** | **FOREIGN JUDGMENTS (LEGISLATION OF VERACRUZ).** |
| Para que una sentencia extranjera pueda producir efectos dentro del territorio veracruzano, se exige que la resolución se haya pronunciado en un juicio, y que en dicho juicio haya sido oída y vencida la parte en cuyo perjuicio se pretende que la sentencia extranjera, sea ejecutada por los tribunales nacionales. Esta interpretación de los artículos 447 y 451 del Código de Procedimientos Civiles, no sólo se apoya en el texto de tales principios, sino también en la aplicación de la Constitución Federal, señaladamente, en la garantía que consagra el artículo 14 constitucional. | In order for a foreign judgment to produce effects within the territory of Veracruz, it is required that the judgment was pronounced in a trial, and that in this trial the party against which the foreign judgments is intended to be enforced by national courts, had been heard and defeated. This interpretation of articles 447 and 451 of the Civil Procedures Code, not only relies on the text of such principles, but also in the implementation of the Federal Constitution, notably, the guarantee enshrined in article 14 of the Constitution. |
| Amparo civil directo 152/51. Hammoud Aly Bahija y coagraviado. 22 de octubre de 1952. Unanimidad de cinco votos. La publicación no menciona el nombre del ponente." | Direct Civil Amparo 152/51 Hammoud Aly Bahija and others. October 22, 2001. Unanimity of five votes. The publication does not mention the name of the rapporteur. |

23

CLA 14

| Spanish | English |
|---|---|
| "**Artículo 14.** A ninguna ley se dará efecto retroactivo en perjuicio de persona alguna.<br><br>Nadie podrá ser privado de la libertad o de sus propiedades, posesiones o derechos, sino mediante juicio seguido ante los tribunales previamente establecidos, en el que se cumplan las formalidades esenciales del procedimiento y conforme a las Leyes expedidas con anterioridad al hecho.<br><br>En los juicios del orden criminal queda prohibido imponer, por simple analogía, y aún por mayoría de razón, pena alguna que no esté decretada por una ley exactamente aplicable al delito de que se trata.<br><br>En los juicios del orden civil, la sentencia definitiva deberá ser conforme a la letra o a la interpretación jurídica de la ley, y a falta de ésta se fundará en los principios generales del derecho." | **Article 14.** No law shall have retroactive effects to the detriment of any person.<br><br>No one shall be deprived of freedom or property, possessions or rights without a trial before previously established courts in which due process is observed and in accordance with the laws enacted before the fact.<br><br>In criminal trials it is prohibited to impose, by simple analogy, or interpretation, any penalty not established by a law exactly applicable to the crime in question.<br><br>In civil actions, the final judgment must be in accordance with the letter or the legal interpretation of the law, and in the absence of such law, shall be based on general principles of law. |

24

CLA 15

| Spanish | English |
|---|---|
| "Época: Quinta Época<br>Registro: 362355<br>Instancia: Tercera Sala<br>Tipo de Tesis: Aislada<br>Fuente: Semanario Judicial de la Federación<br>Tomo XXXVII<br>Materia(s): Común<br>Tesis:<br>Página: 1835 | Epoch: Fifth Epoch<br>Registry: 362355<br>Instance: Third Chamber<br>Type of Precedent: Isolated<br>Source: Judicial Weekly of the Federation<br>Volume XXXVII<br>Matter(s): Common<br>Precedent:<br>Page: 1835 |
| **ORDEN PUBLICO, LEYES DE.**<br><br>El orden público que tiene en cuenta la ley y la jurisprudencia, para establecer una norma sobre las nulidades radicales, no puede estar constituido por una suma de intereses meramente privados; para que el orden público esté interesado, es preciso que los intereses de que se trate, sean de tal manera importantes, que, no obstante el ningún perjuicio y aun la aquiescencia del interesado, el acto prohibido pueda causar un daño a la colectividad, al Estado o a la nación. | **PUBIC ORDER, LAWS OF.**<br><br>The public order taken into account by the law and case law, to establish a standard regarding radical nullities, cannot be constituted by a sum of purely private interests; so, for public order to be involved, it is mandatory for the corresponding interests to be so important that, disregarding the lack of damage and even the acquiescence of the interested party, the forbidden act may cause damage to the community, the State or the nation. |
| Amparo civil directo 2785/31. Díaz Rubín Pedro y coagraviados. 30 de marzo de 1933. Unanimidad de cuatro votos. Ausente: Manuel Padilla. La publicación no menciona el nombre del ponente." | Direct Civil Amparo 2785/31 Díaz Rubín Pedro and others. March, 30, 1933. Unanimity of four votes. Absent: Manuel Padilla. The publication does not mention the name of the rapporteur. |

APP 1001<br>App. 667

CLA 16

| Spanish | English |
|---|---|
| "Época: Quinta Época<br>Registro: 340932<br>Instancia: Sala Auxiliar<br>Tipo de Tesis: Aislada<br>Fuente: Semanario Judicial de la Federación<br>Tomo CXX<br>Materia(s): Común<br>Tesis:<br>Página: 590 | Epoch: Fifth Epoch<br>Registry: 340932<br>Instance: Auxiliary Chamber<br>Type of Precedent: Isolated<br>Source: Judicial Weekly of the Federation<br>Volume CXX<br>Matter(s): Common<br>Precedent:<br>Page: 590 |
| **LEYES DE ORDEN PÚBLICO.** | **PUBLIC ORDER LAWS.** |
| La naturaleza misma de la Ley de Orden Público hace prevalecer su aplicación a las de interés particular, por lo que las renuncias que de ellas se hicieren se tendrán como nulas y no opuestas. Las disposiciones de orden público son irrenunciables, precisamente por el interés de la sociedad en su observancia y aplicación. | The very nature of the Public Order Act gives precedence to its application to the one of private interest, so that waivers that may be made will be considered as null and not asserted. Public order provisions are unwaivable precisely because of the society's interest in their observance and compliance. |
| Amparo civil directo 2995/45. Julia Fajardo de Ancona y coags. 3 de mayo de 1954. Unanimidad de cuatro votos. Ausente: Ángel González de la Vega. La publicación no menciona el nombre del ponente." | Direct Civil Amparo 2995/45. Julia Fajardo de Ancona and others. May 3, 1954. Unanimity of four votes. Absent: Ángel González de la Vega.vThe publication does not mention the name of the rapporteur. |

26

**CLA 17**

| Spanish | English |
|---|---|
| **Carlos Arellano García**, Derecho Internacional Privado 931, 934 (2011)<br><br>"…El orden público viene a ser así un concepto doctrinario sinónimo de orden social, y comprende todas aquellas disposiciones establecidas en forma imperativa por el legislador en resguardo del interés superior de la colectividad o de la moral social…"<br><br>"…El orden público es un remedio que impide la aplicación de la norma jurídica extranjera competente, pues de aplicarse, provocaría un malestar social, impediría la satisfacción de una necesidad colectiva o evitaría la obtención de un beneficio para el conglomerado…" | **Carlos Arellano García**, Derecho Internacional Privado 931, 934 (2011)<br><br>"…Public order is a doctrinaire concept synonymous with social order and comprehensive of all provisions established in an imperative manner by the legislator to safeguard the best interest of the community or the social morality…"<br><br>"…Public order is a remedy that prevents the application of a foreign law because, if applied, it would provoke social unrest, prevent the satisfaction of a collective need or deprive a benefit to the population …" |

APP 1003
App. 669

CLA 18

| Spanish | English |
|---|---|
| "Época: Décima Época<br>Registro: 2008086<br>Instancia: Primera Sala<br>Tipo De Tesis: Aislada<br>Fuente: Gaceta del Semanario Judicial de la Federación<br>Libro 13, Diciembre de 2014, Tomo I<br>Materia(s): Constitucional<br>Tesis: 1a. CDXXV/2014 (10a.)<br>Página: 219 | Epoch: Tenth Epoch<br>Registry: 2008086<br>Instance: First Chamber<br>Type of Precedent: Isolated<br>Source: Judicial Weekly of the Federation<br>Book 13, December 2014, Volume I<br>Matter(s): Constitutional<br>Precedent: 1a. CDXXV/2014 (10a.)<br>Page: 219 |
| **AUTONOMÍA DE LA VOLUNTAD. ES UN PRINCIPIO DE RANGO CONSTITUCIONAL.** | **FREEDOM OF CHOICE. IT IS A PRINCIPLE OF CONSTITUTIONAL RANK.** |
| A consideración de esta Primera Sala de la Suprema Corte de Justicia de la Nación, el principio de autonomía de la voluntad goza de rango constitucional y no debe ser reconducido a un simple principio que rige el derecho civil. Así las cosas, el respeto del individuo como persona requiere el respeto de su autodeterminación individual, por lo que si no existe libertad del individuo para estructurar sus relaciones jurídicas de acuerdo con sus deseos, no se respeta la autodeterminación de ese sujeto. Aunado a lo anterior, el principio de autonomía de la voluntad tiene reflejo en el derecho de propiedad y en la libertad de contratación, la cual también es un elemento central del libre desarrollo de la personalidad, y en cuya virtud las partes de una relación jurídica son libres para gestionar su propio interés y regular sus relaciones, sin injerencias externas. | According to the consideration of the First Chamber of the Supreme Court of Justice of the Nation, the freedom of choice principle enjoys a constitutional rank and must not be reduced to a simple civil law principle. So, respect for the individual as a person requires respect for individual self-determination, so if the individual has no freedom to structure his legal relationships according to his wishes, then that person's self-determination is not respected. In addition to this, the principle of freedom of choice is reflected in property rights and freedom of contract, which is also central to the free development of personality, and under which the parties to a legal relationship are free to manage their own interest and regulate their relations, without external interference. |

28

| Amparo directo en revisión 992/2014. Rosario del Carmen Pacheco Mena y otros. 12 de noviembre de 2014. Mayoría de cuatro votos de los Ministros Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, quien reservó su derecho para formular voto concurrente, Olga Sánchez Cordero de García Villegas y Alfredo Gutiérrez Ortiz Mena. Disidente: Jorge Mario Pardo Rebolledo, quien reservó su derecho para formular voto particular. Ponente: Arturo Zaldívar Lelo de Larrea. Secretario: Javier Mijangos y González.<br><br>Esta tesis se publicó el viernes 05 de diciembre de 2014 a las 10:05 horas en el Semanario Judicial de la Federación." | Direct Amparo in review 992/2014. Rosario del Carmen Pacheco Mena and others. November 12, 2014. Majority of four votes from the Justices Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, who reserved his right to issue a concurrent vote, Olga Sánchez Cordero de García Villegas and Alfredo Gutiérrez Ortiz Mena. Dissident: Jorge Mario Pardo Rebolledo, who reserved his right to issue a dissenting vote. Rapporteur: Arturo Zaldívar Lelo de Larrea. Secretary: Javier Mijangos y González.<br><br>This precedent was published on Friday, December 5th, 2014 at 10:05 hours in the Judicial Weekly of the Federation. |

CLA 19

| Spanish | English |
|---|---|
| "**Artículo 12**.- Las leyes mexicanas rigen a todas las personas que se encuentren en la República, así como los actos y hechos ocurridos en su territorio o jurisdicción y aquéllos que se sometan a dichas leyes, salvo cuando éstas prevean la aplicación de un derecho extranjero y salvo, además, lo previsto en los tratados y convenciones de que México sea parte." | **Article 12**.- Mexican law applies to all people present in the Republic, as well as to the acts and events occurring within its territory or jurisdiction and those who are subject to such laws, except when these laws provide the application of a foreign law and also except the provisions of treaties and conventions to which Mexico is a party. |

CLA 20

| Spanish | English |
|---|---|
| "**Artículo 13**.- La determinación del derecho aplicable se hará conforme a las siguientes reglas:<br>[…]<br>IV. La forma de los actos jurídicos se regirá por el derecho del lugar en que se celebren. Sin embargo,<br>podrán sujetarse a las formas prescritas en este Código cuando el acto haya de tener efectos en el Distrito Federal o en la República tratándose de materia federal;…" | **Article 13**.- The determination of applicable law will be made under the following rules:<br>[…]<br>IV. The formalities of juridical acts shall be governed by the law of the place where they are executed. However, they may be subject to the formalities prescribed in this Code if the act is to take effect on the Federal District or in the Republic for federal issues |

31

## CLA 21

| Spanish | English |
|---|---|
| "**Artículo 1803**.- El consentimiento puede ser expreso o tácito, para ello se estará a lo siguiente:<br>I.- Será expreso cuando la voluntad se manifiesta verbalmente, por escrito, por medios electrónicos,<br>ópticos o por cualquier otra tecnología, o por signos inequívocos, y<br>II.- El tácito resultará de hechos o de actos que lo presupongan o que autoricen a presumirlo, excepto en los casos en que por ley o por convenio la voluntad deba manifestarse expresamente." | **Article 1803**.- Consent can be express or tacit, according to the following:<br>I. It will be express when stated verbally, in writing, by electronic means or any other technology, or by unmistakable signs, and<br>II. Tacit consent will result from facts or acts that presuppose or authorize its presumption, except in cases in which per law or agreement the will must be expressly stated |

32

CLA 22

| Spanish | English |
|---|---|
| Época: Séptima Época<br>Registro: 239988<br>Instancia: Tercera Sala<br>Tipo de Tesis: Aislada<br>Fuente: Semanario Judicial de la Federación<br>Volumen 205-216, Cuarta Parte<br>Materia(s): Civil<br>Tesis:<br>Página: 116 | Epoch: Seventh Epoch<br>Registry: 239988<br>Instance: Third Chamber<br>Type of Precedent: Isolated<br>Source: Judicial Weekly of the Federation<br>Volume 205-2016, Fourth Part<br>Matter(s): Civil<br>Precedent:<br>Page: 116 |
| **NULIDAD ABSOLUTA E INEXISTENCIA. SUS DIFERENCIAS SON CONCEPTUALES Y SIMPLEMENTE TEORICAS, Y SUS SANCIONES SON SEMEJANTES.** | **ABSOLUTE NULITY AND NONEXISTANCE. THEIR DIFFERENCES ARE ONLY CONCEPTUAL AND SIMPLY THEORETICAL, AND THEIR PENALTIES ARE SIMILAR.** |
| Si por actos inexistentes debe entenderse, aquellos que adolecen de un elemento esencial, ya sea el consentimiento o el objeto, y que no reúnen los elementos de hecho que suponen su naturaleza o su finalidad, y en ausencia de los cuales, lógicamente es imposible concebir su existencia; y por cuanto se refiere a los actos jurídicos viciados de nulidad absoluta, puede sostenerse que son aquellos en que el acto se ha realizado de manera imperfecta, aunque sus elementos esenciales se presenten completos, ya que al haber sido celebrados sin observar las reglas imperativas establecidas en la ley, carecen de perfección conforme a las normas previstas para garantizar la defensa del interés general o de orden público, y así, asegurar la protección de un interés | If for nonexistent acts it should be understood those who lack an essential element, either the consent or subject matter, and that not meet the factual elements of their nature or purpose, and in the absence of which is logically impossible to conceive its existence; and regarding the legal acts affected by absolute nullity, it is arguable that they are those in which the act was performed imperfectly, but its essential elements are complete, as having been concluded without observing the mandatory rules established in the law, they lack perfection in accordance with the rules provided to ensure the general interest or public order, and thus ensure the protection of private interests; undoubtedly, in accordance with the forgoing  and with Articles 2078, 2079 |

33

privado; es indudable que, atento lo anterior de conformidad con los artículos 2078, 2079 y 2080 del Código Civil del Estado de México, el acto jurídico que adolezca de objeto o de consentimiento, o haya ilicitud en el objeto, en el fin o en la condición, no es susceptible de valer ni desaparecer por confirmación, cuyos vicios pueden invocarse por todo interesado, a efecto de prevalecerse contra los mismos. En tal virtud, al ser iguales las sanciones para tales actos, por consistir en que no pueden engendrar alguna consecuencia jurídica, pues aunque produzcan provisionalmente ciertos efectos, éstos se retrotraerán al momento en que se declarase judicialmente la nulidad absoluta o la inexistencia, con lo que se destruye el acto de que se trate, tales circunstancias implican que, en la realidad, las diferencias entre nulidad absoluta e inexistencia, son puramente conceptuales y teóricas, de acuerdo con la doctrina. Por lo cual, si el matrimonio es un contrato civil, como así se establece en el párrafo tercero del artículo 130 de la Constitución Política de los Estados Unidos Mexicanos, es evidente que las nulidades y las inexistencias de los actos jurídicos pueden afectar el matrimonio, en razón de ser un contrato; y sin embargo, es válido afirmar que el matrimonio como contrato tiene particularidades y efectos, de las que los demás actos jurídicos y contratos no participan y, consecuentemente, las sanciones civiles que se aplicaren, en el caso de nulidad absoluta o de inexistencia, sustraen al matrimonio del régimen general de las nulidades y de las inexistencias, por lo que los hijos habidos dentro de un

and 2080 of the Civil Code of the State of Mexico, the legal act lacking consent or subject matter, or if there the subject matter, purpose or condition is unlawful, is not susceptible to be valid or disappear by confirmation, whose vices can be invoked by any interested party, in order to prevail themselves against them. As such, having such acts equal penalties, because they consist in the impossibility to generate any legal consequences, since although they provisionally produce certain effects, they will be retroactive when the absolute nullity or non-existence is judicially declared, thus the act in question is destroyed, such circumstances mean that, in reality, the differences between absolute nullity and non-existence, are purely conceptual and theoretical, according to the doctrine. Therefore, if marriage is a civil contract, as so stated in the third paragraph of Article 130 of the Constitution of the Mexican United States, it is clear that nullities and nonexistence of legal acts may affect marriage, because of being a contract; and yet it is valid to say that marriage as a contract has special features and effects which other legal acts and contracts do not have and, consequently, the civil penalties imposed, in case of absolute nullity or non-existence, subtract marriage annulments from the general nullity or non-existence regime, so children born within a marriage declared void, must retain their affiliation, according to what Article 326 of the Civil Code of the State of Mexico provides.

34

| | |
|---|---|
| matrimonio declarado nulo, deben conservar su filiación, según lo estatuye el artículo 326 del Código Civil del Estado de México.<br><br>Amparo directo 4060/85. Félix Humberto Esparza Valdez. 13 de octubre de 1986. Unanimidad de cuatro votos. Ponente: Victoria Adato Green de Ibarra. Secretario: Virgilio Adolfo Solorio Campos.<br>Véase: Apéndice al Semanario Judicial de la Federación 1917-1985, Cuarta Parte, tesis 197, página 590, bajo el rubro "NULIDAD E INEXISTENCIA. SUS DIFERENCIAS SON MERAMENTE TEORICAS.". | Direct Amparo 4060/85. Félix Humberto Esparza Valdez. October 13, 1986. Unanimity of four votes. Rapporteur: Victoria Adato Green de Ibarra. Secretary: Virgilio Adolfo Solorio Campos.<br>See: Appendix to the Judicial Weekly of the Federation 1917-1985, Fourth Part, precedent 197, page 590, under the title "NULITY AND NONEXISTANCE. THEIR DIFFERENCES ARE JUST THEORICAL". |

CLA 23

| Spanish | English |
|---|---|
| "Época: Sexta Época<br>Registro: 272665<br>Instancia: Tercera Sala<br>Tipo de Tesis: Aislada<br>Fuente: Semanario Judicial de la Federación<br>Volumen XI, Cuarta Parte<br>Materia(s): Civil<br>Tesis:<br>Página: 170 | Epoch: Sixth Epoch<br>Registry: 272665<br>Instance: Third Chamber<br>Type of Precedent: Isolated<br>Source: Judicial Weekly of the Federation<br>Volume XI, Fourth Part<br>Matter(s): Civil<br>Precedent:<br>Page: 170 |
| **SEGUROS. EL ARTICULO 45 DE LA LEY SOBRE EL CONTRATO DE SEGURO COMPRENDE, EN CUANTO A LA NULIDAD QUE CONSIGNA, TANTO AL SEGURO DE COSAS COMO AL DE VIDA.** | **INSURANCES. ARTICLE 45 OF THE INSURANCE CONTRACT LAW, REGARDING THE NULITY IT PROVIDES, APPLIES TO BOTH GOOD'S INSURANCE AND LIFE INSURANCE.** |
| Independientemente de que conforme al bien conocido principio de interpretación de las leyes, de que donde éstas no distinguen no se debe distinguir, y que es precisamente el caso del artículo 45 de la Ley sobre el Contrato de Seguro, ya que los términos genéricos en que está redactado no conducen a establecer distinción alguna, lo cierto es que atendiendo a la teoría general del acto jurídico, y que por cierto recoge al respecto el artículo 1794 del Código Civil Federal, aplicable supletoriamente a la legislación mercantil, según el artículo 2o. del Código de Comercio, son elementos esenciales del contrato, que, como se sabe, no es sino una especie del acto jurídico: el consentimiento y el objeto. | Despite that under the well-known principle of statutory interpretation, that where they do not distinguish a distinction should not be made, and that is precisely the case of Article 45 of the Insurance Contract Law, because the generic terms in which it is drafted do not lead to establish any distinction, the truth is that considering the general theory of the act, and that by the way is included in Article 1794 of the Federal Civil Code, applicable in a supplementary manner to the commercial law, according to article 2 of the Commerce Code, these are essential elements of the contract, which, as is known, is nothing but a kind of legal act: consent and subject matter. It is essential subject of the specific |

36

Es objeto esencial del contrato específico de seguro ello es notorio y por consecuencia no cabe discusión ni duda sobre el particular, dada la calidad de aleatorio de dicho contrato que el seguro recaiga sobre un riesgo incierto, pues de otro modo no se concebiría su existencia, como tampoco se concebiría, por ejemplo, la de un contrato de compraventa cuyo objeto no fuera transmitir el dominio por la sencilla razón de que en tales supuestos se estaría en presencia de hechos jurídicamente imposibles, ya que entonces el contrato de seguro, del mismo modo que el caso del ejemplo puesto con relación al de compraventa, seria, de conformidad con el artículo 1828 del citado código supletorio, contrario a una norma jurídica que debe regirlo necesariamente y que constituye un obstáculo insuperable para su realización. Así las cosas, claramente se explica que el mencionado artículo 45 de la Ley sobre el Contrato de Seguro establezca que éste será nulo si en el momento de su celebración el riesgo hubiere desaparecido o el siniestro se hubiere ya realizado, pues es también evidente que, por las razones antes dadas, si tales riesgos o posibilidad del siniestro no existen, no hay ni puede haber contrato de seguro. Por eso es también que el propio precepto admite la posibilidad de que se pueda celebrar el contrato aunque el riesgo hubiere desaparecido y el siniestro se hubiere realizado, si los mismos fueron ignorados por las partes contratantes, para cuyos eventos el citado precepto establece que los efectos del contrato podrán

insurance contract, it is noticeable and consequently there is no discussion or doubt on the matter, given the random quality of said contract that insurance falls on an uncertain risk, because otherwise its existence cannot be conceived, as nor be conceived, for example, a purchase contract whose purpose was not transfer property for the simple reason that in such cases we would be in the presence of facts legally impossible, because then the insurance contract, just as the example set in relation to purchases, would be, in accordance with Article 1828 of the said supplementary code, contrary to a rule of law must necessarily govern it and constitutes an insuperable obstacle to its realization. So, it is clearly explainable that Article 45 of the Insurance Agreement Law provides that it shall be void if at the time of its execution the risk has disappeared or sinister has already happened, because it is also clear that, for the reasons given above, if such risks or possibility of loss does not exist, nor can there be insurance contract. That is also the reason why the provision itself admits the possibility that the contract can be executed although the risk had disappeared and sinister had occurred, if they were ignored by the contracting parties, for whose events the quoted provision states that the effects of the contract may be made retroactive by express agreement of the parties, but making sure to add that in the referred cases of retroactivity, the insurance company that does not know the disappearance

37

hacerse retroactivos por convenio expreso de aquéllas, pero cuidando de agregar que en los casos de retroactividad a que el mismo se refiere, la empresa aseguradora que conozca la desaparición del riesgo, no tendrá derecho a las primas ni al reembolso de sus gastos, y si es la otra parte quien conoce la circunstancia contraria, o sea que el siniestro ya se realizó, perderá el derecho a la restitución de las primas y estará obligada al pago de los gastos, supuestos que evidentemente se realizarían, por ejemplo, en el caso del barco que habiendo salido de un puerto llevara a bordo efectos de comercio a otro puerto y que durante su travesía el dueño de la mercancía quisiera asegurarla tomando un seguro con efectos retroactivos desde el día de la salida del barco del puerto de partida, hasta el día en que llegue a su destino, y caso en el cual son bien claras las dos hipótesis previstas en el artículo 45, o sean: primera, que cuando el dueño de la mercancía tomó el seguro, ya sabia que el barco se había hundido o que la mercancía hacia sufrido cierta avería, en caso en el cual el contrato seria nulo porque el siniestro ya se había realizado; y segunda, que la empresa aseguradora, al celebrar el contrato, hubiera sabido que el barco había llegado felizmente al lugar de su destino, simulando, sin embargo, el desconocimiento de tal hecho, y caso en el que el contrato también seria nulo, porque en el momento de su celebración el riesgo ya había desaparecido. Pero estas hipótesis que indudablemente son bien claras en cuanto al seguro de

of the risk, will not be entitled to premiums or reimbursement of their expenses and if it is the other party the one who knows the opposite situation, ie that the incident was done, it will lose the right to the refund of premiums and will be required to pay the costs, scenarios that will obviously be realized, for example, in case a ship having leaved a port is carrying on board commercial goods to another port and during their journey the owner of the goods wanted to secure it contracting insurance retroactively from the date of departure of the vessel from the port of departure, until the day it arrives to its destination, and in which case the two cases provided for in Article 45 are clear: first, when the owner of the goods contracted the insurance, he knew that the ship had sunk or the merchandise had suffered damages, where the contract would be null because the incident had already occurred; and second, that the insurance company when executing the contract, knew that the ship had happily arrived to its destination, simulating, however, ignorance of this fact, case in which the contract would also be null, because at the time of its execution the risk had disappeared. But these scenarios that are undoubtedly very clear for the insurance of things, also undoubtedly are not, as they could never occur in them, in case of people's life insurances. Indeed, It has already been said it is an essential element of an insurance contract that the risk is uncertain, as it has also already been

38

APP 1014
App. 680

cosas, también indudablemente que no lo son, pues jamás podrían presentarse en ellos, en tratándose de seguros sobre la vida de las personas. En efecto, ya se dijo que es elemento esencial del contrato de seguro que el riesgo sea incierto, pues también ya se dijo que siendo el contrato de seguro de naturaleza aleatoria, jamás puede concebirse sino en función de la incertidumbre de tal riesgo. Es así que cuando se toma un seguro antedatado y por ello con efectos retroactivos, indiscutiblemente que la incertidumbre del riesgo durante el tiempo ya corrió entre la fecha de la celebración del contrato y aquélla que sirve de base para antedatar el contrato, no puede en manera alguna decirse que haya existido esa incertidumbre, sino antes bien, existe la certeza plena de que durante ese lapso el asegurado ya vivió y por tanto la aseguradora ningún riesgo pudo correr al respecto. Y si ello es así, es también claro que faltando dicho elemento esencial, el contrato es, para hablar dentro del logicismo de la teoría tripartita de la invalidez, un acto inexistente, puesto que le falta un elemento de existencia o de esencia, pero que para el caso es absolutamente igual que la Ley sobre el Contrato de Seguro lo considere expresamente como de nulidad en su multicitado artículo 45, ya que esta Suprema Corte ha sostenido que nuestra legislación civil, supletoria, como ya se dijo, de la de comercio, no tiene, en cuanto a la base que pretende dar para establecer la distinción entre la inexistencia y la nulidad, sino meros efectos teóricos, ya que el tratamiento

said that the insurance contract being random in nature, can never be conceived but in terms of the uncertainty of such risk. So when you take a backdated insurance and therefore with retroactive effects, without doubts the uncertainty of the risk over time already ran from the date of the contract and that which is the basis for backdating the contract, can in no way be said that there has been such uncertainty, but rather, there is full certainty that during this period the insured lived and therefore the insurance company could run no risk in this respect. And if this is so, it is also clear that lacking this essential element, the contract is, in terms of the logicism of the tripartite theory of invalidity, a nonexistent act, since it lacks an element of existence or essence, but for the case is quite the same as the Insurance Contract Law expressly considers it as nullity in its quoted Article 45, since this Supreme Court has held that our civil, supplementary, as already stated, to the commerce law, does not have, as to the basis to distinguish between the non-existence and nullity it attempts to give, but merely theoretical effects, since the treatment received by non-existence in this law receive, is the one of nullities. But not only because of the considerations above, but also, and primarily because legal definitions of legal acts are not subject to the arbitrary arrangement of the parties, but belong to the public order of the nation, since as recognized by the Supreme Court, the man does not

39

que en dicho ordenamiento reciben las inexistencias, es el de las nulidades. Pero no sólo por lo acabado de considerar, sino además, y fundamentalmente porque las definiciones legales de los actos jurídicos no están a la disposición arbitraria de las partes, sino que pertenecen al orden público de la nación, dado que como lo ha reconocido este Alto Tribunal, el hombre no hace al contrato, sino que la esencia de éste está más allá de la autonomía individual y depende de la naturaleza de las cosas; por todo ello hay que concluir que si dentro del mas rigorista logicismo de la teoría tripartita francesa de la invalidez, la falta de un elemento esencial del acto produce la inexistencia del mismo, dentro del sistema tradicional mexicano esa misma falta produce su nulidad absoluta, ya que entraña la violación manifiesta de una norma de orden público, como es la que determina o define la esencia de los contratos y de los actos jurídicos en general, y que en el caso del contrato de seguro, sea de personas o de cosas, no puede ser otra sino la relativa a que para que tal contrato exista, dada su naturaleza aleatoria, forzosamente debe existir la incertidumbre del riesgo.

Amparo directo 7330/56. Monterrey, Compañía de Seguros Sobre La Vida, S. A. 12 de mayo de 1958. Mayoría de tres votos. Disidentes: Mariano Ramírez Vázquez y Alfonso Guzmán Neyra. Ponente: Gabriel García Rojas."

make the contract, but the essence of it is beyond individual autonomy and depends on the nature of things; for all these reasons it follows that if within the more strict logicism of the French tripartite theory of invalidity, the lack of an essential element of the act produces the non-existence thereof, within the traditional Mexican system that same lack produces the absolute nullity, because it involves the flagrant violation of a rule of public order, such as the one that determines or defines the essence of contracts and juridical acts in general and that in the case of the insurance contract, whether of persons or things, it cannot be anything but the one related to that for such a contract to exist, given its random nature, an uncertainty risk must necessarily exist.

Direct Civil Amparo 7330/56. Monterrey, Compañía de Seguros Sobre La Vida, S. A. May 12, 1958. Majority of three votes. Dissidents: Mariano Ramírez Vázquez and Alfonso Guzmán Neyra. Rapporteur: Gabriel García Rojas.

40

CLA 24

| Spanish | English |
|---|---|
| "Época: Décima Época<br>Registro: 2001040<br>Instancia: Tribunales Colegiados de Circuito<br>Tipo de Tesis: Aislada<br>Fuente: Semanario Judicial de la Federación y su Gaceta<br>Libro IX, Junio de 2012, Tomo 2<br>Materia(s): Civil<br>Tesis: I.8o.C.1 C (10a.)<br>Página: 913 | Epoch: Tenth Epoch<br>Registry: 2001040<br>Instance: Collegiate Circuit Courts<br>Type of Precedent: Isolated<br>Source: Judicial Weekly of the Federation and its Gazette.<br>Book IX, June 2012, Volume 2<br>Matter(s): Civil<br>Precedent: I.8o.C.1 C (10a.)<br>Page: 913 |
| **SILENCIO CONTRACTUAL. SU SIGNIFICADO Y ALCANCE.** | **CONTRACTUAL SILENCE. ITS MEANING AND SCOPE.** |
| La aceptación contractual ordinariamente viene configurada por una declaración expresa de conformidad con los términos planteados en la propuesta respectiva; sin embargo, en ocasiones el aceptante no exterioriza su voluntad de modo explícito, sino que ésta se deduce de su conducta (facta concludentia; facta ex quibus voluntas concludi potest); en esta hipótesis, se está frente al denominado consentimiento tácito, donde se aprecia una conducta que no es por sí misma significativa de una declaración de voluntad, a diferencia de lo que sucede con las conductas expresivas. En el caso de la aceptación tácita, de la conducta observada por el destinatario de la oferta contractual debe inferirse la voluntad de aceptarla (indicium voluntatis), por ser aquélla incompatible con la voluntad contraria. Esta manifestación indirecta de la voluntad de aceptar se realiza a través | Contractual acceptance is normally configured by an express declaration of conformity with the terms exposed in the respective proposal; however, sometimes the acceptor does not exteriorize his will explicitly, but his will is deduced from a certain behavior (facta concludentia; facta ex quibus voluntas concludi potest); in this case, we are in front of the so called implied consent, where we find a certain behavior which does not mean by itself a declaration of will, contrarily to the case of express behaviors. In the case of implied consent, we must be able to infer the will of acceptance by a certain conduct of the addressee (indicium voluntatis), for being totally incompatible with the contrary will. This indirect manifestation of will of acceptance is performed through events that, by themselves, do not express such will and, sometimes, are equivocal. Therefore, we often have to resort to |

41

**APP 1017**<br>App. 683

de actos que, por sí mismos, no expresan dicha voluntad y, en ocasiones, son equívocos. Por ello, frecuentemente hay que recurrir a otros datos para poder determinar si existe o no aceptación tácita. En cuanto al silencio como aceptación de los términos contractuales, cabe señalar que supone una conducta completamente inactiva, es decir, que la persona no manifiesta su voluntad, ni expresa, ni tácitamente, pues el sujeto no tiene ningún comportamiento que pueda descubrir una exteriorización de su voluntad. Ahora bien, para el análisis del valor del silencio como manifestación del consentimiento ha de partirse de un concepto restrictivo de aquél, como inactividad del sujeto. En ese sentido, en principio, el comportamiento silencioso no produce, por sí mismo, efecto jurídico positivo alguno, por lo que la inactividad de quien ha recibido la propuesta no puede, por sí sola, constituir una manifestación de voluntad de aceptación, ya que el silencio es una simple abstención de hacer o decir y, desde el punto de vista objetivo, carece de significado positivo. Si se sostuviera que quien calla consiente, se provocaría una situación de claro perjuicio para quien recibe una oferta, ya que estaría obligado a contestar para no verse vinculado contractualmente, y consentir una intromisión de este tipo en la esfera jurídica de las personas, provocaría que éstas se vieran en la obligación permanente de contestar todas las ofertas recibidas. En ese orden de ideas, se concluye que sólo la norma legal o la voluntad previamente expresada de las partes pueden determinar que la

other data in order to determinate whether there is implied consent or not. As for silence as acceptance of contractual terms, note that it is a completely inactive behavior, that is, the person does not manifest its will, either expressly or impliedly, since the person does not show any behavior that could imply an exteriorization of his will. However, for the analysis of the value of silence as a manifestation of consent, we must assume a restrictive concept, as inactivity of the person. In principle, silent behavior does not produce by itself, any positive legal effect, so the inactivity of the addressee of a proposal cannot constitute an expression of acceptance, since silence is a simple abstention from doing or saying and, from the objective point of view, lacks of positive meaning. If we affirmed that the one who is silent, grants, the addressee would be in a situation of clear damage, since he will be obliged to answer in order to avoid undertaking an obligation, and accept that an intromission of this kind in a person's legal sphere, would force everyone to permanently answer every offer they receive. In this sense, we conclude that only the rule of law or the previous expressed will from the parties can determine if the addressee's inactivity must be considered as acceptance. Hence, whenever the parties previously agree that silence of the addressee is equivalent to acceptance, the analysis of that silence will constitute an express declaration of will, and the same happens if the legal provision states that silence has a specific meaning, case in which we will be in front of a manifestation of will

inactividad de quien recibió la oferta deba considerarse como aceptación. Así, cuando las partes han convenido previamente que el silencio de quien recibe la oferta es equivalente a una declaración de aceptación, la observancia de tal silencio constituirá una declaración expresa de voluntad, y lo mismo sucede cuando es la propia ley la que atribuye un significado concreto al silencio, supuesto en el que se estaría frente a una manifestación de la voluntad legalmente tipificada, en cuanto se concede al silencio una eficacia similar a la de la aceptación.

OCTAVO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.
Amparo directo 75/2012. Ingenieros Civiles Asociados, S.A. de C.V. 18 de abril de 2012. Unanimidad de votos. Ponente: Abraham S. Marcos Valdés. Secretaria: María Teresa Lobo Sáenz."

legally typified, since silence is provided very similar effects to the ones of acceptance.

EIGHT COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT.

Direct Amparo 75/2012. Ingenieros Civiles Asociados, S.A. de C.V. April 18, 2012. Unanimity of votes. Rapporteur: Abraham S. Marcos Valdés. Secretary: María Teresa Lobo Sáenz.

43

CLA 25

| Spanish | English |
|---------|---------|
| **Joaquín Martínez Alfaro,** Teoría de las Obligaciones 86 (2003)<br><br>"…El silencio consiste en la abstención de manifestar el consentimiento, sin embargo, algunos lo han considerado como un modo tácito de exteriorizar la voluntad fundándose en que, en materia no jurídica sino psicológica y en el lenguaje vulgar, existe la frase según la cual "el que calla otorga", es decir, quien guarda silencio consiente o acepto; de acuerdo con esta frase el silencio tendría efectos jurídicos equivalentes a un consentimiento tácito, lo que es falso porque el consentimiento tácito es una manifestación de la voluntad y el silencio nada manifiesta; además, esto que psicológicamente puede ser correcto no lo es en materia jurídica, porque en derecho el silencio no puede tener el efecto jurídico de una aceptación, en atención a que aceptar significa jurídicamente obligarse y, en tal virtud, habría que concluir que el que guarda silencio consiente en obligarse si tuviera aplicación jurídica la frase según la cual el que calla otorga; por tanto en materia jurídica el silencio no significa una manifestación de voluntad hecha en el sentido de obligarse; es decir, la regla general es que en derecho quien guarda silencio no manifiesta su voluntad aceptando obligarse; o sea, el que calla no otorga jurídicamente, no consiente…" | **Joaquín Martínez Alfaro,** Teoría de las Obligaciones 86 (2003)<br><br>"…Silence consists in the abstention of manifesting consent, however, some authors have considered as an implied way of exteriorizing will, claiming that, in non-juridical but psychological way and in common language, the phrase "who is silent, grants" affirms that silence is consent; accordingly, silence will have juridical effects equivalent to implied consent, which is totally false since implied consent is a manifestation of the will, and silence does not manifest a single thing; furthermore, even if this is psychologically correct, it is false in juridical matters, since silence cannot have any juridical effect of acceptation, considering that accepting implies to undertake an obligation, and so, we will be forced to conclude that the one silences consents in undertaking an obligation, if the phrase "who is silent, grants" had any juridical application. Consequently, silence does not consist in a manifestation of willing to undertake an obligation in legal matters; therefore, the general principle is that silence does not manifest any will of undertaking an obligation. For instance, who is silent does not grant or consent…" |

44

**APP 1020**
App. 686

CLA 26

| Spanish | English |
|---|---|
| **Javier Martinez Alarcón,** Teoría General de las Obligaciones 36 (2000).<br><br>"…Existen otros ejemplos en que el consentimiento no se da, como el silencio, que se equipara con la nada y con la no manifestación de la voluntad. Una oferta que no se contesta en forma positiva o negativa, verbalmente, por escrito o mediante consentimiento tácito, debe considerarse no otorgada, y el contrato, en consecuencia, no se perfecciona…" | **Javier Martinez Alarcón,** Teoría General de las Obligaciones 36 (2000).<br><br>"…There are other examples in which consent does not exist, for example silence, which is equated to nothing and with the non-manifestation of consent whatsoever. An offer that is not answered in a positive or negative way, written or in an implied consent, must be considered as not giving consent, and the contract, for extension, is not perfected…" |

45

APP 1021
App. 687

CLA 27

| Spanish | English |
|---|---|
| **Ramón Sánchez Medal,** De Los Contratos Civiles 27-28 (2010) | **Ramón Sánchez Medal,** De Los Contratos Civiles 27-28 (2010) |
| "…El consentimiento, en su primera acepción, o sea como voluntad del deudor para obligarse, a cuyo elemento llama el Código Civil francés (Art. 1108) "el consentimiento de la parte que se obliga", exige que el deudor tenga una voluntad real […] y que dicha voluntad se exteriorice, sea en forma expresa o tácita. Se citan como ejemplos de manifestación tácita, la aceptación del mandato y la tácita reconducción por lo que se refiere al arrendatario que continúa sin oposición del arrendador después del término en el uso de la cosa arrendada. Este último, además, es el único caso en que el simple silencio implica consentimiento "qui tacet consentiré videtur", y se genera obligaciones por lo que hace al arrendador cuando éste no exige la desocupación después de ese término…" | Consent, in its first sense, as will from the debtor to undertake an obligation, is defined by the French Civil Code (Art. 1108) as "the consent of the party that agrees", requires a real will from the debtor […] and that will to be exteriorized, in an implied or express way. As examples of implied consent, we can point to the acceptance of commands and the automatic renewal, which is referred to the lessee who continues without opposition from the lessor after the conclusion of the term of use. The last case mentioned, is also the only example in which simple silence implies consent "qui tacet consentire videtur", and generates obligations for the lessor when he does not require the idleness after that term |

APP 1022

App. 688

CLA 28

| Spanish | English |
|---|---|
| "**Artículo 594**.- Los miembros de la colectividad afectada podrán adherirse a la acción de que se trate, conforme a las reglas establecidas en este artículo. | **Article 594**.- The members of the affected community may join the action in question, according to the rules established in this article. |
| En el caso de las acciones colectivas en sentido estricto e individuales homogéneas, la adhesión a su ejercicio podrá realizarse por cada individuo que tenga una afectación a través de una comunicación expresa por cualquier medio dirigida al representante a que se refiere el artículo 585 de este Código o al representante legal de la parte actora, según sea el caso. | In the case of class actions in strict sense, and in individual homogenous class actions, any affected individual may join the proceeding through an express communication sent to the representative that Article 585 of this Code refers to or the legal representative of the plaintiff, as appropriate. |
| Los afectados podrán adherirse voluntariamente a la colectividad durante la substanciación del proceso y hasta dieciocho meses posteriores a que la sentencia haya causado estado o en su caso, el convenio judicial adquiera la calidad de cosa juzgada. | Those affected may voluntarily join the class during the substantiation of the process and up to eighteen months after the judgment or settlement agreement has acquired the status of res judicata. |
| Dentro de este lapso, el interesado hará llegar su consentimiento expreso y simple al representante, quien a su vez lo presentará al juez. El juez proveerá sobre la adhesión y, en su caso, ordenará el inicio del incidente de liquidación que corresponda a dicho interesado. | Within this period, the interested party will forward his express and simple consent to the representative, who in turn will submit it to the judge. The judge will decide about the adhering and, if necessary, will order the start of the liquidation ancillary proceeding corresponding to said subject. |
| Los afectados que se adhieran a la colectividad durante la substanciación del proceso, promoverán el incidente de liquidación en los términos previstos en el artículo 605 de este Código. | The affected persons, who join the class during the substantiation of the process, will promote the liquidation ancillary proceeding on the terms provided in Article 605 of this Code. |
| Los afectados que se adhieran posteriormente a que la sentencia haya causado estado o, en su caso, el convenio judicial adquiera la calidad de cosa juzgada, deberán probar el daño | The affected persons, who adhere after the judgment is definitive or, where appropriate, judicial agreement has acquired the status of res judicata, must prove the damage caused in the |

APP 1023
App. 689

causado en el incidente respectivo. A partir de que el juez determine el importe a liquidar, el miembro de la colectividad titular del derecho al cobro tendrá un año para ejercer el mismo.

En tratándose de la adhesión voluntaria, la exclusión que haga cualquier miembro de la colectividad posterior al emplazamiento del demandado, equivaldrá a un desistimiento de la acción colectiva, por lo que no podrá volver a participar en un procedimiento colectivo derivado de o por los mismos hechos.

Tratándose de acciones colectivas en sentido estricto e individuales homogéneas sólo tendrán derecho al pago que derive de la condena, las personas que formen parte de la colectividad y prueben en el incidente de liquidación, haber sufrido el daño causado.

El representante a que se refiere el artículo 585 de este Código tendrá los poderes más amplios que en derecho procedan con las facultades especiales que requiera la ley para sustanciar el procedimiento y para representar a la colectividad y a cada uno de sus integrantes que se hayan adherido o se adhieran a la acción."

respective ancillary proceeding. From the judge determines the amount payable, the member of the holder collectivity of proceeds will have one year to exercise it.

In the case of voluntarily joining, the exclusion made by any member of the class after the defendant's service of notice, shall constitute a waiver of the class action, and therefore will not be able to take part again in a collective proceeding arising out of or from the same facts.

In case of class actions in the strict sense and individual homogeneous actions, only the people who are part of the class and prove in the liquidation ancillary claim to have suffered the caused damage, will be entitled to the payment resulting from the conviction.

The representative that Article 585 of this Code refers to will have the broadest powers established in law with the special powers required by law to conduct the proceedings and to represent the class and each of its members who have joined or that join the action.

48

APP 1024
App. 690

CLA 29

| Spanish | English |
|---|---|
| Iniciativa de ley y exposición de motivos presentada por el Senador Jesús Murillo Karam al Senado el 7 de septiembre de 2010. | Bill and congressional declaration of purpose submitted by Senator Jesús Murillo Karam to the Senate on September 7, 2010 |
| "Leyes Federales y del Distrito Federal CODIGO FEDERAL DE PROCEDIMIENTOS CIVILES | Federal Laws and of the Federal District FEDERAL CODE OF CIVIL PROCEDURE |
| Fecha de publicación: 30/08/2011 Categoría: DECRETO PROCESOS LEGISLATIVOS EXPOSICION DE MOTIVOS CAMARA DE ORIGEN: SENADORES | Date of publication: 30/08/2011 Category: Decree LEGISLATIVE PROCESSES CONGRESSIONAL DECLARATION OF PURPOSE CHAMBER OF ORIGIN: SENATORS |
| EXPOSICIÓN DE MOTIVOS México, D.F., a 7 de septiembre de 2010. | CONGRESSIONAL DECLARATION OF PURPOSE Mexico, D.F., September 7, 2010 |
| INICIATIVA DE SENADOR (GRUPO PARLAMENTARIO DEL PRI) Gaceta No. 134 | BILL FROM SENATOR (PARLIAMENTARY GROUP OF PRI) Gazette No. 134 |
| INICIATIVA CON PROYECTO DE DECRETO POR EL QUE SE REFORMAN Y ADICIONAN DIVERSOS ARTÍCULOS DEL CÓDIGO FEDERAL DE PROCEDIMIENTOS CIVILES, CÓDIGO CIVIL FEDERAL, LEY FEDERAL DE COMPETENCIA ECONÓMICA, LEY FEDERAL DE PROTECCIÓN AL CONSUMIDOR, LEY ORGÁNICA DEL PODER JUDICIAL DE LA FEDERACIÓN, LEY GENERAL DEL EQUILIBRIO ECOLÓGICO Y LA PROTECCIÓN AL AMBIENTE Y LA LEY DE PROTECCIÓN Y DEFENSA AL USUARIO DE SERVICIOS | BILL WITH DECREE DRAFT BY WHICH SEVERAL ARTICLES OF THE FEDERAL CODE OF CIVIL PROCEDURE, FEDERAL CIVIL CODE, THE FEDERAL ANTITRUST LAW, THE FEDERAL CONSUMER PROTECTION LAW, THE STATUTORY LAW OF THE JUDICIAL BRANCH, FEDERAL GENERAL LAW OF ECOLOGICAL BALANCE AND ENVIRONMENTAL PROTECTION AND THE PROTECTION AND DEFENSE OF THE FINANCIAL SERVICES USER LAW ARE AMENDED AND ADDED. |

49

FINANCIEROS

HONORABLE ASAMBLEA

El suscrito senador Jesús Murillo Karam integrante del Grupo Parlamentario del Partido Revolucionario Institucional de la LXI Legislatura del H. Congreso de la Unión, en ejercicio de la facultad que me confiere el artículo 71, fracción II de la Constitución Política de los Estados Unidos Mexicanos y los artículos 8º fracción I, 164, 165 y 169 del Reglamento del Senado de la República, someto a consideración de esta Soberanía la INICIATIVA CON PROYECTO DE DECRETO POR EL QUE SE REFORMAN Y ADICIONAN DIVERSOS ARTÍCULOS DEL CÓDIGO FEDERAL DE PROCEDIMIENTOS CIVILES, CÓDIGO CIVIL FEDERAL, LEY FEDERAL DE COMPETENCIA ECONÓMICA, LEY FEDERAL DE PROTECCIÓN AL CONSUMIDOR, LEY ORGÁNICA DEL PODER JUDICIAL DE LA FEDERACIÓN, LEY GENERAL DEL EQUILIBRIO ECOLÓGICO Y LA PROTECCIÓN AL AMBIENTE; Y LA LEY DE PROTECCIÓN Y DEFENSA AL USUARIO DE SERVICIOS FINANCIEROS al tenor de la siguiente:
EXPOSICIÓN DE MOTIVOS

[…]

III. Integración de la clase.
En el procedimiento especial colectivo que se propone, se prevé la manera en cómo se integrará la clase a quien afectará o beneficiará la sentencia que en su caso, el juez dicte en el procedimiento colectivo.
Por integración de la clase debemos

HONORABLE ASSEMBLY:

The undersigned senator Jesús Murillo Karam, member of the Parliamentary Group of the Institutional Revolutionary Party of the LXI Legislature of the Honorable Congress of the Union, in exercise of the powers conferred to me by section 71, section II of the Constitution of the United States of Mexico and Articles 8 fraction I, 164, 165 and 169 of the Regulations of the Senate, I submit for the consideration of this Sovereignty the BILL WITH DECREE DRAFT BY WHICH SEVERAL ARTICLES OF THE FEDERAL CODE OF CIVIL PROCEDURE, FEDERAL CIVIL CODE, THE FEDERAL ANTITRUST LAW, THE FEDERAL CONSUMER PROTECTION LAW, THE STATUTORY LAW OF THE JUDICIAL BRANCH, FEDERAL GENERAL LAW OF ECOLOGICAL BALANCE AND ENVIRONMENTAL PROTECTION AND THE PROTECTION AND DEFENSE OF THE FINANCIAL SERVICES USER LAW ARE AMENDED AND ADDED, according to the following:
CONGRESSIONAL DECLARATION OF PURPOSE

[…]

III. Integration of the class.
In the proposed collective special procedure, the manner in which the class to whom the judgment issued by the judge in the collective procedure will affect or benefit, is provided.
By integrating the class we must understand the way in which

50

APP 1026
App. 692

entender como la forma en que los individuos, ya sea que se trate de un procedimiento por violación de derechos difusos, colectivos o individuales de incidencia colectiva, ingresan al grupo o clase que dentro del juicio será la parte actora o afectada y por ende, a quienes beneficiará o parará perjuicio la sentencia definitiva que se dicte dentro del mismo.

En el derecho comparado, existen básicamente dos modelos o formas de integración de la clase: El denominado Optin (en inglés) que significa "opción de ingresar" y el denominado Optout (en inglés), que significa "opción de salir o excluirse".

[…]

Opción de salir o excluirse (Optout).

Este modelo de procedimiento sin duda alguna es el más común en los procedimientos colectivos de América Latina. La clase se integrará por todos aquellos individuos que resientan la violación de un derecho y que ya sea por las circunstancias de hecho o de derecho, en conjunto forman parte o integran esa colectividad.

Se denomina opción de salir o excluirse, porque bajo este modelo, como se ha dicho, todo individuo que se encuentre en esa misma circunstancia o condición de hecho o de derecho, forma parte de la clase; en consecuencia, no tiene que pedir su inclusión voluntaria a la misma para verse beneficiado por una sentencia y por ende, la opción que tendrá en un momento dado es de solicitar al juez la exclusión de esa clase cuando convenga más a sus intereses no formar parte de ella, en el caso de que por ejemplo, haya iniciado un juicio en lo individual reclamando la misma

individuals, whether it is an action for violation of diffuse rights, collective or individual of collective incidence, enter the group or class who within the trial will be the plaintiff or affected and thus to whom the judgment rendered therein will benefit or affect.

In comparative law, there are basically two models or forms of integration of the class: The so-called Optin (in English) meaning "option to enter" and called OptOut (in English), meaning "option to leave or be excluded".

[…]

Option to leave or be excluded (Optout).

This procedure model is undoubtedly the most common in collective proceedings in Latin America. The class shall be comprised by all those individuals who suffer the violation of a right and that either de facto or de iure, as a group are a part or integrate such collectivity.

It is referred to as option to leave or be excluded, because under this model, as has been said, any individual who is in the same circumstance or condition de facto or de iure, is part of the class, and consequently does not have to request his voluntary inclusion thereto to be benefited by a judgment and therefore the option he will have at some point is to request the judge his exclusion from the class where not being part of it is more appropriate to his interests, in the event that for example, he has started individually a trial claiming the same violation.

This model has excelled in comparative law as the most protector and guarantor, as the benefits arising from a

APP 1027
App. 693

violación.

Este modelo se ha destacado en el derecho comparado como el más protector y garantista, pues los beneficios que puedan derivarse de una sentencia favorable a la clase son extendidos a todos los afectados, incluso a aquellos que por diferentes motivos o circunstancias no hubiesen estado en posibilidad de conocer la acción colectiva entablada. No obstante lo anterior, es preciso señalar que cuando la sentencia definitiva dictada en el juicio colectivo ordene entre otros aspectos la reparación del daño a los afectados, cada persona en lo individual tendrá la obligación de comparecer en la etapa de ejecución para acreditar su derecho a la misma.

El presente proyecto propone que el procedimiento esté construido bajo el sistema de la Opción de salir (Optout) antes explicada, pues se considera que ello dará plena vigencia y efectividad a las acciones colectivas, de lo contrario, es decir, de adoptarse el modelo de Opción de ingresar (Optin) el procedimiento podría parecerse más a una figura procesal ampliamente conocida en nuestro sistema jurídico como es el litisconsorcio activo, truncando con ello, el mandato del Poder Reformador de la Constitución. […]

Por ello, el proyecto establece que cualquier miembro de la colectividad o grupo podrá pedir su exclusión para efectos de un procedimiento colectivo en particular.

La solicitud antes referida deberá realizarse por escrito ante el juzgador y será oportuna cuando se haga en cualquier etapa del proceso y hasta

favorable judgment to a class are extended to all those affected, including those who for various reasons or circumstances were not able to know the existence of the class action. Nevertheless, it should be noted that when the final judgment issued in the class action orders among other things the repair of damage to those affected, each individual person is obliged to appear at the enforcement stage to prove his right.

This project proposes that the procedure be built under the system of choice to leave (optout) explained above, since it is deemed this will give full force and effect to the class actions, otherwise, ie, in case the option to enter model (Optin) is adopted, the proceeding might resemble more a procedural figure widely known in our legal system as the active joint litigation, thereby obstructing the mandate of the Constitution Reforming Power.

[…]

Therefore, the bill provides that any member of the community or group may request his exclusion for the purposes of a particular collective proceeding.

The aforementioned request must be made in writing to the judge and will be timely when done at any stage of the process before the issuance of the judgment ..."

52

| antes de dictar sentencia…" | |
|---|---|
| | |

APP 1029
App. 695

CLA 30

| Spanish | English |
|---|---|
| Dictamen sometido por las Comisiones Unidas de Gobierno y Estudios Legislativos al Senado el 9 de diciembre de 2010. | Ruling submitted by the Government and Legislative Studies United Commissions to the Senate on December 9, 2010 |
| "Leyes Federales y del Distrito Federal<br>CODIGO FEDERAL DE PROCEDIMIENTOS CIVILES<br>Fecha de publicación: 30/08/2011<br>Categoría: DECRETO<br>PROCESOS LEGISLATIVOS<br>DICTAMEN/ORIGEN<br>SENADORES<br>DICTAMEN | Federal Laws and of the Federal District<br>FEDERAL CODE OF CIVIL PROCEDURE<br>Date of publication: 30/08/2011<br>Category: Decree<br>LEGISLATIVE PROCESSES<br>RULING/ORIGIN<br>SENATORS<br>RULING |
| México, D.F., a 9 de diciembre de 2010.<br>Gaceta No. 195<br>COMISIONES UNIDAS DE GOBERNACIÓN Y DE ESTUDIOS LEGISLATIVOS.<br>HONORABLE ASAMBLEA:<br>A las Comisiones Unidas de Gobernación y Estudios Legislativos de la LXI Legislatura del Senado de la República, les fue turnada para su estudio y elaboración del dictamen correspondiente la Iniciativa con Proyecto de Decreto por el que se reforman y adicionan diversos artículos del Código Federal de Procedimientos Civiles, Código Civil Federal, de la Ley Federal de Competencia Económica, Ley Federal de Protección al Consumidor, Ley Orgánica del Poder Judicial de la Federación, Ley General del Equilibrio Ecológico y la Protección al Ambiente y Ley de Protección y Defensa al Usuario de Servicios | Mexico, D.F., December 9, 2010<br>Gazette No. 195<br>GOVERNMENT AND LEGISLATIVE STUDIES UNITED COMMISSIONS<br>HONORABLE ASSEMBLY:<br>To the Government and Legislative Studies United Commissions of the LXI Legislature of the Senate of the Republic, was handled for its study and drafting of the corresponding ruling the Bill with Decree Draft by which several articles of the Federal Code of Civil Procedure, Federal Civil Code, the Federal Antitrust Law, the Federal Consumer Protection Law, the Statutory Law of the Judicial Branch, Federal General Law of Ecological Balance and Environmental Protection and the Protection and Defense of the Financial Services User Law are amended and added, submitted by Senator Jesús Murillo Karam, member |

54

APP 1030
App. 696

Financieros, presentada por el Senador Jesús Murillo Karam, integrante del Grupo Parlamentario del Partido Revolucionario Institucional.

Con base en el análisis y estudio de las iniciativas que se dictaminan, estas Comisiones Unidas, con fundamento en lo establecido por los artículos 86, 94, 103 y demás relativos de la Ley Orgánica del Congreso General de los Estados Unidos Mexicanos, así como lo dispuesto en los artículos 182, 188, 190, 191 y demás relativos y aplicables del Reglamento del Senado de la República, someten a la consideración de los integrantes de esta Honorable Asamblea el presente dictamen […]

Integración de la colectividad

No pasa inadvertido a ninguno de los integrantes de estas comisiones dictaminadoras que uno de los puntos torales que podrá definir los alcances, efectos e incluso el desarrollo de los procedimientos colectivos es el concerniente a la integración de la colectividad.

La integración de la colectividad se conceptualiza como la forma en que los individuos, ya sea que se trate de un procedimiento por violación de derechos difusos, colectivos o individuales de incidencia colectiva, ingresan a la colectividad que dentro del juicio será la parte actora y, por ende, formarán el universo de personas al cual beneficiará o parará perjuicio la sentencia definitiva que se dicte dentro del mismo.

Sobre el particular, estas Comisiones dictaminadoras consideraron conveniente establecer un procedimiento para la integración de la

of the parliamentary group of the Institutional Revolutionary Party.

Based on the analysis and study of the bills to be ruled, these Joint Commissions, based on the provisions of Articles 86, 94, 103 and other relevant articles of the Organic Law of the General Congress of the United States of Mexico, as well as articles 182, 188, 190, 191 and other related and applicable of the Regulations of the Senate, submit for the consideration of the members of this Honorable Assembly this ruling […]

Integration of the class

It does not go unnoticed to any of the members of these ruling commissions that one of the main points to define the scope, effects and even the development of collective proceedings is the one concerning the integration of the class.

The integration of the class is conceptualized as the way in which individuals, whether it is an action for violation of diffuse rights, collective or individual of collective incidence, enter the collectivity that in the trial will be the plaintiff and, therefore, will form the universe of people that the final judgment rendered therein will benefit or affect.

On this, these ruling commissions considered convenient to establish a flexible procedure for integrating the community based on the nature of the action.

In the case of collective actions in the strict sense and individual homogeneous actions, it is intended that the adhesion to the community can be made by each affected individual

| | |
|---|---|
| colectividad flexible atendiendo a la naturaleza de la acción.<br><br>En el caso concreto de las acciones colectivas en sentido estricto e individuales homogéneas, se pretende que la adhesión a la colectividad se pueda realizar por cada individuo que tenga una afectación a través de una comunicación expresa por cualquier medio dirigida al representante de la colectividad. Asimismo, se considera conveniente que esta adhesión voluntaria pueda realizarse durante la substanciación del proceso y hasta dieciocho meses posteriores a que la sentencia haya causado estado o en su caso, el convenio judicial adquiera la calidad de cosa juzgada.<br><br>Cabe precisar que si la adhesión es posterior a que la sentencia haya causado estado, el juez deberá ordenar ordenará el inicio del incidente de liquidación que corresponda a dicho interesado, en los términos que se regula dicho incidente, siempre que el miembro de la colectividad acredite formar parte de la colectividad y pruebe, en el incidente de liquidación, haber sufrido el daño causado…" | through an express communication by any means to the representative of the community. Furthermore, it is considered appropriate that this voluntary adherence may be done during the substantiation of the process and up to eighteen months after the judgment is final or where appropriate, the judicial agreement acquires the status of res judicata.<br><br>It should be noted that if the adhesion is done after the judgment is final, the judge shall order the start of the corresponding liquidation ancillary claim for the interested party, in the terms that such ancillary claim is regulated, provided that the member of the class proves to be part of the class and proves, in the ancillary claim, having suffered the caused damage. |

APP 1032<br>App. 698

CLA 31

| Spanish | English |
|---|---|
| "Época: Octava Época<br>Registro: 225834<br>Instancia: Tribunales Colegiados de Circuito<br>Tipo de Tesis: Aislada<br>Fuente: Semanario Judicial de la Federación<br>Tomo V, Segunda Parte-1, Enero-Junio de 1990<br>Materia(s): Civil<br>Tesis:<br>Página: 304 | Epoch: Eight Epoch<br>Registry: 225834<br>Instance: Collegiate Circuit Courts<br>Type of Precedent: Isolated<br>Source: Judicial Weekly of the Federation<br>Volume V, Second Part-1, January-June 1990<br>Matter(s): Civil<br>Precedent:<br>Page: 304 |
| **NORMAS PROCESALES. NO PUEDEN DEJAR DE OBSERVARSE POR RAZONES DE EQUIDAD. (LEGISLACION DEL ESTADO DE PUEBLA).**<br>Las normas procesales por ser de orden público son irrenunciables, por lo que es jurídicamente incorrecta la determinación contenida en una sentencia, en el sentido de que por razones de equidad, tales normas pueden dejar de acatarse. | **PROCEDURAL RULES. THEY CANNOT STOP BEING OBSERVED FOR REASONS OF EQUITY. (LEGISLATION OF THE STATE OF PUEBLA).**<br>The rules of procedure cannot be waived because they are of public order, hence, a judgment holding that such rules can be unobserved for equitable reasons is an incorrect juridical ruling. |
| TERCER TRIBUNAL COLEGIADO DEL SEXTO CIRCUITO.<br>Amparo directo 69/90. Mariano Chantres Molina. 13 de marzo de 1990. Unanimidad de votos. Ponente: Jaime Manuel Marroquín Zaleta. Secretaria: María Guadalupe Herrera Calderón." | THIRD COLLEGIATE COURT OF THE SIXTH CIRCUIT.<br>Direct Amparo 69/90. Mariano Chantres Molina. March 13, 1990. Unanimity of votes. Rapporteur: Jaime Manuel Marroquín Zaleta. Secretary: María Guadalupe Herrera Calderón." |

APP 1033<br>App. 699

# EXHIBIT 33

PROSKAUER
EXHIBIT 33

APP 1034
App. 700

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SAMUEL TROICE, HORACIO MENDEZ, | § | |
| ANNALISA MENDEZ, and | § | |
| PUNGA PUNGA FINANCIAL, LTD., | § | |
| individually and on behalf of a class of all | § | |
| others similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 3:09-CV-1600-N |
| | § | Hon. David C. Godbey |
| PROSKAUER ROSE, LLP, | § | |
| THOMAS V. SJOBLOM, | § | |
| P. MAURICIO ALVARADO, and | § | |
| CHADBOURNE & PARKE, LLP, | § | |
| | § | |
| Defendants. | § | |

## <u>DECLARATION OF ANTONIO GIDI</u>

## I.   INTRODUCTION

### A.  The Consultation

1. I have been asked to provide an opinion with respect to the likelihood that certain Latin American countries will recognize, and accord preclusive effect to, a class action judgment in an action pending in the United States District Court for the Northern District of Texas, Dallas Division.

2. To prepare this Declaration, I have read the following materials provided to me by counsel for the Defendants:  Plaintiffs' Second Amended Class Action Complaint; Plaintiffs' Opposed Motion for Class Certification, For Designation of Class Representatives and Class Counsel; Brief in Support of Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel; Declaration of Receiver Ralph S. Janvey (the "Janvey Declaration"); Order of Notice and Proof of Claim, signed May 4, 2012; Notice of Bar Date and Procedures for Submitting Proofs of Claim; Proof of Claim Form; Notice of Last Day to Submit a Proof of Claim

Form; Notice of Deficiency; Notice of Determination; Settlement Agreement and Cross-Border Protocol; and Declaration of Professor Alejandro M. Garro (the "Garro Declaration").

## B.    Summary of Opinions

3.   Professor Alejandro M. Garro, one of Plaintiffs' experts, has opined on whether certain Latin American countries would be "hospitable" to the enforcement of a judgment rendered in the United States.  That is not the right question.  The issue here is whether these countries would recognize a class action judgment or settlement in a U.S. opt-out action so that absent class members would be bound by any such judgment.  For the reasons explained below, I conclude that Peru, Panama, El Salvador, and Ecuador would not.[1]

## C.    Qualifications

4.   Class actions have been the object of my continuous research for the past twenty-five years.  After graduating from law school in Brazil, I completed a three-year Master's Degree program in Civil Procedure at PUC-São Paulo.  My Masters in Law dissertation was published in 1995 as a 250-page book on *res judicata* and *lis pendens* in Brazilian class actions.[2]

5.   Following my Master's Degree, I lived for more than a year and a half in Italy, where I studied Italian Civil Procedure at the University of Milan, with special attention to the development of class actions in that country.  I also studied the development of class actions in France for approximately five months, at the University of Paris I Law School (Panthéon-Sorbonne).

6.   In 1996, I moved to the United States to continue my research on American class actions.  During my years as a Visiting Scholar in the United States, I finished two doctorates in law, one in Brazil (PUC-São Paulo) and another doctorate at the University of Pennsylvania Law School.  The respective doctoral theses were a 600-page treatise about American class actions[3] and a paper on Brazilian class actions.[4]  I also published a paper about Peruvian class actions.[5]

---

[1] Unless otherwise noted, all translations of foreign documents are my own.

[2] *See* ANTONIO GIDI, COISA JULGADA E LITISPENDÊNCIA EM AÇÕES COLETIVAS (1995).

[3] *See* ANTONIO GIDI, A CLASS ACTION COMO INSTRUMENTO DE TUTELA COLETIVA DOS DIREITOS (2007).

[4] *See* Antonio Gidi, *Class Actions in Brazil – A Model for Civil Law Countries*, 51 AM. J. COMP. L. 311 (2003).

[5] *See* Antonio Gidi, *Comentarios al art. 82 del Código Procesal Civil Peruano*, *in* JOHAN S. CAMARGO ACOSTA (ED.), I CÓDIGO PROCESAL CIVIL COMENTADO POR LOS MEJORES ESPECIALISTAS 360 (2010) (describing and critiquing the Peruvian class action).

7. In 2005, I published a Model Class Action Code for Civil Law Countries.[6] This model code was the culmination of more than a decade of study with the objective of creating class action legislation for civil law countries. This project has been translated into several languages and published in several countries.[7] In addition, I was one of the three General Reporters of the Class Action Model Code for Latin American Countries, a project sponsored by the Ibero-American Institute of Civil Procedure, which was the product of four years of study, analysis, and drafting by eleven legal scholars from various Latin American countries.[8] Following that work, I co-edited three books in Mexico about the Ibero-American project, coordinating the scholarship of more than sixty class action scholars from Latin America and all over the world.[9]

8. My class action research led to invitations from the Brazilian Ministry of Justice and from the Mexican Senate to consult on class action legislation. I was one of the main drafters of the proposed Class Action Bill in Brazil[10] and of the Class Action Law in Mexico, enacted in 2011.[11] I have also published a 500-page monograph on the subject of class action codification in Brazil and in civil-law countries in general.[12]

---

[6] *See* Antonio Gidi, *The Class Action Code: A Model for Civil-Law Countries*, 23 ARIZ. J. INT'L & COMP. L. 37 (2005).

[7] *See, e.g.*, Gidi, *Código de Processo Civil Coletivo. Um Modelo Para Países de Direito Escrito*, 111 REPRO 192 (2003) [**Brazil**]; Gidi, *Código de Proceso Civil Colectivo. Un Modelo Para Países de Derecho Civil*, 11 REVISTA PRÁCTICA DE DERECHO DE DAÑOS 56 (2003) (translated into Spanish by Adriana León and Joaquín Silguero Estagnan) [**Spain**]; *also published in* XXVI CONGRESO COLOMBIANO DE DERECHO PROCESAL, UNIVERSIDAD LIBRE 601 (2005) [**Colombia**]; *also published in* EDUARDO OTEÍZA (ORG.). PROCESOS COLECTIVOS 463 (2006) [**Argentina**]; *also published in* 126 REVISTA JURÍDICA DEL PERU 93 (2011) [**Peru**]; *also published in* 16 REVISTA VASCA DE DERECHO PROCESAL Y ARBITRAJE 753 (2004) [**Spain**]; Gidi, *Il codice del proceso civile collettivo. Un modello per i paesi di diritto civile*, RIVISTA TRIMESTRALE DI DIRITTO E PROCEDURA CIVILE, Anno LIX Fasc 2, 2005, p. 698-711 (translated into Italian by Alessandro Barzaghi) [**Italy**]; Gidi, *Le Code de L'Action Collective: Un Modéle Pour les Pays de Droit Civil*, in CLOSET-MARCHAL & COMPERNOLLE (EDS.) VERS UNE "CLASS ACTION" EN DROIT BELGE? 147-63 (2008) (translated into French by M. Guy Sohou and Caroline Gilbert, with an introductory study in Dutch by Stefaan Voet) [**Belgium**], GIDI, LAS ACCIONES COLECTIVAS (2004) [**Mexico**]; Gidi, 附录:集团诉讼条例（专家建议案）—大陆法系国家模板, 2014 XIAMEN UNIVERSITY L. REV. 271 [**China**]; الگویی جمعی دعوای قانون [Iran] لا سیویل سیستم کشورهای برای.

[8] *See* Ada Pellegrini Grinover, Kazuo Watanabe & Antonio Gidi, *Código Modelo de Procesos Colectivos para Iberoamérica*, 9 REVISTA IBEROAMERICANA DE DERECHO PROCESAL 251 (2006).

[9] *See* ANTONIO GIDI AND EDUARDO FERRER (EDS.), CÓDIGO MODELO DE PROCESOS COLECTIVOS. UN DIÁLOGO IBEROAMERICANO (2009); ANTONIO GIDI AND EDUARDO FERRER (EDS.), PROCESOS COLECTIVOS, 2nd edition (2004); ANTONIO GIDI AND EDUARDO FERRER (EDS.), LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS, 2nd edition (2004). One of these books was later published in Brazil as well.

[10] *See* Federal Bill Number 5,139 of 2009.

[11] *See* Federal Decree of August 30, 2011.

[12] *See* ANTONIO GIDI, RUMO A UM CÓDIGO DE PROCESO CIVIL COLETIVO (2008).

9. Most recently, I have published three articles in English about preclusion in the context of class actions and the recognition of class action judgments abroad.[13]

10. Although my main area of expertise is class actions, I also study comparative civil procedure and international litigation in general.  From 1997 to 2005, I served as Associate Reporter to The American Law Institute's project on Principles and Rules of Transnational Civil Procedure, a project geared towards creating uniform rules of civil procedure for international litigation.  After completion and final approval, the Principles of Civil Procedure was published by Cambridge University Press in 2006.[14]  This project has been published in several languages and in several countries.  In 2009, I co-published a book on Comparative Law with Foundation Press and was in charge of the chapters on comparative civil procedure.[15]  This book is widely used in American law schools.

11. I have taught Civil Procedure, Class Actions, Complex Litigation, Comparative Civil Procedure, and Comparative Law in the United States for the past fifteen years, first as an Adjunct at the University of Pennsylvania Law School, then as an Associate Professor at the University of Houston Law Center, and finally at Syracuse University College of Law.  I have participated in conferences, presented papers, and taught in numerous Latin American countries and Europe, mostly about class actions, but also about domestic civil procedure, comparative civil procedure, and international litigation.

12. I attach my *curriculum vitae* as **Exhibit A** hereto.

### D.    Overview

13. The recognition and enforcement of class action judgments in Latin America present some very specific considerations that do not arise in the context of traditional litigation.

14. Here, Plaintiffs and one of their experts, Professor Garro, assert that a U.S. money judgment would probably be recognized and enforced in certain Latin American countries.  Their analysis largely focuses on the formalistic requirements that a plaintiff needs to follow to enforce a judgment abroad.

15. But that is not the issue here.  The issue is not whether a traditional U.S. judgment in an individual lawsuit between one plaintiff and one defendant would be recognized or

---

[13] *See* Antonio Gidi, *Loneliness in the Crowd: Why Nobody Wants Opt-Out Class Members to Assert Offensive Issue Preclusion Against a Class Defendant*, 66 SMU L. REV. 1 (2013); *Recognition of U.S. Class Action Judgments Abroad*, 37 BROOKLYN J. INT'L L. 893 (2012); *Issue Preclusion Effect of Class Certification Orders*, 63 HASTINGS L.J. 101 (2012).

[14] *See* THE AMERICAN LAW INSTITUTE, PRINCIPLES OF TRANSNATIONAL CIVIL PROCEDURE (Cambridge University Press 2006) (ALI/UNIDROIT Associate Reporter and Secretary) (with Hazard, Stürner, and Taruffo).

[15] *See* UGO MATTEI, TEEMU RUSKOLA & ANTONIO GIDI, SCHLESINGER'S COMPARATIVE LAW (2009).

enforced in Latin America.  Nor is the issue here whether a U.S. class action money judgment favorable to the plaintiff class would be enforced in Latin America if a class member wants to enforce it against the defendants.

16. Rather, the issues at stake are:

> (1) whether a U.S. class action judgment against the interest of the class would bar class members from bringing individual (or class) claims against the same defendant(s) in Latin America; and

> (2) whether a U.S. class action judgment (or settlement) partly in favor of the class, but that a class member finds unsatisfactory for any reason, would bar class members from bringing individual (or class) claims against the same defendant(s) in Latin America for the remainder of the claim.

17. These are the issues.  Thus, I will not discuss each of the requirements that Professor Garro addresses in his declaration (e.g., that the *defendants* be properly served with process and have an opportunity to present their case, or the more formalistic requirements of whether the judgment is authentic, final, certified, notarized, translated, or legalized in a consulate).  Nor will I discuss whether this Court has jurisdiction over the *defendants* under U.S. law or Latin American law.  In my opinion, those issues are irrelevant.

18. In a class action, the traditional issues are reversed:  it is necessary to look not to the defendant, but to the absent members of the plaintiff class.  **The issue addressed in this Declaration, therefore, is whether a U.S. class action judgment (or settlement) that is totally or partly against the interest of class members is binding on the class members who are domiciled in Latin American countries and who did not personally appear in the class action.**

19. I conclude that the courts in Latin American countries, generally, and in Peru, Panama, El Salvador, and Ecuador in particular, would rule in the negative.[16]  Three general obstacles to recognition of opt-out class action judgments are relevant here:

> (1) first, an opt-out class action for damages would violate the public policy of those Latin American countries that:  (a) do not have class actions for damages; (b) have class actions, but only give them preclusive effect if the judgment is favorable to the class; or (c) have only opt-in class actions;

---

[16] Although my analysis applies to the vast majority, if not all, Latin American countries, I only specifically address Peru, Panama, El Salvador, and Ecuador.

(2) second, Latin American countries will demand that parties and absent class members in a foreign proceeding be personally served with process and have an opportunity to present their claims. Latin American countries are not likely to recognize a foreign judgment that binds their domiciliaries in a proceeding in a foreign country, including the U.S., in which those domiciliaries did not voluntarily participate and to which they were not made parties through service of process performed through internationally acceptable means (rogatory letters); and

(3) third, Latin American countries would rule that U.S. courts have no jurisdiction over Latin American class members who acquired their CDs outside of the United States. This analysis turns not on whether the U.S. court concluded that it could properly exercise jurisdiction over the absent plaintiffs under the due process clause of the United States Constitution, but instead on generally established principles of jurisdiction under international law.

20. My analysis proceeds in two parts. First, I discuss the general obstacles to recognition in Latin America of a U.S. opt-out class action judgment for damages. Second, I provide a country-by-country analysis of these general principles to conclude that Peru, Panama, El Salvador, and Ecuador would not recognize a judgment in an opt-out class action for damages to preclude a claim by an absent class member.

## II.      OBSTACLES TO RECOGNITION AND ENFORCEMENT

### A.      Opt-Out Class Action Judgments Violate Public Policy

21. I conclude that the large majority if not all Latin American countries will not recognize or enforce a U.S. class action judgment because an opt-out class action for damages would violate their public policy.

22. There are three independent, and sometimes overlapping, reasons why an opt-out class action for damages would violate the public policy of certain Latin American countries. First, an opt-out class action for damages would violate the public policy of those Latin American countries that do not have class actions for damages. Second, some countries would give preclusive effect only to a class action judgment that is favorable to the class. Third, in those countries that have adopted an opt-in class action mechanism, an opt-out class action judgment would violate public policy.

23. Several Latin American countries simply do not have class actions for damages in statutes, rules, or case law. Some of these countries may have injunctive class actions with different levels of sophistication, ranging from a more liberal injunctive class action

for the protection of the environment or consumers to a very limited type of injunctive class action for the protection of the public interest.[17]

24. The prevailing rule in these countries is that someone may be deprived of their personal rights in courts *only* through due process of law.  Due process of law includes the need to be personally served with process and granted a reasonable opportunity to present claims and defenses.  The idea that individuals may have their rights decided in court without receiving service of process and becoming a formal party is unacceptable.

25. Class actions for damages, particularly opt-out class actions, are so alien to the procedural law of these countries as to be considered a violation of due process of law and against these countries' public policy and constitutional values.  Therefore, these countries would not recognize a U.S. opt-out class action judgment issued against the interests of their domiciliaries.

26. A second reason that a U.S. opt-out class action judgment would be against the public policy of certain Latin American countries arises from differences between the *res judicata* law of those jurisdictions and that of the United States.  In some Latin American countries, a class action judgment is binding only to the extent that it is favorable to the interests of the class members.  Therefore, a judgment for defendants or a judgment or settlement that is less than the full amount of the claim is not binding on the class members.

27. In addition, in some Latin American countries, plaintiffs who present new evidence or even raise new facts would be able to bring the same class action or a corresponding individual action.  Although the concepts of "new evidence" and "new facts" are not clearly defined, in my opinion, they encompass both:  (1) evidence or facts that were available at the time of the proceeding but not produced (with or without due diligence); and (2) evidence or facts that were unavailable.[18]

28. These flexible and liberal *res judicata* rules regarding class judgments exist throughout Latin America.  Binding an absent class member to an adverse judgment in a proceeding in which he or she did not participate would be against these countries' due process of law, public policy, and constitutional values.[19]   Therefore, these countries would not

---

[17] *See* José Carlos Barbosa Moreira, *A ação popular do direito brasileiro como instrumento de tutela jurisdicional dos chamados interesses difusos*, in TEMAS DE DIREITO PROCESSUAL (1977) (discussing the Roman *actio popularis* as an injunctive class action).

[18] *See* ANTONIO GIDI, COISA JULGADA E LITISPENDÊNCIA EM AÇÕES COLETIVAS 131-38 (1995) (discussing the concept of "new evidence" for purposes of bringing the same class action again); Antonio Gidi, *cosa juzgada en acciones colectivas* in ANTONIO GIDI AND EDUARDO FERRER (EDS.), LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 280-84 (2004) (idem).

[19] *See* ANTONIO GIDI, COISA JULGADA E LITISPENDÊNCIA EM AÇÕES COLETIVAS 59 (1995) (stating that a res judicata that binds absent class members "whether favorable or not" is unconstitutional because it violates the due process of law).  Although the author has departed from this understanding, it reflects the mindset in Latin American countries.

recognize a U.S. opt-out class action judgment issued against the interests of its domiciliaries.

29. Third, countries that have adopted an opt-in class action mechanism would not recognize a judgment rendered in an opt-out class action.  The adoption of opt-in, instead of opt-out, class actions stems from the widespread perception that binding an absent class member to a judgment in a proceeding in which he or she did not participate would be a violation of due process of law and against the country's public policy and constitutional values.[20]  Therefore, a country that has adopted an opt-in class action mechanism would not recognize a U.S. opt-out class action judgment issued against the interests of their domiciliaries.

**B.    Formal Service of Process to Class Members through Rogatory Letters is Essential to Foreign Judgment Recognition and Enforcement in Latin America**

30. As in the United States, a key requirement of due process of law in Latin America is that a party be provided adequate notice and an opportunity to participate in the proceedings.

31. As stated in Professor Garro's declaration:

> An additional requirement, present in all the Latin American jurisdictions in question, is that the party against whom the enforcement is sought was duly summoned to appear and given the opportunity to present its case. By and large, both service of process and the right to be heard must be in conformity with the due process standards prevailing in the State of enforcement.

Page 7, ¶ 23.

32. For example, the Bustamante Code requires "personal service of process to the parties or to a legal representative."[21]  A similar requirement is found in Article 2(e) of the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Awards:  "The plaintiff has been summoned or subpoenaed in due legal form substantially equivalent to that accepted by the law of the State where the judgment, award or decision is to take effect."

---

[20] Mexico, for example, has adopted an opt-in class action mechanism, and thus a judgment issued in an opt-out class action would not be recognized or enforced in that country.

[21] *See* Bustamante Code, Article 423.2:  "Que las partes hayan sido citadas personalmente o por su representante legal, para el juicio."  In the translation of Professor Garro, "The parties have been summoned personally or through their legal representatives."  Garro Declaration, p. 9, n. 6.  The Bustamante Code is a treaty in force in several Latin American countries, including Ecuador, El Salvador, Panama, and Peru.  It deals with private international law, including the enforcement of foreign judgments.

33. Service of process on a party domiciled abroad must be effectuated in a manner that is internationally accepted if a judgment is to be recognized abroad.  For example, a large number of Latin American countries (including all countries specifically discussed in this Declaration) are signatories to the Inter-American Convention on Letters Rogatory, as is the United States.  Most Latin American countries will not accept anything short of service by rogatory letter[22] as adequate service of process on their residents for purposes of granting *exequatur* on a foreign judgment[23]—they will not accept service of process by publication, they will not accept service of process by letter, and they will not accept service of process through the attorney.[24]  *A fortiori*, a simple "adequate class action notice" that is typically sent in a U.S. class action is insufficient.

34. An integral part of notice (and due process of law) is the idea of participation in the proceeding and the opportunity to present claims and defenses.  For example, according to Article 23(f) of the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Awards, a foreign judgment would be recognized only if "the parties had an opportunity to present their defense."

35. Naturally, an opportunity to present one's claims or defenses is irrelevant when the claimant prevails in a proceeding.  The problem only arises when the person who did not have such an opportunity loses the case.

36. In the present case, the absent foreign class members will not participate in the class action proceeding.

37. In light of the discussion above, Latin American countries will refuse to recognize a U.S. class action judgment unfavorable to the interest of their domiciliaries because those domiciliaries were not made parties through an internationally acceptable service of process.  In addition, Latin American countries will not recognize a U.S. class action judgment because the absent class members will not participate in the proceedings.

---

[22] *See* Bustamante Code, Article 388 ("all judicial activity that one member state need to practice in another will be performed though letter rogatory. . . .") and Article 427 ("the service of process of whoever must be heard will be performed through letter rogatory according to this Code"); *see also* Julie C. Ferguson and David A. Pearl, *International Litigation in the Hemisphere*, 13 AM. U. INT'L L. REV. 953, 959 (1998) ("A letter of request has been the customary and preferred method for transnational service of process in most civil law countries.").

[23] *See* Ferguson & Pearl, *supra* note 22, at 959, ("[I]f counsel will need to enforce a foreign judgment in [a Latin American country], counsel should make sure that service is effected in accordance with the laws of that country as well."); Maria Angela Jardim de Santa Cruz Oliveira, *Recognition and Enforcement of United States Money Judgments in Brazil*, 19 N.Y. INT'L L. REV. 1, 14 (2006) ("[I]f the respondent is domiciled in Brazil, notice of process must comply with Brazilian law, in that the foreign country must send a rogatory letter to Brazil requesting that the Brazilian domiciled defendant be served notice of the process.").

[24] *See* Oliveira, *supra* note 23, at 15 ("[A]ffidavits, notifications by lawyers, by air mail, or any other method of properly serving notice of process according to foreign jurisdictions' law are invalid if served in Brazilian territory.").

C.    **Latin American Courts Would Conclude that the United States Had Not Validly Obtained Jurisdiction Over the Absent Class Members**

38. In order to recognize and enforce a foreign judgment—in this case, a class action judgment issued by the United States District Court for the Northern District of Texas—Latin American countries would demand that the foreign court have jurisdiction over the parties.  Where parties have not consented to jurisdiction in the foreign court, Latin American courts will apply principles of jurisdiction developed in international law to determine whether there were significant contacts with the United States, which are necessary to create jurisdiction.

39. This analysis turns not on whether the U.S. court concluded that it could properly exercise jurisdiction over the absent class members under the due process clause of the United States Constitution, but instead turns on the laws of the recognizing country and generally established principles of jurisdiction under private international law.

40. This is the general rule in most Latin American countries.  For example, Article 2104.2 of the Civil Code of Peru explicitly states that the foreign court must have jurisdiction according to Peru's own private international law and general principles of international jurisdiction.  Article 556 of the Salvadoran Code of Civil Procedure states that the foreign court must have jurisdiction according to the rules of international jurisdiction of El Salvador.  Article 423 of the Ecuadorian Private International Law Code states that the original court must have jurisdiction to decide the case according to the international rules of the Bustamante Code.  Under Article 423(1) of the Bustamante Code, the foreign court must have jurisdiction "according to the rules in this Code" which means that the jurisdiction seeking to enforce a foreign judgment must apply international rules of jurisdiction and not those of the foreign jurisdiction.[25]  Other Latin American countries also require that the foreign court must have jurisdiction according to the rules of the country where the judgment is sought to be recognized or enforced.[26]

41. Typically, we speak of jurisdiction over the defendant.  We do so because the plaintiff consents to jurisdiction by bringing the claim in the forum and because usually the defendant is the one against whom the judgment will be enforced.  In the class action setting, however, the absent class member's rights are affected in much the same way as a traditional defendant's rights.  Because absent class members do not take affirmative

---

[25] *See* Bustamante Code, Article 423.1: "Que tenga competencia para conocer del asunto y juzgarlo, de acuerdo con las reglas de este Código, el juez o tribunal que la haya dictado."

[26] *See* Venezuela Private International Law Act, Article 53.4 (stating that the foreign court must have jurisdiction according to Venezuelan law); Article 483 of the Brazilian Code of Civil Procedure (stating that a foreign judgment will only be enforceable in Brazil if it complies with the Brazilian Supreme Court Rules and the Brazilian Supreme Court Rule 217 (stating that a prerequisite of enforcement of foreign judgments is that the foreign court have jurisdiction over the party).  This rule is well settled in the Brazilian legal system.  *See* Decree Law 4,657/42, Introductory Law to the Civil Code (stating that a prerequisite of enforcement of foreign judgments is that the foreign court have jurisdiction over the party).

steps to bring a class action, they cannot be said to have consented to the jurisdiction of the U.S. courts.

42. It is true that the putative class members filed a proof-of-claim form with the Receiver, subjecting themselves to the jurisdiction of the United States District Court for the Northern District of Texas for all purposes related to the claims asserted in the SEC action.  The exact words of the jurisdiction clause on the proof-of-claim form are the following:

> CONSENT TO JURISDICTION:  If you submit a Proof of Claim Form in this case, you consent to the jurisdiction of the District Court for all purposes *related to this claim* and agree to be bound by its decisions, including, without limitation, a determination as to the validity and amount of any *claims asserted against the Receivership Entities*. In submitting a Proof of Claim Form, you agree to be bound by the actions of the District Court even if that means your claim is limited or denied.

Proof of Claim Form ¶ 12 (emphases added).

43. Based on this language, Plaintiffs state that:

> The Receiver is already administering distributions to class members, with Court–approved notices and what effectively amounts to an "opt-in" class of investors from around the world who have filed claims in the Receivership.[27]

44. By its own terms, however, **the consent to jurisdiction was limited to the Receiver's claims process**.  The language on the proof-of-claim form is clear that the consent to jurisdiction was "for all purposes related to this claim" and only to "claims asserted against the Receivership Entities."  *See also* Settlement Agreement and Cross-Border Protocol, Section 2.3.

45. The current lawsuit is different from the SEC action in two important aspects:  (1) the type of proceeding; and (2) the parties involved.  First, unlike the SEC action, the current lawsuit is a class action.  Second, the current lawsuit is not brought against the Stanford entities, but against their lawyers.

46. The putative class members never subjected themselves to the jurisdiction of this Court for purposes of the class action brought against the lawyers (different parties), nor have they ever opted into a class action (different type of lawsuit).

---

[27] Brief in Support of Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, p. 54 (referring to the Janvey Declaration).

47. The fact that, for purposes of efficiency, these two lawsuits are in the same court and that the plaintiffs have proposed that the proceeds of the second will be distributed through the Receivership created by the first[28] should not obscure the fact that these are two completely different lawsuits.  While the SEC action was styled Civil Action No. 3:09-CV-0298-N, *Securities & Exchange Commission v. Stanford International Bank, Ltd., et al.*, the current action is styled Civil Action No. 3:09-cv-01600, *Samuel Troice, et al., v. Proskauer Rose, LLP, et al.*

48. Thus, contrary to Plaintiffs' argument made in support of class certification, putative class members' "opt-in" to the Receivership claims process simply has no bearing on their participation in this case.

49. There is a practical way of determining whether this Court has jurisdiction over the putative absent class members in the class action against Proskauer and Chadbourne. One needs only to imagine the inverse situation:  would Proskauer or Chadbourne be able to sue the foreign investors individually in this Court?  Would this Court have jurisdiction over the foreign investors in a lawsuit brought by Proskauer or Chadbourne just because it has jurisdiction over them to determine their claims in the SEC action?  The obvious answer is no.

50. Submitting a proof-of-claim form to the Receiver cannot be a trap for the foreign investors, who are not subjecting themselves to the general jurisdiction of U.S. courts to be sued by anyone about any claim.  It does not matter how a U.S. court views its own jurisdiction—that is how the foreign court would see the matter if it is faced with the prospect of enforcing a class action judgment against its domiciliaries.

51. There are simply no accepted standards under which Latin American courts would accept that a U.S. court would have jurisdiction over a foreigner who lacked significant contacts with the United States, unless the foreigner expressly consented to jurisdiction.

52. It is my opinion, therefore, that the vast majority of, if not all, Latin American countries would not recognize a U.S. class action judgment as binding its domiciliaries, because courts in Latin American countries would find that there is a lack of personal jurisdiction over the absent members of the plaintiff class.

## III.      COUNTRY-BY-COUNTRY ANALYSIS

53. As described above, there are three general reasons why Latin American countries would not recognize or enforce an opt-out class action for damages against the interest of their domiciliaries:  (1) opt-out class action judgments violate public policy; (2) there is no

---

[28] *See* Janvey Declaration ¶ 19 ("I have been coordinating the above litigation with the investor putative class action litigation against almost identical sets of defendants, and putative class counsel have agreed that for purposes of efficiency, any proceeds recovered from the class action cases will be distributed through the Receivership claims distribution mechanism.").

formal service of process to class members by internationally acceptable means; and (3) under Latin American concepts of jurisdiction, the United States cannot validly obtain jurisdiction over absent class members.

54. I now provide an analysis of how these general reasons apply to each of the countries at issue.

## **Peru**

55. Peru has ratified the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Awards and its general rules are consistent with the principles in the Convention.

56. Article 2104 of the Peruvian Civil Code provides that foreign judgments may be recognized in Peru as long as:  (1) the judgment is not against the Peruvian public policy; (2)  the defendant was served with process according to the laws of the proceeding, was given a reasonable time to participate, and was afforded procedural guarantees to defend; and (3) the foreign court has personal jurisdiction according to its own rules of private international law and the general principles of international jurisdiction.[29]

57. Peru does not have opt-out class actions for individual damages.  Peruvian legislation allows only injunctive class actions for the protection of rights that belong to a group of indeterminate people.   These injunctive class actions pertain to public goods of incalculable value, like the environment, the cultural or historical patrimony, or consumer rights.[30]   The law provides that any damages established in the judgment should be delivered to the government to repair and conserve the environment.[31]   These are injunctive class actions, and any award of damages is merely incidental to the injunctive relief and will not be distributed to individual persons.[32]

---

[29] *See* Código Civil (Peru), Artículo 2104:  "Para que las sentencias extranjeras sean reconocidas en la República (...), se requiere (...) 2.- Que el tribunal extranjero haya sido competente para conocer el asunto, de acuerdo a sus normas de Derecho Internacional Privado y a los principios generales de competencia procesal internacional. 3.- Que se haya citado al demandado conforme a la ley del lugar del proceso; que se le haya concedido plazo razonable para comparecer; y que se le hayan otorgado garantías procesales para defenderse (...) 7.- Que no sea contraria al orden público (...)."

[30] *See* Código Procesal Civil (Peru), Article 82(1):  "Patrocinio de intereses difusos. Interés difuso es aquel cuya titularidad corresponde a un conjunto indeterminado de personas, respecto de bienes de inestimable valor patrimonial, tales como el medio ambiente o el patrimonio cultural o histórico o del consumidor."

[31] *See* Código Procesal Civil (Peru), Article 82(7):  "La indemnización que se establezca en la sentencia, deberá ser entregada a las Municipalidades Distrital o Provincial que hubieran intervenido en el proceso, a fin de que la emplee en la reparación del daño ocasionado o la conservación del medio ambiente de su circunscripción."

[32] I had an opportunity to publish a paper about the Peruvian class actions.  *See* Antonio Gidi, *Comentarios al art. 82 del Código Procesal Civil Peruano*, in JOHAN S. CAMARGO ACOSTA (ED.), I CÓDIGO PROCESAL CIVIL COMENTADO POR LOS MEJORES ESPECIALISTAS 360 (2010) (describing and critiquing the Peruvian class action); *see also* Johan S. Camargo Acosta *Comentarios al art. 82 del Código Procesal Civil Peruano*, in JOHAN S. CAMARGO ACOSTA (ED.), I CÓDIGO PROCESAL CIVIL COMENTADO POR LOS MEJORES ESPECIALISTAS 371; Aníbal Quiroga León, La Protección

58. The Peruvian legal system does not recognize a rule that allows an "adequate representative" to represent the individual interests of absent people who are not made parties to a proceeding through service of process.  Binding a nonparty would violate the constitutional principle of due process of law.  Therefore, a judgment rendered in an opt-out class action for damages would violate Peru's public policy.

59. Furthermore, in Peru, only class action judgments that are favorable to absent class members are binding.  Under Article 82.6 of the Code of Civil Procedure, "the final judgment that declares the claim meritorious, will bind those who did not participate in the proceeding."[33]  Therefore, a U.S. class-action judgment would be given preclusive effect in Peru only if favorable to the absent class members.

60. Peru is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[34]  It is expected that class members domiciled in Peru will receive notice of the class action proceeding through rogatory letters.  Because notice of the class action proceeding to domiciliaries of Peru likely would not be effectuated by internationally acceptable means, Peru would not recognize or enforce a U.S. opt-out class action judgment against their interests.

61. In order to recognize and enforce a foreign judgment, Peruvian courts demand that the foreign court have personal jurisdiction according to its own rules of private international law and the general principles of international jurisdiction.  Because Peru will consider that the United States does not have international jurisdiction over domiciliaries of Peru without contacts in the United States, Peru will not recognize or enforce a U.S. opt-out class action judgment against their interest.

62. In summary, it is my opinion that Peru would not recognize or enforce a U.S. opt-out class action for damages against the interest of its domiciliaries because Peru will find that:  (1) a judgment rendered in an opt-out class action for damages would violate Peru's public policy;  (2) the absent class members were not served with process by internationally acceptable means; and (3) the United States does not have jurisdiction over its domiciliaries without contacts in the United States.

---

de Intereses Difusos y Colectivos en la Legislación Peruana y el Proyecto de Código Modelo de Procesos Colectivos para Ibero-América, *in* ANTONIO GIDI AND EDUARDO FERRER (EDS.), CÓDIGO MODELO DE PROCESOS COLECTIVOS. UN DIÁLOGO IBEROAMERICANO 476 (2009).

[33] *See* Código Procesal Civil (Peru), Article 82(6):  "La sentencia definitiva que declare fundada la demanda, será obligatoria además para quienes no hayan participado del proceso."

[34] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited February 13, 2015).

## **Panama**

63. Panama has adopted the Bustamante Code.

64. According to Article 179 of the Code of Private International Law, foreign judgments may be recognized in Panama as long as, among other things: (1) there was personal service of process to the defendant and there was an opportunity to participate in the case (principle of adversariness); and (2) the judgment was issued by a competent court.[35]

65. Panama is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[36]  It is expected that class members domiciled in Panama will receive notice of the class action proceeding through rogatory letters.  Because notice of the class action proceeding to domiciliaries of Panama would not be effectuated by internationally acceptable means, Panama will not recognize or enforce a U.S. opt-out class action judgment against their interests.

66. As Professor Garro argued, the language of Article 179.1 seems to imply that the requirement of jurisdiction is deemed satisfied merely when the jurisdiction of the foreign court is not in conflict with the exclusive jurisdiction of Panamanian courts (Garro Declaration, p. 21, ¶ 47).  But there is no reason to assume that the new law changed decades of legal tradition in Panama and in the world regarding recognition and enforcement of judgments abroad, especially considering that Panama has adopted the Bustamante Code which provides that the foreign court must have jurisdiction "according to the rules in this Code."[37] (Article 423.1).

67. Therefore, it is my opinion that Panama will verify whether the U.S. court had jurisdiction over its domiciliaries according to its own laws and international standards.  Because Panama will consider that the United States does not have international jurisdiction over domiciliaries of Panama without contacts in the United States, Panama will not recognize or enforce a U.S. opt-out class action judgment against their interest.

---

[35] *See* Código de Derecho Internacional Privado de la República de Panamá, Article 179: "(...) ninguna sentencia dictada en país extranjero podrá ser ejecutada en la República de Panamá si no reúne los siguientes requisitos: 1. Que la sentencia haya sido dictada por un tribunal competente, es decir, que no haya conculcado la competencia privativa de los tribunales panameños. Se entiende que la competencia sobre bienes inmuebles ubicados en la República de Panamá es de competencia privativa de los jueces panameños. 2. Que la sentencia no haya sido dictada en rebeldía, entendiéndose por tal, para los efectos de este artículo, el caso en que la demanda no haya sido personalmente notificada al demandado.  Es decir, que el proceso evacuado en el extranjero haya cumplido con el principio del contradictorio.  3. Que la sentencia pronunciada por tribunal extranjero no conculque principios o derechos fundamentales del orden publico panameño."

[36] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited February 13, 2015).

[37] *See* Article 423(1) of the Bustamante Code:  "que tenga competencia para conocer del asunto y juzgarlo, de acuerdo con las reglas de este Código, el juez o tribunal que la haya dictado."

68. In summary, it is my opinion that Panama would not recognize or enforce a U.S. opt-out class action judgment for damages against its domiciliaries because Panama will find that: (1) the absent class members were not served with process by internationally acceptable means; and (2) the United States does not have jurisdiction over its domiciliaries without contacts in the United States.

## El Salvador

69. El Salvador has adopted the Bustamante Code.

70. According to Article 556 of the Salvadoran Code of Civil Procedure, foreign judgments may be recognized in El Salvador as long as: (1) the judgment does not violate the Salvadoran constitutional principles or public policy; (2) the party against whom the recognition is sought, has been legally served with process; and (3) the foreign judgment was issued by a court with jurisdiction according to the rules of international jurisdiction of El Salvador.[38]

71. El Salvador does not have a class action for damages. The Salvadoran legal system does not recognize a rule that allows an "adequate representative" to represent the individual interests of absent people who are not made parties to a proceeding through service of process and not allowed an opportunity to present their case. Binding a nonparty would violate the Salvadoran Constitutional principle of due process of law. Therefore, a judgment rendered in an opt-out class action for damages would violate El Salvador's public policy.

72. El Salvador is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[39] It is expected that class members domiciled in El Salvador will receive notice of the class action proceeding through rogatory letters. Because notice of the class action proceeding to domiciliaries of El Salvador would not be effectuated by internationally acceptable means, El Salvador will not recognize or enforce a U.S. opt-out class action judgment against their interests.

73. In order to recognize and enforce a foreign judgment, Salvadoran courts demand that the foreign court has personal jurisdiction according to its own rules of international

---

[38] *See* Código Procesal Civil y Mercantil, Article 556: "Cuando no hubiere tratados o normas internacionales aplicables al reconocimiento de un título extranjero como título de ejecución en El Salvador, dicho reconocimiento se podrá producir si concurren al menos los siguientes requisitos: 1°. Que la sentencia, con autoridad de cosa juzgada en el Estado en que se ha pronunciado, emane del tribunal competente según las normas salvadoreñas de jurisdicción internacional. 2°. Que la parte demandada, contra la que se pretende realizar la ejecución, hubiese sido legalmente emplazada, aunque fuera declarada rebelde, siempre que se le hubiera garantizado la posibilidad de ejercer su defensa y que se le hubiese notificado legalmente la resolución. 4°. Que la sentencia no afecte los principios constitucionales o de orden público del derecho salvadoreño, y que el cumplimiento de la obligación que contenga sea lícito en El Salvador."

[39] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited February 13, 2015).

jurisdiction. Because El Salvador will consider that the United States does not have international jurisdiction over domiciliaries of El Salvador without contacts in the United States, El Salvador will not recognize or enforce a U.S. opt-out class action judgment against their interest.

74. In summary, it is my opinion that El Salvador would not recognize or enforce a U.S. opt-out class action for damages against the interest of its domiciliaries because El Salvador will find that: (1) a judgment rendered in an opt-out class action for damages would violate El Salvador's public policy; (2) the absent class members were not served with process by internationally acceptable means; and (3) the United States does not have jurisdiction over its domiciliaries without contacts in the United States.

## Ecuador

75. Ecuador adopted the Bustamante Code as well as the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Award.

76. Foreign judgments are enforceable in Ecuador as long as: (1) the foreign judgment does not violate Ecuadorian public law or any national law; (2) the parties have been served with process either personally or through their legal representative; and (3) the original court has jurisdiction to decide the case, according to the international rules of the Bustamante Code.[40]

77. Ecuador is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[41] It is expected that class members domiciled in Ecuador will receive notice of the class action proceeding through rogatory letters. Because notice of the class action proceeding to domiciliaries of Ecuador would not be effectuated by internationally acceptable means, Ecuador will not recognize or enforce an U.S. opt-out class action judgment against their interests.

78. In order to recognize and enforce a foreign judgment, Ecuadorian courts demand that the foreign court has personal jurisdiction according to its own rules of international jurisdiction. Because Ecuador will consider that the United States does not have international jurisdiction over domiciliaries of Ecuador without contacts in the United

---

[40] *See* Ecuadorian Code of Civil Procedure, Article 414: "Las sentencias extranjeras se ejecutarán si no contravinieren al Derecho Público Ecuatoriano o a cualquier ley nacional;" Ecuadorian Code of Private International Law, Article 423: "Artículo 423. Toda sentencia civil o contencioso administrativa dictada en uno de los Estados contratantes, tendrá, fuerza y podrá ejecutarse en los demás si reúne las siguientes condiciones: 1. Que tenga competencia para conocer del asunto y juzgarlo. de acuerdo con las reglas de este Código, el juez o tribunal que la haya dictado; 2. Que las partes hayan sido citadas personalmente o por su representante legal, para el juicio; 3. Que el fallo no contravenga el orden público o el derecho público del país en que quiere ejecutarse (...)"

[41] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited February 13, 2015).

States, Ecuador will not recognize or enforce a U.S. opt-out class action judgment against their interests.

79. In summary, it is my opinion that Ecuador would not recognize or enforce a U.S. opt-out class action judgment for damages against its domiciliaries because Ecuador will find that: (1) the absent class members were not served with process by internationally acceptable means; and (2) the United States does not have jurisdiction over its domiciliaries without contacts in the United States.

## IV.    CONCLUSION

80. In conclusion, a judgment or court-approved settlement in U.S. class action proceedings would not be recognized or enforced in any Latin American country because:  (1) opt-out class action judgments violate public policy; (2) there is no formal service of process to class members by internationally acceptable means; and (3) the United States has not validly obtained jurisdiction over absent class members.

81. If any member of the plaintiffs' class that is not satisfied with the class judgment or class settlement sues the defendants in their own country, the defendants cannot successfully raise a *res judicata* defense.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Syracuse, New York, February 13, 2015

_____
Antonio Gidi

# EXHIBIT A

APP 1054

**ANTONIO GIDI**

Syracuse University College of Law
950 Irving Ave.     Syracuse, NY 13244-6070
gidi@gidi.com.br | (215) 266-6464 | www.gidi.com.br

**EDUCATION**

| | |
|---|---|
| 1998 - 2001 | University of Pennsylvania Law School, Philadelphia, S.J.D. |
| 1994 - 2003 | PUC University at Sao Paulo, Brazil, Ph.D. |
| 2000, 2001 | University of Paris I Law School (Pantheon-Sorbonne), France, Visiting Scholar |
| 1996 - 1997 | University of Pennsylvania Law School, Philadelphia, Visiting Scholar |
| 1994 - 1996 | University of Milan, Italy, Visiting Scholar |
| 1991 - 1993 | PUC University at Sao Paulo, Brazil, L.L.M. |
| 1986 - 1990 | Federal University of Bahia, Brazil, J.D. |
| | *Activities:* Senior Editor, Law Review; Research Assistant; Tutor |

**TEACHING APPOINTMENTS**

2013-present   **University of Syracuse College of Law**
Visiting Professor     *Taught*: Civil Procedure (13, 14), Torts (13, 14), Comparative Law (14, 15),
Class Actions (14, 15)

Fall 2012   **University of Tennessee College of Law**
Visiting Professor     *Taught*: Civil Procedure, Comparative Law

2005 – 2012   **University of Houston Law Center**
Assistant Professor
*Taught*: Civil Procedure (05, 06, 07, 08, 09, 10, 11), Comparative Law (06, 06, 07, 08, 09, 10, 11, 12),
International Commercial Arbitration (06), Latin American Law (in Spanish) (05, 06, 07),
Class Actions (07, 08, 11, 12), Comparative Complex Litigation (07)
*Committees*: Graduate Legal Studies (05-06, 06-07), IEFS & HJCC Scholarship Review (05-06),
International Cooperation (07-08, 08-09, 09-10, 10-11, 11-12), Honor Court (11-12)

Summer 2015   **University of Trento Law School**, Italy
Visiting Professor     *Will Teach*: Comparative Civil Procedure, Class Actions

Summer 2015   **Università degli Studi di Roma "Tor Vergata,"** Italy
Visiting Professor     *Will Teach*: Comparative Civil Procedure, Class Actions

Summer 2011   **University of Gent Law School**, Belgium
Marcel Storme Visiting Professor of Law     *Taught*: Comparative Civil Procedure, Class Actions

Summer 2008   **ITAM Law School**, Mexico City
Visiting Professor   *Taught:* Comparative Civil Procedure, Comparative Class Actions

2006-2007   **Agostinho Neto University School of Law**, Luanda, Angola
Academic Adviser and Visiting Professor, LLM Program     *Taught:* Introduction to US Law
Helped create the first LLM Program in Angola (Oil and Gas)

Summer 2006   **Loyola University Law School**, Summer Program Abroad
*Taught*: Comparative Civil Procedure

Summer 2005   **Penn State Law School**, Summer Program in France and Austria
*Taught*: Comparative Civil Procedure

2003 – 2005   **University of Detroit Mercy School of Law**
Assistant Professor
*Taught*: Civil Procedure (03-04, 04-05), Comparative Law (04, 05), Complex  Litigation (05)
*Committees*: Hiring (03-04, 04-05), Global (03-04, 04-05), Curriculum (04-05), Building (03-04),
Student Evaluations (04-05), Mexico Program (04-05), Library (04-05)

1997 – 2003   **University of Pennsylvania Law School**
Lecturer-in-Law
*Created and taught:* Comparative Civil Procedure, Comparative Professional Responsibility,
Int'l Advocacy, Class Actions in Comparative Perspective

2002 – 2003   **Temple University, Beasley School of Law**
Adjunct Professor.   *Taught*: International Litigation and Arbitration

**APP 1055**

App. 721

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2009 | **Mexican Senate** |
| | Consultant to Senator Murillo Karam.  Drafted the Current Mexican Class Action Code |
| 2009 | **Brazilian Ministry of Justice** |
| | Member of the Advisory Committee.  Drafted a Class Action Bill |
| 1997 – 2005 | **The American Law Institute** |
| | Associate Reporter. Principles and Rules of Transnational Civil Procedure |
| 2002 – 2005 | **Ibero-American Institute of Civil Procedure** |
| | Co-Reporter. Model Class Action Code for Ibero-America |
| 2000 – 2005 | **International Institute for the Unification of Private Law (UNIDROIT)** |
| | Secretary. Working Group on Transnational Civil Procedure |
| 2002 – 2003 | **The Hague Conference on Private International Law** |
| | Member. Working Group on International Jurisdiction and Judgments |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2002 – present | Consultant and expert witness in foreign law, international litigation and arbitration, class actions |
| 2001 | Fine, Kaplan & Black, Philadelphia, PA |
| | Researcher |
| 1993 – 1994 | City of Sao Paulo, Brazil |
| | Staff Attorney, Law Department (Represented the City of Sao Paulo in civil litigation) |
| 1987 - 1989 | Law Offices of Ronilda Noblat & Sergio Schlang |
| | Associate, Litigation Department (drafted pleadings, consulted with clients) |

## PUBLICATIONS

*Books*

MANUAL DE ESTILO JURÍDICO ACADÊMICO (forthcoming 2015) [Brazil]

SCHLESINGER'S COMPARATIVE LAW (w/ Mattei and Ruskola) (Foundation Press, 2009) [U.S.A.]

RUMO A UM CÓDIGO DE PROCESSO CIVIL COLETIVO (Forense, 2008) [Brazil]

A CLASS ACTION COMO INSTRUMENTO DE TUTELA COLETIVA DOS DIREITOS.  AS AÇÕES COLETIVAS EM UMA PERSPECTIVA COMPARADA (Revista dos Tribunais, 2007) [Brazil]

PRINCIPLES OF TRANSNATIONAL CIVIL PROCEDURE (ALI/UNIDROIT Associate Reporter and Secretary) (w/ Hazard, Stürner, and Taruffo) (Cambridge University Press, 2006) [England]

LAS ACCIONES COLECTIVAS Y LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES EN BRASIL. UN MODELO PARA PAÍSES DE DERECHO CIVIL (UNAM, 2004) [Mexico]

COISA JULGADA E LITISPENDÊNCIA EM AÇÕES COLETIVAS (Saraiva, 1995) [Brazil]

*Edited Books*

CLASS ACTIONS IN COMPARATIVE PERSPECTIVE (ed.) (Carolina Academic Press, forthcoming 2015) [U.S.A.]

SÉRIE PROCESSO COLETIVO, COMPARADO E INTERNACIONAL (ed.) (2012) (4 vols.) [Brazil]

COMENTÁRIOS AO CÓDIGO MODELO DE PROCESSOS COLETIVOS (ed.) (w/ Ferrer) (Jus Podivm, 2009) [Brazil]

CÓDIGO MODELO DE PROCESOS COLECTIVOS. UN DIÁLOGO IBEROAMERICANO (ed.) (w/ Ferrer) (Porrua, 2009) [Mexico]

PROCESOS COLECTIVOS (ed.) (w/ Ferrer), 2nd edition (Porrúa, 2004) [Mexico]

LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS (ed.) (w/ Ferrer), 2nd edition (Porrúa, 2004) [Mexico]

*Articles and Book Chapters*

Class Actions in Mexico.  What It Is; What It Could Have Been (forthcoming 2015)

Civil Procedure in Cross-Cultural Dialogue: Eurasia Context (w/ Voet), II RUSSIAN L. J. 125 (2014)

Loneliness in the Crowd.  Why Nobody Wants Opt-Out Class Members to Assert Offensive Issue Preclusion Against a Class Defendant, 66 SMU L. REV. 1 (2013)

Recognition of U.S. Class Action Judgments Abroad, 37 BROOKLYN J. INT'L L. 893 (2012)

Issue Preclusion Effect of Class Certification Orders, 63 HASTINGS L.J. 101 (2012)

Case Management e o Novo CPC: Os "Novos" Poderes do Juiz Brasileiro (w/ Costa) (forthcoming 2015)

2

Limites objetivos da coisa julgada no Projeto de Código de Processo Civil. Reflexões Inspiradas na Experiência Norte-Americana (w/ Tesheiner and Prates), 194 REVISTA DE PROCESSO 101 (2011)

Patrocinio de intereses difusos (Comentarios al art. 82 del Código Procesal Civil Peruano), *in* JOHAN S. CAMARGO ACOSTA (ED.), 1 CÓDIGO PROCESAL CIVIL COMENTADO POR LOS MEJORES ESPECIALISTAS 361 (2010) [Peru]

Iniciativa de Reforma al Código Federal de Procedimientos Civiles (w/ Benítez and Ferrer), *in* CÓDIGO MODELO DE PROCESOS COLECTIVOS. UN DIÁLOGO IBEROAMERICANO 447 (2008) [Mexico]

Twombly e Iqbal: il ruolo della Civil Procedure nello scontro politico-ideologico della società statunitense, INT'L LIS 104 (2010) [Italy]

Кодекс группового судопроизводства: модель для стран континентального права (translated into Russian by Grigiri Arziani and Dmitry Maleshin), 11 ZAKON 151 (2013) [Russia]

A csoportperes törvénykönyv: Minta a polgárjogi államoknak (translated into Hungarian by Noémi Suri) [Hungary]

Διδάσκοντας Συγκριτική Πολιτική Δικονομία, 64 HARMENOPOULOS LAW REVIEW 1637 (2010) (translated into Greek by Anastasia Vezyrtzi) [Greece]

Le Code de L'Action Collective: Un Modèle Pour les Pays de Droit Civil, in CLOSSET-MARCHAL & COMPERNOLLE (EDS), VERS UNE "CLASS ACTION" EN DROIT BELGE? 147-63 (2008) (Translated into French by M. Guy Sohou and Caroline Gilbert, with an introductory study in Dutch by Stefaan Voet) [Belgium]

Teaching Comparative Civil Procedure, 56 JOURNAL OF LEGAL EDUCATION 502 (2007)

Enseigner la Procédure Civile Comparée, STUDIA IN HONOREM PELAYIA YESSIOU-FALTSI 201, Sakkoulas Publications, Athens, 2007 (Translated into French by Guy Sohou, Muriel Fourrier, and Caroline Gilbert) [Greece]

The Class Action Code. A Model for Civil-Law Countries, 23 ARIZ. J. INT'L & COMP. L. 37 (2005)

集团诉讼条例—大陆法系国家模板, 中国国际私法与比较法年刊 (Chinese Yearbook of Private International Law and Commercial Law) (Translated into Chinese by Zhi Li) (forthcoming 2014) [China]

Il codice del proceso civile collettivo. Un modello per i paesi di diritto civile, RIVISTA TRIMESTRALE DI DIRITTO E PROCEDURA CIVILE, Anno LIX Fasc 2, 2005, p. 698-711 (translated into Italian by Alessandro Barzaghi) [Italy]

Anteproyecto de Código Modelo de Procesos Colectivos para Iberoamérica (w/ Grinover and Watanabe), XXVI CONGRESO COLOMBIANO DE DERECHO PROCESAL 1093 (2005) [Colombia]

Anteprojeto de Código Modelo de Procesos Coletivos para Ibero-América (w/ Grinover and Watanabe), 5 REVISTA IBEROAMERICANA DE DERECHO PROCESAL 36 (2004) [Argentina]

Class Actions in Brazil – A Model for Civil Law Countries, 51 AM. J. COMP. L. 311 (2003)

ブラジルのクラスアクション制度—シビルロー国へのモデル, 34 JOURNAL OF THE JAPANESE INSTITUTE OF INTERNATIONAL BUSINESS LAW (KOKUSAI SHŌJI HŌMU) 997 (2006) (translated into Japanese) [Japan]

中国国际私法与比较法年刊, 中国国际私法与比较法年刊 (Chinese Yearbook of Private International Law and Commercial Law) (Translated into Chinese by Chen Rong and Zhi Li) (forthcoming 2014) [China]

Las Acciones Colectivas en Estados Unidos, ESTUDIOS IBEROAMERICANOS DE DERECHO PROCESAL 239 [Venezuela]

El Concepto de Acción Colectiva, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 14 (2004) [Mexico]

Derechos Difusos, Colectivos e Individuales Homogéneos, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 25 (2004) [Mexico]

Legitimación Para Demandar en las Acciones Colectivas, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 107 (2004) [Mexico]

La Representación Adecuada en las Acciones Colectivas Brasileñas y el Avance del Código Modelo, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 142 (2004) [Mexico]

Cosa Juzgada en Acciones Colectivas, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 261 (2004) [Mexico]

Litispendencia en Acciones Colectivas, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 314 (2004) [Mexico]

Notas Críticas al Anteproyecto de Código Modelo de Procesos Colectivos del Instituto Iberoamericano de Derecho Procesal, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 405 (2004) [Mexico]

Código de Processo Civil Coletivo. Um Modelo Para Países de Direito Escrito, 111 REPRO 192 (2003)

Código de Proceso Civil Colectivo. Un Modelo Para Países de Derecho Civil, 11 REVISTA PRÁCTICA DE DERECHO DE DAÑOS 56 (2003) (translated into Spanish by Adriana León and Joaquín Silguero Estagnan) [Spain], *also published in* XXVI CONGRESSO COLOMBIANO DE DERECHO PROCESAL, Universidad Libre 601 (2005) [Colombia], *and in* REVISTA DE DERECHO PROCESAL (2004) [Argentina], *and in* 16 REVISTA VASCA DE DERECHO PROCESAL Y ARBITRAJE 753 (2004) [Spain]

Enseñando Derecho Procesal Civil Comparado, 2 REVISTA URUGUAYA DE DERECHO PROCESAL 241 (2003) [Uruguay]

3

Iniciativas para la Formulación de Normas Uniformes en el Ámbito del Derecho Procesal Civil Internacional, 11 TRIBUNALES DE JUSTICIA 21 (2002) [Spain], *also published in* 54 DERECHO L. REV. 245 (2002) [Peru]

Principios Fundamentales de Proceso Civil Transnacional (w/ Hazard, Taruffo, and Stürner), 11 TRIBUNALES DE JUSTICIA 27 (2002) [Spain], *also in* 54 DERECHO L. REV. 253 (2002) [Peru]

Normas de Proceso Civil Transnacional (w/ Hazard, Taruffo, and Stürner), 11 TRIBUNALES DE JUSTICIA 31 (2002) [Spain], *also in* 54 DERECHO L. REV. 263 (2002) [Peru]

Adequacy of Representation in Class Actions, 108 REVISTA DE PROCESSO 61 (2002)

Notes on Criticizing the Proposed ALI/Unidroit Principles and Rules of Transnational Civil Procedure, 6 UNIFORM L. REV. 819 (2001) [Italy]

Introduction to the Principles and Rules of Transnational Civil Procedure (w/ Hazard, Taruffo, Stürner), 33 N.Y.U. J. INT'L L. & POL. 769 (2001)

Fundamental Principles of Transnational Civil Procedure (w/ Hazard, Stürner, Taruffo), 33 N.Y.U. J. INT'L L. & POL. 785 (2001)

Rules of Transnational Civil Procedure (w/ Hazard, Taruffo, Stürner), 33 N.Y.U. J. INT'L L. & POL. 793 (2001)

Apresentação às Normas Transnacionais de Processo Civil, ROMA E AMERICA 335 (2000) [Italy], 52 DERECHO L. REV. 593 (1998) [Peru]

Vers un procès Civil Transnational. Une Première Réponse aux Critiques, *in* VERS UN PROCES CIVIL UNIVERSEL? (Phillipe Fouchard ed., 2001) (translated into French by G. Mecarelli) [France]

Towards a Transnational Civil Procedure. A Brief Response to Comments and Criticisms, *in* VERS UN PROCÈS CIVIL UNIVERSEL (Phillipe Fouchard ed., 2001) [France]

Acciones de Grupo y "Amparo Colectivo" en Brasil. La Protección de Derechos Difusos, Colectivos e Individuales Homogéneos, *in* DERECHO PROCESAL CONSTITUCIONAL (2001) [Mexico]

### *ALI/UNIDROIT Publications*

PRINCIPLES AND RULES OF TRANSNATIONAL CIVIL PROCEDURE

| THE AMERICAN LAW INSTITUTE | UNIDROIT [Italy] |
|---|---|
| Proposed Final Draft (2004) | Study LXXVI – Secretary's Report (2004) |
| Council Draft No. 2 (2003) | Proposed Final Draft (2003) |
| Discussion Draft No. 4 (2003) | Study LXXVI – Doc. 10 (2003) |
| Preliminary Draft No. 3 (2002) | Study LXXVI – Secretary's Report (2002) |
| Discussion Draft No. 3 (2002) | Study LXXVI – Doc. 9 (2002) |
| Council Draft No. 1 (2001) | Study LXXVI – Secretary's Report (2002) |
| Discussion Draft No. 2 (2001) | Study LXXVI – Doc. 5 (2002) |
| Preliminary Draft No. 2 (2000) | Study LXXVI – Secretary's Report (2001) |
| Discussion Draft No. 1 (1999) | Study LXXVI – Doc. 4 (2001) |
| Interim Revision (1998) | |
| Preliminary Draft No. 1 (1998) | |

### *Prefaces*

Preface. FELIPE NOYA, REPRESENTATIVIDADE E ATUAÇÃO ADEQUADAS NAS AÇÕES COLETIVAS (2014) [Brazil]

Preface. JUAN CARLOS GUAYACAN, LAS ACCIONES POPULARES Y DE GRUPO FRENTE A LAS ACCIONES COLECTIVAS (2014) [Peru]

Preface. MARCELO HOLANDA, AÇÕES COLETIVAS - LEGITIMIDADE E CONTROLE JUDICIAL DA ADEQUAÇÃO DO AUTOR COLETIVO (2012) [Brazil]

Preface. JORDÃO VIOLIN, PROCESSO COLETIVO E PROTAGONISMO JUDICIÁRIO (2012) [Brazil]

Preface. MARÍLIA PRATES, A COISA JULGADA NO DIREITO COMPARADO: BRASIL E ESTADOS UNIDOS (2012) [Brazil]

Preface. EDUARDO CÂNDIA, LEGITIMIDADE ATIVA NA AÇÃO CIVIL PÚBLICA (2012) [Brazil]

Preface. ELPÍDIO DONIZETTI & MARCELO MALHEIROS, CURSO DE PROCESSO COLETIVO (2010) [Brazil]

Preface. ANTONIO ARAÚJO, DIREITO DA PROPRIEDADE INDUSTRIAL E O MÉTODO PIPA (2009) [Brazil]

Preface. FREDIE DIDIER JR & HERMES ZANETI JR, CURSO DE DIREITO PROCESSUAL CIVIL (2007) [Brazil]

Preface. 52 DERECHO L. REV. 1 (1998) [Peru]

### *Comments, Book Reviews, and Other Short Publications*

Colóquio Internacional de Direito Processual Civil, 102 REPRO 403 (2001) [Brazil]

Colóquio Internacional de Direito Processual Civil em Thesaloniki, REPRO [Brazil]

Notas Esparsas sobre o Processo Civil nos Estados Unidos, 6 REV. DIR. PROC. CIV. 851 (1997) [Brazil]

4

*Student Notes*
As Escolas Penais, 3 REV. CEPEJ 113 (1990)
Faculdade Livre de Direito da Bahia, 1 REV. CEPEJ 61 (1988)

**SCHOLARLY PRESENTATIONS**

Curso Monográfico de Processo Coletivo.  Perspectiva Crítica e Comparada, Programa de Pós-Graduação da Faculdade de Direito da UFES, Vitória, July 18 and 24-26, 2014 (20 hours) [in Portuguese]
Direito Processual Coletivo Comparado e Brasileiro, Ministério Público do Estado do Espírito Santo, Vitoria, July 18, 2014 [in Portuguese]
Novos Rumos do Processo Civil Coletivo, Programa de Pós-Graduação da Faculdade de Direito da UFBA, Salvador, May 29 and Jun 26, 27, 29, 2014 (16 hours) [in Portuguese]
Direito Processual Coletivo.  Uma Visão Comparativa e Crítica das Ações Coletivas, Ordem dos Advogados do Brasil, Rio Grande do Sul (OAB-RS), Porto Alegre, June 20 and 21, 2014 (8 hours) [in Portuguese]
Colóquio Tutela Coletiva no Brasil e nos Estados Unidos, Associação da Defensoria Pública do Estado do Rio de Janeiro (ADPERJ), Rio de Janeiro, june 10, 2014 (7 hours) [in Portuguese]
Ações Coletivas Trabalhistas, 14º Congresso Nacional de Direito do Trabalho e Processual do Trabalho do TRT da 15ª Região, Paulínia, June 5, 2014 [in Portuguese]
Ações Coletivas – Uma Abordagem Comparada: Brasil e EUA, Escola Judicial do Tribunal Regional do Trabalho da 15ª Região (TRT-15), Campinas, May 30, 2014 [in Portuguese]
Class Action Models, Faculty of Law at Pazmany Peter Catholic University, Budapest, Hungary, November 5, 2013 [in English]
Towards a New Class Action Code for Hungary, Faculty of Law at Pazmany Peter Catholic University, Budapest, Hungary, November 6, 2013 [in English]
From Transnational Rules to Fundamental Principles and from Fundamental Principles to European Rules, Unidroit – European Law Institute Meeting, Justizpalast (Palace of Justice), Vienna, October 18, 2013 [in English]
Analise Critica da Ação Coletiva no Sistema Brasileiro, Programa de Pós Graduação da Pontifícia Universidade Católica do Rio Grande do Sul, Porto Alegre, August 8 and 9, 2013 (12 hours) [in Portuguese]
A Tutela Coletiva nos Estados Unidos e no Brasil: Principais Desafios, Ministério Público do Estado do Mato Grosso do Sul, Campo Grande, August 1-2, 2013 (15 hours) [in Portuguese]
O Processo Civil Coletivo em uma Perspectiva Comparada, Programa de Pós Graduação da Faculdade de Direito da Universidade Católica do Salvador (UCSal), July 26-27, 2013 (12 hours) [in Portuguese]
Uma Nova Perspectiva para o Direito Brasileiro, Faculdade de Direito da UFMG, Belo Horizonte, July 5, 2013 [in Portuguese]
Sistema de Tutela Coletiva no Brasil e nos Estados Unidos: Principais Problemas e Desafios, Ministério Público do Estado de Minas Gerais, Belo Horizonte, July 11, 2013 [in Portuguese]
Direito Processual Civil Comparado e Coletivo, Programa de Pós Graduação da Faculdade de Direito da UFMG, Belo Horizonte, July 4-5, 11-12, 2013 (20 hours) [in Portuguese]
As Ações Coletivas Norte-Americanas, Programa de Pós Graduação da Faculdade Baiana de Direito, Salvador, June 28 and 29, 2013 [in Portuguese]
Processo Coletivo em uma Abordagem Comparativa, Conselho Nacional do Ministério Público (CNMP), Brasília, June 21, 2013 [in Portuguese]
Ações Coletivas no Direito Comparado, Tribunal Superior do Trabalho, June 20, 2013 (5 hours) [in Portuguese]
Aspectos Contemporâneos da Tutela Coletiva, Escola Judicial do Tribunal Regional do Trabalho do Paraná, Curitiba, June 12, 13 and 14, 2013 (12 hours) [in Portuguese]
A Experiência da Class  Action Como Instrumento de Tutela Coletiva dos Direitos, Pós Graduação da Faculdade de Direito da UFPR, Curitiba, June 13, 2013 [in Portuguese]
As Class Actions do Direito Norte Americano e uma Comparação com o Sistema de Ações Coletivas Brasileiro, Mestrado em Direito da Unibrasil, June 12, 2013 [in Portuguese]
Comparative Civil Procedure. 7th International Conference of Anamatra, Associação Nacional dos Magistrados da Justiça do Trabalho, American University, Washington College of Law, April 3rd, 2013 [in English]
Employment Collective Actions. 7th International Conference of Anamatra, Associação Nacional dos Magistrados da Justiça do Trabalho, American University, Washington College of Law, April 5th, 2013 [in English]
The New Class Action Statute in Mexico, Globalization of the United States Litigation Model, Brooklyn Law School, New York, October 21, 2011 [in English]
Class Actions in Mexico.  What It Is; What It Could Have Been, Instituto de la Judicatura Federal, Mexico City, Sept 08, 2011 [in Spanish]
Critical Analysis of Proposed Class Action Legislation in Belgium, The Marcel Storme Public Lecture, University of Ghent Law School, Belgium, May 11, 2011 [in English]

5

Hacia un Código de Procedimientos Civiles Colectivos para Mexico, Poder del Consumidor, Mexico City, September 24, 2010 [in Spanish]

Riesgos de la Adopción y de la No Adopción de las Acciones Colectivas en México, Al Consumidor, Mexico City, September 25, 2010 [in Spanish]

Hacia un Código de Procesos Colectivos para Perú, Supreme Court of Callao, Peru, November 04, 2009 [in Spanish]

Las Acciones Colectivas y la Protección de los Derechos de los Grupos, Universidad Nacional Mayor de San Marcos, Lima, Peru, November 04, 2009 [in Spanish]

La Proteción Colectiva de los Derechos Difusos, Colectivos y Individuales en Perú, I Jornada Internacional de Derecho Procesal, Facultad de Derecho de la Universidad Andina de Cusco, Peru, November 06, 2009 [in Spanish]

US Civil Procedure in Comparative Perspective, ABA Rule of Law Initiative and the Ecuadorean Judiciary, Oct 22, 2009 [in Spanish]

Poderes do juiz nas ações coletivas, XXII Encontro Pan-Americano de Direito Processual, Instituto Pan-Americano de Direito Processual, August 26, 2009, Goiânia, Goiás [in Portuguese]

Recent Developments on Class Action Litigation, 62nd Annual Meeting, Southeastern Association of Law Schools (SEALS), Palm Beach, Florida, August 02, 2009 [in English]

Comparative Civil Procedure, The Institute for International and Comparative Law, Dallas, Texas, June 10 and 11, 2009 (8 hours) [in English]

Civil Procedure Harmonization and the Common-Law / Civil-Law Divide, International Association of Procedural Law, Toronto, June 05, 2009 [in English]

Emerging Issues in Investment Abroad. Risk and Litigation. State Bar of Texas International Law Section, 21st Annual Institute, March 05, 2009 [in English]

A Codificação do Processo Civil Coletivo, General Assembly of the Brazilian Bar Association, Brasilia, November 06, 2008 [in Portuguese]

Os Anteprojetos de Código de Processo Civil Brasileiros, National Committee of Group Redress of the Brazilian Bar Association, Brasilia, November 05, 2008 [in Portuguese]

New Trends on Class Actions, 10th Anniversary of the Argentinean Civil Procedure Law Review, Jornadas Internacionales de Derecho Procesal Civil, Universidad del Litoral, October 10, 2008, Santa Fe, Argentina [in Spanish]

Res Judicata in Class Action Litigation; Perspectives on Class Actions, Fundesi, October 08, 2008, Buenos Aires, Argentina [in Spanish]

Rumo a um Código de Processo Civil Coletivo, Ministério Público do Rio de Janeiro, June 9, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Justiça Federal do Paraná, Curitiba, June 18, 2009 [in Portuguese]

Legal Education and Legal Profession in Common Law Countries, Universidade Federal do Espírito Santo, June 20, 2009 [in Portuguese]

Codificação das demandas colectivas en México, Comisión de Gobernación de la Cámara de Senadores y Colegio de Secretarios de la Suprema Corte de Justicia de la Nación, Mexico City, March 28, 2008 [Spanish]

La Experiencia de los Estados Unidos en Materia de Acciones Colectivas (Moderador), El Aceso a la Justicia para los Consumidores a través de acciones colectivas, Nov 16, 2007, ITAM Law School, Mexico City [in Spanish]

Hacia un Código de Proceso Civil Colectivo para México, El Aceso a la Justicia para los Consumidores a través de acciones colectivas, Nov 15, 2007, ITAM Law School, Mexico City [in Spanish]

Inovaciones para una ley de demandas colectivas en México, Alconsumidor and ITAM Law School, November 15, 2007 [in Spanish]

Codifying Class Actions, XIII World Congress of Procedural Law, International Association of Procedural Law, Salvador, Bahia, September 20, 2007 [in English]

Public Law Litigation and Enforcement: Consumer and Environmental Law, Moderator, Georgia State University College of Law, Atlanta, Georgia, September 7, 2007 [in English]

Noções de Direito Norte-Americano, Faculdade de Direito da Universidade Federal da Bahia, Salvador, Bahia, July 2007 [in Portuguese]

Ações Coletivas na Experiência Norte-Americana, Faculdade de Direito da Universidade Federal da Bahia, Salvador, Bahia, July 2007 [in Portuguese]

A História Recente das Propostas de Codificação do Processo Coletivo no Brasil.  A Codificação do Processo Coletivo, Ministério Público do Estado de Minas Gerais, Belo Horizonte, July 17, 2007 [in Portuguese]

A Codificação do Processo Coletivo no Brasil, Ministério Público do Estado de Minas Gerais, Belo Horizonte, Minas Gerais, July 17, 2007 [in Portuguese]

As Ações Coletivas Norte-Americanas, Faculdade de Direito da Universidade de Ribeirão Preto, UNAERP, Ribeirão Preto, São Paulo, Jun 30, 2007 [in Portuguese]

6

Curso de Direito Norte-Americano, Faculdade de Direito da Universidade de Ribeirão Preto, UNAERP, Ribeirão Preto, Jun 29, 2007 [in Portuguese]

A Legislação Sobre Tutela Coletiva no Brasil e no Mundo: Releitura da Intervenção do Ministério Público no Processo Civil, Ministério Público Federal no Paraná, Curitiba, Paraná, June 5, 2007 [in Portuguese]

Comparative Law and Civil Procedure, Visiting Professor, University Agostinho Neto Law School, LLM Program, Luanda, Angola, May 17-22, 2007 [in Portuguese]

Recent Developments on Class Actions in Latin America: The Model Class Action Code for Ibero-America.  Latin American Law Workshop – Washington University Law School, Saint Louis, April 19-21, 2007 [in English]

La Cosa Juzgada en Las Acciones Colectivas, XXVII Congreso Colombiano de Derecho Procesal, Cartagena, Colombia, September 7, 2006 [in Spanish]

As ações coletivas e a tutela dos direitos difusos e coletivos, Faculdade de Direito da Universidade Agostinho Neto, Luanda, Angola, July 21, 2006 [in Portuguese]

Direito Processual Civil Comparado, Commemoration of 50 years of the Catholic University of Salvador, Bahia, Brazil, July 12 and 13, 2006 [in Portuguese]

Direito Processual Coletivo, Commemoration of 50 years of the Catholic University of Salvador, Bahia, Brazil, July 6 and 7, 2006 [in Portuguese]

Direito Processual Coletivo, Universidade Federal Fluminense, Rio de Janeiro, July 3, 2006 [in Portuguese]

Direito Processual Civil Comparado, Universidade Federal Fluminense, Rio de Janeiro, May 27, 2006 [Portuguese]

Problemas Actuales en la Protección Jurisdiccional de los Intereses Difusos y Colectivos, Congreso Internacional de Derecho Procesal Administrativo, May 4, 2006, Mazatlán, Sinaloa, Mexico [in Spanish]

Consideraciones Jurídicas y Políticas de los Princípios de Proceso Civil Transnacional, Instituto de Investigaciones Jurídicas de la Universidad Nacional Autónoma de México, Mexico City, April 27, 2006 [in Spanish]

The Principles and Rules of Transnational Civil Procedure as a tool to teach Comparative Law, The American Society of Comparative Law and The Italian Society of Comparative Law, Penn State University, The Dickinson School of Law, Carlisle, Pennsylvania, U.S.A., April 6, 2006 [in English]

Teaching Comparative Law in First Year Civil Procedure Classes: American Civil Procedure in a Global Context, AALS Annual Meeting, January 4, 2006, Washington DC, U.S.A. [in English]

Ações Coletivas nos Estados Unidos, Pontifícia Universidade Católica do Paraná, Curitiba, Paraná, Brazil, October 29, 2005, videoconference [in Portuguese].

História Recente da Codificação do Direito Processual Coletivo no Brasil, Instituto Brasileiro de Direito Processual, Brasília, October 13, 2005 [in Portuguese]

Legal Education in the United States from a Comparative Perspective, Universidade Cooperativa, Bogotá, Colombia, September 10, 2005 [in Spanish]

Acciones Colectivas en una Perspectiva Comparada, XXVI Congreso Colombiano de Derecho Procesal, September 7, 2005, Bogota [in Spanish]

Class Action Model Code, University of Arizona Law School, Comparative Law in the Twenty-First Century, April 8, 2005, Tucson, Arizona, U.S.A. [in English]

Is there such a thing as Latin American Law?, AALL Annual Meeting, July 19, 2005, San Antonio, USA [English]

Acciones Colectivas Pasivas en el Código Modelo para Iberoamérica, Jornadas Procesales, Tribunal Arbitral de Barcelona, June 30, 2005, Barcelona, Spain [in Spanish]

Consumer Class Action Legislation in Civil Law Countries, Federal Trade Commission (FTC) and Consumer Policy Committee of the Organization for Economic Cooperation Development (OECD) Workshop on Comparative Class Actions, April 19, 2005, Washington DC, U.S.A. [in English]

United States Class Actions, Ministério Público Federal, Porto Alegre, Dez 14, 2004 [in Portuguese]

Class Actions in Comparative Perspective, Ministério Público Federal, Porto Alegre Dez 15, 2004 [in Portuguese]

A Codificação do Direito Processual Civil Coletivo no Brazil, Ministério Público Federal, Porto Alegre, Dez 16, 2004 [in Portuguese]

Rumo a um Código Brasileiro de Processo Civil Coletivo, Ministério Público do Paraná, December 9, 2004, Curitiba, Brazil [in Portuguese]

Harmonization of Civil Procedure, Discussant, Lawyers and Jurists in the 21st Century. Celebrating the Centennial of Comparative Law in the United States, Washington University School of Law, November 13, 2004, St. Louis, U.S.A. [in English]

Proyecto de Código para Acciones Colectivas, Facultad de Derecho Universidad de Córdoba, November 26, 2004, Córdoba, Argentina [in Spanish]

Hacia una Legislación Colectiva en México, III Feria Internacional del Libro, Suprema Corte de Justicia de la Nación, October 25, 2004, Mexico [in Spanish]

Class Action in Comparative Perspective, University of Houston Law Center Faculty Luncheon, Houston, October 11, 2004 [in English]

7

Derecho Procesal Comparado, Supremo Tribunal de Justicia del Estado de Michoacán, Instituto de Especialización Judicial, September 29, 2003, Morelia, Mexico [in Spanish]

La Protección Procesal de los Derechos de Grupo en Estados Unidos y Brasil, Universidad Michoacana de San Nicolás de Hidalgo. División de Estudios de Postgrado de la Facultad de Derecho, September 30, 2003, Morelia, Mexico [in Spanish]

Direito Processual Transnacional, Instituto Brasileiro de Direito Processual, August 9, 2003, Iguassu Falls, Brazil [in Portuguese]

Principios y Normas del Derecho Procesal Transnacional, Universidad de Palermo, August 14, 2003, Buenos Aires, Argentina [in Spanish]

Normas Procesales Civiles Uniformes para el Proceso Colectivo, Inter American Bar Association, XXXIX Conference, June 19, 2003, New Orleans [in Spanish]

Norme Trasnazionali di Procedura Civile, University of Bologna, May 17, 2003, Bologna, Italy [in Italian]

Transnational Civil Procedure, Hellenic Institute of International and Foreign Law, Org. Prof. Konstantinos Kerameus, May 29, 2003, Athens, Greece [in English]

Criticizing the Principles of Transnational Civil Procedure, Stockholm Center for Commercial Law, June 03, 2003, Stockholm, Sweden [in English]

Class Action Model Code for Civil Law Countries, Stockholm Center for Commercial Law, June 04, 2003, Stockholm, Sweden [in English]

Transnational Litigation in Comparative Perspective, Riga Graduate School of Law, June 06, 2003, Riga, Latvia [in English]

Class Actions in Civil Law Countries, Riga Graduate School of Law, June 06, 2003, Riga, Latvia [in English]

Class Actions in Comparative Perspective, Faculty Workshop, Osgoode Hall Law School, January 31, 2003, Toronto [in English]

Class Actions in Comparative Perspective, Faculty Workshop, University of Detroit Mercy School of Law, November 21, 2002, Detroit, U.S.A. [in English]

Código Modelo de Proceso Colectivo, XVIII Jornadas Iberoamericanas de Derecho Procesal, October 16, 2002, Montevideo, Uruguay [in Spanish]

Class Actions in Comparative Perspective, Faculty Workshop, Temple University Beasley School of Law, October 30, 2002, Philadelphia, U.S.A. [in English]

Principios y Normas del Proceso Civil Internacional, IV Curso Anual de Preparación y Capacitación para Profesores de Derecho Procesal, July 20, 2002, Toluca, Mexico [in Spanish]

Drafting Principles and Rules of Transnational Civil Procedure, British Institute of International and Comparative Law, May 24, 2002, London, England [in English]

Proyecto de Principios y Normas del Proceso Civil Internacional, Facultad de Derecho de la Universidad Autonoma de Mexico, March 1, 2002, Mexico City, Mexico [in Spanish]

El Proyecto de Principios y Normas del Proceso Civil Internacional, Center of Uniform Law, February 28, 2002, Mexico City, Mexico [in Spanish]

Class Actions in Comparative Perspective, Faculty Workshop, University of Miami Law School, Florida, U.S.A. February 2, 2002 [in English]

Ações Coletivas nos Estados Unidos, Jornadas de Direito Processual Civil, Ministério Público do Paraná, December 14, 2001, Curitiba, Brazil [in Portuguese]

Class Actions in Comparative Perspective, Faculty Workshop, Louisiana State Law School, Baton Rouge, U.S.A., November 15, 2001 [in English]

Iniciativas para la Formulación de Normas Uniformes en el Ámbito del Derecho Procesal Civil Internacional, Nuevos Retos para el Derecho Procesal Civil Internacional, Universidad de Barcelona, November 5, 2001, Barcelona, Spain [in Spanish]

Las Acciones Colectivas en el Nuevo Derecho Español.  Una Perspectiva Comparada, Mullerat, November 6, 2001, Barcelona, Spain [in Spanish]

Uses and Abuses of Comparative Law, Federal University of Bahia Law School, September 27, 2001, Salvador, Brazil [in Portuguese]

Adequacy of Representation in Class Actions, IV Jornadas de Direito Processual Civil, August 8, 2001, Fortaleza, Brazil [in Portuguese]

Teaching Comparative Civil Procedure, AALS Annual Meeting, January 6, 2001, San Francisco [in English]

Transnational Litigation in Comparative Perspective, Colloquio Internazionale: Processi di Integrazione e Soluzione delle Controversie, Università degli Studi di Roma "Tor Vergata", September 9, 2000, Rome, Italy [in Italian]

Brazilian Class-Action Statutes, Debates Over Group Litigation in Comparative Perspective, Duke University and University of Geneve, July 22, 2000, Geneva, Switzerland [in English]

8

**PARTICIPATION IN PEER EDITED LAW REVIEWS**

REVISTA FORENSE  Member of the International Board of Editors (2013 - present)
COMPARATIVE LAW REVIEW  Member of the Scientific Council (2012 – present) [Poland]
AMERICAN JOURNAL OF COMPARATIVE LAW  Member of the Board of Editors (2006 - present)
REVISTA BRASILEIRA DE DIREITO PROCESSUAL  Member of the Advisory Board (2009 – present)
REVISTA BAIANA DE DIREITO, Member of the International Board of Editors (2008 – present)
REVISTA INTERNACIONAL DE ESTUDIOS DE DERECHO PROCESAL Y ARBITRAJE  Member of the Scientific Committee (2007 - present) [Spain]
REVISTA DO PROGRAMA DE PÓS-GRADUAÇÃO EM DIREITO DA UNIVERSIDADE FEDERAL DA BAHIA, Member of the International Board of Editors (2006 – present)
REVISTA IBEROAMERICANA DE DERECHO PROCESAL CONSTITUCIONAL  Member of the Advisory Committee (2004-present) [Mexico]
REVISTA DE PROCESSO  Member of the Editorial Advisory Board (2002 - present)


**ACTIVITIES**

BLACK'S LAW DICTIONARY (2014).  Academic Contributor
The Brazil-United States Legal and Judicial Studies, American University Washington College of Law, Advisory Council (2013 – Present)
The Hague Conference on Private International Law. "International Jurisdiction and Judgments" Project. Participated initially as an observer for UNIDROIT and then as a member of the drafting working group
UNCITRAL.  United Nations meeting on International Arbitration.  Participated as an observer for UNIDROIT
Cambridge University Press.  Peer Reviewer
Oxford University Press.  Peer Reviewer
Jus Podivm Legal Publishers.  Member of the Editorial Advisory Board (2009 – 2010)
18th International Congress on Comparative Law.  Washington 2010.  National Reporter for Brazil, Mexico, and the United States.


**ACADEMIC AFFILIATIONS**

ASCL          American Society of Comparative Law
              Board of Directors (02-06), Executive Committee (07-09), Research and Service (05 – present)
OAB           Admitted to the Brazilian Bar Association, Bahia and Sao Paulo Chapters
IAPL          Member of the International Association of Procedural Law
IIDP          Member of the Ibero-American Institute of Procedural Law
IBDP          Member of the Brazilian Institute of Procedural Law
IAB           Member of the Brazilian Law Institute
CNPDP         Member of the Mexican Association of Civil Procedure Professors


**LANGUAGES**

Fluent in **Portuguese**, **English**, **Italian**, **Spanish**.  Proficient in **French**


**TEACHING SUBJECTS**

All subjects related to **Civil Procedure. Torts, Comparative Law**, and **International Law**, such as Int'l Litigation, Comparative Civil Procedure, Class Actions, Remedies, Evidence, Torts, Federal Courts, Complex Litigation, Judicial Administration, Judicial Process, Mass Torts, Comparative Legal Traditions, Int'l Arbitration, Int'l Business Transactions, Int'l Trade, WTO, Public Int'l Law, Private Int'l Law, Alternative Dispute Resolution, Int'l Organizations, European Union Law, Latin American Law and Institutions


**REFERENCES**

Professor Geoffrey C. Hazard, Jr. (Hastings Law School); hazardg@uchastings.edu; (415) 292-6535
Ass Dean Professor Christian Day (Syracuse University College of Law); ccday@law.syr.edu; (315) 443-3650
Dean Doug Blaze (University of Tennessee College of Law); blaze@utk.edu; (865) 974-2521
Professor Lance Liebman (Columbia University and ALI); lliebman@law.columbia.edu; (212) 854-5699
Judge Peter Messitte (Federal Court, Maryland); Judge_Messitte@mdd.uscourts.gov; (301) 344-0632
Professor Richard Marcus (University of California, Hastings); marcusr@uchastings.edu; (415) 565-4829
Professor Douglas Moll (University of Houston Law Center); dmoll@central.uh.edu; (713) 743-2172
Professor Stephen Zamora (University of Houston Law Center); szamora@uh.edu; (713) 743-2137

9

# EXHIBIT 34

PROSKAUER
EXHIBIT 34

## DECLARATION OF MANUEL A. GOMEZ

I, Manuel A. Gómez, declare that the following is true and correct:

### I.   Qualifications and Background

1.   I have been retained by counsel to Willis of Colorado, Inc. and Willis Limited (together, "Willis") to opine on certain questions of Venezuelan, Mexican and Colombian law, and to address some of the opinions expressed in the October 30, 2014 Declaration of Professor Alejandro M. Garro ("Garro Declaration") submitted by the Plaintiffs in *Troice, et al. v. Willis of Colorado, Inc., et al.*, No. 3:09-cv-01274 (N.D. Tex.) in support of their motion for class certification (the "Motion"). I understand that the Motion seeks certification of a class of all persons who had purchased and still held Certificates of Deposit and/or otherwise maintained deposit accounts with Stanford International Bank Limited as of February 2009.[1]

2.   I am a lawyer duly licensed to practice law in the Bolivarian Republic of Venezuela. I have been an active member, and in good standing, of the Bar Association of the Federal District of Venezuela since 1994.

3.   I am a tenured Associate Professor of Law and the Associate Dean of International and Graduate Studies at Florida International University College of Law in Miami, Florida. I teach courses in International and Comparative Law, Alternative Dispute Resolution, Complex Litigation, Law and Society, and International Commercial Arbitration. All my courses are predominantly focused on Latin America, or give special attention to Latin American jurisdictions, individually and collectively.

4.   I have also taught courses at Stanford Law School, and continue to be affiliated with Stanford University as Fellow of the Stanford Center on the Legal Profession. Moreover, since 1995 I have been a member of the Faculty at the Universidad Central de Venezuela Law School (Caracas, Venezuela), and am also affiliated with the Universidad Metropolitana (also in Caracas, Venezuela) as an Associated Independent Researcher. I have lectured extensively, served as visiting professor, guest lecturer, and speaker at various universities throughout Central and South America, including the Universidad



---

[1] Complaint at ¶ 1, 9.

San Martín de Porres, INIDEM Business School, Universidad Sergio Arboleda, Universidad Surcolombiana, Universidad Gran Colombia, Universidad Metropolitana, Universidad Nacional Autónoma de México, CEBRAP São Paulo, Universidad Católica Andrés Bello, and Universidad Católica del Táchira.

5. In addition, I have been invited to lecture in Europe, Asia, and throughout the United States, and have served as an expert in legal proceedings involving Latin American parties or legal issues relevant to Latin American jurisdictions, in federal and state courts in the United States, and in international arbitral proceedings.

6. In addition to my formal legal training in Venezuela as a lawyer and as specialist in Civil Procedure, I hold two graduate degrees from Stanford Law School, a master's degree in Law (J.S.M) and a doctorate in juridical science (J.S.D.).

7. Regarding my scholarly endeavors, I have conducted research, published academic work, and lectured extensively on a variety of areas, including dispute resolution (litigation, arbitration, and mediation), comparative civil procedure, complex litigation, legal and judicial reform, legal education, and the legal profession. More specifically, I have conducted research and published scholarly works on the status and development of aggregate and collective litigation in Latin America, which has allowed me to become familiar with this field. More generally, throughout my professional and academic career, I have acquired expertise on different aspects of the national legal systems of several Latin American jurisdictions, the scope and application of their laws, and the work of their national courts. A copy of my *curriculum vitae* is attached hereto as "Exhibit A".

8. In addition to my academic career, I have practiced law in Caracas, Venezuela since 1993, first as an associate and then as a principal, at the law firms of Gómez Díaz y Asociados, S.C. and later at M. Gómez & Cía, S.C. As a practicing attorney in Venezuela I have amassed substantial experience in civil and commercial litigation, as well as other areas including business transactions, insurance, contracts, and torts.

9. This report is the independent product of my professional assessment of the issues presented by the parties insofar they involve the application of the laws of the jurisdictions referred herein. My opinion is not subject to any external influence, pressure, or interest in the outcome of any dispute —potential or present—between any and all of the parties involved in this matter. The considerations and conclusions



2

expressed in this report embody my professional opinion on the specific matters to which they refer. Although I am being compensated for my services in this matter, my fees are not dependent on the nature of the opinions I state or on the result of the case.

10. Based on my professional experience, and expert knowledge of the legal systems of various Latin American jurisdictions, I have been asked to opine on whether the courts of Venezuela, Mexico and Colombia, where certain putative class members reside:

    a. Would recognize the judgment issued by an American court in a class action proceeding for money damages.

    b. Are lacking transparency and independence to a point that is likely to affect the enforceability of a domesticated foreign judgment.

11. In addressing the aforementioned issues, I also have been asked to consider the opinions contained in the Garro Declaration insofar they might affect my declaration.

12. In preparing this report, I have reviewed various documents and sources relevant to the present dispute, including (1) Plaintiffs' Third Amended Class Action Complaint with exhibits filed on April 1, 2011 with the United State District Court for the Northern District of Texas Dallas Division ("Third Amended Complaint"); (2) Order issued by the United States District Court for the Northern District of Texas Dallas Division on December 5, 2014 by which the Court granted in part and denied in part Defendants' motions to dismiss various defendants ("12/05/14 Court Order"); (3) Brief in Support of Plaintiffs' Opposed Motion for Class Certification, and for Designation of Class Representatives and Class Counsel dated October 31, 2014 ("Plaintiffs' Class Certification Brief"); (4) Order issued by the United States District Court for the Northern District of Texas Dallas Division on December 15, 2014 by which the Court granted in part and denied in part Defendants' motions to dismiss various defendants ("12/15/14 Court Order"); (5) Declaration of Professor Edward F. Sherman dated October 31, 2014 ("Sherman Declaration"); and (6) the Garro Declaration. Additionally, I have reviewed other relevant statutes, judicial opinions, and scholarly works cited *infra*, all of which have direct relevance to the matters addressed in the present report.



**APP 1067**
App. 733

## II.    Summary of Conclusions

13. It is my professional opinion that neither the courts of Venezuela nor the courts of Mexico would recognize a judgment issued by an American court in a class action proceeding for money damages. The main two reasons are (i) a foreign judgment rendered by an American court which purports to have *res judicata* effect on absent class members who reside in Venezuela or Mexico violates those countries' fundamental guarantees of due process, which is embedded in the notion of public policy, and (ii) the lack of personal jurisdiction of an American court over absent class members who reside in Venezuela or Mexico goes against the rules in those countries for the recognition of a foreign judgment. Besides these formal obstacles, I also opine that the current state of the Venezuelan and Mexican judiciaries would effectively render enforcement of a foreign judgment unavailable in either country.

14. With regards to Colombia, it is my professional opinion that the courts of that country would not recognize a judgment issued by an American court in a class action proceeding for money damages because of (i) the lack of service of process effected on non-resident (Colombian) absent class members who, as a result cannot be bound by the foreign judgment; and (ii) the need for reciprocity regarding the recognition and enforcement of a group litigation-related Colombian judgment in the United States.

15. According to both Venezuelan and Mexican law, final judgments have *res judicata* effect *only with respect to the named parties*—that is, those who were formally incorporated as full participants into the litigation and thus given an opportunity to present their case and have their day in court. As a result, only the parties can benefit directly from the judgment, and, conversely, only the parties are precluded from re-litigating the same issues. In Venezuela and Mexico, as in most of Latin America and in other civil law tradition countries, the incorporation of a party into the litigation may only result from that party's voluntary submission ("*comparecencia voluntaria*") or through service of process by the formal delivery of the summons and complaint ("*citación procesal*") according to their local rules. Unlike United States class actions, whose effects extend to absent class members who are not formally served but merely given notice of the litigation so they can "opt-out," neither Venezuelan nor Mexican law permits "an exception to the general rule that one cannot be bound by a judgment in a litigation to



4

which one is not a party."[2] Therefore, as a matter of both Venezuelan and Mexican law, a judgment cannot have any effect on those who were not properly served, including any potential absent class members that have been merely given notice of the litigation.

16. In the specific case of Colombia, although its group litigation system contains some rules that permit an opt-out mechanism of sorts, non-resident absent class members still have to be adequately served with summons and the complaint, as any failure to do so would violate their due process rights.

17. The Garro Declaration concludes, "the law on the recognition and enforcement of foreign judgments prevailing in the Latin American countries in question [which include Venezuela, Mexico and Colombia] do [sic] not present a major obstacle to the recognition and enforcement of judgments rendered in the United States."[3] I respectfully disagree. While it is true that certain provisions of Venezuelan, Mexican and Colombian law ostensibly allow the recognition and enforcement of foreign judgments as a general matter, the application of those provisions to the present matter leads to the opposite conclusion: The reach of *res judicata* beyond the named parties in an American class action represents not only an "obstacle," but an impenetrable barrier to the domestication of a United States class action judgment in Venezuela, Mexico or Colombia.

18. In the specific case of Venezuela, the enforcement of a United States class action judgment for money damages would not only be unprecedented but also contrary to one of the fundamental tenets of civil litigation in that country. The Venezuelan legal system does not recognize a money damage class action mechanism, or any form of "opt-out" class action, such as that invoked here. Although Venezuelan law offers certain mechanisms for the protection of collective rights, these differ significantly from American class actions. Moreover, the concept of an "opt-out" class action, which has a direct impact on the rights of absent class members, is incompatible with the Venezuelan principle of *res judicata*, which applies only to bar re-litigation of claims by named parties to a prior proceeding. Therefore, it is highly likely that a Venezuelan court would

---

[2] Elizabeth A. Kalenik, *Let the punishment fit the crime: Sanctioning absent class members for failure to respond to postcertification discovery requests*, 81 FORDHAM LAW REVIEW 2013, 2025 (2013).

[3] Garro Declaration ¶ 15.

refuse, as a matter of public policy, to enforce a United States class action judgment for money damages.

19. Even if theoretically possible as a matter of Venezuelan law, there are certain procedural obstacles that would make enforcement of a United States class action judgment for money damages cumbersome as a practical matter. Because Venezuela and the United States have not entered into a reciprocal agreement for the enforcement of foreign judgments, Venezuela's own internal law would govern the enforcement of a judgment issued by a United States court. To enforce a foreign judgment under Venezuelan law would entail a process of obtaining a judicial order known as an "*exequatur*" from Venezuela's highest court, and then following a second stage geared to the effective enforcement of the judgment. This kind of dual-step mechanism for the recognition of foreign judgments is not unique to Venezuela. What sets Venezuela apart is the practical difficulty of applying that mechanism, or, simply put, Venezuela's "law in action." Given the current state of the Venezuelan judiciary—its rampant level of corruption and the political manipulation to which the courts are subject—a seemingly straightforward domestication and enforcement proceeding would likely take years to complete, and would not prevent a plaintiff from commencing litigation in the interim against the party seeking to enforce the foreign judgment.

20. Besides these structural and practical obstacles, the grave situation affecting the courts in Venezuela, including the rampant inefficiency and political manipulation, also affects the handling of litigation, and foreign judgment recognition proceedings are certainly not an exception. Because court proceedings do not occur in a vacuum, but instead are affected by the social, political and economic realities of each country, when evaluating the possibility of enforcing a foreign judgment, one cannot ignore the impact that those realities might have on the handling of judicial matters. In the case of Venezuela, the grim situation of the courts is likely to have a significant impact, as I will explain below.

21. Venezuela's judicial system is subject to pervasive interference and manipulation by political forces and has been routinely cited by non-governmental organizations for inefficiency and corruption. These factors, when coupled with the stridently anti-American posture of Venezuela's government, make it virtually certain that a Venezuelan



**APP 1070**
App. 736

court would refuse to enforce a United States class action judgment for money damages to bar re-litigation by Venezuelan citizens.

22. The situation in Mexico is very similar to that in Venezuela, both in terms of the formal legal impediments to the recognition of a United States class action judgment for money damages, and also with respect to the practical difficulties of actually obtaining relief in the Mexican courts.

23. Regarding the formal legal impediments, it also would be unprecedented for a Mexican court to enforce a United States class action judgment for money damages. The Mexican legal system, like that of Venezuela, does not recognize an "opt-out" class action. Although Mexico recently amended its legislation to enable the possibility of aggregate litigation, the concept of an "opt-out" class action is contrary to the Mexican law of *res judicata*, which, like Venezuelan law, limits the preclusive effect of a judgment to the named parties to the prior proceeding. An "opt-out" class action would also violate Mexican constitutional standards of due process and notice to litigants. Therefore, it is very likely that a Mexican court would find that to recognize a United States class action judgment would infringe Mexico's "public order," leaving the court with no other option but to refuse to domesticate such a judgment.

24. Mexico and the United States are not parties to a treaty governing the enforcement of foreign judgments. Therefore, as with Venezuela, domestic Mexican law would determine the enforceability of an American court judgment in Mexico. The Mexican court system, like Venezuela's, presents numerous procedural obstacles to recognition that would, as a practical matter, make a foreign judgment useless in preventing re-litigation of claims by Mexican citizens.

25. Even if Mexican law did, in theory, require enforcement of a United States class action judgment—which it does not—as a practical matter the Mexican judicial system could not be relied on to enforce such a judgment. The systematic dysfunction of the Mexican judiciary, both in terms of undue delays and rampant corruption, would hinder compliance with any judicial order, and one coming from a foreign court would be no exception.



26. Finally, in the case of Colombia, both the lack of service on non-resident absent class members and the need for reciprocity regarding the recognition and enforcement of a

7

group litigation-related Colombian judgment in the United States, a Colombian court would not recognize a judgment issued by an American court in a class action proceeding for money damages.

27. For the reasons stated herein, and based on my assessment of the facts and circumstances relevant to this case, I conclude that the courts of Venezuela, Mexico and Colombia would <u>not</u> recognize a United States class action judgment for money damages. Such a judgment would not be entitled to recognition as a matter of Venezuelan, Mexican or Colombian law; and, even if recognition were called for in theory (which it is not), the judicial systems in those countries could not be relied upon to recognize such a judgment in practice. In the following sections, I explain in detail the basis for my conclusions.

## III. There Are Issues Affecting Latin American Jurisprudence That Are Critical to Any Determination of Superiority of a Class Action.

28. Any thoughtful consideration of whether a United States class action is a superior—or even feasible—method of resolving disputes between Stanford investors and the Defendants must take into account the lack of any provision for representative actions in the investors' home countries, and the potential conflict that the American procedural device might have with the laws of the countries where recognition of any resulting judgment would be sought. None of the expert reports submitted in support of Plaintiffs' motion considers or addresses the important question of whether courts in Latin American countries will give effect to a judgment in a class action in the United States.

29. The Garro Declaration merely describes the overall foreign judgment domestication regime of several Latin American jurisdictions, including Mexico, Venezuela and Colombia, as to whether they "would be hospitable to the recognition and enforcement of a judgment rendered in the United States,"[4] and concludes that they would be.[5] Whereas Professor Garro acknowledges that in addition to mere hospitality "certain conditions must be met for foreign judgments to be recognized or enforced," his report falls short of addressing whether those conditions are likely to be met when the foreign judgment resolves class action litigation in the United States.

---

[4] Garro Declaration ¶1.



[5] Id. ¶15.

**APP 1072**

App. 738

30. The Garro Declaration notes that in Mexico, Venezuela and Colombia (as in the United States), enforcement of a foreign judgment may be denied based on certain formal grounds such as "lack of jurisdiction by the rendering court, failure to observe basic due process standards, lack of finality, and violation of public policy,"[6] which condition "the enforcement of foreign judgments".[7] But Professor Garro overlooks that it is precisely on these formal grounds that Mexican, Venezuelan, and Colombian courts would *deny* a request that seeks the recognition and enforcement of a class action judgment rendered by an American court. This is the only plausible conclusion to which one can arrive when examining a United States class action judgment through the lens of those formal grounds.

31. Furthermore, any protections or finality that defendants should gain from a judgment of a United States court in a class action would, in reality, be unavailable in the courts of Venezuela, Mexico or Colombia. Yet the Garro Declaration omits any reference to conditions in the political and judicial systems in Venezuela, and Mexico that undermine the independence of the judiciaries of those two countries. As is set out below, it is my opinion that—regardless of the wording of treaties, conventions, or statutes—individual or corporate citizens of the United States cannot be assured that a judgment in a United States court will be duly respected and honored by the courts of Venezuela or Mexico. The current state of affairs of the judiciary of those countries is such that litigants are increasingly deprived of their day in court, and their most basic due process rights are routinely violated. This situation is particularly grave in the case of Venezuela, given the overt animosity of the government—which in turn exercises a sweeping control over the courts—toward the United States. As I mentioned earlier, this is a particularly important practical obstacle that cannot be ignored when analyzing the feasibility for obtaining the recognition of a foreign judgment in any of the aforementioned Latin American jurisdictions.



---

[6] Id. ¶32.

[7] Id..

## A. A Class Action Judgment Rendered in the United States Would Almost Certainly Not be Recognized by Venezuelan Courts

32. Based on my knowledge and experience, as both a legal and practical matter, it is a near certainty that a judgment rendered by, as here, a United States court in a class action for money damages would never be enforced in Venezuela. First, despite exhaustive research, I have not been able to identify a single Venezuelan case in which a United States class action judgment was enforced to bar re-litigation of the same claims by Venezuelan citizens in Venezuela. Professor Garro, apparently, has not found such a case either.[8] Second, the legal, procedural and practical obstacles to such enforcement are insurmountable.[9] For starters, the Venezuelan legal system does not recognize a money damages "opt-out" class action or any notion that a person can be bound by a judgment in a case where they were not served with process in conformity with Venezuelan standards or otherwise affirmatively chose to participate as a party. But even if the Venezuelan courts could get past that basic disconnect in the country's legal system and somehow find that such judgment conformed with Venezuelan law, in practice, United States-based litigants seeking to bar individual suits in Venezuela with a foreign judgment would be faced with intolerable procedural burdens, the Venezuelan judicial system's well-recognized dysfunction and politically manipulated judges, as well as pronounced hostility towards the United States. In my opinion, these obstacles would make any class action judgment obtained in this case useless in barring future re-litigation of claims by absent members of the class who reside in Venezuela.

### 1. A Class Action Judgment Rendered in the United States Would Not be Entitled to Preclusive Effect Under Venezuelan Law

#### a. Background and Procedure for Recognition and Enforcement of Foreign Judgments in Venezuela

33. Venezuela and the United States have not entered into a reciprocal agreement for the enforcement of foreign judgments. As a result, as agreed by Professor Garro, the

---

[8] *See* Garro Declaration ¶¶ 63-64.


[9] *See*, Antonio Gidi, *The recognition of U.S. class action judgments abroad: The case of Latin America*, 37(3) BROOKLYN JOURNAL OF INTERNATIONAL LAW 893, 902 note 12 (2012) (Hereinafter, *"Gidi, US class action judgments in Latin America"*).

**APP 1074**
App. 740

enforcement of a judgment issued by a United States court is subject to Venezuela's own domestic legal regime, which, in the first instance, requires a judicial order commonly known as an "*exequatur*" to be issued.[10] That simply means that, if the *exequatur* is granted, the enforcement of the judgment would have to proceed to a second stage—not that it will necessarily be enforced. Article 850 of Venezuela's Code of Civil Procedure ("CCP") gives exclusive jurisdiction to the Supreme Justice Tribunal ("SJT")—the highest court in Venezuela—to grant an *exequatur* petition.

34. The procedure for obtaining recognition is established in articles 852 through 855 CCP. The request for *exequatur* commences with a written petition filed with an authenticated copy of the foreign judgment duly translated into Spanish, and with the corresponding apostille.[11] Once the Court admits the file, it shall issue summons to be served on the defendant along with a copy of the petition.[12] Serving a defendant can take up to several months, depending on certain conditions, such as whether the defendant has an appointed representative and whether personal service is possible. Once the party against whom the petition is filed has been properly served, he has ten working days to answer the petition and oppose any defenses.[13] The Court may, if it so decides, open an evidentiary phase and notify the Office of the Public Prosecutor (*Fiscalía General de la República*), so they can opine on whether the petition should be granted,[14] after which the Court will make its decision on whether to grant or deny the *exequatur* petition. Notably, the burden of proof at every step of the process is borne by the party (or parties) seeking to enforce the judgment.[15]

---

[10] *See* Ley de Derecho Internacional Privado, article 53 (Private International Law Statute, or PILS); *see also* Garro Declaration ¶¶ 16-17.

[11] Code of Civil Procedure ("CCP"), article 852.

[12] Id. article 853.

[13] Id. article 855.

[14] Ley Orgánica del Ministerio Público (Venez.), article 25(15), Official Gazzette 38647 of March 19, 2007.

[15] Id. article 852.

35. Regarding the requirements that a foreign judgment must meet in order to be recognized by Venezuelan courts through *exequatur*, article 53 of the Private International Law Statute ("PILS") permits enforcement only when a foreign judgment:

   a. Results from a civil or commercial matter, or one that involves private relations (i.e. not involving public law matters);

   b. Is final and has acquired *res judicata* effect in the jurisdiction where it was issued;

   c. Does not involve rights over property situated in Venezuela; or that the foreign court did not unduly deprive Venezuelan courts from asserting exclusive jurisdiction over the matter;

   d. Was rendered by a court with jurisdiction over the matter, pursuant to the general principles set forth in chapter IX of PILS;

   e. That the defendant has been properly served, given sufficient time to appear, and that in general has been afforded sufficient procedural safeguards to adequately present their case; and,

   f. Is not incompatible with a Venezuelan judgment rendered in the same matter, or with proceedings initiated in Venezuela prior to the foreign judgment being issued.

36. In addition to the aforementioned prerequisites, articles 5 and 8 of PILS establish that provisions of foreign law shall be excluded when their application is incompatible with fundamental principles of public policy in Venezuela. This provision is akin to the legal concept in the United States that the laws of other jurisdictions that are contrary to the public policy of a state will not be given any effect in that state. As discussed further below, Venezuela does not recognize the money damages class action mechanism, and some of its features, especially the concept of "opt-out" with its corresponding effect on absent class members, squarely offend Venezuelan public policy.

   b.   *"Opt-Out" Class Actions for Money Damages Are Not an Accepted Form of Litigation in Venezuela*

37. While Professor Garro concedes that the public policy of Venezuela presents a "possible obstacle to the enforcement of foreign judgments," his report falls short of acknowledging that Venezuela does not recognize the "opt out" class action device; and



12

accordingly, his report does not address its impact on, or significance to, the enforceability of a United States money damages class action judgment.[16] In short, the concept of a class action for money damages in which only a few persons represent the interests of others (and can bind those absent others) does not exist in Venezuela. Thus, even if the Venezuelan judiciary was not politically manipulated or biased against United States parties (it clearly is both, as discussed below), there is simply no legal basis upon which a Venezuelan court would or could harmonize the "opt-out" class action procedure with Venezuelan law.

38. In fact, the only form of representative litigation permitted in Venezuelan is that which protects collective or diffuse "rights"—that is, rights that "belong" to an undefined group (e.g., consumers in general), a general sector (e.g., professional associations, unions), or to society as a whole (e.g., the right to clean water, the right to a healthy environment). The procedural vehicles available to achieve the protection of collective and diffuse rights in Venezuela is the constitutional writ of "*amparo*", a remedy originally devised as a constitutional mechanism to protect citizens against actions or omissions that violate the fundamental rights of the Venezuelan people; and the action for the protection of collective and diffuse rights, which procedural rules are established in the Organic Law of the Supreme Justice Tribunal.[17]

39. Unlike the case of an ordinary civil judgment, however, judicial decisions issued in the context of writs of *amparo* and actions for collective or diffuse rights are purely injunctive in nature. The decisions rendered in such proceedings are strictly limited to ordering the defendant to do or to refrain from doing certain acts. *Amparo* judgments expressly foreclose the possibility of awarding monetary damages.[18] Notwithstanding, damages asserted by individual petitioners have to be pursued in individual lawsuits or through joinder of all the petitioners in a single suit, as per Venezuela's ordinary rules of civil procedure.

---

[16] Garro Declaration ¶¶ 25, 66.

[17] Ley Orgánica del Tribunal Supremo de Justicia (Venez.), article 146.


[18] *See generally* ALLAN-RANDOLPH BREWER CARÍAS & CARLOS AYALA CORAO, LA LEY ORGÁNICA DE AMPARO SOBRE DERECHOS Y GARANTÍAS CONSTITUCIONALES (Editorial Jurídica Venezolana, 2d ed. 1988)

APP 1077
App. 743

### c. An "Opt-Out" Class Action Judgment Would be Given No Res Judicata Effect Against Absent Class Members in Venezuela

40. As a matter of well-settled Venezuelan law, *res judicata* serves to bar re-litigation of claims only between the *actual parties* to the other proceeding or case in which the judgment sought to be enforced was issued; it does not extend beyond those parties (such as to absent class members), in accordance with the principles of Venezuelan civil procedure.[19] In fact, it is a fundamental precept established in articles 26 and 49 of the Venezuelan Constitution that every citizen has a right to bring and prosecute their own private claims (similar to the due process rights afforded to United States citizens). The idea that a person could be deprived of that right simply because they did not act to affirmatively "opt-out" of a foreign class action is contrary to Venezuelan public policy and, thus, fails to meet the standards for an *exequatur* to be issued or for a United States class action judgment to then be enforced at the trial court level.

41. As per Venezuelan legal principles, only those who have joined a lawsuit voluntarily as parties,[20] or those who have been incorporated as a result of being properly served,[21] can be deemed parties. The lack of proper service of process renders a proceeding null and void.[22]

42. Although, as a matter of United States law, there are requirements that notice of a class action be given to absent class members, which a United States court might deem adequate and sufficient, the form of such notice does not comply with the requirements to effect service of process under article 218 et. seq. of CCP. When applicable, the class notice routinely issued in the United States does not comply either with any of the international treaties dealing with service of process and transmission of documents to which Venezuela is a party (such as the Inter American Convention on Letters Rogatory and The Hague Convention on the Service Abroad of Judicial and Extrajudicial

---

[19] *See,* Yraida del Carmen Chacín v. Rogelio J. González Silva, Tribunal Supremo de Justicia, Juzgado de los Municipios Mara, Almirante Padilla y Páez de la Circunscripción Judicial del Estado Zulia, File 229-98, of 8 February 2011.

[20] CCP, article 216.

[21] Id. article 218 et. seq.



[22] Id. article 215.

**APP 1078**
App. 744

Documents in Civil or Commercial Matters). Commentators expressly note, "most Latin American countries will not accept as adequate notice to their domiciliaries anything short of service by rogatory letter as a prerequisite to recognizing or enforcing a foreign judgment."[23]

43. Even Professor Garro recognizes in his report how important it is for a Venezuelan court to ensure that the parties have been served in accordance with Venezuelan law. The requirement of service of process issue was key in both examples he offered to illustrate the importance of article 53(5) of PILS.[24] The case involving a person domiciled in Venezuela at the time of suit rejected enforcement of a U.S. judgment precisely because "one of the co-defendants, a Venezuelan resident at the time process was served on him, *had not been served in accordance with Venezuelan law*".[25] Nothing suggests that a Venezuelan court presented with a request to authorize the recognition and enforcement of a foreign class action judgment would decide differently.

44. The main consequence of this principle in Venezuela is that only the actual parties participating in a suit can benefit directly from the judgment, and conversely, only those parties may be precluded from re-litigating the same issues. Any violation of this rule offends the fundamental principle of due process and is in direct contravention of the requirements set forth in article 53(5) PILS regarding the domestication of foreign judgments. As a result, it is almost certain that a Venezuelan court would conclude that an *exequatur* petition to recognize and enforce a class action judgment issued by an American court against absent class members in Venezuela is repugnant to the public policy of Venezuela and the class action judgment would be given no preclusive effect.

### d. *A U.S. Class Action Judgment Involving Foreign Residents Would Not be Recognized Because it Offends Venezuelan Concepts of Jurisdiction*

45. Independently, a Venezuelan court would refuse to grant an *exequatur* petition involving a United States "opt-out" class action judgment on the ground that the American court

---

[23] *See, Gidi, US class action judgments in Latin America* at 955.

[24] *See* Garro Declaration ¶ 64.



[25] Id. (emphasis added).

**APP 1079**
App. 745

lacked personal jurisdiction over all of those against whom the judgment pretends to have the force of *res judicata*. In more specific terms, according to article 53(4) of PILS, one of the requirements for granting an *exequatur* is that the foreign court must have had jurisdiction over the matter, which includes having jurisdiction over the parties (i.e., all those to whom *res judicata* would apply).

46. The jurisdictional review that would be done by the Venezuelan court in an *exequatur* proceeding, however, must be based not on the principles that govern personal jurisdiction in the foreign issuing court (i.e., the United States in this case), but instead on the principles of international jurisdiction in force in Venezuela, including any relevant international treaties.

47. Under Venezuelan law, a court cannot have jurisdiction over non-resident persons, or recognize them as parties, unless (i) they have submitted themselves voluntarily to the jurisdiction of that court for that specific proceeding (e.g., by filing the case or formally appearing to present a defense) as per article 40(4) PILS, or (ii) service of process has been properly effected on them as per article 40(3) PILS.[26] As discussed previously, the "opt-out" class action device and its less formal means of notice do not comport with Venezuelan standards, especially in the context of treaties that demand very strict forms of service to be effected in international cases.

48. As a result, any foreign judgment—including a judgment issued by a United States court in a money damages class action—that purports to extend its effect to anyone who has not been properly incorporated as a party to the original litigation (such as nonresident absent class members) and has not otherwise been served by rogatory letter would not be entitled to *exequatur* under the rules contained in article 53(4) PILS.

### e. The Practical Burdens of Enforcing a Foreign Judgment in Venezuela are Insurmountable

49. Beyond the legal impediments, obtaining recognition and enforcement of a U.S. "opt-out" class action judgment in Venezuela against absent class members would, in practice, be so burdensome and time consuming as to be impossible. Even though the *exequatur*

---

[26] In addition, article 40(1) and 40(2) also grant jurisdiction to the courts of Venezuela in cases involving (i) real property situated in Venezuela, (ii) obligations to be fulfilled in Venezuela or derived from contracts made in Venezuela, or (iii) events that have taken place in Venezuela.



**APP 1080**
App. 746

procedure seems straightforward and the court determination is not subject to appeal, in real terms it could easily take several years to be processed, as illustrated by the case of Núñez Portillo v. Shell Chemical Company et. al. (File 2004-000641), which was originally filed on July 21, 2004, and not finally decided until April 16, 2009, nearly *five years* later.

50. Then, assuming the SJT were to grant an *exequatur* petition (which, itself, is far from certain), the party (or parties) seeking to enforce the judgment would still have to pursue a second phase whereby the a court will carry out its enforcement,[27] which may well take a few more years, depending on the defenses submitted by the parties. This too is an incredibly difficult—and likely unachievable—undertaking.

51. Furthermore, the burden of proof placed on a U.S.-based litigant is daunting. For example, if one assumes a class is certified in this case and the Defendants obtain a favorable judgment, then it is quite possible that Venezuelan members of the class may seek to re-litigate their individual claims again in Venezuela. After answering the litigation in the trial court, the Defendants would have to start a petition in the SJT for *exequatur* and prove that class actions are not contrary to Venezuelan law such that a judgment issued in the United States should be enforced as *res judicata* against the Venezuelan plaintiff(s). Not only would the Defendants have to prove each of the prerequisites identified previously (that the United States court had proper jurisdiction, that Venezuelan courts were not improperly deprived of hearing claims involving transactions occurring in Venezuela, that service of process was properly effected, among other requirements), they would also have to demonstrate the impossible: that Venezuelan citizens can be barred from pursuing their individual claims by a judgment issued in a prohibited form of representative litigation that occurred in a foreign country, and for which they were never properly served a summons and complaint.

52. In sum, given the absence of a reciprocal class action-like procedure for money damages in Venezuela, the limitation of *res judicata* to actual parties to the prior or earlier proceeding, and the requirement of effecting service of process on absent class members

---

[27] CCP, article 523 et. seq; *see also,* Yaritza Pérez Pacheco, *Reconocimiento y ejecución de sentencias Mexicanas de divorcio en Venezuela,* 136 BOLETÍN MEXICANO DE DERECHO COMPARADO 69, 72, 77 (2013) [Hereinafter, *"Perez, Enforcement of Mexican Judgments"*].



APP 1081
App. 747

in a foreign country, it is virtually certain that—even absent the entire lack of independence of the Venezuelan judiciary discussed below—no Venezuelan court would give preclusive effect to a class action judgment for money damages rendered in the United States.

    **2.**     **The Venezuelan Judiciary Lacks Independence and Cannot be Relied on to Enforce A Class Action Judgment Rendered in the United States.**

53. It is not just the absence of provision for class or representative actions in Venezuelan law that leads me to believe that a class action judgment would not be given effect by Venezuelan courts. Rather, there is the further reality—not even mentioned in the Garro Report—that the Venezuelan judiciary is routinely subjected to outside influence from other Venezuelan government institutions.

54. Allegations of corruption and inefficiency of the Venezuelan judiciary and other state institutions are not new,[28] but the situation has become much worse during the last few years in great part due to the increased politicization of the courts, and the constant interference of the government on the judiciary. Former President Chávez, his successor current President Nicolás Maduro, and other government officials have routinely discredited judicial decisions in public, given public directive to judges on how to decide cases, threatened them with summary dismissal or other forms of retaliation, and manipulated the legal system to persecute anyone suspected of being a political opponent.[29]

55. Numerous reports authored by reputable organizations such as the International Bar Association ("IBA"),[30] Human Rights Watch ("HRW"),[31] Transparency International

---

[28] Rogelio Pérez Perdomo, *Corrupción y ambiente de los negocios en Venezuela*, in CORRUPCIÓN Y CONTROL: UNA PERSPECTIVA COMPARADA. (Pérez Perdomo & Capriles, eds., Caracas: Ediciones IESA 1991) [Hereinafter, *Pérez Pedromo, Corrupción y Control*].

[29] Manuel A. Gómez, *Political Activism and the Practice of Law in Venezuela, in* CULTURES OF LEGALITY: JUDICIALIZATION AND POLITICAL ACTIVISM IN LATIN AMERICA (J. Couso, A. Huneeus, and R. Sieder, eds. Cambridge University Press (2010) [Hereinafter, *Gómez, Political activism*].

[30] *See*, International Bar Association, Venezuela: Justice under threat, Report of a mission to Venezuela by the International Bar Association Human Rights Institute, June 2007 (Hereinafter *IBA Venezuela Report 2007*).


[31] *See*, Human Rights Watch, Country Summary: Venezuela, January 2012, available at http://www.hrw.org/world-report-2012/world-report-2012-venezuela (Hereinafter, *HRW 2012 Venezuela Report*).

**APP 1082**
App. 748

("TI"),[32] the Inter American Commission on Human Rights ("IACHR"),[33] and the United States Department of State ("USDS"),[34] have described in great detail the dire state of Venezuela's legal institutions, the rampant levels of corruption that affect all levels of government, and the political manipulation of the judiciary.[35] This latter problem has become evident through the constant "interference and public pressure that judicial officers have been subject to on the part of members of other branches of the State – including the President of the Republic."[36]

56. On February 24, 2010, the Inter American Commission on Human Rights ("IACHR") released a lengthy report titled "Democracy and Human Rights in Venezuela" ("IACHR Report").[37] The report devoted an entire chapter to highlighting "a series of conditions that indicate the absence of an effective separation and independence of the public branches of power in Venezuela".[38] The IACHR Report also expressed "concern over factors affecting the independence and impartiality of the judiciary"[39] including "the executive branch's alleged interference in decisions of the judiciary".[40] The IACHR Report described in great detail, how the system to appoint and remove Justices to the Supreme Tribunal lacked "appropriate mechanisms to keep other branches of government

---

[32] *See*, Transparency International, Transparencia Venezuela, http://transparencia.org.ve/biblioteca/.

[33] *See*, Organization of American States, Inter American Commission on Human Rights, Democracy and Human Rights in Venezuela, OEA/Ser.L/V/II Doc. 54, 30 December 2009, available at: http://www.cidh.org/countryrep/Venezuela2009eng/VE09.TOC.eng.htm (Hereinafter, "IACHR 2009 Venezuela Report").

[34] *See*, UNITED STATES DEPARTMENT OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2013: VENEZUELA, at 12-16 (2013). [Hereinafter "US State Dept. Venezuela 2013 HR Report"].

[35] Id.

[36] *IBA Venezuela Report 2007,* at 3.

[37] Inter American Commission of Human Rights, *Report on Democracy and Human Rights in Venezuela*, OEA/Ser.L/V/II, Doc. 54, March 10, 2010, available at: http://cidh.org/countryrep/Venezuela2009eng/VE09.TOC.eng.htm [Hereinafter, *IACHR Venezuela Report*].

[38] Id. ¶ 4.

[39] Id. ¶ 184.

[40] Id.



**APP 1083**
App. 749

from undermining the court's independence",[41] and how the forty-nine justices appointed since 2002 "were reported to be politically sympathetic to the government".[42]

57. The IACHR Report mentioned that among those appointed to the Supreme Tribunal were "former legislators who had belonged to the ruling party and the former president of the National Electoral Council", and described specific instances of evident partiality arising out of this abnormal situation. One of the most dramatic examples involved the President of the Supreme Tribunal, who "was a member of the Presidential Council for Constitutional Reform and subsequently heard and dismissed the appeals lodged against the proposed constitutional amendment, in spite of having formed part of that Council".[43]

58. The undue influence of the political establishment is by no means limited to the highest court. During the last decade, Venezuelan judges have been appointed and removed "without any sort of oversight or procedure"[44] and "without holding open public competitions for their selection".[45] Just by way of example, the procedures provided for in the Rules for Evaluations and Public Competitions for Entry into and Promotion within the Judicial Career[46] have not been followed at all, so the Venezuelan judiciary has been largely formed by judges selected on the basis of criteria not set forth in the law.

59. "[I]n 2008 alone, a total of 1,451 judges other than regular judges were appointed. Of those, 12% were provisional, 63% were temporary, and 24% were interim. Thus, not one of the 1,451 non-regular judges appointed in 2008 was appointed through the open public competition required by Article 255 of the Venezuelan Constitution. Consequently, all of

---

[41] Id. ¶ 198.

[42] Id. ¶ 199.

[43] Id. ¶ 305.

[44] Id. ¶ 204.

[45] Id. ¶ 201.

[46] In addition, article 255 of the Venezuelan Constitution provides that: "Appointments to judicial positions and promotions of judges shall be carried out by means of public competitions to ensure the suitability and excellence of the participants, with selection by the juries of the judicial circuits, in such a manner and on such terms as may be established by law. The appointment and swearing in of judges shall be the responsibility of the Supreme Court of Justice. Law shall guarantee citizen participation in the process of selecting and appointing judges. Judges shall be removed or suspended from office only through the procedures expressly provided for by law". This is obviously not what occurs in practice. CONSTITUTION (VENEZ.) art. 255.



20

**APP 1084**
App. 750

those judges are freely appointed and removable. (…) Additionally…between January and September 2009 alone, a total of 359 judges were appointed without an open public competition, including 136 temporary judges, 138 interim judges, 59 provisional judges, 2 tenured judges and 24 judges from other categories. All of these judges are freely appointed and removable".[47]

60. Judges appointed on an interim or temporary basis lack tenure and are subject to summary dismissal without having to follow the usual administrative proceedings or any formalities. This situation has given the Chavista government absolute control over the judiciary, including who gets appointed and removed from a judicial post, and how the judges decide their cases. It comes as no surprise that during the last few years, a number of Venezuelan judges have been removed from office at the government's discretion,[48] and even worse, immediately after "handing down decisions that affected government interests" or had major political impact.[49] To highlight the gravity of this situation, the IACHR Report included a list of specific examples that prove this assertion.[50] Moreover, in some instances, the judges' dismissals occurred almost immediately after comments made by the President during media broadcasts calling for swift action against them.[51] Not only the President but also other government officials have continuously made statements "attacking and criticizing justice officials as a result of their decisions,"[52] and have also called "for contempt of their decisions or their dismissal by different means often without the appropriate legal procedures."[53]

---

[47] *IACHR Venezuela Report* ¶ 209, 210.

[48] LEANDRO DESPOUY, *Report of the United Nations Special Rapporteur on the independence of judges and lawyers to the Human Rights Council of the United Nations*. A/HRC/11/41, 11th period of sessions. March 24, 2009, para. 60; *see also*, INTER AMERICAN COMMISSION OF HUMAN RIGHTS, *Democracy and Human Rights in Venezuela*, OEA/Ser.L/V/II, Doc. 54 http://cidh.org/countryrep/Venezuela2009eng/VE09.TOC.eng.htm ¶ 276.

[49] Id. ¶ 285.

[50] Id. ¶ 277, 286, 287, 289, 291, 292, 293, 294, 295, 296 and 297.

[51] Id. ¶ 290 and 298. This was also the subject of a report prepared by a group of independent experts on Human Rights appointed by the United Nations. *See*, "Venezuelan leader violates independence of judiciary", December 16, 2009, available at http://www.un.org/apps/news/story.asp?NewsID=33273&Cr=judges&Cr1.



[52] Id.

[53] Id.

**APP 1085**
App. 751

61. Two cases serve to illustrate this point. The first one involved the arbitrary dismissal of honorable Maria Cristina Reverón Trujillo, which reached the Inter-American Court of Human Rights ("IACtHR"), and resulted in a judgment against Venezuela. In its ruling, the IACtHR concluded that Venezuela had violated not only the petitioner's rights under the American Convention on Human Rights, but also the state's duty to preserve an independent judiciary.[54]

62. The second, and undoubtedly more dramatic case was the one involving Maria Lourdes Afiuni, a former judge who was arrested in 2009 on charges of corruption for ordering the conditional release of Eligio Cedeño, a Venezuelan banker who had been held in pre-trial detention for more than three years, a term that notably exceeded the statutory limits. Cedeño's detention was deemed arbitrary by the UN Working Group on Arbitrary Detention in September of 2008.[55] Judge Afiuni was arrested almost immediately after President Chávez learned that she had ordered the release of Cedeño. In a nationally televised speech, Chávez called for her detention and conviction to the maximum penalty. Chávez, who mentioned having discussed the matter with the President of the Supreme Justice Tribunal, declared "a judge who frees a criminal is much, much, much more serious than the criminal himself", and then opined that "Judge Afiuni should get the maximum penalty".[56]

63. Not only was Judge Afiuni swiftly arrested and processed at the President's urging, but she remained jailed during three and a half years, only to be released in June of 2013 after an incredible amount of international and domestic pressure.[57] During her ordeal, Judge Afiuni was kept in inhumane and degrading prison conditions, including sharing her cell with some inmates that she had convicted as a judge, and was also denied medical

---

[54] *Case of Reverón Trujillo v. Venezuela,* Inter American Court of Human Rights, Judgment of June 30, 2009.

[55] UN News Centre, *Venezuelan leader violates independence of judiciary-UN rights experts*, available at http://www.un.org/apps/news/story.asp?NewsID=33273&Cr=judges&Cr1.

[56] Rory Carroll, *Hugo Chávez demands jailing of judge who freed banker*, THE GUARDIAN, December 15, 2009, available at: http://www.theguardian.com/world/2009/dec/15/chavez-venezuela-judge-cedeno.

[57] William Neuman & María Eugenia Díaz, *Court in Venezuela Orders Release of a Judge Once Scorned and Jailed by Chávez*, THE NEW YORK TIMES, June 14, 2013, available at: http://www.nytimes.com/2013/06/15/world/americas/court-in-venezuela-orders-release-of-a-judge-once-scorned-and-jailed-by-chavez.html.

APP 1086
App. 752

treatment for her cancer.[58] The international community, including organizations such as the International Commission of Jurists, and Human Rights Watch, followed Judge Afiuni's case with great attention. In a joint statement made before the United Nations Human Rights Council, these organizations described the politically motivated actions that led to Judge Afiuni's detention, including the intervention of then-President Hugo Chávez, who "said on national television that the judge was 'a bandit' and called for her to be sentenced to 30 years in prison, the maximum sentence possible in Venezuela. A few days later, he said she was 'correctly jailed' and reiterated that she should be given a maximum sentence, adding that he 'would give her 35 years'."[59] The excerpts quoted above, offer clear evidence of the extreme politicization of the Venezuelan judiciary and its complete submission to the political establishment. As a result, it is reasonable to conclude that the Venezuelan judiciary is unable to guarantee a minimum level of fairness to private parties.

64. Any protections that might otherwise be available are even more doubtful for citizens of the United States, which has been pejoratively labeled as "the Yanqui Empire".[60] High government officials including former President Hugo Chavez and current President Maduro have routinely condemned the presence of American business in Venezuela by accusing them of inflicting damage to the country's economic, social and political structures, allegedly with assistance from previous administrations, members of the local business elite,[61] and even from the United States government.[62] Such accusations

---

[58] Human Rights Center, Universidad Católica Andrés Bello, *Maria Lourdes Afiuni, Urgent Appeal, Deterioration of her health conditions*, January 2011, available at: http://v2.ucab.edu.ve/tl_files/CDH/Maria%20Lourdes%20Afiuni/Update_on_the_health_conditions_of_Judge_Afiuni.pdf.

[59] Joint International Commission of Jurists and Human Rights Watch, *Statement on Judge Alfiuni before the United Nations Human Rights Council*, September 18, 2013, available at: http://www.hrw.org/news/2013/09/18/joint-icj-hrw-statement-judge-afiuni-human-rights-council.

[60] LibreRed. "El imperio yanqui desaparecerá este siglo". September 9, 2009. Available at: http://www.librered.net/wordpress/?p=7307; *see also*, Bolivarian Government of Venezuela. Ministry of the Popular Power for the Communication and Information. "Imperio yanqui es el más grande terrorista de todos los tiempos". Available at: http://www.rnv.gov.ve/noticias/?act=ST&f=3&t=107540.



[61] La Revista Minera de Venezuela. "Ramirez: International arbitration goes against the interests of oil producing countries" July 9, 2009. Available at: http://revistaminera.wordpress.com/2009/07/09/ramirez-arbitraje-internacional-va-contra-los-intereses-de-paises-productores/; *see also*, Bolivarian Government of Venezuela. Vice Presidency of the Bolivarian Republic of Venezuela. "Venezuelan oligarchy fights against revolutionaries during

**APP 1087**
App. 753

evidence and reflect the government's anti-American foreign policy, as well as its domestic agenda.

65. The Venezuelan government's antipathy towards American corporations is reflected in its efforts to diminish their participation in the country's economic sector and to threaten private citizens and corporations with the confiscation of their assets—in many cases making good on such threats. The government has also repudiated many of the agreements authorized under previous administrations with foreign corporations, claiming that they were part of a "larger scheme supported by the Venezuelan oligarchy, which benefited from the bread crumbs left behind by multinational corporations and their media outlets".[63]

66. The legal system has become useful to the current Venezuelan government primarily as a means of eliminating ideological adversaries and solidifying political power.[64] Based on the idea that the new government represents some sort of political revolution—a "Bolivarian" Revolution—the autonomy of the judicial system has been denied, with all legal principles subject to an elastic interpretation that depends on the current, changing needs of the political establishment.[65] Unlike the moderate instrumentalism and the limited manipulation of legal institutions that took place in Venezuela during the era of the so-called "pacted democracy" (1958-1998), the Chávez administration—and continuing under the Maduro administration—has made no secret of its perception of law as a political weapon.[66] Public institutions have fallen under the open and direct control

---

more than 200 years".
http://www.vicepresidencia.gob.ve/web/index.php?option=com_content&task=view&id=1842.

[62] Bolivarian Government of Venezuela. Ministry of the Popular Power for the Communication and Information. "Letter sent by Commander Chavez to Unasur presidents"
http://www.minci.gob.ve/noticias/1/174613/combate_por_soberania.html.

[63] La Revista Minera de Venezuela. "Ramirez: International arbitration goes against the interests of oil producing countries" July 9, 2009. Available at: http://revistaminera.wordpress.com/2009/07/09/ramirez-arbitraje-internacional-va-contra-los-intereses-de-paises-productores/.

[64] Id.



[65] José M. Delgado Ocando, *Revolución y derecho*, in ESTUDIOS SOBRE LA CONSTITUCIÓN: LIBRO HOMENAJE A RAFAEL CALDERA (Caracas, Universidad Central de Venezuela, 1979).

APP 1088
App. 754

of the ruling political party. Moreover, political enemies are persecuted, and their individual rights are routinely violated.

67. Venezuelan courts have become highly politicized and subject to the absolute control of the government. The administration does not accept the idea of an impartial judiciary, and does not tolerate any political opposition that threatens its absolute control of the country. On the contrary, all state institutions are viewed as instruments subject to the political agenda of the Chavista regime,[67] and the government has done everything in its power to keep it that way.

68. In Venezuela, the lines between the judicial and the political terrains have become blurred to the extreme that judges are publicly reprimanded for not following the party line, or praised and rewarded whenever their decisions favor the government.[68] Moreover, legal proceedings have increasingly been used to channel political quarrels, to thwart the political opposition, and to intimidate any possible dissent that should be allowed in any normal democratic society. The Venezuelan government has routinely claimed that the country is still a solid democracy, but its actions show otherwise.

69. Thus, any realistic evaluation of the current state of the judiciary in Venezuela leads to a conclusion of no confidence that a judgment from a court in the United States, which purports to give finality to a dispute involving citizens of Venezuela, will be given effect by a Venezuelan court to the extent that it would otherwise provide issue- or claim-preclusion protections for individual or corporate citizens of the United States.

---

[66] *See, Gómez, political activism,* note 29. *supra; see also,* ROGELIO PÉREZ PERDOMO, DERECHO Y CULTURA EN TIEMPOS DE REVOLUCIÓN (1999-2009) (Caracas: Fundación García Pelayo) (2009) [Hereinafter, *Pérez Perdomo, cultura juridica*].

[67] Rogelio Pérez Perdomo, *Reforma judicial, estado de derecho y revolución en Venezuela,* in EN BÚSQUEDA DE UNA JUSTICIA DISTINTA. EXPERIENCIAS DE REFORMA EN AMÉRICA LATINA (L. Pásara, Ed. Lima: Consorcio Justicia Viva 2004); *see also,* Rogelio Pérez Perdomo, *Judicialization and regime change: the Venezuelan Supreme Court,* in THE JUDICIALIZATION OF POLITICS IN LATIN AMERICA (R.Sieder, L.Schjolden & A.Angell, eds. London: Palgrave Macmillan, 2005).

[68] Id.



**APP 1089**
App. 755

### B.     A Class Action Judgment Rendered in the United States Would Almost Certainly Not be Recognized by Mexican Courts

70. Based on my knowledge and experience in Latin American law, and my review of Mexican law in particular, I opine that a judgment rendered by a United States court in a class action for money damages would not be enforced in Mexico. As with Venezuela, I am unaware of any Mexican case in which a Mexican court has recognized a United States class action judgment for money damages in order to bar re-litigation of the same claims by Mexican citizens in Mexico.[69] Similar to his account of the Venezuelan foreign judgment enforcement regime, Professor Garro's description of Mexico does not address the specific situation of an American class action judgment, which is essential to understand the present case. The legal and procedural obstacles to enforcement of a U.S. foreign judgment in Mexico are also stringent. The Mexican legal system, like most Latin American countries, does not recognize the class action device presented in this case. Although Mexico recently adopted a group litigation procedure, it does not recognize the "opt-out" mechanism. Instead, Mexico requires that "absent class members must *opt into* the class in order to be able to participate in the class action judgment".[70] In addition, as with Venezuela, the form of class action notice in the United States does not comport with Mexican standards and Mexico would not recognize a court's exercise of personal jurisdiction over foreign residents. Further, in practice, while open hostility towards the United States is not as widespread in Mexico as in Venezuela, there are still significant procedural burdens to obtaining *res judicata* enforcement of a United States judgment, and the Mexican judicial system suffers from endemic corruption. In my opinion, these obstacles would make any class action judgment obtained in this case useless in barring future re-litigation of claims by Mexican members of the class.

---

[69] *See generally, Gidi, US class action judgments in Latin America.* The only empirical study that I am aware of regarding the recognition of United States judgments in Mexico does not mention a single class action-related judgment in the time frame considered for the research. *See also,* JORGE ALBERTO SILVA, RECONOCIMIENTO Y EJECUCIÓN DE SENTENCIAS DE ESTADOS UNIDOS EN MEXICO, (Mexico: UNAM) (2011) [Hereinafter, *"Silva, Reconocimiento de sentencias de Estados Unidos"*] at 19.

[70] *See, Gidi, US class action judgments in Latin America,* at 922; and, Manuel A. Gómez, *Will the Birds Stay South? The Rise of Class Actions and Other Forms of Group Litigation Across Latin America,* 43 UNIV. MIAMI INTER-AMERICAN L. REV. 3 (2012) [hereinafter, *"Gómez, Class Actions across Latin America"*]

APP 1090
App. 756

1.   **A Class Action Judgment Rendered in the United States Would Not be Entitled to Preclusive Effect Under Mexican Law**

*a.*   *Background and Procedure for Recognition and Enforcement of Foreign Judgments in Mexico*

71. As with Venezuela,[71] there are no treaties between Mexico and the United States that govern the enforcement of foreign judgments.[72] Consequently, the relevant Mexican federal statutes control the domestication of a judgment issued by a United States court. The Federal Code of Civil Procedures ("FCCP") governs civil matters and the Commercial Code ("CC") governs commercial matters. In addition, because Mexico is a federal republic, there are similar state statutes that could apply to the domestication of foreign judgments when enforcement is sought in their territory.[73]

72. A petition to domesticate a foreign judgment—known under Mexican law as "*exhorto*"[74]—may be filed in a federal or state court depending on the type of controversy, which also determines the procedure to be followed.[75] However, according to article 104 (II) of the Mexican Constitution, federal courts have jurisdiction of "all civil and commercial controversies that arise in connection with the enforcement of federal statutes or international treaties concluded by the Mexican State."[76] Therefore, due to this case's nature, a petition to domesticate a judgment issued by a United States

---

[71] Like Venezuela, Mexico is a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and the Inter-American Convention on International Commercial Arbitration.

[72] *See, Silva, Reconocimiento de sentencias de Estados Unidos* at 12. Mexico, notwithstanding, is a party to several treaties related to the recognition and enforcement of foreign judgments, including the Inter-American Convention on the Extraterritorial Efficacy of Foreign Judgments and Arbitral Awards ("Montevideo Convention of 1979"), and the Inter-American Convention on Jurisdiction in the International Sphere for the Extraterritorial Efficacy of Foreign Judgments and Arbitral Awards ("La Paz Convention of 1984").

[73] In fact, all states except for Guanajuato and Tlaxcala have their own codes of civil procedure, which contain specific provisions dealing with the recognition and enforcement of foreign judgments in similar terms to the FCCP. *See*, Ana Margarita Ríos Farjat, *Reflexiones en torno a los problemas de homologación en Mexico de sentencias patrimoniales dictadas en los Estados Unidos de América*, in PERSPECTIVAS DEL DERECHO EN MEXICO, (Mexico, UNAM 2000) pp. 12, 13 [Hereinafter, "*Rios Farjat, Homologación de sentencias*"].

[74] *See, Perez, Enforcement of Mexican Judgments,* at 78. ["In Mexico, different from Venezuela, the means to obtain the recognition of a foreign judgment is the *exhorto*"].

[75] *Silva, Reconocimiento de sentencias de Estados Unidos* at 34.

[76] Political Constitution of the Mexican United States (Mexico) as amended to July 7, 2014. Available at: http://www.diputados.gob.mx/LeyesBiblio/htm/1.htm.



**APP 1091**
App. 757

court in the present matter would likely fall within the jurisdiction of the federal courts in Mexico.

73. At the federal level, both the FCCP and the CC set forth nearly identical requirements for a foreign judgment to be recognized and enforced in Mexico. The requirements are that the foreign judgment:

a. Fulfills the necessary requirements to be deemed as authentic (i.e. legalized, and the relevant signatures duly authenticated);[77]

b. Conforms to the formalities required by the treaties to which Mexico is a party,[78] or by the FCCP provisions regarding foreign judgments;[79]

c. Does not involve an *in rem* action;[80]

d. Has *res judicata* effect where it was issued, and that there are no appeals against it;[81]

e. That the foreign judge had jurisdiction;[82]

f. That the defendant was given proper notice of the original action, in a way that ensured his due process rights;[83]

g. That there is no pending action in Mexico concerning the same issues and parties involved in the original foreign action;[84] and

h. That the foreign judgment is not contrary to Mexico's public order.[85]

The burden of proving a foreign judgment should be enforced in Mexico is upon the party asserting its binding effect.[86]

---

[77] CC, article 1347-A (VIII), and FCCP, article 571 (VIII).

[78] CC, article 1347-A (I).

[79] FCCP, article 571(I).

[80] CC, article 1347-A (II), and FCCP, article 571(II).

[81] CC, article 1347-A (V), and FCCP, article 571 (V).

[82] CC, article 1347-A (III), and FCCP, article 571(III).

[83] CC, article 1347-A (IV), and FCCP, article 571(IV).

[84] CC, article 1347-A (VI), and FCCP, article 571 (VI).

[85] CC, article 1347-A (VII), and FCCP, article 571 (VII).

**APP 1092**
App. 758

74. Even if the aforementioned requirements are met, both the FCCP and CC give discretion to a Mexican court to deny the recognition and enforcement of a foreign judgment if it is proven that the courts of the country where the foreign judgment originated would refuse to enforce a similar judgment from Mexico.[87] In other words, the recognition of a foreign judgment in Mexico is subject to reciprocity, at the discretion of the enforcing court.

75. Of particular importance is the requirement that the foreign judgment not violate Mexico's "public order;"[88] which, in other words, means that it must not serve an illicit purpose or violate constitutional rights (such as due process).[89] As discussed further below, because Mexico does not recognize the "opt-out" class action device, it is highly likely that a Mexican court would conclude such a judgment fails to comport with Mexican legal protections. Further, the corruption of the judiciary in Mexico and the pernicious tactics commonly employed in these type of proceedings,[90] makes it even more certain that a class action judgment purporting to bar Mexican citizens from prosecuting individual claims against U.S. defendants would be disregarded.

76. Nevertheless, even if one assumes an impartial review by a Mexican court will occur, it is reasonable to conclude that a United States-style class action judgment would not be given any preclusive effect, as a matter of Mexican law, because: (i) the "opt-out" class action device is not accepted in Mexico, (ii) *res judicata* does not apply to individuals who were not actual parties to the original litigation, (iii) the notice provisions of United States-style "opt-out" class actions do not meet Mexican standards; and (iv) a Mexican court would likely rule that a United States court has no jurisdiction to issue a judgment involuntarily binding Mexican citizens in a case involving transactions occurring in Mexico.

---

[86] FCCP, article 572.

[87] CC, article 1347-A, last paragraph, and FCCP, article 571, last paragraph.

[88] FCCP, article 569; *see also, Rios Farjat, Homologación de sentencias* at 13, 17.

[89] Id. at 17.

[90] *See, Silva, Reconocimiento de sentencias de Estados Unidos* at 58. ["Another aspect related to this procedure, which is worth mentioning, is the malicious delay of some lawyers with the purpose of impeding that a foreign judgment is recognized and enforced"].

**APP 1093**
App. 759

### b. *"Opt-Out" Class Actions for Money Damages Are Not an Accepted Form of Litigation in Mexico*

77. As with virtually all Latin American countries, Mexico does not recognize a representative form of litigation to recover money damages in private suits where the nonparticipating class members must "opt-out" to avoid a binding judgment.

78. Since 2011, however, Mexico has begun to regulate and permit certain types of collective litigation.[91] The regime is contained not in a single statute, but in seven different federal laws, to wit: the Federal Civil Procedure Code (CFPC),[92] the Federal Civil Code (CC),[93] the Federal Antitrust Law (LFCE),[94] the Federal Consumer Protection Law (LFPC),[95] the Enabling Law for the Federal Judiciary (LOPFJ),[96] the General Environmental Law (LGEEPA),[97] and the Banking Savings Protection Law (DUSEF).[98]

79. The Mexican concept of collective litigation contrasts from the United States in a few key aspects, however. Unlike the United States, the only parties with standing to prosecute a collective litigation in Mexico are a limited number of public entities, including the Office of the Attorney General[99] and other special federal prosecutors with subject matter

---

[91] *See, Gómez, Class Actions across Latin America* at 516.

[92] Código Federal de Procedimientos Civiles [CFPC] [Federal Civil Procedure Code], *as amended*, Diario Oficial de la Federación [DO], 9 de febrero de 2012 (Mex.).

[93] Código Civil Federal [CC] [Federal Civil Code], *as amended*, Diario Oficial de la Federación [DO], 31 de agosto 1928 (Mex.).

[94] Ley Federal de Competencia Económica [LFCE] [Federal Antitrust Law], *as amended*, Diario Oficial de la Federación [DO], 24 de diciembre de 1992 (Mex.) (hereinafter LFCE).

[95] *See* LFPC, Ley Federal de Protección al Consumidor [Federal Consumer Protection Law], *as amended,* Diario Oficial de la Federación [DO], 24 de diciembre de 1992 (Mex.).

[96] Ley Orgánica del Poder Judicial de la Federación [LOPJF] [Enabling Law for the Federal Judiciary] *as amended,* Diario Oficial de la Federación [DO], 27 de mayo de 1995 (Mex.).

[97] *See* LGEEPA, Ley General de Equilibrio Ecológico y Protección al Ambiente [General Environmental Law], *as amended,* Diario Oficial de la Federación [DO], 4 de junio de 1992 (Mex.).



[98] Ley de Protección y Defensa al Usuario de Servicios Financieros [DUSEF] [Banking Savings Protection Law], *as amended,* Diario Oficial de la Federación [DO], 18 de enero de 1999 (Mex.).

[99] *See* CFPC at art. 585(IV).

**APP 1094**
App. 760

expertise on consumer, securities fraud, antitrust, and environmental issues.[100] In certain instances, registered and authorized civil associations[101] are also allowed to bring suit on issues directly related to their activities, pursuant to their articles of association.[102] This is more similar to civil suits by the Federal Trade Commission in the United States than it is to class actions brought by private litigants, such as in this case.

80. Still, there is an even more critical divergence between Mexico and the United States. Mexico specifically does not accept the idea of an "opt-out" class action. Rather, the notice given to absent members of a potential class in Mexico requires each individual to "opt-in" to be considered a part of the litigation.[103] This means that absent class members are not bound by any judgment unless they formally and affirmatively join the litigation. Thus, as in Venezuela, the concept of an "opt-out" class action for money damages is itself contrary to Mexico's public policy.

### c. An "Opt-Out" Class Action Judgment Would be Given No Res Judicata Effect Against Absent Class Members in Mexico

81. As a matter of well-settled Mexican law, *res judicata* would not bar an absent class member residing in Mexico from re-litigating claims addressed in a United States-style "opt-out" class action.

82. For a judicial decision to have any force and produce *res judicata* effect in Mexico, those affected by it must have been given an opportunity to present their case and be heard in the context of a regularly constituted judicial process. This is widely known as the "relativity principle of *res judicata*",[104] which means that the preclusive effect of a judgment only occurs with regard to the parties, and no one else.

---

[100] *See id.* at art. 585(I) [Including the Federal Prosecutor for Consumer Protection (FPCP), the Federal Prosecutor for Environmental Protection (FPEP), the National Commission for the Protection and Defense of Financial services Users and, and the National Antitrust Commission].

[101] *Id.* at art. 619 [Indicating that, because class representation is deemed to be of public interest, the associations have to register with the Federal Judicial Council (FJC)]

[102] *Id.* at art. 585(III).

[103] *Id.* at arts. 591, 593-94.

[104] *See, generally*, Octavio Cifuentes Rivera, *Cosa juzgada*, 27 REVISTA DE LA FACULTAD DE DERECHO DE MEXICO 35, 73 (1957).

31

83. The only way a person can present his/her case and be heard under Mexican law is when he/she voluntarily appears and participate in the judicial process, or when he/she is served with the summons in person by the bailiff in a manner consistent with Mexican law.[105] Service and joinder of a plaintiff by an "opt-out" class notification is inadequate because it does not conform with the principles of service of process in Mexico. The law in Mexico mandates that service of process be effected in person.[106]

84. Failure to serve a party in Mexico by personal service is a due process violation.[107] Mexican law provides that the right to due process is of the utmost importance,[108] to the point that it is expressly guaranteed by the Constitution,[109] and other statutes including the FCCP in the context of civil litigation.[110] The deprivation of a Mexican citizen's due process rights based on the fact that they did not affirmatively "opt-out" of a foreign class action is completely opposite to Mexico's recently-established form of collective litigation.

85. Accordingly, a United States-style "opt-out" class action would not meet the standards for recognition and enforcement of a foreign judgment in Mexico. A U.S.-based litigant asserting that *res judicata* bars a Mexican member of the class who did not affirmatively join and participate in the litigation from prosecuting claims in a Mexican court would be unsuccessful on the basis that absent class members in Mexico "were not made parties and had no day in court"[111]

---

[105] *Silva, Reconocimiento de sentencias de Estados Unidos* at 85, 86.

[106] FCCP, article 327.

[107] A case presented to illustrate the importance given to the requirement of personal jurisdiction of the foreign court over non-residents is the Robot case (Texas, docket 97-38148) mentioned by Silva in his study about the enforcement of United States judgments in Mexico. In that case, the Mexican court denied the recognition request because it found that the American court did not have personal jurisdiction over non-resident Mexican defendants, which would have been required as a matter of Mexican law. *See, Silva, Reconocimiento de sentencias de Estados Unidos* at 79.

[108] Cipriano Gómez Lara, *El debido proceso como derecho humano*, in ESTUDIOS JURÍDICOS EN HOMENAJE A MARTA MORINEAU, Tomo II, Nuria González Martín, ed. (UNAM, 2006) at 345.

[109] Constitution (Mexico), article 24, second paragraph.

[110] *See, e.g.,* FCCP, articles 275, 571, 574, 578.

[111] *See, Gidi, US class action judgments in Latin America* at 904.

32

**APP 1096**
App. 762

#### d. *A U.S. Class Action Judgment Involving Foreign Residents Would Not be Recognized Because it Offends Mexican Concepts of Jurisdiction*

86. Similar to the Venezuelan situation, an independent reason why a Mexican court would deny a request to recognize and enforce a United States judgment issued in a class action proceeding is that, under Mexican law, the United States court would be found to lack personal jurisdiction over non-resident absent class members.[112] In more specific terms, according to article 1347-A (III) of CC, and article 571(III) of FCCP, one of the requirements for granting a foreign judgment recognition is that the foreign court had jurisdiction over the matter, which includes having jurisdiction over the parties (i.e., all those to whom *res judicata* would apply).

87. The jurisdictional review that would be done by the Mexican court, however, would be based on the principles of international jurisdiction in force in Mexico, including any relevant international treaties, rather than the jurisdictional standards of the United States.

88. Under Mexican law, a court does not have jurisdiction over non-resident persons unless they submitted themselves voluntarily to the jurisdiction of that court (*e.g.*, by filing a claim, or formally appearing to present a defense) or service of process had been properly effected on them. As discussed previously, the "opt-out" class action device and its less formal means of notice do not comport with Mexican standards of personal service.

89. Accordingly, Mexican legal standards of personal jurisdiction would preclude the recognition and enforcement of a United States "opt-out" class action judgment against Mexican residents who did not affirmatively subject themselves to the jurisdiction of United States courts.[113]

#### e. *The Practical Burdens of Enforcing a Foreign Judgment in Mexico are Insurmountable*

90. Lastly, in practice, it would also be a very burdensome and lengthy process to obtain recognition of a United States class action judgment in Mexico. Although the procedure for the recognition and enforcement of foreign judgments, as written, may appear

---

[112] Id. at 945 ["Therefore, a foreign class action judgment that is issued without personal jurisdiction over absent class members is void and would not be recognized in Latin America"].

[113] Id.

**APP 1097**
App. 763

straightforward and simple, in practice it often takes several years to domesticate a foreign judgment.[114] This is more likely to be the case as well when something unusual like a United States "opt-out" class action judgment is presented for recognition and enforcement rather than an ordinary judgment in an individual litigation. Adding to the delay further still, Mexico (unlike Venezuela) also allows appeals in the domestication procedure.[115]

91. Further, similarly to what occurs in Venezuela, even if a Mexican court were to grant a petition to recognize the foreign judgment (which, in this case, is unlikely), the requesting party would still have to present the judgment for enforcement,[116] which may also take a long time depending on the defenses submitted by the parties and given the precarious situation of the Mexican courts. To illustrate this point, in his empirical study about the recognition and enforcement of United States judgments in Mexico, Silva mentions an example of a judgment issued by a California court in 2001. One of the parties immediately sought recognition of the judgment in Mexico that same year. Notwithstanding, it was not until 2007—that is, more than *five years* later—that the Mexican court finally denied the petition to recognize the foreign judgment; but even then the legal battle continued beyond the publication of Silva's book.[117]

92. Again, in any case, the burden of proof placed on Defendants would be overwhelming. If one assumes a class is certified in this case and the Defendants obtain a favorable judgment, then it is quite possible that Mexican members of the class may seek to re-litigate their individual claims again in Mexico. After answering the litigation in the trial court, the Defendants would have the burden to prove all the elements for recognition and enforcement of the judgment under Mexican law. Not only would the Defendants have to prove each of the prerequisites identified above (that the United States court had proper

---

[114] *Silva, Reconocimiento de sentencias de Estados Unidos* at 56 ["Notwithstanding, as the amount in dispute increases, political interests become involved, and requests are filed, the time increases too. Some of these matters may take three or more years. It is disgraceful that the indication of maximum terms by statute not always correspond with reality"].

[115] Id. at 148; *see also,* FCCP, article 608.

[116] *Silva, Reconocimiento de sentencias de Estados Unidos* at 25, 139.

[117] Id. at 57.

APP 1098
App. 764

jurisdiction and that proper notice under Mexican law was given, among others), they would also have to demonstrate the impossible: that Mexican citizens can be barred from pursuing their individual claims by a judgment issued in a prohibited form of representative litigation that occurred in a foreign country, and for which they were never properly served a summons or voluntarily "opted in" as a party.

93. In sum, given the absence of a reciprocal class action procedure in Mexico—in particular, the fact that an "opt-out" form of notice given by less than personal service completely contradicts the public policy recently expressed by Mexico—it is virtually certain that no court in Mexico, even one that is not corrupt or inefficient as discussed below, would give preclusive effect to a class action judgment for money damages rendered in this case to bar an absent class member in Mexico from re-litigating their claims.

### 2. The Mexican Judiciary Lacks Independence and Cannot be Relied on to Enforce A Class Action Judgment Rendered in the United States.

94. According to the latest (2013) edition of the annual report Global Corruption Barometer published by Transparency International, eighty percent of those surveyed considered that the Mexican judiciary "was corrupt/very corrupt",[118] and fifty five percent "reported paying a bribe to the judiciary".[119] The same report also showed Mexico as the most corrupt country of the OECD.[120] Another document prepared by an independent reporter appointed by the Economic and Social Council of the United Nations on the Independence of Judges and Lawyers in Mexico observed that "corruption involves between 50% and 70% of all federal judges",[121] and further said that "the Judicial Council had never sanctioned a federal judge for corruption".[122] The same report

---

[118] http://www.transparency.org/gcb2013/country/?country=mexico.

[119] Id.

[120] http://noticias.univision.com/article/1760025/2013-12-03/mexico/noticias/mexico-el-mas-corrupto-de-la-ocde-segun-informe-de-transparencia-internacional.

[121] Consejo Económico y Social de las Naciones Unidas, Informe del Relator Especial sobre la independencia de los magistrados y abogados, Sr. Dato'Param Coomaraswamy, presentado de conformidad con la resolución 2001/39 de la Comisión de Derechos Humanos, E/CN.4/2002/72/Add.1, January 24, 2002 [Hereinafter, *"UN Report on Independence of Mexican judges and lawyers"]* ¶63.



[122] Id.

**APP 1099**
App. 765

described instances of violence that resulted in the death of federal judges,[123] the pervasive payment of bribes in the context of civil litigation without which "not even a piece of paper is moved",[124] and numerous other instances of systematic malfunctioning that include the abuse of extraordinary procedures such as the constitutional writ of *amparo* as a delay or a blocking tool in case of an adverse ruling.[125] *Amparo* proceedings, the report said, are routinely used "as an additional means to appeal a judgment,"[126] and cause undue delay. Recent studies that rely on empirical data have confirmed this state of affairs, thus proving that it is not just a matter of negative perception, but a fact.[127]

95. The gravity of this situation is not confined to a specific type of court, or geographic area, but seems to be pervasive throughout the country and to affect all areas of the law. Unsurprisingly, civil and commercial courts are not exempted from this endemic failure, and the proceedings geared to obtain the recognition and enforcement of foreign judgments are obviously affected. This opinion seems to be shared by Jorge Luis Silva, who devotes an entire chapter to the topic of corruption and judicial malfunctioning in his book on the recognition and enforcement of United States judgments in Mexico.[128]

96. It is precisely this evidence that leads me to conclude that even if in theory, a Mexican court authorized the enforcement of a United States class action judgment (which I opine it cannot), as a practical matter, the Mexican judicial system could not be relied on to enforce such a judgment because of its systematic failures.

---

[123] Id. ¶71

[124] Id. ¶ 64.

[125] Id. ¶ 140 et. seq.

[126] Id. ¶ 142.



[127] *See, e.g.,* Julio Bustillos, La corrupción de los jueces federales mexicanos y su depuración, 33 Revista del Instituto de la Judicatura Federal 41 (2012).

[128] *Silva, Reconocimiento de sentencias de Estados Unidos* at 159-166.

**APP 1100**
App. 766

C.   **A Class Action Judgment Rendered in the United States Would Almost Certainly Not be Recognized by Colombian Courts**

1.   **A Class Action Judgment Rendered in the United States Would Not be Entitled to Preclusive Effect Under Colombian Law**

97. Colombia has adopted a group litigation regime, which has some similar features to the class actions available in the United States.[129] Notwithstanding, there are some important differences arising from general principles of Colombian procedural law that undeniably pose an obstacle to the recognition and enforcement in Colombia of a judgment that resolves an American class action. The main impediments are: (i) the lack of service of process effected on non-resident (Colombian) absent class members who, as a result, cannot be bound by the foreign judgment,[130] and (ii) the need for reciprocity regarding the recognition and enforcement of a group litigation-related Colombian judgment in the United States. It is because of these reasons that I conclude that the courts of Colombia would not recognize a judgment issued by an American court in a class action proceeding for money damages.

98. The protection of collective interests in Colombia can be traced back to the declaratory relief mechanism set forth among the traditional possessory actions in the country's 1887 Civil Code.[131] Furthermore, the Colombian Political Constitution of 1991[132] contemplated the protection of collective rights as a state policy and set the basis to regulate group litigation in Colombia.[133] In 1998, the Colombian Congress enacted the Popular and Group Actions Act (PGAC or Law 472), the main objective of which was to develop the principles set forth in Article 88 of the 1991 Constitution.[134]

---

[129] *See, Gidi, US class action judgments in Latin America* at 934-35.

[130] Id. at 936.

[131] *See generally,* GERMÁN SARMIENTO PALACIO, LAS ACCIONES POPULARES EN EL DERECHO COLOMBIANO (1988).

[132] CONSTITUCIÓN POLÍTICA DE COLOMBIA [C.P.] art. 88.

[133] *Id.* ("The law will regulate popular actions for the protection of collective rights and interests related to the homeland, space, public safety and health, administrative morality, the environment, free economic competition, and others of a similar nature. It will also regulate the actions arising out of harm caused to a large number of individuals, without barring appropriate individual action. In some way, the law will also define cases of civil liability for harm caused to collective rights and interests.").

[134] L. 472, august 5, 1998, [art. 1] DIARIO OFICIAL [D.O. 43.357] (Colom.).

**APP 1101**
App. 767

99. Law 472, the statute regulating group litigation in Colombia, created a mechanism of group action (*acción de grupo*) devised to offer redress to groups, categories or classes of individuals uniformly situated with respect to an event or product that have caused them harm.[135] As per Article 46 PGAC, group actions are expressly intended to seek monetary compensation for individual damages suffered by group members. A "group" is defined by the existence of uniform conditions with respect to an event alleged to have inflicted harm on each and all of its members.[136] The PGAC does not require the representative party claims to be typical of the rest of the group, but simply that the cause of the alleged harm is common to all group members and that the group is comprised of at least twenty people.[137]

100. The PGAC creates a procedural device whereby, once the litigating group is certified, the court shall direct notice to all members so that they can "opt-in" and join the litigation alongside the original parties.[138] PGAC also allow group members who did not participate in the proceedings to be excluded, as long as they file their request within twenty days of the final ruling on the merits, but may not invoke exemplary damages or partake in any fee awards.[139] Furthermore, the PGAC also provides group members with an opportunity to be excluded within five days following the term established to effect service of process.[140]

101. At first glance, the similarities between the Colombian group litigation model and its American counterpart appears to suggest that there are no major obstacles in obtaining the recognition and enforcement of a United States class action judgment in Colombia.

---

[135] *See*, Gómez, *Class Actions across Latin America* 481, 497.

[136] Id. at 499.

[137] Id. at 499-500. On February 13, 2008, the Colombian Constitutional Court clarified that the twenty-person threshold does not refer to the number of representative plaintiffs, but rather, it refers to an identifiable group of individuals that form the class. *See* Corte Constitucional [C.C.] [Constitutional Court], February 13, 2008, Sentencia C-116/08.

[138] L. 472, August 5, 1998, [art. 53] DIARIO OFICIAL [D.O. 43.357] (Colom.).

[139] Id. at art. 55. The constitutional court abrogated the requirement that the statute of limitations had not lapsed with respect to these class members. *See* Corte Constitucional [C.C.] [Constitutional Court] April 10, 2009, Decision C-241-09.

[140] L. 472 August 5, 1998, [art. 56] DIARIO OFICIAL (D.O.) (Colom.).

38

**APP 1102**
App. 768

However, that is not true. A careful review of the Colombian legal system reveals that there are insurmountable obstacles that arise from the general prerequisites for recognition and enforcement of foreign judgments, such as those related to service of process on absent class members, which would in turn impede the recognition of a judgment produced in a litigation like the present one. In addition, as a matter of Colombian law the recognition and enforcement of a foreign judgment is subject to a reciprocity requirement.[141] This means that a Colombian court would only recognize a United States class action judgment if there is evidence that the United States would recognize a similar decision emanating from a Colombian court. The analysis of these factors against the facts and circumstances present in this case, lead me to conclude that a class action judgment for money damages issued by a United States court cannot be enforced in Colombia.

102. Since the recent entry into force of the new Colombian General Code of Procedure in 2012 ("GCP"),[142] the *exequatur* procedure set forth in Articles 605-607 regulates the recognition of foreign judicial judgments. Hence, pursuant to Article 605 of the GCP, a judgment issued by a foreign court will have in Colombia the binding force granted by international conventions entered into with the relevant State. Absent such a treaty or convention, a foreign judgment will have in Colombia the same binding force granted to Colombian judgments in the relevant foreign State.[143]

### a. *The reciprocity requirement under Colombian law*

103. Similarly to the Mexican and Venezuelan cases, there are no treaties or conventions in force between the United States and Colombia regarding the recognition and enforcement of money judgments. As a result, a United States class action judgment for damages will be granted exequatur *if, and only if,* the Colombian court finds that a similar Colombian judgment would be equally recognized and enforced in the territory of the United States.

---

[141] *See,* GPC, article 605.

[142] L. 1564 July 12, 2012, DIARIO OFICIAL [D.O. 48.489] (Colom.).

[143] [*"Las sentencias y otras providencias que revistan tal carácter, pronunciadas por autoridades extranjeras, en procesos contenciosos o de jurisdicción voluntaria, tendrán en Colombia la fuerza que les concedan los tratados existentes con ese país, y en su defecto la que allí se reconozca a las proferidas en Colombia [...]"*].



**APP 1103**
App. 769

In other words, Article 605 of the GCP imposes a requirement of reciprocity. This certainly poses an obstacle to be faced by a party seeking the recognition and enforcement of a United States class action judgment in Colombia. In other words, unless the party seeking the recognition of a United States class action judgment in Colombia furnishes evidence to the Colombian court that a United States court would grant recognition to a Colombian group litigation judgment, the request would be denied.

### b.  Lack of adequate service of process is an impediment for the recognition and enforcement of a United States judgment in Colombia

104. Furthermore, Article 606 GCP provides the requisites for foreign judgments to have effect in Colombia. According to Article 606(6), a foreign judgment arising out of a foreign litigation procedure can only be recognized in Colombia as long as all parties to the litigation have been properly served a summons, or have voluntarily appeared in the court proceeding to present their case.[144] Similarly to the cases of Venezuela and Mexico, lack of service of process would adversely affect the validity of the entire proceedings and run against the basic notions of Colombian due process. The same effect would happen if service were defective.

105. A typical "opt-out" notice given in the United States to absent class members—unless it was performed individually through letters rogatory as per the Inter-American Convention on Letters Rogatory[145]—would likely be deemed inadequate to afford absent class members in Colombia an opportunity to present their case and exercise their due process rights.[146]

106. Similar to the case of Mexico and Venezuela, a foreign judgment—such as one rendered by a United States court in a class action for damages—that resulted from a process where absent class members were not adequately served with summons and the complaint, is in direct violation of the Colombian guarantee of due process, and is

---

[144] ["*Que si se hubiere dictado en proceso contencioso, se haya cumplido el requisito de la debida citación y contradicción del demandado, conforme a la ley del país de origen, lo que se presume por la ejecutoria.*"].

[145] Both the United States and Colombia are parties to the Convention. *See,* http://www.oas.org/juridico/english/sigs/B-36.html.



[146] *See,* Gidi, US class action judgments in Latin America at 901.

therefore offensive to the public policy of Colombia. As a result, said foreign judgment could not be enforced in Colombia for failing to meet the requisites set forth in article 606 of GCP.

107. For the above reasons, and based on my assessment of the facts and circumstances relevant to this case, I conclude that the applicable legal principles and laws of Venezuela, Mexico and Colombia prohibit the recognition and enforcement of a United States class action judgment for money damages. I also conclude that, even if the laws of Venezuela, Mexico and Colombia did require it, in practice, the recognition and enforcement of a United States class action judgment for money damages would be unavailable in either country.

**D.    Similar Legal Principles and Standards Apply Across All of Latin America**

108. Whereas the conclusions expressed above refer specifically to Venezuela, Mexico and Colombia, my familiarity with the development of collective litigation in Latin America, the characteristics of the procedural mechanisms that have emerged in recent times, their case law, and the overall functioning of Latin American civil litigation systems, also allows me to opine that all the Latin American jurisdictions at issue in this case would have similar reasons for denying recognition to a United States class action judgment for money damages.

109. As apparent from the discussion of just Venezuela, Mexico, and Colombia above, class action litigation is largely unheard of in the majority of Latin American countries. Even in those where some form of group litigation exists, the "opt-out" mechanism used in the United States is not an acceptable form of notice or process in Latin America. The notion of extending the *res judicata* effects of a judgment beyond the actual parties to the dispute and onto someone who was not properly served with formal process (and in accordance with international treaties when applicable), is completely alien to those national legal regimes. But even more important than the general unfamiliarity Latin American legal systems have with United States-style class actions is the fact that the key features of the American device—*res judicata* that binds absent members who remain silent and do not affirmatively "opt out" after receiving a notice sent typically by regular mail or something else less and formal service—stands in direct conflict with



41

fundamental tenets of civil justice in those countries. The fundamental principles of due process and public order are of the utmost importance in Latin America and emanate from the highest constitutional levels.

110. Therefore, it is my opinion, based on my knowledge, experience, and study of Latin American legal systems, that none of the Latin American countries at issue in this litigation would give *res judicata* effect to an "opt-out" class action judgment rendered in this case to preclude one of their own citizens from re-litigating individual claims against the United States-based Defendants.

Miami, February 12, 2015

Manuel A. Gómez

**APP 1106**
App. 772

# EXHIBIT 35

PROSKAUER
EXHIBIT 35

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
        :

SAMUEL TROICE, HORACIO MENDEZ,      :
ANNALISA MENDEZ, and        :
PUNGA PUNGA FINANCIAL, LTD.,      :
individually and on behalf of all others similarly  :
situated,        :
        :
        Plaintiffs,    :   Civil Action No. 3:09-cv-01600-N
        :   Hon. David C. Godbey
    - against -    :
        :
PROSKAUER ROSE LLP,      :
THOMAS V. SJOBLOM,      :
P. MAURICIO ALVARADO, and    :
CHADBOURNE & PARKE LLP,    :
        :
        Defendants.    :
        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## DECLARATION OF PEDRO ALBERTO JEDLICKA

### 1) INTRODUCTION

1. I, Pedro Alberto Jedlicka, submit this declaration at the request of counsel for defendants Proskauer Rose LLP and Chadbourne & Parke LLP, who requested my opinion on whether Venezuelan courts would recognize a class action judgment issued in this opt-out class action to preclude a claim against the same defendants by a Venezuelan class member.

### 2) SUMMARY OF OPINIONS

2. As I explain below, it is highly unlikely that a Venezuelan court would recognize an eventual judgment in this action to preclude a claim against the same defendants by a Venezuelan class member. There are three principal reasons for my conclusion:
   a. First, Venezuelan courts would find that this case is the type over which Venezuelan courts have exclusive jurisdiction. Recognizing, and giving *res judicata* effect to, a foreign judgment in an action in which Venezuelan courts would have exclusive jurisdiction would be a violation of Venezuelan public policy. Specifically, Venezuelan courts would find that they have exclusive jurisdiction over this case because a) it involves the Venezuelan banking sector and b) it is a class action, both of which are considered to be matters that affect Venezuelan public policy;
   b. Second, it is likely that Venezuelan courts would find that the opt-out class action proceeding, in which the judgment subject to recognition would be rendered, violates due process under Venezuelan law; and

1

**APP 1108**
App. 774

c. Third, Venezuelan courts would not be likely to recognize a foreign class action judgment in this proceeding against the interests of Venezuelan nationals. Therefore, it is highly likely that Venezuelan courts would find that a judgment in this action does not bind absent class members who are Venezuelan nationals and prevent them from bringing separate suits in Venezuela against the same defendants.

## 3) **STATEMENT OF QUALIFICATIONS**

3. I obtained my Law Degree from Universidad Católica Andrés Bello in Caracas, Venezuela, in 1995.
4. I have been a member of the Bar of the Capital District (Caracas), Venezuela, since 1996.
5. I obtained my Master's Degree in Procedural Law from Universidad Católica Andrés Bello in Caracas, Venezuela, in 1999.
6. I obtained my Master's Degree in Commercial Law from Universidad Católica Andrés Bello in Caracas, Venezuela, in 2000.
7. I obtained my Master's Degree in International Commercial Law from University of California, Davis in 2001.
8. I completed the Program of Instruction for Lawyers in Negotiation as well as the Advanced Negotiation Program at the Harvard Negotiation Institute, Harvard Law School, in 2006.
9. I have been a professor of Law at Universidad Católica Andrés Bello and Universidad Monteavila, both in Caracas, Venezuela since 2000, on the following subjects: Institutions of Civil Procedure II, General Theory of Evidence and Alternative Methods of Dispute Resolution (negotiation, mediation, and arbitration).
10. I also have been an adjunct professor at the Diplomat of Strategic Negotiation, Instituto de Estudios Superiores de Administración (IESA), in Caracas, Venezuela, since 2009.
11. I have practiced law in Venezuela since 1996.
12. A copy of my *curriculum vitae* is attached as **Exhibit "A."**

## 4) **DOCUMENTS REVIEWED**

13. To prepare this declaration, I have reviewed the following materials:
    - Rule 23 of the Federal Rules of Civil Procedure;
    - Rubenstein, William, "Newberg on Class Actions";
    - Plaintiffs' Second Amended Class Action Complaint, Civil Action No. 3:09-cv-01600-F, October 9, 2009;
    - Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives, and Class Counsel, Civil Action No. 3:09-cv-01600, October 31, 2014 (the "Class Certification Motion");
    - Exhibit 51 to the Class Certification Motion, Civil Action No. 3:09-cv-01600, Declaration of Professor Alejandro M. Garro, October 30, 2014;
    - Maekelt, Tatiana, Ivette Villarroel and Carla Resender, Book II of "*Comments to the Private International Law*", Caracas, 2005;

2

- Badell, Rafael, "The Protection of Collective and Diffuse Interests in Venezuela, Class Action", Caracas, 2014;
- Brewer-Carias, Allan, "Administrative Litigation", Book II of "Political and Constitutional Institutions", Caracas, 1997;
- Venezuelan Private International Law, passed on August 6, 1998, published in the Official Gazette No. 36.511. ("VPIL");
- Constitution of the Bolivarian Republic of Venezuela, of 1999;
- Law of the Institutions of the Banking Sector passed on December 2010 and published in the Extraordinary Official Gazette No. 6.015;
- Different rules issued by the Venezuelan Superintendence of Institutions of the Banking Sector ("SUDEBAN");
- Organic Law of the Supreme Court of Justice, passed on October 1, 2010 and published in the Official Gazette No. 39.522;
- Organic Law for Just Prices, published in the Official Gazette No. 40.340, dated January 23, 2014;
- Law for Social Responsibility in Radio, Television, and Electronic Media (commonly known as RESORTE Law), published in the Official Gazette No. 39.610 of February 7, 2011;
- Organic Law of Municipal Power, published in the Extraordinary Official Gazette No. 6.015, December 28, 2010;
- Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, November 15, 1965;
- Inter-American Convention on Letters Rogatory, of January 30, 1975 and its Additional Protocol, dated May 8, 1979;
- Decision dated February 6, 2000, rendered by the Constitutional Chamber of the Supreme Court, case: Máximo Febres Siso and Nelson Chitty La Roche;
- Decision dated November 14, 2006, rendered by the Chamber of Civil Appeals of the Supreme Court of Justice, case: Commercial Turbine Services, Ltd v. Aeroservicios Carabobo, C.A.;
- Decision dated August 9, 2007, rendered by the Chamber of Civil Appeals of the Supreme Court of Justice, case: Ashenoff & Associates, Inc v. Orlando Castro Castro and Orlando Castro Llanes;
- Decision dated June 22, 2000, rendered by the Chamber of Political and Administrative Matters of the Supreme Court of Justice, case: Los Pequeños Airlines, Inc v. Air Venezuela, C.A.; and
- Additional decisions rendered by the Venezuelan Supreme Court of Justice, particularly during the period between 2000 and 2014, some of which are fully identified in this declaration.[1]

---

[1] Many of the documents I reviewed in preparing this Declaration are in Spanish. The English translations of these documents, where they appear, are my own and are included for the Court's convenience.

3

### 5)  RECOGNITION OF A UNITED STATES CLASS ACTION JUDGMENT IN VENEZUELA

14. Despite a final judgment in this class action from a United States court, it is possible that a Venezuelan class member may file an individual claim in Venezuela in order to obtain an economic result different from the one rendered in the U.S. Under this scenario, it becomes necessary to analyze whether a Venezuelan court would recognize a U.S. court judgment in such a class action and preclude the aforesaid Venezuelan plaintiff from re-litigating the case on the grounds of *res judicata.*

**A. Background:  Regulatory and Legal Framework for Private International Law in Venezuela**

15. The Venezuelan Private International Law ("VPIL"), passed on August 6, 1998 (published in the Official Gazette No. 36.511 and effective February 6, 1999), sets forth the general framework for determining whether to recognize a judgment of a foreign court, including a judgment involving the same parties, and whether to grant that judgment *res judicata* effect in Venezuela.

16. Under Articles 40 and 47 of the VPIL, Venezuelan courts will not recognize a judgment of a foreign court in a case in which Venezuelan courts would retain exclusive jurisdiction.  Under Article 40 of the VPIL, Venezuelan courts will retain exclusive jurisdiction in cases involving obligations performed or to be performed in Venezuela, or arising from facts that occurred within the Venezuelan territory, among others.   Under Article 47 of the VPIL, Venezuelan courts will retain exclusive jurisdiction in cases involving public policy ("*orden público*"), among others.   The purpose of these limitations is to protect the jurisdiction of Venezuelan courts, especially in matters that affect the public policy of Venezuela:

> *The principles in article 47 of the [VPIL] really are limits that regulate the exclusivity of Venezuelan jurisdiction (…) When the legislators deny to the parties the possibility to repeal Venezuelan jurisdiction in matters that affect essential principles of Venezuelan public policy, and therefore do not recognize as valid any agreement that violates said limits, they are seeking to guarantee that national judges will always have jurisdiction if at least one of the parties so wishes. If the matter subject to exclusivity reflects the abovementioned principles, the first remedy that the Venezuelan system proposes to prevent a violation is to maintain the Venezuelan jurisdiction in parallel to the foreign jurisdiction. And the second remedy is to deny the recognition of any foreign ruling that may violate the Venezuelan public policy principles.*

4

Maekelt, Tatiana, Villarroel, Ivette, and Resende, Carla, Book II of "Comments to the Private International Law", Caracas, 2005, pages 1080-1091.

17. Article 53 of the VPIL also sets forth certain factors that a Venezuelan court would consider in determining whether to recognize a foreign judgment. Article 53 confirms that Venezuelan courts will not recognize a foreign judgment where the Venezuelan courts would have exclusive jurisdiction because the case involves matters of Venezuelan public policy.[2] Other factors that a Venezuelan court would consider under Article 53 include whether: a) the foreign court or tribunal had jurisdiction over the case, according to the general rules of jurisdiction provided in the VPIL; b) whether the judgment issued in a foreign court was decided in compliance with the rules of due process and appropriate service or notice; and c) whether the judgment contradicts Venezuelan jurisprudence. Where a foreign judgment does not satisfy these factors, a Venezuelan court will not recognize the foreign judgment.[3]

**B. A Venezuelan Court Is Unlikely to Recognize a Judgment in This Action Because This Proceeding Involves Issues of Public Policy in Venezuela**

18. During the past few decades (and particularly in recent years), Venezuela's legislature has confirmed a marked tendency towards broadening the scope of collective interests and public order, including increasing the participation of the State in the nation's economy, education, health, and industry, among other key sectors. Such participation by the State includes not only the development of new and very strict legal regulations for the private sector, but also the active and growing participation of the State in every single area of the economy.

19. As a result, two types of cases in particular implicate public policy, such that a Venezuelan court would exercise exclusive jurisdiction: a) cases involving the banking sector; and b) class actions.

20. Because this is a class action case involving the banking sector, I conclude that it is very likely that a Venezuelan court would not recognize or give *res judicata* effect to a judgment in this case, to the detriment of an absent class member in Venezuela who did not opt out of the U.S. proceeding. The Venezuelan courts would view such a case as affecting Venezuelan public policy and would therefore treat it as a matter in which the Venezuelan courts retain exclusive jurisdiction. Thus, it would be possible for a Venezuelan citizen to pursue in a Venezuelan court a claim against the same defendants based on the same allegations or arising out of the same alleged facts as this case, regardless of any judgment issued in the United States.

21. I discuss these issues in more detail below.

---

[2] This principle was formerly included in Article 851 of the Venezuelan Code of Civil Procedure. After the enactment of the VPIL in 1998, Article 851 was repealed and replaced by Article 53 of the VPIL.

[3] Articles 5 and 8 of the VPIL also require that, for a foreign judgment to be recognized, foreign rules and laws must be compatible with Venezuelan public policy.

5

**i. Cases Involving the Banking Sector Implicate Public Policy Considerations**

22. Venezuela has become a country in which most subjects involving legal transactions between individuals are regulated by public law. This is the case with respect to banking, leasing, labor, and the sale of certain goods and commodities, among other things. Thus, the scope of civil law in Venezuela is very limited, and many matters that would be treated as private transactions in other countries are treated as public policy (*"orden público"*) in Venezuela. This must be taken into consideration when determining the enforcement or recognition of a foreign judgment in Venezuela.

23. The link of this case to the financial sector would be a particularly important factor in a Venezuelan court's determination as to whether to recognize a judgment in this case. Venezuelan courts of law are competent to decide cases related to banking contracts; however, the scope of contractual freedom in these types of transactions is limited, both by the Law of the Institutions of the Banking Sector (passed in December 2010 and published in the Extraordinary Official Gazette No. 6.015), and by the rules issued by the SUDEBAN.

24. The banking sector in Venezuela is not properly considered a business; rather it is a public service to investors. Although the participation of private enterprises in the banking sector is allowed – in fact, private banking occupies the greatest percentage of the banking sector in country – the activity of such private enterprises is tightly regulated and overseen by the SUDEBAN. Indeed, Venezuela even created a Social Protection Fund for Banking Deposits, in order to guarantee the savings of the investors up to certain amounts. On this matter, Article 8 of the Law of the Institutions of the Banking Sectors reads:

> *Article 8. Public Service. The activities described in the present Law are a public service and must be developed under the strict compliance of the regulations established in article 3, and the commitment to social welfare. The legal entities of private law and the goods of any nature that are used for the development of these activities, will be considered public goods, and therefore, they must fulfill the principles of accessibility, equality, continuity, universality, progressiveness, non-discrimination, and quality.*
>
> *"In compliance with the abovementioned, and in the safeguard of the Diffuse Interests of the Republic, the suitability in the development of the activities regulated by this Law, as well as the stability of the financial and payments system, the President of the Republic, in Counsel of Ministers, may acknowledge the intervention, liquidation, and any other measure deemed fit, over the institutions of the banking sector, as well as over their related companies, on the terms of the present Law.*

25. Because this case involves banking, and the presumed fraud was alleged to be executed, at least partially, within the Venezuelan territory, I believe it is highly likely that Venezuelan courts would treat this matter as involving Venezuelan public policy,

6

and would refuse to recognize or give *res judicata* effect to the judgment of a United States court.

### ii. Class Actions Implicate Public Policy Considerations

26. Class actions in Venezuela implicate public policy considerations because, under Venezuelan law, class actions are meant only to safeguard "diffuse interests" and "collective interests," as those terms are specifically defined in Venezuelan law and explained below.

27. Class actions are new to the Venezuelan system of justice. They were first introduced by article 26 of the 1999 Constitution. Up until 2010 they were not properly regulated. From 1999 until 2010, the Constitutional Chamber of the Supreme Court of Justice issued opinions discussing the procedural rules and principles for class actions. Today, however, class actions are regulated mainly by the Organic Law of the Supreme Court of Justice (passed on October 1, 2010 and published in the Official Gazette No. 39.522), as well as by a series of other special laws related to specific sectors of the economy and types of public entities. These include: a) the Organic Law for Just Prices (Official Gazette No. 40.340, January 23, 2014); b) the Law for Social Responsibility in Radio, Television, and Electronic Media (commonly known as the RESORTE Law) (Official Gazette No. 39.610, February 7, 2011); c) the Organic Law of Municipal Power (Extraordinary Official Gazette No. 6.015, December 28, 2010); and d) all regulations related to the environment, specifically the Organic Law of the Environment (Extraordinary Official Gazette No. 5.833, December 22, 2006). Unlike the United States, Venezuela does not have an "opt out" procedure for class actions.

28. When referring to class actions, the Venezuelan Constitution, laws, and doctrine all agree that such actions safeguard two types of interests: collective and diffuse interests. Collective interests are *"those of a certain and definable group, even if it is not definable in individual or quantifiable terms, and to whom there is a common juridical link"* (Badell, Rafael, *"The Protection of Collective and Diffuse Interests in Venezuela, Class Action"*, Caracas, 2014, page 27). Diffuse interests, on the other hands, refer to general interests that are shared by citizens of Venezuela generally and are not related to a specific or definable group. In any event, both types of interests are understood to involve matters of public policy, even if the particular class action suit seeks reparations for damages caused by the violation of a collective or diffuse interest.

29. Accordingly, the fact that this case is being pursued as a class action is another factor that makes it likely that a Venezuelan court would treat the claims as involving matters of public policy and would refuse to recognize a foreign judgment that affects the rights of Venezuelan citizens.

## C. This Proceeding Involves Issues of Due Process

30. The aforementioned analysis regarding public policy likely is reason alone for a Venezuelan court to deny recognition of a class action judgment issued in this case. Nevertheless, the fact that such a class action judgment would be issued in the context

7

of an opt-out class action in the United States provides another reason for a Venezuelan court to deny recognition. In such an opt-out class action, it is very likely that a Venezuelan court would also deny recognition to a class action judgment because, under principles of Venezuelan law, such judgment would be rendered in a proceeding that is contrary to principles of due process of law.

31. Principles stated in Article 53 of the VPIL require Venezuelan courts – and, in particular, the Supreme Court of Justice in cases of foreign judgment recognition or *exequatur*[4] – to review whether the foreign judgment was issued in accordance with due process under Venezuelan law. Due process, for these purposes, requires providing notice or service of process to the defendant, and respecting the litigant's right to defend his or her interests in court. Despite the specific reference to the defendant in Article 53, these due process requirements apply to any litigant or interested party who becomes affected by a decision rendered by a foreign court without having received proper notice.

32. Although the VPIL regulates the majority of cases involving private international law, it does not contain many procedural rules. This is why most rules related to cooperation with other countries in judicial matters are found in bilateral and multilateral treaties signed between Venezuela and other countries. Moreover, internal procedures are regulated by Venezuela's sovereign laws.

33. If the affected party is domiciled in Venezuela, the court will require that notice be provided according to the procedures set forth in international treaties currently in force between Venezuela and the foreign State. In the case of the relationship between the United States of America and Venezuela, there are three applicable treaties in force: a) the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters; b) the Inter-American Convention on Letters Rogatory; and c) the Additional Protocol of the Convention on Letters Rogatory.

34. Article 5.a of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters allows the signatory States to effect notice according to their internal rules. Reinforcing this rule, Article 10 *eiusdem* allows the signatory States to deny any of the following forms of notice: a) notice by mail; and b) notice through officials of the receiving State. Venezuelan courts are very strict in the enforcement of the rules of notice because Venezuelan doctrine and jurisprudence provide that notice is the main guaranty of due process and the preservation of the right to be heard. It should be noted that notice by mail is not permitted in Venezuela.

35. Considering that class actions are fairly new in Venezuela, there is no precedent analyzing the validity of notice given to members of a putative class in Venezuela in the context of an opt-out class action being pursued in the United States.

36. I have reviewed many decisions, particularly related to *exequatur*, rendered by the Supreme Court between the years 2000 and 2014, in order to cover a period of time governed by the VPIL (enacted in 1998) and the current Code of Civil Procedure (enacted in 1987). The results of my investigation indicate that: a) 90% of the rulings

---

[4] *Exequatur* is the procedural mechanism by which Venezuelan courts may enforce foreign judgments.

8

were related to contentious divorces, of which all were given *exequatur*; and b) 10% of the rulings were related to the recovery of debts and payment of damages, of which only five came from American courts. Two of those in the latter category denied *exequatur* on the ground that the rules of notice were not followed.[5]

37. I conclude that considerations of notice and due process would likely lead a Venezuelan court not to recognize a class action judgment by a U.S. court in the present case. Venezuelan courts would likely examine whether the procedures set forth in the Venezuelan Code of Civil Procedures or in the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, the Inter-American Convention on Letters Rogatory and its Additional Protocol, were followed. My understanding is that the types of notice typically provided to class members in a U.S. opt-out class action would not satisfy these requirements.

38. Specifically, notice given by means of certified mail or private courier services has been rejected by the Venezuelan Supreme Court of Justice on the ground that the notice violates the requirements set forth in the Venezuelan Code of Civil Procedure of 1987 or in the international treaties mentioned above. According to the Venezuelan Supreme Court of Justice, this type of notice is deficient because it violates due process of law and limits the right of the affected party to defend its interests in court. Were these or similar forms of notice to be used in this case, it is likely that a Venezuelan court would find them deficient and would decline to recognize a U.S. class action judgment for this reason (in addition to the reasons described above).

39. Accordingly, I conclude that a Venezuelan court almost certainly would decline to recognize a U.S. class action judgment against any Venezuelan citizen who did not receive actual notice of the action by a recognized means of service under Venezuelan law or applicable treaty.

**D. Venezuelan Courts Are Unlikely to Recognize a Class Action Judgment in This Proceeding Against the Interests of Venezuelan Nationals**

40. Additionally, it is my opinion that a Venezuelan court is unlikely to recognize a foreign judgment that might adversely affect the interests of Venezuelan nationals because of a clear tendency by the Supreme Court of Justice to protect Venezuelan nationals. It is my belief, after many years of legal practice in Venezuela, that the Venezuelan Judicial System is very protective of the interests of its nationals, and will tend to rule on their behalf, whether they are plaintiffs or defendants. The cases in which Venezuelan nationals are held bound by foreign judgments based on foreign laws are the exception, not the norm.

---

[5] Civil Chamber of the Supreme Court of Justice, File No. 2005-000105, Parties: COMERCIAL TURBINE SERVICES, LTD vs AEROSERVICIOS CARABOBO, C.A., Justice Antonio Ramírez Jiménez, ruling dated November 14, 2006; Civil Chamber of the Supreme Court of Justice, File No. 2005-000425, Parties: ASHENOFF & ASSOCIATES, INC vs ORLANDO CASTRO CASTRO and ORLANDO CASTRO LLANES, Justice Antonio Ramírez Jiménez, ruling dated August 9, 2007.

9

### 6) <u>CONCLUSIONS</u>

41. It is my conclusion that both the type of proceeding at hand (a potential opt-out class action under Federal Rule of Civil Procedure 23), and the nature of the claim (a civil claim based on an alleged financial fraud), make it highly unlikely that a judgment in this case would be recognized by a Venezuelan court, including for purposes of *res judicata*.

42. On the contrary, this is the type of case over which Venezuelan Courts have exclusive jurisdiction. This leaves the door open to further claims against the defendants in Venezuela, arising out of the same or similar alleged facts because Venezuelan authorities would not recognize a judgment in a case alleging financial fraud perpetrated within the Venezuelan territory and obtained in a class action proceeding in the United States of America on the grounds that it would violate Venezuelan public policy.

43. The risk of such claims being allowed to proceed in Venezuela is especially high if the plaintiff filing a new action in Venezuela did not actively participate in the class action, but instead was an absent class member who did not opt out. Venezuelan courts would find that recognizing a foreign, opt-out class action would be a violation of due process under Venezuelan law.

44. Lastly, Venezuelan courts would not be likely to find that a judgment in this action would bind absent class members who are Venezuelan nationals and prevent them from bringing separate suits in Venezuela against the same defendants. Thus, if Venezuelan investors in Stanford Bank who did not actively participate in this case decide to pursue a claim against the defendants in Venezuela, it is likely that Venezuelan courts would not grant *res judicata* effect to preclude this new litigation.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Caracas, Venezuela on February 13, 2015.

_____
Pedro A. Jedlicka

10

# Exhibit A

# CURRICULUM VITAE

## Pedro Alberto Jedlicka Zapata
**pjedlicka@imeryurdaneta.com / pjedlicka@markven.com**



**Name**
Pedro Alberto Jedlicka Zapata

**Birth Date and Place**
Caracas, ███████, 1973

**Office Address and Telephone Number:**
Imery Urdaneta Calleja Itriago & Flamarique / Markven, S.C.
Multicentro Empresarial del Este, Torre Libertador, Núcleo A, Piso 5, Of. 51 y 52.
Avenida Libertador, Chacao, Caracas, Venezuela
Telephone: (0212) 265.9745
Fax: (0212) 265.9723
E-mail: pjedlicka@imeryurdaneta.com / pjedlicka@markven.com

**Work experience:**

- **Imery Urdaneta Calleja Itriago & Flamarique, Partner (May 2007 – Present).**
  - Coordinates the Department of Civil and Commercial Litigation and Alternative Methods of Dispute Resolution (Negotiation, Mediation and Arbitration) of the Firm.
  - Areas of specialization: Civil and Commercial Law, Negotiation, Mediation, Arbitration and other alternative methods of dispute resolution: Litigation: Corporate Compliance (specially focused on Anticorruption policies and legislation) and: Intellectual Property.

    Main experience: For more than 18 years, he has focused his professional practice in legal counseling for multinational corporations, in commercial law, including negotiation and wording of contracts, anti-corruption legislation and compliance, new technologies and intellectual property (brand protection and anti-counterfeiting). He has also developed his career, since the very beginning, in Civil And Commercial Litigation at the Venezuelan Courts, including the Supreme Court of Justice, Corporate investigations, International and Domestic Arbitration and Mediation.

- **Markven Propiedad Intelectual, S.C. (December 2004 – Present).**
  - Partner - Head of the Areas of Litigation, Anti-Counterfeiting and Dispute Resolution of the Firm.
  - Areas of Specialization: Trademarks, Copyrights and Anti-Counterfeiting Litigation.
  - Main experience: His practice in intellectual property has been mainly oriented to trademarks, copyrights and anti-counterfeiting litigation at Venezuelan Civil, Commercial and Administrative Courts nationwide, as well as at the Public Administration. He also coordinates private investigations to locate and identify manufacturers, importers and distributors of counterfeit products in Venezuela.

- **Arbitration Center - Caracas Chamber of Commerce (ICC Venezuela) (2007 – Present)**
  - Arbitrator (Member of the list of arbitrators of the Center)
  - Experience: Arbitration Proceedings involving oil and gas issues, construction projects, work and service contracts, leasing, banking and insurance.

- **Arbitration Center - Business Center of Conciliation and Arbitration (CEDCA). Caracas. (2008 – Present)**
  - Arbitrator (Member of the list of mediators and arbitrators of the Center)
  - Experience: He has been involved in arbitration proceedings involving oil and gas matters, work and services contracts, leasing and banking.

- **Travieso Evans Arria Rengel & Paz, Senior Associate (April 1996 – April 2007).**
  - Senior Associate
  - Areas of specialization: Negotiation, Mediation, Arbitration and other alternative methods of dispute resolution; Civil and Commercial Litigation, Commercial Law, International Contracts, Electronic Commerce.
  - Main experience: International and domestic arbitration mostly involving oil & gas contracts and companies, according to the rules of the following centers of arbitration: a) International Chamber of Commerce (ICC); b) Business Center of Conciliation and Arbitration (CEDCA); c) International Centre for Settlement of Investment Disputes (ICSID); d) Caracas Chamber of Commerce. He has been also involved during more than 11 years, in several judicial proceedings filed at the Venezuelan Courts involving civil and commercial disputes.
  - 

**Education:**

- University of California Law School, Davis, California, E.U.A., Master in International Commercial Law. Degree conferred: M.A. in International Commercial Law, 2001.

- Universidad Católica Andrés Bello, Post-graduate School, Master in Commercial Law, Caracas, Venezuela. Degree conferred: Master in Commercial Law (Derecho Mercantil), 2000.

- Universidad Católica Andrés Bello, Post-graduate School, Master in Procedure Law, Caracas, Venezuela. Degree conferred: Master in Procedure Law (Derecho Procesal), 1999.

- Universidad Católica Andrés Bello, Law School, Caracas, Venezuela. Degree conferred: Lawyer, 1995.

**Additional courses and graduate programs:**

- Harvard University, Law School, Cambridge, Massachussets, U.S.A., Program on Negotiation: Negotiation: Creating Value in Deals and Disputes, 2006.

- Harvard University, Law School, Cambridge, Massachussets, U.S.A., Program on Negotiation: Advanced Negotiation: Difficult Conversations, 2006.

- 
- Seminar and Workshop: Negociación en tiempos de Cambio / Getting Past No … to Yes!, William Ury, Harvard Negotiation Project, Caracas, Venezuela, 2002.

- Seminar and Workshop: International Arbitration and Resolution of Disputes related to foreign investments, Business Center of Conciliation and Arbitration (CEDCA )/ Venezuelan American Chamber of Commerce and Industry (VenAmCham), Caracas, Venezuela, 2005;

- International Arbitration in Latin America, International Chamber of Commerce (ICC), Miami, Florida, U.S.A., 2005, 2006, 2007, 2009

- International Commercial Arbitration, International Centre of Dispute Resolution (ICDR / AAA), Miami, Florida, U.S.A., 2004.

- University of California, Davis, California, U.S.A., Structuring an International Joint Venture, 2000.

- University of California, Davis, California, U.S.A., International Financial Transactions, 1999.

- University of California, Berkeley, California, U.S.A., Orientation in USA Law, 1998.

- University of California, Davis, California, U.S.A., Advanced USA Law, The Global Trading System: Substance and Dispute Resolution, 1998.

- Venezuelan Academy of Political and Social Sciences (Academia de Ciencias Políticas y Sociales), The Commercial Arbitration Law (La Ley de Arbitraje Comercial), Caracas Chamber of Commerce, Caracas, 1998.

**Languages:**

- Spanish: Native language.

-   English (Speaks, Reads and writes fluidly).

-   Italian (Beginner Courses).

-   German (Beginner Courses).

**Publications:**

-   "PROMOCIÓN, EVACUACIÓN Y VALORACIÓN DE MENSAJES DE DATOS COMO MEDIOS DE PRUEBA (production of data messages as evidence in a judicial proceeding), publicado en "III Jornadas Aníbal Domínici", Ediciones Funeda, Caracas, 2011

-   "RECURSOS DE TERCEROS FRENTE A MEDIDAS CAUTELARES ACORDADAS POR TRIBUNALES ARBITRALES" (Third-Party-Appeals against provisional measures granted by Arbitral Courts), published in "Revista Derecho y Sociedad No. 9, Negociación , Mediación y Arbitraje", edited by the Universidad Monteavila's Law Faculty, Caracas, 2010.

-   "DISCURSO HOMENAJE A LA OBRA CIENTÍFICA DEL DOCTOR ARÍSTIDES RENGEL ROMBERG" (Speech in tribute to the scientific work of Doctor Aristides Rengel Romberg), published in "Revista Derecho y Sociedad No. 9, Negociación , Mediación y Arbitraje", edited by the Universidad Monteavila's Law Faculty, Caracas, 2010.

-   "BREVES ESTUDIOS SOBRE EL JUICIO DE CUENTAS EN VENEZUELA" (Brief Studies about the Account Trial in Venezuela), published in "Revista Derecho y Sociedad No. 5" a tribute to Dr. Arístides Rengel Romberg, edited by the Universidad Monteávila, Caracas, 2005

-   "COMENTARIOS SOBRE LOS MENSAJES DE DATOS COMO MEDIOS DE PRUEBA" (Comments about Data Messages as means of proof) published in the book Aspectos Legales del Comercio Electrónico (Legal Aspects of Electronic Commerce) edited by the Venezuelan Chamber of Electronic Commerce, Caracas, 2004.

**Academic Experience:**

-   Instituto de Estudios Superiores de Administración (IESA), Escuela de Gerencia, Adjunct Professor of "Negotiation – Harvard Program on Negotiation". (2009 – Present)

-   Universidad Católica Andrés Bello, Adjunct Professor of "Evidence (Teoría General de la Prueba)". (2008 – Present)

-   Universidad Católica Andrés Bello, Law School, Adjunct Professor of Alternative Methods of Dispute Resolution (Negotiation, Mediation and Arbitration), (2006 – present)

-   Universidad del Pacífico, Lima, Perú / Arbitration Center AmCham Peru, Invited Professor of the Subject "Evolution of the Competence-Competence Principle", at the Diplomat in National and International Arbitration. Lima, Peru.

-   Universidad Monteávila, Law School, Adjunct Professor of "Institutions of Procedure Law II" (Instituciones de Derecho Procesal II), (2002 – present).

**Professional Affiliations:**

-   Member of the list of arbitrators and mediators of the Business Center of Conciliation and Arbitration (CEDCA) in Venezuela, as well as of the Arbitration Center of the Caracas Chamber of Commerce

-   Club Español de Arbitraje (founder of the Venezuelan Chapter)

-   Director of the Law Review "Law and Society (Derecho y Sociedad)", published by the Faculty of Jurídical and Political Sciences of the Universidad Monteavila, Caracas, Venezuela

-   Director of the Center of Investigation and Studies for Conflict Resolution (Centro de Investigación y Estudios para la Resolución de Controversias), Universidad Monteávila

-   Venezuelan American Chamber of Commerce and Industry, Arbitration Committee.

-   Venezuelan American Chamber of Commerce and Industry, Electronic Commerce Committee, (2000 – 2008).

-   Colegio de Abogados del Distrito Capital

- Instituto de Previsión Social del Abogado (Venezuelan Bar Association).

**Investigations in which he has participated:**

He is a co-writer of the draft of the Data Messages and Electronic Signatures Law presented before the Venezuelan Ministry of Science and Technology by the Venezuelan-American Chamber of Commerce and Industry (Venamcham).

He is the director and coordinates the Center of Investigation and Studies for Conflict Resolution (Centro de Investigación y Estudios para la Resolución de Controversias), Universidad Monteávila

**Other professional activities (lectures and presentations in seminars, events, congresses)**

- (October 2010) Invited Professor to the Diplomat in Local and International Arbitration. Lima, Peru. Organized by the American Chamber of Peru and Universidad del Pacífico.

- (November 2010) Invited Speaker to the Foreing Chapters reunion of the Spanish Club of Arbitration. Lima, Peru

- (September 2010) Participation as arbitrator at the I National Competition of Commercial Arbitration, organized by the Center of Arbitration of the Caracas Chamber.

- (September 2009) Participation as arbitrator at the II Competition in International Commercial Arbitration, Buenos Aires, Argentina. Organized by the Faculty of Law of the Universidad de Buenos Aires, Argentina, and the Universidad del Rosario, Bogotá, Colombia

- (June 2009) Speaker at the conference: "Arbitration in the Economical Crisis". Barcelona, Spain. Organized by the Spanish Club of Arbitration.

- (April 2009) Speaker at the Conference: "2nd Roundtable in International Arbitration", Mexico City, Mexico. Organized by the Institute of Transnational Arbitration.

- (October 2008) Speaker at the Conference: "Nueva Jurisprudencia Constitucional sobre Arbitraje. ¿Un avance del arbitraje en Venezuela". Organized by the Business Center for Conciliation and Arbitration (CEDCA). Caracas.

- (June 2008) Speaker at the Workshop: "El método de negociación de Harvard". Organized by the Center of Investigation and Studies for Dispute Resolution of the Universidad Monteávila (CIERC).

- (March 2008) Speaker at the Conference: "Resolution of conflicts at family companies". Organized by the Center of Investigation and Studies for Dispute Resolution of the Universidad Monteávila (CIERC).

- (February 2008) Participation as arbitrator at the First Venezuelan Pre-Moot of the competition Willem C. Vis of International Arbitration. Organized by the Universidad Metropolitana. Caracas.

- (November 2007) Speaker at the Workshop: "El método de negociación de Harvard". Organized by the Center of Investigation and Studies for Dispute Resolution of the Universidad Monteávila (CIERC).

- (May 2006) Main speaker at the tribute to Dr. Arístides Rengel Romberg, First Dean of the Faculty of Juridical and Political Sciences of the Universidad Monteávila. Caracas, Venezuela.

- (May 2004) Speaker at the Conference: Applicability of the new Consumer Protection Law to the electronic businesses and transactions. Proceeding of Resolution of Disputes included in this new legislation. Congress: "The new consumer protection law", Organized by the Venezuelan American Chamber of Commerce and Industry (VenAmCham). Maracaibo, State of Zulia, Venezuela.

- (May 2004) Speaker at the Conference: The New Consumer Protection Law. Applicability in Electronic Commerce. Venezuelan American Chamber of Commerce and Industry, Marriott Hotel, Caracas, Venezuela.

- (March 2003) Speaker at the Conference: Legal regulation of the Electronic Commerce. Universidad Monteávila – Caracas, Venezuela.

- (November 2001) Speaker at the Conference: Data Messages and Electronic Signatures Law. International Congress – Communications and Law. Organized by the Bar Association of the Federal District Caracas, Venezuela.

- (October 2001) Speaker at the Conference: Data Messages as means of proof. Bar Association of the Federal District. Caracas, Venezuela.

- (July 2001) Speaker at the Conference: Data Messages as mean of proof– Supreme Court of Justice. Seminar oriented to Venezuelan Judges: Data Messages and Electronic Signatures Law. Caracas, Venezuela

- (May 2001) Speaker at the Conference: Electronic Contracts – Elements of evidence arising from the Data Messages and Electronic Signatures Law. Caracas Hilton Hotel – Organized by the Venezuelan American Chamber of Commerce and Industry (VenAmCham). Caracas, Venezuela.

- (March 2001) Data Messages as means of proof – Caracas Teleport. Organized by the Venezuelan Chamber of Electronic Commerce (Cavecom-e). Caracas, Venezuela