# EXHIBIT 74

TM
EXHIBIT 74

APP 1124

App. 1750

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, et al, on behalf | § | |
| of themselves and all others similarly | § | |
| situated, | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:09-CV-02384-N-BG |
| | § | Judge: Hon. David C. Godbey |
| -Against- | § | Mag: Hon. Nancy M. Koenig |
| | § | |
| TRUSTMARK NATIONAL BANK, et al, | § | |
| Defendants. | § | |

**DECLARATION OF JAMES OTIS RODNER**

July 2, 2015

1

I, James Otis Rodner, attorney of Caracas, Venezuela, to the best of my knowledge, state as follows:

## I.  QUALIFICATIONS

1.      I am a Venezuela citizen and a partner of the law firm Rodner, Martínez and Asociados with offices in Avenida Venezuela, El Rosal, Caracas, Venezuela.  I hold a law degree from the Universidad Católica Andrés Bello and a Juris Doctor from Harvard University.  I also have an MBA from Harvard University, a Specialist in Political Economy from the Universidad Católica Andrés Bello and a Masters in Economics from the Universidad Católica Andrés Bello.

2.      I am an attorney licensed to practice law in the Republic of Venezuela. I am admitted to practice before the Bar of the Federal District of the Republic of Venezuela (*Colegio de Abogados del Distrito Federal*), the Commonwealth of Massachusetts, the District of Columbia and before the United States Supreme Court.

3.      I have been a professor of *Obligaciones* (Contracts and Torts) at the Universidad Católica Andrés Bello, Caracas, Venezuela; of International Finance and Financial Law at the *Instituto de Estudios Superiores de Administración*, Caracas (I.E.S.A.); of Monetary Policy at the Graduate School of Economics of the Universidad Católica Andrés Bello; and of The Legal Theory of Money at the graduate school of the Universidad Central de Venezuela.

4.      I also, from time to time, give lectures at conferences in Venezuela and in other countries on topics related to: the law of contracts and obligations, under Venezuelan law, UNIDROIT Principles, and with respect to comparative law; the Uniform Rules for Demand Guarantees; and arbitration-related topics and procedures, including multiple party arbitrations and review and enforcement of arbitral awards.

2

APP 1126

5.      I have written over forty-seven law review articles, mostly published in Venezuela, some published in the United Kingdom, Holland, France, and Korea.  I have written sixteen books on different topics of law and finance (*see* www.rodner.net).

6.      I am an elected member of the Venezuelan Academy of Political and Social Sciences ("*individuo de número*") and a member of the International Court of Arbitration of the International Chamber of Commerce (ICC).

7.      Attached as Appendix "A" herewith is my curriculum vitae.

8.      Additionally, I note the following: (a) I have not testified as an expert at trial or deposition in the past four years. However, I have acted as an expert in several arbitration procedures, and; (b) I am being compensated for my work in connection with this case at my customary consulting rate of U.S. $ 390 per hour.  My compensation is not contingent on my opinions or on the litigation's outcome.


## II.     DEFINED TERMS AND ABBREVIATIONS

9.      I use the following defined terms and abbreviations in this declaration:

 "Baudin": Patrick Baudin's Venezuelan Code of Civil Procedure with doctrine and cases, 3rd Ed. Caracas, 2011.

"Bustamante Code": Convention of Private International Law adopted in Havana, 1928, ratified by Venezuela 23rd of December 1931.

"FRCP" Federal Rules of Civil Procedure.

"IACRJ":  Inter-American Convention for the Extraterritorial Validity of Foreign Judgments and Arbitral awards, adopted in Montevideo in 1979, ratified by Venezuela in 1985.

"ICC": International Court of Arbitration of the International Chamber of Commerce

"JRG": Jurisprudence Ramirez & Garay.

"*Rotstain* Action": *Rotstain v. Trustmark National Bank*, No. 3:09-CV-02384-N-BG (N.D. Tex.).

3

"SCC": Civil Cassation Chamber of the Venezuelan Supreme Court.

"VCC": Venezuelan Civil Code of 1982.

"VCCP": Venezuelan Code of Civil Procedure.

"Venezuelan Absent Members": as defined in Paragraph 12.

"VNC": Venezuelan Constitution of 1999.

"VPIL": Venezuelan Private International Law, August 6, 1998 (Official Gazette number 36.511).

"VSC": Venezuelan Supreme Court.

"VSCL": Venezuelan Supreme Court Law (Official Gazette number 39.522 of October 1, 2010).


## III.    DOCUMENTS CONSIDERED

10.     In reaching the opinions expressed in this declaration, I have considered the following documents filed in the *Rotstain* Action, along with any other documents or information referenced herein:

   a.  Plaintiffs' Second Amended Class Action Complaint (dated May 1, 2015); and

   b.  Memorandum Supporting Plaintiffs' Motion for Class Certification, for designation of Class Representatives and Class Counsel (dated Apr. 30, 2015).

11.     I reserve the right to supplement or modify my opinions expressed herein, particularly in light of any new arguments raised or materials presented by Plaintiffs in this case.


## IV.    SUMMARY OF OPINION

12.     I have been asked by the Toronto-Dominion Bank whether a judgment or court-approved settlement entered in the class action litigation *Rotstain v. Trustmark National Bank*, No. 3:09-CV-02384-N-BG (N.D. Tex.) (the "*Rotstain* Action")) would bar Venezuelan members

4

who did not opt out of the class (*i.e.*, "Venezuelan Absent Members") from bringing a new action against the Defendants to the *Rotstain* Action in Venezuela. The essential question is whether Venezuela would recognize a judgment or court-approved settlement entered by a U.S. court finding against or partially against Venezuelan Absent Members as supporting a defense of *res judicata* in an action brought by one or more Venezuelan Absent Member against one or more of the Defendants in the *Rotstain* Action.

13.    After reviewing the Venezuelan Code of Civil Procedure (VCCP), the Venezuelan Constitution (VNC), decisions of the Venezuelan Supreme Court (VSC) and other rules and doctrine in Venezuela, it is my opinion that a judgment or court-approved settlement entered in the *Rotstain* Action totally or partially against Venezuelan Absent Members would not bar those absent members from bringing a suit in Venezuela on the same matter.[1]

14.    As discussed below in Section V, the concept of a U.S. class action brought on behalf of, and binding on, unidentified plaintiffs that do not opt out (under Article 23 of the U.S. Federal Rules of Civil Procedure) is alien to Venezuelan procedural traditions. Therefore, as discussed below in Sections VI and VII, a defendant to such a U.S. class action would not be able either to obtain recognition of the judgment ("*exequatur*") by the Venezuelan Supreme Court against the Venezuelan Absent Members or to raise successfully a *res judicata* defense.

---

[1] Obviously, if the member of the class did opt out, he or she will also not be barred from bringing an action against any or all of the Defendants in Venezuela on the same matter.

5

**APP 1129**

App. 1755

## V.  CLASS ACTIONS ARE CONTRARY TO PRINCIPLES PROVIDED UNDER VENEZUELAN CIVIL PROCEDURE

15.        According to civil law doctrine, a party is the person that brings a claim or against whom a claim is made.[2]  Specifically, a plaintiff is the party that brings a suit in his own name, requesting the application of the law.  The defendant is the party against whom the suit is brought.[3]  The parties are the only persons who, in their role as plaintiff or defendant, have the necessary procedural capacity to participate and complete valid acts in a case (*see* SCC, decision dated August 11, 1988).[4]  In addition, only the losing party in a litigation would have the obligation to pay the litigation costs (VCCP, article 274).  The fact that a person may fall into some broad definition of a "class" under U.S. law, subject to the opt-out mechanisms defined in the FRCP, does not make her a recognized plaintiff in Venezuela, much less a party to the litigation.

16.        The Venezuelan Supreme Court (VSC) recognizes that third parties can participate in a proceeding if, and only if, they "incorporate themselves" into—*i.e.*, express an intention to participate in—the case.  Specifically, a case can commence with one plaintiff and one defendant, but a third party can be added by prior approval of the court, only if the party shows that it wishes to participate in the procedure (VSC, May 8, 2002).[5]  Accordingly, a third party must expressly indicate to the court its consent and intention to participate in the proceeding

---

[2] Guasp, J. "*Derecho Procesal Civil*," Instituto de Estudios Políticos, Madrid, 1961. P. 177.

[3] José Chiovenda, "*Principios de Derecho Procesal Civil*," Madrid, Editorial Reus, translation by José Casais y Santaló, Vol. 2, pp. 6-7.

[4] Venezuelan SCC decision of August 11, 1988, reported in JRG, Volume CV, p. 381; *see also* Baudin, 2011, p. 119.

[5] *See* Decision of the SCC, dated May 8, 2002, number. 0059. Also, *see* Articles 370 and 371 of the VCCP.

6

**APP 1130**

(VSC, May 8, 2002). Once such a person has affirmatively become a party to the procedure, it has all the responsibilities and rights of a party, including the ability to appeal a final judgment.

17.    In short, under Venezuelan law, an "incorporated" third party is not an unidentified person, but rather an identified individual that has voluntarily joined the proceeding.  In Venezuela, "incorporated" third parties cannot include unidentified plaintiffs that have never taken any active step in the procedure.  Furthermore, Venezuelan law does not contemplate class actions as these are understood under the FRCP.  Under Venezuelan law, the idea that a person can be plaintiff without expressly and affirmatively participating in an action is totally foreign; the idea that a judgment, favorable or not, will bind all persons who do not request to opt-out of a particular defined "class" is alien and contrary to the fundamental structure of Venezuelan civil procedure.[6]

18.    Venezuela, like most civil law countries in Latin America, does not recognize class actions for damages.  The only actions available under Venezuelan law which have the purpose of protecting collective rights are known as "Collective Group Actions," which are fundamentally different from class actions under the U.S. Federal Rules of Civil Procedure.

19.    Specifically, Collective Group Actions, which follow the procedural rules established by the Venezuelan Supreme Court Law (VSCL, Articles 146 to 166), are actions brought by the People's Attorney ("*Defensoría del Pueblo*")[7] or by any person that acts as a member of society

---

[6]  *See, e.g.,* Antonio Gidi, "The Recognition of U.S. Class Action Judgments Abroad: The Case of Latin America", Volume 37 Brook.J.INT.LL Available at: http://practicum.brooklaw.edu/sites/default/files/print/pdfs/journals/brooklyn-journal-international-law/volume-37/issue-3/bjil_v37iii_2.pdf  P.903.

[7]  The *Defensoría del Pueblo* is a form of attorney general in charge of protecting the people in general against violations of their constitutional and human rights  *See* VCN, Articles 280 and 281; VSC, Constitutional Chamber, decision dated, June 28, 2011, JRG Vol. CCLXXVI, p. 300-301.

7

and invokes a right shared with it.[8] They may be brought under the VNC (Articles 26 and 281 (2)) for the protection of the collective or general interests of a diffuse group ("*intereses colectivos o difusos*") in matters that may affect quality of life and the common good.[9] The result is ordinarily the granting of a constitutional injunction ("*amparo*"), which prescribes a conduct that is damaging to society (or segments of society) as whole. For example, a recent decision of the Venezuelan Supreme Court allowed a Collective Group Action in a health matter regarding the receipt from the State of proper medicines by people affected by AIDS.[10]

20.    Collective Group Actions are fundamentally different from typical U.S. class actions, such as the *Rotstain* Action, which are brought for individual relief for the ostensible class members. Collective Group Actions, on the other hand, are brought for injunctive relief to remedy matters of collective or social interest (as opposed to monetary interests of specific individuals).[11] Only the People's Attorney can ask for a general indemnification in the name of the collective group.[12] To my knowledge, in Venezuela, there has never been a Collective Group Action for the award of damages arising out of a tort.

---

[8] VSC, Constitutional Chamber, decision dated, June 28, 2011, JRG Vol. CCLXXVI, p. 300-301.

[9] *See* Badell Madrid, R. "*La protección de los intereses colectivos o difusos en Venezuela,*" Class Action. Universidad Católica Andrés Bello. Caracas 2014. p. 31.

[10] *See* Decision of the Constitutional Chamber of the Venezuelan Supreme Court dated April 6, 2001 in JRG, Volume CLXXV. In addition to health, Collective Group Actions also concern, among other things, political rights and rights to work, information, and the environment. *See* Venezuelan Supreme Court (VSC), decision of June 30, 2000, JRG Vol. CLXVI, pages 520 to 532.

[11] VSC, Constitutional Chamber, decision dated July 23, 2012, JRG Vol. CCLXXXII, pages 67 to 78.

[12] *Id.*

8

**APP 1132**

App. 1758

## VI.   A VENEZUELAN COURT WOULD NOT GRANT *EXEQUATUR* AGAINST THE VENEZUELA ABSENT MEMBERS

21.        Because a class action such as the *Rotstain* Action is incompatible with principles of Venezuelan procedure and public policy, a Defendant could not obtain recognition in Venezuela of a judgment against the Venezuelan Absent Members, which is a prerequisite to asserting the defense of *res judicata*.

22.        In a decision dated November 29, 2006, the Political and Administrative Chamber of the Venezuelan Supreme Court held that to successfully assert *res judicata* ("*cosa juzgada*") in respect of a foreign judgment (referred to by the Court as international *res judicata*), it is necessary to obtain an *exequatur* of the foreign judgment (SPA, Decision November 29, 2006).[13]

23.        *Exequatur* of a foreign judgment—including a judgment of a U.S. court—is governed by the Venezuelan Code of Civil Procedure (VCCP), as well as the Venezuelan International Private Law (VPIL) adopted in 1998.[14]   Before it can grant the *exequatur*, the Venezuelan Supreme Court must ensure that all Venezuelan procedural guaranties have been respected,[15]

24.        An *exequatur* cannot be granted if the foreign judgment violates public policy (or order) (Articles 5 and 8 VPIL and Article 851.6 VCCP).   Venezuelan public policy requires that the right of defense and due process be properly respected (Constitutional Chamber, February 9,

---

[13]   *See* SPA of the Venezuelan Supreme Court, Decision of November 29, 2006, Political and Administrative Chamber, reported in JRG Vol. CCXXXVIII, p. 556.

[14]   Recognition of foreign judgments in Venezuela is also governed by the rules of the Bustamante Code 1928 and the Inter-American Convention on the Extraterritorial Validity of Foreign Judgments (IACRJ) (1995).   However, because neither the Bustamante Code nor the IACRJ have been ratified by the United States, they are inapplicable to judgments of courts in the United States.

[15]   *See* Comments to the Venezuelan Private International Law, particularly the Comments to Article 53 by German Delgado Soto, Caracas, 2005, p. 1155.

9

**APP 1133**

App. 1759

2001).[16]  Accordingly, for an *exequatur* of a foreign judgment to be granted in Venezuela, the party requesting the *exequatur* must prove that the opposing party has been served and that he or she has enjoyed all of the procedural guaranties necessary for his or her defense (VPIL, Article 53(5)).

25.      Under the Venezuelan Constitution, the right of defense encompasses the rights of both the plaintiff and the defendant to be heard and to present their claims and defenses in any judicial procedure (VCN, Article 49.3).   Additionally, according to Venezuelan doctrine, the principle of *audi alteram partem* requires that all parties at all times have had the right to defend their case.  The principle also demands that both the plaintiff and the defendant be provided with an equal opportunity to be heard and present claims and defenses.[17]

26.      The Venezuelan Supreme Court would not grant *exequatur* of a judgment against a Venezuelan Absent Member in an opt-out class action in the United States, such as the *Rotstain* Action if a judgment were unfavorable to the Venezuelan Absent Member.  This is because the Venezuelan Absent Member would have not have participated or defended itself in the litigation before the U.S. court as a plaintiff is entitled to do under Venezuelan law (*see supra* Section V). To grant the *exequatur* against a Venezuelan Absent Member would violate Venezuelan principles of due process guaranteed to every Venezuelan citizen or resident under the Venezuelan Constitution, and thus would be contrary to Venezuelan public order.

---

[16] *See* Decision of the Constitutional Chamber of the Venezuelan Supreme Court, February 9, 2001, JRG Vol. CLXXIII.

[17] *See* Comments to the Venezuelan Private International Law. *Id.* note 15.

10

## VII. A VENEZUELAN COURT WOULD NOT TREAT A JUDGMENT IN THE *ROTSTAIN* ACTION AS HAVING *RES JUDICATA* EFFECT

27.        Additionally, even if the Venezuelan Supreme Court did grant the *Rotstain* Action *exequatur* against a Venezuelan Absent Member (which it would not), a Venezuelan court would not accord *res judicata* effect to a judgment in the *Rotstain* Action.  The *res judicata* ("*cosa juzgada*") defense is governed by Article 346 (9) of the Venezuela Code of Civil Procedure and by Article 1395 of the Venezuelan Civil Code (VCC), which permit application of the defense only in relation to a judgment in a litigation on the same subject matter and among the same parties.[18]

28.        The parties can also obtain *res judicata* effect of a court-approved settlement (*transacción*) under Articles 1713 and 1718 of the VCC. However, in the case of a court-approved settlement, *res judicata* is also limited to the parties in the procedure that actually entered into the settlement. The Venezuelan Supreme Court, following accepted authority in civil law countries, has held that *res judicata* is a legal presumption created to favor and protect the parties that have participated in a judicial procedure in which a final decision has been reached. (SCC, Decision dated January 15, 1992, Gisela Rosalía Cano Febres Cordero vs. Mercantil Motors).[19]  Accordingly, a claim of *res judicata* can only be raised by a defendant that was a party in the original proceeding against the plaintiffs that participated in the proceeding.

29.        In other words, a party to an action cannot claim *res judicata* in relation to a judgment in a proceeding that was rendered against an unidentified member of an ostensible "class" who

---

[18] *See, e.g.*, Rengel Romberg, A. "Tratado de Derecho Procesal Civil Venezolano", Volume II. Caracas, 1992. Page 483. ("The subjective limits of res judicata derive from Article 1395 of the VCC . . . As a general principle in this matter we can settle, then, from the beginning, that res judicata occurs only between the parties; understood these as the plaintiff and the defendant of the claim that is asserted in the lawsuit") (my own translation).

[19] See Decision of the SCC with the majority opinion by Ezequiel Vivas Terán, in the case Gisela Rosalía Cano Febres Cordero vs. Mercantil Motors Foile, No. 89-0276. Reported in Baudin comments to Article 346 of the VCCP, p. 621.

11

did not participate in the relevant proceeding. Consequently, a judgment in favor of the Defendants in a U.S. opt-out class action, such as the *Rotstain* Action, would not bar a Venezuelan Absent Member, who had not expressly opted out, from bringing an action against the Defendants in Venezuela.

## VIII. CONCLUSION

30.       A U.S. class action, which includes unidentified plaintiffs who do not expressly elect to participate in the action, is at complete odds with Venezuelan conceptions of civil procedure, fundamental fairness, and public policy. As such, defendants to such an action could not obtain an *exequatur* against Venezuelan Absent Members or successfully establish a *res judicata* defense in Venezuela.

31.       Consequently, I conclude with confidence that a Venezuelan court would not grant preclusive effect to a judgment or court-approved settlement against the interests of Venezuelan Absent Members who did not opt out of the *Rotstain* Action, and, therefore, would not bar Venezuelan Absent Members from bringing an action in Venezuela against the Defendants in the U.S. action.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct. This declaration was executed in New York, New York.

July 2, 2015.

_____

James Otis Rodner

12

APP 1136

# APPENDIX A

**APP 1137**

James Otis Rodner S.

## CURRICULUM VITÆ

| | |
|---|---|
| Address: | Rodner, Martínez & Asociados |
| | Edificio Torre Clement, Piso 2, Ofc. 2-A |
| | Avenida Venezuela, Urb. El Rosal |
| | Caracas 1060, Venezuela |
| | |
| | Apartado 1953, Caracas 1010-A |
| | |
| Telephones: | (58.212) 951-3811 (Master) |
| | Telefax:  (58.212) 951-7707 |
| | |
| E-mail: | jrodner@rodnermartinez.com |
| | |
| Languages: | Spanish (native language) |
| | English (native language) |
| | French (reading and conversation) |
| | Italian (reading and conversation) |

## EDUCATION - DEGREES

| | |
|---|---|
| Universidad Católica Andrés Bello | Degree:  Lawyer (1967) Caracas, Venezuela |
| | |
| Harvard University | Degree:  Juris Doctor (1970) Law School Cambridge, Massachusetts, U.S.A. |
| | |
| Harvard University | Degree: Master Business Administration (MBA) (1972) School of Business Administration Cambridge, Massachusetts, U.S.A. |
| | |
| Universidad Católica Andrés Bello | Degree:  Specialist in Political Economy (1992) School of Economics (graduate study). Caracas, Venezuela |
| | |
| | Degree:  Master in Economics (1994).  Thesis on the formation of interest rates in Venezuela under a model of open economy. |

1-Jul-15

**APP 1138**

App. 1764

CURRICULUM VITÆ - 2

| | |
|---|---|
| Public Interpreter | Languages Spanish and English. |
| Ministry of Justice | Public Interpreter of the Republic of Venezuela.  Title N° 28, Folio 44, Volume 1E, September 20, 1983, Official Gazette N° 32.875 |

## ASSOCIATIONS AND TEACHING EXPERIENCE

| | |
|---|---|
| 1989 to 2012: | Member of the International Court of Arbitration, International Chamber of Commerce – Paris, France |
| 2014: | Reappointed as principal member of the Court of Arbitration, International Chamber of Commerce – Paris, France |
| 1999 to date: | Active member of the Venezuelan Committee of the International Chamber of Commerce |
| 2001 to date. | Academy of Political Science, Venezuela (Chair N° 22) |
| 2007 to date: | Member of Board of Directors of the Venezuelan Association of Private Law |
| 1983 to 1989: | Principal Director, Caracas Chamber of Commerce |
| 1999 to date: | Member, Global Lawyers and Physicians Advisory Board - Boston, Massachusetts, U.S.A. |
| 1972 to 1992: | <u>Professor</u> of Instituto de Estudios Superiores (I.E.S.A.) |
| | Financial Law (1972-1980) |
| | International Finance.  Founder of course (1978-1991) |
| | Special courses on Capital Markets. |
| 1972 to 1992: | Professor of Universidad Católica Andrés Bello, Caracas |
| | Civil Law III (Obligations) (until 1981) |
| | Theory of Interest (Graduate studies, Economics) |

1-Jul-15

**APP 1139**

App. 1765

CURRICULUM VITÆ - 3

|  | Monetary Policy (Graduate studies, Economics) |
|---|---|
| 2002: | Professor of Universidad Central de Venezuela (the Legal Theory of Money) |

## ASSOCIATIONS & PROFESSIONAL ORGANIZATIONS

| Caracas Bar | Under N° 4018 |
|---|---|
| Instituto de Previsión Social del Abogado | Under N° 5956 |
| Massachusetts | Admitted before the Supreme Court of the Commonwealth of Massachusetts (April 24, 1972) |
| | United States District Court for the District of Massachusetts (April 7, 1975) |
| | United States Court of Appeals, First Circuit (April 9, 1975) |
| District of Columbia Court of Appeals | Admitted and qualified as a member of the bar of the District of Columbia (October 19, 1978) |
| Supreme Court of the United States of America | Admitted before the Supreme Court of the United States of America (May 21, 1979) |

| Member: | - American Bar Association (1972) |
|---|---|
| | - The American Society of International Law (September 1, 1973) |
| | - The Academy of Political Science, New York (September 10, 1974) |
| | - American Finance Association |
| | - American Economic Association (AEA) |
| | - Massachusetts Bar Association |

1-Jul-15

**APP 1140**

App. 1766

CURRICULUM VITÆ - 4

## PUBLICATIONS

Published Books:

"Los Créditos Subordinados" (Subordination Agreements in Civil Law), Caracas, Editorial Sucre (1981).

"El Contrato y la Inflación / El Uso de Cláusulas de Valor", Caracas, Editorial Sucre (1983).

"Las Obligaciones en Moneda Extranjera y el Régimen Cambiario de Venezuela" (foreign money debts), Caracas, Editorial Sucre (1983) - (Mention of Honor, Prize Luis Sanojo).

"Nueva Definición del Dinero y de la Obligación Pecuniaria (El Pago Escritural y la Transferencia Electrónica)" (new definition of money and money transfers), Revista de Derecho Mercantil, Año III, NE 5, January-June 1988.

"El Crédito Documentario (La Carta de Crédito Comercial, la Carta Contingente y la Garantía Bancaria Independiente", Caracas, Editorial Sucre (1989), 2nd Edition, Caracas (1999)

"La Inversión Internacional", Caracas, Editorial Arte (1993)

"El Dinero, la Inflación y las Deudas de Valor" (legal study of money), Caracas, Editorial Arte (1995).

"Elementos de Finanzas Internacionales", 3rd Edition, Caracas, Editorial Arte (1997)

"La Globalización:  Un Proceso Dinámico" (globalization and the development of legal rules) (2001)

"Los Contratos Enlazados y el Subcontrato", Caracas (2008)

1-Jul-15

**APP 1141**

CURRICULUM VITÆ - 5

"La Globalización (globalización de la norma jurídica)", 2nd Ed., Editorial Torino, Caracas (2012).

"Los Contratos Enlazados" 2nd Ed., Academia de Ciencias Políticas y Sociales, Serie Estudios 104, Caracas (2013).

"La Transferencia del Contrato (Unidroit, Art. 9)", Academia de Ciencias Políticas y Sociales, Serie Estudios 108, Caracas (2014).

Reviews and Articles:

"Obligaciones Convertibles" (convertible bonds), Revista de la Bolsa de Valores de Caracas (July 1976 - May 1977); "La Responsabilidad Civil del Fabricante en el Derecho Venezolano y la Monografía de Angel Rojo" (product liability), Revista de la Facultad de Derecho de UCAB (1977); "La Responsabilidad Civil del Fabricante en el Derecho Venezolano" (re-edition) (ponencia en el Congreso de Derecho Comparado, Budapest, 1978); "Revalorización de Activos Fijos" (Revaluation of Assets), Revista Colegio de Contadores Públicos, re-published in Revista de la Bolsa de Caracas; "Obligaciones en Moneda Extranjera", Revista UCAB N° 24, Caracas (1977); "El Contrato y la Inflación", Revista UCAB N° 26, Caracas (1979); "Emisión de Obligaciones Ordinarias", mimeographed version I.E.S.A. (1981); "Temas Especiales y Casos de Derecho Civil III (Obligaciones)", mimeographed version UCAB (1980); "Lecturas de Derecho Financiero"; mimeographed version I.E.S.A. (1973); "Lecturas de Finanzas Internacionales", Traducción y adaptación; mimeographed version, Caracas I.E.S.A. (1977); "Reformas al Sistema Cambiario en Venezuela", Revista de la Cámara de Comercio (1984); "La Balanza de Pagos de Venezuela", Revista de la Cámara de Comercio (1985); "Current Developments in The Venezuelan Foreign Exchange System", International Law and Finance, Euromoney. London (1985); Venezuela's Approach to Collective Restructurings (International Financial Law Review), Euromoney, London (September 1985); "Los Contratos de Futuros de Intereses", Cámara de Comercio (1985); "Nueva Definición del Dinero y el Pago Electrónico", Revista de Derecho Privado, Caracas (1985); "Debt Equity Swap Program" (International Financial Law Review), London (1987); "El Uso de Obligaciones Atípicas", Revista de Derecho Mercantil (1987); "La Asamblea de Obligacionistas", Revista de la Comisión Nacional de Valores (1988); "Organización Colectiva de los Obligacionistas", Revista de Derecho Privado (1988); "La Carta de Crédito de Garantía", Revista de Derecho Mercantil (1988); "El Concepto de Inversión Internacional: Tipos de Inversión", Revista de Derecho Mercantil (1989); "La Empresa Conjunta" (joint venture), Ponencia Congreso de Derecho Comparado, Montreal (1990); "Los Convenios de Empresa Conjunta y la Legislación Venezolana" (joint venture agreements), Revista del Colegio de Abogados N° 151, July-December 1992; "Correctivos por Inflación en las Obligaciones de Dinero y Obligaciones de Valor", Academia de Ciencias Políticas y Sociales, en "Efectos de la Inflación en el Derecho", December 1994;"Protection of the Right to Reimbursement in Case of Failure of the Issuing Bank", published by ICC,

1-Jul-15

Documentary Credits Insight, Vol. 1 N° 4, Paris, 1995; "Arbitration in Venezuela", ICC, The International Court of Arbitration Bulletin, Special Supplement Arbitration in Latin America, Paris, 1997; "Advantages of Settling Venezuelan Domestic Forwards by Netting", ABN Amro Treasury Handbook, Amsterdam, 1997; "Grupos Societarios en el Derecho Venezolano", Colegio de Abogados del Estado Carabobo, 1998; "El Arbitraje Internacional" (Institutional Arbitration), Academy of Political Science, Venezuelan Review, 1999; "El Negocio Jurídico Electrónico", Revista Academia de Ciencias Políticas Vol. 136, 1999; "Transfers and Assignments of LCs in Colombia", ICC Documentary Credit Insight Vol. 6, Paris, 2000; "Precios de Transferencia", publicado por la Asociación de Derecho Tributario y la Academia de Ciencias Políticas, 2000; "El Negocio Jurídico Electrónico en Venezuela", Ponencia en el Congreso Internacional de Derecho, Lima-Perú, 2000; "La Nouvelle Loi vénézuélienne Sur L'Arbitrage", ICC Court of Arbitration Bulletin, Vol. 9, 2000; "Los Grupos Societarios", in the book dedicated to Fernando Parra A.; "El Negocio Jurídico Electrónico en Venezuela", published in collective work "La Regulación del Comercio Electrónico en Venezuela", Academy of Political Science, Venezuela, 2001; "El Grupo de Sociedades en el Derecho Venezolano" (corporate groups), UCV, Caracas, 2002; "La Responsabilidad Civil del Fabricante en el Derecho Venezolano" (products liability), Caracas, 2002; "International and National Arbitration: A Fading Distinction" (The Journal of International Arbitration, Vol. 19), 2002; "La Nulidad del Laudo Arbitral" (setting aside an award), in the book dedicated to Humberto Cuenca, Supreme Court, Caracas, 2002; "Normas Obligatorias en el Derecho de Sociedades Venezolano – Los Pactos de Accionistas", Academy of Political Science, Vol. 139, Caracas (2002); "The Applicable Interest Rate in International Arbitration (Unidroit Principles, Article 7.4.9)", ICC Court of Arbitration Bulletin, Vol. 15 (2004); "La Teoría de la Imprevisión (dificultad de cumplimiento por excesiva onerosidad)" published in the collective work "El Código Civil Venezolano en los Inicios del Siglo XXI" (200th anniversary of the 1804 French Civil Code), published by the Venezuelan Academy of Social and Political Sciences, Jurisfraven and the French Embassy, Caracas (2005); "Grupo de Sociedades en la Ley General de Bancos y la Ley de Mercado de Capitales" in "Derecho de Grupos de Sociedades", published by the Academy of Political and Social Sciences, Caracas (2005); "Hardship under the Unidroit Principles of Internacional Commercial Contracts", published in "Global Reflections on Internacional Law, Commerce and Dispute Resolution", ICC, Paris (2005); "Los Principios de Unidroit (su aplicación en Venezuela y en el Arbitraje Internacional)", published in "El Arbitraje en Venezuela", Academia de Ciencias Políticas, Caracas (2005). "Los Contratos Enlazados (el grupo de contratos)" (linked contracts), published in "Derecho de las Obligaciones en el Nuevo Milenio", Academy of Political Sciences. Serie Eventos Vol. 23, Caracas (2007); "La compensación en el contrato internacional" (Unidroit Art. 8), Revista de la Academia de Ciencias Políticas y Sociales, Caracas (2010), separata del Boletín N° 148, enero-junio 2010; "Unilateral Setoff and the Principles of Unidroit" (compensación legal y los Principios de Unidroit), in the book dedicated to Serge Lazareff, Paris, 2011; "Cesión de Contrato y los Principios UNIDROIT", published in "Derecho de las Obligaciones", in the book dedicated to José Melich Orsini, Caracas (2012). "BITs in Pieces: The effectiveness of ICSID jurisdiction after the ICSID Convention has been denounced" (with Jaime Martínez E.), published in Journal of International Arbitration (JIA) Vol. 29 (2012). "El Arbitraje Complejo", published in "El Arbitraje en Venezuela", CEDCA, Caracas (2013). "Jurisdiction of the

CURRICULUM VITÆ - 7

Arbitral Tribunal in the Case of Multiple Contracts" (with Angélica Marcano) published in Journal of Arbitration Studies, Vol. 24 No. 3 (September 2014).

1-Jul-15

# EXHIBIT 75

TM
EXHIBIT 75

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated<br><br>v.<br><br><br>TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No 3:09-CV-02384-N-BG<br><br>Judge: Hon. David C. Godbey<br><br>Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF EDUARDO SIQUEIROS T.

### I.   INTRODUCTION

1.      I, Eduardo Siqueiros, am a citizen of, and an attorney authorized to practice law in, Mexico.  A comprehensive account of my professional experience and qualifications relevant to issuing the opinion expressed in this Declaration is attached hereto at Exhibit A.  In particular, my academic credentials include a law degree from *Escuela Libre de Derecho* (*Abogado,* 1980), in Mexico City, Mexico, and an LLM from Harvard Law School (1980), Cambridge, MA.  I am currently a partner at Hogan Lovells BSTL, S.C. in Mexico City in the dispute resolution practice, among others.  I have been a professor at several law schools in Mexico City, and am a frequent lecturer in Mexico and abroad.  During my 36 years as practicing attorney, I have served as: an expert witness on several aspects of Mexican law before both U.S. Courts and arbitral tribunals; arbitrator in both commercial and investor-State proceedings in several jurisdictions; and party counsel before Mexican courts and arbitral tribunals.

2.      I have been retained to provide my opinion as to whether, under Mexican law, a Mexican court would recognize either a judgment rendered in *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*, Civil Action No. 3:09-CV-02384-N-BG ("Action") or a court-approved settlement in the Action, against the interests of those members of the putative class of plaintiffs

who are domiciled in Mexico. I understand that the plaintiffs domiciled in Mexico would form part of the plaintiffs' class on the basis of an opt-out mechanism under U.S. law.

## II. SUMMARY OF CONCLUSIONS

3. In this Declaration, I conclude that Mexican constitutional law and public policy would preclude a Mexican court from recognizing and enforcing a judgment of a U.S. court or a court-approved settlement in an opt-out class action such as the Action at issue.

4. The main obstacle to recognition and enforcement by a Mexican court of a U.S. opt-out class action judgment (or court-approved settlement)[1] results from the difference between U.S. law and Mexican law as to what plaintiffs can and cannot be incorporated into a plaintiffs class. Specifically, Mexican law permits plaintiffs to be included in a class only on an "opt-in" basis; Mexican law does not permit plaintiffs to be included on an opt-out basis. Indeed, this procedural distinction derives from principles at the core of the Mexican legal system, such as the principles of consent, autonomy and self-determination. These principles would preclude a judgment in this Action from being recognized and enforced in a Mexican court.

## III. MATERIALS CONSIDERED

5. In forming my opinions, I have considered the following materials, along with the other documents or information referenced in this declaration:

A) Plaintiffs' Second Amended Class Action Complaint;

B) Memorandum Supporting Plaintiffs Motion for Class Certification, Designation of Class Representatives and Class Counsel;

C) Declaration of Ralph S. Janvey dated October 30, 2014, with Exhibits A-C;

6. In addition, I have examined the following authorities: the Mexican Constitution of 1917 (*Constitución Política de los Estados Unidos Mexicanos*), as amended; the Mexican Code of Commerce of 1889 (*Código de Comercio*), as amended; the Mexican Federal Code of Civil

---

[1] In general, a settlement that has been court-approved is intended to have the same force as a judgment for the purposes discussed in this declaration.

Procedure of 1943 (*Código Federal de Procedimientos Civiles*), as amended; and those federal court precedents and treatises of recognized scholars, as I deemed necessary for this purpose.

7.    I have not testified at a deposition or at trial in the past four years.

8.    I am being compensated for my work in connection with this case at my customary consulting rate of $450 U.S. Dollars per hour.  My compensation is in no way contingent upon the nature of my opinions or the outcome of this litigation.  My opinions expressed herein reflect my own independent, professional judgment.

9.    I reserve the right to supplement or modify my opinions expressed herein, particularly in view of any new arguments raised or materials presented by Plaintiffs in this case.

## IV.    RECOGNITION AND ENFORCEMENT OF FOREIGN CLASS ACTION JUDGMENTS ISSUED UNDER AN OPT-OUT MECHANISM

### A. Mexican Law Permits Opt-In Class Actions Only

10.    Class actions are a specific, unique and uncommon type of proceeding in Mexico.

11.    The Mexican class action statute was enacted in 2011,[2] following the amendment during the previous year of Article 17 of the Mexican Constitution,[3] by which authority was granted to the federal legislature to issue laws on this subject-matter.  In this connection, Articles 578 to 626 of the Federal Code of Civil Procedure cover both substantive and procedural aspects of class actions, such as:  the types of matters capable of being heard in a class action proceeding; the jurisdiction of the courts; interim relief; the effects of the judgment; and, most importantly for my Declaration, how a plaintiff can become a member of a class.  Under Mexican class action law, a plaintiff must affirmatively request to join a plaintiffs class.

---

[2] See Official Federation Gazette dated August 30, 2011 at http://www.dof.gob.mx/index.php?year=2011&month=08&day=30.

[3] Article 17 of the Mexican Constitution, as amended, provides: "[…]The [federal] Congress shall enact statutes governing class actions.  Such statutes shall determine the scope of application, judicial proceedings and mechanisms for the recovery of damages.  Federal judges shall have exclusive jurisdiction over these proceedings and mechanisms".

**APP 1148**

App. 1774

12. Article 594 of the Federal Code of Civil Procedure states as follows:[4]

>    Article 594. Members of an affected group may join the action in question pursuant to the rules in this article.
>
>    In strict class actions[5] and individually homogeneous class actions,[6] any affected individual may join the action through an express notice addressed to the representative referred to in article 585 of this Code[7] or to the legal representative of the plaintiff, as the case may be.
>
>    During the pendency of the proceeding and for an eighteen month period after the judgment or the settlement agreement has become binding—as the case may be—any affected party may voluntarily join the class.
>
>    During this period, the interested party may communicate its express and simple consent to [join the class] to the representative who, in turn, will submit it to the judge.
>
>    […]

13. I understand that under the U.S. opt-out regime, an individual who is in a similar position to the party (or the parties) who initially started the class action, and who therefore meets the

---

[4] The translations provided in this Declaration are my own. Attached hereto as Exhibit B are translated excerpts of relevant legal authorities cited in this Declaration.

[5] Article 581 subsection II of the Federal Code of Civil Procedure defines a "strict class action" (*acción colectiva en sentido estricto*) as an action that seeks protection of collective rights and interests belonging to a determined group or to an ascertainable group [that is capable of being determined] considering common circumstances. Its purpose is to facilitate a claim for recovery of damages from the defendant in the form of action or refrainment from it and also in the form of individual payments to the members of the affected group, which arises from a juridical relationship existing by law among the collective group and the defendant.

[6] Article 581, subsection III of the Federal Code of Civil Procedure defines an "individually homogeneous class action" (*acción individual homogénea*) as that action that seeks protection of interests that are divisible in nature but whose holders are grouped based on common circumstances. Its purpose is to judicially claim from a third party specific performance or termination of a certain agreement and the consequences thereto in accordance with applicable law.

[7] Article 585 of the Federal Code of Civil Procedure provides that the common representative of a class comprised by at least thirty plaintiffs may start a class action. The notice indicating consent to join a class action may be given to the common representative.

characteristics of a class member as defined by the U.S. court, is automatically deemed a member of the class *unless* he/she expressly refuses to join the class (expressly "opts-out". Thus, in the U.S., a class member who does *not* want to be part of the class must actively request removal from the class; remaining passive is considered implied consent to class treatment, and to being bound by the judgment entered or settlement reached in the relevant proceeding.

14.    In Mexico, it is precisely to the contrary.  The fact that an individual falls within the class definition does not result in that individual automatically being a part of the class, much less being entitled to the proceeds of any judgment, unless the individual *expressly consents* to join the class.

15.    To consent to class treatment under Mexican law, one must actively and expressly request to join the class in accordance with Article 594 of the Federal Code of Civil Procedure. This provision provides an "opt-in" procedure and is the only class action mechanism permitted under Mexican law.  Under this mechanism, a party must make an "active" decision to become a member of the class—"active" in the sense that the party must expressly choose and consent to (i) becoming part of the class, (ii) being represented by a certain common representative and (iii) being subject to the same consequences as the rest of the class as a result of the action.

16.    In summary, the essential difference between the Mexican "opt-in" and the American "opt-out" mechanism is consent.  Unlike U.S. law, which assumes that an individual is part of the class unless he expressly opts-out, Mexican law explicitly conditions membership in a class action judicial proceeding on an individual expressing his consent to join the relevant class.  As discussed below, consent is critical to whether a Mexican court would recognize, enforce and give effect to a U.S. class action judgment or court-approved settlement.

### B. The Framework for Recognition and Enforcement of Foreign Judgments in Mexico

#### (i)    *The Statutory Framework for Recognition and Enforcement of Foreign Judgments in Mexico*

17.    Mexican domestic law has rules governing the recognition and enforcement of foreign judgments.  These rules are found in the Code of Commerce, the Federal Code of Civil Procedure and, for local civil matters, state codes of civil procedure.  Further, Mexico is a party

to the 1979 Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards.[8]  The applicability of each of these instruments depends upon the nature of the foreign judgment of which recognition and enforcement is sought. Because the U.S. is not a party to the Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards, the Convention would not govern the recognition of U.S. judgments, including any entered into in the Action.  Mexican courts would instead look to Mexican domestic law in determining whether to recognize and enforce a judgment rendered by a U.S. court.

18.     The Code of Commerce is the federal statute governing *commercial* matters and proceedings in which commercial interests are at stake.  The Federal Code of Civil Procedure is the federal statute governing class actions and proceedings where the applicable substantive law is a federal law (as opposed to state law) or an international treaty.  State codes of civil procedure govern proceedings that do not fall within the scope of either the Code of Commerce or the Federal Code of Civil Procedure.

19.     The Mexican judiciary is split between federal and state jurisdiction.  Generally speaking, federal courts hear cases in which the applicable substantive law is federal law, while state courts hear cases in which the applicable substantive law is state law.  Federal courts have exclusive jurisdiction to hear class actions.[9]

20.     Commercial matters are the exception to this general rule.  The Code of Commerce—the basic statute governing commercial matters in Mexico—is a federal body of law.  However, both federal and state courts have jurisdiction to hear commercial cases.[10]  A plaintiff is free to decide whether to file a commercial complaint or a petition relating to a commercial interest in federal or state court.

---

[8] The U.S. is not a party to this Convention and, therefore, it is not applicable to this case. Nonetheless, it is worth noting that some key provisions of Mexican statutes regarding enforcement of foreign judgments are similar to the provisions of the Convention.

[9] Article 17 of the Constitution as amended. See *supra* footnote 2.

[10] Article 104 section II of the Constitution, as amended (Article 104: Federal courts will hear: [...] II. All civil or commercial disputes arising from compliance with or application of Federal laws or international treaties executed by the Mexican State. Upon the plaintiff's choice and whenever they affect individual interests only, state courts and judges may hear them).

21.      Since the Action is a class action involving allegations of securities fraud in respect of financial institutions—a claim clearly arising out of a commercial activity—the Code of Commerce and the Federal Code of Civil Procedure provide the legal framework for assessing whether any resulting judgment in the Action would be recognized and enforced in Mexico. A federal civil court[11] would hear a petition to recognize and enforce a judgment in this Action because, although it relates to a commercial matter over which both federal and local courts have jurisdiction, the judgment would be entered in a class action in respect of which federal courts have exclusive jurisdiction.

*(ii)*      ***Mexican Law Subjects the Recognition and Enforcement of a Foreign Judgment to Certain Conditions***

22.      Article 1347-A of the Code of Commerce provides prerequisites to the recognition and enforcement of a foreign judgment.[12]  The most important prerequisites include:

1). The foreign judgment of which recognition and enforcement is sought must not have been rendered in an action *in rem* (*e.g.* mortgage-related actions, pledge-related actions);

·2). The court hearing the action from which the foreign judgment arose must have had competence to hear the case;

3). Due process rights must have been observed and, most importantly, proper service of process must have taken place;

4). The foreign judgment must be final and definitive; *i.e.* it must be a non-appealable judgment that is not subject to challenge; and

5). The foreign judgment must not contravene Mexican public policy.[13]

---

[11]  A recent amendment to the Organic Statute of the Judiciary provides for the creation of commercial subject-matter federal courts. Article 53-bis section VII of this statute provides that commercial courts will hear cases related to commercial class actions (as in the case at hand). However, as of the date of this Declaration, the commercial subject-matter federal courts have not yet been established. Thus, civil federal courts continue to have jurisdiction over cases such as the Action.

[12] The process is known as *homologación de sentencia extranjera*.

Additionally, a Mexican court may (but is not required to) refuse recognition and enforcement if the country in which the foreign judgment was rendered would refuse enforcement of a Mexican judgment in an analogous case (the "reciprocity" condition).[14]  I note that the means to satisfy the reciprocity test are complex with regard to determining what is an analogous (or substantially similar) case in the context of collective actions, and reciprocity would by no means be presumed with class actions.

23.      The party seeking to enforce a foreign judgment has the burden of establishing that the judgment satisfies the prerequisites for recognition and enforcement in Mexico.  The way such burden is discharged varies by case, and may be evidenced through different means as most of the requirements relate to matters governed by foreign law and not Mexican law, as applicable (*e.g.* appropriate jurisdiction, service of process, type of action, *res iudicata* status of the judgment, *inter alia*).

24.      Importantly, as a prerequisite, a party seeking recognition and enforcement must demonstrate that the foreign judgment does not contravene Mexican public policy.  In my opinion, a judgment rendered in the Action would not be recognized or enforced in Mexico because it would contravene Mexican public policy.

### C. Consent is a Foundational Requirement Under the Mexican Constitution and a Key Aspect of Public Policy

#### (i)      *The Concept of Public Policy is a Cornerstone of the Mexican Legal System*

---

[13] In addition, this element is further confirmed by article 569 of the Federal Code of Civil Procedure: "Judgments, non-commercial private awards and other judicial foreign rulings will be effective and will be recognized in the Republic [Mexico] insofar they are not contrary to domestic public policy, unless otherwise indicated in treaties and conventions to which Mexico is party." (Emphasis added).

[14] This prerequisite is elaborated in the final paragraph of Article 571, of the Federal Code of Civil Procedure:  "Despite the satisfaction of the above conditions, el court may reject enforcement if it was evidenced that in the country of origin foreign judgments or awards would not be enforced in similar situations."

25.     The concept of "public policy" (*orden público*) is pervasive throughout the Mexican legal system.[15]   Mexican statutes often include express provisions that characterize the statute in question as one of a "public policy" nature or as dealing with issues of "public policy."[16]   Such statutes frequently contain multiple sections and subsections making reference to "public policy" in various contexts.[17]   Further, Mexican judges often invoke "public policy" considerations as bases for their decisions.[18]

### (ii)     The Scope and Content of the Concept of Public Policy Has Been Developed Through Case Law

26.     Although the importance of "public policy" is widely and liberally acknowledged in the Mexican legal system, the content and scope of the concept is not well defined, either statutorily or constitutionally.   Rather, the concept of "public policy" has been developed by the courts and its scope and meaning are derived from case law.[19]

---

[15] The literal translation into English of "*orden público*" is "public order".  However, the notion of "*orden público*" in fact corresponds with the notion of "public policy" in English and, therefore, is the appropriate term to use.

[16] See, e.g., Copyright Act (*Ley Federal del Derecho de Autor*), article 2: "The provisions in this Act a matter of public policy…"; Law on Electoral Institutions and Proceedings (*Ley General de Instituciones y Procedimientos Electorales*), article 1: "The provisions in this Code are a matter of public policy…"; the Federal Economic Competition Act (*Ley Federal de Competencia Económica*), article 1: "This Act…is a matter of public policy…"; the Foreign Investment Law (*Ley de Inversión Extranjera*), article 1: "This act is a matter of public policy…"; and the Consumer Protection Law (*Ley Federal de Protección al Consumidor*), article 1: "This act is a matter of public policy…", among many others.

[17] See, e.g., (i) Code of Commerce, §15 subsection II (and equivalent provisions in state codes), §§1347-A, 1457 subsection II and 1462 subsection II, (ii) Federal Code of Civil Procedure, §571, and Code of Civil Procedure for the Federal District, § 606.

[18] See, e.g., non-binding precedents (*tesis aisladas*) nos. 2009343, 2009346, 2009358 and 2009278.

[19] Precedent (*tesis aislada*) no. 2001132 Arbitral Award. The judge will determine public policy when its avoidance, recognition or enforcement are requested., published in *Semanario Judicial de la Federación* in July 2012, (stating that "a case by case and in depth analysis is necessary to determine a breach to [the Mexican] legal system").

27.    The importance of public policy is entrenched in Mexican law.  Public policy has been described as "the set of legal institutions that identify or distinguish the law in society; principles, guidelines and institutions that cannot be altered either by the free will of individuals (freedom of choice falls outside of its scope) or by the application of foreign law."[20]  Mexican courts have determined that "the judge must consider the essential conditions for the harmonic development of society, that is, the minimum standards of social interaction…."[21]  The Supreme Court of Mexico has stated that "public order provisions are unwaivable, precisely because of the society's interest in their observance and compliance."[22]

28.    Mexican courts hold that "public policy is the mechanism through which the State blocks private acts from affecting society's fundamental interests."[23]  Specifically, public policy constitutes "a limitation that restricts individuals from engaging in certain conduct or certain legal acts that would otherwise be lawful from being effective in a certain legal system."[24]

29.    The Supreme Court of Mexico, in addressing an application for enforcement of a foreign award, has stated that an "award is contrary to public policy, and therefore [] gives rise to a cause for annulment, when the matter addressed is beyond the limits of such order, *i.e.*, beyond State legal institutions, of the principles, laws and institutions that embody it, and which transcends the community because of the offensive and serious nature of the error in the decision."[25]  Moreover,

---

[20] Precedent cited in: González de Cossío, F., <u>Orden Público en México</u>, retrieved from http://www.gdca.com.mx/PDF/arbitraje/ORDEN%20PUBLICO%20EN%20MEXICO.pdf on June 19, 2015.

[21]    Precedent (*tesis aislada*) no. 177560, <u>Public Policy. It is an undetermined legal notion that appears in each specific case based on the minimum rules of social interaction.</u>, published in *Semanario Judicial de la Federación* in August 2005, (stating that "Public policy may only be delineated in account to manner, time and place prevailing at the time of analysis.").

[22] Precedent (tesis aislada)  no340932, Public Policy Laws, published in Semanario Judicial de la Federación (no date available).

[23] Precedent cited in: González de Cossío, F., <u>Orden Público en México</u>, retrieved from http://www.gdca.com.mx/PDF/arbitraje/ORDEN%20PUBLICO%20EN%20MEXICO.pdf on June 19, 2015.

[24] *Id.*

[25] Amparo Review 755/2011 at the First Chamber of the Supreme Court of Justice.

in accordance with the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards,[26] and under the provisions of the Code of Commerce implementing the UNCITRAL Model Law on Arbitration,[27] a Mexican court can refuse to recognize and enforce an arbitral award on the ground that it contravenes Mexican public policy.

30.     As the foregoing demonstrates, Mexican public policy must be considered in determining whether to enforce a U.S. class action judgment in Mexico.

> ### *(iii)     Public Policy Requires Respect for the Principles of Consent, Autonomy and Self-Determination.*

31.     A Mexican court would pay special attention to public policy matters when evaluating a class action judgment, because class actions are a specific, unique and uncommon type of proceeding in Mexico.

32.     The key difference between American opt-out and Mexican opt-in class actions is the role and relevance of a class member's consent.  As a matter of public policy, a class member must consent to being included in a Mexican class action.  Accordingly, a judgment in a U.S. opt-out class action would contravene Mexican public policy as a class member would not have affirmatively consented to join the class; as such, a Mexican court would not recognize or enforce a judgment entered in a U.S. opt-out class action—such as the Action at issue.

33.     It would also violate clear Mexican public policy to recognize and enforce a foreign judgment in which the losing party was not properly served with process. Mexican courts have held in *binding and mandatory* decisions that appropriate service of process is essential in any proceeding as it concerns a defendant's due process rights (*e.g.* fair and equal treatment, right to present a case, produce evidence, *etc.*). Therefore, Mexican courts would not enforce a judgment (or arbitral award)—foreign or domestic—entered in a proceeding in which the party resisting

---

[26]  Article V section 2 subsection (b) of the 1958 of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

[27]  Article 1457 section II of the Code of Commerce.

**APP 1156**

enforcement was not duly served with process on the grounds that such judgments are flawed and contravene Mexican public policy.[28]

34.    Below I address four sources of Mexican law that treat consent as an issue of public policy:  (i) the Mexican constitution; (ii) the case law of Mexican courts; (iii) the legislative history of the Mexican class action statute; and (iv) the Mexican class action statute. For instance, a judgment entered in a proceeding where the losing party was not properly served with process would certainly be against Mexican public policy.

> (1) The Mexican Constitution Treats Autonomy, Self-Determination and Consent as Matters of Public Policy

35.    Consent and self-determination are fundamental aspects of human rights and liberties protected by the Mexican Constitution.  This is evidenced by the freedom to determine one's identity;[29] freedom with respect to family matters;[30] freedom of choice with respect to residency;[31] freedom to choice with respect to methods for resolving disputes;[32] and freedom to vote.[33]  These rights and freedoms are key elements of the foundations of the Mexican State and its legal system.

---

[28] Binding and mandatory precedent (*jurisprudencia*) no. 240531, Service of process. It is a matter of public policy and its analysis is sua sponte, published in *Semanario Judicial de la Federación*  (date not mentioned), stating that "Public policy may only be delineated in account to manner, time and place prevailing at the time of analysis."

[29] Article 4 of the Mexican Constitution.

[30] *Id.*

[31] *Ibid.* article 11.

[32] *Ibid.* article 17.

[33] *Ibid.* article 35 section I.

**APP 1157**

36.     Article 1 of the Constitution sets boundaries on the actions that can be taken by the Mexican State.   Pursuant to Article 1, freedom and self-determination are given maximum protection and "may not be restricted or suspended."[34]:

37.     This protection is further reinforced in Article 5 of the Constitution [which prohibits the State from giving effect to any agreement or contract that acts as "a restriction, loss or irrevocable waiver of an individual's freedom for any reason."[35]

38.     This underscores the importance that Mexican law places on the individual's freedom. All individuals in Mexico enjoy constitutional certainty that the State will not hinder the exercise of their rights (unless such exercise impacts a public interest).   These constitutional protections reflect Mexican public policy in its broadest sense.     Freedom, autonomy and self-determination—including the right to consent—are central tenets of these constitutional protections and lie at the heart of Mexican public policy.

(2) Mexican Courts Treat Autonomy, Self-Determination and Consent as Matters of Public Policy

39.     In line with the Constitution, the Mexican judiciary has held that autonomy and self-determination are principles that must be protected.   By way of example, a recent decision of the First Chamber of the Supreme Court of Justice declared that:[36]

---

[34] Art. 1 states: "In the United Mexican States, all individuals are entitled to recognition of the human rights set forth in this Constitution and in international treaties to which the Mexican State is party to, as well as to the guarantees for their [human rights] protection.  Exercise of these rights and guarantees may not be restricted or suspended, except in those case and subject to the conditions set forth in this Constitution. […]  Any type of discrimination, whether it is based on ethnicity, nationality, gender, age, disability, social condition, health condition, religion, opinions, sexual orientation, marital status or on any other that transgresses human dignity or is intended to void or restrict rights and liberties of the individuals, is prohibited."

[35] Art. 5 states: "The State will not permit the execution of any agreement, contract or covenant which has as its intended effect to impose a restriction, loss or irrevocable waiver of an individual's freedom for any reason."

[36] The Supreme Court of Justice is the highest court in the Mexican judicial system.

**FREEDOM OF WILL. IT IS A CONSTITUTIONAL PRINCIPLE.**[37]

It is the view of this First Chamber of the Supreme Court of Justice, that the **principle of free will is protected under the Constitution** and it cannot be relegated to a simple principle applicable to civil [common][38] rights. Within this framework, **respect for the individual as a person requires respect for his or her individual self-determination**, so if the individual is not at liberty to freely structure his or her own legal relationships, the individual's self-determination is not respected. Furthermore, the principle of free will is reflected in property rights and party autonomy in contracts, which are also a **central element of free personal freedom, in whose virtue the parties of a legal relationship are free to pursue their own interests** and regulate their relationships, without external influence.

This decision of the Supreme Court of Justice reflects the significance that Mexico accords to the principles of self-determination, autonomy and consent. According to the Court, free will must always be respected as it is a vital component of the exercise of personal rights.

40.    The full Supreme Court of Justice has also recognized that a person's freedom to choose is "a superior fundamental right recognized in the Mexican legal system."[39] Numerous other judicial precedents similarly provide that consent and self-determination are core values in the Mexican legal system.[40]

---

[37] See precedent no. 2008086. Freedom of will. It is a constitutional principle, published in *Semanario Judicial de la Federacion* in December 2014 (emphasis added).

[38] To the best of my understanding, the meaning and implications of the phrase "civil rights" in Mexico differs from the United States. Whereas "civil rights" in the U.S. are of the highest hierarchy (*e.g.* freedom of speech, assembly, from servitude and equality) (retrieved from https://www.law.cornell.edu/wex/civil_rights, in the context of the cited precedent, "civil rights" refer to lower ranking (common) rights (*e.g.* right to be compensated for damages, right to be issued a driver's license, right to have a dispute mediated, etc.) set forth in "civil" statutes (*e.g.* Federal Civil Code, Code of Commerce, Copyright Act, etc.). The connotation given to "civil rights" in the U.S. is equivalent to the connation given to "human rights" in Mexico.

[39] See precedent no. 165822. Right to free development of personality. Scope., published in *Semanario Judicial de la Federación* in December 2009 (emphasis added).

[40] See precedent no. 2005118. See precedent no. 2005118, Legally declared incapacity. The disabled person will express its will in accordance with the decision-making assistance model

**APP 1159**

41.     Accordingly, the Mexican Constitution and judicial precedents equally recognize the fundamental importance of an individual's rights to exercise autonomy, self-determination and consent, and firmly treat "consent" as a matter of public policy.

>        (3) The Legislative History of the Mexican Class Action Statutes Demonstrates That Autonomy, Self-Determination and Consent Are Matters of Public Policy

42.     The original class action bill submitted to the Mexican Congress provided for an *opt-out* model.  However, this was rejected during the legislative process, and the model changed to an opt-in only model—opt-out class actions were precluded.[41]

43.     During debate in the Chamber of Deputies (equivalent to the U.S. House of Representatives), it was stated that Congress wanted to adopt a class action mechanism "*without reaching the extremes of the North American legislation, where the legal framework has produced an excess of legal proceedings and profitable businesses for lawyers, but without reaching the other extreme where the law does not represent a true defense in favor of the interests of citizens and consumers*".[42]  This demonstrates that the Mexican legislature was aware of the U.S. class action model and deliberately sought to enact a unique Mexican system.  By modifying the initial bill to eliminate opt-out class actions in favor of an opt-in mechanism, the Mexican legislature underscored the importance of consent.

---

and such will be respected and observed., published in *Semanario Judicial de la Federación* in December 2013 (finding that "[any] judicial decision restricting legal capacity must consider the primacy of the individual's self-determination, otherwise we would be before a "substitute decision-making" scheme….").

[41] Compare bill of proposed amendment to the Federal Code of Civil Proceedings submitted by Senator José de Jesús Murillo Karam on September 7, 2010 with opt-out model at http://legislacion.scjn.gob.mx/Buscador/Paginas/wfProcesoLegislativoCompleto.aspx?IdOrd=129&IdRef=11&IdProc=1, against determination on the bill from the Senate Commissions dated December 9, 2010 with opt-in model at http://legislacion.scjn.gob.mx/Buscador/Paginas/wfProcesoLegislativoCompleto.aspx?IdOrd=129&IdRef=11&IdProc=2.

[42] See Chamber of Deputies Debate Record (Diario de Debates de la Cámara de Diputados) dated April 28, 2011, volume II, p. 177 retrieved from http://cronica.diputados.gob.mx/PDF/61/2011/abr/110428-2.pdf on July 6, 2015.

(4) The Mexican Class Action Statute Treats Autonomy, Self-Determination and Consent Principles as Matters of Public Policy

44.     Mexico has an opt-in model class action system.  The Mexican class action statute plainly requires consent—as a matter of public policy—for an individual to become a class member.

45.     In enacting Article 594 of the Federal Code of Civil Procedure, Congress underscored the importance of consent to becoming a class member.  Article 594 conditions participation in a class action on the provision of "express notice" confirming consent to join the class, and confirms that such consent must be voluntarily and freely given and such consent must be explicit.

46.     Article 594 is a mandatory rule of procedure, which, under Mexican law, is considered "of public order."  Thus, courts in Mexico treat consent to a class action as an "unwaiveable" requirement.

47.     Accordingly, the Mexican Constitution, Supreme Court opinions, and the Mexican class action statute all emphasize that consent is an essential requirement of the Mexican legal system. The existence and adequacy of class members' consent will therefore determine whether a foreign class action judgment will be recognized and enforced in Mexico.

V.     **U.S. Opt-Out Class Action Judgments Will Not Be Recognized and Enforced in Mexico as Class Members Need Not Consent to Participate in Such Proceedings**

48.     As detailed above, consent is *the* foundational pillar of the Mexican class action regime. In conditioning participation in a class on consent, the Mexican legislature determined that consent outweighed any other potential benefit of a class action mechanism.  Accordingly, Mexican courts will view consent as a key factor when assessing whether a foreign judgment rendered in a class action proceeding can be recognized and enforced in Mexico.

49.     Regardless of whether any party seeking to enforce or defend the foreign judgment execution proceeding has argued in favor or against the enforcement of such judgment in the Mexican court, the court may, *sua sponte*, conduct a public policy analysis.

50.     The U.S. opt-out class action mechanism—under which an individual falling within the class definition is automatically included in the class without their consent—is fundamentally at odds with Mexican public policy, which in the class action context prioritizes consent over other interests.   Therefore, a Mexican court would not likely recognize or enforce a foreign class action judgment or settlement that did not comport with the consent required by Mexican law.

51.     Nevertheless, I understand that putative class members in the Action have submitted Proofs of Claim to a court-appointed Receiver and its Claims Agent for claims asserted in a litigation captioned *Securities & Exchange Commission v. Stanford International Bank, Ltd., et al.* Civil Action No. 3:09-CV-0298-N (the "SEC Receivership Action").

52.     I also understand that the SEC Receivership Action is an entirely separate action from the Action, and is brought against an entirely separate group of defendants known as the Receivership Entities, which includes Stanford International Bank, Ltd., Stanford Financial Group Company, Stanford Group Company, Stanford Trust Company, Stanford Capital Management, LLC, and Stanford Coins & Bullion, Inc.[43]

53.     Further, I understand that the plaintiffs in the SEC Receivership Action, by filing Proofs of Claim, submitted to the jurisdiction of the Court for the limited purpose of asserting claims against the Receivership Entities in that action.   The Proof of Claim form states:

> CONSENT TO JURISDICTION:  If you submit a Proof of Claim Form *in this case*, you consent to the jurisdiction of the District Court for all purposes *relating to this claim* and agree to be bound by its decisions, including, without limitation, a determination as to the validity and amount of any *claims asserted against the Receivership Entities*.   In submitting a Proof of Claim Form, you agree to be bound by the actions of the District Court even if that means your claim is limited or denied.

Proof of Claim Form, p. 4 (emphasis added).

54.     It is clear by the face of the Proof of Claim form that a claimholder's consent to participate in the SEC Receivership Action does not constitute consent to join the Action, even if the cases are pending before the same court as consolidated cases.  The SEC Receivership Action

---

[43] Exhibit A to the Janvey Declaration contains a full listing of the entities (p. 2, referencing Exhibit 8), and is available at http://stanfordfinancialreceivership.com.

and the Action are different actions asserting different claims against different defendants, and consent to be a party in one action would not under Mexican law be presumed to constitute consent to be a party in the other.

55.     I am certain that a Mexican court would not consider the requirement of consent to have been met in the Action by virtue of a Mexican domiciliary's submission to the jurisdiction of the Court for purposes of the SEC Receivership Action.

## VI.    CONCLUSIONS

56.     Under Mexican law, a prerequisite to recognition and enforcement of a foreign judgment or settlement is that the judgment or settlement comports with Mexican public policy.

57.     Mexican law does not statutorily define public policy. However, federal jurisprudence has determined that public policy is to be analyzed in the appropriate context, considering the distinguishing factor of the legal system in question and privileging common over private good. In my belief, the appropriate context in this case is the legal framework for class actions in Mexico, and the rationale behind it. The distinguishing factor in the Mexican legal system is its high-regard for consent and self-determination.

58.     The Mexican Constitution, Supreme Court precedents and other key factors strongly indicate that autonomy and consent are cornerstones of Mexican public policy.

59.     Mexican public policy with respect to class actions requires that class members expressly consent to joining the class.

60.     Since the Action involves an opt-out class action mechanism where a Mexican plaintiff falling within the class definition would be included in the class without their express consent, a judgment in the Action would not be enforced by a Mexican court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed in New York, New York.

Dated: July 6, 2015

Eduardo Siqueiros T.

APP 1164

App. 1790

# EXHIBIT A

APP 1165

CURRICULUM VITAE

**EDUARDO SIQUEIROS T.**

I.  **Education**

| | |
|---|---|
| 1973 - 1978 | Escuela Libre de Derecho |
| | México, D.F. |

| | |
|---|---|
| 1979 - 1980 | Master in Laws (LL.M.) |
| | Harvard Law School |
| | Cambridge, Massachussets, E.U.A. |

II.  **Professional Experience**

1981 - Present

**Hogan Lovells, BSTL, S.C.**
(previously Barrera, Siqueiros y Torres Landa, S.C.)
Note: In August 2014 the firm merged with Hogan Lovells LLP
Paseo de los Tamarindos 150 - PB
Bosques de las Lomas
05120, México, D.F.
Position: Partner

September 1980 - July 1981

Covington & Burling
Washington, D.C.
Position: Foreign Associate

September 1975 - June 1979

Martínez y Comella, S.C.
México, D.F.
Position: Associate

III.  **Academic Activities**

- Escuela Libre de Derecho, Mexico City
  Professor in Graduate Programs: International Business, Arbitration and International Trade (1994-2015)

- Universidad Iberoamericana, Mexico City
  Professor, Master's Degree in Legal Issues in International Business (2002 - 05)
  Professor, Corporations (2005 - 2008)

- Universidad Panamericana, Mexico City
  Professor, Arbitration, Legal Issues of International Business  (2011-2015)

- Instituto Tecnológico Autónomo de México (ITAM), Mexico City
  a) Professor, Commercial Contracts (1986-1993), Corporations (1988-1989)
     Legal Issues in International Trade (1989)
  b) Coordinator, Foreign Investment Degree Program (1989-1990)

**APP 1166**

- Speaker in various fora in Mexico and abroad on arbitration and mediation, and other trade and investment topics.

## IV.   Areas of Expertise

The areas of concentration have dealt with arbitration, as well as commercial and joint venture and investment, shareholder agreements, mergers and acquisitions, energy and government concessions.

## V.   Arbitration and Mediation Experience

- Participated as arbitrator in tribunals established before the International Center for Settlement of International Disputes (ICSID) to resolve investment disputes  under Chapter XI of the North American Free Trade Agreement (NAFTA) and Bilateral Investment Treaties.

  o   Waste Management, Inc. v. United Mexican States (ICSID Case ARB(AF)/98/2).

  o   Telefónica S.A. v. The Republic of Argentina (ICSID Case No. ARB/03/20)

  o   Corn Products International, Inc. v. United Mexican States (ICSID Case No. ARB(AF)/04/1), and Archer Daniels Midland Co. and Tate & Lyle Ingredients Americas, Inc. v. United Mexican States (ICSID Case No. ARB(AF)/04/05), Order in connection with  Consolidation.

  o   Archer Daniels Midland Co. and Tate & Lyle Ingredients Americas, Inc. v. United Mexican States (ICSID Case No. ARB(AF)/04/05)

  o   Abengoa, S.A. and Compañía Española de Financiación del Desarrollo, COFIDES, S.A. v. United Mexican States (ICSID Case ARB(AF)/09/2).

  o   Pluspetrol Perú Corporation and others v. Perupetro S.A. (ICSID Case ARB/12/28)  (Chairman of the Tribunal).

- Participated as sole arbitrator as well as chair of the tribunal in multiple arbitration proceedings administered by the International Court of Arbitration of the International Chamber of Commerce (ICC), the International Centre for Dispute Resolution (ICDR) of the American Arbitration Association, the National Chamber of Commerce of Mexico (Cámara Nacional de Comercio - CANACO), and the Arbitration Centre of Mexico (Centro de Arbitraje de México - CAM), as well as in non-administered arbitrations under the UNCITRAL Arbitration Rules.

- Participated as advisor and party counsel in several international arbitration proceedings, both domestic and international, administered primarily by the International Court of Arbitration of the International Chamber of Commerce, the International Centre for Dispute Resolution (ICDR) of the American Arbitration Association, as well as in non-administered arbitrations under the UNCITRAL Arbitration Rules.

**APP 1167**

App. 1793

- Participated as a Mediator in administered and non-administered proceedings.

## VI.    Memberships

- Mexican Bar Association (*Barra Mexicana, Colegio de Abogados*)
- Mexican Mediation Institute (*Instituto Mexicano de la Mediación*)
- Mexican Arbitration Institute (*Instituto Mexicano de Arbitraje*)
- Arbitration Committee, Mexican Chapter of the International Chamber of Commerce

## VII.   Publications

Among others, the following:

- *What are the responsibilities of an Arbitral Tribunal faced with a breach of integrity of one of its members?*, World Arbitration & Mediation Review, 2012.
- *Control in a Corporation (Control en una Sociedad Mercantil).* Ars Juris, Law Review of the Instituto Panamericano de Jurisprudencia, Univesidad Panamericana, 2009.
- *Agency and Distribution Agreements in Mexico*, International Agency and Distribution Agreements, 1991/1994/2002/2007/2014
- *Doing Business in Mexico*, Transnational Juris. Publ. 1991.
- *Legal Framework for the Sale of Goods into Mexico*, Houston Journal of International Law, 1990.
- *Recent Developments in Foreign Investment in Mexico*, State Bar of Texas, 1990.
- *Recent Developments in Foreign Investment, Transfer of Technology and Trade in Mexico*, State Bar of Wisconsin, 1990.

## VIII.  Declarations as Expert Witness

- International Centre For Dispute Resolution
  Case No.  AAA 50 155 T 00114 11
  CapSource Financial, Inc. and Remolques y Sistemas Aliados de Transportacion, S.A. de C.V. v. Hyundai Translead and Hyundai Translead de Mexico S.A. de C.V.

- Superior Court Of Arizona, Maricopa County DocketNo.
  No. CV2008-027700
  Scottsdale Commercial Developments, Inc. v.  Euler Hermes American Credit Indemnity Company

**APP 1168**

App. 1794

# EXHIBIT B

APP 1169

# DECLARATION

# EDUARDO SIQUEIROS

# LEGAL AUTHORITIES CITED

APP 1170

**Statutory Provisions**

**Provisions from the 1917 Mexican Constitution (as amended)**

| Original Text in Spanish | Translation |
|---|---|
| ***Artículo 1o.*** *En los Estados Unidos Mexicanos todas las personas gozarán de los derechos humanos reconocidos en esta Constitución y en los tratados internacionales de los que el Estado Mexicano sea parte, así como de las garantías para su protección, cuyo ejercicio no podrá restringirse ni suspenderse, salvo en los casos y bajo las condiciones que esta Constitución establece. [...]* | **Article 1.** In the United Mexican States, all individuals are entitled to recognition of the human rights set forth in this Constitution and in international treaties to which the Mexican State is party to, as well as to the guarantees for their [human rights] protection. Exercise of these rights and guarantees may not be restricted or suspended, except in those case and subject to the conditions set forth in this Constitution. [...] |
| *Queda prohibida toda discriminación motivada por origen étnico o nacional, el género, la edad, las discapacidades, la condición social, las condiciones de salud, la religión, las opiniones, las preferencias sexuales, el estado civil o cualquier otra que atente contra la dignidad humana y tenga por objeto anular o menoscabar los derechos y libertades de las personas.* | Any type of discrimination, whether it is based on ethnicity, nationality, gender, age, disability, social condition, health condition, religion, opinions, sexual orientation, marital status or on any other that transgresses human dignity or is intended to void or restrict rights and liberties of the individuals, is prohibited. |
| ***Artículo 4o.*** *[...] Toda persona tiene derecho a la identidad y a ser registrado de manera inmediata a su nacimiento. El Estado garantizará el cumplimiento de estos derechos. La autoridad competente expedirá gratuitamente la primera copia certificada del acta de registro de nacimiento. [...]* | **Article 4.** [...] Every person has the right to self-identity and to be registered immediately after being born. The State will guarantee these rights. The competent authority will freely issue the first certificate copy of the certification of birth. [...] |
| ***Artículo 5o.*** *[...] El Estado no puede permitir que se lleve a efecto ningún contrato, pacto o convenio que tenga por objeto el menoscabo, la pérdida o el irrevocable sacrificio de la libertad de la persona por cualquier causa. [...]* | **Article 5.** [...] The State cannot permit the execution of any agreement, contract or covenant which has as its intended effect to impose a restriction, loss or irrevocable waiver of an individual's freedom for any reason. [...] |
| ***Artículo 17.*** *[...] El Congreso de la Unión expedirá las leyes que regulen las acciones colectivas. Tales leyes determinarán las materias de aplicación, los procedimientos judiciales y los mecanismos de reparación del daño. Los jueces federales conocerán de* | **Article 17.** [...] The federal Congress shall enact statutes governing class actions. Such statutes shall determine the scope of application, judicial proceedings and mechanisms for the recovery of damages. Federal judges shall have exclusive jurisdiction over these proceedings and mechanisms". |

| | |
|---|---|
| *forma exclusiva sobre estos procedimientos y mecanismos.* | […] |
| ***Artículo 104.*** *Los Tribunales de la Federación conocerán:*<br><br>*[…]*<br><br>*II. De todas las controversias del orden civil o mercantil que se susciten sobre el cumplimiento y aplicación de leyes federales o de los tratados internacionales celebrados por el Estado Mexicano. A elección del actor y cuando sólo se afecten intereses particulares, podrán conocer de ellas, los jueces y tribunales del orden común.*<br>*[…]* | **Article 104.** Federal courts will hear:<br><br>[…]<br><br>II. All civil or commercial disputes arising from compliance with or application of Federal laws or international treaties executed by the Mexican State. Upon the plaintiff's choice and whenever they affect individual interests only, state courts and judges may hear them.<br>[…] |

**APP 1173**

**Provisions from the 1943 Mexican Federal Code of Civil Procedure (as amended)**

| Original Text in Spanish | Translation |
|---|---|
| **Artículo 569.-** *Las sentencias, los laudos arbitrales privados de carácter no comercial y demás resoluciones jurisdiccionales extranjeros tendrán eficacia y serán reconocidos en la República en todo lo que no sea contrario al orden público interno en los términos de este código y demás leyes aplicables, salvo lo dispuesto por los tratados y convenciones de los que México sea parte.* <br> *[…]* | **Article 569.** Judgments, non-commercial private awards and other judicial foreign rulings will be effective and will be recognized in the Republic [Mexico] insofar they are not contrary to domestic public policy, unless otherwise indicated in treaties and conventions to which Mexico is party. <br> […] |
| **Artículo 581.** *[…] III. Acción individual homogénea: Es aquélla de naturaleza divisible, que se ejerce para tutelar derechos e intereses individuales de incidencia colectiva, cuyos titulares son los individuos agrupados con base en circunstancias comunes, cuyo objeto es reclamar judicialmente de un tercero el cumplimiento forzoso de un contrato o su rescisión con sus consecuencias y efectos según la legislación aplicable.* | **Article 581.** […] III. Individually homogeneous class action: that action that seeks protection of interests that are divisible in nature but whose holders are grouped based on common circumstances. Its purpose is to judicially claim from a third party specific performance or termination of a certain agreement and the consequences thereto in accordance with applicable law. |
| **Artículo 585.-** *Tienen legitimación activa para ejercitar las acciones colectivas:* <br> *[…]* <br><br> *II. El representante común de la colectividad conformada por al menos treinta miembros;* <br> *[…]* | **Article 585.** The following persons and entities may start a class action: <br> […] <br><br> II. The common representative of a class comprised by at least thirty plaintiffs. |
| **Artículo 594.-** *Los miembros de la colectividad afectada podrán adherirse a la acción de que se trate, conforme a las reglas establecidas en este artículo.* <br><br> *En el caso de las acciones colectivas en sentido estricto e individuales homogéneas, la adhesión a su ejercicio podrá realizarse por cada individuo que tenga una afectación a través de una comunicación expresa por cualquier medio dirigida al representante a que se refiere el artículo 585 de este Código o al representante legal de la parte actora, según sea el caso.* | **Article 594.** Members of an affected group may join the action in question pursuant to the rules in this article. <br><br> In strict class actions and individually homogeneous class actions, any affected individual may join the action through an express notice addressed to the representative referred to in article 585 of this Code or to the legal representative of the plaintiff, as the case may be. |

*Los afectados podrán adherirse voluntariamente a la colectividad durante la substanciación del proceso y hasta dieciocho meses posteriores a que la sentencia haya causado estado o en su caso, el convenio judicial adquiera la calidad de cosa juzgada.*

*Dentro de este lapso, el interesado hará llegar su consentimiento expreso y simple al representante, quien a su vez lo presentará al juez. El juez proveerá sobre la adhesión y, en su caso, ordenará el inicio del incidente de liquidación que corresponda a dicho interesado.*
*[...]*

During the pendency of the proceeding and for an eighteen month period after the judgment or the settlement agreement has become binding —as the case may be— any affected party may voluntarily join the class.

During this period, the interested party may communicate its express and simple consent [to join the class] to the representative who, in turn, will submit it to the judge.
[…]

**Provisions from the 1889 Mexican Code of Commerce (as amended)**

| Original Text in Spanish | Translation |
|---|---|
| *Artículo 1347-A.- Las sentencias y resoluciones dictadas en el extranjero podrán tener fuerza de ejecución si se cumplen las siguientes condiciones:* | **Article 1347-A.** Foreign judgments and decisions might be executable if: |
| *[...]* | [...] |
| *II. Que no hayan sido dictados como consecuencia del ejercicio de una acción real;* | II. [The foreign judgment of which recognition and enforcement is sought] was not entered in an *in rem* action; |
| *III. Que el juez o tribunal sentenciador haya tenido competencia para conocer y juzgar el asunto de acuerdo con las reglas reconocidas en el derecho internacional que sean compatibles con las adoptadas por este código.* | III. The court hearing the action from which the foreign judgment arose must have had jurisdiction to hear the case according to the rules recognized in the international law that are compatible with this code. |
| *El juez o tribunal sentenciador extranjero no tiene competencia cuando exista, en los actos jurídicos de que devenga la resolución que se pretenda ejecutar, una cláusula de sometimiento únicamente a la jurisdicción de tribunales mexicanos;* | The foreign judge does not have jurisdiction when in the legal acts from which the decision was entered, there is a clause indicating submission to the jurisdiction of Mexican tribunals only; |
| *IV. Que el demandado haya sido notificado o emplazado en forma personal a efecto de asegurarle la garantía de audiencia y el ejercicio de sus defensas;* | IV. Due process rights must have been observed and, most importantly, proper service of process must have taken place; |
| *V. Que tenga el carácter de cosa juzgada en el país en que fueron dictados, o que no exista recurso ordinario en su contra;* | V. The foreign judgment must be final and definitive; *i.e.* it must be a non-appealable judgment that is not subject to challenge; and |
| *VII. Que la obligación para cuyo cumplimiento se haya procedido no sea contraria al orden público en Mexico; y* | VII. The obligation sought to be fulfilled must not contravene Mexican public policy; and |
| *[...]* | [...] |
| *Artículo 1457.- Los laudos arbitrales solo podrán ser anulados por el juez competente cuando:* | **Article 1457.** Arbitral awards can only be annulled by a competent judge when: |
| *[...]* | [...] |
| *II. El juez compruebe que, según la legislación mexicana, el objeto de la controversia no es susceptible de arbitraje, o que el laudo es contrario al orden público.* | II. The judge considers that, according to Mexican law, the dispute is not subject to arbitration, or that the award is contrary to public policy. |

**Provisions from the 1995 Organic Statute of the Federal Judicary (as amended)**

| Original Text in Spanish | Translation |
|---|---|
| *Artículo 53 Bis.- Los jueces de distrito mercantiles federales conocerán:*<br><br>*[...]*<br><br>*VII. De las acciones colectivas mercantiles a que se refiere el Libro Quinto del Código Federal de Procedimientos Civiles.*<br><br>*[...]* | **Article 53 Bis.** Commercial subject matter courts will hear:<br><br>[...]<br><br>IV. The commercial class actions referred in the Fifth Book of the Federal Code of Civil Procedure.<br><br>[...] |

**Judicial Precedents**

APP 1178

| Original Text in Spanish | Translation |
|---|---|
| *LAUDO ARBITRAL. ORDEN PÚBLICO SERÁ DETERMINADO POR EL JUEZ CUANDO SE RECLAMA SU NULIDAD O RECONOCIMIENTO Y EJECUCIÓN.* | **ARBITRATION AWARD. PUBLIC POLICY WILL BE DETERMINED BY THE JUDGE WHEN THE RECOGNIZED NULLITY OR EXECUTION IS CLAIMED.** |
| *Tesis aislada no. 2001132* | *Single precedent no. 2001132* |
| *Como el concepto de "orden público" no se encuentra definido en la Constitución ni en el Código de Comercio, ello deja claro que es preciso determinar su significado en cada caso concreto pues no basta con asimilarlo a las normas imperativas, sino que es necesario proteger nuestra cultura jurídica mexicana de intromisiones que la desvirtúen. Esto es así, dado que una interpretación conjunta de la fracción II del artículo 1457, con la fracción II del artículo 1462 del Código de Comercio, incluso con el precepto V, inciso 2, de la Convención sobre el Reconocimiento y Ejecución de las Sentencias Arbitrales Extranjeras, lleva a la conclusión de que son dos las hipótesis que pueden ocasionar que el juzgador de oficio declarare que un laudo arbitral es nulo o que no lo reconozca como una resolución acorde al sistema jurídico mexicano y por ende deniegue su ejecución, y es cuando: a) Según la legislación mexicana, el objeto de la controversia no sea susceptible de solución por vía del arbitraje; o, b) Cuando el laudo sea contrario al "orden público" mexicano. Así las cosas, la referencia a la legislación mexicana es para guiar al juzgador quien debe velar que el objeto de la controversia pueda ser objeto de arbitraje, es decir, que no exista alguna disposición legal mexicana que lo impida; mientras que por otra parte, el concepto de "orden público" es más amplio, pues no basta con afirmar que en un laudo arbitral se está dejando de aplicar una disposición legal que se autodefine como de "orden público" para que se tenga necesariamente que concluir que se transgrede el mismo, sino que es necesario un estudio más profundo, caso por caso, que permita concluir que con su reconocimiento y ejecución es evidente que sí se transgrede nuestro orden jurídico. En conclusión, se* | As the concept of "public policy" is not defined in the Constitution or in the Commercial Code, it is clear that its significance is precisely determined in each concrete case; thus, it is not enough to learn the rules, but rather it is necessary to protect our Mexican judicial culture from intrusions that undermine it. This is so, given that a joint interpretation of section II of article 1457 and section II of article 1462 of the Commercial Code, including provision V, subsection 2, of the Convention about Recognition and Execution of Foreign Arbitral Awards, leads to the conclusion that they are two hypotheses which can result in the State court declaring that an arbitral award is null or that it does not recognize it as a resolution according to the Mexican judicial system and the award is hence denied execution, and it is when: a) According to Mexican legislation, the object of the controversy would not be susceptible to a solution by means of arbitration; or, b) When the award would be contrary to Mexican public policy. In such a context, reference to the Mexican legislation is to guide the judge, who should ensure that the object of the controversy could be subject to arbitration, that is to say, that no legal Mexican provision would impede it; while on the other hand, the concept of "public policy" is broader, therefore it is not enough to affirm that an arbitral award is applying a legal provision that is self-defined as "public policy" in order that one necessarily must conclude that the same is violated, but rather a more profound study is necessary, case by case, that allows one to conclude with one's recognition and execution it is evident that our judicial policy is violated. In conclusion, it is reiterated that it should be the judge who in each concrete case determines whether public policy is violated or not. |

| | |
|---|---|
| *reitera deberá ser el juzgador quien en cada caso concreto determine si se transgrede o no el "orden público".*<br><br>*SÉPTIMO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.* | SEVENTH COLLEGIATE TRIBUNAL FOR CIVIL MATTERS OF THE FIRST CIRCUIT. |

| Original Text in Spanish | Translation |
|---|---|
| *ORDEN PÚBLICO. ES UN CONCEPTO JURÍDICO INDETERMINADO QUE SE ACTUALIZA EN CADA CASO CONCRETO, ATENDIENDO A LAS REGLAS MÍNIMAS DE CONVIVENCIA SOCIAL.* | **PUBLIC POLICY. IT IS AN UNDETERMINED JUDICIAL CONCEPT THAT OCCURS IN EACH CONCRETE CASE, ADDRESSING THE STANDARD MINIMUM RULES FOR SOCIAL COEXISTENCE.** |
| *Tesis aislada no. 177560* | *Single precedent no. 177560* |
| *El orden público no constituye una noción que pueda configurarse a partir de la declaración formal contenida en una ley. Por el contrario, ha sido criterio constante de la Suprema Corte de Justicia de la Nación que corresponde al juzgador examinar su presencia en cada caso concreto, de tal suerte que se perfila como un concepto jurídico indeterminado de imposible definición cuyo contenido sólo puede ser delineado por las circunstancias de modo, tiempo y lugar que prevalezcan en el momento en que se realice la valoración. En todo caso, para darle significado, el juzgador debe tener presentes las condiciones esenciales para el desarrollo armónico de la comunidad, es decir, las reglas mínimas de convivencia social; en la inteligencia de que la decisión que se tome en el caso específico no puede descansar en meras apreciaciones subjetivas, sino en elementos objetivos que traduzcan las preocupaciones fundamentales de la sociedad, siempre buscando no obstaculizar la eficacia de los derechos de tercero.* | Public policy does not constitute a notion that can be configured from a formal declaration of law. On the contrary, a constant criteria of the Federal Supreme Court of Justice has been corresponding to the judge to examine public policy's presence in each concrete case, in such a manner that it is profiled as an undetermined judicial concept impossible to define whose only content can be delineated by the circumstances of fashion, time and place that prevail in the moment that the evaluation occurs. In any case, in order to give it significance, the judge should consider the essential conditions for the harmonic development of society, that is to say, the minimum standards for social interaction; with the understanding that the decision is taken in the specific case cannot relax in mere subjective judgments, but rather in objective elements that translate the fundamental concerns of society, always looking to not hinder the effectiveness of the rights of third parties. |
| *CUARTO TRIBUNAL COLEGIADO EN MATERIA ADMINISTRATIVA DEL PRIMER CIRCUITO.* | FOURTH COLLEGIATE TRIBUNAL FOR ADMINISTRATIVE MATTERS OF THE FIRST CIRCUIT. |

| Original Text in Spanish | Translation |
|---|---|
| *EMPLAZAMIENTO. ES DE ORDEN PUBLICO Y SU ESTUDIO ES DE OFICIO.* | **SERVICE OF PROCESS. IT IS A MATTER OF PUBLIC POLICY AND ITS ANALYSIS IS SUA SPONTE.** |
| *Jurisprudencia no. 240531* | *Binding precedent no. 240531* |
| *La falta de emplazamiento o su verificación en forma contraria a las disposiciones aplicables, es la violación procesal de mayor magnitud y de carácter más grave, puesto que da origen a la omisión de las demás formalidades esenciales del juicio, esto es, imposibilita al demandado para contestar la demanda y, por consiguiente, le impide oponer las excepciones y defensas a su alcance; además, se le priva del derecho a presentar las pruebas que acrediten sus defensas y excepciones y a oponerse a la recepción o a contradecir las probanzas rendidas por la parte actora y, finalmente, a formular alegatos y ser notificado oportunamente del fallo que en el proceso se dicte. La extrema gravedad de esta violación procesal ha permitido la consagración del criterio de que el emplazamiento es de orden público y que los Jueces están obligados a investigar de oficio si se efectuó o no y sí, en caso afirmativo, se observaron las leyes de la materia.* | The lack of service process or the lack of due service of process according to the applicable provisions, is the largest and most severe procedural violation, because it creates omissions in the other essential formalities in the proceeding, this means, it turns the defendant's opportunity to reply to a complaint into impossible and, therefore, prevents him to raise the defenses at his reach; additionally, it is prevented to exercise the right to produce evidence that prove his defenses and to challenge the admissibility of the evidence submitted by its opposing party and, finally, to make pleadings and being duly notified of the final decision. The extreme seriousness of the procedural violation has allowed to determine that service of process is a matter of public policy and the judges are constrained to analyze it sua sponte whether it was performed or not and if, in an affirmative case, the applicable law was observed. |
| *TERCERA SALA DE LA SUPREMA CORTE DE JUSTICIA DE LA NACIÓN.* | THIRD CHAMBER OF THE SUPREME COURT OF JUSTICE. |

| Original Text in Spanish | Translation |
|---|---|
| *AUTONOMÍA DE LA VOLUNTAD. ES UN PRINCIPIO DE RANGO CONSTITUCIONAL.* | **FREEDOM OF WILL. IT IS A CONSTITUTIONAL PRINCIPLE.** |
| *Non-binding precedent no. 2008086* | *Single precedent no. 2008086* |
| *A consideración de esta Primera Sala de la Suprema Corte de Justicia de la Nación, el principio de autonomía de la voluntad goza de rango constitucional y no debe ser reconducido a un simple principio que rige el derecho civil. Así las cosas, el respeto del individuo como persona requiere el respeto de su autodeterminación individual, por lo que si no existe libertad del individuo para estructurar sus relaciones jurídicas de acuerdo con sus deseos, no se respeta la autodeterminación de ese sujeto. Aunado a lo anterior, el principio de autonomía de la voluntad tiene reflejo en el derecho de propiedad y en la libertad de contratación, la cual también es un elemento central del libre desarrollo de la personalidad, y en cuya virtud las partes de una relación jurídica son libres para gestionar su propio interés y regular sus relaciones, sin injerencias externas.* | It is the consideration of this First Chamber of the Federal Supreme Court of Justice that the principle of freedom of will enjoys constitutional protection and should not be reworked to a simple principle that applies to civil rights. In such a context, the respect of the individual as a person requires respect for his or her individual self-determination, so individual liberty to structure one's judicial relationships as one wishes does not exist, self-determination about that subject is not respected. Besides the foregoing, the principle of freedom of will is reflected in property rights and contract rights, which also are central elements of free development of the personality, in whose virtue the parties of a judicial relationship are free to pursue their own interest and regulate their relationships, without external influence. |
| *PRIMERA SALA DE LA SUPREMA CORTE DE JUSTICIA DE LA NACIÓN* | FIRST CHAMBER OF THE SUPREME COURT OF JUSTICE |

**APP 1183**

| Original Text in Spanish | Translation |
|---|---|
| *DERECHO AL LIBRE DESARROLLO DE LA PERSONALIDAD. ASPECTOS QUE COMPRENDE.* | **RIGHT TO THE FREE DEVELOPMENT OF PERSONALITY. SCOPE.** |
| *Tesis aislada no. 165822* | *Single precedent no. 165822* |
| *De la dignidad humana, como derecho fundamental superior reconocido por el orden jurídico mexicano, deriva, entre otros derechos personalísimos, el de todo individuo a elegir en forma libre y autónoma su proyecto de vida. Así, acorde a la doctrina y jurisprudencia comparadas, tal derecho es el reconocimiento del Estado sobre la facultad natural de toda persona a ser individualmente como quiere ser, sin coacción ni controles injustificados, con el fin de cumplir las metas u objetivos que se ha fijado, de acuerdo con sus valores, ideas, expectativas, gustos, etcétera. Por tanto, el libre desarrollo de la personalidad comprende, entre otras expresiones, la libertad de contraer matrimonio o no hacerlo; de procrear hijos y cuántos, o bien, decidir no tenerlos; de escoger su apariencia personal; su profesión o actividad laboral, así como la libre opción sexual, en tanto que todos estos aspectos son parte de la forma en que una persona desea proyectarse y vivir su vida y que, por tanto, sólo a ella corresponde decidir autónomamente.* | Among others, every individual's right to freely and autonomously choose its life project derives from human dignity as a superior fundamental right recognized in the Mexican legal system. Thus, in accordance with international scholars and jurisprudence, such right is the State's recognition of every person's natural power to individually be as it wants to be, without any coercion or unjustified controls, in order to fulfill any goals and purposes it has set, according to its values, ideas, expectations, preferences, etc. Therefore, free development of personality encompasses, amongst other expressions, the freedom to get married or not to; to have children and how many or not to have them; to decide on self-appearance; its profession or work activity, as well as free sexual choice. All these aspects constitute the manner in which a person wants to show itself and live its life and, thus, only such person is entitled to autonomously decide on it. |
| *PLENO DE LA SUPREMA CORTE DE JUSTICIA DE LA NACIÓN* | FULL SUPREME COURT OF JUSTICE |

| Original Text in Spanish | Translation |
|---|---|
| *ESTADO DE INTERDICCIÓN. ACORDE AL MODELO DE ASISTENCIA EN LA TOMA DE DECISIONES, LA PERSONA CON DISCAPACIDAD EXTERNARÁ SU VOLUNTAD, MISMA QUE SERÁ RESPETADA Y ACATADA.* | **LEGALLY DECLARED INCAPACITY. THE DISABLED PERSON WILL EXPRESS ITS WILL IN ACCORDANCE WITH THE DECISION-MAKING ASSISTANCE MODEL AND SUCH WILL BE RESPECTED AND OBSERVED.** |
| *Tesis aislada no. 2005118* | *Single precedent no. 2005118* |
| *A juicio de esta Primera Sala de la Suprema Corte de Justicia de la Nación, acorde al modelo social de discapacidad consagrado en la Convención sobre los Derechos de las Personas con Discapacidad, la determinación judicial que limite la capacidad jurídica deberá tomar en consideración la primacía de la autodeterminación libre de la persona, pues de lo contrario nos encontraríamos frente a un esquema de "sustitución en la toma de decisiones", lo cual no sería adecuado en términos del instrumento internacional antes citado. Así, no debe confundirse el principio de mayor protección de la persona con discapacidad en aras de su mayor interés, con la prohibición de que la misma decida qué es lo que le beneficia, situación que redunda de forma directa en el desarrollo libre de la personalidad, así como en el fomento de una vida autónoma y de una identidad propia, sin que deba restringirse la capacidad jurídica de una persona solamente porque la misma ha tomado una opción que la generalidad de la sociedad pudiese considerar o calificar como "no acertada". Por tanto, mediante la adopción del modelo de "asistencia en la toma de decisiones", la persona no debe renunciar al derecho a tomar sus propias decisiones, respetándose así su libertad de elección, ello mediante la asistencia en la toma de las mismas.* | It is the view of this First Chamber of the Supreme Court of Justice that, according to the assistance model foreseen in the Convention for the Rights of Disabled Persons, any judicial decision restricting legal capacity must consider the supremacy of the individual's free self-determination, otherwise we would be before a "substitute decision making" scheme, which would not be in accordance with the aforementioned international instrument. Therefore, we must not confuse the principle of wider protection of disabled persons protecting their best interest, with the prohibition for such persons to decide what their best interest is, situation that affects the free development of the person and the development of an autonomous life and self-identity, without restricting his legal capacity because he has taken a decision that the society deems "incorrect". Therefore, with a decision-making assistance model, the person does not have to waive his right to take decisions, because he will be assisted to perform such right, thereby respecting his liberty to choose. |
| *[...]* | [...] |
| PRIMERA SALA DE LA SUPREMA CORTE DE JUSTICIA DE LA NACIÓN | FIRST CHAMBER OF THE SUPREME COURT OF JUSTICE |

**APP 1185**

# EXHIBIT 76

TM
**EXHIBIT 76**

APP 1186

App. 1812

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated<br><br>v.<br><br>TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No 3:09-CV-02384-N-BG<br>Judge: Hon. David C. Godbey<br>Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF DAVID ARIAS

### I.     Introduction

1.     Overview of qualifications (my full resume is attached as Appendix A):

    (i)     Professor of Procedural Law and Arbitration at *Universidad Francisco de Vitoria* (from 2000 to date) and at *Universidad Complutense de Madrid* (from 1995 to 2000).

    (ii)     International arbitration practitioner and founder of the law firm, Arias SLP.

    (iii)     Arbitrator and counsel in cases with venues across Europe, America and Africa, administered by the main arbitration institutions (International Chamber of Commerce, Permanent Court of Arbitration, London Court of International Arbitration and Stockholm Chamber of Commerce, among others), as well as counsel in complex international commercial litigation cases.

    (iv)     President of the *Club Español del Arbitraje*, Senior Vice Chair of the International Bar Association ("IBA") Arbitration Committee and Chairman of its Subcommittee on Conflicts of Interest, which published the 2014 IBA Guidelines on Conflicts of Interest in International Arbitration.

    (v)     BA in Law, with Honours, and Ph.D., also with Honours, from *Universidad Complutense de Madrid*. Admitted to the Madrid Bar in 1991.

    (vi)     I have not testified as an expert at trial or deposition in the past four years.

2.  Question Asked:

    (i)    I have been asked to provide my opinion as to whether a Spanish court would give preclusive effect to a U.S. class action judgment or court-approved settlement rendered in the litigation styled *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*, Civil Action No. 3:09-CV-02384-N-BG (the "*Rotstain* Action"), such that it would be binding on a person domiciled in Spain who did not affirmatively "opt out" of the plaintiff class within the relevant time period.

3.  Materials Considered and Preliminary Notes:

    (i)    In forming my opinions, I have considered the following materials, along with the other documents or information referenced in this Declaration: (a) a Memorandum Supporting Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel dated 30 April 2015; (b) Plaintiffs' Second Amended Class Action Complaint dated 1 May 2015; and (c) the Declaration of Receiver Ralph S. Janvey, with Exhibits A–C (dated Oct. 30, 2014).

    (ii)    I reserve the right to supplement or modify my opinions expressed herein, particularly in view of any new arguments or materials presented by Plaintiffs in the Action.

    (iii)    Except where otherwise stated, the matters set out in this opinion are within my professional experience and knowledge and are true or are derived from the documents which I have seen and which are true to the best of my knowledge and belief. Where I set out information provided by other persons, I believe that information to be true, except where I identify a difference with my opinion based upon my experience.

    (iv)    For avoidance of doubt, it must be noted that I am not an expert in U.S. law in general or U.S. class actions in particular, nor do I purport to act as such. The comments I make on U.S. class actions are based on the aforementioned materials I considered in forming my opinions and my limited knowledge and independent study of the matter.

    (v)    In this statement I draw certain conclusions apropos the likelihood that a judgment or court-approved settlement rendered in the *Rotstain* Action would not be recognized by a Spanish court for public policy reasons. It goes without saying that those conclusions are not to be read as a critique of the U.S. legal system, which I utterly respect, or as a subjective perception that the mechanics of U.S. class actions run contrary to the notion of due process in the broad sense

2

of the term. My conclusion is limited to the application of Spanish law, which is part of a legal tradition that is different than that of U.S. law.

(vi)   Although my native tongue is Spanish, I believe I read and speak English sufficiently well to make this statement in English. Except where otherwise indicated, the Spanish-to-English translations are my own.

(vii)   I am being compensated for my work in connection with this case at my customary consulting rate of €600 Euros per hour. My compensation is not contingent on my opinions or on the litigation's outcome.

## II.   Summary of conclusions

4.   I conclude that a Spanish court would not give preclusive effect to a judgment or court-approved settlement in the *Rotstain* Action because the U.S. opt-out proceedings do not accord with Spanish public policy for multiple reasons, including that potential class members (i) would not necessarily be given personal notice; (ii) would be considered part of the class even though they took no affirmative or express steps to join it; and (iii) would not have an absolute right to intervene in the proceedings. In my opinion it is very unlikely that a judgment rendered in the *Rotstain* Action would comply with the requirements of Spanish law sufficient for the judgment to be recognized and given preclusive effect in Spain. Furthermore, if a settlement were to be reached in the *Rotstain* Action, a Spanish court would not consider ostensible class members bound to such a settlement if they did not affirmatively approve of it.

## III.   Analysis: Recognition of foreign class action judgments and court-approved settlements issued under an opt-out mechanism such as in the *Rotstain* Action

## A.   Overview of rules governing recognition of foreign judgments and court-approved settlements by Spanish courts

5.   Before being enforced in Spain as preclusive, a foreign judgment or court-approved settlement needs to be recognized. Recognition of a foreign judgment or court-approved settlement is obtained through declaratory proceedings, called *exequatur*, by means of which the foreign judgment is approved and its effects recognized in Spain. Accordingly, the question of whether a judgment or court-approved settlement in the *Rotstain* Action will be enforced as preclusive will turn on whether it will be approved and recognized by a Spanish court (*i.e.*, granted *exequatur*).

6.   There is no single recognition regime under Spanish law. Instead, the procedure applicable for recognition varies depending on the judgment's or settlement's State of

3

origin. Recognition is governed by: (i) European law, where the judgment is rendered by a judge of another EU-member State; (ii) bilateral and multilateral treaties, where the judgment is rendered by a judge from a non-EU member State; and (iii) if no such treaties apply, by Spanish national law. In all cases, the rights and guarantees granted by the Spanish Constitution and, in particular, by its Article 24• which enshrines due process• must be respected.[1]

7. Since no international treaty on recognition and enforcement of foreign judgments has been entered into between the United States and Spain, Spanish national law applies to recognition of U.S. judgments and court-approved settlements,[2] including a judgment in the *Rotstain* Action. The applicable Spanish law for recognition of U.S. judgments is set forth in articles 951 to 958 of the 1881 Spanish Civil Procedure Act ("1881 CPA").[3]

8. The 1881 CPA foresees two alternative avenues to recognition: (i) a reciprocity regime (articles 952 and 953); and (ii) a regime that sets a series of specific conditions under which a judgment shall be recognized (article 954). Under the reciprocity regime, the foreign judgment shall be recognized if the judgment's State of origin recognizes Spanish decisions (positive recognition). The Tribunals have

---

[1] Article 24 of the Spanish Constitution reads as follows in the official English translation available at http://www.congreso.es/constitucion/ficheros/c78/cons_ingl.pdf (last access on 6 July 2015): *"1. Every person has the right to obtain the effective protection of the Judges and the Courts in the exercise of his or her legitimate rights and interests, and in no case may he go undefended. 2. Likewise, all persons have the right of access to the ordinary judge predetermined by law; to the defense and assistance of a lawyer; to be informed of the charges brought against them; to a public trial without undue delays and with full guarantees; to the use of evidence appropriate to their defense; to not make self-incriminating statements; to not declare themselves guilty; and to be presumed innocent. The law shall determine the cases in which, for reasons of family relationship or professional secrecy, it shall not be compulsory to make statements regarding alleged criminal offences"*. The official English translation is used throughout this declaration when quoting the Spanish Constitution.

[2] *See* orders of the Spanish Supreme Court of 20 January 2004 (JUR 2004\54318) and 8 July 2003 (JUR 2003\206114).

[3] The Spanish Civil Procedure Act (*Ley de Enjuiciamiento Civil*) approved on 7 January 2000 ("2000 CPA") superseded the 1881 CPA, except with respect to, among other things, recognition of judgments issued by foreign courts. In particular, the Single Repealing Provision of the 2000 CPA read as follows in the official English translation available at http://www.mjusticia.gob.es/cs/Satellite/Portal/1292426983864?blobheader=application%2Fpdf&blobheadername1=Content-Disposition&blobheadervalue1=attachment%3B+filename%3DCivil_Procedure_Act_%28Ley_de_Enjuiciamiento_Civil%29.PDF (last access on 6 July 2015): *"1. The Civil Procedure Act approved by Royal Decree on 3 February 1881* [1881 CPA] *shall be repealed, with the following exceptions:* […] *c) Articles 951 to 958 on the efficacy in Spain of judgments issued by foreign courts, which shall remain in force until the International Judicial Co-operation Act on Civil Matters enters into force"*. The official English translation is used throughout this declaration when quoting the 2000 CPA

4

**APP 1190**

declared that the reciprocity regime is technically obsolete, and apply in all cases the conditions regime.[4]

9.    The conditions regime under Article 954 of the 1881 CPA sets forth the requirements or conditions under which a foreign judgment shall be recognized in Spain. Article 954 states in the official English translation that:

> *"If they are not covered by any of the cases described in the preceding three articles, final judgments shall have force in Spain if they combine the following circumstances:*
> 1.    *The final judgment must have been issued as a consequence of an action in personam being brought.*
> 2.    *It must not have been entered in default.*
> 3.    *The obligation that the judgment is intended to enforce must be lawful in Spain.*
> 4.    *The judgment document must meet the necessary requirements in the nation in which it was issued to be considered authentic, as well as those required by Spanish law for it to be considered authentic in Spain".*

10.    The Spanish Supreme Court has interpreted these provisions and added some additional requirements in order to, *inter alia*, adapt the system to European Law.[5] The Spanish Supreme Court sets the following requirements that must be fulfilled by a foreign judgment in order for it to be recognized in Spain:

(i)    The decision is final (*i.e.*, cannot be appealed) according to the law of the State of origin;

(ii)    The action giving rise to the judgment was *"in personam"*;

(iii)    The decision has not been rendered in involuntary default of appearance;

(iv)    The decision does not violate Spanish public policy;

(v)    The document including the judgment is authentic;

(vi)    The court which rendered the judgment has jurisdiction and there is no reason to consider that the parties unlawfully searched for a favorable jurisdiction; and

---

[4]    *See* order of the Spanish Supreme Court of 7 April 1998 (JUR 1998\3559). The reasoning behind this abandonment is the fact that the reciprocity regime in practice requires that the party seeking recognition of a judgment proves that a Spanish judgment containing similar findings has been previously approved in the country of origin. If the reciprocity cannot be proved by the requesting party, the Tribunals then have to verify that the foreign judgment fulfills the requirements of Article 954 which inevitably leads to the application of the conditions regime as foreseen by Article 954 of the 1881 CPA.

[5]    *See* orders of the Spanish Supreme Court of 28 May 2002 (JUR 2002\159025), 20 July 1999 (RJ 1999\5237), 22 December 1998 (RJ 1998\10805), 7 April 1998 (RJ 1998\3559) and 10 February 1998 (RJ 1998\2666).

5

**APP 1191**

(vii)  The judgment is not in conflict with another judgment which has been previously rendered in Spain or which is pending before the Spanish courts.

11.    The above requirements also apply to court-approved settlements.

**B.    A judgment or court-approved settlement rendered in a U.S. opt-out class action proceeding would violate Spanish procedural law and public policy**

   **a.  Due Process requirements under Spanish law**

12.    To the best of my knowledge, there is no precedent of a U.S. opt-out class action judgment or court-approved settlement being recognized in Spain.

13.    Spanish public policy has procedural and substantive elements of due process. The procedural due process guarantees are acknowledged by Article 24 of the Spanish Constitution which states, in part, that *"[e]very person has the right to obtain the effective protection of the Judges and the Courts in the exercise of his or her legitimate rights and interests, and in no case may he go undefended"*.[6] The concept of "defense" is not limited to the rights of defendants, but safeguards the procedural rights of all litigants.[7]

14.    The Spanish Constitutional Court has made clear that foreign judgments must comply with the procedural safeguards of Article 24:

   *"[T]he Spanish court, when deciding whether to enforce a foreign judgment, must consider the guarantees contained in Article 24 of the Spanish Constitution and verify that the foreign judgment respected said guarantees when it was rendered"*.[8]

15.    It is my view that there are several procedural guarantees included in Article 24 of the Spanish Constitution that would be infringed by U.S. opt-out class action proceedings.   As further explained in this Section, these guarantees are that:

---

[6]  *See also* note 1.

[7]  *See* judgment of the Spanish Constitutional Court of 14 February 2002 (RTC 2002\40) (this judgment indicates that the right to defense is violated when the principles of *audi alteram partem* and equality of arms of the parties are diminished in such a way that one of the parties is seriously prevented either from arguing and proving its case, or from replying to the case of its counterparty in the same way the other parties are allowed).

[8]  *See* judgment of the Spanish Constitutional Court of 17 June 1991 (RTC 1991\132).

6

**APP 1192**

(i)  Persons whose interests are being adjudicated in legal proceedings are entitled to be duly notified.

(ii)  Persons can only be deemed to have consented to the jurisdiction of a certain court if they take concrete procedural actions (as opposed to simply remaining silent).

(iii)  Persons whose interests are being adjudicated in legal proceedings are entitled to intervene in such proceedings.

**b. The notice requirements for U.S. opt-out class actions do not comply with the procedural due process requirements imposed by Spanish law**

16.  Under Spanish law, due notification is a procedural due process requirement and a legal prerequisite for the commencement of a case.[9] One of the assessments made by a Spanish court when dealing with a request for recognition of a foreign judgment is therefore verifying that the parties and anyone bound by the judgment have been duly notified in accordance with Spanish notice requirements.[10] Spanish courts will not recognize a foreign judgment rendered in proceedings in which those bound by the judgment have not been duly notified.

17.  One of the presumptions of the notice mechanism is that there is an identified addressee.[11] U.S. Federal Rule of Civil Procedure 23 provides that *"the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort"* (emphasis added). Accordingly, the possibility that certain members of the class are not identified is envisaged. As it is obvious, notice cannot identify its addressee in that case. Under Spanish law, if all addressees are not identified and specifically noticed, due process will not be achieved.

18.  As described above, under Spanish law, a notice will be valid only if it is directly and personally served to the addressee. However, as a last resort (*i.e.*, when it is impossible to resort to more effective means of notice), in select circumstances, notice can be made by means of a court order or *edicto*: this entails the publication of

---

[9]  *See* judgment of the Spanish Constitutional Court of 13 March 2000 (RTC 2000\65).

[10]  Article 150.2 of the 2000 CPA provides that notice of the pendency of the proceedings must be given to any person that may be affected by the judgment. A court dealing with a request for recognition of a judgment rendered in a U.S. class action proceeding would therefore need to verify in particular that absent class members have been duly notified. *See* T. Armenta Deu, *Acciones colectivas: reconocimiento, cosa juzgada y ejecución*, 2013, p. 121.

[11]  *See* Article 164 of the 2000 CPA.

7

**APP 1193**

App. 1819

the notice to specific, named individuals on the bulletin board of the court office or the local official gazette.[12] However, it is important to note that Spanish courts are extremely reluctant to accept that a group of affected parties are undetermined and therefore unidentifiable such that the above impersonal means of notice can be employed.[13]

19. Moreover, with reference to the notice requirement for groups of persons, when the proceedings involve determined damaged parties, Article 15.2 of the 2000 CPA provides that the claimant[14] must directly and personally notify those individuals concerned with the intention to file a collective claim (obviously, such notice must come before the filing of the statement of claim). In fact, case law has ruled that this kind of claims cannot be admitted if notice of the claimant's intention to file a collective claim has not been proved. Subsequent to the filing of the statement of claim, another notice (by means of a call or *llamamiento*) will be made to those concerned. Thus, courts have intentionally made the notice requirement in collective actions more stringent by holding that both forms of notices are mandatory.[15]

20. Consequently, given the extremely limited circumstances in which a Spanish court would find the notice requirement satisfied when it is not personally and directly given to each individual, I am of the opinion that recognition of a judgment rendered in a class action proceeding in which certain class members have not been identified (and, therefore, not individually and personally notified) would be rejected by a Spanish court.

### c. Spanish courts would not recognize the jurisdiction of a U.S. court over Spanish persons who took no affirmative steps to consent to the U.S. court's jurisdiction

21. The requirement that a court have jurisdiction over a party to the dispute that it adjudicates is a of matter public policy under Spanish law and is one of the express

---

[12] *See* judgment of the Spanish Constitutional Court of 17 January 2000 (RTC 2000\12). There is a limited exception to the personal notice requirement for collective actions that involve damage to an indeterminate number of persons or a number which is difficult to determine. *See infra* Section IV (discussing collective actions); *see also* Article 15 of the 2011 CPA.

[13] For example, the Spanish Supreme Court has established that consumers affected by a wrongdoing resulting from the subscription of a banking contract –as is a contract for the subscription of a certificate of deposit– may be easily determined. *See* judgment of the Spanish Supreme Court of 29 December 2010 (RJ 2011\48).

[14] Which may be associations or entities constituted for the protection of the rights and interests of consumers, and affected groups integrating the majority of affected consumers.

[15] *See* judgment of the Court of Appeal of Madrid of 28 May 2008 (JUR 2008\212676).

8

requirements of the 1881 CPA for the recognition of foreign judgments, as interpreted by the Spanish Supreme Court.

22. In the case of non-exclusive jurisdiction, the jurisdiction of a particular court over a claimant must be based on the consent of the claimant as manifested by his particular procedural *actions*. In this regard, Article 56 of the 2000 CPA provides that a claimant implicitly consents to the jurisdiction of a particular court by submitting a statement of claim or by filing a petition or application before the court that may hear the dispute.

23. The rationale of this mechanism is that choosing one court or another to bring a particular claim is a decision of great significance under Spanish law. This is particularly the case when the courts available are located in different countries.[16]

24. Is it my opinion that a U.S. opt-out class action device, which extends a U.S. court's jurisdiction to persons who do not opt out of the class action proceedings (*i.e.*, absent class members) runs contrary to Spanish law, which recognizes "implicit" consent only where a party takes concrete procedural actions. In other words, as a matter of Spanish law, absent class members could not be said to have consented to the jurisdiction of the U.S. court over their particular claim because they did not take any concrete procedural action from which consent may follow under Spanish law. Consequently, a judgment issued by a U.S. court that purportedly binds absent class members would be void and would not be recognized by the Spanish courts.

25. I understand that putative class members in the *Rotstain* submitted Proofs of Claim to a court-appointed Receiver and its Claims Agent in a proceeding captioned *Securities & Exchange Commission v. Stanford International Bank, Ltd., et al.*, Civil Action No. 3:09-CV-0298-N (N.D. Tex.), ("SEC Receivership Action"). This entirely separate action is brought against a set of defendants known as the Receivership Entities, which includes: Stanford International Bank, Ltd.; Stanford Financial Group Company; Stanford Group Company; Stanford Trust Company; Stanford Capital Management, LLC; and Stanford Coins & Bullion, Inc. In other words, the SEC Receivership Action and the *Rotstain* Acton are different actions asserting different claims against different entities.

26. By filing Proofs of Claim in the SEC Receivership Action, claimants submitted to the jurisdiction of the court in that action for the limited purposes of asserting claims against the Receivership Entities in that action. This is explicit in the language of the Proof of Claim form for the SEC Receivership Action:

---

[16] Article 36.2.3 of the 2000 CPA provides that Spanish civil courts cannot exercise jurisdiction over a duly summoned respondent who fails to appear, in cases where the international competence of Spanish courts may only be based on the implicit submission of all parties.

APP 1195

> *"CONSENT TO JURISDICTION: If you submit a Proof of Claim Form <u>in this case</u>, you consent to the jurisdiction of the District Court for all purposes <u>relating to this claim</u> and agree to be bound by its decisions, including, without limitation, a determination as to the validity and amount of any <u>claims asserted against the Receivership Entities</u>. In submitting a Proof of Claim Form, you agree to be bound by the actions of the District Court even if that means your claim is limited or denied"* (emphasis added).[17]

27.  I am certain that a Spanish court would not consider that the submission of a Proof of Claim for in the SEC Receivership action to constitute consent to the court's jurisdiction in the *Rotstain* Action.

### d. U.S. class action proceedings contravene the right to intervene as understood under Spanish law

28.  Article 13.1 of the 2000 CPA governs the intervention of third parties in civil proceedings. This provision states that, while these proceedings are pending, any person who has a direct and legitimate interest in the outcome of the case may be joined as claimant or defendant.[18]

29.  Under Article 13 of the 2000 CPA, an intervening party is entitled to submit evidence, make claims, and lodge appeals, just as is any other party to a litigation. The intervening party retains these rights even if the co-litigant abandons the proceedings.

30.  Third-parties even have the right under Article 13 to intervene for the first time when a case is on appeal.

31.  Spanish courts have confirmed that any limitation of the right to intervene violates Article 24 of the Spanish Constitution.

32.  The Spanish Constitutional Court has ruled on several occasions that the curtailment of a person's right to intervene in proceedings in which his interests are being adjudicated impairs his constitutional rights.[19]

---

[17] Proof of Claim Form, p. 4.

[18] Article 15 confirms that the right to intervene also applies to proceedings relating to the collective mechanism of judicial protection provided for by the 2000 CPA (*See* discussion *infra*).

[19] *See* judgments of the Spanish Constitutional Court of 26 February 2001 (RTC 2001\48) and 29 March 2012 (RTC 2012\57) (*"a lack of defense is characterized by a deprivation or limitation of the right to defense, which, when produced as a result of acts of the judicial body, curtails the right to intervene in the proceedings of those whose interests are being decided in such proceedings"*).

10

**APP 1196**

App. 1822

33.    The Supreme Court has also indicated that persons who have standing are entitled to appear as parties. Consequently, a denial of the right to intervene to those persons entails a violation of the right to effective judicial protection.[20]

34.    Further, magistrate Mr. Garnica Martín has qualified any limitation on the right to intervene of individuals in the context of the collective actions available under Spanish law as *"unreasonable and openly contrary to the right of defense of Article 24.1 CE* [Spanish Constitution]*"*.[21]

35.    Accordingly, in my view, U.S. class action proceedings would be regarded as not respecting this right to intervene as understood under Spanish law to the extent they do not provide all potential class members with the inherent right to intervene and actively participate in the litigation by presenting argument and evidence and by appealing. It is my understanding that these procedural safeguards are not guaranteed to potential class members in a U.S. class action. It is also my understanding that under Federal Rule of Civil Procedure 23, a class member may enter an appearance through an attorney, but this notice provision does not grant absent class members an automatic right to intervene.

36.    Moreover, it is my understanding that the Federal Rules of Civil Procedure do not prescribe any specific period within which a notice of the pendency of a class action must be served to the potential class members.[22] The court has discretion in this regard and the only requirement is that the notice is served prior to entry of the final judgment. The possibilities for the class members to intervene is limited to the period ranging from the service of the notice to the entry of the final judgment. If that service may take place immediately prior to the entry of the final judgment, there is a limitation of the possibilities for the class members to intervene.

37.    In fact, the U.S. class action device is designed as a mechanism that comes into being when the class is so numerous that joinder of all members is impracticable.[23] Consequently, the idea of joinder is extraneous to U.S. class actions. If class members were expected to, for instance, opt-in and participate in the case, the class action

---

[20] *See* judgments of the Spanish Supreme Court of 24 February 2011 (RJ 2011\2479) and 7 July 2011 (RJ 2011\5355). *See also* judgments of the Court of Appeal of Madrid of 30 December 2014 (JUR 2015\83497) and of the Court of Appeal of Barcelona of 8 May 2015 (JUR 2015\151884).

[21] *See* J.F. Garnica Martín, "Artículo 15", in M.A. Fernández Ballesteros et al. (coord.), *Comentarios a la Nueva Ley de Enjuiciamiento Civil: Tomo I*, 2000, p. 234.

[22] *See* Rule 23 of the Federal Rules of Civil Procedure.

[23] *See* Rule 23(a)(1) of the Federal Rules of Civil Procedure.

11

mechanism would likely not work. In the U.S., courts are presumed to protect the absent class members' interests by ensuring that they are adequately represented. However, this runs contrary to one of the fundamental principles of Spanish civil procedure: any third party with a direct and legitimate interest in the outcome of the proceedings is entitled to be independently and individually joined to such proceedings.

### e. Conclusion

38. In light of the above, it is my opinion that Spanish courts would rule that the aforesaid procedural guarantees are not respected in U.S. opt-out class action proceedings and, consequently, would refuse to recognize a judgment rendered as a result of such proceedings.

## IV. Collective actions under Spanish law are fundamentally different from U.S. opt-out class actions

39. My opinion that a U.S. opt-out class action would not be recognized in Spain is supported by an examination of Spanish collective actions, which are fundamentally different from U.S. opt-out class actions and illustrative of the ways in which a Spanish court would find U.S. opt-out class actions do not accord with Spanish public policy.

40. Indeed, Spanish case law has described U.S. class actions as *"something extraneous"* to the Spanish legal system,[24] and Spanish law scholarship makes clear that Spanish collective actions are fundamentally different from U.S. class actions:

> *"It cannot be understood that the rules governing the actions brought in defense of collective and diffused interests that were introduced into Act 1/2000 [the 2000 CPA] entail the import of class actions as conceived in the Anglo-Saxon context".*[25]

41. The cornerstone of the Spanish collective action mechanism is Article 11 of the 2000 CPA, which reads as follows:

> *"1. Notwithstanding the individual standing of those damaged, the legally constituted associations of consumers and users shall be authorized to defend the rights and interests of their members and of the association in court, as well as the general interests of consumers and users.*

---

[24] Judgment of the Spanish Supreme Court of 31 January 2012 (RJ 2012\4540).

[25] A. Carrasco Perera & M.C. González Carrasco, "¿Acciones de clase en el proceso civil?", in *Revista Doctrinal Aranzadi Civil-Mercantil 3/2001*.

APP 1198

*2. When those damaged by an event are a group of consumers or users whose components are perfectly determined or may be easily determined, the standing to apply for the protection of these collective interests corresponds to the associations of consumers and users, to the entities legally constituted whose purpose is the defense or protection of these, and the groups affected.*

*3. When those damaged by an event are an undetermined number of consumers or users or a number difficult to determine, the standing to lodge a claim in court in defense of these diffuse interests shall correspond exclusively to the associations of consumers and users which, in accordance with the law, are representative.*

*4. Furthermore, the Public Prosecution Service and the authorized entities referred to in Article 6.1.8. shall be legitimized to exercise the cessation of the defense of the collective interests and the diffuse interests of the consumers and users".*

42.    This mechanism has certain characteristics that make it fundamentally different from U.S. opt-out class actions. In particular,:

   (i)    Spanish collective actions serve to protect specific, and limited areas of the public interest and are not a means of resolution of disputes regarding other subject matters.

   (ii)    Spanish collective actions are restricted to certain groups of claimants.

   (iii)    Representation of the interests of the affected group is generally not assumed by the members of that group, but rather by specific institutions that are under public scrutiny.

   (iv)    Affected individuals are allowed to intervene in collective actions without limitation.

43.    I now address each of those differences separately.

**A.    The mechanism is a means to protect certain specific areas of public interest; not a means to resolve disputes more generally**

44.    Spanish collective actions are not a general means of resolving disputes. Instead the procedures are available exclusively for the protection of *certain* rights. Originally, such rights were exclusively those of consumers.[26] Since 2007, the right to equal treatment of men and women is also granted that particular judicial protection.[27]

---

[26]    *See* Article 11 of the 2000 CPA. Examples of lawsuits brought to protect consumers' interests are those requesting a declaration that certain abusive clauses included in mortgage contracts were null and those requesting damages arising from a temporary cut in telephone networks.

[27]    *See* Article 11bis of the 2000 CPA.

13

**APP 1199**

App. 1825

45.  The Spanish Collective Action procedure cannot be used with respect to any other subject matters.

46.  This limited scope of collective actions has been confirmed by recent case law. In particular, the judgment of the Spanish Supreme Court of 9 May 2013 stated the following:

> "[T]he defense of collective interests in the civil process is not exclusively designed as a means to resolve the intersubjective disputes of those taking part in the proceedings. There is an underlying public interest".[28]

47.  In this same vein, the Court of Appeal of Barcelona qualified the provisions governing the collective mechanism of judicial protection existing under Spanish law as "*provisions of procedural organization designed to safeguard the public interest (the collective interests)*".[29] Public interest justifies granting particular judicial protection exclusively to certain rights through the collective mechanism of judicial protection. Originally, such rights were exclusively those of consumers. The scope of this mechanism is therefore specifically aimed at protecting certain rights that encompass and embody a manifest public interest.

## B.  The mechanism is restricted to certain groups of claimants

48.  In light of this aim to protect specific areas of public interest, only restricted groups of claimants –those affected by wrongdoing against the rights of consumers or the right to equal treatment of men and women– may benefit from the collective mechanism of judicial protection provided for by the 2000 CPA. The restriction of is manifest in light of the clear wording of the 2000 CPA.[30]

49.  No other group of claimants can use this collective mechanism of judicial protection by Spanish courts.[31]

---

[28]  Judgment of the Spanish Supreme Court of 9 May 2013 (RJ 2013\3088).

[29]  Judgment of the Court of Appeal of Barcelona of 8 May 2015 (JUR 2015\151884).

[30]  *See supra* ¶ 41.

[31]  *See* A. Carrasco Perera & M.C. González Carrasco, "¿Acciones de clase en el proceso civil?", in *Revista Doctrinal Aranzadi Civil-Mercantil 3/2001* ("*Beyond those cases involving consumer associations and other entities legally constituted to defend consumers, it is not possible under our civil legal system that affected persons that were absent from the proceedings take any advantage of pecuniary claims brought by the group referred to by Article 6.7º LECiv* [the 2000 CPA]"). Other groups of claimants must use the joinder procedures set forth in Article 72 of the 2000 CPA ("*Actions may be joined and simultaneously brought against several or single subjects, as long as such actions have some sort of link to the basis of a title or the causes of action. It shall be understood that the title or cause of action are identical or connected where the actions are grounded in the same facts*").

14

**APP 1200**

App. 1826

**C.** **Representation of the interests of the affected group is not generally assumed by its members, but rather by specific institutions that are under public scrutiny**

50. As a rule, representation of the interests of an affected group is not assumed by select group members, but instead by certain institutions that are under public scrutiny. In particular:

(i) With respect to defending consumers' rights in actions for which the number of members of that affected group is undetermined or difficult to determine, representation of the interests of the affected group must be undertaken exclusively by the consumer associations representative of that group.[32]

(ii) With respect to defending the right to equal treatment of men and women, trade unions and associations aimed at defending that right may represent the interests of affected groups formed by members of those trade unions and associations if they are authorized by said members to do so.[33]

(iii) With respect to defending the right to equal treatment of men and women in actions for which the group affected by the wrongdoing is undetermined in number or its number is difficult to determine, representation of the interests of the affected group must be undertaken exclusively by (a) the public bodies with competence in the matter; (b) the most representative trade unions; or (c) the national associations which have equality between men and women as a primary objective.[34]

51. There is only one exception to this rule of representation by institutions, which applies when the defense of the right of consumers is at stake and the members of the group of consumers affected by a certain wrongdoing are perfectly determined or may be easily determined. In this case, the group itself may assume representation of its interests.[35] This representation may be exercised in particular by those persons

---

[32] *See* Article 11.3 of the 2000 CPA. Article 24.1 of the Revised Text of the General Law for the Protection of Consumers and Users provides that only consumer associations established in accordance with the provisions set forth in its Title II are authorized to represent the general interests of consumers. In particular, Article 24.2 of the Revised Text of the General Law for the Protection of Consumers and Users states that those associations belonging to the Council of Consumers and Users (*Consejo de Consumidores y Usuarios*) must be considered lawful representative consumer associations for the purposes of Article 11.3 of the 2000 CPA. A list of those associations can be found at http://www.consumo-ccu.es/representacion/organizaciones.asp (last access on 6 July 2015).

[33] *See* Article 11bis.1 of the 2000 CPA.

[34] *See* Article 11bis.2 of the 2000 CPA.

[35] *See* Article 11.2 of the 2000 CPA.

15

**APP 1201**

who *de facto* or by virtue of an agreement act on behalf of the group with regard to third parties.[36]

52. In any case, contrary to what happens in U.S. class actions, the majority of consumers affected by that certain wrongdoing must affirmatively join the group in order for the group to be entitled to file a claim and hence assume representation of the interests of the affected consumer in court.[37]

53. Further, representation in this very specific situation (*i.e.*, when the defense of the right of consumers is at stake and the members of the group of consumers affected by a certain wrongdoing are perfectly determined or may be easily determined) may also correspond to associations of consumers and entities legally constituted to defend or protect consumers (*i.e.*, institutions that are under public scrutiny).[38]

### D. Spanish law allows affected individuals to intervene in collective actions without limitation

54. The Spanish right of interested parties to intervene that is codified in Article 13.1 of the 2000 CPA[39] is expressly extended by Article 15 of the 2000 CPA to collective actions. This right to intervene may be exercised at any time of the proceedings irrespective of whether those affected by the wrongdoing are determined, may be easily determined, or are undetermined.[40]

55. As generally, an intervening party in a collective action is entitled to submit evidence, make claims, and lodge appeals, and retains those rights even if the co-litigant abandons the proceedings.[41]

---

[36] *See* Article 7.7 of the 2000 CPA.

[37] *See* Article 6.1.7º of the 2000 CPA.

[38] *See* Article 11.2 of the 2000 CPA.

[39] *See supra* ¶¶ 28–31.

[40] The wording of Article 15.3 of the 2000 CPA may give the impression that intervention of consumers is not to be allowed once the term fixed to answer the call expires in the cases in which those affected by the wrongdoing are undetermined. However, an integrative interpretation of this provision and 13.1 –which provides that any consumer may intervene in proceedings initiated by entities legally recognized to defend the interests of consumers– necessarily leads to the conclusion that the right to intervene is not temporarily limited (J.F. Garnica Martín, "Artículo 15", in M.A. Fernández Ballesteros et al. (coord.), *Comentarios a la Nueva Ley de Enjuiciamiento Civil: Tomo I*, 2000, p. 234).

[41] *See* Article 13.3 of the 2000 CPA.

16

**APP 1202**

App. 1828

56.    Indeed, the right of intervention is so fundamental to collective actions that they would be unconstitutional under the Spanish constitution without that right. A recent judgment of the Court of Appeal of Barcelona concludes that the matter being decided in a proceeding ensuing from the collective mechanism of judicial protection is *lis pendens* and prevents the exercise of an individual action over the same matter by a particular person affected by the wrongdoing. According to the Court, such *lis pendens* effect does not contravene Article 24 of the Spanish Constitution because those affected by the wrongdoing are entitled *"to intervene in the proceeding in which the collective action is being substantiated in order to uphold their individual rights and interests"*.[42]

**E.    Conclusion**

*57.*    In sum, the collective mechanism of judicial protection available as a matter of Spanish law is fundamentally different from the U.S. opt-out class action procedure because it may only be used by certain parties with respect to certain, enumerated issues; because it is premised on plaintiffs being represented by institutions that are under public scrutiny, as opposed to certain individuals; and because potential plaintiffs retain the absolute right to intervene.

**V.    Recognition of a court-approved settlement in the *Rotstain* Action is particularly unlikely under Spanish law**

58.    The considerations expressed above indicating that incompatibility of a U.S. opt-out class action with Spanish public policy apply both to a U.S. judgment or a U.S. court-approved settlement. Additionally, there are further grounds preventing a Spanish court from recognizing and enforcing a U.S. class action settlement in particular.

59.    First, Article 1713 of the Spanish Civil Code provides in the official English translation that *"[a]n express mandate shall be required to settle"*.[43] In other words, a party must expressly agree to settle a claim.[44] Consequently, a settlement in a U.S.

---

[42]  Judgment of the Court of Appeal of Barcelona of 8 May 2015 (JUR 2015\151884).

[43]    The    official    English    translation    available    at http://www.mjusticia.gob.es/cs/Satellite/Portal/1292427177941?blobheader=application%2Fpdf&blobheadername1=Content-Disposition&blobheadervalue1=attachment%3B+filename%3DSpanish_Civil_Code_%28Codigo_Civil%29.PDF (last access on 6 July 2015) is used throughout this declaration when quoting the Spanish Civil Code.

[44]  *See* Judgment of the Spanish Supreme Court of 26 November 2010 (RJ 2011\1315) (*"Case law has repeatedly declared that a special mandate is needed in order to settle because that is how the requirement of an express mandate set forth in Article 1713 CC* [Spanish Civil Code] *must be understood. A special mandate, in accordance with the case law of this Chamber, is that containing a concrete designation of the*

17

**APP 1203**

class action could only be admitted under Spanish law to the extent that the class representative has an *express* mandate from each of the class members bound by settlement. This is a circumstance that, as far as I am aware, will not be found in U.S. opt-out class actions, where ostensible class members are bound merely by their silence.

60. Second, the provisions governing Spanish collective actions do not envisage the possibility of a settlement.[45] It is hard to imagine a Spanish court recognizing and enforcing a settlement in a U.S. class action if the closest• but still substantially different• mechanism provided for by Spanish law does not even contemplate that possibility.

61. Third, and in any event, a settlement could never have *res judicata* effect under Spanish law. *Res judicata* is part of Spanish procedural public policy. The granting of *res judicata* effect to a settlement agreement in respect of persons who did not opt out would entail an unusual broadening of the principal of *res judicata* and run contrary to the Spanish procedural public policy. This can easily be inferred from <u>Article 1817 of the Spanish Civil Code, which indicates that a settlement reached in such class action circumstances where absent members have not actively and expressly consented to such settlement shall be subject to be declared as null and void.[46]</u> This entails that settlements do not have irrevocable nature and thus it cannot be said of them that they have *res judicata* effect despite the wording of Article 1816 of the Spanish Civil Code.[47] This has been acknowledged by the Spanish Supreme Court[48] and by authors such as Prof. Fernández-Ballesteros.[49]

---

*object for which it is conferred because a general reference to the type of act for which it is conferred is not sufficient"*).

[45] *See* A. Ferreres Comella & A. López de Argumedo, "Las limitaciones del Sistema de tutela colectiva de intereses individuales homogéneos dispuesto en nuestra Ley de Enjuiciamiento Civil. Una propuesta inicial de sistemas alternativos de resolución de conflictos", in Actualidad Jurídica Uría Menéndez, Número especial reformas estructurales, 2012, p. 117. ("*Spanish procedural law, unlike the Netherlands and the U.S., does not envisage the possibility of collective transactions*").

[46] *See* Article 1265 of the Spanish Civil Code.

[47] Article 1816 provides that *"[t]he settlement shall have the authority of res judicata for the parties, but may only be enforced pursuant to enforcement proceedings in the event of enforcement of a court settlement"*.

[48] *See* Judgment of the Spanish Supreme Court of 5 April 2010 (RJ 2010\2541) ("*case law has ruled that settlements cannot be entirely associated with the res judicata effects of final judgments (SSTS [judgments of the Supreme Court] of 28 September 1984, 10 April 1985 and 14 December 1988) and that the impossibility to submit the settled issued does not entail that the settlement is invulnerable, since its validity and effects can be challenged, removing its effects and reviving the prior legal situation*").

[49] *See* M.A. Fernández-Ballesteros, *Avenencia o ADR*, 2013, p. 438 ("*the 'res judicata effect' that Article 1816 CC [Spanish Civil Code] confers to settlements is a beautiful metaphor. They have inter partes binding*

18

### VI. A practical look at Spanish law indicates a Spanish court would not recognize the *Rotstain* Action as precluding a subsequent Spanish case

62. Lastly, I would like to analyze the issue at hand in a manner which is more practical than technical. In my view, this helps to emphasize the points that I have made earlier.

63. In practice, a Spanish court determining whether to recognize the *Rotstain* Action as precluding an action brought in a Spanish court would be confronted with the following dilemma: which behaviour by an absent class member provides a better indication of what that person truly wants: (a) not answering the opt-out notice in the U.S. Action or (b) initiating the Spanish action.

64. In my opinion, the fundamental nature (*i.e.*, the DNA) of Spanish law makes it very unlikely that a Spanish court would find silence (*i.e.*, not opting out) to prevail. Spanish law would trust an explicit expression of someone's true will and also a positive action (*i.e.*, attempting to bring a claim in Spain) which evidenced such will. It is very unlikely that a Spanish court would consider silence enough to precipitate any adverse effect on the silent party, let alone something more worthy of protection than an affirmative action.[50]

65. Put another way, it is very unlikely that a Spanish court would refuse to adjudicate a claim brought before it simply because the claimant in that action failed to respond to an unsolicited U.S. class action notice.

### VII. Conclusions

66. For the foregoing reasons, I conclude that a Spanish court would not give preclusive effect to a judgment or court-approved settlement in the *Rotstain* Action. The U.S. opt-out proceedings do not accord with Spanish public policy for multiple reasons, including that: potential U.S. class members would not necessarily be given personal notice, would be considered part of the class even though they took no affirmative steps to join it, and would not have an absolute right to intervene in the proceedings.

---

*effect (the parties cannot/shall not disregard what has been agreed), but they do not have authority to exclude subsequent revisions that are characteristic of awards and final judgments*").

[50] In this declaration I have given several examples of the preference of Spanish law in this field for action as opposed to inaction. *See* ¶¶ 22, 59. *See also* L. Carballo Piñeiro, *Las acciones colectivas y su eficacia extraterritorial: problemas de recepción y transplante de las class actions en Europa*, 2009, p. 251 ("*If the absent class member has not formally opted out of the class action, but has brought individual proceedings, this behavior amounts to a material exercise of the opt out and, for that reason, is not covered by res judicata of the rendered decision*").

19

**APP 1205**

App. 1831

The incompatibility of the *Rotstain* Action with Spanish public policy is particularly pronounced if the *Rotstain* Action were to settle because ostensible class members would not be required to affirmatively approve such settlement, which is a requirement on under Spanish law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed in Madrid, Spain.

Dated:    July 7, 2015

_____
David Arias

20

# APPENDIX A

APP 1207



### DAVID ARIAS

### CURRICULUM VITAE

**Profile**

Professor of Procedural Law and Arbitration at Universidad Complutense de Madrid (since 1995 to 2000) and at Universidad Francisco de Vitoria (since 2000 to date). BA in Law, with Honors, and PhD, also with Honors, from Universidad Complutense de Madrid. Admitted to the Madrid Bar in 1991.

International arbitration practitioner and founder of Arias SLP. Arbitrator and counsel in cases with venues across Europe, America and Africa, administered by the main arbitration institutions (ICC, PCA, LCIA and SCC, among others), as well as counsel in complex international commercial litigation cases.

President of the *Club Español del Arbitraje*, Senior Vice Chair of the IBA Arbitration Committee and Chairman of its Subcommittee on Conflicts of Interest, which published the 2014 IBA Guidelines on Conflicts of Interest in International Arbitration.

**Representative recent matters as arbitrator**

- Co-arbitrator in two disputes between an Italian enterprise and, on one case, the Ethiopia-Djibouti railway company and, on the second case, the Ministry of Water and Energy of Ethiopia, administered under the rules governing conciliation and arbitration procedure for contracts financed by European Development Fund. The disputes concern on one side a contract of refurbishment of part of the railway line between Addis Ababa and Djibouti and, on the other side, a contract for the construction and operation of a water treatment plant to supply various Ethiopian cities with clean water (PCA, Ethiopia, Ethiopian law, English)

- Emergency Arbitrator in a ICC dispute between a Mexican and a Chilean company arising from a vehicle distribution agreement signed between the parties (ICC, Mexico D.F., Mexican law, English)

- Co-arbitrator in a dispute between an Hungarian and a Spanish company arising from the share purchase agreement signed between the parties (ICC, Madrid, Spanish law, Spanish)

- Co-arbitrator in a dispute between a German and an Italian company arising from the alleged breach of a non-competition clause contained in a share purchase agreement entered into between the parties (CIMA, Madrid, Spanish law, English)

- Chairman in a dispute between a leading Spanish company in the sector of telecom and a Panamanian company of the same sector, regarding the resolution of a joint venture agreement (CIMA, Madrid, Spanish law, Spanish)

- Co-arbitrator in a dispute between a Spanish company, in the area of retail distribution, and a Dutch company due to the alleged breach of a contract of assignment of collection rights (CAM, Madrid, Spanish law, Spanish)

- Chairman in a dispute between Scandinavian claimants and other European respondents for alleged breaches of contract involving the investment and operation of a fishing plant in the U.S.A. (ICC, Paris, Portuguese law, English)

- Co-arbitrator in a dispute between a Spanish multinational company and a state-owned public company in Africa, involving the alleged breach by the state-owned company of a contract financed by the World Bank for the redevelopment and expansion of the electricity distribution system of the African nation (ICC, Frankfurt, local law of the African nation, English)

- Co-arbitrator in a dispute between a Spanish insurance company and two Spanish financial entities relating to an alleged breach of a joint venture shareholders' agreement (CAM, Madrid, Spanish law, Spanish)

- Co-arbitrator in a dispute between a Spanish hotel conglomerate and a company operating in the recreation and leisure sector in relation to a golf course for various breaches of contract (CIMA, Madrid, Spanish law, Spanish)

- Co-arbitrator in an international arbitration between a Latin American state-owned company and a Brazilian bank in an investment dispute regarding a financing agreement (ICC, Rio de Janeiro, Brazilian law, English/Portuguese)

- Co-arbitrator in a dispute between two pharmaceutical companies in relation to the commercialization of special pharmaceutical products in Spain (ICC, Madrid, Spanish law, Spanish)

- Sole arbitrator in a dispute involving a multinational gas company and another Spanish industrial company in a contractual claim for compensation stemming from a change in the law governing the commercialization of natural gas (CAM, Madrid, Spanish law, Spanish)

- Co-arbitrator in a dispute between two Spanish companies in the construction and glass industries in relation to the breach of a joint venture agreement (LCIA, Barcelona, Spanish law, English)

- Co-arbitrator in an arbitration between a Spanish media and communications company and an Italian telecommunications company in relation to a dispute over advertising prices (ICC, Madrid, Spanish law, English)

- Chairman in a dispute between a Spanish shipping company and a Spanish shipbuilding company in an arbitration involving a dispute over payment for the construction and purchase of a shipping vessel (CAM, Madrid, Spanish law, Spanish)

- Co-arbitrator in a dispute between a boat construction company and an engineering company over an alleged breach of contract (Cartagena Court of Arbitration, Cartagena, Spain, Spanish law, Spanish)

- Chairman in a dispute between an Italian oil and gas company and a Spanish oil and gas company in relation to the alleged breach of a contract relating to the issue of the country of ship registration and exclusive supply of combustible fuels for shipping vessels (CIMA, Madrid, Spanish law, Spanish)

2

**APP 1209**

App. 1835

- Chairman in a dispute between a Spanish solar energy company and a French solar energy company relating to alleged breach of contract for the improper sale of shares (ad-hoc, Madrid, Spanish law, French/Spanish)

- Co-arbitrator in a dispute between a Spanish investment consultancy and a Spanish solar company relating to commissions for services in an investment operation (CAM, Madrid, Spanish law, Spanish)

- Co-arbitrator in a dispute between two international telecommunications companies in relation to the voiding of a subscription agreement on the basis of information provided by shareholders (CIMA, Madrid, Spanish law, English)

- Sole arbitrator in a contractual dispute between a Spanish hospital and a radiology company (Spanish Arbitration Court, Madrid, Spanish law, Spanish)

- Co-arbitrator in a dispute between two insurance companies relating to breach of representations and warranties in a sale contract (ICC, Madrid, Chilean law, English)

- Co-arbitrator in a dispute between an international five star hotel group and a Spanish hotel group for breach of a hotel management contract (ICC, Madrid, Spanish law, Spanish)

- Co-arbitrator in a dispute between a Canary Island hotel group and hotel group based in Mallorca, Spain relating to discrepancies in various resort lease contracts (CAM, Madrid, Spanish law, Spanish)

**Representative recent matters as counsel**

- Representing as lead counsel an Italian group leader in the field of engineering and construction of power plants in a multi-party arbitration concerning an alleged breach of contract and improper enforcement of guarantees (ICC, Santiago de Chile, Chilean law, Spanish)

- Representing as lead counsel the Luxembourg subsidiary of a Spanish group leader at international level in the energy sector in an investment-treaty arbitration under the Energy Charter against a European State for the drastic reduction of the aids to the sector (SCC, The Hague, European Energy Charter, English)

- Representing a subsidiary of a Spanish-based leading international energy and renewable energy group in an arbitration arising from a contract entered into by the parties for the manufacture, supply and delivery of certain materials (ICC, London, French law, English)

- Advising an Italian listed company dedicated to industrial construction in a dispute concerning a Spanish company, in relation to an alleged breach of contract of the latter, due to delays in the payment of the agreed price (CAM, Madrid, Spanish law, Spanish)

- Representing a Spanish company leader in the energy sector in an arbitration against another Spanish company managing the gas transmission network, in relation to a dispute concerning the existence, in the gas transmission contract, of a right in favor of the first company to reduce the volume of transported gas (CAM, Madrid, Spanish law, Spanish)

3

- Representing a Spanish multinational company in a complex, multijurisdictional, contractual dispute (England, Brazil, India) with an Indian manufacturer for alleged breach of contract involving a Brazilian government infrastructure project (ICC, London, French law, English)

- Advising an Italian multinational in a dispute with a Spanish company involving an alleged breach of contract for the defective construction of a steel production plant (CAM, Spain, Spanish law, Spanish)

- Representing a French company in a dispute with a Portuguese company involving the acquisition by the latter of the Spanish subsidiary of the French company and non-fulfillment of certain provisions of a share purchase agreement including alleged negligence and a subsequent loss of a right to bring a legal action (ICC, Paris, Spanish law, English)

- Advising a Spanish multinational in a contractual dispute with an Italian renewable energy consultancy firm in a dispute over the construction of solar plants in Sicily (ICC, Spain, Spanish law, English)

- Representing a leading Spanish energy company in a contractual dispute with another leading Spanish energy company involving the sale and purchase of a large power plant project in Spain (ICC, France, Spanish law, English)

- Advising a Spanish engineering company in a contractual dispute involving the engineering and construction of a major infrastructure project in the Middle East (CAM, Madrid, Spanish law, Spanish)

- Advising a Spanish multinational in an energy dispute against a Latin American State under a treaty involving a claim for the breach of an agreement relating to the supply of high voltage electricity (ad-hoc)

- Advising the Spanish entity in charge of the Spanish electricity transportation network in an arbitration against Spain's largest energy company over a price adjustment in a contract for the purchase of the electricity transportation network (CAM, Madrid, Spanish law, Spanish)

- Representing a large Spanish gas company in two ad hoc arbitrations against Spain's largest energy company to claim amounts owed as a result of a price adjustment mechanism in a hydrocarbons contract (ad hoc (ICC appointing institution), Madrid, Spanish law, Spanish)

- Advising a multinational petroleum exploration company in an arbitration involving a complex contractual dispute relating to the distribution of petroleum products (ICC, Madrid, Spanish law, English)

- Representing a Spanish wind technology engineering company in a dispute with a wind energy developer in relation to the breach of a license agreement (ICC, Madrid, Spanish law, English)

- Advising a Spanish company specialized in executive aviation in a dispute involving the breach of a lease contract for the use of an airplane (CIMA, Madrid, Spanish law, Spanish)

4

**APP 1211**

App. 1837

- Advising a multinational technology company and Spanish telecommunications company in an arbitration against a construction company regarding the interpretation of a subrogation agreement within the framework of a construction contract (ad hoc, Madrid, Spanish law, Spanish)

**Experience as mediator**

- Acting as mediator between a leading publicly-listed Spanish gas company and leading publicly-listed Spanish multinational in a complex technology dispute

**Selection of recent speaking engagements and other conference participation**

- II Annual ITA-IEL Joint Conference on International Energy Arbitration, *The revised IBA Guidelines on conflicts of interest in international arbitration* (15-16 January 2015, Houston, USA)

- IBA Annual Conference 2014, *Conflicts of interest in international arbitration: the new IBA Guidelines* (19-24 October 2014, Tokyo, Japan)

- VIII Congreso do Centro de Arbitragem Comercial, *Medidas cautelares* (10-11 July 2014, Lisbon, Portugal)

- Primera Conferencia de la Asociación Latinoamericana de Arbitraje, *Las Directrices de la IBA sobre representación de parte en el arbitraje de internacional,* (17 June 2014, Mexico D.F., Mexico)

- Young Arbitrators Forum, *La sede del arbitraje: qué efectos tiene en el desarrollo del proceso y la ejecutabilidad del laudo* (16 June 2014, Mexico D.F., Mexico)

- X Curso sobre Arbitraje y Mediación, Universidad Rey Juan Carlos, *Régimen de ejecución de laudos arbitrales y acuerdos de mediación* (8 April 2014, Madrid, Spain)

- 17th IBA Arbitration Day, *The Gathering and Taking of Evidence: Should We Seek to Level the Playing Field?* (14 February 2014, Paris, France)

- ICC´s 11th Annual Miami Conference, *A judicial perspective: opening roundtable on current judicial trends on selected topics* (4 November 2013, Miami, United States)

- I Congreso Jueces y Árbitros: Aliados en la Resolución de Disputas Comerciales, *La anulación del laudo: la confirmación de los jueces de las decisiones arbitrales* (15 November 2013, Madrid, Spain)

- II International Arbitration Congress of the Iltre. Colegio de Abogados de Barcelona, *Prevention of dilatory tactics* (24-26 October 2013, Barcelona, Spain)

- IBA Annual Conference 2013, *Arbitrators' conflicts and party representation: working on guidelines* (6-11 October 2013, Boston, United States)

- III Jornadas del Capítulo Portugués del Club Español del Arbitraje (23 September 2013, Lisbon, Portugal)

- PLI´s International Arbitration 2013, *Arbitration Around the World* (10 June 2013, New York, United States)

5

**APP 1212**

- Miradas Cruzadas Franco-Españolas, *Buenas Prácticas de los Árbitros* (November 22-23, 2012, Madrid, Spain)

- ICC 10th Annual Miami Conference 2012*, International Arbitration in Latin America* (November 11-13, 2012, Miami, FL, USA)

- IBA Annual Conference 2012 (September 30-October 5, 2012, Dublin, Ireland)

- Club Español del Arbitraje VII International Conference: Critical Questions in Arbitration, *"Extension of the Arbitration Agreement to Non-signatories and Intervention of Third Parties in the Arbitration"* (June 24-25, 2012, Madrid, Spain)

- ICC International Commercial Arbitration, PIDA Advanced Training, "Study of a Practical Case with the 2012 ICC *Arbitration Rules; The Design of the Procedural Strategy, Focusing on the Preparation of the Request for Arbitration; Sovereign Immunity in International Arbitration: The Execution of Foreign Awards"* (May 14-17, 2012, Punta Cana, Dominican Republic)

- Centre for European Studies, University of CEU San Pablo, Madrid*, "Arbitration and Company Groups"* (April 12, 2012, Madrid, Spain)

- 5th Annual IBA International Arbitration Day, *Neutrality: Myth or Reality?* (March 8-9, 2012, Stockholm, Sweden)

- ICC 9th Annual Miami Conference 2011, 2012 ICC Rules of Arbitration (November 6-8, 2011, Miami, FL, USA)

- IBA Annual Conference 2011 (October 30-November 4, 2011, Dubai, UAE)

- Iberian Lawyer Breakfast Master Class: The Effect of the Economic Recession on Litigation*, "Strategies and Mechanisms to Manage Conflicts in Unstable Environments and Strict Regulatory Contexts"* (October 20, 2011, Madrid)

- American Bar Association International Law 2011 Fall Meeting*, "International Arbitration: The year in review"* (October 11-15, 2011, Dublin, Ireland)

- ICC UK, Is International Arbitration Meeting the Demands of its Users? *"Characteristics of the Right Seat for Arbitration: Seats in South America"* (September 21, 2011, England)

- ICC, The New Legal Framework of International Arbitration, *"The Arbitrator and Lawyer in the New Legal Framework"* (August 26, 2011, Cartagena de Indias, Colombia)

- 22nd Annual Institute of Transnational Arbitration Workshop, *"Litigating the Merits of an International Arbitration"* (June 16, 2011, Dallas, TX, USA)

**Published works**

– Chambers Legal Practice Guides: Litigation, *Chapter on Spain* (Chambers & Partners, 2014)

– *Comentarios a la Ley de Arbitraje* (Coord. Carlos González-Bueno, Consejo General del Notariado, 2014)

6

**APP 1213**

–   Arbitration World, *Chapter on Spain* (4th Edition, Thompson Reuters, London, 2012)

–   *Reflexiones Ley de Mediación (VIII)* (Diariojuridico.com, 2012)

–   *The Role of the Spanish Courts under the Framework of the Arbitration Act*, The Global Legal Post (2010)

–   *El nuevo Reglamento de Arbitraje de UNCITRAL*, Revista Ecuatoriana de Arbitraje (2010)

–   *Fast-track arbitration: An option worth seriously considering*, Chambers Magazine (2010)

–   Arbitration World, *Chapter on Spain* (3rd Edition, European Lawyer, London, 2010)

–   *Hacia una mayor eficacia en el arbitraje: control de tiempos y costos*, Universidad del Rosario (2010)

–   *Código de Arbitraje*, (2nd edition, Thomson-Aranzadi, Navarra, 2009)

–   The International Comparative Legal Guide for Litigation & Dispute Resolution 2008, *Chapter on Spain* (2008)

–   *Preparing for all eventualities*, Iberian Lawyer Litigation & Arbitration Special Report (January-February 2008)

–   *Supreme Court Champions Maximum Validity of Arbitration Agreements*, International Law Office (April 2008)

–   *Promoting Arbitration* (Iberian Lawyer, Sept – Oct 2007)

–   *The Growing Tendency of International Arbitration in Spain Looks Set to Continue* (Chambers Client Report, Autumn 2007)

–   *Ten Reasons why Spain Should Become a Leading Venue for International Arbitration* (Chambers Client Report, February 2006)

–   *Código de Arbitraje*, (1st Edition, Thomson-Aranzadi, Navarra, 2005)

–   *Los Expertos Hablan sobre la Ley de Arbitraje* (Revista de la Asociación Comunitaria de Arbitraje y Mediación (ACAM), Madrid, Spain, 2005)

**Professional Memberships**

▪   Madrid Bar Association

▪   IBA Arbitration Committee

▪   ICC Latin American Arbitration Group

▪   Arbitration Commission, Spanish ICC Committee

**APP 1214**

App. 1840

- London Court of International Arbitration (LCIA)

- Club Español del Arbitraje (CEA)

- Institute for Transnational Arbitration (ITA)

- Latin American Arbitration Association (ALARB)

- International Law Association (ILA)

- International Council for Commercial Arbitration (ICCA)

- Korean Commercial Arbitration Board (KCAB)

- ICC Institute of World Business Law

- Club of Arbitrators of Milan Chamber of Arbitration

8

# EXHIBIT 77

TM
EXHIBIT 77

APP 1216

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated | Civil Action No 3:09-CV-02384-N-BG |
| | Judge: Hon. David C. Godbey |
| v. | Mag.: Hon. Nancy M. Koenig |
| TRUSTMARK NATIONAL BANK, et al., Defendants. | |

## DECLARATION OF PROFESSOR GEORGE A. BERMANN

### I.       INTRODUCTION

1.   I have been asked to address the question of whether a French court would treat a judgment or court-approved settlement in a U.S. class action, such as the above-captioned *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al*., Civil Action No. 3:09-CV-02384-N-BG ("*Rotstain* Action"), as precluding a subsequent action in a French court brought by a claimholder domiciled in France who did not affirmatively "opt out" of the plaintiff class ("French Absent Class Member").

### II.       SUMMARY OF MY OPINIONS

2.   I conclude with confidence that a judgment or court-approved settlement in the *Rotstain* Action would not be recognized by the courts of France so as to preclude subsequent individual suits in those courts by a French Absent Class Member.

3. French courts will, with near certainty, deny recognition of a U.S. class action judgment or court-approved settlement on the ground that such recognition would violate the fundamental French public policy principles of consent and party autonomy.  As I discuss in detail below, several rulings by the French Constitutional Council (*Conseil constitutionnel*) make it abundantly clear that the manner in which U.S. class actions are conducted, particularly in relation to absent class members, would not pass muster in the French courts and would cause a U.S. class action judgment or court-approved settlement to be denied recognition in France. Consequently, a French court would not accord such a U.S. judgment or settlement *res judicata* effect, and a French national would thus not be precluded from bringing suit on the underlying claim in French court.  The *Conseil constitutionnel* website states that "in 'opt-out' class action mechanisms in anglo-saxon countries, the individual would be abusively deprived of his or her rights in violation of the [French] Constitution."  *See infra* Para. 36.  The French government has itself consistently made this clear through a variety of reports and other official documents, and even in an *amicus curiae* brief filed in the U.S. Supreme Court in the case of *Morrison* v. *National Australia Bank.*  There, the French government affirmed that "French courts would *almost certainly* refuse to enforce a court judgment in a U.S. 'opt out' class action because it violates . . . French constitutional principles and public policy." (emphasis added).[1]

III.  **QUALIFICATIONS AND MATERIALS CONSIDERED**

   **a. Professional Qualifications**

4. A copy of my current *curriculum vitae* is attached to this declaration as Appendix A.  Below I briefly summarize some of my relevant experience and qualifications.

---

[1]   *See infra* notes 18-19 and accompanying text.

2

5.  I am a Professor of Law at Columbia Law School in New York, where I hold the Jean Monnet Chair in European Union Law and the Walter Gellhorn Professorship of Law. I currently direct the Law School's Center for International Commercial and Investment Arbitration and for twenty years directed its European Legal Studies Center. I have been a member of the Columbia law faculty since 1975.

6.  I hold the position of *professeur affilié* at the School of Law of the Institut des Sciences Politiques ("Sciences Po") in Paris. For 25 years, I taught law at the law faculties of both the Universities of Paris I (Sorbonne) and Paris II (Assas). I have for many years been visiting professor at the Collège d'Europe in Bruges, Belgium. I hold a doctorat *honoris causa* from the Universities of Fribourg (Switzerland) and Versailles-St. Quentin (France).

7.  At Columbia and abroad, I teach in the fields of Comparative Law (notably French and European Union Law), Transnational Litigation, International Commercial and Investment Arbitration, Conflict of Laws, and WTO Dispute Resolution.

8.  I am the author of numerous books and edited volumes, as well as many journal articles. Among the former are *Cases & Materials on European Union Law* (4th ed. West 2015); *Introduction to French Law* (Kluwer 2008); *French Business Law in Translation* (Juris Pub. 2009); and *Law and Governance in an Enlarged European Union* (Hart Pub. 2006).

9.  Between 2006 and 2014, I was President of the world-wide *Académie internationale de droit comparé* (International Academy of Comparative Law), based in Paris, France, and am currently Council Member of the newly created European Law Institute (ELI). I am past president of the American Society of Comparative Law and past editor-in-chief of the *American Journal of Comparative Law*. I founded and remain chair of the executive editorial board of the *Columbia Journal of European Law.*

3

10. I am currently Chief Reporter of the American Law Institute's ongoing *Restatement of the US Law of International Commercial Arbitration*, co-author of the ongoing project for an UNCITRAL Guide to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and co-editor-in-chief of the *American Review of International Arbitration*.  In addition, I am a member of the board of editorial advisors of the French legal journal, *La Revue de l'Arbitrage*, and a member of the French *Comité français de droit international privé.*

11. I am also an active international arbitrator in both commercial and investment disputes.  I was a founding member of the Governing Body of the International Court of Arbitration of the International Chamber of Commerce in Paris.  I chair the Global Advisory Board of the New York International Arbitration Center (NYIAC), am member of the advisory board of the Center for Conflict Prevention and Resolution (CPR), and serve as a director of the American Arbitration Association.

12. As additional background, and as I have been informed is required for disclosure of expert testimony pursuant to Federal Rule of Civil Procedure 26(a)(2), I note the following:  (1) I have testified as an expert at deposition or trial in many cases over the years, and attach as Appendix B a list of those cases in the period of the last four years; and (2) I am being compensated for my work in connection with this case at my customary consulting rate of $850 U.S. dollars per hour.  My compensation is in no way contingent upon the nature of my opinions or the outcome of this litigation.  My opinions reflect my own independent professional judgment.  The French-to-English translations herein are my own, except where otherwise specified.

**b.   Materials Considered in Forming My Opinions**

13. I have no first-hand knowledge of the specific facts underlying this dispute.  In reaching my

opinions expressed herein, I have considered the following materials, along with the other

documents or information referenced in this declaration:  Plaintiffs' Second Amended Class

Action Complaint (dated May 1, 2015); Memorandum Supporting Plaintiffs' Motion for Class

Certification, for Designation of Class Representatives and Class Counsel (dated April 30,

2015); and the Declaration of Receiver Ralph S. Janvey (dated October 30, 2014), with

Exhibits A-C.

14. I wish to reserve the right to supplement or modify my opinions expressed herein, particularly

in view of any new arguments raised or materials presented by Plaintiffs in this case.

## IV.   ANALYSIS

15. In France, courts refuse to recognize a foreign judgment if doing so would, among other things,

result in a violation of French public policy (*ordre public*).[2]  There are two separate, though

closely related, French public policy norms that would be violated by recognizing and treating

as conclusive a U.S. class action judgment against absent French class members: the principles

of *individual consent* and *party autonomy*.  Both of these norms represent what is characterized

in the general public policy literature as *procedural* rather than *substantive* public policy.  The

distinction is especially important in France because fundamental procedural values tend to

receive even higher public policy protection in international litigation than fundamental

substantive values.

---

[2]   *Cornelissen* v. *Avianca*, Judgment of Feb. 20, 2007, no. 05-14082 (Cass. Civ. 1ère).  These principles do not
apply to a judgment rendered in a country that is party to the Brussels Regulation or Lugano Treaty, or a
bilateral treaty with France on the subject.  None of those exceptions applies here.

### a. *Consentement*

16. French law exhibits a profound attachment to the notion that an action to assert a legal claim may not be instituted without the claimholder's consent (*consentement*).  A person cannot be treated as having submitted a claim or asserted a right to a court without having affirmatively indicated his or her willingness to do so.  A person also may not in any event be compelled to prosecute a claim that he or she possesses.  French law does not regard mere inaction or silence as sufficient to meet the requirement that the plaintiff personally and affirmatively decide to initiate legal action.

17. The effect of U.S.-style "opt-out" class action litigation is, of course, precisely to subject absent class members to the jurisdiction of a court and to the binding effect of that court's judgment on, or settlement of, the underlying dispute, even though they have not signified their consent to having their rights or claims adjudicated at that particular time and in that particular forum.  This is the very essence of U.S. "opt-out" class actions.

18. I understand that none of the French members of the putative class in this case has "opted in" to the present proceeding as plaintiff class member.

19. I understand that putative class members in the *Rotstain* Action have submitted Proofs of Claim to a court-appointed Receiver and its Claims Agent for claims asserted in an action in the U.S. District Court for the Northern District of Texas captioned *Securities & Exchange Commission v. Stanford International Bank, Ltd.*, et al. Civil Action No. 3:09-CV-0298-N (the "SEC Receivership Action").  This entirely separate action is brought against a set of defendants known as the Receivership Entities, which include: Stanford International Bank,

**APP 1222**

App. 1848

Ltd.; Stanford Financial Group Company; Stanford Group Company; Stanford Trust Company; Stanford Capital Management, LLC; Stanford Coins & Bullion, Inc.[3]

20. The plaintiffs in the SEC Receivership Action, by filing Proofs of Claim, submitted to the jurisdiction of the Court for the limited purpose of asserting claims against the Receivership Entities in that action. As the Proof of Claim form explains:

> CONSENT TO JURISDICTION: If you submit a Proof of Claim Form *in this case*, you consent to the jurisdiction of the District Court for all purposes *relating to this claim* and agree to be bound by its decisions, including, without limitation, a determination as to the validity and amount of any *claims asserted against the Receivership Entities*. In submitting a Proof of Claim Form, you agree to be bound by the actions of the District Court even if that means your claim is limited or denied.[4]

21. It is evident that a claimholder's consent to participate in the SEC Receivership Action does not constitute consent on that individual's part to join the *Rotstain* Action, even if the cases are pending before the same court in the U.S. District for the Northern District of Texas as consolidated cases. The SEC Receivership Action and the *Rotstain* Acton are different actions asserting different claims against different entities, and consent to be a party in one action cannot be presumed to constitute consent to be a party in the other.

22. I am certain that, for these very same reasons, a French court would not consider the requirement of *consentement* to have been met in the *Rotstain* Action by virtue of a French domiciliary's submission to the jurisdiction of the Court for purposes of the SEC Receivership Action.

---

[3] For a full listing, see the entities listed in Exhibit A to the Janvey Declaration (p. 2, referencing Ex. 8); *also available at* http://stanfordfinancialreceivership.com.

[4] Proof of Claim Form, p. 4 (emphasis added).

APP 1223

App. 1849

###### b.  L'Autonomie Des Parties

23. French law also recognizes a fundamental normative principle of "party autonomy" *(autonomie des parties)*.[5]  The principle, which is enshrined in France's New Civil Procedure Code,[6] recognizes that the holder of a claim has the right not only to decide whether, when (subject to limitation periods), and where (subject to jurisdictional requirements) to bring an action on that claim,[7] but also to make all the essential litigation determinations that a party is ordinarily privileged to make as a claimant at law.

24. The principle of party autonomy thus requires that a claimant enjoy the right to determine freely and independently such matters as (a) what claims to assert, (b) what arguments to advance in support of those claims, (c) what evidence to adduce, (d) what trial strategy to adopt, and (e) how the litigation should be conducted in all relevant respects.  Similarly, decisions whether at some point in time (f) to settle a claim, (g) to withdraw a lawsuit, or (h) to appeal an adverse judgment all form part of this cluster of prerogatives that belong to the claimant.

25. The French *Conseil constitutionnel*, which is the sole organ in France authorized to determine the constitutionality of domestic legislation, rendered an authoritative ruling to this precise

---

[5]   *See* Conseil constitutionnel, July 25, 1989, Decision no. 89-257DC [hereinafter "1989 Constitutional Council Decision"] (plaintiffs' right to retain freedom to personally decide how his or her interests should be defended and to terminate the case is constitutionally protected).

[6]   New Code of Civil Procedure [hereinafter "NCCP"] Art. 1 states, as a basic normative matter, that:  "Only the parties initiate the proceeding, save in cases where the law provides otherwise.  They are free to terminate it before it is concluded by a judgment or pursuant to the law."

Art. 2 NCCP states that: "The parties conduct the procedure under the responsibilities incumbent upon them."

[7]   The French Civil Procedure Code reflects these fundamental ideas:

Art. 30 NCCP: "The action is the right of the Plaintiff of a claim to bring an action to be heard on the merits … so that the judge may declare it founded or unfounded."

Art. 32 NCCP:  "Any claim raised by or against a person deprived of the right of action is inadmissible."

Art. 53 NCCP:  "The originating action is an action whereby a litigant takes the initiative of proceeding by submitting his claim to a judge.  He institutes the proceeding."

**APP 1224**

App. 1850

effect in 1989.  The case involved a challenge to the constitutionality of a French statute authorizing trade unions to sue on behalf of their members.  The *Conseil constitutionnel* upheld the law's constitutionality, but only on strict compliance with several conditions.  The law was expressly required to ensure "(1) that any individual (union member) be guaranteed actual personal notice in fact of the proceeding before being included in it;" (2) "that each (union member) retain the right to determine how his or its interest should be represented in the proceeding;" and (3) "that each employee be entitled to freely terminate his or its involvement in the action at any point in time prior to judgment."[8]  The *Conseil constitutionnel* held that the personal liberty (*liberté personnelle*) of the employee, which imposed these requirements, occupied "constitutional rank."

26. The *Conseil constitutionnel*'s language is instructive:

> [W]hile the legislature is free to allow representative trade unions to file a court case ... to promote, through an individual's case, an action in support of collective interests, that freedom is subject to the condition that the interested party be put in a position to give his or her fully informed consent and that he or she retain the freedom to personally decide how his or her interests should be defended and to put an end to the case.[9]

27. U.S.-style opt-out class actions do not meet these requirements.  They do not require of a class member an affirmative statement of intention to constitute oneself a plaintiff and institute or join a litigation.  They do not enable class members to determine independently how claims are to be asserted or how litigation is to be conducted.  They also fix a date by which any "opt-out" must be exercised, after which withdrawal from the suit by an individual class member is precluded.  Such ground rules run contrary to the requirements expressly adopted by the *Conseil constitutionnel.*

---

[8]    1989 Constitutional Council Decision at paras. 24-26.

[9]    *Id.* at para. 24.

9

28. In a decision of December 19, 2000,[10] the *Conseil constitutionnel* again upheld legislation –
this time establishing a compensation fund for victims of asbestos poisoning – against
constitutional challenge only upon express statutory assurance of safeguards that are
specifically absent from U.S. class action procedure. The *Conseil constitutionnel* expressly
required that persons who do not make a claim on the fund retain their full individual rights of
legal action. Moreover, an individual claimant must be guaranteed the opportunity to bring an
individual appeal before the Court of Appeal if his or her claim is rejected by the fund, and the
appellate court's decision must be subject to further appeal by the individual to the *Cour de
cassation*, or French Supreme Court.

29. In a third decision, dating from 2007, the *Conseil constitutionnel* once again upheld the right of
French unions to call a strike on their members' behalf, but placed express limits on their right
to commence legal action on behalf of their members.[11] According to a leading commentary,
the ruling permits a union to bring a representative legal action on behalf of a member only
where the member has individually consented to the suit with full knowledge based on
sufficient and personalized information. A statute to any other effect would violate individual
rights under the French Constitution.[12]

30. The principles recognized by the *Conseil constitutionnel* in this case law were applied by a
civil court in a 2005 decision arising squarely in the class action context. French consumer
protection associations brought suit in the civil court of first instance of Paris against an
organization by the name of "ClassAction.fr S.A.R.L.," which a group of attorneys had formed
to solicit class action plaintiffs via the Internet. Individual claimants could not become parties

---

[10]   Decision no. 2000-437 DC.

[11]   Decision no. 2007-556 DC (Aug. 16, 2007), English Translation available at http://www.conseil-
constitutionnel.fr/conseil-constitutionnel/root/bank_mn/anglais/a2007556dc.pdf.

[12]   Les cahiers du Conseil constitutionnel, no. 23.

APP 1226

to any such action without individually and affirmatively joining it, but joining entailed ceding control of the litigation to the attorneys. The consumer protection associations alleged, among other things, that the arrangement violated French public policy. The court upheld the challenge, stating that:

> [A]rticle 8 of the General Conditions provides that "[t]he participants agree that the attorney be the sole judge of the court in which the suit will be filed, the legal grounds for the claim, the amount to be claimed, whether the claim should be pursued, whether settlement negotiations should be initiated and how they should be conducted, as well as whether and how the right to appeal or otherwise challenge [a judgment] should be exercised. The participants will not be able to terminate the representation as long as they are represented by the attorney."

> [It] appears that said article illegally restricts the rights of the consumer by depriving him of his freedom to exercise or not his right to appeal or otherwise challenge the decision as well as to terminate the case if he determines he should do so .... [T]his article is both illicit and abusive and thus not binding on consumers.[13]

The fact that this ruling was issued, even though all participants had "opted in" to the scheme and expressly agreed to the conditions, shows the strength of the party autonomy principle in French law.[14] As one commentator summarized, "[t]he lesson to draw from the judgment of the [court] is that a class action cannot proceed under French law as it currently stands, [*i.e.* via] an opt-in class action. This holds *a fortiori* for an opt-out class action."[15]

31. There is also ample evidence other than these consistent *Conseil constitutionnel* rulings that corroborates the conclusion I reach in this Declaration. This evidence includes:

- the report of a working group tasked with developing legislation on group litigation which

---

[13] *Association de Défense, d'Education et d'Information du Consommateur* v. *SARL Class action.fr,* Judgment of Dec. 6, 2005, JCP (G), II, 10019, 270 (Feb. 8, 2006) (TGI Paris, 1ère Chambre, Section Sociale), *aff'd,* Judgment of Oct. 17, 2006, RG no. 2005/23385 (Ct. App. Paris, 1ère Chambre, Section A).

[14] The *Cour de cassation* (French Supreme Court) has on other occasions as well treated the freedom of individual litigants both to initiate and to terminate suit over their legal rights as a fundamental constitutional right. *See* Judgment of June 23, 1993, no. 91-15306, Bull. no. 101 (Cass. Civ., 3ème).

[15] Raymond Martin, note on TGI Paris, 1ère Chambre, Section Sociale, Dec. 6, 2005, *Association de Défense, d'Education et d'Information du Consommateur c/SARL Class action.fr, id.*

11

stated that "[l]aw professors are quasi-unanimous in considering that the case-law of the
[Constitutional Council], grounded in the individual's freedom to go to court, prohibits the
introduction of an opt-out class action in France;"[16]

- a letter dated April 3, 2007 from the French Ministry of Justice, Department of Civil Matters
  and of the Seal, stating  that "[t]he *Conseil constitutionnel* requires that any person associated
  with a class action procedure 'has been put in a position to give his consent in full knowledge
  of the case and that he may maintain the freedom to personally conduct the defense of his
  interests and to put an end to this action'" and that "[t]he opt out mechanism ... does not
  comply with the constitutional rules established" by the *Conseil constitutionnel*;

- the report of a special French presidential commission appointed by French President Nicolas
  Sarkozy (the Attali Commission), stating in its final report of January 2008 that "any
  proposed consumer class action legislation could only be based on an 'opt-in' model if it
  were to be consistent with French constitutional principles;" and

- a public statement by Guy Canivet, the then-chief justice of the French Supreme Court, in a
  May 16, 2006 interview, that while he supported the extension of collective action
  proceedings in France, he would not support opt-out class actions because "[t]he exclusion
  option ('opt out') is too far removed from [France's] own legal reflexes, and even
  dangerous" in that "[i]t seems ... very difficult to hold someone bound to a legal decision in
  which he did not willingly participate".[17]

32. Significantly, in the seminal U.S. Supreme Court case of *Morrison* v. *National Australia Bank
Ltd.,* the French government filed an *amicus curiae* brief in which it affirmed that a French

---

[16]  *Rapport sur l'Action de Groupe, Groupe de Travail Présidé par Guillaume Cerutti et Marc Guillaume* (Dec.
16, 2005], *available at*
http://www.finances.gouv.fr/directions_services/sircom/protection_conso/protectioneco/rapport.pdf.

[17]  Interview with Guy Canivet, Premier Président de la Cour de cassation, in *La Tribune*, May 16, 2006, at 30.

court would "almost certainly" *not* recognize a U.S. class action judgment against an absent French class member because doing so would violate French public policy, as well as French due process requirements.[18] In its brief, the Republic of France specifically observed that:

> The *Cour de cassation* (the highest court in the French judiciary) recently held that a French judge should recognize and enforce a foreign judgment only if three conditions are met: (1) there is a sufficient link between the dispute and the chosen forum; (2) the decision does not violate French public policy; and (3) the party seeking enforcement did not evade French law in obtaining the foreign judgment.
>
> French courts would almost certainly refuse to enforce a court judgment in a U.S. "opt out" class action because it violates the second prong of that test – specifically, the "opt out" mechanism violates French constitutional principles and public policy.
>
> * * *
>
> [A] U.S. court correctly found that '[a] French court would likely conclude that any judgment rendered by this Court involving absent French class members offends public policy because absent French investors did not consent to this Court's jurisdiction over their claims and the United States' class action procedure would deny them an adequate opportunity to participate in the litigation.' *Alstom*, 253 F.R.D. at 286. The court properly noted that recent legal developments 'demonstrate that French authorities have repeatedly rejected the adoption of an opt-out class action system in France because that type of system violates French constitutional principles and public policy.' *Id.* at 287. 'French authorities' rejection of opt-out class action mechanisms thus provide further evidence suggesting that a French court would likely not recognize a judgment of [a U.S.] Court if the class included absent French investors.' *Id.*[19]

---

[18]   Brief for the Republic of France as Amicus Curiae Supporting Respondents, *Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) (No. 08-1191), 2010 WL 723010.

[19]   *Id.* at 26 (internal citation omitted). In its amicus brief, the Republic of France further cautioned that opt-out class actions "may also be found to violate French public policy on the ground that they are incompatible with French due process requirements." *Id.* at 28 n. 22.

**APP 1229**

App. 1855

The French government repeated, in a 2011 letter to the U.S. Securities and Exchange Commission, that "courts in France … will refuse to enforce judgments in opt-out class actions."[20]

33. The conclusion that French courts would not recognize a U.S. class action judgment as against a French absent class member is only reinforced by the very limited availability of class actions in French courts.

34. In the last ten years, France has deliberated over the enactment of some sort of general class action legislation. During all that time, no proposal of the "opt-out" variety ever received serious consideration. In March 2014, France finally enacted a general class action statute.[21] As in many other countries that have adopted such mechanisms, the statute confines the right to bring a class action to a strictly limited number of approved representative organizations,[22] thus categorically excluding the possibility of privately introduced and managed group actions, such as those that prevail in the U.S. It also allows only a limited number of consumer and competition law claims to be pursued in this manner.

35. Most significant is the modality by which individuals adhere to a French class action. The initial step is that the association as sole plaintiff initiates proceedings. The court determines both the admissibility of the action and the merits (*i.e.*, liability).[23] If the court finds liability, it will then establish criteria to determine membership in the class. Only following the court's

---

[20]  Letter from Catherine Bergeal, on behalf of the Minister of the Economy, Finance and Industry, as well as the Minister for the Budget, Public Accounts, Civil Service and State Reform, to Mary L. Schapiro, Chairperson, U.S. Securities and Exchange Commission 7-8 (Feb. 17, 2011), *available at* https://www.sec.gov/comments/4-617/4617-29.pdf.

[21]  Loi Hamon n. 2014-344 (Mar. 17, 2014). *See* Daniel Mainguy & Malo Depincé, L'Introduction de l'Action de Groupe en Droit Français, La Semaine Juridique: Entreprise et Affaires (Etudes et Commentaires) (no. 12, Mar. 20, 2014), p. 1144.

[22]  "[A]ssociation de défense des consommateurs représentative au niveau national et agréée" (Code de la Consommation, Art. L. 423-1). There are currently only sixteen such organizations.

[23]  Art. L423-5, Code de la Consommation.

14

ruling on these issues may individuals consent to inclusion in the group. Even then, individuals must signify their consent affirmatively and explicitly.[24] Persons who do not "opt in" in this fashion are free thereafter to maintain an individual action, and even persons who do "opt in" may maintain individual actions to obtain compensation for damages not covered by the judgment.

36. Accordingly, under the French procedure, a consumer becomes bound by a class action judgment (a) *only* upon expressly consenting to join the action, (b) *only* at the end of the action when the outcome is known, and (c) *only* where liability is imposed. As the *Conseil constitutionnel* summarized the matter when rejecting a challenge to the procedure:[25]

> The decision [on liability] has res judicata effect in regard to individual members of the group only upon conclusion of the procedure and only on condition that their alleged injury has been compensated. Accordingly, the claim that the legislation would have the effect of bringing consumers into the action without enabling them with full knowledge [*en pleine connaissance de cause*] to consent must fail.

As a commentary on the decision published on the *Conseil constitutionnel*'s website further noted:

> The legislation is not the "opt-out" type, nor is it in reality the "opt-in" type, since the class is constituted not at the stage of the action . . . but rather at the stage of providing compensation.
> . . .
> *The position of the Conseil constitutionnel on the modalities of informing an interested party has been understood as actually outlawing an "opt-out" procedure.*
>
> If respect were not shown for the requirement of individualized consent [*assentiment individualisé*], which is absent for example in *"opt-out" class action*

---

[24] There is also a "simplified procedure" (Art. L423-10), the details of which are not of relevance to this case.

[25] Decision no. 2014-960 DC of March 13, 2014.

15

*mechanisms in anglo-saxon countries, the individual would be abusively deprived of his or her rights in violation of the Constitution.*[26]

37. One can safely conclude that, while the U.S. Supreme Court may have itself concluded that the policy advantages of class action litigation outweigh the U.S. model's evident curtailment of principles of consent and party autonomy,[27] that is not the judgment to which the French judiciary would come. I conclude with confidence that a French court would refuse to lend its assistance to the preclusion of absent French class members' ability to litigate individually in a competent local court on the basis of U.S. class action litigation to which they were, for all practical purposes, strangers.

38. In 2008, in the case of *In re Alstom SA Securities Litigation*,[28] Judge Marrero, facing the same issue that I address here, found that:

> [a] French court would likely conclude that any judgment rendered by this Court involving absent French class members *offends public policy* because absent French investors *did not consent* to this Court's jurisdiction over their claims and the United States' class action procedure would *deny them an adequate opportunity to participate in the litigation.*[29]

39. On that basis, Judge Marrero found that the plaintiffs failed to meet the "Superiority Requirement" for class certification under Federal Rule of Civil Procedure 23(b)(3) with regard to French class members, largely on the ground that the prospective class action judgment most likely would not have *res judicata* effect in France vis-à-vis those parties. The Court ruled that "[t]o satisfy [Rule 23's] Superiority Requirement, Plaintiffs carry the burden

---

[26] *See Commentaire de la Décision du Conseil Constitutionnel* 2014-690, p. 11, *available at* http://www.conseil-constitutionnel.fr/conseil-constitutionnel/root/bank/download/2014690DCccc_690dc.pdf. (emphasis added).

[27] *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 806-14 (1985).

[28] 253 F.R.D. 266 (S.D.N.Y. 2008).

[29] *Id.* at 286 (emphasis added). Judge Marrero expressly relied upon an affidavit I filed in that case.

16

of demonstrating that 'foreign court recognition is more likely than not,'"[30] and concluded that the plaintiffs in *Alstom* failed to carry that burden.

40. In reaching his conclusion, Judge Marrero relied on a variety of authorities, including a 1989 decision of the French *Conseil constitutionnel* (discussed *supra*, paras. 25-26), which sustained the constitutionality of the labor union statute strictly on condition of certain safeguards protecting class members – safeguards that he found absent from the U.S. "opt-out" class action mechanism. He relied as well on the subsequent *Conseil constitutionnel* rulings described earlier,[31] including the 2007 *Conseil constitutionnel* decision describing "Anglo-Saxon mechanisms of 'opt-out' class actions" as causing "the individual … abusively [to] be deprived of a right in violation of the Constitution."[32]

41. Judge Marrero also invoked the various non-judicial documents – a French working group report, the communication from the French Ministry of Justice, the report of a special French presidential commission, and a public statement by the then-chief justice of the French Supreme Court – all of which are described earlier in this Declaration.[33]

42. Judge Marrero found that "the issues of [the] right to individual consent and party autonomy in litigation likely embody fundamental French constitutional values in accordance with principles of universal justice" and that "a French court would likely not recognize a judgment of this Court if the class included absent French investors."[34] He concluded as follows:

> These recent legal developments demonstrate that French authorities have repeatedly rejected the adoption of an opt-out class action system in France because that type of system violates French constitutional principles and public policy. Under the

---

[30]  *Id.* at 282.

[31]  *See supra* paras. 23, 25-29.

[32]  253 F.R.D. at 287 (citations omitted).

[33]  *See supra* para. 31.

[34]  *Alstom*, 253 F.R.D. at 287.

**APP 1233**

App. 1859

circumstances presented by the instant matter, the issues of right to individual consent and party autonomy in litigation likely embody fundamental French constitutional values in accordance with principles of universal justice. [Cite omitted]. French authorities' rejection of opt-out class action mechanisms thus provide further evidence suggesting that a French court would likely not recognize a judgment of this Court if the class included absent French investors.

* * *

After examining the expert declarations and considering the parties' arguments, the Court concludes that Plaintiffs have not sufficiently demonstrated that French courts would more likely than not recognize and give preclusive effect to any judgment rendered by this Court involving absent French class members. Finding otherwise would expose Defendants to the possibility that they may have to relitigate the same or similar issues before a French court. Accordingly, the Court will not certify a class which includes absent French class members.[35]

43. In so holding, Judge Marrero came to a different conclusion than his colleague, Judge Holwell, had reached in the 2007 decision in *In re Vivendi Universal, S.A. Securities Litigation*.[36] Judge Holwell had opined that a U.S. class action judgment would more likely than not be recognized in France as preclusive against an absent class member. Judge Holwell's analysis was brief, and did not indicate in any detail which consideration or considerations predominated in his judgment.[37]

44. Judge Holwell declined to reconsider his ruling in *Vivendi* in light of Judge Marrero's subsequent decision in the *Alstom* case. While acknowledging the recent legal developments identified by Judge Marrero, Judge Holwell considered that they did no more than "reflect the ongoing debate in France and the European Union as to whether class action procedures ought to be adopted, with either an opt-in or opt-out feature."[38] As for the recent government reports cited by *Vivendi*, Judge Holwell considered that they showed no more than that the opt-out

---

[35] *Id.*

[36] 242 F.R.D. 76 (S.D.N.Y. 2007).

[37] *See id.* at 101-02.

[38] *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571, 2009 WL 855799, at *1 (S.D.N.Y. Mar. 31, 2009).

18

**APP 1234**

App. 1860

class action model is constitutionally uncertain, not that it is "certainly unconstitutional."[39]
However, in order to reach the result he did, Judge Holwell systematically overlooked or
minimized what amounted to a consistent pattern of emphatic rejection of the U.S.-style opt-
out class action model on the part of French authorities from all branches of government. He
also erred in suggesting that, in order to exclude absent French class members from a plaintiff
class in a U.S. class action proceeding, it must be shown that giving preclusive effect to an
eventual class action judgment or court-approved settlement would be "certainly
unconstitutional." In fact, it is the party seeking certification that bears the burden of proof,
and that burden is to show that that the foreign court more likely than not would recognize a
judgment or court-approved settlement and, on that basis, bar a foreign absent class member
from litigating the claim in that court.[40]

45. As recently as 2013, and notwithstanding Judge Holwell's ruling, Judge Marrero categorically
reaffirmed his conviction in *Alstom* that a French court would refuse to treat a U.S. class action
judgment as preclusive of any further litigation by an absent French class member on the
underlying claim. In his decision in *Anwar* v. *Fairfield Greenwich Ltd.*,[41] Judge Marrero
stated that "[r]ecent developments have only served to confirm the [*Alstom*] conclusion."[42] He
cited in particular the French Government's categorical assertion before the Supreme Court in
its *amicus* brief in *Morrison* v. *National Australia Bank Ltd.*[43] that U.S.-style opt-out class

---

[39]  *Id.* at *5.

[40]  *See supra* note 30 and accompanying text.

[41]  289 F.R.D. 105, 117 (S.D.N.Y. 2013), *vacated on other grounds and remanded sub nom.*, *St. Stephen's Sch.* v. *PricewaterhouseCoopers Accountants N.V.*, 570 F. App'x 37 (2d Cir. 2014).

[42]  *Id.*

[43]  *See supra* para. 32.

**APP 1235**

App. 1861

action judgments would not be accorded preclusive effect if a French resident were to relitigate the matter in French court.

46. Developments since the *Anwar* ruling further reinforce the conclusion that French courts would not recognize a U.S. action judgment as against an absent French class member.  Since then, (i) the French government in 2014 adopted class action procedures that contain protections exceeding even the protections of an opt-in system, and are available only to a limited number of representative organizations,[44] and (ii) the *Conseil constitutionnel*'s website declared, in connection with a constitutional challenge to the new procedures, that a prior decision "actually outlaw[s] an 'opt-out' procedure ...."[45]  I consider it virtually beyond doubt that a French court would refuse to preclude a French domiciliary from pursuing an action in a French court on account of a prior judgment in a U.S. class action that the French domiciliary had not affirmatively joined.

## V.        CONCLUSION

47. I conclude with confidence that a French court would consider it deeply offensive to the fundamental principles of c*onsentement* (consent) and *autonomie des parties* (party autonomy) for a private party to be deemed to have relinquished its claims or rights without having given its affirmative and express consent to do so.  The U.S. opt-out class action model shifts upon individual French claimholders the burden of affirmatively excluding themselves from a class of litigants that they never joined, at the risk (if they do not so exclude themselves) of being bound with respect to their own claims in their own courts by the result of a litigation to which they never consented and in which they could not meaningfully participate.

---

[44]    *See paras.* 34-36.

[45]    *See supra* note 26 and accompanying text.

20

**APP 1236**

App. 1862

48. On this basis, I consider it far more likely than not that a French court would refuse to permit

forfeiture of a French domiciliary's rights in this manner.  Indeed, I conclude with near

certainty that a French court would not preclude a French domiciliary from bringing a claim in

a French court solely on the ground that, by operation of U.S. law, they were made absent class

members in an earlier U.S. class action on the same claims in which they never consented to

participate.  For the reasons described above, a French court would simply not allow a French

domiciliary to be deprived of access to a French court on the strength of a U.S. class action

judgment or court-approved settlement to which he or she was, for all practical purposes, a

stranger.

APP 1237

App. 1863

I declare, under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Princeton, New Jersey.

Dated: July 7, 2015

George A. Bermann

APP 1238

App. 1864

# APPENDIX A

# GEORGE A. BERMANN

*Walter Gellhorn Professor of Law and Jean Monnet Professor of European Union Law*
*Director, European Legal Studies Center*
**Columbia University School of Law**

**Office**:
435 West 116th Street (Box A-10)
New York, New York 10027
Tel.:  (212) 854-4258
Fax:  (212) 854-7946
e-mail: gbermann@law.columbia.edu

**Home**:
57 Hemlock Circle
Princeton, New Jersey 08540
Tel.:  (609) 924-6149
Fax:  (609) 924-2038

**PERSONAL**:

Date of birth:  December 2, 1945

**EMPLOYMENT**:

Columbia University School of Law: *Walter Gellhorn Professor of Law*, 2002 to present*; Jean Monnet Professor of European Union Law*, 2001 to date*; Charles Keller Beekman Professor of Law*, 1993 to 2002; Professor of Law, 1981-93; Associate Professor of Law, 1979-81; Assistant Professor of Law, 1975-79

Professeur affilié, Ecole de droit, Institut des sciences politiques (Sciences Po), Paris France

Tocqueville-Fulbright Distinguished Chairholder, University of Paris I and Institut des Sciences Politiques (fall term 2006)

College d'Europe (Bruges, Belgium):  member of the visiting faculty of law (2004 to 2013)

**Courses taught**:

| | |
|---|---|
| Transnational Litigation and Arbitration | Foreign Investment Law and Arbitration |
| Contracts | WTO Dispute Resolution |
| European Union Law | Administrative Law |
| Comparative Law and European Law | Government and Public Official Liability |

**UNIVERSITY FUNCTIONS**:

Director, Center for International Commercial and Investment Arbitration (CICIA), 2012 to dare
Director, European Legal Studies Center, 1998 to 2014
Faculty advisor to Columbia Teams in Willem Vis Moot Court and Hong Kong Arbitration Moot Court
 Competitions, European Union Moot Court Competition , and Jessup International Law Moot
 Competition, 1996 to date
Chair, Comparative and International Law Committee, 1991 to 1996, 1997 to 2003, 2008-10
Steering Committee, Columbia-IALS Research Centre (London), 2000 to date
Chair, Curriculum Committee, 1987 to 1988
Advisory Committee, 2000-2002, 2004 to 2008
Appointments Committee, 1984 to 1986
Junior Faculty (Promotions) Committee, 1989 to 1993 (chair 1990 to 1991)
Advisory Committee, University Institute for the Study of Europe, 2000 to date

1

**APP 1240**

App. 1866

Chair, Advisory Committee, Reid Hall Institute for Scholars (Paris), 2002-03
Advisory Committee, Maison Française, 1991 to date

**OTHER EMPLOYMENT**:

Visiting professor, University of Versailles St. Quentin, master of Arbitration and International Commerce (2011)

Visiting professor, Faculty of law of Master 2 Droit et de la Globalisation, University of Paris I and Institut des Sciences Politiques (Paris) (2003 to date)

Visiting Professor, Faculties of Law of University of Paris I (Pantheon-Sorbonne) and University of Paris II (Pantheon-Assas) (1996 to date)

Member of Overseas Faculty, College of Europe, Bruges, Belgium, Department of Law (2003 to date)

Visiting Professor, University of St. Gallen (Switzerland), Master of European Law and International Business Law, offered at CollΠge d'Europe, Bruges (Belgium) (September 1999, September 2000)

Visiting Professor, Faculty of Law of University of Fribourg (Switzerland) (January-July, 1997))

Visiting Professor, New York University School of Law, New York (spring term 2001)

Eason-Weinmann Visiting Professor of Comparative Law, Tulane Law School, New Orleans, La. (fall term 1998)

Faculty, June Program for International Lawyers, Parker School of Foreign and Comparative Law, New York, New York (June 1987-June 1989, June 1992)

Visiting Professor, Faculties of Law of Universities of Paris I and Rouen (France) (1981-1982)

Professor, Leyden-Amsterdam-Columbia Summer Program in American Law, Leyden and Amsterdam (Netherlands) (1979-1982)

Lecturer, International Faculty for the Teaching of Comparative Law (Pescara, Italy, August 1975)

Associate, Davis Polk & Wardwell, One Chase Manhattan Plaza, New York, New York (litigation) (1970-1973)

**PROFESSIONAL MEMBERSHIPS AND ACTIVITIES**:

Chief Reporter, ALI Restatement of the Law (Third) of the US Law of International Commercial Arbitration 2009 to date

Co-author (with Emmanuel Gaillard), UNCITRAL Guide to the New York Convention, 2011 to date

Chair, Global Board of Advisers, New York International Arbitration Center, 2013 to date

Board of Advisers, Center for Conflict Prevention and Resolution (CPR), 2014 to date

Advisory Committee to US State Department Luxembourg Seminar on a US Supreme Court/European Court of Justice Dialogue, 2012 to date

Founding Member, Governing Board, International Chamber of Commerce, Court of International Arbitration, 2012 to 2014)

President of Board, Center for International Investment and Commercial Arbitration, Lahore, Pakistan (2014 to date)

President, International Academy of Comparative Law (Académie internationale de droit compare (2006 to 2014)

Member, Advisory Committee, ALI, Restatement(4th) of Foreign Relations Law of the United States  (2013 to date)

Member, ICC Commission on Arbitration, 2011 to date

Co-Editor in Chief, *American Review of International Arbitration*, 2011 to date

President, American Society of Comparative Law (ASCL), 1998 to 2002

Chief Reporter, ALI Restatement of the U.S. Law of International Commercial Arbitration (2007 to date)

Council Member, European Law Institute, 2011 to date

Member, Comité scientifique of the Revue de l'Arbitrage (Paris), 2011 to date

Co-Editor in Chief, *American Journal of Comparative Law*, 2004 to 2008

2

**APP 1241**

App. 1867

## Professor G.A. Bermann

Board of Directors, American Society of Comparative Law (ASCL), 1988 to date; ASCL Vice-President, 1994-1998

Member, Board of Editors, *American Journal of Comparative Law*, 1976 to date

Board of Directors, American Arbitration Association, 2008 to date

Member of Roster, International Centre for Dispute Resolution ICDR, AAA, CPR, CIETAC, Korean Commercial Arbitration Board, LCIA, Stockholm Chamber of Commerce, Kuala Lumpur Arbitration Center

Member, Academic Council, Institute for Transnational Arbitration (ITA), 2006 to date

Member, New York City Bar Committee on International Commercial Dispute Resolution, 1998 to date

Member, International Arbitration Club of New York, 2009 to date

Consultant to members of the US bar and Expert Witness and Deponent on Foreign (French, German, Swiss, Belgian, UK and European Union) Law and Transnational Law, 1979 to date

Court-appointed Foreign Law Expert on French, German and Swiss Law

Adviser to the Legal Service of the Commission of the European Communities

Member of Board of Advisors, Koç University Law School, Istanbul, Turkey, 2005 to date

Member, Advisory Committee, Centre for European Legal Studies, University of Cambridge, U.K.. 2006 to date

Founder and chair of the Executive Editorial Board, *Columbia Journal of European Law*, 1997 to date (Editor-in-Chief, 1994-1997)

Board of Directors, *Columbia Journal of Transnational Law*, 1989 to date (Board of Advisors, 1976 to date)

Member, Board of Editors, *Tulane European and Civil Law Forum*, 1992 to date

Member, Board of Editors, *Indiana Journal of Global Legal Studies*, 1997 to date

Member, International Academy of Comparative Law (Paris, France), 1991 to date, President of the Common Law Group, 2002 to date

Member of Executive Committee, European Union Studies Association (EUSA), 2001 to 2003

Member, US State Department, Advisory Committee on the Hague Convention on Jurisdiction and Judgments

Member, American Law Institute (ALI), Advisory Committee on the Hague Convention on Jurisdiction and Judgments

Member, American Law Institute (ALI), Advisory Committee on WTO Trade Law

Member, Board of Advisors, Institute for the Study of Europe, Columbia University, 2000 to date

Member, Reid Hall (Paris) Committee, Columbia University, 2000 to date

Member, Advisory Board, Institute for Global Legal Studies, Washington University of St. Louis, School of Law, 2001 to date

Board of Directors, American Foreign Law Association (New York, New York), 1983-1986; Vice-President, 1986 to date

Secretary and member of Board of Directors, American Academy of Foreign Law, 1983 to 1996

Member, European Law Committee, New York City Bar Association (New York, New York), 2000 to date

Delegate of American Bar Association (ABA) to the Union Internationale d'Avocats (UIA), 1993-1995

Member, Team Europe, EU Delegation to the US, 1992 to date

Member, Société de Législation Comparée (Paris, France), 1980 to date

Board of Directors, German American Law Association (GALA) (New York, New York), 1978-1982; member, 1978 to date

Public Member, Administrative Conference of the United States, 1986-1989; Consultant, 1983-1986, 1989-1995

Executive Director, Leyden-Amsterdam-Columbia Summer Program in American Law (Netherlands), 1979-1982; member, Leyden-Amsterdam-Columbia Summer Program Board of Directors, 1979 to date

Consultant, New York State Bar Association, 1979-1981

Consultant and Lecturer, National Center for Administrative Justice, 1979-1982

**APP 1242**

App. 1868

Professor G.A. Bermann

**EDUCATION:**

**Legal**:

Jervey Fellow, Parker School of Foreign and Comparative Law, 1973-1975, resulting in LL.M. Columbia
University School of Law, 1975 (program of study of French, German and Swiss law)
J.D. Yale Law School, 1971; Editor of the *Yale Law Journal*; Legal Education Research Project with
Professor Robert B. Stevens (Stevens, Law Schools and Law Students, 59 Va. L. Rev. 551 (1973))

**Undergraduate**:

B.A. Yale College, 1967; Summa cum laude with exceptional distinction in political science; University
Prize for best senior essay in political science; Phi Beta Kappa; Senior editor and copy editor Yale
Daily *NEWS*; William S. Cowles Scholarship

**Other**:

Tocqueville-Fulbright Scholar, University of Paris I (Pantheon-Sorbonne), Paris, France, 2006
Visiting Fellow, Center for International Studies, Princeton University, Princeton, New Jersey, 2000
Visiting Scholar, Legal Service of the Commission of the European Communities, Brussels, Belgium, 1994
Visiting Scholar at Max Planck Institut für ausländishes öffentliches Recht und Völkerrecht, Heidelberg,
Germany, 1976
Non-degree legal studies at University of Paris II, 1974-1975; University of Munich, 1975; and University
of Heidelberg, 1976
Visiting Scholar at Conseil d'Etat, Paris, France, 1975
Marshall Scholar, University of Sussex, Falmer, Brighton, England, 1967-1968, in law and comparative
politics

**MAJOR PUBLICATIONS**:

ALI, Restatement of the US Law of International Commercial Arbitration, ch. 2 ("Enforcement of the
Arbitration Agreement") (completed March 2015) (slated for ALI approval, May 2015)
The Interpretation and Application of the New York Convention in National Courts (forthcoming Springer
Pub. (2015)
Cases & Materials on European Union Law (West Pub., 4th ed. 2015)
International Commercial Arbitration: Past Present & Future (publication of Center for Conflict
Prevention and Resolution (CPR) (2015)
The European Law Institute: A Transatlantic Perspective (festschrift for Prof. Bernard Audit)
(2015)
Dramatic Sideshows at the Hearing (festschrift for Michael Schneider) (forthcoming 2015)
Une vue outré-atlantique de la Cour et de sa jurisprudence, in The Court of Justice and the Construction of Europe:
Analysis and Perspectives on Sixty Years of case law 719 (T.M.CV. Asser Press 2013)
Navigating EU Law and the Law of International Arbitration, 28 Arb. Int'l 397 (2012)
Arbitrability Trouble, 23 Am. Rev. Int'l Arb. 367 (2012)
The Supreme Court Trilogy and its Impact on U.S. Arbitration Law, 22 Amer. Rev. Int'l Arb. 551 (2011)
Parallel Jurisdiction: Is Convergence Possible?, Yearbook of Private International Law, 2012; also in Coinvergence
and divergence in private International Law (Liber amicorum forKurt Siehr (Katharina boele-Woelki, Talia
Einhorn, Daniel Girsberger, & Syemon Symeonides, eds) 579 (Schultess Pub. 2010);Universidad
Metropolitana (Caracas, Venezuela), Derecho y Democracia III 239 (2011)

4

**APP 1243**

App. 1869

Professor G.A. Bermann

Une Vue Outre-Atlantique de la Cour et de sa Jurisprudence , in volume celebrating the 60th
Anniversary of the European Court of Justice (forthcoming 2012)

Comparing U.S. Law and the Law of the European Union (festschrift for Prof. Camille Jauffret-Spinosi)
(forthcoming 2012)

The "Gateway Problem" in International Commercial Arbitration, 37 Yale Journal of International Law 1
(2012); also in International Arbitration and International Commercial Law: Synergy,
Convergence and Evolution (Liber amicorum for Eric Bergsten) (S. Kröll, L.A. Mistelis, P.
Perales Viscasillas & V. Rogers, eds.) 55 (Kluwer 2011)

The Prospects of *Eco Swiss v. Benetton* for International Commercial Arbitration: A Comment on *Eco
Swiss v. Benetton,* in The Practice of Arbitration: Essays in Honor of Hans van Houtte (eds., P.
Wautelet, T. Kruger & G. Coppens) 305 (Hart Pub. 2012)

American Exceptionalism in International Arbitration, in Contemporary Issues in International Arbitration and
Mediation: The Fordham Papers 2011 (Arthur Rovine, ed.) 3 (Martinus Nijhoff 2012); also in 2
Interdisciplinary Association of Comparative and Private
International Law (IACPIL, Vienna, Austria) (2011)

Reconciling European Union Law Demands with the Demands of International Arbitration, in "A Man for All
Treaties" (Liber Amicorum JC Piris) (Jean Paul Jacqué et al., eds.) 41 (Bruylant, 2011); also in 34 Fordham
Int'l L. J. 1193 (2011)

The UK Supreme Court Speaks to International Arbitration: Learning from the *Dallah* Case, 22 American
Review of International Arbitration 1 (2011)

The Prospects of *Eco Swiss. v. Benetton* for International Commercial Arbitration (festschrift for Prof. Hans  van
Houtte) (forthcoming 2012)

Domesticating the New York Convention:  The Impact of the Federal Arbitration Act, 2011 Journal of
International Dispute Settlement 317 (2011); also in Comparative
Perspectives on international Arbitration (Giuditta Cordero Moss, ed.) (Cambridge Univ. Press (forthcoming
2012)

Mandatory Rules in International Commercial Arbitration, in CONFLICT OF LAWS IN
INTERNATIONAL ARBITRATION (eds., F. Ferrari & S. Kroll) 325 (Sellier Pub., 2010)

American Law Institute, Restatement 3rd of the US Law of International Commercial Arbitration
(in progress)

A Restatement of European Administrative Law:  problems and prospects, in Comparative Administrative
Law (Susan Rose-Ackerman & Peter L. Lindseth, eds.) 595 (Edward Elgar Pub. 2010)

UNCITRAL Guide to the New York Convention (with E. Gaillard) (in progress)

CASES AND MATERIALS ON WTO LAW (with P. Mavroidis & m. Wu) (West Pub., 2010)

CASES AND MATERIALS ON EUROPEAN UNION LAW, 3rd ed. (with R. Goebel, W. Davey & E.
Fox) (West Pub., 2010)

Jurisdiction: Courts vs. Arbitrators, in International Commercial Arbitration in New York, (James Carter &
John Fellas, eds. (Oxford, 2010)

U.S. Class Actions and the 'Global Class,' 19 Kan. J. L. & Pub. Policy 91 (2009)

Restating the Law of International Commercial Arbitration, 42 N.Y.U. J. Law & Politics 175 (2009)

Ascertaining the Parties' Intentions in Arbitral Design, 113 Penn St. L. Rev. 993 (2009)

The Emergence of Transatlantic Regulation, in LEGAL CHALLENGES IN EU ADMINISTRATIVE LAW
168 (eds. H. Hofmann & A. Turk) (Elgar Pub. 2009)

THE INTERNATIONAL TRADE LAW OF CONTIBGENT PROTECTION (ed. with P. Mavroidis & K. Bagwell)
(volume 3 in Columbia Law Series on WTO Law and Policy) (Cambridge Univ. Press, 2009)

New Frontiers in the Relationship between National and European Courts, 32  Ford. Int'l L. J. 601 (2009).

AMERICAN BAR ASSOCIATION GUIDE TO EUROPEAN UNION ADMINISTRATIVE LAW (6-volume set
(ABA Pub., July 2008)

Americanization and Europeanization of Law: Are there Cultural Aspects?, in SESQUICERNTENNIAL ESSAYS OF
THE FACULTY OF COLUMBIA LAW SCHOOL 20 (2008)

INTRODUCTION TO FRENCH LAW (with E. Picard) (Kluwer 2008)

FRENCH BUSINESS LAW IN TRANSLATION (2d ed. with P. Kirch)  (Juris Pub. 2008)

5

**APP 1244**

Professor G.A. Bermann

The Role of Courts and arbitrators in determining Arbitral Jurisdiction in U.S. Law, in festrschrift for Pierre Tercier 727 (Montcretien 2008)

National Parliaments and Subsidiarity: An Outsider's View, in THE LISBON TREATY: THE IRISH NO (I. Pernice, ed.) 453 (Nomos 2008)

The American Law Institute Goes Global, 16 Willamette J. Int'l L. & Disp. Resol. 300 (2008)

Mandatory Rules of Law in International Arbitration, 18 Am. Rev. Int'l Arb. 1 (2007), reprinted in MANDATORY RULES OF LAW IN INTERNATIONAL ARBITRATION (ed. with Loukas Mistelis) 1 (Juris Pub. 2011)

WTO LAW AND DEVELOPING COUNTRIES (ed. with P. Mavroidis) (volume 2 in Columbia Law Series on WTO Law and Policy) (Cambridge Univ. Press, 2007)

Parallel Litigation and the Transnational Civil Procedure Rules, Rev. It. Diritto Privado (2007)

The Emergence of Transatlantic Regulation, in The Move to an Integrated Administration (Hoffmaan & Turk, eds, Elgar Pub. 2008)

La concertation reglementaire transatlantique, in VERS DE NOUVEAUX EQUILIBRES ENTRE ORDRES JURIDIQUES (festschrift for Helene Gaudemet-Tallon, Dalloz 2008)

La protection des droits de l'individu aux Etats-Unis: proportionnalite et federalisme, in Droit global: Des droits au droit : les droits de la personne, fondement du droit (ed. L. Vogel) (Publications de l'Institut de Droit Compare), p. 41 (2007)

The Emergence of Transatlantic Regulation, in ECONOMIC LAW AND JUSTICE IN TIMES OF GLOBALISATION (festschrift for Judge and Prof. Carl Baudenbacher) 275 (Nomos 2007)

Bilingualism and Translation in the US Legal System: A Study of the Louisiana Experience, in 54 AJCL Supp. (2006) p. 89

Constitutional Lessons from Europe, in festschrift for Francis Jacobs, 29 Ford Intl LJ 601 (2006)

Litigation in the Civil Law and the Common Law, in International Litigation (ed. B. Legum) 15 (ABA Pub. 2006)

The Highest Court in Federal Systems, in The Future of the European Judicial system in a Comparative Perspective, Nomos, Berlin (eds. I. Pernice, J. Kokott, C. Saunders) p. 91 (2006)

Introduction to "Immunity and Accountability: Is the Balance Shifting?," Proceedings of the American Society of International Law (2005 annual meeting, Washington DC), 2005 ASIL Proceedings, p. 227 (2006)

Jurisdictional and *Forum non Conveniens* Limitations on the Enforcement of Foreign Arbitral Awards (co-authored report of New York City Bar Association, Committee on International Commercial Dispute Resolution

The Constitution, International Treaties and Contracts, in Convergence of Legal Systems in the 21st Century: General Reports 16th Congress, Brisbane (Bruylant Pub.), p. 1073 (2006)

Constitutional Steps toward Administrative Legitimacy in the European Union, in Festschrift for Prof. Xavier-Blanc Jouvan (forthcoming 2007)

La concertation reglementaire transatlantique, in Festschrift for Prof. Helene Gaudemet-Tallon (forthcoming 2007)

World Trade and Human Health and Safety (ed. with P. Mavroidis) (volume 1 in Columbia Law Series on WTO Law and Policy, 2006)

Executive Power in the New European Constitution, 3 Int'l J. Const'l L. 440-47 (2005). <http://icon.oupjournals.org/cgi/reprint/3/2-3/440?ijkey=X1dLQfEComNDzAp&keytype=ref>

PARTY AUTONOMY: CONSTITUTIONAL AND INTERNATIONAL LIMITS IN COMPARATIVE PERSPECTIVE (Juris Pub. 2005)

The Application of Private International Law Norms to 'Third Countries': The Jurisdiction and Judgments Example, in International Civil litigation in Europe and Relations with Third States (N. Watte & A. Nuyts, eds.) 55 (Bruylant, Brussels, 2005)

Executive Power in the New European Constitution, 3 Int'l J. Const'l L. 421 (2005)

FRENCH BUSINESS LAW IN TRANSLATION (with P. Kirch) (Juris Pub 2005)

LAW AND GOVERNANCE IN AN ENLARGED EUROPEAN UNION (ed., with K.Pistor) (Hart Pub., Oxford 2004)

INTERNATION COMMERCIAL ARBITRATION (West Pub., forthcoming 2005)

Litigation under the Civil Law and the Common Law, in International Litigation Deskbook: Strategies and Practice in Cross-Border Disputes (ed. B. Legum) (ABA Publishing, forthcoming 2005)

*Marbury v. Madison*: Implications for European Law, 36 G.W.U. Int'l L. Rev. 557 (2004)

6

APP 1245

Professor G.A. Bermann

Competences of the Union, in EUROPEAN UNION LAW FOR THE 21st CENTURY: RE-THINKING
THE NEW LEGAL ORDER (T. Tridimas & P. Nebbia, eds.) 65 (Hart Pub., Oxford 2004)

Le droit comparé et le droit international: alliés ou ennemis?, 2003 Revue internationale de droit comparé
519 (2003)

TRANSNATIONAL LITIGATION (West Pub. 2003)

The Constitutional Convention and EU Institutional Reform, in THE GOVERNMENT OF EUROPE:
INSTITUTIONAL DESIGN FOR THE EUROPEAN UNION (J.M. Beneyto Perez, ed.) 27 (S.L.
Dykinson, Madrid, 2003), republished in THE GOVERNMENT OF EUROPE: WHICH
INSTITUTIONAL DESIGN FOR THE EUROPEAN UNION? (J.M.Beneyto Perez & I. Pernice,
eds) 119 (Nomos Verlagsgesellschaft, Baden-Baden 2004)

Member State Liability in the Member State's Own Court: An American Comparison,"in UNE
COMMUNAUTE DE DROIT (festschrift for President Gil Carlos Rodriguez Iglesias, European
Court of Justice) 305 (BWV Pub. Berlin 2003)

Policy Recommendations for Dispute Prevention and Dispute Settlement in Transatlantic Relations: Legal
Perspectives, in TRANSATLANTIC ECONOMIC DISPUTES: THE EU, THE US, AND THE
WTO (E-U Petersmann & M. Pollack, eds) 569 (Oxford Univ. Press 2003)

CASES AND MATERIALS ON EUROPEAN UNION LAW (with R. Goebel, W. Davey & E. Fox) (West
Pub. 2d ed. 2002), plus SELECTED DOCUMENTS (2d ed. 2002), caesbook supplement (2004)

Proportionality and Subsidiarity; in THE LAW OF THE SINGLE EUROPEAN MARKET: UNPACKING
THE PREMISES (C. Barnard & J. Scott, eds.) 75 (Hart Pub. 2002)

Law in an Enlarged European Union, in LAW AND LAWS IN A MULTI-STATE SYSTEM (festscrift in
honor of Prof. Arthur von Mehren) (S. Symeonides & J. Nafziger, eds.) 555 (Transnational Pub.
2002)

TRANSATLANTIC REGULATORY COOPERATION: LEGAL PROBLEMS AND POLITICAL
PROSPECTS (Oxford University Press) (ed., with M. Herdegen & P. Lindseth) (2001)

The Role of Law in the Functioning of Federal Systems, in THE FEDERAL VISION (K. Nicolaidis & R.
Howse, eds.) 191 (Oxford Univ. Press 2001)

European Law: Yesterday, Today and Tomorrow, 36 Texas Int'l L.J. 525 (2001)

The Discipline of Comparative Law in the United States, 1999 Revue Internationale de Droit Comparé
1041 (1999)

Judicial Enforcement of Federalism Principles, in ENTWICKLUNGS PERSPEKTIVEN DER
EUROPAISCHEN VERFASSUNG IM LICHTE DES VERTRAGS VON AMSTERDAM (M.
Klöpfer & I. Pernice, eds.) 64 (Nomos Verlagsgesellschaft, Baden-Baden 1999)

Comparative Law in the New European Community (festschrift for Prof. Rudolf Schlesinger), 21 Hastings
Int'l & Comp. L. Rev. 865 (1998)

The European Intergovernmental Conference: An American Perspective (festschrift for Prof. Peter
Herzog), 25 Syracuse J. Int'l L. & Comm. 61 (1998)

Provisional Relief in Transnational Litigation, 35 Colum. J. Transnat'l L. 553 (1997)

REGULATORY FEDERALISM: EUROPEAN UNION AND UNITED STATES (Hague Academy of
International Law), 263 Recueil des Cours de l'Académie de Droit International de la Haye 9
(1997)

Comparative Law in Administrative Law, in L'ETAT DE DROIT (Mélanges en l'honneur de Guy Braibant)
29 (Editions Dalloz, Paris 1996)

Regulatory Decisionmaking in the European Commission, 1 Colum. J. Eur. L. 415 (1996)

Regulatory Cooperation Between the European Commission and U.S. Administrative Agencies, 9 Adm.
L.J. of Amer. Univ. 933 (1996)

European Community Law from a U.S. Perspective, 4 Tulane J. Int'l & Comp. L. 1 (1995)

Managing Regulatory Rapprochement: Institutional and Procedural Approaches, in REGULATORY CO-
OPERATION FOR AN INTERDEPENDENT WORLD 73 (OECD Pub. 1994)

Taking Subsidiarity Seriously: Federalism in the European Community and the United States, 94 Colum.
L. Rev. 331 (1994)

7

APP 1246

Professor G.A. Bermann

Subsidiarity and the European Community, 17 Hastings Int'l & Comp. L. Rev. 97 (1993); reprinted in 3 [Canadian] National Journal of Constitutional Law [Revue Nationale de Droit Constitutionnel] 357 (1993) and in EUROPE AFTER MAASTRICHT: AMERICAN AND EUROPEAN PERSPECTIVES (P. Lützeler, ed.) 139 (Providence: Berghahn Books 1994)

A Commentary on the Harmonization of European Private Law, 1 Tulane J. Int'l & Comp. L. 47 (1993)

Competence to Set Aside an Award and Procedural Grounds for Refusing Enforcement: The Viewpoint and Role of the Arbitration Law Expert, in IUS ARBITRALE INTERNATIONALE, ESSAYS IN HONOR OFHANS SMIT (T. Carbonneau & V. Pechota, eds.), 3 Am. Rev. Int'l Arb. 93 (1992)

Bijuralism in Federal Systems and in Systems of Local Autonomy (with M. Hilf), in GENERAL REPORTS OF THE XIIITH INTERNATIONAL CONGRESS OF THE INTERNATIONAL ACADEMY OF COMPARATIVE LAW (Montreal, Aug. 1990) 21 (Cowansville, Quebec: Les Editions Yvon Blais 1992)

Administrative Law, in INTRODUCTION TO THE LAW OF THE UNITED STATES (ch. 5) (T. Ansay & D. Clark, eds.) 92 (Berlin: Duncker & Humblot 1992)

Regulatory Cooperation with Counterpart Agencies Abroad: The FAA's Aircraft Certification Experience, 24 Law & Policy in Int'l Bus. 669 (1993), also published in Administrative Conference of the US, Recommendations and Reports 63-172 (1991)

EEC Community-Building under the Single European Act, in COMPARATIVE AND PRIVATE INTERNATIONAL LAW (festschrift for John Henry Merryman) (D. Clark, ed.) 333 (Berlin: Duncker & Humblot 1990)

The Use of Anti-Suit Injunctions in International Litigation, 28 Colum. J. Transnat'l L. 501 (1989)

The Single European Act: A New Constitution for the Community?, 27 Colum. J. Transnat'l L. 529 (1989)

The Hague Evidence Convention in the Supreme Court: A Critique of the *Aérospatiale* Decision, 63 Tulane L. Rev. 525 (1989)

FRENCH LAW: CONSTITUTION AND SELECTIVE LEGISLATION (Transnational Juris Pub.) (with H. de Vries & N. Galston) (1988) (with annual supplements)

Federal Tort Claims at the Agency Level: The FTCA Administrative Process, 35 Case W. Res. L. Rev. 509 (1985)

Administrative Handling of Monetary Claims: Tort Claims at the Agency Level, in Administrative Conference of the United States, Administrative Conference of the US, Recommendations and Reports 639-895 (1984)

La Responsabilité civile des fonctionnaires au niveau fédéral aux Etats-Unis: vers la solution d'une crise, 1983 Revue Internationale de Droit Comparé 319 (1983)

Occupational Licensing in New York State: A Report of the New York State Bar Association, published in New York State Bar Association, NEW YORK STATE REGULATORY REFORM 10 (1982)

Contracts between States and Foreign Nationals: A Reassessment, in INTERNATIONAL CONTRACTS (H. Smit, N. Galston & S. Levitsky, eds.) 184 (New York: Matthew Bender 1981)

French Treaties and French Courts: Two Problems in Supremacy, 28 Int'l & Comp. L.Q. 458 (1979)

Integrating Governmental and Officer Tort Liability, 77 Colum. L. Rev. 1175 (1977)

The Scope of Judicial Review in French Administrative Law, 16 Colum. J. Transnat'l L. 195 (1977)

Les Droits de la défense: réflexions comparatives sur les droits administratifs français et américains B propos d'un cas concret, Actualité Juridique Droit Administratif (AJDA) 410 (1975)

Bringing the Vagueness Doctrine on Campus, 80 Yale L.J. 1261 (1971) (with Ballard Jamieson, Jr.)

**CONFERENCE AND WORKSHOP PAPERS. PRESENTATIONS AND REPORTS**:

The European Union and International Arbitration : A Study in Tensions between International Legal Regimes (presentation at University of Geneva, April 29-30, 2015)

The U.S. Restatement through the Prism of French Arbitration Law (presentation at Paris Bar Association, Paris, France, March 28, 2015)

The Preclusive Effect of Arbitral Awards in Subsequent Court Proceedings (Columbia Arbitration Day,

8

Professor G.A. Bermann

Columbia Law School, March 6, 2015)
Courts and Tribunals; An Evolving Relationship (conference at New York International
Arbitration Center, Oct. 22, 2014)
Complex Isaues in International Arbitration (conference at New York City Bar Association, Oct. 9, 2014)
An Introduction to International Arbitration in the U.S., Federal Judicial Center, Washington DC (Apr.
14, 2014)
Moderator, Docket Management and Control: A Comparative Perspective (panel discussion between US
Supreme Court Justices and Judges of the European Court of Justice European Court of Justice,
Luxembourg (Feb. 11, 2014)
International Commercial Arbitration and its Relationship to Third-Party Funding (conference of Center for
International Commercial and Investment Arbitration (CICIA), Columbia Club, New York (Feb. 7, 2014)
The BG Group Case in the US Supreme Court, Houston International Arbitration Center (Jan. 15, 2014)
Exceptionalism in US Arbitration Law, University of Texas School of Law, Austin, Texas (Jan. 14, 2014)
Lessons from the Restatement, American Foreign Law Association (New York) (Nov. 5, 2013)
Moderator, Challenges to International Commercial Arbitration: A View from the ICC, " Columbia Law
School (Sept. 18, 2013)
Punitive Damages in international Dispute Resolution, conference on *dommages punitifs* at University of
Nancy, Nancy, France (May 5, 2013)
Dealing with the Incomplete Award, Leading Arbitrators' Symposium on the Conduct of International
Arbitration, Vienna, Austria (April 16, 2013),
Speaker at Ministry of Foreign Affairs of Finland (Helsinki), "The Need for an International Investment
Consensus-building Process" (Apr. 8, 2013)
Speaker at ASA/DIS Arbitration Practice Seminar, Badenweiler, Germany (Feb. 18, 2013)
Collision Course: Arbitration and EU law (paper at Program in Law and Public Affairs, Princeton
University, March 11, 2013)
Moderator, panel on Exclusion of Judicial Recourse in Arbitration (Columbia Arbitration Day, Columbia
Law School, March 8, 2013)
The State of the Restatement (conference on corporations and arbitration at Yale Law School, March 1,
2013)
Forum Shopping at the Gateway to Arbitration (conference at New York University School of Law, Feb.
28, 2013)
Moderator, Arbitration Debates (event in memory of Hans Smit, Feb. 27, 2013)
Commentator, Tensions between Arbitral Tribunals and Sovereign Courts (conference at New York
University Law School, Jan. 28, 2013)
Commentator, Exceptionalism and Normalcy in Arbitration Law (talk by Prof. Rusty Park) (conference at
New York University Law School, Nov. 28, 2012)
The Interplay of Mandatory Provisions of Law: The Law of the Contract, the Law of the Seat or the Law of
the Place of Enforcement? (ICC Conference on International Arbitration in Latin America, Miami,
Nov. 12, 2012)
Moderator, The Clash between Constitutional and International Norms: The *Kadi* Case and its
Implications: a conference in honor of Louis Henkin (Nov. 9, 2012)
Injunctions and International Arbitration Proceedings: Academic Perspectives (conference at New York
City Bar Association (Oct. 18, 2012)
Moderator, Collective Action in International Arbitration: Problems and Prospects (conference of
Deutsche-Amerikanische Juristen-Vereinigung at Columbia Law School, Oct. 5, 2012)
Commenter, Transnational Law of Commercial Contracts (conferenmce on Stateless Law, McGill
University, Montreal, Sept. 28, 2012)
Arbitrability Trouble (presentation at New York City Bar Association, Sept. 12, 2012)
The Fundamental Differences between Treaty Rights and Contract Rights (conference of ICC on
Arbitration with States and State Entities, New York, N.Y., Sept. 10, 2012)
International Arbitration: How it Differs from Domestic Arbitration (presentation at New York State Bar

9

**APP 1248**

App. 1874

Professor G.A. Bermann

> Association, Dispute Resolution Section, and Benjamin N. Cardozo School of Law, New York. N.Y., July 17, 2012)

An Agenda for the US Supreme Court – European Court of Justice Dialogue, conference at the European Court of Justice (May 28, 2012)

Restating the Law of International Commercial Arbitration in the United States: Views from Within and Without (inaugural conference of Atlanta International Arbitration Authority (ATLAS) on "The United States and its Place in the InternationalArbitration System of the 21st Century: Trendsetter, Outlier or One in a Crowd? Atlanta, Ga., April 16, 2012)

Threshold Issues in International Arbitration (workshop paper at International Law Colloquium, University of Georgia School of Law, Athens, Georgia, Apr. 13, 2012)

Competence-Competence in Arbitration Law in Comparative Perspective (debate of the Paris – Place de l'Arbitrage on "La Compétence-Compétence à la française: Faut-il toujours donner la priorité à l'arbitre?, Hotel de Ville, Paris, France, Apr. 3, 2012)

Dealing with the Incomplete Award (presentation at Leading Arbitrators' Symposium on the Conduct of International Arbitration, Vienna, Austria, April 2, 2012)

Navigating EU Law and International Arbitration Law (workshop at Yale Law School, New Haven, Conn., Mar. 27, 2012)

The Gateway Problem in International Arbitration (workshop at Yale Law School, New Haven, Conn., Mar. 26, 2012)

Moderator, panel on Enforcement of Arbitral Awards against Foreign Sovereigns (Columbia Arbitration Day conference on Arbitrating with a Sovereign: Issues in Commercial and Investment Arbitration, Columbia Law School, March 23, 2012)

Codification of Administrative procedure: The American Experience (conference on "Towards an EU administrative procedure law?"at Office of European Ombudsman, European Parliament, Brussels, Belgium, March 15, 2012)

"Multi-party arbitration: from Paris to NY" (conference at NYU Law School, Feb. 27, 2012)

The Influence of the UNCITRAL Model Law in non-Model Law Countries (conference at McGill University, School of Law, Nov. 26, 2011)

Salient Issues in Contemporary International Arbitration (conference at Washington College of Law, American University, Center on International Commercial Arbitration, Washington DC, Nov. 16, 2011), published as "Arbitration in the Roberts' Supreme Court" in 27 American University Law Review (forthcoming 2013)

Comments on 20th Anniversary of Joseph Weiler's "the Transformation of Europe" (conference at Yale Law School , New Haven, Conn, Oct. 6, 2011)

Master Class on Gateway Issues in Arbitration, 3rd ICC YAF Global Conference (Paris, July 3, 2011)

Arbitration Academy course on "Gateway issues in international arbitration in the United States" (Arbitration Academy, Paris, France, July 2011)

Third Party Funding of International Arbitration Claims: The Newest "New New Thing" (conference at Fordham Law School, New York, June 15, 2011)

Cross-Examining the Expert Witness in Arbitration (conference at Harvard Club, New York, June 14, 2011)

The European Law Institute: Comments from a Transatlantic Perspective (inaugural congress of European Law Institute, Paris, France, June 1, 2011)

Autour de l'ordre juridique arbitral (conference at Ecole de Droit, Institut des Sciences Politiques, Paris, France, June 1, 2011)

The 'Gateway Problem' in International Commercial Arbitration (conference at Max Planck Institute (Hamburg, Germany) and University of Münster (Münster, Germany), May 24, 26, 2011)

Techniques of Parallel Litigation in International Litigation (conference at University of Tübingen, Germany, May 25, 2011)

Preliminary Jurisdictional Issues in International Arbitration, (conference of the Leading Arbitrators of the World, Vienna, Austria, April 18, 2011)

Launching the European Law Institute (European Public Law Organization, Cape Sounian, Athens, Greece,

10

APP 1249

Professor G.A. Bermann

April 15, 2011)
The Complexity of Annulment, Recognition and Enforcement of Arbitral Awards (Columbia Arbitration
Day, Columbia Law School, New York, March 25, 2011)
The Fragmentation of the International Legal Order (Annual meeting of American Society of International
Law, Washington DC, March 24, 2011)
The Role of Courts in Supervising Arbitration (conference at George Washington University School of
Law, March 18, 2011)
The Immunity of International Arbitrators (master class of International Chamber of Commerce, Paris,
France, March 2, 2011)
Comment, The Social Dimension of International Law (conference of the réseau juridique franco-
américain, Collège de France, March 8, 2011)
Paris in America: Edouard Laboulaye and Stephen Breyer (conference of the Collège de France, March 7,
2011)
The European Law Institute (Vienna, Austria, Nov. 23, 2010)
Privilege in International commercial Arbitration (27th AAA/ICC/ICSID Joint Colloquium on International
Arbitration, Paris, France, Nov. 17, 2010)
The UK Supreme Court in its First Year: An American Perspective, Queen Mary College, University of
London, Nov. 3, 2010)
Reviewing the Koç University School of Law (Istanbul, Turkey, Nov. 1, 2010)
Emerging Issues in International Civil Litigation (European University Institute, Florence, Italy, Oct. 15
2010)
Planning for a European Law Institute (European University Institute, Florence, Italy, Oct. 14, 2010)
The Federalism Dimension of International Commercial Arbitration (annual conference of the American
Trial Lawyers Association, Washington DC, Sept. 23, 2010)
Commentator, Emmanule Gaillard on The Representations of International SArbitration (conference at
New York University School of Law, Sept. 21, 2010)
Panel, Comparative Law: Problems and Prospects (closing plenary session of International Congress of
Comparative Law, Washington, D.C.. July 28, 2010)
Introduction to 19th World Congress of Comparative Law (Law schools of American University, George
Washington University and Georgetown University, Washington DC, July 25, 2010)
Enforceability of the Arbitration Agreement: Who Decides and under Whose Law? (annual Fordham
Conference on International Arbitration, June 14, 2010)
The Restatement of International Commercial Arbitration (conference of Conferencia Latinoamericana de
Arbitraje, Asuncion, Paraguay, June 10, 2010)
Domesticating the New York Convention: The Impact of the US Federal Arbitration Act (conference at
University of Oslo, Norway, May 6, 2010, published, in PERSPECTIVES ON
INTERNATIONAL ARBITRATION (Giuditta Cordero Moss, ed.) (Cambridge Univ. Press 2013)
The Role of the Judiciary in Class Arbitration (Columbia Arbitration Day, Columbia Law School, April 17,
2010)
Electronic Discovery in International Arbitration: Boon or Bane? (conference of the Leading Arbitrators of
the World, Vienna, Austria, March. 29, 2010)
International Arbitration in Iraq's New Oil Concession Agreements of Iraq (organizer of and speaker at
program for lawyers and engineers from the Iraqi Ministry of Oil, Columbia Law School, Feb. 17-
19, 2010)
Bankruptcy and Arbitration on a Collision Course (panelist at annual meeting of the Center for Conflict
Prevention and Resolution, New York, N.Y., Jan. 14, 2010)
Enforcement and Execution of Foreign Arbitral Awards: Two Different Things (conference of Bolivian-
American Chamber of Commerce on "Bolivia at the Crossroads of Arbitration, Dec. 10, 2009)
Introduction to Private International Law for U.S. District Court Judges (speaker at seminar of
International Judicial Academy, U.S. District Court for the eastern district of New York,
Brooklyn, N.Y., Nov. 20, 2009)

11

**APP 1250**

App. 1876

Professor G.A. Bermann

The Challenges of Parallel Litigation (conference of Asociacion Americana de Derecho Internacional
   Privado, Caracas, Venezuela, Nov. 13, 2009)
Table ronde sur l'université d'aujourd'hui (conference of Centre de Droit Comparé, Paris, France, Nov. 6,
   2009)
Moderator, International Arbitration in Periods of Economic Downturn (International Chamber of
   Conference (ICC) conference on Arbitration in Latin America, Nov. 2, 2009)
Transparency in International Commercial Arbitration: An Arbitrator's View (paper at International Law
   Weekend, New York, N.Y., Oct. 23, 2009)
Mediation and Arbitration panel, in Global Justice Forum: Global Litigation in a Post-Economic Crisis
   World (conference at Columbia Law School, Oct. 16, 2009)
Proportionality Principles in American Law (paper at conference on Proportionality, University of Aix-
   Marseilles, Aix-en-Provence, France, Sept. 14, 2009), published in Le Juge constitutionnel et la
   proportionnalité, 2009 Annuaire international de justice constitutionnelle 181 (Economica 2010)
Observations sur la primauté du droit communautaire sur les constitutions nationales, in Regards croisés sur
   l'internationalisation du droit: France – Etats-Unis (Mireille Delmas-Marty & Stephen Breyer,
   eds.) 94 (Société de Législation Comparée 2009)
Observations sur le changement climatique devant les jurisdictions européennes, in Regards croisés sur
   l'internationalisation du droit: France – Etats-Unis (MireilleDelmas-Marty & Stephen Breyer,
   eds.) 218 (Société de Législation Comparée 2009)
Moderator, Effective International Arbitration: A Transatlantic (ICC UK Annual Arbitration Practitioners
   Symposium, London, U.K., July 9, 2009)
Toward a Restatement of European Administrative Law (paper at conference on Renewing European
   Administrative Law, University of Osnabrück, Germany, June 17, 2009)
Moderator, International Networks and Administrative Law (Yale Law School symposium on Comparative
   Administrative Law, May 9, 2009)
U.S. Class Actions and the Global Class (presentation to Columbia Law faculty, Apr. 7, 2009)
Restatements and International Law (paper at Tribute to Prof. Andreas Lowenfeld, New York University
   Law School, April 16, 2009)
Rome I: A Comparative View (paper at conference on the Rome I Regulation, University of
   Verona, Verona, Italy, Mar. 20, 2009)
The Restatement of International Commercial Arbitration Meets the Federal Arbitration Act (paper at
   conference on 50th anniversary of the UN Convention on the Recognition and Enforcement of
   Foreign Arbitral Awards at University of Georgia, Athens, Georgia, Jan. 30, 2009)
Introduction to Conference on the Harmonization and Unification of Private Law (conference of
   International Academy of Comparative Law, Mexico City, Nov. 13, 2008)
Transatlantic Regulatory Networks (paper at conference at Southern Methodist University Law
   School, Dallas, Texas, Nov. 7, 2008)
The ALI and the Restatement of International Commercial Arbitration (paper at Columbia Law European
   Alumni Reunion, London, Oct. 18, 2008)
Discussant, The Kadi case: United Nations Law and European Union Law (New York University School of
   Law, Oct. 6, 2008)
Recognition and Enforcement of U.S. Class Action Judgments Abroad (presentation at
   International Bar Association annual meeting, Buenos Aires, Argentina, Oct. 15, 2008)
Transatlantic Regulation (paper at fall meeting, ABA International Law Section, Brussels, Sept. 24, 2008)
National Parliaments and Subsidiarity: An Outsider's View (paper at conference of European
   Constitutional Law Network on the Treaty of Lisbon, University of Sofia, Bulgaria, April 16-18,
   2008) (forthcoming publication by Nomos Pub.)
Restating International Arbitration (paper at American Society of International Law, Wash. DC, April 11,
   2008)
Moderator of Friedmann Conference on the European Human Rights Convention: Lessons for the
   Interamerican System (Columbia Law School, April 8, 2008)
Soft Law in International Commercial Law (paper at conference of Queen Mary College, University of

12

Professor G.A. Bermann

London, Feb. 8, 2008)

Supranational Administrative Law: The EU Experience (paper at conference on International Regulatory
Authority: A Look at the legal landscape, Georgetown Law Center, Institute of International
Economic Law, Nov. 16, 2007)

Americanization and Europeanization of Law: Are there Cultural Aspects? (paper at conference on Law
and Culture, Cornell Law School, Nov. 3, 2007)

Legal Aspects of Turkish Accession to the EU (moderator at conference on Turkish accession, New York
City Bar Association, Oct. 10, 2007)

Constitutional Adjudication in the EU and US (paper given at conference between justices of the Supreme
Court and judges of European courts, US Mission to the EU, Brussels, Belgium, July 12, 2007)

The Law of the European Union, lecture at 18th annual Harold R. Medina Seminar for State and Federal
Judges on the Humanities and Science (Princeton University, June 15, 2007)

Organizer and moderator of colloquium on Mandatory Rules of Law in International Arbitration (Columbia Law
School, June 8, 2007)

Ethical Considerations in International Arbitration (panel in conference on the Conduct of International Arbitration,
Juris Conferences, Harvard Club, New York, June 1, 2007)

Non-State Law-Making in International law (conference on A World of Legal Conflicts: Multiple Norms in the
International System, at Princeton University, May 31-June 1, 2007)

Commenter, on Olivier Dutheillet de Lamothe, Les cours constitutionnelles européenes et l'intégration des normes
communautaires (Cardozo School of Law, May 15, 2007)

Class Actions and Europe (conference on Class Actions at the Crossroads (ABA/IBA conference, Rome,
May 24-25, 2007)

Globalization through through Regulatory Dialogue (conference on Europe and the Management of Globalization
at Princeton University, Feb. 23, 2007)

Regulatory Dialogue, presented at conference on European Administrative Law – The Move Towards an Integrated
Administration (Univ. of Luxembourg, Luxembourg, Feb. 8, 2007)

Head of Roundtable on European Administrative Law (Commission of the European Communities, Brussels, Feb. 1-2,
2007) [part of ABA Project on EU Administrative Law]

Tocqueville-Fulbright address on La Concertation reglementaire transatlantique (Univ. of Paris I, Jan. 22, 2007)

Speaker at conference of Juris Pub. on "Take the Witness: The Art of Cross-Examination in Arbitration (Paris, France,
Jan. 20, 2007)

Comparative Administrative Law in the Context of EU/US Regulatory Dialoguepaper (paper presented at
the annual meeting of the Association of American Law Schools, Washington, D.C., Jan. 4, 2007)

`   Transatlantic Regulatory Dialogue, speech at the Center for European Legal Studies, University College
London (UCL), University of London (Nov. 15, 2006)

The New Hague Choice of Court Convention, International Law Weekend, New York City Bar Association (Oct. 27,
2006)

Bilingualism and Translation in the US Legal System: A Study of the Louisiana Experience, paper at 17th
International Congress of Comparative Law (Utrecht, the Netherlands, July 20, 2006)

Transatlantic Regulatory Dialogue, paper delivered at the annual Leiden/London Meeting on European Law (Europea
Institute, Leiden University, Netherlands, June 24, 2006)

European Union Law in Transatlantic Perspective, general course of the annual Academy of European Law (European
University Institute, Fiesole, Italy, June 10-13, 2006)

The Law of the European Union, lecture at 17th annual Harold R. Medina Seminar for State and Federal
Judges on the Humanities and Science (Princeton University, June 8, 2006)

Commentator, "Nested and Overlapping Institutions in International Law (Princeton University, Feb. 24,
2006)

Commentator, Implementation of WTO Rulings (at conference on the WTO at 10: Governance, Dispute
Settlement and Developing Countries, Columbia University, April 7, 2006)

Commentator, Promoting Transparency and Consistency in International Investment Arbitration
(at conference of the Center of Global Legal Problems on Law (at conference on Promoting
Transparency and Consistency in International Investment, Columbia University, April 4, 2006)

13

**APP 1252**

Professor G.A. Bermann

Americanization and the Law (paper presented at the annual meeting of the Association of American Law Schools, Washington, D.C., Jan. 5, 2006)

The Transnational Civil Procedure Rules and Parallel Litigation (paper presented at the University of Trieste, Italy, Institute of Comparative Private Law, Dec. 2, 2005)

The "Highest" Court in Federal Systems (paper presented on conference on the future of the European Judiciary, Humboldt University, Berlin, Germany, Nov. 3, 2005)

Constitutionalism in Federal Systems: The European Example (paper presented at 2005 annual meeting of American Society of Comparative Law, University of Hawaii, Honolulu, Hawaii, Oct. 28, 2005)

Americanization and Europeanization: Some Legal Perspectives (paper delivered at conference of Oxford University, St. Anthony's College, UK, Apr. 15-17, 2005)

Moderator, State and Public Official Immunities for International Law Violations (annual meeting American Society of International Law, Washington DC., Apr. 1, 2005)

International Commercial Arbitration in the Contemporary World (Young Arbitrators Forum of United States Council for International Business, New York, Feb. 28, 2005)

The Influence of European Union Law on French Administrative Law (paper delivered at conference at University of San Diego and University of California at San Diego, Jan. 21, 2005)

Transnational Law in the First-Year Curriculum (paper presented at annual meeting of the Association of American Law Schools, San Francisco, California, Jan. 8, 2005)

The European Constitution (paper delivered at International Conference on Comparative Constitutional Law, University of Nice, France, July 12, 2004)

Commentator on Professor Paul Craig's "Executive Power under the Draft European Constitution" (conference at NYU Law School, and Princeton University, Apr. 29-30, 2004)

Parallel Litigation in the United States (panel at ABA International Law Section Annual Meeting, New York, NY, Apr. 14, 2004)

Moderator, "The Big Bang: EU Competition Law on the Eve of Enlargement" (conference at Columbia Law School, Mar. 31, 2004)

Report to ABA, Administrative Law Section, on Project on European Union Administrative Law and Practice (report presented, San Antonio, Texas, Feb. 8, 2004)

The Application of Private International Law Instruments to Third Countries (papers delivered at workshops at University of Barcelona, Oct. 24, 2003, and Free University of Brussels, Jan. 23, 2004)

What's Constitutional about the New Constitution?" (comment on address by Giuliano Amato, vice-president of the Convention on the Future of Europe, Columbia University School of Law, Oct. 7, 2003)

The Institutions and the New Draft Constitution of Europe (paper delivered at conference at University of Lisbon, Portugal Sept. 26, 2003)

The European Union and its New Federalism (paper delivered at conference at Princeton University, Law and Public Affairs Program, Princeton, N.J., May 29, 2003)

The Treaty Basis for European Judicial Cooperation in Civil and Commercial Matters (paper delivered at workshop of Free University of Brussels, European Legal Studies Center of Columbia Law School and New York City Bar Association, at New York City Bar, New York, NY, May 19, 2003)

A US View of "The European Model" (paper delivered at 4th Vienna Globalization Symposium, Austrian Chamber of Commerce, Vienna, Austria, May 15, 2003)

The Competences of the EU under the New Draft Constitution (paper delivered at Hart Workshop, Institute for Advanced Legal Studies, University of London, June 24, 2003)

The New Europe (paper delivered at Columbia Law School Alumni Reunion, Paris, France, June 29, 2003)

Moderator, "The Accession of Cyprus to the EU: Challenges and Opportunities" (conference of the Columbia University Institute for the Study of Europe, New York May 4, 2003)

*Marbury v. Madison*: Implications for European Law (paper delivered at conference at George Washington University College of Law, Wash., D.C., Apr. 11, 2003)

Discussant (with G. deBurca), European Union Governance after Enlargement (conference at Columbia Law School, on Law and Governance in an Enlarged European Union, Apr. 4, 2003)

14

APP 1253

Professor G.A. Bermann

Discussant, Developments in Law and Federalism in the EU (paper delivered at 7th biennial conference of the European Union Studies Association, Nashville, Tenn., Mar. 29, 2003)

The Constitutional Convention and EU Institutional Reform (paper delivered at conference at University of Madrid, Spain, Jan. 30, 2003), published in THE GOVERNMENT OF EUROPE: INSTITUTIONAL DESIGN FOR THE EUROPEAN UNION (M. Oreja Aguirre & J-M Beyneto Perez, eds.) (2003), and republished in THE GOVERNMENT OF EUROPE: WHICH INSTITUTIONAL DESIGN FOR THE EUROPEAN UNION? (J.M.Beneyto Perez & I. Pernice, eds) 119 (Nomos Verlagsgesellschaft, Baden-Baden 2004)

The Precautionary Principle in WTO Case Law (paper delivered at conference at School of International and Public Affairs, Columbia University, NY, NY, Nov. 8, 2002)

Moderator, Comparative Law in Multi-State Practice (conference at Harvard Law School, Cambridge, Mass, Oct. 27, 2002)

Discussant, Trade Diplomats Meet Academics (conference at European University Institute, Florence, Italy, Sept. 13-14, 2002)

Contracts, International Law and Constitutions (general report to the XVIth Congress of the International Academy of Comparative Law, Brisbane, Australia, July 2002)

Policy Recommendations for Dispute Prevention and Dispute Settlement in Transatlantic Relations: Legal Perspectives (conference at European University Institute, Florence, Italy, May 10-11 2002)

Discussant, Non-Discriminatory Sanitary and Phytosanitary Standards: Lessons from the Disputes over Hormones and Genetically Modified Organisms (comment delivered at conference on Dispute Prevention and Dispute Settlement in Transatlantic Partnership, European University Institute, Florence, Italy, July 5, 2001)

The Common Core Project (paper delivered at the 2001 session of the Common Core Project, Trento, Italy, July 14, 2001)

International Tribunals and United States Courts: A New Relationship for the New Millennium (comment delivered at panel at Second Circuit Judicial Conference, Sagamore Resort, Bolton Landing, N.Y. June 16, 2001)

Developments in International Trade and Regulatory Law (Columbia Law School, European alumni reunion, European University Institute, Fiesole, Italy, June 11, 2001)

Transatlantic Regulatory Cooperation: Legal Problems and Political Prospects (paper delivered at 6th biennial conference of the European Community Studies Association, Madison, Wis., June 1, 2001)

Discussant, Making Member States Comply with Community Law (paper delivered at 6th biennial conference of the European Community Studies Association, Madison, Wis., June 1, 2001)

Comment on «Proceduralization of Law and the Transformation of Adjudicative Functions in the EC and the WTO" (Oliver Gerstenberg) and «Indeterminacy and the Establishment of a Working Law of Market Administration" (Michelle Everson) (comments delivered at workshop on Law and New Approaches to Governance in Europe, University of Wisconsin, Madison, Wis., May 29, 2001)

Proportionality and Subsidiarity (paper delivered at workshop on The Legal Foundations of the Single Market: Unpacking the Premises, Cambridge University, Cambridge UK (April 27, 2001)

Opinion on the Implications of Membership in the European Union for a Constitutional Settlement in Cyprus (co-authored opinion of March 29, 2001, to the Attorney-General of Cyprus, published in "Cyprus and European Membership: Important Legal Documents," Press and Information Office, Republic of Cyprus, Nicosia, Cyprus (2001)

The Future of Comparative Law (paper delivered at Centennial Congress of Comparative Law, Tulane University, New Orleans, La., Nov. 4, 2000)

Panelist, Free Movement of Services: European Union Lessons for NAFTA ( U.S-Mexico Law Institute, Santa Fe, N.M.., Oct. 28, 2000)

European Law: Yesterday, Today and Tomorrow (paper delivered at conference of Texas International Law Journal in honor of Prof. Hans Baade, University of Texas, Austin, Texas, Sept. 29, 2000)

Comment, The WTO and Human Health and Safety (paper delivered at World Trade Institute, University of Berne, Berne, Switzerland, August 21, 2000)

15

APP 1254

Professor G.A. Bermann

Panelist, The European Commission: The World's Most Powerful Administrative Agency? (annual meeting of Association of American Law Schools, Washington D.C., Jan. 8, 2000)

La Jurisprudence (paper delivered at colloquium on the Bicentennial of the Conseil d'Etat, Paris, Dec.13-15, 1999, published in 2000 La Revue Administrative 38, 2001 La Revue Administrative 175 (Presses Universitaires de France, 2001)

Regolazione e liberalizzazione dei mercati: un'analisi comparativa (Regulation and Market Liberalization: A Comparative Analysis), in REGOLAZIONE E CONCORRENZA (G. Tesauro & M. D'Alberti eds.) 27 (Soc. Il Mulino, Bologna, 2000)  (paper delivered at conference on Regulation and Competition, AutoritB garante della concorrenza e del mercato (Italian Competition Authority), Rome, Nov. 22-23, 1999)

The Transatlantic Dimension of U.S. and E.U. Federalism (paper delivered at Kennedy School of Government, Harvard University, conference on U.S. and E.U. Federalism, Apr. 19-20, 1999)

The Federalism Dimension of Transatlantic Regulatory Cooperation (paper delivered at conference on Transatlantic Regulatory Cooperation, Columbia University School of Law, Apr.  16-17, 1999)

Judicial Enforcement of Federalism Principles (paper delivered at inaugural conference of Walter Hallstein Institute of European Constitutional Law, Humboldt University, Berlin, Nov. 10-11, 1998)

The Supreme Court's Role in Policing U.S. Federalism (paper delivered at Joint U.S. Supreme Court-European Court Justice Symposium, European Court of Justice, Luxembourg, July 5, 1998)

Constitutional Implications of U.S. Participation in Regional Integration, in U.S. NATIONAL REPORTS TO THE XVth CONGRESS OF THE INTERNATIONAL ACADEMY OF COMPARATIVE LAW (Bristol, U.K., July 1998), 46 Am. J. Comp. L. (Supp.) 463 (1998)

The Treaty of Amsterdam: Institutional Reforms (paper delivered at 1997 International Law Weekend, New York City Bar Association, Nov. 8, 1997)

Comment, Legal Aspects of the New European Single Currency, 4 Colum. J. Eur. L. 353 (1998) (paper delivered at conference on The Euro: A New Single Currency for Europe?, Washington University School of Law, St. Louis, Missouri, Oct. 30, 1997)

La Codification aux Etats-Unis, in FAUT-IL CODIFIER LE DROIT? EXPÉRIENCES COMPARÉES, 82 Revue française d'administration publique 221 (1997) (paper delivered at colloquium of Institut International d'Administration Publique, Paris, France, June 16, 1997)

An American Perspective on the Intergovernment Conference (paper delivered at colloquium of the Free University of Brussels, Belgium, May 23, 1997)

Regulatory Federalism:  A Reprise and Introduction, 2 Colum. J. Eur. L. 395 (1997) (paper delivered at Columbia-Frankfurt symposium on comparative federalism at Columbia University School of Law, April 11, 1996)

Transnational Provisional Relief in the Courts, in INTERNATIONAL DISPUTE RESOLUTION: THE REGULATION OF FORUM SELECTION (J.L. Goldsmith, ed.) 99 (Transnational Publishers Inc., Irvington, N.Y., 1996)  (paper delivered at 14th Sokol Colloquium on Private International Law, University of Virginia School of Law, March 23, 1996)

Civil Procedure:  Trends and Recent Developments in Civil Procedure:  Towards a Modern *ius commune,* in International Association of Legal Science, 1995 Colloquium 253 (Universidad Argentina de la Empresa, Buenos Aires, Argentina, 1999) (paper delivered at colloquium of International Association of Legal Science (IALS), Buenos Aires, Argentina, Sept. 6, 1995)

The Constitutional Amendment Process, in THE EUROPEAN CONSTITUTIONAL AREA (R. Bieber & P. Widmer, eds.) 291 (Schulthess Polygraphischer Verlag, Zurich 1995) (paper delivered at colloquium on the European Constitutional Area, Swiss Institute of Comparative Law and University of Lausanne, Lausanne, Switzerland, April 11, 1995)

Harmonization of Law and Regulatory Federalism, in HARMONIZATION OF LEGISLATION IN FEDERAL SYSTEMS (I. Pernice, ed.) 37 (Nomos Verlagsgesellschaft, Baden-Baden 1996) (paper delivered at Columbia-Frankfurt symposium on comparative federalism at University of Frankfurt-am-Main, Frankfurt, Germany, Feb. 9, 1995)

Decisionmaking Aspects of the European Commission (paper delivered at annual meeting of the Association of American Law Schools, New Orleans, Jan. 6, 1995)

16

APP 1255

Professor G.A. Bermann

Regulatory Cooperation by the EC Commission with US Agencies (report to the Administrative Conference of the United States, Washington, D.C., December 1994)

Subsidiarity as a Principle of U.S. Constitutional Law, in U.S. NATIONAL REPORTS TO THE XIVth CONGRESS OF THE INTERNATIONAL ACADEMY OF COMPARATIVE LAW (Athens, Greece, August 1994) (G. Bermann, F. Juenger, P.J. Kozyris, eds.), 42 Am. J. Comp. L. (Supp.) 555 (1994)

Post-Maastricht Europe (paper delivered at 1993 International Law Weekend, New York City Bar Association, Oct. 29, 1993)

Managing International Regulatory Cooperation (paper delivered at conference of Organization for Economic Cooperation and Development [OECD], Paris, France, Oct. 4, 1993)

Subsidiarity and the European Community, in POST-MAASTRICHT EUROPE (P. Lützeler, ed.) 153 (Berghahn Books 1994) (paper delivered at conference on Post-Maastricht Europe at Washington University in St. Louis, Oct. 2, 1993)

Taking Subsidiarity Seriously (paper delivered at conference of Department of Justice of Canada on Federalism, Economic Union and Subsidiarity: Canadian and European Perspectives, Ottawa, Canada, April 30, 1993)

Subsidiarity and Federalism (paper delivered at symposium of Hastings International and Comparative Law Review on the European Community, San Francisco, California, March 27, 1993)

Moderator, Foreign Sources of Financing Privatization, at conference on Privatization in Eastern Europe (Parker School of Foreign and Comparative Law at Columbia University, New York, New York, Feb. 18, 1993)

The Contemporary Use of Comparative Law in Law Reform (paper presented at annual meeting of the Association of American Law Schools, San Francisco, California, Jan. 9, 1993)

Le Dialogue entre les Entreprises et le Gouvernement fédéral aux Etats-Unis (paper delivered at colloquium of la Commission pour l'Etude des Communautés Européennes [CEDECE] at Université de Paris II, Paris, France, Oct. 8-9, 1992)

Moderator, Communitarianism and the Law (annual meetings of American Society of Comparative Law and International Association of Legal Science, Provo, Utah, Sept. 1992)

Commentator, The Impact of European Integration on Private Law (comment on papers delivered at the Eason-Weinmann Colloquium of the Tulane Law School at University of Helsinki, Helsinki, Finland, June 4, 1992)

1992: The European Community at a New Crossroads (annual meeting of the American Society of International Law, Washington, D.C., April 18, 1991)

Le dualisme juridictionnel: le débat aux Etats-Unis, in LE DUALISME JURIDICTIONNEL (G. Timsit, ed.) 56 (Paris: Presses Universitaires de France 1992) (paper delivered at colloquium of Université de Paris I at the French Senate, Paris, France, May 11, 1990)

Anti-suit Injunctions in International Litigation, and moderator of panel on Provisional Relief from Foreign Courts in International Litigation (1989 International Law Weekend, New York City Bar Association, Nov. 4, 1989)

Le droit administratif américain et le droit administratif français, 42 Conseil d'Etat, Etudes et Documents 169 (1990) (paper for seminar of United States Supreme Court justices, federal circuit court judges and members of the French Conseil d'Etat, in the Franco-American Judicial Exchange, at the National Archives, Washington D.C., Sept. 5, 1989)

Moderator of panel on Equality, Minorities and Pluralism, at Conference of Columbia University Center for the Study of Human Rights on The Declaration of the Rights of Man: France and the United States (Columbia University, April 5-6, 1989)

The Autonomy of the International Arbitral Process (paper delivered at the Third Journées Juridiques Franco-Américaines, New Orleans, Louisiana, Nov. 11-12, 1988)

The Legal Uniqueness of the Italian Constitution, in 2 Italian Journal 5 (1988) (paper delivered at Columbia University colloquium on the Fortieth Anniversary of the Italian Constitution, New York, New York, Sept. 30, 1988)

17

App. 1882

**APP 1256**

Professor G.A. Bermann

Le régime juridique des fondations aux Etats-Unis, in LE DROIT DES FONDATIONS EN FRANCE ET A L'ETRANGER (La Documentation Française, Notes et Etudes Documentaires, no. 4879) 65 (Paris 1989) (paper delivered at colloquium organized by the CollΠge de France, Paris, France, Jan. 29-30, 1988)

Federalism: European and American, in TWO HUNDRED YEARS OF US CONSTITUTION AND THIRTY YEARS OF EEC TREATY (K. Lenaerts, ed.) 75 (Brussels: Story-Scientia, and Deventer: Kluwer 1988) (paper delivered at Leuven Day, Leuven University, Belgium, Mar. 27, 1987)

Les mesures de restriction aux exportations d'application extraterritoriale dans les relations entre l'Europe et les Etats-Unis, in LES RELATIONS COMMUNAUTE EUROPEENE ETATS-UNIS (J. Bourrinet, ed.) 169 (Paris: Economica 1987) (paper delivered at colloquium of la Commission pour l'Etude des Communautés Européennes [CEDECE] at Université d'Aix-Marseille, France, Oct. 9-10, 1986)

Public Law in the Conflict of Laws, in LAW IN THE USA FACES SOCIAL AND SCIENTIFIC CHANGE (Reports for the Twelfth World Congress of Comparative Law, Sydney-Canberra, Australia), published in 34 Am. J. Comp. L. (Supp.) 157 (1986)

The Premises of Government Liability (paper delivered at Administrative Conference of the United States, Washington, D.C., plenary session of June 14, 1985)

Comment, Government in the Sunshine: Lessons from the American Experience (paper delivered at the Second Journées Juridiques Franco-Américaines, Paris, France, Mar. 17-19, 1983)

Administrative Delay and its Control, in LAW IN THE USA FOR THE 1980s (Reports for the Eleventh World Congress of Comparative Law, Caracas, Venezuela) (J. Hazard & W. Wagner eds.), published in 26 Am. J. Comp. L. (Supp.) 473 (1982)

Proliferation of Legislation and Regulation: The United States (paper delivered at symposium of the Institut International des Sciences Administratives, Karlovy-Vary, Czechoslovakia, May 20-21, 1982)

Comment, Denis Tallon, The Constitution and the Courts in France, 27 Am. J. Comp. L. 583 (1979)

The Principle of Proportionality, in LAW IN THE USA IN THE BICENTENNIAL ERA (Reports for the Tenth World Congress of Comparative Law, Budapest, Hungary) (J. Hazard & W. Wagner, eds.), published in 26 Am. J. Comp. L. (Supp.) 415 (1978)

Report on United States law, in LES INSTRUMENTS JURIDIQUES DE LA POLITIQUE FONCIERE DES VILLES: ETUDES COMPARATIVES PORTANT SUR QUATORZE PAYS OCCIDENTAUX (M. Fromont ed.) 329 (Brussels: Bruylant 1978)

**OTHER PUBLICATIONS**:

Book Review, Thomas Carbonneau, Toward a New Federal Arbitration Act (Oxford), reviewed in Global Arbitration Review

Litigation in the Civil law and Common Law: The Basics, in Litigation Strategies and Practice (Barton Legum & Ethan A. Berghoff eds.) (2d edition forthcoming 2014)

A Reply to Chip Brower's "Hollow Spaces" (forthcoming Buffalo Law Review 2014)

Book Review, Peter Rutledge, Arbitration and the Constitution, American Review of International Arbitration (2013)

Preface, Legal Unification in Comparative Perspective (Proceedings of Intermediate Congress of International Academy of Comparative Law, Mexico City (2013)

Comparative Law and International Organizations, in The Cambridge Companion to Comparative Law (Mauro Bussani & Ugo Mattei, eds.) (Cambridge Univ. Press 2012)

Restating the U.S. Law of International Commercial Arbitration, ALI CLE video webcast (Philadelphia, Oct. 15, 2012)

Preface to "The Impact of Uniform law on National Law: Limits and Possibilities" (proceedings of International Academy of Comparative Law, First Intermediate Congress, Mexico City (Universidad nacional autónoma de México, 2010)

18

APP 1257

App. 1883

Professor G.A. Bermann

Introduction to Special Issue on "European Citizenship at Center-Stage," 15 Col. J. Eur. L. 165 (2008)

"Transparency," in 3 Encyclopedia of Law and Society: American and Global Perspectives 1503-05 (David S. Clark, ed.) (Sage Publications 2007)

Introduction, Justice Sandra Day O'Connor: Recipient of 2008 Wolfgang Friedmann Award, 47 Col. J. Transnat'l L. 1 (2008)

Jurisdictional and *Forum non Conveniens* Limitations on the Enforcement of Foreign Arbitral Awards (co-authored report for the NYC Bar Association, committee on international dispute resolution, forthcoming, 2006, in the American Review of International Arbitration)

General Editor, Columbia Law Series on WTO Law and Policy (Cambridge University Press)

General Editor, Columbia-London Law Series in Comparative Law (Hart Pub., Oxford, UK)

Editorial: "La Constitution interminable de l'Europe," Le Figaro (Oct. 27, 2004), La Libre Belgique (Oct. 29, 2004)

Editorial: "The European Union as a Constitutional Experiment," 10 Eur. L. J. 363 (2004)

The Arbitral Award: An Arbitrator's Perspective," in AN ARBITRATION CHECKLIST (L. Newman & R. Hill, eds.) 159 (Juris Pub. 2003)

Introduction to the Decennial Volume, 10 Colum. J. Eur. L. 1 (2003)

Book Review, Lisa Conant, Justice Contained: Law and Politics in the European Union (European Union Studies Assocation Review, April 2003)

Basic Principles for the Allocation of Competence in the United States and the European Union (with K. Nicolaidis), in THE FEDERAL VISION (K. Nicolaidis & R. Howse, eds.) 483 (Oxford Univ. Press 2001)

Book Review, Eric Stein, Thoughts from a Bridge, 94 Am. J. Int'l L. 826 (2000)

Introduction, Special Issue: European Identity and the Opposing Pulls of Globalization, Nationalism and Regionalism, 5 Colum. J. Eur. Law 365 (1999)

Book Review, Ami Barav & Christian Philip, Dictionnaire juridique des communautés européennes, 1995 Revue Internationale de Droit Comparé 260 (1995)

Réflexions sur le droit administratif aux Etats-Unis, 1993-1994 (with P. Lindseth), 46 Conseil d'Etat Etudes et Documents 515 (1994)

Evolution du droit administratif américain 1992-1993 (with P. Lindseth), 45 Conseil d'Etat Etudes et Documents 483 (1993)

Introduction, Symposium on Harmonization in the European Community, 29 Colum. J. Transnat'l L. 7 (1991)

Book Review, Integration through Law: Europe and the American Federal Experience (vol. 1, books 1-3) (M. Cappelletti, M. Seccombe, & J. Weiler), 11 Fordham Int'l L.J. 232 (1987)

In Memoriam: Charles Szladits (1911-1986), 34 Am. J. Comp. L. 822 (1986)

French Public Law, in THE WORLD'S LEGAL SYSTEMS: PAST AND PRESENT (G. Bermann & J. Hazard, eds.) (Condyne Audio Tape Series 1985)

The Law of the European Economic Community, in THE WORLD'S LEGAL SYSTEMS: PAST AND PRESENT (G. Bermann & J. Hazard, eds.) (Condyne Audio Tape Series 1985)

Book Review, P. Schuck, Suing Government: Citizen Remedies for Official Wrongs, 99 Pol. Sci. Q. 120 (1984)

Book Review, Z. Nedjati and J. Trice, English and Continental Systems of Administrative Law, 28 Am. J. Comp. L. 105 (1980)

**GUEST LECTURES AND KEYNOTE ADDRESSES**:

Cravath, Swain & Moore LLP (2014)
&laquo; International commercial Arbitration : Past, Present and Future &raquo;
McGill University, Montreal (2012)
&laquo; The Arbitrability Trap &raquo; (John E. C. Brierley Memorial Lecture)
Washington & Lee University School of Law, Lexington, Va. (2012)
&laquo;Exceptionalism in the U.S. Law of international Arbitration &raquo;

19

**APP 1258**

App. 1884

Professor G.A. Bermann

    Institute for Transnational Arbitration, Annual Meeting of Academic Counci,l San Francisco, CA (2012)
        « A Conversation with George Bermann » (« fireside chat » luncheon conversation with David Caron)
    Loyola University School of Law, Chicagi, Ill,  Wing-Tat Lee Distinguished Lectureship in International and Comparative Law (2011)
        « American Exceptionalism in International Arbitration »
    Fordham Law School (keynote address for 6th Annual Arbitration & Mediation Conference) (2011)
        « American Exceptionalism in International Arbitration »
    Gateway Issues in International Commercial Arbitration (luncheon keynote address to
        International Chamber of Commerce, Young Arbitrators Forum, Global Conference, Paris, France (2011)
    University of Freiburg, Germany (keynote address for opening of Institute on Media and
        Information Law) (2011)
        « Data Privacy Protection :  Cooperation and Conflict between the EU and US »
    Max-Planck Institut für Privatrecht und Internationales Privatrecht, Hamburg, Germany (2011)
        "The Gateway Problem in International Commercial Arbitration "
    Les Questions Liminaires en Arbitrage International Commercial (Cour de Cassation, Paris, France, March 11, 2011)
    International Chamber of Commerce, Court of Arbitration (2011)
        "The Gateway Problem in International Commercial Arbitration "
    University of Stockholm, Sweden (2011)
        "Domesticating the New York Convention in American Law"
    Deutsche-Amerikanische Juristen-Vereinigung, Stuttgart, Germany (2011)
        « Adapting the Federal Arbitration Act to the New York Convention  in American Law »
    University of Vienna (2011)
        « A Status Report on the American Law Institute Restatement of International Commercial Arbitration »
    University of Geneva, Institut des Hautes Etudes (2010)
        « Domesticating the New York Convention in American Law »
    City University of Hong Kong, graduation speaker for Program in legal education for mainland
        Chinese judges (City University of Hong Kong, 2010)
        "Solving the Puzzles of Parallel Litigation"
    Practicing Law Institute, New York (2010)
        "The Restatement of International Commercial Arbitration: An Update"
    International judicial Academy (2009)
        Seminar on International Arbitration Issues for U.S. Judges, held at U.S. district court for the eastern district of New York
    Bar Association of Washington, D.C. (2009)
        "The Restatement of the US Law of International Commercial Arbitration: A Progress Report"
    International Law Weekend West (Willamette Law School, Salem, Oregon, 2009)
        "The American Law Institute Goes Global"
    American Society of International Law (ASIL), 2009 annual meeting, Washington DC, 2009)
        "Restating the U.S. Law of International Commercial Arbitration"
    George Washington University Law School Global Law Workshop, Washington DC, 2009)
        "Restating the U.S. Law of International Commercial Arbitration"
    New York Law School, C.V. Starr Lecture (2009)
        "The Restatement of International Commercial Arbitration"
    American Foreign Law Association, New York, N.Y. (2009)
        "The 'International' American Law Institute" (2009)
    University of Kansas (Lawrence, Kansas), Inaugural Lecture of the endowed Robert Casad Lecture Series (2008)
        "U.S. Class Actions and the 'Global Class'"

20

APP 1259

App. 1885

Professor G.A. Bermann

University of Paris I (2007)
    « La Concertation Reglementaire entre l'Union Europeen et les Etats-Unis »
Columbia Law School Association, at Allen & Overy LLP, London, U.K. (2006)
    "A Transatlantic Perspective on EU Law"
Columbia Law School Lecture Series on Challenges of International Governance Regimes (2004)
    "The European Union as a Constitutional Experiment"
Cour de Cassation (Supreme Court) of France (2003)
    "Le droit comparé et le droit international: alliés or ennemis?"
American Foreign Law Association (New York) (2003)
    "The Expatriation of US Statutory Claims"
Cambridge University (UK), Center for European Law, Cambridge, UK (2002)
    "The Judicial Role in Policing Federalism: The US and the EU"
Institut des Science Politiques, Paris, France, (2002)
    "The Judicial Role in Policing Federalism: The US and the EU"
European Community Studies Association, 6th biennial conference, Madison, Wis (2001)
    «Law in an Enlarged European Union», published in 4 European Union Studies Association
    (EUSA) Review, no. 3 (summer 2001)
British Institute of International and Comparative Law, London, UK (2001)
    «European Law and European Enlargement»
Institut de Droit Comparé, University of Paris II, Paris, France (2001)
    «Proportionality and Federalism in Recent Supreme Court Case Law»
Federal Judicial Center and Princeton University, Princeton, NJ (2001)
    "European Union: Between Law and Politics"
European University Institute, Florence, Italy (2001)
    «Litigating in the Other's Court: A New Forum for Fashioning EU/US Relations»
Columbia University, School of International and Public Affairs (1999-2001)
    "Law in an Enlarged European Union"
Princeton University, Center of International Studies, Princeton, New Jersey (2000)
    «The States and Foreign Affairs»
Tulane University, School of Law, New Orleans, Louisiana (2000) «Introduction to the Centennial World
    Congress of Comparative Law»
University of Wisconsin, Madison, Wisconsin (2000) «Genetically-Modified Organisms and Food Safety
    in US/ EU Relations»
European University Institute, Florence, Italy (2000)
    «Federalism and the Treaty Power»
School of International and Public Affairs, Columbia University (2000)
    «Flexibility in the EU: A Critique of the Amsterdam Treaty's Provisions on 'Closer
    Cooperation'»University of Paris I, France (1998)
University of Paris I, France (1998)
    «Constitutional Jurisdiction of U.S. Courts over Non-Nationals
Legal Service of the Commission of the European Communities, Brussels, Belgium (1998)
    «Federalism Obstacles to Effective US Participation in International Legal Regimes»
Princeton University, Woodrow Wilson School of Internationl Affairs, New Jersey (1998)
    «Subsidiarity: An Update»
Princeton University, Alumni College, New Jersey (1997)
    «The Idea of Europe: A Legal Dimension»
Universities of Berlin (Humboldt University), Bonn, Erlangen-Nüremberg and Munich, Germany (1997)
    «An American Perspective on the 1996 European Intergovernmental Conference»
Universities of Rome (La Sapienza), Italy, and Lausanne, Switzerland (1997)
    Subsidiarity: Does it Have a Future?» (published in Centro di studi e ricerche di diritto comparato
    e straniero, «Saggi, Conferenze e Seminari» (No. 26) (Rome, 1997))

21

Professor G.A. Bermann

American Bar Association, Section of Administrative Law and Regulatory Practice 1996 Mid-year
Meeting, Baltimore, Maryland (1996)
"Regulatory Practice in the European Commission"
University of Barcelona, Spain (1995)
"U.S. Administrative Law in Comparative Perspective"
Tulane Law School, Eason-Weinmann Distinguished Lecture, New Orleans, Louisiana (1994)
"European Community Law from a US Perspective"
Legal Service of the Commission of the European Communities, Brussels, Belgium (1994)
"The Interstate Commerce Clause: Lessons for the European Community"
Association of the Bar of the City of New York, Comparative and Foreign Law Committee (1992)
"Europe after the French Referendum on Maastricht"
Association of the Bar of the City of New York, International Law Weekend (1992)
"The Maastricht Treaty"
National People's Congress of the People's Republic of China (Legislative Affairs Commission,
Administrative Litigation Research Group), Beijing, China (1991)
"Administrative Procedure in the United States and in Western Europe"
National People's Congress of the People's Republic of China (Legislative Affairs Commission,
Administrative Litigation Research Group) Beijing, China (1989)
"Government Liability in the United States, France, West Germany and the European Economic
Community"
New York State Bar Association annual meeting, New York, New York (1989)
"1992: Its Constitutional Significance"
Carnegie Council on Ethics and International Affairs, New York, New York (1987)
"The Single European Act: A New Constitution for the Community?"
Crossroads Africa, African Leaders Program, Southampton, New York, New York, (1983-87)
"Introduction to the American Legal System" (orientation seminar for African jurists)
University of Clermont-Ferrand, Clermont-Ferrand, France (1982)
"*Vermont Yankee* and Judicial Review of Agency Rulemaking" and
"Trends in Governmental and Officer Liability in the United States"
Centre d'Etudes du "Common Law," University of Paris I, Paris, France (1982)
"Trends in Governmental and Officer Liability in the United States"
University of Lausanne, Lausanne, Switzerland (1982)
"Legislative Control of Administrative Action in the United States,"
"Executive Control of Administrative Action in the United States," and
"Judicial Control of Administrative Action in the United States"
University of Paris I, Paris, France (1981)
"Freedom of Information in the United States" and "Proceduralism in American Administrative
Law"
Max-Planck-Institut, Hamburg, Germany (1980)
"Governmental Liability Reform in Germany and the United States"
University of Bonn, Bonn, Germany (1980)
"Governmental Liability Reform in Germany and the United States"

**HONORARY DEGREES AND AWARDS:**

Université de Versailles-St. Quentin (France), doctorate *honoris causa* (conferred Oct. 2011)
Honorary Member, Group of the 100 of the Center of Legal Innovation, Development and Research for
Latin America (Feb. 2011)
Honorary Member, American Association of Private International Law (ASEDIP) (Nov. 2009)
C.V. Starr Award, New York Law School (Apr. 2009)
Honorary Member, American Bar Association, Section of Administrative Law and Regulatory Practice
(Aug. 2008)

22

**APP 1261**

Professor G.A. Bermann

     Director, American Arbitration Association
     Tocqueville-Fulbright Distinguished Professorship (University of Paris) (June-Dec. 2006)
     Arbitration recognition
          Chambers USA  (2006 to date)
          Who's Who Legal (2005 to date)
          Juris Guide to International Arbitrators (2001 to date)
     Distinguished Service Award, American Foreign Law Association (conferred June 2005)
     Honorary President, American Society of Comparative Law (conferred Oct. 2004)
     Jean Monnet Chair of European Law (conferred July 2001)

**BAR ADMISSIONS**:

     Supreme Court of the United States (1992)
     Southern District of New York (Federal) (1980)
     Eastern District of New York (Federal) (1980)
     New York State (1972)

**LEGISLATIVE TESTIMONY:**

     UK Select Committee of House of Lords: UK Ratification of the Draft European Constitution (2005)
     Senate Judiciary Committee: The OPEC countries, sovereign immunity and act of state (2004)
     House Committee on Foreign Affairs: Colombian practice in international arbitration and Andean
          legislation benefits (2002)
     House Committee on Government Operations: Tort liability of Federal public officials (1983)

**FOREIGN LANGUAGES**:

     French, German
     Spanish (reading)

                        date:     April 2015

23

**APP 1262**

App. 1888

# APPENDIX B

APP 1263

# APPENDIX B

**EXPERT DECLARATIONS OF PROF. GEORGE A. BERMANN IN COURTS BETWEEN 2011 AND 2014**

S.A.R.L. GALERIE ENRICO NAVARRA and ENRTCO v. MARLBOROUGH GALLERY INC.

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (May 2015)

ALBANIABEG AMBIENT SH.p.k. v. ENEL S.p.A

NEW YORK SUPREME COURT (Jan. 2015)

TELESOCIAL INC. v. ORANGE S.A.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA (Dec. 2014)

BEACH v. CITIGROUP ALTERNATIVE INVESTMENTS LLC and CITIGROUP INC.

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (Dec. 2014)

IN RE LYONDELL CHEMICAL COMPANY

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (Nov. 2014)

WEISFELNER v. HOFFMAN

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (Nov. 2014)

SCIENCE APPLICATIONS INTERNATIONAL CORPORATION v. THE HELLENIC REPUBLIC

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA (Aug. 2014)

**APP 1264**

App. 1890

HARRIS  v. ORANGE BUSINESS SERVICES

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA (May 2014)


SEALINK FUNDING LIMITED v. DEUTSCHE BANK AG

NEW YORK SUPREME COURT (July 2013)


LANDESBANK BADEN-WÜRTTEMBERG v. DEUTSCHE BANK AG

NEW YORK SUPREME COURT (July 2013)


THAI-LAO LIGNITE (THAILAND) v. GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (June 2013)


BAYERISCHE LANDESBANK, NEW YORK BRANCH v. MORGAN STANLEY

NEW YORK SUPREME COURT (Apr. 2013)


BAYERISCHE LANDESBANK v. THE GOLDMAN SACHS GROUP, INC.

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (April 2013)


IN RE A2P SMS  ANTITRUST LITIGATION

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (Feb. 2013)


WONG  v. GRAND VIEW PRIVATE TRUST COMPANY LTD.

SUPREME COURT OF BERMUDA (Jan. 2013)

**APP 1265**

App. 1891

GLIKLAD v. CHERNEY

NEW YORK SUPREME COURT (Sept. 2012)


MGA ENTERTAINMENT, INC. v. DEUTSCHE BANK AG

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA (Feb. 2012)


MGA ENTERTAINMENT, INC. v. DEUTSCHE BANK AG

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA (Dec. 2011)


SPDT HOLDINGS LTD. V, S.A.R.L. MAREVA NUI IMMO

TRIBUNAL DE COMMERCE DE PARIS (Dec. 2011)


ANWAR v.  FAIRFIELD GREENWICH LTD.

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (Nov. 2013)


FRANCOUNSEL GROUP, LLC v. DESSANGE INTERNATIONAL SA

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS (Sept. 2013)

**APP 1266**

# EXHIBIT 78

TM
EXHIBIT 78

APP 1267

App. 1893

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated<br><br>v.<br><br><br>TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No 3:09-CV-02384-N-BG<br><br>Judge: Hon. David C. Godbey<br><br>Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF PROFESSOR ADRIAN BRIGGS

**I      Introduction**

1.     I have been asked to prepare a Report dealing with the recognition and enforceability, or otherwise, in England of a hypothetical judgment of the United States District Court for the Northern District of Texas, Dallas Division, in *Rotstain and others v Trustmark National Bank and others*, Action No. 3:09-CV-02384-N-BG, in which the plaintiffs have issued a motion for certification of a class action. For convenience of reference, I have referred to this action as 'the US class action', even though the motion for certification has not been determined, and the order by which the US court disposes of the action as 'the US judgment'.

2.     I have made the following assumptions. The US class action involves five separate causes of action (common law aiding, abetting or participation in a fraudulent scheme; aiding, abetting or participation in violations of the Texas Securities Act; aiding, abetting or participation in a breach of fiduciary duty; aiding, abetting or participation in conversion; and civil conspiracy) asserted against several defendants ('the banks') under US law, for which a remedy of damages would be available. The class which is proposed to be approved would include UK nationals who invested in Stanford International Bank Ltd during a particular period and whose claims for losses in relation to that investment are recognised, authorised and calculated by the US receiver for the Stanford entities (page 17 of the Motion for Class Certification). The persons who are proposed to be included within the class will be notified of the existence of the US class action, and will be informed that they have a right to opt out of the US class action on completion and return of a form. I refer to those investors, proposed to be included within the class but who are outside the United States (and are in the United Kingdom), as 'UK absent class members'.

**APP 1268**

App. 1894

3.  In preparing this Report I have considered the following documents: Plaintiffs' Second Amended Class Action Complaint dated 1 May 2015; the Memorandum Supporting Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel dated 30 April 2015; and the Declaration of Receiver Ralph S. Janvey dated 30 October 2014 and the exhibits thereto (A–C). I have also read the Declaration of Professor Jonathan Harris filed in the case of *Anwar v Fairfield Greenwich Ltd* dated 26 February 2011.

**II      My qualifications**

4.  I graduated in law from the University of Oxford in 1978 (degree of Bachelor of Arts with first class honours) and 1979 (degree of Bachelor of Civil Law with first class honours), and taught for a year as a Lecturer in the Faculty of Law at the University of Leeds. Since then my career has been, and continues to be, in the University of Oxford and at the Bar of England and Wales. My *curriculum vitae* is appended to this Report as Annex 1.

5.  I have been a member of the academic staff of the Faculty of Law of the University of Oxford since 1980, as CUF Lecturer in Law and, since October 2004, with the title of Professor of Private International Law. I have lectured, conducted seminars, and carried out research in private international law for these 35 years, and still do. For the same period I have been Fellow and Tutor in Law at St Edmund Hall, Oxford, one of the constituent colleges of the University of Oxford, where I tutor undergraduate and graduate students in several subjects of the legal curriculum, including the conflict of laws. I have supervised several graduate students who have completed and published doctoral theses in the area of private international law.

6.  My principal publications are all in the field of private international law. So far as my principal books are concerned, I am author of Briggs, Civil Jurisdiction and Judgments (London, 6th edition, 2015), of Briggs, Private International Law in English Courts (Oxford, 1st edn, 2014), and of Briggs, Agreements on Jurisdiction and Choice of Law (Oxford, 1st edn 2008). For 15 years I was one of a number of editors assisting Lord Collins of Mapesbury as General Editor of Dicey, Morris & Collins, The Conflict of Laws (London; 15th edition, 2012). Among the nine chapters for which I had primary responsibility were chapters 12 (Forum Non Conveniens, Lis Alibi Pendens, Anti-suit Injunctions and Jurisdiction Agreements), and 14 (Foreign Judgments). I have various other chapters in books and surveys in Year Books; and numerous articles and notes in scholarly journals.

7.  I was called to the Bar of England and Wales by the Middle Temple in 1989. Since 1990 I have practised from chambers in the Middle Temple. My principal area of practice is in the field of commercial conflict of laws. Some cases in which I have appeared are listed in the *curriculum vitae*. I have also given evidence on the English rules of private international law to foreign courts, in particular to courts in the United States, Canada, and Australia; and have given advice to agencies involved in law reform in the United Kingdom.

**APP 1269**

App. 1895

**III     The request for my opinion on a matter of English law**

8.   The issue on which my opinion has been requested is whether an English court would recognise the *res judicata* effect of a judgment in the US class action as precluding UK absent class members who did not 'opt out' of the class from litigating claims brought by them in respect of these losses in an English court.

**IV     My answer: summary**

9.   The answer is the defendants to the US class action could not use the US judgment to preclude the UK absent class members from litigating individual claims in the English courts. Notwithstanding certain observations made in US judicial proceedings, to which I shall refer below, this answer is a practical certainty, as the principles of English law are completely clear and settled, and the result of their application is clear.

10.  My particular conclusions as to English law may be stated in three points, as follows:

11.  First, the banks could not use the US judgment to preclude UK absent class members from litigating their individual claims in the English courts, unless the US court was considered, as a matter of English private international law, to have international jurisdiction over the UK absent class members.

12.  Second, the US court would not be considered under English private international law to have international jurisdiction over the UK absent class members unless *either* they were present within the jurisdiction of the US court when the US class action was commenced, *or* they submitted to the jurisdiction of the US court in relation to the US class action. It is a grave error to contend that a foreign judgment will be regarded as binding a party who is *not* the defendant on the ground that the defendant was considered to be subject to the international jurisdiction of the foreign court.

13.  Third, on the facts as I understand them, it is to be supposed that the UK absent class members were not present in the United States when the US class action was commenced, and that they did not submit to the US court in relation to that action by responding to the Notice, or taking any other step in response to the invitation to become involved in or bound by the US class action. On that basis the UK absent class members would not be seen to have submitted to the jurisdiction of the US court in the class action, and they would not, therefore, be bound by any order made in it.

14.  Two possible counter arguments might be raised, but they would be misconceived, and have no effect on my conclusion as stated above or its degree of certainty. I deal with them towards the end of this Opinion for the sake of completeness, but for no other or positive reason. Specifically: (i) the fact that English domestic law has its own provisions for representative actions and group litigation is wholly irrelevant because the recognition of foreign judgments is, as a matter of English common law, based on 'the doctrine of obligation', not on the concept of reciprocity with domestic jurisdictional rules (and in any case, existing English procedures for group litigation are not equivalent to US class actions); and (ii) the existence of other class members with similar claims to those of the UK absent class members has no impact on the right of the UK absent class members to bring an action before an English court because the UK absent class members will not be considered to be privy to any of

3

them, and will not, therefore, be 'indirectly' subject to the jurisdiction of the US courts as far as English private international law is concerned.

15.   At the end of this Report I make particular reference to the work of Professor Rachel Mulheron, of Queen Mary University of London. I deal with it in this way in order to make two particular points. These are, first, that Professor Mulheron is in substantial agreement with the analysis of English law as I set it out in this Report; and second, that Professor Mulheron shows that in certain recent judgments dealing with the issue considered in this Report, other District Courts have been led into error by expert evidence of English law which, as Professor Mulheron says, would have no chance of judicial endorsement in England.

## V   Explanation of my particular conclusions

16.   I now set out the legal justification for the three conclusions which I have summarised in Part IV of this Opinion.

**The banks could not use the US judgment to preclude UK absent class members from litigating their individual claims in the English courts, unless the US court was considered, as a matter of English private international law, to have international jurisdiction over the UK absent class members.**

17.   The UK absent class members would not be precluded from bringing a claim in the English courts unless, as a matter of English private international law, they were personally subject to the international jurisdiction of the US court and as a result liable to be bound by the orders made by the court in the US class action proceedings. On the facts which I have assumed, an English court would not consider the UK absent class members to be bound by the US court's jurisdiction because they were not present in the United States when the proceedings were begun, and did not otherwise submit to the jurisdiction of the US court in the class action proceedings. The principles involved on this point are so clear that my answer to the question is certain.

18.   The recognition of a foreign judgment in England depends on whether, as a matter of English law, the foreign court has international jurisdiction over a UK absent class member as the person who is to be bound by the judgment in the sense that his hands are to be tied and his litigation freedom is to be restricted by the US judgment. Where one is dealing with a judgment from the United States, its effect in England will be determined by the common law rules of English private international law. This is because there is no treaty or other legislation which applies to the recognition and enforcement of judgments from the United States, in civil claims at least.

19.   For a judgment from the courts of the United States to preclude a UK absent class member from bringing proceedings in England, it will be necessary to show that the judgment is entitled to be recognised, according to the rules of English private international law, *as against that would-be claimant*, as *res judicata*, so that there is nothing left for the English court to adjudicate for itself.

20.   For this condition to be satisfied, it must be shown that the US court had 'international jurisdiction', as a matter of English private international law, or, in other words, that the US court was 'internationally competent', as a matter of English private

4

**APP 1271**

international law, to impose on a UK absent class member an obligation to abide by its order and to be bound by the legal consequences which flow from it as a matter of US law. As the law is stated by the editors of Dicey, Morris & Collins, The Conflict of Laws ('Dicey') at paragraph 14-055 of the 15th edition:

'[a] fundamental requirement for the recognition or enforcement of a foreign judgment in England at common law is that the foreign court shall have had jurisdiction according to the English rules of the conflict of laws.'

21. Thus, in dealing with this condition, one is addressing a question of English private international law, not a question of US law. Or, to put it another way, the fact that US law may provide that the US court had jurisdiction and that UK absent class members are bound by the judgment is not decisive in proceedings before an English court, and may be wholly irrelevant.

**The US court would not be considered to have international jurisdiction over the UK absent class members unless *either* they were present within the jurisdiction of the US court when the US class action was commenced, *or* they submitted to the jurisdiction of the US court in relation to the US class action. It is a grave error to contend that a foreign judgment will be regarded as binding a party who is *not* the defendant on the ground that the defendant was considered to be subject to the international jurisdiction of the foreign court.**

22. English private international law on this issue is summarised in Dicey, in Rule 43, and it is not controversial. In terms of judicial authority, this Rule is confirmed by the judgment of the Court of Appeal in *Adams v Cape Industries plc* [1990] Ch 433. The recognition of a foreign judgment against a person as *res judicata* is only possible if either that person was present within the territorial jurisdiction of the foreign court when the proceedings were commenced, or that person submitted, by prior agreement or by actual appearance, to the jurisdiction of the foreign court. Nothing less will do.

23. This test applies to all judgments. It applies to claimants and defendants alike, that is, according to who is said to be bound by the judgment. It applies to a claimant when *res judicata* is said to follow from a judgment materially adverse to a claimant just as much as it applies to a defendant when it is said to follow from a judgment materially adverse to a defendant. The person who elects to defend a claim raised before a foreign court submits, by appearance, to the jurisdiction of the foreign court and is in principle bound to abide by it. As Dicey puts it at paragraph 14-069, English law rests:

'on the simple and universally admitted principle that a litigant who has voluntarily submitted himself to the jurisdiction of a court by appearing before it cannot afterwards dispute its jurisdiction. Where such a litigant, though a defendant rather than a claimant, appears and pleads to the merits without contesting the jurisdiction, there is clearly a voluntary submission.'

24. Equally, the person who chooses to raise a claim before a foreign court obviously submits by appearance to the jurisdiction of the foreign court and is in principle bound to abide by it: see Dicey at 14-068.

25. In practice, of course, the issue of whether there was a submission almost always arises in relation to defendants: claimants who institute claims are taken to have

5

submitted to the jurisdiction of the court by filing the claim. However, where certain 'claimants' neither file the claim nor actively join the proceedings brought – in some sense – in their interest, they have not submitted themselves to the jurisdiction of the foreign court; accordingly, they will not be bound by its judgment, for precisely the same reason as a defendant who did not submit to the jurisdiction of that court would not be bound.

26.    To an English lawyer applying English rules of private international law, the novelty in US class action proceedings lies in the proposition that one may be regarded as a plaintiff without making a claim. But the question is still the same: did the 'claimant', in the sense in which English private international law uses the term, submit to the foreign court ? If the answer is no, a judgment adverse to the 'claimant' cannot, as a matter of English private international law, be binding on that 'claimant'.

27.    *The Sennar (No 2)* [1985] 1 WLR 490 illustrates the principle that English courts assess a foreign court's jurisdiction by reference to the plaintiff (if the plaintiff is to be bound) as well as by reference to the defendant (if the defendant is to be bound). In *The Sennar (No 2)*, a claimant brought proceedings against a defendant before a Dutch court. The defendant entered an appearance to object to the jurisdiction of the Dutch court on the ground that the claim was covered by an exclusive jurisdiction agreement in favour of the courts of Sudan. The argument was accepted and the Dutch court dismissed the proceedings. The claimant then brought proceedings, which were substantially identical, in England. The defendant again appeared to object to the jurisdiction, this time of the English courts, on the ground that the parties had agreed to the jurisdiction of the courts of Sudan. But on this occasion the defendant relied in support of its submission on the principle of *res judicata*, contending that the decision of the Dutch court, adverse to the claimant, was decisive of the issue before the English court. The House of Lords agreed and dismissed the claimant's claim.

28.    At page 499, Lord Brandon set out the basic principle that:

'[t]he first requirement is that the judgment in the earlier action relied on as creating an estoppel must be by (a) a court of competent jurisdiction ....'

29.    It was not disputed, and therefore was common ground, that the Dutch court was one of competent jurisdiction. This is crucial to an understanding of the decision. This conclusion *must* have been reached by applying the rules which define jurisdictional competence to the claimant, against whom the estoppel was asserted, *not* by reference to the defendant. This must be so, because the requirements of jurisdictional competence *were not, and could not have been, met* in relation to the defendant. This is because the defendant had appeared before the Dutch court only to protest the jurisdiction of that court and seek dismissal on jurisdictional grounds: if the point that this is not submission to the court's jurisdiction by the defendant is not already obvious, there is statutory support for it in Civil Jurisdiction and Judgments Act 1982, section 33(1). Had the rules of jurisdictional competence been applied by reference to the position of the *defendant*, as they manifestly were not, there would have been no basis for finding an estoppel. This is because the defendant was not present within the jurisdiction of the Dutch court, did not submit to the jurisdiction of the Dutch court by appearance, and participated only for the purpose of contesting the jurisdiction of the Dutch court. *The Sennar (No 2)* therefore demonstrates how the rules on jurisdictional

6

APP 1273

competence, which underpin the doctrine of estoppel by *res judicata*, are to be applied by reference to the person said to be bound by the foreign decision (whether plaintiff or defendant).

30.     The point may be demonstrated by a further illustration. Suppose the defendants in the US class action were to bring original proceedings before the US District Court for a declaration that they owed no liability to X, and were to serve process on X in England. If X were to ignore the service of process, and suffer judgment in default, that judgment against X could not possibly be recognised as binding X as a matter of English private international law. For the reasons set out above, the US court would not be jurisdictionally competent in the eyes of English law to give a judgment binding upon X, and its order would have no effect upon X as a matter of English law. X will not have done anything which could, as a matter of English law, be regarded as X's submission to the adjudicatory jurisdiction of the American court.

31.     It appears from material cited on pages 51-52 of the Motion for certification that other US District Courts, on at least two occasions, have accepted on the evidence put before it that, in circumstances similar to those considered here, an English court would consider a US judgment as binding on an absent class member in the position of a UK absent class member because the *defendant* to the US class action had submitted to the jurisdiction of the US court. Although I make this point with the very greatest deference, I am bound to say, candidly, that the courts which accepted this evidence were led into error. This incorrect view of English law first found its way into a judgment of the District Court in *Re Vivendi Universal SA* 242 FRD 76 (2007). It appears in substance to have been followed on this point in *Anwar v Fairfield Greenwich Ltd* 289 FRD 105 (2013).

32.     *The Sennar (No 2)*, which I referred to above, serves for all practical purposes as the disproof of the theory that as long as a defendant submits to the jurisdiction of a court, all parties (or maybe deemed parties) to the proceedings become bound by the decision of the court. It goes without saying – though it needs to be said – that no English scholar has written and published anything at all which could be seen as support for such an interpretation of the principles of *res judicata* in English private international law. The proposition that a person may be estopped as a result of actions taken, exclusively, by his opponent in litigation is manifestly untenable. Whether a person who is said to be party to foreign proceedings is or is not estopped from contradicting the judgment given in those proceedings is determined by his own acts in relation to the court and the summons to appear or to be represented before it. Not otherwise.

33.     Moreover, this theory is further contradicted by the Court of Appeal in *A/S D/S Svendborg v Wansa* [1997] 2 Lloyd's Rep 183. In that case, proceedings had been brought before the courts of Sierra Leone by W against various shipping lines, alleging, probably fraudulently, short delivery of cargo. As well as bringing proceedings against W in London, the shipping lines challenged the jurisdiction of the Sierra Leone courts. In one of them, the Sierra Leone court ruled in favour of W and against the shipping line; and it was then argued that the ruling of the Sierra Leone court was entitled to be recognised as *res judicata*. The opinion of Staughton LJ, with whom the other members of the court agreed, was that the ruling was not binding on

7

the shipping lines, but was binding on W. This was because the shipping lines had not submitted to the jurisdiction, but W had. At p 188, Staughton LJ said:

'First, it was said that the question whether the jurisdiction clauses in the bills of lading should be enforced was submitted to the Sierra Leone Court, and the shipowners were bound by the decision. It is true that [the judge in Sierra Leone] was asked to decide that question, and did decide it on April 25 in the Melbourne case. There was no appeal from his decision. But that episode was part of the Maersk Line's protest to the jurisdiction. I do not see that such a protest can be treated as a submission to the jurisdiction of the foreign court to decide the issue of jurisdiction … The decision may well have been binding on Mr Wansa, but not on Maersk Line.'

34.     In other words, whether a decision is binding on a party is determined by asking whether *that party*, rather than his opponent, submitted to the jurisdiction of the foreign court, exactly as one would suppose. Staughton LJ makes the entirely orthodox point that whether a judgment is binding on an individual is assessed solely in terms of that individual's participation in the foreign proceedings. The contrary view is one which I consider to be heretical.

35.     The point may be tested by another hypothesis. Suppose proceedings were to be brought before a Russian court, organised to be brought on behalf of all those claiming to be owed money by a Russian company, for judgment as to the legal enforceability of those claims. Suppose the company submits to the jurisdiction of the Russian court; and the Russian court makes an order, ostensibly in accordance with Russian law, which dismisses the claims of a number of the foreign creditors. No English lawyer would say that an English creditor was at risk – in principle at least – of having the judgment recognised as binding upon him just because the *defendant* company submitted to the jurisdiction of the Russian court. The law could not possibly, and does not, say that.

36.     I return to what Dicey says, at paragraph 14-068:

'It is obvious that a person who applies to a tribunal himself is bound to submit to its judgment, should that judgment go against him, if for no other reason than that fairness to the defendant demands this. It is no less obvious that a claimant exposes himself to acceptance of jurisdiction of a foreign court as regards any setoff, counterclaim or cross-action which may be brought against him by the defendant.   By the same token, a defendant who resorts to a counterclaim or like cross-proceeding in a foreign court clearly submits to the jurisdiction thereof.'

37.     Service is, of course, necessary, but is certainly not sufficient, to make the foreign judgment one which may be recognised under the rules of English private international law. This can be seen from *Turnbull v Walker* (1892) 67 LT 767, a critically-important case, which I also discuss below in relation to a supposed principle of reciprocity. In that case, legal proceedings had been served out of the jurisdiction of the New Zealand court (with leave of the court) on the defendants in England. The defendants were not present in New Zealand when the action was commenced or at any time thereafter. The English court rejected out of hand any suggestion that the New Zealand court's judgment could be recognised and given effect in England against the defendants – who had not been present in New Zealand at any time and had not appeared before or submitted to the jurisdiction of the New

8

APP 1275

App. 1901

Zealand court – just because the defendants had been served with process and been given notice of the suit. It is abundantly clear from *Turnbull v Walker* and the other sources cited above that, under English law, an English court will not recognise a foreign court as having competent jurisdiction unless the party said to be bound in the subsequent English proceeding (i) was physically present in the foreign jurisdiction or voluntarily submitted to the foreign court's jurisdiction and (ii) had due notice of the proceedings.  If either of these ingredients is missing, recognition fails.

38.    Also on this point, Barnett, in Res Judicata, Estoppel, and Foreign Judgments (Oxford University Press (2001)) does consider the possibility that English law might be altered in the direction of recognising judgments given in US class action proceedings. But Dr Barnett makes it clear that for effect to be given to a US class action judgment in England, the law will focus on the position of the claimant, and will apply the usual *res judicata* principles to the claimant, not the defendant. On page 73, in footnote 81, he says:

> 'jurisdiction in the international sense emphasizes jurisdiction over the defendant and does not refer to the situation where the foreign claimant may deny submission to the jurisdiction, indeed in ordinary litigation it is assumed that the claimant has voluntarily submitted to the court's jurisdiction. But if a claimant in subsequent proceedings in England disavows membership of a class action to which the defendant alleges him to have been a member, the English court – in order to follow its own *res judicata* criteria in these cases – will need to establish some basis for holding that the claimant is or is not bound.'

39.    This also contradicts the theory which appears to have been put to the US District Court in *Re Vivendi*. Dr Barnett makes it plain that where absent class members deny that they are precluded by judgment in the class action, the English court will have to apply 'its own *res judicata* criteria' to them. As these are the rules which determine international jurisdiction, Dr Barnett is saying, as one would expect, that the rules on submission or presence must be applied to the claimant if it is alleged that the claimant is to be estopped.

40.    Finally, suppose a claimant brings a claim against a defendant before a foreign court. Suppose that the defendant does not appear but the foreign court, in accordance with its own procedures, conducts a review of the claim advanced by the plaintiff, and dismisses it on substantive grounds. It is obvious that, as far as English private international law is concerned, the matter will be recognised as *res judicata* against the claimant. Any contention that the losing claimant would not be estopped because the *defendant* had not been subject to the jurisdiction of the foreign court would be plainly wrong.

(i)    **The UK absent class members were not present within the territorial jurisdiction of the US court**

41.    I have proceeded on the basis that the UK absent class members were not personally present within the jurisdiction of the US court when the US class action was commenced. It is therefore not necessary to elaborate on the limb of the rule that, if a person is within the jurisdiction of the court when summoned, the court is jurisdictionally competent as against him or her.

9

**APP 1276**

App. 1902

(ii)     **The UK absent class members did not, as a matter of English law, submit to the jurisdiction of the US court in relation to the US class action**

42.     The question of whether a UK absent class member submitted to the jurisdiction of a foreign court is answered by the application of English rules on what constitutes submission. Though an English court will be highly unlikely to conclude that UK absent class members submitted to the jurisdiction if the foreign court would not have reached that conclusion under its own law, the reverse is not true. An English court may still find that, for the purposes of English law on the recognition of foreign judgments, a person did not submit to the jurisdiction of a foreign court even though the foreign court, applying its own law, might have come the conclusion that that person had submitted. In *Akai Pty Ltd v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90, Thomas J said, at page 97:

'An English court is not bound by the characterisation of a step as a submission merely because the law of the foreign court would regard it as a submission.'

43.     If a UK absent class member, present in England, is sent notification, and makes no response to the notice, the material question for the English court will be whether he or she will be taken thereby to have submitted to the jurisdiction of the US court. The clear answer is that there will be no basis for a finding that they submitted to the jurisdiction of the US court. An order then made by the US court against him, or otherwise affecting him materially, will not be recognised, on the basis of submission, as binding upon him as a matter of private international law so as to preclude the bringing of an action arising from the same facts and matters, whatever the effect it may have in and under the law of the United States.

44.     On the footing that the UK absent class members will not have submitted to the jurisdiction of the US court by actually instructing counsel to appear on their behalves in the US class action, a US judgment against them cannot be regarded as *res judicata* as against them. It would be different, of course, if someone did an act which would allow an English court to conclude that he or she had elected to join the class, for this act would be for him or her to invoke, and thereby submit to, the jurisdiction of the US court.

45.     As a matter of English law, a person who makes no response to a legal notice does not accept it and is not bound by it, whatever he or she may have inwardly intended, and regardless of what any other law may say. This analysis is not affected by whether the legal notice stipulates that failure to respond will still constitute the recipient's consent. It cannot be argued that, when a UK absent class member receives notification that he or she will be represented by US lawyers unless he or she gives notice that he or she does not wish to be represented by them, he or she is bound even though he or she makes no response.

46.     The general common law principle, established in *Felthouse v Bindley* (1862) 11 CBNS 869, is fundamental to the common law as understood in England. In that case, the owner of a horse received a letter telling him that unless the sender heard to the contrary he, the sender of the letter, would consider the horse sold to him. The court ruled that silence in the face of an offer was not a basis for finding the presence of consent, or that a person could not be required to take a particular step to prevent an

10

offer becoming binding on him. It was even irrelevant that the owner may have intended to accept the offer, for he will be judged on the basis of what an objective bystander would suppose his intention to be.

47.     For over 150 years, *Felthouse v Bindley* has been recognised as authority for the common law principle that silence in the face of an offer does not amount to agreement or consent. It is cited as the main authority for this principle in all of the leading commentaries and has been reaffirmed in countless cases. For example, in more recent times, in *Allied Marine Transport Ltd v Vale do Rio Doce S.A. (The Leonidas D)* [1985] 1 WLR 925, a case concerning whether a long delay in pursuing arbitration proceedings could amount to an offer and acceptance by the parties to abandon the action, Goff LJ stated:

> 'We have here to consider an appeal from a decision that a binding agreement should be inferred from silence and inaction. Silence and inaction by both parties are apparently considered to be capable of giving rise to an offer by one, and to an acceptance by the other communicated in response to that offer. This is most surprising. We have all been brought up to believe it to be axiomatic that acceptance of an offer cannot be inferred from silence, save in the most exceptional circumstances.'

48.     Whether applied to contractual offers, unsolicited offers of goods and services, agreements to submit or waive a claim, or whatever else, this is the fundamental rule of the English common law. No doubt a statute could displace it, but in the absence of such intervention, the proposition that silence or its equivalent is not consent is a principle far too deeply embedded in the English common law for it to be challenged. It plainly applies to the circumstances of a person to whom is sent a notice informing them that unless they respond in a particular way, they will be legally bound to the terms set out in the notice. No material exception to its application could apply in the circumstances of the present case. For UK absent class members to be bound by a US judgment in the US class action, it would have to be accepted that, as a matter of the English common law, they had been under an obligation to take positive steps to avoid being included within the class. As a matter of English law, such an argument lacks credibility.

49.     If it were to be argued that the appointment by the US court of lawyers to represent the class (with UK absent class members included within it), with the obligation to look after the interests of all members of the class, meant that the UK absent class members had submitted by appearance in the US proceedings and that submission by appearance was sufficient to establish the 'international jurisdiction' of the US court, such an argument would be wrong.

50.     I repeat: whether a person named as party to proceedings has submitted to the jurisdiction of a foreign court, so as to satisfy a requirement of submission by voluntary appearance, is a matter for the application of English law, not of foreign law. UK absent class members will not have appointed the lawyers who purport to represent them in the US class action. They will not have dealt with them, written to them, retained them, granted them power of attorney, paid them, or in any other way given authority to represent them in the proceedings before the US court. They will not have appointed the lawyers to be their agents and, as a matter of English law, the lawyers are not their agents.

APP 1278

51. Nor can it be argued that when a UK absent class member receives notification that he is about to be represented by lawyers unless he or she gives notice that he or she does not wish to be represented by them, that investor is bound even though no response is made. In the absence of a previous course of dealings creating ostensible authority, or subsequent conduct evidencing ratification, silence cannot create an agency relationship. The leading English textbook on the subject, Bowstead & Reynolds, Agency (20th edn, 2014), states at page 62 that:

'where one person purports to act on behalf of another, the assent of that other will not be presumed merely from his silence, unless there is further indication that he acquiesces in the agency.'

52. This is in line with the axiomatic common law principle, laid down in *Felthouse v Bindley*, that, in the absence of exceptional circumstances, silence will not be construed against a party. No such exceptional circumstances, or further indications of acquiescence, exist here.

53. UK absent class members will not be taken to have ratified the conduct of the lawyers through their silence. Although ratification may be implied, Bowstead & Reynolds notes at page 79 that:

'[s]uch words or conduct must be unequivocal: they must not be such that they could be accounted for by other interpretations …. Such reasoning is necessary to protect the principal against too easily being held as having ratified.'

54. In the case under consideration, the silence is not clear and unequivocal. For example, an investor may never have received the notification, or may have received the notification but not understood it, or may have received and understood the notification but chosen to ignore it. The UK absent class member cannot be taken to have impliedly consented to the agency relationship or ratified the actions of the lawyers appointed in the United States.

55. It follows that so far as English law is concerned, UK absent class members who do not respond to the Notice do not appoint or authorise lawyers to appear on their individual behalves in the US class action, and do not submit by appearance in those proceedings. For UK absent class members who did not submit to the jurisdiction of the US courts, and who were not present when the proceedings were instituted, there is no basis in English private international law on which the US judgment could be recognised against them as *res judicata*. As far as they are concerned, the US class action proceedings are nothing to do with them. They will not be estopped or otherwise affected by them.

**On the facts as I understand them, it is to be supposed that the UK absent class members were not present in the United States when the US class action was commenced, and that they did not submit to the US court in relation to that action by responding to the Notice, or taking any other step in response to the invitation to become involved in or bound by the US class action. On that basis the UK absent class members would not be seen to have submitted to the jurisdiction of the US court in the class action, and they would not, therefore, be bound by any order made in it.**

12

APP 1279

56. The legal analysis on which the answer to the question depends is absolutely clear and certain. The US judgment will not have the effect of *res judicata* so as to bind the UK absent class members or to preclude them from bringing proceedings in the English courts, because they were not present within, and did not otherwise submit to, the jurisdiction of the US court. This is the approach to be applied to every case in which it is contended that any person – claimant or defendant – is bound by the decision of the foreign court.

57. My view that the ordinary principles of English *res judicata* apply in the context of decisions in foreign class actions, was published many years ago in my book titled <u>Civil Jurisdiction and Judgments</u>. The current (sixth) edition states what I understand to be the law at paragraph 7.81 (omitting the footnotes which appear in the text), as follows:

'In an appropriate case, a combination of these principles will produce the answer to the question whether a participant or a non-participant in (say) American class action litigation should be bound by the outcome or the decision of a class action and precluded from bringing an independent claim. According to Rule 23 of the Federal Rules of Civil Procedure, an American court, for example, may designate an action as a class action, which has the approximate effect of allowing all those persons who may have an interest in the claim to be notified, and to opt out or else be bound by the result. Local law will determine the extent of the obligation or preclusion established by the judgment, which will determine its effect in the country of origin.

No real difficulty arises if an attempt is made to assert the preclusive effect of the overseas judgment as against an absentee 'claimant' who was notified of, but who played no part in, the proceedings. If such a person positively opted out of, the jurisdiction of the American court, it is impossible to see that the American court was jurisdictionally competent to bind him by its judgment or order as a matter of English private international law; indeed. American law may agree that, in such a case, the 'opting out claimant' is not bound.Where the would-be claimant is notified that he or she is deemed to have opted in unless he or she opts out, but who does nothing, the ordinary common sense of the common law, that one cannot impose an obligation or deem acceptance to have taken place by virtue of silence or lack of response, will provide the right answer: unless the individual has, as a matter of English law, submitted to the foreign jurisdiction, say by instructing or accepting the offer of attorneys to act on his behalf, he is not bound or obliged by the foreign judgment or settlement. It may just be different if the person had such a connection to the adjudicating court as would allow an English court to conclude that he or she had otherwise subscribed to, or placed himself at risk of non-compliance with, the foreign procedure. But otherwise it is hard to see why the common law common sense expressed in*Felthouse v Bindley* will not settle the argument. A claimant who is not present, and who does not submit to the jurisdiction of a court, cannot be bound by a foreign judgment any more than can a defendant in the same position: the judgment cannot, therefore, be seen as *res judicata*so far as such a claimant is concerned. It does not seem possible to say that such a person should have participated in the class action, except perhaps in the most unusual of circumstances. The result is that, whatever the effect of the judgment may be under the law of the court in which it was given, it is most improbable that it has any impact on a claimant who did not opt in.

That is the answer given by the common law. As against it, it may be said that the class action has been developed in response to a social problem faced by multiple small claimants confronting a powerful single defendant (and, perhaps, to allow a tortfeasor to draw a line under the litigation to which its business may be exposed, to prevent it dragging on for years), and that the common law rules on the recognition and enforcement of judgments should evolve to accommodate and support, and not to frustrate, such litigation. An argument along these general lines was deployed in a related context, to notably beneficial effect, in

13

APP 1280

*Robb Evans* v. *European Bank Ltd.* But the common law cannot do it. Consider it this way. If the natural defendant were to bring proceedings for a declaration of non-liability and serve a natural claimant out of the jurisdiction, a judgment in favour of the natural defendant would not be recognised in England if the natural claimant did not submit by appearance. The legal position cannot rationally be different when a natural claimant is made a party to the foreign proceedings by other claimants, or by the court: the foreign court is still not one of competent jurisdiction in relation to him: what, one may ask rhetorically, has the person in question done to assume the obligation to abide by the judgment? The answer is: nothing. It follows that a court should be extremely cautious before proposing to alter the rules on the recognition of foreign judgments in this area. A person outside the territorial jurisdiction of a foreign court, who does not submit to the jurisdiction of that foreign court, is not bound or obliged by its judgment, even if this judgment purports to affect him. And that is that.'

58.     The issue is dealt with by Dicey at paragraph 14-034 as follows:

'Likewise the question whether a person was a party and is liable on that account to be estopped may require careful examination. For example, persons may be 'represented' in proceedings before a foreign court in which the foreign court has ordered them to be joined or deems them to be bound according to local procedure (for example, in class action proceedings), even though they have not made or given any expression of assent. Even if it is correct to regard a person in such a case as party to the proceedings on the footing that whether a person is party to proceedings is principally a matter for the procedural law of the foreign court to determine, estoppel will only arise against them if the foreign court is regarded as one of competent jurisdiction so far as the individual person is concerned. In the absence of what English law will accept as having been a submission to the adjudicatory jurisdiction of the foreign court, a person who is involuntarily made a party to foreign proceedings, or who is placed by a foreign court in an analogous position, will not be estopped by the decision of the foreign court.'

59.     I was responsible for that passage in Dicey; it is reasonable to suppose that the General Editor, Lord Collins, agreed with it.

60.     I have not been able to discover any reported English case that has had to rule directly on the question of recognition of a judgment in the precise context of a US class action. But the governing principle is completely clear, and the result of its application is likewise; and it is always possible that this clarity and obviousness is a reason for the absence of reported case-law.

61.     Having said that, the issue was considered in *Campos v Kentucky & Indiana Terminal Railroad Co* [1962] 2 Lloyd's Rep 459. McNair J, in *obiter dicta* at page 471, dealt with a submission that *res judicata* should be derived from a judgment in US class action proceedings. At pages 473-474 he said:

'I think there is great force in Mr Foster's contention that in accordance with English private international law a foreign judgment could not give rise to a plea of *res judicata* in the English courts unless the party alleged to be bound [i.e., the absent class member] had been served with the process which led to the foreign judgment .... Finally, though the point was not fully argued before me, as at present advised it seems to me to be contrary to the whole conception of negotiability that the holder of a negotiable bond should be prejudicially affected by a judgment on a similar bond in an action in which he was neither plaintiff nor a party who had been duly served.'

14

**APP 1281**

App. 1907

62. That was more than sufficient for McNair J to reject the plea of *res judicata* on the facts of the case before him. These comments, although not binding, are indicative of the way in which English courts are likely to treat the question of whether judgment in a US class action could be relied upon to support a plea of *res judicata* against a UK absent class member. English courts will not look to see whether the foreign class action is equivalent to English procedural rules: that is legally irrelevant. Rather, they will consider whether the foreign court had jurisdiction over the UK absent class member through that person's presence in, or submission to, the jurisdiction. Service of process is necessary but not sufficient to establish jurisdiction. Where a UK absent class member was not, according to English law, subject to the jurisdiction of the foreign court, the foreign judgment cannot be relied upon as *res judicata* against him or her.

63. Indeed, in its amicus brief to the US Supreme Court in *Morrison v National Australia Bank Ltd*, the United Kingdom government observed that

'Serious doubt exists as to whether a judgment court-approved settlement in a US securities class action would bind a non-US plaintiff who did not opt out of the class. This issue has been addressed directly in only one English case, where the judge, obiter, expressed doubt as to whether a foreign "opt-out" class action could give rise to res judicata'. (citing *Campos v. Kentucky and Indiana Terminal Railroad*, [1962] 2 Lloyd's Rep. 459 (discussed above)).

64. Any suggestion that an English court might 'develop' the common law of foreign judgments, by altering it in such a way that a foreign judgment purporting to bind absent class members would be recognised in England would be impossible. The English Court of Appeal is bound by its previous decisions as a matter of law, and *Adams v Cape* sets out the law on foreign judgments by which it is bound: see above, paragraph 23. Though it is theoretically possible that the Supreme Court of the United Kingdom (which has superseded the House of Lords as the final court of appeal) could alter the common law, it is plain that it will not alter the settled common law in this area. There would be immense difficulty in a court seeking to frame clear and reliable rules to secure the recognition of judgments in class action proceedings.

65. Moreover, in both *Owens Bank Ltd v Bracco* [1992] 2 AC 443, and *Rubin v Eurofinance SA* [2013] 1 AC 236, the House of Lords and Supreme Court of the United Kingdom respectively expressly refused to alter the established common law rules on foreign judgments, on the ground that such a step required legislative, not judicial, initiative. It is sufficient to refer to the judgment of Lord Collins in *Rubin v Eurofinance SA*, at paragraph 129:

'A change in the settled law of the recognition and enforcement of judgments, and in particular the formulation of a rule for the identification of those courts which are to be regarded as courts of competent jurisdiction (such as the country where the insolvent entity has its centre of interests and the country with which the judgment debtor has a sufficient or substantial connection), has all the hallmarks of legislation, and is a matter for the legislature, not for judicial innovation. The law relating to the enforcement of foreign judgments and the law relating to international insolvency are not areas of law which have in recent times been left to be developed by judge-made law. As Lord Bridge of Harwich put it in relation to a proposed change in the common law rule relating to fraud as a defence to the enforcement of a foreign judgment, 'if the law is now in need of reform, it is for the legislature, not the judiciary, to effect it'. *Owens Bank Ltd v Bracco* [1992] 2 AC 443, 489.

APP 1282

App. 1908

66.     One may therefore dismiss the possibility that the Supreme Court may yet re-write the common law of England. I need say nothing about the possibility that legislation may override the common law, the merits of which are certainly not for me, save to say that I am unaware of any debate about, let alone proposal for, the making of such new law.

67.     For the sake of good order, I should finally deal with a possible suggestion that because the UK absent class members have notified claims against Stanford International Bank Ltd in the US receivership, which is being conducted under the jurisdiction of the US District Court, they would be taken as a matter of English law to have submitted much more generally to the jurisdiction of the US District Court, and in particular to its jurisdiction to determine the US class action which is brought against other banks and not against SIBL, and to bind them in relation to it.

68.     It is certainly correct as a matter of English law that, if a creditor makes a claim in an insolvent liquidation and at some later point in the insolvency proceedings an order is made against him, an English court will consider that he has submitted to the jurisdiction of the foreign court in relation to the insolvency proceedings, and is therefore bound by the particular order. This was held to be the law in *ex parte Robertson, in re Morton* (1875) LR 20 Eq 733. It was approved in *Rubin v Eurofinance SA*, and was applied in *Erste Bank Group AG v JSC 'VMZ Red October'* [2015] EWCA Civ 379. The logic of the matter is clear. Where a creditor lodges a claim against an entity which is in insolvent administration, he submits to orders being made in the course of those insolvency proceedings, including orders which may be made for the benefit of the insolvent entity. To put it in simpler language, a creditor cannot claim the benefit, but avoid the burdens, of insolvency proceedings; he cannot blow hot and cold, but must take the bitter with the sweet.

69.     But this could not possibly support the contention that a person who takes part in a receivership procedure, but who then finds that he is deemed to be included in proceedings which are substantively and procedurally separate, outside the framework of the receivership and against defendants other than the entity in receivership, is taken to have submitted to those separate proceedings as well; and it would be *a fortiori* if the contention were to be that the participant was deemed to have brought proceedings which he did not institute, and which could not have been brought within the receivership proceeding in any event. After all, the 'Consent to Jurisdiction' which appears to govern the submission of a Proof of Claim Form in the US Receivership in relation to SIBL is clearly confined to 'all purposes related to this claim', that is to say, the claims made against SIBL, the entity in receivership. It is obvious from its face that it has no relevance or application to claims which may be made against other entities. There is no need to say any more about it.

70.     For all the foregoing reasons I repeat and reaffirm the conclusions which I set out in summary form at paragraphs 9-13 hereof. I consider these conclusions to be as close to certain as makes no practical difference.

16

**APP 1283**

## VI    Two counter-arguments

71.    Two possible counter arguments might be raised, but each is misconceived and neither affects the conclusion stated above or its degree of certainty. They are mentioned here only for the sake of completeness.

72.    First, the fact that English domestic law has its own provisions for representative actions and group litigation is irrelevant because the recognition of foreign judgments is based on the private international law doctrine of obligation, not on the concept of reciprocity with domestic jurisdictional rules.  In any case, these English procedures cannot be considered to be equivalent to US class actions.

73.    The existence and nature of English law procedures for representative actions and group litigation are irrelevant to whether or not an English court would recognize a judgment from a US class action.  Even if English law provided for actions identical to US class actions, which, as I explain below, it does not, that would not and could not lead to an English court recognizing a judgment arising from a US class action.  This is because the test for recognition depends on English private international law principles for determining international jurisdiction, not on whether England has reciprocal laws and procedures that would permit an analogous claim to be heard before English courts.

74.    It has been clear law for at least 140 years that similarities between foreign and English rules on the taking of jurisdiction provide no justification for the recognition of judgments from a foreign court. Such a 'reciprocity' argument was advanced, and was forcefully rejected, in *Schibsby v Westenholz* (1870) LR 6 QB 155. A French court had given judgment which was sought to be recognised in England. It was admitted that, if the facts had been reversed, an English court would have been entitled to take jurisdiction under the Rules of Court permitting service to be made on a defendant out of the jurisdiction. It was argued that reciprocity with domestic English jurisdictional law permitted or required an English court to acknowledge the jurisdictional competence of the French court. The court rejected the argument. The 'similarity' of the French jurisdictional rules was irrelevant.

75.    *Schibsby* was followed and applied in *Turnbull v Walker* in relation to a judgment from New Zealand, where the domestic jurisdiction of the New Zealand court was based on a rule identical with the English provisions for service out of the jurisdiction contained in the predecessor of today's Civil Procedure Rules. The identity of jurisdictional rules was irrelevant to the recognition of the New Zealand judgment, which was refused recognition.

76.    These decisions have stood, unquestioned, for over a century. *Schibsby* and *Turnbull* are, on the recognition of foreign judgments, clear and conclusive.

77.    In any event, English representative actions and group litigation procedures are not equivalent to US class actions, as I understand such US actions. Notwithstanding what I have said above, which provides the full answer to the potential objection raised, it may be helpful to say something about the nature of these English multi-party procedures for the sake of completeness.

17

**APP 1284**

App. 1910

78. Representative actions are permitted under Part 19 of the Civil Procedure Rules 1998, which are made under the authority of the Civil Procedure Act 1997. Rule 19.6 provides:

> '(1) Where more than one person has the same interest in a claim-
>    the claim may be begun; or
>    the court may order that the claim be continued,
> by or against one or more of the persons who have the same interest as representative of any other persons who have that interest.
> (2) The court may direct that a person may not act as a representative.
> (3) Any party may apply to the court for an order under paragraph (2).
> (4) Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule-
>    is binding on all persons represented in the claim; but
>    may only be enforced by or against a person who is not a party to the claim with the permission of the court.'

79. Representative actions are permitted in very limited circumstances only and differ from US class actions in three main ways. To begin with, representative actions are permitted only for claims seeking declaratory relief or where the defendant's total liability can be determined without having regard to the individual circumstances of each claimant. Representative actions are not permitted where English law would require that the damages sought to be proved individually based on multiple factors affecting each claimant. These would include factors such as when each security was purchased, what price was paid for it, whether and when it was sold, and the price for which it was sold. For example, in *Markt & Co Ltd v Knight Steamship Co Ltd* [1910] 2 KB 1021, one cargo owner was not permitted to bring a representative action on behalf of all other cargo owners against a ship owner where the cargo was lost or damaged after the ship sank as each cargo owner had a different contract and different loss.

80. Next, representative actions are permitted only where the claimants are identifiable and so closely associated that effective communication about the existence of the cause of action can be presumed. For example, a resident in a block of 12 flats was allowed to sue as a representative for all the residents in a claim against an architect who carried out negligent roof repairs: *Moon v Atherton* [1972] 2 QB 435. A representative action would not be permitted on the assumed facts because the claimants are not all identifiable and have no pre-existing relationship. Instead, the potential class members are spread out throughout the world without the association or proximity required to ensure effective notice.

81. And finally, representative actions will be enforced against represented persons not party to the litigation only with permission of the court. Moreover, English courts will not permit a representative party to waive the rights of others in the represented group: see Civil Procedure Rule 19.6(4), which is set out above.

82. A person suing in a representative capacity may enforce the rights of the represented group, but cannot give up or alter the rights of those in the represented group. Thus, if the representative party brings one claim but fails to bring another which is also open on the facts, it cannot be said that the representative party waived the rights of those represented to subsequently bring a claim on another basis. For example, in *Re*

APP 1285

*Calgary and Medicine Hat Land Company Ltd* [1908] 2 Ch 652, the court held that a representative party who brought a claim to enforce securities but not for interest on the amount due did not waive the right of those who were represented to later bring a claim for interest. The court reached this conclusion on the basis that the representative party could enforce but not waive or alter the rights of those represented (*see* pages 659, 660 and 662).

83. Partly because representative actions are so narrowly conceived, the Civil Procedure Rules were modified in 2000 to permit a new group litigation procedure. Rule 19.10 states that group litigation orders may be made 'to provide for the case management of claims which give rise to common or related issues of fact or law.' If a claim of the approximate kind in issue in the US class action were to have been brought in England, I envisage that it could be made subject to a group litigation order but would not, for the first two reasons listed above, be permitted as a representative action.

84. A group litigation order is not the same as a US class action because a person would become part of the group, and bound by the judgment, only if that person issued a claim against the defendant and requested that his/her claim be added to the register of group litigants. This is clearly an opt-in provision as a person could not become subject to the group litigation without his or her knowledge and without positive action on his or her behalf. Indeed, when the group litigation procedures were drafted, both opt-in and opt-out models were discussed but the legislature ultimately adopted the opt-in model.

85. Turning now to the second potential counter-argument, the existence of other class members with similar or identical claims to the UK absent class members has no impact on their right to bring an action before an English court because the UK absent class member is not privy to any of them, and is not 'indirectly' subject to the jurisdiction of the US courts.

86. Even if a judgment is not *res judicata* against the party to be bound, there are certain arguments in English law which 'widen' the preclusion which that doctrine otherwise has failed to produce. These arguments are most conveniently taken together, because the authorities (the most recent of which is *Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd* [2014] 1 AC 160) tend to consider them side by side.

87. It may be argued that a UK absent class member would be bound by the judgment on the footing either that (i) he or she was in privity of interest with those plaintiffs who participated in the American action, with the consequence that he or she was regarded as party or privy to the judgment given in the American proceedings, or (ii) it will be regarded as an abuse of the process of the court for him or her, though not party or privy to the judgment, to stand by, waiting to see what happens before bringing separate proceedings of his or her own.

88. Such an argument will fail: there will be no issue estoppel or 'preclusion'. This is because the UK absent class member will not be advancing a claim under, through or on behalf of a party to the US proceedings who will have been bound by their outcome. There is no privity of interest when the victim of an alleged tort has not elected to take any part in proceedings brought by another, independent victim of that tort.

**APP 1286**

App. 1912

89.    As to the second possibility, it would not be possible to contend that it was an abuse of process, which is sometimes regarded as a principle which 'widens' the doctrine of issue estoppel, for a UK absent class member to stand aside from the proceedings and to sue, separately, in his or her own cause.

90.    It would be impossible to describe the bringing of a claim in the English courts as an abuse of the process of the English court as it could not be said that such claims 'could and should' have been brought in the US class action proceedings. The doctrine of abuse of process, established by *Henderson v Henderson* (1843) 3 Hare 100, requires a party to proceedings, in general, to bring forward the whole of his or her case, and not to keep part of it back for use in later proceedings. As UK absent class members could not have brought a claim in the US proceedings, there is no more to say about it.

91.    This limitation on the doctrine of abuse of process applies equally in cases involving different parties, instead of different causes of action.  The case where the issue of different parties was considered is *C v Hackney London Borough Council* [1996] 1 All ER 973. In that case, the local authority provider of housing had so neglected its obligations as landlord to repair and maintain that it caused illness to the occupants, a mother and her daughter. The mother sued the council for damages, recovering £15,000. The daughter then brought a claim against the council for compensation for the injuries done to her by the same disrepair. The council, aware of the difficulty in appealing to the principle of estoppel by *res judicata*, sought to strike out the claim as an abuse of the process of the court, making the argument that the daughter could and should have joined in the action brought by her mother.

92.    The Court of Appeal was emphatic in the rejection of the council's submission. At page 977, it was put this way:

> '(7) The plea of *res judicata* applies only where the cause of action or issue was and remains between the same parties or their predecessors in title.  The single exception to this rule is to be found in the Privy Council decision in *Yat Tung Investment Co v Dao Heng Bank* [1975] AC 581 where the party held estopped in the subsequent proceedings had not itself been a party to the earlier action.  It was, however, a closely related company with common directors and shareholders.
>
> In seeking to support the judge's holding, Mr Lewis for Hackney relies heavily upon *Yat Tung Investment v Dao Heng Bank* and *Talbot v Berkshire County Council*.  *Yat Tung Investment*, he submits, allows the doctrine of *res judicata* in the wider sense to be applied against strangers; Talbot allows it to be invoked to bar a personal injury claim which could, and more conveniently should, have been brought in earlier proceedings.  He contends that the judge was entitled to find as he did that C's dependence on the mother created a sufficient nexus between them that they should be regarded effectively as the same party.
>
> In my judgment, this is an impossible argument, one that stretches the bounds of the doctrine beyond breaking point.  If it were right, it would be right equally in the context of a road accident case where mother and infant child are both injured by the defendant's negligence.  The mother sues and recovers judgment.  Is it to be said that her child is thereby barred from making any subsequent claim?  Such would be to my mind a novel and insupportable suggestion.'

20

**APP 1287**

App. 1913

93.    In the case of the UK absent class members, the arguments would be all the more powerful, for it would have to be argued that they, though having no prior relationship with, or even knowledge of the identities of, other members of the class, could and should have joined in their proceedings before a foreign court. It is inconceivable that an English court would reach such a conclusion.

94.    *Gleeson v Wippell* [1977] 1 WLR 510 concerned two manufacturers, D and W. The plaintiff first sued D, claiming that D – at W's request – had copied W's product, which itself allegedly infringed the plaintiff's copyright. The plaintiff lost, because the first court found that W's product did not infringe, so that D's copying of W's product did not infringe, either. The plaintiff then sued W, making the same allegation of copyright infringement. When W raised a defence of *res judicata*, the court ruled that the plaintiff was not estopped from suing W, because W was not in privity with D even though the action against D had turned on whether W had violated the plaintiff's copyright.

95.    Megarry V-C had to decide whether sufficient privity of interest existed between D and W to satisfy the 'identity of parties' element of a defence of res judicata. First, he observed (at page 515) that privity of interest does not mean 'mere curiosity or concern. Many matters that are litigated are of concern to many other persons than the parties to the litigation, in that the result of a case will at least suggest that the position of others in like case is as good or as bad as, or better or worse than, they believe it to be.' But this 'curiosity or concern' – which W might well have had in the proceedings against D – does not constitute sufficient privity to bind a non-party. Second, 'there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party'. This degree of identification was missing in Gleeson because, as Megarry V-C found (at page 516), there was nothing more than a trade relationship between D and W, in the course of which D, at W's request, had copied W's product. There was certainly not the identity of interest, which Lord Reid identified in *Carl Zeiss (No 2)* [1967] 1 AC 853, between a party against whom some right had been established by court proceedings, and his servant or employee. Nor did Megarry V-C find (at page 515) the type of privity of interest that can exist between trustees and beneficiaries in relation to trust property, so that 'a decision that is binding on the trustees [is] also binding on the beneficiaries, and vice versa.'

96.    Third, Megarry V-C concluded (at page 516) that, 'for privity with a party to the proceedings to take effect, it must take effect whether that party wins or loses.' The court was not willing to hold that W would have been bound if D had lost the first action:

    'Any contention which leads to the conclusion that a person is liable to be condemned unheard is plainly open to the gravest of suspicions. A defendant ought to be able to put his own defence in his own way, and to call his own evidence. He ought not to be concluded (sic) by the failure of the defence and evidence adduced by another defendant in other proceedings unless his standing in those other proceedings justifies the conclusion that a decision against the defendant in them ought fairly and truly to be said to be in substance a decision against him.'

97.    The relationship between the named plaintiffs and the UK absent class members in the US class action does not and cannot satisfy any of the three privity considerations

21

**APP 1288**

examined in *Gleeson*, and is even weaker than the relationship that existed between D and W in that case. First, UK absent class members may well be curious or concerned about the outcome of the named plaintiffs' litigation, but such curiosity or concern does not constitute privity, and they could not be bound by the outcome of the case if it were not for US rules on class actions. Second, the UK absent class members do not have the degree of identification with the named plaintiffs that *Gleeson* requires. In fact, such investors appear to have no connection at all with the named plaintiffs, having simply claims against the same defendant banks. The investors do not have even the type of trade relationship with the named plaintiffs that D and W had between them, and that was deemed insufficient, in *Gleeson*. Third, I would be very surprised if anyone were even to suggest that, if the named plaintiffs lost their case against the banks, English law would preclude a UK absent class member from suing on his or her own claim. Any alleged preclusion here arises from US law governing class actions, not from English law.

98.  In *Gleeson v Wippell* the relationship between the two defendants did not reveal that they had a single interest in the subject matter of the proceedings.  These cases show that the inquiry has to be focussed on the inter-relationship of the defendants or plaintiffs, as the case may be.  Privity of interest is not shown by pointing to separate parallel relationships between D1 and plaintiff, D2 and plaintiff, D3 and plaintiff, and so forth, and asserting their likeness.  The fact that each plaintiff has an identical relationship with the same defendant does not establish privity between the plaintiffs.  Thus, *Gleeson v Wippell* does not support an argument that the UK absent class members are sufficiently in privity with the named plaintiffs in the US class action so that they can be deemed to be subject to the US court's jurisdiction by reason of the named plaintiffs' presence in or submission to the US court.

## VII    The analysis of Professor Mulheron

99.  Professor Rachael Mulheron published, in 2012, a substantial article entitled 'The Recognition, and *Res Judicata* Effect, of a United States Class Actions Judgment in England: A Rebuttal of *Vivendi*: (2012) 75 Modern Law Review 180-211. The article is derived from a paper which Professor Mulheron gave in London in 2010. Professor Mulheron is a member of the Civil Justice Council of England and Wales, and her views are, as can be seen from the article, based on her analysis of material which is in the public domain.

100.  Professor Mulheron has worked on the broader question of whether (and if so, how) the law on collective redress in England and the European Union might be developed by future legislation. But her analysis of the issues as relevant to this Report can be taken from the first two paragraphs of the Conclusion to her article, which read as follows:

'In this article, it has been argued that a US class action judgment/settlement, which purports to bind ECMs [which is defined to mean: a class member domiciled in England; who is not a named representative claimant to the US class action; who falls within the defined class in the US class action, because that class includes English class members; who does not actively participate in the US class action in any respect; and who does not opt out of the class action: see fn 1 on p 180] would not be recognised by an English court, nor would it be given preclusive *res judicata* effect if one (or a group) of those ECMs sought to relitigate the same grievance against the same defendant in an English court. The key reasons for this are two-

22

fold. The US court will lack personal jurisdiction over the ECMs whom the judgment/settlement of the US court proposes to bind; and the requisite identity of parties (or privies) will be absent.

It has further been argued that three rationales proposed in North American jurisprudence for asserting personal jurisdiction would not succeed in English law. Those rationales are: that a US class actions judgment/settlement should be recognised and given preclusive effect if the *defendant* was present in, or voluntarily submitted to, the US court's jurisdiction; that an English court's assumption of jurisdiction over absent class members does (and should) give rise to a reciprocal principle that US courts may assume jurisdiction over ECMs; and that a 'real and substantial' connection between ECMs and the US jurisdiction, with assurances of due process and procedural fairness, should be sufficient to establish jurisdiction over those class members. <u>None of these would appear to have any chance of judicial endorsement in England</u>. However it has been argued that, by analogy to the principles governing unwilling defendants, ECMs may be sufficiently 'tied' to the US jurisdiction, if they have 'taken a step' in the US class action. Such a step could arguably comprise something less than formally filing a claim form during the settlement period. Short of 'taking a step', however, the ECMs will retain the right to re-litigate the same subject matter in an English court.' (Emphasis added.)

101.    In the body of her article, Professor Mulheron makes specific reference to certain propositions of English law which were advanced by Professor Harris in his evidence to the US District Court in *Re Vivendi*: *see*, in particular, her reference to this source material at pages 183-84 (n. 21). She makes specific reference to the contention that a US class action judgment should be recognised if the *defendant* was present in the United States or submitted to the jurisdiction of the US court, noting (at page 198 n 136) that it was strongly supported by Professor Harris in *Re Vivendi*. She makes specific reference to the contention that an English court's assumption of jurisdiction over foreign class members does (or should) gives rise to a reciprocal principle that US courts may assume jurisdiction over absent class members, noting (at page 203 n 159) that this was supported by Professor Harris in *Re Vivendi*. Her clear conclusion is that these propositions of English law appear to her to have no chance of judicial endorsement in England. I agree with her.

### VIII    The decisions in *Re Vivendi Universal SA* and *Anwar v Fairfield Greenwich Ltd*

102.    In the light of the foregoing, and in particular in the light of the analysis of Professor Mulheron, and with the greatest of respect to a court which will have been presented (as Judge Holwell put it, in *Re Vivendi*) with 'a veritable mountain of expert affidavits on foreign law', the only conclusion which is open to an English lawyer is that the District Court for the Southern District of New York in *Re Vivendi* was induced to come to a conclusion of English law which would not be judicially endorsed by an English court.

103.    My reading of the judgment of Judge Holwell is that the learned judge was influenced to reach the conclusion he did by an invitation from Professor Harris to conclude (i) that English common law determines whether the judgment of a foreign court is liable to recognition as against a plaintiff by asking whether the defendant was subject to the international jurisdiction of the foreign court, and (ii) that because English domestic law makes some provision for proceedings which may bind persons who may be analogous to the UK absent class members, it is at least possible that an English court would recognise a class action judgment as binding on such absent class members. No part of this invitation is justifiable.

23

**APP 1290**

App. 1916

104.  In *Anwar v Fairfield Greenwich Ltd* the court also received evidence from Professor Harris, and appears to have been invited to arrive at the same conclusion as had the court in *Re Vivendi*. I was not involved in the *Anwar* action and am not aware of the full evidentiary record submitted in that action. However, to make the point for the final time: if a foreign judgment is said to tie the hands of the defendant, so that he is precluded from asking an English court to re-visit the issues which the foreign court has decided, it must be shown that the defendant was present within, or submitted to, the jurisdiction of the foreign court. Likewise, if a foreign judgment is said to tie the hands of a plaintiff, so that he is precluded from asking an English court to re-visit the issues which the foreign court has decided, it must be shown that the plaintiff was present within, or submitted to, the jurisdiction of the foreign court. It is that simple.

**IX      Summary**

105.  My opinion is therefore that there is no possibility – none – that a judgment in these US class action proceedings would preclude or otherwise prevent a UK absent class member, not present in the US when the US class action was commenced, who had failed to opt out of the class, even if notified of the right to do so, from bringing original proceedings before the English courts.

**X      Compliance with Court Rules**

106.  I believe that this Report represents a complete statement of my opinion and the basis and reasons for it. The source material on which I rely is stated within the Report. I reserve the right to supplement or modify my opinions expressed herein, particularly in light of any new arguments raised or materials presented by Plaintiffs in this case.

**APP 1291**

App. 1917

Pursuant to 28 USC §1746(1), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2015 in Oxford, United Kingdom.

ADRIAN BRIGGS

# <u>ANNEX 1</u>

**APP 1293**

App. 1919

## Annex 1

# PROFESSOR ADRIAN BRIGGS

**St Edmund Hall, Queen's Lane, Oxford OX1 4AR**
adrian.briggs@law.ox.ac.uk
**+44 1865 279000**

**Blackstone Chambers, Blackstone House, Temple, London EC4Y 9BW**
adrianbriggs@blackstonechambers.com
**+44 20 7583 1770**

**Academic positions**

| | |
|---|---|
| **2004-date:** | Professor of Private International Law, University of Oxford |
| **1980-date:** | Fellow and Tutor in Law, St Edmund Hall, Oxford |
| **1980-date:** | CUF Lecturer in Law, University of Oxford |

**Degrees**

| | |
|---|---|
| **1975-78:** | BA Jurisprudence (Hertford College, Oxford: first class honours) |
| **1978-79:** | BCL (Hertford College, Oxford: first class honours) |

**Barrister**

| | |
|---|---|
| **1989:** | Called to Bar of England and Wales |
| **1990-date:** | Chambers at Blackstone House, Temple, London EC4Y 9BW |

**Profile**

Adrian Briggs combines being Professor of Private International Law at the University of Oxford with practice at the Bar of England and Wales.

His new work, *Private International Law in English Courts* was published by the Oxford University Press in September 2014: it presents an account of the subject which starts from the position that most of today's private international law is statutory and European, with the common law being relegated to a residual, or marginalized to a peripheral, role, and that a book which explains the law needs to be constructed with that in mind.

The Sixth Edition of *Civil Jurisdiction and Judgments* was published in June 2015. It is a leading work in its field; a second edition of *Agreements on Jurisdiction and Choice of Law* is in the early stages of production. He was for 15 years a member of the editorial team of Dicey Morris & Collins, *The Conflict of Laws*, working under (and learning much from) the General Editorship of Lord Collins of Mapesbury, but standing down after the publication of the 15th edition in 2012.

He also has a wide range of papers on all aspects of private international law, but especially civil jurisdiction and foreign judgments. He has taught the subject, or given classes, in various places overseas, most recently in Singapore and in Myanmar

1

**APP 1294**

App. 1920

His practice at the Bar is dominated by advisory work, especially on all aspects of private international law, but with particular emphasis on the law on jurisdiction and the enforcement of foreign judgments. He is frequently instructed to give expert evidence, in the context of proceedings before foreign courts on questions of English private international law, such as whether judgments or settlements in foreign proceedings would be regarded as conclusive in England, on whether causes of action pleaded before foreign courts could be asserted in English proceedings, on how English courts would interpret particular jurisdiction clauses, and so on.

## Publications

**Books: as sole author**

- Briggs, *Private International Law in English Courts* (Oxford) 1st edn, 2014
- Briggs, *Civil Jurisdiction & Judgments* (Routledge) 6th edn, 2015 (editions 1 to 5 were published, by Informa, as Briggs & Rees, *Civil Jurisdiction and Judgments*)
- Briggs: *Agreements on Jurisdiction and Choice of Law* (Oxford) 1st edn, 2008
- Briggs: *The Conflict of Laws* (Clarendon Press) 3rd edn, 2012

**Books: as major contributor**

- Dicey, Morris & Collins, *The Conflict of Laws* (15th edn, 2012): one of the team of editors working under the general editorship of Lord Collins of Mapesbury. I worked on the 13th edition (2000) and the 14th edition (2006), as well as on annual Supplements
- Burrows (ed), *English Private Law*: Chapter on Private International Law (Oxford): 3rd edn, 2013

**Articles and surveys:**

**(a)  conflict of jurisdictions and of judgments: common law:**

- Judicial Assistance still in need of judicial assistance: [2015] LMCLQ 179
- In for a penny, in for a pound: [2013] LMCLQ 26
- Recognition of Foreign Judgments: a Matter of Obligation: (2013) 129 LQR 87
- The Subtle Variety of Jurisdiction Agreements: [2012] LMCLQ 364
- *Forum non satis*: *Spiliada* and an inconvenient truth: [2011] LMCLQ 329
- Foreign Judgments: the common law flexes its muscles: (2011) 17 Trusts & Trustees 328
- Recognition: foreign judgments or insolvency proceedings? [2010] LMCLQ 523
- Enforcing and reinforcing an English judgment: [2008] LMCLQ 421
- Note on *Fiona Trust v Privalov:* [2008] LMCLQ 1
- Recognition and enforcement of Russian Judgments in England: Vyestnik 2006, Part 3, 77
- Foreign Judgments and Human Rights: note on *USA v Montgomery*: (2005) 121 LQR 185
- Crossing the river by feeling the stones: re-thinking the law on foreign judgments: (2004) 8 Singapore Year Book of International Law 1
- Anti-suit injunctions in a Complex World: Chapter 12 of *Lex Mercatoria: Essays in International Commercial Law*, ed. Rose (2000)
- Self-restraint in the High Court of Australia: (1998) 114 LQR 27
- The unrestrained reach of an anti-suit injunction: [1997] LMCLQ 90
- Note on *Seaconsar v Bank Markazi*: [1994] LMCLQ 1
- Note on *The Indian Grace*: [1993] LMCLQ 451
- Jurisdiction clauses and judicial attitudes: (1993) 109 LQR 382

**APP 1295**

App. 1921

- Foreign judgments: more surprises: (1992) 108 LQR 549
- Forum non conveniens in Australia: (1989) 105 LQR 200
- Wider still and wider: the bounds of Australian exorbitant jurisdiction: [1989] LMCLQ 216
- Restraint of foreign proceedings: [1987] LMCLQ 391
- Which foreign judgments should we recognise today?: (1987) 36 ICLQ 240
- Forum non conveniens: the last word?: [1987] LMCLQ 1
- The validity of floating choice of law and jurisdiction clauses: [1986] LMCLQ 508
- Forum non conveniens: an update: [1985] LMCLQ 360
- The staying of actions on the ground of forum non conveniens: [1984] LMCLQ 227
- Forum non conveniens: now we are ten?: (1983) 3 Legal Studies 74
- No interference with foreign courts?: (1982) 31 ICLQ 189

**(b) conflict of jurisdictions and judgments: European rules**

- One-sided jurisdiction clauses: French folly and Russian menace: [2013] LMCLQ 137
- What should be done about jurisdiction agreements?: (2011) 12 Yearbook of Private International Law 311
- The Rejection of Abuse in International Civil Procedure: Ch 18 of de la Feria and Vogenauer (eds), Prohibition of Abuse of Law (2011)
- *Timeo danaos* on the Rock of Gibraltar: (2010) 126 LQR 20
- Fear and Loathing in Luxembourg and Syracuse (note on *West Tankers*): [2009] LMCLQ 161
- Who is bound by the Brussels Regulation? (note on *Samengo-Turner*): [2007] LMCLQ 433
- Jurisdiction over defences and connected claims: [2006] LMCLQ 447
- Learning to learn from others in Europe (with B. Dohmann QC): Festschrift für Peter Schlosser zum 70. Geburtstag, p. 161
- Note on *Réunion Européenne*: [1999] LMCLQ 333
- The Impact of Recent Judgments of the European Court on English Procedural Law and Practice: [2005] Zeitschrift für Schweizerisches Recht (2005) 124 II 231
- *Forum non conveniens* and Ideal Europeans: [2005] LMCLQ 378
- Note on *Owusu v Jackson*: (2005) 121 LQR 535
- Anti-suit Injunctions and Utopian Ideals (note on *Turner v Grovit*): (2004) 120 LQR 529
- Some points of friction between English and Brussels Convention jurisdiction: Andenas & Jacobs (eds), *European Community Law in the English Courts*, Ch 19.
- Note on *Pearce v Ove Arup* and *Suzo v Coin Controls*: (1997) 113 LQR 360
- Note on *Marinari v Lloyd's Bank*: [1996] LMCLQ 27
- Note on *The Tatry*: [1995] LMCLQ 161
- Note on *The Sargasso*: [1994] LMCLQ 470
- Note on *Webb v Webb*: (1994) 110 LQR 526
- Note on *Continental Bank v Aeakos*: [1994] LMCLQ 158
- Get your writs out? (Note on *The Duke of Yare*): [1992] LMCLQ 150
- Jurisdiction over restitutionary claims: [1992] LMCLQ 283
- The Brussels Convention reaches the House of Lords: (1992) 108 LQR 186
- Foreign judgments and the Brussels Convention: (1991) 107 LQR 531
- Forum non conveniens and the Brussels Convention again: (1991) 107 LQR 180
- *Spiliada* and the Brussels Convention: [1991] LMCLQ 10
- Survey of cases on the Brussels Convention in the Court of Justice of the EC:
  - 1997: (1997) 17 Yearbook of European Law 515
  - 1996: (1996) 16 Yearbook of European Law 601
  - 1995: (1995) 15 Yearbook of European Law 487

**APP 1296**

App. 1922

- o 1994: (1994) 14 Yearbook of European Law 557
- o 1993: (1993) 13 Yearbook of European Law 511
- o 1992: (1992) 12 Yearbook of European Law 657
- o 1991: (1991) 11 Yearbook of European Law 521
- o 1990: (1990) 10 Yearbook of European Law 481
- o 1989: (1989) 9 Yearbook of European Law 323
- o 1988: (1988) 8 Yearbook of European Law 265

**(c) conflict of laws:**

- Comity in Private International Law: (2012) 354 Recueil des cours 1-129 (Hague Lectures, 2011)
- The Development of Principle by a Final Court of Appeal in Matters of Private International Law, in Lee (ed) *From House of Lords to Supreme Court* (2011)
- Restitution and not-so-local authority swaps (with J Edelman): (2010) 126 LQR 500
- When in Rome, choose as the Romans choose: (2009) 125 LQR 191
- Misappropriated and Misapplied Assets in the Conflict of Laws: in Degeling & Edelman (eds) *Unjust Enrichment in Commercial Law*, 2008
- Contractual Agreements on choice of law: in Burrows & Peel (eds), *Contract Terms* (Oxford, 2007), Chapter 15
- A Map or a Maze: Jurisdiction and choice of law in the Court of Appeal: (2007) 11 Singapore Year Book of International Law 132
- The cost of suppressing insurrection: (2007) 123 LQR 182
- The further consequences of choice of law: (2007) 123 LQR 18
- The Meaning and Proof of Foreign Law: [2006] LMCLQ 1
- On the Application of the Statute Law of Singapore within its Private International Law: [2005] Sing JLS 189
- Public-private law protective schemes and the conflict of laws: [2004] LMCLQ 313
- Owing, owning and the garnishing of foreign debts: [2003] LMCLQ 418
- On drafting agreements on choice of law: [2003] LMCLQ 389
- The real scope of European rules for choice of law: (2003) 119 LQR 352
- The Duke of Brunswick and defamation by internet: (2003) 119 LQR 210
- Choice of Choice of Law: [2003] LMCLQ 12
- Public Policy in the Conflict of Laws: A Sword and a Shield?: (2002) 6 Sing J. Int & Comp L. 953
- The Revenue Rule in the Conflict of Laws: Time for a makeover: [2001] Singapore J.L.S. 280
- Jurisdiction at common law over restitutionary claims: Rose (ed), *Restitution & The Conflict of Laws*, Ch 2
- In praise and defence of renvoi: (1998) 47 ICLQ 877
- From complexity to anti-climax: restitution and choice of law: [1996] Rest. L.R. 88
- Choice of law in restitutionary claims: [1995] Rest. L.R.94
- Choice of law in Tort and Delict: The Private International Law (Miscellaneous Provisions) Act 1995: [1995] LMCLQ 519
- The international dimension to contribution claims: [1995] LMCLQ 437
- Note on *Red Sea Insurance v Bouygues*: (1995) 111 LQR 18
- The formation of international contracts: [1990] LMCLQ 192
- Conflict of laws: postponing the future: (1989) 9 Ox JLS 251
- Tort in the conflict of laws: (1989) 105 LQR 359
- Garnishment of an English debt: foreign complications: [1988] LMCLQ 429
- What did *Boys v Chaplin* decide?: (1983) 12 Anglo-Am LR 237
- Polygamous marriages and English domiciliaries: (1983) 32 ICLQ 737

**APP 1297**

App. 1923

**(d) Decisions of British Courts on questions of Private International Law:**

- 2009: (2009) 80 British Year Book of International Law 575
- 2008: (2008) 79 British Year Book of International Law 501
- 2007: (2007) 78 British Year Book of International Law 588
- 2006: (2006) 77 British Year Book of International Law 641
- 2005: (2005) 76 British Year Book of International Law 537
- 2004: (2004) 75 British Year Book of International Law 537
- 2003: (2003) 74 British Year Book of International Law 511
- 2002: (2002) 73 British Year Book of International Law 435
- 2001: (2001) 72 British Year Book of International Law 437
- 2000: (2000) 71 British Year Book of International Law 331
- 1999: (1999) 70 British Year Book of International Law 319
- 1998: (1998) 69 British Year Book of International Law 332
- 1997: (1997) 68 British Year Book of International Law 331
- 1996: (1996) 67 British Year Book of International Law 577

## Cases of note

- *Bodo Community v Shell Petroleum & Development Co of Nigeria Ltd* [2014] EWHC 1973 (TCC)
- *Starlight Shipping v Allianz, The Alexandros T* [2013] UKSC 70
- *Antonio Gramsci v Stepanovs* [2011] 1 Lloyd's Rep 647
- *Deutsche Bank v Asia Pacific Broadband & Wireless* [2008] 2 Lloyd's Rep 619
- *Lewis v Eliades* [2004] 1 WLR 692
- *Base Metal Trading Ltd v Shamurin* [2002] CLC 322
- *Sarrio SA v Kuwait Investment Authority* [1999] 1 AC 32
- *Haji-Ioannou v Frangos* [1999] 2 Lloyd's Rep 337
- *Kleinwort Benson v City of Glasgow DC* [1996] QB 678
- *Boss Group Limited v Boss France SA* [1996] 4 All ER 970
- Case C-68/93 *Shevill v Presse Alliance* [1995] ECR I–415
- Case C-432/93 *SISRO v Ampersand* [1995] ECR I–2217
- *Kinnear v Falconfilms* [1994] 3 All ER 42
- *The Sargasso* [1994] 3 All ER 180 at 189
- *Spiliada v Cansulex* [1987] AC 460 at 488

## Cases in which I have given evidence as expert or at trial since 1 July 2011

- *Faxtech Pty Ltd v Optronics Ltd* (Federal Court of Australia): October 2011
- *EFG Private Bank Ltd v Samco Turizm ve İnşaat Sanayi Limited Sirketi* (Court of Istanbul): May 2012 and October 2012
- *In re the Estate of Lord Lambton* (Court of Siena, Italy): March 2013
- *Lim Asia Multi-Strategy Fund Inc v Tiny Tantono (sued as Representative of the Estate of Susanto Lim)* (High Court of Singapore): March 2013, April 2013
- *Anchorage Capital Group LLC v BNP Paribas SA* (Supreme Court of New York): July 2013

5

**APP 1298**

App. 1924

# EXHIBIT 79

TM
EXHIBIT 79

APP 1299

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

|  |  |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated<br><br>v.<br><br>TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No 3:09-CV-02384-N-BG<br><br>Judge: Hon. David C. Godbey<br><br>Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF ANTONIO GIDI

### I.  INTRODUCTION

#### A.  The Consultation

1.  I have been asked to provide an opinion with respect to the likelihood that certain Latin American countries will recognize and accord preclusive effect to a class action judgment in the above-captioned action pending in the United States District Court for the Northern District of Texas, Dallas Division.

2.  To prepare this Declaration, I have considered the following materials provided to me by counsel for the Defendants: Plaintiffs' Second Amended Class Action Complaint filed in the United States District Court for the Northern District of Texas Dallas Division ("Second Amended Complaint"); Plaintiff's Memorandum Supporting Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel and exhibits thereto; Declaration of Receiver Ralph S. Janvey dated October 30, 2014 (the "Janvey Declaration") with Exhibits A-C (which includes Order of Notice and Proof of Claim, May 4, 2012; Notice of Bar Date and Procedures for Submitting Proofs of Claim; Notice of Last Day to Submit a Proof of Claim Form; Notice of Deficiency; Notice of Determination; Settlement Agreement and Cross-Border Protocol).

3.  I reserve the right to supplement or modify my opinions expressed herein, particularly in light of any new arguments raised or materials presented by Plaintiffs in this case.

4.  I am being compensated for my work in connection with this case at my customary consulting rate of U.S. $ 500.00 per hour.

## B.  Summary of Opinions

5.  The Motion for Class Certification, without presenting any direct evidence (just decisions from U.S. courts) posits that foreign jurisdictions "would more likely than not enforce a U.S. class action judgment." (pp. 50-1).

6.  That is not the right question.  The issue here is whether these foreign countries would recognize a class action judgment or settlement in a U.S. opt-out action against the interests of foreign nationals, so that absent class members would be bound by any such judgment.  For the reasons explained below, I conclude that (1) Venezuela, (2) Peru, (3) Panama, (4) El Salvador, (5) Ecuador, and (6) Mexico would not.[1]

## C.  Qualifications

7.  Class actions have been the subject of my continuous research for the past twenty-five years.  After graduating from law school in Brazil, I completed a three-year Master's Degree program in Civil Procedure at PUC-São Paulo.  My Masters in Law dissertation was published in 1995 as a 250-page book on *res judicata* and *lis pendens* in Brazilian class actions.[2]

8.  Following my Master's Degree, I lived for more than a year and a half in Italy, where I studied Italian Civil Procedure at the University of Milan, with special attention to the development of class actions in that country.  I also studied the development of class actions in France for approximately five months, at the University of Paris I Law School (Panthéon-Sorbonne).

9.  In 1996, I moved to the United States to continue my research on American class actions.  During my years as a Visiting Scholar in the United States, I finished two doctorates in law, one in Brazil (PUC-São Paulo) and another doctorate at the University of Pennsylvania Law School.  The respective doctoral theses were a 600-page treatise about American class actions[3] and a paper on Brazilian class actions.[4]  I also published a paper about Peruvian class actions.[5]

---

[1] Unless otherwise noted, all translations of foreign documents are my own.

[2] *See* ANTONIO GIDI, COISA JULGADA E LITISPENDÊNCIA EM AÇÕES COLETIVAS (1995).

[3] *See* ANTONIO GIDI, A CLASS ACTION COMO INSTRUMENTO DE TUTELA COLETIVA DOS DIREITOS (2007).

[4] *See* Antonio Gidi, *Class Actions in Brazil – A Model for Civil Law Countries*, 51 AM. J. COMP. L. 311 (2003).

[5] *See* Antonio Gidi, *Comentarios al art. 82 del Código Procesal Civil Peruano*, *in* JOHAN S. CAMARGO ACOSTA (ED.), I CÓDIGO PROCESAL CIVIL COMENTADO POR LOS MEJORES ESPECIALISTAS 360 (2010) (describing and critiquing the Peruvian class action).

2

10.   In 2005, I published a Model Class Action Code for Civil Law Countries.[6]  This model code was the culmination of more than a decade of study with the objective of creating class action legislation for civil law countries.  This project has been translated into several languages and published in several countries.[7]  In addition, I was one of the three General Reporters of the Class Action Model Code for Latin American Countries, a project sponsored by the Ibero-American Institute of Civil Procedure, which was the product of four years of study, analysis, and drafting by eleven legal scholars from various Latin American countries.[8]  Following that work, I co-edited three books in Mexico about the Ibero-American project, coordinating the scholarship of more than sixty class action scholars from Latin America and all over the world.[9]

11.   My class action research led to invitations from the Brazilian Ministry of Justice and from the Mexican Senate to consult on class action legislation.  I was one of the main drafters of the proposed Class Action Bill in Brazil[10] and of the Class Action Law in Mexico, enacted in 2011.[11]  I have also published a 500-page monograph on the subject of class action codification in Brazil and in civil-law countries in general.[12]

---

[6] See Antonio Gidi, *The Class Action Code: A Model for Civil-Law Countries*, 23 ARIZ. J. INT'L & COMP. L. 37 (2005).

[7] See, e.g., Gidi, *Código de Processo Civil Coletivo. Um Modelo Para Países de Direito Escrito*, 111 REPRO 192 (2003) [**Brazil**]; Gidi, *Código de Proceso Civil Colectivo. Un Modelo Para Países de Derecho Civil*, 11 REVISTA PRÁCTICA DE DERECHO DE DAÑOS 56 (2003) (translated into Spanish by Adriana León and Joaquín Silguero Estagnan) [**Spain**]; *also published in* XXVI CONGRESO COLOMBIANO DE DERECHO PROCESAL, UNIVERSIDAD LIBRE 601 (2005) [**Colombia**]; *also published in* EDUARDO OTEÍZA (ORG.). PROCESOS COLECTIVOS 463 (2006) [**Argentina**]; *also published in* 126 REVISTA JURÍDICA DEL PERU 93 (2011) [**Peru**]; *also published in* 16 REVISTA VASCA DE DERECHO PROCESAL Y ARBITRAJE 753 (2004) [**Spain**]; Gidi, *Il codice del proceso civile collettivo. Un modello per i paesi di diritto civile*, RIVISTA TRIMESTRALE DI DIRITTO E PROCEDURA CIVILE, Anno LIX Fasc 2, 2005, p. 698-711 (translated into Italian by Alessandro Barzaghi) [**Italy**]; Gidi, *Le Code de L'Action Collective: Un Modéle Pour les Pays de Droit Civil*, in CLOSET-MARCHAL & COMPERNOLLE (EDS.) VERS UNE "CLASS ACTION" EN DROIT BELGE? 147-63 (2008) (translated into French by M. Guy Sohou and Caroline Gilbert, with an introductory study in Dutch by Stefaan Voet) [**Belgium**], GIDI, LAS ACCIONES COLECTIVAS (2004) [**Mexico**]; Gidi, *附录:集团诉讼条例 专家建议案)—大陆法系国家模板*, 2014 XIAMEN UNIVERSITY L. REV. 271 [**China**]; قانون دعوای جمعی الگویی کشورهای برای سیویل لا [**Iran**].

[8] See Ada Pellegrini Grinover, Kazuo Watanabe & Antonio Gidi, *Código Modelo de Procesos Colectivos para Iberoamérica*, 9 REVISTA IBEROAMERICANA DE DERECHO PROCESAL 251 (2006).

[9] See ANTONIO GIDI AND EDUARDO FERRER (EDS.), CÓDIGO MODELO DE PROCESOS COLECTIVOS. UN DIÁLOGO IBEROAMERICANO (2009); ANTONIO GIDI AND EDUARDO FERRER (EDS.), PROCESOS COLECTIVOS, 2nd edition (2004); ANTONIO GIDI AND EDUARDO FERRER (EDS.), LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS, 2nd edition (2004).  One of these books was later published in Brazil as well.

[10] See Federal Bill Number 5,139 of 2009.

[11] See Federal Decree of August 30, 2011.

[12] See ANTONIO GIDI, RUMO A UM CÓDIGO DE PROCESSO CIVIL COLETIVO (2008).

3

**APP 1302**

App. 1928

12. Most recently, I have published three articles in English about preclusion in the context of class actions and the recognition of class action judgments abroad.[13]

13. Although my main area of expertise is class actions, I also study comparative civil procedure and international litigation in general. From 1997 to 2005, I served as Associate Reporter to The American Law Institute's project on Principles and Rules of Transnational Civil Procedure, a project geared towards creating uniform rules of civil procedure for international litigation. After completion and final approval, the Principles of Civil Procedure was published by Cambridge University Press in 2006.[14] This project has been published in several languages and in several countries. In 2009, I co-published a book on Comparative Law with Foundation Press and was in charge of the chapters on comparative civil procedure.[15] This book is widely used in American law schools.

14. I have taught Civil Procedure, Class Actions, Complex Litigation, Comparative Civil Procedure, and Comparative Law in the United States for the past fifteen years, first as an Adjunct at the University of Pennsylvania Law School, then as an Associate Professor at the University of Houston Law Center, and finally at Syracuse University College of Law. I have participated in conferences, presented papers, and taught in numerous Latin American countries and Europe, mostly about class actions, but also about domestic civil procedure, comparative civil procedure, and international litigation.

15. I have not testified as an expert at trial or by deposition in the previous four years.

16. I attach my *curriculum vitae* as **Exhibit A** hereto.

## D. Overview

17. This is an issue of first impression. Despite the fact that recognition of foreign judgments is a frequently-arising issue, I am not aware of any case in which an opt-out class action judgment or settlement was recognized and enforced in any Latin American country.

18. The recognition and enforcement of class action judgments in Latin America present some very specific considerations that do not arise in the context of traditional litigation.

---

[13] *See* Antonio Gidi, *Loneliness in the Crowd: Why Nobody Wants Opt-Out Class Members to Assert Offensive Issue Preclusion Against a Class Defendant*, 66 SMU L. REV. 1 (2013); *Recognition of U.S. Class Action Judgments Abroad*, 37 BROOKLYN J. INT'L L. 893 (2012); *Issue Preclusion Effect of Class Certification Orders*, 63 HASTINGS L.J. 1023 (2012).

[14] *See* THE AMERICAN LAW INSTITUTE, PRINCIPLES OF TRANSNATIONAL CIVIL PROCEDURE (Cambridge University Press 2006) (ALI/UNIDROIT Associate Reporter and Secretary) (with Hazard, Stürner, and Taruffo).

[15] *See* UGO MATTEI, TEEMU RUSKOLA & ANTONIO GIDI, SCHLESINGER'S COMPARATIVE LAW (2009).

4

19.    Here, Plaintiffs assert generally, "it is more likely than not that courts of the various jurisdictions at issue would recognize, enforce, and give preclusive effect to a judgment entered in this action." (*see* Plaintiffs' Memorandum, p. 54).   Their analysis cites previous decisions by U.S. courts, but does not address the merits of issues that need to be confronted.

20.    The issue is not whether a traditional U.S. judgment in an individual lawsuit between one plaintiff and one defendant would be recognized or enforced in Latin America. Nor is the issue here whether a U.S. class action money judgment favorable to the plaintiff class would be enforced in Latin America if a class member wants to enforce it against the defendants.

21.    Rather, the issues at stake are:

        (1) whether a U.S. class action judgment against the interest of the class would bar class members from bringing individual (or class) claims against the same defendant(s) in Latin America; and

        (2) whether a U.S. class action judgment (or settlement) partly in favor of the class, but that a class member finds unsatisfactory for any reason, would bar class members from bringing individual (or class) claims against the same defendant(s) in Latin America for the remainder of the claim.

22.    These are the issues.   Thus, I will not discuss the requirements that the *defendants* be properly served with process and have an opportunity to present their case.   Nor will I discuss whether this Court has jurisdiction over the *defendants* under U.S. law or Latin American law.   In my opinion, those issues are irrelevant.

23.    In a class action, the traditional issues are reversed:   it is necessary to look not to the defendant, but to the absent members of the plaintiff class.   **The issue addressed in this Declaration, therefore, is whether a U.S. class action judgment (or settlement) that is totally or partially against the interest of class members is binding on the class members who are domiciled in Latin American countries and who did not personally appear in the class action.   The issue is whether a Latin American country would recognize an opt-out class action judgment to bar relitigation of the same claim in Latin America by Latin American citizens.**

24.    I conclude that the courts in Latin American countries, generally, and in (1) Venezuela, (2) Peru, (3) Panama, (4) El Salvador, (5) Ecuador, and (6) Mexico in particular, would rule in the negative.[16]   Three general obstacles to recognition of opt-out class action judgments are relevant here:

---

[16] Although my analysis applies to the vast majority, if not all, Latin American countries, I only specifically address Venezuela, Peru, Panama, El Salvador, Ecuador, and Mexico.

5

(1) first, an opt-out class action for damages would violate the public policy of those Latin American countries that: (a) do not have class actions for damages; (b) have class actions, but only give them preclusive effect if the judgment is favorable to the class; or (c) have only opt-in class actions;

(2) second, Latin American countries will demand that parties and absent class members in a foreign proceeding be personally served with process and have an opportunity to present their claims. Latin American countries are not likely to recognize a foreign judgment that binds their domiciliaries in a proceeding in a foreign country, including the U.S., in which those domiciliaries did not voluntarily participate and to which they were not made parties through service of process performed through internationally acceptable means (rogatory letters); and

(3) third, Latin American countries would rule that U.S. courts have no jurisdiction over Latin American class members who acquired their CDs outside of the United States. This analysis turns not on whether the U.S. court concluded that it could properly exercise jurisdiction over the absent plaintiffs under the due process clause of the United States Constitution, but instead on generally established principles of jurisdiction under international law.

25. My analysis proceeds in two parts. First, I discuss the general obstacles to recognition in Latin America of a U.S. opt-out class action judgment for damages. Second, I provide a country-by-country analysis of these general principles to conclude that Venezuela, Peru, Panama, El Salvador, Ecuador, and Mexico would not recognize a judgment in an opt-out class action for damages to preclude a claim by an absent class member.

## II.     OBSTACLES TO RECOGNITION AND ENFORCEMENT

### A.     Opt-Out Class Action Judgments Violate Public Policy

26. It is my professional opinion that the large majority if not all Latin American countries will not recognize or enforce a U.S. class action judgment because an opt-out class action for damages would violate their public policy.

27. As discussed in more detail below, there are three independent, and sometimes overlapping, reasons why recognition of an opt-out class action for damages as binding on absent class members would violate the public policy of certain Latin American countries. First, it would violate the public policy of countries that do not have class actions for damages. Second, it would violate the public policy of countries that give preclusive effect only to a class action judgment that is favorable to the class. Third, it

6

would violate the public policy of countries that have adopted an opt-in class action mechanism.

28.   The first reason is that several Latin American countries simply do not have class actions *for damages* in statutes, rules, or case law.  Some of these countries may have injunctive class actions with different levels of sophistication, ranging from a more liberal injunctive class action for the protection of the environment or consumers to a very limited type of injunctive class action for the protection of the public interest.[17]

29.   The prevailing rule in these countries is that someone may be deprived of their personal rights in courts *only* through due process of law.  Due process of law includes the need to be personally served with process and granted a reasonable opportunity to present claims and defenses.  The idea that individuals may have their rights decided in court without receiving service of process and becoming a formal party is unacceptable: there is no such thing as an unnamed or absent class member in these Latin American countries.

30.   Class actions for damages, particularly opt-out class actions, are so alien to the procedural law of these countries as to be considered a violation of due process of law and against these countries' public policy and constitutional values.  Therefore, these countries would not recognize a U.S. opt-out class action judgment issued against the interests of their domiciliaries.

31.   A second reason that a U.S. opt-out class action judgment would be against the public policy of certain Latin American countries arises from differences between the *res judicata* law of those jurisdictions and that of the United States.  In some Latin American countries, a class action judgment is binding only to the extent that it is favorable to the interests of the class members.  Therefore, a judgment for defendants or a judgment or settlement that is for less than the full amount of the claim is not binding on the class members.

32.   In addition, in some Latin American countries, plaintiffs who present new evidence or even raise new facts would be able to bring the same class action or a corresponding individual action.  Although the concepts of "new evidence" and "new facts" are not clearly defined, in my opinion, they encompass both:  (1) evidence or facts that were available at the time of the proceeding but not produced (with or without due diligence); and (2) evidence or facts that were unavailable.[18]

---

[17] *See* José Carlos Barbosa Moreira, *A ação popular do direito brasileiro como instrumento de tutela jurisdicional dos chamados interesses difusos*, in Temas de Direito Processual (1977) (discussing the Roman *actio popularis* as an injunctive class action).

[18] *See* Antonio Gidi, Coisa julgada e litispendência em ações coletivas 131-38 (1995) (discussing the concept of "new evidence" for purposes of bringing the same class action again); Antonio Gidi, *cosa juzgada en acciones colectivas* in Antonio Gidi and Eduardo Ferrer (eds.), La Tutela de los Derechos Difusos, Colectivos e Individuales Homogéneos 280-84 (2004) (idem).

7

33. These flexible and liberal *res judicata* rules regarding class judgments exist throughout Latin America. Binding an absent class member to an adverse judgment in a proceeding in which he or she did not participate or expressly join would be against these countries' due process of law, public policy, and constitutional values. Therefore, these countries would not recognize a U.S. opt-out class action judgment issued against the interests of its domiciliaries.

34. Third, countries that have adopted an opt-in class action mechanism would not recognize a judgment rendered in an opt-out class action. The adoption of opt-in, instead of opt-out, class actions stems from the widespread perception that binding an absent class member to a judgment in a proceeding in which he or she did not participate or expressly join would be a violation of due process of law and against the countries' public policy and constitutional values.[19] Therefore, a country that has adopted an opt-in class action mechanism would not recognize a U.S. opt-out class action judgment issued against the interests of their domiciliaries.

**B.    Formal Service of Process to Class Members through Rogatory Letters is Essential to Foreign Judgment Recognition and Enforcement in Latin America**

35. As in the United States, a key requirement of due process of law in Latin America is that a party be provided adequate notice and an opportunity to participate in the proceedings. These Constitutional requirements must be evaluated under the standard of the State of enforcement.

36. For example, the Bustamante Code requires "personal service of process to the parties or to a legal representative."[20] A similar requirement is found in Article 2(e) of the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Awards: "The plaintiff has been summoned or subpoenaed in due legal form substantially equivalent to that accepted by the law of the State where the judgment, award or decision is to take effect."

37. Service of process on a party domiciled abroad must be effectuated in a manner that is internationally accepted if a judgment is to be recognized abroad. For example, a large number of Latin American countries (including all countries specifically discussed in this Declaration) are signatories to the Inter-American Convention on Letters Rogatory, as is the United States. Most Latin American countries will not accept anything short

---

[19] Mexico, for example, has adopted an opt-in class action mechanism, and thus a judgment issued in an opt-out class action would not be recognized or enforced in that country.

[20] *See* Bustamante Code, Article 423.2: "Que las partes hayan sido citadas personalmente o por su representante legal, para el juicio." (that the parties have received service of process either personally or through their legal representative). The Bustamante Code is a treaty in force in several Latin American countries, including Ecuador, El Salvador, Panama, and Peru. It deals with private international law, including the enforcement of foreign judgments.

8

of service by rogatory letter[21] as adequate service of process on their residents for purposes of granting *exequatur* on a foreign judgment[22]—they will not accept service of process by publication, they will not accept service of process by letter, and they will not accept service of process through the attorney.[23] *A fortiori*, a simple "adequate class action notice" is insufficient.

38. An integral part of notice (and due process of law) is the idea of participation in the proceeding and the opportunity to present claims and defenses. For example, according to Article 23(f) of the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Awards, a foreign judgment would be recognized only if "the parties had an opportunity to present their defense."

39. Naturally, an opportunity to present one's claims or defenses is irrelevant when the claimant makes and prevails in all possible claims of a proceeding. The problem only arises when the person who did not have such an opportunity loses the case, loses one or more claims, or fails to assert a claim. That is when the lack of participation is relevant.

40. Typically, we speak of notice or service of process to a defendant. We do so because the plaintiff was the one who originally brought a lawsuit and needs no notice about it. It would be indeed outrageous if a plaintiff would require to receive notice of the lawsuit he or she brought. In the class action setting, however, in addition to the defendant, absent class members also need to be notified of the filing of a class action brought on their behalf.

41. My opinions in the present case proceed on the assumption that the absent foreign class members will not participate or expressly join in the class action proceeding.

42. In light of the discussion above, Latin American countries will refuse to recognize a U.S. class action judgment unfavorable to the interest of their domiciliaries because those domiciliaries were not made parties through an internationally acceptable service

---

[21] *See* Bustamante Code, Article 388 ("all judicial activity that one member state need to practice in another will be performed though letter rogatory. . . .") and Article 427 ("the service of process of whoever must be heard will be performed through letter rogatory according to this Code"); *see also* Julie C. Ferguson and David A. Pearl, *International Litigation in the Hemisphere*, 13 Am. U. Int'l L. Rev. 953, 959 (1998) ("A letter of request has been the customary and preferred method for transnational service of process in most civil law countries.").

[22] *See* Ferguson & Pearl, *supra* note 21, at 959, ("[I]f counsel will need to enforce a foreign judgment in [a Latin American country], counsel should make sure that service is effected in accordance with the laws of that country as well."); Maria Angela Jardim de Santa Cruz Oliveira, *Recognition and Enforcement of United States Money Judgments in Brazil*, 19 N.Y. Int'l L. Rev. 1, 14 (2006) ("[I]f the respondent is domiciled in Brazil, notice of process must comply with Brazilian law, in that the foreign country must send a rogatory letter to Brazil requesting that the Brazilian domiciled defendant be served notice of the process.").

[23] *See* Oliveira, *supra* note 22, at 15 ("[A]ffidavits, notifications by lawyers, by air mail, or any other method of properly serving notice of process according to foreign jurisdictions' law are invalid if served in Brazilian territory.").

of process.  In addition, Latin American countries will not recognize a U.S. class action judgment because the absent class members will not participate or expressly join in the proceedings.

**C.    Latin American Courts Would Conclude that the United States Had Not Validly Obtained Jurisdiction Over the Absent Class Members**

43.    In order to recognize and enforce a foreign judgment—in this case, a class action judgment (or court-approved settlement) issued by the United States District Court for the Northern District of Texas—Latin American countries would demand that the foreign court have jurisdiction over the parties.  Where parties <u>have not taken actions to consent to jurisdiction in the foreign court</u>, Latin American courts will apply principles of jurisdiction developed in international law to determine whether there were significant contacts with the United States, which are necessary to create jurisdiction.

44.    This analysis turns not on whether the U.S. court concluded that it could properly exercise jurisdiction over the absent class members under the due process clause of the United States Constitution, but instead turns on the laws of the recognizing country and generally established principles of jurisdiction under private international law.

45.    This is the general rule in most Latin American countries.  For example, Article 2104.2 of the Civil Code of Peru explicitly states that the foreign court must have jurisdiction according to Peru's own private international law and general principles of international jurisdiction.  Article 556 of the Salvadoran Code of Civil Procedure states that the foreign court must have jurisdiction according to the rules of international jurisdiction of El Salvador.  Article 423 of the Ecuadorian Private International Law Code states that the original court must have jurisdiction to decide the case according to the international rules of the Bustamante Code.  Under Article 423(1) of the Bustamante Code, the foreign court must have jurisdiction "according to the rules in this Code" which means that the jurisdiction seeking to enforce a foreign judgment must apply international rules of jurisdiction and not those of the foreign jurisdiction.[24]  Other Latin American countries also require that the foreign court must have jurisdiction according to the rules of the country where the judgment is sought to be recognized or enforced.[25]

---

[24] *See* Bustamante Code, Article 423.1: "Que tenga competencia para conocer del asunto y juzgarlo, de acuerdo con las reglas de este Código, el juez o tribunal que la haya dictado."

[25] *See* Venezuela Private International Law Act, Article 53.4 (stating that the foreign court must have jurisdiction according to Venezuelan law); Article 483 of the Brazilian Code of Civil Procedure (stating that a foreign judgment will only be enforceable in Brazil if it complies with the Brazilian Supreme Court Rules and the Brazilian Supreme Court Rule 217 (stating that a prerequisite of enforcement of foreign judgments is that the foreign court have jurisdiction over the party).  This rule is well settled in the Brazilian legal system.  *See* Decree Law 4,657/42, Introductory Law to the Civil Code (stating that a prerequisite of enforcement of foreign judgments is that the foreign court have jurisdiction over the party).

46.  Typically, we speak of jurisdiction over the defendant.  We do so because the plaintiff consents to jurisdiction by bringing the claim in the forum and because usually the defendant is the one against whom the judgment will be enforced.  In the class action setting, however, the absent class member's rights are affected in much the same way as a traditional defendant's rights.  Because absent class members do not take affirmative steps to bring a class action, they cannot be said to have consented to the jurisdiction of the U.S. courts.  In such circumstances, one simply cannot focus on the defendant to bar the plaintiff.

47.  I understand that in this case putative class members filed a proof-of-claim form with the Receiver, subjecting themselves to the jurisdiction of the United States District Court for the Northern District of Texas for all purposes solely related to the claims asserted in the SEC action.  The exact words of the jurisdiction clause on the proof-of-claim form are the following:

> CONSENT TO JURISDICTION:  If you submit a Proof of Claim Form in this case, you consent to the jurisdiction of the District Court for all purposes *related to this claim* and agree to be bound by its decisions, including, without limitation, a determination as to the validity and amount of any *claims asserted against the Receivership Entities*. In submitting a Proof of Claim Form, you agree to be bound by the actions of the District Court even if that means your claim is limited or denied.

Proof of Claim Form, p. 4 (emphases added).

48.  Based on this language, one might argue that the receivership is equivalent to an "opt-in" class of those who have filed claims.

49.  By its own terms, however, **the consent to jurisdiction was limited to the Receiver's claims process**.  The language on the proof-of-claim form is clear that the consent to jurisdiction was "for all purposes related to this claim" and only to "claims asserted against the Receivership Entities."

50.  The current lawsuit is different from the SEC action in (at least) two important aspects: (1) the type of proceeding; and (2) the parties involved.  First, unlike the SEC action, the current lawsuit is a class action.  Second, the current lawsuit is not brought against the Stanford entities, but against the financial institutions they allegedly banked with.

51.  The putative class members never subjected themselves to the jurisdiction of this Court for purposes of the class action brought against the financial institutions (different parties), nor have they ever opted into a class action (different type of lawsuit).

52.  The fact that, for purposes of efficiency, these two lawsuits are in the same court and that the plaintiffs have proposed that the proceeds of the second will be distributed

11

through the Receivership created by the first[26] should not obscure the fact that these are two completely different lawsuits, and that is how a Latin American court will see the situation.  While the SEC action was styled Civil Action No. 3:09-CV-0298-N, *Securities & Exchange Commission v. Stanford International Bank, Ltd., et al.*, the current action is styled Civil Action No 3:09-CV-02384-N-BG, *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*

53.   Thus, putative class members' "opt-in" to the Receivership claims process simply has no bearing on their participation in this case.

54.   There is a practical way of conceptualizing whether this Court has jurisdiction over the putative absent class members in the class action against the Banking Institutions.  One needs only to imagine the inverse situation:  would the Banking Institutions be able to sue the foreign investors individually in this Court?  Would this Court have jurisdiction over the foreign investors in a lawsuit brought by the Banking Institutions just because it has jurisdiction over them to determine their claims in the SEC action?  The obvious answer is no.

55.   Submitting a proof-of-claim form to the Receiver cannot be a trap for the foreign investors, who are not subjecting themselves to the general jurisdiction of U.S. courts to be sued by anyone about any claim.  It does not matter how a U.S. court views its own jurisdiction for the purposes of this inquiry: the relevant point of view is the perspective of the Latin American countries—that is how a foreign court would see the matter if it is faced with the prospect of enforcing a class action judgment against its domiciliaries.

56.   There are simply no accepted standards under which Latin American courts would accept that a U.S. court would have jurisdiction over a foreigner who lacked significant contacts with the United States, unless the foreigner expressly consented to jurisdiction.

57.   It is my opinion, therefore, that the vast majority of, if not all, Latin American countries would not recognize a U.S. class action judgment as binding their domiciliaries, because courts in Latin American countries would find that there is a lack of personal jurisdiction over the absent members of the plaintiff class.

### III.   COUNTRY-BY-COUNTRY ANALYSIS

58.   As described above, there are three general reasons why Latin American countries would not recognize or enforce an opt-out class action for damages against the interest of their domiciliaries:  (1) opt-out class action judgments violate public policy; (2) there is no formal service of process to class members by internationally acceptable means;

---

[26] *See* Janvey Declaration (Oct. 30, 2014) ¶ 19 ("I have been coordinating the above litigation with the investor putative class action litigation against almost identical sets of defendants, and putative class counsel have agreed that for purposes of efficiency, any proceeds recovered from the class action cases will be distributed through the Receivership claims distribution mechanism.") (emphasis added).

and (3) under Latin American concepts of jurisdiction, the United States cannot validly obtain jurisdiction over absent class members.

59. I now provide an analysis of how these general reasons apply to each of the countries at issue.

## **Venezuela**

60. Venezuela has ratified the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Awards.[27] Because the United States is not a party to that Convention, the applicable law is the Venezuelan Code of Civil Procedure and rules of Private International Law, which are consistent with the principles in the Convention.

61. According to articles 5 and 53 of the Private International Law Act, a foreign judgment will be recognized in Venezuela as long as, among other things: (1) it is not contrary to the internal public order; (2) the foreign court had jurisdiction over the controversy, according to rules of international jurisdiction provided in the Venezuelan law; and (3) the defendant has received personal service of process in a way to secure his or her right of defense.[28]

62. Venezuela does not recognize opt-out class actions for individual damages. Venezuelan legislation allows only injunctive class actions for the protection of rights that belong to a group of indeterminate people. The Venezuelan legal system does not recognize a rule that allows an "adequate representative" to represent the individual interests of absent people who are not made parties to a proceeding through service of process. Binding a nonparty would violate the constitutional principle of due process of law. Therefore, a judgment rendered in an opt-out class action for damages would violate Venezuela's public policy.

63. Venezuela is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[29] It is therefore expected that class members domiciled in Venezuela

---

[27] *See Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards*, available at http://www.oas.org/juridico/english/sigs/b-41.html (last visited June 1st, 2015).

[28] *See* Private International Law Act: Artículo 5. Las situaciones jurídicas creadas de conformidad con un Derecho extranjero que se atribuya competencia de acuerdo con criterios internacionalmente admisibles producirán efectos en la República, a no ser que contradigan los objetivos de las normas venezolanas de conflicto, que el Derecho venezolano reclame competencia exclusiva en la materia respectiva, o que sean manifiestamente incompatibles con los principios esenciales del orden público venezolano. Artículo 53. Las sentencias extranjeras tendrán efecto en Venezuela siempre que reúnan los siguientes requisitos: 4. Que los tribunales del Estado sentenciador tengan jurisdicción para conocer de la causa de acuerdo con los principios generales de jurisdicción consagrados en el Capítulo IX de esta Ley; 5. Que el demandado haya sido debidamente citado, con tiempo suficiente para comparecer, y que se le hayan otorgado en general, las garantías procesales que aseguren una razonable posibilidad de defensa.

[29] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited June 1st, 2015).

**APP 1312**

will receive notice of the class action proceeding through rogatory letters. Because notice of the class action proceeding to domiciliaries of Venezuela likely would not be effectuated by letters rogatory (or other internationally acceptable means), Venezuela would not recognize or enforce a U.S. opt-out class action judgment against their interests.

64. In order to recognize and enforce a foreign judgment, Venezuelan courts demand that the foreign court have personal jurisdiction according to Venezuela's own rules of private international law and the general principles of international jurisdiction.[30] Because Venezuela will consider that the United States does not have international jurisdiction over domiciliaries of Venezuela without contacts in the United States, Venezuela will not recognize or enforce a U.S. opt-out class action judgment against their interest.

65. In summary, it is my opinion that Venezuela would not recognize or enforce a U.S. opt-out class action for damages against the interest of its domiciliaries because Venezuela will find that: (1) a judgment rendered in an opt-out class action for damages would violate Venezuela's public policy; (2) the absent class members were not served with process by internationally acceptable means; and (3) the United States does not have jurisdiction over Venezuela's domiciliaries without contacts in the United States.

66. In the specific case of Venezuela, one aspect cannot be neglected: the lack of judicial independence in that country, coupled with its open anti-American stance would make it almost impossible to recognize a U.S. class action judgment against the interests of Venezuelan citizens. This environment will more likely cut against a company or bank trying to enforce an American judgment against a Venezuelan national, especially in such a notorious case that showcased the failure of the American Financial Market.

67. In addition, considering that the United States has recently denied recognition to a class action judgment from an Ecuadorean court (*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014)), it is easy to foresee how this event could be used in Venezuela as reason not to recognize a U.S. class action judgment.

### Peru

68. Peru has ratified the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Awards.[31] Because the United States is not a party to that Convention and does not have a treaty with Peru regarding recognition of foreign

---

[30] *See* Private International Law Act: Artículo 53. Las sentencias extranjeras tendrán efecto en Venezuela siempre que reúnan los siguientes requisitos: 4. Que los tribunales del Estado sentenciador tengan jurisdicción para conocer de la causa de acuerdo con los principios generales de jurisdicción consagrados en el Capítulo IX de esta Ley")

[31] *See Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards*, available at http://www.oas.org/juridico/english/sigs/b-41.html (last visited June 1st, 2015).

14

judgments, the applicable law is the Peruvian Code of Civil Procedure, which is consistent with the principles in the Convention.

69.  Article 2104 of the Peruvian Civil Code provides that foreign judgments may be recognized in Peru as long as:  (1) the judgment is not against the Peruvian public policy;  (2) the defendant was served with process according to the laws of the proceeding, was given a reasonable time to participate, and was afforded procedural guarantees to defend; and (3) the foreign court has personal jurisdiction according to Peru's own rules of private international law and the general principles of international jurisdiction.[32]

70.  Furthermore, in the Peruvian system of class actions, only judgments that are favorable to absent class members are binding.  Under Article 82.6 of the Code of Civil Procedure, "the final judgment that declares the claim meritorious, will bind those who did not participate in the proceeding."[33]  Therefore, a U.S. class-action judgment would be given preclusive effect in Peru only if favorable to the absent class members.

71.  Peru is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[34]  It is therefore expected that class members domiciled in Peru will receive notice of the class action proceeding through rogatory letters.  Because notice of the class action proceeding to domiciliaries of Peru likely would not be effectuated by letters rogatory (or other internationally acceptable means), Peru would not recognize or enforce a U.S. opt-out class action judgment against their interests.

72.  In order to recognize and enforce a foreign judgment, Peruvian courts demand that the foreign court have personal jurisdiction according to Peru's own rules of private international law and the general principles of international jurisdiction.  *See supra* note 32.  Because Peru will consider that the United States does not have international jurisdiction over domiciliaries of Peru without contacts in the United States, Peru will not recognize or enforce a U.S. opt-out class action judgment against their interest.

73.  In summary, it is my opinion that Peru would not recognize or enforce a U.S. opt-out class action for damages against the interest of its domiciliaries because Peru will find that:  (1) a judgment against absent class members rendered in an opt-out class action for damages would violate Peru's public policy; (2) the absent class members were not

---

[32] *See* Código Civil (Peru), Artículo 2104:  "Para que las sentencias extranjeras sean reconocidas en la República (...), se requiere (...) 2.- Que el tribunal extranjero haya sido competente para conocer el asunto, de acuerdo a sus normas de Derecho Internacional Privado y a los principios generales de competencia procesal internacional. 3.- Que se haya citado al demandado conforme a la ley del lugar del proceso; que se le haya concedido plazo razonable para comparecer; y que se le hayan otorgado garantías procesales para defenderse (...) 7.- Que no sea contraria al orden público (...)."

[33] *See* Código Procesal Civil (Peru), Article 82(6):  "La sentencia definitiva que declare fundada la demanda, será obligatoria además para quienes no hayan participado del proceso."

[34] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited June 1st, 2015).

15

served with process by internationally acceptable means; and (3) the United States does not have jurisdiction over Peru's domiciliaries without contacts in the United States.

## **Panama**

74. Panama has adopted the Bustamante Code.  Because the United States does not have a treaty with Panama regarding recognition of foreign judgments, the applicable law is the Panamanian Code of Civil Procedure.

75. According to Article 179 of the Code of Private International Law, foreign judgments may be recognized in Panama as long as, among other things:  (1) there was personal service of process to the defendant and there was an opportunity to participate in the case (principle of adversariness); and (2) the judgment was issued by a competent court.[35]

76. Panama is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[36]  It is therefore expected that class members domiciled in Panama will receive notice of the class action proceeding through rogatory letters.  Because notice of the class action proceeding to domiciliaries of Panama would not be effectuated by letters rogatory (or other internationally acceptable means), Panama will not recognize or enforce a U.S. opt-out class action judgment against their interests.

77. The language of Article 179.1 may be read to imply that the requirement of jurisdiction is deemed satisfied merely when the jurisdiction of the foreign court is not in conflict with the exclusive jurisdiction of Panamanian courts.  But there is no reason to assume that the enactment of this provision changed decades of legal tradition in Panama and in the world regarding recognition and enforcement of judgments abroad, especially considering that Panama has adopted the Bustamante Code which provides that the foreign court must have jurisdiction "according to the rules in this Code."[37] (Article 423.1).

---

[35] *See* Código de Derecho Internacional Privado de la República de Panamá, Article 179:  "(...) ninguna sentencia dictada en país extranjero podrá ser ejecutada en la República de Panamá si no reúne los siguientes requisitos: 1. Que la sentencia haya sido dictada por un tribunal competente, es decir, que no haya conculcado la competencia privativa de los tribunales panameños. Se entiende que la competencia sobre bienes inmuebles ubicados en la República de Panamá es de competencia privativa de los jueces panameños. 2. Que la sentencia no haya sido dictada en rebeldía, entendiéndose por tal, para los efectos de este artículo, el caso en que la demanda no haya sido personalmente notificada al demandado.  Es decir, que el proceso evacuado en el extranjero haya cumplido con el principio del contradictorio.  3. Que la sentencia pronunciada por tribunal extranjero no conculque principios o derechos fundamentales del orden publico panameño."

[36] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited June 1st, 2015).

[37] *See* Article 423(1) of the Bustamante Code:  "que tenga competencia para conocer del asunto y juzgarlo, de acuerdo con las reglas de este Código, el juez o tribunal que la haya dictado."

16

**APP 1315**

78.     Therefore, it is my opinion that Panama will verify whether the U.S. court had jurisdiction over its domiciliaries according to Panama's own laws and international standards.  Because Panama will consider that the United States does not have international jurisdiction over domiciliaries of Panama without contacts in the United States, Panama will not recognize or enforce a U.S. opt-out class action judgment against their interest.

79.     In summary, it is my opinion that Panama would not recognize or enforce a U.S. opt-out class action judgment for damages against its domiciliaries because Panama will find that:  (1) the absent class members were not served with process by internationally acceptable means; and (2) the United States does not have jurisdiction over Panama's domiciliaries without contacts in the United States.

### El Salvador

80.     El Salvador has adopted the Bustamante Code.  Because the United States does not have a treaty with El Salvador regarding recognition of foreign judgments, the applicable law is the Salvadoran Code of Civil Procedure.

81.     According to Article 556 of the Salvadoran Code of Civil Procedure, foreign judgments may be recognized in El Salvador as long as:  (1) the judgment does not violate the Salvadoran constitutional principles or public policy; (2) the party against whom the recognition is sought, has been legally served with process; and (3) the foreign judgment was issued by a court with jurisdiction according to the rules of international jurisdiction of El Salvador.[38]

82.     El Salvador does not recognize opt-out class action for individual damages.  The Salvadoran legal system does not recognize a rule that allows an "adequate representative" to represent the individual interests of absent people who are not made parties to a proceeding through service of process and not allowed an opportunity to present their case.  Binding a nonparty (in this case, an absent class member in American legal terminology) would violate the Salvadoran Constitutional principle of due process of law.  Therefore, a judgment rendered in an opt-out class action for damages would violate El Salvador's public policy.

---

[38] *See* Código Procesal Civil y Mercantil, Article 556:  "Cuando no hubiere tratados o normas internacionales aplicables al reconocimiento de un título extranjero como título de ejecución en El Salvador, dicho reconocimiento se podrá producir si concurren al menos los siguientes requisitos: 1º. Que la sentencia, con autoridad de cosa juzgada en el Estado en que se ha pronunciado, emane del tribunal competente según las normas salvadoreñas de jurisdicción internacional. 2º. Que la parte demandada, contra la que se pretende realizar la ejecución, hubiese sido legalmente emplazada, aunque fuera declarada rebelde, siempre que se le hubiera garantizado la posibilidad de ejercer su defensa y que se le hubiese notificado legalmente la resolución. 4º. Que la sentencia no afecte los principios constitucionales o de orden público del derecho salvadoreño, y que el cumplimiento de la obligación que contenga sea lícito en El Salvador."

17

83.   El Salvador is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[39]   It is therefore expected that class members domiciled in El Salvador will  receive notice of the class action proceeding through rogatory letters. Because notice of the class action proceeding to domiciliaries of El Salvador would not be effectuated by letters rogatory (or other internationally acceptable means), El Salvador will not recognize or enforce a U.S. opt-out class action judgment against their interests.

84.   In order to recognize and enforce a foreign judgment, Salvadoran courts demand that the foreign court has personal jurisdiction according to El Salvador's own rules of international jurisdiction.[40]   Because El Salvador will consider that the United States does not have international jurisdiction over domiciliaries of El Salvador without contacts in the United States, El Salvador will not recognize or enforce a U.S. opt-out class action judgment against their interest.

85.   In summary, it is my opinion that El Salvador would not recognize or enforce a U.S. opt-out class action for damages against the interest of its domiciliaries because El Salvador will find that:  (1) a judgment rendered in an opt-out class action for damages would violate El Salvador's public policy; (2) the absent class members were not served with process by internationally acceptable means; and (3) the United States does not have jurisdiction over El Salvador's domiciliaries without contacts in the United States.

**Ecuador**

86.   Ecuador adopted the Bustamante Code as well as the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Award.  Because the United States is not a party to that Convention and does not have a treaty with Ecuador regarding recognition of foreign judgments, the applicable law is the Ecuadorean Code of Civil Procedure, which is consistent with the principles in the Convention.

87.   Foreign judgments are enforceable in Ecuador as long as:  (1) the foreign judgment does not violate Ecuadorian public law or any national law; (2) the parties have been served with process either personally or through their legal representative; and (3) the original court has jurisdiction to decide the case, according to the international rules of the Bustamante Code.[41]

---

[39] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited June 1st, 2015).

[40] *See* Código Procesal Civil y Mercantil, Article 556: "Cuando no hubiere tratados o normas internacionales aplicables al reconocimiento de un título extranjero como título de ejecución en El Salvador, dicho reconocimiento se podrá producir si concurren al menos los siguientes requisitos: 1°. Que la sentencia, con autoridad de cosa juzgada en el Estado en que se ha pronunciado, emane del tribunal competente según las normas salvadoreñas de jurisdicción internacional."

[41] *See* Ecuadorian Code of Civil Procedure, Article 414:   "Las sentencias extranjeras se ejecutarán si no contravinieren al Derecho Público Ecuatoriano o a cualquier ley nacional;" Ecuadorian Code of Private International

18

88. Ecuador is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[42] It is therefore expected that class members domiciled in Ecuador will receive notice of the class action proceeding through rogatory letters. Because notice of the class action proceeding to domiciliaries of Ecuador would not be effectuated by letters rogatory (or other internationally acceptable means), Ecuador will not recognize or enforce an U.S. opt-out class action judgment against their interests.

89. In order to recognize and enforce a foreign judgment, Ecuadorian courts demand that the foreign court has personal jurisdiction according to its own rules of international jurisdiction.[43] Because Ecuador will consider that the United States does not have international jurisdiction over domiciliaries of Ecuador without contacts in the United States, Ecuador will not recognize or enforce a U.S. opt-out class action judgment against their interests.

90. In summary, it is my opinion that Ecuador would not recognize or enforce a U.S. opt-out class action judgment for damages against its domiciliaries because Ecuador will find that: (1) the absent class members were not served with process by internationally acceptable means; and (2) the United States does not have jurisdiction over Ecuador's domiciliaries without contacts in the United States.

91. In addition, it is easy to foresee how the recent denial of recognition to a class action judgment from an Ecuadorean court by a United States court (*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014)) could be used as a further reason not to recognize a US class action judgment.

### Mexico

92. Mexico has ratified the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Awards.[44] Because the United States is not a party to that Convention and does not have a treaty with Mexico regarding

---

Law, Article 423: "Artículo 423. Toda sentencia civil o contencioso administrativa dictada en uno de los Estados contratantes, tendrá, fuerza y podrá ejecutarse en los demás si reúne las siguientes condiciones: 1. Que tenga competencia para conocer del asunto y juzgarlo. de acuerdo con las reglas de este Código, el juez o tribunal que la haya dictado; 2. Que las partes hayan sido citadas personalmente o por su representante legal, para el juicio; 3. Que el fallo no contravenga el orden público o el derecho público del país en que quiere ejecutarse (...)"

[42] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited June 1st, 2015).

[43] *See* Ecuadorian Code of Private International Law, Article 423: "Artículo 423. Toda sentencia civil o contencioso administrativa dictada en uno de los Estados contratantes, tendrá, fuerza y podrá ejecutarse en los demás si reúne las siguientes condiciones: 1. Que tenga competencia para conocer del asunto y juzgarlo. de acuerdo con las reglas de este Código, el juez o tribunal que la haya dictado."

[44] *See Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards*, available at http://www.oas.org/juridico/english/sigs/b-41.html (last visited June 1st, 2015).

19

recognition of foreign judgments, however, the applicable law is the Mexican Code of Civil Procedure, which is consistent with the principles in the Convention.

93.     Articles 564, 569 and 571 of the Federal Code of Civil Procedure provide that a foreign judgment will be recognized in Mexico as long as, among other things:  (1) it is not contrary to the internal public order according to the Code of Procedure and applicable law; (2) the foreign court had jurisdiction over the controversy, according to rules that are recognized by the international law and compatible to the Mexican Code; and (3) the defendant has received personal service of process in a way to secure his or her right of defense.[45]

94.     Mexico does not recognize opt-out class actions for individual damages.  Although in 2011 the country adopted class action legislation, its proceeding is opt-in: absent class members must opt-in to the class action in order to be able to participate in the class action judgment.[46]  Without the affirmative step of opting-in to a class action, absent class members are not bound by any class action judgment or court approved settlement.    Moreover, absent class members may opt-in even after judgment. Therefore, presumably class members will only opt-in to a class action when they agree with its outcome.

95.     I personally participated in all discussions related to the drafting of the Mexican Class Action Act, enacted in 2011.[47]   The choice between opt-in and opt-out class action legislation was clearly in front of the Mexican Senate.  As a matter of fact, the original class action project presented by the Drafting Committee suggested an opt-out class action.  The original proposal was the following:

> Any class member may request his or her exclusion from the class action, as long as the request is done in writing in any phase of the proceeding

---

[45] *See* Código Federal de Procedimientos Civiles (Mexico), Artículo 569:  "Las sentencias, los laudos arbitrales privados de carácter no comercial y demás resoluciones jurisdiccionales extranjeros tendrán eficacia y serán reconocidos en la República en todo lo que no sea contrario al orden público interno en los términos de este código y demás leyes aplicables, salvo lo dispuesto por los tratados y convenciones de los que México sea parte."  Artículo 571, III and IV:  Las sentencias, laudos arbitrales privados de carácter no comercial y resoluciones jurisdiccionales dictados en el extranjero, podrán tener fuerza de ejecución si cumplen con las siguientes condiciones:  III**.-** Que el juez o tribunal sentenciador haya tenido competencia para conocer y juzgar el asunto de acuerdo con las reglas reconocidas en el derecho internacional que sean compatibles con las adoptadas por este Código. El Juez o tribunal sentenciador extranjero no tiene competencia cuando exista, en los actos jurídicos de que devenga la resolución que se pretenda ejecutar, una cláusula de sometimiento únicamente a la jurisdicción de tribunales mexicanos;  IV**.-** Que el demandado haya sido notificado o emplazado en forma personal a efecto de asegurarle la garantía de audiencia y el ejercicio de sus defensas;

[46] *See* articles 594 and 605 of the Mexican Code of Civil Procedure (amended 2011) (providing for the need for absent class members to expressly opt in before they could be benefited or bound by a class action judgment).

[47] Together with Professors Alberto Benítez and Eduardo Ferrer Mac-Gregor, I participated as one of the principal academic drafters of the class action bill that led to the enactment of the Mexican Class Action Statute.  The adoption of an opt-in class action regime was the decision of the Mexican Senate.

20

until the final judgment.[48]

96.  One of the reasons traditionally given for the rejection of the opt-out class action is the fear that binding absent class members, especially to an unfavorable decision, in a proceeding to which they were not a party, would violate the due process of law of absent class members.  In Mexico and other Latin American countries, there is a strong predisposition to consider opt-out class actions as a violation of the due process of law.

97.  Countries that adopted an opt-in class action would consider the idea of an opt-out class action as a violation of their public policy.  The idea of a lawsuit that binds class members by their omission from opting-out of a class was considered and expressly rejected.  Therefore, these countries would not recognize a foreign opt-out class action judgment (or settlement) against the interest of their nationals.

98.  Mexico is a signatory to the Inter-American Convention on Letters Rogatory, as is the United States.[49]  It is therefore expected that class members domiciled in Mexico will receive notice of the class action proceeding through rogatory letters.  Because notice of the class action proceeding to domiciliaries of Mexico likely would not be effectuated by letters rogatory (or other internationally acceptable means), Mexico would not recognize or enforce a U.S. opt-out class action judgment against their interests.

99.  In order to recognize and enforce a foreign judgment, Mexican courts demand that the foreign court have personal jurisdiction according to its own rules of private international law and the general principles of international jurisdiction.[50]  Because Mexico will consider that the United States does not have international jurisdiction over domiciliaries of Mexico without contacts in the United States, Mexico will not recognize or enforce a U.S. opt-out class action judgment against their interest.

100.  In summary, it is my opinion that Mexico would not recognize or enforce a U.S. opt-out class action for damages against the interest of its domiciliaries because Mexico

---

[48] "Cualquier miembro de la colectividad o grupo de que se trate podrá pedir su exclusión de dicha colectividad o grupo para efectos del procedimiento colectivo de que se trate, siempre que lo solicite al juez por escrito en cualquier etapa del proceso y hasta antes de dictar sentencia." *See* Benítez, Mac-Gregor & Gidi, Iniciativa de reforma al Código Federal de Procedimientos Civiles, *in* GIDI & MAC-GREGOR, CÓDIGO MODELO DE PROCESOS COLECTIVOS. UN DIÁLOGO IBEROAMERICANO. COMENTARIOS ARTÍCULO POR ARTÍCULO 447 (2008).

[49] *See* Inter-American Treaty on Letters Rogatory, *available at* http://www.oas.org/juridico/english/sigs/b-36.html (last visited June 1st, 2015).

[50] *See* Código Federal de Procedimientos Civiles (Mexico), Artículo 571, III:  Las sentencias, laudos arbitrales privados de carácter no comercial y resoluciones jurisdiccionales dictados en el extranjero, podrán tener fuerza de ejecución si cumplen con las siguientes condiciones:  III.- Que el juez o tribunal sentenciador haya tenido competencia para conocer y juzgar el asunto de acuerdo con las reglas reconocidas en el derecho internacional que sean compatibles con las adoptadas por este Código. El Juez o tribunal sentenciador extranjero no tiene competencia cuando exista, en los actos jurídicos de que devenga la resolución que se pretenda ejecutar, una cláusula de sometimiento únicamente a la jurisdicción de tribunales mexicanos."

21

will find that: (1) a judgment rendered in an opt-out class action for damages would violate Mexico's public policy; (2) the absent class members were not served with process by internationally acceptable means; and (3) the United States does not have jurisdiction over Mexico's domiciliaries without contacts in the United States.

## IV. CONCLUSION

101. In conclusion, a judgment or court-approved settlement in this U.S. class action proceeding would not be recognized or enforced in Latin American countries because: (1) opt-out class action judgments violate public policy; (2) there is no service of process to absent class members by internationally acceptable means; and (3) the United States has not validly obtained jurisdiction over absent class members.

102. If any member of the plaintiffs' class that is not satisfied with the class judgment or class settlement sues the defendants in their own country, the defendants cannot successfully raise a *res judicata* defense. It is unthinkable that a Latin American country would give preclusive effect to a judgment rendered in an unknown or rejected form of representative litigation issued by a foreign court with no jurisdiction over the Latin American party, and without service of process or opportunity to present claims and arguments.

22

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct and that this declaration was executed in Salvador, Bahia,

Brazil.

Dated:  July 7, 2015

**Antonio Gidi**

23

# EXHIBIT A

APP 1323

**ANTONIO GIDI**
Syracuse University College of Law
950 Irving Ave.    Syracuse, NY 13244-6070
gidi@gidi.com.br | (215) 266-6464 | www.gidi.com.br

## EDUCATION
1998 - 2001    University of Pennsylvania Law School, Philadelphia, S.J.D.
1994 - 2003    PUC University at Sao Paulo, Brazil, Ph.D.
2000, 2001    University of Paris I Law School (Pantheon-Sorbonne), France, Visiting Scholar
1996 - 1997    University of Pennsylvania Law School, Philadelphia, Visiting Scholar
1994 - 1996    University of Milan, Italy, Visiting Scholar
1991 - 1993    PUC University at Sao Paulo, Brazil, L.L.M.
1986 - 1990    Federal University of Bahia, Brazil, J.D.
               *Activities:* Senior Editor, Law Review; Research Assistant; Tutor

## TEACHING APPOINTMENTS
2013-present   **University of Syracuse College of Law**
               Visiting Professor    *Taught:* Civil Procedure (13, 14), Torts (13, 14), Comparative Law (14, 15),
               Class Actions (14, 15)

Fall 2012      **University of Tennessee College of Law**
               Visiting Professor    *Taught:* Civil Procedure, Comparative Law

2005 – 2012    **University of Houston Law Center**
               Assistant Professor
               *Taught:* Civil Procedure (05, 06, 07, 08, 09, 10, 11), Comparative Law (06, 06, 07, 08, 09, 10, 11, 12),
               International Commercial Arbitration (06), Latin American Law (in Spanish) (05, 06, 07),
               Class Actions (07, 08, 11, 12), Comparative Complex Litigation (07)
               *Committees:* Graduate Legal Studies (05-06, 06-07), IEFS & HJCC Scholarship Review (05-06),
               International Cooperation (07-08, 08-09, 09-10, 10-11, 11-12), Honor Court (11-12)

Summer 2015    **University of Trento Law School, Italy**
               Visiting Professor    *Taught:* Comparative Civil Procedure, Class Actions

Summer 2015    **Università degli Studi di Roma "Tor Vergata", Italy**
               Visiting Professor    *Taught:* Comparative Civil Procedure, Class Actions

Summer 2011    **University of Gent Law School, Belgium**
               Marcel Storme Visiting Professor of Law    *Taught:* Comparative Civil Procedure, Class Actions

2007-2009      **Universidade de Ribeirão Preto, Brazil**
               Professor of Law   *Taught:* Comparative Class Actions, Comparative Civil Procedure, Class Actions

Summer 2008    **ITAM Law School, Mexico City**
               Visiting Professor   *Taught:* Comparative Civil Procedure, Comparative Class Actions

2006-2007      **Agostinho Neto University School of Law,** Luanda, Angola
               Academic Adviser and Visiting Professor, LLM Program      *Taught:* Introduction to US Law
               Helped create the first LLM Program in Angola (Oil and Gas)

Summer 2006    **Loyola University Law School,** Summer Program Abroad
               *Taught:* Comparative Civil Procedure

Summer 2005    **Penn State Law School,** Summer Program in France and Austria
               *Taught:* Comparative Civil Procedure

2003 – 2005    **University of Detroit Mercy School of Law**
               Assistant Professor
               *Taught:* Civil Procedure (03-04, 04-05), Comparative Law (04, 05), Complex Litigation (05)
               *Committees:* Hiring (03-04, 04-05), Global (03-04, 04-05), Curriculum (04-05), Building (03-04),
               Student Evaluations (04-05), Mexico Program (04-05), Library (04-05)

1997 – 2003    **University of Pennsylvania Law School**
               Lecturer-in-Law
               *Created and taught:* Comparative Civil Procedure, Comparative Professional Responsibility,

Int'l Advocacy, Class Actions in Comparative Perspective

2002 – 2003     **Temple University, Beasley School of Law**
Adjunct Professor. *Taught*: International Litigation and Arbitration

Fall 2000     **Federal University of Bahia, Brazil**
Visiting Professor of Law.   *Taught*: Comparative Civil Procedure and Class Actions

1992 – 1994     **PUC University at Sao Paulo**, Brazil
Teaching Assistant   *Taught*: Civil Procedure

## ACADEMIC APPOINTMENTS

2009     **Mexican Senate**
Consultant to Senator Murillo Karam. Drafted the Current Mexican Class Action Code

2009     **Brazilian Ministry of Justice**
Member of the Advisory Committee. Drafted a Class Action Bill

1997 – 2005     **The American Law Institute**
Associate Reporter. Principles and Rules of Transnational Civil Procedure

2002 – 2005     **Ibero-American Institute of Civil Procedure**
Co-Reporter. Model Class Action Code for Ibero-America

2000 – 2005     **International Institute for the Unification of Private Law (UNIDROIT)**
Secretary. Working Group on Transnational Civil Procedure

2002 – 2003     **The Hague Conference on Private International Law**
Member. Working Group on International Jurisdiction and Judgments

## PROFESSIONAL EXPERIENCE

2002 – present     Consultant and expert witness in foreign law, international litigation and arbitration, class actions

2001     Fine, Kaplan & Black, Philadelphia, PA
Researcher

1993 – 1994     City of Sao Paulo, Brazil
Staff Attorney, Law Department (Represented the City of Sao Paulo in civil litigation)

1987 - 1989     Law Offices of Ronilda Noblat & Sergio Schlang
Associate, Litigation Department (drafted pleadings, consulted with clients)

## PUBLICATIONS
*Books*

MANUAL DE ESTILO JURÍDICO ACADÊMICO (forthcoming 2015) [Brazil]
LA CLASS ACTION COMO INSTRUMENTO DE TUTELA COLECTIVA DE LOS DERECHOS. LAS ACCIONES COLECTIVAS EN UNA PERSPECTIVA COMPARADA (Rubinzal, forthcoming, 2015) [Argentina]
SCHLESINGER'S COMPARATIVE LAW (w/ Mattei and Ruskola) (Foundation Press, 2009) [U.S.A.]
RUMO A UM CÓDIGO DE PROCESSO CIVIL COLETIVO (Forense, 2008) [Brazil]
A CLASS ACTION COMO INSTRUMENTO DE TUTELA COLETIVA DOS DIREITOS. AS AÇÕES COLETIVAS EM UMA PERSPECTIVA COMPARADA (Revista dos Tribunais, 2007) [Brazil]
PRINCIPLES OF TRANSNATIONAL CIVIL PROCEDURE (ALI/UNIDROIT Associate Reporter and Secretary) (w/ Hazard, Stürner, and Taruffo) (Cambridge University Press, 2006) [England]
LAS ACCIONES COLECTIVAS Y LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES EN BRASIL. UN MODELO PARA PAÍSES DE DERECHO CIVIL (Instituto de Investigaciones Jurídicas de la UNAM, 2004) [Mexico]
COISA JULGADA E LITISPENDÊNCIA EM AÇÕES COLETIVAS (Saraiva, 1995) [Brazil]
ESTATUTO DA ADVOCACIA E DA OAB (Ciência Jurídica, 1994) [Brazil]
ANOTAÇÕES PARA UMA HISTÓRIA DA FACULDADE DE DIREITO DA BAHIA (1991) [Brazil]

*Edited Books*

CLASS ACTIONS IN COMPARATIVE PERSPECTIVE (ed.) (Carolina Academic Press, forthcoming 2015) [U.S.A.]
SÉRIE PROCESSO COLETIVO, COMPARADO E INTERNACIONAL (ed.) (2012) (4 vols.) [Brazil]
COMENTÁRIOS AO CÓDIGO MODELO DE PROCESSOS COLETIVOS (ed.) (w/ Ferrer) (Jus Podivm, 2009) [Brazil]

2

CÓDIGO MODELO DE PROCESOS COLECTIVOS. UN DIÁLOGO IBEROAMERICANO (ed.) (w/ Ferrer) (Porrua, 2009) [Mexico]

PROCESOS COLECTIVOS (ed.) (w/ Ferrer), 2nd edition (Porrúa, 2004) [Mexico]

LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS (ed.) (w/ Ferrer), 2nd edition (Porrúa, 2004) [Mexico]

### *Articles and Book Chapters*

Class Actions in Mexico. What It Is; What It Could Have Been (forthcoming 2015)

Civil Procedure in Cross-Cultural Dialogue: Eurasia Context (w/ Voet), II RUSSIAN L. J. 125 (2014)

Loneliness in the Crowd. Why Nobody Wants Opt-Out Class Members to Assert Offensive Issue Preclusion Against a Class Defendant, 66 SMU L. REV. 1 (2013)

Recognition of U.S. Class Action Judgments Abroad, 37 BROOKLYN J. INT'L L. 893 (2012)

Issue Preclusion Effect of Class Certification Orders, 63 HASTINGS L.J. 101 (2012)

Case Management e o Novo CPC: Os "Novos" Poderes do Juiz Brasileiro (w/ Costa) (forthcoming 2015)

Limites objetivos da coisa julgada no Projeto de Código de Processo Civil. Reflexões Inspiradas na Experiência Norte-Americana (w/ Tesheiner and Prates), 194 REVISTA DE PROCESSO 101 (2011)

Patrocinio de intereses difusos (Comentarios al art. 82 del Código Procesal Civil Peruano), *in* JOHAN S. CAMARGO ACOSTA (ED.), 1 CÓDIGO PROCESAL CIVIL COMENTADO POR LOS MEJORES ESPECIALISTAS 361 (2010) [Peru]

Iniciativa de Reforma al Código Federal de Procedimientos Civiles (w/ Benítez and Ferrer), *in* CÓDIGO MODELO DE PROCESOS COLECTIVOS. UN DIÁLOGO IBEROAMERICANO 447 (2008) [Mexico]

Twombly e Iqbal: il ruolo della Civil Procedure nello scontro politico-ideologico della società statunitense, INT'L LIS 104 (2010) [Italy]

Кодекс группового судопроизводства: модель для стран континентального права (translated into Russian by Grigiri Arziani and Dmitry Maleshin), 11 ZAKON 151 (2013) [Russia]

A csoportperes törvénykönyv: Minta a polgárjogi államoknak (translated into Hungarian by Noémi Suri) [Hungary]

Διδάσκοντας Συγκριτική Πολιτική Δικονομία, 64 HARMENOPOULOS LAW REVIEW 1637 (2010) (translated into Greek by Anastasia Vezyrtzi) [Greece]

Le Code de L'Action Collective: Un Modéle Pour les Pays de Droit Civil, in CLOSSET-MARCHAL & COMPERNOLLE (EDS), VERS UNE "CLASS ACTION" EN DROIT BELGE? 147-63 (2008) (Translated into French by M. Guy Sohou and Caroline Gilbert, with an introductory study in Dutch by Stefaan Voet) [Belgium]

Teaching Comparative Civil Procedure, 56 JOURNAL OF LEGAL EDUCATION 502 (2007)

Enseigner la Procédure Civile Comparée, STUDIA IN HONOREM PELAYIA YESSIOU-FALTSI 201, Sakkoulas Publications, Athens, 2007 (Translated into French by Guy Sohou, Muriel Fourrier, and Caroline Gilbert) [Greece]

The Class Action Code. A Model for Civil-Law Countries, 23 ARIZ. J. INT'L COMP. L. 37 (2005)

集团诉讼条例—大陆法系国家模板, 中国国际私法与比较法年刊 (Chinese Yearbook of Private International Law and Commercial Law) (Translated into Chinese by Zhi Li) (forthcoming 2014) [China]

Il codice del proceso civile collettivo. Un modello per i paesi di diritto civile, RIVISTA TRIMESTRALE DI DIRITTO E PROCEDURA CIVILE, Anno LIX Fasc 2, 2005, p. 698-711 (translated into Italian by Alessandro Barzaghi) [Italy]

Anteproyecto de Código Modelo de Procesos Colectivos para Iberoamérica (w/ Grinover and Watanabe), 5 REVISTA IBEROAMERICANA DE DERECHO PROCESAL 13 (2004) [Argentina], *also published in* XXVI CONGRESO COLOMBIANO DE DERECHO PROCESAL 1093 (2005) [Colombia]

Anteprojeto de Código Modelo de Procesos Coletivos para Ibero-América (w/ Grinover and Watanabe), 5 REVISTA IBEROAMERICANA DE DERECHO PROCESAL 36 (2004) [Argentina]

Class Actions in Brazil – A Model for Civil Law Countries, 51 AM. J. COMP. L. 311 (2003)

ブラジルのクラスアクション制度—シビルロー国へのモデル, 34 JOURNAL OF THE JAPANESE INSTITUTE OF INTERNATIONAL BUSINESS LAW (KOKUSAI SHŌJI HŌMU) 997 (2006) (translated into Japanese) [Japan]

中国国际私法与比较法年刊, 中国国际私法与比较法年刊 (Chinese Yearbook of Private International Law and Commercial Law) (Translated into Chinese by Chen Rong and Zhi Li) (forthcoming 2014) [China]

Las Acciones Colectivas en Estados Unidos, *in* PROCESOS COLECTIVOS 1 (Gidi & Ferrer eds., 2nd Edition, 2004) [Mexico], *also published in* ESTUDIOS IBEROAMERICANOS DE DERECHO PROCESAL 239 [Venezuela]

El Concepto de Acción Colectiva, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVO E INDIVIDUALES HOMOGÉNEOS 14 (Gidi & Ferrer eds., 2nd Edition, 2004) [Mexico]

Derechos Difusos, Colectivos e Individuales Homogéneos, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 25 (Gidi & Ferrer eds., 2nd Edition, 2004) [Mexico]

Legitimación Para Demandar en las Acciones Colectivas, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 107 (Gidi & Ferrer eds., 2nd Edition, 2004) [Mexico]

APP 1326

La Representación Adecuada en las Acciones Colectivas Brasileñas y el Avance del Código Modelo, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 142 (Gidi & Ferrer eds., 2nd Edition, 2004) [Mexico]

Cosa Juzgada en Acciones Colectivas, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 261 (Gidi & Ferrer eds., 2nd Edition, 2004) [Mexico]

Litispendencia en Acciones Colectivas, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 314 (Gidi & Ferrer eds., 2nd Edition, 2004) [Mexico]

Notas Críticas al Anteproyecto de Código Modelo de Procesos Colectivos del Instituto Iberoamericano de Derecho Procesal, *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 405 (Gidi & Ferrer eds., 2nd Edition, 2004) [Mexico]

Legislación Iberoamericana Sobre los Procesos Colectivos (w/ others), *in* LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS 715 (Gidi & Ferrer eds., 2nd Edition, 2004) [Mexico]

Código de Processo Civil Coletivo. Um Modelo Para Países de Direito Escrito, 111 REPRO 192 (2003)

Código de Proceso Civil Colectivo. Un Modelo Para Países de Derecho Civil, 11 REVISTA PRÁCTICA DE DERECHO DE DAÑOS 56 (2003) (translated into Spanish by Adriana León and Joaquín Silguero Estagnan) [Spain], *also published in* XXVI CONGRESO COLOMBIANO DE DERECHO PROCESAL, Universidad Libre 601 (2005) [Colombia], *and in* REVISTA DE DERECHO PROCESAL (2004) [Argentina], *and in* 16 REVISTA VASCA DE DERECHO PROCESAL Y ARBITRAJE 753 (2004) [Spain]

Enseñando Derecho Procesal Civil Comparado, 2 REVISTA URUGUAYA DE DERECHO PROCESAL 241 (2003) [Uruguay]

Iniciativas para la Formulación de Normas Uniformes en el Ámbito del Derecho Procesal Civil Internacional, 11 TRIBUNALES DE JUSTICIA 21 (2002) [Spain], *also published in* 54 DERECHO L. REV. 245 (2002) [Peru], *and in* 26 REV. DIR. PROC. CIV. (2003) [BRAZIL]

Principios Fundamentales de Proceso Civil Transnacional (w/ Hazard, Taruffo, and Stürner), 11 TRIBUNALES DE JUSTICIA 27 (2002) [Spain], *also in* 54 DERECHO L. REV. 253 (2002) [Peru], *and in* 26 REV. DIR. PROC. CIV. (2003) [BRAZIL]

Normas de Proceso Civil Transnacional (w/ Hazard, Taruffo, and Stürner), 11 TRIBUNALES DE JUSTICIA 31 (2002) [Spain], *also in* 54 DERECHO L. REV. 263 (2002) [Peru], *and in* 26 REV. DIR. PROC. CIV. (2003) [BRAZIL]

Adequacy of Representation in Class Actions, 108 REVISTA DE PROCESSO 61 (2002)

Notes on Criticizing the Proposed ALI/Unidroit Principles and Rules of Transnational Civil Procedure, 6 UNIFORM L. REV. 819 (2001) [Italy]

Introduction to the Principles and Rules of Transnational Civil Procedure (w/ Hazard, Taruffo, Stürner), 33 N.Y.U. J. INT'L L. & POL. 769 (2001)

Fundamental Principles of Transnational Civil Procedure (w/ Hazard, Stürner, Taruffo), 33 N.Y.U. J. INT'L L. & POL. 785 (2001)

Rules of Transnational Civil Procedure (w/ Hazard, Taruffo, Stürner), 33 N.Y.U. J. INT'L L. & POL. 793 (2001)

Apresentação às Normas Transnacionais de Processo Civil, 102 REPRO 185 (2001), *also in* ROMA E AMERICA 335 (2000) [Italy], 52 DERECHO L. REV. 593 (1998) [Peru], 8 REV. MEST. DIR. ECO. UFBA 40 (2000), *and in* 90 CIÊNCIA JURÍDICA 358 (1999)

Normas Transnacionais de Processo Civil (transl.) 102 REPRO 196 (2001), *also in* 52 DERECHO L. REV. 1047 (1998) [Peru], *and in* 8 REV. MEST. DIR. ECO. UFBA 54 (2000)

Vers un procès Civil Transnational. Une Première Réponse aux Critiques, *in* VERS UN PROCES CIVIL UNIVERSEL? (Phillipe Fouchard ed., 2001) (translated into French by G. Mecarelli) [France]

Towards a Transnational Civil Procedure. A Brief Response to Comments and Criticisms, *in* VERS UN PROCÈS CIVIL UNIVERSEL (Phillipe Fouchard ed., 2001) [France]

Acciones de Grupo y "Amparo Colectivo" en Brasil. La Protección de Derechos Difusos, Colectivos e Individuales Homogéneos, *in* DERECHO PROCESAL CONSTITUCIONAL (2001) [Mexico]

Presentación del Proyecto de Normas Transnacionales del Proceso Civil, 52 DERECHO L. REV. 607 (1998) (translated into Spanish by A. León) [Peru]

A Disciplina da Coisa Julgada na Ação Popular, 77 CIÊNCIA JURÍDICA 328 (1997)

Aspectos da Inversão do Ônus da Prova no Código do Consumidor, 3 REV. DIR. PROC. CIV. 583 (1996) *also in* 64 CIÊNCIA JURÍDICA 24 (1995)

Assistência em Ações Coletivas *in* CÓDIGO DE PROCESSO CIVIL. 20 ANOS DE VIGÊNCIA (1995) *also in* 88 RePro 269 (1995)

Legitimidade para Agir em Ações Coletivas, 14 DIRCON 52 (1995)

Direitos Subjetivos Difusos, Coletivos e Individuais Homogêneos (1994)

Coisa Julgada e Ações Coletivas no Direito Norte-Americano (1994)

O Título-Ação, 1 REV. MEST. PUC-SP (1993)

Da Adequação entre o Pedido Cautelar e o Pedido Principal, 54 CIÊNCIA JURÍDICA 291 (1993)

4

**APP 1327**

A Dimensão Política do Direito de Ação, 60 REPRO 197 (1991)

A Ação na Teoria Geral dos Títulos de Créditos, 52 CIÊNCIA JURÍDICA (1992)

A teoria de Rudolph von Ihering e a sua Repercussão na Disciplina da Posse no Código Civil Brasileiro, 45 CIÊNCIA JURÍDICA 67 (1992)

José Machado de Oliveira. A História da Faculdade de Direito na Perspectiva da Vida do Seu Fundador, 35 REV. FAC. DIR. UFBA 216 (1991)

Ponciano de Oliveira. O Velho Ponciano, 35 REV. FAC. DIR. UFBA 245 (1991)

## *ALI/UNIDROIT Publications*

PRINCIPLES AND RULES OF TRANSNATIONAL CIVIL PROCEDURE

| THE AMERICAN LAW INSTITUTE | UNIDROIT [Italy] |
| --- | --- |
| Proposed Final Draft (2004) | Study LXXVI – Secretary's Report (2004) |
| Council Draft No. 2 (2003) | Proposed Final Draft (2003) |
| Discussion Draft No. 4 (2003) | Study LXXVI – Doc. 10 (2003) |
| Preliminary Draft No. 3 (2002) | Study LXXVI – Secretary's Report (2002) |
| Discussion Draft No. 3 (2002) | Study LXXVI – Doc. 9 (2002) |
| Council Draft No. 1 (2001) | Study LXXVI – Secretary's Report (2002) |
| Discussion Draft No. 2 (2001) | Study LXXVI – Doc. 5 (2002) |
| Preliminary Draft No. 2 (2000) | Study LXXVI – Secretary's Report (2001) |
| Discussion Draft No. 1 (1999) | Study LXXVI – Doc. 4 (2001) |
| Interim Revision (1998) | |
| Preliminary Draft No. 1 (1998) | |

## *Prefaces*

Preface. FELIPE NOYA, REPRESENTATIVIDADE E ATUAÇÃO ADEQUADAS NAS AÇÕES COLETIVAS (2014) [Brazil]

Preface. JUAN CARLOS GUAYACAN, LAS ACCIONES POPULARES Y DE GRUPO FRENTE A LAS ACCIONES COLECTIVAS (2014) [Peru]

Preface. MARCELO HOLANDA, AÇÕES COLETIVAS - LEGITIMIDADE E CONTROLE JUDICIAL DA ADEQUAÇÃO DO AUTOR COLETIVO (2012) [Brazil]

Preface. JORDÃO VIOLIN, PROCESSO COLETIVO E PROTAGONISMO JUDICIÁRIO (2012) [Brazil]

Preface. MARÍLIA PRATES, A COISA JULGADA NO DIREITO COMPARADO: BRASIL E ESTADOS UNIDOS (2012) [Brazil]

Preface. EDUARDO CÂNDIA, LEGITIMIDADE ATIVA NA AÇÃO CIVIL PÚBLICA (2012) [Brazil]

Preface. Apresentação à Série Processo Coletivo, Comparado e Internacional (2012) [Brazil]

Preface. ELPÍDIO DONIZETTI & MARCELO MALHEIROS, CURSO DE PROCESSO COLETIVO (2010) [Brazil]

Preface. ANTONIO ARAÚJO, DIREITO DA PROPRIEDADE INDUSTRIAL E O MÉTODO PIPa (2009) [Brazil]

Preface. COMENTÁRIOS AO CÓDIGO MODELO DE PROCESSOS COLETIVOS (w/ Ferrer) (2009) [Brazil]

Preface. CÓDIGO MODELO DE PROCESOS COLECTIVOS (w/ Ferrer) (2008) [Mexico]

Preface. FREDIE DIDIER JR & HERMES ZANETI JR, CURSO DE DIREITO PROCESSUAL CIVIL (2007) [Brazil]

Preface to the Second Edition. LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS (w/ Ferrer) (2004) [Mexico]

Preface. PROCESOS COLECTIVOS (w/ Ferrer) (2004) [Mexico]

Preface. LA TUTELA DE LOS DERECHOS DIFUSOS, COLECTIVOS E INDIVIDUALES HOMOGÉNEOS (w/ Ferrer) (2003) [Mexico]

Preface. 52 DERECHO L. REV. 1 (1998) [Peru]

## *Comments, Book Reviews, and Other Short Publications*

Colóquio Internacional de Direito Processual Civil, 102 REPRO 403 (2001) [Brazil]

Colóquio Internacional de Direito Processual Civil em Thesaloniki, REPRO [Brazil]

Notas Esparsas sobre o Processo Civil nos Estados Unidos, 6 REV. DIR. PROC. CIV. 851 (1997) [Brazil]

## *Student Notes*

As Escolas Penais, 3 REV. CEPEJ 113 (1990)

Faculdade Livre de Direito da Bahia, 1 REV. CEPEJ 61 (1988)

5

## SCHOLARLY PRESENTATIONS

Curso de Aperfeiçoamento em Processo Coletivo e Precedentes Judiciais: Perspectiva Crítica e Comparada, Fundação Escola do Ministério Público do Distrito Federal e Territórios (FEMPDFT), Jul 31 – August 2, 2014 (15 hours) [in Portuguese]

Curso Monográfico de Processo Coletivo. Perspectiva Crítica e Comparada, Programa de Pós-Graduação da Faculdade de Direito da UFES, Vitória, July 18 and 24-26, 2014 (20 hours) [in Portuguese]

Direito Processual Coletivo Comparado e Brasileiro, Ministério Público do Estado do Espírito Santo, Vitoria, July 18, 2014 [in Portuguese]

Novos Rumos do Processo Civil Coletivo, Programa de Pós-Graduação da Faculdade de Direito da UFBA, Salvador, May 29 and Jun 26, 27, 29, 2014 (16 hours) [in Portuguese]

Direito Processual Coletivo. Uma Visão Comparativa e Crítica das Ações Coletivas, Ordem dos Advogados do Brasil, Rio Grande do Sul (OAB-RS), Porto Alegre, June 20 and 21, 2014 (8 hours) [in Portuguese]

Colóquio Tutela Coletiva no Brasil e nos Estados Unidos, Associação da Defensoria Pública do Estado do Rio de Janeiro (ADPERJ), Rio de Janeiro, june 10, 2014 (7 hours) [in Portuguese]

Ações Coletivas Trabalhistas, 14º Congresso Nacional de Direito do Trabalho e Processual do Trabalho do TRT da 15ª Região, Paulínia, June 5, 2014 [in Portuguese]

Ações Coletivas – Uma Abordagem Comparada: Brasil e EUA, Escola Judicial do Tribunal Regional do Trabalho da 15ª Região (TRT-15), Campinas, May 30, 2014 [in Portuguese]

Class Action Models, Faculty of Law at Pazmany Peter Catholic University, Budapest, Hungary, November 5, 2013 [in English]

Towards a New Class Action Code for Hungary, Faculty of Law at Pazmany Peter Catholic University, Budapest, Hungary, November 6, 2013 [in English]

From Transnational Rules to Fundamental Principles and from Fundamental Principles to European Rules, Unidroit – European Law Institute Meeting, Justizpalast (Palace of Justice), Vienna, October 18, 2013 [in English]

Analise Crítica da Ação Coletiva no Sistema Brasileiro, Programa de Pós Graduação da Pontifícia Universidade Católica do Rio Grande do Sul, Porto Alegre, August 8 and 9, 2013 (12 hours) [in Portuguese]

A Tutela Coletiva nos Estados Unidos e no Brasil: Principais Desafios, Ministério Público do Estado do Mato Grosso do Sul, Campo Grande, August 1-2, 2013 (15 hours) [in Portuguese]

O Processo Civil Coletivo em uma Perspectiva Comparada, Programa de Pós Graduação da Faculdade de Direito da Universidade Católica do Salvador (UCSal), July 26-27, 2013 (12 hours) [in Portuguese]

Uma Nova Perspectiva para o Direito Brasileiro, Faculdade de Direito da UFMG, Belo Horizonte, July 5, 2013 [in Portuguese]

Sistema de Tutela Coletiva no Brasil e nos Estados Unidos: Principais Problemas e Desafios, Ministério Público do Estado de Minas Gerais, Belo Horizonte, July 11, 2013 [in Portuguese]

Direito Processual Civil Comparado e Coletivo, Programa de Pós Graduação da Faculdade de Direito da UFMG, Belo Horizonte, July 4-5, 11-12, 2013 (20 hours) [in Portuguese]

As Ações Coletivas Norte-Americanas, Programa de Pós Graduação da Faculdade Baiana de Direito, Salvador, June 28 and 29, 2013 [in Portuguese]

Processo Coletivo em uma Abordagem Comparativa, Conselho Nacional do Ministério Público (CNMP), Brasília, June 21, 2013 [in Portuguese]

Ações Coletivas no Direito Comparado, Tribunal Superior do Trabalho, June 20, 2013 (5 hours) [in Portuguese]

Aspectos Contemporâneos da Tutela Coletiva, Escola Judicial do Tribunal Regional do Trabalho do Paraná, Curitiba, June 12, 13 and 14, 2013 (12 hours) [in Portuguese]

A Experiência da Class Action Como Instrumento de Tutela Coletiva dos Direitos, Pós Graduação da Faculdade de Direito da UFPR, Curitiba, June 13, 2013 [in Portuguese]

As Class Actions do Direito Norte Americano e uma Comparação com o Sistema de Ações Coletivas Brasileiro, Mestrado em Direito da Unibrasil, June 12, 2013 [in Portuguese]

Comparative Civil Procedure. 7th International Conference of Anamatra, Associação Nacional dos Magistrados da Justiça do Trabalho, American University, Washington College of Law, April 3rd, 2013 [in English]

Employment Collective Actions. 7th International Conference of Anamatra, Associação Nacional dos Magistrados da Justiça do Trabalho, American University, Washington College of Law, April 5th, 2013 [in English]

The New Class Action Statute in Mexico, Globalization of the United States Litigation Model, Brooklyn Law School, New York, October 21, 2011 [in English]

Class Actions in Mexico. What It Is; What It Could Have Been, Instituto de la Judicatura Federal, Mexico City, Sept 08, 2011 [in Spanish]

Critical Analysis of Proposed Class Action Legislation in Belgium, The Marcel Storme Public Lecture, University of Ghent Law School, Belgium, May 11, 2011 [in English]

Hacia un Código de Procedimientos Civiles Colectivos para Mexico, Poder del Consumidor, Mexico City, September 24, 2010 [in Spanish]

6

Riesgos de la Adopción y de la No Adopción de las Acciones Colectivas en México, Al Consumidor, Mexico City, September 25, 2010 [in Spanish]

Hacia un Código de Procesos Colectivos para Perú, Supreme Court of Callao, Peru, November 04, 2009 [in Spanish]

Las Acciones Colectivas y la Protección de los Derechos de los Grupos, Universidad Nacional Mayor de San Marcos, Lima, Peru, November 04, 2009 [in Spanish]

La Proteción Colectiva de los Derechos Difusos, Colectivos y Individuales en Perú, I Jornada Internacional de Derecho Procesal, Facultad de Derecho de la Universidad Andina de Cusco, Peru, November 06, 2009 [in Spanish]

US Civil Procedure in Comparative Perspective, ABA Rule of Law Initiative and the Ecuadorean Judiciary, Oct 22, 2009 [in Spanish]

Poderes do juiz nas ações coletivas, XXII Encontro Pan-Americano de Direito Processual, Instituto Pan-Americano de Direito Processual, August 26, 2009, Goiânia, Goiás [in Portuguese]

Recent Developments on Class Action Litigation, 62nd Annual Meeting, Southeastern Association of Law Schools (SEALS), Palm Beach, Florida, August 02, 2009 [in English]

Comparative Civil Procedure, The Institute for International and Comparative Law, Dallas, Texas, June 10 and 11, 2009 (8 hours) [in English]

Civil Procedure Harmonization and the Common-Law / Civil-Law Divide, International Association of Procedural Law, Toronto, June 05, 2009 [in English]

Emerging Issues in Investment Abroad. Risk and Litigation. State Bar of Texas International Law Section, 21st Annual Institute, March 05, 2009 [in English]

A Codificação do Processo Civil Coletivo, General Assembly of the Brazilian Bar Association, Brasilia, November 06, 2008 [in Portuguese]

Os Anteprojetos de Código de Processo Civil Brasileiros, National Committee of Group Redress of the Brazilian Bar Association, Brasilia, November 05, 2008 [in Portuguese]

New Trends on Class Actions, 10th Anniversary of the Argentinean Civil Procedure Law Review, Jornadas Internacionales de Derecho Procesal Civil, Universidad del Litoral, October 10, 2008, Santa Fe, Argentina [in Spanish]

Res Judicata in Class Action Litigation; Perspectives on Class Actions, Fundesi, October 08, 2008, Buenos Aires, Argentina [in English]

Rumo a um Código de Processo Civil Coletivo, PUC-SP, (cancelado), June 03, 2008, São Paulo [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Ministério Público do Rio de Janeiro, June 9, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, UERJ (cancelado), June 10, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Defensoria Pública do Estado do Rio de Janeiro (cancelado), June 10, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Unesa (cancelado), June 11, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Congresso Brasileiro das Carreiras Jurídicas de Estado, Brasília, June 12, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Academia Brasileira de Direito Processual, Porto Alegre, June 14, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Universidade Federal do Rio Grande do Sul, Porto Alegre, June 16, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Instituto Bacellar, Curitiba, June 17, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, PUC-PR, June 17, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Universidade Federal do Parana, June 18, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Justiça Federal do Paraná, Curitiba, June 18, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Universidade Federal do Espírito Santo, June 19, 2009 [in Portuguese]

Rumo a um Código de Processo Civil Coletivo, Ministério Público do Espírito Santo, June 20, 2009 [in Portuguese]

Legal Education and Legal Profession in Common Law Countries, Universidade Federal do Espírito Santo, June 20, 2009 [in Portuguese]

Codificación de las demandas colectivas en México, Comisión de Gobernación de la Cámara de Senadores y Colegio de Secretarios de la Suprema Corte de Justicia de la Nación, Mexico City, March 28, 2008 [Spanish]

La Experiencia de los Estados Unidos en Materia de Acciones Colectivas (Moderador), El Aceso a la Justicia para los Consumidores a través de acciones colectivas, Nov 16, 2007, ITAM Law School, Mexico City [in Spanish]

Hacia un Código de Proceso Civil Colectivo para México, El Aceso a la Justicia para los Consumidores a través de acciones colectivas, Nov 15, 2007, ITAM Law School, Mexico City [in Spanish]

Inovaciones para una ley de demandas colectivas en México, Alconsumidor and ITAM Law School, November 15,

7

2007 [in Spanish]

Codifying Class Actions, XIII World Congress of Procedural Law, International Association of Procedural Law, Salvador, Bahia, September 20, 2007 [in English]

Public Law Litigation and Enforcement: Consumer and Environmental Law, Moderator, Georgia State University College of Law, Atlanta, Georgia, September 7, 2007 [in English]

Noções de Direito Norte-Americano, Faculdade de Direito da Universidade Federal da Bahia, Salvador, Bahia, July 2007 [in Portuguese]

Ações Coletivas na Experiência Norte-Americana, Faculdade de Direito da Universidade Federal da Bahia, Salvador, Bahia, July 2007 [in Portuguese]

A História Recente das Propostas de Codificação do Processo Coletivo no Brasil. A Codificação do Processo Coletivo, Ministério Público do Estado de Minas Gerais, Belo Horizonte, July 17, 2007 [in Portuguese]

A Codificação do Processo Coletivo no Brasil, Ministério Público do Estado de Minas Gerais, Belo Horizonte, Minas Gerais, July 17, 2007 [in Portuguese]

As Ações Coletivas Norte-Americanas, Faculdade de Direito da Universidade de Ribeirão Preto, UNAERP, Ribeirão Preto, São Paulo, Jun 30, 2007 [in Portuguese]

Curso de Direito Norte-Americano, Faculdade de Direito da Universidade de Ribeirão Preto, UNAERP, Ribeirão Preto, Jun 29, 2007 [in Portuguese]

A Legislação Sobre Tutela Coletiva no Brasil e no Mundo: Releitura da Intervenção do Ministério Público no Processo Civil, Ministério Público Federal no Paraná, Curitiba, Paraná, June 5, 2007 [in Portuguese]

Comparative Law and Civil Procedure, Visiting Professor, University Agostinho Neto Law School, LLM Program, Luanda, Angola, May 17-22, 2007 [in Portuguese]

Recent Developments on Class Actions in Latin America: The Model Class Action Code for Ibero-America. Latin American Law Workshop – Washington University Law School, Saint Louis, April 19-21, 2007 [in English]

La Cosa Juzgada en Las Acciones Colectivas, XXVII Congreso Colombiano de Derecho Procesal, Cartagena, Colombia, September 7, 2006 [in Spanish]

As ações coletivas e a tutela dos direitos difusos e coletivos, Faculdade de Direito da Universidade Agostinho Neto, Luanda, Angola, July 21, 2006 [in Portuguese]

Direito Processual Civil Comparado, Commemoration of 50 years of the Catholic University of Salvador, Bahia, Brazil, July 12 and 13, 2006 [in Portuguese]

Direito Processual Coletivo, Commemoration of 50 years of the Catholic University of Salvador, Bahia, Brazil, July 6 and 7, 2006 [in Portuguese]

Direito Processual Coletivo, Universidade Federal Fluminense, Rio de Janeiro, July 3, 2006 [in Portuguese]

Direito Processual Civil Comparado, Universidade Federal Fluminense, Rio de Janeiro, May 27, 2006 [Portuguese]

Problemas Actuales en la Protección Jurisdiccional de los Intereses Difusos y Colectivos, Congreso Internacional de Derecho Procesal Administrativo, May 4, 2006, Mazatlán, Sinaloa, Mexico [in Spanish]

Consideraciones Jurídicas y Políticas de los Princípios de Proceso Civil Transnacional, Instituto de Investigaciones Jurídicas de la Universidad Nacional Autónoma de México, Mexico City, April 27, 2006 [in Spanish]

The Principles and Rules of Transnational Civil Procedure as a tool to teach Comparative Law, The American Society of Comparative Law and The Italian Society of Comparative Law, Penn State University, The Dickinson School of Law, Carlisle, Pennsylvania, U.S.A., April 6, 2006 [in English]

Teaching Comparative Law in First Year Civil Procedure Classes: American Civil Procedure in a Global Context, AALS Annual Meeting, January 4, 2006, Washington DC, U.S.A. [in English]

Ações Coletivas nos Estados Unidos, Pontifícia Universidade Católica do Paraná, Curitiba, Paraná, Brazil, October 29, 2005, videoconference [in Portuguese].

História Recente da Codificação do Direito Processual Coletivo no Brasil, Instituto Brasileiro de Direito Processual, Brasília, October 13, 2005 [in Portuguese]

Legal Education in the United States from a Comparative Perspective, Universidade Cooperativa, Bogotá, Colombia, September 10, 2005 [in Spanish]

Acciones Colectivas en una Perspectiva Comparada, XXVI Congreso Colombiano de Derecho Procesal, September 7, 2005, Bogota [in Spanish]

Class Action Model Code, University of Arizona Law School, Comparative Law in the Twenty-First Century, April 8, 2005, Tucson, Arizona, U.S.A. [in English]

Is there such a thing as Latin American Law?, AALL Annual Meeting, July 19, 2005, San Antonio, USA [English]

Acciones Colectivas Pasivas en el Código Modelo para Iberoamérica, Jornadas Procesales, Tribunal Arbitral de Barcelona, June 30, 2005, Barcelona, Spain [in Spanish]

Consumer Class Action Legislation in Civil Law Countries, Federal Trade Commission (FTC) and Consumer Policy Committee of the Organization for Economic Cooperation Development (OECD) Workshop on Comparative Class Actions, April 19, 2005, Washington DC, U.S.A. [in English]

United States Class Actions, Ministério Público Federal, Porto Alegre, Dez 14, 2004 [in Portuguese]

8

Class Actions in Comparative Perspective, Ministério Público Federal, Porto Alegre Dez 15, 2004 [in Portuguese]

A Codificação do Direito Processual Civil Coletivo no Brazil, Ministério Público Federal, Porto Alegre, Dez 16, 2004 [in Portuguese]

Rumo a um Código Brasileiro de Processo Civil Coletivo, Ministério Público do Paraná, December 9, 2004, Curitiba, Brazil [in Portuguese]

Harmonization of Civil Procedure, Discussant, Lawyers and Jurists in the 21st Century. Celebrating the Centennial of Comparative Law in the United States, Washington University School of Law, November 13, 2004, St. Louis, U.S.A. [in English]

Proyecto de Código para Acciones Colectivas, Facultad de Derecho Universidad de Córdoba, November 26, 2004, Córdoba, Argentina [in Spanish]

Hacia una Legislación Colectiva en México, III Feria Internacional del Libro, Suprema Corte de Justicia de la Nación, October 25, 2004, Mexico [in Spanish]

Class Action in Comparative Perspective, University of Houston Law Center Faculty Luncheon, Houston, October 11, 2004 [in English]

Derecho Procesal Comparado, Supremo Tribunal de Justicia del Estado de Michoacán, Instituto de Especialización Judicial, September 29, 2003, Morelia, Mexico [in Spanish]

La Protección Procesal de los Derechos de Grupo en Estados Unidos y Brasil, Universidad Michoacana de San Nicolás de Hidalgo. División de Estudios de Postgrado de la Facultad de Derecho, September 30, 2003, Morelia, Mexico [in Spanish]

Direito Processual Transnacional, Instituto Brasileiro de Direito Processual, August 9, 2003, Iguassu Falls, Brazil [in Portuguese]

Principios y Normas del Derecho Procesal Transnacional, Universidad de Palermo, August 14, 2003, Buenos Aires, Argentina [in Spanish]

Normas Procesales Civiles Uniformes para el Proceso Colectivo, Inter American Bar Association, XXXIX Conference, June 19, 2003, New Orleans [in Spanish]

Norme Trasnazionali di Procedura Civile, University of Bologna, May 17, 2003, Bologna, Italy [in Italian]

Transnational Civil Procedure, Hellenic Institute of International and Foreign Law, Org. Prof. Konstantinos Kerameus, May 29, 2003, Athens, Greece [in English]

Criticizing the Principles of Transnational Civil Procedure, Stockholm Center for Commercial Law, June 03, 2003, Stockholm, Sweden [in English]

Class Action Model Code for Civil Law Countries, Stockholm Center for Commercial Law, June 04, 2003, Stockholm, Sweden [in English]

Transnational Litigation in Comparative Perspective, Riga Graduate School of Law, June 06, 2003, Riga, Latvia [in English]

Class Actions in Civil Law Countries, Riga Graduate School of Law, June 06, 2003, Riga, Latvia [in English]

Class Actions in Comparative Perspective, Faculty Workshop, Osgoode Hall Law School, January 31, 2003, Toronto [in English]

Class Actions in Comparative Perspective, Faculty Workshop, University of Detroit Mercy School of Law, November 21, 2002, Detroit, U.S.A. [in English]

Código Modelo de Proceso Colectivo, XVIII Jornadas Iberoamericanas de Derecho Procesal, October 16, 2002, Montevideo, Uruguay [in Spanish]

Class Actions in Comparative Perspective, Faculty Workshop, Temple University Beasley School of Law, October 30, 2002, Philadelphia, U.S.A. [in English]

Principios y Normas del Proceso Civil Internacional, IV Curso Anual de Preparación y Capacitación para Profesores de Derecho Procesal, July 20, 2002, Toluca, Mexico [in Spanish]

Drafting Principles and Rules of Transnational Civil Procedure, British Institute of International and Comparative Law, May 24, 2002, London, England [in English]

Proyecto de Principios y Normas del Proceso Civil Internacional, Facultad de Derecho de la Universidad Autonoma de Mexico, March 1, 2002, Mexico City, Mexico [in Spanish]

El Proyecto de Principios y Normas del Proceso Civil Internacional, Center of Uniform Law, February 28, 2002, Mexico City, Mexico [in Spanish]

Class Actions in Comparative Perspective, Faculty Workshop, University of Miami Law School, Florida, U.S.A. February 2, 2002 [in English]

Ações Coletivas nos Estados Unidos, Jornadas de Direito Processual Civil, Ministério Público do Paraná, December 14, 2001, Curitiba, Brazil [in Portuguese]

Class Actions in Comparative Perspective, Faculty Workshop, Louisiana State Law School, Baton Rouge, U.S.A., November 15, 2001 [in English]

9

Iniciativas para la Formulación de Normas Uniformes en el Ámbito del Derecho Procesal Civil Internacional, Nuevos Retos para el Derecho Procesal Civil Internacional, Universidad de Barcelona, November 5, 2001, Barcelona, Spain [in Spanish]

Las Acciones Colectivas en el Nuevo Derecho Español. Una Perspectiva Comparada, Mullerat, November 6, 2001, Barcelona, Spain [in Spanish]

Uses and Abuses of Comparative Law, Federal University of Bahia Law School, September 27, 2001, Salvador, Brazil [in Portuguese]

Adequacy of Representation in Class Actions, IV Jornadas de Direito Processual Civil, August 8, 2001, Fortaleza, Brazil [in Portuguese]

Teaching Comparative Civil Procedure, AALS Annual Meeting, January 6, 2001, San Francisco [in English]

Transnational Litigation in Comparative Perspective, Colloquio Internazionale: Processi di Integrazione e Soluzione delle Controversie, Università degli Studi di Roma "Tor Vergata", September 9, 2000, Rome, Italy [in Italian]

Brazilian Class-Action Statutes, Debates Over Group Litigation in Comparative Perspective, Duke University and University of Geneve, July 22, 2000, Geneva, Switzerland [in English]

## PARTICIPATION IN PEER EDITED LAW REVIEWS

REVISTA FORENSE  Member of the International Board of Editors (2013 - present)

COMPARATIVE LAW REVIEW  Member of the Scientific Council (2012 – present) [Poland]

AMERICAN JOURNAL OF COMPARATIVE LAW  Member of the Board of Editors (2006 - present)

REVISTA BRASILEIRA DE DIREITO PROCESSUAL  Member of the Advisory Board (2009 – present)

REVISTA BAIANA DE DIREITO, Member of the International Board of Editors (2008 – present)

REVISTA INTERNACIONAL DE ESTUDIOS DE DERECHO PROCESAL Y ARBITRAJE  Member of the Scientific Committee (2007 - present) [Spain]

REVISTA DO PROGRAMA DE PÓS-GRADUAÇÃO EM DIREITO DA UNIVERSIDADE FEDERAL DA BAHIA, Member of the International Board of Editors (2006 – present)

REVISTA IBEROAMERICANA DE DERECHO PROCESAL CONSTITUCIONAL  Member of the Advisory Committee (2004-present) [Mexico]

REVISTA DE PROCESSO  Member of the Editorial Advisory Board (2002 - present)

REVISTA DE DIREITO PROCESSUAL CIVIL  Member of the Editorial Advisory Board (1996 - present)

REVISTA CIÊNCIA JURÍDICA  Member of the Editorial Advisory Board (1991 - present)

## ACTIVITIES

BLACK'S LAW DICTIONARY (2014).  Academic Contributor

The Brazil-United States Legal and Judicial Studies, American University Washington College of Law, Advisory Council (2013 – Present)

The Hague Conference on Private International Law. "International Jurisdiction and Judgments" Project. Participated initially as an observer for UNIDROIT and then as a member of the drafting working group

UNCITRAL. United Nations meeting on International Arbitration. Participated as an observer for UNIDROIT

Cambridge University Press. Peer Reviewer

Oxford University Press. Peer Reviewer

Jus Podivm Legal Publishers. Member of the Editorial Advisory Board (2009 – 2010)

18th International Congress on Comparative Law. Washington 2010. National Reporter for Brazil, Mexico, and the United States.

## BAR ADMISSIONS AND ACADEMIC AFFILIATIONS

| | |
|---|---|
| ASCL | American Society of Comparative Law |
| | Board of Directors (02-06), Executive Committee (07-09), Research and Service (05 – present) |
| OAB | Admitted to the Brazilian Bar Association, Bahia and Sao Paulo Chapters |
| IAPL | Member of the International Association of Procedural Law |
| IIDP | Member of the Ibero-American Institute of Procedural Law |
| IBDP | Member of the Brazilian Institute of Procedural Law |
| IAB | Member of the Brazilian Law Institute |
| CNPDP | Member of the Mexican Association of Civil Procedure Professors |

## LANGUAGES

Fluent in **Portuguese, English, Italian, Spanish**. Proficient in **French**

10

**APP 1333**

**TEACHING SUBJECTS**

All subjects related to **Civil Procedure. Torts, Comparative Law**, and **International Law**, such as Int'l Litigation, Comparative Civil Procedure, Class Actions, Remedies, Evidence, Torts, Federal Courts, Complex Litigation, Judicial Administration, Judicial Process, Mass Torts, Comparative Legal Traditions, Int'l Arbitration, Int'l Business Transactions, Int'l Trade, WTO, Public Int'l Law, Private Int'l Law, Alternative Dispute Resolution, Int'l Organizations, European Union Law, Latin American Law and Institutions

**REFERENCES**

Professor Geoffrey C. Hazard, Jr. (Hastings Law School); hazardg@uchastings.edu; (415) 292-6535
Ass Dean Professor Christian Day (Syracuse University College of Law); ccday@law.syr.edu; (315) 443-3650
Dean Doug Blaze (University of Tennesee College of Law); blaze@utk.edu; (865) 974-2521
Professor Lance Liebman (Columbia University and ALI); lliebman@law.columbia.edu; (212) 854-5699
Judge Peter Messitte (Federal Court, Maryland); Judge_Messitte@mdd.uscourts.gov; (301) 344-0632
Professor Richard Marcus (University of California, Hastings); marcusr@uchastings.edu; (415) 565-4829
Professor Douglas Moll (University of Houston Law Center); dmoll@central.uh.edu; (713) 743-2172
Professor Stephen Zamora (University of Houston Law Center); szamora@uh.edu; (713) 743-2137

11

**APP 1334**

# EXHIBIT 80

TM
EXHIBIT 80

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

|  |  |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated<br><br>v.<br><br><br>TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No 3:09-CV-02384-N-BG<br><br>Judge: Hon. David C. Godbey<br><br>Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF ROGIER F. VAN DEN HEUVEL

### I. Introduction

1.  I have been asked to address whether a court in the former Netherlands Antilles would recognize and give preclusive effect to a US class action judgment rendered in the above-captioned *Rotstain, et al. v. Trustmark National Bank, et al.* ("the Rotstain Action" or the "Action"), or a court-approved settlement in the Action, such that it would be binding on an investor domiciled in the former Netherlands Antilles who did not "opt out" of the plaintiff class.

### II. Summary of Opinion

2.  An opt-out mechanism whereby a party is bound to a judgment or court-approved settlement merely for failing to opt out would be in contravention of public policy. In my opinion, it is highly unlikely that courts of the former Netherlands Antilles would recognize and give preclusive effect to such a judgment or court-approved settlement in an opt-out class action, including the Rotstain Action.

3.  Further, in my opinion, class action judgments awarding compensatory damages would be at considerable risk of being in contravention of public policy since these would be irreconcilable with applicable domestic provisions on collective actions that expressly preclude claims for pecuniary damages.

4.  Lastly, in my opinion, it is highly unlikely that courts of the former Netherlands Antilles would recognize and give preclusive effect to any judgment awarding punitive damages because punitive damages would also contravene public policy as a matter of principle.

**APP 1336**

App. 1962

### III. Qualifications and Materials Considered

#### A. Professional Qualifications

5.   I am a practicing attorney (*advocaat*) at the law firm VanEps Kunneman VanDoorne in Curacao. I am a national of the Netherlands where I obtained my degree in law (*meester in de rechten*, LL.M) at Leiden University in 2001. I practiced law at the Netherlands law firm Simmons & Simmons (and its predecessors) before joining VanEps Kunneman VanDoorne.

6.   I am a member of the bar of the Common Court of Justice of Aruba, Curacao and Sint Maarten and of Bonaire, Sint Eustatius and Saba, as well as the Netherlands Bar.

7.   I have had a litigation practice since the beginning of my career. In my daily practice I regularly deal with matters of recognition and enforcement of foreign judgments in the former Netherlands Antilles. Hence, I consider myself qualified to render this professional opinion.

8.   I am the (visiting) lecturer of private international law at the University of Curacao Dr. Moises da Costa Gomez. My *curriculum vitae* is attached to this opinion as Exhibit A.

9.   I have not testified at a deposition or at trial in the past four years.

10.  I am being compensated for my work in connection with the Action at my customary consulting rate of $480 US Dollars per hour. My compensation is in no way contingent upon the nature of my opinions or the outcome of this litigation. My opinions reflect my own independent, professional judgment.

#### B. Documents Considered In Forming My Opinion

11.  In reaching my opinions, I have considered the following materials, along with the other documents or information referenced in this Declaration: (i) a Memorandum supporting plaintiffs' motion for class certification, for designation of class representatives and class counsel dated 30 April 2015, and (ii) a Plaintiffs' second amended class action complaint dated 1 May 2015. I understand that both documents have been submitted to the United States District Court, Northern District of Texas, Dallas Division, in the Rotstain Action.

12.  For the purpose of giving this opinion and relying on these documents, I have assumed the following facts.

13.  This is a putative class action on behalf of domestic and foreign persons who invested considerable sums of money in certificates of deposits ("CDs") issued by R.A. Stanford's Antigua-based Stanford International Bank, Ltd ("SIBL").

14.  The plaintiffs' investments were part of an operation that the Dallas court has determined was a Ponzi scheme.

15.  The plaintiffs allege that they were unaware of this, for lack of disclosure by R.A. Stanford, and therefore, could not have known that SIBL would be unable to repay principal and interest on the CDs.

16. The plaintiffs further allege that five banks, the "Bank Defendants," possessed the information required to expose the Ponzi scheme, but failed to sever their banking relations with SIBL and related entities, tolerated R.A. Stanford's fraud and even assisted in that fraud in exchange for profit. Plaintiffs argue that the Bank Defendants (i) aided violations of the Texas Securities Act, (ii) aided fraud, (iii), participated in a breach of fiduciary duty, and (iv) aided conversion of money, which results in four asserted corresponding causes of action, together with a fifth asserted cause of action, being civil conspiracy.

17. The plaintiffs request that the Court certify the "Class" as defined in that second amended class action complaint, award damages in an amount to be determined at trial, and in accordance with the claim determinations of the US Receiver, as well as attorneys' fees and costs, permitted by law, and other relief as the court may deem just and appropriate.

18. I reserve the right to supplement or modify my opinions expressed herein, particularly in view of any new arguments or materials presented by plaintiffs in the Action.

### IV. The Legal Systems of the Former Netherlands Antilles

19. At the outset, I should point out that the Netherlands Antilles, which have not included Aruba since 1986, ceased to exist altogether as of 10 October 2010. Since then, the Kingdom of the Netherlands consists of the autonomous countries (i) the Netherlands, (ii) Aruba, (iii) Curacao and (iv) Sint Maarten, while the island territories (v) Bonaire, (vi) Sint Eustatius and (vii) Saba (the latter three together the "BES") have become public bodies of the Netherlands. My opinions expressed herein address the recognition of a US class action judgment or court-approved settlement in Aruba, Curacao, Sint Maarten, and the BES, which for simplicity I refer to collectively as the "former Netherlands Antilles."

20. The Kingdom of the Netherlands has five regional legal systems (viz. one for the Netherlands, one for Aruba, one for Curacao, one for Sint Maarten and one for the BES). While these legal systems are very similar to each other, there are differences between the various legal systems. A most notable difference between the legal system of the Netherlands on the one hand and the legal systems of the former Netherlands Antilles on the other hand, that bears relevance to this opinion, concerns the provisions on court-approved class action settlements, which provisions do not exist in the former Netherlands Antilles. Further, the various legal systems do not share the same public policy. Fundamental values differ between the countries. A clear example is that a marriage between people of equal gender can be lawfully concluded in the Netherlands or in Bonaire, but not in Curacao, where it is considered contrary to public policy.

21. In view of the (otherwise) abundant similarities between the various legal systems within the Kingdom, and the principle of concordance[1] that is applied in the drafting

---

[1] The principle of concordance follows form article 39 of the Charter for the Kingdom of the Netherlands, which provides that (*inter alia*) civil law should be provided for in a similar fashion in The Netherlands, Aruba, Curaco, Sint Maarten, and the BES.

and interpretation of the laws of the various countries within the Kingdom,[2] the Supreme Court's decisions in Dutch cases bear authority in the former Netherlands Antilles' courts. In addition, lower courts' judgments throughout the Kingdom may set precedents for other courts to follow. In addition, Dutch legislative history, such as explanatory notes, which is generally more elaborate than in the former Netherlands Antilles, is relevant to the interpretation of the laws in the former Netherlands Antilles to the extent that these laws are concordant.

22.    From the perspective of civil procedure, the former Netherlands Antilles are one regional jurisdiction, sharing the same rules of civil procedure (*wetboek van burgerlijke rechtsvordering* or code of civil procedure, "CCP"). There is a court of first instance (*Gerecht in Eerste Aanleg*) in each of the former Netherlands Antilles. The former Netherlands Antilles have one common appellate court, the common court of justice (*Gemeenschappelijk Hof Justitie van Aruba, Curacao, Sint Maarten en van Bonaire, Sint Eustatius en Saba*). Judgments of the common court of justice can be appealed in cassation before the Dutch Supreme Court (*Hoge Raad*) in The Hague, the Netherlands.

### A. Rules on Class Actions in the Former Netherlands Antilles

23.    Like the Netherlands, all legal systems of the former Netherlands Antilles provide for class actions (or, using Dutch parlance, collective actions) in articles 3:305a of the various Civil Codes.

24.    The relevant provisions bestow upon an interest organization the right to institute a collective action. This right, however, is a subsidiary right that does not replace the right of an individual to assert his own claim in court. According to Dutch legislative history the attribution of preclusive effect of a collective action to members of the represented class, that are not themselves a party to the litigation, was not included for it would contravene fundamental principles of Dutch civil procedure, more specifically a party's right to self-determination in the pursuit of its legal interests, and the right to a fair trial, including the right to access to court and the right to be heard there. The Supreme Court has confirmed in several instances that, indeed, a class action judgment ex 3:305a Civil Code does not have preclusive effect to non-parties.[3] The aforementioned principle applies equally to the Netherlands and to the former Netherlands Antilles.

25.    The provisions of 3:305a Civil code expressly exclude the possibility of a pecuniary damage award for such a class action (Art. 3:305a para. 3). The legislature was of the opinion that as a matter of principle, only parties that suffered damages are entitled to claiming damages, and an award for damages requires an assessment of each individual claim. Questions as to causal connections between unlawful acts and damages, prescription and mitigating circumstances, such as the victim's own fault, cannot normally be established collectively. The legislative history provides the following explanation, in my own translation:

---

[2] Article 40 of the Charter for the Kingdom of the Netherlands.

[3] Supreme Court, 14 June 2002, NJ 2003/689.

Considering the principle that damages would have to be paid to the persons that have suffered the damages, I do not see a possibility for interest organizations to claim damages for others. [...] Pursuant to paragraph 3 of article 305a [...] an interest organization cannot claim pecuniary damages for others. Compelling arguments can be adduced against such a possibility. It is inconceivable without all kinds of restrictions that would do justice to the interests of the parties involved. Opening the opportunity would bring about a multitude of legal-technical complications. [...] The legal-technical complications referred to include that the total damages inflicted to the group represented by the interest organization, and subsequently, it would have to be determined how the total damages should be divided between this group. The individual damages would usually differ and questions as to the victims' own fault could influence the obligation to compensate damages. This shows, that in most cases, individual circumstances oppose the bundling of claims for damages.

26. An important difference between Netherland and former Netherlands Antilles class action-related laws is that since 2005, through the entry into force of the Dutch Mass Claims Settlement Act (*Wet collectieve afwikkeling massaschade*; MCSA), the Netherlands' law additionally provides for a procedure for collective settlement of mass damages on the basis of a settlement agreement concluded between one or more representative organizations and one or more allegedly liable parties for the benefit of a group of affected persons to whom damage was allegedly caused. Once such a collective settlement is concluded, the parties may jointly request the Amsterdam Court of Appeal to declare it binding. If the Court grants the request, the agreement binds all persons covered by its terms and represented by the representative organization, except for any person who has expressly elected to opt out within a specific period. Any person having opted out retains his right to initiate individual proceedings against the defendant. Importantly, a similar procedure does **not** exist in the former Netherlands Antilles.

### B. Recognition and Enforcement of Foreign Judgments in the Former Netherlands Antilles

27. There is no applicable Convention that governs the recognition of a US class action judgment or a US court-approved settlement judgment. Thus, recognition (or lack thereof) by a Netherlands Antilles court would be determined on the basis of domestic rules. These rules are identical in all countries of the Kingdom of the Netherlands.

28. Article 431 of the CCP provides:

1. Except for what is stated in Articles 985-994 [CCP], no decision rendered by foreign judges nor authentic deeds issued abroad can be enforced in this country.[4]
2. The matters can be dealt with and settled de novo by the courts in this country.

---

[4] "In this country" is the literal translation of *hier te lande*, which according to the preliminary article A to the CCP, means "in Aruba, Curacao and Sint Maarten and in the public bodies Bonaire Sint Eustatius and Saba".

29. The provision (Article 431) means that a judgment of a foreign court is only enforceable by virtue of a convention or a specific domestic legal provision. The recognition and enforcement of other foreign court judgments is not possible, so a new procedure on the merits is required. The wording of paragraph 2 would exclude the possibility of recognition. The application of this provision has, however, been limited considerably in case law. The Supreme Court recently confirmed the conditions for the recognition of foreign judgments:

    (1) The jurisdiction of the foreign court is based on internationally accepted jurisdictional grounds;

    (2) The rules for due process have been observed;

    (3) The recognition of the foreign judgment does not violate domestic public policy; and

    (4) The foreign decision must not be irreconcilable with a domestic court ruling between the same parties or with a prior foreign court ruling between the same parties, in a dispute about the same subject and based on the same cause, if that prior ruling is fit for recognition by the domestic court.[5]

30. If a foreign judgment meets these criteria, then the domestic court has to assume that the parties are bound by that foreign decision (*res judicata*).[6]

### V. Recognition by the Former Netherlands Antilles of a Judgment or Court-Approved Settlement in the Action

31. It is my understanding that US class actions, such as the Action, employ an opt-out mechanism whereby persons who fall within the class definition as set by the Court become members of the class and are bound by any judgment or court-approved settlement entered into in the action unless they affirmatively "opt out," in which case they are not bound by any judgment or settlement. Failure to opt out of a class constitutes implied consent to class treatment.

32. Hereunder, I will address the latter two conditions for the recognition of foreign judgments and explain herein why they are impediments to recognition of a judgment or court-approved settlement in the Rotstain Action.

#### A. Public Policy

33. The shield of public policy serves as an exception to withhold recognition of a judgment that would infringe fundamental legal principles or values.

34. As mentioned hereinabove, fundamental principles of Dutch civil proceedings are the right to self-determine how one wishes to pursue his/her legal interests and the right

---

[5] Supreme Court, 26 September 2014, ECLI:NL:HR:2014:2838, NIPR 2014, 381.

[6] Idem, para. 3.6.5.

to access to court, as well as the right to be heard there. A US class action judgment or court-approved settlement to which a party is bound for the mere reason of not having opted-out would be an infringement of that right.[7] The Supreme Court's rulings of the effect that a collective action as contemplated in article 3:305a CC does not have preclusive effect to non-parties pursue from the same notion (see para. 24, hereinabove).

35. Admittedly, there is one precedent in Dutch case law, in which the court of Amsterdam dated 23 June 2010 held that a court-approved class settlement (United States District Court for the district of Maryland in *In re Royal Ahold N.V.*; civil no.: 1:03-md-01539) was fit for recognition and therefore had preclusive effect.[8] The Amsterdam court reached that decision after concluding that procedural safeguards applied in the US action were comparable to those provided for in the MCSA.

36. The same reasoning would not apply in the former Netherlands Antilles, however, for the simple reason that a law similar to the MCSA does not exist in any of the former Netherlands Antilles legal systems.

37. Secondly, it should be noted that the Amsterdam case concerned the recognition of a settlement, for the class certified by the Maryland court was for settlement purposes only. This is a situation much different from the situation in which a condemnatory class action judgment awarding pecuniary damages would be rendered. Such a judgment would be at considerable risk of being in contravention of public policy since it would be irreconcilable with domestic provisions on collective actions, which expressly preclude claims for pecuniary damages on "compelling arguments" recognized by the legislature (see para. 25, hereinabove). In her annotation to the Amsterdam court's ruling referred to in para. 35, Professor I.N. Tzankova explains (in my own translation):

> [I]n the Dutch context I consider of decisive importance the fact that the US settlement was approved for "settlement purposes only", as a consequence of which a comparison with the Dutch MCSA is justifiable. If it would concern the recognition and enforcement of a class action judgment awarding damages, or if the collective settlement would have been concluded after the class would have been held admissible in the class action to recover damages (certification), from the perspective of the Dutch collective action tradition one could have critically questioned whether the judgment was not rendered or the US settlement was not approved in proceedings that would be in contravention with Dutch public policy. After all, article 3:305a para. 3 Civil Code expressly excludes a collective action for damages.

38. As far as I am aware, no former Netherlands Antilles court has ever recognized a US class action judgment or court settlement upon absent class members.

---

[7] The Dutch council of state, advising the Dutch government on legislation and governance, confirmed as much in its advice on the draft MCSA, see *Tweede Kamer*, vergaderjaar 2003-2004, 29414, nr. 4, p. 2

[8] Amsterdam Court 23 June 2010, SOBI v. Deloitte et al., JOR 2010/225, annotation Tzankova.

39. Finally, it is my understanding that Plaintiffs seek punitive damages in the Rotstain Action. Punitive damages contravene the former Netherlands Antilles provisions on damages (*restitutio ad integrum*), which are merely compensatory in nature. This is a fundamental difference between the U.S. legal system and the former Netherlands Antilles legal systems. Dutch courts have held judgments awarding punitive damages in contravention of Dutch public policy.[9] The same reasoning would apply if a former Netherlands Antilles court would have to decide on the preclusive effect of such a judgment.

### B. Irreconcilable Prior Rulings

40. This criterion speaks for itself. If prior rulings, irreconcilable with a US judgment in the Action would exist, this would be an impediment to recognition.

### VI. Conclusion

41. The notion of being bound by a settlement or judgment for the mere reason of not having opted-out, would be in contravention of the former Netherlands Antilles' public policies. Therefore, it is highly unlikely that such a settlement or judgment would be recognized and given preclusive effect by the courts of the former Netherlands Antilles.

42. Judgments awarding pecuniary compensatory damages are irreconcilable with the rules for class actions (collective actions) that apply in the former Netherlands Antilles, and therefore are at a considerable risk of being in contravention of public policy.

43. Judgments damages awarding punitive damages are in contravention of the former Netherlands Antilles' public policies as a matter of principle. Such judgments are therefore highly unlikely to be recognized and given preclusive effect by courts in the former Netherlands Antilles.

---

[9] Asser/Kramer & Verhagen 10-III Internationaal vermogensrecht (2015) nr. 1123.

9

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2015, in Curacao.

Rogier F. van den Heuvel

APP 1344

# EXHIBIT A

APP 1345

## Curriculum Vitae

Rogier Frederik van den Heuvel
Date of birth 25 October 1976
Place of Birth: Gouda, the Netherlands
Nationality: Dutch

### Education

- 2001 LL.M. Leiden University 2001

- 2006 Grotius Academy (Radboud University, Nijmegen) Corporate Litigation

### Professional experience

- 2001-2012    attorney at law (*advocaat*) Simmons & Simmons, Amsterdam, the Netherlands

- 2012-present    attorney at law (advocaat) VanEps Kunneman VanDoorne, Curacao

- Admitted to the bar of Amsterdam and to the bar of the Common Court of Justice of Aruba, Curacao, Sint Maarten and of Bonaire, Sint Eustatius and Saba.

### Additional positions

- 2012-present    visiting lecturer private international law at the University of Curacao Dr. Moises da Costa Gomez

- 2013-present    board member of Curacao Bar Association (*Orde van Advocaten Curacao*), vice-dean of the Curacao Bar Association since 2014

### Publications

- B.E.L.J.C. Verbunt and R.F. van den Heuvel, De rol van toerekening van wetenschap bij aansprakelijkheid voor zuiver nalaten in het rechtspersonenrecht, *Geschriften vanwege de Vereniging Corporate Litigation 2006-2007*

    On the role of the attribution of knowledge in case of liability for plain omissions in the context of corporate law.

- Annotation to Den Haag Court of Appeal, 24 August 2008, LJN B190, Ondernemingsrecht 2009, 75.

**APP 1346**

App. 1972

On the court's ruling on a contractual price determination mechanism in contravention of a price determination provision in the company's articles, that would apply in case of a shareholder's forced exit.

- R.F. van den Heuvel and M.M. Huijzen, Eén maatstaf voor de externe aansprakelijkheid van bestuurders en ondergeschikten, *Geschriften vanwege de Vereniging voor Corporate Litigation 2001-2012*

    Arguing that in Dutch law, there is in effect one common threshold for a legal person's managing directors' and subordinates' liability, towards third parties, rather than different thresholds, as often argued.

- Annotation to Common Court of Justice of Aruba, Curacao, Sint Maarten and of Bonaire Sint Eustatius and Saba, 15 July 2013

    On a court ordered inquiry into the policy and course of affairs of various government companies in Curacao. The inquiry procedure is a specific procedure aimed at establishing mismanagement within corporate entities and offering redress.

- Kroniek Curacaos Enqueterecht 2012-2013

    Chronicle of Curacao inquiry law  2012-2013.