Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

6.      Offering documents within the meaning of Section 11 (1), first sentence, of the Securities Acquisition and Takeover Act.

### Section 2
### Application for Establishment of a Model Case

(1) By application for the establishment of a model case, in a proceeding at first instance, the establishment of the existence or non-existence of conditions justifying or ruling out entitlement or the clarification of legal questions may be sought (establishment objective). Application for the establishment of a model case may be made by the plaintiff and the defendant.

(2) Application for the establishment of a model case shall be made with the court trying the matter and shall include indication of the establishment objective and the public capital markets information.

(3) Such application must contain information on all factual and legal circumstances which serve to justify the model case. The applicant shall substantiate that the decision on the establishment objective in a model case (model case ruling) may have significance for other similar cases beyond the individual dispute concerned.

(4) The respondent shall be granted opportunity to comment on the matter.

### Section 3
### Admissibility of Application for the Establishment of a Model Case

(1) The court trying the matter shall deny the application for the establishment of a model case as inadmissible, with no possibility to appeal such order, if

1.      A decision on the dispute upon which the application for the establishment of a model case is based is not dependent on the claimed establishment objective,

2.      The evidence described is unsuitable as proof of the claimed establishment objective,

3.      The significance of the case for other legal disputes is not demonstrated, or

4.      Application for the establishment of a model case is made for the purpose of delaying proceedings.

(2) The court trying the matter shall announce publicly an admissible application for the establishment of a model case in the Federal Gazette under the title "Complaint Registry pursuant to the Capital Markets Model Case Act" (Complaint Registry). There shall be no possibility to appeal such order. The public announcement shall contain only the following information:

1.      The complete name of the accused party and its legal representative,

2.      The name of the issuer of securities or offeror of other investments to which the application for the establishment of a model case refers,

3.      The name of the court trying the matter,

4.      The case number at the court trying the matter,

5.      The establishment objective of the application for the establishment of a model case,

6.      A brief summary of the subject matter, and

7.      The exact date of receipt of the application by the court trying the matter and the exact date of the public announcement in the Complaint Registry.

(3) The court trying the matter shall publicly announce admissible applications for the establishment of a model case within six months of receipt of the application. Any delay in

APP 1810

App. 2491

Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

the making of this public announcement is to be justified in an order which there shall be no possibility to appeal.

(4) The court trying the matter may abstain from publicly announcing applications for the establishment of a test case in the Complaint Registry if the conditions for the introduction of a model case pursuant to Section 6 (1), first sentence, have already been met.

## Section 4
## Complaint Registry; Power to Issue Statutory Instruments

(1) Applications for the establishment of a model case whose establishment objective refers to the same subject matter (related applications) shall be listed in the Complaint Registry chronologically according to the date of their announcement.

(2) The court making the announcement bears responsibility for the protection of data that it has made public in the Complaint Registry, in particular for the legality of the collection of this data, the permissibility of its announcements and the correctness of its representation.

(3) Access to the Complaint Registry shall be open to everyone free of charge.

(4) Data stored in the Complaint Registry shall be deleted without delay upon final and binding conclusion of the model case proceeding or in the event of denial of an application for the establishment of a model case pursuant to Section 6 (5).

(5) The Federal Ministry of Justice shall be empowered to stipulate by statutory order more precise provisions on the content and structure of the Complaint Registry, in particular with regard to entries, amendments, deletions, rights of access, data security and data protection. This shall include provisions on the setting of dates for deletions and provisions which ensure that the public announcements

1.    Remain intact, complete and current, and

2.    Can be traced to their origins at any time.

## Section 5
## Interruption of Proceedings

Proceedings shall be interrupted upon public announcement of the application for the establishment of a model case in the Complaint Registry.

## Section 6
## Reference to the Higher Regional Court; Power to Issue Statutory Instruments

(1) The court trying the matter shall order the referral of the decision on the establishment objective of related applications for the establishment of a model case to the Higher Regional Court which is the higher court of instance if at least nine other related applications for the establishment of a model case have been announced within six months after the first announcement of an application for the establishment of a model case. The order referring the matter to a higher court of instance shall be without appeal and binding for the Higher Regional Court.

(2) The court trying the matter of the first application for the establishment of a model case which was publicly announced shall be responsible for the order referring the matter to a higher court of instance.

(3) The order referring the matter to a higher court of instance shall contain:

1.    The establishment objective, and

2.    A brief summary of the essential content which the related applications for the establishment of a model case share in common.

(4) The court trying the matter shall publicly announce the content of the order referring the matter to a higher court of instance in the Complaint Registry.

(5) If within six months after the public announcement of the respective application for the establishment of a model case, nine additional similar applications have not been announced

APP 1811

App. 2492

Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

publicly, the court trying the matter shall deny the application by order and continue the proceedings. This order shall be without appeal.

(6) If more than one Higher Regional Court has been instituted in any given Land, competency for model cases may be assigned by order of the Land government to one of the Higher Regional Courts or the highest Regional Court. The Land governments may stipulate by order the transfer of this authority to the Land administrations of justice. The competency of a Higher Regional Court for specific districts or an entire region of several Länder may be established through a treaty between Länder.

### Section 7
### Precluding Effects of the Order Referring the Matter to a Higher Court of Instance

Upon issuance of the order referring the matter to a court of higher instance, the initiation of a further model case proceeding for the proceeding which is to be suspended pursuant to Section 8 (1) shall be inadmissible. An order referring the matter to a court of higher instance which is nonetheless issued shall not be binding.

### Section 8
### Suspension

(1) After the public announcement of the model case in the Complaint Registry, the court trying the matter shall suspend ex oficio all pending proceedings or any proceedings brought prior to the handing down of a final decision regarding the establishment objective in the model case proceeding whose decision is contingent upon the claimed establishment objective. This shall apply regardless of whether an application for the establishment of a model case was made in the proceeding. The parties shall be heard unless they have waived their right to do so.

(2) The plaintiff may withdraw the complaint within a month of the suspension order without the consent of the defendant, even if the main model case proceedings have begun.

(3) In the suspension order, the court trying the matter shall inform the plaintiff

   1.      That the pro rata costs of the model case shall make up part of the costs of the trial proceedings, and

   2.      That no. 1 shall not apply if the complaint is withdrawn within a month of the service of the order of suspension of the main proceedings (Section 24 (2)).

(4) The court trying the matter shall without delay inform the Higher Regional Court conducting the model case proceedings of the suspension order. The amount of the claim, if it is affected by the establishment objective of the model case, is to be named in the suspension order.

### Part 2
### Conducting Model Case Proceedings

### Section 9
### Parties to the Model Case Proceedings

(1) The parties to the model case proceedings shall be:

   1.      The model case plaintiff,

   2.      The model case defendant,

   3.      Interested parties summoned.

(2) The Higher Regional Court shall designate by order as appears equitable the model case plaintiff from among the plaintiffs whose proceedings have been suspended pursuant to Section 8 (1). Consideration shall be given to the following:

   1.      The suitability of the plaintiff to conduct the model case proceedings in consideration of the interests of the parties summoned,

APP 1812

App. 2493

Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

2.      Agreement among several plaintiffs designating a single model case plaintiff, and

3.      The amount of the claim, if it is affected by the establishment objective of the model case.

There shall be no contestation of such order.
(3) The plaintiffs who are not selected as the model case plaintiff shall be summoned to the model case proceeding.
(4) The Higher Regional Court may, upon request of a summoned interested party, dismiss the model case plaintiff and appoint a new model case plaintiff in accordance with (2) if the model case plaintiff is not conducting the model case appropriately.
(5) Model case defendants shall be all defendants in the suspended proceedings.

### Section 10
### Public Announcement of Model Case Proceedings; Registration of a Claim

(1) Upon selecting the model case plaintiff, the Higher Regional Court shall publicly announce the following in the Complaint Registry:

1.      The name of the model case plaintiff and his legal representative (Section 9 (1) no. 1),

2.      The name of the model case defendants and their legal representatives (Section 9 (1) no. 2), and

3.      The case number of the Higher Regional Court.

(2) Within a period of six months after the public announcement in accordance with (1), a claim regarding the model case proceeding may be registered in writing with the Higher Regional Court. Such registration is inadmissible if a complaint has already been registered for the same claim. The registrant must be represented by a lawyer. The public announcement shall provide information about the conditions and time limit of the registration in accordance with (1).
(3) The registration of a claim must contain:

1.      The name of the registrant and his legal representative,

2.      The case number of the model case proceeding and a declaration of intent to register a claim,

3.      The names of the model case defendants against whom the claim is being made, and

4.      The grounds for and amount of the claim that is to be registered.

(4) The registration is to be served on the model case defendants named therein.

### Section 11
### General Procedural Rules; Power to Issue Statutory Instruments

(1) The applicable provisions stipulated under the Code of Civil Procedure for proceedings at the first instance before the Regional Courts shall apply mutatis mutandis to the test case proceeding, provided no other derogating stipulations have been agreed to. Section 278 (2) to (5) and Sections 306, 348 to 350 and 379 of the Code of Civil Procedure shall not apply. Interested parties summoned must not be named in orders.
(2) Public announcement may be made in lieu of service to interested parties of summonses to court hearings and interlocutory decisions. Public announcement shall be effected by entry into the Complaint Registry. There must be a period of at least four weeks between public announcement and the date of the hearing.
(3) The Federal Government and the Land governments may determine by order for their area of competency the following:

APP 1813

App. 2494

Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

1.      The point in time as of which electronic files are to be kept in the model case proceeding, and

2.      The applicable organisational and technical basis necessary for the creation, maintenance and storage of such electronic files.

The Land governments may transfer this authority by order to the Land administrations of justice.

(4) The Federal Government and the Land governments may prescribe by order for their area of competency

1.      That in model case proceedings statements are to be submitted to the court in electronic form,

2.      That confirmations of receipt are to be sent in response electronically, and

3.      That the parties shall be required to ensure that electronic documents may be served on them by the court, as well as

4.      What form is suitable for the processing of the documents.

The Land governments may transfer this authority by order to the Land administrations of Justice.

### Section 12
### Preparation of the Hearing; Written Pleadings

(1) In preparation of the hearing, the presiding judge or a member of the bench designated by him may instruct the interested parties summoned to the hearing to submit additions to the written pleadings provided by the model case plaintiff, and in particular may set a deadline for the clarification of certain points which require further elucidation.

(2) Written pleadings of the parties to the model case and interlocutory decisions of the Higher Regional Court in the model case proceeding shall be announced in an electronic information system that is only accessible to parties to the model case. The data stored in the electronic information system shall be deleted without delay upon final and binding conclusion of the model case proceeding or upon any other ending of the suspended proceedings. The Land administrations of justice shall determine what electronic information and communication system is used for the stored data, and are responsible for the implementation of the electronic retrieval procedure. The Länder may prescribe a cross-regional central electronic information and communication system.

### Section 13
### Effects of Withdrawal; Ending the Proceedings

(1) The Higher Regional Court shall designate a new model case plaintiff pursuant to Section 9 (2) if the model case plaintiff withdraws his complaint in the course of the main model case proceedings. The same shall apply in the event of the initiation of insolvency proceedings in respect of the model case plaintiff's assets.

(2) The same shall apply in the event that the legal counsel representing the plaintiff applies for suspension of the model case proceedings for any of the following reasons:

1.      The model case plaintiff has died,

2.      The model case plaintiff no longer has the capacity to sue or to be sued,

3.      The model case plaintiff has lost his legal representative,

4.      A court order has been issued subjecting an estate to administration, or

5.      A reversionary succession has occurred.

(3) Withdrawal of the complaint by one of the parties summoned shall have no effect on the progress of the model case proceedings.

APP 1814

App. 2495

Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

(4) Withdrawal of an application for establishment of a model case shall have no effect on the status of a model case plaintiff or the progress of the proceedings.
(5) A model case ruling shall not be issued if the model case plaintiff, the model case defendant and the interested parties summoned agree unanimously that they want to end the model case proceedings. The Higher Regional Court shall end the model case proceedings by order. There shall be no contestation of such order, and it shall be announced publicly. Section 11 (2), second sentence, shall apply mutatis mutandis.

## Section 14
### Legal Position of Interested Parties Summoned
The interested parties summoned must engage in the model case proceeding at the stage it is in at the time of the suspension of the trial proceedings conducted by them. They are entitled to avail themselves of means of contestation or defence and to effectively undertake all relevant procedural acts, as long as their statements and actions are not contrary to the statements and actions of the model case plaintiff.

## Section 15
### Expansion of the Model Case Proceedings
(1) Upon public announcement of the order referring the matter to a higher court of instance pursuant to Section 6 (4), the Higher Regional Court shall expand the establishment objective by order, provided that

1. The decision on the dispute which the case is based upon is dependent on the additional establishment objective,

2. The establishment objectives concern the same subject matter, which is the basis of the order referring the matter to a court of higher instance, and

3. The Higher Regional Court deems the expansion to be relevant to the case.

The application is to be submitted to the Higher Regional Court and is to include the establishment objective and public capital markets information.
(2) The Higher Regional Court shall publicly announce the expansion of the model case proceedings in the Complaint Registry.

## Section 16
### Model Case Ruling
(1) The Higher Regional Court shall hand down by order a model case ruling based on an oral hearing. The interested parties summoned need not be named in the title of a model case ruling. The model case ruling shall be served on the parties to the case and the applicants. A public announcement may be made in lieu of such notification. Section 11 (2), second sentence, shall apply mutatis mutandis.
(2) The court trying the matter shall make the decision regarding the costs incurred through the model case proceedings.

## Section 17
### Settlement Proposal
(1) The model case plaintiff and the model case defendant may conclude a litigation settlement agreement by submitting to the court a written settlement proposal ending the model case proceedings and the main case proceedings or by accepting a written settlement proposal from the court through a written pleading to the court. The interested parties summoned shall be granted the opportunity to comment on the matter. The settlement shall require the approval of the court under Section 18. The approved settlement shall take effect if fewer than 30 per cent of the interested parties summoned declare their withdrawal from the settlement under Section 19 (2).
(2) The settlement proposal shall also include provisions on the following matters:

1. The distribution of the agreed benefits among the parties,

APP 1815

App. 2496

Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

2. The evidence of eligibility for benefits that is to be provided by the parties,

3. The dates on which benefits are payable, and

4. The distribution of the costs of the model case proceedings among the parties.

### Section 18
### Approval of the Settlement
(1) The court shall approve the settlement through an order that shall be without appeal, if it deems it to be a suitable amicable settlement of the suspended legal dispute, taking into consideration the previous state of affairs and of the dispute of the model case proceedings and of the outcome of the hearing of the interested parties summoned.
(2) After approval has been granted, the settlement may no longer be revoked.

### Section 19
### Announcement of the Settlement; Withdrawal
(1) The approved settlement shall be served on the interested parties summoned.
(2) The interested parties summoned may declare their withdrawal from the settlement within a period of one month after the serving of the settlement. Such withdrawal must be announced in writing to the court; it may be put on record at the court registry.
(3) The interested parties summoned shall be informed of their right to withdraw from the settlement, of the required conditions and time limit, and of the effect of the settlement.

### Section 20
### Appeal on Points of Law
(1) An appeal on points of law shall be directed against the model case ruling.  The legal matter is always of fundamental significance within the meaning of Section 574 (2) no. 1 of the Code of Civil Procedure. The appeal on points of law may not be based upon the wrongful obtaining of a model case ruling by the court trying the matter pursuant to Section 6 (1) and (2). All parties shall be entitled to appeal.
(2) The appeals court shall inform the other parties to the model case proceedings and the applicants of the receipt of an appeal if the appeal is admissible of itself and has been submitted in compliance with the legally established conditions and time limit. Notification shall be served. A public announcement may be made in lieu of such notification; Section 11 (2), second sentence, shall apply mutatis mutandis.
(3) The other parties may join the appeal proceedings within a deadline of one month from the serving of notification pursuant to (2). Grounds for the written pleading to join the appeal proceedings shall be provided within a month of the serving of notification pursuant to (2). Section 551 (2), fifth and sixth sentences, of the Code of Civil Procedure shall apply mutatis mutandis.
(4) If one of the parties chooses not to join the appeal or does not submit a statement within the time period named in (3), the model case proceedings before the appeals court shall proceed without him.  Section 14 shall apply mutatis mutandis to the legal position of the parties that have joined the appeal process.
(5) Notification of the ruling on the appeal shall be served on the parties and the applicants. A public announcement may be made in lieu of such notification; Section 11 (2), second sentence, shall apply mutatis mutandis.

### Section 21
### Model Case Appellant
(1) If the model case plaintiff submits an appeal against the model case ruling, he continues the model case proceedings with the appeal authority as the model case appellant. The appeals court shall select the model case appellee from among the model case defendants by order as appears equitable. Section 574 (4), first sentence, of the Code of Civil Procedure shall apply mutatis mutandis to all other model case defendants.

APP 1816

App. 2497

Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

(2) If the appeal against the model case ruling is filed not by the model case plaintiff but by one or more of the interested parties summoned, the one among the interested parties summoned who was the first to file an appeal shall be designated the model case appellant by the appeals court.

(3) If one or more of the model case defendants files an appeal against the model case ruling, the model case defendant who was the first to file an appeal shall be designated the model case appellant by the appeals court. The model case plaintiff shall be the model case apellee. Section 574 (4), first sentence, of the Code of Civil Procedure shall apply mutatis mutandis to the interested parties summoned.

(4) If the model case appellant withdraws his appeal, the court of appeal shall in accordance with Section 13 (1) designate a new model case appellant from among the parties that have joined the appeal proceedings on the side of the model case appellant, unless these also decline to continue the appeal.

### Part 3
### Effect of the Model Case Ruling and the Settlement; Costs

### Section 22
### Effect of the Model Case Ruling

(1) The model case ruling shall be binding on the courts trying all proceedings that have been suspended pursuant to Section 8 (1). Without prejudice to subsection (3), the model case ruling shall have effect for and against all parties to the model case proceedings irrespective of whether the party itself has expressly complained of all the points of dispute in the model case proceedings. This shall also apply if the model case plaintiff or the interested party summoned has withdrawn its complaint in the main proceedings after the deadline named in Section 24 (2).

(2) The order shall be defined as taking final and binding effect to the extent that a ruling has been handed down in regard to the establishment objectives of the model case proceedings.

(3) Upon final and binding conclusion of the model case proceedings, the interested parties summoned shall only be heard in legal disputes brought against the model case defendants which assert that the model case plaintiff conducted the model case inadequately to the extent that

1.      Due to the stage of the model case proceedings at the time of the suspension of their legal dispute or on account of the statements and actions of the model case plaintiff, they were hindered from availing themselves of means of contestation or defence, or

2.      Means of contestation or defence of which they were unaware were not availed of by the model case plaintiff, either intentionally or due to gross negligence.

(4) Main proceedings shall be recommenced upon submission of the final and binding model case ruling by a party to the model case proceedings.

(5) The model case ruling shall also have effect for and against the parties which did not join the appeal process.

### Section 23
### Effect of Settlement

(1) The Higher Regional Court shall prescribe by order when the approved settlement comes into effect. There shall be no possibility to appeal such order. The order shall be publicly announced. Section 11 (2), second sentence, shall apply mutatis mutandis. Upon announcement of the order establishing that the settlement is in effect, the settlement shall have effect for and against all parties that have not declared their withdrawal from the settlement.

(2) The settlement shall end the model case proceedings.

(3) Provided that the plaintiff has not declared his withdrawal from the settlement, the court trying the matter shall end the suspended proceedings by order and shall decide about the costs as appears equitable and taking into consideration the arrangement made pursuant to

APP 1817

App. 2498

Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

Section 17 (2) no. 4. A complaint may be lodged forthwith against the order. The opposing party shall be heard before a decision is made about the complaint.
(4) If the plaintiff claims non-fulfilment of the settlement, the proceedings shall be reopened upon his request. If the complaint is now directed at the fulfilment of the settlement, the amended complaint shall be admissible.

### Section 24
### Subject Matter of the Decision on Costs in the Main Proceedings

(1) The costs incurred by the model case plaintiff and the interested parties summoned for model case proceedings at first instance shall comprise part of the costs of the respective main proceedings at first instance.
(2) The costs incurred by the model case defendants for model case proceedings at first instance shall on a pro rata basis comprise part of the costs of the respective main proceedings unless the complaint is withdrawn within a month of the serving of the order suspending the main proceedings. The respective share in the costs shall be determined according to the ratio of the amount of the claim made by the respective plaintiff, insofar as the establishment objectives of the model case concerns him, to the total amount of the claims made against the model case defendants in the proceedings suspended pursuant to Section 8 (1), insofar as the establishment objectives of the model case proceedings concern these claims.
(3) A claim shall not be considered in the total amount to be calculated pursuant to subsection (2) if the complaint is withdrawn within a month of the serving of the suspension order.
(4) Section 96 of the Code of Civil Procedure shall apply mutatis mutandis.

### Section 25
### Violation of the Requirement to Refer the Matter to the Higher Regional Court

An appeal against the final ruling of the court trying the matter in the main proceedings may not be based on the Higher Regional Court not having had jurisdiction to issue a model case ruling or not having met the conditions for issuing an order referring the matter to a higher court of instance.

### Section 26
### Decision concerning Costs in Appeal on Points of Law Proceedings

(1) The costs of an appeal on points of law which was unsuccessful shall be carried, depending on the degree of their involvement, by the model case appellant and those interested parties summoned who joined the appeal of points of law proceedings on the side of the model case appellant.
(2) If the appeals court itself gives the decision on the matter, the costs ensued in bringing a successful appeal on points of law by one of the model case defendants shall be carried by the model case plaintiff and all interested parties summoned, depending on the degree of their involvement in the model case proceedings. If the appeal on points of law was successfully brought by the model case plaintiff or one of the interested parties summoned, the costs of the appeal on points of law shall be carried by all model case defendants, depending on the degree of their involvement in the model case proceedings of the court of first instance.
(3) In the event of partial success and loss, section 92 of the Code of Civil Procedure shall apply mutatis mutandis.
(4) In the event that the appeals court sets aside the model case ruling by the Higher Regional Court and remits the matter for a new decision, the Higher Regional Court shall rule at its equitable discretion on the carrying of costs in appellate proceedings simultaneously with the handing down of its ruling on the model case proceedings. In doing so, the outcome of the model case proceedings shall be taken as its basis. Section 99 (1) of the Code of Civil Procedure shall apply mutatis mutandis.

APP 1818

App. 2499

Service provided by the Federal Ministry of Justice and Consumer Protection
in cooperation with juris GmbH – www.juris.de

(5) If the model case plaintiff and the interested parties summoned are ordered to pay costs incurred in the appellate proceedings, they shall reimburse the court fees advanced by the model case defendants and the attorney's fees of the model case defendants according to the respective value arising from the claims made by them in the main proceedings, insofar as these concern the establishment objectives of the model case proceedings.

### Section 27
### Transitional Provisions

In respect of model case proceedings in which oral arguments were heard before 1 November 2012, the version of the Act on Model Case Proceedings in Disputes under Capital Markets Law in force prior to 1 November 2012 shall continue to apply.

### Section 28
### Expiry

This Act shall expire on 1 November 2020.

APP 1819

App. 2500

# Exhibit 11

# Decision of the
# German Federal Court of Justice
# BGHZ 120, 305

APP 1820

ENTSCHEIDUNGEN
DES BUNDESGERICHTSHOFES

HERAUSGEGEBEN VON
DEN MITGLIEDERN DES BUNDESGERICHTSHOFES
UND DER BUNDESANWALTSCHAFT



CARL HEYMANNS VERLAG KG
KÖLN · BERLIN

ENTSCHEIDUNGEN
DES BUNDESGERICHTSHOFES
IN ZIVILSACHEN

BGHZ

120. BAND



1993

CARL HEYMANNS VERLAG KG
KÖLN · BERLIN

APP 1821

App. 2502

Vermögens beeinträchtigt und seine Teilnahme am Geschäftsverkehr behindert, ist eine Übersicherung grundsätzlich als unangemessen im Sinne des § 9 Abs. 1 AGBG zu bewerten, falls nicht zumindest gleichwertige Interessen des Sicherungsnehmers diese Benachteiligung zu rechtfertigen vermögen (M. Wolf in Festschrift Baur, 1981, S. 147, 166); die Zulässigkeit einer Übersicherung ist daher auf die Wertgrenze zu beschränken, die zur Absicherung des Sicherungsnehmers einschließlich etwaiger Risiken der Verwertung unerläßlich ist. Wird, wie hier, nicht der Nennwert, sondern der realisierbare Wert der eingeräumten Sicherheiten zur Grundlage der Vergleichsberechnung gemacht, sind aber bestehende Verwertungsrisiken bereits berücksichtigt. Demgemäß kann aus der Zulässigkeit von Globalzessionen, die eine Freigabe der sicherungshalber abgetretenen Forderungen erst vorsehen, wenn deren Nennwert die Kreditsumme um 50 % übersteigt (BGHZ 98 aaO), für die hier festzulegende Freigabegrenze im Rahmen eines zugunsten des Lieferanten vereinbarten verlängerten Eigentumsvorbehalts nichts hergeleitet werden. Weitergehende Interessen des Vorbehaltsverkäufers, die eine Sicherung, die über die mit Rücksicht auf regelmäßig bestehende Risiken anerkannte Toleranzgrenze hinausgeht, erforderlich machen, sind weder vorgetragen noch aus dem Sachverhalt erkennbar. Bei einem zugunsten des Lieferanten ausbedungenen verlängerten Eigentumsvorbehalt muß daher grundsätzlich, um eine unangemessene Benachteiligung des Vorbehaltskäufers auszuschließen, zugleich eine Freigabepflicht des Vorbehaltsverkäufers bei einer Übersicherung von mehr als 20 % vereinbart sein (so auch Palandt/Heinrichs, BGB 51. Aufl. § 138 Rdnr. 97; Soergel/Zeiss, BGB 12. Aufl. § 398 Rdz. 10; Soergel/Stein § 9 AGBG Rdz. 70; Brandner in Ulmer/Brandner/Hensen, AGB-Gesetz 6. Aufl. Anh. §§ 9 – 11 Rdnr. 658).

2. Da die Allgemeinen Lieferbedingungen der Klägerin eine Verpflichtung zur Freigabe der ausbedungenen Sicherheiten erst für den Fall enthalten, daß deren realisierbarer Wert die zu sichernden Forderungen um 1/4 übersteigt, liegt eine unangemesse Übersicherung der Klägerin vor, die zur Unwirksamkeit des formularmäßig vereinbarten Eigentumsvorbehalts führt. Damit entfällt die Rechtsgrundlage für die von der Klägerin im

Wege der Stufenklage geltend gemachten Auskunfts- und Rechnungslegungsansprüche, ohne daß es noch eines Eingehens auf die weiteren von der Revision vorgebrachten Angriffe bedarf.

Die Klage war daher unter Aufhebung des Teilurteils des Landgerichts sowie des Berufungsurteils insgesamt abzuweisen (BGHZ 94, 268, 275; BGH, Urteil vom 13. Dezember 1989 – IVb ZR 22/89 = FamRZ 1990, 863 unter 1 a, jeweils m.w.Nachw.).

## 30

a) War das ausländische Gericht an die Regeln des Haager Zustellungsabkommens gebunden, kann eine nicht ordnungsmäßige Zustellung des verfahrenseinleitenden Schriftstücks an den deutschen Beklagten nicht dadurch als geheilt angesehen werden, daß es ihm tatsächlich zugegangen ist (hier: auf dem Postwege durch Einschreiben mit Rückschein ohne Übersetzung).

b) Der Versagungsgrund des § 328 Abs. 1 Nr. 2 ZPO entfällt nicht, wenn der Beklagte nach Erlangung der Kenntnis von der ausländischen Entscheidung keinen nach der Verfahrensordnung des Urteilsstaats zulässigen Rechtsbehelf eingelegt hat.

ZPO §§ 328 Abs. 1 Nr. 2, 187; Haager Übk. ü. d. Zustellung
gerichtl. u. außergerichtl. Schriftstücke im Ausl.
in Zivil- o. Handelssachen v. 15. November 1965,
BGBl 1977 II 1452, Art. 5, 10.
XII. Zivilsenat. Beschl. vom 2. Dezember 1992
in einem Anerkennungsverfahren.
XII ZB 64/91.

Oberlandesgericht Frankfurt am Main

APP 1822
App. 2503

## Aus den Gründen:

I. Die Beteiligten zu 1 und 2, beide jedenfalls auch deutsche Staatsangehörige, schlossen am 27. April 1971 in Deutschland die Ehe, aus der ein im Jahre 1975 geborenes Kind hervorging. Sie lebten in Ch. (South Carolina/USA), bis sich die Ehefrau (Antragsgegnerin) entweder 1985 oder 1987 nach Deutschland begab, während der Ehemann (Antragsteller) in den Vereinigten Staaten verblieb.

Der Ehemann betrieb im Jahre 1987 bei einem Gericht des Staates South Carolina die Ehescheidung. Die Klageschrift nebst Vorladung wurde der Ehefrau am oder am 24. Juni 1987 in Deutschland auf dem Postwege (Einschreiben mit Rückschein) übermittelt. Sie erschien zur mündlichen Verhandlung vom 9. November 1987 nicht und war dort auch nicht vertreten. Auch sonst ignorierte sie das Verfahren des Gerichts in der Annahme, sie könne in ihrer Abwesenheit nicht geschieden werden. Das angegangene Gericht erkannte durch Urteil vom 10. November 1987 u.a. auf Scheidung der Ehe.

Im März 1989 betrieb die Ehefrau bei einem deutschen Gericht die Ehescheidung. Der Ehemann beantragte im Januar 1990 bei der Landesjustizverwaltung gemäß Art. 7 § 1 FamRÄndG die Anerkennung der Ehescheidung durch das Urteil vom 10. November 1987. Der Antrag wurde durch Bescheid des Hessischen Ministeriums der Justiz abgelehnt, weil der Ehefrau das verfahrenseinleitende Schriftstück nicht ordnungsgemäß zugestellt worden sei (§ 328 Abs. 1 Nr. 2 ZPO). Der Ehemann hat daraufhin nach Art. 7 § 1 Abs. 4 FamRÄndG Antrag auf gerichtliche Entscheidung gestellt, mit der er sein Anerkennungsbegehren weiterverfolgt.

Das angerufene Oberlandesgericht Frankfurt am Main teilt die Auffassung der Landesjustizverwaltung, daß die Entscheidung des ausländischen Gerichts aufgrund des § 328 Abs. 1 Nr. 2 ZPO nicht anerkannt werden könne. An der Zurückweisung des Antrags des Ehemannes sieht es sich jedoch durch einen Beschluß des Bayerischen Obersten Landesgerichts vom 29. November 1974 (BayObLGZ 1974, 471 = FamRZ 1975, 215)

gehindert, in dem die Auffassung vertreten worden ist, der Mangel einer nicht ordnungsgemäßen Zustellung der Klageschrift werde dadurch geheilt, daß dem deutschen Beklagten das Schriftstück tatsächlich zugehe. Es hat deshalb die Sache gemäß Art. 7 § 1 Abs. 6 Satz 4 FamRÄndG i.V. mit § 28 Abs. 2 FGG dem Bundesgerichtshof zur Entscheidung vorgelegt.

Die Vorlage ist zulässig.

1. Der Beschluß ergibt, daß das Oberlandesgericht zu einer anderen Entscheidung gelangt wäre, wenn es der Rechtsauffassung gefolgt wäre, die das BayObLG in dem angeführten, gleichfalls im Anerkennungsverfahren nach Art. 7 § 1 FamRÄndG ergangenen Beschluß vertreten hat und auf der diese Entscheidung beruht. Seine Auffassung, daß es auf die streitige Rechtsfrage ankommt, ist bindend.

2. Der Zulässigkeit der Vorlage steht nicht entgegen, daß die Vorlagepflicht nach Art. 7 § 1 Abs. 6 Satz 4 FamRÄndG erst mit Wirkung vom 1. Juli 1977 eingeführt wurde, während die Entscheidung, von der das Oberlandesgericht abweichen will, vor diesem Zeitpunkt erging (vgl. Senatsbeschluß BGHZ 82, 34, 38). Das gleiche gilt für den Umstand, daß § 328 Abs. 1 Nr. 2 ZPO mit Wirkung ab 1. September 1986 geändert worden ist (Art. 4 Nr. 1 des IPR-Neuregelungsgesetzes vom 25. Juli 1986 – BGBl. I 1142). Denn bei Anwendung sowohl der alten wie der neuen Fassung der Vorschrift stellt sich die Vorlagefrage in gleicher Weise, so daß nach wie vor ein Bedürfnis für eine höchstrichterliche Klärung bestehe.

3. Die streitige Rechtsfrage ist bisher vom Bundesgerichtshof nicht entschieden worden. Der Vorlagebeschluß des Kammergerichts vom 26. Januar 1988 (FamRZ 1988, 641), der dieselbe Frage betraf, hat zu keiner Entscheidung geführt, weil der Senat in seinem Beschluß vom 27. Juni 1990 (XII ZB 38/88 – FamRZ 1990, 1100) darauf nicht einzugehen brauchte. Für den Anwendungsbereich von Art. 27 Nr. 2 des EG-Übereinkommens vom 27. September 1968 über die gerichtliche Zuständigkeit und die Vollstreckung gerichtlicher Entscheidungen in Zivil- und Handelssachen – EGÜbk, an den sich § 328 Abs. 1 Nr. 2 ZPO anlehnt, hat der Bundesgerichtshof nach vorgängiger Vorlage an

20*

**APP 1823**

den Europäischen Gerichtshof bereits entschieden, daß die Möglichkeit einer Heilung von Zustellungsmängeln nach dem Recht des Urteilsstaates einschließlich der einschlägigen völkerrechtlichen Verträge zu beurteilen ist (Beschluß vom 20. September 1990 – IX ZB 1/88 – NJW 1991, 641). Dabei hat er auch ausgesprochen, daß u.a. im Haager Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen vom 15. November 1965 (BGBl 1977 II 1452 – Haager Zustellungsabkommen, HZÜ) eine Heilungsmöglichkeit nicht vorgesehen ist. Das macht jedoch eine Entscheidung der Vorlagefrage für den Anwendungsbereich des § 328 Abs. 1 Satz 2 ZPO nicht entbehrlich.

III. Der Senat, der infolge der zulässigen Vorlage über den Antrag des Ehemannes auf gerichtliche Entscheidung zu befinden hat (Art. 7 § 1 Abs. 6 Satz 4 FamRÄndG i.V. mit § 28 Abs. 3 FGG), gelangt in Übereinstimmung mit der Landesjustizverwaltung und dem vorlegenden Oberlandesgericht zu dem Ergebnis, daß die Anerkennung des Scheidungsausspruchs im Urteil vom 10. November 1987 zu versagen ist.

1. Mangels einer vorrangigen zwischenstaatlichen Regelung bestimmen sich die Anerkennungsvoraussetzungen nach § 328 ZPO in der seit 1. September 1986 geltenden Fassung, die schon im Zeitpunkt des ausländischen Verfahrens gegolten hat. Nach Abs. 1 Nr. 2 der Vorschrift ist die Anerkennung u.a. dann ausgeschlossen, wenn dem Beklagten, der sich auf das Verfahren nicht eingelassen und sich hierauf beruft, das verfahrenseinleitende Schriftstück nicht ordnungsgemäß oder nicht so rechtzeitig zugestellt worden ist, daß er sich verteidigen konnte.

a) Wie im Vorlagebeschluß zutreffend dargelegt ist, hat sich die Ehefrau auf das Scheidungsverfahren des Gerichts des Staates South Carolina nicht eingelassen. Sie hat bewußt jede Reaktion gegenüber diesem Gericht vermieden, weil sie dadurch eine Scheidung zu verhindern hoffte. Auch der von ihr mit der Regelung finanzieller Angelegenheiten mit ihrem Ehemann eingeschaltete Anwalt ist dem Gericht gegenüber nicht in Erscheinung getreten. Danach ist eine Einlassung zu verneinen (vgl. Senatsbeschluß vom 27. Juni 1990 aaO).

b) Im Anerkennungsverfahren hat sich die Ehefrau ausdrücklich darauf berufen, daß sie sich auf das ausländische Scheidungsverfahren nicht eingelassen hat. Sie möchte eine Scheidung nach deutschem Recht erreichen, die sie für günstiger hält. Daß sie im März 1989 bei einem deutschen Gericht die Ehescheidung beantragt hat, kann deshalb nicht als Verzicht auf den aus § 328 ZPO folgenden Schutz gewertet werden.

c) Das verfahrenseinleitende Schriftstück, hier die Klageschrift nebst einer Vorladung, ist der Ehefrau nicht ordnungsgemäß zugestellt worden. Diese Frage ist im Anerkennungsverfahren ohne Bindung an die Beurteilung des ausländischen Gerichts zu entscheiden. Mängel liegen in zweifacher Hinsicht vor: Sowohl die Vereinigten Staaten als auch die Bundesrepublik Deutschland sind dem Haager Zustellungsabkommen beigetreten, die ersteren im Jahre 1969, letztere im Jahre 1979 (vgl. Junker JZ 1989, 121). Soweit daher das vom Ehemann angerufene Gericht des Staates South Carolina die Zustellung der Klageschrift nebst Vorladung an die in Deutschland lebende Ehefrau veranlaßte, mußte es sich an die Regeln dieses Abkommens halten (vgl. Junker aaO S. 123; Pfeil/Kammerer, Deutsch-amerikanischer Rechtshilfeverkehr in Zivilsachen – 1987 – S. 53). Dieses gestattete es hier nicht, die Schriftstücke direkt auf dem Postwege zu übermitteln. Die im Abkommen an sich vorgesehene Möglichkeit, gerichtliche Schriftstücke an im Ausland befindliche Personen unmittelbar durch die Post zu übersenden (Art. 10 Buchst. a), besteht nach dem Wortlaut der Vorschrift nur, »sofern der Bestimmungsstaat keinen Widerspruch erklärt«. Die Bundesrepublik Deutschland hat insoweit formgerecht widersprochen (Nr. 4 Satz 3 der Bekanntmachung vom 21. Juni 1979 – BGBl. II 779), weshalb es im Ausführungsgesetz zu dem Übereinkommen vom 22. Dezember 1977 (BGBl. I 3105) in § 6 Satz 2 ausdrücklich heißt: »Eine Zustellung nach Art. 10 des Übereinkommens findet nicht statt.«

Zum anderen handelte es sich um eine förmliche Zustellung i.S. von Art. 5 Abs. 1 des Übereinkommens. Dazu hat die Bundesrepublik Deutschland in Nr. 1 der angeführten Bekanntmachung vom 21. Juni 1979 erklärt, daß eine solche nur zulässig ist,

APP 1824

wenn das zuzustellende Schriftstück in deutscher Sprache abge-
faßt oder in diese Sprache übersetzt ist. Nach den glaubhaften
Angaben der Ehefrau, denen der Ehemann nicht widersprochen
hat, sind ihr die fraglichen Schriftstücke nur in der Gerichtsspra-
che zugegangen. Auch darin liegt ein Mangel, der die Zustellung
als unwirksam erscheinen läßt (vgl. MünchKomm-ZPO/Gott-
wald § 328 Rdn. 74; Junker aaO S. 123; Stürner JZ 1992, 326,
330; s.a. BGH, Beschluß vom 20. September 1990 aaO zur
Zustellung eines französischen Gerichts ohne Übersetzung).

d) Auf die Frage, ob der Ehefrau die Klageschrift so rechtzei-
tig bekannt geworden ist, daß sie sich verteidigen konnte,
kommt es nicht an, wenn es schon an einer ordnungsgemäßen
Zustellung fehlt. Die Anerkennung setzt kumulativ eine ord-
nungsmäßige und eine rechtzeitige Zustellung der Klageschrift
voraus. Für den insoweit gleichlautenden Art. 27 Nr. 2 EGÜbk
hat dies der Europäische Gerichtshof durch Urteil vom 3. Juli
1990 bereits entschieden (vgl. Slg. 1990 I-2725, Rdn. 15 ff.).
§ 328 Abs. 1 Nr. 2 ZPO kann im wesentlichen gleich ausgelegt
werden wie Art. 27 Nr. 2 EGÜbk (vgl. Zöller/Geimer, ZPO
17. Aufl. § 328 Rdn. 133).

2. Ob ein Zustellungsmangel dadurch geheilt wird, daß das
Schriftstück dem Empfänger tatsächlich zugegangen ist, wird für
§ 328 Abs. 1 Nr. 2 ZPO unterschiedlich beurteilt. Für eine
zumindest entsprechende Anwendung des § 187 Satz 1 ZPO tre-
ten neben dem Bayerischen Obersten Landesgericht (aaO und
BayobLGZ 1978, 132, 133) ein: Stein/Jonas/Schumann ZPO
20. Aufl. § 328 Rdn. 186; Zöller/Geimer aaO § 328 Rdn. 135;
MünchKomm-ZPO/Gottwald § 328 Rdn. 71; Baumbach/Hart-
mann, ZPO 51. Aufl. § 328 Rdn. 23; Thomas/Putzo ZPO
17. Aufl. § 328 Anm. 2 Nr. 2 c; Staudinger/Spellenberg, BGB
12. Aufl. § 328 ZPO Rdn. 341; Martiny in Handbuch des Inter-
nationalen Zivilverfahrensrechts Bd. III.1 Rdn. 849. Anderer
Auffassung sind: KG FamRZ 1988, 641; AK-ZPO/Koch § 328
Rdn. 33; Jansen, FGG 2. Aufl. Art. 7 § 1 Fam RÄndG Rdn. 25;
Staudinger/Gamillscheg, BGB 10./11. Aufl. Anh. Art. 17
EGBGB § 328 ZPO Rdn. 258; Kryzwon StAZ 1989, 93, 100
m.w.Nachw.; LJV Bad/Württ. FamRZ 1990, 1015, 1018 (für

den Anwendungsbereich des Art. 27 Nr. 2 EGÜbk und des
HZÜ s.a. OLG Hamm MDR 1978, 941 und IPRspr. 1987 Nr.
159; OLG Stuttgart IPRspr. 1983 Nr. 173; Kropholler, Europäi-
sches Zivilprozeßrecht 3. Aufl. Art. 27 EGÜbk Rdn. 30; Rau-
scher IPRax 1991, 155, 159; Stürner JZ 1992, 325, 331).

Der Senat teilt die Auffassung des vorlegenden Gerichts.

Die Entscheidung des Bayerischen Obersten Landesgerichts,
die Anlaß zu der Vorlage gegeben hat, ist vor dem Beitritt der
Bundesrepublik Deutschland zum Haager Zustellungsabkom-
men ergangen. Soweit darauf abgestellt wird, daß die Rechts-
praxis in den Vereinigten Staaten förmliche Zustellungen in andere
Staaten generell nicht für erforderlich hält, trifft das nach neue-
ren Berichten nicht mehr zu; der Vorrang des Abkommens wird
im Verhältnis zu den Vertragsstaaten anerkannt, obwohl zahlrei-
che Prozeßrechte der Einzelstaaten es einem Kläger erlauben,
die Klageschrift direkt durch eingeschriebenen Brief ins Ausland
zu senden (vgl.Junker aaO S. 123 f.; Pfeil/Kammerer aaO S. 53).
Die Ansicht, die Wirksamkeit der Zustellung in Deutschland sei
unmittelbar nach deutschem Verfahrensrecht als der lex fori
(und damit auch nach § 187 Satz 1 ZPO) zu beurteilen, ist über-
holt. Die Zustellung der Klage ist vielmehr Teil des Verfahrens
des ausländischen Gerichts, so daß sich die Frage ihrer Ord-
nungsmäßigkeit und der möglichen Heilung von Zustellungs-
mängeln nach dessen Verfahrensrecht einschließlich der ein-
schlägigen völkerrechtlichen Verträge richtet. Dies hat der Euro-
päische Gerichtshof in der bereits angeführten Entscheidung
vom 3. Juli 1990 zu Art. 27 Nr. 2 EGÜbk überzeugend dargelegt
(vgl. Slg. 1990 I-2425, Rdn. 29 ff.); das kann für den Anwen-
dungsbereich des § 328 Abs. 1 Nr. 2 ZPO unbedenklich über-
nommen werden.

Viele Befürworter einer Heilung durch tatsächlichen Zugang
sehen in § 187 Satz 1 ZPO den Ausdruck eines allgemeinen
Rechtsgedankens des Verfahrensrechts, demzufolge Zustel-
lungsmangel als geheilt gelten sollen, sobald der Zustellungs-
empfänger das zuzustellende Schriftstück tatsächlich erhalten
hat. Der Senat vermag für diese Ansicht aber eine ausreichende
Grundlage jedenfalls dann nicht zu sehen, wenn im zwischen-

APP 1825

staatlichen Verkehr – wie hier – völkerrechtlich wirksame Erklärungen entgegenstehen (verneinend auch Stellungnahme der Bundesregierung in EuGH Slg. 1990 I-2733 f.; Kropholler aaO; Rauscher aaO S. 159; Stürner aaO 332). In solchen Fällen müssen nationale Heilungsgrundsätze zurücktreten. Die Bundesrepublik Deutschland hat durch die bereits angeführten Widersprüche bei der Bekanntmachung des Haager Zustellungsabkommens für den Regelungsbereich dieses Abkommens verbindlich festgelegt, daß förmliche Zustellungen an den deutschen Beklagten auf dem direkten Postweg und ohne Übersetzung in die deutsche Sprache nicht zulässig sind. Es stehen also Belange eines geordneten zwischenstaatlichen Rechtsverkehrs in Frage, die über die Wahrung des rechtlichen Gehörs für den auf deutschem Staatsgebiet befindlichen Beklagten hinausgehen (nach Junker aaO S. 123 und Stürner aaO S. 331 wird die staatliche Souveränität berührt – s.a. BGHZ 58, 177, 179 f. – a.A. insoweit Zeller/Geimer aaO § 199 Rdn. 3 m.w.Nachw.). Diese Belange sind nicht weniger gewichtig als die Fälle, in denen auch innerstaatlich eine Heilung durch tatsächlichen Zugang ausscheidet, nämlich bei der Ingangsetzung einer Notfrist (§ 187 Satz 2 ZPO) oder einer Präklusionsfrist (BGHZ 76, 236, 239). Dem Beklagten zuzumuten, für eine Übersetzung der Klageschrift gegebenenfalls selbst zu sorgen (so offenbar Stein/Jonas/Schumann aaO), könnte auch auf eine Aushöhlung des Schutzes hinauslaufen, den die Bundesrepublik Deutschland mit ihrer diesbezüglichen Erklärung beabsichtigt hat. Gegen die Zulassung einer Heilung spricht schließlich, daß ein Verstoß gegen wesentliche Förmlichkeiten des internationalen Rechtsverkehrs sanktionslos bliebe, wenn das zuzustellende Schriftstück den Beklagten nur auf irgendeine Weise erreichte. Dies liefe dem erstrebenswerten Ziel einer einheitlichen Anwendung des Abkommens in den Vertragsstaaten zuwider.

Es ist somit in vorliegenden Fall nur entscheidend, ob und inwieweit das für das erkennende Gericht des Staates South Carolina verbindliche Verfahrensrecht eine Heilung von Zustellungsmängeln zuläßt. Dabei kommt es nicht darauf an, ob dieses Recht für Zustellungen an Ausländer auf dem Staatsgebiet der Vereinigten Staaten oder an solche unbekannten Aufenthalts eine dem § 187 Satz 1 ZPO entsprechende Regelung enthält. Da an die in Deutschland mit bekannter Anschrift lebende Ehefrau zugestellt worden ist, galt ausschließlich das Haager Zustellungsabkommen, nicht nur für die zu beachtenden Förmlichkeiten, sondern auch für die Frage einer Heilung von Zuständigkeitsmängeln (vgl. dazu Stürner aaO S. 328, 331; Rauscher IPRax 1992, 71, V2). Der Bundesgerichtshof hat bereits entschieden, daß dieses Abkommen, insbesondere auch dessen Art. 15, eine Heilung von Zustellungsmängeln nicht vorsieht (vgl. Beschlüsse vom 20. September 1990 aaO S. 642 und vom 4. April 1991 – IX ZB 87/90 – WM 1991, 1050, 1051 f.; ebenso Rauscher aaO; Stürner aaO S. 332; Schack, Internationales Zivilverfahrensrecht – 1991 – Rdn. 619). Dem schließt sich der erkennende Senat an. Damit ist hier die Frage der Heilung aufgrund Zugangs zu verneinen; sie ist bei Exklusivität des Abkommens in allen Vertragsstaaten unabhängig vom innerstaatlichen Recht zu beantworten.

3. Es wird auch die Auffassung vertreten, daß der Versagungsgrund des § 328 Abs. 1 Nr. 2 ZPO entfällt, wenn der Beklagte u.a. bei nicht ordnungsgemäßer Zustellung der Klageschrift die Möglichkeit gehabt hat, gegen die ergangene Entscheidung im Urteilsstaat ein Rechtsmittel einzulegen (vgl. insbesondere Zeller/Geimer aaO § 328 Rdn. 136 m.w.Nachw.). Eine ausdrückliche Regelung diesen Inhalts enthält das bilaterale deutsch-niederländische Zustellungsabkommen vom 30. August 1962 in Art. 2 Buchst. c Nr. 2.2 (BGBl. 1965 II 27). Danach ist der Einwand der nicht rechtzeitigen oder nicht ordnungsgemäßen Ladung unerheblich, wenn der Kläger nachweist, daß der Beklagte gegen die Entscheidung keinen Rechtsbehelf eingelegt hat, obwohl er von ihr Kenntnis erhalten hat. Ob darin ein allgemeines Rechtsprinzip der internationalen Urteilsanerkennung zu sehen ist (so Zöller/Geimer aaO), war Gegenstand einer Vorlage des Bundesgerichtshofs an den Europäischen Gerichtshof (Beschluß vom 4. April 1991 aaO). In dieser hat der IX. Zivilsenat in Übereinstimmung mit der überwiegenden Meinung zu erkennen gegeben, daß ein solches Rechtsprinzip nicht ange-

APP 1826

nommen wird (ablehnend etwa auch OLG Frankfurt am Main
RIW 1991, 587 und IPRax 1992, 90, 92; OLG Köln OLGZ
1990, 381, 383; OLG Stuttgart RIW 1979, 130; BayObLGZ
1978. 132, 134; MünchKomm-ZPO/Gottwald § 328 Rdn. 73;
Staudinger/Spellenberg aaO § 328 ZPO Rdn. 344; Schack aaO
Rdn. 851; Kropholler aaO Rdn. 38; Stürner aaO S. 332). Der
Europäische Gerichtshof hat auf die Vorlage durch Urteil vom
12. November 1992 (C-123/91) für den Regelungsbereich des
Art. 27 Nr. 2 EGÜbk in gleichem Sinne entschieden. Er hat aus-
geführt, daß das Erfordernis der ordnungsgemäßen und recht-
zeitigen Zustellung auf den Zeitpunkt der Verfahrenseinleitung
abstellt. Die Möglichkeit, später einen Rechtsbehelf gegen die
ergangene Entscheidung einzulegen, sei der Verteidigung vor
deren Erlaß prozessual nicht gleichwertig. Daher sei die Aner-
kennung bei nicht ordnungsgemäßer Zustellung des verfah-
renseinleitenden Schriftstücks zu versagen, ungeachtet des
Umstands, daß der Beklagte, der sich auf das Verfahren nicht
eingelassen hat, von der Entscheidung Kenntnis erhalten und
dagegen keinen Rechtsbehelf eingelegt hat. Dem schließt sich
der erkennende Senat für den Anwendungsbereich des § 328
Abs. 1 Nr. 2 ZPO an. Der Versagungsgrund entfällt hier somit
nicht aufgrund des Umstands, daß die Ehefrau nach Erlangung
der Kenntnis von dem Scheidungsurteil vom 10. November
1987 keinen nach der Verfahrensordnung des Urteilsstaats zuläs-
sigen Rechtsbehelf eingelegt hat.

## 31

Der Anspruch auf Erteilung einer Rechnung mit geson-
dert ausgewiesener Mehrwertsteuer (§ 14 Abs. 1 Satz 1
UStG) verjährt in 30 Jahren.

UStG 1991 § 14 Abs. 1.
VIII. Zivilsenat. Urt. vom 2. Dezember 1992
i.S. E.K. (Bekl.) w. S.(Kl.).
VIII ZR 50/92.

I. Landgericht Zweibrücken
II. Oberlandesgericht Zweibrücken

Der Kläger verlangt die Erteilung einer Rechnung gemäß § 14
Abs. 1 UStG über einen von der Beklagten aus ihrem Betriebs-
vermögen verkauften Pkw der Marke Porsche 911 SC Carrera.
Er ist bereits im Besitz einer von der Beklagten unter dem 1. Juli
1985 ausgestellten Rechnung folgenden Inhalts:

»Wir verkaufen Ihnen einen Pkw Porsche 911 SC Carrera, unfallfrei,
Erstzulassung April 1984, km-Stand ca. 26.000, Fahrgestell-Nr. ...
zu DM:                                                 58 000,–
                                        + 14% MWSt.     8 120,–
                                                       ─────────
                                                        66 120,–

Betrag dankend erhalten.«

Ein Empfänger ist in der Rechnung nicht genannt. Die
Beklagte hat den ausgewiesenen Kaufpreis in Höhe von 66 120
DM (brutto) erhalten; das Fahrzeug wurde im Fahrzeugbrief
am 11. Juli 1985 auf den Kläger umgeschrieben.

Die Finanzbehörde erließ am 12. Februar 1990 nach Ab-
schluß einer beim Kläger durchgeführten Betriebsprüfung einen
gesonderten Umsatzsteuerbescheid für das Kalenderjahr 1985,
worin der aus dem Kfz-Verkauf resultierende Vorsteuerbetrag
in Höhe von 8 120 DM nicht anerkannt wurde, weil die über
den Kauf erstellte Rechnung nicht den Kläger als Leistungsemp-
fänger ausweise. Der bereits 1985 zur Verrechnung gebrachte
Vorsteuerbetrag wurde nachgefordert. Den Einspruch des Klä-
gers wies das Finanzamt am 14. Februar 1991 zurück.

APP 1827

# Exhibit 12

# Decision of the
# German Federal Court of Justice
# BGHZ 141, 286

APP 1828

# ENTSCHEIDUNGEN
## DES BUNDESGERICHTSHOFES

HERAUSGEGEBEN VON
DEN MITGLIEDERN DES BUNDESGERICHTSHOFES
UND DER BUNDESANWALTSCHAFT

# ENTSCHEIDUNGEN
## DES BUNDESGERICHTSHOFES
## IN ZIVILSACHEN

# BGHZ

141. BAND



CARL HEYMANNS VERLAG KG
KÖLN · BERLIN



2000

CARL HEYMANNS VERLAG KG
KÖLN · BERLIN

APP 1829

App. 2510

## 32

a) Für die Anerkennung der internationalen Zuständigkeit US-amerikanischer Bundesgerichte ist allein darauf abzustellen, ob irgendein Gericht innerhalb der gesamten USA zuständig ist.

b) Das verfahrenseinleitende Schriftstück kann auch dann ordnungsgemäß zugestellt sein, wenn es keinen bestimmten Antrag enthält, aber dem Beklagten hinreichend zu erkennen gibt, aus welchem Rechtsgrund von ihm Zahlungen in beträchtlicher Höhe verlangt werden.

c) Eine Zustellung kann rechtzeitig sein, wenn dem Beklagten zwar eine verhältnismäßig kurze Erwiderungsfrist gesetzt wird, diese aber allgemein auf begründeten Antrag ausreichend verlängert wird.

d) Hat sich ein Beklagter trotz ordnungsgemäßer und rechtzeitiger Klagezustellung nicht auf das ausländische Verfahren eingelassen und gilt er deshalb als säumig, wird die deutsche öffentliche Ordnung nicht ohne weiteres dadurch verletzt, daß der Beklagte zu einem anschließenden Verhandlungstermin nicht mehr geladen wird.

e) Hat sich der Beklagte im Ausland nicht eingelassen, kann er im Anerkennungsverfahren rügen, der Gegner habe das Urteil durch vorsätzlich falschen Prozeßvortrag im Erststaat erschlichen; diese Voraussetzung muß der Beklagte beweisen.

f) Erkennt eine ausländische Rechtsordnung den deutschen Gerichtsstand des Vermögens nicht an, kann die Gegenseitigkeit dennoch verbürgt sein, soweit das ausländische Recht die deutsche internationale Zuständigkeit spiegelbildlich unter einem anderen Gesichtspunkt anerkennt, den das deutsche Recht wiederum nicht kennt.

g) Die Verbürgung der Gegenseitigkeit muß beweisen, wer die Anerkennung des ausländischen Urteils im Inland erstrebt.

ZPO § 328 Abs. 1 Nr. 1, 2, 4 und 5; § 23.
IX. Zivilsenat. Urt. Vom 29. April 1999
i. S. L. (Kl.) w. O., E. und B. L. (Bekl.).
IX ZR 263/97.

I. Landgericht Bielefeld
II. Oberlandesgericht Hamm

Die in Wisconsin/USA ansässige Klägerin erwarb im Jahre 1986 von der L. Machine Tool Company, Inc. aus Illinois/USA eine Stahldrehmaschine, welche die L. Werkzeugmaschinenfabrik in Lü. hergestellt hatte. Der Beklagte zu 1 war alleiniger Anteilsinhaber der L. Machine Tool Company, Inc. sowie Betriebsleiter der L. Werkzeugmaschinenfabrik in Lü. Inhaberin dieser Firma war seinerzeit die Beklagte zu 2; im Jahre 1990 übernahm die Beklagte zu 3 die Firma.

Nach Darstellung der Klägerin wies die Drehmaschine Mängel auf und konnte nicht ordnungsgemäß in Betrieb genommen werden. Die Klägerin verklagte Anfang 1991 zunächst die L. Machine Tool Company, Inc. vor dem United States District Court, Eastern District of Wisconsin, auf Schadensersatz. Anschließend erstreckte sie die Klage auch auf die – in Deutschland wohnenden – Beklagten zu 1 bis 3, jeweils mit dem Zusatz »geschäftlich tätig als L. Werkzeugmaschinenfabrik in Lü.« Die Klageschrift nebst Vorladung wurde den Beklagten am 23. März 1991 zugestellt. Zu dieser Zeit gehörte den Beklagten zu 1 und 2 ein Grundstück im Staat Illinois, USA, das sie im Laufe des Jahres 1991 an die Beklagte zu 3 übertrugen. Die Beklagten und die L. Machine Tool Company, Inc., die im Sommer 1991 in den USA Konkurs anmeldete, ließen sich auf das Verfahren nicht ein. Durch Versäumnisurteil vom 16. Januar 1992 verurteilte das US-amerikanische Distriktgericht die Beklagten, als Gesamtschuldner an die Klägerin $ 2 280 057,30 nebst Kosten und Auslagen zu zahlen; von der Urteilssumme entfielen $ 1 Million auf Strafschadensersatz.

Im vorliegenden Verfahren begehrt die Klägerin die Vollstreckbarerklärung des US-amerikanischen Urteils gegen die

18 BGHZ 141

APP 1830

Beklagten zu 1 bis 3 wegen des auf Ausgleichsschadensersatz entfallenden Teilbetrages von $ 1 280 057,30 nebst Kosten und Auslagen in Höhe von $ 120. Das Landgericht hat der Klage stattgegeben. Das Oberlandesgericht (sein Urteil ist abgedruckt in RIW 1997, 1039 ff.) hat sie abgewiesen. Die dagegen gerichtete Revision der Klägerin führte zur Aufhebung und Zurückverweisung.

Aus den Gründen:

I.

Das Berufungsgericht hat die Klage für *zulässig* gehalten und ausgeführt, insbesondere könnten die Beklagten keine Prozeßkostensicherheit gemäß § 110 Abs. 1 ZPO verlangen. Demgegenüber hat die Revisionserwiderung erstmals nach Antragstellung in der mündlichen Verhandlung vor dem Revisionsgericht im Wege der Gegenrüge auf den seit August 1998 neu gefaßten Inhalt des § 110 ZPO verwiesen.

§ 113 Satz 2 ZPO ist für die vorliegende Klage bedeutungslos. Der Klägerin ist keine Frist zur Leistung einer Sicherheit für die Prozeßkosten bestimmt worden. Die darauf gerichteten, in den Vorinstanzen gestellten Anträge der Beklagten sind durch Zurückweisung erledigt worden. Sogar wenn man die Gegenrüge der Revision als ein erneutes Verlangen nach Prozeßkostensicherheit im Sinne von § 110 ZPO auslegen könnte, wäre es als solches verspätet. Der Senat vermag dem Kläger keine Frist im Sinne des § 113 Satz 1 ZPO mehr zu setzen, nachdem in der Hauptsache mündlich verhandelt worden ist (§ 137 Abs. 1 ZPO). Denn jedenfalls von diesem Zeitpunkt an darf die Gegenpartei auf einer Entscheidung gemäß der gegenwärtigen Rechtslage bestehen.

II.

Zur Begründetheit der Klage hat das Berufungsgericht ausgeführt: Die Klage sei nach § 328 Abs. 1 Nr. 1 ZPO unbegründet, weil Gerichte des US-Teilstaates Wisconsin nicht zur Ent-

scheidung zuständig gewesen seien. § 23 ZPO stütze die Zuständigkeit nicht, weil die Beklagten nicht dort, sondern im Teilstaat Illinois Vermögen gehabt hätten. Bei »Mehrrechtsstaaten« sei auf den jeweiligen Einzelstaat mit autonomer Gesetzgebung und Gerichtsorganisation als Urteilsstaat abzustellen. Eine solche Sichtweise entspreche der Eigenständigkeit des Rechts- und Gerichtssystems der jeweiligen US-Bundesstaaten und stehe im Einklang mit der Praxis, die für die Frage, ob die Gegenseitigkeit im Sinne des § 328 Abs. 1 Nr. 5 ZPO verbürgt ist, auch auf den jeweiligen US-Bundesstaat abstelle. Wie Art. 4 Abs. 3 EGBGB verdeutliche, sei der Begriff »Staat« nicht notwendigerweise deckungsgleich mit dem Gesamtstaat als Völkerrechtssubjekt. Es könne ebenso eine Untergliederung des Gesamtstaates mit selbständiger Teilrechtsordnung gemeint sein. Schließlich werde die hier vertretene Auffassung auch dem Sinn und Zweck des § 328 Abs. 1 Nr. 1 ZPO gerecht, der die Durchsetzung der deutschen Vorstellungen über die Gerichtspflichtigkeit bezwecke und damit wesentlich dem Schutz des Beklagten diene.

III.

In dieser Allgemeinheit teilt der erkennende Senat die Auffassung des Berufungsgerichts nicht. Das Urteil, um dessen Vollstreckbarkeit hier gestritten wird, stammt von einem Gericht des *Bundes*staates USA, nämlich eines Federal District Court. Jedenfalls für die internationale Zuständigkeit US-amerikanischer *Bundes*gerichte ist gemäß § 723 Abs. 2 Satz 2 i.V.m. § 328 Abs. 1 Nr. 1 ZPO allein zu prüfen, ob irgendein Gericht innerhalb der gesamten USA zuständig ist.

1. § 328 Abs. 1 Nr. 1 ZPO stellt nur darauf ab, ob »die Gerichte« des Erststaates nach den deutschen Gesetzen - international - zuständig sind. Ob gerade das einzelne Gericht, das entschieden hat, auch örtlich zuständig wäre, ist unerheblich (RGZ 51, 135, 136 f.; Zöller/Geimer, ZPO 21. Aufl. § 328 Rdnr. 97; Schack, Internationales Zivilverfahrensrecht 2. Aufl. Rdnr. 836; vgl. RGZ 107, 308, 309; BGHZ 34, 134, 138; Stein/Jonas/Roth, ZPO 21. Aufl. § 328 Rdnr. 86).

APP 1831

App. 2512

US-amerikanische Bundesgerichte waren hier, spiegelbildlich an den deutschen Gesetzen gemessen, im Hinblick auf die Grundstücke der Beklagten im Teilstaat Illinois zuständig. Solange Deutschland die sehr weitreichende Zuständigkeit des § 23 ZPO für sich selbst in Anspruch nimmt, bestimmt diese aus deutscher Sicht auch umgekehrt die internationale Zuständigkeit der anderen Staaten mit (Zöller/Geimer aaO Rdnr. 96b; MünchKomm-ZPO/Gottwald § 328 Rdnr. 60; Schack aaO Rdnr. 837; vgl. RGZ 51, 135, 136 f; 75, 147, 148 f; OLG Frankfurt IPRax 1982, 71, 73; ferner BGH, Beschl. v. 28. Oktober 1996 - X ARZ 1071/96, RIW 1997, 238, 239; zur weiteren Frage der Gegenseitigkeit siehe unten IV. 4). Für den vorliegenden Fall ist hier nicht etwa dargetan, daß das Grundstück der Beklagten keinen wesentlichen Befriedigungswert gehabt hätte. Ob auch im Rahmen des § 328 Abs. 1 Nr. 1 ZPO spiegelbildlich die Einschränkung gilt, daß § 23 ZPO zusätzlich einen hinreichenden Inlandsbezug voraussetzt (vgl. BGHZ 115, 90, 94 ff.), kann hier offenbleiben. Denn für die in den USA ansässige Klägerin konnten US-amerikanische Bundesgerichte ohnehin international zuständig sein; Anlaß für den Rechtsstreit bot eine in den USA gekaufte, von der Maschinenfabrik L. hergestellte Drehmaschine. Beide Umstände gaben jedenfalls einen ausreichenden Bezug zur Absicherung eines US-amerikanischen Vermögensgerichtsstands.

Maßgeblicher Zeitpunkt für das Vorliegen der Zuständigkeitstatsachen ist - gemäß allgemeinen deutschen zivilprozessualen Regeln - grundsätzlich derjenige, der dem tatsächlichen Erkenntnisstand des ausländischen Urteils zugrunde liegt (KG NJW 1988, 649; BayObLGZ 1990, 217, 219; BayObLG NJW-RR 1992, 514; im Sinne einer Fortdauer auch Stein/Jonas/Roth aaO Rdnr. 32), hier also derjenige der mündlichen Verhandlung vor dem US-amerikanischen Distriktgericht am 16. Januar 1992. Ein möglicher Wegfall der Voraussetzungen bis zum Zeitpunkt der Anerkennung in Deutschland wäre unerheblich, weil hier gerade nicht die Voraussetzungen für eine Verurteilung selbständig nachgeprüft werden (vgl. im Gegenteil § 723 Abs. 1 ZPO); statt dessen ist nur zu fragen, ob das ausländische Gericht bei seiner Entscheidung seine internatio-

nale Zuständigkeit aus deutscher Sicht mit Recht annehmen durfte. Im Januar 1992 gehörte das Grundstück im H. Industrial Park in C. C., Illinois, der Beklagten zu 3. Die Beklagten zu 1 und 2 hatten zu dieser Zeit zwar möglicherweise selbst kein werthaltiges Vermögen in den USA mehr, weil sie das bezeichnete Grundstück während der Rechtshängigkeit des ausländischen Prozesses an die Beklagte zu 3 veräußert hatten; bei Zustellung der Klage gehörte es ihnen aber noch. Insoweit gilt aus deutscher Sicht § 261 Abs. 3 Nr. 2 ZPO ebenfalls spiegelbildlich (ebenso MünchKommZPO/Gottwald aaO Rdnr. 65; Zöller/Geimer aaO Rdnr. 124; Baumbach/Lauterbach/Hartmann, ZPO 57. Aufl. § 328 Rdnr. 16 a.E.; vgl. auch BGHZ 34, 134, 140). Sogar wenn Einschränkungen dieses Grundsatzes für die internationale Zuständigkeit - etwa gegenüber Gesetzesänderungen - nicht allgemein auszuschließen sein sollten (so Stein/Jonas/Schumann aaO § 261 Rdnr. 86, 88; Stein/Jonas/Roth aaO § 328 Rdnr. 90, 98), gilt er jedenfalls gegenüber freiwilligen Verhaltensweisen von Beklagten, welche die Zuständigkeit - nur - des jeweils angegangenen Gerichts nachträglich entfallen lassen sollen oder können: Der Beklagte, der bei Zustellung einer Klage im Ausland noch Vermögen dort hatte, kann die dadurch begründete Zuständigkeit nicht durch eine Entäußerung des Vermögensstücks nachträglich wieder beseitigen. Zwar wäre ohne eine Entäußerung des Grundstücks durch die Beklagten zu 1 und 2 hier auch keine Zuständigkeit eines US-amerikanischen Bundesgerichts gegenüber der Beklagten zu 3 begründet worden, doch schließt dies nicht die Zuständigkeit gegenüber allen drei Beklagten aus: Während der Rechtshängigkeit eines Prozesses kann das angerufene Gericht auch noch für die Klage gegen weitere Beklagte zuständig werden.

2. Das Berufungsgericht stützt sein gegenteiliges Ergebnis ersichtlich auf den Umstand, daß außer dem Bundesstaat USA auch alle seine Teilstaaten eigene, selbständige Gerichtsbarkeiten haben, die in erheblichem Umfang mit derjenigen der Bundesgerichte konkurrieren können. Für Gerichte von Teilstaaten oder autonomen regionalen Territorien der USA wird überwiegend die Meinung vertreten, daß auf die internationale

APP 1832

Zuständigkeit des jeweiligen Teilstaates abzustellen sei (LG München I RIW 1988, 738; Stein/Jonas/Roth aaO § 328 Rdnr. 88; Schack aaO Rdnr. 906; Rahm/Künkel/Breuer, Handbuch des Familiengerichtsverfahrens VIII Rdnr. 256 a.E.; Baumbach/Lauterbach/Hartmann aaO Rdnr. 16; Sieg IPRax 1996, 77, 79 f.; wohl auch BayObLG NJW 1990, 3099; a.M. LG Heilbronn RIW 1991, 343 mit insoweit ablehnender Anmerkung von Jayme IPRax 1991, 262; Zöller/Geimer aaO Rdnr. 97 a; Staudinger/Spellenberg, BGB 13. Bearbeitung EGBGB/IPR Internationales Verfahrensrecht in Ehesachen § 328 ZPO Rdnr. 350).

Welcher Ansicht insoweit zu folgen ist, braucht hier nicht allgemein entschieden zu werden. Jedenfalls ist eine territoriale Aufspaltung für die US-amerikanische *Bundes*gerichtsbarkeit nicht gerechtfertigt.

a) Der Bundesstaat USA ist ein eigenständiger Staat im Sinne des § 328 Abs. 1 Nr. 1 ZPO mit autonomer Gesetzgebung. Seine Gerichte sind von denen der Teilstaaten getrennt und folgen im Ansatz eigenen Verfahrensregeln (vgl. von Hoffmann/Hau RIW 1998, 344, 349 f.; Haas/Stangel IPRax 1998, 452, 455). Daß sie auch das an ihrem jeweiligen Sitz geltende regionale materielle Recht sowie ergebnisbezogenes Verfahrensrecht anzuwenden haben, soweit keine Bundesgesetze entgegenstehen (vgl. Schack, Einführung in das US-amerikanische Zivilprozeßrecht 2. Aufl. S. 14 ff.), berührt die Unabhängigkeit des Gerichtssystems nicht.

Die internationale Zuständigkeit der US-amerikanischen Bundesgerichte insgesamt erfaßt das ganze Hoheitsgebiet der USA.

b) Der Zweck des § 328 Abs. 1 Nr. 1 ZPO rechtfertigt eine Aufspaltung der einheitlichen Zuständigkeit eines Bundesstaates in mehrere regionale Teilzuständigkeiten ebenfalls nicht. Die Vorschrift soll zum einen sicherstellen, daß das Verfahrensrecht des Erststaates wenigstens im Ansatz auf international akzeptierte Grundsätze Rücksicht nimmt (vgl. MünchKomm-ZPO/Gottwald aaO Rdnr. 53). Zum anderen soll sie den Beklagten davor schützen, sich vor ausländischen Gerichten verteidigen zu müssen, die nach inländischen Vor-

stellungen keinen genügenden Bezug zum Streitgegenstand haben (BGHZ 120, 334, 340 f.). Beides beschränkt sich auf die Gerichtsbarkeit des Erststaates insgesamt, bezieht sich aber nicht auf die örtliche Zuständigkeit innerhalb dieses Staates. Das gilt auch dann, wenn mit dieser Zuständigkeit zugleich gewisse , voneinander abweichende prozessuale und materielle Rechtsregeln verbunden sind. Den Schutz des Beklagten vor der Anwendung unerwünschten ausländischen Rechts übernimmt allein § 328 Abs. 1 Nr. 4 ZPO.

Die gegenteilige Auffassung würde die Anerkennungsfähigkeit von Urteilen ausländischer Bundesstaaten sehr stark einschränken, indem ungeachtet ihrer eigenen Souveränität sowie unter Aufteilung ihres einheitlichen Staatsgebietes zusätzlich die Zuständigkeit des örtlich betroffenen Teilstaates vorausgesetzt würde. Das ist weder sachlich geboten noch international vertretbar. Im Gegenteil gebietet die Rechtsklarheit eine möglichst einheitliche Anknüpfung. Art. 4 Abs. 3 EGBGB hat daneben im vorliegenden Zusammenhang keine Bedeutung. Daß im Rahmen der Gegenseitigkeitsprüfung bei § 328 Abs. 1 Nr. 5 ZPO ein anderer, speziellerer Bezugspunkt zugrunde zu legen sein kann (s.u. IV. 4), ist unerheblich. Denn dort geht es um eine Einschränkung der Anerkennungsfähigkeit allein im öffentlichen Interesse; der hierfür gebotene Vergleich mit dem ausländischen Anerkennungsverhalten gegenüber deutschen Urteilen kann sich nur auf die besonderen Umstände des jeweiligen Einzelfalls stützen.

Zwar weist die Revisionserwiderung zutreffend darauf hin, daß Kläger in den USA unter bestimmten Voraussetzungen die Wahl zwischen der Inanspruchnahme der Gerichte der Teilstaaten und denen der Bundesgerichtsbarkeit haben. Es mag sein, daß diese Wahl auch durch die erleichterte Anerkennungsfähigkeit von Urteilen der einen oder anderen Gerichtsbarkeit mit beeinflußt werden kann. Eine derartige Folge konkurrierender Zuständigkeiten ist aber für die Anerkennungsfähigkeit regelmäßig bedeutungslos. § 328 Abs. 1 Nr. 1 ZPO hat nicht selbständig den Zweck zu verhindern, daß Kläger einen für sie verhältnismäßig günstigen Gerichtsstand auswählen. Allenfalls bei mißbräuchlichem Ausnutzen formaler Zu-

APP 1833

ständigkeitsregelungen könnte und müßte gegebenenfalls die Anerkennung versagt werden, doch ist dafür hier nichts vorgetragen.

IV.

Das danach auf einem Rechtsfehler beruhende Berufungsurteil erweist sich derzeit nicht aus anderen Gründen im Ergebnis als richtig (§ 563 ZPO). Nach dem Vorbringen der Klägerin kommt der Erlaß eines Vollstreckungsurteils gemäß § 722 ZPO in Betracht.

1. Das Versäumnisurteil des Distriktgerichts vom 16. Januar 1992 ist im Sinne von § 723 Abs. 2 Satz 1 ZPO nach dem insoweit maßgeblichen ausländischen Recht rechtskräftig. Diese Voraussetzung hat allein den Zweck, ein bei Anerkennung bloß vorläufig vollstreckbarer Entscheidungen möglicherweise entstehendes mehrfaches Hin und Her bei der Anerkennung zu verhindern (Martiny, in: Handbuch des internationalen Zivilverfahrensrechts Bd. III/1 Rdnr. 487; Wolff, in: Handbuch des internationalen Zivilverfahrensrechts Bd. III/2 Kap. IV Rdnr. 37). Es kommt deshalb nur darauf an, ob die Entscheidung nach dem Prozeßsystem des Erststaates grundsätzlich unabänderlich ist. Das ist sie, wenn gegen die Entscheidung innerhalb des Ausgangsverfahrens kein Rechtsmittel mehr zulässig ist (Martiny aaO Rdnr. 588; Thomas/Putzo/Hüßtege, ZPO 21. Aufl. § 328 Rdnr. 3).

Das Versäumnisurteil des US-amerikanischen Distriktgerichts vom 16. Januar 1992 ist in diesem Sinne rechtskräftig. Fristen für Änderungsmöglichkeiten (Rule 59 der Federal Rules of Civil Procedure) oder Rechtsmittel (Rule 4 der Federal Rules of Appellate Procedure) sind nach dem Parteivortrag längst ergebnislos abgelaufen.

Das von den Beklagten zwischenzeitlich gestellte Wiedereinsetzungsgesuch wegen Versäumnis eines Rechtsbehelfs steht der Rechtskraft nicht entgegen (so ausdrücklich Rule 60 Abs. b Satz 3 der F.R.Civ.P.; vgl. Martiny aaO Rdnr. 489). Es eröffnet noch nicht von sich aus wieder den Rechtsmittelzug gegen das Urteil selbst. Nach dem eigenen Vorbringen der

Beklagten hat das Bezirksgericht bisher nicht etwa dem Gesuch stattgegeben, sondern auf formelle Mängel des Antrags hingewiesen.

2. Die dem Urteil zugrunde liegende Klageschrift nebst deutscher Übersetzung wurde allen drei Beklagten ausweislich der öffentlichen Urkunde des Amtsgerichts Lü. am 23. März 1991 auf der Grundlage des Haager Zustellungs-Übereinkommens ordnungsgemäß und rechtzeitig zugestellt (§ 328 Abs. 1 Nr. 2 ZPO). Die Beklagten waren - ungeachtet etwaiger Erläuterungen in der Klageschrift, daß sie unter dem Namen der Maschinenfabrik Lü. aufgetreten seien - selbst als Beklagte bezeichnet.

a) Die Zustellung der »geänderten Klageschrift« vom 13. März 1991 genügte, weil nur diese sich gegen die drei Beklagten persönlich richtete. Sie war ordnungsgemäß. Daß entsprechend einer weit verbreiteten ausländischer Übung (vgl. Lange/Black, Der Zivilprozeß in den Vereinigten Staaten Rdnr. 13; Barnard, The Civil Court in Action 2. Aufl. S. 56 f.; 90 ff.) ein bestimmter Antrag noch nicht in der Klageschrift angekündigt wurde, ist für die Wirksamkeit der Zustellung unerheblich. In zahlreichen Prozeßordnungen werden Anträge erst nach Erklärung der Verteidigungsbereitschaft des Beklagten oder sogar als Ergebnis eines auf Beweisermittlung gerichteten gerichtlichen Zwischenverfahrens beziffert. Zu Art. 27 Nr. 2 EuGVÜ hat der Senat bereits entschieden, daß dieser Versagungsgrund nicht eingreift, wenn im einleitenden Schriftstück ein niedrigerer Antrag angekündigt als im späteren Verhandlungstermin gestellt wurde (Beschl. v. 10. Juli 1986 - IX ZB 27/86, WM 1986, 1370, 1371; vgl. auch BGH, Beschl. v. 21. März 1990 - XII ZB 71/89, NJW 1990, 2201, 2202). Der Schutzzweck des § 328 Abs. 1 Nr. 2 ZPO erfordert einen bestimmten Antrag nicht (ebenso MünchKomm-ZPO/Gottwald aaO Rdnr. 68, Schack, Zivilverfahrensrecht aaO Rdnr. 852; vgl. auch Zöller/Geimer aaO § 328 Rdnr. 138 b, 138 c; a.M. Grunsky IPRax 1987, 219 f.; wohl auch Stürner JZ 1992, 325, 333). Die Vorschrift soll durch das Abstellen auf einen formalisierten Nachweis gegen einen säumigen Beklagten gewährleisten, daß ihm bei der Verfahrenseinleitung recht-

APP 1834

liches Gehör (Art. 103 Abs. 1 GG) eingeräumt wurde. Dem ist schon genügt, wenn der Beklagte aufgrund der Angaben im einleitenden Schriftstück die Entscheidung sachgerecht zu treffen vermag, ob er sich darauf einläßt oder nicht. Für den weiteren Verfahrensablauf wird die Gewährung rechtlichen Gehörs im Erstverfahren durch § 328 Abs. 1 Nr. 4 ZPO mittelbar erzwungen (s.u. 4 a).

Die den Beklagten zugestellte Klageschrift genügte jenen Mindestanforderungen. Sie vermittelte den Beklagten Kenntnis von dem gegen sie eingeleiteten Verfahren und gab an, daß aus Anlaß des bezeichneten Kaufvertrags sowohl Ausgleichs- als auch Strafschadensersatz in Höhe von mehr als 50 000 $ verlangt werde. Zu den einzelnen Folgen des angeblichen Vertragsbruchs hieß es jeweils, ihr Ausmaß sei noch im Prozeß festzusetzen. Darauf konnten die Beklagten ihre Entscheidung über eine Einlassung sachgerecht stützen.

Erst recht gehört die Ankündigung eines bestimmten Verhandlungstermins nicht schon zwingend zur·Zustellung der Klageschrift (siehe unten 4 a).

b) Die Zustellung erfolgte auch *rechtzeitig*. In der zugestellten Klageschrift wurden die Beklagten zwar aufgefordert, binnen 20 Tagen zu antworten. Dies entspricht Rule 12 Abs. a F.R.Civ.P. Durch die verhältnismäßig kurze Frist wurde die Möglichkeit der Beklagten zur Verteidigung nicht unzumutbar erschwert; erst recht wurde nicht ihr Anspruch auf Gewährung rechtlichen Gehörs (Art. 103 Abs. 1 GG) verletzt. Die Einlassungsfrist kann auf begründeten Antrag vom jeweiligen Kläger oder dem Gericht um bis zu weitere 20 Tage verlängert werden (vgl. Lange/Black Rdnr. 14; Schurtmann/Walter, Der amerikanische Zivilprozeß S. 42). Derartige Möglichkeiten im ausländischen Prozeß muß auch eine inländische Partei auszunutzen versuchen; dafür reichte die gesetzte Frist jedenfalls aus.

Das Vorbringen der Beklagten läßt nicht erkennen, daß sie sich nicht einmal hierum hätten erfolgversprechend bemühen können. Die Klagezustellung traf sie weder völlig unvorbereitet noch ganz unerwartet. Wenigstens der Beklagte zu 1 war vorher viele Jahre lang als Anteilsinhaber und Präsident der L.

Machine Tool Company, Inc. in den USA berufstätig gewesen. Der Klageerhebung war ein Schriftwechsel mit der Klägerin über die Abwicklung des fraglichen Kaufvertrages vorausgegangen. Die Beklagten legen selbst nicht dar, daß sie sich vor dem US-amerikanischen Gericht etwa nicht sachgerecht hätten vertreten lassen können. Wenn sie darauf bewußt verzichtet haben, weil sie erwarteten, daß das Urteil eines US-amerikanischen Gerichts in Deutschland keine Wirkungen haben würde, hilft ihnen das im vorliegenden Zusammenhang nichts. Tatsächlich hat die Klägerin erst mit Schriftsatz vom 19. November 1991 ein Versäumnisurteil beantragt. Sogar danach kann das US-amerikanische Gericht nach Rule 55 Abs. c F.R.Civ.P. ein Säumnisverfahren noch ablehnen, wenn dafür durchschlagende Gründe vorgetragen werden.

3. Aufgrund des Vorbringens der Klägerin führt die Anerkennung des Urteils des Bezirksgerichts auch zu einem Ergebnis, das mit wesentlichen Grundsätzen des deutschen Rechts offensichtlich unvereinbar ist (§ 328 Abs. 1 Nr. 4 ZPO).

a) Zum Verhandlungstermin vor dem US-amerikanischen Distriktgericht am 16. Januar 1992 - also fast zehn Monate nach der Klagezustellung - sind die Beklagten nicht geladen worden. Dies stellt ebenfalls noch keinen Verstoß gegen den deutschen verfahrensrechtlichen ordre public dar (vgl. BGHZ 48, 327, 330 ff.; dazu BVerfG, Beschl. v. 28. März 1968 - 1 BvR 740/67). Er umfaßt zwar die Prinzipien, die dem Verfahrensgrundrecht auf rechtliches Gehör (Art. 103 Abs. 1 GG) zugrunde liegen. Diese erstrecken sich aber nicht auf eine bestimmte verfahrensrechtliche Ausgestaltung, insbesondere nicht auf eine Terminsladung. Sie verbieten allerdings grundsätzlich, eine Entscheidung zu erlassen, bevor der Betroffene Gelegenheit zur Äußerung hatte, und gebieten es, daß ein Beteiligter in der Lage sein muß, auf den Verfahrensablauf aktiv Einfluß zu nehmen. Dies wird durch die ordnungsmäßige Zustellung der Klageschrift ermöglicht. Darüber hinaus gewährleistet Art. 103 Abs. 1 GG nur die - von Staats wegen ungehinderte - zumutbare Gelegenheit, sich am Gerichtsverfahren zu beteiligen. Nimmt der Berechtigte sie nicht wahr, hindert das nicht die Anerkennung des ausländischen Urteils.

APP 1835

Es stand hier allgemein im Machtbereich der Beklagten, sich in dem ihnen bekannten Verfahren in Wisconsin zu verteidigen. Für ihre ordnungsmäßige Vertretung in einem ihr bekannten Gerichtsverfahren hat in erster Linie jede Partei selbst nach besten Kräften zu sorgen (BGHZ 118, 312, 321 ff.). Durch Untätigkeit konnten sich die Beklagten dieser Obliegenheit nicht wirksam entziehen. Es ist nichts dafür ersichtlich, daß sie zum Verhandlungstermin nicht geladen worden wären, wenn sie ihre Verteidigungsbereitschaft und ihr Interesse an einer Teilnahme dem US-amerikanischen Gericht angezeigt hätten. Die reinen Säumnisfolgen waren bereits dadurch ausgelöst, daß sie sich im schriftlichen Vorverfahren nicht rechtzeitig geäußert hatten. Unter diesen Umständen kann auch ein deutsches Gericht gemäß § 331 Abs. 3 i.V.m. § 276 ZPO sogar ohne mündliche Verhandlung ein Versäumnisurteil erlassen. Wenn das US-amerikanische Distriktgericht zusätzlich einen besonderen Termin zur Verhandlung über die Säumnisfolgen anberaumt, aber nicht eine gesonderte Ladung der Beklagten hierzu veranlaßt hat, erscheint dieses Ergebnis aus rechtsstaatlicher Sicht nicht unerträglich. Da das verfassungsrechtliche Gebot einer fairen Verfahrensgestaltung unter den bezeichneten Voraussetzungen eine mündliche Verhandlung nicht einmal zwingend voraussetzt, verstößt das dem vorliegenden Versäumnisurteil zugrundeliegende Verfahren ebenfalls nicht dagegen.

Erst recht ergeben die kostenrechtlichen Erwägungen der Beklagten nichts für die Verletzung der deutschen öffentlichen Ordnung (vgl. BGHZ 118, 312, 325 f.).

b) Die Schadensberechnung im Urteil des US-amerikanischen Bezirksgerichts ist mit Grundsätzen des deutschen materiellen ordre public vereinbar. Gemäß dem Versäumnisurteil setzt sich der Ausgleichsschaden wie folgt zusammen:

| | | |
|---|---|---|
| Gezahlter Kaufpreis | $ | 277 467,30 |
| Bisherige Reparaturkosten | $ | 23 692,06 |
| Entgangener Gewinn | $ | 756 365,25 |
| *Mehr*kosten für den Erwerb einer | | |
| Ersatzmaschine | $ | 322 532,70 |
| | $ | 1 380 057,31 |
| (Statt errechnet | $ | 1 280 057,30) |

Auch nach deutschem Recht kann der Käufer unter bestimmten Voraussetzungen vom Verkäufer Schadensersatz verlangen (§ 463 BGB). Ob die Voraussetzungen und Folgen mit denen des entsprechenden ausländischen Rechts im einzelnen übereinstimmen, gehört grundsätzlich nicht zur deutschen öffentlichen Ordnung.

4. Endlich ist derzeit nicht auszuschließen, daß die Gegenseitigkeit im Sinne von § 328 Abs. 1 Nr. 5 ZPO mit Bezug auf das hier fragliche Versäumnisurteil verbürgt ist. Eine Verbürgung in diesem Sinne liegt vor, wenn das beiderseitige Anerkennungsrecht und die Anerkennungspraxis bei einer Gesamtwürdigung im wesentlichen gleichwertige Bedingungen für die Vollstreckung eines Urteils gleicher Art im Ausland schaffen (BGHZ 42, 194, 196; 59, 116, 121). Insoweit ist im vorliegenden Zusammenhang - obwohl das anzuerkennende Urteil von einem US-amerikanischen Bundesgericht stammt (siehe oben III) - von der Rechtslage im Teilstaat W. auszugehen. Denn es gibt kein einheitliches Recht zur Anerkennung ausländischer Urteile für die USA insgesamt; die Anerkennungsvoraussetzungen richten sich vielmehr nach dem Recht der Teilstaaten (vgl. Weinschenk, Die Anerkennung und Vollstreckung bundesdeutscher Urteile in den Vereinigten Staaten unter den »Foreign Country Money - Judgment Recognition Acts« S. 37 f.). Sogar US-amerikanische Bundesgerichte hätten deshalb über eine Anerkennung ausländischer Urteile gemäß dem Recht des Teilstaates zu befinden, in dem ihr Sitz ist (Schütze, Deutsch-amerikanische Urteilsanerkennung S. 8; Schack, Einführung aaO S. 77). Da im vorliegenden Falle ein Gericht mit Sitz in W. entschieden hat, ist darauf abzustellen, ob ein unter entsprechenden Voraussetzungen in Deutschland erlassenes Versäumnisurteil nach dem Recht des Staates W. anerkannt würde. Soweit bekannt, hat W. bisher nicht den »Uniform Foreign Money-Judgments Recognition Act« angenommen. Ausländische Urteile werden aber grundsätzlich gemäß den Regeln der »comity« anerkannt (Schütze JR 1989, 145 und in Urteilsanerkennung aaO S. 153 f.; Weinschenk aaO S. 205; Martiny in Handbuch aaO Rdnr. 1568).

19 BGHZ 141

APP 1836

Fraglich kann danach aus US-amerikanischer Sicht insbesondere sein, ob - spiegelbildlich zum vorliegenden Fall gesehen - ein deutsches Gericht die persönliche Zuständigkeit (personal jurisdiction) über Beklagte gehabt hätte, die sämtlich in den USA wohnen und denen die Klage dort auch zugestellt worden wäre. Wäre das zu verneinen, so wäre für die hier zu beurteilende Fallgestaltung - ungeachtet allgemein anzuerkennender Gegenseitigkeit - diese nicht verbürgt (vgl. BGHZ 52, 251, 255 f.; 53, 332, 335): Trotz der auch aus deutscher Sicht an sich vorliegenden internationalen Zuständigkeit des ausländischen Gerichts (s.o. III 2) wird diese aus Gründen der Gegenseitigkeit ausnahmsweise nicht anerkannt, wenn der Urteilsstaat exorbitante Zuständigkeiten nur für sich selbst beansprucht, sie aber anderen Staaten nicht in vergleichbarem Umfange zugesteht. Zur Sicherung dagegen ist die Gegenseitigkeit insoweit - partiell - als nicht verbürgt anzusehen (ebenso Stein/Jonas/Roth aaO § 328 Rdnr. 152; vgl. auch Geimer/Schütze, Internationale Urteilsanerkennung Band I 2. Halbband § 245 II 3, S. 1780).

Allein darauf, daß Personen mit Wohnsitz in den USA Vermögen auch in Deutschland haben, könnte eine deutsche internationale Zuständigkeit aus US-amerikanischer Sicht nicht gestützt werden, weil ein Gerichtsstand des Vermögens (§ 23 ZPO) in den USA nicht anerkannt wird (Weinschenk aaO S. 89 f.; Scoles/Hay, Conflict of Laws 2. Aufl. S. 1011). Allerdings genügt es, um das Gegenseitigkeitserfordernis im Sinne von § 328 Abs. 1 Nr. 5 ZPO zu erfüllen, wenn das Recht des Staates Wisconsin ersatzweise eine deutsche internationale Zuständigkeit unter einem anderen, dem deutschen Recht an sich fremden Gesichtspunkt anerkennen würde. Insoweit könnte insbesondere auch nach den Regeln der »comity« der Gesichtspunkt eingreifen, daß die Beklagten eine Niederlassung im Erststaat unterhielten und das Verfahren einen daraus entstandenen Anspruch betraf (vgl. § 5 Buchst. a Nr. 5 des Uniform Foreign Money-Judgments Recognition Act).

a) Der Beklagte zu 1 unterhielt zwar nicht persönlich eine Niederlassung in den USA. Er war aber alleiniger Anteilsinhaber und Präsident der L. Machine Tool Company, Inc. mit

Sitz in Illinois. Zu klären ist, ob gemäß der in Wisconsin geltenden Rechtsauffassung als eine Niederlassung einer natürlichen Person in anerkennungsrechtlichen Sinne auch eine selbständige juristische Person gilt, die der natürlichen Person gehört, oder ob das Verhalten des Beklagten zu 1 anläßlich der Vertragsanbahnung oder -abwicklung die »personal jurisdiction« unter einem anderen Gesichtspunkt begründet. Trifft dies zu, könnte möglicherweise auch im umgekehrten Falle ein deutsches Urteil gegen eine natürliche Person mit Sitz in den USA anzuerkennen sein, die in Deutschland beispielsweise die Anteile einer GmbH innehält und als deren Geschäftsführer einen Kaufvertrag abschließt und abwickelt.

b) Die Beklagte zu 2 war, soweit dargetan, nicht an der L. Tool Company, Inc. beteiligt. Sie war aber Inhaberin der L. Werkzeugmaschinenfabrik in Lü. Nach der Behauptung der Klägerin soll sie sich unter anderem mit dieser Firma um persönlich verpflichtet haben. In einem Schreiben vom 13. Mai 1988 hat sich die L. Werkzeugmaschinenfabrik in Lü. im Zusammenhang mit dem hier fraglichen Kaufvertrag zudem unmittelbar an die Klägerin gewandt.

Es ist danach nicht von vornherein auszuschließen, daß derartige Verhaltensweisen eines in den USA ansässigen Beklagten im Ausland hier aus US-amerikanischer Sicht ebenfalls eine internationale Zuständigkeit begründen, insbesondere unter dem Gesichtspunkt eines Zuständigkeitsdurchgriffs (vgl. Schütze Urteilsanerkennung aaO S. 167) oder von »business transactions« (vgl. Weinschenk aaO S. 66 ff.; Lange/Black aaO Rdnr. 9; Schurtmann/Walter aaO S. 38 f.; aber auch Hay, Einführung in das amerikanische Recht 4. Aufl. S. 154 Fußn. 8; Scoles/Hay aaO S. 1012).

c) Für die Beklagte zu 3 ist allerdings weder eine Niederlassung noch eine geschäftliche Tätigkeit in den USA substantiiert behauptet. Ob ihr gegenüber die Gegenseitigkeit verbürgt wäre, erscheint danach zweifelhaft.

d) Da diese Fragen in den Vorinstanzen bisher nicht näher erörtert worden sind, ist den Parteien Gelegenheit zur Stellungnahme zu geben (§ 139 ZPO). Die Darlegungs- und Beweislast für die Gegenseitigkeit trägt die Klägerin. § 328

19 BGHZ 141

APP 1837

Abs. 1 Nr. 5 ZPO regelt, trotz seines Wortlauts, nicht durchweg Ausnahmen von einer regelmäßigen Anerkennungsfähigkeit, sondern überwiegend die Voraussetzungen jeder Anerkennung (Stein/Jonas/Roth aaO § 328 Rdnr. 28, 30; Baumbach/Lauterbach/Hartmann aaO Rdnr. 14; vgl. BayObLG NJW 1976, 1037, 1038). Insbesondere ist die allein im öffentlichen Interesse eingeführte Voraussetzung der Gegenseitigkeit - welche die Anerkennungsfreundlichkeit ausländischer Staaten fördern soll - von demjenigen zu beweisen, der ein Vollstreckungsurteil erlangen will (vgl. MünchKomm-ZPO/Gottwald aaO Rdnr. 93; Stein/Jonas/Roth aaO § 328 Rdnr. 145; Martiny aaO Rdnr. 1264). Die gegenteilige Erwägung, § 328 Abs. 1 Nr. 5 ZPO solle nur erwiesene Verstöße gegen die zwischenstaatliche Kooperation vergelten (Pfeiffer RabelsZ 55 [1991], 734, 751 ff.), wird dem vorbeugenden Gesetzeszweck nicht gerecht. Ihr kann allerdings durch einen großzügigen Maßstab der »Verbürgung« Rechnung getragen werden.

V.

Zu dem weiteren Verteidigungsvorbringen weist der Senat auf folgendes hin:

1. Nach der Behauptung der Beklagten zu 3 enthielt die ihr zugestellte Klageschrift keine Übersetzung in die deutsche Sprache.

a) Diese war für eine ordnungsmäßige Zustellung im Sinne von § 328 Abs. 1 Nr. 2 ZPO nötig. Denn im Verhältnis zwischen Deutschland und den USA ist das Haager Zustellungsübereinkommen vom 15. November 1965 (BGBl 1977 II 1453) maßgeblich (vgl. Junker JZ 1989, 121; Weinschenk aaO S. 51 ff.). Auf der Grundlage des Art. 5 Abs. 3 dieses Übereinkommens verlangt die Bundesrepublik Deutschland zum Schutz inländischer Beklagter gemäß § 3 des Ausführungsgesetzes vom 22. Dezember 1977 (BGBl 1 3105), daß das zuzustellende Schriftstück in deutscher Sprache abgefaßt oder in diese Sprache übersetzt ist. Das war ein wesentliches deutsches Anliegen bei den Vertragsverhandlungen (vgl. Denkschrift zu Art. 5 HZÜ, BT-Drucks. 7/4892 S. 44). Fehlt die Übersetzung,

handelt es sich nicht um eine förmliche Zustellung, wie sie § 328 Abs. 1 Nr. 2 ZPO voraussetzt. Seinen Zweck kann § 3 des Ausführungsgesetzes nur erfüllen, wenn ein Verstoß zur Unwirksamkeit der Zustellung führt. Deren Ordnungsmäßigkeit ist zudem selbständige Anerkennungsvoraussetzung neben ihrer Rechtzeitigkeit (BGHZ 120, 305, 310).

b) Die Heilung eines solchen Zustellungsmangels scheidet hier aus. Sie bestimmt sich auch auf der Grundlage des autonomen deutschen Anerkennungsrechts nach dem Recht des Gerichts des Urteilsstaates einschließlich der einschlägigen völkerrechtlichen Verträge (BGHZ 120, 305, 311 f. im Anschluß an EuGH IPRax 1991, 177, 178). Ob das hier vom US-amerikanischen Distriktgericht zu beachtende Recht eine solche Heilungsmöglichkeit vorsieht, ist nicht dargetan, aber auch unerheblich. Denn maßgeblich wäre sie nur, soweit sie mit dem Haager Zustellungsübereinkommen vereinbar wäre (ebenso BGHZ 120, 305, 312 f. im Anschluß an Senatsbeschl. v. 20. September 1990 - IX ZB 1/88, NJW 1991, 641, 642); andernfalls wäre die Nichtbeachtung dieses völkerrechtlichen Vertrages für den jeweiligen Urteilsstaat folgenlos, soweit sein nationales Recht Heilungsmöglichkeiten vorsieht. Im vorliegenden Falle entspricht eine Heilung nicht dem Haager Zustellungsübereinkommen.

Allerdings sieht Art. 5 Abs. 2 HZO regelmäßig die Zustellung durch einfache Übergabe des Schriftstücks an den Empfänger vor, wenn er zur Annahme bereit ist. Unter dieser Voraussetzung könnte auch eine auf anderem Wege fehlerhaft versuchte Zustellung geheilt werden. Sie ist hier aber nicht festzustellen. Vielmehr erfolgte die Zustellung ersatzweise (§ 181 Abs. 1 ZPO) an die Bedienstete Birgit C. Die Beklagte zu 3 leugnet zwar nicht, inzwischen die Klageschrift kennengelernt zu haben. Über ihre Annahmebereitschaft gegenüber einer Zustellung ist aber nichts bekannt.

Art. 15 HZO sieht inhaltlich nicht die Heilung eines Zustellungsmangels vor. Die Vorschrift gestattet vielmehr nur dem Urteilsstaat eine vertragsgerechte Verfahrensfortführung ohne ordnungsmäßigen Zustellungsnachweis. Damit wird nicht ein Zustellungsmangel selbst geheilt, sondern nur dessen

APP 1838

verfahrensmäßige Auswirkungen werden gemildert (Senats-
beschl. v. 18. Februar 1993 – IX ZB 87/90, NJW 1993, 2088;
Stürner JZ 1992, 325, 332; Rauscher IPRax 1991, 155, 159;
wohl auch Schack, Zivilverfahrensrecht aaO Rdnr. 619).

Endlich verweist Art. 5 Abs. 1 Buchst. a HZO wegen der
Zustellung auf die Form des ersuchten Staates. Daraus wird
teilweise zugleich auch ein Verweis auf dessen Heilungsregeln
abgeleitet (Stein/Jonas/Roth aaO § 187 Rdnr. 27, 32 und § 328
Rdnr. 114; Schack, Zivilverfahrensrecht aaO Rdn. 618); eine
Heilung könnte danach jedenfalls insoweit in Betracht kom-
men, als sie sowohl dem Recht des Urteilsstaates als auch dem
des Zustellungsstaates entspricht. Sogar das würde hier aber
der Klägerin nicht helfen, weil § 187 Satz 1 ZPO eine Zustel-
lung ohne die erforderliche Übersetzung nicht heilt (BGHZ
120, 305, 313; Stürner JZ 1992, 325, 331; Stein/Jonas/Roth aaO
§ 187 Rdnr. 33).

d) Allerdings weist die Zustellungsurkunde des Amtsge-
richts Lü. vom 28. März 1991 aus, daß auch den Beklagten zu
3 Übersetzungen der zugestellten Schriftstücke in die deutsche
Sprache zugeleitet worden sind. Das Fehlen der Übersetzung
wird die Beklagte gemäß § 418 ZPO zu beweisen haben.

2. Die Beklagten machen geltend, das Versäumnisurteil des
Distriktgerichts beruhe auf vorsätzlich falschem Prozeßvor-
trag der Klägerin. Die Anerkennung eines durch zielgerichtete
Täuschung des ausländischen Gerichts erschlichenen Urteils
verstößt gegen die deutsche öffentliche Ordnung im Sinne von
§ 328 Abs. 1 Nr. 4 ZPO (vgl. zu Art. 27 Nr. 1 EuGVÜ
Senatsbeschl. v. 10. Juli 1986 - IX ZB 27/86, WM 1986, 1370,
1371; Entsprechendes gilt auch nach § 4 Abs. b Nr. 3 des
US-amerikanischen Uniform Foreign Money-Judgments
Recognition Act ). Dabei kommt es allein auf die Begründung
zum Ausgleichsschadensersatz an, weil die weitergehende Ver-
urteilung zu Strafschadensersatz hier nicht Streitgegenstand
ist.

Das Versäumnisurteil des US-amerikanischen Distrikt-
gerichts stützt die Verurteilung der drei Beklagten zu materiel-
lem Schadensersatz auf die Behauptung der Klägerin, die Dreh-
maschine von den Beklagten gekauft zu haben.

a) Nach den im vorliegenden Prozeß eingereichten Unterla-
gen war Verkäuferin der Maschine die L. Machine Tool Com-
pany, Inc. eine selbständige juristische Person. Daß dem dem
Bezirksgericht verschwiegen worden wäre, ist nicht dargetan.

Der Beklagte zu 1 war alleiniger Anteilsinhaber und Präsi-
dent der Verkäuferin. Falls er damit nach dem Recht des Staates
Wisconsin ebenfalls ohne weiteres als Verkäufer gilt, ist das
auch im Hinblick auf die deutsche öffentliche Ordnung hinzu-
nehmen (§ 328 Abs. 1 Nr. 4 ZPO).

In der dem Versäumnisurteil zugrundeliegenden, geänder-
ten Klageschrift vom 13. März 1991 heißt es ergänzend, die L.
Machine Tool Company, Inc. in den USA sei nur »instru-
mentality, agent, representative and/or alter ego« der L. Werk-
zeugmaschinenfabrik Lü. Dies könnte auf eine Mitverpflich-
tung der Beklagten zu 2 als Inhaberin dieser deutschen Maschi-
nenfabrik hinweisen. Falls eine solche Rechtsfolge gemäß den
Gesetzen des Staates Wisconsin aus dem genannten pauschalen
Vorbringen abzuleiten ist, wäre das in Deutschland hinzuneh-
men, ohne daß § 328 Abs. 1 Nr. 4 ZPO dem entgegenstünde.

Die Behauptung eines Verkaufs auch durch die Beklagten
zu 1 und 2 persönlich beruht dann allein auf einer Bewertung
ihrer Beteiligung an den beiden Maschinenfabriken L. Ein -
unzutreffender - Tatsachenvortrag liegt in derartig pauschalen
Wertungen nicht. Die Beklagten hätten sich dagegen gegebe-
nenfalls vor dem US-amerikanischen Distriktgericht verteidigen
müssen.

b) Nach dem bisherigen Vorbringen ist aber keinerlei tat-
sächliche Grundlage für die Behauptung der Klägerin zu er-
kennen, auch die Beklagte zu 3 habe die Drehmaschine mit-
verkauft. Ihr Name ist in keiner Urkunde erwähnt, die sich auf
den Vertrag oder dessen Abwicklung bezieht. Es wird auch
nichts dafür dargetan, daß diese Beklagte sich persönlich an
irgendwelchen Verhandlungen mit Bezug auf den Vertrag betei-
ligt hätte. In der eidesstattlichen Versicherung des Präsiden-
ten der Klägerin wird die Beklagte zu 3 nicht erwähnt. Sie hat
die L. Werkzeugmaschinenfabrik Lü. erst im Jahre 1990 über-
nommen, also rund vier Jahre nach dem Vertragsschluß und
auch lange nach den letzten Schreiben, auf welche die Klägerin

APP 1839

ihren Anspruch auf Strafschadensersatz gestützt hat. Das alles konnte der Klägerin nicht verborgen geblieben sein.

Unter diesen Umständen erscheint das Vorbringen unter Nr. 4 der geänderten Klageschrift vom 13. März 1991 unzutreffend, auch die Beklagte B. L. habe »at times relevant hereto« unter dem Namen L.Werkzeugmaschinenfabrik Lü. Geschäfte abgewickelt. Dann könnte der Vorwurf der Beklagten zu 3 schlüssig sein, ihre Verurteilung habe die Klägerin durch vorsätzlich unrichtigen Vortrag, also einen Prozeßbetrug erwirkt.

Im Verfahren auf Vollstreckbarerklärung ist ergänzender Tatsachenvortrag der Parteien jedenfalls insoweit zulässig, als aus der Art des Zustandekommens des anzuerkennenden Urteils ein Verstoß gegen § 328 Abs. 1 Nr. 4 ZPO abgeleitet werden soll. Dem steht nicht der Grundsatz entgegen, daß ein betrügerisches Erschleichen eines ausländischen Urteils nicht mit denselben Beweismitteln dargelegt werden kann, deren sich ein Beklagter bereits im Ausgangsverfahren bedient hat oder hätte bedienen können (BGH, Beschl. v. 19. September 1977 - VIII ZR 120/75, NJW 1978, 1114, 1115). Dieser Grundsatz greift ein, wenn sich ein Beklagter vor dem Gericht des Erststaates tatsächlich verteidigt. Dagegen stellen sowohl § 328 Abs. 1 Nr. 2 als auch Nr. 4 ZPO es dem im Inland ansässigen Beklagten frei, sich im Ausland überhaupt einzulassen. Geht er das Risiko ein, sich im Ausland verurteilen zu lassen, so nimmt er die Erschwernis auf sich, im Anerkennungsverfahren nur noch eng begrenzte Verteidigungsmittel geltend machen zu dürfen. Jedenfalls der Betrugseinwand wird ihm aber nicht abgeschnitten.

Allerdings obliegt die Beweislast dafür, daß das Urteil des Erststaates auf vorsätzlich falschem Parteivortrag der Klägerin beruht, der Beklagten zu 3. Denn sie beruft sich auf anerkennungsfeindliche Tatsachen, die im Ersturteil nicht festgestellt sind.

Ausweislich der Eintragung im Handelsregister hat die Beklagte zu 3 bei der Übernahme der Firma L. Werkzeugmaschinenfabrik Lü. die Haftung für die im Betrieb der früheren Inhaberin begründeten Verbindlichkeiten gemäß § 25

Abs. 2 HGB ausgeschlossen. Nur wenn eine solche Haftungsbeschränkung eines Firmenübernehmers vom Recht des Staates Wisconsin nicht anerkannt würde, hätte unzutreffender Vortrag über die Beteiligung der Beklagten zu 3 am Kaufvertrag das hier fragliche Versäumnisurteil nicht verursachen können. Dann wäre allerdings die Frage zu prüfen, ob eine solche ausländische Haftungserweiterung noch mit dem deutschen materiellen ordre public vereinbar ist.

## 33

a) Einem Ehegatten, der im gesetzlichen Güterstand der DDR gelebt und nach dem Beitritt keine Erklärung zur Fortgeltung dieses Güterstandes gemäß Art. 234 § 4 Abs. 2 EGBGB abgegeben hat, kann bei Scheidung der Ehe nach dem Beitritt gegen den anderen Ehegatten ein Ausgleichsanspruch nach § 40 FGB-DDR zustehen.

b) Für die Bemessung dieses Ausgleichsanspruchs ist auf den Wert des Alleinvermögens zum Stichtag 3. Oktober 1990 abzustellen (Abgrenzung zum Senatsurteil vom 5. Mai 1993 - XII ZR 38/92 - FamRZ 1993, 1048).

c) Zur Frage der Erledigung des Auskunftsanspruchs im Rahmen einer Stufenklage.

EGBGB 1986 Art. 234 § 4; DDR: FGB § 40; ZPO § 254.
XII. Zivilsenat. Urt. vom 5. Mai 1999
in einer Familiensache.
XII ZR 184/97.

I. Amtsgericht Hohenstein-Ernstthal
II. Oberlandesgericht Dresden

Die seit 19. Mai 1984 miteinander verheirateten Parteien lebten bis zum Beitritt im gesetzlichen Güterstand der Eigen-

APP 1840

# Exhibit 13

# German Introductory Act
# to the Hague Service Convention

APP 1841

Ausführungsgesetz zu den Haager Reformübereinkommen von 1965 und 1970                    Seite 1 von 3

Gesetz zur Ausführung
des Haager Übereinkommens vom 15. November 1965
über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke
im Ausland in Zivil- oder Handelssachen
und des
Haager Übereinkommens vom 18. März 1970
über die Beweisaufnahme im Ausland in Zivil- oder Handelssachen

Vom 22. Dezember 1977
(BGBl. I S. 3105)

in der Fassung des Gesetzes vom 10. Dezember 2008
(veröffentlicht im Bundesgesetzblatt Jahrgang 2008 Teill Nr. 57, Seite 2399 ff.,
ausgegeben zu Bonn am 15. Dezember 2008

Der Bundestag hat mit Zustimmung des Bundesrates das folgende Gesetz
beschlossen:

**Erster Teil**

Vorschriften zur Ausführung des Haager Übereinkommens vom 15. November
1965
über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland
in Zivil- oder Handelssachen

**§ 1**

Die Aufgaben der Zentralen Behörde (Artikel 2, 18 Abs. 3 des Übereinkommens)
nehmen die von den Landesregierungen bestimmten Stellen wahr. Jedes Land
kann nur eine Zentrale Behörde einrichten. Die Landesregierungen können die
Befugnis nach Satz 1 auf die Landesjustizverwaltungen übertragen.

**§ 2**

Für die Entgegennahme von Zustellungsanträgen, die von einem ausländischen
Konsul innerhalb der Bundesrepublik Deutschland übermittelt werden (Artikel 9
Abs. 1 des Übereinkommens), sind die Zentrale Behörde des Landes, in dem die
Zustellung bewirkt werden soll, und die Stellen zuständig, die gemäß § 1 des
Gesetzes zur Ausführung des Haager Übereinkommens vom 1. März 1954 über
den Zivilprozeß vom 18. Dezember 1958 (BGBl. I S. 939) zur Entgegennahme
von Anträgen des Konsuls eines ausländischen Staates zuständig sind.

**§ 3**

Eine förmliche Zustellung (Artikel 5 Abs. 1 des Übereinkommens) ist nur
zulässig, wenn das zuzustellende Schriftstück in deutscher Sprache abgefaßt
oder in diese Sprache übersetzt ist.

**§ 4**

(1) Die Zentrale Behörde ist befugt, Zustellungsanträge unmittelbar durch die
Post erledigen zu lassen, wenn die Voraussetzungen für eine Zustellung
gemäß Artikel 5 Abs. 1 Buchstabe a des Übereinkommens erfüllt sind. In

**APP 1842**

App. 2523

diesem Fall händigt die Zentrale Behörde das zu übergebende Schriftstück der Post zur Zustellung aus. Die Vorschriften der Zivilprozeßordnung über die Zustellung von Amts wegen gelten entsprechend.

(2) Im übrigen ist für die Erledigung von Zustellungsanträgen das Amtsgericht zuständig, in dessen Bezirk die Zustellung vorzunehmen ist. Die Zustellung wird durch die Geschäftsstelle des Amtsgerichts bewirkt.

## § 5

Das Zustellungszeugnis (Artikel 6 Abs. 1, 2 des Übereinkommens) erteilt im Fall des § 4 Abs. 1 die Zentrale Behörde, im übrigen die Geschäftsstelle des Amtsgerichts.

## § 6

Eine Zustellung durch diplomatische oder konsularische Vertreter (Artikel 8 des Übereinkommens) ist nur zulässig, wenn das Schriftstück einem Angehörigen des Absendestaates zuzustellen ist. Eine Zustellung nach Artikel 10 des Übereinkommens findet nicht statt.

### Zweiter Teil

Vorschriften zur Ausführung des Haager Übereinkommens vom 18. März 1970 über die Beweisaufnahme im Ausland in Zivil- oder Handelssachen

## § 7

Die Aufgaben der Zentralen Behörde (Artikel 2, 24 Abs. 2 des Übereinkommens) nehmen die von den Landesregierungen bestimmten Stellen wahr. Jedes Land kann nur eine Zentrale Behörde einrichten. Die Landesregierungen können die Befugnis nach Satz 1 auf die Landesjustizverwaltungen übertragen.

## § 8

Für die Erledigung von Rechtshilfeersuchen ist das Amtsgericht zuständig, in dessen Bezirk die Amtshandlung vorzunehmen ist.

## § 9

Rechtshilfeersuchen, die durch das Amtsgericht zu erledigen sind (Kapitel I des Übereinkommens), müssen in deutscher Sprache abgefaßt oder von einer Übersetzung in diese Sprache begleitet sein (Artikel 4 Abs. 1, 5 des Übereinkommens).

## § 10

Mitglieder des ersuchenden ausländischen Gerichts können bei der Erledigung eines Rechtshilfeersuchens durch das Amtsgericht anwesend sein, wenn die Zentrale Behörde dies genehmigt hat.

APP 1843

App. 2524

## § 11

Eine Beweisaufnahme durch diplomatische oder konsularische Vertreter ist unzulässig, wenn sie deutsche Staatsangehörige betrifft. Betrifft sie Angehörige eines dritten Staates oder Staatenlose, so ist sie nur zulässig, wenn die Zentrale Behörde sie genehmigt hat (Artikel 16 Abs. 1 des Übereinkommens). Eine Genehmigung ist nicht erforderlich, wenn der Angehörige eines dritten Staates zugleich die Staatsangehörigkeit des Staates des ersuchenden Gerichts besitzt.

## § 12

(1) Ein Beauftragter des ersuchenden Gerichts (Artikel 17 des Übereinkommens) darf eine Beweisaufnahme nur durchführen, wenn die Zentrale Behörde sie genehmigt hat. Die Genehmigung kann mit Auflagen verbunden werden.

(2) Das Gericht, das für die Erledigung eines Rechtshilfeersuchens in derselben Angelegenheit nach § 8 zuständig wäre, ist befugt, die Vorbereitung und die Durchführung der Beweisaufnahme zu überwachen. Ein Mitglied dieses Gerichts kann an der Beweisaufnahme teilnehmen (Artikel 19 Satz 2 des Übereinkommens).

## § 13

Für die Erteilung der Genehmigung nach den §§ 10, 11 und 12 (Artikel 19 des Übereinkommens) ist die Zentrale Behörde des Landes zuständig, in dem die Beweisaufnahme durchgeführt werden soll.

## § 14

(1) Rechtshilfeersuchen, die ein Verfahren nach Artikel 23 des Übereinkommens zum Gegenstand haben, werden nicht erledigt.

(2) Jedoch können, soweit die tragenden Grundsätze des deutschen Verfahrensrechts nicht entgegenstehen, solche Ersuchen unter Berücksichtigung der schutzwürdigen Interessen der Betroffenen erledigt werden, nachdem die Voraussetzungen der Erledigung und das anzuwendende Verfahren durch Rechtsverordnung näher geregelt sind, die der Bundesminister der Justiz mit Zustimmung des Bundesrates erlassen kann.

APP 1844
App. 2525

# Exhibit 14

# Decision of the
# Higher Regional Court Nürnberg
# IPRax 2006, 38-40

Case 3:12-cv-80384-NBCG Document 85-19   Filed 07/00/18   Page 37 of 97   PageID 21597

und insoweit aus Gründen der Rechtsstaatlichkeit des Verfahrens aufgestellt wird (vgl. *Stürner*, Die Aufklärungspflicht der Parteien im Zivilprozess, 1976, S. 112 ff.), lädt die Möglichkeit der Erhebung unsubstantiierter Klagen mit anschließender Ausforschung der beklagten Partei nach dem US-amerikanischen Prozessrecht zum Rechtsmissbrauch ein. Diese Missbrauchsanfälligkeit ist zwar nicht per se ein Grund, den deutschen ordre public als verletzt anzusehen (vgl. BGHZ 118, 312, 323 f. = IPRax 1993, 310); sie kann aber im Einzelfall den Hintergrund eines konkreten Rechtsmissbrauchs bilden, der zum Eingreifen des Souveränitätsvorbehalts nach Art. 13 Abs. 1 HZÜ führt.

d) Besondere Bedeutung im vorliegenden Fall ein weiterer Aspekt, der der Klage das Gepräge als Rechtsmissbrauch verleiht. Die Inanspruchnahme extraterritorialer Rechtsprechungsgewalt verletzt im konkreten Fall das Territorialitätsprinzip und ist daher auch völkerrechtswidrig. Sie verleiht bereits der Klagezustellung erhebliche rechtliche Bedeutung, denn im Fall der Extraterritorialität eine zuständigkeitsbegründende Wirkung zukommen kann, die andernfalls nicht bestünde (vgl. *Koch/Diedrich* ZIP 1994, 1830).

Die Kl. wollen die Ast., welche ihren Sitz in Deutschland hat, wegen eines Verhaltens ihrer kanadischen Tochtergesellschaft auf kanadischem Hoheitsgebiet in den USA auf Schadensersatz, Gewinnabschöpfung und Unterlassung weiterer Handlungen in Kanada in Anspruch nehmen. Damit wird eine deutsche Gesellschaft wegen extraterritorialer Handlungen in einem Drittstaat vor einem US-amerikanischen Gericht verklagt. Dieses Begehren kann im konkreten Fall auch durch Klagezustellung im Inland als Hoheitsakt gefördert werden, weil es die Hoheitsrechte der Bundesrepublik Deutschland im Sinne von Art. 13 Abs. 1 HZÜ gefährdet.

Extraterritoriale Ausübung von Rechtsprechungsgewalt ist nicht per se und wegen Verletzung des Territorialitätsgrundsatzes völkerrechtswidrig. Sie wird nicht nur vom US-amerikanischen Wettbewerbsrecht in Anspruch genommen, sondern sie liegt etwa auch der deutschen Regelung des § 98 Abs. 2 GWB zugrunde, der dem Auswirkungsprinzip folgt, wobei allerdings nicht lediglich theoretische Auswirkungen der extraterritorialen Handlung auf den innerstaatlichen Wettbewerb genügen (vgl. *Bestle*, Souveränität und Verfahrensrecht, S. 159). Das US-amerikanische Antitrust-Recht nach der Rechtsprechung des U.S. Supreme Court folgte nur zunächst der Ansicht, dass extraterritoriale Handlungen, die nach dem Recht des Handlungsortes rechtmäßig sind, nicht dem US-amerikanischen Recht und der dortigen Jurisdiktion unterliegen (American Banana Co. vs. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 [1909]). Später wurde dies in Fällen eingeschränkt, in denen sich die extraterritoriale Handlung als Einfuhrbeschränkung in die Vereinigten Staaten auswirkt (U.S. vs. Sisal Sales Corp., 274 U.S. 268, 7 S.Ct. 592, 71 L.Ed. 1042 [1927]). Dies ist nun ständige Rechtsprechung, die den innerstaatlichen Erfolg extraterritorialer Handlungen der inländischen Handlung gleichsetzt (U.S. vs. Aluminium C. of America, 148 E2d 416 [2d Cir. N.Y. 1945]). Neben der Inlandswirkung wird dabei aber auch geprüft, ob ein "true and direct conflict" vorliegt, also eine Abweichung des US-amerikanischen Rechts von dem Recht des Staates, in dem die wettbewerbsbeschränkende Handlung vorgenommen wurde. Das trifft hier nicht zu.

Im vorliegenden Fall geht es darum, dass die Importbeschränkung, welche durch das behauptete Handeln der Tochtergesellschaft der Ast. in Kanada zum Nachteil des US-amerikanischen Marktes bewirkt wird, sogar in Einklang mit dem Arz-

neimittelimportverbot des US-amerikanischen Rechts steht. Die Einfuhr von verschreibungspflichtigen Medikamenten durch US-Bürger aus Kanada in die Vereinigten Staaten ist auch nach dem US-amerikanischen Recht verboten und nach dem Klagevorbringen nur aufgrund einer rechtspolitischen Wunschvorstellung "de facto legal". Wird dieser dem geltenden Gesetzesrecht widersprechende Wunsch im Klageweg unter Ausnutzung der Schwächen der Institute der "class action" oder der "pre-trial-discovery", der "treble damages" sowie einer erheblichen Medienkampagne mit dem Ziel verfolgt, die beklagten Unternehmen zu Vergleichsabschlüssen zu zwingen, so verletzt dieser Rechtsmissbrauch die Hoheitsrechte der Bundesrepublik Deutschland, soweit es um die Klagezustellung an ein deutsches Unternehmen im Inland geht.

**Nr. 2\* OLG Nürnberg – HZÜ Art. 5 Abs. 1, 3 i. V. m. AGHZÜ § 3; Deutsch-Türkisches Abkommen Art. 9 Abs. 1 i. V. m. Art. 4 Abs. 2b**

(Urteil v. 15. 2. 2005 – 4 VA 72/05)

Als Mindestanforderung an die bei der förmlichen Zustellung nach dem HZÜ erforderliche Übersetzung ist zu erwägen, dass sie trotz aller sprachlichen Unzulänglichkeiten wenigstens so verständlich sein muss, dass sie ihren wesentlichen Informationszweck erfüllt. Der Zustellungsempfänger sollte also insbesondere erkennen können, wer mit dem Schriftstück welchen Zweck verfolgt und was er selbst unternehmen kann, um sich dagegen zu verteidigen.

*Gründe:*

I. Auf Ersuchen des 3. Vollstreckungsamts Istanbul Küçükçekmece veranlasste das AG Nürnberg die Zustellung von Schriftstücken an die Kl. Die Schriftstücke, darunter einen Formular-Bescheid über die "Betreibung (gemeint: Beitreibung) gerichtlich nicht festgestellter Ansprüche", erhielt die Ast. in am 3. Januar 2005 zugestellt. Sie enthalten eine deutsche Übersetzung, die den Stempelaufdruck zufolge von einer beeideten Dolmetscherin stammt und laut Bestätigungsvermerk "mit dem Original in Türkisch übereinstimmend".

Aus dem Formular-Bescheid – offenbar eine Art Mahnbescheid – geht hervor, dass die Gläubigerin gegen die Ast.in des hiesigen Verfahrens (Schuldnerin) eine Forderung in Höhe von umgerechnet 16.361.340 EUR geltend macht. Den "Schuldgrund" formuliert die deutsche Übersetzung wie folgt:

"*Durch die Anweisung der schuldigen Gesellschaft an ihre Vertreter bzw. Mitglieder des Verwaltungsrates, dass sie ihren privaten Verpflichtungen nicht nachkommen, unsere Gesellschaft lastend Verlust.*"

Die Ast.in rügt, dass der Bescheid mangels einer Übersetzung, die diese Bezeichnung verdiene, von vornherein nicht hätte zugestellt werden dürfen. Was die beigefügte Übersetzung als Schuldgrund beschreibe, sei völlig unverständlich und nicht nachvollziehbar. Außerdem sei die siebentägige Einlassungsfrist unangemessen knapp bemessen. Nachdem aber die Zustellung, wenn auch rechtswidrig, nun einmal erfolgt sei, dürfe als Zustellungsakt wenigstens nun fortgesetzt werden; die rechtswidrig zustande gekommene Zustellungsurkunde müsse vernichtet werden.

Die Ast.in beantragt daher, 1) den Ag. zu untersagen, die Zustellung der in dem initiierten Zustellungsantrag des 3. Vollstreckungsamtes Istanbul Küçükçekmece (Nr. 21912) genannten Schriftstücke an die

---

\* Dazu oben *Wilske/Knapff*, Zur Qualität von Übersetzungen bei Zustellung ausländischer gerichtlicher Schriftstücke, IPRax 2006, 10 (in diesem Heft).

**APP 1846**

App. 2527

Case 1:04-cv-00397-BCG Document 913 Filed 02/08/16 Page 38 of 99 PageID 41668

Ast.in durch Erteilung und Rücksendung eines Zustellungszeugnisses gegenüber den türkischen Behörden zu bescheinigen, 2) den Ag. anzuweisen, die Zustellungsurkunde zu vernichten, 3) den Ag. anzuweisen, weisen, die Zustellungsverfahren zu vernichten, 3) den Ag. anzuweisen, die Erledigung des undatierten Zustellungsantrags des 3. Vollstreckungsamtes Istanbul Küçükçekmece (Nr. 21912) abzulehnen. Für den Fall, dass nicht der Ag. (= Präsident des AG), sondern das AG selbst als richtiger Adressat der Anträge anzusehen sei, beantragt sie hilfsweise, der tiger Adressat der Anträge anzusehen sei, beantragt sie hilfsweise, Anweisungen dem AG zu erteilen. Ursprünglich hatte die Kl. auch noch einstweiligen Rechtsschutz beantragt. Diese Eilanträge hat sie jedoch zurückgenommen, nachdem sich der Ag. bereit erklärt hat, das jedoch zurückgenommen, nachdem sich der Ag. bereit erklärt hatte, die Fortsetzung der Zustellungsverfahren bis zur Entscheidung des Senats zurückzustellen. Der Ag. beantragt, den Anträgen nicht stattzugeben. Für die Zustellung fremdsprachiger Schriftstücke sei es erforderlich, aber auch ausreichend, dass überhaupt eine beglaubigte Übersetzung beigefügt sei. Eine solche liege hier vor. "Verständlichkeit" der Übersetzung werde in den einschlägigen Abkommen nicht vorausgesetzt. Wollte man sie verlangen, müsste die Zustellungsbehörde das bereits übersetzte Schriftstück noch einmal übersetzen lassen, um festzustellen zu können, ob die mangelnde Verständlichkeit lediglich der Übersetzung anhafte oder dem ausländischen Ursprungstext.

II. Die Anträge sind zulässig. Sie sind form- und fristgerecht bei dem zur Entscheidung zuständigen OLG eingelegt worden (§§ 23 ff. EGGVG). Die Ast.in wird durch die Mitwirkung des Ag. am Zustellungsverfahren, das als Justizverwaltungsakt zu werten ist, beschwert.

Das Rechtsschutzbedürfnis der Ast.in entfällt nicht dadurch, dass sie inzwischen bei der türkischen Behörde gegen den Bescheid rechtzeitig Einspruch eingelegt hat und sich nunmehr "vor Ort" gegen die in ihren Augen ungerechtfertigte Forderung verteidigen kann. Es ist nämlich nicht fern liegend, jedenfalls aber nicht auszuschließen, dass sich ihre Rechtsverteidigung in der Türkei günstiger darstellt, wenn die offizielle Bescheinigung der förmlichen Zustellung und die Übermittlung des Zustellungszeugnisses unterbleiben.

III. Den Anträgen kann jedoch nicht stattgegeben werden; denn weder handelte der Ag. rechtswidrig, als er die Zustellung der Schriftstücke veranlasste, noch verhält er sich rechtswidrig, wenn er – wie beabsichtigt – nach Abschluss des gerichtlichen Verfahrens das Zustellungsverfahren fortsetzt.

1) Die Art und Weise der Zustellung richtet sich vorliegend nach dem Haager Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- und Handelssachen vom 15. 11. 1965 (BGBl. 1977 II S. 1453 ff. – HZÜ –) in Kraft getreten für die Bundesrepublik Deutschland am 26. 6. 1979 (Bekanntmachung vom 21. 6. 1979, BGBl. 1979 II S. 779; vgl. Art. 3 Abs. 2 des Gesetzes vom 22. 12. 1977, BGBl. 1977 II S. 1452), für die Republik Türkei am 28. 4. 1972 (BGBl. 1980 II S. 907) – nach Maßgabe des Ausführungsgesetzes zum HZÜ vom 22. 12. 1977 (BGBl. 1977 I S. 3105 – AGHZÜ) –

– in Verbindung mit dem Deutsch-Türkischen Abkommen über den Rechtsverkehr in Zivil- und Handelssachen vom 28. 5. 1929 (RGBl. 1930 II S. 6, 1931 II S. 539; vgl. Bekanntmachung vom 29. 5. 1952, BGBl. II S. 608).

Nach Art. 5 Abs. 1 HZÜ in Verbindung mit § 3 AGHZÜ (vgl. auch Nr. 3 der Bekanntmachung vom 21. 6. 1979) ist eine förmliche Zustellung nur zulässig, wenn das zuzustellende Schriftstück in deutscher Sprache abgefasst oder ins Deutsche übersetzt ist. Auch Art. 9 Abs. 1 in Verbindung mit Art. 4 Abs. 2 b des Deutsch-Türkischen Abkommens verlangt eine Übersetzung und schreibt darüber hinaus vor, dass diese durch einen beeidigten Dolmetscher des ersuchenden Staates (oder durch andere, hier nicht einschlägige Stellen) beglaubigt sein muss.

Eine Übersetzung liegt hier vor. Sie wurde ersichtlich bereits in der Türkei gefertigt, wie sie stammt – unstreitig – von einer laut Stempelaufdruck "beeideten Dolmetscherin" und weist einen Beglaubigungsvermerk auf.

2) Allerdings ist der Ast.in einzuräumen, dass sich der Sinn dessen, was in der Rubrik "Angabe des Schuldgrundes" in deutscher Sprache formuliert ist, nicht auf Anhieb erschließt. Das gilt insbesondere für solche Leser, denen die Hintergründe der Angelegenheit nicht bekannt sind. Ob sich auch die Ast.in dazu rechnet, trägt sie nicht vor, obwohl dies eigentlich zu erwarten gewesen wäre, wenn sie sich aus der angemeldeten Forderung überhaupt keinen Reim machen könnte, mit der Gläubigerin keinerlei Kontakt gehabt hätte und von dem ihr zugestellten Bevollmächtigten niemals vertreten worden wäre. Aber selbst mit Kenntnis des möglichen Hintergrundes fällt es dem Leser schwer, den Sinn des oben wiedergegebenen Schuldgrunds in allen Einzelheiten zu erfassen.

a) Ob diese sprachlichen Unebenheiten an der Übersetzung selbst liegen oder ob es bereits der türkische Ursprungstext sprachlich missglückt ist, vermag der Senat mangels türkischer Sprachkenntnisse nicht zu beurteilen. Darauf kommt es jedoch für die Frage, ob der Ag. die Zustellung vornehmen durfte oder sie hätte ablehnen müssen, nicht entscheidend an. Wesentlich ist, dass die Übersetzung – wenn auch mühsam – einen Sinn ergibt, der den Empfänger in die Lage versetzt, das Ziel des zugestellten Schriftstücks zu erkennen und sachgerecht zu reagieren. Das ist hier der Fall.

b) Eine fehlerfreie Übersetzung, wie sie die Ast.in fordern zu können glaubt, ist auch in Geltungsbereich der oben angeführten Abkommen keine unabdingbare Voraussetzung, deren Fehlen schon die Zustellung des Schriftstückes verbieten würde. Es kann dahinstehen, ob die zustellende Behörde die Zustellung vom Nachweis einer fehlerfreien Übersetzung abhängig machen dürfte. Ebenso kann offen bleiben, wie sich die behauptete Fehlerhaftigkeit der Übersetzung auf die Wirksamkeit der dennoch erfolgten Zustellung auswirken würde und welchen Einfluss dies auf die an die Zustellung anknüpfenden Rechtsfolgen hätte. Vorliegend geht es allein darum, ob sich der Ag. rechtswidrig verhielt, als er die Zustellung trotz der sprachlichen Unebenheiten vornehmen ließ, und sich weiter rechtswidrig verhielte, wenn er das Zustellungsverfahren fortsetzen würde.

Für ihre gegenteilige Rechtsmeinung beruft sich die Ast.in auf *Kondring* ("Die Heilung von Zustellungsmängeln im internationalen Rechtsverkehr") und *G. Geimer* ("Die Neuordnung des internationalen Zustellungsrechts"). Beide fordern in der Tat, dass die Übersetzung fehlerfrei sein müsse (*G. Geimer*, S. 88) bzw. nicht fehlerhaft sein dürfe (*Kondring*, S. 180). Abgesehen davon, dass aus den von der Ast.in vorgelegten Buchauszügen nicht eindeutig hervorgeht, ob eine mangelhafte Übersetzung die Zustellung schlechthin verbieten soll oder erst deren Wirksamkeit beeinträchtigt, bleiben beide Autoren eine Begründung für diesen rigorosen Standpunkt schuldig. In den angeführten Zustellungsvorschriften findet sich für derart hoch gesteckte Anforderungen, die in letzter Konsequenz selbst bei marginalen Fehlern zu einem Zustellungsverbot führen würden, jedenfalls kein Anhalt.

Auch die von der Ast.in angeführte Entscheidung des OLG Hamm vom 25. 11. 1992 (Az. 11 U 92/92) gibt für ihren extrem strengen Standpunkt nichts her. Diese Entscheidung befasst sich zwar, wenn auch nur eher am Rande, mit dem Problem einer mangelhaften Übersetzung. Jedoch ging es auch um die Auswirkungen von Übersetzungsmängeln auf eine bereits *zugestellte* Klage. Überdies ließ das OLG Hamm die Zustellungswirkung gerade *nicht* daran scheitern, dass die Klageschrift "von schlechter Qualität und nur mühsam verständlich" war; jeden-

APP 1847
App. 2528

Case 3:12-cv-00384-NBC Document 85-9 Filed 02/06/16 Page 39 of 99 PageID 27999

falls sie sie „(noch) hinreichend verständlich" gewesen und von der Gegenseite auch verstanden worden.

Wollte man bereits die Zustellung eines Schriftstücks von Vorhandensein oder gar vom Nachweis einer *fehlerfreien* Übersetzung abhängig machen, würde dies den Zustellungsverkehr, der durch internationale Übereinkommen gerade erleichtert werden soll, über Gebühr verlangsamen und verkomplizieren. Die Zustellungsbehörde, deren Aufgabe sich im Allgemeinen lediglich auf die Vermittlung der Zustellung und die Einhaltung einfach festzustellender Formalien beschränkt, müsste jeweils vor deshalb eine eigene Übersetzung des in der Amtssprache des Ursprungsstaates verfassten Textes veranlassen, um zuverlässig feststellen zu können, ob eventuelle Unklarheiten gerade auf die Übersetzung zurückzuführen sind (nur dann wäre zu erwägen, die Zustellung am Fehlen einer brauchbaren Übersetzung scheitern zu lassen) oder ob sie bereits im fremdsprachigen Ursprungstext angelegt waren. Hierzu müsste sich die Zustellungsbehörde mangels eigener Sprachkenntnis ebenfalls eines Übersetzers bedienen und dessen Kenntnissen vertrauen. Eine solche Kontrolle der Übersetzung eines vereidigten Übersetzers durch einen weiteren Übersetzer ist nicht Aufgabe der Zustellungsvermittlung.

Anders mag es sich verhalten, wenn die Unbrauchbarkeit der beigefügten Übersetzung klar zutage tritt, wenn sich also die beigefügte Übersetzung letztlich nur als Schein-Übersetzung erweist. So liegt jedoch der Fall hier nicht.

3) Zu erwägen wäre allerdings, als Mindestanforderung an die von der ersuchenden Stelle mitgelieferte Übersetzung zu verlangen, dass sie trotz aller sprachlichen Unzulänglichkeiten wenigstens so verständlich sein muss, dass sie ihren wesentlichen Informationszweck erfüllt. Der Zustellungsempfänger sollte also insbesondere erkennen können, wer mit dem Schriftstück welchen Zweck verfolgt und was er selbst unternehmen kann, um sich dagegen zu verteidigen.

Solchen Mindestanforderungen wird die vorliegend beigefügte Übersetzung des Anspruchsgrundes indes (noch) gerecht. Sie ist zwar in einem – zurückhaltend ausgedrückt – grammatikalisch sehr eigenwilligen Deutsch verfasst und lässt an Klarheit einiges zu wünschen übrig. Immerhin kann ihr aber selbst der mit den Hintergründen nicht vertraute Leser in der Zusammenschau mit anderen Informationen des zugestellten Bescheides entnehmen,

– wer Gläubiger und wer Schuldner sein soll,
– dass die Gläubigerin der angeblichen Schuldnerin vorwirft, Verpflichtungen nicht nachgekommen zu sein oder zumindest für die Nichterfüllung von Verpflichtungen verantwortlich zu sein,
– dass sie dadurch einen Vermögensschaden erlitten haben will,
– für den sie 16.361.340 EUR Schadensersatz geltend macht,
– und zwar beim 3. Vollstreckungsamt Istanbul Küçükçekmece
– im Verfahren zur „Beitreibung gerichtlich nicht festgestellter Ansprüche".

Dem Bescheid ist ferner eine Rechtsmittelbelehrung beigefügt, die – wenn auch nicht auf Anhieb – das Wesentliche erkennen lässt, insbesondere die Notwendigkeit eines Einspruchs innerhalb von sieben Tagen, falls sich die Schuldnerin gegen die Forderung wehren wolle (von dieser Einspruchsmöglichkeit hat die Ast.in mittlerweile Gebrauch gemacht).

Dass der im Original oben rechts aufgestempelte Zusatz „20 EKIM 2004" (wohl das Datum des nachfolgenden Beitreibungs-Bescheids) nicht mit übersetzt ist, beeinträchtigt die Ver-

ständlichkeit des Gesamtdokuments nicht wesentlich. Weshalb er für den behaupteten Anspruch oder für den weiteren Ablauf des Verfahrens bedeutsam sein soll, ist weder vorgetragen noch ersichtlich. Das Fehlen seiner Übersetzung hindert die Zustellung des Bescheids daher nicht.

4) Kein Hinderungsgrund für die Zustellung des Bescheids und deren weitere Abwicklung ist ferner, dass die Beschreibung des Schuldgrundes, wie der Ast.in einzuräumen ist, auch *inhaltlich* äußerst dürftig ausgefallen ist.

Zwar gibt die Beschreibung – jedenfalls für den Außenstehenden – weder darüber Aufschluss, gegen welche konkrete Verpflichtung die Schuldnerin verstoßen haben soll, noch lässt sie erkennen, wodurch dies geschehen sein soll. Ob eine so vage Beschreibung des Schuldgrundes schlüssig ist und für eine Verurteilung, ggf. Vollstreckung ausreicht, braucht aber nicht vertieft zu werden. Denn im Rahmen des Zustellungsverfahrens steht der Zustellungsbehörde eine gegen Schlüssigkeitsprüfung nicht zu; erst recht kann sie nicht von ihr verlangt werden.

5) Die von der Ast.in als unangemessen kurz gerügte Einspruchsfrist von sieben Tagen rechtfertigt es ebenfalls nicht, das Zustellungsersuchen abzulehnen.

Hierbei handelt es sich anscheinend um die nach türkischem Recht vorgesehene Frist für Rechtsbehelfe gegen Bescheide der zugestellten Art. Ob diese Frist richtig festgesetzt und ausreichend bemessen ist, braucht die inländische Zustellungsbehörde jedoch nicht zu überprüfen. Sie darf dies im Allgemeinen auch nicht, da sich ihre Prüfungsbefugnis auf die formellen Voraussetzungen der Zustellung beschränkt.

Die Einspruchsfrist ist auch nicht so unvertretbar kurz, dass sie einen Verstoß gegen den „ordre public" nahe legen könnte. Abgesehen davon hat die Ast.in im konkreten Fall, soweit ersichtlich, die Frist trotz deren Kürze wahren können.

6) Da weder gegen das bisherige noch gegen das beabsichtigte weitere Vorgehen des Ag. durchgreifende rechtliche Bedenken bestehen, kann dahinstehen, ob dann, wenn die Zustellung rechtswidrig gewesen wäre, die Ast.in die mit ihren Anträgen verfolgten Ziele hätte erreichen können, insbesondere also den Ag. zu verwehren, der ersuchenden Behörde die Tatsache der nun einmal erfolgten Zustellung zu bestätigen, oder ihm gar vorzuschreiben; die zutreffend ausgestellte Zustellungsbescheinigung – immerhin eine öffentliche Urkunde – zu vernichten. [...]

---

**Nr. 3\* BGH – EuGVÜ Art. 5 Nr. 1 und 3**

(Urteil v. 7. 12. 2004 – XI ZR 366/03)

**1. Zur internationalen Zuständigkeit gemäß Art. 5 Nr. 3 EuGVÜ bei Ansprüchen aus unerlaubter Handlung.**

**2. Zur internationalen Zuständigkeit gemäß Art. 5 Nr. 1 EuGVÜ bei Ansprüchen aus Darlehen.**

**3. Die Entscheidungsbefugnis des nach Art. 5 Nr. 3 EuGVÜ für die Entscheidung über deliktische Ansprüche international zuständigen Gerichts erstreckt sich nicht auf die Prüfung anderer, nicht deliktsrechtlicher Anspruchsgrundlagen (Bestätigung von BGHZ 132, 105 ff. und BGHZ 153, 173 ff.).**

---

\* Dazu oben *Loacker*, Internationale Zuständigkeit für Ansprüche aus Darlehen nach dem EuGVÜ – Auswertung der besonderen Gerichtsstände kraft Sachzusammenhangs?, IPRax 2006, 14 (in diesem Heft).

APP 1848

# EXHIBIT 86

TM
EXHIBIT 86

APP 1849

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated<br><br>v.<br><br><br>TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No 3:09-CV-02384-N-BG<br><br>Judge: Hon. David C. Godbey<br><br>Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF EDUARDO ZULETA

### I.   INTRODUCTION

1.   My name is Eduardo Zuleta, and I am an attorney duly licensed to practice law in the Republic of Colombia.  I have practiced law in private practice for more than twenty five years in the areas of contract law, project finance and litigation and arbitration.  I am presently a partner of Gómez-Pinzón Zuleta Abogados S.A.S. in Bogotá D.C., Colombia, where my practice is focused on international arbitration, international litigation and international law.

2.   I received my J.D. degree ("*abogado*") and a post graduate degree in Financial law from *Universidad del Rosario* in Bogotá D.C., Colombia.  I received an LL.M., with Merits, specializing in International Dispute Resolution from the University of London, Queen Mary.

3.   I was a professor of law at *Universidad del Rosario*, with a focus on introduction to law, international arbitration and complex international contracts, and at *Universidad Sergio Arboleda* (Colombia), with a focus on complex contracts.  I currently co-direct the research center in International Arbitration at *Pontificia Universidad Javeriana* School of Law in Bogotá D.C., Colombia.

4. I have been chair, co-arbitrator, sole arbitrator and counsel in scores of international commercial arbitrations under the Rules of Arbitration of the International Chamber of Commerce ("ICC"), the United Nations Commission on International Trade Law ("UNCITRAL"), the International Center for Dispute Resolution ("ICDR"), the Inter-American Commercial Arbitration Commission ("IACAC") and the Chamber of Commerce of Bogotá ("CCB") in matters involving private and State parties, relating to construction, oil & gas, energy, infrastructure, utilities, distribution, contracts for decontamination, commercial contracts in general and project finance.

5. I have been chair, co-arbitrator and advisor in investor-State arbitration under the Rules of the International Centre for Settlement of Investment Disputes ("ICSID")—including arbitrations and annulment committees—and under the UNCITRAL Rules, and have been appointed to the ICSID panel of arbitrators by the Chairman of the ICSID Administrative Council.

6. I currently serve as Vice-President of the ICC Court of Arbitration, member of the International Bar Association ("IBA") Legal Practice Division and member of the London Court of International Arbitration ("LCIA"). I served as Co-Chair of the IBA Arbitration Committee for the period 2013-2014.

7. As a private practitioner and partner of a law firm, I have acted before the Colombian Supreme Court of Justice (the "Colombian Supreme Court") and provided advice to clients in proceedings for the recognition and enforcement of foreign awards and foreign judicial decisions in Colombia. I have advised clients and State entities in litigation matters before Colombian courts, including constitutional actions arising from international dispute settlement mechanisms. Additionally, I have been called upon to opine before foreign courts and international arbitration tribunals in matters related to general contract law and private international law.

8. I have written several articles on matters related to conflict of laws, international litigation, international commercial arbitration, and investment arbitration.

9. My *curriculum vitae* is attached as Exhibit "A" hereto.

10. I have not testified as an expert at deposition or trial in the past four years; and I am being compensated for my work in connection with this case at my customary consulting rate of U.S. $500 per hour. My compensation is not contingent upon either the nature of my opinions or the outcome of this litigation. My opinions expressed in this Declaration reflect my own independent, professional judgment.

## II.   QUESTION POSED

11. I have been asked to provide my opinion as to whether, under Colombian law, a Colombian court would recognize a judgment rendered in *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*, Civil Action No. 3:09-CV-02384-N-BG ("Action"), against the interests of members of the putative class of plaintiffs who are domiciled in Colombia, or a court-approved settlement in the Action. For purposes of this declaration, I assume that the plaintiffs domiciled in Colombia would form part of the plaintiffs' class on the basis of an opt-out mechanism under U.S. law, and would automatically be included in that class without having affirmatively expressed their consent to join the action. I refer herein to these individuals as "Colombian Absent Claimholders".

## III.   MATERIALS CONSIDERED

12. For purposes of forming my opinion with respect to the above question, I have considered: (i) Plaintiffs' Second Amended Class Action Complaint filed in the United States District Court for the Northern District of Texas, Dallas Division (May 1, 2015) ("Second Amended Complaint"); (ii) Memorandum Supporting Plaintiffs' Motion for Class Certification, for designation of Class Representatives and Class Counsel filed in the United States District Court for the Northern District of Texas, Dallas Division (Apr. 30, 2015) ("Plaintiffs' Memorandum for Class Certification"); and (iii) the Declaration of Receiver Ralph S. Janvey (Oct. 30, 2014), with Exhibits A-C. Additionally, I have reviewed all relevant laws, statutes, judicial decisions and scholarly works cited in this Declaration, all of which I consider relevant to the subjects and matters that I address.

13. I reserve the right to supplement or modify my opinions expressed herein, particularly if any new materials come to light or any new arguments are raised by Plaintiffs in this case.

**IV.   SUMMARY OF CONCLUSIONS**

14. Based on my understanding of the facts that I have ascertained from the materials referenced above, my conclusions for the scenarios discussed below are as follows:  (A) a Colombian court would not recognize a judgment or court-approved settlement rendered in the Action, against the interests of the Colombian Absent Claimholders, since such a judgment or settlement would be contrary to Colombian public policy on the basis of due process concerns; and (B) a Colombian court would not recognize a judgment or court-approved settlement rendered in the Action as there is no basis to find that the reciprocity requirement under Colombian law would be fulfilled.

15. In the following scenarios, the recognition in Colombia of a judgment rendered in the Action would be denied by the Supreme Court on public policy grounds arising, in particular, from the following due process concerns:  (a) pursuant to Colombian concepts of public policy and due process, the Colombian Absent Claimholders would be deemed to be deprived of their right of access to justice if they were not provided with an opportunity to participate freely and to prosecute and protect their own interests in the lawsuit; and (b) the Colombian Absent Claimholders would not have an effective right to opt-out of the Action because service of process would not take place pursuant to the terms of the applicable law or the Inter-American Convention on Letters Rogatory and its Additional Protocol.

16. These aspects of the opt-out class action mechanism both (i) violate the Colombian Absent Claimholders' rights of access to justice and to present one's case under Colombian law, and (ii) disregard the principle of due process that is encompassed within the notion of "international public policy," a breach of which constitutes a ground for a Colombian court to refuse to recognize and enforce a foreign judgment.

17. Finally, the reciprocity requirement, under which the party seeking recognition in Colombia must demonstrate to the Colombian Supreme Court that the domestic legislation

**APP 1853**

of the State where the relevant foreign court judgment or settlement was rendered would recognize and enforce an equivalent Colombian judgment, would not be satisfied in this Action.

## V. RECOGNITION AND ENFORCEMENT OF FOREIGN CLASS ACTION JUDGMENTS ISSUED UNDER AN OPT-OUT MECHANISM

### A. General overview of the rules governing the recognition and enforcement of foreign judgments in Colombia.

18. As a general rule, the recognition and enforcement of foreign judgments in Colombia requires an action to be brought before the Colombian Supreme Court. Recognition of foreign judgments is obtained by means of an "*exequatur*" proceeding, which is governed by Articles 693 through 695 of the Code of Civil Procedure ("CCP") (Decrees 1400 and 2019 of 1970, as amended).[1]

19. Pursuant to article 695 of the CCP, an action for *exequatur* must be filed with the Civil Chamber of the Colombian Supreme Court. The foreign judgment must meet the following requirements in order for an *exequatur* to be granted:

   i. The foreign judgment must not relate to *in rem* rights with respect to assets that were located in Colombia at the time of commencement of the foreign proceedings (CCP, § 694.1; GCP, § 605.1).

   ii. The foreign judgment must not contravene or conflict with Colombian public policy.[2] (CCP, § 694.2; GCP, § 605.2). As discussed at Section V.B of this Declaration, the Colombian Supreme Court has determined

---

[1] These provisions will be superseded by Articles 605 through 607 of the General Code of Procedure ("GCP") (Law 1564 of 2012), upon the entry into force of the GCP pursuant to Article 627, paragraph 6 thereof, and as determined by the Judiciary Council (*Consejo Superior de la Judicatura*). However, the GCP contains substantially the same requirements that a foreign judgment must fulfill for recognition to be granted. In fact, Articles 694 of the CCP and 605 of the CGP use similar wording to list the prerequisites that a foreign judgment must satisfy in order to be recognized in Colombia. On May 28, 2014, the Judiciary Council issued an ordinance suspending the implementation schedule for the entry into force of the GCP. Consequently, the provisions of the CCP governing *exequatur* proceedings remain in force.

[2] The concept of public policy does not include Colombian procedural rules, which are local mandatory rules.

that public policy within the meaning of Article 694.2 encompasses certain essential principles of the Colombian legal system, such as the prohibition on abuse of rights, good faith, impartiality, and respect for due process.

iii. The foreign judgment must be final under the laws of the country where it was issued, and a duly authenticated and legalized copy of the foreign judgment must be submitted in the Colombian *exequatur* proceeding (CCP, § 694.3).

iv. The foreign judgment must not rule on any matter in respect of which Colombian courts have exclusive jurisdiction (CCP, § 694.4; GCP, § 605.4).[3]

v. There must be no final judgment or pending proceedings in Colombia in relation to the subject matter of the foreign judgment (CCP, § 694.5; GCP, § 605.5).

vi. Rules regarding service of process and the right to present one's defense (*contradicción*) in the place where the judgment was issued must have been respected (CCP, § 694.6; GCP, § 605.6).

vii. As explained at section V.C of this Opinion, absent a treaty between Colombia and the home jurisdiction of the judgment, it is necessary to prove that there is reciprocal recognition and enforcement of judgments by the courts of the home jurisdiction and the Colombian courts.

20. Failure to satisfy any of the requirements set forth above would result in the *exequatur* claim being dismissed.[4]

---

[3] CCP Article 23 and GCP Article 28 provide that the Colombian courts have exclusive jurisdiction in the following proceedings: (i) proceedings seeking division, expropriation, restitution or adjudication of assets located in Colombia; and (ii) bankruptcy and insolvency proceedings (CCP, § 694, paragraphs 10 and 12; GCP, § 605, paragraphs 7 and 8). Additionally, as to matters related to paternity or *patria potestas*, GCP Article 28 provides for exclusive jurisdiction of the court of the place where children live (GCP, § 605.2).

[4] Conversely, if these requirements are met, the Colombian Supreme Court will issue a decision granting recognition of the foreign judgment. Upon the issuance of an *exequatur* decision by the Supreme Court, the claimant may request a first instance judge to enforce the foreign judgment through an executive action (*acción ejecutiva*).

**B. In the specific scenarios addressed in this declaration, the Colombian Supreme Court would refuse recognition of a judgment rendered in the Action since that judgment would contravene Colombian public policy.**

21. In this section, I (a) discuss the concept of public policy as a ground for denying recognition of foreign judgments, (b) explain the concept of due process as it forms part of international public policy, and (c) describe the scenarios in which a Colombian court would deny recognition of a judgment rendered in the Action against Colombian Absent Claimholders.

### a. Contravention of Colombian public policy as a ground for denying recognition of foreign judgments

22. As explained in Section V.A above, pursuant to both the CCP and the GCP, a violation of Colombian public policy constitutes a ground for denying recognition of foreign judgments.

23. In the context of *exequatur* proceedings, the Colombian Supreme Court has held that the notion of "public policy" found in the CCP corresponds to the private international law concept of "international public policy".[5]   According to the Colombian Supreme Court, "international public policy" is comprised of the "*most basic and fundamental principles of Colombian juridical institutions*", which include (i) good faith, which encompasses the prohibition of an abuse of rights, (ii) impartiality of the court or tribunal, and (iii) due process.[6]

---

[5]    *See*, *e.g.*: Colombian Supreme Court of Justice, Decision dated July 27, 2011. Justice Ruth Marina Diaz delivered the opinion of the Court. This decision concerns an application for recognition and enforcement under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") of an ICC award rendered by a an arbitral tribunal seated in New York

[6]    Colombian Supreme Court of Justice, Decision dated July 27, 2011. Justice Ruth Marina Diaz delivered the opinion of the Court.  Decision dated December 19, 2011. Justice Fernando Giraldo delivered the opinion of the Court. Note that the Colombian Supreme Court has drawn a clear distinction between "international public policy" and local mandatory rules. *See*, *e.g.*: Colombian Supreme Court of Justice, Decision dated August 6, 2004. Justice Edgardo Villamil delivered the opinion of the Court; Colombian Supreme Court of Justice, Decision dated January 30, 2004. Justice José Fernando Ramírez delivered the opinion of the Court.  Pursuant to the Colombian Supreme Court's jurisprudence, an inconsistency between a foreign judgment and a domestic mandatory rule does not automatically implicate a violation of Colombia's international public policy so as to result in non-recognition of the foreign judgment.  This is the case only

### b. Due process as international public policy

24. The principle of due process is a basic institution of the Colombian legal system and forms part of its "international public policy".  Consequently, a judgment or a court-approved settlement in the Action would be denied recognition in Colombia if the Colombian Supreme Court were to find that a violation of due process had taken place in the foreign proceedings.

25. Due process has the status of a foundational principle of the Colombian legal system, as enshrined in Article 29 of the Colombian Constitution.  The Colombian Constitutional Court has defined due process as: "*The set of guarantees provided in the legal system aimed at the protection of an individual involved in a trial or administrative procedure in order to ensure the protection of its rights and secure a proper application of justice.*"[7] Furthermore, the Constitutional Court has established that the principle of due process "*requires an ex ante legal regulation in order for the legal proceedings to be subject to the law and not the will of the public authority.*"[8]

26. The Colombian Constitutional Court has consistently identified five core elements of the principle of due process:[9]

> (i)    The right of access to justice ("*derecho de acceso a la administración de justicia*").  This right entails the right to be treated equally before judicial and

---

when the inconsistency between the foreign judgment and the local mandatory rule "*results in the violation of superior guarantees*" such as "*the abuse of rights doctrine, good faith, fairness of the arbitral tribunal and due process.*"  *See* Colombian Supreme Court of Justice, Decision dated July 27, 2011. Justice Ruth Marina Diaz delivered the opinion of the Court (emphasis added).  *See also*, Colombian Supreme Court of Justice, Decision dated December 19, 2011. Justice Fernando Giraldo delivered the opinion of the Court.

[7]    Colombian Constitutional Court, Decision No. C-248 of 2013. Justice Mauricio González delivered the opinión of the Court: "*La jurisprudencia constitucional ha definido el derecho al debido proceso "como el conjunto de garantías previstas en el ordenamiento jurídico, a través de las cuales se busca la protección del individuo incurso en una actuación judicial o administrativa, para que durante su trámite se respeten sus derechos y se logre la aplicación correcta de la justicia.*"

[8]    Colombian Constitutional Court, Decision No. C-641 of 2002. Justice Rodrigo Escobar delivered the opinión of the Court: "*El debido proceso es la regulación jurídica que de manera previa limita los poderes del Estado y establece las garantías de protección a los derechos de los individuos, de modo que ninguna de las actuaciones de las autoridades públicas dependa de su propio arbitrio, sino que se encuentren sujetas a los procedimientos señalados en la ley*".

[9]    Colombian Constitutional Court, Decision No. C-980 of 2010. Justice Gabriel Eduardo Mendoza delivered the opinion of the Court.

administrative authorities, as well as the right to obtain reasoned decisions which may be the subject of an appeal;

(ii)     The right to be heard by a competent court ("*principio de juez natural*");

(iii)    The right to present one's case.  This right entails the right to receive proper notice, to present allegations, to be heard in judicial proceedings and to submit and challenge evidence;

(iv)     The right to a public and timely proceeding; and

(v)      The right to an independent and impartial judge.

27. The Colombian Supreme Court, when addressing the principle of due process in proceedings for the recognition of foreign decisions, has confirmed that these elements are at the core of the due process principle.  For example, in *Petrotesting Colombia SA & Southeast Investment Corp* and *Drummond v. Ferrovías* the Court ruled that:

"*among the minimum protection guarantees, article 29 of the constitution enshrines: (i) the right of access to justice; (ii) the right to be informed of any proceeding dealing with the creation, extinction or modification of a right or obligation; (iii) the right to freely express opinions; (iv) the right to contest the claims or make counterclaims; (v) the right to a decision made in a timely manner; and (vi) the right to submit and contest evidence.*" [10]

28. Thus, pursuant to the decisions issued by Colombia's highest court, due process is a core institution of the Colombian legal system, and it comprises, *inter alia*, the right of access

---

[10]     Colombian Supreme Court of Justice, Decision dated July 27, 2011. Justice Ruth Marina Díaz delivered the opinion of the Court: "*Ahora, en el escenario jurídico colombiano las posibilidades de defensa que se deben ofrecer en cualquier procedimiento se han desarrollado a partir de la temática de protección de los derechos fundamentales y sobre el particular la jurisprudencia constitucional ha señalado, que "(...) entre las garantías mínimas objeto de protección, el artículo 29 de la Constitución Política consagra, entre otras, (i) el derecho de acceso a la administración de justicia con la presencia de un juez natural; (ii) el derecho a ser informado de las actuaciones que conduzcan a la creación, modificación o extinción de un derecho o a la imposición de una obligación o sanción; (iii) el derecho de expresar libre y abiertamente sus opiniones; (iv) el derecho de contradecir o debatir las pretensiones o excepciones propuestas; (v) el derecho a que los procesos se desarrollen en un término razonable y sin dilaciones injustificadas y, por supuesto, (vi) el derecho a presentar pruebas y controvertir las que se alleguen en su contra.*"  This particular decision was rendered in a proceeding regarding the recognition of an arbitral award, but the Colombian Supreme Court has established an equivalent standard applicable to decisions of foreign courts. *See, e.g*, Colombian Supreme Court of Justice, Decision dated June 6, 2013. Justice Ruth Marina Diaz delivered the opinion of the Court.

to justice and the rights to be heard and to present one's case. Accordingly, a violation of either the right of access to justice or the right to present one's case would undermine the principle of due process and constitute a breach of Colombia's international public policy as defined by the Colombian Supreme Court.

        (i)      <u>The right of access to justice under Colombian law</u>

29.  The right of access to justice is a core element of the due process standard under Colombian law. According to the Colombian Constitutional Court, the right of access to justice is comprised of:

> *"The possibility recognized by law for every individual to have an equal right to participate in judicial proceedings, in order to advocate the integrity of the legal order and for the protection of his legal rights and interests."*[11]

30.  The right of access to justice entails: (i) the possibility to submit a claim to a competent judge; (ii) the obligation of the State to provide a means for resolution of a claim; and (iii) the obligation of the State to guarantee that judicial decisions are given effect.[12]

31.  Accordingly, a violation of the right of access to justice takes place whenever a law, regulation or judicial decision: (i) prevents courts from ruling on the merits of a case; (ii) establishes unreasonable limitations on access to the justice system; (iii) does not respect statutes of limitation; (iv) fails to provide a mechanism for resolving disputes and protecting interests; (v) results in indefinite litigation contrary to the principle of *res*

---

[11]     Colombian Constitutional Court, Decision No. T-283 of 2013. Justice Jorge Ignacio Pretelt delivered the opinión of the Court: *"La posibilidad reconocida a todas las personas residentes en Colombia de poder acudir en condiciones de igualdad ante los jueces y tribunales de justicia, para propugnar por la integridad del orden jurídico y por la debida protección o el restablecimiento de sus derechos e intereses legítimos(…)"*.

[12]     Colombian Constitutional Court, Decision No. T-665 of 2012. Justice Adriana María Guillén delivered the opinión of the Court: *"Por su parte, esta Corporación ha considerado que el derecho de acceso a la administración de justicia "tiene tres pilares que lo conforman, a saber, i) la posibilidad de acudir y plantear el problema ante el juez competente, ii) que el problema planteado sea resuelto y iii) que tal decisión se cumpla de manera efectiva"*.

*judicata*;[13] and (vi) allows a third party to restrict another person's right to access justice.[14]

32. In sum, the right of access to justice imposes obligations on the State to grant individuals effective access to the judicial system and to remove any undue obstacles that may impede such access. Notably, however, it is the prerogative of the right holder to decide whether, in fact, to access the judicial system and to exercise his or her right of access to justice. Accordingly, an intrinsic part of the review that the Supreme Court would conduct in considering whether to permit recognition of any judgment in the Action would be whether, under Colombian concepts of access to justice and due process, the Colombian Absent Claimholders were provided the opportunity to participate freely and to prosecute and protect their own interests in the lawsuit.

      (ii)    <u>Collective litigation proceedings under Colombian law and the protection of the right of access to justice</u>

33. Colombian law provides for two types of collective litigation proceedings, namely: (i) popular actions ("*acciones populares*"), which are designed to protect collective rights and interests;[15] and (ii) group actions ("*acciones de grupo*") pursuant to which a number of individuals uniformly affected by the same cause may seek monetary compensation for damages.[16]

34. The basis for the *acciones de grupo* is found in Article 88 of the Colombian Constitution, which calls for the regulation of "*actions arising from damages caused to a number of*

---

[13]    Colombian Constitutional Court, Decision No. T-766 of 2008. Justice Marco Gerardo Monroy delivered the opinión of the Court : "*Por consiguiente, la jurisprudencia constitucional ha considerado que se viola el derecho de acceso a la administración de justicia y por esa razón puede ser protegido por vía de tutela cuando la ley, la reglamentación, los jueces o sus decisiones, entre otros casos: i) impidan que se profiera una decisión de fondo, ii) cuando establecen traban irrazonables para acudir a la justicia, iii) no observen los términos procesales sin justificación al respecto, iv) no existieran instrumentos procesales que le permitan a los afectados acudir al Estado para resolver sus conflictos y, v) autoricen conflictos indefinidos, esto es, cuando no respeten la cosa juzgada ni la definición última de un conflicto.*"

[14]    Colombian Constitutional Court, Decision No. T-283 of 2013. Justcie Jorge Ignacio Pretelt delivered the opinión of the Court: "*En segundo lugar, la obligación de proteger requiere que el Estado adopte medidas para impedir que <u>terceros interfieran u obstaculicen el acceso a la administración de justicia del titular del derecho</u>.*" (Emphasis added).

[15]    Law 472 of 1998, Article 2.

[16]    Law 472 of 1998, Articles 3 and 43.

*individuals, without prejudice to the corresponding individual actions.*"[17]  In accordance with its constitutional mandate, the Colombian Congress enacted Law 472 of 1998 ("Law 472") which sets forth the legal regime applicable to *acciones populares* and *acciones de grupo*.

35. *Acciones de grupo* are exclusively intended to seek compensation for damages caused to a group.[18]  These damages may arise from violations of collective rights or interests, as well as from interference with individual rights of a legal or constitutional nature.[19]  The jurisprudence of the Colombian Constitutional Court[20] and the Council of State[21] have identified the following characteristics of *acciones de grupo*:

   i.  *Acciones de grupo* are intended exclusively to seek compensation for damages caused to a group.[22]  Pursuant to the provisions of Law 472, a "group" exists if at least 20 persons have suffered damage from the same cause.  In turn, damages may arise from violations of collective rights or interests, as well as from interferences with individual rights of a legal or constitutional nature.[23]

   ii.  *Acciones de grupo* may be brought by one individual or corporate plaintiff provided that such plaintiff appears on behalf of the affected group.[24]  The

---

[17]  Colombian Constitution, Article 88: "[La ley] *también regulará las acciones originadas en los daños ocasionados a un número plural de personas, sin perjuicio de las correspondientes acciones particulares.*"

[18]  Law 472 of 1998, Article 46.  *See also*, Colombian Constitutional Court, Decision No. T-766 of 2008. Justice Marco Gerardo Monroy delivered the opinion of the Court.

[19]  Colombian Constitutional Court, Decision No. C-1062 of 2000.  Justice Álvaro Tafur delivered the opinion of the Court.

[20]  Colombian Constitutional Court, Decision No. C-304 of 2010. Justice Luis Ernesto Vargas delivered the opinion of the Court.

[21]  Council of State, Third Section, Decision dated October 6, 2005. Justice Ruth Stella Correa delivered the opinion of the Court.

[22]  Law 472 of 1998, Article 46.  *See also*, Colombian Constitutional Court, Decision No. T-766 of 2008. Justice Marco Gerardo Monroy delivered the opinion of the Court.

[23]  Colombian Constitutional Court, Decision No. C-1062 of 2000.  Justice Álvaro Tafur delivered the opinion of the Court.

[24]  Law 472 of 1998, Articles 3, 46, 48 and 52.

individual plaintiff is required to identify the members of the group or to submit information that allows the group to be identified.

iii.   *Acciones de grupo* are subject to preferential and abbreviated proceedings (*procedimiento preferencial y sumario*).  Those proceedings have a dual character.  The ordinary compensatory claims are resolved before the judiciary while the execution of the decisions rendered by the judiciary – payment of damages to individuals – is undertaken by administrative authorities.[25]

36. Law 472 makes a distinction between two different groups in *acciones de grupo*: (i) the members of the group that submitted the claim and pursued the proceedings (*grupo demandante*); and (ii) the members of the group that is affected (*grupo afectado*).

37. The individuals forming part of the affected group are presumed to be part of the proceedings and represented by the group that pursues the proceedings.  All members of the group of plaintiffs pursuing the proceedings and the affected group are bound by decisions in the case,[26] unless an individual member exercises the right to be excluded (*see* ¶¶ 42-45 below).

38. Pursuant to the procedural rules governing *acciones de grupo*, individuals meeting the requirements for being part of the group may opt to join the claim.[27] The understanding of Article 55 of Law 472 of 1998 by courts and scholars is that when making a submission to join the *acción de grupo*, individuals are entitled to (i) present new evidence; (ii) present new facts; (iii) present new claims; and (iv) correct formal procedural errors if those persons deem it necessary.[28]   Individuals have such

---

[25]   Law 472 of 1998, Article 65.

[26]   Law 472 of 1998, Article 48.

[27]   Law 472 of 1998, Article 55.

[28]   *See* Council of State, Decision No. AG-002, dated September  8,2000; *see also*: Martín Bermudez Muñoz, *La accion de grupo,  Colección textos de Jurisprudencia*, Universidad del Rosario, 2007, p.345; Javier Tamayo Jaramillo, *Las acciones populares y de grupo en la responsabilidad civil, Bibloteca Jurídica Dike*, 2011, pp. 252-258.

entitlements to the extent their submissions do not modify the character of the group as it was originally established.[29]

39. Any individual meeting the requirements for being part of the group may opt to join the claim—and make the above-referenced submissions—either (i) before the commencement of the evidentiary stage, or (ii) after the decision is rendered by submitting an application within 20 days of issuance of the judgment.[30]  Scenario (ii) was the subject of a constitutionality challenge in 1999.  The claimant challenging this provision argued that extending the effects of a judgment to a person who did not take part in the proceedings would be contrary to the due process standard contained in Article 29 of the Colombian Constitution.[31]  In reviewing the challenge, the Constitutional Court explained that the possibility of joining the action after the judgment was rendered had been established to the benefit of the person wishing to be bound by the relevant judgment.[32]  Moreover, the Constitutional Court held that the challenged provision was not contrary to due process standards because the party "adhering to" or joining the judgment would make its decision with the benefit of knowing the content of the decision and with the certainty that the process was carried out in accordance with procedural guarantees.[33]

40. *Contrario sensu*, if a person was bound by a decision rendered in an *acción de grupo* without knowing its content or without having any guarantees as to the fairness of the proceedings, due process standards would be breached.  Therefore, the Colombian

---

[29]    Once the individuals are deemed part of the group, they are not entitled to present evidence, facts or new claims independently from the group.

[30]    Law 472 of 1998, Article 55.

[31]    *See*, Colombian Constitutional Court, Decision No. C-215 of April 14, 1999.  Justice Martha Victoria Sáchica de Moncaleano delivered the opinion of the Court.

[32]    Colombian Constitutional Court, Decision No. C-215 of April 14, 1999.  Justice Martha Victoria Sáchica de Moncaleano delivered the opinion of the Court.

[33]    Colombian Constitutional Court, Decision No. C-215 of April 14, 1999.  Justice Martha Victoria Sáchica de Moncaleano delivered the opinion of the Court.  In the words of the Court: "[*que una persona que no participó en el proceso se acoja a los beneficios de la sentencia*] *no desconoce en ningún caso, el debido proceso, pues quien se acoge al fallo, lo hace a sabiendas del contenido del mismo y del respeto y garantía que al trámite del proceso le dio el juez, siempre avalado con la intervención del Ministerio Público.*"

Constitutional Court preserves and protects the right of an individual to consent (or not) to adhere to a decision rendered in an *acción de grupo*.

41. As discussed above, Law 472 allows an individual that did not commence an *acción de grupo* to join and participate in the proceeding. However, this does not equate to an *obligation* to participate in the proceedings or an obligation to exercise the right to bring a claim.

42. In fact, Article 56 of Law 472 has special regulations aimed at allowing an individual in the group not to join an *acción de grupo* in order to protect the individual's overriding right to bring individual claims. For those purposes, Article 56 contains a "right to be excluded" or *derecho de exclusión* whereby the effects of a decision of an *acción de grupo* would not bind the individual exercising this right. Under Colombian law, the exercise of such right to be excluded is entirely discretionary and no explanation must be given in order for it to be allowed.[34]

43. Pursuant to Law 472, the right to be excluded applies in the following circumstances: (i) when an individual files a timely submission seeking exclusion; (ii) when a party to the proceedings proves that its interests were not properly represented; and (iii) whenever serious errors of notice were committed by the court.

44. The jurisprudence of the Colombian Constitutional Court and the Council of State has analyzed the importance of the existence of this right and its intrinsic relationship with the right of individual access to justice. For instance, the Constitutional Court, when deciding on a Presidential Objection to the enactment of Article 55 of Law 472, has held that:

> "*the recognition of the right to be excluded allows an individual to commence an action independently from the remaining individuals that suffered a common damage. As a result, the standing that is given to any possible plaintiff to assume the representation of the group does not*

---

[34] Martin Bermudez Muñoz, *La Acción de Grupo: Normativa y Aplicación en Colombia*, Universidad del Rosario, p. 347: "*Ejercer el derecho de exclusión luego de instaurada la acción de grupo es un requisito necesario para incoar una acción individual y este es un derecho totalmente discrecional del miembro del grupo, razón por la cual su ejercicio no requiere fundamentarse en ningún tipo de consideración.*"

> *prevent the submission of individual actions. The legal scheme promotes*
> *access to justice by the collective of those harmed, but does not prevent*
> *individual proceedings from being commenced if individuals choose to*
> *do so."[35]*

45. Similarly, the Council of State ruled that the importance of the right to be excluded from an *acción de grupo* is linked to the correlative right of individuals to submit an individual civil liability claim.[36]

46. Pursuant to Law 472 and the decisions of the Colombian Constitutional Court and the Council of State, the right to give one's consent to opt out of an *acción de grupo* is rooted in the right of access to justice. This right seeks to preserve the individual's freedom to decide whether it wishes to pursue either a collective or an individual action, and this freedom to decide is entrenched in the notion of due process under Colombian law.

   **c. Scenarios under which a judgment in the Action would not be recognized on public policy grounds arising from due process concerns and, in particular, breach of the right of access to justice.**

47. The Colombian Supreme Court would deny recognition to a judgment in the Action on public policy grounds in the event that the Colombian Absent Claimholders were prevented from exercising either (i) the right of access to justice, or (ii) the right to present one's case (discussed below).

   *i. The right of access to justice*

48. The Colombian Supreme Court likely would not recognize a judgment rendered in the Action against the interests of Colombian Absent Claimholders if they did not enjoy the opportunity to access justice with respect to the Action. As explained above, the right of

---

[35] Colombian Constitutional Court Decision C-036/98, Eduardo Cifuentes: "*La consagración del derecho de exclusión, permite que el interesado pueda iniciar una acción independiente del resto de las personas cobijadas por la misma causa que originó un daño plural. Por lo tanto, la legitimación que se confiere a cualquier miembro del grupo para asumir la representación de los demás, no es óbice para que se entablen acciones individuales, por fuera de las acciones de grupo. El esquema legal estimula el efectivo acceso a la justicia del conjunto de damnificados, pero no impide que se instauren procesos singulares por parte de quienes decidan obrar de manera individual.*"

[36] Council of State – Third Section Decision dated October 6 2005, Ruth Stella Correa Palacio.

access to justice includes the right to join (and, in so doing, to present new evidence, facts, and claims, and to correct procedural errors) or be excluded from a group claim (*acción de grupo*).  *See supra* ¶¶ 38-43.  To the extent these rights are not afforded to putative Colombian class members in the Action, this would constitute a violation of the right of access to justice provided for under Colombian law, would be contrary to the principle of due process embedded in the notion of "international public policy," and would be a ground for refusing recognition.

     *ii.*       *The right to present one's case*

49. A*s* mentioned above in Paragraphs 25–28, the right to present one's case comprises the right to receive proper notice, to present allegations, to be heard in judicial proceedings and to submit and challenge evidence.

50. In this regard, the first element – proper notice – is considered to be an essential component of the principle of due process under Colombian law.[37]  Indeed, the Colombian Constitutional Court has expressly stated that proper notice "*ensures full compliance with the right to defense and the due process standard, which has constitutional status.*"[38]

51. Furthermore, as expounded by the Colombian Constitutional Court, the main purpose of the notice requirement is to make the existence of judicial claims and proceedings known to the "parties", so as to guarantee their constitutional right to be heard in the proceeding.[39]

52. The Colombian Supreme Court shares the same view.  In the context of recognition of foreign arbitral awards under the New York Convention, the Colombian Supreme Court

---

[37]    Colombian Constitutional Court, Decision No. T-400 of April 29, 2004.  Justice Clara Inés Vargas delivered the opinion on the Court.

[38]    Colombian Constitutional Court, Decision No. C-370 of 1994. Justice Fabio Morón delivered the opinion of the Court.  *See also*, Colombian Constitutional Court, Decision C-648 of June 20, 2001.  Justice Marco Gerardo Montoy delivered the opinion of the Court: "*La notificación entendida como el acto mediante el cual se pone en conocimiento de los sujetos procesales el contenido de las providencias que se produzcan dentro del proceso, tiene como finalidad garantizar los derechos de defensa y de contradicción como nociones integrantes del concepto de debido proceso.*"

[39]    Colombian Constitutional Court, Decision No. T-684 of 1998.  Justice Alfredo Beltrán delivered the decision of the Court.

has explained that giving proper notice to the defendant has the purpose of informing him of the existence of the proceedings so that he may deploy any available means and strategies to defend his interests in a timely manner.[40]   Accordingly, in interpreting Article V(1)(b) of the New York Convention, the Colombian Supreme Court implied that failure to provide proper notice would result in the inability of the individual to defend his rights.

53. In line with the reasoning laid out by both the Colombian Constitutional Court and the Colombian Supreme Court, lack of notice or failure to properly deliver notice, obstructs an individual's right to be heard and is thus a breach of due process.

54. As discussed in Section V.A. above, another precondition to granting an *exequatur* is that the defendant in the foreign proceeding was duly summoned and given a reasonable opportunity to defend against the claims in accordance with the law of the State in which the decision was issued. (CCP, § 694.6; GCP, § 605.6).   Accordingly, compliance with the requirements under the law of the State in which the judgment was rendered is not sufficient for recognition; the summons and opportunity for defense must comply with the notion of due process under Colombian law, absent which, as discussed in V.B.b above, there may be an independent ground for denial of recognition.

55. Accordingly, the Colombian Supreme Court – at a minimum – would verify that the method used to provide service of process or notice to the person affected by the foreign judgment was effective in making him aware of the existence of the proceedings in which the judgment was rendered in accordance with Colombian standards of due process:

> "*The proper notice requirement is aimed at assuring that the defendants to any process are aware of the existence of proceedings in order for them to be capable of advancing the procedural strategies that better fit their interests.  International commentators are consistent in that there*

---

[40]   Colombian Supreme Court of Justice, Decision dated July 27, 2011.  Justice Ruth Marina Díaz delivered the opinion of the Court. "*El estado de indefensión, según se desprende del literal b), numeral 1°, artículo V de la aludida Convención de New York, se refiere al supuesto no solo de la indebida notificación y se extiende también a cualquier razón por la que no hubiere podido una de las partes hacer valer sus derechos.  Las actuaciones relacionadas con la citada garantía, abarcan la notificación del citado o demandado, la cual tiene como propósito enterarlo de la existencia del proceso y así pueda oportunamente, esgrimir los medios o estrategias de defensa de sus intereses. (…)*"

> are no formal requirements or standards generally accepted and
> therefore the proper notice can be done in any manner agreed by the
> parties."[41]

56. In an opt-out class action proceeding, the rights and interest of the claimant group are affected in precisely the same way as those of the defendant. Accordingly, due process requirements demand that all individuals who would ultimately be bound by the judgment rendered in a class action proceeding be given a reasonable opportunity to make a decision in connection with his or her participation in the class action.

57. Due process also requires that all persons affected by administrative or judicial proceedings be served process or notified so as to ensure protection of their rights to be heard and to present their case in the relevant proceeding.

58. In the case of U.S. opt-out class actions, in order for the right to be heard to be effectively protected, an individual must be put in a position to knowingly either consent to join the class action proceeding by not exercising the opt-out right or to not participate by timely opting-out.

59. Either decision requires (i) knowledge that a class action proceeding that may affect the individual is taking place, and (ii) knowledge of the scope and extent of the claims being made in the proceeding.

60. In Colombia, decisions concerning the initiation of proceedings must be communicated via personal notice ("*notificación personal*"). Indeed, personal notice is considered to be the most appropriate method for ensuring that: (i) the due process clause is applied by linking the affected parties to the proceeding and allowing them to gain proper knowledge of the decisions made within the proceeding; and (ii) the interested persons can exercise their right to be heard and to contest the claims, by timely submitting their defenses and exceptions.[42]

---

[41]    Colombian Supreme Court of Justice, Decision dated December 19, 2011. Justice Fernando Giraldo delivered the opinion of the Court: "*Con relación a la forma de surtir ese acto, a la luz del referido instrumento internacional, la doctrina es insistente en que no existe ningún requisito formal con carácter general, por lo que debe valer cualquier medio al que las partes hayan prestado su consentimiento.*"

[42]    Colombian Constitutional Court, Decision No. T-400 of April 29, 2004. Justice Clara Inés Vargas delivered the opinion on the Court: "*En tanto que elemento esencial del derecho al debido proceso, a lo largo de los*

61. Based on the above considerations, the Supreme Court would require that an internationally acceptable system of notification be used to provide the person concerned with the information necessary to make an informed and affirmative decision as to whether or not to join the foreign class action proceeding.

62. In this regard, I note that Colombia and the United States of America are parties to the Inter-American Convention on Letters Rogatory and its Additional Protocol (the "Convention").  The Convention applies, *inter alia*, to letters rogatory issued in conjunction with judicial proceedings in civil and commercial matters, with the purpose of performing procedural acts of a formal nature such as service of process, summonses or subpoenas abroad.[43]

63. Moreover, the Convention mandates that letters rogatory be accompanied by certain documents to be delivered to the person on whom process, summons or subpoena is being served.  These documents are as follows:

   a. *"An authenticated copy of the complaint with its supporting documents, and of other exhibits or rulings that serve as the basis for the measure requested;*

   b. *Written information identifying the judicial or other  adjudicatory authority issuing the letter, indicating the time-limits allowed the person affected to act upon the request, and warning of the consequences of failure to do so;*

   c. *Where appropriate, information on the existence and address of the court-appointed defense counsel or of competent legal-aid societies in the State of origin."*[44]

64. Accordingly, when faced with a request for recognition of the foreign judgment rendered in the Action against the interests of the Colombian Absent Claimholders, the Colombian

---

*años, la Corte ha mantenido una sólida línea jurisprudencial, en el sentido de que la notificación, en cualquier clase de proceso, se constituye en uno de los actos de comunicación procesal de mayor efectividad, en cuanto garantiza el conocimiento real de las decisiones judiciales con el fin de dar aplicación concreta al debido proceso mediante la vinculación de aquellos a quienes concierne la decisión judicial notificada, es un medio idóneo para lograr que el interesado ejercite el derecho de contradicción, planteando de manera oportuna sus defensas y excepciones."*

[43]    Convention, Article 2(a).

[44]    Convention, Article 8.

Supreme Court will assess whether those members were properly served process or given notice of the proceedings in a manner that allowed them either to consent to the proceedings or to opt-out of the Action in accordance with the terms of the Convention.[45]

65. Failure to provide notice or improper service of process or notice would contravene the due process standard under Colombian law as it would adversely affect all of (i) the right to freely consent to be bound by a judicial decision; (ii) the ability to present one's case and be heard in the process; and (iii) the right of access to justice, if a foreign judgment in the Action were to trump the person's ability to initiate a separate action on the ground of *res judicata*.

66. More importantly, the Council of State has held that an improper notice, which prevents individuals from exercising their right to be excluded, should be characterized as a "*flagrant and grave violation of the principle of due process*"[46] precisely because it extends the effects of *res judicata* over parties that have not consented to the proceedings, thereby preventing them from bringing an individual claim.[47]

67. In sum, proper notice is paramount to compliance with the due process standard, as applied under Colombian law.  It is therefore unlikely that the Supreme Court would grant *exequatur* to a judgment in the Action, which purported to bind Colombian Absent Claimholders, if those claimholders were not formally served process or notice through letters rogatory pursuant to the terms of the Convention.

**d.  Conclusion**

App. 2551

---

[45]     *See, e.g.*, Colombian Supreme Court, Decision dated July 11, 2000. Justice Jorge Santos Ballesteros delivered the opinion of the Court; Supreme Court, Decision dated December 3, 2003.  Justice Carlos Ignacio Jaramillo delivered the opinion of the Court.

[46]     Council of State – Third Section, Decision dated August 16 2007. Enrique Gil Botero: "*Sin duda, la indebida comunicación del auto admisorio de la demanda a los miembros del grupo vulnera de manera flagrante la garantía del debido proceso, dado que los excluye de la posibilidad de tomar alguna decisión frente a la acción incoada y, adicionalmente, restringe de manera radical su posibilidad de intervenir en el proceso. Debe agregarse que las irregularidades en la comunicación al grupo, del auto admisorio de la demanda, crean una preocupante incertidumbre en la decisión final de los casos, objeto de la acción de grupo, ya que el literal b) del mismo artículo 56 establece que la sentencia no vincula a los miembros del grupo, respecto de los cuales "hubo graves errores en la notificación*".

[47]     Council of State – Third Section Decision dated April 25 2002 María Elena Giraldo Gómez.

68. Consequently, the Colombian Supreme Court would deny recognition to a judgment rendered in the Action if: (i) the Colombian Absent Claimholders were not provided with an effective opportunity to access the US judicial system or to consent to opt out; and (ii) the Colombian Absent Claimholders could not opt out from the Action because they would not properly be served process pursuant to the terms of the applicable law or the Convention.

## C. There is no basis to find that the reciprocity requirement under Colombian Law would be fulfilled.

69. Under Colombian law, the basic principle governing the recognition of foreign judgments or court-approved settlements incorporated in the form of a judgment is *reciprocity*.[48] Reciprocity may be either *diplomatic* (*i.e.*, if there is a treaty with the State in which the decision was issued) or *legislative* (*i.e.*, if no treaty is applicable, it must be analyzed whether Colombian decisions are effectively recognized by the domestic legislation of the State where the foreign decision was rendered).[49]

70. There are no treaties, conventions or international agreements in force between the United States of America and Colombia regarding the recognition and enforcement of foreign judgments. Accordingly, diplomatic reciprocity is not possible. Therefore, the individual seeking recognition must demonstrate legislative reciprocity to the Colombian Supreme Court in order for *exequatur* to be granted to a class action judgment issued in the United States.

71. The Colombian Supreme Court considers legislative reciprocity between Colombia and the United States by analyzing whether State law (that is the State in which the U.S. judgment was issued) would provide that a similar Colombian judgment would be equally recognized and enforced in that given State.[50] As a result, the Colombian

---

[48]  CCP, Article 693.

[49]  *See, e.g.*, Colombian Supreme Court of Justice, Decision dated December 19, 2011; Colombian Supreme Court of Justice; Constitutional Court of Colombia, Decision C-893/09, Decision dated December 2nd, 2009.

[50]  *See*, Colombian Supreme Court of Justice, Decision dated June 6, 2013. Justice Ruth Marina Diaz delivered the opinion of the Court; Supreme Court of Justice, Decision dated July 31st, 1998. Justice Jorge Santos Ballesteros delivered the opinion on the Court.

Supreme Court will grant *exequatur* to a class action judgment issued in the United States only if it finds that a similar Colombian judgment would be equally recognized and enforced in the State of Texas.

72. The Colombian Supreme Court has not ruled on whether there is "legislative reciprocity" between the courts of Colombia and the State of Texas for purposes of recognition and enforcement of judicial decisions. Moreover, I have reviewed the jurisprudence of the Colombian Supreme Court and have not found that the Court has reviewed or ruled upon the recognition and enforcement in Colombia of a decision rendered within a group litigation in the State of Texas. Accordingly, a the party seeking the recognition of a U.S. class action judgment in Colombia would have to prove to the Supreme Court that a Texas court would grant recognition to a judgment rendered in a Colombian collective litigation proceeding (for example, *acciones de grupo*).

73. In the absence of legislative reciprocity between the courts of Colombia and the State of Texas, there is no basis to assert that the reciprocity requirement under Colombian law would be fulfilled in the present case, unless the party seeking the recognition furnishes evidence that a court from the State of Texas would grant recognition to a judgment proffered in a Colombian collective litigation proceeding.

## VI. CONCLUSIONS

74. Based on the what is set forth above:

i. The Colombian Supreme Court would deny recognition of a judgment rendered in the Action because: (a) Colombian Absent Claimholders would not be provided with the opportunity to affirmatively and expressly join the proceeding; and (b) Colombian Absent Claimholders could not effectively opt-out of the Action because they were not properly served process pursuant to the requirements of due process under Colombian law or in accordance with the Convention. In these circumstances, there would be violations of several principles of Colombian law, including the rights of access to justice and to present one's case, and any judgment in the Action would not be recognized and enforced in Colombia as it

would be contrary to the principle of due process entrenched in the notion of "international public policy".

ii.   The Supreme Court's jurisprudence has not established legislative reciprocity in relation to this matter between the courts of Colombia and the State of Texas. Therefore, there is no basis to assert that the reciprocity requirement under Colombian law would be fulfilled in this case, unless a party seeking the recognition could demonstrate that a court from the State of Texas would grant recognition to a judgment made in a Colombian collective litigation proceeding.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Bogotá D.C., 7 July 2015

Eduardo Zuleta

# EXHIBIT A

APP 1875

# EDUARDO ZULETA

ezuleta@gpzlegal.com

Partner of a Colombian based law firm, Mr. Zuleta has been chair, co-arbitrator, sole arbitrator and counsel in international commercial arbitrations under ICC, UNCITRAL and ICDR Rules in matters involving private and State parties and related to construction, oil & gas, infrastructure, utilities, distribution, contracts for decontamination, commercial contracts in general and project finance.

Mr. Zuleta has acted as advisor and arbitrator in investment arbitration under ICSID – including arbitrations and annulment committees- and UNCITRAL Rules and has been appointed to the ICSID panel of arbitrators by the Chairman of the ICSID Administrative Council. Mr. Zuleta serves as Vice-President of the ICC Court of Arbitration and is a member of the International Bar Association Legal Practice Division and of the London Court of International Arbitration.

He has provided advice in international law in matters related, *inter alia*, to conflict of law rules and principles, application of the Vienna Convention on the Law of Treaties and actions before international commissions and courts in matters related to human rights.

Born: Bogotá D.C., Colombia.

Languages: Spanish (native), English (fluent).

Post graduate studies:

- Iona College, New York, N.Y.

- Courses in international arbitration in the Court of International Arbitration in Paris.

- Master of Laws in Financial Law, Universidad del Rosario, Bogotá, D.C., Colombia.

- LLM, with Merits, covering commercial and investment arbitration, investment law and law of the treaties, with specialization in International Dispute Resolution, University of London, Queen Mary.

Law studies:

- Universidad del Rosario, Bogotá, D.C., Colombia. Graduated with honors, best student of class.

Experience:

Experience in arbitration includes:

- International arbitration:

  o Chair and co-arbitrator under ICSID and UNCITRAL rules in investment arbitration.
  o Chair and member of the panel in annulment cases in ICSID.
  o Chair, co-arbitrator and sole arbitrator in arbitrations under ICC, UNCITRAL, IACAC and ICDR Rules in several jurisdictions worldwide in matters involving private and State parties and related to construction, oil & gas, infrastructure, utilities, distribution, commercial contracts in general and project finance.
  o Counsel and co-counsel in several international arbitrations in Colombia and in several jurisdictions worldwide in matters related to construction, oil & gas, infrastructure, utilities, distribution, M&A, commercial contracts in general and project finance.
  o Counsel to a State entity in arbitrations related to the construction of hydroelectric projects.
  o Counsel to private entities in arbitrations related to termination of license and supply agreements, infrastructure, telecommunications and project finance.
  o Expert witness in international arbitration tribunals in matters related to validity and enforceability of arbitration clauses and matters of liability and international law.
  o Counsel to State parties and to private investors in matters related to international treaties for investment protection.

- In local arbitration:

  o Chair of the arbitration tribunal of several arbitration tribunals in the

Center of Arbitration of the Chamber of Commerce of Bogotá in matters related to supply agreements, oil & gas, construction contracts, transportation contracts and infrastructure projects.

o  Co-arbitrator in several arbitration tribunals in the Center of Arbitration of the Chamber of Commerce of Bogotá in matters related to project finance, oil & gas, infrastructure, distribution, and construction.

o  Counsel to multinational telecommunications companies in several arbitrations involving Empresa Nacional de Telecomunicaciones for breach in the payment under shared risk association contracts.

o  Counsel for Comisión Nacional de Televisión in several arbitration claims commenced by private television companies related to concession agreements.

o  Counsel for an airport's concessionaire in an arbitral procedure against the airport's administrator regarding the concession's price adjustment.

- Legal advice:

  o  Counsel to a State in the alternative dispute settlement procedures initiated due to a foreign investor's claim under an international investment agreement.

  o  Advice to Colombian companies – publicly owned and private – in matters related to investments in light of available International Investment Agreements.

  o  Counsel for companies of the oil industry – private and publicly owned - in the definition of arbitration schemes and applicable law for Joint Operating Agreements (JOA) to be entered into with companies of the oil sector.

  o  Counsel to national and foreign companies in matters related to the recognition and enforcement of foreign awards in Colombia.

  o  Counsel to national and foreign companies in matters related to the possibility of agreeing on international arbitration and foreign law in transnational contracts.

  o  Counsel to international companies in the negotiation of arbitration agreements with state entities in Colombia in telecommunications and energy.

- Other experience:

    o Counsel in claims before the Inter-American Commission of Human Rights.
    o Expert advice in the application of international treaties.
    o Expert opinions in litigation in the United States in matters related to contractual liability and tort.
    o Member of the commission of experts created by the Colombian government to review and amend the arbitration law.
    o Counsel for international banks and counsel of sponsors in infrastructure projects related to infrastructure in telephone networks, hydroelectric plants, oil and gas pipelines and roads.
    o Counsel for international banks and counsel for sponsors in projects for the construction, acquisition or sale of oil and gas and mining facilities.
    o Counsel for multinational companies in cross border M&A transactions in several major industries, including banking, automotive, oil & gas, consumer products, pharmaceutical and telecommunications.
    o Counsel of international and Colombian companies in privatization projects.
    o Counsel for international banks and for creditors in the restructuring of international debts.

Labor:

- Partner of Gómez-Pinzón Zuleta Abogados S.A. (2008 to date);

- Founding partner of Zuleta & Partners Legal Group (2000-2008);

- International partner Baker & McKenzie (1989- 2000);

- Associate of Baker & McKenzie (1982-1989);

- Director of the International Division of Banco de Colombia (1981-1982);

- Assistant legal counsel in the Banking Association (1977-1981).

Academic:

- Tutor in international arbitration in the program organized by the OAS and the IACAC in several Latin American countries, including Argentina, Chile and Venezuela.

- Training to the Ministry of Trade, Industry and Tourism – Division of Foreign Investments – and to governmental officials at different levels on international arbitration.

- Professor and tutor in the Center of Arbitration of the Chamber of Commerce of Bogota in international arbitration and investment arbitration.

- Invited by the United Nations Conference on Trade and Development (UNCTAD) to participate in experts meeting in "Investment for Development".

- Invited as lecturer in the University of Miami School of Law in the specialization in International Arbitration.

- Invited as lecturer in New York University School of Law on matters related to investment arbitration.

- Professor and lecturer in various forums in Colombia and abroad on matters related to arbitration, including:

- Conference Chair, IBA Arbitration Day, Paris, France, 2014;

- Moderator in the ITA Workshop, "The Spectre of Enforcement Risk and Inefficient Arbitral Procedures", Dallas, Texas, USA, 2014;

- Speaker, "The Allocation of Costs in International Arbitration". ICC Conference on the Eve of the 17th Annual IBA International Arbitration Day. Paris, France, 2014;

- Speaker, 2nd Annual GAR Live New York, "Survivor island meets International Arbitration: which Latin American seat?" New York, New York, USA, 2013;

- Brick Court Chambers: The IBA Guidelines on Party Representation, 2013;

- Panelist, ITA Conference 25th Anniversary: "Advocacy from the Arbitrator's Perspective: What is Helpful and What is Not?", Dallas, Texas, USA, 2013;

- Interviewer, ITA Conference 25th Anniversary: "Arbitral Decision-Making: The Legal Theory and the Psychological Reality", Dallas, Texas, USA, 2013;

- Speaker, X Conference of International Arbitration: "Soft law and arbitration", Sao Paulo, Brazil, 2013;

- Session Co-Chair, Biennial IBA Latin American Regional Forum Conference - Latin America: "Challenges and developments in a time of opportunities", Bogotá, D.C., Colombia, 2012;

- Speaker, International Arbitration Seminar "Tension issues in investment arbitration – Investment protection laws that do not contain offers to arbitrate?, Quito, Ecuador, 2011;

- Chair in the annual IBA Conference "Hot Topics in International Arbitration", Vancouver, Canada, 2010;

- Panelist in the annual ICCA annual conference "Advocacy after the arbitral award", Rio de Janeiro, Brazil, 2010;

- IBA-ICC panelist in the panel "Cost controls in investment arbitration", Mexico, 2010;

- Speaker, IBA/ICC Investment State Arbitration in Latin America: Recent issues and future prospects, Mexico City, Mexico, 2010;

- Chair ICC/IBA conference "FTA v. BITs?", San Jose, Costa Rica, 2009;

- Panelist, II Jornada Internacional de Arbitraje: "Temas actuales de Arbitraje" Buenos Aires, Argentina, 2009;

- IBA, chair in the panel "Court support for arbitration in the Americas – The role of Public law", Buenos Aires, Argentina, 2008;

- Speaker, ICDR and AIPN "Dispute Resolution in the International Oil & Gas

Business", Rio de Janeiro, Brazil, 2008;

- Speaker, Institute for Transnational Arbitration, "18th Annual International Commercial Arbitration Workshop", "Complex Energy Disputes", Dallas, Texas, USA, 2007;

- Speaker, Institute for Transnational Arbitration, "Young Arbitrators Forum", "Arbitration and the Courts", Dallas, Texas, USA, 2007;

- Speaker Ecuadorian American Chamber of Commerce "Recognition and enforcement of foreign awards" Quito, Ecuador, 2007;

- IBA, Co-chair in the panel "Investment: Problem and Litigation", Sao Paulo, Brazil, 2006;

- IBA, panelist in the panel "Sovereignty issues in Litigation and Arbitration in Latin America", Prague, Czech Republic, 2005;

- Speaker Institute for Transnational Arbitration, "16th Annual International Commercial Arbitration Workshop", "The Art of Arbitrating", Dallas, Texas, USA, 2005;

- Lectures on international arbitration and on investment arbitration, specifically on the Argentinean cases, in the event organized by the International Court of Arbitration of the ICC " The Developments of International Arbitration in Ecuador and Latin America", Quito, Ecuador, 2005;

- Co-chair of the International Arbitration Congress "The New York Convention, Application and Scope", Bogotá, D.C., Colombia, 2005;

- Lecturer in the event organized by the International Court of Arbitration of the ICC "Impact of the New York Convention in the Development of International Commercial Arbitration", Caracas, Venezuela, 2005;

- IBA, panelist "Insolvency is changing globally: How and Why?", Seville, Spain, 2004;

- Lecturer in the event organized by the International Court of Arbitration of

the ICC "International Commercial Arbitration in Latin America: The ICC Perspective", Miami, Florida, USA, 2004;

- Lecturer in the event organized by the International Court of Arbitration of the ICC and the Center of Arbitration of the Chamber of Commerce of Bogotá "Arbitration without an arbitration clause", Bogotá, D.C., Colombia, 2003;

- Lecturer in the event organized the University of Columbia, New York, "Enforcement of arbitral awards", New York, New York, USA, 2001;

- Professor in international arbitration at the Universidad del Rosario (post graduate studies in administrative law);

- Professor in international arbitration at Universidad Javeriana;

- Director "Revista Internacional de Arbitraje";

- Reporter ITA (Kluwer Law);

- Professor Basics of Private Law, Universidad del Rosario;

- Professor commercial contracts, Universidad Sergio Arboleda;

- Professor international contracts Universidad del Rosario;

Publications include:

- "The Challenges of Creating a Standing International Investment Court" in "Reshaping the Investor-State Dispute Settlement System, Journeys for the 21st Century", Jean E. Kalicki and Anna Joubin-Bret (eds.), Nijhoff International Investment Law Series, 2015.

- "The Challenges of Creating a Standing International Investment Court" in "Reform of Investor-State Dispute Settlement: In Search of A Roadmap", TDM 1 (2014).

- "Enforcement of Foreign Judgments", in Louis Garb, Lew Julian (Eds.), Kluwer Law, 2014;

- "Colombia", in Interim Measures in International Arbitration (L.W. Newman and C. Ong eds.), Juris, 2014;

- "Colombia Enacts a New Arbitration Statute," 32(1) ASA Bull. 8 (2014) (with Rafael Rincón);

- El concepto de laudo arbitral, Universidad del Rosario, 2013;

- "Post Award Advocacy: The Relationship Between Interim and Final Awards – Res Judicata Concerns," Arbitration Advocacy in Changing Times, ICCA Congress Series No 15 at 231, Kluwer 2011;

- Global Administrative Law and International Jurisprudence in Global Administrative Law: Towards a *Lex Administrativa* (with Santiago Jaramillo and Rafael Rincón), Javier Robalino-Orellana and Jaime Rodríguez-Arana (eds.) 2010;

- "Treaty Planning: Current Trends in International Investment Disputes that Impact Foreign Investment Decisions and Treaty Drafting," in Liber Amicorum Bernardo Cremades 1207 (La Ley, 2010) (with A. Saldarriaga and A. Vohryzek-Griest);

- "La relevancia de la llamada 'Nacionalidad de la Sentencia Arbitral' en la Convención de Nueva York" en "Revista Ecuatoriana de Arbitraje", Instituto Ecuatoriano de Arbitraje, Cevallos Editora Jurídica, 2010;

- "Diez años de Merck: una década de evolución del arbitraje comercial internacional en Colombia", en "Revista Ecuatoriana de Arbitraje", Instituto Ecuatoriano de Arbitraje, Cevallos Editora Jurídica, 2009;

- A Current Look at the Protection of Foreign Investment in Colombia  Latin America, TDM 4 (2009);

- Co-editor "Arbitraje Comercial Internacional – Estudio de la Convención de Nueva York con Motivo de su 50 Aniversario" – AbeledoPerrot 2008;

- "El arbitraje de inversión en el Tratado de Libre Comercio suscrito entre Colombia y Estados Unidos," in Arbitraje Internacional - Tensiones Actuales 109 (F. Mantilla-Serrano ed., Legis, 2007);

- "The return to Calvo and the gun boat diplomacy: The future of investor-State arbitration", Revista Internacional de Arbitraje, Legis, 2006;

- "Arbitration in Colombia", Revista de Derecho Comparado, Buenos Aires, 2005;

- "ICSID Arbitration, the need for specific consent ", Ámbito Jurídico", Legis S.A., 2005;

- "Arbitration *ratione materia* – Arbitration and tort" in "El Contrato de Arbitraje", Eduardo Silva Romero (ed.) Legis, 2005;

- "International Recognition and Enforcement of Annulled Awards", Revista "De Acuerdo", Chamber of Commerce of Bogota, 2002;

- "ICSID, an option to consider" Revista de Derecho Público, Universidad de los Andes, 2002;

- "Special Constitutional Action to Preserve International Arbitration", Journal of International Arbitration, Kluwer Law International, 200l;

- "Distribution Agreements in Colombia", B&M, 1995;

- "International Letters of Credit", Legis, 1980.

Memberships and listings:

- Vice-President of the ICC Court of Arbitration;

- Listed in the ICSID panel of arbitrators appointed by the Chairman of the ICSID Administrative Council;

- Member of the IBA Legal Practice Division;

- Member of the Court of Arbitration of LCIA;

- Member ICCA Council;

- Past Co-Chair, Arbitration Committee International Bar Association (IBA);

**APP 1885**

- Member of the Advisory Board of NYIAC;

- Member of the panel of Arbitrators of the Energy Arbitrators List (EAL);

- Member of the panel of Arbitrators of the Singapore International Arbitration Center;

- Member panel of arbitrators International Center of Arbitration of British Columbia;

- Member Chartered Institute of Arbitrators;

- Member panel of arbitrators of the Center of Arbitration of the Chamber of Commerce of Bogotá D.C.;

- Member advisory Board Institute for Transnational Arbitration;

- Vice Chair Institute for Transnational Arbitration;

- Member ICC Latin American Practice Group;

- Chair Latin American Arbitration Association; and

- Member Club Español de Arbitraje.

# EXHIBIT 87

TM
EXHIBIT 87

APP 1887

App. 2568

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

Peggy Roif Rotstain, et al.,

      Plaintiffs,          Civil Action No. 3:09-CV-2384-N

     v.

Trustmark National Bank, et al.,

      Defendants.

### DECLARATION OF PROFESSOR
### DR. ISABELLE ROMY ON SWISS LAW

I, Isabelle Romy, declare the following:

1. I have been asked by Counsel for Defendant Société Générale Private Banking (Suisse) SA ("SG Suisse") to provide an opinion on whether a Swiss court will recognize the preclusive effect of a class-action judgment issued by a United States District Court in favor of "SG Suisse" if an unnamed class member from Switzerland or another jurisdiction that does not recognize class actions later attempts to sue SG Suisse in Switzerland.

2. I conclude that Swiss Courts will not give *res judicata* effect to a U.S. class action judgment in this situation, for the reasons stated below.

### I. BACKGROUND AND QUALIFICATIONS

3. I am a partner at the Swiss law firm FRORIEP, one of the large business law firms in Switzerland. I was admitted to the bar of the Canton of Vaud, Switzerland, in 1991. I joined my current law firm as a partner in 2012. Prior to that, I was a partner (from 2003 to 2012) and an associate (from 1995 to 2003) with another large business law firm in Zurich. I am registered with the Attorney's Register of the Canton of Zurich. My practice centers in the areas of international litigation, arbitration and private international law. A copy of my professional resume is attached as Exhibit 1.

1

**APP 1888**

App. 2569

4. In addition, I am a Professor of Law teaching at the University of Fribourg (Switzerland) and at the Federal Institute of Technology in Lausanne (EPFL), Switzerland. I have held these positions since 1996. Currently, I teach a series of classes, including among other topics, Transnational Litigation and a course on Swiss and European Private International Law. I have been supervising several master and doctoral candidates in various areas, including transnational litigation.

5. I was a Deputy Judge at the Swiss Federal Supreme Court from January 2003 until December 2008. I was assigned to the 1st Civil Chamber (Première Cour Civile) adjudicating, among other things, cases involving contract, tort, commercial law and issues of international private law related to said topics. From 2003 until 2005, I was assigned to the Criminal Chamber (Cour de Cassation pénale).

6. I have authored several publications on comparative law between U.S. and Swiss law and on issues related to the recognition and enforcement of U.S. class action judgments in Switzerland.

7. I studied law at the University of Lausanne (graduating in 1986). I then completed my doctorate degree at the University of Lausanne in 1990 (PhD equivalent). Later, in connection with my Professorial degree, I was a visiting scholar at Boalt Hall School of Law, University of California at Berkeley from 1992 to 1994 and I completed my Professorial thesis ("Habilitation") at the University of Fribourg (Switzerland), graduating in 1996, on enforcement actions in environmental law and on mass tort litigation and class action under U.S. and Swiss law.

## II.  DOCUMENTS REVIEWED

8. In making this declaration, I have read the relevant sections and where necessary will refer to copies of the following documents:

      (a)  Plaintiffs' Second Amended Class Action Complaint;

      (b)  Memorandum supporting Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel;

      (c)  Receiver's notice of filing of bar date notice and proof of claim form.

2

### III. PRECLUSIVE EFFECT OF FOREIGN JUDGMENTS UNDER SWISS LAW

9. Swiss law governs the issues of whether investors are allowed to bring individual suits against the Defendants in Switzerland and what the preclusive effect of a United States class action judgment (or settlement) would be in said subsequent Swiss actions.

10. There is no bilateral or multilateral agreement between Switzerland and the United States governing the recognition and enforcement of judgments rendered by their respective courts. The relevant provisions are set out in the Swiss Federal Statute on Private International Law of December 18, 1987 (hereinafter PILA).

11. PILA does not expressly govern the issue of the preclusive effect of a class action judgment in Switzerland because class action procedures are not known in Switzerland. In fact, the issue of whether class action procedures should be adopted in Switzerland has been publicly discussed in relation to the drafting of the new Swiss Code of Civil Procedure that became effective on January 1, 2011[1]. The Commission of Experts that elaborated a preliminary draft of such Code has examined said question and came to the conclusion that the system would constitute a "foreign body" in the Swiss procedural law[2]. This view was shared by the Federal Council (the Swiss Federal Government)[3]. In 2013, the Federal Council reiterated that American-style class action procedure was neither necessary nor advisable and should hence be firmly rejected[4]. More recently, the preliminary Draft Federal Statute on Financial Services published in June 2014 included a provision on a collective settlement mechanism based on the Netherland Act on the collective Settlement of Mass Claims of 2005. This proposition was

---

[1]    In Switzerland, for historical reasons, each Canton had its own Code of civil procedure. The new Federal Code of Civil Procedure has replaced the cantonal regulations as of January 1, 2011.

[2]    Cf. Report of the Commission of Experts concerning art. 79 preliminary draft.

[3]    See the message concerning the Swiss Code of Civil Procedure in FF 2006 6841, 6902. The Federal Council considered in substance that the mechanism of a class action is even disputed in its country of origin (U.S.) because it may lead to serious problems of organization. Further it may not always bring litigation to an end since class members have the possibility to opt-out. Finally, class actions can be misused, as the damages claimed are often so substantial that the defendant is forced to settle (Message, p. 6902).

[4]    Exercice collectif des droits en Suisse: état des lieux et perspectives, Rapport du Conseil fédéral, July 3, 2013, p. 41 seq.

3

heavily debated and criticized during the consultation procedure and was finally withdrawn from the draft[5].

12. The issue at hand, namely whether a U.S. class action judgment would be recognized in Switzerland and what its binding effect would be, has not been examined by a Swiss court yet. Treatises on the subject are scarce. I have addressed these issues in an article on "U.S. class action and Swiss private international law" published in 1999[6]. A doctoral thesis on the same topic was published in 2008 by Leandro Perucchi. I shall revert to it hereinafter where necessary for the analysis[7].

13. The legal theory of *res judicata* (or claim preclusion), which purpose is to prevent contradictory decisions, is well recognized in Switzerland[8]. It bars litigation for the same cause of action between the same parties where a prior judgment has been rendered between them. Res judicata constitutes an absolute bar to a subsequent action involving the same cause of action[9]. The defense of res judicata requires three elements: (1) the first decision must be final, (2) it must have been rendered between the same parties, and 3) it must have the same object as the subsequent suit[10].

14. Furthermore, a foreign judgment can only have a preclusive effect in Switzerland if the conditions for its recognition in Switzerland are fulfilled[11]. According to Art. 25 (a) PILA, a foreign judgment will be recognized in Switzerland if (1) the foreign court rendering the decision has jurisdiction according to Swiss legal principles; (2) the decision is final; and (3) there is no ground to refuse recognition under art. 27 PILA.

15. These conditions are examined hereinafter in more details with the focus on absent class members.

---

[5] Rapport du Département fédéral des finances sur les résultats de la consultation relative à la loi sur les services financiers (LSFin) et à la loi sur les établissements financiers (LEFin) of March 13, 2015.

[6] I. Romy, Class actions américaines et droit international privé Suisse, PJA/AJP 1999, 783 seq.

[7] L. Perucchi, Anerkennung und Vollstreckung von U.S. class action-Urteilen und - Vergleichen in der Schweiz, Zurich 2008.

[8] Art. 27 (3) PILA; ATF 123 III 16 c. 2 (ATF is the French official abbreviation for Reports of the Swiss Supreme Court); M. Guldener, Schweizerisches Zivilprozessrecht, Zurich 1979, 364 seq.

[9] ATF 121 III 474.

[10] ATF 123 III 16; Romy, in PJA 1999, 783 seq, 791 seq.

**APP 1891**

App. 2572

## IV.    A U.S. CLASS ACTION JUDGMENT INVOLVING SWISS ABSENT CLASS MEMBERS WOULD VIOLATE SWISS PUBLIC POLICY

16. According to art. 27 PILA, a foreign decision shall not be recognized in Switzerland if the recognition would be obviously incompatible with Swiss substantive public policy (ordre public) or with Swiss procedural public policy. The three rules formulated in art. 27 par. 2 PILA establish that procedural public policy is violated where:

   a)    a party was not duly summoned according to the law of its domicile or according to the law of its ordinary residence unless it made an appearance in the proceedings without reservation;

   b)    the decision was rendered in violation of fundamental principles of Swiss procedural law, in particular that the party's right to be heard was denied;

   c)    a proceeding involving the same parties and the same subject matter was first brought in Switzerland, or adjudicated in Switzerland, or that it was earlier adjudicated in a third state and that this decision is recognizable in Switzerland.

17. As for the substantive public policy prong, I am of the opinion that under Swiss law, a class action judgment that disposes of the substantive rights of absent class members without their active participation infringes their procedural autonomy and their substantive rights. Furthermore, the damages allocated to the class do not correspond to the effective damage suffered by the injured parties, some of whom are unknown. This is contrary to Swiss substantive public policy[12].

18. A class action judgment that includes absent class members over whom the U.S. court does not have jurisdiction from a Swiss law perspective and who did not receive proper notice according to Swiss law infringes Swiss fundamental principles of procedural law and hence Swiss procedural public policy. Moreover, regardless of whether the jurisdictional and notice requirements were met, the class action judgment would still not pass the Swiss public policy test, because this kind of representative action is foreign to Swiss law and contradicts fundamental principles of Swiss procedural law.

---

[11]    ATF 127 III 279 c. 2.

[12]    Romy, PJA, 797. Professor Dutoit agrees with this statement: Droit international privé suisse, Commentaire de la loi fédérale du 18 décembre 1987, 4ème éd., Basel 2005, N 10bis ad art. 25 PILA.

5

19. It is a fundamental principle of Swiss procedural law that a claim and the right to vindicate said claim in court may not be dissociated. The legislator strongly reiterated this principle while drafting the new Swiss Code of Civil Procedure; he stated that the protection of individual interests is fundamental to Swiss procedural law and collective action (such as enacted under art. 89 of the Code) shall remain an exception[13]. It results therefrom that a representative may not vindicate the rights of a third party in court without an express assignment of claim or a power-of-attorney. Said power-of-attorney must be expressly given and may not be implied. This rule is clearly stated in Art. 68 (3) of the Swiss Code of Civil Procedure and in Art. 396 (3) of the Swiss Code of Obligation. Explicit consent is required.

20. For the sake of being complete, it should be noted that in the Swiss Code of Civil Procedure and in other Federal statutes, the federal legislator has provided for some form of associative or group actions[14]. However, the claimant (an association for example) acts in its own name and not as representative of the members and is never allowed by law to claim payment of damages for the members of the association. Representative actions such as monetary class actions are unknown in Switzerland and are considered a foreign body in the Swiss legal system. Furthermore, the action brought by the association or organization does not have a binding effect on its members[15].

21. Finally, the right to be heard is a fundamental principle of Swiss law that is set forth in art. 6 of the European Convention on Human Rights and in art. 29 of the Swiss Federal Constitution. Absent class members who have no knowledge of the class action proceedings may assert a violation of their right to be heard. For the reasons stated hereinabove, this conclusion applies to all Swiss absent class members who did not actively participate in the proceedings. Indeed, leading legal scholars recognize that, to include Swiss absent class members in a procedure they do not understand, without them having actively chosen to

---

[13]   FF 2006, 6901.

[14]   See art. 89 of the Swiss Code of Civil Procedure and art. 10 of the Federal Act on Unfair Competition of 1986.

[15]   K. Spühler/, BSK ZPO, 2013, N. 20 ad art. 89. The proposal made in the preliminary Draft of the Federal Statute on Financial Services to provide for a representative action limited to a declaratory relief that would bind all members of the group was rejected.

6

participate in the commencement of the lawsuit or actively opting-in at a later stage, would violate their procedural autonomy and their right to be heard[16].

## V. ACCORDING TO SWISS LAW ON RES JUDICATA, ABSENT CLASS MEMBERS WOULD NOT BE PRECLUDED FROM INITIATING THEIR OWN COMPLAINT AGAINST DEFENDANTS

22. Assuming that a member of the U.S. class action files a subsequent lawsuit against the same defendant in Switzerland, based on the same cause of action, and that the defendant raises the objection of res judicata, the Swiss court in front of which the subsequent action is pending shall examine whether the condition of the identity of parties is fulfilled (see § 13 hereinabove; I assume that the other conditions of identity of object and of finality are met).

23. It is broadly admitted that the definition of the party to the action is governed by the *lex fori*, hence by Swiss law[17]. Swiss courts shall examine pursuant to Swiss law whether the class action procedure and the subsequent individual action present an identity of parties.

24. In spite of the lack of a general definition of a "party" under Swiss law, it is recognized that a party (1) must be *identified* and *designated by his/her/its name* and also have (2) the autonomy to decide if, when and to which extent, he, she, or it wants to vindicate his/her/its rights in justice[18]. Swiss courts will therefore examine according to these criteria whether the investor, plaintiff in the subsequent suit, was a party to the class action procedure. Since a member of a class action may appear in different "roles", namely as a named or unnamed or absent plaintiff or even as an opt-out member of the class, the court should take all these alternatives into consideration.

25. The *named plaintiffs* should be deemed a party according to Swiss law. The persons who chose *to opt out* of the class action and expressed so their intention not to be bound by the class action judgment are not parties[19].

26. Members of the class who remain *entirely passive* (*i.e.* members of the class that do not opt out of the class but do not actively participate in the proceeding) do not meet the

---

[16]    See Professor Paul Oberhammer's declaration on Swiss law in the case In re Converium Holding AG Securities Litigation, No 04 Civ. 7897 (DLC), 2007 WL 3192012 (S.D.N.Y.), § 33; D. Schramm, Handkommentar zum Schweizer Privatrecht, Internationales Privatrecht, 2012, N 42 ad art. 27.

[17]    See Dutoit, no 2 ad art. 9; Romy, PJA, 792.

[18]    Romy, PJA, 792; Schramm, N 12 ad art. 9 IPRG.

[19]    Romy, PJA, 793-795.

7

APP 1894

App. 2575

criteria identified above and thus are not parties. This is so because they are not designated by name and do not show by their behavior that they want to be bound by the judgment. Hence, they do not fulfill the definition of a party under Swiss law and, significantly, *are not precluded from initiating their own complaint against the defendants* in a Swiss court at a later stage[20].

## VI. ABSENT CLASS MEMBERS WHO REMAIN PASSIVE WOULD NOT BE BOUND BY A U.S. CLASS ACTION JUDGMENT FOR LACK OF INDIRECT JURISDICTION

27. I have supported the view that it would be unfair to allow an unnamed plaintiff dissatisfied by the result of a U.S. class action judgment or settlement to litigate the same case again in Switzerland against the same defendant. In particular, U.S. class action passive members who are subject to the jurisdiction of the U.S. court and are bound by the class action judgment in the U.S. could escape the consequences of this collective action to the detriment of foreign defendants and litigate the same claims anew in a foreign court[21]. To remedy this unbalance, I have suggested that it is appropriate to consider absent class members as if they were defendants to the action since their procedural situation is analogous: indeed, their rights are being vindicated in court without their express consent at a time they have not chosen. Therefore, I have expressed the opinion that a Swiss court should examine whether the unnamed or absent plaintiffs may be deemed a party and hence be bound by a class action judgment (or settlement) by applying *by analogy* the Swiss private international law rules applicable for recognition's purposes to determine the (indirect) jurisdiction of a foreign court *upon a defendant*[22]. According to art. 26 seq. PILA, a defendant to an action is bound by a foreign judgment provided that (1) the foreign court had jurisdiction over the defendant according to PILA, *and* (2) the defendant was duly summoned according to the law of its domicile.

28. It is true that, for Swiss recognition purposes, PILA sets forth the requirements for determining whether a foreign court has jurisdiction over *a defendant*. The reason thereof is that this statute envisions and addresses the traditional form of civil litigation that opposes two or a few litigants and in which the plaintiff deliberately chooses the time, the jurisdiction and the

---

[20] This opinion is shared by Schramm, N 42 ad art. 27 IPRG.

[21] Romy, PJA, 793.

[22] Romy, PJA, 793. Professor Paul Oberhammer supported and endorsed this view in his declaration on Swiss law in the case In re Converium Holding AG Securities Litigation, No 04 Civ. 7897 (DLC), 2007 WL 3192012 (S.D.N.Y.); Professor Bernard Dutoit refers with regard thereto to my article in PJA 1999 in his notable commentary of the PILA (see N 2bis ad Art. 9 PILA). Perucchi, 124 seq., also agrees as a rule with this approach.

8

venue of the action. In such a case, there is no point in assessing provisions regarding personal jurisdiction over a plaintiff because, by suing in a foreign court, plaintiff agrees with said jurisdiction. However, *absent class members* have neither chosen the venue of the action nor the time of filing; they have not explicitly manifested their intention to bring a claim before a foreign court. In these respects, they are in the same situation as a defendant. Therefore, PILA jurisdictional requirements should be applied to them as well by analogy. Moreover, these absent class members have a constitutional right to have their claims adjudicated by a court that has jurisdiction pursuant to Art. 30 of the Swiss Federal Constitution, which is not restricted to defendants but applies to any person.

29. Applied by analogy to the situation of absent class members, these principles require a Swiss court to examine pursuant to the PILA's requirements whether the U.S. court had jurisdiction over *the unnamed or absent members* of the class as if they were defendants to the action. Pursuant to Art. 26 PILA, a foreign court has jurisdiction (from a Swiss law perspective) in the following cases: (1) if a provision of the PILA so provides or, if there is no specific provision in the PILA, if the defendant was domiciled in the State where the judgment was rendered; (2) if, in pecuniary disputes, the parties submitted to the jurisdiction of the foreign court by agreement; (3) if, in pecuniary disputes, the defendant proceeded on the merits without objecting to jurisdiction; or (4) in the event of a counterclaim, the foreign court had jurisdiction over the original claim and there are common questions (of law or facts) between the two claims.

30. Specific PILA provisions broaden the scope of foreign jurisdiction for particular claims and disputes. According to art. 149 par. 1 let. a PILA, foreign decisions concerning claims based on the law of obligations (contracts, torts) shall be recognized in Switzerland if they have been rendered in the State in which the respondent is resident. Therefore, the application by analogy of said provision in the matter at hand would allow a Swiss court to recognize the jurisdiction of the U.S. court over the unnamed plaintiffs who have their domicile in the U.S. but not over class members resident in Switzerland who remain passive.

31. As to passive class members who have their residence neither in the United States nor in Switzerland, the Swiss court will only accept jurisdiction of the U.S. court over them if the conditions set forth in art. 149 § 2 PILA are fulfilled. Namely, should the claim be based on a contract, the place of performance of the contract has to be in the United States (art. 149 § 2 lit. a PILA). Should the claim be based on tort, the place where the tort was committed

9

or the effect thereof has to be in the Unites States (art. 149 § 2 lit. f PILA). Should these conditions not be fulfilled, these members would not be bound by the U.S. judgment, for lack of jurisdiction, unless they made an appearance within the meaning of art. 26 let. c PILA.

32. According to Art. 26 (2) PILA, a foreign court shall have jurisdiction over a dispute if the parties have entered into a valid jurisdiction agreement according to Swiss law[23].

33. I have been informed that certain investors have signed and filed a proof of claim in a (parallel) proceeding (SEC v. Stanford International Bank, Ltd, 3-09-CV-0298-N), that contains the following Consent to jurisdiction:

> *If you submit a Proof of Claim Form in this case, you consent to the jurisdiction of the District Court for all purposes related to this claim and agree to be bound by its decisions, including, without limitation, a determination as to the validity and amount of any claim asserted against the Receivership Entities. In submitting a Proof of Claim Form, you agree to be bound by the actions of the District Court even if that means that your claim is limited or denied* (emphasized by the undersigned).

34. The issue arises whether this clause may be interpreted as a valid agreement that would confer jurisdiction of the U.S. court over these investor-members of the class. For Swiss recognition purposes, Swiss law governs the conditions under which such an agreement is valid. The relevant requirements are set forth in Art. 5 PILA, which provides in its § 1 (1st sentence) that: "For pecuniary claims, the parties may agree to a place of jurisdiction for an existing or future legal dispute under a specific legal relationship". The agreement must be made in writing. The choice of jurisdiction is exclusive unless expressly otherwise provided. Further, the agreement must be made in favor of a determined court of a specific State[24]. A jurisdiction agreement encompasses all claims arising from a specific relationship.

35. The clause mentioned above provides for the jurisdiction of the District Court for all purposes related to the proof of claim in a different case against different parties that is (to my knowledge) not related to the *Rotstain* class action proceeding. The proof of claim applies to claims asserted by investors in the SEC proceedings against the Receivership Entities. In the case at hand, the action is brought by investors against other Defendants than the Receivership Entities. Thus, a Swiss court would consider that the jurisdiction agreement does not extend to such proceedings against third parties. Indeed, a clause that governs a possible dispute

---

[23] ATF 122 III 439 c. 3a.

[24] Dutoit, N 5 ad art. 5 PILA.

10

between the Claimants, the Receiver and the Receivership Entities in one case cannot be construed as meaning that a specific investor agrees to extend the jurisdiction of a U.S. court over him in a separate class action initiated by other investors against third parties. For all these reasons, under Swiss law, the above mentioned jurisdiction agreement is not applicable to confer (indirect) jurisdiction of the U.S. court over (Swiss or foreign) absent class members in a class action against third parties.

VII.   ABSENT CLASS MEMBERS WHO REMAIN PASSIVE WOULD NOT BE BOUND BY A U.S. CLASS ACTION JUDGMENT WITHOUT VALID NOTICE ACCORDING TO THE LAW OF THEIR DOMICILE

36. Swiss law requires that in order to be bound by a foreign judgment, the parties were duly summoned according to the law of their domicile (Art. 27 (2) PILA). Hence class members shall be served with a class action notice in accordance with the requirements applicable in their country of residence[25]. As for non U.S. class members, namely investors in Switzerland, the adequacy of the notice shall be examined according to Swiss law.

37. The requirements for summons and service in international matters between the United States and Switzerland are set out in The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters of 1965 (Hague Service Convention) as well as in the relevant provisions of the Swiss Code of Civil Procedure that entered into force on January 1, 2011.

38. As a rule, under the Hague Service Convention, service of process requires *individual notice* through the Swiss Central Authority and local Swiss courts. As to notice by mail, Switzerland expressly objected to art. 10 (a) of the Hague Convention, rejecting this form of service. The Convention is not applicable when the address of the addressee is not known (art. 1 par. 2). This exclusion applies restrictively and requires that the authority has carried out all the searches that could be reasonably expected under the circumstances[26]. If the Hague Service Convention is not applicable, then service shall be performed according to Swiss law (art. 11a PILA).

39. The Swiss Code of Civil Procedure (art. 141) allows service *by publication* where formal service is impossible, for instance because the defendant's address is not known.

---

[25]   Romy, PJA, 794 and art. 27 par. 2 let. a PILA.

[26]   See Schramm, N 32 ad art. 27.

11

However, service *by publication* remains an exception and is restricted to official newspapers (such as the Swiss official gazette). It never occurs in the local press or on the internet.

40. Pursuant to Art. 27 par. 2 let. a PILA, a violation of the rules on service of process is immaterial *if the party (the addressee) makes an appearance without reservation.* It results from said provision that, for recognition's purposes, notice through the internet or local newspapers or mail may only be effective and valid if the addressees, i.e., the unnamed members, *expressly manifest their intent* to be part of the class; thus there must be an affirmative act by the unnamed members that shows that they effectively agree to be part of the class.

41. The Swiss Federal Supreme Court held that, should the addressee remain passive and the service infringe the sovereignty of the State of his residence (as service in local media or the internet would constitute such an infringement in Switzerland), then the service is void and has no effect in Switzerland, even if the defendant had actual knowledge of the action initiated against him or her[27]. Based on said decision and Swiss constitutional due process rules, a Swiss court would not presume that the passive unnamed class members agree to be bound by the class action judgment.

42. Finally, even if actual notice through the internet and local newspapers would be sufficient to bind the passive unnamed class members, which it is not, the Defendants would be deprived of the possibility to validly raise the res judicata objection, because, according to art. 8 of the Swiss Civil Code, the burden to prove actual notice lies with the party who raises the res judicata objection. Here, Defendants would have the burden to prove the facts necessary to establish that the objection of res judicata is well-founded. In other words, Defendants would have the extremely difficult burden of proving that the class members in Switzerland have received actual notice of the class action litigation. It would not be up to the absent class members to show that they did not have or could not have knowledge, as Swiss law rejects the imposition on the class members of the burden to establish a negative fact, namely that they did not receive notice.

43. Swiss constitutional rules of due process do not allow for a presumption that passive class members agree to be bound by the class action judgment. Indeed, the U.S. law fiction according to which absent class members implicitly ratify the representations powers

---

[27]    4A-161/2008, Swiss Federal Supreme Court, 1st July 2008.

**APP 1899**

App. 2580

given to the named plaintiffs unless they opt-out of the class cannot be transposed as such in Switzerland. It is a fundamental principle of Swiss substantive law that silence or mere passivity is not acceptance and that a party may not dispose of his or her substantive rights by remaining passive[28]. Said principle is reflected *inter alia* in art. 6 of the Code of obligations according to which silence may have the effect of an acceptance in only exceptional circumstances, such as where the parties have been bound by a long term business relationship. None of the exceptions, however, is relevant in the context of a litigation.

44. Another reason why mere passivity may not be construed as consent is that Swiss residents are not familiar with this kind of representative action which is not part of Swiss procedural tradition. They might not understand the consequences of failing to opt out. To include them in a procedure they do not understand would violate their procedural autonomy and their right to be heard[29].

## VIII.    CONCLUSION

45. For all these reasons, I reach the conclusion that a U.S. judgment in the pending class action procedure will have no preclusive effect in Switzerland against Swiss resident and foreign absent class members.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed at Zurich, Switzerland on July 13, 2015.

ISABELLE ROMY

---

[28]    ATF 123 III 53, 59; see also A. Morin, Commentaire romand du Code des obligations, 2ème éd., Bâle 2012, no 1 ad art. 6 CO.

[29]    See Schramm, N 42 ad art. 27.

13

**APP 1900**

App. 2581

# CURRICULUM VITAE

PROF. DR. ISABELLE ROMY
Bellerivestrasse 201
8034 Zurich

Phone: +41 44 386 60 00
Fax:     +41 44 383 60 50
E-Mail:  iromy@froriep.ch

## Current positions

Attorney at law, partner at the law firm FRORIEP in Zurich, Switzerland (since 2012)

Associate Professor at the University of Fribourg (Switzerland) and at the Federal Institute of Technology in Lausanne (EPFL), Switzerland since 1996 (courses on Transnational Litigation, Swiss and European Private International Law, Environmental Law and Construction Law)

Vice-Chairman of the Sanction Commission of the SIX Swiss Exchange (since 2002)

Member of Board of Directors of UBS AG (since 2012) and of UBS Group AG (since 2014)

Member of the Swiss Committee for UNICEF

## Education/prior activities

| | |
|---|---|
| 1995-2012 | Associate, then Partner (2003-2012) at the law firm Niederer Kraft & Frey Ltd in Zurich, Switzerland |
| 2003-2008 | Deputy Judge at the Swiss Federal Supreme Court (Juge suppléante au Tribunal fédéral) assigned to the 1st Civil Court (contract, tort, commercial law) from 2005 to 2008 and assigned to the Criminal Court from 2003 to 2005 |
| 1999-2007 | Member of the ethical commission at the EPFL |
| 1994-1996 | Teaching Assistant at the Law School of the University of Lausanne (Criminal law) |
| 1993 - 1996 | Professoral thesis (thèse d'habilitation) at the University of Fribourg on enforcement actions in environmental law and on mass tort litigation and class action under US law and Swiss law |
| 1992 - 1994 | Visiting scholar at Boalt Hall, School of Law, University of California at Berkeley |

APP 1901

| 1986 - 1989 | Doctoral thesis (thèse de doctorat) on comparative (Swiss, French, German and Dutch) liability for transboundary water pollutions |
| 1986 – 1986 | Scientific Assistant at the Law School of the University of Lausanne (Commercial and Corporate law) |
| 1983 - 1986 | University of Lausanne, Licence en droit (equivalent to J.D.) |

## Languages

French, English, German

## Publications and lectures

**Procédure et droit international privé (procedure and private international law)**

- Les contrats de services financiers comme contrats de consommation: for et droit applicable, in : Journée de droit bancaire et financier (2010), Genève 2011, p. 21-44

- Revidierter Konsumentengerichtsstand - eine Gefahr für Finanzdienstleister? In: Das schweizerische Prozessrecht im Umbruch, Publikation Niederer Kraft und Frey Nr. 16, 2010, p. 118-136

- Le "For du consommateur" et les contrats de services financiers à la lumière de la jurisprudence récente du Tribunal fédéral, in: Zeitschrift für Zivilprozessrecht, 03/2009, p. 317-332

- Commentaire de la Loi fédérale sur la poursuite pour dettes et la faillite, publié par Dallèves-Foëx-Jeandin, Bâle 2005, commentaire des art. 197 à 207

- Class actions américaines et droit international privé suisse, PJA 1999, p. 783 à 801

- Massenschäden in der Schweiz, in Grossschäden - Complex Damages. Rechtliche und alternative Regulierungsstrategien im In- und Ausland, édité par Harald Koch/Armin Willingmann, Baden-Baden 1998, p. 177 à 190

- Litiges de masse, Des *class actions* aux solutions suisses dans les cas de pollutions et de toxiques, Fribourg 1997 (thèse d'habilitation)

- Mise en oeuvre de la protection de l'environnement, des *citizen suits* aux solutions suisses, Fribourg 1997 (thèse d'habilitation)

2

APP 1902

App. 2583

- Les pollutions transfrontières des eaux, l'exemple du Rhin. Moyens d'action des lésés, Lausanne 1990 (thèse de doctorat)

- Résumés et commentaire de jurisprudence sur l'arbitrage dans le domaine de la construction dans la revue "Droit de la construction/ Baurecht"

**Droit des obligations**

- Commentaire des art. 143 à 150 du Code des obligations, in: Commentaire romand, Code des Obligations I, édité par Thévenoz-Werro, 2ème édition, Bâle, 2012

- Les devoirs d'information du banquier à la lumière de la jurisprudence fédérale récente, in: Mélanges en l'honneur de Pierre Tercier, Schulthess 2008, p. 646-664 (co-auteur avec *Olivier Bloch*)

- Responsabilité des organes: jurisprudence actuelle sur la qualité pour agir des créanciers et le dommage direct et indirect, in: La responsabilité civile de l'entreprise, CEDIDAC, Lausanne 2004, p. 1 à 23

- Mise en oeuvre des prétentions en responsabilité des créanciers et exécution forcée, in Neuere Tendenzen im Gesellschaftsrecht, Festschrift für Peter Fortsmoser, Zurich 2003, p. 479 à 496

- Droit de la construction et la poursuite pour dettes et la faillite, Journées du droit de la construction 1999

- Responsabilité au sein du réseau de distribution sélective et exclusive, in: Les contrats de distribution, quelques aspects juridiques, Contributions offertes au Professeur François Dessemontet à l'occasion de ses 50 ans, Lausanne 1998, p. 381 à 401 (co-auteur avec *Eve Gautier)*

- Concurrence déloyale: textes législatifs et répertoire des arrêts fédéraux et cantonaux, CEDIDAC No 12, Lausanne 1989 (co-auteur avec *Eve Gautier Wollmann et Martin Wernli)*

- UWG: Gesetz, Materialien, Rechtsprechung, CEDIDAC No 13, Lausanne 1989 (co-auteur avec *Martin Wernli et Eve Gautier Wollmann*)

**Droit de l'environnement**

- Installation de transport d'énergie, DC/BR 2015, p. 124-128 (co-auteur avec *Jean-Baptiste Zufferey et Milena Pirek)*

- Environmental law and practice in Switzerland: overview (co-auteur avec *Fabian Klaber*) in Practical Law, Multi-jurisdictional Guide 2015/16

3

- Commentaire romand de la Loi fédérale sur la protection de l'environnement, art. 32*b* à 32*<sup>e</sup>*, 2012

- Commentaire romand de la Loi fédérale sur la protection de l'environnement, art. 10 et OPAM (co-auteur avec *Jean-Michel Brahier*), 2012

- Questions de droit matériel en relation avec la répartition des responsabilités selon l'art. 32d LPE, in DEP 2011, p. 612-632

- Construction et développement durable: aspects choisis en matière de protection contre le radon, le risque sismique et l'amiante ainsi que de mesures d'économie d'énergie, in Journées suisses du droit de la construction, 2011, p. 155-195

- La construction et son environnement en droit public (360 pages, co-auteur avec *Jean-Baptiste Zufferey*), aux Presses polytechniques et universitaires romandes, Lausanne 2010

- Environment in Switzerland, in: Getting the deal through 2010 (co-auteur avec *Andreas Vögeli*)

- Sites pollués, sociétés et responsabilités, in: Journées du droit de la construction 2009, p. 163-194

- Sort des responsabilités environnementales dans le transfert d'entreprises, in: Publication CEDIDAC 82, Lausanne 2009

- Constructions et installations OPAM, in: Revue du droit de la construction 3/2007, p. 108 à 114 (co-auteur avec Jean-Michel Brahier)

- Sites contaminés: Questions de droit public et de droit privé, in: Mélanges publiés par l'Association des Notaires Vaudois à l'occasion de son centenaire, édité par F. Bianchi, Genève-Zurich-Bâle 2005, p. 255 à 295

- Responsabilités environnementales et transactions, in Aspects actuels du droit de la société anonyme, Travaux réunis pour le 20<sup>ème</sup> anniversaire du CEDIDAC, Lausanne 2005, p. 525 à 557

- Sites contaminés : les points essentiels pour les exploitants, in Protection de l'environnement et immobilier, Principes normatifs et pratique jurisprudentielle, Genève 2005, p. 47 à 83

- Sites contaminés, à la croisée du droit public et du droit privé, Journées suisses du droit de la construction 2003, JDC 2003, p. 141 à 177

- Les recours de droit administratif des particuliers et des organisations en matière de protection de l'environnement, DEP 2001, p. 248 à 276

- L'européanisation du droit de la responsabilité civile pour les dommages de pollution, in L'européanisation du droit privé, Vers un Code civil européen? Fribourg 1998, p. 463 à 477

4

**APP 1904**

App. 2585

- Diverses autres publications (notes de bibliographie, recensions)


## Lectures (extracts)

- Les nouveaux défis de la gouvernance d'entreprise, Club des quatre saisons, Zurich, 11 juin 2014

**Procédure et droit international privé**

- Swiss and European Private International Law (March 2015, MLCBP, University of Fribourg, School of Law)

- Conférence sur la procédure collective selon l'avant-projet de loi sur les services financiers, Centre de droit bancaire et financier de l'Université de Genève, 1$^{er}$ octobre 2014

- Conférence sur les "Actions collectives: quel(s) modèle(s) pour la Suisse?" à la Commission spécialisée FSA procédure/arbitrage, 15 mars 2013

- Course on procedural and substantive law aspects of mass claim à l'Académie de droit international de la Haye, dans le cadre du Seminar for Advanced Studies in Public and Private International Law, Responding to the Challenges of Natural and Industrial Catastrophes (janvier 2012)


**Droit de l'environnement**

- Direction de la journée de formation continue sur les sites pollués, 16 juin 2015, HEIG-VD Yverdon

- Cours sur les aspects juridiques de la protection de l'air intérieur, dans le cadre du CAS en qualité de l'air intérieur, 10 janvier 2014, à l'Ecole d'ingénieurs et d'architectes de Fribourg

- Cours sur les sites contaminés dans le cadre du programme Avocat (e) spécialisé (e) FSA Droit de la construction et de l'immobilier 2013-2014, Certificate of Advanced Legal Studies Droit de la construction et de l'immobilier (Construction and Real Estate Law) 2013-2014, 4 avril 2014, Fribourg

- Direction de la journée de formation continue intitulée "Le droit de l'environnement : Le rayonnement non-ionisant (électro-smog)" et conférence sur ce thème, 20 mai 2014, HEIG-VD Yverdon

- Direction de la journée de formation continue intitulée "Sites contaminés: Aspects et enjeux financiers, juridiques et techniques" et conférence sur ce thème, 9 septembre 2014, HEIG-VD Yverdon

APP 1905

App. 2586

- Conférence intitulée " Änderung USG Art 32dbis Abs. 1 und 2 dbis: Sicherstellung der Kostendeckung durch die Kantone" à la demi-journée Altlasten intensiv : Vollzug im föderalistischen System, Kostensicherstellung und neueste Praxis der Kostentragung du 18 septembre 2014 à Zurich

- Module "aspects légaux de la protection contre le radon" dans le cadre du « CAS en qualité de l'air intérieur » organisé par l'Ecole d'ingénieurs et d'architectes de Fribourg, 21 novembre 2014

- Garanties financières: mise en oeuvre et points importants pour les cantons, Tagung Fournier - Umsetzung Artikel 32d$^{bis}$ USG (organisé par l'OFEV), 10 décembre 2013


## Expert Declarations

- Supreme Court of the State of New York County of Nassau, Opinion on due process requirements under Swiss law in view of the recognition and enforcement of two civil judgments entered in the District Court of Zurich against defendants resident in New York (June 2014)

- In the High Court of the Hong Kong Special Administration Region Court of first instance, Commercial action no 16 of 2009, Affirmation on The requirements of service of foreign judicial and extra judicial acts in Switzerland pursuant to the Hague Service Convention as well as on Art. 271 of the Swiss Penal Code (January 2013)

- USDC for the District of Delaware, Civil Action No. 11-cv-00084-SLR, Declaration regarding Art. 271 of Swiss Penal Code (April 2012)

- USDC for the District of Delaware, Civil Action No. 11-cv-00084-SLR, Declaration regarding Art. 273 of Swiss Penal Code (April 2012)

- Superior Court Judicial District of Stamford-Norwalk at Stanford, Affirmation on Art. 271 of Swiss Penal Code (November 2011)

- USDC Southern District of New York, Master File No. 09-cv-118 (VM), Declaration on res judicata effect of a US class action judgment in Switzerland (September 2011)

- In the High Court of Justice (civil action), Opinion on Swiss Financial Privacy Law and international judicial assistance (September 2011)

- USDC, Central District of California, Case no SACV 08-01029 AG (RNBx) Expert declaration on Swiss Financial Privacy Law and Obtention of Evidence in Switzerland through judicial assistance (September 2011)


Zurich, July 2015

6

**APP 1906**

App. 2587