# EXHIBIT AA

WILLIS
EXHIBIT AA

APP 1907
Willis APP 647

## DECLARATION OF MANUEL A. GOMEZ

I, Manuel A. Gómez, declare that the following is true and correct:

### I.    Qualifications and Background

1.  I have been retained by counsel to Willis of Colorado, Inc. and Willis Limited (together, "Willis") to opine on certain questions of Venezuelan, Mexican and Colombian law, and to address some of the opinions expressed in the October 30, 2014 Declaration of Professor Alejandro M. Garro ("Garro Declaration") submitted by the Plaintiffs in *Troice, et al. v. Willis of Colorado, Inc., et al.*, No. 3:09-cv-01274 (N.D. Tex.) in support of their motion for class certification (the "Motion"). I understand that the Motion seeks certification of a class of all persons who had purchased and still held Certificates of Deposit and/or otherwise maintained deposit accounts with Stanford International Bank Limited as of February 2009.[1]

2.  I am a lawyer duly licensed to practice law in the Bolivarian Republic of Venezuela. I have been an active member, and in good standing, of the Bar Association of the Federal District of Venezuela since 1994.

3.  I am a tenured Associate Professor of Law and the Associate Dean of International and Graduate Studies at Florida International University College of Law in Miami, Florida. I teach courses in International and Comparative Law, Alternative Dispute Resolution, Complex Litigation, Law and Society, and International Commercial Arbitration. All my courses are predominantly focused on Latin America, or give special attention to Latin American jurisdictions, individually and collectively.

4.  I have also taught courses at Stanford Law School, and continue to be affiliated with Stanford University as Fellow of the Stanford Center on the Legal Profession. Moreover, since 1995 I have been a member of the Faculty at the Universidad Central de Venezuela Law School (Caracas, Venezuela), and am also affiliated with the Universidad Metropolitana (also in Caracas, Venezuela) as an Associated Independent Researcher. I have lectured extensively, served as visiting professor, guest lecturer, and speaker at various universities throughout Central and South America, including the Universidad



---

[1] Complaint at ¶ 1, 9.

**APP 1908**

**Willis APP 648**

San Martín de Porres, INIDEM Business School, Universidad Sergio Arboleda, Universidad Surcolombiana, Universidad Gran Colombia, Universidad Metropolitana, Universidad Nacional Autónoma de México, CEBRAP São Paulo, Universidad Católica Andrés Bello, and Universidad Católica del Táchira.

5. In addition, I have been invited to lecture in Europe, Asia, and throughout the United States, and have served as an expert in legal proceedings involving Latin American parties or legal issues relevant to Latin American jurisdictions, in federal and state courts in the United States, and in international arbitral proceedings.

6. In addition to my formal legal training in Venezuela as a lawyer and as specialist in Civil Procedure, I hold two graduate degrees from Stanford Law School, a master's degree in Law (J.S.M) and a doctorate in juridical science (J.S.D.).

7. Regarding my scholarly endeavors, I have conducted research, published academic work, and lectured extensively on a variety of areas, including dispute resolution (litigation, arbitration, and mediation), comparative civil procedure, complex litigation, legal and judicial reform, legal education, and the legal profession. More specifically, I have conducted research and published scholarly works on the status and development of aggregate and collective litigation in Latin America, which has allowed me to become familiar with this field. More generally, throughout my professional and academic career, I have acquired expertise on different aspects of the national legal systems of several Latin American jurisdictions, the scope and application of their laws, and the work of their national courts. A copy of my *curriculum vitae* is attached hereto as "Exhibit A".

8. In addition to my academic career, I have practiced law in Caracas, Venezuela since 1993, first as an associate and then as a principal, at the law firms of Gómez Díaz y Asociados, S.C. and later at M. Gómez & Cía, S.C. As a practicing attorney in Venezuela I have amassed substantial experience in civil and commercial litigation, as well as other areas including business transactions, insurance, contracts, and torts.

9. This report is the independent product of my professional assessment of the issues presented by the parties insofar they involve the application of the laws of the jurisdictions referred herein. My opinion is not subject to any external influence, pressure, or interest in the outcome of any dispute —potential or present—between any and all of the parties involved in this matter. The considerations and conclusions

2

**APP 1909**

**Willis APP 649**

expressed in this report embody my professional opinion on the specific matters to which they refer. Although I am being compensated for my services in this matter, my fees are not dependent on the nature of the opinions I state or on the result of the case.

10. Based on my professional experience, and expert knowledge of the legal systems of various Latin American jurisdictions, I have been asked to opine on whether the courts of Venezuela, Mexico and Colombia, where certain putative class members reside:

    a. Would recognize the judgment issued by an American court in a class action proceeding for money damages.

    b. Are lacking transparency and independence to a point that is likely to affect the enforceability of a domesticated foreign judgment.

11. In addressing the aforementioned issues, I also have been asked to consider the opinions contained in the Garro Declaration insofar they might affect my declaration.

12. In preparing this report, I have reviewed various documents and sources relevant to the present dispute, including (1) Plaintiffs' Third Amended Class Action Complaint with exhibits filed on April 1, 2011 with the United State District Court for the Northern District of Texas Dallas Division ("Third Amended Complaint"); (2) Order issued by the United States District Court for the Northern District of Texas Dallas Division on December 5, 2014 by which the Court granted in part and denied in part Defendants' motions to dismiss various defendants ("12/05/14 Court Order"); (3) Brief in Support of Plaintiffs' Opposed Motion for Class Certification, and for Designation of Class Representatives and Class Counsel dated October 31, 2014 ("Plaintiffs' Class Certification Brief"); (4) Order issued by the United States District Court for the Northern District of Texas Dallas Division on December 15, 2014 by which the Court granted in part and denied in part Defendants' motions to dismiss various defendants ("12/15/14 Court Order"); (5) Declaration of Professor Edward F. Sherman dated October 31, 2014 ("Sherman Declaration"); and (6) the Garro Declaration. Additionally, I have reviewed other relevant statutes, judicial opinions, and scholarly works cited *infra*, all of which have direct relevance to the matters addressed in the present report.



3

**APP 1910**

**Willis APP 650**

## II.    Summary of Conclusions

13. It is my professional opinion that neither the courts of Venezuela nor the courts of Mexico would recognize a judgment issued by an American court in a class action proceeding for money damages. The main two reasons are (i) a foreign judgment rendered by an American court which purports to have *res judicata* effect on absent class members who reside in Venezuela or Mexico violates those countries' fundamental guarantees of due process, which is embedded in the notion of public policy, and (ii) the lack of personal jurisdiction of an American court over absent class members who reside in Venezuela or Mexico goes against the rules in those countries for the recognition of a foreign judgment. Besides these formal obstacles, I also opine that the current state of the Venezuelan and Mexican judiciaries would effectively render enforcement of a foreign judgment unavailable in either country.

14. With regards to Colombia, it is my professional opinion that the courts of that country would not recognize a judgment issued by an American court in a class action proceeding for money damages because of (i) the lack of service of process effected on non-resident (Colombian) absent class members who, as a result cannot be bound by the foreign judgment; and (ii) the need for reciprocity regarding the recognition and enforcement of a group litigation-related Colombian judgment in the United States.

15. According to both Venezuelan and Mexican law, final judgments have *res judicata* effect *only with respect to the named parties*—that is, those who were formally incorporated as full participants into the litigation and thus given an opportunity to present their case and have their day in court. As a result, only the parties can benefit directly from the judgment, and, conversely, only the parties are precluded from re-litigating the same issues. In Venezuela and Mexico, as in most of Latin America and in other civil law tradition countries, the incorporation of a party into the litigation may only result from that party's voluntary submission ("*comparecencia voluntaria*") or through service of process by the formal delivery of the summons and complaint ("*citación procesal*") according to their local rules. Unlike United States class actions, whose effects extend to absent class members who are not formally served but merely given notice of the litigation so they can "opt-out," neither Venezuelan nor Mexican law permits "an exception to the general rule that one cannot be bound by a judgment in a litigation to



4

**APP 1911**

**Willis APP 651**

which one is not a party."[2] Therefore, as a matter of both Venezuelan and Mexican law, a judgment cannot have any effect on those who were not properly served, including any potential absent class members that have been merely given notice of the litigation.

16. In the specific case of Colombia, although its group litigation system contains some rules that permit an opt-out mechanism of sorts, non-resident absent class members still have to be adequately served with summons and the complaint, as any failure to do so would violate their due process rights.

17. The Garro Declaration concludes, "the law on the recognition and enforcement of foreign judgments prevailing in the Latin American countries in question [which include Venezuela, Mexico and Colombia] do [sic] not present a major obstacle to the recognition and enforcement of judgments rendered in the United States."[3] I respectfully disagree. While it is true that certain provisions of Venezuelan, Mexican and Colombian law ostensibly allow the recognition and enforcement of foreign judgments as a general matter, the application of those provisions to the present matter leads to the opposite conclusion: The reach of *res judicata* beyond the named parties in an American class action represents not only an "obstacle," but an impenetrable barrier to the domestication of a United States class action judgment in Venezuela, Mexico or Colombia.

18. In the specific case of Venezuela, the enforcement of a United States class action judgment for money damages would not only be unprecedented but also contrary to one of the fundamental tenets of civil litigation in that country. The Venezuelan legal system does not recognize a money damage class action mechanism, or any form of "opt-out" class action, such as that invoked here. Although Venezuelan law offers certain mechanisms for the protection of collective rights, these differ significantly from American class actions. Moreover, the concept of an "opt-out" class action, which has a direct impact on the rights of absent class members, is incompatible with the Venezuelan principle of *res judicata*, which applies only to bar re-litigation of claims by named parties to a prior proceeding. Therefore, it is highly likely that a Venezuelan court would

---

[2] Elizabeth A. Kalenik, *Let the punishment fit the crime: Sanctioning absent class members for failure to respond to postcertification discovery requests*, 81 FORDHAM LAW REVIEW 2013, 2025 (2013).

[3] Garro Declaration ¶ 15.

**APP 1912**
**Willis APP 652**

refuse, as a matter of public policy, to enforce a United States class action judgment for money damages.

19. Even if theoretically possible as a matter of Venezuelan law, there are certain procedural obstacles that would make enforcement of a United States class action judgment for money damages cumbersome as a practical matter. Because Venezuela and the United States have not entered into a reciprocal agreement for the enforcement of foreign judgments, Venezuela's own internal law would govern the enforcement of a judgment issued by a United States court. To enforce a foreign judgment under Venezuelan law would entail a process of obtaining a judicial order known as an "*exequatur*" from Venezuela's highest court, and then following a second stage geared to the effective enforcement of the judgment. This kind of dual-step mechanism for the recognition of foreign judgments is not unique to Venezuela. What sets Venezuela apart is the practical difficulty of applying that mechanism, or, simply put, Venezuela's "law in action." Given the current state of the Venezuelan judiciary—its rampant level of corruption and the political manipulation to which the courts are subject—a seemingly straightforward domestication and enforcement proceeding would likely take years to complete, and would not prevent a plaintiff from commencing litigation in the interim against the party seeking to enforce the foreign judgment.

20. Besides these structural and practical obstacles, the grave situation affecting the courts in Venezuela, including the rampant inefficiency and political manipulation, also affects the handling of litigation, and foreign judgment recognition proceedings are certainly not an exception. Because court proceedings do not occur in a vacuum, but instead are affected by the social, political and economic realities of each country, when evaluating the possibility of enforcing a foreign judgment, one cannot ignore the impact that those realities might have on the handling of judicial matters. In the case of Venezuela, the grim situation of the courts is likely to have a significant impact, as I will explain below.

21. Venezuela's judicial system is subject to pervasive interference and manipulation by political forces and has been routinely cited by non-governmental organizations for inefficiency and corruption. These factors, when coupled with the stridently anti-American posture of Venezuela's government, make it virtually certain that a Venezuelan



6

**APP 1913**

**Willis APP 653**

court would refuse to enforce a United States class action judgment for money damages to bar re-litigation by Venezuelan citizens.

22. The situation in Mexico is very similar to that in Venezuela, both in terms of the formal legal impediments to the recognition of a United States class action judgment for money damages, and also with respect to the practical difficulties of actually obtaining relief in the Mexican courts.

23. Regarding the formal legal impediments, it also would be unprecedented for a Mexican court to enforce a United States class action judgment for money damages. The Mexican legal system, like that of Venezuela, does not recognize an "opt-out" class action. Although Mexico recently amended its legislation to enable the possibility of aggregate litigation, the concept of an "opt-out" class action is contrary to the Mexican law of *res judicata*, which, like Venezuelan law, limits the preclusive effect of a judgment to the named parties to the prior proceeding. An "opt-out" class action would also violate Mexican constitutional standards of due process and notice to litigants. Therefore, it is very likely that a Mexican court would find that to recognize a United States class action judgment would infringe Mexico's "public order," leaving the court with no other option but to refuse to domesticate such a judgment.

24. Mexico and the United States are not parties to a treaty governing the enforcement of foreign judgments. Therefore, as with Venezuela, domestic Mexican law would determine the enforceability of an American court judgment in Mexico. The Mexican court system, like Venezuela's, presents numerous procedural obstacles to recognition that would, as a practical matter, make a foreign judgment useless in preventing re-litigation of claims by Mexican citizens.

25. Even if Mexican law did, in theory, require enforcement of a United States class action judgment—which it does not—as a practical matter the Mexican judicial system could not be relied on to enforce such a judgment. The systematic dysfunction of the Mexican judiciary, both in terms of undue delays and rampant corruption, would hinder compliance with any judicial order, and one coming from a foreign court would be no exception.



26. Finally, in the case of Colombia, both the lack of service on non-resident absent class members and the need for reciprocity regarding the recognition and enforcement of a

7

**APP 1914**

**Willis APP 654**

group litigation-related Colombian judgment in the United States, a Colombian court would not recognize a judgment issued by an American court in a class action proceeding for money damages.

27. For the reasons stated herein, and based on my assessment of the facts and circumstances relevant to this case, I conclude that the courts of Venezuela, Mexico and Colombia would <u>not</u> recognize a United States class action judgment for money damages. Such a judgment would not be entitled to recognition as a matter of Venezuelan, Mexican or Colombian law; and, even if recognition were called for in theory (which it is not), the judicial systems in those countries could not be relied upon to recognize such a judgment in practice. In the following sections, I explain in detail the basis for my conclusions.

## III. There Are Issues Affecting Latin American Jurisprudence That Are Critical to Any Determination of Superiority of a Class Action.

28. Any thoughtful consideration of whether a United States class action is a superior—or even feasible—method of resolving disputes between Stanford investors and the Defendants must take into account the lack of any provision for representative actions in the investors' home countries, and the potential conflict that the American procedural device might have with the laws of the countries where recognition of any resulting judgment would be sought. None of the expert reports submitted in support of Plaintiffs' motion considers or addresses the important question of whether courts in Latin American countries will give effect to a judgment in a class action in the United States.

29. The Garro Declaration merely describes the overall foreign judgment domestication regime of several Latin American jurisdictions, including Mexico, Venezuela and Colombia, as to whether they "would be hospitable to the recognition and enforcement of a judgment rendered in the United States,"[4] and concludes that they would be.[5] Whereas Professor Garro acknowledges that in addition to mere hospitality "certain conditions must be met for foreign judgments to be recognized or enforced," his report falls short of addressing whether those conditions are likely to be met when the foreign judgment resolves class action litigation in the United States.

---

[4] Garro Declaration ¶1.



[5] Id. ¶15.

8

**APP 1915**

**Willis APP 655**

30. The Garro Declaration notes that in Mexico, Venezuela and Colombia (as in the United States), enforcement of a foreign judgment may be denied based on certain formal grounds such as "lack of jurisdiction by the rendering court, failure to observe basic due process standards, lack of finality, and violation of public policy,"[6] which condition "the enforcement of foreign judgments".[7] But Professor Garro overlooks that it is precisely on these formal grounds that Mexican, Venezuelan, and Colombian courts would *deny* a request that seeks the recognition and enforcement of a class action judgment rendered by an American court. This is the only plausible conclusion to which one can arrive when examining a United States class action judgment through the lens of those formal grounds.

31. Furthermore, any protections or finality that defendants should gain from a judgment of a United States court in a class action would, in reality, be unavailable in the courts of Venezuela, Mexico or Colombia. Yet the Garro Declaration omits any reference to conditions in the political and judicial systems in Venezuela, and Mexico that undermine the independence of the judiciaries of those two countries. As is set out below, it is my opinion that—regardless of the wording of treaties, conventions, or statutes—individual or corporate citizens of the United States cannot be assured that a judgment in a United States court will be duly respected and honored by the courts of Venezuela or Mexico. The current state of affairs of the judiciary of those countries is such that litigants are increasingly deprived of their day in court, and their most basic due process rights are routinely violated. This situation is particularly grave in the case of Venezuela, given the overt animosity of the government—which in turn exercises a sweeping control over the courts—toward the United States. As I mentioned earlier, this is a particularly important practical obstacle that cannot be ignored when analyzing the feasibility for obtaining the recognition of a foreign judgment in any of the aforementioned Latin American jurisdictions.

---



[6] Id. ¶32.

[7] Id..

**APP 1916**

**Willis APP 656**

## A.     A Class Action Judgment Rendered in the United States Would Almost Certainly Not be Recognized by Venezuelan Courts

32. Based on my knowledge and experience, as both a legal and practical matter, it is a near certainty that a judgment rendered by, as here, a United States court in a class action for money damages would never be enforced in Venezuela. First, despite exhaustive research, I have not been able to identify a single Venezuelan case in which a United States class action judgment was enforced to bar re-litigation of the same claims by Venezuelan citizens in Venezuela. Professor Garro, apparently, has not found such a case either.[8] Second, the legal, procedural and practical obstacles to such enforcement are insurmountable.[9] For starters, the Venezuelan legal system does not recognize a money damages "opt-out" class action or any notion that a person can be bound by a judgment in a case where they were not served with process in conformity with Venezuelan standards or otherwise affirmatively chose to participate as a party. But even if the Venezuelan courts could get past that basic disconnect in the country's legal system and somehow find that such judgment conformed with Venezuelan law, in practice, United States-based litigants seeking to bar individual suits in Venezuela with a foreign judgment would be faced with intolerable procedural burdens, the Venezuelan judicial system's well-recognized dysfunction and politically manipulated judges, as well as pronounced hostility towards the United States. In my opinion, these obstacles would make any class action judgment obtained in this case useless in barring future re-litigation of claims by absent members of the class who reside in Venezuela.

### 1.     A Class Action Judgment Rendered in the United States Would Not be Entitled to Preclusive Effect Under Venezuelan Law

#### a.     *Background and Procedure for Recognition and Enforcement of Foreign Judgments in Venezuela*

33. Venezuela and the United States have not entered into a reciprocal agreement for the enforcement of foreign judgments. As a result, as agreed by Professor Garro, the

---

[8] *See* Garro Declaration ¶¶ 63-64.

[9] *See*, Antonio Gidi, *The recognition of U.S. class action judgments abroad: The case of Latin America*, 37(3) BROOKLYN JOURNAL OF INTERNATIONAL LAW 893, 902 note 12 (2012) (Hereinafter, *"Gidi, US class action judgments in Latin America"*).

APP 1917

Willis APP 657

enforcement of a judgment issued by a United States court is subject to Venezuela's own domestic legal regime, which, in the first instance, requires a judicial order commonly known as an "*exequatur*" to be issued.[10] That simply means that, if the *exequatur* is granted, the enforcement of the judgment would have to proceed to a second stage—not that it will necessarily be enforced. Article 850 of Venezuela's Code of Civil Procedure ("CCP") gives exclusive jurisdiction to the Supreme Justice Tribunal ("SJT")—the highest court in Venezuela—to grant an *exequatur* petition.

34. The procedure for obtaining recognition is established in articles 852 through 855 CCP. The request for *exequatur* commences with a written petition filed with an authenticated copy of the foreign judgment duly translated into Spanish, and with the corresponding apostille.[11] Once the Court admits the file, it shall issue summons to be served on the defendant along with a copy of the petition.[12] Serving a defendant can take up to several months, depending on certain conditions, such as whether the defendant has an appointed representative and whether personal service is possible. Once the party against whom the petition is filed has been properly served, he has ten working days to answer the petition and oppose any defenses.[13] The Court may, if it so decides, open an evidentiary phase and notify the Office of the Public Prosecutor (*Fiscalía General de la República*), so they can opine on whether the petition should be granted,[14] after which the Court will make its decision on whether to grant or deny the *exequatur* petition. Notably, the burden of proof at every step of the process is borne by the party (or parties) seeking to enforce the judgment.[15]

---

[10] *See* Ley de Derecho Internacional Privado, article 53 (Private International Law Statute, or PILS); *see also* Garro Declaration ¶¶ 16-17.

[11] Code of Civil Procedure ("CCP"), article 852.

[12] Id. article 853.

[13] Id. article 855.

[14] Ley Orgánica del Ministerio Público (Venez.), article 25(15), Official Gazzette 38647 of March 19, 2007.

[15] Id. article 852.

APP 1918

Willis APP 658

35. Regarding the requirements that a foreign judgment must meet in order to be recognized by Venezuelan courts through *exequatur*, article 53 of the Private International Law Statute ("PILS") permits enforcement only when a foreign judgment:

   a. Results from a civil or commercial matter, or one that involves private relations (i.e. not involving public law matters);

   b. Is final and has acquired *res judicata* effect in the jurisdiction where it was issued;

   c. Does not involve rights over property situated in Venezuela; or that the foreign court did not unduly deprive Venezuelan courts from asserting exclusive jurisdiction over the matter;

   d. Was rendered by a court with jurisdiction over the matter, pursuant to the general principles set forth in chapter IX of PILS;

   e. That the defendant has been properly served, given sufficient time to appear, and that in general has been afforded sufficient procedural safeguards to adequately present their case; and,

   f. Is not incompatible with a Venezuelan judgment rendered in the same matter, or with proceedings initiated in Venezuela prior to the foreign judgment being issued.

36. In addition to the aforementioned prerequisites, articles 5 and 8 of PILS establish that provisions of foreign law shall be excluded when their application is incompatible with fundamental principles of public policy in Venezuela. This provision is akin to the legal concept in the United States that the laws of other jurisdictions that are contrary to the public policy of a state will not be given any effect in that state. As discussed further below, Venezuela does not recognize the money damages class action mechanism, and some of its features, especially the concept of "opt-out" with its corresponding effect on absent class members, squarely offend Venezuelan public policy.

### b. *"Opt-Out" Class Actions for Money Damages Are Not an Accepted Form of Litigation in Venezuela*

37. While Professor Garro concedes that the public policy of Venezuela presents a "possible obstacle to the enforcement of foreign judgments," his report falls short of acknowledging that Venezuela does not recognize the "opt out" class action device; and



12

**APP 1919**
**Willis APP 659**

accordingly, his report does not address its impact on, or significance to, the enforceability of a United States money damages class action judgment.[16] In short, the concept of a class action for money damages in which only a few persons represent the interests of others (and can bind those absent others) does not exist in Venezuela. Thus, even if the Venezuelan judiciary was not politically manipulated or biased against United States parties (it clearly is both, as discussed below), there is simply no legal basis upon which a Venezuelan court would or could harmonize the "opt-out" class action procedure with Venezuelan law.

38. In fact, the only form of representative litigation permitted in Venezuelan is that which protects collective or diffuse "rights"—that is, rights that "belong" to an undefined group (e.g., consumers in general), a general sector (e.g., professional associations, unions), or to society as a whole (e.g., the right to clean water, the right to a healthy environment). The procedural vehicles available to achieve the protection of collective and diffuse rights in Venezuela is the constitutional writ of "*amparo*", a remedy originally devised as a constitutional mechanism to protect citizens against actions or omissions that violate the fundamental rights of the Venezuelan people; and the action for the protection of collective and diffuse rights, which procedural rules are established in the Organic Law of the Supreme Justice Tribunal.[17]

39. Unlike the case of an ordinary civil judgment, however, judicial decisions issued in the context of writs of *amparo* and actions for collective or diffuse rights are purely injunctive in nature. The decisions rendered in such proceedings are strictly limited to ordering the defendant to do or to refrain from doing certain acts. *Amparo* judgments expressly foreclose the possibility of awarding monetary damages.[18] Notwithstanding, damages asserted by individual petitioners have to be pursued in individual lawsuits or through joinder of all the petitioners in a single suit, as per Venezuela's ordinary rules of civil procedure.

---

[16] Garro Declaration ¶¶ 25, 66.

[17] Ley Orgánica del Tribunal Supremo de Justicia (Venez.), article 146.

 [18] *See generally* ALLAN-RANDOLPH BREWER CARÍAS & CARLOS AYALA CORAO, LA LEY ORGÁNICA DE AMPARO SOBRE DERECHOS Y GARANTÍAS CONSTITUCIONALES (Editorial Jurídica Venezolana, 2d ed. 1988)

**APP 1920**

**Willis APP 660**

### c.   An "Opt-Out" Class Action Judgment Would be Given No Res Judicata Effect Against Absent Class Members in Venezuela

40. As a matter of well-settled Venezuelan law, *res judicata* serves to bar re-litigation of claims only between the *actual parties* to the other proceeding or case in which the judgment sought to be enforced was issued; it does not extend beyond those parties (such as to absent class members), in accordance with the principles of Venezuelan civil procedure.[19] In fact, it is a fundamental precept established in articles 26 and 49 of the Venezuelan Constitution that every citizen has a right to bring and prosecute their own private claims (similar to the due process rights afforded to United States citizens).  The idea that a person could be deprived of that right simply because they did not act to affirmatively "opt-out" of a foreign class action is contrary to Venezuelan public policy and, thus, fails to meet the standards for an *exequatur* to be issued or for a United States class action judgment to then be enforced at the trial court level.

41. As per Venezuelan legal principles, only those who have joined a lawsuit voluntarily as parties,[20] or those who have been incorporated as a result of being properly served,[21] can be deemed parties. The lack of proper service of process renders a proceeding null and void.[22]

42. Although, as a matter of United States law, there are requirements that notice of a class action be given to absent class members, which a United States court might deem adequate and sufficient, the form of such notice does not comply with the requirements to effect service of process under article 218 et. seq. of CCP. When applicable, the class notice routinely issued in the United States does not comply either with any of the international treaties dealing with service of process and transmission of documents to which Venezuela is a party (such as the Inter American Convention on Letters Rogatory and The Hague Convention on the Service Abroad of Judicial and Extrajudicial

---

[19] *See,* Yraida del Carmen Chacín v. Rogelio J. González Silva, Tribunal Supremo de Justicia, Juzgado de los Municipios Mara, Almirante Padilla y Páez de la Circunscripción Judicial del Estado Zulia, File 229-98, of 8 February 2011.

[20] CCP, article 216.

[21] Id. article 218 et. seq.



[22] Id. article 215.

**APP 1921**

**Willis APP 661**

Documents in Civil or Commercial Matters). Commentators expressly note, "most Latin American countries will not accept as adequate notice to their domiciliaries anything short of service by rogatory letter as a prerequisite to recognizing or enforcing a foreign judgment."[23]

43. Even Professor Garro recognizes in his report how important it is for a Venezuelan court to ensure that the parties have been served in accordance with Venezuelan law. The requirement of service of process issue was key in both examples he offered to illustrate the importance of article 53(5) of PILS.[24] The case involving a person domiciled in Venezuela at the time of suit rejected enforcement of a U.S. judgment precisely because "one of the co-defendants, a Venezuelan resident at the time process was served on him, *had not been served in accordance with Venezuelan law*".[25] Nothing suggests that a Venezuelan court presented with a request to authorize the recognition and enforcement of a foreign class action judgment would decide differently.

44. The main consequence of this principle in Venezuela is that only the actual parties participating in a suit can benefit directly from the judgment, and conversely, only those parties may be precluded from re-litigating the same issues. Any violation of this rule offends the fundamental principle of due process and is in direct contravention of the requirements set forth in article 53(5) PILS regarding the domestication of foreign judgments. As a result, it is almost certain that a Venezuelan court would conclude that an *exequatur* petition to recognize and enforce a class action judgment issued by an American court against absent class members in Venezuela is repugnant to the public policy of Venezuela and the class action judgment would be given no preclusive effect.

### d.   *A U.S. Class Action Judgment Involving Foreign Residents Would Not be Recognized Because it Offends Venezuelan Concepts of Jurisdiction*

45. Independently, a Venezuelan court would refuse to grant an *exequatur* petition involving a United States "opt-out" class action judgment on the ground that the American court

---

[23] *See, Gidi, US class action judgments in Latin America* at 955.

[24] *See* Garro Declaration ¶ 64.

 [25] Id. (emphasis added).

**APP 1922**

**Willis APP 662**

lacked personal jurisdiction over all of those against whom the judgment pretends to have the force of *res judicata*. In more specific terms, according to article 53(4) of PILS, one of the requirements for granting an *exequatur* is that the foreign court must have had jurisdiction over the matter, which includes having jurisdiction over the parties (i.e., all those to whom *res judicata* would apply).

46. The jurisdictional review that would be done by the Venezuelan court in an *exequatur* proceeding, however, must be based not on the principles that govern personal jurisdiction in the foreign issuing court (i.e., the United States in this case), but instead on the principles of international jurisdiction in force in Venezuela, including any relevant international treaties.

47. Under Venezuelan law, a court cannot have jurisdiction over non-resident persons, or recognize them as parties, unless (i) they have submitted themselves voluntarily to the jurisdiction of that court for that specific proceeding (e.g., by filing the case or formally appearing to present a defense) as per article 40(4) PILS, or (ii) service of process has been properly effected on them as per article 40(3) PILS.[26] As discussed previously, the "opt-out" class action device and its less formal means of notice do not comport with Venezuelan standards, especially in the context of treaties that demand very strict forms of service to be effected in international cases.

48. As a result, any foreign judgment—including a judgment issued by a United States court in a money damages class action—that purports to extend its effect to anyone who has not been properly incorporated as a party to the original litigation (such as nonresident absent class members) and has not otherwise been served by rogatory letter would not be entitled to *exequatur* under the rules contained in article 53(4) PILS.

> ### *e.   The Practical Burdens of Enforcing a Foreign Judgment in Venezuela are Insurmountable*

49. Beyond the legal impediments, obtaining recognition and enforcement of a U.S. "opt-out" class action judgment in Venezuela against absent class members would, in practice, be so burdensome and time consuming as to be impossible. Even though the *exequatur*

---

[26] In addition, article 40(1) and 40(2) also grant jurisdiction to the courts of Venezuela in cases involving (i) real property situated in Venezuela, (ii) obligations to be fulfilled in Venezuela or derived from contracts made in Venezuela, or (iii) events that have taken place in Venezuela.



**APP 1923**

**Willis APP 663**

procedure seems straightforward and the court determination is not subject to appeal, in real terms it could easily take several years to be processed, as illustrated by the case of Núñez Portillo v. Shell Chemical Company et. al. (File 2004-000641), which was originally filed on July 21, 2004, and not finally decided until April 16, 2009, nearly *five years* later.

50. Then, assuming the SJT were to grant an *exequatur* petition (which, itself, is far from certain), the party (or parties) seeking to enforce the judgment would still have to pursue a second phase whereby the a court will carry out its enforcement,[27] which may well take a few more years, depending on the defenses submitted by the parties. This too is an incredibly difficult—and likely unachievable—undertaking.

51. Furthermore, the burden of proof placed on a U.S.-based litigant is daunting. For example, if one assumes a class is certified in this case and the Defendants obtain a favorable judgment, then it is quite possible that Venezuelan members of the class may seek to re-litigate their individual claims again in Venezuela. After answering the litigation in the trial court, the Defendants would have to start a petition in the SJT for *exequatur* and prove that class actions are not contrary to Venezuelan law such that a judgment issued in the United States should be enforced as *res judicata* against the Venezuelan plaintiff(s). Not only would the Defendants have to prove each of the prerequisites identified previously (that the United States court had proper jurisdiction, that Venezuelan courts were not improperly deprived of hearing claims involving transactions occurring in Venezuela, that service of process was properly effected, among other requirements), they would also have to demonstrate the impossible: that Venezuelan citizens can be barred from pursuing their individual claims by a judgment issued in a prohibited form of representative litigation that occurred in a foreign country, and for which they were never properly served a summons and complaint.

52. In sum, given the absence of a reciprocal class action-like procedure for money damages in Venezuela, the limitation of *res judicata* to actual parties to the prior or earlier proceeding, and the requirement of effecting service of process on absent class members

---

[27] CCP, article 523 et. seq; *see also,* Yaritza Pérez Pacheco, *Reconocimiento y ejecución de sentencias Mexicanas de divorcio en Venezuela,* 136 BOLETÍN MEXICANO DE DERECHO COMPARADO 69, 72, 77 (2013) [Hereinafter, *"Perez, Enforcement of Mexican Judgments"*].



**APP 1924**
Willis APP 664

in a foreign country, it is virtually certain that—even absent the entire lack of independence of the Venezuelan judiciary discussed below—no Venezuelan court would give preclusive effect to a class action judgment for money damages rendered in the United States.

> **2.    The Venezuelan Judiciary Lacks Independence and Cannot be Relied on to Enforce A Class Action Judgment Rendered in the United States**.

53. It is not just the absence of provision for class or representative actions in Venezuelan law that leads me to believe that a class action judgment would not be given effect by Venezuelan courts. Rather, there is the further reality—not even mentioned in the Garro Report—that the Venezuelan judiciary is routinely subjected to outside influence from other Venezuelan government institutions.

54. Allegations of corruption and inefficiency of the Venezuelan judiciary and other state institutions are not new,[28] but the situation has become much worse during the last few years in great part due to the increased politicization of the courts, and the constant interference of the government on the judiciary. Former President Chávez, his successor current President Nicolás Maduro, and other government officials have routinely discredited judicial decisions in public, given public directive to judges on how to decide cases, threatened them with summary dismissal or other forms of retaliation, and manipulated the legal system to persecute anyone suspected of being a political opponent.[29]

55. Numerous reports authored by reputable organizations such as the International Bar Association ("IBA"),[30] Human Rights Watch ("HRW"),[31] Transparency International

---

[28] Rogelio Pérez Perdomo, *Corrupción y ambiente de los negocios en Venezuela*, in CORRUPCIÓN Y CONTROL: UNA PERSPECTIVA COMPARADA. (Pérez Perdomo & Capriles, eds., Caracas: Ediciones IESA 1991) [Hereinafter, *Pérez Pedromo, Corrupción y Control*].

[29] Manuel A. Gómez, *Political Activism and the Practice of Law in Venezuela, in* CULTURES OF LEGALITY: JUDICIALIZATION AND POLITICAL ACTIVISM IN LATIN AMERICA (J. Couso, A. Huneeus, and R. Sieder, eds. Cambridge University Press (2010) [Hereinafter, *Gómez, Political activism*].

[30] *See,* International Bar Association, Venezuela: Justice under threat, Report of a mission to Venezuela by the International Bar Association Human Rights Institute, June 2007 (Hereinafter *IBA Venezuela Report 2007*).

[31] *See,* Human Rights Watch, Country Summary: Venezuela, January 2012, available at http://www.hrw.org/world-report-2012/world-report-2012-venezuela (Hereinafter, *HRW 2012 Venezuela Report*).

**APP 1925**
**Willis APP 665**

("TI"),[32] the Inter American Commission on Human Rights ("IACHR"),[33] and the United States Department of State ("USDS"),[34] have described in great detail the dire state of Venezuela's legal institutions, the rampant levels of corruption that affect all levels of government, and the political manipulation of the judiciary.[35] This latter problem has become evident through the constant "interference and public pressure that judicial officers have been subject to on the part of members of other branches of the State – including the President of the Republic."[36]

56. On February 24, 2010, the Inter American Commission on Human Rights ("IACHR") released a lengthy report titled "Democracy and Human Rights in Venezuela" ("IACHR Report").[37] The report devoted an entire chapter to highlighting "a series of conditions that indicate the absence of an effective separation and independence of the public branches of power in Venezuela".[38] The IACHR Report also expressed "concern over factors affecting the independence and impartiality of the judiciary"[39] including "the executive branch's alleged interference in decisions of the judiciary".[40] The IACHR Report described in great detail, how the system to appoint and remove Justices to the Supreme Tribunal lacked "appropriate mechanisms to keep other branches of government

---

[32] *See*, Transparency International, Transparencia Venezuela, http://transparencia.org.ve/biblioteca/.

[33] *See*, Organization of American States, Inter American Commission on Human Rights, Democracy and Human Rights in Venezuela, OEA/Ser.L/V/II Doc. 54, 30 December 2009, available at: http://www.cidh.org/countryrep/Venezuela2009eng/VE09.TOC.eng.htm (Hereinafter, "IACHR 2009 Venezuela Report").

[34] *See*, UNITED STATES DEPARTMENT OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2013: VENEZUELA, at 12-16 (2013). [Hereinafter "US State Dept. Venezuela 2013 HR Report"].

[35] Id.

[36] *IBA Venezuela Report 2007,* at 3.

[37] Inter American Commission of Human Rights, *Report on Democracy and Human Rights in Venezuela*, OEA/Ser.L/V/II, Doc. 54, March 10, 2010, available at: http://cidh.org/countryrep/Venezuela2009eng/VE09.TOC.eng.htm [Hereinafter, *IACHR Venezuela Report*].

[38] Id. ¶ 4.

[39] Id. ¶ 184.



[40] Id.

APP 1926

Willis APP 666

from undermining the court's independence",[41] and how the forty-nine justices appointed since 2002 "were reported to be politically sympathetic to the government".[42]

57. The IACHR Report mentioned that among those appointed to the Supreme Tribunal were "former legislators who had belonged to the ruling party and the former president of the National Electoral Council", and described specific instances of evident partiality arising out of this abnormal situation. One of the most dramatic examples involved the President of the Supreme Tribunal, who "was a member of the Presidential Council for Constitutional Reform and subsequently heard and dismissed the appeals lodged against the proposed constitutional amendment, in spite of having formed part of that Council".[43]

58. The undue influence of the political establishment is by no means limited to the highest court. During the last decade, Venezuelan judges have been appointed and removed "without any sort of oversight or procedure"[44] and "without holding open public competitions for their selection".[45] Just by way of example, the procedures provided for in the Rules for Evaluations and Public Competitions for Entry into and Promotion within the Judicial Career[46] have not been followed at all, so the Venezuelan judiciary has been largely formed by judges selected on the basis of criteria not set forth in the law.

59. "[I]n 2008 alone, a total of 1,451 judges other than regular judges were appointed. Of those, 12% were provisional, 63% were temporary, and 24% were interim. Thus, not one of the 1,451 non-regular judges appointed in 2008 was appointed through the open public competition required by Article 255 of the Venezuelan Constitution. Consequently, all of

---

[41] Id. ¶ 198.

[42] Id. ¶ 199.

[43] Id. ¶ 305.

[44] Id. ¶ 204.

[45] Id. ¶ 201.

[46] In addition, article 255 of the Venezuelan Constitution provides that: "Appointments to judicial positions and promotions of judges shall be carried out by means of public competitions to ensure the suitability and excellence of the participants, with selection by the juries of the judicial circuits, in such a manner and on such terms as may be established by law. The appointment and swearing in of judges shall be the responsibility of the Supreme Court of Justice. Law shall guarantee citizen participation in the process of selecting and appointing judges. Judges shall be removed or suspended from office only through the procedures expressly provided for by law". This is obviously not what occurs in practice. CONSTITUTION (VENEZ.) art. 255.

APP 1927

Willis APP 667

those judges are freely appointed and removable. (…) Additionally…between January and September 2009 alone, a total of 359 judges were appointed without an open public competition, including 136 temporary judges, 138 interim judges, 59 provisional judges, 2 tenured judges and 24 judges from other categories. All of these judges are freely appointed and removable".[47]

60. Judges appointed on an interim or temporary basis lack tenure and are subject to summary dismissal without having to follow the usual administrative proceedings or any formalities. This situation has given the Chavista government absolute control over the judiciary, including who gets appointed and removed from a judicial post, and how the judges decide their cases. It comes as no surprise that during the last few years, a number of Venezuelan judges have been removed from office at the government's discretion,[48] and even worse, immediately after "handing down decisions that affected government interests" or had major political impact.[49] To highlight the gravity of this situation, the IACHR Report included a list of specific examples that prove this assertion.[50] Moreover, in some instances, the judges' dismissals occurred almost immediately after comments made by the President during media broadcasts calling for swift action against them.[51] Not only the President but also other government officials have continuously made statements "attacking and criticizing justice officials as a result of their decisions,"[52] and have also called "for contempt of their decisions or their dismissal by different means often without the appropriate legal procedures."[53]

---

[47] *IACHR Venezuela Report* ¶ 209, 210.

[48] LEANDRO DESPOUY, *Report of the United Nations Special Rapporteur on the independence of judges and lawyers to the Human Rights Council of the United Nations.* A/HRC/11/41, 11th period of sessions. March 24, 2009, para. 60; *see also*, INTER AMERICAN COMMISSION OF HUMAN RIGHTS, *Democracy and Human Rights in Venezuela*, OEA/Ser.L/V/II, Doc. 54 http://cidh.org/countryrep/Venezuela2009eng/VE09.TOC.eng.htm ¶ 276.

[49] Id. ¶ 285.

[50] Id. ¶ 277, 286, 287, 289, 291, 292, 293, 294, 295, 296 and 297.

[51] Id. ¶ 290 and 298. This was also the subject of a report prepared by a group of independent experts on Human Rights appointed by the United Nations. *See*, "Venezuelan leader violates independence of judiciary", December 16, 2009, available at http://www.un.org/apps/news/story.asp?NewsID=33273&Cr=judges&Cr1.



[52] Id.

[53] Id.

APP 1928

Willis APP 668

61. Two cases serve to illustrate this point. The first one involved the arbitrary dismissal of honorable Maria Cristina Reverón Trujillo, which reached the Inter-American Court of Human Rights ("IACtHR"), and resulted in a judgment against Venezuela. In its ruling, the IACtHR concluded that Venezuela had violated not only the petitioner's rights under the American Convention on Human Rights, but also the state's duty to preserve an independent judiciary.[54]

62. The second, and undoubtedly more dramatic case was the one involving Maria Lourdes Afiuni, a former judge who was arrested in 2009 on charges of corruption for ordering the conditional release of Eligio Cedeño, a Venezuelan banker who had been held in pre-trial detention for more than three years, a term that notably exceeded the statutory limits. Cedeño's detention was deemed arbitrary by the UN Working Group on Arbitrary Detention in September of 2008.[55] Judge Afiuni was arrested almost immediately after President Chávez learned that she had ordered the release of Cedeño. In a nationally televised speech, Chávez called for her detention and conviction to the maximum penalty. Chávez, who mentioned having discussed the matter with the President of the Supreme Justice Tribunal, declared "a judge who frees a criminal is much, much, much more serious than the criminal himself", and then opined that "Judge Afiuni should get the maximum penalty".[56]

63. Not only was Judge Afiuni swiftly arrested and processed at the President's urging, but she remained jailed during three and a half years, only to be released in June of 2013 after an incredible amount of international and domestic pressure.[57] During her ordeal, Judge Afiuni was kept in inhumane and degrading prison conditions, including sharing her cell with some inmates that she had convicted as a judge, and was also denied medical

---

[54] *Case of Reverón Trujillo v. Venezuela,* Inter American Court of Human Rights, Judgment of June 30, 2009.

[55] UN News Centre, *Venezuelan leader violates independence of judiciary-UN rights experts*, available at http://www.un.org/apps/news/story.asp?NewsID=33273&Cr=judges&Cr1.

[56] Rory Carroll, *Hugo Chávez demands jailing of judge who freed banker*, THE GUARDIAN, December 15, 2009, available at: http://www.theguardian.com/world/2009/dec/15/chavez-venezuela-judge-cedeno.

[57] William Neuman & María Eugenia Díaz, *Court in Venezuela Orders Release of a Judge Once Scorned and Jailed by Chávez*, THE NEW YORK TIMES, June 14, 2013, available at: http://www.nytimes.com/2013/06/15/world/americas/court-in-venezuela-orders-release-of-a-judge-once-scorned-and-jailed-by-chavez.html.

APP 1929

Willis APP 669

treatment for her cancer.[58] The international community, including organizations such as the International Commission of Jurists, and Human Rights Watch, followed Judge Afiuni's case with great attention. In a joint statement made before the United Nations Human Rights Council, these organizations described the politically motivated actions that led to Judge Afiuni's detention, including the intervention of then-President Hugo Chávez, who "said on national television that the judge was 'a bandit' and called for her to be sentenced to 30 years in prison, the maximum sentence possible in Venezuela. A few days later, he said she was 'correctly jailed' and reiterated that she should be given a maximum sentence, adding that he 'would give her 35 years'."[59] The excerpts quoted above, offer clear evidence of the extreme politicization of the Venezuelan judiciary and its complete submission to the political establishment. As a result, it is reasonable to conclude that the Venezuelan judiciary is unable to guarantee a minimum level of fairness to private parties.

64. Any protections that might otherwise be available are even more doubtful for citizens of the United States, which has been pejoratively labeled as "the Yanqui Empire".[60] High government officials including former President Hugo Chavez and current President Maduro have routinely condemned the presence of American business in Venezuela by accusing them of inflicting damage to the country's economic, social and political structures, allegedly with assistance from previous administrations, members of the local business elite,[61] and even from the United States government.[62] Such accusations

---

[58] Human Rights Center, Universidad Católica Andrés Bello, *Maria Lourdes Afiuni, Urgent Appeal, Deterioration of her health conditions*, January 2011, available at:
http://w2.ucab.edu.ve/tl_files/CDH/Maria%20Lourdes%20Afiuni/Update_on_the_health_conditions_of_Judge_Afiuni.pdf.

[59] Joint International Commission of Jurists and Human Rights Watch, *Statement on Judge Alfiuni before the United Nations Human Rights Council*, September 18, 2013, available at: http://www.hrw.org/news/2013/09/18/joint-icj-hrw-statement-judge-afiuni-human-rights-council.

[60] LibreRed. "El imperio yanqui desaparecerá este siglo". September 9, 2009. Available at:
http://www.librered.net/wordpress/?p=7307; *see also*, Bolivarian Government of Venezuela. Ministry of the Popular Power for the Communication and Information. "Imperio yanqui es el más grande terrorista de todos los tiempos". Available at: http://www.rnv.gov.ve/noticias/?act=ST&f=3&t=107540.



[61] La Revista Minera de Venezuela. "Ramirez: International arbitration goes against the interests of oil producing countries" July 9, 2009. Available at: http://revistaminera.wordpress.com/2009/07/09/ramirez-arbitraje-internacional-va-contra-los-intereses-de-paises-productores/; *see also*, Bolivarian Government of Venezuela. Vice Presidency of the Bolivarian Republic of Venezuela. "Venezuelan oligarchy fights against revolutionaries during

**APP 1930**

**Willis APP 670**

evidence and reflect the government's anti-American foreign policy, as well as its domestic agenda.

65. The Venezuelan government's antipathy towards American corporations is reflected in its efforts to diminish their participation in the country's economic sector and to threaten private citizens and corporations with the confiscation of their assets—in many cases making good on such threats. The government has also repudiated many of the agreements authorized under previous administrations with foreign corporations, claiming that they were part of a "larger scheme supported by the Venezuelan oligarchy, which benefited from the bread crumbs left behind by multinational corporations and their media outlets".[63]

66. The legal system has become useful to the current Venezuelan government primarily as a means of eliminating ideological adversaries and solidifying political power.[64] Based on the idea that the new government represents some sort of political revolution—a "Bolivarian" Revolution—the autonomy of the judicial system has been denied, with all legal principles subject to an elastic interpretation that depends on the current, changing needs of the political establishment.[65] Unlike the moderate instrumentalism and the limited manipulation of legal institutions that took place in Venezuela during the era of the so-called "pacted democracy" (1958-1998), the Chávez administration—and continuing under the Maduro administration—has made no secret of its perception of law as a political weapon.[66] Public institutions have fallen under the open and direct control

---

more than 200 years".
http://www.vicepresidencia.gob.ve/web/index.php?option=com_content&task=view&id=1842.

[62] Bolivarian Government of Venezuela. Ministry of the Popular Power for the Communication and Information. "Letter sent by Commander Chavez to Unasur presidents"
http://www.minci.gob.ve/noticias/1/174613/combate_por_soberania.html.

[63] La Revista Minera de Venezuela. "Ramirez: International arbitration goes against the interests of oil producing countries" July 9, 2009. Available at: http://revistaminera.wordpress.com/2009/07/09/ramirez-arbitraje-internacional-va-contra-los-intereses-de-paises-productores/.

[64] Id.

[65] José M. Delgado Ocando, *Revolución y derecho*, in ESTUDIOS SOBRE LA CONSTITUCIÓN: LIBRO HOMENAJE A RAFAEL CALDERA (Caracas, Universidad Central de Venezuela, 1979).

APP 1931

Willis APP 671

of the ruling political party. Moreover, political enemies are persecuted, and their individual rights are routinely violated.

67. Venezuelan courts have become highly politicized and subject to the absolute control of the government. The administration does not accept the idea of an impartial judiciary, and does not tolerate any political opposition that threatens its absolute control of the country. On the contrary, all state institutions are viewed as instruments subject to the political agenda of the Chavista regime,[67] and the government has done everything in its power to keep it that way.

68. In Venezuela, the lines between the judicial and the political terrains have become blurred to the extreme that judges are publicly reprimanded for not following the party line, or praised and rewarded whenever their decisions favor the government.[68] Moreover, legal proceedings have increasingly been used to channel political quarrels, to thwart the political opposition, and to intimidate any possible dissent that should be allowed in any normal democratic society. The Venezuelan government has routinely claimed that the country is still a solid democracy, but its actions show otherwise.

69. Thus, any realistic evaluation of the current state of the judiciary in Venezuela leads to a conclusion of no confidence that a judgment from a court in the United States, which purports to give finality to a dispute involving citizens of Venezuela, will be given effect by a Venezuelan court to the extent that it would otherwise provide issue- or claim-preclusion protections for individual or corporate citizens of the United States.

---

[66] *See, Gómez, political activism,* note 29. *supra*; *see also,* ROGELIO PÉREZ PERDOMO, DERECHO Y CULTURA EN TIEMPOS DE REVOLUCIÓN (1999-2009) (Caracas: Fundación García Pelayo) (2009) [Hereinafter, *Pérez Perdomo, cultura jurídica*].

[67] Rogelio Pérez Perdomo, *Reforma judicial, estado de derecho y revolución en Venezuela*, in EN BÚSQUEDA DE UNA JUSTICIA DISTINTA. EXPERIENCIAS DE REFORMA EN AMÉRICA LATINA (L. Pásara, Ed. Lima: Consorcio Justicia Viva 2004); *see also,* Rogelio Pérez Perdomo, *Judicialization and regime change: the Venezuelan Supreme Court*, in THE JUDICIALIZATION OF POLITICS IN LATIN AMERICA (R.Sieder, L.Schjolden & A.Angell, eds. London: Palgrave Macmillan, 2005).



[68] Id.

**APP 1932**

**Willis APP 672**

**B.    A Class Action Judgment Rendered in the United States Would Almost Certainly Not be Recognized by Mexican Courts**

70. Based on my knowledge and experience in Latin American law, and my review of Mexican law in particular, I opine that a judgment rendered by a United States court in a class action for money damages would not be enforced in Mexico. As with Venezuela, I am unaware of any Mexican case in which a Mexican court has recognized a United States class action judgment for money damages in order to bar re-litigation of the same claims by Mexican citizens in Mexico.[69] Similar to his account of the Venezuelan foreign judgment enforcement regime, Professor Garro's description of Mexico does not address the specific situation of an American class action judgment, which is essential to understand the present case. The legal and procedural obstacles to enforcement of a U.S. foreign judgment in Mexico are also stringent. The Mexican legal system, like most Latin American countries, does not recognize the class action device presented in this case. Although Mexico recently adopted a group litigation procedure, it does not recognize the "opt-out" mechanism. Instead, Mexico requires that "absent class members must *opt into* the class in order to be able to participate in the class action judgment".[70] In addition, as with Venezuela, the form of class action notice in the United States does not comport with Mexican standards and Mexico would not recognize a court's exercise of personal jurisdiction over foreign residents. Further, in practice, while open hostility towards the United States is not as widespread in Mexico as in Venezuela, there are still significant procedural burdens to obtaining *res judicata* enforcement of a United States judgment, and the Mexican judicial system suffers from endemic corruption. In my opinion, these obstacles would make any class action judgment obtained in this case useless in barring future re-litigation of claims by Mexican members of the class.

---

[69] *See generally, Gidi, US class action judgments in Latin America.* The only empirical study that I am aware of regarding the recognition of United States judgments in Mexico does not mention a single class action-related judgment in the time frame considered for the research. *See also,* JORGE ALBERTO SILVA, RECONOCIMIENTO Y EJECUCIÓN DE SENTENCIAS DE ESTADOS UNIDOS EN MÉXICO, (Mexico: UNAM) (2011) [Hereinafter, *"Silva, Reconocimiento de sentencias de Estados Unidos"*] at 19.

[70] *See, Gidi, US class action judgments in Latin America,* at 922; and, Manuel A. Gómez, *Will the Birds Stay South? The Rise of Class Actions and Other Forms of Group Litigation Across Latin America,* 43 UNIV. MIAMI INTER-AMERICAN L. REV. 3 (2012) [hereinafter, *"Gómez, Class Actions across Latin America"*]

**APP 1933**

**Willis APP 673**

I.   **A Class Action Judgment Rendered in the United States Would Not be Entitled to Preclusive Effect Under Mexican Law**

a.   *Background and Procedure for Recognition and Enforcement of Foreign Judgments in Mexico*

71. As with Venezuela,[71] there are no treaties between Mexico and the United States that govern the enforcement of foreign judgments.[72] Consequently, the relevant Mexican federal statutes control the domestication of a judgment issued by a United States court. The Federal Code of Civil Procedures ("FCCP") governs civil matters and the Commercial Code ("CC") governs commercial matters. In addition, because Mexico is a federal republic, there are similar state statutes that could apply to the domestication of foreign judgments when enforcement is sought in their territory.[73]

72. A petition to domesticate a foreign judgment—known under Mexican law as "*exhorto*"[74]—may be filed in a federal or state court depending on the type of controversy, which also determines the procedure to be followed.[75] However, according to article 104 (II) of the Mexican Constitution, federal courts have jurisdiction of "all civil and commercial controversies that arise in connection with the enforcement of federal statutes or international treaties concluded by the Mexican State."[76] Therefore, due to this case's nature, a petition to domesticate a judgment issued by a United States

---

[71] Like Venezuela, Mexico is a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and the Inter-American Convention on International Commercial Arbitration.

[72] *See, Silva, Reconocimiento de sentencias de Estados Unidos* at 12. Mexico, notwithstanding, is a party to several treaties related to the recognition and enforcement of foreign judgments, including the Inter-American Convention on the Extraterritorial Efficacy of Foreign Judgments and Arbitral Awards ("Montevideo Convention of 1979"), and the Inter-American Convention on Jurisdiction in the International Sphere for the Extraterritorial Efficacy of Foreign Judgments and Arbitral Awards ("La Paz Convention of 1984").

[73] In fact, all states except for Guanajuato and Tlaxcala have their own codes of civil procedure, which contain specific provisions dealing with the recognition and enforcement of foreign judgments in similar terms to the FCCP. *See*, Ana Margarita Ríos Farjat, *Reflexiones en torno a los problemas de homologación en Mexico de sentencias patrimoniales dictadas en los Estados Unidos de América*, in PERSPECTIVAS DEL DERECHO EN MEXICO, (Mexico, UNAM 2000) pp. 12, 13 [Hereinafter, "*Rios Farjat, Homologación de sentencias*"].

[74] *See, Perez, Enforcement of Mexican Judgments*, at 78. ["In Mexico, different from Venezuela, the means to obtain the recognition of a foreign judgment is the *exhorto*"].

[75] *Silva, Reconocimiento de sentencias de Estados Unidos* at 34.

[76] Political Constitution of the Mexican United States (Mexico) as amended to July 7, 2014. Available at: http://www.diputados.gob.mx/LeyesBiblio/htm/1.htm.



**APP 1934**

**Willis APP 674**

court in the present matter would likely fall within the jurisdiction of the federal courts in Mexico.

73. At the federal level, both the FCCP and the CC set forth nearly identical requirements for a foreign judgment to be recognized and enforced in Mexico. The requirements are that the foreign judgment:

    a. Fulfills the necessary requirements to be deemed as authentic (i.e. legalized, and the relevant signatures duly authenticated);[77]

    b. Conforms to the formalities required by the treaties to which Mexico is a party,[78] or by the FCCP provisions regarding foreign judgments;[79]

    c. Does not involve an *in rem* action;[80]

    d. Has *res judicata* effect where it was issued, and that there are no appeals against it;[81]

    e. That the foreign judge had jurisdiction;[82]

    f. That the defendant was given proper notice of the original action, in a way that ensured his due process rights;[83]

    g. That there is no pending action in Mexico concerning the same issues and parties involved in the original foreign action;[84] and

    h. That the foreign judgment is not contrary to Mexico's public order.[85]

The burden of proving a foreign judgment should be enforced in Mexico is upon the party asserting its binding effect.[86]

---

[77] CC, article 1347-A (VIII), and FCCP, article 571 (VIII).

[78] CC, article 1347-A (I).

[79] FCCP, article 571(I).

[80] CC, article 1347-A (II), and FCCP, article 571(II).

[81] CC, article 1347-A (V), and FCCP, article 571 (V).

[82] CC, article 1347-A (III), and FCCP, article 571(III).

[83] CC, article 1347-A (IV), and FCCP, article 571(IV).

[84] CC, article 1347-A (VI), and FCCP, article 571 (VI).

[85] CC, article 1347-A (VII), and FCCP, article 571 (VII).

APP 1935

Willis APP 675

74. Even if the aforementioned requirements are met, both the FCCP and CC give discretion to a Mexican court to deny the recognition and enforcement of a foreign judgment if it is proven that the courts of the country where the foreign judgment originated would refuse to enforce a similar judgment from Mexico.[87] In other words, the recognition of a foreign judgment in Mexico is subject to reciprocity, at the discretion of the enforcing court.

75. Of particular importance is the requirement that the foreign judgment not violate Mexico's "public order;"[88] which, in other words, means that it must not serve an illicit purpose or violate constitutional rights (such as due process).[89] As discussed further below, because Mexico does not recognize the "opt-out" class action device, it is highly likely that a Mexican court would conclude such a judgment fails to comport with Mexican legal protections. Further, the corruption of the judiciary in Mexico and the pernicious tactics commonly employed in these type of proceedings,[90] makes it even more certain that a class action judgment purporting to bar Mexican citizens from prosecuting individual claims against U.S. defendants would be disregarded.

76. Nevertheless, even if one assumes an impartial review by a Mexican court will occur, it is reasonable to conclude that a United States-style class action judgment would not be given any preclusive effect, as a matter of Mexican law, because: (i) the "opt-out" class action device is not accepted in Mexico, (ii) *res judicata* does not apply to individuals who were not actual parties to the original litigation, (iii) the notice provisions of United States-style "opt-out" class actions do not meet Mexican standards; and (iv) a Mexican court would likely rule that a United States court has no jurisdiction to issue a judgment involuntarily binding Mexican citizens in a case involving transactions occurring in Mexico.

---

[86] FCCP, article 572.

[87] CC, article 1347-A, last paragraph, and FCCP, article 571, last paragraph.

[88] FCCP, article 569; *see also, Rios Farjat, Homologación de sentencias* at 13, 17.

[89] Id. at 17.

[90] *See, Silva, Reconocimiento de sentencias de Estados Unidos* at 58. ["Another aspect related to this procedure, which is worth mentioning, is the malicious delay of some lawyers with the purpose of impeding that a foreign judgment is recognized and enforced"].

APP 1936

Willis APP 676

### b. "Opt-Out" Class Actions for Money Damages Are Not an Accepted Form of Litigation in Mexico

77. As with virtually all Latin American countries, Mexico does not recognize a representative form of litigation to recover money damages in private suits where the nonparticipating class members must "opt-out" to avoid a binding judgment.

78. Since 2011, however, Mexico has begun to regulate and permit certain types of collective litigation.[91] The regime is contained not in a single statute, but in seven different federal laws, to wit: the Federal Civil Procedure Code (CFPC),[92] the Federal Civil Code (CC),[93] the Federal Antitrust Law (LFCE),[94] the Federal Consumer Protection Law (LFPC),[95] the Enabling Law for the Federal Judiciary (LOPFJ),[96] the General Environmental Law (LGEEPA),[97] and the Banking Savings Protection Law (DUSEF).[98]

79. The Mexican concept of collective litigation contrasts from the United States in a few key aspects, however. Unlike the United States, the only parties with standing to prosecute a collective litigation in Mexico are a limited number of public entities, including the Office of the Attorney General[99] and other special federal prosecutors with subject matter

---

[91] *See, Gómez, Class Actions across Latin America* at 516.

[92] Código Federal de Procedimientos Civiles [CFPC] [Federal Civil Procedure Code], *as amended*, Diario Oficial de la Federación [DO], 9 de febrero de 2012 (Mex.).

[93] Código Civil Federal [CC] [Federal Civil Code], *as amended*, Diario Oficial de la Federación [DO], 31 de agosto 1928 (Mex.).

[94] Ley Federal de Competencia Económica [LFCE] [Federal Antitrust Law], *as amended*, Diario Oficial de la Federación [DO], 24 de diciembre de 1992 (Mex.) (hereinafter LFCE).

[95] *See* LFPC, Ley Federal de Protección al Consumidor [Federal Consumer Protection Law], *as amended*, Diario Oficial de la Federación [DO], 24 de diciembre de 1992 (Mex.).

[96] Ley Orgánica del Poder Judicial de la Federación [LOPJF] [Enabling Law for the Federal Judiciary] *as amended*, Diario Oficial de la Federación [DO], 27 de mayo de 1995 (Mex.).

[97] *See* LGEEPA, Ley General de Equilibrio Ecológico y Protección al Ambiente [General Environmental Law], *as amended*, Diario Oficial de la Federación [DO], 4 de junio de 1992 (Mex.).

[98] Ley de Protección y Defensa al Usuario de Servicios Financieros [DUSEF] [Banking Savings Protection Law], *as amended*, Diario Oficial de la Federación [DO], 18 de enero de 1999 (Mex.).

[99] *See* CFPC at art. 585(IV).

APP 1937

Willis APP 677

expertise on consumer, securities fraud, antitrust, and environmental issues.[100] In certain instances, registered and authorized civil associations[101] are also allowed to bring suit on issues directly related to their activities, pursuant to their articles of association.[102] This is more similar to civil suits by the Federal Trade Commission in the United States than it is to class actions brought by private litigants, such as in this case.

80. Still, there is an even more critical divergence between Mexico and the United States. Mexico specifically does not accept the idea of an "opt-out" class action. Rather, the notice given to absent members of a potential class in Mexico requires each individual to "opt-in" to be considered a part of the litigation.[103] This means that absent class members are not bound by any judgment unless they formally and affirmatively join the litigation. Thus, as in Venezuela, the concept of an "opt-out" class action for money damages is itself contrary to Mexico's public policy.

### c.    An "Opt-Out" Class Action Judgment Would be Given No Res Judicata Effect Against Absent Class Members in Mexico

81. As a matter of well-settled Mexican law, *res judicata* would not bar an absent class member residing in Mexico from re-litigating claims addressed in a United States-style "opt-out" class action.

82. For a judicial decision to have any force and produce *res judicata* effect in Mexico, those affected by it must have been given an opportunity to present their case and be heard in the context of a regularly constituted judicial process. This is widely known as the "relativity principle of *res judicata*",[104] which means that the preclusive effect of a judgment only occurs with regard to the parties, and no one else.

---

[100] *See id.* at art. 585(I) [Including the Federal Prosecutor for Consumer Protection (FPCP), the Federal Prosecutor for Environmental Protection (FPEP), the National Commission for the Protection and Defense of Financial services Users and, and the National Antitrust Commission].

[101] *Id.* at art. 619 [Indicating that, because class representation is deemed to be of public interest, the associations have to register with the Federal Judicial Council (FJC)]

[102] *Id.* at art. 585(III).

[103] *Id.* at arts. 591, 593-94.

[104] *See, generally,* Octavio Cifuentes Rivera, *Cosa juzgada,* 27 REVISTA DE LA FACULTAD DE DERECHO DE MEXICO 35, 73 (1957).

APP 1938

Willis APP 678

83. The only way a person can present his/her case and be heard under Mexican law is when he/she voluntarily appears and participate in the judicial process, or when he/she is served with the summons in person by the bailiff in a manner consistent with Mexican law.[105] Service and joinder of a plaintiff by an "opt-out" class notification is inadequate because it does not conform with the principles of service of process in Mexico. The law in Mexico mandates that service of process be effected in person.[106]

84. Failure to serve a party in Mexico by personal service is a due process violation.[107] Mexican law provides that the right to due process is of the utmost importance,[108] to the point that it is expressly guaranteed by the Constitution,[109] and other statutes including the FCCP in the context of civil litigation.[110] The deprivation of a Mexican citizen's due process rights based on the fact that they did not affirmatively "opt-out" of a foreign class action is completely opposite to Mexico's recently-established form of collective litigation.

85. Accordingly, a United States-style "opt-out" class action would not meet the standards for recognition and enforcement of a foreign judgment in Mexico. A U.S.-based litigant asserting that *res judicata* bars a Mexican member of the class who did not affirmatively join and participate in the litigation from prosecuting claims in a Mexican court would be unsuccessful on the basis that absent class members in Mexico "were not made parties and had no day in court"[111]

---

[105] *Silva, Reconocimiento de sentencias de Estados Unidos* at 85, 86.

[106] FCCP, article 327.

[107] A case presented to illustrate the importance given to the requirement of personal jurisdiction of the foreign court over non-residents is the Robot case (Texas, docket 97-38148) mentioned by Silva in his study about the enforcement of United States judgments in Mexico. In that case, the Mexican court denied the recognition request because it found that the American court did not have personal jurisdiction over non-resident Mexican defendants, which would have been required as a matter of Mexican law. *See, Silva, Reconocimiento de sentencias de Estados Unidos* at 79.

[108] Cipriano Gómez Lara, *El debido proceso como derecho humano*, in ESTUDIOS JURÍDICOS EN HOMENAJE A MARTA MORINEAU, Tomo II, Nuria González Martín, ed. (UNAM, 2006) at 345.

[109] Constitution (Mexico), article 24, second paragraph.

[110] *See, e.g.,* FCCP, articles 275, 571, 574, 578.

[111] *See, Gidi, US class action judgments in Latin America* at 904.

32

**APP 1939**

**Willis APP 679**

### d.   A U.S. Class Action Judgment Involving Foreign Residents Would Not be Recognized Because it Offends Mexican Concepts of Jurisdiction

86. Similar to the Venezuelan situation, an independent reason why a Mexican court would deny a request to recognize and enforce a United States judgment issued in a class action proceeding is that, under Mexican law, the United States court would be found to lack personal jurisdiction over non-resident absent class members.[112] In more specific terms, according to article 1347-A (III) of CC, and article 571(III) of FCCP, one of the requirements for granting a foreign judgment recognition is that the foreign court had jurisdiction over the matter, which includes having jurisdiction over the parties (i.e., all those to whom *res judicata* would apply).

87. The jurisdictional review that would be done by the Mexican court, however, would be based on the principles of international jurisdiction in force in Mexico, including any relevant international treaties, rather than the jurisdictional standards of the United States.

88. Under Mexican law, a court does not have jurisdiction over non-resident persons unless they submitted themselves voluntarily to the jurisdiction of that court (*e.g.*, by filing a claim, or formally appearing to present a defense) or service of process had been properly effected on them. As discussed previously, the "opt-out" class action device and its less formal means of notice do not comport with Mexican standards of personal service.

89. Accordingly, Mexican legal standards of personal jurisdiction would preclude the recognition and enforcement of a United States "opt-out" class action judgment against Mexican residents who did not affirmatively subject themselves to the jurisdiction of United States courts.[113]

### e.   The Practical Burdens of Enforcing a Foreign Judgment in Mexico are Insurmountable

90. Lastly, in practice, it would also be a very burdensome and lengthy process to obtain recognition of a United States class action judgment in Mexico. Although the procedure for the recognition and enforcement of foreign judgments, as written, may appear

---

[112] Id. at 945 ["Therefore, a foreign class action judgment that is issued without personal jurisdiction over absent class members is void and would not be recognized in Latin America"].

[113] Id.

APP 1940

Willis APP 680

straightforward and simple, in practice it often takes several years to domesticate a foreign judgment.[114] This is more likely to be the case as well when something unusual like a United States "opt-out" class action judgment is presented for recognition and enforcement rather than an ordinary judgment in an individual litigation. Adding to the delay further still, Mexico (unlike Venezuela) also allows appeals in the domestication procedure.[115]

91. Further, similarly to what occurs in Venezuela, even if a Mexican court were to grant a petition to recognize the foreign judgment (which, in this case, is unlikely), the requesting party would still have to present the judgment for enforcement,[116] which may also take a long time depending on the defenses submitted by the parties and given the precarious situation of the Mexican courts. To illustrate this point, in his empirical study about the recognition and enforcement of United States judgments in Mexico, Silva mentions an example of a judgment issued by a California court in 2001. One of the parties immediately sought recognition of the judgment in Mexico that same year. Notwithstanding, it was not until 2007—that is, more than *five years* later—that the Mexican court finally denied the petition to recognize the foreign judgment; but even then the legal battle continued beyond the publication of Silva's book.[117]

92. Again, in any case, the burden of proof placed on Defendants would be overwhelming. If one assumes a class is certified in this case and the Defendants obtain a favorable judgment, then it is quite possible that Mexican members of the class may seek to re-litigate their individual claims again in Mexico. After answering the litigation in the trial court, the Defendants would have the burden to prove all the elements for recognition and enforcement of the judgment under Mexican law. Not only would the Defendants have to prove each of the prerequisites identified above (that the United States court had proper

---

[114] *Silva, Reconocimiento de sentencias de Estados Unidos* at 56 ["Notwithstanding, as the amount in dispute increases, political interests become involved, and requests are filed, the time increases too. Some of these matters may take three or more years. It is disgraceful that the indication of maximum terms by statute not always correspond with reality"].

[115] Id. at 148; *see also,* FCCP, article 608.

[116] *Silva, Reconocimiento de sentencias de Estados Unidos* at 25, 139.

[117] Id. at 57.

APP 1941

Willis APP 681

jurisdiction and that proper notice under Mexican law was given, among others), they would also have to demonstrate the impossible: that Mexican citizens can be barred from pursuing their individual claims by a judgment issued in a prohibited form of representative litigation that occurred in a foreign country, and for which they were never properly served a summons or voluntarily "opted in" as a party.

93. In sum, given the absence of a reciprocal class action procedure in Mexico—in particular, the fact that an "opt-out" form of notice given by less than personal service completely contradicts the public policy recently expressed by Mexico—it is virtually certain that no court in Mexico, even one that is not corrupt or inefficient as discussed below, would give preclusive effect to a class action judgment for money damages rendered in this case to bar an absent class member in Mexico from re-litigating their claims.

### 2. The Mexican Judiciary Lacks Independence and Cannot be Relied on to Enforce A Class Action Judgment Rendered in the United States.

94. According to the latest (2013) edition of the annual report Global Corruption Barometer published by Transparency International, eighty percent of those surveyed considered that the Mexican judiciary "was corrupt/very corrupt",[118] and fifty five percent "reported paying a bribe to the judiciary".[119] The same report also showed Mexico as the most corrupt country of the OECD.[120] Another document prepared by an independent reporter appointed by the Economic and Social Council of the United Nations on the Independence of Judges and Lawyers in Mexico observed that "corruption involves between 50% and 70% of all federal judges",[121] and further said that "the Judicial Council had never sanctioned a federal judge for corruption".[122] The same report

---

[118] http://www.transparency.org/gcb2013/country/?country=mexico.

[119] Id.

[120] http://noticias.univision.com/article/1760025/2013-12-03/mexico/noticias/mexico-el-mas-corrupto-de-la-ocde-segun-informe-de-transparencia-internacional.

[121] Consejo Económico y Social de las Naciones Unidas, Informe del Relator Especial sobre la independencia de los magistrados y abogados, Sr. Dato'Param Coomaraswamy, presentado de conformidad con la resolución 2001/39 de la Comisión de Derechos Humanos, E/CN.4/2002/72/Add.1, January 24, 2002 [Hereinafter, *"UN Report on Independence of Mexican judges and lawyers"*] ¶63.



[122] Id.

APP 1942

Willis APP 682

described instances of violence that resulted in the death of federal judges,[123] the pervasive payment of bribes in the context of civil litigation without which "not even a piece of paper is moved",[124] and numerous other instances of systematic malfunctioning that include the abuse of extraordinary procedures such as the constitutional writ of *amparo* as a delay or a blocking tool in case of an adverse ruling.[125] *Amparo* proceedings, the report said, are routinely used "as an additional means to appeal a judgment,"[126] and cause undue delay. Recent studies that rely on empirical data have confirmed this state of affairs, thus proving that it is not just a matter of negative perception, but a fact.[127]

95. The gravity of this situation is not confined to a specific type of court, or geographic area, but seems to be pervasive throughout the country and to affect all areas of the law. Unsurprisingly, civil and commercial courts are not exempted from this endemic failure, and the proceedings geared to obtain the recognition and enforcement of foreign judgments are obviously affected. This opinion seems to be shared by Jorge Luís Silva, who devotes an entire chapter to the topic of corruption and judicial malfunctioning in his book on the recognition and enforcement of United States judgments in Mexico.[128]

96. It is precisely this evidence that leads me to conclude that even if in theory, a Mexican court authorized the enforcement of a United States class action judgment (which I opine it cannot), as a practical matter, the Mexican judicial system could not be relied on to enforce such a judgment because of its systematic failures.

---

[123] Id. ¶71

[124] Id. ¶ 64.

[125] Id. ¶ 140 et. seq.

[126] Id. ¶ 142.



[127] *See, e.g.,* Julio Bustillos, La corrupción de los jueces federales mexicanos y su depuración,  33 Revista del Instituto de la Judicatura Federal 41 (2012).

[128] *Silva, Reconocimiento de sentencias de Estados Unidos* at 159-166.

APP 1943

Willis APP 683

C.      **A Class Action Judgment Rendered in the United States Would Almost
        Certainly Not be Recognized by Colombian Courts**

1.      **A Class Action Judgment Rendered in the United States Would Not
        be Entitled to Preclusive Effect Under Colombian Law**

97. Colombia has adopted a group litigation regime, which has some similar features to the
    class actions available in the United States.[129] Notwithstanding, there are some important
    differences arising from general principles of Colombian procedural law that undeniably
    pose an obstacle to the recognition and enforcement in Colombia of a judgment that
    resolves an American class action. The main impediments are: (i) the lack of service of
    process effected on non-resident (Colombian) absent class members who, as a result,
    cannot be bound by the foreign judgment,[130] and (ii) the need for reciprocity regarding the
    recognition and enforcement of a group litigation-related Colombian judgment in the
    United States. It is because of these reasons that I conclude that the courts of Colombia
    would not recognize a judgment issued by an American court in a class action proceeding
    for money damages.

98. The protection of collective interests in Colombia can be traced back to the declaratory
    relief mechanism set forth among the traditional possessory actions in the country's 1887
    Civil Code.[131] Furthermore, the Colombian Political Constitution of 1991[132] contemplated
    the protection of collective rights as a state policy and set the basis to regulate group
    litigation in Colombia.[133] In 1998, the Colombian Congress enacted the Popular and
    Group Actions Act (PGAC or Law 472), the main objective of which was to develop the
    principles set forth in Article 88 of the 1991 Constitution.[134]

---

[129] *See, Gidi, US class action judgments in Latin America* at 934-35.

[130] Id. at 936.

[131] *See generally,* GERMÁN SARMIENTO PALACIO, LAS ACCIONES POPULARES EN EL DERECHO COLOMBIANO (1988).

[132] CONSTITUCIÓN POLÍTICA DE COLOMBIA [C.P.] art. 88.

[133] *Id.* ("The law will regulate popular actions for the protection of collective rights and interests related to the
homeland, space, public safety and health, administrative morality, the environment, free economic competition, and
others of a similar nature. It will also regulate the actions arising out of harm caused to a large number of
individuals, without barring appropriate individual action. In some way, the law will also define cases of civil
liability for harm caused to collective rights and interests.").

[134] L. 472, august 5, 1998, [art. 1] DIARIO OFICIAL [D.O. 43.357] (Colom.).

**APP 1944**

**Willis APP 684**

99. Law 472, the statute regulating group litigation in Colombia, created a mechanism of group action (*acción de grupo*) devised to offer redress to groups, categories or classes of individuals uniformly situated with respect to an event or product that have caused them harm.[135] As per Article 46 PGAC, group actions are expressly intended to seek monetary compensation for individual damages suffered by group members. A "group" is defined by the existence of uniform conditions with respect to an event alleged to have inflicted harm on each and all of its members.[136] The PGAC does not require the representative party claims to be typical of the rest of the group, but simply that the cause of the alleged harm is common to all group members and that the group is comprised of at least twenty people.[137]

100. The PGAC creates a procedural device whereby, once the litigating group is certified, the court shall direct notice to all members so that they can "opt-in" and join the litigation alongside the original parties.[138] PGAC also allow group members who did not participate in the proceedings to be excluded, as long as they file their request within twenty days of the final ruling on the merits, but may not invoke exemplary damages or partake in any fee awards.[139] Furthermore, the PGAC also provides group members with an opportunity to be excluded within five days following the term established to effect service of process.[140]

101. At first glance, the similarities between the Colombian group litigation model and its American counterpart appears to suggest that there are no major obstacles in obtaining the recognition and enforcement of a United States class action judgment in Colombia.

---

[135] *See*, Gómez, *Class Actions across Latin America* 481, 497.

[136] Id. at 499.

[137] Id. at 499-500. On February 13, 2008, the Colombian Constitutional Court clarified that the twenty-person threshold does not refer to the number of representative plaintiffs, but rather, it refers to an identifiable group of individuals that form the class. *See* Corte Constitucional [C.C.] [Constitutional Court], February 13, 2008, Sentencia C-116/08.

[138] L. 472, August 5, 1998, [art. 53] DIARIO OFICIAL [D.O. 43.357] (Colom.).

[139] Id. at art. 55. The constitutional court abrogated the requirement that the statute of limitations had not lapsed with respect to these class members. *See* Corte Constitucional [C.C.] [Constitutional Court] April 10, 2009, Decision C-241-09.

[140] L. 472 August 5, 1998, [art. 56] DIARIO OFICIAL (D.O.) (Colom.).

APP 1945

Willis APP 685

However, that is not true. A careful review of the Colombian legal system reveals that there are insurmountable obstacles that arise from the general prerequisites for recognition and enforcement of foreign judgments, such as those related to service of process on absent class members, which would in turn impede the recognition of a judgment produced in a litigation like the present one. In addition, as a matter of Colombian law the recognition and enforcement of a foreign judgment is subject to a reciprocity requirement.[141] This means that a Colombian court would only recognize a United States class action judgment if there is evidence that the United States would recognize a similar decision emanating from a Colombian court. The analysis of these factors against the facts and circumstances present in this case, lead me to conclude that a class action judgment for money damages issued by a United States court cannot be enforced in Colombia.

102. Since the recent entry into force of the new Colombian General Code of Procedure in 2012 ("GCP"),[142] the *exequatur* procedure set forth in Articles 605-607 regulates the recognition of foreign judicial judgments. Hence, pursuant to Article 605 of the GCP, a judgment issued by a foreign court will have in Colombia the binding force granted by international conventions entered into with the relevant State. Absent such a treaty or convention, a foreign judgment will have in Colombia the same binding force granted to Colombian judgments in the relevant foreign State.[143]

### a.   The reciprocity requirement under Colombian law

103. Similarly to the Mexican and Venezuelan cases, there are no treaties or conventions in force between the United States and Colombia regarding the recognition and enforcement of money judgments. As a result, a United States class action judgment for damages will be granted exequatur *if, and only if*, the Colombian court finds that a similar Colombian judgment would be equally recognized and enforced in the territory of the United States.

---

[141] *See,* GPC, article 605.

[142] L. 1564 July 12, 2012, DIARIO OFICIAL [D.O. 48.489] (Colom.).

[143] [*"Las sentencias y otras providencias que revistan tal carácter, pronunciadas por autoridades extranjeras, en procesos contenciosos o de jurisdicción voluntaria, tendrán en Colombia la fuerza que les concedan los tratados existentes con ese país, y en su defecto la que allí se reconozca a las proferidas en Colombia [...]"*].



**APP 1946**

**Willis APP 686**

In other words, Article 605 of the GCP imposes a requirement of reciprocity.   This certainly poses an obstacle to be faced by a party seeking the recognition and enforcement of a United States class action judgment in Colombia.   In other words, unless the party seeking the recognition of a United States class action judgment in Colombia furnishes evidence to the Colombian court that a United States court would grant recognition to a Colombian group litigation judgment, the request would be denied.

> ### b.   Lack of adequate service of process is an impediment for the recognition and enforcement of a United States judgment in Colombia

104. Furthermore, Article 606 GCP provides the requisites for foreign judgments to have effect in Colombia. According to Article 606(6), a foreign judgment arising out of a foreign litigation procedure can only be recognized in Colombia as long as all parties to the litigation have been properly served a summons, or have voluntarily appeared in the court proceeding to present their case.[144] Similarly to the cases of Venezuela and Mexico, lack of service of process would adversely affect the validity of the entire proceedings and run against the basic notions of Colombian due process. The same effect would happen if service were defective.

105. A typical "opt-out" notice given in the United States to absent class members—unless it was performed individually through letters rogatory as per the Inter-American Convention on Letters Rogatory[145]—would likely be deemed inadequate to afford absent class members in Colombia an opportunity to present their case and exercise their due process rights.[146]

106. Similar to the case of Mexico and Venezuela, a foreign judgment—such as one rendered by a United States court in a class action for damages—that resulted from a process where absent class members were not adequately served with summons and the complaint, is in direct violation of the Colombian guarantee of due process, and is

---

[144] ["*Que si se hubiere dictado en proceso contencioso, se haya cumplido el requisito de la debida citación y contradicción del demandado, conforme a la ley del país de origen, lo que se presume por la ejecutoria.*"].

[145] Both the United States and Colombia are parties to the Convention. *See,* http://www.oas.org/juridico/english/sigs/B-36.html.



[146] *See,* Gidi, US class action judgments in Latin America at 901.

**APP 1947**

**Willis APP 687**

therefore offensive to the public policy of Colombia. As a result, said foreign judgment could not be enforced in Colombia for failing to meet the requisites set forth in article 606 of GCP.

107. For the above reasons, and based on my assessment of the facts and circumstances relevant to this case, I conclude that the applicable legal principles and laws of Venezuela, Mexico and Colombia prohibit the recognition and enforcement of a United States class action judgment for money damages. I also conclude that, even if the laws of Venezuela, Mexico and Colombia did require it, in practice, the recognition and enforcement of a United States class action judgment for money damages would be unavailable in either country.

### D.    Similar Legal Principles and Standards Apply Across All of Latin America

108. Whereas the conclusions expressed above refer specifically to Venezuela, Mexico and Colombia, my familiarity with the development of collective litigation in Latin America, the characteristics of the procedural mechanisms that have emerged in recent times, their case law, and the overall functioning of Latin American civil litigation systems, also allows me to opine that all the Latin American jurisdictions at issue in this case would have similar reasons for denying recognition to a United States class action judgment for money damages.

109. As apparent from the discussion of just Venezuela, Mexico, and Colombia above, class action litigation is largely unheard of in the majority of Latin American countries. Even in those where some form of group litigation exists, the "opt-out" mechanism used in the United States is not an acceptable form of notice or process in Latin America. The notion of extending the *res judicata* effects of a judgment beyond the actual parties to the dispute and onto someone who was not properly served with formal process (and in accordance with international treaties when applicable), is completely alien to those national legal regimes. But even more important than the general unfamiliarity Latin American legal systems have with United States-style class actions is the fact that the key features of the American device—*res judicata* that binds absent members who remain silent and do not affirmatively "opt out" after receiving a notice sent typically by regular mail or something else less and formal service—stands in direct conflict with

41

**APP 1948**

**Willis APP 688**

fundamental tenets of civil justice in those countries. The fundamental principles of due process and public order are of the utmost importance in Latin America and emanate from the highest constitutional levels.

110. Therefore, it is my opinion, based on my knowledge, experience, and study of Latin American legal systems, that none of the Latin American countries at issue in this litigation would give *res judicata* effect to an "opt-out" class action judgment rendered in this case to preclude one of their own citizens from re-litigating individual claims against the United States-based Defendants.

Miami, February 12, 2015

Manuel A. Gómez

APP 1949

Willis APP 689

[11/02/2014]

# MANUEL ALEJANDRO GÓMEZ

Florida International University College of Law

11200 SW 8th Street, RDB 2043, Miami, Florida 33199

Direct: +1+305+3481158

magomez@fiu.edu

## EDUCATION

| Degree | Institution | Field | Dates |
|---|---|---|---|
| Juris Science Doctor (J.S.D.) | Stanford University, School of Law | Law | 2002-2007 |
| Juris Science Master (J.S.M.) | Stanford University, School of Law | Law | 2001-2002 |
| Spec. in Civil Procedure | Universidad Católica Andrés Bello | Law | 1994-1996 |
| J.D. *cum laude* | Universidad Católica Andrés Bello | Law | 1989-1993 |

## FULL-TIME ACADEMIC EXPERIENCE

| Institution | Rank | Field | Dates |
|---|---|---|---|
| FIU College of Law | Associate Professor | Law | 5/2010-present |
| FIU College of Law | Assistant Professor | Law | 8/2007-5/2010 |
| U. of Iowa College of Law | Visiting Professor | Law | 5/2012 |
| INIDEM Business Law School | Visiting Professor | Law | 4/2012-present |
| Universidad Sergio Arboleda | Visiting Professor | Law | 12/2009-present |
| Stanford Law School | Teaching Fellow and Lecturer | Law | 8/2005-7/2007 |
| Universidad Metropolitana | Visiting Professor | Law | 6/2005-8/2005 |
| Universidad Central de Venezuela | Assistant Professor | Law | 8/1995-8/2001 |
| Universidad Católica Andrés Bello | Visiting Professor | Law | 8/2000-8/2001 |
| Universidad Católica del Táchira | Visiting Professor | Law | 8/1996-8/1997 |

1

**APP 1950**

**Willis APP 690**

## PROFESSIONAL EXPERIENCE

| Place of Employment | Title | Dates |
|---|---|---|
| M. Gómez & Cía, LL.P. | Principal | 1/1997-7/2005 |
| Gómez Díaz & Asociados | Associate/Partner | 9/1993-1/1997 |

## RECENT PUBLICATIONS

### Books

ROGELIO PÉREZ-PERDOMO & MANUEL A. GÓMEZ, LEGAL AND POLITICAL CULTURE IN REVOLUTIONARY VENEZUELA 1999-2013 (Universidad Metropolitana Press) "In Press"

ROGELIO PÉREZ-PERDOMO & MANUEL A. GÓMEZ, INNOVATIONS IN LEGAL EDUCATION IN LATIN AMERICA, 2nd Ed. (Universidad Metropolitana Press) "In Press"

LAWRENCE M. FRIEDMAN, ROGELIO PEREZ-PERDOMO & MANUEL A. GÓMEZ, LAW IN MANY SOCIETIES: A READER (Stanford University Press, 2011)

### Articles

Manuel A. Gómez, *The Tower of David: Social Order in the Vertical Slum,* FLORIDA INTERNATIONAL UNIVERSITY LAW REVIEW (2014) (forthcoming)

Manuel A. Gómez, *Crowd funded justice: On the potential benefits and challenges of crowd funding as a litigation financing tool,* 49 UNIVERSITY OF SAN FRANCISCO LAW REVIEW (2014) (forthcoming)

Manuel A. Gómez, *Precious Resolution: The Use of Intra-Community Arbitration by Jain Diamond Merchants,* 2 BELGIAN REVIEW OF ARBITRATION, B-ARBITRA (2013) (Peer reviewed)

Manuel A. Gómez, *The Global Chase: Seeking the Recognition and Enforcement of the Lago Agrio Judgment Outside of Ecuador,* 1 STAN. J. COMPLEX LIT. 101 (2013) (Peer Reviewed)

Manuel A. Gómez, *Order in the Desert: Law Abiding Behavior at Burning Man,* J. DISP. RES. (2013)

Manuel A. Gómez, *Malleable Law: The (mis)use of legal tools in the pursuit of a political agenda,* 19 ILSA J. Int'l & Comp. L. (2013)

Manuel A. Gómez, *Will the Birds Stay South? The Rise of Class Actions and Other Forms of Group Litigation Across Latin America*, 43 Univ. Miami Inter- American L. Rev. 3 (2012)

APP 1951

Willis APP 691

Manuel A. Gómez, *Knowledge and social networks in the construction of elite lawyers in Venezuela*, XXXVI/2009/3 SOCIOLOGIA DEL DIRITTO (2010) Reprinted as *Greasing the Squeaky Wheel of Justice: Lawyers, Social Networks and Dispute Processing* in THE ROLE OF LAWYERS IN THE CONSTRUCTION OF STATES (Yves Dezalay & Bryant Garth, Routledge, 2011)

Marta Vides, Manuel A. Gómez & Luis F. Pérez-Hurtado, *The American Way: Los abogados latinoamericanos como estudiantes de maestría en los Estados Unidos de América,* 130 Boletín Mexicano de Derecho Comparado (2011) (Peer Reviewed)

Manuel A. Gomez, *Recent developments in Collective Litigation in Latin America: A regional report.* (December 2008) http://globalclassactions.stanford.edu/taxonomy/term/59

Manuel A. Gómez & Rogelio Pérez-Perdomo, *Innovaciones en la Educación Jurídica de América Latina,* Derecho y Democracia II, 15 Cuadernos Unimetanos (2008) (symposium editor, proceedings from conference on Innovations in Legal Education in Latin America)

Manuel A. Gómez, *All In The Family: The Influence of Social Networks on Dispute Processing,* 36 GA. J. INT'L. & COMP. L. 291 (2008)

Manuel A. Gomez, *Class Actions, Group Litigation and other Aggregate Procedures in Latin America: A general overview* (December 2007), available at http://globalclassactions.stanford.edu/taxonomy/term/59

Manuel A. Gómez, *Latin American Laws and the Status of Women, in* THE OXFORD ENCYCLOPEDIA OF WOMEN HISTORY (Oxford U. Press 2007)

Manuel A. Gómez & Rogelio Pérez-Perdomo, *Alternative Justices in Venezuela*, 7 REFORMA JUDICIAL 161-190 (UNAM, México 2006)

Manuel A. Gómez, *Like Migratory Birds: Latin American Claimants in U.S. Courts and the Ford-Firestone Rollover Litigation*, 11 SW. J. L. & TRADE AM. 281 (2005)

Manuel A. Gómez, *The Venezuelan Legal Regime of Crimes Commited Under Voluntary Intoxication* (*Algunas Notas sobre la Responsabilidad Penal por la Comisión de Delitos en Estado de Intoxicación Voluntaria en Venezuela*), 15 DERECHO PENAL CONTEMPORÁNEO 83-107 (Legislec: Bogotá 2005)

Manuel A. Gómez & Rogelio Pérez-Perdomo, *Alternative Dispute Processing Mechanisms in Venezuela* (*Los Mecanismos Alternativos para el Manejo de Conflictos en Venezuela*) (Jornadas Domínguez Escobar: Barquisimeto, Venezuela, 2005)

Manuel A. Gómez, *The Venezuelan Business Lawyers* (*Los Abogados de Negocios en Venezuela*). 125 REVISTA DE LA FACULTAD DE DERECHO DE LA U.C.V. (2003) (Peer Reviewed)

3

**APP 1952**

**Willis APP 692**

Manuel A. Gómez, The Legal Regime of the Conciliatory Power of Venezuelan Judges from 1836 to the present (*La función conciliatoria de los Jueces y su regulación en la Legislación Venezolana, desde 1836 hasta el presente*), ÁMBITO JURÍDICO (Legislec: Caracas 2001)

Manuel A. Gómez & Marisol Santana, The formula for the calculation of labor and Social Security contribution. (*Factor de cálculo para determinar las contribuciones laborales y de Seguridad Social.*) *in* 36 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

Manuel A. Gómez & Marisol Santana, The legal regime of mandatory lay-offs (*El subsistema de Paro Forzoso*)*.* 38 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

Manuel A. Gómez & Marisol Santana, Minimum Wages and Decision 892 (*Fijación del salario mínimo y el Decreto 892*) 36 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

Manuel A. Gómez, Notes on Preferential Acquisition Rights (*Notas sobre los derechos de adquisición preferente*), 33-34-35 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

Manuel A. Gómez, Some Notes about the Legal Regime of Accidental Death Presumptions (*Notas en torno a la presunción de muerte por accidente.*) 29 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

Manuel A. Gómez, Merger by Takeover: The Most Relevant Aspects (*La fusión por absorción: Sus aspectos más relevantes.*) 26 ÁMBITO JURÍDICO (Legislec: Caracas 1999)

Manuel A. Gómez, Audiovisuals as Evidentiary Material (*Consideraciones sobre el Audiovisual como Medio de Prueba.*) 24 ÁMBITO JURÍDICO (Legislec: Caracas 1999)

Manuel A. Gómez, Can videogames and other graphic projections be used as audiovisual evidence? (*¿Son Pruebas Audiovisuales los juegos de video y otras proyecciones graficas?*) 9 REVISTA DE DERECHO PROBATORIO, Editorial Alva, Caracas. 1997.

**Chapters in Books**

MANUEL A. GÓMEZ, *On the Edges: The depiction of law and legal institutions in Breaking Bad* in LAW AND POPULAR CULTURE (Pedro Fortes, ed.) (Fundação Getulio Vargas: São Paulo) (2015)

MANUEL A. GÓMEZ, *The manipulation of law through the social agenda: The case of two Bolivarian misiones, in* LEGAL AND POLITICAL CULTURE IN REVOLUTIONARY VENEZUELA 1999-2013 (co-edited with Rogelio Pérez-Perdomo) "In Press"

MANUEL A. GÓMEZ, *Developments of Latin American Legal Education in the Age of Globalization, in* INNOVATIONS IN LEGAL EDUCATION IN LATIN AMERICA, 2nd Ed. (co-edited with Rogelio Pérez-Perdomo) "In Press"

APP 1953

Willis APP 693

Manuel A. Gomez, *Smoking Signals from the South: Tobacco Litigation in Brazil*, in CLASS ACTIONS IN CONTEXT: HOW ECONOMICS, POLITICS AND CULTURE SHAPE COLLECTIVE LITIGATION (Deborah R. Hensler, Christopher Hodges, and Ianika Tzankova, eds. Edward Elgar Publishing Ltd) "In Press"

Manuel A. Gómez, *Collective Redress in Latin America: The regulation of class actions and other forms of aggregate and group litigation for the protection of consumer rights, IN* L'ART. 140 BIS DEL CODICE DEL CONSUMO L'AZIONE DI CLASSE, a cura di Lorenzo Mezzasoma e Francesco Rizzo, Roma: Edizioni Scientifiche Italiane, 2011

Manuel A. Gómez, *Latin America: A Regional Report, in* FUNDING AND COSTS OF CIVIL LITIGATION (Christopher Hodges, Stefan Vogenauer and Magdalena Tulibacka, eds, Oxford: Hart 2011)

Manuel A. Gómez, *Political Activism and the Practice of Law in Venezuela, in* CULTURES OF LEGALITY: JUDICIALIZATION AND POLITICAL ACTIVISM IN LATIN AMERICA (J. Couso, A. Huneeus, and R. Sieder, eds) (Cambridge University Press*, 2010)

Manuel A. Gómez, *Greasing the Squeaky Wheel of Justice: Lawyers, Social Networks and Dispute Processing, in* LAWYERS AND THE RULE OF LAW IN AN ERA OF GLOBALIZATION (Yves Dezalay & Bryant Garth, eds. Routledge, 2011) (Also published as *Knowledge and social networks in the construction of elite lawyers in Venezuela*, XXXVI/2009/3 SOCIOLOGIA DEL DIRITTO)

**Government Reports or Monographs**

Manuel A. Gómez, Legal and Strategic Culture in Venezuela, *in* STRATEGIC CULTURE: A MULTIFACETED CULTURAL APPROACH TO THE STUDY OF LATIN AMERICA, Florida International University Applied Research Center (2009)

**Book Reviews**

Manuel A. Gómez, *Seeing the Forest and the Trees: A Review of Peter Binder's Analytical Commentary to the UNCITRAL Arbitration Rules of 2010*, 2 BELGIAN REVIEW OF ARBITRATION, B-ARBITRA (2013) "In press".

## SELECTED PRESENTED PAPERS AND LECTURES SINCE 2010

1. November 2, 2014, Presentation "The Jain Way: Consensus building and conflict resolution among Gujarati diamond merchants", Acharya Tulsi International Conference, at Florida International University College of Law, Miami, FL.

2. October 24, 2014, Presentation "The Tower of David: Social order in the vertical slum", at Layers of Law and Social Order Symposium, at Florida International University College of Law, Miami, FL.

APP 1954

Willis APP 694

3. October 27, 2014, Lecture on "Dispute resolution and negotiation", El derecho procesal penal desde una perspectiva comparada Colombia-EEUU, at Florida International University College of Law, Miami, FL.

4. October 17, 2014, Presentation "Big Law in Venezuela: The provision of high-end corporate legal services during times of the Chavista administrations", Big Law in Latin America, Stanford Law School, Stanford, CA.

5. July 13-19, 2014, Presentation "A sour battle in Lago Agrio: The judicial protection of the environment and indigenous rights in Ecuador", XVIII ISA World Congress of Sociology, Yokohama, Japan.

6. June 9-13, 2014, Lecture series "Negotiation and dispute resolution", Universidad San Martín de Porres, Lima, Peru.

7. May 29-June 1, 2014, Roundtable discussant at the session "Coming full circle: The transformation of law practice, the globalization of the legal profession, and innovations in legal education" at the Law and Society Association Annual meeting, Minneapolis, MN.

8. May 15-18, Panel moderator and closing remarks at the Inaugural conference for junior scholars: On Law and (In)formality, Stanford Law School, Stanford, CA.

9. April 28, 2014, Panel moderator at "Lawyers in the Andes and beyond", Andean Studies-LACC, Florida International University, Miami, FL.

10. April 24, 2014, Lecture "Introduction to US law" FIU-CAJ/Universidad Grancolombiana Seminar on the Penal System from a Comparative Perspective, at Florida International University College of Law, Miami, FL.

11. April 11, 2014, Presentation "The rise of international commercial arbitration in Latin America and its importance for Miami", at the FIU-LACC Latin American Forum meeting, Miami, FL.

12. April 9, 2014, Panel moderator "Ethical standards in investment arbitration: Challenges in practice", ILA-ILdeA-FIU Lunch Seminar, American Arbitration Association, Miami, FL.

13. April 7, 2014, Presentation "Emerging topics in international arbitration: Interdisciplinary approaches and student competitions as pedagogical tools", in ICCA Miami Academic Interest Group Session, ICCA Congress Miami 2014, Miami, FL.

14. April 6, 2014, Panel discussant "Crisis in Venezuela", National Association of Hispanic Journalists, Miami-Dade College, Miami, FL.

**APP 1955**

Willis APP 695

15. March 28, 2014, Panel discussant "Jurisdictional overalps arising out of treaty obligations", Interactions between different fora in international arbitration, Columbia Arbitration Day 2014, at Columbia Law School, NY.

16. March 11, 2014, Presentation at the "Roundtable discussion on the Venezuelan currency exchange system", at Holland & Knight LLP, Miami, FL.

17. February 28, 2014, Presentation "Enforcement of Annulled Arbitral Awards", Panel on Hot Topics in International Arbitration, International Litigation and Arbitration Conference of the Florida Bar, Miami, FL.

18. February 26, 2014, Panel moderator, "The Role of Brazil in the Globalization of Law and the Legal Profession", Florida International University College of Law, Miami, FL.

19. February 12, 2014, Presentation "Venezuela and the Inter American System of Human Rights", at the LACC Affiliated Faculty Interdisciplinary Colloquium Series, The Inter American Court of Human Rights, at Florida International University, Miami, FL.

20. February 4, 2014, Presentation "Recovering World War II's Looted Art", Tuesday Times Roundtable, at Florida International University, Miami, FL.

21. January 31, 2014, Presentation, "Crowd funding in litigation", at the panel Funding the Fight: Ethical Alternative Litigation Funding, Law Review Symposium Legal Ethics in the 21st Century: Technology, Speech, and Money, University of San Francisco School of Law, San Francisco, CA.

22. January 5, 2014, Presentation, "US Law Schools, Foreign Lawyers, and the Reform of Legal Education in Latin America", AALS Presidential Workshop on Tomorrow's Law Schools: Economics, Governance and Justice, at the AALS Annual Meeting, New York City, NY.

23. December 4-6, 2013, Guest lecture at the "Second High Level Meeting on International Commercial Arbitration", organized by the Organization of American States, Santiago, Chile.

24. November 7, 2013, Presentation, "Alternative Litigation Financing Heads South: The Potential for and obstacles to third party funding in Latin America" at Washington & Lee University School of Law, Lexington, VA.

25. November 6, 2013, Presentation "The Amparization of International Arbitration", Roundtable Current Issues in International Arbitration in the Americas, Florida International University College of Law, Miami, FL.

26. October 24, 2013, Presentation, "Big Law in Venezuela: From the Oil Opening to the Bolivarian Revolution, 1994-2013" at Stanford Law School, Stanford, CA.

7

**APP 1956**

Willis APP 696

27. September 16-20, 2013, Lecture series on "International Commercial Arbitration" for Pontificia Universidad Javeriana de Bogotá, at Florida International University College of Law, Miami, FL.

28. July 22-24, 2013, Guest lecture and panel moderator at the "Meeting on International Commercial Arbitration", organized by the Organization of American States, San Jose, Costa Rica.

29. July 17, 2013, Guest lecture "The globalization of law and business" at the Seminar on Entrepreneurship and Government held at Florida International University College of Law, Miami, FL.

30. June 12, 2013, Keynote speech "The case method as a pedagogical tool in American legal education" at the Academia de la Magistratura del Peru, Lima, Peru.

31. May 31, 2013, Conference presentation, "Challenges to the enforcement of foreign judgments in South America". Paper presenter at the Session "Courts in the Globalized and Complex Society" held at the Law and Society Association's Annual Meeting in Boston, MA.

32. May 31, 2013, Conference presentation, "Order in the Desert: Law Abiding Behavior at Burning Man". Roundtable organizer and presenter at the "Roundtable: Layers of Private Ordering in Contemporary Societies" held at the Law and Society Association's Annual Meeting in Boston, MA.

33. May 31, 2013, Conference presentation, "Scholarly legal literature in Venezuela 2000-2012". Paper presenter at the session "Reflecting the Rule of Law" held at the Law and Society Association's Annual Meeting in Boston, MA.

34. May 15, 2013, Faculty presentation, "The Global Chase: Enforcing the Lago Agrio Judgment Outside of Ecuador". Presentation given to the law faculty at the University of Iowa College of Law, Iowa City, IA.

35. May 11, 2013, Panel commentator at the Regional Colloquium on Globalization of Law, International Organizations and International Law held at the University of Wisconsin Law School, Madison, WI.

36. May 8, 2013, Conference presentation, "A Sour Battle in Lago Agrio: The Judicial Protection of the Environment and Indigenous Rights in Ecuador". Paper presenter at the

8

APP 1957

Willis APP 697

conference "Constitutional Innovation, Human Rights, and Public Interest Litigation in the Global South" held at Stanford Law School, Stanford, CA.

37. April 10, 2013, Presentation, "Order in the Desert: Law Abiding Behavior at Burning Man". Special presentation at Stanford Law School, Stanford, CA.

38. March 8, 2013, Conference presentation, "Venezuela after Chavez: Initial reactions and a forecast of what's to come", Latin American and Caribbean Center at Florida International University, Miami, FL.

39. March 1, 2013, Panel moderator, "Avoiding Pitfalls when Using Documents in Foreign Proceedings: Civil Notaries, Consularization, and More", at the International Litigation and Arbitration Conference hosted by the International Law Section of the Florida Bar, Miami, FL.

40. February 17, 2013, Keynote speech, "Gemstone Justice". Hosted by the Jain Education and Research Foundation, Weston, FL.

41. February 8, 2013, Conference Presentation, "The Enforcement of the Lago Agrio Judgment". Paper presenter at the conference "Lessons From the Chevron Ecuador Litigation" organized by the Stanford Journal of Complex Litigation at Stanford Law School, Stanford, CA.

42. November 29, 2012, Presentation, "The World of International Commercial Arbitration", hosted by the Universidad de Oviedo Law School, Oviedo, Spain

43. November 8, 2012, Conference presentation "Social policies in Venezuela" in "Law and Society in Venezuela under Chavez" at Stanford Law School, Stanford, CA.

44. November 1, 2012, Conference presentation, "Order in the Desert: Law Abiding Behavior at Burning Man" at the Michigan State University College of Law Junior Faculty Forum, East Lansing, MI.

45. October 20, 2012, Conference presentation, "La mediación electronica: una apuesta de presente y future, Roundtable at the World Mediation Forum, Valencia, Spain.

46. October 19, 2012, Conference presentation, "Resolución en línea", World Mediation Forum, Valencia, Spain.

APP 1958

Willis APP 698

47. October 19, 2012, Conference Presentation, "Precious Resolution: Consensus Building Among Gujarati Diamond Merchants", World Mediation Forum, Valencia, Spain.

48. October 17, 2012, Keynote speech, "Abogados globales: Los retos que enfrentan los despachos de abogados ante la globalización del comercio y las estrategias que han adoptado", to the participants of the IX Masters in International Business Law at the Universidad Complutense de Madrid Law School, Madrid, Spain.

49. October 11, 2012, Conference presentation, "Social Policies in Venezuela", paper presenter at the conference "Legal and Political Culture in Venezuela 1999-2012" held at Florida International University College of Law, Miami, FL.

50. October 1, 2012, Conference presentation "The legal dimension of trade" at the CHLI Trade & International Affairs Symposium, held in Washington, DC.

51. September 17, 2012, Conference presentation "Elections in Venezuela" at the Latin American Regional Council, Florida International University College of Law, Miami, FL.

52. July 12, 2012, Conference presentation "Presidential Elections in Venezuela" at Florida International University College of Law, Miami, FL.

53. June 8, 2012, Conference presentation "Smoking Signals from the South: Tobacco litigation in Brazil". At the Law and Society Association Annual Meeting in Honolulu, HI

54. June 8, 2012, Conference presentation "Legal Problems and Access to Justice". At the Law and Society Association Annual Meeting in Honolulu, HI

55. April 19-21, 2012, visiting Professor to teach "International Commercial Arbitration" at INIDEM Business Law School in Miami, FL.

56. April 12, 2012, Guest lecture "Cross border legal practice" at the University of Miami School of Law, Coral Gables, FL.

57. March 27, 2012, Panel moderator "Venezuelan Politics and Presidential Health", held at the School of International and Public Affairs, Florida International University, Miami, FL.

APP 1959

Willis APP 699

58. March 22-24, 2012, visiting Professor to teach "International Commercial Arbitration" at the Universidad Sergio Arboleda, in Santa Marta, Colombia.

59. February 15, 2012, Conference presentation "Smoking signals from the South: The social, political, and economic impact of tobacco litigation in Brazil" at the 4th LACC Affiliated Faculty Colloquium "Politics, Law, Culture, Media and Business in Contemporary Brazil" at Florida International University, Miami, FL.

60. February 6, 2012, Guest lecture "State compliance with the Inter-American system of human rights", at the University of Miami, Coral Gables, FL.

61. January 24, 2012, Presentation "Corporations, Contaminations & Accountability", Tuesday Times Roundtables at Florida International University, Miami, FL.

62. December 7-8, 2011, Conference presentation "The Chevron Ecuador Litigation in Latin America", at the Fifth International Conference on the globalization of class actions held in The Hague, The Netherlands.

63. November 9, 2011, Panel moderator "FIU-ILDEA Third Annual Investment Arbitration", held at Florida International University in Brickell, Miami, FL.

64. October 20, 2011, Conference presentation "The effect of alternative financing on international arbitration" at the Works-In-Progress conference held at the University of Missouri Law School, Columbia, MO.

65. October 13, 2011, Book presentation "Law in Many Societies" at Stanford Law School, Stanford, CA.

66. October 6, 2011, Keynote speech "Professionalism and Legal Education in Latin America" at the Congreso Internacional de Etica held at the Universidad Gran Colombia in Bogotá, Colombia.

67. September 13, 2011, Presentation "Birth of a nation: South Sudan" at the Tuesday Times Roundtable at Florida International University, Miami, FL.

68. September 7, 2011, Conference presentation "Venezuelan developments in international arbitration", at the 7th Annual Joint Seminar on Arbitration in Latin America co-sponsored by the London branch of the Chartered Institute of Arbitration and the London Court of International Arbitration, in London, UK.

11

**APP 1960**

Willis APP 700

69. August 11-16, 2011, visiting Professor to teach "Fundamental Aspects of U.S. Law" at the Universidad Sergio Arboleda in Bogotá, Colombia.

70. August 10, 2011, Presentation "Possible Avenues of Collaboration between law schools and the Miami International Arbitration Society", at the Miami International Arbitration Society meeting, Miami, FL.

71. June 11-15, 2011, Conference presentation "The inclusion of international and comparative law elements in the law school curriculum", AALS Conference on Curricular Innovations, Seattle, WA.

72. June 3-5, 2011, Conference presentation "The role of legal scholars" at the Law and Society Association's Annual Meeting, San Francisco, CA.

73. June 3-5, 2011, Conference presentation "Tobacco litigation in Latin America" at the Law and Society Association's Annual Meeting, San Francisco, CA.

74. May 6, 2011, Panel moderator "A closer look at the energy sector in Latin America" at FIU's International Arbitration in Latin America's Annual Summit, Florida International University College of Law, Miami, FL.

75. May 12-13, 2011, Conference presentation "Law, governance, and social policies in Venezuela" at the the Seminário internacional sobre as relações entre direito e políticas de desenvolvimento em países da América Latina, held at the Centro Brasileiro de análisis e planejamiento (CEBRAP) in São Paulo, Brazil.

76. April 8, 2011, Keynote speech "The influence of the 1988 Colombian Constitution on the Development of Collective Litigation in Latin America" at the the V Coloquio Surcolombiano y IV Internacional de Derecho Constitucional "20 años de la Constitución Política de Colombia" held at the Universidad Surcolombiana in Neiva, Colombia.

77. April 1, 2011, Conference presentation "Law abiding behavior at the Burning Man festival" at the Burning Man Regional Leadership Summit held in San Francisco, CA.

78. February 24, 2011, Conference presentation ""Legal perspectives on the financing of small businesses" at the Small Business Forum hosted by the FIU College of Business and co-sponsored by The Miami Herald and the Eugenio Pino & Family Global Entrepreneurship Center, Miami, FL.

12

APP 1961

Willis APP 701

79. January 20-23, 2011, visiting Professor to teach "International commercial arbitration" at the Universidad Sergio Arboleda in Santa Marta, Colombia.

80. January 3, 2011, Guest lecture "The taking of evidence in international commercial arbitration" at the Universidad Católica Andrés Bello in Caracas, Venezuela.

81. December 10, 2010, Conference presentation "The Protection of Collective Rights in Latin America". Conference organizer, moderator, and presenter at the 4th International Conference on the Globalization of Collective Litigation: The Latin American Perspective, Florida International University College of Law in Miami, FL.

82. November 17-18, 2010, Conference presentation "Legal Strategies and Venture Capital". Conference organizer and moderator at the 2010 Americas Venture Capital Conference, Florida International University College of Business, Miami.

83. November 5-6, 2010, Conference presentation "Current Developments in Investment Arbitration". Conference organizer and moderator at the First FIU-ILDEA Seminar on Investment Arbitration, Florida International University College of Law, Miami.

84. July 8-9, 2010, Conference presentation "Bearing the burden: Litigation costs and funding issues in Latin America". Invited speaker at the workshop on Current socio-legal perspectives on Dispute Resolution, International Institute for the Sociology of Law in Oñati, Spain.

85. April 25, 2010, Conference presentation "Law and governance of social policies in Venezuela: A case study of the Bolivarian Misiones". Invited speaker at the 28th Annual Symposium of the Wisconsin International Law Journal, Laws Locations: Textures of legality in developing and transitional societies, University of Wisconsin Law School in Madison, WI.

86. April 16, 2010, Panel moderator and conference organizer "The legal and social ramifications of neuroscience evidence" at the First Annual Symposium on Law and Medicine at Florida International University, Miami, FL.

87. March 19, 2010, Conference presentation "Inaugural International Arbitration Annual Summit". Conference organizer and presenter, Florida International University College of Law, Miami, FL.

13

APP 1962

Willis APP 702

88. February 20, 2010, Conference presentation "The claims debate: The future of U.S. property in Cuba". Invited discussant at the Symposium Cracking the Door: The future of U.S. Property, Trade, and Investment in Cuba, Inter-American Law Review, University of Miami in Coral Gables, FL.

89. February 11, 2010, Conference presentation "In the shadow of the Florida Bar: The role of unlicensed Cuban lawyers in Miami". Session chair on The Impact of Cuban Lawyers and Scholars in the Americas, at the 8th Cuban Research Institute's Conference on Cuban and Cuban-American Studies, Cuba 2010: An Island in a Global World, Florida International University in Miami, FL.

## WORKS IN PROGRESS

1. Manuel A. Gómez, *A CRUDE reality? The use of the media as a litigation strategy: The Chevron-Ecuador saga*

2. Manuel A. Gómez, *Funders in the Tropic: Incentives and Challenges to the Use of Alternative Financing in the Realm of International Arbitration in Latin America*

3. Manuel A. Gómez, *Property Rights in Action: Circumventing limitations on the transfer of property in Cuba*

4. Manuel A. Gomez, *In the Shadow of the Bar: Cuban Lawyers in Florida during the 1960s.*

## PROFESSIONAL HONORS, PRIZES, FELLOWSHIPS

1. FIU Center for International Business Education and Research CIBER, 2013 Faculty Award (shared with Professor Carlos M. Parra from the COB)
2. Fellow, Stanford Center for the Legal Profession, Stanford Law School (2012-present)
3. Investigador Libre Asociado, Universidad Metropolitana (2012-present)
4. Florida International University Bhagwan Mahavir Junior Faculty Fellowship (2011)
5. Research Excellence Diploma and appointment as Honorary Member of Grupo Nuevas Visiones del Derecho, Universidad Surcolombiana, Colombia (2011)
6. Law and Society Association, Dissertation Award for outstanding scholarship in a dissertation (2008)
7. Latin American Studies Association, Venezuelan Studies Section, Best Article (2007)
8. Richard S. Goldsmith Award for Best Paper in Dispute Resolution at Stanford University (2007)
9. Colegio de Abogados del Distrito Federal, Mención Honorífica
10. Ayacucho Graduate Fellow, Center for Latin American Studies (2002-2005).
11. Fellow, Stanford Center for Conflict and Negotiation (2004).
12. Fellow, Stanford Law School Class of 2002 Fellowship in Conflict Resolution (2003).

## OFFICES HELD IN PROFESSIONAL SOCIETIES

14

APP 1963

Willis APP 703

1. Colegio de Abogados del Distrito Capital (1993-present)
2. Law and Society Association, member (2002-present)
3. Latin American Studies Association, Venezuelan Studies Section (2006-present)
4. Editorial Board, Derecho y Democracia (2006-present)
5. American Association of Law Schools (2007-present)
6. American Bar Association (2007-present)
7. International Section of the Florida Bar (2008-present), Member of the Executive Council and co-chair of the Faculty Council (elected in 2013)
8. Miami International Arbitration Society (2010-present)
9. Club Español del Arbitraje, Florida Chapter, Board member (2012-present)
10. Institute of Transnational Arbitration, Academic Council member (elected in 2012)
11. ICCA Miami 2014, Member of the Planning Committee (2013-present)
12. Venezuelan-American National Bar Association, VENAMBAR, Founding member (2013-Present)

15