# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford receivership estate; The OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated, | § § § § § § § § § § | |
| Plaintiffs. | § § | CIVIL ACTION NO. 3:12-cv-04641-N |
| vs. | § § | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; and YOLANDA SUAREZ, | § § § § | |
| Defendants. | § § | |

## DECLARATION OF EDUARDO SIQUEIROS

Pursuant to 28 USC §1746(1), I, Eduardo Siqueiros, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

## I.   INTRODUCTION

1.   I am over eighteen (18) years of age, and I have personal knowledge of the facts set forth in this declaration.

2.   I provided a declaration and expert analysis in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel in *Rotstain v. Trustmark National Bank*, No. 3:09-cv-02384 (N.D. Tex.). I attach a copy of that declaration and its attachments here as Exhibit A (the "Rotstain Declaration").

## II.    BACKGROUND AND QUALIFICATIONS

3.     A comprehensive account of my professional experience and qualifications relevant to issuing the opinion expressed in this Declaration is attached hereto at Exhibit A of the Rotstain Declaration.  In particular, my academic credentials include a law degree from Escuela Libre de Derecho (Abogado, 1980), in Mexico City, Mexico, and an LLM from Harvard Law School (1980), Cambridge, MA. I am currently a partner at Hogan Lovells BSTL, S.C. in Mexico City in the dispute resolution practice, among others. I have been a professor at several law schools in Mexico City, and am a frequent lecturer in Mexico and abroad. During my 36 years as a practicing attorney, I have served as: an expert witness on several aspects of Mexican law before both U.S. Courts and arbitral tribunals; arbitrator in both commercial and investor-State proceedings in several jurisdictions; and party counsel before Mexican courts and arbitral tribunals.

4.     I have not testified at a deposition or at trial in the past four years.

5.     I am being compensated for my work in connection with this case at my customary consulting rate of $450 U.S. Dollars per hour. My compensation is in no way contingent upon the nature of my opinions or the outcome of this litigation. My opinions expressed herein reflect my own independent, professional judgment.

6.     I reserve the right to supplement or modify my opinions expressed herein, particularly in view of any new arguments raised or materials presented by Plaintiffs in this case.

7.     I have no first-hand knowledge of the specific facts underlying this dispute.  In forming my opinions, along with the other documents or information referenced in the attached Exhibit A, I have considered the following materials related to *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641 (N.D. Tex):  Plaintiffs' Original Complaint – Class Action, dated

**Hunton App. 0469**

November 15, 2012;  Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated October 5, 2015; and the Brief in Support of Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated October 5, 2015.

## III.   OPINION

8.     My analysis and conclusions in the *Rotstain* matter apply equally to *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641 (N.D. Tex),  except as follows.

    a.   Under Mexican law, *Janvey v. Greenberg Traurig* is civil in nature because it arises from allegations of aiding and abetting fraud through legal services, whereas the *Rotstain* matter is commercial because it arises from allegations involving commercial entities, ie, banks, and/or relating to financial services. Legal services, such as the ones from which this matter stems from, are civil acts under articles 2688-2735 of the Federal Civil Code. On the other hand, financial services are acts of commerce under article 75 section XIV of the Mexican Code of Commerce.

    b.   In Rotstain, as indicated in my previous declaration, the Code of Commerce of 1889 (as amended) *and* the Federal Code of Civil Procedure of 1943 (as amended) both governed enforcement of the judgment.   But here, the difference in categorization means that the statutes governing enforcement of the judgment entered in this case would be only the Federal Code of Civil Procedure of 1943 (as amended),  as per articles 569 to 577 of such Federal Code of Civil Procedure.

**Hunton App. 0470**

c.  However, since the substantive requisites that the petitioner must meet to seek enforcement of a foreign judgment in the Code of Commerce (article 1347-A) are exactly the same as those in the Federal Code of Civil Procedure (article 571), the arguments, reasoning and conclusions in my previous declaration remain. As such, the conclusion also remains: a US-court issued class action judgment would not be enforceable in Mexico for reasons of Mexican public policy.

d.  In light of the foregoing, the following amendments to Exhibit A must be considered as if they were expressly included in such.[1]

   i.  Paragraph 6: "In addition, I have examined the following authorities: the Mexican Constitution of 1917 (*Constitución Política de los Estados Unidos Mexicanos*), as amended; ~~the Mexican Code of Commerce of 1889 (*Código de Comercio*);~~ the Mexican Federal Civil Code of 1928 as amended; the Mexican Federal Code of Civil Procedure of 1943 (*Código Federal de Procedimientos Civiles*), as amended; and those federal court precedents and treatises of recognized scholars, as I deemed necessary for this purpose."

   ii.  Paragraph 17: "Mexican domestic law has rules governing the recognition and enforcement of foreign judgments. These rules are found in the ~~Code of Commerce~~ Federal Civil Code, the Federal Code of Civil Procedure and, for local civil matters, state codes of civil procedure. Further, Mexico is a party to the 1979 Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards. (footnote remains) The applicability of each of these instruments depends upon the nature of the foreign judgment of which recognition and enforcement is sought. Because the U.S. is not a party to the Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards, the Convention would not govern the recognition of U.S. judgments, including any entered into in the Action. Mexican courts would instead look to Mexican domestic law in determining whether to recognize and enforce a judgment rendered by a U.S. court."

---

[1] The inapplicable text from the Rotstain Declaration is denoted with a strikethrough. The replacement text applicable in this action is highlighted in gray.

Hunton App. 0471

     iii. Paragraph 18: ~~The Code of Commerce is the federal statute governing *commercial* matters and proceedings in which commercial interests are at stake.~~ "The Federal Civil Code is the federal statute governing *civil* matters and proceedings in which civil interests are at stake. The Federal Code of Civil Procedure is the federal statute governing class actions and proceedings where the applicable substantive law is a federal law (as opposed to state law) or an international treaty. State codes of civil procedure govern proceedings that do not fall within the scope of either the Code of Commerce or the Federal Code of Civil Procedure."

     iv. Remove paragraph 20 entirely as it is not relevant to this case.

     v. Paragraph 21: "Since the Action is a class action ~~involving allegations of securities fraud in respect of financial institutions—a claim clearly arising out of a commercial activity—the Code of Commerce~~ involving allegations of aiding and abetting securities fraud while rendering legal services —i.e., a claim arising out of a civil act pursuant to Mexican law—the Federal Civil Code and the Federal Code of Civil Procedure provide the legal framework for assessing whether any resulting judgment in the Action would be recognized and enforced in Mexico. A federal civil court (footnote remains) would hear a petition to recognize and enforce a judgment in this Action because, ~~although it relates to a commercial matter over which both federal and local courts have jurisdiction,~~ the judgment would be entered in a class action in respect of which federal courts have exclusive jurisdiction."

e. Paragraph 22: "Article ~~1347-A of the Code of Commerce~~ 571 of the Federal Code of Civil Procedure provides prerequisites to the recognition and enforcement of a foreign judgment. (footnote remains)."

9.     I therefore adopt Exhibit A as my declaration in this matter, as modified by the analysis and conclusions set forth in Paragraph 8 above.

Date: November 19, 2015

_____
Eduardo Siqueiros

5

# EXHIBIT A

Hunton App. 0473

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

|  |  |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated<br><br>v.<br><br>TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No 3:09-CV-02384-N-BG<br><br>Judge: Hon. David C. Godbey<br><br>Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF EDUARDO SIQUEIROS T.

### I.    INTRODUCTION

1.      I, Eduardo Siqueiros, am a citizen of, and an attorney authorized to practice law in, Mexico.  A comprehensive account of my professional experience and qualifications relevant to issuing the opinion expressed in this Declaration is attached hereto at Exhibit A.  In particular, my academic credentials include a law degree from *Escuela Libre de Derecho* (*Abogado,* 1980), in Mexico City, Mexico, and an LLM from Harvard Law School (1980), Cambridge, MA.  I am currently a partner at Hogan Lovells BSTL, S.C. in Mexico City in the dispute resolution practice, among others.  I have been a professor at several law schools in Mexico City, and am a frequent lecturer in Mexico and abroad.  During my 36 years as practicing attorney, I have served as: an expert witness on several aspects of Mexican law before both U.S. Courts and arbitral tribunals; arbitrator in both commercial and investor-State proceedings in several jurisdictions; and party counsel before Mexican courts and arbitral tribunals.

2.      I have been retained to provide my opinion as to whether, under Mexican law, a Mexican court would recognize either a judgment rendered in *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*, Civil Action No. 3:09-CV-02384-N-BG ("Action") or a court-approved settlement in the Action, against the interests of those members of the putative class of plaintiffs

Hunton App. 0474

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 9 of 118   PageID 6625
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 24 of 175   PageID 20943

2

who are domiciled in Mexico.  I understand that the plaintiffs domiciled in Mexico would form part of the plaintiffs' class on the basis of an opt-out mechanism under U.S. law.

## II.   SUMMARY OF CONCLUSIONS

3.     In this Declaration, I conclude that Mexican constitutional law and public policy would preclude a Mexican court from recognizing and enforcing a judgment of a U.S. court or a court-approved settlement in an opt-out class action such as the Action at issue.

4.     The main obstacle to recognition and enforcement by a Mexican court of a U.S. opt-out class action judgment (or court-approved settlement)[1] results from the difference between U.S. law and Mexican law as to what plaintiffs can and cannot be incorporated into a plaintiffs class. Specifically, Mexican law permits plaintiffs to be included in a class only on an "opt-in" basis; Mexican law does not permit plaintiffs to be included on an opt-out basis.   Indeed, this procedural distinction derives from principles at the core of the Mexican legal system, such as the principles of consent, autonomy and self-determination.  These principles would preclude a judgment in this Action from being recognized and enforced in a Mexican court.

## III.   MATERIALS CONSIDERED

5.     In forming my opinions, I have considered the following materials, along with the other documents or information referenced in this declaration:

> A) Plaintiffs' Second Amended Class Action Complaint;

> B) Memorandum Supporting Plaintiffs Motion for Class Certification, Designation of Class Representatives and Class Counsel;

> C) Declaration of Ralph S. Janvey dated October 30, 2014, with Exhibits A-C;

6.     In addition, I have examined the following authorities:  the Mexican Constitution of 1917 (*Constitución Política de los Estados Unidos Mexicanos*), as amended; the Mexican Code of Commerce of 1889 (*Código de Comercio*), as amended; the Mexican Federal Code of Civil

---

[1] In general, a settlement that has been court-approved is intended to have the same force as a judgment for the purposes discussed in this declaration.

Hunton App. 0475

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 10 of 118   PageID 6626
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 25 of 175   PageID 20944

3

Procedure of 1943 (*Código Federal de Procedimientos Civiles*), as amended; and those federal court precedents and treatises of recognized scholars, as I deemed necessary for this purpose.

7.     I have not testified at a deposition or at trial in the past four years.

8.     I am being compensated for my work in connection with this case at my customary consulting rate of $450 U.S. Dollars per hour.  My compensation is in no way contingent upon the nature of my opinions or the outcome of this litigation.  My opinions expressed herein reflect my own independent, professional judgment.

9.     I reserve the right to supplement or modify my opinions expressed herein, particularly in view of any new arguments raised or materials presented by Plaintiffs in this case.

## IV.     RECOGNITION AND ENFORCEMENT OF FOREIGN CLASS ACTION JUDGMENTS ISSUED UNDER AN OPT-OUT MECHANISM

### A. Mexican Law Permits Opt-In Class Actions Only

10.     Class actions are a specific, unique and uncommon type of proceeding in Mexico.

11.     The Mexican class action statute was enacted in 2011,[2] following the amendment during the previous year of Article 17 of the Mexican Constitution,[3] by which authority was granted to the federal legislature to issue laws on this subject-matter.  In this connection, Articles 578 to 626 of the Federal Code of Civil Procedure cover both substantive and procedural aspects of class actions, such as:  the types of matters capable of being heard in a class action proceeding; the jurisdiction of the courts; interim relief; the effects of the judgment; and, most importantly for my Declaration, how a plaintiff can become a member of a class.  Under Mexican class action law, a plaintiff must affirmatively request to join a plaintiffs class.

---

[2] See Official Federation Gazette dated August 30, 2011 at
http://www.dof.gob.mx/index.php?year=2011&month=08&day=30.

[3] Article 17 of the Mexican Constitution, as amended, provides: "[…]The [federal] Congress shall enact statutes governing class actions.  Such statutes shall determine the scope of application, judicial proceedings and mechanisms for the recovery of damages.  Federal judges shall have exclusive jurisdiction over these proceedings and mechanisms".

Hunton App. 0476

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 11 of 118   PageID 6627
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 26 of 175   PageID 20945

4

12.     Article 594 of the Federal Code of Civil Procedure states as follows:[4]

> Article 594. Members of an affected group may join the action in question pursuant to the rules in this article.
>
> In strict class actions[5] and individually homogeneous class actions,[6] any affected individual may join the action through an express notice addressed to the representative referred to in article 585 of this Code[7] or to the legal representative of the plaintiff, as the case may be.
>
> During the pendency of the proceeding and for an eighteen month period after the judgment or the settlement agreement has become binding—as the case may be—any affected party may voluntarily join the class.
>
> During this period, the interested party may communicate its express and simple consent to [join the class] to the representative who, in turn, will submit it to the judge.
>
> […]

13.     I understand that under the U.S. opt-out regime, an individual who is in a similar position to the party (or the parties) who initially started the class action, and who therefore meets the

---

[4] The translations provided in this Declaration are my own. Attached hereto as Exhibit B are translated excerpts of relevant legal authorities cited in this Declaration.

[5] Article 581 subsection II of the Federal Code of Civil Procedure defines a "strict class action" (*acción colectiva en sentido estricto*) as an action that seeks protection of collective rights and interests belonging to a determined group or to an ascertainable group [that is capable of being determined] considering common circumstances. Its purpose is to facilitate a claim for recovery of damages from the defendant in the form of action or refrainment from it and also in the form of individual payments to the members of the affected group, which arises from a juridical relationship existing by law among the collective group and the defendant.

[6] Article 581, subsection III of the Federal Code of Civil Procedure defines an "individually homogeneous class action" (*acción individual homogénea*) as that action that seeks protection of interests that are divisible in nature but whose holders are grouped based on common circumstances. Its purpose is to judicially claim from a third party specific performance or termination of a certain agreement and the consequences thereto in accordance with applicable law.

[7] Article 585 of the Federal Code of Civil Procedure provides that the common representative of a class comprised by at least thirty plaintiffs may start a class action. The notice indicating consent to join a class action may be given to the common representative.

Hunton App. 0477

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 12 of 118   PageID 6628
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 27 of 175   PageID 20946

5

characteristics of a class member as defined by the U.S. court, is automatically deemed a member of the class *unless* he/she expressly refuses to join the class (expressly "opts-out"). Thus, in the U.S., a class member who does *not* want to be part of the class must actively request removal from the class; remaining passive is considered implied consent to class treatment, and to being bound by the judgment entered or settlement reached in the relevant proceeding.

14.    In Mexico, it is precisely to the contrary. The fact that an individual falls within the class definition does not result in that individual automatically being a part of the class, much less being entitled to the proceeds of any judgment, unless the individual *expressly consents* to join the class.

15.    To consent to class treatment under Mexican law, one must actively and expressly request to join the class in accordance with Article 594 of the Federal Code of Civil Procedure. This provision provides an "opt-in" procedure and is the only class action mechanism permitted under Mexican law. Under this mechanism, a party must make an "active" decision to become a member of the class—"active" in the sense that the party must expressly choose and consent to (i) becoming part of the class, (ii) being represented by a certain common representative and (iii) being subject to the same consequences as the rest of the class as a result of the action.

16.    In summary, the essential difference between the Mexican "opt-in" and the American "opt-out" mechanism is consent. Unlike U.S. law, which assumes that an individual is part of the class unless he expressly opts-out, Mexican law explicitly conditions membership in a class action judicial proceeding on an individual expressing his consent to join the relevant class. As discussed below, consent is critical to whether a Mexican court would recognize, enforce and give effect to a U.S. class action judgment or court-approved settlement.

**B. The Framework for Recognition and Enforcement of Foreign Judgments in Mexico**

> **(i)    *The Statutory Framework for Recognition and Enforcement of Foreign Judgments in Mexico***

17.    Mexican domestic law has rules governing the recognition and enforcement of foreign judgments. These rules are found in the Code of Commerce, the Federal Code of Civil Procedure and, for local civil matters, state codes of civil procedure. Further, Mexico is a party

Hunton App. 0478

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 13 of 118   PageID 6629
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 28 of 175   PageID 20947

6

to the 1979 Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards.[8]  The applicability of each of these instruments depends upon the nature of the foreign judgment of which recognition and enforcement is sought. Because the U.S. is not a party to the Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards, the Convention would not govern the recognition of U.S. judgments, including any entered into in the Action.  Mexican courts would instead look to Mexican domestic law in determining whether to recognize and enforce a judgment rendered by a U.S. court.

18.    The Code of Commerce is the federal statute governing *commercial* matters and proceedings in which commercial interests are at stake.  The Federal Code of Civil Procedure is the federal statute governing class actions and proceedings where the applicable substantive law is a federal law (as opposed to state law) or an international treaty.  State codes of civil procedure govern proceedings that do not fall within the scope of either the Code of Commerce or the Federal Code of Civil Procedure.

19.    The Mexican judiciary is split between federal and state jurisdiction.  Generally speaking, federal courts hear cases in which the applicable substantive law is federal law, while state courts hear cases in which the applicable substantive law is state law.  Federal courts have exclusive jurisdiction to hear class actions.[9]

20.    Commercial matters are the exception to this general rule.  The Code of Commerce—the basic statute governing commercial matters in Mexico—is a federal body of law.  However, both federal and state courts have jurisdiction to hear commercial cases.[10]  A plaintiff is free to decide whether to file a commercial complaint or a petition relating to a commercial interest in federal or state court.

---

[8] The U.S. is not a party to this Convention and, therefore, it is not applicable to this case. Nonetheless, it is worth noting that some key provisions of Mexican statutes regarding enforcement of foreign judgments are similar to the provisions of the Convention.

[9] Article 17 of the Constitution as amended. See *supra* footnote 2.

[10] Article 104 section II of the Constitution, as amended (Article 104: Federal courts will hear: […] II. All civil or commercial disputes arising from compliance with or application of Federal laws or international treaties executed by the Mexican State. Upon the plaintiff's choice and whenever they affect individual interests only, state courts and judges may hear them).

Hunton App. 0479

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 14 of 118   PageID 6630
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 29 of 175   PageID 20948

7

21.     Since the Action is a class action involving allegations of securities fraud in respect of financial institutions—a claim clearly arising out of a commercial activity—the Code of Commerce and the Federal Code of Civil Procedure provide the legal framework for assessing whether any resulting judgment in the Action would be recognized and enforced in Mexico.  A federal civil court[11] would hear a petition to recognize and enforce a judgment in this Action because, although it relates to a commercial matter over which both federal and local courts have jurisdiction, the judgment would be entered in a class action in respect of which federal courts have exclusive jurisdiction.

> (ii)     ***Mexican Law Subjects the Recognition and Enforcement of a Foreign Judgment to Certain Conditions***

22.     Article 1347-A of the Code of Commerce provides prerequisites to the recognition and enforcement of a foreign judgment.[12]  The most important prerequisites include:

> 1). The foreign judgment of which recognition and enforcement is sought must not have been rendered in an action *in rem* (*e.g.* mortgage-related actions, pledge-related actions);

> 2). The court hearing the action from which the foreign judgment arose must have had competence to hear the case;

> 3). Due process rights must have been observed and, most importantly, proper service of process must have taken place;

> 4). The foreign judgment must be final and definitive; *i.e.* it must be a non-appealable judgment that is not subject to challenge; and

> 5). The foreign judgment must not contravene Mexican public policy.[13]

---

[11]  A recent amendment to the Organic Statute of the Judiciary provides for the creation of commercial subject-matter federal courts.  Article 53-bis section VII of this statute provides that commercial courts will hear cases related to commercial class actions (as in the case at hand).  However, as of the date of this Declaration, the commercial subject-matter federal courts have not yet been established.  Thus, civil federal courts continue to have jurisdiction over cases such as the Action.

[12] The process is known as *homologación de sentencia extranjera*.

Hunton App. 0480

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 15 of 118   PageID 6631
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 30 of 175   PageID 20949

8

Additionally, a Mexican court may (but is not required to) refuse recognition and enforcement if the country in which the foreign judgment was rendered would refuse enforcement of a Mexican judgment in an analogous case (the "reciprocity" condition).[14]  I note that the means to satisfy the reciprocity test are complex with regard to determining what is an analogous (or substantially similar) case in the context of collective actions, and reciprocity would by no means be presumed with class actions.

23.      The party seeking to enforce a foreign judgment has the burden of establishing that the judgment satisfies the prerequisites for recognition and enforcement in Mexico.  The way such burden is discharged varies by case, and may be evidenced through different means as most of the requirements relate to matters governed by foreign law and not Mexican law, as applicable (*e.g.* appropriate jurisdiction, service of process, type of action, *res iudicata* status of the judgment, *inter alia*).

24.      Importantly, as a prerequisite, a party seeking recognition and enforcement must demonstrate that the foreign judgment does not contravene Mexican public policy.  In my opinion, a judgment rendered in the Action would not be recognized or enforced in Mexico because it would contravene Mexican public policy.

### C. Consent is a Foundational Requirement Under the Mexican Constitution and a Key Aspect of Public Policy

#### (i)      The Concept of Public Policy is a Cornerstone of the Mexican Legal System

---

[13] In addition, this element is further confirmed by article 569 of the Federal Code of Civil Procedure: "Judgments, non-commercial private awards and other judicial foreign rulings will be effective and will be recognized in the Republic [Mexico] insofar they are not contrary to domestic public policy, unless otherwise indicated in treaties and conventions to which Mexico is party."  (Emphasis added).

[14] This prerequisite is elaborated in the final paragraph of Article 571, of the Federal Code of Civil Procedure:   "Despite the satisfaction of the above conditions, el court may reject enforcement if it was evidenced that in the country of origin foreign judgments or awards would not be enforced in similar situations."

Hunton App. 0481

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 16 of 118   PageID 6632
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 31 of 175   PageID 20950

9

25.     The concept of "public policy" (*orden público*) is pervasive throughout the Mexican legal system.[15]   Mexican statutes often include express provisions that characterize the statute in question as one of a "public policy" nature or as dealing with issues of "public policy."[16]   Such statutes frequently contain multiple sections and subsections making reference to "public policy" in various contexts.[17]   Further, Mexican judges often invoke "public policy" considerations as bases for their decisions.[18]

    **(ii)**    ***The Scope and Content of the Concept of Public Policy Has Been Developed Through Case Law***

26.     Although the importance of "public policy" is widely and liberally acknowledged in the Mexican legal system, the content and scope of the concept is not well defined, either statutorily or constitutionally.   Rather, the concept of "public policy" has been developed by the courts and its scope and meaning are derived from case law.[19]

---

[15] The literal translation into English of "*orden público*" is "public order".   However, the notion of "*orden público*" in fact corresponds with the notion of "public policy" in English and, therefore, is the appropriate term to use.

[16] See, e.g., Copyright Act (*Ley Federal del Derecho de Autor*), article 2: "The provisions in this Act a matter of public policy…"; Law on Electoral Institutions and Proceedings (*Ley General de Instituciones y Procedimientos Electorales*), article 1: "The provisions in this Code are a matter of public policy…"; the Federal Economic Competition Act (*Ley Federal de Competencia Económica*), article 1: "This Act…is a matter of public policy…"; the Foreign Investment Law (*Ley de Inversión Extranjera*), article 1: "This act is a matter of public policy…"; and the Consumer Protection Law (*Ley Federal de Protección al Consumidor*), article 1: "This act is a matter of public policy…", among many others.

[17] See, e.g., (i) Code of Commerce, §15 subsection II (and equivalent provisions in state codes), §§1347-A, 1457 subsection II and 1462 subsection II, (ii) Federal Code of Civil Procedure, §571, and Code of Civil Procedure for the Federal District, § 606.

[18] See, e.g., non-binding precedents (*tesis aisladas*) nos. 2009343, 2009346, 2009358 and 2009278.

[19] Precedent (*tesis aislada*) no. 2001132 <u>Arbitral Award. The judge will determine public policy when its avoidance, recognition or enforcement are requested.</u>, published in *Semanario Judicial de la Federación* in July 2012, (stating that "a case by case and in depth analysis is necessary to determine a breach to [the Mexican] legal system").

Hunton App. 0482

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 17 of 118   PageID 6633
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 32 of 175   PageID 20951

10

27.    The importance of public policy is entrenched in Mexican law.  Public policy has been described as "the set of legal institutions that identify or distinguish the law in society; principles, guidelines and institutions that cannot be altered either by the free will of individuals (freedom of choice falls outside of its scope) or by the application of foreign law."[20]  Mexican courts have determined that "the judge must consider the essential conditions for the harmonic development of society, that is, the minimum standards of social interaction...."[21]  The Supreme Court of Mexico has stated that "public order provisions are unwaivable, precisely because of the society's interest in their observance and compliance."[22]

28.    Mexican courts hold that "public policy is the mechanism through which the State blocks private acts from affecting society's fundamental interests."[23]  Specifically, public policy constitutes "a limitation that restricts individuals from engaging in certain conduct or certain legal acts that would otherwise be lawful from being effective in a certain legal system."[24]

29.    The Supreme Court of Mexico, in addressing an application for enforcement of a foreign award, has stated that an "award is contrary to public policy, and therefore [] gives rise to a cause for annulment, when the matter addressed is beyond the limits of such order, *i.e.*, beyond State legal institutions, of the principles, laws and institutions that embody it, and which transcends the community because of the offensive and serious nature of the error in the decision."[25]  Moreover,

---

[20] Precedent cited in: González de Cossío, F., <u>Orden Público en México</u>, retrieved from http://www.gdca.com.mx/PDF/arbitraje/ORDEN%20PUBLICO%20EN%20MEXICO.pdf on June 19, 2015.

[21]    Precedent (*tesis aislada*) no. 177560, <u>Public Policy. It is an undetermined legal notion that appears in each specific case based on the minimum rules of social interaction.</u>, published in *Semanario Judicial de la Federación* in August 2005, (stating that "Public policy may only be delineated in account to manner, time and place prevailing at the time of analysis.").

[22] Precedent (tesis aislada)  no340932, Public Policy Laws, published in Semanario Judicial de la Federación (no date available).

[23] Precedent cited in: González de Cossío, F., <u>Orden Público en México</u>, retrieved from http://www.gdca.com.mx/PDF/arbitraje/ORDEN%20PUBLICO%20EN%20MEXICO.pdf on June 19, 2015.

[24] *Id.*

[25] Amparo Review 755/2011 at the First Chamber of the Supreme Court of Justice.

Hunton App. 0483

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 18 of 118   PageID 6634
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 33 of 175   PageID 20952

11

in accordance with the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards,[26] and under the provisions of the Code of Commerce implementing the UNCITRAL Model Law on Arbitration,[27] a Mexican court can refuse to recognize and enforce an arbitral award on the ground that it contravenes Mexican public policy.

30.     As the foregoing demonstrates, Mexican public policy must be considered in determining whether to enforce a U.S. class action judgment in Mexico.

### (iii)     *Public Policy Requires Respect for the Principles of Consent, Autonomy and Self-Determination.*

31.     A Mexican court would pay special attention to public policy matters when evaluating a class action judgment, because class actions are a specific, unique and uncommon type of proceeding in Mexico.

32.     The key difference between American opt-out and Mexican opt-in class actions is the role and relevance of a class member's consent.  As a matter of public policy, a class member must consent to being included in a Mexican class action.  Accordingly, a judgment in a U.S. opt-out class action would contravene Mexican public policy as a class member would not have affirmatively consented to join the class; as such, a Mexican court would not recognize or enforce a judgment entered in a U.S. opt-out class action—such as the Action at issue.

33.     It would also violate clear Mexican public policy to recognize and enforce a foreign judgment in which the losing party was not properly served with process. Mexican courts have held in *binding and mandatory* decisions that appropriate service of process is essential in any proceeding as it concerns a defendant's due process rights (*e.g.* fair and equal treatment, right to present a case, produce evidence, *etc.*). Therefore, Mexican courts would not enforce a judgment (or arbitral award)—foreign or domestic—entered in a proceeding in which the party resisting

---

[26]  Article V section 2 subsection (b) of the 1958 of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

[27]  Article 1457 section II of the Code of Commerce.

Hunton App. 0484

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 19 of 118   PageID 6635
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 34 of 175   PageID 20953

12

enforcement was not duly served with process on the grounds that such judgments are flawed and contravene Mexican public policy.[28]

34.      Below I address four sources of Mexican law that treat consent as an issue of public policy:  (i) the Mexican constitution; (ii) the case law of Mexican courts; (iii) the legislative history of the Mexican class action statute; and (iv) the Mexican class action statute. For instance, a judgment entered in a proceeding where the losing party was not properly served with process would certainly be against Mexican public policy.

> (1) <u>The Mexican Constitution Treats Autonomy, Self-Determination and Consent as Matters of Public Policy</u>

35.      Consent and self-determination are fundamental aspects of human rights and liberties protected by the Mexican Constitution.  This is evidenced by the freedom to determine one's identity;[29] freedom with respect to family matters;[30] freedom of choice with respect to residency;[31] freedom to choice with respect to methods for resolving disputes;[32] and freedom to vote.[33]  These rights and freedoms are key elements of the foundations of the Mexican State and its legal system.

---

[28] Binding and mandatory precedent (*jurisprudencia*) no. 240531, <u>Service of process. It is a matter of public policy and its analysis is sua sponte,</u> published in *Semanario Judicial de la Federación* (date not mentioned), stating that "Public policy may only be delineated in account to manner, time and place prevailing at the time of analysis."

[29] Article 4 of the Mexican Constitution.

[30] *Id.*

[31] *Ibid.* article 11.

[32] *Ibid.* article 17.

[33] *Ibid.* article 35 section I.

Hunton App. 0485

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 20 of 118   PageID 6636
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 35 of 175   PageID 20954

13

36.     Article 1 of the Constitution sets boundaries on the actions that can be taken by the Mexican State.   Pursuant to Article 1, freedom and self-determination are given maximum protection and "may not be restricted or suspended."[34]:

37.     This protection is further reinforced in Article 5 of the Constitution [which prohibits the State from giving effect to any agreement or contract that acts as "a restriction, loss or irrevocable waiver of an individual's freedom for any reason."[35]

38.     This underscores the importance that Mexican law places on the individual's freedom. All individuals in Mexico enjoy constitutional certainty that the State will not hinder the exercise of their rights (unless such exercise impacts a public interest).   These constitutional protections reflect Mexican public policy in its broadest sense.     Freedom, autonomy and self-determination—including the right to consent—are central tenets of these constitutional protections and lie at the heart of Mexican public policy.

        (2)   Mexican Courts Treat Autonomy, Self-Determination and Consent as Matters of Public Policy

39.     In line with the Constitution, the Mexican judiciary has held that autonomy and self-determination are principles that must be protected.   By way of example, a recent decision of the First Chamber of the Supreme Court of Justice declared that:[36]

---

[34] Art. 1 states: "In the United Mexican States, all individuals are entitled to recognition of the human rights set forth in this Constitution and in international treaties to which the Mexican State is party to, as well as to the guarantees for their [human rights] protection. Exercise of these rights and guarantees may not be restricted or suspended, except in those case and subject to the conditions set forth in this Constitution. […]  Any type of discrimination, whether it is based on ethnicity, nationality, gender, age, disability, social condition, health condition, religion, opinions, sexual orientation, marital status or on any  other that transgresses human dignity or is intended to void or restrict rights and liberties of the individuals, is prohibited."

[35] Art. 5 states:  "The State will not permit the execution of any agreement, contract or covenant which has as its intended effect to impose a restriction, loss or irrevocable waiver of an individual's freedom for any reason."

[36] The Supreme Court of Justice is the highest court in the Mexican judicial system.

Hunton App. 0486

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 21 of 118   PageID 6637
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 36 of 175   PageID 20955

14

**FREEDOM OF WILL. IT IS A CONSTITUTIONAL PRINCIPLE.[37]**

It is the view of this First Chamber of the Supreme Court of Justice, that the **principle of free will is protected under the Constitution** and it cannot be relegated to a simple principle applicable to civil [common][38] rights. Within this framework, **respect for the individual as a person requires respect for his or her individual self-determination**, so if the individual is not at liberty to freely structure his or her own legal relationships, the individual's self-determination is not respected. Furthermore, the principle of free will is reflected in property rights and party autonomy in contracts, which are also a **central element of free personal freedom, in whose virtue the parties of a legal relationship are free to pursue their own interests** and regulate their relationships, without external influence.

This decision of the Supreme Court of Justice reflects the significance that Mexico accords to the principles of self-determination, autonomy and consent. According to the Court, free will must always be respected as it is a vital component of the exercise of personal rights.

40.   The full Supreme Court of Justice has also recognized that a person's freedom to choose is "a superior fundamental right recognized in the Mexican legal system."[39] Numerous other judicial precedents similarly provide that consent and self-determination are core values in the Mexican legal system.[40]

---

[37] See precedent no. 2008086. Freedom of will. It is a constitutional principle, published in *Semanario Judicial de la Federacion* in December 2014 (emphasis added).

[38] To the best of my understanding, the meaning and implications of the phrase "civil rights" in Mexico differs from the United States. Whereas "civil rights" in the U.S. are of the highest hierarchy (*e.g.* freedom of speech, assembly, from servitude and equality) (retrieved from https://www.law.cornell.edu/wex/civil_rights), in the context of the cited precedent, "civil rights" refer to lower ranking (common) rights (*e.g.* right to be compensated for damages, right to be issued a driver's license, right to have a dispute mediated, etc.) set forth in "civil" statutes (*e.g.* Federal Civil Code, Code of Commerce, Copyright Act, etc.). The connotation given to "civil rights" in the U.S. is equivalent to the connation given to "human rights" in Mexico.

[39] See precedent no. 165822. Right to free development of personality. Scope., published in *Semanario Judicial de la Federación* in December 2009 (emphasis added).

[40] See precedent no. 2005118. See precedent no. 2005118, Legally declared incapacity. The disabled person will express its will in accordance with the decision-making assistance model

Hunton App. 0487

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 22 of 118   PageID 6638
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 37 of 175   PageID 20956

15

41.     Accordingly, the Mexican Constitution and judicial precedents equally recognize the fundamental importance of an individual's rights to exercise autonomy, self-determination and consent, and firmly treat "consent" as a matter of public policy.

(3) The Legislative History of the Mexican Class Action Statutes Demonstrates That Autonomy, Self-Determination and Consent Are Matters of Public Policy

42.     The original class action bill submitted to the Mexican Congress provided for an *opt-out* model.  However, this was rejected during the legislative process, and the model changed to an opt-in only model—opt-out class actions were precluded.[41]

43.     During debate in the Chamber of Deputies (equivalent to the U.S. House of Representatives), it was stated that Congress wanted to adopt a class action mechanism "*without reaching the extremes of the North American legislation, where the legal framework has produced an excess of legal proceedings and profitable businesses for lawyers, but without reaching the other extreme where the law does not represent a true defense in favor of the interests of citizens and consumers*".[42]  This demonstrates that the Mexican legislature was aware of the U.S. class action model and deliberately sought to enact a unique Mexican system.  By modifying the initial bill to eliminate opt-out class actions in favor of an opt-in mechanism, the Mexican legislature underscored the importance of consent.

---

and such will be respected and observed., published in *Semanario Judicial de la Federación* in December 2013 (finding that "[any] judicial decision restricting legal capacity must consider the primacy of the individual's self-determination, otherwise we would be before a "substitute decision-making" scheme….").

[41] Compare bill of proposed amendment to the Federal Code of Civil Proceedings submitted by Senator José de Jesús Murillo Karam on September 7, 2010 with opt-out model at http://legislacion.scjn.gob.mx/Buscador/Paginas/wfProcesoLegislativoCompleto.aspx?IdOrd=129&IdRef=11&IdProc=1, against determination on the bill from the Senate Commissions dated December 9, 2010 with opt-in model at http://legislacion.scjn.gob.mx/Buscador/Paginas/wfProcesoLegislativoCompleto.aspx?IdOrd=129&IdRef=11&IdProc=2.

[42] See Chamber of Deputies Debate Record (Diario de Debates de la Cámara de Diputados) dated April 28, 2011, volume II, p. 177 retrieved from http://cronica.diputados.gob.mx/PDF/61/2011/abr/110428-2.pdf on July 6, 2015.

Hunton App. 0488

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 23 of 118   PageID 6639
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 38 of 175   PageID 20957

16

(4) The Mexican Class Action Statute Treats Autonomy, Self-Determination and Consent Principles as Matters of Public Policy

44.     Mexico has an opt-in model class action system.  The Mexican class action statute plainly requires consent—as a matter of public policy—for an individual to become a class member.

45.     In enacting Article 594 of the Federal Code of Civil Procedure, Congress underscored the importance of consent to becoming a class member.  Article 594 conditions participation in a class action on the provision of "express notice" confirming consent to join the class, and confirms that such consent must be voluntarily and freely given and such consent must be explicit.

46.     Article 594 is a mandatory rule of procedure, which, under Mexican law, is considered "of public order."  Thus, courts in Mexico treat consent to a class action as an "unwaiveable" requirement.

47.     Accordingly, the Mexican Constitution, Supreme Court opinions, and the Mexican class action statute all emphasize that consent is an essential requirement of the Mexican legal system.  The existence and adequacy of class members' consent will therefore determine whether a foreign class action judgment will be recognized and enforced in Mexico.

**V.     U.S. OPT-OUT CLASS ACTION JUDGMENTS WILL NOT BE RECOGNIZED AND ENFORCED IN MEXICO AS CLASS MEMBERS NEED NOT CONSENT TO PARTICIPATE IN SUCH PROCEEDINGS**

48.     As detailed above, consent is *the* foundational pillar of the Mexican class action regime.  In conditioning participation in a class on consent, the Mexican legislature determined that consent outweighed any other potential benefit of a class action mechanism.  Accordingly, Mexican courts will view consent as a key factor when assessing whether a foreign judgment rendered in a class action proceeding can be recognized and enforced in Mexico.

49.     Regardless of whether any party seeking to enforce or defend the foreign judgment execution proceeding has argued in favor or against the enforcement of such judgment in the Mexican court, the court may, *sua sponte*, conduct a public policy analysis.

Hunton App. 0489

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 24 of 118   PageID 6640
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 39 of 175   PageID 20958

17

50.     The U.S. opt-out class action mechanism—under which an individual falling within the class definition is automatically included in the class without their consent—is fundamentally at odds with Mexican public policy, which in the class action context prioritizes consent over other interests.   Therefore, a Mexican court would not likely recognize or enforce a foreign class action judgment or settlement that did not comport with the consent required by Mexican law.

51.     Nevertheless, I understand that putative class members in the Action have submitted Proofs of Claim to a court-appointed Receiver and its Claims Agent for claims asserted in a litigation captioned *Securities & Exchange Commission v. Stanford International Bank, Ltd., et al.* Civil Action No. 3:09-CV-0298-N (the "SEC Receivership Action").

52.     I also understand that the SEC Receivership Action is an entirely separate action from the Action, and is brought against an entirely separate group of defendants known as the Receivership Entities, which includes Stanford International Bank, Ltd., Stanford Financial Group Company, Stanford Group Company, Stanford Trust Company, Stanford Capital Management, LLC, and Stanford Coins & Bullion, Inc.[43]

53.     Further, I understand that the plaintiffs in the SEC Receivership Action, by filing Proofs of Claim, submitted to the jurisdiction of the Court for the limited purpose of asserting claims against the Receivership Entities in that action.   The Proof of Claim form states:

> CONSENT TO JURISDICTION:  If you submit a Proof of Claim Form *in this case*, you consent to the jurisdiction of the District Court for all purposes *relating to this claim* and agree to be bound by its decisions, including, without limitation, a determination as to the validity and amount of any *claims asserted against the Receivership Entities*.   In submitting a Proof of Claim Form, you agree to be bound by the actions of the District Court even if that means your claim is limited or denied.

Proof of Claim Form, p. 4 (emphasis added).

54.     It is clear by the face of the Proof of Claim form that a claimholder's consent to participate in the SEC Receivership Action does not constitute consent to join the Action, even if the cases are pending before the same court as consolidated cases.   The SEC Receivership Action

---

[43] Exhibit A to the Janvey Declaration contains a full listing of the entities (p. 2, referencing Exhibit 8), and is available at http://stanfordfinancialreceivership.com.

Hunton App. 0490

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 25 of 118   PageID 6641
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 40 of 175   PageID 20959

18

and the Action are different actions asserting different claims against different defendants, and consent to be a party in one action would not under Mexican law be presumed to constitute consent to be a party in the other.

55.     I am certain that a Mexican court would not consider the requirement of consent to have been met in the Action by virtue of a Mexican domiciliary's submission to the jurisdiction of the Court for purposes of the SEC Receivership Action.

## VI.     CONCLUSIONS

56.     Under Mexican law, a prerequisite to recognition and enforcement of a foreign judgment or settlement is that the judgment or settlement comports with Mexican public policy.

57.     Mexican law does not statutorily define public policy. However, federal jurisprudence has determined that public policy is to be analyzed in the appropriate context, considering the distinguishing factor of the legal system in question and privileging common over private good. In my belief, the appropriate context in this case is the legal framework for class actions in Mexico, and the rationale behind it. The distinguishing factor in the Mexican legal system is its high-regard for consent and self-determination.

58.     The Mexican Constitution, Supreme Court precedents and other key factors strongly indicate that autonomy and consent are cornerstones of Mexican public policy.

59.     Mexican public policy with respect to class actions requires that class members expressly consent to joining the class.

60.     Since the Action involves an opt-out class action mechanism where a Mexican plaintiff falling within the class definition would be included in the class without their express consent, a judgment in the Action would not be enforced by a Mexican court.

Hunton App. 0491

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 26 of 118   PageID 6642
Case 3:09-cv-02384-N-BG   Document 351-6   Filed 11/02/15   Page 41 of 175   PageID 20960

19

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed in New York, New York.

Dated:  July 6, 2015

Eduardo Siqueiros T.

Hunton App. 0492

# EXHIBIT A

Hunton App. 0493

CURRICULUM VITAE

**EDUARDO SIQUEIROS T.**

I.   **Education**

|  |  |
|---|---|
| 1973 - 1978 | Escuela Libre de Derecho<br>México, D.F. |
| 1979 - 1980 | Master in Laws (LL.M.)<br>Harvard Law School<br>Cambridge, Massachussets, E.U.A. |

II.   **Professional Experience**

| | |
|---|---|
| 1981 - Present | **Hogan Lovells, BSTL, S.C.**<br>(previously Barrera, Siqueiros y Torres Landa, S.C.)<br>Note: In August 2014 the firm merged with Hogan Lovells LLP<br>Paseo de los Tamarindos 150 - PB<br>Bosques de las Lomas<br>05120, México, D.F.<br>Position: Partner |
| September 1980 - July 1981 | Covington & Burling<br>Washington, D.C.<br>Position: Foreign Associate |
| September 1975 - June 1979 | Martínez y Comella, S.C.<br>México, D.F.<br>Position: Associate |

III.   **Academic Activities**

- Escuela Libre de Derecho, Mexico City
  Professor in Graduate Programs: International Business, Arbitration and International Trade (1994-2015)

- Universidad Iberoamericana, Mexico City
  Professor, Master's Degree in Legal Issues in International Business (2002 - 05)
  Professor, Corporations (2005 - 2008)

- Universidad Panamericana, Mexico City
  Professor, Arbitration, Legal Issues of International Business  (2011-2015)

- Instituto Tecnológico Autónomo de México (ITAM), Mexico City
  a)   Professor, Commercial Contracts (1986-1993), Corporations (1988-1989)
       Legal Issues in International Trade (1989)
  b)   Coordinator, Foreign Investment Degree Program (1989-1990)

Hunton App. 0494

- Speaker in various fora in Mexico and abroad on arbitration and mediation, and other trade and investment topics.

IV.   **Areas of Expertise**

The areas of concentration have dealt with arbitration, as well as commercial and joint venture and investment, shareholder agreements, mergers and acquisitions, energy and government concessions.

V.   **Arbitration and Mediation Experience**

- Participated as arbitrator in tribunals established before the International Center for Settlement of International Disputes (ICSID) to resolve investment disputes  under Chapter XI of the North American Free Trade Agreement (NAFTA) and Bilateral Investment Treaties.

  o  Waste Management, Inc. v. United Mexican States (ICSID Case ARB(AF)/98/2).

  o  Telefónica S.A. v. The Republic of Argentina (ICSID Case No. ARB/03/20)

  o  Corn Products International, Inc. v. United Mexican States (ICSID Case No. ARB(AF)/04/1), and Archer Daniels Midland Co. and Tate & Lyle Ingredients Americas, Inc. v. United Mexican States (ICSID Case No. ARB(AF)/04/05), Order in connection with  Consolidation.

  o  Archer Daniels Midland Co. and Tate & Lyle Ingredients Americas, Inc. v. United Mexican States (ICSID Case No. ARB(AF)/04/05)

  o  Abengoa, S.A. and Compañía Española de Financiación del Desarrollo, COFIDES, S.A. v. United Mexican States (ICSID Case ARB(AF)/09/2).

  o  Pluspetrol Perú Corporation and others v. Perupetro S.A. (ICSID Case ARB/12/28)  (Chairman of the Tribunal).

- Participated as sole arbitrator as well as chair of the tribunal in multiple arbitration proceedings administered by the International Court of Arbitration of the International Chamber of Commerce (ICC), the International Centre for Dispute Resolution (ICDR) of the American Arbitration Association, the National Chamber of Commerce of Mexico (Cámara Nacional de Comercio - CANACO), and the Arbitration Centre of Mexico (Centro de Arbitraje de México - CAM), as well as in non-administered arbitrations under the UNCITRAL Arbitration Rules.

- Participated as advisor and party counsel in several international arbitration proceedings, both domestic and international, administered primarily by the International Court of Arbitration of the International Chamber of Commerce, the International Centre for Dispute Resolution (ICDR) of the American Arbitration Association, as well as in non-administered arbitrations under the UNCITRAL Arbitration Rules.

Hunton App. 0495

- Participated as a Mediator in administered and non-administered proceedings.

VI.   **Memberships**

- Mexican Bar Association (*Barra Mexicana, Colegio de Abogados*)
- Mexican Mediation Institute (*Instituto Mexicano de la Mediación*)
- Mexican Arbitration Institute (*Instituto Mexicano de Arbitraje*)
- Arbitration Committee, Mexican Chapter of the International Chamber of Commerce

VII.   **Publications**

Among others, the following:

- *What are the responsibilities of an Arbitral Tribunal faced with a breach of integrity of one of its members*?, World Arbitration & Mediation Review, 2012.
- *Control in a Corporation (Control en una Sociedad Mercantil)*. Ars Juris, Law Review of the Instituto Panamericano de Jurisprudencia, Univesidad Panamericana, 2009.
- *Agency and Distribution Agreements in Mexico*, International Agency and Distribution Agreements, 1991/1994/2002/2007/2014
- *Doing Business in Mexico*, Transnational Juris. Publ. 1991.
- *Legal Framework for the Sale of Goods into Mexico*, Houston Journal of International Law, 1990.
- *Recent Developments in Foreign Investment in Mexico*, State Bar of Texas, 1990.
- *Recent Developments in Foreign Investment, Transfer of Technology and Trade in Mexico*, State Bar of Wisconsin, 1990.

VIII.   **Declarations as Expert Witness**

- International Centre For Dispute Resolution
  Case No.  AAA 50 155 T 00114 11
  CapSource Financial, Inc. and Remolques y Sistemas Aliados de Transportacion, S.A. de C.V. v. Hyundai Translead and Hyundai Translead de Mexico S.A. de C.V.

- Superior Court Of Arizona, Maricopa County DocketNo.
  No. CV2008-027700
  Scottsdale Commercial Developments, Inc. v.  Euler Hermes American Credit Indemnity Company

**Hunton App. 0496**

# EXHIBIT B

App. 1795

Hunton App. 0497

# DECLARATION

## EDUARDO SIQUEIROS

## LEGAL AUTHORITIES CITED

Hunton App. 0498

**Statutory Provisions**

**Hunton App. 0499**

**Provisions from the 1917 Mexican Constitution (as amended)**

| Original Text in Spanish | Translation |
|---|---|
| ***Artículo 1o.** En los Estados Unidos Mexicanos todas las personas gozarán de los derechos humanos reconocidos en esta Constitución y en los tratados internacionales de los que el Estado Mexicano sea parte, así como de las garantías para su protección, cuyo ejercicio no podrá restringirse ni suspenderse, salvo en los casos y bajo las condiciones que esta Constitución establece. [...]* | **Article 1.** In the United Mexican States, all individuals are entitled to recognition of the human rights set forth in this Constitution and in international treaties to which the Mexican State is party to, as well as to the guarantees for their [human rights] protection.   Exercise of these rights and guarantees may not be restricted or suspended, except in those case and subject to the conditions set forth in this Constitution. […] |
| *Queda prohibida toda discriminación motivada por origen étnico o nacional, el género, la edad, las discapacidades, la condición social, las condiciones de salud, la religión, las opiniones, las preferencias sexuales, el estado civil o cualquier otra que atente contra la dignidad humana y tenga por objeto anular o menoscabar los derechos y libertades de las personas.* | Any type of discrimination, whether it is based on ethnicity, nationality, gender, age, disability, social condition, health condition, religion, opinions, sexual orientation, marital status or on any   other that transgresses human dignity or is intended to void or restrict rights and liberties of the individuals, is prohibited. |
| ***Artículo 4o.** [...] Toda persona tiene derecho a la identidad y a ser registrado de manera inmediata a su nacimiento. El Estado garantizará el cumplimiento de estos derechos. La autoridad competente expedirá gratuitamente la primera copia certificada del acta de registro de nacimiento. [...]* | **Article 4.** […] Every person has the right to self-identity and to be registered immediately after being born. The State will guarantee these rights. The competent authority will freely issue the first certificate copy of the certification of birth. […] |
| ***Artículo 5o.** [...] El Estado no puede permitir que se lleve a efecto ningún contrato, pacto o convenio que tenga por objeto el menoscabo, la pérdida o el irrevocable sacrificio de la libertad de la persona por cualquier causa. [...]* | **Article 5.** […] The State cannot permit the execution of any agreement, contract or covenant which has as its intended effect to impose a restriction, loss or irrevocable waiver of an individual's freedom for any reason. […] |
| ***Artículo 17.** [...] El Congreso de la Unión expedirá las leyes que regulen las acciones colectivas. Tales leyes determinarán las materias de aplicación, los procedimientos judiciales y los mecanismos de reparación del daño. Los jueces federales conocerán de* | **Article 17.** […] The federal Congress shall enact statutes governing class actions. Such statutes shall determine the scope of application, judicial proceedings and mechanisms for the recovery of damages. Federal judges shall have exclusive jurisdiction over these proceedings and mechanisms". |

Hunton App. 0500

| | |
|---|---|
| *forma exclusiva sobre estos procedimientos y mecanismos.* | […] |
| ***Artículo 104.** Los Tribunales de la Federación conocerán:* | **Article 104.** Federal courts will hear: |
| *[…]* | […] |
| *II. De todas las controversias del orden civil o mercantil que se susciten sobre el cumplimiento y aplicación de leyes federales o de los tratados internacionales celebrados por el Estado Mexicano. A elección del actor y cuando sólo se afecten intereses particulares, podrán conocer de ellas, los jueces y tribunales del orden común.*<br>*[…]* | II. All civil or commercial disputes arising from compliance with or application of Federal laws or international treaties executed by the Mexican State. Upon the plaintiff's choice and whenever they affect individual interests only, state courts and judges may hear them.<br>[…] |

**Hunton App. 0501**

**Provisions from the 1943 Mexican Federal Code of Civil Procedure (as amended)**

| Original Text in Spanish | Translation |
|---|---|
| **Artículo 569.-** *Las sentencias, los laudos arbitrales privados de carácter no comercial y demás resoluciones jurisdiccionales extranjeros tendrán eficacia y serán reconocidos en la República en todo lo que no sea contrario al orden público interno en los términos de este código y demás leyes aplicables, salvo lo dispuesto por los tratados y convenciones de los que México sea parte. [...]* | **Article 569.** Judgments, non-commercial private awards and other judicial foreign rulings will be effective and will be recognized in the Republic [Mexico] insofar they are not contrary to domestic public policy, unless otherwise indicated in treaties and conventions to which Mexico is party. […] |
| **Artículo 581.** *[...] III. Acción individual homogénea: Es aquélla de naturaleza divisible, que se ejerce para tutelar derechos e intereses individuales de incidencia colectiva, cuyos titulares son los individuos agrupados con base en circunstancias comunes, cuyo objeto es reclamar judicialmente de un tercero el cumplimiento forzoso de un contrato o su rescisión con sus consecuencias y efectos según la legislación aplicable.* | **Article 581.** […] III. Individually homogeneous class action: that action that seeks protection of interests that are divisible in nature but whose holders are grouped based on common circumstances. Its purpose is to judicially claim from a third party specific performance or termination of a certain agreement and the consequences thereto in accordance with applicable law. |
| **Artículo 585.-** *Tienen legitimación activa para ejercitar las acciones colectivas: [...]*<br><br>*II. El representante común de la colectividad conformada por al menos treinta miembros; [...]* | **Article 585.** The following persons and entities may start a class action: […]<br><br>II. The common representative of a class comprised by at least thirty plaintiffs. |
| **Artículo 594.-** *Los miembros de la colectividad afectada podrán adherirse a la acción de que se trate, conforme a las reglas establecidas en este artículo.*<br><br>*En el caso de las acciones colectivas en sentido estricto e individuales homogéneas, la adhesión a su ejercicio podrá realizarse por cada individuo que tenga una afectación a través de una comunicación expresa por cualquier medio dirigida al representante a que se refiere el artículo 585 de este Código o al representante legal de la parte actora, según sea el caso.* | **Article 594.** Members of an affected group may join the action in question pursuant to the rules in this article.<br><br>In strict class actions and individually homogeneous class actions, any affected individual may join the action through an express notice addressed to the representative referred to in article 585 of this Code or to the legal representative of the plaintiff, as the case may be. |

Hunton App. 0502

| | |
|---|---|
| *Los afectados podrán adherirse voluntariamente a la colectividad durante la substanciación del proceso y hasta dieciocho meses posteriores a que la sentencia haya causado estado o en su caso, el convenio judicial adquiera la calidad de cosa juzgada.*<br><br>*Dentro de este lapso, el interesado hará llegar su consentimiento expreso y simple al representante, quien a su vez lo presentará al juez. El juez proveerá sobre la adhesión y, en su caso, ordenará el inicio del incidente de liquidación que corresponda a dicho interesado.*<br>*[...]* | During the pendency of the proceeding and for an eighteen month period after the judgment or the settlement agreement has become binding —as the case may be— any affected party may voluntarily join the class.<br><br>During this period, the interested party may communicate its express and simple consent [to join the class] to the representative who, in turn, will submit it to the judge.<br>[…] |

App. 1801

**Hunton App. 0503**

### Provisions from the 1889 Mexican Code of Commerce (as amended)

| Original Text in Spanish | Translation |
|---|---|
| **Artículo  1347-A.-**  *Las  sentencias  y resoluciones dictadas en el extranjero podrán tener fuerza de ejecución si se cumplen las siguientes condiciones:* | **Article 1347-A.** Foreign judgments and decisions might be executable if: |
| *[...]* | [...] |
| *II.  Que  no  hayan  sido  dictados  como consecuencia del ejercicio de una acción real;* | II. [The foreign judgment of which recognition and enforcement is sought] was not entered in an *in rem* action; |
| *III. Que el juez o tribunal sentenciador haya tenido competencia para conocer y juzgar el asunto de acuerdo con las reglas reconocidas en  el  derecho  internacional  que  sean compatibles con las adoptadas por este código.* | III. The court hearing the action from which the foreign judgment arose must have had jurisdiction to hear the case  according  to  the  rules  recognized  in  the international law that are compatible with this code. |
| *El juez o tribunal sentenciador extranjero no tiene competencia cuando exista, en los actos jurídicos de que devenga la resolución que se pretenda  ejecutar,  una  cláusula  de sometimiento únicamente a la jurisdicción de tribunales mexicanos;* | The foreign judge does not have jurisdiction when in the legal acts from which the decision was entered, there  is  a  clause  indicating  submission  to  the jurisdiction of Mexican tribunals only; |
| *IV. Que el demandado haya sido notificado o emplazado  en  forma  personal  a  efecto  de asegurarle  la  garantía  de  audiencia  y  el ejercicio de sus defensas;* | IV. Due process rights must have been observed and, most importantly, proper service of process must have taken place; |
| *V. Que tenga el carácter de cosa juzgada en el país en que fueron dictados, o que no exista recurso ordinario en su contra;* | V. The foreign judgment must be final and definitive; *i.e.* it must be a non-appealable judgment that is not subject to challenge; and |
| *VII. Que la obligación para cuyo cumplimiento se haya procedido no sea contraria al orden público en Mexico; y* | VII. The obligation sought to be fulfilled must not contravene Mexican public policy; and |
| *[...]* | [...] |
| **Artículo 1457.-**  *Los  laudos  arbitrales solo podrán ser anulados por el juez competente cuando:* | **Article 1457.** Arbitral awards can only be annulled by a competent judge when: |
| *[...]* | [...] |
| *II. El juez compruebe que, según la legislación mexicana, el objeto de la controversia no es susceptible de arbitraje, o que el laudo es contrario al orden público.* | II. The judge considers that, according to Mexican law, the dispute is not subject to arbitration, or that the award is contrary to public policy. |

**Hunton App. 0504**

**Provisions from the 1995 Organic Statute of the Federal Judicary (as amended)**

| Original Text in Spanish | Translation |
|---|---|
| ***Artículo 53 Bis.-*** *Los jueces de distrito mercantiles federales conocerán:*<br><br>*[...]*<br><br>*VII. De las acciones colectivas mercantiles a que se refiere el Libro Quinto del Código Federal de Procedimientos Civiles.*<br><br>*[...]* | **Article 53 Bis.** Commercial subject matter courts will hear:<br><br>[...]<br><br>IV. The commercial class actions referred in the Fifth Book of the Federal Code of Civil Procedure.<br><br>[...] |

Hunton App. 0505

**Judicial Precedents**

**Hunton App. 0506**

| Original Text in Spanish | Translation |
| --- | --- |
| *LAUDO ARBITRAL. ORDEN PÚBLICO SERÁ DETERMINADO POR EL JUEZ CUANDO SE RECLAMA SU NULIDAD O RECONOCIMIENTO Y EJECUCIÓN.* | **ARBITRATION AWARD. PUBLIC POLICY WILL BE DETERMINED BY THE JUDGE WHEN THE RECOGNIZED NULLITY OR EXECUTION IS CLAIMED.** |
| *Tesis aislada no. 2001132* | *Single precedent no. 2001132* |
| *Como el concepto de "orden público" no se encuentra definido en la Constitución ni en el Código de Comercio, ello deja claro que es preciso determinar su significado en cada caso concreto pues no basta con asimilarlo a las normas imperativas, sino que es necesario proteger nuestra cultura jurídica mexicana de intromisiones que la desvirtúen. Esto es así, dado que una interpretación conjunta de la fracción II del artículo 1457, con la fracción II del artículo 1462 del Código de Comercio, incluso con el precepto V, inciso 2, de la Convención sobre el Reconocimiento y Ejecución de las Sentencias Arbitrales Extranjeras, lleva a la conclusión de que son dos las hipótesis que pueden ocasionar que el juzgador de oficio declarare que un laudo arbitral es nulo o que no lo reconozca como una resolución acorde al sistema jurídico mexicano y por ende deniegue su ejecución, y es cuando: a) Según la legislación mexicana, el objeto de la controversia no susceptible de solución por vía del arbitraje; o, b) Cuando el laudo sea contrario al "orden público" mexicano. Así las cosas, la referencia a la legislación mexicana es para guiar al juzgador quien debe velar que el objeto de la controversia pueda ser objeto de arbitraje, es decir, que no exista alguna disposición legal mexicana que lo impida; mientras que por otra parte, el concepto de "orden público" es más amplio, pues no basta con afirmar que en un laudo arbitral se está dejando de aplicar una disposición legal que se autodefine como "orden público" para que se tenga necesariamente que concluir que se transgrede el mismo, sino que es necesario un estudio más profundo, caso por caso, que permita concluir que con su reconocimiento y ejecución es evidente que sí se transgrede nuestro orden jurídico. En conclusión, se* | As the concept of "public policy" is not defined in the Constitution or in the Commercial Code, it is clear that its significance is precisely determined in each concrete case; thus, it is not enough to learn the rules, but rather it is necessary to protect our Mexican judicial culture from intrusions that undermine it. This is so, given that a joint interpretation of section II of article 1457 and section II of article 1462 of the Commercial Code, including provision V, subsection 2, of the Convention about Recognition and Execution of Foreign Arbitral Awards, leads to the conclusion that they are two hypotheses which can result in the State court declaring that an arbitral award is null or that it does not recognize it as a resolution according to the Mexican judicial system and the award is hence denied execution, and it is when: a) According to Mexican legislation, the object of the controversy would not be susceptible to a solution by means of arbitration; or, b) When the award would be contrary to Mexican public policy. In such a context, reference to the Mexican legislation is to guide the judge, who should ensure that the object of the controversy could be subject to arbitration, that is to say, that no legal Mexican provision would impede it; while on the other hand, the concept of "public policy" is broader, therefore it is not enough to affirm that an arbitral award is applying a legal provision that is self-defined as "public policy" in order that one necessarily must conclude that the same is violated, but rather a more profound study is necessary, case by case, that allows one to conclude with one's recognition and execution it is evident that our judicial policy is violated. In conclusion, it is reiterated that it should be the judge who in each concrete case determines whether public policy is violated or not. |

Hunton App. 0507

| | |
|---|---|
| *reitera deberá ser el juzgador quien en cada caso concreto determine si se transgrede o no el "orden público".* | |
| *SÉPTIMO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.* | SEVENTH COLLEGIATE TRIBUNAL FOR CIVIL MATTERS OF THE FIRST CIRCUIT. |

**Hunton App. 0508**

| Original Text in Spanish | Translation |
|---|---|
| *ORDEN PÚBLICO. ES UN CONCEPTO JURÍDICO INDETERMINADO QUE SE ACTUALIZA EN CADA CASO CONCRETO, ATENDIENDO A LAS REGLAS MÍNIMAS DE CONVIVENCIA SOCIAL.* | **PUBLIC POLICY. IT IS AN UNDETERMINED JUDICIAL CONCEPT THAT OCCURS IN EACH CONCRETE CASE, ADDRESSING THE STANDARD MINIMUM RULES FOR SOCIAL COEXISTENCE.** |
| *Tesis aislada no. 177560* | *Single precedent no. 177560* |
| *El orden público no constituye una noción que pueda configurarse a partir de la declaración formal contenida en una ley. Por el contrario, ha sido criterio constante de la Suprema Corte de Justicia de la Nación que corresponde al juzgador examinar su presencia en cada caso concreto, de tal suerte que se perfila como un concepto jurídico indeterminado de imposible definición cuyo contenido sólo puede ser delineado por las circunstancias de modo, tiempo y lugar que prevalezcan en el momento en que se realice la valoración. En todo caso, para darle significado, el juzgador debe tener presentes las condiciones esenciales para el desarrollo armónico de la comunidad, es decir, las reglas mínimas de convivencia social; en la inteligencia de que la decisión que se tome en el caso específico no puede descansar en meras apreciaciones subjetivas, sino en elementos objetivos que traduzcan las preocupaciones fundamentales de la sociedad, siempre buscando no obstaculizar la eficacia de los derechos de tercero.* | Public policy does not constitute a notion that can be configured from a formal declaration of law. On the contrary, a constant criteria of the Federal Supreme Court of Justice has been corresponding to the judge to examine public policy's presence in each concrete case, in such a manner that it is profiled as an undetermined judicial concept impossible to define whose only content can be delineated by the circumstances of fashion, time and place that prevail in the moment that the evaluation occurs.  In any case, in order to give it significance, the judge should consider the essential conditions for the harmonic development of society, that is to say, the minimum standards for social interaction; with the understanding that the decision is taken in the specific case cannot relax in mere subjective judgments, but rather in objective elements that translate the fundamental concerns of society, always looking to not hinder the effectiveness of the rights of third parties. |
| *CUARTO TRIBUNAL COLEGIADO EN MATERIA ADMINISTRATIVA DEL PRIMER CIRCUITO.* | FOURTH COLLEGIATE TRIBUNAL FOR ADMINISTRATIVE MATTERS OF THE FIRST CIRCUIT. |

Hunton App. 0509

| Original Text in Spanish | Translation |
|---|---|
| *EMPLAZAMIENTO. ES DE ORDEN PUBLICO Y SU ESTUDIO ES DE OFICIO.* | **SERVICE OF PROCESS. IT IS A MATTER OF PUBLIC POLICY AND ITS ANALYSIS IS SUA SPONTE.** |
| *Jurisprudencia no. 240531* | *Binding precedent no. 240531* |
| *La falta de emplazamiento o su verificación en forma contraria a las disposiciones aplicables, es la violación procesal de mayor magnitud y de carácter más grave, puesto que da origen a la omisión de las demás formalidades esenciales del juicio, esto es, imposibilita al demandado para contestar la demanda y, por consiguiente, le impide oponer las excepciones y defensas a su alcance; además, se le priva del derecho a presentar las pruebas que acrediten sus defensas y excepciones y a oponerse a la recepción o a contradecir las probanzas rendidas por la parte actora y, finalmente, a formular alegatos y ser notificado oportunamente del fallo que en el proceso se dicte. La extrema gravedad de esta violación procesal ha permitido la consagración del criterio de que el emplazamiento es de orden público y que los Jueces están obligados a investigar de oficio si se efectuó o no y sí, en caso afirmativo, se observaron las leyes de la materia.* | The lack of service process or the lack of due service of process according to the applicable provisions, is the largest and most severe procedural violation, because it creates omissions in the other essential formalities in the proceeding, this means, it turns the defendant's opportunity to reply to a complaint into impossible and, therefore, prevents him to raise the defenses at his reach; additionally, it is prevented to exercise the right to produce evidence that prove his defenses and to challenge the admissibility of the evidence submitted by its opposing party and, finally, to make pleadings and being duly notified of the final decision. The extreme seriousness of the procedural violation has allowed to determine that service of process is a matter of public policy and the judges are constrained to analyze it sua sponte whether it was performed or not and if, in an affirmative case, the applicable law was observed. |
| *TERCERA SALA DE LA SUPREMA CORTE DE JUSTICIA DE LA NACIÓN.* | THIRD CHAMBER OF THE SUPREME COURT OF JUSTICE. |

Hunton App. 0510

| Original Text in Spanish | Translation |
|---|---|
| *AUTONOMÍA DE LA VOLUNTAD. ES UN PRINCIPIO DE RANGO CONSTITUCIONAL.* | **FREEDOM OF WILL. IT IS A CONSTITUTIONAL PRINCIPLE.** |
| *Non-binding precedent no. 2008086* | *Single precedent no. 2008086* |
| *A consideración de esta Primera Sala de la Suprema Corte de Justicia de la Nación, el principio de autonomía de la voluntad goza de rango constitucional y no debe ser reconducido a un simple principio que rige el derecho civil. Así las cosas, el respeto del individuo como persona requiere el respeto de su autodeterminación individual, por lo que si no existe libertad del individuo para estructurar sus relaciones jurídicas de acuerdo con sus deseos, no se respeta la autodeterminación de ese sujeto. Aunado a lo anterior, el principio de autonomía de la voluntad tiene reflejo en el derecho de propiedad y en la libertad de contratación, la cual también es un elemento central del libre desarrollo de la personalidad, y en cuya virtud las partes de una relación jurídica son libres para gestionar su propio interés y regular sus relaciones, sin injerencias externas.* | It is the consideration of this First Chamber of the Federal Supreme Court of Justice that the principle of freedom of will enjoys constitutional protection and should not be reworked to a simple principle that applies to civil rights. In such a context, the respect of the individual as a person requires respect for his or her individual self-determination, so individual liberty to structure one's judicial relationships as one wishes does not exist, self-determination about that subject is not respected. Besides the foregoing, the principle of freedom of will is reflected in property rights and contract rights, which also are central elements of free development of the personality, in whose virtue the parties of a judicial relationship are free to pursue their own interest and regulate their relationships, without external influence. |
| *PRIMERA SALA DE LA SUPREMA CORTE DE JUSTICIA DE LA NACIÓN* | FIRST CHAMBER OF THE SUPREME COURT OF JUSTICE |

App. 1809

| Original Text in Spanish | Translation |
|---|---|
| ***DERECHO AL LIBRE DESARROLLO DE LA PERSONALIDAD. ASPECTOS QUE COMPRENDE.*** | **RIGHT TO THE FREE DEVELOPMENT OF PERSONALITY. SCOPE.** |
| *Tesis aislada no. 165822* | *Single precedent no. 165822* |
| *De la dignidad humana, como derecho fundamental superior reconocido por el orden jurídico mexicano, deriva, entre otros derechos personalísimos, el de todo individuo a elegir en forma libre y autónoma su proyecto de vida. Así, acorde a la doctrina y jurisprudencia comparadas, tal derecho es el reconocimiento del Estado sobre la facultad natural de toda persona a ser individualmente como quiere ser, sin coacción ni controles injustificados, con el fin de cumplir las metas u objetivos que se ha fijado, de acuerdo con sus valores, ideas, expectativas, gustos, etcétera. Por tanto, el libre desarrollo de la personalidad comprende, entre otras expresiones, la libertad de contraer matrimonio o no hacerlo; de procrear hijos y cuántos, o bien, decidir no tenerlos; de escoger su apariencia personal; su profesión o actividad laboral, así como la libre opción sexual, en tanto que todos estos aspectos son parte de la forma en que una persona desea proyectarse y vivir su vida y que, por tanto, sólo a ella corresponde decidir autónomamente.* | Among others, every individual's right to freely and autonomously choose its life project derives from human dignity as a superior fundamental right recognized in the Mexican legal system. Thus, in accordance with international scholars and jurisprudence, such right is the State's recognition of every person's natural power to individually be as it wants to be, without any coercion or unjustified controls, in order to fulfill any goals and purposes it has set, according to its values, ideas, expectations, preferences, etc. Therefore, free development of personality encompasses, amongst other expressions, the freedom to get married or not to; to have children and how many or not to have them; to decide on self-appearance; its profession or work activity, as well as free sexual choice. All these aspects constitute the manner in which a person wants to show itself and live its life and, thus, only such person is entitled to autonomously decide on it. |
| *PLENO DE LA SUPREMA CORTE DE JUSTICIA DE LA NACIÓN* | FULL SUPREME COURT OF JUSTICE |

**Hunton App. 0512**

| Original Text in Spanish | Translation |
|---|---|
| *ESTADO DE INTERDICCIÓN. ACORDE AL MODELO DE ASISTENCIA EN LA TOMA DE DECISIONES, LA PERSONA CON DISCAPACIDAD EXTERNARÁ SU VOLUNTAD, MISMA QUE SERÁ RESPETADA Y ACATADA.* | **LEGALLY DECLARED INCAPACITY. THE DISABLED PERSON WILL EXPRESS ITS WILL IN ACCORDANCE WITH THE DECISION-MAKING ASSISTANCE MODEL AND SUCH WILL BE RESPECTED AND OBSERVED.** |
| *Tesis aislada no. 2005118* | *Single precedent no. 2005118* |
| *A juicio de esta Primera Sala de la Suprema Corte de Justicia de la Nación, acorde al modelo social de discapacidad consagrado en la Convención sobre los Derechos de las Personas con Discapacidad, la determinación judicial que limite la capacidad jurídica deberá tomar en consideración la primacía de la autodeterminación libre de la persona, pues de lo contrario nos encontraríamos frente a un esquema de "sustitución en la toma de decisiones", lo cual no sería adecuado en términos del instrumento internacional antes citado. Así, no debe confundirse el principio de mayor protección de la persona con discapacidad en aras de su mayor interés, con la prohibición de que la misma decida qué es lo que le beneficia, situación que redunda de forma directa en el desarrollo libre de la personalidad, así como en el fomento de una vida autónoma y de una identidad propia, sin que deba restringirse la capacidad jurídica de una persona solamente porque la misma ha tomado una opción que la generalidad de la sociedad pudiese considerar o calificar como "no acertada". Por tanto, mediante la adopción del modelo de "asistencia en la toma de decisiones", la persona no debe renunciar al derecho a tomar sus propias decisiones, respetándose así su libertad de elección, ello mediante la asistencia en la toma de las mismas.* | It is the view of this First Chamber of the Supreme Court of Justice that, according to the assistance model foreseen in the Convention for the Rights of Disabled Persons, any judicial decision restricting legal capacity must consider the supremacy of the individual's free self-determination, otherwise we would be before a "substitute decision making" scheme, which would not be in accordance with the aforementioned international instrument. Therefore, we must not confuse the principle of wider protection of disabled persons protecting their best interest, with the prohibition for such persons to decide what their best interest is, situation that affects the free development of the person and the development of an autonomous life and self-identity, without restricting his legal capacity because he has taken a decision that the society deems "incorrect". Therefore, with a decision-making assistance model, the person does not have to waive his right to take decisions, because he will be assisted to perform such right, thereby respecting his liberty to choose. |
| *[...]* | [...] |
| PRIMERA SALA DE LA SUPREMA CORTE DE JUSTICIA DE LA NACIÓN | FIRST CHAMBER OF THE SUPREME COURT OF JUSTICE |

App. 1811

**Hunton App. 0513**

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford receivership estate; The OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated, | § § § § § § § § § § | |
| Plaintiffs. | § § | CIVIL ACTION NO. 3:12-cv-04641-N |
| vs. | § § | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; and YOLANDA SUAREZ, | § § § § | |
| Defendants. | § § | |

## DECLARATION OF ROGIER VAN DEN HEUVEL

Pursuant to 28 USC §1746(1), I, Rogier van den Heuvel, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

## I.    INTRODUCTION

1.    I am over eighteen (18) years of age, and I have personal knowledge of the facts set forth in this declaration.

2.    I provided a declaration and expert analysis in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel in *Rotstain v. Trustmark National Bank*, No. 3:09-cv-02384 (N.D. Tex.).  I attach a copy of that declaration and its attachments here as Exhibit A (the "Rotstain Declaration").

II.  **BACKGROUND AND QUALIFICATIONS**

3.      I am a practicing attorney (*advocaat*) at the law firm VanEps Kunneman VanDoorne in Curacao.  I am a national of the Netherlands where I obtained my degree in law (*meester in de rechten*, LLM) at Leiden University in 2001. I practiced law at the Netherlands law firm Simmons & Simmons (and its predecessors) before joining VanEps Kunneman VanDoorne.

4.      I am a member of the bar of the Common Court of Justice of Aruba, Curacao and Sint Maarten and of Bonaire, Sint Eustatius and Saba, as well as the Netherlands Bar.

5.      I have had a litigation practice since the beginning of my career. In my daily practice I regularly deal with matters of recognition and enforcement of foreign judgments in the former Netherlands Antilles. Hence, I consider myself qualified to render this professional opinion.

6.      I am the (visiting) lecturer of private international law at the University of Curacao Dr. Moises da Costa Gomez. My curriculum vitae is attached to this opinion as Exhibit A to the Rotstain Declaration.

7.      I have not testified at a deposition or at trial in the past four years.

8.      I am being compensated for my work in connection with this matter at my customary consulting rate of $480 US Dollars per hour. My compensation is in no way contingent upon the nature of my opinions or the outcome of this litigation. My opinions reflect my own independent, professional judgment.

9.      I reserve the right to supplement or modify my opinions expressed herein, particularly in view of any new arguments or materials presented by plaintiffs in this matter.

2

10.     I have no first-hand knowledge of the specific facts underlying this dispute.  In forming my opinions, along with the other documents or information referenced in the attached Exhibit A, I have considered the following materials related to *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641 (N.D. Tex):   Plaintiffs' Original Complaint – Class Action, dated November 15, 2012;   Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated October 5, 2015; and the Brief in Support of Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated October 5, 2015.

**III.     OPINION**

11.     My analysis and conclusions in the *Rotstain* matter apply equally to *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641 (N.D. Tex). However, I noted a few clerical errors in that declaration. While some may be ignored, I should correct the following:

  a.  In paragraph 25 I quoted Dutch legislative history (in my own translation). A foot note, citing the source, should have been included, which is *Kamerstukken II (1991-1992), nr. 22 486, nr. 3, p. 30.*

  b.  In the quotation there is a small omission. Hereunder, I include the correct quotation, underlining the previously omitted language.

> Considering the principle that damages would have to be paid to the persons that have suffered the damages, I do not see a possibility for interest  organizations to claim damages for others. [...] Pursuant to paragraph 3 of article 305a [...] an interest organization cannot claim pecuniary damages for others. Compelling arguments can be adduced against such a possibility. It is inconceivable without all kinds of restrictions that would do justice to the interests of the parties involved. Opening the opportunity would bring about a multitude of legal-technical complications. [...] The legal-technical complications referred to include that the total damages inflicted to the group represented by the interest organization <u>would have to be established</u>, and

3

**Hunton App. 0516**

subsequently, it would have to be determined how the total damages should be divided between this group. The individual damages would usually differ and questions as to the victims' own fault could influence the obligation to compensate damages. This shows, that in most cases, individual circumstances oppose the bundling of claims for damages.

12.     I therefore adopt Exhibit A as my declaration in this matter, as modified by the corrections set forth in Paragraph 11.

Date:  17 November 2015

_____
Rogier van den Heuvel

Hunton App. 0517

# EXHIBIT A

Hunton App. 0518

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| PEGGY ROIF ROTSTAIN, et al. on behalf of themselves and all others similarly situated <br><br> v. <br><br> TRUSTMARK NATIONAL BANK, et al., Defendants. | Civil Action No 3:09-CV-02384-N-BG <br><br> Judge: Hon. David C. Godbey <br><br> Mag.: Hon. Nancy M. Koenig |

## DECLARATION OF ROGIER F. VAN DEN HEUVEL

### I. Introduction

1.  I have been asked to address whether a court in the former Netherlands Antilles would recognize and give preclusive effect to a US class action judgment rendered in the above-captioned *Rotstain, et al. v. Trustmark National Bank, et al.* ("the Rotstain Action" or the "Action"), or a court-approved settlement in the Action, such that it would be binding on an investor domiciled in the former Netherlands Antilles who did not "opt out" of the plaintiff class.

### II. Summary of Opinion

2.  An opt-out mechanism whereby a party is bound to a judgment or court-approved settlement merely for failing to opt out would be in contravention of public policy. In my opinion, it is highly unlikely that courts of the former Netherlands Antilles would recognize and give preclusive effect to such a judgment or court-approved settlement in an opt-out class action, including the Rotstain Action.

3.  Further, in my opinion, class action judgments awarding compensatory damages would be at considerable risk of being in contravention of public policy since these would be irreconcilable with applicable domestic provisions on collective actions that expressly preclude claims for pecuniary damages.

4.  Lastly, in my opinion, it is highly unlikely that courts of the former Netherlands Antilles would recognize and give preclusive effect to any judgment awarding punitive damages because punitive damages would also contravene public policy as a matter of principle.

Hunton App. 0519

2

### III.  Qualifications and Materials Considered

#### A. Professional Qualifications

5.  I am a practicing attorney (*advocaat*) at the law firm VanEps Kunneman VanDoorne in Curacao. I am a national of the Netherlands where I obtained my degree in law (*meester in de rechten*, LL.M) at Leiden University in 2001. I practiced law at the Netherlands law firm Simmons & Simmons (and its predecessors) before joining VanEps Kunneman VanDoorne.

6.  I am a member of the bar of the Common Court of Justice of Aruba, Curacao and Sint Maarten and of Bonaire, Sint Eustatius and Saba, as well as the Netherlands Bar.

7.  I have had a litigation practice since the beginning of my career. In my daily practice I regularly deal with matters of recognition and enforcement of foreign judgments in the former Netherlands Antilles. Hence, I consider myself qualified to render this professional opinion.

8.  I am the (visiting) lecturer of private international law at the University of Curacao Dr. Moises da Costa Gomez. My *curriculum vitae* is attached to this opinion as Exhibit A.

9.  I have not testified at a deposition or at trial in the past four years.

10.  I am being compensated for my work in connection with the Action at my customary consulting rate of $480 US Dollars per hour. My compensation is in no way contingent upon the nature of my opinions or the outcome of this litigation. My opinions reflect my own independent, professional judgment.

#### B. Documents Considered In Forming My Opinion

11.  In reaching my opinions, I have considered the following materials, along with the other documents or information referenced in this Declaration: (i) a Memorandum supporting plaintiffs' motion for class certification, for designation of class representatives and class counsel dated 30 April 2015, and (ii) a Plaintiffs' second amended class action complaint dated 1 May 2015. I understand that both documents have been submitted to the United States District Court, Northern District of Texas, Dallas Division, in the Rotstain Action.

12.  For the purpose of giving this opinion and relying on these documents, I have assumed the following facts.

13.  This is a putative class action on behalf of domestic and foreign persons who invested considerable sums of money in certificates of deposits ("CDs") issued by R.A. Stanford's Antigua-based Stanford International Bank, Ltd ("SIBL").

14.  The plaintiffs' investments were part of an operation that the Dallas court has determined was a Ponzi scheme.

15.  The plaintiffs allege that they were unaware of this, for lack of disclosure by R.A. Stanford, and therefore, could not have known that SIBL would be unable to repay principal and interest on the CDs.

Hunton App. 0520

3

16.  The plaintiffs further allege that five banks, the "Bank Defendants," possessed the information required to expose the Ponzi scheme, but failed to sever their banking relations with SIBL and related entities, tolerated R.A. Stanford's fraud and even assisted in that fraud in exchange for profit. Plaintiffs argue that the Bank Defendants (i) aided violations of the Texas Securities Act, (ii) aided fraud, (iii), participated in a breach of fiduciary duty, and (iv) aided conversion of money, which results in four asserted corresponding causes of action, together with a fifth asserted cause of action, being civil conspiracy.

17.  The plaintiffs request that the Court certify the "Class" as defined in that second amended class action complaint, award damages in an amount to be determined at trial, and in accordance with the claim determinations of the US Receiver, as well as attorneys' fees and costs, permitted by law, and other relief as the court may deem just and appropriate.

18.  I reserve the right to supplement or modify my opinions expressed herein, particularly in view of any new arguments or materials presented by plaintiffs in the Action.

### IV.  The Legal Systems of the Former Netherlands Antilles

19.  At the outset, I should point out that the Netherlands Antilles, which have not included Aruba since 1986, ceased to exist altogether as of 10 October 2010. Since then, the Kingdom of the Netherlands consists of the autonomous countries (i) the Netherlands, (ii) Aruba, (iii) Curacao and (iv) Sint Maarten, while the island territories (v) Bonaire, (vi) Sint Eustatius and (vii) Saba (the latter three together the "BES") have become public bodies of the Netherlands. My opinions expressed herein address the recognition of a US class action judgment or court-approved settlement in Aruba, Curacao, Sint Maarten, and the BES, which for simplicity I refer to collectively as the "former Netherlands Antilles."

20.  The Kingdom of the Netherlands has five regional legal systems (viz. one for the Netherlands, one for Aruba, one for Curacao, one for Sint Maarten and one for the BES). While these legal systems are very similar to each other, there are differences between the various legal systems. A most notable difference between the legal system of the Netherlands on the one hand and the legal systems of the former Netherlands Antilles on the other hand, that bears relevance to this opinion, concerns the provisions on court-approved class action settlements, which provisions do not exist in the former Netherlands Antilles. Further, the various legal systems do not share the same public policy. Fundamental values differ between the countries. A clear example is that a marriage between people of equal gender can be lawfully concluded in the Netherlands or in Bonaire, but not in Curacao, where it is considered contrary to public policy.

21.  In view of the (otherwise) abundant similarities between the various legal systems within the Kingdom, and the principle of concordance[1] that is applied in the drafting

---

[1] The principle of concordance follows form article 39 of the Charter for the Kingdom of the Netherlands, which provides that (inter alia) civil law should be provided for in a similar fashion in The Netherlands, Aruba, Curaco, Sint Maarten, and the BES.

Hunton App. 0521

4

and interpretation of the laws of the various countries within the Kingdom,[2] the Supreme Court's decisions in Dutch cases bear authority in the former Netherlands Antilles' courts. In addition, lower courts' judgments throughout the Kingdom may set precedents for other courts to follow. In addition, Dutch legislative history, such as explanatory notes, which is generally more elaborate than in the former Netherlands Antilles, is relevant to the interpretation of the laws in the former Netherlands Antilles to the extent that these laws are concordant.

22.    From the perspective of civil procedure, the former Netherlands Antilles are one regional jurisdiction, sharing the same rules of civil procedure (*wetboek van burgerlijke rechtsvordering* or code of civil procedure, "CCP"). There is a court of first instance (*Gerecht in Eerste Aanleg*) in each of the former Netherlands Antilles. The former Netherlands Antilles have one common appellate court, the common court of justice (*Gemeenschappelijk Hof Justitie van Aruba, Curacao, Sint Maarten en van Bonaire, Sint Eustatius en Saba*). Judgments of the common court of justice can be appealed in cassation before the Dutch Supreme Court (*Hoge Raad*) in The Hague, the Netherlands.

**A. Rules on Class Actions in the Former Netherlands Antilles**

23.    Like the Netherlands, all legal systems of the former Netherlands Antilles provide for class actions (or, using Dutch parlance, collective actions) in articles 3:305a of the various Civil Codes.

24.    The relevant provisions bestow upon an interest organization the right to institute a collective action. This right, however, is a subsidiary right that does not replace the right of an individual to assert his own claim in court. According to Dutch legislative history the attribution of preclusive effect of a collective action to members of the represented class, that are not themselves a party to the litigation, was not included for it would contravene fundamental principles of Dutch civil procedure, more specifically a party's right to self-determination in the pursuit of its legal interests, and the right to a fair trial, including the right to access to court and the right to be heard there. The Supreme Court has confirmed in several instances that, indeed, a class action judgment ex 3:305a Civil Code does not have preclusive effect to non-parties.[3] The aforementioned principle applies equally to the Netherlands and to the former Netherlands Antilles.

25.    The provisions of 3:305a Civil code expressly exclude the possibility of a pecuniary damage award for such a class action (Art. 3:305a para. 3). The legislature was of the opinion that as a matter of principle, only parties that suffered damages are entitled to claiming damages, and an award for damages requires an assessment of each individual claim. Questions as to causal connections between unlawful acts and damages, prescription and mitigating circumstances, such as the victim's own fault, cannot normally be established collectively. The legislative history provides the following explanation, in my own translation:

---

[2] Article 40 of the Charter for the Kingdom of the Netherlands.

[3] Supreme Court, 14 June 2002, NJ 2003/689.

Hunton App. 0522

5

Considering the principle that damages would have to be paid to the persons that have suffered the damages, I do not see a possibility for interest organizations to claim damages for others. [...] Pursuant to paragraph 3 of article 305a [...] an interest organization cannot claim pecuniary damages for others. Compelling arguments can be adduced against such a possibility. It is inconceivable without all kinds of restrictions that would do justice to the interests of the parties involved. Opening the opportunity would bring about a multitude of legal-technical complications. [...] The legal-technical complications referred to include that the total damages inflicted to the group represented by the interest organization, and subsequently, it would have to be determined how the total damages should be divided between this group. The individual damages would usually differ and questions as to the victims' own fault could influence the obligation to compensate damages. This shows, that in most cases, individual circumstances oppose the bundling of claims for damages.

26. An important difference between Netherland and former Netherlands Antilles class action-related laws is that since 2005, through the entry into force of the Dutch Mass Claims Settlement Act (*Wet collectieve afwikkeling massaschade*; MCSA), the Netherlands' law additionally provides for a procedure for collective settlement of mass damages on the basis of a settlement agreement concluded between one or more representative organizations and one or more allegedly liable parties for the benefit of a group of affected persons to whom damage was allegedly caused. Once such a collective settlement is concluded, the parties may jointly request the Amsterdam Court of Appeal to declare it binding. If the Court grants the request, the agreement binds all persons covered by its terms and represented by the representative organization, except for any person who has expressly elected to opt out within a specific period. Any person having opted out retains his right to initiate individual proceedings against the defendant. Importantly, a similar procedure does **not** exist in the former Netherlands Antilles.

## B. Recognition and Enforcement of Foreign Judgments in the Former Netherlands Antilles

27. There is no applicable Convention that governs the recognition of a US class action judgment or a US court-approved settlement judgment. Thus, recognition (or lack thereof) by a Netherlands Antilles court would be determined on the basis of domestic rules. These rules are identical in all countries of the Kingdom of the Netherlands.

28. Article 431 of the CCP provides:

1. Except for what is stated in Articles 985-994 [CCP], no decision rendered by foreign judges nor authentic deeds issued abroad can be enforced in this country.[4]
2. The matters can be dealt with and settled de novo by the courts in this country.

---

[4] "In this country" is the literal translation of *hier te lande*, which according to the preliminary article A to the CCP, means "in Aruba, Curacao and Sint Maarten and in the public bodies Bonaire Sint Eustatius and Saba".

Hunton App. 0523

6

29.    The provision (Article 431) means that a judgment of a foreign court is only enforceable by virtue of a convention or a specific domestic legal provision. The recognition and enforcement of other foreign court judgments is not possible, so a new procedure on the merits is required. The wording of paragraph 2 would exclude the possibility of recognition. The application of this provision has, however, been limited considerably in case law. The Supreme Court recently confirmed the conditions for the recognition of foreign judgments:

    (1)    The jurisdiction of the foreign court is based on internationally accepted jurisdictional grounds;

    (2)    The rules for due process have been observed;

    (3)    The recognition of the foreign judgment does not violate domestic public policy; and

    (4)    The foreign decision must not be irreconcilable with a domestic court ruling between the same parties or with a prior foreign court ruling between the same parties, in a dispute about the same subject and based on the same cause, if that prior ruling is fit for recognition by the domestic court.[5]

30.    If a foreign judgment meets these criteria, then the domestic court has to assume that the parties are bound by that foreign decision (*res judicata*).[6]

### V.    Recognition by the Former Netherlands Antilles of a Judgment or Court-Approved Settlement in the Action

31.    It is my understanding that US class actions, such as the Action, employ an opt-out mechanism whereby persons who fall within the class definition as set by the Court become members of the class and are bound by any judgment or court-approved settlement entered into in the action unless they affirmatively "opt out," in which case they are not bound by any judgment or settlement. Failure to opt out of a class constitutes implied consent to class treatment.

32.    Hereunder, I will address the latter two conditions for the recognition of foreign judgments and explain herein why they are impediments to recognition of a judgment or court-approved settlement in the Rotstain Action.

### A.    Public Policy

33.    The shield of public policy serves as an exception to withhold recognition of a judgment that would infringe fundamental legal principles or values.

34.    As mentioned hereinabove, fundamental principles of Dutch civil proceedings are the right to self-determine how one wishes to pursue his/her legal interests and the right

---

[5] Supreme Court, 26 September 2014, ECLI:NL:HR:2014:2838, NIPR 2014, 381.

[6] Idem, para. 3.6.5.

Hunton App. 0524

7

to access to court, as well as the right to be heard there. A US class action judgment or court-approved settlement to which a party is bound for the mere reason of not having opted-out would be an infringement of that right.[7] The Supreme Court's rulings of the effect that a collective action as contemplated in article 3:305a CC does not have preclusive effect to non-parties pursue from the same notion (see para. 24, hereinabove).

35.   Admittedly, there is one precedent in Dutch case law, in which the court of Amsterdam dated 23 June 2010 held that a court-approved class settlement (United States District Court for the district of Maryland in *In re Royal Ahold N.V.*; civil no.: 1:03-md-01539) was fit for recognition and therefore had preclusive effect.[8] The Amsterdam court reached that decision after concluding that procedural safeguards applied in the US action were comparable to those provided for in the MCSA.

36.   The same reasoning would not apply in the former Netherlands Antilles, however, for the simple reason that a law similar to the MCSA does not exist in any of the former Netherlands Antilles legal systems.

37.   Secondly, it should be noted that the Amsterdam case concerned the recognition of a settlement, for the class certified by the Maryland court was for settlement purposes only. This is a situation much different from the situation in which a condemnatory class action judgment awarding pecuniary damages would be rendered. Such a judgment would be at considerable risk of being in contravention of public policy since it would be irreconcilable with domestic provisions on collective actions, which expressly preclude claims for pecuniary damages on "compelling arguments" recognized by the legislature (see para. 25, hereinabove). In her annotation to the Amsterdam court's ruling referred to in para. 35, Professor I.N. Tzankova explains (in my own translation):

> [I]n the Dutch context I consider of decisive importance the fact that the US settlement was approved for "settlement purposes only", as a consequence of which a comparison with the Dutch MCSA is justifiable. If it would concern the recognition and enforcement of a class action judgment awarding damages, or if the collective settlement would have been concluded after the class would have been held admissible in the class action to recover damages (certification), from the perspective of the Dutch collective action tradition one could have critically questioned whether the judgment was not rendered or the US settlement was not approved in proceedings that would be in contravention with Dutch public policy. After all, article 3:305a para. 3 Civil Code expressly excludes a collective action for damages.

38.   As far as I am aware, no former Netherlands Antilles court has ever recognized a US class action judgment or court settlement upon absent class members.

---

[7] The Dutch council of state, advising the Dutch government on legislation and governance, confirmed as much in its advice on the draft MCSA, see *Tweede Kamer*, vergaderjaar 2003-2004, 29414, nr. 4, p. 2

[8] Amsterdam Court 23 June 2010, SOBI v. Deloitte et al., JOR 2010/225, annotation Tzankova.

Hunton App. 0525

8

39.    Finally, it is my understanding that Plaintiffs seek punitive damages in the Rotstain Action. Punitive damages contravene the former Netherlands Antilles provisions on damages (*restitutio ad integrum*), which are merely compensatory in nature. This is a fundamental difference between the U.S. legal system and the former Netherlands Antilles legal systems. Dutch courts have held judgments awarding punitive damages in contravention of Dutch public policy.[9] The same reasoning would apply if a former Netherlands Antilles court would have to decide on the preclusive effect of such a judgment.

### B. Irreconcilable Prior Rulings

40.    This criterion speaks for itself. If prior rulings, irreconcilable with a US judgment in the Action would exist, this would be an impediment to recognition.

### VI. Conclusion

41.    The notion of being bound by a settlement or judgment for the mere reason of not having opted-out, would be in contravention of the former Netherlands Antilles' public policies. Therefore, it is highly unlikely that such a settlement or judgment would be recognized and given preclusive effect by the courts of the former Netherlands Antilles.

42.    Judgments awarding pecuniary compensatory damages are irreconcilable with the rules for class actions (collective actions) that apply in the former Netherlands Antilles, and therefore are at a considerable risk of being in contravention of public policy.

43.    Judgments damages awarding punitive damages are in contravention of the former Netherlands Antilles' public policies as a matter of principle. Such judgments are therefore highly unlikely to be recognized and given preclusive effect by courts in the former Netherlands Antilles.

---

[9] Asser/Kramer & Verhagen 10-III Internationaal vermogensrecht (2015) nr. 1123.

Hunton App. 0526

9

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2015, in Curacao.

_____
Rogier F. van den Heuvel

Hunton App. 0527

# EXHIBIT A

Hunton App. 0528

**Curriculum Vitae**

Rogier Frederik van den Heuvel
Date of birth 25 October 1976
Place of Birth: Gouda, the Netherlands
Nationality: Dutch

**Education**

- 2001 LL.M. Leiden University 2001

- 2006 Grotius Academy (Radboud University, Nijmegen) Corporate Litigation

**Professional experience**

- 2001-2012      attorney at law (*advocaat*) Simmons & Simmons, Amsterdam, the Netherlands

- 2012-present   attorney at law (advocaat) VanEps Kunneman VanDoorne, Curacao

- Admitted to the bar of Amsterdam and to the bar of the Common Court of Justice of Aruba, Curacao, Sint Maarten and of Bonaire, Sint Eustatius and Saba.

**Additional positions**

- 2012-present   visiting lecturer private international law at the University of Curacao Dr. Moises da Costa Gomez

- 2013-present   board member of Curacao Bar Association (*Orde van Advocaten Curacao*), vice-dean of the Curacao Bar Association since 2014

**Publications**

- B.E.L.J.C. Verbunt and R.F. van den Heuvel, De rol van toerekening van wetenschap bij aansprakelijkheid voor zuiver nalaten in het rechtspersonenrecht, *Geschriften vanwege de Vereniging Corporate Litigation 2006-2007*

    On the role of the attribution of knowledge in case of liability for plain omissions in the context of corporate law.

- Annotation to Den Haag Court of Appeal, 24 August 2008, LJN B190, Ondernemingsrecht 2009, 75.

Hunton App. 0529

On the court's ruling on a contractual price determination mechanism in contravention of a price determination provision in the company's articles, that would apply in case of a shareholder's forced exit.

- R.F. van den Heuvel and M.M. Huijzen, Eén maatstaf voor de externe aansprakelijkheid van bestuurders en ondergeschikten, *Geschriften vanwege de Vereniging voor Corporate Litigation 2001-2012*

   Arguing that in Dutch law, there is in effect one common threshold for a legal person's managing directors' and subordinates' liability, towards third parties, rather than different thresholds, as often argued.

- Annotation to Common Court of Justice of Aruba, Curacao, Sint Maarten and of Bonaire Sint Eustatius and Saba, 15 July 2013

   On a court ordered inquiry into the policy and course of affairs of various government companies in Curacao. The inquiry procedure is a specific procedure aimed at establishing mismanagement within corporate entities and offering redress.

- Kroniek Curacaos Enqueterecht 2012-2013

   Chronicle of Curacao inquiry law  2012-2013.

Hunton App. 0530

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity | § | |
| as court-appointed receiver for the | § | |
| Stanford receivership estate; | § | |
| The OFFICIAL STANFORD | § | |
| INVESTORS COMMITTEE; | § | |
| PAM REED; | § | |
| SAMUEL TROICE; and | § | |
| MICHOACAN TRUST; individually | § | |
| and on behalf of a class of all others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiffs. | § | CIVIL ACTION NO. 3:12-cv-04641-N |
| | § | |
| vs. | § | |
| | § | |
| GREENBERG TRAURIG, LLP; | § | |
| HUNTON & WILLIAMS, LLP; and | § | |
| YOLANDA SUAREZ, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF JANET WALKER

Pursuant to 28 USC §1746(1), I, Janet Walker, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

## I.    INTRODUCTION AND OVERVIEW

1.    I am over eighteen (18) years of age, and I have personal knowledge of the facts set forth in this declaration.

2.    Counsel for Defendant, HUNTON & WILLIAMS, LLP have asked me to provide my opinion on whether the courts in Canada would likely recognize a judgment rendered in the

Hunton App. 0531

putative class action against Hunton & Williams LLP and Greenberg Traurig LLP (the "U.S. Class Action") as granting preclusive effect in Canada so as to prevent putative Canadian class members who failed to respond to a notice of the class action issued in the U.S. Class Action ("absent Canadian class members") from bringing their own actions.

3.     I provided a declaration and expert analysis in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel in *Rotstain v. Trustmark National Bank*, No. 3:09-cv-02384 (N.D. Tex.).  I attach a copy of that declaration and its attachments here as Exhibit A (the "Rotstain Declaration").   As explained below, my analysis and conclusions in the *Rotstain* matter apply to *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641 (N.D. Tex), with certain necessary changes, as explained below.

4.     For the reasons explained in paragraphs 11-29 below, in my opinion it is unlikely that a Canadian court would recognize and grant preclusive effect to a judgment in the U.S. Class Action because to date no Canadian court has recognized a foreign class action judgment as precluding absent class members from bringing an action in Canada and it is unlikely that the judgment in this case would meet all three criteria Canadian courts have suggested they would require to grant preclusive effect to such a judgment.

## II.     BACKGROUND AND QUALIFICATIONS

5.     I am a Professor of Law at Osgoode Hall Law School of York University in Toronto, and past Associate Dean of the Law School. I have been a full time member of the faculty since 1996, and I have been a member of the Bar of Ontario since 1998. From 2006–2015, I was the common law advisor to the Federal Courts (Canada) Rules Committee.

2

6.    My qualifications may be found in my *curriculum vitae*, which are set out in Exhibit 1 to the Rotstain Declaration, including a list of all publications authored by me within the past ten years. Of particular relevance in my *curriculum vitae* are the following:

a.    I am the sole author of the major Canadian treatise on the Conflict of Laws, entitled *Castel and Walker: Canadian Conflict of Laws* (6 ed looseleaf, 2005+) which is regularly cited by courts at all levels across Canada), and the monograph, entitled *Halsbury's Laws of Canada: Conflict of Laws;* I am the general editor of the only published casebook on Civil Procedure, entitled *The Civil Litigation Process,* and one of two co-authors of *Civil Procedure* (Irwin, 2009); and I am the general editor of *Class Actions in Canada,* the only published casebook on this subject in Canada.

b.    I have authored numerous publications in the field of international and domestic litigation, and on the recognition and enforcement of class action judgments, which are listed in my curriculum vitae, including comparative studies of class actions in a range of common law and civil law jurisdictions around the world, such as "Who's Afraid of US-style Class Actions?" (2012) Southwestern Int LJ 509.

c.    I have taught courses on civil procedure and the conflict of laws at Osgoode Hall Law School since 1996, and at other universities, including: Monash University Faculty of Law in Melbourne; Haifa University Faculty of Law; University of Toronto Faculty of Law; New York University School of Law (Hauser Visiting Professor); Oxford University (Leverhulme Visiting Professor); National University of Singapore; and from 2001-2014 at the Faculté des sciences juridiques, politiques et sociales de Tunis.

d.    I was an International Advisor to the American Law Institute in its project with Unidroit to propose Transnational Principles and Rules of Civil Procedure, and I am a member of the Presidium of the International Association of Procedural Law.

e.    I have been a member of various Task Forces and Working Groups on the subject of Crossborder Class Actions, in particular, the Uniform Law Commission of Canada: National Class Action Reform Project (2004-06); International Law Association, Committee on International Litigation and the Interests of the Public: International

3

Aspects of Group Actions (2006-08); ABA Litigation Section Working Group on U.S.-Canada Cross-border Class Action Protocols (2007-11); and the International Bar Association Task Force on International Procedures and Protocols for Collective Redress (2007-11).

7.      My *curriculum vitae* lists 4 of the 5 cases in which I have testified as an expert at trial or by deposition in the past four years.  Since I filed the Rotstain Declaration, I was deposed in *Rotstain v. Trustmark National Bank*, No. 3:09-cv-02384 (N.D. Tex.) based on my declaration in that case. In addition, following the submission of the Rotstain Declaration, the Superior Court of Justice (Ontario) released its decision in *Airia Brands v Air Canada*, 2015 ONSC 5332, staying a proposed class action as it related to absent foreign claimants, in part, with reference to an expert's report that I provided in that case (although I was not called to testify). Finally, since the preparation of the Rotstain Declaration, I have been granted a license as a legal consultant in the State of New York.

8.      I am being compensated for my work in connection with this case at my customary consulting rate of U.S. $565 per hour.

9.      I reserve the right to supplement or modify my opinions expressed herein, particularly in light of any new arguments raised or materials presented by Plaintiffs in this case.

10.      I have no first-hand knowledge of the specific facts underlying this dispute.  In forming my opinions, along with the other documents or information referenced in the attached Exhibit A, I have considered the following materials related to *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641 (N.D. Tex):   Plaintiffs' Original Complaint – Class Action, dated November 15, 2012; Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel, dated October 5, 2015; and the Brief in Support of Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class

4

Counsel, dated October 5, 2015 ("Plaintiffs' Brief"). I have also reviewed the declaration of Professor Vaughan Black dated 14 August 2015, submitted in the Rotstain matter, and it has not altered the opinions expressed in the Rotstain Declaration or in respect of the question on which I was asked to opine in this declaration.

## III.   OPINION

11.     Plaintiffs' Brief asserts on pages 68-70 that the jurisdictions where a substantial majority of Stanford investors reside would more likely than not enforce a U.S. class action judgment, thereby supporting a determination that a U.S. class action is superior to other forms of adjudication. In my opinion, for the reasons expressed below, this is not so with respect to Canada.

12.     In my opinion a class action judgment in this case is unlikely to be enforced in Canada because a Canadian court is unlikely to find that (i) there is a real and substantial connection linking the claims of absent Canadian class members to Texas, (ii) the rights of absent Canadian class members are adequately represented, and (iii) absent Canadian class members have received adequate notice.

13.     To date, no judgment in an opt-out class action from a foreign jurisdiction has ever been granted preclusive effect in Canada to prevent an absent Canadian class member from pursuing an action in a Canadian court.

14.     In refusing to grant preclusive effect to a class action judgment from the U.S. in 2005, in *Currie v. McDonald's Restaurants of Canada Ltd.,* (2005) 74 O.R. (3d) 321, the Court of Appeal for Ontario acknowledged the theoretical possibility that a foreign class action judgment might one day be granted preclusive effect. The court suggested the following requirements for recognition would all need to be met:

5

In my view, provided (a) there is a real and substantial connection linking the cause of action to the foreign jurisdiction, (b) the rights of non-resident class members are adequately represented, and (c) non-resident class members are accorded procedural fairness including adequate notice, it may be appropriate to attach jurisdictional consequences to an unnamed plaintiff's failure to opt out. In those circumstances, failure to opt out may be regarded as a form of passive attornment sufficient to support the jurisdiction of the foreign court. I would add two qualifications: First, as stated by LaForest J. in *Hunt v. T & N plc.*, above at p. 325, "the exact limits of what constitutes a reasonable assumption of jurisdiction" cannot be rigidly defined and "no test can perhaps ever be rigidly applied" as "no court has ever been able to anticipate" all possibilities. Second, it may be easier to justify the assumption of jurisdiction in interprovincial cases than in international cases: see *Muscutt v. Courcelles* (2002), 60 O.R. (3d) 20 at paras. 95-100 (C.A.).

15.     It remains to be determined whether some day, in an appropriate case, these requirements will be considered sufficient for the enforcement of a judgment in a foreign opt-out class action. However, even if a Canadian court were at some later date to find those three requirements sufficient for recognition, in my opinion, for the following reasons, a judgment in this case is unlikely to meet those three requirements and, therefore, a class action judgment in *this* case is unlikely to be recognized and granted preclusive effect in Canada. I will now discuss each requirement in turn.

### 1. It is unlikely that a Canadian court would find a real and substantial connection linking the claims of absent Canadian class members to Texas.

16.     In considering whether this jurisdictional requirement has been met, it is important to bear in mind that under Canadian law, the analysis must be conducted not from the perspective of where a *defendant* might reasonably expect the case to be decided, but from the perspective of where an *absent class member* might reasonably expect the case to be decided.

6

17.     Plaintiffs' Brief, at pages 65-66, asserts that Texas law will govern this action and any other potential jurisdiction lacks a significant interest in this adjudication. It is for the Texas court in deciding whether to accept jurisdiction over the claims of absent class members in this case to determine for itself which law would apply and whether other potential jurisdictions have any significant interest in this adjudication.

18.     However, in deciding whether to grant preclusive effect to a judgment from a District Court in Texas, a court in Canada will make its own independent assessment of what law and forum absent Canadian class members would have expected to apply.

19.      In paragraphs 48-53 of the Rotstain Declaration, I explained this further with reference to the recent jurisprudence in Canada.

> 48. Even if the alternative to certifying a class action in Canada were not to give effect to a Receiver's action, but rather to recognize a class action judgment or court-approved settlement in the matter in the U.S., the certification of a U.S. class action would not automatically be granted preclusive effect.
>
> 49. This was illustrated in *Silver v. IMAX Corp*., 2013 ONSC 1667 (S.C.J.) ("*Imax*"), a class proceeding relating to the purchase of shares on both Canadian and U.S. exchanges. In that case, steps were taken to coordinate the Canadian and U.S. class actions so that the claims would be adjudicated in the courts of the country where the shares were traded. The certification order that was granted in the United States was made conditional on the exclusion by the Canadian court from the plaintiff class in the action before it of shareholders who had used the NASDAQ to purchase their shares. The grounds for this requirement were that those purchasers would have a reasonable expectation that their claims would be adjudicated in the United States.
>
> 50. The Canadian court excluded the shareholders who had used the NASDAQ because the U.S. Court has a strong jurisdictional connection with the matters at issue. The Canadian court noted that other courts had "referred to the

7

'reasonable expectations' of the class members as to where their claims might be litigated as relevant to the question of a court's jurisdiction. It would be consistent with the reasonable expectations of the overlapping class members, who acquired their shares on the NASDAQ, and in circumstances where IMAX was subject to both U.S. and Ontario securities laws, that their rights could be determined by the U.S. Court in the context of applicable U.S. law. This is a factor that, while not determinative, weighs in favour of the order sought." (*Imax, supra,* para 183)

51. Accordingly, the *Imax* decision illustrates the perceived need for cross-border coordination of collective redress proceedings to secure court approval for certification and for settlement.

52. The *Imax* decision also demonstrates the principle that the importance of coordinating parallel proceedings across borders for court approval in Canada is not a function of a perceived parochialism on the part of Canadian courts such that they would be reluctant to defer to U.S. courts. This was demonstrated also in *Kaynes v. BP* 2014 ONCA 580 (C.A.) ("*Kaynes*"). In that case, there were certification motions in class actions both in the United States and in Canada in respect of purchasers resident in both countries. The defendant had conceded that the Ontario courts had jurisdiction to entertain the claims of those members of the proposed class who purchased their shares on the Toronto Stock Exchange, but it challenged the jurisdiction of the Ontario court over those who had purchased their shares on the New York Stock Exchange. The Court of Appeal for Ontario held that the Superior Court in Ontario had jurisdiction, but that it should decline to exercise that jurisdiction on grounds of *forum non conveniens* in favour of a determination by the U.S. court of the claims of those who had purchased their shares on the New York Stock Exchange.

53. The *Kaynes* and *Imax* decisions reflect the inclination of Canadian courts in cases involving investors in cross-border situations to favour the adjudication of the investors' claims in the jurisdiction in which the investors would reasonably expect them to be decided.

8

20.     The recognition that Canadian courts would support the expectations of Canadian investors to have their claims decided in the courts of the country they anticipated according to that country's law prompted the formation of the ABA Litigation Section Working Group on U.S.-Canada Cross-border Class Action Protocols (2007-11). This Working Group developed notice and court-to-court communications protocols to facilitate the efforts of Canada and the U.S. to coordinate related proceedings in their respective jurisdictions so that investors can have their claims decided in the appropriate country based on their expectations.

21.     In my opinion, it is unclear that a Canadian court's analysis would lead to the conclusion that absent Canadian class members' reasonable expectations were protected by a class action judgment issued by a court in a foreign jurisdiction that applied its own law and regarded itself alone as interested in the adjudication, without reference to any other laws, including the law of Canada.

### 2. It is unlikely that the rights of absent Canadian class members would be regarded as adequately represented.

22.     As a preliminary matter, the assertions in Plaintiffs' Brief (discussed above in paragraph 17) that Texas law will govern this action and any other potential jurisdiction lacks a significant interest in this adjudication is also relevant to the second *Currie* requirement. In my opinion, those assertions would be regarded by a Canadian court as further indications that the rights of absent Canadian class members were unlikely to be represented adequately in this case.

23.     Furthermore, in this case, as in the proposed class action in *Rotstain*, none of the representative plaintiffs is Canadian. In paragraphs 56-57 of the Rotstain Declaration, I explained the concerns about the capacity of the proposed representative plaintiffs in that action to provide adequate representation of the absent Canadian class members as follows:

9

56. It is also notable that the proposed U.S. Class Action fails to include a representative plaintiff from Canada. In the *Breast Implant* litigation, a proposed settlement that had been negotiated entirely by U.S. lawyers and which allocated only 3% of the fund for claimants from all other countries, the claimants from Ontario, Québec and Australia were presumptively excluded at the request of their representatives because the settlement fund inappropriately discounted the value of their claims for which class actions in their own courts provided a viable alternative. (*In re Silicone Gel Breast Implant Prods. Liab. Litig.,* Nos. CV 92-P-10000-S & CV 94-P-I 1558-5, 1994 WL 578353 (N.D. Ala. Sept. 1, 1994).

57. In view of the history of cases like the *Breast Implant* litigation, it is unlikely that a Canadian court would be persuaded that the interests of claimants who would otherwise expect to have their claims decided in Canada under Canadian law would be well served in a U.S. class action in which there was no Canadian representative plaintiff.

24.    Accordingly, in my opinion, the lack of any Canadians among the representative plaintiffs would undermine the adequacy of the representation of absent Canadian class members who would otherwise reasonably expect to have their claims considered in Canadian courts and would make it unlikely that a judgment in the U.S. Class Action would be recognized in Canada as precluding them from doing so.

**3. It is unlikely that absent Canadian class members would be regarded as having received adequate notice.**

25.    The proposed class definition in this case is "….all persons who invested money in SIBL and whose claims for losses related to investments in SIBL have been allowed by the United States Receiver for the Stanford Entities, Ralph S. Janvey", together with sub-classes based on the time periods in which investments were made. Plaintiffs argue at page 71 of their brief in support of their motion for class certification that by participating in the Receiver's

10

claims process, all putative class members have "submitted to the jurisdiction" of the District Court in Texas.  Through that argument, Plaintiffs appear to imply that by submitting a Proof of Claim Form to the U.S. Receiver, the absent Canadian class members submitted to U.S. court jurisdiction for any proceedings that eventually transpired in respect of their investments with Stanford provided those proceedings were authorized by the United States Receiver, including this U.S. Class Action.

26.     However, the Proof of Claim Form provided for "consent to the jurisdiction of the District Court for all purposes related to *this claim*…".  (emphasis added).  As I described in paragraphs 70-72 of the Rotstain Declaration:

> 70.  Accordingly, it would appear that the Proof of Claim Form sent to the U.S. Receiver would be interpreted by a Canadian court as submission to the jurisdiction of the U.S. District Court for the Northern District of Texas exclusively for the SEC Action and not as submission to that jurisdiction in respect of the proposed U.S. Class Action.

> 71.  The reasonable interpretation of the Proof of Claim Form is important because, in considering the possibility of granting preclusive effect to foreign class action judgments or settlements, Canadian courts have demonstrated considerable concern to ensure that absent class members receive adequate notice and opportunity to opt out.

> 72.  In *Canada Post Corporation v. Lépine,* 2009 SCC 16 (S.C.C.) the Supreme Court of Canada considered an application in Québec for preclusive effect to be given to a class action judgment from Ontario. The application was denied because it was held that the notice of the Ontario settlement would fail to inform residents of Québec (who also received notice of the Québec action) of the potential impact of the Ontario settlement on their rights in the Québec action. The confusion created by the conflicting notices gave rise to a breach of a fundamental principle of procedure, warranting the refusal to recognize the Ontario judgment.

11

27.     Therefore, submission of the Proof of Claim Form to the U.S. Receiver would be unlikely to be regarded as adequate notice of the U.S. Class Action against the law firm defendants.

28.     To my knowledge, Plaintiffs have not yet provided notice to absent Canadian class members, so I cannot opine that the notice they would provide would be adequate under Canadian law.

29.     Accordingly, for the reasons expressed, it is my opinion that a Canadian court is unlikely to recognize and grant preclusive effect to a U.S. class action judgment in this matter because no Canadian court has done so to date, and it is unlikely that a Canadian court would regard the three requirements contemplated for recognition as having been met.

12

Date:  25 November 2015

Janet Walker

Hunton App. 0543

# EXHIBIT A

Hunton App. 0544

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, et al. | § | Civil Action No 3:09-CV-02384-N-BG |
| on behalf of themselves and all others | § | |
| similarly situated, | § | Judge: Hon. David C. Godbey |
| | § | |
| Plaintiffs, | § | Mag.: Hon. Nancy M. Koenig |
| | § | |
| v. | § | |
| | § | |
| TRUSTMARK NATIONAL BANK, ET AL., | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF JANET WALKER**

I, Janet Walker, state as follows:

**I.   Introduction and Overview**

1.   Counsel for Defendant, THE TORONTO-DOMINION BANK, Inc ("TD Bank") have
     asked me:

   a.   to describe the features of the action commenced by the Joint Liquidators ("JLs")
        of Stanford International Bank, Ltd. ("SIB") against TD Bank in Ontario (No. CV-
        12-9780-00CL) ("JLs' Canadian Action") to enable its comparison with the
        proposed class action in *Peggy Roif Rotstain, et. al. v. Trustmark National Bank,
        et. al.*, (Civil Action No 3:09-CV-02384-N-BG) ("proposed U.S. Class Action"),
        pending in the U.S. District Court for the Northern District of Texas; and

**Hunton App. 0545**

Case 3:09-cv-02384-N-BG Document 351 Filed 11/02/20 Page 82 of 118 PageID 6698
Case 3:23-cv-08611-D Document 35-11 Filed 05/26/20 Page 83 of 118 PageID
21324
2

b.  to provide my opinion on whether the courts in Canada would likely recognize a judgment or court-approved settlement rendered in the proposed U.S. Class Action as granting preclusive effect in Canada.

2.  For the reasons explained in paragraphs 9–38, it is my opinion that (i) the beneficiaries in the JLs' Canadian Action include the beneficiaries in the proposed U.S. Class Action; (ii) the quantum of damages sought from TD Bank in the JLs' Canadian Action appears to be greater than that sought in the proposed U.S. Class Action; (iii) the request for equitable remedies in the JLs' Canadian Action has the potential to increase the recovery beyond the quantum of the damages specifically sought in that action; (iv) the differences between the ways in which attorneys' fees would be calculated and awarded in the JLs' Canadian Action and the proposed U.S. Class Action could make more of the award granted in the JLs' Canadian Action available to be distributed to the beneficiaries; (v) the allegations pursued in the JLs' Canadian Action appear to be broadly similar to those in the proposed U.S. Class Action; and (vi) both the JLs' Canadian Action and the U.S. Class Action assert that the conduct of TD Bank in dealing with the SIB investors would be governed by Canadian legal and regulatory standards.

3.  For the reasons explained in paragraphs 39–74, in my opinion, it is unlikely that a Canadian court would recognize and grant preclusive effect to a judgment or court-approved settlement in the proposed U.S. Class Action because (i) the JLs have exclusive authority to initiate and pursue proceedings in Canada; (ii) the JLs' exclusive authority would need first to be varied for a foreign judgment or court-approved settlement to be recognized; (iii) a Canadian court is unlikely to be inclined to vary the order of the Québec Superior Court in favour of recognizing a judgment or court-approved settlement

**Hunton App. 0546**

in the proposed U.S. Class Action; and (iv) the beneficiaries of the JLs' Canadian Action

are unlikely to be regarded as having consented to jurisdiction in the proposed U.S. Class

Action.

4.  In forming this opinion I have considered the following:

    a.  Civil Action No 3:09-CV-02384-N-BG - Plaintiffs' Second Amended Class
        Action Complaint ("U.S. Class Action Complaint");

    b.  Civil Action No 3:09-CV-02384-N-BG - Memorandum Supporting Plaintiffs'
        Motion for Class Certification, for Designation of Class Representatives and Class
        Counsel ("Certification Memorandum");

    c.  First Amended Statement of Claim *Joint Liquidators of Stanford International
        Bank, Ltd. v. Toronto-Dominion Bank*, No. CV-12-9780-00CL (Can. Ont. Sup. Ct.
        J.) ("JLs' Canadian Action Statement of Claim"));

    d.  Declaration of Receiver Ralph S. Janvey, 30 October 2014 ("Janvey Declaration")
        with Exhibits A-C; and

    e.  Canadian and other authorities relevant to the issues considered in this declaration.

5.  I am being compensated for my work in connection with this case at my customary

consulting rate of U.S. $565 per hour.

6.  I reserve the right to supplement or modify my opinions expressed herein, particularly in

light of any new arguments raised or materials presented by Plaintiffs in this case.

**II. Background and Qualifications**

7.  I am a Professor of Law at Osgoode Hall Law School of York University in Toronto, and

past Associate Dean. I have been a full time member of the faculty since 1996, and I have

been a member of the Bar of Ontario since 1998. From 2006–2015, I was the common law

advisor to the Federal Courts (Canada) Rules Committee.

8.  My qualifications may be found in my curriculum vitae, which are set out in Exhibit 1,

including a list of all publications authored by me within the past ten years and a list of all

**Hunton App. 0547**

cases in which I have testified as an expert at trial or by deposition in the past four years.
Of particular relevance in my curriculum vitae are the following:

a. I am the author of the major Canadian treatise on the Conflict of Laws, entitled *Castel and Walker: Canadian Conflict of Laws* (6 ed looseleaf, 2005+) which is regularly cited by courts at all levels across Canada), and the monograph, entitled *Halsbury's Laws of Canada: Conflict of Laws;* I am General Editor of the only published casebook on Civil Procedure, entitled *The Civil Litigation Process,* and one of two co-authors of *Civil Procedure* (Irwin, 2009); and I am the General Editor of *Class Actions in Canada,* the only published casebook on this subject in Canada.

b. I have authored numerous publications in the field of international and domestic litigation, and on the recognition and enforcement of class action judgments, which are listed in my curriculum vitae;

c. I have taught courses on civil procedure and the conflict of laws at Osgoode Hall Law School since 1996, and at other universities, including: Monash University Faculty of Law in Melbourne; Haifa University Faculty of Law; University of Toronto Faculty of Law; New York University School of Law (Hauser Visiting Professor); Oxford University (Leverhulme Visiting Professor); National University of Singapore; and from 2001–2014 at the Faculté des sciences juridiques, politiques et sociales de Tunis.

d. I was an International Advisor to the American Law Institute in its project with Unidroit to propose Transnational Principles and Rules of Civil Procedure, and, from 2006-2015, and I am a member of the Presidium of the International Association of Procedural Law.

9. I have been a member of various Task Forces and Working Groups on the subject of Crossborder Class Actions, in particular, the Uniform Law Commission of Canada: National Class Action Reform Project (2004–06); International Law Association, Committee on International Litigation and the Interests of the Public: International

**Hunton App. 0548**

Aspects of Group Actions (2006–08); ABA Litigation Section Working Group on U.S.-Canada Cross-border Class Action Protocols (2007–11); and the International Bar Association Task Force on International Procedures and Protocols for Collective Redress (2007–11).

### III. Analysis

### A. Description of JLs' Canadian Action

10. In May 2011, the Joint Liquidators, Marcus A. Wide and High Dickson of Grant Thornton LLP ("JLs") were appointed by order of the Eastern Caribbean Supreme Court and vested with all the assets of SIB. The JLs were empowered to sue entities in relation to SIB in any jurisdiction where they believed assets or property of SIB may be located. The JLs replaced liquidators who had been appointed in 2009. ("JLs' Canadian Action Statement of Claim," paras 28–29)

11. In August 2011, the JLs were authorized by the Superior Court of Québec to replace the interim receiver who had been given exclusive authority to initiate and pursue proceedings in respect of SIB. The order authorizing the JLs to replace the interim receiver recognized the JLs to have "'the equivalent or substantially similar powers and capacities than those of a trustee in bankruptcy or other insolvency holder within Canada' and (it) authorized the JLs to exercise those powers and capacities for the purposes of the institution and litigation of the within action against TD Bank." Pursuant to this order, the JLs commenced an action in the Superior Court of Justice of Ontario in accordance with their exclusive authority to initiate and pursue proceedings in Canada in respect of SIB. (JLs' Canadian Action Statement of Claim, paras 30, 32)

**Hunton App. 0549**

12. I understand that a motion for summary judgment to dismiss the JLs' Canadian Action on the basis of a limitations defense is currently pending, and that, if this motion is granted, the JLs' Canadian Action would be dismissed in full. I note that the claims against TD Bank based on negligent acts committed in Ontario would be understood by an Ontario court to be governed by Ontario law, including its limitation period, wherever the matter was decided. (*Limitations Act, 2002,* S.O. 2002, c. 24, Sch B).

**B.  Description of Proposed U.S. Class Action**

13. In May 2015, six named plaintiffs, on behalf of themselves and all others allegedly similarly situated, filed a proposed Second Amended Class Action Complaint in the United States District Court for the Northern District of Texas.  Plaintiffs alleged that, *inter alia*, TD Bank and four other banks provided assistance to R.A. Stanford, in his misappropriation of SIB investor funds.  Specifically, plaintiffs allege: (i) common law aiding, abetting or participation in a fraudulent scheme; (ii) aiding, abetting or participation in violations of the Texas Securities Act; (iii) aiding, abetting or participation in breach of fiduciary duty; (iv) aiding, abetting or participation in conversion; and (v) civil conspiracy. (U.S. Class Action Complaint, pp. 1–3, 120–26)

14. The following analysis provides a comparison between the JLs' Canadian Action and the proposed U.S. Class Action in respect of (i) beneficiaries, (ii) quantum of damages, (iii) other remedies, (iv) attorneys' fees, (v) allegations pursued, and (vi) applicable regulatory standards.

### *(i) Beneficiaries*

15. The JLs commenced the Canadian Action for damages against TD Bank in their capacity as representatives of SIB and of SIB's approximately 21,000 creditors. The Statement of

**Hunton App. 0550**

Claim states that "[a]ny damages awarded to SIB will form part of SIB's estate and be disbursed to SIB's creditors." (JLs' Canadian Action Statement of Claim, para 35)

16. The proposed U.S. Class Action has been brought on behalf of "[a]ll persons who invested in SIBL CD(s) from August 23, 2004 – February 16, 2009, inclusive, and whose claims for losses related to SIBL CDs are recognized, authorized, and calculated by the United States Receiver for the Stanford Entities, Ralph S. Janvey." (U.S. Class Action Complaint, para 420)

17. Accordingly, it would appear that the beneficiaries of the JL's Action in Canada include all the potential beneficiaries of the proposed U.S. Class Action in respect of the recovery sought from TD Bank.

### (ii) Quantum of Damages

18. The JLs' Canadian Action Statement of Claim states that the relief sought in the Canadian Action includes "damages in the Canadian dollar amount equivalent to U.S. $5.5 billion and further amounts to be determined prior to trial" for approximately 21,000 investors. (JLs' Canadian Action Statement of Claim, para 1)

19. The class in the proposed U.S. Class Action is limited to include investors whose claims have been allowed by the Receiver, with the number estimated as exceeding 17,000 investors with over U.S. $4.4 billion in approved claims. (Certification Memorandum, p. 19)

20. Thus, the total amount of damages and the per person dollar value of the damages sought in the JLs' Canadian Action appears to be slightly larger than in the proposed U.S. Class Action.

#### (iii) Other remedies

21. In addition to the damages claimed, the JLs' Canadian Action also seeks "an accounting and disgorgement of profits in amounts to be determined prior to trial." (JLs' Canadian Action Statement of Claim, para 1(b))

22. In Ontario, under the rule against double recovery (*Kosanovic v. Wawanesa Mutual Insurance Co.* (2005) 70 O.R. (3d) 161 (C.A.)), it would not ordinarily be possible to recover under both the claim for damages and the claim for equitable relief, but if the Ontario court decided that more than US $5.5 billion was recoverable through an accounting and disgorgement of profits (*i.e.*, the equitable relief), that higher amount could be awarded.

23. Accordingly, the request in the JLs' Canadian Action for equitable remedies has the potential to increase the quantum of recovery beyond the level of the damages specifically sought.

24. The JLs' Canadian Action Statement of Claim also seeks "prejudgment and post-judgment interest on the foregoing amounts pursuant to the Court of Justice Act." (JLs' Canadian Action Statement of Claim, para 1(c)) Although this is not specifically sought in the proposed U.S. Class Action Complaint, it is my understanding that a request for recoverable pre-judgment and post-judgment interest would be presumed and generally implied in the request for "further and other relief" in the proposed U.S. Class Action Complaint. (U.S. Class Action Complaint, p. 126) Accordingly, there does not appear to be a substantive difference between the two proceedings in this regard.

#### (iv) Attorneys' fees

**Hunton App. 0552**

25. Finally, in addition to the substantive remedies and interest, the JLs' Canadian Action seeks "costs of this action on a substantial indemnity basis plus H.S.T. [taxes]" (JLs' Canadian Action Statement of Claim, para 1(d)), whereas the proposed U.S. Class Action seeks an order "Awarding attorneys' fees, and costs, as permitted by law." (U.S. Class Action Complaint, p. 126)

26. In Canada, in cases in which there are no settlement offers outstanding at the time of trial, it is common for costs to be awarded in favour of the prevailing party. However, costs are awarded on a substantial indemnity basis only in exceptional cases, typically as a sanction for misconduct in the litigation of the matter. Ordinarily, approximately 55–60% of the prevailing party's counsel fees are awarded to the prevailing party. Accordingly, although the JLs' Canadian Action Statement of Claim states that "[a]ny damages awarded to SIB will form part of SIB's estate and be disbursed to SIB's creditors" (JLs' Canadian Action Statement of Claim, para 35), it would appear that the portion of the attorneys' fees that are not reimbursed through the costs award (*e.g.*, 40–45%) would be borne by the estate of SIB.

27. Nevertheless, it is my understanding that, despite the request for an order for attorneys' fees in the proposed U.S. Class Action (U.S. Class Action Complaint, p. 126), the prevailing rule in the United States is that each party bears its own attorneys' fees. Typically, attorneys' fees in a U.S. class action are taken from the award that is otherwise distributed to the class. Furthermore, it is my understanding that the quantum payable for attorneys' fees is ordinarily fixed as a percentage of the award, and that it often exceeds the amount that would be payable based on the attorneys' usual hourly rate.

**Hunton App. 0553**

28. Accordingly, in my view, the differences between the ways in which attorneys' fees are calculated and awarded could result in more of the award being available for distribution to the beneficiaries in the JLs' Canadian Action than would be available for distribution to the beneficiaries in the proposed U.S. Class Action.

### (v) Allegations pursued

29. The U.S. Class Action Complaint and the JLs' Canadian Action Statement of Claim both contain broadly similar descriptions of the events underlying the claims brought.

30. The claims asserted in the U.S. Class Action Complaint include: (i) common law aiding, abetting, or participation in a fraudulent scheme; (ii) aiding, abetting or participation in violations of the Texas Securities Act; (iii) aiding, abetting, or participation in breach of fiduciary duty; (iv) aiding, abetting, or participation in conversion; and (v) civil conspiracy. (U.S. Class Action Complaint, pp. 120–126)

31. The allegations in the JLs' Canadian Action include negligence and knowing assistance. (JLs' Canadian Action Statement of Claim, paras 316–331)

32. In Ontario, a plaintiff's pleadings must contain a concise statement of the material facts on which the party relies for the claim, but it is not necessary to raise points of law in a pleading. A party is not prohibited from doing so if it so wishes, provided that the supporting material facts are pleaded.

33. The allegations pursued in the JLs' Canadian Action appear to be broadly similar to those in the proposed U.S. Class Action.

### (vi) Applicable regulatory standards

34. The U.S. Class Action Complaint explains:

In Canada, TD Bank and other banks are regulated by the Office of the Superintendent of Financial Institutions ("OSFI"). OSFI has developed a manual of best practices for banks with regard to deterring and detecting money laundering. In addition to that guide, banks in Canada are governed by the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*, S.C. 2000, c. 17 (the "PCMLTFA").

(U.S. Class Action Complaint, para 65)

35. The U.S. Class Action Complaint goes on to describe the applicable statutory and regulatory standards (U.S. Class Action Complaint, pp. 21–23) and it concludes that: "These rules and regulations governed the conduct of TD Bank and applied to its relationship with SIBL, R.A. Stanford, and the Stanford Entities." (U.S. Class Action Complaint, para 70)

36. The JLs' Canadian Action Statement of Claim similarly describes the applicable legal and regulatory standards as administered by, *inter alia*, the Office of the Superintendent of Financial Institutions, and the way in which these standards governed the conduct of TD Bank pursuant to the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act,* S.C. 2000, c. 17 and its Regulations, and the *Criminal Code of Canada.* (JLs' Canadian Action Statement of Claim, pp. 68–94)

37. Accordingly, the U.S. Class Action Complaint and the JLs' Canadian Action Statement of Claim are in agreement that the conduct of TD Bank in dealing with the SIB investors is governed by Canadian legal and regulatory standards.

**B.  It is unlikely that a judgment or court-approved settlement in the proposed US Class Action would be granted preclusive effect in Canada**

**Hunton App. 0555**

38. In my opinion, it is unlikely that a Canadian court would recognize and grant preclusive effect to a judgment or court-approved settlement in the proposed U.S. Class Action for the following reasons.

### *(i) The JLs have exclusive authority to initiate and pursue proceedings in Canada*

39. In August 2011, the Superior Court of Québec granted the JLs' exclusive authority to initiate and pursue proceedings in respect of SIB. The *Bankruptcy and Insolvency Act (Canada)* is a federal statute. Orders such as the August 2011 order of the Superior Court of Québec (*see supra* para 10) in this case operate throughout Canada. Accordingly, in acting pursuant to the order of the Superior Court of Québec with "'the equivalent or substantially similar powers and capacities (as) those of a trustee in bankruptcy or other insolvency holder within Canada" (JLs' Canadian Action Statement of Claim, para 32), the exclusive authority of the JLs to commence proceedings would be recognized throughout Canada.

40. Where a court in Canada has exclusive authority over a particular matter, a foreign judgment or court-approved settlement will not be granted preclusive effect by a Canadian court.

41. Article 3155(1) of the Civil Code of Québec provides that "A decision rendered outside Québec is recognized and, where applicable, declared enforceable by the Québec (court), except (where) … (1) the authority of the State where the decision was rendered had no jurisdiction under the provisions of this Title …". Article 3165(1) provides that "The jurisdiction of foreign (courts) is not recognized by Québec (courts) … (1) where, by reason of the subject matter or an agreement between the parties, Québec law grants

**Hunton App. 0556**

exclusive jurisdiction to its (courts) to hear the action which gave rise to the foreign decision …".

42. In the rest of Canada, the same principle applies, such that a decision rendered by a foreign court in a matter in which a Canadian court has exclusive jurisdiction is not capable of recognition and enforcement in Canada. (*Duke v Andler* [1932] S.C.R. 734 (S.C.C.))

***(ii) The JL's exclusive authority would need first to be varied for a foreign judgment or court-approved settlement to be recognized***

43. It is acknowledged that the order of the Superior Court of Québec was made in the context of a larger cross-border co-operative arrangement for the administration of the SIB insolvency, one in which the U.S District Court for the Northern District of Texas, as the court at the place designated as the "Centre of Main Interest," appointed a Receiver over all property, assets, and records of the Stanford Defendants, and all entities they own or control. (Janvey Declaration, para 2) Also in this cross-border co-operative arrangement for the administration of the SIB insolvency, the courts of the SIB's domicile approved a multilateral settlement agreement and cross border protocol between the various parties, including the JLs, the U.S. Receiver, the U.S. Securities and Exchange Commission, the Official Stanford Investor's Committee, the U.S. Department of Justice and the U.S. Court Appointed Examiner ("Antiguan Cross Border Protocol").

44. However, within Canada, the order of the Québec Superior Court is independently determinative unless and until it is varied. Accordingly, if there were to be a variation so as to permit a departure from the exclusive authority currently enjoyed by the JLs over proceedings against TD Bank, this would need to be decided by a Canadian court in light

**Hunton App. 0557**

of the potential preferability of other means of proceeding; and it would not be accepted by a Canadian court merely as a consequence of the certification of a U.S. Class Action.

***(iii) A Canadian court is unlikely to be inclined to vary the order of the Québec Superior Court in favour of recognizing a judgment or court-approved settlement in the proposed U.S. Class Action***

45. Within Canada there is no inevitable hierarchy of preferred methods of seeking collective redress in a situation such as that involving the investors of SIB. Whether a class action can be certified in a matter in which there is an ongoing regulatory action will depend upon whether the class action is the "preferable" method of proceeding. (Class Proceedings Act, S.O. 1992, c. 6, s. 5(1))

46. For example, in *AIC Limited v Fischer*, 2013 SCC 69, the Supreme Court of Canada held that a settlement in a regulatory proceeding brought by the Ontario Securities Commission did not preclude the certification of a class action both because (a) the settlement, which had been negotiated with limited participation on the part of the beneficiaries had been entered into on a without prejudice basis, and (b) the expert evidence estimated that investors had received only a small portion of the compensation that they might otherwise receive. In this situation, a class proceeding (in addition to the previously established settlement) was determined preferable.

47. In another example, in *Mondor v. Fisherman; CC&L Dedicated Enterprise Fund (Trustee of) v. Fisherman* [2002] O.J. No. 1855 (S.C.J.), the Ontario Superior Court approved a settlement that had been negotiated jointly by class counsel in Ontario, and the Receiver and the Independent Litigation Supervisor appointed in Alberta. The Court of Queen's Bench of Alberta had previously approved the recommendation of the Independent Litigation Supervisor to implement the proposed settlement. Accordingly, in this situation,

**Hunton App. 0558**

the concern for preferability was addressed by the cooperation between the receiver and class counsel, and by the coordination of the potential proceedings.

48. Even if the alternative to certifying a class action in Canada were not to give effect to a Receiver's action, but rather to recognize a class action judgment or court-approved settlement in the matter in the U.S., the certification of a U.S. class action would not automatically be granted preclusive effect.

49. This was illustrated in *Silver v. IMAX Corp.*, 2013 ONSC 1667 (S.C.J.) ("*Imax*"), a class proceeding relating to the purchase of shares on both Canadian and U.S. exchanges. In that case, steps were taken to coordinate the Canadian and U.S. class actions so that the claims would be adjudicated in the courts of the country where the shares were traded. The certification order that was granted in the United States was made conditional on the exclusion by the Canadian court from the plaintiff class in the action before it of shareholders who had used the NASDAQ to purchase their shares. The grounds for this requirement were that those purchasers would have a reasonable expectation that their claims would be adjudicated in the United States.

50. The Canadian court excluded the shareholders who had used the NASDAQ because the U.S. Court has a strong jurisdictional connection with the matters at issue. The Canadian court noted that other courts had "referred to the 'reasonable expectations' of the class members as to where their claims might be litigated as relevant to the question of a court's jurisdiction. It would be consistent with the reasonable expectations of the overlapping class members, who acquired their shares on the NASDAQ, and in circumstances where IMAX was subject to both U.S. and Ontario securities laws, that their rights could be

**Hunton App. 0559**

determined by the U.S. Court in the context of applicable U.S. law. This is a factor that, while not determinative, weighs in favour of the order sought." (*Imax, supra,* para 183)

51. Accordingly, the *Imax* decision illustrates the perceived need for cross-border coordination of collective redress proceedings to secure court approval for certification and for settlement.

52. The *Imax* decision also demonstrates the principle that the importance of coordinating parallel proceedings across borders for court approval in Canada is not a function of a perceived parochialism on the part of Canadian courts such that they would be reluctant to defer to U.S. courts. This was demonstrated also in *Kaynes v. BP* 2014 ONCA 580 (C.A.) ("*Kaynes*"). In that case, there were certification motions in class actions both in the United States and in Canada in respect of purchasers resident in both countries. The defendant had conceded that the Ontario courts had jurisdiction to entertain the claims of those members of the proposed class who purchased their shares on the Toronto Stock Exchange, but it challenged the jurisdiction of the Ontario court over those who had purchased their shares on the New York Stock Exchange. The Court of Appeal for Ontario held that the Superior Court in Ontario had jurisdiction, but that it should decline to exercise that jurisdiction on grounds of *forum non conveniens* in favour of a determination by the U.S. court of the claims of those who had purchased their shares on the New York Stock Exchange.

53. The *Kaynes* and *Imax* decisions reflect the inclination of Canadian courts in cases involving investors in cross-border situations to favour the adjudication of the investors' claims in the jurisdiction in which the investors would reasonably expect them to be decided.

**Hunton App. 0560**

54. In the case at hand, in my opinion, a Canadian court would be unlikely to endorse the abandonment of the JLs' Canadian Action in favour of the proposed U.S. Class Action because the SIB investors would reasonably expect the claims at issue to be decided in accordance with Canadian law.

55. In part, this is because, notwithstanding that the U.S. Class Action Complaint concedes that Canadian law provides the applicable legal standards to adjudicate the actions of TD Bank (see paras. 65-70), the U.S. Certification Memorandum indicates that it is unlikely that class counsel will seek to have Canadian law applied in the claims against TD Bank, in view of the assertion that Texas Law would govern the U.S Class Action. (Certification Memorandum, pp 45–49)

56. It is also notable that the proposed U.S. Class Action fails to include a representative plaintiff from Canada. In the *Breast Implant* litigation, a proposed settlement that had been negotiated entirely by U.S. lawyers and which allocated only 3% of the fund for claimants from all other countries, the claimants from Ontario, Québec and Australia were presumptively excluded at the request of their representatives because the settlement fund inappropriately discounted the value of their claims for which class actions in their own courts provided a viable alternative. (*In re Silicone Gel Breast Implant Prods. Liab. Litig.,* Nos. CV 92-P-10000-S & CV 94-P-I 1558-5, 1994 WL 578353 (N.D. Ala. Sept. 1, 1994).

57. In view of the history of cases like the *Breast Implant* litigation, it is unlikely that a Canadian court would be persuaded that the interests of claimants who would otherwise expect to have their claims decided in Canada under Canadian law would be well served in a U.S. class action in which there was no Canadian representative plaintiff.

Hunton App. 0561

58. Also of note in the proposed U.S. Class Action is the assertion that "any other potential jurisdiction lacks a significant interest in this adjudication" (Certification Memorandum, p. 45). This assertion is patently contrary to the current arrangements for cross-border cooperation, which entail the litigation of the TD Bank claims in Ontario. (Janvey Declaration; JLs' Canadian Action Statement of Claim)

59. A final consideration is that the Certification Memorandum misrepresents the Canadian law on the recognition of foreign class action judgments. The passage cited from *Anwar II*, 289 F.R.D. at 117–18 in pages 51–52 of the Certification Memorandum is, with respect, incorrect.

60. In England, where there is currently no form of action comparable to an opt-out class action, such as exists in the United States and in Canada, there is no case law directly addressing the preclusive effect of a foreign class action judgment or court-approved settlement on the rights of absent class members who seek to sue independently in the courts of England and Wales. The English jurisprudence focuses on the circumstances of the named parties in litigation.

61. The courts in Canada have long recognized that different considerations apply to the recognition of preclusive effects of foreign class action judgments or court-approved settlements on absent class members (*e.g., Currie v. McDonald's Restaurants of Canada Ltd.* [2005] O.J. No. 506 (C.A.). It flies in the face of more than two decades of increasingly sophisticated jurisprudence on class actions law and practice in Canada to suggest that Canadian courts would look to the United Kingdom for guidance on the recognition and enforcement of foreign judgments or court-approved settlements in the context of class actions. Indeed, there is no relevant English jurisprudence for a Canadian

Hunton App. 0562

court to consult.

62. In sum, the Certification Memorandum alleges, inconsistently with the U.S. Class Action Complaint, that Texas law and not Canadian law will apply; that no jurisdiction other than Texas has a significant interest in the adjudication; and misrepresents the state of Canadian law on the recognition and enforcement of foreign class action judgments or court-approved settlements. Moreover, the proposed U.S. Class Action includes no representative plaintiff from Canada. .

63. Accordingly, in my view, a Canadian court would regard it as important for the claims by the SIB investors against TD Bank to be adjudicated in the forum that they would reasonably expect them to be decided—namely, Canada—and on the basis of Canadian law. The proposed U.S. Class Action promises to do neither and, consequently, a Canadian court would be unlikely to endorse the abandonment of the JLs' Canadian Action in favour of the proposed U.S. Class Action.

*(iv) The beneficiaries of the JLs' Canadian Action have not submitted to the proposed U.S. Class Action*

64. Assuming that the Québec Superior Court could, in principle, be persuaded by the beneficiaries of the JLs' Canadian Action expressing their interest in having their claims adjudicated in the proposed U.S. Class Action to vary its current order granting exclusive authority to the JLs to pursue an action against TD Bank, it would remain for the Court to be persuaded that the beneficiaries had expressed such an interest. The Memorandum Supporting Plaintiffs' Motion for Class Certification argues that by filing the Proof of Claim Form, the beneficiaries did so:

**Hunton App. 0563**

Case 3:09-cv-02384-N-BQ Document 351-1 Filed 11/02/16 Page 100 of 118   PageID 6716
Case 3:09-cv-02384-N-BG Document 356-1 Filed 11/02/16 Page 130 of 148   PageID
21342
20

> The proposed class is defined to include only investors whose claims
> have been recognized and allowed by the Receiver in the SEC Action.
> Thus, class members are persons that have filed claims and submitted
> to the jurisdiction of this court. … (in) what effectively amounts to an
> "opt-in" class of investors from around the world.

(Certification Memorandum, pp. 54-55)

65. It is, of course, for the U.S. District Court in the Northern District of Texas to determine whether the filing of the Proof of Claim Form in the Receiver action constitutes submission to its jurisdiction *for the proposed U.S. Class Action*, as the Certification Memorandum seems to contend. However, any decision by the U.S. District Court in Texas to exercise jurisdiction over absent class members in the proposed U.S. Class Action is not determinative of whether a Canadian court would recognize that jurisdiction (and thereafter grant preclusive effect to a judgment or court-approved settlement rendered by the U.S. District Court in such an action). A Canadian court would decide for itself, applying on its own law, whether the submission of claim forms to the Receiver and its Claims Agent by SIB investors would give the U.S. District Court jurisdiction over claims in the proposed U.S. Class Action.

66. For the reasons stated below, in my view, a Canadian court is unlikely to consider the claims submission described herein to confer jurisdiction for the purposes of the proposed U.S. Class Action.

67. Perhaps most significant is that the Proof of Claim Form appears to confer jurisdiction only for limited purposes. Page 4 of the form provides the "Consent to Jurisdiction" provision stating as follows:

> CONSENT TO JURISDICTION:  If you submit a Proof of Claim
> Form *in this case*, you consent to the jurisdiction of the District Court
> for all purposes *relating to this claim* and agree to be bound by its

Hunton App. 0564

> decisions, including, without limitation, a determination as to the
> validity and amount of any *claims asserted against the Receivership*
> *Entities*.  In submitting a Proof of Claim Form, you agree to be bound
> by the actions of the District Court even if that means your claim is
> limited or denied.
>
> (emphasis added)

68. Thus, the Proof of Claim Form refers to the claims asserted against the Receivership
Entities in the Receivership action—an action separate and apart from the proposed U.S.
Class Action.

69. In Canada, attornment to the jurisdiction of a court in respect of a proceeding is confined
to that proceeding and does not constitute a submission to the court's jurisdiction in other
proceedings. (*McCaffrey v. Dalla-Longa*  [2007] O.J. No. 4628 (S.C.J.) para 18) In the
related context of waiver of immunity to the court's jurisdiction, "the test…is a strict one.
The Court of Appeal has instructed that any contractual waiver of immunity must be
"clear and unequivocal; it cannot be presumed." (*Bombardier Inc. v. AS Estonian Air*
2013 ONSC 3039 (S.C.J.) citing *United States v. Friedland* (1999), 46 O.R. (3d) 321, at
para 15 (C.A.)

70. Accordingly, it would appear that the Proof of Claim Form sent to the U.S. Receiver
would be interpreted by a Canadian court as submission to the jurisdiction of the U.S.
District Court for the Northern District of Texas exclusively for the SEC Action and not as
submission to that jurisdiction in respect of the proposed U.S. Class Action.

71. The reasonable interpretation of the Proof of Claim Form is important because, in
considering the possibility of granting preclusive effect to foreign class action judgments
or settlements, Canadian courts have demonstrated considerable concern to ensure that
absent class members receive adequate notice and opportunity to opt out.

Hunton App. 0565

72. In *Canada Post Corporation v. Lépine,* 2009 SCC 16 (S.C.C.) the Supreme Court of Canada considered an application in Québec for preclusive effect to be given to a class action judgment from Ontario. The application was denied because it was held that the notice of the Ontario settlement would fail to inform residents of Québec (who also received notice of the Québec action) of the potential impact of the Ontario settlement on their rights in the Québec action. The confusion created by the conflicting notices gave rise to a breach of a fundamental principle of procedure,warranting the refusal to recognize the Ontario judgment.

73. Accordingly, for the foregoing reasons, it is unlikely that a judgment or court-approved settlement in the proposed U.S. Class Action would be granted preclusive effect in Canada.

Case 3:12-cv-04641-N-BQ   Document 183-6   Filed 02/26/16   Page 103 of 118   PageID 6719
Case 3:09-cv-02384-N-BG   Document 351-10   Filed 11/02/15   Page 98 of 113   PageID
21345
23

Pursuant to 28 USC §1746(1), I declare under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct.

Executed on July 7, 2015 in New York, New York.

_____

Professor Janet Walker

Hunton App. 0567

# <u>EXHIBIT 1</u>

Hunton App. 0568

# JANET WALKER

Osgoode Hall Law School, 4700 Keele Street, Toronto, Ontario, Canada M3J 1P3
Arbitration Place, 900-333 Bay Street, Toronto, Ontario, Canada M5T 2H4
Outer Temple Chambers, 222 Strand, London WC2R 1BA
janet@janet-walker.com - www.janet-walker.com

## Professional

### Positions Held

| | |
|---|---|
| 1996-present | Professor, Osgoode Hall Law School, York University (Associate Dean, 2003-05 Member, Academic and Administrative Program Review, 2014) |
| 2006-15 | Common Law Advisor, Federal Courts Rules Committee |
| 1994-96 | Researcher, Litigation Department, Tory Tory DesLauriers & Binnington |
| 1993-94 | Law Clerk to the Chief Justice of Ontario and Justices of the Court of Appeal |

### Visiting Positions

| | |
|---|---|
| 2014-present | Academic Advisor, Chartered Institute of Arbitrators |
| 2001-2014 | Foreign Research Professor in Private International Law, Faculté des sciences juridiques, sociales et politiques de Tunis, Masters Program in Common Law (Course on Private International Law) |
| 2014 | Chartered Institute of Arbitrators (Oxford Diploma Course in International Arbitration) |
| 2013, 2015 | Institute in International Commercial Law and Dispute Resolution, Pittsburgh, Touro and Zagreb in Zadar, Croatia (Course on Advocacy in International Arbitration) |
| 2013 | Monash University in Prato, Italy (Course on Transnational Litigation) |
| 2010 | Leverhulme Visiting Professor, University College, Oxford University (Project on Teaching Procedure) |
| 2008 | Visiting Professor, Hauser Global Law Faculty, NYU/NUS Joint Program (Singapore) (Course in Comparative Private International Law) |
| 2007 | Visiting Professor, Hauser Global Law Faculty, NYU School of Law (Seminar in International Litigation) |
| 2006 | Visiting Professor, Faculty of Law, University of Toronto (Course on Private International Law) |
| 2006 | Visiting Professor, Faculty of Law, Haifa University, Israel (Course on Comparative Private International Law) |
| 2002 | Visiting Professor, Faculty of Law, Monash University, Melbourne, Australia (Course on Conflict of Laws) |

### Professional Qualifications and Activities

| | |
|---|---|
| 1998-present | Member of the Bar of Ontario and the Law Society of Upper Canada |

Hunton App. 0569

| | |
|---|---|
| 2014-present | Associate Member, Outer Temple Chambers, London |
| 2012-present | Member Arbitrator, Arbitration Place, Toronto |
| 2003-present | International Association of Procedural Law (Secretary General, 2011-present; Editorial Board of the International Journal of Procedural Law, 2010-present) |
| 2001-present | Member of Canadian Panel of Arbitrators, International Chamber of Commerce (ICC); International Panel of Neutrals, International Center for Dispute Resolution (ICDR); Panel of Foreign Arbitrators, China International Economic and Trade Arbitration Commission (CIETAC); Panel of Foreign Arbitrators, Shanghai International Economic and Trade Arbitration Commission (SHIAC); Panel of Arbitrators, Kuala Lumpur Regional Centre for Arbitration KLRCA; appointments as sole arbitrator (ICC 11707, 14579, 16319; ICDR 622-09; 137-13), co-arbitrator (ICC 13333) and chair (ICC 12939); and participation in courses and symposia, including LCIA Users' Symposium (Toronto, 2013), (London, 2010), (Boston, 2013) (Tylney Hall, 2008, 2014), (Toronto, 2007), (Chicago, 2006), (Montreal, 2004); ICC Workshop (Montreal, 2010); ICDR International Symposia in Advanced Case Management Issues (Toronto, 2007), (Prague, 2005); Juris Leading Arbitrators' Symposium (New York, 2007), (Toronto, 2005); Canadian Bar Association Conferences (with UNCITRAL, Ottawa, 2004), (with ICC, Calgary 2003), (with ICC, Montreal 2002), (with LCIA, Toronto 2001); ICC/CCIB Panel of Arbitrators Symposium, 2005, 2004, 2003, 2002; Chartered Institute of Arbitrators, FCIArb; Member, ICC Commission (2013-) |
| 1998-present | Expert witness and counsel to members of the profession and governments in Canada and elsewhere in matters relating to crossborder and domestic procedure |
| 2006-2012 | Chair, Toronto Chapter, Chartered Institute of Arbitrators |
| 2009-2011 | President, International Law Association, Canadian Branch |
| 2007-2010 | Working Group on Protocols for Parallel Class Actions, ABA Litigation Section |
| 2010-present | International Lawyers for Africa, Tunisian National Committee Member |
| 2009 | Conference Co-Chair, "Common Law-Civil Law: The Future of Categories-Categories of the Future" IAPL Conference (Toronto, June 3-6, 2009) |
| 2008 | Law Commission of Ontario, Scholar-in-Residence |
| 2008 | Cours de langue et civilisation françaises de la Sorbonne |
| 2007-2008 | IBA Task Force on International Procedures and Protocols for Collective Redress |
| 2006-2008 | ILA Committee on International Litigation and the Interests of the Public: International Aspects of Group Actions |
| 2006 | Conference Co-Chair, 72nd Biennial Conference of the International Law Association (Toronto, June 2006) |
| 2004-06 | Uniform Law Commission of Canada: National Class Action Reform Project |
| 1998-04 | International Adviser to the American Law Institute/Unidroit Transnational Rules and Principles of Civil Procedure Project |
| 1996-98 | Counsel on int'l dispute resolution to Tory, Tory, DesLauriers & Binnington |
| 1996 | Asst to the Hon CL Dubin QC in "An Independent Review of the Canadian Medical Protective Association" |
| 1993 | Panelist Assistant, Canada-US Free Trade Bi-national Panel |

**Hunton App. 0570**

1991-93        Research Coordinator, Province of Ontario Enquiry on Non-therapeutic Medical
                    Procedures on Behalf of Mentally Incapable Individuals

## *Associations*

American Arbitration Association—ICDR Panel of International Neutrals
American Law Institute
American Society of International Law (Steering Cmte, Private Int'l Law Interest Group 2001-03)
Arbitralwomen (Founding Member, Board Member 2008-2010)
Arbitration Roundtable of Toronto/Toronto Commercial Arbitration Society (Program
          Committee 2010-2014)
Arbitration Place
Athenaeum Club, London
Canadian Bar Association
Canadian Association of Law Teachers
Canadian Council on International Law (1996-2008, Board of Directors, 2004-08)
Chartered Institute of Arbitrators (FCIArb) (Chair, Toronto Chapter, 2006-12; Executive, 2012-)
China Int'l Economic and Trade Arbitration Commission (CIETAC) Panel of Arbitrators
Governor General's Horse Guards Association (Life Member)
International Academy of Commercial and Consumer Law
International Association of Procedural Law (Presidium Member, 2011-present)
International Bar Association
ICC Canada, (Program Committee 2012-14; Executive Committee 2014-15) (formerly ICC
          Canadian National Committee (CCC) (Canadian Panel of Arbitrators 2001-present)
ICC Commission (2014-present)
International Law Association—(Advisory Committee, Research, 2002-08) (Canadian Branch
          Vice-President, 2004-09; President 2009-11) (2006 Biennial Conference Co-Chair)
Kuala Lumpur Regional Centre for Arbitration (KLRCA) Panelist member
Law Society of Upper Canada (non-practising member)
London Court of International Arbitration
Massey College, Senior Fellow
Osgoode Society
Shanghai Int'l Economic and Trade Arbitration Commission (SHIAC) Panel of Arbitrators
The Advocates' Society
University Club of Toronto
Worshipful Company of Arbitrators
Young Canadian Arbitration Practitioners' (Steering Cmte 2004-06, Advisory Board 2006-12)

## *Community Service, Honours*

1977-2014   Canadian Forces Primary Reserve (411 Air Reserve Squadron, 1977-87; Governor
                    General's Horse Guards, 1987-2014; Bandmaster 2010-11; retiring rank MWO)
2012            Queen's Diamond Jubilee Medal
2011            Governor General's Horse Guards Commanding Officer and Regimental
                    Sergeant Major's Award of Excellence
2011            Land Force Central Area Commander's Award of Excellence
2002            Queen's Golden Jubilee Medal
1989            Canadian Forces Decoration (1st clasp 1999, 2nd clasp 2009)

**Hunton App. 0571**

## Education

### Degrees

| | |
|---|---|
| 2002 | DPhil, Oxford University (Law – Conflict of Laws) (MA, 2010) |
| 1993 | JD (formerly LLB) Osgoode Hall Law School |
| 1982 | MA, York University (Social Theory) |
| 1979 | BA (Hons), York University (Arts – Individualized Studies) |

### Academic Awards

| | |
|---|---|
| 2010 | Osgoode Professional Development Part-time LLM Teaching Award |
| 2009 | Walter Owen Book Prize (*Éléments de common law canadienne – comparaison avec le droit civil québécois*, A Grenon, L Belanger-Hardy eds) |
| 1995 | Viscount Bennett Fellowship |
| 1995-96 | SSHRC Doctoral Fellowship |
| 1994-96 | Overseas Research Students Award |
| 1994 | JSD Tory Research and Writing Award |
| 1993 | Osgoode Hall Law School Silver Medal |
| 1993 | JSD Tory Research and Writing Award |
| 1993 | Benjamin Laufer Prize in International Law |
| 1993 | Christopher Robinson Memorial Scholarship |
| 1993 | Matthew Wilson Memorial Scholarship |
| 1993 | Cassels, Brock & Blackwell Centennial Prize in Lawyering Skills |
| 1992 | McCarthy Tétrault Prize |
| 1992 | Carswell Company Prize |
| 1992 | Gurston Allen Prize |
| 1992 | Prize in Conflict of Laws |
| 1992 | The Honourable Newton W Rowell Scholarship |
| 1991 | Clifton H Lane Memorial Prize in Property II |
| 1991 | Bassel, Sullivan & Leake Prize in Civil Procedure I |
| 1980-82 | Ontario Graduate Scholarship |
| 1979 | SSHRC Special MA Scholarship |
| 1979 | York Scholarship |
| 1977, '78, '79 | York In-Course Scholarships |
| 1976 | York Entrance Scholarship |
| 1975 | Ontario Scholar |

## Publications and Presentations *(past 10 years)*

### Books and Journal Issues

*Canadian Conflict of Laws* 7th ed looseleaf (Markham: Butterworths, 2016+) (forthcoming)

*The Civil Litigation Process: Cases and Materials*, 8th ed (Toronto: Emond Montgomery, 2015) General Editor (forthcoming)

*Castel & Walker: Canadian Conflict of Laws* 6th ed looseleaf (Markham: Butterworths, 2005+)

*Special Issue on Teaching Procedure*, (2014) 51 Osgoode Hall Law Journal, Guest Editor

*Class Actions in Canada, Cases and Materials* (Toronto: Emond Montgomery, 2013) General Editor

Hunton App. 0572

*Halsbury's Laws of Canada: Conflict of Laws,* 2011 reissue (Markham: Lexis Nexis Canada, 2011)

*Common Law, Civil Law and the Future of Categories (*Markham: LexisNexis, 2010) Editor, with Oscar Chase (736 pages), also published as (2010) 49 S.C.L.R. (2d)

*Civil Litigation (*Toronto: Irwin Law, 2010) with Lorne Sossin (300 pages)

*The Civil Litigation Process: Cases and Materials,* 7th ed (Toronto: Emond Montgomery, 2010) General Editor (983 pages)

*The Vis Book: A Participant's Guide to the Vis International Commercial Arbitration Moot* (Huntington, NY: Juris, 2007) Editor (190 pages)

*Halsbury's Laws of Canada: Conflict of Laws* (Markham: Lexis Nexis Canada, 2006) (854 pages)

*The Civil Litigation Process,* 6th ed (Toronto: Emond Montgomery, 2005) General Editor

*E drejta ndërkombëtare private (Private International Law: A Course for Magistrates)*, Magistrates' School, Tirana, Albania (World Bank, 2005) with Arta Mandro-Balili and Ardian Kalia

*Canadian Conflict of Laws* 5th ed, looseleaf (Markham, Butterworths: 2002) with J-G Castel

*Special Issue of the Osgoode Hall Law Journal in Honour of Jean-Gabriel Castel,* (2000) Guest Editor

*The Civil Litigation Process,* 5th ed (Toronto: Emond Montgomery, 1999) with GD Watson, W Bogart, A Hutchinson, J Mosher and T Pinos

*A Practical Guide to Mooting* (Toronto: Emond Montgomery, 1995) with S Williams

### Looseleaf Casebooks

*Canadian Conflict of Laws: Cases and Materials* (1996, 1997, 1998, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2010, 2012)

*Transnational Litigation* (1998, 2000, 2002, 2008, 2010, 2012)

*International Business Transactions: Cases and Materials* (1998, 1999)

*Civil Procedure I* (1997, 1998, 1999)

### Journal Articles and Book Chapters

"Class Actions in Canada" in *Class Actions in International Perspective,* eds Diego Corapi - Gianluca Scarchillo 2016 (forthcoming)

"Australian and Canadian Perspectives on Arbitration: A Joint Discussion" (2014) 4 Quaderni de Colloqui

"Prohibited Means of Obtaining and Presenting Evidence" in Burkhard Hess, ed *Reports of the XIVth World Congress, International Association of Procedural Law* (2013)

"XVIIIth Moot" in eds L Barrington, N Casado Filho, C Finkelstein, *The Danubia Files* (Parker, CO: Outskirts Press, 2013)

"Cultural Dimensions of Group Litigation" in *Civil Procedure in Cross-Cultural Dialogue* (Moscow: CTATYT, 2012) 413-458

"Class Actions: Settlement, Approval, Res Judicata, Claims Administration and Cy-pres Awards" in *Procesos Colectivos/Class Actions* (Buenos Aires, U de Buenos Aires, 2012) 535-542

"Who's Afraid of US-style Class Actions?" (2012) Southwestern International LJ 509-566

"Summary Judgment has its Day in Court" (2012) 37 Queen's LJ 697-728

"Same-sex Divorce Tourism Comes to Canada" (2012) LQR 344-346

**Hunton App. 0573**

"Ethical Lawyering in the Clientless World of Class Actions in Canada (2012) Jotwell

"Current Jurisdictional and Recognitional Issues in the Conflict of Laws" (2011) 50 Cdn Bus LJ 499-525 (with Vaughan Black and Joost Blom)

"Canada" in The Funding and Costs of Civil Litigation in Comparative Perspective (Oxford: Hart Publishing, 2011) 239-60 (with Erik Knutsen)

"*Conflict of Laws* by Stephen G.A. Pitel and Nicholas S. Rafferty" (2010) 49 Cdn Bus LJ 478-480

"Are National Class Actions Constitutional?—A Reply to Hogg and McKee (2010) 48 Osgoode Hall LJ 95-143

"Applying Foreign Law" in *Private International Law in Common Law Canada* (Toronto: Emond Montgomery, 2010) 553-590

"Immovables" in *Private International Law in Common Law Canada* (Toronto: Emond Montgomery, 2010) 785-818

"El Litigio en Materia Civil y las Nuevas Technologías" en Roberto Berizonce, *XXV Congreso Nacional de Derecho Procesal: Hacia el Bicentenario – Por una jusiticia transparente en el sistema republicano* (Buenos Aires: Universidad de Buenos Aires, 2010) 1110-1137

"*Muscutt* Misplaced: The Future of Forum of Necessity Jurisdiction in Canada" (2009) 48 Cdn Bus LJ 135-143

"*Teck Cominco* and the Wisdom of Deferring to the Court First Seised, All Things Being Equal" (2009) 47 Cdn Bus LJ 192-208

"Le droit international privé" in *Éléments de common law canadienne – comparaison avec le droit civil québécois,* A Grenon ed (2008) 439-524

"Recognizing Multijurisdiction Class Action Judgments within Canada: Key Questions — Suggested Answers" (2008) 46 Cdn Bus 450-69

"Getting the Best Seats in International Commercial Arbitration" (2008) ADRIC Journal 9-24

"Forum Selection Clauses and Unfair Jurisdictions" (2007) 1 Dispute Resolution International 187-198 with Stefan Rützel and Sylvia Wünsch

"New Trends in Procedural Law: New Technologies and the Civil Litigation Process" (2007) 31 Hastings Int'l & Comp LR 251-94 with Garry Watson

"*Castillo v Castillo:* Closing the Barn Door" (2006) 43 Cdn Bus LJ 487-500

"Agreeing to Disagree: Can We Just Have Words?" (2006) 25 J of Law and Commerce 153-166

"Preliminary or Summary Proceedings, Scope and Importance" in XII Congreso Mundial de Derecho Procesal, Volumen I, eds M Storme & C Gomez-Lara (México: Universidad Nacional Autónoma de México, 2006) at 193-238, with Garry Watson

"The Role of Domestic Courts in the International Legal Order" (2005) 11 ILSA J International & Comparative Law 365-370

"Coordinating Multijurisdiction Class Actions through Existing Certification Processes" (2005) 42 Cdn Bus LJ 112-121

"Twenty Questions (about Section 23 of the Ontario Limitations Act, 2002) in J Ziegel, et al eds,

App. 2182

Hunton App. 0574

*The New Ontario Limitations Regime: Exposition and Analysis* (Toronto, Ont Bar Assoc, 2005) 95-121

"Crossborder Class Actions: A View from across the Border" (2004) Mich State DCL LR 755-798

### Reports

"Class Proceedings in Canada" Report for Session II-C—Civil Procedure, 18th Int'l Congress on Comparative Law (International Academy of Comparative Law, Washington 2010) 30 pp

"Consultation Paper: Reforming the Law of Crossborder Litigation: Judicial Jurisdiction" (Toronto: Law Commission of Ontario, 2009) 63 pp

"A Comparative Survey of Conflict of Law Rules in Canada: Overview, Bibliography and Comparative Tables" for Civil Justice Section, Bijuralism Group, Department of Justice, 2005

### Public Lectures

The Hague Academy of international law, Special Lectures: "Federalism, Regionalism and the Evolution of Private International Law" (July 2005)

### Conference Papers and Other Presentations

"Security for Costs" (June 2015) Costs in International Arbitration, International Bar Association (Munich)

"Of Guerillas and Elves" Hot Topics in International Arbitration (May 2015) Arbitration and Wealth Management, (Tortola, BVI)

"International Arbitration and the Core Curriculum" (April 2015) The Evolution and Future of International Arbitration: The Next 30 Years, Queen Mary University of London (London)

"How are Seats Chosen: An Inside View" (March 2015) CIArb Centenary Conference (Hong Kong)

"Mock Case Management Conference" (February 2015) VI ICC Congreso (San Jose, Costa Rica)

"Common Principles in the Area of Procedure ("Brussels 0"): Jurisdiction" (November 2014) The Evolution of European Private International Law: Coherence, Common Values and Consolidation, British Institute of International and Comparative Law (London)

"Challenges to Arbitrators, Responses from Arbitrators, and Challenge-proof Awards: Is there such a Beast?" (November 2014) CIArb UEA Branch International Conference (Dubai)

"Education and Training in International Arbitration" (November 2014) 2nd Annual Sydney Arbitration Week (Sydney)

"Multijurisdictional Class Actions (October 2014) Windsor Law School Seminar on Class Actions (Windsor by video)

"Collective Redress Across Borders - How Consumers are Flexing their Multi-jurisdictional Muscle" (October 2014) IBA Annual Conference (Tokyo)

"Ideological Background of the Constitution, Constitutional Rules and Civil Procedure" (Moderator, September 2014) International Association of Procedural Law Conference (Seoul)

"Class Actions" (August 2014) Ontario Justice Education Network (Toronto)

"The Comparative Context" (June 2014) Collective Actions: Experience and Expectations:

**Hunton App. 0575**

Association of European Competition Law Judges (Bucharest)

"Building a Good Seat" (June 2014) The UNCITRAL Model Law and Beyond (Tel Aviv)

"Enforcement: The Latest Developments" (May 2014) IBA Arbitration Committee: First Principles, Current Practice, Latest Trends (Toronto)

"The Future of International Arbitration Education" (May 2014) Chartered Institute of Arbitrators Board of Trustees Meeting (London)

"The Post-Hearing Phase" (April 2014) 10th Annual Leading Arbitrators Symposium (Vienna)

"Australian and Canadian Perspectives on Arbitration: A Joint Discusssion" (March 2014) Milan Chamber of Arbitration Colloquium (Milan)

"Summary Judgment in the Supreme Court of Canada: *Hryniak v Maludin* and its Implications (March 2014) Osgoode Professional Development Webinar  (Toronto)

"Confidentiality in International Arbitration" (November 2013) CIArb Toronto Chapter AGM Symposium (Toronto)

"*Ex-parte* Communications in International Arbitration (November 2013) Toronto Commercial Arbitration Society AGM Symposium (Toronto)

"International Issues Arising Out of the Uniform Law Conference Reform Project" (October 2013) ICC Canada Annual Conference (Toronto)

"Demolishing Legal Borders: Cross-border judicial cooperation and promoting effective remedies for collective redress and class action litigants" (October 2013) International Bar Association Conference (Boston)

"The managerial (or mismanaging) arbitrator: what are the limits of her power and the requirements of her duty?" (August 2013) Mastering the Challenges in International Arbitration (Stockholm)

"Practice and Procedure in International Arbitration" (May 2013) LCIA North American Symposium (Toronto)

"ICC Case Management Conference" (February 2013) IV Congeso International del Arbitraje, San José

"Who Speaks for the Class?" (December 2012) Keynote Speech - 4th Annual Class Action Colloquium (Toronto)

"Advising the Court: The Role of Experts" (November 2012) in *From Bench to Bench: Pharmaceutical Patents from Lab Bench to the Courtroom,* Toronto

"Where are the Women?" (November 2012) Arbitralwomen Symposium (Toronto)

"Arbitration Practice and Procedure" (November 2012) TCAS Annual Conference (Toronto)

"Cultural Dimensions of Group Litigation" (September 2012) International Association of Procedural Law, Moscow

"Three Engines of Trade: The Model Law, the CISG and Education" (June 2012) Reopening the Silk Road in the Legal Dialogue between Turkey and China, Istanbul

"Collective Proceedings and the Cultural Issues they Raise" (June, 2012) Buenos Aires

"Is the Witness Credible? Five Lies About the Truth" (May 2012) Alberta Arbitration and Mediation Society, Edmonton

"Recent Developments in Judgments" (May 2012) National Judicial Institute Civil Justice Seminar, Moncton

"Early Career Workshop: Civil Procedure" (February 2012) ANU, Canberra

"Are National Class Actions Constitutional?—A Debate with Peter Hogg" (February 2012) Toronto

"Who's Afraid of US-style Class Actions?" (January 2012) Our Courts and the World: Transnational Litigation and Civil Procedure, Los Angeles

"Conflict of Laws in 90 minutes" Federal Courts Clerks Seminar (January 2012) Ottawa

"Women in Arbitration in Canada and Beyond" (December 2011) Arbitration Place, Toronto

"Harmonization under the CISG and the Model Law" (November 2011) The Model Law After 25 Years: Global Perspectives on International Commercial Arbitration Law, Montreal

"Judicial Jurisdiction in Crossborder Matters: Time for Real and Substantial Change?" (November 2011) The Advocate's Society Fall Convention, Costa Rica

"Prohibited Means of Obtaining and Presenting Evidence" (July 2011) XIVth World Congress, International Association of Procedural Law, Heidelberg

"The ABA Protocols for Crossborder Class Actions" in *Multi-Jurisdictional, Cross-Border, and International Class Actions: Where Are We Heading?* (August 2011) American Bar Association Annual Meeting, Toronto

Expert Meeting: European Mass Claims and Private International Law (May 2011) Rotterdam

"International Arbitration Canadian Style: A Distinctive Approach?" American Bar Association Section on International Law Teleseminar (December 2010) Toronto

"Crossborder Mass Claims and Collective Redress: Are we on the road to an International Multijurisdictional Litigation Panel?" International Bar Association Annual Conference (October 2010) Vancouver

"International Litigation Issues" International Bar Association Young Lawyers' Program (October 2010) Vancouver

"Family Law Now – Crossborder Issues" Law Society of Upper Canada (September 2010) Toronto

"Civil Procedure in Canada" International Congress Association of the Associado dos Magistrados Brasileiros (September 2010) Toronto

"Access to Justice for Consumers and Small Businesses in a Post-territorial Era" International Association of Commercial and Consumer Law (July 2010) Toronto

"Solving Disputes in Israel-North American/European Commerce" Israel Bar Association 10th Annual Conference (June 2010) Eilat

"Quo Vadis: The Teaching of Procedure and the Future of the Profession" Public and Private Justice: Landscape of the European Legal Profession – Has Unity been Lost? (May 2010) Inter-University Centre, Dubrovnik

**Hunton App. 0577**

Moderator, London Court of International Arbitration European Users Symposium (March 2010) London

"Coordinating the Chaos: A Global Update on Mass Claims – Can Litigation, Arbitration and Government Remedies Work Together?" International Bar Association Annual Conference (October 2009) Madrid

"Litigation Funding and Costs in Canada" (July 2009) International Conference on Litigation Costs and Funding, Centre for Socio-Legal Studies & Institute of European and Comparative Law, Oxford University, Oxford (with Erik Knutsen)

"Procedural Reform: A View from the Shop Floor" (June 2009) International Seminar on Procedure: Theory and Practice, Hebrew University of Jerusalem, Jerusalem

"Civil Litigation in Canada: An Intensive Course for Senior Judges from Liaoning Province" (February 2009) Rotman School of Management, University of Toronto, Toronto

"Foreign Judgments and Multijurisdictional Agreements: Two Presentations to McMillan" (February 2009) McMillan, Toronto

"Drafting Effective Arbitration Clauses: Countdown to Success" Arbitration Primer for Corporate Counsel and Business Lawyers (October 2008) Arbitration Roundtable of Toronto, Toronto

"Overlapping Multijurisdiction Class Actions in Canada" (November 2008) National Judicial Institute, Moose Jaw, Saskatchewan

"Discretion and Codification in Private International Law" (October 2008) Wuhan University, Wuhan, China

"Recent Developments in Canadian Conflict of Laws" (October 2008) Zhongnan University, Wuhan, China

"The Rise and Fall of Forum non Conveniens" (October 2008) Private International Law Workshop, International Bar Association Annual Conference, Buenos Aires

"*Teck Cominco* and the first seised principle" (October 2008) Consumer and Commercial Law Workshop, Winnipeg (15 pp)

"The UNCITRAL Model Law: Past, Present and Future" (August 2008) International Arbitration Conference Brunei and 2nd RAIF Conference, Brunei Darussalam, 12 pp

"The Flightless Cormorant and the Future of Collective Redress in Europe" (June 2008) Class Actions in Europe and North America, Florence

"Recognizing Multijurisdiction Class Action Judgments within Canada: Key Questions—Suggested Answers" (April 2008) National Judicial Institute, Class Actions Conference for Judges, Toronto 13 pp

"International Arbitration: Fresh Ideas for a Changing World" (October 2007) ABILA International Law Weekend, New York, Moderator

"…there are parts of the world where things are badly wrong…': Forum Selection Clauses and Unfair Jurisdictions" (October 2007) International Bar Association Conference, Singapore 8 pp

 "Jurisdiction to Grant Global Class Action Judgments and Settlements – dream or reality?"

**Hunton App. 0578**

(October 2007) International Bar Association Conference, Singapore

"Hindsight: Pitfalls and Mistakes in Resource Disputes" (September 2007) International Centre for Dispute Resolution (ICDR) ADR after NAFTA, Toronto

"The Preclusive Effect of Judgments in Collective Actions: Implications for Jurisdiction and Appropriate Forum" (July 2007) ILA Committee Meeting, Paris

"Challenges to Jurisdiction and Non-Signatories in Arbitration" (June 2007) Arbitration Roundtable of Toronto, *Current Issues in Canada-US Arbitration Practice: A Canadian Perspective,* New York

"What's with Article III? — The nature of judicial authority and private international law" (May 2007) Faculty Workshop, NYU School of Law 30 pp

"Pathological Clauses: A Hallowe'en Primer" (Oct 2006) Young Canadian Arbitration Practitioners (YCAP) Symposium, Montreal

"Initial Considerations in Drafting Arbitration Clauses" (September 2006) Arbitration Roundtable of Toronto (ART) *Arbitration for the In-House Counsel: Essentials for an Effective Arbitration Clause,* Toronto

"Group Actions in Canada" (June 2006) Report for the 2006 Meeting of the International Law Association, Committee on International Civil Litigation and the Interests of the Public, Toronto 16 pp

"When Transnational Contracts Come Before Domestic Courts" (May 2006) National Judicial Institute, *Civil Law Seminar: Contract Law,* Halifax

"Cross-Border Dilemmas: Multi-jurisdictional Class Actions" (April 2006) Ontario Bar Association, *National Civil Litigation CLE Conference,* Toronto

"Questions, Questions, Questions: Recent Developments in the Conflict of Laws" (March 2006) Blake, Cassels & Graydon, Toronto

"The Conflict of Laws" and "The Constitution and Statutes of Repose" (November 2005) Ontario Bar Association, *The New Ontario Limitations Regime: Exposition and Analysis*, Toronto

"The Basic Elements "(October 2005) Arbitration Roundtable of Toronto (ART) *Essentials for an Effective Dispute Resolution Clause,* Toronto

"Fragmentation: Diversification and Expansion of International Law — Private International Law", Panel Coordinator and Moderator (October 2005) Canadian Council on International Law 34th Annual Conference, Ottawa

"Recent Class Actions Developments in Canada and the US: National Class Actions" (October 2005) 35th Annual Consumer and Commercial Law Workshop, Toronto

"Reciprocity and Bilateralism in the Enforcement of Foreign Judgments" (June 2005) Canadian-American Research Centre for Law and Policy (CARC) *Commercial and Corporate Law across the Canada-United States Border*, Windsor 8 pp

"Jurisdiction and Foreign Parties: Developments in *Muscutt*, the Rules and Forum Conveniens" Osgoode Professional Development Centre (May 2005) Civil Litigation: The New Realities, Toronto

"The Real and Substantial Truth about Jurisdiction in Canada (April 2005) Canadian Bar Association, *National Civil Litigation Conference,* Toronto

"The World's Longest Undefended Border" (April 2005) Hamilton Law Association, *First Annual Emerging Issues in Cross-Border Commercial Litigation Seminar*, Niagara-on-the-Lake 8 pp

**Hunton App. 0579**

"Agreeing to Disagree: Can we just have words?" (March 2005) Vienna International Arbitration Centre: *From the 1980 Vienna Conference to the Digest and Beyond: Cases, Analysis and Unresolved Issues in the CISG*, Vienna 12 pp

### *Funded Research*

2010 The Project on Teaching Procedure
2006 Law Foundation of Ontario: 72nd Biennial Conference of the International Law Association
2006 Department of Justice: 72nd Biennial Conference of the International Law Association
2002 Foundation for Legal Research: Improvements to *Canadian Conflict of Laws*

## Expert Evidence    *(past 4 years)*

2011         CNR v Software AG, Inc Quebec Superior Court No.: 500-17-059969-10

2012         Newfoundland and Labrador v Rothmans, 2011 01G No 0826

2013         Bieberstein v Kirchberger Superior Court of Justice (Ontario) CV-1-08534-00CL


## Teaching and Supervision    *(past 10 years)*

### *Courses at Osgoode Hall Law School*

JD Program    Administration of Civil Justice: Class Actions
              Civil Procedure I
              Conflict of Laws
              Ethical Lawyering in the Global Community
              International Business Transactions
              International Commercial Arbitration
              Litigation Dispute Resolution and the Administration of Justice Colloquium
              Vis International Commercial Arbitraiton Moot Seminar
              Vis Team Faculty Advisor

LLM Program Transnational Litigation
              International Commercial Dispute Resolution

### *Other Teaching*

2014         Oxford Diploma Course, CIArb

2013         Assessor, CIArb Accelerated Route to Fellowship Course (Sao Paolo; Geneva)

2012         Tutor, CIArb Introduction to International Arbitration Course (Toronto)

2012         Arbitro, Competencia Internacional de Arbitraje Comercial, American College of Law, Washington

2002-2014    Organizer, Canadian Regional Round, Vis Int'l Commercial Arbitration Moot

2005, 08-10  Faculty Adviser, Osgoode/Hebrew University of Jerusalem Exchange Program

2001-2014    Arbitrator, Vis Int'l Commercial Arbitration Moot, and Advisor (Osgoode Team,

Hunton App. 0580

2001-2014) (Tunis Team, 2008-2014)

| | |
|---|---|
| 2008 | ICC Int'l Commercial Arbitration Workshop, McGill U Faculty of Law (Montreal) |
| 2004-06 | Osgoode-Aix Exchange, Lecturer on Contracts in the Conflict of Laws |

### *Supervisor*

| | |
|---|---|
| 2015 | Sagi Peari, SSHRC Post-doctoral Fellowship in Private International Law |
| 2012 | Peter Mazzacano, *Excuses for Nonperformance in International Commercial Law and CISG Article 79: The Elusive Goal of Uniformity* PhD (Osgoode) |
| 2011 | Wafa Younes, "The Recognition of *Forum Necessitatis* in Private International Law" LLM (Tunis II) |
| 2011 | Reyihanguli Aisaiti, "Saving Face in Canadian Courtrooms: The niqab and fundamental freedoms" LLM (Osgoode) |
| 2010 | Christina Poretta, "Assessing Damages in the Conflict of Laws: A New Framework for an Old Set of Rules" (LLM (Osgoode) |
| 2007 | Natasha Macleod, *Judgments from Questionable Jurisdictions* LLM (Osgoode) (in progress) |
| 2008 | Beligh Balti "The Reciprocity Requirement in the Recognition and Enforcement of Foreign Judgments: A Study in Light of the American Law Institute's Proposed Federal Law" LLM (Tunis II) |
| 2007 | Raya Jebali, "Registration Procedures for the Recognition and Enforcement of Judgments: A Comparative Study" LLM (Tunis II) |
| 2007 | Karim Toumi "International Enforcement of Judgments and Reciprocity" (Tunis II) |
| 2006 | Nawel Zemni, "Review of Damages in Foreign Judgments in Common Law Courts" LLM (Tunis II) |
| 2004 | Ramla Allani, *Private International Law and the Protection of the Cyber Consumer* PhD (Tunis II) (in progress) |
| 2004 | Virtus Igbokwe, *The Applicable Law in International Commercial Arbitration of Investment Disputes*, DJur (Osgoode) |

### *External Examiner*

| | |
|---|---|
| 2014 | Benjamin Hayward "Arbitral discretion in resolving conflicts of laws - the case for a bright-line closest connection test in international commercial arbitration" DPhil Thesis (Monash University) |
| 2008 | Amina Ben Dowa "The Law on Embryos in the United States" (Tunis II) |
| 2007 | Thoraya Zidi Sassi, " Carriage of Goods by Sea"(Tunis II) |
| 2006 | Natasha McLeod, "Influences on the Canadian Recognition and Enforcement of Judgments Regime" LLM (Queen's) |
| 2006 | Atef Jebali, "Study of Swap Agreements' Characteristics" LLM (Tunis II) |
| 2006 | Lofti Meziou, "Liability of International Carriers of Goods under American Maritime Law" LLM (Tunis II) |
| 2004 | Kethiri Med Jihad, "Pre-incorporation Contracts: A Comparative Study between Tunisian and American Laws" LLM (Tunis II) |

Hunton App. 0581

## Administrative Appointments *(past 10 years)*

| | |
|---|---|
| 2014-15 | York Academic and Administrative Program Review Task Force; Senate Academic Policy, Planning and Research Committee; Co-Director, Civil Litigation and Dispute Resolution Part-time LLM Program; Grades Review Committee |
| 2013-14 | Senate Academic Policy, Planning and Research Committee; Nominating Committee, Alumni Board, Co-Director, Civil Litigation and Dispute Resolution Part-time LLM Program |
| 2012-13 | Senate Academic Policy, Planning and Research Committee; Nominating Committee, Alumni Board, Co-Director, Civil Litigation and Dispute Resolution Part-time LLM Program |
| 2011-12 | Co-Director, Civil Litigation and Dispute Resolution Part-time LLM Program; Nominating Committee, Alumni Board |
| 2010-11 | Faculty Recruitment Committee |
| 2009-10 | Decanal Search Committee |
| 2008-09 | Faculty Recruitment Committee |
| 2007-08 | Faculty Recruitment Committee, Tenure and Promotions Committee, Merit Pay Advisory Committee, File Preparation Committees (three files) |
| 2006-07 | Grades Review Committee, Library Committee, Senate Executive Sub-Committee on Honorary Degrees and Ceremonials (one file) |
| 2005-06 | Fall: Associate Dean: *ex officio* – Academic Policy Committee, Admissions Committee, Clinical Education Committee, Curriculum Review Committee, Equality Committee, Faculty Recruitment Committee, Grades Review Committee (Chair) Library Committee, Management Committee, Nominating Committee, (Building) Project Committee, Strategic Planning Committee (Core Group), Tenure and Promotions Committee (Chair); Web Management Committee; First Year Curricular Reform Committee<br>Senate Executive Sub-Committee on Honorary Degrees and Ceremonials<br>Winter: Faculty Recruitment Committee, Tenure and Promotions Committee, Senate Executive Sub-Committee on Honorary Degrees and Ceremonials |
| 2004-05 | Associate Dean: *ex officio* – Academic Policy Committee, Admissions Committee, Clinical Education Committee, Curriculum Review Committee, Equality Committee, Faculty Recruitment Committee, Grades Review Committee (Chair), Library Committee, Management Committee, Nominating Committee, (Building) Project Committee, Strategic Planning Committee, Tenure and Promotions Committee (Chair)<br>Convener, Litigation, Dispute Resolution and the Administration of Justice Program |

Hunton App. 0582