# EXHIBIT 14

# EXHIBIT 93

Hunton App. 0925

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| PEGGY ROIF ROTSTAIN, et al. | § | Civil Action No 3:09-CV-02384-N-BG |
| on behalf of themselves and all others | § | |
| similarly situated, | § | Judge: Hon. David C. Godbey |
| | § | |
| Plaintiffs, | § | Mag.: Hon. Nancy M. Koenig |
| | § | |
| v. | § | |
| | § | |
| TRUSTMARK NATIONAL BANK, et al. | § | |
| | § | |
| Defendants. | § | |

Hunton App. 0926

## DECLARATION OF VAUGHAN BLACK

I, Vaughan Black, state as follows:

## I.        Introduction and Overview

1.    Counsel for the Plaintiffs Peggy Roif Rotstain et al. have asked me to provide my opinion on whether courts in Canada would recognize a judgment or court-approved settlement rendered in the proposed class action *Peggy Roif Rotstain, et al. v. Trustmark National Bank, et al.*, (Civil Action No 3:09-CV-02384-N-BG) pending in the United States District Court for the Northern District of Texas (proposed U.S. Class Action) as having preclusive effect in Canada.

2.        Setting aside for the moment the possible effects of the Ontario action brought by the Joint Liquidators (JLs) there are no likely bars to recognition in Canada of a judgment or judicial settlement (hereafter simply "a judgment") of the proposed U.S. Class Action. By "recognized" I mean that a judgment in favour of the plaintiffs would be enforced, and one in favour of the defendants would be accorded preclusive effect against plaintiffs bringing a similar action in Canada.  Assuming that the proposed U.S. Class Action resulted in a judgment that was (i) final, (ii) not tainted by fraud, (iii) not based on the application of laws that a Canadian court would regard as deeply offensive to Canadian public policy, and (iv) not obtained in violation of natural justice, it would be recognized in Canada.   There is no indication that any of these bars is likely to arise.  In particular, the concern over lack of notice to Canadian plaintiffs raised by the Walker Declaration should not be judged at this point but only in light of such steps to provide notice to Canadians who fall within the defined class as might later be taken.

3. Even when the JLs' Ontario action is taken into account there is at this point no bar to enforcement of a judgment or settlement of the proposed U.S. class action.  If, however, that Ontario action were to result in a judgment on the merits or court-approved settlement *before* a judgment of the proposed U.S. Class Action were brought to Canada for recognition that might preclude recognition of a judgment arising from the proposed U.S.

Hunton App. 0927

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 5 of 193   PageID 7082
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 107 of 129   PageID
21986

Class Action.  As discussed in more detail below, even this is uncertain.

4. In forming this opinion I have considered:

   a.   Civil Action No 3:09-CV-02384-N-BG - Plaintiffs' Second Amended Class
        Action Complaint (U.S. Class Action Complaint);

   b.   Civil Action No 3:09-CV-02384-N-BG - Memorandum Supporting Plaintiffs'
        Motion for Class Certification, for Designation of Class Representatives and Class
        Counsel (Certification Memorandum);

   c.   6 April 2009 Order of the Superior Court of Québec authorizing the first Joint
        Liquidators to act as foreign representative under the Bankruptcy and Insolvency
        Act (First Joint Liquidators Order);

   d.   11 September 2009 decision of the Superior Court of Quebec (E&Y Order);

   e.   19 August 2011 Order of the Superior Court of Québec authorizing the current Joint
        Liquidators to sue TD Bank in Canada (Authorization Order);

   f.   Fresh as Amended Statement of Claim *Joint Liquidators of Stanford International
        Bank, Ltd. v. Toronto-Dominion Bank*, No. CV-12-9780-00CL (Can. Ont. Sup. Ct.
        J.) (JLs' Canadian Action Statement of Claim);

   g.   28 January 2014 decision of the Québec Superior Court on TD Bank's *forum non
        conveniens* motion (*forum non conveniens* judgment);

   h.   Declaration of Receiver Ralph Janvey of 30 October 2014 (Janvey Declaration);

   i.   Declaration of Janet Walker in this proposed class action (Walker Declaration); and

   j.   Canadian authorities relevant to the question considered in this declaration.

5.  I am being compensated for my work on this case at U.S. $400 per hour.  I attach

Hunton App. 0928

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 6 of 193   PageID 7083
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 108 of 129   PageID
21987

as Exhibit 1 my *curriculum vitae*, which contains a list of all my publications over
the past ten years.

6.   I reserve the right to supplement or modify the opinions expressed here, particularly in
light of any new arguments raised or materials presented by the Defendants.

## II. Background and Qualifications

7.   I am a Professor of Law at the Schulich School of Law, Dalhousie University, Halifax,
Nova Scotia.  I have been a full-time faculty member here since 1982.  I have regularly
taught courses in conflicts of law, commercial law, judicial remedies, and torts, and have
served as faculty lawyer at our legal aid clinic.   During that period I have also been a
visiting scholar at the UCLA School of Law, a Visiting Professor at the Faculty of Law of
the University of Auckland, the James Lewtas Visiting Chair at Osgoode Hall School of
Law (twice), the Walter Owen Visiting Chair at the University of British Columbia, a
lecturer at the Hague Academy of International Law and finally, and of particular relevance
to this Declaration, a Fulbright Research Chair at the North American Center for
Transborder Studies at the University of Arizona, where I focussed on Canada-United
States cross-border judgment enforcement.

8.       Other qualifications are set out in Exhibit 1.   Of particular relevance to this
Declaration are numerous articles on conflicts of laws which have been cited in eight
judgments of the Supreme Court of Canada, sometimes in more than one set of reasons,
and my books *Foreign Currency Claims in the Conflict of Laws* (Oxford: Hart Publishing
2010), *Statutory Jurisdiction: An Analysis of the Court Jurisdiction and Proceedings
Transfer Act* (Toronto: Carswell, 2012) (with Stephen Pitel and Michael Sobkin), and
*Remedies: Cases and Materials*, 6th ed. (Toronto: Emond Montgomery, 2012) (with
Jeffrey Berryman *et al.*).  I have served as an advisor to the Canadian and Nova Scotia
Departments of Justice and the Uniform Law Conference of Canada on matters of private
international law and have acted as an expert at the Hague Conference of Private
International Law on the Hague judgment enforcement project.   I am the Canadian
representative on the editorial advisory board of the *Journal of Private International Law*.

Hunton App. 0929

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 7 of 193   PageID 7084
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 109 of 129   PageID
21988

### III. Analysis

9.      I discuss recognition of a Texas judgment in Canada in two stages: (1) setting aside the possible effect of the JLs' Ontario action against TD and (2) considering the possible effect of that Ontario action.

### A. Putting aside the Ontario Action

10.     A foreign-country judgment will be recognized and enforced in Canada if, in the eyes of a Canadian court, the foreign court that rendered it had jurisdiction (either through the defendant's presence when served, the defendant's submission, or a substantial connection between the foreign jurisdiction and the subject matter of the action) and the foreign judgment is not tainted by fraud, denial of natural justice or the application of laws regarded as inconsistent with the fundamental public policy of Canada. (*Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.) (*Morguard*); *Beals v. Saldanha*, [2003] 3 S.C.R. 416, 2003 SCC 72 (S.C.C.) (*Beals*)). There are other possible barriers to enforcement of foreign-country judgments in Canada, for example relating to enforcement of foreign tax or antitrust laws. However, as those do not appear pertinent to this matter I will not discuss them.

11.     A judgment in the proposed U.S. Class Action would appear to have no difficulty in satisfying the conditions laid out by the Supreme Court of Canada in *Morguard* and *Beals* and summarized in the preceding paragraph. Assuming TD Bank appeared and contested the U.S. action on the merits it would be deemed to have submitted to the jurisdiction of that court. In the eyes of a Canadian court that would constitute sufficient grounds for holding that the U.S. court had jurisdiction for the purposes of recognition of its judgment in Canada.

12.     Even if TD Bank did not appear and defend on the merits, so that the U.S. judgment in question was a default one, a Canadian court would still regard that judgment as worthy of recognition. This is because the subject matter of the proposed U.S. Class Action has a

Hunton App. 0930

substantial connection with Texas, at least assuming the facts in paragraphs 314-59 of the U.S. Class Action Complaint are proven.    It is alleged there that investors from all over the world wire transferred funds to Stanford entities' accounts at TD Bank and that TD Bank then facilitated further transfers to and from Texas where Stanford entities were headquartered.  TD personnel are alleged to have taken several trips over the course of many years to Houston to meet with Stanford personnel to discuss, monitor, and facilitate this process.  If proven, this would constitute a sufficient factual nexus with Texas to provide the jurisdictional basis for enforcement in Canada of a judgment in the proposed U.S. Class Action.  Indeed one Canadian court has already stated that Texas would be an appropriate place to sue TD Bank in connection with its involvement with the Stanford entities: *forum non conveniens* judgment, paragraph 40.  Although this statement was made in a somewhat different context, it does indicate that a Canadian court would regard Texas as an appropriate forum for TD Bank to answer for its actions, and that is what lies at the root of the substantial-connection requirement for recognition of foreign-country judgments.

13.    The other possible hurdles to enforcement mentioned above in paragraph 10 -- the impeachment defences: fraud, denial of natural justice, application of laws offending Canadian public policy – should not normally be assessed at this point.  Nevertheless, since the Walker Declaration raises one of them, I will do so.  The Walker Declaration states (paras. 64-74) that the plaintiffs in the proposed U.S. Class action have not, in the eyes of a Canadian court, submitted to the Texas Court.  It argues that mere signing of the Proof of Claim Form against the Receivership Entities by those plaintiffs would not be regarded by a Canadian court as sufficient notice of the proposed class action to absent plaintiffs and would therefore amount to a bar to recognition in Canada.

14.    It is true that, where foreign class actions judgments are concerned, insufficient notice to absent plaintiffs may be regarded by a Canadian court as a breach of natural justice and thus as a bar to foreign-judgment recognition.  (*Currie v. McDonald's Restaurants of Canada Ltd.*, (2005), 74 O.R. (3d) 321 (Can. Ont. C.A.) (*Currie*); *Canada Post Corp. v. Lépine*, 2009 SCC 16, [2009] 1 S.C.R. 549 (S.C.C.) (*Lépine*)).  However, it is premature to assess that question at this stage.  In considering whether to recognize a

Hunton App. 0931

foreign class action judgment Canadian courts look to the notice that is prescribed by the foreign court in conjunction with its certification of the class action in question and then carried out by plaintiffs. (*Currie*, *Lépine*).  In assessing this question in *Lépine*, the Supreme Court of Canada looked to the judicially-imposed notice requirements that were established when the parties presented a proposed settlement to the foreign court. Assuming that a court certifying the proposed U.S. Class Action required that reasonable notice be provided to absent plaintiffs, and that the notice was then in fact given, the concerns in paragraphs 64-74 of the Walker Declaration would disappear.  Pronouncing on the notice question at this stage, as the Walker Declaration does, amounts to concluding before the proposed U.S. Class Action has really started that it will be conducted in a manner that would violate the rules of natural justice.

15.     To conclude this part, a judgment in the proposed U.S. Class Action presents an easy case for recognition in Canada, at least provided that the persons falling within the certified class are provided with proper notice in time for them to decide whether to participate.

**B. Considering the Ontario Action**

16.     Thus far I have considered the enforceability in Canada of a possible judgment in the proposed U.S. Class Action without taking into account the possible effect on this question of the JLs' Ontario action against TD.  I now bring that into the picture.  Much of what is said in the following paragraphs responds to the Walker Declaration, since, putting aside the notice point just dealt with, it is the Ontario action (and the Quebec courts' *Bankruptcy and Insolvency Act* decisions which authorized it) which constitute the chief bases for the Walker Declaration's opinion that Canadian courts would not recognize a judgment in the proposed U.S. Class Action.

17.     The gist of the argument that the JLs' Ontario action amounts to a reason for not recognizing a judgment in the proposed U.S. Class Action is that Canadian courts have granted exclusive jurisdiction over this matter to the JL's Ontario action against TD Bank. It is stated in the Walker Declaration that, having done so, those courts would decline to

Hunton App. 0932

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 10 of 193   PageID 7087
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 112 of 129   PageID
21991

enforce any foreign judgment on the same matter.  Much effort is then spent in demonstrating that the two actions against the TD Bank – the Ontario one and the proposed U.S. one – are in essence the same. In my judgment this is misconceived. The Walker Declaration draws its support for the argument that "a decision rendered by a foreign court in a matter in which a Canadian court has exclusive jurisdiction is not capable of recognition and enforcement in Canada" (Walker Declaration, para. 42) from the decision of the Supreme Court of Canada in *Duke v. Andler*, [1932] S.C.R. 734.  That case is good law.  However, it is disanalogous to and in operative in this case.  *Duke v Andler* dealt with an attempt to enforce in the Canadian province of British Columbia a California judgment which purported to decide a title dispute over real property in Canada. The Supreme Court of Canada held that the judgment should not be enforced.  The reasoning justifying non-recognition of that California judgment was that there was only one jurisdiction in the world whose courts had the right to decide title to land in British Columbia – namely, British Columbia.  Accordingly, no non-British Columbia judgment which purported to decide that matter should be enforced in British Columbia.

18.     However, in the case I am here considering there is no comparable Canadian decision that only one court anywhere in the world has the right to address the role that TD Bank played in defrauding the investors in SIBL.  Canadian court decisions on the matter of the Stanford bankruptcy, in particular the E&Y Order, have acknowledged the existence of the U.S. Receiver Janvey, who might act in the United States, as well as the authority of the Joint Liquidators appointed by the High Court of Antigua and Barbuda.   This is simply not a case where Canadian courts have taken the view that only one court in the world has the authority to entertain legal actions relating to the Stanford bankruptcy.  The principle which emerges from *Duke v. Andler* is inapplicable here.

19.     Even if that principle were applicable as regards actions against the bankrupt Stanford International Bank Ltd (SIBL) it is crucial to note that the proposed U.S. Class Action is not against the bankrupt, or indeed any Stanford entity, but against five banks (of which the TD Bank is one) whose sole connection with the Stanford entities is a contractual one.  Even if Canadian courts purported to assert worldwide exclusive judicial jurisdiction in respect of the SIBL bankruptcy, which they do not, this would have no effect

Hunton App. 0933

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 11 of 193   PageID 7088
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 113 of 129   PageID
21992

on suits against TD Bank.  This principle is illustrated by *Braycon International Inc. v. Everest & Jennings Canadian Ltd.* (2001), 26 C.B. (4th) 154, 2001 CanLII 28471 (Can. Ont. S.C.) (*Braycon*).  There, an action was brought in Ontario against two defendants: one was an American company which was the subject of bankruptcy proceedings in Delaware (E&J USA) and the other was its Canadian affiliate (E&J Canada).  The Ontario court granted a stay of proceedings against E&J USA to facilitate the Delaware bankruptcy proceedings.  However, it held that there was no basis for interfering with the action against E&J USA's Canadian affiliate, which was a separate, solvent company. Facilitating a process where all claims against the bankrupt should be brought in one court (which was not itself required, but rather simply a matter of judicial discretion) had no effect on suits against other parties, even corporate affiliates of the bankrupt.  If this distinction operates when a defendant is a corporate affiliate of the bankrupt, as in *Braycon*, it must apply *a fortiori* where, as in the case of the proposed U.S. Class Action, the defendant's connection with the bankrupt is merely contractual.

20.     In this connection it is important to note that the Authorization Order (the 19 August 2011 decision of the Québec Superior Court which granted the JLs the right to bring the Ontario Action against TD) made no reference to "exclusive", "exclusivity" or any similar term, and there is nothing in that order from which such exclusivity should be inferred.  Canada's *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 (*BIA*) under which the Québec Superior Court was operating, permits exclusivity only for "proceedings concerning the debtor's property, debts, liabilities or obligations" (*BIA*, s 171(1)(a)).  Thus, as *Braycon* illustrates, the operative statute would not give the Québec Superior Court the authority, even if it were so inclined, to preclude other actions against TD Bank, and these other actions include the proposed U.S. Class Action as well as actions in Canada to recognize a judgment arising from the proposed U.S. Class Action.

21.     Even in cases where, unlike here, there are two suits against the bankrupt, the Supreme Court of Canada has held that, where international bankruptcies are concerned, judicial exclusivity is not required.  This is demonstrated by *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, 2001 SCC 90 (S.C.C.) (*Holt Cargo*).  There the Supreme Court of Canada dealt with a case where a Belgian trustee in bankruptcy had received an order from a Quebec court under the *Bankruptcy and*

Hunton App. 0934

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 12 of 193   PageID 7089
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 114 of 129   PageID
21993

*Insolvency Act* empowering it, as foreign representative, to bring an action anywhere in Canada against the bankrupt, a Belgian. It did so. It was then argued that another Canadian action against the bankrupt by an American creditor should be stayed. The lower courts refused to do so and the Supreme Court of Canada upheld that decision. At para. 28, Binnie J., for a unanimous Supreme Court of Canada, wrote words which are applicable to the present case:

> The appellant Trustees take the position that once the Canadian bankruptcy court was activated on this file, its power and authority occupied the field in relation to matters pertaining to the bankrupt, so to speak, to the exclusion of courts not possessing bankruptcy jurisdiction. This proposition is, in my view, too broad.

Again at para. 60 Binnie J. wrote (emphasis in the original):

> The Trustees argue that once the Belgian bankruptcy court issued its order on April 5, 1996, or, at the very latest, when the request for assistance was accepted by the Canadian bankruptcy court, the matter before MacKay J. became one of bankruptcy and thus within the *exclusive* jurisdiction of the Canadian bankruptcy court. I have already rejected the Trustees' notion that once a foreign bankruptcy court is activated it necessarily occupies the field in relation to matters pertaining to the bankrupt in this country.

The Supreme Court of Canada's judgment in the companion case *Antwerp Bulkcarriers, N.V. (Re)*, [2001] 3 S.C.R. 951, 2001 SCC 91 (S.C.C.) (*Antwerp Bulkcarriers*) is to the same effect.

22.     This is applicable in the present case. Indeed the present case presents a far stronger argument against exclusivity than *Holt Cargo* and *Antwerp Bulkcarriers*. In each of those cases both claims were brought against the bankrupt and both were brought in Canada. The Supreme Court still held against exclusivity. If exclusivity does not operate when both actions (the one by the foreign representative under the *Bankruptcy and Insolvency Act*, and the one by the other creditor) are brought against the bankrupt, then it must *a fortiori* be the case that there is no necessary exclusivity of jurisdiction where, as here, the defendant is not the bankrupt but a contractual partner of the foreign bankrupt.

23.     To recapitulate, the Quebec Superior Court's Authorization Order granting the JL's the right to sue TD Bank nowhere made reference to exclusivity. This is understandable, since the statute under which it was operating, the *BIA*, does not grant it the power to do so. The Supreme Court of Canada has said that in the case of international bankruptcies

Hunton App. 0935

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 13 of 193   PageID 7090
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 115 of 129   PageID
21994

centred elsewhere, we should not presume exclusivity, even within Canada. In any event
we should not presume world-wide exclusivity. The *Duke v. Andler* principle is
inapplicable to judgments arising from the proposed U.S. Class Action.

24.    For the same reason, the point in para. 41 of the Walker Declaration is
inapplicable. That paragraph notes that article 3165(1) of the Civil Code of Québec
(which would apply only to recognition questions in that province) precludes recognition
of a foreign judgment in cases where Québec law grants exclusive jurisdiction to its
authorities to hear the action which gave rise to the foreign decision. For all the reasons
given above with respect to the *Duke v. Andler* argument, that does not apply here. There
is no such exclusivity. Any claim to the exclusivity required by article 3165(1) is belied
on the face of things, as the Quebec court authorized an action to be brought anywhere in
Canada. Moreover, even if there were such exclusive jurisdiction of the Quebec court, it
would not be granted by Quebec law (as required by article 3165(1)) but by the *BIA*, a
Canadian federal statute.

25.    For the foregoing reasons it is unnecessary to engage with the question, which
occupies such a large part of the Walker Declaration, of similarities and differences
between the JLs' Ontario action and the proposed U.S. Class Action, since no action
against TD Bank, in Canada or otherwise, can have the type of exclusivity required to
engage the *Duke v. Andler* principle. Briefly, however, I note that the proposed U.S. Class
Action action focuses on TD Bank's aiding and participating in fraud and breach of the
Texas Securities Act in connection with the sales of certificates of deposit. This is in
contrast to the JLs' case in Canada, which, unlike the proposed U.S. Class Action, includes
a Stanford entity (SIBL) as plaintiff, and is premised on the theory that the sole defendant,
TD Bank, was careless in not detecting money laundering and thus in allowing other
Stanford entities and several individuals to loot SIBL. This whole scenario assumes SIBL
was a blameless actor looted by other Stanford entities and that TD Bank should have
perceived this and prevented it. The differences between the two actions are so
considerable that, even if I am wrong in everything I have said about exclusivity, a
judgment in the proposed U.S. Class Action in this case might still not be covered by the
*Duke v. Andler* principle.

Hunton App. 0936

26.     There is, however, one respect in which the Ontario Action might have an effect on recognition in Canada of a judgment in the proposed U.S. Class Action – namely, if judgment in the JLs' Ontario action were to be given before the Texas judgment was brought to Canada for recognition.  Existence of a prior Canadian judgment in that case might operate to deny preclusive effect to a second-in-time foreign judgment.

27.     Whether that would be so might depend on who the winner and loser in the prior Canadian judgment was.  If a prior Canadian judgment was in the plaintiff JL's favour then it seems quite possible that a later Texas judgment against TD Bank would be refused recognition in Canada.  This might be so regardless of what is noted above in paragraph 25 about the differences between the Ontario Action and the proposed U.S. Class Action. Rather, for a first-in-time, plaintiff-favouring judgment in the Ontario action to gain preclusive effect over a later foreign one it would be sufficient that the two judgments grew out of the same factual matrix such that enforcing both would penalize TD Bank twice for the same acts and would correspondingly amount to double recovery for some plaintiffs. (Likewise, if a plaintiff-favouring Texas judgment came down first and was enforced in Canada, I would expect that to be taken into account at the remedies stage of the Ontario action to prevent double recovery were the plaintiffs to succeed there.)

28.     If, however, a first-in-time judgment in the Ontario action went in favour of the Defendant TD Bank then the question of whether it would operate to preclude recognition of a later, plaintiff-favouring judgment in the proposed U.S. Class Action is more difficult to judge. It might or might not, depending on what issues were pronounced on in the respective judgments.  For example, a judgment for the plaintiffs in the proposed U.S. Class Action might be based on TD Bank's aiding breach of the Texas Securities Act.  This statute is a significant part of the proposed U.S. Class Action but is nowhere mentioned in JLs' Canadian Action Statement of Claim.  So a first-in-time judgment in the JLs' Ontario action might be regarded by a Canadian court as not precluding enforcement of a foreign judgment based on that cause of action, since it was based on a theory of liability, and accompanying facts, not addressed in the earlier, defendant-favouring Ontario judgment. However, it is also possible, depending on the reasoning of those two, hypothetical

Hunton App. 0937

judgments, that a Canadian court would accord preclusive effect to the first-in-time defendant-favouring Ontario judgment. The question of the effect that a first-in-time defendant-favouring judgment in the Ontario Action on enforcement of a later, plaintiff-favouring judgment in the proposed U.S. Class Action is very difficult to answer. Much would depend on the reasons given for those two hypothetical judgments.

29.     In short, a prior judgment in the JLs' Ontario action might operate to preclude enforcement of a later judgment in the proposed U.S. Class Action, but given the variables involved it is difficult to assess the likelihood of this. None of this, however, affects what was said above about recognition in Canada of a first-in-time judgment in the proposed U.S. Class Action.

30.     In conclusion, the likelihood that a judgment in the proposed U.S. Class Action would be recognized in Canada is high. Provided it is rendered before any judgment is delivered in the JLs' Ontario action there are no significant barriers to recognition of such a judgment. If it were to be rendered after a judgment was delivered in the Ontario action that might preclude recognition of the U.S. judgment in Canada, but it is difficult to assess the likelihood of this as it depends on a number of variables that will for some time remain unknown.

Pursuant to 28 USC §1746(1), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 14 August 2015 in Halifax, Nova Scotia, Canada.

_____

Vaughan Black

Hunton App. 0938

14

Hunton App. 0939

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 17 of 193   PageID 7094
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 119 of 129   PageID
21998
15

**EXHIBIT 1**

CURRICULUM VITAE OF VAUGHAN BLACK

CURRENT TO AUGUST 2015

Professor Vaughan Black                                    Ph. 902-494-1011

Schulich School of Law                                    Fax 902-494-1316

Dalhousie University                                vaughan.black@dal.ca

B.A. (Carleton, 1972), M.A. (Carleton, 1974), Ll.B. (Tor., 1980), Ll.M. (Cal., Berkeley, 1982).

Professor, Dalhousie Law School, since 1982 (Assistant Professor 1982-87; Associate Professor 1987-91; Full Professor since 1991). Also Visiting Scholar U.C.L.A. School of Law 1986-87; Visiting Professor, Faculty of Law, University of Auckland, 1990; James L. Lewtas Professor at Osgoode Hall Law School, 2000 and 2002; Lecturer at The Hague Academy of International Law, 2003; and Walter Owen Visiting Professor at the Faculty of Law, University of British Columbia, 2003-04. In the first term of 2012 I was the Fulbright Visiting Research Chair in Transborder Studies at Arizona State University. Subjects Taught: Conflicts of Law, Commercial Law, Legal Aid Clinic (Faculty Lawyer), Torts, Judicial Remedies, Contracts, Graduate Seminar, Unjust Enrichment, Animals and the Law.

Law-Related Publications:

Index to Vols. 1 to 20 of *The Criminal Law Quarterly*, (Canada Law Book, 1980)

Annotation to *Cowan* v. *Cowan* (1983) 37 R.F.L. (2d) 66

"One if by Land; Two if by Sea: Old Directions in Maritime Law" in *New Directions in Maritime Law, 1984*, D.J. Sharpe and W. Spicer eds. (Carswell, 1984)

Review of Stern, *Judgment in Berlin* (1985) 79 Am. J. Int'l L. 480

Hunton App. 0940

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 18 of 193   PageID 7095
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 120 of 129   PageID
21999
16

Review of Voskuil (ed.), *Hague-Zagreb Essays 4: On the Law of International Trade* (1985), 79 Am. J. Int'l L. 511

"Quebec Marriage Contracts in Common Law Courts: Room for Improvement" (1985) 45 R.F.L. (2d) 93

Review of Hancock, *Studies in Modern Choice of Law* (1985) 17 Ottawa L. Rev. 677

"Unsecured Creditors and Unregistered Chattel Securities" (1986) 64 Can. Bar Rev. 386 (with Hugh Kindred)

Chapter on Conflicts of Law in *Matrimonial Property Law in Canada*, Bissett-Johnson and Holland, eds. (Carswell, 1986)

Review of Cavers, *Choice of Law, Selected Essays, 1933-1983*, (1986) Netherlands Int'l Law Review 422

"The Strange Cases of Alberta's Guarantees Acknowledgement Act: A Study in Choice-of-Law Method" (1987) 11 Dalhousie L.J. 208

Annotation to *Vladi* v. *Vladi* (1987) 7 R.F.L. (3d) 337

Review of MacDonald, *Court Jesters*, (1987) 21 U.B.C. L. Rev. 581

Annotation to *Thom* v. *Thom* (1987) 27 E.T.R. 185

"The Antisuit Injunction Comes to Canada" (1988) 13 Queen's L.J. 103

"A Brief Word About Advertising" (1988) 20 Ottawa L. Rev. 509

Hunton App. 0941

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 19 of 193   PageID 7096
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 121 of 129   PageID
22000
17

Teaching Materials for Conflict of Laws (with Angela Swan), internal publication of Dalhousie Law School.

"Jurisdiction and Enforcement of Judgments in Canada" (1989) 9 Oxford Journal of Legal Studies 547

Review of Law Reform Commission of British Columbia, Working Paper on the Enforcement of Judgments Between Canadian Provinces (1990) 69 Can. Bar Rev. 813

Annotation to *Kornberg* v. *Kornberg* (1990) 27 R.F.L. (3d)

"The Standard for Issuing Antisuit Injunctions in Canada" (1991) 44 C.P.C. (2d) 30

"New Rules for the Enforcement of Foreign Judgments" (1991) 12 The Advocates' Quarterly 489 (with John Swan)

Case Comment, *Zurich Insurance Co.* v. *Ontario Human Rights Commission* (1991) 45 C.C.L.I. 304

Review of MacFarlane, *The Erebus Papers,* (1991) 11 Windsor Yearbook of Access to Justice 253

Chapter on Territorial Jurisdiction in *Child Custody Law and Practice,* (Carswells, 1992), and annual updates to 1999

"Damages for Foreign Exchange Losses in Contract Actions" [1991] New Zealand Recent Law Review 190

Review of Gold, *Legal Effects of Fluctuating Exchange Rates,* (1992) 71 Can. Bar Rev. 180

"Section 6 of the Divorce Act:  What Must Be Transferred?" (1992) 37 R.F.L. (3d) 307

Hunton App. 0942

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 20 of 193   PageID 7097
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 122 of 129   PageID
22001
18

Annotation to *H.* v. *H.* (1992) 37 R.F.L. (3d) 446

Annotation to *Kim* v. *Yun* (1992) 35 M.V.R. (2d) 82

Legislative Comment on the Uniform Enforcement of Canadian Judgments Act (1993) 71 Can. Bar
Rev. 721

"Statutory Confusion in International Child Custody Disputes" (1993) 9 Canadian Family Law
Quarterly 279

"*Tezcan* v. *Tezcan*: Choice of Law in Matrimonial Property" (1993) 9 Canadian Family Law
Quarterly 293

Comments on *Wilson* v. *Challis* and *Thibeault* v. *Green* (1993) 9 Canadian Family Law Quarterly
303

"Choosing the Applicable Law for Cross-Border Auto Accidents" (1993) 15 C.C.L.T. (2d) 73 (with
Graham Flack)

"The Other Side of *Morguard*: New Limits on Judicial Jurisdiction" (1993) 22 Canadian Business
Law Journal 4

"Cites for Sore Ears (A Paper Moon)" (1993) 16 Dalhousie L.J. 217 (with David Fraser)

"Did She Mention My Name?  Citation of Academic Authority in the Supreme Court of Canada,
1985-1990" (1993), 16 Dalhousie L.J. 377 (with Nicholas Richter)

Annotation to *Thomson* v. *Thomson* (1994) 50 R.F.L. (3d) 147 (Man. C.A.).

Review of Sterling, *The Hacker Crackdown*, (1994) 6 Current Issues in Criminal Justice 310

Hunton App. 0943

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 21 of 193   PageID 7098
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 123 of 129   PageID
22002
19

"Constitutional Alchemy in the Supreme Court" (1994) 5 National Journal of Constitutional Law 79
(with Wayne MacKay)

"GATT For Kids:  New Rules for Intercountry Adoption of Children" (1994) 11 Canadian Family
Law Quarterly 253

Annotation to *Manitoba* v. *Dukelow* (1994) 4 Estates and Trusts Reports (2d) 2

Case Comment, *Thomson* v. *Thomson* (1995) 12 Canadian Family Law Quarterly 321

Review of Tetley, *International Conflict of Laws*, 42 Netherlands Int'l. L. Rev. 453

Review of Castel, *Canadian Conflict of Laws*, 42 Netherlands Int'l. L. Rev. 437

Review of Collins, *Essays in International Litigation and the Conflict of Laws*, (1996) 26
Canadian Business Law Journal 462

Comment on *Hollis v. Dow Corning Corp.* (1996) 75 Can. Bar Rev. 355 (with Dennis Klimchuk)

"Consumer Bankruptcies and Bill C-5" (1996) 13 National Insolvency Review 81 (with J. Ziegel
*et al.*)

"Causation, Damages and Thin Skulls" (1997) 31 U.B.C. L. Rev. 163 (with Dennis Klimchuk)

"Consumer Protection and the Conflict of Laws" in *Consumer Law in the Global Economy*, ed.
I. Ramsay, (Brookfield, VT: Dartmouth Publishing, 1997)

"Mareva Injunctions in Canada: Territorial Aspects" (1997) 28 Canadian Business Law Journal 430
(with Ed Babin)

Hunton App. 0944

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 22 of 193   PageID 7099
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 124 of 129   PageID
22003
20

Review of Mullany, *Torts in the Nineties,* (1997) 76 Can. Bar Rev. 605

Comment on *Arndt v. Smith* (1997) 76 Can. Bar. Rev. 569 (with Dennis Klimchuk)

"A Collecting Bank's Liability for Conversion of Cheques" (1997) 5 Tort Law Review 187

Reviews of McLachlan & Nygh, *Transnational Tort Litigation: Jurisdictional Principles* and
Lowenfeld, *International Litigation and the Quest for Reasonableness* (1997) 2 Canadian
International Lawyer 255

"Not a Chance" (1998) 30 Canadian Business Law Journal 96

"Territorial Jurisdiction Based on the Plaintiff's Residence" (1998) 14 Carswell's Practice Cases
222

"The Uniform Enforcement of Canadian Decrees Act" (1998) 20 The Advocates' Quarterly 261

"Crash: The Ontario Court of Appeal Bumps into *Tolofson*" (1998) 41 C.C.L.T. (2d) 170

Annotation to *Kirschenbaum-Green v. Surchin* (1999) 44 C.C.L.T. 68 (with Gillian Derneyere and
Dennis Klimchuk)

"Legally Dead: The Grateful Dead and American Legal Culture" in R. Weiner ed., *Perspectives on
the Dead* (Greenwood, 1999)        .

"Parsing the Supreme Court's New Pronouncements on Vicarious Liability for Sexual Battery",
(1999) 46 C.C.L.T. (2d) 126 (with Sheila Wildeman)

Review of *McGregor on Damages,* (2000) 33 Canadian Business Law Journal 154

Hunton App. 0945

"Lost Cause in the Ontario Court of Appeal: A Comment on *Walker Estate v. York Finch General Hospital*, (2000) 8 Health Law Review 24 (with Dennis Klimchuk).

"Adjudicatory Jurisdiction for Internet Torts" (2000) 33 Canadian Business Law Journal 427 (with Mike Deturbide)

"Commodifying Justice for Global Free Trade: The Proposed Hague Judgments Convention" (2001) 38 Osgoode Hall Law Journal 237

"Loose Change: Problems with Foreign Currency Conversions" (2001) 35 Canadian Business Law Journal 123

"A Farewell to Cause" (2001), 24 The Advocates' Quarterly 478

"Interprovincial Inter-Insurer Interactions" (2002), 36 Canadian Business Law Journal 436

Chapters on intercountry adoption of children in Nova Scotia and Ontario, *in Internal and Intercountry Adoption Laws* (The Hague: Kluwer, 2002).

"The Transformation of Causation in the Supreme Court", in Todd Archibald, ed., *Annual Review of Civil Litigation, 2002* (Toronto: Carswell, 2003)

"Old and in the Way? The Revenue Rule and Big Tobacco" (2003), 38 Canadian Business law Journal 1.

"The Deconstitutionalization of Canadian Private International Law?" (2003), 21 Supreme Court Law Review 181 (with Janet Walker).

"*Rylands v. Fletcher* Update" (2004), Continuing Legal Education Society of British Columbia

Hunton App. 0946

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 24 of 193   PageID 7101
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 126 of 129   PageID
22005
22

"A New Approach to Extraterritoriality" (2004), 40 Canadian Business Law Journal 161 (with Elizabeth Edinger).

"Foreign Currency Obligations in Private International Law" (2004), 302 *Recueil des cours* 1.

"The Temporal Element of the Duty to Inform" (2004), 13 Health Law Review 36 (with Elaine Gibson).

"Causation after *Fairchild v. Glenhaven*", in *New Horizons in Tort Law* (Ottawa: National Judicial Institute, 2005)

"Enforcement of Foreign Non-Money Judgments" (2005), 42 Canadian Business Law Journal 81.

"Rights Gone Wild" (2005), 40 University of New Brunswick Law Journal 3.

"Ghost of a Chance: *Gregg v. Scott* in the House of Lords" (2005), 14(2) Health Law Review 38.

*Remedies, Cases and Materials*, 5th ed., Berryman *et al.* (Toronto: Emond Montgomery, 2006) (responsible for chapters 3 and 4).

Review of Markoff, *What the Dormouse Said*, (2005), 4 Canadian Journal of Law and Technology 215.

"Material Contribution and Quantum Uncertainty" (2006) 43 Canadian Business Law Journal 155 (with David Cheifetz)

Review of Guerrini, *Experimenting with Humans and Animals* (2006), 23 Canadian Bulletin of Medical History 589.

"The Hague Choice of Court Convention" (2006), 6 Canadian International Lawyer 181.

Hunton App. 0947

"The Continuing Incoherence of Canadian Choice of Law Methodology", in *Fragmentation: Diversification and Expansion of International Law* (Ottawa, Canadian Council on International Law, 2006).

"Decision Causation: Pandora's Tool-Box", in *Emerging Issues in Tort Law* (Oxford: Hart Publishing, 2007).

"Canada and the US Contemplate Changes to Foreign-Judgment Enforcement" (2007) 3 Journal of Private International Law 1.

*The Hague Choice of Court Convention and the Common Law*.  This is a report commissioned by the Federal Department of Justice for the use of the Uniform Law Conference of Canada.  It appears in the Annual Proceedings of the Uniform Law Conference of Canada for 2007: http://www.ulcc.ca/en/poam2/Hague_Choice_of_Court_Convention_Common_Law_En.pdf.

"Through the Looking-Glass, Darkly: *Resurfice Corp. v. Hanke*" (with David Cheifetz) (2007), 45 Alberta Law Review 241.

"Concurrent Judicial Jurisdiction: A Race to the Court House or to Judgment?" (with Angela Swan) (2008), 46 Canadian Business Law Journal 292.

Review of Khoury, *Uncertain Causation in Medical Liability*, (2008) 47 Canadian Business Law Journal 145.

"Reform of Ontario's Law on Jurisdiction" (with Stephen Pitel) (2009) 47 Canadian Business law Journal 469.

"*Muscutt v. Courcelles* Revisited: The Court of Appeal for Ontario Takes Another Look" (with Mat Brechtel)  (2009) 36 The Advocates' Quarterly 35.

*Foreign Currency Claims in the Conflict of Laws* (Oxford: Hart Publishing, 2010)

Hunton App. 0948

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 26 of 193   PageID 7103
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 128 of 129   PageID
22007
24

"Cultural Thin Skulls" (2010) 60 University of New Brunswick Law Journal 189.


Review of Briggs, *Agreements on Jurisdiction and Choice of Law*, (2010) 49 Canadian Business Law Journal 300.


"Current Jurisdictional and Recognitional Issues in the Conflict of Laws" (2011) 50 Canadian Business Law Journal 499-524 (with J. Blom and J. Walker).


*Remedies: Cases and Materials*, 6th ed. (Toronto: Emond Montgomery, 2012) (with Jeff Berryman *et al.*).


"A Regulated Regard: Comparing the Governance of Animal and Human Experimentation" (2012) 24 *Revue québécoise de droit international* 237.


*Statutory Jurisdiction: An Analysis of the Court Jurisdiction and Proceedings Transfer Act* (Toronto: Carswell, 2012) (with Stephen Pitel and Michael Sobkin).


"Don't Think About Elephants" (2012) 63 University of New Brunswick Law Journal 145 (with Katie Sykes).


"A Canada-US Full Faith and Credit Clause" (2012) 18 Southwestern International Law Journal.


"Simplifying Court Jurisdiction in Canada" (2012), Journal of Private International Law 411.


"Choice of Law and Jurisdiction of Courts in Family Matters" (2013) 32 Canadian Family Law Quarterly 53.


"Conditional *Forum Non Conveniens* in Canadian Courts" (2013) 39 Queen's Law Journal 41.  This paper received the David Watson Memorial Award, an annual prize for the paper published in the Queen's Law Journal judged to make the most significant contribution to legal scholarship.

Hunton App. 0949

Case 3:12-cv-04641-N-BQ   Document 183-10   Filed 02/26/16   Page 27 of 193   PageID 7104
Case 3:09-cv-02384-N-BG   Document 351-19   Filed 11/02/15   Page 129 of 129   PageID
22008
25

"Out of Bounds: Can a Court Sit Outside its Home Jurisdiction?" (2013) 41 The Advocates' Quarterly 503 (with Stephen Pitel).


*Perspectives on Animal Law in Canada,* (Toronto: Irwin Law, 2014), co-edited with Peter Sankoff and Katie Sykes.


"Informed Consent Comes to Britain", forthcoming, The Advocates' Quarterly, (with Michael Hadskis)


"Forum Selection Clauses: Beyond the Contracting Parties", forthcoming, Journal of Private International Law (with Stephen Pitel).


In addition, I have delivered numerous talks at various conferences, workshops, continuing legal education seminars, judicial education sessions and faculty seminars. My writings on the conflict of laws have many times been cited by Canadian judges, including provincial appellate courts and eight decisions of the Supreme Court of Canada. I am a member of the Academic Advisory Group to the Federal Department of Justice on issues of private international law and have on several occasions advised the department on issues related to the conflict of laws, including travelling to the Hague Conference on Private International Law as part of the Canadian delegation. I have also provided advice and information on private international law to the Nova Scotia Department of Justice, the Law Commission of Ontario and practising lawyers. I sit on the editorial advisory board of the *Journal of Private International Law* and on the board of directors of Animal Justice Canada.

Hunton App. 0950

# EXHIBIT 15

Civil Action No 3:09-CV-02384-N-BG

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION


PEGGY ROIF ROTSTAIN, et al. on behalf of

themselves and all others similarly situated,

Plaintiffs

v.


TRUSTMARK NATIONAL BANK, ET AL.

Defendants


## DECLARATION OF PROFESSOR JONATHAN HARRIS


I, Jonathan Harris, hereby declare as follows:


**A. QUALIFICATIONS**

1.      I am Professor of International Commercial Law at King's College, London (part of the University of London), where I specialise in private international law. I was appointed to this position, which I hold on a part-time basis, in September 2011. Previously, I was Professor of International Commercial Law at the University of Birmingham from January 2002-August 2011 (full-time until September 2009 and thereafter part-time). Prior to that, I was a Reader in Law at the University of Nottingham (September 2000- December 2001); and a Lecturer in Law at the University of Birmingham (September 1995-August 2000).

1

**Hunton App. 0951**

2.  I have recently been appointed as the joint general editor (along with Lord Collins of Mapesbury, who had been the sole general editor since 1987) of England's leading work on private international law, *Dicey, Morris and Collins, The Conflict of Laws* (first published in 1896), with effect from the second supplement to the current 15th edition (which was published in July 2015 under our joint general editorship). I also currently have responsibility for eleven chapters in the book, including material on jurisdiction, recognition and enforcement of foreign judgments and choice of law. Prior to becoming joint general editor, I had been one of the editors of the book since 2006.

3.  I am also the co-editor (and co-founder in 2005) of the *Journal of Private International Law,* the leading English language journal in the field. We have also held international conferences under the auspices of the journal in venues including New York, Madrid, Milan and London and will be holding a conference at the University of Cambridge over three days in September 2015. I am also the co-founder and joint series editor of the *Studies in Private International Law* monograph series published by Hart Publishing, Oxford.

4.  My other major publications include co-authorship of the book "*International Sale of Goods in the Conflict of Laws*" (Oxford University Press, 2005) and sole authorship of the book *"The Hague Trusts Convention"* (Hart Publishing, 2002). I have written a large number of articles on all aspects of private international law in leading journals and been actively involved in the field for almost 20 years.

5.  I have taught university courses in private international law in every academic year since I began my career. At King's College, London, I am responsible for, and the sole teacher of, an LLM course entitled "International Business Transactions I: Litigation", which focuses in depth on the rules of jurisdiction and recognition and enforcement of foreign judgments.

6.  I am a member of the Lord Chancellor's Advisory Committee on Private

2

International Law, chaired by Lord Mance, a judge of the Supreme Court. The Committee formally advises the UK government on private international law reform. I have also previously given evidence to the House of Lords Select Committee on European Union Law on private international law issues relating to succession.

7. I have previously held positions as Visiting Professorial Fellow at the University of New South Wales, Australia and Visiting Professor, National University of Singapore. I taught LLM courses in private international law at both institutions.

8.    I am also a practising barrister. Since 1 May 2009, I have been a tenant (i.e. full member) at Serle Court Chambers in London, a leading set of chambers in commercial and chancery law. A great deal of my work in chambers is of an international nature. I have appeared on behalf of successful parties in the Supreme Court and the Privy Council. As from 1 October 2009, I have been dividing my time between practice at the Bar and academia. Prior to that, I practised on a part-time basis as a "door tenant" at Brick Court Chambers in London, one of the leading sets of commercial law chambers in England. In my work at the Bar, I have been involved in high profile litigation raising issues of private international law.

9.  I have previously had my deposition taken in *Re Royal Dutch/ Shell Transport Securities Litigation*, No. 04-cv-374 (D.N.J.). I have also given expert testimony in the Court of First Instance of Athens, Greece in *Ambrosiadou v Coward.*

10. I have provided expert reports on the enforceability of US class action judgments in England in a number of US cases: *Re Royal Dutch/ Shell Transport Securities Litigation*, No. 04-cv-374 (D.N.J.); *Re Vivendi Universal, S.A., Securities Litigation*, No. 02-cv-05571 (S.D.N.Y.); *Re Royal Ahold N.V. Securities & ERISA Litigation*, No. 03-MD-01539 (D. Md.); *Re Parmalat Securities Litigation*, No. 04-MD-1653 (S.D.N.Y.)*; Re SCOR Holding (Switzerland) AG Securities Litigation,* No. 04-cv-7897 (S.D.N.Y.); *Re Alstom SA Securities* Litigation, No.

**Hunton App. 0953**

03-cv-6595 (S.D.N.Y.); *Anwar, et al. v Fairfield Greenwich Limited, et al., 09-cv-0118 (S.D.N.Y.)*; *Re Optimal US Litigation*, 10-cv-4095 (S.D.N.Y.) *; and Re BP plc Securities Litigation*, 10-MD-2185 (S.D. Tex.).

11. My views as to the enforceability of US class action judgments in England are expressed in an article in "The Recognition and Enforcement of US Class Action Judgments in England" [2006] 2 *Contratto e impresa/ Europa* 617.

12. A copy of my CV is attached to this declaration.

13. I am being remunerated at the rate of £600 per hour for providing this opinion.

**B.  DOCUMENTS REVIEWED**

14. I have reviewed the following documents:

- Plaintiffs' First Amended Petition filed on 13 November 2009;

- Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel dated 30 April 2015;

- Memorandum Supporting Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel dated 30 April 2015;

- Plaintiffs' Second Amended Class Action Complaint dated 1 May 2015;

- Declaration of Professor Adrian Briggs dated 7 July 2015.

**C.    ASSUMED FACTS AND QUESTIONS PRESENTED**

15.    I am informed that, under US law, one or more individuals may bring an

4

action on behalf of a "class" of all persons with similar alleged claims. Although the action is styled a class action upon filing, Federal Rule of Civil Procedure 23 requires the proposed class representative to ask the court to certify the class. Unless and until a class is certified, no member of the proposed class, other than the named plaintiff, can be bound by the result, whether favorable or unfavorable to plaintiffs. If, and only if, the US court certifies the class, the action proceeds as a class action and includes all similarly situated individuals, known as "class members," who do not choose to exclude themselves from (or "opt out" of) the class. All such class members are provided notice of the class action, including their right to opt out of the class, through a combination of direct mail, publication in newspapers, and postings on the Internet. This notice is drafted to be as simple and clear as possible, is given in English and the predominant language in the country or area where the notice is given, and does not require the retention of a lawyer to understand.

16. I have been asked to opine on the following question:

"In the event a judgment is rendered in this class action case in favour of the defendants, what is the likelihood that a plaintiff could bring new litigation on this same matter against any of the defendants in the courts of England?"

In the course of doing so, I have also carefully considered the views expressed in the Declaration of Professor Briggs.

## D.    SUMMARY OF CONCLUSIONS

17. There is no binding English authority one way or the other as to the entitlement of a United States class action judgment to recognition and enforcement in England. No case, even at trial court level, has had to resolve the point. As such, in my opinion, it would be impossible to conclude there was anything approaching certainty as to the law in this area point. Despite the suggestion Professor Briggs in his Declaration that the position is clear, this is, in my opinion, plainly not the

Hunton App. 0955

case. None of the cases that he deals with directly addresses and decides the issue.

18. In fact, the true position is as stated by Professor Briggs at para 60 of his Declaration:

> *"I have not been able to discover any reported English case that has had to rule directly on the question of recognition of a judgment in the precise context of a US class action".*

The absence of a binding authority directly on point appears to be common ground between us.

19. In the absence of any binding authority, there are reasonable and respectable arguments that can be advanced for and against the recognition of a US class action judgment in England. Different views have been expressed in the secondary literature, which tends only to illustrate the absence of any clear answer to this question. Indeed, the volume of academic literature generated in recent years on this subject only goes to show that there is a real debate on the issue.

20. I believe, however, that a good case exists for the recognition and enforcement of a US class action judgment in England. The English rules on recognition and enforcement of foreign judgments, as stated in the authorities and leading works, have hitherto been formulated in relation to the position of the defendant; and certainly not in respect of plaintiffs[1] who do not opt out of a class action ("absent class members"). If an English court were to develop rules on recognition and enforcement of foreign judgments to apply to absent class members, I believe that a cogent case can be made for arguing that the judgment in the present proceedings should be recognised (and that, in the absence of a binding authority

---

[1] English terminology now refers to "claimants" rather than "plaintiffs". Nonetheless, for the benefit of the court, the present Declaration refers to "plaintiffs", save, of course, where it quotes from sources which use the word "claimant".

6

on the entitlement of such judgments to recognition, this is possible without the need for legislation). I further consider that if the judgment were otherwise entitled to recognition, it is unlikely that an English court would hold that it would nonetheless be contrary to English standards of natural justice or public policy to do so (and Professor Briggs does not suggest otherwise).

21. Hence, in my opinion, in the absence of any binding authority on this issue, the proper and balanced conclusion in such circumstances is that there is nothing approaching certainty as to the law in this area. I strongly disagree with Professor Briggs's assertion that the law is entirely clear, or that US class action judgments unequivocally fit within established principles of the English common law on the recognition of foreign judgments.

22. It is also worth noting that in other recent class action litigation, expert declarations submitted in opposition to certification of the class have have adopted a notably more measured tone than Professor Briggs. Sir Christopher Staughton in *Re Royal Dutch/ Shell Transport Securities Litigation* expressly said that he did not believe the non-recognition of the US judgment in England to be a near certainty. In his declaration in reply to my own declaration, he observed (Reply Declaration, para 26) that it was his "confident opinion" that the judgment would be unenforceable and specifically declined to go further, observing that: "I do not think that a lawyer or judge should say that anything is a 'near certainty'". Nor did Professor Edwin Peel in *Re Royal Ahold Securities*, or Laurence Rabinowitz QC in *Re Vivendi Universal SA Securities* suggest that it was a "near certainty" that a US class action judgment would not recognised in England. In *Royal Ahold*, Mr Peel accepted that there was very real doubt on the subject and stressed the uncertainty of the situation, before going on to say that it was, in his opinion, "unlikely" (para 4) that a judgment against class action members who did not opt out of the class would be enforceable in England.

23. Professor Briggs has developed arguments and views on this issue (based in very

7

large part on the assumption that 19th century decisions concerning jurisdictional competence over the defendant must inevitably be applied to the very different situation of absent class members, which they plainly did not have in mind); but, in my respectful opinion, they cannot and should not be taken as an established and incontrovertible statement of the entitlement of a US class action judgment to recognition in England.

24. That a good case exists for the recognition and enforcement of US class action judgments in England was recognised by Judge Holwell in *Re Vivendi Universal, S.A. Securities Litigation*, No. 02-cv-05571 (S.D.N.Y.); by Marrero, U.S.D.J in *Re Alstom SA Securities Litigation* No. 03-cv-6595 (S.D.N.Y.); and again by Marrero, U.S.D.J in *Anwar, et al. v Fairfield Greenwich Limited, et al.,* 09-cv-0118 (S.D.N.Y.).

25. I provided an expert report on this issue in these three cases. The substantive arguments for and against recognition of a US class action judgment in England were set out fully by the experts in these cases and then determined by the court. I entirely disagree with Professor Briggs's suggestion that there was any serious error in the views that I expressed in the declarations in these cases; and nor did the courts on three different occasions think so. Nor do I consider that there is any basis for his suggestion that the courts in *Re Vivendi, Re Alstom* and *Anwar v Fairfield Greenwich Limited* were each lured into error, or that they did not properly understand and evaluate the expert evidence before them in reaching their determination. Nothing in Professor Briggs's Declaration, or his reference to my declaration in the *Anwar* litigation, in any way changes my views on this matter.

26. I do not consider that the law in England has changed in any material respect since these three decisions were handed down. It would appear that Professor Briggs, whilst holding differing views to me, agrees that the law in England has not substantively changed since these decisions were handed down.

8

27. I shall begin by outlining briefly in section E below the most important rules on the recognition and enforcement of foreign judgments which may relate to this case; before going on in section F to consider the application of the law to US class action judgments. In section G, I shall briefly explain certain features of multi-party proceedings in England and why, on the one hand, these may support the view that recognition of a US class action judgment in England would not be contrary to natural justice or public policy; but that, on the other, English law lacks a class action properly so called. I shall also briefly explain that English law typically requires the losing party to bear the costs of the successful party- meaning that, in a practical sense, the best possibility of redress for English would-be class members is likely to be in the proposed class action proceedings in Texas.

E.    **THE RECOGNITION AND ENFORCEMENT OF FOREIGN JUDGMENTS IN ENGLAND**

### (1) *The schemes of recognition and enforcement of foreign judgments applicable in England*

28. Four major schemes of recognition and enforcement of foreign judgments are applicable in England. Regulation (EU) No. 1215/2012 ("the recast Judgments Regulation"),[2] the Administration of Justice Act 1920, the Foreign Judgments (Reciprocal Enforcement) Act 1933 and the common law. The appropriate scheme depends upon the court which delivered judgment and/or the basis of its jurisdiction. The recast Judgments Regulation applies only to judgments from courts in the European Union. The Administration of Justice Act 1920 and the Foreign Judgments (Reciprocal Enforcement) Act 1933 apply to judgments from certain countries with which the UK has a reciprocal enforcement arrangement.

---

[2] This replaces Regulation (EC) No. 44/2001 ("the Judgments Regulation") for proceedings commenced in an EU Member State on or after 10 January 2015. For judgments from Iceland, Norway and Switzerland, the Lugano Convention ([2007] L 339/3) applies for matters within its ambit.

**Hunton App. 0959**

The United States is not one of these countries. Hence, in the case of a judgment from the United States, the common law rules are applicable.

### *(2) The key requirement for recognition of a foreign judgment at common law: jurisdictional competence in the eyes of English law*

29. If a foreign judgment meets the criteria for recognition in England and no relevant defence is made out, the judgment will create a cause of action estoppel in England between the same parties, preventing the matter from being reopened in England (see *Dicey, Morris and Collins, The Conflict of Laws,* 15th ed. 2012, 14-030-14-043).

30. A judgment will be recognised in England if the foreign court was jurisdictionally competent in the eyes of English law. The English court will assess this question for itself, rather than being concerned with whether the foreign court considered itself to have jurisdiction. The English courts will regard the overseas court as jurisdictionally competent either if the defendant had the requisite territorial connection with the foreign state, or if the defendant submitted to proceedings in that state. We shall consider these alternative requirements briefly in turn.

### *(3) The defendant was present and/or resident in the overseas jurisdiction:*

#### *Individuals*

31. It is somewhat uncertain whether the defendant must be resident in the state of origin, or whether his presence at the time of instigation of proceedings will suffice. The judgment of Buckley LJ in *Emanuel v Symon* [1908] 1 KB 302 suggests that residence is required. However, the court in *Adams v Cape Industries* [1990] Ch 433 reviewed the law and suggested *obiter* that presence would be sufficient.

#### *Companies*

Hunton App. 0960

32. Where there is a corporate defendant, it was decided in *Adams v Cape Industries* [1990] Ch 433 that there must be a fixed place of business maintained at the company's own expense from which it has carried out its own business in the overseas jurisdiction. It will suffice that its business is transacted at that place through representatives of the company carrying out the corporation's business. (See also *Littauer Glove Corp v FW Millington* (1928) 44 TLR 746).

### *(4) Submission*

33. A court to which a defendant has submitted will be seen as jurisdictionally competent in the eyes of English law (see *Dicey, Morris and Collins, The Conflict of Laws* (15th ed, 2012), Rule 43). The most obvious means of submitting is by acceptance of service of a claim form. Submission by a defendant may also occur by voluntarily pleading to the merits. If a defendant, having unsuccessfully objected to the jurisdiction, proceeds to file a defence on the merits, then that party will be deemed to have submitted to the foreign court. Equally, if a defendant filed a motion to dismiss that went beyond challenging the jurisdiction of the court to attack the claims on the merits (in circumstances where local procedure did not require it to file its defence on the merits at the same time as its jurisdiction challenge), then it would be deemed to have submitted to the foreign court.

34. Submission may also occur by agreeing to a jurisdiction clause for the courts of a particular state. This will be the case whether the jurisdiction clause in favour of the foreign court is exclusive or non-exclusive, since, in either case, the parties will have voluntarily accept that the foreign court is one of competent jurisdiction (see *Dicey, Morris and Collins,* 15th ed, para 14-069).

35. Furthermore, in *Schibsby v Westenholz* (1870-71) LR 6 QB 155, 161, Blackburn J stated that:

Hunton App. 0961

"we think it clear, upon principle, that if a person selected, as plaintiff, the tribunal of a foreign country as the one in which he would sue, he could not afterwards say that the judgment of that tribunal was not binding upon him."

36. This is reflected in *Dicey, Morris and Collins,* 15th ed, 2012, para 14-068, which states that a judgment shall be recognised:

"If the person against whom the judgment was given was claimant, or counterclaimed, in the proceedings in the foreign court".

37. Blackburn J makes the point that a party who has instigated proceedings overseas cannot then be heard to argue that the foreign court lacked jurisdiction. But Blackburn J did not need to address (and, one can assume, did not have in mind in 1870) the question whether plaintiffs who do not opt out of a foreign class action can subsequently object to the jurisdictional competence of the foreign court and, if so, on what basis.

### (5)  *The rules of jurisdictional competence have been developed in relation to the defendant*

38. No other established basis of jurisdictional competence in a foreign court can be found at common law. An important point to note is that the requirements of jurisdictional competence, as developed in the authorities, have been focused on the position of the *defendant*. This, of course, is hardly surprising given that, in the paradigm cases, the plaintiff has instigated proceedings and the question is whether the foreign judgment binds the defendant.

39. The leading authority of *Schibsby v Westenholz* (1870) LR 6 QB 155 refers to the

12

obligation of the <u>defendant</u> to an action.[3] Blackburn J said (at 159) that:

> "We think that, for the reasons there given, the true principle on which the judgments of foreign tribunals are enforced in England is that stated by Parke, B., in *Russell v. Smyth* [9 M. & W. at p. 819] , and again repeated by him in *Williams v. Jones* [13 M. & W. at p. 633], that the judgment of a court of competent jurisdiction <u>over the defendant imposes a duty or obligation on the defendant</u> to pay the sum for which judgment is given, which the courts in this country are bound to enforce; and consequently that anything which negatives that duty, or forms a legal excuse for not performing it, is a defence to the action." (Emphasis added.)

At pp 159-160, he says:

> "Should a foreigner <u>be sued</u> under the provisions of the statute referred to, and then come to the courts of this country and desire to be discharged, the only question which our courts could entertain would be whether the Acts of the British legislature, rightly construed, gave us jurisdiction over this foreigner, for we must obey them." (Emphasis added.)

And at 160:

> "Now on this we think some things are quite clear on principle. <u>If the defendants</u> had been at the time of the judgment subjects of the country whose judgment is sought to be enforced against them, we think that its laws would have bound them. <u>Again, if the defendants had been at the</u>

---

[3] As indicated in paras 32-33 above, the court in *Schibsby v Westenholz* does make the obvious point that a party who has chosen to instigate proceedings cannot then deny that he is bound by the foreign judgment. But it says nothing about the applicability of rules of jurisdictional competence to absent class action plaintiffs.

13

time when the suit was commenced resident in the country, so as to have the benefit of its laws protecting them, or, as it is sometimes expressed, owing temporary allegiance to that country, we think that its laws would have bound them. If at the time when the obligation was contracted the defendants were within the foreign country, but left it before the suit was instituted, we should be inclined to think the laws of that country bound them; though before finally deciding this we should like to hear the question argued." (Emphasis added.)

40. Likewise, the authors of a leading textbook, *Cheshire, North and Fawcett, Private International Law,* 14th ed (2008), at p 514 explain that:

"Once the judgment is provided the burden lies on the defendant to show why he should not perform the obligation."

They go on to cite a passage from *Schibsby v Westenholz* in support of this proposition. They then quote Lord Esher's remark in *Grant v Easton* (1883) 13 QBD 302, 303 that:

"the liability of the defendant arises upon an implied contract to pay the amount of the foreign judgment". (Emphasis added.)

41. Moreover, Lindley M.R. remarked in *Pemberton v Hughes* [1899] 1 Ch 781, 791:

"There is no doubt that the courts of this country will not enforce the decisions of foreign courts which have no jurisdiction in the sense above explained - i.e., over the subject matter or over the persons brought before them… But the jurisdiction which alone is important in these matters is the competence of the court in an international sense - i.e., its territorial

14

<u>competence over the subject matter and over the defendant. Its competence or jurisdiction in any other sense is not regarded as material by the courts of this country"</u>. (Emphasis added.)

42. Hence, the leading authorities are concerned with jurisdictional competence over the defendant. The position of the plaintiff who commences proceedings in a foreign court needs little or no consideration since, on any conceivable view, that person will be bound by the resulting judgment. None of this, however, expressly determines how, if at all, rules of jurisdictional competence should be applied to class action *plaintiffs* who do not opt out of the class; or whether it is necessary to develop new rules to accommodate what is essentially a novel scenario.

## *(6) Defences to recognition and enforcement*

43. Assuming that these requirements of jurisdictional competence are satisfied, the foreign judgment is *prima facie* entitled to recognition and enforcement in England. If so, then the question whether a valid defence to recognition and enforcement of the judgment can be made out should be considered. Two defences appear potentially relevant in the present context: that the foreign judgment is in breach of natural justice; and that it is contrary to English public policy. It is to these defences that I now turn.

### *The judgment was in breach of natural justice or infringed the European Convention of Human Rights*

44. The defendant must have had the opportunity adequately to defend himself. This means that he must have been served with proper notice of the proceedings, been allowed properly to arrange his defence, and that the procedures of the foreign court must have been acceptable. In *Adams v Cape Industries* [1990] Ch 433, the Court of Appeal stated that the court could refuse to recognise and enforce a foreign judgment if the foreign proceedings amounted to a denial of substantial justice. In that case, the judge in Texas, with the assistance of counsel for the

Hunton App. 0965

plaintiffs, had assessed damages to be awarded to some 206 plaintiffs on the basis of an average amount per plaintiff, rather than in respect of their individual entitlements. The Court of Appeal held that compensation should be objectively and independently assessed and said *obiter* that this amounted to a breach of natural justice.

45. It is, however, important to note that the English courts have generally been reluctant to condemn foreign procedures. In the judgment of Lindley M.R. in *Pemberton v Hughe*s [1899] 1 Ch 781, 790, his Lordship remarked that:

> "If a judgment is pronounced by a foreign court over persons within its jurisdiction and in a matter with which it is competent to deal, English courts never investigate the propriety of the proceedings in the foreign court, unless they offend against English views of substantial justice. Where no substantial justice, according to English notions, is offended, all that English courts look to is the finality of the judgment and the jurisdiction of the court, in this sense and to this extent - namely, its competence to entertain the sort of case which it did deal with, and its competence to require the defendant to appear before it. If the court had jurisdiction in this sense and to this extent, the courts of this country never inquire whether the jurisdiction has been properly or improperly exercised, provided always that no substantial injustice, according to English notions, has been committed."

46. Considerable uncertainty still surrounds the meaning of the term "substantial justice". But it is very rare for a court to deny recognition to a foreign judgment on natural justice grounds. *Cheshire, North and Fawcett, Private International Law,* 14th ed, (2008) 564, observes that:

> "The English courts are reluctant to criticise the procedural rules of foreign countries … and will not measure their fairness by reference to the English equivalents…"

16

They continue:

> "If the foreign court, in proceedings *in personam*, is prepared to dispense with notice of the proceedings, or to allow notice to be served in a manner inadequate to satisfy an English court, it is not for the English court to dispute the foreign judgment…" (citing *Jeannot v Fuerst* (1909) 100 LT 816 and *Vallée v Dumergue* (1849) 4 Exch 290, 303).

So too, Professor Briggs states in *Civil Jurisdiction and Judgments* (6th ed, 2015), para 7.71 that "Examples of this defence in the case law are few". Thus, the weight of authority supports the conclusion that it will be difficult to establish the natural justice defence in the English courts.

47. Furthermore, the European Convention on Human Rights, given the force of law in England by the Human Rights Act 1998, provides in Article 6 that every person has the right to a fair trial for the determination of his or her civil rights and obligations. Although the United States is not, of course, bound by the European Convention on Human Rights, the question has arisen whether an English court, which is bound by it, can recognise or enforce a judgment from a non-Convention State that is incompatible with Article 6. In *Government of USA v Montgomery (No.2)* [2004] UKHL 37, [2004] 1 W.L.R. 2241, the House of Lords held (considering the earlier decision of the European Court of Human Rights in *Pellegrini v Italy* (2002) 35 E.H.R.R. 44) that the enforcement of a United States judgment could only be refused by reference to the European Convention of Human Rights where there was a "flagrant" breach of a party's rights (see also *Merchant International Co Ltd v Natsionalna Aktsionerna Kompaniya Naftogaz Ukrayiny* [2012] EWCA Civ 196, [2012] 1 W.L.R. 3036; *Joint Stock Co Aeroflot v Berezovsky* [2014] EWCA Civ 20, [2014] 1 C.L.C. 53). Hence, the scope of the defence is very narrow, and circumstances in which it might be successfully pleaded but the natural justice defence would not also be available are likely to be

17

extremely rare.

*Recognition would be contrary to English public policy*

48. This defence is rarely sustained. It has been suggested that it might apply e.g. in the case where an injunction not to proceed in a foreign court has been disobeyed: (see e.g. *Phillip Alexander Securities & Futures Ltd v Bamberger* [1997] I.L.Pr. 73, *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7, [2012] 1 W.L.R. 1804 (P.C.),* at para 121; *Dicey, Morris and Collins,* at para 14-163). However, the mere fact that a foreign judgment was obtained on the basis of laws of which an English court disapproves should be irrelevant, as the defence relates to the judgment itself and not the underlying cause of action.

49. In *Israel Discount Bank of New York v Hadjipateras* [1983] 3 All ER 129, the defendant alleged that a New York judgment for the plaintiff was obtained because his father had exercised undue influence over him to make him enter into a contract of guarantee. The public policy defence to enforcement was rejected by the Court of Appeal, on the basis that New York law on undue influence was substantially similar to English law. Accordingly, the defendant could have raised the issue overseas. Having failed to do so, the defendant could not now raise the defence in the English court.

## F.   APPLICATION OF THE LAW TO THE RECOGNITION OF US CLASS ACTION JUDGMENTS AND SETTLEMENTS IN ENGLAND

### *(1) Settlements*

50. An initial distinction should be drawn between a court judgment and a settlement. I understand that if there were a settlement, the court would then hold a fairness hearing on the settlement. The settlement would include a judgment to be entered by the court. The judgment may include a bar order prohibiting class members, including absent class members, from bringing individual actions against the

Hunton App. 0968

settling defendants. Hence, there will be a release of the defendants' liability.

51. The settlement will then be the product of a consensual agreement between the parties. If so, then the parties can be viewed as having waived any objections to the instigation of proceedings in the US court, and it would appear to follow that the agreement would be enforceable in England as to any class members participating in the settlement.

52. More involved questions only arise if absent class members receive actual notice of the settlement and decline to submit claims as to whether those absent class members would then be barred from bringing individual claims against the settling defendants. It is to this issue that I now turn.

## *(2) The effect in England of a US class action judgment in favour of the defendants*

53. In the absence of a settlement, I turn to consider whether absent class members would be barred by a US class action judgment from filing suit in a particular jurisdiction. In answering this question, I consider three possibilities: first, the US class action results in judgment for the defendants; second, the class action results in judgment for the plaintiffs but for a lesser sum that the absent class members had hoped to recover; and third, judgment is given in favour of the plaintiffs for an amount that satisfies the absent class members.

54. The most complex situation is where the US class action judgment is in favour of the defendants, who seek to rely upon this in England as a defence to a further action by the plaintiffs.

### *No binding authority; competing academic views; how should English law determine whether to recognise US class action judgments?*

19

55. There is no direct English law precedent as to whether a US class action judgment would be recognised against absent class members (see also para 60 of Professor Briggs's Declaration). Accordingly, I consider that the position in England is uncertain. I shall, consider the arguments of Professor Briggs and authorities to which he refers, the views of competing academics and the question of principle as to whether an absent class action plaintiff might be bound by a class action judgment.

56.  We have seen above that the English authorities on the jurisdictional competence of a foreign court have, understandably, focused upon, and developed in relation to, the position of the defendant. Similarly, English law has a defence that the foreign judgment was in breach of natural justice, which is normally pleaded by the overseas defendant. It is, accordingly, difficult to predict how, if at all, an English court might apply its rules on the recognition of foreign judgments to absent class action plaintiffs.

57. Just one English case at trial court level, decided more than fifty years ago, has considered the *res judicata* effect of a US class action judgment. In *Campos v. Kentucky & Indiana Terminal Railroad Company* [1962] 2 Lloyd's Rep 459, 473, McNair J commented that:

> "…in accordance with English private international law a foreign judgment could not give rise to a plea of *res judicata* in the English Courts unless the party alleged to be bound had been served with the process which led to the foreign judgment."

58. However, this remark did not form part of the *ratio* of the case, since the claim failed on other grounds. The reasoning of McNair J is also somewhat curious, since, as one author has pointed out:

> "The service of process rule is *necessarily* defendant-based: it is the

Hunton App. 0970

plaintiff that does the serving of process, so she could never be served with process."

(Stiggelbout "The Recognition in England and Wales of United States Judgments in Class Actions" (2011) 52 *Harvard International Law Journal* 433, at 482).

59. Moreover, the context to the *Campos* decision shows that McNair J's comment was induced partly by the prior finding that even in the United States, the claim in *Campos* was not thought to be a class action capable of binding the plaintiffs. Some sentences previously (at p 473), McNair J had said that:

"…the defendants…. have not satisfied me that the… action was a true class action or that in accordance with American law the judgment in that case bound anyone who was not an original party or did not intervene".

60. The present situation is clearly distinguishable, in that the intention of the United States action is to bind all members of the class. Thus, *Campos* is by no means a clear or binding authority.

61. In *Rossano v Manufacturers Life Insurance Co* [1962] 1 Lloyd's Rep. 187, the English court referred to the need for the Egyptian court to have jurisdiction over the "plaintiff", Rossano. However, it was referring to him as the "plaintiff" in the subsequent *English* proceedings before it. In respect of the proceedings in Egypt, Rossano was alleged to owe money to the would-be garnishor, the Egyptian revenue authorities, who sought to recover payment from Rossano's insurers. In other words, he was not a plaintiff in Egypt; to the contrary, as an alleged debtor in Egypt, he was, effectively, in the position of a defendant in that country, and as such, the English court insisted that the Egyptian court should have jurisdiction over such a party.

21

62. In *Schibsby v Westenholz,* considered above, Blackburn J stated that a party who has instigated proceedings overseas cannot then be heard to say that the foreign court lacked jurisdiction. But Blackburn J did not address, and clearly did not have in mind when handing down judgment in 1870, the question whether plaintiffs in a US class action who do not opt out can object to the jurisdictional competence of a foreign court and, if so, on what basis. Professor Briggs's conclusion that nineteenth century authorities, which plainly did not have in mind the situation of foreign opt-out class actions, must be applied to this situation and inextricably lead to the conclusion that US class action judgments have no effect in England in respect of absent class members is, in my opinion, neither necessary nor attractive.

63. Professor Briggs contends that there are authorities which establish beyond doubt that a US class action judgment would not be recognised in England. I do not agree or consider that this is a balanced exposition of the current position in England. None of these authorities is concerned with the recognition of foreign class action judgments, or the issues to which foreign opt out procedures give rise. In my opinion, the authorities which Professor Briggs cite fail to provide the support which he purports to draw from them; and I certainly do not think it that they can be said to provide clear authority which resolves the issue as to the enforceability of a US class action judgment. Professor Briggs relies, instead, on somewhat oblique references in cases concerned with quite different issues to support his argument that English law is clear.

64. Professor Briggs refers to *The Sennar (No 2)* [1985] 1 WLR 490 (paras 27-29 of his report). In that case, the issue was whether a Dutch court had preclusively determined that a claim was covered by an exclusive jurisdiction clause for the courts of Sudan. As is typically the case with issue estoppel, the *defendant* relied upon that finding in an English court to preclude the plaintiff from suing here. Moreover, the defendant succeeded, so that the plaintiff was unable to bring further proceedings in England.

22

Hunton App. 0972

65. Professor Briggs appears to suggest (at para 29 of his Declaration) that the House of Lords found in *The Sennar (No 2)* that the Dutch court was jurisdictionally competent over the *plaintiff*, even though it was not jurisdictionally competent over the defendant. But this theory has significant difficulties, not least since it was the *defendant* who relied upon the Dutch judgment as a defence to a further action brought against it in England. Professor Briggs appears to consider that, although the court was not jurisdictionally competent in the eyes of English law over the defendant, the defendant was permitted to rely on that ruling, and to reap the benefits of it, against the plaintiff.

66. In support of his view that the Dutch court was not jurisdictionally competent in the eyes of English law over the defendant, Professor Briggs refers (at para 29 of his Declaration) to section 33 of the Civil Jurisdiction and Judgments Act 1982. This provides, *inter alia,* that an appearance solely for the purposes of challenging jurisdiction overseas does not amount to submission for the purposes of determining whether the foreign judgment should be recognised in England. In this respect, Professor Briggs's analysis is puzzling. The proceedings in *The Sennar (No 2)* were commenced on 21 May 1980. The challenge to the jurisdiction was brought on 13 February 1981. In other words, the events occurred *before* the Civil Jurisdiction and Judgments Act 1982 entered into force; and, unsurprisingly, the House of Lords made no reference to the legislation. Insofar as Professor Briggs relies on the Act to support his interpretation of *The Sennar (No 2)*, I consider that such reliance is misplaced.

67. In my opinion, a simpler and better explanation for the passage from Lord Brandon's judgment which Professor Briggs quotes is that the defendant had *asked* the Dutch court to interpret the jurisdiction clause and to determine the nature of the cause of action which existed against it and to rule that the jurisdiction was valid and that the proposed proceedings fell within its ambit. To that limited extent, the defendant had *accepted* the competence of the Dutch court

23

to determine that question as to the scope and effects of the jurisdiction clause and the nature of the cause of action. This gave rise to an issue estoppel upon which the defendant could rely. As *Cheshire, North and Fawcett, Private International Law* (14th ed, 2008) state (p 549), "Since the substance of the claim had not been decided by the Dutch court this was not a case of cause of action estoppel but one of issue estoppel".

68. Lord Brandon held that an estoppel on this limited point could arise, since it was a conclusive ruling on the merits as to the effects of the clause.

> "Looking at the matter positively a decision on the merits is a decision which established certain facts as proved or not in dispute; states what are the relevant principles of law applicable to such facts; and expresses a conclusion with regard to the effect of applying those principles to the factual situation concerned" (at p 499 of *The Sennar (No 2)*).

69. *Cheshire, North and Fawcett,* observe (pp 549-550) that:

> "Lord Diplock agreed that the Dutch decision was as to the merits. He held that the Dutch court did not simply decide that it did not have jurisdiction; it decided, first, that the only claim against the shipowners was for breach of contract; and, second, that as a result of the Sudanese exclusive jurisdiction clause that claim was enforceable only in the courts of Sudan… There was no need for the exercise of caution in the use of issue estoppel in the instant case since all the issues decided in the Netherlands had been fully litigated."

70. Furthermore, they go on to note (at p 550) that the issue estoppel doctrine should be applied more readily where it "…was being used to prevent claimants from relitigating the same claim on another basis in a different jurisdiction". Their point is that one should be *more* willing to hold that a judgment is of preclusive effect in such a context than when it is the defendant who is unjustly denied the

24

Hunton App. 0974

opportunity to raise a defence in England. In any event, *Cheshire, North and Fawcett* certainly do not suggest (as Professor Briggs does) that the effect of *The Sennar (No 2)* was that the foreign court's decision was binding solely on the *plaintiff* and not on the defendant (but could nonetheless still be invoked against it by the defendant).

71. Professor Briggs also places considerable weight (at para 33 of his Declaration) on an *obiter* remark by Staughton LJ in *A/S D/S Svendborgv Wansa* [1997] 2 Lloyd's Rep 183 to support his assertion that English law on the enforceability of class action judgments is absolutely settled. In fact, he omits an important sentence. The key passage reads:

> "First it was said that the question whether the jurisdiction clauses in the bills of lading should be enforced was submitted to the Sierra Leone court, and the shipowners were bound by the decision. It is true that Ademosu J was asked to decide that question and did decide it on 25 April 1994 in the Melborne case. There was no appeal from his decision. But that episode was part of the Maersk Line's protest against the jurisdiction. I do not see that such a protest can be treated as a submission to the jurisdiction of the foreign court to decide the issue of jurisdiction. <u>(At one time English law took the contrary view on that point, but see now *Dicey & Morris on the Conflict of Laws* (12th edn), p. 480.)</u>The decision may well have been binding on Mr Wansa, but not on Maersk Line." (Emphasis added)

The underlined statement suggests that, far from being self-evident, English law *did* at one time take the view that an appearance to ask a foreign court not to exercise jurisdiction could amount to submission (see further *Henry v Geoprosco International Ltd* [1976] QB 726 where a defendant was held to have submitted to the jurisdiction of the Supreme Court of Alberta when the defendant applied to set aside service out of the jurisdiction on *forum non conveniens* grounds. The effects of this decision were reversed by section 33, Civil Jurisdiction and

Hunton App. 0975

Judgments Act 1982).

72. Again, to suggest that the passage in *A/S D/S Svendborgv Wansa* provides a clear authority on the enforceability of a US class action judgment in England is, in my opinion, unjustifiable. Staughton LJ did no more than suggest *obiter* that a plaintiff who voluntarily started proceedings abroad may be bound by the judgment; whereas if the defendant did not have the requisite territorial connection with the foreign court and had not submitted to it, the defendant would not be bound. But this *obiter* remark addresses only the case where the plaintiff voluntarily instigated proceedings in a foreign court. It is also considerably more cautiously expressed on even that narrow point than Professor Briggs's conclusions. As with the nineteenth century cases to which Professor Briggs refers, it says *nothing* about foreign class actions and absent class members. It certainly does not address the question of whether a judgment against an absent class member could be recognised in England.

73. Indeed, it would appear that Professor Briggs's opinion draws upon a series of oblique remarks from cases on quite different matters, to form the conclusion that they amount to a clear line of authority applicable to US class action judgments against absent class members. None of these sources, however, comes close to dealing with the situation in the instant case; and, in my opinion, they cannot reasonably lead to the conclusion that the law is completely clear. Other experts who have addressed the recognition of a US class action judgment on behalf of the defendants in cases in which I have been involved have not attached much, or any, importance to the decisions in *The Sennar (No 2)* or *A/S D/S Svendborgv Wansa*. In any event, in my view, they clearly do not bear the weight which Professor Briggs attaches to them to reach his view that English law is entirely clear as to whether a US class action judgment would be entitled to recognition in England.

74. The logic of Professor Briggs's interpretation of the obligation theory

26

underpinning the recognition of judgments at common law (see para 39 above) is that a judgment may be binding on one *party* (in particular, upon a defendant who is present in Texas or submits to the Texan courts) when asserted against him or her but will not be binding on the *counterparty* (in particular, upon an absent class member) when asserted against him or her. (See, in particular, para 19 of his Declaration).

75.   Professor Briggs suggests (para 34 of his Declaration) that "whether a decision is binding on a party is determined by asking whether *that party,* rather than his opponent, submitted to the jurisdiction of the foreign court". On this basis, one cannot arguably speak of the *judgment* itself being entitled to recognition at common law. Professor Briggs's theory apparently has the consequence that if the plaintiff should bring further proceedings in England on the same cause of action or issues which the Texan court determines, then (i) on the one hand, the absent class member is free to argue any issue afresh, even where it has been decided against him or her in Texas; but (ii) on the other hand, on each and every issue decided against the defendants (over whom the court was jurisdictionally competent), they would be precluded in the same proceedings from making any argument on issues determined by the Texan court. Or, to put it differently, the plaintiff would receive the entirety of the benefit of the favourable parts of the Texan judgment for him or her, discarding the unfavourable parts; whilst the exact opposite would be true for the defendants. Indeed, if the *same* finding of the Texan court is relied upon by both parties in support of their respective arguments in the English courts, it would suggest that only one party (the plaintiff) could rely on the Texan court's determination issue against the other (the defendant).

76.   Conversely, this view would appear to mean that in litigation where the plaintiff voluntarily commences proceedings overseas against a defendant who is not present in the foreign jurisdiction and does not submit, and succeeds in obtaining a reasoned judgment against the defendant, the consequences may be catastrophic for the successful plaintiff in England. On the one hand, the defendant would not

27

be bound by the foreign judgment; but on the other, if "whether a decision is binding on a party is determined by asking whether *that party,* rather than his opponent, submitted to the jurisdiction of the foreign court" (to use Professor Briggs's words), then this might suggest that since the plaintiff has submitted to the foreign court, it is precluded from relitigating any of the issues determined in its favour, even though it cannot have the judgment recognised or enforced against the defendant in England. The plaintiff is a victim of its own success, with all the disadvantages and none of the advantages of having obtained a judgment in its favour overseas. If that really were the position in England, it would be very surprising.

77. Professor Briggs' view that a US class action judgment would not be entitled to recognition in England in respect of plaintiffs who did not opt out of the class is set out at greater length in Briggs, *Civil Jurisdiction and Judgments* (6th ed, 2015). He suggests (at para 7.81) that the rules of jurisdictional competence developed in respect of defendants overseas should be applied to class action plaintiffs. He approaches the matter by considering what would happen if the parties to foreign proceedings were reversed, so that the person who would ordinarily expect to be the defendant to proceedings (the "natural" defendant) were instead to bring proceedings for a declaration of non-liability against the "natural" plaintiff. He argues that if a "natural" defendant to a US class action, D, were instead to seek a declaration of non-liability against an absent class member, P, the judgment would not be recognised unless the court was jurisdictionally competent over P, the defendant to that action; and that it follows that if the absent class member were instead in the position of a plaintiff in an action against D (as is the case in the present action), it should similarly be the case that jurisdictional competence must be established over D. He makes a somewhat similar point at para 30 of his Declaration.

78. I do not find this reasoning entirely compelling. English conflict of laws does attach a great deal of weight to the question of which party is the *defendant* in the

**Hunton App. 0978**

proceedings in question. So, if P sues D in an English court, the question of whether the court has jurisdiction is determined by the personal connections of the defendant, D, in the instant proceedings before the English court. If D instead commences proceedings in England against P for a declaration that he is not liable to P, then the court must have *in personam* jurisdiction *over P*, who is the defendant to this particular action. In other words, it is the defendant in the English action over whom the English court must have jurisdiction (in the first example, D; in the second example, P), and it is his situation (the defendant's situation) which is key to whether the court has jurisdiction. In my opinion, one cannot, accordingly, argue that just because a state of affairs exists if P sues D, the result should necessarily be the same if D sues P (or if D seeks to invoke a *res judicata* defence in some future proceedings).

79.  Professor Briggs suggests that there is something extraordinary about the rules on the recognition of foreign judgments being focused on the position of the defendant. I do not share his view. Moreover, the English rules of jurisdiction are very familiar with the idea that the defendant's situation is paramount. For example, it should be noted that the private international law rules on the jurisdiction of English courts at common law are also concerned *over the defendant*. (*Maharanee of Baroda v Wildenstein* [1972] 2 QB 288; Companies Act 2006; Civil Procedure Rules ("CPR"), Part 6 and Practice Direction B to CPR Part 6).

80. The decisive significance of the position of the defendant to the rules of jurisdiction of an English court can also be seen by using an example. Take the case of a New York plaintiff instigating proceedings in England against an English defendant in respect of a tort that occurred in New York. Since the *defendant* is domiciled in an EU Member State, Regulation (EU) 1215/2012 ("the recast Judgments Regulation") applies, and the English court has jurisdiction under Article 4 (which states that, subject to certain exceptions and alternatives, "persons domiciled in a Member State shall, whatever their nationality, be sued in

29

the courts of that Member State.") Furthermore, assuming that the English court is first seised, it may not stay its proceedings in favour of the New York court (Case C-281/02 *Owusu v Jackson* [2005] ECR I-1383). Now take the case of an English plaintiff seeking to sue a New York defendant in England in respect of a tort that again occurred in New York. Since the *defendant* is not domiciled in an EU Member State, this time, the common law regime of jurisdiction will apply; and it is likely that the English court would either refuse permission for service of the claim form out of the jurisdiction, or grant a stay of its proceedings at the instigation of the defendant (*The Albaforth* [1984] 2 Lloyd's Rep 91; *Berezovsky v Forbes* [2000] 1 WLR 1004; *VTB Capital plc v Nutritek International Corpn* [2013] UKSC 5, [2013] 2 A.C. 337). In each case, the domicile of the plaintiff is *irrelevant* to the analysis.

81. Professor Briggs also refers (at para 63 of his Declaration) to the *amicus curiae* brief that the U.K. government submitted to the U.S. Supreme Court in *Morrison v National Australia Bank Ltd.,* 130 S.Ct 2869 (2010). This, however, appears to me not to advance matters. The present matter is not concerned (as that case was) with the exercise of extra-territorial jurisdiction and comments on this expressed on behalf of the UK government. It is also, of course, the case that an *amicus* brief merely reflects the beliefs of the government then in power and those who drafted the brief on their behalf. Unless Parliament enacts legislation, the courts rather than the government decide whether a foreign judgment has preclusive effect, and I do not regard the views expressed in that brief as having particular weight.

82. Professor Briggs focuses on the brief statement in the *amicus* brief (at 28) that: "Serious doubts exist as to whether a judgment or court-approved settlement in a U.S. securities class action would bind a non-U.S. plaintiff who did not opt out of the class. This issue has been addressed directly in only one English case, where the judge, *obiter*, expressed doubt as to whether a foreign "opt-out" class action would give rise to *res judicata*." (*Amicus* brief at 10). The use of the phrase "serious doubts exists" is very far from the unequivocal expression of the view

30

that the English courts would not recognise the preclusive effect of a judgment in favour of the defendants in an opt-out class action that Professor Briggs adopts. Indeed, it does not even assert the view that it is more likely than not that such a judgment would be denied recognition.

83. Furthermore, the reasoning in the *amicus* brief is very thin and refers to the decision in *Campos v. Kentucky & Indiana Terminal Railroad Company* [1962] 2 Lloyd's Rep 459, 473. I dealt with the *Campos* case above. This was a trial court decision, more than fifty years ago, in which the matter was considered *obiter.* The *amicus* brief refers to no supporting literature whatsoever. It is the slenderest of bases on which to assert that a US class action judgment would not be entitled to recognition, and contrary to Professor Briggs's own view, it is equivocal and only goes to show the paucity of authority in this area. Otherwise, no real justification for the UK government's position is offered and, indeed, there is no real consideration of the issue.

84. Another argument made by Professor Briggs is that, in English domestic contract law, a party is not bound by a failure to respond to an offer: see *Felthouse v Bindley* (1862) 142 ER 1037 (see paras 46-48 of his Declaration). He makes a similar argument in *Civil Jurisdiction and Judgments* (6th ed, 2015) at para 7.81, where he assets that "it is hard to see" why the common law principle that one cannot impose an obligation by silence on a party "will not settle the argument" that a US class action judgment should not bind absent class members. But again, I do not find this entirely compelling. First, rules developed in the English domestic law of contract need not simply be transplanted to the private international law context to determine whether to recognise a US class action judgment. The question, which is common ground between Professor Briggs and me, is as to whether the Texan court is jurisdictionally competence in the eyes of English *private international law.*

85. Second, as explained in section G below, English law itself has the concept of a representative action and CPR 19.6 provides that parties who omit to opt out *can,*

31

in certain circumstances, be bound by their silence. There are also provisions allowing for opt-out collective proceedings and settlements in private competition law actions contained in Consumer Rights Act 2015, section 81 and Schedule 8.

86. Indeed, Professor Briggs appears to be somewhat inconsistent in his views as to the relevance of English domestic law to the recognition of foreign judgments. On the other hand, he appears to consider the existence of English multi-party procedures as entirely irrelevant to the private international law rules on the recognition of foreign judgments (see paras 62 and 73 of his Declaration); but on the other, he seeks to invoke principles of domestic English contract (and agency) law at length (paras 42-55) in support of his views as to the English private international law on the recognition of foreign judgments.

87. Another author, Professor Mulheron, criticises Professor Briggs's reliance on domestic contract law doctrines and states (in "The Recognition and *Res Judicata* Effect of a United States Class Actions Judgment in England: A Rebuttal of *Vivendi,* (2012) 75 *Modern Law Review* 180):

> "However, a difficulty with that argument is that the *Felthouse v Bindley* rule simply has no application to the (non) actions of absent class members in class actions jurisprudence. Silence *does* mean consent to be bound by the outcome of the action, if that action is conducted on opt-out principles; and consistently with this, the collective action proposed for the Financial Services Bill 2010 [referred to in section G of this Opinion, below] clearly envisaged that silence would amount to class membership, if that action was judicially-ordered to follow an opt-out approach. Moreover, as mentioned previously, silent class members *can* be bound by an English representative action under CPR 19.6 [on which, see section G of this Opinion, below] by doing absolutely nothing- their express mandate of the representative action is not required. By corollary, it is the writer's view that the *Felthouse v Bindley* rule should not govern the question of what amounts to 'voluntary appearance' by an ECM in a US class action". (Emphasis in original).

Hunton App. 0982

88. Accordingly, Professor Briggs's views as to the application of the rules of *res judicata* to US class action judgment cannot, in my opinion, reasonably be presented as a categorical statement of the law. There is no binding authority as to the enforceability of class action judgments in England against absent class members (as Professor Briggs accepts). The English courts have barely had to consider the circumstances in which an absent class member can be bound by a foreign judgment. This, of course, is because the authorities have very largely been concerned with the paradigm case where jurisdictional competence over the defendant in the eyes of English law must be established. Barnett, the author of the leading book devoted to the preclusive effect of foreign judgments in England, *Res Judicata, Estoppel, and Foreign Judgments* (2001), comments at p 73, n. 81 in relation to class actions that:

> "'…jurisdiction in the international sense' emphasizes jurisdiction over the *defendant* and does not refer to the situation where the foreign *claimant* may deny submission to the jurisdiction…"

89. How then, in the *absence* of any directly binding authority on the issue, should an English court determine whether to recognise a US class action judgment in respect of member of the class who omitted to opt out? One possibility is that it might conclude that jurisdictional competence must be established over the person to be bound by the judgment; and that the existing rules developed to determine jurisdictional competence over the defendant should also be applied to a class action plaintiff who does not opt out of the class. On that basis, if the plaintiff does not have the requisite territorial connection to the foreign jurisdiction and has not submitted to the courts thereof, this might suggest that the judgment should not be recognised.

90. Whilst this is a possibility, as I have explained, the English rules were simply not developed in the nineteenth century to deal with foreign class action judgments

33

and, in my view, the conclusion that US class action judgments should routinely have no effect in England is neither attractive nor required by existing authority. In any event, in my opinion, it cannot be stated with certainty and I disagree, in particular, with the suggestion of Professor Briggs that it can be so expressed.

91. Other authors do not share Professor Briggs's views. One such author, Mr Dixon, has expressed the view in a leading academic journal that US class action judgments *should* be recognised in England: see "The *Res Judicata* Effect in England of a US Class Action Settlement" (1997) 46 *International and Comparative Law Quarterly* 134). He summarises his views as follows (at p. 136):

> "I reach the conclusion that the Order [i.e. a court approved class action settlement] has a good chance of supporting a plea of *res judicata* in England. It is a final judgment of a court of competent jurisdiction which disposes of the rights of the parties… The judge, acting under an obligation to protect the absent class members, held a hearing, considered the evidence and made a ruling. That ruling is entitled to be upheld by the English court, and is unlikely to be rejected on the grounds of breach of natural justice."

92. So too, Pinna, "Recognition and *Res Judicata* of US Class Action Judgments in European Legal Systems" (2008) 1 Erasmus LR 31, 44, considers that "it is likely that the *Res Judicata* effect will indeed be granted [to a US class action judgment]."

93. The relevant chapter of *Dicey, Morris and Collins, The Conflict of Laws* (15th ed, 2012), chapter 14, suggest (para 14-034) that a class action judgment would not be recognised in England:

> "In the absence of what English law will accept as having been a submission to the adjudicatory jurisdiction of the foreign court, a person who is

34

involuntarily made a party to foreign proceedings, or who is placed by the foreign court in an analogous position, will not be estopped by the decision of the foreign court."

94. As I stated above, this is an issue on which different authors can reasonably differ. It may, however, be noted that chapter 14 of the present edition of *Dicey, Morris and Collins, The Conflict of Laws* was edited by Professor Briggs (who has since left the team of editors). It is, therefore, somewhat unsurprising that it reflects Professor Briggs's view.

95. It would also appear that Professor Briggs has changed his views somewhat over time. In the main volume of the previous 14th edition of *Dicey, Morris and Collins* (2006), Professor Briggs referred to the issue of recognition of US class action judgments only in a footnote (see para 14-029, note 19). He said this:

"For discussion of whether judgments or settlements in US class actions may be regarded as *res judicata* against class members resident outside the United States, see Dixon (1997) 46 I.C.L.Q. 134. In *Currie v McDonald's Restaurants of Canada Ltd* (2005) 250 D.L.R. (4th) 224 (Ont CA), it was held that issue estoppel could in principle bind persons who, having been sufficiently notified of US class action proceedings, had "passively submitted" to the jurisdiction by failing to opt out. It is doubtful whether this reasoning is consistent with the English common law."

96. This statement by Professor Briggs is expressed in far more equivocal terms than his Declaration. It refers to the article by Dixon as a leading authority on this issue. As explained above, Dixon's article endorses the view that a US class action judgment would be entitled to recognition in respect of absent class members. Professor Briggs did not criticise Mr Dixon's views and expressed no view that a class action judgment would be denied recognition in England. There was no development in England which changed the position in the intervening

**Hunton App. 0985**

period, between the 14th and 15th editions of *Dicey, Morris and Collins* (and none is referred to by Professor Briggs). It may be noted that Professor Briggs submitted declarations on the issue of recognition and enforcement on behalf of defendants in earlier US class action proceedings on this issue: including (to my knowledge, in matters in which I gave expert evidence submitted on behalf of the plaintiffs), in *In re Converium Holding AG Securities* Litigation, No. 04-7897 (MBM), 2007 WL 3192034 (S.D.N.Y. Oct. 4, 2007) and in *Re Parmalat Securities Litigation,* No. 04-0030 (LAK), 2006 WL 6047415 (S.D.N.Y. Oct. 10, 2006)*, and a joint declaration in *In re Royal Dutch/Shell Transport Securities Litigation*, No. 04-0374 (S.D.N.Y.)

97. Although Professor Mulheron also expresses the opinion that a US class action judgment would not be entitled to recognition in England in respect of absent class members ((2012) 75 *Modern Law Review* 180), she notes the uncertainty on this issue and that "no English court has been asked to adjudicate upon the issue" (at 183). She refers (footnote 2 at 183) to "other interesting and thought-provoking academic considerations" of the issue by Dixon, Stiggelbout and myself. Mulheron accepts there are arguments both ways and, although I do not agree with her conclusions, I do agree that the issue has not been the subject of any binding decision; and that arguments can reasonably be advanced either way.

98. Professor Mulheron suggests that, in order for a US class action judgment to be recognised, it would be necessary to identify acts by the class action plaintiff which amount to submission in the eyes of English law. This view proceeds on the assumption that the criteria of jurisdictional competence developed in respect of defendants (and parties who commence proceedings) should also be applied to absent class members (a matter which I have considered above). She does, however, accept that, even on this analysis, certain steps arguably *do* amount to submission by the plaintiff, so that the resulting judgment would be recognised in England. She suggests (at p.201) that this would be the case where the absent class action plaintiff:

Hunton App. 0986

- "completes and returns the claim form to the Settlement Administrator;

- completes the claim form online on the designated/ court-authorised websites set up for refunds;

- comments in writing on the Settlement agreement;

- objects in writing to the Settlement agreement in the prescribed manner;

- writes to the Settlement Administrator, or to the class of defendant airlines' lawyers, directly, indicating that the ECM [English class member] intends to submit, or has submitted, a refund claim;

- instructs and/or pays a lawyer to appear on the ECM's behalf (or files a Notice of Intention to Appear) at the fairness hearing for the Settlement Agreement;

- instructs and/or pays a lawyer (whether court-appointed class lawyers or his own) to represent him in seeking a refund under the Settlement Agreement;

- registers his details on the class lawyers' website, preparatory to a claim for refund;

- enters into some funding/costs agreement with a third party funder or ATE insurer (if any individual issues require resolution);

- submits a statement of facts which seek to prove some individual issue (e.g., causation, or quantum).

99. Professor Mulheron suggests (*ibid*) somewhat tentatively that "What (arguably) does not constitute voluntary submission" would include being aware of or seeing the form but taking no steps to respond to it, contacting the Settlement Administrator's website or writing to the Settlement Administrator to find out more about the action but without indicating an intention to claim a refund, or registering contact information on a court-authorised website without taking any further steps. Again, this presupposes that it is necessary to apply the rules on jurisdiction competence developed in respect of defendants to class action plaintiffs.

37

100.     Although Professor Briggs suggests that English law is clear (a matter I have dealt with above), he recognises (*Civil Jurisdiction and Judgments,* 6th ed, 2015, para 7.81) that there may be reasons in policy for recognising class action judgments:

> "As against it, it may be said that the class action has been developed in response to a social problem faced by multiple small claimants confronting a powerful single defendant (and, perhaps, to allow a tortfeasor to draw a line under the litigation to which its business may be exposed, to prevent it dragging on for years), and that the common law rules on the recognition and enforcement of judgments should evolve to accommodate and support, and not to frustrate, such litigation."

101.     Professor Briggs appears to consider such policy arguments irrelevant because he regards the English common law position that such judgments would not be recognised as clear. In my view, however, as I explain above, there is a good argument that the existing state of English law does *not* provide a clear answer to the question whether a US class action judgment should be recognised in England. It may, however, be that English law will develop specific rules to deal with the *res judicata* effect of class action judgments. If it does so, there are policy reasons for recognising such judgments.

102.     Indeed, one author, Stiggelbout, ("The Recognition in England and Wales of United States Judgments in Class Actions" (2011) 52 *Harvard International Law Journal* 433, at pp 500-501) concludes that English law should develop specific criteria for the recognition of US class action judgments (and does not suggest that legislation would be required to do so):

> "The U.S. federal class action judgment is an animal as yet quite unknown to the English conflict of laws… [A]n English court has never had to deal

38

with the peculiar circumstance of a *plaintiff* objecting that a judgment binding upon her abroad ought not to bind her in England…

<u>If and when the essential question of the core case arises before an English court, the court will face the basic dilemma of determining whether to try to apply the existing rules or to develop a new approach for a new problem.</u> If the advocates [for application to absent plaintiffs of the rules currently applied to defendants] are correct, the court must distort the language of the existing rules and apply the existing tests of jurisdictional competence as best it can. Even if this approach is adopted, the tests of "implied consent" and "privity of interest" [on which, see below] could each provide a pathway to the recognition of the U.S. class action judgment.

However… given the peculiar position of the non-participant class action plaintiff, <u>the English court could and should develop a 'representative action' criterion of recognition that is more tailored to the novel issues before it.</u> In particular, it has been stressed that, unlike in the case of *parties* to foreign proceedings, the U.S. federal court lacks the ability to impose meaningful sanctions on nonparticipant plaintiffs, such that the only substantive concern of the English conflict of laws ought to be the potential extinguishment of individuals' legal claims. In reality, the magnitude of such claims is likely to be so small that, when coupled with the benefits of the class action as an institution and the ability to avoid the *res judicata* effect by return of mail, the 'opt out' mechanism ought to be treated as validly conferring international jurisdictional competence on the U.S. federal courts. Fortunately, as those well versed in the Anglo-American legal tradition will appreciate, the common law has never yet lacked the resources for a socially-conditioned expansion of its ever-developing toolbox." (Italics in original; underlining added)

39

It will be noted that Stiggelbout does not share Professor Briggs's view that the law is clear and that, in consequence, English courts could not develop criteria for the recognition of US class action judgments.

103.    Another author, Barnett, writes in his book *Res Judicata, Estoppel, and Foreign Judgments* (2001), comments at p. 73 that:

> "<u>Given that it is not clear how the existing judgment recognition and *res judicata* criteria assist</u> [in determining whether to recognise a US class action judgment against an absent class member], perhaps a specific criterion- a 'multi-parties' rule- is called for in these situations, to test whether an alleged class member should (in the interests of natural justice) by bound by a judgment in a foreign representation or class action"
>
> <u>The trend in the common law world has been that *all* members of the class whom a party purports to represent will be deemed parties and thus bound by an order of the court, provided that the representative party has acted *bona fides* in the interests of the class.</u>" (Underlining added; italics in original.)
>
> (Citing *Wytcherley v Andrews* (1871) LR 2 P&D 327; *Cox v Dublin City Distillery Co (No 3)* [1917] 1 IR 203; *Naken v General Motors of Canada Ltd* (1983) 144 DLR (3d) 385; and *Carnie v Esanda Finance Corp* (1995) 183 CLR 398, 423-4 (High Court of Australia)).

104.    He goes on to suggest that the English courts might additionally require that:

> "(i) the claimant in the subsequent proceedings had notice of the foreign class action and had the chance to withdraw or object; and (ii) the foreign court, acting under an obligation to protect absent class members, held a hearing, considered the evidence and made a ruling as to membership".

Hunton App. 0990

105.    Barnett clearly recognises that existing authorities do not clearly determine whether a US class action judgment should be recognised in England. Nor does he suggest that any reform would inevitably require legislative amendment. Indeed, he s (p 73, n 82) that:

> "if a claimant in subsequent proceedings in England disavows membership of a class action to which the defendant alleges him to have been a member, the English court- in order to follow its own *res judicata* criteria in these cases- will need to establish some basis for holding that the claimant is or is not bound". (Emphasis added)

Again, this (i) does not suggest that the answer is unequivocally established by the application of existing authorities; and (ii) suggests that the *courts* could develop rules to deal with the recognition of US class action judgments and that legislation is not necessarily required."

106.    In summary, respectable views have been expressed either way as to the entitlement of a US class action judgment to recognition in England in respect of plaintiffs who omitted opt out of the class. It is my firm view that the present state of the authorities does not provide a clear answer; and that if the English courts were to formulate specific rules to deal with this issue, a good case for recognition of such judgments would exist. The conclusion that there is no possibility of such a judgment being recognised in England, which Professor Briggs offers, does not strike me as a balanced one and it is one that I do not find convincing.

107.    Finally, I should say that I do not agree with Professor Briggs (paras 64-66 of his Declaration) that legislation would necessarily be required to facilitate the recognition of US class action judgments in England. This argument is premised on his assertions (which, as I explained above, I consider to be substantially overstated) that the position in England is already clear and

41

established by authority and that, in consequence, it is the legislature, not the courts, which should consider reforming the law. The issue is not about *reform;* it is about what the rules of the English common law applicable to foreign class action judgments in respect of absent class members *actually are*: and it seems reasonable to suppose that an English court (especially an appellate court), might seek to formulate such principles. In short:

(i)   There is *no* binding authority applying rules of jurisdictional competence to absent class action plaintiffs (a view not contradicted by any authority produced by Professor Briggs);

(ii)  On that basis, there is presently no authority which compels the conclusion that US class action judgments in respect of absent class action plaintiffs should not be recognised in England;

(iii) The English courts are, therefore, faced with the possibility either of deciding: (a) that no requirement of jurisdictional competence applies to absent class action plaintiffs; or (b) deciding (as Professor Briggs suggests) that the same rules on jurisdictional competence formulated in the nineteenth century for defendants should be applied to absent class members; or (c) developing a requirement of jurisdictional competence in respect of absent class members *in the absence of any authority on the point.*

(iv)  In the absence of any authority on the point, the English courts *could* develop rules of jurisdictional competence to apply to absent class action plaintiffs. There would be no requirement for legislation to do so. Both Barnett and Stiggelbout suggest in the passages quoted above that English courts could develop rules for the recognition of US class action judgments. It might also be noted that (as I explain below), the Canadian courts felt able to develop the English common law rules on the recognition of foreign judgments without legislative intervention.

(v)   Accordingly, I disagree with the view expressed by Professor Briggs in his Declaration that legislation would be required in order for rules of

42

jurisdictional competence to be developed to apply to absent class action members.

*Privity of interest*

108.     Even if the English courts were to decide that the rules of jurisdictional competence developed in relation to defendants should be applied to absent class members, a further possibility is that there is a privity of interest between the absent plaintiffs and other class action plaintiffs over whom the court has jurisdictional competence, such as to render the absent plaintiffs bound by the US class action judgment. It should be observed that the very existence of the privity of interest doctrine is an example of an obligation being imposed on a plaintiff who did not choose to instigate his or her own proceedings.

109.     There is some uncertainty as to the scope of the privity of interest doctrine (which, in itself, is a reason why one cannot form a firm conclusion as to whether the doctrine might be applicable, as Professor Briggs suggests). In *Gleeson v Wippell & Co Ltd* [1977] 1 WLR 510, the court applied the following test (at p 515):

> "having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase 'privity of interest.'"

110.     In *House of Spring Garden v Waite* [1991] 1 QB 241, the English Court of Appeal considered the effects of an Irish judgment against three joint tortfeasors. The first two tortfeasors had applied to set the judgment aside in Ireland on the grounds of fraud and had failed. The Court of Appeal found that as the Irish judgment was a judgment against the defendants jointly and severally, the third

43

Hunton App. 0993

defendant, who was aware of the Irish proceedings and was privy to them, was similarly estopped from contesting the recognition of the judgment.

111.     Furthermore, the Court of Appeal in *House of Spring Garden v Waite* considered that it would be an abuse of process for the third defendant to litigate the fraud issue in England. As Stuart-Smith LJ said (at 254-5):

> "In my opinion the same result can equally well be reached by this route, which is untrammelled by the technicalities of estoppel. The categories of abuse of process are not closed: see *Hunter v. Chief Constable of the West Midlands Police* [1982] A.C. 529, 536)…
>
> The principle has recently been applied in this court to analogous cases, where issues of fact have been litigated exhaustively in sample cases<u>; it is an abuse of process for a litigant, who was not one of the sample cases, to re-litigate all the issues of fact on the same or substantially the same evidence</u>: see *Ashmore v. British Coal Corporation* [1990] 2 Q.B. 338.
>
> The question is whether it would be in the interests of justice and public policy to allow the issue of fraud to be litigated again in this court, it having been tried and determined by Egan J. in Ireland. In my judgment it would not; indeed, I think it would be a travesty of justice. Not only would the plaintiffs be required to re-litigate matters which have twice been extensively investigated and decided in their favour in the natural forum, but it would run the risk of inconsistent verdicts being reached, not only as between the English and Irish courts, but as between the defendants themselves… Public policy requires that there should be an end of litigation and that a litigant should not be vexed more than once in the same cause." (Emphasis added.)

112.     In a decision of the Privy Council in *Nana Ofori Atta II v Nana Abu*

44

*Nonsra II* [1958] AC 95, the court observed (at 101-2) that:

> "English law recognizes that the conduct of a person may be such that he is estopped from litigating the issue all over again. This conduct sometimes consists of active participation in the previous proceedings, as, for instance, when a tenant is sued for trespassing on his neighbour's land and he defends it on the strength of the landlord's title and does so by the direction and authority of the landlord. If the tenant loses the action, the landlord would not be allowed to litigate the title all over again by bringing an action in his own name. On other occasions the conduct consists of taking an actual benefit from the judgment in the previous proceedings, such as happened in *In re Lart, Wilkinson v. Blades* [1896] 2 Ch. 788. Those instances do not however cover this case, which is not one of active participation in the previous proceedings or actual benefit from them, but of standing by and watching them fought out or at most giving evidence in support of one side or the other. In order to determine this question the West African Court of Appeal quoted from a principle stated by Lord Penzance in *Wytcherley v. Andrews* [(1871) L.R. 2 P. & D. 327, 328].The full passage is in these words: "There is a practice in this court, by which any person having an interest may make himself a party to the suit by intervening; and it was because of the existence of that practice that the judges of the Prerogative Court held, that if a person, knowing what was passing, was content to stand by and see his battle fought by somebody else in the same interest, he should be bound by the result, and not be allowed to re-open the case. <u>That principle is founded on justice and common sense, and is acted upon in courts of equity, where, if the persons interested are too numerous to be all made parties to the suit, one or two of the class are allowed to represent them; and if it appears to the court that everything has been done bona fide in the interests of the parties seeking to disturb the arrangement, it will not allow the matter to be re-opened.</u>" (Emphasis added.)

45

113.        In *OJSC Oil Co Yugraneft v Abramovich* [2008] EWHC 2613 (Comm), the court observed that whether privity of interest exists turns on the facts of each case. It noted that: "Deciding what it is just to hold requires consideration of a number of relevant factors and a determination of where, looking at the matter overall, justice lies" (at para 414). On the facts, it found that such privity existed between a company and shareholder. The test applied suggests a significant element of flexibility to determine what the ends of justice require.

114.        Although it is a matter for English law to determine whether its requirements for establishing privity of interest are met, it will, of course, need to determine whether the parties to the Texan class action share the same interest so as to satisfy that test.

115.        On the facts of the present case, my understanding is that the Texan court would not certify the class action unless the interests of the various plaintiffs were sufficiently similar. I am informed that the U.S. Supreme Court stated in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011) that:

> "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' *Califano v. Yamasaki,* 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). In order to justify a departure from that rule, 'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.' *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)). Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements— numerosity, commonality, typicality, and adequate representation— 'effectively 'limit

46

the class claims to those fairly encompassed by the named plaintiff's claims.' *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (quoting *General Telephone Co. of Northwest v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980))."

116.   Furthermore, I am informed that under the Texas Securities Act (and in accordance with the principles set out in *Sterling Trust Co. v. Adderley,* 168 S.W.3d 835, 839 (Tex. 2005); Tex. Rev. Civ. Stat. Ann. § art. 581-33(F)(2)), the defendants are each "jointly and severally liable with the primary violator"- in the present case, Mr Stanford and the Stanford entities—"to the same extent as if [they] were the primary violator." I am further informed that the Texas Securities Act provides for "contribution as in cases of contract among the several persons so liable" (Tex. Rev. Civ. Stat. Ann. § art. 581-33(F)(3)). I am informed that these provisions remain applicable even where, as in the present case, the Plaintiffs have not sought relief against Stanford, the primary violator; and that the court stated in *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 231 (Tex. App. 1996) that: "Article 581–33(F) provides for joint and several liability, and does not require a plaintiff to seek affirmative relief against the controlled entity before such relief may be sought from a control person. We decline to impose such an additional requirement.")

117.   In such circumstances, it would appear that the proposed class action would (leaving aside other issues) only be certified if the class members represent the same interest. If the Texan court is satisfied that the representatives and other class members share a common interest, there is a good argument that an English court might also take the view that there is privity of interest between those parties (within the meaning of the English law test summarised above) such that absent class members should be able to benefit from, and be bound by, the Texan court's judgment. I do not consider Professor Briggs's opinion that there is no prospect of the English court making such a finding to be a balanced one.

47

118.    It should, however, be reiterated that this point would only become relevant if the English courts were first to conclude that the judgment was not otherwise entitled to recognition.

*Recognition and enforcement of class action judgments in Canada and relevance to the position in England :*

119.    The test for recognition of foreign judgments in Canada is now somewhat broader than that in England (since, in addition to the English common law criteria of jurisdictional competence set out above, it now also recognises judgments where the foreign jurisdiction had a real and substantial connection with the claim: *Morguard Investments Ltd v De Savoye* [1990] 3 S.C.R. 1077; *Beals v Saldanha* [2003] 3 S.C.R. 416). Importantly, however, the Supreme Court of Canada considered that it was *not* precluded from extending the English common law rules on recognition of foreign judgments (which had hitherto applied) in Canada.

120.     Indeed, in *Morguard* (in the context of recognition of the judgment of a sister Canadian province)*,* the Supreme Court of Canada commented about the inappropriateness of being constrained by applying 19th century English precedents (and did not consider that it need be so constrained):

    "34      The world has changed since the above rules were developed in 19th-century England. Modern means of travel and communications have made many of these 19th-century concerns appear parochial…."

121.    Hartley, *International Commercial Litigation* (2nd ed, 2015), p 441 notes that the Supreme Court of Canada considered that it *was* possible to extend the common law rules of recognition derived from English law:

    "Although there were hints that there may be a constitutional element to the

48

new rule, the court did not base it on that ground. <u>So it must be derived from a reinterpretation of the common law</u>. The Supreme Court of Canada can do this because, unlike the Supreme Court of the United States, it can give judgments on the common law, even if the matter is within provincial jurisdiction." (Emphasis added)

122.     In extending the ambit of the ruling in *Morguard* to judgments from overseas jurisdiction (in that case, a judgment from Florida), the majority in *Beals* held that it was possible to amend Canadian law on the recognition of foreign judgments, which had hitherto been based on 19th century English common law authorities, without legislative intervention. To the contrary, it noted that the legislature could, if it wished, choose to curtail the rules of private international law which the court was developing:

"28     International comity and the prevalence of international cross-border transactions and movement call for a modernization of private international law. The principles set out in *Morguard*, *supra*, and further discussed in *Hunt v. T&N plc*, [1993] 4 S.C.R. 289, can and should be extended beyond the recognition of interprovincial judgments, even though their application may give rise to different considerations internationally. Subject to the legislatures adopting a different approach by statute, the 'real and substantial connection' test should apply to the law with respect to the enforcement and recognition of foreign judgments."

123.     The Canadian courts felt able to extend what they regarded as *established* but anachronistic nineteenth century principles of English law on the recognition of foreign judgments which would plainly have otherwise prevented recognition on the facts (which principles Professor Briggs considers to be set in stone in the English courts). It is tempting to suggest that if the Canadian courts felt able to extend generally their rules on recognition of foreign judgments beyond English 19th century precedents, English courts could take the significantly less far

49

reaching step of not extending those 19th century precedents to a situation which the judges in those cases plainly did *not* have in mind, namely the recognition of US class action judgments against absent class members- especially as this would have the ostensibly unattractive consequence of leading to the routine refusal to recognise all such judgments (absent presence in the state of origin or submission by the absent class member) even though the US class action procedure is likely to be the most expedient means of resolving all claims in a single forum.

124.    It is, moreover, worthy of note that in *Currie v McDonald's Restaurants of Canada Ltd* (2005) 250 DLR (4th) 224, the Court of Appeal for Ontario indicated that, it would, in principle, be prepared to recognise a court-approved settlement in a class action before the US courts, where the plaintiff had not opted-out of the class. As Share JA explained:

> "1 The plaintiff Greg Currie brings a proposed class action alleging wrongdoing in relation to promotional games offered to customers of McDonald's Restaurants of Canada Ltd. ("McDonald's Canada"). He is met with an Illinois judgment approving the settlement of a class action brought on behalf of an American and international class of McDonald's customers, including the customers of McDonald's Canada (the "Boland judgment"). The Illinois court directed that notice of the class action to Canadian class members be given by means of an advertisement in Maclean's magazine. Currie did not participate in the Illinois proceedings but Preston Parsons, the named plaintiff in another Ontario class proceeding, represented by the same law firm and purporting to rep-resent the same class, appeared in the Illinois court to challenge the settlement.

> 2 The central issue on this appeal is whether the Boland judgment is binding so as to preclude Currie's pro-posed class action in Ontario."

125.    The Court of Appeal went on:

**Hunton App. 1000**

"16 Recognition and enforcement rules should take into account certain unique features of class action proceedings. In this case, we must consider the situation of the unnamed, non-resident class plaintiff. In a traditional non-class action suit, there is no question as to the jurisdiction of the foreign court to bind the plaintiff. As the party initiating proceedings, the plaintiff will have invoked the jurisdiction of the foreign court and thereby will have attorned to the foreign court's jurisdiction. The issue relating to recognition and enforcement that typically arises is whether the foreign judgment can be enforced against the defendant.

17 Here, the tables are turned. It is the defendant who is seeking to enforce the judgment against the unnamed, non-resident plaintiffs."

126.     The Court went on to cite the article by Dixon on recognition of class actions in England with approval:

20 … I am not persuaded that a model entirely based upon the position of the defendant in a traditional two-party lawsuit can adequately capture the legal dynamics and complexity of the situation of an unnamed plaintiff in modern cross-border class action litigation. The position of the class action plaintiff is not the same as that of a typical defendant. Rules for recognition and enforcement of class action judgments should reflect those differences. The class action plaintiff is not hauled before a foreign court and required to defend him or herself upon pain of default judgment. As stated by Rehnquist J. in the leading American decision, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (U.S. Kan. 1985), at 809 "[un]like a defendant in a civil suit, a class-action plaintiff is not required to fend for himself." Class action regimes typically impose upon the court a duty to ensure that the interests of the plaintiff class members are adequately represented and protected. This is a factor favouring recognition and

51

**Hunton App. 1001**

enforcement against unnamed class members: see John C.L. Dixon, "The *Res Judicata* Effect in England of a U.S. Class Action Settlement" (1997) 46 I.C.L.Q. 134 at 136, 150-51. (Emphasis added).

127.    Since it was impossible to apply a traditional analysis of jurisdictional competence to the class action proceedings, the court saw the matter in terms of ensuring that the rights and interests of the unnamed class members were protected by sufficient safeguards. It held that "it is my opinion that the notice issue does bear upon jurisdiction" (at [31]). The court specifically rejected the argument that only foreign proceedings operating on an "opt in" basis could be recognised, noting (at [29]) that this would negate the whole notion of a class action:

> "An order requiring members of the plaintiff class to opt in would, as a practical matter, effectively negate meaningful class action relief."

128.    Of course, the decision in *Currie v McDonald's* cannot be of binding effect in England and draws heavily on the developments in Canadian law in *Morguard* and in *Beals* outlined above. Nonetheless, it is notable that the court referred to Dixon's article on the preclusive effect of class action judgments in England as an important source. The development in *Currie* might be thought to be reflective of a desire to support collective litigation as a means to promote the expediency of the litigation process.

129.    Notably, the court considered that traditional rules on the recognition and enforcement of foreign judgments *simply did not accommodate the situation of class actions members*. It was this that led it to devise a method to determine the enforceability of class actions; and to conclude that the relevant concern was that the procedural rights of the class members were adequately protected. The court did not, however, see any reason why a class action judgment binding an absent class action member should not be recognised in Canada.

Hunton App. 1002

130.     A similar conclusion has been upheld by the Supreme Court of Canada in *Canada Post Corporation v. Lépine* (2009) 304 D.L.R. (4th) 539, in the context of recognition of a judgment of one Canadian province in another. A motion was filed by *Lépine* in the Quebec Superior Court for authorisation to institute a class action against the Canada Post Corporation on behalf of all natural persons residing in Quebec who had purchased an internet package sold by Canada Post Corporation that was subsequently withdrawn. In March 2002, a representative, PM, commenced a class proceeding against the Corporation in the Ontario Superior Court of Justice on behalf of everyone who had purchased the Corporation's service, except Quebec residents. Then, in May 2002, representative JC commenced a class proceeding in the British Columbia Supreme Court on behalf of residents of that province. A settlement was reached in Alberta in December 2002, and the Corporation agreed to refund the purchase price of a CD-ROM to Canadian consumers who returned the CD-ROM to it. The applicants for certification of the class proceedings in British Columbia and Ontario accepted the Corporation's offers; but the applicant in the Quebec action, ML, rejected them. The Corporation obtained a judgment from the Ontario Superior Court of Justice declaring that the claims against it had been settled, including the claims of Quebec residents.

131.     It was held that the Ontario Superior Court of Justice had jurisdiction since the corporation had its head office in Ontario. Provided that the notice of the class action was worded sufficiently clearly, it was capable of binding Quebec purchasers. On the facts, it was found that the notices were not sufficiently clear, since separate Quebec proceedings had already been instigated and parties receiving notice might reasonably have concluded that proceedings elsewhere in Canada did not affect them. Again, the decision draws heavily on the developments in Canadian law in *Morguard* and in *Beals*. But outside the rather particular facts of that case, the principle that a class action judgment could be recognised so as to bind absent class members was reaffirmed.

53

*If a natural justice or European Convention of Human Rights argument*
*were asserted by the plaintiff, would it be sustained on the facts of the*
*case?*

132.    This defence has, understandably, developed in the authorities so as to
protect the position of defendants. If a natural justice argument could be asserted
by an absent member of a US class action in subsequent proceedings in England
in response to a *res judicata* defence asserted by the defendants, it is my opinion
that it would not be successfully made out. Private international law
commentators in England recognise that that the natural justice defence is
narrowly construed and that examples of its successful establishment are very few
and far between

133.    Dixon, "The *Res Judicata* Effect in England of a US Class Action
Settlement" (1997) 46 *International and Comparative Law Quarterly* 134,
concludes (at p. 150):

> "Accordingly, a defendant should be able to maintain in any English
> litigation that as the manner in which the judgment was obtained does not
> offend English concepts of substantial justice or, more positively, that as
> the US Order comports with natural justice, it ought to be upheld…This is
> particularly true because, in the US class action context, irrespective of the
> ability of a class member with notice of the action to take steps to protect
> his or her own interests… the judge is under an obligation to protect the
> interests of the absent class members".

134.    There is no suggestion of a lack of procedural proprietary in the Texan
courts in this case. I understand that notice will be provided to the absent class
members in the class action and that they will be informed of their right to opt out,
in clear language, using a number of different media. I further understand that

54

ample opportunity will also be given to absent class members to participate in the action and, at a later stage, to object to any proposed settlement. There is no reason to suppose that the action on behalf of the class will not be fairly and rigorously heard by the Texan court, or any reason to believe that it will reach a decision that is substantively unfair to any plaintiffs who do not opt out. I also understand that the damages awarded will be allocated on the basis of the plaintiffs' recognisable damages pursuant to a plan that will require approval by the Texan court.

135.     In all the circumstances, it is my opinion that absent class members would not be able to sustain an argument in the English courts that recognition of the class action judgment in the present case would be contrary to natural justice.

136.     *A fortiori*, in the circumstances, it seems very unlikely that a plaintiff would be able to assert that the US proceedings amounted to a "flagrant" denial of his or her right to a fair trial in accordance with Article 6 of the European Convention of Human Rights.

137.     That being the case, there is no reason to think that the natural justice defence would successfully be made out by any absent class members in the present case. Indeed, Professor Briggs does not even consider the applicability of this defence, still less suggest that it would be successfully invoked on the facts. The courts in *Re Vivendi Universal SA Securities*, *Re Alstom SA Securities Litigation* and *Anwar v Fairfield Greenwich Limited* took a similar view. In my opinion, there is no basis on which to criticise or impugn these decisions on this point.

### *Public policy*

138.     It has been shown that successful invocation of the public policy defence in English courts is extremely rare. As Professor Briggs puts it in *Civil*

**Hunton App. 1005**

*Jurisdiction and Judgments* (6th ed, 2015), para. 7.72:

> "The usual colourful examples are an order to pay damages for breach of a contract to kidnap or to sell narcotics, or those based on openly racist laws".

It is clear that, on the facts of the present case, we are very far from the typical, extreme cases where the public policy has successfully been used.

139.     Moreover, this defence normally relates either to the award itself, or, occasionally, to the substance of the law applied in the foreign court. In the instant case, there is no reason to object to the law applied in the foreign court, and certainly no reason at this stage to believe that any ensuing court judgment will be repugnant to an English court on its substance. The only arguments are procedural; and we have already seen that English courts are loath to make comparisons between the procedures of different states. It is suggested that the public policy defence adds nothing in the present context to the defence of natural justice. If the foreign judgment is unobjectionable on natural justice grounds, there is no reason to think that it will be objectionable on public policy grounds.

140.     Furthermore, as I explain in section G below, English law has its own procedures for multi-party litigation which, although somewhat different in nature, suggest that it would not regard another sophisticated foreign legal system which adopted its own procedures for dealing with such disputes as contrary to public policy.

141.     It may be noted that Professor Mulheron, who, as explained above, expresses scepticism about the entitlement of US class action judgments to recognition in England (on the basis that she considers that the rules of jurisdictional competence developed in respect of defendants should be applied to absent class members), nonetheless concludes that no defence is likely to be applicable if the judgment is otherwise entitled to recognition: see Mulheron,

56

(2012) 75 *Modern Law Review* 180, 194-5.

142.     If all other requirements for recognition of the US class action judgment are met, I do not consider that recognition would be withheld on the ground of public policy. I note that Professor Briggs advances no argument to suggest that recognition of the judgment would be contrary to public policy.

143.     Indeed, it seems to me that if the Texan judgment is otherwise entitled to recognition in England, it is unlikely that any defence to the recognition of the judgment could be successfully invoked by the absent class members.

### (1) *The effect in England of a US class action judgment in the absent class member's favour for a sum with which he/ she is not satisfied*

144.     Of course, it is possible that the judgment might be delivered in a plaintiff's favour, but for a lesser sum than he or she had hoped to recover.

145.     A first point is that I understand that a class member in the United States who accepts the benefit of a settlement is typically required to sign a release of his or her claims. Suppose, however, that the absent class member seeks to disregard the United States court's judgment and instead to sue afresh in England.

146.     Normally, a successful plaintiff overseas is estopped from doing so by section 34 of the Civil Jurisdiction and Judgments Act of 1982, which provides that:

> "no proceedings may be brought by a person in England and Wales or Northern Ireland on a cause of action in respect of which a judgment has been given in his favour in proceedings between the same parties, or their privies, in a court in another part of the United Kingdom or in a court in an overseas country, unless that judgment is not enforceable or entitled to

Hunton App. 1007

recognition in England and Wales or, as the case may be, Northern Ireland."

147.     However, if an absent class member was awarded a sum of money with which he or she is not content, the foreign judgment might be seen effectively as a burden on the plaintiff. Accordingly, in such circumstances, it is my opinion that the same principles should apply as where the judgment is given in the defendants' favour. For the reasons given above, there is a good argument that such a judgment would be entitled to recognition and enforcement in England.

### *(2) The effect in England of a US class action judgment in the absent class member's favour for a sum with which he/ she is satisfied*

148.     Of course, if the judgment were to be delivered in the plaintiff's favour for a sum with which he or she is satisfied, it might not be necessary for the plaintiffs to seek enforcement in England, insofar as the defendants have substantial assets in the US which can be foreclosed upon. I note that the Plaintiffs' Second Amended Class Action Complaint states (at pp 37-38) the extensive connections between the defendants and Texas and describes Texas as the "epicentre" of the Stanford Entities with whom Defendants regularly conducted business.

149.     If efforts were made to enforce the judgment in England, I consider that a strong case for enforcement would exist. If an absent class member chooses to accept a sum awarded in a US class action, he has effectively waived any objections to that judgment and it is difficult to see why he should not be bound by that decision. In such circumstances, the absent class member would be precluded from relitigating the matter in England.

### G.     PRACTICAL CONSIDERATIONS: MULTI-PARTY LITIGATION IN ENGLAND; ABSENCE OF A US STYLE CLASS ACTION PROPERLY SO-CALLED; FURTHER IMPLICATIONS FOR THE RECOGNITION

Hunton App. 1008

AND ENFORCEMENT OF FOREIGN JUDGMENTS; COSTS IN ENGLAND

### (1)  *Introduction*

150.     As I will briefly explain below, English courts have various procedures for the conduct of multi-party litigation. These procedures share certain features with US class actions. This renders it intrinsically less likely that they would consider the class action in US law to be repugnant and so contrary to its standards of natural justice or public policy.

151.     Nonetheless, English law lacks a class action properly so called, still less a US class action procedure. It may well be, accordingly, that a class action in the US would, in a practical sense, be in the best interests of the proposed English class members and tend to provide them with a more effective means of redress than is available in the English courts.

### (2)  *Representative actions*

152.     The Civil Procedure Rules ("CPR"), Part 19.6 allows for representative actions. It states that:

"19.6 (1) Where more than one person has the same interest in a claim –

(a) the claim may be begun; or

(b) the court may order that the claim be continued,

by or against one or more of the persons who have the same interest as representatives of any other persons who have that interest.

(2) The court may direct that a person may not act as a representative.

59

**Hunton App. 1009**

(3) Any party may apply to the court for an order under paragraph (2).

(4) Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule –

(a) is binding on all persons represented in the claim; but

(b) may only be enforced by or against a person who is not a party to the claim with the permission of the court...”

153.     A representative action will normally bind those on whose behalf the claim is brought and hence have a *res judicata* effect on the represented class. (Compare *Moon v Atherton* [1972] 2 QB 435, 441).

154.     The representative must have the same interest as the members whom he represents. Such actions would not be available where damages would have to be proved individually (*Markt & Co v Knight Steamship Co* [1910] 2 KB 1021).

155.     It should be noted that the possibility of an obligation being imposed on a party through his or her silence does exist in CPR 19.6(4), which states that:

 “Unless the court otherwise directs, any judgment or order given in a claim in which a party is acting as a representative under this rule… (b<u>) may only be enforced by or against a person who is not a party to the claim with the permission of the court.</u>” (Emphasis added)

This shows that the concept of an opt-out procedure (and the imposition of obligations on a party by their inaction) *is* known in English law.

156.     Indeed, one author, Stiggelbout, has commented that:

“This mechanism undoubtedly provides for a form of representative

Hunton App. 1010

litigation capable of binding non-participants via *res judicata*. Furthermore, it is somewhat broader than the Rule 23(b)(3) class action in the sense that non-participants are not even granted the ability to opt out of the class; there is no requirement of notice."

(Stiggelbout "The Recognition in England and Wales of United States Judgments in Class Actions" (2011) 52 *Harvard International Law Journal* 433, at 445).

157.    Dixon, (1997) 46 *International and Comparative Law Quarterly* 134 comments on the enforceability of a US class action settlement (at p. 146) that:

"Accordingly, because English law allows absent represented parties to be bound, it is likely that an English court would hold that a US court was a court of competent jurisdiction over the parties. This element of the plea of *res judicata* is thus satisfied."

158.    Given the limitations of the representative procedure, however, I do not consider that a representative action would be available on the present facts. But the very existence of a representative action in English law, and CPR 19.6(4) in particular, supports the view that there is nothing intrinsically objectionable about an opt-out procedure which might be adopted in a foreign legal system. The approach taken in the United States may be viewed as a legitimate, albeit different, method of dealing with actions involving multiple plaintiffs.

### *(3)    Group Litigation Orders*

159.    English law also has the concept of the Group Litigation Order ("GLO"), where actions raise common issues of fact or law, but where the interests of the parties concerned are not identical. This is the principal form of proceeding in multi-party disputes.

**Hunton App. 1011**

160.  CPR Part 19.12 states that:

> "19.12(1)
>
> Where a judgment or order is given or made in a claim on the group register in relation to one or more GLO issues –
>
> (a) that judgment or order is binding on the parties to all other claims that are on the group register at the time the judgment is given or the order is made unless the court orders otherwise; and
>
> (b) the court may give directions as to the extent to which that judgment or order is binding on the parties to any claim which is subsequently entered on the group register."

161.  As Lord Walker explained in *Autologic Holdings plc v Commissioners of Inland Revenue* [2005] UKHL 54; [2006] 1 AC 118 at pp 144-5:

> "The key features and normal effect of any GLO are that it identifies the common issues which are a precondition for participation in a GLO; it provides for the establishment and maintenance of a register of GLO claims; it gives the managing court wide powers of case management, including the selection of test claims and the appointment of a lead solicitor for the claimants or the defendants, as appropriate; it provides for judgments on test claims to be binding on the other parties on the group register; and it makes special provision for costs orders."

162.  Each party must, however, opt-in to the action. English law would require a person to issue a claim against the defendant and to request to be added to the registered group of litigants.

### (4)  *Further implications for recognition of foreign judgments*

Hunton App. 1012

163.    Both the English and United States multi-party procedures are concerned with seeking to promote the efficient handling of multiple plaintiffs' actions against one or more common defendants. Both are concerned, in different manners, with trying to take reasonable steps to ensure that the action is brought to the attention of potential plaintiffs, and that he is given sufficient time to decide whether to opt out of a US class action or opt in with respect to the English representative action.

164.    Of course, the availability of English procedures in litigation before the English courts does not determine the effect to be given to a foreign judgment in an English court. An English court need not necessarily adopt identical, or even similar, rules in the conflict of laws when recognising and enforcing foreign judgments to those applied in the domestic context of litigation in England. But the approach of English courts in the domestic setting is strongly indicative of the English court's views concerning acceptable standards of procedural protection, and acceptable methods of efficiently bringing multi-party litigation. At the very least, the English court's view in the domestic context is persuasive as to the standards of procedural fairness and natural justice of foreign courts which are likely to be accepted from foreign courts. The standards applied in English domestic law are a benchmark by which an English court may assess the standards applied in a foreign court. This point is accepted by Barnett, *Res Judicata, Estoppel, and Foreign Judgments* (2001), who observes (p. 74) that:

> "The addition of these rules offers, at least, a template for assessing *foreign* rules governing group litigation…" (Emphasis in original)

63

**Hunton App. 1013**

165.     Indeed, the English multi-party procedures were introduced following the fundamental review of English civil procedure by Lord Woolf. In his report, "Access to Justice: Final Report to the Lord Chancellor on the Civil Justice System in England and Wales" (1996), chapter 17, para.2, Lord Woolf observed that:

> "The new procedures [on multi-party actions] should achieve the following objectives:
>
> (a) provide access to justice where large numbers of people have been affected by another's conduct, but individual loss is so small that it makes an individual action economically unviable;
>
> (b) provide expeditious, effective and proportionate methods of resolving cases, where individual damages are large enough to justify individual action but where the number of claimants and the nature of the issues involved mean that the cases cannot be managed satisfactorily in accordance with normal procedure;
>
> (c) achieve a balance between the normal rights of claimants and defendants, to pursue and defend cases individually, and the interests of a group of parties to litigate the action as a whole in an effective manner."

166.     I understand that the United States Supreme Court has asserted similar justifications for the class action device:

> "The justifications that led to the development of the class action include the protection of the defendant from inconsistent obligations, the protection of the interests of absentees, the provision of a convenient and economical means for disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous litigants with similar claims." (*US Parole Commission v Geraghty*, 445 U.S. 388, 402-03 (1980)).

64

**Hunton App. 1014**

167.     As to the latter objective - the facilitation of the spreading of litigation costs- the US Supreme Court has also said:

> "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." (*Deposit Guaranty Nat. Bank, Jackson, Miss. v Roper*, 445 U.S. 326, 339 (1980). *See also* 1 Alba Conte & Herbert Newberg, Newberg on Class Actions § 1:6 (4th ed. 2002)).

168.     It is also, in my view, highly unlikely that recognition of a US class action judgment would be considered to be contrary to English public policy. Indeed, it has been noted that:

> "The relevance of this defense to the essential question of the core case is likely to be low. Any objection to the aggregation of claims *per se* is likely to be given short shrift, given the existence of two mechanisms for conducting group litigation in England
>
> (Stiggelbout "The Recognition in England and Wales of United States Judgments in Class Actions" (2011) 52 *Harvard International Law Journal* 433, at 471).

169.     It is in the very essence of private international law, and the recognition of foreign judgments in particular, that English courts will be faced by procedures, and substantive rules, applied in foreign courts which are different to those that an English court might have applied. Something more is needed before the judgment can be denied recognition. Professor Briggs comments in *Civil Jurisdiction and Judgments* (6th ed, 2015), para 4.31, that:

> "All civilised systems of civil procedure strike their own balance to protect the rights of the parties and to get at and expose the truth. It is, therefore,

Hunton App. 1015

inappropriate to point to an isolated difference by comparing a rule of English law, and one of foreign law, each wrenched out of its context, and to contend that the comparison shows that the claimant is exposed to the risk of an injustice if not permitted to proceed in England."

170.     *Dicey, Morris and Collins, The Conflict of Laws* (15th ed, 2012) para 14-163, state that:

"… [a] foreign judgment… is not impeachable because the court admitted evidence which is inadmissible in England or did not admit evidence which is admissible in England".

171.     In a different, but relevant context, Lord Goff said of the English common law rules on taking jurisdiction, and the question whether an English court should refuse to stay proceedings where the centre of gravity of a case lies overseas but the plaintiff alleges that he would not obtain justice in the foreign court (*Spiliada Maritime Corp* v *Cansulex Ltd* [1987] AC 460, 482):

"The key to the solution of this problem lies, in my judgment, in the underlying fundamental principle. We have to consider where the case may be tried suitably for the interests of all the parties and for the ends of justice… Now, as a general rule, I do not think that the court should be deterred from granting a stay of proceedings, or from exercising its discretion against granting leave under R.S.C. Ord. 11, simply because the plaintiff will be deprived of such an advantage, provided that the court is satisfied that substantial justice will be done in the available appropriate forum. Take, for example, discovery. We know that there is a spectrum of systems of discovery applicable in various jurisdictions, ranging from the limited discovery available in civil law countries on the continent of Europe to the very generous pre-trial oral discovery procedure applicable in the United States of America. Our procedure lies somewhere in the middle of

66

this spectrum. No doubt each of these systems has its virtues and vices; but, generally speaking, I cannot see that, objectively, injustice can be said to have been done if a party is, in effect, compelled to accept one of these well-recognised systems applicable in the appropriate forum overseas."

172.     All of this suggests that a US class action would not be regarded as repugnant to English law.

173.     Professor Briggs suggests (para 103 of his Declaration) that I have stated that because English law itself has domestic procedures on representative and group actions, it might on this basis alone be willing to recognise a foreign class action judgment. In this respect, he speculates that this statement may have led the court in *Vivendi* to an erroneous conclusion. I said no such thing in *Vivendi* or anywhere else. It is axiomatic, and common ground between us, that the question of whether to recognise a foreign judgment is: (i) determined in the eyes of English private international law, not New York law; and (ii) that the rules on recognition form a separate body of rules to those on the jurisdiction of English courts (see the discussion above). In *Vivendi,* I considered the English multiparty procedures in the discussion of *defences*, if a judgment were otherwise entitled to recognition under the heading: "Would A Natural Justice Argument, If Asserted By Absent Class Members, Be Sustained On The Facts Of The Case?" I concluded that, in view of the existence of multi-party procedures in England containing an opt-out element (albeit much more limited than a US class action), it is unlikely that such a defence would be established. I stand by this view. Indeed, as I explained above, Professor Briggs does not suggest that such defences would be established either.

174.     Again, I expressly stated in *Anwar* that an English court need not necessarily adopt identical, or even similar, rules in the conflict of laws when recognising and enforcing foreign judgments to those applied in the domestic context of litigation in England. I believe that the courts in *Vivendi* and *Anwar*

Hunton App. 1017

appreciated this; and understood that, in the absence of any authority and conflicting views expressed by English writers, it would be inconceivable to conclude that English law was completely clear and that the judgment would definitely not be recognised in England. In this respect, I find Professor Briggs's attempts to suggest that the rulings of the courts in *Vivendi* or *Anwar* were based on an inaccurate account of English law speculative and unconvincing. The court reached in both cases its conclusions on the basis of the expert opinions before them filed by the plaintiffs and the defendants, including the substantive arguments that Professor Briggs reiterates in his Declaration in the present case; and neither Professor Briggs nor I suggest that English law has changed in any material respect since then.

### (5)   *The limits of English multi-party procedures; the lack of a U.S. style class action; practical implications*

175.    English law, however, goes only so far in permitting multi-party litigation. This limits the opportunities to provide expedient multi-party redress in the English courts. Professor Mulheron concludes that English law should go further and explicitly adopt the class action procedure. She concludes with the following observations ((2005) 24 *Civil Justice Quarterly* 424, p. 448)):

> "Various judicial statements have sought to interpret the English representative rule as containing elements of a class action, a wider device than the strict representative action, under which a commonality, rather than identicality, of interest is sufficient, and where separate contracts, separate defences and different claims for damages are easily tolerated. It is highly arguable that the less restrictive class action criteria which the English judiciary have struggled to fit over the rubric of the representative action should be expressly implemented in this jurisdiction. This would serve to lessen the artificiality of judicial interpretations which strain the boundaries of the language used in r.19.6. Secondly, it is not a huge leap from the

68

representative rule, as judicially interpreted, to the class action as legislatively drafted. Somewhat similar superiority assessments, numerosity tests, attitudes toward class description and members' identities, adequacy of representation, recognition of sub-classes, and the absence of any requirement for an express mandate from class members, are evident under both representative rule and class action."

176.     Similar views are expressed in her book *The Class Action in Common Law Legal Systems* (Hart Publishing, 2004). See also Mulheron, "*Research Paper for the Civil Justice Council of England and Wales: Reform of Collective Redress in England and Wales: A Perspective of Need* (Civil Justice Council, February 2008) available at:

*https://www.judiciary.gov.uk/wp-content/uploads/JCO/Documents/CJC/Publications/Other+papers/reform-of-collective-redress.pdf*

where she considers nineteen "building blocks" which provide "overwhelming evidence of the need for a further collective redress mechanism, in order to supplement presently-existing procedural devices available to claimants." (page vii).

177.     Indeed, there is clearly dissatisfaction in some quarters as to England's current law on multi-party procedures. Unless and until that law is improved, it may properly be thought that the best prospects for the proposed US class action plaintiffs is indeed to be members of the US class.

178.     In 2008, the Civil Justice Council published "*Improving Access to Justice through Collective Actions, Developing a More Efficient and Effective Procedure for Collective Actions. A Series of Recommendations to the Lord Chancellor*" (July 2008) available at:

Hunton App. 1019

https://www.judiciary.gov.uk/publications/cjc-improving-access-justice-consumers/ .

The report was compiled by a team of experts, consisting of three editors (John Sorabji ; Michael Napier CBE QC and Robert Musgrove) and seven contributing editors (Michael Black QC; Ingrid Gubbay; His Honour Judge Graham Jones; Alistair Kinley; Professor Rachael Mulheron; Robert Musgrove; and John Sorabji).

179.     The recommendations of the report included that:

> "**RECOMMENDATION 1 –** A generic collective action should be introduced. Individual and discrete collective actions could also properly be introduced in the wider civil context i.e., before the CAT or the Employment Tribunal to complement the generic civil collective action.
>
> **RECOMMENDATION 2 –** Collective claims should be capable of being brought by a wide range of representative parties: individual representative claimants or defendants, designated bodies, and ad hoc bodies.
>
> **RECOMMENDATION 3 –** Collective claims may be brought on an opt-in or opt-out basis. Where an action is brought on an opt-out basis the limitation period for class members should be suspended pending a defined change of circumstance."

180.     This Report concluded that:

> "9. These three themes – access to justice, proportionality & efficiency, fairness – remain valid benchmarks to be applied when considering the various consultations and approaches to collective redress since Lord Woolf. One of the fundamental drawbacks of

70

**Hunton App. 1020**

the GLO regime which has been identified since its introduction is that it fails to facilitate effective access to justice for individuals whose claims fall within the first of the three goals. Because the GLO... requires individual citizens to take positive steps to commence litigation or join the claim register there has been little take up or use of it where claims are individually small even though the totality of the claim when aggregated is extremely large."

181.        And at para 16, the Report says of GLOs:

"They are not, however, ideal vehicles for the prosecution of collective claims. Claimants must opt-in through issue of a claim form, rather than opt-out. Barriers to entry, to access to justice, remain therefore a part of the GLO regime, which cannot provide effective access to justice for those individuals whose claims are of limited individual quantum and where the litigation (cost) risk far outweighs the potential value of a successful judgment. Moreover simply being party to a GLO remains in itself a relatively expensive exercise for individual litigants in any event, not least because, as an opt-in mechanism, it still requires, as was evident from *Taylor v Nugent* significant front-loading of litigation cost. The GLO does not therefore mitigate, but on the contrary, institutionalises the inability of those litigants, with relatively small claims that give rise to common issues, to prosecute them effectively. The GLO does nothing to satisfy the first of Lord Woolf's three principles which collective actions are required to meet."

182.    A    register    of    GLOs    can    be    found    online    at:
https://www.justice.gov.uk/courts/rcj-rolls-building/queens-bench/group-

Hunton App. 1021

litigation-orders . This, however, shows that since the introduction of the GLO in 2000, just 92 actions have been brought. This is a very low number given the volume of large scale, multi-party litigation that passes through the English courts. Moreover, very few of these cases appear to involve allegations of securities fraud.

183.     It bears reiteration that there is no direct equivalent in English law to the US class action, which would operate on an opt-out basis and allow parties with similar (but not identical) interests to form a class of plaintiffs and seek compensation for their respective losses. Hence, as the Court of Appeal noted in *Adams v Cape Industries* [1990] Ch 433, at 564-5

> "We recognize further that the federal courts have been required to determine, and to develop methods for the effective control and management of, civil litigation in product liability cases in which large numbers of plaintiffs have made claims against numerous defendants arising out of similar classes of injury and having broadly similar consequences but with differing degrees of severity. We have had some experience in this country of such litigation but in smaller volume. Our own procedures have to an extent been modified to deal with the preparation and settlement of such cases but we have not, to the same extent, developed the techniques of a class action or the role of the judge in procuring settlements. We are aware that our present system has been subjected to criticism in having failed, as it has been said, to respond sufficiently to the requirements of such litigation."

184.     Having regard to the absence of an English opt-out class action, on 19 November 2009, the then UK government proposed sector-specific provisions in the Financial Service Bill which would have allowed opt-out actions in certain cases. It was proposed that, at the court's discretion, a collective action could proceed on either an opt-in or an opt-out basis. As Mulheron, "Recent Milestones

Hunton App. 1022

in Class Actions in England: a Critique and a Proposal" (2011) 127 *Law Quarterly Review* 288, explains:

> "...it represented an historic landmark in collective redress reform in England, for it was the *first* occasion upon which there was a clear political intent to enact an *opt-out* class action (whereby, at the outset of an action, it is sufficient to *describe a class of persons* as claimants, with the appointment of a suitable representative claimant to litigate the common issues on behalf of that class of described, rather than identified, persons)."

> (Emphasis in original).

185.     The relevant provisions of the Bill were, however, not passed owing to political pressures to steer the Bill through Parliament prior to a general election held on 6 May 2010. Hence, "the achievement of tangible reform, via an opt-out mechanism for collective redress, remains for the future". (Mulheron, (2011) 127 *Law Quarterly Review* 288, 314). Mulheron goes on to criticise "the decision by English policy-makers to pursue sectoral, rather than generic reform of opt-out collective redress" as "flawed" (at p 314). In any event, it is clear that English law continues to lack a US-style opt-out class action procedure.

186.     Consumer Rights Act 2015 contains provisions in section 81 and Schedule 8 on private actions in competition law (which came partially into force on 3 August 2015). These include limited provisions for the introduction of opt-out collective proceedings and settlements as an alternative to opt-in procedures. For instance, Regulation 5 (which is not yet in force) amends section 47B(11), Competition Act 1998 to state:

> "'Opt-out collective proceedings' are collective proceedings which are brought on behalf of each class member except—

Hunton App. 1023

(a) any class member who opts out by notifying the representative, in a manner and by a time specified, that the claim should not be included in the collective proceedings, and

(b) any class member who—

(i) is not domiciled in the United Kingdom at a time specified, and

(ii) does not, in a manner and by a time specified, opt in by notifying the representative that the claim should be included in the collective proceedings."

It will be noted that the definition does not allow for the possibility of opt out proceedings against persons domiciled outside the United Kingdom.

187.    Regulation 10 inserts a new section 49A, Competition Act 1998 making provision for the possibility of opt-out collective settlement agreements.

188.    These provisions, however, are limited sectoral reforms in the field of competition law, which, on the one hand, indicate the increasing acceptance of the possibility of opt-out procedures in England and provide further evidence that English law does, in some circumstance, permit obligations to be imposed on a party by his or her inaction; but which, on the other hand, are sector specific and certainly do not make general provision for the introduction of an opt-out class action in England. They would not be applicable on the present facts.

189.    By contrast, a US class action would allow common issues of fact and law to be litigated in one place, rather than there being multiple law suits in different jurisdictions that could lead to conflicting and inconsistent rulings. In the absence of an English class action procedure capable of accommodating all members of the proposed class, it may properly be thought that the interests of plaintiffs would typically be better served by a US class action judgment.

Hunton App. 1024

*(6)*     **_Costs in English proceedings_**

190.     In practice, the English rules of costs may well be a significant deterrent to any would-be plaintiff litigating or relitigating in the English courts. In a typical case, a litigant faces the strong risk that it will have to pay the costs of the other party if it is unsuccessful.

191.     The subject of costs is a complex one in English law. Briefly stated, however, CPR Part 44.2 confers a broad discretion on the courts as to how to apportion costs. But it is rooted in a firm presumption, which is contained in CPR 44.2(2)(a):

> "(2) If the court decides to make an order about costs –
>
> (a) the general rule is that the unsuccessful party will be ordered to pay the costs of the successful party" (Emphasis added.)

192.     In *Arkin v Borchard Lines Ltd* [2005] EWCA Civ 655, [2005] 1 WLR 3055, Lord Phillips MR noted (at [23]) that:

> "A claimant who brings an unjustified claim against a defendant so that the defendant is forced to incur legal costs in resisting that claim should indemnify the defendant in respect of the costs he has caused the defendant to incur."

193.     The effect of this may be to create a significant disincentive for plaintiffs to instigate and pursue proceedings in the English courts. In particular, an individual plaintiff may face the risk of paying extremely high legal costs of the defendant in the event that he or she loses, which may even exceed the value of the dispute itself. Even if the plaintiff wins, the court has the discretion to order him to pay some or all of the costs of the proceedings. This may well be sufficient to deter a plaintiff from seeking to assert his rights in England.

75

194.    Zuckerman, *Civil Procedure- Principles of Practice,* 3rd ed, 2013 (p 1307) notes the practical difficulties to which the English system of costs give rise:

> "The subject of costs, which would deserve only modest attention in a well-balanced system, requires extensive treatment in England. Far from being of incidental importance, the various aspects of litigation costs occupy a central place in the administration of civil justice. England is unique in this regard as there is no other country where courts and litigants devote so much time, effort, resources and money to questions of costs. There is no other system where the incidence of costs and their extent occupies the parties' minds from the very moment that a dispute has arisen. The sheer volume of litigation over costs and its expense to parties and courts is without parallel. Issues of costs have become so crucial to the decision whether to litigate, or indeed to the financial ability to contemplate litigation, that at times the court is called upon to adjudicate hypothetical questions of costs in order to enable the parties to decide whether to available themselves of access to justice.
>
>        The reason for this systematic preoccupation with costs is twofold. First, the cost of litigation is very high, and not infrequently out of proportion to the amount claimed. Second, the unsuccessful party would normally have to pay the successful party's costs. As a result, an unsuccessful litigation may face a costs bill which is out of all proportion to the value of the subject matter in dispute and which could prove financially ruinous. Today the fear of costs is no longer confined to litigants of modest means. It affects even the rich and preoccupies even mighty Government departments. The complexity of the costs rules combine with the extensive court discretion whether to order a party to pay costs and how much to pay. The exercise of this discretion has proved fertile ground for disputes, which could turn to be as extensive and costly as the resolution of the substantive action".

Hunton App. 1026

195.     In the circumstances, it seems to me that the likelihood of English would-be class members bringing further proceedings in England may be small; and the costs risks of doing so very considerable. In practical terms, they may well be better off being made party to the proposed class action in Texas.

## H.     CONCLUSION

196.     I agree with Professor Briggs (at para 60 of the Declaration) that no English court, even at trial level, has determined whether a US class action judgment would have preclusive effect in England. In my opinion, the position is much more uncertain and nuanced than Professor Briggs's would suggest; and I have real difficulty seeing how one could reasonably arrive at the unequivocal conclusions that he provides in his Declaration as to the present state of English law. The authorities which Professor Briggs cites do not directly address the issue in question or bear the weight that he places on them. Furthermore, the level of academic debate on the enforceability of US class action judgments in England would tend to suggest that the issue is far less clear-cut that Professor Briggs suggests.

197.     In the absence of any binding authority, there are reasonable and respectable arguments as to the position in England. As I have explained, I consider that whilst there is uncertainty as to the position in England, a good case can be made for the recognition and enforcement in England of a judgment in the US class action against the defendants in respect of passive members of a class who did not opt out of the class action.

198.     Such an opinion may be supported by the fact that the English authorities on recognition of foreign judgments have very largely developed in relation to the jurisdictional competence of a foreign court over defendants and certainly did not have the position of absent class members in mind; by the possibility and desirability in policy terms of the courts establishing a solution for class action

77

judgments which ensures that such judgments, which are typically likely to provide class members with the most effective means of redress, are not simply routinely denied any effect in England; by the procedural safeguards existing in the US courts; and by academic support in the literature considering the matter.

199.     In my opinion, recognition of a U.S. class action judgment would also not be held to be contrary to English standards of natural justice or public policy, or amount to a flagrant violation of Article 6 of the European Convention on Human Rights. I also note that English law permits representative actions and Group Litigation Orders. The existence of these multi-party procedures adds further support to the view that recognition of a US class action would not amount to a denial of natural justice or be contrary to public policy. Professor Briggs does not appear to suggest that a plaintiff would be likely to invoke a defence successfully if the judgment was otherwise entitled to recognition.

200.     The view that a good case for recognition of US class action judgments in England exists was also adopted by the US courts on three occasions: by Judge Holwell in *Re Vivendi Universal, S.A. Securities Litigation*, No. 02-cv-05571 (S.D.N.Y.); by Marrero, U.S.D.J in *Re Alstom SA Securities Litigation* No. 03-cv-6595 (S.D.N.Y.); and again by Marrero, U.S.D.J in *Anwar, et al. v Fairfield Greenwich Limited, et al.,* 09-cv-0118 (S.D.N.Y.).

201.     I note that the Memorandum Supporting Plaintiffs' Motion for Class Certification, for Designation of Class Representatives and Class Counsel dated 30 April 2015 states (at pp 51-52) that a similar conclusion should be reached in this case as in other US class action judgments in which this issue has been determined in the plaintiffs' favour. The legal issues as to the entitlement of a US class action judgment to enforcement in England have been advanced, with expert evidence adduced by each party, and determined in the plaintiffs' favour on several occasions in previous cases. I see no reason to share Professor Briggs's speculation that the court was unable properly to evaluate the expert evidence

78

before it and form a view on it (which, of course, is the role of the courts not of the experts). Certainly, his suggestion that the court was lured into error by the views I expressed in my expert reports is one that I consider speculative and entirely unfounded.

202.     There has been no relevant development in English law since the decisions in *Re Vivendi Universal SA Securities*, *Re Alstom SA Securities Litigation* and *Anwar v Fairfield Greenwich Limited* were given which would suggest that any different conclusion as to the position in English law should be reached.

203.     Finally, it seems to me that, in a practical sense, the prospects of English would-be plaintiffs choosing to litigate in England are small. English law does not have a U.S. style class action properly so-called and hence does not afford the same scope for the bringing of a composite action on an opt-out basis on behalf of parties who have similar interests. Moreover, would-be plaintiffs face very significant costs risks if they attempt to bring fresh proceedings in England. For all practical purposes, it may well be much more expedient for there to be a composite determination of the dispute in the proposed class action proceedings in Texas.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of August 2015, in London, England.

*[signature]*

_____

Professor Jonathan Harris

79

# PROFESSOR JONATHAN M. HARRIS, BCL, MA, PhD

**Current positions:**

- May 2009- present

  Barrister practising at Serle Court Chambers, London, specialising in cross-border commercial and chancery disputes.

- September 2011- present

  Professor of International Commercial Law, King's College, London. I currently work at the university on a 30% basis.

**Previous positions:**

- January 2002-August 2011

  Professor of International Commercial Law, Law School, University of Birmingham (full-time January 2002- April 2009 and thereafter part-time).

  I served as Director of Research (for six years) and Deputy Head of the Law School (for three years).

- September 2000- December 2001

  Reader in Law, University of Nottingham

- September 1995- August 2000

  Lecturer in Law, University of Birmingham

**Joint General Editor,** *Dicey, Morris and Collins, The Conflict of Laws*

- 2014- present

  I have recently been appointed as Joint General Editor (with Lord Collins of Mapesbury) of what is widely considered to be the foremost English work on private international law. The second supplement to the present 15th edition was published in July 2015 under our joint general editorship.

**Authored and edited books**

1

*The Hague Trusts Convention* (Oxford, Hart Publishing, 2002)

> This book, published in May 2002, is the first monograph to address the subject. It is some 544 pages in length. The book is sole authored. It has been the subject of very positive reviews.

*International Sale of Goods in the Conflict of Laws* (Oxford, OUP, 2005)

> Co-authored with Prof. James Fawcett (Nottingham University) and Prof. Michael Bridge (UCL). This is the first monograph on this subject. It is 1458 pages in length. I wrote 9 of the 21 chapters. Prof. David McClean describes it in the *British Yearbook of International Law* as a "magnificent work" and observes that "This is simply the finest book on private international law in the English language to appear for many decades."

*Dicey, Morris and Collins, The Conflict of Laws,* 14th edition, (London, Sweet and Maxwell, 2006)

> I was responsible for eight chapters in the 14th edition.

> *Dicey, Morris and Collins, The Conflict of Laws –First, Second, Third and Fourth Supplements to the 14th edition* (London, Sweet and Maxwell, 2007-2010)

*Dicey, Morris and Collins, The Conflict of Laws,* 15th edition, (London, Sweet and Maxwell, 2012

> I wrote eight chapters for the new edition of this leading work, published in autumn 2012. The new edition has been extensively revised. I have, for instance, written a new chapter on unjust enrichment and equitable doctrines and an extensively rewritten chapter on trusts.

> *Dicey, Morris and Collins, The Conflict of Laws –First and Second Supplements to the 15th edition* (London, Sweet and Maxwell, 2014-15)

> I wrote eleven chapters for the supplements (in addition to my duties from the Second Supplement onwards as joint general editor).

**Authorship of substantial parts of books**

*Underhill and Hayton*, *Law Relating to Trusts and Trustees* (16th edition, 2003; and 17th edition, 2006). I was responsible for the part of the book which deals with private international aspects of trusts.

2

*Product Liability* by Prof. John Miller and Dr Richard Goldberg (Oxford, OUP, 2004). I wrote around 100 book pages of this work.

*Benjamin's Sale of Goods* (8th edition, 2010). I was responsible for the conflict of laws section, which was very extensively rewritten to take account of the entry into force of the Rome I Regulation.

> *Benjamin's Sale of Goods, Supplement to the 8th edition* (2012); *Second Supplement to the 8th edition* (2013)

**Journal publications and chapters in books**

"The Ambivalent Plaintiff and the Scope of *Forum Non Conveniens*", (1996) 15 *Civil Justice Quarterly* 279-283.

"Recognition of Foreign Judgments at Common Law- the Anti-Suit Injunction Link", (1997) 17 *Oxford Journal of Legal Studies* 477-498.

"Anti-Suit Injunctions- a Home Comfort?", [1997] *Lloyd's Maritime and Commercial Law Quarterly* 413-422.

**"**Rights *in Rem* and the Brussels Convention", (1997) 22 *European Law Review* 179-185.

"Staying Proceedings for another Contracting State to the Brussels Convention", (1997) 113 *Law Quarterly Review* 557-562.

"Restraint of Foreign Proceedings- the View from the other Side of the Fence", (1997) 16 *Civil Justice Quarterly* 283-289.

"Launching the Rocket- Capacity and the Creation of *Inter Vivos* Transnational Trusts**",** (1997) 6 *Journal of International Trusts and Corporate Planning* 118-132 and 165-179 (two-part article) ISSN 1350-7605; also published in Glasson (ed) *International Trust Laws* (Jordans), Chapter C.3, pp. 1- 28.

A new edition of this article (which was extensively revised and updated) was published in January 2006 in Glasson (ed) *International Trust Laws.*

"Choice of Law in Tort- Blending in with the Landscape of the Conflict of Laws?", (1998) 61 *Modern Law Review* 33-55.

"Jurisdiction Clauses and Void Contracts", (1998) 23 *European Law Review"* 279-285.

"Related Actions and the Brussels Convention", [1998] *Lloyd's Maritime and Commercial Law Quarterly* 145-152.

3

"Public Policy and the Enforcement of International Arbitration Awards: Controlling the Unruly Horse", [1998] *Lloyd's Maritime and Commercial Law Quarterly* 568-578 (with Frank Meisel).

"Transnational Trust Litigation: Jurisdiction and the Enforcement of Foreign Judgments", Glasson (ed) *International Trust Laws* (1998, Jordans), Chapter C.1, pp. 1-71. Substantially revised and updated in 2000 for the same publication; Chapter C.1 pp. 1-74. *Substantially revised and updated* in December 1999 for publication in the *Journal of International Trusts and Corporate Planning* as a three-part article: see (1999) 7 J Int P 227-254; (2000) 8 J Int P 37-57; (2000) 8 J Int 101-132.

 "Civil Jurisdiction and Judgments" and "Enforcement of Foreign Judgments"- Book Reviews, (1999) 18 *Civil Justice Quarterly* 185-188.

"Justiciability, Choice of Law and the Brussels Convention", [1999] *Lloyd's Maritime and Commercial Law Quarterly* 360-369.

"Use and Abuse of the Brussels Convention," (1999) 115 *Law Quarterly Review* 576-583.

"Autonomy in International Contracts"- Book Review, (2000, January) 19 *Civil Justice Quarterly* 92-94.

"Contractual Freedom and the Conflict of Laws", (2000) 20 *Oxford Journal of Legal Studies* 247-269.

"Transnational Health Care Litigation and the Private International Law (Miscellaneous Provisions) Act 1995, Part III" , in Goldberg and Lonbay (eds) *Pharmaceutical Medicine, Biotechnology and European Law* (Cambridge University Press, 2000), chapter 9, pp. 205-229.

"Consumer Protection in Private International Law", in *Property and Protection: Essays in Honour of Brian Harvey* (Oxford, Hart Publishing, 2000), chapter 11, pp. 245-268.

"Law's Future(s)- the Conflict of Laws", in Hayton (ed) *Law's Future(s)* (Oxford, Hart Publishing, 2000) (with Prof. David McClean), chapter 9, pp.161-184.

"Forum Shopping in International Libel", (2000) 116 *Law Quarterly Review* 562-569.

Ordering the Sale of Land Situated Overseas", [2001] *Lloyd's Maritime and Commercial Law Quarterly* 205-214.

"The Brussels Regulation", (2001) 20 *Civil Justice Quarterly* 218-224.

"Joinder of Parties Located Overseas", (2001) 20 *Civil Justice Quarterly* 290-300

4

"Jurisdiction and the Enforcement of Foreign Judgments in Transnational Trusts Litigation", in J Glasson (ed), *The International Trust*, chapter 1, pages 9-87.

"Launching the Rocket- Capacity and the Creation of *Inter Vivos* Transnational Trusts", in J Glasson (ed), *The International Trust*, chapter 2, pages 89-119.

"The Trust in Private International Law", in *Festschrift for Sir Peter North* (Oxford, OUP, 2002), pp 187-213.

"Tracing and the Conflict of Laws", (2002) 73 *British Yearbook of International* Law, 65- 102.

"Does Choice of Law Make Any Sense?" (2004) 57 *Current Legal Problems*" 305-353.

 "Variation of Trusts Governed by Foreign Law upon Divorce", (2005) 121 *Law Quarterly Review* 16-23.

"Arbitration Clauses and the Restraint of Proceedings in Another Member State of the European Union", [2005] *Lloyd's Maritime and Commercial Law Quarterly* 159-167.

"Stays of Proceedings and the Brussels Convention", (2005) 54 *International and Comparative Law Quarterly* 933-950.

"Commercial Trusts in European Private Law", [2006] *Lloyd's Maritime and Commercial Law Quarterly* 278-282.

"Damages and the Application of Foreign Law: *Harding v Wealands*", *The Lawyer, September 2006.*

"Jurisdiction and the Enforcement of Foreign Judgments in Transnational Trusts Litigation", in J Glasson (ed), *The International Trust*, 2nd ed. (Jordans, 2006) pp 3-109.

"Launching the Rocket- Capacity and the Creation of *Inter Vivos* Transnational Trusts" in J Glasson (ed), *The International Trust*, 2nd ed. (Jordans, 2006), pp 111-156.

"Reflections on the Rome I Regulation Proposal on Choice of Law for Contractual Obligations" in *The Brussels Agenda*, December 2006 (published by the Law Society of England and Wales). Available at http://www.lawsociety.org.uk/secure/file/159739/e:/teamsite-deployed/documents//templatedata/Newsletter/Brussels%20Agenda/Documents/Brussels%20Agenda%20-%20December%202006.pdf

"The Recognition and Enforcement of US Class Action Judgments in England", in (2006) 22 *Contratto e Impresa/ Europa*, 617-650.

**Hunton App. 1034**

"The New Private International Law Rules of the Trusts (Amendment No 4) (Jersey) Law - A Retrograde Step?", [2007] (February) *Jersey and Guernsey Law Review* 9-19.

"Conflict of Laws and the Hague Trusts Convention", chapter C1 in *Planning and Administration of Offshore and Onshore Trusts* (Tolleys).

"Comity Overcomes Statutory Resistance", [2007] (May) *Jersey and Guernsey Law Review* 184-201.

"Sale of Goods and the Relentless March of the Brussels I Regulation", (2007) 123 *Law Quarterly Review* 522-528.

"EU Private International Law"- Book Review, (2007) 32 *European Law Review* 597-600.

"Green Paper on Succession And Wills", Report of Evidence to House of Lords European Union Committee, 2nd Report of 2007-8, HL Paper 12, pp 1-12.

"Reflections on the Proposed EU Regulation on Wills and Succession", published as a guest editorial on www.conflictoflaws.net (February 2008)

"Guernsey's New Private International Law Rules for Trusts- Model Offshore Solution or Recipe for Conflict?", [2008] (October) *Jersey and Guernsey Law Review* 289-317.

"The Brussels I Regulation, the ECJ and the Rulebook", (2008) 124 *Law Quarterly Review* 523-529.

"The Proposed EU Regulation on Succession and Wills: Prospects and Challenges", (2008) 22 *Trust Law International* 181-235.

"The Brussels I Regulation and the Re-Emergence of the English Common Law", [2008] *European Legal Forum* 181-189.

"Understanding the English Response to the Europeanization of Private International Law", (2008) 4 *Journal of Private International Law* 347-395.

"The ECJ decision in *West Tankers*", published as a guest editorial on www.conflictoflaws.net (February 2009).

"Mandatory Rules and Public Policy in the Rome I Regulation", in Ferrari and Leible (eds) *The Rome I Regulation* (Munich, Sellier, 2009) 269-342.

"Agreements on Jurisdiction and Choice of Law: Where Next?", [2009] *Lloyd's Maritime and Commercial Law Quarterly* 537-561.

**Hunton App. 1035**

"Service Contracts, Carriage by Air and the Brussels I Regulation", (2010) 126 *Law Quarterly Review* 30-36 (with Martin George).

"Civil Jurisdiction and Judgments", (2010) 16 *Trusts and Trustees* 873-876.

"European Aspects of *Granatino v Radmacher*", (2011) 103 *Family Law Journal* 2-4.

"*Granatino v Radmacher* and its Implications for Cross-Border Trusts Disputes", (2011) 17 *Trusts and Trustees* 112-123.

"Jurisdiction and Judgments in International Trusts Litigation—Surveying the Landscape", (2011) 17 *Trusts and Trustees* 236-260.

"The Commission's Proposal for Reform of the Judgments Regulation", (2011) 26 *Journal of International Banking and Financial Law* 389-891.

"Crossing borders", (2011) 103 *Family Law Journal* 2-4.

"In Harmony's Way", (2011) 25(47) *The Lawyer* 40.

"Jurisdiction and the Enforcement of Foreign Judgments in Transnational Trusts Litigation", in D Hayton (ed), *The International Trust*, (3rd edition, 2011), chapter 1.

"Launching the Rocket- Capacity and the Creation of *Inter Vivos* Transnational Trusts", in D Hayton (ed), *The International Trust*, (3rd edition, 2011), chapter 2.

"Trusts and Divorce", in (2012) 18 *Trusts and Trustees* 132-148 (with Nicholas Francis QC)

"Constructive Trusts and Choice of Law", (2012) 18 *Trusts and Trustees* 965-979.

"The Re-Amendment of Jersey's Firewall Legislation: All Right Now?" (2013) 19 *Trusts and Trustees* 766-786.

"The Recast Judgments Regulation: Imminent Reform of the Rules of Jurisdiction and Enforcement of Foreign Judgments in the EU", (2014) 29 *Journal of International Banking and Financial Law* 709-712.

"Mandatory Rules Revisited" in Ahern and Binchy (eds), *The Rome I Regulation on Choice of Law in Contract* (forthcoming).

**Editorships of journals and convening of journal conferences**

*Journal of Private International Law*

7

I am one of two founding editors of the *Journal of Private International Law*, (with Prof. Paul Beaumont, Aberdeen), launched by Hart Publishing in April 2005. The journal was initially published twice per year. As from 2008, it is now published three times per year.

We also have an associated website/ blog: www.conflictoflaws.net.

We organise regular international conference under the auspices of the journal. These include:

A two-day launch conference at the University of Aberdeen in 2005.

A two-day conference at Birmingham University on 26-27 June 2007.

A conference in collaboration with Herbert Smith in September 2008. The event was held at Herbert Smith's premises in London.

A two-day *Journal of Private International Law* conference at New York University on 18-19 April 2009.

A three-day *Journal of Private International Law* conference at the University of Milan in April 2011.

A conference on "The Brussels I Regulation Recast" in collaboration with Reed Smith at their premises in London in February 2013.

A three-day *Journal of Private International Law* conference took place in Madrid in collaboration with Universidad Autónoma de Madrid and Universidad Complutense in September 2013.

A three-day *Journal of Private International Law* conference has been organised in collaboration with the University of Cambridge and will take place in Cambridge on 3-5 September 2015.

<u>*Trusts and Trustees*</u>

I am also on the editorial board of the leading specialist trusts journal, *Trusts and Trustees* (published by OUP).

<u>*Former editorial board positions*</u>

I was formerly on the editorial board of the *Journal of International Trust and Corporate Planning*.

I was formerly an Assistant Editor of the journal *Civil Justice Quarterly* for more than seven years.

**Hunton App. 1037**

**Book series editorship**

I am the joint founder and series editor (with Prof. Paul Beaumont) of the *Studies in Private International Law* monograph series published by Hart Publishing. Some seventeen titles have been published in the series to date.

**Teaching**

I am course leader and the sole teacher of the LLM "International Business Transactions I: Litigation" course at King's College, London. The course is devoted to the detailed comparative study of the law of jurisdiction and the recognition of foreign judgments.

At the University of Birmingham, I was the course leader for the LLB Conflict of Laws course in Birmingham, on which I was the sole teacher. I was also course leader for the LLM Commercial Conflict of Laws course.

I have been teaching private international law courses every year since 1995.

I have supervised numerous doctoral students pursuing research in the Conflict of Laws. In recent years, several students that I supervised went on to begin highly successful careers at leading universities.

I also lectured and gave tutorials in Equity and Trusts every year from 1995 at the University of Birmingham and at University of Nottingham.

**Administration**

Law School, Birmingham University

- 2003- 2009    *Director of Research*- I had overall responsibility in the School for research and produced the School's return to the Research Assessment Exercise (RAE).

In the RAE 2008, the School recorded its best ever results. In terms of the percentage of its activity judged to be of 3* or 4* standard, the School was ranked equal 7th in the United Kingdom.

- August 2006- 2009    *Deputy Head of School*

I advised the Head of School extensively on all aspects of the running of the School.

- 2003- 2009 *Law School's Management Committee*

College of Arts and Law

- 2008- 2011    *College Promotions Panel*

9

This committee is responsible for considering promotions to all positions within the College of Arts and Law.

- 2008- 2009    *College Research and Knowledge Transfer Committee*

Previous administrative posts

2005- 2008    *University Research and Knowledge Transfer Committee*

This is the University's main research committee

2002- 2004    *Deputy Director, LLM degree*
2000- 2001    *Tutor for LLM Admissions, University of Nottingham.*
1997- 2000    *Tutor for Undergraduate Admissions, Law School, University of Birmingham.*

**Recent Visiting Posts**

Visiting Professor, National University of Singapore (2013)

I devised and taught an intensive LLM course on Comparative Conflict of Laws in August 2013 (covering issues of jurisdiction, enforcement of foreign judgments and choice of law in Singapore, the EU, England, Australia, Canada and the US).

Visiting Professorial Fellow, University of New South Wales, Australia

I was appointed to this post in 2011, initially for a three-year term. I devised and delivered a successful LLM course on Anglo-Australian private international law.

**Government advisory work**

Lord Chancellor's Advisory Committee on Private International Law. This committee, under the chairmanship of Lord Mance, formally advises the government on law reform proposals in the field of private international law and on whether to opt into EU Regulations in this field.

From 2007, I advised the Ministry of Justice on the proposed EU Regulation on Cross-Border Succession and Wills. In this capacity, I gave evidence to the North Committee on Private International Law in September 2007; and to the House of Lords Select Committee on European Union Law in October 2007. I also attended meetings at the European Commission in December 2007 and in June 2008.

In October 2009, the European Commission's Proposal was issued. I was retained to advise the Ministry of Justice as to whether the United Kingdom should opt into the Regulation.

10

**Hunton App. 1039**

**Legislative work**

I was extensively involved in the drafting of a new Trusts Act for the British Virgin Islands and have had a major influence upon the content of the new Private International Law provisions of the Act. The approach adopted is a unique development, which, it is hoped, will prove an inspiration for other offshore jurisdictions around the world.

I have also drafted trusts legislation in Gibraltar which is currently before the Gibraltar Parliament.

**Barrister and tenant at Serle Court, London**

I am a qualified barrister and have held a full tenancy at Serle Court in London since 1 May 2009. I specialise in the fields of commercial and chancery law; and especially in cross-border disputes.

Notable cases include:

*Granatino v Radmacher* [2011] 1 A.C. 534, heard before nine members of the Supreme Court on 22-23 March 2010. I appeared as a counsel for the successful wife. The case concerns the weight to be given to a pre-nuptial agreement executed overseas in ancillary relief proceedings.

*Hutcheson v Spread Trustees* [2012] 2 A.C. 194, appeared as counsel in the Privy Council on behalf of the successful appellant in a landmark case on trustee exemption clauses.

Prior to moving to Serle Court, I held a door tenancy at Brick Court Chambers in London from August 2006-April 2009 inclusive (having completed pupillage at Brick Court in August 2006).

**Other activities**

Member of Advisory Council of British Institute of International and Comparative Law.

Honorary Life Member of Association of Contentious Trust and Probate Specialists (ACTAPS). (The other Honorary Members largely consist of senior members of the judiciary).

Full member of Society of Trust and Estate Practitioners (STEP).

11

**Hunton App. 1040**

# EXHIBIT 16

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

Case No. 3:09-CV-02384-N-BG

Judge: Hon. David C. Godbey

Mag.: Hon. Nancy M. Koenig

PEGGY ROIF ROTSTAIN *et al.*,

on behalf of themselves and
all others similarly situated

PLAINTIFFS,

v.

TRUSTMARK NATIONAL BANK *et al.*,

DEFENDANTS

---

EXPERT REPORT OF ÁNGEL R. OQUENDO

---

-i-

Hunton App. 1041

**OUTLINE**

I.   **Background and Qualifications**

II.  **Scope of Opinion**

III. **Summary of Conclusions**

IV.  **Discussion**

    A.  **Concrete Scenario**

    B.  **Recognition Requirements**

    C.  **From Reciprocity to Respect for Exclusive Local Jurisdiction**

    D.  **Public Order**

        1.  **Definition and Overview**

        2.  **Due Process and Class Action Absentees**

        3.  **Due Process and the Opt-Out Regime**

        4.  **Defendants' and Plaintiffs' Procedural Entitlements**

        5.   **Latin American Representative Litigation**

            a) **In General**

            b) **Suits Resembling 23(b)(3) Actions**

            c) **Suits Resembling 23(b)(2) Actions**

        6.  **Wrap-up**

    E.  **Overall Summation**

V.   **Signature**

**Hunton App. 1042**

**REPORT:**

I, Ángel R. Oquendo, declare that the following is true and correct.

## I.    Background and Qualifications

I presently hold the George J. and Helen M. England Chair at the University of Connecticut.  However, I am not writing this Report on behalf or in representation of my home institution.  Furthermore, I declare that I am independent from the Parties, their legal advisors, and the District Court.

On November 27, 2012, I testified as an expert before the Arbitration Tribunal in Chevron Corp. v. The Republic of Ecuador, PCA Case No. 2009-23.  Secondly, I contributed two Expert Reports in that proceeding on September 2, 2010 and on August 28, 2012, respectively.  Thirdly, I submitted an Expert Report to the United District Court for the Southern District of New York, on July 1, 2011, in Chev. Corp v. Salazar *et al.*, Case No. 11-CV-3718.  Fourthly, I presented an Expert Report on March 1, 2013 and Direct Testimony on October 7, 2013, to the same Court in Chev. Corp v. Donziger *et al.*, Case No. 11 Civ. 0691 (LAK).  I have not otherwise provided testimony at trial or by deposition in the previous four years.

I obtained an A.B. (*magna cum laude*) in Economics and Philosophy from Harvard University in 1983.  In 1986, Yale University awarded me a J.D. degree.  Upon a two-year doctoral research fellowship at the Free University of Berlin, I received an M.A. and a Ph.D. in Philosophy from Harvard University in 1995.  In 1986-87, I served as a

Hunton App. 1043

judicial clerk for Judge Stephen Reinhardt of the U.S. Court of Appeals for the Ninth Circuit.

I have acted as a visiting professor at the Berkeley Law School, the Georgetown University Law Center, the Free University of Berlin, the University of Hamburg, the University of Aix-en-Provence, the Autonomous University of Mexico, the University of Puerto Rico, the Inter-American University of Puerto Rico, the Javeriana Catholic University of Cali (Colombia), the University of Chile, the Federal University of Rio de Janeiro, and the State University of Rio de Janeiro.  Besides, I have frequently lectured at other U.S., European, and Latin American universities.

I am qualified to offer the opinions stated in this Report, which I originally prepared in English and based on my professional expertise.  Since 1993, I have worked as a full-time legal academic and scholar and have taught civil procedure and complex litigation, along with business organizations, human rights, and philosophy, in the United States, Europe, and Latin America.  Moreover, I have produced numerous articles in these fields, focusing on international and comparative questions.  For instance, my work on representative suits north and south of the border has appeared in the *Columbia Journal of Transnational Law* and other journals.[1]  Finally, Foundation Press has been publishing my leading textbook on *Latin American Law* since 2006, with a third edition scheduled for 2016.[2]  Exhibit A includes a list of my publications from the last ten years.

---

[1] *See, e.g.*, Ángel R. Oquendo, *Upping the Ante:  Collective Litigation in Latin America* (Revised), originally published at 47 COLUM. J. TRANSNAT'L L. 248, 280 (2009), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2298792 (hereinafter Oquendo (2009)); *Six Degrees of Separation:  From Derivative Suits to Shareholder Class Actions,* 48 WAKE FOREST L. REV. 643-672 (2013).
[2] *See* ÁNGEL R. OQUENDO, LATIN AMERICAN LAW (2011) (hereinafter OQUENDO (2011)).  *See also* ÁNGEL R. OQUENDO, LATIN AMERICAN LAW (2006); LATIN AMERICAN LAW (2016) (forthcoming).

Hunton App. 1044

In the course of my career, I have studied thousands of Latin American and civil-law decisions, dealing mostly with commercial, procedural, civil, and constitutional law and often with collective entitlements.  At the same time, I have become very familiar with Latin American and European codes and constitutions, as well as those of the United States, and have analyzed their application extensively.  In drafting this Expert Report, I have drawn on this experience and have formed my conclusions relying on my own knowledge and understanding of the issues, as well as on the sources cited in the foot-notes.

## II.   Scope of Opinion

I have been asked to opine, from a comparative law point of view, whether a tri-bunal in Latin America would likely recognize a final decision on the merits in this case.  In particular, I have been requested to assess whether it would do so if any of the absent Latin American class members filed an essentially identical complaint back home upon an adverse ultimate ruling.  According to the terms of the request, the opinion should dis-cuss Latin America generally, in addition to the six countries in which most of the foreign absentees reside or from which they have their citizenship:  Mexico, Venezuela, Colom-bia, Panama, Peru, and Ecuador.  It should determine the likelihood of judicial recogni-tion in the region and in these specific jurisdictions.  In carrying out this task, I have ana-lyzed the seven main factors that Latin American judges would usually consider in decid-ing the issue:  (1) Reciprocity from the State of Origin; (2) Jurisdiction of the Foreign Court over the Matter; (3) Sufficiency of Service and Defense Opportunities; (4) Finality

Hunton App. 1045

of the Judgment; (5) Absence of Any Pending Similar Domestic Suit; (6) Respect for Areas of Exclusive National Jurisdiction; and (7) Compatibility with the Public Order.  Finally, I have been invited to react to the Declarations submitted on behalf of the defendants by Professor Antonio Gidi, Professor Eduardo Siqueiros Twomey, Professor James Otis Rodner, Professor Eduardo Zuleta, Justice Arturo Hoyos, and Professor José Domingo Rivarola Reisz.

### III.  Summary of Conclusions

First, Section A will identify the filing of an essentially identical complaint back home by absent class members from Latin America upon losing on the merits in the United States as the most likely—though still rather improbable—scenario in which Latin American tribunals might confront the question whether to recognize the judgment rendered in this case.  It will attribute the relative likelihood to the practical impossibility of all other options and the outweighing improbability to overarching civil law impediments to this kind of litigation, as well as to the high chance of dismissal either for lack of jurisdiction or for expiration of the statute of limitations.  In any event, the Report will conclude that a judge from the region would, almost certainly, reject any such action in deference to this Court's ultimate ruling.

Section B will list the following as the main conditions for recognition in Latin America:

(1) Reciprocity from the State of Origin
(2) Jurisdiction of the Foreign Court over the Matter
(3) Sufficiency of Service and Defense Opportunities
(4) Finality of the Judgment

Hunton App. 1046

(5) Absence of Any Pending Similar Domestic Suit
(6) Respect for Areas of Exclusive National Jurisdiction
(7) Compatibility with the Public Order

It will underscore the presumption in favor of enforcing foreign decisions and then show that the relevant legislation in Mexico, Venezuela, Colombia, Panama, Peru, and Ecuador incorporates some or all of these items.

Next, Section C will demonstrate that the ultimate ruling in this dispute would meet the first six requirements. Section D and its various subdivisions will, in turn, assert that it would satisfy the seventh too. They will define the public order, which includes due process, and explain that a judgment resolving this controversy would cohere with both notions. Indeed, it would rest on a number of fairness controls designed for class actions generally and for those falling under Rule 23(b)(3) specifically.

Accordingly, a Latin American judge would almost surely agree with the U.S. Supreme Court that the opt-out regime fully comports with due process, especially since Latin America imported this concept from the United States and preserved its central components intact. Moreover, he or she could point to any available local actions permitting, along the lines of Rule 23(b)(3), the aggregation of similar, interrelated individual claims of a large number of individuals, who acquiesce either by opting in rather informally or simply by failing to opt out. Furthermore, he or she could note that diffuse rights suits, which resemble Rule 23(b)(2) actions and exist throughout the continent, invariably bind absentees who have in no way consented or even received individual notice. As a whole, the discussion will stress that Latin American absent class members could not legitimately complain inasmuch as they would have free ridden on the efforts of their representatives with a chance at compensation, would have benefited from the

-5-

Hunton App. 1047

aforementioned general and specific safeguards, and could have similarly faced preclusion in Latin America based on a suit lodged by someone else without their authorization.

## IV. Discussion

### A. Concrete Scenario

This Section will imagine a concrete scenario in which an adjudicator in Latin America might have to determine whether to recognize a final decision in the present controversy. In the end, it will envisage precisely the one presumed by the question posed; namely, that of a Latin American absent class member proceeding anew back home upon losing on the merits in this suit. The concluding paragraphs will acknowledge that such a situation is unlikely to materialize. Nonetheless, they will ultimately assert that if it ever did come about, the judiciary in Latin America would almost certainly opt for recognition.

Upon a ruling favorable to them, Latin American plaintiffs or absentees will pretty definitely not pursue execution in Latin America. Quite the opposite: they will undoubtedly demand compliance and, if necessary, seek enforcement in the United States. After all, a U.S. judge, in contrast to his or her southern counterparts, enjoys broad contempt powers,[3] can access with relative ease the assets of defendants processed in the United States, and can otherwise enforce U.S. judgments with considerable effi-

---

[3] *See* OQUENDO (2011) at 64 (A civil law court, in contrast to its common law counterpart, "does not have contempt powers to enforce its orders.").

-6-

Hunton App. 1048

ciency.  For similar reasons, the complainants' opponents will, for their part, have little to gain from re-litigating the matter south of the border.

If, instead, the adjudication ends up disfavoring the class, Latin American representatives or represented members of the class will probably not try to take another bite at the apple in Latin America.  After all, they would run into general and specific impediments to any such attempt.  Generally, any such repeat litigant would have to (1) hire a lawyer on a non-contingency basis,[4] (2) pay the attorney's fees of the other side upon defeat,[5] (3) rely on fact rather than notice pleading,[6] (4) do without discovery,[7] (5) meet a higher "deep-seated[-]conviction," in lieu of a more-likely-than-not, standard of proof,[8] (6) present the evidence before a judge instead of a jury,[9] and, as already suggested, (7) make do with judicial coercion mechanisms other than contempt.[10]  In particular, he or she would face an uphill battle against dismissal either (1) for lack of jurisdiction, as the

---

[4] *Id*. (Litigants "may not enter into a contingency fee agreement with their lawyer.  They must therefore pay up front and hope for a victory on the merits in order to obtain a reimbursement. . . .").

[5] *Id*. ("The trial court also orders the defeated party to reimburse the other side's attorney's fees.  Litigants must therefore keep in mind that if they lose, they will have to cover their adversary's litigation expenses, as well as their own.").

[6] *See* Scott Dodson, *Comparative Convergences in Pleading Standard*s, 158 U. PA. L. REV. 441, 443 (2010) ("Unlike civil law countries, which require detailed fact pleading and often evidentiary support at the outset, . . . Rule 8 requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' a formula that has traditionally focused on notice rather than facts.").

[7] *See* OQUENDO (2011) at 62 ("The parties . . . do not have to go through a protracted . . . discovery phase.").

[8] *See* Kevin M. Clermont, *Standards of Proof Revisited*, 33 VT. L. REV. 469, 471 (2009) ("Instead of asking whether some fact X (say, that the defendant executed the promissory note disputed in a noncriminal, or civil, lawsuit) is more likely true than not, the Civil Law asks whether the fact is so probable as to create an inner and deep-seated conviction of its truth.").

[9] *See* OQUENDO (2011) at 62 ("The parties . . . do not have to . . . prepare the case for jury trial.  The judge decides both legal and factual issues.").

[10] *See supra* note 3 and accompanying text.

-7-

defendants find themselves and the alleged injury took place mostly abroad,[11] or (2) because the statute of limitations has expired.[12]

If any of the concerned Latin Americans insisted on lodging a complaint despite these disincentives, he or she would not, in all likelihood, survive a motion to dismiss, if not on the grounds just mentioned, then quite certainly for reasons of *res judicata*, with an endorsement of the ultimate outcome of this litigation.  Of course, the defendants would, in all probability, not take the exoneration attained in the United States all the way out to Latin America for judicial validation.  On the contrary, they would, without much doubt, first sit on it: ready to interpose it against any effort by their adversaries to reignite the dispute.

The aforementioned obstacles perhaps explain why barely anyone seems to have tried to stake in Latin America a claim previously rejected in the United States under Federal Rule of Civil Procedure 23 and why the judiciary of the region appears to have seldom confronted the issue of preclusion regarding U.S. class actions.  In 2013, the U.S. District Court for the Southern District of New York observed, in Anwar v. Fairfield Greenwich, that "the majority of Latin American courts have not specifically addressed the enforcement of United States class-action judgments."[13]  The observation remains true to this day.  In reality, my research has uncovered no opinion on point.

In any event, this Report will maintain that Latin American tribunals could only arbitrarily refuse recognition and that they would almost surely not do so if they ever received a request.  Therefore, it will wind up agreeing with the finding in *Anwar* "that

---

[11] *See*, *infra*, Section IV(C).
[12] *See generally*, Anwar v. Fairfield Greenwich, Ltd., 289 F.R.D. 105, 120 (S.D.N.Y. 2013) ("The Court . . . takes into account the unlikely ability of plaintiffs from the relevant Latin American countries to bring a duplicative action in their home countries.").
[13] *Id*. at 120.

-8-

**Hunton App. 1050**

courts in . . . Latin American countries would more likely than not recognize a class-action judgment"[14] and will indeed assess the chances at much greater than fifty percent. Obviously, the judiciary in Latin America, as elsewhere, might actually engage in arbitrariness, whether due to incompetence or bias, and conduct itself in a legally unpredictable manner. Nevertheless, it normally should not.

Of course, the parties may end up securing the Court's approval under Rule 23(e) and settling. If so, they could invoke the agreement in most Latin American jurisdictions, including the six under examination, as a valid contract,[15] or even as *res judicata*,[16] against any subsequent suit. As a result, a settlement would operate as the functional equivalent of an adjudication. Accordingly, the discussion will exclusively focus on the latter from now on and will bear upon the former *mutatis mutandis*.

---

[14] *Id*. at 119-120. *See also id*. at 120 ("[It is] more likely than not that the courts of the various [Latin American] jurisdictions would recognize, enforce, and give preclusive effect to a judgment in this action."). In re Vivendi Universal defines the general standard: "Where plaintiffs are able to establish a probability that a foreign court will recognize the *res judicata* effect of a U.S. class action judgment, plaintiffs will have established this aspect of the superiority requirement. . . . Where plaintiffs are unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority and, taken in consideration with other factors, may lead to the exclusion of foreign claimants from the class. The closer the likelihood of non-recognition is to being a "near certainty," the more appropriate it is for the Court to deny certification of foreign claimants." 242 F.R.D. 76, 95 (S.D.N.Y. 2007).

[15] *See* Cd. Civ. (D.F.) (Mex.) (1928), art. 2944 ("La transacción es un contrato por el cual las partes haciéndose recíprocas concesiones, terminan una controversia presente o previenen una futura."); Cd. Civ. (Venez.) (1982), art. 1713 ("La transacción es un contrato por el cual las partes, mediante recíprocas concesiones, terminan un litigio pendiente o precaven un litigio eventual."); Cd. Civ. (Colom.) (1887), art. 2469 ("La transacción es un contrato en que las partes terminan extrajudicialmente un litigio pendiente o precaven un litigio eventual."); Cd. Civ. (Pa.) (1916), art. 1500 ("La transacción es un contrato por el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen término al que habían comenzado."); Cd. Civ., art. 1302 (Peru) (1984) ("Por la transacción las partes, haciéndose concesiones recíprocas, deciden sobre algún asunto dudoso o litigioso, evitando el pleito que podría promoverse o finalizando el que está iniciado."); Cd. Civ. (Ecuad.) (2005), art. 2348 ("Transacción es un contrato en que las partes terminan extrajudicialmente un litigio pendiente, o precaven un litigio eventual.").

[16] *See* Cd. Civ. (D.F.) (Mex.) (1928), art. 2953 ("La transacción tiene, respecto de las partes, la misma eficacia y autoridad que la cosa juzgada. . . ."); Cd. Civ. (Venez.) (1982), art. 1718 ("La transacción tiene entre las partes la misma fuerza que la cosa juzgada."); Cd. Pro. Civ. (Venez.) (1990), art. 255 ("La transacción tiene entre las partes la misma fuerza que la cosa juzgada."); Cd. Civ. (Colom.) (1887), art. 2483 ("La transacción produce el efecto de cosa juzgada en última instancia. . . ."); Cd. Civ. (Pa.) (1916), art. 1506 ("La transacción tiene para las partes la autoridad de la cosa juzgada."); Cd. Civ. (Peru) (1984), art. 1302 ("La transacción tiene valor de cosa juzgada."); Cd. Civ. (Ecuad.) (2005), art. 2362 ("La transacción surte el efecto de cosa juzgada en última instancia.").

Hunton App. 1051

## B.  Recognition Requirements

Latin American countries, relative to each other, set equivalent parameters for the recognition of a final judicial decision from abroad.  In this sense, they evince the influence of a regional and civil law legislative and scholarly debate on the topic,[17] of the 1928 Private International Law Convention,[18] mainly drafted by Antonio Sánchez de Bustamante y Sirven, and of the 1979 Inter-American Convention on the Extraterritorial Validity of Foreign Judgments and Arbitral Awards.[19]  Each of the nations under examination provides a case in point.[20]

The relevant regimes apply when no special treaty exists, as with the United States, and invariably rest on the presumption of enforcement.  As a result, they compel a judge to enforce except upon a failure to satisfy any of the following conditions:

> (1) Reciprocity from the State of Origin;
> (2) Jurisdiction of the Foreign Court over the Matter;
> (3) Sufficiency of Service and Defense Opportunities;
> (4) Finality of the Judgment;
> (5) Absence of Any Pending Similar Domestic Suit;
> (6) Respect for Areas of Exclusive National Jurisdiction;
> (7) Compatibility with the Public Order.

---

[17] There has been an "intense cross-fertilization of procedural ideas in the region."  OQUENDO (2011) at 700.  *See*, *generally*, *id*. at 5 ("[T]he various systems of law [in Latin America] resemble each other . . . [due to] a shared history as well as . . . an intense process of cross-fertilization."); 114 ("In the realm of public law, Latin American countries [have] . . . focused considerably on each other's law.  European and North American influences often arrived *via* sister Iberian American nations.  This intense cross-fertilization . . . has continued to this day.").

[18] *See* Convention on Private International Law (Bustamante Code), Feb. 20, 1928, O.A.S. T.S. No. 34.

[19] Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards, May 8, 1979, 1439 U.N.T.S. 91; 18 I.L.M. 1224.

[20] "Generally, the relevant Latin American countries, regardless of whether they are signatories, look to the principles embodied in the Bustamante Code and Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards . . . to determine whether to recognize a foreign judgment."  Anwar v. Fairfield Greenwich, Ltd., 289 F.R.D. 105, 119 (S.D.N.Y. 2013).

Hunton App. 1052

While the specific national formulations of each may vary, they all operate essentially identically, at least for purposes of this discussion.

Of course, the applicable scheme will usually require certain solemnities. For instance, it may demand the translation or authentication of the original decision. This Report will not attend to these requirements. Assuming that the requesting party would have fulfilled them, it will zero in instead on the conditions just listed.

First, Chapter VI of the Mexican Federal Code of Civil Procedure regulates the "Execution of Judgments."[21]   At the outset, Article 569 enunciates that "private, non-commercial, foreign judgments . . . shall be enforced and recognized in Mexico so long as they do not run counter to the local public order."[22]   Hence, it presumes recognition, approaches public order as an exceptional ground of refusal, and, curiously, does not mention the other pre-requisites. Nonetheless, the latter do appear subsequently in connection with the process of executing a decision from abroad and presumably govern that of solely recognizing it too.

In particular, Article 571 imposes "conditions" on the "execution" of "judgments." It embraces every single one of those already enumerated:

> (1) "[T]he tribunal may deny execution upon proof that in the country of origin, foreign judgments . . . are not executed in analogous cases."[23]
> (2) "The judge or tribunal rendering the judgment must have had jurisdiction to consider and decide the matter under recognized international law rules that are compatible with those adopted by this Code."[24]

---

[21] Cd. Fed. Pro. Civ. (Mex.) (1943), Lib. IV, Tít. I, Cap. VI ("Ejecución de Sentencias"). *Cf.* Cd. Pro. Civ. D.F. (Mex.) (1932), Tít. VII, Cap. VI ("De la Comparación Procesal Internacional"); Cd. Com. (Mex.) (1889), Lib. V, Tít. I, Cap. XXVII. ("Ejecución de Sentencias").

[22] Cd. Fed. Pro. Civ. (Mex.) (1943), art. 569 ("Las sentencias . . . privad[a]s de carácter no comercial y . . . extranjer[a]s tendrán eficacia y serán reconocidos en la República en todo lo que no sea contrario al orden público.").

[23] *Id.,* art. 571 ("[E]l tribunal podrá negar la ejecución si se probara que en el país de origen no se ejecutan sentencias . . . extranjer[a]s en casos análogos").

-11-

Hunton App. 1053

(3) "The defendant must have been personally notified and served so as to assure his right to a hearing and to carry out his defense."[25]

(4) "[The judgment] must constitute *res judicata* in the country in which [it was] pronounced, with no further ordinary appeal available."[26]

(5) "The original action may not involve a matter presently pending before a Mexican tribunal in a dispute between the same parties."[27]

(6) "[The judgment] may not stem from an *in rem* action."[28]

(7) "The obligation enforced by the original action may not run counter to the public order in Mexico."[29]

Somewhat typically, this provision focuses on the exclusive local jurisdiction over *in rem* suits.

Second, the 1998 Law of Private International Law controls this area in Venezuela.[30]  Preserving the original numbering, it features all of the previous "requirements" except the first one (1):

(2) "The tribunals issuing the judgments must have jurisdiction over the cause of action. . . ."[31]

(3) "The defendant must have been duly served, must have had sufficient time to appear, and must have benefited from procedural guaranties that would reasonably allow him to build a defense."[32]

(4) "The judgments must constitute *res judicata* according to the law of the state in which they were issued."[33]

---

[24] *Id.*, art. 571(III) ("Que el juez o tribunal sentenciador haya tenido competencia para conocer y juzgar el asunto de acuerdo con las reglas reconocidas en el derecho internacional que sean compatibles con las adoptadas por este Código.").

[25] *Id.*, art. 571(IV) ("Que el demandado haya sido notificado o emplazado en forma personal a efecto de asegurarle la garantía de audiencia y el ejercicio de sus defensas.").

[26] *Id.*, art. 571(V) ("Que [la sentencia] tenga[] el carácter de cosa juzgada en el país en que fue[] dictad[a], o que no exista recurso ordinario en su contra.").

[27] *Id.*, art. 571(VI) ("Que la acción que les dio origen no sea materia de juicio que esté pendiente entre las mismas partes ante tribunales mexicanos.").

[28] *Id.*, art. 571(II) ("Que [la sentencia] no haya[] sido dictad[a] como consecuencia del ejercicio de una acción real.").

[29] *Id.*, art. 571(VII) ("Que la obligación para cuyo cumplimiento se haya procedido no sea contraria al orden público en México.").

[30] L. Dcho. Int. Priv. (Venez.) (1998).

[31] *Id.*, art. 53(4) ("Que los tribunales del Estado sentenciador tengan jurisdicción para conocer de la causa. . .").

[32] *Id.*, art. 53(5) ("Que el demandado haya sido debidamente citado, con tiempo suficiente para comparecer, y que se le hayan otorgado en general, las garantías procesales que aseguren una razonable posibilidad de defensa.").

[33] *Id.*, art. 53(2) ("Que tengan fuerza de cosa juzgada de acuerdo con la ley del Estado en el cual han sido pronunciadas.").

-12-

Hunton App. 1054

(5) "No lawsuit on the same matter, between the same parties, and initi-
ated prior to the issuance of the foreign judgment may be pending before
Venezuelan tribunals."[34]

(6) "The judgments may neither impinge upon real property rights pertain-
ing to real estate located in Venezuela nor effectively deprive Venezuela
of any exclusive jurisdiction it may have over the matter at stake."[35]

(7) "Legal determinations based on . . . foreign law . . . shall produce ef-
fects in Venezuela, unless they contradict . . . the essential principles of
the Venezuelan public order."[36]

The first five items derive from various subparts of Article 53, which bears the heading
"The Validity of Foreign Judgments."[37]  The last one figures as the fifth of the "General
Provisions" of Chapter I,[38] recalling its Mexican analogue in its embrace of a presump-
tive implementation of foreign judicial decisions.  Coincidentally, the adjudicator must
assess *res judicata* "according to the law of the state in which [the judgments] were is-
sued," not of Venezuela, as Professor James Otis Rodner seems to suppose.[39]

Third, Title XXXVI of Book Five of the Colombian Code of Civil Procedure
deals with "Judgments . . . Issued Abroad."[40]  It opens Chapter I with a slightly different
articulation, under Article 693, of the presupposition that enforcement will occur, stress-
ing the need to establish reciprocity rather than the public order:  "Judgments pronounced
in a foreign country . . . shall have, [in the absence of a treaty,] the same force as that

---

[34] *Id.*, art. 53(6) ("que no se encuentre pendiente, ante los tribunales venezolanos, un juicio sobre el mismo objeto y entre las mismas partes, iniciado antes que se hubiere dictado la sentencia extranjera.").

[35] *Id.*, art. 53(3) ("Que no versen sobre derechos reales respecto a bienes inmuebles situados en la Repúbli-ca o que no se haya arrebatado a Venezuela la jurisdicción exclusiva que le correspondiere para conocer del negocio.").

[36] *Id.*, art. 5 ("Las situaciones jurídicas creadas de conformidad con [el] Derecho extranjero . . . producirán efectos en la República, a no ser que contradigan . . . los principios esenciales del orden público venezola-no.").

[37] *Id.*, art. 53 ("De la Eficacia de las Sentencias Extranjeras").

[38] *Id.*, Cap. I ("Disposiciones Generales").

[39] Otis Rodner Declaration at 11, ¶ 27 ("The *res judicata* ("*cosa juzgada*") defense is governed by Article 346 (9) of the Venezuela Code of Civil Procedure and by Article 1395 of the Venezuelan Civil Code (VCC), which permit application of the defense only in relation to a judgment in a litigation on the same subject matter and among the same parties.").

[40] Cd. Pro. Civ. (Colom.) (1970), Lib.V, Tít. XXXVI ("Sentencias . . . Proferid[a]s en el Exterior").

-13-

granted there to those issued in Colombia."[41]   In addition, Article 694 contains all of the

former "requirements," except the first two (1, 2).

> (3) "[T]he defendant must have been duly served and afforded the opportunity to contest the charges, in accordance with the law of the state of origin, all of which is presumed by virtue of the finality of the judgment."[42]
> (4) "The judgment must be final under the law of the country of origin. . . ."[43]
> (5) "There may be neither a pending suit nor a final judgment in Colombia on the same matter."[44]
> (6) "The judgment may not involve rights pertaining to real property located on Colombian territory. . . ."[45]; nor any "matter over which Colombian judges have exclusive jurisdiction."[46]
> (7) "The judgment may not run counter to Colombian laws related to the public order."[47]

Significantly, the provision takes a unique approach by starting from the premise of a

suitable summons.

Fourth, Chapter III of Title VIII of the 2014 Panamanian Code of Private International Law governs "The Process of Recognition and Execution of Foreign Judgments."[48]

It lists, in its Article 179, all of the "requirements" except the fifth one (5).

> (1) "In the absence of a special treaty with the state of origin, the judgment may be executed, [e]xcept in case of proof that in that state no compliance with the decisions rendered by Panamanian tribunals takes place."[49]

---

[41] *Id.*, art. 693 ("Las sentencias . . . pronunciadas en un país extranjero . . . tendrán, [de no haber un tratado,] la fuerza . . . que allí se reconozca a las proferidas en Colombia.").

[42] *Id.*, art. 694(6) ("Que . . . se haya cumplido el requisito de la debida citación y contradicción del demandado, conforme a la ley del país de origen, lo que se presume por la ejecutoria.").

[43] *Id.*, art. 694(3) ("Que se encuentre ejecutoriada de conformidad con la ley del país de origen. . . .").

[44] *Id.*, art. 694(5) ("Que en Colombia no exista proceso en curso ni sentencia ejecutoriada . . . sobre el mismo asunto.").

[45] *Id.*, art. 694(1) ("Que no verse sobre derechos reales constituidos en bienes que se encontraban en territorio colombiano. . . .").

[46] *Id.*, art. 694(4) ("Que el asunto sobre el cual recae, no sea de competencia exclusiva de los jueces colombianos.").

[47] *Id.*, art. 694(2) ("Que no se oponga a leyes u otras disposiciones colombianas de orden público. . . .").

[48] L. 7, Cd. Dcho. Int. Priv. (Pan.) (2014), Tít. VIII, Cap. III ("Proceso de Reconocimiento y Ejecución de Sentencia Extranjera").

[49] *Id.*, art. 178 ("Si no hubiera tratados especiales con el Estado en el que se haya pronunciado la sentencia, esta podrá ser ejecutada, [s]alvo prueba de que en dicho Estado no se dé cumplimiento a las dictadas por tribunales panameños").

-14-

(2)"The judgment must have been rendered by a tribunal with jurisdiction. . . ."[50]

(3) "The defendant [must have been] personally served with the complaint.  In other words, the proceedings abroad must have allowed him to contest the charges."[51]

(4) The "foreign judgment" must "constitute *res judicata*; it must be firm and final, as well as no longer subject to appeal."[52]

(6) "The judgment may not encroach upon the Panamanian judiciary's exclusive jurisdiction.  Panamanian judges have exclusive jurisdiction over real estate located in Panama."[53]

(7) "The judgment may not infringe upon fundamental principles or rights under the public order of Panama."[54]

In Panama, in contradistinction to Colombia, the law apparently merely *permits* execution if reciprocity exists.

Fifth, Title IV of Book X of Peru's 1984 Civil Code addresses the "Recognition and Execution of Foreign Judgments. . . ."[55]  To this end, Article 2104 catalogs all seven "requirements."

(1) "Reciprocity must be proven."[56]

(2)  "The foreign tribunal must have had jurisdiction over the matter in accordance with the rules of private international law and with general principles on international procedural jurisdiction."[57]

(3) "The defendant must have been served according to the law of the forum; had a reasonable amount of time to appear, and benefited from procedural guaranties to conduct his defense."[58]

---

[50] *Id.*, art. 179 (1) ("Que la sentencia haya sido dictada por un tribunal competente. . . .").

[51] *Id.*, art. 179 (2): ("Que . . . la demanda . . . haya sido personalmente notificada al demandado.  Es decir, que el proceso evacuado en el extranjero haya cumplido con el principio del contradictorio.").

[52] *Id.*, art. 179 (La "sentencia extranjera" debe estar "revestida de autoridad de cosa juzgada y . . . en el resorte de su jurisdicción . . . firme y no sujeta a recurso alguno").

[53] *Id.*, art. 179 (1) ("Que la sentencia . . . no haya conculcado la competencia privativa de los tribunales panameños.  Se entiende que la competencia sobre bienes inmuebles ubicados en la República de Panamá es de competencia privativa de los jueces panameños.").

[54] *Id.*, art. 179 (3) ("Que la sentencia pronunciada por tribunal extranjero no conculque principios o derechos fundamentales del orden público panameño.").

[55] Cd. Civ. (Peru) (1984), Lib. X, Tít. IV ("Reconocimiento y ejecución de sentencias . . . extranjer[a]s.").

[56] *Id.*, art. 2104 (8) ("Que se pruebe la reciprocidad.").

[57] *Id.*, art. 2104 (2) ("Que el tribunal extranjero haya sido competente para conocer el asunto, de acuerdo a sus normas de Derecho Internacional Privado y a los principios generales de competencia procesal internacional.").

[58] *Id.*, art. 2104 (3) ("Que se haya citado al demandado conforme a la ley del lugar del proceso; que se le haya concedido plazo razonable para comparecer; y que se le hayan otorgado garantías procesales para defenderse.").

-15-

(4) "The judgment must constitute *res judicata* under the law of the forum."[59] "The judgment may not clash with an earlier one that meets the requirements for recognition and execution established in this Title."[60]
(5) "There may be no trial pending in Peru between the same parties, on the same matter, and initiated prior to the lodging of the complaint from which the judgment ensued."[61]
(6) "The judgment may not involve matters within Peru's exclusive jurisdiction."[62]
(7) "The judgment may not run counter to the public order or to good morals."[63]

Echoing its Colombian counterpart, Article 2102 proclaims:  "In the absence of a treaty with the country in which the judgment was pronounced, the latter shall have the same effect as that given there to judgments pronounced by Peruvian tribunals."[64]  Furthermore:  "If the judgment stems from a country that does not comply with the decisions of Peruvian tribunals, it shall have no force whatsoever in Peru."[65]

In fact, Article 838 of the Code of Civil Procedure declares:  "The existence of reciprocity regarding the effect given abroad to judgments . . . pronounced in Peru shall be presumed.  Whoever denies it shall bear the burden of negative proof."[66]  Professor José Domingo Rivarola Reisz accordingly identifies "a rebuttable presumption favouring reciprocity."[67]  Nonetheless, he rejects it as inapplicable "because no collective action rul-

---

[59] *Id.*, art. 2104 (4) ("Que la sentencia tenga autoridad de cosa juzgada en el concepto de las leyes del lugar del proceso.").
[60] *Id.*, art. 2104 (6) ("Que no sea incompatible con otra sentencia que reúna los requisitos de reconocimiento y ejecución exigidos en este título y que haya sido dictada anteriormente.").
[61] *Id.*, art. 2104 (5) ("Que no exista en el Perú juicio pendiente entre las mismas partes y sobre el mismo objeto, iniciado con anterioridad a la interposición de la demanda que originó la sentencia.").
[62] *Id.*, art. 2104 (1) ("Que no resuelvan sobre asuntos de competencia peruana exclusiva.").
[63] *Id.*, art. 2104 (7) ("Que no sea contraria al orden público ni a las buenas costumbres.).
[64] *Id.*, art. 2102 ("Si no hay tratado con el país en el que se pronunció la sentencia, tiene ésta la misma fuerza que en aquel país se da a las sentencias pronunciadas por los tribunales peruanos.").
[65] *Id.*, art. 2103 ("Si la sentencia procede de un país en el que no se da cumplimiento a los fallos de los tribunales peruanos, no tiene fuerza alguna en la República.").
[66] Cd. Pro. Civ. (Peru) (1993), art. 838 ("Se presume que existe reciprocidad respecto a la fuerza que se da en el extranjero a las sentencias . . . pronunciados en el Perú.  Corresponde la prueba negativa a quien niegue la reciprocidad.  Corresponde la prueba negativa a quien niegue la reciprocidad.").
[67] Rivarola Reisz Declaration at 10, ¶ 31.

-16-

ings have been yet issued in Perú."[68]  In addition, he argues that a Peruvian court could not find that the judiciary in the United States would enforce a final decision from Peru "in similar litigations" because Peruvian opt-out class suits "are dissimilar" in that they neither allow an individual as plaintiff nor address violations of securities law.[69]

In my estimation, however, an adjudicator in Peru will presume that U.S. courts reciprocate, independently of whether they have yet had occasion to do so.  Besides, he or she will probe whether the United States abides by "decisions of Peruvian tribunals," in general, not just by those of the same type, specifically.  In sum, he or she will initially accord the United States the benefit of the doubt, disregarding what happens in practice, until the petitioner demonstrates a clear U.S. reluctance to uphold Peru's judgments in any kind of controversy.

Finally, Article 414 of Ecuador's Code of Civil Procedure announces, likewise, that "foreign judgments . . . shall be complied with" even "[i]n the absence of international treaties and conventions,"[70] basically treating compliance as the rule rather than the exception.  It integrates only three of the seven strictures (4, 6, 7), expressly commanding the enforcement court to ascertain:

> (4) "That the judgment constitutes *res judicata* under the laws of the country in which it was rendered."[71]
> (6) "That the judgment was rendered upon a personal cause of action."[72]
> (7) That the judgment does not "contravene public law or the laws of Ecuador."[73]

---

[68] *Id*. at 10-11, ¶ 32.
[69] *Id*. at 11, ¶ 33.
[70] Cd. Pro. Civ. (Ecuad.) (2005), art. 414 ("A falta de tratados y convenios internacionales, se cumplirán [las sentencias extranjeras].").
[71] *Id.*, art. 414(a) ("Que la sentencia pasó en autoridad de cosa juzgada, conforme a las leyes del país en que hubiere sido expedida.").
[72] *Id.*, art. 414(b) ("Que la sentencia recayó sobre acción personal.").
[73] *Id.*, art. 414 ("no contravenir al Derecho Público o a las leyes ecuatorianas").

Hunton App. 1059

The phrase "a personal cause of action" refers to suits sounding in contract, tort, or the like,[74] and thereby suggests the exclusion of those asserting real property claims.[75] Moreover, the language quoted at the very end presumably means that the judgment may not collide with the notion of public order as reflected in Ecuadorian laws.

The Report will now examine whether a decision in the case at hand would live up to all of the referenced prerequisites. Ultimately, it will conclude that all of the jurisdictions under consideration would most likely opt for recognition. In my opinion, they could only arbitrarily hold otherwise. Once again, the judiciary in Latin America, just like anywhere else, might actually fall prey to such arbitrariness, whether for lack of competence or impartiality, and act legally unpredictably. Nonetheless, it normally should not.

On this front, Professor Antonio Gidi speculates that in Venezuela, "the lack of judicial independence . . . , coupled with [an] open anti-American stance would make it almost impossible to recognize a U.S. class action judgment against the interests of Venezuelan citizens."[76] Yet it seems to me that the leftist Venezuelan authorities will probably not feel much tempted to pressure the judiciary in a dispute that does not touch upon their political agenda in order to favor a group of mostly relatively wealthy national

---

[74] *See* BLACK'S LAW DICTIONARY ONLINE SECOND EDITION (http://thelawdictionary.org/personal-action/) (last checked on 6/6/15) ("A personal action seeks to enforce an obligation imposed on the defendant by his contract or delict; that is. it is the contention that he is bound to transfer some dominion or to perform some service or to repair some loss.").

[75] "Personal rights," according to the influential Chilean Civil Code, "are those that may only be vindicated against certain persons. . . . Personal actions derive from these rights." Cd. Civ. (Chile) (1857), art. 578 ("Derechos personales . . . son los que sólo pueden reclamarse de ciertas personas. . . . De estos derechos nacen las acciones personales."). *See also* Cd. Civ. (Colom.) (1887), art. 666; Cd. Civ. (Ecuad.) (2005), art. 596. "Real property rights," in contrast, "are those that we have over a thing, unrelated to any particular person. . . . Real actions derive from these rights." Cd. Civ. (Chile) (1857), art. 577 ("Derecho real es el que tenemos sobre una cosa sin respecto a determinada persona. . . . De estos derechos nacen las acciones reales."). *See also* Cd. Civ. (Colom.) (1887), art. 665; Cd. Civ. (Ecuad.) (2005), art. 595.

[76] Gidi Declaration at 14, ¶ 66.

-18-

investors against a number of international banks.  They will perhaps adopt a position of neutrality or, at worst, of indifference.

In any event, the analysis will now turn concretely to the first six standards.  The subsequent and penultimate Section D will concentrate on the remaining one.  In order to cover all of the underlying issues, it will break down into a number of Subsections.

## C.  From Reciprocity to Respect for Exclusive Local Jurisdiction

First, Mexico, Panama and Peru, which openly require reciprocity, should readily concede it exists in relation to the State of Texas.  So should the remaining nations, insofar as they might incorporate the same requirement *sub silentio*.  After all, Chapter 36 of the Texas Civil Practice & Remedies Code provides, amply enough, for the "Enforcement of Judgments of Other Countries."[77]  It establishes, in Section 36.004, that "a [final] foreign country judgment that is filed with notice . . . is [generally] conclusive between the parties to the extent that it grants or denies recovery of a sum of money [and] is enforceable in the same manner as a judgment of a sister state that is entitled to full faith and credit."[78]  Quite predictably and consistently with its Latin American equivalents, the statute carves out exceptions when, *inter alia*, the legal system of origin lacks impartiality or "due process,"[79] "the court did not have personal jurisdiction over the defendant"[80] or "over the subject matter,"[81] "the defendant . . . did not receive notice of the proceedings

---

[77] Tex. Civ. Prac. & Rem. Code , Ch. 36.
[78] *Id.*, § 36.004.
[79] *Id.*, § 36.005(a)(1).
[80] *Id.*, § 36.005(a)(2).
[81] *Id.*, § 36.005(a)(3).

-19-

Hunton App. 1061

in sufficient time to defend,"[82] "the judgment was obtained by fraud,"[83] "the [underlying] cause of action . . . is repugnant to the [local] public policy,"[84] "the judgment conflicts with another final and conclusive judgment,"[85] or "the foreign country in which the judgment was rendered does not recognize [Texan] judgments."[86]

      This legislative framework seems, in itself, to undermine Professor Eduardo Zuleta's bare assertion that, in relation to Colombia, "the reciprocity requirement . . . would not be satisfied in this Action."[87] Professor Antonio Gidi, however, posits that the fact "that the United States has recently denied recognition to a class action judgment from an Ecuadorean court (*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014)) . . . could be used in Venezuela as reason not to recognize a U.S. class action judgment,"[88] as well as in Ecuador.[89]  In *Donziger*, a federal judge in New York enjoined plaintiffs' lawyers and their associates from enforcing an Ecuadorian final decision that they had procured, in his own words, through "egregious fraud,"[90] "planned, supervised, financed and executed in important (but not all) respects by Americans in the United States in order to extract money from a U.S. victim."[91]  This isolated adjudication in a case that the tribunal itself labeled as "extraordinary"[92] will most likely not lead to a generalized refusal by the judiciary in Ecuador, let alone in Venezuela, to recognize judgments from Texas or anywhere else in the United States.

---

[82] *Id.*, § 36.005(b)(1).
[83] *Id.*, § 36.005(b)(2).
[84] *Id.*, § 36.005(b)(3).
[85] *Id.*, § 36.005(b)(4).
[86] *Id.*, § 36.005(b)(7).
[87] Zuleta Declaration at 4-5, ¶ 17.
[88] Gidi Declaration at 14, ¶ 67.
[89] *Id.* at 19, ¶ 91.
[90] Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 385 (S.D.N.Y. 2014).
[91] *Id.*
[92] *Id.* at 384.  Interestingly, the Ecuadorian suit sought the vindication of diffuse rather than homogenous individual rights and therefore resembled a class action under Rule 23(b)(2), not 23(b)(3).  For a discussion of these two types of entitlements and procedures, *see*, *infra*, Subsections IV(5)(b-c).

**Hunton App. 1062**

Second, the U.S. District Court for the Northern District of Texas would enjoy the requisite jurisdictional power over the subject matter in Mexico, Venezuela, Panama, and Peru, as well as in any other nation that might impose this pre-requisite by implication. "The judge or tribunal rendering the judgment," according to Mexico's Federal Code of Civil Procedure, "must have had jurisdiction to consider and decide the matter under recognized international law rules that are compatible with those adopted by this Code."[93] Indeed, the latter largely cohere with the former and would allow the Texan judiciary, as well as its federal counterpart, to assert jurisdiction in this affair. In particular, they accord jurisdictional authority to the tribunal "of the domicile of the defendant" in "personal actions,"[94] *e.g.*, those sounding in contracts or torts, as well as to the tribunal "located in the place where fulfillment of the obligation was agreed upon to take place."[95] This Court would therefore possess jurisdiction inasmuch as it sits at the state of domicile of at least some of the defendants,[96] as well as to the degree that there might have been an agreement to fulfill any related duties there.

Furthermore, Venezuela and Panama have legislated separately on private international law, defining specialized jurisdictional norms in this field. For instance, Articles 40 and 47, of the Venezuelan 1998 Law of Private International Law, jurisdictionally empower the tribunals of the "territory" where the "facts" happened, where the "obliga-

---

[93] Cd. Fed. Pro. Civ. (Mex.) (1943), art. 571(III) ("Que el juez o tribunal sentenciador haya tenido competencia para conocer y juzgar el asunto de acuerdo con las reglas reconocidas en el derecho internacional que sean compatibles con las adoptadas por este Código.").

[94] *Id.*, art. 24(IV). *See supra* notes 74-75 and accompanying text.

[95] Cd. Fed. Pro. Civ. (Mex.) (1943), art. 24(II).

[96] "If there were various defendants with different domiciles, the judge sitting in the domicile chosen by the plaintiff shall have jurisdiction." Cd. Pro. Civ. D.F. (1932), art. 156(IV) ("Cuando sean varios los demandados y tuvieren diversos domicilios, será competente el juez que se encuentre en turno del domicilio que escoja el actor.").

-21-

tions were to be carried out," or where the "contracts" were executed.[97]  Similarly, Chapter V of the Preliminary Title of the Panamanian 2014 Code of Private International Law bears the caption "Forum of Judicial Jurisdiction."[98]  In Article 13, it confers "jurisdiction" in "torts" upon "tribunals . . . where the harm occurred"; "in personal actions" upon those "of the defendant's domicile"; and otherwise upon those "where the defendant's goods and assets are located."[99]  In Peru, for its part, the 1984 Civil Code's Title IV, captioned "Recognition and Execution of Foreign Judgments . . .,"[100] solely invokes, under Article 2104(2), international legal norms:  "The foreign tribunal must have had jurisdiction over the matter in accordance with its rules of private international law and general principles on international jurisdiction."[101]

Once again, this federal Court could exercise its jurisdictional power under these international standards.  After all, it sits where many of the relevant actions allegedly transpired, where some of the defendants are domiciled, where some of defendants' resources are presumably located, and where some of the averred obligations should have been performed.  Moreover, the judge will rule on the merits possibly upon concluding, for purposes of venue under 28 U.S.C. § 1391(b)(2), that "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" in his "judicial district."[102]  If so, he would agree with the complaint's contention that "Texas was the epicenter of the Stanford Entities with

---

[97] L. Dcho. Int. Priv. (Venez.) (1998), arts. 40 & 47.
[98] Cd. Dcho. Int. Priv. (Pan.) (2014), Tít. Prelim., Cap. V ("Foro de Competencia Judicial").
[99] *Id*., art. 13.
[100] Cd. Civ. (Peru) (1984), Lib. X, Tít. IV ("Reconocimiento y ejecución de sentencias . . . extranjer[a]s.").
[101] *Id*., art. 2104 (2) ("Que el tribunal extranjero haya sido competente para conocer el asunto, de acuerdo a sus normas de Derecho Internacional Privado y a los principios generales de competencia procesal internacional.").
[102] 28 U.S.C. § 1391(b)(2).

-22-

whom Defendants regularly conducted business."[103]   In reality, he has already "held that notwithstanding the appearance of multiple legal entities, Stanford's financial empire was a single business enterprise centered in Houston, Texas."[104]   Finally, the requested application of the law of Texas would have to ride on a determination that the "State [has] a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."[105]

Professor Antonio Gidi suggests that in assessing whether this tribunal enjoys "jurisdiction under private international law,"[106] a Latin American adjudicator would pass on whether it possesses what the common law denominates "personal jurisdiction over the absent members of the plaintiff class."[107]   Likewise, Justice Arturo Hoyos declares:  "A Panamanian court would . . .  analyze whether a U.S. court had personal jurisdiction over Absent Panamanians."[108]   In my opinion, however, the judiciary in Latin America would most probably focus *not* on any such issue, but rather on the criteria just discussed.  As explained in the next Section, it would most likely take the due process rights of absentees into account when ascertaining the final decision's coherence with the public order and ultimately find no violation of those entitlements.

---

[103] Plaintiffs' Second Amended Class Action Complaint (May 1, 2015), ¶ 37, p. 11-12.

[104] Order of June 5, 2014, Rotstain v. Trustmark National Bank, Civil Action No. 3:09-CV-2384-N (N.D. Tex.) at 4.

[105] Allstate Insurance Co. v. Hague, 449 U.S. 302, 313 (1981).

[106] Gidi Declaration at 10, ¶ 44.

[107] *Id*. at 12, ¶ 57.  *See also id*. at 10, ¶ 43 ("Latin American courts will apply principles of jurisdiction developed in international law to determine whether there were significant contacts with the United States, which are necessary to create jurisdiction."); *id*. at 12, ¶ 56 ("There are simply no accepted standards under which Latin American courts would accept that a U.S. court would have jurisdiction over a foreigner who lacked significant contacts with the United States. . . .").

[108] Hoyos, Declaration at 14, ¶ 40(a).  *See also id*. at 14, ¶ 40(a) ("If there were insufficient contacts between the Absent Panamanians and the U.S. jurisdiction (which is a factual question), a Panamanian court would not find personal jurisdiction and therefore would not enforce the *Rotstain* Action as binding on Absent Panamanians.").

-23-

**Hunton App. 1065**

As to the third parameter, the summons in the present lawsuit and the trial as a whole will unfold under Federal Rules of Civil Procedure.  Consequently, they will afford each defendant suitable service and occasion vigorously to defend itself, as expressly mandated in Mexico Venezuela, Colombia, Panama, and Peru and as might be expected elsewhere.  Obviously, none of these schemes calls, with respect to other persons, for any kind of notification or a corresponding opportunity to litigate effectively, let alone a full-fledged summons, along the lines propounded by several of the defendant's experts.[109]  All the same, absent class members will—by virtue of Rules 23(c)(2)(B), 23(d)(1)(B)(iii), and 24—receive individual notice and have a chance to participate in the litigation.[110]  As shown in Subsections IV(D)(2-3), they will benefit overall from a series of safeguards that completely comport with due process, as construed in Latin America, as well as in the United States.

Fourth, the ultimate decision will possess finality and amount to *res judicata* under U.S. law, as prescribed by all of the Latin American regimes under consideration.  *Ex hypothesis*, the federal judiciary would have finally decided the controversy, with no possibility of further appeal, by the time a tribunal south of the border would confront the request for recognition.  In addition, the judgment will constitute *res judicata* in the terms spelled out by the Supreme Court of the United States:

> There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation . . . .  Basic principles of *res judicata* (merger and bar or claim preclusion) . . . apply.  A judgment in favor of the plaintiff class extinguishes their claim, which merges into the judgment granting relief.  A judgment in favor of the defendant extinguishes the claim, barring a subsequent action on that claim.[111]

---

[109] *See* Subsection IV(D)(4), *infra*.
[110] FED. R. CIV. P. 23(c)(2)(B), 23(d)(1)(B)(iii), & 24.
[111] Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 874 (1984).

-24-

Hunton App. 1066

Hence, the judgment will preclude all parties and all absentees.

Fifth, the question posed equally presupposes the absence of any pending similar domestic suit, as explicitly demanded in Mexico, Venezuela, Colombia, and Peru and as perhaps implicitly necessitated in other nations.  It zeroes in on the very first Latin American complaint, which as such would precede any competing attempts.  As to the sixth standard, which all of the concerned countries embrace, the controversy touches neither upon real estate located in Latin America, nor upon any local jurisdictional pre-rogatives.

## D.  Public Order

### 1.  Definition and Overview

Latin American jurisdictions, including all six focused on by this Report, invaria-bly permit a tribunal to refuse to uphold a final judicial decision from abroad that runs counter to the public order.  Obviously, they do not thus purport to eradicate or under-mine the presumption in favor of recognition.  The exception in question applies only if the judgment at stake clearly collides with vital precepts of the national legal system and polity.[112]

---

[112] *Cf.* Anwar v. Fairfield Greenwich, Ltd., 289 F.R.D. 105, 115 (S.D.N.Y. 2013) ("Therefore, the Court concludes that, where a plaintiff sufficiently demonstrates that the stated policy of a foreign country is to recognize and enforce foreign judgments, or that its law is generally inclined to favor that course of action, such a showing would create a rebuttable presumption that, absent an affirmative showing to the contrary, recognition of a particular United States judgment, even in class action litigation, does not violate a foreign country's public policy.").

Hunton App. 1067

The Supreme Court of Panama has defined the public order, after quoting French jurist Henri Capitant, in these terms:

> [T]he public order encompasses norms and principles that advance the interests of individuals and guarantee societal coexistence. It contributes to social and collective welfare guided by the precepts of justice and morality that should prevail in every nation. It finds expression in the fundamental principles enshrined in our Constitution.[113]

In other words, this notion comprises a series of shared normative convictions that relate to the well-being of the people, individually and collectively, and that ordinarily take constitutional form.

Consequently, the public order does not amount merely to the laws currently in force. Nor does it boil down to official policy, which may stem from an isolated or tentative determination by one of the branches of government. The public order sets itself apart precisely because it usually develops over time, under the influence of numerous institutions, and impinges upon communal life as an entirety in a relatively permanent manner.

Of course, the laws and policies in force may coincide with or reflect the public order. They often do not; though. Hence, one must check for further corroboration. For example, a judge in an extradition proceeding may have to assess a foreign death penalty for consistency with the public order.[114] He or she may start by observing that the national penal code does not provide for the capital sentence and that the current administration has, as a matter of policy, opposed an amendment. Nonetheless, the adjudicator

---

[113] [Grupo Capital Factoring v. Karikal Investment], Exp. No. 852-02, Sala 4ta Neg. Gen., Ct. Supr. Jus. (Pan.) (2008) ("[E]l orden público comprende las normas y principios que defiende los intereses de los particulares y que garantiza la convivencia en sociedad, busca la seguridad social y colectiva, donde se destacan los principios de justicia y moral que deben regir en todo Estado; además de concebirse como los principios fundamentales estipulados en nuestra constitución.").

[114] In Argentina, for example, extradition will not "lie whenever it would run counter to . . . the public order." L. 24767 (Arg.) (1998), art. 10 (No "procederá la extradición cuando existan especiales razones de . . . orden público[.]").

Hunton App. 1068

would normally also examine the local bill of rights, ratified international treaties, and so forth in order to look for the requisite denunciation—rather categorical and definitive—of this sort of punishment.

> In this sense, the Mexican Supreme Court has declared:

>> The public order takes the law and the case law into account and ultimately constitutes a norm that has a nullifying effect under extreme circumstances.  It does not rest on a sum of purely private interests.  It touches upon interests of such an importance that it ends up forbidding acts that may harm the collectivity, the state, or the nation, even if the concerned parties suffer no loss and actually acquiesce.[115]

From this standpoint, an extraneous judgment must clash with these crucial interests, or with the previously mentioned fundamental principles, and cause this type of injury to the society as a totality in order to qualify as incompatible with the public order.

A no longer appealable decision in the case at bar would, *ex hypothesis*, fully comply with U.S. law on substance and procedure and, therefore, with almost any conceivable cardinal norm in Latin America.  All the same, it might raise due process concerns because of the way in which it would preclude absent class members.  More concretely, Latin American absentees seeking a second bite at the apple back home might protest that they never explicitly agreed to the suit, let alone to its *res judicata* consequences.

In truth, the concept of due process, together with its strict ban on legally arbitrary deprivations of life, liberty, or property, has become a central component of the constitu-

---

[115] 3ra Sala, 5ta Época, Seman. Jud. Fed., T. XXXVII, p. 1835, Supr. Ct. Just. Nac. (Mex.) (1933) ("El orden público que tiene en cuenta la ley y la jurisprudencia, para establecer una norma sobre las nulidades radicales, no puede estar constituido por una suma de intereses meramente privados; para que el orden público esté interesado, es preciso que los intereses de que se trate, sean de tal manera importantes, que, no obstante el ningún perjuicio y aun la aquiescencia del interesado, el acto prohibido pueda causar un daño a la colectividad, al Estado o a la nación.").

Hunton App. 1069

tion and the public order everywhere in Latin America.[116]  Significantly, it traveled from the United States southward, starting in the nineteenth century, and eventually reached every corner of this vast territory.[117]  As a result, the inquiry into whether the preclusion, under Rule 23(c)(3)(B), of a person who has not affirmatively consented to the complaint contravenes due process would not unfold much differently north and south of the border.

In all likelihood, a tribunal in Latin America would, as much as one in the United States, essentially pass on the fairness of the procedural setup *vis-à-vis* absent class members.[118]  All in all, it would probe into the extent to which they had their welfare regard-

---

[116] *See generally* OQUENDO (2011) at 351 ("Since the attainment of independence in the nineteenth century, Latin American constitutions have guaranteed . . . due process.").

[117] *See, e.g.*, *id.* at 746 ("Article 14 [of the Mexican Federal Constitution] enunciates various guaranties that echo U.S. constitutional principles such as the ban on *ex post facto* laws and due process."), 289 ("Articles 14 and 16 [of the Mexican Federal Constitution] echo the due process clauses of the U.S. Constitution's fifth and fourteenth amendments."), 789 (Constitution (Brazil) (1988), Title II (Fundamental Rights and Guarantees), Chapter I (Individual and Collective Rights and Duties), Article 5(LIV):  "No one shall be deprived of his or her liberty or assets without due process of law."). The District Court on Civil and Labor Matters for the State of Nuevo Leon in Mexico, for its part, has observed that "the notion due process of law, which has its origins in Anglo-American law, was exported to Mexico" and that, in this respect, "the United States and Mexico honor the same principle." Exp. Jud. 32/9009-II, Juz. Dist. Mat. Civ. & Tbjo. Nuevo León (Mex.) (2010), pp. 22-23 ("[E]l debido proceso legal cuyo origen es el derecho anglosajón . . . se exportó a México.") ("[E]n Estados Unidos de América como en México se consagra el mismo principio.").

[118] *See, generally*, OQUENDO (2011), Ch. XII, §§ C, E (Due Process Case Law in Mexico and Brazil).  Latin American tribunals, like their U.S. counterparts, essentially assess whether existing procedures treat concerned individuals fairly.  In Melgar Castillejos v. President, for example, the Mexican Supreme Court held that the preliminary internment of a person for mental incompetence without a hearing violates due process.  It declared:  "We conclude that the challenged statute could lead to confinement and appointment of a tutor when the person concerned is in full possession of all of his or her capacities.  The statutory provisions clearly deny him or her the opportunity to make allegations or introduce evidence to establish his or her lucidity, for they do not entitle him or her to intervene in the process." *Id.* at 752-753.  In Brazilian Union of Composers v. Villarinho, Brazil's Supreme Court reasoned along parallel lines when it struck down an organization's decision to throw out a member without allowing him to respond:  "[The complainant's] expulsion . . . without guaranteeing him an ample defense, cross-examination, and constitutional due process disadvantages him considerably.  He can no longer exercise the copyright related to the performance of his works.  Moreover, even if plaintiff had joined other similar entities, at the national or international level, the imminent disciplinary exclusion would burden him. . . ." *Id.* at 792.  Precisely in an execution proceeding, the District Court on Civil and Labor Matters for the State of Nuevo Leon in Mexico took an analogous approach in rejecting the defendant's objection to the service of process under Texas law.  It stated:  "This tribunal cannot question the particular mechanisms available [in the United States] to enforce the right to a hearing . . . for one cannot expect the summons in that nation to comport with Mexican law, only that it assure the defendant the right to fair treatment." Exp. Jud. 32/9009-II, Juz. Dist. Mat. Civ. & Tbjo. Nuevo León (Mex.) (2010), p. 23 ("este juzgado no puede cuestionar los mecanismos [estadounidenses] para hacer efectiva la garantía de audiencia; . . . por lo que es imposible pretender que el emplazamiento en

-28-

ing the affair at hand appropriately protected in the proceedings, through their representative, their class attorney, and the trial judge, into the sufficiency of the notice they received, and into whether they had a real possibility of preserving their right to a day in court. The next two Subsections will deal with these matters in relation to class actions in general and to those specifically controlled by Rule 23(b)(3), respectively.

Furthermore, a Latin American judge would almost certainly consider comparable homegrown suits. He or she would determine whether they share those features of Rule 23(b)(3) actions alleged to infringe upon due process. Subsection 4 will first discuss regional suits that operate analogously in that they allow the vindication of a large number of similar, interrelated individual entitlements, so-called "homogenous individual rights." In the end, they instantly bind scores of people, who have assented to the litigation either by opting in rather informally or simply by failing to opt out. Accordingly, the U.S. opt-out scheme will, in all probability, not come across as unfair even in jurisdictions that require represented persons somehow to opt in.

Finally, Subsection 4 will analyze diffuse rights suits, which resemble Rule 23(b)(2) actions or citizen suits and which exist in every single one of the nations under consideration, as well as all over the continent. It will expose them as wresting the individual right to sue from an absentee without securing any kind of consent from him or her, without affording him or her personal notification, and without according him or her an opportunity to bail out. Upon stressing the irrelevance of the fact that the underlying substantive entitlement is collective instead of individual, the analysis will close with the assertion that Latin American tribunals would almost surely adjudge Rule 23(b)(3) ac-

---

esa nación sea conforme a la legislación mexicana; lo relevante es que se asegure al demandado la garantía de trato.").

Hunton App. 1071

tions, as well as these ubiquitous diffuse rights suits, consistent with due process and the public order.

As a whole, the ensuing segments of this Section will endorse the holding in An-war v. Fairfield Greenwich that an adjudicator in Latin America would *not* deem a "judgment [in a Rule 23(b)(3) action] manifestly contrary to the . . . public [order]."[119] Nevertheless, they will progress from noting, likewise, "the absence . . . of any authority from the relevant Latin American countries expressly stating that the enforcement of a United States opt-out class action judgment would manifestly violate the public [order] of any of the relevant Latin American countries"[120] to demonstrating, along the lines just delineated, that the two would indeed cohere with each other.  That is to say, a judge in Latin America could not only presume but also ascertain such coherence.

Moreover, a Latin American tribunal would probably realize that a refusal to rec-ognize would, in practice, deprive defendants themselves of due process, as well as dis-criminate against them.  In particular, they would have risked effective liability to absent class members from Latin America without really attaining a corresponding, complete exoneration upon a victory on the merits.  Finally, these absentees, irrespective of whether they had ever lived in or even visited the United States, could not rightfully de-nounce the preclusive impact on them.  After all, they would have had a shot at compen-sation through the effort of others, would have benefited from a panoply of protections, along with the right to ample information and to exit, and could have faced basically the same sweeping *res judicata* effect in their lands of origin.

---

[119] Anwar v. Fairfield Greenwich, Ltd., 289 F.R.D. 105, 119 (S.D.N.Y. 2013).
[120] *Id*. at 120.

-30-

**Hunton App. 1072**

## 2.    Due Process and Class Action Absentees

On first impression, any judgment arrived at in the present controversy might seem to encroach upon due process insofar as it binds absent class members who reside in Latin America, who did not appear as plaintiffs, and who merely failed to "opt out." These claimants might contend that they never really consented to this collective suit, let alone participated in it, and that they should, consequently, preserve the right to re-litigate their claims upon a defeat on the merits.

Actually, class actions exist precisely for the sake and advantage of the represented persons.  Not surprisingly, the drafters and the judicial interpreters of Rule 23 have painstakingly sought to secure the entitlements of absentees.  Moreover, they have done so based on the same due process concept that Latin American jurisdictions have adopted.  While this process of adoption has entailed some adaptation and modification, it has not led to an alteration of the basic tenets, through which U.S. law has developed this litigation device.[121]  Therefore, a judge in Latin America should deem neither a U.S. class action, such as the one presently under way, nor the final decision to be incompatible with the local conception of due process.

Significantly, the Advisory Committee on the 1966 Amendment, which produced, in essence, the currently enforced Rule 23,[122] viewed the mission undertaken as treating fairly, or consistently with due process,[123] the totality of class members subject to preclu-

---

[121] *See*, *generally*, OQUENDO (2011), Ch. XII.

[122] Ortiz v. Fibreboard, 527 U.S. 815, 833 (1999) ("[M]odern class action practice emerged in the 1966 revision of Rule 23."); Amchem v. Windsor, 521 U.S. 591, 613 (1997) ("Rule 23, governing federal-court class actions, stems from equity practice and gained its current shape in an innovative 1966 revision.").

[123] Clark v. Arizona, 548 U.S. 735, 771 (2006) ("[D]ue process requires" "the standard of fundamental fairness,"); Daniels v. Williams, 474 U.S. 327, 331 (1986) ("[T]he Due Process Clause promotes fairness."); Landon v. Plasencia, 459 U.S. 21, 34-35 (1982) ("The role of the judiciary is limited to determining

-31-

sion by virtue of the ultimate ruling.  It perceived as a main deficiency of the original version the failure to "provide an adequate guide to the proper extent of the judgments in class actions" and "squarely [to] address . . . the question of the measures that might be taken during the course of the action to assure procedural fairness."[124]  In response, the end product expressly "provides that all class actions maintained to the end as such will result in judgments including those whom the court finds to be members of the class, whether or not the judgment is favorable to the class[,] and refers to the measures which can be taken to assure the fair conduct of these actions."[125]

Naturally, because the representatives appear themselves before the judge, issues of fairness arise mostly with respect to represented class members.  Hence, the Supreme Court has interpreted many of the "specifications of the Rule" as "designed to protect absentees by blocking unwarranted or overbroad class definitions."[126]  In this sense, it has held that the prerequisites established in subsections (a) and (b) do not solely "focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives," but also, more generally, aim at "the protection of absent class members [and] serve to inhibit appraisals of the chancellor's foot kind."[127]

Indeed, Rule 23 structures the whole procedure for class actions with an eye to ensuring the fair treatment of every class member.  For instance, it does not permit the plaintiffs simply to lodge a complaint and proceed, but, rather, commands them to certify

---

whether . . . procedures meet the essential standard of fairness under the Due Process Clause."); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953) ("[D]ue process of law" encompasses "traditional standards of fairness").

[124] FED. R. CIV. P. 23 advisory committee's note (1966 Amendment) (Difficulties with the Original Rule).

[125] *Id.*

[126] *Amchem*, 521 U.S. at 620.

[127] *Id.* at 621.

-32-

the class beforehand.  In particular, they must show, *inter alia*, that they "will fairly and adequately protect the interests of the class."[128]  As read by the highest federal tribunal, this "adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent."[129]  Only upon certification and this specific determination may the suit go forward.

The Supreme Court has explained how these controls safeguard the absentees' well-being:

> A plaintiff class . . . cannot first be certified unless the judge, with the aid of the named plaintiffs and defendant, conducts an inquiry into the common nature of the named plaintiffs' and the absent [members'] claims, the adequacy of representation, the jurisdiction possessed over the class, and any other matters that will bear upon proper representation of the [absentees'] interest.  *See, e. g.*, . . . Fed. Rule Civ. Proc. 23.  Unlike a defendant in a civil suit, [an absent] class [member] is not required to fend for himself. . . .  The court and named plaintiffs protect his interests.[130]

All in all, these checks should sufficiently guarantee that absentees will profit from the litigation.

If the complainants successfully pass the battery of preliminary tests, the tribunal must then "appoint class counsel."[131]  In so doing, it "may consider any . . . matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."[132]  "If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class."  Consistently, the Rule defines

---

[128] FED. R. CIV. P. 23(a)(4).
[129] *Amchem*, 521 U.S. at 625.
[130] Phillips Petroleum v. Shutts, 472 U.S. 797, 809 (1985).
[131] FED. R. CIV. P. 23(c)(1)(A).
[132] FED. R. CIV. P. 23(g)(1)(B).

Hunton App. 1075

"Counsel's Duty" in the following terms:  "Class counsel must fairly and adequately represent the interests of the class."[133]

Moreover, judges become very engaged in a class action proceeding, more so than in an individual suit.  They must constantly make sure to look after the welfare of class members.  Thus, in "conducting [the] action, the court may issue orders that . . . require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of (i) any step in the action; (ii) the proposed extent of the judgment; or (iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action."[134]  It may also "impose conditions on the representative parties or on intervenors, . . . require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly or deal with similar procedural matters."[135]

In a parallel vein, Rule 23 compels the plaintiffs litigating under it, in contradistinction to their counterparts in an ordinary suit, to obtain judicial endorsement prior to settling, voluntarily dismissing, or compromising the claim.[136]  Furthermore, it obligates them to "file a statement identifying any agreement made in connection with [any such] proposal" and to send "notice in a reasonable manner to all class members who would be bound by the proposal."[137]  "Any class member may," at this point, "object to the proposal" and "may [withdraw the objection] only with the court's approval."[138]  Most im-

---

[133] FED. R. CIV. P. 23(g)(4).
[134] FED. R. CIV. P. 23(d)(1)(B).
[135] FED. R. CIV. P. 23(d)(1)(C-E).
[136] FED. R. CIV. P. 23(e).
[137] FED. R. CIV. P. 23(e)(3, 1).
[138] FED. R. CIV. P. 23(e)(5).

-34-

Hunton App. 1076

portantly, "if the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."[139]  With these constraints, the law meticulously upholds the due process entitlements of the entire membership.  In the words of the Supreme Court, it specifically manifests "concern . . . for the [absentees]" and a "continuing solicitude for their rights."[140]  At the end of the day, "an absent class [member] is not required to do anything.  He may sit back and allow the litigation to run its course, content in knowing that there are safeguards provided for his protection."[141]

In ascertaining whether a class action infringes upon the entitlements of the passive class members, a Latin American tribunal would examine the inner mechanics too. It would, most probably, understand them as effectively devised to honor absentees' entitlements.  In all likelihood, the strictures in place would suffice for purposes of due process in Latin America, as well as in the United States.

Ultimately, defeated Latin American absent class members could hardly cry foul *ex post facto*, any more than their U.S. peers.  They would have free-ridden on the plaintiffs' efforts, with a chance at compensation upon a favorable ruling, and would have benefited, throughout the proceedings, from a judge, a class attorney, and a representative solicitous, by law, of their welfare in relation to the affair at hand.  In this particular suit, the Official Stanford Investors Committee, which "this Court [has] designated . . . to represent the interests of [all Stanford International Bank] investors in [the Receiver's suits] and related proceedings"[142] and which has already intervened,[143] should likewise play

---

[139] FED. R. CIV. P. 23(e)(2).
[140] *Phillips*, 472 U.S. at 810.
[141] *Id*.
[142] The Official Stanford Investors Committee, Intervenor Complaint (Dec. 14, 2012) at 8, ¶ 19.

Hunton App. 1077

such a guardian role. In my estimation, the judiciary in Latin America would most likely regard the entire arrangement as patently fair. In addition, it would almost certainly appreciate that this collective litigation had enabled Latin American absentees to stake their claim, to begin with, without having to travel northward in order to familiarize themselves with the legal system, hire a lawyer, and prosecute a separate complaint in the United States.

### 3.    Due Process and the Opt-Out Regime

"Rule 23(b)(3)," which resulted from the 1966 revision and under which the proceedings will unfold, "added to the complex-litigation arsenal class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be excluded."[144] Not surprisingly, it introduced a number of supplemental parameters precisely to enhance fairness toward absentees. At the outset, tribunals must verify "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[145] They must especially assess "the class members' interests in individually controlling the prosecution or defense of separate actions."[146]

"For any class certified under Rule 23(b)(3), the judge must," specifically, "direct to class members the best notice that is practicable under the circumstances, including

---

[143] *See id.* at 9, ¶ 20 ("The Committee now brings this action as an intervening plaintiff pursuant to this Court's Order dated December 6, 2012, granting the Committee's motion to intervene. . . .").

[144] *Amchem*, 521 U.S. at 614-615.

[145] FED. R. CIV. P. 23(b)(3).

[146] FED. R. CIV. P. 23(b)(3)(A).

-36-

Hunton App. 1078

individual notice to all members who can be identified through reasonable effort."[147]  The Supreme Court has strictly construed this command:  "Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort."[148]  "The notice must," according to the provision itself,

> clearly and concisely state in plain, easily understood language:
> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members. . . .[149]

The drafting Advisory Committee set forth this notification regime in order to ensure compliance with due process:  "This mandatory notice . . . , together with any discretionary notice which the court may find it advisable to give . . . , is designed to fulfill requirements of due process to which the class action procedure is of course subject."[150]

    In passing on the fairness of a judgment in a 23(b)(3) class action, a Latin American tribunal would have to take into account these special measures conceived to keep an absent member abreast of the developments and to permit him or her to exit.  It would quite certainly view them as not only very protective of absentees but also as deliberately contrived for that purpose.  In my opinion, the efforts undertaken by the framers on this front would almost surely come across as more than sufficient in a region that essentially shares the due process concept with the United States.

---

[147] FED. R. CIV. P. 23(c)(2)(B).
[148] Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173 (1974).
[149] FED. R. CIV. P. 23(c)(2)(B)(i-vii).
[150] FED. R. CIV. P. 23 advisory committee's note (1966 Amendment) (Subdivision (d)).

Hunton App. 1079

Pertinently, the U.S. Supreme Court confronted, in Phillips Petroleum Co. v. Shutts, the argument "that the 'opt out' procedure . . . is not good enough, and that an 'opt in' procedure is required to satisfy the Due Process Clause of the Fourteenth Amendment."[151]  For the sake of clarity, it explained that "an 'opt in' provision would require that each class member affirmatively consent to his inclusion within the class."[152] The oft divided justices on this occasion unanimously "reject[ed] [the] contention that the Due Process Clause of the Fourteenth Amendment requires that absent [class members] affirmatively 'opt in' to the class, rather than be deemed members of the class if they do not 'opt out.'"[153]  They retorted that a tribunal "may [indeed] exercise jurisdiction over the claim of an absent[ee]"[154] and held "that the protection afforded . . . class members . . . satisfies the Due Process Clause."[155]

The highest federal tribunal argued that:  "The interests of [absentees] are sufficiently protected by the forum . . .  when those [persons] are provided with a request for exclusion that can be returned within a reasonable time to the court."[156]  It elaborated its thinking as follows:

> If the forum . . . wishes to bind an absent [class member] concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection.  The [absentee] must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. . . .  The notice should describe the action and the plaintiffs' rights in it.  Additionally, . . . due process requires at a minimum that an absent [class member] be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court.  Finally, the Due Process

---

[151] *Phillips*, 472 U.S. at 811.
[152] *Id*.
[153] *Id*. at 812.
[154] *Id*. at 811.
[155] *Id*. at 815.
[156] *Id*. at 814.

-38-

Hunton App. 1080

Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.[157]

The justices underscored that class members acquiesce by declining to bail out when allowed to do so.

> [T]he "opt out" procedure . . . is by no means *pro forma*, and . . . the Constitution does not require more to protect what must be the somewhat rare species of class member who is unwilling to execute an "opt out" form, but whose claim is nonetheless so important that he cannot be presumed to consent to being a member of the class by his failure to do so. [W]e do not think that the Constitution requires . . . sacrific[ing] the obvious advantages in judicial efficiency resulting from the "opt out" approach for the protection of [such a] *rara avis*. . . .[158]

Naturally, the "advantages in judicial efficiency" inure mostly to the benefit of absentees. Therefore, these individuals can scarcely repudiate the judgment as unfair to them.

In all probability, Latin American judges would reason along the lines of their U.S. colleagues that the safeguards in place generally for class actions and particularly for those of the opt-out kind suffice. As a consequence, they would most likely conclude that Rule 23(b)(3) class actions, just as the comparable local suits referenced in the next Subsection, comport with due process and, accordingly, with the public order. Once again, the same basic notion of due process should not yield different answers on one and the other side of the border.

For all of these reasons, Latin American absent class members could not subsequently remonstrate with just cause, any more than their U.S. counterparts, about the way in which they became part of the class. They would have learned, in their native tongue, about the litigation details and had a fair chance to stay on board or jump ship. In my estimation, an adjudicator in Latin America should rebuff any remonstrations in this regard.

---

[157] *Id*. at 811-812.
[158] *Id*. at 813-814.

**Hunton App. 1081**

Moreover, a Latin American tribunal could very well assess how the background conditions, such as the Receivership proceeding, might influence the access to information and the capacity to grant or withhold consent. Accordingly, it could consider that the Receiver further informed absentees about the case and that those who assented to his representation knew of and effectively utilized the existing channel of communication to express their preferences. As a result, they could hardly allege disconnection, lack of familiarity with the communicative options at hand, or a generalized aversion to delegating the vindication of their entitlements.

In particular, absent class members who signed and submitted the proof-of-claim forms thereby explicitly "consent[ed] to the jurisdiction of the District Court for all purposes related to [any claim asserted against the Receivership Entities] and agree[d] to be bound by [the Judge's] decisions, including, without limitation, a determination . . . den[ying the assertion]."[159]  As Professor Antonio Gidi, Professor Eduardo Siqueiros Twomey and Justice Arturo Hoyos properly note,[160] they did not thus acknowledge the authority of the tribunal *vis-à-vis* this class action. All the same, Professor Gidi's statement that "putative class members' "opt-in" to the Receivership claims process simply has no bearing on their participation in this case"[161] strikes me as overdrawn. The Proofs of Claim constitute part of the context within which any such absentee failed to opt out of

---

[159] Proof of Claim Form (attached, as Exhibit 4, to Receiver Ralph S. Janvey Declaration (October 30, 2014)) (May 4, 2012), p. 4.

[160] *See* Gidi Declaration at 11, ¶¶ 49, 51 ("By its own terms, however, *the consent to jurisdiction was limited to the Receiver's claims process*. . . .  The putative class members never subjected themselves to the jurisdiction of this Court for purposes of the class action brought against the financial institutions (different parties). . . ."); Siqueiros Twomey Declaration at 17, ¶ 54 ("It is clear by the face of the Proof of Claim form that a claimholder's consent to participate in the SEC Receivership Action does not constitute consent to join the Action, even if the cases are pending before the same court as consolidated cases."); Hoyos Declaration at 16, ¶ 42 ("The Proof of Claim forms submitted by plaintiffs in the SEC Receivership Action make clear that the submission pertains to the SEC Receivership Action only and not to any other actions. . . .").

[161] Gidi Declaration at 12, ¶ 53.

Hunton App. 1082

the present litigation and, as such, are relevant to the issue whether that failure might concretely imply his or her acquiescence.  They seem to me to reinforce the conclusion that he or she could have easily walked out, knowingly refused to do so, and should accept the outcome, as well as that the judiciary in Latin America would perceive his or her preclusion as fair.

### 4.    Defendants' and Plaintiffs' Procedural Entitlements

Professor Antonio Gidi suggests that, as part of "due process in Latin America" and "in the United States,"[162] "absent class members in a foreign proceeding [must] be personally served with process."[163]  In particular, he proposes that they must be "made parties through service of process performed through internationally acceptable means (rogatory letters)."[164]  He insinuates that the Inter-American Convention on Letters Rogatory, which "a large number of Latin American countries (including all countries specifically discussed in [his] Declaration)" and "the United States" have signed,[165] would require such a summons.  Professor Eduardo Zuleta and Justice Arturo Hoyos, in their own respective Reports, apparently concur.[166]

---

[162] Gidi Declaration at 8, ¶ 35.

[163] *Id*. at 6, ¶ 24(2).

[164] *Id*.  *See also id*. at 9-10, ¶ 42 ("Latin American countries will refuse to recognize a U.S. class action judgment unfavorable to the interest of their domiciliaries because those domiciliaries were not made parties through an internationally acceptable service of process.").

[165] *Id*. at 8, ¶ 37.

[166] *See* Zuleta Declaration at 4, ¶ 15 ("[S]ervice of process [of Colombian Absent Claimholders must] take place pursuant to the terms of the applicable law or the Inter-American Convention on Letters Rogatory and its Additional Protocol."); Hoyos Declaration at 14, ¶ 40b. ("International service of process under Panamanian law requires the service of a Letter Rogatory. . . .  If Absent Panamanians are not served notice of the *Rotstain* Action by Letter Rogatory this would be an independent violation of their due process rights.").

Hunton App. 1083

The Convention applies, by its own terms, to letters rogatory aiming at "service of process" and "summonses."[167]  It evidently means those that seek to serve or summon the usual addressee, namely, the defendant, and obviously does not mention any other party or person.  The Additional Protocol to the Inter-American Convention on Letters Rogatory removes any doubt on the matter by annexing Form B, which expressly speaks of "service on the defendant."[168]  Consistently, Miguel Ángel Narváez Carvajal's Manual on Rogatory Letters, which principally focuses on the Inter-American system, on Latin America, and on Ecuador, specifies that this kind of "international judicial cooperation" enables "national judges and tribunals . . . to summon the defendant [through the] judicial organs of other states. . . ."[169]

In re Vivendi Universal supports this interpretation.  The U.S. District Court for the Southern District of New York specifically refused to read into this kind of treaty a command to serve absentees in an action under Rule 23(b)(3).  It held that "service of process in th[e] context [of the analogous Hague Service Convention] refers to the formal delivery of an initial pleading to an *opposing* party, *i.e.*, the defendant, [and] cannot readily be thought of as a means of providing notice by plaintiff to a member of the plaintiff class."[170]

---

[167] Conv. Inter-Am. Exhortos o Cartas Rog. (1975), Jan. 30, 1975, 1438 U.N.T.S. 287; 14 I.L.M. 339 ("notificaciones"; "emplazamientos").  The official English version speaks of "service of process" and "summonses."  Inter-Am. Conv. Letters Rog. (1975), Jan. 30, 1975, 1438 U.N.T.S. 287; 14 I.L.M. 339.

[168] Form. B, Anexo Proto. Ad. Conv. Inter-Am. Exhortos o Cartas Rog., May 8, 1979, 1438 U.N.T.S. 322; 18 I.L.M. 1238 ("citación al demandado").  The official English version reads "service on [the addressee] as a defendant."  Form. B, Annex Add. Proto. Inter-Am. Conv. Letters Rog., May 8, 1979, 1438 U.N.T.S. 322; 18 I.L.M. 1238.

[169] Miguel Ángel Narváez Carvajal, Manual sobre exhortos y cartas rogatorias 26 (2014) ("La cooperación judicial internacional [permite a] las juezas, jueces y tribunales nacionales . . . citar al demandado [a través de los] órganos judiciales de otros Estados. . ..").

[170] In re Vivendi Universal, 242 F.R.D. 76, 104 (S.D.N.Y. 2007).

-42-

All the same, the question remains whether due process in itself, independently of international law, commands summoning absentees. A summons under Rule 4 would actually inform them less comprehensively about the aspects of the procedure that concern them than the notification under Rule 23(c)(2)(B)(i-vii). The former would, in essence, explicate the consequences of "failure to appear and defend" and "name the court and the parties," as well as "the plaintiff's attorney."[171] The latter would, as already pointed out, describe "the nature of the action," "the class certified," and "the class claims," along with the mechanics of participation and "exclusion" and "the binding effect of a class judgment."[172]

Of course, service of process would include the complaint, in addition to the summons.[173] More importantly, it would take place personally,[174] not just by mail. In my opinion, however, neither of these advantages justifies requiring the plaintiff to serve passive class members because they will obtain sufficient information about the dispute anyway and may always ask for a copy of the complaint and because the notice sent to them should reliably reach them. The remaining controls under Rule 23 seem to me sufficiently to guard their interests.

In Phillips Petroleum v. Shutts, an undivided U.S. Supreme Court rebuffed an attempt to guarantee absentees all of the due process protections of the defendants. It reasoned that a lawsuit burdens the latter differently and more heavily than the former.

> The burdens placed by a State upon an absent class-action [member] are not of the same order or magnitude as those it places upon an absent defendant. An out-of-state defendant summoned by a plaintiff is faced with the full powers of the forum State to render judgment *against* it. The de-

---

[171] FED. R. CIV. P. 4(a)(1).
[172] FED. R. CIV. P. 23(c)(2)(B)(i-vii).
[173] FED. R. CIV. P. 4(c)(1).
[174] FED. R. CIV. P. 4(c)(2).

-43-

fendant must generally hire counsel and travel to the forum to defend itself from the plaintiff's claim, or suffer a default judgment. The defendant may be forced to participate in extended and often costly discovery, and will be forced to respond in damages or to comply with some other form of remedy imposed by the court should it lose the suit. The defendant may also face liability for court costs and attorney's fees. These burdens are substantial. . . .[175]

The justices observed that absentees did not find themselves in a situation as burdensome as that of their adversaries in the litigation.

Besides th[e] continuing solicitude for their rights [under Rule 23], absent . . . class members are not subject to other burdens imposed upon defendants. They need not hire counsel or appear. They are almost never subject to counterclaims or cross-claims, or liability for fees or costs. Absent . . . class members are not subject to coercive or punitive remedies. Nor will an adverse judgment typically bind an absent [member] for any damages, although a valid adverse judgment may extinguish any of the [member's] claims which were litigated.[176]

In *Vivendi*, the tribunal rejected precisely the claim that due process entitled absentees to a full-fledged summons: "[I]t makes little sense to evaluate a class member's due process right to adequate notice in terms of whether the service requirements of Rule 4 of the Federal Rules of Civil Procedure have been satisfied."[177]

As a result, due process does not really mandate serving absentees. In general, it permits binding them with all of the Rule 23 safeguards in place. In my estimation, the contrary construal on both points proffered by Professors Gidi, Eduardo Siqueiros Twomey, and Zuleta, as well as by Justice Hoyos, in relation to Latin America as a whole, Mexico, Colombia, and Panama, respectively,[178] cannot stand.

---

[175] *Phillips*, 472 U.S. at 808.
[176] *Id*. at 810.
[177] *Vivendi*, 242 F.R.D. at 104.
[178] Siqueiros Twomey Declaration at 11-12, ¶ 33 ("Mexican courts would not enforce a judgment (or arbitral award)—foreign or domestic—entered in a proceeding in which the party resisting enforcement was not duly served with process."); Zuleta Declaration at 23, ¶ 74(b) ("Colombian Absent Claimholders could not effectively opt-out of the Action because they were not properly served process pursuant to the requirements of due process under Colombian law or in accordance with the Convention."); Hoyos Declara-

-44-

In any event, absent class members enjoy the specific plaintiff entitlements that Professor Siqueiros Twomey and Professor James Otis Rodner assert that due process necessitates. Focusing on Mexico, Professor Siqueiros Twomey emphasizes the "individual's rights to exercise autonomy, self-determination and consent."[179]  With respect to Venezuela, Professor James Otis Rodner underscores the right "to be heard and to present [one's] claims and defenses."[180]  Absentees may autonomously determine whether to free ride on their representatives' efforts, to take part in the proceedings separately, or to bail out altogether, *i.e.*, whether to consent tacitly, affirmatively, fully, partially, or not at all. Ultimately, they may attain collective self-determination through the litigation. Similarly, absent class members may demand a hearing to claim their due or to defend their interests and ordinarily receive notification about this possibility. In any class action, "the court may . . . require . . . notice . . . of . . . the members' opportunity . . . to intervene and present claims or defenses, or to otherwise come into the action."[181]  In a Rule 23(b)(3) suit, it "must direct to class members . . . notice . . . that [they] may enter an appearance through an attorney if [they] so desire[] [and] that [it] will exclude from the class any member who requests exclusion."[182]

Moreover, Rule 23 does grant absentees the requisite right of access to justice under Colombian law, as construed by Professor Zuleta, inasmuch as they are indeed "provided with an opportunity to participate freely and to prosecute and protect their own interests in the lawsuit."[183]  Likewise, it affords them the three plaintiff entitlements that,

---

tion at 15, ¶ 40(b) ("If Absent Panamanians are not served notice of the *Rotstain* Action by Letter Rogatory this would be an independent violation of their due process rights.").
[179] Siqueiros Twomey Declaration at 15, ¶ 41.
[180] Otis Rodner Declaration at 10, ¶ 25.
[181] FED. R. CIV. P. 23(d)(1)(B)(iii).
[182] FED. R. CIV. P. 23(c)(2)(B)(iv-v).
[183] Zuleta Declaration at 4, ¶ 15(a).

-45-

according to Justice Hoyos, Panamanian due process calls for, *viz.*, "to appoint the attorney of their preference to represent them," to "contradict evidence or allegations of the defendants or of other members of the class that may be detrimental to their interests," and to challenge any measure that might "affect[] or jeopardize[] [their] property." Finally, the same provision accords passive class members, as compelled by Peruvian due process under Professor Rivarola Reisz's construction, "a reasonable chance to know about the class action proceedings and to *affirmatively and expressly* exercise their right to opt-out of the class."[184] They may join in without restraint in order to make their case, bring their own attorney, challenge their adversaries' evidentiary and argumentative submissions, oppose the judge's determinations, ask any question they may have about the litigation, and explicitly extricate themselves from the adjudication. Of course, as Professor Zuleta recalls, "it is the prerogative of the right holder to decide whether, in fact, to access the judicial system and to exercise his or her right of access to justice."[185] This statement holds true for all of the other plaintiff entitlements considered.

### 5. Latin American Representative Litigation

#### a) In General

Latin American tribunals would have more than the grounds just discussed to reject a public order challenge to the recognition of a Rule 23(b)(3) class action judgment. They could also point to existing homegrown suits that operate essentially as class ac-

---

[184] Rivarola Reisz Declaration at 5, ¶ 15(c)(i).
[185] Zuleta Declaration at 11, ¶ 32.

Hunton App. 1088

tions.  In order to hold that the latter collide with the public order, the judiciary would have to deem, most improbably, that the former do too and dismiss them summarily upon each filing.

Lately, the region has actually been opening up to collective litigation in general, far more than Europe.  It has at times exceeded, in its openness, even the United States.[186] In light of this trend, an adjudicator in Latin America should not find U.S. class actions aberrant or, at any rate, contrary to the public order.

This Subsection will first examine suits that resemble Rule 23(b)(3) actions, that have recently emerged in many Latin American nations, and that bind absentees who have either opted in rather informally or simply failed to opt out.  Then, it will consider suits that call to mind Rule 23(b)(2) actions or citizen suits, that exist everywhere in the continent, and that deprive the represented collectivity's absent members, who have not assented to the litigation, of their right to sue.  All of these procedural devices, by their very existence, further shore up the conclusion that a judge in Latin America, fully familiar with them, would adjudge a final decision in this case compatible with any local notion of due process.  In addition, they would likewise undermine any contention by a Latin American absentee, whether residing in the United States or Latin America, that he or she could not have expected, or that he or she would in fairness deserve an exemption from, the preclusive effect of the judgment.

---

[186] *See*, *generally*, Oquendo (2009).

-47-

### b) Suits Resembling 23(b)(3) Actions

Latin America has started authorizing suits that aggregate similar, interrelated individual entitlements along the lines of Rule 23(b)(3).  It usually refers to the underlying entitlements as "homogenous individual rights."  Of the six countries under consideration, four have taken this step.  Two of these four jurisdictions, Mexico and Colombia, require an individual to opt in rather informally.  In contrast, the other two, Panama and Peru, generally include him or her unless he or she opts out.

In Mexico, the Federal Code of Civil Procedure, as revised in 2011, provides for an action for the protection of "individual rights and interests . . . pertaining to similarly situated individuals"[187] and relating to consumer matters or to the environment.[188]   It grants standing to "the representative of the collectivity."[189]   Concerned persons may enter the suit "by expressly informing the representative by any means,"[190] perhaps even by email or orally.  They will have a "right to compensation" only if they "belong to the collectivity,"[191] possibly meaning that they must submit the informal expression of intent just mentioned.  "The representative," in turn, represents "the collectivity and the members who have joined the action."[192] Article 586 echoes the U.S. Federal Rules of Civil

---

[187] Cd. Fed. Pro. Civ. (Mex.) (1943), art. 581(III) ("derechos e intereses individuales . . ., cuyos titulares son los individuos agrupados con base en circunstancias comunes").

[188] *Id*., art. 578 ("en materia de relaciones de consumo de bienes o servicios, públicos o privados y medio ambiente").

[189] *Id*., art. 585(II) ("El representante común de la colectividad").

[190] *Id*., art. 594 ("a través de una comunicación expresa por cualquier medio dirigida al representante").

[191] *Id*. ("derecho al pago que derive de la condena"); *id*. ("las personas que formen parte de la colectividad.").

[192] *Id*. ("El representante . . . representa[] a la colectividad y a cada uno de sus integrantes que se hayan adherido . . . a la acción.").

-48-

Procedure with the following language:  "The representation" undertaken by a person or an organization in any kind of collective suit "shall be adequate."[193]

In Colombia, Law 472 of 1998 purports to carry out the Constitution's mandate "to regulate group actions,"[194] which "are filed by a plurality or by a number of persons who have similarly suffered individual harm stemming from the same source."[195]  "The action," pursuant to Article 3, "shall be filed exclusively to establish liability and to secure compensation for the loss."[196]  Furthermore:  "The judge shall ensure the respect of due process, procedural guaranties, and equality among the parties."[197]

The enactment describes the representation at stake in these terms:  "In a group action, the plaintiff . . . represents the other persons, who have individually suffered as a result of the allegedly injurious actions and who therefore need not sue separately or grant power of attorney."[198]  Members of the group may sign up with a simple communication, in writing but without the ordinarily requisite notarization:  "When the action is for injuries inflicted upon a plurality of persons and stemming from the same act or omission, . . . those who suffered harm may become part of the suit . . . by submitting a docu-

---

[193] *Id.*, art. 586 ("La representación . . . deberá ser adecuada.").

[194] L. 472 (Colom.) (1998), art. 1 ("La presente ley tiene por objeto regular las acciones populares y las acciones de grupo de que trata el artículo 88 de la Constitución Política de Colombia.").

[195] *Id.*, art. 3 ("Son aquellas acciones interpuestas por un número plural o un conjunto de personas que reúnen condiciones uniformes respecto de una misma causa que originó perjuicios individuales para dichas personas.").  *See also* art. 46  ("Son aquellas acciones interpuestas por un número plural o un conjunto de personas que reúnen condiciones uniformes respecto de una misma causa que originó perjuicios individuales para dichas personas.").

[196] *Id.*, art. 3 ("La acción de grupo se ejercerá exclusivamente para obtener el reconocimiento y pago de indemnización de los perjuicios.").  *See also* art. 46 ("La acción de grupo se ejercerá exclusivamente para obtener el reconocimiento y pago de indemnización de los perjuicios.").

[197] *Id.*, art. 5 ("El Juez velará por el respeto al debido proceso, las garantías procesales y el equilibrio entre las partes.").

[198] *Id.*, art. 48 ("En la acción de grupo el actor . . . representa a las demás personas que hayan sido afectadas individualmente por los hechos vulnerantes, sin necesidad de que cada uno de los interesados ejerza por separado su propia acción, ni haya otorgado poder.").

-49-

Hunton App. 1091

ment containing their name, identifying their injury and its source, and expressing their willingness to accept the judgment and to join the group that filed the complaint. . . ."[199]

In Panama, Chapter III of the 2007 Law 45, which amends Law 29 of 1996, entitles "one or more members of a group or class of persons who have suffered harm or prejudice stemming from a product or service"[200] to lodge "consumer class actions."[201] "Upon admitting the complaint, the tribunal shall," under Article 172(3), "register it and publish an announcement . . . in a nationally circulating newspaper so that . . . the plaintiff and all persons who belong to the group may appear to vindicate their rights, formulate arguments or participate in the suit."[202]   In my estimation, Justice Arturo Hoyos incorrectly rejects Professor Antonio Gidi's classification of these actions as opt-out suits.[203]   After all, Article 129(4) underscores that:  "Any member who would like to exclude himself may do so until the scheduling of the preliminary hearing."[204]   In any event, Article 172(6) proclaims:  "The judgment shall bind all the plaintiffs that belong to the group even if they have not intervened in the process."[205]

Moreover, Panamanian Law 19 of 2008 creates a suit to vindicate homogeneous individual rights in international litigation.  It incorporates into the Judicial Code Article

---

[199] *Id.*, art. 55 ("Cuando la demanda se haya originado en daños ocasionados a un número plural de personas por una misma acción u omisión, . . . quienes hubieren sufrido un perjuicio podrán hacerse parte dentro del proceso . . . mediante la presentación de un escrito en el cual se indique su nombre, el daño sufrido, el origen del mismo y el deseo de acogerse al fallo y de pertenecer al conjunto de individuos que interpuso la demanda. . . .")

[200] L. 45 (Pan.) (2007), art. 129 ("uno o más miembros, de un grupo o clase de personas que han sufrido un daño o perjuicio derivado de un producto o servicio.").

[201] *Id.* ("acciones de clase, en materia de consumo").

[202] *Id.*, art. 129 (3) ("El tribunal, al acoger la demanda, la . . . publicará edicto . . . en un diario de reconocida circulación nacional, para que . . . el demandante y todas las personas pertenecientes al grupo comparezcan a hacer valer sus derechos, a formular argumentos o a participar en el proceso.")

[203] Hoyos Declaration at 11, ¶ 34, n. 8 (citing Antonio Gidi, *The Recognition of U.S. Class Action Judgments Abroad: The Case of Latin America*, 37 BROOK. J. INT'L L. 893, 938–39 (2012)).

[204] *Id.*, art. 129(4) ("El miembro de la clase que desee excluirse podrá hacerlo hasta antes de que se fije fecha para la audiencia preliminar.").

[205] *Id.*, art. 129(8) ("La sentencia afectará a todos los demandantes que pertenezcan a dicho grupo, aunque no hayan intervenido en el proceso.").

Hunton App. 1092

1421-I, which reads, partly, as follows: "Upon a violation of similarly defined individual rights of the members of a group, collectivity, or class, the concerned persons themselves, their representative association, or a non-governmental organization devoted to the defense of collective entitlements shall have standing to sue for the vindication of their homogeneous individual rights."[206]  The statute does not define (1) what notification the complainants must send to those they purport to represent, (2) whether absentees must include or exclude themselves into or out of the litigation, (3) how the proceedings will unfold, or (4) what *res judicata* consequences the ultimate ruling will have.  Presumably, standard preclusion norms apply, foreclosing any additional litigation on the original claims.

In Peru, Article 131.1 of Law 29571, the Code of Consumer Protection and Defense, empowers the "National Institute for the Defense of Competition and for the Protection of Intellectual Property"[207] "to prosecute suits to defend the collective interests of consumers,"[208] as well as to "delegate [this] authority . . . to consumer associations,"[209] but not to individuals.  As announced by Article 131.3, this agency "represents all concerned consumers . . . except those who declare expressly and in writing the desire not to vindicate their rights or to do so separately. . . ."[210]  A non-appealable adjudication on the merits should bar all members of the group who have not opted out in this manner from

---

[206] L. 19 (Pan.) (2008), art. 1421-I ("Cuando se lesionen derechos subjetivos individuales, provenientes de origen común y tengan como titulares a los miembros de un grupo, categoría o clase, los afectados, colectivos de afectados o las organizaciones no gubernamentales constituidas para la defensa de derechos colectivos estarán legitimados para promover la acción en defensa de los derechos individuales homogéneos.").
[207] L. 29571, Cd. Protec. & Defen. Consum. (Peru) (2010), art. 105 ("Instituto Nacional de Defensa de la Competencia y de la Protección de la Propiedad Intelectual (Indecopi)").
[208] *Id.*, art. 131.1 ("para promover procesos en defensa de intereses colectivos de los consumidores.").
[209] *Id.*, ("delegar [esta] facultad . . . a las asociaciones de consumidores").
[210] *Id.*, art. 131.3 (El Instituto "representa a todos los consumidores afectados . . . si aquellos no manifiestan expresamente y por escrito su voluntad de no hacer valer su derecho o de hacerlo por separado. . . .").

Hunton App. 1093

staking their claims anew.  In Professor José Domingo Rivarola Reisz's formulation, it does so based on the "implied consent" of these "nonappearing class members."[211]

In addition, the Peruvian Constitutional Court has built into Article 60 of the Code of Constitutional Procedure an action to enforce homogenous individual rights under the Constitution.  In 2008, it explained that in the face of "*an unconstitutional state of affairs*," characterized by "a generalized violation of the fundamental rights of different persons,"[212] "any person whose individual rights have been impinged upon may file a complaint [and] the effects of the decision . . . may extend to other similarly situated persons. . . ."[213]  "A declaration of an unconstitutional state of affairs," according to the opinion, "essentially extends the effects of the decision to persons who were not plaintiffs, who did not otherwise participate in the suit that led to the declaration, but who find themselves in precisely the same situation that was held to be unconstitutional."[214]

Obviously, Peru's justices were primarily thinking of a case in which the trial court determines that a "violation of a constitutional right"[215] has occurred.  Nonetheless, they should approach the preclusive impact of a contrary determination identically in fairness to the party accused of committing the infringement.  Inevitably, either the judicial or the legislative branch will eventually have to settle this question.  In the meantime, the Peruvian judiciary will most probably steer clear of the irony of holding that Rule

---

[211] Rivarola Reisz Declaration at 9, ¶ 26.
[212] [Lovón Ruiz-Caro v. Minis. Rel. Ext.], No. Exp. 05287-2008-PA/TC. Trib. Const. (Peru) (2009), § 2.3.2 ("*estado de cosas inconstitucional*") ("una violación generalizada de derechos fundamentales de distintas personas").
[213] *Id.*, § 2.5.1(a) ("cada persona afectada en sus derechos en forma individual puede presentar la demanda.") ("los efectos de la decisión sobre un caso particular pueden extenderse a otras personas en similar situación.").
[214] *Id.*, § 2.3.2 ("La característica esencial de la declaración de una determinada situación como un *estado de cosas inconstitucional* consiste en extender los efectos de una decisión a personas que no fueron demandantes ni participaron en el proceso que dio origen a la declaratoria respectiva, pero que se encuentran en la misma situación que fue identificada como inconstitucional.").
[215] *Id.*, § 2.5.1(a).

-52-

Hunton App. 1094

23(c)(3)(B), which does afford the defendant equitable treatment in this sense, violates due process.

In light of these various suits, a tribunal from any of these places or from else-where in the region will tend to regard Rule 23(b)(3) actions as compatible with the pub-lic order.  In my estimation, it should view them as comparable enough to the local suits to justify ruling that they do not contravene any of the relevant systemic principles.  The differences in the details should not affect the analysis.

Of course, Latin American absent class members seeking a second bite at the ap-ple might press for the rejection of an adverse judgment unless the jurisdiction at the re-ceiving end binds represented persons who have not explicitly extricated themselves from the suit.  This position, which would help claimants from nations other than Panama or Peru, does not sound very persuasive, though.  After all, it treats as decisive a contin-gency that does not seem to concern the public order at all—to wit, how absentees par-take in the ongoing litigation under the statutory parameters in force locally.  On the one hand, countries that have adopted an opt-in arrangement, such as Mexico and Colombia, could have perfectly legitimately instituted an opt-out regime instead without altering their constitutional or basic legal framework.  Actually the Mexican Congress originally considered and ultimately discarded a proposal that would have necessitated that a "member of the collectivity or group . . . request his exclusion."[216]  On the other hand, nations without legislation on point, like Venezuela and Ecuador, may very well still em-brace such an approach.

---

[216] Iniciativa Ad. Disposiciones Cd. Fed. Pro. Civ. (Acciones y procedimientos colectivos), Dip. Jaime Fer-nando Cárdenas Gracia (Feb. 9, 2010), art. 554 ("miembro de la colectividad o grupo . . . pedir su exclu-sión").

-53-

Hunton App. 1095

Nevertheless, several of the defendants' experts apparently believe that Latin American jurisdictions will not themselves recognize a final decision from abroad unless their own law would allow an identical suit.  From Professor Antonio Gidi's standpoint, for instance, they will balk, on grounds of "public policy," if they "(a) do not have class actions for damages; (b) have class actions, but only give them preclusive effect if the judgment is favorable to the class; or (c) have only opt-in class actions."[217]  In a parallel vein, Professor Eduardo Siqueiros Twomey avers that:  "The main obstacle to recognition and enforcement by a Mexican court of a U.S. opt-out class action judgment . . . results from the difference between U.S. law and Mexican law as to [which] plaintiffs can and [which] cannot be incorporated into a [plaintiff] class."[218]

Professor James Otis Rodner, for his part, postulates that Venezuela's judiciary will refuse to enforce because "the concept of a U.S. class action brought on behalf of, and binding on, unidentified plaintiffs that do not opt out (under Article 23 of the U.S. Federal Rules of Civil Procedure) is alien to Venezuelan procedural traditions."[219]  Of course, he also contends that the suits in question would run counter to "the fundamental structure of Venezuelan civil procedure."[220]  All the same, he supports this contention simply by noting that these actions do not exist in Venezuela:  "Under Venezuelan law, the idea that a person can be plaintiff without expressly and affirmatively participating in an action is totally foreign; the idea that a judgment, favorable or not, will bind all per-

---

[217] Gidi Declaration at 5, ¶ 24(1).
[218] Siqueiros Twomey Declaration at 2, ¶ 4.
[219] Otis Rodner Declaration at 5, ¶ 14.
[220] *Id*. at 7, ¶ 17.

Hunton App. 1096

sons who do not request to opt-out of a particular defined 'class' is alien and contrary to the fundamental structure of Venezuelan civil procedure."[221]

Finally, Professor Rivarola Reisz argues analogously in relation to Peru: "The methods available for group redress under Peruvian law are fundamentally different."[222] "Since Peruvian procedural law does not provide for a *procesos colectivos* [collective-suits] scheme for damages where the cause of action is the breach of securities regulations duties," he elaborates, "the Peruvian domiciliary against whom the recognition procedure is being asserted may file the affirmative defense of deviation of pre-existing procedural laws."[223]

Once again, one must keep in mind that judges may not resist recognition merely because the foreign statute applied differs from its domestic counterpart. They would have to ascertain, additionally, an unmistakable clash with long-standing, deep rooted societal precepts. As in the death penalty example invoked in Subsection IV(D)(1), the judicial inquiry would have to turn up a conflicting cardinal norm in the fundamental laws, constitution, ratified international treaties, *etc*. My own research for this Report, drawing on my experience with Latin American law, has uncovered no such conflict *vis-à-vis* Rule 23(b)(3) actions.

Hence, one may respond to the objections raised by each cited expert as the U.S. District Court for the Southern District of New York did in Anwar v. Fairfield Greenwich to those posed with reference to Spain: "Defendants fail to identify an explicit conflict with [the] public [order] that would bar recognition of the judgment. The mere fact that [local] law does not explicitly embrace a foreign legal mechanism does not mean that it

---

[221] *Id.*
[222] Rivarola Reisz Declaration at 6, ¶ 17.
[223] *Id.* at 9, ¶ 27.

Hunton App. 1097

would find the judgment so repugnant that it would reject it as violating [the] public [order]."[224]

At the end of the day, absentees from Latin America could not rightfully decry the broad preclusive impact of a final decision on the merits as unfair. They could have hardly expected the present class action, about which they would have individually received detailed information, to proceed as a comparable homegrown suit, about which they would have realistically known little. In particular, a citizen and resident of practically any state in the region, including Mexico or Colombia, could neither persuasively nor credibly maintain that he or she did not read the notifying letter, assumed that she had to opt into the suit as under some of the regional enactments, and should consequently escape preclusion. Naturally, he or she could more convincingly object if his or her legal system of origin would never terminate, based on an action that he or she did not explicitly approve, his or her right to sue. The Report will now show that virtually all Latin American jurisdictions permit the termination of the entitlement at issue under these circumstances.

### c) Suits Resembling 23(b)(2) Actions

So-called diffuse rights suits, which resemble Rule 23(b)(2) actions and citizen suits, have developed dramatically in Latin America in the last three decades.[225] They usually entitle any person, without a showing of individual injury, to litigate on behalf of society as a whole or a certain community for injunctive relief and frequently damages, in

---

[224] Anwar v. Fairfield Greenwich, Ltd., 289 F.R.D. 105, 118 (S.D.N.Y. 2013).
[225] *See*, *generally*, Oquendo (2009).

Hunton App. 1098

order to enforce diffuse or societal entitlements, such as those pertaining to the environment or collective cultural goods.  The popular unconstitutionality action provides a special case in point.  It empowers anybody to vindicate the polity's right to legislative or administrative adherence to the constitution and to have a given law or regulation pronounced unconstitutional on its face.  Independently of the entitlement exercised or the remedy requested, the final decision normally precludes everybody else from prosecuting the claim anew, thereby extinguishing the previously held right to sue.

Such a suit bears critical relevance to the discussion.  It actually operates more extremely than Rule 23(b)(3) actions inasmuch as it (1) binds mostly a much larger number of non-consenting individuals, (2) affords group members no individual notice at all, and (3) accords them no opportunity to opt out.  In light of the pervasiveness of this sort of procedure in Latin America, a tribunal there could hardly deem a Rule 23(b)(3) judgment unfamiliar, let alone contrary to the public order.

Diffuse rights suits have had a long history in Latin America.  They descend from civil law popular actions.  The latter date back at least to Roman law and had from the beginning a preclusive effect on the procedural entitlements of other community members.  Title 23 of Book 47 of the Justinian Code, *Corpus Juris Civilis*, which deals with such suits, proclaims:   "If an action is repeatedly brought on the same cause and on the same fact, the ordinary exception of *res judicata* may be raised."[226]

---

[226] CORPUS JURIS CIVILIS, 47.23.3 (534) ("*Sed si ex eadem causa saepius agatur [agetur], cum idem factum sit, exceptio vulgaris rei iudicatae opponitur.*")   "If a particular matter had been disposed of in a popular action, the respondent in a subsequent action based upon the same cause of action could plead *res judicata.*"   Johan D. Van der Vyver, Actiones Populares *and the Problem of Standing in Roman, Roman-Dutch, South African and American Law*, 1978 ACTA JURIDICA 191, 192 (1978).  *Cf.* 3 WILLIAM BLACKSTONE, COMMENTARIES 160 ("But if any one hath begun a *qui tam* or popular action, no other person can pursue it; and the verdict passed upon the defendant in the first suit is a bar to all others, and conclusive even to the king himself.").

Hunton App. 1099

In the nineteenth century, the framers of Latin American Civil Codes regularly codified existing local law, which included the Law of Rome, both directly and through the Spanish *Siete Partidas*.  Therefore, they implicitly incorporated the corresponding preclusion consequences when they wrote in the popular actions already in force.  For example, Chile's current Civil Code, drafted by Venezuelan Andrés Bello in 1855, institutes several such suits for very specific purposes, such as (1) to protect the life of unborn children, (2) to safeguard the right of way on public roads, (3) to remove objects that hang from buildings and that may fall on passersby, or (4) to set aside a potential harm to which an indeterminate number of people are exposed.[227]  This piece of legislation was adopted *verbatim* by seven other nations (Colombia (1860), Panama (1860, 1917), El Salvador (1860), Ecuador (1861), Venezuela (1863), Nicaragua (1871), Honduras (1880, 1906)) and heavily influenced codification in Argentina (1876) and Paraguay (1876).[228]

Since the 1990s and up to today, Latin America has experienced an explosion in this form of litigation.[229]  It has embraced not only derivative and associational suits, in which shareholders or associates proceed in the name of a corporation or an association, but also wide-ranging public-law diffuse rights actions.[230]  Constitutions and statutes all over the continent feature a variety of these suits, including the unconstitutionality suit cited earlier.  They often explicitly underscore the preclusive effect with respect to all,

---

[227] Cd. Civ. (Chile) (1857), Arts. 75, 948, 2328, 2333.  *See also* Cd. Civ. (Colom.) (1873), Arts. 91, 1005, 2355, 2359; Cd. Civ. (Ecuad.) (2005), Arts. 61, 990, 2228, 2236.  The Panamanian Civil Code, in turn, authorizes popular actions to enforce the ban on the exaction of compound interests, Cd. Civ. (Pan.) (1916), art. 994-A, and to remove or alter, as well as to recover damages caused by, a construction obstructing a public way, *id.*, art. 625.

[228] *See* OQUENDO (2011) at 437, 443 (reproducing Bernardino Bravo Lira, *Civil Codification in Iberian America and on the Iberian Peninsula (1827-1917): National v. Europeanized Law*, FUENTES IDEOLÓGICAS Y NORMATIVAS DE LA CODIFICACIÓN LATINOAMERICANA (1992)).  *See, generally, id.* at 417 ("In the nineteenth century, some countries in the region simply enacted Bello's 1857 Code *in toto*, while others drew heavily from it.").

[229] *See, generally*, Oquendo (2009).

[230] *See, generally, id.*

-58-

*viz.*, *erga omnes*.  Not surprisingly, every single one of the jurisdictions under consideration has participated in this transcontinental movement.

In Mexico, Article 580(I) of the Federal Code of Civil Procedure authorizes "collective actions . . . to enforce diffuse . . . entitlements and interests, understood as those held by an indeterminate . . . collectivity of factually . . . similarly situated persons."[231]  It specifies that these suits, in which "the entitlements and interest pertain to an indeterminate collectivity, . . . aim at legally compelling the defendant to repair the harm to the collectivity either by reestablishing the *status quo ante* or through an alternative reparation for the impairment of the collectivity's rights or interests."[232]

Significantly, an adjudication on the merits wrests the right to litigate from all other members.  For purposes of standing under Article 588(V), for instance, "[t]he matter may not have become *res judicata* as a result of a prior suit."[233]  In a parallel vein, Article 614 states:  "A non-appealable judgment shall have *res judicata* consequences."[234]  Presumably, preclusion applies even to a different suitor.  Otherwise, the judiciary would run the risk of confronting an endless sequence of identical complaints.

In Venezuela, Article 26 of the 1999 Constitution reads:  "Any person shall have the right to vindicate his or her rights or interests, including those of a collective or diffuse nature, to enforce them, and to secure a prompt decision on point before a court of

---

[231] Cd. Fed. Pro. Civ. (Mex.) (1943), art. 580(I) ("las acciones colectivas son procedentes para tutelar . . . [d]erechos e intereses difusos y colectivos, entendidos como aquéllos de naturaleza indivisible cuya titularidad corresponde a una colectividad de personas, indeterminada o determinable, relacionadas por circunstancias de hecho o de derecho comunes").

[232] *Id.*, art. 581(I) ("[de] los derechos e intereses [es] titular . . . una colectividad indeterminada" y la acción "tiene por objeto reclamar judicialmente del demandado la reparación del daño causado a la colectividad, consistente en la restitución de las cosas al estado que guardaren antes de la afectación, o en su caso al cumplimiento sustituto de acuerdo a la afectación de los derechos o intereses de la colectividad. . . .").

[233] *Id.*, art. 588(V) ("[R]equisito[] de procedencia de la legitimación en la causa . . . :  Que la materia de la litis no haya sido objeto de cosa juzgada en procesos previos.").

[234] *Id.*, art. 614 ("La sentencia no recurrida tendrá efectos de cosa juzgada.").

Hunton App. 1101

justice."[235]  The 2010 Organic Law of the Supreme Court governs this type of litigation. It succinctly announces in its Article 146:  "Any person shall have the right to sue for the protection of his or her collective or diffuse rights or interests."[236]  Under the terms of Article 153:  "The summons shall be published in a national or regional newspaper, depending on the facts of the case, so that anyone concerned may appear in court within ten days. . . ."[237]  Article 154, labeled "Tacit Notification of Concerned Individuals," declares:  "After the expiration of the deadlines set in the previous Article and upon the elapse of ten additional workdays, all concerned individuals shall be presumed to have been notified."[238]  A final decision on the merits should bind all other members of the collectivity and extinguish their procedural right to prosecute the claim.  In this sense, Article 150(3) advises that "the complaint shall be declared inadmissible . . . in case of *res judicata*. . . ."[239]

Moreover, the same enactment also commands the Constitutional Chamber of the Supreme Court to hear "popular complaints of unconstitutionality."[240]  In 2010, this institution itself explained that "the nullity action of unconstitutionality is a popular action that may be filed by any citizen, *i.e.*, any person is, in principle, procedurally interested or

---

[235] Const. Rep. Bol. Venez. (Venez.) (1999), art. 26 ("Toda persona tiene derecho de acceso a los órganos de administración de justicia para hacer valer sus derechos e intereses, incluso los colectivos o difusos, a la tutela efectiva de los mismos y a obtener con prontitud la decisión correspondiente.").

[236] L. Org. Tb. Supr. (Venez.) (2010), art. 146 ("Toda persona podrá demandar la protección de sus derechos e intereses colectivos o difusos.").

[237] *Id*., art. 153 ("El cartel de emplazamiento será publicado en un diario de circulación nacional o regional, según el caso, para que los interesados concurran dentro del lapso de diez días. . . .").

[238] *Id*., art. 154 ("Cuando venzan los lapsos previstos en el artículo anterior, deberá dejarse transcurrir un término de diez días de despacho para que se entienda que los interesados han quedado notificados.").

[239] *Id*., art. 150(3) ("se declarará la inadmisión de la demanda . . . [c]uando haya cosa juzgada.").

[240] *Id*., art. 32 ("demanda popular de inconstitucionalidad").

Hunton App. 1102

qualified enough to challenge laws . . . through a nullity action of unconstitutionality."[241]

"The effect of the judgment," according to the statute, "shall be general in scope. . . ."[242]

In Colombia, the 1998 Law 472 controls "popular actions . . . for the protection of collective rights and interests."[243]  "Popular actions," in the words of Article 9, "lie against any action or omission of the public authorities or of private persons that have violated or threaten to violate collective rights and interests."[244]  Article 21 specifies that: "The members of the community may be notified through a means of mass communication or any other effective mechanism, in view of all of the possible beneficiaries."[245]  "A judgment upholding the plaintiffs' claim in a popular action may," pursuant to Article 34, "grant an injunction, damages, . . . and an order to carry out actions necessary to reestablish the *status quo ante*. . . ."[246]  "The judgment," under Article 35, "shall constitute *res judicata* with respect to the parties and the public in general."[247]

In addition, the Colombian Constitution permits "citizens" to lodge "unconstitutionality complaints . . . against laws."[248]  Article 6 of the 1991 Decree 2067 warns that: "Complaints against laws that have benefited from a judgment that constitutes *res judi-*

---

[241] [Asociación Civil Súmate v. Res. Consejo Nac. Elec.,] Sent. 796, Sala Const., Trib. Supr. Just. (Venez.) (2010) ("la acción de nulidad por inconstitucionalidad es una acción popular que puede ser ejercida por cualquier ciudadano, vale decir, que toda persona tiene, en principio, la cualidad o interés procesal para la impugnación de las leyes o actos con rango de ley, por medio de la acción de nulidad por inconstitucionalidad.").

[242] L. Org. Tb. Supr. (Venez.) (2010), art. 32 ("Los efectos de dicha sentencia serán de aplicación general.").

[243] L. 472 (Colom.) (1998), art. 2 ("Acciones populares . . . para la protección de los derechos e intereses colectivos.").

[244] *Id*., art. 9 ("Las acciones populares proceden contra toda acción u omisión de las autoridades públicas o de los particulares, que hayan violado o amenacen violar los derechos e intereses colectivos.").

[245] *Id*., art. 21 ("A los miembros de la comunidad se les podrá informar a través de un medio masivo de comunicación o de cualquier mecanismo eficaz, habida cuenta de los eventuales beneficiarios.").

[246] *Id*., art. 34 ("La sentencia que acoja las pretensiones del demandante de una acción popular podrá contener una orden de hacer o de no hacer, condenar al pago de perjuicios . . . y exigir la realización de conductas necesarias para volver las cosas al estado anterior. . . .").

[247] *Id*., art. 35 ("La sentencia tendrá efectos de cosa juzgada respecto de las partes y del público en general.").

[248] Const. Pol. Colom. (Colom.) (1991), art. 241 ("las demandas de inconstitucionalidad que presenten los ciudadanos contra las leyes").

Hunton App. 1103

*cata* shall be dismissed. . . ."[249]  "The Constitutional Court," in its own phrasing, "takes the norms submitted to it for examination and ascertains their validity or invalidity . . . , with constitutional *res judicata* consequences . . ., with an *erga omnes* effect, and in a generally obligatory manner, thereby binding all persons and public authorities, with no exception whatsoever."[250]  Hence, a non-appealable determination on the merits unequivocally precludes any other citizen from launching a posterior suit on the same issues.

In Panama, Law 24 of 1995, in its Article 78, establishes:  "Any person may file, under this law, an environmental public action . . . regarding not an individual or direct injury, but rather a threat or injury to diffuse interests or to the interests of a collectivity."[251]  Article 3(4) defines a diffuse interest as "one that is disseminated throughout a collectivity; that pertains to each member; and that does not derive from property entitlements, or concrete rights or actions."[252]  Once again, a presumption of generalized preclusion should attach to these suits.

Furthermore, constitutional Article 206(1) obligates the Plenary Chamber of the Panamanian Supreme Court to "decide . . . upon the unconstitutionality of laws . . . challenged by any person on procedural or substantive grounds."[253]  In 2009, that very body

---

[249] Decr. 2067 (Colom.) (1991), art. 6 ("Se rechazarán las demandas que recaigan sobre normas amparadas por una sentencia que hubiere hecho tránsito a cosa juzgada. . . .).

[250] [Zapata Londoño v. art. 20, L. 393/1997,] Sent. C-600/98, Ct. Const. (Colom.) (1998), § VI.3 ("La Corte Constitucional, en lo que hace a las normas sometidas a su examen, define, con la fuerza de la cosa juzgada constitucional . . . , su exequibilidad o inexequibilidad . . . , con efectos *erga omnes* y con carácter obligatorio general, oponible a todas las personas y a las autoridades públicas, sin excepción alguna.").

[251] L. 24 (Pan.) (1995), art. 78 ("En cumplimiento de la presente Ley, toda persona podrá interponer acción pública ambiental, sin necesidad de asunto previo cuando por su naturaleza no exista una lesión individual o directa, sino que atañe a los intereses difusos o a los intereses de la colectividad.").

[252] *Id.*, art. 3(4) ("aquel que se encuentra diseminado en una colectividad, corresponde a cada uno de sus miembros y no emana de títulos de propiedad, derechos o acciones concretas.").

[253] Const. Pol. Rep. Pan. (Pan.) (1972), art. 206(1) ("decidirá . . . sobre la inconstitucionalidad de las Leyes . . . que por razones de fondo o de forma impugne ante ella cualquier persona.").

Hunton App. 1104

determined that *res judicata* forecloses instituting an unconstitutionality complaint upon a prior one when the two "involve the same facts and grounds."[254]  It deliberated thus:

> [T]he requirement of identity of parties—meaning that precisely the same individuals, who are bound by the decision that supposedly produced *res judicata* consequences, must be suing again—is often mentioned.  Nonetheless, the area of constitutional law requires a certain modification because the issues transcend the legal relations among persons, touch upon purely legal matters, and produce consequences for the society as a whole, rather than exclusively for the complainants in the unconstitutionality action.[255]

As an upshot of the ultimate ruling upon the first plaintiff's prosecution, all other citizens lose their right to prosecute the claim.  In the quoted paragraph, Panama's justices make explicit what the other jurisdictions normally imply, to wit, that the final decision in a collective action may preclude someone who is not, strictly speaking, a party.  This possibility would seem to belie Professor Otis Rodner's contention that, in Venezuela, a defendant "cannot claim *res judicata* in relation to a judgment in a proceeding that was rendered against an unidentified member of an ostensible 'class' who did not participate in the relevant proceeding."[256]

In Peru, Article 40 of the Code of Constitutional Procedure assures that "any person may file for a writ of protection when a threat to or a violation of environmental or other diffuse rights that have constitutional stature is at stake. . . ."[257]  The judge may ap-

---

[254] [Jované de Puy v. art. 233, Cd. Electoral], Exp. 937-08, Pleno, Ct. Supr. Just. (Pan.) (2009) ("contengan los mismos hechos o fundamentos").

[255] *Id*. ("[S]e habla del requisito de identidad de partes, que alude a la concurrencia al proceso de los mismos sujetos vinculados con la decisión que da lugar a la supuesta cosa juzgada. Sin embargo, en este punto el hecho de tratarse de la rama constitucional produce cierta modificación, ya que en este ámbito del derecho, las cuestiones trascienden las relaciones jurídicas entre personas para versar aspectos netamente de derecho, produciendo consecuencias a todo el conglomerado social y no exclusivamente al o los promotores de la acción de inconstitucionalidad.").

[256] Otis Rodner Declaration at 11-12, ¶ 29.

[257] L. 28237, Cd. Pro. Const. (Peru) (2004), art. 40 ("Asimismo, puede interponer demanda de amparo cualquier persona cuando se trate de amenaza o violación del derecho al medio ambiente u otros derechos difusos que gocen de reconocimiento constitucional. . . .").  "A writ-of-protection (*amparo*) action . . . shall lie against acts or omissions that stem from any authority, official, or person and that encroach upon or threatens . . . constitutionally recognized rights."  Const. (Peru) (1993), art. 200(2) ("La Acción de Amparo

-63-

prove "a declaration of nullity," "restitution of the *status quo ante*," or an injunction,[258] as well as "monetary compensation."[259] Article 6, for its part, stresses that "a final decision" amounts to "*res judicata*."[260] "The judgment" in these suits, the Peruvian Constitutional Court has written, "will have an effect on '*all other members of the collectivity who find themselves in a situation identical to that of the person who brought the action in the first place*.' In consequence, the effect of the decision transcends the individual or group that filed the complaint."[261] Coincidentally, Peru's justices have observed that the "the class action [in the United States is] related" to "diffuse rights"[262] and that the U.S. approach to adequate representation is not "foreign to [Peru's] constitutional order."[263]

The Peruvian Code of Constitutional Procedure also regulates popular and unconstitutionality actions.[264] The former allow "any person"[265] to dispute the constitutionality or legality of administrative regulations.[266] The latter enable a group of at least "five thousand citizens"[267] to contest the constitutionality of laws.[268] A final decision on the merits in these suits "constitutes *res judicata* and therefore . . . has general effects."[269]

---

. . . procede contra el hecho u omisión, por parte de cualquier autoridad, funcionario o persona, que vulnera o amenaza los . . . derechos reconocidos por la Constitución.").

[258] L. 28237, Cd. Pro. Const. (Peru) (2004), art. 55 ("[d]eclaración de nulidad," "[r]estitución . . . ordenando que las cosas vuelvan al estado en que se encontraban," "[o]rden y definición precisa de la conducta a cumplir").

[259] *Id*., art. 59 ("prestación monetaria").

[260] *Id*., art. 6 ("la decisión final" "adquiere . . . autoridad de cosa juzgada.").

[261] [Lovón Ruiz-Caro v. Minis. Rel. Ext.], Exp. No. 05287-2008-PA/TC, Trib. Const. (Peru) (2009), § 2.5.1(a) (quoting Eduardo Ferrer Mac-Gregor, JUICIO DE AMPARO E INTERÉS LEGÍTIMO: LA TUTELA DE LOS DERECHOS DIFUSOS Y COLECTIVOS 12 (2003)). *See also* [Viuda de Mariátegui e Hijos v. S.U.N.A.T. & T.F.], S.A., Exp. No. 04878-2008-PA/TC, Trib. Const. (Peru) (2009), § 2.5.1(a).

[262] 5270-2005-PA/TC, Trib. Const. (Peru) (2006), p. 4, ¶13 ("la acción colectiva (class action) [está] relacionada con los derechos difusos.").

[263] *Id*. at 5, ¶14 ("ajena a nuestro ordenamiento constitucional").

[264] Cd. Pro. Const., L. 28237 (Peru) (2004), Tít. VI-VIII.

[265] *Id*., art. 84.

[266] *Id*., art. 76.

[267] Const. Pol. Perú (Peru) (1993), art. 203(5).

[268] Cd. Pro. Const., L. 28237 (Peru) (2004), art. 77.

[269] *Id*., art. 82 ("tiene[] autoridad de cosa juzgada, por lo que . . . produce[] efectos generales."). *See also id*., art. 81.

-64-

Hunton App. 1106

In Ecuador, Article 43 of the 1999 Environmental Management Act informs that "persons, legal entities, [and] groups of people united by a common interest and directly affected by the injurious action or omission may sue . . . for damages in relation to any sanitary or environmental harm."[270]  It clarifies that environmental rights are "collective" and "shared by the community" and describes "diffuse interest[s]," somewhat confusingly, as "homogeneous and indivisible interests held by indeterminate groups of individuals tied by common circumstances."[271]  Presumably, *res judicata* principles apply, so that a firm judicial ruling bars any subsequent litigation.

Similarly, Ecuadorian unconstitutionality suits offer anybody so inclined the means to question the facial constitutionality of laws and regulations.[272]  The Organic Act on Judicial Guaranties and Constitutional Review spells out the *erga omnes* preclusive consequences.  As articulated in Article 95:  "Judgments issued in the exercise of abstract constitutional review shall constitute *res judicata* and shall have a general and prospective effect."[273]  Upon analyzing this provision, Álvaro Gutiérrez Godoy "conclude[s]—on the basis of the statute and in expectation of the necessary case-law development—that the Ecuadorian unconstitutionality declaration brings about the banishment, from the le-

---

[270] L. 77, L. Gest. Amb. (Ecuad.) (1999), art. 43 ("Las personas naturales, jurídicas o grupos humanos, vinculados por un interés común y afectados directamente por la acción u omisión dañosa podrán interponer ante el Juez competente, acciones por daños y perjuicios y por el deterioro causado a la salud o al medio ambiente incluyendo la biodiversidad con sus elementos constitutivos.").

[271] *Id.*, Glosario de Definiciones ("Inter[eses]  Difuso[s]") ("intereses homogéneos y de naturaleza indivisible,  cuyos  titulares son grupos indeterminados de individuos ligados por circunstancias comunes.").

[272] *See* Const. Rep. Ecuad. (Ecuad.) (2008), art. 436(2); L. Org. Garant. Jurisd. Control Const. (Ecuad.) (2009), art. 98.

[273] *Id.*, art. 95 (2009) ("Las sentencias que se dicten en el ejercicio del control abstracto de constitucionalidad surten efectos de cosa juzgada y producen efectos generales hacia el futuro.").

-65-

gal order, of the challenged law and the establishment of constitutional *res judicata* with general and prospective effect (*erga omnes* and *ex nunc*)."[274]

As already underscored, all of these suits bear a resemblance to Rule 23(b)(2) actions, as well as citizen suits, in that they turn on a genuinely collective assertion. While they thus diverge from Rule 23(b)(3) actions, which aggregate a number of similar, interrelated individual claims, they obviously may matter enormously to the concerned people. For example, someone may understandably care about the option to proceed against the pollution of a nearby communal lake as much as, or even more than, against the contamination of her backyard.

More importantly, however, the ultimate ruling in a diffuse rights suit does deprive absent community members of an individual entitlement, namely, the right to sue. It robs them, so to speak, of their day in court. Upon a definitive judgment, absentees individually lose the right to litigate (1) on their substantive collective entitlements in this kind of litigation and (2) on their substantive individual entitlements in a Rule 23(b)(3) action.

For present purposes, a final decision in a diffuse rights suit effectively differs from one in a Rule 23(b)(3) class action only in the minimal respect just discussed: The former entails a loss of an individual procedural entitlement related to a collective substantive entitlement, the latter that of an individual procedural entitlement related to an individual substantive entitlement. In my estimation, Latin American judges could only

---

[274] Álvaro Gutiérrez Godoy, El control constitucional en Ecuador y Colombia: un análisis comparado. 12 IURIS DICTO REV. COLEGIO JURIS. 55-64, 61 (6) (Oct. 2009) ("De lo anterior podemos concluir que, basados en la normativa y a la expectativa del necesario desarrollo jurisprudencial, para el caso ecuatoriano la declaratoria de inconstitucionalidad conlleva a la desaparición del ordenamiento jurídico de la norma acusada, haciendo tránsito a cosa juzgada constitucional, con efectos generales (*erga omnes*) y hacia el futuro (*ex nunc*).").

Hunton App. 1108

arbitrarily find an infringement upon due process and the public order in one instance, but not in the other.  Most likely, they would not do so.

Accordingly, absentees from Latin America could not really complain.  They could not truthfully say that back home they would never face preclusion through an action that they did not lodge or at least consent to.  After all, a diffuse rights suit precludes the entire citizenry in precisely this manner.  And it does so ever more frequently, in virtue of its increased availability and popularity.[275]


6.   **Wrap-up**


Subsection 1 defined the concept of public order, which incorporates that of due process, and summarized the ensuing discussion.  Subsections 2 and 3 maintained, respectively, that a tribunal in Latin America would very probably hold that U.S. class action judgments in general and those pronounced under Rule 23(c)(3)(B) in particular treat absent class members fairly and cohere with these two cardinal notions.  As explained in Subsection 4's various subdivisions, such a holding would find further support in the availability of homogenous individual rights suits, which recall Rule 23(b)(3) actions and bind absentees who have either opted in rather informally or simply failed to opt out.  Moreover, it would attain definitive confirmation in the fact that Latin American analogues to Rule 23(b)(2) actions and citizen suits invariably wrest the right to sue from the represented collectivity's non-assenting absent members.  At the outset, Section D noted that a refusal of recognition would, in effect, deprive defendants themselves of due process, as well as discriminate against them.  As a whole, it emphasized that absentees from

---

[275] *See*, *generally*, Oquendo (2009).

**Hunton App. 1109**

Latin America, even those who have always resided there, could not reject the final decision's broad *res judicata* impact as unfair because they would have taken a free ride on the litigation with perhaps their only realistic chance at compensation, would have benefited from a wide array of safeguards, including the right to notice and to exit, and could have faced preclusion under similar circumstances in their homeland.

### E.  Overall Summation

The discussion started by imagining a concrete situation in which a Latin American tribunal might confront the question whether to recognize a judgment issued in this case.  It posited as the most likely (and yet rather improbable) scenario one in which absent class members launch a substantively identical complaint in Latin America upon losing on the merits in the United States.  In the end, these individuals will probably not embark upon a path of renewed litigation because of the overarching civil law obstacles in the way and the high chance of dismissal either for lack of jurisdiction or for expiration of the statute of limitations.  In any event, a Latin American adjudicator would, in all likelihood, dismiss any such suit in deference to the final decision of this Court.

Section B listed the following as the main conditions for recognition in Latin America.

    (1) Reciprocity from the State of Origin
    (2) Jurisdiction of the Foreign Court over the Matter
    (3) Sufficiency of Service and Defense Opportunities
    (4) Finality of the Judgment
    (5) Absence of Any Pending Similar Domestic Suit
    (6) Respect for Areas of Exclusive National Jurisdiction
    (7) Compatibility with the Public Order

-68-

It identified a presumption in favor of enforcing judgments from abroad and then showed that the relevant legislation in Mexico, Venezuela, Colombia, Panama, Peru, and Ecuador incorporates some or all of these items.

Next, Section C demonstrated that the ultimate ruling in this dispute would meet the first six requirements. Section D and its various segments, in turn, maintained that it would satisfy the seventh too. They defined the public order, which includes due process, and explained that the judgment in this controversy would cohere with both notions. In particular, it would rest on a number of safeguards for class actions generally and for those filed under Rule 23(b)(3) specifically.

Accordingly, a Latin American judge would almost certainly agree with the U.S. Supreme Court that the opt-out regime fully comports with due process, a concept that has traveled from the United States to Latin America, preserving its essential components intact. Moreover, he or she could point to regional suits permitting, along the lines of Rule 23(b)(3), the aggregation of similar, interrelated individual claims of non-parties who acquiesce either by opting in rather informally or simply by failing to opt out. Finally, he or she could note that diffuse rights suits, which resemble Rule 23(b)(2) actions and exist throughout the continent, invariably bind absentees who have in no way consented or even received individual notice.

Hunton App. 1111

## V.   Signature

I hereby affirm that my opinions are based on true facts, and that my conclusions are the product of my own views.  I reserve the right to supplement, amend, change or modify my opinions to this Report.

_____

**Ángel R. Oquendo**

Signed at Rio de Janeiro, Brazil, on August 5, 2015

-70-

**Hunton App. 1112**

# EXHIBIT A

## ÁNGEL R. OQUENDO

***George J. and Helen M. England Professor of Law***
***University of Connecticut***

### PUBLICATIONS 2005-2015

1. Conference Paper:  *Six Degrees of Separation:  From Derivative Suits to Shareholder Class Actions,* 48 WAKE FOREST L. REV. 643-672 (2013)

2. *Pondering Language Rights:  A Novella*, 13 REV. ESP. JUR. 117-140 (2012)

3. *Möglichkeiten und Grenzen:  In Richtung einer ganzheitlichen Auffassung und Umsetzung von Rechten in Lateinamerika*, LIBER AMICORUM DETLEF LEENEN (de Gruyter) (Martin Häublein, Stephen Utz eds. 2012)

4. *A Polis Desafiada:  Direitos Humanos, Democracia, etc*., A PROBLEMÁTICA DOS DIREITOS HUMANOS FUNDAMENTAIS NA AMÉRICA LATINA E NA EUROPA/DESAFIOS MATERIAIS E EFICACIAIS  (Editora Unoesc) (Narciso Leandro Xavier Baez,Gerson Luiz Carlos Branco, Marcelo Porciuncula eds. 2012)

5. *La Polis Desafiada:  Derechos Humanos, Democracia, etc*., LA PROBLEMÁTICA DE LOS DERECHOS HUMANOS FUNDAMENTALES EN AMÉRICA LATINA Y EN EUROPA/DESAFÍOS MATERIALES (2012)

6. *Em direção a uma nova cultura de direitos*, A REALIZAÇÃO E A PROTEÇÃO INTERNACIONAL DOS DIREITOS HUMANOS FUNDAMENTAIS - DESAFIOS DO SÉCULO XXI (Narciso Leandro Xavier Baez, Douglas Cassel eds. 2011)

7. LATIN AMERICAN LAW (Foundation Press) (2nd Ed.) (2011)

8. *Estómago*, IV CERTAMEN INTERNACIONAL RELATO BREVE, SERVICIO PUB. UNIV. CÓRDOBA (2011)

9. *Constitucionalismo en los Estados Unidos y más allá*, EL CONSTITUCIONALISMO MEXICANO:  INFLUENCIAS CONTINENTALES Y TRAS-ATLÁNTICAS 33-61 (Editorial Siglo XXI) (Patricia Galeana ed. 2010)

10. *Liberación femenina*, XIV CONCURSO *TODOS SOMOS DIFERENTES* (Asamblea Juvenil de Derechos Civiles) (2009)

Hunton App. 1113

11. *Infinito*, XIV CONCURSO *TODOS SOMOS DIFERENTES* (Asamblea Juvenil de Derechos Civiles) (2009)

12. *Upping the Ante:  Collective Litigation in Latin America*, 47 COLUM. J. TRANS- NAT'L L. 248-291 (2009)

13. DEMOCRACIA E PLURALISMO (De Andrea Ferreira e Morgado Editores) (2009)

14. *En sueño*, II CERTAMEN INTERNACIONAL RELATO BREVE, SERVICIO PUB. UNIV. CÓRDOBA (2008)

15. Conference Paper: *Straight From the Mouth of the Volcano:  The Lowdown on Law, Language, and* Latin@s, 83 IND. L.J. 1481 (2008)

16. *Irony/Ironía,* 11 HARV. LATINO L. REV. 205-216/217-228 (2008)

17. *The Solitude of Latin America:  The Struggle for Rights South of the Border*, 43 TEX. INT'L L.J. 185-237 (2008)

18. DEMOCRACIA Y PLURALISMO (Fontamara/México) (2nd Ed.) (2007)

19. *Refletindo sobre o processo civil desde uma perspectiva brasileira*, *Reflecting on Civil Process from a Brazilian Perspective*, *Afterword to* HUMBERTO DALLA, TE- ORIA GERAL DO PROCESSO CIVIL CONTEMPORÂNEO (Lumen Juris 2007)

20. LATIN AMERICAN LAW (Foundation Press) (2006)

21. *Íntimo y personal:  una perspectiva sobre la violencia*, 9 JURIS POIESIS 39 (2006)

22. *Book Review:  PEDRO A. MALAVET, AMERICA'S COLONY (N.Y.U. Press 2004)*, 55 J. LEGAL EDUC. 416 (2005)

23. Conference Paper:  *Indigenous Self-Determination in Latin America*, 17 FLA. J. INT'L L. 625-632 (2005)

24. Conference Paper:  *National Culture in Post-National Societies*, 50 VILL. L. REV. 963-1007 (2005)

25. *Más allá de la democracia deliberativa*, 10 POLIS 1 (2005)

**Hunton App. 1114**