# EXHIBIT 17

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, et al.,            )
                                    )
            Plaintiffs,             )
                                    )
vs.                                 ) CIVIL ACTION
                                    ) NO.
GREENBERG TRAURIG, LLP, HUNTON &    ) 3:12cv-4641-N
WILLIAMS, LLP; and YOLANDA          )
SUAREZ,                             )
                                    )
            Defendants.             )

-------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

PAMELA G. REED

December 3, 2015

-------------------------------------


    ORAL DEPOSITION of PAMELA G. REED, produced as a

witness the instance of the Defendant Greenberg

Traurig, and duly sworn, was taken in the above styled

and numbered cause on December 3, 2015, from 9:00 a.m.

to 11:41 a.m., before Jeff L. Foster, a Certified

Shorthand Reporter in and for the State of Texas, at

the offices of Strasburger & Price, 901 Main Street,

Suite 4400, Dallas, Texas 75202, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record.

Hunton App. 1115

Pamela G. Reed

---

**6**

1   A. In Austin.
2   Q. Run off where you've practiced real quickly?
3   A. Okay. I was at the city attorney's office in
4   Austin for four years, I believe, and then went to
5   Davis & Davis and was there for four years. And then
6   I started running for office.
7   Q. Started running for office?
8   A. Yes, sir.
9   Q. Which office would that be?
10  A. I was county commissioner, Travis County in
11  Austin, and then I was a commissioner on the Texas
12  Water Commission and then the Texas Natural Resources
13  Commission.
14  Q. I want to do something here, Ms. Reed, if we
15  might to try to save some time. You have been and are
16  a party to other lawsuits involved in this
17  receivership, aren't you?
18  A. Yes, sir.
19  Q. As a representative plaintiff, --
20  A. Yes, sir.
21  Q. -- correct? Let me take one of those, if I
22  can. I'm going to talk to you just a moment so we can
23  get an overall picture of the story you and your
24  husband had.
25  A. Okay.

---

**7**

1   Q. I am not going to introduce any of these into
2   evidence, but I'm going to mark them just so we know
3   what we're talking about. Fair enough?
4   A. Yes, sir.
5   Q. Let me hand you what's been marked -- excuse
6   me, let me mark it -- as Defendants' Exhibit 1.
7   A. Thank you.
8   Q. And tell you that that is, I think everybody
9   at this table will agree, a copy of that particular
10  lawsuit in which you are a representative plaintiff
11  against BDO?
12  A. Yes, sir.
13  Q. All right. I want to see if we can pin down
14  very quickly and broadly and generally your story in
15  this matter. Would you turn to page 38?
16  A. (The witness complied.)
17  Q. Let me read some of this to you. I have it
18  highlighted so you can go right to it, if you would,
19  please.
20  A. Yes.
21  Q. Paragraph 82. "In early 2007 plaintiff Pam
22  Reed and her husband Bob Gibbins were convinced by
23  their Austin-based financial advisor to relocate their
24  investments from Smith Barney to Stanford Financial
25  Group when their financial advisor joined SGC." And

---

**8**

1   think in the rest of the petition SGC means Stanford
2   Group Company, --
3   A. Correct.
4   Q. -- right?
5   A. Yes, sir.
6   Q. All right. That is correct, you first got
7   involved really in early 2007, is it not?
8   A. Yes, sir.
9   Q. "In April of 2007 after their financial
10  advisor joined SGC, Gibbins and Reed moved their
11  investment portfolio from Smith Barney to SGC." Prior
12  to that time your financial advisor had been at Smith
13  Barney for a long time, hadn't he?
14  A. Yes, sir.
15  Q. And you-all had used him at that institution?
16  A. Yes, sir.
17  Q. Paragraph 83. "Gibbins and Reed's financial
18  advisor then convinced them to invest their money in
19  SBI -- SIBL CDs. On May the 11th, 2007 Gibbins and
20  Reed invested $2,416,958 with SGC following the advice
21  of their financial advisor." Is that correct?
22  A. Yes, sir.
23  Q. "Purchased one SIBL fixed CD in the amount of
24  160,000 pounds." That equals about $300,000, does it
25  not, something like that?

---

**9**

1   A. I believe so, something like that.
2   Q. Okay. "And another SIBL fixed CD in the
3   amount of $2,156,286," and it gives the account
4   numbers. "Both CDs were issued in the name of Gibbins
5   and Reed jointly and had a one-year term maturing in
6   May 2008." Is all that correct?
7   A. I believe so.
8   Q. So you bought the CDs and they had a one-year
9   maturing -- maturity date and would mature in May 2008.
10  A. I believe so.
11  Q. Okay. Skip down to the last sentence in
12  paragraph 84. "The financial advisor also told
13  Reed and Gibbins that SIBL was part of SGC." SIBL, you
14  know that is the bank, that's the initials for the
15  Stanford International Bank in Antigua, don't you?
16  A. Yes, sir.
17  Q. And it was part of Stanford Group Companies;
18  is that right?
19  A. That's what we understood.
20  Q. That's what he said?
21  A. Yes, sir.
22  Q. And SGC was a licensed broker/dealer just like
23  Smith Barney. You have no reason to question that.
24  That's correct, isn't it?
25  A. Correct.

3 (Pages 6 to 9)

DepoTexas, Inc.

Hunton App. 1116

Pamela G. Reed

10

1    Q.   All right.  85.  "In February 2008 before
2  their CDs matured the FA, financial advisor, invited
3  Gibbins and Reed to visit SIBL in Antigua."  Is that
4  correct?
5    A.   Yes, sir.
6    Q.   Reed met with Allen Stanford and SIBL
7  president Juan Rodriguez Tolinto" -- how do you
8  pronounce that?
9        MR. SNYDER:  Tolentino.
10        MR. COWLES:  Tolentino.
11    Q.   (BY MR. COWLES)  -- "who provided Reed with a
12  tour of SIBL, and once again assured Reed that SIBL's
13  CDs were in an entirely safe and liquid product."
14  Those facts are true, are they not?
15    A.   Yes, sir.
16    Q.   All right.  Paragraph 86.  "Upon their return
17  from Antigua, financial advisor sought to convince
18  Gibbins and Reed to roll over and reinvest their
19  SIBL CD proceeds into new SIBL CDs when the CDs matured
20  in May of 2008."  So in May when they matured you
21  rolled them over into new CDs; is that correct?
22    A.   I believe we did, yes.
23    Q.   "During these discussions near the end of
24  April of early May 2008, financial advisor, one,
25  reaffirmed the safety, security and low risk of the

11

1  SIBL CDs"; is that correct?
2    A.   Yes, sir.
3    Q.   "Reiterated that the SIBL CDs were insured
4  against the loss"; is that correct?
5    A.   Yes, sir.
6    Q.   "And represented that SIBL CDs were completely
7  backed by SIBL assets, which had been audited by an
8  international audit firm."  Correct fact as you
9  understand it?
10    A.   At I remember it, yes, sir.
11    Q.   And the last paragraph we're going to talk
12  about here, 87.  "In May 2008 as a result of their
13  financial advisor's misrepresentations about the safety
14  and low risk of SIBL CDs, Gibbins and Reed rolled over
15  and reinvested proceeds from their maturing SIBL CDs to
16  purchase new SIBL CDs.  The new SIBL CDs were issued in
17  their names jointly and Reed invested an additional
18  300,000 into SIBL CDs."  Are those matters in your
19  first amended class action complaint in the BDO case --
20  as far as you know and understand they were correct?
21    A.   Yes, sir, as far as I know and understand.
22    Q.   Thank you.  So you moved the investment funds
23  from Smith Barney to Stanford Group Company.
24    A.   Yes, sir.
25    Q.   The financial advisor at that time was a man

12

1  named Nigel Bowman, wasn't he?
2    A.   Yes, sir.
3    Q.   You had known him a long time.
4    A.   Yes, sir.
5    Q.   He was a friend.
6    A.   Yes, sir.
7    Q.   And I assume you had great respect for his
8  ability as a financial advisor.
9    A.   I did.  We both did.
10    Q.   And he did change from Smith Barney to
11  Stanford Group Companies in May 2007.
12    A.   I believe that was the date, yes.  Uh-huh.
13    Q.   I think it is.
14    A.   (Witness nods head.)
15    Q.   And you and your husband changed with him and
16  moved your investment funds to Stanford, right?
17    A.   Yes, sir.
18    Q.   Let me hand you what's been marked Defendants'
19  Exhibit 2.  Ask you if you recognize that as the
20  agreement with Stanford Group Company and you and your
21  husband?
22    A.   It purports to be, yes.
23    Q.   Did you read the agreement when it was first
24  presented to you?
25    A.   I'm sure I skimmed it.  I don't know if I read

13

1  it or not.
2    Q.   It's got a lot of small print, doesn't it?
3    A.   Correct.
4    Q.   Would you look over on page 3 under capital
5  B -- paragraph capital B entitled "Financial Advisor"?
6  See that?
7    A.   Yes, sir.
8    Q.   And I think I have it highlighted on here, do
9  I not?
10    A.   No, sir.
11        MR. SNYDER:  I think mine does.  Here you
12  go.  Gave me the wrong one.
13    A.   On page 3?
14    Q.   (BY MR. COWLES)  Yeah, right here is the
15  three.
16    A.   Uh-huh.  It's not highlighted on this one
17  either.  But it's B, financial advisor; is that
18  correct?
19    Q.   Let's try this one.  Now, did you find it,
20  B, entitled, "Financial Advisor"?  Well, you can read
21  it without it being highlighted.  Look at B.
22    A.   Yes, sir.
23    Q.   It states, does it not, that, "Stanford's
24  financial advisors will be available to meet with the
25  client" -- client would be your and your husband,

4  (Pages 10 to 13)

Hunton App. 1117

Pamela G. Reed

14

1  wouldn't it, --
2  **A. Correct.**
3  Q. -- under this agreement? "To discuss and
4  review the account consistent with services provided
5  herein." Did he meet with you, --
6  **A. Yes, sir.**
7  Q. -- Nigel?
8  **A. Yes. Nigel met with us.**
9  Q. Nigel --
10  **A. Yes, sir.**
11  Q. -- Bowman. And did y'all discuss the
12  investment?
13      MR. SNYDER: Objection, form. Which
14  investment?
15  **A. Which investment?**
16  Q. (BY MR. COWLES) The very first one.
17  **A. I'm sure --**
18  Q. Moving your funds over and buying CDs.
19  **A. I'm sure we did discuss it with him.**
20  Q. Would you turn to page 4, please?
21  **A. Highlighted.**
22  Q. Paragraph five, "Representations." Did
23  Stanford represent that it is authorized and empowered
24  to enter into this agreement and is a registered -- is,
25  A, registered as an investment advisor under the

15

1  Advisors Act, registered as a broker/dealer with the
2  U.S. Securities and Exchange Commission, SEC, and state
3  jurisdictions, and a member of the National Association
4  of Securities Dealers, Inc., NASD, N-A-S-D, and the
5  National Futures Association, and registered as an
6  introducing broker with the Commodity Futures Trading
7  Commission Company? Did Nigel Bowman advise you about
8  that, that they were members -- the Stanford Group were
9  members of all that?
10  **A. I'm not sure if he was specific. He said that**
11  **they were just like Smith Barney.**
12  Q. And that's what you really wanted to hear,
13  because Smith Barney had been pretty good to you,
14  hadn't it?
15  **A. Yes, sir.**
16  Q. All right. Turn to the next page, if you
17  would.
18  **A. "The witness complied.)**
19  Q. Paragraph capital E. I want to know if you
20  read this at the time. "The client recognizes that
21  there may be loss or depreciation of the value of the
22  investment due to the fluctuation of market values.
23  The client represents that no party -- recognizes" --
24  excuse me, "Client represents that no party to this
25  agreement has made any guarantee, either oral or

16

1  written, that the client's investment objectives will
2  be achieved." Is that a correct statement?
3      MR. SNYDER: Objection, form.
4  **A. I'm not sure I read it at the time, but**
5  **that's sure what all broker/dealers say.**
6  Q. (BY MR. COWLES) Okay. How about the next
7  paragraph, F? "Client acknowledges that he or she has
8  reviewed and understands the risk factors and the fees
9  associated with the account and has determined that the
10  selected program is appropriate according to all
11  relevant factors, including client's past and
12  anticipated investment activity and holding of assets,
13  the cost and potential benefits of this program and the
14  clients investment objectives and goals," and is that a
15  correct statement?
16      MR. SNYDER: Objection, form. You
17  mean --
18  Q. (BY MR. COWLES) As far as you know?
19      MR. SNYDER: -- is that what this says?
20  Is that what you're asking her?
21  Q. (BY MR. COWLES) No, is it correct what it
22  says?
23  **A. I assume that's what all broker/dealers tell**
24  **their clients.**
25  Q. Was it correct as to you and Mr. Bowman?

17

1  **A. I'm sure that -- I'm sure that we had**
2  **discussed what the program was and what the fees were.**
3  Q. Okay. Turn over to page 7, would you?
4  **A. Yes, sir.**
5  Q. It's entitled, "Transaction Subject to
6  Industry Regulation and Standards." This, again, is
7  part of the agreement that we'll see in a minute that
8  you signed with Stanford Group Company in 2007. It
9  says, "All transactions shall be subject to the
10  regulations of all applicable government authorities
11  and self-regulatory agencies, including, but not
12  limited to, the" --
13  **A. It's hard to read.**
14  Q. Yeah, it really is. -- "constitutions and
15  rules of the clearinghouse, exchange or maker -- or
16  market where executed, all applicable anti money
17  laundering policies and procedures, and the USA Patriot
18  Act of 2001." Were you aware it was subject to that
19  act?
20  **A. I don't know if I specifically was aware it**
21  **was subject to that act.**
22  Q. Okay. "And any amendments thereto. The
23  client understands that Stanford is registered as an
24  investment advisor under the Advisers Act." Did you
25  know that?

DepoTexas, Inc.

**Hunton App. 1118**

Pamela G. Reed

18

1    A.  I can't say that I specifically knew that.
2    Q.  That's fine.  "And is a full service
3    broker/dealer registered with the SEC and state
4    jurisdictions and as such is obligated to comply with
5    all applicable rules, laws and regulations, including
6    those of the SEC and other regulatory and
7    self-regulatory agencies."  Were you aware of all that
8    when you entered into this agreement?
9    A.  I don't know that I was aware of those things
10   specifically, but, again, I was assured that they were
11   just like Smith Barney, were subject to any -- were
12   complying with any laws and regulations that they were
13   supposed to.
14   Q.  And Smith Barney did that.
15   A.  Yes, sir.
16   Q.  Turn over to page 8 just a moment.
17   (The witness complied.)
18   Q.  Paragraph J.  It's entitled, "Written
19   Disclosure Statements."  It says, "Simultaneously with
20   full execution of this agreement Stanford will deliver
21   to client" -- that's you and your husband --
22   "Stanford's schedule H of form ADV and sub-advisor's
23   schedule H of form ADV or part two of form ADV or
24   similar disclosure document as its brochure pursuant to
25   Rule 204.3 of the Advisers Act.  The client will

19

1    receive prospective -- prospectus for each of the
2    mutual funds in which the assets in the account are
3    invested."  Did they comply with that provision?
4    A.  I have no memory if they did or not.
5    Q.  Could they have?
6    A.  Sorry?
7    Q.  They could have, but you don't have memory of
8    it?
9    A.  Yes, sir.
10   Q.  Well, that brings the question right straight
11   up.  Do you have any memory at all of receiving any
12   disclosure statement in connection with your
13   investments in the Stanford Group Company?
14   MR. SNYDER:  Of any -- just objection,
15   form.  CDs or any investments whatsoever?
16   MR. COWLES:  Well, any investments.
17   MR. SNYDER:  Okay.
18   Q.  (BY MR. COWLES) Did you or not?
19   A.  Well, I'm sure we did.  I don't remember
20   specifically which ones.
21   Q.  Okay.  Did Mr. Bowman state to you and your
22   husband, your husband in your presence, that the CDs
23   were FDIC insured?
24   A.  I believe he did.
25   Q.  Do you know when?

20

1    A.  I would assume it was sometime prior to our
2    purchasing the CDs.
3    Q.  Okay.  Did he state to you that these CDs were
4    securities that were regulated by the U.S. government?
5    A.  I believe he did.
6    Q.  Can you refer us, Ms. Reed, to a document
7    anywhere stating those two facts, that he said that to
8    you?
9    A.  No, sir, I don't know where that document
10   would be.
11   Q.  Do you have anything in writing anywhere,
12   anywhere in this whole world of ours, that says the
13   CDs were FDIC insured?
14   A.  Not that I know of.
15   Q.  Do you have any document anywhere in the world
16   that says the bank regulated these CDs by the U.S.
17   government -- was regulated by the U.S. government?
18   A.  I don't know.
19   Q.  Okay.  Well, you and your husband came to a
20   parting of the ways with Mr. Bowman, didn't you?
21   A.  Yes, sir.
22   Q.  Been a longtime friend?
23   A.  Yes, sir.
24   Q.  A man you trusted?
25   A.  I did.  We both did.

21

1    Q.  Did anyone with the Stanford Group, even
2    including Allen Stanford, ever orally say to you these
3    CDs are FDIC insured?
4    A.  Mr. Bowman did.
5    Q.  Other than Mr. Bowman.
6    A.  I don't remember anyone else.
7    Q.  Okay.  Did anyone -- the same question as to
8    regulation of the bank by U.S. government.  Anybody
9    ever say to you that was a fact other than Mr. Bowman?
10   A.  I'm not sure if anybody other than Mr. Bowman
11   said that.
12   Q.  Okay.  That's great.  You ended up having to
13   bring a lawsuit against Mr. Bowman, didn't you, you and
14   your husband?
15   A.  We did.
16   Q.  And that was filed in August of 2010; is that
17   right?
18   A.  I'm not sure of the date.  Whatever date it
19   says on the petition.
20   Q.  Well, I can't tell.  The Travis district clerk
21   is a little bit funny the way they stamp these things.
22   I can't tell what they're saying, but it looks like
23   that.
24   A.  Okay.
25   Q.  And it was styled Bob Gibbins, Pam Reed,

DepoTexas, Inc.

Pamela G. Reed

22

1  Michael Gale and Lara Gale.  They were friends of yours
2  and your husband, weren't they?
3  **A.  Yes, sir.**
4  Q.  Michael and Lara Gale?
5  **A.  Yes, sir.**
6  Q.  All right.  And it's versus Nigel Bowman.
7  **A.  Correct.**
8  Q.  Is that how you pronounce it, Nigel?
9  **A.  Nigel.**
10  Q.  Nigel.
11  **A.  Uh-huh.  Yes.**
12  Q.  All right.
13       MR. COWLES: 3?
14       THE WITNESS: 3.
15       (Deposition Exhibit 3 marked.)
16       MR. COWLES:  Keep track of that.
17  Q.  (BY MR. COWLES)  Let me hand you a copy of
18  what I think is a copy of that lawsuit.  Look familiar
19  to you?
20  **A.  I know I've seen it, but I can't say familiar.**
21  Q.  Okay.  Before I go any further, when we were
22  talking about the previous exhibit, the client
23  agreement with the Stanford Group Company?
24  **A.  Yes, sir.**
25  Q.  I failed to get one thing from you and just to

23

1  be clear, let me get that.  Back to that exhibit,
2  that's 2, Defendants' Exhibit 2.  Would you look on the
3  last page, page 10?  Did you and your husband both sign
4  that instrument?
5  **A.  Yes, sir.**
6  Q.  And was the date April 11th, 2007?
7  **A.  It says it is, yes, sir.**
8  Q.  All right.  And Mr. Bowman signed it on that
9  same day, didn't he?
10  **A.  Yes, he did.**
11  Q.  And then a Stanford Group Company
12  representative also signed it, correct?
13  **A.  Yes, sir.  Looks like they did.**
14  Q.  Now, look at Exhibit 3.  Did you get one
15  that's highlighted?
16  **A.  Yes.**
17  Q.  Wow.  Paragraph nine, take a quick look at
18  that.  I don't want to take the time to go over it, but
19  I think it's just about exactly what you've said
20  already.
21  **A.  Yes, sir.**
22  Q.  Paragraph 11.  It talked about in that
23  paragraph that -- that the defendant, Bowman, Nigel
24  Bowman, had convinced the plaintiffs in paragraph nine
25  to invest their money in CDs issued by a related

24

1  company in Antigua called Stanford International Bank
2  Limited, --
3  **A.  Yes, sir.**
4  Q.  -- correct?
5  **A.  Yes, sir.**
6  Q.  Now, down to 11.  "Like all other Stanford
7  brokers and advisors, defendant received these
8  above-market commissions on the sale of the SIB CDs."
9  The defendant being Nigel Bowman?
10  **A.  Correct.**
11  Q.  He received above average commissions for the
12  sale of the CDs to your and your husband?
13  **A.  I did not know that at the time.**
14  Q.  The next sentence, "Due to this built-in
15  incentive to push the SIB CDs on prospective clients,
16  defendant failed to inquire about material facts and
17  risks of the SIB CDs, that defendant had he exercised
18  reasonable diligence and fulfilled his fiduciary duties
19  to plaintiffs, should have known and understood as an
20  investment advisor representing the plaintiffs."  And
21  that is a correct statement of your position in this,
22  is it not?
23  **A.  I believe it's a correct statement of one of
24  our positions, yes.**
25  Q.  One of them.

25

1  **A.  Yes.**
2  Q.  Not the only one.
3  **A.  Correct.**
4  Q.  All right.  Okay.  Look on page 6 -- that page
5  6 right there.
6  **A.  (The witness complied.)**
7  Q.  Right at the top.  "Based on the
8  representations made to them by defendant," that's
9  Nigel Bowman, --
10  **A.  Correct.**
11  Q.  -- "plaintiffs made the decision to invest
12  their retirement savings in SIB CDs."
13  **A.  Yes, sir.**
14  Q.  That is certainly true, is it not?
15  **A.  Yes, sir.**
16  Q.  And then in the next paragraph it repeats the
17  same investments we talked about earlier, a total of
18  $2,416,958.
19  **A.  Yes, sir.**
20  Q.  Do you know why Mr. Bowman asked you to invest
21  part of it in pounds, sterling?
22       MR. SNYDER: Objection, form.
23  Q.  (BY MR. COWLES)  Just do you know?
24  **A.  No, sir.  There was -- no, sir, I don't.**
25  Q.  He did and asked you -- 160,104 pounds, didn't

Hunton App. 1120

Pamela G. Reed

26

1    he?
2        A.  Correct.
3        Q.  And, again, we both know that amount -- you
4    can add it up, but it's about $300,000, right?
5        A.  Correct.
6        Q.  Okay.  He never told you why, that you recall.
7        A.  Not that I recall.
8        Q.  Okay.  I'm skipping a lot so you can get back
9    to Austin.
10       A.  Thank you.
11           MR. SNYDER:  Hell, Jim, we'll stipulate
12   the whole document says what it says if that will speed
13   this up.
14           MR. COWLES:  I know the document says
15   what it says, Ed, I can read, but also I want to know
16   what she says.
17           MR. SNYDER:  All right.
18       Q.  (BY MR. COWLES)  Would you turn over to page
19   16, please, way over there?
20       A.  Yes.  Yes, sir.
21       Q.  Paragraph 38, it is highlighted in yours, is
22   it not?
23       A.  Yes, sir.
24       Q.  I want to read this one with you and make sure
25   it is correct in your understanding.  "All of the above

27

1    representations," talking about what Mr. Bowman told
2    you, "were inaccurate or false.  Plaintiff relied upon
3    the truthfulness and accuracy of these facts and the
4    assurance -- assurances of defendant" -- again, that's
5    Mr. Bowman, right?
6        A.  Correct.
7        Q.  -- "that they had performed their required due
8    diligence on the operations of SIB and the
9    representations made by SIB to defendant to determine
10   the truthfulness of these facts."  A little further
11   down there, "Defendant never made the proper inquiries
12   and as a result violated their duties to plaintiff."
13   Again, the defendant, Mr. Bowman, isn't it?
14       A.  Yes, sir.
15       Q.  "Plaintiffs alleged that defendant failed at
16   all times to inform plaintiffs that defendants had not
17   made these due diligence inquiries on behalf of
18   plaintiff -- on plaintiff's behalf and defendant had no
19   knowledge one way or another whether the
20   representations that were being made to plaintiff were
21   accurate."  You are, of course, a lawyer and you've
22   practiced law and are familiar with the concept that in
23   making an investment due diligence needs to be
24   performed to investigate it and make sure it is a
25   proper investment; isn't that correct?

28

1        A.  I'm familiar with the concept.
2        Q.  Yes.  And here did you -- other than talking
3    to Mr. Bowman, did you do anything in the way of due
4    diligence?
5        A.  No, sir.
6        Q.  Did your husband, Bob?
7        A.  No, sir.
8        Q.  You relied on Mr. Bowman?
9        A.  Yes, sir.
10       Q.  Is it true Mr. Bowman was getting these high
11   commissions on the sale of CDs, as far as you know?
12       A.  Well, from what I've read after the fact.
13       Q.  Okay.  And that he was really working in
14   connection with the Stanford Group people, wasn't he,
15   as a financial advisor?
16       A.  Yes, sir.
17       Q.  With SGC, Stanford Group Company?
18       A.  Yes, sir.
19       Q.  Did you feel that you would get -- that he
20   didn't have some reason to tell you you ought to invest
21   in those if he was going to get a high commission?
22           MR. SNYDER:  Objection, form.
23       A.  Well, at the time I didn't know anything about
24   a commission.  And we had always trusted Nigel, so I
25   didn't feel that I couldn't at that occasion.

29

1        Q.  (BY MR. COWLES)  Well -- right.  As it turned
2    out he was getting a high commission and, according to
3    what you remember he told you, he did not correctly
4    represent --
5        A.  Yes, sir.
6        Q.  -- the facts about the CDs and Stanford, did
7    he?
8        A.  Especially about the CDs and Stanford, yes,
9    sir.
10       Q.  Did you make any attempt at all to get an
11   independent -- get independent assistance in performing
12   the due diligence for this investment?
13       A.  No, sir.
14       Q.  You invested the -- close to two and a half
15   million dollars, then, based on one thing and that was
16   the statements of Nigel Bowman.
17       A.  Correct.  That was the only knowledge that we
18   had at the time.
19       Q.  Yes.  And a man that was connected to and his
20   income came from the Stanford Group Companies,
21   including the bank, SIBL.
22       A.  Yes, sir.
23       Q.  All right.  Did you even go on the Internet
24   and look the companies up?
25       A.  No, sir, at the time didn't do much Internet

8  (Pages 26 to 29)

**Hunton App. 1121**

Pamela G. Reed

30

1  due diligence.
2      Q.  I saw in your deposition where you said you
3  couldn't Google it at that time.  Actually, you could.
4      A.  I couldn't.
5      Q.  Well, okay.  Googling started in 1998.  This
6  was 2007.  So it had been around for nine years or so.
7  But you couldn't -- why couldn't you do it?
8      A.  I didn't -- I didn't use the computer very
9  much.
10     Q.  Okay.  No question but that you understand
11 that you were in the category of an accredited
12 investor, you and Bob, your husband.
13     A.  I do understand that, yes.
14     Q.  And you understand what that means.  You were
15 told what that means.
16     A.  Yes, sir.
17     Q.  So have you ever looked at the disclosure
18 statement that was being passed out by the Stanford
19 Group Company at that time for the sale of CDs?
20     A.  I'm sure I have at sometime, but I don't
21 remember when.
22         MR. COWLES:  4?  4?
23         MR. ISRAELOFF:  Yes.
24     Q.  (BY MR. COWLES)  Let me hand you what's been
25 marked Defendants' Exhibit 4.  And, Ms. Reed, if I

31

1  understand, you don't remember whether you did or
2  didn't get this or even looked at it, do you?
3      A.  No, I don't.
4      Q.  If it was the practice at that time to furnish
5  a copy of the disclosure statement to everybody who
6  opened a new account, made investments with them, you
7  can't of your own knowledge say that wasn't true as far
8  as you were concerned, because you just don't remember?
9      A.  Correct.
10         MR. SNYDER:  Objection, form.
11     Q.  (BY MR. COWLES)  Well, let's look at it a
12 minute.  Let's see if you've got any information
13 contrary to this.  Disclosure statement, we'll use
14 these numbers at the bottom.  That will be easier to
15 see, 183.  This is a document with information that
16 normally is put out by the seller of an investment or
17 securities and so forth, right?
18     A.  I assume so, yes.
19     Q.  And you had experienced that with Smith
20 Barney, hadn't you?
21     A.  Yes, sir.
22     Q.  Yeah, it wasn't anything unusual to you.
23 You-all had made investments, read disclosure
24 statements, entered into subscription agreements, all
25 of that, hadn't you?

32

1      A.  Yes, sir.
2      Q.  Uh-huh.  And when they say here, "We have not
3  registered the CD deposits provided in connection with
4  the U.S. Accredited Investor CD or our related
5  certificates of ownership under the U.S. Federal
6  Securities Act of 1933 as amended, or securities laws
7  of any state or any other jurisdiction -- or other
8  jurisdiction," excuse me, "CD deposits and the CD
9  certificates are being offered to the general public,
10 but are available only to accredited investors," that's
11 not the kind of a statement that -- that's totally
12 unfamiliar to you, is it?
13     A.  Not totally, no.
14     Q.  Okay.  Just below that, "Neither the
15 U.S. Securities and Exchange commission, SEC, nor any
16 other regulatory agency has approved, recommended or
17 endorsed the U.S. Accredited Investor CD or the offer
18 of the CD deposits or CD certificates, nor has any such
19 authority passed upon the accuracy or completeness of
20 the disclosure statement and representations to the
21 contrary is a criminal offense."  Were you aware of
22 that when you bought these CDs that the SEC nor any
23 other regulatory had approved them as such?
24     A.  I don't believe I was.
25     Q.  Okay.  In a number of places in your

33

1  deposition and these kind of things in the prior cases,
2  you've been asked about them, --
3      A.  Yes, sir.
4      Q.  -- and the attorney asking the questions would
5  then follow that with the question would that have made
6  a difference to you in effect or what would you have
7  done if you had known that.  You answered, and I
8  counted them up, I think it was about 14 times, that I
9  would have asked more questions.
10     A.  Yes, sir.
11     Q.  Do you remember that?
12     A.  Yes, sir, I do.
13     Q.  And that was a very honest answer on your
14 part, wasn't it?
15     A.  Yes, sir.
16     Q.  If you had known something like that you would
17 have asked more questions.
18     A.  Yes.
19     Q.  Might still have invested, but you would have
20 asked more questions.
21     A.  Correct.
22     Q.  Okay.  If you look at the next paragraph, "The
23 SIBL products," that's what these CDs were, "are not
24 subject to reporting requirements of any jurisdiction,
25 nor are they covered by the investor protection or

DepoTexas, Inc.

Pamela G. Reed

34

1  securities insurance laws of any jurisdiction, such as
2  the U.S. Securities Investor Protection Insurance
3  Corporation or the bonding requirements thereunder.
4  The CD deposits and the CD certificates are not insured
5  by the Federal Deposit Insurance Corporation, FDIC, or
6  any other agency of the United States Government or any
7  state jurisdiction or by any insurance program of the
8  government of Antigua Barbuda -- and Barbuda." Did
9  you -- did you make these investments, purchase these
10  CDs thinking they were covered by FDIC insurance?
11     **A. Yes, sir.**
12          MR. SNYDER: Objection, asked and
13  answered.
14     Q. (BY MR. COWLES) That, again, came only from
15  Mr. Bowman.
16     **A. Yes, sir.**
17     Q. So I'll ask you the question that lawyer kept
18  asking you before. And so if you had known they
19  weren't covered by FDIC insurance, what would you have
20  done?
21     **A. Asked more questions.**
22     Q. Thank you. Bear with me. I'm going to try to
23  cut through this, because time is short. Page 185, --
24     **A. (The witness complied.)**
25     Q. -- third paragraph. It says, "In making an

35

1  investment decision investors must rely on their own
2  examination of the issuer and the terms of the
3  offering, including the merits and risks involved."
4  What do you understand that to mean, they're telling
5  you?
6     **A. I understand it to be the typical scary**
7  **legalese that comes with any investment that says that**
8  **it's your problem, not ours.**
9     Q. Okay. This scary legalese that you're talking
10  about, Lawyer Reed, okay, you call that scary legalese,
11  but did you understand it was -- you should make your
12  own examination of the offering and of the issuer?
13     **A. Well, in hindsight every investment I've ever**
14  **made I should have made an investigation of the**
15  **offering and the issuer. But we didn't. We depended**
16  **on our advisor.**
17     Q. Okay. Would you look on page 187, please?
18     **A. (The witness complied.)**
19     Q. It is entitled, "Risk and Other Factors
20  Affecting Stanford International Bank and the
21  U.S. Accredited Investor CD Program." The very first
22  sentence says, "Before purchasing the CD deposits you
23  should carefully consider the information in this
24  disclosure statement, including the following important
25  facts -- factors, among others."

36

1          MR. COWLES: Do we need to wait?
2          MR. BUNCHER: No, no, go ahead.
3     Q. (BY MR. COWLES) Okay. They're telling you
4  you need to consider everything in this disclosure
5  statement when you're thinking about buying these CDs
6  aren't they?
7     **A. Yes, sir.**
8     Q. Look down at the third paragraph. "Investing
9  in securities issued by international governments and
10  corporations involves considerations and risk not
11  typically associated with investing in obligations
12  issued by the U.S. Government and U.S. Corporations."
13  Would you agree with that and did you know that?
14     **A. I'm sure that's a general provision that's in**
15  **a lot of things.**
16     Q. Yes. And were you aware of it?
17          MR. BUNCHER: Aware of what specifically?
18     Q. (BY MR. COWLES) What that says, investing in
19  securities issued by international governments involve
20  considerations, risk not typically associated with
21  investing in obligations issued by the U.S. Government
22  and U.S. corporations?
23     **A. I'm not sure that I was aware of that.**
24     Q. Okay. That's fair. Look down at regulatory
25  issues, would you, please?

37

1     **A. Yes, sir.**
2     Q. The sentence starts about four sentences down.
3  "SIBL," that's the bank, Stanford International Bank,
4  "is subject to regulation by the Financial Services
5  Regulatory Commission and the Ministry of Finance of
6  the government of Antigua and Barbuda." When you
7  bought these CDs, did you know that?
8     **A. No, sir.**
9     Q. The sentence down, "By making this offering to
10  accredited investors in the United States, SIBL and its
11  officers are subject to certain laws of the United
12  States, including the antifraud provisions of the
13  U.S. federal securities laws and similar state laws."
14  Were you aware of that when you bought the securities?
15     **A. That they were subject to certain laws of the**
16  **United States? I would assume that they were.**
17     Q. Okay.
18     **A. Yes.**
19     Q. Turn to the next page, please, 188.
20     **A. (The witness complied.)**
21     Q. Were you aware that the bank's products were
22  not subject to reporting requirements of any
23  jurisdiction nor are they covered by the investor
24  protection or securities insurance laws of any
25  jurisdiction such as the U.S. Securities Investor

10  (Pages 34 to 37)

Hunton App. 1123

Pamela G. Reed

**38**

1    Protection Insurance Corporation or the bonding
2    requirements thereunder?
3        A.  **No, sir.**
4        Q.  Were you aware that CD deposits and
5    CD certificates are not insured by the FDIC or any
6    other agency of the United States Government or any
7    state jurisdiction by any insurance program of the
8    government of Antigua and Barbuda?
9        A.  **No, sir.**
10       Q.  As a lawyer and longtime investor, I want to
11   read to you the representations of the Stanford Group
12   Company about due diligence.  "We have prepared this
13   disclosure statement to provide you selected
14   information about the U.S. Accredited Investor CD.
15   Because the disclosure statement cannot be all
16   inclusive, we recommend you conduct further due
17   diligence, including examination of supplemental data
18   and information available through us before making
19   definitive commitments.  We will make available to you
20   for inspection during normal business hours our
21   relevant business, financial and other information and
22   data, which you may reasonably request to make informed
23   judgments with respect to investing in the U.S.
24   Accredited Investor CD, including, but not limited to,
25   our most recently published annual report."  Is that an

**39**

1    invitation, as you read it, to investigate further
2    before you invest and to ask them for anything you want
3    to see, as best you read it?
4        A.  **I guess it is an invitation, yes, sir.**
5        Q.  Did you exercise that invitation?
6        A.  **I don't remember.**
7            MR. SNYDER:  Objection, form.  There's no
8    evidence she actually got this information, Mr. Cowles.
9            MR. COWLES:  We'll get to that in just a
10   minute.  Right now I want to ask the questions.
11       A.  **Did I accept the invitation?  I don't think**
12   **so.**
13           MR. COWLES:  Yes, that was the question
14   and she gave the answer.
15       Q.  (BY MR. COWLES)  On that same page under
16   registration it says, "The CD deposits have not been,
17   nor will they be, registered in the U.S. Federal
18   Securities Act of 1933 as amended or the securities
19   laws of any state within the United States or any other
20   jurisdiction."  Did you know that or not when you
21   bought --
22       A.  **I don't believe I did.**
23       Q.  Okay.
24       A.  **Is there a font smaller than this?**
25       Q.  I don't -- and would you believe this is

**40**

1    enlarged?  Turn to the next page, 189.
2        A.  **Yes, sir.**
3        Q.  You knew that you could not resell these CDs,
4    didn't you?
5        A.  **I don't understand what you mean by "resell."**
6        Q.  You and your husband could not sell them to
7    other purchasers in the investor -- accredited investor
8    program?
9        A.  **I'm sorry.  I think that's the way CDs always**
10   **are.  You can turn them into the bank, but you don't**
11   **sell them to others.**
12       Q.  All right.  Would you look under the next,
13   "Investment Risk and Strategy"?  It says, "You may lose
14   your entire investment under circumstances where we may
15   be financially unable to repay those amounts and its
16   payment of principal and interest are subject to risk."
17   Did you know that when you made the investment?
18       A.  **I don't know that I had read this.  I think**
19   **this is canned language that you see in just about**
20   **anything, so --**
21       Q.  It may be, but it is language in there and it
22   is --
23       A.  **Yes, and I don't know if I read this or not.**
24       Q.  Okay.  Were you aware that you might lose your
25   entire investment?  It's a risk you took?

**41**

1        A.  **Well, if there's a run on the bank, I guess**
2    **there could have been a risk, yes.**
3        Q.  Turn all the way over to about the next to
4    last page, 203.  The title is at the bottom, "Purchase
5    of CD Deposits."  Do you see that?
6        A.  **Yes, sir.**
7        Q.  All right.  Are they telling you in that
8    paragraph that, "Depositors desiring to acquire CD
9    deposits" -- that was you and your husband, right?
10       A.  **Yes, sir.**
11       Q.  -- "should carefully read and follow the
12   instructions set forth in the subscription agreement
13   and investor questionnaire.  Each depositor will be
14   required to return the executed subscription agreement
15   and investor questionnaire accompanied by a personal
16   check, cashier's check or wire transfer in the amount
17   of the proposed CD deposit set forth in such
18   depositor's investor questionnaire."  Did you receive
19   and read and sign a subscription agreement?
20       A.  **I assume that we did if we purchased the CDs.**
21       Q.  Okay.  You don't have an independent memory of
22   it, but if you purchased them -- yeah.
23       A.  **Yes, sir.**
24       Q.  All right.  And when you did sign that
25   subscription agreement, had you carefully read and

DepoTexas, Inc.

Hunton App. 1124

Pamela G. Reed

50

1  receiving --
2  Q. Okay.
3  A. -- these documents or the disclosure
4  statement.
5  Q. That's fair. All right. By the way, have you
6  seen a disclosure statement that was signed by you or
7  your husband since August of 2010 or 2009 or anytime?
8  Have you seen one?
9  MR. SNYDER: Objection, form. As to the
10  CDs or as to any disclosure statements?
11  MR. COWLES: As to the CDs.
12  A. As to the CDs? Everything that we had in our
13  file went to Mr. Snyder, so I don't know that I've seen
14  one or not.
15  Q. (BY MR. COWLES) Well, did you look at the
16  documents yourself before you sent them somewhere?
17  A. I probably went through them with my
18  assistant.
19  Q. And do you recall you or your assistant
20  noticing a disclosure statement that was signed by you?
21  A. No, sir. I do not recall noticing a
22  disclosure statement.
23  Q. So if you did, you don't know where it is.
24  A. Correct.
25  Q. All right.

51

1  MR. COWLES: You got the next one? Okay.
2  MR. ISRAELOFF: 8.
3  MR. COWLES: Well, I don't have a sticker
4  on it.
5  MR. ISRAELOFF: I don't either.
6  MR. COWLES: We don't need to introduce
7  it. It's the declaration anyway.
8  Q. (BY MR. COWLES) So I'm just going to hand you
9  this document.
10  MR. COWLES: Give them one.
11  MR. ISRAELOFF: I did.
12  MR. COWLES: It shouldn't be in evidence
13  anyhow.
14  Q. (BY MR. COWLES) Do you recognize this
15  document?
16  A. Yes, sir, I do.
17  Q. It is a declaration of Pam Reed.
18  A. Correct.
19  Q. You know who that is.
20  A. I remember that one.
21  Q. Okay. For the nonlawyers, what's a
22  declaration? You are a lawyer.
23  A. Well, I'm not practicing. I'm a recovering
24  lawyer. I haven't practiced in a long time.
25  Q. Okay.

52

1  A. It is a statement of facts.
2  Q. Is it in affidavit style?
3  A. Yes, sir.
4  Q. Okay.
5  A. It's not notarized, but it's affidavit style.
6  Q. Do you understand under the federal rules you
7  don't need to notarize a declaration?
8  A. Yes, sir, I do now understand that.
9  Q. Okay. And that is filed in this case.
10  A. Yes, sir.
11  Q. All right. Let's look at that just a moment.
12  You said on page 1 at the bottom, "My husband Bob
13  Gibbins, now deceased, and I invested in the Stanford
14  Financial Group of companies." We've already gone over
15  that, haven't we?
16  A. Yes, sir.
17  Q. "For approximately 18 years, Nigel Bowman had
18  been our trusted financial advisor at Smith Barney,"
19  right?
20  A. Correct.
21  Q. Did you meet Allen Stanford?
22  A. Yes, sir.
23  Q. You took a trip to Antigua, didn't you?
24  A. I did.
25  Q. And your friends, the Gables?

53

1  A. The Gales.
2  Q. Gales?
3  A. Yes, sir.
4  Q. The Gales went with you? And you flew down
5  there on his executive jet?
6  A. Yes, sir.
7  Q. Spent two or three days there?
8  A. I think it was two and a half. Yes, two and a
9  half, three days.
10  Q. And during that time you did actually meet
11  Stanford himself.
12  A. I did.
13  Q. Did you have any discussion about the CDs with
14  him down there?
15  A. No, sir.
16  Q. Mr. Bowman rode with you, didn't he?
17  A. Yes, sir.
18  Q. All right. Look at paragraph six just a
19  moment.
20  A. (The witness complied.)
21  Q. This is your declaration, affidavit if you
22  want to call it that. "In making decisions to invest
23  in the SIBL CDs, I received and reviewed various
24  Stanford financial and marketing materials and
25  brochures regarding SIBL and Stanford Financial as a

14 (Pages 50 to 53)

Hunton App. 1125

Pamela G. Reed

58

1   Whatever you had you gave to the lawyers.
2       A.   Correct.
3       Q.   Do you recall whether you had an e-mail from
4   Bowman or anyone making representations to you about
5   the CDs?
6       A.   I do not recall, but I've given all copies of
7   e-mails to Mr. Snyder as well.
8       Q.   Oh, okay.
9       A.   Yes.
10      Q.   Well, I'm sure he's given them to us.
11      A.   I'm sure he has.
12      Q.   How about just a handwritten note?
13      A.   Not that I remember.
14      Q.   You don't have any real recollection of
15  anything written or electronic, do you?
16      A.   No, sir, I don't.
17      Q.   When you were working with Mr. Bowman on
18  investments both at Smith Barney and Stanford Group on
19  these CDs -- by the way, did you invest in anything but
20  the CDs?
21      A.   Yes, sir.
22      Q.   What else?
23      A.   Oh, he had -- he took our stocks and bond
24  investments as well.  Those were at Stanford as well.
25      Q.   Okay.  But you didn't change those.  He just

59

1   transferred them to him at Stanford Group Company from
2   Smith Barney?
3       A.   Correct.
4       Q.   So he was managing them at Stanford Group
5   Company?
6       A.   Correct.
7       Q.   But did you have any other kind of investment
8   in the Stanford companies at all?
9       A.   No, sir.
10      Q.   There was what is called an express account.
11  Do you know -- do you remember anything about that?
12      A.   I've seen that mentioned, but I'm not -- I
13  don't know what it was.
14      Q.   Okay.  All you knew was the CDs.
15      A.   Correct.
16      Q.   Okay.  That's fair.  Would you say you
17  deferred to Mr. Bowman's judgment in making this
18  investment?
19      A.   Yes.
20      Q.   If Mr. Bowman was either in error or
21  misrepresenting something to you, there was no check on
22  that you had.  You weren't talking to anybody else, --
23      A.   No, sir.
24      Q.   -- saying, "Is Nigel right or not," anything
25  like that?

60

1       A.   No, sir.
2       Q.   Okay.
3       A.   We were talking to Nigel.
4       Q.   Let me ask you this question:  Whatever
5   Mr. Bowman furnished you in connection with your making
6   an investment in those CDs, whatever written material
7   he furnished you, you would have read it; is that right
8   or not?  Or would you have just scanned some of it?
9       A.   Oh, I might have scanned it.  I can't -- I
10  can't say that I read every piece of paper that comes
11  with investments, but I don't know -- I would have
12  scanned them --
13      Q.   Okay.
14      A.   -- probably.
15      Q.   Well, any document you signed you would have
16  read, wouldn't you?
17      A.   I would have read part of it.  Mr. Cowles,
18  being a lawyer doesn't mean you're going to read all
19  the papers.
20      Q.   Thank you.  The reason I asked you that, on
21  page 20 -- if you want to follow -- page 20.  It's
22  actually -- it's page -- right here up in the
23  right-hand corner it's page 77.
24      A.   Okay.
25      Q.   Would you look at that on line 23?  You were

61

1   asked this question:  "Did he provide you with any
2   written materials concerning Stanford CDs?"  And your
3   answer was what?
4       A.   "I'm sure he did, but I have no idea where it
5   is."
6       Q.   And the lawyer asked you then, "Would you have
7   reviewed those written materials?"  And what was your
8   answer to him?
9       A.   "Yes."
10      Q.   So if he furnished you disclosure statements,
11  brochures, marketing materials, subscription agreement,
12  questionnaires, here you say you would have read them,
13  reviewed them?
14      A.   I'm sure I would have looked over them, yes.
15      Q.   Okay.  I'm going to finish in 15 minutes.
16          MR. SNYDER:  For the whole thing or
17  just --
18          MR. COWLES:  I can't finish the whole
19  thing, but I will finish my questions, you know.
20          MR. SNYDER:  Okay.
21          MR. COWLES:  You've got some other people
22  that want to ask questions, though.
23          MR. BUNCHER:  Is there a question that
24  hasn't been asked already in one of those other
25  depositions?

16  (Pages 58 to 61)

Hunton App. 1126

Pamela G. Reed

70

1 representative until now.
2 Q. And what did you do during those ten hours?
3 A. I have reviewed the initial petition, I have
4 looked at my deposition in the Proskauer case, and I
5 looked at the motion to create the class.
6 Q. And did you prepare a declaration for this
7 case?
8 A. I believe I did. I believe that's what we
9 went through earlier, yes.
10 Q. And how much time did you spend putting
11 together that declaration?
12 A. I would say an hour or so.
13 Q. And did you work with anyone to prepare that?
14 A. Mr. Snyder.
15 Q. And what did you do to work with Mr. Snyder?
16 Did you have a telephone call or did you meet in
17 person?
18 A. No, it would have been a telephone call.
19 Q. And did you do anything to respond to
20 interrogatories in this case?
21 A. I have talked to Mr. Snyder about them, but I
22 haven't done anything personally.
23 Q. Did you review the interrogatory responses
24 that were served in this case?
25 A. I'm not sure if I've seen those or not.

71

1 Q. And there were also responses to document
2 requests that were served in this case. Did you review
3 those?
4 A. I believe I went over those with Mr. Snyder.
5 Q. Okay. And was everything in the document
6 responses correct, to the best of your knowledge?
7 A. To the best of my knowledge, yes.
8 Q. And what did you do to prepare for today's
9 deposition?
10 A. I -- as I said, I went over the documents that
11 have been filed, I looked at my deposition, and I met
12 with Mr. Snyder.
13 Q. Okay. And how much time did you spend to
14 prepare for today's deposition?
15 A. Probably -- well, in reading everything --
16 well, a couple of hours, and then I met with Mr. Snyder
17 for about an hour.
18 Q. And is that in addition to the ten hours of
19 preparation you mentioned earlier or is that included?
20 A. It's inclusive.
21 Q. And who was present for the preparation
22 session with Mr. Snyder? Was there anyone else there?
23 A. No, just the two of us.
24 Q. And before you agreed to serve as a class
25 representative in this litigation, were you aware of

72

1 the case?
2 A. I heard the style of the case and I knew that
3 it existed, yes.
4 Q. And when did you first become aware of the
5 case?
6 A. I have been following all cases that have been
7 filed in relation to Stanford in terms of knowing that
8 they existed. So whenever it was filed, I knew that it
9 existed.
10 Q. And do you know who the other class
11 representatives are in this case?
12 A. I know that Jorge is one and I'm not sure who
13 the other one is.
14 Q. Does Samuel Troice ring a well?
15 A. Yes.
16 Q. So is he another class representative?
17 A. Yes.
18 Q. And have you met Mr. Troice before?
19 A. I have not.
20 Q. And have you met Jorge Salgado before today?
21 A. Yes.
22 Q. And when had you met Mr. Salgado?
23 A. Last night.
24 Q. And did you speak with Mr. Salgado last night?
25 A. A little, yes.

73

1 Q. And did you discuss this case?
2 A. I didn't, no.
3 Q. And was counsel present during that
4 discussion?
5 A. Yes.
6 Q. Was there anybody else present?
7 A. Yes, Jorge's grandson, Jorge.
8 Q. And did you discuss anything related to
9 Stanford during that discussion?
10 A. I think -- I did not do much discussion last
11 night with all of them. They were all speaking
12 Spanish.
13 Q. And did you understand what was being said?
14 A. I understood some of it, yes.
15 Q. And was any of what you understood related to
16 Stanford?
17 A. Some of it was, yes.
18 Q. And what -- what was discussed that was
19 related to Stanford?
20 A. I think they were discussing how Jorge had
21 initially been enticed to buy CDs and that was just
22 about all I got. Then we wandered on to other things.
23 Q. And about how long did that discussion last?
24 A. Probably about 20 minutes.
25 Q. And did you discuss any particular individuals

19 (Pages 70 to 73)

Hunton App. 1127

Pamela G. Reed

74

1  in the context of that discussion who are related to
2  Stanford?
3          MR. SNYDER: Objection, form.
4      A. And, again, I don't remember, I was trying to
5  keep up. I was not participating very much. My
6  Spanish is not that good. So --
7      Q. (BY MS. BISHOP) Do you recall any names that
8  were mentioned during the conversation?
9      A. I don't.
10     Q. And do you recall Hunton being mentioned
11  during the conversation?
12     A. Not during the conversation last night.
13     Q. Did you discuss the depositions during your
14  discussion last night?
15     A. I did not. Again, I'm just listening.
16  Mr. Snyder was explaining what a deposition is to
17  Jorge.
18     Q. Is there anything else you recall from that
19  discussion?
20     A. Not really, no.
21     Q. And so had you met Mr. Salgado before last
22  night?
23     A. No, I had not.
24     Q. Had you spoken to Mr. Salgado before last
25  night?

75

1      A. No, I had not.
2      Q. Had you had any e-mail communication with
3  Mr. Salgado?
4      A. No.
5      Q. And how about with Mr. Troice?
6      A. No.
7      Q. Are there any other of the class
8  representative plaintiffs that you've spoken with?
9      A. No.
10     Q. And I understand from your Proskauer
11  deposition testimony that at one point you knew
12  Annalisa Mendez?
13     A. Correct.
14     Q. Who was a -- and Ms. Mendez was a former class
15  representative in the Proskauer lawsuit; is that
16  correct?
17     A. I believe so, yes.
18     Q. Have you spoken with Ms. Mendez since your
19  deposition in February?
20     A. I have not.
21     Q. Have you had any e-mail communication with
22  Ms. Mendez since that time?
23     A. I have not.
24     Q. I'd like to go over something that Mr. Cowles
25  went over a little bit earlier. And if you can pull up

76

1  Defendants' Exhibit 1. It should be at the bottom of
2  the stack, which is the complaint in the BDO action.
3      A. Yes.
4      Q. And earlier in the deposition Mr. Cowles went
5  through the testimony here and asked about its truth,
6  and as part of that he went over paragraph 83, which is
7  on page 39. If would please open that up.
8      A. Okay.
9      Q. And that goes over your investment history in
10  the CDs; is that correct?
11     A. Correct. Yes.
12     Q. Now, next to that can you please pull up your
13  declaration in this case, which would have been near
14  the very end?
15     A. (The witness complied.)
16     Q. And if you can open that to paragraph five.
17     A. (The witness complied.)
18     Q. And that also discusses your investment
19  history?
20     A. Correct.
21     Q. Now, Ms. Reed, is the information in paragraph
22  83 of Exhibit 1 and paragraph five of your declaration
23  the same?
24     A. I think Mr. Hohmann drafted this. I think we
25  had included interest.

77

1      Q. Mr. Hohmann drafted which?
2      A. The original, yeah, petition in BDO.
3      Q. Okay. So Mr. Hohmann drafted Exhibit 1?
4      A. Yes, and I think that my accountant had
5  included interest, accumulated interest in the amount.
6      Q. Okay.
7      A. So the numbers in my declaration are the ones
8  that are correct.
9      Q. Okay. So there are different numbers --
10     A. Yeah.
11     Q. -- in Exhibit 1 and your declaration?
12     A. Yeah, because there had been interest included
13  in the initial --
14     Q. Okay. And is there also a difference in the
15  timing in Exhibit 1? Exhibit 1, paragraph 83, says
16  that you purchased a fixed CD in the amount of
17  approximately 160,000 pounds and another fixed CD in
18  the amount of approximately $2.1 million, and that both
19  had a one-year term, maturing in May 2008.
20     A. Well, that I know is incorrect. The two
21  million -- we looked at the CD during the break and the
22  two million was -- had a five-year maturity and the
23  150,000 pounds, I believe, was the year.
24     Q. Okay. So is the information contained in
25  paragraph five of your declaration in this case -- is

20 (Pages 74 to 77)

Hunton App. 1128

Pamela G. Reed

78

1  that information correct?
2      A.  Yes.
3      Q.  And so Mr. Cowles also asked you about a trip
4  that you took to Antigua --
5      A.  Yes.
6      Q.  -- during the deposition earlier.  And when
7  did that trip take place?
8      A.  We have it somewhere.  I believe it was in
9  2008.
10     Q.  Does February 2008 sound right?
11     A.  Thank you.  Yes.
12     Q.  And who else went on that trip with you?
13     A.  Mr. Bowman, Michael and Lara Gale and Carol
14  McCann.
15     Q.  I'm going to hand you what's marked
16  Defendants' Exhibit 9.
17         (Deposition Exhibit 9 marked.)
18     A.  Okay.  Should I put these away?  Are we done?
19     Q.  (BY MS. BISHOP)  Yeah, we're done with those.
20  And is this document familiar to you?
21     A.  I think these are the -- this is the itinerary
22  from that trip.
23     Q.  Okay.  And if you can flip to page 2.
24     A.  I'm not flipping -- there.
25     Q.  And it has a list of passengers there?

79

1      A.  Yes.
2      Q.  And does that -- does that passenger list look
3  accurate --
4      A.  It does.
5      Q.  -- as to who was on the trip?
6      A.  Also Elizabeth Schurig and Carolyn Beckett
7  were on the trip.
8      Q.  Okay.  And how were you invited to go on the
9  trip?
10     A.  Mr. Bowman invited me to go.
11     Q.  And do you know how the Gales were invited?
12     A.  They were considering purchasing CDs, and I
13  think that was why he invited them.
14     Q.  Okay.  So did the invitation come from you or
15  from Nigel?
16     A.  Oh, from Mr. Bowman.  He invited everyone.
17     Q.  Okay.  And did you know the Gales at that
18  time?
19     A.  I met them on this trip.
20     Q.  Okay.  And do you know how Mrs. Schurig was
21  invited?
22     A.  Again, Mr. Bowman invited everyone.
23     Q.  And did you know Mrs. Schurig before --
24     A.  I did know --
25     Q.  -- that trip?

80

1      A.  -- her, yes.
2      Q.  And had you ever discussed Stanford CDs with
3  Mrs. Schurig before the trip?
4      A.  I'm not sure if I had before the trip or not.
5      Q.  And did you know Mrs. Beckett before the trip?
6      A.  I did.
7      Q.  And had you ever discussed Stanford CDs with
8  Mrs. Beckett before this trip?
9      A.  I don't know if I had before this trip or not.
10     Q.  Is it possible that you might have?
11     A.  It's possible, but I'm not sure.
12     Q.  Okay.  Under what circumstances do you think
13  you might have discussed it?
14     A.  I can't -- can't postulate.  I don't know that
15  I did or not.
16     Q.  Okay.  Did you ever talk about your
17  investments in Stanford CDs with other people you knew?
18     A.  Not really, no.
19     Q.  And why not?
20     A.  Because I didn't talk about my investments
21  with people particularly.
22     Q.  And did you talk about Mr. Bowman ever with
23  people you knew?
24     A.  Yes, I did.
25     Q.  And what would you say about Mr. Bowman?

81

1      A.  That he was really good and that we had
2  appreciated working with him.
3      Q.  And did you ever recommend to anyone you knew
4  that they work with Mr. Bowman?
5      A.  I did.
6      Q.  And did you recommend that when he was at
7  Smith Barney or when he was with Stanford or at both?
8      A.  I know I did at Smith Barney and I cannot --
9  I'm not sure if I did at Stanford or not.
10     Q.  Do you know if anyone that you recommended to
11  work with Mr. Bowman did, in fact, work with Mr. Bowman
12  as a financial advisor?
13     A.  I think some people did when he was at
14  Smith Barney.
15     Q.  And about how many people would you guess that
16  was?
17     A.  Maybe two.
18     Q.  And do you know how many clients Mr. Bowman
19  had?
20     A.  I have no idea.
21     Q.  And who is it that you recommended to work
22  with Mr. Bowman --
23     A.  Oh, gosh.
24     Q.  -- who may have?
25     A.  I have no idea who it was, who the names were.

21 (Pages 78 to 81)

Hunton App. 1129

Pamela G. Reed

82

1    I don't know.
2        Q.   Okay.  Do you know --
3        A.   I just remember that I had recommended some
4    friends and he said thank you.  But I don't remember
5    who actually ended up with him.
6        Q.   And do you know about what year that was?
7        A.   Probably would have been in 2005 or '6,
8    sometime in that area.
9        Q.   So with what you -- sitting here today, do you
10   know of any friends of yours who invested with
11   Mr. Bowman?
12           MR. SNYDER:  Objection, form.  Object --
13   invested in CDs or invested generally with Mr. Bowman
14   whether at Smith Barney or Stanford?  Can you narrow
15   your question, please?
16       Q.   (BY MS. BISHOP)  Sitting here today --
17           MR. SNYDER:  To make it relevant to class
18   certification.
19       Q.   (BY MS. BISHOP) -- do you know of any friends
20   who invested with Mr. Bowman generally?
21       A.   Not at Stanford, no.
22       Q.   But do you know of anyone who invested with
23   Mr. Bowman --
24       A.   At Smith Barney.
25       Q.   -- without reference to the CDs?

83

1        A.   I can't think of anybody specifically who did.
2    I know that I had talked about Nigel and that he had
3    thanked me on occasion for -- for talking him up, but I
4    don't -- I can't think of anybody in particular.
5        Q.   And do you know how many of Mr. Bowman's
6    clients made the switch with him when he moved from
7    Smith Barney to Stanford?
8        A.   I don't know.
9        Q.   Did you have any sense over whether he lost
10   any business with the move?
11       A.   I don't think we ever discussed that.  I don't
12   know.
13       Q.   So sitting here today do you know of anyone
14   who also invested in Stanford CDs through Mr. Bowman?
15       A.   Only the Gales and they were on this trip.
16       Q.   Okay.  And you said that you met the Gales on
17   the trip?
18       A.   Yes.
19       Q.   And did you discuss the Stanford CDs with the
20   Gales on the trip?
21       A.   I don't think I discussed with them, no.
22       Q.   Did you discuss the CDs with anyone else on
23   the trip?
24       A.   Well, it was -- we were there to listen to the
25   propaganda and so that -- that was the discussion.  We

84

1    listened to whatever they had to tell us.
2        Q.   And did you say anything in response to those
3    presentations?
4        A.   Not that I remember.
5        Q.   After the presentations did you discuss the
6    CDs with anyone else on the trip?
7        A.   Not that I remember.
8        Q.   Did you discuss the content of the
9    presentations with the other people on the trip?
10       A.   I don't remember.
11       Q.   Is it possible that you might have?
12       A.   I could have, but --
13           MR. SNYDER:  Objection, form.
14       A.   -- I don't remember.
15       Q.   (BY MS. BISHOP)  Did you discuss the
16   presentations from the trip with anyone after the trip
17   was over?
18       A.   No.
19       Q.   Did you discuss them with your husband at all?
20       A.   He was rarely interested in any of this, so I
21   don't think -- I probably went over what happened, that
22   we listened, but I'm sure that I didn't dispense any of
23   the information to him.
24       Q.   Did you discuss the presentations with anyone
25   from the trip after you returned?

85

1        A.   Not that I remember.
2        Q.   Do you know if anyone else who was on the trip
3    ultimately ended up investing in Stanford CDs?
4        A.   I only know about the Gales.
5        Q.   And do you know when they invested?
6        A.   I don't.
7        Q.   Did you have any conversations with them about
8    Stanford CDs after you met them?
9        A.   No, we didn't have any conversations about
10   them until after 2009.
11       Q.   And did you have any conversations with them
12   about Mr. Bowman before February 2009?
13       A.   I don't believe so, no.
14       Q.   And the Gales are also plaintiffs in
15   your lawsuit against Mr. Bowman; is that correct?
16       A.   That's correct.
17       Q.   And as we -- as you discussed with Mr. Cowles
18   earlier, that lawsuit was filed in August of 2010 or
19   April --
20       A.   Yes.
21       Q.   -- of 2010?
22       A.   Yes, ma'am.
23       Q.   And what's the status of that lawsuit now?
24       A.   I think it is sitting.
25       Q.   And have you done anything in connection with

22  (Pages 82 to 85)

**Hunton App. 1130**

Pamela G. Reed

90

1  creditors of the company under Section 204"?
2      A.  I see that.
3      Q.  And do you see the last sentence there, "In
4  order to rebalance the creditor position we are
5  initiating a callback process through the courts"?
6      A.  I see that.
7      Q.  And so do you feel it's a fair explanation to
8  say that those payments were unfairly prejudicial to
9  other creditors?
10         MR. SNYDER:  Objection, form.
11     A.  They can think whatever they want to.  That's
12  not my position.
13     Q.  (BY MS. BISHOP)  But do you understand them to
14  be saying that payment --
15     A.  I understand what they're saying, yes.
16     Q.  So you understand them to say that the payment
17  is unfairly prejudicial to the other creditors?
18     A.  I don't agree with them on that, no.  But I
19  understand what they're saying.
20     Q.  Okay.  And what do you think the position of
21  investors who have not received what the JLs are
22  terming preference payments would be on return of these
23  payments?
24         MR. SNYDER:  Objection, form.
25     A.  I have no idea.

91

1      Q.  (BY MS. BISHOP)  Do you think investors who
2  did not receive what the JLs have called preference
3  payments would like these preference payments to be
4  returned?
5          MR. SNYDER:  Objection, form.
6      A.  I have no idea.
7      Q.  (BY MS. BISHOP)  And is it true that returning
8  the preference payment would increase the pool of money
9  available to all investors?
10         MR. SNYDER:  Objection, form.
11     A.  Well, since the pool is negligible, I don't
12  know.
13     Q.  (BY MS. BISHOP)  But if money was returned to
14  the JLs, that would go into the pool of money for
15  investors?
16     A.  I don't know what the JLs are doing with the
17  money.
18     Q.  So you don't -- you don't believe that any
19  money that goes to the JLs will be redistributed to
20  investors?
21     A.  I don't know what they're doing with the
22  money.
23     Q.  Okay.  And you began working with
24  Mr. Bowman -- you had been working with Mr. Bowman for
25  about 20 years before the Stanford collapse; is that

92

1  correct?
2      A.  No, it had been less than that.  So it was in
3  the early '90s, I think.
4      Q.  Okay.  And how much money did you begin
5  investing with Mr. Bowman as compared to your Stanford
6  investments?  Like did you invest more money or less
7  money?
8      A.  I don't know.
9      Q.  Do you know if your investment funds with
10  Mr. Bowman had grown by the time he moved to Stanford?
11     A.  They had -- yes, they had grown with Smith
12  Barney and Mr. Bowman.
13     Q.  And had they grown through management of the
14  portfolio or had you contributed more funds?
15     A.  Both, I believe.
16     Q.  Okay.  So your portfolio grew with
17  Mr. Bowman --
18     A.  Correct.
19     Q.  -- while he was at Smith Barney?
20     A.  Correct.  I'm sorry.
21     Q.  And what type of investments did you have with
22  him?
23     A.  Whatever he recommended.
24     Q.  And do you know what some of those investments
25  were?

93

1      A.  Well, I'm sure, you know, there were stocks,
2  there were bonds, there was emerging markets.  It was
3  anything that he recommended for what was called a
4  well-rounded portfolio.
5      Q.  And do you know what the balance was between
6  the different types of investments in that portfolio?
7      A.  I don't remember now.
8      Q.  And when Mr. Bowman was at Smith Barney, what
9  did you tell him about the risk level that you wanted
10  with your investments?
11     A.  I believe we kept low risk on just about
12  everything.
13     Q.  And did the amount of risk you were taking
14  change over time or was that consistent?
15     A.  I believe it was fairly consistent.
16     Q.  And did -- when you first moved -- when
17  Mr. Bowman first moved over to Stanford, did the
18  balance of your investments change?
19     A.  I don't -- I don't think so.  I think it
20  mainly -- the investment side stayed the same, the only
21  difference was the CDs.
22     Q.  And when you purchased the CDs, where did that
23  money come from?
24     A.  I'm not sure.  I think we may have liquidated
25  some stocks.  I'm not exactly sure.

24  (Pages 90 to 93)

Hunton App. 1131

Pamela G. Reed

94

1    Q.  Okay.  Do you know whether it would have been
2  in new money that was coming into your investment
3  portfolio or a reallocation of money that was already
4  in it?
5    A.  Sorry.  I believe that it was most likely
6  reallocation.
7    Q.  And what percentage of your assets were -- of
8  your investment portfolio was placed into the CDs?
9    MR. SNYDER:  How is that relevant to
10  class certification?
11    MS. BISHOP:  It goes to risk.
12    MR. VAIL:  The question is pending.
13    MR. SNYDER:  I'll object and instruct her
14  not to answer.
15    MR. VAIL:  Okay, if you want to instruct
16  her not to answer that question.  Based on what,
17  relevancy?
18    MR. SNYDER:  Yeah.
19    MR. BUNCHER:  The judge's order says that
20  no discovery is to take place other than -- than class
21  certification discovery.
22    MR. VAIL:  Understood.  We believe the
23  question is relevant.  It's been asked.  I don't
24  believe that's a basis to instruct a witness not to
25  answer.

95

1    MR. SNYDER:  Well, I've instructed her,
2  so take it up with the judge if you want to.  You know,
3  her -- the size of her asset portfolio, her wealth,
4  whatever, is not at issue in class certification.  So
5  my instruction has been given.  You can file the motion
6  with the judge and maybe he'll hear it next year
7  sometime.
8    MR. VAIL:  Well, if you want --
9    Q.  (BY MS. BISHOP)  So was your entire investment
10  portfolio in SIB CDs?
11    A.  No.
12    Q.  Was more than half of your investment
13  portfolio in SIB CDs?
14    A.  I have no idea.  I told you-all earlier that
15  we had -- all of our investments from Smith Barney went
16  with Mr. Bowman and I don't know what percentage.
17    Q.  And do you continue to have investments today?
18    A.  I do, yes.
19    Q.  And what types of assets are your investments
20  in?
21    A.  Not CDs with Stanford.  It's stocks and bonds.
22    Q.  And do you invest in any real estate?
23    A.  I own some real estate.
24    Q.  And do you invest in any startup companies?
25    A.  No.

96

1    Q.  And do you -- have you read disclosure
2  statements for investments you've made since you
3  invested in Stanford CDs?
4    A.  Not particularly.
5    Q.  Ms. Reed, you're a member of the OSIC; is that
6  correct?
7    A.  I am.
8    Q.  And how long have you been on the OSIC?
9    A.  My memory for dates is just horrible.  Oh, it
10  was in -- yeah, it was in 2013.
11    Q.  And what are your duties as a member of the
12  OSIC?
13    A.  Well, I listen to all the presentations
14  basically.
15    Q.  And do you have any voting capacity on actions
16  the OSIC takes?
17    A.  I am.  I'm a victim's representative.
18    Q.  Do you have any voting capacity in that?
19    A.  I do.
20    Q.  Okay.  And how many votes are on the OSIC?
21    A.  I'm not sure.
22    Q.  Do you have a guess of about how many?
23    A.  Ten perhaps.
24    Q.  And has your role in the OSIC changed over
25  time or has it remained pretty consistent?

97

1    A.  It has remained consistent.
2    Q.  And are you aware that OSIC is bringing its
3  own claims in this suit?
4    A.  Yes, I am.
5    Q.  And what's your understanding of how those
6  claims are the same or different from the claims you're
7  bringing as a class representative?
8    MR. SNYDER:  How is that relevant to
9  class certification?
10    MS. BISHOP:  It goes to her role as a
11  class representative and what she understands her
12  duties and responsibilities there to be.
13    MR. SNYDER:  You can ask her about her
14  role as a class representative, but now you're asking
15  about the claims by OSIC, which if you guys want --
16  again, I said this to Mr. Cowles.  If y'all want to
17  open up general merits of discovery and I start taking
18  depositions of Hunton lawyers, I'm ready to do it.
19  Just tell me.
20    A.  I'll be glad to tell you what I understand my
21  class representation to be.  My representation on OSIC
22  I have -- I had not participated when this was
23  originally filed.  But I'll be glad to tell you what I
24  think my class representation requires of me.
25    Q.  (BY MS. BISHOP)  Please go ahead and do that.

25  (Pages 94 to 97)

DepoTexas, Inc.

Pamela G. Reed

98

1    A.  It is -- a class representative has to be
2  someone that cares about the entire class.  It would
3  be -- I mean, the reason we have class actions is
4  because it would be ridiculous to have 17,000 people
5  file their own actions.
6        So I having to be cognizant of what -- of
7  what we're doing, of how it's going to benefit the
8  entire class, and I have to take everybody's
9  requirements into account when I decide what to do
10  going forward.  And I have to talk to the attorneys.  I
11  have to participate in the case.
12    Q.  And you have filed your own individual lawsuit
13  in addition to the class representative status, right?
14  Your lawsuit against Mr. Bowman?
15    A.  Well, that's totally separate, yes.
16    Q.  But you have filed your own individual action?
17    A.  Against Mr. Bowman, not against any of the
18  named defendants in this case.
19        THE VIDEOGRAPHER:  Ms. Reed, can you
20  scoot to your left just a little bit?
21        THE WITNESS:  Sure.
22        THE VIDEOGRAPHER:  Thank you very much.
23        THE WITNESS:  Is that better?
24        THE VIDEOGRAPHER:  Perfect.
25    Q.  (BY MS. BISHOP)  Ms. Reed, you testified

99

1  during your deposition in Proskauer that you reported
2  your investment in SIB CDs on your taxes?
3    A.  Yes.
4    Q.  And did you report your losses from SIB CDs on
5  your taxes?
6    A.  Yes.
7    Q.  And did you report those losses to the
8  receiver when you filed your claim?
9    A.  I don't know if we did or not.
10    Q.  Now, Ms. Reed, as part of your efforts as a
11  class representative in this lawsuit, did you go
12  through the Stanford related documents you had?
13    A.  Before this deposition?
14    Q.  Yes.
15    A.  No, I did not.
16    Q.  But serving as a class representative, when
17  Mr. Snyder asked, did you gather all the Stanford
18  related documents that you had?
19    A.  I gave him all my Stanford related documents
20  when we first hired him, yes.
21    Q.  And as you were discussing with Mr. Cowles
22  earlier, as part of that effort you went through your
23  e-mails?
24    A.  Yes.
25    Q.  And when did you do that?

100

1    A.  It had to have been a while ago.
2    Q.  Do you know if it was before or after the
3  deposition that you did in February?
4    A.  I had gone through them prior to that, and
5  then I had said in that deposition that there was one
6  that I didn't know if I -- we had e-mailed or not, but
7  I would check on it and I didn't find anything.
8    Q.  Okay.  And what did you do to check on your
9  e-mails after that deposition?
10    A.  I went back to see if they were in any folder
11  that I had, anything that I had saved.
12    Q.  So you looked at the files you had in your
13  e-mail account?
14    A.  Correct.  Yes.
15    Q.  Did you contact the e-mail provider at all to
16  see if there were any other e-mails you could obtain?
17    A.  No.
18    Q.  And what e-mail provider do you use?
19    A.  Time Warner.
20    Q.  And has that been the same e-mail account
21  through the time you invested in SIB CDs?
22    A.  I believe so.  I'm not positive, but I believe
23  so.
24    Q.  If there were another account -- is it
25  possible there might have been another e-mail account?

101

1    A.  Possible, but not probable.
2    Q.  Who might that have -- that e-mail account
3  have been with?  Would that also have been the
4  Time Warner account?
5    A.  Most likely, yes.
6    Q.  Are there any other e-mail addresses you
7  used --
8    A.  No.
9    Q.  -- outside of those?  And when did you first
10  get an e-mail account?
11        MR. SNYDER:  Really?
12    A.  God, you see how good I am with --
13        MR. SNYDER:  Go ahead.  I won't --
14    A.  -- with dates.
15        MR. SNYDER:  -- instruct her not to
16  answer that one.
17    Q.  (BY MS. BISHOP)  Did you have an e-mail
18  account in 2008?
19    A.  Yes.  Thank you.
20    Q.  And in 2008 would Mr. Bowman have ever
21  e-mailed you?
22    A.  I think so, yes.  Yes.
23    Q.  And what types of things would he e-mail you
24  about?
25    A.  Usually it was -- it was just personal things,

26 (Pages 98 to 101)

Hunton App. 1133

Pamela G. Reed

---

**102**

1  checking on me, checking on my husband, reporting on
2  his family.
3     Q.  Would he ever e-mail you about your
4  investments?
5     A.  I know -- I know he e-mailed me about this
6  trip, but I can't remember e-mailing about the
7  investments.
8     Q.  How frequently would you say you got e-mails
9  from him?
10    A.  Infrequently.
11    Q.  And I don't believe we got any of those
12  e-mails in the production in this case.  Would those
13  have been --
14    A.  Anything I had -- I'm sorry.  Go ahead.  I'm
15  sorry.
16    Q.  Did you routinely keep your e-mails or delete
17  your e-mails?  What was your habit?
18    A.  Delete.  I try to keep it very clean, so I
19  deleted a lot of -- most of them.
20    Q.  And is that still the practice you follow
21  today?
22    A.  It is.
23    Q.  And as -- and so you said earlier that you
24  searched the e-mails in your folder for production in
25  this case.  Are there any other steps you took?

---

**103**

1     A.  I went through archives.  I searched anything
2  that I know to search on my computer.
3     Q.  Now, in the search you were doing both in your
4  e-mails and in your documents, do you recall ever
5  seeing any documents with the name Hunton on them?
6     A.  I don't specifically recall.
7     Q.  So there are no documents that you recall with
8  the name Hunton on them?
9     A.  I don't know if there are or not.  I just
10  don't recall seeing the name.
11    Q.  So you don't recall any specific documents
12  with that name?
13    A.  Correct.
14    Q.  And do you recall any documents with the name
15  Carlos Loumiet?
16    A.  I don't recall any.
17    Q.  And you didn't come across any in your search
18  for documents?
19    A.  Not that I recall.
20    Q.  And is there anything -- did you have any
21  conversations with any attorneys from Hunton?
22    A.  Not that I know of.
23    Q.  And is there anything -- do you recall ever
24  having any conversations with Mr. Bowman where he
25  mentioned Hunton?

---

**104**

1     A.  I don't recall, no.
2     Q.  Do you recall any conversations with
3  Mr. Bowman where he mentioned Carlos Loumiet?
4     A.  No, I don't.
5        MR. VAIL:  Short break?
6        MR. SNYDER:  Sure.
7        THE WITNESS:  Sure.
8        MR. VAIL:  Ed, what I'd like to do on the
9  break is to give Laura an opportunity to explain to
10  you --
11       THE VIDEOGRAPHER:  We're off the record
12  at 11:33 a.m.
13       MR. VAIL:  Could you leave it on the
14  record, please?  I just want to finish this.  So she
15  can explain to you the question to which you instructed
16  the witness not to answer, the basis for that question
17  and why it ties to class outside the presence of the
18  witness and see if that changes your instruction.
19       MR. SNYDER:  Well, look, I don't mind you
20  asking about like maybe percentage of her assets, but
21  when you're asking her how much money did you have
22  other than Stanford, I mean, that's just outside the
23  bounds.  I mean, what -- how is that possibly
24  relevant -- what -- and not only that, it's
25  confidential financial information of the --

---

**105**

1        THE WITNESS:  Do you want me to step out?
2        MR. VAIL:  Yeah, could we talk about it
3  outside the presence of the witness?
4        MR. SNYDER:  I figured the way she
5  phrased it -- maybe she intended something else, but
6  way she phrased the question was how much money you
7  got.  I mean --
8        MR. VAIL:  Fair.  Now, we can go off the
9  record.
10       MS. BISHOP:  Should Mr. Salgado not be in
11  the room for this either?
12       THE VIDEOGRAPHER:  Do you guys want to go
13  off the record?
14       MR. VAIL:  Yes, please.
15       THE VIDEOGRAPHER:  We're off the record
16  at 11:34 a.m.
17       (Recess taken.)
18       (Deposition Exhibit 11 marked.)
19       THE VIDEOGRAPHER:  We're on the record at
20  11:39 a.m.
21    Q.  (BY MS. BISHOP)  Now, Ms. Reed, I'm handing
22  you what's been marked Defendants' Exhibit 11.
23    A.  Thank you.
24    Q.  And do you recognize this document?
25       MR. BUNCHER:  What was 10?  I'm sorry.

27  (Pages 102 to 105)

Hunton App. 1134

Pamela G. Reed

**110**

1      I, PAMELA G. REED, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6
              PAMELA G. REED
7
8
9  THE STATE OF _____ )
10  COUNTY OF _____ )
11      Before me, _____, on this day
12  personally appeared PAMELA G. REED, known to me (or
13  proved to me under oath) or through _____
14  (description of identity card or other document) to be
15  the person whose name is subscribed to the foregoing
16  instrument and acknowledged to me that they executed
17  the same for the purposes and consideration therein
18  expressed.
19      Given under my hand and seal of office this
20  _____ day of _____, 2015.
21
22
23
         NOTARY PUBLIC IN AND FOR
24           THE STATE OF _____
         MY COMMISSION EXPIRES:
25

**112**

1     ____ was not requested by the deponent or a party
2  before the completion of the deposition.
3      I further certify that I am neither attorney or
4  counsel for, nor related to, nor employed by any of the
5  parties to the action in which this testimony was
6  taken.
7      Further, I am not a relative or employee of any
8  attorney of record in this cause, nor do I have a
9  financial interest in the action.
10      Subscribed and sworn to on this 7th day of
11  December, A.D., 2015.
12
13
14      Jeff L. Foster, CSR, RMR, CRR
        Texas CSR No. 5434
15      Expiration Date: 12/31/2016
        DepoTexas, Inc.
16      DepoTexas Firm Registration No. 459
        6500 Greenville Avenue, Suite 445
17      Dallas, Texas 75206
        (214) 373-4977
18
19
20
21
22
23
24
25

**111**

1       IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2           DALLAS DIVISION
3  RALPH S. JANVEY, et al.,   )
              )
4      Plaintiffs,   )
              )
5  vs.        ) CIVIL ACTION
           ) NO.
6  GREENBERG TRAURIG, LLP, HUNTON &  ) 3:12cv-4641-N
   WILLIAMS, LLP; and YOLANDA   )
7  SUAREZ,     )
              )
8      Defendants.   )
9
10       REPORTER'S CERTIFICATION
    ORAL DEPOSITION OF PAMELA G. REED
11         December 3, 2015
12      I, Jeff L. Foster, certified shorthand reporter
13  in and for the State of Texas, do hereby certify to the
14  following:
15     That the witness, PAMELA G. REED, was duly sworn by
16  the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19     I further certify that pursuant to FRCP Rule
20  30(f)(1) that the signature of the deponent:
21     _X__ was requested by the deponent or a party
22  before the completion of the deposition and returned
23  within 30 days from date or receipt of the transcript.
24  If returned, the attached Changes and Signature Page
25  contains any changes and the reasons therefor;

29  (Pages 110 to 112)

**Hunton App. 1135**

# EXHIBIT 18

Mark Russell

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, et al.,            )
                                    )
            Plaintiffs,             )
                                    )
vs.                                 ) CIVIL ACTION
                                    ) NO.
GREENBERG TRAURIG, LLP, HUNTON &    ) 3:12cv-4641-N
WILLIAMS, LLP; and YOLANDA          )
SUAREZ,                             )
                                    )
            Defendants.             )

-------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

MARK RUSSELL

December 17, 2015

-------------------------------------

        ORAL DEPOSITION of MARK RUSSELL, produced as a

witness the instance of the Defendant Greenberg

Traurig, and duly sworn, was taken in the above styled

and numbered cause on December 17, 2015, from 9:06 a.m.

to 3:17 p.m., before Jeff L. Foster, a Certified

Shorthand Reporter in and for the State of Texas, at

the offices of Baker Botts, LLP, 2001 Ross Avenue,

Suite 1100, Dallas, Texas 75201, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record.

Hunton App. 1136

Mark Russell

**10**

1　We don't have a copy of what they're operating off of.
2　　Q.　Well, it was my understanding that there was
3　an agreement to share information that was signed
4　between the two parties?
5　　A.　There is.
6　　Q.　So why hasn't Mr. Janvey been able to get
7　copies of that and make those comparisons?
8　　A.　I don't know that he's asked for copies in
9　order to do it.　So I don't know that he -- I don't
10　know that he can't or hasn't been able to.　I don't --
11　I don't know if he's even asked for a copy to compare
12　it to.
13　　Q.　Have you or the receiver asked to see the
14　backups of the old SIB database held in Antigua?
15　　A.　We have not.　We have not asked for them or
16　looked at them.
17　　Q.　Do you know why?
18　　A.　I don't.
19　　Q.　The data that you have up here from the
20　Temenos database only goes back to a certain prior
21　date, right?
22　　A.　Correct.
23　　Q.　What date?
24　　A.　So kind of generally the earliest information
25　we have is from August of 2003.　Scattering here and

**11**

1　there we'll see some transactions that predate that
2　date, but primarily all of our transactions begin in
3　August of 2003.
4　　Q.　But the receiver has not asked the Antigua
5　joint liquidators to give data prior to that date,
6　right?
7　　A.　I don't know whether he's asked for it
8　specifically or not.　I know that I haven't seen a copy
9　of it from them.
10　　Q.　Well, if he had gotten a copy, you would have
11　seen it, right?　That's your job?
12　　A.　We would have seen it if he would have then
13　asked us to do a comparison.　So I know I haven't been
14　asked to do that.　So I haven't -- I haven't seen a
15　copy of it.
16　　Q.　Does that mean there is a possibility that the
17　Temenos database that you have up here has some spots
18　where it does not agree with the database held down in
19　Antigua, but you just don't know it?
20　　A.　I mean, it's always a possibility.　We haven't
21　seen any instances of that, though.
22　　Q.　Let's next talk about the paper files that you
23　say are held down in Antigua.　What do you understand
24　them to consist of?
25　　A.　So our understanding is that they have -- do

**12**

1　you want like more specific to the CD-related ones or
2　just in general?
3　　Q.　Go ahead in general.
4　　A.　Okay.　So in general it's just normal business
5　records, so like stuff you would expect at any
6　business, contracts, accounting, all those types of
7　business type documents, accounting and finance
8　documents.　And then in addition to that they have a
9　client file room that contains folders for all of the
10　different SIBL CD investors and then within those
11　folders there's the account statement and account
12　opening information and SIBL CD type agreement copies
13　that they have down there.
14　　Q.　Does the client file room down in Antigua hold
15　copies of signed subscription agreements?
16　　A.　I don't recall if it specifically does or
17　doesn't.
18　　Q.　Have you had occasion to request any
19　particular client file from Antigua?
20　　A.　I don't know if that's happened or not.
21　　Q.　Who would know?
22　　A.　I'd assume somebody that works for the
23　receiver would know.　I couldn't tell you specifically
24　who would know.
25　　Q.　Are there any other paper files that you

**13**

1　understand are being held down in Antigua?
2　　A.　Not that I -- not that I have direct knowledge
3　on, no.
4　　Q.　Next let me ask if you know what sort of
5　either indexes or computer files are searchable among
6　the documents and records held down in Antigua?
7　　A.　I don't know if -- like electronic searchable
8　kind of format?　I don't know.
9　　Q.　What about with respect to the papers held in
10　the client file room?　Are there any indexes that you
11　know of about what is in that client file room?
12　　A.　I don't know.
13　　Q.　Have you seen the client file room that time
14　you went to Antigua?
15　　A.　I did.
16　　Q.　What did it look like?
17　　A.　It's like a big -- big room, kind of shelves
18　lined out, and then kind of alphabetically -- I think
19　it was alphabetically; it may have been by CD number.
20　There's folders kind of in those shelves of various
21　client files.
22　　Q.　Did you have occasion to look at a sample of
23　what was in one of those folders?
24　　A.　I know I looked through a few.　I don't
25　specifically remember everything that was in there.

4　(Pages 10 to 13)

Hunton App. 1137

Mark Russell

14

1    Q.  What do you remember?
2    A.  Generally it was CD type documents that we had
3  kind of seen before from our work in the U.S. like --
4  so account opening type information, sometimes
5  statements.  But specifically whether each one
6  contained all the same information or not, I don't
7  know.
8    Q.  Do you understand that the paper files would
9  include all of the some 17,000 client files?
10   A.  I don't know one way or the other.  I know
11 there's a lot of them.
12   Q.  Is there anything else that you are aware of
13 that's being held in Antigua other than the computer
14 files and paper files we've just discussed?
15   A.  Not with specific knowledge, no.
16   Q.  What about generally?
17   A.  I mean, I would assume that they have the
18 claims-related information that they have from their
19 claims process.  But, you know, that -- I think that
20 happened after our visit, so I don't -- I don't know
21 exactly where they're keeping that or where that is.
22   Q.  Does Mr. Janvey get copies of the claims and
23 claim-related information from Antigua?
24   A.  The receivership gets information related to
25 their claims process.  But I don't think -- we're not

15

1  getting every piece of paper and every piece of
2  document filed in the claims process.
3    Q.  What sort of information does the receiver
4  get?
5    A.  So we're getting information related to kind
6  of like at a claim level what's -- what are the
7  accounts in the claim, what's the amount that he's
8  allowing, and then we get some information related to
9  the addresses of the claimants and some additional
10 information on a claim-by-claim basis.
11   Q.  Has the U.S. receiver modified or adjusted his
12 own records and claims processing based on things that
13 were received from Antigua?
14   A.  In some instances we compare what we have to
15 what they've determined.  But that's kind of on a
16 case-by-case basis when we get an objection or a
17 request to do so.  And then I know as part of the joint
18 agreement with the liquidators we've agreed to consider
19 their claims in our process, so we're looking at that
20 from a consideration on including them in our claims
21 process to the extent they haven't -- they haven't been
22 before.
23   Q.  You indicated in your prior deposition that it
24 is possible that Mr. Janvey up here in the United
25 States will recognize claims made to the Antigua joint

16

1  liquidators as long as they were made before the cutoff
2  date set in the case here in Dallas; is that right?
3    A.  I know that he has agreed to consider the
4  claims that are filed in that process that were filed
5  prior to the U.S. bar date.  I know that those are
6  currently being reviewed right now.  And to the extent
7  that he does allow any claims on those claims, like
8  they'll end up getting a conditional notice of their
9  determination.  But that's still an ongoing process
10 right now of finalizing what will and what won't end up
11 being allowed in the U.S. receivership process.
12   Q.  Does that mean that the claims that the U.S.
13 receiver has approved as of today might change?
14   A.  I'm trying to think about how to say this
15 correctly.  I would say there are additional claims
16 that may be approved, not necessarily that the claims
17 that are approved would change, if that distinction
18 makes sense.
19   Q.  What is your understanding as to why there
20 might be additional claims that were filed with the
21 Antigua joint liquidators that would not have also been
22 filed already with the United States receiver?
23   A.  I really don't know.  You know, why somebody
24 would have filed with them instead of us?
25   Q.  Right.  Is there -- is there some feeling that

17

1  certain customers of Stanford International Bank don't
2  want to come or submit things to the United States
3  receiver?
4    A.  I don't know.  I haven't seen anything that
5  kind of says why -- sorry, why those ones haven't filed
6  with us in the U.S.
7    Q.  The United States receiver has as part of its
8  claims process the requirement that those who submit
9  claims must submit to the jurisdiction of the United
10 States district court with respect to those claims.  Do
11 you understand that?
12   A.  That's my understanding.
13   Q.  Will that same requirement be put on people
14 who have made claims only with the Antigua joint
15 liquidators?
16   A.  My understanding is that in order for them to
17 be allowed and have a distribution, if that's what's
18 determined, they will have to sign a conditional notice
19 of determination and that that conditional notice is
20 conditioned on them submitting to the U.S. receivership
21 process in the U.S. courts.
22   Q.  We've seen the forms for the submission of
23 claims directly to the U.S. receiver.  Is there a form
24 there now for the conditional notice of determination
25 or what it is that those additional claimants would

5 (Pages 14 to 17)

Hunton App. 1138

Mark Russell

18

1  have to sign if they wanted their claim to be
2  recognized up here?
3      A.  I don't -- I don't know if that's been
4  formally put together yet or not.
5      Q.  Let's just finish out this section.  Is there
6  anything else that you're aware of with regard to the
7  Stanford International Bank that's being held by the
8  joint liquidators down in Antigua?
9      A.  In terms of like documents and records and
10  data?
11      Q.  Documents, records, anything of importance
12  to -- for example, claims against law firms.
13      A.  I mean, without knowing specifics, like just
14  general business type documents that you'd expect to be
15  kept by an entity.  So, you know, there's vendor files
16  and that kind of stuff down there, so -- but I kind of
17  consider that a part of the accounting records.
18      Q.  What about e-mails?  Are you aware of whether
19  either the U.S. receiver or the Antigua joint
20  liquidators have possession of e-mail records?
21      A.  I know the U.S. receivership does.  I don't
22  know whether or not the joint liquidators do.
23      Q.  We'll get to the receiver in a moment.  And
24  that moment should be right now.  Very good.  Let's
25  move on now to the second question, which is what sort

19

1  of data and records the receiver, Mr. Janvey, has with
2  regard to the Stanford International Bank and related
3  entities?
4      A.  Oh, that's a big question.  So I'll kind of
5  give broad categories.  So there's electronic
6  information, which I would kind of describe as we have
7  some of the underlying accounting kind of general
8  ledger Oracle type system accounting records.  Those
9  generally include general ledger detail.  We also have
10  like vendor payment detail.  Those are kind of the two
11  primary ones that we've used in our investigation so
12  far.  There's other tables that we just haven't used as
13  much from that Oracle database.
14          We also have more -- more electronic type
15  accounting records that we've received over time from
16  the various -- like various accounting people at
17  Stanford.  We have e-mail records, so when the
18  receivership took over there was an effort to image and
19  preserve the e-mail and computer and hard drive
20  information of a large number of individuals.  I don't
21  know the specifics on it.  I know that FTI has a record
22  of what's been done.  And then some of that has been
23  loaded and is available from a review perspective.
24          Then we also have the --
25      Q.  What is -- I don't recall.  What was the name

20

1  of that e-mail system?
2      A.  I know that they had a lot of e-mail like on
3  an exchange server.  I don't know -- I don't know
4  specifically if they were running Microsoft.  I think
5  they were, but -- like a Microsoft exchange, but they
6  had servers with the live e-mail on it.
7      Q.  Okay.
8      A.  And then --
9      Q.  I know in other cases parties have had
10  searches run and I just don't recall the name of
11  that -- either the database or the system they were
12  using.
13          All right.  Please keep going.  What
14  other records or material of the Stanford bank and
15  Stanford empire does the U.S. receiver currently have?
16      A.  And then we also have -- like we discussed
17  earlier, we have a copy set of the SIBL CD database
18  that was live at the time that we took over, so it's
19  tables and information from the Temenos and the
20  Data Pro databases.
21          We've also received from several of the
22  banking institutions that the Stanford entities used
23  wire information and bank statements and check images.
24  So that's primarily going to be from Toronto Dominion,
25  Trustmark National Bank, Bank of Houston.  I believe

21

1  we've also gotten some stuff from HSBC.  And then we
2  also have a lot of paper records of the paper records
3  that were in the various Stanford offices when the
4  receivership took over.  So there's a warehouse that
5  has boxes of information from the paper documents.
6      Q.  Down in Houston?
7      A.  Yes, it's down in Houston.
8      Q.  Are there any indexes to the warehouse in
9  Houston?
10      A.  My understanding is there's like kind of a
11  high-level index that says generically kind of what's
12  available in the various boxes down there.
13      Q.  Has either the receiver or FTI created a more
14  detailed index?
15      A.  Not that I'm aware of.
16      Q.  Have you had occasion or FTI to search for
17  records in that warehouse?
18      A.  I haven't personally searched for records.  I
19  don't -- I'm trying to think if anybody from FTI would
20  have ever gone there to look for anything specifically.
21  I know that nobody from FTI has done like a
22  comprehensive review of all the records that are in the
23  warehouse, but I don't know whether or not anybody has
24  ever gone down to go pull a specific box to see if
25  there's something that they were looking for or not.

6  (Pages 18 to 21)

Hunton App. 1139

Mark Russell

22

1    Q.  It's my understanding that the high-level
2    index doesn't really help you very much if you need to
3    look for a particular file or folder.  Is that right?
4    A.  I don't know that I would agree with that.  I
5    think it gives you -- it gives you direction to go look
6    for where that document may be if it exists.
7    Q.  I thought the index -- well, tell us what the
8    index was for.  I thought it had to do with whose
9    office each file came out of.
10   A.  Some of it is related to that.  I also know
11   that like some of it relates to telling you kind of
12   what entity does that box relate to.  I know I've
13   seen -- and I don't know exactly how populated it is
14   for every box, but like the boxes came from like the
15   legal file room.  And so like for a lot of our purposes
16   if we're looking for contracts and that kind of
17   documents, I would say that it is helpful because it
18   directs us to this is where legal type boxes are, these
19   are where this individual's information is and we know
20   what role that person played, and so it's helpful to
21   that extent.  But if you're looking for -- I'm looking
22   for this contract, it won't have a listing of where
23   that contract is in the boxes.
24   Q.  What else does the receiver, Mr. Janvey, have
25   related to Stanford?

23

1    A.  I mean, the broad categories I think that's
2    basically what we obtained when we took over.  So the
3    only thing really in addition to that would be anything
4    that we've gotten from either claimants or other
5    defendant third parties, either -- like in -- like in
6    negotiations, like if we're suing a net winner, they
7    may give us some statement information.  Similar to the
8    claimants process, they'll file documents with us so we
9    would also have that information.
10   (Deposition Exhibit 1 marked.)
11   Q.  (BY MR. ISRAELOFF)  Let me show you what's
12   been marked Exhibit Number 1 and ask if you can tell us
13   what it is.
14   A.  So this is the U.S. receivership's claim form
15   that a claimant filing a claim in the U.S.
16   receivership's claim process would have to fill out and
17   file with the U.S. receivership.
18   Q.  Did the receiver receive one of these claim
19   forms for each claimant that the receiver has
20   subsequently allowed a claim from?
21   A.  We've received the information that would be
22   needed in the claim form.  I know -- I know that the
23   process by which electronically filed claims get filed.
24   You're not necessarily going to have a version of a
25   claim form that looks like this for a pure electronic

24

1    filing.
2    Q.  But the electronic claims would have required
3    all the same information?
4    A.  Correct.  It would have captured and required
5    the same information, it's just you're not going to --
6    you're not going to have a copy of this that you can
7    print out for that electronic filing.
8    Q.  Exhibit Number 1 does show the types of
9    information now that the receiver has for each claimant
10   for which the receiver has allowed a claim either on
11   paper form or in electronic form?
12   A.  I'm trying to think.  I know that this
13   is -- this is the information that's requested.  I'm
14   trying to think.  I don't remember specifically what
15   would cause a claim to be -- there's some information
16   that if it's requested it would cause a claim to be
17   deficient if it wasn't there.  Some information that
18   may have been just we want this information, but we
19   don't have to have it, so I don't -- I can't say that
20   every claim has all of this, but every claim would have
21   everything that's required for it not to be deficient
22   if it's been allowed.
23   Q.  That's fair.  What sort of information on
24   Exhibit 1 would be considered important enough to
25   render a claim deficient?

25

1    A.  So we'd have to have an address for them so we
2    could contact them, their name.  We'd need to know what
3    account number they're claiming on.  We would need to
4    know what amount they're claiming.  I think they would
5    have to tell us -- I think they would have to answer
6    some of the questions regarding -- sorry -- whether or
7    not they are or not an employee, the type of claim that
8    they're filing, so are they filing a CD claim, a
9    brokerage claim, some other type of claim against the
10   Stanford recceivership.  I'm trying to think.
11   That's what I -- that's what I remember
12   offhand like in terms of what would be necessary for us
13   to be able to calculate an allowed amount, an allowed
14   claim.
15   Q.  Sure.  On the second page at the top there's a
16   list of Stanford entities A through G, and only A is
17   the Stanford International Bank itself.  What do the
18   others -- what did the others do that would result in a
19   claim on this form?
20   A.  I can't specifically tell you why somebody
21   would have made a claim against those entities.  I can
22   tell you generic -- like generally what that entity was
23   involved in.
24   Q.  That will -- that will be fine.
25   A.  So Stanford Group Company was the U.S.

7  (Pages 22 to 25)

Mark Russell

26

1   brokerage.  So they had financial advisors that were
2   essentially responsible for selling the CDs to
3   U.S. investors.  Stanford Capital Management was kind
4   of more like an investment banking type company for
5   Stanford, so they would like assist in deals and that
6   kind of stuff.  Stanford Trust Company was a trust
7   company in Louisiana that held or administered trusts
8   that held CDs.  Stanford Financial Group Company was
9   kind of like a back office, shared service type entity
10   that provided accounting, payroll, vendor payment, that
11   kind of activity for a multitude of Stanford entities.
12   And then Stanford Coins and Bullion was a coins and
13   bullion dealer that sold coins and bullion to customers
14   that either were just customers of SCNB or customers of
15   other Stanford entities as well.
16   Q.  The claim numbers, claim names and amounts
17   that you have provided in your declaration in this
18   case, do those include any claims other than CDs?
19   A.  They do not.
20   Q.  What other types of claims does the receiver
21   have other than CD claims?
22   A.  The ones that I have specific knowledge on is
23   I know there were claims made for like gold and bullion
24   claims.  I'm sure there's others, but we weren't -- we
25   being FTI weren't involved in kind of the processing

27

1   and evaluation of nonCD claims, so I don't know the
2   multitude of other types of claims that may have been
3   filed.
4   Q.  Are the claims that you have described in your
5   declaration in this case, do those include other
6   accounts like express accounts?
7   A.  They -- they include any SIBL account.  So any
8   account that would have been held at the bank in the
9   Temenos or Data Pro system.  So that would be accounts
10   that the database calls express accounts or CD accounts
11   or loan accounts.
12   Q.  When you say "SIBL," just for our record,
13   you're referring to SIBL, the abbreviation for Stanford
14   International Bank Limited.
15   A.  That's correct.
16   Q.  How much of the claims either in terms of
17   numbers or in terms of dollars that you have testified
18   to relate to accounts at SIBL other than CDs?
19   A.  We haven't attempted to do that kind of a
20   determination.  So when we look at our claims from a
21   CD perspective or a SIBL perspective, we're looking at
22   just money going into SIBL versus money coming out.  So
23   for the claims process it just matters that it went
24   into SIBL and came out of SIBL, not necessarily what
25   account it went into within -- within the bank itself

28

1   or type of account.
2   Q.  So that I understand this correctly, let me
3   ask it in this way:  The testimony you have provided in
4   this case, your declaration, includes accounts other
5   than CD purchases; is that right?
6   A.  You're talking about the 14,000 clients and
7   the 3,000 like from my actual declaration?
8   Q.  Yes.
9   A.  We did not attempt to exclude those types of
10   accounts from the analysis.  I don't know whether that
11   specific 3,000 includes them or not.
12   Q.  Well, if you didn't exclude them, then it
13   would of necessity include them, wouldn't it?
14   A.  So it's more of a nuance.  So we did the
15   analysis across the entire database, which would
16   include both express CD and other types of accounts
17   like loan accounts.  What I'm saying is we were in a
18   query that produced an output of an answer, not -- the
19   output that we got did not list every account and the
20   detail.  So I don't know whether or not each account
21   that makes up the 3,000 is CD or express or is it all
22   CD.  I can't tell you as I sit here whether or not that
23   3,000 is a mixture or if it's purely CD or not.
24   Q.  How would you determine that?
25   A.  I would have my team just run a listing and

29

1   then we could identify that based on the account
2   number.
3   Q.  As you're sitting here today you cannot
4   exclude the possibility that the numbers of accounts
5   and dollar amounts that you put in your declaration
6   include amounts that were not held in CDs?  You can't
7   exclude that possibility because of the way you ran the
8   query?
9   A.  I agree with you, yeah.
10   Q.  I may have already asked you this.  What other
11   kinds accounts at SIBL do you have in your database?
12   A.  So the three ones that -- that I can remember
13   is there's express -- there's CD and then there's loan
14   accounts.  I know that there is -- I cannot remember
15   the name of it off the top of my head right now, but
16   there's another account type that's very — doesn't
17   appear very often that's very similar to an express
18   account, it just has a slightly different name.  But it
19   kind of operates and looks like an express account from
20   the way the data runs.
21   Q.  How would loan accounts give rise to a claim
22   with Mr. Janvey?
23   A.  So from our perspective when Janvey is
24   calculating the claim from the receivership's claims
25   process, we're just looking at money going into SIBL as

DepoTexas, Inc.

Hunton App. 1141

Mark Russell

34

1   review and it's been determined that it has all the
2   information we need to run it through the query, it
3   will be processed into the query.  And then the query
4   is going to do three step -- three primary things.
5          The first thing it's going to do is it's
6   going to look at the claim and attempt to determine if
7   it may be duplicative of other claims that we already
8   have in our database.  So it's going to look at the
9   account number being claimed and determine whether that
10  account number has already been claimed in another
11  claim group.
12         Once it's determined that a claim is not
13  duplicative, it will then evaluate what claim group
14  does that claim need to go into or which claims need to
15  be grouped together.  The primary driver of what gets
16  grouped is a field in our database that we refer to as
17  client I.D., so each account that was in Temenos has an
18  associated client I.D. that identifies the SIBL client
19  that owns that account, so one client can own multiple
20  accounts.
21         And so any claim -- all claims on
22  accounts that share a common client I.D. will be
23  grouped together.  All claims that are claiming similar
24  accounts -- or not similar, that are claiming the same
25  account numbers will be grouped together.

35

1          And then kind of the third step is the
2   receivership earlier in the 2009, '10 time frame had
3   done an analysis to try to identify net winners, and so
4   there was grouping processes done through that process
5   as well.  And so any -- any accounts that we had
6   previously grouped in that process together would be
7   grouped together by the query.
8      Q.  Remind us what the receiver considers to be
9   net winners.
10     A.  Sorry.  So a net winner would be somebody who
11  had more money out than money in.
12     Q.  What's the next step in the receiver's claims
13  process?
14     A.  So once the accounts have been grouped they're
15  then run through the net position calculation, so
16  that's the step where all the -- all the accounts
17  within a group are analyzed by a query that we've
18  developed that will determine the total money into
19  those accounts and the total money out from those
20  accounts to determine whether or not they have a net
21  position of being a loser, i.e., more money in than
22  out; or winner, more money out than in.
23     Q.  If you group a bunch of claims into a single
24  group, does that sometimes include different
25  individuals, for example, family members?

36

1      A.  That is a possibility.  So based on --
2   there's -- this is kind of how the query kind of --
3   this is kind of the -- as we step through.  So that is
4   possible that if they share client I.D. or if -- if the
5   family members were claiming the same account number or
6   if they're kind of filing a single claim that includes
7   all of their different account numbers, then that could
8   happen with the way that the query's programming logic
9   works.
10     Q.  What, if anything, is done to break out the
11  analysis of money in compared to money out for an
12  individual person as opposed to a group?
13     A.  So we don't do it on -- we do it at a group
14  level.  We don't do another step to break it out by the
15  individual components within that group.  The only time
16  that that would happen is at the end of the process if
17  they object and say, hey, this is really a mother and a
18  son and we think that our accounts should be split.  We
19  would -- that would be a part of the receivership's
20  consideration and if he had decided to agree with that,
21  then subsequently they would be split and recalculated.
22     Q.  Has there been instances in which the receiver
23  has agreed to break out what was initially considered
24  one group into more than one claim?
25     A.  Yes, that has.

37

1      Q.  Have there been occasions in which the
2   receiver has decided not to break an existing group
3   apart into different elements or owners?
4      A.  I'm trying to remember if I know a specific
5   instance or not.  I know that there's been instances
6   where individuals have asked their accounts to be
7   split, but because they actually show up on one account
8   as a joint owner, the receivership has elected not to
9   split them.
10     Q.  Are there any other examples of requests to
11  split a group that the receiver would not agree with?
12     A.  Not that I have specific knowledge on, no.
13     Q.  What about generally?
14     A.  I'm not -- I don't make the decisions, so
15  I don't know if there's other reasons why he may or may
16  not decide to split a group.
17     Q.  What's the difference, then, in terms of
18  claims between groups and clients?
19     A.  You're talking about how many groups do we
20  have versus how many clients are within those groups?
21     Q.  That's a start.  Let's go there.
22     A.  I don't -- I can give you a good -- it's a
23  good start.  I don't know that specific answer.  I
24  haven't looked at that.  It's something we could look
25  at, but we haven't looked at that yet.

10  (Pages 34 to 37)

Hunton App. 1142

Mark Russell

**38**

1    Q. How many total customers, if I can use that
2  generic term, are contained within the group of total
3  allowed claims against SIBL?
4    A. I don't know that answer either. We
5  haven't -- we haven't looked at the count of clients
6  like customers within that.
7        MR. ARLINGTON: Sim, if I may -- I'm
8  sorry to interrupt, but --
9        MR. ISRAELOFF: Please.
10        MR. ARLINGTON: -- we -- it won't go
11  directly to the question you're asking, but we have
12  based on kind of our claims stats put together just --
13  you probably saw it in the other deposition, but a
14  report that just has some basic claim stats that might
15  give you at least a framework from which to ask some of
16  those questions. I'd be happy to share that with you.
17        MR. ISRAELOFF: I have at least the first
18  and last page of that.
19        MR. ARLINGTON: Okay. So what I've got
20  is an exhibit based on the latest claims --
21        MR. ISRAELOFF: Oh, thank you, yes.
22        MR. ARLINGTON: -- report that may -- may
23  or may not be useful for your purposes.
24        MR. ISRAELOFF: Thank you. I would
25  appreciate that. Thank you very much.

**39**

1        MR. ARLINGTON: I will save one back for
2  Jesse here.
3        (Deposition Exhibit 2 marked.)
4    Q. (BY MR. ISRAELOFF) Let's mark that as
5  Exhibit 2 and ask if somebody can identify that for our
6  record, please?
7    A. So this is a report that the receiver put
8  together that summarizes some claims information from
9  the receiver's most recent report to the court on the
10  claims process that was filed November 6th, 2015.
11    Q. All right. Let's walk through that at least
12  briefly. The first bullet point refers to timely
13  unique CD claims. Again, where -- where in that
14  definition are the human beings? How many human beings
15  purchased CDs either in their own name or in the name
16  of some entity like a trust?
17    A. So that -- that number would be something
18  higher than the 18,000. So this is -- and the reason
19  I say that is this is the number of unique claims on
20  accounts, and so there could be an instance where a
21  husband and wife are both jointly filing a single
22  claim. So I would say that the 18,000 is the least
23  number, but it could be higher. We haven't done that
24  kind of a count.
25    Q. How many of the unique CD claims shown on

**40**

1  Exhibit Number 2 are claims held in the name of an
2  entity, like a trust, an IRA account, corporate?
3    A. I don't know the answer to that question. I'm
4  sure it's knowable, I just don't know it.
5    Q. Is that information part of a database that
6  the receiver has accessible?
7    A. I believe that information would be available
8  from the claims database. I just can't speak to
9  how -- how thorough it is in terms of population across
10  every single one. I know that they capture the
11  claimant and all the information filed by the claimant,
12  so it should capture that information.
13    Q. How would you go about formulating a query to
14  the database to find out how many unique CD claims are
15  on behalf of an entity as opposed to a person?
16    A. I would reach out to the guys that do the
17  SQL programming. So first off I think we would want to
18  say, okay, what is all the unique -- give us all the
19  unique names that exist. And from that we should then
20  be able to identify, A, not only what are the names
21  being filed by the claimants, but what were also the
22  names on the accounts that were filed.
23        And so generally when there's like an IRA
24  or a trust, the name on the account will indicate so
25  from the SIBL database. And so we could run a query

**41**

1  that kind of compares both the claims information and
2  gathers name information that's being filed by the
3  claimant as well as by the names on the account, and
4  then we could review that information for any names
5  containing trust corporation entity names.
6    Q. What types of entities are contained in this
7  database, at least as far as you know? Could you just
8  list the ones that you've seen or are aware of?
9    A. So I know that there's trusts. I know that
10  there's some -- I don't know what the specific legal
11  status of them would be, but corporation type
12  companies, whether that's LLC or -- I can't -- like
13  S Corp. type companies, I know I've seen stuff like
14  that. I'm trying to think if there's --
15    Q. Partnerships?
16    A. I don't -- I'm trying to think if I've seen
17  any partnerships specifically or not. It wouldn't
18  surprise me if they're in there. I don't -- I don't
19  remember personally seeing any in what I've seen to
20  date.
21    Q. Are there any governmental type investments in
22  CDs that you're aware of?
23    A. Not that I specifically recall. But I
24  couldn't -- I couldn't explicitly say no.
25    Q. Pension funds?

11 (Pages 38 to 41)

Hunton App. 1143

Mark Russell

42

1    A.  Again, not that I've seen.
2    Q.  Are there any other types of entities that you
3  can recall just as you're sitting here today that
4  purchased Stanford CDs?
5    A.  Not -- not that I recall.
6    Q.  The next level I'd like to ask you about is
7  for those entities that do have unique CD claims,
8  ABC Trust, for example, does the database contain
9  information about those entities such as were they
10  formed under the laws of Antigua, Venezuela, the United
11  States, et cetera?
12    A.  In terms of formation?
13    Q.  Yes.
14    A.  We're talking about the SIBL CD database?
15    Q.  Yes.
16    A.  I don't think formation laws are in the
17  database. I think what we have is like related entity
18  type information, so like beneficiaries, owners, that
19  kind of information.
20    Q.  So if this hypothetical ABC Trust has made a
21  claim for Stanford CD losses, the receiver's database
22  would not have information about where that trust was
23  created or what law it is governed by; is that right?
24    A.  I know that the Temenos -- I don't believe the
25  Temenos or Data Pro database would have that

43

1  information. I don't know if that information would
2  have been provided as part of what they submitted
3  potentially through the claims process. So I kind of
4  view those as two different databases, but I don't
5  know.
6    Q.  It's not requested on Exhibit 1, the claim
7  form, is it?
8    A.  Right, but the claimant isn't limited to just
9  providing information that's on the claim form.
10    Q.  Well, let's put it this way: The receiver has
11  not asked through the claim form that entities like
12  trusts or corporations provide information about where
13  they're formed and what laws they are governed under,
14  correct?
15    A.  Correct, yes.
16    Q.  Okay. If the receiver ever got some of that
17  information it would be on an individual voluntary
18  basis when a claimant might submit that information;
19  is that right?
20    A.  Yeah, either through submission or if -- like
21  if the claim is for a trust and somebody is saying you
22  need to pay me as the beneficiary, that may be
23  information that we've obtained when we're trying to
24  verify that that person is the -- is the beneficiary of
25  the trust.

44

1    Q.  Have estates filed claims for CD losses,
2  estates of deceased persons?
3    A.  I believe I've seen that, yes.
4    Q.  As far as the law of formation or governing
5  law for estate claims, would your answer be the same,
6  that is, the receiver hasn't asked for that
7  information, but you don't know if he might have gotten
8  it?
9    A.  I know that if -- if the owner of the account
10  that -- in the database is the one -- if somebody other
11  than the owner of the account in our Temenos/Data Pro
12  database is filing a claim on an account, part of that
13  initial intake review process is to then have them
14  verify ownership that they are the allowed recipient of
15  that account. So I don't know specifically what
16  information is being provided as part of that
17  verification process. But, again, it would have been
18  on more of an ad hoc basis as those are filed. It
19  wasn't part of the initial claims request.
20    Q.  Let's move on to individual claimants where
21  you have the name of Mr. Smith or Mr. Gutierrez. What
22  information does the receiver have as to the
23  nationality of those claimants?
24    A.  So there's kind of two different primary data
25  pieces that we have. One, we have the legal mailing

45

1  address of all the accounts, so that can provide some
2  information. And then I know in the Temenos database
3  there's actually a field that's -- that's represented
4  to be in the database to be the nationality for the
5  account. And so that's populated for all the accounts
6  as well.
7    Q.  Do you know when the Temenos field for
8  nationality was created?
9    A.  Like when a customer purchased it when would
10  the nationality field be --
11    Q.  Yes.
12    A.  -- input? I don't have specific knowledge.
13    Q.  If a person who was -- listed their
14  nationality as, let's say, Venezuela, when they first
15  opened an account a number of years ago, if they have
16  since moved to another country, is that information
17  anywhere in the receiver's database?
18    A.  So the database does track the address for the
19  account, so like the mailing address for the account.
20    Q.  No, I'm not talking about address, I'm talking
21  about nationality.
22        MR. ARLINGTON:  Then I object as vague.
23    A.  I don't know that somebody's nationality would
24  change, though, just because they moved. I guess I'm
25  not understanding.

12  (Pages 42 to 45)

DepoTexas, Inc.

Hunton App. 1144

Mark Russell

46

1          MR. ISRAELOFF:  Let's break for a change
2  of tape and we'll pick it up here in a moment.
3          THE WITNESS:  Okay.
4          THE VIDEOGRAPHER:  The time is 10:07.  We
5  are off the video record.
6          (Recess taken.)
7          THE VIDEOGRAPHER:  The time is 10:30.  We
8  are back on the video record, tape number two.
9      Q.  (BY MR. ISRAELOFF)  Before the break we were
10  talking about what information the receiver has with
11  regard to an individual claimant's nationality.  Let me
12  ask it this way:  If the receiver was asked what
13  nationality a particular claimant has, where would you
14  go to get that information?
15      **A.  So there's -- there's two different**
16  **possibilities I could foresee when we're talking about**
17  **claimants.  One would be the field that we just**
18  **discussed in the Temenos/Data Pro database.  There's a**
19  **field that refers to nationality.  And then also**
20  **potentially like he could send out a request to the**
21  **actual claimants with approved claims to request that**
22  **information kind of as a confirmatory process.**
23      Q.  Now, that's something new I haven't heard
24  before.  Where in all of this process is the receiver
25  requiring somebody to answer new requests like what is

47

1  your nationality?  Where is that?
2      **A.  So I haven't seen anything where it's been**
3  **required, but it's more of is it a possibility.  Could**
4  **he ask that information and could he ask the question?**
5  **And I think the answer is, yes, but I don't know.  Like**
6  **in terms of has he ever -- has he asked that question**
7  **or required that answer before, I don't -- I don't**
8  **think so.**
9      Q.  All right.  Let's stick with the available
10  information as the receiver has it today.
11      **A.  Okay.**
12      Q.  And I'll ask the question again.  If the
13  receiver was asked today what the nationality of a
14  particular claimant was, would he have that
15  information?
16      **A.  He would have the nationality as reflected in**
17  **the Temenos and Data Pro database.**
18      Q.  And you don't know at what point in time that
19  field in the database was filled, right?
20      **A.  Yeah, correct.**
21      Q.  Do you know what checking -- fact checking, if
22  you will, was made on the field for nationality when it
23  was first entered in the Temenos database?
24      **A.  I don't specifically know where that**
25  **nationality field was coming from from an application**

48

1  perspective.
2      Q.  Similarly we know, for example, from our named
3  plaintiff, Mr. Troice, he has two citizenships, one in
4  Mexico and one in the United States.  If a claimant
5  like Mr. Troice has two nationalities, which one would
6  be in the receiver's available data?
7      **A.  I don't know what would be populated in the**
8  **nationality field.  I know there's some other fields in**
9  **the database that refer to like legal document I.D.,**
10  **identification, that's populated about 80 percent of**
11  **the time in the database.  I don't know one way or the**
12  **other whether that would contain additional nationality**
13  **information or not, though.**
14      Q.  Well, which nationality would be contained in
15  the receiver's answer to such a question?
16      **A.  I don't know whether that determination has**
17  **been reached yet.  So I think that would still be up**
18  **for consideration, a determination the receivership --**
19  **the receiver would have to make that I don't think he's**
20  **made yet.**
21      Q.  Is the nationality field filled out for a
22  hundred percent of the claim records?
23      **A.  The nationality field is filled out a hundred**
24  **percent in the Temenos database for the accounts, and**
25  **so since the claims are based on the account numbers,**

49

1  yes.  I had to walk through that in my head to make
2  sure.
3      Q.  Is the nationality field filled out in the
4  database for accounts in the name of entities?
5      **A.  It's filled out for all of the accounts.  So**
6  **to the extent that there's entity accounts and entity**
7  **clients, then there would be a nationality associated**
8  **with it, yes.**
9      Q.  Do you know what SIBL did, if anything, to
10  check on the declaration of nationality?
11      **A.  From a verification standpoint?**
12      Q.  Yes.
13      **A.  I don't know one way or the other.**
14      Q.  If somebody moves and immigrates to another
15  country between the time they open their account and
16  today, is there anything in the receiver's data that
17  would disclose that?
18      **A.  So like if they change their citizenship?**
19      Q.  Yes.
20      **A.  I don't know -- I don't know one way or the**
21  **other whether that nationality field would be**
22  **reflective of their new nationality or not.**
23      Q.  Related to that question, let me go to the
24  physical location that an individual customer would
25  have had.  Is there anything in the receiver's database

13  (Pages 46 to 49)

**Hunton App. 1145**

Mark Russell

50

1  which indicates where physically a customer was when
2  they opened an account with Stanford bank?
3    A.  So what we have available is the mailing and
4  legal address that were provided for that account
5  opening.
6    Q.  I don't know if that answered my question or
7  not.  Do you have any data that says customer A was
8  physically in Venezuela when they opened their account
9  as opposed to where their mailing address might be?
10   A.  I don't believe so.  Like at a point in time
11  when they actually were signing the document where were
12  they physically standing?  I don't think that that
13  would be a record that's in the database.
14   Q.  Similarly does the receiver have any records
15  indicating where the customer was when they were given
16  the sales pitch typically by a financial advisor?
17   A.  Specifically where they were?
18   Q.  Yes.
19   A.  Unless it's somewhere like in an e-mail
20  somewhere, not -- not documented as like a field in the
21  database, no.
22   Q.  Okay.  You are aware, are you not, that some
23  customers who live in a particular country,
24  particularly Latin America, might have a different
25  mailing address either of a family member or relative

51

1  in another country?  You're aware of that, aren't you?
2        MR. ARLINGTON:  Objection, vague.
3    A.  I don't have any specific knowledge of that in
4  this -- in this case one way or the other.  It wouldn't
5  surprise me, though.
6    Q.  (BY MR. ISRAELOFF)  All right.  Let's return
7  to the previous question asking you to outline the
8  steps in the process of determining a claim.  I think
9  we left off with grouping claims into the groups.  What
10  is the next step after the receiver receives claims,
11  checks them out to make sure they're complete and then
12  decides how to group them?  What's the next step?
13   A.  So once the claims are grouped, the claim
14  groups that are ready are then run through the claims
15  calculation, so it's a query that determines the net
16  position of the group.  So total money in, total money
17  out, what's its net position.
18        And so it's going to come up with an
19  amount that this is the net position per our query.
20  Once the query amount is determined, it's compared to
21  the aggregate amount being claimed by the claims in
22  that group, so we're comparing what's our determination
23  of the claim versus what the claim group is claimed in
24  total.
25        To the extent that they match, we would

52

1  then say your allowable amount is what our query has
2  produced.  To the extent that they're claiming
3  something less than what we've calculated, we would
4  then allow the amount that they've claimed.  To the
5  extent that our claim calculation is less than what
6  they've claimed, depending upon the difference between
7  the two, it would go to different levels of review.
8        So if it's just a small difference, I
9  think like a hundred thousand or less, it would
10  automatically be allowed based on our calculation.  I
11  believe if it was between hundred thousand and 250,000,
12  it would go through kind of a review from Gilardi, the
13  receivership staff and then FTI if needed.  Generally
14  it's looking to see if there's any -- anything obvious
15  that we may need to adjust for or just look into more
16  in depth.  Generally those are all going to be allowed
17  at the calculation amount.
18        And then if it had like a 250,000 or more
19  variance between what was being calculated and what was
20  being claimed it would go through all levels of review,
21  both Gilardi's initial, the receivership personnel and
22  FTI.  And then the allowed amount again would end up
23  being the amount calculated by our query.
24   Q.  Have you actually seen instances in which a
25  claimant requests less money than the receiver shows in

53

1  its money in/money out calculation?
2    A.  That has occurred.
3    Q.  Do you know any examples of why that would be
4  the case?
5    A.  Not off the top of my head.  I don't -- I
6  don't remember.
7    Q.  If the amount that somebody is claiming
8  exceeds your calculation, money in versus money out,
9  and the excess of the claim is up to a hundred thousand
10  dollars greater, that claim is allowed?
11   A.  The claim is allowed.  The allowable amount is
12  the amount calculated by our query.
13   Q.  Then what makes any difference if it's a
14  hundred thousand dollars over or under?  You're only
15  going to allow the same amount for every one of these
16  categories?
17   A.  It just determines -- it -- my understanding
18  is the receivership -- the receiver made kind of a cost
19  benefit determination that anything that has a variance
20  below -- within this dollar range we're not going to do
21  any additional review on, we're going to go with our
22  query calculation and then rely on the objections
23  process to do any additional review for claimants that
24  object to our determination.
25        But the amounts that had higher variances

14  (Pages 50 to 53)

Hunton App. 1146

Mark Russell

54

1  we wanted to do at least an additional -- some
2  additional manual review to make sure that everything
3  was working the way that we expected it to before
4  issuing our allowable amount on the calculated amount.
5      MR. JIMENEZ-EKMAN: I apologize.  Can I
6  have the question and answer back?
7      (Record read.)
8      MR. JIMENEZ-EKMAN:  Thank you.
9  Q.  (BY MR. ISRAELOFF)  Does that mean the
10  receiver will not do any further manual review if the
11  amount claimed is less than a hundred thousand dollars
12  more than the calculated amount?
13      A.  It means we'd only do additional review if the
14  claimant objected to our claimed amount and provided us
15  like information that alloyed us to do more review.
16  But we wouldn't do it without an objection.
17      Q.  Now, we all understand that some of the
18  Stanford International Bank financial records were
19  simply fraudulent, right?
20      A.  Correct.
21      Q.  That's why Mr. Stanford is now in prison.
22  What, if anything, has the receiver done to determine
23  if the claims information in the Temenos database is
24  real or if it contains some fraudulent content?
25      A.  So as part of -- not specific to the claims

55

1  process itself, but as part of kind of the overall
2  receivership process, there was a large analysis --
3  cash tracing analysis done in support of some of
4  Karyl's opinions and some of the legal matters.  And
5  when we were doing our analysis to determine whether it
6  was or wasn't a Ponzi scheme, part of that analysis was
7  comparing the bank records we had to the actual
8  transaction activity in the database.
9      And so I wouldn't say that we've done it
10  a hundred percent on the transaction activity in
11  Temenos and Data Pro, but for the activity that would
12  have been processed through Toronto Dominion and
13  Trustmark at least, we've done a lot of comparative --
14  a comparison of the transaction activity in Temenos and
15  Data Pro to the actual bank records of the receipt of
16  funds and the withdrawal of funds.
17      Q.  That review of actual bank records through
18  Toronto Dominion and Trustmark, that was not a
19  comparison to any individual investor records in the
20  Temenos database, was it?  It was more of a gross
21  review?
22      A.  We didn't -- so that review was not specific
23  to any investor.  It was holistically for the database.
24      Q.  All right.
25      A.  There have been other instances where --

56

1  primarily related to the net winner litigation that's
2  going on where we've actually traced the outgoing
3  withdrawals and deposits for individual net winner
4  groups to the bank information.
5      Q.  That sort of review has not been done with
6  regard to the claimants, though; is that right?
7      A.  I would say that from a holistic data
8  perspective it has and that's what's driving the claims
9  determination amounts.  But for individual claimants -
10  for all of the individual claimants we haven't
11  attempted to say -- to do a specific tracing on each
12  one apart from that gross comparison.
13      Q.  So you cannot rule out the possibility that
14  one or more claimants is completely fictitious?
15      A.  I'm just trying to think of -- I know we
16  haven't -- we haven't ever seen an instance so far
17  where we haven't been able to agree with the
18  information.  I don't know if I can prove a negative
19  one way or the other.  I see -- I think I understand
20  your question, I'm just trying to think of what the
21  actual -- what the answer is.  Could you -- basically
22  you're asking is there a possibility that there is an
23  account in the database that doesn't have any real
24  outside world transactions.
25      Q.  The question was, has the receiver done

57

1  anything to determine whether or not some of the
2  CD claims are fictitious?
3      MR. ARLINGTON:  Objection, vague.
4      A.  Well, for all of the claims that we've
5  received we verify that there actually are CD accounts
6  in our database.  We haven't undertaken an analysis to
7  attempt to identify whether there are any purely --
8  like a specific analysis that says are there things in
9  this database that do not exist in the bank records.
10  But in the analysis that we've done so far we haven't
11  seen that there aren't.
12      Q.  The holistic analysis that you've done.
13      A.  Correct.
14      Q.  But you've done -- and I'm saying you meaning
15  the receiver.  The receiver has, in fact, done a bank
16  reconciliation when there has been a challenge to the
17  net winner depositors, right?
18      A.  Not every time, but there are instances where
19  when a net winner has either -- a net winner has
20  challenged or is part of ongoing litigation and I'm
21  assuming settlement discussions, where we've actually
22  not only provided what we have from the SIBL records,
23  but also here's the information related to the -- where
24  the wire was coming from, so we match it to the actual
25  database and where the wire was going to.

15  (Pages 54 to 57)

Hunton App. 1147

Mark Russell

58

1    Q.  That was done for some of the net winner
2  claims, but not all of them?
3    A.  Yeah, again, on a -- for specific net winners
4  from that -- from that level.
5    Q.  All other claimants who are not in that net
6  winners category, --
7    A.  Uh-huh.
8    Q.  -- that sort of tracing has not been done for
9  any of them, correct?
10    A.  It has been done for -- I know it's been done
11  for some through the objections process.  But it
12  hasn't -- we haven't undertaken to do that for every
13  single one of the claimants.
14    Q.  All right.  That means, therefore, that the
15  receiver cannot rule out the possibility that one or
16  more CD claimant files showing up in the Temenos
17  database are completely fictitious accounts?
18        MR. ARLINGTON:  Objection, vague and
19  mischaracterizes the prior testimony.
20    A.  Yeah, again, I think -- I'm trying to
21  ascertain whether or not you're saying is there a claim
22  that's been allowed, that the claimant is fictitious or
23  that the underlying information driving the allowed
24  amount is fictitious?
25    Q.  (BY MR. ISRAELOFF)  The entire account.  We do

59

1  know, do we not, that some Allen Stanford entries into
2  their financial books were fictitious.
3    A.  Correct.
4    Q.  Hence my question.  Has the receiver been able
5  to rule out the possibility that some of the CD claims
6  are also fictitious claim amounts?
7        MR. ARLINGTON:  Objection, vague.
8    A.  So I'll answer it, I think, kind of the same
9  way I did and it's the best answer I give you, is we
10  have done comparison analysis and we haven't seen
11  anything of that nature.  But we haven't done a
12  specific analysis to say that one way or the other.  So
13  I don't know whether the receiver could rule it out if
14  that analysis was done or not.  But I can't agree that
15  he can't rule it out.  It's just we haven't -- unless
16  we've done the analysis, I can't say that one way or
17  the other.
18    Q.  (BY MR. ISRAELOFF)  Let me broaden this line
19  of questioning to the entire Temenos database.
20    A.  Okay.
21    Q.  What, if any, activities has the receiver
22  undertaken to determine if the Temenos database is
23  reliable?
24    A.  So, again -- so like we discussed before, what
25  we've done is the cash tracing analysis, where we've

60

1  holistically done a comparison of transactions that we
2  have in the bank information of transactions and
3  matched them up to transactions in the Temenos and
4  Data Pro information.
5    Q.  Is that everything or just on a sample type
6  basis or what you say when you have that transfer
7  information?
8    A.  So it depends on which bank we're talking
9  about, so for TD it was a comparison holistically of
10  all the wire data that we have.  Which I think if I
11  remember right a lot of our TD wire data goes back as
12  far as 2002.  So that would cover all the periods that
13  we have data for Data Pro and Temenos.
14    Q.  But that's only relating to wire deposits as
15  opposed to any other kind of deposit?
16    A.  It would be for wire deposits and
17  U.S. dollars, Canadian dollars, I think there's one
18  other denomination that ran through TD.  So that would
19  be on the wire side.
20    Q.  My question was, it would not include deposits
21  from customers who made their payment other than
22  through a wire transfer, right?
23    A.  Correct.  That particular comparison would
24  not, correct.
25    Q.  All right.  What other banks were reviewed to

61

1  match up transfer data?
2    A.  So the other bank that we looked at was
3  Trustmark, which handled the check deposits from
4  customers.  So that wasn't done on a hundred percent
5  basis, but we looked at -- that was done more on a
6  sampling type basis where we gathered large checks on a
7  large -- I can't remember the exact numbers off the top
8  of my head, but a large portion of the checks and
9  compared them to check deposits in a civil database.
10    Q.  You're familiar with what an audit means under
11  Generally Accepted Accounting Principles, right?
12    A.  Correct.
13    Q.  Has the Temenos database been audited since
14  the receiver's appointment?
15    A.  We haven't been retained to do an audit or an
16  assurance on it.  We've done a lot of testing and
17  review of the underlying transactions to confirm that
18  they occurred.
19    Q.  But that's not an audit under Generally
20  Accepted Accounting Principles, is it?
21    A.  Right.  And we weren't retained to do an
22  audit.  It's a very specific --
23    Q.  Was anybody else retained to audit the Temenos
24  database?
25    A.  Not that I'm aware of.

16 (Pages 58 to 61)

Hunton App. 1148

Mark Russell

---

**62**

1    Q.  Okay.  Let's move to the subject of rollovers.
2    A.  Okay.
3    Q.  What is your understanding of what a rollover
4  means with regard to Stanford CDs?
5    A.  So it would be when an investor's CD has
6  matured and that individual chooses to remain invested
7  in that CD or to use those funds to open up new CDs.
8  In other words, not withdraw their funds, but like
9  renew the same one or renew into new investments.
10   Q.  Isn't it the case that Stanford CDs were
11  issued with the provision that they would automatically
12  roll over unless the customer gave other instructions?
13   A.  That's my understanding, yes.
14   Q.  When a Stanford CD matured with this automatic
15  rollover provision, was that same CD simply renewed or
16  was a new CD issued?
17   A.  From a transactional perspective, the
18  automatic renewal would show up as a rollover and so
19  the same CD number would survive.  From an issuance
20  perspective I don't know -- I don't specifically know
21  if they would then issue a new CD with a new principal
22  amount or not.  I just don't know.
23   Q.  What information does the receiver have which
24  would indicate whether a particular claim included CDs
25  that had rolled over once or more than once?

---

**63**

1    A.  So for the automatic rollovers where it's the
2  same CD account, there's actually -- within the SIB CD
3  databases, Temenos and Data Pro, there are renewal or
4  rollover transactions, so you can see the point in time
5  when a CD rolls over.  There's actually a transaction
6  for that in the underlying detail.
7    Q.  Does the receiver's records indicate in
8  connection with these rollover transactions whether the
9  customer had discussions with their broker or financial
10  advisor or simply stayed quiet and let the CD
11  automatically roll over?
12   A.  So the receivership's records in general, that
13  level of discussion potentially could be in the client
14  files and/or e-mail with their brokers.  But the
15  underlying SIBL database itself is not going to keep a
16  record of that one way or the other.
17   Q.  Well, have you ever seen such a piece of
18  information in a client file?
19   A.  I know I've seen discussions regarding
20  renewal.  I could not give you a specific instance.
21  Just over the last seven years I vaguely remember
22  seeing that in an e-mail or document before.  But I
23  don't -- I don't -- I couldn't tell you specifically
24  which one or who.
25   Q.  So you're not able to really say one way or

---

**64**

1  the other, are you, that for each renewal transaction
2  the receiver would be able to say if the customer had a
3  discussion with their financial advisor or simply
4  stayed quiet and let the automatic renewal take place?
5    A.  As I sit here today, I don't know whether we'd
6  be able to say that or not.
7    Q.  More broadly, does the receiver have any
8  information to indicate for each rollover why the
9  customer allowed the CD to be rolled over as opposed to
10  cashed in?
11   A.  Again, I think it would be the same as the
12  previous question.  The databases aren't going to
13  contain anything.  That information may be available in
14  other types of records, but I don't know whether or not
15  it would exist for every single instance of a rollover
16  or not.
17   Q.  For those CD accounts where the records show
18  rollovers, was there anything significant in the nature
19  of that investment or did it stay essentially the same
20  kind of investment?
21   A.  I'm trying -- the only thing that potentially
22  could have changed is it may have gotten a new interest
23  rate on the current interest rates whenever it rolled
24  over.  But other than that, it would have stayed the
25  same.  From a transactional perspective, all you see is

---

**65**

1  the interest being now rolled into principal so it has
2  a new principal amount transactionally.
3    Q.  Do you know whether any of the CD customers
4  considered whether some other investment might be more
5  desirable when the time came for a CD to mature?
6    A.  I don't know what they -- what they would have
7  been thinking.  So unless they've documented it in
8  something that would be in their client file, we
9  wouldn't have a way of knowing what the investors were
10  thinking themselves.
11   Q.  Does the Temenos database include CD accounts
12  that were already in existence when the Temenos
13  database began?
14   A.  And when you say "Temenos," you mean Temenos
15  and Data Pro?
16   Q.  And Data Pro.
17   A.  Yes.  So our data starts in August of 2003, so
18  there's some accounts that begin in our data with a
19  principal and interest balance.
20   Q.  Does the data show when the original CD
21  account began or how it was funded?
22   A.  It does not.
23   Q.  What do you do in those situations?
24   A.  So for purposes of the receiver calculating
25  the allowable amounts and calculating their net

17 (Pages 62 to 65)

Hunton App. 1149

Mark Russell

66

1  position, those -- the principal portion of those are
2  treated as if they were a deposit into their account.
3  So money in -- a money in type transaction.
4      Q.  If a customer bought a $100,000 CD in the year
5  1999 and that CD earned interest, which was posted to
6  their account, what amount should show up in August of
7  2003?
8      A.  It would depend on the type of CD, so -- and
9  the underlying assumption is this person hasn't taken
10  any withdrawals and if it required rollover it would
11  have rolled over.
12      Q.  Correct.
13      A.  So it would depend on the CD.  So if the --
14  like they went up anywhere to like five years, so if it
15  was a five-year CD, the principal would still show a
16  hundred thousand and it would have an interest amount.
17  And so the receiver would just be calling the hundred
18  thousand the deposit.  If it was some period less than
19  five years, then any amount of interest that had rolled
20  over would now be showing up in the principal column.
21  So I'd have to do some math, but it would be some
22  number higher than a hundred thousand that would be
23  called money in in the receivership's calculation.
24      Q.  In most cases the principal balance shown as
25  of August 2003, those were not round numbers, were

67

1  they?
2      A.  I honestly haven't looked at it that way.
3      Q.  There would be a lot of principal balances
4  shown in August of 2003 that were odd numbers with
5  specific hundreds, tens, ones and pennies, right?
6      A.  I would say that those types of balances would
7  exist.  Whether it's a lot or most, I can't say,
8  because we haven't looked at it that way.
9      Q.  If the receiver was asked what year was this
10  CD first purchased, this rollover type account first
11  purchased, would he have enough data to answer that
12  question if the account was already in existence in
13  August 2003?
14      A.  Not -- not with the records that are in the
15  Temenos and Data Pro data.
16      Q.  If the receiver were asked to identify what an
17  individual CD owner relied upon when they decided to
18  purchase a CD, would the receiver have that
19  information?
20      A.  I know we have access to some records of --
21  like the account opening documents that are a part of
22  the opening, and I know we have access to records in
23  terms of what was supposed to be given to investors.  I
24  don't know that I could answer one way or the other
25  what that individual did or did not in their mind rely

68

1  upon whenever they were making the decision.
2      Q.  If the receiver was asked to identify what was
3  told to a prospective investor by a financial advisor
4  in a verbal conversation, would the receiver have data
5  to answer that question?
6      A.  So like in a verbal conversation only?
7      Q.  Yes.
8      A.  Not with the records that we currently have,
9  no.
10      Q.  As an example, plaintiff Pam Reed in this case
11  has testified that her financial advisor told her in
12  verbal conversations that the Stanford CDs were insured
13  by the FDIC.
14      A.  Uh-huh.
15      Q.  If the receiver was asked to identify what
16  sorts of assurances like the one given to Ms. Reed were
17  given to anybody else, could he answer that question?
18      A.  As of today with the data we have, no.  But
19  could he ask the claimants whether they had been
20  verbally told that?  He could reach out to them because
21  we have the ability to make that contact.  But as I sit
22  here today with the information I have, we couldn't
23  answer that question.
24          (Deposition Exhibit 3 marked.)
25      Q.  (BY MR. ISRAELOFF)  The plaintiffs in this

69

1  case have produced a portion of the allowed claim
2  records consisting of an extremely long Excel
3  spreadsheet.  Are you familiar with that document?
4      A.  I believe so, yes.
5      Q.  I have copied simply the first page and the
6  last page for ease of reference as Exhibit Number 3.
7      A.  Okay.
8      Q.  Is this the form that you are familiar with
9  that has been produced in this case?
10      A.  It is.
11      Q.  And at least in this form, according to the
12  page numbers, the report was 393 pages long.
13      A.  That's what it says.
14      Q.  Let me ask you to walk through the columns and
15  explain what each one refers to.
16      A.  Okay.  So I'm going to start with the middle
17  one that's claims.  So within that column you'll see
18  strings of text and numbers that generally read
19  Stanford and then there will be a string of eight
20  numbers following it.  Each one of those Stanford
21  followed by eight numbers represents an individual
22  claim that's been filed in the claims process.
23          And so off to the left of that there's a
24  column that says claim group.  That is a number that is
25  assigned in the claims process to a group of claim

Hunton App. 1150

Mark Russell

74

1  documents relating to the process. I don't know -- I
2  don't know if there's like a final form that says
3  here's the steps. I know that there was an in-process
4  creation of here's the process for evaluating claims.
5      Q.  Well, somebody has to have given instructions
6  to the staff people who carried them out.
7      A.  Correct.
8      Q.  Doesn't that pretty much indicate that there
9  is a set of instructions somewhere?
10     A.  Right. So that's what I'm saying. Because I
11 know there's a document. I don't know if it was ever a
12 like final, final document that says here's -- here's
13 the process of how we evaluate -- how you need to
14 evaluate the claims.
15     Q.  Well, how did the staff people know what to
16 do, then?
17     A.  They would have used that document and/or
18 direction from the personnel that they were working
19 with. The answer to your question is, yes, there's a
20 document that lays that out, but I don't know
21 that -- yeah. I guess -- I'm just trying to -- I'm
22 thinking about it more from like my perspective, like
23 there's drafts and then there's changes to it and
24 there's edits to it as we learn new stuff.
25         But like there's a document that lays

75

1  out -- when you run into these situations the rule is
2  the claimed amount is less, put in allowed amount as
3  claimed amount. If it's in this bucket it needs to do
4  this. Like that is -- there's a document that lays
5  that out. Does that answer your question? I don't
6  know.
7      Q.  Somewhere somehow the staff people who carried
8  out this work had to have been instructed what to do.
9      A.  Right.
10     Q.  That instruction almost certainly, wouldn't
11 you think, is reflected in one or more documents?
12     A.  Yeah, so the document I just talked about as
13 well as potentially just communication with -- whether
14 that be in some e-mail that may have been sent giving a
15 directive and/or verbally with the people that
16 they're -- like the team may be working with like a
17 supervisor.
18     Q.  If you were asked to go retrieve such a
19 document, who would you ask and what would you call it?
20     A.  I'd ask the receiver for the claims process
21 document maybe.
22         (Deposition Exhibit 4 marked.)
23     Q.  (BY MR. ISRAELOFF) Exhibit Number 4 is the
24 declaration that you signed in this case. If you would
25 just flip through it and make sure we've got all of it,

76

1  that would be helpful.
2      A.  Yeah.
3      Q.  Let's start with paragraph five, if we could.
4      A.  Okay.
5      Q.  In paragraph five the first sentence states
6  that, "FTI has not been specifically retained to
7  determine the damages methodology in this case as of
8  the date of the declaration." Has it been retained to
9  do that through today?
10     A.  No.
11     Q.  Do you know what damages methodology is going
12 to be used in this lawsuit?
13     A.  Not specifically yet, no.
14     Q.  Then I have to say I've never before come
15 across a witness who says in a sworn statement I don't
16 know what the damages methodology is, but I have the
17 ability and receivership data necessary to do such a
18 calculation.
19     A.  Uh-huh.
20     Q.  And yet that's what paragraph five says,
21 doesn't it?
22     A.  It does.
23     Q.  Can you explain that a little bit more?
24     A.  So the purpose of the statement is to
25 basically say a damages methodology will be

77

1  established. That damages methodology will have
2  different factors that may or may not need to place
3  limits on the data. It may or may not need to treat
4  certain transactions different ways depending upon what
5  the expert says.
6          But what it's basically saying is that
7  the people at FTI have the ability to take what those
8  assumptions are and those determinations are that that
9  damages -- that damages expert says we need to place
10 these types of limits and filters on our data. We can
11 then take that information and apply it to the data we
12 have and filter it to calculate the damage -- the
13 damage amount in the manner that he has instructed us
14 to.
15     Q.  Okay. I think I see where you're headed.
16 What you're really saying in paragraph five is that if
17 the damages methodology requires some sort of
18 calculations of the data that is available to the
19 receiver, then it can be done. Is that -- is that
20 fair?
21     A.  And if it requires us to obtain information
22 that we may not have that we could then limit our
23 damages calculation on how much of that information
24 we're able to subsequently get.
25     Q.  Well, that's a little different.

20 (Pages 74 to 77)

Hunton App. 1151

Mark Russell

78

1    A.  Uh-huh.
2    Q.  Let's explore that.  What you're trying to say
3  in paragraph five is that you can do a formula based on
4  data that's already in the receiver's hands.  That
5  would be --
6    A.  Correct.
7    Q.  -- the first part of it.  And you're saying
8  for data that is not currently in the receiver's
9  database, how would that information be obtained?
10   A.  So -- so my understanding is right now the
11  proposed class is some -- is either the claimants that
12  have allowed amounts or some subpopulation of that.
13  And so the receivership has the ability to contact
14  those individuals, request the additional information
15  if it's necessary, and then once it's obtained we could
16  then factor that into our analysis.
17   Q.  But as you sit here today, if there is an item
18  in the damages methodology that is not currently in the
19  receiver's database, the receiver could not generate a
20  report as of today with respect to items that aren't in
21  that database; isn't that right?
22   A.  I would agree with that.
23   Q.  So for anything in terms of a damages
24  methodology that is not currently in the Temenos
25  database or the claims database, the receiver is simply

79

1  saying trust me, I can get that additional information.
2        MR. ARLINGTON:  Objection, calls for --
3    Q.  (BY MR. ISRAELOFF)  Is that right?
4        MR. ARLINGTON:  Objection, calls --
5  mischaracterizes the testimony.
6    A.  I would say that the receiver -- what we're
7  saying is that the receiver has the ability to request
8  and obtain that information.  I don't know how the
9  court would rule on people that failed to respond.  But
10  on those that then we receive responses on, we could
11  add that information and then limit our damages
12  calculation as required.
13   Q.  (BY MR. ISRAELOFF)  Approximately how many
14  individual claimants are there?
15   A.  So I think there's somewhere in the
16  neighborhood of, what is it, 17,000 claim -- unique
17  claims that have received -- that -- sorry, that have
18  received certifications to date.  So it's somewhere a
19  little bit north of that.  So through our regular
20  claims process there's a certification that's required
21  for a different -- for a different issue, for them to
22  receive a distribution.  There's about 17,000 and
23  change that have received that certification to date.
24  So it's somewhere a little bit north of that.
25   Q.  If the damages methodology required some sort

80

1  of a request from the receiver for more information,
2  that kind of request would require a determination
3  individually for each of those 17,000 plus claimants,
4  right?
5    A.  It would require obtaining that information
6  for them.  But it could be factored into a calculation
7  all at once, kind of in one holistic calculation.
8    Q.  I think I see where you're going.  But the
9  first part of that statement is -- is true, is it not,
10  that if the receiver has to request and obtain
11  additional information, that would have to be done
12  individually for each claimant, wouldn't it?
13   A.  I mean, there would be a request per claimant.
14   Q.  Yes, sir.
15   A.  But the request -- but in both the request and
16  anything that we do it could be done holistically, so
17  it wouldn't be a matter -- the receiver is not going to
18  have to like lick an envelope for every single
19  claimant.  I see -- yeah, so each -- each claimant gets
20  their own request, but it's not -- it's not like we
21  have to send out each request individually like one at
22  a time.  I don't know if that's making sense.  Like we
23  can send them out in batches.  But, yes, each claimant
24  gets their own individual request.
25   Q.  Well, paragraph five says a little bit more

81

1  than that, doesn't it?  If you'll read down that first
2  long sentence, "While FTI has not been specifically
3  retained to determine the damages methodology in this
4  case as of this date of this declaration, FTI has the
5  ability and receivership data necessary to limit any
6  such damages calculation to those investors who
7  invested money in SIBL after certain dates."
8    A.  Correct.
9    Q.  That's not really an accurate statement with
10  regard to obtaining additional information, is it?
11   A.  Well, we wouldn't need to obtain any
12  additional information to limit it to those date
13  ranges.
14   Q.  Okay.  But if the damages methodology requires
15  additional information -- let's just say nationality at
16  the time a CD was purchased and let's say that the
17  nationality field in Temenos might or might not relate
18  to the day when each CD was purchased, so that
19  additional information has to be obtained.  Let's just
20  use that as a simple example.
21        FTI does not have receivership data
22  necessary to generate a complete list within those
23  dates today, does it?
24   A.  I would agree with that.
25   Q.  All right.  The last sentence in paragraph

21  (Pages 78 to 81)

Mark Russell

94

1 reflective of what's being claimed or the information
2 that's been provided?
3 Q. No, sir. What you described a moment ago as
4 far as all the different sources of information
5 received --
6 A. Uh-huh.
7 Q. -- by the receiver which -- that resulted in a
8 claims database, you listed a string of things,
9 documents and paper records, records from the
10 claimants, possible money tracing from other financial
11 institutions. If I wanted to go and double check all
12 of that calculation, I would need not only the
13 Temenos/Data Pro electronic database, but I would also
14 need to be able to see all of those other records.
15 A. I see what you're saying now, yeah.
16 MR. ARLINGTON: Objection, vague and
17 confusing.
18 A. So you would need the Temenos and Data Pro
19 records through the claims information that we've been
20 provided through the claims process, the wire
21 information from the bank data that we have, and then
22 the -- which should be a part of the claims
23 information, the documents that we've received through
24 the objections process that have allowed us to like do
25 restorations and transactions from that side as well.

95

1 Q. (BY MR. ISRAELOFF) That's a lot of material,
2 isn't it?
3 A. It's a lot of information, yes.
4 Q. How much money has FTI charged the receiver to
5 date for all of that sort of work?
6 A. For all work? I can -- I can -- I can give
7 you a ballpark of what I remember. So -- and I know
8 it's in claims fee applications that they file with the
9 court that the receiver does, so this will hopefully
10 ballpark what's in there. So for claims specific
11 related items it's somewhere in the neighborhood, I
12 believe, of about 3.3, maybe 3.4 million. And then for
13 more general receivership type matters and litigation
14 it's somewhere in the neighborhood, I think, of 33,
15 maybe 34 million, somewhere around there.
16 Q. One more question hopefully and then we can
17 move on past paragraph six. When you say that you have
18 determined that over $2 billion was deposited into SIBL
19 accounts, I thought you told us earlier that SIBL
20 accounts include things like express accounts.
21 A. They do. So the dollar amount here is the
22 amount deposited into the SIBL database. So it would
23 be any type of account within the SIBL database.
24 Q. So this $2 billion number in paragraph six is
25 not deposits into CD purchases, it's deposits into any

96

1 and every kind of SIBL accounts, right?
2 A. It's into any and all, yes.
3 Q. All right. Let's move on.
4 MR. JIMENEZ-EKMAN: Sim, she has got to
5 change the tape.
6 MR. ISRAELOFF: Yeah, at this point we'll
7 stop and change the tape. Thank you for reminding me.
8 THE VIDEOGRAPHER: The time is 11:50. We
9 are off the video record.
10 (Recess taken.)
11 THE VIDEOGRAPHER: The time is 12:48. We
12 are back on the video record, tape number three.
13 Q. (BY MR. ISRAELOFF) We're back on the record.
14 Let me show you Exhibit Number 5, which is Greenberg
15 Traurig's request for production to the receiver,
16 Ralph Janvey. Have you ever seen this one?
17 A. I believe I looked at it as part of my
18 preparation for this deposition.
19 Q. I wanted to go through just to see if there
20 are such documents, and if so, where they would be and
21 that sort of thing. So let me turn you to the page
22 where it has please produce the following. Notice we
23 said please.
24 A. Okay.
25 Q. Let me know when you're there.

97

1 A. I'm there.
2 Q. Request one as you can see asks for documents
3 supporting the statement that is quoted here that is
4 from your declaration and I think we pretty much
5 covered all that. Is there any other documents that
6 evidence or support that statement besides the ones
7 that I think we've spoke about this morning?
8 A. No, that would -- that would be all of them.
9 Q. I think number two probably falls the same
10 way, does it not?
11 A. It does.
12 Q. And request number three I think we've
13 covered. Is there any other document that is described
14 in request number three beyond the ones that we spoke
15 about this morning?
16 A. Not that I recall, no.
17 Q. Why don't you just recap what documents would
18 fall into that category for request number three,
19 please?
20 A. So for request number three you'd -- to
21 recreate that you would need access to the SIBL
22 database transactions and then the information that
23 we've gotten such through the claims process and/or
24 through our other bank information that we've used to
25 restore transactions that we use in that calculation.

Mark Russell

98

1    Q.   Thank you.  Does the same answer really
2    fall -- does the same answer really apply to request
3    actually from one all the way down to number seven?
4        A.   Yes, except for four and six.  To redo those
5    numbers you'd also need information related to claim
6    groups and the client IDs in those claim groups from
7    the claims database.
8        Q.   Okay.  Let's turn, if you would, please, to
9    request number eight.
10       A.   Okay.
11       Q.   Does the receiver have documents sufficient to
12   show when each putative class member purchased their
13   CDs, including the date and dollar amount of each
14   CD purchase?
15       A.   I think it would -- I think it's going to
16   ultimately -- that depends on what the actual class is
17   determined to be.  So as we discussed earlier, like we
18   know that there's information that doesn't exist prior
19   to August of 2003.  So for -- if those individuals are
20   determined to need to be in the putative class, then we
21   wouldn't have information on when their specific CDs
22   were purchased.
23           What we do have is for the transaction
24   information that we had from August forward we know the
25   dates of money coming in as well as the dates when --

99

1    for instance, money may not necessarily go straight
2    into a CD account, it may flow through an express
3    account.  We wouldn't have transaction information on
4    the date that that money moved from the express account
5    to a CD account.  So I don't know if that answers your
6    question.
7        Q.   Well, that may be a part of the answer.  But
8    if I wanted to know simply whether the receiver could
9    generate a list with the name of the CD purchaser, --
10       A.   Uh-huh.
11       Q.   -- the date of each CD they purchased and the
12   dollar amount of what they purchased, that is, new
13   money coming in, could the receiver do that?
14       A.   So I think it -- once you kind -- you have
15   to -- you'd have to say what defines a CD being
16   purchased.  Because we know -- and this is -- this is
17   more along the lines of we know that money comes
18   into -- like a lot of times money will come into an
19   express account and then that money will be used to
20   fund multiple CDs sometimes.  So we could provide you
21   in that instance both the date that the actual deposit
22   came in, the name on the account that that deposit came
23   into from an express account, as well as the date that
24   those funds moved into the actual CDs and the names on
25   those.

100

1        So if you're defining the purchase of a
2    CD as just kind of more generically how the
3    receivership does it which is money coming in, the
4    answer is yes.  If you then subdivide it into something
5    else, we would have to do a little bit more work from a
6    tracing perspective in our query, but we could get to
7    that answer.  But it kind of depends on how you -- how
8    ultimately the CD purchase ends up being defined for
9    that purpose.
10       Q.   Well, let's define it in the obvious terms.
11   Does the receiver have enough data to determine when
12   each depositor purchased a CD, that is, they got in the
13   mail --
14       A.   Uh-huh.
15       Q.   -- a piece of paper marked certificate of
16   deposit for you, could the receiver develop a list of
17   when each CD was purchased, the date of the purchase,
18   the person and the dollar amount of that CD?
19       A.   Again, subject to the ones we talked about for
20   August?
21       Q.   Right.
22       A.   Within -- within the time frame that we have
23   the data, the answer would be -- if you're defining a
24   CD as an actual account in the database called --
25   that's called a CD --

101

1        Q.   Let's not talk about accounts or account
2    numbers, let's talk about -- because I don't know if
3    more than one CD might be in one account.  So let's
4    just call it like you would --
5        A.   Sorry.
6        Q.   If an average person walked into a bank and
7    bought a CD and got that CD in their hand or in the
8    mail, do you have the data necessary to say here are
9    the list of all CDs as CDs, not as an account, the date
10   they were purchased, the name and the amount?
11       A.   We could tell you both when the funds
12   originally came in and the date that those funds were
13   transferred to those CDs.  Whether or not that --
14   whether or not you called one of those two the purchase
15   date for any particular CD, we'd have to just decide
16   how do you define the purchase date.  Is it the date
17   that the bank received the funds or the date the funds
18   transferred from the express account to the CD.  But we
19   could do either/or.
20       Q.   When you say you could tell when money was
21   transferred from an express account to a CD, what are
22   you talking about?
23       A.   So kind of at a high level the CDs within the
24   database get funded in two different ways.  One way is
25   that the actual physical money from a transaction

26 (Pages 98 to 101)

DepoTexas, Inc.

Mark Russell

102

1    perspective shows in the CD account as a deposit. So
2    it's like a wire in or a check deposit.
3           The other way that the CD accounts get
4    funded is an individual will have money deposited into
5    their express account and then within the transactional
6    information there will be a transfer from that express
7    account to a CD account. And so sometimes there may be
8    a day or two delay between when it was originally
9    deposited in the express account and when it actually
10   made it to the CD account. And so if the purchase date
11   is that later date we could tell you that. We could
12   also tell you -- we could also show the purchase date
13   as being the earlier date depending upon how -- how
14   somebody ultimately defined the purchase date should be
15   the date SIBL received the money or the date that the
16   CD account received the money. But we could do
17   either/or.
18          Q.   Does an account, which is named a CD account,
19   does that refer to a single CD or if it might have more
20   than one CD in the CD account?
21          A.   It would be a single CD.
22          Q.   Each CD is listed as a separate account
23   number?
24          A.   Correct.
25          Q.   What about when that CD rolled over? What

103

1    would happen?
2           A.   So when it's a rollover within itself, the
3    account number does not change. So those are the
4    instances where you'll see an actual transaction that's
5    a renewal or rollover transaction in the database.
6    There's also instances where somebody may have a CD
7    mature and they may decide to purchase multiple CDs
8    with those funds, in which case you will see transfers
9    occur, and then those new CDs that are purchased would
10   have new account numbers. So it can happen both ways.
11          Q.   It's my understanding that some of the CDs, I
12   believe they were called Flex CDs -- do you know that
13   name?
14          A.   Yes.
15          Q.   What's your understanding of how a Flex CD
16   worked?
17          A.   So a Flex CD allowed, kind of as the name
18   implies, a little more flexibility with the CD funds.
19   So an individual could make multiple deposits into the
20   account. And I don't remember the exact percentage,
21   but they were also allowed to withdraw a certain
22   percent of those funds without incurring a penalty.
23          Q.   When you have the financial records of money
24   in and money out and there is a Flex CD, how is that
25   treated?

104

1           A.   How do you mean?
2           Q.   Does that show a new CD being purchased or is
3    that simply a deposit into an existing CD account?
4           A.   So the -- for the transactional data that we
5    have, the CD account number would stay the same.
6           Q.   Okay. Let me circle back and make sure I
7    understood what you said just a second ago. The two
8    ways that CDs could be funded, the first into --
9    directly deposited into a CD account I understood.
10   Then you said the second way would be to deposit money
11   into an express account and then transfer from an
12   express account into a CD account, right?
13          A.   Correct.
14          Q.   But then as to rollovers, I didn't follow
15   that. What are the two possibilities of how rollovers
16   are -- are deposited and documented?
17          A.   So when an investor's CD matures, they have an
18   option to withdraw or renew their CD. If they choose
19   to renew, there's two -- basically two different
20   options. They can renew that specific CD, which will
21   then reflect as a rollover in our transaction data or a
22   renewal. So that CD number will stay the same in our
23   transaction data and there will actually be a
24   transaction that -- that is a rollover or renewal
25   transaction in the data.

105

1           The second way that they could do that is
2    they could leave their money in SIBL, but purchase or
3    transfer those funds to completely new CDs. So they --
4    their CD matures, that one goes away, and then rather
5    than withdrawing the funds they just transfer it to new
6    CD account numbers.
7           Q.   Do you know why it would be done one way
8    versus another way?
9           A.   You know, I don't know the specifics. I
10   believe it would just be at the direction of the
11   investor. So if they want more than one CD, if they
12   want smaller dollar amounts, if they want different
13   maturities, if there may be more advantageous interest
14   rates if they're doing it in different CDs, I wouldn't
15   know specifically why an individual would choose one
16   over the other, though.
17          Q.   Circling back to request number eight in the
18   document request, are you saying that the receiver
19   could generate a printout literally showing the name,
20   date and dollar amount of each CD purchased or not?
21          A.   Again -- again -- so like going back to what
22   we just discussed on a rollover -- from a rollover
23   perspective. What we could show you is for each unique
24   CD account number we could show you the date that
25   either complete outside money came into it, the first

27  (Pages 102 to 105)

Hunton App. 1155

Mark Russell

106

1    instance of that happening, when the first instance of
2    money being transferred into it occurred, and then we
3    could also give you the names on the accounts. Whether
4    or not you consider that rollover of an old becoming
5    new as a purchase of a CD, that's -- I think that's a
6    question. And so -- but we could give you the
7    information.
8        Q. The receiver doesn't have actual copies of the
9    CDs that were issued, does he?
10       A. Not all of them, no, not that I'm aware of.
11       Q. Your ability to generate the report of
12   CD purchases, would it necessarily reflect the same
13   dollars as are shown on the CDs that were issued by the
14   bank?
15       A. I would say that it should and in the
16   instances where we have seen copies they match. But I
17   couldn't speak to whether that's a hundred percent
18   true, because we haven't done that kind of a
19   comparison.
20       Q. Okay. Let me ask you to look at number nine,
21   please, the question about claims that have been sold.
22       A. Uh-huh.
23       Q. First, can you give us an overview of what you
24   understand is going on with regard to companies or
25   people that are buying up claims? What's your

107

1    understanding?
2        A. So my understanding is there's a group of
3    companies who are going out to investors that have --
4    sorry -- claims in our claims process and then they're
5    offering them some amount of money to purchase their
6    claims and they're buying their claims from them.
7        Q. What, if anything, comes to the receiver after
8    that happens?
9        A. So my understanding is that those claims
10   purchasers are -- they basically as part of that
11   purchaser wanting an acknowledgment from the receiver
12   acknowledging that it occurs. So I don't know the
13   specifics on what you would call the document they're
14   providing, but they're basically reaching out to the
15   receiver, giving notice to the receiver saying, hey, we
16   purchased this claim, will you please acknowledge it.
17   And then -- so that's how -- that's how we're becoming
18   aware of those claims purchases.
19       Q. Can the receiver generate a report showing
20   which claims have been sold in that way?
21       A. Yes.
22       Q. Do you know what, if anything, that would do
23   to the numbers and dollars shown in your declaration in
24   each of those groups of claimants if -- if there was a
25   list of claims that had been sold out and were no

108

1    longer owned by the original investor?
2        A. Are you saying if you asked me to exclude
3    those ones that have been sold from my numbers, what
4    that would do to the numbers?
5        Q. Yes.
6        A. I haven't looked at that, so I don't know
7    exactly how that would play out.
8        Q. Let me ask you about another set of potential
9    data.
10       A. Okay.
11       Q. And whether or not the receiver has that
12   in -- in his possession. We had already talked a bit
13   about nationalities, so let's skip that one. For U.S.
14   residents who are claimants of the Stanford estate,
15   does the receiver have information indicating what
16   state each of those U.S. depositors resided in when
17   they bought their CDs?
18       A. I can tell you what we do have. I don't know
19   if it answers your question. So we have -- we have the
20   mailing address of the individuals, and so from a state
21   perspective on each -- each account basis, that's what
22   we have available, mailing and -- the mailing/legal
23   address for that account. But I --
24       Q. As of what point in time do you have the
25   mailing address for U.S. residents?

109

1        A. So each account over its life has the -- my
2    understanding of it is the mailing address at the time
3    that that CD was -- existed. And so that address can
4    change over time and you'll see an account with
5    multiple instances. So we would have the address as
6    of -- as of when that account first existed all the way
7    through what the address was through kind of the end of
8    its existence.
9        Q. All right. And I assume you're aware of
10   situations in which somebody might live in one state,
11   work across the state line and get their mail in a
12   different place?
13       A. That's a possibility.
14       Q. So what the receiver has in the way of
15   information is not directly a state of residence, but
16   simply a state of mailing address. Is that fair?
17       A. That would be accurate.
18       Q. Does the receiver have information indicating
19   where each claimant was -- let's talk about U.S. only
20   at this time. Does the receiver have information
21   indicating where the claimant was when they got their
22   information about the CDs, when they had their sales
23   talk, if you will?
24       A. Again, like the other ones, unless it's
25   documented in some kind of e-mail or other client file,

28  (Pages 106 to 109)

Hunton App. 1156

Mark Russell

110

1  there's not a database that contains that information.
2      Q.  So if the measure of damages in this case were
3  in any way to depend on where the claimant was when
4  they were sold these CDs, the receiver wouldn't have
5  that information across the board, would he?
6      A.  As we sit here today? I don't know. But,
7  yeah, there's not a database that I'm aware of that
8  would have had that.
9      Q.  Does the receiver have information on which
10 claimants on Stanford bank were outside of the United
11 States when they received information about the CDs and
12 when they actually bought the CDs?
13     A.  It would be the same as the other ones, so
14 unless it's like in a client file or in an e-mail,
15 there's not a database that's going to specifically say
16 where that person is located when they received the
17 information.
18     Q.  If any of the claims or damages in this case
19 depended on whether or not the claimant was outside of
20 the United States at the time when they received their
21 sales pitch and bought their CDs, the receiver could
22 not calculate that damage calculation at this time,
23 could he?
24     A.  As we sit here today, that's correct, yes.
25     Q.  Does the receiver have information on whether

111

1  or not each claimant actually relied on any particular
2  misrepresentation or omission?
3      A.  Again, so like the other ones, unless it's
4  documented somewhere in an e-mail or client file,
5  there's not a database that would have it all.
6      Q.  I guess the same would be true that the
7  receiver would not have any information on whether each
8  particular claimant might have bought the CD anyway if
9  they had learned about something in the omitted
10 category?
11     A.  Yes, the same as the other, unless it's
12 documented in some other form or fashion.
13     Q.  I understand that the approved claim amounts
14 in the U.S. do not typically match up with the approved
15 claim amounts from the Antigua liquidators; is that
16 right?
17         MR. ARLINGTON:  Objection, misleading.
18     A.  We haven't done like a full comparison to know
19 whether that -- whether you -- whether I would say
20 typically.  But we know there's instances where they
21 don't agree, yes.
22     Q.  (BY MR. ISRAELOFF) Do you have any idea why
23 they don't agree?
24     A.  We haven't done a comparison claim by claim,
25 but I know of reasons why they would differ based on

112

1  the differences in the claims -- in how the claims are
2  assessed.
3      Q.  Can you just run down the list of those
4  reasons?
5      A.  So kind of the first reason is the grouping
6  methodology.  So in our process we group accounts based
7  on the client I.D. like we discussed before.  And then
8  we also group it based on how the claimants are
9  submitting their claims.  So if they put accounts
10 together, those are going to go together.  And then we
11 also will assess groupings from an objections
12 perspective.  The JLs use a different identifier that
13 they refer to as primary express account.  And so
14 they'll group accounts based on primary express
15 account.
16         And so we've -- because of that
17 difference, our groups would potentially contain
18 different account numbers which will just on -- on its
19 own that will result in differences between -- in the
20 allowable amounts.
21         A couple of the other drivers is there's
22 the way certain transactions are treated in the
23 processes from a calculation standpoint are different.
24 So in our process there's -- when somebody withdraws a
25 CD early there's a fee or penalty assessed.  And our

113

1  process, since no money really moved with that fee or
2  penalty, we don't consider that money in or money out.
3  In the JL's process, from what we've seen, it looks
4  like they're considering that as if it's a withdrawal
5  transaction, so actual money that that person owed.  So
6  they treat it as a withdrawal, reducing their net
7  position.
8          They also treat loan transactions
9  differently.  So in the JL's process they look at what
10 the balance of the loan was at the end of the day.  And
11 they say that's the amount that you owe that gets
12 offset against your withdrawal -- against your
13 deposits.  In the receivership process we just look at
14 the money that went into and out of the loan account as
15 if it was any other account, so that can result in
16 differences.
17         And then one of the other primary drivers
18 is when the different processes choose to translate
19 foreign currency, the JLs do their analysis on an
20 account-by-account basis, get to an amount and then
21 translate it as of February 2009.  Or as in the
22 receivership process we're translating money in and
23 money out on the date that that transaction is
24 occurring historically.  And so those are the primary
25 drivers of what will cause differences between the two

29 (Pages 110 to 113)

Hunton App. 1157

Mark Russell

122

1    Q.  All right.  Mr. Arlington?
2    A.  Correct.  Yes.
3    Q.  Anybody else?
4    A.  I met with Jesse -- not met.  Jesse dropped in
5    for maybe half an hour and we just kind of had some
6    high-level discussions on like you're being deposed,
7    here's the topics.  You know, I think we're good.
8    Q.  Okay.
9    A.  Pretty -- pretty short and quick with Jesse.
10   Q.  That's Mr. Castillo?
11   A.  Mr. Castillo, sorry, yes.
12   Q.  And he is not your lawyer or FTI's lawyer,
13   correct?
14   A.  That would be my understanding, yes.
15   Q.  Okay.  Do you remember anything that he told
16   you or that you learned about what the damages theories
17   are in the case?
18   A.  We didn't discuss that as part of that.
19   Q.  So do you have any information about what the
20   damages theories are in the case?
21   A.  At a high level what I remember from the
22   claims brief was that the class plaintiffs are saying
23   that -- and this is just kind of general what I got
24   from the claims brief was that the damages are the
25   allowed amounts from the receiver through his

123

1    receivership process on whoever ends up in the actual
2    class as a putative class member.
3    Q.  So the information that you have is based on
4    the public filings and the legal briefs?
5    A.  Correct.
6    Q.  Do you have any other source of information
7    about that?
8    A.  Not for what the class plaintiffs are alleging
9    from a damages perspective.
10   Q.  Any other information about damages in the
11   case generally?
12   A.  So I know -- I know in the claims brief
13   there's also mention of like the -- I don't know if
14   it's the receivership's, but like payments that were
15   made to both firms, and so I know that we were -- I
16   know basically those dollar amounts from that claims
17   brief as well and that they're alleging that those
18   payments should be returned or something to that
19   effect.
20   Q.  Anything else?
21   A.  And just from those -- if it's not outside the
22   claims brief, like if there's something related to like
23   TSA, but I don't know exactly how that's being applied.
24   But --
25   Q.  Just go back briefly to Exhibit 4, which is

124

1    your declaration in this case.
2    A.  Yeah.
3    Q.  Who -- who wrote the words in Exhibit 4?
4    A.  I did.
5    Q.  And did somebody give you guidance about what
6    ought to be contained in there?
7    A.  Just substantively in terms of what some of
8    the parameters they're looking for and then like a
9    request on what can you say regarding your ability to
10   calculate damages.  But in terms of the actual words,
11   we wrote them and then I believe like receivership
12   counsel like just reviewed it to see if there was any
13   comments that they had.  But it was written by me
14   personally.
15   Q.  So you described yourself as a forensic
16   accountant?
17   A.  Correct.
18   Q.  Are you a CPA?
19   A.  I am.
20   Q.  And you've been out of school about ten years?
21   A.  I graduated December 2004.
22   Q.  With a Master's degree?
23   A.  So a Bachelor's administration in accounting
24   and then a Master's in finance.
25   Q.  Was there any specialized focus on forensic

125

1    accounting in your schooling?
2    A.  No, there wasn't.
3    Q.  Okay.  Do you have any legal training of any
4    kind?
5    A.  I don't.
6    Q.  Did you have any classes on legal issues as a
7    part of your accountancy training?
8    A.  I did not.
9    Q.  Or finance training?
10   A.  Not -- other than like stuff that's kind of
11   covered in general management classes, no.
12   Q.  Have you personally ever been called upon to
13   prepare a damages assessment in a legal case?
14   A.  To be like the designated expert --
15   Q.  Or --
16   A.  -- or like to help assist or --
17   Q.  Either way.
18   A.  I mean, I've assisted from like a staff
19   perspective.  I'm trying to think if -- if it was more
20   accounting or if we had actual damages in those.  I
21   know I've -- I know I have assisted in cases.  I
22   couldn't tell you specifically which ones or like
23   exactly what the damages related to anymore.  It was --
24   Q.  After school have you done anything to study
25   what kinds of damages are recoverable as a legal matter

32  (Pages 122 to 125)

Hunton App. 1158

Mark Russell

126

1    and what kinds aren't?
2        A.  Not specifically, no.
3        Q.  How about generally?
4        A.  I mean, I did like through -- like when I was
5    with FTI we did like just a damage modeling type like
6    class which was more about structuring a damage model,
7    how to put it together, making sure that it functions
8    correctly and how to lay it out so that it can be
9    reviewed by another individual, that kind of stuff.
10   But not in terms of like what's legally allowed or not
11   or what a legal determination would be regarding it,
12   no.
13       Q.  You don't have any training, education,
14   experience about that stuff?
15       A.  Not in making like a legal determination, no.
16       Q.  Or in kind of looking at factual circumstances
17   through some kind of a legal lens to produce some kind
18   of an analysis?
19       A.  I mean, from a damages perspective you're
20   generally taking guidance from the attorneys on the
21   legal interpretation and then you're taking their
22   guidance to apply to your model.  So in that aspect,
23   that's what we've done.  But in terms of independently
24   assessing what is the actual legal requirement and then
25   developing a model off of that, I wouldn't say that

127

1    I've ever independently formed a legal conclusion on
2    what's the appropriate damage model.  It would be more
3    like with counsel, if that makes more sense.  I don't
4    know if I'm articulating that clearly.
5        Q.  Well, I guess I'm confused.  So you said you
6    provided support from a staff --
7        A.  Right.
8        Q.  -- perspective for damages studies.
9        A.  Correct.
10       Q.  Sim skipped this, but you've got to wait until
11   I finish my question.
12       A.  Okay.  Sorry.
13       Q.  You know, it's just the court reporter, et
14   cetera.
15       A.  Sorry.
16       Q.  And you don't always -- sometimes I'll
17   surprise you.  You don't always know where I'm going to
18   end up as I meander along.  You had personally not been
19   retained to prepare a damages study, correct?
20       A.  Correct.
21       Q.  And then I had asked you about training and
22   you said you had had a class about that, right?
23       A.  That's correct.
24       Q.  But other than that, I guess I'm confused,
25   because now it sounds like you have actually done

128

1    higher level work on some kind of damages study.
2        A.  Well, I mean, I have assisted people who have
3    been hired as experts in damages models from a staff
4    level.  So I'm not the one making determinations, but
5    I've been around the determinations as they've been
6    made.  I guess I'm trying -- I'm trying to say what --
7    I guess -- I guess are you asking whether I have
8    personally made and reached those types of conclusions
9    or are you asking have I been involved in cases in word
10   streams where those decisions and conclusions are being
11   made?
12       Q.  Well --
13       A.  Or is it neither?  Sorry.
14       Q.  It sounds like you have been involved at least
15   on a staff level in cases where those kinds of
16   determinations were made.  Fair?
17       A.  Fair.  Yes.
18       Q.  And then -- so then the next question is have
19   you ever been in charge of making those kinds of
20   determinations?
21       A.  No, I have not.
22       Q.  And other than looking at some of the briefing
23   in this case, you haven't had any conversation with any
24   attorney who has given you any instructions about what
25   might go into a damages model here, correct?  And when

129

1    I say "here," now I'm talking about this case.
2        A.  Correct.  No, we haven't had that discussion.
3        Q.  So I think I know the answer to this, but you
4    haven't made any determination or made any assumption
5    about what damages measure would be appropriate for the
6    various claims in the case, correct?
7        A.  I have not.
8        Q.  And would it be fair to distinguish a measure
9    on the one hand and a methodology on the other?  Is
10   there a difference in your mind between those things?
11       A.  I would say the methodology is what determines
12   the measurement.  So you have a method for measuring.
13   To me when I hear measure I think of the actual dollar
14   amount that results from the methodology you apply.
15       Q.  Okay.  That's the way you think about it?
16       A.  That's -- in my head that's the way I would
17   think about it.
18       Q.  So if I asked the same question about
19   methodology here, you -- you also haven't had any
20   conversation about what methodology would be
21   appropriate, correct?
22       A.  Correct, yeah.
23       Q.  So if we go back -- well, let me -- before I
24   go back to the declaration, since this is the way
25   I think about it, is it okay if I call your last

Hunton App. 1159

Mark Russell

134

1  on the claims database for a second, --
2    A. Uh-huh.
3    Q. -- is there a set number of fields -- you
4  know, is there a database structure that has a hundred
5  fields or 200 fields?
6    A. I don't know enough to speak to specifics on
7  it, because that claims information is maintained by
8  Gilardi. I know that there are specific fields like
9  related to like the claimant's name, their address, the
10  CD accounts that they're claiming, the claim number,
11  those -- that type of information. I can't speak to a
12  hundred percent of everything that is contained from a
13  field's perspective.
14    Q. And so you don't know whether that information
15  would be available or not? In other words, a list of
16  every single field that's in the claims database?
17    A. I don't know if that exists right now. And it
18  would have to be an assumption, but I would assume that
19  Gilardi would be able to say here are the fields that
20  are in our database, though.
21    Q. And I think you've described --
22    A. Uh-huh.
23    Q. -- your knowledge of a subset of them, but --
24    A. Correct.
25    Q. -- you don't know what the exhaustive list is?

135

1    A. Correct.
2    Q. So Sim asked you a number of questions that --
3  for example, focusing on the state where a particular
4  claimant might have received representations. Do you
5  remember those --
6    A. I do.
7    Q. -- questions? And so there were a number of
8  times when you said, well, there may -- there may be
9  information in some of the particular files for
10  particular people, correct?
11    A. Correct.
12    Q. But as it relates to the things that he asked
13  about, like the state where they may have received
14  representations, those are not things as far as you
15  know that are part of the claims database that could be
16  electronically queried. Fair?
17    A. That's fair, not to my knowledge, yeah.
18    Q. And so in order to figure out whether there
19  was information in a particular category such as a
20  state where these things were received, somebody would
21  have to do a manual investigation of some kind to
22  figure that out, true?
23    A. If we're speaking about what the receiver
24  currently has on hand, I believe that would be true.
25    Q. All right. So leaving open the possibility of

136

1  some kind of future additional information development,
2  are there any plans to develop additional information
3  as part of the claims database?
4    A. Not to my knowledge. I don't know one way or
5  the other.
6    Q. And as you sit here, I mean, you haven't
7  performed any assessment of the qualitative accuracy of
8  what random things might be in these files, right?
9    A. I mean, have I reviewed the files to see what
10  exactly exists in them?
11    Q. For example.
12    A. I have not.
13    Q. I may be retreading a little ground here, but
14  if we look again at paragraph five --
15    A. Okay.
16    Q. -- of Exhibit 4, which is your declaration.
17  That last sentence there says, "Further, FTI has the
18  ability and receivership data necessary to perform the
19  calculation of damages, once the damages methodology is
20  determined, whether that determination is made by FTI
21  or another third-party damages expert." Did I read
22  that correctly?
23    A. You did.
24    Q. What did -- what, if anything, did you do to
25  investigate that ability before including that

137

1  statement in your declaration?
2    A. So primarily what I focused on was what --
3  what CD information do we have, what are some of the
4  limits that currently exist in any of our databases to
5  any -- to that extent, and what other sources of
6  information potentially do we have that we could then
7  go to augment our data for it.
8      And then with the understanding that in a
9  damages methodology you can -- an expert -- you know,
10  you can kind of make certain assumptions and you can
11  make certain different caveats as long as you're able
12  to support them. Did I feel that we had, A, data and
13  enough outside data from the database to be able to run
14  calculations and do limits on that data.
15      I believe like my primary focus was on
16  date ranges and do we have the ability to exclude one
17  way or the other. And so I may not have contemplated
18  every potential possibility, which I think was -- when
19  I was discussing it with Mr. Sim. But like the primary
20  focus was like on transactionally do we have the data,
21  can we then -- do we have the information that allows
22  us to identify dates, can we identify when money is
23  moving between accounts. And the level of detail that
24  we have, I felt comfortable with being able to say that
25  if somebody puts limits on what information needs to be

35 (Pages 134 to 137)

DepoTexas, Inc.

Mark Russell

138

1  considered from our data, we could successfully limit
2  that information.
3      Q.  There's a lot in there.  You said what
4  information might be considered from our data.  So it
5  sounds like one of the things you looked at was how you
6  could manipulate the data that you had to produce
7  certain queries, correct?
8      A.  Correct.
9      Q.  And it sounds like the output from the queries
10  that you're talking about based on the data that you
11  have is going to be the money in/money out model,
12  correct?
13     A.  Correct.  So the current query we have
14  produces money in/money out.
15     Q.  Okay.  You could write other queries.
16     A.  Correct.
17     Q.  But it would still be limited to whatever data
18  you have that's electronically available in the tables,
19  correct?
20     A.  And/or that we could augment that information
21  with information that we have that may not be in the
22  tables already.
23     Q.  Right.  And we've agreed there's no plans to
24  do that right now, correct?
25     A.  Currently there's not.  That's right.

139

1      Q.  Well, there's no plans either, right?  Has
2  anybody talked about doing that?
3      A.  I mean, it was a general discussion that that
4  is a possibility of something that we could do if it
5  was necessary.  But there isn't a formal plan of this
6  is going to happen, this is when it's going to happen.
7  But that was a contemplation when -- when this -- when
8  the report was being drafted, if that makes --
9      Q.  That there was some possibility that you might
10  try and augment the existing data with other sources at
11  some future point?
12     A.  Right.  That we may -- that if necessary we
13  may need to augment the additional data with the
14  information that we have outside of the database.
15     Q.  So have you done -- you being FTI -- anything
16  either qualitatively, anecdotally or systematically to
17  figure out what, if any, additional data is available
18  to augment the tables?
19     A.  So for us the primary data that we have
20  available is the bank information that we have, a lot
21  of which primarily is electronic.  And so for us a lot
22  of it is do we need to -- can we augment places where
23  we may have like a missing piece with the bank data
24  that we have.
25     Q.  So bank data, that's flow of funds?

140

1      A.  Correct.
2      Q.  So, for example, there might be an external
3  piece of bank data showing funds coming in at a time
4  when a CD was purchased?
5      A.  Correct.
6      Q.  There's other kinds of data that you could
7  theorize might be part of a damages calculation that
8  obviously are not going to be available in the bank
9  data, correct?
10     A.  Potentially, yeah.
11     Q.  All right.  And, I mean, Sim gave you a couple
12  of examples of that, correct?
13     A.  Correct.
14     Q.  And you said, well, there might be something
15  in the -- in the files for some of the claimants,
16  correct?
17     A.  Correct.
18     Q.  You haven't done anything to figure out
19  whether there is anything in the files for the
20  claimants that could, in fact, supplement it that way,
21  correct?
22     A.  For like the types off stuff that we were
23  talking about?
24     Q.  Yeah.
25     A.  No, I have not.

141

1      Q.  So it might be there, it might not.
2      A.  That's correct.
3      Q.  Let me go back a little bit to the claims
4  process.  So Exhibit 1 was this claim form here.
5      A.  Correct.
6      Q.  So when somebody submitted this claim form or
7  similar data electronically, this is sworn, correct?
8      A.  I would need to read it.
9      Q.  The last page says it's sworn.  See where it
10  says, "I/we declare under penalty of perjury"?
11     A.  I do, yes.
12     Q.  So you have that piece of information.  Then
13  you -- you have the SIBL records, correct?
14     A.  Correct.
15     Q.  And those show -- those are internal records
16  to the bank which are -- you know, putatively at least
17  reflect transaction and CDs, correct?
18     A.  Correct.
19     Q.  And then there's the external bank records
20  that you have for some, but not all of the
21  transactions, correct?
22     A.  I don't know one way or the other if we have
23  all.  I know we have some.
24     Q.  What, if anything, else is done to corroborate
25  an assertion in these claim forms as it relates to a

36  (Pages 138 to 141)

Hunton App. 1161

Mark Russell

142

1   claim other than the things that I just mentioned?
2       A. So I can speak to CD.
3       Q. Okay.
4       A. So for CD claims that's primarily what FTI was
5   involved in. Gilardi does -- the verification step is
6   they're verifying that the person making the claim
7   matches -- or the names and associations on the claim
8   form match who the owner of the actual account is
9   that's being claimed. And to the extent that it
10  doesn't, that would be a deficiency that would then
11  have reach-out done to get verification that you do, in
12  fact, own this account and you should be receiving it.
13      But in terms -- I'm trying to think. So
14  that's on the front end to verify the claim. Then we
15  do a calculation and compare it to what they've
16  claimed. And then on the back end there's a
17  certification process that they have to return before
18  they can get paid. I'm trying to think.
19      I guess it depends on what piece are you
20  asking -- like are we verifying. Like are you asking
21  if we're making a judgment on verifying their claimed
22  amount? Because that's kind of what the purpose of us
23  doing the calculation and comparing it to is. Or are
24  you asking more like does -- are we verifying
25  everything that this person has put on here to make

143

1   sure that they were truthful in every single thing that
2   they said?
3       Q. I'm asking the whole -- the whole thing.
4   Someone has made an assertion.
5       A. Right.
6       Q. Presumably if this process is successful,
7   there's going to be a payment made to that person based
8   on those assertions. If we don't have a class, then
9   each one of those people is going to have to prove
10  those assertions by a preponderance of the evidence.
11      A. Uh-huh.
12      Q. Okay. So I'm trying to figure out what the
13  receiver has done to kind of make that unnecessary
14  here.
15      A. I got you. Okay.
16      Q. All right.
17      A. So from -- it's -- this is my general
18  understanding of the claims process. When the intake
19  has happened, what the Gilardi team is doing is they're
20  verifying that the person whose name is appearing on
21  the claim, who is filing that claim is the same person
22  who owns the accounts that they're claiming, and, if
23  not, getting additional verification that they do, in
24  fact, own those accounts.
25      Q. But the comparison is to the internal civil

144

1   records, the --
2       A. Correct, yes.
3       Q. -- Temenos and Data Pro.
4       A. So clearly -- sorry.
5       Q. As I said, you've got to wait for me to
6   finish, otherwise --
7       A. I'm sorry. It's only my second time.
8       Q. No, no, and you're doing great. Well, I don't
9   want to -- your lawyer can tell you whether you're
10  doing great.
11      But -- so -- so the comparison there is
12  from what was on the claim form and it's between that
13  and what exists in the Temenos -- Temenos and Data Pro
14  databases.
15      A. That's correct.
16      Q. And if those two things match up nothing more
17  is done to verify it. Is that fair? On an individual
18  basis assuming there's no objection.
19      A. Not that I'm aware of.
20      Q. Okay. And looping back a little bit, if the
21  judge were to decide in this particular case that, for
22  example, in order to figure out the damages you needed
23  to know the state in which the person was physically
24  present when they bought the CDs, as of right now you
25  can't tell me one way or another whether the data

145

1   that's been collected would allow the receiver to
2   calculate damages, correct?
3       A. If we were required to split it based on where
4   they physically were purchasing the CDs, we don't have
5   a database that would tell us that as we sit here
6   today.
7       Q. And any of the other information that doesn't
8   exist in the database, you can't say whether it's
9   possible to augment -- augment the database with that
10  information because nobody has investigated that to
11  date, correct?
12      MR. ARLINGTON: Objection, overbroad and
13  vague.
14      A. As it relates to information that the receiver
15  currently has, I don't know whether that would be
16  possible or not.
17      Q. (BY MR. JIMENEZ-EKMAN) We just don't know one
18  way or the other.
19      A. Right.
20      Q. In the Trustmark deposition, you remember
21  generally there was a discussion about some of the SIBL
22  data quality issues?
23      A. Like are you referring to like some of the
24  gaps that we have in the Temenos and Data Pro data?
25      Q. Yes.

37 (Pages 142 to 145)

Mark Russell

146

1      A.  Yes, I do.
2      Q.  And I think when someone was asking you
3   questions you said that you understood that the joint
4   liquidators may have, for example, some archival tapes,
5   backups of databases?
6      A.  That's what they represented to us, yes.
7      Q.  So they've said that, but you don't know one
8   way or the other.
9      A.  Correct.
10     Q.  Do you know -- have they made any
11  representation as to whether any of that data might
12  relate to the period before 2003?
13     A.  So their representation was that these were
14  archives of the databases that existed before Data Pro.
15  So it would be -- and I don't -- and when we were there
16  they told us what the names of them were.  I do not
17  remember what those databases were called.  But it
18  would be the archives of those -- of the databases that
19  were the predecessors to Data Pro.  So in theory if
20  that was there, it would be the transaction information
21  predating Data Pro.
22     Q.  Meaning it's quite likely that there could be
23  some archive data that relates to the period for
24  2003 -- from before 2003?
25     A.  Yeah, it's possible.

147

1      Q.  And I apologize, because Sim may have asked
2   you this, but the receiver has not asked for that
3   information?
4      A.  We have not asked for that.
5      Q.  Because?
6         MR. ARLINGTON:  Objection, calls for
7   speculation.
8      A.  I mean, my understanding is a lot of the
9   decisions are based on a cost benefit analysis.  And so
10  the receiver is looking at it from like is -- is the
11  additional work worth the additional money for what
12  we're going to be using it for in this particular
13  purpose.  So my understanding is the these types of
14  decisions are a cost benefit from a receivership
15  perspective.
16     Q.  (BY MR. JIMENEZ-EKMAN)  Do you know whether
17  some of the claims in this case might implicate time
18  periods before 2003?
19     A.  It would depend on how the class is defined.
20  So if it's just generally everybody who had a loss,
21  then there are allowed claimants who have initial
22  balances from August 2003.  So like potentially have --
23  and therefore would have transactions predating August
24  of 2003.
25     Q.  And if the amount of recovery -- well, let me

148

1   step back for a second.
2         You understand that the claims process
3   that the receiver has decided upon does not necessarily
4   reflect what the damages measure against any particular
5   defendant might be, correct?
6      A.  Yes, I do.
7      Q.  Okay.
8      A.  Yes.
9      Q.  So, for example, you might need to know when
10  purchases were made depending on the legal theory for a
11  particular plaintiff against a particular defendant,
12  right?
13     A.  Potentially, yes.
14     Q.  Okay.  In any case, as far as you know, the
15  pre 2003 information has not been collected by anybody
16  in the United States --
17     A.  Correct.
18     Q.  -- as opposed to the joint liquidators?
19     A.  Correct.
20     Q.  And when you went down there, did they
21  indicate whether they even still had the hardware and
22  the software to fire these things up?
23     A.  I don't think it was discussed one way or the
24  other.
25     Q.  Okay.

149

1      A.  But I don't remember specifically.
2      Q.  And going back to the testimony you gave in
3   the Trustmark deposition about the second half of 2006,
4   that there's some gaps there, --
5      A.  There are.
6      Q.  -- has anything changed since your Trustmark
7   testimony?  Have you been able to fill in any of those
8   gaps at all?
9      A.  So since the deposition we haven't done a
10  holistic review to see if we can fill it in.  There is
11  a possibility that through the ongoing claims process
12  we may have done some restoration in that time period
13  based on documents that we've -- or objections we're
14  getting from claimants.  So nothing holistically to try
15  to fill the gap.  But I don't know whether or not there
16  may have been some one-off restorations in that period
17  just from the normal course of what the receiver is
18  doing.
19     Q.  So when you say holistically, I would think
20  about it more systematic, right?
21     A.  Systematic, holistically, an attempt to
22  restore anything and everything that we can from that
23  period.  That's what I would -- that's what I would
24  mean when I'm saying holistically versus more ad hoc,
25  which would be we get an objection, this person says

38  (Pages 146 to 149)

Hunton App. 1163

Mark Russell

150

1  you're missing something from that time period, here's
2  my statement that proves it. We review it. And so
3  then we go in and make that restoration on more of a
4  one-off basis.
5      So it's the latter part, I don't know
6  specifically if any of that has happened since my
7  deposition. But the former, which is the more
8  systematic everything, that has not been attempted
9  since the last deposition.
10     Q.  Okay. And going back to the pre 2003 data for
11  a second, were you involved in any discussions about
12  the costs and benefits of potentially getting that
13  data?
14     A.  I was not personally involved.
15     Q.  So you're not sure how the receiver may have
16  weighed the advantages and disadvantages of trying to
17  get that?
18     A.  Correct. It would just be an assumption and
19  that's my understanding on how the decisions are made.
20  But I wasn't involved with any specific knowledge on
21  exactly what factored into the decision to ask or not
22  to ask for that data.
23     Q.  So as the receiver makes decisions about these
24  whole processes, one of the things the receiver is
25  thinking about is how much they cost, right?

151

1      A.  That's my understanding, yes.
2      Q.  Well, do you interact directly with the
3  receiver at all?
4      A.  Occasionally, not on a daily basis.
5      Q.  So how -- how do you get directions about what
6  to do that come from the receiver?
7      A.  So most of the direction that FTI receives
8  comes through receivership counsel.
9      Q.  And Sim asked you some questions about the
10  state of affairs as it related to determining the
11  citizenship of folks.
12     A.  Uh-huh.
13     Q.  Do you know whether the receiver has any
14  intention of expending any additional resources to try
15  and gather that information.
16     A.  I don't.
17     Q.  As far as you know he doesn't?
18         MR. ARLINGTON: Objection, you
19  mischaracterized his testimony.
20     A.  As far as I know, I don't know one way or the
21  other, whether he's made a decision to do that or not.
22     Q.  (BY MR. JIMENEZ-EKMAN) Have you heard any
23  other than being asked about it at your depositions,
24  have you had any discussions about the reasons why you
25  might do that?

152

1      A.  Absent preparation for deposition?
2      Q.  Well, I'm not trying to get into something
3  that's privileged. So if --
4      A.  Oh, I see what you're saying.
5      Q.  -- it's something that your lawyer said, I
6  don't want to hear about it, but if it's something that
7  somebody else said, like Mr. Castillo, it's fair game.
8      A.  So are you -- so are you asking -- I just want
9  make sure I understand the question.
10     Q.  Sure.
11     A.  Are you asking do I know of reasons why the
12  receiver may request that information or are you asking
13  whether the receiver currently has plans to ask for
14  that information?
15     Q.  I think I asked the first one --
16     A.  Right.
17     Q.  -- and then you said "I don't know."
18     A.  Right.
19     Q.  And then now I'm asking a second question and
20  I'll phrase it more succinctly. Are you aware of any
21  benefits from attaining that information or reasons why
22  it might be necessary?
23     A.  So I can think of reasons. So if -- so kind
24  of like this case, if there are factors that need to be
25  applied from a class perspective that we don't have, I

153

1  could see the receiver potentially reaching out and
2  attempting to get that information from the claimants.
3  But I don't know whether he actually would or not.
4  Does that answer your question?
5      Q.  So the process for doing that might be to send
6  out a request for -- an additional kind of request or
7  certification from the claimants?
8      A.  Either certification or questionnaire or, you
9  know, a list of, hey, we're looking for this
10  information from our claimants. I could see that as a
11  possibility.
12     Q.  But as far as you know, it's -- it's not
13  planned as of now.
14     A.  Yeah, as far as I know there's not a specific
15  plan to do that.
16     Q.  Is there a general plan to do it?
17     A.  Sorry. I shouldn't have been specific. As
18  far as I know, yeah, you're correct. As far as I know
19  there's not a plan to do that.
20     Q.  Okay. I think you testified earlier that at
21  some point while there was not an audit there was a
22  gross or holistic comparison between the SIBL account
23  records and the external bank records?
24     A.  Correct.
25     Q.  Do you -- do you have any quantitative

39 (Pages 150 to 153)

Hunton App. 1164

Mark Russell

154

1 information about that?  For example, do you know what
2 percentage, if any, were able to be affirmatively
3 reconciled or tied?
4      A.  I know from what we were doing we were
5 actually looking at it from the other direction.  So we
6 were looking at our bank data to confirm whether or not
7 it was or was not a CD purchase.  So we were going from
8 bank to SIBL CD database.  I don't know that we've gone
9 the other direction, so I can't give you a percentage
10 of how much of that ultimate database we've been able
11 to match, because I just don't think we've looked at it
12 from that direction yet.  We kind of went the other
13 way.  So like -- so in kind of doing that it kind of
14 prevents me from knowing the answer to the other side
15 kind of.
16      Q.  Did you discover any errors?  In other words,
17 since you went from bank to SIBL, did you find any bank
18 transactions that you couldn't reconcile with anything
19 in the SIBL records?
20      A.  Not that appeared to be a CD transaction.  So
21 the bank -- the bank information doesn't just contain
22 CD deposits.  But we weren't finding -- you know, other
23 than what we've discussed earlier where we have some
24 gaps in our data within the database, we weren't
25 finding, you know, transactions that are here -- that

155

1 we would expect to see here that -- except for kind of
2 the gaps that we've discussed today and that were
3 discussed in my Trustmark deposition.  I don't know if
4 that answers your question.
5      Q.  Well --
6      A.  I'm trying to be helpful.
7      Q.  And you are.  I guess it sounds like there was
8 some ability to corroborate bank transactions with
9 corresponding SIBL CD transactions, right?
10      A.  Correct.
11      Q.  But I guess this -- we talked about an audit
12 earlier.  This sounds pretty darn far from the kind of
13 certitude that you would expect from an audit, right?
14      A.  Well, it's more -- you have to look at what
15 the purpose of the analysis was.
16      Q.  And what was the purpose?
17      A.  So the purpose of the analysis really was to
18 say of the amounts that are coming into this
19 TD account in the aggregate, how much of that deposit
20 is actual CD funds.  And then also when we see amounts
21 coming out of this account, how much in dollar amounts
22 are we seeing coming out that we can match to CD funds.
23           Because the purpose of the analysis was
24 more on the establishment of a Ponzi scheme, working
25 with Karyl.  So can we prove that the money coming into

156

1 this account is CD money and what's going out is
2 CD money.  So really what's happening is it's a Ponzi
3 scheme.  It's just current investors being paid out
4 with prior -- or prior investors being paid out with
5 current investor money, because all that is flowing
6 through this account is just CD money.  So the purpose
7 of it was to kind of establish what percent of the
8 deposits into this account is traceable to a CD
9 deposit.
10      Q.  For the purpose -- I'm sorry, I didn't mean to
11 cut you off.
12      A.  That's good.
13      Q.  For the purpose of characterizing whether this
14 was a Ponzi scheme or not.
15      A.  Correct.
16      Q.  So the point of the exercise was not to focus
17 on the reliability, for example, of the SIBL internal
18 records.
19      A.  That was not the purpose of it.  I wouldn't
20 say it doesn't give us information related to it.  But
21 we didn't undertake an analysis to say start with SIBL.
22 Can I -- can I identify all of these transactions in
23 the bank.  We haven't -- we haven't done an analysis
24 from that perspective.
25      Q.  And --

157

1      A.  Which to me would be what you're speaking of.
2 That would be the purpose of doing that analysis.
3      Q.  Right.  In other words, if you were -- if you
4 were outside of the context here where you had resource
5 limitations and so on and if you were just trying to --
6 you got this database of CD account transactions and
7 you were trying to figure out whether it was reliable,
8 you would want to try and tie it to external bank
9 records as best you could, right?
10      A.  You know, depending upon for what purpose it
11 was, that would be -- that would be one of the things
12 you would potentially do.  Whether you would do it a
13 hundred percent or on a test basis or based on
14 statistical samples or something to that effect,
15 depending upon what your ultimate use was going to be,
16 that would be one of the -- one of the measures that
17 you could look at from a reliability standpoint.
18      Q.  So if you wanted to be able to rely on it to,
19 you know, pay people money, you'd want at least some --
20 some degree of accuracy, correct?
21      A.  I agree.
22      Q.  Okay.  And so you talked about potentially
23 sampling, which is -- which can be a proper audit
24 technique, right?
25      A.  Correct.

Hunton App. 1165

Mark Russell

158

1      Q. So there are different levels depending on
2  what level of reliability you might need, correct?
3      A. And, again, I don't mean to mince words, but
4  you keep using audit, which has a very specific
5  connotation, especially like with CPAs. Like we're
6  not -- we're not doing an audit, which is -- which is
7  us giving an opinion regarding something.
8          And so like for the purposes of what
9  we're doing, we've done a lot of analysis that does
10  match up those records. And we haven't seen a reason
11  to say -- we haven't seen anything that tells us that,
12  well, I've got a deposit over here that says it's a
13  million, but that same one over here is only showing up
14  as a hundred thousand. And so we haven't seen things
15  that lead us to believe that that information is not
16  reliable.
17         But the direction that we've done it in
18  doesn't allow me to give you a, hey, I've looked at
19  this and attempted to identify everything, so I can't
20  really give you a percentage breakdown.
21         MR. JIMENEZ-EKMAN: We have to change the
22  tape.
23         THE VIDEOGRAPHER: The time is 2:15.
24  We're off the video record.
25         (Recess taken.)

159

1          THE VIDEOGRAPHER: The time is 2:24. We
2  are back on the video record, tape number four.
3      Q. (BY MR. JIMENEZ-EKMAN) Mr. Russell, when the
4  receiver -- or FTI is looking at a claim, I think we
5  talked about the information supplied by the claimant
6  is reviewed and it's compared against the SIBL
7  databases, correct?
8      A. That's correct.
9      Q. But then it, generally speaking, is not going
10  to be compared against the external bank data unless
11  there's an objection or something that needs to be
12  tracked down, true?
13     A. That would be true, yes.
14     Q. And then we were going back and forth and I
15  realize I'm using the word audit, which does mean
16  something, you know, quite specific or can mean
17  something quite specific in the context of, for
18  example, audited financial statements.
19         But if we're just talking about means of
20  testing reliability of the data -- well, first let me
21  ask you this: Have you personally -- were you
22  personally involved in that holistic attempt to figure
23  out whether this was a Ponzi scheme that has yielded
24  some information about the reliability of the SIBL
25  data?

160

1      A. I was.
2      Q. Okay. So I'll ask a pointed question, then.
3  If it were your personal money that was at issue, would
4  you consider the SIBL database to be reliable enough to
5  rely on for the distribution of that money?
6      A. You know, considering the additional costs it
7  would take to kind of augment our missing information,
8  you know, personally I kind of think I kind of fall
9  with where the receiver is, that that additional
10  expense doesn't make sense from a claims perspective.
11  It may cost more to do that than kind of in the
12  aggregate it's going to benefit the claimants, like
13  just as a whole.
14     Q. I appreciate that answer from a systemic
15  perspective, but my question was a little bit
16  different. It was if it was your money at stake, --
17     A. Uh-huh.
18     Q. -- is the database reliable enough to rely on
19  to figure out who gets what?
20         MR. ARLINGTON: Objection, overbroad and
21  vague.
22     A. I think it's reliable enough to do what the
23  receivership needs to do. I think if it was -- if I
24  was a claimant, then depending upon whatever that
25  answer came out for me, then I may or may not object

161

1  depending upon what the answer was.
2      Q. (BY MR. JIMENEZ-EKMAN) And why do you think
3  it's reliable enough to do what the receiver needs to
4  do?
5      A. Because it's providing sufficient information
6  to allow the receivership to calculate the position
7  based on his determination of how to do that
8  calculation.
9      Q. But we've already talked about he's only using
10  two pieces of data, unless there's an objection, what
11  the claimant provides and the SIBL database, right?
12     A. Correct.
13     Q. So the claimant -- you know, there's --
14  there's no way to check -- well, let me step back.
15         Unless there's an objection or some
16  problem nobody is independently investigating the truth
17  or falsity of anything that's on these claim forms or
18  electronic forms, right?
19         MR. ARLINGTON: Objection, you're
20  mischaracterizing his testimony.
21     A. I mean, my understanding, you know, the one
22  thing that they do is they do verify that the person
23  making the claim does own the account that they're
24  claiming.
25     Q. (BY MR. JIMENEZ-EKMAN) Based on the SIBL

41  (Pages 158 to 161)

Hunton App. 1166

Mark Russell

162

1   records?
2       A.  Based on the records that are in the database,
3   correct.
4       Q.  Okay.  So I'm just talking about something
5   external.  We've got -- we've got the forms and we've
6   got the SIBL database, right?  So the forms, people can
7   write whatever they want on the forms and send them in.
8       A.  Uh-huh.
9       Q.  And putting aside for a moment double checking
10  the SIBL database, nobody goes out and does any
11  investigation of -- you know, external investigation of
12  what's on the forms.  Fair?
13      A.  You mean like sending somebody out to verify
14  that the person who is putting their name as Sara is
15  Sara?
16      Q.  Anything.  Anything other than checking it
17  against the SIBL database.
18      A.  So the receiver verifies it against his data.
19      Q.  Which is the SIBL data.
20      A.  Right.  So -- right.  No, I agree with you
21  there.
22      Q.  All right.
23      A.  I don't know -- I don't know what else the
24  receiver could do personally just, you know, here.
25  But, yeah, I mean, what the receivership does is the

163

1   receivership compares the information that the claimant
2   is providing on their claim form to what we have
3   available for those accounts in the SIBL database to
4   verify whether or not the claim matches what they're
5   claiming.
6       Q.  Right.
7       A.  But to the extent there's not an additional
8   verification beyond that step to like having an
9   investigator go out and look at like is this person
10  living in the house they say they're living in, that
11  type of thing isn't being done.
12      Q.  Right.  So other than the comparison between
13  what the claimant self-reports and the SIBL database,
14  no external verification is done, correct?
15          MR. ARLINGTON:  Objection, asked and
16  answered.
17      A.  Like specifically from a verification
18  standpoint, no.  But, you know, if they're getting a
19  check it's being issued in the name of the person whose
20  name is on the claim.  So if that's not that person,
21  they wouldn't be able to get that money.
22      Q.  (BY MR. JIMENEZ-EKMAN)  Well, there's a lot of
23  other information on the form.
24      A.  Right.  So, I mean, there's --
25      Q.  I'm sorry, I didn't mean to cut you off.

164

1       A.  No, that's okay.  I just don't know -- I'm
2   trying to make sure I'm answering what you're trying to
3   get at.
4       Q.  Well, I'm asking something very specific.
5       A.  Yeah.
6       Q.  And you might be outthinking yourself here.
7       A.  Okay.  That's possible.
8       Q.  Okay.  So other than comparing the information
9   that's provided on a form or electronically to the SIBL
10  database, the receiver doesn't do anything to
11  externally verify any of the information on the form.
12      A.  I would say the only other thing that we do is
13  when we have cases where there isn't a match, there's
14  additional reach-out and request for information to be
15  provided by the claimant.
16      Q.  Okay.  So -- go ahead.
17      A.  So that would be -- that would be the only
18  additional thing that I'm aware of that would be done
19  from a verification standpoint.
20      Q.  All right.  So assuming that the data on the
21  form is not inconsistent with the data in the SIBL
22  database, no external verification is done, correct?
23      A.  That's my understanding, yes.
24      Q.  I think I know the answer to this, but let me
25  just make sure I've got it right.  In the receiver's

165

1   calculations of the money in/money out, results for CD
2   rollovers, when interest is rolled into new principal,
3   does that count one way or the other in terms of money
4   in or money out?
5       A.  For money in/money out, it's a nonevent.  It's
6   neither.
7       Q.  It's only a physical -- well, physical is not
8   the right word.  But only actual inflows and outflows
9   of money, so --
10      A.  So like I can describe for you what we have --
11  what we define as money in/money out.  Because there
12  are some types of transactions from an
13  investor-to-investor perspective that we may consider
14  money in and money out that's not an actual flow of
15  funds through the bank.
16      Q.  Let's hear them.
17      A.  So money in is defined as -- there's basically
18  three categories, initial balances, so like the
19  principal balance from the August 2003 that we were
20  discussing before.  That would be considered a money in
21  transaction.  So we'd give credit to that investor for
22  that amount that they had in the principal.
23          Similarly like we have a data gap that, I
24  think, is in the -- in the -- in my prior deposition
25  that runs the second half of 2006.  So there is

42  (Pages 162 to 165)

DepoTexas, Inc.

Hunton App. 1167

Mark Russell

166

1  instances where an account just all of a sudden appears
2  like with a balance at 12-31-2006. So we treat the
3  balance and the principal for those accounts similarly
4  that we do for the '03. That gets treated as what we
5  call an initial balance and it's treated as money in.
6           Additionally then we have the actual cash
7  transfers that you're referring to, so like deposits of
8  checks, deposits of wire transfers that are coming in
9  to the accounts. Those get treated as money in.
10          There's also situations where two
11 unrelated investors may transfer money amongst
12 themselves. So money going from me to David per se
13 would be treated as if I took money out and he got
14 money in. So when we're trying to calculate his
15 position, he received the benefit of money from me
16 that -- and we're unrelated people. So for his purpose
17 that would be money in.
18      Q.  How common are those transactions?
19      A.  I don't have a count, to be honest with you.
20 It's something we could derive at, because our query
21 allows us to identify them. I don't remember offhand
22 like how pervasive it would be across the groups.
23      Q.  How many -- sorry. How many CD accounts
24 existed as of August 2003 in the Temenos database?
25      A.  I'm trying to remember what -- because I know

167

1  we did this. I'm trying to remember what the numbers
2  are. I know that there's about -- and I cannot
3  remember the counts, but I know the dollar amount.
4  There's about $1.6 billion worth of principal balance
5  at that point in time. Roughly 900 million of that is
6  in groups that are in like -- or accounts that are in
7  groups that have -- that are a part of the claims
8  process. And then the other 7,750 million are on
9  accounts that have never been claimed as part of the
10 receivership claims process.
11      Q.  Sorry, I'm jumping around a little bit here,
12 but that's what happens with cleanup people sometimes.
13      A.  That's fine.
14      Q.  If -- so if we go back to the ability to
15 calculate --
16      A.  Uh-huh.
17      Q.  -- damages and what you've said in your
18 declaration, we've talked about date restrictions,
19 right?
20      A.  Uh-huh.
21      Q.  And we've talked about as an output the
22 money -- the net money in/money out calculation,
23 correct?
24      A.  Correct.
25      Q.  As you sit here based on your knowledge of the

168

1  database structure, --
2      A.  Uh-huh.
3      Q.  -- what other -- other than -- other than
4  putting in date restrictions and getting out money in
5  and money out, what else would the database yield?
6  What else -- how could you query it that you can think
7  of that might be a proper damages measure?
8           MR. ARLINGTON:  Objection, overbroad and
9  vague.
10      A.  I don't know about proper damages model. I
11 can think of other -- like, you know, one of the things
12 that I considered when I was saying can we do something
13 is if it became necessary to say the dollar amounts
14 that are being allowed by the receivership come from
15 what deposits, like would we be able to trace specific
16 dollars throughout the database to get to -- well, is
17 this dollar -- is a dollar from this deposit from 2006
18 actually in that allowable amount, or in theory what's
19 the composition of the allowable amount, what deposits
20 does it consist of.
21          And so the question I kind of asked
22 myself and asked my team is could we develop a way to
23 do that, kind of trace dollars throughout, and it would
24 be possible. There would be certain assumptions that
25 would have to be made and agreed upon in terms of what

169

1  order do transactions move out of accounts, like a last
2  in/first out method, a first in/first out. Do
3  transactions and interest move like on an allocation
4  basis. Those are all determinations that would have to
5  be made. But the transaction information is detailed
6  enough to allow us to flow that through.
7      Q.  (BY MR. JIMENEZ-EKMAN)  So --
8      A.  So that's one of the contemplations is do we
9  need -- potentially -- potentially maybe -- I can't
10 talk right now. Potentially may we be required to
11 speak to the composition of the allowed amount and/or
12 any net winning amount, however it needs to be
13 determined.
14      Q.  Okay. Can you think of anything else?
15          MR. ARLINGTON:  Same objection.
16      A.  I mean, as I sit here today I haven't really
17 tried to think of anything else.
18      Q.  (BY MR. JIMENEZ-EKMAN)  This is my chance to
19 test you based on your pretty broad statement in your
20 declaration.
21      A.  Uh-huh. I mean --
22      Q.  So --
23          MR. ARLINGTON:  And it's also required
24 that we have a specific question as opposed to can you
25 think of anything you could do with the database.

43 (Pages 166 to 169)

Hunton App. 1168

Mark Russell

---

**194**

```
 1              CHANGES AND SIGNATURE
 2   WITNESS NAME:           DATE OF DEPOSITION
 3   MARK RUSSELL       December 17, 2015
 4   PAGE    LINE   CHANGE        REASON
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

---

**195**

```
 1        I, MARK RUSSELL, have read the foregoing
 2   deposition and hereby affix my signature that same is
 3   true and correct, except as noted above.
 4
 5
 6        _____
 7                  MARK RUSSELL
 8
 9   THE STATE OF _____ )
10   COUNTY OF _____ )
11        Before me, _____, on this day
12   personally appeared MARK RUSSELL, known to me (or
13   proved to me under oath) or through _____
14   (description of identity card or other document) to be
15   the person whose name is subscribed to the foregoing
16   instrument and acknowledged to me that they executed
17   the same for the purposes and consideration therein
18   expressed.
19        Given under my hand and seal of office this
20   _____ day of _____, 2015.
21
22
23        _____
24        NOTARY PUBLIC IN AND FOR
         THE STATE OF _____
25        MY COMMISSION EXPIRES:
```

---

**196**

```
 1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
 2                  DALLAS DIVISION
 3   RALPH S. JANVEY, et al.,        )
 4        Plaintiffs,        )
 5   vs.                 ) CIVIL ACTION
                          ) NO.
 6   GREENBERG TRAURIG, LLP, HUNTON & ) 3:12cv-4641-N
     WILLIAMS, LLP; and YOLANDA      )
 7   SUAREZ,                )
                            )
 8        Defendants.        )
 9
10        REPORTER'S CERTIFICATION
         ORAL DEPOSITION OF MARK RUSSELL
11             December 17, 2015
12        I, Jeff L. Foster, certified shorthand reporter
13   in and for the State of Texas, do hereby certify to the
14   following:
15        That the witness, MARK RUSSELL, was duly sworn by
16   the officer and that the transcript of the oral
17   deposition is a true record of the testimony given by
18   the witness;
19        I further certify that pursuant to FRCP Rule
20   30(f)(1) that the signature of the deponent:
21        _X__ was requested by the deponent or a party
22   before the completion of the deposition and returned
23   within 30 days from date or receipt of the transcript.
24   If returned, the attached Changes and Signature Page
25   contains any changes and the reasons therefor;
```

---

**197**

```
 1        ____ was not requested by the deponent or a party
 2   before the completion of the deposition.
 3        I further certify that I am neither attorney or
 4   counsel for, nor related to, nor employed by any of the
 5   parties to the action in which this testimony was
 6   taken.
 7        Further, I am not a relative or employee of any
 8   attorney of record in this cause, nor do I have a
 9   financial interest in the action.
10        Subscribed and sworn to on this 23rd day of
11   December, A.D., 2015.
12
13
14        Jeff L. Foster, CSR, RMR, CRR
          Texas CSR No. 5434
15        Expiration Date: 12/31/2016
          DepoTexas, Inc.
16        DepoTexas Firm Registration No. 459
          6500 Greenville Avenue, Suite 445
17        Dallas, Texas 75206
          (214) 373-4977
18
19
20
21
22
23
24
25
```

---

50 (Pages 194 to 197)

Hunton App. 1169

# EXHIBIT 19

Jorge Salgado

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, et al.,           )
                                   )
            Plaintiffs,            )
                                   )
vs.                                ) CIVIL ACTION
                                   ) NO.
GREENBERG TRAURIG, LLP, HUNTON &   ) 3:12cv-4641-N
WILLIAMS, LLP; and YOLANDA         )
SUAREZ,                            )
                                   )
            Defendants.            )

---------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

JORGE SALGADO

December 4, 2015

---------------------------------------


    ORAL DEPOSITION of JORGE SALGADO, produced as a

witness the instance of the Defendant Hunton &

Williams, and duly sworn, was taken in the above styled

and numbered cause on December 4, 2015, from 8:32 a.m.

to 2:07 p.m., before Jeff L. Foster, a Certified

Shorthand Reporter in and for the State of Texas, at

the offices of Strasburger & Price, 901 Main Street,

Suite 4400, Dallas, Texas 75202, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record.

Hunton App. 1170

Jorge Salgado

**6**

1  reporter please administer the oath?
2          JORGE SALGADO,
3  having been first duly sworn, testified as follows:
4          EXAMINATION
5  BY MS. BISHOP:
6     Q.  Good morning, Mr. Salgado.
7     **A.  Good morning.**
8     Q.  How are you doing?
9     **A.  Perfect.  How are you?**
10    Q.  I'm well, thank you.  Mr. Salgado, as we begin
11 I'd like to go over a few ground rules for the
12 deposition today.
13    **A.  That sounds good.**
14    Q.  Have you been deposed before?
15    **A.  Never.**
16    Q.  And did you sit in on yesterday's deposition
17 for a little while?
18    **A.  I came a little bit later.  I was here before**
19 **10:00.**
20    Q.  So today's deposition will go a lot like
21 yesterday's.
22    **A.  Perfect.**
23    Q.  And this deposition is being recorded by video
24 and by a court reporter, so it's important that you
25 speak up so that everyone can hear your answers.

**7**

1     **A.  I will do it.**
2     Q.  And because there's a record it's important
3  that we don't talk over each other and that we give
4  both you, me and the interpreter time to finish their
5  question before anyone speaks.
6     **A.  Correct.**
7     Q.  And if you need a break at any time, just let
8  us know.
9     **A.  Thank you.**
10    Q.  And I just ask that if you need to take a
11 break that if there's -- if I've asked a question that
12 you answer that question before we take a break.
13    **A.  I do understand.  Okay.  In other words, I**
14 **cannot leave before I answer the last question.**
15    Q.  You can -- before the last question that's
16 been asked.
17    **A.  Okay.  Understood.**
18    Q.  And if you don't understand a question, let me
19 know.
20    **A.  Correct.**
21    Q.  And is there -- is there anything that would
22 stop you from giving complete and honest testimony
23 today?
24    **A.  No, not at all.**
25    Q.  Mr. Salgado, have you been a plaintiff in any

**8**

1  other lawsuits?
2     **A.  Never.**
3     Q.  Mr. Salgado, are you a citizen of Mexico?
4     **A.  Yes, the Mexican republic, state of Michoacan.**
5  **And I do live in Mexico City, DF.**
6     Q.  Have you ever -- are you a citizen of any
7  other countries?
8     **A.  No.**
9     Q.  Have you ever lived in any other cities?
10    **A.  I was born in this little town and I was**
11 **living there until I was 14 years old.  The name is a**
12 **little bit difficult to spell, but it's Churintzio,**
13 **Michoacan.**
14    Q.  And have you lived in Mexico City since then?
15    **A.  Correct, yes.**
16    Q.  And do you have residences in any other
17 cities?
18    **A.  No.**
19    Q.  Have you ever lived in Los Angeles?
20    **A.  I have visited Los Angeles for two or three**
21 **days.**
22    Q.  And some of the documents that you produced in
23 this case had an address listed for you in Los Angeles.
24 Do you know why that would be?
25    **A.  Well, yes, because I have relatives in**

**9**

1  L.A., so all the mail comes to that address.  It is
2  much easier to go to that address than have it lost in
3  the state of Mexico.
4     Q.  And do you ever stay with your relatives in
5  Los Angeles?
6     **A.  Yes, in July.**
7     Q.  And how long have you been going to
8  Los Angeles in July?
9     **A.  Three days.**
10    Q.  So, Mr. Salgado, we're conducting today's
11 deposition in Spanish.  Do you understand any English?
12    **A.  Well, just a little bit.  I think I can read**
13 **it better, mainly because everything related to my work**
14 **and I'm an accountant and those -- you know, some kind**
15 **of terminology is easier for me.  But I haven't**
16 **practiced it.  I think it was since 2004, so it's been**
17 **11 years, you know, since I was retired, so I haven't**
18 **been practicing it.**
19    Q.  Can you still read English today?
20    **A.  Well, yes.  Not a hundred percent, but, yes,**
21 **I can -- I can have the sense of what I'm reading, you**
22 **know.**
23    Q.  And you were employed as an accountant?
24    **A.  Well, yes, you see I have been an employee**
25 **for -- for the last 50 years and I have had three**

3  (Pages  6  to  9)

**Hunton App. 1171**

Jorge Salgado

**10**

1  different jobs. I was not working -- I was not working
2  as an accountant at the beginning. It was maybe when
3  I was 20, 21 after I finished my high school and that's
4  when I start studying accounting. Something else?
5  Q.  And are you retired now?
6  A.  Yes, since 2004.
7  THE INTERPRETER: May the interpreter
8  tell him something about when he's talking too long?
9  Because --
10  MR. SNYDER: Okay. Sure.
11  THE INTERPRETER: -- I cannot retain
12  everything.
13  MR. SNYDER: I was wondering why you let
14  him go on for so long.
15  (Pause.)
16  THE INTERPRETER: Thank you.
17  Q.  (BY MS. BISHOP) And what was your last job
18  before you retired?
19  A.  During ten years this is like a club resort by
20  the name Royal Club.
21  Q.  And what was your job there?
22  A.  I was a treasurer.
23  Q.  And what sort of duties did you have at that
24  job?
25  A.  Well, I was handling or managing the cash.

**11**

1  That company had very serious problems of liquidity.
2  Q.  And what sort of liquidity problems?
3  A.  Well, just as a background I have been working
4  for more than 30 years also in a commercial business, a
5  group commercial business. And a coworker -- a
6  previous coworker had been working already in this
7  group. So he asked me to call -- I mean, he called me
8  and he asked me to work for them, and I helped them
9  maybe between six and eight months. This took place in
10  1994 in the month of September. And they thought that
11  we could go to the stock market in 1995 in the month of
12  February. And they wanted for me to be assisting them
13  because of the experience that I had.
14  But then Mexico had a problem that was in
15  December of 1994. But then we have our new president,
16  Mr. Cedillo, C-E-D-I-L-L-O, and along with his minister
17  of treasury didn't do proper work, so we have the
18  problem.
19  MR. SNYDER: Wait. Objection. He said
20  that he caused the economy to collapse in Mexico.
21  THE INTERPRETER: Sorry.
22  MR. SNYDER: A little bit bigger than
23  just a problem.
24  A.  Do you want me to keep going with this, or do
25  you think this information that I'm giving you is not

**12**

1  that relevant?
2  Q.  (BY MS. BISHOP) Yeah, I think if we can keep
3  it more closely tied to what you were doing at your
4  job, that would be helpful.
5  A.  Well, I was trying to organize what in reality
6  was just something -- just disastrous, I mean,
7  terrible, totally out of control. And after this
8  economical crisis I was asked not to leave them after
9  just six months. And that's the reason why I stayed
10  there until 2004 working for them.
11  So I worked there for ten years and my
12  job was about to receive from different places and
13  different sales for the company. And then just to make
14  a good program from all the income. So make a good --
15  a proper job with the cash.
16  Q.  And were you the primary person responsible
17  for the company's financials?
18  A.  It was the general manager, general director,
19  and I was -- but I was making decisions for the
20  treasury.
21  Q.  And how big was that business?
22  A.  Sales were 55 or 60 millions of dollars
23  annually.
24  Q.  And you said that before that job you worked
25  for 30 years in a commercial business?

**13**

1  A.  Yes. Would you like to have the name?
2  Q.  Yes, please.
3  A.  Salinas, S-A-L-I-N-A-S, and Rocha, R-O-C-H-A,
4  and then SA.
5  Q.  And what did that company do?
6  A.  Well, mainly they sell furniture, but it
7  belongs to a group that is by the name Salinas Group.
8  But now it's not any longer the original Salinas Rocha,
9  because they had a problem in the year of 1960 through
10  1962. So there were problems between the families,
11  Salinas and Rocha.
12  And then they decided when they had an
13  agreement to have a director that will come from
14  outside the family. And they stay like that until 1992
15  or 1993. But then it was falling down, so they had to
16  sell it out.
17  So it was one of the grand grandchildren,
18  one of the grand grandkids that bought the company.
19  And his name is Ricardo Benjamin Salinas Pliego,
20  P-L-I-E-G-O.
21  Q.  And what was your job title at that company?
22  A.  For a little while I started as a salesman for
23  two months. And that's when I started accounting, and
24  then they placed me at the accounting department as the
25  auxiliary. And then I went to the department of

4 (Pages 10 to 13)

Hunton App. 1172

Jorge Salgado

14

```
1   control --
2       MR. SNYDER:  It's like the controller,
3   controller's office.
4       A.  Like the controller officer also as an
5   auxiliary.  And then I was, you know, going up and
6   going up and then by 1962 or 1963 I was the
7   sub-treasurer.  And afterwards for more than 20 years
8   I was the treasurer.
9       Q.  (BY MS. BISHOP)  And what were your job duties
10  as treasurer?
11      A.  I was receiving for more than 60 different
12  stores.  I was receiving the money.  And I was working
13  on all the income that come proper to the company.
14      Q.  And what were the annual sales of that
15  company?
16      A.  Well, during the evolution we have very high
17  inflation, so everything was about millions and
18  millions.  But then normal times it will be -- we could
19  say more than 3 billion -- 3 billion pesos.
20      MR. SNYDER:  It's like the Macy's of
21  Mexico or it was.
22      Q.  (BY MS. BISHOP)  And why did you leave that
23  job?
24      A.  There were changes in the general direction.
25  And I really didn't trust too much what they were
```

15

```
1   doing, and I was about to turn 60 years old.  So I
2   decided to retire and obtain a pension from the Social
3   Security.  And then, you know, the company also had a
4   plan like a provision plan so you could dispose from --
5   according to the plans that they had, and then you will
6   be able to retire.  So that's something that I did.  So
7   I decided to do that.  I thought about my future and I
8   thought that I wouldn't have any problems for me or my
9   family economically.
10          So I go retire and then I decided that if
11  there was the need I will find me another job or I will
12  do something for myself.  And then after three years is
13  when I was asked to go and work for this company, the
14  one that I already told you.
15      Q.  And what is your college and post college
16  education?
17      A.  Well, post college, no.  Only college.
18      Q.  And what did you study in college?
19      A.  Accounting, the career of accounting.
20      Q.  And do you have any sort of professional
21  accounting license?
22      A.  No, because I never had that need.  I was
23  working as an employee, so I didn't need it.
24      Q.  And you're here today serving as the
25  representative for the Michoacan Trust?
```

16

```
1       MR. SNYDER:  Michoacan.
2       MS. BISHOP:  Michoacan.
3       MR. SNYDER:  Trust.  Just wait -- wait
4   for the question and just answer the question.
5       A.  I didn't -- well, not only as a
6   representative, because I did it because -- because I
7   made an investment -- an investment with my savings.
8   And then also because the person who invited me to be
9   part of this, Stanford, he told me that it was
10  necessary to establish a --
11      THE INTERPRETER:  You have to help me.
12      MR. SNYDER:  A trust.
13      THE INTERPRETER:  A trust.
14      (Conversation in Spanish between
15  Mr. Snyder and the witness.)
16      (Pause.)
17      Q.  (BY MS. BISHOP)  And are you the principal for
18  the Michoacan Trust?
19      A.  Well, the trust, there is just a name and I
20  have the signature.
21      Q.  Are you the only one who makes decisions for
22  the Michoacan Trust?
23      A.  I gave the signature to my daughter, the name,
24  Margarita Salgado.  And my wife is my beneficiary,
25  Emilia, E-M-I-L-I-A, Soria, S-O-R-I-A.
```

17

```
1       Q.  And have either of them ever been involved in
2   the financial decisions for the Michoacan Trust?
3       A.  Never.
4       Q.  Are you the only one who's been involved in
5   the financial decisions for the Michoacan Trust?
6       A.  Yes.  Exclusively, yes.
7       Q.  And so you're serving as a class
8   representative in the lawsuit Janvey versus Greenberg
9   Traurig; is that correct?
10      THE INTERPRETER:  Tell me again the name.
11      MS. BISHOP:  Janvey versus Greenberg
12  Traurig.  Traurig.
13      THE INTERPRETER:  Traurig.
14      MR. SNYDER:  And she didn't say
15  representative -- class representative, she just said
16  representative.  So if you want to ask the question
17  again so she can add the class part.  Ask your question
18  again.
19      Q.  (BY MS. BISHOP)  And you're serving as a class
20  representative in the lawsuit Janvey versus Greenberg
21  Traurig, correct?
22      MR. SNYDER:  Objection, form.  Michoacan
23  Trust, I think, is the plaintiff.
24      A.  I would like to hear the objection that has
25  placed my lawyer.
```

5 (Pages 14 to 17)

Hunton App. 1173

Jorge Salgado

30

1 reporter.)
2    Q.  (BY MS. BISHOP)  And I see that you've brought
3 several documents with you today to the deposition.
4    A.  Yes.  I have my balances and the background
5 that I have, you know, why I got convinced to make that
6 investment; a letter of congratulations from the person
7 who invited me, and, you know, that later on I accepted
8 to be an investor, just a document showing the way I
9 sent the money from the last company I was working for.
10    Q.  And have you given everything that you have
11 with you to Mr. Snyder?
12    A.  No.
13    Q.  Have you shown him all the documents that you
14 have with you?
15    A.  Well, I told him my story.
16        MR. SNYDER:  Just to be clear, these are
17 his original documents.  He hasn't given those to me.
18 But y'all have all the copies of all that stuff.  I
19 mean, you can ask him that, but --
20    A.  Yes.
21    Q.  (BY MS. BISHOP)  So you have given copies of
22 all the documents you have with you to Mr. Snyder?
23    A.  I don't remember whether -- from every single
24 document, but I know he has some.
25    Q.  So have you shown Mr. Snyder all the documents

32

1 reporter.)
2    Q.  (BY MS. BISHOP)  So is everything in this
3 document accurate, to the best of your knowledge?
4        MR. SNYDER:  Well, and I'll object to the
5 form.  I mean, obviously this has a bunch of legal
6 objections to it that he has no knowledge of.  I
7 mean --
8    A.  And, you know, it's not only that I don't know
9 it, but I don't understand it.
10    Q.  (BY MS. BISHOP)  Mr. Salgado, if you'll turn
11 to page 9.
12    A.  Okay.
13    Q.  And you'll see there's a request number 24 and
14 a response beneath it.
15    A.  Yes.
16    Q.  And there's a sentence near the end of that
17 response that says, "Plaintiff Michoacan Trust is not a
18 named class plaintiff or plaintiff in any other
19 Stanford related state or federal court litigation."
20        THE INTERPRETER:  Let me get my glasses
21 so I can read it if you don't mind.
22        MS. BISHOP:  Oh, yes.
23        THE INTERPRETER:  Just tell me what -- it
24 was number what?
25        THE WITNESS:  24.

31

1 you have with you?
2    A.  Very -- in a very fast way.
3    Q.  And did you review those documents in advance
4 of today's deposition?
5    A.  Not just to review it, just to make sure what
6 I had, you know, just to show what I had.
7    Q.  As part of your role representing the trust as
8 a class representative in this case, did you review the
9 class plaintiffs' responses to the document requests in
10 this case?
11    A.  Yes.
12        MS. BISHOP:  Let the record reflect I'm
13 handing the plaintiff what's been marked Defendants'
14 Exhibit 5.
15    Q.  (BY MS. BISHOP)  And, Mr. Salgado, do you
16 recognize this document?
17    A.  Well, yes, but without asking me an
18 explanation about this.  Okay?
19    Q.  Did you review this document prior to today?
20    A.  I did it yesterday.  I saw it yesterday.
21    Q.  And to the best of your knowledge, was
22 everything accurate yesterday?
23        MR. SNYDER:  Objection, form.
24    A.  Yes.
25        (Discussion out of the hearing of the

33

1        THE INTERPRETER:  Okay.  The request or
2 the response you want me to read?
3        MS. BISHOP:  The response, the sentence
4 beginning, "Plaintiff Michoacan Trust," which is the
5 second to last sentence in the response.
6        THE INTERPRETER:  Second to last.  Okay.
7        (Pause.)
8    A.  So what is the question?
9    Q.  (BY MS. BISHOP)  Is that correct?
10    A.  Yes.
11    Q.  So Michoacan Trust has not served as a
12 plaintiff in a Stanford related suit before?
13    A.  Never.
14        MS. BISHOP:  Let the record reflect I'm
15 handing the plaintiff what's been marked Defendants
16 Exhibit 6.
17    Q.  (BY MS. BISHOP)  Mr. Salgado, do you recognize
18 this document?
19    A.  Just to see it at a glance, no.
20    Q.  And do you see at the top there is a case
21 number, a cause number at the first page?
22    A.  Yes.
23    Q.  And do you see on the second page it says,
24 "Plaintiffs' First Amended Petition"?
25    A.  Yes.

9  (Pages 30 to 33)

Hunton App. 1174

Jorge Salgado

34

1    Q.   And do you see above that there are several
2    defendants listed and several plaintiffs?
3    A.   Yes.
4    Q.   And flipping back to the first page near the
5    bottom, do you see listed Michoacan Trust C/O Jorge
6    Salgado?
7    A.   Yes.
8    Q.   So Michoacan Trust is listed as a plaintiff in
9    this petition, right?
10   A.   Yes.
11   Q.   And if you'd turn to page 3, paragraph two.
12   THE INTERPRETER:   Page 3?
13   MS. BISHOP:   Page 3, paragraph two.
14   A.   Yes.
15   Q.   (BY MS. BISHOP)   And the first sentence of
16   paragraph two says, "This action is filed in
17   representation of 49 defrauded investor clients of
18   Houston, Texas based Stanford Financial Group"?
19   A.   Yes, I'm looking at this.
20   Q.   And have you ever seen this document before?
21   A.   No.
22   Q.   But Michoacan Trust is listed as a plaintiff
23   in this lawsuit; is that correct?
24   A.   Yes.
25   Q.   And on the top of the front page, on the top

35

1    right, you'll see there's a file stamp showing this was
2    filed with the court?
3    A.   Yes.
4    Q.   And if you flip to page 94, the second to last
5    page. You'll see that Mr. Snyder signed this?
6    A.   Yes.
7    Q.   Did Mr. Snyder ever talk to you about this
8    lawsuit?
9    A.   Do you understand that I really do not
10   understand anything about legal terminology or legal
11   process? And I really cannot keep in my mind how this
12   all happened.
13   Q.   But do you know whether Mr. Snyder ever spoke
14   to you about this lawsuit?
15   A.   It should have been a yes?
16   (Interruption by the reporter.)
17   THE INTERPRETER:   It should have been a
18   yes.
19   MR. SNYDER:   A yes?
20   Q.   (BY MS. BISHOP)   Do you recall whether he did?
21   A.   Let me repeat myself. Maybe I could have
22   missed saying something whether yes or not.
23   Q.   So you're not sure whether Mr. Snyder
24   discussed this lawsuit with you?
25   A.   All this is so complex, ma'am, that --

36

1    (Discussion out of the hearing of the
2    reporter.)
3    Q.   (BY MS. BISHOP)   So, Mr. Salgado, do you know
4    whether you're a plaintiff in one lawsuit or two
5    lawsuits related to Stanford?
6    MR. SNYDER:   And I'll object to the form.
7    This case has not proceeded at all as you guys well
8    know.
9    Q.   (BY MS. BISHOP)   Mr. Salgado, do you know
10   whether you're a plaintiff in one lawsuit or two
11   lawsuits related to Stanford?
12   A.   There is a confusion here.
13   Q.   And what is the confusion?
14   A.   Knowing whether this lawsuit has been divided
15   or no.
16   Q.   What do you mean by "divided"?
17   A.   That maybe what's present in those documents
18   embraces everything or not everything.
19   Q.   So you're not sure whether the complaint in
20   front of you is part of the lawsuit we're talking about
21   today?
22   MR. SNYDER:   Objection, form.
23   THE INTERPRETER:   Repeat it again,
24   please.
25   Q.   (BY MS. BISHOP)   So you're not sure whether

37

1    the complaint you have in front of you, Defendant -- or
2    Defendants' Exhibit 6, is part of the lawsuit we're
3    talking about today?
4    A.   I don't know.
5    Q.   Mr. Salgado, have you met the other -- do you
6    know the other class representatives in this case?
7    A.   No.
8    MR. SNYDER:   And objection, form. Are
9    you talking about the document you have in front of him
10   that he's looking at right now, or are you talking
11   about the Greenberg case?
12   A.   These are the plaintiffs. And I don't know
13   them.
14   Q.   (BY MS. BISHOP)   And you can --
15   MR. SNYDER:   And let the record reflect
16   he's referring to Exhibit Number 6.
17   Q.   (BY MS. BISHOP)   And you can put away Exhibit
18   Number 6 now. And so moving back to the case against
19   Greenberg, do you know the other class representatives
20   in the case against Greenberg?
21   MR. SNYDER:   The other class
22   representatives, not --
23   A.   Just Mrs. Pam. Pam Reed. Yes, Pam Reed.
24   Pam.
25   Q.   (BY MS. BISHOP)   Do you know any of the other

DepoTexas, Inc.

Hunton App. 1175

Jorge Salgado

38

1   class representatives?
2       A.   No.
3       Q.   And do you know how many class representatives
4   there are in this lawsuit?
5       A.   We are three.
6       Q.   And you mentioned that Ms. Pam --
7       A.   Well, three -- well, no, four because there
8   also exists a liquidator -- liquidator.
9       Q.   And you mentioned you know Ms. Pam Reed.  Have
10  you met her before?
11      A.   No.  We went to have dinner the day before,
12  yesterday -- yesterday when she had her deposition.
13      Q.   And if I told you the last class
14  representative was Sam Troice, does that sound right to
15  you?
16          MR. SNYDER:  Samuel.
17          MS. BISHOP:  Samuel.
18          MR. SNYDER:  He doesn't go by Sam.
19          (Pause.)
20          MR. SNYDER:  Troice.
21          THE INTERPRETER:  Troice.
22      A.   I don't know him.
23      Q.   (BY MS. BISHOP)  So, Mr. Salgado, I'd like to
24  talk with you about the formation of the Michoacan
25  Trust.

39

1       A.   Correct.
2       Q.   And when was that created?
3       A.   When I didn't shape my investment, my broker
4   assistant, he told me that it was necessary to create a
5   trust.  It was just like an invention, because really
6   from the judicial way there's no such trust --
7   Michoacan Trust.
8          MR. SNYDER:  Objection to the
9   translation.  Can you --
10      A.   Yes, for me I mentioned Michoacan Trust, like
11  I could have said X.  Because it was something
12  necessary to make the investment.
13      Q.   (BY MS. BISHOP)  And you said your broker
14  assistant told you this?
15      A.   Yes, that I had to make a trust, but she
16  didn't suggest the name.
17      Q.   And what was the name of your broker
18  assistant?
19      A.   Mary Bautista, B-A-U-T-I-S-T-A.
20      Q.   And how did you meet Ms. Bautista?
21      A.   She was working for Sun Trust Bank.  And I was
22  working for this club, Royal Holiday Club.  And we have
23  an account in Miami at the Sun Trust Bank.  So she was
24  my contact to have operations or transactions.
25      Q.   And she was located in Miami?

40

1       A.   Yeah, she was living in Miami.
2       Q.   And you were in Mexico at that time?
3       A.   In Mexico.  Yes, in Mexico.
4       Q.   And approximately what year was that?
5       A.   2000 -- well, no, it was at the end of the
6   years 90.
7       Q.   And how did Ms. Bautista come to be your
8   broker?
9       A.   Because she moved from Sun Trust Bank to
10  Stanford.
11      Q.   And was she your broker before she moved to
12  Stanford?
13      A.   No.  No.
14      Q.   And so why did she become your broker once she
15  moved to Stanford?
16      A.   Because I have my personal check account in
17  Sun Trust Bank and she invited me to make the
18  investment.
19          MR. COWLES:  I maybe just can't hear it,
20  but I never did hear a year.  Was a year given?
21          MR. BUNCHER:  '90s, late '90s.
22          MR. COWLES:  Late '90s is what she said?
23  Okay.  Thank you.
24      Q.   (BY MS. BISHOP)  And what year did
25  Ms. Bautista move to Stanford?

41

1       A.   My understanding is that when she invited me
2   to join it in 2001, she had been there only for a
3   while.
4       Q.   Would that be for a few months or --
5       A.   No, I don't know.
6       Q.   And how long had you known Ms. Bautista before
7   she moved to Stanford?
8       A.   Two, three years.
9       Q.   And did she handle your personal account at
10  Sun Trust?
11      A.   Well, there was a group here in Sun Trust and
12  they will assist me, you know, different people.
13      Q.   So how close was your relationship while she
14  was at Sun Trust?
15      A.   She came to visit us in Mexico on one
16  occasion, but that conversation would be frequently
17  because of the business.
18      Q.   And when you said she came to visit you, was
19  that to visit you personally or to visit your business?
20      A.   It was just a visit to the business and it was
21  not maybe only to the club, but some other businesses.
22      Q.   And when was that visit?
23      A.   Around 2000.
24      Q.   And when did Ms. Bautista first contact you
25  about investing in Stanford?

11  (Pages 38 to 41)

Hunton App. 1176

Jorge Salgado

42

1    A.  2001.
2    Q.  And did she contact you by phone?
3    A.  Yes, and she visit with me.
4    Q.  And did she come to Mexico to visit with you?
5    A.  Yes.
6    Q.  And where did you meet?
7    A.  My work, at my office.
8    Q.  And did she have anyone else with her?
9    A.  No.
10   Q.  And was there anyone else with you to meet
11   with her?
12   A.  No.
13   Q.  And what did she tell you during that visit?
14   A.  She told me just wonderful things about the
15   Stanford Group.
16   Q.  And what had she told you on the phone before
17   she came to visit?
18   A.  If I will agree and make an investment.
19   Q.  So she asked you on the phone to make an
20   investment?
21   A.  Yes, but we didn't do it.  We didn't complete
22   it.
23        MR. SNYDER:  Finalize it.
24        THE INTERPRETER:  Finalize it.
25        MR. SNYDER:  Can we take a break?  I need

43

1    to go to the restroom.  We've been going an hour and a
2    half.
3        MS. BISHOP:  Yeah, a break is fine.
4        THE INTERPRETER:  Thank you.
5        THE VIDEOGRAPHER:  We're off the record
6    at 9:54 a.m.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  We are on the record
9    at 10:09 a.m.
10   Q.  (BY MS. BISHOP)  Mr. Salgado, before the break
11   we were talking about Mary Bautista's visit to your
12   offices in 2001.
13   A.  Yes.
14   Q.  And how long was her visit?
15       THE VIDEOGRAPHER:  Is your mic on?
16       THE INTERPRETER:  Yes.  You cannot hear
17   him?
18       THE VIDEOGRAPHER:  You, your mic.
19       THE INTERPRETER:  Oh, sorry.  Okay.
20   A.  We just have a small conversation and then we
21   went to have lunch.
22   Q.  (BY MS. BISHOP)  About how long was the
23   conversation?
24   A.  15, 20 minutes.
25   Q.  And what did you discuss?

44

1    A.  About my future, my financial future and how
2    they'll be able to help me to have a much better
3    investment in the future, the outcome of that
4    investment.
5    Q.  And did you discuss that over lunch as well?
6    A.  Oh, just about football.  Sometimes you don't
7    know -- not even what to talk about, you know.
8    Q.  And did Ms. Bautista bring any written
9    materials with her to the visit?
10   A.  Just marketing, publicity.
11   Q.  And did you read those?
12   A.  We talk about it.
13   Q.  And what did Ms. Bautista tell you about
14   Stanford?
15   A.  A solid company, serious one, the best in the
16   market, and with a wonderful outcome for years.
17   Q.  And are any of the materials that she gave you
18   at that meeting in the file that you provided to
19   Mr. Snyder?
20   A.  Just something -- you know, very, very few.  A
21   bunch of them, I just threw them away.  Like, for
22   example, this one.
23   Q.  You can hold on to that, sir.
24        MS. BISHOP:  And let the record reflect
25   that the plaintiff was handing me --

45

1    A.  I have her person -- I mean, her business
2    card.
3        MS. BISHOP:  Let the record reflect that
4    I am handing the plaintiff what's been marked
5    Defendants' Exhibit 7 after plaintiff handed me a
6    document that is the same document, but the original.
7    A.  Yes.
8    Q.  (BY MS. BISHOP)  And is this the document that
9    you were going to hand me?
10   A.  Yes.
11   Q.  And what is this document?
12   A.  About Stanford services that he could bring to
13   me.
14   Q.  And is this the document -- a document that
15   Ms. Bautista gave you at your first meeting?
16   A.  I don't remember that.
17   Q.  Is it a document that she gave you later?
18   A.  I don't understand your question.
19   Q.  Do you know when you received this document?
20   A.  No.
21   Q.  Is it possible it was during your first
22   meeting?
23   A.  Possible.  Possible, yes.
24   Q.  And do you know who gave this to you?
25   A.  I don't know it.  You want to know why?

12  (Pages 42 to 45)

Hunton App. 1177

Jorge Salgado

46

1    Q.  Yes.
2    A.  There were different visits.  She will come to
3    Mexico like twice per year.  Plus we have mail in
4    between, like regular mail.
5    Q.  And was it always Ms. Bautista who visited
6    you?
7    A.  For this question, yes.
8    Q.  And did she ever bring anyone else with her?
9    A.  No.
10   Q.  And was there ever anyone else with you when
11   you met with her?
12   A.  No.
13   Q.  And was your daughter ever present for the
14   meetings with Ms. Bautista?
15   A.  No.
16   Q.  Was your grandson ever present for the
17   meetings with Ms. Bautista?
18   A.  No.  No.  He was a little kid.
19   Q.  During Ms. Bautista's first visit, do you
20   recall whether she told you anything about SIBL CDs in
21   particular?
22       MS. BISHOP:  SIBL CDs.
23   A.  She talked about investment without looking at
24   the documents.
25   Q.  (BY MS. BISHOP)  Was she talking more

47

1    generally about Stanford Group or about this particular
2    investment product?
3    A.  Well, more concretely, no.  I mean, she was
4    telling me about the times like, you know, how much
5    money I would be receiving, how she will be sending me
6    the statements and also along, you know, with the time.
7    And she was explaining it to me, the percentage that I
8    would receive in time.  It could be three months, six
9    months, one year, different percentages.
10   Q.  Did she tell you anything about the insurance
11   on those products during the first visit?
12   A.  Totally insured.  There was no risk at all.
13   Q.  And did she tell you what country the
14   investment products were from?
15   A.  Which country what?
16   Q.  Which country the investment products were
17   from.
18       MR. SNYDER:  And objection, form.  What
19   products?  Are we talking just about the CDs?
20   Q.  (BY MS. BISHOP)  Sorry, if we can strike that
21   last question.  To go back to my question before, you
22   said -- you said that Ms. Bautista told you the
23   investments were totally insured.
24   A.  A hundred percent.
25   Q.  And after the visit, did you do anything to

48

1    check up on that?
2    A.  No.  No.  I mean, there were proof and --
3    there was proof and no.
4    Q.  And where was the proof that you saw?
5    A.  Well, I was -- I had this trust for this
6    broker.  And what can you know about, you know, a
7    company like that unless I would have had a big amount
8    of money.  Then I would have hired someone to
9    investigate the company.
10   Q.  How much money would you consider to be enough
11   to hire an investigator?
12       MR. SNYDER:  Objection, form.  Calls for
13   speculation.
14   A.  I wouldn't know that.
15   Q.  (BY MS. BISHOP)  But that's not something you
16   did for your investment in the CDs?
17   A.  I didn't do anything.
18   Q.  And did you have anyone else look into the
19   investment for you?
20   A.  No.
21   Q.  And what else did Ms. Bautista tell you about
22   the investments?
23   A.  As I told you, that it was a wonderful
24   investment.
25   Q.  Did she tell you anything about what bank was

49

1    issuing the investment products?
2    A.  A bank located in the United States with
3    relations in Antigua.
4    Q.  And did she tell you anything about who
5    regulated the investment products?
6    A.  No.
7    Q.  Did you ask about who regulated the investment
8    products?
9    A.  No.
10   Q.  Did you ask Ms. Bautista any questions about
11   the investment products in your first meeting?
12       MR. SNYDER:  And, again, objection.
13   We're still talking about the CDs?
14       MS. BISHOP:  Talking about Stanford
15   investment products.
16       MR. SNYDER:  Well, then I object until
17   you define what those are.
18   A.  So what was the question?
19   Q.  (BY MS. BISHOP)  Did you ask Ms. Bautista any
20   questions about the Stanford investment products she
21   was telling you about?
22       MR. SNYDER:  Objection, form.
23   A.  Well, it's because I do know the market in
24   Mexico.  And she was offering me something similar to
25   that in the United States.  It was a dollars investment

13  (Pages 46 to 49)

Hunton App. 1178

Jorge Salgado

50

1    with very good revenues.
2          MR. SNYDER:  Return.
3          THE INTERPRETER:  Return.
4      Q.  (BY MS. BISHOP)  So you didn't ask her
5    questions about them?
6      A.  No.
7      Q.  And you said that you believed Stanford's
8    investment products were similar to the Mexican
9    investments you had made previously?
10     A.  Yes.
11     Q.  And what about them was similar?
12     A.  Well, related to the bank's duties or
13   obligations, the reports to the customers, percentages,
14   et cetera.
15     Q.  And did you decide whether to invest with
16   Stanford after that first meeting?
17     A.  Yes.
18     Q.  And did you decide you wanted to invest in
19   Stanford investment products?
20     A.  Yes.
21     Q.  And did you decide specifically that you
22   wanted to invest in Stanford CDs?
23     A.  Yes.  Yes.  I mean --
24     Q.  And how long after that first meeting did you
25   make your first investment?

51

1      A.  Right away, immediately.
2      Q.  And you said earlier that you had to form a
3    trust for your investment?
4      A.  She asked me to do so, but it was just in the
5    air, up in the air.  It was not just in front of a
6    notary or lawyer.
7      Q.  Did you fill out -- did you create the trust
8    the day that Ms. Bautista visited you?
9      A.  Created?  It was just to speak about it.
10     Q.  Did you sign any documents related to the
11   trust that first day?
12     A.  Nothing.  Never.
13     Q.  And when did you sign the documents to create
14   the trust?
15     A.  If I do understand properly, that trust was
16   never made.  If I do understand it properly, that trust
17   was never created as a --
18         MR. SNYDER:  Legal entity.
19     A.  -- legal entity.
20         MR. SNYDER:  I think he's confused.
21         MR. VON HOENE:  Can you repeat the answer
22   again?
23         THE INTERPRETER:  Repeat what he said?
24     A.  Okay.  Mary asked me to do this trust, because
25   it was necessary to make it.

52

1          MR. SNYDER:  Make the investment.
2          THE INTERPRETER:  To make the investment.
3      A.  And then she says make up a name and that's
4    something that I did.  Why Michoacan Trust?  Because
5    that's my town, my land.
6      Q.  (BY MS. BISHOP)  Okay.  Let's go back for a
7    minute and talk a little bit more about the document
8    that you have in front of you, which is one of these
9    marketing brochures.  And so the front page shows that
10   this is a -- for trust services for Stanford Trust
11   Company, Limited?
12         THE INTERPRETER:  Which page are you on?
13         MS. BISHOP:  The first page.
14     A.  Yes.
15     Q.  (BY MS. BISHOP)  And if you flip to the next
16   page, 1069.
17     A.  Yes.
18     Q.  And do you see there that it shows that
19   Stanford Trust Company, Limited and Stanford Fiduciary
20   Investor Services are part of the Stanford Financial
21   Group?
22     A.  Yes, I can see it.
23     Q.  And did you understand at the time that you
24   met with Ms. Bautista that she was representing
25   Stanford Trust Company?

53

1      A.  Yes.
2      Q.  And if you'll flip to the next page, 1070.
3    And do you see the first sentence says that the
4    headquarters of Stanford Trust Company Limited are
5    located in Antigua?
6          THE INTERPRETER:  Oh, this is in Spanish.
7    I was trying to read, but I don't know what to read.
8    I'm sorry.
9      A.  But, first of all, they always have United
10   States in the front, like you can see it here.  It's
11   page 75.
12     Q.  (BY MS. BISHOP)  To turn back to page 1070, do
13   you see where it says the headquarters of Stanford
14   Trust Company, Limited are located in Antigua?
15     A.  Yes.
16     Q.  And did you understand at the time that you
17   met with Ms. Bautista that the headquarters were
18   located in Antigua?
19     A.  No.  No, they were in Mexico.
20     Q.  Did Ms. Bautista tell you that?
21     A.  I meant United States, not Mexico.  I'm sorry.
22   Here in the United States.
23     Q.  So did Ms. Bautista tell you that the
24   headquarters of Stanford Trust Company were in the
25   United States?

14  (Pages 50 to 53)

Hunton App. 1179

Jorge Salgado

62

1   And this page is titled, "Higher Interest Rates on
2   Deposits." Do you see that?
3       A. Yes.
4       Q. And did Ms. Bautista explain to you during
5   your meeting why the interest rates on Stanford CDs
6   were higher?
7           MR. BUNCHER: Higher than what?
8       A. Because of the -- because of the investment
9   strategy that they had.
10      Q. (BY MS. BISHOP) And do you see the first
11  paragraph there titled, "Consistent Profitability"?
12      A. Yes.
13      Q. And did Ms. Bautista tell you that Stanford
14  International Bank had been consistently profitable
15  before you made your investment?
16      A. Yes.
17      Q. And would it have changed your decision to
18  invest if that had not been true?
19      A. I do not make the investment.
20      Q. Do you see the second paragraph titled,
21  "Prudent Investments"?
22      A. Yes.
23      Q. And that paragraph says that, "Global
24  investments, not loans are the primary source of bank
25  earnings"?

63

1       A. Yes.
2       Q. And had Ms. Bautista told you that global
3   investments were the primary source of bank earnings
4   before you decided to invest?
5       A. Yes.
6       Q. And would it have changed your decision to
7   invest if that had not been true?
8       A. Well, I will say no after that.
9       Q. Did you know that that statement was untrue at
10  the time you made your investment?
11      A. No, I didn't know.
12      Q. And do you see the third paragraph that says
13  there's low overhead?
14      A. Yes.
15      Q. And did you understand at the time you made
16  your investment that one of the reasons the interest
17  rate was higher was because of low overhead?
18      A. Yes.
19      Q. And going back to page 5 for a minute. Did
20  you know the representations made in the global
21  investment strategy paragraph were untrue at the time
22  you made your investment?
23      A. I did believe in everything.
24      Q. And did you understand that the
25  representations made in the no credit risk paragraph

64

1   were untrue at the time you made your investment?
2       A. I didn't know about it.
3           MR. SNYDER: You're basically asking him
4   if he knew that he was being lied to? Is that what
5   you're asking him?
6           MS. BISHOP: Right now that's where I'm
7   asking the questions.
8           MR. SNYDER: Okay. I mean, I think his
9   answer is going to be no. You can ask every question
10  you want about what did he know that is all lies. He's
11  going to say, no I didn't, I mean, but go ahead. It's
12  your depo.
13      Q. (BY MS. BISHOP) And, Mr. Salgado, if you had
14  known that the representations made in the no credit
15  risk paragraph were untrue, would you have made your
16  investment?
17      A. No.
18      Q. And turning -- can you turn now to page 7?
19      A. (The witness complied.)
20      Q. And do you see the top paragraph there, "Zero
21  tax jurisdiction"?
22      A. Yes.
23      Q. And the next sentence that says, "Our domicile
24  does not tax earnings"?
25      A. Yes.

65

1       Q. And at the time you made your investment, did
2   you understand that the -- that that sentence was true,
3   that the domicile of SIB did not tax earnings?
4       A. It's stated here, but I don't know.
5       Q. Did you discuss the tax on the investment with
6   Ms. Bautista?
7           MR. SNYDER: Objection, form. Are you
8   talking about the tax on the bank pursuant to this
9   paragraph you just read him or a tax on Michoacan
10  Trust?
11      Q. (BY MS. BISHOP) The question I asked is,
12  Mr. Salgado, did you discuss the tax on your investment
13  with Ms. Bautista?
14      A. No.
15      Q. Did you discuss the taxes that Stanford Bank
16  was subject to with Ms. Bautista?
17      A. No.
18      Q. And do you see the second paragraph on this
19  page that says, "No loan losses"?
20      A. Yes.
21      Q. And did you understand the representations in
22  this paragraph to be true at the time you made your
23  investment?
24      A. I did hear about it. I didn't know whether it
25  was true or not.

17 (Pages 62 to 65)

Hunton App. 1180

Jorge Salgado

66

1      Q.  If you had known it was untrue, would that
2  have changed your decision to invest?
3      A.  Yes.
4      Q.  And if you will turn now to page 8.
5      A.  (The witness complied.)
6      Q.  And do you see there that it states that,
7  "Stanford International Bank CDs have outperformed
8  U.S. bank CDs by an average of 4.6 percent"?
9      THE INTERPRETER:  Say that again, please,
10  because you went too fast and I couldn't find it.
11      Q.  (BY MS. BISHOP)  Do you see on the left side
12  of the page it says that, "Stanford International Bank
13  CDs have outperformed U.S. bank CDs by an average of
14  4.6 percent"?
15      A.  Yes.
16      Q.  And did you understand that to be true at the
17  time you made your investment with Stanford Bank?
18      A.  I did believe in that.
19      Q.  And would it have changed your decision to
20  invest if you had known that was untrue?
21      A.  Yes.
22      Q.  And we're done with that document now, so you
23  can put it down.
24      MR. SNYDER:  I'm going to use the
25  restroom.  Can you --

67

1      MR. BUNCHER:  Yeah.  Yeah.
2      Q.  (BY MS. BISHOP)  And so you said earlier that
3  you made your investment with Stanford right after your
4  meeting with Ms. Bautista.
5      A.  Yes.
6      Q.  And how did you go about making that
7  investment?
8      THE INTERPRETER:  How did he go?  I don't
9  understand your question.  How did he go?
10      MS. BISHOP:  So strike that question.
11      Q.  (BY MS. BISHOP)  How did you -- did you
12  contact Ms. Bautista to make that investment after the
13  meeting?
14      A.  Well, there were visits.  I do not remember
15  exactly the dates.  We have conversations over the
16  phone, communication.
17      Q.  Approximately how many phone calls did you
18  have before you decided to invest in Stanford CDs?
19      A.  Very few.  Talking about the investment, maybe
20  five or six.
21      Q.  And were all of those conversations with
22  Ms. Bautista?
23      A.  Yes.
24      Q.  And did you discuss your decision to invest
25  with anyone in your family?

68

1      A.  No.
2      Q.  And how long total were the conversations that
3  you had with Ms. Bautista before you decided to invest
4  in Stanford CDs?
5      A.  Very little.  I trusted her.  Because of the
6  background, that I had met her already doing business
7  or some other businesses.
8      MS. BISHOP:  Let the record reflect I'm
9  handing the witness what's been marked Defendants'
10  Exhibit 9.
11      Q.  (BY MS. BISHOP)  And, Mr. Salgado, do you
12  recognize this document?
13      A.  Yes.
14      Q.  And what is it?
15      A.  Well, this is the agreement that we celebrated
16  for the investment.
17      (Interruption by the reporter.)
18      THE INTERPRETER:  For the investment.
19  No?
20      MR. SNYDER:  You basically did a direct
21  translation.  Celebrated is not a word we would use in
22  English to sign a contract, but --
23      THE INTERPRETER:  I'm sorry.  We agree on
24  it.
25      MR. SNYDER:  The agreement that we

69

1  entered into, I guess, you could say.  They have
2  balloons and fireworks and --
3      THE INTERPRETER:  Yeah, I'm sorry, I went
4  extremely literally.  I'm sorry.
5      Q.  (BY MS. BISHOP)  And, Mr. Salgado, did you
6  fill out this form?
7      A.  I did sign it.
8      Q.  Did you fill it out?
9      A.  What she asked me to do, yes.
10      Q.  And did Ms. Bautista ask you to fill this out?
11      A.  Maybe she sent it to me already with the
12  information that I had given her previously.
13      Q.  Were you with Ms. Bautista when you signed
14  this document?
15      A.  No.  No.
16      Q.  So she sent the document to you?
17      A.  Yes.
18      Q.  And about how long after your first meeting
19  did she send you this document?
20      A.  It was very soon.  I do not remember dates,
21  but it was soon.
22      Q.  Would you say it was more or less than a week
23  after your meeting?
24      A.  More than a week.
25      Q.  Was it more or less than a month?

18  (Pages 66 to 69)

**Hunton App. 1181**

Jorge Salgado

70

1    MR. SNYDER: Does it really matter?
2    A. Maybe a month possibly.
3    Q. (BY MS. BISHOP) And, Mr. Salgado, do you see
4    at the top of page 1 that it says, "The undersigned
5    requests that Stanford Trust Company, Limited act as
6    trustees"?
7    A. Yes.
8    Q. And do you see that it lists the location of
9    Stanford Trust Company as St. John's, Antigua?
10   A. Yes, but keeping in mind that I thought -- I
11   mean, I was keeping in my mind that everything was
12   located in the United States.
13   Q. And if you'll flip to page 2.
14   A. (The witness complied.)
15   Q. And you'll see the second half of this page is
16   written in English?
17   A. Yes.
18   Q. And do you recall whether you reviewed this
19   language before signing the trust agreement?
20   A. Mary did explain it to me.
21   Q. Did you have the language translated into
22   Spanish?
23   A. No.
24   Q. And do you see paragraph five says that, "This
25   trust is established under the laws of the British

71

1    Virgin Islands and shall be deemed for all purposes to
2    be principally administered in the British Virgin
3    Islands"?
4    A. I can see it.
5    Q. And did you understand at the time that you
6    signed the trust agreement that the trust would be
7    under the laws of the British Virgin Islands?
8    A. Well, let me repeat myself. But everything
9    administrated here in United States, in an office in
10   United States.
11   Q. But did you understand that the trust was
12   established under the laws of the British Virgin
13   Islands?
14   A. It was not relevant. It was not relevant for
15   me there.
16   Q. Did Ms. Bautista tell you that the trust would
17   be established under the laws of the British Virgin
18   Islands?
19   A. No.
20   Q. And on the next page, page 1306, that is your
21   signature?
22   A. Yes.
23   Q. And what did you do after you had signed this
24   trust agreement?
25   MR. SNYDER: Objection, form. You mean

72

1    like did he go to the bathroom or something?
2    MS. BISHOP: Strike the question.
3    Q. (BY MS. BISHOP) Did you send the trust
4    agreement back to Ms. Bautista?
5    A. Yes.
6    Q. And that was after you had signed it?
7    A. Yes.
8    Q. And did you make your investment with Stanford
9    after you had returned the trust agreement to her?
10   A. This document? Yes.
11   Q. And how long after you returned the trust
12   agreement did you make your investment?
13   A. Immediately.
14   Q. And how much money did you invest with
15   Stanford?
16   MR. SNYDER: Objection, form as to time
17   frame. Do you mean at the beginning or overall?
18   MS. BISHOP: So I'll strike that
19   question.
20   Q. (BY MS. BISHOP) Mr. Salgado, how much did you
21   invest with Stanford in your first investment?
22   A. $100,000.
23   Q. And did you invest more money with Stanford
24   after that date?
25   A. Several. Several more.

73

1    Q. And when was the next investment you made with
2    Stanford?
3    MR. SNYDER: Can he look at his
4    documents?
5    A. Several months afterwards when I was able to
6    buy another hundred thousand dollars. But maybe six,
7    seven, eight months, but I do not remember dates.
8    Q. (BY MS. BISHOP) Did you say you invested when
9    you were able to buy another hundred thousand dollars?
10   A. Yes.
11   Q. And what do you mean by "buy"?
12   A. Go to the bank, give pesos, and receive in
13   return dollars.
14   Q. And did you invest any more money with
15   Stanford after that second investment?
16   A. Yes.
17   Q. And when was the next investment after that?
18   A. I don't remember, however, I do remember the
19   last one.
20   Q. And when was your last investment with
21   Stanford?
22   A. It was in 2004 when I was receiving the
23   liquidation from my -- the company, when I was leaving
24   the company, and that was in 2004 and I was receiving
25   the money up to maybe 97 or $98,000.

19 (Pages 70 to 73)

Hunton App. 1182

Jorge Salgado

74

1   Q.  And so you did not invest any money with
2   Stanford after 2004?
3   A.  No, only the renewals.  Nothing new, no
4   "news."
5   Q.  Going back to your first investment, you said
6   that was for a hundred thousand dollars?
7   A.  Yes.
8   Q.  And what was the source of that money?
9   A.  My savings.
10  Q.  And did you take that money from any other
11  investment or was it in cash previously?
12  A.  Well, I had my check account in Sun Trust and
13  then I have in Mexico another kind of investment.
14  Q.  And what was the other kind of investment?
15  A.  In Mexico?
16  Q.  Yes.
17  A.  Well, investments in savings with that due
18  time.  So I changed that in dollars to be able to send
19  it.
20  Q.  Before you invested with Stanford, had you
21  ever purchased any CDs?
22  A.  No.
23  Q.  Had you ever purchased any stocks?
24  A.  A long time before from the old company I was
25  working for, Salinas and Rocha, you know, they went to

75

1   the -- to the market share and they were very high and
2   then they went down very low.  And I was able to buy
3   them for eight pesos each one.  Those had been in the
4   market previously for 151 pesos each.
5   Q.  So how long had you been investing in the
6   stock market before you bought the Stanford CD?
7   MR. SNYDER:  Objection, form.
8   A.  For years.
9   Q.  (BY MS. BISHOP)  And had you ever invested in
10  real estate before you purchased the Stanford CDs?
11  A.  Well, my own house and an apartment for an
12  office.
13  MS. BISHOP:  So I'm about to switch lines
14  of questioning.  I don't know if anybody needs a break
15  for --
16  MR. SNYDER:  Yeah, let's take a break.
17  Sure.
18  THE VIDEOGRAPHER:  We're off the record
19  at 11:09 a.m.
20  (Recess taken.)
21  THE VIDEOGRAPHER:  We're on the record at
22  11:17 a.m.
23  Q.  (BY MS. BISHOP)  Mr. Salgado, can you please
24  take out Exhibit 4 that we discussed earlier, which is
25  your declaration in this case?

76

1   THE INTERPRETER:  Number 4 you said,
2   right?
3   MS. BISHOP:  Yes.
4   A.  Yes.
5   Q.  (BY MS. BISHOP)  Can you please turn to page
6   2, paragraph eight?
7   A.  Yes.
8   Q.  And in this declaration you list three CDs
9   with dates in 2008; is that correct?
10  (Conversation in Spanish between
11  Mr. Snyder and the witness.)
12  MR. SNYDER:  Are you looking at the same
13  document?  Uno, dos, tres.
14  A.  Yes.
15  MS. BISHOP:  And let the record reflect
16  I'm handing the plaintiff what's been marked
17  Defendants' Exhibit 10.
18  A.  Yes.
19  Q.  (BY MS. BISHOP)  And, Mr. Salgado, do you
20  recognize this document?
21  A.  Yes.
22  Q.  And what is this document?
23  A.  This is my investment balance with Stanford.
24  Q.  And are the three CDs that you name in
25  paragraph eight of the declaration reflected in this

77

1   account statement?
2   A.  Should be.  Yes, I can see this amount for
3   111 and something, the other one for 162,106, and then
4   the other one, which is -- the one for 40,270.  Yes,
5   exactly.
6   MS. BISHOP:  And let the record reflect
7   I'm handing the plaintiff what's been marked
8   Defendants' Exhibit 11.
9   Q.  (BY MS. BISHOP)  And, Mr. Salgado, do you
10  recognize what's been marked as Exhibit 11?
11  A.  I'm not able to read anything here.
12  Q.  Can you tell from looking at it what they are?
13  A.  A deposit certificate.  But, no, I do not
14  recognize it.
15  MR. SNYDER:  You should have the separate
16  ones, don't you?
17  MS. BISHOP:  Yeah, we can.
18  Q.  (BY MS. BISHOP)  Do you know if these are the
19  three CDs that are named in your declaration?
20  A.  They're shown here in the previous -- in the
21  previous exhibit, the amounts, yes.
22  Q.  And do you see on the side of the page there's
23  writing that says, "Missing CD, account number 304780"?
24  A.  Yes.
25  Q.  And whose writing is that?

20  (Pages 74 to 77)

Hunton App. 1183

Jorge Salgado

78

1    A.  I don't know.
2    Q.  Did you put this document together?
3    A.  No.
4    Q.  Do you know how it came to be in your files?
5    A.  No.
6         MS. BISHOP:  Let the record reflect I'm
7    handing the witness what's been marked as Defendants'
8    Exhibit 12.
9    A.  Yes.
10   Q.  (BY MS. BISHOP)  And do you recognize this
11   document?
12   A.  No.
13   Q.  Do you see in the top left-hand corner it
14   says, "Certificate of deposit"?
15   A.  Yes.
16   Q.  And that in the top right corner it says
17   "18778"?
18   A.  Yes.
19   Q.  And that underneath the heading, "Stanford
20   International Bank, Limited" it says "Michoacan Trust"?
21   A.  Yes.
22   Q.  And the amount beneath that?
23   A.  Yes.
24   Q.  And is this the first CD that's mentioned in
25   your declaration?

79

1         MR. SNYDER:  In paragraph eight?
2         MS. BISHOP:  Yes.
3    A.  These are automatic renewals from my
4    investment, but it's not something that I will give
5    them instructions or anything.  It was just a renewal.
6    Q.  (BY MS. BISHOP)  So how would a renewal work
7    when you renewed a CD?
8    A.  A phone call with the broker, Mary.
9    Q.  Would Mary call you?
10   A.  Both ways it could be.  But she will be most
11   of the times the one who call me and she will offer me
12   different terms.
13   Q.  And that's before your prior CD expires?
14   A.  Before that.
15   Q.  Did one of you call the other before -- at the
16   end of each CD term?
17   A.  Yes.
18   Q.  Was there ever a time when a CD expired
19   without a phone call between you?
20   A.  No.
21   Q.  And when you had these phone calls, how long
22   would they last?
23   A.  Three minutes, five minutes.
24   Q.  And you said that she would offer you new
25   CD terms?

80

1    A.  Yes.
2    Q.  Was anything else ever discussed on those
3    calls?
4    A.  No.
5    Q.  Did you have to do anything else to renew the
6    CD?
7    A.  No.  Just to agree, just to say yes.  Just to
8    agree, yeah.
9    Q.  Did you send anything in writing?
10   A.  No.
11   Q.  Did she send you anything in writing?
12   A.  Yes.
13   Q.  And what did she send you?
14   A.  My balances.
15   Q.  And was there anything different about the
16   balances she sent you when you were renewing a CD as
17   opposed to normal account statements?
18   A.  It will be different because of the amount,
19   because of the interest, and also a different due date.
20        MS. BISHOP:  Let the record reflect I'm
21   handing the witness what's been marked Defendants'
22   Exhibit 13.
23   A.  Yes.
24   Q.  (BY MS. BISHOP)  And, Mr. Salgado, do you
25   recognize this document?

81

1    A.  Yes.
2    Q.  And what is it?
3    A.  My balance.
4    Q.  And will you flip it over to page 2?
5    A.  Yes.
6    Q.  And do you see in the second box where -- the
7    entry dated 29 March 2007?
8    A.  Let me see, second box?  Yes.
9    Q.  And do you see the description there, "NRWL,"
10   then an amount?
11   A.  Yes.
12   Q.  And is that how the renewals of your CD would
13   be shown in an account statement?
14   A.  Yes.  Yes.  So after the renewal the next one
15   will come with the interest.
16   Q.  Mr. Salgado, did you ever renew -- or withdraw
17   money from your Stanford investments?
18   A.  Yes.
19   Q.  And when did you withdraw money?
20   A.  October of 2008.
21   Q.  And why did you want to withdraw your money at
22   that time?
23   A.  Because the reserves that I had in pesos had
24   been going down, so I need to renew those -- those
25   amounts for my family.

21  (Pages 78 to 81)

Hunton App. 1184

Jorge Salgado

82

1   Q.   And what did you do to withdraw the money?
2   A.   To talk to the broker and just give him
3   instructions, saying for that day, the due day, you
4   need to make a transfer for this bank in Mexico to my
5   own account.
6           MR. SNYDER:   At the maturity date.
7   Q.   (BY MS. BISHOP)   Did you call Ms. Bautista?
8   A.   Yes, and I wrote her.
9   Q.   And what did she say in response to your
10  request to withdraw the money?
11  A.   She told me there was no problem at all and
12  she will send something in writing.
13  Q.   And during the time that you -- that the
14  Michoacan Trust had investments with Stanford, how
15  often did you talk to Ms. Bautista?
16  A.   Every time that I was missing a balance on
17  time or every time that when I have a maturity, I mean,
18  we will talk. I will ask her. I will call her. When
19  it was my birthday and it was my name's day.
20  Q.   About how many times a year would you speak
21  with Ms. Bautista?
22  A.   Six, eight or more.
23  Q.   How long were those conversations?
24  A.   Very short ones, just the greetings, talk
25  about what we needed to talk, and that's it.

83

1   Q.   And what sort of things would you need to talk
2   about on those calls?
3   A.   Just about renewals.
4   Q.   Did she ever tell you anything about the
5   Stanford companies?
6   A.   I remember I did mention it to her when we
7   will hear something about the United States was having
8   problems with the banks. And exactly in 2008 when
9   the -- when the economy in the United States fell down,
10  I talked to her about my investment. And she told me
11  there's no problem. She mentioned we are out of this
12  market.
13  Q.   What market was she talking about?
14  A.   When she was talking about the --
15          MR. SNYDER:   Real estate.
16  A.   -- real estate that had been going down really
17  bad and she said but we did not.
18  Q.   (BY MS. BISHOP)   So Ms. Bautista told you that
19  Stanford was not investing in real estate?
20  A.   Exactly.
21  Q.   And when did that conversation take place?
22  A.   When?
23  Q.   Yes.
24  A.   In 2008 when this problem was coming, when you
25  will hear about the problem in United States. Pretty

84

1   much the same time that I made my withdrawal.
2   Q.   So it would have been in the fall 2008 that
3   your conversation took place with Ms. Bautista?
4   A.   Yes.
5   Q.   And did she tell you anything else about
6   Stanford or your investments on that call?
7   A.   Just to make sure -- assuring me that I was in
8   the best hands.
9   Q.   And about how long did that conversation last?
10  A.   Short. It was always short.
11  Q.   Did Ms. Bautista ever send you any written
12  materials about Stanford after you invested?
13  A.   Just publicity or marketing and my balance.
14          MR. SNYDER:   Well, estado de cuenta
15  really is account statements.
16          THE INTERPRETER:   Oh, okay.
17          MR. SNYDER:   You've been saying balance,
18  I didn't correct you before, but estado de cuenta is
19  account statements.
20          THE INTERPRETER:   Okay.
21  Q.   (BY MS. BISHOP)   How frequently would
22  Ms. Bautista send you publicity and marketing
23  materials?
24  A.   Maybe once or twice a year.
25  Q.   Would you read those materials?

85

1   A.   Well, yes, but if it was something long or
2   something that was not important, I would just flip it
3   over.
4           MR. SNYDER:   Scan it.
5   Q.   (BY MS. BISHOP)   And did you keep those
6   materials?
7   A.   No.
8   Q.   Did anything you read in those materials ever
9   lead you to ask Ms. Bautista questions about your
10  investments?
11  A.   No.
12  Q.   Do you know if Ms. Bautista sent you annual
13  reports from Stanford?
14          THE INTERPRETER:   Let me just clarify.
15  A.   Okay. Yes, she did, but it was not constantly
16  and it will go by certified mail. Oh, I'm sorry, the
17  account statements were certified.
18  Q.   (BY MS. BISHOP)   Did Ms. Bautista ever send
19  you annual reports about the Stanford companies? Not
20  about your investments, but about the companies?
21  A.   Yes, like I told you, like the financial
22  statements from the company.
23  Q.   And how frequently did you receive those?
24  A.   Not every year, maybe two or three times along
25  all the time.

22  (Pages 82 to 85)

Hunton App. 1185

Jorge Salgado

90

1 for you?
2   A.  No.
3   Q.  And if you'll take a look at that first
4 sentence there.  Do you see that it says, "Stanford
5 International Bank, Limited is a private financial
6 institution chartered under the laws of Antigua and
7 Barbuda"?
8   A.  I do understand it now.
9   Q.  And if you had read that language at the time,
10 would it have affected your decision to renew your
11 Stanford CDs?
12   A.  I pay no attention to that.  I give no
13 importance to that.  That's the reason why I kept
14 renewing it.
15   Q.  If you had known that SIBL was chartered under
16 the laws of Antigua and Barbuda, would you have renewed
17 your CDs?
18   A.  Just don't forget, keep in mind that I was
19 always protected.  According to what I knew and
20 according to what my broker told me, I have been
21 protected in the United States.
22   Q.  Mr. Salgado, if you had known that SIBL was
23 chartered in Antigua, would you have renewed your
24 investment?
25   A.  Well, it's because -- yes, I did -- I did know

91

1 about it, but I always thought that this was -- Bermuda
2 (sic) was only like a branch.  But I was protected here
3 in the United States.  That was just something
4 independent from the United States.
5   Q.  And do you see the second half of that
6 sentence that says, "Deposits are not covered by
7 deposit insurance protection provided by U.S. Federal
8 Deposit Insurance Corporation"?
9   A.  But always we go back to the same -- the
10 broker's argument was you are protected a hundred
11 percent in United States.
12   Q.  If you had read that language, would it have
13 caused you to question what your broker was telling
14 you?
15   MR. SNYDER:  Objection, form.
16   A.  Well, let me tell you it's because I always
17 have the same response from her.  Like -- like, for
18 example --
19   MR. SNYDER:  Hold on.
20   A.  Like, for example, in February '9 the problem
21 from Stanford exploded and then I talked to her.  And I
22 said, "What's going" -- and I said, "What's going on?"
23 And she told me, "There is no problem.  That is not
24 true.  Don't go to a lawyer.  The proof of that is that
25 Stanford -- Mr. Stanford is free.  And there is no

92

1 problem."
2   Q.  (BY MS. BISHOP)  So do you believe
3 Ms. Bautista was telling you the truth when she told
4 you that?
5   A.  Well, kind of, like half of it.  Because I had
6 made a withdrawal in October and I didn't have any
7 problem.  And she assure me that there will be no
8 problem.  But then I went to --
9   MR. SNYDER:  Stanford funds.
10   A.  Then I went to the Stanford funds, a branch
11 that they have in Mexico.  And then I did ask them
12 what's going on here.  And then the person who was
13 assisting me recommended me to go and talk to a lawyer,
14 because a notice was coming out.  So I was given some
15 names and I did go to that meeting.
16   And then I talked to my broker and still
17 then she assured me that there was no problem at all.
18 And after that I made like maybe three or four phone
19 calls later after that, but then you see there was no
20 reply.  You will call and then you could go before to
21 the voicemail, but -- but then after that it will say
22 that there was no space for more messages in that phone
23 number.
24   Q.  (BY MS. BISHOP)  Before that time, while you
25 had your investments --

93

1   MR. SNYDER:  Can we clarify the time?
2   Q.  (BY MS. BISHOP)  Before the time you were just
3 discussing in your last answer, in February 2008, when
4 you had your investments, you trusted when Ms. Bautista
5 told you over what you read about Stanford?
6   A.  It was February 2009.  That's when the problem
7 exploded.  But not February 2008.
8   Q.  In October of 2008, when you spoke to
9 Ms. Bautista about your investments and what you had
10 heard about Stanford, you trusted what she told you
11 over what you had heard, right?
12   MR. SNYDER:  Objection, form.  There's no
13 evidence -- there's been no testimony about what he,
14 quote/unquote, heard about Stanford in October 2008.
15 So I object to you trying to mislead this witness.
16 Okay.  Ask your question again.
17   Q.  (BY MS. BISHOP)  Mr. Salgado, you spoke
18 earlier about speaking with Ms. Bautista in October
19 2008 when you were concerned about your investments.
20   A.  Yes, and she did confirm to me that everything
21 was perfect.  And as proof I made the withdrawal and
22 there was no problem.
23   Q.  And you trusted what Ms. Bautista told you on
24 that call?
25   A.  Well, if it hadn't been like a hundred

24  (Pages 90 to 93)

Hunton App. 1186

Jorge Salgado

94

1  percent -- anyhow she has proof, because I have been
2  withdrawing the money. Because I did receive that
3  money.
4      Q. But the thing she told you about your
5  investments on that call weren't true, right?
6      A. Now I've come to realize it, that it was not.
7  But back those days she did assure me that that was
8  true.
9      Q. And did you ever speak to anyone else involved
10  with Stanford besides Mary Bautista? And to clarify my
11  question, did you ever speak with anyone involved with
12  Stanford before February 2nd, 2009?
13         MR. SNYDER: And objection. When you say
14  "involved with Stanford," what do you mean by that?
15  I mean, an investor? Are you talking about an
16  employee? What are you talking about?
17      A. And from where?
18      Q. (BY MS. BISHOP) Did you ever speak to any
19  other brokers affiliated with Stanford before February
20  2009?
21      A. Only this Stanford funds in Mexico and with
22  this employee that is only just there like customer
23  service, you know, trying to find out what's going on,
24  I mean, to the people. But nobody related to finances.
25      Q. And that was in February 2009?

95

1      A. Yes.
2      Q. And do you recall what that person's name was?
3      A. No.
4      Q. Did you ever meet any other Stanford employees
5  prior to February 2009?
6      A. No.
7      Q. And did you ever travel to the United States
8  in connection with your Stanford CD investments?
9      A. No.
10      Q. Did forming a trust have any reporting
11  obligations in Mexico?
12         MR. SNYDER: Objection, form.
13      A. In this case an entity was not created. We
14  just named a name.
15      Q. (BY MS. BISHOP) So how did you report your
16  investment obligation -- or your investment in Stanford
17  CDs on your taxes?
18      A. I will have to report it if I have had a
19  profit, but I had a loss.
20      Q. Did you ever report your investments prior to
21  the collapse of the Stanford entities?
22         MR. SNYDER: Objection, form.
23      A. No.
24         MR. SNYDER: This gentleman did not have
25  the investment in his personal name. You can ask him

96

1  if Michoacan Trust reported it in Mexico. But you're
2  asking him personally is the way I'm understanding your
3  question.
4      Q. (BY MS. BISHOP) Did the Michoacan Trust file
5  any forms with the government of Mexico?
6      A. No.
7      Q. Did the Michoacan Trust ever file tax forms
8  with any government entity?
9      A. No.
10      Q. Did you ever individually report any income
11  that came from the trust?
12         MR. SNYDER: Objection, form.
13      A. When you -- when I was receiving my salary in
14  Mexico religiously, I will have to pay the taxes
15  because the company doesn't give you the exact amount.
16  If I'm making a hundred pesos, they're not going to
17  give me 100 pesos, they're going to give me just the
18  net amount, because the other amount goes straight to
19  the taxes. So once I receive that money, that money
20  belongs to me. That is after taxes.
21      Q. (BY MS. BISHOP) So did you report income from
22  the Michoacan Trust as part of your personal taxes?
23         MR. SNYDER: Objection, form. Assumes
24  facts not in evidence.
25      A. But I didn't receive any profit. I lost.

97

1      Q. (BY MS. BISHOP) So did you ever report the
2  interest that the Michoacan Trust earned during the
3  time period of your investments?
4         MR. SNYDER: Objection, form.
5      A. Well, you have a profit when you obtain
6  something, but I never got anything. It was just in
7  paper.
8         MS. BISHOP: I think now is a good time
9  for a lunch break if you agree.
10         MR. SNYDER: No, I think we keep going.
11         MS. BISHOP: Okay.
12         MR. SNYDER: Take your lunch break at
13  12:30 or 1:00. How much longer do you have? We can
14  take a short break if y'all need to take a break short.
15         MR. VAIL: Let's take a short break. I
16  need to do a quick call.
17         MR. SNYDER: Okay.
18         THE VIDEOGRAPHER: We're off the record
19  at 12:03.
20         (Recess taken.)
21         THE VIDEOGRAPHER: We're on the record at
22  12:05.
23         MS. BISHOP: Let the record reflect I'm
24  handing the witness what's been marked Defendants'
25  Exhibit 15.

25 (Pages 94 to 97)

**Hunton App. 1187**

Jorge Salgado

102

1 "According to the company records"?
2   **A. Uh-huh.**
3   Q. And then it says, "You have received
4 preference payments of U.S. dollars, 143,921.13, which
5 must be -- which we require to be repaid to the
6 estate"?
7   **A. But I don't understand it.**
8        MR. SNYDER: Hold on. She's translating
9 estate as the state. If you can use a different word
10 than estate, because there is no translation for estate
11 in Spanish. She's translated it as the state, like
12 he's got to pay some government.
13        MS. BISHOP: It's the language of the
14 letter, so --
15        MR. SNYDER: Well, I understand that, but
16 if you want him to answer the question, you need to
17 help the translator.
18   Q. (BY MS. BISHOP) Do you recall being asked by
19 the joint liquidators to return money to them?
20   **A. Yes. I did receive a notice, yes.**
21   Q. And did you return money to the joint
22 liquidators?
23   **A. I didn't have the money. I couldn't return**
24 **the money.**
25   Q. If you had the money, would you return it?

103

1   **A. No. It was my money.**
2   Q. Why wouldn't you return it?
3   **A. Well, because I had invested 300 and something**
4 **thousand dollars and on top of that I have received**
5 **some profits. So the withdrawal that I had made was my**
6 **money and that money didn't belong to anybody in this**
7 **world. I demand for the rest of the money.**
8   Q. Do you understand why the joint liquidators
9 asked you to return that money?
10        MR. SNYDER: Objection, form.
11   **A. I don't know on what grounds they asked me**
12 **that.**
13   Q. (BY MS. BISHOP) Do you see in paragraph two
14 of this letter, the second sentence?
15   **A. Yes.**
16   Q. It states, "We consider that these payments
17 were unfairly prejudicial to the other creditors"?
18   **A. And I don't see any reason for that, because I**
19 **never took one peso from anybody.**
20   Q. So turning back to the exhibits before this,
21 the first letter from the joint liquidators and the
22 notice of determination from the receiver, which would
23 be Exhibit --
24        THE INTERPRETER: What is the number?
25        MS. BISHOP: 16 and 15.

104

1        (Discussion out of the hearing of the
2 reporter.)
3        MS. BISHOP: 15 and 16, right.
4   **A. Okay.**
5   Q. (BY MS. BISHOP) And the amount on Exhibit 15,
6 179,286.12, is the amount allowed by the joint
7 liquidators; is that right?
8   **A. No. No, this is the amount -- okay, from the**
9 **total amount that I invested, I withdraw what I did**
10 **withdraw and this is the difference of that amount.**
11   Q. Mr. Salgado, have you seen any documents in
12 your Stanford related file that mentioned Hunton &
13 Williams?
14        THE INTERPRETER: What's the first name?
15        MS. BISHOP: It's the law firm Hunton
16 & Williams.
17   **A. Hunton, yes.**
18   Q. (BY MS. BISHOP) What documents are those?
19   **A. Well, the documents have been prepared by my**
20 **lawyer along with the rest of the group and all the**
21 **lawsuit -- what is this lawsuit going to.**
22        MR. SNYDER: I think you need to refine
23 your question.
24   Q. (BY MS. BISHOP) Before February 2009, had you
25 ever seen the name Hunton & Williams on any of your

105

1 Stanford related documents?
2   **A. No, I don't think so. I don't remember that.**
3   Q. And before February 2009 had you ever seen the
4 name Carlos Loumiet on any of your Stanford related
5 documents?
6        MR. SNYDER: Carlos Loumiet.
7   **A. No.**
8   Q. (BY MS. BISHOP) And before February 2009, did
9 you ever have any conversations with any attorneys from
10 Hunton & Williams?
11   **A. No.**
12        MS. BISHOP: And I think at this point
13 we're ready to take a break and pass it over to
14 Greenberg.
15        MR. SNYDER: Okay. You're passing the
16 witness?
17        MS. BISHOP: Yes.
18        MR. SNYDER: Okay.
19        THE VIDEOGRAPHER: We're off the record
20 at 12:21.
21        (Recess taken.)
22        THE VIDEOGRAPHER: We are on the record
23 at 1:14 p.m.
24
25

27 (Pages 102 to 105)

Hunton App. 1188

Jorge Salgado

106

```
1              EXAMINATION
2   BY MR. ISRAELOFF:
3       Q.  Good afternoon, Mr. Salgado.  Very nice to
4   make your acquaintance.  And let me say before we get
5   started I'm very sorry for your loss with the Stanford
6   investment trusts.
7       A.  Well, this is about a group, you know, in
8   favor --
9       Q.  Oh, I'm sorry.
10      A.  -- for a group, yeah.
11      Q.  I'm sorry for your loss.
12      A.  That's no problem.
13      Q.  All right.  Thank you.  Did I understand you
14  to say you worked with Royal Holiday Club?
15      A.  Yes, for ten years.
16      Q.  What was your job at Royal Holiday Club?
17      A.  Treasury director or director of treasury.
18      Q.  All right.  What is Grupo Costamex?
19      A.  Okay.  Royal Club is a group that sells
20  memberships and he gives the concession to
21  Grupo Costamex.
22      Q.  Did you have a job at Grupo Costamex?
23      A.  Let's say that Costamex was like the boss, you
24  know, the head of this.  And Royal will give the
25  concession to Costamex to sell all the memberships, so
```

107

```
1   I was really an employee of Costamex.  I was working
2   for them.
3       Q.  Thank you.  Was your career in the field of
4   treasury or finance?
5       A.  Yes, sir, I'm an accountant and before that I
6   worked for 30 years for -- 38 years for Salinas and
7   Rocha.
8       Q.  What is Salinas and Rocha?
9       A.  It's a commercial group dedicated mainly to
10  the sale of furniture.
11          (Interruption by the reporter.)
12          THE INTERPRETER:  Yes, furniture.
13      Q.  (BY MR. ISRAELOFF)  Were you in the treasury
14  area of Salinas and Rocha?
15      A.  Yes.  So at the beginning I start working as a
16  salesman just for a short time.  That was the idea that
17  I have to make money.  But it was just for a short
18  time, it was supposed to be just for the Christmas
19  break until January the 6th.  But then there was a need
20  to fill this position as an auxiliary for accountant
21  and they named me for that position.  That's when I
22  realized that I needed to study the whole accounting
23  career.
24      Q.  Did you study accounting at university?
25          MR. SNYDER:  And, Sim, I know you weren't
```

108

```
1   here, man, but all these questions -- he's already
2   testified about all the background -- I know you
3   weren't here, but --
4           MR. ISRAELOFF:  Sorry.
5           MR. SNYDER:  -- it's already in the
6   record.
7       A.  Yes, this college Politecnico Nacional.
8           THE INTERPRETER:  And I'll give it to you
9   later.  Okay?
10      Q.  (BY MR. ISRAELOFF)  Very well.  Thank you.
11  When you first purchased the CDs from Stanford, did you
12  have a purpose in mind, a goal?
13      A.  Well, yes, it was for the goodwill of my
14  family and also to have a savings account in dollars.
15  So when the time will come there will be enough funds
16  to pay a Master's degree for my grandson out of the
17  country.
18      Q.  All right.  That first investment was for a
19  hundred thousand dollars?
20      A.  Exactly.
21      Q.  And did you leave that first investment in the
22  Stanford CDs all the way until 2009?
23      A.  All the time and it was incremented.
24      Q.  The interest earnings stayed in the CD?
25      A.  Well, yes, but then I made a total investment
```

109

```
1   for around $314,000.
2       Q.  Yes, sir.  Let's take them one investment at a
3   time, and then we'll get to the total.
4       A.  Okay.
5       Q.  That first investment of a hundred thousand
6   dollars, did it continue to roll over until 2009?
7       A.  Yes, every time that they will be mature, it
8   will have those interests accumulated and then it will
9   be renewed.
10      Q.  This morning you said it was an automatic
11  rollover; is that correct?
12      A.  Well, yes -- well, let me explain to you.
13  Like at the beginning I said we didn't have any kind of
14  documents exchange.  Okay?  I would just give the
15  instructions.  And that's what I said, that it will go
16  automatically.  Because once it was mature it will go
17  again to a renewal.
18          MR. SNYDER:  And he added that I never
19  took out the money -- got the money and then put it
20  back in.
21      Q.  (BY MR. ISRAELOFF)  All right.  Thank you.
22  Now, I understand that you left Grupo Costamex in 2004?
23      A.  Exactly.
24      Q.  And you got some sort of liquidation at that
25  time?
```

28  (Pages 106 to 109)

Hunton App. 1189

Jorge Salgado

110

1    A.  Yes.
2    Q.  Did you invest all of that liquidation in
3  Stanford CDs?
4    A.  Everything, yes, all.
5    Q.  Is that the second time that you made an
6  investment in Stanford CDs, 2004?
7    A.  No, there was the last one and the third one.
8    Q.  What was the second one?
9    A.  It was 2004 in October.
10   Q.  The first investment was 2001?
11   A.  2001.
12   Q.  The second investment was when?
13   A.  October 2001.
14   Q.  Thank you.
15   A.  So there was another extra 100,000 that made
16  200,000.
17   Q.  And the third investment was 2004?
18   A.  Along -- I mean, ten months I was receiving
19  $10,000 every month from my liquidation and they were
20  putting that money there.
21   Q.  Were there any other times when you invested
22  money into the Stanford CDs?
23   A.  I don't remember.  New money, no, no.  I have
24  this idea that maybe there were 14 or 15,000 more
25  dollars, but I don't have an idea about the date.  I'm

111

1  not sure.
2    Q.  Did you keep all of your records about this
3  investment in that notebook?
4    A.  The statements, the account statements, I was
5  keeping everything where they were informing me how
6  much money I was getting or what I had.
7    Q.  Just for our record, could I get you to hold
8  up the notebook so that they can see it on camera,
9  please?
10   A.  Like this?
11   Q.  Absolutely.  Thank you.
12   A.  Thank you.
13   Q.  Did you also keep in that notebook a copy of
14  the contract for the trust?
15   A.  Yes.
16   Q.  Do you think it is important to keep copies of
17  all the contracts that you signed with Stanford?
18   A.  Yes.
19   Q.  Could you please take the contract out of the
20  copy in front of you?  It's Number 9.
21       THE INTERPRETER:  Are you talking about
22  this stack of papers or --
23       MR. ISRAELOFF:  Yes.
24       THE INTERPRETER:  -- his own --
25       MR. ISRAELOFF:  No, these.

112

1    A.  Number 9.
2    Q.  (BY MS. ISRAELOFF)  Thank you.  What did you
3  understand was going to work -- how the trust was going
4  to work?
5       MR. SNYDER:  Objection, form.
6    A.  Well, I will make an investment for a certain
7  period of time for a certain money for certain
8  interest, so I will have certain amount at the end of
9  that period.
10   Q.  (BY MR. ISRAELOFF)  What did you understand
11  the trust was supposed to do with you?
12   A.  The reason -- what was my wish for that trust
13  or why I wanted that money for or what is your
14  question?
15   Q.  How was the trust going to be different than a
16  bank account in your name?
17       MR. SNYDER:  As he understood it or what
18  was told to him?
19   A.  Well, actually the investment, I wanted to do
20  it under my name, but then the broker told me that it
21  had to be under the trust name.
22   Q.  (BY MR. ISRAELOFF)  How did you understand the
23  difference between an account in your name and an
24  account in the trust's name?
25   A.  That -- the difference will be the money that

113

1  will be charged for managing the trust and they
2  wouldn't charge me any money.
3    Q.  Do you understand what a trust is in general?
4    A.  Yes.
5    Q.  What is your understanding of what a trust is
6  in general?
7    A.  I give instructions to the trust, and even if
8  I'm not there any longer, the trust will carry out my
9  wishes and they will keep doing that and that's their
10  duty.
11   Q.  Is that what you thought the Stanford trust
12  was going to do?
13   A.  In case that I will pass away, yes.
14   Q.  Who did you understand was going to be the
15  trustee in this Stanford case?
16   A.  Will you please ask your question again?  I do
17  not understand.
18   Q.  Who was the trustee when you bought Stanford
19  CDs?
20       MR. SNYDER:  No, I think that's a
21  translation issue.
22       (Conversation in Spanish between
23  Mr. Snyder and the witness.)
24   A.  And it was Stanford.
25   Q.  (BY MR. ISRAELOFF)  Who is the trustee of your

29  (Pages 110 to 113)

Hunton App. 1190

Jorge Salgado

126

```
1      Q.  So you have a claim against the brokers?
2      A.  Well, not only from my broker, but the whole
3  group.
4      Q.  Your broker worked for Stanford, correct?
5      A.  She worked for Stanford.  She did.
6      Q.  Is that part of the group that you think is
7  responsible?
8      A.  That's what I think, but, however, the
9  authorities are the ones who are going to decide.
10         MR. ISRAELOFF:  Thank you.  That's all
11  the questions I have.  Thank you very much.
12         THE WITNESS:  That's all?
13         MR. SNYDER:  Thank you, guys.  Thank you,
14  guys.  Y'all get an earlier flight?  Good.  Awesome.
15         THE VIDEOGRAPHER:  Off the record?  We're
16  off the record at 2:07.
17
18
19
20
21
22
23
24
25
```

128

```
1         I, JORGE SALGADO, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6         _____
           JORGE SALGADO
7
8
9  THE STATE OF _____ )
10  COUNTY OF        _____ )
11         Before me, _____, on this day
12  personally appeared JORGE SALGADO, known to me (or
13  proved to me under oath) or through _____
14  (description of identity card or other document) to be
15  the person whose name is subscribed to the foregoing
16  instrument and acknowledged to me that they executed
17  the same for the purposes and consideration therein
18  expressed.
19         Given under my hand and seal of office this
20  _____ day of _____, 2015.
21
22
23         _____
24         NOTARY PUBLIC IN AND FOR
           THE STATE OF _____
           MY COMMISSION EXPIRES:
25
```

127

```
1         CHANGES AND SIGNATURE
2  WITNESS NAME:              DATE OF DEPOSITION
3  JORGE SALGADO         December 4, 2015
4  PAGE    LINE    CHANGE       REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

129

```
1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION
3  RALPH S. JANVEY, et al.,      )
                                 )
4      Plaintiffs,        )
                                 )
5  vs.               ) CIVIL ACTION
                     ) NO.
6  GREENBERG TRAURIG, LLP, HUNTON &  ) 3:12cv-4641-N
   WILLIAMS, LLP; and YOLANDA      )
7  SUAREZ,                  )
                           )
8      Defendants.        )
9
10     REPORTER'S CERTIFICATION
       ORAL DEPOSITION OF JORGE SALGADO
11         December 4, 2015
12  I, Jeff L. Foster, certified shorthand reporter
13  in and for the State of Texas, do hereby certify to the
14  following:
15      That the witness, JORGE SALGADO, was duly sworn by
16  the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19      I further certify that pursuant to FRCP Rule
20  30(f)(1) that the signature of the deponent:
21     _X__ was requested by the deponent or a party
22  before the completion of the deposition and returned
23  within 30 days from date or receipt of the transcript.
24  If returned, the attached Changes and Signature Page
25  contains any changes and the reasons therefor;
```

33 (Pages 126 to 129)

Hunton App. 1191

Jorge Salgado

```
                                                    130
 1        ____ was not requested by the deponent or a party
 2   before the completion of the deposition.
 3        I further certify that I am neither attorney or
 4   counsel for, nor related to, nor employed by any of the
 5   parties to the action in which this testimony was
 6   taken.
 7        Further, I am not a relative or employee of any
 8   attorney of record in this cause, nor do I have a
 9   financial interest in the action.
10        Subscribed and sworn to on this 7th day of
11   December, A.D., 2015.
12
13
14        Jeff L. Foster, CSR, RMR, CRR
          Texas CSR No. 5434
15        Expiration Date: 12/31/2016
          DepoTexas, Inc.
16        DepoTexas Firm Registration No. 459
          6500 Greenville Avenue, Suite 445
17        Dallas, Texas 75206
          (214) 373-4977
18
19
20
21
22
23
24
25
```

DepoTexas, Inc.

Hunton App. 1192

# EXHIBIT 20

Samuel Troice

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION


RALPH S. JANVEY, ET AL.,     *
                              *

     Plaintiffs,         *
                              *

VS.                   *    CIVIL ACTION NO.
                              *      3:12cv4641-N

GREENBERG TRAURIG, LLP;    *
HUNTON & WILLIAMS, LLP; AND*
YOLANDA SUAREZ,         *
                              *

     Defendants.        *

*********************************
ORAL AND VIDEOTAPED DEPOSITION OF
SAMUEL TROICE
DECEMBER 14, 2015
*********************************

         ORAL AND VIDEOTAPED DEPOSITION of

SAMUEL TROICE, produced as a witness at the instance of

the Defendants Greenberg Traurig, LLP, and Hunton &

Williams, LLP, and duly sworn, was taken in the

above-styled and numbered cause on the 14th day of

December, 2015, from 8:36 a.m. to 11:12 a.m., before

Brenda R. Gardner, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of

Strasburger & Price, LLP, 901 Main Street, Suite 4400,

in the City of Dallas, Dallas County, Texas, pursuant

to the Federal Rules and the provisions stated on the

record or attached hereto.

Hunton App. 1193

Samuel Troice

**14**

1  spent in this litigation.
2     A.   Three years ago, approximately, I traveled
3  to Houston, and it was for a mediation, and it was
4  about this case.  So we had two days for mediation, and
5  one day traveling, and for this day --
6       MR. SNYDER:  For this case.
7     A.   -- for this case that, you know, we are
8  here, I have been using two days; and then, more or
9  less, through one month of being -- talking to my
10  lawyer, I could gather like maybe two or three more
11  days, complete days.
12     Q.   (BY MS. BISHOP) Did you review the
13  complaint in this litigation before it was filed?
14     A.   Yes.
15     Q.   How much time would you estimate that you
16  spent on that?
17     A.   Well, to read it and to understand it
18  correctly, if I can start adding hours, I could make
19  24 hours.  You know, it's very difficult for me to give
20  you an answer to that, because I do work, so I have to
21  do that in different hours, so it's difficult.
22     Q.   When you receive documents in this case, do
23  you review them in English or Spanish?
24     A.   English.
25     Q.   Did you review interrogatory responses in

**15**

1  this case?
2     A.   Yes.
3     Q.   About how long did you spend reviewing those
4  responses?
5     A.   I don't know, ma'am.  I mean, if I put time,
6  if I put hours in this case, I mean...
7     Q.   Do you have an estimate for how long you
8  spent specifically on the interrogatories?
9     A.   Okay.  I swear to tell you the truth, right,
10  so I cannot give you an estimate time when I am not
11  sure whether it's true or not.
12     Q.   Do you have an estimate of whether it was
13  more than an hour?
14     A.   Yes.
15     Q.   Do you know who the other class repre- --
16  the other individuals seeking to serve as class
17  representatives in this lawsuit are?
18     A.   I do not know them physically, but I know
19  who they are.
20     Q.   Who are they?
21     A.   Pam Reed, and Michoacan Trust.
22     Q.   Do you know who the representative for the
23  Michoacan Trust is?
24     A.   I don't remember the name, his name, but I
25  know he was under a company, a company with the name of

**16**

1  Trust -- Michoacan Trust.
2     Q.   Have you ever corresponded with either of
3  the other class representatives?
4       MR. SNYDER:  And objection, form.  Are
5  you talking about without the presence of counsel on
6  the e-mail chain or with the presence of counsel on the
7  e-mail chain?
8     Q.   (BY MS. BISHOP) With the presence but not
9  revealing any privileged information from your
10  attorney.
11     A.   In the e-mails chain, we have been.  But
12  directly -- but directly, between one of them and
13  myself, no.
14     Q.   Mr. Troice, what countries are you a citizen
15  of?
16     A.   Mexico and United States.
17     Q.   And when did you become a citizen of the
18  United States?
19     A.   It's been seven or eight years.  I do not
20  remember exactly the date.
21     Q.   Have you ever had your primary residence in
22  the United States?
23     A.   It's been like maybe 30 years ago, and it
24  was only for four years.
25     Q.   How much time do you spend in the United

**17**

1  States on a yearly basis?
2     A.   If I can add the whole year, no more than
3  15 days, or 20.
4     Q.   Are you married?
5     A.   Yes.
6     Q.   Where is your wife's primary residence?
7     A.   Mexico.
8     Q.   Has she ever lived in the United States?
9     A.   Yes.
10     Q.   Has she lived in the United States since
11  1995?
12     A.   No.
13     Q.   Did you ever come to the United States in
14  connection with your Stanford CDs?
15       MR. SNYDER:  Objection, form, as to
16  what that means.
17     Q.   (BY MS. BISHOP) You can answer the question
18  if you understand.
19     A.   If I came specifically to Stanford?  No.
20     Q.   Mr. Troice, I understand that you worked
21  with a broker in relation to your Stanford CDs named
22  David Nanes.
23       THE INTERPRETER:  David?
24       THE WITNESS:  (In English) Nanes.
25       THE INTERPRETER:  "Anes"?

**5 (Pages 14 to 17)**

Hunton App. 1194

Samuel Troice

**18**

1    THE WITNESS: (In English) Nanes.
2    A.   Yes.
3    Q.   (BY MS. BISHOP)  How did you meet Mr. Nanes?
4    A.   Through different relations, and that's
5    among the Jewish community in Mexico, and someone
6    introduced me to him.
7    Q.   Do you remember who that person was?
8    A.   No, it's just among friends.  You know, one
9    friend introduce you to someone else.  So who did it?
10   No, I don't know.  Someone specifically that would take
11   me with him?  No, I don't remember.  Maybe was during a
12   party or in a meeting, and then later on Mr. Nanes call
13   me for an appointment.
14   Q.   During the time you invested in Stanford
15   CDs, did you know any other people who were investing
16   in Stanford CDs through Mr. Nanes?
17   A.   Yes.
18   Q.   About how many people?
19   A.   Many.
20   Q.   Do you have an estimate of about how many?
21   A.   No.
22   Q.   Do you know if it was more than 50?
23   A.   I don't think so.
24   Q.   Was it more than 20?
25   A.   Okay.  You want to know if I know them or if

**19**

1    I meet them?
2    Q.   If they are people that you know.
3    MR. SNYDER:  Like friends or
4    something?
5    MS. BISHOP:  Yes.
6    MR. SNYDER:  Or a business
7    acquaintance?
8    A.   I don't think it's more than 20.
9    Q.   (BY MS. BISHOP)  Did you ever recommend to
10   other people that they work with Mr. Nanes?
11   A.   Not directly.
12   Q.   Did you recommend that people work with
13   Mr. Nanes indirectly?
14   A.   Not to recommend.  I mean, we were good
15   friends with Nanes, and if someone will ask me if it
16   was a good bank, I would say yes, but not to recommend.
17   Q.   How many people asked you if the Stanford
18   CDs were a good buy during the time you were investing?
19   A.   Well, I couldn't tell you how many people.
20   You see, sometimes you have conversations over a coffee
21   or you're talking sometimes about politics or sometimes
22   other business, so I couldn't tell you.
23   Q.   Would you estimate that people asked you
24   whether to invest in Stanford CDs more than five times?
25   A.   Yes.

**20**

1    Q.   More than ten times?
2    A.   Yes.
3    Q.   More than 20 times?
4    A.   I don't remember.
5    Q.   How often did you meet with Mr. Nanes during
6    the time you were investing?
7    A.   Possible, more or less between 30 and 45,
8    every 40 -- 30 or 45 days.
9    Q.   Where did those meetings take place?
10   A.   In a restaurant, to have breakfast, or in
11   his offices.
12   Q.   Did any of those meetings ever take place in
13   the United States?
14   A.   No, none.
15   Q.   Did you ever meet any other Stanford
16   employees while you were investing?
17   A.   Yes.
18   Q.   Who are those other employees?
19   A.   Galia Chiquiar.  And the assistants, I do
20   not remember their names.  You know, the kind of people
21   that would receive the phone calls, would take the
22   message, or would send information.
23   Q.   Did you meet any other employees?
24   A.   Well, to go to the office and meet people,
25   you know, just because I was in the office, yes.  But

**21**

1    just like to know names or anything else, no.  Like how
2    the lady here at the reception desk, so she -- she
3    remembers me from -- from February, so she says "hello"
4    to me and I say "hello" to her, and that's it.
5    Q.   Did you ever meet any other brokers?
6    A.   No.
7    Q.   Did Mr. Nanes ever offer to take you on a
8    trip to Antigua?
9    A.   He did not.  No, he didn't.
10   Q.   Did someone else?
11   A.   No.  To take me to Antigua, no.  But I did
12   go once to Antigua.
13   Q.   When did --
14   A.   I'm sorry, I was about to answer, so...
15   Q.   When did you go to Antigua?
16   A.   Maybe like 17 years ago.
17   Q.   Was that before or after you had invested in
18   Stanford CDs?
19   A.   After.
20   Q.   Why did you go?
21   A.   I have a business, a painting business, in
22   Mexico, a manufacturer of paint.  So I do export to
23   Central American and the Caribbean.  So I did ask David
24   Nanes how was the business of paints in Antigua.  So he
25   made appointments with different companies, paint

**6 (Pages 18 to 21)**

Hunton App. 1195

Samuel Troice

**22**

1    companies, in Antigua, just to see if we were able to
2    sell them. So I went to have different meetings on
3    business for paint.
4        Q.   Were you able to sell any paint during that
5    trip?
6        A.   Unfortunately, I did not.
7        Q.   Was there -- strike that.
8             Did you do anything related to your
9    Stanford CD investments while you were in Antigua?
10       A.   No, I didn't do anything. I just had dinner
11   with one of the bank's executives, but we didn't talk
12   about any topic. He just gave me the names of these
13   paint companies, and he gave me instructions of how to
14   get there.
15       Q.   When you say you had dinner with a "bank"
16   executive, is that a Stanford International Bank
17   executive?
18       A.   Yes.
19       Q.   Do you remember his name?
20       A.   No.
21       Q.   Do you remember his position?
22       A.   No.
23       Q.   How long --
24       A.   I don't know whether he was a director; I
25   don't know whether he was an employee. I don't know.

**23**

1        Q.   Did Mr. Nanes or anyone else from Stanford
2    pay for any portion of that trip?
3        A.   No, nothing.
4        Q.   Have you ever visited any of Stanford's
5    offices in any country other than Mexico?
6        A.   Yes.
7        Q.   Where?
8        A.   Houston and Miami.
9        Q.   And how many times did you visit Stanford's
10   offices in Houston?
11       A.   Once.
12       Q.   How many times did you visit Stanford's
13   operations in Miami?
14       A.   Once.
15       Q.   Did Mr. Nanes ever offer to take you on any
16   trips anywhere other than Antigua?
17       A.   He never offered to me to go to any place,
18   nor to go to Antigua. The one to Antigua, it was about
19   the paints, and it was for my part, the -- the
20   question.
21       Q.   Why did you decide to invest in Stanford
22   CDs?
23       A.   Because they had a very personalized
24   service.
25            Well, number one, because of the

**24**

1    customer service they have, because it's very easy to
2    do different operations. I mean, the investments, they
3    will be much easier. It was much easier -- it was
4    easier -- it was like a smaller bank. And they -- and,
5    also, the percentage, they were paying 1 percent more.
6    It was not that much more, but it was very easy to work
7    with them.
8        Q.   After Stanford collapsed, you submitted a
9    claim to the U.S. receiver; is that right?
10       A.   Yes.
11            (Deposition Exhibit 1 marked.)
12            MS. BISHOP: Let the record reflect I
13   am showing the witness what's been marked Defendants'
14   Exhibit 1.
15       Q.   (BY MS. BISHOP) Mr. Troice, do you
16   recognize this document?
17       A.   Yes.
18       Q.   What is this?
19       A.   I'm showing here, I am presenting here my
20   numbers, my CD numbers, the amount, the lost amount,
21   and that's when I am stating everything relating to the
22   lawsuit.
23       Q.   And this document is titled Notice of
24   Determination; is that right?
25       A.   Yes.

**25**

1        Q.   And it's dated February 22nd, 2013?
2        A.   Yes.
3        Q.   And if you will flip to the second page,
4    which is labeled P6, the fifth column states "Allowed
5    Claim Amount." And do you see the amount there?
6        A.   Yes.
7        Q.   And after you received this notice of
8    determination, did you file any sort of objection with
9    the receiver?
10       A.   Yes.
11       Q.   What was that objection?
12       A.   The difference between the claim amount and
13   the amount that they state in there.
14       Q.   Did the receiver respond to your objection?
15       A.   I don't remember his answer, but I know that
16   the amount they state was the one that is on the fifth
17   column.
18            (Deposition Exhibit 2 marked.)
19            MS. BISHOP: Let the record reflect I
20   am handing the witness what's been marked Defendants'
21   Exhibit 2.
22       Q.   (BY MS. BISHOP) Mr. Troice, do you
23   recognize this document?
24       A.   Yes.
25       Q.   And what is this?

7 (Pages 22 to 25)

Hunton App. 1196

Samuel Troice

---

**26**

1    A.  It is a second claim where the names of my
2 sister have been removed, and then the amount goes
3 down, because for any problem and mistake, they had
4 included --
5          THE INTERPRETER: I'm sorry.
6    A.  -- they had included my sister's amounts of
7 my sister's accounts.
8    Q.  (BY MS. BISHOP) Did you ask the receiver to
9 take out your sister's accounts?
10   A.  Yes.
11   Q.  And have you received any additional letters
12 from the receiver since this notice of determination?
13   A.  No.
14   Q.  Have you filed any objections to this notice
15 of determination?
16   A.  From this second one, no.
17   Q.  Do you plan to file any objections?
18   A.  No.
19   Q.  Why not?
20   A.  Because the amount that is stated there is,
21 more or less, correct after removing the amounts of my
22 sister's.
23       (Deposition Exhibit 3 marked.)
24       MS. BISHOP:  Let the record reflect I
25 am handing the witness what's been marked Defendants'

---

**27**

1 Exhibit 3.
2    Q.  (BY MS. BISHOP) Do you recognize this
3 document?
4    A.  Yes.
5    Q.  And what is this?
6    A.  This is the amount that has been claimed;
7 it's a liquidation.
8    Q.  And this is addressed to Lois S.?
9    A.  Yes.
10   Q.  Who is that?
11   A.  Lois is my wife.
12   Q.  The address on this is in San Antonio,
13 Texas. Do you know why that address is used as a
14 mailing address?
15   A.  Uh-huh.  Yes.
16   Q.  Why?
17   A.  This is my lawyer's office.
18   Q.  And do you see on the second line of the
19 letter, it states an allowed claim amount?
20   A.  Yes.
21   Q.  And that amount is $1,610,940?
22   A.  Yes.
23   Q.  And if you will take a look at Exhibit 2 and
24 compare that number with the allowed claim amount in
25 column 5, --

---

**28**

1    A.  Yes.
2    Q.  -- those numbers are different, right?
3    A.  Yes.
4    Q.  Do you know why they are different?
5    A.  No.
6    Q.  Mr. Troice, did the joint liquidators ask
7 you to repay something called a "preference payment"?
8          THE INTERPRETER:  Sorry, the last --
9 the last question?
10         MS. BISHOP: "Preference payment."
11         MR. SNYDER:  She didn't get the
12 translation right.  I think the better way would be to
13 ask if they asked you to return money to them.
14   Q.  (BY MS. BISHOP) Mr. Troice, did the joint
15 liquidators ask you to return money to them for
16 something called a "preference payment"?
17   A.  From -- the liquidators from Antigua, yes.
18   Q.  And in reviewing your deposition testimony
19 in Proskauer, you said at that time that you did not
20 plan to return the money; is that correct?
21   A.  Correct.
22   Q.  Is that still your position today?
23   A.  Yes.
24   Q.  Have you had any further correspondence with
25 the joint liquidators since your last deposition about

---

**29**

1 that preference payment?
2    A.  No.
3    Q.  Do you understand why the joint liquidators
4 asked you to repay that money?
5    A.  My understanding is, like, if someone had
6 withdrawn money six months before the problem -- before
7 the problem, that, you know, we would have to return
8 the money.  And I really don't understand the reason
9 why.  At the end, you know, they kept all my money.
10   Q.  If the receiver asked you to repay that
11 money, would you repay it to the receiver?
12         MR. SNYDER:  Objection, form.  Calls
13 for speculation.
14   A.  No, because I don't have it.
15   Q.  (BY MS. BISHOP) If you had the money, would
16 you return it?
17         MR. SNYDER:  Objection, calls for
18 speculation.
19   A.  No.  That is my money.  There's no reason
20 why I have to return the money.
21   Q.  (BY MS. BISHOP) Have you received any
22 recovery checks from the joint liquidators?
23   A.  One, yes.
24         MR. SNYDER:  She didn't say "the
25 Antigua"; she just said "the joint liquidators."

---

8  (Pages 26 to 29)

Hunton App. 1197

Samuel Troice

**38**

1 presented a claim for compensation for at least a part
2 of my claim amount from one or more sources distinct
3 from the receivership."
4     Q.   (BY MS. BISHOP)  And why did you check that
5 box?
6     A.   **Because I filed the compensation claim.**
7     Q.   Are you saying that you checked the box
8 because you filed the compensation claim with the joint
9 liquidators?
10    A.   **Yes.**
11    Q.   Are there any other reasons that you checked
12 that box?
13    A.   **No.**
14         MR. SNYDER:  I mean, other than the
15 three lawsuits that we're talking about?
16         MS. BISHOP:  Yes.  We have those in
17 the record.
18         MR. SNYDER:  Okay.
19    Q.   (BY MS. BISHOP)  Mr. Troice, did you review
20 your documents in preparation for this lawsuit?
21    A.   **Yes.**
22    Q.   And you provided Mr. Snyder copies of those
23 documents?
24    A.   **Well, the documents are prepared by the**
25 **lawyer and then he gives it to me to review them, and**

**39**

1 we reviewed them together.
2     Q.   Did you review your files in preparation for
3 this lawsuit?
4     A.   **Which file?  All the documents are prepared**
5 **by my lawyer, as I stated before.**
6          MR. SNYDER:  I think you're talking
7 about his account statements and stuff, right?
8          MS. BISHOP:  Right.
9     Q.   (BY MS. BISHOP)  Mr. Troice, as part of this
10 lawsuit, did you go through your Stanford-related file?
11    A.   **Yes.**
12    Q.   Do you recall seeing any documents with the
13 name Hunton & Williams in that file?
14    A.   **Yes, I do remember those names.**
15    Q.   What documents were those names on?
16    A.   **I don't remember.  Insurance companies.**
17         MR. SNYDER:  No, but she's asking
18 specifically about Hunton & Williams.
19    A.   **I saw the names.**
20    Q.   (BY MS. BISHOP)  Did you see the name Hunton
21 & Williams on any documents that you had prior to 2009?
22    A.   **David Nanes, he would show me some documents**
23 **from different auditors, auditing companies, lawyers'**
24 **companies -- firms, just showing that everything was**
25 **totally legal.**

**40**

1     Q.   Did you have any conversations with any
2 attorneys from Hunton & Williams prior to 2009?
3     A.   **No.**
4     Q.   Did you ever ask to have any conversations
5 with anyone from Hunton & Williams prior to 2009?
6     A.   **No.  You know, usually, when I go to a bank**
7 **trying to open an account, I don't ask to talk to the**
8 **lawyers of bank.**
9          MS. BISHOP:  I think at this point
10 we're going to pass the witness to Mr. Israeloff for
11 questioning.
12         MR. SNYDER:  Oh, really?  Can we take
13 a break?
14         MS. BISHOP:  We can take a break,
15 yeah.
16         MR. JIMINEZ-EKMAN:  Before we pass,
17 can we actually take a break?
18         MR. SNYDER:  Yeah.
19         VIDEOGRAPHER:  We are going off the
20 record at 9:37.
21         (Recess.)
22         VIDEOGRAPHER:  Back on the record at
23 9:58 for the start of tape number 2, the videotaped
24 deposition of Samuel Troice.
25    Q.   (BY MS. BISHOP)  Mr. Troice, you said

**41**

1 earlier that you recalled seeing the name Hunton &
2 Williams on a document.  Do you recall specifically
3 what that document was?
4     A.   **I don't remember.  Like I stated before, you**
5 **know, David Nanes used to show me documents, documents**
6 **coming, you know, from lawyers, from accountants, from**
7 **insurance companies, just to show that everything was**
8 **perfectly well.**
9          MR. SNYDER:  "Legal and regulated," he
10 said.
11    A.   **Legal and regulated.**
12    Q.   (BY MS. BISHOP)  Do you remember
13 specifically Hunton & Williams, or do you just remember
14 documents about lawyers?
15    A.   **No.  I remember seeing specifically the name**
16 **of that company, that law firm, as well as some others.**
17    Q.   Was that -- did you keep that document in
18 your files?
19    A.   **No.**
20    Q.   Were there any documents that you provided
21 in this case that had Hunton & Williams on them?
22    A.   **No.**
23    Q.   Do you remember when you saw the document
24 naming Hunton?
25    A.   **There were so many meetings with David**

**11  (Pages 38 to 41)**

Hunton App. 1198

Samuel Troice

**42**

1  Nanes, and sometimes he would show it, so I cannot tell
2  you when or where, no, not specifically.
3      Q.  Do you remember what year it was?
4      A.  No, I don't remember exactly.  You know, the
5  very first time that I had the first meeting with
6  Mr. Nanes, which I do not remember -- he showed me a
7  lot of documents.  Could be 2008, 2008 -- '07.  But,
8  you know, there were a lot of documents.
9          Every time that I would ask him about
10  it, if everything was okay, he would show me documents
11  stating that everything has been good and regulated.
12      Q.  Prior to 2009, did you see any documents
13  with the name Carlos Loumiet on them?
14          THE INTERPRETER:  Carlos?
15          MS. BISHOP:  Carlos Loumiet.
16      A.  Directly, no.  But I know who is Carlos
17  Loumier (phonetic).
18          THE WITNESS:  (In English) Loumiet.
19          THE INTERPRETER:  "Loumiet."
20          MR. SNYDER:  But before 2009.
21      Q.  (BY MS. BISHOP)  Did you know who Carlos
22  Loumiet was before 2009?
23      A.  I have heard about him.
24      Q.  How?
25      A.  Conversations with David Nanes.

**43**

1      Q.  When were those conversations?
2      A.  One out of many that I had with him.
3      Q.  It was only in one conversation?
4      A.  I think so, yes.  Well, I met with -- with
5  David many times, because he belongs to the Jewish
6  community, so I will find him in different places out
7  of business.  I mean, he came to my daughter's wedding.
8      Q.  Was the time that Mr. Nanes mentioned
9  Mr. Loumiet specifically in connection with your CDs?
10      A.  About mine, no.
11      Q.  Was Mr. -- did Mr. Nanes mention Mr. Loumiet
12  in connection with Stanford CDs?
13          THE WITNESS:  (In English) Nanes.
14          MR. SNYDER:  Nanes.
15      A.  No.
16      Q.  (BY MS. BISHOP)  What was he talking about
17  Mr. Loumiet for?
18      A.  No, he would never talk about him.  We
19  didn't have a conversation on Carlos Loumiet.  You see,
20  the way he would mention that how the owner was
21  Len [sic] Stanford; he would mention --
22          MR. SNYDER:  Allen Stanford.
23      A.  -- Allen Stanford.  He would mention some
24  other names as well.  Just an informal conversation.
25          (Reporter clarification.)

**44**

1      Q.  (BY MS. BISHOP)  You don't have any
2  documents in your file from before 2009 that name
3  Carlos Loumiet, do you?
4      A.  I don't remember having it.
5          MS. BISHOP:  At this time, I'm going
6  to pass the witness to Greenberg.
7          MR. SNYDER:  Okay.
8          MS. BISHOP:  Thank you, Mr. Troice.
9          THE WITNESS:  (In English)  Thank you.
10          EXAMINATION
11  BY MR. SIM ISRAELOFF:
12      Q.  How do you pronounce your name, sir?  How do
13  you pronounce your last name, your surname?
14          THE WITNESS:  (In English) "Troice."
15      Q.  (BY MR. ISRAELOFF)  "Troice," thank you.
16          We have met once before in Houston, I
17  believe you and -- I believe your wife was with you as
18  well.
19      A.  Correct.
20      Q.  Very nice to see you again.
21      A.  Gracias.  Same here.
22      Q.  And, by the way, I am very sorry for your
23  loss with Stanford.
24      A.  Same as my family and I, sir.
25      Q.  Has your experience with Stanford caused you

**45**

1  to act differently now in the way that you do banking?
2      A.  Yes.
3      Q.  How so?
4      A.  When I make an investment, I like to make
5  investments without risks.  I have my own business,
6  so -- I have my own business, and if there is any risk,
7  I do it with my own business, so that when I go to a
8  bank, I try to review more deeply any kind of
9  documents.
10      Q.  Where do you do your banking today?
11      A.  In Mexico.
12      Q.  What is the name of the bank?
13      A.  Do you want to know my personal account or
14  the business account?
15      Q.  Both.
16      A.  There are like five banks.
17      Q.  All right.  Which ones do you bank at today?
18      A.  Santander; --
19          THE INTERPRETER:  I'll give you the
20  names.
21      A.  -- Banamex, B-A-N-A-M-E-X; BanBanjio,
22  B-A-N-B-A-J-I-O; Banorte, B-A-N-O-R-T-E; Mifel,
23  M-I-F-E-L.
24      Q.  (BY MR. ISRAELOFF)  Do you do any banking in
25  the United States today?

12  (Pages 42 to 45)

Hunton App. 1199

Samuel Troice

**46**

1  A.  My wife has an account in United States.
2  Q.  What bank?
3  A.  Wells Fargo.
4  Q.  In one of your prior depositions, you
5  described yourself as a "zero risk." What does that
6  mean?
7  A.  I don't like to invest in stocks that are
8  going to give you a lot of interest with the risk of
9  losing money. Like, for example, my wife's account, I
10  think you don't get not even half of a percentage. I
11  prefer to take care of my capital.
12  Q.  In the case that you have against Willis,
13  you spoke about receiving insurance letters from
14  Willis. Do you recall that?
15  A.  Yes.
16  Q.  And you said if you had not received those
17  letters, you would not have invested with Stanford.
18  A.  Correct.
19  Q.  What other information or documents did you
20  receive before you invested with Stanford and which you
21  would not have invested without them?
22  A.  I received different brochures with all the
23  services that they were offering, and then copies of
24  different letters for insurance coverage. Like, for
25  example, something that made me feel secure, it was a

**47**

1  letter from Lloyd -- De Lloyd [sic] insurance.
2  MR. SNYDER: Lloyd's of London.
3  THE INTERPRETER: Not De Lloyd's?
4  MR. SNYDER: Not "De Lloyd's," no.
5  THE INTERPRETER: Oh, I'm sorry.
6  A.  -- Lloyd's, which is a very well-known
7  company, so that would give us safety. And every year,
8  David will give another letter, like a renewal of those
9  insurances [sic].
10  Q.  (BY MR. ISRAELOFF) Did you also receive
11  assurances from Mr. Nanes that your investment was
12  safe?
13  A.  Well, an insurance from him, no. But
14  comments and letters from him, yes.
15  MR. SNYDER: Just -- the interpreter
16  translated "assurances" as "insurance," just so you
17  know, Sim.
18  Q.  (BY MR. ISRAELOFF) Let me ask a different
19  way: Did you receive information from Mr. Nanes that
20  led you to believe that an investment with Stanford was
21  safe?
22  A.  Yes. Always.
23  Q.  Would you say that the information you got
24  from Mr. Nanes motivated you to make your investment?
25  A.  From Nanes and all the documentation coming

**48**

1  from Stanford, yes, that made me do my investment.
2  Q.  Would you have made your investment if you
3  had not received brochures?
4  THE INTERPRETER: Just one thing.
5  MR. SNYDER: That is "insurance."
6  THE INTERPRETER: "Insurance," okay.
7  A.  All the brochures, plus all the letters
8  with -- stating, you know, that it have been insured,
9  yes.
10  Q.  (BY MR. ISRAELOFF) If I understand what you
11  are saying, the things that motivated you to make this
12  investment were all the brochures, the insurance
13  letters, including a letter from Lloyd's of London, and
14  the information you got from Mr. Nanes. Is that what
15  motivated you to make this investment?
16  A.  Plus the fast service that was offered.
17  MR. ISRAELOFF: Say again?
18  THE INTERPRETER: Plus the -- the
19  service that had been offered.
20  (Reporter clarification.)
21  Q.  (BY MR. ISRAELOFF) So all of those things
22  together is what motivated you to buy the Stanford CDs?
23  A.  Yes.
24  Q.  What are your feelings towards Mr. Nanes
25  today?

**49**

1  A.  He couldn't be by -- just by himself, and he
2  was not the owner of the bank, so all this fraud is
3  coming from the top and with the help of some other
4  external people, or outsiders.
5  Q.  Do you believe Mr. Nanes lied to you?
6  A.  At the beginning, he did not. I think
7  everything came out of his hands, not only from his
8  hands, but from all the organization in the Americas.
9  Q.  Do you believe that Mr. Nanes knowingly lied to
10  you?
11  A.  I think that at the very last conversation
12  that I had with him, yes.
13  Q.  What was that?
14  A.  Nanes and I would get together to have
15  breakfast, and we would talk about several topics:
16  sports, horses, and then we would talk about my
17  account, how it was.
18  Now, in February of 2009, when the
19  bank was in bankruptcy, I was at his office and we were
20  talking about personal issues, and he never mentioned
21  to me that the bank has been intervened.
22  Q.  Do you believe he lied to you in that
23  conversation?
24  A.  I think so, yes.
25  Q.  Have you heard about Mr. Nanes' recent

13 (Pages 46 to 49)

Hunton App. 1200

Samuel Troice

**54**

1 under investigation many years ago but that no charges
2 were filed, would you have invested with Stanford?
3     THE INTERPRETER: I'm sorry, "charges"
4 about what? Or just "charges," like that, or under
5 someone, or just like that?
6     MR. ISRAELOFF: Just like that.
7     THE INTERPRETER: Okay.
8     MR. SNYDER: Objection, calls for
9 speculation.
10     I think you're messing up the
11 translation.
12     I think she's saying that they did
13 have charges against them. Do you want to reask the
14 question?
15   Q. (BY MR. ISRAELOFF) If you were told that
16 Stanford International Bank was investigated to
17 determine if it was engaged in drug-money laundering
18 many years ago but that no money laundering was found,
19 would you still have invested?
20   **A. If I had learned that they had been under**
21 **any kind of investigation, right then or before,**
22 **previously, by any agency, no, I'd have not done it.**
23   Q. Do you know whether any of your current five
24 banks have ever been under government investigation?
25   **A. No, I don't know.**

**55**

1   Q. Have you investigated to find out if any of
2 those five banks have ever been under government
3 investigation?
4   **A. No.**
5   Q. Do you understand, from your work in this
6 lawsuit, that Stanford International Bank was
7 investigated by the Securities and Exchange Commission?
8     MR. SNYDER: "Securities and
9 Exchange."
10   **A. Yes, I did learn about it through all this**
11 **process. Yes, I did.**
12   Q. (BY MR. ISRAELOFF) What do you now
13 understand the Securities and Exchange Commission did?
14   **A. To possess the offices in Houston and Miami,**
15 **review the documents, make a process for Stanford, —**
16     MR. SNYDER: Allen Stanford.
17   **A. — Allen Stanford —**
18     (Reporter clarification.)
19   **A. — and determine that this has been a fraud.**
20   Q. (BY MR. ISRAELOFF) Do you understand that
21 the "SEC" -- can I use that term for the Securities and
22 Exchange Commission?
23   **A. Yes.**
24   Q. Do you now understand that the SEC was aware
25 that Stanford might be a fraud as early as 1997?

**56**

1   **A. I didn't know that it was since that date.**
2 **I would have not made any investments. I learned about**
3 **this -- I learned that they were under investigation**
4 **when everything came out.**
5   Q. Do you now know that the SEC had concerns
6 about Stanford International Bank since the year 1997?
7   **A. I didn't know about the date, but now I**
8 **learned that it has been a while.**
9   Q. Do you understand that in all those years,
10 the SEC took no action to close down Stanford
11 International Bank?
12   **A. Yes, I did learn about it.**
13   Q. If you were allowed to sue the SEC for the
14 Stanford problems, would you do that?
15   **A. If I could, if I had the documents and --**
16 **and I would see a possibility to win, possible.**
17   Q. Let me ask you about "rollovers." Do you
18 understand what that term means?
19   **A. Not exactly.**
20   Q. The CDs you purchased from Stanford, do you
21 understand that when they matured, if you did nothing,
22 they would automatically roll over into a new CD?
23   **A. Yes.**
24   Q. Is that something that you used, that is,
25 automatic rollovers?

**57**

1   **A. "Rollover," like to renew?**
2   Q. Yes.
3   **A. Yes.**
4   Q. A number of your Stanford CDs were
5 automatically renewed, were they not?
6   **A. Yes.**
7   Q. Why did you allow your CDs to roll over and
8 renew?
9   **A. Number one, because the money that I had**
10 **there was for one specific need, and I didn't need it**
11 **in that moment.**
12   Q. What was the specific need?
13   **A. Medical expenses for my daughter.**
14   Q. Was it your plan to let each CD
15 automatically renew until you needed the money for your
16 daughter's medical care?
17   **A. Yes.**
18   Q. Each time one of your CDs automatically
19 renewed, did it renew as another CD?
20   **A. Let me explain it with -- you know, a little**
21 **bit longer. Okay. I did my investment in Stanford,**
22 **okay. The movements that they will do about the CDs --**
23 **there was a movement with the CDs with different**
24 **accounts. Okay. The CDs will go -- the money will go**
25 **to one CD, and then they will move it into another**

**15 (Pages 54 to 57)**

Hunton App. 1201

Samuel Troice

**58**

```
1   account.
2         The only thing that I asked to Nanes
3   is to be able to have liquidity whenever I would
4   request -- whenever I would request anything that I
5   would need for my daughter's medical expenses.
6         Okay. So the topic about it, without
7   talking too much, it was an accident; that's all for my
8   daughter. So I needed the money. I needed it --
9   today. These expenses are every day and for life.
10  Q.   I forgot to ask you: Do you have an
11  occupation, or do you work at a business or trade
12  today?
13  A.   Yes. I have my own business.
14  Q.   What is that?
15  A.   It's a paint factory.
16  Q.   Does the company have a company name?
17  A.   Yes.
18  Q.   What is the paint factory's name?
19  A.   Do you want me to give it to you in English?
20  Q.   Please.
21        THE WITNESS: (In English) It is
22  Industrial -- Industrial, I-N-D-U-S-T-R-I-A-L,
23  Industrial, T-E-C-N-I-C-A, D-E, Pinturas, P-I-N-T-U-A-S
24  [sic]. Industrial Tecnica.
25        MR. ISRAELOFF: Pintura -- is it
```

**60**

```
1   English to Spanish.
2   A.   Yes.
3   Q.   (BY MR. ISRAELOFF) It also looks like one
4   of these checks came from a bank called Hemisphere
5   National Bank.
6   A.   Yes.
7   Q.   Do you still have bank accounts at either
8   one of these banks?
9   A.   No.
10  Q.   Why not?
11  A.   Because the account is under my wife's name,
12  and she decided to switch banks for just -- for
13  comfortable.
14        MR. JIMINEZ-EKMAN: To Wells Fargo,
15  right?
16        THE WITNESS: (In English) Yes.
17        THE WITNESS: Can I take a break?
18        MR. ISRAELOFF: Sure.
19        MR. SNYDER: Oh, that's good. I need
20  to go, too.
21        VIDEOGRAPHER: Off the record, 10:46.
22        (Recess.)
23        VIDEOGRAPHER: Back on the record at
24  10:52 for the start of tape number 3, the videotaped
25  deposition of Samuel Troice.
```

**59**

```
1   "Pinturas"?
2         THE WITNESS: (In English) Pinturas.
3         MR. ISRAELOFF: "Pinturas." Okay.
4         THE WITNESS: (In English) Yes,
5   "Pinturas."
6         MR. ISRAELOFF: Thank you very much.
7         THE WITNESS: (In English) like
8   Sherwin-Williams. Not as small as Sherwin-Williams.
9         MR. ISRAELOFF: Yes.
10        THE INTERPRETER: Did you get it?
11  I'll give it to you.
12  Q.   (BY MR. ISRAELOFF) When you made your
13  investments in 2001, I saw copies of some checks from
14  Chase. Did you have accounts with Chase at that time?
15  A.   I don't remember the dates, but I remember
16  in a certain time I had an account with them.
17        (Deposition Exhibit 5 marked.)
18  Q.   (BY MR. ISRAELOFF) Exhibit Number 5 is a
19  copy of one of the documents that your lawyers provided
20  in this lawsuit. Do you recognize these two checks?
21        THE INTERPRETER: Sí.
22        MR. SNYDER: In English.
23        THE INTERPRETER: Sorry. He said
24  "yes."
25        MR. ISRAELOFF: You translated from
```

**61**

```
1   Q.   (BY MR. ISRAELOFF) I am not sure I
2   understood what you were saying earlier about hearing
3   the name Carlos Loumiet. In what type of conversation
4   did you hear that name?
5   A.   It was an informal conversation with David
6   Nanes.
7   Q.   Did that conversation have to do with
8   Stanford CDs?
9   A.   No. No.
10  Q.   Okay. I have seen reference in this case to
11  a Stanford business in Mexico with the name Stanford
12  Bolsa y Banca, S.A. Did you ever have any dealings
13  with that group?
14        MR. SNYDER: And let me just object,
15  Sim. I think you got confused. I think that's
16  Ecuador. I don't think that's Mexico.
17        MR. ISRAELOFF: Well, --
18        MR. SNYDER: There's a Stanford Fundos
19  in Mexico.
20  Q.   (BY MR. ISRAELOFF) Do you have any
21  knowledge about a company called Stanford Bolsa y
22  Banca?
23  A.   No.
24  Q.   Mr. Nanes' business card says he was with a
25  company called Stanford Group Mexico, S.A. de C.V. Do
```

**16 (Pages 58 to 61)**

Samuel Troice

**62**

1  you know what that company is?
2  　　A.  I would like to believe that is the same
3  company which is International at Stanford, with its
4  offices in Mexico.  S.A. -- S.A. of -- the C.V. means a
5  Mexican company.
6  　　Q.  Thank you.
7  　　　　Do you know Mr. Nanes' other last
8  name?
9  　　A.  No.  I got to see it on the news, but I
10  don't remember his other last name.
11  　　Q.  What is your full name, with both surnames?
12  　　A.  Samuel Troice Miramontes.
13  　　　　THE INTERPRETER:  M-I-R-O --
14  M-I-R-A-M-O-N-T-E-S.
15  　　Q.  (BY MR. ISRAELOFF)  Thank you.
16  　　　　What is your wife's full name, with
17  all surnames?
18  　　A.  Lois, L-O-I-S, Martin Sommerfeld.
19  　　Q.  I have also seen her name on certain
20  documents written as "Lois M. Troice."
21  　　A.  Correct.  Yeah, that's correct.  It's Lois
22  M., and then D-E, and Troice, because that's the way we
23  write the names in Mexico.
24  　　Q.  Thank you.
25  　　　　When you bought Stanford CDs, were

**63**

1  they put in the name of both you and your wife?
2  　　A.  Yes.
3  　　Q.  Do you own those CDs together?
4  　　A.  Yes.
5  　　Q.  Why is it that she is not bringing this
6  lawsuit together with you?
7  　　A.  Because we decided that I will do it by
8  myself.  Anyhow, she has half of everything.
9  　　Q.  Was the claim that you submitted to the U.S.
10  receiver submitted in both names, you and your wife?
11  　　A.  I really do not remember whether the letter
12  was under both names, but I know, like on certain
13  occasions, like, for example, the check, both names are
14  included.
15  　　Q.  Do you still have all of the records of your
16  Stanford CD purchases all the way back to 2001?
17  　　A.  Most of them, yes.  I am not sure whether
18  they are completely, but most of them, yes.
19  　　Q.  Do you still have copies of everything you
20  signed, that is, a document that required a signature
21  at the bottom?
22  　　A.  Related to these claims or lawsuits?
23  　　Q.  Yes.  For example, the application to open
24  an account with Stanford.
25  　　A.  I really don't remember.  You know, there

**64**

1  are so much documents and it's been such a long time,
2  but I will have to look up for all those documents.
3  　　Q.  Were you in Mexico when you made the
4  decision to buy Stanford CDs?
5  　　A.  Yes.
6  　　Q.  Is that where Mr. Nanes gave you all the
7  information about Stanford?
8  　　A.  When he gave to me all the information?
9  　　Q.  Yes.
10  　　A.  Yes.  Yes.
11  　　Q.  What were your primary goals when you first
12  purchased CDs from Stanford?
13  　　A.  This was to have money secured and be able
14  to have access whenever we would want to, and to make
15  1 percent more.
16  　　Q.  1 percent more than what else?
17  　　A.  From the regular interest that you would
18  receive in that moment.
19  　　Q.  In one of your prior depositions, you were
20  shown a brochure in English dated 2008.  That brochure
21  said, "There is no guarantee that investors will
22  receive their interest or the return of their
23  principal."
24  　　　　THE INTERPRETER:  And let me just make
25  clear, when you say "return" --

**65**

1  　　　　MR. SNYDER:  "Principal" you said,
2  right?
3  　　　　MR. ISRAELOFF:  Principal.
4  　　　　THE INTERPRETER:  The interpreter has
5  a little problem.  When you say "return of the
6  principal," you're talking about the whole --
7  　　　　MR. ISRAELOFF:  The money invested,
8  the original investment.
9  　　　　THE INTERPRETER:  All the money, okay.
10  　　A.  Yeah, you're right.  There was a brochure in
11  English from 2008, but the brochure that we received,
12  they were previous to that and they were in Spanish.  I
13  don't remember reading something like that.
14  　　Q.  (BY MR. ISRAELOFF)  I believe you said you
15  have not seen that English brochure, but -- but if you
16  had seen it, you would not have invested?
17  　　A.  Correct.
18  　　Q.  Why not?
19  　　A.  Because they very clearly are stating that
20  they are going to steal from me.
21  　　Q.  Do you believe any investor that was no
22  risk, like you, would invest after they saw that
23  brochure?
24  　　　　MR. SNYDER:  Objection, form.  Calls
25  for speculation.

**17  (Pages 62 to 65)**

Hunton App. 1203

Samuel Troice

**70**

```
1              CORRECTIONS AND SIGNATURE
2    WITNESS NAME:           DATE OF DEPOSITION:
3    SAMUEL TROICE          DECEMBER 14, 2015
4    PAGE   LINE    CORRECTION     REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20       I, SAMUEL TROICE, have read the foregoing
21   deposition and hereby affix my signature that same
22   is true and correct except as noted herein.
23
24       _____
25            SIGNATURE OF WITNESS
                    257943
```

**71**

```
1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION
3    RALPH S. JANVEY, ET AL.,      *
                                   *
4       Plaintiffs,                *
                                   *
5    VS.              *  CIVIL ACTION NO.
                      *  3:12cv4641-N
6    GREENBERG TRAURIG, LLP;  *
     HUNTON & WILLIAMS, LLP; AND*
7.   YOLANDA SUAREZ,       *
                          *
8       Defendants.        *
9
10         REPORTER'S CERTIFICATION
          ORAL AND VIDEOTAPED DEPOSITION OF
11                SAMUEL TROICE
               DECEMBER 14, 2015
12
13
14       I, Brenda R. Gardner, Certified
15   Shorthand Reporter in and for the State of Texas,
16   hereby certify to the following:
17       That the witness SAMUEL TROICE, was
18   duly sworn by the officer and that the transcript of
19   the oral deposition is a true record of the testimony
20   given by the witness;
21       I further certify that pursuant to
22   FRCP Rule 30(f)(1) that the signature of the deponent:
23      __X__ was requested by the deponent or
24   a party before the completion of the deposition and
25   returned within 30 days from date of receipt of the
```

**72**

```
1    transcript. If returned, the attached Changes and
2    Signature Page contains any changes and the reasons
3    therefor;
4       _____ was not requested by the deponent
5    or a party before the completion of the deposition.
6       I further certify that I am neither attorney nor
7    counsel for, related to, nor employed by any of the
8    parties to the action in which this deposition was
9    taken. Further, I am not a relative or employee of any
10   attorney of record in this cause, nor do I have a
11   financial interested in the action.
12
13       Subscribed and sworn to on this the 17th of
14   December, 2015.
15
16
17
18   _____
     BRENDA R. GARDNER, TEXAS CSR NUMBER 2581
19   Expiration Date: 12-31-2017
     DepoTexas-Dallas, Firm Registration #459
20   6500 Greenville Avenue, Suite 445
     Dallas, Texas 75206
21   (214) 373-4977
22
23
24
25   Job No. 257943
```

**19  (Pages 70 to 72)**

**Hunton App. 1204**