# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated. | § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 3:12-cv-04641-N |
| vs. | § § | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ, | § § § § | |
| Defendants. | § § | |

## CLASS PLAINTIFFS' RESPONSE TO GREENBERG TRAURIG, LLP'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, OR IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS AND SUPPORTING BRIEF

EDWARD C. SNYDER
State Bar No. 00791699
JESSE R. CASTILLO
State Bar No. 03986600
**CASTILLO SNYDER, P.C.**
Bank of America Plaza, Suite 1020
300 Convent Street
San Antonio, TX 78205
Telephone:  (210) 630-4200
Facsimile: (210) 630-4210

PETER D. MORGENSTERN
(*admitted pro hac vice*)
morgenstern@butzel.com
JOSH ABRAHAM
(*admitted pro hac vice*)
abraham@butzel.com
**BUTZEL LONG, P.C.**
230 Park Avenue, Suite 850
New York, New York 10169
(212) 818-1110
(212) 818-0494 (Facsimile)

i

DOUGLAS J. BUNCHER
State Bar No. 03342700
JOHN D. GAITHER
State Bar No. 24055516
**NELIGAN FOLEY, LLP**
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone: (214) 840–5320
Facsimile:  (214) 840–5301

JUDITH BLAKEWAY
State Bar No. 02434400
**STRASBURGER & PRICE, LLP**
2301 Broadway
San Antonio, Texas 7821
Telephone: (210) 250-6000
Facsimile: (210) 250-6100


**Counsel for the Plaintiffs and the
Putative Class**

## **TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................................. 1

II. ARGUMENT ..................................................................................................................... 2

    A.     This Court has subject matter jurisdiction. .................................................. 2

    B.     Defendants are not protected by attorney immunity.................................... 5

            *1.   Attorney immunity does not extend to fraudulent activities unconnected to any litigation.* ......................................................................................................... 5

                  a.     Greenberg's reliance on *Chu* is misplaced. ............................................. 7

                  b.     Loumiet's wrongful acts outside of the litigation context did not require the "office of an attorney" and "are entirely foreign to the duties of an attorney." ................................................................................................. 8

            *2.   Attorneys are not immune from suit when they engage in criminal conduct.* ....... 9

            *3.   Attorney immunity does not apply to claims under the Texas Securities Act.* ..... 19

III. CONCLUSION ................................................................................................................ 23

IV. PRAYER ....................................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*A.C. Frost & Co. v. Coeur d'Alene Mines Corp.,*
  312 U.S. 38, S.Ct. 414, 85 L.Ed. 500 (1941) ........................................................ 22

*Aegis Ins. Holding Co. v. Gaiser,*
  No. 04-05-00938-CV, 2007 Tex. App. LEXIS 2364, *15-19 (Tex. App.—San Antonio 2007,
  pet. denied) .................................................................................................... 20

*Anheuser-Busch Cos. v. Summit Coffee Co.,*
  934 S.W.2d 705 (Tex. App.—Dallas 1996, writ dismissed by agr.)........................ 21

*Bailey v. State,*
  No. 08-02-00424-CR, 2008 Tex. App. LEXIS 3133 (Tex. App.—El Paso, May 1, 2008) ...... 14

*Baker v. Putnal,*
  75 F.3d 190 (5th Cir. 1996) ...................................................................................... 4

*Basic Inc. v. Levinson,*
  485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ........................................... 21

*Bateman Eichler,*
  472 U.S. 299 (1985) ............................................................................................ 21

*Bradt v. West,*
  892 S.W.2d 56 (Tex. App.—Houston [1st Dist.] 1994, writ denied)........................ 11

*Cantey Hanger, LLP v. Byrd,*
  467 S.W.3d 477 (Tex. 2015) ........................................................................ passim

*Chu v. Chong Hui Hong,*
  249 S.W.3d 441 (Tex. 2008) .............................................................................. 8, 9

*Copperweld Corp. v. Indep. Tube Corp.,*
  467 U.S. 752 (1968) ............................................................................................ 21

*Cox v. Texas,*
  354 Fed. Appx. 901(5th Cir. 2009) ........................................................................ 3

*Daniels-Hall v. Nat'l Educ. Ass'n,*
  629 F.3d 992 (9th Cir. 2010) ................................................................................. 3

*Duperier v. Texas State Bank,*
  28 S.W.3d 740 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.)................... 20

*Estate of Stonecipher v. Estate of Butts,*
  686 S.W.2d 101 (Tex. 1985) .................................................................................. 6

*Flowers v. Dempsey-Tegeler & Co.,*
  472 S.W.2d 112 (Tex. 1971) ................................................................................ 21

*Gaia Envtl., Inc. v. Galbraith,*
  451 S.W.3d 398 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).................... 10

*Harrell v. Bowles*,
   No. 3:04-CV-1216-P, 2005 U.S. Dist. LEXIS 7329, *3 n.3 (N.D. Tex. April 25, 2005) .......... 4

*Hays v. State*,
   370 S.W.3d 775, (Tex. App.—Texarkana 2012, no pet.)........................................................ 14

*Herman & MacLean v. Huddleston*,
   459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ............................................................ 22

*Highland Cap. Mgmt., LP v. Looper Reed & McGraw, P.C.*,
   No. 05-15-00055-CV, 2016 WL 164528, 2016 Tex. App. LEXIS 442 (Tex. App.—Dallas

Jan. 14, 2016, pet. filed).......................................................................................................... 10

*Hunter v. Bryant*,
   502 U.S. 224 (U.S. 1991) .......................................................................................................... 4

*IBP, Inc. v. Klumpe*,
   101 S.W.3d 461 (Tex. App.—Amarillo 2001, pet. denied) ............................................... 10, 11

*In re Am. Housing Found.*,
   2011 WL 4625349 at *32 (N.D. Tex. 2011) ........................................................................... 22

*Ins. Co. of N.A. v. Morris*,
   928 S.W.2d 133 (Tex. App.—Houston [14th Dist.] 1996) ...................................................... 20

*JJJJ Walker LLC v. Yollick*,
   447 S.W. 3d 453 (Tex. App. – Hous. [14th Dis.] 2014)............................................................ 7

*Little v. Tex. AG*,
   No. 3:14-CVV-3089-D, 2015 U.S. Dist. LEXIS 127941, *25-31 (N.D. Tex. Sept. 24, 2015)... 4

*Mayfield v. Troutman*,
   613 S.W. 2d 339 (Tex. App. – Tyler 1981 .............................................................................. 20

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*,
   991 S.W.2d 787 (Tex. 1999) ..................................................................................................... 6

*N.C. U.A. Bd. v. Morgan Stanley & Co.*,
   No. 13 Civ. 6705 (DLC), 2014 U.S. Dist. LEXIS 58751, *24-25 (S.D. N.Y. April 28, 2014)  20

*Pearson v. Northwest Airlines, Inc.*,
   659 F.Supp. 2d 1084 (C.D. Cal. 2009) ...................................................................................... 3

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
   392 U.S. 134 (1984) ................................................................................................................ 21

*Poole v. H. & T.C.R. Co.*,
   58 Tex. 134 (1882) ........................................................................................................... 6, 7, 9

*Prison Legal News v. Livingston*,
   No. C-09-296, 2010 U.S. Dist. LEXIS 39126, *4-5 (S.D. Tex. Apr. 21, 2010) ........................ 4

*Rawhide Mesa-Partners, Ltd. v. Brown McCarroll, L.L.P.*,
   344 S.W.3d 56 (Tex. App.—Eastland 2011, no pet.)............................................................... 10

*Reagan Nat'l Advertising of Austin, Inc. v. Hazen*,
   2008 WL 2938823 at *9-10 (Tex. App. – Austin 2008) ........................................... 10

*Riggs v. Riggs*,
   322 S.W.2d 571 (Tex. Civ. App.—Dallas 1959, no writ) ........................................ 20

*Rusk State Hosp. v. Black*,
   392 S.W.3d 88 (Tex. 2012) ............................................................................................. 3

*Sacks v. Hall*,
   No. 01-13-00531-CV, 2014 WL 6602460, 2014 Tex. App. LEXIS 12570 (Tex. App.—
   Houston [1st Dist.] Nov. 20, 2014, no pet.) ............................................................. 10

*Shields v. State*,
   27 S.W.3d 267 (Tex. App. – Austin 2003, no pet.) ................................................. 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) .......................................... 21

*Troice v. Proskauer Rose, L.L.P.*,
   No. 15-10500, 2016 WL 929476, 2016 U.S. App. LEXIS 4480 (5th Cir. Mar. 10, 2016) passim

*Troice*,
   2016 U.S. App. LEXIS 4480 at *13-18 .................................................................. 5, 7

*Trustees of Screen Actors-Guild-Producers Pension & Health Plans v. NYCA, Inc.*,
   572 F.3d 771 (9th Cir., 2009) ........................................................................................ 3

*U.S. Bank, N.A. v. Sheena*,
   479 S.W.3d 475 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ......................... 7

*United States v. Harris*,
   No. 15-50106, 2016 U.S. App. LEXIS 7734 (5th Cir. April 28, 2016) ................... 13

*Wesolek v. Layton*,
   914 F.Supp.2d 853 (S.D. Tex. 2012) .......................................................................... 20

RULES

Rule 12(b)(1) ............................................................................................................... 3, 4

Rule 12(b)(6) ............................................................................................................... 3, 4

REGULATIONS

18 U.S.C. §1341 ............................................................................................................ 13

18 U.S.C. §1343 ............................................................................................................ 13

18 U.S.C. §2 ................................................................................................................... 14

18 U.S.C. §371 .............................................................................................................. 12

S<span>TATUTES</span>

T<span>EX</span>. R<span>EV</span>. C<span>IV</span>. S<span>TAT</span>. A<span>NN</span>. §581-4(A) ....................................................................................... 14

T<span>EX</span>. R<span>EV</span>. C<span>IV</span>. S<span>TAT</span>. A<span>RT</span>. §581-10-1B ................................................................................ 20

T<span>EX</span>. R<span>EV</span>. C<span>IV</span>. S<span>TAT</span>. A<span>RT</span>. §581-29 ........................................................................................ 14


O<span>THER</span> A<span>UTHORITIES</span>

13 C. Wright, A. Miller, E. Cooper, R. Freer, Federal Practice & Procedure, §3522 at 138 (3d ed. 2008) .......................................................................................................................................... 4

5B Wright & Miller, Federal Practice & Procedure §1350 (3d ed. 2004) ..................................... 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated.<br><br>                      Plaintiffs,<br><br>vs.<br><br>GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ,<br>                      Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**CLASS PLAINTIFFS' RESPONSE TO GREENBERG TRAURIG, LLP'S
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, OR IN
THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS
AND SUPPORTING BRIEF**

Class Plaintiffs submit this Response and Brief to Greenberg's Rule 12 motion.[1]

## I.      INTRODUCTION

Relying on a five-to-four decision from the Texas Supreme Court, *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015), and the Fifth Circuit's decision in *Troice v. Proskauer Rose, L.L.P.,* No. 15-10500, 2016 WL 929476, 2016 U.S. App. LEXIS 4480 (5th Cir. Mar. 10, 2016), Greenberg moves to dismiss for lack of subject matter jurisdiction, or in the alternative, for judgment on the pleadings.  The motion should be denied for three reasons:

---

[1]      Plaintiffs (including the Receiver and OSIC) filed a Motion to Sever the Receiver and OSIC's claims on December 15, 2015 that is fully briefed and pending a ruling by this Court.  Doc 163.  Because of the likelihood that an appeal will result no matter how this Court rules on the attorney immunity defense, Plaintiffs once again request that the Court sever the Receiver and OSIC's claims so that said claims may proceed to trial and not be delayed by said appeal.

- neither case extends attorney immunity to non-litigation conduct;

- neither case addresses the crime exception to attorney immunity; and

- common law affirmative defenses – like attorney immunity – do not apply to statutory claims under the Texas Securities Act.

First, neither *Cantey Hanger* nor *Troice* decided that attorney immunity applies to conduct – like that alleged here – occurring outside of litigation.  For over 100 years it has been the law in Texas that if an attorney participates in fraudulent activities with a client outside the litigation context, he has no immunity.  Nothing in *Cantey Hanger* or *Troice* changes that rule.  In fact, *Cantey Hanger* itself acknowledges that "participating in a fraudulent business scheme with a client" is "foreign to the duties of an attorney," and, hence, not immune conduct.  467 S.W.3d at 480.

Second, neither case addresses the crime exception to attorney immunity.  It has long been the rule in Texas that criminal conduct can negate attorney immunity.  Although Greenberg suggests that *Cantey Hanger* involved criminal conduct, there is nothing in the opinion suggesting that the Texas Supreme Court intended to give attorneys blanket immunity for criminal conduct.

Finally, nothing in either decision overturns – or indeed even mentions – the line of authority holding that common law defenses do not apply under the Texas Securities Act.  Because attorney immunity is a non-statutory common law affirmative defense to liability, it is not available in TSA actions.

For these reasons, Greenberg's motion to dismiss or for judgment on the pleadings, should be denied.

## II.      <u>ARGUMENT</u>

### A.      **This Court has subject matter jurisdiction.**

Greenberg cites three authorities in support of its claim of lack of jurisdiction, none of which hold that an attorney's immunity defense deprives a federal court of subject matter jurisdiction:

- a case involving eleventh amendment immunity of a state from suit in federal court, *Cox v. Texas*, 354 Fed. Appx. 901, 902 (5th Cir. 2009);

- a Texas state court case dealing with the jurisdiction of state courts over governmental entities, *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012); and

- the Fifth Circuit decision dismissing the investor plaintiffs' claims against Proskauer Rose LLP on the ground of attorney immunity under Rule 12(b)(6) for failure to state a claim. *Troice v. Proskauer Rose LLP*, No. 15-10500, 2016 U.S. App. LEXIS *18 (5th Cir. Mar. 10, 2016).

Greenberg improperly conflates a 12(b)(1) motion for dismissal for lack of subject matter jurisdiction and a 12(b)(6) motion for dismissal for failure to state a claim. As the Ninth Circuit has clarified, a 12(b)(1) motion for dismissal for lack of subject matter jurisdiction and a 12(b)(6) motion for dismissal for failure to state a claim are based on distinct concepts: "the former determines whether the plaintiff has a right to be in the particular court and the latter is an adjudication as to whether a cognizable legal claim has been stated." *Trustees of Screen Actors-Guild-Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771 (9th Cir., 2009), *quoting* 5B Wright & Miller, Federal Practice & Procedure §1350 (3d ed. 2004); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 997-98 (9th Cir. 2010) (district court erred in dismissing for lack of subject matter jurisdiction under Rule 12(b)(1), but should have dismissed for failure to state a claim under Rule 12(b)(6)); *Pearson v. Northwest Airlines, Inc.*, 659 F.Supp. 2d 1084, 1087 (C.D. Cal. 2009) (a 12(b)(1) motion for dismissal for lack of subject matter jurisdiction and a 12(b)(6) motion for dismissal for failure to state a claim are based on distinct concepts).

As Wright & Miller explain:

> A distinction also must be drawn between lack of jurisdiction and lack of merit in a plaintiff's claim.  The jurisdiction of the federal courts is dependent on the subject matter of the action or the status of the parties to it; it is not dependent on the merits of the claim asserted.  Thus, a court may have subject matter jurisdiction over a case even though the action is one to which there is no merit. This is true even if the latter fact is determined on a preliminary motion and the action is dismissed.

13 C. Wright, A. Miller, E. Cooper, R. Freer, Federal Practice & Procedure, §3522 at 138 (3d ed. 2008).   That is what happened in the *Troice* case: the Fifth Circuit dismissed under Rule 12(b)(6).  The basic premise of Greenberg's argument—that state law determines federal district court jurisdiction—is incorrect.

Moreover, "immunity from suit" does not deprive a federal district court of jurisdiction. For example, qualified immunity, like attorney immunity, is "immunity from suit."  *See Hunter v. Bryant*, 502 U.S. 224, 227 (U.S. 1991).  Yet, qualified immunity does not deprive a court of subject matter jurisdiction.  *See, e.g., Prison Legal News v. Livingston,* No. C-09-296, 2010 U.S. Dist. LEXIS 39126, *4-5 (S.D. Tex. Apr. 21, 2010) (citing *Baker v. Putnal*, 75 F.3d 190, 197 (5th Cir. 1996)) (noting how the Fifth Circuit has held that the defense of qualified immunity should be analyzed under a Rule 12(b)(6) motion to dismiss or a Rule 56 motion for summary judgment and that Rule 12(b)(1) is not a proper vehicle to assert dismissal on grounds of qualified immunity); *Little v. Tex. AG,* No. 3:14-CVV-3089-D, 2015 U.S. Dist. LEXIS 127941, *25-31 (N.D. Tex. Sept. 24, 2015) (after denying 12(b)(1) motion based on alleged lack of standing, dismissing claims under Rule 12(b)(6) on the grounds of qualified immunity).  Indeed, a court must have subject matter jurisdiction before it can reach the question of qualified immunity.  *See Harrell v. Bowles*, No. 3:04-CV-1216-P, 2005 U.S. Dist. LEXIS 7329, *3 n.3 (N.D. Tex. April 25, 2005) ("[A]s a court must first have subject matter jurisdiction before

deciding qualified immunity, . . . this Court cannot entertain the issue of qualified immunity due to lack of jurisdiction.").

For these reasons, attorney immunity does not deprive this Court of jurisdiction.

**B.**      **Defendants are not protected by attorney immunity.**

   *1.*      *Attorney immunity does not extend to fraudulent activities unconnected to any litigation.*

In *Cantey Hanger*, five Justices rejected the notion that merely labeling an attorney's conduct "fraudulent" destroys attorney immunity under Texas law.  *Cantey Hanger*, 467 S.W.3d at 483.  Subsequently, the Fifth Circuit in *Troice*, relying on the *Cantey Hanger* decision, held that the claims asserted against Proskauer Rose, LLP – another law firm that previously represented Stanford – should be dismissed on attorney immunity grounds.  *Troice*, 2016 U.S. App. LEXIS 4480 at *13-18.  In light of these two decisions, Greenberg contends that the claims against it must likewise be dismissed.  It is mistaken.

Neither decision held that attorney immunity extends beyond conduct occurring in litigation.  The critical issue in *Cantey Hanger* was whether falsifying a bill of sale for an airplane awarded to a client in a divorce decree constituted litigation.  The four dissenting Justices, recognizing that "to be entitled to litigation immunity, the defendant–attorney's conduct must have occurred in litigation," concluded that Cantey Hanger failed to conclusively establish that its conduct occurred in litigation.  467 S.W.3d at 488.

The dissenters also accused the majority of expanding the scope of immunity beyond litigation.  *Id*. at 493. The majority disclaimed any intent to do so, explaining:

> Because we conclude that Cantey Hanger's alleged conduct falls within the scope of its duties in representing its client in litigation, we need not consider the attorney-immunity doctrine's application to an attorney's conduct that is unrelated to litigation but nevertheless falls within the ambit of client representation and "requires the office, professional training, skill, and authority of an attorney." The dissent thus mischaracterizes the scope of our opinion in asserting that we

"suggest[] that this form of attorney immunity applies outside of the litigation context."

*Id*. at 482 n.6 (internal citation omitted).

The disagreement between the majority and the dissenters in *Cantey Hanger* was whether the conduct at issue was conclusively shown to be within the scope of the attorneys' duties in representing their client <u>in litigation</u>—the Court did not overrule its previous authority allowing liability against attorneys for conduct occurring outside of litigation.  *Estate of Stonecipher v. Estate of Butts*, 686 S.W.2d 101, 103 (Tex. 1985) (affirming a judgment against an attorney for conspiracy to defraud where an attorney, in an effort to assist a client in evading a judgment, received title to the client's property before the judgment and then transferred title back to the client after the judgment creditor had ceased trying to collect); *Poole v. H. & T.C.R. Co.*, 58 Tex. 134, 137-38 (1882) (immunity did not protect an attorney who fraudulently assumed apparent ownership of his client's goods to evade seizure of the goods by a judgment creditor); *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 794 (Tex. 1999) (attorney liable to non-client for negligent misrepresentation).

*Cantey Hanger* itself acknowledges that non-litigation fraudulent activities are "foreign to the duties of an attorney" such that they are not immune: "[W]e have held that an attorney 'will not be heard to deny his liability' for the damages caused by his participation in a fraudulent business scheme with his client, as 'such acts are entirely foreign to the duties of an attorney.'" 467 S.W.3d at 482.   The three examples of conduct "foreign to the duties of an attorney" provided by the *Cantey Hanger* court are (1) "damages caused by [an attorney's] participation in a fraudulent business scheme with a client," (2) "knowingly assist[ing] their clients in evading a judgment through a fraudulent transfer" and (3) "assaulting opposing counsel

during trial." 479 S.W.3d 479-80. *See also U.S. Bank, N.A. v. Sheena*, 479 S.W.3d 475, 479 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

As for the Fifth Circuit, it declined to reach the issue of whether attorney immunity applies only in the litigation context by holding that the plaintiffs waived the argument by not raising it in the trial court. *Troice*, 2016 U.S. App. LEXIS 4480 at *17.

Thus, because *Cantey Hanger* was limited to the litigation context, Texas authorities holding that attorneys are liable for fraudulent conduct occurring outside of litigation must be followed in this *Erie*-bound case. **Indeed the Texas Supreme Court recently indicated as much when it recently – post-*Cantey Hanger* - declined to accept a Petition for Review of a case wherein the attorney immunity defense was rejected based on the fraud exception in a non-litigation setting.** *JJJJ Walker LLC v. Yollick*, 447 S.W. 3d 453 (Tex. App. – Hous. [14th Dis.] 2014) (pet. denied Oct. 23, 2015; rehearing of petition for review denied May 06, 2016). According to the writ history, the Texas Supreme Court declined to accept review of *Yollick* in October 2015, which is 1 month after it issued its decision in *Cantey Hanger*, and then denied a rehearing on the petition in May 2016.

As the dissent in *Cantey Hanger* explains, the only way to reconcile the majority's holding with *Poole* and progeny is to limit immunity to the litigation conduct:

> A comparison of *Kruegel* and *Poole* is critical to understanding the context in which litigation immunity applies. In both cases, the attorney or law firm allegedly engaged in conduct that would be actionable without attorney immunity. The only meaningful distinction between the outcomes is the context in which that conduct occurred. In *Kruegel*, the conduct occurred in litigation, while in *Poole* the conduct occurred outside of any litigation. In my view, the only way to reconcile these cases and give meaning to the purpose behind attorney immunity is to require the defendant-attorney's conduct to have occurred in litigation.

467 S.W.3d at 488.

**a.      Greenberg's reliance on *Chu* is misplaced.**

Greenberg argues that an attorney enjoys complete immunity from civil liability for all conduct committed during representation of a client, even conduct unrelated to litigation, citing *Chu v. Chong Hui Hong*, 249 S.W.3d 441, 445 (Tex. 2008). But *Chu* did not hold that attorneys are immune to suit for fraudulent acts undertaken in the representation of a client; it indicated exactly the opposite: "An attorney who personally steals goods or tells lies on a client's behalf may be liable for conversion or fraud . . . ." 249 S.W.3d at 446 & n.19.

In *Chu*, the Supreme Court held that a buyer's attorney could not be held liable for drawing up a bill of sale of community property, a shop, at his client's request when he knew that the seller was selling the shop without his spouse's consent. 249 S.W.3d at 446. The Court reasoned that the buyer's attorney had a fiduciary duty to further the best interests of his client, the buyer, and imposing on him a second duty to the sellers "would inevitably conflict with the first." *Id.*

**b.     Loumiet's wrongful acts outside of the litigation context did not require the "office of an attorney" and "are entirely foreign to the duties of an attorney."**

Because Greenberg and partner Carlos Loumiet ("Loumiet") participated in a fraudulent business scheme with Stanford outside of litigation, such conduct is foreign to the duties of attorneys, and thus Defendants are not entitled to immunity. For example, the Complaint alleges, among other things, that Greenberg lawyers (principally Loumiet):

- lied to regulators on Stanford's behalf on multiple occasions [Complaint, ¶¶ 74-75, 91, 168-176, 188, 194];

- assisted Stanford to hijack and control the Antiguan government through loans, bribes and corruption [*Id.* at ¶¶ 66-68, 104, 106, 112, 114-117, 123, 164, 207, 218, 223, 230];

- drafted letters for Stanford's Antiguan regulators to sign [*Id.* at ¶¶ 93-95];

- re-wrote Antiguan regulations while being paid to do so by Stanford [*Id.* at ¶¶ 143-153, 221-224];

- participated in what amounted to a counter-intelligence campaign against the U.S. Government to find out what the Feds had on Stanford [*Id.* at ¶¶ 98, 134-135];

- threatened U.S. government officials [*Id.*, at ¶¶130-132]; and

- assisted in the creation of the Miami trust representative office knowing its real purpose was to market and sell SIBL CDs while avoiding U.S. regulations [*Id.* at ¶¶ 165-185].

None of these acts "requires the office, professional training, skill, and authority of an attorney", or even a law license for that matter, and such conduct – when coupled with Loumiet's knowledge of Stanford's illicit business practices - is foreign to the duties of lawyers.  As the Texas Supreme Court has repeatedly held, an attorney can be liable for knowing participation in a fraudulent business scheme.  *Cantey Hanger*, 479 S.W.3d at 479 (for participating in fraudulent business scheme); *Poole*, 58 Tex. at 137-38 (attorney was not shielded from liability for "knowingly committing willful and premeditated frauds for another"); *Chu*, 249 S.W.3d at 446 ("An attorney who personally . . . tells lies on a client's behalf may be liable for . . . fraud . . . .").  Attorneys are not entitled to immunity when they engage in fraudulent activities with their clients, when such activities are unconnected to any litigation.  Therefore, Greenberg's motion should be denied.

2.      *Attorneys are not immune from suit when they engage in criminal conduct.*

Greenberg's motion should be denied for the additional reason that Plaintiffs have pleaded the crime exception to attorney immunity.  As numerous courts have recognized, "[c]riminal conduct can negate attorney immunity."  *See Gaia Envtl., Inc. v. Galbraith*,

451 S.W.3d 398, 404 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (recognizing criminal exception to attorney immunity doctrine); *Rawhide Mesa-Partners, Ltd. v. Brown McCarroll, L.L.P.*, 344 S.W.3d 56, 60 (Tex. App.—Eastland 2011, no pet.) (noting that Texas courts have consistently held lawyers liable for criminal activity); *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 475-76 (Tex. App.—Amarillo 2001, pet. denied) (lawyer complicit in client's theft of trade secrets not immune); *Reagan Nat'l Advertising of Austin, Inc. v. Hazen*, 2008 WL 2938823 at *9-10 (Tex. App. – Austin 2008) (acknowledging the crime exception).

Claiming that the crime exception no longer exists, Greenberg argues that the attorney in *Cantey Hanger* was accused of "'evad[ing] tax liability,' which is a criminal act." Motion at 9. But nothing in that opinion suggests that the attorney's conduct rose to the level of criminal activity, nor is there any indication that the plaintiff ever invoked the crime exception or that the Court considered it.

Nor did the Plaintiff in *Highland Cap. Mgmt., LP v. Looper Reed & McGraw, P.C.*, No. 05-15-00055-CV, 2016 WL 164528, 2016 Tex. App. LEXIS 442 (Tex. App.—Dallas Jan. 14, 2016, pet. filed), invoke the crime exception to attorney immunity; rather, the plaintiff argued that the law firm was not entitled to immunity because its allegations went well beyond the law firm's discharge of its duties in representing its client. 2016 Tex. App. LEXIS 442, at *11-12. The court disagreed, holding that the actions were "the kinds of actions that are part of the discharge of an attorney's duties in representing a party in hard-fought litigation." *Id.* at *15.

*Sacks v. Hall*, No. 01-13-00531-CV, 2014 WL 6602460, 2014 Tex. App. LEXIS 12570 (Tex. App.—Houston [1st Dist.] Nov. 20, 2014, no pet.) involved the wrongful disclosure of medical records. The court recognized the existence of the crime exception to attorney immunity but found that it did not apply. *Sacks*, 2014 Tex. App. LEXIS 12570 at *34-35. In so doing, the

court first noted how the criminal allegations in that case "stand[] in stark contrast to the type of criminal acts other courts have indicated negate an attorney's entitlement to qualified immunity." *Id.* at *35 (citing *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 475-76 (Tex. App.—Amarillo 2001, pet. denied) (attorney not entitled to immunity when plaintiff alleged criminal conspiracy to commit crime of theft of trade secrets) and *Bradt v. West*, 892 S.W.2d 56, 72 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (attorney's assault of opposing counsel during trial).   Because the conduct at issue in *Sacks* was committed during litigation, and was even specifically contemplated by the Rules of Evidence, the court held that the attorneys were protected by attorney immunity.   Thus, *Sacks* does not stand for the proposition that the crime exception does not exist; it held only that the crime exception did not apply under the facts of that case.

Plaintiffs plead facts which if proved, demonstrate that Carlos Loumiet was guilty of a host of federal crimes.   First, Plaintiffs plead a fraudulent Ponzi scheme in which Carlos Loumiet was complicit:

> Allen Stanford ("Stanford") was a former bankrupt gym owner who perpetrated one of the largest and most notorious Ponzi schemes in the history of the United States.   For over twenty years, and through a web of companies commonly referred to as "Stanford Financial", Stanford utilized the veneer of an offshore bank in the Caribbean – that was in actuality run entirely from the United States – to steal billions of dollars of thousands of investors through the fraudulent sale of bogus bank "CDs".   In reality, the offshore bank was Stanford's personal "piggy bank", and the global "Stanford Financial" network of entities was simply a collection of "feeder" companies who sole purpose was to sell the bogus CDs and thereby pump money into the pockets of Stanford.
>
> Stanford violated a host of laws around the world in order to implement, effectuate and perpetuate his global securities fraud Ponzi scheme.   Stanford refused to comply with laws, including proper registration of his securities business in the U.S., because full compliance and registration would have led to more government scrutiny of his offshore bank and exposed the fraudulent nature of the CD programs.   As a result, and with the help of Defendants, Stanford insulated himself against regulatory scrutiny and was able to operate what amounted to an unregistered investment company issuing unregistered securities from the United States while deceiving his customers into believing that his global operations were legitimate and properly regulated, and that the CD

products offered by his offshore Ponzi bank were safer and more secure than CDs issued by U.S. Banks.

Stanford could not have perpetrated this global mass fraud on his own.  He needed corrupt regulators in his chosen offshore jurisdiction of Antigua, shady accountants, and skilled and complicit lawyers to help him.  He found the perfect match in Carlos Loumiet ("Loumiet"), a Miami international banking lawyer who was Stanford's kindred spirit and legal facilitator for over twenty years. . . .

Complaint ¶¶ 10-12.

The Court can take judicial notice that on March 6, 2012, a jury in Houston, Texas convicted Allen Stanford of four counts of wire fraud, one count of conspiracy to commit wire and mail fraud, five counts of mail fraud, one count of conspiracy to obstruct an SEC proceeding, one count of obstruction of an SEC proceeding, and one count of conspiracy to commit money laundering, all related to his Ponzi scheme.  *See* Verdict [808] in *United States v. Stanford*.

Plaintiffs plead facts demonstrating that Loumiet was a co-conspirator with Allen Stanford in a corrupt conspiracy to commit wire fraud and mail fraud, as well as violations of the Texas Securities Act, and that he aided and abetted Allen Stanford's criminal conduct.

The crime of conspiracy requires proof of the following elements:

1.   that the defendant and at least one other person made an agreement to commit an offense against the United States or defraud the United States or agency of the United States;

2.   the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

3.   one of the conspirators during the existence of the conspiracy knowingly committed at least one overt act to accomplish some object or purpose of the conspiracy.

18 U.S.C. §371.

The crime of wire fraud requires proof of the following elements:

1.   that a person knowingly created a scheme to defraud;

2.     that the scheme employed false material representations;

3.     that a person used interstate wire communications facilities for the purpose of carrying out the scheme;

4.     that a person acted with a specific intent to defraud.

18 U.S.C. §1343.  *See United States v. Harris*, No. 15-50106, 2016 U.S. App. LEXIS 7734 (5th Cir. April 28, 2016) (knowledge that representations regarding compliance were false when made sufficient to establish specific intent to defraud).

A person commits the offense of mail fraud by using the mail to carry out a scheme to defraud.  The crime of mail fraud requires proof that:

1.     that a person knowingly devised or intended to devise a scheme to defraud;

2.     that the scheme to defraud involved false material representations;

3.     that a person mailed something through the United States Postal Service or private or commercial interstate carrier for the purpose of executing such scheme or attempting to do so; and

4.     that the person acted with a specific intent to defraud.

18 U.S.C. §1341.

Article 581-29 of Title 19 entitled "Blue Sky Law Securities" makes it a criminal offense to:

a)     Sell, offer for sale or delivery, solicit subscriptions to and orders for, dispose of, invite orders for, or who shall deal in any other manner in any security or securities issued after September 6, 1955, unless said security or securities have been registered or granted a permit as provided in Section 7 of this Act, shall be deemed guilty of a felony of the third degree.

b)     In connection with the sale, offering for sale or delivery of, the purchase, offer to purchase, invitation of offers to purchase, invitations of offers to sell, or dealing in any other manner in any security or securities, whether or not the transaction or security is exempt under Section 5 or 6 of this Act, or in connection with the rendering of services as an investment adviser or an investment adviser representative, directly or indirectly:

(1)    engage in any fraud or fraudulent practice;

(2)      employ any device, scheme, or artifice to defraud;

(3)      knowingly make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

(4)      engage in any act, practice or course of business which operates or will operate as a fraud or deceit upon any person is

     (a)  guilty of a felony of the third degree, if the amount involved in the offense is less than $10,000;

     (b)  guilty of a felony of the second degree, if the amount involved in the offense is $10,000 or more but less than $100,000; or

     (c)  guilty of a felony of the first degree, if the amount involved if $100,000 or more.

TEX. REV. CIV. STAT. ART. §581-29.  *See Bailey v. State*, No. 08-02-00424-CR, 2008 Tex. App. LEXIS 3133 (Tex. App.—El Paso, May 1, 2008) (defendant was properly convicted of the fraudulent sale of securities, even though certificates of deposit were not specifically included the definition of a security under TEX. REV. CIV. STAT. ANN. §581-4(A), because the motivation for the purchase of such was a high interest rate, and an offshore shell bank offered no protection for defendant's clients); *Hays v. State*, 370 S.W.3d 775, (Tex. App.—Texarkana 2012, no pet.) (evidence that appellant intentionally withheld certain information from investors concerning company's spending practices sufficed to uphold securities fraud conviction).

The following elements are required to obtain a conviction for aiding and abetting:

1.      that the substantive offense was committed by some person;

2.      that a person associated with the criminal venture;

3.      that the person purposefully participated in the criminal venture; and

4.      that the defendant sought by action to make that venture successful.

18 U.S.C. §2.

The Complaint alleges that Greenberg (principally through Loumiet):

- Knew that Stanford's principal business strategy was to operate an offshore, unlicensed and unregulated investment company from the U.S. (for marketing purposes) while wholly evading U.S. laws.  Complaint at ¶49, 53, 165-166, 168.

- Knew that Stanford had been accused by the OCC of violating U.S. banking laws by operating an unlicensed bank from U.S. soil.  *Id.*, at ¶57.

- Knew that the government of Montserrat had accused Stanford of using an auditor, Hewlett, who was not qualified, and of operating his bank in a manner detrimental to its depositors and withholding information from the bank's audited financial statements.  *Id.*, at ¶60-61.

- Knew that Hewlett continued to be SIBL's only auditor throughout its history. *Id.*, at footnote 12.

- Knew that Stanford had an informant inside the Montserrat government that relayed information to Stanford about said government's (and the British government's) investigation of Stanford.  *Id.*, at footnote 6.

- Knew that Antigua, where Stanford later moved his offshore banking operations, was infamous as a cesspool of corruption and lax regulation, and had reputation as a known haven for drug running and money laundering.  *Id.*, at ¶64, 122.

- Knew in 1990 that the U.S. Government was investigating Stanford for criminal violations.  *Id.* at ¶75.

- Knew in 1991 that a British journalist accused Stanford of deceiving investors into believing that his bank was regulated by the U.S. government.  *Id.* at ¶77.

- Knew that SIBL was just a façade and that SIBL's real banking operations were carried out from the U.S.  *Id.* at ¶83-84, 189-191.

- Knew that Stanford was consistently under investigation by various agencies within the US government, including the OCC; FBI (*Id.*, at ¶97); and Customs (*Id.*, at ¶99); for, inter alia, money laundering.  *Id.* at ¶99-100.

- Knew that a Texas joint task force investigation of Stanford in 1991 caused Stanford to fire several Stanford employees suspected of leaking information to the authorities.  *Id.*, at ¶99.

- Knew that Stanford had corrupted several members of the Antiguan government, including former Antiguan Prime Minister Lester Bird and the Minister of Finance in charge of regulating SIBL, through loans, gifts and bribes. *Id.*, at ¶104, 112, 114-117. Also knew that this corruption of government officials was not an isolated event but continued unabated until Stanford was shut down. *Id.*, at ¶¶164, 218, 230.

- Knew that Stanford exercised inordinate control over the Antiguan Government through, *inter alia*, the tens of millions of dollars in loans his banks (BoA and SIBL) extended to Antigua which gave Stanford a lien on the entire country. *Id.*, at ¶106.

- Knew that Stanford's BoA did not have sufficient funds to make the loans to the Government of Antigua that it purported to make, and had reason to know said loans were in reality funded with SIBL CD investor funds. *Id.*, at ¶92, 106, 107; 223.

- Knew that in 1995 the Antiguan press had accused Stanford of violating Antiguan banking laws by purporting to have BoA loan money (that it didn't have) to the Antiguan Government. *Id.*, at ¶110. Also knew in 1996 that a US-based journalist also accused Stanford of making the loans to the government using SIBL investor funds in violation of Antiguan law. *Id.*, at ¶123.

- Knew that Stanford's loans to the Antiguan Government violated Antiguan law because no other banks had participated in the loans. *Id.*, ¶207, 223.

- Knew that Stanford took over the Antiguan bank regulatory system, rewrote Antiguan bank regulations applicable to SIBL, and appointed himself and his agents (including Loumiet) to the commission overseeing the regulation of SIBL. *Id.*, at ¶143-153.

- Knew that one of Stanford's goals in re-writing Antiguan banking laws and regulations was to make it more difficult for US authorities to investigate cases involving fraudulent accounting in Antigua. *Id.*, at 147-149.

- Knew that Stanford didn't want US authorities to gain access to SIBL's information through computer linkages with Stanford employees in the US. *Id.*, at footnote 17.

- Knew that the U.S. and British governments accused Stanford of manipulating and controlling the regulation of his banks in Antigua and issued warnings about doing business with Antigua. *Id.*, at ¶152, 154-155.

- Knew that Stanford's "de facto" representative offices for SIBL in the U.S. likely violated U.S. banking laws. *Id.*, at ¶167.

- Knew that the real purposes of the SFIS "trust representative" offices Stanford established in Miami, Houston and San Antonio was to market and sell SIBL CDs in violation of U.S. banking laws. *Id.*, at ¶168.

- Knew in 1998 that the SEC was investigating Stanford for violations of federal securities laws. *Id.*, at ¶192.

- Knew that Stanford marketed SIBL's portfolio as being invested conservatively in safe and liquid instruments, and that Stanford did not disclose to investors any investments by SIBL in loans to Stanford or the Antiguan Government, Caribbean real estate or private equity companies. *Id.,* at ¶196-198.

- Knew that Stanford marketed SIBL CDs as being insured to greater extent than FDIC insurance and that a deposit in SIBL was safer than a deposit in a US commercial bank because SIBL did not make loans. *Id.*, at ¶197-198.

- Knew that a former Stanford employee had accused Stanford of manipulating SIBL's financial statements, and that Stanford trained the SGC sales force to falsely market the SIBL CDs as being 100% insured. *Id.*, at ¶200-201.

- Knew that SIBL investors were being duped into believing their CD investments were insured. *Id.*, at ¶203, ¶236.

- Knew in 1998 that Stanford was experiencing severe liquidity problems, and that his Antiguan trust company and BOA were in regulatory trouble and financial difficulty. *Id.*, at ¶223-224.

Plaintiffs further allege that despite being armed with the afore-mentioned knowledge,

Greenberg nevertheless engaged in the following conduct:

- Assisted Stanford to move his operations to Antigua after Stanford was effectively run out of Montserrat. *Complaint,* at ¶66-68.

- Lied to Nationsbank about Stanford's historical compliance with U.S. law. *Id., at* ¶73.

- Lied to US Treasury Department about Stanford's problems with the Montserrat Government. *Id.,* at ¶74-75.

- Used lawsuits and threats of lawsuits to silence multiple journalists who at various times publicly raised questions about Stanford's illegal or fraudulent activities. *Id.,* at ¶¶77-80; ¶¶ 124-128.

- Lied to the U.S. Federal Reserve about Stanford's past problems in Montserrat as part of Stanford's attempt to qualify his Bank of Antigua in the U.S. so SIBL could sell more CDs. *Id.,* at ¶91.

- Prepared letters to the Federal Reserve to be signed by Stanford cronies in the Antiguan government to assist Stanford's goal of selling more CDs. *Id.*, at ¶93-95.

- Directed a counter-espionage campaign against the U.S. Government on Stanford's behalf using FOIA requests to find out what the U.S. Government knew about Stanford's activities. *Id.*, at ¶98, 134-135.

- Prepared all the legal documentation for the tens of millions of dollars in loan transactions between Stanford and the Antiguan Government. *Id.*, at ¶106; 207.

- Assisted Stanford with the establishment of the U.S. broker-dealer Stanford Group Company ("SGC") in 1996 and prepared all of the related party transaction documents for CD referral fees between SGC, SIBL and other Stanford entities. *Id.,* at ¶138.

- Drafted the Reg. D disclosures for SGC in 1997-1998 to market and sell the SIBL CDs as private placement securities, while omitting to disclose that Stanford was under constant investigation by the U.S. Government and had loaned tens of millions of dollars to the Antiguan government and had written its banking laws. *Id.,* at ¶139; 209.

- Served on Stanford's Antiguan bank regulatory reform commission and - while being paid by Stanford - wrote the regulations that made it more difficult for the U.S. government to investigate Stanford's activities in Antigua.  *Id.*, at ¶147-152.

- Lied to, concealed facts from, and provided fraudulent documents to Florida state banking regulators in order to help Stanford obtain a license to operate offshore trust representative offices for SFIS.  *Id.*, at ¶168-176.

- Lied to Louisiana state regulators about Stanford's troubles with the OCC and the Montserrat government in order to help Stanford get STC Louisiana approved.  *Id.*, at ¶188.

- Helped Stanford respond to the SEC's 1998 investigation by lying about the scope of regulation of SIBL.  *Id.* at ¶194.

- Sued and threatened to sue a former Stanford employee whistleblower.  *Id.*, at ¶202-206.

- Advised Stanford that he did not need to register SIBL as an investment company because it was a commercial bank, despite the fact that Loumiet and Greenberg knew that SIBL was not a commercial bank and marketed itself as being a safer investment precisely because it was not a commercial bank.  *Id.*, at ¶213.

At a minimum, the above conduct of Loumiet and Greenberg in knowingly making false representations and omissions to government agencies and others to further the goal of Allen Stanford to market certificates of deposits issued by SIBL violates several criminal statutes including the conspiracy statute, as well as Texas state securities laws.  Defendants' knowing conduct in facilitating a fraudulent offshore securities scheme was foreign to the duties of an attorney.  These allegations more than suffice to bring Loumiet's conduct (and that of Defendant Greenberg) well within the crime exception to attorney immunity.

> ### 3.   *Attorney immunity does not apply to claims under the Texas Securities Act.*

Finally, Defendant's motion should be denied because Defendant has not established as a matter of law that the attorney immunity defense applies to claims under the Texas Securities Act (TSA).

Common law affirmative defenses are unavailable under the TSA. *See*, *e.g.*, *Aegis Ins. Holding Co. v. Gaiser*, No. 04-05-00938-CV, 2007 Tex. App. LEXIS 2364, *15-19 (Tex. App.—San Antonio 2007, pet. denied) (unclean hands); *Duperier v. Texas State Bank*, 28 S.W.3d 740, 753-54 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) (waiver); *Ins. Co. of N.A. v. Morris*, 928 S.W.2d 133, 154 (Tex. App.—Houston [14th Dist.] 1996) (ratification and estoppel), *aff'd in part and rev'd in part on other grounds*, 981 S.W.2d 667 (Tex. 1998); *Riggs v. Riggs*, 322 S.W.2d 571, 574 (Tex. Civ. App.—Dallas 1959, no writ) (laches); *Mayfield v. Troutman*, 613 S.W. 2d 339 (Tex. App. – Tyler 1981 (ratification).

Attorney immunity is a non-statutory affirmative defense to liability. It is, therefore, not available in TSA actions. *See N.C. U.A. Bd. v. Morgan Stanley & Co.*, No. 13 Civ. 6705 (DLC), 2014 U.S. Dist. LEXIS 58751, *24-25 (S.D. N.Y. April 28, 2014) (holding that non-statutory defenses are not available under the TSA); *see id.* at *11-12. Greenberg cites *Wesolek v. Layton*, 914 F.Supp.2d 853, 864 (S.D. Tex. 2012) for the proposition that the defenses contained in the TSA are not exclusive. But there the plaintiff never raised the argument that only statutorily-recognized defenses apply under the TSA.

Texas courts' refusal to allow common law defenses to violations of the TSA is grounded in Texas' long-standing public policy of protecting the investing public. Texas courts have repeatedly underscored Texas' strong interest in protecting investors through the strict enforcement of the TSA, which courts are mandated to construe broadly "to effectuate its general purposes *to protect investors.*" Tex. Rev. Civ. Stat. Art. §581-10-1B; *Shields v. State*, 27

S.W.3d 267, 273 (Tex. App. – Austin 2003, no pet.); *Anheuser-Busch Cos. v. Summit Coffee Co.*, 934 S.W.2d 705, 708 (Tex. App.—Dallas 1996, writ dismissed by agr.)(quoting *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 114 (Tex. 1971)).

That policy is similar to the policy undergirding the U.S. securities laws, and includes promoting private rights of action to assist in the enforcement of securities laws to protect investors. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (the protection of United States investors and the regulation of United States capital markets are matters of national public interest, and private securities class actions are an important component of that protection); *Basic Inc. v. Levinson,* 485 U.S. 224, 230–31, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (the securities laws are remedial in nature, and the courts must encourage private lawsuits to effectuate their purpose of protecting investors).

To foster that public interest, the U.S. Supreme Court has refused to allow common law defenses to statutory actions where such defenses would interfere with the public purposes behind the statute at issue. *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 138–40 (1984) (finding that Congress did not intend to allow defendants to assert *in pari delicto* defenses under an antitrust statutory scheme because of the importance of deterring antitrust violations, and noting that "[w]e have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes."), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752 (1968). *See also Bateman Eichler,* 472 U.S. 299, 310 (1985), citing *Perma Life,* 392 U.S. 134 (concluding that allowing defendants who were insider trading tippers to assert *in pari delicto* claims against insider trading tippees in fraud claims would undermine the purpose of securities laws to deter unfair trading practices); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 388-389, 103 S.Ct.

683, 690-691, 74 L.Ed.2d 548 (1983) (common-law doctrines are sometimes of "questionable pertinence" in applying the securities laws, which were intended "to rectify perceived deficiencies in the available common-law protections by establishing higher standards of conduct in the securities industry"); *A.C. Frost & Co. v. Coeur d'Alene Mines Corp.,* 312 U.S. 38, 43, 61 S.Ct. 414, 417, 85 L.Ed. 500 (1941) (rejecting the unclean hands defense because it would "seriously hinder rather than aid the real purpose" of the securities laws).

Following that principle, one federal court in the Northern District of Texas has refused to permit the application of a common law defense where its application would "dilute the purpose and force of the statute at issue." See *In re Am. Housing Found.*, 2011 WL 4625349 at *32 (N.D. Tex. 2011). The Court held that *Perma Life* required it to consider, when analyzing a common law defense against a statutory claim, whether allowing such common law defense would effectively emasculate the statute's purpose. *Id.* *American Housing* held that "public policy precludes . . . assertion of the defense" because to allow the defense would "not deter future wrongdoing, does not prevent unjust enrichment, degenerates the [statute] and principles of equity, and offends public policy". *Id.* at *33.

The same is true here. If the Court permits attorney immunity to immunize Defendant's fraudulent and criminal conduct, it will emasculate the TSA and create different standards for different classes of violators of that statute—there will be one rule for lawyers and a different one for everyone else. If immunized, lawyers would be free to conspire with their clients, participate in their clients' fraudulent securities schemes, and harm countless investors. Ironically, the lawyers' clients would be susceptible to private suit by the aggrieved investors but the lawyers would not. Not only does such a scheme not deter wrongdoing – it actively encourages it.

### III.   CONCLUSION

Allowing attorney immunity to defeat Plaintiffs' claims will

- frustrate the purpose of the TSA to protect investors against fraud;

- allow lawyers, but not their clients, to commit securities fraud with impunity;

- permit lawyers to escape civil liability for criminal conduct; and

- exponentially expand the carefully circumscribed litigation immunity which the Texas Supreme Court recognized.

The Court should confine the doctrine of attorney immunity to the boundaries set by the Texas Supreme Court in *Cantey Hanger,* namely, conduct "not foreign to the duties of an attorney" in connection with litigation.

### IV.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Court deny Defendant's motion to dismiss or for judgment on the pleadings.

Dated: July 6, 2016

Respectfully submitted,

CASTILLO SNYDER, P.C.

By:   _/s/ Edward C. Snyder_
    Edward C. Snyder
    esnyder@casnlaw.com
    Jesse R. Castillo
    jcastillo@casnlaw.com
    One Riverwalk Place
    700 N. St. Mary's Street, Suite 405
    San Antonio, Texas  78205
    (210) 630-4200
    (210) 630-4210 (Facsimile)

NELIGAN FOLEY, LLP

By:   _/s/ Douglas J. Buncher_
    Douglas J. Buncher
    dbuncher@neliganlaw.com
    John D. Gaither
    jgaither@neliganlaw.com
    Republic Center
    325 N. St. Paul, Suite 3600
    Dallas, Texas  75201
    (214) 840-5320
    (214) 840-5301 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: _/s/ Judith Blakeway_
    Judith R. Blakeway
    judith.blakeway@strasburger.com
    2301 Broadway
    San Antonio, Texas  78215
    Telephone: (210) 250-6000
    Facsimile: (210) 250-6100

**BUTZEL LONG, P.C.**

By: _/s/ Peter D. Morgenstern_
    Peter D. Morgenstern (_admitted pro hac vice_)
    morgenstern@butzel.com
    Josh Abraham
    abraham@butzel.com
    230 Park Avenue, Suite 850
    New York, New York 10169
    (212) 818-1110
    (212) 818-0494 (Facsimile)

**COUNSEL FOR THE PLAINTIFFS**

**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330
David N. Kitner
david.kitner@strasburger.com

## CERTIFICATE OF SERVICE

    On July 6, 2016, I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

              By: _/s Edward C. Snyder_
                    Edward C. Snyder