# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; the OFFICIAL STANFORD INVESTORS COMMITTEE; PAM REED; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated. | § § § § § § § § § | CIVIL ACTION NO. 3:12-cv-04641-N |
| Plaintiffs, | § § | |
| vs. | § § | |
| GREENBERG TRAURIG, LLP; HUNTON & WILLIAMS, LLP; AND YOLANDA SUAREZ, | § § § § | |
| Defendants. | § | |

## CLASS PLAINTIFFS' RESPONSE TO HUNTON & WILLIAMS LLP'S
## MOTION FOR JUDGMENT ON THE PLEADINGS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT AND AUTHORITIES ....................................................................................... 3

    A.    HUNTON IS NOT PROTECTED BY THE ATTORNEY IMMUNITY
           DOCTRINE ....................................................................................................... 3

           1.    The Attorney Immunity Doctrine does not Extend to Hunton's
                  Fraudulent Conduct Unconnected to Litigation-Related Activities .................... 3

           2.    Loumiet's Wrongful Acts Outside of the Litigation Context "Are
                  Entirely Foreign to the Duties of an Attorney." .................................................. 5

           3.    Attorneys Are Not Immune From Suit When They Engage in Criminal
                  Conduct. ............................................................................................................. 8

           4.    The Attorney Immunity Defense Does Not Apply to Claims Brought by
                  Investors Under the Texas Securities Act. ........................................................ 18

    B.    THE ATTORNEY IMMUNITY DOCTRINE DOES NOT BAR ANY OF
           THE RECEIVER'S CLAIMS AGAINST HUNTON, NOR DOES IT BAR
           OSIC'S CLAIMS AS THE RECEIVER'S ASSIGNEE ........................................... 21

    C.    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS
           ACTION ......................................................................................................... 24

CONCLUSION & PRAYER .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*A.C. Frost & Co. v. Coeur d'Alene Mines Corp.,*
  312 U.S. 38, 61 S.Ct. 414, 85 L.Ed. 500 (1941).................................................... 20

*Aegis Ins. Holding Co. v. Gaiser*,
  No. 04-05-00938-CV, 2007 Tex. App. LEXIS 2364 (Tex. App.—San Antonio 2007, pet.
  denied) ............................................................................................. 18

*Anheuser-Busch Cos. v. Summit Coffee Co.*,
  934 S.W.2d 705 (Tex. App.—Dallas 1996) ......................................................... 19

*Bailey v. State*,
  No. 08-02-00424-CR, 2008 Tex. App.
  LEXIS 3133 (Tex. App.—El Paso, May 1, 2008) ................................................... 13

*Basic Inc. v. Levinson*,
  485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)............................................. 19

*Bateman Eichler*,
  472 U.S. 299 (1985)................................................................................ 19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................. 1

*Bradt v. West*,
  892 S.W.2d 56 (Tex. App.—Houston [1st Dist.] 1994) ............................................ 9

*Canales v. Jim Wells Cnty.*,
  No. C–12–171, 2012 WL 3262432, at *3 (S.D. Tex. Aug. 8, 2012)............................... 22

*Cantey Hanger, LLP v. Byrd,*
  467 S.W.3d 477 (Tex. 2015)................................................................. passim

*Chu v. Chong Hui Hong*,
  249 S.W.3d 441 (Tex. 2008)......................................................................... 7

*City of Garland v. Booth*,
  971 S.W.2d 631 (Tex. App.—Dallas 1998, pet. denied)........................................... 23

*Copperweld Corp. v. Indep. Tube Corp.,*
  467 U.S. 752 (1968)................................................................................ 19

*Duperier v. Texas State Bank*,
  28 S.W.3d 740 (Tex. App.—Corpus Christi 2000) .................................................. 18

*Essex Crane Rental Corp. v. Carter*,
  371 S.W.3d 366 (Tex. App.—Houston [1st Dist.] 2012) ......................................... 4

*Estate of Stonecipher v. Estate of Butts*,
  686 S.W.2d 101 (Tex. 1985) ................................................................................... 4

*F.D.I.C. v. Bledsoe*,
  989 F.2d 805 (5th Cir. 1993) ................................................................................ 23

*Flowers v. Dempsey-Tegeler & Co.*,
  472 S.W.2d 112 (Tex. 1971) ................................................................................ 19

*Gaia Envtl., Inc. v. Galbraith*,
  451 S.W.3d 398 (Tex. App.—Houston [14th Dist.] 2014) ....................................... 8

*Hays v. State*,
  370 S.W.3d 775, (Tex. App.—Texarkana 2012) ................................................... 13

*Herman & MacLean v. Huddleston*,
  459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ........................................... 19

*Highland Cap. Mgmt., LP v. Looper Reed & McGraw, P.C.*,
  No. 05-15-00055-CV, 2016 WL 164528, 2016 Tex. App.
  LEXIS 442 (Tex. App.—Dallas Jan. 14, 2016) ...................................................... 9

*IBP, Inc. v. Klumpe*,
  101 S.W.3d 461 (Tex. App.—Amarillo 2001) .................................................... 8, 9

*In re Am. Housing Found.*,
  2011 WL 4625349 (N.D. Tex. 2011) .................................................................... 20

*In re Katrina Canal Breaches Litig.*,
  495 F.3d 191, 2015 (5th Cir. 2007) ....................................................................... 1

*Ins. Co. of N.A. v. Morris*,
  928 S.W.2d 133 (Tex. App.—Houston [14th Dist.] 1996), 981 S.W.2d 667 (Tex. 1998)....... 18

*Janvey v. Adams & Reese, LLP*,
  Case No. 3:12-CV-0495-N (N.D. Tex. Filed Feb. 16, 2012) ................................. 21

*Janvey v. DSCC*,
  712 F.3d 185 (5th Cir. 2013) ............................................................................... 21

*JJJJ Walker, LLC v. Yollick,*
   447 S.W.3d 453 (Tex. App.—Houston [14th Dist.] 2014) ..................................................... 4, 5

*Likover v. Sunflower Terrace II, Ltd.,*
   696 S.W.2d 468 (Tex. App.—Houston [1st Dist.] 1985) ...................................................... 5

*Mayfield v. Troutman,*
   613 S.W. 2d 339 (Tex. App. – Tyler 1981) ....................................................................... 18

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,*
   991 S.W.2d 787 (Tex. 1999) .......................................................................................... 4

*Mosier v. Stonefield Josephson, Inc.,*
   2011 WL 5075551 (C.D. Cal. 2011) .............................................................................. 21

*N.C. U.A. Bd. v. Morgan Stanley & Co.,*
   No. 13 Civ. 6705 (DLC), 2014 U.S. Dist. LEXIS 58751 (S.D. N.Y. April 28, 2014) ............ 18

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.,*
   392 U.S. 134 (1984) ................................................................................................. 19, 20

*Poole v. H. & T.C.R. Co.,*
   58 Tex. 134 (1882) .................................................................................................. 4, 5, 7

*Querner v. Rindfuss,*
   966 S.W.2d 661, 666, 670 (Tex. App.—San Antonio 1998, pet. denied) ............................ 5

*Rawhide Mesa-Partners, Ltd. v. Brown McCarroll, L.L.P.,*
   344 S.W.3d 56 (Tex. App.—Eastland 2011) ..................................................................... 8

*Reagan Nat'l Advertising of Austin, Inc. v. Hazen,*
   2008 WL 2938823 (Tex. App. – Austin 2008) ................................................................... 8

*Riggs v. Riggs,*
   322 S.W.2d 571 (Tex. Civ. App.—Dallas 1959) .............................................................. 18

*Sacks v. Hall,*
   No. 01-13-00531-CV, 2014 WL 6602460, 2014 Tex. App. LEXIS 12570 (Tex. App.—
   Houston [1st Dist.] Nov. 20, 2014, no pet.) ...................................................................... 9

*Santiago v. Mackie Wolf Zientz & Mann, P.C.,*
   No. 05-13-00620-CV, 2014 Tex. App. LEXIS 9165 (Tex. App.—Dallas 2014) ..................... 4

*Scholes v. Schroeder,*
   744 F. Supp. 1419 (N.D. Ill. 1990) ............................................................................... 21

*Shields v. State*,
  27 S.W.3d 267 (Tex. App. – Austin 2003) ............................................................. 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ........................................ 19

*U.S. Bank, N.A. v. Sheena*,
  479 S.W.3d 475 (Tex. App.—Houston [14th Dist.] 2015) ....................................... 6

*United States v. Harris*,
  No. 15-50106, 2016 U.S. App. LEXIS 7734 (5th Cir. April 28, 2016) .................... 12

*Vinson & Elkins v. Moran*,
  946 S.W.2d 381 (Tex. App.—Houston [14th Dist.] 1997, writ dismissed by agt.)). ............... 23

*Wright v. Sydow*,
  173 S.W.3d 534, 550 (Tex. App.—Houston [14th Dist.] 2004, writ den'd.) ......................... 23

**Statutes**

18 U.S.C. § 2 ................................................................................................................ 13

18 U.S.C. § 371 .......................................................................................................... 11

18 U.S.C. § 1341 ........................................................................................................ 12

18 U.S.C. § 1343 ........................................................................................................ 12

**Rules**

FED. R. CIV. P. 12(b)(1) ......................................................................................... 1, 24

FED. R. CIV. P.  12(b)(6) ............................................................................................. 1

FED. R. CIV. P 12(c) .................................................................................................... 1

**Other Authorities**

TEX. REV. CIV. STATE. ART. § 581-4(A) .................................................................. 13

TEX. REV. CIV. STATE. ART. § 581-10-1B ............................................................... 18

TEX. REV. CIV. STATE. ART. 581-29 ........................................................................ 13

Pam Reed, Samuel Troice, and Michoacan Trust, individually and on behalf of all others similarly situated (collectively, "Class Plaintiffs") file this brief in response to Defendant Hunton & Williams LLP's ("Hunton") motion for judgment on the pleadings under Rule 12(c), and in support respectfully state as follows:

## PRELIMINARY STATEMENT

Hunton has filed a motion for judgment on the pleadings under Rule 12(c) or, in the alternative, to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), arguing that Texas' "attorney immunity doctrine" forecloses the Class Plaintiffs' claims against it as a matter of law.[1]

While Hunton acknowledges that this Court has already considered and denied its previous motion to dismiss on the basis of attorney immunity, Hunton is now mistakenly relying on the Texas Supreme Court's decision in *Cantey Hanger, LLP v. Byrd,* 467 S.W.3d 477 (Tex. 2015), and the Fifth Circuit Court of Appeals' decision in *Troice v. Proskauer Rose, LLP*, 816 F.3d 341, 348 (5th Cir. 2016) as a purported basis for its renewed efforts to obtain dismissal.

In *Cantey Hanger*, five Justices rejected the notion that merely labeling an attorney's conduct as "fraudulent" destroys attorney immunity under Texas law. *Cantey Hanger*, 467 S.W.3d at 483. Subsequently, the Fifth Circuit in *Troice*, relying on the *Cantey Hanger* decision, held that the claims asserted against Proskauer Rose, LLP – another law firm that previously represented the Stanford Financial Group – should be dismissed on attorney immunity grounds.

---

[1]   "The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss." *Guidry v. American Public Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 2015 (5th Cir. 2007). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* "The plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

*Troice*, 816 F.3d at 344-50.  In light of these two decisions, Hunton contends that the claims against it must likewise be dismissed.  But Hunton is mistaken and misreads these authorities.

Significantly, *Cantey Hanger* never held that the attorney immunity doctrine extends beyond conduct occurring in litigation.  In fact, both the majority and dissent opinions expressly noted that the decision was limited to conduct occurring <u>in or closely related to litigation</u>.

Additionally, in *Troice* – the most recent Stanford-related opinion addressing the applicability of *Cantey* – the Fifth Circuit expressly declined to consider the plaintiffs' argument that attorney immunity applies only in the litigation context because that issue was not raised by the plaintiffs in the district court.  Consequently, *Cantey Hanger* and *Troice* do nothing whatsoever to support Hunton's second attempt at dismissal on the basis of attorney immunity for its conduct occurring *outside of litigation*.

Moreover, the Courts in *Cantey Hanger* and *Troice* did not address the applicability of the attorney-immunity doctrine when the attorney in question – as here – is alleged to have engaged in conduct that rises to the level of criminal wrongdoing.

And nothing in *Cantey Hanger* and *Troice* overturns the clear line of authority holding that common law defenses such as attorney immunity cannot be invoked by defendants sued for violations of the Texas Securities Act ("<u>TSA</u>").  Because attorney immunity is a non-statutory common law defense to liability, it is not available in actions such as this that properly state claims for violations of the TSA.[2]

For these reasons, and as demonstrated below, Hunton's motion for judgment on the pleadings should be denied in its entirety.

---

[2]   The Court sustained the Class Plaintiffs' pleading of TSA violations against Hunton by Order dated February 4, 2015.  [Doc. 123.]  The Class Plaintiffs' TSA and other claims are now the subject of a motion for class certification which is fully briefed and pending before the Court.

**ARGUMENT AND AUTHORITIES**Error! Bookmark not defined.

**A.**     **HUNTON IS NOT PROTECTED BY THE ATTORNEY IMMUNITY DOCTRINE**

> **1.**     **The Attorney Immunity Doctrine does not Extend to Hunton's Fraudulent Conduct Unconnected to Litigation-Related Activities.**

As stated above, neither the *Cantey Hanger* nor *Troice* decisions held that attorney immunity extends beyond conduct occurring in the context of litigation.

The critical issue in *Cantey Hanger* was whether falsifying a bill of sale for an airplane awarded to a client in a divorce action constituted a continuation of litigation-related activities. The four dissenting Justices, recognizing that "to be entitled to litigation immunity, the defendant–attorney's conduct must have occurred in litigation," concluded that Cantey Hanger failed to conclusively establish that its conduct occurred in litigation.  467 S.W.3d at 488.  And the dissent therefore accused the majority of expanding the scope of attorney immunity beyond litigation.  *Id*. at 493.

But the majority disagreed:

> Because we conclude that Cantey Hanger's alleged conduct falls within the scope of its duties in representing its client in litigation, we need not consider the attorney-immunity doctrine's application to an attorney's conduct that is unrelated to litigation but nevertheless falls within the ambit of client representation and "requires the office, professional training, skill, and authority of an attorney." The dissent thus mischaracterizes the scope of our opinion in asserting that we "suggest[] that this form of attorney immunity applies outside of the litigation context."

*Id*. at 482 n.6 (internal citation omitted).

Thus, it is clear that the disagreement between the majority and the dissent in *Cantey Hanger* was whether the conduct at issue was within the scope of the attorneys' duties in representing their client <u>in litigation</u>.  *Id.*   The Court did <u>not</u> overrule its previous authority allowing liability against attorneys for conduct occurring outside of litigation. *See e.g.*, *Estate of*

*Stonecipher v. Estate of Butts*, 686 S.W.2d 101, 103 (Tex. 1985) (affirming a judgment against an attorney for conspiracy to defraud where an attorney, in an effort to assist a client in evading a judgment, received title to the client's property before the judgment and then transferred title back to the client after the judgment creditor had ceased trying to collect); *Poole v. H. & T.C.R. Co.*, 58 Tex. 134, 137-38 (1882) (immunity did not protect an attorney who fraudulently assumed apparent ownership of his client's goods to evade seizure of the goods by a judgment creditor); *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 794 (Tex. 1999) (attorney liable to non-client for negligent misrepresentation).

As for the Fifth Circuit in *Troice*, it expressly declined to reach the issue of whether attorney immunity applies only in the litigation context because the plaintiffs waived the argument by not raising it in the trial court below.  *Troice*, 816 F.3d at 349.

Thus, because *Cantey Hanger* was expressly limited to the litigation context, Texas authorities holding that attorneys are liable for fraudulent conduct occurring outside of litigation must be followed in this *Erie*-bound case.  *See e.g., Poole v. Houston & T.C. Ry. Co.*, 58 Tex. 134, 137 (1882) (intercepting shipment of goods and changing bill of lading to facilitate shipment to insolvent buyer); *Santiago v. Mackie Wolf Zientz & Mann*, *P.C.*, No. 05-13-00620-CV, 2014 Tex. App. LEXIS 9165 *5 (Tex. App.—Dallas 2014, pet. denied) (attorneys acting on behalf of their clients are not shielded from liability for their fraudulent conduct because fraudulent acts are "entirely foreign to the duties of an attorney"); *JJJJ Walker, LLC v. Yollick*, 447 S.W.3d 453, 468 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("[I]t is well established that an attorney can be held liable for his own fraudulent conduct even though it was performed on a client's behalf."); *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 382 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (drafting fraudulent documents to evade

lawful seizure of property by judgment creditor); *Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985, no writ) (conspiracy to defraud purchaser of apartment complex); *Querner v. Rindfuss*, 966 S.W.2d 661, 666, 670 (Tex. App.— San Antonio 1998, pet. denied) (fraud in connection with probate administration).[3]

Hunton, for its part, argues that it is "not aware of *any* decision – not one – in which a Texas federal court, the Texas Supreme Court, or a Texas appellate court has held that the attorney immunity doctrine applies exclusively to litigation-related conduct.  [Doc. 207] p. 18 (emphasis in original).  But Hunton need look no further than *Canter Hanger* itself for this rule of law.[4]

## 2.    Loumiet's Wrongful Acts Outside of the Litigation Context "Are Entirely Foreign to the Duties of an Attorney."

*Cantey Hanger* itself acknowledges that non-litigation fraudulent activities are "foreign to the duties of an attorney" such that they are not immune: "[W]e have held that an attorney 'will not be heard to deny his liability' for the damages caused by his participation in a

---

[3]      As the dissent in *Cantey Hanger* explains, the only way to reconcile the majority's holding with *Poole* and its progeny is to limit immunity to the litigation conduct:

> A comparison of *Kruegel* and *Poole* is critical to understanding the context in which litigation immunity applies. In both cases, the attorney or law firm allegedly engaged in conduct that would be actionable without attorney immunity. The only meaningful distinction between the outcomes is the context in which that conduct occurred.  In *Kruegel*, the conduct occurred in litigation, while in *Poole* the conduct occurred outside of any litigation.  In my view, the only way to reconcile these cases and give meaning to the purpose behind attorney immunity is to require the defendant-attorney's conduct to have occurred in litigation.

467 S.W.3d at 488.

[4]      Significantly, the Texas Supreme Court, in a post-*Cantey Hanger* determination, declined to accept a Petition for Review of a case in which the attorney immunity defense was rejected based on the fraud exception in a non-litigation setting. *See JJJJ Walker LLC v. Yollick*, 447 S.W. 3d 453 (Tex. App. – Hous. [14th Dis.] 2014) (pet. denied Oct. 23, 2015; rehearing of petition for review denied May 06, 2016).  The Texas Supreme Court declined to accept review of *Yollick* in October 2015 – 1 month after it issued its decision in *Cantey Hanger* – and further denied a rehearing on the petition in May 2016.

---

fraudulent business scheme with his client, as 'such acts are entirely foreign to the duties of an

attorney.'"  467 S.W.3d at 482.[5]

Here, because Hunton attorney Carlos Loumiet ("Loumiet") participated in a fraudulent

business scheme with his client outside of litigation or litigation-related activities, Loumiet's

conduct is foreign to the duties of attorneys and Hunton is not entitled to immunity.  For

example, the Complaint alleges, among other things, that Loumiet:

- Represented the Stanford Entities in structuring $40 million in loans from Stanford's Bank of Antigua ("BoA") to the Antiguan government, despite the fact that Loumiet knew that such amount exceeded BoA's capital.  *Id.* at ¶¶ 252-254.

- Recommended that Stanford conduct an internal investigation of Stanford International Bank, Ltd. ("SIBL") accounts, and continued to represent the Stanford Entities when this audit recommendation was rejected. *Id.* at ¶ 261.

- Sent undercover agents to infiltrate a meeting of an Antiguan opposition party in order to spy on what was said about the Stanford Entities.  *Id.* at ¶¶ 267-275.

- Sent letters of recommendation to Panamanian and Venezuelan regulators endorsing Stanford and representing that Stanford was compliant with laws and regulations despite knowledge that Stanford was under constant U.S. government investigation.  *Id.* at ¶¶ 309-311.

- Lied to Venezuelan government about Stanford's compliance with laws in order to help Stanford establish banking operations in that country.  *Id.* at ¶ 311.

- Assisted to extricate SIBL from money laundering charges in Mexico and prevent Stanford's Mexican operations from being shut down.  *Id.* at ¶¶321-324.

- Helped Stanford evade increased regulatory oversight of SIBL by the Caribbean central bank authority, the Eastern Caribbean Central Bank ("ECCB").  *Id.* at ¶¶329-334.

---

[5]    The three examples of conduct "foreign to the duties of an attorney" provided by the *Cantey Hanger* court are (1) "damages caused by [an attorney's] participation in a fraudulent business scheme with a client," (2) "knowingly assist[ing] their clients in evading a judgment through a fraudulent transfer" and (3) "assaulting opposing counsel during trial."  479 S.W.3d 479-80; *see also U.S. Bank, N.A. v. Sheena*, 479 S.W.3d 475, 479 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

- Communicated with and drafted legal strategy for SIBL's purported regulator, Leroy King, to use to prevent increased oversight of SIBL by the ECCB. *Id.* at ¶¶329-334.

- Used political connections in Washington to assist the Stanford Entities to restructure and relocate his global operations to the U.S. Virgin Islands to personally benefit Stanford through reduction in personal taxes. *Id.* at ¶¶335-344.

- Represented Stanford in making private equity and venture capital investments (with knowledge that Stanford was funding the transactions with SIBL investor funds). *Id.* at ¶¶ 345-350, 361.

- Represented Stanford in Caribbean real estate deals (with knowledge that Stanford was using SIBL investor money to fund the transactions). *Id.* at ¶¶351-359.

- Referred private equity and venture capital deals to Stanford. *Id.* at ¶¶348-350, 364.

- Assisted to expand SIBL certificate of deposit ("CD") sales operations in the U.S. by referring new brokerage and sales teams. *Id.* at ¶ 366.

- Assisted to expand SIBL CD sales in the U.S. and in establishment of new Stanford Trust Corporation offices in various states. *Id.* at ¶¶ 367-368.

- Lied to Florida regulators during their investigation of SFIS by falsely representing that Stanford's trust operations had nothing to do with SIBL. *Id.* at ¶ 374.

- Provided a deceptive letter from Leroy King to Florida regulators attesting to Stanford's compliance with Antiguan law in bid to try and protect SFIS from being shut down. *Id.* at ¶ 382.

    None of these acts were done in the context of any Stanford-related litigation. And as the Texas Supreme Court has repeatedly said, an attorney can be liable for knowing participation in a fraudulent business scheme. *Cantey Hanger*, 479 S.W.3d at 479 (for participating in fraudulent business scheme); *Poole*, 58 Tex. at 137-38 (attorney was not shielded from liability for "knowingly committing willful and premeditated frauds for another"); *Chu v. Chong Hui Hong*, 249 S.W.3d 441, 446 (Tex. 2008) ("An attorney who personally . . . tells lies on a client's behalf may be liable for . . . fraud . . . .").

In sum, attorneys are not entitled to immunity under Texas law when they engage in fraudulent activities with their clients, when such activities are unconnected to any litigation. Therefore, on this basis alone, Hunton's motion should be denied.

**3.    Attorneys Are Not Immune From Suit When They Engage in Criminal Conduct.**

Hunton's motion should be denied for the additional reason that the Class Plaintiffs have pleaded the crime exception to attorney immunity.

As numerous courts have recognized, "[c]riminal conduct can negate attorney immunity." *See Gaia Envtl., Inc. v. Galbraith*, 451 S.W.3d 398, 404 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (recognizing criminal exception to attorney immunity doctrine); *Rawhide Mesa-Partners, Ltd. v. Brown McCarroll, L.L.P.*, 344 S.W.3d 56, 60 (Tex. App.—Eastland 2011, no pet.) (noting that Texas courts have consistently held lawyers liable for criminal activity); *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 475-76 (Tex. App.—Amarillo 2001, pet. denied) (lawyer complicit in client's theft of trade secrets not immune); *Reagan Nat'l Advertising of Austin, Inc. v. Hazen*, 2008 WL 2938823 at *9-10 (Tex. App. – Austin 2008) (acknowledging the crime exception).

Claiming that the crime exception does not exist, Hunton argues that the attorney in *Cantey Hanger* was accused of "conspiring with and aiding a client to falsify documents and evade tax liability," which is potentially criminal conduct. *See* [Doc. 207] p. 19.  But nothing in *Cantey Hanger* suggests that the attorney's conduct rose to the level of criminal activity, nor is there any indication that the plaintiff ever attempted to raise the crime exception.  *Cantey Hanger* held only that there is no fraud exception to attorney immunity when the conduct occurs in an attorney's representation of his client in litigation.

In an attempt to preempt the Class Plaintiffs' argument, Hunton cites to two cases in support of its claim that no such crime exception exists. But these cases are wholly inapplicable. Thus, in *Highland Cap. Mgmt., LP v. Looper Reed & McGraw, P.C.*, No. 05-15-00055-CV, 2016 WL 164528, 2016 Tex. App. LEXIS 442 (Tex. App.—Dallas Jan. 14, 2016, pet. filed) the plaintiff argued that the law firm was not entitled to immunity because its allegations went well beyond the law firm's discharge of its duties in representing its client. 2016 Tex. App. LEXIS 442, at *11-12. The court disagreed, holding that the actions were "the kinds of actions that are part of the discharge of an attorney's duties in representing a party in hard-fought litigation." *Id.* at *15.

Similarly, *Sacks v. Hall*, No. 01-13-00531-CV, 2014 WL 6602460, 2014 Tex. App. LEXIS 12570 (Tex. App.—Houston [1st Dist.] Nov. 20, 2014, no pet.) involved the wrongful disclosure of medical records. The court recognized the existence of the crime exception to attorney immunity but found that it did not apply. *Sacks*, 2014 Tex. App. LEXIS 12570 at *34-35. In so doing, the court first noted how the criminal allegations in that case "stand[ ] in stark contrast to the type of criminal acts other courts have indicated negate an attorney's entitlement to qualified immunity." *Id.* at *35 (citing *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 475-76 (Tex. App.—Amarillo 2001, pet. denied) (attorney not entitled to immunity when plaintiff alleged criminal conspiracy to commit crime of theft of trade secrets) and *Bradt v. West*, 892 S.W.2d 56, 72 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (attorney's assault of opposing counsel during trial). Because the conduct at issue in *Sacks* was committed during litigation, and was even specifically contemplated by the Rules of Evidence, the court held that the attorneys were protected by attorney immunity. Thus, *Sacks* does not stand for the proposition that the crime

exception does not exist; it held only that the crime exception did not apply under the facts of that case.

Here, in contrast, the Class Plaintiffs plead facts that, if proved, demonstrate that Loumiet was guilty of a host of federal crimes for acts committed outside the context of litigation.  First, Plaintiffs plead a fraudulent Ponzi scheme in which Loumiet was complicit:

> Allen Stanford ("Stanford") was a former bankrupt gym owner who perpetrated one of the largest and most notorious Ponzi schemes in the history of the United States.  For over twenty years, and through a web of companies commonly referred to as "Stanford Financial", Stanford utilized the veneer of an offshore bank in the Caribbean – that was in actuality run entirely from the United States – to steal billions of dollars of thousands of investors through the fraudulent sale of bogus bank "CDs".  In reality, the offshore bank was Stanford's personal "piggy bank", and the global "Stanford Financial" network of entities was simply a collection of "feeder" companies whose sole purpose was to sell the bogus CDs and thereby pump money into the pockets of Stanford.

> Stanford violated a host of laws around the world in order to implement, effectuate and perpetuate his global securities fraud Ponzi scheme.  Stanford refused to comply with laws, including proper registration of his securities business in the U.S., because full compliance and registration would have led to more government scrutiny of his offshore bank and exposed the fraudulent nature of the CD programs.  As a result, and with the help of Defendants, Stanford insulated himself against regulatory scrutiny and was able to operate what amounted to an unregistered investment company issuing unregistered securities from the United States while deceiving his customers into believing that his global operations were legitimate and properly regulated, and that the CD products offered by his offshore Ponzi bank were safer and more secure than CDs issued by U.S. Banks.

> Stanford could not have perpetrated this global mass fraud on his own.  He needed corrupt regulators in his chosen offshore jurisdiction of Antigua, shady accountants, and skilled and complicit lawyers to help him.  He found the perfect match in Carlos Loumiet ("Loumiet"), a Miami international banking lawyer who was Stanford's kindred spirit and legal facilitator for over twenty years. . . .

Complaint ¶¶ 10-12.

The Court can take judicial notice that on March 6, 2012, a jury in Houston, Texas convicted Allen Stanford of four counts of wire fraud, one count of conspiracy to commit wire

and mail fraud, five counts of mail fraud, one count of conspiracy to obstruct an SEC proceeding, one count of obstruction of an SEC proceeding, and one count of conspiracy to commit money laundering, all related to his Ponzi scheme.[6]

The Class Plaintiffs further plead facts demonstrating that Loumiet was a co-conspirator with Allen Stanford in a corrupt conspiracy to commit wire fraud and mail fraud, as well as violations of the Texas Blue Sky law, and that he aided and abetted Allen Stanford's criminal conduct.

The crime of conspiracy requires proof of the following elements:

1.   *that the defendant and at least one other person made an agreement to commit an offense against the United States or defraud the United States or agency of the United States;*

2.   *the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and*

3.   *one of the conspirators during the existence of the conspiracy knowingly committed at least one overt act to accomplish some object or purpose of the conspiracy.*

18 U.S.C. § 371.

The crime of wire fraud requires proof of the following elements:

1.   *that a person knowingly created a scheme to defraud;*

2.   *that the scheme employed false material representations;*

3.   *that a person used interstate wire communications facilities for the purpose of carrying out the scheme;*

4.   *that a person acted with a specific intent to defraud.*

---

[6]      Hunton concedes that on this motion for judgment on the pleadings, the Court may take judicial notice of matters related to the pleadings.  *See* [Doc. 207] p. 5.

18 U.S.C. § 1343; *see also United States v. Harris*, No. 15-50106, 2016 U.S. App. LEXIS 7734 (5th Cir. April 28, 2016) (knowledge that representations regarding compliance were false when made sufficient to establish specific intent to defraud).

A person commits the offense of mail fraud by using the mail to carry out a scheme to defraud.  The crime of mail fraud requires proof,

1.   *that a person knowingly devised or intended to devise a scheme to defraud;*

2.   *that the scheme to defraud involved false material representations;*

3.   *that a person mailed something through the United States Postal Service or private or commercial interstate carrier for the purpose of executing such scheme or attempting to do so; and*

4.   *that the person acted with a specific intent to defraud.*

18 U.S.C. § 1341.

Article 581-29 of Title 19 entitled "Blue Sky Law Securities" makes it a criminal offense to:

a)   Sell, offer for sale or delivery, solicit subscriptions to and orders for, dispose of, invite orders for, or who shall deal in any other manner in any security or securities issued after September 6, 1955, unless said security or securities have been registered or granted a permit as provided in Section 7 of this Act, shall be deemed guilty of a felony of the third degree.

b)   In connection with the sale, offering for sale or delivery of, the purchase, offer to purchase, invitation of offers to purchase, invitations of offers to sell, or dealing in any other manner in any security or securities, whether or not the transaction or security is exempt under Section 5 or 6 of this Act, or in connection with the rendering of services as an investment adviser or an investment adviser representative, directly or indirectly:

(1)   engage in any fraud or fraudulent practice;

(2)   employ any device, scheme, or artifice to defraud;

(3)   knowingly make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

(4)    engage in any act, practice or course of business which operates or will operate as a fraud or deceit upon any person is

    (a)   guilty of a felony of the third degree, if the amount involved in the offense is less than $10,000;

    (b)   guilty of a felony of the second degree, if the amount involved in the offense is $10,000 or more but less than $100,000; or

    (c)   guilty of a felony of the first degree, if the amount involved is $100,000 or more.

TEX. REV. CIV. STATE. ART. 581-29; *see also Bailey v. State*, No. 08-02-00424-CR, 2008 Tex. App. LEXIS 3133 (Tex. App.—El Paso, May 1, 2008) (defendant was properly convicted of the fraudulent sale of securities, even though certificates of deposit were not specifically included in the definition of a security under Tex. Rev. Civ. State. Ann. § 581-4(A), because the motivation for the purchase of such was a high interest rate, and an offshore shell bank offered no protection for defendant's clients); *Hays v. State*, 370 S.W.3d 775, (Tex. App.—Texarkana 2012, no pet.) (evidence that appellant intentionally withheld certain information from investors concerning company's spending practices sufficed to uphold securities fraud conviction).

The following elements are required to obtain a conviction for aiding and abetting:

5.    *that the substantive offense was committed by some person;*

6.    *that a person associated with the criminal venture;*

7.    *that the person purposefully participated in the criminal venture; and*

8.    *that the defendant sought by action to make that venture successful.*

18 U.S.C. § 2.

Here, the Complaint alleges that Loumiet:

- Knew that Stanford's principal business strategy was to operate an offshore, unlicensed and unregulated investment company from the U.S. (for marketing purposes) while wholly evading U.S. laws. Complaint at ¶ 49, 53, 165-166, 168.

- Knew that Stanford had been accused by the OCC of violating U.S. banking laws by operating an unlicensed bank from U.S. soil.  *Id.*, at ¶ 57.

- Knew that the government of Montserrat had accused Stanford of using an auditor, Hewlett, who was not qualified, and of operating his bank in a manner detrimental to its depositors and withholding information from the bank's audited financial statements.  *Id.*, at ¶ 60-61.

- Knew that Hewlett continued to be SIBL's only auditor throughout its history. *Id.*, at footnote 12.

- Knew that Stanford had an informant inside the Montserrat government that relayed information to Stanford about said government's (and the British government's) investigation of Stanford.  *Id.*, at footnote 6.

- Knew that Antigua, where Stanford later moved his offshore banking operations, was infamous as a cesspool of corruption and lax regulation, and had a reputation as a known haven for drug running and money laundering.  *Id.*, at ¶ 64, 122.

- Knew in 1990 that the U.S. Government was investigating Stanford for criminal violations.  *Id.* at ¶75.

- Knew in 1991 that a British journalist accused Stanford of deceiving others into believing that SIBL was regulated by the U.S. government.  *Id.* at ¶ 77.

- Knew that SIBL was just a façade and that SIBL's real banking operations were carried out from the U.S.  *Id.* at ¶83-84, 189-191.

- Knew that Stanford was consistently under investigation by various agencies within the US government, including the OCC; FBI (*Id.*, at ¶ 97); and Customs (*Id.*, at ¶ 99); for, *inter alia*, money laundering.  *Id.* at ¶ 99-100.

- Knew that a Texas joint task force investigation of Stanford in 1991 caused Stanford to fire several Stanford employees suspected of leaking information to the authorities.  *Id.*, at ¶ 99.

- Knew that Stanford had corrupted several members of the Antiguan government, including former Antiguan Prime Minister Lester Bird and the Minister of Finance in charge of regulating SIBL, through loans, gifts and bribes. *Id.*, at ¶ 104, 112, 114-117.  Also knew that this corruption of government officials was not an isolated event but continued unabated until Stanford was shut down. *Id.*, at ¶¶ 164, 218, 230.

- Knew that Stanford exercised inordinate control over the Antiguan Government through, *inter alia*, the tens of millions of dollars in loans his banks (BoA and SIBL) extended to Antigua which gave Stanford a lien on the entire country. *Id.*, at ¶ 106.

- Knew that Stanford's BoA did not have sufficient funds to make the loans to the Government of Antigua that it purported to make, and had reason to know said loans were in reality funded with SIBL CD investor funds. *Id.*, at ¶ 92, 106, 107; 223.

- Knew that in 1995 the Antiguan press had accused Stanford of violating Antiguan banking laws by purporting to have BoA loan money (that it didn't have) to the Antiguan Government. *Id.*, at ¶ 110. Also knew in 1996 that a US-based journalist also accused Stanford of making the loans to the government using SIBL investor funds in violation of Antiguan law. *Id.*, at ¶ 123.

- Knew that Stanford's loans to the Antiguan Government violated Antiguan law because no other banks had participated in the loans. *Id.*, ¶ 207, 223.

- Knew that Stanford took over the Antiguan bank regulatory system, rewrote Antiguan bank regulations applicable to SIBL, and appointed himself and his agents (including Loumiet) to the commission overseeing the regulation of SIBL. *Id.*, at ¶ 143-153.

- Knew that one of Stanford's goals in re-writing Antiguan banking laws and regulations was to make it more difficult for US authorities to investigate cases involving fraudulent accounting in Antigua. *Id.*, at ¶ 147-149.

- Knew that Stanford didn't want US authorities to gain access to SIBL's information through computer linkages with Stanford employees in the US. *Id.*, at footnote 17.

- Knew that the U.S. and British governments accused Stanford of manipulating and controlling the regulation of his banks in Antigua and issued warnings about doing business with Antigua. *Id.*, at ¶ 152, 154-155.

- Knew that Stanford's "de facto" representative offices for SIBL in the U.S. likely violated U.S. banking laws. *Id.*, at ¶ 167.

- Knew that the real purposes of the SFIS "trust representative" offices Stanford established in Miami, Houston and San Antonio was to market and sell SIBL CDs in violation of U.S. banking laws. *Id.*, at ¶ 168.

- Knew in 1998 that the SEC was investigating Stanford for violations of federal securities laws. *Id.*, at ¶ 192.

- Knew that Stanford marketed SIBL's portfolio as being invested conservatively in safe and liquid instruments, and that Stanford did not disclose to investors any investments by SIBL in loans to Stanford or the Antiguan Government, Caribbean real estate or private equity companies. *Id.*, at ¶ 196-198.

- Knew that Stanford marketed SIBL CDs as being insured to greater extent than FDIC insurance and that a deposit in SIBL was safer than a deposit in a US commercial bank because SIBL did not make loans. *Id.*, at ¶ 197-198.

- Knew that a former Stanford employee had accused Stanford of manipulating SIBL's financial statements, and that Stanford trained the SGC sales force to falsely market the SIBL CDs as being 100% insured. *Id.*, at ¶ 200-201.

- Knew that SIBL investors were being duped into believing their CD investments were insured. *Id.*, at ¶ 203, ¶ 236.

- Knew in 1998 that Stanford was experiencing severe liquidity problems, and that his Antiguan trust company and BOA were in regulatory trouble and financial difficulty. *Id.*, at ¶ 223-224.

Plaintiffs further allege that despite this knowledge, Hunton nevertheless:

- Sent undercover agents to infiltrate a meeting of an Antiguan opposition party in order to spy on what was said about Stanford. *Id.* at ¶¶ 267-275.

- Sent false letters of recommendation to Panamanian and Venezuelan regulators endorsing Stanford and representing that Stanford was compliant with laws and regulations despite knowledge that Stanford was under constant U.S. government investigation. *Id.* at ¶¶ 309-311.

- Lied to Venezuelan government about Stanford's compliance with laws in order to help Stanford establish banking operations in that country. *Id.* at ¶ 311.

- Assisted to extricate SIBL from money laundering charges in Mexico and prevent Stanford's Mexican operations from being shut down. *Id.* at ¶¶ 321-324.

- Helped Stanford evade increased regulatory oversight of SIBL by the Caribbean central bank authority, the Eastern Caribbean Central Bank ("ECCB"). *Id.* at ¶¶ 329-334.

- Represented Stanford in making private equity and venture capital investments (with knowledge that Stanford was funding the transactions with SIBL investor funds). *Id.* at ¶¶ 345-350, 361.

- Represented Stanford in Caribbean real estate deals (with knowledge that Stanford was using SIBL investor money to fund the transactions). *Id.* at ¶¶ 351-359.

- Assisted to expand SIBL certificate of deposit ("CD") sales operations in the U.S. by referring new brokerage and sales teams. *Id.* at ¶ 366.

- Assisted to expand SIBL CD sales in the U.S. and in establishment of new Stanford Trust Corporation offices in various states. *Id.* at ¶¶ 367-368.

- Lied to Florida regulators during their investigation of SFIS by falsely representing that Stanford's trust operations had nothing to do with SIBL. *Id.* at ¶ 374.

- Provided a deceptive letter from Leroy King to Florida regulators attesting to Stanford's compliance with Antiguan law in bid to try and protect SFIS from being shut down. *Id.* at ¶ 382.

This conduct of Loumiet and Hunton in knowingly making false representations and omissions to government agencies and others to further the goal of the Stanford Entities to market fraudulent CDs issued by SIBL violates the conspiracy statute, the aiding and abetting statute and Texas state securities laws. Loumiet's knowing conduct in facilitating a fraudulent Ponzi scheme was foreign to the duties of an attorney. These allegations more than suffice to bring Loumiet's conduct (and that of Defendant Hunton) well within the crime exception to attorney immunity.

**4.** **The Attorney Immunity Defense Does Not Apply to Claims Brought by Investors Under the Texas Securities Act.**

Finally, Hunton's motion should be denied because the attorney immunity defense does not apply as a matter of law to claims brought by investors under the Texas Securities Act ("TSA").

It is well-settled that common law affirmative defenses are unavailable to defendants under the TSA. *See, e.g., Aegis Ins. Holding Co. v. Gaiser*, No. 04-05-00938-CV, 2007 Tex. App. LEXIS 2364, *15-19 (Tex. App.—San Antonio 2007, pet. denied) (unclean hands); *Duperier v. Texas State Bank*, 28 S.W.3d 740, 753-54 (Tex. App.—Corpus Christi 2000; *Ins. Co. of N.A. v. Morris*, 928 S.W.2d 133, 154 (Tex. App.—Houston [14th Dist.] 1996) (ratification and estoppel), *aff'd in part and rev'd in part on other grounds*, 981 S.W.2d 667 (Tex. 1998); *Riggs v. Riggs*, 322 S.W.2d 571, 574 (Tex. Civ. App.—Dallas 1959, no writ) (laches); *Mayfield v. Troutman*, 613 S.W. 2d 339 (Tex. App. – Tyler 1981 (ratification).

Attorney immunity is a common law, non-statutory affirmative defense to liability. It is, therefore, not available to defendants in actions alleging violation of the TSA. *See N.C. U.A. Bd. v. Morgan Stanley & Co.*, No. 13 Civ. 6705 (DLC), 2014 U.S. Dist. LEXIS 58751, *24-25 (S.D. N.Y. April 28, 2014) (holding that non-statutory defenses are not available under the TSA); *see also id.* at *11-12.

Hunton's arguments for a departure of this rule – all based on purported policy-related considerations – fail. In fact, courts have stressed repeatedly that Texas has a strong interest in protecting investors through the strict enforcement of the TSA. Indeed, courts are instructed to construe the TSA broadly "to effectuate its general purposes *to protect investors*." TEX. REV. CIV. STAT. art. 581-10-1B (emphasis supplied); *see also Shields v. State*, 27 S.W.3d 267, 273

(Tex. App. – Austin 2003, no pet.); *Anheuser-Busch Cos. v. Summit Coffee Co.*, 934 S.W.2d 705, 708 (Tex. App.—Dallas 1996, writ dismissed by agr.) (quoting *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 114 (Tex. 1971)). That policy includes encouraging private rights of action to assist in the enforcement of securities laws to protect investors. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (the protection of United States investors and the regulation of United States capital markets are matters of national public interest, and private securities class actions are an important component of that protection); *Basic Inc. v. Levinson,* 485 U.S. 224, 230–31, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (the securities laws are remedial in nature, and the courts must encourage private lawsuits to effectuate their purpose of protecting investors).

In that regard, the Supreme Court has declined to allow parties to interpose common law defenses in statutory actions where – as here – such common law defenses would disrupt and undermine the public purposes behind the statute at issue. *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 138–40 (1984) (finding that Congress did not intend to allow defendants to assert *in pari delicto* defenses under an antitrust statutory scheme because of the importance of deterring antitrust violations, and noting that "[w]e have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes."), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752 (1968); *see also Bateman Eichler,* 472 U.S. 299, 310 (1985), citing *Perma Life,* 392 U.S. 134 (concluding that allowing defendants who were insider trading tippers to assert *in pari delicto* claims against insider trading tippees in fraud claims would undermine the purpose of securities laws to deter unfair trading practices); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 388-389, 103 S.Ct. 683, 690-691, 74 L.Ed.2d 548 (1983) (common-law doctrines

are sometimes of "questionable pertinence" in applying the securities laws, which were intended "to rectify perceived deficiencies in the available common-law protections by establishing higher standards of conduct in the securities industry"); *A.C. Frost & Co. v. Coeur d'Alene Mines Corp.,* 312 U.S. 38, 43, 61 S.Ct. 414, 417, 85 L.Ed. 500 (1941) (rejecting the unclean hands defense because it would "seriously hinder rather than aid the real purpose" of the securities laws).

Applying this principle, a federal court in this district refused to permit the assertion of a common law defense where its application would "dilute the purpose and force of the statute at issue." *See In re Am. Housing Found.*, Case No. 9-202320-RLJ-11, 2011 WL 4625349, at *32 (Bankr. N.D. Tex. Sep. 30., 2011). The court held that the Supreme Court's decision in *Perma Life* required it to consider, when analyzing a common law defense against a statutory claim, whether allowing such common law defense would effectively emasculate the statute's purpose. *Id.* Consequently, the court in *American Housing* held that "public policy precludes . . . assertion of the defense" because to allow the defense would "not deter future wrongdoing, does not prevent unjust enrichment, degenerates the [statute] and principles of equity, and offends public policy." *Id.* at *33.

The same reasoning holds true in the present action. If the Court permits Hunton to hide behind an attorney immunity defense, it will emasculate the TSA and create different standards for different classes of violators of that statute. Such a holding will create one preferential rule for lawyers and a different rule for all other defendants. Lawyers would be free to conspire criminally with their clients, participate in their clients' fraudulent securities schemes, all the while harming unsuspecting investors in Texas. Clients would be susceptible to private suit by the aggrieved investors – but the lawyers who actually set the stage for or shielded the fraud

would not.   Not only would such an outcome fail to deter wrongdoing, it would actively

encourage it.  This cannot possibly be the rule under the TSA.

**B.** **THE ATTORNEY IMMUNITY DOCTRINE DOES NOT BAR ANY OF THE RECEIVER'S CLAIMS AGAINST HUNTON, NOR DOES IT BAR OSIC'S CLAIMS AS THE RECEIVER'S ASSIGNEE**

In addition to the Class Plaintiffs, the Receiver and OSIC (as the Receiver's assignee)

have properly stated separate, direct claims against Hunton for (i) legal negligence; (ii) aiding

and abetting breaches of fiduciary duty; (iii) violations of the Texas Uniform Fraudulent Transfer

Act; (iv) unjust enrichment; and (v) negligent retention/negligent supervision (collectively, the

"Estate Claims").  *See* [Doc. 114] (order largely denying Hunton's motion to dismiss the Estate

Claims).

These Estate Claims are legal claims made by clients – the Stanford Entities in

Receivership and their assignee, OSIC – directly against their former attorneys, Hunton.  The

Estate Claims are not claims made by investors or "third-parties" and clearly are not barred by

the attorney immunity doctrine, to the extent this doctrine is even applicable in this action.  *See*

*Janvey v. DSCC*, 712 F.3d 185, 190 (5th Cir. 2013) (a federal equity receiver has standing to

assert the claims of the entities in receivership); Sept. 11, 2013 Order 8, in *Janvey v. Adams &*

*Reese, LLP*, Case No. 3:12-CV-0495-N (N.D. Tex. Filed Feb. 16, 2012) (Stanford Receiver has

standing to bring legal claims against former law firm of Stanford Entities); *see also Mosier v.*

*Stonefield Josephson, Inc.*, 2011 WL 5075551, at *3-4 (C.D. Cal. 2011) (receiver has standing to

pursue claims against accounting firm that aided in concealing receivership entity's misconduct);

*Scholes v. Schroeder*, 744 F. Supp. 1419, 1422 (N.D. Ill. 1990) ("[F]raud on the *receivership*

*entity* that operates to its damage is for the *receiver* to pursue. . . ." ) (emphasis in original)).

Hunton, however, argues that a discreet subset of the Receiver's claims – i.e., the claims against Hunton for its role as Stanford's personal attorney – should be dismissed based on the *Cantey Hanger* decision.   Hunton argues briefly and without elaboration that these claims by the Receiver are somehow third-party "non-client claims" against Hunton and should be dismissed. *See* [Doc. 207] p. 15.  But the Receiver also stands in the shoes of Allen Stanford for purposes of pursuing legal claims against his attorneys.  In its Order appointing the Receiver, the Court states clearly that Allen Stanford's assets are included in the Receivership Estate.  *See* Case No. 3:09-cv-00298-N [Doc. 10] (This matter came before me … for the appointment of a Receiver for Defendants Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, **Robert Allen Stanford**, James M. Davis, and Laura Pendergest-Holt ("Defendants") … This Court assumes exclusive jurisdiction and takes possession of the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendants and all entities they own or control ("Receivership Assets")) (emphasis supplied).  Consequently, the Receiver is not a "third-party" to these legal claims – which are assets of Allen Stanford – under *Cantey Hanger*.

In any event, the question of whether Hunton was serving as an attorney for Allen Stanford in his personal capacity or for the Stanford Entities for a particular engagement is clearly a question of fact not appropriate for resolution on the present motion, which addresses only the legal question of the application of the attorney immunity doctrine to this action.  *See Canales v. Jim Wells Cnty.*, No. C–12–171, 2012 WL 3262432, at *3 (S.D. Tex. Aug. 8, 2012) (questions of fact not appropriate for resolution on a motion for judgment on the pleadings). Hunton's representation of Allen Stanford in his personal capacity is very much a question of

fact, especially in light of the allegations in the Complaint that Hunton's legal bills for their purported work for Allen Stanford were paid by the Stanford Entities. *See* [Doc. 1] ¶ 300.

Hunton also argues that *Cantey Hanger* (again, to the extent this decision is applicable to this case), bars OSIC from asserting claims against Hunton as the Receiver's assignee. But the Texas Supreme Court in *Cantey Hanger* did not disturb long-settled law that an assignee stands in the shoes of the assignor for purposes of pursuing legal claims. *See F.D.I.C. v. Bledsoe*, 989 F.2d 805, 810 (5th Cir. 1993) ("the common law speaks in a loud and consistent voice: An assignee stands in the shoes of his assignor."). As such, OSIC is not a "third-party" asserting claims against an attorney; it stands directly in the Receiver's shoes.

In support of dismissal of the claims assigned to OSIC, Hunton further cites to cases that purportedly stand for the proposition that legal malpractice claims cannot be assigned in Texas.[7] *See* [Doc. 207] p. 14 (citing *City of Garland v. Booth*, 971 S.W.2d 631, 635 (Tex. App.—Dallas 1998, pet. denied) and *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 394 (Tex. App.—Houston [14th Dist.] 1997, writ dismissed by agt.)).

But the assignment of legal malpractice claims is invalid in Texas only if the assignment violates principles of public policy. *See Wright v. Sydow*, 173 S.W.3d 534, 550 (Tex. App.—Houston [14th Dist.] 2004, writ den'd.) ("Generally, under Texas law, causes of action are assignable … <u>In addressing the propriety of assigning malpractice claims, Texas courts focus on public policy issues</u>.") (court voiding assignment of malpractice claim because it precludes the parties from settling a litigation and thus violated Texas' public policy of encouraging dispute resolution) (citations omitted) (emphasis supplied). This is a fact-intensive inquiry. *Id.*

---

[7]      Of course, Hunton's argument is limited to the legal malpractice claims and does not address the other Receivership tort claims properly assigned to OSIC, such as aiding and abetting breaches of fiduciary duty.

Here, the Court established OSIC in order to assist the Receiver in bringing claims against third-parties, and to reduce the administrative and financial burden of the Receivership Estate for the benefit of investors and victims of the Stanford fraud. The Court's Order appointing the Receiver explicitly permits the assignment of legal claims to OSIC, which is clearly for the public good. *See* Case No. 3:09-cv-00298-N [Doc. 10] ¶ 8(d). The Receiver's assignment to and joint prosecution of legal claims with OSIC per the terms of the Court's Order establishing OSIC does not in any way violate the public policy of Texas.

In any event, Hunton has long ago waived this argument concerning OSIC's standing to prosecute the Estate Claims. In its briefing on the motion to dismiss the Estate Claims, Hunton explicitly conceded that OSIC's standing to sue Hunton is derivative of and dependent on the Receiver's standing. *See* Order on Motion to Dismiss [Doc. 114] p. 10 ("As an assignee of the Receiver's tort claims, OSIC has standing. Indeed, <u>Defendants concede that if the Receiver has standing to bring tort claims, then OSIC does as well</u>.") (emphasis supplied) (citing Hunton's Reply Brief at pp. 29–30) (arguing OSIC lacks standing because the Receiver has none to assign). In light of this concession, and applying settled law, the Court held that both the Receiver and OSIC have standing to maintain the Estate Claims. *Id.* Hunton should not be permitted to re-litigate an issue that it has already conceded. And there is certainly no basis to overturn this prior determination based on the *Cantey Hanger* decision.

**C.**    **THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS ACTION**

Finally, Hunton argues (in the alternative) that the Court should dismiss the Class Plaintiffs' claims for lack of subject matter jurisdiction under Rule 12(b)(1). In advancing this argument, Hunton simply adopts and incorporates the arguments made by its co-defendant

Greenberg in its similar motion to dismiss based on attorney immunity.  Because the Class Plaintiff's have addressed this issue extensively in response to Greenberg's motion (*see* [Doc. 204] pp. 2-5), the Class Plaintiffs hereby adopt and incorporate their arguments in response to that motion.

## CONCLUSION & PRAYER

For all the foregoing reasons, the Class Plaintiffs respectfully request that this Court deny Hunton's motion for judgment on the pleadings based on the attorney immunity defense.

Dated: August 5, 2016

Respectfully submitted,

**CASTILLO SNYDER, P.C.**

By:  */s/ Edward C. Snyder*
     Edward C. Snyder
     esnyder@casnlaw.com
     Jesse R. Castillo
     jcastillo@casnlaw.com
     300 Convent Street, Suite 1020
     San Antonio, Texas  78205
     (210) 630-4200
     (210) 630-4210 (Facsimile)

**NELIGAN FOLEY, LLP**

By:  */s/ Douglas J. Buncher*
     Douglas J. Buncher
     dbuncher@neliganlaw.com
     Republic Center
     325 N. St. Paul, Suite 3600
     Dallas, Texas  75201
     (214) 840-5320
     (214) 840-5301 (Facsimile)

**BUTZEL LONG, P.C.**

By:  */s/ Peter D. Morgenstern*
     Peter D. Morgenstern (*admitted pro hac vice*)
     morgenstern@butzel.com
     477 Madison Avenue, Suite 1230
     New York, New York 10022
     (212) 818-1110
     (212) 818-0494 (Facsimile)

**STRASBURGER & PRICE, LLP**

By:  */s/ Judith R. Blakeway*
     Judith R. Blakeway
     judith.blakeway@strasburger.com
     2301 Broadway
     San Antonio, Texas  78215
     (210) 250-6000
     (210) 250-6100 (Facsimile)

**COUNSEL FOR THE PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

On August 5, 2016, I hereby certify that I served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

By:     */s Joshua E. Abraham*
               Joshua E. Abraham