# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford receivership estate; SANDRA DORRELL; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated | § § § § § § § § | |
| Plaintiffs | § § | CIVIL ACTION NO. 3:12-cv-04641-N |
| v. | § § | |
| GREENBERG TRAURIG, LLP; GREENBERG TRAURIG, PA; and YOLANDA SUAREZ | § § § § | |
| Defendants | § | |

---

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

---

## TABLE OF CONTENTS

I. PARTIES ..................................................................................................................1

II. OVERVIEW OF CASE .........................................................................................2

III. PERSONAL JURISDICTION ............................................................................5

IV. SUBJECT MATTER JURISDICTION & VENUE .............................................6

V. FACTUAL BACKGROUND .................................................................................7

    **A.**    The Stanford Financial Group Empire ................................................7

    **B.**    Stanford Financial's Operations in the United States and Texas Base ..................9

    **C.**    The Anatomy of the Stanford Illicit Securities Scheme .........................................11

    **D.**    Stanford Financial's Regulatory Obstruction and Concealment Conspiracy ........12

    **E.**    Stanford Financial Expands CD Sales into the United States ...............................13

    **F.**    Stanford Financial Breeds Employee Loyalty Through Exorbitant Compensation ...........................................................................................................14

    **G.**    Dissecting the Stanford Fraud ..............................................................................15

    **H.**    Loumiet and Greenberg Assist Stanford's Illicit Securities Scheme ...................17

        **1.**    The Beginning: Representing the Rogue Offshore Banker ......................17

        **2.**    Stanford Flees Montserrat ..........................................................................21

        **3.**    Greenberg Assists Stanford to Buy His Way into Antigua .......................23

        **4.**    Greenberg Helps Stanford to Target and Silence U.S. Regulatory Officials ......................................................................................................28

        **5.**    Greenberg Assists Stanford to Silence Journalists ...................................29

        **6.**    Greenberg Acts as Securities Counsel for Stanford ..................................30

        **7.**    Greenberg Knows Stanford is Violating U.S. Securities Laws ................31

        **8.**    Loumiet Joins Stanford Financial's Advisory Board ...............................33

        **9.**    Greenberg Assists Stanford's Attempts to Establish Bank Sales Offices in the U.S. .................................................................................34

        **10.**    Greenberg Continues to Assist Stanford with Repeated U.S. Government Investigations .......................................................................36

        **11.**    Loumiet Convinces Stanford to Change the Names of his Companies ...............................................................................................37

        **12.**    Greenberg Assists Stanford to Consolidate his Influence over Antigua ...................................................................................................38

        **13.**    Greenberg's Knowledge of Stanford's Corruption of Antiguan Officials ...................................................................................................41

14.    Greenberg Helps Stanford Become Antigua's "Shadow Government"............................................................................43

15.    Greenberg Protects Stanford by Suing Journalists.....................44

16.    Greenberg Protects Stanford by Threatening U.S. Government Officials............................................................................47

17.    Greenberg Conducts a Counter-Intelligence Campaign against the U.S. Government ...........................................................48

18.    Greenberg Assists Stanford to set up Stanford Group Company .............49

19.    Stanford Expands His Massive Real Estate Investments in Antigua.........50

20.    Greenberg Help Stanford Take Over Antigua's Banking Regulatory System ........................................................................51

21.    Greenberg Advises Stanford on Implications of His Bribery of Antiguan Officials......................................................................59

22.    Greenberg Helps Stanford Establish Representative Offices in the U.S. for Stanford's Antiguan Trust Company ...........................60

23.    Greenberg Assists Stanford to Establish Stanford Trust Louisiana...........67

24.    Greenberg Assists Stanford With His Personal IRS Dispute....................68

25.    Greenberg Represents Stanford in SEC Inquiry .......................................69

26.    Greenberg Helps Stanford Crush Employee Whistleblower ....................72

27.    Greenberg Learns Stanford's Loans to Antigua Violate Antiguan Law ..............................................................................74

28.    Greenberg Assists Stanford with its Reg D Sales of SIBL CDs to U.S. Citizens ..............................................................75

29.    Greenberg Advises Stanford Not to Register as an Investment Company.............................................................................76

30.    Greenberg Helps Stanford With Another DEA Investigation ..................77

31.    Greenberg Learns That Stanford is Violating Antiguan Election Laws ................................................................................78

32.    Greenberg Discovers Signs that SIBL is a Ponzi Scheme........................79

33.    Greenberg Assists Stanford's Attempt to Buy a U.S. Bank: More Red Flags .........................................................................82

34.    Loumiet Moves to Hunton & Williams; Greenberg Continues to Represent Stanford...................................................................83

35.    Loumiet's Personal Relationship with Allen Stanford ............................88

36.    Suarez Handles Stanford Money Laundering Crisis in Mexico ...............90

37.    Suarez Handles Crisis in Ecuador............................................................92

**38.**   The Beginning of the End: Suarez Resigns ................................................92

**39.**   The End of Stanford Financial ..................................................................93

**40.**   Growth in SIBL CD Sales During Defendants' Representation of Stanford Financial ......................................................................................94

**I.**   The Findings of this Court ....................................................................................94

**VI.** STATUTE OF LIMITATIONS DEFENSES ...........................................................95

**A.**   Discovery Rule / Inquiry Notice / Tolling Agreements/Continuing Tort/Equitable Tolling .........................................................................................95

**VII.** RECEIVER CLAIMS ..................................................................................................96

**A.**   Negligence ...............................................................................................................96

**B.**   Aiding, Abetting, or Participation in Breaches of Fiduciary Duties......................97

**C.**   Breaches of Fiduciary Duties.................................................................................98

**D.**   Fraudulent Transfer/Unjust Enrichment ...............................................................99

**1.**   In the Alternative, the Receiver is Entitled to Disgorgement of CD Proceeds from Defendants under the Doctrine of Unjust Enrichment. ..............................................................................................105

**2.**   In the Alternative, the Receiver is Entitled to Restitution Under the Theory of Money Had and Received. .......................................................105

**E.**   Negligent Retention / Negligent Supervision ......................................................106

**VIII.** INVESTOR CLASS ACTION CLAIMS................................................................107

**A.**   Class Allegations ..................................................................................................111

**IX.** INVESTOR CLASS CAUSES OF ACTION ........................................................112

**A.**   Aiding and Abetting Violations of the Texas Securities Act...............................112

**1.**   Sales of Unregistered Securities ..............................................................112

**2.**   Sales of Securities by Unregistered Dealers ............................................115

**3.**   Untruth or Omission .................................................................................117

**4.**   Co-Conspirator Liability...........................................................................118

**B.**   Participation in/Aiding and Abetting Breach of Fiduciary Duty .........................119

**C.**   Aiding and abetting/Participation in a Fraudulent Scheme .................................120

**D.**   Civil Conspiracy ..................................................................................................121

**X.** RESPONDEAT SUPERIOR ...................................................................................122

**XI.** ACTUAL DAMAGES ...............................................................................................123

**XII.** PUNITIVE DAMAGES ............................................................................................123

**XIII.** JURY DEMAND .......................................................................................................123

**XIV.** PRAYER .....................................................................................................................123

Ralph S. Janvey, in his capacity as the Court-Appointed Receiver for the Stanford Receivership Estate; and SANDRA DORRELL, SAMUEL TROICE, and MICHOACAN TRUST, individually and on behalf of a class of all others similarly situated (collectively hereinafter "Class Plaintiffs"), file this Amended Complaint.

## I. PARTIES

1.        Plaintiff RALPH S. JANVEY was appointed by the United States District Court for the Northern District of Texas, Dallas Division, to serve as the Receiver ("Receiver") for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities that the foregoing persons and entities own or control, including but not limited to Stanford Financial Group Global Management, LLC and Stanford Financial Group Company (collectively, the "Stanford Receivership Estate"). Plaintiff Janvey is asserting claims in this Complaint in his capacity as the Receiver for the Stanford Receivership Estate.

2.        Plaintiff SANDRA DORRELL is a citizen of the United States of America currently residing in Harris County, Texas.

3.        Plaintiff SAMUEL TROICE, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

4.        Plaintiff MICHOACAN TRUST is an offshore trust set up by Stanford Trust Company Ltd. (Antigua)("STC Ltd.") through its Miami representative office Stanford Fiduciary Investor Services ("SFIS") and is wholly managed by a Mexican citizen from Mexico City, Mexico.

5.      Additionally, this case seeks certification of a class of all investors who, as of February 17, 2009, had purchased and still owned Certificates of Deposit ("CD") and/or otherwise maintained deposit accounts with Stanford International Bank Ltd. ("SIBL"), or such other classes or subclasses as determined by the Court.

6.      Defendant GREENBERG TRAURIG, LLP is a limited liability partnership organized under the laws of the State of New York. Greenberg has been served and answered. Defendant GREENBERG TRAURIG PA is a professional corporation organized under the laws of the state of Florida.  Defendant's home office address is 333 SE 2nd Avenue, Suite 4400, Miami, Florida 33131.  Because Defendant engages in business in Texas and has done so at all material times but does not maintain a place of regular business in Texas or a designated agent on whom process can be served, service on Defendant should be made by serving the Secretary of State of Texas, Capitol Station, Austin, Texas 78711, and forwarded to Defendant's home or home office, 333 SE 2nd Avenue, Suite 4400, Miami, Florida 33131.  Plaintiffs' cause of action arose from or is connected with one or more transactions with Defendant Greenberg that occurred or were consummated in Texas, as more particularly described in this pleading and any included exhibits.   Greenberg Traurig LLP and Greenberg Traurig PA are hereinafter collectively referred to as "Greenberg."

7.      Defendant YOLANDA SUAREZ ("Suarez") resides in Miami, Florida.  She has been served and answered.

## II.  <u>OVERVIEW OF CASE</u>

*"you are one of my very best friends…and a major reason why I was able to survive the difficult battles over the years and are in the position I am today".*

Allen Stanford December 1, 2004 e-mail to Carlos Loumiet

*"my loyalty is first and foremost to you, and not anyone else, so I will watch out for your interests, and not those of anyone else in your organization".*

Carlos Loumiet December 1, 2004 e-mail to Allen Stanford,

*"I wouldn't be where I am today without you"*.

Allen Stanford 2006 e-mail to Carlos Loumiet

*"I am SO proud of you"*

Carlos Loumiet 2006 e-mail to Stanford (emphasis in original)

8.    Allen Stanford ("Stanford") was a former bankrupt gym owner who perpetrated one of the largest and most notorious Ponzi schemes in the history of the United States. For over twenty years, and through a web of companies commonly referred to as "Stanford Financial", Stanford utilized the veneer of an offshore bank in the Caribbean - that was in actuality run entirely from the United States - to steal billions of dollars from thousands of investors through the fraudulent sale of bogus bank "CDs". In reality, the offshore bank was Stanford's personal "piggy bank", and the global "Stanford Financial" network of entities was simply a collection of "feeder" companies whose sole purpose was to sell the bogus CDs and thereby pump money into the pockets of Stanford.

9.    Stanford violated a host of laws around the world in order to implement, effectuate and perpetuate his global securities fraud Ponzi scheme. Stanford refused to comply with laws, including proper registration of his securities business in the U.S., because full compliance and registration would have led to more government scrutiny of his offshore bank and exposed the fraudulent nature of the CD program. As a result, and with the help of Defendants, Stanford insulated himself against regulatory scrutiny and was able to operate what amounted to an unregistered investment company issuing unregistered securities from the United States while deceiving his customers into believing that his global operations were legitimate and properly regulated, and that the CD products offered by his offshore Ponzi bank were safer and more secure than CDs issued by U.S. banks.

10.     Stanford could not have perpetrated this global mass fraud on his own. He needed corrupt regulators in his chosen offshore jurisdiction of Antigua, shady accountants, and skilled and complicit lawyers to help him. He found the perfect match in Carlos Loumiet ("Loumiet"), a Miami international banking lawyer who was Stanford's kindred spirit and legal facilitator for over twenty years, and Suarez, Loumiet's protégé who rose to become Stanford's Chief of Staff and right hand.

11.     Loumiet served as the Texas-based Stanford Financial Group of companies' self-proclaimed "outside general counsel" for over twenty years, from 1988 until 2009. For 13 of those years, Loumiet was a partner at Greenberg leaving that firm and taking the Stanford relationship with him to join Hunton & Williams, ("Hunton") in 2001. In 1992 Loumiet recommended his protégé, Suarez, to Stanford and she became General Counsel of Stanford Financial and later Chief of Staff to Stanford himself.

12.     As internal and external general counsel to the Stanford Financial Group of companies, including, in particular, the Antiguan-based offshore bank SIBL, Loumiet and Suarez were deeply involved in virtually every facet of Stanford's business model and were always present on the front lines of Stanford's empire. Loumiet and Suarez knew that Stanford's principal business was the sale of the CDs from his offshore bank; knew that Stanford needed a U.S. sales and marketing base in order to be able to lend legitimacy to his offshore bank and thereby sell the CD products; and knew that, in order to succeed, Stanford needed to have complete control over the offshore haven where his bank was based. Loumiet and Suarez helped Stanford achieve all of those goals.

13.     While at Greenberg Loumiet materially assisted Stanford's global Ponzi enterprise in three essential ways: (i) he helped Stanford take over the tiny, impoverished

Caribbean island of Antigua and thereafter control the notoriously corrupt Antiguan government in order to establish a "safe haven" where Stanford could operate above the law; (ii) he assisted Stanford to establish all of his U.S. marketing and sales "feeder" offices, including the illegal offshore "trust" representative offices in Miami, Houston and San Antonio whose sole purpose was the sale of SIBL CDs to Latin American investors and ultimately funnel billions of dollars into Stanford's Ponzi scheme; and (iii) he and his law firm helped Stanford structure the transactions through which Stanford "invested" the money he pilfered from SIBL, including massive investments in Caribbean real estate and speculative venture capital investments that eventually even included a very unsuccessful and expensive movie project.

14.     In the final analysis Loumiet and Suarez succeeded for 21 years in enabling Stanford Financial to effectively operate free of governmental regulations and oversight and completely outside the law. They provided all of this assistance with full knowledge that Stanford was under investigation by the U.S. federal government -- in one form or another -- every step of the way. Indeed Loumiet counseled Stanford for over twenty years on how to evade U.S. laws and regulations while still operating primarily from U.S. soil – essentially providing the architectural structure for Stanford to pull off his $7 billion Ponzi scheme. In short, Loumiet's and Suarez's finger prints are all over the Stanford Ponzi scheme from beginning to end, and to tell the story of Loumiet's and Suarez's involvement with Stanford is to tell the story of the Stanford Financial Group itself.

### III.  PERSONAL JURISDICTION

15.     This Court has personal jurisdiction over the non-resident Defendants under the Texas Long Arm Statute. Suarez lived in Houston, Texas during much of the time period described in this Complaint and thereafter engaged in daily contact with other Stanford personnel

in Texas as part of her responsibilities as General Counsel and then Chief of Staff of the Stanford
Financial Group

16.    Greenberg is subject to general jurisdiction because it has offices and agents in
Texas and has conducted continuous and systematic business in the State of Texas for many
years. Furthermore, as described herein, Greenberg engaged in extensive specific jurisdiction
contacts with the State of Texas for over 21 years specifically with the Stanford Financial Group
headquartered in Houston, Texas that give rise to Plaintiffs' causes of action, and therefore
Greenberg has done business and committed torts in the State of Texas.

17.    Based on their general and specific contacts with the State of Texas, Defendants
have purposefully availed themselves of the privilege of conducting activities within Texas and
have established minimum contacts with the State of Texas under the Long Arm Statute.

18.    Furthermore this Court has personal jurisdiction over Defendants pursuant to FED.
R. CIV. P. 4(k)(1)(C) and 15 U.S.C. §§ 754 and 1692.

## IV.  SUBJECT MATTER JURISDICTION & VENUE

19.    This Court has jurisdiction over this action, and venue is proper, under Chapter 49
of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754). Further, as the Court that
appointed the Receiver and the Committee, this Court has jurisdiction over any claim brought by
the Receiver to execute Receivership duties. Further, within 10 days of the entry of the Order and
Amended Orders Appointing Receiver, the Receiver filed the original SEC Complaint and the
Order Appointing Receiver in the United States District Court for the Southern District of
Florida and the United States District Courts for the districts in Texas pursuant to 28 U.S.C. §
754, giving this Court *in rem* and *in personam* jurisdiction in those districts and every other
district where the Complaint and Order have been filed.

**20.**     This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(A) because this action is, in part, a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of states and countries different from Defendants.

## V.  FACTUAL BACKGROUND

### A.    *The Stanford Financial Group Empire*

**21.**     From the mid-1980s through February 2009, R. Allen Stanford (sometimes referred to hereinafter as "Stanford") — a former bankrupt gym owner from Mexia, Texas — built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment funds. The empire was comprised of over 140 companies across the globe, all of which were ultimately owned by Stanford himself. The companies operated under the brand name "Stanford Financial Group" with their worldwide headquarters located in Houston, Texas. The conglomeration of Stanford companies (collectively, "Stanford Financial" or "Stanford") included but were not limited to: (i) the Houston, Texas-based registered broker/dealer and investment adviser company Stanford Group Company ("SGC"); (ii) the Houston-based administrative company that serviced all the different companies, Stanford Financial Group Company; (iii) the offshore bank Stanford International Bank Ltd. ("SIBL"), formerly known as Guardian International bank Ltd. ("GIBL"), organized under the laws of Antigua; (iv) Stanford Trust Company (Louisiana) ("STC"); (v) Stanford Trust Company Ltd. (Antigua) ("STC Ltd."); and (vi) the representative offices of Stanford Trust Company Ltd. (Antigua), d/b/a "Stanford Fiduciary Investor Services" ("SFIS"), that operated in Miami, Houston, and San Antonio. Stanford Financial was ultimately controlled and managed from Houston, Texas in the United States.

22.     Over the years, Stanford Financial grew into a purported full-service financial services firm, offering worldwide clients private banking and U.S.-based broker/dealer and investment adviser services. Stanford Financial gave its clients all the appearances of a highly successful operation, with lavish offices in some of the world's premier cities. Stanford himself made the Forbes list of the richest people in the world with a personal fortune estimated at $2.2 billion.

23.     The entire Stanford Financial operation was fueled primarily by one product: Certificates of Deposit ("CDs") issued by SIBL. Clients who were introduced to Stanford Financial, whether in Houston, Miami, Caracas, or Mexico City, quickly learned that the main financial product peddled by the group was the SIBL CD. SIBL CDs were sold worldwide by a web of different Stanford Financial "feeder" companies, including SGC, STC and SFIS, whose function was to promote the sale of SIBL CDs. For example, to access additional investor capital in Latin America, Stanford Financial established representative offices in Colombia (Stanford Group Columbia a/k/a Stanford Bolsa y Banca), Ecuador (Stanford Group Ecuador a/k/a Stanford Group Casa de Valores, S.A. and Stanford Trust Company Administradora de Fondos y Fideicomisos, S.A.), Mexico (Stanford Group Mexico a/k/a Stanford Group Mexico S.A. de C.V. and Stanford Fondos), Panama (Stanford Group Panama a/k/a Stanford Bank Panama and Stanford Casa de Valores Panama), Peru (Stanford Group Peru a/k/a Stanford Group Peru S.A. Sociedad Agente de Bolsa), and Venezuela (Stanford Group Venezuela a/k/a Stanford Group Venezuela C.A., Stanford Bank Venezuela, and Stanford Group Venezuela Asesores de Inversion). These foreign offices were ultimately controlled and administered by Stanford Financial employees in Houston, Texas. By February 2009, Stanford Financial's records reveal that SIBL had total purported CD account balances of approximately $7.2 billion.

**B.**     ***Stanford Financial's Operations in the United States and Texas Base***

24.     For the first decade of its operations, 1985 to 1995, Stanford Financial targeted a Latin American clientele. But by the late 1990s, Stanford Financial Group had established a foothold in the United States. In 1995, Stanford Financial Group established SGC, which in February 1996 was registered with the Securities Exchange Commission ("SEC") as a broker/dealer and investment adviser. SGC established offices initially in Houston and Baton Rouge, Louisiana, and SGC began the practice of "head hunting" for U.S. brokers, bankers, and other financial advisers, paying them enormous signing bonuses to leave their jobs at other firms. Fueled by this influx of veteran bankers, brokers and financial advisers, SGC grew from 6 branch offices in the United States in 2004 to more than 25 offices across the United States (but principally concentrated in the Southern United States) in 2007.

25.     Since the 1980s, Allen Stanford recognized the huge potential for marketing his offshore CDs to Latin Americans via the "gateway" city of Miami. In 1998, Stanford Financial – with Defendants' assistance – established SFIS in Miami to sell the SIBL CDs to foreign investors. SFIS was organized under Florida state law in order to evade federal banking and securities regulations. The Miami office of SFIS generated over $1 billion in SIBL CD sales for Stanford Financial, primarily from sales of CDs to investors from Latin American countries including but not limited to Colombia, Ecuador, Peru, and Venezuela. Stanford Financial also set up SFIS offices in Houston and San Antonio, Texas to cater to Mexican investors visiting those cities.

26.     Stanford Financial also increased sales of SIBL CDs by targeting the IRA accounts of its U.S. investors. In 1998, Stanford Financial Group established STC in Baton Rouge, Louisiana to serve as the trustee/custodian for IRA accounts owned by SGC clients. After

STC was established, SGC's brokers and investment advisers convinced the IRA investors to invest some or, in many cases, *all* of their IRA account funds in the SIBL CDs.

27.     For all of these "feeder" companies — whether SGC, SFIS, or STC — the primary product marketed and sold was the SIBL CD, as it sustained Stanford Financial's operations and paid its employees' exorbitant salaries and bonuses. The "feeder" companies were all members of Stanford Financial, were ultimately owned by Stanford himself, and were interconnected via intercompany marketing and referral fee agreements. Additionally, the "feeder" companies were all controlled by personnel at the Stanford Financial Group headquarters in Houston.

28.     The Stanford Financial's Group's nerve center and principal base of all operations including SIBL, SGC, SFIS, and STC was in Houston. STC was wholly owned by Houston-based SGC and controlled by Stanford Financial personnel in Houston. In addition, virtually every member of the STC Board of Directors at any time was an employee of SGC. Stanford Financial directed STC's operations and provided all administrative functions from its Houston headquarters. STC's annual budget and financial forecasts were prepared by Stanford Financial personnel in Houston, and even reimbursement of expenses for STC employees was handled out of Houston.

29.     All the sales and marketing practices for the entire Stanford Financial group of companies — including SIBL — as well as general operational and administrative functions, were managed under the overall direction, supervision, and control of the Houston offices of Stanford Financial. SIBL itself never had a marketing or sales arm in Antigua; rather it depended entirely on all the separate promoter or "feeder" companies like SGC, SFIS, and STC to sell its

CDs. The head of Stanford Financial's global sales operation for the marketing and sale of SIBL CDs was also located in Houston.

30.    The sales practices, directives, techniques, strategies and reward programs for Stanford Financial - including SIBL - were developed and crafted in Houston and disseminated to the various Stanford Financial branch offices around the world, including SGC, STC and SFIS. The sales force training manuals, promotional literature, and materials for SIBL, including the Spanish- language promotional materials used by SGC, STC and SFIS, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other Stanford Financial sales offices around the world to be utilized by the local sales force in each country.

31.    In addition, mandatory sales training for the Stanford Financial sales force for SIBL CDs was conducted principally in Houston (known to the foreign financial advisers as the "Houston experience") by Stanford Financial personnel. In those mandatory training sessions, sometimes twice a year, Stanford Financial's financial advisers ("FAs") were trained to sell the Stanford Financial Group's image as a premier financial services company based in the United States. The "script" for why SIBL was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled into the FAs' heads.

*C.*    ***The Anatomy of the Stanford Illicit Securities Scheme***

32.    In reality, Stanford Financial operated an illegal, unregulated investment company selling unregistered and unregulated – and therefore patently risky and dangerous - securities from the United States. Stanford Financial sold its investment company "internal products", denominated as SIBL "CDs", from its base in the United States through a flashy marketing campaign that was designed to trick investors into believing they were purchasing safe, secure, insured, and highly liquid bank CDs, which were purportedly regulated in the United States

because Stanford Financial was based in the United States and SGC was a U.S. licensed broker/dealer.

33.     Stanford Financial induced investors to buy the CDs by offering unusually consistent and above-market rates, publishing fraudulent financial statements prepared by a small accounting firm in Antigua, C.A.S Hewlett & Co., Ltd. ("Hewlett"), furnishing other data that significantly overstated SIBL's purported earnings and assets, and misrepresenting the bank's business model, regulatory environment, investment strategy, financial strength, safety and nature of its investments, and other facts important to investors.

34.     In reality, SIBL's earnings and assets were insufficient to meet its CD-payment obligations, so the only way Stanford Financial could keep the scheme going was by using proceeds from new CD sales to pay CD redemptions, interest, and operating expenses of the web of companies under the Stanford Financial Group umbrella. SIBL's purported assets were fraudulently inflated to offset CD obligations and its revenues were "reverse-engineered" to arrive at desired levels. Each year or quarterly reporting period, Stanford Financial would simply determine what level of fictitious revenue SIBL "needed" to report to entice investors, satisfy regulators, and purport to cover its CD obligations and other expenses. Stanford Financial would then "plug" the necessary revenue amount by assigning equally fictitious revenues to each category (equity, fixed income, precious metals, alternatives) of a fictitious investment allocation.

**D.      *Stanford Financial's Regulatory Obstruction and Concealment Conspiracy***

35.     Stanford was able to pull off his massive Ponzi scheme for over two decades because of his ability to operate his unregistered and unregulated investment company from the U.S. while wholly evading U.S. laws and regulations, and because of his control of his offshore Antiguan "safe haven". In the U.S., and with Defendants' material assistance, Stanford

successfully skirted U.S. law and grew his "feeder" companies in plain view and notwithstanding the existence of constant governmental investigations into his activities. In Antigua, with Defendants' material assistance Stanford managed to co-opt and outright "buy" the local government, thereby creating a complicit safe haven to shield SIBL from regulatory scrutiny from other governments around the world. With Defendants' material assistance, Stanford thwarted regulatory scrutiny in every country in which his companies operated - including the United States - by evading any and all laws that might affect his scheme and concealing the true nature of Stanford Financial's operations.

E.      *Stanford Financial Expands CD Sales into the United States*

36.      In 1996, Stanford Financial finally entered the United States securities market. First, it registered the newly formed SGC as an SEC-licensed securities broker/dealer and investment adviser. In September 1998, Stanford Financial established a trust representative office in Miami for its Antiguan offshore trust company, Stanford Trust Company Ltd. ("STC Ltd."), naming the new U.S. office Stanford Fiduciary Investor Services ("SFIS"). Stanford Financial later expanded this SFIS model by opening additional SFIS "trust representative offices" in Houston and San Antonio in 2001 and 2005. SFIS's sole mission was to sell SIBL CDs to Latin American investors, including exclusively Mexican investors through the San Antonio office. The SFIS model proved very successful: Stanford Financial sold more than $1 billion in SIBL CDs through the Miami office alone.

37.      In 1998, Stanford Financial also established STC in Baton Rouge, Louisiana. STC provided trustee and custodial services that allowed SGC to sell SIBL CDs to its clients' IRA accounts. This new IRA component of the Stanford Ponzi scheme eventually funneled hundreds of millions of dollars into Stanford Financial.

**38.**     In November 1998, SIBL filed a Form D with the SEC for a Regulation D ("Reg. D") exemption. The purported exemption allowed SGC to sell SIBL CDs to "accredited investors" in the United States without registering the CDs as securities. This initial exemption, which permitted a $50 million offering, planted the seed for Stanford Financial's exponential future growth.

**39.**     In 2001, SIBL filed an amended Form D to increase the CD offering to $150 million. By 2003, Stanford Financial had printed and distributed some 30,000 offering brochures for its FAs to use to sell the CDs to U.S. investors. In response to increasing sales to U.S. investors, SIBL filed two additional Form D amendments in 2004 that increased the offering to $200 million and then ***$1 billion***. These amendments set the stage for an extensive television advertising campaign, which Stanford Financial launched in 2005 to promote further sales to purportedly accredited investors in the United States.

**40.**     By March 2006, Stanford Financial had distributed 4,424 SIBL CD "Accredited Investor" packets to investors under the Reg. D offering. Finally, in November 2007, SIBL filed yet another Form D amendment to increase the offering to $2 billion.

**F.**     ***Stanford Financial Breeds Employee Loyalty Through Exorbitant Compensation***

**41.**     From 2004 to 2008, Stanford Financial grew into a high-powered sales and marketing machine. The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars". To market and sell SIBL CDs, Stanford Financial established a commission structure that provided huge incentives for its FAs, including those at SGC, to "push" the SIBL CDs on investors. SIBL paid disproportionately large referral fees to SGC for the sale of its CDs: SGC received a 3% referral fee for each CD sale, with 1% going to the SGC broker who made the sale. The FAs were eligible to receive an additional 1% trailing commission throughout the

term of the CD, as extended, thus providing a built-in incentive for the FAs to convince their clients to "roll over" and continue their CD investments. Stanford also held "sales contests" and gave lavish gifts to FAs who sold the most CDs. Stanford Financial used these inflated commissions to recruit established financial advisers, and to reward advisers who aggressively sold SIBL CDs to investors. Of course, these incentives are extremely rare for bank CDs because they are economically unsustainable. Defendants were all aware of these Stanford sales practices.

G.      *Dissecting the Stanford Fraud*

42.    The ultimate reality of Stanford Financial is that it was a massive, worldwide Ponzi scheme run from Houston, Texas. In essence, Stanford and his co-conspirators used the SIBL CDs to lure investor money into Stanford Financial and then steal billions of dollars in assets from Stanford Financial companies for their own personal benefit. Substantial sums of these stolen funds were used to: (i) support the lavish lifestyles of Stanford and his Ponzi insiders; (ii) issue bogus, unsecured personal "loans" to Stanford; (iii) capitalize other entities wholly owned by Stanford; and (iv) fund investments in speculative, illiquid, and high-risk assets, including private equity holdings and speculative investments in Antiguan real estate. By February 2009, Stanford and his cronies had stolen at least $1.8 billion through the bogus loans alone. Stanford Financial also blew through hundreds of millions of CD investor funds to create and perpetuate the charade of Stanford Financial's image, with lavish offices, excessive bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to create the illusion of wealth, power, and prestige.

43.    In addition to stealing billions of dollars from Stanford Financial companies, Stanford and his co-conspirators violated U.S. securities laws by functioning as an unregistered investment company in violation of the Investment Company Act. Furthermore, Stanford

Financial's sales of SIBL CDs were unenforceable against investors under Section 47(b) of the

Investment Company Act:

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.

15 U.S.C. § 80a-46.

**44.** These facts were never disclosed to CD investors. Instead, investors were

consistently and uniformly told — both verbally and via promotional materials — that Stanford

Financial was compliant, authorized, and regulated by the SEC and the Financial Industry

Regulatory Authority ("FINRA"), and backed by insurance coverage from the Securities Investor

Protection Corporation ("SIPC") and Lloyd's of London. CD investors were never told that the

acts of Stanford Financial and its unregistered investment company were void as a matter of law

under Section 47 of the Investment Company Act.

**45.** As part of this fraud, Stanford Financial also uniformly touted the high liquidity

of SIBL's purported investment portfolio. For example, in its marketing materials distributed to

CD investors from at least 1995 through 2009, Stanford Financial emphasized the importance of

the SIBL CD's liquidity. Under the heading "Depositor Security," Stanford Financial's materials

state that the bank focuses on "maintaining the highest degree of liquidity as a protective factor

for our depositors." None of that was true. Likewise, Stanford Financial trained its FAs to stress

liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that

the "liquidity/marketability of SIBL's invested assets" was the "most important factor to provide

security to SIBL clients . . . ." To ensure investors would buy SIBL CDs, Stanford Financial,

through its FAs, assured investors that SIBL's investments were liquid and diversified, and therefore the CDs themselves were highly liquid and could be redeemed with just a few days notice.

46.     As proven in the criminal trial of Stanford, Stanford and his CFO Jim Davis fabricated the nature, size, and performance of SIBL's purported investment portfolio. Gilbert Lopez and Mark Kuhrt, accountants for the Stanford Financial companies, fabricated the financial statements using pre-determined returns on investments that were typically provided by Stanford or Davis. Lopez and Kuhrt used these fictitious returns to reverse-engineer the bank's financial statements and report investment income that SIBL did not actually earn. The information in SIBL's financial statements, "blessed" by SIBL's Antiguan auditor Hewlett, bore no relationship to the actual performance or existence of SIBL's purported investments. SIBL's financial statements were prepared, drafted, and approved by Stanford in conjunction with Davis, Lopez and Kuhrt. Stanford and Davis also fraudulently inflated real estate and private equity holdings in SIBL's purported portfolio so the bank could appear to maintain its minimum capital requirements.

## H.     *Loumiet and Greenberg Assist Stanford's Illicit Securities Scheme*

### 1.     <u>The Beginning: Representing the Rogue Offshore Banker</u>

47.     Since the first day he met him, Loumiet knew that Stanford's intent was to operate an offshore, unlicensed investment company from U.S. soil but skirting U.S. law. Loumiet and his law firm Greenberg started representing Stanford and Stanford Financial in April 1988, when Stanford was running his predecessor offshore bank, Guardian International Bank Ltd. ("GIBL") from the tiny Caribbean island nation of Monserrat (12,000 residents). At that point in time in 1988, Loumiet was 37 years old and had been practicing law for ten years. He had joined Greenberg in 1982 and had been made a partner in 1984. His specialization was in

international corporate and banking law, and he professed a disdain for government regulation or "geographic borders" for banking. Allen Stanford was 38 years old and declared business and personal bankruptcy in Waco following the failure of his chain of gyms just two years prior to moving offshore and setting up GIBL in 1986. Loumiet and Greenberg established their attorney-client relationship, including billing relationship, with Stanford Financial centered in Houston, Texas.[1]

48.     After being introduced to Loumiet, on March 25, 1988 GIBL's Houston-based General Counsel, Sidney Adler, sent a letter to Loumiet describing Stanford Financial and its Board of Directors (including Allen Stanford and his father James Stanford) and outlining its business model, which he described as taking time deposits through GIBL from primarily Mexican depositors and re-investing that money in "other foreign banks" to earn an interest rate spread. Adler told Loumiet that GIBL was an "**investment bank**", and **_not_** a commercial bank because it **did not make loans**. Loumiet's early understanding of Stanford's business model is crucial given Greenberg's advice to Stanford in 1998 that it did not need to register as an investment company because SIBL was a commercial bank. It also underscores Loumiet's knowledge of where the money was coming from (GIBL and then SIBL) over the years as Stanford Financial continued to make investments via other Stanford entities.[2]

---

[1]       Greenberg's file opening memorandum for the initial Stanford file dated April 21, 1988 listed GIBL as the client, with its address at 1100 Milam, Houston, Texas. Another Greenberg client file opening memorandum from 1995, this one to help Stanford "draft offshore trust statute", similarly listed Stanford's Houston office – now 5050 Westheimer – as the client address.

[2]       Stanford regularly provided Loumiet with the financial statements for GIBL and, later SIBL, which Loumiet regularly reviewed. In April 1989, Adler sent Loumiet GIBL's financial statements as of March 31, 1989, which showed that GIBL had $31 million in assets but $30 million of that was comprised of client deposits. Shareholder equity in GIBL totaled just $1 million.

49.     Adler explained to Loumiet in the same March 1988 letter that, even though GIBL was chartered in Montserrat as a "Class B" international bank,[3] it had a "representative office" in Houston through which it conducted *all* of its sales and marketing. At that point in 1988, GIBL held about $17 million in deposits, primarily from Mexican citizens.

50.     In the same letter, Adler informed Loumiet that Stanford Financial also owned a real estate investment and development company called Guardian International Investment Services ("GIIS"), that invested primarily in apartment complexes in Houston. Adler told Loumiet that GIIS sold limited partnership interests to foreign investors interested in investing in real estate in the United States, and had offices in Houston and Miami.

51.     Loumiet realized immediately that the key to Stanford's success was his ability to market his banking operations as being based in the United States. Indeed, at all times in the late 1980s, GIBL's sales and marketing office and administrative nerve center was in Houston, Texas. When Loumiet started representing Stanford in the late 1980s, Stanford was in the process of attempting to register GIBL with the United States Treasury Department as a "foreign bank". But U.S. Treasury had repeatedly rejected Stanford's registration applications because GIBL was an "offshore" bank that had no domestic operations in its domicile of Montserrat, and also because Treasury considered GIBL to be largely, if not wholly, *unregulated* by any real government regulator in Montserrat.

52.     After retaining Loumiet and Greenberg, on April 13, 1988 Adler solicited Loumiet's assistance with regard to establishing a sales representative office for GIBL in Miami. Adler asked Loumiet to "be creative" about his legal advice, because "*if we cannot do something directly, perhaps the same result can be achieved indirectly, perhaps through [GIIS]*". Adler

---

3       A Class "B" charter meant that GIBL was an international or "offshore" bank because it could not accept deposits in the local currency or from local residents of Montserrat.

then described to Loumiet how GIBL's marketing offices were in Houston, and how virtually all activities related to GIBL occurred in Houston, including receiving clients and having them fill out GIBL account documentation; placing calls to prospective investors on behalf of GIBL; and mailing out promotional and marketing materials and correspondence from GIBL to actual and prospective investors.[4] Adler closed the letter by asking Loumiet whether GIIS could perform the same functions for GIBL from its Miami office, and informed Loumiet that Stanford wanted to push the issue of what could be done from the GIIS Miami office "*to the legal limit*".

53.     In May, 1988 Loumiet and Greenberg advised Stanford Financial that it could utilize GIIS in Miami as a "liaison" office for GIBL in the U.S. Greenberg advised that the way to do it was for GIIS to sign a "Management Service Contract" with GIBL whereby GIIS provided "administrative services" for GIBL. Adler informed Stanford of this advice in a May 12, 1988 Memo, in which he pointed out that the Management Services Agreement would be a "*good self-serving document, frankly, in the event any questions are raised*". Importantly, virtually everything in this May 1988 Memo about the kinds of services (including marketing and bank customer relation services) GIIS could provide for GIBL is virtually identical to what Loumiet later told Stanford SFIS could do for SIBL in 1998.

54.     The GIBL / GIIS structure provided the starting point and roadmap for Stanford's eventual expansion and success over the ensuing 21 years, as Stanford followed this same strategy of utilizing an offshore bank coupled with U.S. sales, marketing and administrative offices in order to maximize sales while minimizing regulatory scrutiny.

55.     At the time of the formation of their attorney-client relationship, Loumiet and Greenberg became aware that Stanford had been accused of violating banking laws in Texas for

---

4       In another memo also dated April 13, 1988, Adler informed Loumiet that GIBL even generated and mailed its customers' bank account statements from Houston.

running unlicensed "feeder" sales offices in Houston and El Paso for Guardian Bank. Loumiet was also made aware by Stanford that in 1988 and again in 1989, the U.S. Office of the Comptroller of the Currency ("OCC") had issued advisories concerning Stanford Financial's similar violations of banking laws in Florida and California.

56.    In April 1988, Adler provided Loumiet with correspondence between Stanford Financial and the Texas Department of Banking and the U.S. Treasury Department. Adler also made Loumiet aware during this same time period of Stanford Financial's precarious position with regard to whether its primary product, the GIBL CDs, constituted securities under U.S. law and whether the CD securities could be lawfully marketed and sold from the United States. In a June 17, 1988 Memo from Adler to Stanford, a copy of which Adler or Stanford provided to Loumiet, Adler informed Stanford that it was absolutely "imperative" for GIBL to obtain a Class "A" license in Montserrat for two reasons: (1) so that the U.S. Treasury Department would allow GIBL to open bank representative offices in the U.S., and (2) *so that Stanford Financial would not be deemed to be selling unregistered securities from the U.S. in violation of U.S. securities laws*. Indeed Adler went on to tell Stanford (and thereby Loumiet) via the June 17, 1988 Memo that "**there is no question**" that the GIBL CDs were securities. Thus Loumiet knew from the very beginning of his representation of Stanford that these were two key issues for Stanford, and these two issues (unregistered securities sold from unlicensed sales offices in the U.S.) thereafter framed Loumiet's attorney-client relationship with Stanford for the next twenty years.

2.    **Stanford Flees Montserrat**

57.    Throughout the 1980s Montserrat was well known (including to Loumiet) as an "outlaw" banking jurisdiction utilized primarily by fraudsters, con artists and money launderers,

where anyone could buy a banking license for a couple thousand dollars, no questions asked.[5] By 1989, the banking system in Montserrat came under investigation by British and U.S. authorities. Stanford and GIBL also came under investigation by the FBI and British authorities for laundering money for the Medellin and Cali drug cartels, so Stanford looked to move his bank to a new location.

58.     On November 28, 1990, after being debriefed by the FBI regarding Stanford's activities, the Financial Secretary of Montserrat determined that it had to get rid of Stanford and so notified Stanford that it was going to revoke GIBL's banking licenses because: (i) GIBL's auditor, Hewlett, was not an approved auditor; (ii) **GIBL was operating in a manner "*detrimental to its depositors*"**; (iii) GIBL failed to supply satisfactory details as to its liquidity; (iv) one of Guardian Bank's directors (Stanford himself) was a former bankrupt; and (v) GIBL had failed to submit annual financial statements. The Montserrat Government gave Stanford until December 21, 1990 to show cause why GIBL's banking license should not be revoked. Stanford informed Loumiet about the above accusations when they were made in 1990 and sought his guidance and legal advice.

59.     After receiving Stanford's response to its revocation notice, the Montserrat Government specifically found that Stanford's accountant, Hewlett, who he had used and would use continuously from 1987 until Stanford's collapse in 2009, fell short of the standard of qualification for an approved auditor, and that, by not employing an internationally recognized accounting firm, Stanford had managed to "*influence the withholding of detailed information that would normally be expected in audited financial statements*". The Montserrat Government noted that Stanford's response as to GIBL's liquidity relied on information purportedly

---

5       Loumiet and Greenberg informed Adler in 1988 that Montserrat's reputation in international banking was "not good and getting worse" and was attracting the attention of federal authorities.

evidencing the bank's liquidity that was not typically used for measuring bank liquidity, which the government found "*reflects poorly on the management's understanding of the workings of a bank*". Stanford made Loumiet aware of all of these allegations.[6]

60.     But before the Montserrat Government could finalize its threatened revocation of GIBL's license, on December 20, 1990, just a day before Stanford was required to show cause why GBL's license shouldn't be revoked, Stanford surrendered his Montserrat bank licenses for GIBL and picked up and moved and re-incorporated GIBL in Antigua and transferred all the assets of his Montserrat-licensed bank to the new Antiguan-licensed GIBL. By May 1991, Stanford's banking license was officially revoked by the Montserrat Government (although the Board of GIBL sued the Government of Montserrat later that year to have that order rescinded since GIBL had technically surrendered the license *before* the revocation became effective).

61.     At the same time that Stanford was dealing with the Montserrat situation, he informed Loumiet in August 1989 that an official from the "OCC" by the name of John Shockey had been spreading rumors about Stanford Financial and its directors, including that they had no international banking experience and were based in Montserrat for nefarious purposes possibly linked to drugs or money laundering. Stanford told Loumiet that in the very near future he wanted to "deal with Shockey in the most aggressive manner".

3.     <u>**Greenberg Assists Stanford to Buy His Way into Antigua**</u>

62.     Stanford could not have perpetuated his fraudulent and illegal securities scheme without his absolute control over the island nation of Antigua. Stanford had fled Montserrat precisely because he could not exert such control over the local government, which led to his

---

6       During this same time period, in August 1989, Stanford informed Loumiet that he had an "inside man" inside the Montserrat Government who had allowed Stanford to review the Montserrat Government's internal files on GIBL which included confidential correspondence between said government and the British Ambassador to the U.S. concerning GIBL. Stanford shared this communication with Loumiet.

bank being swept up in Montserrat's clean-up of the banking sector in the late 1980s. When Stanford fled to Antigua in December 1990, Antigua had the reputation of being the most corrupt island in the Caribbean, which reputation was well known to Loumiet and his partners at Greenberg, who thereafter constantly forwarded news articles about Antigua's reputation as a cesspool of corruption, fraud and money laundering to Stanford.

63.     Stanford's goal from the beginning was to take control of Antigua and use it as the new base for his offshore schemes. He found a willing partner in Loumiet who viewed the corrupt island nation as the ideal location for a massive experiment in private sector self-governance. Loumiet's views are reflected in a February 24, 1998 e-mail he sent to his partners at Greenberg regarding an opportunity to write laws for Antigua's offshore gambling sector, wherein Loumiet referred to Antigua as being "a *small enough jurisdiction to make it ideal as a 'laboratory' for this type of effort*."

64.     Loumiet and Greenberg knowingly assisted Stanford to basically "hijack" and take over the country of Antigua in order to use it as his safe haven. Greenberg helped Stanford gain leverage over Antigua through a series of multi-million dollar loans that encumbered the entire nation.[7] In doing so, Greenberg helped Stanford to use his customers' money to install himself as the "shadow" government in Antigua, and even helped Stanford write Antiguan laws to regulate his own business activities.  Greenberg provided this assistance despite Loumiet's knowledge of Stanford's illicit activities and despite Greenberg's own rampant conflicts of interest whereby it aided a private sector client (Stanford) to loan money to an impoverished, third world government (Antigua) which was the sole regulator of the client's global business enterprises, while at the same time representing the same government in writing the laws

---

[7]     Stanford's quasi-dictatorial control over Antigua was highlighted in a March 5, 2002 Wall Street Journal cover story (known to Greenberg) that described Antigua as a corrupt country that was Allen Stanford's "personal fief" because he had a "lien on [the] whole country" through all the loans he had extended to Antigua.

designed to regulate their client (Stanford), for which government work Greenberg was actually paid by the client: Stanford.

65.     Loumiet knew that Stanford had fled Montserrat before his banking license could be revoked by the local government for the reasons described above. With full knowledge of Stanford's problems in Montserrat, the issues Stanford was having with the Texas banking department, U.S. Treasury and the O.C.C., and Antigua's reputation for corruption, Greenberg assisted Stanford to "buy his way" into Antigua in 1990 by purchasing (for roughly E.C.$500,000) the ailing and insolvent Bank of Antigua ("BoA"), which was on the verge of a collapse that potentially would have cost the Antiguan Government millions of dollars. In doing so Loumiet was able to extract concessions for Stanford from the Antiguan Government, including permits for Stanford to establish GIBL as an Antiguan offshore bank, as well as set up the Guardian Trust Company Ltd ("GTCL"), which was eventually established in 1991 as a wholly owned subsidiary of GIBL.

66.     As part of Stanford's proposal, which Loumiet prepared and transmitted to Mr. D.L.K. Hurst, the Antiguan Minister of Finance on October 16, 1990, Stanford agreed to inject E.C.$18 million of capital into BoA, to give it shareholder equity of some E.C.$10 million, and also agreed to purchase four acres of prime land fronting the airport so that Stanford's Guardian Development Company could construct a new headquarters building to house BoA, GIBL and the new trust company. In return for these investments, Stanford demanded a tax holiday exempting all of his Antiguan ventures from income tax for 15 years; an exemption from import taxes so he could import equipment; the right to fund the development of the airport and its surroundings; visas and work permits for his employees that would relocate to Antigua; and that

Allen Stanford be made a permanent resident of Antigua and also, "promptly at his request at any time in the next 36 months", a citizen of Antigua.

67.     The BoA deal was the perfect solution for Stanford. He got a new haven for his offshore bank; gained the gratitude of the local government; and also acquired a domestic Antiguan bank that he could then try and use to help him establish the foreign bank "representative" offices in the U.S. he needed to serve as sales magnets for his main offshore bank business, GIBL. Loumiet and Greenberg were fully aware of this strategy and, as described infra, later assisted Stanford to try and establish such representative offices for BoA in the U.S.

68.     As part of the approval process by the Antiguan Government for Stanford's acquisition of BoA, the Antiguan government established a committee to consider the proposal and to investigate Stanford Financial. On November 12, 1990, one of the members of that committee, Mr. Bernard Percival, issued a report to the Antiguan Minister of Finance regarding his findings. He reported that one of the officials attached to the Antiguan Embassy in Washington had spoken with John Shockey at the OCC, and that Shockey had told him that Stanford had been "operating on the fringe of illegality for many years"; that GIBL's operations in Montserrat were "under scrutiny"; and that Stanford was possibly being investigated by the DEA, U.S. Customs and the Texas banking commission.

69.     Nevertheless, and given the desperate condition of BoA, the committee eventually recommended that Stanford's proposed deal be approved. Stanford received a copy of Mr. Percival's November 12, 1990 letter and promptly forwarded same to Loumiet. On November 28, 1990, the Antiguan Cabinet reviewed the Stanford proposal in connection with Mr. Percival's recommendation, and noted that the Bank of Antigua would not be able to survive past Christmas without an injection of capital. The Cabinet therefore approved the Stanford proposal,

subject to a few conditions. On November 29, 1990, Financial Secretary Hurst advised BoA's regulator, the East Caribbean Central Bank ("ECCB"), that the Antiguan Government had "reluctantly agreed to accept" the Stanford proposal.

70.     Almost immediately following Stanford's acquisition of BoA, Loumiet became aware that Stanford was using BoA as a platform for GIBL's own offshore business. In June 1991, Stanford faxed to Loumiet some correspondence from BoA's correspondent bank in the U.S., Citizens and Southern International Bank "(C&S Bank"). In that correspondence, C&S Bank terminated its correspondent bank account relationship with BoA because it had discovered that many of the checks being deposited into that correspondent account contained endorsements from *GIBL*, with which C&S Bank stated it was "not comfortable". Loumiet thereafter represented BoA and GIBL in the structuring of an agreement whereby the C&S Bank account was closed, with BoA leaving $1 million in the C&S Bank account for a period of time as a "showing of good faith".

71.     Later that same month, Loumiet accompanied Stanford to a meeting with NCNB bank to establish a new correspondent bank relationship for BoA and GIBL. Less than a year later, in May 1992, Loumiet found himself trying to calm that bank's concerns about Stanford, as Loumiet wrote to a Nationsbank official that (and notwithstanding Loumiet's knowledge of all of the allegations of improper activities leveled against GIBL and Stanford over the preceding four years) Greenberg had "not seen any behavior" by Stanford that "would give rise to any concern about…the law-abiding nature" of Stanford or the Stanford Financial entities. Loumiet went on in the same letter to dismiss Nationsbank's concerns about the allegations that GIBL had operated unlicensed representative offices in Florida as being just a minor affair about advertisements in 1986 that Stanford had discontinued.

**4.**      **Greenberg Helps Stanford to Target and Silence U.S. Regulatory Officials**

**72.**      Stanford then turned to Loumiet and Greenberg to assist him to silence his nemesis at the OCC – John Shockey. Loumiet immediately put some Greenberg lawyers to work researching the viability of suing the U.S. Government. And, in what was the first of several threatening letters Loumiet and his law firms would send to the U.S. Government on Stanford's behalf over the succeeding years, Loumiet sent a letter to the U.S. Treasury Department on October 29, 1990 complaining about Mr. Shockey's warnings to the Antiguan Minister of Finance regarding Stanford being under investigation for money laundering, and accusing Shockey of engaging in "*as gross an example of defamation and tortious interference with a prospective business relationship as I have seen in fifteen years of practicing law*" and noting that the OCC had no authority in Antigua and therefore had no "legal basis" to interfere with Stanford's proposed purchase of BoA. Loumiet went on to defend Stanford, including misrepresenting to the U.S. Treasury Department that Stanford had "not had any difficulties with" either the Montserrat government (which he knew was false) or the British authorities which supervised it. Loumiet then threatened the Treasury Department, and Mr. Shockey, with federal court action to "call…to task…overstepping regulators".[8]

**73.**      The OCC responded to Loumiet's complaints via letter dated November 13, 1990 from the OCC's deputy chief counsel to Loumiet, informing Loumiet that "*[a]t this time, I am not at liberty to confirm or deny the existence of any criminal investigation into Guardian and its owners*".

**74.**      In the meantime, on November 8, 1990, Loumiet wrote to Allen Stanford and relayed to him the bad news that litigation against the OCC and Shockey would be very difficult

---

[8]      At the time Loumiet wrote the threatening letters to the Treasury Department, he knew that Shockey was a leading federal government expert on illegal offshore bank practices.

due to governmental immunity, and that instead Stanford should use political pressure through his Congressmen, and even the White House, to "*keep the heat on Shockey*".

      **5.**     **Greenberg Assists Stanford to Silence Journalists**

     **75.**     In what became a regular occurrence over the course of his twenty years representing Stanford, in 1991 Loumiet assisted Stanford to silence a journalist who had raised questions about Stanford Financial's business practices. In September, 1991 Stanford sent Loumiet a copy of an article written by British journalist Tony Hetherington exposing Stanford Financial's shady dealings in Montserrat and Antigua and reporting that Stanford Financial did not have authorization to operate banking offices in the United States. Hetherington published another article entitled "*Monster Rat in Montserrat*", in which he described how GIBL's advertisements offered CD rates 2-3 points higher than rates obtainable at any other financial institution and that even though GIBL was purportedly an Antiguan bank, prospective clients were directed by the advertisement to request more information from GIIS' offices in Houston. Hetherington questioned how GIBL could be selling its bank products from the U.S. since it had no banking license there, and also hypothesized that Latin American depositors might be tricked by such advertisements into believing that, in dealing with GIBL, they were dealing with "*Texans who have been checked out by the authorities and granted a banking license*".

     **76.**     Of course, that was Stanford's entire business model from 1986 all the way until 2009.

     **77.**     In December 1991, Loumiet helped Stanford's father, James Stanford, draft a threatening letter to Mr. Hetherington's editors at the Financial Times, demanding a full public retraction or else Stanford Financial's lawyers (i.e., Greenberg) would take "full legal recourse" against all parties involved. As a result of this letter, and apparently to avoid litigation, the

Financial Times did indeed publish an apology, despite the fact that everything Mr. Hetherington had said was true.

### 6.    Greenberg Acts as Securities Counsel for Stanford

**78.**    Greenberg routinely provided U.S. securities law advice and counsel to Stanford, particularly after Stanford hired (at Loumiet's recommendation) former Greenberg lawyer Yolanda Suarez ("Suarez") to be the General Counsel for Stanford Financial in February, 1992. Suarez had been an associate at Greenberg under Loumiet's tutelage and Loumiet recommended her to Stanford to become Stanford's chief "in-house" counsel.

**79.**    In January 1991, Stanford Financial employees prepared several draft "service agreements" to be executed between GIIS and the newly constituted Antiguan entities, GIBL, Guardian Trust Company ("GTC") and BoA, as well as Guardian Development Corporation ("GDC"), and sent them to Loumiet to review and approve. Loumiet provided Stanford with his comments on the service agreements via letter dated February 1, 1991, in which he noted that Stanford Financial was operating in a "grey area" with respect to whether or not GIIS was carrying out banking operations in the United States at its Houston and Miami offices by providing bank "representation" services to GIBL.[9] Loumiet also warned Stanford about Stanford Financial's sales of securities from the U.S., which might require it to be registered as a securities broker, which, Loumiet reminded Stanford, was something that "*I am sure you would like to avoid*".

**80.**    Thereafter in 1992, Greenberg continued to advise Stanford Financial regarding whether GIBL's affiliated U.S. company GIIS had to register as a broker/dealer or as an

---

9    In 1996, Greenberg lawyers worked on a U.S. Tax Court brief in Stanford's dispute with the IRS, and represented to the court that Stanford owned *"three foreign corporations (the "Guardian Banking Companies")* *which **jointly conduct the operations of an offshore bank**, including its financial, management and marketing* *operations"*. The three corporations were GIBL, GIIS and Stanford Financial Group – with the latter two entities based in the United States.

investment adviser. One Greenberg lawyer, after conducting legal research that included research on the Reg D exemption, eventually advised Stanford in March, 1992 that GIIS did *not* need to register as a U.S. broker/dealer. The fact that Greenberg was even looking at this issue clearly shows that Greenberg *knew* Stanford was offering the GIBL CDs through GIIS offices in the U.S.

### 7.   Greenberg Knows Stanford is Violating U.S. Securities Laws

**81.**    In January 1993, a Greenberg litigation partner interviewed Suarez and Stanford Financial's Miami-based manager of GIIS, Oreste Tonarelli, as part of Greenberg's work representing GIBL in a DEA money laundering investigation of a GIBL customer, Banco de los Andes. In her Memo to the file, the Greenberg partner described Suarez's explanation of GIBL and its role within the Stanford organization in stark terms: "*GIBL is basically an 'operations department', has no real contact with clients and does not engage in investment of funds*". She went on to describe how Suarez told her that all business promotion was performed by Houston-based GIIS, and how all investment decisions were made by Houston-based Stanford Financial Group Ltd., and that the "*various banking functions are conducted by the separate corporate entities so that GIBL would not be considered to be conducting banking business from the United States*".

**82.**    Suarez essentially told the Greenberg partner that GIBL was a pass-through sham banking entity used as a front for Stanford's U.S.-based unlicensed investment company securities sales operation. Suarez even told the Greenberg partner about Stanford's past problems with the Government of Montserrat. The Greenberg lawyer noted in her Memo that "*[w]e should probably get more information about this.*" Of course, Loumiet already knew about the allegations made against Stanford and his illicit banking operations by the Montserrat Government. Suarez also told the Greenberg partner that the GIBL correspondent account at

Chase had been closed by Chase, and she also noted "*[w]e should probably get more information about the circumstances surrounding this closing*". But Loumiet and Greenberg thereafter just ignored those warning signs.

83.     Stanford's Oreste Tonarelli told the same Greenberg litigation partner that Stanford Financial had fully transitioned its primary business model away from real estate investment and development to private banking, and that its primary business and main product going forward was the sale of the GIBL CDs sold from Stanford's Miami and Houston offices, mostly to Latin American investors who bought the CDs using funds already on deposit in U.S. banks. Tonarelli also told the Greenberg lawyer that sometimes the clients sent checks directly to GIIS in Miami for investment, and GIIS would then "pouch them" and send them to Antigua.

84.     Handwritten notes taken by the same Greenberg litigation partner during a meeting with Stanford Financial CFO Jim Davis on January 11, 1993 also reveal Greenberg's knowledge of Stanford's securities law violations. The notes reveal that Greenberg was reviewing with Stanford the question of whether GIIS needed to register as an investment adviser in the U.S., and that Stanford had told Greenberg in no uncertain terms that he did <u>not</u> want to register with the U.S. Government, and was "resistant to any registration". The notes also reveal that Greenberg was aware that Stanford Financial was operating as an "investment bank" and that the majority of the client funds being invested with Stanford Financial came from the clients' already existing U.S. bank accounts.

85.     In June 1994, various news articles circulated in Miami regarding federal criminal charges being brought against an offshore bank's U.S. affiliate, Lombard Credit, for carrying out unlicensed banking operations from Miami. Many of the GIIS executives, including its President Oreste Tonarelli, became very nervous about this news, given that GIIS was doing the same

thing. So Suarez sent a Memo to Tonarelli to calm him down, pointing out that Loumiet was serving as the banking industry expert witness for Lombard in the criminal case (she also attached Loumiet's Affidavit submitted in the Lombard criminal case) and that Loumiet had assured her that GIIS' policies and procedures were different than Lombard's and adequate to keep GIIS (and GIBL) out of trouble.

86.    Later, in November 1994, Loumiet and fellow Greenberg lawyer Patricia Menendez Cambo prepared yet another Memo for Stanford addressing once again the interplay between Stanford's offshore bank and his U.S. sales operations and what activities the U.S.-based company could engage in without being considered to be a "representative office" of the offshore bank subject to licensing requirements and regulation. Loumiet noted that the U.S.-based company would (1) serve as a liaison between the offshore bank and its customer; (2) refer customers to the offshore bank; and (3) also provide investment adviser services to the clients. Loumiet opined that as such the U.S.-based company would not have to be licensed, at least not in the state of Florida, despite his knowledge that Stanford's Florida-based company GIIS was already operating as an investment adviser.

### 8.    Loumiet Joins Stanford Financial's Advisory Board

87.    In June 1993 Stanford invited Loumiet to join the "Advisory Board" of Stanford Financial. Stanford thanked Loumiet for his "*efforts and sound advice which have played an immeasurable role in our growth and success*". Stanford also informed Loumiet that he would be paid an annual honorarium of $3,000 and that all expenses associated with his participation on the Advisory Board would be paid for by Stanford. Loumiet promptly joined the Stanford Advisory Board and served on said Board (and other iterations of said Board) until Stanford's collapse over fifteen years later.

9.    **Greenberg Assists Stanford's Attempts to Establish Bank Sales Offices in the U.S.**

88.    As had been the case since Loumiet's first involvement with Stanford in 1988, Stanford continued to search for ways to establish affiliate "representative" offices in the United States for GIBL/SIBL, but without actually subjecting GIBL/SIBL to registration or regulation in the U.S. Now that Stanford owned a "domestic" bank in Antigua, BoA, serving the local Antiguan community, he decided to try to set up representative offices for BoA in the U.S. that could be used as sales platforms for GIBL. As usual, Stanford turned to Greenberg for assistance.

89.    Stanford and Greenberg approached the Federal Reserve Board in order to qualify BoA to open a representative office in Miami. On October 27, 1994, Greenberg lawyer Patricia Menendez Cambo ("Menendez") wrote to the Federal Reserve in Atlanta, attaching Stanford Financial brochures, GIBL audited financial statements, and miscellaneous marketing materials, and informed that BoA wanted to establish a representative office in Miami "*primarily to act as a liaison between foreign customers, the Bank of Antigua and the affiliated Guardian International Bank Ltd.*" She went on to downplay the previous issues GIBL had had with the OCC's John Shockey by misrepresenting that those problems were related to name confusion with a different Guardian bank, not GIBL, and requested a meeting.

90.    The next day, October 28, 1994, Suarez sent Menendez BoA's 1993 audited financial statements, which showed total assets of less than EC$30 million (roughly $11 million U.S. dollars). Suarez noted that Stanford expected BoA to have total assets of approximately EC$60 million (roughly $22 million US dollars) at year-end 1994.

91.    As part of follow up documentation that Greenberg provided to the Federal Reserve as part of Stanford's BoA application, Menendez informed Suarez that they would need to submit a letter to the Federal Reserve from GIBL's regulators: the Antiguan Minister of

Finance and the Eastern Caribbean Central Bank ("ECCB"). By this time, and as discussed *infra*, Greenberg knew that Stanford had the Antiguan regulator, Molwyn Joseph, literally in his pocket, and consequently Loumiet and Menendez actually prepared the draft of the letter that was to be signed by both the Antiguan Minister of Finance and the ECCB.

92.     On November 14, 1994, Menendez forwarded the draft of the proposed "regulator" letter she and Loumiet had prepared to Suarez to get signed by the Antiguan regulators and sent to the Federal Reserve. The draft letter, written by Loumiet and Menendez but purportedly from the ECCB and Antiguan Minister of Finance,[10] stated (with regard to GIBL) that:

> We have adequate procedures for monitoring and controlling the Bank's activities worldwide. We periodically perform examinations of the Bank and evaluate the Bank's prudential standards on a worldwide basis. We obtain reports and information on a consolidated basis regarding the Bank, Guardian and their respective subsidiaries.
>
> We understand that the Bank will shortly be applying to you for permission to establish a representative office in Florida. In connection with that application, we wanted you to know that based upon our supervision and regulation of the Bank and Guardian, we believe both entities are being operated in a safe and sound matter.

93.     Of course, when they wrote this draft letter, Loumiet and Menendez had no way of knowing whether any of the above statements were true, but they apparently fully anticipated that Suarez and Stanford would get the letters signed by the Antiguan Government officials verbatim as they had written them.

94.     Stanford finally gave up on the efforts to obtain Federal Reserve approval for a U.S. representative office for BoA after Menendez sent Suarez a letter dated December 5, 1994, in which she informed Suarez that Stanford would have to fill out a "name check information

---

10     Menendez noted in her cover letter to Suarez that the letters had to be "customized" to reflect the supervisory authority of each of the regulatory authorities".

sheet" in order to "negate any and all rumors surrounding Stanford". The information sheet required Stanford to disclose whether he or any of his companies had ever been in bankruptcy; whether he or any of his companies had ever had any licenses revoked; and whether he or any of his companies had ever been the subject of any criminal investigations. Of course, Greenberg knew that the answers to all of those questions was affirmative.

**10.   Greenberg Continues to Assist Stanford with Repeated U.S. Government Investigations**

95.     In the meantime, Greenberg continued to assist Stanford to ward off U.S. Government investigations, particularly money laundering investigations. In February 1994, Greenberg partner Patrick O'Brien ("O'Brien"), a former Special Agent for U.S. Customs, wrote a memo to fellow partner Mark Schnapp ("Schnapp"), a former Assistant U.S. Attorney, concerning a new FBI money laundering investigation of Stanford in Texas (as O'Brien put it in his Memo, "***Stanford/Guardian's ongoing problems with various law enforcement agencies***"). O'Brien solicited Schnapp to contact the Assistant U.S. Attorney in San Antonio to try and resolve the investigation. The FBI investigation was closed shortly thereafter.

96.     As a result of all the U.S. Government investigations of Stanford, Stanford determined that he wanted to find out what information the federal government had on him and his companies. So he asked Greenberg, via Pat O'Brien, to find out. O'Brien initiated what amounted to a counter-espionage campaign of Freedom of Information ("FOIA") requests on the U.S. Government in an attempt to uncover what the "Feds" knew about Stanford and his activities. O'Brien made his first FOIA request on the FBI on March 9, 1994, and continued making FOIA requests on various agencies of the U.S. Government throughout 1995-1997 with the goal of finding out what the Government knew about Stanford.

97.     O'Brien eventually learned that in 1991 the FBI, U.S. Customs and local Mexia, Texas law enforcement authorities had investigated Stanford's possible involvement in drug money laundering, which had resulted in a Customs search of Stanford's private Hawker 900 jet aircraft upon return from the Caribbean. The FBI documents O'Brien received revealed that, subsequent to that search of Stanford's airplane, "*the Stanfords proceeded to fire a number of employees whom they suspected might be providing information to the authorities*."

98.     Another document produced to Greenberg by U.S. Customs pursuant to O'Brien's FOIA requests described GIBL as having "*constant cash flow*" from foreign depositors but "*no regulation of its activities*", and indicated that U.S. Customs, San Antonio, also had taken an interest in the "*possible smuggling activities of principals in the Stanford organization*". O'Brien received more documents from the FBI in January 1997 which revealed that Stanford had been under constant investigation for possible money laundering since 1989, and that the FBI had even sent an agent to London as part of the investigation in September 1992.

**11.     <u>Loumiet Convinces Stanford to Change the Names of his Companies</u>**

99.     On November 8, 1994, Loumiet sent Suarez a letter attaching the transcript of a PBS show that exposed the flagrant offshore fraud and illegalities occurring in British dependencies in the Caribbean (including Montserrat). Highlighted in the story was a Cayman Island bank called Guardian Bank & Trust Ltd. Loumiet informed Suarez that "the name Guardian is a plague", and that it was "*little surprise that American Express panicked*" and refused to do business with Stanford. Loumiet recommended that Stanford change the name of his companies and disassociate itself from the Guardian name.

100.    Shortly thereafter, Stanford officially changed the name of his offshore Antiguan Ponzi bank from GIBL to Stanford International Bank Ltd. ("SIBL"). He likewise changed the names of all of the related companies, removing the "Guardian" name and replacing it with

Stanford. By the end of 1994, the newly renamed SIBL reported total deposits of just under $200 million.

### 12.    Greenberg Assists Stanford to Consolidate his Influence over Antigua

101.    In 1994, Allen Stanford involved himself and his banks in the Antiguan Government's efforts to build a new, state-of the-art national hospital. The Antiguan Government had selected a Utah company, DSI Investments Inc., to develop the hospital and lease it back to Antigua. The total cost of the project was $42 million. But then Stanford got involved.

102.    Right after the award of the contract to DSI, specifically on October 25, 1994, Antiguan Prime Minister Lester Bird believed he was suffering a heart attack, and Stanford paid (at a cost of $28,000 billed to Stanford Financial in Houston) to fly Bird out of Antigua on a private jet to St. Luke's Hospital in Houston for examinations. Bird remained hospitalized in Houston for four days, and all of the hospital and treating physician bills (roughly $20,000) were sent to, and paid by, Stanford Financial. As noted in his November 14, 1994 letter to Allen Stanford, a copy of which was located in Greenberg's files, Prime Minister Bird thereafter was forever indebted to Stanford.

103.    As a result, by November 1994, Stanford was able to insert himself directly into the new hospital transaction. Stanford Development Company in Antigua became the "eyes and ears" of the Antiguan Government with regard to selection of contractors, and Stanford's BoA and SIBL assumed the role of lead financiers on the project. Lester Bird accepted Stanford's role as "investment banker" for this transaction via letter dated February 21, 1995.

104.    Thereafter, Stanford informed Bird that *SIBL* would provide an interim loan to the Government of Antigua to finance 100% of the architectural and engineering costs for the project. Greenberg received and reviewed this letter. Eventually Stanford, purportedly through

his BoA, lent the Antiguan Government over $30 million for the new hospital. This was on top of additional BoA loans to the Antiguan Government for airport improvements ($20 million) and general use ($10 million).[11] Of course, Greenberg had every reason to know that all this money that Stanford lent to the Antiguan Government came from the SIBL depositors, because at that time in 1995 Greenberg knew that BoA only had assets of some $22 million at year-end 1994 (*supra* at ¶92), and knew that Stanford had already proposed to Lester Bird that SIBL would loan some of the money for the hospital project. Greenberg also knew that Stanford had a habit of mixing BoA and SIBL's accounts, as alleged by BoA's former clearing bank C&S Bank (*supra* at ¶72), and that Stanford wanted to use BoA as a platform to sell SIBL CDs in the U.S. (*supra* at ¶¶90-96).[12] Greenberg eventually prepared all of the legal documentation for the BoA loan to the Antiguan Government, in the amount of $31 million, and billed all of its lawyers' time to the Stanford Financial file.

105. Stanford's involvement prompted DSI to level tortious interference charges at Stanford. Stanford's General Counsel Suarez responded to that charge via letter dated December 12, 1994 to DSI's lawyers, pointing out that Stanford was just acting as a friend and informal advisor to Prime Minister Lester Bird, and threatening Rule 11 sanctions against DSI and its counsel if litigation were commenced. Suarez also pointed out to DSI that *either SIBL or BoA would be providing the financing for the hospital*. She forwarded that letter, along with all of the above mentioned correspondence regarding the Hospital, to Loumiet at Greenberg.

---

11    Suarez faxed Loumiet and Schnapp a list of BoA loans, including amounts, as of January 1996, as part of the DSI investigation.

12    At the same time, Greenberg knew that SIBL had sufficient assets to make such a loan to the Antiguan Government. As part of the ordinary course of Loumiet's service on the Stanford Advisory Board, on July 7, 1995 Suarez sent Loumiet a copy of SIBL's 1994 annual report, which revealed that SIBL held some $230 million in assets. The 1994 Annual Report also noted that Hewlett, whom the Montserrat Government had criticized, was still serving as the only auditor for SIBL.

**106.**     DSI also set off a Congressional investigation of corruption in Antigua, with Senator Orrin Hatch calling for Congress to consider revoking Antigua's most favored nation status, because DSI's President accused Lester Bird of soliciting a $3.5 million dollar bribe in return for awarding the contract to DSI. That led to a Justice Department criminal investigation of Stanford's involvement in corruption in Antigua, spearheaded by the FBI. Greenberg was retained by Stanford to formulate a defense strategy, and Greenberg conducted its own investigation of the DSI corruption allegations, opened in March 28, 1996 with matter description "Foreign Corrupt Practices Act Investigation of Antiguan Hospital".

**107.**     Stanford, through Greenberg, entered into a "joint defense" agreement with the Government of Antigua with respect to the investigation. It was through the DSI corruption investigation that Greenberg learned of, and came into possession of the documents detailing, all of Stanford's loans, bribes and "favors" to senior Antiguan Government officials, as hereinafter described. DSI and the Government of Antigua eventually settled their dispute, with Antigua paying DSI $250,000.00.

**108.**     The Antiguan Hospital/DSI scandal also set off a firestorm of negative press reports in Antigua about Lester Bird, Antiguan corruption and Stanford's overwhelming influence in Antigua, all of which was received and reviewed by Greenberg. One March 1995 front page article in Antigua's "Outlet" newspaper that was received and reviewed by Greenberg alleged that Antiguan Prime Minister Lester Bird and two other Antiguan Government officials had solicited bribes of $3.5 million from DSI for their approval of the hospital project. In a pair of November, 1995 front page articles in Antigua's "Outlet" newspaper, one (dated November 17, 1995) entitled "*Allen Stanford Antigua's New Massa*" and the other one (dated November 24, 1995) entitled "*Loans From Massa Could Spell Ruin*", also received and reviewed by Greenberg

lawyers, the author reported that Stanford's BoA had loaned the Antiguan Government $40 million, and *questioned where that money really came from because the Bank of Antigua did not publish its financial statements as required by Antiguan banking law, and likely did not even have that kind of money.*[13] The article pointed out that the Bird government had turned a blind eye to Stanford's violations of Antiguan banking laws, and that the U.S. Government had recently named Antigua as one of the worst offenders in money laundering. The article also complained that Lester Bird's government had basically allowed Allen Stanford to gain control over Antigua and to "run things", and that the government had been giving away Antiguan land to Stanford, including the Antiguan airport and contiguous land. Another Op-ed piece in the Antiguan "Daily Observer" newspaper likewise warned of Stanford's rapidly growing and overbearing influence in Antigua, and closed with a prescient warning: **"[t]ake warning Antigua. When this one blows it will be too big to run and hide"**.

**109.** Stanford sent all of these news articles to Loumiet after they were published and he or other Greenberg lawyers reviewed them.

### 13.  Greenberg's Knowledge of Stanford's Corruption of Antiguan Officials

**110.** Once he was established in Antigua, Stanford set about corrupting local government officials. Loumiet and Greenberg were well aware that Stanford had corrupted members of the Antiguan Government through loans and kickbacks (variably disguised as "political contributions"). As reflected in Greenberg's records, Stanford's various companies loaned tens of thousands of dollars to various Antiguan Government officials. As just one example, Loumiet and Greenberg were aware that Stanford Financial Group had loaned $30,000 to the Antiguan Minister of Finance responsible for regulating GIBL, Molwyn Joseph, in

---

13    In fact, Greenberg **_knew_** that BoA didn't have that kind of money because Suarez had just told Greenberg lawyer, Menendez, that BoA only had roughly USD $12 million in assets at year end 1993.

February, 1992, evidenced by a Promissory Note found in Greenberg's files. Joseph, who as the Antiguan Minister of Finance *was charged with overseeing GIBL*, never paid a dime on that loan.

111.   When he established a residence in Antigua in 1991, Stanford also rented the home of one of the Antiguan Finance Ministry officials, Keith Hurst (the man to whom Loumiet had directed Stanford's proposal to purchase BoA), for $3,000 a month for three years, with a three year renewal option. Hurst was also a shareholder of BoA when Stanford purchased it.

112.   The manner in which Stanford disguised his "gifts" to government officials is evidenced by one May 6, 1994 memo from Stanford to his personal assistant Jean Gilstrap, also found in Greenberg's files, in which Stanford instructed Gilstrap to mark as "paid" the very same Promissory Note for the loan made to Molwyn Joseph (again, at that time the Antiguan Minister of Finance) and carry it on the company's books as a political contribution. He further noted that, prior to the recent Antiguan elections, Stanford had informed Joseph that he would contribute to Joseph's political party, the ALP, by "liquidating" Joseph's personal note. Stanford also instructed Gilstrap to make sure she noted that the "contribution" was made "after" the elections.

113.   In January, 1996, Gilstrap sent a Memo to Greenberg partner Schnapp informing him of the "retirement" of the Joseph Note, as well as Stanford's payments of $48,217.17 for medical expenses incurred by Antiguan Prime Minister Lester Bird. Gilstrap informed Schnapp that she was sending him the information "pertaining to the information you requested." Greenberg stamped this document as "Work Product" and "Attorney/Client Privileged".

114.   Also in January 1996, and apparently as part of Greenberg's involvement in the DSI Antiguan hospital matter, Suarez sent several spreadsheets to Greenberg detailing money Stanford had lent to senior Antiguan Government officials, either through direct loans or through

credit cards, as well as loans made to the Antiguan Government. That document revealed that, at that time in January 1996, the Antiguan Government owed Stanford's banks $31 million, and that eleven senior Antiguan Government officials, including Lester Bird and Molwyn Joseph (who had received a new $100,000 loan from Stanford), owed Stanford a combined $140,000.

115.    Apparently in recognition of all the bribery going on in Antigua, on February 7, 1996, Loumiet faxed Suarez a copy of the U.S. securities law code section (§78dd-1) prohibiting any issuer of securities (like SIBL) from bribing foreign government officials.

### 14.    Greenberg Helps Stanford Become Antigua's "Shadow Government"

116.    In June 1995, Stanford asked Greenberg to draft offshore trust legislation for Antigua because Antigua had no such legislation in existence (despite the fact that Stanford had set up a "trust" company, Stanford Trust Company f/k/a Guardian Trust Company, in Antigua in 1991). Suarez informed a Greenberg trust lawyer that Stanford needed trust legislation for Antigua because it wanted to "develop Antigua as a platform" for offshore trust operations. Suarez provided Greenberg with a copy of trust legislation prepared by some English solicitors. Greenberg thereafter worked with Stanford's Antiguan counsel, Errol Cort, to prepare and revise the draft offshore trust legislation. The Stanford-sponsored trust legislation was eventually adopted by the Antiguan Government and became law years later.

117.    The next month Stanford asked Loumiet to provide an opinion on whether the Antiguan Government could mandate that all Antiguan-chartered offshore corporations be required to deposit their paid-up capital in an Antiguan depository bank (e.g., Stanford's BoA) so that the Antiguan Government (and Stanford) could "more closely monitor" the maintenance of the paid-up capital required for the offshore corporations. Loumiet addressed his opinion letter, dated July 26, 1995, on this matter to Stanford, and opined that the Antiguan Government could mandate such a requirement on Stanford's Antiguan competitors.

118.     Also in 1995, Stanford tasked another Greenberg partner with drafting another set of laws for Antigua --- this time with respect to drafting legislation creating the Antigua Airport Authority as part of Stanford's take-over of the operations of the Antiguan airport.

119.     In its December 1995 issue spotlighting lawyers under 45 years of age, American Lawyer magazine reported that Loumiet's international practice group at Greenberg was responsible for 20% of the law firm's revenues that year.

### 15.     Greenberg Protects Stanford by Suing Journalists

120.     By 1996, Stanford was under constant attack by negative press reports, both in Antigua as well as abroad. Moreover, the Caribbean offshore industry – and Antigua itself - were under siege. Greenberg lawyers Loumiet and Schnapp were regularly sending news articles to Stanford or Suarez about offshore banking and money laundering scandals in the Caribbean. Schnapp sent Suarez a Time magazine article from February 1996 describing Antigua as one of the most corrupt islands in the region "long known for sheltering traffickers in armaments and drugs", and citing unnamed U.S. undercover agents alleging that Americans and Russians were moving into Antigua and setting up offshore banks to launder drug money, with 50 new offshore banks being set up in one year alone. It even quoted Antiguan opposition party head Baldwin Spencer as saying that the Antiguan economy was so dependent on drug money that it would collapse if the drug activity ceased. In what appears to be a warning, Schnapp sent Suarez another article published in the Miami Herald on March 21, 1996 entitled "Offshore Scams", describing how a task force of FBI and Scotland Yard agents had teamed up to crack down on Caribbean offshore frauds. As detailed below, Stanford eventually heeded that warning and moved to take control of the situation to protect his safe haven.

121.     Then the February-March 1996 edition of the "Caribbean Week" newspaper published an article entitled "*Drugs and the Economy*", written by Professor Klaus von

Albuquerque, a Fulbright Scholar, that was part of a five-part series on drugs and the Caribbean. The article prominently featured a front page photograph of Stanford's BoA. The article referenced the 1995 reporting by the Antiguan newspaper, the "Outlet", describing how Stanford's loans to the Antiguan Government were under investigation by U.S. authorities because the loans exceeded the capital in the Bank of Antigua and *therefore the proceeds likely came from his offshore bank, SIBL, which was illegal under Antiguan law*.

  **122.** Stanford blew up. After sending the article to Loumiet, Stanford instructed Greenberg to sue the Caribbean Week newspaper and the author, Prof. Albuquerque, for defamation.[14] On April 29, 1996, Stanford's "enforcers" did just that, suing Prof. Albuquerque and the newspaper's parent company on behalf of Stanford and BoA in federal court in Miami and seeking millions of dollars in damages, including punitive damages. Schnapp appeared as lead counsel on the complaint. In a March 4, 1996 demand letter he sent to the newspaper and Albquerque prior to the lawsuit being filed, Schnapp accused them of "falsely stating or implying" that Stanford was involved in "bribery of public officials". Of course, Schnapp already knew that Stanford had bribed a slew of Antiguan Government officials, including the Minister of Finance charged with regulating his banks.

  **123.** On March 20, 1996, Allen Stanford sent a Memo to Suarez, with copy to Loumiet and Schnapp, telling them: "I want no delay in our attacks on DSI (i.e., Wayne Kelley), Caribbean Week, Klaus de Albuquerque, Shipman, the Outlet or the reporter that wrote the article in the Daily Observer." Stanford ordered a meeting immediately, and instructed Suarez, who by this time had become his trusted "right hand" advisor, that he wanted her to report to him directly on these attacks on "a weekly, if not daily" basis.

---

14  As usual, Greenberg opened up a new matter file for this litigation on March 5, 1996 listing Stanford Financial as the client, with address at 5050 Westheimer, Houston, Texas.

**124.**     On April 17, 1996, Stanford instructed Schnapp that he would be willing to settle with the Caribbean Week newspaper and Prof. Albuuqerque if the newspaper published a full retraction and apology, and if it paid him $500,000 and paid Bank of Antigua $500,000. Stanford also told Schnapp that it appeared that the FBI was losing interest in the DSI investigation of the hospital scandal, but that he did not want to be left with "another cloud of suspicion" hanging over him and his bank forever. Stanford instructed Schnapp that he had no choice but to pursue these matters "regardless of the time, energy and money it may take" and that, since he had no choice, he wanted to "go for the individuals' and/or business jugular in every instance." This had become Stanford's modus operandi: to aggressively pursue and crush anyone who challenged him or threatened his business interests, with full scale legal, investigative and political power. Greenberg served as Stanford's primary "enforcers".

**125.**     In the end, and facing the full brunt of Greenberg Traurig's muscle backed by Stanford's (or rather, his duped investors') money, the Caribbean Week was forced to surrender to Stanford's demands and published a retraction and an apology. It also agreed never to publish anything in the future about Allen Stanford or BoA. Professor Albuquerque informed Stanford that he would "get nothing from me" because he had been diagnosed with cancer. After winning the "Distinguished Series Press Award" in 1998 for the same series on the Caribbean for which he was sued by Stanford and Greenberg, he died of cancer in 1999.

**126.**     Then Stanford went after the Antiguan "Outlet" newspaper. In April 1996, Stanford and BoA sued the Outlet newspaper, along with its editor and publisher, for libel in Antiguan court, citing in the complaint some of the allegations that the Outlet had made, including that Stanford's offshore bank SIBL had been the "real" lender (using BoA as intermediary) of the $40 million to the Antiguan Government. Stanford was represented by Errol

Cort in said lawsuit, and said lawsuit was coordinated with the Albuquerque litigation under the supervision of Greenberg lawyer Schnapp.

127.    All of the negative press coverage also got Stanford to thinking that he needed to control the Antiguan press as well. Like a Third World dictator, Stanford decided freedom of the press was not for him, and that he needed to control the press in Antigua. Therefore he established his own newspaper, the "Antiguan Sun", in 1997. The Antiguan Sun thereafter became Stanford's mouthpiece and primary defender in Antigua.

### 16.    Greenberg Protects Stanford by Threatening U.S. Government Officials

128.    In April 1996, Allen Stanford became aware that the U.S. Ambassador to Barbados, Jeanette Hyde, had refused to meet with him due to rumors about his illicit business activities in Antigua.[15] In what had become his regular *modus operandi* whenever anyone dared to question or challenge him, Stanford immediately went on the offensive. He sent five separate demand letters to the US Embassy in Barbados in April and May, 1996, with copies to Loumiet, threatening to file a formal complaint with the State Department and pursue the matter "in the most aggressive manner available" if the Embassy did not disclose the "source and details" of any negative information.

129.    In what also became his regular *modus operandi* whenever anyone dared to question or challenge him, Stanford also turned the matter over to Loumiet and Greenberg. In a letter to Loumiet dated May 30, 1996, Stanford told Loumiet that "*the only way I am going to 'surface' this negative information is to put pressure*" on the Embassy in Barbados.

130.    Greenberg went to work, and performed a background investigation on some of the U.S. Embassy personnel involved. Then, with Schnapp's assistance, as well as with input from a Greenberg partner who was a former State Department lawyer-turned-lobbyist from

---

15      The U.S. Embassy in Barbados was also responsible for U.S. affairs in Antigua.

Greenberg's Washington office, Loumiet bashed out a letter to Ambassador Hyde dated July 11, 1996. After touting Greenberg's credentials, Loumiet complained about the Embassy's treatment of Stanford and proceeded to detail all of the times Stanford had been investigated or allegedly "defamed" by the U.S. Government, including the 1990 OCC (John Shockey) "interference" with Stanford's acquisition of the Bank of Antigua; the Department of Justice investigation into Stanford's role in the construction of the hospital in Antigua; a 1993 FBI investigation of SIBL's correspondent bank account at First Nationwide Bank in Louisiana; and Stanford's problems in Antigua. He accused the Embassy staff of character assassination and demanded that the Ambassador reprimand the Embassy staff involved in spreading rumors about Stanford. He closed the letter by informing the Ambassador that he was filing a formal protest with the State Department.

131.      Ambassador Hyde responded to Loumiet on July 23, 1996, and apologized to Stanford and insisted that she would be delighted to meet Mr. Stanford anytime.

### 17.      Greenberg Conducts a Counter-Intelligence Campaign against the U.S. Government

132.      Thereafter, Stanford determined that he needed to ramp up his counter-espionage campaign and find out what information the U.S. Government had on him and his operations. Therefore he instructed Greenberg to continue its counter-intelligence operation against the U.S. Government. As part of that effort, Greenberg sent FOIA requests to the FBI, DEA, OCC, Federal Reserve, and US Customs seeking any and all information related to Stanford or his offshore banks. As he had done in 1994, Greenberg partner and former U.S. Customs official O'Brien handled the FOIA requests for Stanford in June and July, 1996 (charging $300 an hour.) The OCC and DEA denied the requests based on FOIA's "law enforcement" withholding exception, and Greenberg appealed those decisions. O'Brien also appealed an FBI decision to

redact the documentation it had produced because Stanford wanted to find out the names of the sources listed in the documents.

133.    O'Brien received more documents from the FBI in January 1997, also heavily redacted, but which revealed that the Stanfords had been under investigation for possible money laundering since 1989, but that by 1991 the FBI (New Orleans field office) had not been able to substantiate any connection to drugs, so it had turned the investigation over to the Treasury Department as an "economic crimes" investigation. Thereafter in 1992, Customs' Houston division had reopened the investigation after receiving more information. The FBI even sent an agent to London as part of the investigation in September 1992.

### 18.    Greenberg Assists Stanford to set up Stanford Group Company

134.    After having failed with his application for a representative bank office license for BoA in 1994, Stanford thereafter set about looking for new ways to establish sales offices in the U.S. for SIBL. He settled on establishing a broker/dealer company in the U.S..

135.    Stanford established the SEC-licensed securities broker/dealer and investment adviser company Stanford Group Company ("SGC") in 1996. SGC was formed as a Texas corporation, with headquarters in Houston, Texas. SGC was to serve as a traditional broker/dealer and investment adviser, but, just as with the previous "bank representation" offices Stanford had pushed for so many years, SGC's primary mission was to refer customers to SIBL in Antigua for the purchase of SIBL CDs.

136.    Once SGC was formed, in June 1996 Suarez enlisted Greenberg's assistance to draft all of the inter-company service and referral agreements between Stanford Financial Group Company ("SFG"), SGC, SIBL and Stanford Trust Company Ltd. (Antigua) (hereinafter "STC Ltd."). Thus, per one of the agreements drafted by Greenberg, SFG was to provide all of the accounting, marketing, human resources, legal and other support services to SGC for a fee. In

another agreement, SGC was to earn fees for referrals of clients to SIBL for CD purchases, and pursuant to another agreement, STC Ltd. was to pay SGC a referral fee. All of these agreements, executed by Stanford Financial as drafted by Greenberg, thereafter governed the relationship between the various Stanford Financial companies and SGC.

137.    Greenberg also drafted the client disclosures that explained the relationship between SGC and SIBL and how SGC was to earn referral fees from SIBL CDs. In February 1997 Greenberg lawyers also drafted the Reg. D disclosure and Subscription documents, with editing by Loumiet, for SGC to sell the SIBL CDs to U.S. citizens. The Reg. D CD disclosure statement was further revised by Loumiet in July 1998. Through his work on the SIBL CDs disclosures, Loumiet reconfirmed his knowledge of what Stanford was representing to the SIBL CD investors as to the composition of SIBL's asset portfolio, and knew that Stanford did not disclose to the investors that SIBL had made loans to the Antiguan Government or investments in venture capital private equity companies or Caribbean real estate.

138.    In August 1996, Greenberg began studying the question of whether Stanford needed to register the SIBL CDs with the SEC as "securities". According to Greenberg billing records, the Greenberg lawyers looking at the issue also considered whether SIBL needed to be registered under the Investment Company Act.

**19.    Stanford Expands His Massive Real Estate Investments in Antigua**

139.    By June, 1996 Stanford was rapidly expanding his real estate development investments in Antigua and his dream of a high-end "super" resort complex in the Caribbean, centered on Antigua, began to take shape. On June 13, 1996 Suarez sent a report to Stanford outlining the various real estate development projects Stanford had going in Antigua. One of the projects was the V.C. Bird Airport, of which Stanford wanted to directly (or indirectly through the Airport Authority Board) take operating control. Greenberg assisted Stanford with that

project.[16] Another project was the "Five Islands" resort, which was just beginning to germinate. Suarez also addressed three other projects: legislation for and regulation of Stanford's offshore trust business; regulation of offshore banks; and public relations for Antigua and Antigua's financial sector internationally and regionally.

140.    In a follow up Memo to Stanford dated June 27, 1996, Suarez informed him that the Antiguan Government had been slow to act on some Stanford real estate transactions, and that "[g]iven the proposed $200 million investment in Antigua", she was concerned with the Antiguan Government's failure to follow through on its promises to sell or transfer properties to Stanford. She went on to specifically identify Stanford's proposed purchase of Pearn's Point, which was "only the beginning of our investment for the proposed Five Islands resort". Greenberg was actively involved in Stanford's Five Islands resort project in 1996, as evidenced by the fact that Greenberg represented Stanford on the Pearn's Point project under the billing file name "Real Estate Joint Venture".

### 20.    Greenberg Help Stanford Take Over Antigua's Banking Regulatory System

141.    With all the negative press Antigua was getting in the mid-1990s, including the February 1996 Time Magazine article, Stanford decided he had to act before it was too late. Just like Montserrat in 1989-1990, Stanford knew that the negative press about Antigua was bad for his business, and he had too much of a good thing going to pick up and move again. So he decided to take the bull by the horns and try and "reform" Antigua's reputation before it was too late.

---

16      In 1997 and 1998, Greenberg represented Stanford with regard to Stanford's planned development of Antigua's airport complex. A Greenberg lawyer even flew to Beijing and Shanghai China in June 1998 to complete Stanford's negotiations with the Chinese contractor companies retained by Stanford to assist in the construction of the airport complex.

**142.**    As usual, Stanford turned to Loumiet. On September, 18 1996 Loumiet sent a letter to Antigua's Prime Minister Lester Bird offering his suggestions on how Antigua could clean up its offshore banking sector. An early draft of the letter referenced that Loumiet had prepared it *"[a]t the request of our mutual friend, Mr. R. Allen Stanford"*, but this was omitted from the final version. In the letter, Loumiet pointed out how Antigua had recently been the subject of some terrible reports in the press, including an article in the Washington Post describing how Antigua, and its offshore banking sector, had become a haven for fraudsters and con-artists. Loumiet then suggested fifteen steps the Government of Antigua could take in the offshore banking and trust areas to establish some credibility for Antigua's financial sector.

**143.**    As a result of Loumiet's letter, in the spring of 1997, Prime Minister Bird formed an Advisory Board for Antigua's offshore business sector, and asked Stanford and Loumiet to be on it. In June 1997, the Advisory Board then appointed the "Antiguan Offshore Financial Sector Planning Committee" to formulate recommendations to reform the Antiguan offshore banking sector along the lines suggested by Loumiet. Stanford himself was appointed to chair the Committee. The Committee then formed two Task Forces to (i) review all offshore banks licensed in Antigua to ensure they were legitimate, and (ii) to evaluate Antigua's banking regulatory regime and make recommendations to address weaknesses identified.

**144.**    Stanford appointed every member of the Task Forces, and every one of them was on Stanford's pay roll. No Antiguan citizen served on the Task Forces. The members of the Task Forces included Greenberg Traurig partners Loumiet, Schnapp and O'Brien; Kroll executives Tom Cash and Ivan Diaz; and BDO Seidman (Stanford's audit firm) partners Michael Ancona; Jeffrey Balmer; Keith Ellenburg; and Barry Hersh. BDO's Ellenburg and Hersh were involved in

the Task Forces at the same time they were working on an "operational review" of SIBL in Antigua.

145.    On September 15, 1997, Greenberg partner Patrick O'Brien sent a memo to Allen Stanford and the other members of the Task Forces, including Loumiet, in which he outlined some of the recommendations the Task Forces had formulated "for further development and eventual implementation" by the Antiguan Government. In the section entitled "International Cooperation", O'Brien wrote that it was important for the Antiguan Government to cooperate with the judicial and regulatory authorities of other countries, but that, at the same time, "*it is essential that Antigua and Barbuda not permit the wealth of its people and businesses to become the targets of overly aggressive enforcement actions.*" One way to avoid such *"overly aggressive enforcement actions*", according to the Task Force, was to revise the list of "prescribed offenses" in Antiguan law such that the Antiguan Government would only be required to cooperate with foreign governments with respect to the "*most serious of crimes, as intended, and **not to lesser crimes which could conceivably be included under such vague terms as 'fraud' or 'false accounting'**"*. This same proposal was included in the Task Force's final recommendation to the Antiguan Government.

146.    The fact that Greenberg even proposed these revisions to the law evidences the true purpose behind Stanford's reform efforts: to protect Stanford and his safe haven.

147.    Another provision on "Confidentiality" proposed by Greenberg made it "unlawful" for any person, ***including any Antiguan Government official***, to disclose "any information relating to the business affairs of a financial institution".[17] In an August 1998 Memo

---

17    During this same time period, specifically in March and April 1998, a Greenberg lawyer performed research for Stanford on whether U.S. authorities could gain access to SIBL information in Antigua by virtue of SIBL having representatives based in the U.S. that had computer access to SIBL. She also researched whether

Greenberg provided to the Task Force, Loumiet and O'Brien summarized this change as repealing the prior "general exception" that provided for disclosure of bank information to foreign government authorities without regard to Antigua's confidentiality laws and regulations. Now Antigua's new confidentiality laws trumped the general international cooperation exception. Stanford later used some of the confidentiality provisions he had, with Greenberg's material assistance, caused to be enacted in 1998-1999 to ward off the SEC's subpoenas and requests for documents when the SEC investigated Stanford's CD operations from 2005 through 2008. Stanford's constant refrain was that SIBL was prohibited by Antiguan law from turning over any of its financial records to the SEC.

148. The Task Force worked closely with Wrenford Ferrance, an Antiguan government official that Prime Minister Bird nominated as the Government's representative (although he was not an official member of the Task Force – only Stanford agents were on the Task Force). He was appointed by Prime Minister Bird to serve as the "Director of International Business Corporations" for Antigua. But he relied entirely on Loumiet and the other Stanford agents on the Task Force to tell him what to do. So when it was time for the Antiguan Government to make demand for information from all of the existing offshore banks in Antigua, he turned to Loumiet to prepare the letter for him. Loumiet drafted the letter to be placed on Ferrance's letterhead and sent to other banks.

149. Greenberg's O'Brien actually moved to Antigua as part of his service on Stanford's Task Force from 1998 to 1999. In that capacity he helped shepherd the legislation through the Antiguan legislature and then also assisted with its implementation. While serving on the Task Force in Antigua, O'Brien officed at SIBL, and sent and received e-mail on Stanford's

---

Antigua's bank secrecy laws would prevent U.S. authorities from gaining access to SIBL's information, even if U.S.-domiciled personnel had computer access to said information.

e-mail server. His e-mail address during this time period was pobrien@stanfordeagle.com. O'Brien's time for serving on the Task Force was billed at a flat rate of $2,750 a day to the Antiguan Government, but all bills were sent "care of" Stanford Financial Group in Houston, Texas, attention Allen Stanford, for payment by Stanford Financial.

150. Stanford's regulatory reforms in Antigua created a new Antiguan regulatory body, the International Financial Sector Authority ("IFSA"), that was placed in charge of supervising and regulating the offshore bank sector. Amazingly, Stanford was appointed as the initial interim Chair of the IFSA and Pat O'Brien served on it along with Stanford's Antiguan lawyer, Errol Cort, who just so happened to also be the Attorney General of Antigua under Lester Bird at that time. As a former member of the British High Commission in Barbados, Rodney Gallagher, put it: "*Stanford effectively became the man who controlled the regulator*".

151. One of Stanford's first orders of business after the IFSA was set up was to seize the banking records of all of SIBL's offshore bank competitors in Antigua. Althea Crick, an Antiguan woman who had been appointed as the new executive director of the IFSA, refused to turn the records over to Stanford. So on February 8, 1999, Stanford sent O'Brien and another one of Stanford's agents to the IFSA offices in the middle of the night, where they took the locked door off of its hinges and stormed in and seized the file cabinets containing the confidential bank records and carted them off to Stanford's offices to be copied.[18]

152. Shortly after Antigua adopted the amendments to its banking laws to incorporate the Task Force's recommendations, the U.S. Government responded to the "reforms" in April 1999, when the U.S. Treasury Department's Financial Crimes Enforcement Network

---

[18]    Michael Bilton, "*The Texan Who Fell to Earth*", The Sunday Times, January 9, 2011. Upon information and belief, in February or March 2000, Althea Crick sued O'Brien for his conduct in Antigua, as reflected in Greenberg's Stanford billing statements, which reference meetings between O'Brien and Greenberg's General Counsel related to "Crick lawsuit", and O'Brien's preparation of a letter to Greenberg's malpractice insurance carrier. O'Brien billed all his time on the Crick lawsuit matter to Stanford.

("FinCEN") issued an Advisory (the "Advisory") to warn banks and other financial institutions worldwide that banking transactions involving Antigua should be given enhanced scrutiny because the Antiguan government had significantly weakened its banking laws and regulatory agencies. The Advisory also warned that the Antiguan government's new Stanford-created and Stanford-staffed regulatory agency, IFSA, was rife with conflicts of interest because its "*board of directors includes representatives of the very institutions the Authority is supposed to regulate.*" According to the Advisory, this "*raises serious concerns that those representatives are in fact in control of the IFSA, so that the IFSA is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards.*" The Advisory continued,

> *The amendment of the Money Laundering (Prevention) Act, combined with changes in [Antigua's] treatment of its offshore financial services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation regarding assets secreted in [Antigua]. These changes threaten to create a 'haven' whose existence will undermine international efforts of the United States and other nations to counter money laundering and other criminal activity, a concern of which the United States has repeatedly made the government of [Antigua] aware. The actions taken by the government of [Antigua] that weaken that nation's anti-money laundering laws and oversight of its financial institutions necessarily raise questions about the purposes of transactions routed into or out of [Antigua] or involving entities organized or domiciled . . . in [Antigua].*

153.    British authorities issued a similar warning two days later.

154.    Stanford reacted to this criticism of his take over of the Antiguan banking regulatory system in typical fashion: he demanded that Greenberg sue the U.S. Government. Stanford and Loumiet even discussed whether the lawsuit could be brought on behalf of the Antiguan Government but be funded by Stanford. As part of that discussion, Loumiet sent an e-mail to a fellow Greenberg partner and (at that time) World Trade Organization ("WTO") judge on June 23, 1999 inquiring as to whether Greenberg could represent Antigua in a WTO

proceeding against the United States, and whether such an endeavor could be funded by a private company (Stanford). The Greenberg partner responded that a private company (like Stanford) could fund the WTO litigation against the U.S., but that he, as a member on the WTO panel, would not be interested in risking incurring a conflict "*for anything less than very significant compensation for the firm*".

155.    Stanford's reaction to the Treasury advisory against Antigua, and the actions he took in response, are amazing given that the advisory was issued – not against Stanford or his banks – but against a country, Antigua. Yet Stanford took it upon himself to act for that country, as if he were somehow its self-appointed ruler.

156.    Stanford also had Loumiet call in some additional Greenberg lobbyist "heavy hitters" from Greenberg's Washington office to advise Stanford on a political strategy to combat and "reverse" the Treasury advisory. Loumiet described one of the Greenberg lobbyists in an August 1999 e-mail to O'Brien as "using his well-honed diplomatic skills on Treasury, where he has excellent contacts." On June 28, 1999, the Greenberg lobbyists attended a meeting in Miami with Stanford, Suarez, Loumiet, Schnapp, O'Brien, and Antiguan Attorney General/Stanford's personal Antiguan lawyer Errol Cort to discuss a strategy to "reverse" the Treasury advisory. The Greenberg lobbyists went back to Washington to lobby for Stanford, including placing calls to "Administration officials".

157.    Loumiet also got another Greenberg Washington lobbyist, Jim Miller, to help out on the efforts. In a March 1999 Greenberg billing entry on the Stanford file, Jim Miller billed four hours for "[s]etting up meetings with Hastert, Delay, Archer" and for making "arrangements" for a check to be delivered from Stanford to the National Republican Campaign

Committee. This was Stanford's initiation into the world of high stakes political lobbying that he would thereafter use to his advantage for the next ten years.

158.    Stanford even had Greenberg investigate a U.S. journalist who reported on the scandal. When journalist Doug Farah published an article on Stanford in the Washington Post in October 1999 entitled "*Texas Banker at Center of Reform Controversy*", Greenberg had one its associate lawyers investigate Farah and his background. This led to a bizarre dinner invitation to Farah (which Farah later recounted in 2010) where he was invited to dinner at the Washington D.C. Four Seasons Hotel by a Stanford agent.[19] Upon arriving for the dinner, Farah was surprised to also meet Stanford's right hand and General Counsel, Yolanda Suarez, who proceeded to attempt to dissuade him from reporting on Stanford. Farah later recounted that it seemed like Suarez was "running the business".[20]

159.    Then in early 2000, the U.S. State Department issued its annual International Narcotics Control Strategy Report, in which the State Department blasted Stanford and Antigua: "*[i]ndividuals suspected of involvement in money laundering and other illicit economic activities used their considerable financial influence to weaken Antigua's anti-money laundering legislation*".

160.    Stanford again blew up and wanted to sue the U.S. Government. Loumiet had another Greenberg lawyer research whether Stanford could directly sue the U.S. Government for defamation under the Federal Tort Claims Act. Loumiet also got his partner, Ruth Espey-Romero, wife of former State Department official (and Stanford ally) Peter Romero, involved to lobby the State Department and Treasury to try and lift the Advisory against Antigua.

---

19    Recounted in Zachary Roth, "*Top Stanford Aide Schmoozed Lawmakers, Sweet-Talked Journos*", TPMMuckraker, January 4, 2010.
20    *Id*.

**161.**     In the meantime, Loumiet sought to leverage his "insider" relationship with the Antiguan Government in order to market Greenberg's services to other potential clients. On February 24, 1998, Loumiet sent an e-mail to all of the Greenberg partners informing them of what he had accomplished in Antigua and also informing them that the Antiguan Government wanted to retain Greenberg to write its laws and regulations governing Internet gambling, but that (as with Stanford) the *Antiguan Government wanted Greenberg's fees to be paid by someone else*; i.e., a company involved in the Internet gambling industry. Loumiet pointed out to his partners that "*[o]ne huge advantage to [Antigua] in this regard is that we have sufficient support from its Government and it is a small enough jurisdiction to make it ideal as a 'laboratory' for this type of effort.*"

### 21.     Greenberg Advises Stanford on Implications of His Bribery of Antiguan Officials

**162.**     At the same time that Greenberg was engaging in massive conflicts of interest by having its fees paid by its private sector client, Stanford, so it could rewrite laws for the Government of Antigua that regulated Stanford's business, Greenberg was also still advising Stanford of the implications of his bribing of Antiguan Government officials. In late 1997, while the Greenberg-led Stanford Task Forces was changing Antigua's laws, Greenberg gained knowledge that Stanford was making payments to outside contractors on behalf of Prime Minister Bird's political party. In January, 1998, a Greenberg lawyer sent a Memo to Suarez, with copy to Greenberg partner Schnapp, regarding whether Stanford's continued "donations" to the Lester Bird political party violated the Foreign Corrupt Practices Act. Greenberg advised Stanford that it was legal for Stanford to make payments to an American public relations firm on behalf of Bird's party, as long as there was no "quid pro quo" arrangement between Stanford and the Antiguan Government, but that Stanford would be better off paying that bill "indirectly" by

making a direct political contribution to the political party, so as to avoid an appearance of impropriety. Schnapp also sent Suarez several law review articles about the Foreign Corrupt Practices Act that same month.

### 22.   Greenberg Helps Stanford Establish Representative Offices in the U.S. for Stanford's Antiguan Trust Company

163.    In October 1997, Stanford and Loumiet once again considered other ways Stanford could operate marketing and sales offices for SIBL from the United States without exposing SIBL to formal regulation by the U.S. Government. Loumiet suggested that Stanford use Stanford's Antiguan trust company, STC Ltd., as the "platform" to establish "trust representative offices" in the U.S. in order to sell the SIBL CDs to Latin American investors.

164.    Loumiet knew at all times that the objective of these proposed "trust representative offices" was the same as the bank representative offices he and Greenberg had worked on with Stanford since 1988: to serve as a U.S. domiciled sales office for SIBL to sell the CDs without exposing SIBL to regulation in the U.S. More alarming, Greenberg knew at that time in 1998 that Antigua did not even have any laws in place governing trusts when Greenberg helped Stanford set up its Antiguan trust company outpost in the U.S.

165.    Loumiet assigned Greenberg lawyer Carl Fornaris to work on the trust representative office project. In a Memo he prepared on this subject, which Loumiet forwarded to Suarez on November 5, 1997, Fornaris opined that Stanford could open a "trust representative office" for STC Ltd. in Florida, without even seeking approval from the Florida Department of Banking, but that its activities would be limited to "*soliciting business, liaising with customers and facilitating the transfer of documents to the Trust Company's head offices*" in Antigua. Evidencing the fact that he knew that the true purpose of the new representative offices was to serve as a "pass through" marketing and sales vehicle for SIBL, Fornaris described how he had

researched Regulation K and the International Banking Act and had spoken on an anonymous basis with staff from the Federal Reserve, and concluded that in order to avoid any entanglements with the Federal Reserve, the new trust company representative offices would <u>not</u> be able to solicit any business of any kind in Florida on behalf of SIBL. Fornaris closed the Memo by noting that if the proposed trust representative office solicited business for SIBL, it could be found to be an unlicensed "de facto" representative office of SIBL under Chapter 663 of Florida's banking law and subject to legal sanction.

166.   Of course, Loumiet knew that the whole reason for the creation of a "trust representative office" in Florida was to market and sell the SIBL CDs because that had been Stanford's goal since Loumiet first started representing Stanford in 1988. Loumiet's (and Greenberg's) knowledge of that goal is further evidenced by a pair of early November, 1997 billing entries by a Greenberg associate lawyer, in which he reported that he had met with Loumiet on November 4, 1997 and then spent several hours researching SEC opinion letters on whether a trust company "*must register CDs issued by an offshore affiliate being offered to the Trust's institutional clients*". Loumiet's billing record for the next day also indicate he researched securities law on this subject as well. Another Greenberg lawyer also met with Loumiet regarding this same trust issue, and his billing record indicates they discussed "*use of an affiliate*". Thus Greenberg's creation of the Miami trust representative office was always premised on a "wink and nod" understanding between Loumiet and Stanford as to its real purpose to market and sell SIBL CDs.

167.   In September 1998, Stanford made the decision to go forward with the establishment of the Miami trust representative office. Suarez asked Greenberg to advise Stanford to what extent the proposed trust representative office could engage in the business of

banking without being deemed a "representative office" of a foreign bank; specifically Suarez wanted to know if the proposed trust representative office could refer customers to SIBL from its Florida offices.

168.     Greenberg lawyers Loumiet and Fornaris prepared yet another Memo to Suarez responding to her inquiries. Greenberg advised Stanford that the proposed trust representative office would not constitute a foreign bank representative office of SIBL under the Foreign Bank Supervision Enhancement Act of 1991 because it technically was not a SIBL "office", despite the fact that Greenberg knew that the main purpose of the trust representative office was to solicit new CD customers for SIBL. One of the reasons Greenberg took this position was that the proposed Florida trust representative office would not be referring U.S. customers to SIBL, but rather would only refer *foreign* (i.e., Latin American) customers to SIBL *by way of STC Ltd.*, which Greenberg described as "*providing an accommodation to its own customers*".

169.     As part of its advice to Stanford on how the proposed Florida trust representative office could get away with acting as a sales representative office of SIBL without "technically" violating federal and state banking laws, Greenberg prepared and attached a list of "Do's and Don'ts" for the Florida trust representative office. The list of "Do's" included that the proposed trust representative office could accept money "to be held in trust" by the trust company, and that it could also "deal in any way" with SIBL, including transferring money to SIBL, as long as all such business was done in the name of the trust company and the proposed trust representative office did not list itself in writing as an "agent" or "representative" of SIBL.

170.     In October 1998, Greenberg notified the Florida Department of Banking that Stanford was preparing to open its trust representative office in Miami. In that letter, Fornaris represented that the proposed Florida trust representative office would only act on behalf of STC

Ltd. and would not make discretionary investment decisions or administer fiduciary accounts in Florida. Together with that notice, Greenberg filed an Application on behalf of STC Ltd. to transact business in Florida.

171.    The Florida Department of Banking initially threw a wrench in Loumiet's plans by suggesting that Stanford's proposed Florida trust representative office would need to obtain an international bank representative office license in order to operate in Florida. Apparently that suggestion was provoked by one of the Florida regulators expressing concerns that the trust representative office was being proposed for an offshore entity, STC Ltd.

172.    In order to right the ship, Loumiet and Fornaris then asked Greenberg Tallahassee partner and Florida lobbyist Ronald Laface to help out on the Stanford project. Together, the Greenberg team prepared a Memo dated November 2, 1998 directed to the Florida Department of Banking arguing Greenberg's position as to why the proposed Florida trust representative office did not need to be licensed as a bank representative office; which was primarily because, according to Greenberg's Memo, SFIS would not be engaged in the "banking business" in Florida (despite the fact that Greenberg knew the real purpose of SFIS was to act as a conduit to SIBL and despite Fornaris' 1997 Memo to Stanford in which he concluded that SFIS could be found to be a "de facto" branch of SIBL).

173.    As an attachment designed to provide the principal support for the arguments contained in its Memo to the Florida Department of Banking, Greenberg prepared an Affidavit for Stanford's Antiguan lawyer, Errol Cort, to sign, in which Cort opined that STC Ltd. was licensed and regulated under the Antiguan International Business Corporations Act (the same law Greenberg was helping Stanford modify at that same time, which Greenberg failed to mention) and that said Act did not allow STC Ltd. to engage in banking business in Antigua;

therefore, went Greenberg's argument, SFIS could not engage in banking business in Florida because its parent company, STC Ltd. was itself prohibited by Antiguan law from engaging in banking business. Of course this was absolutely false, and Loumiet knew it, because Loumiet knew that SIBL was similarly licensed and *regulated under the same exact law* as STC Ltd., the Antiguan International Business Corporations Act, but nevertheless SIBL functioned as a bank in Antigua.

174.    The reason Greenberg had to point to the Antiguan International Business Corporations Act as the sole law that regulated Stanford Trust Company was because Greenberg knew that ***Antigua did not even have specific trust legislation at that time***.[21] But in 1998, Greenberg failed to mention to the Florida regulators that the trust representative office they were seeking to set up for Stanford was representing a foreign trust company from a country that had no laws governing trusts whatsoever.

175.    In November 1998, Greenberg lawyers prepared a draft Consent Order for submission to the state regulators. That first draft stated that STC Ltd. "operated" SIBL and that one of the activities for the proposed trust representative office was to facilitate customers' communications with SIBL. Loumiet struck those parts out and, as revised, the proposed Consent Order that was submitted to the Florida banking department neglected to even mention SIBL. Nevertheless the Florida regulators rejected the Consent Order without comment.

176.    As a result, Greenberg lobbyist partner Ron LaFace scheduled a meeting with Craig Kiser, who at the time was the Florida Deputy Comptroller and direct supervisor to the Florida banking division officials that Greenberg was negotiating with. Said meeting is believed to have occurred on December 10, 1998. Discovery will reveal the content of that and any other

---

21      In January 2000, O'Brien wrote to Suarez to inform her that Antigua still did not have any laws governing the formation and administration of trusts.

meetings between Greenberg's LaFace and Florida state officials, but the Florida Banking Department abruptly did an "about face" and by December 1998 Greenberg was back negotiating a Memorandum of Agreement with the Florida banking department, which was eventually executed by and between Yolanda Suarez on behalf of STC Ltd. and the Florida Department of Banking.

177.    Per that agreement, Stanford agreed not to use the word "trust" in its name, and instead established the new trust representative office under the name "Stanford Fiduciary Investor Services" ("SFIS"). Under the agreement, STC Ltd. agreed that its new representative office, SFIS, would not engage in any trust administration or discretionary investment activity in Florida, and that the Florida Department of Banking could "reasonably examine" the trust representative office. In return, the Florida Department of Banking agreed that SFIS could, *inter alia*, market and promote SIBL CDs to prospective trust customers; transfer money to STC Ltd.; and facilitate communications between customers and SIBL.

178.    E-mails from within the Florida regulators office reveal that during their negotiations with Greenberg over the establishment of SFIS, Florida regulators were uninformed with respect to the subject matter they were negotiating. Press reports reveal that Florida state regulatory counsel Richard Donelan, who led the negotiations with Greenberg on behalf of the State of Florida, did not even understand what a "trust representative office" was, and that in talking to the Greenberg lawyers about such an office, he "might as well" have been discussing "reconnaissance satellites". Thus the State of Florida was easily bamboozled by Stanford and Greenberg, who misled the state authorities about the true purpose of the new office.

179.    What was perhaps most bizarre about the SFIS arrangement with the State of Florida is that it purported to allow SFIS to accept deposits of money in Miami for subsequent

transfer to SIBL to purchase the SIBL CDs, which is one of the things Greenberg specifically told Stanford (via Loumiet's Memo to Suarez dated November 4, 1998) that SFIS could ***not*** do or else it would be in violation of federal banking law and §663.062 of Florida banking law. In essence, Greenberg's agreement with the State of Florida set SFIS on a collision course with federal banking law, and SFIS would ultimately collide with the Federal Reserve in 2007 after having funneled hundreds of millions of dollars to SIBL, as discussed below.

180.    But as of the end of 1998, and thanks to Greenberg, Stanford finally had the U.S. representative office for SIBL that he had been trying to accomplish for over 10 years. The offices of SFIS in Miami were established adjacent to the offices of Stanford's broker/dealer SGC, and virtually every Latin American investor who invested through the Miami office of SFIS believed they were dealing with the Houston-based SGC or Stanford Financial, not with an offshore trust company's representative office.

181.    The *Miami Herald* eventually described the SFIS Miami office as a "money pipeline between Miami and Antigua" in a 2009 article.[22] Stanford proceeded to use the new SFIS Miami office to market and sell SIBL CDs exclusively to Latin American investors visiting Miami, with Stanford employees stuffing money – typically checks -- into pouches in Miami and flying the pouches to Antigua in Stanford's private jets.[23] None of those sales were reported to any regulators, and the SFIS Miami office routinely shredded the documents evidencing the sales once the money left for Antigua.[24] By 2009, the SFIS office in Miami alone had sold upwards of $1 billion in SIBL CDs.[25] Former Stanford employee Charles Hazlett described how the SFIS Miami office was the "busiest" in the Stanford operation, with "30 to 40 people, everyone selling

---

22      See Michael Sallah, *Allen Stanford Ponzi Scheme Case Puts Lawyers in Spotlight*, Miami Herald, October 23, 2009.
23      *Id.*
24      Michael Sallah, *Florida Aided Allen Stanford, Suspect in Huge Swindle*, Miami Herald, July 5, 2009.
25      Sallah, Miami Herald, October 23, 2009.

CDs".[26] In 2005, sixteen of the SFIS employees were licensed securities brokers, working in a purported trust representative office that was not supposed to "sell" anything.

182.     Stanford expanded the SFIS model by opening additional SFIS offices in Houston in 2001 (also confusingly located in the same Stanford headquarters building at the Galleria as SGC) and San Antonio in 2005, catering primarily to Mexican investors.

183.     In a 2009 interview in the Miami Herald, long time Miami banking lawyer Bowman Brown described how Stanford had once visited him seeking representation to establish a representative office for SIBL in Miami.[27] While the time period of the meeting is unclear, Bowman described that Stanford's plan was to set up an office in Miami to serve as a platform to attract Latin Americans to invest in his offshore bank securities, but that Stanford indicated that he did not want his business to be subjected to banking regulations or government examinations. Brown declined the representation; Loumiet and Greenberg did not and continued to work at it until Stanford got exactly what he wanted.

### 23.     Greenberg Assists Stanford to Establish Stanford Trust Louisiana

184.     At the same time Greenberg assisted Stanford to establish the "trust representative office" for SIBL/STC Ltd. in Florida, Greenberg also assisted Stanford to purchase an existing trust company in Louisiana. Specifically, beginning in November, 1997 Greenberg spearheaded Stanford's efforts to establish the Stanford Trust Company ("STC") in Baton Rouge by having SGC purchase an existing Louisiana trust company, the Southern Trust Company. The initial directors of STC were Jay Comeaux, J.D. Perry, Jay Zager, Jason Green, and Suarez.

185.     Stanford had to seek approval for the acquisition of the Southern Trust Company from the Louisiana Office of Financial Institutions ("OFI"). As part of that process, OFI Chief

---

26      Sallah, Miami Herald, July 5, 2009.
27      Michael Sallah, *Florida Aided Allen Stanford, Suspect in Huge Swindle*, Miami Herald, Jul 5, 2009.

Examiner Sidney Seymour sent a letter to one of Loumiet's Greenberg lawyers on April 13, 1998 asking for more detailed information about SGC and SGC's affiliated companies. The OFI's Seymour told Greenberg that in particular the OFI wanted to know more about the extent of Stanford's involvement with GIBL in Montserrat, which Seymour noted had been the subject of an OCC Banking Circular in 1989 regarding unauthorized banking activities in the United States. The OFI also specifically requested that Greenberg provide it with copies of "any enforcement, termination, or other similar action initiated by any…foreign licensing or chartering agency against [GIBL]".

186.    Loumiet drafted the response to the Louisiana OFI in May 1998. In it he informed the OFI that Stanford had made an unfortunate choice in his name for GIBL, because the name "Guardian" was extremely common and had been used by other offshore banks that had been associated with scandals and which, Loumiet stated in a transparent attempt to mislead the OFI, had also been the subject of OCC circulars. Loumiet then lied to the OFI by stating that Stanford had closed the Houston representative office of GIBL (which he never did), and that the OCC never responded to Loumiet's letters in 1990 (despite the fact that Loumiet knew the OCC had responded to him and had told him that it could not "*confirm or deny the existence of any criminal investigation into Guardian and its owners*"). Loumiet forwarded the letter to the OFI after it was approved by Suarez.

24.    **Greenberg Assists Stanford With His Personal IRS Dispute**

187.    At the same time that Greenberg was advising Stanford that his US "representative offices" should not be engaged in banking business in the U.S., Greenberg was helping Stanford make the ***exact opposite*** arguments in his long-running dispute with the IRS related to income earned from GIBL back in the early 1990s. During at least 1997 and 1998, Greenberg tax lawyers assisted Stanford in said dispute, which wound its way through the U.S.

Tax Court and into the Fifth Circuit as *Stanford v. Commissioner of Revenue*. The Greenberg lawyers reviewed and commented on all of the briefing in that case, particularly the briefs filed in the Fifth Circuit in 1998, and in doing so Greenberg knew that Allen Stanford's official position in that case was that *Stanford's subsidiaries operating in the United States, Stanford Financial Group and GIIS, **were** involved in the banking business and providing banking related services for and with GIBL*.

188.    Thus for U.S. regulatory purposes, Stanford's (and Greenberg's) position was always that the U.S.-based Stanford entities were *not* engaged in the business of banking in the U.S. But when it came to Allen Stanford's personal income taxes, Greenberg took the exact opposite position – that Stanford's income derived from GIBL could be offset by deficits incurred by Stanford Financial and GIIS precisely because both entities were engaged in the same "qualified activity" as GIBL: the business of banking. In a Memo dated December 2, 1997, Greenberg even took the position that the GIBL-GIIS-Stanford Financial structure was "*artificial*" in nature and had only been set up that way initially due to Montserrat law considerations, **but that otherwise the three entities were basically all one and the same and dedicated to GIBL's business of offshore banking**.

189.    Loumiet was involved with and oversaw the Greenberg tax lawyers' work on Stanford's personal tax matter.

25.    **Greenberg Represents Stanford in SEC Inquiry**

190.    In early June 1998, Suarez notified Loumiet that the SEC had sent a letter to SGC's compliance officer Ellen McCorkle indicating that SGC might be violating certain provisions of the federal securities laws. In its letter, which Suarez sent to Loumiet on June 5, 1998, the SEC requested that SGC provide documentation related to SGC's referrals of customers to SIBL.

PLAINTIFFS' AMENDED COMPLAINT                              PAGE 69
4843-9271-5642.1/40936/0102/110918

**191.** Loumiet then held several teleconferences with Stanford and Suarez, and then with Stanford, Suarez, and Stanford's Texas-based securities counsel (and former SEC officials) Wayne Secore ("Secore") and Jack Ballard. Stanford and Suarez asked Loumiet to help Secore and Ballard respond to the SEC letter. Following Stanford's instructions, on June 17, 1998, Secore sent the response letter he had drafted to Loumiet for his review. Secore's draft letter informed the SEC that SGC had serious concerns about the SEC contacting its "referral customers" because it could "create a perception of instability at SGC or [SIBL]".

**192.** Loumiet prepared and faxed a Memo to Secore dated that same day, June 17, 1998. In the Memo, Loumiet told Secore to "avoid a defensive tone", and instead tell the SEC that SGC was just as anxious about the SEC's concerns. He also advised Secore to emphasize that 98% of SIBL's customers were foreign citizens, not U.S. citizens or residents, and that SGC was willing to cooperate as long as the SEC left SIBL's foreign customers alone. Loumiet also pointed out that SIBL was audited by CAS Hewlett, and was examined annually by the Antiguan Ministry of Finance _and_ the Eastern Caribbean Central Bank (which Loumiet knew was not true, as evidenced by the fact that in 2005 Loumiet helped Stanford nix the ECCB's proposal to start examining SIBL, as discussed _infra_).

**193.** Loumiet also advised Secore to tell the SEC that the SIBL CDs did _not_ constitute securities anyway, and he attached to his Memo to Secore (and separately sent to Suarez) a page from an analysis letter Loumiet had prepared in 1996 for another client (a Brazilian bank) that was selling offshore bank CDs in the U.S. issued by its Bahamian branch. In that 1996 letter, Loumiet had concluded that the "law was 'gray' in this area", but that, based on his past experience, the client could expect an "uphill fight" trying to convince courts and regulators that the level of banking regulation and supervision in the Caribbean was on par with the regulatory

system in the U.S., *such that it was very likely that CDs issued from the Bahamas would be deemed to be securities and subject to SEC regulation*. Yet Loumiet had told Secore to argue to the SEC the **exact opposite** -- that the SIBL CDs were not securities.

194.     As part of preparing the response to the SEC, Greenberg lawyers operating under Loumiet's direction gathered SIBL marketing materials and forwarded them to Stanford's securities counsel, Secore via letter dated July 22, 1998, which was also copied to Suarez. Those marketing documents, reviewed by Greenberg lawyers including Loumiet, represented to SIBL investors that SIBL's portfolio was invested only in safe and liquid instruments, including bonds, securities, commercial paper, Eurodollars, foreign currency bank deposits, and U.S. Treasury Bills and notes. The marketing materials omitted to disclose that SIBL was lending money to Allen Stanford and to the Antiguan Government, or that SIBL was investing in Caribbean real estate or making venture capital investments in private equity companies. The marketing documents also touted SIBL's insurance coverage that insured "deposits".

195.     One of the marketing documents the Greenberg lawyers sent to Secore as part of the SEC investigation was a Memo from Suarez to all of the Stanford FAs dated May 17, 1996, in which she advised the FAs, in their marketing efforts with clients, to adhere to the "concepts and notions" regarding "the insurance coverage offered by SIB" set forth in a Memo she attached entitled "Seguridad" (Spanish for "Security"). That Spanish language memo details how SIBL CD customers were *protected* by Stanford's "Depository Insolvency" and "Excess FDIC Deposit" insurance policies, and that, in addition, SIBL had a "Banker's Blanket Bond" insurance policy from Lloyd's of London that covered SIBL's financial transactions in case of "a loss caused by fraud or theft". The memo described the latter insurance as being "*very difficult to*

*obtain and very few international banks are able to comply with the financial stability requirements to obtain it*".

196.    Another Stanford Spanish language marketing document the Greenberg lawyers attached to the letter to Secore describes how an investment in SIBL was "safer" than investing in a commercial bank because SIBL did not make loans, and because SIBL "offered more guarantees" because it had the above referenced insurance policies that were much better than FDIC insurance because FDIC insurance only covered up to $100,000 in deposits per customer.

197.    Around this same time, in June 1998, SGC compliance officer Fred Ferrara wrote to Greenberg's Schnapp, who was representing Stanford in yet another DEA money laundering investigation, that for securities regulatory purposes it was "critical" that the "separateness" of SGC and SIBL be maintained, both in appearance as well as reality. Apparently Ferara was concerned that some DEA subpoenas had been addressed to Yolanda Suarez at SGC, even though Suarez did not technically work at SGC. Of course, Greenberg knew that it was a distinction without a difference since Suarez was Greenberg's point of contact for *all* Stanford business, including SGC.

## 26.    Greenberg Helps Stanford Crush Employee Whistleblower

198.    The first of many of Stanford's ex-employee whistleblowers surfaced in 1998. In a March 1998 letter to Allen Stanford, lawyers for former employee Irma O'Bourke advised that they believed that Ms. O'Bourke had been terminated by Stanford in violation of the Whistle Blower's statute. This letter was followed by a second letter from O'Bourke's lawyer dated June 20, 1998 and directed to a Greenberg litigation partner, in which O'Bourke's lawyer alleged that, during a 1997 meeting with Allen Stanford and several other Stanford executives in which draft 1996 audited financial statements for SIBL were discussed, O'Bourke and others discovered that Allen Stanford was the recipient of certain unsecured loans from SIBL (in the amount of $15

million) that were not properly disclosed in the 1995 financial statements. The letter went on to allege that, when questioned about the loans, Stanford destroyed the page in the financial statements that contained the loan information and replaced it with a different page after the auditor had signed off on the document.

199.    The letter also alleged that Stanford had trained O'Bourke and other employees to market the CDs as being 100% insured, but that in 1997 O'Bourke had learned that the representations about the CDs being insured were false, and that she had expressed her concerns about this falsehood to Stanford executives at a meeting. She was terminated thereafter.

200.    Stanford responded with what soon became his modus operandi when it came to former employee whistleblowers: crush them with lawyers. On July 1, 1998, Stanford's right hand, Suarez, called Greenberg to discuss the O'Bourke matter. Hand written notes from that Suarez call taken by a Greenberg associate reveal Suarez's marching orders to Greenberg on how to handle O'Bourke: make her "*very, very unhappy*"; "*severe pain inflicted on her*"; "*prosecuted zealously*"; "*no expense spared*"; "*no stone left unturned*".

201.    By August 1998 Suarez discovered that O'Bourke had begun sending letters to her former Stanford clients informing them that their investments in the SIBL CDs were **not** insured. As a result of O'Bourke's letters to her Stanford clients, at least one such client sent a letter to Stanford – which Stanford's Suarez provided to Greenberg on September 18, 1998 -- expressing concern about the allegations that the SIBL CDs were not insured. Thus, Greenberg knew in 1998 that SIBL clients were being told by Stanford FAs that the SIBL CDs were insured.

202.    Greenberg recommended that Stanford sue O'Bourke for tortious interference and for defamation. Greenberg lawyers prepared a draft lawsuit against O'Bourke, naming SGC as

the plaintiff, and sent it to Suarez on September 13, 1998. Incredibly, **the Complaint alleged that SGC's whole business model was to "solicit" investors and refer them to SIBL, and that O'Bourke had damaged SGC's relations with its investors by telling them that the SIBL CDs were not insured**.

203.    Loumiet then talked to the Greenberg litigation partner handling the case, and as a result of that conversation the litigation partner sent a letter to Yolanda Suarez in which he informed Suarez that even if SGC limited the scope of relief sought in the lawsuit, he could not assure Stanford that such a limit would effectively limit the scope of discovery concerning SGC's relationship with SIBL and the "referral" process. Clearly this was something that Loumiet and Suarez were concerned about.

204.    Suarez responded to Greenberg via email dated September 22, 1998 that she had discussed the matter further with Loumiet and that she had decided to keep SGC out of any proposed lawsuit against O'Bourke and to instead substitute SIBL as the plaintiff, even though O'Bourke was employed by SGC. She also told Greenberg that for the time being she just wanted Greenberg to send O'Bourke a "nastygram", threatening legal action if O'Bourke persisted in contacting Stanford's clients. Greenberg thereafter sent a letter to O'Bourke's counsel demanding that she cease and desist from sending letters to Stanford clients or Stanford would sue her. Greenberg never heard from Ms. O'Bourke again after her lawyer withdrew from representing her.

### 27.    <u>Greenberg Learns Stanford's Loans to Antigua Violate Antiguan Law</u>

205.    In 1998, Stanford documented the $31 million in loans he had made to the Antiguan Government for the construction of the hospital, to be called the Mt. St. John's Medical Centre. Greenberg lawyers prepared the draft loan documentation, and participated in the finalization of the loan documentation with Stanford's Antiguan counsel, Errol Court. In a Memo

to Greenberg dated July 9, 1998, Cort objected to the Loan Agreement listing Stanford's BoA as the *sole* lender, because that "would be contrary to the Banking Act of Antigua." The Greenberg lawyer's notes of a conversation he had with Cort on June 24, 1998 reveal that Cort told him that BoA could not be the sole lender of $31 million because the loan was "*too big for the asset base*" of BoA. Cort suggested that the Loan Agreement be modified so that the lender be defined as a "consortium of banks" instead of just BoA, although Cort did not feel it was necessary to identify in the Loan Agreement the individual banks that comprised the consortium. Of course, Greenberg knew that no other banks participated in that loan other than BoA, and the loan was funded with SIBL investor money.

### 28.    Greenberg Assists Stanford with its Reg D Sales of SIBL CDs to U.S. Citizens

**206.**    In 1998, in the ultimate act of hubris, Stanford made his biggest mistake by "crossing the Rubicon" to start selling SIBL CDs to U.S. investors, a move that would eventually lead to his downfall. He and Suarez once again turned to Greenberg to help him make that happen.

**207.**    In late June 1998, Suarez asked Loumiet to perform a review of the state securities laws ("Blue Sky" laws) for the sale of SIBL CDs in Texas, Florida, Colorado, Louisiana and New York. She also sent Loumiet a draft of SIBL's proposed Reg D Disclosures, which Loumiet proceeded to heavily edit and rewrite until the final product became, essentially, Loumiet's disclosures. Said revised disclosures, which Greenberg provided to Suarez on July 16, 1998, omitted to disclose that Stanford and SIBL had consistently been under U.S. Government investigation since the late 1980s; that Stanford had made loans to the Antiguan Government and to Antiguan Government officials; and that Stanford had written the laws and effectively taken control of the Antiguan offshore bank regulatory system that regulated SIBL. The disclosures *did* disclose that Allen Stanford had personally borrowed over $13 million from SIBL, despite the

fact that Stanford always marketed (and Loumiet knew that Stanford marketed) SIBL as an investment bank that did not make loans. SIBL's Reg D disclosures, as revised by Loumiet, were thereafter used by Stanford to sell the SIBL CDs to U.S. investors from 1998 until Stanford's collapse in 2009.

208.    Greenberg's review of the state securities laws resulted in a Memo to Suarez dated July 15, 1998, in which a Greenberg securities lawyer opined that the CDs would most likely be considered securities under the laws of the states under review. In fact, and based on a conversation she had with the Texas State Securities Board, the **Greenberg securities lawyer opined that the SIBL CDs would definitely qualify as securities under Texas law**. However, she also concluded that Stanford could avoid registration of the CDs in each of the states by relying on the Reg D exemption.

### 29.    Greenberg Advises Stanford Not to Register as an Investment Company

209.    In July 1998, and as part of their work on the securities issues surrounding SIBL's proposed private offering of SIBL CDs to U.S. citizens, both Loumiet and the Greenberg securities lawyer began looking into the issue of whether SIBL needed to register as an investment company under the Investment Company Act of 1940.

210.    In November, 1998 Suarez specifically asked Greenberg for a formal opinion on the Investment Company Act issue. Suarez had already received an opinion from another lawyer, Deon Warner of the Chan Warner law firm in Houston, Texas, **who had concluded in a November 4, 1998 opinion that Stanford would need to register as an investment company because SIBL likely did not qualify as a foreign "commercial bank" since it did not make loans**. Warner had recommended that SIBL request a no-action letter from the SEC to find out the SEC's position or limit the number of purchasers of the SIBL CDs to less than 100.

211.     Instead of doing any of that, Suarez asked Greenberg for a second opinion. As always, Greenberg was eager to please. Loumiet and the Greenberg securities lawyer prepared a Memo to Suarez dated November 11, 1998, in which they opined that Stanford's private placement of SIBL CDs to an "unlimited number of qualified purchasers" did not require Stanford to register under the Investment Company Act, because as a "foreign bank", SIBL was exempted under the Investment Company Act. Incredibly, Loumiet and the Greenberg securities lawyer's opinion on the foreign bank exemption was based entirely on the notion that the majority of SIBL's income was derived from making commercial loans, when Loumiet (and Greenberg) **_knew_** that SIBL did not make loans, and indeed, marketed itself as a safer than regular banks precisely because it did not make loans.

### 30.     Greenberg Helps Stanford With Another DEA Investigation

212.     In April 1998, SIBL was served with a bank account seizure warrant issued by a Miami federal court at the request of the DEA for monies deposited at SIBL in accounts held by two reputed Mexican drug traffickers or money launderers – Juan Zepeda and Jorge Bastida. The seizure warrants were addressed to SIBL but served on Stanford's Miami office (i.e., SGC and SFIS's offices at 201 S. Biscayne Boulevard). Stanford employees immediately faxed the warrants to Schnapp at Greenberg, and Schnapp began interfacing with DEA on behalf of Stanford.

213.     Shortly thereafter on June 12, 1998 an SGC compliance officer, Fred Ferrara, wrote to Schnapp to inform him that SGC's outside securities counsel, Deon Warner, was working on a regulatory matter for SGC in which it was "_critical that the "separateness" of the brokerage firm (SGC) and the bank (SIB) be maintained, both in appearance as well as in reality_." He informed Schnapp that the DEA warrants had been addressed to SGC, c/o Yolanda Suarez, and pointed out to Schnapp that Suarez was not technically an employee of SGC, but

rather was an officer of Stanford Financial Group, and suggested that the DEA should not direct any more warrants or subpoenas to her. Of course, Greenberg already knew the reality that SIBL (and formerly GIBL) was and had been since 1988 effectively operating out of both Miami and Houston.

214.    In July, 1998 the DEA's money laundering investigation of Stanford hit the Wall Street Journal. The WSJ report came at a bad time for Stanford because SGC was on the verge of closing a referral arrangement with international consulting firm PKF's Texas and Mexico offices. Therefore Stanford, via Suarez and SGC President Jay Comeaux, requested that Greenberg send letters to four of the PKF principals confirming that Stanford was not the target of any DEA investigation. Schnapp complied with this request, and sent the letters out on his letterhead on August 28, 1998, attesting to how Stanford was fully cooperating with the ongoing DEA investigation.

215.    In a bid to clean up his tarnished reputation with the U.S. Government, Stanford provided full cooperation with the DEA investigation. The result of Stanford's cooperation was that, in February 1999, Stanford and the Antiguan Government jointly turned over to the DEA some $3 million in funds that had been on deposit at SIBL. As part of that transaction and by agreement, the U.S. Government agreed to share with the Antiguan Government 1/3 of the forfeited money, totaling some $1 million. Ironically, Stanford convinced the Antiguan Government to use that money to pay the fees incurred by Stanford's representatives on the bank reform Task Forces, including Greenberg; thus the DEA indirectly paid Greenberg's fees for helping Stanford change Antigua's banking laws!

31.    **Greenberg Learns That Stanford is Violating Antiguan Election Laws**

216.    In March 1999 Stanford forwarded to Greenberg certain articles from Antiguan newspapers accusing Allen Stanford of forcing his Antiguan employees to actively campaign for

Lester Bird's political party or else face dismissal or suspension, and of "buying" votes for Bird by giving away EC$3 million in televisions and VCRs to voters. The article, published in the "Outlet" newspaper on February 26, 1999, prompted Stanford to send a Memo to all Stanford Antiguan employees, copy of which he also sent to Greenberg, in which Stanford personally informed the employees that their employment was not conditioned on their political party affiliation or vote. He also published an "open letter" to the Antiguan people, copied to Greenberg, in which he basically admitted that Stanford's companies and employees had, in fact, campaigned for the Bird party, but that the Stanford employees had not been coerced into doing so.

217.     Following his typical routine, Stanford then had his Antiguan lawyer, Errol Cort, send a letter to the "Outlet" newspaper threatening a lawsuit. Shortly thereafter, following Lester Bird's political party's victory in the March 1999 elections, Stanford's Antiguan lawyer, Errol Cort, became the new Attorney General of Antigua.

### 32.     Greenberg Discovers Signs that SIBL is a Ponzi Scheme

218.     In August 1999 Greenberg discovered that Stanford's Antiguan banking operations bore the hallmarks of a Ponzi scheme. On August 6, 1999 Pat O'Brien, who was still in Antigua at the time overseeing Stanford's regulatory reforms, wrote an e-mail to Loumiet from his computer at SIBL. In the e-mail O'Brien informed Loumiet of what had been going on in Antigua, including that Stanford's Antiguan lawyer and newly installed Attorney General of Antigua, Errol Cort, was preparing trust legislation and was being "very cooperative" and was willing to make "whatever changes we want" to the proposed Antiguan trust laws. Obviously it was important to Stanford's new "trust representative offices" in Miami that Antigua actually have laws on the books governing trusts.

219.    But, when Loumiet asked about whether Greenberg was getting paid its fees from the $1 million that Antigua had received from the DEA as its portion of the forfeited drug money, O'Brien proceeded to tell Loumiet that the Antiguan Government had misappropriated money that Stanford had loaned the Government to be used to pay Greenberg, and, importantly, that Stanford appeared to be having "some serious financial problems".

220.    Loumiet wrote back immediately: "Worried about this. What are the signs?".

221.    O'Brien responded:

*Carlos ,*

*This is all confidential, and a bit incomplete. I really am not in a position to ask a lot about these matters, but hear a bit here and a bit there (often from impeccable sources), and it appears to spell trouble.*

*1.    RAS committed in publicly and unequivocally on more than one occasion to providing funding to the IFSA to cover Lloyd and my bills from April to June, and then withdrew the offer and changed the loan document eliminating the April-June money entirely, without telling Lloyd and me. RAS has a different version of events, putting the blame on Antigua for not signing a loan document, but I know for a fact that he eliminated the April-June funds before even presenting the note for signature.*

*2.    Even when making the April-June commitment, he was not really making the money available to the Government, but giving it a line of credit on which it could draw over a three month period. There were actually no funds to cover the line of credit, and he was going to make then available to Bank of Antigua only if, and when, Antigua attempted to draw on the line.*

*3.    After the Government refused to pay Shandwick the $136,000 RAS had advanced for Shandwick payment, he promised Shandwick he would pay it himself. He has not, and Shadwick is now preparing to sue the Government and RAS.*

*4.    RAS has made several commitments to the Government to provide substantial amounts of money, and then repeatedly resists following through.*

*5.    **The ECCB (Central Bank) is after BOA because it is carrying $25 million in overdrafts for Stanford Development Company. BOA keeps***

*telling the ECCB that it is rectifying the situation, but it appears to only be stalling.*

6.   *Stanford Trust Company is now below the minimum stated capital of US$250,000, because of an unexplained expense of US$1,500,000.* **STC appears to be in the hole about US$1,250,000 instead of on the plus side US$250,000, and has received a letter advising it that it is no longer in good standing***.*

7.   **RAS cannot get any banks to share the US$31 million hospital loan (I think it will run over US$40 million before it is over). I don't think he can absorb that kind of outlay with no income for years.**

8.   **RAS calls some (who told me about it) everyday, asking how much money came in that day. I don't know which company(ies) they're talking about or whether it's income or deposits, but the person who told me said that RAS was always interested in the cash flow, but never like this. The person concludes that there is a serious cash flow problem.**

9.   **RAS is very upset that it takes 1-2 days to FedEx checks from the States to Antigua and wants to get them there overnight.**

*There are some more minor things, but that's the crux of it. Maybe it's all OK,* **_but it seems to paint a grim picture for me_***. If RAS can't cover my bills and can't make the loan to the Government, I think I have to bail out ASAP. Can you enlighten me at all? PAT*

**222.**   This e-mail raised multiple glaring red flags of Stanford's illegalities for Greenberg including that (i) BoA was over-drafted $25 million by Stanford's real estate development company (on tops of the tens of millions of dollars BoA had loaned to the Antiguan Government) and was in trouble with its regulator the ECCB; (ii) Stanford's Antiguan trust company that was the parent of the new SFIS offices Greenberg had just set up in Miami was in financial difficulty; (iii) Stanford could not get any other banks to participate in the BOA $31 million hospital loan to the Antiguan government, despite Errol Cort's warning that such a loan was illegal if no other banks participated; and (iv) Stanford was facing severe liquidity problems and waiting anxiously and calling Antigua every day to find out if the next SIBL depositor's money had arrived because he needed it desperately to satisfy other obligations. Yet all

Greenberg seemed to care about was when and how Stanford was going to be able to pay Pat O'Brien's bills for changing Antigua's banking laws at Stanford's behest.

### 33.    Greenberg Assists Stanford's Attempt to Buy a U.S. Bank: More Red Flags

223.    In late 2000, Greenberg helped Stanford in his efforts to acquire a U.S. savings bank, Metro Savings Bank ("Metro"), in Florida. The purchase was to be made by a new Stanford company set up for this purpose, Stanford Acquisition Corporation. As part of the federal regulatory application process for that transaction, Loumiet and Greenberg corresponded with the Office of Thrift Supervision ("OTS") regarding Allen Stanford (who was the official applicant) and his business entities. In particular, the OTS wanted to know about Stanford's background and, specifically, where the money to fund the purchase was going to come from.

224.    As part of that application process, in February 2001 Loumiet reported to the OTS that Stanford had been in personal bankruptcy in 1984, right before he opened up Guardian International Bank in Montserrat.[28] Greenberg also informed the OTS that Stanford intended to open branches of Metro bank in Houston and Baton Rouge because of the trust companies Stanford already had operating in those two cities (STC and SFIS).

225.    The OTS rejected Stanford's application to purchase Metro via letter to Loumiet dated February 21, 2001 based on a lack of complete information concerning Allen Stanford's previous bankruptcies and a lack of understanding as to the accounting methods used by Stanford's long time offshore accountant, CAS Hewlett. The OTS also referenced that there were "other" issues and concerns surrounding Stanford that were noted but which had not been addressed in the letter.

---

28    In fact Loumiet eventually came into possession of Stanford's personal bankruptcy records and knew that **when Stanford filed for personal bankruptcy in 1984 he listed $13.6 million in liabilities against $229,735 in assets**. He also knew that Stanford's business prior to opening up his offshore bank business was running health clubs (gyms) from 1976-1983.

226.     Loumiet thereafter flew to Atlanta to meet with the head of the OTS. At that meeting, and as revealed in an e-mail Loumiet wrote to his fellow Greenberg partner and Washington DC lobbyist, Jim Miller, Loumiet was told in no uncertain terms that the OTS would never allow Stanford to take over Metro Bank because the OTS would never get "comfortable" with Stanford given the nature and location of his offshore business. Loumiet asked Miller to use his government contacts to find out "what really happened here", and informed Miller that Greenberg lobbying partner Ron LaFace was going to talk to the Florida Comptroller to see if they could convert Metro to a state-chartered bank so Stanford could still buy it. However, nothing ever came of these efforts.

## 34.    Loumiet Moves to Hunton & Williams; Greenberg Continues to Represent Stanford

227.     In early May 2001, Loumiet and several other partners from Greenberg moved their practice to the Miami office of Virginia based law firm Hunton & Williams ("Hunton"). Despite Loumiet's move to Hunton, Greenberg continued to represent Stanford in various matters and on a consistent basis up until Stanford's collapse in February 2009. In fact, Greenberg made a concerted effort in early May 2001 to retain as much of the Stanford business as it could, with Pat O'Brien pointing out that Hunton did not have the type of lawyers that Stanford needed, being ex-federal officials like O'Brien and Schnapp with experience in money laundering and federal *criminal law*. Greenberg continued to represent Stanford in a variety of matters thereafter until Stanford collapsed in 2009.

228.     During those years, Greenberg continued to receive information about Stanford's corrupt influences in Antigua, including a November 2003 news article reporting that Stanford had been accused of bribing two Antiguan Government officials, his old friend Molwyn Joseph and Gaston Browne, by giving them $100,000 each. The article reported that Stanford's response

to the accusation was to hold a press conference in which he "surprised" the audience by declaring that he was going to donate an additional $200,000 each to the two Antiguan Government officials. Greenberg filed this article away with a handwritten note on the file folder that says "accused of bribery charges".

229.    In an October 18, 2001 e-mail to a fellow Greenberg partner, O'Brien stated that he wanted to introduce the other Greenberg partner to Suarez "of Stanford International Bank and Stanford Trust Company" in order to gin up some business, including that "*[w]e might also be able to generate some work writing Antiguan laws with them [Stanford] paying for it.*"

230.    In April 2006, Stanford turned to Greenberg (via Greenberg partner Ruth Espey-Romero, wife of Stanford Advisory Board member Peter Romero) for assistance with respect to a scandal that emerged out of Stanford's Venezuelan office. Stanford accused the head of Stanford's Venezuelan operations, Gonzalo Tirado, of embezzling millions of dollars from him. Tirado countered the accusations by making accusations of his own against Stanford: that Stanford's entire offshore banking empire was a fraud. Espey-Romero asked Mark Schnapp in the Miami office to handle the matter, telling him that "*[Greenberg] could get work from this billion dollar client if we shine on this one*".

231.    From 2006 through 2007, Schnapp spearheaded a multinational campaign to destroy Tirado that also included getting Stanford's friend and Stanford Advisory Board member Peter Romero involved to lobby the U.S. State Department and the U.S. Embassy in Caracas to put pressure on Tirado as well. As part of that diplomatic effort, Greenberg sent a letter to the U.S. Embassy in Caracas requesting that the Embassy revoke Tirado's U.S. visa.

232.    During the course of his representation of Stanford regarding the Tirado matter in 2006-2007, Schnapp and other Greenberg lawyers traveled to Houston and interviewed several

Stanford U.S.-based employees, including in particular Stanford personnel involved in accounting and audit functions. During one of those interviews, of Stanford in-house lawyer Ramon Becerra, Becerra told the Greenberg lawyers, including Schnapp, that Stanford had funded the purchase price of the Stanford bank in Venezuela, some $18 million, through other Stanford companies, which loaned the money "*on behalf of the shareholder [Stanford]*".

233.    Greenberg also became aware that in 2005, Stanford's operations in Ecuador, specifically the sale of the SIBL CDs, had been suspended by Ecuadoran authorities for violating Ecuadorian law. Espey-Romero's husband, Peter Romero, flew to Ecuador to meet with Ecuadorian regulators on Stanford's behalf to try to quell the storm.

234.    Greenberg also received more evidence that Stanford was promising investors that the SIBL CD deposits were insured by Stanford's insurance program through Lloyd's of London. Greenberg received an October 2005 e-mail from a Stanford executive describing how a SIBL CD investor had called Stanford's insurance broker Bowen Miclette & Britt to obtain confirmation that his CD investment was insured as had been represented by his Stanford broker.

235.    During the course of his representation of Stanford regarding the Tirado matter, Schnapp in April 2006 was also made aware that Stanford had reached out to U.S. Congressman Gregory Meeks (D-NY) and requested that Meeks use his influence to get the Venezuelan Government to launch a criminal investigation of Tirado. According to stories that later ran in the Miami Herald in 2009, Meeks complied and flew to Venezuela to meet with Hugo Chavez and relayed Stanford's request that the Venezuelan Government indict Tirado.[29]

236.    Schnapp also recommended to Suarez that, because the Stanford group was based in the U.S., they should report Tirado's alleged theft to the Justice Department and FBI in Miami

---

[29]    Meeks was later investigated by the U.S. Justice Department for his ties to Stanford. *Feds Probe Banker Allen Stanford's Ties to Congress*, Miami Herald, December 27, 2009.

in order to get the U.S. Government involved. Schnapp offered to use his connections in the U.S. Attorney's office in Miami to make that happen.

237.    Later, in September 2007, Schnapp reported to Suarez that he had discussed the matter with his former Justice Department colleague, Assistant U.S. Attorney Dick Gregorie, who had informed Schnapp that the U.S. Government was proceeding with its own investigation of Tirado. But during that same conversation on September 26, 2007, *Gregorie also informed Schnapp that the Government had an "unrelated" investigation open on Stanford*.

238.    In October 2007 Schnapp received word that the Miami Herald was about to publish an article on Stanford's problems in Venezuela, and specifically that Stanford was being investigated by the Venezuelan Government for tax fraud and money laundering. Schnapp persuaded the reporter not to run the story.

239.    STC also hired Greenberg in 2007 to help STC Louisiana open a representative office in Florida to continue STC's IRA model. That application eventually sparked an investigation of Stanford's other Florida-based trust representative office, SFIS, by the Florida Office of Financial Regulation ("OFR"), discussed below. Greenberg even helped prepare the Business Plan for the new Florida trust company.

240.    Greenberg's continued representation of Stanford after Loumiet's departure in 2001 also involved corporate matters related to Stanford's investments in small, private equity companies using SIBL's depositors' money. This was a bizarre change in the nature of Stanford's business model, as Greenberg had known it for the preceding thirteen or fourteen years, and consequently raised red flags. Instead of making money running an offshore bank as it had done previously, all of a sudden Stanford Financial had become some kind of venture capital/real estate investment fund. Of course, Greenberg just ignored and never questioned

where the money was coming from to make these investments even though the answer (SIBL investor money) flashed brightly before Greenberg's eyes for years.

241.    In 2002, Greenberg assisted Stanford Financial Group Company's newly formed "Capital Markets Group" to purchase Tangible Asset Galleries, Inc., a retailer, wholesaler and auctioneer of rare coins and stamps, fine art and antique collectibles, for $3 million. Other private equity acquisition projects that Greenberg worked on for Stanford included work performed for a new Stanford entity – Stanford Venture Capital – related to said new entity's acquisitions of Miller Golf; U.S. Farm & Ranch; Telecom Wireless Solutions; and Greystone Pharmaceutical. Virtually over night and right before the very eyes of Greenberg, Stanford had magically transformed itself from an offshore banking operation selling offshore bank CDs that was constantly under government investigation, to a venture capital firm acquiring private equity companies right and left. All of those private equity acquisitions were made using the SIBL depositors' money, but no one at Greenberg bothered to ask any questions. They just kept opening new files and billing fees to Stanford.

242.    Perhaps the most outlandish investment Stanford made with the SIBL investor money (other than the investment in "Cowboys and Indians" magazine) was when Stanford decided he wanted to start making movies. Between 2005 and 2008, Greenberg's Los Angeles office helped Stanford structure a $16 million investment to make the Christian religious-themed movie, "The Ultimate Gift". One of Greenberg's early bills to Stanford on this movie project in September 2005, *for one month's work*, was *$162,000*. By 2008 the movie had tanked and the film company was in default on its obligations to Stanford. Greenberg was still actively involved in exploring options for Stanford to try and recover its $16 million investment in the movie business when Stanford was taken over by the SEC in February 2009.

35.   **Loumiet's Personal Relationship with Allen Stanford**

243.   Over the years of representing Stanford since 1988, Loumiet developed a very close personal relationship with Allen Stanford. Loumiet and Stanford frequently got together for drinks and dinner, with and without wives (or, in Stanford's case, mistresses)[30] whenever Stanford was in Miami.

244.   Loumiet also evinced a personal connection to Stanford and Stanford's success. As an example, Loumiet wrote Stanford a letter dated November 26, 2001 congratulating Stanford for "embracing" his (fraudulent) connection with the founder of Stanford University, Leland Stanford. As discussed *infra*, Stanford continued to extol his supposed blood relationship to the Stanford University founder until Stanford University eventually cried foul and sued Stanford for trademark infringement.

245.   Stanford told Loumiet that "you are one of my very best friends…**and a <u>major reason</u> why I was able to survive the difficult battles over the years and are in the position I am today" (emphasis added)**.

246.   Loumiet replied as follows:

> *Allen, thanks for the very, very kind and undeserved words. I feel the same way about you, and it is always a huge pleasure to interact with you, either in a business or a social context.*
>
> *I realize that even though you are the owner of your companies, and therefore what you say should go, you need to take into account the legitimate concerns of others in your companies.*
>
> *Whatever happens, our friendship will not be affected. **One of the things that I'm proudest of in 27 years of practice is my association with you, watching you grow business and otherwise, facing huge problems together, side by side, and beating them.** That pride and our friendship will remain no matter what. We were friends for many years when you had little or no legal work to give out, and I was just as loyal, ferocious and determined in my representation of you then as I have*

---

30   After dining with Stanford and his second "outside wife" Louise Sage Stanford, Loumiet later represented Stanford in his separation and support dispute with Ms. Sage.

*been since. If tomorrow you sold everything (or lost it) and needed a friend, I would still be there.*

***You would be amazed how often, without your knowledge, I silence skeptics who cannot understand how you succeeded, and like Shockey or Weiner, assume bad things.***

*From the point of view of my doing legal work, please understand that I am not asking for charity. You've seen my work in many contexts for 17 years, and only once have I failed to achieve what we set out to do. I believe I have earned through hard work and high ethical and professional standards the reputation I have as a lawyer. At the same time, **much of the friendly brainstorming that I have been able to share with you has become a successful reality (something I am immensely proud of)**.*

*You also know that I will not accept anything but the highest quality work for you. that I will not permit you to be ripped off by lawyers or anyone else, that I will always take a long-term relationship view of anything we do for you, and that **<u>my loyalty is first and foremost to you, and not anyone else, so I will watch out for your interests, and not those of anyone else in your organization</u>**. Hopefully these are all considerations that would allow you to sleep easy wherever you may find yourself on any given night.*

*I understand from "a little birdie" that congratulations are in order over a certain island in Antigua. I'm very happy for you.*

*Talk to you soon.*

*Best.*
*Carlos Loumiet*
*Hunton & Williams LLP - Miami*

247.    Loumiet remained in close, almost daily, contact with Stanford over the succeeding years, including regularly inviting Stanford out for lunch, dinner or drinks.  When Stanford appeared in an edition of World Finance magazine after he was knighted and started the Antiguan 20/20 cricket concept, Loumiet wrote Stanford an e-mail that said "*I am SO proud of you*" (emphasis in original).

248.    On December 28, 2006, Loumiet wrote to advise Stanford that he (Loumiet) had been accused by the OCC of concealing the crimes of some former bank executives at Hamilton Bank, telling Stanford that he was "*now the subject of those silly, scurrilous, unfounded,*

*deceitful, faceless-bureaucrat attacks that you've had to put up with over the years*". Stanford responded that Loumiet was a genuine friend and he was behind Loumiet 100%, and proceeded to thank Loumiet for "*fighting some of my battles back in the early days*" and told Loumiet that "***I wouldn't be where I am today without you*** *and a very few others who believed in me and stood shoulder to shoulder with me in dealing with my own attacks and bs from the gutless little losers like Shockey and Weiner*".

249.    When Stanford decided to buy a bank in Venezuela, Banco Galicia, and realized that Venezuelan law required diversity of shareholders, he called upon Loumiet to serve as an additional shareholder owning .1% of the shares of the bank.

250.    In August 2007, Stanford invited Loumiet to serve on the Stanford Advisory Board, and Stanford Financial paid Loumiet $100,000 a year to serve as counsel to the Advisory Board.

251.    Loumiet even organized his step son's wedding in Antigua with Stanford's help. In fact, Loumiet held a pre-wedding "Antigua theme" party in Miami for his step son for those persons who could not travel to Antigua, and he asked Suarez to send him cricket materials from the 20/20 tournament Stanford was sponsoring in Antigua for use as decorations.

### 36.    Suarez Handles Stanford Money Laundering Crisis in Mexico

252.    In October 2005, Suarez informed Loumiet that Stanford Mexico's human resources director, Veronica Spindola, was detained inside Stanford's private airplane at the Toluca, Mexico airport carrying some $5 million in checks bound for SIBL in Antigua, none of which had been declared to Mexican Customs. For many years, the principal way Stanford got investment funds from Mexican investors out of Mexico and into SIBL was via private flights on Stanford-owned or chartered airplanes out of the Toluca, Mexico airport. About once every month, Stanford's Mexico office bundled large amounts (millions of dollars) of checks and cash

from Mexican investors, including checks drawn on U.S. bank accounts, and loaded them in briefcases to fly the money out of the Toluca airport to Antigua, in violation of Mexican law.[31]

253.    As a result of the detention of Spindola, SIBL was criminally accused of money laundering by Mexican authorities.

254.    Suarez and Loumiet traveled to Mexico City "on instructions from RAS" and spent three days there (October 19-21) with Stanford's local Mexican counsel, Angel Junquera Sepulveda, negotiating for the release of Ms. Spindola.

255.    After spending 90 days in criminal detention, Spindola was released in December 2005 and was given an award for excellence in 2006 by Allen Stanford as the Stanford Financial "employee of the year".[32] Upon information and belief, Stanford, under Suarez's direction, paid an exorbitant amount of money to extricate SIBL and Spindola from the Mexican criminal charges. Said money, totaling some $5.7 million, was paid through two separate Mexican law firms in December, 2005 per Suarez's instructions. Stanford personally approved the payments to save his Mexican operations.

256.    Specifically, on October 31, 2005, Stanford wired $2.5 million to one of the Mexican law firms. Later, on December 13, 2005 that same Mexican law firm wrote to Suarez to remind Suarez of the deal they had that Stanford would pay a "bonus" if a "remittal" were achieved, which was defined as: (1) no intervention by the Mexican Government in any Stanford entity; (2) release of Spindola from custody; (3) no Stanford Mexico employee, officer, director or legal representative arrested; and (4) the case would be converted from a money laundering investigation to a  "contraband" investigation. The Mexican law firm affirmed that all conditions

---

31     Gabriel Bauducco, *Imperio de Papel*, at 98 (2009). Of course, this was the same procedure utilized by SFIS to fly money in "pouches" from Miami to Antigua.
32        *Id*., at 115.

had been met and therefore requested its bonus. Stanford wired an additional $3.2 million later that month.

257.    In December 2005, Loumiet sent Suarez an article from Corporate Counsel magazine entitled "*They Should Have Known Better*", which concerned Bank of New York's failure to detect illegal schemes being run through the bank. In his fax cover note to Suarez, Loumiet wrote (in Spanish) that "given the problems in Mexico, be careful about the attached".

### 37.    Suarez Handles Crisis in Ecuador

258.    In September and October 2005, the Ecuadorian Government prohibited Stanford's sales of SIBL CDs and threatened to shut down Stanford's whole operation in Ecuador after it determined that SIBL was illegally operating in Ecuador without proper registration based on SFIS-Miami direct-mail solicitation letters mailed into Ecuador that the Ecuadorian Government had obtained. In the ensuing investigation, the Ecuadorian Government determined that Stanford's mailings were misleading and that the SFIS employees were (as was the case in Mexico) violating Ecuadorian law by taking deposits for SIBL in Ecuador without reporting anything.[33] The Ecuadorian Government eventually declared most of Stanford's business practices illegal.

### 38.    The Beginning of the End: Suarez Resigns

259.    In November 2008, and apparently seeing the writing on the wall, Suarez bailed out of the sinking Stanford ship. She forwarded to her old friend and mentor, Loumiet, an e-mail she had sent to Stanford whereby she resigned.

260.    On February 13, 2009, as the press reported on the implosion of Stanford, Loumiet sent e-mails to his old friends at Stanford Financial. To Allen Stanford he wrote: "*[a]s I*

---

[33]    Michael Sallah, *Florida Regulators Failed to Stop Stanford's Miami Operations*, The Miami Herald, August 8, 2009.

*recall, you and I successfully fought through some tough times together in the past. Hang in there and remember I will always be happy to help any way I can.*" To Mauricio Alvarado he wrote (in Spanish): "*Mauricio, I want you to know that I have you all in my thoughts, I know that this is all BS, and that you will all triumph*". To Jim Davis he wrote: "*Thinking of you, my friend. Hang in there.*"

### 39.    The End of Stanford Financial

**261.**    Four days later, on February 17, the SEC filed its lawsuit against Stanford, SGC and SIBL alleging a "massive Ponzi scheme of staggering proportions." The SEC obtained an injunction to freeze the assets of Stanford Financial, and Ralph S. Janvey was appointed to serve as Receiver to liquidate the Stanford Financial companies.

**262.**    On January 08, 2010, the SEC filed its Second Amended Complaint alleging, *inter alia*, that Stanford Financial violated Section 7(d) of the Investment Company Act by operating an unregistered investment company selling unregistered investment company securities from the United States.

**263.**    On June 18, 2009, Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts, including wire and mail fraud, obstruction of an SEC investigation, and money laundering. Former Stanford Financial CFO Jim Davis subsequently pled guilty to several crimes, including conspiracy to commit securities fraud and conspiracy to obstruct an SEC proceeding. On March 6, 2012, Allen Stanford was convicted on multiple criminal counts, including wire fraud, mail fraud, obstruction of an SEC investigation, conspiracy to commit wire and mail fraud, conspiracy to obstruct an SEC investigation, and conspiracy to commit money laundering. On June 14, 2012, Stanford was sentenced to 110 years in prison for his crimes.

**40.** **Growth in SIBL CD Sales During Defendants' Representation of Stanford Financial**

**264.** When Loumiet and Greenberg began representing Stanford Financial in 1988, Stanford's offshore bank, GIBL, held $17 million in investor CD deposits. By 1999, the year after Loumiet and Greenberg assisted Stanford to set up his U.S.-based sales structure with the creation of SGC, STC (Louisiana) and SFIS, Stanford's offshore bank SIBL held $676 million in investor CD deposits. With the U.S.-based sales structure in place, Stanford Financial thereafter grew exponentially, such that by 2001 SIBL CD deposits had grown to close to $1.2 billion; by 2004 they had grown to $3 billion; by 2006 they had grown to over $5 billion; and grew an additional billion dollars per year in 2007 and 2008. When Stanford was taken over by the SEC in February, 2009, SIBL held $7.2 billion in CD deposits. All of that growth was made possible with Defendants' material assistance.

*I.*      ***The Findings of this Court***

**265.** This Court has already found that the Stanford fraud was a Ponzi scheme. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."); *id.* at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."); id. at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . ."); and Case No. 3:09-CV-0721-N, Doc. 176 at note 23 ("…the Court here clarifies that Stanford operated a Ponzi scheme"). This Court has also found that SIBL was insolvent since "at least" 1999. *Id.*, at 28.

**266.** In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's findings that Stanford operated as a Ponzi scheme. *See Janvey v. Alguire*, 628 F.3d 164, 175 (5th

Cir. 2010) (upholding this Court's Order). In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> *We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.*
>
> \*        \*        \*
>
> *The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme ab initio.*
>
> \*        \*        \*
>
> *The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . . .*
>
> \*        \*        \*
>
> *Here, the Receiver provided evidence of a massive Ponzi scheme . . . . The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized.*
>
> *Id*. at \*9-13.

## VI.  STATUTE OF LIMITATIONS DEFENSES

### A.   *Discovery Rule / Inquiry Notice / Tolling Agreements/Continuing Tort/Equitable Tolling*

**267.**   The SEC filed an action against Stanford, SGC and SIBL *et al.* on February 17, 2009, and on that same day the Receiver was appointed. Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered until more recently, Defendants' participation in the Stanford Ponzi scheme and their involvement in causing the injury suffered by Plaintiffs because Defendants' wrongful acts were inherently undiscoverable.

**268.**   Moreover, Plaintiff entered into a tolling agreement with Greenberg LLP effective February 1, 2011 and said tolling agreement was extended through November 14, 2012. Greenberg Traurig PA was not named in the tolling agreement by mutual mistake.  Alternatively,

Greenberg Traurig LLP fraudulently concealed the fact that it was not formed until 1999 and the correct Defendant was Greenberg Traurig PA. Because there was a fiduciary relationship between Stanford and Greenberg, Greenberg had a duty to disclose the responsible party's identity yet Greenberg LLP entered into a tolling agreement, amended it 14 times without disclosure, and admitted that Loumiet worked for Greenberg Traurig LLP, a fact it now denies.

269.    Moreover Defendant engaged in tortious conduct to aid and abet Stanford's illegal schemes, and continued to represent Stanford Financial, continuously and uninterruptedly beginning in 1988. Therefore Loumiet, and by extension the law firm Defendants, engaged in continuing representation of Stanford and continuing torts which also toll the limitations period.

270.    Plaintiffs also assert the doctrine of equitable tolling.

## VII.  <u>RECEIVER CLAIMS</u>

### A.    *Negligence*

271.    The Defendants owed a duty to SIBL, SGC, STC, SFIS and the Stanford Financial Group generally, and therefore to the Receiver, that required the Defendants to exercise the degree of care, skill, or diligence that attorneys of ordinary skill and knowledge commonly possess. The Defendants violated their duties to the Stanford entities by subordinating their duties to the entities to their loyalty to Allen Stanford personally. As Loumiet told Stanford in December 2004: "*my loyalty is first and foremost to you, and not anyone else, so I will watch out for your interests, and not those of anyone else in your organization*". The Defendants' negligent acts breached their duties owed to SIBL, SGC, STC, SFIS and Stanford Financial generally, and therefore to the Receiver. The Defendants' breach of their duties proximately caused injury to SIBL, SGC, STC, SFIS and the Stanford Financial Group generally, and therefore to the Receiver, by increasing these entities' liabilities and by enabling Stanford and his co- conspirators to misappropriate billions of dollars in assets from Stanford Financial

companies, including at least $1.8 billion in funds that were improperly diverted and subsequently misappropriated from Stanford Financial companies.

**B.     *Aiding, Abetting, or Participation in Breaches of Fiduciary Duties***

272.     The directors and officers of the various entities within the Stanford Financial Group (including but not limited to Allen Stanford, Jim Davis, Yolanda Suarez, Mauricio Alvarado, and Danny Bogar) owed fiduciary duties to their respective member companies within Stanford Financial, and therefore owed fiduciary duties to the Receiver. As described herein, the Stanford Financial directors and officers breached their fiduciary duties by causing SIBL, SGC, STC and SFIS, and Stanford Financial generally to engage in illegal activity proximately causing increased liabilities, and by assisting Stanford and his co-conspirators in misappropriating billions of dollars in assets from Stanford Financial companies, including at least $1.8 billion in funds that were improperly diverted and subsequently misappropriated from Stanford Financial companies.

273.     The Defendants knowingly or recklessly aided, abetted, or participated in these breaches of fiduciary duties. The Defendants knew that the Stanford Financial directors and officers owed fiduciary duties to their respective Stanford Financial companies, and the Defendants were aware that these directors and officers were breaching their fiduciary duties. The Defendants aided, abetted, and participated in these breaches of fiduciary duties by their conduct as alleged herein, which proximately causing increased liabilities and assisted Stanford and his co-conspirators in misappropriating billions of dollars in assets from Stanford Financial companies, including at least $1.8 billion in funds that were improperly diverted and subsequently misappropriated from Stanford Financial companies. The Defendants violated their duties to the Stanford entities by subordinating their duties to the entities to their loyalty to Allen Stanford personally. As Loumiet told Stanford in December 2004: "*my loyalty is first and*

*foremost to you, and not anyone else, so I will watch out for your interests, and not those of anyone else in your organization*".

274.    The directors' and officers' fiduciary breaches and the Defendants' participation in these breaches were a proximate cause of actual damages to the Stanford Financial Group of companies generally, and therefore to the Receiver. The Defendants knew or should have known that their aiding, abetting, or participation in these breaches of fiduciary duties would proximately cause extraordinary harm to Stanford Financial, and therefore to the Receiver. Accordingly, Plaintiffs are entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

## C.    *Breaches of Fiduciary Duties*

275.    Greenberg owed fiduciary duties to its Stanford Financial clients as a matter of law. Suarez served as an officer (General Counsel and then Chief of Staff) and a director on the boards of companies within Stanford Financial Group. Suarez owed fiduciary duties to the Stanford Financial Group and, upon insolvency, directly to its creditors to use reasonable care in operating and managing the Stanford Financial Group's business in a reasonably prudent manner. Suarez also owed fiduciary duties to the Stanford Financial Group and its constituent companies, including SIBL, SGC, SFIS and STC, to operate said companies in compliance with all applicable laws and regulations.

276.    Defendants breached their fiduciary duties by failing to use reasonable care in operating and managing and representing the Stanford Financial companies and instead subordinating their loyalties to the companies to their personal loyalty to Allen Stanford, and in thereby failing to operate or represent Stanford Financial's business in a reasonably prudent manner, and in failing to operate or represent Stanford Financial and its constituent companies in compliance with all applicable laws and regulations. Specifically, Suarez and Loumiet (and

thereby Greenberg) consistently made clear that their loyalties were to Allen Stanford individually and Suarez and Loumiet always did what Allen Stanford wanted, no matter if it exposed the Stanford Financial companies to insolvency and illegalities. Suarez and Loumiet breached their fiduciary duties by continuously ignoring the numerous red flags discussed in this Complaint and continuing to provide services that furthered the Stanford Ponzi scheme, despite their extensive first-hand knowledge of the illicit operations of SIBL, SGC, SFIS and STC (as well as Stanford Mexico, Stanford Ecuador and Stanford Venezuela). Suarez and Loumiet allowed themselves and the companies they were supposed to protect to be dominated, controlled and exploited by Allen Stanford for his own personal gain.

277.    The Defendants' willful, reckless, and/or grossly negligent acts and omissions demonstrate an entire want of care and actual conscious indifference to the rights, safety, and welfare of Stanford Financial and its constituent companies and their investor clients. The Defendants' willful, reckless, and/or grossly negligent acts and omissions also manifest an actual awareness by the Defendants that their conduct posed an extreme degree of risk and likelihood of serious injury to SIBL, SGC, SFIS, STC, and Stanford Financial generally. The Defendants' fiduciary breaches played a pivotal role in furthering the Stanford Ponzi scheme, increasing the liabilities of the Stanford Financial entities and assisting Allen Stanford and his co- conspirators to misappropriate billions of dollars in assets from Stanford Financial companies, thereby proximately causing injury to the Receiver and/or the Committee.

### D.    *Fraudulent Transfer/Unjust Enrichment*

278.    As described above, this Court and the Fifth Circuit have found that the Stanford fraud was a Ponzi scheme.  At all times relevant to this Amended Complaint, the Stanford Parties were insolvent, and Defendant R. Allen Stanford operated the Stanford entities in furtherance of

his fraudulent scheme.  Each payment of CD Proceeds from the Stanford Parties to Defendants was made with actual intent to hinder, delay, and defraud the Stanford Parties' creditors.

279.    CD Proceeds from the Ponzi scheme described above were transferred at various times by or at the direction of the Stanford Financial entities to Defendants Greenbergand Suarez. Defendants did not provide reasonably equivalent value for the transfers of CD Proceeds and cannot establish that they were good-faith transferees.

280.    The Receiver has identified payments of CD Proceeds totaling millions of dollars from the Stanford Financial entities to Defendants. See Schedule of payments, attached hereto as **Exhibit "A"** (Greenberg) and **Exhibit "B"** (Suarez).

281.    The transfers of CD Proceeds to Greenberg from the Stanford Financial Entities consisted of at least the following: $4,171,836.57 between February 2006 and February 2009.

282.    The transfers of CD Proceeds to Suarez from the Stanford Financial entities consisted of at least $5,169,282.10, $4,292,604.23 of which occurred after December 17, 2006 and $876,677.87 of which occurred before December 17, 2006.

283.    The Receiver is entitled to disgorgement of the CD Proceeds transferred from the Stanford Parties to Suarez because such payments constitute fraudulent transfers under applicable law.  The Stanford Parties made the payments to Suarez with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, the Receiver is entitled to the disgorgement of those payments.  Additionally, the Stanford Parties transferred the funds to Suarez at a time when the Stanford Parties were insolvent, and the Stanford Parties did not receive reasonably equivalent value in exchange for the transfers.

284.    The Receiver may avoid transfers made with the actual intent to hinder, delay, or defraud creditors.  [T]ransfers made from a Ponzi scheme are presumptively made with intent to

defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Alguire*, 628 F.3d at 176 ("[A] Ponzi scheme 'is, as a matter of law, insolvent from its inception.'"); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception . . . . The Receiver's proof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").  Moreover, "in determining actual intent . . . , consideration may be given, among other factors, to whether . . . the transfer or obligation was to an insider." TEX. BUS. & COM. CODE ANN. § 24.005(b)(1) (Vernon 2009).  Because Suarez was an insider with the Stanford entities, the fraudulent transfers to her were made with the actual intent to hinder, delay, or defraud creditors. *See* TEX. BUS. & COMM. CODE ANN. § 24.002(7) (defining "Insider" for the purposes of the fraudulent-transfer statute).

285.    The Stanford Parties were running a Ponzi scheme and paid Suarez with funds taken from unwitting SIB CD investors.  The Receiver is, therefore, entitled to disgorgement of the CD Proceeds the Stanford Parties fraudulently transferred to Suarez.

286.    Consequently, the burden is on Suarez to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value. *See* Case No. 3:09-CV-0724-N,  Dc. 456 at 13 ("A defendant invoking this defense has the burden to show *both* objective good faith and reasonable equivalence of consideration.") (emphasis in original); *see also Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly.").  The Receiver is, therefore, entitled to recover the full amount of the payments that Suarez received—

either directly or indirectly—unless she proves *both* objective good faith *and* reasonably equivalent value.

287.    The good-faith element of this affirmative defense requires that Suarez—an insider—prove objective, rather than subjective, good faith.  *See Warfield*, 436 F.3d at 559-560 (good faith is determined under an "objectively knew or should have known" standard); *In re IFS Fin. Corp.*, Bankr. No. 02-39553, 2009 WL 2986928, at *15 (Bankr, S.D. Tex. Sept. 9, 2009) (objective standard is applied to determine good faith); *Quilling v. Stark*, No. 3:05-CV-1976-BD, 2007 WL 415351, at *3 (N.D. Tex. Feb. 7, 2007) (good faith "must be analyzed under an objective, rather than a subjective, standard.   The relevant inquiry is what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint." (internal citations and quotation marks omitted).

288.    There is no evidence that Suarez provided any value—much less reasonably equivalent value—in exchange for the fraudulent transfers she received.   Moreover, both this Court and the Fifth Circuit have held that providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value.   *Warfield,*, 436 F.3d at 555, 560; Case No. 3:09-CV-0724-N, doc. 456 at 13-14 ("[A]s a matter of law, services provided in furtherance of a Ponzi scheme does not confer reasonably equivalent value.'").   furthermore, consideration which has no utility from the creditor's perspective does not satisfy the statutory definition of "value." *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000).   Suarez cannot now claim that, in return for furthering the Ponzi scheme and helping it endure, she should be entitled to keep the over $5.1 million in CD Proceeds she received from the Stanford Parties.   Suarez cannot meet her burden to establish that she provided reasonably equivalent value for the CD Proceeds she directly or indirectly received from the

Stanford Parties and that she received such payments in good faith.  Accordingly, the Receiver is entitled to the disgorgement of those funds.

289.    Moreover, under applicable fraudulent-transfer law, the Receiver is entitled to attorneys'' fees and costs for their claims against Suarez.  *See, e.g.,* TEX. BUS. & COMM. CODE ANN. § 24.013 ("[T]he court may award costs and reasonable attorney's fees as are equitable and just.")  As a result, the Receiver requests reasonable attorneys' fees and costs for prosecuting its fraudulent-transfer claim against Suarez.

290.    In order to carry out the duties delegated to them by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the CD Proceeds received by Suarez.

291.    The Receiver was able to discover the fraudulent nature of the above-referenced transfers only after R. Allen Stanford and his accomplices were removed from control of the Stanford entities, and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Stanford entities.  The Court has recognized the necessarily complex nature of such investigation.  *See, e.g.*, Doc. 1315 at 11, 14 ("This Court has charged the Receiver with the responsibility of tracking down and collecting ill-gotten funds that properly belong to the Receivership Estate and, ultimately, defrauded investors.  That task has been complicated by the Ponzi scheme's complexity . . . .  The Stanford Defendants' Ponzi scheme collected and dissipated billions of dollars over its long existence.  Coupled with the scheme's Byzantine structure, the process of recouping any fraudulently obtained funds necessarily includes weeding through a massive number of individual transactions and any documents and information related to those transactions.").  Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period.  *See, e.g., Wing v. Kendrick*, No. 08-CV-01002, 2009 WL 1362383, at *3 (D. Utah May 14, 2009); *Quilling v.*

*Cristell*, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 29, 2006); *see also* TEX. BUS. & COMM. CODE ANN. § 24.010(a)(1) (claims may be brought either within four years of the transfer *or* within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

292.    The Stanford Parties, who orchestrated the Ponzi scheme, transferred the CD Proceeds to Suarez with actual intent to hinder, delay, or defraud their creditors.  The Receiver is, therefore, entitled to disgorgement of all CD Proceeds fraudulently transferred to Suarez. Pursuant to the equity powers of this Court, the Receiver seeks an order that: (a) (CD Proceeds received directly or indirectly by Suarez were fraudulent transfers under applicable law; (b) CD Proceeds received directly or indirectly by Suarez are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Suarez is liable to the Plaintiff for an amount equaling the amount of CD Proceeds she directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Receiver.

293.    The Receiver was able to discover the fraudulent nature of the above-referenced transfers only after R. Allen Stanford and his accomplices were removed from control of the Stanford entities, and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Stanford entities.  Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period.

294.    The Receiver's investigation is continuing, and should more payments of CD Proceeds to any of the Defendants be discovered, the Receiver will amend this Complaint to assert claims regarding such additional payments.

1.   **In the Alternative, the Receiver is Entitled to Disgorgement of CD Proceeds from Defendants under the Doctrine of Unjust Enrichment.**

295.    In the alternative, the Receiver is entitled to disgorgement of the CD Proceeds paid to Defendants pursuant to the doctrine of unjust enrichment under applicable law. Defendants received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors. Defendants have been unjustly enriched by such funds, and it would be unconscionable for them to retain the funds.

296.    In order to carry out the duties delegated to it by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the CD Proceeds received by Defendants.

297.    Defendants have been unjustly enriched by their receipt of CD Proceeds from the Stanford Entities. The Receiver is, therefore, entitled to disgorgement of all CD Proceeds Defendants received. Pursuant to the equity powers of this Court, the Receiver seeks an order that: (a) CD Proceeds received directly or indirectly by Defendants unjustly enriched Defendants; (b) CD Proceeds received directly or indirectly by Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Defendants are liable to the Receiver for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Receiver.

2.   **In the Alternative, the Receiver is Entitled to Restitution Under the Theory of Money Had and Received.**

298.    In the alternative, the Receiver is entitled to restitution of the CD Proceeds paid to Defendants pursuant to the doctrine of money had and received, or recoupment. To prove a claim for money had and received, the Receiver need only show the following: (1) that Defendants hold/received money and (2) the money, in equity and good conscience belongs to the Plaintiffs.

Defendants received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors. The Committee is accordingly entitled to all CD Proceeds Defendants received. Further, the recovery of attorney's fees is expressly authorized for this claim. Tex. Civ. Prac. & Rem. Code § 38.001 et seq.

### E.    *Negligent Retention / Negligent Supervision*

**299.**    Greenberg is directly liable to the Receiver for negligent retention and supervision of Loumiet. Greenberg owed a duty to SGC, SIBL, STC, SFIS and Stanford Financial generally, and therefore to the Receiver, to use ordinary care in the hiring, supervision and retention of its agents and employees and in monitoring the activities of its agents and employees in representing Stanford Financial and its affiliated entities. Greenberg knew or should have known that its agents and employees had been specifically retained by Stanford Financial and its affiliated entities to help them evade regulation of Stanford's activities, particularly the activities and operations of SIBL. As a result, Greenberg breached the duty it owed to SGC, SIBL, STC, SFIS and Stanford Financial generally, and therefore to the Receiver, by not exercising ordinary care in the hiring, supervision and retention of its agents and employees and in not monitoring its agents and employees' activities with regard to this specific, inherently high-risk, client matter. Greenberg's breaches of such duties and failures to supervise have proximately caused damages to SGC, SIBL, STC, SFIS, and Stanford Financial generally, and therefore to the Receiver by increasing the entities' liabilities and assisting Allen Stanford and his co-conspirators to misappropriate billions of dollars in assets from Stanford Financial companies, including at least $1.8 billion in SIBL CD funds that were improperly diverted and subsequently misappropriated from Stanford Financial companies.

## VIII.  INVESTOR CLASS ACTION CLAIMS[34]

**300.**    All of the Investor Class Plaintiffs invested in the Stanford Financial/SIBL Ponzi scheme by purchasing SIBL CDs or placing their money in other investment accounts with SIBL. Over the years that Class Plaintiffs purchased and maintained investments in SIBL, Plaintiffs were repeatedly and uniformly told, either directly by their Stanford Financial FAs or via Stanford Financial promotional materials, that, inter alia: (1) an investment in SIBL was safer than investing in U.S. banks because SIBL did not make loans but instead invested in safe and highly liquid instruments; (2) Stanford Financial was a U.S.-based business regulated by the U.S. Government; and (3) that an investment in SIBL was completely safe and secure because it was guaranteed and insured by Lloyd's, was thoroughly regulated, was audited by an "outside" audit firm and subjected to regular, "stringent" risk management examinations. All of this was false.

**301.**    During the time that Class Plaintiffs purchased and maintained investments in SIBL, Plaintiffs' Stanford Financial FAs and Stanford's uniform promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*: (1) Stanford Financial was not regulated by the U.S. Government and indeed, with Defendants' material assistance, had evaded and skirted U.S. laws and government regulation at every turn; (2) Plaintiffs' investments in SIBL were not insured; (3) SIBL was operating illegally as an unregistered investment company soliciting and selling unregistered securities by, from and through Houston, Texas; (4) SIBL was not invested in safe, secure and liquid instruments but instead 80% of SIBL's assets were invested in illiquid, high risk investments that included $1.8 billion in unsecured loans to Allen Stanford, venture capital investments in private equity companies, Caribbean airlines, and speculative real estate investments in the Caribbean; (5) SIBL was not adequately or

---

[34]    The class action allegations were dismissed by the district court on November 27, 2017 and are currently on appeal in the Fifth Circuit.  They remain in this complaint because of possible reversal and remand.

effectively regulated or supervised by the Antiguan Government and was only audited by a one man "mom and pop" audit shop under the control of Allen Stanford; (6) Allen Stanford controlled the Antiguan Government through loans, bribes and corrupt political machinations; (7) Stanford had consistently been under investigation by the U.S. Government since 1988; and (8) Stanford Financial (assisted by Defendants and others) was perpetuating a massive Ponzi scheme facilitated by, *inter alia*, evasion and violation of laws and regulation in various countries.

302.     Based on the representations and omissions of material fact made to Class Plaintiffs repeatedly and uniformly over the years, both in person by Plaintiffs' Stanford Financial FAs and via Stanford Financial promotional materials, Class Plaintiffs decided to, and did, invest money in, and maintain investments in, the SIBL CDs.

303.     Class Plaintiff **Samuel Troice** first invested in SIBL CDs through Stanford Mexico in 1997. Troice dealt directly with his FA David Nanes. Nanes was a registered U.S. broker/dealer and registered investment adviser registered under SGC since 1997. In that capacity, Nanes was employed directly by SGC in Houston and received his compensation and sales commissions from SGC. Nanes also ran all of Stanford Mexico as its CEO and is ultimately responsible for all of the SIBL CD sales in Mexico from 1997 through 2009.

304.     Nanes always promoted the SIBL CDs to Troice as the only investment product offered by Stanford Financial. In making the initial and subsequent decisions to invest and reinvest with Stanford Financial, Troice received the Stanford Financial marketing materials regarding Stanford Financial's operations as a whole, including that it was a Houston, Texas-based financial services conglomerate, and also was informed by Nanes that his CD investments in SIBL were insured by Lloyd's of London. Troice was never informed that (i) Stanford

Financial was not regulated by the U.S. Government; (ii) that Stanford was consistently under U.S. Government investigation; (iii) that Stanford was violating the law and operating an unlicensed investment company; (iv) that Stanford controlled the Antiguan Government through loans, bribes and corrupt political machinations; or (v) that 80% of SIBL's assets were invested in illiquid, high risk investments that included $1.8 billion in unsecured loans to Allen Stanford, venture capital investments in private equity companies, Caribbean airlines, and speculative real estate investments in the Caribbean. Troice relied on such representations and omissions of material fact in making the decision to invest in the CDs and in deciding to maintain his investments in (i.e., repurchase) SIBL CDs every year until 2009. Troice did not sell any "covered" securities to purchase SIBL CDs.

305.     The representative for **Michoacán Trust** first met Stanford Financial FA Marie O. Bautista Nieves ("Bautista") in the late 1990's when she worked for Suntrust Bank in Miami. Soon after, Bautista began working in the Miami office of SFIS. Eventually, in 2001, Bautista persuaded the representative for Michoacán Trust to invest in SIBL CDs by touting the CDs' attractive interest rates, liquidity and safety. Bautista repeatedly represented to the Representative of Michoacán Trust that an investment in SIBL CDs was safe, secure and highly liquid and much safer than investing in the stock market. Bautista omitted to inform Representative of Michoacán Trust about all of Stanford's violations of law or investigations by the U.S. Government, corrupt control of Antigua or any of the other omissions of material facts described above.

306.     Bautista explained to the Representative of Michoacán Trust that he needed to open a trust account through STC Ltd. in order to invest in the SIBL CDs. The Representative of Michoacán Trust was deceived by Bautista into investing hundreds of thousands of dollars in the

SIBL CDs. After having rolled over and renewed its investments SIBL CDs many times over the years, in 2008 Michoacán Trust purchased SIBL CDs as follows: a $40,270.49 CD in February 2008; a $162,206.42 CD in March 2008; an $11,425.06 CD and separately a $111,932.99 CD in in April 2008, for a total of $325,834.96. The money Michoacán Trust invested in the SIBL CD was destined for retirement and to complete the university and post-graduate studies of the grandson of the Representative of Michoacán Trust.

307.    Plaintiff **Sandra Dorrell** followed her investment adviser and broker Doug Shaw to Stanford Financial after he left Wachovia Securities to join SGC in 2005. In September 2005, Shaw convinced Dorrell to invest her life savings in the SIBL CDs by assuring her that the CDs were a safer alternative than the stock market because SIBL was a bank and investments in SIBL were liquid and insured by Lloyd's of London. Dorrell invested in the SIBL CDs again in March and May of 2006 based on Shaw's representations about the safety and security the bank CDs. Shaw omitted to inform Dorrell about all of Stanford's violations of law or investigations by the U.S. Government, or corrupt control of Antigua or any of the other omissions of material facts described above.

308.    Based on Shaw's recommendations, representations and omissions, Dorrell ultimately invested her life savings, some $1.3 million, in the SIBL CDs between September 2005 and February 3, 2009, when Shaw convinced her to invest an additional $100,000 in a CD. The last purchase had to be made by personal check from her account instead of a wire transfer through Pershing; no one at Stanford told Ms. Dorrell at that time that Pershing had refused to wire transfer investment funds for Stanford. Before making this final investment in SIBL CDs, Dorrell asked Shaw about SIBL's condition given the financial crisis at the time, and Shaw told

her that Allen Stanford was extremely wealthy and proud and would never allow the bank to fail, and that SIBL was as "solid as a rock" and "cash rich".

## A.      *Class Allegations*

309.    Plaintiffs request this case be certified as a class action pursuant to FRCP 23. More than twenty thousand investors still had money invested in the SIBL CDs and other depository accounts at Stanford Financial through SIBL as of February 2009. The numbers of affected investors are so numerous that joinder of all members is impracticable. There are common questions of law and fact that are common to the class and these common questions predominate over individual issues. The Named Class Plaintiffs' claims are typical of the class claims. The Named Class Plaintiffs have no interest adverse to the interests of other members of the Class. The Named Class Plaintiffs will fairly and adequately protect the class' interests. The Named Class Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international securities litigation.

310.    Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses:

      i.        All persons or entities that had purchased and still owned CD or other depository accounts with SIBL as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action; and

      ii.       Such other classes or sub-classes as the Court may determine.

      Excluded from the class are:

      a.       Defendants, and their employees and agents; and

      b.       Any officer, director, employee, or promoter of Stanford Financial, including SIBL, SGC, SFIS, STC, Stanford Mexico and Stanford Venezuela as those entities have been defined herein

**311.** The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy. Indeed, this is a case of "fraud created the market" and "fraud on the regulators" because Stanford's fraud could not have existed or flourished were it not for the fraud Stanford committed on regulators around the world and the fraud Stanford committed by misleading investors into believing that their investments in SIBL were insured. The Class Plaintiffs and the Class relied on the integrity of the market in deciding to invest in the SIBL CDs. Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

## IX. <u>INVESTOR CLASS CAUSES OF ACTION</u>

(The Following Causes of Action are Plead on Behalf of Class Plaintiffs Individually and on Behalf of a Class of Others Similarly Situated Against Greenberg)

*A.      Aiding and Abetting Violations of the Texas Securities Act*

1.      <u>Sales of Unregistered Securities</u>

**312.** Greenberg is liable as an "aider" for sales of unregistered securities to Plaintiffs. In particular, by its actions described herein, Greenberg provided substantial assistance to Stanford Financial, including Allen Stanford, SGC, STC, SFIS and SIBL, and made it possible for Stanford Financial to effectuate the sale of the SIBL CDs to Plaintiffs, and materially aided Stanford Financial to sell unregistered securities to Plaintiffs from and through Texas. The CDs offered and sold by Stanford Financial and SIBL constitute "securities" under the relevant securities law jurisprudence, primarily the Reves test, precisely because the SIBL CDs were not insured by the FDIC, nor guaranteed by any similar government regulatory insurance regime. By

assisting Stanford Financial Group's sales of these securities products Greenberg acted recklessly and knew or should have known and were willfully blind to the fact that said sales were illegal. But for Greenberg's participation, Stanford Financial could not have sold unregistered securities to Plaintiffs from and through Texas.

313.    Greenberg was generally aware that it was assisting in the sale of unregistered securities from and through Texas. Greenberg knew that Stanford Financial and SGC were based in Texas, that Stanford Financial controlled and made all the decisions for SIBL from Texas, and that the primary purpose behind SGC, STC and SFIS was to sell SIBL CDs. Greenberg also knew that SIBL represented to investors that it did not function as a regular bank making loans, but rather invested the CD proceeds in a private, supposedly "liquid" investment portfolio. Furthermore, Greenberg knew that the SIBL CDs had not been registered as securities with the SEC or Texas State Securities Board, and knew that Stanford Financial was involved in "general solicitation". Based on its knowledge of Stanford Financial's operations, the size of the CD offerings made by SIBL, and the television advertising Stanford was running in the United States, Greenberg also knew that the Reg. D exemption did not apply and that Stanford Financial was operating as an unregistered "fund" in violation of the Investment Company Act, selling unregistered investment company securities.

314.    In assisting a Houston-based enterprise in the sale of unregistered securities, Greenberg was subjectively conscious of and willfully blind to a risk of illegality, and Greenberg assisted Stanford Financial in the face of a perceived risk that its assistance would facilitate Stanford Financial's violations of the Texas Securities Act. None of the SIBL CDs sold to Plaintiffs were ever registered with the Texas State Securities Board and therefore were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act. In assisting Stanford

Financial, including SGC, STC, SFIS and SIBL, to effectuate the sale of the unregistered securities from and through Texas, Greenberg acted intentionally or with reckless disregard for the truth and the law. As a result of Greenberg's conduct in materially aiding SGC, STC, SFIS and SIBL to sell unregistered securities from and through Texas, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission. In the alternative, Greenberg's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, measured as the difference between their investments as stated in their last account statements and the amounts that Plaintiffs may receive from the receivership distribution.

315.    Moreover, and despite SGC's, STC's, and SIBL's scheme to evade compliance with the Texas Securities Act by claiming a Reg. D exemption, the global offering of CDs by Houston- based Stanford Financial Group to "accredited" U.S. investors was in fact an unregistered public offering made in violation of Article 581 of the Texas Securities Act. It was an integrated offering under Texas securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from registration:

    i.    The integrated offering involved general solicitation. This general solicitation by Stanford Financial Group through SGC, STC, SFIS, and its U.S. affiliates, agents and brokers, as well as through foreign financial advisors, included general public advertisements, mass mailings publicly distributed magazine articles, television and other communications, and media published in print in Houston, Texas and distributed broadly for general distribution in the United States and abroad to offerees and purchasers of the CDs.

    ii.    The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas, Louisiana and Florida, of Stanford Financial Group's products, including the SIBL CDs.

    iii.    The integrated offering involved seminars and meetings conducted in the United States (including Texas, Louisiana, and Florida), Mexico, and Venezuela and elsewhere in Latin America. The integrated offering was

conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

iv.    The integrated offering involved offers to tens of thousands of offerees and purchases by thousands of offerees involving sums of money, in the billions of dollars, far in excess of that disclosed to the SEC in SIBL's Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of Texas, Louisiana, and Florida residents or those otherwise subject to Texas, Louisiana, or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of Stanford Financial Group and/or SFIS.

v.    The aggregate size of the sales of SIBL CDs during this period was approximately $7.2 billion. The aggregate size of the sales in the United States during this period was in excess of $1.5 billion. The number of investors purchasing the SIBL CDs in the U.S. under the Reg. D filing was far in excess of 1,000, and over 1,000 IRA accounts at STC were invested in the SIBL CDs.

vi.    The offering was made to investors with whom Stanford Financial Group, including SGC, had no pre-existing relationship, through brokers or affiliates of Stanford Financial Group who were paid substantial and excessive undisclosed commissions in connection with the SIBL CDs.

vii.    The offering was made to persons who did not qualify as "accredited United States investors," and far more than 35 persons who did not qualify as "accredited United States investors" purchased the SIBL CDs; indeed the vast majority, at least $5 billion of the CDs, were sold to foreign citizens that did not qualify as "accredited United States investors."

## 2.    <u>Sales of Securities by Unregistered Dealers</u>

**316.**    Greenberg aided and abetted SIBL, STC, SFIS and Stanford Financial generally in the sale of securities to Plaintiffs from and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act. Specifically, and as alleged herein, Greenberg knew or should have known that the global conglomeration of entities known collectively as "Stanford Financial" was acting as a type of investment company or "fund" without being registered as such under the Investment Company Act, and that the "fund" was illegally disguising itself as a bank (SIBL) and issuing unregistered "fund" shares, disguised as CDs, to the general public from, by and through Texas. The Stanford

Financial "fund" made these sales without registering with the Texas State Securities Board as a dealer under Section 12(A).

317.    Greenberg intentionally and actively aided and abetted the Stanford Financial "fund" to sell securities from and through Texas, by means of the conduct described herein. With full knowledge or willful blindness to the fact that Stanford Financial was, directly or through its web of companies, including SIBL, acting as an unregistered investment company in Texas selling unregistered investment company securities from and through Texas, and that Stanford Financial, including SIBL, was being operated and "run" from Texas, Greenberg aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial's, SGC's, SFIS' and SIBL's violations of the Texas Securities Act by continuing to provide the services described herein to help perpetuate sales of the worthless CDs and fund the Ponzi scheme.

318.    Greenberg was generally aware of and willfully blind to the fact that it was assisting the sales by an unregistered investment company of unregistered "fund" securities from and through Texas. In assisting the sale of unregistered "fund" securities through a Houston-based enterprise, Greenberg was subjectively conscious of a risk of illegality, and Greenberg assisted Stanford in the face of a perceived risk that its assistance would facilitate Stanford Financial Group's violations of the Texas Securities Act. In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Greenberg acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law. As a result of Greenberg's conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission. In the alternative, Greenberg's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, measured as the

difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs may receive from the receivership distribution.

### 3.   <u>Untruth or Omission</u>

**319.**   Greenberg, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial, SGC, SFIS, and SIBL and their principals in the sale of uncovered securities (the SIBL CDs) through the use of untrue representations or materially misleading omissions, and also aided and abetted the fraudulent practices of registered investment advisers in violation of the Texas Securities Act. In particular, and as found by this Court Stanford Financial was a massive Ponzi scheme that was perpetuated by the continued sales of the SIBL CDs to unsuspecting investors like Plaintiffs. Stanford Financial led Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial's Houston office, to believe that their money was being invested in a bank whose portfolio consisted of safe, liquid investments and that their investments in the bank were insured and that Stanford Financial was regulated by the U.S. Government, which was a material misstatement because SIBL's portfolio was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and used to finance Stanford Financial's principals' lavish lifestyles and to invest in long-term, illiquid and high-risk investments including venture capital investments, airlines, and real estate development projects in the Caribbean. Moreover, Stanford Financial omitted to inform Plaintiffs that it was selling them unregistered securities and that it was evading government regulation and operating as an unregistered, unregulated, uninsured, illegal investment company "fund" in violation of the Investment Company Act and the Texas Securities Act.

**320.**   Greenberg was generally aware of and willfully blind to the fact that it was involved in improper activity and was assisting the sale of unregistered securities from and

through Texas. Indeed, Greenberg knowingly advanced Stanford's master plan to skirt U.S. law by running an unregistered and unregulated investment company from the United States while tricking investors into believing that Stanford Financial was based in the U.S. and compliant with U.S. laws and regulations. With knowledge that Stanford Financial was misleading investors about the nature and risk of investments in related-party bank SIBL, particularly with regard to regulatory issues, and with reckless disregard for the truth and the law, Greenberg provided substantial assistance to Stanford Financial as described herein, and thereby materially aided the Stanford Financial entities' sales of securities through the use of untruths and materially misleading omissions. Greenberg was subjectively aware of, and absolutely indifferent to, the risk posed by their conduct. Greenberg was subjectively conscious of a risk of illegality, and Greenberg assisted Stanford in the face of a perceived risk that its assistance would facilitate Stanford's violations of the Texas Securities Act. In short, Greenberg's actions as described herein allowed Stanford Financial, including SGC, SFIS, and SIBL, to continue to sell securities to Plaintiffs from and through Texas using untruths and materially misleading omissions.

321.    As a result of Greenberg's conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission. In the alternative, Geenberg's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs may receive from the receivership distribution.

### 4.    Co-Conspirator Liability

322.    Greenberg is jointly and severally liable as a co-conspirator for Stanford Financial's, including SGC's, SFIS, and SIBL's, primary violations of the Texas Securities Act.

In particular, Greenberg knowingly conspired and combined together with others at Stanford Financial to assist Stanford Financial to operate as unregistered investment company and to sell unregistered securities to Plaintiffs using untrue representations or materially misleading omissions, as described herein. Greenberg took various overt acts designed to assist Stanford Financial to accomplish the goal of selling CDs from and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas. Greenberg's conspiracy with Stanford Financial to violate the Texas Securities Act is a proximate cause of rescission and/or actual damages to Plaintiffs, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs may receive from the Receivership distribution.

**B.       *Participation in/Aiding and Abetting Breach of Fiduciary Duty***

**323.**    On November 30, 2011, this Court issued an Order (Doc. 1483) in the SEC action holding that the SEC had adequately alleged that Allen Stanford acted as an investment adviser to all of the SIBL CD investors. Class Plaintiffs hereby allege that Allen Stanford was an investment advisor with respect to sales of the SIBL CDs to the Class Plaintiffs and all of the SIBL CD holders. As an investment adviser, Allen Stanford owed fiduciary duties to Class Plaintiffs and breached those duties. Greenberg participated in and aided and abetted Allen Stanford's breaches of fiduciary duties owed to Class Plaintiffs.

**324.**    As investment advisers, SGC, SFIS and all of the Stanford Financial FAs who, for compensation, advised Plaintiffs to buy the SIBL CDs, owed a fiduciary duty to Class Plaintiffs and the class as a matter of law. SGC, SFIS and the Stanford Financial FAs breached their respective fiduciary duties to Plaintiffs by advising them to invest their money in the SIBL CDs, because such investments were entirely imprudent and unsuitable for any investor and because SGC, SFIS and the FAs had no idea how SIBL was using their money and the FAs were

financially incentivized to recommend the related-party SIBL CDs above other investment products. SGC, SFIS and the Stanford Financial FAs did not have the basic financial information regarding the SIBL CD investments necessary to make such investment recommendations to Plaintiffs, but instead made the recommendations to purchase the SIBL CDs based on the huge, above-market commissions that SGC, SFIS and the FAs were paid to promote the CDs.

325.    Greenberg knew that Allen Stanford, SGC, SFIS and the Stanford FAs generally owed fiduciary duties to Plaintiffs, and Greenberg was aware that Allen Stanford, SGC, SFIS and the Stanford FAs were breaching these fiduciary duties. Greenberg also knew that that it was aiding, abetting, and otherwise participating in Allen Stanford's, SGC's, SFIS's and the Stanford FA's breaches of those duties by the conduct alleged herein. The breaches of fiduciary duties by Allen Stanford, SGC, SFIS and the Stanford FAs, and Greenberg's awareness of its participation in such breaches, were a proximate cause of actual damages to Plaintiffs. Greenberg knew or should have known that their aiding, abetting, and participation in the breaches of fiduciary duties set out above likely would result in extraordinary harm to Plaintiffs. Accordingly, Plaintiffs are entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this court.

C.      *Aiding and abetting/Participation in a Fraudulent Scheme*

326.    By their conduct described herein, Greenberg aided, abetted, and participated with Stanford Financial, including SGC and SFIS, in a fraudulent scheme, making Greenberg directly liable for fraud. In particular, Greenberg assisted and enabled Stanford Financial, including SGC and SFIS, in their sales of SIBL CDs to Plaintiffs through their services to Stanford. Such actions by Greenberg in combination with Stanford Financial are a proximate cause of actual damages to Plaintiffs measured as the difference between their investments in Stanford Financial as stated in

their last account statements and the amounts that Plaintiffs may receive from the Receivership distribution.

### D.     Civil Conspiracy

**327.**     Greenberg conspired with employees and agents of Stanford Financial, including SGC, STC, SFIS, and SIBL, to commit the wrongful conduct described herein, including breach of fiduciary duty, violations of the Texas Securities Act, and fraud, all centered around aiding Stanford to run an illegal, unregistered investment company from the United States while wholly evading U.S. laws and regulations. Greenberg is responsible for all wrongdoing done by each and the other members of the conspiracy, including Allen Stanford, Jim Davis, Mauricio Alvarado, C.A.S. Hewlett, Danny Bogar, Jane Bates, Lena Stinson, Bernie Young, SIBL's president Juan Rodriguez Tolentino, Leroy King, and others, in furtherance of the unlawful conspiracy and enterprise.

**328.**     In particular, the central aim of Stanford's Ponzi scheme conspiracy revolved around evading regulation (particularly in the U.S.) of Stanford Financial and SIBL and their operations. There was a meeting of the minds between Stanford, Davis, Hewlett and others beginning in 1988 and extending until February 2009 as to the need to conceal Stanford Financial's true nature and activities (particularly the contents of SIBL's portfolio) and to evade regulatory scrutiny at all levels and in all countries. This meeting of the minds grew to include Greenberg. Greenberg joined the conspiracy and had a meeting of the minds with the principals of Stanford Financial since 1988 and agreed to assist Stanford Financial to establish SIBL CD sales operations in the U.S. while evading U.S. laws and regulations, which evasion was crucial and central to the perpetuation of Stanford's Ponzi scheme. Greenberg continued to be actively involved in furthering the objective from 1988 through 2009 so as to enable Stanford Financial

to continue operating as an "outlaw", unregulated, unregistered investment company, and to sell unregistered securities from, by and through the State of Texas from 1988 through 2009.

329.    As described herein, Greenberg took various overt acts designed to assist Stanford Financial and SIBL to accomplish the goal of shielding Stanford Financial and SIBL from regulatory scrutiny and therefore allow Stanford Financial and SIBL to continue selling CDs from, by and through the State of Texas and operate as an unregistered investment company selling unregistered securities from Texas. By doing so, Greenberg acted pursuant to its meeting of the minds with Stanford, Davis, Alvarado and others in pursuit of the common purpose of the conspiracy – to conceal the fraudulent nature of Stanford Financial's activities and shield Stanford Financial from regulatory scrutiny so as to allow Stanford Financial and SIBL to continue in business. Greenberg's conspiracy with Stanford Financial is a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIBL as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

## X.  <u>RESPONDEAT SUPERIOR</u>

330.    Greenberg is liable for the tortious acts of its employees and agents who acted in representation of Stanford, including Mark Schnapp, Burt Bruton, Patrick O'Brien, Patricia Mendez Cambo, Bonnie Moncada, Jennifer Demberg, Carl Fornaris, Carlos Loumiet, Fernando Margarit, Ronald Rosengarten, Fernando Alonso, Ron LaFace, Jim Miller, Ronald P. Cima, David Bunning,  Frank Cordero, Ronald Scheman, Kelle Bevine, Daniel Schloss, Jeffrey Oshinsky, who worked for Greenberg Traurig LLP or Greenberg Traurig PA.  They were acting within the course and scope of their employment and agency with Greenberg, and in furtherance of Defendants' business, when they engaged in the wrongful conduct described herein.

## XI.  **ACTUAL DAMAGES**

331.      The Receiver claims damages in the billions of dollars in increased liabilities to the Stanford entities, proximately caused by the conduct alleged herein, in addition to the approximately over $4 million that Greenberg received and $5 million that Suarez received in fraudulent transfers from Stanford. . Defendants are jointly and severally liable for the injury they caused under Texas common law of joint and several liability as well as under the Texas Securities Act.

## XII.  **PUNITIVE DAMAGES**

332.      The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code. Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

333.      All conditions precedent to filing this Complaint have been met.

## XIII.  **JURY DEMAND**

334.      Plaintiffs demand a trial by jury.

## XIV.  **PRAYER**

(As to Greenberg)

335.      The Receiver prays for judgment against Greenberg for

- actual damages;

- punitive damages;

- disgorgement of fraudulent transfers;

- attorneys' fees;

- costs;

- prejudgment and post-judgment interest; and

- such other relief to which he may be entitled.

(As to Suarez)

336. The Receiver prays for judgment against Suarez for

- actual damages;

- punitive damages;

- disgorgement of fraudulent transfers;

- attorneys' fees;

- costs;

- prejudgment and post-judgment interest; and

- for such other relief to which he may be entitled

(As to Class)

327. Plaintiffs pray that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the classes and sub-classes as set forth in each cause of action hereof recover:

- actual damages;

- punitive damages;

- costs;

- attorneys' fees;

- prejudgment and post-judgment interest; and

- for such other relief to which they may be justly entitled.

Respectfully Submitted,

**NELIGAN LLP**
By: */s/ Douglas J. Buncher*
Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301

**CASTILLO SNYDER**
By: */s/ Edward C. Snyder*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 405
San Antonio, Texas 78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210

**CLARK HILL STRASBURGER**
By: */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@clarkhillstrasburger.com
2301 Broadway
San Antonio, Texas 78215
Telephone: (210) 250-6004
Facsimile: (210) 258-2706

By: */s/ David N. Kitner*
David N. Kitner
david.kitner@clarkhillstrasburger.com
901 Main Street, Suite 4400
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

**ATTORNEYS FOR PLAINTIFFS**

### CERTIFICATE OF SERVICE

On November 9th, 2018, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve Defendants individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

*/s/ Judith R. Blakeway*
Judith R. Blakeway

EXHIBIT A

## Payments made to Greenberg Traurig, LLP

| Transferor | Check Date | | Amount |
|---|---|---|---|
| Stanford Venture Capital Holdings | 2/22/2007 | $ | 960,000.00 |
| Stanford Venture Capital Holdings | 2/27/2007 | $ | 40,000.00 |
| Stanford Venture Capital Holdings | 3/28/2007 | $ | 292.50 |
| Stanford Venture Capital Holdings | 4/5/2007 | $ | 1,000,000.00 |
| Stanford Venture Capital Holdings | 5/4/2007 | $ | 1,000,000.00 |
| Stanford Venture Capital Holdings | 5/25/2007 | $ | 1,934.00 |
| Stanford Venture Capital Holdings | 6/4/2007 | $ | 1,000,000.00 |
| Stanford Venture Capital Holdings | 7/5/2007 | $ | 3,068.56 |
| Stanford Venture Capital Holdings | 10/3/2007 | $ | 4,616.46 |
| Stanford Venture Capital Holdings | 2/6/2008 | $ | 13,418.32 |
| Stanford Venture Capital Holdings | 4/30/2008 | $ | 878.97 |
| Stanford Venture Capital Holdings | 12/15/2008 | $ | 22,431.56 |
| Stanford Venture Capital Holdings | 12/17/2008 | $ | 30,145.66 |
| Stanford Venture Capital Holdings | 1/7/2009 | $ | 9,635.01 |
| Stanford Venture Capital Holdings | 1/21/2009 | $ | 8,203.66 |
| Stanford Venture Capital Holdings | 1/29/2009 | $ | 21,794.28 |
| **Stanford Venture Capital Holdings Total** | | $ | **4,116,418.98** |
| | | | |
| Stanford Financial Group Limited | 12/1/2006 | $ | 1,765.88 |
| Stanford Financial Group Limited | 2/1/2008 | $ | 39,063.02 |
| Stanford Financial Group Limited | 5/2/2008 | $ | 7,426.63 |
| **Stanford Financial Group Limited Total** | | $ | **48,255.53** |
| | | | |
| Stanford Group Company | 4/20/2007 | $ | 2,592.24 |
| Stanford Group Company | 8/3/2007 | $ | 329.32 |
| Stanford Group Company | 9/21/2007 | $ | 4,240.50 |
| **Stanford Group Company Total** | | $ | **7,162.06** |
| | | | |
| **GRAND TOTAL** | | $ | **4,171,836.57** |

## EXHIBIT "A"

EXHIBIT B

| Type | Dates | Amount |
|------|-------|--------|
| Regular Earnings | 8/15/2006 | $ 12,500.00 |
| Regular Earnings | 8/31/2006 | $ 12,500.00 |
| Regular Earnings | 9/15/2006 | $ 12,500.00 |
| Regular Earnings | 9/29/2006 | $ 12,500.00 |
| Regular Earnings | 10/13/2006 | $ 12,500.00 |
| Regular Earnings | 10/31/2006 | $ 12,500.00 |
| Regular Earnings | 11/15/2006 | $ 12,500.00 |
| Regular Earnings | 11/30/2006 | $ 12,500.00 |
| Regular Earnings | 12/15/2006 | $ 12,500.00 |
| Quarterly Bonus | 10/31/2006 | $ 300,000.00 |
| CD Proceed from Saurez's CDs | 10/1/2003 | $ 5,000.00 |
| CD Proceed from Saurez's CDs | 10/28/2003 | $ 45.00 |
| CD Proceed from Saurez's CDs | 12/5/2003 | $ 85,842.58 |
| CD Proceed from Saurez's CDs | 1/2/2004 | $ 1,903.82 |
| CD Proceed from Saurez's CDs | 1/6/2004 | $ 88.60 |
| CD Proceed from Saurez's CDs | 1/16/2004 | $ 1,600.00 |
| CD Proceed from Saurez's CDs | 1/28/2004 | $ 400.00 |
| CD Proceed from Saurez's CDs | 1/28/2004 | $ 85.12 |
| CD Proceed from Saurez's CDs | 2/10/2004 | $ 60,000.00 |
| CD Proceed from Saurez's CDs | 2/25/2004 | $ 81.77 |
| CD Proceed from Saurez's CDs | 3/18/2004 | $ 78.55 |
| CD Proceed from Saurez's CDs | 3/19/2004 | $ 1,250.00 |
| CD Proceed from Saurez's CDs | 3/25/2004 | $ 1,000.00 |
| CD Proceed from Saurez's CDs | 3/29/2004 | $ 46,235.56 |
| CD Proceed from Saurez's CDs | 4/23/2004 | $ 75.44 |
| CD Proceed from Saurez's CDs | 5/28/2004 | $ 72.47 |
| CD Proceed from Saurez's CDs | 6/16/2004 | $ 1,200.00 |
| CD Proceed from Saurez's CDs | 6/18/2004 | $ 69.61 |
| CD Proceed from Saurez's CDs | 7/8/2004 | $ 2,000.00 |
| CD Proceed from Saurez's CDs | 7/8/2004 | $ 800.00 |
| CD Proceed from Saurez's CDs | 7/8/2004 | $ 200.00 |
| CD Proceed from Saurez's CDs | 7/23/2004 | $ 70.76 |
| CD Proceed from Saurez's CDs | 7/26/2004 | $ 700.00 |
| CD Proceed from Saurez's CDs | 8/10/2004 | $ 2,297.00 |
| CD Proceed from Saurez's CDs | 8/30/2004 | $ 1,000.00 |
| CD Proceed from Saurez's CDs | 8/31/2004 | $ 67.97 |
| CD Proceed from Saurez's CDs | 9/24/2004 | $ 1,000.00 |
| CD Proceed from Saurez's CDs | 9/24/2004 | $ 100.00 |
| CD Proceed from Saurez's CDs | 10/6/2004 | $ 3,500.00 |
| CD Proceed from Saurez's CDs | 10/27/2004 | $ 79.63 |
| CD Proceed from Saurez's CDs | 11/11/2004 | $ 4,000.00 |
| CD Proceed from Saurez's CDs | 11/25/2004 | $ 76.49 |
| CD Proceed from Saurez's CDs | 12/1/2004 | $ 5,000.00 |
| CD Proceed from Saurez's CDs | 12/1/2004 | $ 500.00 |
| CD Proceed from Saurez's CDs | 12/8/2004 | $ 6,100.00 |
| CD Proceed from Saurez's CDs | 12/29/2004 | $ 3,000.00 |

| Type | Dates | Amount |
|------|-------|--------|
| CD Proceed from Saurez's CDs | 12/30/2004 | $ 73.48 |
| CD Proceed from Saurez's CDs | 1/4/2005 | $ 1,914.66 |
| CD Proceed from Saurez's CDs | 1/17/2005 | $ 1,200.00 |
| CD Proceed from Saurez's CDs | 1/24/2005 | $ 70.60 |
| CD Proceed from Saurez's CDs | 2/7/2005 | $ 1,000.00 |
| CD Proceed from Saurez's CDs | 3/10/2005 | $ 67.82 |
| CD Proceed from Saurez's CDs | 3/15/2005 | $ 14,000.00 |
| CD Proceed from Saurez's CDs | 3/16/2005 | $ 1,000.00 |
| CD Proceed from Saurez's CDs | 4/1/2005 | $ 133.03 |
| CD Proceed from Saurez's CDs | 4/13/2005 | $ 1,000.00 |
| CD Proceed from Saurez's CDs | 4/21/2005 | $ 59.27 |
| CD Proceed from Saurez's CDs | 4/22/2005 | $ 700.00 |
| CD Proceed from Saurez's CDs | 5/20/2005 | $ 116.26 |
| CD Proceed from Saurez's CDs | 5/31/2005 | $ 3,000.00 |
| CD Proceed from Saurez's CDs | 6/1/2005 | $ 800.00 |
| CD Proceed from Saurez's CDs | 6/28/2005 | $ 54.75 |
| CD Proceed from Saurez's CDs | 6/29/2005 | $ 2,520.00 |
| CD Proceed from Saurez's CDs | 7/12/2005 | $ 1,010.00 |
| CD Proceed from Saurez's CDs | 7/27/2005 | $ 52.59 |
| CD Proceed from Saurez's CDs | 8/3/2005 | $ 1,510.00 |
| CD Proceed from Saurez's CDs | 8/11/2005 | $ 10,000.00 |
| CD Proceed from Saurez's CDs | 8/12/2005 | $ 3,643.63 |
| CD Proceed from Saurez's CDs | 8/23/2005 | $ 56.04 |
| CD Proceed from Saurez's CDs | 9/8/2005 | $ 2,500.00 |
| CD Proceed from Saurez's CDs | 9/20/2005 | $ 2,510.00 |
| CD Proceed from Saurez's CDs | 9/28/2005 | $ 3,000.00 |
| CD Proceed from Saurez's CDs | 9/30/2005 | $ 2,000.00 |
| CD Proceed from Saurez's CDs | 10/13/2005 | $ 500.00 |
| CD Proceed from Saurez's CDs | 10/28/2005 | $ 112.49 |
| CD Proceed from Saurez's CDs | 11/25/2005 | $ 54.10 |
| CD Proceed from Saurez's CDs | 12/13/2005 | $ 710.00 |
| CD Proceed from Saurez's CDs | 12/23/2005 | $ 1,510.00 |
| CD Proceed from Saurez's CDs | 1/3/2006 | $ 2,082.76 |
| CD Proceed from Saurez's CDs | 1/4/2006 | $ 500.00 |
| CD Proceed from Saurez's CDs | 1/9/2006 | $ 51.97 |
| CD Proceed from Saurez's CDs | 1/31/2006 | $ 101.97 |
| CD Proceed from Saurez's CDs | 2/3/2006 | $ 1,000.00 |
| CD Proceed from Saurez's CDs | 3/24/2006 | $ 100.00 |
| CD Proceed from Saurez's CDs | 4/11/2006 | $ 1,100.00 |
| CD Proceed from Saurez's CDs | 4/28/2006 | $ 50.00 |
| CD Proceed from Saurez's CDs | 5/18/2006 | $ 4,010.00 |
| CD Proceed from Saurez's CDs | 5/26/2006 | $ 50.00 |
| Other Toronto Dominion Wires | 7/11/2003 | $ 2,000.00 |
| Other Toronto Dominion Wires | 7/11/2003 | $ 1,500.00 |
| Other Toronto Dominion Wires | 8/20/2003 | $ 500.00 |
| Other Toronto Dominion Wires | 8/15/2006 | $ 2,000.00 |

| Type | Dates | Amount | |
|---|---|---|---|
| Other Toronto Dominion Wires | 10/23/2006 | $ | 1,000.00 |
| Other Toronto Dominion Wires | 11/17/2006 | $ | 4,000.00 |
| Other Toronto Dominion Wires | 12/1/2006 | $ | 10,000.00 |
| Expenses | 4/6/2006 | $ | 6,437.64 |
| Expenses | 4/10/2006 | $ | 555.91 |
| Expenses | 5/4/2006 | $ | 14,467.25 |
| Expenses | 5/10/2006 | $ | 6,151.84 |
| Expenses | 5/26/2006 | $ | 17,577.90 |
| Expenses | 6/26/2006 | $ | 19,319.31 |
| Expenses | 7/13/2006 | $ | 8,155.73 |
| Expenses | 8/21/2006 | $ | 7,510.99 |
| Expenses | 8/31/2006 | $ | 4,266.61 |
| Expenses | 9/14/2006 | $ | 3,790.71 |
| Expenses | 9/28/2006 | $ | 7,499.73 |
| Expenses | 10/16/2006 | $ | 19,250.44 |
| Expenses | 10/18/2006 | $ | 8,057.06 |
| Expenses | 10/26/2006 | $ | 571.07 |
| Expenses | 10/30/2006 | $ | 1,517.83 |
| Expenses | 11/13/2006 | $ | 9,844.37 |
| Expenses | 11/22/2006 | $ | 957.52 |
| Expenses | 11/30/2006 | $ | 1,965.10 |
| Expenses | 12/7/2006 | $ | 2,428.38 |
| Expenses | 12/14/2006 | $ | 1,406.69 |

| Sub-Total Transfers before or on December 17, 2006 | | $ | 876,677.87 |
|---|---|---|---|

| Type | Dates | Amount |
|------|-------|--------|
| Regular Earnings | 12/29/2006 | $ 12,500.00 |
| Regular Earnings | 1/12/2007 | $ 12,500.00 |
| Regular Earnings | 1/31/2007 | $ 12,500.00 |
| Regular Earnings | 2/15/2007 | $ 12,500.00 |
| Regular Earnings | 2/28/2007 | $ 12,500.00 |
| Regular Earnings | 3/15/2007 | $ 12,500.00 |
| Regular Earnings | 3/30/2007 | $ 12,500.00 |
| Regular Earnings | 4/13/2007 | $ 12,500.00 |
| Regular Earnings | 4/30/2007 | $ 12,500.00 |
| Regular Earnings | 5/15/2007 | $ 12,500.00 |
| Regular Earnings | 5/31/2007 | $ 12,500.00 |
| Regular Earnings | 6/15/2007 | $ 12,500.00 |
| Regular Earnings | 6/29/2007 | $ 12,500.00 |
| Regular Earnings | 7/13/2007 | $ 12,500.00 |
| Regular Earnings | 7/31/2007 | $ 12,500.00 |
| Regular Earnings | 8/15/2007 | $ 12,500.00 |
| Regular Earnings | 8/31/2007 | $ 12,500.00 |
| Regular Earnings | 9/14/2007 | $ 12,500.00 |
| Regular Earnings | 9/28/2007 | $ 12,500.00 |
| Regular Earnings | 10/15/2007 | $ 12,500.00 |
| Regular Earnings | 10/31/2007 | $ 12,500.00 |
| Regular Earnings | 11/15/2007 | $ 12,500.00 |
| Regular Earnings | 11/30/2007 | $ 12,500.00 |
| Regular Earnings | 12/14/2007 | $ 12,500.00 |
| Regular Earnings | 12/31/2007 | $ 12,500.00 |
| Regular Earnings | 1/15/2008 | $ 12,500.00 |
| Regular Earnings | 1/31/2008 | $ 12,500.00 |
| Regular Earnings | 2/15/2008 | $ 12,500.00 |
| Regular Earnings | 2/29/2008 | $ 12,500.00 |
| Regular Earnings | 3/14/2008 | $ 12,500.00 |
| Regular Earnings | 3/31/2008 | $ 12,500.00 |
| Regular Earnings | 4/15/2008 | $ 12,500.00 |
| Regular Earnings | 4/30/2008 | $ 12,500.00 |
| Regular Earnings | 5/15/2008 | $ 12,500.00 |
| Regular Earnings | 5/30/2008 | $ 12,500.00 |
| Regular Earnings | 6/13/2008 | $ 12,500.00 |
| Regular Earnings | 6/30/2008 | $ 12,500.00 |
| Regular Earnings | 7/15/2008 | $ 12,500.00 |
| Regular Earnings | 7/31/2008 | $ 12,500.00 |
| Regular Earnings | 8/15/2008 | $ 12,500.00 |
| Regular Earnings | 8/29/2008 | $ 12,500.00 |
| Regular Earnings | 9/15/2008 | $ 12,500.00 |
| Regular Earnings | 9/30/2008 | $ 12,500.00 |
| Regular Earnings | 10/15/2008 | $ 12,500.00 |
| Regular Earnings | 10/31/2008 | $ 12,500.00 |
| Regular Earnings | 11/14/2008 | $ 12,500.00 |

| Type | Dates | Amount |
|------|-------|--------|
| Regular Earnings | 11/26/2008 | $ 12,500.00 |
| Regular Earnings | 12/15/2008 | $ 12,500.00 |
| Regular Earnings | 12/31/2008 | $ 12,500.00 |
| Quarterly Bonus | 1/31/2007 | $ 225,000.00 |
| Quarterly Bonus | 5/3/2007 | $ 225,000.00 |
| Quarterly Bonus | 8/3/2007 | $ 500,000.00 |
| Quarterly Bonus | 10/31/2007 | $ 750,000.00 |
| Quarterly Bonus | 2/1/2008 | $ 750,000.00 |
| Vacation Pay | 1/15/2009 | $ 17,307.02 |
| Semi Annual Bonus | 7/31/2008 | $ 200,000.00 |
| CD Proceed from Saurez's CDs | 1/3/2007 | $ 2,078.62 |
| CD Proceed from Saurez's CDs | 1/10/2007 | $ 437.38 |
| CD Proceed from Saurez's CDs | 1/10/2007 | $ 209.52 |
| CD Proceed from Saurez's CDs | 2/23/2007 | $ 93.64 |
| CD Proceed from Saurez's CDs | 2/23/2007 | $ 60.99 |
| CD Proceed from Saurez's CDs | 3/16/2007 | $ 106.41 |
| CD Proceed from Saurez's CDs | 3/23/2007 | $ 58.54 |
| CD Proceed from Saurez's CDs | 4/20/2007 | $ 102.47 |
| CD Proceed from Saurez's CDs | 4/27/2007 | $ 56.29 |
| CD Proceed from Saurez's CDs | 4/30/2007 | $ 700.00 |
| CD Proceed from Saurez's CDs | 5/25/2007 | $ 98.35 |
| CD Proceed from Saurez's CDs | 6/22/2007 | $ 108.68 |
| CD Proceed from Saurez's CDs | 7/27/2007 | $ 189.96 |
| CD Proceed from Saurez's CDs | 7/27/2007 | $ 50.00 |
| CD Proceed from Saurez's CDs | 8/10/2007 | $ 63,091.04 |
| CD Proceed from Saurez's CDs | 8/17/2007 | $ 87.05 |
| CD Proceed from Saurez's CDs | 8/17/2007 | $ 50.00 |
| CD Proceed from Saurez's CDs | 8/30/2007 | $ 5,000.00 |
| CD Proceed from Saurez's CDs | 9/28/2007 | $ 83.61 |
| CD Proceed from Saurez's CDs | 9/28/2007 | $ 50.00 |
| CD Proceed from Saurez's CDs | 10/26/2007 | $ 88.10 |
| CD Proceed from Saurez's CDs | 10/26/2007 | $ 50.00 |
| CD Proceed from Saurez's CDs | 11/30/2007 | $ 84.68 |
| CD Proceed from Saurez's CDs | 12/3/2007 | $ 50.00 |
| CD Proceed from Saurez's CDs | 12/20/2007 | $ 50.00 |
| CD Proceed from Saurez's CDs | 12/24/2007 | $ 1,000.00 |
| CD Proceed from Saurez's CDs | 12/28/2007 | $ 81.35 |
| CD Proceed from Saurez's CDs | 1/2/2008 | $ 2,325.62 |
| CD Proceed from Saurez's CDs | 1/11/2008 | $ 132.94 |
| CD Proceed from Saurez's CDs | 1/24/2008 | $ 50.00 |
| CD Proceed from Saurez's CDs | 2/28/2008 | $ 128.04 |
| CD Proceed from Saurez's CDs | 3/3/2008 | $ 50.00 |
| CD Proceed from Saurez's CDs | 3/25/2008 | $ 50.00 |
| CD Proceed from Saurez's CDs | 4/1/2008 | $ 122.96 |
| CD Proceed from Saurez's CDs | 4/25/2008 | $ 118.17 |
| CD Proceed from Saurez's CDs | 5/7/2008 | $ 50.00 |

| Type | Dates | Amount |
|---|---|---|
| CD Proceed from Saurez's CDs | 5/21/2008 | $ 796.04 |
| CD Proceed from Saurez's CDs | 6/12/2008 | $ 24,641.33 |
| CD Proceed from Saurez's CDs | 6/27/2008 | $ 112.25 |
| CD Proceed from Saurez's CDs | 7/17/2008 | $ 85.52 |
| CD Proceed from Saurez's CDs | 7/23/2008 | $ 171.35 |
| CD Proceed from Saurez's CDs | 9/1/2008 | $ 100,000.00 |
| CD Proceed from Saurez's CDs | 9/2/2008 | $ 100.43 |
| CD Proceed from Saurez's CDs | 9/5/2008 | $ 100,010.00 |
| CD Proceed from Saurez's CDs | 9/22/2008 | $ 167.21 |
| CD Proceed from Saurez's CDs | 9/22/2008 | $ 96.55 |
| CD Proceed from Saurez's CDs | 10/21/2008 | $ 1,500.00 |
| CD Proceed from Saurez's CDs | 10/21/2008 | $ 94.96 |
| CD Proceed from Saurez's CDs | 10/21/2008 | $ 78.81 |
| CD Proceed from Saurez's CDs | 11/12/2008 | $ 261,941.86 |
| CD Proceed from Saurez's CDs | 12/10/2008 | $ 2,000.00 |
| CD Proceed from Saurez's CDs | 12/19/2008 | $ 574.10 |
| CD Proceed from Saurez's CDs | 12/29/2008 | $ 23,000.00 |
| CD Proceed from Saurez's CDs | 1/5/2009 | $ 194.75 |
| CD Proceed from Saurez's CDs | 1/19/2009 | $ 229.64 |
| CD Proceed from Saurez's CDs | 1/23/2009 | $ 379.04 |
| Expenses | 12/28/2006 | $ 1,724.73 |
| Expenses | 1/8/2007 | $ 1,988.72 |
| Expenses | 1/15/2007 | $ 1,015.56 |
| Expenses | 1/18/2007 | $ 1,915.10 |
| Expenses | 1/22/2007 | $ 8,016.77 |
| Expenses | 1/25/2007 | $ 1,737.43 |
| Expenses | 2/5/2007 | $ 6,998.74 |
| Expenses | 2/8/2007 | $ 2,679.10 |
| Expenses | 2/15/2007 | $ 4,334.41 |
| Expenses | 2/22/2007 | $ 2,506.68 |
| Expenses | 3/1/2007 | $ 1,424.46 |
| Expenses | 3/5/2007 | $ 933.40 |
| Expenses | 3/15/2007 | $ 4,204.45 |
| Expenses | 3/26/2007 | $ 3,550.27 |
| Expenses | 4/5/2007 | $ 1,979.68 |
| Expenses | 4/9/2007 | $ 10,410.01 |
| Expenses | 4/12/2007 | $ 1,488.44 |
| Expenses | 4/26/2007 | $ 3,374.38 |
| Expenses | 5/7/2007 | $ 1,492.81 |
| Expenses | 5/14/2007 | $ 11,330.02 |
| Expenses | 5/21/2007 | $ 4,298.30 |
| Expenses | 6/4/2007 | $ 4,258.37 |
| Expenses | 6/11/2007 | $ 4,674.54 |
| Expenses | 6/21/2007 | $ 9,289.82 |
| Expenses | 6/25/2007 | $ 321.65 |
| Expenses | 6/29/2007 | $ 14,839.71 |

| Type | Dates | Amount |
|------|-------|--------|
| Expenses | 7/24/2007 | $ 54,386.70 |
| Expenses | 9/11/2007 | $ 54,202.33 |
| Expenses | 9/25/2007 | $ 22,171.97 |
| Expenses | 10/2/2007 | $ 9,501.69 |
| Expenses | 10/5/2007 | $ 746.77 |
| Expenses | 10/12/2007 | $ 5,004.07 |
| Expenses | 10/23/2007 | $ 3,588.98 |
| Expenses | 11/13/2007 | $ 6,371.57 |
| Expenses | 11/20/2007 | $ 5,094.90 |
| Expenses | 12/11/2007 | $ 7,249.06 |
| Expenses | 12/18/2007 | $ 4,881.14 |
| Expenses | 12/21/2007 | $ 639.50 |
| Expenses | 1/15/2008 | $ 5,936.81 |
| Expenses | 1/29/2008 | $ 9,955.78 |
| Expenses | 2/15/2008 | $ 5,953.88 |
| Expenses | 2/29/2008 | $ 1,212.08 |
| Expenses | 3/4/2008 | $ 5,981.54 |
| Expenses | 3/21/2008 | $ 10,859.62 |
| Expenses | 4/4/2008 | $ 7,194.50 |
| Expenses | 4/15/2008 | $ 394.54 |
| Expenses | 4/18/2008 | $ 7,586.69 |
| Expenses | 4/22/2008 | $ 2,008.65 |
| Expenses | 5/2/2008 | $ 11,970.97 |
| Expenses | 5/9/2008 | $ 692.41 |
| Expenses | 5/30/2008 | $ 9,315.12 |
| Expenses | 6/13/2008 | $ 14,409.79 |
| Expenses | 7/18/2008 | $ 3,263.14 |
| Expenses | 7/25/2008 | $ 5,857.09 |
| Expenses | 8/1/2008 | $ 5,384.62 |
| Expenses | 8/15/2008 | $ 4,467.03 |
| Expenses | 8/22/2008 | $ 1,749.12 |
| Expenses | 9/5/2008 | $ 1,514.81 |
| Expenses | 9/26/2008 | $ 3,523.93 |
| Expenses | 10/17/2008 | $ 1,182.83 |
| Expenses | 1/9/2009 | $ 3,164.32 |
| Other Pay | 1/26/2009 | $ 11,273.46 |

| | | |
|---|---|---|
| Sub-Total Transfers after December 17, 2006 | $ | 4,292,604.23 |

| | | |
|---|---|---|
| Total Transfers | $ | 5,169,282.10 |