**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **RALPH S. JANVEY, in his capacity** | § | |
| **as court-appointed receiver for the** | § | |
| **Stanford Receivership estate;** | § | |
| **The OFFICIAL STANFORD** | § | |
| **INVESTORS COMMITTEE;** | § | |
| **SANDRA DORRELL;** | § | |
| **SAMUEL TROICE; and** | § | |
| **MICHOACAN TRUST; individually** | § | |
| **and on behalf of a class of all others** | § | **Civil Action No. 3:12cv4641-N** |
| **similarly situated,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | |
| | § | |
| **GREENBERG TRAURIG, LLP;** | § | |
| **GREENBERG TRAURIG, PA; and** | § | |
| **YOLANDA SUAREZ,** | § | |
| | § | |
| **Defendants.** | § | |

## GREENBERG TRAURIG'S ANSWER
## TO SECOND AMENDED COMPLAINT[1]

Defendants Greenberg Traurig, LLP and Greenberg Traurig, PA (collectively,

"Greenberg")[2] file this answer to Plaintiffs' Second Amended Complaint and state as follows:

---

[1] Despite the caption of this action, the Receiver is the only remaining plaintiff. The claims of the investors were dismissed by the Court under the attorney-immunity doctrine; and, by agreement of the parties, the Official Stanford Investors Committee ("OSIC"), has not continued its claims. Therefore, this Answer will respond to only the claims of the Receiver. This Answer respectfully reserves all rights, defenses and responses to the other claims for possible needed pleading if and to the extent those claims are reinstated by the United States Court of Appeals for the Fifth Circuit.

[2] Greenberg Traurig LLP, a New York limited liability partnership, was formed in 1999. Certain Greenberg attorneys are or were employed by Greenberg Traurig LLP; and certain Greenberg attorneys are or were employed by Greenberg Traurig, P.A., a Florida professional corporation. The attorneys who were or are employees of the LLP were not and are not employees of the PA; and those employed by the PA were not and are not employed by the LLP. Knowing and being on notice about that, the Receiver collectively refers to both the LLP and the PA as "Greenberg," without distinguishing between the two. Since the Receiver has chosen to do so, Greenberg Traurig LLP and Greenberg Traurig PA are responding to the Complaint's allegations without the distinctions warranted by their separate existence and nature and will do so jointly as "Greenberg."

**ANSWER TO SECOND AMENDED COMPLAINT- Page 1**

## OVERVIEW

**Who knew that Stanford was misappropriating depositor money and issuing false financial statements?**

Thousands of people and companies worked for or provided services to Stanford and his companies. After one of the most massive government investigations in decades, it has now been revealed who actually knew of Stanford's frauds and knowingly helped him to commit them— which does not include Greenberg. Here are but a few examples of that:

> *Q. Mr. Davis, to your knowledge, who knew for a fact that Stanford International Bank was funding Mr. Stanford's personal lifestyle and his other companies?*
>
> *A. Mr. Stanford, myself, Mr. Harry Failing, Mr. Gil Lopez, Mr. Mark Kuhrt, Mr. Henry Amadio.*

James Davis, Stanford's Chief Financial Officer, testifying for the Government under a plea agreement (Oct. 19, 2012).

> *"There is no evidence whatsoever that anybody other than the five or six folks that Mr. Davis identifies at the beginning of his testimony knew word one that the original source of the funds from Mr. Stanford's lifestyle and companies was the bank."*

Jeffrey A. Goldberg, Deputy Chief, Fraud Section, U.S. Department of Justice Criminal Division (Nov. 14, 2012).

> *"[O]nly Stanford and a handful of people in his inner circle knew that his outsized lifestyle and its trappings were entirely at the expense of his depositors, and not remotely close to the 'investments' into which depositors believed they had placed their savings based on Stanford's lies."*

U.S. Government's Sentencing Memorandum, U.S. v. Stanford (June 6, 2012).

> *"Loumiet has nothing involved -- yeah.  Loumiet is not a target in Stanford."*

Gregg J. Costa, Assistant U.S. Attorney and prosecutor of Allen Stanford (Feb. 8, 2012).

## PRELIMINARY STATEMENT

---

These defendants expressly preserve their individuality and distinctions and all defenses which they may have individually whether or not pleaded jointly here.

Greenberg sympathizes with the investors who lost money as a result of Allen Stanford's criminal fraud, but Greenberg played no part in causing those losses. Greenberg has searched the Second Amended Complaint in vain for the most basic and necessary allegation—that Carlos Loumiet or Greenberg knew about Allen Stanford's Ponzi scheme, including the theft of depositor money, false financial reports or fraudulent sales practices which were involved in it.

The plain fact is that neither Loumiet nor Greenberg knew about or are responsible for the fraud committed by Stanford. In the criminal trials of Stanford, Lopez and Kuhrt, the U.S. Government proved conclusively that *only* Stanford, his CFO, and a few other specified insiders knew about his fraud. Greenberg could not have wrongfully participated in, conspired with or aided unlawful conduct it did not know about.

Greenberg is an international full-service law firm serving clients from offices in the United States, Latin America, Europe, the Middle East and Asia. It was one of over twenty outside law firms that provided legal services for the many Stanford companies. Greenberg's work for Stanford was proper, ethical, and aboveboard. It advised Stanford to deal openly with depositors and to comply with all applicable laws.

In early 1998, Carlos Loumiet was shown an early draft Disclosure Statement which had been written by someone else. Loumiet recommended in writing that Stanford inform potential depositors up front about the CDs including the following recommended disclosures:

- **"THE CD DEPOSITS ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION OR UNDER ANY SIMILAR INSURANCE PROGRAM OF THE GOVERNMENT OF ANTIGUA AND BARBUDA."**

- **"NOT REGISTERED WITH THE SEC OR ANY STATE AGENCY."**

The Disclosure Statement ultimately issued by Stanford International Bank Ltd. ("SIBL") was the work of others. In the years following the issuance of the Original Disclosure Statement at least six Amended Disclosure Statements were issued, each of which superseded and replaced all prior

**ANSWER TO SECOND AMENDED COMPLAINT- Page 3**

Disclosure Statements.  Each Amended Disclosure Statement was prepared with no involvement of Greenberg.  On information and belief all losses incurred on SIBL CDs that were sold with a Disclosure Statement involved amended statements in which Greenberg had no involvement whatsoever.

If any depositors were told that their CDs were insured, or were regulated by the U.S., it was contrary to Loumiet's recommendations, the written Disclosure Statement, and the written Subscription Agreement signed by U.S. investors.

When Stanford opened a trust representative office in Florida, Loumiet and Carl Fornaris provided a written list of legal Do's and Don't's, including "[D]o not solicit business on behalf of Stanford International Bank."  If Stanford used the trust office to solicit CD sales, he absolutely violated these clear written instructions.

When Greenberg learned, after the fact, that Stanford might have previously made loans to Antigua officials, Stanford was cautioned and Loumiet sent Stanford a copy of the Foreign Corrupt Practices Act prohibiting certain payments to foreign officials.

Loumiet, Pat O'Brien and others helped the Government of Antigua strengthen its offshore banking laws to protect against money laundering and fraud.  **They wrote and helped Antigua enact laws and regulations that would have prevented the very frauds for which Stanford was later convicted**, including the following:

- A regulation prohibiting banks like SIBL from loaning money to their owners "without securing collateral equal to one hundred percent of the amount of the loan."  This made it illegal for Stanford to take money from SIBL in the form of unsecured loans.

- Another new regulation required banks to "maintain a ratio of equity to assets of five percent or greater."  Had this rule been enforced it would have ensured that SIBL kept sufficient assets to repay every depositor in full and still have five percent equity left over.

- Another regulation subjected banks like SIBL to annual on-site bank examinations to ensure compliance with all laws.

**ANSWER TO SECOND AMENDED COMPLAINT- Page 4**

- An amended statute required banks like SIBL to furnish annual audited financial statements to the regulators.

Had Antigua enforced the laws and regulations that were recommended, Stanford would have been unable to carry out his alleged Ponzi scheme and not one of the Plaintiffs would have lost anything.

Carlos Loumiet is a respected international business lawyer. He provided honest and competent legal services to Stanford-owned businesses without knowledge of any fraud going on behind the scenes. He also successfully defended Stanford against unfounded allegations of drug money laundering that were unrelated to Stanford's later Ponzi fraud. Loumiet left Greenberg in 2001, years before the issuance of the CDs on which class investors sued. On the limited matters in which Greenberg Traurig attorneys were subsequently consulted, they properly advised Stanford entities.

## ANSWER

Subject to and without waiving the foregoing grounds for dismissal, Greenberg answers Plaintiffs' Second Amended Complaint as follows:

### Parties

1.      Greenberg admits that Ralph S. Janvey was appointed Receiver by an order of this Court, the content of which speaks for itself.

2.      Greenberg denies that Sandra Dorrell is a party to this action. Ms. Dorrell withdrew from this action and was dismissed in 2015. Docket Entry ("D.E.") 144. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 and therefore denies them.

3.      Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and therefore denies them. All of this Plaintiff's claims in this action have been dismissed, and thus no further answer is required.

4.      Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 and therefore denies them. All of this Plaintiff's claims in this action have been dismissed, and thus no further answer is required.

5.      Greenberg admits Plaintiffs seek class certification but denies that certification is warranted.  All putative class claims have been dismissed by the Court, and thus no answer to this allegation is necessary.

6.       Admitted that Greenberg Traurig, LLP is a limited liability partnership organized under the laws of the State of New York, and that it has been served with and answered prior versions of the Complaint.  Admitted that Greenberg Traurig, PA is a professional corporation organized under the laws of Florida with the office address that is alleged.  Greenberg Traurig, PA admits it has accepted service of the Second Amended Complaint.   Greenberg denies that Plaintiffs' cause of action arise from "transactions … that occurred or were consummated in Texas," and refers to its answer to specific allegations.  Because Plaintiff collectively refers to Greenberg Traurig LLP and Greenberg Traurig PA as "Greenberg," without distinguishing between the two, Defendants also will respond to the Second Amended Complaint's allegations without such distinctions.  Defendants do so while preserving all defenses.

7.      Greenberg admits that Suarez has answered the complaint. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 7 and therefore denies them.

Overview of Case

8.      Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 and therefore denies them.

9.      Greenberg denies that it helped Stanford commit any wrongdoing.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9 and therefore denies them.

10.     Greenberg denies that Carlos Loumiet or any attorneys at Greenberg were complicit in any Stanford wrongdoing.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 10 and therefore denies them.

11.     Greenberg admits that Loumiet was an employee of Greenberg from 1988 until leaving the firm in 2001, when he took the Stanford relationship with him to Hunton & Williams ("Hunton").  Greenberg admits that Loumiet recommended Suarez to Stanford, where she served as general counsel to Stanford Financial Group, but Greenberg lacks knowledge or information sufficient to form a belief as to Suarez's role as Chief of Staff, and therefore denies this allegation. Greenberg denies all other allegations in paragraph 11, and specifically denies that Loumiet served as outside general counsel for the Stanford Group of Companies.

12.     Denied.

13.     Denied.

14.     Denied.

## Personal Jurisdiction

15.     Does not require admission or denial by this Defendant.

16.     Greenberg does not challenge personal jurisdiction in this court with respect to this case.  The remainder of the allegations of paragraphs 16-18 are therefore moot.

17.     Does not require admission or denial by Greenberg.

18.     Does not require admission or denial by Greenberg.

Subject Matter Jurisdiction & Venue

19.    Greenberg admits that this Court has subject matter jurisdiction and venue of this action by virtue of the Stanford Receivership orders.  Greenberg denies all other asserted grounds of subject matter jurisdiction and venue.

20.    Denied.

Factual Background

21.    Greenberg admits that R. Allen Stanford owned and operated a series of financial services companies which were placed into receivership in February 2009.  Greenberg denies the remaining allegations and characterizations contained in paragraph 21.

22.    Greenberg admits that R. Allen Stanford owned and operated a series of financial services companies.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 and therefore denies them.

23.    Greenberg admits that SIBL sold Certificates of Deposit and that SIBL was owned by Allen Stanford.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23 and therefore denies them.

24.    Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 and therefore denies them.

25.    Greenberg admits SFIS was established in Miami.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 25, including Stanford's alleged improper plans for SFIS, and therefore denies them.

26.    Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 and therefore denies them.

27.    Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 and therefore denies them.

28.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies them.

29.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies them.

30.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 and therefore denies them.

31.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies them.

32.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 and therefore denies them.

33.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 and therefore denies them.

34.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and therefore denies them.

35.     Greenberg denies that it provided material assistance to any illegal or improper conduct.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 and therefore denies them.

36.     Greenberg admits that SFIS was established as a Miami trust representative office of STC.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36 and therefore denies them.

37.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 and therefore denies them.

38.     Greenberg admits, on information and belief from public records, that SIBL filed a form D notice with the SEC, the content of which speaks for itself.  Greenberg lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38 and therefore denies them.

39.     Greenberg admits, on information and belief from public records, that SIBL filed several amended Form D notices with the SEC, the contents of which speak for themselves. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 39 and therefore denies them.

40.     Greenberg admits, on information and belief from public records, that SIBL filed an amended Form D notice with the SEC in 2007, the content of which speaks for itself.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 and therefore denies them.

41.     Greenberg denies it was aware of any improper sales practices. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 41 and therefore denies them.

42.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 and therefore denies them.

43.     Greenberg denies that it conspired with Stanford.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 and therefore denies them.

44.     On information and belief, based on the Disclosure Statement and similar documents provided to depositors as found in the public record, Greenberg denies the allegation that investors were told that Stanford was "regulated by the SEC" and FINRA and "backed by insurance coverage from the Securities Investor Protection Corporation ('SIPC')."   To the contrary:

The SIBL **Disclosure Statement** dated September 30, 2004 states in part as follows:

- "We have not registered the CD deposits provided in connection with the U.S. Accredited Investor CD (the 'CD Deposits') or our related certificates of ownership (the 'CD Certificates') under the U.S. Securities Act of 1933, as amended, or securities laws of any state or other jurisdiction."

- "SIBL's products are not subject to the reporting requirements of any jurisdiction, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation…."

- "**[T]he CD Deposits and the CD Certificates are not insured** by the Federal Deposit Insurance Corporation or any other agency of the United States Government or any state jurisdiction…."

- "We are regulated by the Financial Services Regulatory Commission and the Ministry of Finance of the Government of Antigua and Barbuda."

- "We also maintain Depository Insolvency insurance.  **The latter insurance protects us** against the possible insolvency of any financial institution where we may place our own funds, **and is not the equivalent of the FDIC insurance** offered on deposits at many institutions in the United States."

- "We have not authorized any dealer, sales representative or any other person to give any information or to make any representations in connection with this offering other than those contained in this Disclosure Statement.  If given or made, such information must not be relied upon as having been authorized by SIBL."

The **Subscription Agreement** for U.S. depositors states in part as follows:

- "As a condition of our accepting your subscription and any subsequent deposits in the case of a Flex CD, you state as follows:

    (a) You have received a Disclosure Statement and other relevant Offering Documents…. You have read and you understand the Offering Documents, particularly the discussion of the risks associated with the U.S. Accredited Investor CD."

The **Training and Marketing Manual** states in part as follows:

- "Since  Stanford International Bank is not a U.S. Bank, it is not covered by the FDIC insurance."
- "What authority supervises Stanford International Bank?

    The Financial Services Regulatory Commission (FSRC) has the responsibility to supervise and regulate the [international financial institutions] sector."

If someone represented to depositors that SIBL was regulated by the SEC and FINRA, or that CD depositors were insured, which is unknown to Greenberg, it would be contrary to the written disclosures and investor-signed agreements and could not reasonably be relied upon.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 44 and therefore denies them.

45.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 and therefore denies them.

46.     Greenberg admits that Allen Stanford, Jim Davis, Gilbert Lopez and Mark Kuhrt were convicted of criminal acts.  The evidence admitted in their cases speaks for itself.

47.     Greenberg denies that it knew Stanford's intent was to operate an unlicensed investment company or skirt U.S. law.  Greenberg denies that it started representing (or formed an attorney-client relationship with) Stanford or an entity or group called "Stanford Financial" in 1988.   Greenberg denies that GIBL's address was in Houston, Texas.  GIBL correspondence, as well as paragraph 49 of the Complaint, reflect that GIBL was headquartered in Montserrat, British West Indies and had only a representative office in Houston.  Greenberg admits that in 1988, Carlos Loumiet was 37 years old and had been practicing law for ten years, and that he joined Greenberg in 1982 and became a shareholder in 1984.  Greenberg admits that Loumiet practiced banking law during his time at Greenberg, but denies the characterizations of Loumiet's beliefs about regulations and borders.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 47 and therefore denies them.

48.     Greenberg admits that Sidney Adler sent a letter to Loumiet in March 1988, the content of which speaks for itself.  Greenberg denies the remaining allegations of paragraph 48.

49.     Greenberg admits that Sidney Adler sent a letter to Loumiet in March 1988, the content of which speaks for itself, and that GIBL was chartered in Montserrat.  Greenberg denies the remaining allegations of paragraph 49.

50.     Greenberg admits that Sidney Adler sent a letter to Loumiet in March 1988, the content of which speaks for itself.

51.     Greenberg denies the first sentence of paragraph 51.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 51 and therefore denies them.

52.     Greenberg admits that Sidney Adler sent memos to Loumiet in April 1988, the contents of which speak for themselves.  Greenberg denies the remainder of paragraph 52.

53.     Greenberg denies the first and last sentences of paragraph 53.  Greenberg admits, on information and belief, that Sidney Adler sent a memo to Allen Stanford dated May 12, 1988, the content of which speaks for itself.

54.     Denied.

55.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55 and therefore denies them.

56.     Greenberg denies that Loumiet knew Stanford intended to violate any laws. Greenberg admits that at some point it received copies of correspondence between Guardian International Bank Ltd. and the Texas Banking Department, the contents of which speak for themselves. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 56 and therefore denies them.

57.     Greenberg denies that Loumiet was aware of illegal conduct or the characterizations in the first sentence of paragraph 57.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 57 and therefore denies them.

**ANSWER TO SECOND AMENDED COMPLAINT- Page 13**

58.    Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58 and therefore denies them.

59.    Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59 and therefore denies them.

60.    Greenberg admits that Stanford moved his business from Montserrat to Antigua, but denies the characterizations in this paragraph. On information and belief based on court findings in the public record, Greenberg denies that the Montserrat Government effectively revoked Guardian's banking license, and states that Montserrat concluded that any purported revocation was illegal and unjustified.

61.    On information and belief, Greenberg admits that Stanford prepared a memo to Loumiet in August 1989, stating that Shockey had been spreading false and defamatory rumors about Guardian, including false statements about Guardian's Sr. VP and General Counsel Sidney Adler, that Shockey later acknowledged were false and referred to a different and unrelated Mr. Adler.  Greenberg denies that Stanford "told Loumiet that in the very near future he wanted to 'deal with Shockey in the most aggressive manner.'"  The actual language of the referenced passage is as follows:

> "As I see our position today and where we want to go in the future, several extremely important decisions must be addressed, which are:  1) Dealing with Shockey in the most aggressive manner, without creating further fall out from his defensive tactics…."

The balance of the referenced memo speaks for itself.

62.    Denied.

63.    Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 63 and therefore denies them.  Greenberg denies the second sentence of paragraph 63.  Greenberg admits that Loumiet sent an e-mail dated February 24, 1998, but denies the gross mischaracterization of the memo as purportedly reflecting that

**ANSWER TO SECOND AMENDED COMPLAINT- Page 14**

Loumiet "viewed the corrupt island nation as the ideal location for a massive experiment in private

sector self-governance."  To the contrary, the memo states as follows, in its entirety:

> **For the past nine months, at the expense of a client with a sizable investment in the islands, we have been helping the Government of Antigua and Barbuda to clean up its international banking sector through the adoption of model legislation and regulations and the elimination of questionable financial institutions operating there.  That effort has won strong praise even from British monetary authorities (A&B remains part of the Commonwealth), who have acknowledged the quality of the proposed measures.  Another sector of the economy that has developed on those islands is internet gambling, and the Government of A&B now wishes us to help it be a pioneer in the adoption of model legislation and regulations to regulate the industry and eliminate many of the abuses that have been associated with it.  Our client has asked whether we represent any companies active in the field which would like to actively participate in, and help fund, an effort to adopt such regulation in order to give themselves and the over-all industry a better image.  One huge advantage to A & B in this regard is that we have sufficient support from its Government and it is a small enough jurisdiction to make it ideal as a 'laboratory' for this type of effort. Please let me know if you know of any clients which would like to be involved."**

64.     Denied.

65.     Denied.

66.     Greenberg admits that Loumiet sent a letter to D.K.L. Hurst dated October 16,

1990, the content of which speaks for itself.

67.     Denied.

68.     Greenberg admits that Mr. Percival sent a letter to Mr. St. Luce dated Nov. 12,

1990, the content of which speaks for itself.  Greenberg notes that the letter also includes the

following statement which was omitted from the allegations in paragraph 68:  "**Mr. Spencer

concludes that from the information received to date 'there is no tangible evidence to

associate Guardian International with any criminal activity.'**"  Greenberg lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

68 and therefore denies them.

69.    On information and belief, Greenberg admits that the Cabinet approved the referenced proposal as set out in a document dated Nov. 28, 1990, and that Financial Secretary Hurst sent a letter to the Deputy Governor of the East Caribbean Central Bank dated Nov. 29, 1990, regarding Antigua's acceptance of the proposal with conditions.   The content of each document speaks for itself.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 69 and therefore denies them.

70.    Greenberg admits that Loumiet was sent a copy of Citizens and Southern National Bank correspondence to Bank of Antigua dated June 4, 1991, the content of which speaks for itself. Greenberg denies the allegation that "Loumiet became aware that Stanford was using BoA as a platform for GIBL's own business."  The referenced letter contains no such statement or reference. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 70 and therefore denies them.

71.    Greenberg admits that Loumiet wrote a letter to NationsBank International Miami dated May 29, 1992, the content of which speaks for itself.   Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 71 and therefore denies them.

72.    Greenberg admits that Loumiet represented Guardian in connection with false statements made by John Shockey.  Greenberg admits that Loumiet wrote a letter to the General Counsel of the Office of Comptroller of the Currency dated October 29, 1990, the content of which speaks for itself.  The balance of paragraph 72 is denied.

73.    Greenberg admits that the OCC sent a letter dated Nov. 13, 1990, the content of which speaks for itself.

74.    Greenberg admits that Loumiet wrote a letter to Stanford dated Nov. 8, 1990, the content of which speaks for itself.  The balance of paragraph 74 is denied.

75.     Greenberg admits that it became aware of an article entitled "Monster Rat in Montserrat," the content of which speaks for itself. The remaining allegations in this paragraph are denied.

76.     Denied.

77.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77 and therefore denies them.

78.     Greenberg admits that Loumiet recommended Suarez to Stanford, and that she worked as a lawyer at Greenberg, was hired by Stanford, and became General Counsel for Stanford Financial. The remainder of the allegations in paragraph 78 are denied.

79.     Greenberg admits that Loumiet sent Stanford a letter dated February 1, 1991, the content of which speaks for itself.  Greenberg denies the mischaracterization of the letter as purportedly discussing whether GIIS was carrying out banking operations in the United States by providing "services to GIBL."   The letter actually refers to proposed services to Bank of Antigua, Ltd. and states as follows in pertinent part:

> **The Service Agreement with Bank of Antigua, Ltd. should make it clear that Guardian International Investment Services, Ltd. ('Services') will not sell the bank's services to residents of the United States.  Whether or not CD's of Bank of Antigua, Ltd. would constitute 'securities' for U.S. law purposes, which is arguable, the likelihood of getting in trouble with state banking and securities regulators is much greater if Services is promoting the sales of those deposits to residents of the U.S.  I therefore do not recommend it.** [emphasis added]

Greenberg denies the mischaracterization that "Loumiet also warned Stanford about Stanford Financial's sales of securities in the U.S., which might require it to be registered as a securities broker."  The letter actually refers to proposed sales of limited partnerships and bonds by the Guardian Development Corporation and states as follows in pertinent part:

> My other concern is securities law relating to the services to be rendered by Services for Guardian Development Corporation (GDC).  Specifically, I am concerned about the 'marketing and support services' to be provided by Services

<u>in connection with the sales by GDC of 'various limited partnerships and subordinated bond interests.'</u> [emphasis added]

The balance of paragraph 79 is denied.

80.     Greenberg admits that a letter was sent to Guardian International dated March 25, 1992, the content of which speaks for itself.  Greenberg denies the mischaracterization that this letter shows that Greenberg knew "Stanford was offering GIBL CDs" through GIIS offices in the U.S.  The letter contains no such statement or reference.  Greenberg denies that Greenberg advised an entity defined by plaintiffs as "Stanford Financial."  The balance of paragraph 80 is denied.

81.     Greenberg admits that a memo to the file dated January 8, 1993 was prepared, the content of which speaks for itself.

82.     Greenberg denies the mischaracterization that Suarez "essentially told the Greenberg partner that GIBL was a pass-through sham banking entity used as a front for Stanford's U.S.-based unlicensed investment company securities sales operation."  The referenced memo contains no such statements or characterizations.  The balance of the memo speaks for itself.  The remainder of paragraph 82 is denied.

83.     Denied.

84.     Greenberg denies the mischaracterization that the referenced notes "reveal Greenberg's knowledge of Stanford's securities law violations."  The referenced notes contain no such statements or characterizations.  Greenberg denies the mischaracterization that the notes reveal that "Stanford had told Greenberg" that he was resistant to any registration.  The referenced notes do not purport to reflect any discussions with Stanford.  Greenberg admits that those handwritten notes speak for themselves. The remainder of the allegations in paragraph 84 are denied.

85.     Greenberg admits that Loumiet sent Suarez a copy of his affidavit dated January 13, 1994, the content of which speaks for itself.  Greenberg lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 85 and therefore denies them.

86.     Greenberg admits that Loumiet and Menendez Cambo prepared a Draft for Discussion Purposes memo dated November 12, 1994, the content of which speaks for itself.  The remainder of paragraph 86 is denied.

87.     Greenberg admits that Stanford extended an invitation dated June 18, 1993, for Loumiet to become a member of the Advisory Board of Stanford Financial Group, Ltd., the content of which speaks for itself.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 87 and therefore denies them.

88.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 and therefore denies them.

89.     Greenberg admits that Menendez Cambo wrote a letter to a representative of the Federal Reserve Bank of Atlanta dated Oct. 27, 1994, the content of which speaks for itself. Greenberg denies the remaining allegations, and specifically denies that the letter contained any misrepresentations.

90.     Greenberg admits that Suarez sent a letter to Menendez Cambo dated Oct. 28, 1994, the content of which speaks for itself.

91.     Greenberg denies the colorful but physically-challenging allegation that "Greenberg knew that Stanford had the Antiguan regulator, Molwyn Joseph, literally [sic] in his pocket." Greenberg admits that a draft letter was prepared and sent by Menendez Cambo to Suarez. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 91 and therefore denies them.

92.     Greenberg admits that Menendez Cambo sent a letter to Suarez dated Nov. 14, 1994, the content of which speaks for itself.  Greenberg denies the allegation that the draft attached

to this letter purportedly "stated (with regard to GIBL) that:  We have adequate procedures for monitoring and controlling the Bank's activities worldwide."  The attached draft defines "Bank" as referring to Bank of Antigua, not GIBL.

93.    Denied.

94.    Greenberg admits that Menendez Cambo sent a letter to Suarez dated Dec. 5, 1994, the content of which speaks for itself.  Greenberg denies that the Name Check Information Sheet asked if Stanford or any of his companies "**had ever been** the subject of any criminal investigation."  The actual language of the document states:

> **"If you are involved in any material pending administrative proceeding, civil litigation, either as plaintiff or defendant or have been advised that you are the subject of any actual or potential investigation conducted by, or to be conducted by, any regulatory agency or criminal justice agency, set forth (a) the title and nature of lawsuit or proceeding…"**

Greenberg denies that the answer to such question was affirmative as of December 1994, and denies that Greenberg knew the answer was affirmative.  Greenberg denies that it knew in December 1994 of Stanford's prior bankruptcy.  Greenberg further denies that Stanford or any of his companies had ever had any licenses revoked.  Plaintiffs acknowledge that the threatened revocation of a license by Montserrat—the only potential revocation identified in the Complaint— was rescinded and was not carried out.  *See* Second Amended Complaint ¶ 60.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 94 and therefore denies them.

95.    Greenberg admits O'Brien wrote a memo to Schnapp dated February 1, 1994, the content of which speaks for itself.  As noted in the memo, the FBI money laundering investigation was closed without any findings or charges being filed against Stanford.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 95 and therefore denies them.

96.     Greenberg lacks knowledge or information sufficient to form a belief as to Stanford's motivations and therefore denies them.  Greenberg admits that Pat O'Brien submitted requests under the Freedom of Information Act, the contents of which speak for themselves. Greenberg denies the mischaracterization of a FOIA request as an act of "counter-espionage" against the United States.  According to the United States Department of Justice:

> "The FOIA is a law that gives you the right to access information from the federal government.  It is often described as the law that keeps citizens in the know about their government.  … As Congress, the President, and the Supreme Court have all recognized, the FOIA is a vital part of our democracy."

http://www.foia.gov/about.html.

97.     Greenberg admits that it received certain documents as a result of its FOIA requests, the contents of which speak for themselves.  Greenberg denies that any investigation ever found Stanford to be involved in drug money laundering.  As Plaintiffs acknowledge, the investigations found no support for any such claims and were closed without findings or charges being filed against Stanford.  *See, e.g.,* Second Amended Complaint paragraph 95.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 97 and therefore denies them.

98.     Greenberg admits that it received certain documents as a result of its FOIA requests, the contents of which speak for themselves. This paragraph appears to refer to an FBI internal document dated Jan. 27, 1992, which states in part:  "**Extensive investigation to date has not put a drug nexus to the operation run by subjects**."  The purported quotes contained in paragraph 98 are taken out of context.  The complete passage states:  "In essence, Guardian International functions as a bank for foreign depositors in the U.S. with a constant cash flow to Europe. However there is no regulation of its activities."  To Greenberg's knowledge no investigation ever found that Stanford had engaged in drug money laundering or smuggling and no such charges were

ever filed against him. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 98 and therefore denies them.

99.     Greenberg admits that Loumiet sent Stanford and Suarez a letter dated Nov. 8, 1994, the content of which speaks for itself. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 99 and therefore denies them.

100.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 and therefore denies them.

101.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 and therefore denies them.

102.     Greenberg denies the allegation that the Prime Minister "noted in his November 14, 1994 letter" that he "was forever indebted to Stanford." The referenced letter contains no such statement. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 102 and therefore denies them.

103.     Greenberg admits that Lester Bird sent Stanford a letter dated February 21, 1995, the content of which speaks for itself. Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 103 and therefore denies them.

104.     Greenberg admits the allegations in the first sentence of paragraph 104, and lacks sufficient knowledge and information to form a belief as to the truth of the allegations in the third and fourth sentence and therefore denies them. Greenberg denies all other allegations in paragraph 104.

105.     Greenberg admits DSI threatened a tortious interference with contract claim against Stanford and that Suarez responded to the threat with a letter dated December 12, 1994, the content

of which speaks for itself.  Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 105 and therefore denies them.

106.   Greenberg admits DSI attempted to use U.S. political pressure to influence the Government of Antigua & Barbuda to award the financing and construction of the proposed hospital to DSI, and that Senator Hatch urged Congress to revoke Antigua's most favored nation status.  Greenberg admits that Stanford was then investigated for his activities related to the Antiguan hospital dispute.  The investigation ended with no charges being filed.  Greenberg denies the remaining allegations in paragraph 106.

107.   Denied.

108.   Greenberg admits there were "negative" press reports and articles concerning the Antiguan Hospital dispute, the content of which speak for themselves.  Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 108 and therefore denies them.

109.   Greenberg admits the referenced articles in paragraph 109 were sent to Loumiet. Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 109 and therefore denies them.

110.   Greenberg denies the allegations in the first two sentences of paragraph 110. Greenberg admits documents in its records show loans or extensions of credit to the Antigua Government and Government officials and the repayment histories of those loans, the content of which speak for themselves.  Greenberg denies the remaining allegations in paragraph 110. Greenberg denies knowledge that any such loans were illegal.

111.   Greenberg admits the allegations of paragraph 111.

112.   Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the allegation in paragraph 112 that "the manner in which Stanford disguised his 'gifts' to

**ANSWER TO SECOND AMENDED COMPLAINT- Page 23**

government officials is evidenced by one May 6, 1994 memo" and therefore denies them. Greenberg denies knowledge that Stanford was planning to or engaged in illegal gifts or loans to government officials.  Greenberg denies the remaining allegations in paragraph 112.

113.    Denied.

114.    Denied.

115.    Greenberg admits Loumiet faxed a copy of the Foreign Corrupt Practices Act to Suarez on or about February 7, 1996, but denies it was "in recognition of all the bribery going on in Antigua" as alleged in paragraph 115.

116.    Greenberg admits that Suarez provided a Greenberg attorney a copy of legislation prepared by an English law firm.  Greenberg denies the remaining allegations in paragraph 116.

117.    Greenberg admits that Loumiet prepared a letter dated July 26, 1995, the content of which speaks for itself.  Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 117, and therefore denies them.

118.    Greenberg admits that it billed time for reviewing and drafting documents related to the Antigua Airport Authority.  Greenberg denies the remaining allegations in paragraph 118.

119.    Greenberg admits that the December 1995 issue of American Lawyer magazine spotlighted Loumiet, the content of which speaks for itself.  Greenberg denies the remaining allegations in paragraph 119.

120.    Greenberg admits Loumiet and Schnapp from time to time sent articles to Suarez that related to the Caribbean offshore banking industry and money laundering, including the referenced Time magazine and Miami Herald articles relating to drug trafficking and to law enforcement cracking down on Caribbean money laundering fraud.  Greenberg denies the remaining allegations in paragraph 120.

121.     Greenberg admits that Caribbean Week published an article titled "*Drugs and the Economy*" written by Klaus Von Albuquerque, the content of which speaks for itself.  Greenberg denies the remaining allegations in paragraph 121.

122.     Greenberg admits Schnapp represented Stanford in connection with a claim against Klaus Von Albuquerque and the Caribbean Week newspaper for defamation.  Greenberg denies the remaining allegations in paragraph 122, and specifically denies Schnapp "already knew that Stanford had bribed a slew of Antiguan Government officials, including the minister of Finance charged with regulating his banks."

123.     Greenberg admits Stanford instructed "I want no delay in our attacks on DSI (i.e. Wayne Kelly), Caribbean Week, Klaus de Albuquerque, Shipman, the Outlet or the reporter who wrote the article in the Daily Observer" and that he ordered Suarez to report to him "on a weekly, if not daily" basis.  Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 123, and therefore denies them.

124.     Greenberg admits that Stanford discussed with Schnapp a possible retraction by Caribbean Week but denies that paragraph 124 accurately summarizes or characterizes such discussions.  Greenberg denies the last two sentences of paragraph 124.

125.     Greenberg admits that in response to the defamation claim the Caribbean Week newspaper published a retraction that apologized for the statements it made about Stanford in the subject articles.  Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 125, and therefore denies them.

126.     Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 126, and therefore denies them.

127.    Greenberg admits that Stanford owned the *Antiguan Sun* newspaper.  Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in paragraph 127, and therefore denies them.

128.    Greenberg admits that in April and May 1996, Stanford wrote several letters to individuals at the U.S. Embassy in Barbados seeking the source and details of the "negative" information about him that reportedly caused Ambassador Hyde to not wish to meet him, and indicating his intent to aggressively pursue the matter.  Greenberg denies the remaining allegations in paragraph 128.

129.    Greenberg admits Stanford sent a letter to Loumiet dated May 30, 1996, the content of which speaks for itself.  Greenberg denies the remaining allegations in paragraph 129.

130.    Greenberg denies the allegations in the first sentence of paragraph 130.  Greenberg admits that Loumiet wrote a letter to Ambassador Hyde dated July 11, 1996, the content of which speaks for itself.  Greenberg denies the remaining allegations in paragraph 130.

131.    Greenberg admits the allegations in paragraph 131.

132.    Greenberg admits O'Brien sent Freedom of Information requests to the FBI, DEA, OCC, Federal Reserve and US Customs seeking information about Stanford, that the OCC and DEA withheld some information based on the "law enforcement" exception and the FBI redacted certain information, and O'Brien appealed those decisions on behalf of the client.  Greenberg denies the remaining allegations and characterizations in paragraph 132.

133.    Greenberg admits that information produced by the FBI indicated Stanford had been investigated for alleged money laundering of drug money in the late 1980s and early 1990s; that the FBI had never been able to substantiate any connection between Stanford and drug money; that an investigation of Stanford by US Customs in 1992 did not substantiate any allegations of

wrongdoing; and that the FBI sent an agent to London in 1992, as part of its investigation. Greenberg denies the remaining allegations in paragraph 133.

134.   Greenberg lacks sufficient knowledge to form a belief as to the truth of the allegations paragraph 134, and therefore denies them.

135.   Greenberg admits the SEC-licensed broker/dealer, SGC, a Texas corporation, was established in the United States on or about 1996, with its principal place of business in Houston, Texas.  Greenberg lacks sufficient knowledge to form a belief as to the truth of the other allegations in paragraph 135, and therefore denies them.

136.   Denied.

137.   Greenberg admits that in July 1998, Loumiet provided comments on a draft disclosure statement received from SIBL.  Greenberg attorneys had no involvement in the preparation of the disclosure statement ultimately used with the initial Reg D offering or subsequent Reg D disclosure statements.  Greenberg denies the remaining allegations in paragraph 137.

138.   Denied.

139.   Greenberg lacks sufficient information to form a belief as to the truth of the allegations in paragraph 139 and therefore denies them.

140.   Greenberg lacks knowledge and information to form a belief as to the truth of the allegations in paragraph 140, and therefore denies them.

141.   Greenberg lacks sufficient available knowledge and information to form a belief as to the truth of the allegations in paragraph 141, and therefore denies them.

142.   Greenberg admits that on September 18, 1996, Loumiet wrote a letter to Antigua's Prime Minister Bird offering fifteen suggested steps that could be taken by the government to "foster the type of first rate reputation as a center for international banking and finance that you

[the Prime Minister] so strongly desire for your country."  The letter referenced recent articles in the Washington Post and Miami Herald that were "injurious" to Antigua's goal for a first rate reputation as a center for international banking and finance.  Greenberg denies the remaining allegations in paragraph 142.

143.   Greenberg admits an Advisory Board was formed and that Stanford, Loumiet and others were asked to serve on it.  Greenberg admits that the OFSPC was formed and that Stanford was initially appointed chair.  Greenberg admits two Task Forces were formed, one to review existing offshore banks and the other to review Antigua's money laundering prevention laws and regulations and offer suggestions to strengthen them and the offshore banking sector to foster Antigua's goal to have a first rate reputation as a center for international banking and finance. Greenberg denies that paragraph 143 accurately summarizes or characterizes these events or their background and purpose.

144.   Greenberg admits members of the Task Force included Greenberg attorneys Loumiet, Schnapp, and O'Brien; Kroll executives Tom Cash and Ivan Diaz; and BDO Seidman partners Michael Ancona, Jeffrey Balmer, Keith Ellenburg and Barry Hirsch.  Greenberg lacks sufficient information to form a belief as to the truth of the other allegations in paragraph 144, and therefore denies them.

145.   Greenberg admits O'Brien authored a memo dated September 15, 1997, to members of the Task Force with copies to Stanford and Wrenford Ferrance, Antigua's Minister of Finance.  The memo was very early in the process of the Task Force's work and contained planning and task assignments for Task Force members.  The memo included recommendations for such areas as development of an organizational structure for Antigua's money laundering prevention program; development of comprehensive oversight program for banks; and numerous regulations which if enforced would have prevented the frauds committed by Stanford.  The memo included

recommendations for development of training manuals for use by the public and private sectors for implementation of and compliance with the money laundering prevention program which would include annual on-site inspections of banks and requirements for quarterly audited financial reports.   The memo recognized the difficulty of regulation of offshore banks because of the international nature of their operations and recommended specific steps to prevent offshore banks (like SIBL) from using their international character to circumvent licensing and supervision requirements.   With regard to international cooperation, the memo provided:

**10.     International Cooperation**

**Because any money laundering in Antigua and Barbuda almost invariably involves criminal elements located in other nations, cooperation with the judicial, enforcement and regulatory authorities of other countries is critical to the effectiveness of the money laundering prevention effort. At the same time, it is essential that the Government of Antigua and Barbuda not permit the Wealth of its people and businesses to become the targets of overly aggressive enforcement actions designed primarily to supplement the treasuries of foreign nations. This can be accomplished through the following measures.**

**<u>Recommendation</u>**

A.     Implementing regulations and procedures enabling the Minister of Finance to provide information to judicial, enforcement or regulatory agencies and officials of other countries pursuing investigations of activities which are illegal under the laws of Antigua and Barbuda.

B.     Implementing regulations and procedures whereby foreign authorities pursuing money laundering and related investigations may provide evidence and request the seizure of monies and other property connected to money laundering activities when such activities constitute a violation of the laws of Antigua and Barbuda.

C.     Implementing regulations providing that any forfeited monies and other property connected to money laundering activities are remitted to the Government of Antigua and Barbuda.

D.     Reviewing and revising the list of "prescribed offenses" in the Second Schedule to the Money Laundering (Prevention) Act to ensure that the provisions of the Act apply only to the most serious of crimes, as intended, and not to lesser crimes which could conceivably be included under such vague terms as "fraud" or "false accounting."

**ANSWER TO SECOND AMENDED COMPLAINT- Page 29**

**Assignments**

A.      Greenberg Traurig will work with Wrenford Ferrance drafting appropriate regulations to enhance international cooperation and in drafting an order to be published in the *Gazette* revising the Second Schedule to the Act.

B.      Kroll Associates will work with Wrenford Ferrance drafting procedures to enhance international cooperation.

Greenberg admits the recommendation in section "D" above was included in the final recommendations to the Government of Antigua, but it was not among the recommendations accepted by the government and passed into law.  Greenberg denies the remaining allegations in paragraph 145.

146.    Greenberg denies the allegation in paragraph 146.

147.    Greenberg denies the allegations in paragraph 147.  Greenberg specifically denies that any Greenberg-recommended amendments of existing confidentiality laws were ever used to thwart SEC subpoenas.

148.    Greenberg admits that Ferrance was appointed to serve as the Director of International Business Corporations, that the Task Force worked closely with him, and that Loumiet authored a letter for Ferrance's consideration to all offshore banks (including SIBL) as part of the enforcement effort of Task Force I.  Greenberg denies the remaining allegations of paragraph 148, and specifically denies Ferrance "relied entirely on Loumiet and other Stanford agents on the Task Force to tell him what to do."

149.    Greenberg admits O'Brien established a temporary residence in Antigua as part of his work for the Government of Antigua as a part of the OFSPC Task Force, and that he helped advocate passage of anti-money laundering laws and regulations, and after passage, he helped with implementation of the new laws and regulations.  Greenberg admits O'Brien utilized an email address pobrien@stanfordeagle.com while on the island and that legal fee bills were sent to the

Government of Antigua in care of SFG in Houston "attention Allen Stanford" for payment by the Government of Antigua.  Greenberg denies the remaining allegations in paragraph 149.

150.    Greenberg admits that the 1998 Amendments to Antigua's International Business Corporations Act and Money Laundering Act of 1996 created a new Antiguan regulatory authority, IFSA, that Stanford was the initial interim chair, and that O'Brien and Errol Cort also served on the Board of IFSA.  Greenberg denies the remaining allegations in paragraph 150.

151.    Greenberg admits that Althea Crick was appointed as the Executive Director of IFSA.  Greenberg admits Crick unsuccessfully sued O'Brien in connection with his work on behalf of IFSA and that O'Brien wrote a memo to Greenberg's General Counsel describing the factual background of the lawsuit.  Greenberg denies the remaining allegations of paragraph 151.

152.    Greenberg admits that FinCEN issued Advisory No. 11 in April 1999, the content of which speaks for itself.

153.    Greenberg admits the allegations of paragraph 153.

154.    Greenberg admits Loumiet emailed Jim Bacchus, seeking advice on making a WTO claim against the United States on behalf of the Government of Antigua, and Bacchus responded by email with advice on the topic.  The content of the emails speak for themselves.  Greenberg denies the remaining allegations in paragraph 154.

155.    Greenberg denies the allegations of paragraph 155.

156.    Denied.

157.    Greenberg denies that Greenberg attorney Jim Miller worked on a strategy for reversing the FinCEN Advisory which had not yet been issued at the time of the events alleged in paragraph 157 took place.  Greenberg admits that Miller had a billing entry for four hours that read "Setting up meetings with Hastert, Delay and Archer; talks with client to get background for

meetings; arrangements for check to NRCC."   Greenberg denies the remaining allegations in paragraph 157.

158.    Greenberg admits that Doug Farah wrote the article "*Texas Banker at Center of Reform Controversy*" but denies that a Greenberg attorney "investigated" Farah.  Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations of paragraph 158, and therefore denies them.

159.    Greenberg admits that in March 2000, the US State Department issued the INCSR 1999, which speaks for itself.  Greenberg denies the truth of the statement quoted from the report.

160.    Greenberg admits that in June 1999, Ruth Espey-Romero made telephone calls to individuals with the Department of Treasury and U.S. State Department in connection with lifting the FinCEN advisory.  Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations of paragraph 160, and therefore denies them.

161.    Greenberg admits Loumiet sent an email to shareholders on February 24, 1998, with a subject line "Internet Gambling," which is quoted in its entirety in the response to paragraph 63 above.

162.    Greenberg admits that it gave legal advice concerning the Foreign Corrupt practices Act (FCPA) in the form of a January 1998 memorandum to Suarez, the content of which speaks for itself, and that Schnapp sent legal articles about the FCPA to Suarez in January 1998. Greenberg denies the other allegations in paragraph 162.

163.    Greenberg admits it gave legal advice regarding the establishment of trust representative offices of STC, Ltd. in the United States.  Greenberg denies the other allegations of paragraph 163.

164.    Greenberg denies the allegations of paragraph 164.

165.     Greenberg admits it gave legal advice in a memo dated November 5, 1997, to Suarez regarding the establishment of a trust representative office of STC, Ltd. in the U.S., which speaks for itself.   Greenberg denies the remaining allegations in paragraph 165.   Greenberg specifically denies the allegation Fornaris knew "the true purpose of the new representative offices was to serve as a 'pass through' marketing and sales vehicle for SIBL."

166.     Greenberg denies the allegations in paragraph 166.

167.     Greenberg admits that it provided legal advice regarding the establishment of trust representative offices in September 1998, but denies the other allegations of paragraph 167.

168.     Greenberg denies the allegations of paragraph 168 other than to admit Loumiet and Fornaris provided a memorandum to Suarez dated September 15, 1998, regarding potential activities of the trust representative offices, the content of which speaks for itself.

169.     Greenberg admits that the September 15, 1998, memorandum included a list of specific "Do's and Don'ts For Stanford Trust Company Representative Offices in Florida," which speaks for itself.   Greenberg denies the other allegations of paragraph 169.

170.     Greenberg admits that by letter dated October 12, 1998, Fornaris represented that the proposed Florida trust representative office would "act only as a representative of" STC, Ltd., would "not make discretionary investment decisions or accept, approve or otherwise administer fiduciary accounts in Florida" and that "consistent with the Division of Banking" it would "meet with customers at the TRO and would facilitate the transfer of documents and assist customer communications."   The letter in its entirety speaks for itself.

171.     Greenberg admits that at one point in time STC Ltd. was incorrectly informed by the staff of the Florida Division of Corporations that STC Ltd. needed to obtain "a charter" from the Division of Banking before the Division of Corporations could grant STC Ltd. a certificate for a foreign corporation to transact business in Florida.   Ultimately it was determined that a charter

was not necessary and in December 1998, a Memorandum of Agreement between STC Ltd. and the Florida Department of Banking and Finance was entered into addressing that issue and other regulatory and operational issues of the trust representative office.

172.    Greenberg admits that a memorandum was sent to the Florida Department of Banking entitled "Memorandum Regarding the Legal Authority of Stanford Trust Company Limited to Establish a Trust Representative Office in the State of Florida" dated November 2, 1998, which speaks for itself.  Greenberg denies the remaining allegations in paragraph 172.

173.    Greenberg admits an affidavit of Errol Cort was included with the November 2, 1998 memorandum to provide support for the arguments made in the memorandum.  The affidavit of Cort includes the statement "Pursuant to sections 246 to 254 of the International Business Corporations Act foresaid, the Trust Company does not and cannot engage in any general banking business and, accordingly, the Trust Company does not accept deposits, cash cheques, make loans, or engage in other banking activities."  Greenberg denies the remaining allegations in paragraph 173.

174.    Greenberg denies the allegations in paragraph 174.

175.    Greenberg admits that in November 1998 Greenberg and Florida regulators conducted negotiations over a proposed Consent Order.  Greenberg denies the remaining allegations in paragraph 175, except it lacks knowledge or information, to form a belief as to the truth of the last sentence, and therefore denies them.

176.    Greenberg admits that in December 1998, Greenberg attorneys met with Florida regulators and that a Memorandum of Agreement between STC Ltd. and the Florida Department of Banking and Finance was entered into addressing regulatory and operational issues of the proposed trust representative office.   Greenberg denies the remaining allegations and characterizations of paragraph 176.

**ANSWER TO SECOND AMENDED COMPLAINT- Page 34**

177.    Greenberg admits that in December 1998, a Memorandum of Agreement between STC Ltd. and the Florida Department of Banking and Finance was entered into addressing regulatory and operational issues of the proposed trust representative office, the terms of which speak for itself.  Greenberg admits STC Ltd. agreed to apply to do business in the State of Florida as Stanford Trust Company Limited d/b/a Stanford Fiduciary Services, Inc. (SFIS).  STC Ltd. further agreed in the Memorandum of Agreement that the Florida Department of Banking and Finance had the right to reasonably examine any trust representative office established by STC Ltd. within the State of Florida to assure that no prohibited business is conducted in such office. Greenberg admits that under the Memorandum of Agreement, it was proper for the representative trust office to, among other things, solicit new fiduciary accounts on behalf of STC Ltd., including providing written information and conducting meetings with prospective trust customers. Greenberg further admits that under the Memorandum of Agreement, it was proper for the representative trust office to, among other things, facilitate communications between customers and companies where investments held in trust are located; and act as liaison between existing and potential customers and offices of STC Ltd. located outside the State of Florida.  Greenberg denies the remaining allegations in paragraph 177.

178.    Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 178, except it specifically denies that Greenberg "bamboozled" and "misled" state authorities about the true purpose of the new office.

179.    Greenberg denies the allegations in paragraph 179.

180.    Greenberg denies the allegations in paragraph 180.

181.    Greenberg admits that Michael Sallah published an article in October 2009, the content of which speaks for itself.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 181, and therefore denies them.

182.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 182, and therefore denies them.

183.     Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 183, except it specifically denies the allegation "Loumiet and Greenberg did not and continued to work at it until Stanford got exactly what he wanted."

184.     Greenberg admits, on information and belief, that the initial directors of Stanford Trust Company in Louisiana (STC) were Jay Comeaux, J.D. Perry, Jay Zager, Jason Green and Suarez.  Greenberg denies the remaining allegations in paragraph 184.

185.     Greenberg admits Sidney E. Seymour, Chief Examiner of Financial Institutions, sent a letter dated April 13, 1998, to Fernando Margarit requesting additional information in connection with the acquisition of The Southern Trust Company by SGC, including a request for additional information about Stanford's involvement with Guardian International Bank, an account of the circumstances leading to the issuance of the OCC Banking Circular BC-171, and a copy of any enforcement, termination or any similar action by any foreign licensing or chartering agency against Guardian.  The letter speaks for itself.  Greenberg denies the remaining allegations in paragraph 185.

186.     Greenberg admits Loumiet prepared a draft response to the April 13, 1998 letter from Sidney Seymour regarding the "Notice of Acquisition of Control of the Southern Trust Company, Ruston, Louisiana, by the Stanford Group Company."  Greenberg lacks knowledge or information sufficient to form a belief as to the truth as to whether Loumiet later forwarded the letter to OFI.  Greenberg denies the remaining allegations in paragraph 186.

187.     Denied.

188.     Greenberg denies the allegations of paragraph 188.

189.    Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 189, and therefore denies them.

190.    Greenberg admits that Suarez sent a copy of the SEC's letter to Loumiet on June 5, 1998, the content of which speaks for itself.

191.    Greenberg admits Loumiet was consulted in connection with the SEC inquiry, that Loumiet reviewed a draft response dated June 17, 1998, prepared by Jack Ballard and provided input concerning the content.  The content of the draft response prepared by Ballard speaks for itself.  Greenberg denies the remaining allegations in paragraph 191.

192.    Greenberg admits Loumiet provided his input concerning the response to the SEC via a June 17, 1998, memo to Wayne Secore which speaks for itself.  Greenberg denies the remaining allegations in paragraph 192.

193.    Greenberg admits Loumiet's June 17, 1998 memo to Wayne Secore suggested informing the SEC "we do not concede that the CDs sold by SIB are 'securities' for U.S. law purposes" and that Loumiet's input included a brief discussion of the law and a copy of "page 3 of a letter of ours to another client on the issue of foreign bank CDs and 'securities'."  The remainder of the June 17, 1998 memo speaks for itself.  Greenberg denies the remaining allegations in paragraph 193.

194.    Greenberg admits that one of its attorneys provided information to Secore via letter dated July 22, 1998, that included the information described in and attached to the letter.  The letter and the attachments speak for themselves.  Greenberg denies the remaining allegations in paragraph 194.

195.    Greenberg admits that the attachments to the July 22, 1998 letter to Secore included an interoffice memo dated May 17, 1996, regarding "SIB Safety and Insurance," which speaks for itself.  Greenberg denies the remaining allegations in paragraph 195.

196.     Greenberg admits that the attachments to the July 22, 1998 letter to Secore included a document titled "Seguridad" concerning insurance which speaks for itself.  Greenberg denies the remaining allegations in paragraph 196.

197.     Greenberg admits that Fred Ferrara wrote a letter to Schnapp in June 1998, the content of which speaks for itself.   Greenberg denies the remaining allegations of paragraph 197.

198.     Greenberg admits that Ms. O'Bourke's attorney sent several letters, the contents of which speak for themselves. Greenberg denies that paragraph 198 accurately summarizes or characterizes the letters or their background.

199.     Greenberg admits that Ms. O'Bourke's attorney sent a letter, the content of which speaks for itself.

200.     Denied.

201.     Greenberg admits that Suarez provided a copy of O'Bourke's letter to Greenberg in September 1998.  Greenberg denies the remaining allegations in paragraph 201.

202.     Greenberg admits that it prepared an initial draft of a complaint against O'Bourke, but that complaint was never filed.  Greenberg denies the remaining allegations of paragraph 202.

203.     Greenberg admits Loumiet and another Greenberg attorney sent a letter to Suarez, the content of which speaks for itself.  Greenberg denies the remaining allegations in paragraph 203.

204.     Greenberg admits the allegations in paragraph 204.

205.     Denied.

206.     Greenberg denies the allegations in paragraph 206.

207.     Greenberg admits Suarez requested a review of state securities laws in connection with the possible sale of SIBL CDs in Texas, Florida, Colorado, Louisiana, and New York. Greenberg admits that Loumiet provided comments on a partial draft of SIBL's Reg D Disclosures

**ANSWER TO SECOND AMENDED COMPLAINT- Page 38**

that was sent to him by Suarez in approximately July 1998.  To Greenberg's knowledge Loumiet had no further involvement with the draft disclosures before they were completed by SIBL and issued on or about October 15, 1998.  Greenberg denies the grossly inaccurate assertion that Loumiet "proceeded to heavily edit and rewrite [them] until the final product became, essentially, Loumiet's disclosures."  Greenberg denies the remaining allegations in paragraph 207.

208.    Greenberg admits that a July 1998 memorandum to Suarez opined that "due to the broad nature of the term 'security' in Colorado, New York and Texas it is safest to conclude that in those states a certificate of deposit can also qualify as a security, because it evidences an indebtedness."  The memorandum speaks for itself insofar as it addresses whether SIBL could avoid registration in a particular state by relying on the Reg D exemption.  Greenberg denies the remaining allegations in paragraph 208.

209.    Greenberg admits that Loumiet and Bonnie Moncada looked into certain questions under the Investment Company Act.  Greenberg denies the remaining allegations of paragraph 209.

210.    Greenberg admits that in November 1998, Suarez asked Loumiet for an opinion on the Investment Company Act issue, and that attorney Deon Warner had previously given an opinion on the issue, the content of which speaks for itself.  Greenberg denies the remaining allegations in paragraph 210.

211.    Greenberg admits that in November 1998, Suarez asked Loumiet for an opinion on an Investment Company Act issue and that Loumiet and Moncada wrote a memorandum dated November 11, 1998, in which it opined that, under certain circumstances described in the memo, "the private placement of certificates of deposit to an unlimited number of qualified purchasers by Stanford does not require registration under the Act."  The reasoning in the memorandum speaks for itself.  Greenberg denies the remaining allegations in paragraph 211.

212.   Greenberg denies the allegations in paragraph 212.

213.   Greenberg admits the allegations of paragraph 213, except it denies the last sentence of the paragraph.

214.   Greenberg denies the DEA money laundering investigation was of Stanford, but rather was of certain customers.  Greenberg admits that at the request of Jay Comeaux, Schnapp sent letters to four PFK principals indicating Stanford was not a target of the investigation and was fully cooperating with the DEA.  Greenberg denies the remaining allegations in paragraph 214.

215.   Greenberg admits Stanford fully cooperated with the DEA investigation and in February 1999, Stanford and the Antiguan Government jointly turned over to the DEA over $3 million in money deposited into SIBL accounts by alleged criminals, and by agreement the U.S. shared with the Government of Antigua 1/3 of the forfeited money.  Greenberg lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 215, and therefore denies them.

216.   Greenberg admits Stanford forwarded articles from Antiguan newspapers and published a letter addressed to the Antiguan people, the contents of which speak for themselves.

217.   Greenberg admits that Errol Cort became Attorney General in Antigua.  Greenberg denies that paragraph 217 accurately summarizes or characterizes the referenced events or their background.

218.   Greenberg denies the allegation that through an email dated August 6, 1999, "Greenberg discovered that Stanford's Antiguan banking operation bore the hallmarks of a Ponzi scheme."  The referenced email contains no such statements or characterizations.  Greenberg admits an email exchange between O'Brien and Loumiet took place on August 6, 1999, the content of which speaks for itself.  Greenberg denies the remaining allegations in paragraph 218.

219.    Greenberg admits O'Brien informed Loumiet that "Allen has personally guaranteed" payment of Greenberg fees, but that there were a few signs "Allen could have some serious financial problems."  Greenberg denies the remaining allegations in paragraph 219.

220.    Greenberg admits the allegations of paragraph 220.

221.    Greenberg admits that without the added emphasis of bold type, italics and underlining, the email is accurately quoted.

222.    Greenberg denies the allegations in paragraph 222.

223.    Greenberg admits the allegations in paragraph 223.

224.    Greenberg admits the allegations of paragraph 224, except it is without knowledge and information sufficient to form a belief as to the truth of the allegations in footnote 28, and therefore denies them.

225.    Greenberg admits that the OTS rejected the application and notified Loumiet via letter dated February 21, 2001, the content of which speaks for itself.  Greenberg denies the remaining allegations in paragraph 225.

226.    Greenberg admits Loumiet wrote an email regarding his meeting with the OTS, the content of which speaks for itself.  Greenberg denies that the remaining allegations accurately summarize or characterize the referenced events or their background.

227.    Greenberg admits Loumiet moved his practice to Hunton & Williams after May 1, 2001, and thereafter, Greenberg only periodically represented various Stanford companies in specific matters.  Greenberg admits it sought to retain Stanford business when Loumiet left, and considered the experience of O'Brien as a former U.S. Customs official and Schnapp as a former Assistant U.S. Attorney to be a Greenberg advantage in that effort.  Greenberg denies the remaining allegations in paragraph 227.

228.    Greenberg admits it received at an unknown time a copy of a news article in which alleged bribes of Gaston Browne and Molwyn Joseph are denied by Stanford, as well as political contributions Stanford admits that he made and would make to Gaston Browne and Molwyn Joseph.  Greenberg denies the remaining allegations in paragraph 228.

229.    Greenberg admits the allegations in paragraph 229.

230.    Greenberg admits the allegations in paragraph 230.

231.    Greenberg denies the allegations in paragraph 231.

232.    Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 232, and therefore denies them.

233.    Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 233, and therefore denies them.

234.    Greenberg admits that file materials in the Tirado matter included an email dated October 7, 2005, the content of which speaks for itself.  Greenberg denies that the email reflects that "Greenberg also received more evidence that Stanford was promising investors that the SIBL CD deposits were insured…."  The referenced email states that when a potential client in Venezuela asked if his CD would be insured, Tirado determined to "**check who gave that wrong information, in order to avoid this situation happening again.**"  Greenberg denies the remaining allegations in paragraph 234.

235.    Greenberg is without knowledge and information sufficient to determine the truth of the allegations in paragraph 235, and therefore denies them.

236.    Greenberg admits the allegations in paragraph 236.

237.    Greenberg admits the allegations in paragraph 237.

238.    Greenberg admits Schnapp was informed the Miami Herald was considering publishing an article and attempted to contact the Miami Herald.  Greenberg otherwise lacks

sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 238 and therefore denies them.

239.   Denied.

240.   Greenberg denies the allegations in paragraph 240.

241.   Greenberg admits it provided legal services to Stanford companies in connection with acquisitions of Tangible Asset Galleries, Inc.; Miller Golf; U.S. Farm & Ranch; Telecom Wireless Solutions; and Greystone Pharmaceutical.  Greenberg denies the remaining allegations in paragraph 241.

242.   Greenberg admits it provided legal services to Stanford in connection with the movie "The Ultimate Gift" and that one of its early bills for work on the project was approximately $162,000.  Greenberg denies the remaining allegations in paragraph 242.

243.   Greenberg denies the allegations in paragraph 243.

244.   Greenberg admits that a letter exists dated November 26, 2001, which speaks for itself, and otherwise denies the allegations in paragraph 244.

245.   Greenberg admits that the allegations in paragraph 245 are a partial quote from a communication that Stanford sent to Loumiet a number of years after Loumiet joined Hunton & Williams, and denies that the referenced quote is complete or in context.

246.   Greenberg admits the email from Loumiet email is correctly quoted with the exception of the italics and bold emphasis.

247.   Admitted that Stanford sent Loumiet an email containing the phrase "*I am SO proud of you*," the content of which speaks for itself.  Greenberg denies the remaining allegations in paragraph 247.

248.     Admitted that Loumiet and Stanford exchanged emails on December 28, 2006, the contents of which speak for themselves.  Greenberg denies the remaining allegations in paragraph 248.

249.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 249, and therefore denies them.

250.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 250, and therefore denies them.

251.     Greenberg denies the first sentence of paragraph 251.  Greenberg is without knowledge and information sufficient to form a belief as to the truth of the remaining allegations in paragraph 251, and therefore denies them.

252.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 252, and therefore denies them.

253.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 253, and therefore denies them.

254.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 254, and therefore denies them.

255.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 255, and therefore denies them.

256.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 256, and therefore denies them.

257.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 257, and therefore denies them.

258.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 258, and therefore denies them.

259.     Admitted that Suarez forwarded an email regarding her resignation to Loumiet in November 2008, the content of which speaks for itself.   Greenberg denies the remaining allegations in paragraph 259.

260.     Admitted that Loumiet sent emails containing the language quoted in paragraph 260, the contents of which speak for themselves.   Greenberg denies the remaining allegations in paragraph 260.

261.     Greenberg admits the SEC filed suit and obtained an injunction as alleged, and the Court appointed Ralph S. Janvey as Receiver.

262.     Greenberg admits the SEC filed its Second Amended Complaint on January 08, 2010, and said Complaint speaks for itself.

263.     Greenberg admits the allegations in paragraph 263.

264.     Greenberg is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 264 and therefore denies them.

265.     The Court's findings in Stanford-related cases are of record and speak for themselves.   Greenberg denies that these findings have any *res judicata* effect in this case.

266.     The 5th Circuit's rulings in Stanford related cases are of record and speak for themselves. Greenberg denies that these findings have any *res judicata* effect in this case.

267.     Greenberg admits the SEC Filed an action as pled in the first sentence of paragraph 267, but otherwise denies the allegations in paragraph 267.

268.     Greenberg admits the first sentence of Paragraph 268.   Greenberg admits that Greenberg Traurig, P.A. was not named in the tolling agreement, but denies that was due to mutual mistake, and denies the remaining allegations of paragraph 268.

269.     Greenberg denies the allegations in paragraph 269.

270.     Paragraph 270 is a legal assertion to which no response is required, but if a response were required, Greenberg denies that equitable tolling is applicable.

271.     Greenberg denies the allegations in paragraph 271.

272.     Greenberg denies the allegations in paragraph 272.

273.     Greenberg denies the allegations in paragraph 273.

274.     Greenberg denies the allegations in paragraph 274.

275.     Greenberg denies the allegations in paragraph 275.

276.     Greenberg denies the allegations in paragraph 276.

277.     Greenberg denies the allegations in paragraph 277.

278.     Greenberg denies the allegations in paragraph 278.

279.     Greenberg denies the allegations in paragraph 279.

280.     Greenberg denies the allegations in paragraph 280, including Exhibit "A".

281.     Greenberg denies the allegations in paragraph 281.

282.     Does not require admission or denial from this Defendant.

283.     Does not require admission or denial from this Defendant.

284.     Does not require admission or denial from this Defendant.

285.     Does not require admission or denial from this Defendant.

286.     Does not require admission or denial from this Defendant.

287.     Does not require admission or denial from this Defendant.

288.     Does not require admission or denial from this Defendant.

289.     Does not require admission or denial from this Defendant.

290.     Does not require admission or denial from this Defendant.

291.     Does not require admission or denial from this Defendant.

292.     Does not require admission or denial from this Defendant.

293.    Greenberg denies the allegations in paragraph 293.

294.    Does not require admission or denial from this Defendant.

295.    Greenberg denies the allegations in paragraph 295.

296.    Greenberg denies the allegations in paragraph 296.

297.    Greenberg denies the allegations in paragraph 297.

298.    Greenberg denies the allegations in paragraph 298.

299.    Greenberg denies the allegations in paragraph 299.

300 – 329. These allegations pertain to claims that have been dismissed by the Court, and are made on behalf of plaintiffs who have been dismissed from this litigation. Accordingly, no answer to these allegations is required.

330.    Greenberg admits that the attorneys listed are or were employees of Greenberg, and that actions by its attorneys were done as attorneys within the scope of their employment.  All other allegations in paragraph 330 are denied.

331.    Greenberg denies the allegations in paragraph 331.

332.    Greenberg denies the allegations in paragraph 332.

333.    Greenberg lacks sufficient knowledge and information to form a belief as to the truth of the allegations in paragraph 333, and therefore denies them.

334.    Greenberg admits the complaint, as amended, contains a jury demand.

335.    Greenberg admits that the Receiver prays for judgment against Greenberg but denies that Plaintiff is entitled to any judgment and therefore denies the allegations in paragraph 335.

336.    Greenberg admits that the Receiver prays for judgment against Suarez but lacks sufficient knowledge and information to form a belief as to the truth of such claims and therefore denies the allegations in paragraph 336.

337.     This allegation pertains to plaintiffs whose claims have been dismissed, and thus no answer to this allegation is required.

### Affirmative Defenses

1.      Plaintiffs' claims are time-barred, in whole or part, under all statutes of limitations and statutes of repose applicable to each asserted claim, including but not limited to Texas common law, and the common and statutory law of all relevant jurisdictions.   To the extent that the discovery rule is applicable to any claim, Greenberg asserts that the claim was or could have been discovered prior to February 1, 2011, and is therefore time-barred.

2.      Plaintiffs' claims are barred, in whole or part, under the doctrine of *in pari delicto*, also referred to as the unlawful acts doctrine.

3.      Greenberg is immune from one or more of Plaintiffs' claims under applicable doctrines of qualified immunity, attorney immunity, or judgmental immunity attaching to a lawyer's legal services and advice to clients and to the conduct of litigation.   Greenberg is further immune under the Noerr-Pennington doctrine to the extent of its assistance to clients seeking to lawfully influence government action.

4.      Plaintiffs' claims are barred, in whole or part, to the extent that Stanford failed to follow or heed the information, advice and warnings provided by Greenberg on matters for which Greenberg was consulted.   Greenberg is not responsible for any failures by Stanford and his companies to follow legal advice.

5.      If Greenberg is held to have the burden to establish an exemption from registration, which is denied, Greenberg would show that the CDs made the basis of this action were exempt from federal securities registration pursuant to Reg. D (17 C.F.R §230.506 et. seq.), Reg. S (17 C.F.R. §230.903 et seq.) and the right to make coincident offers and sales under each exemption. Plaintiffs' claims are also preempted by the National Securities Markets Improvements Act of

1996 (15 U.S.C. § 77r et seq.), which provides in pertinent part that State securities registration laws may not directly or indirectly prohibit, limit, or impose conditions on the sale of covered securities.

6.      In addition, and in the alternative, the CDs were exempt from Texas state registration under the Texas uniform limited offering exemption (7 Tex. Admin. Code § 109.13(k)), the exemption for sales to nonresidents (7 Tex. Admin. Code § 139.7) and/or the accredited investor exemption (7 Tex. Admin. Code § 139.19).

7.      Any claims premised on SIBL allegedly operating as, or failing to register as, an investment company or investment advisor are barred, in whole or part, because SIBL was exempt under the foreign bank exemption, the Section 3(b)(1) exemption or the qualified purchaser exemption of the Investment Company Act, or would have been exempt under the circumstances and qualifications set out by Mr. Loumiet.  In addition, and in the alternative, such claims are barred or rendered moot by the SEC registrations maintained by Stanford Group Company and related entities.

8.      To the extent that Plaintiffs' claims would challenge or contradict official actions of the Government of Antigua and Barbuda, including but not limited to that Government's licensing of SIBL as an Antigua-chartered bank, such claims are barred by the Act of State Doctrine under which U.S. courts will not sit in judgment on the actions of a foreign government within its own territory.

9.      Plaintiffs' claims, including those that have been dismissed and are on appeal, or might be subject to future appeal,  are barred, in whole or part, because they constitute the improper fracturing or splitting of claims and the assertion of redundant, unnecessary or non-cognizable claims, including but are not limited to the following:

(a) Breach of fiduciary duty, aiding and abetting/participation in breach of fiduciary duty and negligent retention/supervision, in addition to/redundant of the claim for professional negligence;

(b) Aiding and abetting/participation in fraudulent transfers (as to money transferred by Stanford to himself or third parties), in addition to/redundant of the claim for professional negligence and the claim for aiding and abetting/participation in breach of fiduciary duty; and

(c) Unjust enrichment and money had and received (as to legal fees paid to Greenberg), in addition to/redundant of the claim for fraudulent transfer.

10.     Plaintiffs' claims are barred, in whole or part, by Plaintiffs' failure to mitigate their alleged damages.

11.     The Receiver's fraudulent transfer and related claims are barred, in whole or part, because the alleged transfers—payments for legal services rendered—were received in good faith and in exchange for reasonably equivalent value and did not directly assist Stanford's frauds.

12.     To the extent that any fault or responsibility is assessed on account of the acts or omissions of Carlos Loumiet, which is denied, Plaintiffs' claims against Greenberg are barred, in whole or part, because Mr. Loumiet was no longer associated with Greenberg after May 1, 2001. Greenberg had no right to control, or vicarious liability for, the conduct of Mr. Loumiet after such date.  Any conspiracy claims based on Mr. Loumiet's actions or knowledge are denied but are, in any event, barred under the doctrine of withdrawal after May 1, 2001.  On information and belief, all of the CDs and other investments that form the basis of this suit were issued and sold long after Mr. Loumiet had joined Hunton & Williams.

13.     One or more of Plaintiffs' claims are barred, in whole or part, under principles of *res judicata*, collateral estoppel and/or judicial estoppel.

14.     To the extent that any fault or responsibility is assessed against Greenberg, which is denied, Greenberg is entitled to a reduction, offset or credit for the negligence or fault of the Plaintiffs and all others who caused or contributed to the alleged harm for which Plaintiffs seek

damages.  Greenberg is entitled to such reduction under principles of contributory negligence, comparative causation, comparative fault, proportionate responsibility and, to the extent Texas law is applicable, under Chapter 33 of the Texas Civil Practice & Remedies Code and the rules regarding apportionment of liability to Responsible Third Parties.  Greenberg is not liable for any injury or damage caused by such persons and entities.  The Receiver is barred because he is a "claimant" under Chapter 33 on behalf of Allen Stanford and the Stanford entities, who bore more than 51% responsibility for the claimed damages.

15.     To the extent that any fault or responsibility is assessed against Greenberg, which is denied, Greenberg is entitled to offsets and credits including but not limited to credit for any settlements entered into by other persons or entities on account of Stanford's frauds.

16.     The injuries at issue were not proximately caused by any act or omission of Greenberg,  or they were the result of a new and independent superseding and/or intervening cause not reasonably foreseeable by Greenberg, which destroyed the causal connection, if any, between any act or omission of Greenberg and the injuries at issue.

17.     The acts or omissions of persons not party to this suit, including but not limited to Robert Allen Stanford, James Davis, Laura Pendergest-Holt, Gilbert Lopez, Mark Kuhrt, Leroy King, and C.A.S. Hewlett, were the sole proximate cause of the injuries at issue.

18.     The claims are barred, in whole or in part, by the doctrine of ratification because, at various points in time, one or more directors, officers, or employees of certain Stanford entities (whose acts are imputed to the Stanford entities) approved Greenberg's prior conduct in connection with its legal representation, with full knowledge of the nature and extent of that conduct and with the intention of giving validity to that conduct.

19.     The claims are barred, in whole or in part, by the doctrine of unclean hands because the illegal and otherwise wrongful conduct of certain officers and employees of the Stanford

entities, including Robert Allen Stanford, James Davis, Laura Pendergest-Holt, Gilbert Lopez, and Mark Kuhrt, is imputed to the Stanford entities on whose behalf Plaintiffs bring their claims. Such illegal and wrongful acts have injured Greenberg by, among other things, subjecting Greenberg to suit in this court, forcing Greenberg to incur considerable legal costs to defend itself, and casting an undeserved shadow on Greenberg's reputation.

20.     The claims are barred, in whole or in part, because, if certain of the allegations are true, then the Stanford entities (on whose behalf the Plaintiffs bring the claims) committed a fraud on Greenberg.   This is because the Stanford entities, through their respective officers and employees, represented to Greenberg that they were operating successful and legitimate businesses in compliance with applicable law, rules, and regulations.   The Stanford entities made these representations to Greenberg knowing they were false and with the intention to cause Greenberg to agree to provide legal representation or to continue to provide legal representation to one or more of the Stanford entities, and Greenberg did in fact rely on the Stanford entities' false representations when it decided, at various points in time, to provide legal representation to the Stanford entities. These false representations have caused substantial injury to Greenberg by, among other things, subjecting Greenberg to suit in this court, forcing Greenberg to incur considerable legal costs to defend itself, and casting an undeserved shadow on Greenberg's reputation.

21.     The claims are barred, in whole or in part, by the doctrines of laches and waiver because Plaintiffs unreasonably delayed filing their claims against Greenberg, and Greenberg has been harmed as a result of the delay.

22.     Plaintiffs' claims are barred, in whole or in part, by the Petition Clause of the U.S. Constitution, and related protections for petitioning activity, such as the Noerr-Pennington

doctrine, to the extent Plaintiffs' claims are based on conduct by Greenberg's attorneys on behalf of clients petitioning the United States or foreign governments for legislative change.

23.     Plaintiffs' claims are barred, in whole or in part, to the extent there is no private right of action or derivative liability under the relevant provisions of the Investment Company Act, Section 10(b) of the Securities Act of 1934, or any other Act, rule, or regulation upon which Plaintiffs purport to base their claims.

24.     Plaintiffs lack standing. In particular, Plaintiffs lack standing for their claims for malpractice with respect to legal work not performed for Stanford entities, including legal work performed on behalf of the Government of Antigua or other agents and instrumentalities of Antigua.

25.     Plaintiffs' effort to impose liabilities, including compensatory and punitive damages, on Greenberg with respect to damages arising from Stanford's Ponzi scheme, and actions by Stanford and others that were not known to Greenberg, violates the Due Process clause of the U.S. Constitution, and the Eighth Amendment to the U.S. Constitution.

26.     Any award of punitive damages would be contrary to the facts of this case, the laws of the State of Texas, and the Constitution of Texas.

27.     Any award of damages would be speculative and not recoverable.

28.     Greenberg adopts and incorporates by reference any defense asserted by any other defendant in this action to the extent such defense applies to Greenberg. Greenberg reserves the right to assert additional defenses as may become apparent through further investigation and discovery.

Respectfully submitted,


By: */s/ Murray Fogler*


**FOGLER, BRAR, FORD, O'NEIL & GRAY, LLP**

Murray Fogler
mfogler@fbfog.com
Michelle E. Gray
mgray@fbfog.com
Robin O'Neil
roneil@fbfog.com
909 Fannin Suite 1640
Houston, Texas  77010
Telephone:  (713) 481-1010
Facsimile:   (713) 574-3224


**BOIES SCHILLER FLEXNER LLP**

Stuart H. Singer
ssinger@bsfllp.com
Sashi C. Bach
sbach@bsfllp.com
Pascual A. Oliu
poliu@bsfllp.com
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile:  (954) 356-0022


**COWLES & THOMPSON, P.C.**

Jim E. Cowles
jcowles@cowlesthompson.com
Sim Israeloff
sisraeloff@cowlesthompson.com
Charles A. Green
cgreen@cowlesthompson.com
901 Main Street, Suite 3900
Dallas, Texas  75202
Telephone: (214) 672-2000
Facsimile:  (214) 672-2347


**ANSWER TO SECOND AMENDED COMPLAINT- Page 54**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 3, 2018, a true and correct copy of the foregoing document was delivered via electronic means using the ECF system pursuant to FED. R. CIV. P. 5(b)(2)(D) and Local Rule 5.1, to all counsel of record.


 */s/ Murray Fogler*
**MURRAY FOGLER**