UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as | § | |
| Court-appointed receiver for the Stanford | § | |
| Receivership Estate; SANDRA | § | |
| DORRELL; SAMUEL TROICE; and | § | |
| MICHOACAN TRUST; individually and | § | |
| on behalf of a class of all others similarly | § | |
| situated, | § | CIVIL ACTION NO. 3:12-cv-04641-N |
|            Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| GREENBERG TRAURIG, LLP; | § | |
| GREENBERG TRAURIG, PA; and | § | |
| YOLANDA SUAREZ, | § | |
|            Defendants. | § | |

---

**APPENDIX IN SUPPORT OF THE RECEIVER'S
MOTION TO EXCLUDE TESTIMONY OF MARTIN WEINSTEIN**

---

**NELIGAN LLP**

By: */s/ Douglas J. Buncher*
Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301

**CLARK HILL STRASBURGER**

By: */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@clark hillstrasburger.com
2301 Broadway
San Antonio, Texas 78215
Telephone:  (210) 250-6004
Facsimile: (210) 258-2706

4849-0023-3117.1/D0624/B08864/072219

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 1560
San Antonio, Texas 78205
(210) 630-4200
(210) 630-4210 (Facsimile)

**CLARK HILL STRASBURGER**

By: */s/ David N. Kitner*
David N. Kitner
david.kitner@clarkhillstrasburger
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:    (214) 651-4300
   Facsimile:   (214) 651-4330

4849-0023-3117.1/D0624/B08864/072219

**TABLE OF CONTENTS**

| EXHIBIT | DOCUMENT | APPENDIX PAGE(S) |
|---------|----------|------------------|
| A | Expert Report of Martin Weinstein | 5-80 |
| B | Excerpts from the Deposition of Martin Weinstein | 81-88 |

3

APP. 3

Respectfully submitted,

**NELIGAN LLP**

By: */s/ Douglas J. Buncher*
Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301

**CLARK HILL STRASBURGER**

By: */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@clark hillstrasburger.com
2301 Broadway
San Antonio, Texas 78215
Telephone:  (210) 250-6004
Facsimile: (210) 258-2706

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 1560
San Antonio, Texas 78205
(210) 630-4200
(210) 630-4210 (Facsimile)

**CLARK HILL STRASBURGER**

By: */s/ David N. Kitner*
David N. Kitner
david.kitner@clarkhillstrasburger
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:    (214) 651-4300
Facsimile:    (214) 651-4330

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2019 I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Judith R. Blakeway*
Judith R. Blakeway

4849-0023-3117.1/D0624/B08864/072219

APP. 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford Receivership estate; The OFFICIAL STANFORD INVESTORS COMMITTEE; SANDRA DORRELL; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>GREENBERG TRAURIG, LLP; GREENBERG TRAURIG, PA; and YOLANDA SUAREZ,<br><br>      Defendants | Civ. Action No. 3:12-cv-04641-N |

**EXPERT REPORT OF MARTIN WEINSTEIN**

April 15, 2019

EXHIBIT A

# TABLE OF CONTENTS

**Page**

I.    Assignment ...................................................................................................1

II.   Professional Background ............................................................................1

III.  Summary Opinions .......................................................................................2

IV.   The Anti-Bribery Provisions of the FCPA .................................................2

    A.    The Anti-Bribery Provisions of the FCPA as Amended in 1988 .........3

        1.    Elements of an FCPA Anti-Bribery Violation ...............................3

        2.    Possible Defenses to an Anti-Bribery Violation .........................6

    B.    The 1998 Amendments to the FCPA .................................................6

V.    The January 1998 Greenberg Memo Provided Competent FCPA Advice .........7

    A.    The Criticisms in Koehler Report, Paragraph 155, Section A Are Not
Supported by the Evidence ...............................................................7

    B.    The Criticisms in Koehler Report, Paragraph 155, Section B Are Not
Supported by the Evidence ...............................................................8

    C.    The Criticisms in Koehler Report, Paragraph 155, Section C Are Not
Supported by the Evidence ...............................................................9

    D.    The Criticisms in Koehler Report, Paragraph 155, Section D Are Not
Supported by the Evidence .............................................................10

    E.    The Criticisms in Koehler Report, Paragraph 155, Section E Are Not
Supported by the Evidence .............................................................11

    F.    The Criticisms in Koehler Report, Paragraph 155, Section F Are Not
Supported by the Evidence .............................................................11

    G.    The Criticisms in Koehler Report, Paragraph 155, Section G Are Not
Supported by the Evidence .............................................................12

VI.   The Specific Transactions Discussed by Koehler in His Report Do Not Violate the
Anti-Bribery Provisions of the FCPA ......................................................13

    A.    Purchase of the Bank of Antigua ....................................................14

    B.    Hurst Lease .....................................................................................17

    C.    Loans and a Possible Gift of Clothing .............................................17

        1.    Loans to Government Officials ....................................................17

        2.    Clothing .....................................................................................19

    D.    Political Contribution .......................................................................20

    E.    Medical Expenses for Lester Bird ...................................................22

    F.    Other Gifts ......................................................................................24

    G.    Travel .............................................................................................25

    H.    Donation of Medical Supplies and Equipment ................................30

    I.    The Offshore Financial Sector Planning Committee and the International
Financial Sector Authority ...............................................................31

VII.  Greenberg's FCPA Advice Neither Aided and Abetted Nor Prolonged Stanford's
Ponzi Scheme ..........................................................................................37

    A.    Greenberg's Advice Did Not Aid and Abet an FCPA Anti-Bribery
Violation ..........................................................................................38

i

B.    Greenberg Provided Competent Advice Regarding the Requirements of the FCPA and Conducted a Competent FCPA Investigation ...............................39

C.    Obtaining Influence Does Not Necessarily Violate the FCPA ...........................40

D.    There is Nothing Improper about Submitting FOIA Requests ............................41

E.    Lawyers Do Not Have to Withdraw if Their Client Has Violated the FCPA........43

VIII.   Conclusion ...................................................................................................................43

## I.  Assignment

1.  I have been engaged in connection with the above-captioned litigation brought by Ralph S. Janvey in his capacity as court-appointed receiver for the Stanford Receivership estate, et al. ("Plaintiffs") against Greenberg Traurig, LLP, Greenberg Traurig, PA, ("Greenberg Traurig," and, collectively with Greenberg Traurig, LLP and the attorneys of either entity, "Greenberg") and Yolanda Suarez.  The case is pending in the U.S. District Court for the Northern District of Texas.  I have been engaged on behalf of Greenberg by their legal counsel, Boies Schiller Flexner LLP.

2.  I have been asked to give my opinion on certain issues involving the U.S. Foreign Corrupt Practices Act ("FCPA") in this matter.  In particular, I have been asked to provide an opinion as to the adequacy of the FCPA advice provided by Greenberg to R. Allen Stanford and entities owned or controlled by Stanford ("Stanford entities").  I have also been asked to respond to the expert reports of Mike Koehler, Karyl Van Tassel, Charles Herring, Jr., and James C. Spindler, as they pertain to my opinions.

3.  I am being compensated for my expert witness services at my standard rate of $1,600 per hour.  My compensation is not contingent on the outcome of this matter.

## II.  Professional Background

4.  The opinions I have formed in connection with this matter are based upon my substantial experience prosecuting, defending, and providing counsel to companies and individuals regarding allegations under the FCPA, both as a federal prosecutor and as a private practitioner.  My background and experience are summarized below and more fully described in my Curriculum Vitae, which is attached to this report as Appendix A.  A list of my publications from 2007 to March 2019 is attached to this report as Appendix B.

5.  In performing my analysis, I have examined a variety of materials, including legal pleadings, documents, exhibits, and deposition testimony provided in discovery in this case, case law, filings made and press releases issued by the U.S. Department of Justice (the "DOJ") and the U.S. Securities and Exchange Commission (the "SEC"), and news articles.  A list of documents upon which I relied in forming my opinions is attached to this report as Appendix C.  I have been assisted in this matter by my colleagues at Willkie Farr & Gallagher LLP ("Willkie"), who worked under my direction and were compensated at their standard hourly rates.  My work on this matter is ongoing, and I reserve the right to modify or supplement my opinions in the event that I become aware of additional facts, information, or contentions of the parties or witnesses, including in any rebuttal report submitted by Plaintiffs' experts.

6.  Over the course of my more than 30-year career, I have represented the U.S. government, multinational corporations, and individuals in a wide variety of matters involving allegations of bribery and violations of the accounting provisions under the FCPA.  I have been ranked by *Chambers USA* and *Chambers Global* each year since 2007, and have been named on *Ethisphere Magazine*'s "Attorneys Who Matter" list seven times.

1

7.      For the past 22 years, I have been in private practice, most recently as a partner in the Washington, DC office of Willkie, where I am Chair of the Compliance & Enforcement Practice Group and a member of Willkie's Executive Committee.  During this time, I have defended clients in many significant FCPA cases before the DOJ and the SEC, including cases involving Alcatel-Lucent, Daimler, Lucent Technologies, Teva Pharmaceuticals, Titan, and Tyco International.  I have represented clients in hundreds of matters ranging from bet-the-company, high-stakes investigations involving the DOJ and the SEC to discrete whistleblower complaints or other inquiries.

8.      I have also advised numerous clients in connection with due diligence investigations, including pre- and post-acquisition anti-corruption due diligence on behalf of both the acquiring entity and the target entity, and anti-corruption due diligence of third parties and potential business partners.  My anti-corruption due diligence experience has spanned various industries, including the extractive industries, defense, telecommunications, entertainment, media, and life sciences.  In each case, I have advised on scoping appropriate anti-corruption due diligence, following up on red flags identified in the review, determining if violations have occurred, analyzing possible enforcement outcomes and penalties, and advising on remediation and compliance program enhancements.  Additionally, I have frequently participated in the underwriting due diligence process when an issuer has FCPA risks or is the subject of an ongoing FCPA investigation.

### III.    Summary Opinions

9.      Greenberg, through its representation of Stanford and the Stanford entities, did not prolong Stanford's Ponzi scheme.

10.     Greenberg provided competent FCPA advice in a January 23, 1998 memo from Greenberg attorney Gary Weinfeld.

11.     The transactions discussed by Koehler in his report do not constitute FCPA anti-bribery violations, and thus Greenberg could not and should not have been aware of any "prima facie" FCPA violations.

12.     Greenberg's FCPA advice neither aided and abetted nor prolonged Stanford's Ponzi scheme.

13.     Greenberg's FCPA advice was competent, and the firm conducted a competent FCPA investigation.

### IV.    The Anti-Bribery Provisions of the FCPA

14.     The FCPA was signed into law on December 19, 1977.  Foreign Corrupt Practices Act of 1977, Pub. L. No. 95-213, 91 Stat. 1494 (1977), https://www.govinfo.gov/content/pkg/STATUTE-91/pdf/STATUTE-91-Pg1494.pdf.  It was then amended on August 23, 1988.  Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 5001-03, 102 Stat. 1107, 1415-25 (1988), https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg1107.pdf#page=309.  Because all of the relevant transactions discussed in Section VI

were completed after the 1988 amendments, we will only discuss the law as amended in 1988, and the 1998 amendments to the law.

### A.    The Anti-Bribery Provisions of the FCPA as Amended in 1988

### 1.    Elements of an FCPA Anti-Bribery Violation

15.    The FCPA made it unlawful:

- for any issuer, domestic concern, or any officer, director, employee, or agent of an issuer or domestic concern, or any stockholder acting on behalf of an issuer or domestic concern ("Covered Person") to

- make use of the mails or a means or instrumentality of interstate commerce to

- offer, pay, promise to pay, or authorize the payment of money or anything of value

- to any foreign government official, foreign political party, foreign political party official, or candidate for foreign political office (collectively, "Foreign Official"), or to a third party "while knowing" that all or part of the payment or other thing of value would be given to a Foreign Official

- corruptly for the purpose of influencing any act or decision of a Foreign Official in his official capacity, inducing a Foreign Official to do or omit to do any act in violation of his lawful duty, or inducing a Foreign Official to use his influence to affect an act of the foreign government

- in order to obtain or retain business.

15 U.S.C. §§ 78dd-1 to 78dd-2 (2018); Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 5001-03, 102 Stat. 1107, 1415-25 (1988), https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg1107.pdf#page=309; Foreign Corrupt Practices Act of 1977, Pub. L. No. 95-213, 91 Stat. 1494 (1977), https://www.govinfo.gov/content/pkg/STATUTE-91/pdf/STATUTE-91-Pg1494.pdf.

16.    With respect to the definition of the term "anything of value," U.S. regulators have brought charges against covered persons or entities for providing sightseeing tours, lavish entertainment, and expensive gifts to Foreign Officials or family members of Foreign Officials.  Criminal Division of the U.S. Dep't of Justice and Enforcement Division of the U.S. Securities and Exchange Commission, *FCPA: A Resource Guide to the U.S. Foreign Corrupt Practices Act*, https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2015/01/16/guide.pdf ("DOJ/SEC Resource Guide").

17.    The payment or thing of value must also be provided to a Foreign Official or any person while knowing that all or some of the thing of value will be offered or given to a Foreign Official.  Thus, a payment to a foreign government body or agency does not violate the FCPA, assuming the person making the payment does not know the thing of value will go

to a Foreign Official.  15 U.S.C. §§ 78dd-1 to 78dd-2 (2018); Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 5001-03, 102 Stat. 1107, 1415-25 (1988),        https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg1107.pdf#page=309; Foreign Corrupt Practices Act of 1977, Pub. L. No. 95-213, 91 Stat. 1494 (1977), https://www.govinfo.gov/content/pkg/STATUTE-91/pdf/STATUTE-91-Pg1494.pdf.

18.   However, the payment need not be given directly to the Foreign Official to violate the FCPA.  The FCPA criminalizes payments to "any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official." *Id.*

19.   The FCPA defines "knowing" to include actual knowledge, a "firm belief," or an awareness of "a high probability of the existence" of a circumstance.  *Id.*  Thus, knowledge that a payment is intended or will be passed on to a Foreign Official can be shown by evidence of actual knowledge or by evidence of willful blindness or "deliberate ignorance." H.R. Rep. No. 100-576, at 919-20 (1988).

20.   Whether a company is willfully blind that a payment will be made to or for the benefit of a Foreign Official, and is therefore considered to have knowledge, is based on a fact-specific inquiry into the presence or absence of evidence that the payment is for legitimate business activity or is for a corrupt purpose.

21.   Crucially, the FCPA does not prohibit all payments to Foreign Officials.  Rather, the statute prohibits only payments made "corruptly . . . for purposes of influencing any act or decision of such foreign official, . . . inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official," or "inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality." 15 U.S.C. §§ 78dd-1 to 78dd-2 (2018); Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 5001-03, 102 Stat. 1107, 1415-25 (1988), https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg1107.pdf#page=309; Foreign Corrupt Practices Act of 1977, Pub.    L.    No.    95-213,    91    Stat.    1494    (1977), https://www.govinfo.gov/content/pkg/STATUTE-91/pdf/STATUTE-91-Pg1494.pdf.

22.   Therefore, it is the intent of the payment or offer of payment that is critical.  "Proof that any foreign official was actually influenced is not required." Jury Charge at 28, *United States v. Bourke*, No. 05-cr-0518-SAS-2 (S.D.N.Y. 2009), https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2013/10/16/DE-642-16-Government%27s-Response-to-Supplement-to-Motion-to-Dismiss-for-Prosecutorial-Misconduct.pdf; *see also* Jury Instructions at 36, *United States v. Aguilar*, No. 2:10-cr-1031-AHM (C.D. Cal. May 6, 2011) (same).

23.   The term "corruptly" is not defined in the statute.  Courts have stated that for purposes of the FCPA, "corrupt" signifies "that the offer, payment, and promise was intended to influence an official to misuse his official position."  *United States v. Kozeny*, 667 F.3d 122, 135 (2d Cir. 2011).

4

24.   The legislative history of the FCPA demonstrates that, by using the word "corruptly" in the statute, Congress intended the term to have the same meaning as in the domestic bribery statute, 18 U.S.C. § 201.  H.R. Rep. No. 95-640, at 7-8 (1977).

25.   Corrupt intent is present only if a *quid pro quo* motivated the transfer or promise to transfer a thing of value to the Foreign Official.  *United States v. Kay*, 359 F.3d 738, 743 (5th Cir. 2004) (an FCPA bribery violation requires a "*quid pro quo*"); *see also* U.S. Dep't of Justice, Criminal Resource Manual § 834, https://www.justice.gov/jm/criminal-resource-manual-834-intent-parties (for 18 U.S.C. § 201(b)-(c), which prohibit domestic bribery, "a bribe requires a quid pro quo"); *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999) ("for [18 U.S.C. § 201(b)] bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act") (emphasis in original).

26.   Courts have decided that transfers or payments made to promote general goodwill do not meet the definition of "corruptly" under the domestic bribery statute, and therefore, given Congressional intent, they would not meet the definition of "corruptly" as used in the FCPA.  *See Sun-Diamond Growers*, 526 U.S. at 404-05.

27.   Indeed, the DOJ has acknowledged that non-specific desires to "influenc[e] legislation and regulations" are not violations of the FCPA.  Brief for Plaintiff-Appellant, *United States v. Kay*, 359 F.3d 738 (5th Cir. 2004), (No. 02-20588), 2002 WL 32507953, at *14-15.

28.   Lastly, in order to violate the FCPA, the corrupt payment must be to "assist . . . in obtaining or retaining business," the so-called "business nexus" element of the FCPA.  15 U.S.C. §§ 78dd-1 to 78dd-2 (2018); Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 5001-03, 102 Stat. 1107, 1415-25 (1988), https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg1107.pdf#page=309; Foreign Corrupt Practices Act of 1977, Pub. L. No. 95-213, 91 Stat. 1494 (1977), https://www.govinfo.gov/content/pkg/STATUTE-91/pdf/STATUTE-91-Pg1494.pdf.

29.   This provision of the FCPA has been interpreted to include the award of contracts or other direct business, as well as specific government actions that impact a company's business.  For example, in *United States v. Kay*, the Fifth Circuit Court of Appeals held that payments to Haitian officials to avoid substantial customs duties and sales taxes would satisfy the FCPA's business nexus requirement *if intended* to produce an effect that would assist in obtaining or retaining business.  The court held that the connection between the bargained-for favor and the business obtained or retained does not have to be direct.  Rather, the business nexus would be satisfied if it could be shown that lower customs duties would have lowered the company's business costs sufficiently to give the company an advantage over competitors in obtaining or retaining business in the country.  *United States v. Kay*, 359 F.3d 738 (5th Cir. 2004).

### 2.   Possible Defenses to an Anti-Bribery Violation

30.   The FCPA contains one exception and two explicit affirmative defenses.  The statute states that a "facilitating or expediting payment" does *not* violate the FCPA anti-bribery provisions.  15 U.S.C. §§ 78dd-1(b), 78dd-2(b); Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 5001-03, 102 Stat. 1107, 1415-25 (1988), https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg1107.pdf#page=309.

31.   With respect to the affirmative defenses, one of the statutory affirmative defenses covers conduct that is legal under the local jurisdiction's written law.  *Id.*

32.   The other affirmative defense is for "reasonable and bona fide expenditure[s]," and it applies to "reasonable and bona fide expenditure[s], such as travel and lodging expenses, incurred by or on behalf of a foreign official, party, party official, or candidate [which are] directly related to—(A) the promotion, demonstration, or explanation of products or services; or (B) the execution or performance of a contract with a foreign government or agency thereof."  15 U.S.C. §§ 78dd-1(c), 78dd-2(c); Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 5001-03, 102 Stat. 1107, 1415-25 (1988), https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg1107.pdf#page=309.

33.   Reasonable expenses can be construed as those that are fair, proper or moderate under the circumstances, and are evaluated on a case-by-case basis.  Martin Weinstein, Robert Meyer, & Jeffrey Clark, The Foreign Corrupt Practices Act: Compliance, Investigations and Enforcement, § 2.08 (2016).

### B.   The 1998 Amendments to the FCPA

34.   On November 10, 1998, the FCPA was amended.  The relevant key changes were as follows:

- The amendments added a provision making it unlawful for any person, other than an issuer or domestic concern, to violate the anti-bribery provisions "while in the territory of the United States."  Previously the FCPA had only applied to issuers, domestic concerns, and their employees/agents.

- Prior to the 1998 amendment, an issuer or domestic concern would violate the FCPA only if it made use of the mails or an instrumentality of interstate commerce in furtherance of the corrupt payment.  The amendments added that any U.S. issuer or U.S. person could violate the FCPA through acts outside the U.S. irrespective of any use of the mails or an instrumentality of interstate commerce.

- Third, the term "improper advantage" was added to the statute, so that it was now illegal not only to corruptly influence any act or decision of a Foreign Official or induce such Foreign Official to do or omit to do any act in violation of his/her

lawful duty, but also to give something of value to a Foreign Official "for purposes of . . . securing any improper advantage."

International Anti-Bribery and Fair Competition Act of 1998, Pub. L. No. 105-366, 112 Stat. 3302 (1998), https://www.govinfo.gov/content/pkg/PLAW-105publ366/pdf/PLAW-105publ366.pdf.

## V.    The January 1998 Greenberg Memo Provided Competent FCPA Advice

35.    Plaintiffs' Exhibit 365 is a January 23, 1998 memo from Greenberg attorney Gary Weinfeld to Yolanda Suarez ("January 1998 Greenberg Memo"). The January 1998 Greenberg Memo was drafted to advise whether the FCPA prohibited Allen Stanford or Stanford entities "from undertaking at the request of an Antiguan political party (the 'Party') to pay to an American public relations firm (the 'Firm') a portion of the fees charged or to be charged by the Firm for services rendered to the Party." Pls.' Ex. 365 at 2; *see also* Deposition of Mark Schnapp ("Schnapp Dep.") 103-04.

36.    The memo also opined as to "whether the [FCPA] prohibit[ed] the making by [the] Stanford [entities] of a political contribution to the Party upon the request of the Party." Pls.' Ex. 365 at 2.

37.    The memo accurately laid out a summary of the key elements of an FCPA violation.

38.    In his report, Declaration of Professor Mike Koehler, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641-N (N.D. Tex. Feb. 20, 2019) ("Koehler Report"), Koehler has purported to identify errors in the analysis in the January 1998 Greenberg Memo. However, the issues identified are not in fact errors. I shall discuss each in the order Koehler analyzes them in his report.

### A.    The Criticisms in Koehler Report, Paragraph 155, Section A Are Not Supported by the Evidence

39.    The January 1998 Greenberg Memo stated as an assumed fact that "the Party's request for a contribution or for assistance in the payment of its public relations expenses is not accompanied by an offer or promise to Stanford of anything of value, i.e., a proposed quid pro quo arrangement" and "that Stanford has not conditioned and will not condition any payment or contribution by him upon his receipt from the Party of anything of value." Pls.' Ex. 365 at 2.

40.    The clear purpose of these assumptions is to address the requirement of the anti-bribery provisions that any payment or offer of payment be made "corruptly."

41.    As discussed earlier, "corruptly" in this context means that the payment or offer of payment is made by the payor/offeror as part of a corrupt *quid pro quo*. In other words, the payor/offeror has to intend to wrongfully influence the government official.

42.    Koehler declares the above statement is an error because he says the intent of the *government official* is not relevant. That is, of course, correct, but the import of this passage

from the January 1998 Greenberg Memo is not about the intent of the government official, but whether some corrupt *quid pro quo* exists. Indeed, Koehler implicitly acknowledges this, as he omits from his quotation of the January 1998 Greenberg Memo the phrase "i.e., a proposed quid pro quo arrangement." *Id.*

43. Moreover, this is simply an introductory part of the January 1998 Greenberg Memo, and, as Koehler acknowledges, in the analysis section, the January 1998 Greenberg Memo correctly lays out that the payor/offeror must make the payment with the intent of corruptly influencing the government official to misuse his/her position. *Id.* at 5; *see* Koehler Report ¶ 155 n.72 (acknowledging that "later in the memo a more expanded description" of the FCPA is provided, which includes a more fulsome explanation of corrupt intent and the requirement that the payment be intended to cause a government official to misuse his/her position).

44. Koehler also criticizes this section of the memo by saying that the FCPA does not require that the payor "succeed in producing the desired outcome," *i.e.* the statute does not require a successful *quid pro quo*. Koehler Report ¶ 155. Again, this is a true statement of the law, but nowhere does the January 1998 Greenberg Memo state that a "successful" *quid pro quo* is a requirement. Rather, it says that the authors assume that the transaction will *not* be part of a corrupt *quid pro quo*, for if the transaction were, it would likely violate the FCPA (assuming all the remaining elements were met).

**B.     The Criticisms in Koehler Report, Paragraph 155, Section B Are Not Supported by the Evidence**

45. Koehler describes the section of the January 1998 Greenberg Memo *summarizing* the "scope" of the FCPA as "deficien[t]" for three reasons. Koehler Report ¶ 155; Pls.' Ex. 365 at 3-4.

46. First, he says it fails to mention that it is a violation to make a corrupt payment to a foreign political party, foreign party official, or candidate for foreign political office.

47. However, the part of the January 1998 Greenberg Memo that Koehler is criticizing is a high-level summary of the FCPA. In the full analysis provided by the January 1998 Greenberg Memo, the authors *do* make this point, noting that the FCPA covers payments to "any 'foreign official,' *foreign political party, foreign political party official or candidates* [sic] *for office*." Pls.' Ex. 365 at 5 (emphasis added). Indeed, Koehler acknowledges this in a footnote. Koehler Report ¶ 155, n.71.

48. Second, Koehler criticizes this summary for failing to mention that the thing of value need not be offered or given directly to a foreign government official.

49. However, this level of detail *is* provided in the full analysis. The January 1998 Greenberg Memo states that it is prohibited to make a corrupt payment to all the individuals/entities listed above, which the memo defines collectively as a "foreign recipient," and then adds it is prohibited to offer or make a payment to "any person while 'knowing' that all or a part of the thing of value will be offered to a foreign recipient." Pls.' Ex. 365 at 5.

50.    Third, Koehler criticizes this summary for failing to state that the law prohibits making or offering payments that are "intended to induce the recipient to do or omit to do an act in violation of the lawful duty of such official, party or candidate, or securing any improper advantage in order to assist in obtaining or retaining business."  Koehler Report ¶ 155.

51.    However, such detail is provided later in the analysis, as the January 1998 Greenberg Memo states that payments are prohibited if made "for the purpose of influencing any official act or decision or inducing the foreign recipient to act in violation of his lawful duty, or induce such recipient to use his influence with a foreign government or instrumentality to affect any decision of that government or instrumentality."  Pls.' Ex. 365 at 5.

52.    Koehler again acknowledges that this full discussion exists in the memo, but criticizes that discussion for omitting "reference of 'securing any improper advantage.'"  Koehler Report ¶ 155 n.72.

53.    But, as discussed above, the language regarding "securing any improper advantage" was not part of the FCPA in January 1998 when this memo was written.  Rather, that language was added as part of the *November* 1998 amendments.  International Anti-Bribery and Fair Competition Act of 1998, Pub. L. No. 105-366, 112 Stat. 3302 (1998), https://www.govinfo.gov/content/pkg/PLAW-105publ366/pdf/PLAW-105publ366.pdf.

54.    Thus, the description provided was a sufficient and accurate description of the law at that time.

### C.    The Criticisms in Koehler Report, Paragraph 155, Section C Are Not Supported by the Evidence

55.    Koehler criticizes the January 1998 Greenberg Memo as "legally deficient" for stating that "a domestic concern does not violate the FCPA merely because its agents make illicit (but unknown and unauthorized) payments to a foreign party or official."  Pls.' Ex. 365 at 6; Koehler Report ¶ 155.

56.    However, the preceding sentence in the January 1998 Greenberg Memo provides the necessary context and makes the meaning of this quotation clear.  The January 1998 Greenberg Memo states:

> Under the FCPA a domestic concern may not corruptly pay or corruptly authorize the payment of anything of value to any person (presumably including a public relations firm retained by the foreign party) knowing that any portion of such payment will be used by the third party to make an illicit payment to a foreign political party or foreign official.  However, a domestic concern does not violate the FCPA merely because its agents make illicit (but unknown and unauthorized) payments to a foreign party or official.  Pls.' Ex. 365 at 5-6.

9

57.   This refers to the section of the FCPA that prohibits payments to "any person, while *knowing* that all or a portion of such money or thing of value will be" offered or given to a Foreign Official.  Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 5001-03, 102 Stat. 1107, 1415-25 (1988), https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg1107.pdf#page=309 (emphasis added).

58.   Thus, the January 1998 Greenberg Memo is correct in saying that a violation does not exist unless the payment to a third party is made knowing it is intended to go to a Foreign Official.

59.   It is true that in this particular section the memo does not fully explain the legal definition of knowing and that such a definition includes the concept of willful blindness.  However, such an explanation appears a mere two paragraphs later, including an extensive footnote that discusses the definition of knowledge in the legislative history of the FCPA.  Pls.' Ex. 365 at 6-7.

60.   Koehler claims that this footnote is "incomplete" but does not explain why.  Koehler Report ¶ 155.  Given that he then block quotes the definition of knowledge, his critique seems to be that the footnote does not quote this entire section of the FCPA.  However, the footnote in the January 1998 Greenberg Memo does quote the relevant parts of the definition of knowledge and explains what is meant by that term.  Pls.' Ex. 365 at 6-7.  Competent legal advice need not block quote the statute.  Instead, it can explain the statute in a way that is helpful to a non-expert.  Indeed, Koehler has at times done this in his own commentary.  *E.g.*, Aaron Blake, Is Floating a $50 Million Trump Tower Penthouse for Vladimir Putin Illegal?, Wash. Post (Nov. 30, 2018), https://www.washingtonpost.com/politics/2018/11/30/is-floating-million-trump-tower-penthouse-vladimir-putin-illegal/?utm_term=.657f4de4a834 (a news article listed in Koehler's curriculum vitae in which Koehler is quoted as saying, "The FCPA's third-party payment provisions state that an individual such as Trump is liable only to the extent he has 'knowledge' of the third-party's conduct").

61.   Thus, the explanation of the knowledge requirement in the January 1998 Greenberg Memo is sufficient.

   **D.   The Criticisms in Koehler Report, Paragraph 155, Section D Are Not Supported by the Evidence**

62.   Koehler criticizes the January 1998 Greenberg Memo for saying, "Under the FCPA an issuer or domestic concern is criminally liable if it directly or indirectly pays anything of value to a foreign party or official while 'knowing' that the payment will be treated as a bribe."  Pls.' Ex. 365 at 6.

63.   In support of this statement, the January 1998 Greenberg Memo cites to 15 U.S.C. §§ 78dd-1(a)(3), 78dd-2(a)(3).  Having already laid out that it is prohibited to pay or offer a thing of value to a Foreign Official in order to have that official misuse his/her position, the January 1998 Greenberg Memo was simply turning to the elements of a violation on the

10

basis of a payment/thing of value being given or an offer of a payment/thing of value being made to a third party while "knowing" that some or all of that payment/thing of value would go to a government official.

64.     Indeed, this paragraph describes the definition of "knowing" in the FCPA.  Thus, the quoted sentence is simply shorthand for describing that a payment/thing of value (or an offer of a payment/thing of value) made to a third party can violate the FCPA if that is done with the knowledge that some or all of the payment/thing of value will be passed on so that the Foreign Official misuses his/her position.  In other words, if the payment is being made to a third party so that party will treat it as a bribe to be passed to a government official, that is a violation of the FCPA.

### E.     The Criticisms in Koehler Report, Paragraph 155, Section E Are Not Supported by the Evidence

65.     Koehler criticizes the January 1998 Greenberg Memo for stating that the "FCPA expressly considers travel and lodging expenses a 'reasonable and bona fide expenditure.'"  Pls.' Ex. 365 at 9.  He says that such a sentence is incorrect because it does not indicate that the expenditures need to be directly related to the "promotion, demonstration, or explanation of products or services" or the "execution or performance of a contract with a foreign government."  Koehler Report ¶ 155.

66.     However, that very context appears in the January 1998 Greenberg Memo in the sentence immediately preceding the one Koehler quotes.  Specifically, the January 1998 Greenberg Memo states that the FCPA has an affirmative defense for "payments, gifts, offers, or promises to foreign recipients[1] that constitute 'reasonable and bona fide expenditure[s],' i.e., expenditures that are 'directly related' either to the promotion of products and services or to the execution or performance of a contract with a foreign government or agency."  Pls.' Ex. 365 at 9.

### F.     The Criticisms in Koehler Report, Paragraph 155, Section F Are Not Supported by the Evidence

67.     Koehler criticizes the statement that the "FCPA also requires issuers to create a system of internal accounting controls that reasonably assure that transactions are properly authorized" as lacking in detail.  *Id.* at 10; Koehler Report ¶ 155.  He then quotes the entire section of the statute.

68.     However, to be effective, legal analysis must not simply block quote the statute, but explain it in a way that is helpful to a non-expert.  The essential purpose of the internal controls provision is to do precisely what the January 1998 Greenberg Memo said, ensure that transactions involving assets of the company are properly reviewed and authorized.

---

[1]     As discussed above in paragraph 49, foreign recipients was a defined term in the January 1998 Greenberg Memo.

69.  Moreover, the purpose of the memo was not to provide a fulsome explanation of all the provisions of the FCPA.  Rather it was to identify whether two specific potential transactions would violate the FCPA.  These transactions needed to be analyzed under the FCPA's anti-bribery provisions and the books and records provisions, and the January 1998 Greenberg Memo did that.

70.  Conversely, an analysis of the internal controls provision is not transaction specific but instead looks at what system of accounting controls is in place.  The internal controls provision is not relevant to analysis of specific transactions, and hence was appropriately treated in a summary fashion in the January 1998 Greenberg Memo.

71.  Thus, although the January 1998 Greenberg Memo arguably does not capture every nuance of the internal controls provision, it accurately does what it purports to do, provide a "general overview" of the internal controls provision.  Pls.' Ex. 365.

**G.   The Criticisms in Koehler Report, Paragraph 155, Section G Are Not Supported by the Evidence**

72.  Koehler critiques the January 1998 Greenberg Memo for stating, under the heading "Affirmative Defenses," that "[u]nder the FCPA no criminal liability results from technical or insignificant accounting errors." Pls.' Ex. 365 at 10; Koehler Report ¶ 155. He is correct that the words "technical" and "insignificant" do not appear in the statute.  Koehler Report ¶ 155.

73.  But again, the purpose of a legal memo such as this is not simply to quote the entire statute verbatim.  Rather, in this context, it is to provide arguments that could be raised to defend against a charge of criminal violations of the accounting provisions.

74.  Indeed, that is precisely what the January 1998 Greenberg Memo is doing, as this is an explanation of the requirement that an issuer's books and records accurately reflect "in reasonable detail" the "dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A) (2018).

75.  "Technical" or "insignificant" errors would thus not cause a violation, as the issuer's books would still reflect *reasonable* detail.  Indeed, the very words "technical" and "insignificant" come from a 1981 speech by Harold Williams, then Chairman of the SEC, who made clear that a company would not be held to violate the FCPA if there were "mistakes" in the accounting.  The Accounting Provisions of the Foreign Corrupt Practices Act: An Analysis, Exchange Act Release No. 17500, 21 SEC Docket 1466-1 (Jan. 29, 1981).

76.  Indeed, Koehler himself has written about these requirements and the valuable guidance this Williams speech and other sources provide in interpreting the books and records provision of the FCPA.  *See, e.g.*, Mike Koehler, *SEC Administrative Law Judge Gets It Right When Talking About the Books and Records and Internal Controls Provisions*, FCPA Professor (Feb. 25, 2019), http://fcpaprofessor.com/sec-administrative-law-judge-gets-right-talking-books-records-internal-controls-provisions/ (stating that the FCPA Professor has "frequently highlighted . . . prior SEC guidance . . . including most notably a 1981 speech by Harold Williams," and noting that a recent SEC administrative law judge's

12

decision "[d]emonstrat[ed] once again that this 'old' legal authority and guidance remains relevant"); Mike Koehler, *The Difficulty of Reconciling Existing Legal Authority and Even Enforcement Agency Guidance with Certain FCPA Books and Records and Internal Controls Enforcement Actions*, FCPA Professor (Jan. 31, 2018), http://fcpaprofessor.com/difficulty-reconciling-existing-legal-authority-even-enforcement-agency-guidance-certain-fcpa-books-records-internal-controls-enforcement-actions/ (describing the Williams speech as the "most extensive guidance ever issued by the enforcement agencies regarding the books and records and internal controls provision" and quoting Williams's remarks that "[n]o rational federal interest in punishing insignificant mistakes has been articulated" and that the FCPA's "accounting provisions do not require a company or its senior officials to be the guarantors of all conduct of company employees").

77.   Finally, to the extent that the January 1998 Greenberg Memo treated some of the anti-bribery analysis at a high level, this should not have created any confusion because Greenberg made clear in the January 1998 Greenberg Memo that it was providing a "general overview of the FCPA," not a detailed treatise, and Greenberg had provided a very detailed, in-depth discussion of the FCPA anti-bribery provisions days earlier. Pls.' Ex. 365 at 3.

78.   On January 14, 1998, Schnapp had faxed to Suarez a June 30, 1994 report from the Department of Commerce on the anti-bribery provisions of the FCPA, as well as a February 1992 report from the DOJ and the Department of Commerce on the FCPA anti-bribery provisions. Both reports describe the anti-bribery requirements of the FCPA in detail. Pls.' Ex. 364.

## VI.   The Specific Transactions Discussed by Koehler in His Report Do Not Violate the Anti-Bribery Provisions of the FCPA

79.   In his report, Koehler identified several transactions or categories of transactions that he stated constituted "prima facie violations of the FCPA's anti-bribery provisions." Koehler Report ¶ 13.

80.   Based on the evidence in the record, the record does not support concluding that these transactions violated the anti-bribery provisions of the FCPA. Specifically, the evidence is insufficient to conclude for any of the transactions identified that the payments or things of value were offered or given with a corrupt intent.

81.   As discussed above, in order to establish a corrupt intent, an enforcement authority must establish that the offer or payment was motivated by a desire to effectuate a corrupt *quid pro quo*.

82.   Koehler has previously discussed the need for a *quid pro quo* to demonstrate the corrupt intent required by an anti-bribery violation. In his media interviews and writings, where he has not seen evidence of such a *quid pro quo*, he has stated the conduct does not violate the FCPA.

13

83. For example, in a December 3, 2018 article regarding the allegation that the Trump Organization discussed offering the penthouse apartment in Trump Tower Moscow to Russian President Vladimir Putin, Koehler was quoted as saying that even if such an offer had been made, it would not be illegal if it had been simply an attempt to market the building. Matthew Mosk & Lauren Pearle, *Legal Questions Swirl Around Idea to Offer $50 Million Penthouse to Putin in Trump Tower Moscow*, ABC News (Dec. 3, 2018), https://abcnews.go.com/Politics/legal-questions-swirl-fate-50-million-penthouse-trump/story?id=59558768.

84. Rather, the government would need to demonstrate what the Trump Organization "[sought] to gain and what decision by Putin . . . it [sought] to influence." *Id.*; *see also* Aaron Blake, Is Floating a $50 Million Trump Tower Penthouse for Vladimir Putin Illegal?, Wash. Post (Nov. 30, 2018), https://www.washingtonpost.com/politics/2018/11/30/is-floating-million-trump-tower-penthouse-vladimir-putin-illegal/?utm_term=.657f4de4a834 (Koehler expresses the same opinion).

85. Given this, Greenberg could not have been aware of FCPA anti-bribery violations since there were no FCPA anti-bribery violations. Moreover, as I will discuss below, to the extent there was evidence available to Greenberg of Stanford's intent, one goal appeared to be a legitimate intent both to help individuals and improve Antigua's regulatory regime.

86. I will now analyze in detail each transaction or category of transactions Koehler discusses in his report.

### A.   Purchase of the Bank of Antigua

87. In or around November 1990, Stanford and/or Stanford entities acquired the Bank of Antigua. Pls.' Ex. 50. The vast majority of the shares of the Bank of Antigua were owned by Jack L. Henderson, who, to my knowledge, was not a government official. Henderson owned 31,044 shares out of 36,020 shares, or over 86% of the company. Pls.' Ex. 877 at 1.

88. The next largest shareholder was the government of Antigua and Barbuda ("Antigua"), with 1,500 shares, or about 4% of the company. *Id.* There were 10 other shareholders, including some who were government officials (*e.g.*, Keith Hurst, who was "Financial Secretary" for the Ministry of Finance). *Id.* John St. Luce, the Minister of Finance at the time, was not a shareholder. *Id.*; Pls.' Ex. 52 at 1.

89. As laid out in a letter from Hurst, the government had significant, legitimate concerns about the bank failing, including that failure would lead to "considerable losses to the depositors" and "could also seriously undermine public confidence in the commercial banking system, particularly affecting the credibility of the local Banks [sic]." Pls.' Ex. 877 at 2.

90. Given these concerns, the government did not want the bank to be liquidated. The government therefore solicited multiple entities to purchase the bank, and offered incentives to potential purchasers, including waiving some duties and taxes. *Id.* at 3.

14

91.     Stanford had several conversations with Finance Secretary Hurst about possibly purchasing the Bank of Antigua.  On October 16, 1990, Greenberg Traurig, on Stanford's behalf, submitted a 29 page proposal for purchasing the Bank of Antigua.  Loumiet Ex. 6. According to the proposal drafted by Greenberg Traurig, Hurst had "requested that our client [Stanford] submit to the Government of Antigua and Barbuda . . . a written proposal." *Id.* at 1-2.  The October 1990 letter laid out Stanford's terms for acquiring the Bank of Antigua.  *Id.* at 6-25.

92.     A committee, including the Attorney General and Senator Bernard Percival, then conducted due diligence on Stanford and Guardian International Group.  This committee submitted a report of its findings to the Minister of Finance, John E. St. Luce.  Pls.' Ex. 49.

93.     The cabinet of the Antiguan government then discussed the report and the proposal at a meeting on November 28, 1990.  The cabinet agreed to accept Stanford's proposal subject to conditions recommended by Percival.  The cabinet also created a committee consisting of "Honourable K.M.E. Ford, Q.C., Honourable R. Harris and Senator Bernard Percival" to "monitor the operation of the new management of the Bank of Antigua and keep [the] Cabinet informed of the position from time to time." *Id.* at 2.

94.     St. Luce, Ford, Harris, and Percival were not shareholders in the Bank of Antigua.  Pls.' Ex. 877 at 1.  Thus, there were several government officials without a financial interest in the Bank of Antigua who evaluated and approved the transaction.  Moreover, a committee of such disinterested individuals was created to monitor the bank's performance.

95.     In fact, rather than attempting to operate in a corrupt matter, the cabinet was very conscious of the potential for self-dealing or even the appearance of self-dealing, and took steps such as those described above, to avoid such an issue.  *See* Pls.' Ex. 40 ("Keith Hurst presented the [Stanford] proposal to [the] cabinet last Wednesday, October 17.  One of the Ministers suggested that a sub-committee be formed as Keith owns 250 shares so no one would accuse him of self-dealing.  The Attorney General and the Manager of the Antiguan Development Bank are to head this sub-committee.").

96.     Thus, the record does not reflect any corrupt intent in making the purchase, and thus does not demonstrate the purchase violated the anti-bribery provisions of the FCPA.

97.     Although a corrupt intent does not need to be proven directly, here the evidence is indicative of a legitimate business transaction, not a corrupt one.  Such evidence includes that the transaction would not specially benefit government official shareholders as opposed to non-government shareholders, that government officials were small, minority shareholders, that the government, for several legitimate policy reasons, was attempting to offer a sale to other buyers, and that the government officials that ultimately approved the sale included several government officials with no ownership interest in the bank.

98.     Moreover, Koehler points to no specific action by a government official that Stanford wrongly sought to influence through his purchase.  Rather, he refers to "various discretionary action items."  Koehler Report ¶ 52.  Koehler then lists a few of these "items," but they were all concessions Stanford openly sought from the government in connection

with his purchase of the bank.  Koehler Report ¶¶ 54-55; Pls.' Ex. 39; Pls.' Ex. 52.  St. Luce, who again was not a shareholder in the bank and thus was not receiving a thing of value in connection with Stanford's purchase of the bank, was the one who signed the agreement granting Stanford many of these concessions. Pls.' Ex. 52.  Koehler does not state, and the record does not indicate, that it was illegal for Stanford to receive these concessions.  It is not unusual for a country's government to negotiate with a private party in connection with a transaction important to the financial health of that country.  And again, the record indicates that the Antiguan government was very conscious of potential conflict of interests and sought to create a process to avoid them. Pls.' Ex. 40.  Thus, to Greenberg, the record would not have indicated the transaction was motivated by some corrupt purpose.

99. Even if Stanford were attempting to curry favor with government officials through the purchase, and the evidence does not prove that, an effort to obtain generalized goodwill does not meet the corrupt intent requirement of the FCPA.  *See Sun-Diamond Growers*, 526 U.S. at 405-07.  Thus, there is no evidence of what Stanford "[sought] to gain" or what decision he "[sought] to influence."  Matthew Mosk & Lauren Pearle, *Legal Questions Swirl Around Idea to Offer $50 Million Penthouse to Putin in Trump Tower Moscow*, ABC News (Dec. 3, 2018), https://abcnews.go.com/Politics/legal-questions-swirl-fate-50-million-penthouse-trump/story?id=59558768 (as discussed above, Koehler's analytical framework in discussing whether Donald Trump violated the FCPA).

100. The *SEC v. Ashland Oil* enforcement action that Koehler cites to in support of his argument is readily distinguishable from the facts in this matter.   In that matter, Ashland Development Inc. purchased a 75% beneficial interest in a company in which a government official owned a "62% beneficial interest" and in which the government official's relatives owned additional shares.  Ashland Development Inc. knew the company to be essentially "worthless," but made the purchase with the corrupt intent of having the government official improperly use his government position so that Ashland Oil, Inc. would receive government contracts for crude oil at a below market rate.  Thus, that case had clear evidence of a *quid pro quo*, and is completely dissimilar to the facts in the record in this case.   Complaint, *SEC v. Ashland Oil, Inc.*, No. 86-cv-1904 (D.D.C. July 8, 1986), http://fcpa.stanford.edu/fcpac/documents/3000/001610.pdf.

101. Even *if* Stanford had acted with a corrupt intent, absent evidence of that intent and given all of the facts of the transaction, Greenberg should not have reasonably considered this transaction to be a violation of the FCPA.  In particular, the vast majority of the bank was owned by non-government officials and the government of Antigua had specifically created review procedures for the transaction to reduce or eliminate the influence of government officials who held a small ownership interest in the bank.  Such information is indicative of a *lack* of corruption and would not have demonstrated to Greenberg a clear violation of the FCPA anti-bribery provisions.

16

### B.      Hurst Lease

102.    Stanford appears to have leased a house owned by Hurst for $3,500 a month for five years, with an option to extend the lease for another five years. *See* Pls.' Ex. 217 at 12; Pls.' Ex. 884.

103.    The FCPA does not prohibit doing business with a government official. Rather it prohibits a *corrupt* transaction with a government official (assuming the other elements of a violation are met).

104.    Paying an above market rate for a lease could be an indication that the lease had a corrupt purpose, but in and of itself, it is not sufficient. Moreover, it is not clear from the record whether this lease was at or above market value. The negotiated price of the lease was higher than the previous lease, but this particular lease also locked in the price for 10 years. Pls.' Ex. 217 at 12; Pls.' Ex. 884 at 1.

105.    The terms of the lease also appear to include benefits beyond that of a normal lease. For example, it appears Hurst was to provide "assistance" in identifying a "maid (live-in) and a cook," as well as a gardener. Pls.' Ex. 884 at 2. It also appears that under the lease, Stanford obtained the rights to build a swimming pool and have the costs of the pool "deducted from the monthly rental [sic] at the rate of 1/36th per month." *Id.* at 1.

106.    Furthermore, there is nothing in the record, and Koehler does not point to anything specific, that Stanford was seeking from Hurst in exchange for this lease.

107.    The purchase of the Bank of Antigua, of which Hurst was a very small shareholder, had been completed, and, as discussed earlier, the record does not demonstrate that this purchase was corrupt.

108.    Thus, there is nothing in the record to indicate that this lease was intended to be part of a corrupt *quid pro quo* with Hurst. In other words, there is nothing in the record that demonstrates what Stanford sought to gain and what government decision he sought to influence.

### C.      Loans and a Possible Gift of Clothing

#### 1.      Loans to Government Officials[2]

109.    Koehler's report points to a few different loans and credit cards provided by the Bank of Antigua to government officials as constituting violations of the FCPA.

---

[2]      In their April 3, 2019 Third Amended Objections and Answers to Greenberg Traurig's First Set of Interrogatories, Plaintiffs allege that Greenberg's preparation of a "construction loan agreement and note for a construction loan for $31 million from the Bank of Antigua to the Antiguan government to build a hospital in Antigua so that the Prime Minister of Antigua could fulfill a campaign promise" meant that Greenberg assisted a "transaction [that] violated the Foreign Corrupt Practices Act." Receiver's Third Amended Objections and Answers to Greenberg Traurig's First

110.  However, as Koehler himself acknowledges, "there is nothing inherently wrong from an FCPA perspective with a bank executing a loan with a foreign official." Koehler Report ¶ 76. Instead, for there to be a violation of the FCPA, the loan must be made with a corrupt intent.

111.  The corrupt link between the loans and the discretionary government action(s) desired can be established by circumstantial evidence, but it must be established for there to be a violation. Evidence that a loan is being made on terms highly favorable to the government official can be an indication of a corrupt intent.

112.  Here, the evidence does not demonstrate that the loans made by Stanford entities to government officials were on highly favorable terms to the government officials.

113.  First, the interest rates on the loans appear to have been in line with lending interest rates in Antigua. The reported interest rates on the loans ranged from 11% to 18%. Pls.' Ex. 184 at 2; Schnapp Dep. 198. For those loans that listed origination dates, the document states that the loans were issued between 1993 and 1995. Pls.' Ex. 184.

114.  The International Monetary Fund collects data on "representative" lending interest rates "offered by banks to resident customers," which is available on The World Bank's website. Lending Interest Rate (%), The World Bank (last accessed Apr. 5, 2019), https://data.worldbank.org/indicator/FR.INR.LEND?end=2017&locations=AG&start=19 78&view=chart&year_high_desc=false. In 1993, the representative rate was 12.676%; in 1994, the representative rate was 13.147%; and in 1995, the representative rate was 12.696%. *Id.*; *see also* Schnapp Dep. 198 (noting that the lending interest rates for the loans do not appear to be artificially low).

115.  Second, in the documentation in the record, the loans to government officials were analyzed in January 1996. That analysis found that some of the loans were outstanding but not yet matured, two had been paid off in full, and a few had been "written off." Pls.' Ex. 184 at 2-4; Schnapp Dep. 200-01.

116.  Similarly, the bank had issued credit cards to some government officials. Some of these credits cards in January 1996 had balances of $0. Pls.' Ex. 184 at 4. Such a balance does not indicate that the Bank of Antigua was extending special favors to government officials.

117.  Moreover, Koehler does not point to any evidence in the record as to what Stanford was seeking from these government officials in exchange for these loans.

---

Set of Interrogatories at 19-20, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-CV-04641-N (N.D. Tex., Apr. 3, 2019). Koehler seemingly does not allege that the loan violated the FCPA, likely because it does not. The thing of value, the loan, was made to the *government*, not a government official, and again, Plaintiffs do not link this loan to a decision sought to be influenced (*i.e.*, no corrupt *quid pro quo*). Plaintiffs' further allegation that the transaction violated *Antiguan* law, *see id.*, does nothing to establish an FCPA violation. To the extent Koehler does consider the loan a violation of the FCPA, he considers it as part of the award of the hospital development project. As such, we also address the loan in the hospital project section of this report.

118. This is in clear contrast to the Telia Company AB ("Telia") matter that Koehler cites to as being analogous. In Telia, in addition to millions of dollars in other bribes, TeliaSonera Uzbek Telecom Holding B.V. ("Telia Uzbek") entered into a series of agreements by which Telia Uzbek paid $15 million dollars to a third-party to assume a debt owed by a Swiss company. Managers of Telia knew that the Swiss company was beneficially owned by a foreign government official. "In return for this bribe," that foreign official enabled a Telia subsidiary "to obtain certain 4G frequencies and continue to do business in Uzbekistan." Information, *United States v. Coscom LLC*, No. 1:17-cr-00581-GBD-2 (S.D.N.Y. Sept. 21, 2017), http://fcpa.stanford.edu/fcpac/documents/5000/003569.pdf. Thus, forgiving the debt was clearly linked to an improper government action.

### 2. Clothing

119. With respect to the alleged gift of clothing to the daughter of Molwyn Joseph, it is not even clear that Stanford provided the clothing. Stanford wrote in a letter: "I hope all is well with you [Molwyn Joseph] and Paula and that your new daughter has enjoyed wearing her new outfit." Pls.' Ex. 100 at 1. This could indicate Stanford bought an outfit for, seemingly, a baby, but it could also indicate that Joseph had been discussing with Stanford a new outfit Joseph had bought for his daughter. Based on this very limited information, Greenberg could not have concluded that this constituted a violation of the FCPA's anti-bribery provisions.

120. Regardless, there is no indication that this outfit was particularly lavish or expensive. Although there is no *de minimis* requirement in the FCPA, the SEC and the DOJ have not prosecuted a case involving a single, low-value gift because such a gift is not reflective of a corrupt intent. Rather, "DOJ and SEC enforcement cases . . . have involved single instances of large, extravagant gift-giving (such as sports cars, fur coats, and other luxury items) as well as widespread gifts of smaller items as part of a pattern of bribes." DOJ/SEC Resource Guide, 15.

121. Moreover, the evidence does not indicate that the clothing was given, if it was even given by Stanford, with any corrupt intent. The record does not demonstrate that the clothing was given as part of a corrupt *quid pro quo* by which Stanford sought for Joseph to misuse his government position.

122. Koehler cites to the PTC Inc. settlement with the SEC as evidence that a gift can constitute a bribe, but that case was substantially different. There, two PTC Inc. subsidiaries made multiple improper gifts, along with providing improper entertainment and travel. The total spent on gifts and excessive entertainment exceeded $274,313; it was not one article of clothing. Rather the SEC stated that the subsidiaries provided cell phones, iPods, GPS systems, gift cards, wine, and clothing. Moreover, the SEC linked the improper gifts, travel, and entertainment as being given in exchange for contracts with state-owned entities for whom the government official recipients worked. *PTC Inc.*, Exchange Act Release No. 77145 (Feb. 16, 2016), http://fcpa.stanford.edu/fcpac/documents/4000/003197.pdf.

123. Thus, the gifts in the PTC Inc. matter were given with the intent of a clear *quid pro quo*.

19

### D.   Political Contribution

124.   Stanford apparently forgave a debt of Molwyn Joseph, a government official, around May 1994.  Pls.' Ex. 107 at 1.  This was not the potential political contribution Greenberg was asked to analyze in its 1998 memo.  Pls.' Ex. 365.

125.   It does not appear Greenberg was aware of the donation at the time it was made.  *See* Pls.' Ex. 183 at 1 (The exhibit is a memo sent to Suarez and "Mark Schanpp [sic]" that encloses what the memo states is documentation supporting a "Note Receivable on SFG Ltd.'s books due from Molywn [sic] and Paula Joseph that was retired by political contribution after the election."  The memo is dated January 16, 1996, two years after the note was apparently forgiven.).

126.   Koehler declares that this donation constituted a "prima facie" violation of the anti-bribery provisions of the FCPA by analogizing to several settled enforcement actions that involved, in part, political contributions.  Koehler Report ¶ 90.

127.   One of the enforcement actions cited to, however, did not involve anti-bribery charges.  In the Sociedad Química y Minera de Chile, S.A. matter, the DOJ and the SEC settled books and records and internal controls charges.  One cannot infer from cases that did not find violations of the anti-bribery provisions of the FCPA that Stanford's conduct violated the anti-bribery provisions of the FCPA.  Information, *United States v. Sociedad Química y Minera de Chile, S.A.*, No. 17-cr-00013 (D.D.C. Jan. 13, 2017), http://fcpa.stanford.edu/fcpac/documents/4000/003440.pdf; *Sociedad Química y Minera de Chile, S.A.*, Exchange Act Release No. 79795 (Jan. 13, 2017), http://fcpa.stanford.edu/fcpac/documents/4000/003443.pdf.

128.   In all of the other enforcement actions listed by Koehler, the facts established a clear corrupt intent by the defendant as demonstrated by a corrupt *quid pro quo*.  I address each of these enforcement actions in turn.

129.   In the Titan Corporation ("Titan") matter, Titan had a contract to build a telecommunications network in Benin.  The contract called for Titan to pay some of its profits as subsidies for the development of health, education, and agriculture programs in Benin.  These payments were referred to as "social payments."  Plea Agreement ¶ 14, *United States v. Titan Corp.*, No. 3:05-cr-00314 (S.D. Cal. Mar. 1, 2005), http://fcpa.stanford.edu/fcpac/documents/1000/000412.pdf.

130.   Titan instead paid $2 million in "social payments" to an agent despite having "reason to believe" that these payments would not be used for the purposes identified in the contract.  The payments were "made in exchange for, *and contingent upon,* the agreement of the OPT [Postal and Telecommunications office of the Republic of Benin] that TITAN's management fee" under the contract would be "increased from 5% to 20%."  *Id.* ¶¶ 16-17 (emphasis added).

131.   In the Halliburton Company and KBR, Inc. ("KBR") matter, KBR and others devised a scheme by which payments would be routed through a "UK Agent" and a "Japanese Agent" to Nigerian government officials in exchange for contracts to build liquefied natural

gas ("LNG") production facilities in Nigeria.  The SEC complaint specifies that "[a]s the joint venture received payments for the construction from Nigeria LNG [Nigeria LNG, Ltd., a government entity], it paid the UK Agent."  Some of the money routed through the UK Agent went to a Nigerian political party, but that money, and all the other bribe payments routed through the UK Agent, were intended to be made in exchange for receiving the LNG contracts.  Complaint ¶ 17, *SEC v. Halliburton Co.*, No. 4:09-cv-00399 (S.D. Tex. Feb. 11, 2009), http://fcpa.stanford.edu/fcpac/documents/2000/001005.pdf.

132.    In the Keppel Offshore & Marine Ltd. enforcement action, the bribe payments to government officials and a political party were made "in connection with thirteen projects in Brazil."  In other words, the political party and politicians "administered a scheme to secure corrupt payments equal to a percentage of a contract's value from the companies awarded those projects."  Thus, the payments were made with a corrupt *quid pro quo* intended.  Information ¶¶ 18-19, *United States v. Keppel Offshore & Marine Ltd.*, No. 1:17-cr-00697        (E.D.N.Y.        Dec.        22,        2017), http://fcpa.stanford.edu/fcpac/documents/5000/003623.pdf.

133.    In the Bilfinger SE, Willbros Group, Inc., James Kenneth Tillery, and Jason Edward Steph matters, the defendants conspired to violate the FCPA.  The "purpose and object of the conspiracy was to obtain and retain contracts . . . through the promise and payment of over $6 million in bribes to" Nigerian government officials and a Nigerian political party.  Information ¶ 20, *United States v. Bilfinger SE*, No. 4:13-cr-00745 (S.D. Tex. Dec. 9, 2013), http://fcpa.stanford.edu/fcpac/documents/3000/002325.pdf; *see also* Information at 28, *United States v. Willbros Grp., Inc.*, No. 4:08-cr-00287 (S.D. Tex. May 14, 2008), http://fcpa.stanford.edu/fcpac/documents/2000/000917.pdf (Willbros Group, Inc. and Willbros International, Inc. agreed to make more than $6 million in corrupt payments to Nigerian government officials and a Nigerian political party in order to obtain a natural gas project and related work); Plea Agreement ¶ 19, *United States v. Steph*, No. 07-cr-00307 (S.D. Tex. Nov. 5, 2007), http://fcpa.stanford.edu/fcpac/documents/2000/000715.pdf (same); Indictment ¶¶ 19, 22, *United States v. Tillery*, No. 4:08-cr-00022 (S.D. Tex. Jan. 17, 2008), http://fcpa.stanford.edu/fcpac/documents/2000/000900.pdf (same).[3]  Thus, there was again a clear exchange between the corrupt payments and the government action sought.  All of these matters involved a clear corrupt *quid pro quo*.

134.    In *United States v. W.S. Kirkpatrick Inc.*, the defendant paid $580,973 "while having reason to believe that a portion of such money" would be given to Nigerian government officials and a Nigerian political party to induce those individuals/entities to use their positions corruptly "in order to obtain a contract for flight training equipment for W.S. Kirkpatrick,

---

[3]    Tillery was indicted for conspiring to violate the FCPA, but never tried.  He appears to remain a fugitive.  Richard L. Cassin, *Willbros Wins Final Dismissal*, The FCPA Blog (Apr. 19, 2012, 2:28 AM), http://www.fcpablog.com/blog/2012/4/19/willbros-wins-final-dismissal.html.  As he was never convicted and did not settle the charges, one should not analogize to his case to determine what violates the FCPA as it is possible a court or jury would have found his conduct did *not* violate the FCPA.  Nonetheless, because his indictment is included in the Koehler Report and because that indictment contains the same *quid pro quo*, we include the citation and explanatory parenthetical for the reader's reference.

Inc." Information at 1-2, *United States v. W.S. Kirkpatrick Inc.*, No. 85-cr-415 (D.N.J. Nov. 18, 1985), http://fcpa.stanford.edu/fcpac/documents/3000/001968.pdf.

135. In *United States v. King*, King conspired and "secretly [paid] money to foreign officials, political parties, party officials, and candidates for public office in Costa Rica to obtain from the Government of the Republic of Costa Rica a land concession to develop" certain construction projects. Indictment ¶¶ 3, 5, *United States v. King*, No. 01-cr-00190 (W.D. Mo. June 27, 2001), http://fcpa.stanford.edu/fcpac/documents/1000/000217.pdf. Thus, the corrupt intent was established by demonstrating this intended corrupt *quid pro quo*, money in exchange for a land concession.

136. In *SEC v. Straub*, Straub, the chairman and CEO of Magyar Telekom, Plc. ("Magyar Telekom"), offered a designee of a minority political party the ability to choose a company that would participate in a Magyar Telekom contract in exchange for the minority party supporting specific regulatory changes favorable to Magyar Telekom. Complaint ¶¶ 3, 29, *SEC v. Straub*, No. 1:11-cv-09645 (S.D.N.Y. Dec. 29, 2011).

137. In contrast to the demonstrated *quid pro quo* in each of these cases, Koehler does not provide evidence of any intended corrupt *quid pro quo* with respect to the Joseph note. Nowhere does he show what decision Stanford or the Stanford entities sought to change or what Stanford or the Stanford entities sought to gain.

138. Indeed, the record indicates that Stanford was a frequent contributor to both of the main political parties in Antigua. Deposition of Yolanda Suarez 104. It is not at all unusual for prominent businessmen or businesswomen to make political contributions to politicians who share similar political views as them. It is also common for prominent businesspeople to make such contributions to generate generalized goodwill. A political contribution only becomes an FCPA violation if it is demonstrated that the contribution was motivated by an intent to effectuate a corrupt *quid pro quo*.

139. Moreover, the evidence in the record does not indicate that making such a political contribution was illegal under written Antiguan law. If such a payment were legal, it would be permissible under the written law affirmative defense.

### E.  Medical Expenses for Lester Bird

140. Stanford or Stanford entities spent $48,217.17 related to medical expenses for Lester Bird. Pls.' Ex. 183 at 1. Koehler is correct that this constitutes providing a thing of value to a government official.

141. However, Koehler's analogy to the Kozeny/Bourke enforcement action is misplaced. First, the indictment Koehler cites to was the initial indictment. Koehler Report, ¶ 93; Indictment, *United States v. Kozeny*, No. 1:05-cr-00518-SAS (S.D.N.Y. May 12, 2005), http://fcpa.stanford.edu/fcpac/documents/1000/000344.pdf (indicting Viktor Kozeny, Frederic Bourke, Jr., and David Pinkerton). There were two superseding indictments filed a few years later. Indictment, *United States v. Bourke*, No. 1:05-cr-00518-SAS (S.D.N.Y. May 5, 2009), https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2012/06/01/05-05-09bourke-1st-supersed-indict.pdf; Indictment, *United*

*States v. Bourke*, No. 1:05-cr-00518-SAS (S.D.N.Y. May 26, 2009), http://fcpa.stanford.edu/fcpac/documents/3000/002382.pdf. Bourke was then convicted of a conspiracy to violate the FCPA and the Travel Act, among other things. Press Release, U.S. Dep't of Justice, Connecticut Investor Found Guilty in Massive Scheme to Bribe Senior Government Officials in the Republic of Azerbaijan (July 10, 2009), https://www.justice.gov/opa/pr/connecticut-investor-found-guilty-massive-scheme-bribe-senior-government-officials-republic.

142. In its indictment, the DOJ described the conspiracy as Bourke and others paying bribes to Azeri government officials to induce those officials to, among other things, ensure the privatization of the State Oil Company of the Azerbaijan Republic ("SOCAR") and to give Bourke and others a share in SOCAR. Indictment, *United States v. Bourke*, No. 1:05-cr-00518-SAS (S.D.N.Y. May 26, 2009).

143. The government demonstrated that paying for the medical expenses, along with "millions of dollars worth of bribes," were all part of a corrupt scheme to obtain ownership in SOCAR. Press Release, U.S. Dep't of Justice, Connecticut Investor Found Guilty in Massive Scheme to Bribe Senior Government Officials in the Republic of Azerbaijan (July 10, 2009), https://www.justice.gov/opa/pr/connecticut-investor-found-guilty-massive-scheme-bribe-senior-government-officials-republic.

144. Thus, the case involved a clear intended *quid pro quo*. The evidence in this case does not establish the intent of a corrupt *quid pro quo*.

145. Unlike in other sections of his report, Koehler seemingly argues that a possible corrupt *quid pro quo* existed: that the medical expenses were paid with the intent of causing government officials to misuse their government positions in awarding Stanford the right to develop a hospital in Antigua and in executing a $31 million loan agreement with the Bank of Antigua for the hospital.

146. However, the primary link between payment of these expenses and the hospital project is the timing, as Bird received medical care in late October 1994, around the time the Antiguan government was considering whether to continue with DSI International's ("DSI's") proposal for the hospital bid. This, in and of itself, is not sufficient to establish a corrupt *quid pro quo* when there is substantial evidence that DSI's proposal was rejected not because of corruption but because it was unsatisfactory.

147. First, despite DSI's protests, the evidence suggests that the company had provided a proposal for evaluation, meaning the government of Antigua was well within its rights to reject the proposal. The government of Antigua provided DSI with a letter of intent that made clear that the government would enter into a lease agreement with DSI upon the "mutual agreement of the Government and DSI to the design and lease payments." Pls.' Ex. 114 at 1. Moreover, the government instructed DSI to "proceed at your own risk to prepare conceptual design documentation and provide a lease rate for the proposed design," again demonstrating that a final deal had not been reached as the government still needed to evaluate DSI's proposal. *Id.*; *see also* Pls.' Ex. 143 at 2 (a letter from Suarez to counsel for DSI similarly noting there is no binding contract, and quoting a letter from DSI's

counsel that stated that DSI was "currently in the process of finalizing the contract documents"); Pls.' Ex. 244 (mentioning "DSI proposal").  A rejection of an inadequate proposal would not be a misuse of an official's position.

148.   Architects Wolfberg Alvarez & Partners ("Wolfberg"), whom the record indicates are well-respected, were retained by counsel for the government of Antigua to evaluate the DSI proposal.  Pls.' Ex. 244 at 3; Schnapp Dep. 73.

149.   Wolfberg evaluated the proposal from DSI and found it to be "cursory" and lacking in sufficient details.  Pls.' Ex. 244 at 5.

150.   Wolfberg also found that the proposal gave too much latitude to DSI, meaning DSI could modify the "scope and quality" of the construction simply to increase its profits.  Wolfberg called these aspects of the proposal "absurd" and said that they "would cause most deals to be rejected."  *Id.*

151.   The proposal apparently did not outline the construction costs, "soft costs," or interest rates.  *Id.*

152.   The proposed lease for the building commenced after the building was substantially completed rather than occupied.  This was, according to Wolfberg, not a standard industry practice.  *Id.* at 6.

153.   The design of the building failed to account for the "hilly terrain of the site."  *Id.*

154.   The drawings submitted were "inadequate, amateurish, and in no way represent[ed] a document to which the Government should commit."  *Id.*

155.   The designs for the hospital apparently had the hospital cafeteria directly opposite an operating room.  Deposition of Carlos Loumiet 150.

156.   Moreover, Koehler does not point to any statements in the record that demonstrate a corrupt *quid pro quo*.  At most, they indicate that paying for the medical expenses generated goodwill with Lester Bird.

157.   Thus, the evidence simply does not support inferring any intent to pay for the medical costs in order to take over the financing, design, and development of the hospital project.  Rather, the evidence suggests that DSI's proposal was abandoned because it was of poor quality.

### F.   Other Gifts

158.   Koehler makes passing reference to a few gifts allegedly made by Stanford or Stanford entities to Foreign Officials.

159.   The allegations include: Stanford instructed his assistant to upgrade the flight of Althea Crick, apparently a government official, to first class tickets.  Stanford gave Leroy King, a government official, 2004 and 2006 Super Bowl tickets.  "From at least February 2005," Stanford paid King bribes, including cash, the use of Stanford's private jets, and the use of

a Stanford entity corporate car.  Koehler Report, ¶¶ 104, 105; *see also* Superseding Indictment, *United States v. Stanford*, No. 4:09-cr-00342 (S.D. Tex. May 4, 2011), https://www.justice.gov/sites/default/files/criminal-vns/legacy/2011/05/10/05-10-11stanford-superseding.pdf.  However, Koehler does not point to any business nexus for these gifts, nor any evidence of a corrupt intent.

160.  Moreover, most of this conduct occurred *after* Loumiet had left Greenberg and taken most of the legal work for the Stanford business relationship with him.

161.  It is also unclear whether Stanford procured (and King received) the 2006 Super Bowl tickets, as Stanford was acquitted of wire fraud in connection with the alleged purchase of those tickets.  Superseding Indictment ¶ 41, *United States v. Stanford*, 4:09-cr-00342, (S.D. Tex.   May   4,   2011),   https://www.justice.gov/sites/default/files/criminal-vns/legacy/2011/05/10/05-10-11stanford-superseding.pdf;  Verdict, *United States v. Stanford*, 4:09-cr-00342 (S.D. Tex. Mar. 6, 2012).

### G.    Travel

162.  Similarly, Koehler asserts that certain travel expenses paid for government officials and their spouses/guests violated the FCPA.  In November 1994, it appears that Dr. Joseph John, Laurie Urrutia, Keith Hurst, Mrs. Hurst, Sam Aymer, and Dr. Rodney Williams traveled from Antigua to Houston.  Pls.' Ex. 132.

163.  The purpose of the trip appears to have been related to speaking with medical professionals in Houston to learn information to benefit the construction of the new hospital.  *Id.* (referring to a meeting between Hurst and Dr. Hall).

164.  Dr. John may have been a government official, as he was apparently the doctor supervising the construction of the hospital project.  Schnapp Dep. 54.  As discussed above, Keith Hurst was a government official.  Based on the documents, it is not clear if Mrs. Hurst and Urrutia were government officials or guests of Keith Hurst and Dr. John, respectively.  It is not clear if Williams was a government official.  Pls.' Ex. 132.  It is also not clear who Sam Aymer is, though he may have been a medical professional or in the medical industry.  *See Mount St John Sued over Chester Clarke's Death*, The Daily Observer (May 5, 2011), https://antiguaobserver.com/mount-st-john-sued-over-chester-clarke%E2%80%99s-death/.

165.  Keith Hurst, Mrs. Hurst, John, Urrutia, and Williams did not fly directly to Houston.  Instead, they flew from Antigua to Miami, and then from Miami to Houston.[4]

---

[4]   It is not clear how Aymer came to Houston.  Based on the letter to John from Ellen Green of the Stanford Financial Group Limited, Aymer was not on the same flights as Keith Hurst, Mrs. Hurst, Williams, John, and Urrutia.  That group arrived in Houston on Friday, November 18, 1994.  Aymer arrived in Houston on Saturday, the next day.  The letter does not discuss any details of Aymer's flight(s) to Houston, indicating that Stanford/the Stanford entities did not pay for the flight(s).  Pls.' Ex. 132.

166.    It appears that neither Stanford nor Stanford entities paid for the connecting flight from Antigua to Miami, as Ellen Green of the Stanford Financial Group Limited stated she was uncertain if all the individuals were on the same flight, indicating Stanford/Stanford entities did not arrange the flights.  Pls.' Ex. 132 (Green wrote that "[i]t is our understanding that you, Ms. Laurie Urrutia, Mr. and Mrs. Hurst, and Dr. Rodney Williams will all be traveling together."  Had Stanford or a Stanford entity booked the travel, Green would not have needed to hedge by saying it was her "understanding."  Rather, she would have been certain as to the travel arrangements.).

167.    It does not appear that these individuals received any entertainment or engaged in any tourism in Miami.  Indeed, it seems the individuals did not spend much time at all in Miami.  Rather, it appears that immediately upon arrival in Miami, the individuals were taken to their flight to Houston.  *Id.* (stating that Keith Hurst, Mrs. Hurst, Williams, John, and Urrutia would, upon arrival in Miami, be met by a driver who would take them to their plane to Houston).

168.    It also appears that all the individuals arranged for their own flights back to Antigua, and the evidence does not state that Stanford or Stanford entities paid for these flights.  *Id.* ("It is our understanding that everyone in your party will book their own return passage to Antigua.")

169.    It appears that Stanford/a Stanford entity provided to all the individuals, except Aymer, use of a "Hawker jet" from "Signature Flight Services" for the flight from Miami to Houston.  These individuals were apparently taken by a car service to the jet.  Again, Aymer appears to have arrived on a different flight.  *Id.*

170.    It also appears that Stanford/a Stanford entity made reservations at The Houstonian Hotel, and arranged for a car service to take all the individuals, except Aymer, to the hotel.  It is not clear who paid for the hotel stays.  *Id.*

171.    Internet searches indicate that The Houstonian Hotel is currently priced comparably to other business hotels in Houston.  For example, a March 21, 2019 search on the travel site Expedia found that the average nightly price for The Houstonian Hotel for a stay from April 26 to April 30, 2019 would be $227.  Expedia, https://www.expedia.com/ (search performed Mar. 21, 2019).

172.    By way of comparison, the average nightly price at the Magnolia Hotel Houston, a Tribute Portfolio Hotel was $216, the Hotel Alessandra was $225, the Hilton Americas – Houston was $265, The Lancaster Hotel was $278, the Hotel Zaza Houston Museum District was $273, the Houston Marriott Medical Center/Museum District was $229, the Westin Houston Downtown was $240, the Westin Galleria Houston was $222, and the Hotel ICON Autograph Collection by Marriott was $224.  Several other hotels had significantly higher average nightly prices than The Houstonian, such as the Marriott Marquis Houston ($354), The St. Regis Houston ($383), the Hotel Granduca Houston ($414), The Post Oak Hotel at Uptown Houston ($411), and the LUXE LIFE ($600).  *Id.*

173.   Thus, the record indicates that the trip was a legitimate business trip to learn more about hospital design.  The evidence does not suggest that the trip was for a corrupt *quid pro quo*. The only possible corrupt *quid pro quo* that Koehler seems to suggest—paying for these travel expenses in exchange for a Stanford entity acquiring the rights to finance and develop the hospital project—is not supported by the evidence in the record, as discussed above.

174.   Given this record, one does not even need to consider the affirmative defense for reasonable and bona fide business expenditures because the conduct does not constitute a violation. Even if one were to consider the transactions under the affirmative defense, the expenses would seem to fall squarely into the defense.  Arranging for a car service is a common and reasonable business expense, and The Houstonian Hotel appears to be a reasonable business hotel.  It appears that Stanford/the Stanford entities did not pay for the majority of flights.  Stanford did provide the use of a private jet, but given the purpose of the trip and the type and cost of the other expenses provided, the trip as a whole appears reasonable and bona fide, and appears related to promoting the hospital project.

175.   Moreover, the enforcement actions Koehler lists as being analogous to this trip to Houston are readily distinguishable.  First, the BHP Billiton Ltd. and BHP Billiton Plc enforcement action was a books and records and internal controls case.  No anti-bribery charges were brought.   *BHP Billiton Ltd.*, Exchange Act Release No. 74998 (May 20, 2015), http://fcpa.stanford.edu/fcpac/documents/4000/002707.pdf.   As such, one cannot argue that the case supports concluding the conduct here violated the anti-bribery provisions.

176.   Second, the remaining enforcement actions make clear that there was no reasonable business purpose that justified incurring the travel expenses or the majority of the travel expenses.

177.   In *United States v. Mebiame*, Samuel Mebiame, among other things, paid $440,000 to rent a private Airbus jet for a Guinean official's general use.  Information at ¶ 19, *United States v. Mebiame*, No. 1:16-cr-00627 (E.D.N.Y. Dec. 9, 2016), http://fcpa.stanford.edu/fcpac/documents/4000/003463.pdf.

178.   Koehler states that the SEC enforcement action against FLIR Systems, Inc. ("FLIR") involved "allegations about luxury hotel accommodations for foreign officials."  Koehler Report ¶ 100.  However, the conduct at issue was far more extravagant.  FLIR planned a 20-night "world tour" for Saudi government officials that included stops in Casablanca, Paris, Dubai, and Beirut.  The stated business purpose of the trip was an inspection of a Boston facility, but of the 20 days of the trip, only eight were scheduled in Boston. Moreover, on only one of those days, for five hours, did the officials inspect the facility. The rest of the eight days were spent in a few additional meetings, but also with significant leisure time, including a weekend trip to New York paid for by FLIR.  "There was no business purpose for the stops outside of Boston."  Moreover, in addition to this trip, FLIR paid for additional travel without any business purpose.  For example, FLIR twice paid to take the officials to Dubai over the New Year holiday.  *FLIR Systems, Inc.*, Exchange Act Release No. 74673, ¶¶ 5-6, 10-11 (Apr. 8, 2015), http://fcpa.stanford.edu/fcpac/documents/4000/002596.pdf.

179.     In the Legg Mason, Inc. enforcement action, a Legg Mason, Inc. subsidiary and Société Générale S.A. took a number of steps in furtherance of a corrupt scheme, including paying for the following on behalf of a Libyan government official: "multiple days of entertainment in the United States, including . . . stays at expensive hotels, expensive meals, nightlife excursions, and gifts of luxury goods."  Moreover, the trip was not for a legitimate business purpose but to "discuss[] and plan[] the corrupt scheme."  Non-Prosecution Agreement among the Department of Justice and Legg Mason, Inc. at Attachment A, ¶ 24 (June 4, 2018), http://fcpa.stanford.edu/fcpac/documents/5000/003687.pdf.

180.     In the Och-Ziff Capital Management Group LLC ("Och-Ziff") matter, Och-Ziff retained a Libyan intermediary to act as an agent on behalf of Och-Ziff.  That intermediary, among other things, provided payments for "luxury travel, hotel accommodations and jewelry" without any business purpose.  Deferred Prosecution Agreement at Attachment A, ¶¶ 1, 13, 90, *United States v. Och-Ziff Capital Mgmt. Grp. LLC*, No. 1:16-cr-00516 (E.D.N.Y. Sept. 29, 2016), http://fcpa.stanford.edu/fcpac/documents/4000/003321.pdf.

181.     In the Metcalf & Eddy, Inc. ("Metcalf") enforcement action, Metcalf paid for two trips that had no or limited business purposes.  Metcalf paid for first-class travel for the government official, his wife, and his two children.  The first trip included travel to Boston, Washington, D.C., Chicago, and Orlando, and the second involved travel to Paris, Boston, and San Diego.  The government official was paid a per diem, and the company paid for "most of the travel and entertainment expenses incurred by and on behalf of the Chairman and his family," essentially double paying the official.  Complaint ¶¶ 16-17, 19, *United States v. Metcalf & Eddy, Inc.*, No. 99-cv-12566 (D. Mass. Dec. 14, 1999), http://fcpa.stanford.edu/fcpac/documents/3000/002360.pdf.

182.     In the Alcatel-Lucent S.A. (collectively, with its subsidiaries, "Alcatel") matter, Alcatel, among other things, provided approximately $2,000 for an "educational trip" for the daughter of a government official.  Alcatel also paid for the official and the official's spouse to travel to Paris.  Koehler notes that prosecutors stated the Paris trip took place via a "chauffeur-driven vehicle."  However, the full clause clearly distinguishes this trip, as the information states that "most of the [Paris] trip consisted of *touring activities* via a chauffeur-driven vehicle."  Information ¶ 59, *United States v. Alcatel-Lucent, S.A.*, 1:10-cr-20907 (S.D. Fla. Dec. 27, 2010), http://fcpa.stanford.edu/fcpac/documents/3000/002270.pdf (emphasis added).

183.     In the Aon Corporation ("Aon") enforcement matter, Aon, among other things, funded travel for multiple trips for government officials.  Some of the trips had a "small business-related component" but a "significant portion of the funds expended on the trips were used for the personal benefit of the officials and their wives."  Moreover, a "substantial number of the trips . . . were in connection with conferences and seminars in tourist destinations, including London, Paris, Monte Carlo, Zurich, Munich, Cologne, and Cairo.  Many of the invoices and other records for these trips [did] not provide the business purpose of the expenditures, if any, or showed that the expenses were *clearly not related to a legitimate business purpose*" or "had no logical connection to the insurance industry."  Non-Prosecution Agreement among the Dep't of Justice and Aon Corp. at Appendix A, ¶¶ 12-

13 (Dec. 20, 2011), http://fcpa.stanford.edu/fcpac/documents/2000/001346.pdf (emphasis added).

184. Lastly, the DOJ investigated whether Stanford had violated the FCPA in connection with the hospital project and did not bring charges.  Schnapp Dep. 47-48.  This further indicates that there was not a "prima facie" violation of the anti-bribery provisions, much less a violation of which Greenberg could have or should have been aware.

185. Koehler also seemingly argues that these things of value were provided with the intent of receiving "confidential" information about DSI's proposal.  However, the record does not establish that this proposal was to be confidential.  DSI claimed that the September 19, 1994 letter from the government of Antigua "clearly" showed DSI had been selected and that by accepting the proposal submitted by DSI, the government had agreed to keep the proposal confidential.  Pls.' Ex. 135 at 1.

186. However, the September 19 letter provided DSI with a letter of intent that made clear that the government would enter into a lease agreement with DSI upon the "mutual agreement of the Government and DSI to the design and lease payments."  Pls.' Ex. 114 at 1.  Moreover, the government instructed DSI to "proceed at your own risk to prepare conceptual design documentation and provide a lease rate for the proposed design," again demonstrating that a final deal had not been reached as the government still needed to evaluate DSI's proposal.  *Id.*  The letter also makes no mention of keeping the proposal confidential.  *Id.*

187. These facts are thus readily distinguishable from the two FCPA enforcement actions to which Koehler cites.

188. In the Alcatel matter, the information provided to Alcatel was a misuse of the government official's position, as the information was from competing bids in a *confidential* tender process.  Information ¶¶ 58, 108, *United States v. Alcatel-Lucent, S.A.*, No. 1:10-cr-20907 (S.D. Fla. Dec. 27, 2010), http://fcpa.stanford.edu/fcpac/documents/3000/002270.pdf.

189. In the Panasonic Corporation ("Panasonic") matter, with respect to the conduct that related to FCPA anti-bribery violations, Panasonic was negotiating a contract with a government-owned airline and received confidential information from a government official about the government airline to help Panasonic negotiate a more advantageous contract with the government airline.  *Panasonic Corp.*, Exchange Act Release No. 83128 ¶ 17 (Apr. 30, 2018), http://fcpa.stanford.edu/fcpac/documents/5000/003669.pdf.

190. In both these cases, the government officials had a clear duty to keep the information confidential, and misused their positions in providing the information.

191. In this case, the evidence does not support that the Antiguan government officials were misusing their positions, as it does not appear the information was confidential.  Certainly, from the perspective of Greenberg, it would not have been clear that such information was to be kept confidential.  Moreover, the purpose of disclosing the information was to *improve* the hospital, as compared to the Alcatel and Panasonic matters, where the information was disclosed in order to *disadvantage* the government.

192.   Not only does all of this demonstrate there was not an FCPA anti-bribery violation, it also demonstrates that even if this conduct *did* constitute an FCPA violation, Greenberg would not have been aware of there being a violation, based on this record.

### H.   Donation of Medical Supplies and Equipment

193.   In February 1995, Stanford or a Stanford entity may have made a charitable donation. It appears he/the entity donated medical supplies, equipment, and medical beds to the Ministry of Health. Pls.' Ex. 147 at 2.

194.   As the things of value were given to the government and not a government official, such donations do not constitute a violation of the anti-bribery provisions of the FCPA.

195.   Even if one were to assume a government official received some sort of benefit from the donation of supplies to the Ministry of Health, the evidence in the record does not reflect that this contribution was intended to be tied to a corrupt *quid pro quo*.

196.   Donations made to government entities to generate generalized goodwill, good publicity for a company or person, or for humanitarian purposes do not satisfy the corrupt intent element of the FCPA, and as such, do not violate the anti-bribery provision.

197.   In a letter to Lester Bird in which he discusses the donation, Stanford does mention ongoing projects he has in Antigua, such as finalizing development of an airport, but he does not indicate any specific government action is needed or requested. *Id.* at 1.

198.   He also states that Stanford Financial Group would consider providing the financing for a new hospital. *Id.* at 1-2. However, as discussed above, the evidence does not support that Stanford acquired the hospital project through corrupt means.

199.   Although a donation made with a corrupt intent need not succeed in corrupting the government official in order to violate the FCPA, the fact that the Antigua government initially solicited a proposal from DSI instead of Stanford indicates that Stanford was not attempting to corrupt any government official.

200.   Moreover, as detailed above, the reason the government switched to the Stanford proposal from DSI appears to have been because the DSI proposal was deeply flawed. Thus, this donation is readily distinguishable from the cases Koehler cites to in his report.

201.   First, the Schering-Plough Corporation and Stryker Corporation ("Stryker") matters were books and records and internal controls cases. Complaint, *SEC v. Schering-Plough Corp.*, No. 1:04-cv-00945 (D.D.C. June 8, 2004), http://fcpa.stanford.edu/fcpac/documents/1000/000341.pdf; *Schering-Plough Corp.*, Exchange Act Release No. 49838 (June 9, 2004), http://fcpa.stanford.edu/fcpac/documents/4000/002867.pdf; *Stryker Corp.*, Exchange Act Release No. 70751 (Oct. 24, 2013), http://fcpa.stanford.edu/fcpac/documents/3000/002132.pdf. There were no anti-bribery violations, and thus the Schering-Plough Corporation and Stryker matters do not offer guidance as to what constitutes an anti-bribery violation.

202.  In the case of Stryker, even if one were to analogize, the SEC found that Stryker made "improper payments" in Poland and that internal Stryker documents explicitly confirmed the "quid pro quo arrangement" between Stryker and a foreign official. *Stryker Corp.*, Exchange Act Release No. 70751 (Oct. 24, 2013), http://fcpa.stanford.edu/fcpac/documents/3000/002132.pdf.

203.  The Eli Lilly and Company ("Eli Lilly") matter involved books and records, internal controls, and anti-bribery violations. However, the SEC clearly excluded the donations to charities from its description of Eli Lilly's anti-bribery violations. In its complaint in paragraph 48, the SEC stated that the violations of the anti-bribery provision were described in paragraphs 4-6, 25-32, and 37-42 of the complaint. Complaint, *SEC v. Eli Lilly & Co.*, No. 1:12-cv-02045 (D.D.C. Dec. 20, 2012), http://fcpa.stanford.edu/fcpac/documents/3000/001962.pdf. The descriptions of the donations to charities are in paragraphs 2, 7, 9-15, 43, and 44. *Id.* Thus, the SEC did *not* prosecute the charitable contributions as violations of the anti-bribery provisions. *Id.* This indicates that the SEC did *not* consider such contributions to violate the anti-bribery provisions. At the very least, one cannot conclude that the Eli Lilly matter *supports* the conclusions that the charitable contributions at issue in this matter violated the FCPA.

204.  In the case of the Alstom Power, Inc. enforcement matter, the corrupt intent of the charitable donation was made clear because the payments were booked as expenses related to two projects building steam power generating units for a government entity, rather than as separate and independent charitable contributions. Information ¶ 34, *United States v. Alstom Power, Inc.*, 3:14-cr-00248 (D. Conn. Dec. 22, 2014), http://fcpa.stanford.edu/fcpac/documents/3000/002450.pdf.

## I. The Offshore Financial Sector Planning Committee and the International Financial Sector Authority

205.  Toward the end of his report, Koehler suggests that something Stanford may have been seeking to induce from Antiguan government officials was his appointment and that of other individuals identified by him to a body charged with drafting financial regulations, as well as the appointment of him and others identified by him to an Antiguan financial regulator.

206.  However, when all of the evidence is examined in full, the evidence suggests that the body that drafted the laws and the financial regulator were created to and attempted to *improve*, not weaken, Antigua's financial regulation.

207.  Around June 1997, Greenberg was engaged by the government of Antigua "to advise . . . on procedures which should be taken to ensure the proper, lawful development of the country's international financial sector." Pls.' Ex. 329 at 1.

208.  Greenberg's fees appear to have been paid by Stanford or Stanford entities directly or through loans to the government. *See* Pls.' Ex. 955; Pls.' Ex. 958; Deposition of Patrick O'Brien ("O'Brien Dep.") 133-36. This would not violate the FCPA as the thing of value is being provided for the benefit of the government, not a government official.

31

APP. 38

209.   Around the same time, Prime Minister Bird created the Offshore Financial Sector Planning Committee ("OFSPC") to "create a vibrant offshore financial sector and effective anti-money laundering program."   Pls.' Ex. 587 at 1.   The OFSPC was "comprised of government officials and businessmen thoroughly familiar with the offshore sector, and chaired by R. Allen Stanford."   *Id.*; *see also* O'Brien Dep. 109 (stating that the goal of the project was to grow the offshore banking industry while preventing money laundering).

210.   The OFSPC in turn, created two task forces.   "Task Force I was established for the specific purpose of evaluating every offshore bank in Antigua to determine their financial stability, the integrity of their owners, directors and management, the reliability of their operations and the possibility that they are being or could be used for illicit purposes."   Pls.' Ex. 345 at 2.   "Task Force II was formed for the purpose of evaluating the present regulatory regime governing offshore financial institutions, identifying existing or potential vulnerabilities and recommending specific measures to address those weaknesses in an effective manner."   *Id.*

211.   The task forces appear to have been staffed with experienced professionals with relevant backgrounds and skills.   The members were listed as:

- Michael Ancona, Managing Senior Associate at BDO Seidman, LLP.   Ancona had at that time a 17-year career in banking and finance.   *Id.* at 61.

- Jeffrey G. Balmer, Audit Partner at BDO Seidman, LLP.   A CPA, Balmer had at the time more than 12 years of experience in public accounting.   *Id.* at 62.

- Thomas V. Cash, Senior Managing Director at Kroll Associates.   Cash oversaw "Kroll's Risk Management, Litigation Support and international fraud and competitive intelligence practices."   Prior to working for Kroll Associates, Cash had worked for the Drug Enforcement Administration, including several years as "Special Agent in Charge of DEA's Florida and Caribbean Division."   *Id.* at 63.

- Ivan J. Diaz, Kroll Associates and a banking consultant.   Diaz had previously been Secretary of Commerce for Puerto Rico.   *Id.* at 64; O'Brien Ex. 2.

- Keith Ellenburg, Audit Partner BDO Seidman, LLP.   Pls.' Ex. 345 at 65.

- Barry Hersh, Audit Partner at BDO Seidman, LLP.   Hersh at the time had more than 36 years of experience in public accounting.   *Id.* at 66.

- Carlos Loumiet, Chairman of the International Practice Group at Greenberg.   Loumiet graduated from Yale College and Yale Law School.   *Id.* at 67.

- Patrick T. O'Brien, Shareholder (Partner) at Greenberg.   Previous to practicing law, O'Brien was a United States Customs Service Special Agent for more than 25 years.   *Id.* at 68.

- Mark P. Schnapp, Shareholder (Partner) at Greenberg.  Schnapp worked as a prosecutor in the DOJ for several years, and was eventually promoted to Chief of the Criminal Division of the U.S. Attorney's Office for the Southern District of Florida.  *Id.* at 69.

212.  The OFSPC was not a paper entity.  The committee reviewed existing legislation and recommended changes to prevent money laundering, fraud, and similar crimes.  The OFSPC issued a report of recommendations in January 1998.  Pl's Ex. 363.  At the March 25, 1998 meeting of the Caribbean Financial Action Task Force, the Antiguan representative presented and distributed the OFSPC January recommendations.  GREENBERG 00025988.  A U.S. government "interagency team" reviewed the materials and was "encouraged that many of the report's recommendations comply with international anti-money laundering standards."  *Id.*  The USG also sent a written response to the government of Antigua with some suggested edits.  *Id.*  In August 1998, the OFSPC issued its final recommendations.  O'Brien Ex. 2.  With certain changes to the OFSPC's recommendations, on October 28, 1998, the Antiguan Parliament passed the International Business Corporations (Amendment) (No. 2) Act, 1998 and Money Laundering (Prevention) (Amendment) Act, 1998.  O'Brien Ex. 4; Money Laundering (Prevention) (Amendment) Act, 1998 (1998), http://laws.gov.ag/wp-content/uploads/2018/08/a1998-18.pdf.

213.  The new legislation and regulations implemented the following, among other changes:

- The creation of an independent bank supervisory agency, the International Financial Sector Authority ("IFSA"), which was charged with regulating Antigua's offshore financial sector.  Prior to the creation of the entity, "decisions regarding offshore financial institutions were made by two individuals" in a confidential manner.  Pls.' Ex. 587 at 3.

- Starting due diligence investigations into the ownership and management of all offshore financial institutions, and the prohibition of "bearer share" ownership.  *Id.*

- All directors of offshore financial institutions were required to be "real persons, and at least one had to reside in Antigua."  *Id.*

- "Each offshore financial institution was required to appoint a Compliance Officer responsible for ensuring compliance with the Money Laundering (Prevention) Act, the International Business Corporations Act and all other applicable statutes and regulations."  *Id.* at 4.

- "The IFSA was expressly permitted to disseminate information concerning the management and operation of offshore financial institutions to foreign regulatory agencies.  There was no similar provision under prior Antiguan law."  *Id.*

- "All loans to affiliates had to be 100% collateralized, and no loans could be made for a third party to acquire a beneficial interest in the lending institution."  *Id.*

- "Offshore banks were required to keep records of all transactions for a period of five years." *Id.* at 5.

- "If the Board of Directors of the IFSA had reasonable grounds for believing that a bank was not in a sound financial condition or was not operating in a reasonable and prudent manner, it could send in its examiners and act on the result of the examination." *Id.*

- "All offshore banks became subject to mandatory annual examinations." *Id.*

- "The Money Laundering Supervisory Authority could unilaterally freeze tainted funds for up to 96 hours upon mere suspicion of money laundering," and a "court could freeze tainted funds for up to 30 days." *Id.*

- "All tainted funds located in Antigua and Barbuda were subject to forfeiture, regardless of where in the world a person was charged." *Id.*

214.  Although there were some criticisms of the legislation, previously the offshore financial service industry had been essentially unregulated. *See id.* at 1. Thus, the statutes and regulations were a clear step forward. *See also* O'Brien Dep. 305 ("[T]he goal . . . was that if people were going to launder money, we wanted them to go someplace else, get out of Antigua.")

215.  Six individuals were appointed to the newly created IFSA board of directors, including Brian Stuart-Young, another banker and seemingly a competitor of Stanford's, O'Brien, Stanford, and Errol Cort, an attorney. The remaining positions were filled by bankers. Pls.' Ex. 587 at 6; O'Brien Dep. 162-63, 165-67.

216.  O'Brien, the Greenberg lawyer, objected to appointing bankers to this regulatory body because of the possible or perceived conflict of interest (*i.e.*, bankers regulating themselves). However, his opinion did not prevail. O'Brien Dep. 165-67.

217.  The response to O'Brien's objections was that the population of Antigua was small, and therefore there were limited people with sufficient expertise to regulate the financial services industry. O'Brien Dep. 167. Such an argument is plausible, and not indicative *per se* of corruption.

218.  The draft legislation and regulations reflect this good-faith debate. In June 1998, O'Brien circulated a memo that laid out the proposed changes to Antiguan legislation and regulation. Among the changes were amendments to the International Business Corporations Act, including the creation of the International Business Corporations Authority, which would later be renamed the IFSA. O'Brien Ex. 1; O'Brien Ex. 4. As then drafted, the International Business Corporations Authority was to consist of a chairman, executive director, and "five other persons, appointed by the Minister of Finance with the approval of the Cabinet." O'Brien Ex. 1.

219.    In August 1998, O'Brien circulated the "final draft" of the new legislation and regulations. The International Business Corporations Authority would now consist of a chairman, deputy chairman, and "four other persons, each with at least ten years banking, trust, insurance and/or related experience, appointed by the Minister of Finance with the approval of the Cabinet."  O'Brien Ex. 2.[5]  Under the OFSPC's final recommendation, neither the chairman nor deputy chairman was required to have banking experience.  *Id.* at 19 (proposed amendments to the International Business Corporations Act § 316(6)(a)-(b)). The adopted legislation changed the recommendation, requiring both the chair and the deputy chair to have at least ten years of banking experience, but reducing the requisite banking experience for the other four members from ten years to seven years.  International Business Corporations (Amendment) (No. 2) Act, 1998 (1998), http://laws.gov.ag/wp-content/uploads/2018/08/a1998-17.pdf (Ant. & Barb.).

220.    Thus, the Antigua Parliament, in requiring that *all* members of the IFSA have significant banking experience, and the Minister of Finance, in appointing bankers to the board, acted in spite of the concerns O'Brien had raised and against his recommendations.  O'Brien Dep. 165-67.  However, from O'Brien and Greenberg's perspective, the government's decision was not one of corruption but based on a desire to have qualified, experienced individuals on the board.

221.    Furthermore, while Greenberg was representing Stanford, the IFSA improved as a regulatory organization.  For example:

•       The bankers were taken off the IFSA board shortly after their appointments. O'Brien Dep. 168.

•       Lloyd Harrell was appointed Supervisor of Banks and Superintendent of Insurance. Pls.' Ex. 968 at 3.  Harrell was a former FBI agent in Texas, who had significant experience investigating savings and loan associations.  Michael Sallah & Rob Barry, *Allen Stanford Ponzi Case Puts Lawyers in Spotlight*, Bradenton Herald (Apr. 17, 2010), https://www.bradenton.com/latest-news/article34483965.html; O'Brien Dep. 293-94.

•       The Antiguan government closed 47 problematic banks.  O'Brien Dep. 314.

222.    In April 1999, the United States Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") did advise banks and financial institutions "to give enhanced scrutiny to all financial transactions routed into or out of Antigua and Barbuda."  Advisory 11, Enhanced Scrutiny for Transactions Involving Antigua and Barbuda, FinCEN Advisory, U.S. Dep't of the Treasury Financial Crimes Enforcement Network (Apr. 1999), https://www.fincen.gov/sites/default/files/advisory/advis11.pdf.

---

[5]       Although the memos in O'Brien Ex. 1 and O'Brien Ex. 2 list O'Brien as the author, the substance reflected the views of the entire committee, not necessarily O'Brien's views.  O'Brien Dep. 165-66.

223.   However, the advisory was largely based on a misunderstanding of perceived weaknesses in the new regulatory regime created by the Antiguan government.  O'Brien Ex. 5; *see also* Pls.' Ex. 955.  Moreover, changes were made to address the concerns raised by the Treasury Department.  O'Brien Dep. 313, 318.  None of these significantly changed the law and the protections in it; FinCEN was nonetheless satisfied with the changes and withdrew the Advisory in 2001.  *See id.*; FinCEN Advisory, U.S. Dep't of the Treasury Financial Crimes Enforcement Network (Aug. 1, 2001), https://www.fincen.gov/resources/advisories/advisory-withdrawal-issue-11a (withdrawing Advisory 11 as "Antigua and Barbuda ha[d] enacted significant reforms to its counter-money laundering system, addressing the points noted in Advisory 11, and ha[d] taken concrete steps to bring these reforms into effect").

224.   Moreover, the DOJ had a very positive assessment of the changes made to Antigua's financial regulations.  O'Brien Dep. 313.

225.   Eventually, O'Brien, Harrell, and other qualified individuals were forced out of the IFSA, and the IFSA eventually became significantly less effective.  *See* O'Brien Dep. 169; Pls.' Ex. 968.  Thus, the weakening of financial regulation was not Greenberg's doing, but the doing of others.

226.   Based on this factual record, there is no evidence of a corrupt *quid pro quo* related to the creation of the OFSPC or the IFSA.  The individuals appointed were experienced professionals.  The Greenberg individuals involved worked diligently to improve the financial regulatory structure and achieved real results.  Such actions are not indicative of an attempt to corrupt government officials, and hence there is no evidence of an FCPA anti-bribery violation.

227.   Koehler quotes O'Brien as saying that the IFSA board was unqualified and that the employees were overpaid and unqualified.  He tries to use this as evidence that the creation of the IFSA was a violation of the FCPA.  However, O'Brien made clear that having unqualified individuals on the board was *not* the intended goal.  Rather, he was writing this to Stanford to propose strategies for *improving* the situation and making the IFSA a more effective regulator.  Pls.' Ex. 968.

228.   Again, efforts to *improve* financial regulations are inconsistent with a corrupt motive to cause government officials to misuse their government position.

229.   In summary, Koehler seems to misunderstand fundamentally what is meant by a prima facie violation of the FCPA.  None of the transactions identified evidence a corrupt *quid pro quo*.  In several cases, Koehler does not even specify a "*quo*," what Stanford "[sought] to gain" or what decision he "[sought] to influence."  *See* Matthew Mosk & Lauren Pearle, *Legal Questions Swirl Around Idea to Offer $50 Million Penthouse to Putin in Trump Tower Moscow*, ABC News (Dec. 3, 2018), https://abcnews.go.com/Politics/legal-questions-swirl-fate-50-million-penthouse-trump/story?id=59558768 (as discussed above, Koehler's analytical framework in discussing whether Donald Trump violated the FCPA).

230.    In other cases, at most what Koehler describes is an effort to obtain generalized goodwill, which does not meet the corrupt intent requirement of the FCPA. *See Sun-Diamond Growers*, 526 U.S. at 404-05.

231.    Moreover, Koehler fails to analyze each alleged violation to determine if all the elements of an FCPA violation are met.[6]  For example, some of the alleged violations consist of payments to the government rather than government officials.  Furthermore, nowhere does Koehler systematically consider the requirement that, prior to the 1998 amendments, an FCPA violation needed to involve the use of the mails or an instrumentality or means of interstate commerce.  Indeed, at times in the report, Koehler seems to tacitly acknowledge this by referring to FCPA risk instead of FCPA violations.

232.    At no point does Koehler establish that any of the above-discussed transactions violated the FCPA anti-bribery provisions.

233.    Therefore, and more importantly, Greenberg could not have known of any FCPA anti-bribery violations because none existed.  And, as also discussed above, even if one were to conclude incorrectly that any of the described transactions violated the FCPA, the evidence Greenberg had at the time did not support such a conclusion.  Thus, Greenberg was not aware and should not have been aware of any "prima facie" FCPA violations.

## VII.    Greenberg's FCPA Advice Neither Aided and Abetted Nor Prolonged Stanford's Ponzi Scheme

234.    Koehler suggests that Greenberg's responses to and advice on FCPA questions that came up from time to time aided and abetted Stanford's Ponzi scheme and/or prolonged it, presumably thereby damaging later investors.

235.    Van Tassel makes similar statements and claims to have established a "causal connection" between the advice Greenberg provided Stanford and the Stanford entities and the claimed damage to investors.

236.    As proof of this, Van Tassel states that Greenberg represented Stanford and the Stanford entities, that "Greenberg assisted Stanford in establishing and maintaining influence in Antigua," and that "Greenberg assisted Stanford in influencing the banking regulatory environment in Antigua."   Declaration of Karyl Van Tassel ¶ 29, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-CV-04641-N (N.D. Tex. Mar. 6, 2019) ("Tassel Decl.").

---

[6]     As a reminder, prior to the November 1998 amendments to the FCPA, to prove an FCPA anti-bribery violation, the DOJ or the SEC had to show that a (1) Covered Person (2) made use of the mails or a means or instrumentality of interstate commerce (3) to offer, pay, promise to pay, or authorize the payment of money or anything of value (4) to a Foreign Official or a third party "while knowing" that all or part of the payment or thing of value would be given to a Foreign Official (5) corruptly, for the purpose of influencing any act or decision of a Foreign Official in his official capacity, inducing a Foreign Official to do or omit to do any act in violation of his lawful duty, or inducing a Foreign Official to use his influence to affect an act of the foreign government, (6) in order to obtain or retain business.

237. However, the evidence in the record shows that Greenberg's FCPA advice neither aided and abetted nor prolonged Stanford's Ponzi scheme.

238. This section first shows that Greenberg's legal advice did not aid and abet any FCPA anti-bribery violations. It next shows that the advice Greenberg provided and the investigation Greenberg conducted were competent and did not prolong the Ponzi scheme. This section then describes that obtaining "influence" in a country does not violate the FCPA. Fourth, this section addresses the accusation by Plaintiffs that Greenberg "initiated what amounted to a counter-espionage campaign of Freedom of Information [sic] ('FOIA') requests on the U.S. Government [sic] in an attempt to uncover what the 'Feds' knew about Stanford and his activities." Plaintiffs' Second Amended Complaint, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641-N (N.D. Tex. Nov. 19, 2018). This section concludes by addressing the mistaken premise advanced by Plaintiffs that lawyers aware of an FCPA violation by their client must withdraw from representing that client.

### A. Greenberg's Advice Did Not Aid and Abet an FCPA Anti-Bribery Violation

239. Both civil and criminal aiding and abetting have similar requirements.

240. As the FCPA is a federal statute, the relevant aiding and abetting criminal statute is 18 U.S.C. § 2. In order to be guilty of aiding and abetting a federal crime, such as an FCPA anti-bribery violation, "a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.'" *Rosemond v. United States*, 572 U.S. 65, 76 (2014) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

241. "In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.'" *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).

242. In order to prove the aider and abettor provided "substantial assistance," the SEC must prove "that the defendant 'in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'" *Id.* (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

243. Neither civil nor criminal aiding and abetting apply here. First, as described above, there were no FCPA anti-bribery violations to aid and abet. *United States v. Staten*, 581 F.2d 878, 887 (D.C. Cir. 1978) ("To be sure, there must be a guilty principal before there can be an aider and abettor. . . ."). Moreover, at no point does the evidence in the record establish that Greenberg had the *mens rea* required for proving someone aided and abetted an FCPA violation.

244.   Nowhere does the record demonstrate that Greenberg had the desire to further any anti-bribery violations.  In fact, the record demonstrates the opposite, that Greenberg would not knowingly further any anti-bribery violation.  *E.g.*, Schnapp Dep. 86-87.

**B.     Greenberg Provided Competent Advice Regarding the Requirements of the FCPA and Conducted a Competent FCPA Investigation**

245.   With respect to whether Greenberg's conduct prolonged Stanford's Ponzi scheme, as described in detail in the prior section, the evidence in the record does not establish that there were any FCPA anti-bribery violations.  Thus, Greenberg's conduct did not facilitate any FCPA violations that prolonged the Ponzi scheme, contrary to Plaintiffs' allegations.

246.   Even if there were anti-bribery violations, Greenberg's actions were standard steps for an FCPA lawyer.

247.   As outlined in Section V, Greenberg provided competent analysis of the specific transactions it was asked to analyze under the FCPA.

248.   In his report, Koehler also argues that Greenberg should have insisted that the agreement to purchase the Bank of Antigua include FCPA representations and warranties.  However, the concern that Koehler highlights is the concern that Stanford/Stanford entities were bribing government officials.  Thus, the relevant representation would be to have Stanford/Stanford entities represent that they were not violating the FCPA.

249.   Yet, Greenberg was representing the Stanford entities.  It would be highly unusual for a lawyer to encourage its own client to make representations.  Rather, Greenberg's focus would be on necessary representations *by the opposing party*.

250.   Therefore, it is not at all unusual that Greenberg did not require its own client to make FCPA representations.  And, it could have reasonably concluded, given the structure of the transaction and the approval process for the transaction, that the owners of the Bank of Antigua were not bribing government officials (something not alleged by Plaintiffs) and thus, FCPA representations and warranties for the Bank of Antigua were not needed.

251.   Had there been an anti-bribery violation by Stanford or Stanford entities and had Greenberg known of that violation, the reasonable conduct by Greenberg would not have been, as Koehler suggests, to add representations and warranties that Greenberg knew its client could not truthfully represent and warrant.  Rather, the reasonable step would have been to remediate the problematic conduct.  Since, as discussed above, there was no anti-bribery violation, there was nothing for Greenberg to remediate.

252.   Moreover, when asked to investigate whether Stanford's/Stanford entities' conduct violated the FCPA in connection with the hospital project, Greenberg conducted a competent investigation.

253.   Greenberg conducted interviews of relevant individuals and collected relevant documents. Schnapp Dep. 52-61, 74; Pls.' Ex. 194.

254.   Greenberg asked appropriate questions about the hospital project, including whether there had been any bribery, why DSI's proposal had been rejected, what were the problems with DSI's design, and what were the problems with DSI.  Schnapp Dep. 54-57, 99-101.

255.   Based on this investigation, Greenberg concluded that DSI was rejected for developing the hospital site because of an inadequate proposal, not bribery.  Pls.' Ex. 244 at 3 (a letter from Schnapp to David Frank of the Fraud Section of the DOJ, in which Schnapp sends Frank a copy of an evaluation of the DSI proposal and says that that evaluation "sheds further light on the inadequacy of the DSI proposal and the business justification for its rejection by the Government of Antigua").

256.   Such an investigation, targeted to the issues of concern and targeted to only relevant documents and interviewees is entirely appropriate.

257.   When conducting an investigation of FCPA issues, it is critical to appropriately scope the matter so as to thoroughly investigate the matter but not waste time and money scouring for any possible hint of an issue.

258.   This is not simply the advice of experienced practitioners in this area, but of the DOJ itself. The DOJ has stated that companies should conduct targeted investigations and not "boil the ocean."  Leslie R. Caldwell, Assistant Attorney General Leslie R. Caldwell Delivers Remarks at New York University Law School's Program on Corporate Compliance and Enforcement (Apr. 17, 2015), https://www.justice.gov/opa/speech/assistant-attorney-general-leslie-r-caldwell-delivers-remarks-new-york-university-law ("Although we expect internal investigations to be thorough, we do not expect companies to aimlessly boil the ocean.  Indeed, there have been some instances in which companies have, in our view, conducted overly broad and needlessly costly investigations, in some cases delaying our ability to resolve matters in a timely fashion."); *see also* Mike Koehler, *Is Cognizant Technology "Boiling The Ocean"*, FCPA Professor (Mar. 3, 2017), http://fcpaprofessor.com/cognizant-technology-boiling-ocean/ (questioning whether an internal investigation was too broad and unfocused); Mike Koehler, *Six Reasons Why The Corporate Community Should Take the DOJ's "Pilot Program" With a Grain of Salt*, FCPA Professor (Apr. 19, 2016), http://fcpaprofessor.com/reasons-why-the-corporate-community-should-take-the-dojs-pilot-program-with-a-grain-of-salt/ (criticizing law firms and other practitioners for turning FCPA investigations into "billing boondoggle[s]").

259.   Thus, Greenberg undertook an appropriate review of these matters.

### C.   Obtaining Influence Does Not Necessarily Violate the FCPA

260.   Van Tassel states that "Greenberg assisted Stanford in establishing and maintaining influence in Antigua" and that "Greenberg assisted Stanford in influencing the banking regulatory environment in Antigua."  Tassel Decl. ¶ 29.

261.   Although stating that this constituted "corruption," Van Tassel does not provide any evidence that Greenberg's actions constituted a violation of the FCPA anti-bribery provisions.  *Id.* ¶ 58 n.66.

262. Instead, the declaration generally describes the same transactions and legislation described in the Koehler Report, and various documents that Van Tassel says demonstrate that Stanford has a close personal relationship with government officials in Antigua. *Id.* ¶¶ 58-70, 83-88.

263. However, it is not a violation of the FCPA to conduct business with government officials, to conduct business with a foreign government, or even to give things of value to government officials if the thing of value is given without a corrupt intent. It is not a violation of the FCPA to have a personal relationship with a government official or government officials.

264. Establishing or attempting to obtain "influence" is not, in and of itself, a violation of the FCPA. Receiver's Third Amended Objections and Answers to Greenberg Traurig's First Set of Interrogatories at 10, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641-N (N.D. Tex. Apr. 3, 2019). That remains true even if, in the eyes of some, the amount of influence attained is "unseemly." *Id.*

265. As explained above, a transaction only violates the anti-bribery provisions of the FCPA if it is motivated by a corrupt intent. Corrupt intent is present only if a *quid pro quo* motivated the transfer or promise to transfer a thing of value to the foreign official. *Kay*, 359 F.3d at 743 (an FCPA bribery violation requires a "*quid pro quo*").

266. Transfers or payments made to promote general goodwill do not meet the definition of "corruptly" for the domestic bribery statute, and therefore, given Congressional intent, they would not meet the definition of "corruptly" as used in the FCPA. *See Sun-Diamond Growers*, 526 U.S. at 404-05. The DOJ has itself acknowledged that non-specific desires to "influenc[e] legislation and regulations" are not violations of the FCPA. Brief for Plaintiff-Appellant, *United States v. Kay*, 359 F.3d 738 (5th Cir. 2004), (No. 02-20588), 2002 WL 32507953, at *14-15.

267. The evidence in the record does not demonstrate that the transactions Greenberg assisted Stanford or the Stanford entities with violated the FCPA, nor does the evidence in the record show that Greenberg had the intent to violate or aid and abet a violation of the FCPA. There is nothing improper with a lawyer assisting a client in engaging in lawful transactions with government entities or officials. Thus, Greenberg's lawful and competent FCPA advice and investigations did not prolong the Ponzi schemes.

## D.    There is Nothing Improper about Submitting FOIA Requests

268. Plaintiffs declare that Greenberg "initiated what amounted to a counter-espionage campaign of Freedom of Information [sic] ('FOIA') requests on the U.S. Government [sic] in an attempt to uncover what the 'Feds' knew about Stanford and his activities." Plaintiffs' Second Amended Complaint, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641-N (N.D. Tex. Nov. 19, 2018); *see also* Receiver's Second Amended Objections and Answers to Greenberg Traurig's First Set of Interrogatories at Exhibit A, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641-N (N.D. Tex. Mar. 1, 2019) (stating that Greenberg "[d]irected a counter-espionage campaign against the U.S. Government on Stanford's

behalf using FOIA requests to find out what the U.S. Government knew about Stanford's activities").

269.  However, the Freedom of Information Act ("FOIA") is a statute that gives the public the right to access information held by federal government agencies. U.S. Dep't of Justice, *United States Department of Justice Guide to the Freedom of Information Act: Introduction* at 1 (Mar. 7, 2019), https://www.justice.gov/oip/foia-guide/introduction/download.

270.  It is not illegal to submit FOIA requests. If a request covers a topic that falls into a FOIA exemption, the request will simply be rejected. 5 U.S.C. § 552 (2018).

271.  Among the many exemptions under which a FOIA request can be denied is one for "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. 552(b)(7); Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207, 3207-48 (1986), https://www.govinfo.gov/content/pkg/STATUTE-100/pdf/STATUTE-100-Pg3207.pdf.

272.  Law enforcement proceedings has been interpreted broadly by courts, and applies not just to criminal proceedings, but also civil actions and regulatory proceedings. U.S. Dep't of Justice, *United States Department of Justice Guide to the Freedom of Information Act: Exemption 7(A)* at 534 (Aug. 10, 2009), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/exemption-7A-2009.pdf.

273.  Indeed, "courts grant agencies wide latitude in defining their law enforcement purposes." U.S. Dep't of Justice, *United States Department of Justice Guide to the Freedom of Information Act: Exemption 7* at 13 (May 21, 2014), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/exemption7.pdf.

274.  Information can be withheld if "a law enforcement proceeding is pending or prospective" and if the "release of information . . . could reasonably be expected to cause some articulable harm." U.S. Dep't of Justice, *United States Department of Justice Guide to the Freedom of Information Act: Exemption 7(A)* at 524 (Aug. 10, 2009), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/exemption-7A-2009.pdf. An agency must point to a specific pending or contemplated law enforcement proceeding, but there is no time limit for ongoing investigations. *Id.* at 524-25.

275.  Thus, the fact that Greenberg and Stanford received any information indicates that the material was not critical to any ongoing law enforcement investigations. Such material is therefore not proof of any violation of law since the investigations were closed *without* a finding of a violation. In my experience, many companies are investigated by government regulators who ultimately determine that the conduct did not violate U.S. law because there was no violation of law.

276.  Moreover, characterizing the FOIA requests as "counter-espionage" is bizarre, as it implies that Greenberg's conduct was somehow secretive, but a FOIA request, in contrast, is a very transparent action.

42

277.   FOIA requests are made to the agency from which the material is requested. 5 U.S.C. § 552 (2018). Thus, the agencies were well aware of the FOIA requests. There was nothing secretive or illegal about the requests.

278.   I have submitted FOIA requests on behalf of clients under investigation or in connection with cases or internal investigations.

### E.   Lawyers Do Not Have to Withdraw if Their Client Has Violated the FCPA

279.   Finally, Plaintiffs seemingly assert that a lawyer aware of FCPA violations by a client must withdraw from representing that client.

280.   This is incorrect. Such a position would lead to the absurd result that any company that violated the FCPA could not have legal representation in DOJ and SEC investigations. Rather, if a lawyer becomes aware his/her client has violated the FCPA, the lawyer cannot act to *further* the violation, and should counsel the client on how best to remediate the violation.

281.   Similarly, the suggested inference that a lawyer should avoid or disengage from representations that appear "unseemly" to the public is also mistaken. FCPA lawyers often represent clients who may have engaged in "unseemly" or even illegal conduct, and such representations are not improper. Again, it is the role of a lawyer to *defend* clients who may have violated the FCPA or who are alleged to have violated the FCPA, subject to applicable rules of professional conduct. This means a lawyer cannot work to further any violation of law, but can still counsel a client who has violated the law.

## VIII.  Conclusion

282.   In conclusion, the evidence in the record does not support that there were any FCPA violations, that Greenberg took any action that aided and abetted any FCPA violations, and that Greenberg failed to give competent advice on the FCPA matters it was asked to advise on or investigate.


Executed this 15th day of April, 2019


_Martin J. Weinstein_

43

# Appendix A

# WILLKIE FARR & GALLAGHER LLP



**Martin J. Weinstein**
Partner

### Washington

Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
T 202 303 1122
F 202 303 2122
mweinstein@willkie.com

## EMPLOYMENT EXPERIENCE

**Willkie Farr & Gallagher**
Washington, DC

Chair, Compliance & Enforcement Practice Group
Partner, Litigation Department
2003 – Present

Over the course of his more than 30-year career, Martin Weinstein has represented the U.S. government, multinational corporations, and individuals in a wide variety of matters involving allegations of bribery and violations of the accounting provisions under the FCPA.  Mr. Weinstein has been ranked by *Chambers USA* and *Chambers Global* each year since 2007, and has been named on *Ethisphere Magazine*'s "Attorneys Who Matter" list seven times.

For the past 22 years, Mr. Weinstein has been in private practice, most recently as a partner in the Washington, DC office of Willkie, where he is Chair of the Compliance & Enforcement Practice Group and a member of the Firm's Executive Committee.  During this time, Mr. Weinstein has defended clients in many significant FCPA cases before the DOJ and the SEC, including cases involving Alcatel Lucent, Daimler, Lucent Technologies, Teva Pharmaceuticals, Titan, and Tyco International.  He has represented clients in hundreds of matters ranging from bet-the-company, high-stakes investigations involving the DOJ and the SEC to discrete whistleblower complaints or other inquiries.  A significant portion of Mr. Weinstein's practice consists of internal investigations with no government involvement; other investigations have involved limited government interaction but no formal government resolution; some resulted in a more robust government investigation but no formal resolution; and a smaller portion of his representations in investigations have resulted in a monetary penalty for his client.  Most of the settlements that resulted in a monetary penalty involved relatively small dollar amounts.  On a handful of occasions, the settlements involved large penalties.  A criminal plea or conviction has been even rarer.

**Education**
University of Virginia School of Law, J.D., 1984
Dartmouth College, B.A., 1981

**Bar Admissions**
District of Columbia
Georgia
Maryland

**Court Admissions**
United States Supreme Court

WILLKIE FARR & GALLAGHER LLP

Mr. Weinstein has also advised numerous clients in connection with due diligence investigations, including pre- and post-acquisition anti-corruption due diligence on behalf of both the acquiring entity and the target entity and anti-corruption due diligence of third parties and potential business partners.  His anti-corruption due diligence experience has spanned various industries, including the extractive industries, defense, telecommunications, entertainment, and life sciences, including pharmaceuticals.  In each case, Mr. Weinstein has advised on scoping appropriate anti-corruption due diligence, following up on red flags identified in the review, determining if violations have occurred, analyzing possible enforcement outcomes and penalties, and advising on remediation and compliance program enhancements.  Additionally, Mr. Weinstein has frequently participated in the underwriting due diligence process when an issuer has FCPA risks or is the subject of an ongoing FCPA investigation.

Mr. Weinstein has also developed comprehensive anti-corruption compliance programs for numerous Fortune 500 companies and evaluated, and made recommendations to strengthen, existing programs.  For example, he recently completed performing compliance oversight for a major oilfield services company that operates in geographic areas with high corruption risk by reviewing relevant documents, transactions, and company policies; interviewing company employees; and, when appropriate, suggesting revisions to company policy to deter corrupt behavior.

In addition to Mr. Weinstein's representations, Mr. Weinstein has published an authoritative, in-depth treatise on the FCPA, which includes detailed sections on best practices for pre-acquisition due diligence, compliance programs, investigations, and interactions with FCPA enforcement agencies in the United States.[i]  Mr. Weinstein has published dozens of articles and updates discussing significant FCPA developments and issues of current concern under the FCPA, including best practices for conducting transaction-related anti-corruption due diligence.  He has also spoken at numerous industry and legal conferences throughout the years, including the American Conference Institute's Annual International Conference on the FCPA.  Mr. Weinstein led the development of a first-of-its-kind web-based application for multinational companies, attorneys, and compliance professionals called Willkie Compliance Concourse.[ii]  The Willkie Compliance Concourse offers free, on-demand access to comprehensive practice guides, real-time news and analysis, and CLEs covering, among other things, anti-corruption, compliance programs, internal investigations, and enforcement in the US and UK.

WILLKIE FARR & GALLAGHER LLP

**Foley & Lardner**                       Partner

Washington, DC                            1996 – 2003

Maintained a diversified domestic and international practice in law firm of over
600 lawyers worldwide.  Represented corporations and individuals in analysis of
full scope of issues involving foreign business practices, including the FCPA.
Advised on international transactions, conducted internal investigations,
designed and implemented compliance programs, and represented clients before
federal and state authorities. Counseled clients in white-collar matters, including
financial issues involving healthcare, tax, securities, intellectual property, and
government contracts.

**United States Attorney's Office**       Assistant United States Attorney

Atlanta, GA                               1989 – 1996

Oversaw the investigation, prosecution, and trial of numerous corporations and
individuals in matters involving complex financial frauds relating to international
and domestic transactions.  Served as lead prosecutor in the *Lockheed* case,
which involved violations of the FCPA, and resulted in a criminal fine and civil
settlement totaling $24.8 million.[iii] Litigated and negotiated civil as well as
criminal controversies with emphasis on foreign corruption, tax, securities,
government contracts, and healthcare. Tried more than 20 federal jury trials,
negotiated in excess of 50 guilty pleas, and investigated hundreds of other cases
involving allegations of federal criminal conduct.  Created and managed teams of
attorneys, investigators and accountants from grand jury investigation through
appeal.

Developed extensive experience in non-traditional AUSA activities involving
international issues. Conducted sensitive bilateral negotiations with senior foreign
government officials during visits throughout the Middle East and Europe. Utilized
substantive knowledge of international finance and business practices, including
FCPA and government contract regulations.

**United States Department of Justice**   Trial Attorney, Tax Division
Washington, DC                            1988 – 1989

Prosecuted tax-related crimes in jurisdictions nationwide. Served as lead
prosecutor in districts which requested outside counsel with special skills in
investment fraud and white-collar offenses.

**Howrey & Simon**                        Associate
Washington, DC                            September 1984 – January 1988

Developed federal litigation practice including civil antitrust, intellectual property,
international business and white-collar criminal defense.

**WILLKIE FARR & GALLAGHER** LLP

## RELATED EXPERIENCE

### EXPERT WITNESS

- Testified as an FCPA expert for breach of contract cases, *Juan Fabri Sr. and Juan F. Fabri Jr. v. United Technologies International, Inc.*, No. 396-CV-02358 (PCD) (D. Conn. 2001), and *Breezevale Limited v. Exxon Corp. et al.*, No. 96-08063-E (D. Tex., Dallas Co. 1998).

- Submitted expert report on securities and wire fraud for *Hemispherx Biopharma, Inc. v. Asensio, et al.*, No. 3970 (Pa. Com. Pl. 2001).

### PROFESSIONAL AND COMMUNITY INVOLVEMENT

| | |
|---|---|
| **DARTMOUTH COLLEGE** | President's Leadership Council |
| | 2013 – Present |
| | |
| **LANDON SCHOOL** | Trustee |
| | 2013 – Present |
| | |
| **COMMUNITY FOUNDATION FOR THE** | Chairman      2013 – 2016 |
| **NATIONAL CAPITAL REGION** | Board Member   2009 – 2016 |
| | |
| **DEPARTMENT OF STATE** | Advisor |
| Washington, DC | April – May 1996 |

At State Department's request, worked with U.S. embassies in Latvia and Lithuania regarding economic and legal counsel regarding the restructuring of Baltic finance laws. Met with U.S. business leaders, international consultants, and foreign cabinet ministers to assist in the development of transparent capital markets system.

**WILLKIE FARR & GALLAGHER** LLP

## RELEVANT PRINT PUBLICATIONS

- *The Foreign Corrupt Practices Act: Compliance, Investigations and Enforcement*, coauthors Martin J. Weinstein, Robert J. Meyer, and Jeffrey D. Clark, Law Journal Press, 2012, supp. 2016.

- *United Kingdom Enacts Bribery Act 2010*, coauthors Martin J. Weinstein, Robert J. Meyer, and Jeffrey D. Clark, Financial Fraud Law Report, June 2010.

- *Fraud Law Developments*, coauthors Martin J. Weinstein, Robert J. Meyer, and Jeffrey D. Clark, Financial Fraud Law Report, March 2010.

- *Voluntary Disclosure under the FCPA*, TRACE Quarterly Newsletter, Spring 2008.

- *The World of International Compliance: What Transactional Lawyers Need to Know to Perform Ethically and Responsibly*; Houston Journal of International Law, Vol. 29, Issue 2 (Winter 2007), pp. 311-326.

- *Designing and Implementing An Effective Corporate Compliance Programme*, coauthors Martin J. Weinstein, Howard W. Fogt, Jr., and Ivonne Mena King; The Antitrust Review of the Americas 2000, October 1999.

- *New OECD Treaty Fights Corruption*, coauthor Allison C. George; The National Law Journal, Vol. 21, No. 27, March 1999.

- *The Foreign Corrupt Practices Act and International Bribery and Corruption: Recent Developments*, Mineral Law Series: Rocky Mountain Mineral Law Foundation, 2 CH7B (21), March 1997.

## OTHER RELEVANT PUBLICATIONS

- "Court Refuses to Extend FCPA Liability Beyond Statutorily Defined Covered Persons," Willkie Farr & Gallagher Client Memorandum, August 30, 2018.

- "SEC's First FCPA Enforcement Action in 2017 Highlights the Importance of Third Party and Transaction-Related Anticorruption Due Diligence," Willkie Farr & Gallagher Client Memorandum, February 1, 2017.

- "U.S. Regulators Settle FCPA Enforcement Actions Based on Hiring Relatives of Government Officials," Willkie Farr & Gallagher Client Memorandum, December 1, 2016.

**WILLKIE FARR & GALLAGHER** LLP

- "Two Recent FCPA Enforcement 'Firsts': Settlement with Large Hedge Fund and Two of Its Senior Executives and Two DOJ Pilot Program Declinations Requiring Disgorgement," Willkie Farr & Gallagher Client Memorandum, October 6, 2016.

- "Recent FCPA Enforcement Action Highlights Risks Related to Charitable Contributions," Willkie Farr & Gallagher Client Memorandum, September 23, 2016.

- "DOJ's Fraud Section Issues Guidance on Pilot Program for Self-Reporting, Cooperation, Remediation and Fine Reduction," Willkie Farr & Gallagher Client Memorandum, April 6, 2016.

- "U.S. Department of Justice Issues New Guidance to Encourage the Prosecution of Individuals in Corporate Cases," Willkie Farr & Gallagher Client Memorandum, September 16, 2015.

- "BHP Billiton Fined $25 Million for FCPA Violations Related to Olympic Entertainment," Willkie Farr & Gallagher Client Memorandum, May 27, 2015.

- "Company Compliance Officer Wins a Dodd-Frank Whistleblower Award," Willkie Farr & Gallagher Client Memorandum, April 27, 2015.

- "Alstom S.A. Pleads Guilty to FCPA Violations and Agrees to Pay a Record $772 Million Criminal Fine," Willkie Farr & Gallagher Client Memorandum, December 23, 2014.

- "Landmark Decision Issued on the Scope of the Terms 'Foreign Official' and 'Instrumentality' under the Foreign Corrupt Practices Act," Willkie Farr & Gallagher Client Memorandum, May 20, 2014.

- "Ralph Lauren Settles Foreign Corrupt Practices Act Allegations with First-Ever SEC Non-Prosecution Agreement in an FCPA Case," Willkie Farr & Gallagher Client Memorandum, April 29, 2013.

- "Department of Justice and Securities and Exchange Commission Issue Long-Awaited FCPA Guidance," Willkie Farr & Gallagher Client Memorandum, November 16, 2012.

- "Vigorous FCPA Compliance Program Averts U.S. Enforcement Action against Financial Services Firm for Rogue Employee Violations," Willkie Farr & Gallagher Client Memorandum, July 20, 2012.

- "Imposition of Compliance Monitors in FCPA Settlements is Down, But Recent Court Ruling Increases the Risk of Public Access to Monitor Reports," Willkie Farr & Gallagher Client Memorandum, April 20, 2012.

**WILLKIE FARR & GALLAGHER** LLP

## RELEVANT PRESENTATIONS AND SPEAKING ENGAGEMENTS

- **American Conference Institute's 35th International Conference on the Foreign Corrupt Practices Act**, Panel Moderator in "Year in Review," November – December 2018.

- **C5's 12th Annual International Conference on Anti-Corruption**, Panel Moderator, "Global Corporate Risks and Increased Individual Liability: How to Evidence to Regulators that Your Control Systems Adequately Detect, Monitor and Mitigate Risks," June 2018.

- **Bloomberg Law Leadership Forum**, Panel Participant, "Investigations in the Global Enforcement Environment," May 2018.

- **American Conference Institute's 34th International Conference on the Foreign Corrupt Practices Act**, Panel Moderator in "40 Years of the FCPA: Former FCPA Unit and Enforcement Heads Discuss Key Enforcement Takeaways, and the Practical Realities Affecting Investigations and Settlements," November – December 2017.

- **C5's 11th Annual International Conference on Anti-Corruption**, Panel Participant, "Challenge the Experts," June 2017.

- **American Conference Institute's 33rd International Conference on the Foreign Corrupt Practices Act**, Participant in "FCPA Moot Court: An Interactive Debate on the Definition of 'Government Official' and 'Disgorgement,'" November – December 2016.

- **C5's 10th Annual International Conference on Anti-Corruption**, Panel Interviewer, "A Q&A with US DOJ and SEC Prosecutors: Cooperation, Compliance, Internal Controls Expectations and the Increased Liability of Individuals," May 2016.

- **1st Annual Global Anti-Corruption & Compliance Summit (Corporate Parity)**, Keynote Address & Panel Participant, April 2016.

- **American Conference Institute's 32nd International Conference on the Foreign Corrupt Practices Act**, Panel Moderator, "Data Privacy Case Studies: How to Manage the Risk of Foreign Data Privacy Violations in the Context of Internal and Government FCPA Investigations," November 2015.

WILLKIE FARR & GALLAGHER LLP

- **C5's 9th Annual International Conference on Anti-Corruption**, Panelist, "The Art of Conducting Effective Investigations in High Risk Markets: How to Manage Investigative Approach, Evidence Preservation, Voluntary Disclosures and Local Law Pitfalls," June 2015.

- **American Conference Institute's 17th Annual New York Conference on the Foreign Corrupt Practices Act**, Panel Moderator, "FCPA Disclosures and their Impact on Credit, Mitigation and Settlement Prospects: Strategic Insights on Balancing Company, Board, Management, Lawyer and Accountant Objectives," April 2015.

- **American Conference Institute's 31st International Conference on the Foreign Corrupt Practices Act**, Panel Moderator, "The Meaning of 'Cooperation' with Government: How Global Anti-Corruption Investigations are Becoming More Challenging and Raising More Local Law Issues and Parallel Investigations," November 2014.

- **C5's 8th Annual International Conference on Anti-Corruption**, Panelist, "Conducting Effective Internal Investigations," June 2014.

- **American Conference Institute's 30th International Conference on the Foreign Corrupt Practices Act**, Panelist, "Minimizing FCPA Risk Exposure in Majority, Minority, and Contractual Joint Ventures," November 2013.

- **ABA's 6th Annual Institute on the Foreign Corrupt Practices Act**," Panelist, "Accessing and Addressing Potential FCPA Risks in Mergers and Acquisitions," September 20, 2013.

- **C5's 7th Advanced Forum on Anti-Corruption**, Panelist, "Minimizing Third Party Risks: How to Apply the Right Level of Due Diligence," June 2013.

- **American Conference Institute's 29th International Conference on the Foreign Corrupt Practices Act**, Moderator, "Uncovering FCPA Risk in Mergers & Acquisitions: How to Conduct Effective Pre-Merger Due Diligence to Detect Risk and Mitigate Potential Successor Liability," November 2012.

- **C5's 6th Annual European Forum on Anti-Corruption**, Panelist, "Achieving the Best Negotiated Settlements: Lessons Learned from Recent Settlements," June 2012.

**WILLKIE FARR & GALLAGHER** LLP

## AWARDS & DISTINCTIONS

- **Chambers USA & Chambers Global**, band 1 or band 2 ranking since 2007.

- **Ethisphere Magazine's "Attorneys Who Matter,"** 2009-2015.

- **Ethisphere Magazine's "100 Most Influential People in Business Ethics for 2007."**

- **The John Marshall Award**: presented by Attorney General Reno for outstanding legal achievement in trial and litigation; a national honor selected annually from among the nation's federal prosecutors (1995).

- **Federal Law Enforcement Officers Association's Prosecutorial Award**: presented annually by organization representing law enforcement officers nationwide (1995).

## EDUCATION

| | |
|---|---|
| **UNIVERSITY OF VIRGINIA LAW SCHOOL**<br>Charlottesville, VA | Juris Doctor (1984) |
| **DARTMOUTH COLLEGE**<br>Hanover, NH | Bachelor of Arts (1981) |

## TEACHING

| | |
|---|---|
| **UNIVERSITY OF VIRGINIA LAW SCHOOL'S**<br>**TRIAL ADVOCACY INSTITUTE** | Instructor<br>1988 – approx. 1995 |
| **UNITED STATES ATTORNEY GENERAL'S**<br>**ADVOCACY INSTITUTE**<br>Washington, D.C. | Instructor<br>1992 – 1993 |
| **GEORGIA STATE UNIVERSITY**<br>Atlanta, GA | Adjunct Professor of Law<br>1993 – 1996 |

---

i       Martin Weinstein, Robert Meyer, & Jeffrey Clark, The Foreign Corrupt Practices Act: Compliance, Investigations and Enforcement (2012 Supp. 2016).

ii      Willkie Compliance Concourse, https://complianceconcourse.willkie.com (last visited Apr. 13, 2019).

iii     Judgment, *United States v. Lockheed Corp.*, No. 1:94-CR-226-01-MHS (N.D. Ga. Feb. 2, 1995); Plea Agreement, *United States v. Lockheed Corp.*, No. 1:94-CR-226-01-MHS (N.D. Ga. June 22, 1994).

# Appendix B

## **List of Martin Weinstein's Publications 2007-March 2019**

PRINT PUBLICATIONS

- *The Foreign Corrupt Practices Act: Compliance, Investigations and Enforcement*, coauthors Martin J. Weinstein, Robert J. Meyer, and Jeffrey D. Clark, Law Journal Press, 2016.

- *United Kingdom Enacts Bribery Act 2010*, coauthors Martin J. Weinstein, Robert J. Meyer, and Jeffrey D. Clark; Financial Fraud Law Report, June 2010.

- *Fraud Law Developments*, coauthors Martin J. Weinstein, Robert J. Meyer, and Jeffrey D. Clark; Financial Fraud Law Report, March 2010.

- *Voluntary Disclosure under the FCPA*, TRACE Quarterly Newsletter, Spring 2008.

- *The World of International Compliance: What Transactional Lawyers Need to Know to Perform Ethically and Responsibly*; Houston Journal of International Law, Vol. 29, Issue 2 (Winter 2007), pp. 311-326.

- "Chapter 12: Transnational Crimes," coauthors Martin J. Weinstein, Gary Lincenberg, and David Zinn, The State of Criminal Justice 2006, American Bar Association Criminal Justice Section, February 2007.

WILLKIE CLIENT ALERTS

- "CFTC DOE Issues New Reporting and Cooperation Advisory Tailored to Foreign Corrupt Practices," Willkie Farr & Gallagher Client Memorandum, March 11, 2019.

- "China Enacts New International Criminal Judicial Assistance Law, May Impact Investigation and Enforcement by Foreign Authorities," Willkie Farr & Gallagher Client Memorandum, November 28, 2018.

- "DOJ Announces New Enforcement Priorities Focused Squarely on China," Willkie Farr & Gallagher Client Memorandum, November 15, 2018.

- "Brazilian Oil Giant Petrobras Settles Largest-Ever FCPA Enforcement Action for $1.78 Billion," Willkie Farr & Gallagher Client Memorandum, October 1, 2018.

- "Court Refuses to Extend FCPA Liability Beyond Statutorily Defined Covered Persons," Willkie Farr & Gallagher Client Memorandum, August 30, 2018.

- "DOJ Declines Prosecution in First Case Under New Leniency Policy," Willkie Farr & Gallagher Client Memorandum, April 26, 2018.

- "DOJ Criminal Division Announces Expansion of Leniency Policy," Willkie Farr & Gallagher Client Memorandum, March 5, 2018.

- "Court Finds Disclosure to SEC Required for Anti-Retaliation Protection," Willkie Farr & Gallagher Client Memorandum, February 27, 2018.

- "Court Orders Disclosure of Attorney Work Product Based on Cooperation in a Government Investigation," Willkie Farr & Gallagher Client Memorandum, December 12, 2017.

- "DOJ Adopts 'FCPA Corporate Enforcement Policy,'" Willkie Farr & Gallagher Client Memorandum, November 30, 2017.

- "SEC's First FCPA Enforcement Action in 2017 Highlights the Importance of Third Party and Transaction-Related Anticorruption Due Diligence," Willkie Farr & Gallagher Client Memorandum, February 1, 2017.

- "U.S. Regulators Settle FCPA Enforcement Actions Based on Hiring Relatives of Government Officials," Willkie Farr & Gallagher Client Memorandum, December 1, 2016.

- "Two Recent FCPA Enforcement 'Firsts': Settlement with Large Hedge Fund and Two of Its Senior Executives and Two DOJ Pilot Program Declinations Requiring Disgorgement," Willkie Farr & Gallagher Client Memorandum, October 6, 2016.

- "Recent FCPA Enforcement Action Highlights Risks Related to Charitable Contributions," Willkie Farr & Gallagher Client Memorandum, September 23, 2016.

- "D.C. Circuit Overturns District Court's Rejection of Deferred Prosecution Agreement, Confirms Courts' Limited Scope of Review of DPAs," Willkie Farr & Gallagher Client Memorandum, April 13, 2016.

- "DOJ's Fraud Section Issues Guidance on Pilot Program for Self-Reporting, Cooperation, Remediation and Fine Reduction," Willkie Farr & Gallagher Client Memorandum, April 6, 2016.

- "Changes to Iran Sanctions Post-Implementation Day," Willkie Farr & Gallagher Client Memorandum, January 19, 2016.

- "Imminent Changes to Iran Sanctions: Implementation of the Joint Comprehensive Plan of Action and a Changing Legal Landscape for International Business," Willkie Farr & Gallagher Client Memorandum, January 14, 2016.

- "U.S. Department of Justice Issues New Guidance to Encourage the Prosecution of Individuals in Corporate Cases," Willkie Farr & Gallagher Client Memorandum, September 16, 2015.

- "BHP Billiton Fined $25 Million for FCPA Violations Related to Olympic Entertainment," Willkie Farr & Gallagher Client Memorandum, May 27, 2015.

- "Company Compliance Officer Wins a Dodd-Frank Whistleblower Award," Willkie Farr & Gallagher Client Memorandum, April 27, 2015.

- "Schlumberger Oilfeld Holdings Ltd. Agrees to Plead Guilty and Pay $232 Million for Violating U.S. Sanctions by Facilitating Trade with Iran and Sudan," Willkie Farr & Gallagher Client Memorandum, March 30, 2015.

- "Alstom S.A. Pleads Guilty to FCPA Violations and Agrees to Pay a Record $772 Million Criminal Fine," Willkie Farr & Gallagher Client Memorandum, December 23, 2014.

- "U.S., EU Expand Russia Sanctions and Export Controls," Willkie Farr & Gallagher Client Memorandum, September 15, 2014.

- "Second Circuit Issues Key Decision on the Extraterritorial Applicability of the Dodd-Frank Whistleblower Protection Provisions," Willkie Farr & Gallagher Client Memorandum, August 25, 2014.

- "New OFAC Guidance on 50% Rule Expands U.S. Sanctions Against Russia," Willkie Farr & Gallagher Client Memorandum, August 15, 2014.

- "U.S. Imposes Sectoral Sanctions Against Russia; Targets Banking, Energy and Arms, But Scope is Limited," Willkie Farr & Gallagher Client Memorandum, July 18, 2014.

- "Paradigm Capital Pays Over $2 Million in First Ever SEC Whistleblower Retaliation Enforcement Action," Willkie Farr & Gallagher Client Memorandum, June 23, 2014.

- "Landmark Decision Issued on the Scope of the Terms 'Foreign Official' and 'Instrumentality' under the Foreign Corrupt Practices Act," Willkie Farr & Gallagher Client Memorandum, May 20, 2014.

- "U.S. and Europe Impose New Sanctions Against Russia," Willkie Farr & Gallagher Client Memorandum, April 29, 2014.

- "Ralph Lauren Settles Foreign Corrupt Practices Act Allegations with First-Ever SEC Non-Prosecution Agreement in an FCPA Case," Willkie Farr & Gallagher Client Memorandum, April 29, 2013.

- "Supreme Court Limits Scope of Alien Tort Statute," Willkie Farr & Gallagher Client Memorandum, April 19, 2013.

- "Department of Justice and Securities and Exchange Commission Issue Long-Awaited FCPA Guidance," Willkie Farr & Gallagher Client Memorandum, November 16, 2012.

- "Vigorous FCPA Compliance Program Averts U.S. Enforcement Action against Financial Services Firm for Rogue Employee Violations," Willkie Farr & Gallagher Client Memorandum, July 20, 2012.

- "Imposition of Compliance Monitors in FCPA Settlements is Down, But Recent Court Ruling Increases the Risk of Public Access to Monitor Reports," Willkie Farr & Gallagher Client Memorandum, April 20, 2012.

- "Second Circuit Upholds Investor's FCPA Conviction on Willful Blindness Theory," Willkie Farr & Gallagher Client Memorandum, December 19, 2011.

- "New Insurance Products Protect Against Costs of FCPA Investigations," Willkie Farr & Gallagher Client Memorandum, August 9, 2011.

- "Securities and Exchange Commission Enters Into First Deferred Prosecution Agreement," Willkie Farr & Gallagher Client Memorandum, May 20, 2011.

- "SEC Investigating Financial Industry's Compliance with the Foreign Corrupt Practices Act When Dealing With Sovereign Wealth Funds," Willkie Farr & Gallagher Client Memorandum, January 20, 2011.

- "ABB Ltd. Settles FCPA Charges," Willkie Farr & Gallagher Client Memorandum, October 6, 2010.

- "U.K. Ministry of Justice Opens Consultation Period Regarding Draft 'Adequate Procedures' Guidance Under the U.K. Bribery Act," Willkie Farr & Gallagher Client Memorandum, September 23, 2010.

- "Key Provisions of the Dodd-Frank Act Broadly Implicate FCPA Compliance Issues, Reward Whistleblowing for Securities Law Violations, and Require Reports of Certain Foreign Payments," Willkie Farr & Gallagher Client Memorandum, July 26, 2010.

- "United Kingdom Enacts Bribery Act 2010," Willkie Farr & Gallagher Client Memorandum, April 19, 2010.

- "First Quarter of 2010 Shows Sharp Increase in FCPA Enforcement," Willkie Farr & Client Memorandum, April 15, 2010.

- "BAE Reaches Global Settlement with U.S. and U.K. Authorities, Agreeing to Pay $447 Million in Fines and Ending Five Years of Bribery Investigations," Willkie Farr & Gallagher Client Memorandum, February 12, 2010.

- "U.S. Senate Hearing on Foreign Corruption May Result in New Anti-Money Laundering Rules for Some U.S. Businesses," Willkie Farr & Gallagher Client Memorandum, February 5, 2010.

- "SEC Brings FCPA Charges Based on Extorted Payments," Willkie Farr & Gallagher Client Memorandum, January 20, 2010.

- "Recent Enforcement Actions by U.K. Serious Fraud Office and Introduction of New U.K. Bribery Bill in Parliament Demonstrate Increased Focus on Corruption," Willkie Farr & Gallagher Client Memorandum, January 5, 2010.

- "Avery Dennison Settles FCPA Charges Related to Conduct in China, Indonesia, and Pakistan," Willkie Farr & Gallagher Client Memorandum, August 14, 2009.

- "Investor Convicted on FCPA-Related Charges," Willkie Farr & Gallagher Client Memorandum, July 20, 2009.

- "Halliburton and KBR Entities to Pay $579 Million, The Largest Penalty Ever Paid By a U.S. Company in an FCPA Case," Willkie Farr & Gallagher Client Memorandum, February 13, 2009.

- "Supplemental Update: Siemens Agrees to Pay an Additional €395 Million to Settle Corruption Charges with German Authorities; Total Penalties Exceed $1.6 Billion," Willkie Farr & Gallagher Client Memorandum, December 16, 2008.

- "Siemens Pleads Guilty to FCPA Charges, Including First Ever Criminal Internal Controls Violation, and Agrees to Pay a Record $800 Million in Penalties," Willkie Farr & Gallagher Client Memorandum, December 15, 2008.

- "Former Vetco International Subsidiary Aibel Group Ltd. Admits to Failing to Meet Obligations under Deferred Prosecution Agreement and Agrees to Pay $4.2 Million Fine for Violating the Foreign Corrupt Practices Act," Willkie Farr & Gallagher Client Memorandum, December 1, 2008.

- "Court Decision Limits 'Local Law Defense' Under the Foreign Corrupt Practices Act," Willkie Farr & Gallagher Client Memorandum, October 28, 2008.

- "DOJ Releases FCPA Opinion on Promotional Expenses to Be Paid to Journalists of State-Owned Media Outlets," Willkie Farr & Gallagher Client Memorandum, July 22, 2008.

- "DOJ Releases Opinion Addressing Acquirers' FCPA Liability for Conduct of Acquiree Where the Ability to Conduct Pre-Closing Due Diligence is Restricted," Willkie Farr & Gallagher Client Memorandum, June 27, 2008.

- "Willbros Group Inc. Agrees to Pay $32 Million in Penalties, Disgorgement, and Prejudgment Interest for Violations of the Foreign Corrupt Practices Act," Willkie Farr & Gallagher Client Memorandum, June 9, 2008.

- "Court of Appeals Approves Covert Coordination between SEC and DOJ," Willkie Farr & Gallagher Client Memorandum, April 21, 2008.

- "Role of Monitors in Corporate Investigations and Prosecutions Update: New Justice Department Guidelines and Continuing Criticism," Willkie Farr & Gallagher Client Memorandum, March 17, 2008.

- "WABTEC Settles FCPA Claims Related to Foreign Subsidiary's Improper Payments," Willkie Farr & Gallagher Client Memorandum, February 26, 2008.

- "Lucent Settles FCPA Claims Related to Travel and Entertainment Expenses," Willkie Farr & Gallagher Client Memorandum, February 5, 2008.

- "Congress and the Media Criticize Role of Monitors in Corporate Investigations and Prosecutions," Willkie Farr & Gallagher Client Memorandum, January 25, 2008.

- "Major New Compliance Rule for Government Contractors," Willkie Farr & Gallagher Client Memorandum, October 18, 2007.

- "DOJ Releases Two Opinions on Hosting Foreign Officials under the Foreign Corrupt Practices Act," Willkie Farr & Gallagher Client Memorandum, September 19, 2007.

- "Baker Hughes to Pay Record Amount in FCPA Case," Willkie Farr & Gallagher Client Memorandum, May 7, 2007.

- "Vetco Pays Largest Criminal Fine in the History of the FCPA," Willkie Farr & Gallagher Client Memorandum, February 13, 2007.

# Appendix C

# Documents Relied Upon or Considered For
# Expert Report of Martin Weinstein[i]

| Title / Bates Range | Date |
| --- | --- |
| **Pleadings, Declarations, and Expert Reports in This Case** | |
| Plaintiffs' Second Amended Complaint, *Janvey v. Greenberg Traurig, LLP* (3:12-cv-04641-N) | November 19, 2018 |
| Greenberg Traurig's Answer to Second Amended Complaint, *Janvey v. Greenberg Traurig, LLP* (3:12-cv-04641-N) | December 3, 2018 |
| Declaration of Professor Mike Koehler, *Janvey v. Greenberg Traurig, LLP* (3:12-cv-04641-N) | February 20, 2019 |
| Receiver's Second Amended Objections and Answers to Greenberg Traurig's First Set of Interrogatories, *Janvey v. Greenberg Traurig, LLP* (3:12-cv-04641-N) | March 1, 2019 |
| Declaration of Karyl Van Tassel, *Janvey v. Greenberg Traurig, LLP* (3:12-cv-04641-N) | March 6, 2019 |
| Receiver's Third Amended Objections and Answers to Greenberg Traurig's First Set of Interrogatories, *Janvey v. Greenberg Traurig, LLP* (3:12-cv-04641-N) | April 3, 2019 |
| **Depositions** | |
| Deposition of Burt Bruton | November 14, 2018 |
| Deposition of Carlos Loumiet | January 14-15, 2019 |
| Deposition of Mark Schnapp | January 17, 2019 |
| Deposition of Ralph Janvey | January 23, 2019 |
| Deposition of Patrick O'Brien | February 18, 2019 |

| Deposition of Yolanda Suarez | February 27, 2019 |
| --- | --- |

| **Books** | |
| --- | --- |
| Martin Weinstein, Robert Meyer, & Jeffrey Clark, The Foreign Corrupt Practices Act: Compliance, Investigations and Enforcement | 2016 |

| **Cases, Briefs, Complaints, Indictments, Transcripts, and Filings in Other Matters** | |
| --- | --- |
| Expert Report of Charles Herring, Jr., *Janvey v. Proskauer Rose, LLP*, No. 1:16-cv-418-LY (N.D. Tex.) | No date |
| Jury Charge, *United States v. Bourke*, No. 1:05-cr-0518-SAS-2 (S.D.N.Y.), https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2013/10/16/DE-642-16-Government%27s-Response-to-Supplement-to-Motion-to-Dismiss-for-Prosecutorial-Misconduct.pdf | No date |
| *United States v. Staten*, 581 F.2d 878 (D.C. Cir.) | May 9, 1978 |
| Information, *United States v. W.S. Kirkpatrick Inc.*, No. 85-cr-415 (D.N.J.), http://fcpa.stanford.edu/fcpac/documents/3000/001968.pdf | November 18, 1985 |
| Complaint, *SEC v. Ashland Oil, Inc.*, No. 86-cv-1904 (D.D.C.), http://fcpa.stanford.edu/fcpac/documents/3000/001610.pdf | July 8, 1986 |
| *United States v. Sun-Diamond Growers*, 526 U.S. 398 | April 27, 1999 |
| Complaint, *United States v. Metcalf & Eddy, Inc.*, No. 99-cv-12566 (D. Mass.), http://fcpa.stanford.edu/fcpac/documents/3000/002360.pdf | December 14, 1999 |
| Indictment, *United States v. King*, No. 01-cr-00190, (W.D. Mo.), http://fcpa.stanford.edu/fcpac/documents/1000/000217.pdf | June 27, 2001 |
| Brief for Plaintiff-Appellant, *United States v. Kay*, 359 F.3d 738 (5th Cir.), (No. 02-20588), 2002 WL 32507953 | September 9, 2002 |
| *United States v. Kay*, 359 F.3d 738 (5th Cir.) | February 4, 2004 |

Complaint, *SEC v. Schering-Plough Corp.*, No. 04-cv-00945 (D.D.C.),                                June 8, 2004
http://fcpa.stanford.edu/fcpac/documents/1000/000341.pdf

*Schering-Plough Corp.*, Exchange Act Release No. 49838,                                            June 9, 2004
http://fcpa.stanford.edu/fcpac/documents/4000/002867.pdf

Plea Agreement*, United States v. Titan Corp.*, No. 05-cr-00314 (S.D. Cal.),                        March 1, 2005
http://fcpa.stanford.edu/fcpac/documents/1000/000412.pdf

Indictment, *United States v. Kozeny*, No. 05-cr-518 (S.D.N.Y.),                                    May 12, 2005
http://fcpa.stanford.edu/fcpac/documents/1000/000344.pdf

*United States v. Kozeny*, 493 F. Supp. 2d 693 (S.D.N.Y.)                                           June 21, 2007

Plea Agreement, *United States v. Steph*, No. 07-cr-00307 (S.D. Tex.),                              November 5, 2007
http://fcpa.stanford.edu/fcpac/documents/2000/000715.pdf

Indictment, *United States v. Tillery*, No. 4:08-cr-00022 (S.D. Tex.),                              January 17, 2008
http://fcpa.stanford.edu/fcpac/documents/2000/000900.pdf

Information, *United States v. Willbros Grp., Inc.*, No. 4:08-cr-00287 (S.D. Tex.),                 May 14, 2008
http://fcpa.stanford.edu/fcpac/documents/2000/000917.pdf

Complaint, *SEC v. Halliburton Co.*, No. 4:09-cv-00399 (S.D. Tex.),                                 February 11, 2009
http://fcpa.stanford.edu/fcpac/documents/2000/001005.pdf

Indictment, *United States v. Bourke*, No. 05-cr-518 (S.D.N.Y.),                                    May 5, 2009
https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2012/06/01/05-05-09bourke-1st-supersed-
indict.pdf

Indictment, *United States v. Bourke*, No. 05-cr-518 (S.D.N.Y.),                                    May 26, 2009
http://fcpa.stanford.edu/fcpac/documents/3000/002382.pdf

Indictment, *United States v. Stanford*, No. 4:09-cr-00342 (S.D. Tex.),                             June 18, 2009
https://www.justice.gov/sites/default/files/criminal-vns/legacy/2010/04/26/06-18-09Stanford.pdf

| | |
|---|---|
| Information, *United States v. Alcatel-Lucent, S.A.*, No. 1:10-cr-20907 (S.D. Fla.), http://fcpa.stanford.edu/fcpac/documents/3000/002270.pdf | December 27, 2010 |
| Superseding Indictment, *United States v. Stanford*, No. 4:09-cr-00342 (S.D. Tex.), https://www.justice.gov/sites/default/files/criminal-vns/legacy/2011/05/10/05-10-11stanford-superseding.pdf | May 4, 2011 |
| Jury Instructions, *United States v. Aguilar*, No. 2:10-cr-1031-AHM (C.D. Cal.) | May 6, 2011 |
| *United States v. Kozeny*, 667 F.3d 122 (2d Cir.) | December 14, 2011 |
| Non-Prosecution Agreement among the Department of Justice and Aon Corporation, http://fcpa.stanford.edu/fcpac/documents/2000/001346.pdf | December 20, 2011 |
| Complaint, *SEC v. Straub*, No. 1:11-cv-09645 (S.D.N.Y.), http://fcpa.stanford.edu/fcpac/documents/2000/001486.pdf | December 29, 2011 |
| Verdict, *United States v. Stanford*, No. 4:09-cr-00342 (S.D. Tex.) | March 6, 2012 |
| *SEC v. Apuzzo*, 689 F.3d 204 (2d Cir.) | August 8, 2012 |
| Transcript, *United States v. Stanford*, No. 4:09-cr-00342 (S.D. Tex.) | January 31, 2012 |
| Complaint, *SEC v. Eli Lilly & Co.*, No. 1:12-cv-02045 (D.D.C.), http://fcpa.stanford.edu/fcpac/documents/3000/001962.pdf | December 20, 2012 |
| *Stryker Corp.*, Exchange Act Release No. 70751, http://fcpa.stanford.edu/fcpac/documents/3000/002132.pdf | October 24, 2013 |
| Information, *United States v. Bilfinger SE*, No. 4:13-cr-00745 (S.D. Tex.), http://fcpa.stanford.edu/fcpac/documents/3000/002325.pdf | December 9, 2013 |
| *Rosemond v. United States*, 572 U.S. 65 | March 5, 2014 |
| *United States v. Esquenazi*, 752 F.3d 912 (11th Cir.) | May 16, 2014 |
| Information, *United States v. Alstom Power, Inc.*, No. 3:14-cr-00248 (D. Conn.), http://fcpa.stanford.edu/fcpac/documents/3000/002450.pdf | December 22, 2014 |

APP. 72

| | |
|---|---|
| *FLIR Systems, Inc.*, Exchange Act Release No. 74673, http://fcpa.stanford.edu/fcpac/documents/4000/002596.pdf | April 8, 2015 |
| *BHP Billiton Ltd.*, Exchange Act Release No. 74998, http://fcpa.stanford.edu/fcpac/documents/4000/002707.pdf | May 20, 2015 |
| *PTC Inc.*, Exchange Act Release No. 77145, http://fcpa.stanford.edu/fcpac/documents/4000/003197.pdf | February 16, 2016 |
| Deferred Prosecution Agreement, *United States v. Och-Ziff Capital Mgmt. Grp. LLC*, No. 1:16-cr-00516 (E.D.N.Y.), http://fcpa.stanford.edu/fcpac/documents/4000/003321.pdf | September 29, 2016 |
| Information, *United States v. Mebiame*, No. 1:16-cr-00627 (E.D.N.Y.), http://fcpa.stanford.edu/fcpac/documents/4000/003463.pdf | December 9, 2016 |
| Information, *United States v. Sociedad Química y Minera de Chile, S.A.*, No. 17-cr-00013 (D.D.C.), http://fcpa.stanford.edu/fcpac/documents/4000/003440.pdf | January 13, 2017 |
| *Sociedad Química y Minera de Chile, S.A.*, Exchange Act Release No. 79795, http://fcpa.stanford.edu/fcpac/documents/4000/003443.pdf | January 13, 2017 |
| Report of James C. Spindler, *Janvey v. Proskauer Rose, LLP*, No. 3:13-cv-00477-N (N.D. Tex.) | August 25, 2017 |
| Information, *United States v. Coscom LLC*, No. 1:17-cr-00581-GBD-2 (S.D.N.Y.), http://fcpa.stanford.edu/fcpac/documents/5000/003569.pdf | September 21, 2017 |
| Information, *United States v. Keppel Offshore & Marine Ltd.*, No. 1:17-cr-00697 (E.D.N.Y.), http://fcpa.stanford.edu/fcpac/documents/5000/003623.pdf | December 22, 2017 |
| *Panasonic Corp.*, Exchange Act Release No. 83128, http://fcpa.stanford.edu/fcpac/documents/5000/003669.pdf | April 30, 2018 |
| Non-Prosecution Agreement among the Department of Justice and Legg Mason, Inc., http://fcpa.stanford.edu/fcpac/documents/5000/003687.pdf | June 4, 2018 |

**Statutes, Legislation, and Administrative Codes**

5 U.S.C. § 552 (2018)

15 U.S.C. § 78m (2018)

15 U.S.C. § 78u (2018)

15 U.S.C. § 78dd-1 (2018)

15 U.S.C. § 78dd-2 (2018)

15 U.S.C. § 78dd-3 (2018)

18 U.S.C. § 2 (2018)

18 U.S.C. § 201 (2018)

Foreign Corrupt Practices Act of 1977, Pub. L. No. 95-213, 91 Stat. 1494,                    December 19, 1977
https://www.govinfo.gov/content/pkg/STATUTE-91/pdf/STATUTE-91-Pg1494.pdf

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207,                              October 27, 1986
https://www.govinfo.gov/content/pkg/STATUTE-100/pdf/STATUTE-100-Pg3207.pdf

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §§ 5001-03, 102 Stat. 1107,   August 23, 1988
https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg1107.pdf#page=309

Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, 110 Stat. 3048,   October 2, 1996
https://www.govinfo.gov/content/pkg/PLAW-104publ231/pdf/PLAW-104publ231.pdf

International Business Corporations (Amendment) (No. 2) Act, 1998, http://laws.gov.ag/wp-        October 28, 1998
content/uploads/2018/08/a1998-17.pdf (Ant. & Barb.)

Money Laundering (Prevention) (Amendment) Act, 1998 (1998), http://laws.gov.ag/wp-             October 28, 1998
content/uploads/2018/08/a1998-18.pdf (Ant. & Barb.)

| | |
|---|---|
| International Anti-Bribery and Fair Competition Act of 1998, Pub. L. No. 105-366, 112 Stat. 3302, https://www.govinfo.gov/content/pkg/PLAW-105publ366/pdf/PLAW-105publ366.pdf | November 10, 1998 |
| Intelligence Authorization Act for Fiscal Year 2003, Pub. L. No. 107-306, 116 Stat. 2383, https://www.govinfo.gov/content/pkg/STATUTE-116/pdf/STATUTE-116-Pg2383.pdf | November 27, 2002 |

**Legislative History**

| | |
|---|---|
| H.R. Rep. No. 95-640 | September 28, 1977 |
| H.R. Rep. No. 100-576 | April 20, 1988 |

**Produced Documents**

GREENBERG 00025988-00025991

Loumiet Ex. 6 (GT03-22-2011ST-0012801)

O'Brien Ex. 1

O'Brien Ex. 2 (GT03-22-2011ST-0012540)

O'Brien Ex. 4

O'Brien Ex. 5

Plaintiffs' Ex. 39 (GT03-22-2011ST-0010948)

Plaintiffs' Ex. 40 (GT03-22-2011ST-0012795)

Plaintiffs' Ex. 49 (GT03-22-2011ST-0003399)

Plaintiffs' Ex. 50 (GT03-22-2011ST-0003412)

Plaintiffs' Ex. 52 (GT03-22-2011ST-0003401)

Plaintiffs' Ex. 100 (GT03-22-2011ST-0007010)

Plaintiffs' Ex. 107 (GT03-22-2011ST-0003385)

Plaintiffs' Ex. 114 (GT03-22-2011ST-0003292)

Plaintiffs' Ex. 132 (GT03-22-2011ST-0003575)

Plaintiffs' Ex. 135 (GT03-22-2011ST-0000943)

Plaintiffs' Ex. 143 (GT03-22-2011ST-0000909)

Plaintiffs' Ex. 147 (GT03-22-2011ST-0007090)

Plaintiffs' Ex. 183 (GT03-22-2011ST-0003389)

Plaintiffs' Ex. 184 (GT03-22-2011ST-0003456)

Plaintiffs' Ex. 194 (GT03-22-2011ST-0006829)

Plaintiffs' Ex. 217 (GT03-22-2011ST-0006732)

Plaintiffs' Ex. 244 (GT03-22-2011ST-0003269)

Plaintiffs' Ex. 290 (GT03-22-2011ST-0007182)

Plaintiffs' Ex. 329 (HW_00059128)

Plaintiffs' Ex. 345 (GT03-22-2011ST-0011501)

Plaintiffs' Ex. 363 (GT03-22-2011ST-0002264)

Plaintiffs' Ex. 364 (GT03-22-2011ST-0012995)

Plaintiffs' Ex. 365 (STAN P CAST_0022815)

Plaintiffs' Ex. 587 (HW_00060491)

Plaintiffs' Ex. 884 (GT03-22-2011ST-0006982)

Plaintiffs' Ex. 877 (GT03-22-2011ST-0003393)

Plaintiffs' Ex. 921 (GREENBERG 00026084)

Plaintiffs' Ex. 955 (GREENBERG 00024870)

Plaintiffs' Ex. 958 (GREENBERG 00026678)

Plaintiffs' Ex. 968 (GREENBERG 00026588)

| News Articles, Blog Posts, and Publicly Available Databases | |
| --- | --- |
| Richard L. Cassin, *In Search of the Level Playing Field*, The FCPA Blog, http://www.fcpablog.com/blog/2008/10/2/in-search-of-the-level-playing-field.html | October 1, 2008 |
| Michael Sallah & Rob Barry, *Allen Stanford Ponzi Case Puts Lawyers in Spotlight*, Bradenton Herald, https://www.bradenton.com/latest-news/article34483965.html | April 17, 2010 |
| *Mount St John Sued over Chester Clarke's Death*, The Daily Observer, https://antiguaobserver.com/mount-st-john-sued-over-chester-clarke%E2%80%99s-death/ | May 5, 2011 |
| Richard L. Cassin, *Willbros Wins Final Dismissal*, The FCPA Blog, http://www.fcpablog.com/blog/2012/4/19/willbros-wins-final-dismissal.html | April 19, 2012 |
| Mike Koehler, *Six Reasons Why The Corporate Community Should Take the DOJ's "Pilot Program" With a Grain of Salt*, FCPA Professor, http://fcpaprofessor.com/reasons-why-the-corporate-community-should-take-the-dojs-pilot-program-with-a-grain-of-salt/. | April 19, 2016 |
| Mike Koehler, *Is Cognizant Technology "Boiling The Ocean"*, FCPA Professor, http://fcpaprofessor.com/cognizant-technology-boiling-ocean/ | March 3, 2017 |
| Mike Koehler, *The Difficulty of Reconciling Existing Legal Authority and Even Enforcement Agency Guidance with Certain FCPA Books and Records and Internal Controls Enforcement Actions*, FCPA | January 31, 2018 |

| | |
|---|---|
| Professor, http://fcpaprofessor.com/difficulty-reconciling-existing-legal-authority-even-enforcement-agency-guidance-certain-fcpa-books-records-internal-controls-enforcement-actions/ | |
| Aaron Blake, *Is Floating a $50 Million Trump Tower Penthouse for Vladimir Putin Illegal?*, Wash. Post, https://www.washingtonpost.com/politics/2018/11/30/is-floating-million-trump-tower-penthouse-vladimir-putin-illegal/?utm_term=.657f4de4a834 | November 30, 2018 |
| Matthew Mosk & Lauren Pearle, *Legal Questions Swirl Around Idea to Offer $50 Million Penthouse to Putin in Trump Tower Moscow*, ABC News, https://abcnews.go.com/Politics/legal-questions-swirl-fate-50-million-penthouse-trump/story?id=59558768. | December 3, 2018 |
| Mike Koehler, *SEC Administrative Law Judge Gets It Right When Talking About the Books and Records and Internal Controls Provisions*, FCPA Professor, http://fcpaprofessor.com/sec-administrative-law-judge-gets-right-talking-books-records-internal-controls-provisions/ | February 25, 2019 |
| Search performed on Expedia, https://www.expedia.com/, for Houston hotels | March 21, 2019 (search performed) |
| Lending Interest Rate (%), The World Bank, https://data.worldbank.org/indicator/FR.INR.LEND?end=2017&locations=AG&start=1978&view=chart&year_high_desc=false | April 5, 2019 (last accessed) |
| Foreign Corrupt Practices Act Clearinghouse, Stan. L. Sch., http://fcpa.stanford.edu/advanced-search.html | April 13, 2019 (last accessed) |
| U.S. Code, Legal Information Institute, Cornell L. Sch., https://www.law.cornell.edu/uscode/text | April 13, 2019 (last accessed) |
| Willkie Compliance Concourse, https://complianceconcourse.willkie.com/ | April 13, 2019 (last accessed) |

| **Treasury, DOJ, and SEC Manuals, Speeches, Press Releases, Advisories, and Guidance** | |
|---|---|
| The Accounting Provisions of the Foreign Corrupt Practices Act: An Analysis, Exchange Act Release No. 17500, 21 SEC Docket 1466-1. | January 29, 1981 |
| Advisory 11, Enhanced Scrutiny for Transactions Involving Antigua and Barbuda, FinCEN Advisory, U.S. Dep't of the Treasury Financial Crimes Enforcement Network, https://www.fincen.gov/sites/default/files/advisory/advis11.pdf. | April 1999 |

FinCEN Advisory, U.S. Dep't of the Treasury Financial Crimes Enforcement Network, https://www.fincen.gov/resources/advisories/advisory-withdrawal-issue-11a — August 1, 2001

Press Release, U.S. Dep't of Justice, Connecticut Investor Found Guilty in Massive Scheme to Bribe Senior Government Officials in the Republic of Azerbaijan, https://www.justice.gov/opa/pr/connecticut-investor-found-guilty-massive-scheme-bribe-senior-government-officials-republic. — July 10, 2009

U.S. Dep't of Justice, *United States Department of Justice Guide to the Freedom of Information Act: Exemption 7(A)*, https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/exemption-7A-2009.pdf — August 10, 2009

Criminal Division of the U.S. Dep't of Justice and Enforcement Division of the U.S. Securities and Exchange Commission, *FCPA: A Resource Guide to the U.S. Foreign Corrupt Practices Act*, https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2015/01/16/guide.pdf — November 14, 2012

U.S. Dep't of Justice, *United States Department of Justice Guide to the Freedom of Information Act: Exemption 7*, https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/exemption7.pdf — May 21, 2014

Leslie R. Caldwell, Assistant Attorney General Leslie R. Caldwell Delivers Remarks at New York University Law School's Program on Corporate Compliance and Enforcement, https://www.justice.gov/opa/speech/assistant-attorney-general-leslie-r-caldwell-delivers-remarks-new-york-university-law — April 17, 2015

U.S. Dep't of Justice, *The Freedom of Information Act, 5 U.S.C. § 552*, https://www.justice.gov/oip/freedom-information-act-5-usc-552. — August 2, 2016

U.S. Dep't of Justice, *United States Department of Justice Guide to the Freedom of Information Act: Introduction*, https://www.justice.gov/oip/foia-guide/introduction/download — March 7, 2019

U.S. Dep't of Justice, *United States Department of Justice Guide to the Freedom of Information Act*, https://www.justice.gov/oip/doj-guide-freedom-information-act-0 — March 21, 2019

U.S. Dep't of Justice, *What is FOIA?*, https://www.foia.gov/about.html — April 3, 2019 (last accessed)

U.S. Dep't of Justice, Criminal Resource Manual, https://www.justice.gov/jm/criminal-resource-manual — April 8, 2019 (last accessed)

---

[i] I also relied upon all documents in my Expert Report, regardless of whether such documents are cited in this appendix.  In addition, with respect to the Declaration of Karyl Van Tassel, Janvey v. Greenberg Traurig, LLP (3:12-cv-04641-N), the Deposition of Burt Bruton, the Deposition of Carlos Loumiet, the Deposition of Mark Schnapp, the Deposition of Ralph Janvey, the Deposition of Patrick O'Brien, and the Deposition of Yolanda Suarez, I considered the exhibits thereto.  I also considered the publications and documents listed under the sections "Scholarship," "Other Recent Publications," and "Recent Media Mentions" in the Declaration of Professor Mike Koehler, Janvey v. Greenberg Traurig, LLP (3:12-cv-04641-N), all exhibits cited in that declaration, the Testimony of Professor Mike Koehler, U.S. Senate, Subcommittee on Crime and Drugs of the Judiciary Committee, "Examining Enforcement of the Foreign Corrupt Practices Act," (November 30, 2010), as well as blog posts on the FCPA Professor website, http://fcpaprofessor.com.



# Transcript of Martin J. Weinstein

**Date:** May 31, 2019
**Case:** Janvey, et al. -v- Greenberg Traurig, LLP, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

EXHIBIT B                        APP. 81

209

1    A  No.  So, I think it's important, though --
2    no, I haven't, but I think it's important to
3    recognize the affirmative defense only comes into
4    play if you have all of the elements of the -- of
5    the statute in place.  So, the affirmative defense
6    matters if, in the absence of the local law, you
7    would have a violation.  If you don't have a
8    violation, there's nothing to affirmatively
9    defend, just so we're clear about that.
10      And I think, to a large degree, the
11   Greenberg memo, although it was written many years
12   ago, actually captures this in -- particularly in
13   the conclusion.  So, I just want to make sure that
14   we're clear, the affirmative defense only matters
15   if you have a violation.
16   Q  In the Greenberg memo, it tells -- it
17   tells Stanford that, "We didn't look at Antiguan
18   law"; right?
19   A  No, but it does at the end say you
20   either -- I don't want to paraphrase it, but it
21   does say either -- if you have violation, the
22   local law defense comes in.  If you don't have a
23   quid pro quo, you don't need the local law.  It
24   doesn't say it quite that way, but that's the gist
25   of it.  And in that way, I think it's quite

210

1    accurate.  But go ahead.  Keep going.
2    Q  Okay.  Now, the local law defense is an
3    affirmative defense; right?
4    A  That's correct.
5    Q  And what that means, it is not the burden
6    on the plaintiff to show or the government or
7    whoever is alleging --
8    A  No such thing -- no such thing as a
9    plaintiff in these things.
10   Q  Okay.  The burden is not on the person
11   alleging a Foreign Corrupt Practices Act
12   violation.
13   A  The burden is not on the prosecutor.  The
14   burden is not on the Department of Justice.
15   Q  The burden is on the defense --
16   A  If the defendant is charged with the
17   crime, the burden of the affirmative defense is on
18   the defendant --
19   Q  Okay.
20   A  -- which is different than most aspects of
21   federal criminal law.
22   Q  Okay.  And do you have any evidence to
23   show the jury that any of the political
24   contributions made by Allen Stanford were legal
25   under Antiguan law?

211

1      MS. BACH:  Objection.
2    A  I have not reviewed Antiguan law, but what
3    I have reviewed is the fact that they do not
4    appear to have been made with any intent to obtain
5    any government official's misuse of their
6    position.  And, so, my view is limited to U.S.
7    law.  And, so, under U.S. law, I would say they
8    are not violations, regardless of the existence of
9    the affirmative defense or not.
10   Q  And the reason that you say that there is
11   no violation of the Foreign Corrupt Practices Act
12   is because you have not seen evidence of corrupt
13   intent?
14   A  There is no corrupt -- there is no --
15   there is insufficient evidence of corrupt intent.
16   Q  Insufficient evidence or no evidence?
17   A  Well, as I said before, I think we've said
18   this, is that Antigua, in and of itself, is a
19   country that -- that's a factor.  So, I don't want
20   to say -- in almost -- I don't want to say that
21   there's -- that there's -- Antigua, in itself, is
22   a factor.
23      What I'm looking at is whether or not
24   there's any indication of anything being given to
25   the political party in exchange for some -- and

212

1    there was no evidence of that.
2    Q  There was no evidence of anything given to
3    a political party?
4    A  In exchange for something, some specific
5    action, on the other side.  There was no -- there
6    might have been the quid.  There was no pro quo.
7    Right?  So, clearly --
8    Q  The pro quo is what Allen Stanford would
9    receive; right?
10   A  What he -- what he intended to receive,
11   not what he did receive.  It's important to note,
12   the question is when he gave the contribution to
13   the political party, did he do so with the
14   intention of having a government official misuse
15   their official position to give him something that
16   would help him obtain or retain business or gain
17   an improper advantage over a competitor.
18   Q  And you saw no evidence of that in any of
19   the information that you reviewed?
20   A  I did not see any indication that he gave
21   the contributions to the political party in
22   exchange for a misuse of a government official --
23   position.  Sorry.
24      (Telephone interruption.)
25      (A discussion was held off the record.)

Transcript of Martin J. Weinstein
Conducted on May 31, 2019

305

1 was involved in the DSI investigation?
2     A I read that.
3         MS. BACH:  Objection.
4     A I read that.  Well, "involved" is a strong
5 word.
6     Q Well, he had been contacted by Wayne
7 Kelly.  Do you remember that?
8     A Yeah, that I -- that I read.
9     Q And were you aware that Stanford was
10 interested in getting Senator Hatch off of
11 Stanford's back?
12     A Sorry?
13     Q Were you aware that Stanford was
14 interested in getting Senator Orrin Hatch off of
15 Stanford's back?
16         MS. BACH:  Objection.
17     A That Stanford was interested in getting
18 Senator Hatch off of his back.  I didn't know he
19 was on his back.
20     Q Oh.
21     A This -- this -- your -- your assessment of
22 this whole thing I think misses the point, which
23 is people complain to their congressmen or
24 senators all the time about somebody else doing
25 something wrong, and then the -- the senator or

306

1 congressman does what Hatch and these -- I think
2 somebody else did, which was they just refer it to
3 the Department of justice.
4         MS. BACH:  Yeah, he's out.
5         THE VIDEOGRAPHER:  Just go off the record
6 now.  I can put another DVD in and we can keep
7 going.
8         MS. BLAKEWAY:  Okay.
9         MS. BACH:  All right.  We need a break,
10 though, if you're going to keep going.
11         MS. BLAKEWAY:  I think I have about two
12 more questions.
13         MS. BACH:  We'll have -- I'll have some
14 more questions, so, just a couple.  So, we've got
15 to take a little -- I've just got to take a little
16 break.
17         THE VIDEOGRAPHER:  We are going off the
18 record.  The time is 3:23.
19         (A recess was taken.)
20         THE VIDEOGRAPHER:  We are going back on
21 the record.  The time is 3:41.
22 BY MS. BLAKEWAY:
23     Q Mr. Weinstein, just a couple more
24 questions.
25         If you were in Greenberg Traurig's shoes,

307

1 would you have done what Greenberg Traurig did?
2         MS. BACH:  Objection.
3     A Well, I have no way to answer that because
4 in 1990 -- in 1990, there hadn't been a -- nobody
5 had ever gone to jail under the FCPA.  The law was
6 fairly undeveloped in the nineties.  I can't
7 answer that question.
8     Q Would you --
9     A I do believe, looking back at it, and
10 this, I think, is more relevant -- looking back at
11 it from the perspective now, I believe what they
12 did was reasonable and appropriate.
13     Q Would you advise your client to do what
14 Greenberg Traurig advised Stanford to do?
15         MS. BACH:  Objection.
16     A Again, I'll go back to -- I'll go back to
17 what I said before, which is this depends on what
18 the client told me.  Based on what I've seen --
19 based on what I understand the client told
20 Greenberg Traurig, their advice and their actions
21 were reasonable in my opinion.
22     Q Is it still your opinion that there was no
23 corrupt intent on Robert Allen Stanford's part?
24         MS. BACH:  Objection.  Are you going to
25 specify a time frame there?

308

1     Q At any time?
2     A So -- so, I can't answer the "any time."
3 I can say with regards to the transactions that I
4 looked at, there was no corrupt intent in
5 connection with those transactions.
6         MS. BLAKEWAY:  Pass the witness.
7 EXAMINATION BY COUNSEL ON BEHALF OF THE DEFENDANTS
8 BY MS. BACH:
9     Q Mr. Weinstein, are you -- do you consider
10 yourself to be an expert on the Foreign Corrupt
11 Practices Act?
12     A I do.
13     Q And why do you consider yourself to be an
14 expert in that?
15     A I have in excess of 25 years of
16 experience, some of that time as a prosecutor,
17 much of that time as a defense lawyer, either
18 prosecuting -- I've prosecuted a very big case,
19 defended many big cases.  I've done dozens of
20 internal investigation, appeared in front of the
21 Department of Justice dozens, hundreds, some
22 numerous amount of time, been involved in opinion
23 releases, written a book on the topic, read
24 extensively on the topic, been an expert witness
25 on the topic, handled compliance and FCPA issues

Transcript of Martin J. Weinstein
Conducted on May 31, 2019

---

317

1        THE COURT REPORTER: Ms. Blakeway, are you
2   ordering this for transcription?
3        MS. BLAKEWAY: Yes.
4        THE COURT REPORTER: Is standard eight
5   business days' delivery okay?
6        MS. BLAKEWAY: Yes.
7        THE COURT REPORTER: And would you like
8   the exhibits attached?
9        MS. BLAKEWAY: Yes.
10       THE COURT REPORTER: Thank you.
11       And, Ms. Bach, are you ordering a copy of
12  the transcript?
13       MS. BACH: We are, yes. Thank you.
14       THE COURT REPORTER: With the exhibits
15  attached?
16       MS. BACH: Yes.
17       THE COURT REPORTER: Thank you.
18       MS. BACH: Yeah, I think we want
19  expedited.
20       THE COURT REPORTER: When would you like
21  to receive it?
22       MS. BACH: Let me confer and I'll let you
23  know before we leave.
24       THE COURT REPORTER: Okay. Great. Thank
25  you.

---

318

1        THE VIDEOGRAPHER: I have a similar
2   question for the video orders. I'm sure you'll be
3   back but --
4        MS. BACH: We will, yes. I'll be back in
5   a minute but --
6        MS. BLAKEWAY: Yes, just regular.
7        THE VIDEOGRAPHER: Just regular. Did you
8   want it sync'd with the transcript?
9        MS. BLAKEWAY: Yes. Yes, I want it
10  sync'd, please.
11       THE VIDEOGRAPHER: Absolutely.
12       MS. BLAKEWAY: Yes.
13       (Off the record.)
14       MS. BACH: So, yeah, we would like to
15  expedite it. What are our choices? Let's see.
16  It's Friday. We don't -- let's see. So, next
17  week is really an off week for us, so if we got
18  it -- let me think. I'm just thinking.
19       THE COURT REPORTER: Sure.
20       MS. BACH: Could you do it by, like,
21  Wednesday?
22       THE COURT REPORTER: This coming
23  Wednesday?
24       MS. BACH: Yeah.
25       THE COURT REPORTER: Sure.

---

319

1        MS. BACH: Yeah. Is that --
2        THE COURT REPORTER: Yeah, that's fine.
3        MS. BACH: Okay. Great.
4        (Off the record at 3:56 p.m.)

---

320

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2        I, Victoria L. Wilson, the officer before
3   whom the foregoing deposition was taken, do hereby
4   certify that the foregoing transcript is a true
5   and correct record of the testimony given; that
6   said testimony was taken by me stenographically
7   and thereafter reduced to typewriting under my
8   direction; that reading and signing was not
9   discussed; and that I am neither counsel for,
10  related to, nor employed by any of the parties to
11  this case and have no interest, financial or
12  otherwise, in its outcome.
13       IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my notarial seal this 5th day of
15  June, 2019.
16  My commission expires January 31, 2024.
17
18
19
20  _____
21  VICTORIA L. WILSON
22  NOTARY PUBLIC IN AND FOR
23  THE DISTRICT OF COLUMBIA
24
25

---

No. 243311

Re:   Deposition of **Martin J. Weinstein**
      Date: 5/31/2019
      Case: Janvey, et al. -v- Greenberg Traurig, LLP, et al.
      Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 14 | 15 | Febres should be Fabri |
| 16 | 14 | Suliman should be Suleiman |
| 16 | 16 | Alan should be Allen |
| 24 | 21 | Law Review should law review |
| 26 | 8 | would that a be foreign should be would that be a foreign |
| 39 | 9 | Give you two should be Give you a few |
| 47 | 11 | Kaye should be Kay |
| 47 | 17 | Kaye should be Kay |
| 47 | 22 | Kaye should be Kay |
| 61 | 10 | perspective should be prospective |
| 70 | 4 | got should be have |
| 87 | 17 | The document it speaks should be The document, it speaks |
| 109 | 11 | K.G. should be K.J. |
| 110 | 8 | Tandy should be Tanny |
| 110 | 11 | Lenox Gardner should be Lennox Gardener |
| 125 | 19 | Noke should be Knoche |
| 126 | 15 | Noke should be Knoche |
| 127 | 7 & 12 | unlock should be unblock |
| 135 | 1 | put that should be looked at |
| 158 | 17 | Schnaap should be Schnapp |
| 159 | 4 & 19 | Schnaap should be Schnapp |

_____
(Date)

_____
(Signature)

APP. 85

No. 243811

Re:  Deposition of **Martin J. Weinstein**
Date: 5/31/2019
Case: Janvey, et al. -v- Greenberg Traurig, LLP, et al.
Return to: transcripts@planetdepos.com

| 167 | 5 | now should be not |
|-----|------|------------------|
| 176 | 7 & 21 | Regulatory Authority should be regulatory authority |
| 178 | 9-10 | Regulatory Authority should be regulatory authority |
| 188 | 18 | Regulatory Authority should be regulatory authority |
| 189 | 7 | international business corporations should all be capitalized |
| 200 | 14 | Regulatory Authority should be regulatory authority |
| 202 | 11 | Regulatory Authority should be regulatory authority |
| 214 | 7 | This line should NOT be in bold |
| 238 | 5 | prosecute should be prosecuted |
| 249 | 11 & 23 | Regulatory Authority should be regulatory authority |
| 258 | 14 | Schnaap should be Schnapp |
| 258 | 23 | Schnaap's should be Schnapp's |
| 259 | 3 | Schnaap's should be Schnapp's |
| 260 | 8 | Schnaap should be Schnapp |
| 262 | 7 | Schnaap should be Schnapp |
| 266 | 18 | Schnaap's should be Schnapp's |
| 266 | 21 | Schnaap should be Schnapp |
| 267 | 3 & 8 | Schnaap should be Schnapp |
| 267 | 13 | Schnaap's should be Schnapp's |
| 271 | 12 | Schnaap should be Schnapp |

_____
(Date)                              (Signature)

APP. 86

No. 243/11

Re: Deposition of **Martin J. Weinstein**
Date: 5/31/2019
Case: Janvey, et al. -v- Greenberg Traurig, LLP, et al.
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 272 | 3 & 21 | Schnaap should be Schnapp |
| 272 | 10 | Any should be And |
| 273 | 13 | Schnaap should be Schnapp |
| 274 | 16 | Schnaap's should be Schnapp's |
| 279 | 23 | company should be country |
| 284 | 10 | Schnaap should be Schnapp |
| 285 | 3 & 8 | Schnaap should be Schnapp |
| 287 | 16 | Schnaap should be Schnapp |
| 288 | 14 | Schnaap should be Schnapp |
| 289 | 6 & 22 | Schnaap should be Schnapp |
| 290 | 6 & 12 | Schnaap should be Schnapp |
| 290 | 13 | truthful should be truth |
| 291 | 15 | shotty should be shoddy |
| 292 | 19 | shotty should be shoddy |
| 294 | 2 | Schnaap should be Schnapp |
| 302 | 25 | men should be mean |
| 303 | 20 | Regulatory Authority should be regulatory authority |
| 304 | 10-11 | Regulatory Authority should be regulatory authority |
| 308 | 4 | no corrupt intent should be insufficient evidence of corrupt intent |
| | | |
| | | |

_____
(Date)

_____
(Signature)

APP. 87

No. 243311

Re:   Deposition of **Martin J. Weinstein**
     Date: 5/31/2019
     Case: Janvey, et al. -v- Greenberg Traurig, LLP, et al.
     Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Martin J. Weinstein, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

_____7/6/19_____          _____
     (Date)                    (Signature)