UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; SANDRA DORRELL; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>GREENBERG TRAURIG, LLP; GREENBERG TRAURIG, PA; and YOLANDA SUAREZ,<br>　　　　　　　Defendants. | § § § § § § § § § § § § § § § | CIVIL ACTION NO. 3:12-cv-04641-N |

**THE RECEIVER'S MOTION TO EXCLUDE OR LIMIT CERTAIN TESTIMONY OF STEPHEN HALPERT AND BRIEF IN SUPPORT**

**NELIGAN LLP**

By: */s/ Douglas J. Buncher*
Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone:  (214) 840-5320
Facsimile:   (214) 840-5301

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 1560
San Antonio, Texas 78205
Telephone:  (210) 630-4200
Facsimile:   (210) 630-4210

**CLARK HILL STRASBURGER**

By: */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@clark hillstrasburger.com
2301 Broadway
San Antonio, Texas 78215
Telephone:  (210) 250-6004
Facsimile:   (210) 258-2706

**CLARK HILL STRASBURGER**

By: */s/ David N. Kitner*
David N. Kitner
david.kitner@clarkhillstrasburger
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:  (214) 651-4300
Facsimile:   (214) 651-4330

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

I.  INTRODUCTION .............................................................................................................1

II. MR. HALPERT'S PROFFERED TESTIMONY ..............................................................2

    A.    Testimony that it was reasonable and proper for Greenberg to provide Stanford with a Memo advising that Stanford qualified for, or might qualify for, certain exemptions to registration under the ICA, when Greenberg knew that Stanford didn't qualify for any of the exemptions. ...............2

    B.    Testimony that Stanford could have manipulated his financial statements and altered his business practices to qualify for an exemption under the ICA ......................................................................................................................3

    C.    Testimony that proper registration under the ICA would not have prevented Stanford's fraud .................................................................................4

III. ARGUMENT .....................................................................................................................4

    A.    Mr. Halpert is not qualified to render opinions on the ICA. ..................................4

    B.    Mr. Halpert's testimony is unreliable. .....................................................................5

        1.    Halpert's testimony that Stanford qualified for the commercial bank exemption is unreliable. ......................................................................6

        2.    Halpert's testimony that Stanford could have manipulated his financial statements and altered his business practices to qualify for an exemption under the ICA is unreliable. .............................................8

        3.    Halpert's testimony that proper registration under the ICA would not have prevented Stanford's fraud is unreliable. .....................................8

IV. CONCLUSION ................................................................................................................10

4841-6417-8333.2/D0624/B08864/071819

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Conde v. Velsicol Chem. Corp.*,
   24 F.3d 809 (6th Cir. 1994) ...........................................................................................7

*Conroy v. Vilsack*,
   707 F.3d 1163 (10th Cir. 2013) .....................................................................................5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .......................................................................................................5

*Gunn v. McCoy*,
   554 S.W.3d 645 (Tex. 2018) ..........................................................................................7

*Houston Unlimited, Inc. v. Metal Processing v. Mel Acres Ranch*,
   443 S.W.3d 820 (Tex. 2014) ..........................................................................................8

*Khoury v. Philips Med. Sys.*,
   614 F.3d 888 (5th Cir. 2010) .........................................................................................5

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) .........................................................................................5

*United States v. Coutentos*,
   651 F.3d 809 (8th Cir. 2011) .........................................................................................7

**RULES**

Fed. R. Evid. 104(a) ...........................................................................................................5

Fed. R. Evid. 702(a) ...........................................................................................................5

Fed. R. Evid. 702(b) ...........................................................................................................7

4841-6417-8333.2/D0624/B08864/071819

The Receiver asks the Court to exclude or limit certain portions of the testimony of Stephen Halpert, Greenberg's proposed expert on securities law generally, and the Investment Company Act specifically.

## I.  INTRODUCTION

Plaintiff Ralph S. Janvey as Receiver of the Stanford Receivership Estate has sued Greenberg for participating in breaches of fiduciary duty by Stanford officers and directors—Allen Stanford and Yolanda Suarez—and for malpractice. The Receiver alleges that Robert Allen Stanford and Yolanda Suarez caused Stanford International Bank, Ltd. ("SIBL") to violate the Investment Company Act of 1940 (the "ICA"); and SIBL and Stanford Group Company ("SGC") to violate the Securities Act of 1933, the Investment Advisors' Act, and the Securities Exchange Act of 1934 and SEC Rule 10b-5.

The Receiver alleges that Greenberg knowingly participated in each of these breaches of fiduciary duty and committed malpractice. One of the multiple examples of Greenberg's wrongdoing alleged by the Receiver is Greenberg's preparation and submission to Stanford in November 1998 of a Memo advising Stanford that it qualified for, or could qualify for, multiple exemptions to registration under the ICA (the "ICA Memo").

Defendant Greenberg has designated Stephen Halpert as an expert witness to testify that:

- It was reasonable and proper for Greenberg to provide Stanford with the ICA Memo advising that Stanford qualified for, or might qualify for, certain exemptions to registration under the ICA, when Greenberg knew that Stanford didn't qualify for any of the exemptions.[1]

- It was "contestable" that SIBL may have qualified for the "commercial bank" exemption of the ICA.[2]

- Stanford could have altered his business practices to qualify for an exemption under the ICA.[3]

---

[1]  Halpert Expert Report, at 9-17, App. 012 - 020.
[2]  Halpert Report, at 11-14; App. 014 – 017.

- Proper registration under the ICA would not have prevented Stanford's fraud anyway.[4]

The Court should exclude Mr. Halpert's testimony for two reasons.

*First*, Halpert is not qualified to render opinions on the ICA.

*Second*, his opinion testimony described above is unreliable because it reflects a lack of knowledge and basic understanding of the ICA, and is not based on legal precedent, scholarly analysis, or industry publications regarding the ICA, and therefore his opinions are not generally accepted—and indeed are contrary to the views widely held—in the ICA specialized legal community.

## II. MR. HALPERT'S PROFFERED TESTIMONY

**A. Testimony that it was reasonable and proper for Greenberg to provide Stanford with a Memo advising that Stanford qualified for, or might qualify for, certain exemptions to registration under the ICA, when Greenberg knew that Stanford didn't qualify for any of the exemptions.**

As evidenced from the following excerpts from his report and deposition testimony, Mr. Halpert intends to testify that it was reasonable and proper for Greenberg to provide Stanford with a Memo advising that Stanford qualified for, or might qualify for, certain exemptions to registration under the ICA,[5] when Greenberg knew that Stanford didn't qualify for any of the exemptions.

In his expert report and deposition testimony, Halpert opines that Greenberg properly advised Stanford as to the availability of the "commercial bank" exemption to ICA registration because it was a "contestable" issue whether Stanford might qualify for the commercial bank exemption, even though Greenberg knew that SIBL was not subject to any meaningful regulation

---

[3] Halpert Report at 5, 17, App. 008, 020.
[4] Halpert Report at 18, App. 021.
[5] Of the 3 exemptions to ICA registration detailed by Greenberg in its November 1998 ICA Memo, Halpert agreed in his deposition that Stanford could not qualify for two of the exemptions cited by Greenberg. Halpert Depo., at 96:4-97:2, App. 049 – 050 (the Section 3(b)(1) exemption), and 54:7-15, App. 034 (agreeing that it was unlikely Stanford could qualify for the "qualified purchaser" exemption).

in Antigua and that it had marketed itself for years as *not* being a commercial bank because it did *not* make any commercial loans.

In his expert report, Halpert opined that Greenberg "correctly assumed" that Stanford would qualify for the commercial bank exemption because, in Halpert's opinion:

(1) all that is required is that SIBL be regulated "as a bank" in its home jurisdiction, not that its regulation be similar to regulation applicable to banks in the U.S.;[6] and

(2) all that is required is that SIBL take deposits and engage in some minimal amount of commercial lending activity;[7]

In his deposition, Halpert expanded on his views, testifying that there was no legal support for the proposition that in order for a foreign bank to qualify for the commercial bank exemption under the ICA, it must be subjected to meaningful regulation in its home jurisdiction similar to that applied by the U.S. to domestic commercial banks.[8]

Halpert also testified in his deposition that it was entirely proper for Greenberg to have issued the 1998 ICA Memo advising Stanford on the "commercial bank" exemption" because, in his view, it was a "contestable issue" as to whether SIBL engaged in sufficient commercial lending activity.[9]

**B.  Testimony that Stanford could have manipulated his financial statements and altered his business practices to qualify for an exemption under the ICA**

Mr. Halpert intends to offer testimony that Stanford could have altered his business practices to qualify for an exemption under the ICA, by e.g., "merely recasting (fictitious) assets of SIBL as commercial loans rather than investments". Halpert Report at 5, 17, App. 008, 020.

---

[6] Halpert Report, at 12-13, App. 015 – 016.
[7] Halpert Report, at 14, App. 017.
[8] Halpert Depo., at 42:10-44:2, App.031 - 033; 68:2-69:6, App. 037 - 038; 77:23-78:3, App. 043 – 044.
[9] Halpert Depo., at 58:5-59:9, App. 035 - 036; 70:6-71:17, App. 039 - 040; 80:18-81:12, App. 045 - 046; 93:14-94:10, App. 047 - 048.

In his deposition, Halpert, while admitting that he was engaging in pure speculation because there was no evidence in the record to support his opinion, testified that Stanford could have "with minor manipulation" altered his balance sheets to reflect more commercial loans – despite the fact that the evidentiary record shows that Stanford's consistent marketing campaign for the preceding 10 years had placed great emphasis on the fact that SIBL was a safe and stable investment and was able to generate the returns it did *precisely because it was not engaged in commercial lending*.[10]

### C. Testimony that proper registration under the ICA would not have prevented Stanford's fraud

Mr. Halpert intends to offer testimony that proper registration under the ICA would not have prevented Stanford's fraud. Halpert Report at 18, App. 021. This opinion is based on Mr. Halpert's view that examination of SIBL by the SEC's investment company examiners would have been no more help in stopping Stanford's fraud than was the SEC's examinations of SGC, as described in the SEC's Inspector General report, as well as Stanford's control over SIBL's Board of Directors. *Id.* As described below, Halpert's opinion on this issue just further demonstrates his lack of knowledge of how the ICA operates, and therefore his lack of qualifications to render opinions on the ICA in this case.

### III. ARGUMENT

### A. Mr. Halpert is not qualified to render opinions on the ICA.

The Receiver moves the Court to exclude or limit Mr. Halpert as an expert witness on the ICA because he is unqualified to provide expert testimony on the ICA.[11] A court should exclude the testimony of an expert witness who is not qualified by knowledge, skill, experience, training,

---

[10] Halpert Depo., at 112:15-114:21, App. 051 - 053.
[11] The Receiver does not request that the Court exclude Mr. Halpert entirely as an expert witness in this case, as he may be qualified to provide expert testimony on other aspects of the U.S. securities laws – just not on the ICA.

4

or education to render an opinion based on scientific, technical, or other specialized knowledge. FED. R. EVID. 702(a); *see* FED. R. EVID. 104(a); *Conroy v. Vilsack*, 707 F.3d 1163, 1168-69 (10th Cir. 2013); *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892-93 (5th Cir. 2010).

Mr. Halpert is a law professor at the University of Miami School of Law,[12] and one of three classes he teaches is securities regulation (the other two being insurance law and torts). Mr. Halpert admits that he has never written a treatise, law review article or any other publication about the ICA.[13] He has never issued an "ICA status memo"—a legal opinion on whether or not an entity qualifies for an exemption from under the ICA[14] –and has not considered whether a company might qualify as an investment company since he was a young associate at Skadden Arps from 1979-1982, almost 40 years ago.[15] Although he claimed that he once served as an expert witness on the ICA, he could not recall the name of the case, what it was about, when it took place, or whether he testified in deposition or at trial.[16] The Court should therefore exclude his testimony.

**B.     Mr. Halpert's testimony is unreliable.**

In addition to his lack of credentials, Halpert's lack of understanding of the ICA also disqualifies him from testifying about the ICA.

Part of the Court's role as gatekeeper is to ensure that self-proclaimed experts do not testify to opinions that they "make up", are mere *ipse dixit*, and which have no demonstrable and reasoned basis in fact or law. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

---

[12] https://www.law.**miami**.edu/faculty/**stephen-k-halpert**
[13] Halpert Depo., at 8:16-21, App. 027.
[14] *Id.*, at 10:4-8, App. 029
[15] *Id.*, at 9:21-11:8, App. 028 - 030.
[16] *Id.*, at 8:22-9:12, App. 027 - 028.

Here, Halpert's opinions regarding the ICA fly in the face of established precedent and industry standards and customs.

### 1. Halpert's testimony that Stanford qualified for the commercial bank exemption is unreliable.

Halpert's testimony that the commercial bank exemption to the ICA was available to Stanford even if Antiguan bank regulation was not similar to U.S. bank regulation is unreliable because it is not based on any established legal precedent and is contrary to SEC regulations. When it adopted the exemption, the SEC stated that it was designed to put foreign banks wishing to offer their securities in the U.S. on "equal footing" with domestic banks offering their securities in the U.S. The exemption extends this comity of treatment to a foreign bank provided it is regulated in its home country in a manner similar to the way the U.S. regulates domestic banks. As the SEC stated, "[t]he principal purpose [of the exemption] … is to put foreign banks selling securities in the United States on an equal footing under the [1940] Act with banks *in like circumstances organized under the laws of the United States*."[17]

Similarly, Halpert's testimony that Stanford could qualify for the commercial bank exemption if it engaged in *some* lending activity is unsupported by legal precedent. For this opinion Halpert cites an SEC no-action letter called *Seward & Kissel*.[18] However, contrary to Halpert's testimony, that no-action letter states that the ICA legal community believed that a foreign bank could rely on the exemption only if commercial loans constituted at least 20% of its activities (and, as noted above, Stanford's oft-repeated public position was that it made <u>no</u>

---

[17] See Investment Company Act Rel. No. 18381 (Nov. 4, 1991). Even before it adopted the exemption, when the SEC dealt with foreign bank issues through individual exemptive requests, the SEC took the same position about the need for home country bank regulation being similar to U.S. regulation. See, e.g., Fruchtman, "Foreign Banks and the Investment Company Act," Financial Services Regulation 215, 217 (Dec. 16, 1987) (To obtain an exemptive order, a foreign bank must represent, among other things, "that the regulation to which it is subject [in its home country] is similar to domestic bank regulation.").
[18] Halpert Depo. at 71:13-72:14, App. 040 - 041.

commercial loans).[19] Moreover, even assuming that Halpert's testimony about lending is correct, the no-action letter sets forth a four-part test that Halpert simply ignores, which includes requirements that a foreign bank:

> (1) be authorized to accept demand and other types of deposits and to extend commercial and other types of credit;
>
> **(2) hold itself out as engaging in, and to engage in, each of those activities on a continuous basis, including actively soliciting depositors and borrowers**;
>
> **(3) engage in both deposit taking and credit extension at a level sufficient to require separate identification of each in publicly disseminated reports and regulatory filings describing the bank's activities**; and
>
> (4) engage in either deposit taking or credit extension as one of the bank's principal activities.[20]

Halpert's opinion is unreliable because it is premised solely on prongs one and four of the above test, and completely ignores the second and third prongs, which do not support his opinions. *Conde v. Velsicol Chem. Corp.*, 24 F.3d 809 (6th Cir. 1994) (sources relied on by the witness must actually support the opinions).

Halpert's opinion is also unreliable because it ignores the record that clearly demonstrates that Stanford could not satisfy either of those two "missing" prongs because SIBL for years consistently held itself out in its marketing and training materials, Reg D disclosure statement, and annual reports as *not* being in the commercial lending business.[21] *See* FED. R. EVID. 702(b); *United States v. Coutentos*, 651 F.3d 809, 820 (8th Cir. 2011); *Gunn v. McCoy*, 554 S.W.3d 645, 662 (Tex. 2018) (expert's opinion unreliable if it is based on assumed facts that vary from actual facts); *Houston Unlimited, Inc. v. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 853

---

[19] *Seward & Kissel* No Action letter, at App. 061.
[20] *Seward & Kissel* No Action letter, at App. 062.
[21] See discussion of the evidentiary record with Greenberg's other ICA expert, Mark Perlow, in his deposition. Perlow Depo., at 81:2-99:13, App. 070 - 088; 100:8-101:25, App. 089 - 090; 114:117:25, App. 091 - 094.

(Tex. 2014) (if expert's material factual assumptions have no evidentiary support in the record or are contrary to proven facts, expert's testimony is incompetent).

Because Halpert's opinion is contrary to facts in the record and not supported by the legal authority he cites, it is unreliable. Thus, it should be excluded.

2. **Halpert's testimony that Stanford could have manipulated his financial statements and altered his business practices to qualify for an exemption under the ICA is unreliable.**

Halpert admits that his proposed testimony that Stanford could have manipulated SIBL's financial statements to make it appear as if SIBL was engaged in commercial lending activity[22] is unsupported by the record. Indeed, to meet the four-part test of the *Seward & Kissel* no-action letter, Stanford would have had to travel back in time to 1988 and changed SIBL's entire marketing campaign so that SIBL could hold itself out as engaging in commercial lending and actively soliciting commercial borrowers. Moreover, manipulating its financial statements would not have allowed SIBL to rely on the commercial bank exemption because it still would not have satisfied the requirement that it be regulated in its home country like a U.S. bank. As a result Halpert's testimony on this issue is unreliable and, hence, inadmissible.

3. **Halpert's testimony that proper registration under the ICA would not have prevented Stanford's fraud is unreliable.**

Halpert's testimony that the "prophylactic benefits" of the 1940 Act "are overstated" and would not have stopped Stanford's fraud,[23] demonstrates his ignorance of the ICA and the well-known protections it has provided the investing public for the last 70 years.[24]

---

[22] Halpert Depo. 114:11-25, App. 053.
[23] Halpert Report, p. 18, App. 021; Halpert Depo. 118:4-120:9; App. 055 - 057.

[24] See, e.g., "The 1940 Act was a turning point for the mutual fund industry. The checks and balances built into each fund have **virtually eliminated losses to funds from insider abuse** and have created a climate of investor confidence." See Storey and Clyde, "The Uneasy Chaperone: A Resource for Independent Directors of Mutual Funds" at 35 (Management Practice Inc. 2000); "Without government subsidies or taxpayer credit, investment companies have operated with **remarkable safety** and provided capital to meet the needs of a growing economy."

Halpert seems to not understand that SIBL itself—not merely SGC—would have been subjected to examination by the SEC's investment company compliance examiners, not the broker-dealer or investment adviser examiners in the Fort Worth office of the SEC, as Halpert seems to imply by his recitation of the facts outlined in the SEC's OIG Report.[25] Indeed Halpert appears to be unaware that the SEC has a dedicated ICA compliance staff that examines investment companies.[26] Halpert further fails to comprehend that under the ICA Allen Stanford could not simply appoint his own "stooges" to the Board of Directors of SIBL.

Greenberg's other ICA expert Mark Perlow has a completely different view of the protections provided under the ICA, including the important ICA provision that the Board of Directors be independent, as well as the requirement that the investment company's pool of

---

See SEC Staff, "Protecting Investors: A Half Century of Investment Company Regulation" (May 1992); While it's not the only piece of regulation governing Wall Street, the Investment Company Act of 1940 certainly affects our portfolios in the biggest way. Providing the **necessary oversight, checks and balances**, and requirements for mutual funds and other investment vehicles, the Act basically **allows investors to sleep at night, knowing that their investments are safe from fraud**. All in all, it could be considered the single most important piece of regulation for the average investor. See Levitt, "What is the Investment Company Act of 1940?" mutualfunds.com (Sept. 13, 2004); "The Investment Company Act gives you, as a mutual fund investor, **peace of mind that you are not sending your money to some sort of scam or that fund managers will steal the money**." See Plaehn, "Investment Company Act of 1940 and Mutual Funds," Zacks; "The Investment Company Act of 1940 created an **intricate system of checks and balances to keep mutual fund money safe**." See Lankford, "How Mutual Fund Assets are Protected," kiplinger.com (Oct. 2, 2008); When the U.S. House of Representatives passed a bill in 2016 that would eliminate the exemption from the 1940 Act for funds organized in U.S. Territories, Congresswoman Nydia Velazquez (D-NY), explained that "[a]s a result of this exemption, investment companies located in U.S. territories can sell products to the residents and not be subject to the oversight, disclosure, and conflict-of-interest requirements that such companies located in the mainland U.S. are subject to. The outcome is that those located in the U.S. territories have been subject to investment losses, some resulting from behavior that likely would have been prohibited if the act applied to the island's investment companies." See Freeman, "Congress Poised to Extend Investment Company Act to U.S. Territories," lexology.com (July 13, 2013); "The devastating decline in the investment of individual stocks following the Enron, Tyco, and WorldCom scandals has pushed more investors into the mutual fund industry, an **area that has been relatively free from scandal. This is due in large part to the core fiduciary principles** set forth in the Investment Company Act of 1940 (ICA); "See Labuz, "Shareholders' Rights to a Cause of Action Under the Investment Company Act of 1940 Following Exxon Mobil v. Allapattah," 39 J. Marshall L. Rev. 1521 (2006); "There is little doubt that the Investment Company Act and the Investment Advisers Act have been successful in achieving the goals established by Congress." See Donohue and Baris, "Still Spry at 75: Reflections on the Investment Company Act and the Investment Advisers Act," ABA Spring Meeting (Apr. 17, 2015).

[25] Halpert report, at 18, App. 021.
[26] Halpert Depo. at 117:23-118:9, App. 054 - 055.

9

assets be held in custody by a third party U.S. bank and subject to "surprise" audits three times per year.[27] Perlow admits that the ICA's requirement that SIBL's assets be held by an independent custodial U.S. bank would have made it difficult for Allen Stanford to loot SIBL as he did.[28]

In short, Halpert's opinions and testimony on this issue, as well as the others, reveal his general lack of knowledge and understanding of the ICA, which render his opinions unreliable.They should be excluded.

The Receiver attaches Stephen Halpert's report and deposition excerpts to this motion to establish facts not apparent from the record.

## IV.    CONCLUSION

For these reasons, the Receiver asks the Court to set this motion for a hearing and, after the hearing, to exclude the testimony of Stephen Halpert.

---

[27] Perlow Depo., 128:1-129:5, App. 095 - 096.
[28] Perlow Depo. at 130:1-8, App. 097.

4841-6417-8333.2/D0624/B08864/071819

Respectfully submitted,

| | |
|---|---|
| **NELIGAN LLP** | **CLARK HILL STRASBURGER** |
| By: */s/ Douglas J. Buncher* | By: */s/ Judith R. Blakeway* |
| Douglas J. Buncher | Judith R. Blakeway |
| dbuncher@neliganlaw.com | judith.blakeway@clark hillstrasburger.com |
| Republic Center | 2301 Broadway |
| 325 N. St. Paul, Suite 3600 | San Antonio, Texas 78215 |
| Dallas, Texas 75201 | Telephone: (210) 250-6004 |
| Telephone: (214) 840-5320 | Facsimile: (210) 258-2706 |
| Facsimile: (214) 840-5301 | |
| | |
| **CASTILLO SNYDER, P.C.** | **CLARK HILL STRASBURGER** |
| By: */s/ Edward C. Snyder* | By: */s/ David N. Kitner* |
| Edward C. Snyder | David N. Kitner |
| esnyder@casnlaw.com | david.kitner@clarkhillstrasburger |
| Jesse R. Castillo | 901 Main Street, Suite 6000 |
| jcastillo@casnlaw.com | Dallas, Texas 75202 |
| 700 N. St. Mary's, Suite 1560 | Telephone: (214) 651-4300 |
| San Antonio, Texas 78205 | Facsimile: (214) 651-4330 |
| Telephone: (210) 630-4200 | |
| Facsimile: (210) 630-4210 | |

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2019 I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Judith R. Blakeway
Judith R. Blakeway