**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| RALPH S. JANVEY, ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | Case No.:  3:12-cv-4641-N |
| | § | |
| v. | § | |
| | § | |
| GREENBERG TRAURIG, LLP, ET AL., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |
| | § | |
| | § | |

---

**GREENBERG TRAURIG'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

---

## <u>TABLE OF CONTENTS</u>

Page

SUMMARY OF MOTION ................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS .................................................................... 4

I.   GREENBERG DID NOT KNOW OF STANFORD'S PONZI SCHEME OR
     BREACHES OF DUTY ....................................................................................... 4

II.  GREENBERG'S LEGAL ADVICE WAS TO FOLLOW THE LAW AND
     GREENBERG RECOMMENDED STEPS COMPLETELY INCONSISTENT WITH
     LAWYERS SEEKING TO AID FRAUD ............................................................ 7

III. STANFORD VIOLATED GREENBERG'S ADVICE TO FOLLOW THE LAW ........... 10

IV.  STANFORD'S PONZI SCHEME GREW EXPONENTIALLY AFTER 2001 –
     YEARS IN WHICH NO GREENBERG CONDUCT IS AT ISSUE ................................ 11

V.   PRIOR PROCEEDINGS IN THIS ACTION ................................................... 13

     A.  The Hunton Settlement ............................................................................ 13

     B.  Investor Claims Barred By Attorney Immunity Doctrine ............................. 14

     C.  Magistrate Judge's Ruling on Causation and Damages Discovery ............ 14

ARGUMENT ................................................................................................................. 15

I.   THE JUDGMENT IN THE HUNTON SETTLEMENT RELEASING LOUMIET
     FOR ALL CONDUCT, INCLUDING HIS CONDUCT AT GREENBERG, IS RES
     JUDICATA AS TO ANY CLAIM AGAINST GREENBERG BASED ON
     LOUMIET'S CONDUCT .................................................................................. 16

     A.  The Judgment In Favor of Loumiet Has Claim-Preclusive Effect Here ........ 17

     B.  The Judgment Does Not Prevent Greenberg from Asserting This Defense ....... 18

II.  THE CLAIM FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
     FAILS BECAUSE THE RECEIVER CANNOT ESTABLISH GREENBERG'S
     "ACTUAL KNOWLEDGE" OR CAUSATION .............................................. 21

     A.  The Receiver Cannot Satisfy the "Actual Knowledge" Requirement of the Aiding
         and Abetting Claim ................................................................................ 22

         1.  The Receiver Must Show Greenberg Had "Actual Knowledge" of Stanford's
             Ponzi Scheme Fraud ...................................................................... 22

2.  The Receiver Cannot Satisfy the "Actual Knowledge" Requirement through Evidence of Recklessness or Negligence ............................................................. 26

B.  The Receiver Cannot Satisfy the "Double" Causation Requirement of the Aiding and Abetting Claim .................................................................................................. 28

1.  The Receiver Cannot Prove That Any Act of Greenberg Was a "Substantial Factor" in the Fraud ............................................................................................. 29

2.  The Receiver Cannot Prove That Any Tort in Which Greenberg Was a "Substantial Factor" Was the Proximate Cause of His Ponzi Scheme Damages .... 31

C.  The Causation Element of the Aiding and Abetting Claim Also Fails Because the Receiver Improperly Treats His Damages as Indivisible and Refuses to Identify What Damages Were Caused by Greenberg's Allegedly Wrongful Conduct .............. 33

III.  THE NEGLIGENCE CLAIM FAILS FOR LACK OF CAUSATION ............................. 33

A.  The Receiver Refuses to Identify What Portion Of His Damages He Attributes to Each Act of Alleged Negligence ..................................................................................... 34

B.  The Receiver Has Not Attempted to Prove How Stanford (a Convicted Criminal Who Was Not Trying to Comply with the Law) or the SEC (Which Already Believed It Was a Ponzi Scheme) Would Have Acted if Stanford Had Received Different Legal Advice from Greenberg. ................................................................................................. 35

C.  The Failure of Causation Is Underscored by an Examination of the Specific Greenberg Representations Identified by the Receiver ................................................... 38

1.  The 1998 Investment Company Act Memo Was Not a Cause-In-Fact of the Alleged Damages ..................................................................................................... 38

2.  The TRO "Dos and Don'ts" Memo Was Not a Cause in Fact of the Alleged Damages .................................................................................................................. 39

3.  No "Other Acts" Were a Cause-in-Fact of the Alleged Damages ........................... 41

IV.  THE RECEIVER CANNOT ESTABLISH RECOVERABLE DAMAGES ..................... 42

A.  The Receiver's Damages Methodology Improperly Seeks to Measure Damages by Investor Losses ............................................................................................................... 42

B.  The SEC Judgment Does Not Establish Damages ........................................................ 44

V.  THE RECEIVER'S NEGLIGENT SUPERVISION AND RETENTION CLAIM FAILS FOR LACK OF PROOF ......................................................................................... 46

VI.  THE FRAUDULENT TRANSFER CLAIMS AGAINST GREENBERG HAVE BEEN LARGELY ABANDONED AND ARE WITHOUT SUPPORT ........................................ 47

VII.  AT A MINIMUM, GREENBERG IS ENTITLED TO PARTIAL SUMMARY
      JUDGMENT .................................................................................................................... 48

      A.  Alleged Breaches of Fiduciary Duty and Negligence Occurring After 2001 ............... 48

      B.  Claims Based on Greenberg's Representation of Antigua in Its Legislative Reform ... 49

      C.  Claims Based on Stanford's Alleged Violations of the FCPA ...................................... 52

CONCLUSION........................................................................................................................... 53

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Abreu v. Bank of Am.*,
  812 F. Supp. 2d 316 (S.D.N.Y. 2011)......................................................................... 28

*Amacker v. Rennaissance Asset Mgmt.*,
  657 F.3d 252 (5th Cir. 2011) ..................................................................................... 26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................... 15

*Axcess Int'l v. Baker Botts, LLP*,
  No. 05-14-01151-CV, 2016 WL 1162208 (Tex. App.—Dallas March 24, 2016, no pet.)....... 36

*Brooks v. Raymond Dugat Co. L C*,
  336 F.3d 360 (5th Cir. 2003) ..................................................................................... 18

*Bustamante v. Ponte*,
  529 S.W.3d 447 (Tex. 2017).................................................................................. 34, 35

*BWD, Inc. v. Stevens*,
  No. 11-09-00132-CV, 2011 WL 664759 (Tex. App.—Eastland Feb. 24, 2011, no pet.) ........ 27

*Celotex Corp. v. Catrett*,
  477 U.S. 317, (1986)................................................................................................... 15

*Citibank, N.A. v. Data Lease Fin. Corp.*,
  904 F.2d 1498 (11th Cir. 1990) ........................................................................... *passim*

*Comer v. Murphy Oil USA, Inc.*,
  718 F.3d 460 (5th Cir. 2013) ..................................................................................... 17

*Conwill v. Greenberg Traurig, L.L.P.*,
  2012 WL 4482937 (E.D. La. Sept. 28, 2012) ............................................................ 21

*Cox Tex. Newspapers, L.P. v. Wootten*,
  59 S.W.3d 717 (Tex. App.—Austin 2001, pet. denied)............................................. 28

*Doe v. Boys Club of Greater Dallas, Inc.*,
  907 S.W.2d 472 (Tex. 1995)....................................................................................... 34

*Dubai Islamic Bank v. Citibank, N.A.*,
  256 F. Supp. 2d 158 (S.D.N.Y.2003)......................................................................... 23

*First United Pentecostal Church of Beaumont v. Parker*,
  514 S.W.3d 214 (Tex. 2017)....................................................................................... 32

*Great Am. Ins. Co. v. Hamel*,
  525 S.W.3d 655 (Tex. 2017)............................................................................. 4, 45

*Groom v. Bank of Am.*,
  2012 WL 50250 (M.D. Fla. 2012) ......................................................................... 26

*Harrison v. Taft*,
  381 Fed. Appx. 432 (5th Cir. 2010)....................................................................... 36

*Hays v. Page Perry, LLC*,
  92 F. Supp. 3d 1315, 1324 (N.D. Ga. 2015) ..................................................... 32, 41

*HMC Hotel Props. II Ltd. P'ship v. Keystone-Tex. Prop. Holding Corp.*,
  439 S.W.3d 910 (Tex. 2014).............................................................................. 34, 35

*Houston Prof'l Towing Ass'n v. City of Houston*,
  812 F.3d 443 (5th Cir. 2016) ................................................................................. 17

*Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*,
  525 S.W.3d 875 (Tex. App.—Houston [14th Dist.] 2017, no pet.)................................. *passim*

*In re Agape Litig.*,
  773 F. Supp. 2d 298 (E.D.N.Y. 2011) ..................................................................... 28

*In re CitX Corp.*,
  448 F.3d 672 (3rd Cir. 2006) ................................................................................. 44

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
  888 F.3d 753 (5th Cir. 2018) .............................................................................. 1, 21

*In re Palm Beach Finance Partners, L.P.*,
  488 B.R. 758 (S.D. Fla. Bankr. 2013) ................................................................. 23, 25

*In re Plaza Mortg. & Fin. Corp.*,
  187 B.R. 37 (Bankr. N.D. Ga. 1995) ....................................................................... 44

*In re Sharp Intern. Corp.*,
  281 B.R. 506 (Bankr.E.D.N.Y.2002)........................................................................ 24

*In re SI Restructuring*,
  532 F.3d 355 (5th Cir. 2008) ................................................................................. 44

*Isaiah v. JPMorgan Chase Bank, N.A.*,
  2017 WL 5514370 (S.D. Fla 2017) .................................................................. 23, 25, 26

*Janvey v. Brown*,
  767 F.3d 430 (5th Cir. 2014) ............................................................................... 5, 30

v

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
   712 F.3d 185 (5th Cir. 2013) ................................................................. 5

*Janvey v. Golf Channel, Inc.*,
   487 S.W.3d 560 (Tex. 2016)........................................................... 47, 48

*Janvey v. Willis of Colo. Inc.*, et al.,
   No. 3:13-CV-3980-N (Dec. 5, 2014, Doc. No. 64) ............................... 43

*Joe N. Pratt Ins. v. Doane*,
   2009 WL 4506586 (S.D. Tex. 2009) ..................................................... 27

*Knauer v. Jonathon Roberts Fin. Grp., Inc.*,
   348 F.3d 230 (7th Cir. 2003) ................................................................ 44

*Krakauer v. Wells Fargo*,
   No. 02-14-00273-CV 2016 WL 5845924 (Tex. App.—Fort Worth Oct. 6, 2016, no pet.)...... 27

*Lamm v. State Street Bank and Trust*,
   749 F.3d 938 (11th Cir. 2014) .............................................................. 27

*Landers v. East Tex. Salt Water Disposal Co.*,
   248 S.W.2d 731 (Tex. 1952)................................................................. 33

*Litson–Gruenber v. JPMorgan Chase & Co.*,
   2009 WL 4884426 (N.D. Tex. Dec. 16, 2009) ............................... 25, 27

*Lubrizol Corp. v. Exxon Corp.*,
   871 F.2d 1279 (5th Cir. 1989) ...................................................... *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
   475 U.S. 574 (1986)............................................................................. 15

*Meadows v. Hartford Life Ins. Co.*,
   492 F.3d 634 (5th Cir. 2007) ........................................................... 2, 22

*National Oilwell Varco L.P. v. Sadagopan*,
   2018 WL 3844714 at n.2 (S.D. Tex. Aug. 13, 2018).......................... 1, 21

*Neilson v. Union Bank, N.A.*,
   290 F. Supp. 2d 1101 (C.D. Cal. 2003) ............................................... 28

*Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*,
   No. 3:12-CV-4641-N, 2017 WL 6761765 (N.D. Tex. Dec. 5, 2017)....................................... 14

*Official Stanford Inv's Comm., et al. v. Greenberg Traurig, LLP, et al.*,
   No. 3:09-CV-0298-N (Dec. 17, 2014, Doc. No. 114) ...................... 43, 44

*Phan Son Van v. Pena*,
    990 S.W.2d 751 (Tex. 1999) ........................................................................ 51, 52

*Reneker v. Offill ("Reneker II")*,
    CIV.A.3:08-CV-1394-D, 2009 WL 3365616 (N.D. Tex. Oct. 20, 2009) ........................ *passim*

*Reneker v. Offill ("Reneker III")*,
    No. 3:08-CV-1394-D, 2012 WL 2158733 (N.D. Tex. June 14, 2012) ........................ 4, 42, 43

*Reneker v. Offill ("Reneker IV")*,
    3:08-CV-1394-D, 2012 WL 3599231 (N.D. Tex. Aug. 22, 2012) ................................ 43, 44

*Rogers v. Zanetti*,
    518 S.W.3d 394 (Tex. 2017) ..................................................................... 33, 34, 35

*Russell v. SunAmerica Secs., Inc.*,
    962 F.2d 1169 (5th Cir. 1992) .......................................................................... 17, 18

*Ryan v. Hunton & Williams*,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ....................................................... 23, 28

*S.E.C. v. AmeriFirst Funding, Inc.*,
    CIV A 307-CV-1, 188-D, 2008 WL 1959843 (N.D. Tex. May 5, 2008) ............................. 37

*SEC v. Recile*,
    10 F.3d 1093 (5th Cir.1993) ................................................................................. 15

*SEC v. Stanford Int'l Bank, Ltd.*,
    No. 3:09-cv-00298-N, D.E. 1858 (N.D. Tex. April 25, 2013) ................................ 4, 12, 44

*SEC v. Stanford Int'l Bank, Ltd.*,
    ---F.3d---, 2019 WL 2496901 (5th Cir. June 17, 2019) ............................................... 20

*Stanfield v. Neubaum*,
    494 S.W.3d 90 (Tex. 2016) ...................................................................... *passim*

*Sterling Tr. Co. v. Adderley*,
    168 S.W.3d 835 (Tex. 2005) .............................................................................. 24

*Stern v. Charles Schwab & Co., Inc.*,
    No. CV-09-1229-PHX, 2010 WL 1250732 (D. Ariz. Mar. 24, 2010) .............................. 28

*Stevenson v. Rochdale Investment Mgmt., Inc.*,
    2000 WL 1278479 (N.D. Tex. Sept. 7, 2000) ........................................................... 28

*Swank v. Cunningham*,
    258 S.W.3d 647 (Tex. App. 2008) ......................................................................... 49

*TIG Ins. Co. v. Sedgwick James of Wash.*,
   276 F.3d 754 (5th Cir. 2002) ................................................................. 15

*Troice v. Greenberg Traurig, L.L.P.*,
   921 F.3d 501 (5th Cir. 2019) ................................................... 3, 14, 42

*Varga v. U.S. Bank Nat'l Ass'n*,
   952 F. Supp. 2d 850 (D. Minn. 2013) .................................................... 28

*Vines v. Univ. of Louisiana at Monroe*,
   398 F.3d 700 (5th Cir. 2005) ................................................................. 20

*Wiand v. Wells Fargo Bank, N.A.*,
   938 F. Supp. 2d 1238 (M.D. Fla. 2013) .................................................. 27

*Williams v. Performance Diesel, Inc.*,
   14-00-00063-CV, 2002 WL 596414 (Tex. App.—Houston [14th Dist.]
   Apr. 18, 2002, no pet.) ........................................................................... 48

*Zacarias v. Stanford Int'l Bank*
   No. 17-11073 (5th Cir. July 22, 2019) .................................................. 43

## **Rules**

Fed. R. Civ. P. 5(b)(2)(D) ............................................................................. 54

Fed. R. Civ. P. 37(c)(1) ............................................................................ 48, 49

Fed. R. Civ. P. 56(e) ..................................................................................... 15

In this case, the Receiver seeks to hold Greenberg Traurig ("Greenberg") responsible for all of the same supposed $4.9 billion damages he has sought from many others. The Receiver seeks to do so even though Greenberg admittedly had no knowledge that Stanford was running a Ponzi scheme and Greenberg's legal services long pre-dated or were unrelated to the fraudulent sales and cannot be connected causally to them. As shown below, the Receiver's claims are barred by settled law and, in any event, are unsupported by evidence and, indeed, contrary to the undisputed evidence. This case is therefore inappropriate for trial, and Greenberg is entitled to summary judgment at this time.

## SUMMARY OF MOTION

The Receiver's claims are based on legal theories that the Fifth Circuit has held do not exist in federal courts in Texas and based on conduct for which the Receiver has already provided a full release. Specifically, the Fifth Circuit has held that *Erie* precludes a federal court from recognizing the claim for aiding and abetting.[1] In addition, in his settlement with Hunton & Williams, the Receiver consented to a judgment that expressly released Carlos Loumiet for all conduct – including his conduct during the period in which he was the Greenberg lawyer advising Stanford – while preserving all Greenberg defenses based on that judgment. Thus, as a matter of

---

[1] *See In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018) (holding that, because "[t]he Texas Supreme Court 'has not expressly decided whether Texas recognizes a cause of action for aiding and abetting,' and because "a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts," *Erie* does not authorize federal courts to recognize aiding and abetting claims.); *accord National Oilwell Varco L.P. v. Sadagopan*, 2018 WL 3844714 at n.2 (S.D. Tex. Aug. 13, 2018) (Rosenthal, J.). The Court already has before it a pending fully briefed motion for judgment on the pleadings based on the Fifth Circuit's directive in *DePuy*, which the Fifth Circuit has not altered.

res judicata, the Receiver may not bring vicarious-liability claims against Greenberg based on Loumiet's released conduct.[2]

Furthermore, discovery has revealed that the Receiver cannot prove the elements of his claims: knowledge by Greenberg, causation, or damages. Most important in this regard is the Receiver's *admission* that he does not claim (and cannot claim) that Greenberg had knowledge of Stanford's Ponzi scheme:

> Q.    Do you contend that Greenberg ever discovered that the Stanford entities were conducting a Ponzi scheme?
>
> A.    No, I've never alleged they knew that it was a Ponzi scheme.

(Appendix (hereinafter "App.") at 0075 at 161:14-22; App. 1975 at RFA 51.). The Receiver has adduced no evidence to show the requisite guilty knowledge by Greenberg, and Greenberg witnesses have unequivocally denied any such knowledge. Because the Receiver is seeking Ponzi scheme damages, the law requires that the Receiver prove that Greenberg had actual knowledge of the Ponzi scheme that caused the damages he is seeking.[3] *A fortiori*, one cannot *knowingly* aid or participate in a fraud which it admittedly did not know of.

Instead, the Receiver seeks to hold Greenberg liable for Stanford's sale of CDs many years after Greenberg's long-superseded work for Stanford in the late 1980s and 1990s on the theory that Greenberg established the structures and mechanisms that were later used illegally. That

---

[2] *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1289 (5th Cir. 1989); *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1505 (11th Cir. 1990) (*res judicata* bars a claim against a principal when the court has entered a judgment dismissing claims based on a general release to the agent). As the Court will recall, Greenberg filed written objections when the Receiver *proposed* a final order & judgment saying (apparently in fear of this rule) that the release should not have any effect on the claims against Greenberg. After briefing, the Receiver relented and the court expressly preserved all of Greenberg's defenses in its Final Order & Judgement §21. (App. 1893.) Those proceedings were specifically and expressly about the effect of the Loumiet release.

[3] *See, e.g.*, *Meadows v. Hartford Life Ins*. Co., 492 F.3d 634, 639 (5th Cir. 2007).

theory fails legally for several reasons. Perhaps most importantly, Greenberg's conduct was not a proximate cause, much less the "but for" cause of the damages. To the contrary, Loumiet advised Stanford to make prominent risk disclosures in connection with the CD sales, leading to Greenberg no longer doing any securities work. Both before and then after Loumiet left Greenberg for Hunton in April 2001, Stanford engaged and relied on several other prominent counsel and law firms (*not* Greenberg) to advise and guide him as to the securities laws with respect to the fraudulent sale of Certificates of Deposit. Greenberg had no role in these sales.

The Receiver's damages expert, who gave the same opinion here against Greenberg that she gave against many of the other prior defendants, has admitted that she has not even sought to determine which of the other defendants and Greenberg caused which part of the alleged damages; and the Receiver has admitted in discovery proceedings before the Magistrate Judge in this case that he cannot do so and will not try to do so at trial. Instead, the Receiver says that $4.9 billion was lost over the duration of the scheme, and that the Court and jury should simply award it all against Greenberg, or figure out, on their own, who caused what. Further undermining his case, the Receiver's witnesses have acknowledged that it is mere speculation what would have happened had Greenberg given different legal advice than it did in the years before the sale of CDs he is seeking to recover.[4]

Another independent basis for summary judgment is that the Receiver is actually seeking as damages the losses that *investors* allegedly suffered, even though this Court, affirmed by the Fifth Circuit, has dismissed the investor claims,[5] and those damages have not been established in

---

[4] *See, e.g.*, *Reneker v. Offill*, CIV.A.3:08-CV-1394-D, 2009 WL 3365616, at *6 (N.D. Tex. Oct. 20, 2009) (*Reneker II*) ("It is speculative to assume that any change in [the lawyers'] actions would have altered the actions of the [clients] themselves").

[5] *Troice v. Greenberg Traurig, L.L.P.*, 921 F.3d 501 (5th Cir. 2019).

this case or any other. The Receiver's $4.9 billion damages demand is based on an *uncontested* judgment that the SEC obtained against Stanford wrongdoers, merely tallying all unreimbursed CD sales to investors without regard for, among other things, Stanford's assets.[6] The Receiver's alleged damages thus are actually the *investors'* losses. However, as another court in this District has found on a similar case involving a receiver's claims against a law firm in the aftermath of fraud, the Receiver stands in the shoes of *the Stanford entities*, not the investors.[7] Simply adding up unreimbursed CD sales is not a proper damage measure of damages to those entities.

**STATEMENT OF UNDISPUTED FACTS**

The Receiver's 125-page complaint alleges fault in nearly every piece of legal work that Greenberg performed for its client Stanford between 1988 and 2001. The Receiver's claims fail as a matter of law for multiple reasons set forth in the Argument below. The undisputed facts relevant to these legal issues are set forth below.

**I.   GREENBERG DID NOT KNOW OF STANFORD'S PONZI SCHEME OR BREACHES OF DUTY**

It is undisputed that, when representing Stanford, *Greenberg did not know Stanford was operating a Ponzi scheme.* (App. 0075 at 161:14-22; App. 1975 at RFA 51).

> Q.   Do you contend that Greenberg ever discovered that the Stanford entities were conducting a Ponzi scheme?

> A.   *No, I've never alleged they knew that it was a Ponzi scheme.*

(App. 0075 at 161:14-22 (emphasis added).).

---

[6] *See* App. 1640, *S.E.C. v. Stanford International Bank, Ltd.*, No. 3:09-cv-00298-N, D.E. 1858 (N.D. Tex. April 25, 2013). Of course, such an uncontested SEC consent judgment which was not litigated by anyone, much less by Greenberg, is not binding on Greenberg. *See Great Am. Ins. Co. v. Hamel*, 525 S.W.3d 655, 667 (Tex. 2017) (holding that a collusive judgment between a plaintiff and insured defendant could not bind the defendant's insurer).

[7] *See e.g., Reneker v. Offill*, No. 3:08-CV-1394-D, 2012 WL 2158733, at *6 (N.D. Tex. June 14, 2012) ("*Reneker III*").

The Receiver's admission is not surprising. No one but a small group of insiders knew of the scheme. The deputy chief of the United States Department of Justice has stated:

> "There is no evidence whatsoever that anybody other than the five or six folks that Mr. Davis identifies at the beginning of his testimony knew word one that that the original source of the funds from Mr. Stanford's lifestyle and companies was the bank."

(App. 1630 at 4503:5-9.) *See also Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 197 (5th Cir. 2013) ("Stanford and Davis [were] the only individuals who knew of the true nature of Stanford's operations and the whereabouts of the vast majority of the SIBL's supposedly multi-billion-dollar investment portfolio …."). At Allen Stanford's sentencing in 2012, the U.S. government confirmed that "only Stanford and a handful of people in his inner circle knew that his outsized lifestyle and its trappings were entirely at the expense of his depositors, and not remotely close to the 'investments' into which depositors believed they had placed their savings based on Stanford's lies." (App. 1626.) The Fifth Circuit has recognized that Stanford and his co-conspirators used "creative reverse engineering" accounting practices to implement the Ponzi scheme and conceal its existence. *Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014). This court has recognized "the Ponzi scheme's complexity" and "the scheme's Byzantine structure." (App. 1633-1634, quoted at Second Amended Complaint, D.E. 287 (hereinafter the "SAC"), ¶ 291.) The Receiver's own expert has described in detail the "secret" Swiss bank accounts Allen Stanford used to conceal the Ponzi scheme. (App. 1563-1564 at ¶ 43.)

The Receiver deposed nine Greenberg and former Greenberg attorneys. Every one of them denied any knowledge whatsoever of the Ponzi scheme and of breaches of duty by Stanford or others. (App. 0101-0102 at 33:16-34:1; App. 0208-0209 at 216:12-217:4; App. 0265 at 188:17-20; App. 0223 at 77:17-22, App. 0240 at 317:2-20; App. 0063-0065 at 186:23-188:12; App. 0261-

0262 at 238:7-239:3; App. 0055-0056 at 137:18-138:14; App. 0041-0042 at 118:16-119:21; App. 0218 at 90:11-25; App. 0219-0220 at 96:25-97:11; App. 0243 at 89:1-23.)

Loumiet, the lead Greenberg shareholder on the representation, was not a target of the criminal investigation, and was not even interviewed in connection with it. (App. 0102-0103 at 34:12-35:5.) Lead prosecutor Gregg Costa (now a Fifth Circuit Judge) stated at trial that "Loumiet has nothing involved—yeah. Loumiet is not a target in Stanford." (App. 1623.)

The Receiver wrongly asserts that Greenberg was Stanford's "outside general counsel," and suggests that he knew all aspects of Stanford's business. In contrast, Yolanda Suarez, the Receiver's actual general counsel during much of the relevant period, denied that Greenberg was Stanford's outside general counsel. (App. 0281-0282 at 71:16-72:3.) Carlos Loumiet confirmed that Greenberg limited its legal work to the matters on which it was retained (App. 0099 at 28:14-19); Greenberg did not handle all of Stanford's legal work (App. 0098 at 27:1-3), or even all of his banking work (App. 0098 at 27:10-12, App. 2018 at RFA 362-363); Greenberg did no significant work for the broker-dealer (App. 0099 at 28:5-13); Greenberg had no reason to investigate Stanford Financial Group's portfolio of investments (App. 0099 at 28:14-19); Greenberg had no dealings with Stanford investors or prospective investors (App. 0099 at 28:20-23); Greenberg did not assist Stanford in the preparation of financial statements (App. 0100 at 29:17-19; App. 2022, RFA 392); and Greenberg never attended a board meeting for any Stanford entity (App. 0100 at 29:20-23.)[8] Greenberg did not even learn that Stanford had previously filed for personal bankruptcy until 2000, well after the latest legal advice by Greenberg that is challenged by the

---

[8] The Receiver alleges that Stanford served on an advisory board for Stanford for over fifteen years – until the collapse – but, in fact, Loumiet was asked to serve on the board in 1991, and declined out of concern that if he was too closely linked to one particular bank client, it could affect his overall practice. (App. 0132-0134 at 86:24-88:1.)

Receiver. (App. 0207 at 213:15-21.) Multiple law firms other than Greenberg advised Stanford on important work during the same period, including: SEC investigations of Stanford (App. 0139-0140 at 95:21-96:8; App. 0639; App. 0315-0317 at 77:7-79:1; App. 0320-0321 at 124:14-125:7; App. 0300 at 367:9-14; App. 1987 at RFA 116 & 117); all of Stanford's broker-dealer work, including registration with three different agencies (App. 0138 at 92:1-14; App. 0318-0319 at 102:16-103:10; App. 0291-0292 at 330:23-331:14; App. 1987 at RFA 117); advice on registration under the Investment Company Act (App. 0851-0853; App. 2019 at RFA 367); and advice on a Texas trust representative office. (App. 0298-0299 at 345:13-346:10.) Stanford-related work was only about eight percent of Loumiet's $33 million in originations when he was at the firm, a small fraction of Greenberg's overall business. (App. 0096-0097 at 25:15-26:21.)

Importantly, the Receiver has conceded that there is no evidence of involvement or knowledge by Greenberg in the core elements of the Ponzi scheme, admitting that he has *no evidence* "that Greenberg participated in the falsification of Stanford's financial statements" (App. 1972 at RFA 29); "that Greenberg participated in the falsification of investment returns in Stanford's financial statements" (App. 1973 at RFA 33); "that Greenberg knew about the falsification of investment returns in Stanford's financial statements" (App. 1973 at RFA 35); "that Greenberg participated in Stanford's bribes to C.A.S. Hewlett" (App. 1973 at RFA 37); "that Greenberg knew about Stanford's bribes to C.A.S. Hewlett" (App. 1974 at RFA 39); "that Greenberg participated in Stanford's bribes to LeRoy King" (App. 1974 at RFA 41); or "that Greenberg knew about Stanford's bribes to LeRoy King." (App. 1974 at RFA 43).

## II. GREENBERG'S LEGAL ADVICE WAS TO FOLLOW THE LAW AND GREENBERG RECOMMENDED STEPS COMPLETELY INCONSISTENT WITH LAWYERS SEEKING TO AID FRAUD

In Greenberg's legal representations of Stanford, Stanford's general counsel repeatedly asked Greenberg for advice on *how to follow the law*. For instance, in one of Greenberg's first

representations, Stanford's then-general counsel Sidney Adler asked Loumiet what their Miami office could do "*without violating the law*." (App. 0407 (emphasis added); App. 0104-0106 at 40:22-42:7.) Greenberg, in turn, gave Stanford advice on how to follow the law. When giving securities advice, Greenberg advised Stanford that he should assume his offerings would be treated as securities, and, therefore, that he should comply with securities laws. (App. 2022 at RFA 393; App. 0125 at 76:18-24; App. 0128 at 82:2-14; App. 0460-0461; App. 0466.) On the only three occasions that Stanford asked Greenberg for advice on disclosures to prospective investors, Greenberg advised Stanford that his disclosures should be extensive – essentially by disclosing the same information that the SEC would require for a public offering. (App. 1986 at RFA 108-113; App. 0128-0131 at 82:19-85:6; App. 0144-0145 at 103:11-104:6; App. 0145 at 104:17-:21; App. 0146-0148 at 106:8-108:8; App. 0148-0151 at 108:15-111:9; App. 0151-0155 at 111:24-115:13; App. 0488; App. 0506.)[9] When Loumiet did not change this advice, Stanford looked to other counsel for this work. (App. 0156-0158 at 116:15-118:4.)

On the single occasion in which Stanford sought Greenberg's thoughts in connection with an SEC investigation (that was being handled by Wayne Secore, a different, non-Greenberg

---

[9] The Receiver admits that in 1998, Greenberg recommended that Stanford's U.S. Accredited CD disclosure statement contain bold language that "the CD deposits are not insured by the Federal Deposit Insurance Corporation or under any similar insurance program of the Government of Antigua and Barbuda," (App. 1986 at RFA 108); contain a notice on the first page that the CDs were "not registered w[ith the] SEC or any State Agency," and that the CDs were not registered under the Securities Act of 1933 or the securities laws "of any other state or jurisdiction," (App. 1986 at RFA 109); contain a warning that "NO ONE WHO CANNOT BEAR THE LOSS OF THEIR INVESTMENT WITHOUT ITS SIGNIFICANTLY AFFECTING HIS OR HER LIFESTYLE SHOULD INVEST IN A CD DEPOSIT" (App. 1986 at RFA 110); contain notices that depositors should "hold their CD deposits and CD certificates until maturity," and that "no depositor should purchase a CD deposit or CD certificate with the intention of reselling the same," (App. 1986 at RFA 111); bear a legend stating "Republic of Antigua and Barbuda" on the first page, (App. 1986 at RFA 112); and that the CDs were part of an offering "directed only" at "affluent and sophisticated" persons who qualify "as 'accredited investors' under U.S. federal securities laws," (App. 1986 at RFA 113).

attorney), Loumiet recommended to Secore that Stanford cooperate fully with the SEC, and "put our brokers at the SEC's disposal, so that the SEC can inquire as to their sales practices" and "explain our training processes for our brokers." (App. 0477; App. 0139-0141 at 95:21-97:14; App. 0142-0143 at 100:18-101:5; App. 0300-0301 at 367:22-368:17.)

When giving banking advice to Stanford, Greenberg advised Stanford to do *more* than was required. While the Receiver claims that Stanford improperly used a trust representative office ("TRO") in Miami to sell CDs to investors, Greenberg specifically advised Stanford *not* to market products of SIB (or any other company), *unless the product is offered in the context of an existing or proposed trust relationship*, and *not* to solicit business *of any nature* on behalf of SIB (or any other company other than the trust company). (App. 0556 (emphasis added); App. 1993 at RFA 162.) Even though it was not legally required, Greenberg advised Stanford to go voluntarily to Florida regulators, inform them of the trust representative office, agree to be subject to regulation in this area, and let Florida's Department of Banking and Finance conduct examinations. (App. 0174 at 144:13-25.) Stanford followed this advice, entering into a Memorandum of Agreement ("MOA") with Florida's Department of Banking and Finance, which set out what business Stanford could conduct at the office and gave Florida regulators the right to examine the TRO in order to ensure that it was not conducting business that was prohibited by the MOA. (App. 0557; App. 0175-0176 at 145:9-146:20; App. 0177-0178 at 147:14-148:16; App. 1992 at RFA 150, 151, 152.)

In addition, Greenberg's proposals for Antiguan legislative reform included recommendations for tough restrictions (App. 0181-0189 at 165:5-173:24), including a total prohibition on insider lending that would have prevented a bank owner, such as Allen Stanford, from receiving loans from his bank (App. 0192-0194 at 176:21-178:24; App. 0233-0234 at 300:24-

301:18; App. 2000 at RFA 207); required annual audited financial statements, quarterly call reports, minimum capitalization requirements, and transaction reports for any movement of currency over $10,000 (App. 0182 at 166:11-:24; App. 0184-0185 at 168:18-169:9; App. 0188 at 172:2-:8; App. 0233 at 300:7-:17; App. 0234-0235 at 301:19-302:5; App. 2000 at RFA 208); and punishment of knowing misrepresentations as a felony (App. 0187 at 171:1-:7). Stanford never asked Loumiet to draft any legislation to protect his own bank (App. 0202-0203 at 192:25-193:2), or requested more lenient treatment of his banks (App. 0203 at 193:6-8; App. 0232 at 294:6-15).

The representations of Stanford by Greenberg are discussed in greater detail in the accompanying factual appendix, attached as Exhibit A hereto (hereinafter "Factual Appendix").

## III. STANFORD VIOLATED GREENBERG'S ADVICE TO FOLLOW THE LAW

Stanford repeatedly and secretly violated and misused Greenberg's legal advice. For instance: unbeknownst to Greenberg, Stanford's final general counsel Mauricio Alvarado repeatedly claimed he had an opinion letter advising Stanford it did not have to register under the Investment Company Act. Though Alvarado refused to show anyone the letter (and he had memos from three law firms), (App. 0023-0027 at 32:1-36:7), the Receiver now contends it was Greenberg's memo that provided this advice. But the Receiver's own expert admits that the memorandum did no such thing and that Alvarado's use of the memorandum was unreasonable. (App. 0274-0276 at 233:14-235:9.) Further, the Receiver has admitted that the memorandum "contained no analysis of whether SIBL was substantially engaged in commercial banking activity." (App. 1989 at RFA 135.) Indeed, Alvarado told Stanford's compliance officer that he *understood* there was a risk that the company was operating in violation of the ICA, and that it was a risk he felt was worth taking. (App. 0028-0030 at 37:7-39:19; App. 0031 at 41:5-:16.)

In addition, according to the Receiver, Stanford sold CDs out of his Miami Trust Representative Office – in violation of both Greenberg's 1998 do's and don'ts memorandum and

Stanford's MOA with Florida Regulators, but Florida regulators did not enforce the MOA against Stanford. (App. 0269 at 146:10-:15.) Greenberg was not involved in any further work related to the TRO. Loumiet was not asked for further advice on the TRO until 2007 – over nine years later and well after his departure from Greenberg. (App. 0172 at 141:4-7.)

In Antigua, years after Greenberg recommended legislative and regulatory reform, and without any knowledge or involvement by Greenberg, Stanford secretly bribed an Antiguan official to avoid discovery and regulation in Antigua – including sealing it with a bizarre blood oath. (App. 2289-2290 at 2808:10-2809:15; App. 2291-2293 at 2823:12-2825:1.) This criminal act by Stanford was nothing Greenberg had any involvement in or knowledge of, and it occurred years after the latest challenged work by Greenberg. (App. 1974 at RFA 41, 43.)

## IV.  STANFORD'S PONZI SCHEME GREW EXPONENTIALLY AFTER 2001 – YEARS IN WHICH NO GREENBERG CONDUCT IS AT ISSUE

In April 2001, Loumiet left Greenberg with a group of lawyers focusing on international law work and joined Hunton & Williams. (App. 0094-0095 at 16:20-17:19; App. 1972 at RFA 22.) While Greenberg continued to do some work for Stanford after Loumiet's departure, none of the Receiver's experts take issue with any legal work by Greenberg after Loumiet's departure.(App. 1479 at ¶ 29.B; App. 1282 at ¶ 12; App. 1023 at ¶ 15 n.9; App. 1411 at n.23.) In fact, after 1999, Mauricio Alvarado had his own preferred firms and reduced the use of Greenberg and Loumiet even further. (App. 279-280 at 47:21-48:1; App. 0302-0304 at 377:21-379:5; App. 0305-0306 at 380:24-381:2.)

It was during the period after 1998, and especially after 2001, that Stanford's sales of CDs and his fraudulent scheme expanded dramatically. (App. 1473 at Table 2; App. 1258-1260.) Greenberg played no role in that expansion.

11

Moreover, nothing Greenberg did in the earlier years could have concealed the scheme: the SEC believed as early as 1997 *that Stanford was likely running a Ponzi scheme*, and this conclusion was reiterated in future SEC examinations, all the way until the SEC took steps that led to Stanford being placed in receivership 2009. (App. 2015 at RFA 333-338.)[10] According to the Receiver in a different Complaint:

> The bottom line is that from 1997 to 2005, the SEC's staff in Fort Worth strongly suspected that Allen Stanford and Stanford Financial were operating some kind of fraud or Ponzi scheme. *See* OIG Report at 103 ("Everybody, everybody believed that this was probably a Ponzi scheme.").

(App. 1662.)[11] Greenberg, of course, had nothing to do with the SEC's decision not to bring an enforcement action against Stanford. (App. 1126, 1128.)

When the SEC finally brought a suit against the Stanford entities, the Receiver consented to a judgment finding that the entities had engaged in violations of the securities laws and the 1940 Act. Additionally, the Receiver accepted, without litigating, a $5.9 billion damages figure, which the Receiver seeks to use in this litigation. (App. 1640, *SEC. v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-00298-N, D.E. 1858 (N.D. Tex. April 25, 2013).)

---

[10] According to the OIG Report: "[T]he SEC's Fort Worth office was aware since 1997 that Robert Allen Stanford was likely operating a Ponzi scheme . . .," and "[n]otwithstanding this lack of Enforcement action, by the summer of 1998, it was clear that both the investment adviser and broker-dealer *examiners 'knew that [Stanford] was a fraud.'*" (emphasis added). (App. 2151, 2154.)

[11] The Receiver also stated: "According to the March 31, 2010 Report of Investigation from the SEC Office of Inspector General ('OIG'), the SEC's Fort Worth office first suspected that Allen Stanford and Stanford Financial were running a Ponzi scheme in 1997. From 1997 through 2004 … the Commission's Fort Worth office conducted a broker/dealer examination of Allen Stanford and Stanford Financial four times (1997, 1998, 2002 and 2004), and in each examination, the staff doubted the legitimacy of SIBL's CDs and believed SIBL's purported investment returns were "highly unlikely" given the bank's purportedly conservative investments. *Because of these doubts, the examination staff concluded that SIBL's CDs were likely a Ponzi scheme or similar fraudulent scheme.*" (App. 1660-1661 (emphasis added) (quoting OIG Report, at App. 2151-2152).)

## V.  PRIOR PROCEEDINGS IN THIS ACTION

### A.  *The Hunton Settlement*

The Receiver and a class of investors then brought suit against Greenberg and Hunton in 2012.[12] On August 16, 2017, the Receiver asked the Court to approve its settlement with Hunton, which also broadly released Loumiet for all Stanford-related conduct, including while Loumiet was employed by Greenberg. (App. 1741.) Paragraphs 10 and 11 of the proposed order, however, stated that the plaintiffs' vicarious-liability claims against Greenberg based on Loumiet's conduct would not be affected by this release. (App. 1742-1743.)

Greenberg objected to this proposed settlement and bar order because, among other things, it improperly sought to dictate the effect of the settlement and Loumiet release on Greenberg, which was not a party to the settlement. (App. 2301-2302.) Hunton responded to this objection, arguing that: "If Greenberg wants to argue in Court that the Settlement has some particular sort of effect … the Court's approval of the Settlement Agreement and the Proposed Bar Orders does not prevent Greenberg from making any arguments or defenses that it is otherwise entitled to make." (App. 1872.) The Receiver was even more explicit in his response: "There is absolutely nothing in the Settlement Agreement or in the proposed Bar Order that will prevent Greenberg from making any arguments, or asserting any defenses, that it wants to assert. … Greenberg is welcome to make whatever arguments it wishes concerning the legal effect of the parties' agreement, but it is not entitled to control the terms of the agreement." (App. 1853.)

The objection was finally resolved when the plaintiffs, Hunton, and Greenberg agreed to add additional language to the proposed bar order. (App. 1877.) The additional agreed language

---

[12] Certain claims were also assigned to and brought by the Official Stanford Investors Committee. *See* D.E. 1 ¶ 2. The independence of such claims was abandoned by the Receiver and OSIC in subsequent complaints. Compare D.E. 1 with SAC (dropping Committee as plaintiff).

stated that (a) nothing would "impair or prejudice the legal rights or obligations of Greenberg in responding to or defending against the claims asserted against Greenberg in the Litigation"; (b) that the Hunton Settlement "shall not prove any matter against Greenberg in the Litigation, including, without limitation, as to . . . the effect of the Hunton Settlement on Greenberg's defenses or alleged liability to Plaintiffs"; and (c) that Greenberg is subject to paragraphs 8 and 11, but "nothing in this sentence is intended to, or shall, restrict Greenberg's defense to the claims against it." (*Id.*) The bar order was ultimately entered with this language in it. (App. 1881.)

### B.   *Investor Claims Barred By Attorney Immunity Doctrine*

In 2018, the Court entered a judgment on the pleadings in favor of Greenberg on the Investors' suit, finding all of their claims barred by the attorney immunity doctrine. *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2017 WL 6761765, at *1 (N.D. Tex. Dec. 5, 2017). Earlier this year, the Fifth Circuit Court of Appeals affirmed this Court's decision. *Troice v. Greenberg Traurig, L.L.P.*, 921 F.3d 501 (5th Cir. 2019). Thus, the remaining claims for the Court to adjudicate are only those which are the subject of this Motion.

### C.   *Magistrate Judge's Ruling on Causation and Damages Discovery*

Because the Receiver had failed to identify specific causes for the claimed damages in response to Greenberg's Interrogatories, Greenberg brought a motion to compel. Magistrate Judge Bryant ordered the Receiver to explain "(1) how each alleged breach and negligent act committed by Greenberg contributed to the $5.9 billion judgment and (2) what portion of the judgment he attributes to each act." (App. 1901-1902.) The Receiver never appealed this order.

In response, the Receiver identified various allegedly negligent acts, but refused to identify what portion of his damages he attributes as being caused by what act. Rather, the Receiver summarily claimed that *each* allegedly negligent act caused the *entire* $4.9 billion loss. (App. 1962-1964.)

14

At a hearing to enforce the Magistrate Judge's order requiring the Receiver to explain "what portion of the judgment he attributes to each act," the Receiver's counsel asserted that it was impossible or impractical to establish "whether a breach or act by Greenberg independently caused the specific damages to be recovered." (App. 1919.) The Receiver's counsel stated that whether this approach was permissible was a matter "for summary judgment." (*Id.*) Given the Receiver's position that it was impossible to do more, the Magistrate Judge denied the motion to enforce, while observing that "if the receiver is saying this is all they've got, then maybe your motion for summary judgment gets easier." (App. 1932.)

## ARGUMENT

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. The court must draw all justifiable inferences in favor of the non-moving party. *Id.* at 255. Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993).

15

I.   **THE JUDGMENT IN THE HUNTON SETTLEMENT RELEASING LOUMIET FOR ALL CONDUCT, INCLUDING HIS CONDUCT AT GREENBERG, IS RES JUDICATA AS TO ANY CLAIM AGAINST GREENBERG BASED ON LOUMIET'S CONDUCT**

Under the doctrine of res judicata, a judgment dismissing claims against an employee precludes vicarious-liability claims against the employer. *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1289 (5th Cir. 1989) ("[T]he vicarious liability relationship between Exxon and its employees Evans and Lower, which forms the only asserted basis for Exxon's liability for the computer dispute, justifies claim preclusion."); *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1505 (11th Cir. 1990).

This Court's March 26, 2018, Final Judgment and Bar Order (the "Judgment") provided that Carlos Loumiet[13] "shall be completely released, acquitted, and forever discharged from any action, cause of action, suit, liability, claim, right of action, or demand, whatsoever" that "is in any manner connected with" the "Stanford Entities." D.E. 265, App. 1888 at ¶ 8. Thus, the Judgment precludes the Receiver's vicarious-liability claims against Greenberg based on the same conduct. Moreover, the Judgment expressly preserves Greenberg's right to assert this defense: after Greenberg objected to language purporting to limit its rights to assert this defense, language was added making clear that nothing in the Judgment "shall impair or prejudice the legal rights or obligations of Greenberg," or "restrict Greenberg's defense to the claims against it." *Id.* at ¶ 21. Accordingly, the Receiver's vicarious-liability claims against Greenberg are barred by the doctrine of res judicata and should be dismissed.

---

[13] Carlos Loumiet was defined as one of the "Hunton Released Parties," and all Hunton Released Parties were so released. (App. 1690 at ¶ 3.)

**A.   *The Judgment In Favor of Loumiet Has Claim-Preclusive Effect Here***

Res judicata, or claim preclusion, bars a claim based on an earlier judgment if "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Houston Prof'l Towing Ass'n v. City of Houston*, 812 F.3d 443, 447 (5th Cir. 2016) (quoting *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 467 (5th Cir. 2013)). All four factors are satisfied here.

First, the vicarious-liability relationship between an employer and employee satisfies the "privity" requirement of claim preclusion. *Russell v. SunAmerica Secs., Inc.*, 962 F.2d 1169, 1175 (5th Cir. 1992); *Lubrizol*, 871 F.2d at 1289; *Citibank*, 904 F.2d at 1502-03. For example, in *Lubrizol*, the Fifth Circuit held that claims against Exxon employees were precluded because the plaintiff had settled and dismissed vicarious-liability claims against Exxon arising from the same conduct. *Lubrizol*, 871 F.2d at 1289. The court observed that most other federal circuits have concluded that employer-employee or principal-agent relationships may ground a claim-preclusion defense, and concluded that "the vicarious liability relationship between Exxon and its employees . . . which forms the only asserted basis for Exxon's liability for the . . . dispute, justifies claim preclusion." *Id.* at 1289. Here, the Receiver has asserted vicarious-liability claims against Greenberg for Loumiet's conduct while employed at Greenberg. This vicarious-liability, employer-employee relationship thus satisfies the first element of the test for claim preclusion.

The second element of claim preclusion cannot be disputed: this Court had jurisdiction to enter the Judgment. As for the third element, the Judgment was both final and on the merits—by its own terms, it "completely released, acquitted, and forever discharged" Loumiet "from any action, cause of action, suit, liability, claim, right of action, or demand, whatsoever" that "is in any manner connected with" the "Stanford Entities." (App. 1888 at ¶ 8.) Judgments resulting from

settlement agreements satisfy this part of the test for claim preclusion. *Russell*, 962 F.2d at 1173; *Lubrizol*, 871 F.2d at 1287.

Finally, claims asserting the vicarious liability of an employer are treated as "the same claim or cause of action" as the direct claim against the employee for res judicata purposes. *Lubrizol*, 871 F.2d at 1287-88; *Citibank*, 904 F.2d at 1503-04. This is because "[t]o determine whether the two suits involve the same cause of action, [the Fifth Circuit] applies the transactional test and asks whether the two suits involve the same nucleus of operative facts." *Brooks v. Raymond Dugat Co. L C*, 336 F.3d 360, 362 (5th Cir. 2003). By definition, a vicarious liability claim seeks to hold an employer liable for the same facts for which the employee is liable. *E.g.*, SAC ¶ 330 ("Greenberg is liable for the tortious acts of its employees and agents who acted in representation of Stanford, including . . . Carlos Loumiet . . ."). Here, the Receiver expressly released these claims against Loumiet. The Receiver's settlement agreement states, for example: "For the avoidance of doubt, the Settled Claims . . . include Settled Claims against Loumiet that arise from or relate in any way to Loumiet's alleged conduct or knowledge while employed at or affiliated with Greenberg . . . ." (App. 1752 at ¶ 4.) The Judgment similarly acquits and discharges Loumiet from any such claims.

Because Greenberg is in privity with Loumiet for purposes of the vicarious-liability claims, and because Loumiet has been "completely released, acquitted, and forever discharged" from claims involving the same operative facts, these claims against Greenberg are precluded by res judicata.

### B.   *The Judgment Does Not Prevent Greenberg from Asserting This Defense*

The Judgment states that it does not "release any claims or causes of action that Plaintiffs have or may have against Greenberg"—but it also makes clear that Greenberg remains free to argue that the Judgment is res judicata as to the vicarious-liability claims. Paragraph 21 of the

Judgment states: "Nothing in the Final Bar Order, the Rule 54(b) Final Judgment and Bar Order, the Settlement Agreement, or any other order entered with respect to the Settlement . . . shall impair or prejudice the legal rights or obligations of Greenberg in responding to or defending against the claims asserted against Greenberg in the Litigation." (App. 1893 at ¶ 21(a).) The same paragraph also states that while Greenberg is subject to the releases of the Judgment, "nothing in this sentence is intended to, or shall, restrict Greenberg's defense to the claims against it." (App. 1893 at ¶ 21(c).)

This language was added to the Judgment after Greenberg objected to the original proposed draft, on the grounds that it unfairly limited Greenberg's right to argue about the effect of the settlement. (App. 2301 – 2305.) Greenberg explained that the effect of the Plaintiffs' release was a question of law that could not be resolved by an agreement between other parties (namely, in a settlement between Hunton and the Receiver), and further that the question of the release's effect had not yet been briefed or argued. (*Id.*) In response, the Receiver stated: "There is absolutely nothing in the Settlement Agreement or in the proposed Bar Order that will prevent Greenberg from making any arguments, or asserting any defenses, that it wants to assert. . . . Greenberg is welcome to make whatever arguments it wishes concerning the legal effect of the parties' agreement, but it is not entitled to control the terms of the agreement." (App. 1852 – 53.) Hunton concurred, stating: "If Greenberg wants to argue in Court that the Settlement has some particular sort of effect . . . the Court's approval of the Settlement Agreement and the Proposed Bar Orders does not prevent Greenberg from making any arguments or defenses that it is otherwise entitled to make." (App. 1872.) Nonetheless, Hunton proposed adding Paragraph 21 of the Judgment to further "address[] Greenberg's concerns." (*Id.* at 1872 - 73.) This additional language was essential to securing Greenberg's assent to the final Judgment and, as the Receiver acknowledged, leaves

Greenberg free "to make whatever arguments it wishes concerning the legal effect of the parties' agreement."

The reservation of Greenberg's right to assert res judicata was also essential to the Judgment itself, which, absent the reservation, would unfairly close off both Greenberg's right to assert res judicata and also its ability to seek contribution from Loumiet if it were ultimately held liable for Loumiet's conduct. *Cf. S.E.C. v. Stanford Int'l Bank, Ltd.*, ---F.3d---, 2019 WL 2496901, at \*6, 11 (5th Cir. June 17, 2019) (explaining that settlement between two parties, and resulting bar order, cannot preclude a third party's right to recovery).

The Receiver's contrary reading would improperly allow a plaintiff and an employee to limit preclusion in a subsequent suit against the employer through a consent judgment. While a court can limit the preclusive effect of its own judgments in certain circumstances, *e.g.*, *Vines v. Univ. of Louisiana at Monroe*, 398 F.3d 700, 712 (5th Cir. 2005),[14] it cannot prevent an employer facing vicarious-liability claims from asserting the res judicata effect of a judgment dismissing the employee. *See Citibank*, 904 F.2d at 1505. In *Citibank*, the Eleventh Circuit held that a consent judgment dismissing an employee precluded claims against the vicariously liable employer, even though the judgment expressly stated that all such claims were reserved. *Id.* The court noted that while the settling parties had tried to reserve these claims by agreement, the employer was "not a party to the settlement" and "did not so agree." *Id.* at 1504. Accordingly, the court applied ordinary principles of claim preclusion notwithstanding the reservation in the earlier order.

---

[14] In contrast to the case here, *Vines* explained that a court could limit the preclusive effect of a judgment on future claims between the *same* parties, such as where a court declines to exercise supplemental jurisdiction over a plaintiff's state-law claims, but expressly states that the plaintiff can continue to pursue those claims in the future. 398 F.3d at 712. *Vines* did not involve a consent judgment, and the court did not hold that a court can limit the preclusive effect of a judgment on claims against a party whose liability is purely vicarious.

Moreover, even if (contrary to the precedent above) a court could limit the preclusive effect of its own judgment in the vicarious-liability setting, any limitation must be clearly stated or it is ineffective. *See Conwill v. Greenberg Traurig, L.L.P.*, 2012 WL 4482937, at *6 (E.D. La. Sept. 28, 2012) (finding that an earlier order "[a]t best . . . create[d] an ambiguity regarding the unasserted state law claims," and that an ambiguous reservation does not defeat res judicata). Given the language in the Judgment that nothing "shall impair or prejudice the legal rights or obligations of Greenberg in responding to or defending against the claims asserted against Greenberg in the Litigation"—which would necessarily include Greenberg's right to assert the claim-preclusive effect of the Judgment on the Receiver's vicarious-liability claims arising from the same conduct—there is no clear limitation on the preclusive effect of the Judgment.

## II.  THE CLAIM FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY FAILS BECAUSE THE RECEIVER CANNOT ESTABLISH GREENBERG'S "ACTUAL KNOWLEDGE" OR CAUSATION

Greenberg has a pending motion for judgment as a matter of law, based on recent Fifth Circuit authority, that there is no claim for aiding and abetting. In *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018), the Fifth Circuit held that because "[t]he Texas Supreme Court 'has not expressly decided whether Texas recognizes a cause of action for aiding and abetting," *Erie* principles do not authorize federal courts to recognize aiding and abetting claims. The court reasoned that "a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts." *Id.*; *accord National Oilwell Varco L.P. v. Sadagopan*, No. H-16-2261, 2018 WL 3844714 at *8 n.2 (S.D. Tex. Aug. 13, 2018) (Rosenthal, J.), *amended on other grounds*, 2018 WL 5778250 (S.D. Tex. Oct. 31, 2018).

This motion is dispositive of the aiding and abetting claim. However, even if such a claim existed, it would require proof that "(1) the primary actor committed a tort; (2) the defendant had

knowledge that the primary actor's conduct constituted a tort; (3) defendant had intent to assist the primary actor; (4) defendant gave the primary actor assistance or encouragement; and (5) defendant's conduct was a substantial factor in causing the tort," – in addition to proof that the tort at issue proximately cause the injury. *Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*, 525 S.W.3d 875, 882 – 83 (Tex. App.—Houston [14th Dist.] 2017, no pet.). The Receiver's claim fails because there is no evidence (a) that Greenberg had *actual knowledge* of the Stanford Ponzi scheme; (b) that Greenberg's legal work was a *substantial factor* in the Ponzi scheme, or (c) that any conduct in which Greenberg's work was a substantial factor was the *proximate cause* of all of the Ponzi scheme damages the Receiver is seeking. Moreover, the Receiver's claim fails for an additional independent reason: he has steadfastly refused to identify what breaches by Greenberg were the cause of what damages, even after being directed to do so by Magistrate Judge Bryant, and has instead claimed, improperly, that he need not establish causation because his damages are "indivisible." Each issue is addressed in turn.

**A.** ***The Receiver Cannot Satisfy the "Actual Knowledge" Requirement of the Aiding and Abetting Claim***

An essential element of the Receiver's aiding and abetting claim is proof that the defendant "*was aware* that it was participating in the breach of [a] fiduciary relationship." *Meadows v. Hartford Life Ins*. Co., 492 F.3d 634, 639 (5th Cir. 2007) (emphasis added). As set forth below, the Receiver cannot satisfy this element because he cannot show that Greenberg had actual knowledge of the Ponzi scheme and cannot establish knowledge through lesser evidence of recklessness or negligence.

**1.** ***The Receiver Must Show Greenberg Had "Actual Knowledge" of Stanford's Ponzi Scheme Fraud***

When asked to identify what breaches of fiduciary duty Greenberg aided and abetted, the Receiver's response was: "*every* CD sold by the Stanford entities" – *i.e.*, the entire Ponzi scheme.

(App. 1942.) Similarly, the Receiver's $4.9 billion damages claim is based on *every* unreimbursed CD sale to investors in the Stanford Ponzi scheme from December 1998 through February 2009. (App. 1499-1501 at ¶¶70-71; App. 1527 at ¶6; App. 1532-33 at ¶16).[15]

Thus, to bring a claim for aiding and abetting the sale of *every* CD sold in the Ponzi scheme after 1998, the Receiver must establish "actual knowledge" by Greenberg *of the Ponzi scheme through which these CDs were sold* – not knowledge of any lesser infractions, red flags or even "symptoms of a Ponzi scheme." *See, e.g.*, *Isaiah v. JPMorgan Chase Bank, N.A.*, 2017 WL 5514370, at *4 (S.D. Fla. 2017) (requiring proof of "actual knowledge" of Ponzi scheme, and holding that proof "knowledge of the symptoms of the Ponzi scheme," including even detecting suspicious activity on accounts, was insufficient to support claim).[16]

Unable to prove Greenberg's actual knowledge of the Ponzi scheme, the Receiver instead dissects the origins of the Ponzi scheme into a series of alleged breaches that occurred between 1988 and 2001, and purports to offer circumstantial evidence that Greenberg "knowingly participated" in at least one of those breaches. (App. 1948-49.) In this way, the theory goes, Greenberg "set the stage" for what followed long after Greenberg stopped rendering legal services

---

[15] The Receiver has confirmed on the record that he seeks Ponzi scheme damages. (App. 1919-20 at 10:21-11:2) ("[O]n damages, they have our calculations. They have the amount of damages. They have the way we calculated it. … This is a Ponzi scheme.")

[16] *See also In re Palm Beach Finance Partners, L.P.*, 488 B.R. 758, 772 (S.D. Fla. Bankr. 2013) (requiring proof of actual knowledge of the Ponzi scheme in claim for aiding and abetting fraud in connection with a Ponzi scheme); *Ryan v. Hunton & Williams,* 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (in claim for aiding and abetting a Ponzi scheme, holding that proof that bank was "on notice of various 'red flags' that indicated fraudulent conduct" and "that [the bank] suspected fraudulent activity . . . do not raise an inference of actual knowledge of . . . fraud."); *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003) (holding "actual knowledge" sufficiently alleged because Citibank employees "*actually knew of … the unlawful scheme* to steal from [plaintiff] DIB and launder the money stolen from DIB,' altered checks in furtherance of the scheme, and continued to move stolen money to Swiss bank after closing the fraudster's account) (emphasis added).

to Allen Stanford and his companies, therefore, Greenberg is liable for the entire scheme. (App. 1950 at 2.g.) This unprecedented approach to aiding and abetting fails as a matter of law.[17]

The "actual knowledge" element is necessarily informed by what the plaintiff seeks to hold the aider and abettor liable *for*. For example, in *In re Sharp Intern. Corp.*, 281 B.R. 506, 513-14 (Bankr. E.D.N.Y. 2002), a defendant bank investigated a company that was a customer of the bank in response to red flags, and learned that two of the company's principals had created fictitious customers and inflated their accounts receivables. *Id.* at 510. Unbeknownst to the bank, the principals were not just falsifying financial statements, but were also looting the company. The bank and the principals then reached an agreement through which the company secured "new financing from investors unaware of the fraud" and then used "that financing to pay off" a debt. After filing for bankruptcy, the company sued the bank for aiding and abetting the principal's breach of fiduciary duty. The court rejected the claim, holding that the actual knowledge requirement was not satisfied even though the bank had known of wrongful conduct by the principals. The court reasoned:

> [T]he wrong for which Sharp [the company] seeks to hold State Street [the bank] liable is the Spitzes' [the principals'] unlawful diversion of monies from Sharp. *This is made clear by the fact that the damages which Sharp seeks to recover on its aiding and abetting claim are the monies that were looted by the Spitzes after State Street allegedly discovered the Spitzes' fraud. ... The fact that a company is inflating its receivables does not necessarily mean that the company's principals are looting it.* Although it is possible that State Street suspected that the Spitzes were engaged in this activity in order to cover up the fact that they were siphoning monies from Sharp, suspicion and surmise do not constitute actual knowledge.

---

[17] While this Court allowed the Receiver's complaint to survive a motion to dismiss (Order at 8), the Court's ruling was before the Receiver claimed Greenberg was responsible for $4.9 billion in damages – essentially the entire Ponzi scheme damages – while refusing to attribute or apportion any part of those damages to specific conduct by Greenberg. In addition, one of the cases cited for that proposition is not a knowing participation in a breach of fiduciary duty case, but rather, a claim for aiding and abetting a securities act violation under the Texas Securities Act. That Act only requires "reckless disregard for the truth or the law," *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 846 (Tex. 2005) – a different standard than is required here.

281 B.R. 506, 513-14 (emphasis added).

*Isaiah v. JPMorgan Chase Bank, N.A.*, 2017 WL 5514370 (S.D. Fla. 2017), is similar. Two fraudsters formed corporations and opened company bank accounts to operate a Ponzi scheme. The bank had detected fraud on the account, as indicated on withdrawal slips which specifically noted there was "fraud on account" and that this fraudulent activity was detected by the bank's "internal anti-money laundering controls." The scheme later collapsed and left the companies bankrupt. The receiver for the bankrupt companies sued the bank for aiding and abetting the fraudsters' breach of fiduciary duties, and sought damages based on the Ponzi scheme (much as the Receiver does here). The court rejected the receiver's aiding and abetting claim, even though the bank had discovered fraud on the account, because the bank did not have actual knowledge of the Ponzi scheme. The court reasoned: "even if JPMC detected suspicious activity on the accounts as alleged, *this only demonstrates knowledge of the symptoms of the Ponzi scheme, not JPMC's actual knowledge of the scheme itself.*" 2017 WL 5514370 at *4 (emphasis added). *See also In re Palm Beach Finance Partners, L.P.*, 488 B.R. 758, 772 (S.D. Fla. Bankr. 2013) (dismissing aiding and abetting claim where the "factual narrative is merely a trail of suspicious activity that Plaintiff contends should have provided Defendant notice of the ponzi scheme" and the "Plaintiff fails to plausibly allege that [the bank] had actual knowledge of [the] Ponzi Scheme." 488 B.R. at 772 (emphasis added) (quoting *Litson–Gruenber v. JPMorgan Chase & Co.*, 2009 WL 4884426, at *3 (N.D. Tex. Dec. 16, 2009)).

Here, because the Receiver is seeking to hold Greenberg liable for essentially the entire Ponzi scheme, he must prove actual knowledge *of the scheme*. Even if Greenberg had knowledge of other breaches of fiduciary duty by Stanford (which it did not), and even if certain of those

breaches rose to the level of illegal or fraudulent conduct (which is not conceded), Greenberg's undisputed lack of actual knowledge *of the Ponzi scheme* is fatal to the claim.

> **2.    *The Receiver Cannot Satisfy the "Actual Knowledge" Requirement through Evidence of Recklessness or Negligence***

While conceding that Greenberg did not know of the fraud, the Receiver instead points to various factors through which he contends Greenberg *should have* known. However, evidence of recklessness, negligence, malpractice, "red flags" and suspicion is insufficient as a matter of law to establish "actual knowledge" and withstand summary judgment. Holding Greenberg liable without proof of actual knowledge of the scheme would render lawyers insurers of their clients' conduct; this is not the law.

For instance, failure to conduct an adequate investigation, even when it rises to the level of recklessness, does not constitute actual knowledge. *Cf. Amacker v. Rennaissance Asset Mgmt.,* 657 F.3d 252, 256-58 (5th Cir. 2011) (distinguishing between "knowledge" and "extreme recklessness" and further concluding that defendants' "failure to conduct more than a cursory investigation" would not satisfy either standard).

In addition, proof that an alleged participant "failed to adhere to an appropriate standard of care or to follow relevant policies, procedures, or regulations [is] likewise insufficient to demonstrate actual knowledge for the purposes of an aiding and abetting claim." *Isaiah v. JPMorgan Chase Bank, N.A.,* 2017 WL 5514370 (S.D. Fla. 2017) (citing *Groom v. Bank of Am.*, 2012 WL 50250, at *1 (M.D. Fla. 2012) (dismissing complaint seeking to impose liability on bank for aiding and abetting a customer's Ponzi scheme based on allegations regarding "atypical and irregular banking practices" and failure to "adhere to the customary and accepted standard of care and fail[ure] to monitor incoming deposits and wires and other monies" because such allegations do not create a plausible inference of actual knowledge)).

Nor are normal financial benefits received by the defendant sufficient to establish actual knowledge. *Krakauer v. Wells Fargo*, No. 02-14-00273-CV 2016 WL 5845924 (Tex. App.—Fort Worth Oct. 6, 2016, no pet.) (affirming summary judgment in favor of bank accused of aiding and abetting breach of fiduciary duty in Ponzi scheme and rejecting claims that banks overdraft fees and other charges were evidence that bank "knowingly participated"); *BWD, Inc. v. Stevens*, No. 11-09-00132-CV, 2011 WL 664759 (Tex. App.—Eastland Feb. 24, 2011, no pet.) (fact that the defendant received discounts on purchases from the plaintiff corporation was not evidence that the defendant knowingly participated in a breach of fiduciary duty by the plaintiff's employee, and testimony that defendant offered to mow the company's grass to get the discount constituted "no more than a scintilla of evidence that defendant knowingly participated in any breach of fiduciary duty.").

Moreover, evidence of suspicious facts or "red flags" is insufficient as a matter of law. *Litson–Gruenber v. JPMorgan Chase & Co.*, 2009 WL 4884426, at *3 (N.D. Tex. 2009) ("Plaintiffs factual narrative is, at best, merely a story of suspicious activity that Plaintiff contends should have provided Defendant notice of the [P]onzi scheme. As such, this is not sufficient to satisfy the requirement of actual knowledge for aider and abettor liability") (applying California law).

Federal courts applying Texas law (prior to recent precedent clarifying that the action does not exist) are aligned with the majority of courts that have held that "red flags" indicating suspicious activity are legally insufficient to establish actual knowledge of a fiduciary's fraudulent conduct. [18] *See Joe N. Pratt Ins. v. Doane,* 2009 WL 4506586 (S.D. Tex. 2009) (plaintiff cannot

---

[18] *See, e.g.*, *Lamm v. State Street Bank and Trust*, 749 F.3d 938, 950 (11th Cir. 2014) (no actual knowledge if "'bank disregarded red flags such as 'atypical activities' on a customer's account'"); *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013) ("'red flags' . . .

"survive summary judgment on its 'knowing participation' claims" where] [t]he evidence offered by Pratt is nothing more than suspicion and speculation and, essentially, argues that the Trinity Defendants 'must have known' about the Easley Defendants' allegedly improper behavior. This is not enough to survive summary judgment.") (citing *Stevenson v. Rochdale Investment Mgmt., Inc.*, 2000 WL 1278479, at \*5 (N.D. Tex. Sept. 7, 2000)). *See also Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex. App.—Austin 2001, pet. denied) (affirming dismissal of knowing participation where secondary defendant was not actually aware of underlying breach).

In summary, because the Receiver cannot establish "actual knowledge," Greenberg is entitled to summary judgment on the aiding and abetting claim.

## B. *The Receiver Cannot Satisfy the "Double" Causation Requirement of the Aiding and Abetting Claim*

The Receiver's aiding and abetting claim also fails on the causation element, which itself has two components: the defendant's conduct must be a "substantial factor" in causing the primary actor's tort, and that tort must proximately cause the injury. *See Immobiliere*, 525 S.W.3d at 882

---

are insufficient to establish a claim for aiding and abetting"); *Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 858 (D. Minn. 2013) ("it is not enough to plead awareness" of "red flags"); *de Abreu v. Bank of Am.*, 812 F. Supp. 2d 316, 325 (S.D.N.Y. 2011) ("[N]otice of 'red flags' that [a customer] was engaging in fraudulent activity . . . would not be sufficient to support an allegation of actual knowledge"); *In re Agape Litig.*, 773 F. Supp. 2d 298, 318-19 (E.D.N.Y. 2011) ("While the Plaintiffs have gathered allegations of 'red flags' and suspicious circumstances, which in hindsight may appear to indicate the obviousness of the fraud, these allegations fail to . . . sufficiently allege[] facts that raise a strong inference of actual knowledge from circumstantial evidence."); *Stern v. Charles Schwab & Co., Inc.*, No. CV-09-1229-PHX, 2010 WL 1250732, at \*11 (D. Ariz. Mar. 24, 2010) (knowledge of "red flags" insufficient to show knowledge of underlying Ponzi scheme); *Neilson v. Union Bank, N.A.*, 290 F. Supp. 2d 1101, 118-19 (C.D. Cal. 2003) ("knew or should have known" allegations were insufficient to show actual knowledge of Ponzi scheme: "while aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act."); *Ryan v. Hunton & Williams*, 2000 WL 1375265, at \*9 (E.D.N.Y. Sept. 20, 2000) (In suit alleging that bank aided and abetted its customer's Ponzi scheme, allegations that the bank was "on notice of various of 'red flags' that indicated fraudulent conduct" and "that [the bank] suspected fraudulent activity . . . do not raise an inference of actual knowledge of . . . fraud.").

(holding that causation "plays into the analysis twice: once as an element of proof required for the underlying tort and once in establishing that the defendant's conduct have been a substantial factor in causing the underlying tort"). Thus, the Receiver must show both that Greenberg's conduct was a "substantial factor" in causing tortious conduct by Stanford insiders, and that the tortious conduct which Greenberg was a substantial factor in proximately caused the Ponzi scheme damages he is seeking. The Receiver's claim fails on both components of the causation test.

## 1. *The Receiver Cannot Prove That Any Act of Greenberg Was a "Substantial Factor" in the Fraud*

The Receiver's aiding and abetting claim is premised on substantially all the legal work that Greenberg did for Stanford during the 1988-2001 time period. (App. 1948; App. 1952.) However, the Receiver cannot establish that any of this legal work was a substantial factor in causing Stanford or Stanford insiders to sell CDs in a Ponzi scheme – much less *every* CD sold after 1998.

Neither the Receiver nor his experts have even attempted to show that Stanford would have acted differently in any way had Greenberg provided different advice. At a hearing before Magistrate Judge Bryant, the court specifically inquired about the Receiver's theory of but-for causation, asking: "I assume that's the receiver's position, that *if Greenberg had done what you allege they should have done, the CDs wouldn't have been issued*, et cetera?" (App. 1926 at 17:3-6 (emphasis added).) Incredibly, the Receiver disavowed this position, stating: "Well, Your Honor, *we will never know*, because that's not what Greenberg did." (App. 1926 at 17:7 – 8 (emphasis added).) Similarly, at his own deposition, the Receiver admitted that he could only "speculate" about what would have happened if Greenberg had provided different advice about the Investment Company Act, (App. 0073 at 133:12-18), refused to work on Antiguan reforms, (App. 0079-80 at 176:21-177:10 ("I wouldn't even guess, I don't know.")), or even resigned from the representation

29

entirely in 1998, (App. 0074 at 153:18-21 ("I don't know that Stanford would have done any different after that, if they'd withdrawn in 1998, I don't know that, it's speculation. We'll never know though, I don't know.")).

It makes sense that the Receiver declines to speculate about what would have happened without Greenberg. The Ponzi scheme continued for years after the last challenged work by Greenberg in 1998, and the scheme was fueled by multiple, intentional breaches of duties by Stanford and his insiders that had nothing whatsoever to do with Greenberg – such as "creative reverse engineering," a "Byzantine structure," secret bank accounts, movement of funds to and from such secret accounts, and the bribery and "blood oath" with an Antiguan official. (App. 1626 at p. 11; *Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014); App. 1633; App. 1634; App. 1563-64 at ¶ 43.)

The Receiver has not claimed – and could not plausibly claim – that Greenberg's legal advice was a substantial factor in these later breaches. However, the Receiver has made no effort to limit his claim accordingly, and is instead seeking to recover damages for *every* unreimbursed CD sold after 1998, regardless of what conduct or breaches led to that sale.

In *Immobiliere*, the court rejected a similar theory and upheld a summary judgment on an aiding-and-abetting claim. There, a defendant bank and its principal were accused of aiding and abetting one partner's breach of fiduciary duty to another partner by using partnership assets as collateral for a loan, the proceeds of which were then used for a non-partnership purpose. *Id.* at 878. Later, the partners refinanced this loan, obtained a second loan to pay off the original, and then subsequently diverted partnership assets to pay off the second loan, all without the defendants' help. *Id.* Rejecting the aiding-and-abetting claim, the court noted that the defendants' involvement was limited to the original loans, and "obtaining the original loans in this manner, even if wrongful,

did not proximately cause actual damages to the partnerships." *Id.* at 882. Rather, the partnership was damaged when assets were diverted to pay off the *subsequent* loans, and the defendants "had no role in this intervening diversion of assets or in the two intervening refinancings of the original loans." *Id.* The court emphasized that "the alleged harm is simply too attenuated from the alleged aiding and abetting conduct and insufficiently foreseeable for liability to follow." *Id.* at 882.

Similarly, the harm in this case arose not because Allen Stanford was diligently following legal counsel and was misadvised, but because he intentionally ran a Ponzi scheme while looting his companies. As in *Immobiliere*, the $4.9 billion in unreimbursed CD sales that accrued over the course of ten years after the alleged wrongful acts "is simply too attenuated from the alleged aiding and abetting conduct and insufficiently foreseeable for liability to follow." *Immobiliere*, 525 S.W.3d at 882.

### 2. The Receiver Cannot Prove That Any Tort in Which Greenberg Was a "Substantial Factor" Was the Proximate Cause of His Ponzi Scheme Damages

The Receiver's claim also fails on the second required causation element: proof that the tortious conduct (in which Greenberg was a "substantial factor") was the proximate cause of the Ponzi scheme damages he is seeking.

The Receiver instead contends that Greenberg's early legal advice "set the stage for, and enabled Stanford to grow and expand the sales of SIBL CDs from December 30, 1998 until the SEC shut down the Stanford entities in February 2009." (App. 1950.) However, this stage-setting theory does not establish proximate causation of the CD sales. *Immobiliere*, 525 S.W.3d at 882 (rejecting causal link between original loan and subsequent lending that caused the ultimate harm); *accord Stanfield*, 494 S.W.3d at 97 (Tex. 2016) (If an act "'merely create[es] the condition that makes the harm possible,' it is not a substantial factor in causing the harm as a matter of law.").

Nor can the Receiver establish causation by trying to establish a link between Greenberg and earlier, lesser conduct by Stanford insiders. He cannot prove that such conduct was the proximate cause of his Ponzi scheme damages, and certainly not the cause of every CD sale after 1998. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017) (rejecting knowing participation claim where there was "no evidence the church was harmed by the only wrongful act in which" defendant allegedly participated).[19]

Suarez's alleged breaches of fiduciary duty are especially attenuated from the harm, which was caused not by Suarez's acts as general counsel, but by Stanford's decision to sell CDs in a Ponzi scheme and steal from his companies. If her fiduciary duty to the entities compelled Suarez to advise Stanford to register SIBL as an Investment Company, stop making loans to Antiguan officials, or make additional disclosures to investors, there is no evidence the sales of CDs would have ended—and the Receiver has not even attempted to assert that there is such evidence. Rather, the Receiver's theory, espoused by his expert, is that "Stanford was never going to register" and thus "Stanford did not want advice on how to comply" with the ICA. (App. 0091 at 50:5-23.)[20]

---

[19] The Court began its analysis "by noting that this Court has not expressly decided whether Texas recognizes a cause of action for aiding and abetting." *Parker*, 514 S.W.3d at 224.

[20] The Receiver's securities expert, Spindler, could testify only that had Yolanda Suarez advised Stanford to stop selling securities, "there's a chance it could have—it could have lessened things." (App. 0270, 204:2-204:13.) This is the classic type of speculation that is prohibited for proving causation. *See Reneker II*, 2009 WL 3365616, at *6 (unless clients were "unaware of illegality of their actions" or "their illegal actions were unintentionally so," it is "speculative to assume" that different legal advice would have prevented securities-fraud damages); *Hays*, 92 F. Supp. 3d at 1324 ("[N]either Lighthouse's compliance issues nor DeHaan's theft was caused by inadequate legal advice. They were caused by DeHaan's deliberate choice to flout applicable regulations, lie to his attorneys, and continue his fraudulent scheme.").

**C.** ***The Causation Element of the Aiding and Abetting Claim Also Fails Because the Receiver Improperly Treats His Damages as Indivisible and Refuses to Identify What Damages Were Caused by Greenberg's Allegedly Wrongful Conduct***

The causation element of the Receiver's aiding and abetting claim fails for another independent reason: the Receiver claims that he cannot identify what damages were caused by each of Greenberg's allegedly wrongful acts because the injury is indivisible. To be truly "indivisible," an injury must be one which "from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers. *Landers v. East Tex. Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952). The SIB CDs were sold over a two-decade period in thousands of separate transactions with separate investors in separate locations at separate times. The Receiver has divided CD sales by time period, by geographic area, and by defendant in other instances. Here, for example, the Receiver has specifically linked Greenberg's Do's and Don'ts Memo to $324 million in CDs (later reduced to $209 million) that were supposedly sold through a particular SFIS trust representative office in Miami. (App. 1964.) Similarly, the Receiver has had no trouble dividing sales by time periods in pursuit of other defendants. (*See, e.g.*, App. 2352-2354; App. 1618-20).

Critically, most of the unreimbursed CD transactions about which the Receiver complains occurred years after Greenberg's challenged conduct, including the multi-billion dollar increase in "CD Liability Balances" that occurred after Loumiet left Greenberg in 2001. None occurred before 1998, when Greenberg was actually doing the work that is challenged. (App. 1472, ¶ 21.) Because the Receiver's damages are not properly "indivisible" as he claims, he cannot establish causation for the full, undivided $4.9 billion liability.

## III.  THE NEGLIGENCE CLAIM FAILS FOR LACK OF CAUSATION

To prove a legal malpractice claim, "the client must establish that: (1) the lawyer owed a duty of care to the client; (2) the lawyer breached that duty; and (3) the lawyer's breach proximately caused damage to the client." *Rogers v. Zanetti*, 518 S.W.3d 394, 400 (Tex. 2017).

Proximate cause has two elements: cause in fact and foreseeability. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017). *Cause in fact* requires proof of (1) *substantial factor causation*, that is, "the act or omission was a substantial factor in bringing about the injuries," and (2) *but-for causation*, that is, "without it, the harm would not have occurred." *Id.*; *accord HMC Hotel Props. II Ltd. P'ship v. Keystone-Tex. Prop. Holding Corp.*, 439 S.W.3d 910, 914-17 (Tex. 2014); *Zanetti*, 518 S.W.3d at 400.

*Foreseeability* addresses "*whether the harm incurred should have been anticipated* and whether policy considerations should limit the consequences of a defendant's conduct." *Zanetti*, 518 S.W.3d at 402 (emphasis added); *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (holding that foreseeability is established by showing that the defendant "should have anticipated the danger created by a negligent act or omission"). "Conjecture, guess and speculation" are insufficient to prove both cause in fact and foreseeability. *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016).

Thus, the Receiver must prove through non-speculative evidence (1) that each act of alleged negligence by Greenberg was a *substantial cause* of the $4.9 billion in Ponzi scheme damages he is seeking (or what portion it was a substantial cause of), (2) that these damages would not have occurred *but for* each allegedly negligent act by Greenberg, and (3) that this harm *should have been anticipated* by Greenberg when it was doing each allegedly negligent act. The Receiver has not satisfied these elements of causation, and cannot do so at a trial, for multiple reasons.

### A.   *The Receiver Refuses to Identify What Portion Of His Damages He Attributes to Each Act of Alleged Negligence.*

A discussed above, in response to orders from the Magistrate Judge compelling responsive interrogatory answers, the Receiver could not identify which portion of the claimed damages were caused by particular acts. (App. 1901-1902.) At a hearing to enforce the Magistrate Judge's order,

the Receiver's counsel asserted that it was impossible or impractical to establish "whether a breach or act by Greenberg independently caused the specific damages to be recovered" (App. 1919.) Similarly, the Receiver's damages expert did not even try to apportion damages to any particular act of Greenberg, and instead simply claims that Greenberg's conduct helped "establish the structures and mechanisms" that allowed Stanford to sell fraudulent CDs. (App. 1498-1499 at ¶ 68).

This approach is not permissible, and should be rejected at summary judgment. As set forth above (Section II.C, *supra*), the Receiver's damages are not indivisible: they can and have been apportioned in a variety of ways. In addition, the theory that Greenberg's work "set the stage" for the later fraud or that Greenberg helped "establish the structures and mechanisms" that allowed Stanford to sell fraudulent CDs does not satisfy the proximate cause requirement. *Stanfield*, 494 S.W.3d at 97 ("If a negligent act or omission 'merely create[es] the condition that makes the harm possible,' it is not a substantial factor in causing the harm as a matter of law.").

Summary judgment should be entered on the negligence claim because the Receiver has not even sought to do this.

**B.   *The Receiver Has Not Attempted to Prove How Stanford (a Convicted Criminal Who Was Not Trying to Comply with the Law) or the SEC (Which Already Believed It Was a Ponzi Scheme) Would Have Acted if Stanford Had Received Different Legal Advice from Greenberg.***

The "but for" element of the causation test requires proof that, without the negligent action, "the harm would not have occurred." *Bustamante*, 529 S.W.3d at 456; *HMC Hotel Props.*, 439 S.W.3d at 914-17; *Zanetti*, 518 S.W.3d at 400. Where proof of but for causation depends on third parties doing something differently but for the alleged wrongful conduct, the hypothetical actions of those third parties must be proven by competent, non-speculative evidence. *HMC Hotel*, 439 S.W.3d at 914-17.

Thus, the Receiver must prove "with competent, non-speculative evidence" that, but for Greenberg's conduct, Allen Stanford "*would* have actually" ceased the sales of CDs or that the SEC "*would* have actually" shut down the Stanford entities sooner. *Axcess Int'l v. Baker Botts, LLP*, No. 05-14-01151-CV, 2016 WL 1162208, at *5 (Tex. App.—Dallas March 24, 2016, no pet.) (emphasis in original); *see also Reneker II*, 2009 WL 3365616, at *6; *Harrison v. Taft*, 381 Fed. Appx. 432, 436-37 (5th Cir. 2010) (granting defense summary judgment where plaintiffs' expert could not say that other lawyers would have negotiated terms more favorable to the plaintiffs or that other parties would have agreed).

The Receiver has all but admitted that he cannot meet this standard. When specifically asked by Magistrate Judge Bryant, the Receiver's counsel incredibly *declined* to assert that if Greenberg had done what the Receiver alleges that they should have done, "the CDs wouldn't have been issued, etcetera." (App. 1926, at 17:3-8). Similarly, at his own deposition, the Receiver admitted that it is speculative what would have happened if Greenberg had given different legal advice or if Greenberg had withdrawn in 1998. (App. 0073 at 133:12-18; App. 0079-80 at 176:21-177:10; App. 0074 at 153:18-21). Likewise, the Receiver's damages expert admits that she has not examined what would have happened "but-for" Greenberg's actions, or considered foreseeability. Ms. Van Tassel was asked point-blank whether she would be "offering opinions about anything that would have happened differently if Greenberg had provided different advice," and her response was unequivocal: "No, I've not asked—been asked to do so." (App. 310 at 34:18-21.)[21]

Because Stanford was a convicted criminal who intentionally defrauded investors, it is speculative – *at best* – to conclude that Stanford would have acted differently if different legal advice had been given. Simply put, there is no evidence that a crook would have stopped being a

---

[21] She also testified that she "do[es] not have an opinion on foreseeability." (App. 309 at 15:16.)

crook if given different legal advice. This is a critical failure in a legal malpractice case arising from fraud, as another court in this District explained. *See Reneker v. Offill*, CIV.A.3:08-CV-1394-D, 2009 WL 3365616, at *5 (N.D. Tex. Oct. 20, 2009) (*Reneker II*). There, a law firm's clients were shut down by the SEC for running an investment fraud, and the receiver brought negligence claims against the law firm for failing to advise the clients about securities-laws violations. *Id.* at *1, 5; *S.E.C. v. AmeriFirst Funding, Inc.*, CIV A 307-CV-1188-D, 2008 WL 1959843, at *1 (N.D. Tex. May 5, 2008). The court dismissed these claims, and rejected the receiver's causation theory as "speculative" because the receiver did "not allege that, absent their lawyers' advice, the [clients] were actually unaware that their actions were illegal or that they lacked knowledge that the representations made during securities sales were in fact misrepresentations." *Id.* Therefore, the court reasoned, it is "speculative to assume that any change in [the lawyers'] actions would have altered the actions of the [clients] themselves." *Id.* at *6.

Nor can the Receiver establish that the SEC would have done anything differently if Greenberg had given different advice, since the SEC already suspected that Stanford was a Ponzi scheme. The Receiver himself has alleged that the SEC conducted four examinations (in 1997, 1998, 2002 and 2004), doubted the legitimacy of SIBL's CDs in each of the examinations, and concluded that the CDs "*were likely a Ponzi scheme or similar fraudulent scheme*." (App. 1660-1661; App. 2151 at Executive Summary ("[T]he SEC's Fort Worth office was aware since 1997 that Robert Allen Stanford was likely operating a Ponzi scheme.") In addition the Receiver's expert Ms. Van Tassel declined to offer any opinion "about whether the fraud or Ponzi scheme would have been stopped earlier by the SEC if Greenberg had done something differently" (*Id.* at 34:14-17).

C.  *The Failure of Causation Is Underscored by an Examination of the Specific Greenberg Representations Identified by the Receiver*

While the issues identified above warrant entry of summary judgment on the negligence claim on their own, this conclusion is reinforced by an examination of the specific representations by Greenberg identified by the Receiver in response to the Magistrate Judge Bryant's Order. The Receiver identified three categories of allegedly negligent acts: (1) the Investment Company Act Memo, which the Receiver contends caused the entire $4.9 billion loss; (2) the "Dos and Don'ts Memo," which allegedly caused $324 million[22] in unreimbursed CD sales from the Miami office of SFIS; and (3) various "other acts." Each are discussed in turn below.

1.  *The 1998 Investment Company Act Memo Was Not a Cause-In-Fact of the Alleged Damages*

In November 1998, at the request of Stanford's then-general counsel, Suarez, Greenberg prepared a memorandum summarizing the qualified purchaser exemption and other exemptions to registration under the Investment Company Act ("ICA"). (App. 531; Factual Appendix at 2.d.) The Receiver alleges that "Greenberg's negligence in failing to advise Stanford that SIBL needed to register under the Investment Company Act" caused $4.9 billion of the alleged "increased liability." (App. 1963.)

To causally connect this memo to the alleged harm, the Receiver makes two assumptions with no evidentiary support. First, the Receiver assumes that if Greenberg had advised Stanford to stop selling CDs or register as an investment company, Stanford would have done so. But, as discussed above, there is no evidence supporting that naked assertion. Indeed, when specifically asked "what would have happened differently had Greenberg" advised Stanford to register under the ICA, the Receiver stated, "[s]peculation, I don't know what they would have done." (App. 73

---

[22] The Receiver's damages expert reduced this number to $209,179,750 in her Supplemental Declaration. (App. 1527-1528 at ¶¶ 6-7.)

at 133:12-18.) In fact, the evidence in the record shows Stanford had *no* intention of registering SIBL as an Investment Company or ceasing the sale of CDs under any circumstances. Even the Receiver's own expert on the ICA, Thomas Lemke, testified unequivocally that Stanford had already decided *not* to register under the ICA by the time Greenberg was asked for advice. (App. 89 at 48:4-8; App. 91 at 50:5-23.).[23] *See Reneker II*, 2009 WL 3365616, at *5-6 (holding it was "speculative" to assume different legal advice would have prevented the injury when the fraudsters "knew they were committing-indeed, fully intended to commit-fraud").

Second, the Receiver assumes, without evidence, that even if Stanford had been willing to register as an investment company and could have done so, registration would have resulted in the SEC's earlier discovery and termination of Stanford's fraud. However, as discussed above, the SEC had *already discovered* the fraud, and there is no evidence that registration under the ICA would have resulted in any different action by the SEC. (App. 1660-1661; App. 2151.)

### 2.   *The TRO "Dos and Don'ts" Memo Was Not a Cause in Fact of the Alleged Damages*

In September 1998, Greenberg advised Stanford regarding the proper relationship between a proposed Trust Representative Office ("TRO") in Miami, Florida, and Stanford's foreign bank, SIB, in Antigua. (App. 537; App. 168 at 135:10-21.) The memorandum included, at the request of Suarez, a two-page list of "do's and don'ts" for conduct that the Trust Representative Office should and should not engage in. (App. 556; App. 169-170 at 137:12-138:15.)

---

[23] Other lawyers, for example, recommended that Stanford take certain actions to comply with the Investment Company Act, and Stanford consistently refused. *E.g.*, (App. 853; App. 326.) Mauricio Alvarado, Stanford's general counsel after Suarez, made it clear to Jane Bates, Stanford's compliance officer, that he understood there was a risk that the company was operating in violation of the ICA, and that it was a risk he felt was worth taking. (App. 29 at 38:15-41:7). While Alvarado claimed that he was acting on Greenberg's 1998 advice in reaching that determination, the Receiver's own expert has opined that it was unreasonable for him to rely on that memo. (App. 272-273 at 222:17-223:3.)

The Receiver claims that $209 million (originally $324 million) in increased CD liability was caused by Greenberg's allegedly negligent advice "concerning the legality of Stanford's marketing and offering of SIBL CDs through the Miami office of SFIS," *i.e.*, the TRO. (App. 1964; App. 1530-1531.) While this is the only instance in which the Receiver has attempted to tie Greenberg's conduct to any specific amount of damages short of the entire fraud (and belies the Receiver's assertion the harm is indivisible), this claim also fails for lack of causation.

This damages claim is based on the dollar amount of CDs allegedly sold out of the Miami TRO. (App. 1964.) However, the Receiver has no evidence that Greenberg's advice was a substantial factor in causing the alleged CD sales from that office, or that the fraudulent sale of CDs from the office was foreseeable by Greenberg. Instead, the only record evidence is that Greenberg advised Stanford that it should *not* sell CDs from the office. (App. 848; *see also* Factual Appendix at 4).

For instance, "don't" number 3 specifically instructed Stanford *not* to market products of SIB (or any other company), unless the product is offered in the context of an existing or proposed trust relationship, and "don't" number 6 further instructed Stanford *not* to solicit business of any nature on behalf of SIB (or any other company other than the trust company). (App. 556; App. 1993 at RFA 162.) In addition, even though it was not legally required, Greenberg advised Stanford to enter into an agreement with Florida regulators setting out what activities the Trust Representative Office could conduct and permitting examinations of the office by regulators. (App. 167 at 134:9-14; App. 173 at 142:10-14; App 174 at 144:6-7, 144:13-25; App. 175 at 145:9-14; App. 176 at 146:2-20; App. 557; App. 1992 at RFA 150, 151, 152.) After giving this advice, Greenberg had no further involvement in the TRO. (App. 171 at 141:4-7.)

Greenberg's advice *not* to sell CDs from the trust representative office and to submit voluntarily to regulation of the office could not have caused Stanford to sell CDs illegally from that office. Moreover, the fact that Stanford *defied* Greenberg's advice demonstrates that he would not have done anything differently if Greenberg had offered different advice. *See Hays v. Page Perry, LLC*, 92 F. Supp. 3d 1315, 1324 (N.D. Ga. 2015) (rejecting causal link where "despite the allegedly inadequate audits, the Defendants ultimately gave DeHaan correct legal advice—e.g., to return the checks that were made payable to Lighthouse—and DeHaan ignored it"); *Reneker II*, 2009 WL 3365616, at *5-6 (if wrongdoers "knew they were committing-indeed, fully intended to commit-fraud," then "[i]t is speculative to assume that any change in [the law firm's] actions would have altered the actions of the [clients] themselves").

### 3.   *No "Other Acts" Were a Cause-in-Fact of the Alleged Damages*

In the third category, the Receiver has identified 14 discrete "other acts" which allegedly caused the entire $4.9 billion damages that the Receiver is seeking. (App. 1963; App. 1934 at 25:20-23.) The Receiver has not established causation for these "other acts" for the same reasons set forth above: He has not even attempted to show that any of them were a substantial factor in, or a but for cause of, *any portion* of the alleged $4.9 billion loss; he has adduced no evidence that Allen Stanford or the SEC would have done anything differently had Greenberg offered different advice in any particular instance; and he has no evidence that the alleged injuries were foreseeable.

Rather, for these 14 discrete "other acts," the Receiver simply alleges that they "set the stage" for the later fraud. Conduct that merely "sets the stage for" the ultimate injury is not sufficient to prove a negligence claim. *Stanfield*, 494 S.W.3d at 97 ("If a negligent act or omission 'merely create[es] the condition that makes the harm possible,' it is not a substantial factor in causing the harm as a matter of law."). Nor can the Receiver put forth a new or more specific theory of causation for these acts now. (App. 1935 ("[T]he evidence provided at trial or summary

41

judgment will be limited to that that has specifically been identified or disclosed by the receiver in his discovery responses.").)

## IV.  THE RECEIVER CANNOT ESTABLISH RECOVERABLE DAMAGES

Summary judgment should be entered on all claims because the Receiver cannot establish damages for the following reasons.

### A.  *The Receiver's Damages Methodology Improperly Seeks to Measure Damages by Investor Losses*

The Receiver stands in the shoes of the Stanford entities, and therefore, may only seek to recover for harm to those entities. He has no standing to recover harm to investors and this Court has held that the attorney-immunity doctrine prevents the investors from suing Stanford's outside lawyers directly, a decision recently affirmed by the Fifth Circuit. *Troice v. Greenberg Traurig, LLP*, 921 F.3d 501, 504 (5th Cir. 2019).

This is not mere semantics. In *Reneker v. Offill*, No. 3:08-CV-1394-D, 2012 WL 2158733, at *6 (N.D. Tex. June 14, 2012) ("*Reneker III*") the court dismissed a receiver's claim against a law firm for "liabilities incurred by the [clients] to the defrauded investors, or the increased liabilities to such investors" that appeared on the clients' books, because the clients' liability was "mathematically equivalent" to investor losses and was "not distinct from investor losses." *Id.* Thus, the court reasoned, whether the damages were styled as "investor losses" or as "increased liabilities to investors," the receiver lacked standing to the extent its claim was based on liabilities incurred to defrauded investors. *See id.* The receiver then moved for reconsideration on the grounds that sales to new investors helped prolong the scheme, causing unnecessary new liabilities. The court again rejected the receiver's theory, explaining that increased investments "do not necessarily deepen insolvency or harm a corporation, given that they infuse capital into the corporation" and, therefore, only the "*creditors,* not the [clients], were injured from delayed

42

liquidation because the continued depletion of assets reduced their recovery." *Reneker v. Offill*, 3:08-CV-1394-D, 2012 WL 3599231, at *1 (N.D. Tex. Aug. 22, 2012) ("*Reneker IV*").

This Court has previously held that the Receiver may allege that a defendant's tort "contributed to the liabilities of the Receivership Estate," Ct.'s Order at 9, *Official Stanford Inv's Comm., et al. v. Greenberg Traurig, LLP, et al.*, No. 3:09-CV-0298-N (Dec. 17, 2014, D.E. 114), and the Court and the Receiver have at times referred to this notion as "increased liabilities"—that is, harm that increased the liabilities of the Stanford entities. However, this Court's statements regarding this type of harm have come in the context of rulings on motions to dismiss,[24] and the Court has not considered the issue addressed in *Reneker III* that such increased liabilities cannot be nothing more than a mechanism to recover investor losses, *Reneker III*, 2012 WL 2158733, at *6, or that the amount of unreimbursed CD sales constitutes a proper measure for such increased liabilities.[25]

Here, as in *Reneker*, the $4.9 billion the Receiver is seeking is "mathematically equivalent" to the investors' losses. It is simply the increase in unreimbursed CD liability on SIB's books from December 30, 1998, to the time of the receivership, less the fictitious interest SIB had represented it would pay to the investors. (App. 1521-1522.)

---

[24] *See*, *e.g*, *id.*; App. 1673-1674, *Janvey v. Willis of Colo. Inc.*, et al., No. 3:13-CV-3980-N, D.E. 64 (Dec. 5, 2014).

[25] While *Zacarias v. Stanford Int'l Bank,* Case No. 17-11073 (5th Cir. July 22, 2019), acknowledges in *dicta* that a Receiver can sue for an increase of the liabilities of entities in whose shoes he or she stands, it does not alter the fact that Van Tassel did not use an acceptable mode to determine that or that her opinion is unreliable for the reasons detailed in text. *Zacarias* does not say *how* such an increase of liabilities must be shown, much less that Van Tassel's mode is acceptable. The holding in *Zacarias* is narrow, merely reaffirming that, as this Court has done in this case, a district court can properly bar investor claims when it approves a settlement.

And, as in *Reneker*, these investments are not what injured the Stanford entities. Each CD sale creates an asset and a liability of equivalent value, while the effect on the books of the company is neutral. *See Knauer v. Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230, 234 (7th Cir. 2003) ("Ponzi entities themselves are not injured by the sales of securities."); *Reneker IV*, 2012 WL 3599231, at *1; *In re Plaza Mortg. & Fin. Corp.*, 187 B.R. 37, 45 (Bankr. N.D. Ga. 1995) (explaining that a trustee's damages for a Ponzi scheme are not "an amount equal to the funds invested in the debtor's Ponzi scheme," but are measured by the funds improperly paid out by the debtor").[26]

The Receiver's damages expert admits this from an accounting and financial viewpoint. (App. 311-312 at 46:5-19, 47:4-12.) She also admits that it is "what happens afterwards" – *i.e.*, *after* the sale of CDs – that harms the entities. (App. 311-312.) In the case of the Stanford entities, that harm was Allen Stanford's looting of the money to support his lavish lifestyle and making imprudent investments. Yet this is not what Van Tassel's damages analysis, which simply refers to the total unreimbursed CD sales after a given date (*i.e.*, investor losses), seeks to quantify.

### B.   *The SEC Judgment Does Not Establish Damages*

The Receiver cannot avoid providing proper proof of damages by pointing to the entry of a $5.9 billion judgment against SIB and SGC.[27]

---

[26] If the Receiver's theory that selling CDs constitutes harm to the Stanford entities were correct, it would run afoul of the deepening insolvency line of cases. Prolonging "an insolvent corporation's life through bad debt" is not an actionable harm for which the Receiver could recover damages. *See In re SI Restructuring*, 532 F.3d 355, 363 (5th Cir. 2008); *see also*, *In re CitX Corp.*, 448 F.3d 672, 678 (3rd Cir. 2006) ("[D]eepening of a firm's insolvency is not an independent form of corporate damage." (citation omitted)).

[27] In the judgment, this Court found SIB and SGC jointly and severally liable with Allen Stanford for violations of certain U.S. securities laws, and ordered them to disgorge the amount of "gains" they enjoyed as a result of the fraud. (App. 1652, Order, *Securities and Exchange Commission v. Stanford International Bank, Ltd.*, Civil Action No. 3:09-CV-0298-N, D.E. 1858, at 12.) The Court

First, this judgment was not contested and was not the result of any adversarial process. Therefore, the Receiver's own conduct in failing to defend the entities is an intervening cause that—by itself—breaks the chain of causation between every alleged act of wrongdoing and this judgment. *See Stanfield v. Neubaum*, 494 S.W.3d 90, 99 (Tex. 2016). As the SEC explained in the underlying motion, the Receiver "concurs with the Commission that the facts set out in this motion are true and does not contest the entry of partial summary judgment against the entities." (App. 1638 at n.4.) Neither SIB nor SGC responded to the SEC's motion, and the Court accepted the SEC's facts as to these defendants "as undisputed." (App. 1652.)

Second, because the order was not the result of an adversarial process, it is not binding on Greenberg. *See Great Am. Ins. Co. v. Hamel*, 525 S.W.3d 655, 667 (Tex. 2017) (holding that a collusive judgment between a plaintiff and insured defendant could not bind the defendant's insurer).

Third, even if this uncontested judgment were binding on Greenberg, it is premised on the same increased CD liabilities which is an impermissible measure of damages (as discussed above).[28] The incorporation of the increased CD liabilities into a judgment against SIB and SGC does not magically transform investor losses into harm suffered by the Stanford entities. The Receiver consented to the judgment with full knowledge that the Stanford entities had been insolvent for a long time (App. 1459 at ¶ 9-12), had no ability to pay a judgment, and would never be called upon to pay any portion of the judgment.

---

found that the forfeiture figure established in the criminal proceeding, which went unchallenged by the Receiver, was a "reasonable approximation of defendant's ill-gotten gains." *Id.*

[28] As Ms. Van Tassel sets out in her report, this Court relied on numbers from Allen Stanford's criminal trial, starting with the approximately $7.2 billion found to be owed to the CD depositors at the time of the receivership. (App. 1521.) After deducting "fictitious" interest, the resulting number was $5.9 billion. Ms. Van Tassel then determined the portion of the disgorgement amount allegedly attributable to Greenberg "as measured by increased SIB CD liabilities" for the period from December 1998 to February 2009. *Id.*

## V. THE RECEIVER'S NEGLIGENT SUPERVISION AND RETENTION CLAIM FAILS FOR LACK OF PROOF

The Receiver's claim that "Greenberg is directly liable to the Receiver for negligent retention and supervision of Loumiet" (SAC ¶ 199) fails as a matter of law. The Texas Supreme Court has "not ruled definitively on the existence, elements, and scope of such torts and related torts such as negligent training and hiring." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 n.27 (Tex. 2010). Thus, under *Erie* principles, federal courts applying state law may not recognize such claims or define their elements either. *Depuy*, 888 F.3d at 781 ("a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts").

Rather than recognizing a broad claim for negligent hiring or supervision, the Texas Supreme Court has identified only "limited instances where an employer has a duty to control its employee and is directly liable when it fails to do so." *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 504 (Tex. 2017). These exceptionally narrow instances "pertain to when employers require employees to consume alcohol as part of their job or exercise affirmative control over employees known to have become intoxicated from alcohol." *Douglas v. Hardy*, No. 12-18-00035-CV, --- S.W.3d ---, 2019 WL 2119670, at *5 (Tex. App.—Tyler May 15, 2019, no pet. h.); *accord Washington v. Tyson Foods, Inc.*, No. 9:17-CV-126, 2018 WL 3603092, at *2 (E.D. Tex. June 27, 2018). Obviously there is no such allegation here, and to recognize liability beyond these "limited instances" would improperly expand "[Texas] law beyond its presently existing boundary." *Depuy*, 888 F.3d at 781 (quoting *Rubinstein v. Collins*, 20 F.3d 160, 172 (5th Cir. 1994)).

Even if the claim could be recognized, there is no allegation or evidence that Greenberg knew or should have known he was "incompetent or unfit." (App. 2297). [29] The Receiver's attempt to revive its negligent supervision claim with expert testimony also fails. Herring, the Receiver's ethics expert, states that "Greenberg supervising partners *apparently* engaged in intentional or negligent compartmentalization of work and limited assignments among Greenberg lawyers to restrict their knowledge of the context and significance of their work in furthering the wrongdoing of [Stanford]." (App. 1030 at ¶22 (emphasis added).) First, "apparently" is not an admissible opinion; it is by definition speculation. Second, the circumstantial evidence referenced by Herring in his report amounts to nothing more than normal staffing in which not every lawyer on the team is aware of every aspect of a client's business. There is no evidence that Greenberg lawyers were told not to talk to each other; in fact, many of the lawyers were in the same city and in the same building and worked together on the same floor. (App. 245-246 at 24:21-25:6.) There is no evidence that the Stanford-related work was designated as secret or otherwise given any higher level of "confidentiality" than Greenberg's work for any other client.

## VI.  THE FRAUDULENT TRANSFER CLAIMS AGAINST GREENBERG HAVE BEEN LARGELY ABANDONED AND ARE WITHOUT SUPPORT

A fraudulent transfer claim requires the plaintiff to prove (1) a "transfer made or obligation incurred by a debtor," and (2) that "the debtor made the transfer or incurred the obligation … with actual intent to hinder, delay, or defraud any creditor of the debtor." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016) A fraudulent transfer claim cannot be brought against a "mere

---

[29] Under ordinary principles of negligence, the Receiver would have to prove (1) a legal duty owed to the plaintiff, (2) a breach of that duty by the defendant, and (3) damages proximately caused by the breach. *Douglas*, 2019 WL 2119670, at *4. The tasks and responsibilities that Greenberg lawyers were retained to perform and that Greenberg lawyers supervised are the same tasks and responsibilities that the Receiver challenges in the malpractice claim. (App. 1952 – 61.). Thus, the Receiver's failure to establish causation as to the malpractice claims is equally fatal to the negligent supervision/retention claim. (Section II, *supra*).

financial conduit" that never had "dominion" or "control" under funds, and thus was never an "initial transferee." *Williams v. Performance Diesel, Inc.*, 14-00-00063-CV, 2002 WL 596414, at *5–6 (Tex. App.—Houston [14th Dist.] Apr. 18, 2002, no pet.). In addition, transfers could not be avoided if funds are taken in good faith and the subsequent transfers provided "reasonably equivalent value." *See Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 564 (Tex. 2016). The Receiver brought a fraudulent transfer claim for $4.171 million against Greenberg based on a number of transactions occurring between February 2006 and February 2009. (SAC ¶¶ 280-81 and Exh. A.) Because four of these transactions totaling $3.960 million were not transfers to Greenberg at all, the Receiver has reduced its fraudulent transfer claim against Greenberg to $211,836.57. (App. 2031 at RFA 470; App. 334, 388, 405.) The Receiver must prove this remaining claim.

## VII. AT A MINIMUM, GREENBERG IS ENTITLED TO PARTIAL SUMMARY JUDGMENT

Greenberg is also entitled to partial summary judgment on the following:

### A. *Alleged Breaches of Fiduciary Duty and Negligence Occurring After 2001*

With respect to Greenberg's alleged knowing participation in a breach of fiduciary duty, the Receiver's answers to interrogatories referenced only the time period "[g]enerally between 1988 and 2001" and incorporated his expert witness reports. (App. 1950 at No. 2(f).) None of the expert reports identify participation in any breaches occurring after 2001, and four explicitly restrict their analysis to the 1988 to 2001 period. (App. 1479 at ¶ 29.B; App. 1282 at ¶ 12; App.1023 at ¶ 15 n.9; App. 1411 n.23.) Greenberg is therefore entitled to summary judgment on "knowing participation" after 2001. Fed. R. Civ. P. 37(c)(1). (App. 1935 ("[T]he evidence provided at trial or summary judgment will be limited to that that has specifically been identified or disclosed by the receiver in his discovery responses.").)

With respect to negligence, the Receiver's answers to interrogatories also confined the relevant time period to "1988 to 2001," except to state that Greenberg was negligent "from 1988-February 2009 for the ongoing omission/failure to advise Stanford that it needed to register SIBL . . . and register the SIBL CDs." (App. 1961-1962 at No. 4.b.) It is undisputed that Loumiet left Greenberg in 2001, (App. 1972, RFA 22), and there is no evidence that Greenberg handled securities issues related to the CDs after this time. Stanford hired other counsel to advise him on securities issues, especially after he did not like advice Loumiet provided on a Regulation-D disclosure statement in 1998. (App. 156 – 58, 116:15 – 118:4; Factual Appendix at 11). Accordingly, Greenberg is entitled to summary judgment with respect to all alleged acts of negligence that occurred after 2001. *See* Fed. R. Civ. P. 37(c)(1). (App. 1935.)

**B.   *Claims Based on Greenberg's Representation of Antigua in Its Legislative Reform***

Partial summary judgment is appropriate on the Receiver's claim that Greenberg's representation of the Government of Antigua and Barbuda ("Antigua") on legislative reforms allowed Stanford "to continue to operate and sell more SIB CDs from the time that Greenberg represented them until February 2009 when they were placed into receivership." (App. 1465 at ¶ 18; App. 1955-1956 at No. 3(5)(c) & 3(5)(d).)[30]

A claim for malpractice may only be brought by the client. *Swank v. Cunningham*, 258 S.W.3d 647 (Tex. App. 2008) ("Texas does not recognize a cause of action for legal malpractice asserted by a party not in privity with the offending attorney."). Greenberg represented Antigua,

---

[30] In 1997 and 1998, Greenberg attorneys served on a Planning Committee, which made recommendations to the Prime Minister's Cabinet for various legislative reforms. (App. 595.) On October 28, 1998, the Antigua government passed the Money Laundering (Prevention) (Amendment) Act ("1998 MLPA") and the International Business Corporation (Amendment) Act ("1998 IBCA"). (App. 2000 at RFA 205-206.)

not Stanford, on legislative reform. (App. 1961-1962, No. 4.b.(c)). The malpractice claim fails on this basis alone.

Additionally, both the malpractice and the aiding-and-abetting claims fail, as a matter of law, because the Receiver cannot show that Greenberg's work on legislative reform was the proximate cause of the Ponzi scheme damages.

*First*, the Receiver has admitted that, prior to the passage of the Antiguan legislation that Greenberg worked on, the 1998 Money Laundering Prevention Act ("MLPA") and the 1998 International Business Corporations Act ("IBCA"), "there were no compliance examinations that applied to offshore banks in Antigua and Barbuda" (App. 2003 at RFA 235); "there were no prudential rules that applied to offshore banks in Antigua and Barbuda" (App. 2004 at RFA 236); and "the 'Supervisor of Banking and Trust Corporations' (as defined under the IBCA) was not an entity with staff or funding" and "did not examine offshore banks for compliance with prudential rules." (App. 2004 at RFA 237-238.) Given the admitted absence of prudential supervision before the reforms, the Receiver's causation premise—that Greenberg's work on legislative reform made it "easier for SIBL to evade regulatory scrutiny" (App. 1955-1956 at 3(5)(c) & 3(5)(d))—is untenable and fails as a matter of law.

*Second*, the reforms were in effect for less than a year before being repealed and revised by Antigua. (App. 2046; App. 2005 at RFA 245); (Factual Appendix at 13-16.) Thus, the very laws the Receiver is claiming caused the damages he is seeking were repealed and amended nearly ten years before his Receivership began. Yet the Receiver *was not even aware* that the laws were

amended (App. 76-77 at 170:19-171:1), and he could not recall why FinCEN lifted the 1999 Advisory, (App. 78-81, 175:5-175:8).[31]

Any connection between Greenberg's work on legislative reform and the Receiver's alleged damages is broken by the fact that, for nearly a decade after Greenberg's work on the reforms had ended, Allen Stanford repeatedly violated Antiguan law and the very recommendations Greenberg had made to strengthen Antiguan law. For instance, Greenberg recommended a prohibition on any institution directly or indirectly loaning funds to any owner of more than 10% of its stock, without securing collateral equal to 100% or more of the loan. (App. 2000 at RFA 207-208.) Nevertheless, SIBL made "1.8 billion in unsecured loans to Allen Stanford"— a clear violation of Greenberg's earlier recommendation. (SAC ¶¶ 272-278.)

Stanford's violation of Antiguan law was enabled—not by anything Greenberg did—but by Stanford's bribery of Leroy King, the head of the Financial Regulatory Services Commission, which occurred years after Greenberg's involvement. The Receiver admits that Greenberg knew nothing about, and did not participate in, Stanford's bribery of King. (App. 1974 at RFA 41, 43.) Thus, the Receiver's alleged damages (including $1.8 billion in loans to Allen Stanford) was not caused by Greenberg's work on legislative reforms, but by Allen Stanford's intervening and superseding criminal violations of Greenberg's recommendations and Antiguan law. *Phan Son*

---

[31] The Receiver claims that Greenberg's work on the 1998 legislative reforms somehow helped Stanford, through his non-Greenberg attorney Sjoblom, resist SEC subpoenas "from 2005 through 2009" (SAC ¶ 147), but this is impossible. These SEC subpoenas were served on Stanford well after the legislation had been repealed, replaced, and revised. In addition, the Receiver has admitted that Sjoblom's reading of the Antiguan law in effect at the time was unfounded: "*On its face, in plain English,* the statute provides privacy only to customer information, not the bank's portfolio." App. 1666-1669, *Janvey v. Proskauer Rose LLP*, Case 3:13-cv-00477-N-BQ, Receiver's Opp. Br. at 10-13 D.E. 236 (emphasis added); *see* App. 2124, 1999 IBCA §244. Furthermore, the documents necessary to reveal Stanford's fraud were *located in Texas*, not Antigua. *See* App. 80 at 177:18. (App. 2018 at 355, 356, 357.)

*Van v. Pena*, 990 S.W.2d 751, 756 (Tex. 1999) (criminal acts are a superseding cause as a matter of law).

### C.  *Claims Based on Stanford's Alleged Violations of the FCPA*

This Court should grant partial summary judgment on the Receiver's aiding and abetting and negligence claims stemming from any alleged FCPA violations, because the record is *wholly devoid* of *any evidence* linking the alleged FCPA violations between 1988 and 2001 to the $4.9 billion in Ponzi scheme damages. (App. 1285 at ¶ 14.D and Section IV; App. 1947 at 1956-1959 at ¶¶ 2.c.(4), 3.(6), 3.(7), 3.(8), 3.(9), 3.(11).) Mike Koehler, the Receiver's FCPA expert, does not render any opinion as to whether or how the FCPA violations were causally related to the Ponzi scheme. (App. 1283-1285 at ¶ 13; App. 86 (stating that he is not opining on causation).) Similarly, the Receiver's responses to Greenberg's causation interrogatories, which this Court has held contain "everything [the Receiver] has when it comes to the basis for establishing causation in this matter in regard to an indivisible injury," (App. 1935[32]), contain no information at all linking the FCPA violations to the alleged damages. (App. 1950, 1962 – 64, at ¶¶ 2.g., 4.c.) Similarly, Ms. Van Tassel's report, including ¶ 113, does not give any opinion that the alleged FCPA violations caused the damages claimed. (App. 1519-1520.)

Furthermore, the Receiver admits that Greenberg had *no knowledge or involvement in* Stanford's later alleged FCPA violations, such as bribes to Antiguan regulator Leroy King long after Greenberg's involvement. (App. 1974 at RFA 41, 43.) *See Phan Son Van*, 990 S.W.2d at 756 (criminal acts are a superseding cause as a matter of law).

Indeed, years before Stanford's bribery of King, Greenberg cautioned Stanford that bribery of the sort that Stanford engaged in with King *would* violate the FCPA (App. 760 at 818-823,

---

[32] App. 1935 ("[T]he evidence provided at trial or summary judgment will be limited to that that has specifically been identified or disclosed by the receiver in his discovery responses.").

(describing at length the "Anti-Bribery Provision" of the FCPA); at 826 ("Contributions by Stanford . . . do not violate the FCPA if not made pursuant to a quid pro quo arrangement."). Greenberg also sent Suarez the text of the FCPA and publications describing the anti-bribery provisions of the FCPA, which plainly show that such bribery is impermissible. (App. 653; App. 732.) Stanford ignored Greenberg's FCPA advice.

Accordingly, partial summary judgment should be entered on the FCPA components of the claims.

## CONCLUSION

For the reasons set forth herein, summary judgment should be granted in favor of Greenberg on all claims.

Dated: July 22, 2019                          Respectfully submitted,

FOGLER, BRAR, FORD, O'NEILL &          BOIES SCHILLER FLEXNER LLP
   GRAY LLP

                                       By: /s/ Stuart H. Singer
 Murray Fogler                         Stuart H. Singer
 mfogler@fbfog.com                      ssinger@bsfllp.com
 Michelle E. Gray                       Sashi C. Bach
 mgray@fbfog.com                        sbach@bsfllp.com
 Robin O'Neil                           Pascual A. Oliu
 roneil@fbfog.com                       poliu@bsfllp.com
 909 Fannin, Suite 1640                 401 East Las Olas Blvd., Suite 1200
 Houston, Texas 77010                   Fort Lauderdale, Florida 33301
 Telephone: (713) 481-1010              Telephone: (954) 356-0011
 Facsimile:  (713) 574-3224             Facsimile:  (954) 356-0022

COWLES & THOMPSON, P.C.

 Jim E. Cowles
 jcowles@cowlesthompson.com
 Sim Israeloff
 sisraeloff@cowlesthompson.com
 Charles A. Green
 cgreen@cowlesthompson.com
 901 Main Street, Suite 3900
 Dallas, Texas 75202

Telephone: (214) 672-2000
Facsimile:  (214) 672-2347

**Counsel for Defendants, Greenberg Traurig, LLP, et al.**


## CERTIFICATE OF SERVICE

The undersigned certifies that on the 22nd day of July, 2019, a true and correct copy of the

foregoing document was delivered via electronic means pursuant to FED. R. CIV. P. 5(b)(2)(D)

and Local Rule 5.1, to all counsel of record.


/s/ Sashi C. Bach
Sashi C. Bach, Esq.

54