UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as Court-appointed receiver for the Stanford Receivership Estate; SANDRA DORRELL; SAMUEL TROICE; and MICHOACAN TRUST; individually and on behalf of a class of all others similarly situated, | § § § § § § § | |
| Plaintiffs, | § | CIVIL ACTION NO. 3:12-cv-04641-N |
| | § | |
| v. | § | |
| | § | |
| GREENBERG TRAURIG, LLP; GREENBERG TRAURIG, PA; and YOLANDA SUAREZ, | § § § | |
| Defendants. | § | |

**BRIEF IN SUPPORT OF THE RECEIVER'S RESPONSE TO
GREENBERG TRAURIG'S MOTION FOR SUMMARY JUDGMENT**

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 1560
San Antonio, Texas 78205
(210) 630-4200
(210) 630-4210 (Facsimile)

**NELIGAN LLP**

By: */s/ Douglas J. Buncher*
Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301

**CLARK HILL STRASBURGER**

By: */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@clark hillstrasburger.com
2301 Broadway
San Antonio, Texas 78215
Telephone:   (210) 250-6004
Facsimile:   (210) 258-2706

**CLARK HILL STRASBURGER**

By: */s/ David N. Kitner*
David N. Kitner
david.kitner@clarkhillstrasburger
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:   (214) 651-4300
Facsimile:   (214) 651-4330

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

I.     Preliminary Statement .................................................................................. 1

II.    Facts established by the summary judgment record ................................. 4

       A.     Allen Stanford and Yolanda Suarez breach their fiduciary duties by
              causing the Stanford entities to engage in illegal activities. ...................... 4

       B.     Greenberg "greenlights" Stanford's use of unlicensed securities
              sales offices in the U.S. ............................................................................... 6

       C.     Greenberg assists Stanford in buying his way into Antigua after his
              offshore bank was expelled from Montserrat. ........................................... 11

       D.     Greenberg helps Stanford to silence critics. ............................................. 13

       E.     Greenberg learns that Stanford has been under constant
              investigation by various agencies of the U.S. government since
              1989 ........................................................................................................... 14

       F.     Greenberg reviews, revises, and copyrights Stanford's marketing
              materials. .................................................................................................... 20

       G.     Greenberg assists Stanford with the launch of its Regulation D sales
              of SIBL CDs in the U.S. ........................................................................... 20

       H.     Greenberg assists SIBL to establish additional CD sales offices in
              the U.S. ...................................................................................................... 22

       I.     Greenberg rewrites the laws of Antigua for Stanford and Stanford is
              appointed to the board of the Antiguan government agency set up to
              regulate SIBL. ........................................................................................... 26

       J.     Greenberg learns Stanford is using SIBL investor money to fund
              speculative undisclosed investments contrary to SIBL's marketing
              materials, and that Stanford is dependent on a constant influx of new
              investor money. ......................................................................................... 31

       K.     Greenberg assists Stanford in forestalling the SEC. ................................ 32

       L.     Greenberg learns Stanford falsely markets insurance on the SIBL
              CDs and that Allen Stanford "loaned" himself $15 million from
              SIBL to pay his personal taxes. ................................................................. 32

       M.     Greenberg "greenlights" Stanford's violation of the Investment
              Company Act (ICA). ................................................................................. 34

N.      The SEC obtains $5.9 billion judgment against SIBL and SGC for, inter alia, failure to register under the ICA. ................................37

III.    Argument and Authorities.........................................................................38

A.      The Receiver's Causes of Action................................................38

B.      Greenberg knowingly participated in Allen Stanford and Yolanda Suarez's breaches of fiduciary duty...................................39

    1.      Greenberg knew that Stanford and Suarez were breaching their fiduciary duties. ....................................................40

    2.      Greenberg substantially participated in Allen Stanford's and Yolanda Suarez's breaches of fiduciary duty. ..............45

    3.      Greenberg's conduct need not cause the damages; Greenberg is liable for damages caused by the breaches of fiduciary duty. ......................................................................47

    4.      The Receiver's damages are indivisible. ........................51

C.      Greenberg's negligence caused damages to the Receivership estate.........52

    1.      Greenberg's negligence was a proximate cause of the Receiver's damages. ......................................................53

    2.      Greenberg's clients would have acted differently had it provided competent advice. ...........................................54

    3.      Greenberg's negligence contributed to the Receivership Estate's indivisible injuries for which Greenberg is jointly and severally liable. .....................................................57

D.      The Receiver sues for recoverable damages. ............................59

    1.      Increased liabilities is a valid measure of damages. .....................59

    2.      Greenberg misses the point in arguing that it is not bound by the SEC judgment. .......................................................62

E.      Greenberg is guilty of negligent supervision. ..........................64

F.      Greenberg is not entitled to partial summary judgment.............65

G.      The Hunton judgment, which expressly reserves "any claims that Plaintiffs have or may have against Greenberg Traurig LLP (Greenberg) . . . including but not limited to any claims or causes of action based on the conduct of Carlos Loumiet while employed or

affiliated with Greenberg," is not res judicata as to claims against
Greenberg based on Loumiet's conduct. ...................................................69

IV.    Conclusion ........................................................................................................74

CERTIFICATE OF SERVICE ........................................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amacker v. Renaissance Asset Mgmt.*,
  657 F.3d 252 (5th Cir. 2011) ................................................41

*Austin Road Co. v. Pope*,
  147 Tex. 430, 216 S.W.2d 563 (Tex. 1949) .........................52

*Basalto Shipping Co., S.A. v. HTCO-3011*,
  129 F.3d 611 (5th Cir. 1997) ...............................................50

*Biaggi v. Patrizio Rest. Inc.*,
  149 S.W.3d 300 (Tex. App.—Dallas 2004, pet. denied)........50

*Borg Warner Corp. v. White Motor Co.*,
  344 F.2d 412 (5th Cir. 1965) ..........................................52, 59

*BWD Inv. v. Stevens*,
  2011 WL 664759 (Tex. App.—Eastland 2011, no pet.)........41

*CBIF Ltd. P'ship v. TGI Friday's Inc.*,
  No. 05-15-00157-CV, 2017 WL 1455407 (Tex. App.—Dallas Apr. 21, 2017, pet.
  denied)...............................................................................40, 48, 68

*Citibank, N.A. v. Data Lease Fin. Corp.*,
  904 F.2d 1498 (11th Cir. 1990) ...........................................74

*City of Beaumont v. Excavators & Constructors, Inc.*,
  870 S.W.2d 123 (Tex. App.—Beaumont 1993, writ denied) ...............59

*City of Fort Worth v. Pippen*,
  439 S.W.2d 660 (Tex. 1969).................................................47

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)................................................................59

*D. Houston, Inc. v. Love*,
  92 S.W.3d 450 (Tex. 2002)...................................................54

*Darocy v. Abildtrup*,
  345 S.W.3d 129 (Tex. App.—Dallas 2011, no pet.).............40

*Davis v. Dallas County, Texas*,
  541 F. Supp. 2d 844 (N.D. Tex. 2008) .................................50

iv

*Elizondo v. Krist*,
    415 S.W.3d 259 (Tex. 2013) ........................................................................................ 57, 70

*Exxon Co., U.S.A. v. Sofec, Inc.*,
    517 U.S. 830 (1996) ...................................................................................................... 50

*FDIC v. Nathan*,
    804 F. Supp. 888 (S.D. Tex. 1992) ............................................................................... 65

*First United Pentecostal Church of Beaumont v. Parker*,
    514 S.W.3d 214 (Tex. 2017) ......................................................................................... 51

*Flock v. Scripto-Tokai Corp.*,
    319 F.3d 231 (5th Cir. 2003) ........................................................................................ 53

*Floyd v. CIBC World Markets, Inc.*,
    426 B.R. 622 (S.D. Tex. 2009) ...................................................................................... 50

*Floyd v. Hefner*,
    556 F.Supp.2d 617 (S.D. Tex. 2008) ................................................................ 40, 48, 49, 68

*Garcia v. Wheelabrator Group, Inc.*,
    2011 WL 13232701 (N.D. Tex. Nov. 3, 2011) ....................................................... 56, 69

*Gearhart Indus. v. Smith Int'l*,
    741 F.2d 707 (5th Cir. 1984) ........................................................................................... 3

*Graham Mortg. Corp. v. Hall*,
    307 S.W.3d 472 (Tex. App.—Dallas 2010, no pet.) ..................................................... 48

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003) .......................................................................................... 3

*Hamburger v. State Farm Mut. Auto Ins. Co.*,
    361 F.3d 875 (5th Cir. 2004) ................................................................................... 53, 54

*Heat Shrink Innovs., LLC v. Medical Extrusion Tech.-Texas, Inc.*,
    2014 WL 5307191 (Tex. App.—Fort Worth, Oct. 16, 2014, pet. denied) ................ 48, 68

*Hunter Bldgs. & Mfg., L.P. v. MBI Global L.L.C.*,
    436 S.W.3d 9 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ........................... 48

*IHS Cedars Treatment Center of Desoto, Tex., Inc. v. Mason*,
    143 S.W.3d 794 (Tex. 2004) ......................................................................................... 54

*Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*,
    525 S.W.3d 875 (Tex. App—Houston [14th Dist.] 2017, no pet.) ............................... 49

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
    794 F. Supp. 1424 (D. Ariz. 1992) ................................................................................ 57

*In re Brooke Corp.*,
   467 B.R. 492 (Bankr. D. Kan. 2012) ................................................................. 61, 63

*In re CitX Corp., Inc.*,
   448 F.3d 672 (3d Cir. 2006) ..................................................................................... 63

*In re LeNature's Inc.*,
   2009 WL 3571331 (W.D. Pa. Sep. 16, 2009) ........................................................ 60

*In re Life Partners Holdings, Inc. S'holder Deriv. Litig.*,
   2015 U.S. Dist. LEXIS 168198 (W.D. Tex. 2015) .................................................... 3

*In re Palm Beach Fin. Partners L.P.*,
   488 B.R. 758 (S.D. Fla. Bankr. 2013) ..................................................................... 41

*In re Sharp Intern. Corp.*,
   281 B.R. 506 (Bankr. E.D.N.Y. 2002) ..................................................................... 41

*Isaiah v. JP Morgan Chase Bank NA*,
   2017 WL 5514370 (S.D. Fla. 2017) ......................................................................... 41

*James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce, N.A. Inc.*,
   403 S.W.3d 360 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ........................... 48

*Janvey v. Adams & Reese*,
   Case No. 3:12-CV-0495-N (N.D. Tex. Feb. 16, 2012) ............................................ 60

*Janvey v. Amadio*,
   Case No. 3:14-CV-03560-N (N.D. Tex. Jul. 20, 2015) ........................................... 59

*Janvey v. Bogar*,
   No. 3:14-cv-03635, 2016 WL 11471975 (N.D. Tex. Feb. 24, 2016) ...................... 59

*Janvey v. Dem. Sen. Camp. Comm.*,
   712 F.3d 185 (5th Cir. 2013) ("*DSCC*") ............................................................ 57, 58

*Janvey v. Hamm*,
   Case No. 3:14-CV-03213-N (N.D. Tex. Jun. 17, 2015) .......................................... 60

*Janvey v. Hamric*,
   2015 WL 11120301 (N.D. Tex. Nov. 5, 2015) ....................................................... 59

*Janvey v. Maldonado*,
   3:14-CV-2826-N, 2015 WL 1428612 (N.D. Tex. Feb. 19, 2015) .......................... 59

*Janvey v. Proskauer Rose LLP*,
   2015 WL 11121540 (N.D. Tex. Jun. 23, 2015) .......................................... 48, 56, 65

*Janvey v. Willis of Colorado, Inc.*,
   No. 3:13-cv-3980, 2014 WL 12670763 (N.D. Tex. Dec. 5, 2014) .......................... 60

*Joe N. Pratt Ins. v. Doane*,
    2009 WL 4506586 (S.D. Tex. 2009) ........................................................41

*Juhl v. Airington*,
    936 S.W.2d 640 (Tex. 1996) ...................................................................49

*King v. Provident Life & Accident Ins. Co.*,
    23 F.3d 926 (5th Cir. 1994) ....................................................................74

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,
    138 Tex. 565, 160 S.W.2d 509 (1942) .........................................39, 48, 68

*Knutson v. Morton Foods, Inc.*,
    603 S.W.2d 805 (Tex. 1980) ...................................................................73

*Krakauer v. Wells Fargo*,
    2016 WL 5845924 (Tex. App.—Fort Worth 2016, no pet.) .....................41

*Lamm v. State Street Bank & Trust*,
    749 F.3d 938 (11th Cir. 2014) ................................................................41

*Landers v. E. Tex. Salt Water Disposal Co.*,
    151 Tex. 251, 248 S.W.2d 731 (Tex. 1952) ............................................52

*Litson-Gruener v. JP Morgan Chase & Co.*, 2009
    WL 4884426 (N.D. Tex. Dec. 16, 2009) ................................................41

*Lubrizol Co. v. Exxon Corp.*,
    871 F.2d 1279 (5th Cir. 1989) ................................................................73

*Meadows v. Hartford Life Ins. Co.*,
    492 F.3d 634 (5th Cir. 2007) ...........................................39, 47, 48, 50, 59, 68

*Milligan v. Salamone*,
    No. 1:18-CV-327-RP, 2019 WL 1208999 (W.D. Tex. 2019) .................40

*Morgan v. Compugraphic Corp.*,
    675 S.W.2d 729 (Tex. 1984) ...................................................................53

*Nelson v. Vernco Constr. Inc.*,
    566 S.W.3d 716 (Tex. App.—El Paso 2018) ..........................................40

*Norfolk Southern Corp. v. Chevron U.S.A. Inc.*,
    371 F.3d 1285 (11th Cir. 2004) ..............................................................72

*O'Cain v. Harvey Freeman & Sons, Inc.*,
    603 So.2d 824 (Miss.1992) .....................................................................50

*Off'l Comm. of Unsec. Cred. Of Allegheny Health, Ed., and Research Found. v. Pricewaterhouse Coopers LLP*, 2007 WL 141059 (W.D. Pa. Jan. 17, 2007), *vacated and remanded on different grounds*, 607 F.3d 346 (3d Cir. 2010) .........................................60

*Off'l Stanf. Inv. Comm. v. Greenberg Traurig, LLP*, 2014 WL 12572881 (N.D. Tex. Dec. 17, 2014) .........................................57, 58, 60

*Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009) ......................................................72

*Reneker v. Offill*, 2009 WL 3365616, at *5 (N.D. Tex. Oct. 20, 2009)...........................................57, 58

*Reneker v. Offill*, 3:08-CV-1394-D, 2012 WL 2158733 (N.D. Tex. June 14, 2012)....................................61, 62

*Rodriguez v. Moerbe*, 963 S.W.2d 808 (Tex. App.—San Antonio 1998, pet. denied) ...............................50

*Ryan v. Hunton & Williams*, 2000 WL 1375265 (E.D.N.Y. 2000).......................................................41

*Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340 (Tex. App.—Tyler 2001, pet. denied).........................................50

*Stanfield v. Neubaum*, 494 S.W.3d 90 (Tex. 2016)....................................................49, 50

*Stevenson v. Rochdale Investment Mgmt., Inc.*, 2000 WL 1278479 (N.D. Tex. Sept. 7, 2000).........................................41

*Tex. Dept. of Trans. v. Olson*, 980 S.W.2d 890 (Tex. App.—Fort Worth 1998, no pet.) ......................................53

*Thabault v. Chait*, 541 F.3d 512 (3d Cir. 2008)....................................................60

*TMTV Corp. v. Mass Prod. Inc.*, 645 F.3d 464 (1st Cir. 2011)....................................................72

*Tompkins v. Cyr*, 202 F.3d 770 (5th Cir. 2000) ....................................................53

*Travis v. City of Mesquite*, 830 S.W.2d 94 (Tex. 1992)....................................................50, 54

*Troice v. Greenberg Traurig, L.L.P.*, 921 F.3d 501 (5th Cir. 2019) ....................................................64

*Troice v. Proskauer Rose LLP*,
   2015 WL 1219522 (N.D. Tex. Mar. 4, 2015), *rev'd on other grounds*, 816 F.3d 341
   (5th Cir. 2016).................................................................................................................48

*United States v. Kuhrt*,
   788 F.3d 403 (5th Cir. 2016) ...........................................................................................40

*United States v. Peterson*,
   244 F.3d 385 (5th Cir. 2001) ...........................................................................................68

*United States v. Ricard*,
   922 F.3d 693 (5th Cir. 2019) ...........................................................................................68

*United States v. Stanford*,
   805 F.3d 557 (5th Cir. 2015) .............................................................................................5

*Vines v. Univ. of La.*,
   398 F.3d 700 (5th Cir. 2005) ...........................................................................................74

*Warfield v. Byron*,
   436 F.3d 551, 560 (5th Cir. 2006) ...................................................................................62

*Waste Mgmt. of La., LLC v. River Birch, Inc.*,
   920 F.3d 958 (5th Cir. 2019) ...............................................................................67, 68, 69

*Wojciechowski v. Kohlberg Ventures, LLC*,
   923 F.3d 685 (9th Cir. 2018) ...........................................................................................72

*Zacarias, et al. v. Official Stanford Investors' Committee*, Case No. 17-11073 (5th Cir. Jul.
   22, 2019) ...........................................................................................................................60

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF JUDGMENTS ¶ 26 (1982) ..................................................................74

Plaintiff Ralph S. Janvey (the Receiver) files this response to Greenberg's motion for summary judgment and memorandum of law in support [Doc. 340 and 341].

## I.   PRELIMINARY STATEMENT

Greenberg served as Stanford's primary outside counsel during Stanford's critical growth stage throughout the 1990s,[1] when Stanford – with Greenberg's assistance – established all of the structures and mechanisms which enabled Stanford to rapidly expand his illegal sales of the CD securities issued by Stanford International Bank Ltd. ("SIBL").  Allen Stanford's business plan was to lie, cheat and steal.  His twenty-year global scheme was massive in scope and devastating in effect, causing billions of dollars in catastrophic damages to Greenberg's clients, the Stanford entities, including a $5.9 billion judgment against the entities, a portion of which the Receiver now seeks to recover.  Allen Stanford could not have perpetrated this 20 year global fraud on his own.  He needed the assistance of complicit lawyers.  Greenberg provided that assistance.

Greenberg's participation in Stanford's scheme was pervasive and extensive, and its work for Stanford laid the groundwork for the scheme to succeed and rapidly expand.  Over the course of twenty years as many as 40 Greenberg lawyers worked on Stanford matters.  Greenberg attorneys assisted Stanford in evading regulatory oversight, which not only facilitated the fraud but raised it to new levels.   Greenberg never said "no" to anything Stanford wanted to do, and instead Greenberg consistently advised Stanford on ways  he could violate banking and securities laws and get away with it and helped Stanford open more securities sales office in the U.S. to sell more illegal CD securities.  Greenberg knew that Stanford was bribing Antiguan officials to look

---

[1]  Stanford would introduce Loumiet as his "outside general counsel." App. 141, Loumiet Depo. at 206:7-22; Suarez testified that during the time she was General Counsel of Stanford (until 1999), she referred "a lot" of work to Greenberg, and Greenberg had up to 30 active matter files opened for Stanford and upwards of 40 Greenberg lawyers worked on Stanford matters.  App. 674, Suarez Depo. 299:1-6; App. 131-32, Loumiet Depo., at 94:22-95:6; App. 2478-82, 2888-91, Px 384 and 584 (listings of Greenberg matter files opened for Stanford in 1998 and 2000). Greenberg was the only U.S. law firm listed in SIBL's Annual Reports throughout the 1990s.  App. 3097-3130, at 3128, Px 832 (1993 SIBL Annual Report); App. 3097-3130, at 3128, Px 832 (1994 SIBL Annual report).  Loumiet did not raise any objections to Greenberg (or his later firm Hunton & Williams) being listed in SIBL's Annual Reports until 2006 or 2007.  App. 359-60, Loumiet Depo. 566:3-567:19.

the other way and allow Stanford to control his Antiguan "safe haven" to ensure no regulatory oversight while Stanford sold unregulated and uninsured CDs to unsuspecting investors. Greenberg also knew that Stanford was diverting investor money to 1) fund speculative real estate investments, 2) make "loans" to the Antiguan Government that would never be repaid, and 3) pay millions of dollars in his personal taxes.   Nevertheless, Greenberg 1) helped Stanford violate securities laws and make material truthful disclosures to investors, 2) documented illegal sham loans to the Antiguan government and government officials, 3) ignored Foreign Corrupt Practices Act ("FCPA") violations by Stanford, 4) advised Stanford to make contributions to Antiguan politicians and political parties, and 5) told Stanford it did not have to register its CDs as securities or register SIBL under the Investment Company Act when Greenberg knew Stanford would violate state and federal law by failing to register or halting its improper sale of securities – the SIBL CDs -- in the United States.  If Stanford had been subjected to regulation in the U.S., or properly regulated by the government of Antigua, had registered under the Investment Company Act, had marketed the CDs truthfully, disclosing all material facts, then Stanford's scheme would never have succeeded.   Greenberg furthered Allen Stanford's unlawful purpose and essentially provided Stanford a license to steal, causing catastrophic liabilities to Greenberg's clients, the Stanford entities.  At every step, Greenberg lawyers greenlighted conduct that they knew was illegal and violated fiduciary duties.  This was not a one-time failure—it was consistent, pervasive, extensive and long-lasting.

Without Greenberg's help, Allen Stanford never could have pulled off the second largest securities fraud scheme in U.S. history for as long as he did. Indeed in 2004 Allen Stanford wrote Carlos Loumiet, the Greenberg partner responsible for the Stanford relationship, that:

> *"you are…a major reason why I was able to survive the difficult battles over the years and are in the position I am today."*[2]

---

[2]  See App. 1718-19, Px 1.  In 2006, Allen Stanford wrote Loumiet: "*Thanks so much for fighting some of my battles back in the early years.  **I wouldn't be where I am today without you** and a very few others who believed in me and stood shoulder to shoulder with me in dealing with my own attacks and bs from the gutless little losers like Shockey*

2

Greenberg defends its conduct by claiming it never knew Allen Stanford was running a Ponzi scheme, and it persists in arguing that in order to prevail on his claims the Receiver must prove that Greenberg knew Stanford was running a Ponzi scheme.  But this Court already has rejected this argument, holding that it is enough for the Receiver to prove that Greenberg knew that Stanford was breaching a fiduciary duty.[3]  The Receiver has no burden to  prove Greenberg's knowledge of the Ponzi scheme. Indeed, the jury will not be asked a single question at trial about whether Greenberg knew about—or aided—a Ponzi scheme, because it is not an element of either of the Receiver's causes of action.

The Receiver is suing Greenberg for participation in breaches of fiduciary duty and for negligence/malpractice.   Thus, the jury will be asked (i) whether Greenberg knowingly participated in breaches of fiduciary duty by Allen Stanford and former Stanford General Counsel Yolanda Suarez ("Suarez") centered on their causing the Stanford entities to violate securities and banking laws and the FCPA, and (ii) whether Greenberg was negligent in its representation of Stanford.[4]  There is substantial evidence from which a jury could find in the Receiver's favor on both issues.

*First*, there is overwhelming evidence that Greenberg knowingly participated in Stanford officers' and directors' breaches of fiduciary duties in causing the Stanford entities to violate U.S. securities and banking laws and the FCPA.[5]  The evidence establishes that, (a) despite knowing

---

and Weiner."  App. 3309-3313, Px 3.

[3]  Dec. 17, 2014 Order, ECF Doc. No. 114 at 8 (addressing former defendant Hunton & Williams' identical argument).

[4]  This Court previously held in this case that lawyers owe a "duty to protect their clients from liability", to advise and "help them avoid wrongdoing" and to "urge the cessation" of regulatory violations.  Order, ECF Doc. No. 114 at 6-7. The evidence set forth below establishes that Greenberg utterly failed in this duty.

[5]  It is axiomatic that a corporate director or officer breaches his fiduciary duty by causing the entity to engage in illegal conduct.  *Gearhart Indus. v. Smith Int'l*, 741 F.2d 707, 719 (5th Cir. 1984) (holding that a director will be held personally liable for a breach of the duty of obedience if he intentionally directs the corporation to violate positive law); *In re Life Partners Holdings, Inc. S'holder Deriv. Litig*., 2015 U.S. Dist. LEXIS 168198 *32 (W.D. Tex. 2015) (holding that a director is liable for a "knowing violation of law"); *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey.").  App. 718-21, Spindler Decl. 8-11.

that Stanford's CD's were securities, Greenberg incorrectly advised Stanford that his entities could market and sell the CDs from the U.S. without licenses or registrations, (b) Greenberg knew Stanford was offering the SIBL CDs through material misrepresentations and omissions, yet never advised Stanford to cease its fraud and instead assisted Stanford to open more unlicensed CD sales offices in the U.S. and provided Stanford with sham memorandums arming Stanford with excuses not to comply with the law, and (c) despite knowing that Stanford was violating the FCPA by in essence corruptly taking control of the Antiguan government and its regulators, Greenberg facilitated these activities and provided unsound legal advice to Stanford while doing so.[6]  *Second*, there can be no dispute that Greenberg failed to exercise the level of care required of an attorney under these circumstances and therefore, in addition to its participation in breaches of fiduciary duty, Greenberg committed malpractice in its representation of its clients, the Stanford entities.  At a minimum, the evidence set forth below creates fact issues that preclude summary judgment.

## II.  FACTS ESTABLISHED BY THE SUMMARY JUDGMENT RECORD

### A.  Allen Stanford and Yolanda Suarez breach their fiduciary duties by causing the Stanford entities to engage in illegal activities.

Allen Stanford was the Chairman of the Board of Stanford International Bank Ltd. (SIBL).[7] He was also a director of the SEC-registered broker-dealer and investment advisor Stanford Group Company (SGC).[8]  Despite not being a securities lawyer,[9] Yolanda Suarez served as general counsel of Stanford Financial Group (SFG), which provided legal services to all Stanford

---

[6]  Former Stanford General Counsel Suarez testified that she hired Greenberg to ensure that Stanford complied with the law.  App. 573-74, Suarez Depo. 64:25-65:9.
[7]   App. 3227, Greenberg response to RFA 11.
[8]   App. 3351, Suarez Ex. 4.
[9]   App. 640, 654-55, Suarez Depo. 232:9-13; 258:25-259:9.

entities—including SIBL[10] and SGC—from February 24, 1992 to August 1999.[11]  She was Chief of Staff of SFG from August 1999 to November 12, 2008.[12]

Allen Stanford and Suarez had fiduciary duties to ensure that disclosures to investors were complete and accurate, and that the Stanford companies complied with U.S. securities and banking laws, the FCPA, and Antiguan banking laws.[13] Instead, they caused SIBL and SGC (and other Stanford entities) to violate the Investment Company Act of 1940 (the "ICA"), § 10(b) of the Exchange Act, Rule 10b-5, § 5 and § 12 of the Securities Act of 1933,  § 15 of the Securities Exchange Act of 1934, the Investment Advisors Act,  the International Banking Act of 1978, the Foreign Bank Supervision Act and Regulation K, including causing SIBL to violate securities registration requirements for the CDs and broker-dealer and investment adviser licensing requirements for Stanford financial advisers.[14]  These violations of securities laws inevitably led to the $5.9 billion SEC judgment entered by this Court against SIBL and SGC in 2013.[15]  Stanford and Suarez also caused the Stanford entities to violate the FCPA and make loans to the Antiguan government that were illegal under Antiguan law, all as part of Allen Stanford's plan to avoid regulatory oversight of his offshore bank's illegal activities.[16]  Allen Stanford was convicted of wire fraud, mail fraud, conspiracy to commit wire fraud, conspiracy to commit mail fraud,

---

[10]  Incredibly, Suarez testified in deposition that despite the fact that she was effectively the General Counsel for SIBL, she did not know how the bank made money, including how it invested its depositors' money, and didn't recall ever asking anyone how the bank made money.  App. 563-64, 629-31, Suarez Depo. 54:25-55:10; 194:11-196:16. She also admitted to doing nothing to ensure that SIBL's marketing materials were accurate.  *Id.*, at App.566, 57:3-15.  She also couldn't explain why SIBL touted various insurance policies in its marketing materials under the heading "Depositor Security" when none of the insurance policies insured the depositors.  App. 631a-d.  *Id.*, at 200:8-203:1. She also testified that she didn't know what a Ponzi scheme was.  App. 633, Suarez Depo. 209:24-25.

[11]  App. 3239, Greenberg response to RFA 44; App. 533, Suarez Depo. 24:7-10.  Loumiet recommended that Stanford hire Suarez to be General Counsel for Stanford.  App. 3264, Greenberg response to RFA 130.

[12]  App. 3239, Greenberg response to RFA 46.

[13]  App. 718-21, Spindler Decl. 8-11; App.550-51, Suarez Depo. 41:5-42:25; App. 675, 306:6-15; App.775, Furgeson Decl. 17.

[14]  App. 2896-2912, Px 723; App. 3425-46, 3280, Greenberg response to RFA 63, 64, 175; App. 803, 806-12, Lemke Decl. 24 (second paragraph), 27-33; App. 777, Lemke Depo. 96:15-25; App. 715, 753-56, 758, Spindler Decl. 5 (¶5), 43-46 (Section VII (A)-(D)) and 48 (Conclusion); App. 687-90, 691-92, 693, 695-705, Spindler Depo. 37:6-40:20, 45:12-46:1, 69:7-70:18, 75:20-76:19, 97:9-99:21, 122:1-123:25, 130:5-10, 246:5-247:1, and 267:5-270:1.

[15]  App. 2896-2912, Px 723, N.D. Tex. Case No. 3:09-cv-00298-N [Doc. 1858] (the "SEC Judgment").

[16]  App. 823-24, Koehler Decl. ¶ 12-13; App. 896-97, 907-909, Bruton Depo. 11:1-12; 12:21-23; 21:8-23:11; App. 2223-27, Px 277.

5

obstruction of an SEC investigation, conspiracy to obstruct an SEC investigation and conspiring to commit money laundering[17] and sentenced to 110 years in prison.[18]

**B.      Greenberg "greenlights" Stanford's use of unlicensed securities sales offices in the U.S.**

From the inception of its representation of the Stanford entities, Greenberg knew that Stanford intended to sell his CDs in the United States without complying with applicable securities and banking laws, in violation of his fiduciary duties to the Stanford entities, and Greenberg was instrumental in helping him do so.  At a minimum, Greenberg failed to provide competent legal advice regarding Stanford's proposed activities.

In the mid-1980s, Stanford decided to get into the offshore banking business to sell CD securities.  He tried to hire prominent Florida banking lawyer Bowman Brown. After listening to Stanford's business plan, Brown declined to represent Stanford because: Stanford "had no banking experience or financial institutions experience;" Stanford wanted to establish a securities sales platform in Miami without complying with licensing requirements, or "submitting to government examiners;" Stanford's offshore bank was located in a "pirate" banking jurisdiction (Montserrat) well known for fraud;  the "lack of transparency" in Stanford's business model; and the above-market returns offered on the CDs suggested that "something was wrong."[19]

After Brown turned him down, Stanford turned to Greenberg to help him with his scheme. Unlike Brown, despite knowing that Stanford was operating an offshore bank in a corrupt jurisdiction known for fraud,[20] and that he wanted to evade regulation of his securities sales

---

[17]  App. 3223, 3231, 3233-36, Greenberg response to RFA 1, 24-28, 32-36.

[18]  *United States v. Stanford*, 805 F.3d 557, 565 (5th Cir. 2015).

[19]  App. 918-30, Brown Depo. 13-14, 18-25, 28-30.  As for Montserrat, Brown testified that during the time Stanford was operating GIBL in Montserrat, Montserrat had a "bad reputation as a place fraudsters would go to set up offshore banks." *Id.*, at 924-25.

[20]  App. 200, Loumiet Depo. 325:2-10 (Loumiet admitting that he knew "Montserrat had a lot of problems" and had a terrible reputation as a place where "*illegalities and fraud [were] being committed by people that had offshore banks*"); App. 205a, 331:13-332:1 (Montserrat had a "terrible" reputation in the 1980s "*for money laundering and **any type of fraud you could imagine***").

activities in the U.S.,[21] Greenberg had no qualms about representing Stanford.  In April 1988, Stanford hired Greenberg to advise Stanford with respect to marketing his offshore Guardian International Bank, Ltd. (GIBL n/k/a SIBL) from "representative offices" in Miami and Houston, including illegally offering securities via advertising, providing sales materials to prospective investors, extensive telephone solicitation of potential investors, acceptance of deposits in the United States and execution of sales paperwork in Houston.[22]  Greenberg partner Carlos Loumiet ("Loumiet") was the relationship partner for Stanford at Greenberg.[23]  Loumiet learned that even though Stanford intended to sell his unregistered offshore bank CDs via its U.S.-based entities (which Greenberg's own banking law expert has testified would be illegal under U.S. banking laws),[24] he did "*not want to be under federal SEC supervision, nor that of the state of Florida*", as "*the entire operation is designed to avoid such requirements*."[25]

Greenberg knew from the beginning that Stanford's operations also violated U.S. banking laws. In 1989 Greenberg received copies of correspondence from the U.S. Treasury Department and the U.S. Office of the Comptroller of the Currency ("OCC") indicating that Stanford was illegally operating bank representative marketing and sales offices for GIBL from the U.S. without proper registration.[26]  Rather than advising Stanford to stop selling the CDs though these unlicensed bank representative offices in the United States, however, Greenberg devised a plan that encouraged Stanford to continue the sales by circumventing the law. [27]

---

[21]  App. 129-30, Loumiet Depo., at 77:19-78:16 (admitting to knowledge that Stanford did not want to register "in any way with the SEC or any other securities authority").

[22]  App. 1751-55, Px 22 (GT03-22-2011ST-0011044) (letter from Sidley Adler (then, general counsel of Stanford) to Loumiet dated April 6, 1988 re: "Do's and Don'ts for Guardian International Bank Ltd. and Guardian International Investment Services, Ltd. in Miami;" and memorandum from Adler to Loumiet dated April 13, 1988 re: "Deposit Procedures"); App.3261, Greenberg response to RFA 120.

[23]  App. 576, Suarez Depo. 67:20-23.

[24]  App. 933-49, Stutts Depo 41:18-57:22.

[25]  App. 1751-55, at 1752, Px 22.

[26]  App. 1725-47, at 1732, Px 16 (GT03-22-2011ST00010858) (Banking Circular from Office of the Comptroller of the Currency dated January 7, 1988, stating that "This Office has received information from State Banking Officials of Florida and California that the subject entity [Guardian International Bank, Ltd.] is not authorized to have a banking address as indicated about [in Miami and San Diego'.''); App. 146-47, Loumiet Depo. 239:1-240:22.

[27]  App.142-50, 164-67, Loumiet Depo. 232:1-233:20; 237:2-238:12; 242:1-244:25; 259:1-260:1; 262:8-263:15; App. 1762-1765, 1773-1777, 3011-3013, Px 29, 34; 805.

7

Greenberg also knew from the inception of its relationship with Stanford that the CDs were securities. As part of its early representation of Stanford, Greenberg received a copy of a June 17, 1988 memo from Stanford's general counsel, Sidney Adler, to Allen Stanford in which Adler told Stanford that it was imperative for GIBL to obtain a "Class A" license in Montserrat "so that Stanford Financial would not be deemed to be selling unregistered securities from the U.S. in violation of U.S. securities law."[28]  Adler informed Stanford that "*there is no question that the GIBL CDs are securities.*"[29]

To get around the prohibition on GIBL selling unregistered securities from unlicensed bank representative offices in the U.S., Greenberg lawyer Fernando Alonso advised Stanford to market and offer the GIBL CDs from the Miami offices of Stanford's Guardian International Investment Services ("GIIS") by having GIIS enter into a "service agreement" with GIBL that disclaimed that GIIS was acting as an agent of the bank, while keeping Montserrat in the picture, "at least on paper".[30]  Greenberg approved the Service Agreement between GIBL and GIIS in which GIIS agreed to market GIBL CDs and solicit business for the bank in return for fees.[31]  Initially Loumiet advised that whether Stanford was engaged in illegal banking in the U.S. was a "grey area" and that GIIS' activities might cause it to have to register its sales agents as securities broker-dealers;[32] but Loumiet later informed Stanford that he had changed his mind about the broker concern.[33]

---

[28]  App. 3262, Greenberg response to RFA 122.

[29]  App.1759-61, at 1760, Px 28.

[30]  App. 1757-58, Px 27; App. 152-62, Loumiet Depo. 246-56.  Loumiet admitted that he most likely was involved in producing the legal advice Alonso provided to Stanford with regard to GIIS' operations in Miami.  App. 151, 154-55, 158, Loumiet Depo. 245:1-18; 248:25-249:5; 252:6 ("I'm not trying to walk away from the advice").

[31]  App. 1822-25, Px 56 (Greenberg comments) and App. 1826-27, Px57 (STAN P_SP0011816) (Service Agreement between Guardian International Bank Ltd. and Guardian International Investment Services Ltd., dated 1991).  The Services Agreement provided that GIIS would provide promotional material and engage in selling efforts with regard to "prospective customers," and to relay account opening and other instructions to the bank, though deposits were supposed to be sent directly to GIBL in Antigua.  Also according to the agreement, GIIS was an independent entity and was to be paid for its promotional efforts; this would qualify it as a "broker" under the reasoning of Loumiet's February 1, 1991 comments to Allen Stanford.  App.735-36, Spindler Decl. 25-26, fn 34.

[32]  App. 1824, Px 56 (GT03-22-2011ST-0010622) (Letter dated February 1, 1991 from Carlos Loumiet to Allen Stanford); App. 168-74, Loumiet Depo. 265:18-271:9.

[33]  App. 1828-38, at 1830, Px 58, at GT-22-2011ST-0010611.

8

Greenberg's own banking law expert witness testified that the activities that Greenberg advised Stanford it could carry out through the GIIS office in Miami, and listed in the Service Agreement, violated U.S. banking laws when done—as Stanford did--without a foreign bank representative license.[34]  Loumiet always knew that GIBL and SIBL were in actuality operated from the U.S.,[35] and that Stanford's CDs were securities.[36]  Nevertheless, Greenberg never advised Stanford to license his U.S. sales offices as foreign bank representative offices,  to register the CDs with the SEC, or to register Stanford's CD sales force - the so-called "Investment Officers" ("IOs") - as brokers or investment advisers. [37]  Based on Greenberg's advice, SIBL and GIIS never registered and continued to sell CDs from the U.S. in violation of U.S. securities and banking laws.

Instead of providing the correct legal advice, Greenberg erroneously advised Stanford that GIIS was not required to register as a broker-dealer,[38] even though GIIS was offering securities in the U.S. and failed to qualify under the relevant SEC rule.[39]  Stanford followed Greenberg's advice and did not register any of its sales entities as broker-dealers or investment advisors until it registered SGC in 1996, despite widespread and continuous securities sales activities conducted, with Greenberg's knowledge, out of U.S. offices from 1988 to 1996.

Greenberg's knowledge of Stanford's consistent violations of banking and securities laws was extensive. In 1993, during one of many U.S. government investigations of Stanford, Stanford General Counsel Suarez told Greenberg partner Holly Skolnik that GIBL was just an "operations

---

[34]  App. 933-53, at 949, Stutts Depo. 41:18-61:19, at 57.

[35]  App. 162-63, Loumiet Depo. 256:23-257:9.

[36]  App. 128, Loumiet Depo. 76:9-24.

[37]  Suarez testified that the "IOs" were sales people for the CDs.  App. 644, Suarez Depo. 236:13-22.

[38]  App. 1897-1912, Px 85 (GT03-22-2011ST-0010756) (letter from L. Frank Cordero (of Greenberg) to Suarez dated March 25, 1992, discussing Exchange Act Rule 3a4-1 and attaching SEC Release 34-22171).

[39]  App. 735-36, Spindler Decl. 25-26. The rule on which Greenberg purported to rely, Exchange Rule 34a4-1, required that, in order to be exempt from broker-dealer registration, the affiliate "[i]s not compensated in connection with his participation by the payment of commissions or other remuneration based either directly or indirectly on transactions in securities. . . ."  App. 1899-1912, at 1910, Px 85 at GT03-22-2011ST-0010769 (SEC Release 34-22172).  Further, the activities of GIIS were not limited to those allowed under 3a4-1(a)(4)(i), which allow only limited solicitation activities.  As Greenberg already knew from its work on the Service Agreement and prior work, GIIS was being paid to market and offer GIBL CDs, did so through a variety of written and oral means, was putatively independent from GIBL, and had as its sole purpose the solicitation of banking business.  App. 1822-25, 1826-27, Px 56, 57.

9

department", "has no real contact with clients", and that GIIS handled all of the marketing and sales promotion for GIBL from its Miami office while Stanford Financial Group ("SFG") made the investment decisions for GIBL from Houston.[40]   These facts confirmed what Greenberg already knew—that Stanford was illegally operating a foreign bank and selling unregistered securities from the United States in violation of banking and securities laws.

Skolnik also had a conference with Loumiet, Suarez and another Greenberg tax lawyer, in which she was told that Stanford's goal was "*minimal*" or "*no regulation*", and that an "*IA [investment advisor] license was not necessary*".[41]   Greenberg also learned that purchases of Stanford CDs by Latin Americans were funded mostly from existing U.S. bank accounts, and checks were sent to GIIS in Miami which then pouched them to Antigua,[42] confirming once again that Stanford was selling unregistered securities in the United States.[43]

GIIS continued marketing and selling the GIBL (and SIBL) CDs through its unlicensed IOs in Miami until December 1994, when Stanford merged GIIS into SFG.[44]   But the same model of using unlicensed sales representatives in Miami to market and sell the SIBL CDs to Latin

---

[40]  App. 1927-1931, at 1927, Px 96 (Skolnik January 8, 1993 Memo) ("Yolanda and Oreste explained to me that GIB is basically an 'operations department,' has no real contact with clients and does not engage in investment of funds . . . . Yolanda explained that the various banking functions are conducted by separate corporate entities so that GIB would not be considered to be conducting banking business in the United States."); App.179-84, Loumiet Depo. 283:7-288:9.  Loumiet admitted that he knew that "a lot of the back office and the decisions [for GIBL] were being taken in Houston" [App. 162-63, Loumiet Depo. 256:23-257:5] and that he understood that SFG was based in Houston. Skolnik's own hand-drawn corporate chart attached as the last page of her memo, App. 1931, Px 96 [GT-22-2011ST-0014321], lists SFG as being based in Houston.  When questioned about the Skolnik Memo, **Greenberg's own banking law expert testified that it appeared to him that Greenberg was aware that Stanford was violating U.S. banking law by having GIIS conduct foreign bank "representational" activities in Miami without a license.** App. 954-58, Stutts Depo at 63:21-67:16 ("*from the reflection in [the Skolnik Memo] it's certainly been represented to Greenberg that the company was engaged in these representational functions*").
[41]  App.1932-36, at 1935, Px 97 [GT03-22-2011ST-0007448]; App. 196-98, Loumiet Depo. 316:19-317:22, 322:5-323:2.
[42]  App. 1929, Px 96 ("Approximately 90% of the clients have accounts at U.S. banks and the money is deposited into GIB by wire transfer, from either a U.S. bank account or through checks drawn on U.S. banks. . . .  The GIIS office in Miami does not do banking.  Sometimes, however, checks may be sent to GIIS and the office then pouches them and sends them to Antigua.").
[43]  Loumiet admitted that GIIS' function was to market and sell GIBL CDs from its Miami office.  App. 191-95, Loumiet Depo. 301:6-305:20.
[44]  App. 3184-86, Px 1054, 1055.

American investors continued when Greenberg helped Stanford establish SFIS in 1998 (discussed below).

In June, 1993 when Loumiet joined GIBL's Advisory Board, Allen Stanford thanked him for his "*efforts and sound advice which have played an immeasurable role in our growth and success.*"[45]

## C.   Greenberg assists Stanford in buying his way into Antigua after his offshore bank was expelled from Montserrat.

Initially Stanford's offshore bank, GIBL, was located in Montserrat.   When the British government began to crack down on Montserrat's illicit offshore banking sector in August, 1989, Stanford needed to find a new haven for his offshore bank.   Once again, he turned to Greenberg for help.    Greenberg assisted Stanford in moving his bank to Antigua, "*one of the most corrupt [islands] in the region long known for sheltering traffickers in armaments and drugs*" where many of the Montserrat banks moved when shut down.[46]  Greenberg was instrumental not only in moving GIBL to Antigua, but ultimately in helping Stanford position himself so as to control the local government and eliminate any regulatory scrutiny of the bank in Antigua.

Stanford had to move to Antigua because in 1990 the Financial Secretary of Montserrat notified Stanford that it was going to revoke Stanford's Montserrat banking licenses because (1) GIBL's auditor, CAS Hewlett, was not an approved auditor; (2) GIBL was operating in a manner "detrimental to its depositors"; (3) GIBL failed to supply satisfactory details as to its liquidity; (4)

---

[45]  App. 1939, Px 101.

[46]  App. 2017-21 Px. 195 ("Caribbean Blizzard," Time (2/26/96) (stating that Antigua "has become the newest *offshore banking center for shady American and Russian businessmen*," and . . .Under decades of rule by Vere Bird Sr., the tiny island . . . became *one of the most corrupt in the region, long known for sheltering traffickers in armaments and drugs*. . . . Bird's son Vere Jr. has been tied to a 1990 plot to establish a school that would train mercenaries to fight for the Medellin cartel.  He was also involved . . . in covert gun shipments to the cartel through Antigua. . . . [T]he Bird dynasty—the current Prime Minister is *Vere's son Lester [who] continues to look the other way as traffickers operate*."); App. 3180-82, Px. 1002 ("Rum sort of banking," U.S. News & World Report (10/30/96) ("Antigua has a *virtually unregulated banking industry, no reporting requirements and secrecy laws that punish bank violations of bank clients' confidentiality*. . . . [N]ations such as Antigua have become *notorious for the extravagant winks they cast at illegal activities*. . . .  Antigua's ruling Bird family has long made the island's business its business, and the cozy relationship between banks and the government makes action difficult. . . . **A veteran British investigator who helped close down the [***Montserrat***] banks says that many simply moved to Antigua** and Grenada.").

11

one of GIBL's directors (Allen Stanford) was a former bankrupt; and (5) GIBL had failed to submit annual financial statements.[47]  The Montserrat government set a December 21, 1990 deadline for Stanford to show cause why GIBL's license should not be revoked.[48]  The day before the deadline, Stanford surrendered GIBL's license to the Montserrat government.[49]  Montserrat subsequently revoked GIBL's banking license.[50]

Greenberg knew about the revocation of Stanford's banking license when it happened, and assisted Stanford's Caribbean counsel in suing the Montserrat government to reverse the revocation.[51]  Stanford eventually won a judgment against the Montserrat government confirming that he had surrendered GIBL's bank license before it was revoked.[52]  The judgment (a copy of which Greenberg received in 1996) recites all of the above-described allegations made against Stanford by the Montserrat government, including that Allen Stanford had been in personal bankruptcy and that GIBL was withholding detailed information that would normally be expected in financial statements.[53]

To help Stanford move his offshore bank to Antigua, Loumiet negotiated the purchase of the ailing Bank of Antigua ("BoA") from, among others, the Prime Minister of Antigua and its Finance Secretary (who regulated the bank).[54]  At that time, BoA was in dire straits and teetering on the verge of bankruptcy.[55]  Greenberg knew that Antigua approved Stanford's purchase of

---

[47] App. 3131-33, Px 874 (AO1359437-000148) (letter from Montserrat Ministry of Finance & Economic Development to Allen Stanford dated November 28, 1990).
[48] *Id.,*
[49]  App. 1847 Px 63 (July 7, 1991 letter to Montserrat Ministry of Finance from Kenneth Allen stating that on December 20, 1990 Stanford surrendered GIBL's banking license to the Minister of Finance).
[50] App. 1846, Px 63 (GT03-22-2011ST-0010682) (letter from Montserrat Ministry of Finance to Kenneth Allen dated June 19, 1991, informing Stanford of revocation order for Guardian International Bank Ltd. banking licenses); App. 228-29, Loumiet Depo. 381:9-382:9.
[51]  App. 226-29, Loumiet Depo. 379:12-382:9; App. 1846, 1848-1873, Px 63, 66.
[52]  App. 2931-89, Montserrat Judgment, Px 778.
[53]  App. 2945, Px 778.  App. 234-37, Loumiet Depo. 390:7-393:20.
[54]  App. 453-81, Loumiet Ex. 6; App. 3263, 3293, 3294, Greenberg responses to RFA 127, 224, 226; App. 222, Loumiet Depo. 368:6-22.  Loumiet testified that the Antiguan Finance Minister stood to benefit from Stanford's purchase of BoA.  App. 222, Loumiet Depo. 368:20-22.
[55]  App. 213-15, Loumiet Depo. 340:3-342:8.

BoA—despite receiving information that Stanford had been "*operating on the fringes of illegality for many years*"—because otherwise BoA would not survive through Christmas.[56]

In connection with the BoA purchase, Greenberg obtained unusual concessions for Stanford, including permits for Stanford to establish an offshore bank (SIBL) and a trust company, Stanford Trust Company, Ltd. (STCL), a 99 year lease on land for the bank, a 15-year exemption from income taxes, the right to chair the airport authority, exemption from customs duties, consumption taxes and service taxes, residency status in Antigua for Stanford and his executives, and immediate citizenship for Allen Stanford.[57]   The Receiver's FCPA expert has opined that this transaction that Greenberg assisted violated the FCPA.[58]

**D.    Greenberg helps Stanford to silence critics.**

Greenberg also assisted Stanford to stifle criticism of Stanford's illegal securities offerings and unseemly influence in Antigua in order to avoid the loss of investor confidence in his bank and further evade regulatory scrutiny.  In September 1991, British journalist Tony Hetherington wrote an article called "*Monster Rat in Montserrat*", reporting that Stanford was not authorized to operate banking offices in the U.S., questioning how GIBL could sell its products from the U.S. without a license, suggesting that Latin American depositors might be tricked into believing they were dealing with "Texans who have been checked out by the authorities and granted banking license," and contrasting the high interest rates that GIBL was paying to U.S. CD rates (8.25-10.25%, compared to 6-7%).[59]  After receiving a copy of Mr. Hetherington's article[60] as well as a contemporaneous Stanford promotional LODIS magazine detailing how the GIIS Miami office was mass mailing GIBL CD promotional materials to Latin America,[61] Greenberg followed the

---

[56]  App. 1809-10, Px 49; App.223-25, Loumiet Depo. 372:1-374:2.
[57]  App. 1811-21, Px 52.
[58]   App. 841-850, Koehler Decl., at 21-25.
[59]  App. 3314, Px 76 ("*Monster Rat*" article); App. 238-42, Loumiet Depo. 394:9-398:23.
[60]  App. 243-49, Loumiet Depo. 399:4-405:12; App. 1881-1889, Px 79.
[61]  App. 175-78, Loumiet Depo. 278:18-281:2; App. 3004-3010, at 3007, Px 801 (Stanford's Sept. 1991 LODIS report found in Greenberg's files).

familiar pattern of giving Stanford what he wanted by threatening Hetherington and his editors at the Financial Times with a libel suit to shut them up.[62]

By 1996, Stanford was the subject of increasing negative news coverage in Antigua and the Caribbean. Allen Stanford instructed Suarez, Loumiet and Mark Schnapp (another Greenberg partner), to "attack" Stanford critics[63] and "go for the jugular."[64]  On behalf of Stanford Greenberg sued a journalist and publisher reporting that the United States government was investigating Stanford's loans to Antigua in order to shut him up.[65]

**E.     Greenberg learns that Stanford has been under constant investigation by various agencies of the U.S. government since 1989.**

Greenberg knew that Stanford was under constant federal government investigation throughout its tenure as Stanford's lead counsel, yet never took any precautions to determine whether any of the allegations against Stanford were true.  Loumiet was informed in 1990 that Stanford was the subject of a money laundering investigation.[66]  To ferret out what the U.S. government had on Stanford, Greenberg partner Pat O'Brien spearheaded a campaign of FOIA requests to various agencies, including the DOJ, FBI, DEA, OCC, Treasury Department and U.S. Customs.[67]

As a result of O'Brien's FOIA campaign, Greenberg learned that: (1) there were multiple U.S. government task force investigations of Stanford and GIBL for drug money laundering from 1989 through 1996;[68]  (2) Allen Stanford had been in personal bankruptcy in 1984;[69] (3) GIBL

---

[62]  App. 1881-89, 1890-96, Px 79, 80; App. 243-44, Loumiet Depo. 399:4-400:9.

[63]  App. 2028-31, Px 206; App.294, Loumiet Depo. 461:9-462:25; App. 596-97, Suarez Depo. 87:14-88:11; App. 1081-83, Schnapp Depo. 165:15-167:19.

[64]  App. 2056-57, Px 220; App. 1089, Schnapp Depo. 179:2-21.

[65]  App. 2058-74, Px 233.

[66]  App. 125-26, Loumiet Depo. 61:22-62:10.

[67]  App. 230-31, Loumiet Depo. 384:19-385:22; App.1119-21, O'Brien Depo. 27:1-18, 31:13-32:17; App. 1945-49, Px 105 (FOIA request on FBI); App. 2100-98, Px 262 (responsive documents from FBI); App. 2199-2201, Px 267 (response letter from DEA); App. 2206-11, Px 271, App. 2274-75, Px 303 (O'Brien FOIA request on U.S. Customs); App. 2212-16, Px 272, 22577-58, Px 295 (O'Brien FOIA request on Federal Reserve); App. 2217-22, Px 273 (O'Brien FOIA request on DEA);

[68]  App.231, Loumiet Depo 385:13-22; App. 2100-98, Px 262; App. 2241-56, Px 292; App. 2259-69, Px 299; App. 2993-3000, Px 789.

[69]  App. 1124-25, O'Brien Depo 64:24-65:16; App. 2164-94, Px 262 (FBI document questioning how Allen Stanford

14

started as a shell bank;[70] (4) Stanford acquired BoA to gain access to more correspondent bank relationships for wire transfer services;[71] (5) GIBL functioned as a bank in the U.S., catering to foreign investors but with no regulation of its activities;[72] (5) in 1992 the FBI authorized expenditures for an agent to travel to London as part of its investigation of Stanford;[73] and (6) when U.S. Customs searched Stanford's private jet returning from the Caribbean, Stanford "proceeded to fire a number of employees whom they suspected might be providing information to the authorities".[74]

Over the years Greenberg was also exposed to other facts demonstrating the illicit nature of Stanford's offshore banking business.  In 1991 Loumiet helped Stanford reach a settlement with BoA's existing correspondent bank in the U.S., which terminated its relationship with BoA due, in part, to checks being deposited that bore GIBL, instead of BoA, endorsements.[75]  Later, Chase Bank also terminated its correspondent banking relationship with GIBL.[76]  Nevertheless, Loumiet wrote Donna Alexander, V.P. NationsBank Int'l Miami vouching for Stanford stating "we have not seen any behavior by our clients that would give rise to any concern regarding the honesty, integrity, or law-abiding nature of the entities and individuals involved."[77]

Greenberg greenlights Stanford's bribery of Antiguan government officials.

In order to continue to sell the CDs without regulation in the U.S., Stanford needed a safe offshore haven for his bank free from regulatory oversight.  Indeed, Stanford never could have

---

had amassed substantial assets in Texas after forming GIBL in 1987 despite having been in personal bankruptcy in 1984); App. 2267, Px 299.  **O'Brien testified that he read the FBI's concerns about Allen Stanford's prior bankruptcy** but doubted that he discussed it with Stanford or anyone at Greenberg.  App. 1125, O'Brien Depo. 65:6-16.  Greenberg also separately received notice of Allen Stanford's personal bankruptcy since it was one of the grounds for Montserrat's revocation of GIBL's banking license, and Loumiet admitted to reading the court decision - where Allen Stanford's bankruptcy is plainly described - in 1996.  App. 232-233, Loumiet Depo. 388:14-389:3; App. 1846-47, Px 63; App. 2948, Px 778.

[70]  App. 2150, Px 262.

[71]  App.2150, Px 262.

[72]  App. 2151, Px 262.

[73]  App. 2166-67, Px 262; App. 2990-92, Px 788.

[74]  App. 1122-23, O'Brien Depo. 61:16-62:20; App. 2254, Px 292 at GT03-22-2011ST-0014512.  O'Brien testified that he never asked Stanford about those allegations.  App. 1123, O'Brien Depo. 62:10-20.

[75]  App. 250-58, Loumiet Depo. 407:16-415:20; App. 1839-40, Px 60; App. 1844-45, Px 62.

[76]  App. 257-58, Loumiet Depo 414:4-415:3.

[77]  App. 1913-14, Px 89.

15

pulled off the second largest securities fraud scheme in U.S. history without his offshore haven, Antigua. To assure that his offshore bank would not be scrutinized or regulated by Antigua, Stanford bribed Antiguan government officials and positioned himself to where he, in effect, called the shots in Antigua. Loumiet acknowledged that although he had seen corruption in many other countries, he had never seen the level of influence that Stanford achieved in Antigua in terms of being appointed by the Antiguan government to head the local airport, hospital and the regulation of the Antiguan offshore banking sector.[78]

Stanford began to corruptly influence Antiguan government officials in violation of the FCPA beginning in the early to mid-1990s and the aim of this influence was to neutralize any legitimate regulatory oversight in Antigua of SIBL. Greenberg knew that Stanford ingratiated himself with Antiguan Prime Minister Lester Bird by flying him to Houston and paying for all of his medical expenses when Bird thought he was having a heart attack.[79] As a result of Stanford's help, Bird agreed to allow Stanford to finance the construction of a new hospital in Antigua, and promised that "no party will become involved [in the hospital project] without [Stanford's] approval.[80] Bird thereafter refused to honor a letter of commitment to have a U.S. company called DSI design, construct and finance the new hospital in Antigua,[81] and signed a letter Loumiet "ghost wrote" for the Prime Minister saying Antigua was "very displeased with" the DSI design."[82]

When Stanford's involvement in the hospital project prompted a Department of Justice FCPA investigation of corruption in Antigua,[83] Greenberg again came to Stanford's aid by performing a "whitewash" investigation of the corruption allegations. DSI's President Wayne

---

[78] App. 317-18, Loumiet Depo. 488:14-489:16.
[79] App. 1982-2001, Px 183; App. 265-67, Loumiet Depo. 424-26; App. 589-90, Suarez Depo. 80:24-81:24.
[80] App. 1976, Px 178.
[81] App. 1977-81, Px 181; App. 1032, Schnapp Depo. 44:8-16.
[82] App. 259-62, Loumiet Depo. 417:19-420:24; App. 1957-59, Px. 141. Loumiet sent that letter and another letter he "ghost wrote" for the Prime Minister addressed to Allen Stanford to Stanford's Antiguan counsel, Errol Cort, to present to the Prime Minister for signature. App. 3145, Px 898; App. 262, Loumiet Depo. 420:8-24. In 1999 Cort became the Attorney General of Antigua. App. 350-51, Loumiet Depo. 548:12-549:21.
[83] App. 1977-81, Px 181; App. 588-89, Suarez Depo. 79:8-80:19.

Kelley alleged that he had been solicited by one of Prime Minister Bird's cronies, Hartley Henry, to make a $3.5 million "campaign contribution" to Antiguan officials in connection with the contract to build the hospital, and that when Kelly refused the Antiguan government terminated the contract.[84]

Greenberg lawyer Mark Schnapp was asked by Suarez to conduct an investigation to respond to the DOJ investigation of Mr. Kelley's accusations,[85] as well as to "ascertain" that Stanford had not violated the Foreign Corrupt Practices Act ("FCPA").[86]  As part of his investigation, in January 1996 Schnapp was informed by Suarez that:

- Stanford Financial had paid $28,000 to fly Prime Minister Lester Bird to Houston by private medi-vac plane;[87]

- Stanford Financial had paid $20,000 in medical bills for Prime Minister Lester Bird;[88]

- Stanford had loaned $32,000 to Antiguan Minister of Finance Molwyn Joseph (who was purportedly overseeing SIBL) in February 1992;[89]

- Stanford instructed that the loan to Joseph be marked paid and carried on the company's books "after" the Antiguan election as a political contribution;[90]

- Stanford's bank had "loaned" $140,000 to eleven senior Antiguan government officials, including Lester Bird and Molwyn Joseph (who received another $100,000 loan).[91]

In March 1996, Schnapp accompanied Suarez to Antigua to interview Antiguan officials in connection with the DOJ's FCPA investigation of the hospital transaction.[92]  But during those interviews Schnapp did not ask Hartley Henry whether he solicited a $3.5 million bribe from Wayne Kelley, did not ask Molwyn Joseph about the $32,000 note that was recharacterized as a

---

[84]  App. 1977-81, Px 181; App. 1965-67, Px 152; App. 1033, Schnapp Depo. 45:8-23.
[85]   App. 1968-69, Px 158; App. 1033-34, Schnapp Depo. 45:1-46:4, 47:3-23; App. 589-90, 600-02, Suarez Depo. 80:24-81:5, 91:17-92:8, 95:7-13.
[86]  App. 602-03, Suarez Depo. 95:3-96:2.
[87]  App. 1982-2001, Px 183; App. 590, Suarez Depo. 81:11-21.
[88]  *Id.*
[89]  App. 1937-38, Px 100; App. 1982-84, Px 183; App. 590-91, 607, Suarez Depo. 81:25-82:17, 103:1-17.
[90]  App. 1950-53, Px 107.
[91]  App. 2002-05, Px 184; App.3264, Greenberg response to RFA 132; App.599-601, Suarez Depo. 90:13-92:8.
[92]  App.605, Suarez Depo. 101:18-25; App. 1039-40, Schnapp Depo. 52:17-53:22.

17

political contribution by Stanford or the $100,000 loan from Stanford, did not ask the Prime Minister about the medical bills and private jet paid for by Stanford, and did not ask any of the other officials about the other "loans" and contributions of which both Schnapp and Suarez were aware.[93]  Schnapp admitted that he did not interview Allen Stanford or anyone else at Stanford (other than Suarez) about the bribery allegations,[94] even though he admitted that he was aware that Allen Stanford enjoyed a close personal relationship with several high ranking Antiguan officials.[95]  Instead, Greenberg conducted a "whitewash," convincing the DOJ that "there is nothing to see here."  And consistent with Greenberg's pattern of never saying "no" to Stanford, Greenberg never told Stanford that he was violating the FCPA by forgiving loans and making gifts to Antiguan government officials.[96]

When Stanford asked Greenberg for advice about making political contributions to an American public relations firm on behalf of Prime Minister Bird's political party, once again Greenberg said "yes, and advised Suarez that, assuming no *quid pro quo*, "Stanford would not violate the FCPA by making the proposed payment," all the while knowing that there was a *quid pro quo*—Stanford made gifts and loans to Antiguan officials precisely so that he could continue to operate his offshore bank without interference and would be in a position to control what happened in Antigua, which is exactly what happened.  Stanford was—as Greenberg knew— appointed to head the hospital authority, the airport authority and eventually even appointed to the Board of the Antiguan government agency that regulated his own bank.

After Greenberg advised Stanford it was legal to make political contributions to Prime Minister Bird's party, Stanford was accused of bribing two Antiguan officials by giving them $100,000 each as an inducement for their help in a land swap Stanford was trying to orchestrate.[97]

---

[93]  App. 2032-55, Px 217; App. 608-10, Suarez Depo. 113:2-115:22.
[94]  App. 1043, Schnapp Depo. 65:4-17.
[95]  App.1068-69, Schnapp Depo. 135:20-136:12.
[96]  App. 604, Suarez Depo. 99:14-22.
[97]  App. 2892-95, Px 662 (news article located in Greenberg's files with handwritten annotation "accused of bribery

Stanford's response to the accusation was to double-down by donating an *additional* $200,000 each to the two Antiguan candidates.[98]   Greenberg later became aware of Stanford's substantial involvement in the reelection campaign of Prime Minister Bird, including Stanford's compelling Stanford employees to campaign for the Prime Minister's political party, and providing refrigerators, TVs and VCRs for the Prime Minister's party to dole out to voters.[99]

Greenberg was also involved in Stanford's loans to the Antiguan government, including tens of millions of dollars in loans to Antigua for the new hospital, airport improvements, and other uses.[100]   Through these loans, Stanford's tentacles of control and leverage over the Antiguan government tightened, as Stanford's loans (as prepared by Greenberg) were secured by Antigua's tax base such that Stanford had a lien on the entire country.   Greenberg represented Stanford in the extension of the $31 million hospital loan to Antigua,[101] and Loumiet was aware that SIBL was going to be one of the lenders on the loan  - which was contrary to SIBL's marketing materials that represented to investors that SIBL did not make loans.[102]   Allen Stanford himself was appointed by the Antiguan government to chair the hospital board to oversee the construction of the hospital.[103] This was in addition to his being in control of the Antiguan airport authority based on his loans of millions more dollars to the Antiguan government—secured by the airport's landing fees[104] —to improve the airport.[105]

---

charges").

[98]   *Id.*

[99]   App. 302-04, Loumiet Depo. 470:4-472:20; App. 2846, Px 542 (Antiguan newspaper article found in Greenberg's files).

[100]   App. 1962-63, Px 147 (GT03-22-2011ST-0007090) (Letter from Allen Stanford to Lester Bird dated February 12, 1995, offering Bird between $40 and $50 million of financing from Stanford to build hospital); App. 2396-2402, Px 349 (GT03-22-2011ST-0000346) (draft loan agreement between BoA and Antiguan government for $31 million); App. 2420-23, Px 361 (HW_00057960) (Greenberg timesheet showing work on Antiguan hospital loan); App. 3014-96, Px 810 (Loan Agreement between BoA and Antiguan government dated August 14, 1998); App. 19974-75, Px 177 (GT03-22-2011ST-0003190) (The Outlet, "Loans from Massa Could Spell Ruin," November 24, 1995) (alleging that the loans from Bank of Antigua exceeded the total deposits of the bank).

[101]   App. 267-71, Loumiet Depo. 426:16-430:24.

[102]   App. 269-70, Loumiet Depo. 428:8-429:1; App. 1964, Px 150.

[103]   App. 616-17, Suarez Depo. 155:7-156:4.

[104]   App. 619-20, Suarez Depo. 165:7-166:2.

[105]   App. 272, 273, 286-87, Loumiet Depo. 435:2-24, 438:3-10, 452:4-453:2. Greenberg represented Stanford in establishing the airport authority and the airport development project.  App. 295-301, Loumiet Depo. 463:9-469:17.

**F.     Greenberg reviews, revises, and copyrights Stanford's marketing materials.**

Greenberg was aware of representations made by Stanford to SIBL investors.  Over the years, Greenberg was involved in reviewing and editing Stanford's marketing materials sent to investors.[106]  Loumiet also forwarded Stanford marketing materials to third parties, including other banks like Barclay's, Nationsbank, American Express International Bank, and Southwest Bank of Texas, in an attempt to interest them in doing business with Stanford.[107]

In 1998 Greenberg assisted Stanford to copyright the primary SIBL promotional brochure that was used to market and sell the SIBL CDs to investors,[108] and Loumiet also reviewed and commented on promotional materials for STCL.[109]  Greenberg was also provided Stanford's Standard Operating Procedure for training Stanford's sales force to market SIBL CDs, and commented on the SIBL Reg D Disclosure statement given to U.S. accredited investors.  Yet, Greenberg never told Stanford to correct the misrepresentations and omissions in those materials, such as those described below.

**G.     Greenberg assists Stanford with the launch of its Regulation D sales of SIBL CDs in the U.S.**

Suarez continued to request Greenberg's advice and assistance as Stanford geared up to further expand SIBL CD sales by offering the SIBL CDs to U.S. citizens.[110]  Stanford formed SGC and registered it with the SEC as a broker-dealer and investment advisor in 1996.[111]  Loumiet drafted the intercompany service and referral agreement under which SIBL paid SGC fees for "referring" investor clients to SIBL.[112]  Greenberg securities lawyers Bob Grossman and Jeffrey

---

[106]  App. 218-21, Loumiet Depo. 364:2-367:15; App. 3002, 3003 Px 799, 800.
[107]  App. 361-70, Loumiet Depo. 574:23-583:25; App. 1954, Px 108, App. 1913-14, Px 89, App. 1955-56, Px 109, App. 2868, Px 573.
[108]   App. 2838-41, 2862-67, 3152-77 Px 533, 572, 1001; App. 627-28, Suarez Depo. 188:9-189:4; App. 372-73, Loumiet Depo. 585:7-586:12.
[109]  App. 305-06, Loumiet Depo. 475:12-476:25; App. 3134-40, Px 878.
[110]   App. 634-35, Suarez Depo. 226:18-227:1.   Suarez testified that she requested Loumiet's assistance on these securities matters because she considered him qualified to address these issues and because Loumiet had access to securities lawyers at Greenberg who were experts in the area.  App. 671, Suarez Depo. 282:1-19.
[111]  App. 3264-65, Greenberg response to RFA 133.
[112]   App. 376-78, Loumiet Depo. 595:2-597:3; App. 2075-80, Px 256 (STAN P CAST_0023586) (letter from Suarez

Oshinsky researched (i) whether the SIBL CDs were securities, (ii) "integration of Regulation S offering", (iii) issues under the ICA, and (iv) "investment company integration".[113]  Greenberg prepared the initial draft Reg D disclosure document as well as the Subscription Agreement that SGC would use to solicit CD sales to U.S. investors.[114]  Greenberg also advised Suarez that the SIBL CDs likely would be considered securities under the Blue Sky laws of Texas, Florida, Colorado, Louisiana and New York, but that SIBL could avoid registration of the CDs as securities by relying on Regulation D sales to "accredited investors".[115]  Loumiet also revised SIBL's Regulation D disclosure.[116]  Loumiet knew at the time that SIBL was getting ready to offer the SIBL CDs to "accredited investors" in the U.S. under Reg D. [117]

The Reg D disclosures as revised by Greenberg failed to disclose material information of which Greenberg was aware, such as:

- Stanford had been under constant U.S. government investigation since the late 1980s;

- Stanford had made gifts and forgiven loans to Antiguan officials;

- Stanford had staffed and paid for a task force that rewrote the banking laws of Antigua and placed Allen Stanford on the board of the regulatory authority;

---

to Greenberg's Howard Eliofson requesting assistance in "reduc[ing] to writing" relationships between SGC regarding referrals, commissions, and other services provided); App. 2081-99, Px 258 (STAN P CAST_0012811) (draft agreement between SFGC and SGC dated June 14, 1996, prepared by Greenberg); App. 2228-33, Px 283 (HW_00057539) (Greenberg draft, dated July 25, 1996 of Stanford Financial Joint Marketing Agreement between SIBL and SGC); App. 2234-36, Px 285 (STAN P CAST_0021095) (draft Referral Agreement between STCL and SGC, dated August 8, 1996); App.3265, Greenberg response to RFA 134, 135.

[113]  App.379-82, Loumiet Depo. 599:21-602:20; App. 2271-72, Px 301. **Greenberg's research on integration demonstrates that it was aware that the potential for integration between Stanford's U.S. and foreign CD sales was an issue.**

[114]  App. 2681-82, Px 443 (HW_00057488) (Greenberg draft dated February 21, 1997 of SIBL offering document); App. 2276-82, Px 321 (HW_00057514) (draft of SIBL CD Investment Program disclosure Statement); App. 2283-89, Px 322 (HW_00-059968) (Greenberg draft of SIBL CD Investment Program Disclosure Statement dated February 21, 1997); App. 2290-2306, Px 323 (HW_00060169) (letter from Anna Oestereicher (of Greenberg) to Suarez dated February 28 1997, attaching draft disclosure statement and subscription agreement); App. 482-99, Loumiet Ex. 17; App. 3259, Greenberg response to RFA 114.

[115]  App. 2535-41, Px 425; App. 1206-12, Moncada Depo. 49:12-53:21, 57:6-58:7.

[116]  App. 2606-24, Px 426 (draft with Loumiet's handwritten revisions); App. 2625-46, Px 427 (redlined draft incorporating Loumiet's revisions); App. 437-38, Loumiet Depo. 653:12-654:17; App. 1230, Moncada Depo. 106:2-13.

[117]  App. 438, Loumiet Depo. 654:18-22.  App. 439-40, Loumiet Depo. 656:7-657:8.  Part of Loumiet's revisions to the draft Reg D disclosure document was to insert that the CD sales would be made to "accredited investors", _not_ "qualified" investors.  App. 1218-20, Moncada Depo. 88:7-90:3.

- Stanford had made a $31 million loan to the Antiguan government; and

- the lack of meaningful regulation of SIBL by the Antiguan government.[118]

In fact, Loumiet struck out language in the Reg D disclosure statement that informed potential investors that SIBL was *not* subject to regulation in the U.S. *or* in Antigua, and that SIBL's management believed that such lack of regulation was good for SIBL's business.[119]

The Reg D disclosure that Greenberg revised also included a discussion of SIBL's business model and investment portfolio, and made clear that SIBL did not make commercial loans and, instead, invested in a portfolio of "securities from established, quality companies and governmental agencies". Greenberg, having edited and provided comments on the disclosure, was aware of these facts, rendering its contemporaneous advice that Stanford did not have to register under the ICA because SIBL was *not* in the business of buying and selling securities (described below) utterly specious.[120]

In November 1998 SIBL filed a Form D with the SEC to allow SGC to sell SIBL CDs to "accredited investors" in the U.S. without registering the CDs as securities.[121]

## H.     Greenberg assists SIBL to establish additional CD sales offices in the U.S.

In 1997 and 1998, Greenberg assisted Stanford to establish two additional sales and marketing conduit offices for the marketing and sale of the SIBL CDs:  (1) Stanford Trust Company in Baton Rouge ("STC Louisiana"), which was established as an IRA custodian to allow Stanford to sell SIBL CDs to the IRA accounts of U.S. citizens, and (2) Stanford Fiduciary Investor Services ("SFIS") in Miami, which was established as a U.S.-based "trust representative office"

---

[118] App. 636-39, Suarez Depo. 228:5-231:19; App. 440-, Loumiet Depo. 657:17-661:8; App. 2606-24, 2625-46, Px 426, 427.
[119]  App. 440-43, Loumiet Depo. 657:13-660:23; App. 1221-25, Moncada Depo. 91:22-95:4; App. 2612, Px 426 (Loumiet handwritten comments striking out "management of SIB believes SIB is not currently subject to any U.S. securities or banking regulation or Antiguan banking regulation."); App. 2632, Px 427 (redlined draft incorporating Loumiet's revisions).
[120]  App. 444-45, Loumiet Depo. 661:9-662:14; App. 1226-28, 1230-37, Moncada Depo. 101:5-103:21, 106:16-110:1, 111:21-113:25.  App. 2606, 2619, Px 426; App. 2625, 2639-40, Px 427.
[121]  App. 1276-84, Warner Ex. 24.

of Stanford's Antiguan trust company, STCL, and designed to market and offer the SIBL CDs to Latin American investors in Miami, just as GIIS had been doing previously.[122]  Loumiet has admitted that such a "trust representative office" ("TRO") was his brainchild.[123]

Greenberg was aware that the purpose of both new offices was to market and offer the unregistered SIBL CDs.  As part of the acquisition of the trust company that became STC Louisiana, Loumiet had a Greenberg associate research whether the trust company would have to register the SIBL CDs that would be offered to STC Louisiana's clients as securities.[124] Greenberg proceeded to assist Stanford in establishing STC Louisiana for the purpose of offering the CDs.[125]

A different Greenberg associate, Carl Fornaris,[126] researched how Stanford could establish a TRO in Miami to market the SIBL CDs.[127]  Fornaris called a staff attorney at the Federal Reserve to inquire what activities the TRO could engage in without being deemed a representative office of a foreign bank, which would require a license from the Federal Reserve.[128] The staff attorney told Fornaris that without a bank representative office license the TRO could not solicit any business for SIBL.[129]

After talking to the Federal Reserve Fornaris drafted a memo advising Stanford that its proposed TRO should _not_ solicit new business for SIBL, or serve as a liaison between SIBL and its customers, or accept compensation from SIBL for client referrals.[130]  But Loumiet revised a later draft of the memo, striking out[131] a section in which Suarez had informed Greenberg that the

---

[122]  After SFIS was established in Miami with Greenberg's assistance, it subsequently established additional offices in Houston and San Antonio.
[123]  App. 138-39, Loumiet Depo., at 128:24 – 129:7 ("[i]t was my concept and it stemmed from my teaching").
[124]  App. 383, Loumiet Depo. 605:9-24; App. 2684, Px 449.
[125]  App. 383-86, Loumiet Depo. 605:9-608:17 ("I assume that the trust company in Louisiana was selling in the United States"); App. 2464-77, Px 375 (GT03-22-2011ST-0007190) (letter from Louisiana Office of Financial Institutions to Fernando Margarit (of Greenberg) dated April 13, 1998.
[126]  App. 2828, Px 500; App. 1395-96, Fornaris Depo. 39:1-40:1.
[127]  App. 1382-94, Fornaris Depo. 23:19-35:22; App. 2409-19, Px 351.
[128]  App. 1390-91, Fornaris Depo. 31:22-32:21; App. 2413-14, Px 351.
[129]  App. 2414, Px 351; App. 3355-64, Px 354 (STAN P CAST_0026309) (fax from Loumiet to Suarez attaching Fornaris memorandum); App. 1390-91, Fornaris Depo. 31:22-32:21.
[130]  App. 2715-36, at 2734-35, Px 460; App. 1399-404, 1406-20, Fornaris Depo. 47:1-52:9, 56:22-70:23.
[131]  App. 447-49, Loumiet Depo. 665:16-667:17; App. 1422-23, Fornaris Depo. 72:19-73:5; App. 2756, Px 465. Loumiet also struck out recommendations that Fornaris had originally made that SFIS should refrain from soliciting

purpose of the TRO was to (1) solicit business for SIBL; (2) perform marketing and administrative functions; and (3) act as liaison between SIBL and its customers.[132]  Loumiet then advised Stanford that it was perfectly legal for the TRO to offer the SIBL CDs to prospective TRO clients from Miami as long as it did so in conjunction with the trust business.[133]  Greenberg always knew that the real purpose of the proposed TRO in Miami was to sell SIBL CDs but never advised Stanford that it needed to register the TRO (which came to be named SFIS) with the Federal Reserve as a foreign bank representative office of SIBL.[134]  In fact Suarez testified that she didn't believe federal law would even apply to the TRO.[135] The SFIS office was just a sham artifice created by Greenberg to allow Stanford to keep selling the unregistered CDs to Latin American investors from Miami, just as GIIS had done previously for many years.

The final version of Greenberg's memo to Stanford for the Miami TRO office of SFIS included a list of "Dos and Dont's" drafted by Loumiet advising Stanford that, notwithstanding Fornaris' original draft opinion that such activities were impermissible under federal banking law,[136] as long as customers set up a trust with SFIS it would be legal for SFIS to (i) market and promote and offer the SIBL CDs to prospective clients; (ii) provide SIBL marketing materials to prospective customers in the Miami office; (iii) accept money from prospective customers for the purchase of SIBL CDs and forward it to SIBL; and (iv) serve as a liaison between SIBL and its customers that came through the Miami office of SFIS.[137]  When questioned how SFIS could market and offer the SIBL CDs to foreign investors from the Miami office without violating the

---

business for SIBL or from acting as liaison between SIBL and clients referred by SFIS.  App. 1423-24, Fornaris Depo. 73:10-74:16; App. 2734-35, 2762, 2807-08; Compare Px 460 with Px 465 and Px 469.

[132]  App. 2756, Px 465; App. 1406-08, Fornaris Depo. 56:15-58:18; App. 446-49, Loumiet Depo. 664:14-667:17.

[133]  App. 2773-89 Px 468 (GT03-22-2011ST-0004554) (draft memorandum from Loumiet and Fornaris to Suarez dated September 15, 1998, with Loumiet comments); App. 2790-2808 Px 469 (final draft of SFIS Memo sent to Stanford).

[134]  App. 1411-13, Fornaris Depo. 61:10-63:4, 123:5-13 (Greenberg never considered approaching the Federal Reserve to seek federal approval for SFIS's planned business).

[135]  App. 672, Suarez Depo. 288:20-289:4..

[136]  App. 1425a-e, Fornaris Depo. 77:5-81:12; App. 2734-35, 2807-08.  Compare Px 460 and Px 469.

[137]  App. 2807-08, Px 469; App. 1426-42, Fornaris Depo. 81:25-83:17, 87:13-89:2, 89:22-92:7, 94:6-95:6, 98:15-103:4.

Regulation S exemption for unregistered securities offerings, Loumiet testified that he neglected to consider his advice for the SFIS office from a securities law perspective,[138] despite the fact that Loumiet *always* considered the SIBL CDs to be securities,[139] and that Greenberg was simultaneously providing securities law advice on the sale of the CDs in the U.S. under Reg D, including issuing its Blue Sky memo just two months prior concluding that the CDs were securities.[140]

Greenberg's securities law expert testified that the type of marketing and sales activity that was sanctioned by Greenberg for the SFIS Miami office in its September 1998 Memo would have blown the Regulation S exemption to registering the CDs as securities.[141]   The Receiver's securities law expert has testified that once the Reg S exemption was lost for the SFIS CD sales, all such sales became illegal and (as Greenberg anticipated when it performed the research on integration (see *supra* note 113 and accompanying text), would be integrated with all of Stanford's other CDs sales, rendering them all illegal offerings of unregistered securities.[142]

In December 1998, Greenberg negotiated and executed a Memorandum of Agreement between STCL/SFIS and the Florida Department of Banking, in an effort to provide some "cover" for the SFIS office while avoiding proper registration with the Federal Reserve.[143] Thereafter, and as established and "blessed" by Greenberg, the sham Miami office of SFIS marketed and sold some $324 million of SIBL CDs to prospective trust customers and transferred the money to Antigua.[144]

---

[138]  App. 450-51, Loumiet Depo. 669:21-670:15.
[139]  App. 128, Loumiet Depo. at 76:9-24.
[140]  App. 2535-41, Px 425.  Fornaris testified that while he was working on the Miami TRO issue for Stanford, he had no idea that his fellow Greenberg associate Bonnie Moncada was preparing the Blue Sky Memo concluding that the CDs were securities.  App. 1397-98, 1405, Fornaris Depo. 41:4-42:8, 53:9-25.
[141]  App. 3373-74, Halpert Depo. 124:8-125:6.
[142]   App. 703-704, Spindler Depo. 246-247.__
[143]  App. 500-16, Loumiet Ex. 23 (GT03-22-2011ST-0010071) (Memorandum of Agreement between State of Florida Department of Banking and Finance and Stanford Trust Company Limited, dated December 14, 1998).  Fornaris agreed that notwithstanding the agreement that SFIS reached with the State of Florida, such agreement would have no effect on the Federal Reserve's ability to enforce federal banking law.  App.1443-44, Fornaris Depo. 130:15-131:20.
[144]  App.1376-77, Van Tassel Supp. Decl. ¶¶ 11-13.

**I.      Greenberg rewrites the laws of Antigua for Stanford and Stanford is appointed to the board of the Antiguan government agency set up to regulate SIBL.**

By 1996, Antigua had developed a bad reputation for corruption and money laundering (which was known to Greenberg),[145] and the U.S. government began exerting pressure on Antigua to reform its offshore banking sector with respect to money laundering – including threatening to prevent Antiguan offshore banks like SIBL from having access to correspondent banking relationships in the U.S.[146]  Prime Minister Bird was beginning to bend to the U.S. pressure that might expose offshore banks like SIBL to U.S. scrutiny.[147]  Stanford decided he had to take action to protect his safe haven.  He told Loumiet he did not want a repeat of his predicament in Montserrat because he had spent a lot of money getting "settled" in Antigua and did not want to have to move his offshore bank again.[148]  One of Stanford's employees recommended that Stanford take the "bull by the horns" and assume an offensive position to "protect the current system" by assisting the Antiguan government to enact legislation to avoid unwanted changes "imposed by U.S. authorities".[149]  That was what Stanford eventually did,[150] and as usual turned to Greenberg for assistance in steering the reform process to keep the U.S. at bay.

At Stanford's request, and emblematic of the influence Stanford exerted in Antigua, Loumiet drafted a letter to Prime Minister Bird offering suggestions for reforming Antigua's offshore banking laws.[151]  The Prime Minister subsequently formed the Antiguan Offshore Financial Sector Planning Committee (the "Committee") and asked Allen Stanford to chair it; the

---

[145]  App. 307, 313-16, Loumiet Depo. 478:5-19, 484:9-487:16; App. 1130-31, O'Brien Depo. 81:20-82:4; App.1067, Schnapp Depo. 128:2-9.

[146]  Loumiet testified that during this time frame the U.S. government was threatening to prevent Antiguan offshore banks like SIBL from having any correspondent banking relationships in the U.S., something that – **according to Greenberg's offshore bank regulatory expert - would have doomed SIBL's ability to continue in business**.  App. 321, Loumiet Depo. 498:8-14; App. 3366-67, Gordon Depo. 78:20-79:10.

[147]  App. 3354, Px 185; App. 307-12, Loumiet Depo. 478:20-483:5; App. 1073-74, Schnapp Depo. 140:20-141:21.

[148]  App. 140, Loumiet Depo. 164:7-13.

[149]  App. 3178-79, Px 1002; App. 623-26, Suarez Depo. 176:10-179:14.

[150]  App. 1132-33, O'Brien Depo. 83:22-84:12.

[151]  App. 358, Loumiet Depo. 560:1; App. 2237-40, Px 290 (GT03-22-2011ST-0007182) (letter from Loumiet to P.M. Bird dated September 8, 1996); App. 2202-05, Px 270 (STAN P CAST_0016040) (draft correspondence from Loumiet to Bird dated June 28, 1996 referencing "our mutual friend" Allen Stanford).

other members of the Committee included Greenberg lawyers Loumiet, O'Brien and Schnapp and other agents of Stanford.[152] The only Antiguan member of the Committee was Wrenford Ferrance,[153] but, as had become routine in terms of Greenberg "ghost writing" letters for Antiguan government officials, Greenberg lawyers drafted letters for Ferrance to sign to carry out his official duties.[154]

As part of Greenberg's involvement on the Committee, Greenberg's O'Brien reported to Loumiet in 1997 that the Antiguan government *had no regulatory body overseeing the offshore banking sector, and offshore banks, including SIBL, were basically <u>regulating themselves</u>*.[155] Yet, Greenberg did not express any surprise that Stanford was self-regulating his own bank, or advise Stanford to disclose this fact to investors in the Regulation D disclosure statement that Greenberg reviewed and revised,[156] or elsewhere.

Greenberg's O'Brien moved to Antigua in 1998 and lived there for two years as part of Stanford's efforts to get his money laundering reforms enacted to keep the U.S. from meddling with his safe haven, billing his time to the Antiguan government even though Greenberg's fees were actually paid by Stanford.[157]  As part of the reforms drafted by Greenberg lawyers and adopted by Antigua, Antigua created a new regulatory agency, the International Financial Sector Authority (IFSA) to regulate the offshore banking sector, including SIBL.  Allen Stanford was appointed as a member of the board of IFSA,[158] and interim chair,[159] and other board members included two Stanford lawyers:  Greenberg's O'Brien and Stanford's local Antiguan lawyer Errol

---

[152]   App. 1134, O'Brien Depo. 87:2-11; App. 1064-65, Schnapp Depo. 122:10-123:3; App. 2317-26, Px 344 (HW_00059609) (memorandum dated September 15, 1997 to Allen Stanford et al. regarding the Antigua Task Force to Prevent Money-Laundering through International Banks); App. 613, Suarez Depo. 137:18-25; App. 3267, Greenberg response to RFA 139.
[153]   App. 1066, Schnapp Depo. 127:8-20.
[154]   App. 322-23, Loumiet Depo. 503:9-504:9; App. 2312-16, Px 342.
[155]   App. 2930, Px 768; App. 1135-37, O'Brien Depo. 93:14-95:18; App.319-21, Loumiet Depo. 496:10-498:7.
[156]   App. 2606-24, Px 426.
[157]   App. 1142-43, 1178-80, O'Brien Depo. 114:20-115:13; 226:6-228:13; App. 875-78, Koehler Decl. ¶¶170-77; App. 324, Loumiet Depo. 506:15-25; App. 618 a-b, Suarez Depo. 163:11-22.
[158]   App. 325-26, Loumiet Depo. 507:4-508:3; App. 1157-58, O'Brien Depo. 163:10-164:4.
[159]   App. 3267, Greenberg response to RFA 140.

27

Cort.[160]  O'Brien admitted in his deposition that IFSA was not "independent" because bankers and their agents served on its board,[161] and agreed that this created a conflict of interest which he claims he raised with both Stanford and Loumiet.[162]  Yet Greenberg never advised Stanford to disclose this conflict of interest to SIBL investors.[163]  O'Brien served as a member of the IFSA board (officially a position in the Antiguan government) while still being employed and paid by Greenberg,[164] and while Greenberg simultaneously represented the Antiguan government and Stanford.[165]  The other changes suggested by the Stanford/Greenberg-led Committee included—at Stanford's request[166]—deleting "fraud" and "false accounting" from the list of money laundering offenses,[167] and limiting the ability of the Antiguan government to cooperate with foreign (such as U.S.) investigations of offshore banks.[168]  Greenberg never advised Stanford to disclose any of that to investors either.

The United States government was not happy with Greenberg's revisions to Antigua's laws.[169]  In April 1999 the financial crimes section of the U.S. Treasury Department ("FINCEN") issued an advisory warning all U.S. banks that the reforms were "likely to erode supervision, stiffen

---

[160] App. 1157-58, O'Brien Depo. 163:10-164:4; App. 1075-76, Schnapp Depo. 158:17-159:5.

[161] App. 1138-39, O'Brien Depo. 99:23-100:10, App. 1156, 157:4-21.

[162] App. 1159-61, O'Brien Depo. 165:6-166:16, 169:16-23.  O'Brien sent Stanford an email in August 1998 about the conflict issue and suggested arguments to address it.  App. 3146, Px 919.

[163] Stanford's Chief Compliance Officer for SGC, Jane Bates, was equally unaware of Stanford's and Greenberg's involvement in the re-write of Antiguan laws, or of Stanford's and the Greenberg lawyers' service on the Committee and IFSA, and testified that she considered it a conflict of interest for Allen Stanford to be on the board of the government agency that regulated his own bank.  App. 1537-38, 1541, Bates Depo., 132:2-133:7, 151:15-19.

[164] App. 1140-42, O'Brien Depo. 112:15-114:18.

[165] App. 1146-51, O'Brien Depo. 136:15-141:6.

[166] App. 1153-55, 1168-71, O'Brien Depo. 153:16-155:9, 189:20-192:16.

[167] App. 2325-26, Px 344; App. 2384, Px 345, at GT03-22-2011ST-0011558; App. 1152-54, O'Brien Depo. 147:14-23, 153:16-154:20; App. 1070-73, Schnapp Depo. 137:14-139:9, 140:10-14.

[168]  App. 2325-26, Px 344 (HW_00059609) (Report of Antigua Task Force, stating with regard to international cooperation, "it is essential that the Government of Antigua and Barbuda not permit the wealth of its people and businesses to become the target of overly aggressive enforcement actions designed primarily to supplement the treasuries of foreign nations.")  The recommendations included allowing cooperation only when the investigated activity was illegal under Antiguan law, and only of the "most serious of crimes."  App. 2337, Px 345 (final report recommendations); App. 2687-2714, Px 451 (memorandum from Patrick O'Brien with final draft legislation dated August 16, 1998).

[169] App. 327-28, Loumiet Depo. 510:7-511:5.

bank secrecy, and decrease the possibility for effective international law enforcement",[170] noting that IFSA's "board of directors includes representatives of the very institutions [IFSA] is supposed to regulate, thus raising serious concerns that . . . the Authority is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards."[171]

After the issuance of the FINCEN advisory, Greenberg engaged in extensive lobbying efforts on behalf of Stanford and the Antiguan government, all of it funded by Stanford, to get the advisory lifted.  O'Brien traveled to Washington to meet with Treasury officials, after which O'Brien was accused by the U.S. government of engaging in lobbying without proper registration.[172]  Loumiet got several Greenberg lobbyists from its Washington DC office to assist in the lobbying effort, which involved cash donations from Stanford to Dennis Hastert and the NRCC.[173]  Eventually in 2000, the Antiguan government bowed to the pressure and scrapped all the law reforms Greenberg had drafted.  Allen Stanford, O'Brien and Cort resigned from the IFSA Board,[174] and the U.S. government lifted the FINCEN advisory.[175]

---

[170]  App. 2847-48, Px 549 (HW_00059876) (FinCEN Advisory, Enhanced Scrutiny for Transactions Involving Antigua and Barbuda, April 1999); App. 327-31, Loumiet Depo. 510:18-511:5, 518:1-520:13.  The Advisory stated in part that:

> In November 1998, the government of Antigua and Barbuda amended its Money Laundering (Prevention) Act in a manner that significantly weakened that Act….In November 1998, the Antiguan and Barbudan government also changed the supervision of its offshore financial services sector, by vesting authority over that sector in a new International Financial Sector Authority.  The Authority's board of directors includes representatives of the very institutions the Authority is supposed to regulate, thus raising serious concerns that those representative are in fact in control of the Authority, so that the Authority is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards.
> The amendment of the Money Laundering (Prevention) Act, combined with changes in [Antigua's] treatment of its offshore financial services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation regarding assets secreted in [Antigua]**.  These changes threaten to create a 'haven' whose existence will undermine international efforts of the United States and other nations to counter money laundering and other criminal activity**….

App. 2849-51, Px 550.
[171]  *Id.*
[172]  App. 332-36, Loumiet Depo. 522:1-526:1; App. 1162-64, 1181-82, O'Brien Depo. 171:25-173:1, 247:1-248:1; App. 2849-51, 3150-51, Px 550, Px 1000.
[173]  App. 336-49, Loumiet Depo. 526:15-539:6; App. 2852-61, 2872-83, Px 553, 577.
[174]  App. 1075-76, Schnapp Depo. 158:13-159:5.
[175]  App. 343-44, Loumiet Depo. 533:3-534:24.

Although Greenberg's attempt to rewrite Antiguan law to benefit Stanford was ultimately unsuccessful, Stanford remained firmly in control of Antiguan officials. O'Brien admitted that enforcement of the laws depended on the integrity of the people that examined the banks in Antigua, and that he didn't have much confidence in the integrity of Antiguan government officials, including Prime Minister Bird – who he admitted was influenced by Allen Stanford.[176] He also testified that he didn't believe SIBL was *ever* subjected to an examination by IFSA or any of its bank examiners.[177]

At the same time that Greenberg helped Stanford re-write Antiguan banking laws and install himself on the IFSA board, Stanford also closed the $31 million loan to the Antiguan government for the hospital so that Prime Minister Bird could fulfill a campaign promise.[178] Greenberg's Burt Bruton, who prepared the hospital loan documents and construction agreement for Stanford, testified that no lawyer represented the Antiguan government in the $31 million loan transaction, which he admitted was unusual, and that "the interface with the Antiguan government was all done by Dr. Cort", Stanford's Antiguan lawyer.[179] Bruton testified that Cort told him that it would violate Antiguan law if BoA were the sole lender in the transaction, because BoA did not have sufficient capital to make a $31 million loan, but that he was never aware of any other lender being involved in the transaction.[180] Suarez also testified that she was not aware of any other banks participating in the loan.[181] Greenberg drafted the loan documents to reflect that the loan would be made by a consortium of banks when Greenberg knew that there was no consortium, and that

---

[176] App. 1176-80, 1183-84, O'Brien Depo. 224:17-24, 225:18-228:13,255:25-256:13 (**admitting that Stanford was "pulling the strings" in Antigua, including with Prime Minister Bird**).
[177] App. 1174-75, O'Brien Depo. 197:7-19, 198:16-19.
[178] App. 1091-1114, Schnapp Ex. 6; App. 3301, Greenberg response to RFA 249; App. 3014-96, Px 810. Stanford's Chief Compliance Officer for SGC Jane Bates testified that she was unaware of this loan transaction. App. 1539-40, Bates Depo. 134:25-135:12.
[179] App. 905-07, Bruton Depo. 19:10-21:4.
[180] App. 907-09, 911, Bruton Depo. 21:17-23:5; 41:6-15; App. 2223, Px 277; App. 1975, Px 177 ("What is concerning U.S. authorities is since the $40 million in loans made by Stanford's Bank of Antigua was greater than its deposits, and therefore unlawful, where in fact, did the money loaned come from?").
[181] App. 621-22, Suarez Depo. 171:24-172:21.

4833-4020-2146.1/D0624/B08864/082119

BoA did not have enough money to fund the loan.[182]  Greenberg knew that SIBL actually funded the $31 million loan to the Antiguan government,[183] despite its representations to SIBL investors that it did not make loans.

**J.   Greenberg learns Stanford is using SIBL investor money to fund speculative undisclosed investments contrary to SIBL's marketing materials, and that Stanford is dependent on a constant influx of new investor money.**

In 1999 O'Brien warned Loumiet that there were "*warning signs*" that Stanford "*could be facing some serious financial problems*", was having a "*severe cash flow problem*", was anxious for influxes of new money at the bank and was upset that it took two days for FedEx to transport checks to Antigua from the U.S.[184]

O'Brien knew that Allen Stanford was using SIBL depositor money to make illiquid and "unwise" "risky" investments in Antigua, including the sham loans to the Antiguan government.[185] He emailed Lloyd Harrell (another Stanford agent who served on the Committee in Antigua) that Stanford "*would be in big s___ once the economy went south and he was hit with withdrawals*" since he had been using depositors' funds for his investments.[186]  O'Brien warned Allen Stanford that the Antiguan government would never repay the loans Stanford made using the SIBL depositors' money.[187]  Nevertheless, Greenberg assisted Stanford in preparing Reg D disclosures and copyrighting its SIBL marketing materials that failed to disclose these "unwise" and illiquid investments and sham loans to Antigua.

---

[182]  App. 912-13, Bruton Depo. 86:8-87:3; App. 1974-75, 2223, Px 177, 277.

[183]  App. 374-75, Loumiet Depo. 589:5-590:6 (admitting that the only commercial loan he was aware SIBL made was the loan to the Antiguan Government); App.1128-29, O'Brien Depo. 79:16-80:13; App. 2869, Px 574 (O'Brien's August 1999 e-mail to Loumiet from Antigua, reporting that the hospital loan was growing to $40 million and no other bank would participate in it).

[184]  App. 2869-71, Px 574; App. 2927-29, Px 767; App. 1185-88, O'Brien Depo. 257:15-260:20; App. 352-57, Loumiet Depo. 551:19-556:16. Despite these and other disturbing issues about Stanford's operations in Antigua included in O'Brien's e-mail to Loumiet, he didn't do anything to advise Greenberg's other client – the Antiguan government - about any of them, revealing that his sole allegiance was to Stanford.  App. 187-88, O'Brien Depo. 259:3-260:20.

[185]  App.1128-29, 1191-95, O'Brien Depo.  79:16-80:13, 269:23-270:20, 271:7-21, 274:13-275:7.  Loumiet also admitted he knew that SIBL had loaned the Antiguan government millions of dollars.  App. 374-75, Loumiet Depo. 589:5-590:6.

[186]  App. 3183, Px 1029; App. 1196-99, O'Brien Dep. 276:10-279:14; App. 3306, Greenberg response to RFA 265.

[187]  App. 1129, 1200, O'Brien Depo. 80:2-13, 316:4-18.

31

**K.      Greenberg assists Stanford in forestalling the SEC.**

In June 1998, Suarez requested Greenberg's assistance with an inquiry from the SEC

pertaining to potential securities law violations arising from SGC's "referrals" of CD investors to

SIBL.[188]  Instead of advising Stanford to remedy its violations of the securities laws and make

proper disclosures to investors, Loumiet advised Wayne Secore, Stanford's Texas-based securities

lawyer who handled the 1998 SEC inquiry, to tell the SEC that 98% of SIBL's customers were

foreign citizens,[189] and to argue that the SIBL CDs were *not* securities, even though Loumiet

always believed that the CDs were securities.[190]

A Greenberg lawyer sent Wayne Secore copies of certain SIBL training materials,

including a "Standard Operating Procedure" regarding insurance on the CDs, as well as an internal

memo regarding "Seguridad," SIBL safety and insurance.[191] Among other things, these training

materials clearly stated that the SIBL CDs were safe and secure because of private insurance

policies SIBL had procured, without informing investors that there was absolutely no insurance

for their deposits if SIBL failed.[192]  Yet, and despite Loumiet's assurances that Stanford wanted to

"cooperate" with the SEC and would put its IOs "at the SEC's disposal",[193] Loumiet did not advise

Stanford to "come clean" with the SEC about its marketing practices, including the existence of a

whistleblower, but instead told Stanford to take false and misleading positions with the SEC.

**L.      Greenberg learns Stanford falsely markets insurance on the SIBL CDs and that Allen
          Stanford "loaned" himself $15 million from SIBL to pay his personal taxes.**

In June 1998, a week after Suarez forwarded the SEC inquiry letter to Loumiet, Greenberg

received a demand letter from former GIIS investment officer Irma O'Bourke ("O'Bourke").[194]  In

---

[188]  App. 414-15, Loumiet Depo. 621:10-622:19; App. 2483-87, Px 389.
[189]  App. 415a, 416-17, 417a, Loumiet Depo. 625:2-628:14; App. 2505-06, Px 396.
[190]  App. 417-417a, Loumiet Depo. 627:18, 628:14; App. 3268, 3304, Greenberg response to RFA 141, 260.
[191]  App. 2647-80, Px 435; App. 3315-24, 435A (certified English translation of a portion of Px 435); App. 987-1008, Demberg Depo. 81:24-102:19; App. 424-34, Loumiet Depo. 635:2-645:12.
[192]  App. 2653-69, Px 435; App. 3315,3322, 435A (certified English translation); App. 641-49, Suarez Depo. 233:17-241:9; App. 425-30, Loumiet Depo. 636:4-641:22.
[193]   App.  416-417, Loumiet Depo, 626:23-627:17
[194]  App. 2488-89, Px 390; App. 961-63, Demberg Depo. 24:5-6:14; App. 419-20, Loumiet Depo. 630:22-631:12.

the demand letter, O'Bourke alleged that Allen Stanford took an undisclosed $15 million personal loan from SIBL, and that she had been trained to market the SIBL CDs as insured by private insurance.[195]

Greenberg's subsequent investigation confirmed that Stanford had in fact taken a $15 million loan from SIBL to pay his personal taxes.[196]  And the SIBL training materials provided to Greenberg reflect that the Stanford IOs like O'Bourke *were* trained to market SIBL's insurance policies as providing security to the CD investors. [197]  The materials even tout SIBL's private insurance policies as being <u>better</u> than FDIC insurance.  Nowhere do they disclose that these policies provide absolutely no deposit insurance for investors.[198]  As a result of Greenberg's investigation, it had actual knowledge that Stanford was violating the securities laws by marketing its CDs through material omissions and misrepresentations, but instead of counseling correction and proper disclosure, Greenberg continued to support Stanford's practices and help Stanford expand his CD sales by e.g., assisting Stanford to open the SFIS office in Miami and providing sham advice regarding the ICA.

Instead of questioning Stanford about its fraudulent insurance marketing scheme for the CDs, Greenberg followed Suarez's instructions to make Ms. O'Bourke "*very, very unhappy*", to prosecute her "*zealously*," with "*severe pain inflicted on her*" with "*no expense spared*" and "*no

---

[195]  App. 2488-89, Px 390; App. 961-63, Demberg Depo. 24:5-26:14; App. 1450-52, Rosengarten Depo. 12:17-14:22; App. 420-23, Loumiet Depo. 631:13-634:11.  As part of its investigation of O'Bourke's claims, Greenberg learned that O'Bourke had been an employee of GIIS since 1993 offering the SIBL CDs from GIIS' Miami office without a securities license.  App. 1453-62, Rosengarten Depo. 19:10-28:24; App. 190-95, Loumiet Depo. 300:2-305:20; App. 964-72, Demberg Depo. 32:8-40:23; App. 1940-43, Px 102; App. 2522-23, Px 416.

[196]  App. 1463-66, Rosengarten Depo. 30:8-31:13, 33:10-24; App. 975-77, 982-83, Demberg Depo. 54:11-56:6, 71:2-72:5; App. 2523-24, Px 416.

[197]  App. 983-84, 991, Demberg Depo. 72:19-73:20, 85:5-21; App. 2525, Px 416 at p. 6 [GT03-22-2011ST-0000372] (Tonarelli produced the training materials to Demberg when she inquired about O'Bourke's allegations concerning insurance on the CDs); App. 2653-68, Px 435; App. 3315, 3322 (English translation, Px 435A); App. 1467-75, 1501-04, Rosengarten Depo. 41:9-49:6, 114:9-117:2; App. 425-30, Loumiet Depo. 636:4-641:22; App. 641-49, Suarez Depo. 233:17-241:9.

[198]  App. 1471-75, 1483, 1504-05, Rosengarten Depo. 45:23-49:6, 57:3-16, 122:3-123:14; App. 2653-68, Px 435 and 435A. Suarez and Rosengarten both admitted that the training materials that Greenberg reviewed did not instruct the IOs to disclose to the potential CD investors that SIBL's insurance policies did *not* protect their investments.  App. 647-49, Suarez Depo. 239:23-241:9; App. 1501-02, 1505, Rosengarten Depo. 114:9-115:10, 123:16-24.

*stone left unturned*,"[199] and drafted a lawsuit against O'Bourke, which recited how "numerous" SIBL investors had complained upon learning that, in fact, the CDs were not insured.[200]  But Greenberg cautioned Stanford against doing something that might reveal its fraud, warning Suarez that actually filing a lawsuit would open Stanford to discovery about the relationship between SGC and SIBL.[201] Greenberg instead sent O'Bourke a letter threatening to sue her.[202]

## M.    Greenberg "greenlights" Stanford's violation of the Investment Company Act (ICA).

In conjunction with the Reg D offering of SIBL CDs to U.S. investors, Suarez asked Greenberg and a Houston lawyer, Deon Warner whether SIBL would have to register as an investment company under the ICA.[203]  Suarez was unfamiliar with the ICA,[204] and did not know whether SIBL was subject to the ICA, which is why she asked for the opinions.[205]  If Stanford had registered under the ICA, it would have subjected SIBL to SEC examination and audit of its portfolio holdings and how it invested its money.[206]  The true composition of SIBL's portfolio and how investor money was actually being used – which struck at the heart of the fraud – would have been disclosed.  If Stanford had registered under the ICA, his scheme would have never succeeded given all of the rigorous requirements – including independent third party custody of SIBL's assets and SEC examination of those assets - ICA registration would have entailed.[207]

---

[199]  App. 985-86, Demberg Depo. 75:1-76:21; App. 2513, Px 412.  Suarez did not deny that she made those statements to Demberg.  App. 650, Suarez Depo. 251:1-21.

[200]  App. 2763-72, Px 467; App. 2919-26, Px 762; App. 1017-27, Demberg Depo. 112:22-122:18; App. 1484-85, Rosengarten Depo. 58:4-59:25. Rosengarten pointed out that under Florida law Stanford could sue O'Bourke for merely telling the truth.  App.1485, Rosengarten Depo. 59:12-25; App. 2768-69, Px 467; App. 1490-93, Rosengarten Depo. 68:21-71:25; App. 1489-91,  Rosengarten Depo. 63:23-64:17, 69:11-15.

[201]  App. 1494-96, Rosengarten Depo. 75:9-77:9; App. 2813, Px 471.

[202]  App. 1507-10, Rosengarten Ex. 1, [GT03-2011ST-0000271-274]; App. 1497-98, Rosengarten Depo. 85:17-86:19.

[203]  App. 651-52, 658, 668-70, 677, Suarez Depo. 253:12-254:20, 263:21-22, 277:1-3, 280:25-281:8, 338:2-2-9. Suarez testified she asked for opinions from both firms at the same time.  App. 656, Suarez Depo. 260:1-10.

[204]  App. 676, Suarez Depo. 322:7-17.

[205]  App. 653, Suarez Depo. 255:5-9.

[206]  App. 806-12, Lemke Decl. 27-33; App. 1273, Warner Depo. 171.

[207]  *Id.*  As an example, Greenberg's own expert witness on the ICA testified that it would have been difficult for Stanford to have looted SIBL if Stanford had registered with the ICA.  App. 683, Depo. of Mark Perlow, at 130:1-8.

After analyzing Antiguan banking law and SIBL's balance sheets,[208] Warner advised Suarez that SIBL might be required to register under the ICA because it likely did not qualify for the foreign "commercial bank" exemption to registration because it did not make loans.[209] Warner recommended that SIBL request a no-action letter from the SEC or limit the number of purchasers of SIBL CDs to less than 100.[210] Despite knowing that Stanford did not want to register under the ICA,[211] Warner refused to advise Stanford that it did not have to register.[212] Warner told Suarez he did not think SIBL would qualify for the "foreign bank" exemption to the ICA and recommended that Stanford seek another opinion from counsel specializing in the ICA.[213]

Greenberg had no such qualms when Suarez asked Greenberg to "*confirm . . . in writing that the private placement of certificates of deposits to qualified purchasers by [Stanford] does **not** require registration under the ICA*"[214] Greenberg once more told Stanford what it wanted to hear. Even though Loumiet admitted that Greenberg was not qualified to render such an opinion,[215] Bonnie Moncada (a second year associate who had no experience with the ICA)[216] prepared a memo edited by Loumiet that confirmed in writing that "the private placement of certificates of deposit to an unlimited number of qualified purchasers by Stanford does *not* require registration under the ICA."[217] Greenberg gave this advice even though Loumiet knew that the

---

[208] App. 1251-55, 1267, 1271, Warner Depo. 32:25-34:25, 37:16-22, 38:18-39:2, 148:11-16, 162:2-20. Warner admitted that a SIBL balance sheet provided to him by Suarez in 1998 as part of his ICA analysis contained no reference to any commercial loans extended by SIBL. *Id.* App. 1271.

[209] App. 2815-17, Px 493; App. 1269-70, Warner Depo. 160:22-161:3.

[210] App. 2817, Px 493; App. 1261-63, Warner Depo. 95:22-97:20.

[211] App. 1259-60, 1262-63, Warner Depo. 69:18-70:2, 96:21-97:20.

[212] App. 1534, Bates Depo. 121:22. Warner's advice on the ICA was consistent with later advice provided by K&L Gates that Stanford needed to limit the number of CD sales to less than 100 purchasers to comply with the ICA. App. 1531-34, Bates Depo. 89:13-23, 98:17-99:21, 121:15-22.

[213] App. 1253, 1263-64, 1265-66, 1268, Warner Depo. 34:14-34:25, 97:25-98:8,143:16-144:5, 149:9-20.

[214] App. 2834, Px 505; App. 1248, Moncada Depo. 191:6-16.

[215] App. 136, Loumiet Depo. 123:12-21 (admitting that if Suarez wanted a "real" '40 Act opinion, Greenberg was "not the law firm for it").

[216] App. 1239, Moncada Depo. 126:10-19. Moncada testified that no Greenberg securities lawyers assisted on the ICA memo. App. 1238-39, *Id.*, 28:15-29:6; 125:21-126:19.

[217] App. 2834-37, Px 505; App. 657, Suarez Depo. 262:4-8. The Greenberg second year associate that did most of the work on the ICA Memo, Moncada, testified that she didn't do anything to determine whether SIBL would qualify for any of the exemptions cited in the Greenberg ICA Memo, that Loumiet was her sole source for information about SIBL, that Loumiet did not provide her much information about Stanford or its business, and that she didn't request

Reg D offering—the disclosure statement he and Moncada had been working on just a few months prior—would not be limited to "qualified purchasers," but would instead be marketed to "accredited" U.S. investors (a group to which the exemption did not apply).[218]

Greenberg's opinion that Stanford was exempt from registration under the ICA was also based on another exemption requiring a foreign bank to be engaged in commercial banking, but Greenberg knew that SIBL was not a commercial bank.[219]   Loumiet conceded that he did not believe that Stanford would qualify for the foreign bank exemption, but he included it in the memo anyway in case Stanford might qualify for it in the future.[220]   Suarez testified that Loumiet had copies of SIBL's financial statements (which showed SIBL did not make loans)[221] and that SIBL's own marketing and training materials (which Greenberg had) made clear that SIBL did not make commercial loans.[222]

Greenberg also told Stanford it could avoid registration under the ICA under the "not primarily engaged in securities" exemption.[223]   Moncada testified that Loumiet told her that SIBL was <u>not</u> engaged in the business of investing in securities (despite all of the evidence to the contrary, including the Reg D disclosure statement that Loumiet edited).[224]   Suarez admitted that SIBL's marketing and training materials (of which Greenberg was aware) represented that SIBL invested its portfolio in securities.[225] Greenberg's own securities law expert testified that he could

---

any such information from Stanford.  App. 1203-05, 1229, 1242-44, Moncada Depo. 23:19-24:5, 37:7-15, 104:9-17, 146:2-147:19, 156:11-14.

[218]  App.133, Loumiet Depo. 114:4-16.  Warner did not mention the "qualified purchaser" exemption in his Memo because he knew, from reviewing the same Reg disclosure document that Greenberg worked on, that Stanford was going to be selling the CDs to "accredited investors" in the U.S.  App. 1257-58, Warner Depo. 61:20-62:11.  Even Greenberg's own securities law expert has testified that reliance on the "qualified purchaser" exemption was "weak" because Stanford would not qualify for that exemption."  App. 3370, Halpert Depo. p. 54:7-15.

[219]  App. 2834-35, Px 505; App. 657-58, Suarez Depo. 262:9-263:22; App. 374-75, Loumiet Depo. 589:5-590:14; App. 1748-49, Px 21 (March 1988 letter from Sidney Adler to Loumiet describing GIBL as an "investment bank (which made no loans)".

[220]  App. 136-37, Loumiet Depo. 123:22-124:6.

[221]  App. 661-62, Suarez Depo. 266:15-267:2.

[222]  App. 632, 644-46, Suarez Depo. 207:6-23, 236:18-238:9.

[223]  App. 2836, Px 505 (advising **"[s]ince we understand Stanford is not primarily engaged in the business of investing…in securities, it should <u>*also*</u> be exempt from registration**" under the ICA based on this exemption).

[224]  App. 1245-47, Moncada Depo. 186:17-188:1.

[225]  App. 662-67, Suarez Depo. 270:3-275:13.

36

not understand how Greenberg concluded that such an exemption was available to Stanford, or why that exemption was even included in the Greenberg memo.[226]

Despite knowing that Stanford did not qualify for any ICA exemptions, Greenberg "confirm[ed] in writing" that Stanford need not register under the ICA.  Stanford thereafter used Greenberg's opinion as the basis to never register under the ICA.[227]  When SGC compliance officer Bates asked Stanford General Counsel Mauricio Alvarado why SIBL did not need to register under the ICA,  Alvarado told Bates that Stanford had a legal opinion from an outside law firm that supported Stanford's position.[228]  Later, in a meeting with Stanford CFO Jim Davis, when Bates asked Davis for the memo, Davis called Loumiet (confirming that it was Greenberg's memo.)[229] And in 2009, when Tom Sjoblom of Proskauer Rose asked Alvarado for the ICA opinion Stanford was relying on to help him "shut down" the SEC's investigation of  Stanford's violation of the ICA, Alvarado sent him the Greenberg ICA memo.[230]

## N.    The SEC obtains $5.9 billion judgment against SIBL and SGC for, inter alia, failure to register under the ICA.

It was Stanford's violation of the ICA, as well as other securities law violations, that was the basis for the Court's judgment against SIBL and SGC, jointly and severally, for $5.9 billion plus $861,189,969.06 in prejudgment interest.  *See* N.D. Tex. Case No. 3:09-cv-00298-N [Doc. 1858] (the "SEC Judgment").[231]

---

[226]  App. 3371-72, Halpert Depo. 96:1-97:2.
[227]  App.  658, 668, 669-70, 677, Suarez Depo. 263:21-22, 277:1-3, 280:25-281:8, 338:2-9 (Stanford management made the decision that it was not necessary to register under the ICA based on the legal opinions).
[228]  App. 1518-22, Bates Depo. 18:21-20:6, 21:10-22:15.
[229]  App. 1525-26, Bates Depo. 34:21-35:20.
[230]  App. 2913, 2914-18, Px 744 and 745.
[231]  App. 2896-2912, Px 723.

### III.   ARGUMENT AND AUTHORITIES

**A.    The Receiver's Causes of Action**

The above evidence abundantly demonstrates that Greenberg knowingly participated in Allen Stanford and Yolanda Suarez's breaches of fiduciary duty and committed malpractice. Since the beginning of Greenberg's relationship with Stanford, Greenberg knew that Stanford and Suarez were engaged in a constant pattern of conduct to push and expand the sale of unregistered SIBL CDs from the U.S.  Greenberg knew that in doing so Stanford and Suarez were causing the Stanford entities to violate securities laws governing (1) the registration of the CDs as securities, (2) the registration of GIIS and SFIS sales staff as brokers and investment advisers; (3) the registration of SIBL as an investment company under the ICA; (4) fraud in the offer and sale of securities, as well  as causing the entities to violate U.S. banking laws prohibiting the operation of unlicensed foreign bank representative offices in the U.S., and violating the FCPA to ensure Stanford's corrupt control over Antigua.

At every turn, Greenberg said "yes" to what Stanford wanted to do.   Rather than provide proper advice that Stanford should cease selling the CDs until it ensured compliance with securities and banking laws, Greenberg provided memoranda to Stanford, always heavily edited by Loumiet, providing legal "cover" to Stanford and advising Stanford that he could do what he wanted to do to expand CDs sales.  And instead of providing proper advice to Stanford regarding compliance with the FCPA, Greenberg assisted Stanford to, *inter alia*, over-leverage Antigua with loans and create a new bank regulatory structure  so Stanford could effectively continue to self-regulate his own bank.

Greenberg's actions constitute participation in Stanford and Suarez's breaches of fiduciary duty and malpractice and created the infrastructure that enabled Stanford to exponentially expand his CD sales from 1998 forward.

**B.    Greenberg knowingly participated in Allen Stanford and Yolanda Suarez's breaches of fiduciary duty.[232]**

Under Texas law, a claim for participation in breach of fiduciary duty has only three elements: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship. *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007). Importantly, these are ***not*** the same elements as a claim for common law aiding and abetting. *Floyd v. Hefner*, 556 F.Supp.2d 617 at n. 35 (S.D. Tex. 2008).

To prevail on its claim that Greenberg participated in a breach of fiduciary duty, the Receiver is *not* required to prove that Greenberg was aware of the Ponzi scheme, but only that Greenberg was aware that Allen Stanford and Yolanda Suarez were breaching duties they owed to SIBL and SGC as officers and directors by causing SIBL and SGC to sell the SIBL CDs through fraud and in violation of securities and banking laws and the FCPA.[233] *Milligan v. Salamone*, No. 1:18-CV-327-RP, 2019 WL 1208999 *7 (W.D. Tex. 2019) (denying Greenberg's motion to dismiss knowing participation claim because plaintiff plausibly alleged Greenberg's knowledge of officer's and director's violation of fiduciary duties); *Darocy v. Abildtrup*, 345 S.W.3d 129, 137-138 (Tex. App.—Dallas 2011, no pet.) (affirming trial court judgment against participant in managing partner's breach of fiduciary duty based on his overall "role and involvement" and "knowledge of problems"); *Nelson v. Vernco Constr. Inc.*, 566 S.W.3d 716, 760-761 (Tex. App.—El Paso 2018) (affirming judgment against participant in breach of fiduciary duty.)  A jury can infer actual knowledge from circumstantial evidence. *United States v. Kuhrt*, 788 F.3d 403, 416

---

[232]  Contrary to Greenberg's oft-repeated argument, Texas recognizes a claim for participation in breach of fiduciary duty. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942) ("It is settled law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor with the fiduciary and is liable as such.").  The Receiver adopts and incorporates herein his prior briefing on this issue.  ECF Nos. 297, 316.

[233]  Dec. 17, 2014 Order, ECF Doc. No. 114 at 8 (rejecting former defendant Hunton & Williams' identical argument).

(5th Cir. 2016); *CBIF Ltd. P'ship v. TGI Friday's Inc.*, No. 05-15-00157-CV, 2017 WL 1455407, *42-64 (Tex. App.—Dallas Apr. 21, 2017, pet. denied).

The above-cited evidence is certainly sufficient for a rational juror to conclude that Greenberg (1) knew of the breaches of fiduciary duty and (2) participated in them.   Although Greenberg professes innocence and attempts to present itself as an unsuspecting dupe of crooked clients, a rational juror could disbelieve Greenberg.   Regardless of whether Greenberg knew that Allen Stanford and Jim Davis falsified SIBL's financials (and a reasonable factfinder could infer that it must have known), Greenberg knew that its client's directors and officers were breaching their fiduciary duties by violating various laws.   That is all that the Receiver is required to show.

The majority of the cases cited by Greenberg in support of its argument on the knowledge prong of the Receiver's participation in breach of fiduciary duty claim are inapposite because they are based on statutory or common law aiding and abetting law from other states—***not*** Texas law on participation in breach of fiduciary duty.[234]   Furthermore, the few Texas cases cited by Greenberg are all distinguishable on their facts.[235]

### 1.   Greenberg knew that Stanford and Suarez were breaching their fiduciary duties.

Specifically Greenberg knew, among other things:

---

[234] See e.g., *Isaiah v. JP Morgan Chase Bank NA*, 2017 WL 5514370 (S.D. Fla. 2017) (applying Florida aiding and abetting law); *In re Palm Beach Fin. Partners L.P.*, 488 B.R. 758 (S.D. Fla. Bankr. 2013) (applying Florida aiding and abetting law); *Lamm v. State Street Bank & Trust*, 749 F.3d 938 (11th Cir. 2014) (applying Florida aiding and abetting law); *Litson-Gruener v. JP Morgan Chase & Co.*, 2009 WL 4884426 (N.D. Tex. Dec. 16, 2009) (applying California aiding and abetting law); *Ryan v. Hunton & Williams*, 2000 WL 1375265 (E.D.N.Y. 2000) (applying New York aiding and abetting law); *In re Sharp Intern. Corp.*, 281 B.R. 506 (Bankr. E.D.N.Y. 2002) (applying New York aiding and abetting law); *Amacker v. Renaissance Asset Mgmt.*, 657 F.3d 252 (5th Cir. 2011) (applying statutory aiding and abetting under the Commodity Exchange Act).

[235] *Joe N. Pratt Ins. v. Doane*, 2009 WL 4506586 (S.D. Tex. 2009) (court denied motion for reconsideration based on knowing participation claim raised for the first time *after* grant of summary judgment); *Stevenson v. Rochdale Investment Mgmt., Inc.*, 2000 WL 1278479 (N.D. Tex. Sept. 7, 2000) (finding the record "devoid of any evidence" to support a participation in breach of fiduciary duty claim and castigating the plaintiffs' counsel for misrepresenting the record); *Krakauer v. Wells Fargo*, 2016 WL 5845924 (Tex. App.—Fort Worth 2016, no pet.) (affirming summary judgment because plaintiffs failed to challenge grant of no evidence summary judgment on their participation in breach of fiduciary duty claim); *BWD Inv. v. Stevens*, 2011 WL 664759 (Tex. App.—Eastland 2011, no pet.) (affirming no evidence summary judgment).

- Allen Stanford and Yolanda Suarez were breaching their fiduciary duties by causing the Stanford entities to sell unregistered securities (the SIBL CDs) in violation of the Investment Company Act, § 10(b) of the Exchange Act, Rule 10b-5, the Securities Act of 1933,the Securities Exchange Act of 1934, and the Investment Advisors Act.

  - GIIS' "investment officers" were marketing and offering the CDs from 1988 to 1996 without being licensed as securities brokers or investment advisers.[236]

  - The GIBL/SIBL CDs were securities that were never registered.[237]

  - SFIS' sales of CDs from the Miami office were unregistered securities offerings without an exemption and therefore violated U.S. securities laws.[238]

  - Stanford always operated as an unregistered investment company[239] and didn't qualify for any of the exemptions Greenberg recited in its November 1998 ICA memo because (1) SIBL did not limit CD sales to qualified purchasers;[240] (2) SIBL was not a commercial bank;[241] and (3) SIBL was primarily engaged in the business of investing in securities.[242]

- Allen Stanford and Yolanda Suarez were breaching their fiduciary duties by causing the Stanford entities to utilize fraudulent marketing materials containing material misrepresentations and omissions that failed to disclose that Stanford (1) was violating securities and banking laws, (2) was not regulated in Antigua because Stanford controlled the Antiguan government through bribes and loans to the government and Antiguan

---

[236] App. 168-78, 191-95, Loumiet Depo. 265:18-281:2, 301:6-305:20; App. 1830, Px 58, at GT-22-2011ST-0010611.
[237] App. 128, Loumiet Depo. 76:9-24; App. 1206-17, Moncada Depo. 49:12-53:21, 57:6-63:4; App. 2535-2541, Px 425.
[238] App. 450-51, Loumiet Depo. 669:21-670:15 (admitting that he neglected to consider the SFIS CD offerings under the securities laws). Greenberg's securities law expert testified that the type of marketing and sales activity that was sanctioned by Greenberg for the SFIS Miami office would have blown the Regulation S exemption to registering the CDs as securities. App. 3373-74, Halpert Depo. 124:8-125:6.
[239] App. 374-75, Loumiet Depo. 589:5-590:14; App. 1749, Px 21 (March 1988 letter from Sidney Adler to Loumiet describing GIBL as an "investment bank (which made no loans)".
[240] App. 133, Loumiet Depo. 114:4-16. Even Greenberg's own securities expert has testified that reliance on "qualified purchaser" exemption was "weak" because Stanford would not qualify for that exemption." App. 3370, Halpert Depo. 54:7-15.
[241] App. 136-37, 374-75, 444-45, Loumiet Depo. 123:22-124:6, 589:5-590:14; 661:9-662:14; App. 1749, Px 21 (March 1988 letter from Sidney Adler to Loumiet describing GIBL as an "investment bank (which made no loans)."
[242] App. 1226-37, 1245-47, Moncada Depo. 101:5-103:21, 106:16-110:1, 111:21-113:25, 186:17-188:1; App. 662-67, Suarez Depo. 270:3-275:13; App. 444-45, Loumiet Depo. 661:9-662:14. Greenberg's own securities law expert testified that he couldn't understand how Greenberg could have concluded that such an exemption was available to Stanford, or why that exemption was even included in the Greenberg memo. App. 3371-72, Halpert Depo. 96:1-97:2.

41

government officials , (3) was violating the FCPA, and (4) using depositor funds in ways contrary to what was represented in the marketing materials, including to make "unwise," illiquid investments in Antiguan real estate and loans to the Antiguan government.

- Stanford didn't disclose to investors in its offering documents (1) the loans to the Antiguan government; (2) that it had been under constant U.S. government investigation since 1989; (3) that Allen Stanford had been in personal bankruptcy; (4) Stanford had made gifts and forgiven loans to Antiguan government officials;  (5) Stanford paid to have Greenberg reform Antiguan laws which resulted in Allen Stanford being appointed to the board of the Antiguan government agency that regulated SIBL; (6) SIBL was not regulated in the U.S. or in Antigua.[243]

- Inconsistent with what it told investors, Stanford was using SIBL depositor money to make illiquid and "unwise" "risky" investments in Antigua, including the loans to the Antiguan government.[244]

- Allen Stanford took a $15 million loan from SIBL to pay his personal taxes.[245]

- Stanford was defrauding investors by marketing the CDs as being insured by private insurance policies that were equal to or better than FDIC insurance.[246]

- Allen Stanford and Yolanda Suarez were breaching their fiduciary duties by bribing Antiguan government officials in violation of the Foreign Corrupt Practices Act and co-

---

[243] App. 636-39, Suarez Depo. 228:5-231:19; App. 440-44, Loumiet Depo. 657:17-661:8; App. 1221-25, Moncada Depo. 91:22-95:4; App. 2612, Px 426 (Loumiet handwritten comments to SIBL Reg D disclosure document striking out "management of SIB believes SIB is not currently subject to any U.S. securities or banking regulation or Antiguan banking regulation."); App. 2632, Px 427 (redlined draft incorporating Loumiet's revisions).  Greenberg had access to GIBL and SIBL marketing and offering materials over the years, and even copyrighted the main SIBL brochure for Stanford in 1998.  App. 361-73, Loumiet Depo. 574:23-586:12; App. 1954, Px 108; App. 1955, Px 109; App. 2838, 2862, 2868, 3152-77, Px 533, 572, 573, 1001; App. 627-28, Suarez Depo. 188:9-189:4.  Greenberg also received a copy of Stanford's training Standard Operating Procedure (SOP) for training the investment officers selling the CDs. App. 2647-68, Px 435 (Stanford SOP); App. 3315-23, 435A (certified English translation of a portion of SOP, Px 435); App. 987-1008, Demberg Depo. 81:24-102:19; App. 424-34, Loumiet Depo. 635:2-645:12; App. 641-49, Suarez Depo. 233:17-241:9.

[244] App. 1128-29, 1191-99, O'Brien Depo. 79:16-80:13, 269:23-270:20, 271:7-21, 274:13-275:7, 276:10-279:14; App. 3183, Px 1029.  Loumiet also admitted he knew that SIBL had loaned the Antiguan government millions of dollars.  App. 374-75, Loumiet Depo. 589:5-590:6.

[245] App. 1463-64, 1466, Rosengarten Depo. 30:8-31:13, 33:10-24; App. 975-77, 982-83, Demberg Depo. 54:11-56:6, 71:2-72:5; App. 2523-24, Px 416.

[246] App. 2653-68, Px 435 (including certified English translation,  App. 3315, 3322, Px 435A); App. 1511-14, Rosengarten Ex. 2 [GT 03-22-2011ST-0000331-334] (letter from Greenberg representing that it has reviewed the training materials). App. 1467-77, 1483, 1501-05, Rosengarten Depo. 41:9-51:3, 57:3-16, 114:9-117:2, 122:3-123:14; App. 425-30, Loumiet Depo. 636:4-641:22; App. 641-49, Suarez Depo. 233:17-241:9.  Suarez and Rosengarten both admitted that the training materials that Greenberg reviewed did not instruct the IOs to disclose to the potential CD investors that SIBL's insurance policies did *not* protect their investments.  App. 647-49, Suarez Depo. 239:23-241:9; App. 1501-02, 1505, Rosengarten Depo. 114:9-115:10, 123:16-24.

4833-4020-2146.1/D0624/B08864/082119

opting the Antiguan government, in violation of the FCPA, to evade and avoid regulation of their illegal securities sales activities without disclosing the utter lack of regulation to investors.

- Montserrat revoked GIBL's bank license because (1) GIBL's auditor was not an approved auditor; (2) GIBL was operating in a manner "detrimental to its depositors"; (3) GIBL failed to supply satisfactory details as to its liquidity; (4) one of GIBL's directors (Allen Stanford) was a former bankrupt; and (5) GIBL had failed to submit annual financial statements.[247]

- Stanford moved GIBL/SIBL to Antigua, which had a reputation as one of most corrupt island nations in the Caribbean.[248]

- Stanford purchased the insolvent BoA from, *inter alia*, certain Antiguan government officials who stood to benefit from the transaction.[249]

- Allen Stanford paid all of Antiguan Prime Minister's medical and travel expenses for his trip to Houston for medical care.[250]

- Stanford's banks loaned money to Antiguan government officials, including forgiving a loan to the Antiguan Finance Minister charged with overseeing GIBL/SIBL.[251]

- Stanford directly paid an American P.R. firm assisting Prime Minister Bird's reelection campaign.[252]

- Stanford compelled his employees in Antigua to campaign for Prime Minister Bird's reelection, and donated televisions, refrigerators and other appliances to be doled out to Antiguan voters to gain their votes.[253]

---

[247] App. 1047, Schnapp Depo. 70:9-16; App. 232-33, Loumiet Depo. 388:14-389:3; App. 1848-49, Px 66; App. 2941-43 Px 778.  In 1996, Loumiet and Schnapp received a copy of the Judgment which recited the reasons for Montserrat's revocation of GIBL's license, including that Allen Stanford was a former bankrupt.  App. 1044-47, Schnapp Depo. 67:19-70:16; App. 234-37, Loumiet Depo. 390:7-393:20.

[248] App. 307, 313-16, Loumiet Depo. 478:5-19, 484:9-487:16; App. 1130-31, O'Brien Depo. 81:20-82:4; App. 1035-38, 1067, Schnapp Depo. 48:13-51:19, 128:2-9.  Schnapp testified he wasn't concerned when he saw all the loans Stanford had made to Antiguan government officials.  App. 2017-21, Px 195.  The article also reported that Prime Minister Bird's family was involved in a plot to train mercenaries for the Medellin cartel, covert gun shipments, and drug trafficking. *Id.*

[249] App. 3263, 3293, 3294, Greenberg responses to RFA 127, 224, 226; App. 213-15, 222-25, Loumiet Depo. 340:3-342:8, 368:6-22, 372:1-374:2; App. 1809-10, Px 49.

[250] App. 1982-2001, Px 183; App. 589-90, 607; Suarez Dep. 80:24-81:24, 103:1-25.

[251] App.607, Suarez Depo. 103:1-22; App. 1048-53, 1055-59, Schnapp Depo. 74:5-79:24, 82:2-86:9; App. 1950, 1982, 2002-05, Px 107, 183, 184. Schnapp testified he wasn't concerned when he saw all the loans Stanford had made to Antiguan government officials.  App. 1054, Schnapp Depo. 81:19-23; App. 590-91, 600-01, 607, Suarez Depo. 81:25-82:17, 91:17-92:8, 103:1-17; App. 3264, Greenberg response to RFA 132.

[252] App. 3452, Px 365; App. 1062-63, Schnapp Depo. 102:8-103:14; App. 611-12, Suarez Depo. 125:3-126:11.

[253] App. 302-04, Loumiet Depo. 470:4-472:20; App. 2846, Px 542 (Antiguan newspaper article found in Greenberg's files).

- Stanford bribed Antiguan government officials.[254]

- SIBL and BoA loaned tens of millions of dollars to the Antiguan government for construction of a hospital, improvements at the Antiguan airport, and for general operations.[255]

- In reality, the $31 million loan to the Antiguan government for the hospital was funded with SIBL investor money (which was never disclosed to investors).[256]

- The Antiguan government appointed Allen Stanford to chair the hospital board and the airport authority.[257]

- Prime Minister Bird allowed Stanford and Greenberg to form a committee composed of Greenberg and other Stanford agents to rewrite Antigua's financial laws.[258]

- Prime Minister Bird allowed Stanford, O'Brien and Cort to sit on the board of the financial regulatory agency, IFSA, established to regulate offshore banks like SIBL.[259]

- IFSA was not independent, and Stanford's membership on IFSA's board created a conflict of interest;[260] Despite the reforms, SIBL was never examined by IFSA.[261]

- Allen Stanford and Yolanda Suarez were breaching their fiduciary duties by causing the Stanford entities to violate banking laws.

  - GIIS (and later SFIS) conducted CD sales and marketing and customer liaison activities in the U.S. from 1988 to 1996 (GIIS) and then 1998 to 2009 (SFIS) without a license, which violated U.S. banking laws.[262]

---

[254] App. 2892-95, Px 662 (news article located in Greenberg's files with handwritten annotation "accused of bribery charges").

[255] App. 267-71, Loumiet Depo. 426:16-430:24; App. 619-20, Suarez Depo. 165:7-166:2.

[256] App. 1128-29, O'Brien Depo. 79:16-80:13; App. 2869, Px 574 (O'Brien's August 1999 e-mail to Loumiet from Antigua, reporting that the hospital loan was growing to $40 million and no other bank would participate in it); App. 269-70, Loumiet Depo. 428:8-429:1, 589:5-590:6 (admitting that the only commercial loans he was aware SIBL made was the hospital loan to the Antiguan Government); App. 1964, Px 150.

[257] App. 616-17, Suarez Depo. 155:7-156:4; App. 272, 273, 286-87, 317-18, Loumiet Depo. 435:2-24, 438:3-10, 452:4-453:2, 488:14-489:16. Greenberg represented Stanford in establishing the airport authority and the airport development project. App. 295-301, *Id.* 463:9-469:17.

[258] App. 1134-35, O'Brien Depo. 87:2-11; App. 1064-66, Schnapp Depo. 122:10-123:3, 127:8-20; App. 2317-26, Px 344 (HW_00059609) (memorandum dated September 15, 1997 to Allen Stanford et al. regarding the Antigua Task Force to Prevent Money-Laundering through International Banks); App. 613, Suarez Depo. 137:18-25; App. 3267, Greenberg response to RFA 139.

[259] App. 325-26, Loumiet Depo. 507:4-508:3; App. 1157-58, O'Brien Depo. 163:10-164:4; App. 1075-76, Schnapp Depo. 158:17-159:5; App. 3267, Greenberg response to RFA 140.

[260] App. 1138-39, 1156, 1159-61, O'Brien Depo. 99:23-100:10, 157:4-21, 165:6-166:16, 169:16-23.

[261] App. 1174-75, O'Brien Depo. 197:7-19, 198:16-19.

[262] App. 191-95, Loumiet Depo. 301:6-305:20. **Greenberg's own banking law expert testified that Greenberg was aware that Stanford was violating U.S. banking law by having GIIS conduct foreign bank "representational"**

44

- The U.S. OCC had accused GIIS of operating unlicensed foreign bank representative offices from the U.S. in violation of U.S. banking laws,[263] yet Stanford continued to operate them anyway.[264]

This evidence is more than sufficient to allow a jury to infer that Greenberg knew that Allen Stanford and Suarez, as directors and officers of SIBL and SGC, were breaching their fiduciary duties by directing and causing the entities to violate laws (securities and banking laws and the FCPA) and engage in illicit and fraudulent conduct.  At a minimum, it raises genuine issues of material fact, precluding summary judgment.

### 2.    Greenberg substantially participated in Allen Stanford's and Yolanda Suarez's breaches of fiduciary duty.

Even if Greenberg's position were correct (which it is not since this is not a common law aiding and abetting claim) that the Receiver must prove that Greenberg's participation in Stanford's breaches was substantial, the record is replete with evidence of Greenberg's substantial participation.  Greenberg participated in the breaches of fiduciary duty by (1) assisting Allen Stanford and Yolanda Suarez to establish and implement the U.S.-based sales and marketing vehicles (GIIS, SGC, STC, and SFIS) that Allen Stanford and Yolanda Suarez utilized to market and sell SIBL's unregistered and fraudulent securities in violation of the U.S. securities laws; (2) issuing a sham ICA opinion advising that Stanford did not need to register under said Act based upon exceptions Greenberg knew did not apply to Stanford, and advising Stanford that it was legal for Stanford to market SIBL CDs in the U.S. through GIIS and SFIS without regard to compliance with U.S. securities laws; (3) materially assisting Stanford to commit securities fraud through its work on and approval of the Reg D Disclosure statement and other marketing materials that included material misrepresentations and omissions; (4) advising Stanford it was proper to make

---

**activities in Miami without a license.**  App. 954-58, Stutts Depo at 63:21-67:16 ("*from the reflection in [the Skolnik Memo] it's certainly been represented to Greenberg that the company was engaged in these representational functions*").
[263] App. 146-47, Loumiet Depo. 239:1-240:22; App. 1732, 1873, Px 16; Px 66.
[264] App. 142-45, 148-50, 164-67, Loumiet Depo. 232:1-233:20, 237:2-238:12, 242:1-244:25, 259:1-260:1, 262:8-263:15; App. 1762-65, 1773-77, 3011-13, Px  29, 34, 805.

political contributions to Antiguan political parties and officials and looking the other way while Stanford bribed and in effect took over the Antiguan government; and (5) helping Stanford to silence its critics.

Two instances are illustrative. *First*, Greenberg advised Stanford that SIBL did not need to register under the ICA based upon exceptions Greenberg knew were inapplicable to Stanford.[265] The Receiver's ICA expert Tom Lemke testified that had SIBL registered under the ICA, Stanford could not have continued carried out his fraud scheme, and that the entirety of the $5.9 billion SEC judgment is attributable to Stanford's violation of the ICA.[266]  Plaintiff's damages expert Karyl Van Tassel has calculated $4.9 billion of increased liability damages resulting from Stanford's violation of the ICA alone.[267]

*Second*, Greenberg advised Stanford that it could promote and offer SIBL CDs through the Miami SFIS office without registering the sales staff as broker dealers or investment advisors, without registering the CDs as securities, and without registering the SFIS office as a representative office of a foreign bank (SIBL) with the Federal Reserve.[268]  Such advice exposed the Stanford entities to securities and banking law violations.[269]  Ms. Van Tassel has calculated a minimum of $209 million of increased CD liabilities resulting from sales through the Miami SFIS office alone.[270]

The Receiver's liability experts, Messrs. Spindler, Lemke and Herring, all testified that the breaches of fiduciary duty in which Greenberg participated were a cause of the increased CD liability damages the Receiver seeks to recover.  Karyl Van Tassel, Plaintiff's damages expert,

---

[265]  *See* Facts Established by Summary Judgment Record § O.
[266]  App. 803, 806-12, 777, Lemke Decl. 24 (¶ 2), 27-38; App. 777, Lemke Depo. 96:15-25.
[267]  App. 1366-69, Van Tassel Decl. ¶¶ 113-118.
[268]  *See* Facts Established by Summary Judgment Record § J.
[269]  App. 715, 753-56, 757-58, Spindler Decl. 5 (¶ 5), 43-46 (§ VII (A)-(D)), 48 (Conclusion); App. 687-708, Spindler Depo., 37:6-40:20, 45:12-46:1, 69:7-70:18, 75:20-76:19, 97:9-99:21, 122:1-123:25, 130:5-10, 246:5-247:1, and 267:5-270:1
[270]  App. 1375-77, Van Tassel Supp. Decl. ¶¶ 10-13.

also opines that the damages were caused by Stanford's breaches of fiduciary duty as aided by Greenberg's conduct from her perspective as a damages expert.[271]  This evidence raises a fact issue precluding summary judgment on causation.

### 3. Greenberg's conduct need not cause the damages; Greenberg is liable for damages caused by the breaches of fiduciary duty.

Because Greenberg knowingly participated in the breaches of fiduciary duty, Greenberg is jointly and severally liable for the damages caused by those breaches of fiduciary duty.  *Meadows v. Hartford Life Ins. Co.,* 492 F.3d 634, 639 (5th Cir. 2007); *City of Fort Worth v. Pippen*, 439 S.W.2d 660, 665 (Tex. 1969); *Kinzbach Tool Co. v. Corbett Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942).[272]

To prevail on its knowing participation claim, the Receiver is not required to prove that Greenberg's conduct caused the damages.  *Janvey v. Proskauer Rose LLP*, 2015 WL 11121540, at *7 (N.D. Tex. Jun. 23, 2015); *Troice v. Proskauer Rose LLP*, 2015 WL 1219522, at *10 (N.D. Tex. Mar. 4, 2015), *rev'd on other grounds*, 816 F.3d 341 (5th Cir. 2016).  The relevant inquiry is whether the breaches of fiduciary duty caused damages, not whether the participant caused damages.  *See, e.g., Heat Shrink Innovs., LLC v. Medical Extrusion Tech.-Texas, Inc.*, 2014 WL 5307191, at *8 (Tex. App.—Fort Worth, Oct. 16, 2014, pet. denied) (defendant who knowingly participates in a breach of fiduciary duty is jointly and severally liable for damages *caused by the breach*).

When "one knowingly participates in some other party's breach of fiduciary duty, then the knowing participant has not committed a separate tort but has participated in the underlying tort;

---

[271]  App. 1326, 1366-69, Van Tassel Decl. ¶¶ 29, 113- 117; App. 1379-80, Van Tassel Supp. Decl. ¶¶ 17-18.
[272]  *See also Hunter Bldgs. & Mfg., L.P. v. MBI Global L.L.C.*, 436 S.W.3d 9, 15 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *CBIF Ltd. P'ship v. TGI Fridays Inc.*, No. 05-15-00157-CV, 2017 WL 1455407 *42-45 (Tex. App.—Dallas, April 21, 2017, pet. denied); *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce, N.A. Inc.*, 403 S.W.3d 360, 368 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.); *Floyd v. Hefner*, 556 F.Supp. 2d at 654 (parties who knowingly join a fiduciary in breaching his fiduciary duties are jointly and severally liable).

he is a joint tortfeasor and steps into the shoes of the one who committed the tort." *Heat Shrink*, 2014 WL 5307191, at *8. The knowing participant is jointly and severally liable because he is a joint tortfeasor, not because of some other theory of joint and several liability; he has joined in the commission of the underlying tort and stands liable alongside his joint tortfeasor. *Id.* at *8, 12.

Greenberg argues that the Receiver cannot prove "double causation" or that Greenberg's conduct was a "substantial factor" in causing the breaches of duty in which it allegedly participated. There is no "double causation" requirement or "substantial factor" element for a knowing participation claim, *Meadows*, 492 F.3d at 639; *Floyd v. Hefner*, 556 F. Supp.2d 617, at n. 35 (S.D. Tex. 2008). And there is no requirement that the participant's conduct directly cause the damages. *Id.* In support of this "double causation" argument, Greenberg improperly relies upon *Immobiliere*, a case involving an aiding and abetting claim under Section 876 of the RESTATEMENT (SECOND) OF TORTS.[273] The Receiver does not assert an aiding and abetting claim under the Restatement, and *Immobliere* thus has no application to this case. Furthermore, in *Immobiliere*, the court found that the breaches of fiduciary duty in which the defendants had allegedly participated (obtaining a loan the proceeds of which were later diverted) was not a cause of any damages to the entities, because the original loan was paid off with a subsequent loan in which the defendants had no involvement before any proceeds were diverted. In contrast, Stanford and Suarez's breaches of fiduciary duties in which Greenberg participated clearly harmed the Stanford entities by increasing their liabilities and enabling the looting of their assets. Unlike the *Immobiliere* loan, those liabilities have never been repaid.

There is no question that the breaches of fiduciary duty by Stanford and Suarez (violation of the ICA and other securities laws) caused billions of dollars in increased liabilities to the Stanford entities. Because Greenberg knowingly participated in those breaches—by providing

---

[273] Greenberg Motion at 28 (citing *Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*, 525 S.W.3d 875, 882 (Tex. App—Houston [14th Dist.] 2017, no pet.)). *Immobiliere* in turn cites *Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex. 1996) for the elements of an aiding and abetting claim, which *Juhl* derives from the Restatement. *Id.*

Stanford a sham ICA opinion, greenlighting the Miami SFIS office even though Greenberg knew the sole purpose of that office was to sell SIBL CDs, and helping Stanford control the Antiguan government that allowed Stanford to evade regulation over SIBL—Greenberg is jointly and severally liable for the billions of dollars in increased CD liabilities caused by Stanford and Suarez's breaches of fiduciary duty. Greenberg is also jointly and severally liable for the assets that Stanford looted, enabled by the breaches of fiduciary duty.[274]

Greenberg's reliance on *Stanfield v. Neubaum*, 494 S.W.3d 90 (Tex. 2016), is misplaced because *Stanfield* and the cases it cites are negligence cases, in which proximate cause is an element. Proximate cause is not an element of the Receiver's knowing participation claim—the causation runs from the fiduciary breach by Stanford and Suarez. *Meadows,* 492 F.3d at 639.

However, even if the principles of *Stanfield* had some application to Plaintiff's knowing participation claim, the evidence demonstrates (or at a minimum raises a fact issue) that Greenberg's conduct was a concurring, not intervening cause of the damages to the Stanford entities.[275] Greenberg's representation of Stanford was an integral part of Stanford's ability to continue to sell billions of dollars of SIB CDs without any U.S. regulation over SIBL, allowing SIBL to keep its investment portfolio secret until it was shut down in 2009. Thus, because the evidence shows that Greenberg's conduct was a concurring cause of the Receiver's damages,

---

[274]App. 1287b, Van Tassel Deposition at 29:14-21.

[275] There can be more than one proximate cause of an injury, i.e., a concurrent proximate cause, and all persons whose negligent conduct contributes to the injury are liable. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). "[A] concurring cause 'concurs with the continuing and cooperating original negligence in working the injury,' leaving the causal connection between the defendant's negligence and the plaintiff's harm intact." *Stanfield*, 494, S.W. 3d at 98 (Tex. 2016). *See Davis v. Dallas County, Texas,* 541 F. Supp. 2d 844, 854-855 (N.D. Tex. 2008)("[a]ll persons who contributed to the injury are liable"); *Biaggi v. Patrizio Rest. Inc.*, 149 S.W.3d 300, 309 (Tex. App.—Dallas 2004, pet. denied)("An intervening cause of plaintiff's injury, even if unforeseeable, may be a concurring cause if the chain of causation flowing from the defendant's original negligence is continuous and unbroken."); *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 350 (Tex. App.—Tyler 2001, pet. denied)("It is no defense that a third person's negligent act intervened to cause the injury to the plaintiff, if the new act cooperates with the still persisting original negligence of the defendant to bring about the injury."); *Rodriguez v. Moerbe*, 963 S.W.2d 808, 819 (Tex. App.—San Antonio 1998, pet. denied).

49

Greenberg is liable for the harm along with Stanford and Suarez, and Greenberg's argument based upon *Stanfield* is without merit.[276]

      The fact that damages accrued after Greenberg's conduct is of no consequence. Greenberg's work provided Stanford with the foundation and infrastructure to rapidly expand CD sales from the United States. Moreover, Greenberg expressly advised Stanford it could sell the SIBL CDs from the United States without registration under the ICA and that it could sell the CDs from the SFIS Miami office without registration as a broker dealer or investment advisor, without registration of the CDs as securities, and without registration as a foreign representative bank office with the Federal Reserve.[277] Based on that advice, Stanford continued and expanded his CD sales campaign and CD sales grew exponentially for years.[278] Greenberg's ICA memo was used by Stanford to justify its failure to register under the ICA until the bitter end in 2009, and Stanford's violation of the ICA, among other laws, resulted in a $5.9 billion judgment against the Stanford entities.[279] Knowing since the inception of the representation that Stanford wanted to push his U.S. operation to the legal limit and avoid any state or federal regulation, Greenberg helped Stanford lay the groundwork for Stanford's massive fraud by advising Stanford that he did not need to comply with the ICA (or other securities laws) even though Greenberg knew that SIBL was an investment company, advising Stanford he could sell SIBL securities from the SFIS Miami office

---

[276] Moreover, questions of superseding causation, like proximate causation, are to be decided by the "fact finder" at trial. *See Basalto Shipping Co., S.A. v. HTCO-3011*, 129 F.3d 611, 612 (5th Cir. 1997); *see also Floyd v. CIBC World Markets, Inc.,* 426 B.R. 622 (S.D. Tex. 2009) (typically "[t]he issues of proximate causation and superseding cause involve application of law to fact, which is left to the fact finder"); (*Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840–41 (1996)); *O'Cain v. Harvey Freeman & Sons, Inc.*, 603 So.2d 824, 830 (Miss.1992)) ("the question of superseding intervening cause is so inextricably tied to causation, it is difficult to imagine a circumstance where such issue would not be one for the trier of fact.").

[277] *See* Facts Established by Summary Judgment Record §§ B, C, F, J, K and O.

[278] *See* Declarations and Depositions of Plaintiff's Experts – App. 803, 806-12, Lemke Decl. 24 (second paragraph), 27-38; App. 777, Lemke Depo. 96:15-25; App. 715, 753-58, Spindler Decl 5 (¶ 5), 43-46 (Section VII (A)-(D)) and p. 48 (Conclusion); App. 687-708, Spindler Depo., 37:6-40:20, 45:12-46:1, 69:7-70:18, 75:20-76:19, 97:9-99:21, 122:1-123:25, 130:5-10, 246:5-247:1, 267:5-270:1; App. 1573, 1577-88, Herring Report ¶¶ 11, 18-29; App. 1549-57, Herring Depo. 11:8-15, 105:7-106:12, 128:1-129:3, 151:11-154:17; App. 1325-26, 1366-69, Van Tassel Decl. ¶¶ 28-29, 113-118; App. 1376-77, 1379-80, Van Tassel Supp. Decl. ¶¶ 11-13, 17-18.

[279] App. 2913-18, Px 744 and 745.

50

without registering the securities or the sales staff as broker dealers and investment advisors, and helping Stanford maintain control and secrecy in Antigua. This conduct by Greenberg enabled Stanford to sell billions of dollars in SIB CDs for many years to come.

Greenberg's argument based upon *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017)) also misses the mark. There, after finding a party had waived its claim for aiding and abetting, the court noted in *dicta* that the alleged conduct of the participant in covering up theft at the church by the fiduciary did not give rise to a claim because there was no evidence that the participant knew about or participated in the theft. 514 S.W.3d at 225. Here, in contrast, Greenberg knowingly participated in the breaches of fiduciary duty.

### 4. The Receiver's damages are indivisible.

It has long been the rule in Texas that "[w]here the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit." *Landers v. E. Tex. Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731, 734 (Tex. 1952); *Austin Road Co. v. Pope*, 147 Tex. 430, 435, 216 S.W.2d 563, 565 (Tex. 1949). The Fifth Circuit has applied the indivisible injury rule to hold two joint tortfeasors who committed negligence jointly and severally liable for a single indivisible injury. *See Borg Warner Corp. v. White Motor Co.*, 344 F.2d 412, 415 (5th Cir. 1965).

This is particularly true given Greenberg's significant and long-term involvement with and representation of Stanford, assisting Allen Stanford to build and implement all of the structures and mechanisms from 1988 to 1999 that enabled him to grow his businesses and expand his illegal CD sales. Given Greenberg's extensive involvement over the years supporting the many different levels of Stanford's misconduct in the U.S. and Antigua, there is simply no way to effectively tie specific amounts of damages to each individual bad act by Greenberg.

Greenberg's argument that the CD liabilities can be divided based upon time period is irrelevant. There is only one time period applicable to this case—December 31, 1998 to February 16, 2009—the period following all of the conduct engaged in by Greenberg which laid the foundation for Stanford's CD sales expansion, including Greenberg's advice that Stanford could continue to sell its CDs from the United States without registration under the ICA and could offer the CDs from the Miami SFIS office in violation of the securities laws.

Similarly, the fact that Ms. Van Tassel was able to compute CD liabilities attributable to sales from the Miami office is irrelevant to whether the Receiver is suing for an indivisible injury. While Ms. Van Tassel was able to isolate and validate sales from that office through Receivership financial records,[280] it is not possible to do so on any other geographic basis, because sufficient information does not exist regarding the actual location of the investors, many of whom had designated Stanford as their address or used P.O. boxes in the United States, but were residents or citizens of other countries.[281] In any event there is no need to segregate the CD liability damages on geographic lines, because Greenberg's assistance with Stanford's violation of the ICA and the other applicable securities laws results in a claim for *all* of the CD liabilities regardless of where the sale occurred.[282]

Thus, Greenberg's motion based upon inapplicability of the indivisible injury rule should be denied.

**C.      Greenberg's negligence caused damages to the Receivership estate.**

Greenberg argues that the Receiver cannot establish that Greenberg's malpractice proximately caused Stanford's damages. As an initial matter, causation is typically a question of fact for the jury. *Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 237 (5th Cir. 2003); *Tex. Dept. of*

---

[280]  App. 1375-76, Van Tassel Supp. Decl. ¶¶ 10-12.

[281]  App. 1289-96, Van Tassel Depo. 71:15-78:1.

[282]  App. 803, 806-12, 777, Lemke Decl. 24 (second paragraph), 27-38; App. 777, Lemke Depo. 96:15-25; App. 715, 753-58, Spindler Decl. 5 (¶ 5), 43-46 (Section VII (A)-(D)), 48 (Conclusion); App. 687-708, Spindler Depo. 37:6-40:20, 45:12-46:1, 69:7-70:18, 75:20-76:19, 97:9-99:21, 122:1-123:25, 130:5-10, 246:5-247:1, and 267:5-270:1

*Trans. v. Olson*, 980 S.W.2d 890, 893 (Tex. App.—Fort Worth 1998, no pet.).  Direct evidence is not necessary; "circumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation." *Tompkins v. Cyr*, 202 F.3d 770, 782 (5th Cir. 2000).  Establishing causation requires facts sufficient for a jury to reasonably infer that the defendant[']s acts were a substantial factor in bringing about the injury." *Flock,* 319 F.3d at 237.[283]

In Texas, "[t]he two elements of proximate cause are cause in fact (or substantial factor) and foreseeability." *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002).  "Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *IHS Cedars Treatment Center of Desoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2004).  "Foreseeability" means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992)

### 1.     Greenberg's negligence was a proximate cause of the Receiver's damages.

The Receiver has presented ample evidence to demonstrate a causal link between Greenberg's negligence and Stanford's ability to sell SIBL CDs without any regulation in the U.S. or Antigua and in violation of U.S. securities laws.[284]  A jury could conclude that Greenberg's advice to Stanford that it did not need to register under the ICA was a proximate cause of the SEC judgment and the resulting CD liabilities incurred by the Stanford entities.  Greenberg's conduct is not too attenuated from the CD liabilities simply because some of them were incurred after 2001

---

[283]  Even "[l]ay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Hamburger v. State Farm Mut. Auto Ins. Co.,* 361 F.3d 875, 884 (5th Cir. 2004) (quoting *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 733 (Tex. 1984)).  "Generally lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation." *Id.*

[284]  Facts Established by Summary Judgment Record §§ B, C, F, J, K and O; App. 803, 806-12, Lemke Decl. 24 (¶ 2), 27-33; App. 777, Lemke Depo. 96:15-25; App. 715, 753-56, 757-58, Spindler Decl. 5 (¶ 5), 43-46 (§ VII (A)-(D)), 48 (Conclusion); App. 687, 691-708, Spindler Depo. 37:6-40:20, 45:12-46:1, 69:7-70:18, 75:20-76:19, 97:9-99:21, 122:1-123:25, 130:5-10, 246:5-247:1, 267:5-270:1; App. 1573, 1577-88, 1595-97, Herring Decl. ¶¶ 11, 18-29, 46-49; App. 1549-57, Herring Depo. 11:8-15, 105:7-106:12, 128:1-129:3, 151:11-154:17; App. 1325-26, 1366-69, Van Tassel Decl. ¶¶ 28-29, 113-118; App. 1376-77, 1379-80, Van Tassel Supp. Decl. ¶¶ 11-13, 17-18.

when Loumiet left Greenberg.  Stanford sold billions of dollars of CDs from 1998 to 2009 without registering as an investment company and was <u>still</u> using Greenberg's opinion as a basis not to register under the ICA in 2009.[285]  But for Greenberg's negligent advice, Stanford would not have sold billions of dollars of SIBL CDs in violation of the ICA, resulting in $4.9 billion in increased liabilities.

Similarly, but for Greenberg's advice that it was permissible for Stanford to offer the SIBL CDs from the Miami SFIS office (while neglecting to consider the implications of U.S. securities laws on such sales) Stanford would not have sold $209 million in SIBL CDs from that office from 1998 to 2009.[286]  Moreover, because the SFIS CD sales were made in violation of U.S. securities laws governing proper registration of securities, the Regulation S exemption that might have otherwise have applied to sales to foreign customers was violated, resulting in an integration of the U.S. sales with foreign sales causing the entire $4.9 billion in sales to be illegal.[287]

### 2. Greenberg's clients would have acted differently had it provided competent advice.

Greenberg speculates that Stanford would not have done anything different had Greenberg given competent advice.  First and foremost, Greenberg has presented no evidence that Stanford would not have acted differently had Greenberg given different advice as to the application of the ICA or the securities laws applicable to Stanford's Miami SFIS office.  Rather, Greenberg merely speculates that its advice didn't matter.

More fundamentally, the Receiver represents the Stanford entities in this lawsuit, *not* Allen Stanford, and it is therefore irrelevant what Allen Stanford would or would not have done.  The entities are innocent under the law and the Receiver should not be saddled with the bad acts or

---

[285]  App. 2913, 2914-18, Px 744 and 745; App. 1325-26, 1366-69, Van Tassel Decl. ¶¶ 28-29, 113-118; App. 1376-77, 1379-80, Van Tassel Supp. Decl. ¶¶ 11-13, 17-18.
[286]  App. 1376-77, Van Tassel Supp. Decl. ¶¶ 11-13.
[287]  App. 715, 753-58, Spindler Decl. 5 (¶5), 43-46, 48; App. 687-91, 703-08, Spindler Depo. 37:6-40:20; 45:12-25; 246:5-247:1; 267:5-270:1.

54

intentions of corrupt management.[288]  Greenberg's argument otherwise is just another version of the *in pari delicto* defense.  Allen Stanford repeatedly asked Greenberg to validate his bad conduct, Greenberg repeatedly told him his conduct was acceptable (when it was illegal) and Stanford thereafter pursued his illegal and fraudulent conduct – to the detriment of the entities.  Greenberg advised Allen Stanford that he was not required to register SIBL under the ICA, despite knowing that SIBL did not qualify for the regulatory exemptions.[289]  Greenberg advised Allen Stanford that he could offer unregistered SIBL CDs from the Miami SFIS office, while failing to consider U.S. securities laws.[290]  Given that Loumiet proposed the Miami "TRO" in the first place,[291] it is reasonable to infer that, but for his advice, Stanford would not have sold hundreds of millions of dollars in CDs from that office.  Thus, Greenberg's negligent legal advice led directly to the increased CD liability damages sought by the Receiver.

Greenberg's argument that the SEC would not have shut down Stanford any earlier regardless of what advice they gave is entirely speculative and completely irrelevant.  It is not a defense to Greenberg's wrongful conduct to argue that the regulator was incompetent and would not have done anything even if Greenberg had not engaged in wrongful conduct.  This Court has already rejected this argument, ruling that the Receiver's "injuries were not the result of SEC action" (or inaction) and that an attorney's alleged misrepresentations to the SEC could have resulted in harm (in the form of increased liabilities) to the Stanford entities regardless of Stanford's individual conduct.  *Janvey v. Proskauer Rose, LLP*, 2015 WL 11121540, at *5 (N.D. Tex. Jun. 23, 2015).[292]

---

[288]  Moreover, there is evidence that other Stanford officers, including former Chief Compliance officer Jane Bates, wanted the entities to comply with the law.   App. 1516-1517, 1529-30, Bates Depo. 10:25-11:6; 76:19-77:7.

[289]  *See* Facts Established by Summary Judgment Record § O.

[290]  App. 450-51, Loumiet Depo. 669:21-670:15.

[291]  App. 138-39, Loumiet Depo. 128:24 – 129:7 ("[i]t was my concept and it stemmed from my teaching").

[292]  Although not decided in the context of a negligence claim, "the gist of Defendants' [arguments]" in Proskauer was that the Receiver could not "allege that the Stanford entities or the SEC would have done anything differently in the absence of Sjoblom's alleged assistance."  *Id.*  Greenberg makes the same argument in this case.

It was foreseeable to any lawyer in Greenberg's position that if its advice was wrong and encouraged violations of the law, then Stanford would violate securities laws, resulting in massive liabilities to Greenberg's clients, the Stanford entities.  The Receiver's experts have testified that such harm was foreseeable, and that Greenberg's negligence was a cause of the harm.[293]  At a minimum, this evidence raises genuine issues of material fact on causation and damages.  *Garcia v. Wheelabrator Group, Inc.*, 2011 WL 13232701, at *5 (N.D. Tex. Nov. 3, 2011) (direct and circumstantial evidence of causation creates question of fact for jury); *Elizondo v. Krist*, 415 S.W.3d 259, 272 (Tex. 2013) (evidence from which a reasonable juror could infer plaintiff sustained damages precludes summary judgment).

As this Court has found in the context of a motion to dismiss, the Receiver's evidence that Greenberg's "assistance in skirting regulation . . .enabl[ed] the Stanford entities to conduct their business" is sufficient to raise "a reasonable inference that [Greenberg's] deficient legal services contributed to the size and scope of the underlying scheme, which ultimately resulted in Stanford's financial ruin."  *Off'l Stanf. Inv. Comm. v. Greenberg Traurig, LLP*, 2014 WL 12572881, at *6 (N.D. Tex. Dec. 17, 2014).  *See also, In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1453 (D. Ariz. 1992) (denying motion for summary judgment to law firm that contended that it would have been futile to advise client to cease regulatory violations because those controlling corporations would not have stopped illegal conduct.)

Greenberg's argument that Stanford's misconduct insulates Greenberg from liability resembles the *in pari delicto* defense that has been squarely rejected by the Fifth Circuit.  *Janvey v. Dem. Sen. Camp. Comm.*, 712 F.3d 185, 192 (5th Cir. 2013) ("*DSCC*").  The rationale underlying that decision is that Allen Stanford's fraud harmed the Stanford entities, and that the

---

[293]  App. 803, 806-12, Lemke Decl. 24 (second paragraph), 27-33; App. 777, Lemke Depo. 96:15-25; App. 715, 753-58, Spindler Decl. 5 (¶ 5), 43-46 (Section VII (A)-(D)), 48 (Conclusion); App. 687-708, Spindler Depo. 37:6-40:20, 45:12-46:1, 69:7-70:18, 75:20-76:19, 97:9-99:21, 122:1-123:25, 130:5-10, 246:5-247:7, 267:5-270:1; App. 1573, 1577-88, Herring Report, ¶¶ 11, 18-29; App. 1549-57, Herring Depo. 11:8-15, 105:7-106:12, 128:1-129:3, 151:11-154:17.

entities themselves should not be barred from recovery simply because they were used as his robotic tools. *Id*. The same logic applies here. Greenberg's negligent conduct resulted in harm to the Stanford entities—Greenberg's clients—and those clients are not precluded from recovering for that harm because they were used by Allen Stanford to perpetuate a fraud. *Id*.

*Reneker v. Offill* does not compel a different result. 2009 WL 3365616, at *5 (N.D. Tex. Oct. 20, 2009). In *Reneker*, the court dismissed a receiver's malpractice claim against the lawyers for the receivership entity for failing to tell the client that it was violating securities laws. *Id*. The court based its decision on the fact that the plaintiff had not alleged that the clients were "actually unaware that their actions were illegal" or that they were violating securities laws. *Id*. Like Greenberg, the *Reneker* decision conflates the entities, who were the lawyers' clients, with the individuals perpetrating the fraud and improperly imputes those individuals' knowledge to the client entities, which the Fifth Circuit has since held is impermissible. *DSCC*, 712 F.3d at 190. Further, Stanford actually did follow Greenberg's bad advice, resulting in Stanford's "financial ruin." *Greenberg*, 2014 WL 12572881, at *6. Stanford continued until its demise to rely on Greenberg's ICA opinion to justify its failure to register under the ICA. Greenberg's reliance on *Reneker* is therefore unavailing.

Summary judgment for failure to prove causation on the Receiver's negligence claims should be denied.

### 3. Greenberg's negligence contributed to the Receivership Estate's indivisible injuries for which Greenberg is jointly and severally liable.

As set forth above, Greenberg's conduct contributed to an indivisible injury to the Stanford entities. As a joint tortfeasor, Greenberg is jointly and severally liable for that indivisible injury. Expert testimony establishes that Greenberg's negligent ICA advice resulted in $4.9 billion in damages, Greenberg's negligent advice concerning the SFIS Miami office resulted in at least $209 million, and Greenberg's failure to consider U.S. securities laws in connection with its SFIS advice

resulted in the integration of the U.S. and foreign sales, causing all sales of SIBL CDs thereafter to be illegal.[294]  This is sufficient to defeat summary judgment.

Greenberg wrongly argues that this is not a case involving apportionment among joint tortfeasors, but rather a case involving apportionment of damages among different wrongful conduct by the same tortfeasor.[295]  If Greenberg was a knowing participant in breaches of fiduciary duty by Mr. Stanford and Ms. Suarez, they are all jointly and severally liable for the damages caused by those breaches.  *See, e.g., Meadows*, 492 F.3d at 639.  The same is true with respect to the Receiver's negligence claim.  *See, e.g., Borg Warner*, 344 F.2d at 415.

In support of its argument that the Receiver must prove separate damages caused by Greenberg's discrete acts, Greenberg relies heavily on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  *Comcast* involved class certification under Rule 23 and a determination of whether individual damages calculations overwhelmed questions common to the class.  *Id.* at 34.  *Comcast* did not involve joint tortfeasors, theories of joint and several liability, or an indivisible injury under state law and thus has no application to the facts of this case.

As set forth above, the jury in this case will determine whether Greenberg knowingly participated in breaches of fiduciary duty and whether its negligence contributed to the damages the Receiver seeks, which stem from an indivisible injury.  Under either scenario, Greenberg is jointly and severally liable for all of the damages the Receiver seeks to recover.  Therefore, there is no need for the Receiver to segregate or subdivide the damages he seeks relative to each of Greenberg's wrongful acts.  *Comcast* does not hold otherwise.[296]

---

[294] App. 715, 753-58, Spindler Decl. 5 (¶5), 43-46, 48; App. 687-91, 703-08, Spindler Depo. 37:6-40:20; 45:12-25; 246:5-247:1; 267:5-270:1.

[295] Greenberg Motion, p. 15.

[296] The same is true of the other cases Greenberg cites, none of which hold that a plaintiff suing on a theory of joint and several liability among joint tortfeasors must segregate and attribute his damages among each individual tortfeasor.  Motion at p. 13-14.  Indeed, in *City of Beaumont v. Excavators & Constructors, Inc.*, 870 S.W.2d 123, 139 (Tex. App.—Beaumont 1993, writ denied), the court expressly noted that apportionment of damages among defendants is only required if "one defendant is liable for some of the causes of the damages but not all."  Put differently, apportionment is *not* required if the defendant is jointly and severally liable for all the harm at issue.

D.      **The Receiver sues for recoverable damages.**

    1.      **Increased liabilities is a valid measure of damages.**

    As the Court has repeatedly held, "the Receiver may allege damages under an 'increased liability' theory of damages." *Janvey v. Maldonado*, 3:14-CV-2826-N, 2015 WL 1428612, at *3 (N.D. Tex. Feb. 19, 2015); *Janvey v. Hamric*, 2015 WL 11120301, at *5 (N.D. Tex. Nov. 5, 2015) ("Winter's breach of his fiduciary duty injured SIBL by causing SIBL to incur increased liabilities."). *Janvey v. Bogar*, No. 3:14-cv-03635, 2016 WL 11471975, at *1 (N.D. Tex. Feb. 24, 2016); Order [Docket No. 25] at 4-5, *Janvey v. Amadio*, Case No. 3:14-CV-03560-N (N.D. Tex. Jul. 20, 2015); Order [Docket No. 154] at 8, *Janvey v. Hamm*, Case No. 3:14-CV-03213-N (N.D. Tex. Jun. 17, 2015); *Janvey v. Willis of Colorado, Inc.*, No. 3:13-cv-3980, 2014 WL 12670763, at *3 (N.D. Tex. Dec. 5, 2014).  In this very case, the Court rejected the argument that the Receiver lacks standing, holding that "the Receiver's tort claims belong to the Receivership Estate.  This Court has held that the Receiver may assert tort claims against third parties based on allegations that the third parties' torts contributed to the liabilities of the Receivership Estate." *Off'l Stanford Inv. Comm. v. Greenberg Traurig, LLP*, No. 3:12-cv-4641, 2014 WL 12572881, at *4 (N.D. Tex. Dec. 17, 2014) citing Order [Docket No. 58] at 8-9*, Janvey v. Adams & Reese*, Case No. 3:12-CV-0495-N (N.D. Tex. Feb. 16, 2012).  As the Court explained, "the Receiver alleges that Defendants' services were essential to the growth and success of the Stanford Ponzi scheme, and the liabilities that ultimately accompanied it.  The Receiver thus pleads that his claims belong to the Receivership Estate." *Id.  See also Zacarias, et al. v. Official Stanford Investors' Committee*, Case No. 17-11073 (5th Cir. Jul. 22, 2019) at p. 22 (claims for increased liabilities are claims of the Stanford entities—not of their creditors—alleging injuries only to the Stanford entities).

    Numerous other courts recognize increased liabilities as a valid measure of damages.  *See Thabault v. Chait*, 541 F.3d 512, 523-25 (3d Cir. 2008) ("Today we hold that an increase in liabilities is a harm to the company and the law provides a remedy when a plaintiff proves a

59

negligence cause of action . . .   When a plaintiff brings an action for professional negligence and proves that the defendant's negligent conduct was the proximate cause of a corporation's increased liabilities . . ., the plaintiff may recover damages in accordance with state law."); *In re LeNature's Inc.*, 2009 WL 3571331, at *8 (W.D. Pa. Sep. 16, 2009) ("if available under applicable law, damages for an increase in a corporation's liabilities . . . remain available regardless of the impact on the solvency calculation."); *Off'l Comm. of Unsec. Cred. Of Allegheny Health, Ed., and Research Found. v. Pricewaterhouse Coopers LLP*, 2007 WL 141059, at *7 (W.D. Pa. Jan. 17, 2007), *vacated and remanded on different grounds,* 607 F.3d 346 (3d Cir. 2010) ("[T]he Committee alleges independent causes of action in the form of professional negligence, breach of contract, and aiding and abetting breach of fiduciary duty, which, if viable, give [the debtor] a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits."); *In re Brooke Corp.*, 467 B.R. 492, 511-12 (Bankr. D. Kan. 2012) (recognizing increased liabilities as a damage model where there is "proof of specific itemized damages, such as increased liabilities, . . . proximately caused by a breach of a legally recognized duty").

None of the cases cited by Greenberg involve a damages claim for increased liabilities based on a judgment against a receivership or debtor entity in favor of a third party.  For that reason alone, *Reneker v. Offill* and *In re Plaza Mortgage & Finance Corp.* lack relevance to the present case, because the basis of the Receiver's damages claim is SIB's and SGC's liability *to a third party, the SEC*, as reflected in the SEC Judgment.

*Reneker* was a legal malpractice action and did not involve claims for participation in breach of fiduciary like the present case.  The *Reneker* damage calculation has no bearing on Ms. Van Tassel's damage calculation in this case, which arises directly from the SEC judgment. Although the judgment is based on a subset of the CD liabilities, it is itself an independent liability of SIBL and SGC.  The SEC judgment is most similar in kind to the liability for "professional fees

60

incurred by the SEC Receivership" upheld by the *Reneker* court. *Reneker v. Offill*, 3:08-CV-1394-D, 2012 WL 2158733, at *9 (N.D. Tex. June 14, 2012).

With respect to *In re Plaza*, Greenberg argues that Ms. Van Tassel "could have determined the monies improperly used by Allen Stanford, and in fact she has done so in other cases," citing Ms. Van Tassel's calculations in *Janvey v. Hamric et al*. regarding "funds that had been diverted from the Stanford Companies 'to prop up Allen Stanford's other money-losing entities and bankroll his lavish lifestyle.'" Doc. 338 at 12. As reflected in Greenberg's own words, Greenberg is aware of Ms. Van Tassel's specific calculations on this very issue, including in other Stanford cases. In this case, Ms. Van Tassel has likewise provided evidence regarding the misuse of investor funds, including the $1.8 billion that Mr. Stanford looted from SIB.[297] During Ms. Van Tassel's deposition, Greenberg asked if "Greenberg played any role in connection with Allen Stanford's borrowing $1.8 billion of CD proceeds for his own personal use and benefit" and further stated "[t]here's no question, is there, Ms. Van Tassel, that Allen Stanford's conduct in borrowing $1.8 billion from the bank was a significant cause of harm to the Stanford entities, is there?"[298] In response, Ms. Van Tassel testified that the looting was part of the damage to the Stanford entities and that Greenberg enabled the looting.[299] In addition, *Greenberg's own expert witness on the ICA testified that it would have been difficult for Mr. Stanford to have looted SIBL if Stanford had complied with and registered under the ICA*.[300]

Greenberg's argument that the sale of SIBL CDs "did not cause harm to the entities because, as Van Tassel admits, the sale of each CD brought in the same amount in funds to the bank as the corresponding liability" is on par with the broker's contention in *Warfield v. Byron* that "the RDI Ponzi scheme benefited from his efforts to extend the fraud by securing new

---

[297] App. 1304-05, 1307-17, Van Tassel Decl. at 6-7, para. 7; 11, para. 12(c); 13, para. 16; 14-15, para. 18.
[298] App. 1287a-b, , Van Tassel Depo. at 28:6-9 and 28:24 – 29:2.
[299] , App. 1287b,Van Tassel Depo. at 29:14-21.
[300] App. 683, Perlow Depo. 130 (registration under the ICA would have prevented Stanford's looting of SIBL).

investments." 436 F.3d 551, 560 (5th Cir. 2006). Greenberg cites no authority for the proposition that harm is measured at the point of transaction only, and one of the few cases it does cite finds otherwise. *See Reneker v. Offill*, 308-CV-1394-D, 2012 WL 2158733, at *7-8 (N.D. Tex. June 14, 2012) (concluding that an expert who opined that "the effect of the lawyer's conduct was that it allowed AmeriFirst to receive illegally-obtained investments, subjected AmeriFirst to being enjoined, and harmed the AmeriFirst businesses" at "most support[s] a reasonable finding that Godwin Pappas' conduct enabled the AmeriFirst Clients to continue selling the [Collateral Secured Debt Obligation Notes], which harmed the *AmeriFirst Clients*.") (emphasis in original).

As Ms. Van Tassel testified, both Mr. Stanford and Ms. Suarez enabled the misuse of investor funds.[301] As a result, neither SIBL nor SGC received a benefit for the sales of SIB CDs. Moreover, as investor funds were deposited at SIB, SGC did not even nominally take in investor money, with the exception of approximately three percent as a commission for SGC's CD sales. SGC was therefore exposed to a liability far out of proportion to any supposed benefit it received through the sale of CDs.[302]

## 2. Greenberg misses the point in arguing that it is not bound by the SEC judgment.

Here, again, Greenberg's arguments entirely miss the point. The issue is not whether the SEC judgment is binding on Greenberg, the issue is whether the Stanford entities incurred a liability as a result of the judgment. Ms. Van Tassel independently verified the liabilities from

---

[301] App. 1287b, Van Tassel Depo. 29:14-21.

[302] In a footnote, Greenberg argues that the Receiver's "increased liabilities" damage model runs afoul of cases prohibiting claims for "deepening insolvency." But Ms. Van Tassel calculated increased liabilities, not deepening insolvency. For an explanation of the distinction between "deepening insolvency" and "increased liabilities," *see In re Brooke Corp.*, 467 B.R. at 511-12. In short, "deepening insolvency" as a measure of damages entails a comparison of balance sheets before and after the alleged wrongful act, whereas "increased liabilities" as a measure of damages "require[s] proof of specific itemized damages, such as increased liabilities and lost profits, proximately caused by a breach of a legally recognized duty." *Id.* at 511. As the *Brooke Corp.* court explained, "[t]he fact that damages may be labeled deepening insolvency damages does not change the fact that they can be classic damages too; despite the similarity, the difference is in the proof: not just a comparison of balance sheets, but proof of specific, actual, itemized damages proximately caused by the wrongdoing." *Id.*; *see also In re CitX Corp., Inc.*, 448 F.3d 672, 678 (3d Cir. 2006) (noting that the calculation of damages in the form of increased liabilities is made "without reference to the incidental impact upon the solvency calculation.").

Stanford's financial statements and electronic databases and tested those records to determine that they were reliable.[303]  Greenberg's arguments concerning the SEC judgment are without merit.[304]

Greenberg's claim that the SEC judgment and Ms. Van Tassel's calculations merely reflect liability to the investors, instead of the Stanford entities, is a similarly unsupported attempt to insulate itself from liability for the direct role Greenberg played in the establishment and perpetuation of the Stanford securities fraud scheme.  The basis of the underlying damages calculation is irrelevant to whether the SEC judgment is itself a liability of the Stanford entities. Greenberg cites no authority for the proposition that a valid judgment can cease to be a liability based on the manner in which the judgment was calculated.  What is clear is Greenberg's strong interest in recasting the SEC Judgment as liability to investors; as Greenberg notes, the investors do not have standing to bring a claim against Greenberg.  *Troice v. Greenberg Traurig, L.L.P.*, 921 F.3d 501, 504 (5th Cir. 2019).  The SEC Judgment—and the fact that the Stanford entities were unable to satisfy the judgment—is a liability of the Stanford entities and one for which Greenberg bears direct responsibility.

The court should also reject Greenberg's attempt to circumvent the SEC judgment by claiming that it is uncontested, non-adversarial, and therefore not binding on Greenberg. Doc. 341 at 54.  Here again, Greenberg's arguments entirely miss the point.  The issue is not whether the SEC judgment is binding on Greenberg, the issue is whether the Stanford entities incurred a liability as a result of the judgment.  At trial, Greenberg is welcome to present the jury with some (as yet unidentified) meritorious defense that the Receiver could have asserted to avoid the liability set forth in the judgment.

---

[303]  App. 1368-69, Van Tassel Decl. ¶ 116; App. 1375, Van Tassel Supp. Decl. ¶ 9; App. 1286, 1288, 1292, Van Tassel Depo. 26:12-27, 67:13-24, 74:3-74:4.  Stanford's records are reliable in this regard because it had to closely monitor and keep records of the CD liabilities in order to produce monthly statements to the investors.
[304]  Greenberg's argument that the SEC judgment is premised on investor losses fails for the same reasons as its arguments concerning Stanford's increased liabilities generally.

4833-4020-2146.1/D0624/B08864/082119

E.      **Greenberg is guilty of negligent supervision.**

Greenberg argues that a claim for negligent retention or supervision does not exist under Texas law, or exists only in situations involving alcohol.  Motion at 46.  But this Court has already recognized the claims' validity when it denied Hunton's and Proskauer Rose's motions to dismiss the same claim.[305]  *See also FDIC v. Nathan*, 804 F. Supp. 888 (S.D. Tex. 1992) (holding law firm could be liable for failure to supervise attorneys in firm).

The evidence—at a minimum—raises fact issues on how and why Greenberg failed to supervise Loumiet given the high-risk nature of Stanford as a client.  From the inception of the relationship Greenberg knew that Stanford operated an offshore bank in a jurisdiction (Montserrat) that was known for fraud, and that after the local government revoked his banking license Stanford then moved the bank—with Greenberg's help—to another offshore haven well known as one of the most corrupt in the Caribbean.  And Greenberg knew that its client, Stanford, was continuously under investigation by the U.S. government.  Yet despite opening some thirty separate matter files for Stanford on which some 40 Greenberg lawyers worked over the years,[306] Greenberg ignored these facts and allowed Loumiet and other Greenberg lawyers to assist Stanford to, e.g., rewrite Antiguan laws and install himself as his own regulator in Antigua, and Loumiet and Moncada to issue legal opinions to Stanford, such as the ICA memo, for which they were unqualified, and to greenlight securities offering structures in the U.S. (e.g., SFIS) without regard to securities laws.

Greenberg allowed Loumiet to compartmentalize Stanford-related work so that Greenberg lawyers working on Stanford matters were kept in separate "silos" and not exposed to the totality of the facts.  Fornaris never considered the SFIS office from a securities law perspective and had no idea that his fellow associate Moncada was—at the very same time in 1998—preparing a Blue

---

[305]  Dec. 17, 2014 order, ECF Doc. No. 114 at 27-28 (addressing former defendant Hunton & Williams' identical argument); *Janvey v. Proskauer Rose*, 2015 WL 11121540 (N.D. Tex. June 23, 2015) at *23-25.
[306]  App. 131-32, Loumiet Depo. 94:22-95:6; App. 2478-82, 2888-91, Px 384 and 584 (listings of Greenberg matter files opened for Stanford in 1998 and 2000).

Sky law memorandum for Stanford concluding that the SIBL CDs were securities.[307]  Similarly, the Greenberg partner in charge of the O'Bourke whistleblower complaint, Rosengarten, had no idea that at the same time he was investigating O'Bourke's claims about Stanford's sales practices, Loumiet was providing recommendations to Wayne Secore on how to respond to the SEC inquiry into Stanford's sales practices.[308]  And Burt Bruton prepared all the legal documentation for Stanford's $31 million loan to the Antiguan government in 1998 without knowing anything about any other matters Greenberg was working on at that same time, including Greenberg's work revising Antiguan banking law.[309]  These facts as well as others, support the Receiver's expert on malpractice, Charles Herring's opinion that Greenberg was negligent in supervising Greenberg lawyers working on Stanford matters.[310]

## F.    Greenberg is not entitled to partial summary judgment.

Greenberg moves for partial summary judgment on claims for (1) breaches of fiduciary duty and negligence occurring after 2001, (2) Greenberg's representation of Antigua in its legislative reform, and (3) violations of the FCPA.  But the Receiver is not suing Greenberg to recover damages for things Loumiet did after leaving Greenberg, or for malpractice committed after 2001, or because Greenberg did a substandard job in drafting Antiguan legislation, or for Greenberg's violations of the FCPA.  The Receiver is suing Greenberg for participating in Allen Stanford's and Yolanda Suarez's breaches of fiduciary duties to SIBL and SGC and its negligence in providing services to its clients SIBL and SGC.

Greenberg's motion is really a stealth motion to exclude relevant evidence.  Evidence of acts after 2001 is relevant to show a continuing pattern or practice of conduct.  Evidence of

---

[307] App. 1397-98, Fornaris Depo. 41:4-42:8 (didn't know Moncada was analyzing whether SIBL CDs were securities); App. 1404-05, 52:10-53:16 (didn't analyze SFIS from securities law standpoint).
[308] App. 1499-501, Rosengarten Depo. 112:19-113:4.  Similarly the Greenberg associate that worked on the O'Bourke matter forwarded the SIBL CD sales training materials to Wayne Secore in 1998 but testified she didn't know for what purpose.  App. 987-1008, Demberg Depo. 81:21-102:19.
[309] App. 900, 902, 910, Bruton Depo. 14:16-20, 16:8-15, 32:2-7.
[310] App. 1585-87, Herring Decl. ¶¶ 25-27.

Greenberg rewriting Antiguan laws at Stanford's expense and Stanford's subsequent appointment by Antiguan officials to the authority regulating Stanford's banks in Antigua is relevant to show Stanford's FCPA violations, Greenberg's knowledge of the violations, and how the violations enabled Stanford to escape regulatory scrutiny.  Evidence of FCPA violations is relevant to show Stanford's corruption of Antiguan officials to provide a safe haven for his fraud to flourish.  This evidence is admissible to provide the context of events in time and place so that the jury can evaluate all the circumstances under which Greenberg lawyers operated, what they knew about Stanford's operations, and when.  It provides background as to Stanford's and Greenberg's *modus operandi*.

A recent Fifth Circuit case counsels that this type of circumstantial evidence is admissible. *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958 (5th Cir. 2019).  In that case, Waste Management alleged that River Birch bribed former New Orleans Mayor Ray Nagin to shut down a landfill.  Waste Management alleged River Birch also bribed Henry Mouton, a former commissioner for the Louisiana Department of Wildlife and Fisheries, to influence Nagin to shut down the landfill.  The district court granted summary judgment as to the alleged bribery of Mouton.  The Fifth Circuit vacated the district court's ruling insofar as it precluded consideration of the alleged bribery of Mouton and his efforts to further River Birch's alleged scheme to shutter the landfill.

The inquiry under the Louisiana bribery statute—similar to the inquiry under the FCPA— is whether a gift is made . . . "with the intent to influence the conduct of the public servant in relation to his position, employment or duty."  920 F.3d at 964.  River Birch—like Greenberg— argued that there was no evidence of a *quid pro quo*. *Id.* at 966.  Waste Management argued that evidence that River Birch bribed Mouton to influence Nagin was part of a well-orchestrated campaign to unlawfully and unfairly influence the operations of its competitors.  Mouton testified that River Birch's employees or their attorneys drafted letters for Mouton—like the letters

66

Greenberg drafted for Antiguan officials—to send to government agencies, urging the closure of the landfill for alleged environmental reasons. Mouton also threatened the city with a lawsuit—like litigation Stanford repeatedly threatened—seeking an injunction to shut the landfill and River Birch recruited plaintiffs and secretly financed a lawsuit against the city seeking closure of the landfill. The Fifth Circuit held that this evidence was admissible to "complete the story of the crime by proving the immediate context of events in time and place, and to evaluate all of the circumstances under which the defendant acted." *Id.* at 968.

So too here. Evidence of breaches of fiduciary duty and negligence after 2001, Greenberg's rewriting of Antiguan laws, and violations of the FCPA all provide circumstantial evidence about knowledge, intent and motives and allow the jury to evaluate the circumstances under which Greenberg acted. A jury could conclude that Greenberg's assistance to Stanford and Suarez was knowing based on Greenberg's knowledge of: (1) Stanford's bribing of Antiguan officials, (2) what Stanford received from the officials, (3) the reason for and effect of revisions to Antiguan law including its effect on SIBL's competitors, and (4) FCPA violations. Loumiet's continuation of the same pattern of conduct in representing Stanford after Loumiet left Greenberg is relevant to whether his conduct was inadvertent or whether it was intentional. *United States v. Ricard*, 922 F.3d 693 (5th Cir. 2019) (holding admissible evidence of similar subsequent conduct to draw inferences about intent); *United States v. Peterson*, 244 F.3d 385, 392-93 (5th Cir. 2001) (same).

Furthermore, this conduct is admissible as circumstantial evidence of causation. The relevant inquiry for a claim of participating in a breach of fiduciary duty is whether the breach of fiduciary duty caused damages, *not* whether the participant himself caused the damages. *Meadows*, 493 F.3d at 639 (parties who knowingly join a fiduciary in breaching his fiduciary duties are jointly and severally liable); *Floyd*, 556 F.Supp. 2d at 654; *Kinzbach*, 160 S.W.2d at 514 (". . . where a third party knowingly participates in the breach of duty of a fiduciary, such third party

becomes a joint tortfeasor with the fiduciary and is liable as such."); *Heat Shrink*, No. 2014 WL 5307191, at *8 (same); *CBIF*, 2017 WL 1455407 *42-45.

Once again, *Waste Management* is instructive.  In that case, Waste Management had the burden of establishing that the payment to the mayor was the "but for" cause and proximate cause of his decision to shutter the landfill.  The district court granted summary judgment on Waste Management's claim that River Birch bribed the mayor because "the circumstantial evidence on which Waste Management relies is far too speculative and conclusory to permit a reasonable trier of fact to find the requisite causal connection."  920 F.3d at 963.  The Fifth Circuit reversed, holding that circumstantial evidence of the chain of events, if accepted by the jury, would support an inference that River Birch's bribery influenced the mayor's action.  Thus, there were genuine issues of material fact whether the payment was the but for and proximate cause of the mayor's decision to close the landfill.  *Id.* at 973.

Like in *Waste Management*, here circumstantial evidence is admissible to support an inference that Stanford's conduct in staffing and funding Greenberg to rewrite Antiguan laws and Greenberg's assistance in ignoring Stanford's FCPA violations, advising Stanford to make contributions to Antiguan political parties "openly and notoriously, and rewriting Antiguan laws, contributed to continuation of the scheme and resulting damages.

Finally, the record does not bear out Greenberg's assertion that there is no evidence from Professor Koehler on causation. [311]

In sum, evidence of conduct after 2001, rewriting the laws in Antigua, and FCPA violations is admissible, not to create liability independent of the two claims the Receiver has brought, but to provide circumstantial evidence from which a jury can decide those claims.

---

[311] App. 818, Koehler Depo. 114:9-21.

4833-4020-2146.1/D0624/B08864/082119

At a minimum, this evidence raises genuine issues of material fact on causation and damages. *Waste Mgmt.*, 920 F.3d at 969-70, 973 (reversing summary judgment because circumstantial evidence of causation sufficient to go to jury); *Garcia v. Wheelabrator Group, Inc.*, 2011 WL 13232701, at *5 (N.D. Tex. Nov. 3, 2011) (direct and circumstantial evidence of causation creates question of fact for jury); *Elizondo*, 415 S.W.3d at 272 (evidence from which a reasonable juror could infer plaintiff sustained damage precludes summary judgment.)

Therefore, Greenberg's motion for partial summary judgment should be denied.

**G.    The Hunton judgment, which expressly reserves "any claims that Plaintiffs have or may have against Greenberg Traurig LLP (Greenberg) . . . including but not limited to any claims or causes of action based on the conduct of Carlos Loumiet while employed or affiliated with Greenberg," is not *res judicata* as to claims against Greenberg based on Loumiet's conduct.**

The Receiver sued Greenberg and Hunton. On August 16, 2017, the Receiver asked the Court to approve its settlement with Hunton, including Carlos Loumiet, a lawyer employed by Hunton after he was employed by Greenberg.[312] Attached to the motion was the Hunton settlement agreement which contained an express reservation of rights against Greenberg:

> For the avoidance of doubt, "Hunton Released Parties" does not include Greenberg or Yolanda Suarez ("Suarez"), and it is the Parties' intent that the Settlement shall have no impact whatsoever on the claims asserted by Plaintiffs against Greenberg and Suarez in the Litigation.[313]
>
> 42.    No Effect on Greenberg or Suarez Claims:    The releases and covenants not to sue set forth in this Agreement do not include, and shall have no effect upon, any claims or causes of action Plaintiffs have against Greenberg or Suarez, including, but not limited to, claims or causes of action based on the conduct or knowledge of Loumiet while employed by or affiliated with Greenberg. The releases and the covenants not to sue set forth in this Agreement do not limit in any way the evidence that Plaintiffs may offer against the remaining defendants in the Litigation, Greenberg and Suarez.[314]

The release of Carlos Loumiet also expressly excepted claims against Greenberg:

> 8.    No Effect on Greenberg or Suarez Claims:    The releases and covenants not to sue set forth in this Release do not include, and shall have no effect upon, any

---

[312] App. 1614-53.
[313] App. 1675.
[314] App. 1689 ¶42.

4833-4020-2146.1/D0624/B08864/082119

claims or causes of action Plaintiffs have against Greenberg or Yolanda Suarez ("Suarez"), including but not limited to claims or causes of action against Greenberg or Suarez based on the conduct or knowledge of Loumiet while employed at or affiliated with Greenberg.  The releases and the covenants not to sue set forth in this Release do not limit in any way the evidence that Plaintiffs may offer against Greenberg and Suarez, as the remaining defendants in the Litigation.[315]

Both releases are governed by Texas law.[316]

The judgment and bar order incorporate the settlement agreements by reference[317] and also expressly carve out claims against Greenberg:

Additionally, the foregoing releases do not release any claims or causes of action that Plaintiffs have or may have against Greenberg Traurig, LLP ("Greenberg"), or Yolanda Suarez ("Suarez"), including but not limited to any claims or causes of action based on the conduct of Carlos Loumiet while employed by or affiliated with Greenberg.[318]

Greenberg objected to the proposed judgment, in particular to the incorporation by reference of the Hunton settlement agreement,[319] and the reservation of claims against Greenberg.[320]  Greenberg also objected to ¶ 42 of the Hunton settlement reserving claims against Greenberg and to portions of the release given to Loumiet (but not the carve out of claims against Greenberg).[321]

Greenberg then negotiated the terms of the proposed judgment and the parties later notified the Court that they had agreed to a new paragraph 21 at the end of the judgment.[322]  The additional language stated that (a) nothing would "impair or prejudice the legal rights or obligations of Greenberg in responding to or defending against the claims asserted against Greenberg in the Litigation;" (b) that the Hunton Settlement "shall not prove any matter against Greenberg in the

---

[315] App. 3328 ¶ 8.
[316] App. 1697.
[317] App. 1657.
[318] App. 1661.
[319] App. 1705 ¶ 2.
[320] App. 1705 ¶ 5
[321] App. 1709-10 ¶¶19-22.
[322] App. 1713-16.

Litigation, including, without limitation, as to . . . the effect of the Hunton Settlement on Greenberg's defenses or alleged liability to Plaintiffs;" and (c) that Greenberg is subject to paragraphs 8 and 11, but "nothing in this sentence is intended to, or shall, restrict Greenberg's defense to the claims against it."[323]   The judgment was ultimately entered with this language in it.[324]

Despite the express language in the settlement agreements and the judgment—which it negotiated—Greenberg contends that the judgment extinguishing the Receiver's claims against Loumiet precludes claims against Greenberg for vicarious liability for Loumiet's conduct.   It argues that the language added to the judgment that provides that nothing in the judgment shall "prejudice its rights" or "restrict its defenses" means that the judgment—despite what it says— does not preserve the Receiver's claims against Greenberg.   This begs the question of what rights Greenberg has.   The added language does not give Greenberg more rights or defenses, it just allows it to assert rights and defenses that it has.

The preclusive effect of a consent judgment is determined by the intent of the parties. *Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 689 (9th Cir. 2018) ("We look to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement rather than a general principles of claim preclusion."); *TMTV Corp. v. Mass Prod. Inc.*, 645 F.3d 464, 472-73 (1st Cir. 2011) (courts look to intent of settling parties in determining preclusive effect of a judgment based on a settlement); *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 211 (4th Cir. 2009) ("the preclusive effect of a settlement depends on the parties' intent"); *Norfolk Southern Corp. v. Chevron U.S.A. Inc.*, 371 F.3d 1285, 1258 (11th Cir. 2004) ("The expressed intent of the parties is also the determining factor in whether a consent-based judgment is given collateral estoppel effect.").

---

[323] *Id.*
[324] App. 3344.

71

Here, the intent of the parties—and the Court which approved the settlement and entered the judgment—is clearly to dismiss claims against Hunton and Loumiet while preserving claims against Greenberg. Given the Court's charge to the Receiver to recover as much as possible for the benefit of the estate, it is doubtful that the Court would have approved a settlement or entered a judgment releasing all claims against Greenberg, who paid nothing.

Under Texas law, a release discharges only the person or entity specifically named in the release; release of an employee or agent does not release the principal under the doctrine of respondeat superior. *Knutson v. Morton Foods, Inc.*, 603 S.W.2d 805, 806 (Tex. 1980).

Nevertheless, Greenberg argues—despite the parties' intent and the Court's express reservation in the judgment—the consent judgment dismissing claims against Loumiet precludes vicarious liability claims against his employer, Greenberg, citing *Lubrizol Co. v. Exxon Corp.*, 871 F.2d 1279 (5th Cir. 1989). There the court considered the preclusive effect of a judgment on nonparties. (Of course, Greenberg is not a nonparty, negotiated the terms of the judgment, and agreed to its entry.) The Court held that Lubrizol's claims against two Exxon employees for unauthorized access to certain restricted data (the computer dispute) was barred by a settlement agreement and dismissal of an earlier suit by Lubrizol against Exxon. Notably, the court acknowledged that a reservation of rights in the settlement agreement was effective to save some claims but not the computer claim because the reservation did not include the computer dispute. 871 F.2d at 1286. ("Of course, had Lubrizol and Exxon so chosen ¶ 4.02 would have been the vehicle for expressly reserving the computer dispute."). Here, that is precisely what the parties did—expressly reserve in the settlement agreements and judgment claims against Greenberg arising from Loumiet's conduct. And unlike in *Lubrizol*, the judgment here is not in a subsequent suit but in the *very same suit* in which Greenberg was a co-defendant with Hunton and agreed to entry of the judgment.

Moreover, the Fifth Circuit has recognized that a court has the ability to control the preclusive consequences of its rulings.  A judgment—like the judgment here—that expressly leaves open the opportunity to bring another action on the same claims does not bar those claims. *King v. Provident Life & Accident Ins. Co.*, 23 F.3d 926, 928 (5th Cir. 1994) (explaining that if a judgment "expressly leaves open the opportunity to bring a second action on specified parts of the claim or cause of action that was advanced in the first action" preclusion should be forestalled); *Vines v. Univ. of La.*, 398 F.3d 700, 704 (5th Cir. 2005) (explaining that because the district court judgment made no statement that certain claims were reserved, res judicata applied); RESTATEMENT (SECOND) OF JUDGMENTS ¶ 26 (1982) ("When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant: . . . (b) The court in the first action has expressly reserved the plaintiff's right to maintain the second action.). Here, the judgment expressly reserves claims against Greenberg.  It is clear that neither the parties nor this Court intended the dismissal of Loumiet to affect claims against Greenberg since all such claims were expressly reserved.

*Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1505 (11th Cir. 1990) does not compel a different result.  In that case, the plaintiff Data Lease, in entering into a settlement with directors, tried to reserve its rights against Citibank, but agreed to a court order dismissing its claims against the directors with prejudice without a reservation of rights in the judgment. Citibank, not a party to the settlement between Data Lease and the directors, did not so agree.  The Court held that "Data Lease gave up those rights [against Citibank] when it caused its action on this case against seven directors to be dismissed with prejudice, without any agreement or waiver by Citibank."  904 F.2d at 1501.  Here, in contrast, Greenberg was not a stranger to the judgment. It negotiated the terms of the judgment and <u>agreed</u> to its entry.  And the judgment contains an

73

express reservation of the Receiver's rights to bring claims against Greenberg arising from Loumiet's conduct.  Accordingly, res judicata does not apply.

Finally, Greenberg contends that even if the Court could limit the preclusive effect of its own judgment, it didn't here because the language Greenberg added to the judgment that nothing "shall impair or prejudice the legal rights of Greenberg in responding to or defending claims asserted against Greenberg in the Litigation," including Greenberg's right to assert the preclusive effect of the judgment, somehow renders ambiguous the Court's reservation in the judgment of claims against Greenberg.  Not so.  It does not change a judgment that allows the Receiver to sue Greenberg for Loumiet's conduct into one that does not.

Accordingly, summary judgment on Greenberg's affirmative defense of res judicata argument should be denied.

## IV.   CONCLUSION

Greenberg has failed to establish its entitlement to a judgment as a matter of law. There is ample evidence that Greenberg knowingly and substantially facilitated breaches of fiduciary duty by Allen Stanford and Yolanda Suarez, and committed malpractice causing damages to the Receivership estate.   At a minimum, there are genuine issues of material fact for the jury. Greenberg's motion must therefore be denied.

Dated August 21, 2019

Respectfully submitted,

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
Edward C. Snyder
esnyder@casnlaw.com
Jesse R. Castillo
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 1560
San Antonio, Texas 78205
(210) 630-4200
(210) 630-4210 (Facsimile)

**CLARK HILL STRASBURGER**

By: */s/ Judith R. Blakeway*
Judith R. Blakeway
judith.blakeway@clark hillstrasburger.com
2301 Broadway
San Antonio, Texas 78215
Telephone:   (210) 250-6004
Facsimile:   (210) 258-2706

74

**NELIGAN LLP**

By: */s/ Douglas J. Buncher*
Douglas J. Buncher
dbuncher@neliganlaw.com
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301

**CLARK HILL STRASBURGER**

By: */s/ David N. Kitner*
David N. Kitner
david.kitner@clarkhillstrasburger
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:    (214) 651-4300
Facsimile:    (214) 651-4330

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of August, 2019 I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Edward C. Snyder*
Edward C. Snyder

4833-4020-2146.1/D0624/B08864/082119